Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email:  pajones@cov.com

*Attorney for Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC;*
*Facebook Operations, LLC; Facebook*
*Payments, Inc.; Facebook Technologies, LLC;*
*Instagram, LLC; Siculus, Inc.; and*
*Mark Elliot Zuckerberg*

*Additional parties and counsel listed on*
*signature pages*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>ALL ACTIONS | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR<br><br>**CASE MANAGEMENT STATEMENT**<br><br>Judge Yvonne Gonzalez Rogers |

Pursuant to Case Management Order #1 (ECF No. 75) ("CMO #1"), the Parties respectfully submit this Case Management Statement in advance of the status conference scheduled for December 14, 2022 at 8:30 a.m.  The Parties' Proposed Agenda is attached hereto as **Exhibit A**.

In CMO #1, the Court directed the parties to "meet and confer and to provide the Court with proposed orders or recommendations to facilitate judicious resolution" of several topics by the next case management conference.  The parties have met and conferred in good faith, and on that basis make the following recommendations and, where appropriate, attach proposed orders relating to these topics.

## 1.      Master Complaint & Motions to Dismiss Schedule

The Parties have met and conferred and have reached agreement on the schedule for filing the Master Complaint and Motions to Dismiss, set forth below.

| Date | Event |
|------|-------|
| February 14, 2023 | Plaintiffs file their Master Complaint(s); Plaintiffs identify to Defendants up to five or six of their claims for the first phase of Motions to Dismiss; and Plaintiffs provide Defendants with a proposed Short Form Complaint ("SFC") and SFC Implementation Order ("SFC Order"). |
| February 28, 2023 | Parties file a joint proposed SFC Order and SFC and proposed specifications for Defendants' Motion(s) to Dismiss, or submit letter briefs no longer than 5 pages double-spaced with their respective positions on disputed issues. |
| March 14, 2023 | [Assumed date of entry of SFC Order] |
| April 4, 2023 (or 21 days after entry of SFC Order, whichever is later) | Plaintiffs with complaints filed by the date of the SFC order file SFCs. |
| April 17, 2023* | Defendants file Motion(s) to Dismiss. |
| June 1, 2023* | Plaintiffs file opposition(s) to the Motion(s) to Dismiss |
| June 30, 2023* | Defendants file reply brief(s) |

* If the SFC order is entered after March 14, this deadline is extended by the number of days between (a) March 14 and (b) the date the SFC order is entered.

**Plaintiffs' position:**

Defendants insist that they may move to dismiss Plaintiffs' claims under Section 230 or the First Amendment.  That is neither efficient nor in keeping with the Court's guidance.  As discussed during the initial status conference, the state of the law does not support a Section 230 defense given the nature of the allegations that Plaintiffs have raised and will raise.  *See* Hr'g Tr. at 110:14-17 (Nov. 9, 2022) ("Defendants' attempt to recast the Plaintiffs' complaint in their own preferred manner [as related to the content of the platforms] will be just rejected unless the Supreme Court provides some guidance to the

1    contrary.").  Moreover, while it is impossible to predict whether and to what extent the U.S. Supreme

2    Court will reverse *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), such an outcome is eminently

3    plausible.  Notably, since the last hearing, the United States government[1] and twenty-seven states[2] have

4    filed briefs siding with the petitioner in *Gonzalez*—indicating broad support across the legal and

5    political spectrum for limiting the expansive interpretation of Section 230 that Defendants doubtless

6    intend to offer here.

7            The schedule above represents a compromise proposed by Plaintiffs to Defendants.  Plaintiffs'

8    compromise proposal was expressly discussed with defense counsel as mooting a dispute by the Parties

9    regarding whether SFCs must be filed prior to MTDs. Defendants' unnecessary argument essentially

10   asks the Court for an advisory opinion, in addition to violating the spirit of the compromise.  Plaintiffs

11   requested that Defendants remove their argument, but Defendants refused.

12           SFCs do not need to be filed before Defendants file their Motions to Dismiss ("MTDs").  Nor

13   does the case law cited by Defendants stand for that proposition.  *In re Atrium Med. Corp.*, No. 16-MD-

14   2753-LM, 2018 WL 11397878 (D.N.H. Jan. 8, 2018) is a good example. There, the SFC did not allow or

15   provide for "individual plaintiffs to include particularized allegations of fraud;" instead the case

16   management order contemplated a long form complaint should the case be selected for specific phase

17   discovery.  *Id.* at *5–6.  As a result, any motion to dismiss based on Rule 9(b) was premature as it

18   "would require case-specific rulings to determine the sufficiency of each individual plaintiff's factual

19

20

21   ─────────────────────

22   [1] *See* Br. for United States as Amicus Curiae in Support of Vacatur, Docket No. 21-1333, *Gonzalez v. Google*, https://www.supremecourt.gov/DocketPDF/21/21-1333/249441/20221207203557042_21-1333tsacUnitedStates.pdf.

23   [2] *See* Br. for the States of Tennessee, Alabama, Alaska, Arkansas, California, Colorado, Connecticut,
24   Idaho, Illinois, Indiana, Kentucky, Louisiana, Massachusetts, Minnesota, Mississippi, Nebraska, New
     Hampshire, New Jersey, New York, North Carolina, Oregon, Rhode Island, South Carolina, South
25   Dakota, Vermont, Virginia, and the District of Columbia as Amicus Curiae in Support of Petitioners,
     Docket No. 21-1333, *Gonzalez v. Google*, https://www.supremecourt.gov/DocketPDF/21/21-
26   1333/249216/20221206154322634_21-1333tsac%20States%20TN%20Final.pdf; *see* Br. for the
     State of Texas as Amicus Curiae Suggesting Reversal, Docket No. 21-1333, *Gonzalez v. Google*,
27   https://www.supremecourt.gov/DocketPDF/21/21-1333/249350/20221207133346483_21-
28   1333_Amicus%20Brief.pdf.

allegations." *Id.* at *6 (citation omitted).  This, however, did not mean that the master complaint was otherwise "immune from a motion to dismiss under Rule 12(b)(6)." *Id.* at *5.

In any event, SFCs will of course continue to be filed by new Plaintiffs as the litigation goes forward, after the SFC deadline for already-filed complaints, after the MTDs are filed, and potentially after the Court's rulings on the motions.  This is commonplace in MDLs and the Parties and the Court can readily address the applicability of any orders on a going-forward basis, as will be necessary regardless of the schedule adopted.

**<u>Defendants' statement:</u>**

Defendants are pleased the Parties were able to reach agreement on a proposed schedule under which both the Master Complaint and Short-Form Complaints will be filed before Defendants file their Motions to Dismiss.  This is important because, as the Court observed during the Initial CMC, "[t]he whole point of the MDL process is to streamline, and if the plaintiffs haven't adopted the complaint on which there is motion practice, then it's not binding."  Nov. 9, 2022 Hr'g Tr. ("Hr'g Tr.") at 105:25–106:2.  Indeed, the "master complaint has no legal effect, standing alone," but takes on legal status as a complaint only "when it is adopted by a plaintiff through the filing of an individual [short-form] complaint." *In re Atrium Med. Corp.*, 2018 WL 11397878, at *5 (D.N.H. Jan. 8, 2018) (quoting *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *6 (D. Mass. Apr. 24, 2017) (internal quotation marks omitted)); *see also, e.g.*, *In re Zantac (Ranitidine) Prods. Liab. Litig.*, 339 F.R.D. 669, 674 (S.D. Fla. 2021) ("[T]he Master Personal Injury Complaint together with the Short Form Complaint shall be deemed the operative Complaint"); *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *6 ("[T]he complaint in each action in this proceeding consists of the master complaint and the individual short-form complaint, taken together.").  The Court therefore must consider the Master and Short Form Complaints together to issue a ruling on the Motions to Dismiss in order for that ruling to have binding effect. *In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, 2017 WL 2362003, at *6–7 (S.D. Ind. May 31, 2017) (granting motion for judgment on the pleadings because allegations in master and short form complaints did "not assert allegations" necessary to state a claim).

Finally, Defendants note that while Plaintiffs are the master of their complaint, Defendants are the masters of their motion to dismiss.  Plaintiffs' suggestion that Defendants cannot move to dismiss on

Section 230 and First Amendment grounds is not fairly supported by the record.  Defendants have stated their intent and reserve their right to move on Section 230 and the First Amendment.

  **2.**  **Service of Process, Waiver and Direct Filing**

  The Parties have agreed upon a proposed case management order that addresses service of process, waiver of service, and direct filing.  The parties expect to file that proposed order with the Court tomorrow (December 8, 2022).

  **3.**  **First Stage Discovery Protocols**

  The Court directed the Parties "meet and confer and submit a proposed order for the immediate preservation of discovery, including setting forth initial ESI protocols."  CMO #1, at 5.  The Parties have exchanged and continue to confer regarding orders governing the preservation of potentially relevant information (the "Preservation Order"), governing discovery of electronically stored information and hard copy documents (the "ESI Order"), and governing the protection of confidential personal and business information  ("the Protective Order").  The Parties will continue to confer regarding the draft Orders and will provide a further update to the Court prior to the December 14 status conference.

  **4.**  **Initial Discovery Production**

  The Parties have met and conferred and cannot reach agreement as to what extent, notwithstanding the stay of discovery ordered by the Court, Plaintiffs can "obtain materials that [D]efendants may have produced in other litigation and/or in connection with various investigations."  CMO #1, ¶ 5.  The Parties believe they will benefit from the Court's guidance on this dispute.

  **Plaintiffs' position:**

  Plaintiffs seek re-production of materials *already* gathered, reviewed, and produced in connection with other proceedings, investigations, or hearings that concern "the health or behavioral effects of their products on minors."  ECF No. 45.  This is a well-defined set of materials.  The limited burden, if any, re-production imposes on Defendants is substantially outweighed by the importance of these documents.  *Cf.* Tr. at 125 ("It's not a burden … It's an inconvenience.  It's something that you don't want to do, but it's not what we would call a burden.").

  In MDLs and other complex litigation, courts routinely require early, pre-motion to dismiss production of materials defendants already have produced in other investigations or litigation.  For

example, in *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, Dkt. 443, PTO No. 10 at V.(a) (June 17, 2019), the court ordered defendants to produce within ten days documents produced in prior proceedings.  Notably, the defendants had to produce these previously produced materials prior to the Court resolving the defendants' entitlement to a government contractor defense – which, like Defendants' Section 230 defense here, would immunize them from liability for certain claims.[3] Similarly, in *In re National Prescription Opiate Litig.*, Dkt. 232, CMO No. 2 at 15 (Apr. 11, 2018), over the defendants' objections, Judge Polster ordered that documents previously produced in a pre-MDL case to one PEC firm should be immediately deemed produced in the MDL and made available to the rest of the PEC.  Judge Polster further required the defendants to make rolling productions over a 61-day period of documents from all other prior lawsuits and civil investigations "involving the marketing or distribution of opioids."  And in *In re Volkswagen "Clean Diesel*," the Discovery Schedule entered after the initial Case Management Conference required re-production into the MDL of materials the defendants previously produced in government investigations "regarding whether Volkswagen, Audi, or Porsche vehicles were equipped with devices designed to defeat or that did defeat emissions regulations or laws."  Dkt. 1252, PTO No. 9 at 4.D.1 (Feb. 25, 2016).  In each of these cases, production was ordered ***before*** motions to dismiss were decided (or, in most cases, even briefed).[4]

---

[3] Defendants suggest that the 3M defendants voluntarily produced the previously produced materials without objection.  Defendants fail to appreciate the reality that often in complex litigation a court's guidance (rather than court order) is all that is necessary for the parties to resolve discovery disputes.  In *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, at the initial status conference, the court encouraged the defendants to voluntary produce these materials.  *See*, e.g., Ex. B, 4/17/2019 Tr. at 55.

[4] Other precedents are legion. *See, e.g.*, *In re High-Tech Antitrust Litig.,* Dkt. 88 (Koh, J.) (ordering production of materials from two DOJ investigations, to the extent those documents were responsive to seven of the plaintiffs' initial document demands); *Pension Trust Fund for Operating Eng'rs v. Assisted Living Concepts, Inc*., 943 F. Supp. 2d 913 (E.D. Wis. 2013) ("Courts have lifted stays with regard to certain documents already produced in other actions with governmental agencies or others. That is partly because, where documents have already been collated and produced to other entities, the burdens of discovery are far less substantial."); *Munoz v. PHH Corp.,* 2013 WL 684388 (E.D. Cal. 2013) ("Defendants will suffer little if any burden … because these documents have already been produced . . . ."); *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716, at *16-17 (C.D. Cal. 2012) (granting motion to compel all documents provided to any "'Government'" regarding subject matter of case); *In*

Defendants to date have refused to even *identify* prior litigations, investigations, or hearings where any of the Defendants have made relevant productions.  Plaintiffs' request therefore is based on what Plaintiffs have been able to glean from public sources.[5]

### A.   Meta Documents Produced by Whistleblower Frances Haugen in California Litigation

Plaintiffs asked Meta to allow Plaintiffs' Leadership in this MDL to review the materials one of its former employees (Frances Haugen) produced in a California state court action, *Ashman v. Instagram LLC, et al*., No. 22-CIV-03178 (Cal. 2022).  The documents are highly relevant to this case because they address, among other things, the impact of Instagram on the mental health and body image of teenagers, and reveal that Meta's "own research likened the app's young users to addicts who feel unable to step away from a service that makes them unhappy."[6]  These documents are already in the possession of Co-Lead Counsel Previn Warren because his firm is also counsel in the state court action.

Meta's position that "Motley Rice obtained the Haugen Documents … in a way that prevented Meta from asserting its rights" is specious.  It was Meta's choice *not* to challenge the subpoena or otherwise seek relief in state court, given that Motley Rice afforded Meta the opportunity to conduct a privilege review (which has been completed) and committed not to publicly disclose the Haugen documents until such time as the parties have met and conferred about what confidentiality designations, if any, should apply.  The parties agreed to that process in early September, well before the *Ashman* case was stayed on September 21, 2022.  During the parties' extensive discussions concerning the Haugen documents, Meta not once so much as suggested procedural impropriety in how Motley Rice obtained those documents.  Any arguments to that effect are as waived as they are meritless.

---

*re New* Century, WL 9568860, at *6-7 (C.D. Cal. 2009) (compelling production of documents previously produced to bankruptcy examiner and governmental investigative bodies).

[5] Defendants for the first time in this filing disclose that they had not made productions in certain litigations, but were unwilling to volunteer any of that information in the Parties' meet and confers.

[6] J. Waterson and D. Milmo, "Facebook whistleblower Frances Haugen calls for urgent external regulation", The Guardian (Oct. 25, 2021), https://www.theguardian.com/technology/2021/oct/25/facebook-whistleblower-frances-haugen-calls-for-urgent-external-regulation

Defendants next assert that some documents may contain sensitive information, and it would be burdensome to have to redact such information now.  But there are no bona fide confidentiality concerns.  Nor would redaction of *purported* confidential information or even irrelevant information be appropriate.  The Parties are negotiating (and the Plaintiffs have agreed to) a three-tier Protective Order that will sufficiently safeguard any private or confidential information.  Indeed, it is well settled that the Protective Order is the proper way to address concerns about potentially confidential or irrelevant information within responsive documents.  *See, e.g., Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1211 (9th Cir. 2002) ("The law, however, gives district courts broad latitude to grant protective orders to prevent disclosure of materials for many types of information, including, but not limited to, trade secrets or other confidential research, development, or commercial information."); *Live Nation Merch., Inc. v. Miller*, 2014 WL 1877912, at *2 (N.D. Cal. May 9, 2014) ("[R]edactions of otherwise discoverable documents here are unwarranted because [a party's] concern about protecting privacy interests and confidential/proprietary information could be addressed through a protective order. As courts have recognized, this type of unilateral redaction is disfavored, and a protective order could ensure the confidentiality of sensitive information.").[7]

Moreover, Plaintiffs met and conferred with Defendants and proposed a voluntary disclosure, whereby Plaintiffs would accord the discovery materials the highest confidentiality designation under Plaintiffs' proposed Protective Order, pending the Court's entry of that Order.  The "Highly Confidential" designation is specifically designed to protect information from being received by a party. In any event, most, if not all, of these documents have already been produced to Congress and the press, eliminating any genuine argument that they are "confidential," even if a somewhat smaller subset of the documents has been published to the world.  Yet, Meta refuses to allow Mr. Warren to share these documents with Plaintiffs' Leadership.  It is important to keep in mind that Meta and Plaintiffs in the

---

[7] *See also Magana-Munoz v. W. Coast Berry Farms, LLC*, 2022 WL 6584545, at *2 (N.D. Cal. Sept. 29, 2022 ("Several district courts have held that where a protective order is in place, the unilateral redaction of otherwise responsive documents is improper .... [I]f materials are already shielded by a protective order, unilateral redactions do little more than breed suspicion between the parties, generate discovery disputes, and invite unnecessary intervention by the court.").

anticipated JCCP possess these documents – placing Plaintiffs' Leadership at a disadvantage and information imbalance.

### B.   Defendants' Documents Previously Produced in Other Litigations or in Connection with Government Investigation or Hearing

Plaintiffs also asked Meta to re-produce its document productions (and transcripts) from a UK Coroner's Court's inquest concerning the suicide of Molly Russell, a fourteen- year-old Instagram who, in the last six months of her life, used her Instagram account more than 120 times a day.  Following her suicide, a senior Meta executive apologized for allowing Molly to view graphic Instagram posts on self-harm and suicide.  The inquest looked at how algorithms used by Meta and others may have contributed to Molly's death—and ultimately found Meta culpable.  Meta produced at least 36,000 pages of responsive evidence in the inquest.[8]  It was reported that the coroner had sought data from Snap, but during the meet and confer process Snap had declined to disclose whether it produced any data in response.  Snap for the first time in this filing states it had not made a production.  This information was requested and should have been provided during the Parties' meet and confers.

There is no sound reason for Defendants to refuse to allow Plaintiffs access to these documents or similar documents produced in other cases or in response to specific government investigations and hearings (to the extent concluded).[9]  Government investigations are not categorically off limits from

---

[8] "Molly Russell: Family frustrated by Meta's inquest evidence delay", BBC News (March 16, 2022), https://www.bbc.com/news/uk-england-london-60763442; https://www.bbc.com/news/uk-england-london-54307976.

[9] Plaintiffs have requested re-production of documents produced in response to: U.K Parliament Investigation – Draft Online Safety Bill, October 28, 2021; European Parliament Internal Market & Consumer Protection Committee Hearing "Whistleblower's testimony on the negative impact of big tech companies' products on users", November 8, 2022; U.S. Senate Committee on Commerce, Science & Transportation, "Protecting Kids Online: Testimony from Facebook Whistleblower (Frances Haugen), Hearing held October 5, 2021; U.S. Senate Committee on Commerce, Science & Transportation, "Protecting Kids Online: Snapchat, TikTok, and YouTube, Hearing held on Oct. 26, 2021; Attorneys General Nationwide Investigation into Instagram; National Association of Attorneys General (44 total) Coalition Urging Facebook to Abandon Launch of Instagram Kids; Texas Investigation into TikTok for alleged violations of children's privacy and facilitation of human trafficking; Attorneys General Investigation into TikTok's effect on kids' health; Department of Homeland Security investigation into TikTok CSAM, April 2022.

order of re-production in civil litigation.[10]  Defendants' claim that all investigations Plaintiffs have flagged are ongoing is wrong.  For example, the State of Indiana filed two lawsuits against TikTok, one of which is for consumer fraud based on representations about child safety.  *Indiana v. TikTok et. al*, 02D02-2212-PL-000400 (In. Sup. Ct., Allen County); *Indiana v. TikTok et. al*, 02D03-2212-PL-000401 (In. Sup. Ct., Allen County).[11]  Defendants also lack standing to object on behalf of the government.[12]  Thus, Defendants' objections on behalf of the government's interest in the confidentiality of its investigations are improper.  In *In re National Prescription Opiate Litig.*, the court only amended its order to limit disclosures related to ongoing investigations after the United States Department of Justice asked it to do so—and even then, did not extend that reasoning to state court investigations, presumably because state governments did not object.  Neither the Department of Justice ("DOJ") nor state attorney generals have made comparable requests here.[13]

Given the nature of these investigations, any documents Defendants produced to the relevant government entities will also be relevant here.  Of course, Defendants' unwillingness to even identify whether they have produced documents in these proceedings leaves Plaintiffs at a serious information

---

[10] Government investigations are not categorically off limits.  *E.g., Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co*., 297 F.R.D. 99 (S.D.N.Y. 2013) (granting plaintiff's request in part, stating the "documents are reasonably calculated to lead to admissible evidence, and such responses to government investigations should therefore be produced."); *In re Merck & Co., Inc. Securities, Derivative & ERISA Litig*., 05-2367 SRC, 2012 WL 4764589 (D.N.J. Oct. 5, 2012) (granting plaintiffs' request for documents "previously produced in connection with government investigations" in full and accepting plaintiffs' assertion that production would "not impose an undue burden on Defendants because Defendants have already gathered and produced the responsive documents.").

[11] "Attorney General Todd Rokita launches litigation against TikTok to protect children and combat threats from China", Office of the Indiana Attorney General (Dec. 7, 2022), https://events.in.gov/event/attorney_general_todd_rokita_launches_litigation_against_tiktok_to_protect_children_and_combat_threats_from_china?utm_campaign=widget&utm_medium=widget&utm_source=State+of+Indiana

[12] "A party may not ask for an order to protect the rights of another party or a witness if that party or witness does not claim protection for himself, but a party may seek an order if it believes its own interest is jeopardized by discovery sought from a third person."  Wright and Miller 8A Fed. Prac. & Proc. Civ. § 2035 (3d ed.).

[13] To the extent the Court is concerned about the DOJ's interests, it should ask the DOJ whether it objects to such an order—it should not allow Meta to stand in the DOJ's shoes.

disadvantage in making this assessment.  With respect to Meta's assertion that it would take 800 hours to make relevancy redactions, it is well settled that relevance-based redactions are inappropriate under the Federal Rules of Civil Procedure and should be prohibited absent consent of the Parties or court order.  *Shenwick v. Twitter, Inc.*, 2018 WL 833085, at *3 (N.D. Cal. 2018) ("In general, courts frown upon the practice of redacting irrelevant information from documents based on one party's unilateral assessment of relevance.") (collecting cases); *In re Medeva Sec. Litig.,* 1995 WL 943468, at *3 (C.D. Cal. May 30, 1995):

> The Court does not welcome unilateral editing of documents by the producing party. Even when implemented with restraint and in good faith, the practice frequently gives rise to suspicion that relevant material harmful to the producing party has been obscured. It also tends to make documents confusing or difficult to use.

In sum, the equities strongly favor ordering the limited relief requested.  The Court should direct Defendants to 1) provide to Plaintiffs (or, for the Haugen documents, allow them access to) the materials produced in the prior proceedings above, including the Molly Russell inquest, within fifteen days, and 2) disclose where else they have made productions of relevant and responsive information.

**Defendants' position:**

As ordered by the Court, "[d]iscovery has previously been stayed in the case and will continue to be stayed through the resolution of a motion to dismiss."  CMO #1 at 5.  Nevertheless, Plaintiffs have demanded all "materials that defendants may have produced in other litigation and/or in connection with various investigations."  *Id.*  In response to that request, the Court directed the Parties following the Initial CMC to meet and confer on "what, if any, material may exist that can be shared at the onset of this litigation."  *Id.*  The Court observed at the Initial CMC that any productions "may be premature," but in order to consider Plaintiffs' request, said, "I do need to know specifically what it is that you're asking for and what the scope of those productions were."  Hr'g Tr. at 124:11, 125:7–8.

Plaintiffs seized on that statement not only to identify a laundry list of cases and investigations, but also to demand that Defendants immediately "reproduce in this litigation discovery produced in any court case, government investigation, or government hearing (whether domestic or international) regarding the health or behavioral effects of their products on minors."  12/2/2022 Email from C. Ayers.

On Friday, December 2, 2022, after being pressed by Defendants, Plaintiffs provided a list of more than a dozen proceedings. Defendants are still investigating the nature of many of these proceedings and will be prepared to address them further at the December 14 CMC.[14]  But Plaintiffs' requests largely concern matters that do not relate to the issues in this MDL, in which no documents have been produced, and/or are part of ongoing government investigations, which are not the proper subject of discovery. Indeed, all of Plaintiffs' premature demands violate the "immunity from suit" conferred by Section 230, which is also intended to protect against "having to fight costly and protracted legal battles" in the first place. *Fair Housing Council v. Roommates.com*, *LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc). *See* discussion *infra*.

Below, Defendants outline their position on Plaintiffs' request for materials from civil lawsuits, hearings/investigations, and documents obtained by Motley Rice from Francis Haugen in a separate state court proceeding that Ms. Haugen impermissibly took from Meta during her employment.

### C.    To the Extent Such Productions Even Exist, Plaintiffs Are Not Entitled to the Vast Majority of Them.

**Civil Lawsuits.**  Plaintiffs have identified four civil lawsuits from which they seek re-productions: (1) *Manigault-Johnson v. Google LLC*, 2:18-cv-01032-BHH (D.S.C.); (2) *T.K. v. ByteDance Technology Co., Ltd.*, 1:19-cv-07915 (N.D. Ill.); (3) *Doe v. Snapchat, Inc.*, 2:16-cv-04955 (C.D. Cal.); and (4) *Anderson v. TikTok, Inc.*, 2:22-cv-01849-PD (E.D. Pa). The *Manigault* and *T.K.* cases involve privacy claims unrelated to social media addiction or minor health. *See* Order Granting Motion to Dismiss for Failure to State a Claim, *Manigault-Johnson v. Google LLC*, 2:18-cv-01032-BHH (D.S.C. Mar. 31, 2019), ECF No. 31 (dismissing on the pleadings allegations that Google collected and monetized viewer personal information); Compl., *T.K. v. ByteDance Tech. Co., Ltd.*, 1:19-cv-07915 (N.D. Ill. Dec. 3, 2019), ECF No. 1 (alleging TikTok tracked, collected, and disclosed minors' personally identifiable information in a case that was resolved without discovery). There was also no discovery in the *Manigault* case, or in the third case. *See Doe v. Snapchat, Inc.*, 2:16-cv-04955 (C.D. Cal.) (case settled before discovery). The Court should deny Plaintiffs' request as to these cases. The

---

[14] At the Initial CMC, Plaintiffs specifically identified three matters related to Meta, each of which is addressed in further detail herein.

*Anderson* case was a parallel proceeding subject to a Conditional Transfer Order for inclusion in this MDL that has since been dismissed on Section 230 grounds.  Although TikTok made one production in that matter, it objected to premature discovery before a ruling on its motion to dismiss—an objection that was vindicated when all claims were thereafter dismissed.  *See* Memorandum Order, *Anderson v. TikTok, Inc.*, 2:22-cv-01849-PD (E.D. Pa Oct. 25, 2022), ECF No. 40.  That production included confidential user-specific account information that may not be re-produced to Plaintiffs' here.  If and when discovery opens in this MDL, TikTok will respond to Plaintiffs' document requests and, as necessary, produce any responsive documents produced in *Anderson* after redaction of confidential user-specific account data.  The Court should, therefore, also deny Plaintiffs' premature request as to *Anderson*.[15]

**Hearings/Investigations.**  Plaintiffs also identified in their December 2, 2022 email nine proceedings that they describe as "hearings/investigations."  In certain of these matters, it appears Defendants provided few (or no) documents, and the documents they provided are publicly available.  *E.g.*, "UK Parliament Investigation – Draft Online Safety Bill, October 28, 2021"; European Parliament Internal Market & Consumer Protection Committee Hearing, "Whistleblower's testimony on the negative impact of big tech companies' products on users," November 8, 2021; "National Association of Attorneys General (44 total) Coalition Urging Facebook to Abandon Launch of Instagram Kids"; Senate Commerce Subcommittee on Consumer Protection, Product Safety, and Data Security, October 26, 2021.

While Plaintiffs now apparently are limiting their request to "concluded" investigations, many of the matters identified by Plaintiffs in fact concern ongoing government investigations, for which courts routinely deny discovery requests seeking re-productions because they could compromise those investigations, as demonstrated by authority cited by Plaintiffs to the Court during the Initial CMC.  In

---

[15] There is no basis, to the extent Plaintiffs are so requesting, to require Defendants to sift through their dockets to identify *any* case in which they may have produced some document that could be related to "health or behavioral effects of their products on minors," review those productions to see if any such documents were in fact produced, and then re-produce those documents here.  That is not how discovery works—certainly not in a case where discovery has been stayed and Defendants intend to mount a Section 230 defense.

the *Opiate* MDL, the court denied such a request (as well as requests to identify ongoing investigations) because doing so "could reveal to outside entities the thrust of that investigation, thereby jeopardizing both that investigation and any other, similar ones being pursued." Order Regarding Requested Modifications to Discovery Ruling No. 22 at 2, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio Apr. 30, 2020), ECF No. 3286; *see also* Amendment to Discovery Ruling No. 22 at 2, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio Oct. 3, 2019), ECF No. 2712 (declining to require defendants to re-produce documents from ongoing federal investigations); *In re WorldCom, Inc. Sec. Litig.*, 2003 WL 22953645, at *7 (S.D.N.Y. Dec. 16, 2003) ("The SSB Defendants have not pointed to any legal authority that would give them a right of access to ongoing government investigations or that would entitle them to the work of criminal and regulatory investigators.").[16]  Discovery from ongoing investigations is thus improper at this time, as Plaintiffs appear to now concede.

  **Molly Russell Coroner's Inquest.**  A coroner's inquest is a unique type of non-adversarial foreign proceeding in which the coroner is precluded from determining any questions of criminal or civil liability.  Plaintiffs' characterizations of the Molly Russell inquest, including that it "found Meta

---

[16] Plaintiffs' other cited authority is likewise inapposite. *See* Initial CMC Statement at 22–23, ECF No. 45.  In *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103 (N.D. Cal. 2012), the DOJ had publicly filed an antitrust suit with nearly identical claims as plaintiffs' civil complaint.  Here, there is no government complaint bringing identical personal injury and product liability claims.  Moreover, there was no order in that case, as Plaintiffs incorrectly suggest, that the defendants simply hand over their prior productions to the DOJ.  Instead, the court directed the defendants to "respond to and produce ***relevant***, non-privileged documents responsive to" certain document requests the plaintiffs had already served.  Minute Order and Case Management Order at 1, *In re High-Tech Emp. Antitrust Litig.*, No. 5:11-cv-02509 (N.D. Cal. Oct. 26, 2011), ECF No. 88 (emphasis added).  In *Ohio Police & Fire Pension Fund v. Standard & Poor's Financial Services*, 2010 WL 2541366 (S.D. Ohio June 18, 2010), the court did not order broad re-productions like Plaintiffs seek here, but rather only limited re-productions related to limited topics. *See also Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99 (S.D.N.Y. 2013) (same) (explaining that plaintiffs were "not entitled to all documents relating to RMBS that the defendants have turned over to 'any government body or agency' pursuant to subpoena").  Finally, in *Galaria v. Nationwide Mutual Insurance Co.*, 2013 WL 6578730 (S.D. Ohio Dec. 16, 2013), the court did not order production of any documents; it only declined to broadly stay discovery pending the defendant's motion to dismiss as the defendant did not offer any evidence or facts as to the burden it would face if discovery proceeded.  Here, there are clear burdens associated with any discovery. *See infra.*

culpable," are inaccurate.  And although the coroner can require persons within the jurisdiction to provide documents and to attend the inquest to give oral testimony, the vast majority of information provided by Meta Platforms Ireland Ltd. to the coroner is information specific to Ms. Russell's Instagram account, including third-party personal data and private communications.  For privacy reasons, and in line with the coroner's concerns expressed at the inquest about maintaining the privacy of Ms. Russell's family and of those with whom she interacted, and pursuant to privacy laws (including, but not limited to, the U.K. Data Protection Regulation), Meta cannot voluntarily provide materials containing such personal information.  Moreover, the information, relating to a young woman who is not a plaintiff in these cases and her friends and associates, would not be relevant in the present litigation in any event.

Nevertheless, Meta anticipates that it can agree to share certain materials from the inquest proceeding and will continue to discuss the terms of such an agreement with Plaintiffs in advance of the CMC.  Any materials Meta provides to Plaintiff must be afforded the highest level of confidentiality protection under a protective order to be entered by the Court, would be without waiver to Meta's position that all discovery should be stayed, and would not reflect any agreement that the materials in question are relevant or admissible in the present litigation.

Plaintiffs' statement regarding Snap and the UK Coroner's Court's inquest concerning Molly Russell is inaccurate.  First, Snap has never refused to disclose, to Plaintiffs or anyone else, whether it produced any information in response to the inquest.  Second, the UK Coroner did not seek information from Snap in connection with the investigation into Molly Russell's death.  Following the issuance of the UK Coroner's findings concerning Molly Russell, the Coroner sent to Snap (along with several other social media companies) requests for information relating to their services, and Snap produced responses to those questions just earlier this month.

**Motley Rice's Request Regarding Haugen Documents Should Be Denied.**  Motley Rice has requested an order allowing them to "share" documents obtained from former Meta employee Francis Haugen in a state court case entitled *Ashman v. Instagram et al.* pending in San Mateo Superior Court (No. 22-cv-03178).  Their request should be denied.  *Ashman* has been stayed, so Meta has not yet been able to challenge whether and to what extent the Haugen Documents can be used in that matter, given

the manner in which Motley Rice obtained them.  Meta also has not had the opportunity to address its concerns about numerous issues implicated by these documents, including federal privacy laws and safety and security issues—which is critical given that these documents contain third-party user content and personally identifiable information about Meta employees involved in efforts to combat human trafficking and drug crimes and victims of those crimes.  The issue is therefore not whether Motley Rice can "share" these documents—they can't, including because their right to possess and use them in *Ashman* has yet to be litigated, a protective order has not yet been negotiated and entered, and many of the documents are irrelevant.  Instead, the issue is whether Meta should be required to produce any of these documents to Plaintiffs in the MDL.  The answer to that question is no.

In *Ashman*, Motley Rice obtained the Haugen Documents from Ms. Haugen in a way that prevented Meta from asserting its rights, in violation of state procedural rules.  On August 25, 2022, Motley Rice served a subpoena on Ms. Haugen seeking, among other things, "any and all documents" she obtained from Meta "during the period of [her] employment"—*i.e.*, documents Ms. Haugen copied and took in violation of her employment agreement.  The return date for the subpoena was September 14, 2022.  On August 28, 2022, Meta informed Motley Rice that it would move to quash the subpoena. The next day, on August 29, 2022, Motley Rice responded that Meta's motion to quash would be "moot" because Ms. Haugen had already provided the documents, including hundreds of documents that neither Ms. Haugen nor anyone else had previously made public.  Motley Rice did not explain how or why Ms. Haugen had already provided the documents, or why it had accepted them, despite the subpoena's express instruction, required by California Code of Civil Procedure § 2020.430(d):  "Do not release the requested records to the deposition officer prior to the date and time stated above."

Given the subpoena's broad request for "any and all documents" Ms. Haugen had taken without permission from Meta, and the fact that those documents covered a wide range of topics, the vast majority of documents Motley Rice obtained from Ms. Haugen have nothing to do with the issues in this MDL.  These documents also raise privilege, confidentiality, and safety issues because they contain (1) information protected by the attorney-client privilege and work product doctrine; (2) information subject to the Stored Communications Act, 18 U.S.C. § 1701 *et seq.*, and therefore cannot be disclosed absent additional legal process or redaction; (3) Meta's proprietary information; (4) personally

identifiable information of Meta employees involved in efforts to combat human trafficking and drug crimes that could put their lives, and the lives of their families, at risk; and (5) personally identifiable information of victims of trafficking and other crimes, whose lives also could be put at risk from disclosure.  While Motley Rice agreed not to review privileged documents and to treat the documents as confidential pending entry of a protective order in *Ashman*, Meta intends to litigate the above issues in *Ashman* (or the JCCP of which it is now a part) once the stay is lifted.[17]  This Court should deny Motley Rice's request for an order that would essentially circumvent those state court proceedings and would also require Meta to review and carefully redact thousands of pages of documents (that were taken without permission and many of which have never been disclosed publicly) to address the issues identified above, which Meta estimates would take over one hundred hours of attorney time.  This is an undue burden.

### D.   All of Plaintiffs' Re-production Requests Should Be Denied for Additional Reasons.

Beyond the reasons for denying Plaintiffs' requests for re-productions from specific matters, as discussed above, all of Plaintiffs' requests are unduly burdensome, overbroad, and procedurally improper, and should be denied for those reasons as well.

*First*, requiring any production of documents from other matters at this time would impose disproportionate burdens on Defendants.  Even if potentially relevant documents exist within past productions, Defendants cannot just push a button to "re-produce" them.  Instead, these documents would have to be reviewed for potential relevancy (which is not even possible at this stage, when the operative pleadings may be materially changing) and redacted to address, *inter alia*, issues of confidentiality, trade secrets, disclosure prohibitions under the Stored Communications Act, 18 U.S.C. § 2701 *et seq.*, personally identifying information, and other information that could pose a safety and

---

[17] Plaintiffs suggest that their offer to treat any "re-productions" as covered by "the highest confidentiality designation under Plaintiffs proposed Protective Order, pending the Court's entry of that order" should mitigate any concerns about burden or confidentiality.  Not so.  Meta has made clear to Motley Rice that it has not yet applied all necessary redactions to the Haugen documents.  Meta should not be required to disclose such documents without an opportunity to apply such redactions (particularly in light of the serious safety concerns identified), which would impose significant burdens.  (And Plaintiffs' offer rings particularly hollow given that they have made clear their intention to argue at the earliest juncture that the documents are not confidential–which Meta disputes.

security threat to employees or others, which would take significant time and effort to complete.  For example, with respect to the ongoing State Attorneys' General investigation against Meta referenced by Plaintiffs at the Initial CMC, Meta estimates that it would take more than 800 attorney hours, in additional to substantial internal resources, to re-review the documents for relevancy and apply relevant redactions and confidentiality designations.  Defendants cannot be required to assume these burdens before the Court rules on the forthcoming motions to dismiss.  *See, e.g.*, *Kincheloe v. Am. Airlines, Inc.*, 2021 WL 5847884, at *3 (N.D. Cal. Dec. 9, 2021) ("[A] temporary stay of discovery while the Court considers American's motion to dismiss would conserve the parties' resources.  The Court agrees that review of nearly 50,000 search hits and families—which American contends would take over 1,000 attorney hours to review—is a substantial undertaking."); *O'Sullivan v. Deutsche Bank AG*, 2018 WL 1989585, at *8 (S.D.N.Y. Apr. 26, 2018) (staying discovery pending financial institutions' motion to dismiss claims under Anti-Terrorist Act; refusing to "[l]imit[] discovery to documents produced in connection with earlier investigations," and stating that "[a]lthough defendants have gathered these documents for regulators, this does not obviate the need for the defendants . . . to review these documents prior to production to plaintiffs"); *Nexstar Broad., Inc.*, 2011 WL 4345432, at *4 (N.D. Ind. Sept. 15, 2011) (denying the plaintiffs' request for early production of information provided to state AG prior to the filing of dispositive motions because "requiring [defendant] to review all of the information provided to the Attorney General to parse out the relevant and non-confidential information that could be given to [plaintiff] would be burdensome").

*Second*, to the extent Plaintiffs are asking Defendants to produce all documents produced in any proceeding that may relate to "the health or behavioral effects of their products on minors," this request is overbroad and is nothing close to a "well defined set of materials" as Plaintiffs claim.  *See, e.g.*, *King Cnty. v. Merrill Lynch & Co.*, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) (Even if "each and every document produced in the government investigations is relevant," "Plaintiff must make proper discovery requests, identifying the specific categories of documents sought, in order to obtain them—

and each category must be relevant to its claims and defenses.").[18]  While such an overbroad demand would be objectionable at any stage of the case, it is particularly egregious here, where the Court has ordered master operative pleadings that Plaintiffs have made clear will "pare . . . down" the current complaints, resulting in "a list of the claims that the plaintiffs really want to pursue"—and an operative pleading that could look very different from the current complaints.  Hr'g Tr. at 16:21–17:6.  As a result, and as the Court observed, there is currently "insufficient information about . . . the claims that plaintiffs will proceed" on to assess whether re-productions could even be relevant or warranted.  CMO #1 at 5.  Plaintiffs' own authority is in accord.  *See In re Merck & Co., Inc. Sec., Derivative & ERISA Litig.*, 2012 WL 4764589, at *8 (D.N.J. Oct. 5, 2012) ("The Court cannot compel discovery based on anticipated filings.").

When the pleadings are settled and if discovery opens, Plaintiffs will be entitled to seek discovery that is relevant and proportional to their claims, Fed. R. Civ. P. 26(b)(1), through requests that "describe with reasonable particularity each item or category of items to be inspected," Fed. R. Civ. P. 34(b)(1)(A).  But Plaintiffs should not be permitted to circumvent these rules through premature, overbroad demands—as Plaintiffs' own cases recognize.  *See, e.g.*, *Fort Worth Employees' Retirement Fund v. J.P. Morgan Chase & Co.*, 297 F.R.D. 99, 110 (S.D.N.Y. 2013) (rejecting argument that "every document produced in response to any government subpoena related to [the subject-matter of the litigation] is relevant").  Indeed, many of Plaintiffs' cited cases are inapposite because they involved proper requests made during proper discovery, after the pleadings had settled.  *See, e.g.*, *In re New Century*, 2009 WL 9568860 (C.D. Cal. July 8, 2009) (motion to compel productions filed nearly two years after consolidated complaint was filed); *In re Toyota Motor Corp. Sec. Litig.*, 2012 WL 3791716,

---

[18] *See also Chen v. Ampco System Parking*, 2009 WL 2496729, at *2–3 (S.D. Cal. Aug. 14, 2009) (holding that "similarities between the [prior] cases . . . are not enough to require a carte blanche production of all documents"); *Pensacola Firefighters' Relief Pension Fund Bd. of Trustees v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 265 F.R.D. 589, 597 (N.D. Fla. 2010) (agreeing that the "production of all of the documents produced to the SEC, without a more particularized request, could potentially allow plaintiff to bypass the limitations on the scope of discovery established by the Rules"); *TravelPass Grp., LLC v. Caesars Ent. Corp.*, 2020 WL 698538, at *6 (E.D. Tex. Jan. 16, 2020) ("[A]n informal request that seeks wholesale duplicates of discovery produced in other litigation is improper as failing to make the requisite showing of relevance).

at *1–2 (C.D. Cal. 2012) (involving motion to compel decided after dispositive motion practice and class certification); *Munoz v. PHH Corp.*, 2013 WL 684388 (E.D. Cal. 2013).

*Third*, Plaintiffs' broad demands are particularly inappropriate where, as here, the Court has directed that threshold legal issues determinative of whether cases in this MDL "get past the gate and discovery opens" will be decided "up-front" through phased motion practice.  Hr'g Tr. at 12:3–16; *In re Graphics Processing Units Antitrust Litig.*, 2007 WL 2127577, at *5 (absent any "compelling need for prompt discovery"—such as "if provisional relief were being sought or if testimony needed to be preserved due to ill health of a witness"—"discovery should . . . be postponed pending the resolution of the motions to dismiss"); *In re Commodity Exchange, Inc., Gold Futures & Options Trading Litig.*, No. 1:14-md-02548-VEC (S.D.N.Y. Oct. 20, 2014), ECF No. 22 at 2 (declining "to require Defendants and third parties to expend the considerable time and resources that the discovery in this case will demand without a clearer understanding of the scope of relevant issues following motion practice").

Requiring Defendants to undertake any discovery at this juncture—and particularly the costly and burdensome discovery Plaintiffs envision—would also violate the "immunity from suit" conferred by Section 230.  *See Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1125 (9th Cir. 2003); *see also* 47 U.S.C. § 230(c)(2) & (e)(3) (no claim "may be brought" that would hold interactive computer services liable for third party content).  The very purpose of Section 230 is to protect defendants not only from ultimate liability but also "from having to fight costly and protracted legal battles" in the first place, *Roommates.com*, 521 F.3d at 1175—which is precisely why courts in this District routinely stay discovery pending resolution of a motion raising a colorable claim for Section 230 immunity, *see, e.g.*, *Onuoha v. Facebook, Inc.*, 2017 WL 11681325, at *1 (N.D. Cal. Apr. 7, 2017); *Fields v. Twitter, Inc.*, No. 16-cv-00213-WHO (N.D. Cal. Apr. 7, 2016), ECF No. 28; *Gonzalez v. Twitter, Inc.*, No. 16-cv-03282-DMR (N.D. Cal. Sept. 21, 2016), ECF No. 47; *see also Doe v. Reddit, Inc.*, 2021 WL 4348731, at *3, *7 (C.D. Cal. July 21, 2021).

Not surprisingly, none of the authority relied upon by Plaintiffs in the Parties' prior Case Management Statement (*see* ECF No. 45 at 18, 22–23), at the CMC hearing (Hr'g Tr. at 126:19–22), or

in this submission involved a Section 230 defense or otherwise support their early discovery demands here.[19]

### 5.    ADR

The Parties have agreed to exchange names of potential mediators prior to the December 14, 2022 status conference and believe they will benefit from additional time to confer and attempt to reach agreement on a mediator.

### 6.    Public Access

**Plaintiffs' position:**

Plaintiffs consent to making video recordings of the Court's proceedings available online to the extent those proceedings are not otherwise sealable.

**Defendants' position:**

Defendants do not have a general objection to participation in the Cameras in Courtroom Pilot Program, but reserve the right to object to the recording of specific hearings.  By way of example only, Defendants reserve the right to move to seal filings and restrict public access to (including any recording of) hearings that (1) address Defendants' highly confidential systems, tools and policies, which could undermine critical safety efforts by providing a roadmap to bad actors to evade or undermine safety measures, or (2) would raise safety concerns for employees should their names and roles be made public.  Defendants understand that a Request for Video Recording must be submitted at least 21 days

---

[19] Among other reasons, these courts in these cases did not "require" productions, as Plaintiffs assert, but rather the Defendants had specifically agreed to make early productions.  *See In re Volkswagen "Clean Diesel,"* No. 15-md-2672-CRB (JSC), ECF No. 1252 at 3; Joint Rule 26(f) Report at 3–4, *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-02885-MCR (N.D. Fla., June 14, 2019), ECF No. 434; Joint Case Management Conference Statement and [Proposed] Agenda at 14–17, *In re Juul Labs, Inc.*, No. 19-md-02913-WHO (N.D. Cal. Dec. 5, 2019), ECF No. 291; Order Regarding Requested Modifications to Discovery Ruling No. 22 at 4, *In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-02804-DAP (N.D. Ohio Apr. 30, 2020), ECF No. 3286 (defendants previously agreed to the re-productions and therefore "clear[ly]" "waive[d]" any objections).  Moreover, in *Juul*, initial document productions took place prior to the formation of the MDL in one of the constituent cases, *Colgate v. Juul Labs, Inc.*, No. 18-cv-02499-WHO (N.D. Cal.), which had been filed and litigated for more than a year and a half by the time the MDL was formed.  Thus, the framework for the parties' agreement was already in place at the time the MDL was formed, and therefore was made in the context of a mature litigation.  Here, in contrast, there is no framework for producing documents, let alone documents previously produced in government investigations.

before any scheduled hearing and, to the extent any Party intends to object to such request, they will submit an objection within seven calendar days of the request being docketed.

### 7.    Guardian Ad Litem

Plaintiffs have developed a streamlined process for the appointment of guardian ad litems for Plaintiffs that require one and shared it with Defendants.  Plaintiffs expect to file a motion and proposed order on this issue with the Court before the December 14, 2022 status conference.

Respectfully submitted,

/s/ Christopher A. Seeger
CHRISTOPHER A. SEEGER
CHRISTOPHER L. AYERS
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656
cseeger@seegerweiss.com
cayers@seegerweiss.com

LEXI J. HAZAM
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
T: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone:  415-986-1400
jennie@andrusanderson.com

Liaison Counsel

JOSEPH G. VANZANDT
**BEASLEY ALLEN CROW METHVIN**

**PORTIS & MILES, P.C.**
234 COMMERCE STREET
MONTGOMERY, AL 36103
Telephone:  334-269-2343
joseph.vanzandt@beasleyallen.com

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
220 W. GARDEN STREET, 9TH FLOOR
PENSACOLA, FL 32502
Telephone: 850-316-9100
ejeffcott@forthepeople.com

RON AUSTIN
**RON AUSTIN LAW**
400 Manhattan Blvd.
Harvey LA, 70058
Telephone: (504) 227–8100
raustin@ronaustinlaw.com

MATTHEW BERGMAN
GLENN DRAPER
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone:  206-741-4862
matt@socialmediavictims.org
glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone:  212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
T: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
T: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR

NEW YORK, NY 10016
Telephone:  917-882-5522
jconroy@simmonsfirm.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
T: (646) 666-8908
carrie@cagoldberglaw.com

KIRK GOZA
**GOZA & HONNOLD, LLC**
9500 Nall Avenue, Suite 400
Overland Park, KS 66207
T: 913-451-3433
kgoza@gohonlaw.com

SIN-TINY MARY LIU
**AYLSTOCK WITKIN KREIS & OVERHOLTZ,
PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone:  510-698-9566
mliu@awkolaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone:  510-350-9717
amm@classlawgroup.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone:  850-435-7107
epaulos@levinlaw.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone:  (818) 839-2333
Facsimile:  (818) 986-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036

T: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone:  215-592-1500
mweinkowitz@lfsbalw.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone:  205.855.5700
fu@dicellolevitt.com

ROBERT H. KLONOFF
**ROBERT KLONOFF, LLC**
2425 SW 76TH AVENUE
PORTLAND, OR 97225
Telephone:  503-702-0218
klonoff@usa.net

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212.213.8311
hnappi@hrsclaw.com

ANTHONY K. BRUSTER
**BRUSTER PLLC**
680 N. Carroll Ave., Suite 110
Southlake, TX 76092
(817) 601-9564
akbruster@brusterpllc.com

FRANCOIS M. BLAUDEAU, MD JD FACHE FCLM
**SOUTHERN INSTITUTE FOR MEDICAL AND
LEGAL AFFAIRS**
2762 B M Montgomery Street, Suite 101
Homewood, Alabama 35209
T: 205.564.2741
francois@southernmedlaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170

Telephone:  212-372-3030
jamesmarsh@marshlaw.com

*Attorneys for Plaintiffs*

COVINGTON & BURLING LLP

By:    */s/ Phyllis A. Jones*
       Phyllis A. Jones, *pro hac vice*
       COVINGTON & BURLING LLP
       One CityCenter
       850 Tenth Street, NW
       Washington, DC 20001-4956
       Telephone: + 1 (202) 662-6000
       Facsimile: + 1 (202) 662-6291
       Email:  pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC; Facebook*
*Operations, LLC; Facebook Payments, Inc.;*
*Facebook Technologies, LLC; Instagram, LLC;*
*Siculus, Inc.; and Mark Elliot Zuckerberg*

GIBSON, DUNN & CRUTCHER LLP

By:    */s/ Rosemarie T. Ring*
       Rosemarie T. Ring
       GIBSON, DUNN & CRUTCHER LLP
       555 Mission Street, Suite 3000
       San Francisco, CA 94105-0921
       Telephone: 415.393.8200
       Email:  rring@gibsondunn.com

*Attorney for Defendants Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC; Facebook*
*Operations, LLC; Facebook Payments, Inc.;*
*Facebook Technologies, LLC; Instagram, LLC;*
*Siculus, Inc.; and Mark Elliot Zuckerberg*

KING & SPALDING LLP

By:    */s/ Geoffrey M. Drake*

Geoffrey M. Drake
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: + 1 (404) 572-4600
Facsimile: + 1 (404) 572-5100
Email: gdrake@kslaw.com

*Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

FAEGRE DRINKER LLP

By:    */s/ Andrea Roberts Pierson*
Andrea Roberts Pierson
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000
Email: andrea.pierson@faegredrinker.com

*Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

MUNGER, TOLLES & OLSEN LLP

By:    */s/ Jonathan H. Blavin*
Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105-3089
Telephone:  (415) 512-4000
Facsimile:  (415) 512-4077

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Laura M. Lopez, (SBN 313450)
Ariel T. Teshuva  (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702

Lauren A. Bell (*pro hac vice forthcoming*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,

Suite 500 E
Washington, D.C.  20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300

*Attorneys for Defendant Snap Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

By:      */s/ Brian M. Willen*
Brian M. Willen
bwillen@wsgr.com
Vivek Tata
vtata@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Lauren Gallo White
lwhite@wsgr.com
Samantha A. Machock
smachock@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA  94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

Christopher Chiou
cchiou@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

## ATTESTATION

I, Phyllis A. Jones, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:          December 8, 2022          By:    */s/ Phyllis A. Jones*
                                                              Phyllis A. Jones

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>ALL ACTIONS | )<br>)<br>)<br>)<br>)<br>)<br>) |

MDL No. 3047

Case No. 4:22-md-03047-YGR

Judge Yvonne Gonzalez Rogers

**<u>EXHIBIT A—PROPOSED AGENDA FOR DECEMBER 14 STATUS CONFERENCE</u>**

Pursuant to Case Management Order #1 (ECF No. 75), the Parties respectfully submit this proposed agenda for the December 14, 2022 status conference.

1. Master complaint/short-form complaint/MTD schedule

2. Plaintiffs' request for materials from other proceedings

3. Docket control measures

4. Plaintiffs' proposed Common Benefit Order

**EXHIBIT B**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

IN RE: 3M COMBAT ARMS EARPLUG     )     Case No. 3:19md2885
PRODUCTS LIABILITY LITIGATION,    )
                                  )     Pensacola, Florida
                                  )     April 17, 2019
                                  )     9:17 a.m.
                                  )
                                  )
_____)


**FIRST CASE MANAGEMENT CONFERENCE**

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE M. CASEY RODGERS
UNITED STATES DISTRICT JUDGE
(Pages 1-60)

*Donna L. Boland, RPR, FCRR*
*United States Court Reporter*
*100 N Palafox Street * Pensacola, Florida  32502*
**Donna_Boland@flnd.uscourts.gov**

**A P P E A R A N C E S**

FOR THE PLAINTIFFS:          **BRYAN F. AYLSTOCK, ESQUIRE**
                             **CAITLYN P. MILLER, ESQUIRE**
                             Aylstock, Witkin, Kreis & Overholtz
                             17 E Main Street, Suite 200
                             Pensacola, Florida  32502


FOR THE DEFENDANT:           **KIMBERLY BRANSCOME, ESQUIRE**
                             **F. CHADWICK MORRISS, ESQUIRE**
                             Kirkland & Ellis, LLP
                             333 South Hope Street
                             Los Angeles, California  90071

| | |
|---|---|
| 1 | P R O C E E D I N G S |
| 2 | **THE COURT:**  Wow, I think we have set a record |
| 3 | for this courtroom. |
| 4 | Good morning, everyone.  I'm Judge Casey |
| 5 | Rodgers.  It's my pleasure to have you all here with |
| 6 | us this morning.  Of course, we're here for the first |
| 7 | case management conference in the 3M Combat Earplugs |
| 8 | Product Liability Litigation, that's Case No. |
| 9 | 3:19md2885. |
| 10 | Has everyone been accommodated with a seat? |
| 11 | Do we have anyone out in the lobby or reception area? |
| 12 | No? |
| 13 | I do apologize about the space constraints. |
| 14 | As you've probably heard, we are undergoing a major |
| 15 | multi-year renovation of our courthouse across the |
| 16 | street, our main courthouse.  That is expected to be |
| 17 | substantially completed December of this year. |
| 18 | GSA -- or the contractor, Yates Construction, |
| 19 | has 60 days following that substantial completion date |
| 20 | to move us back into the courthouse.  We've been out |
| 21 | almost four years.  But we do expect to be in the main |
| 22 | courthouse in which we have much more space capability |
| 23 | there.  A nice, big ceremonial courtroom, which is the |
| 24 | courtroom that I utilize, will be available to us |
| 25 | hopefully by the end of February 2020. |

1        But we are fortunate to have this beautifully
2   restored historic courthouse, and I do hope you all
3   are comfortable here.  There are a couple of seats
4   still in the jury box, if anyone wishes to come
5   forward.  Not many people take me up on that
6   invitation.  It looks a little bit like jury selection
7   out here this morning.
8        If at any time -- I just want to offer it --
9   if at any time during the MDL if you feel that we need
10  more space -- and I probably should have anticipated
11  it this morning, although I obviously didn't -- we do
12  have the ability to utilize our courthouse in
13  Tallahassee, which has plenty of space, if need be.
14  Otherwise, we'll be here until February and then we'll
15  be back across the street.  But I'm happy to meet you
16  in Tallahassee if that suits you all.
17       I'm going to take just a moment to introduce
18  you to some of the court personnel with whom you'll be
19  working with.  I don't know if you're already
20  acquainted with them.  Before I do that, though, let
21  me, for the record -- I'm not going to ask all of you
22  to introduce yourselves.  I have several dozen
23  attorneys here in the courtroom.  There are probably
24  many more appearing by telephone.  I think we would be
25  here most of the morning if I did that.  I will

1  identify or ask those at counsel table if you would

2  identify yourselves, please, for the record.

3          Mr. Aylstock, we'll start with you.

4          **MR. AYLSTOCK:**  Good morning, Your Honor.

5  Bryan Aylstock for the plaintiffs.  I'm joined by

6  Caitlyn Miller from our firm.

7          **THE COURT:**  Good morning.

8          And Ms. Branscome?  I know it's tight.

9          **MS. BRANSCOME:**  That's all right.

10          Good morning, Your Honor.  Kimberly Branscome

11  on behalf of 3M Company and Aearo Technologies, LLC.

12  And I'm joined by my colleague, Chad Morriss.

13          **MR. MORRISS:**  Good morning, Your Honor.

14          **THE COURT:**  Good morning.

15          First I'd like to introduce you to Magistrate

16  Judge Gary Jones.  Judge Jones is appearing by

17  videoconference.  He is appearing today with us.  He

18  is the assigned magistrate judge to this litigation,

19  and we're all very fortunate that he has agreed to

20  take on this litigation.  He played an indispensable

21  role in the *Abilify* MDL.  He is extremely efficient.

22  He was effective in helping to manage that litigation.

23  He is also very experienced and knowledgeable with

24  electronic discovery, ESI.  And we will be relying on

25  him for that and many other things in this litigation.

1        So good morning, Judge Jones, to you.  Happy

2    to have you here.

3        **JUDGE JONES:**  Good morning, everyone.  Glad

4    to be here.

5        **THE COURT:**  Seated to my immediate left is

6    Ms. Tevenia Jacobs.  She is the law clerk assigned to

7    this MDL, and we're all fortunate in that regard as

8    well because she is excellent.

9        Seated in front of me to my left is Ms. Susan

10   Simms.  Ms. Simms is a deputy clerk of the District

11   Court.  She serves as my courtroom deputy.  She's

12   available to you for any logistical issues that might

13   arrive.  She's also very involved with scheduling in

14   the MDL.  And so please meet her, introduce yourselves

15   to her, if you have not already.

16       To my right is Ms. Donna Boland.  Ms. Boland

17   is my court reporter, our official court reporter for

18   these proceedings.  If there are any special requests

19   that you have for real-time transcripts, that sort of

20   thing, or official transcripts, that is Ms. Boland's

21   responsibility, so please do introduce yourselves to

22   her because I'm sure you'll have those needs

23   throughout the litigation.

24       Mr. Leonard Thomas is our court security

25   officer.  He is obviously responsible for maintaining

1    security here in our courtroom, and he is responsible

2    for -- there he is -- for enforcing all of the Court's

3    orders here in the courtroom, although I don't think

4    that's going to be an issue in this litigation.

5         Finally, over here to my far left -- and

6    she'll be upset with me for introducing her -- is

7    Ms. Donna Bajzik.  Ms. Bajzik is the MDL coordinator

8    for our clerk's office.  In that role, she manages the

9    electronic docket for the MDL, and she has

10   responsibility for all of the day-to-day activity on

11   both the master and the individual case docket.  So if

12   you need any of that type of docket assistance, she

13   would be the one to contact.

14        And then, finally, she is not here in the

15   courtroom here this morning but she's indispensable to

16   me, and that is my judicial assistant, Ms. Kathy Rock.

17   You are free to contact her with any needs that may

18   arise that you have.  If you need to get word to me

19   about something, either Ms. Jacobs or Ms. Rock would

20   be who you would communicate with.  And Ms. Rock is

21   the one who typically would answer the chambers phone.

22        Once an MDL website for this MDL is up and

23   running -- and that's being worked on as I'm speaking

24   -- we'll be posting a list of the contact information

25   for the people that I've just introduced you to.

1          All right.  I'm going to switch gears now and

2     first I want to thank both sides for your

3     preconference submissions.  They were very helpful to

4     me in preparing for today's conference.

5          One thing that certainly I've learned from my

6     experience just as a judicial officer but also

7     specifically in the complex litigation realm with the

8     *Abilify* MDL is that there is no magic formula or

9     recipe for handling any MDL.  Every one is unique, has

10    its own unique challenges.  Approaches that may work

11    in one context do not necessarily fit or work in

12    another.

13         So I want you all to know that, while I will

14    draw on my experience from the *Abilify* litigation, I

15    recognize that this litigation is special and unique

16    in its own right, it has its own challenges, and I

17    will treat it as such, as unique litigation.

18         I also plan to listen to you all, and

19    hopefully we will collaboratively develop a case

20    management plan for this litigation.  All of you here

21    I know bring a wealth of experience and perspectives

22    to the table.  I'll be relying on you as we move

23    through this process.

24         I do see my role largely as a facilitative

25    role.  That is, I view it as my responsibility to get

1     you the information that you need to ultimately

2     resolve these cases on the merits either here in the

3     MDL or back in the transferor courts or to settle the

4     matter.  And those are decisions that you all will

5     make, but my role is to help facilitate that process.

6           I view every step that is taken in these

7     consolidated proceedings designed to generate data

8     points or information for you about the strengths and

9     weaknesses of your respective positions and that will

10    help you learn your case and ultimately decide how you

11    wish to resolve that case.

12          So, in that spirit, I'm going to turn to the

13    agenda items.  And I have my own checklist so I'm

14    going to go down my own checklist.  It may not track

15    the tentative agenda just perfectly, but I think it'll

16    cover everything that we need to discuss.

17          And you'll hear me say this several times,

18    but in the spirit of transparency I will share with

19    you that this morning I did meet with Mr. Aylstock and

20    Ms. Branscome prior to coming in this morning.

21          Let me start with the state of the MDL.  As

22    you all know, the panel transfer order was entered on

23    April 3rd, 2019.  And as I understand it, the state of

24    the MDL right now is that we have 108 cases that are

25    now pending.  Ten of those cases were originally filed

1    in this district prior to the transfer order.  Another
2    24 cases have been filed here in this district since
3    the transfer order.

4          I understand that there are a large number of
5    cases that are pending transfer at this time from the
6    panel.  The opposition period, though, has not yet
7    expired.

8          At this time, I don't have a firm grip on the
9    number of cases that we may ultimately be dealing with
10   in this litigation.  You all probably have a much
11   better idea of it than I do.  But no doubt, it will be
12   large.

13         I think I will ask, though, before I continue
14   along those lines, Mr. Aylstock, if you have any sense
15   of the size of the litigation at this time, have some
16   basis --

17         **MR. AYLSTOCK:**  As far as any individual
18   plaintiffs, I do know that many thousands, in fact
19   probably more than ten or 20,000, are already
20   represented, servicemen and women.  So I anticipate
21   this to be a very large MDL at the end of the day,
22   tens of thousands.

23         **THE COURT:**  And many are active duty; is that
24   correct?

25         **MR. AYLSTOCK:**  Some are active and some are

1    out of the service.

2             **THE COURT:**  But some are active?

3             **MR. AYLSTOCK:**  Yes.  There are a very select

4    few that are civilians who used the civilian version

5    as well.

6             **THE COURT:**  I saw that in your position

7    papers there is a firefighter, I believe, and then

8    also a tree trimmer, I believe I saw referenced to

9    outside of the majority of the cases being active duty

10   and former military veterans.

11            **MR. AYLSTOCK:**  That's correct, we do believe

12   that most will be military servicemen and women

13   plaintiffs in this case.

14            **THE COURT:**  All right.  Thank you.

15            And now I'd like to confirm with both you,

16   Mr. Aylstock, and Ms. Branscome the issue of

17   federal-state coordination and whether that's

18   something that I need to focus on at this point in the

19   MDL or do we expect the cases to all be in the MDL as

20   opposed to parallel state court proceedings.

21            Ms. Branscome?

22            **MS. BRANSCOME:**  Certainly, Your Honor.  We

23   have seen the majority of the state cases filed, as

24   you might expect, in Minnesota and Indiana.  We have

25   seen a few cases filed in Delaware, Pennsylvania,

1      perhaps one or two other states.  We have either
2      already removed or are in the process of removing
3      those cases to federal court.  We have a number of
4      bases for removal that will apply across future cases
5      that would be filed in state court.  So our
6      expectation is that the cases will all end up in
7      federal court and, absent some unforeseen reason, they
8      should be transferred into the MDL.

9           We do think state coordination, if it does
10     ever arise, would be essential, but we don't expect
11     any state litigation certainly to get out in front of
12     the MDL, nor do we think that, given the removals,
13     that that is necessarily an immediate priority,
14     although it is an important one if it were to arise.

15          **THE COURT:**  Thank you.  Am I correct, the
16     state cases, they were removed quickly, I think, so
17     there's no discovery that's been conducted in any of
18     those state cases?

19          **MS. BRANSCOME:**  That is correct.  The primary
20     basis of removal is the federal questions that are
21     involved which don't involve necessarily discovery.
22     There are some additional grounds that may, you know,
23     would potentially be susceptible to jurisdictional
24     discovery, but that has not become an issue.

25          There have been a few motions to remand, but

1   either they have been stayed or they were rendered

2   moot by the transfer.

3           THE COURT:   I'm aware of Minnesota and

4   Delaware, that there were those motions to remand that

5   were pending at the time of the transfer and they were

6   rendered moot by virtue of I believe my pretrial

7   order.  I believe that's correct.

8           MS. JACOBS:   Yes.

9           THE COURT:   Yes, I believe so.  And my

10  question would be to those plaintiffs if they'll be

11  refiling those motions here in the MDL.

12          MR. AYLSTOCK:   My understanding, Your Honor,

13  is that, yes, some motions to remand will be refiled

14  here.  And after leadership is established, perhaps

15  the Court would want to have a briefing schedule on

16  that, as it's the position of those individuals that

17  their cases should be in state court.

18          I do know that in Minnesota they have a

19  coordinated proceeding procedure.  They had one in the

20  mesh cases as well.  So I think at this point,

21  obviously Your Honor would need to take that under

22  advisement if in fact they are refiled pursuant to

23  your second pretrial order, which we anticipate.  But

24  I think we can probably set a briefing schedule after

25  leadership is established.

1      **THE COURT:**  All right, that will be fine.
2  Thank you.

3      And I did note the putative class actions
4  that are potentially tag-alongs.  There are six that
5  were filed in the Southern District of Florida, one in
6  the District of Columbia.  And my understanding is
7  that either they've been transferred or they will be
8  transferred into the MDL.

9      And my question is, and it's probably
10 premature, but whether you have had any discussions
11 before this conference about how those actions will
12 proceed in the MDL.  Again, this may be premature, but
13 it's something that we will need to discuss obviously.

14      **MR. AYLSTOCK:**  We haven't discussed that yet,
15 Your Honor.  I do agree with you it's premature for
16 really us to worry about those quite yet.  And I'm
17 sure whatever structure is established by Your Honor
18 we'll be able to deal with those in due course.

19      **THE COURT:**  All right.  I want to address an
20 issue of some pending motions.  There are several
21 motions now that are pending, *pro hac vice* motions.
22 In those motions the plaintiff attorneys who are
23 requesting PHV status have not identified a case in
24 which they are attorney of record, and not even
25 identified one that is anticipated to be transferred

1    into the MDL.  So without that information, those *pro*

2    *hac* admissions won't be granted.  Only attorneys of

3    record for individual cases that appear on our docket

4    are eligible for that type of admission for purposes

5    of the MDL.

6          Now, I don't want any attorney to be

7    prevented from participating in the MDL while awaiting

8    the transfer process, so I'm inclined to grant a

9    temporary PHV status or admission to those attorneys,

10   but that would be conditioned on them getting their

11   case transferred to this district shortly thereafter,

12   and there would be a time frame.  But I would need

13   those motions refiled.

14         And I can enter an order that restates this.

15   But those motions will be denied without prejudice to

16   be refiled, in which case the attorneys need to

17   identify the case in which they believe they are going

18   to be attorney of record in before the MDL, if that

19   makes sense.  I hope so.  So that will be more clear

20   in a written order I'll enter likely later today or

21   tomorrow.

22         As I said, we're in the process of developing

23   a website for the 3M MDL, and that will be on our

24   court's public website.  I plan is to include an

25   overview of the case, certainly all relevant orders

1    and filings, the contact information of pertinent

2    court personnel, as I mentioned just a moment ago, as

3    well as leadership counsel.  There are frequently

4    asked questions and answers.  We had these posted on

5    the *Abilify* website as well.  There's links to

6    additional resources such as our local rules, copies

7    of other relevant information, master and short form

8    complaints.  And once there's a profile form, those

9    types of things would be included on the website.

10        But I am open to any other suggestions.  You

11   all are well versed in MDL litigation and mass tort

12   litigation.  And if there's something else that you

13   think from prior experiences you've had in other

14   courts that would be helpful to add for our website,

15   then I would ask that you please share that with me.

16   I welcome that input from you.  I would like to make

17   it as user friendly as possible and as informative as

18   possible.

19        My pretrial order No. 2 required the parties

20   to familiarize or refamiliarize themselves with the

21   Manual for Complex Litigation, the 4th Edition.  That

22   needs to be adjusted now to ask you to refamiliarize

23   yourself with the Annotated Manual for Complex

24   Litigation.  That is the most recently updated manual

25   from 2017.  So that was an error on my part.  I should

1  have included that and wanted to make that clear that

2  that is what we'll be referencing.

3        Now, I want to talk broadly about leadership

4  and leadership structure, and then we'll get more into

5  the weeds.  Obviously we're not going to be

6  establishing the leadership structure today, but it is

7  obviously a top priority at this stage of the

8  litigation.  I have some thoughts about leadership for

9  this MDL, a rough vision.  But this is your

10  litigation, and I'm certainly open to hearing from you

11  all about your thoughts on leadership as well.

12        So I will draw on my experience from the only

13  other MDL that I've had, which was the *Abilify* MDL.

14  But I want you to know that this is not simply going

15  to be Abilify II or a repeat of *Abilify*.

16        What I did in that litigation was I solicited

17  applications for leadership positions and then

18  designed a leadership structure that I think worked

19  well for us in that litigation.  People were appointed

20  to leadership positions and then committees and

21  subcommittees.  I tried to involve as many people as I

22  felt were necessary for an effective management of

23  that litigation.  So I intend to do the same here.

24        The application process -- or application

25  itself, let me say, may be a little different.  I may

1    modify it in some respects.  But in that litigation I

2    simply went through -- and it was a much smaller

3    scale, but I simply went through the applications that

4    I received and made a decision and made those

5    appointments.

6          In this litigation, what I'm considering

7    doing is soliciting applications, and then, depending

8    on the number of applications that I receive, there

9    will be a culling process.  I have no idea how many

10   applications that I'm going to receive, but by the

11   looks of the courtroom it may be more than I can

12   manage myself.  So I may solicit some support in terms

13   of reviewing those applications and then narrowing it

14   to a number that I feel like is more manageable.

15         And then I plan to hold -- and it's probably

16   going to take the Court the better part of a couple of

17   days -- oral presentations from those who have applied

18   who have made that cut, if you will, here in the

19   courtroom.  And I'm going to solicit support from some

20   others in that process who will assist me in making

21   the decision, so those individuals will be present

22   here in the courtroom for your presentations.  He

23   doesn't know it yet, but one of those panel members

24   will be Judge Jones.

25         And my purpose in doing this this way or

1  designing the process in this way is to make it as

2  transparent and as fair as I can.

3         Mr. Aylstock was appointed, as you all know,

4  as interim lead and liaison counsel.  He was appointed

5  for two reasons.  They should be obvious to most

6  people.  One is he's local, and the other is that he

7  was involved in a leadership position in my very

8  recent MDL that is still actually ongoing, *Abilify*,

9  and he did an outstanding job in that litigation in

10 that role and even, in my view, played an even broader

11 role.  And so he seemed a natural choice for me in

12 that interim role.  That role is necessary as an

13 interim position, and I don't know that I know anyone

14 else -- well, I see a few faces that I didn't know

15 were involved in this litigation until this morning.

16        So Mr. Aylstock was appointed for those two

17 reasons.  But it's an interim appointment, and I

18 explained this to him this morning.  And I think he

19 probably even knew that before without me having to

20 explain it to him that it's an interim appointment.

21 There's no decision here that has been made as far as

22 any permanent leadership position, nothing preordained

23 or predetermined in any way.  And I do want this to be

24 a very fair and transparent process.  I think that is

25 important.

1           I will be looking to establish, as I did in

2    *Abilify*, a diverse team.  I'll be looking for a

3    leadership team certainly with individuals who have

4    demonstrated the capacity, the knowledge, and skill

5    set, reputation, resources, and energy to effectively

6    and efficiently lead the MDL.  And I'll also be

7    looking to establish a team that reflects the

8    diversity, to the extent possible, of the individual

9    plaintiffs in this MDL.

10          In the interest of transparency and

11   disclosure, I do want to say that the Aylstock law

12   firm has had that experience with the Court.  But

13   beyond that, I have no relationship with that law

14   firm, I have no relationship with Mr. Aylstock.  He's

15   never been to my home, I've never been to his home.

16   We don't socialize together.  We did practice on the

17   other side of the courtroom from one another I think

18   25 years ago.  But other than that, we don't have any

19   type of relationship outside of a professional

20   relationship with *Abilify*.

21          I do want you to know that my daughter has

22   accepted a position with that law firm, my youngest

23   daughter.  She will start -- and I disclosed this to

24   Ms. Branscome earlier, as I disclosed it to the

25   attorneys in *Abilify*.  She will begin that associate

position in August or September of 2020.  She is soon
to graduate from law school in a couple of weeks, and
she will be doing a clerkship with Judge David Proctor
in Birmingham for a year before she returns home --
yay -- back to Pensacola to start her practice.

          The canons of judicial conduct do not require
disqualification in this type of a situation as long
as she is not a partner in the law firm, which she is
not or will not be, at least not any time soon, and as
long as she does not appear before me, obviously, and
does not perform any work at all in this litigation.

          And this was the case with *Abilify*.  My
daughter worked at that firm periodically at summer
recesses and holidays.  *Abilify* was ongoing during
those times when she was there.  And I believe -- it's
my understanding that it was the firm's strict policy
that there was a Chinese wall, and she did not touch
any of that litigation.  She and I don't discuss the
litigation nor will we discuss this litigation even
before she starts at the firm.  But again, I wanted to
disclose that to you all, again, in the spirit of
transparency.

          There's one more matter to disclose, and that
is that Ms. Miller is a former law clerk of mine.  I
did not know that Ms. Miller was involved in this

1   litigation.  But she has been away from this job for
2   almost two years.  August will be two years.  And my
3   policy and the policy of most judges is one year that
4   a law clerk may not appear before that judge.  And
5   that's my policy not just with Ms. Miller but with all
6   my law clerks.

7           I also have had law clerks leave and go to
8   work at defense firms.  Actually one that was involved
9   in *Abilify* now works at Winston & Strawn, one of the
10  defense firms in that litigation.

11          So with all of that out, I would like to hear
12  if there's anyone -- and I'll open it up, it doesn't
13  have to just come from Mr. Aylstock -- but if there's
14  anyone who would like to address the Court in regards
15  to -- not a leadership application, not yet --
16  *[Laughter]* -- but in regards to leadership structure
17  or the design of it.

18          You've heard what I've just sort of roughly
19  laid out.  Nothing set in stone yet at this point.
20  Those are preliminary thoughts that I have.  But if
21  there's anyone -- Mr. Aylstock?

22          **MR. AYLSTOCK:**  Thank you, Your Honor.  As you
23  can see, there's a lot of interest in this case, and
24  there's a lot of folks that the people in this room
25  represent, and there's also a tremendous amount of

1     legal talent on the plaintiffs' side in this room.

2     This is a very different case than *Abilify*, different

3     dynamic, and I'm happy to hear that you will treat it

4     uniquely, as it should be.

5            In light of that and the work that needs to

6     be done, in my view, the committee structures could be

7     expanded.  And I would hope that anybody who would

8     want to participate, whether they have a title or not,

9     would be able to participate meaningfully in the

10    common benefit for the folks that they represent in

11    this MDL.

12           **THE COURT:**  Thank you.

13           Anyone else?

14           *[No response.]*

15           Anyone on the telephone?

16           *[No response.]*

17           No?  All right.

18           Ms. Branscome, I've confirmed --

19           Is there someone on the phone who wishes to

20    speak?

21           *[No response.]*

22           Okay.  Ms. Branscome, I confirmed with you

23    earlier that, due to the limited number of defendants

24    in the case and counsel, we will not need to be

25    considering any former leadership structure for the

1    Defense.

2             **MS. BRANSCOME:**   That is correct, Your Honor.

3             **THE COURT:**   Thank you.

4             I would like you all to be thinking about

5    what you feel might be appropriate for this litigation

6    in terms of a structure.   There's typically lead and

7    co-lead counsel, there's liaison counsel for the

8    plaintiffs' side, sometimes an executive committee as

9    well as a steering committee, and then there are

10   committees and sometimes subcommittees.

11            This case has some unique aspects to it, not

12   the least of which is the government or military

13   aspect to it.   So I would anticipate there being some

14   number of individuals, probably a very small number,

15   that I would task with coordinating that aspect of the

16   litigation, and that would be a joint committee or

17   subcommittee.   I'm not sure where it's going to fall

18   in the structure, but that would be a joint committee

19   from my standpoint, so I would ask for lawyers from

20   the Defense to participate as well.

21            And again, this is something I am borrowing

22   from *Abilify*.   I had, I believe, two or three joint

23   committees in *Abilify*, and I think it worked very

24   well.   So that's one unique aspect.

25            The other that I'm considering in terms of a

```
 1    committee or subcommittee is an early vetting
 2    committee, which probably won't be a joint committee.
 3              [Laughter]
 4              But I do think that's a process that needs to
 5    be put into place certainly sooner rather than later.
 6              Is there anyone today who has thought of any
 7    other unique aspect?  I mean, ESI certainly, you know,
 8    discovery, those are fairly common in terms of
 9    committee structure.  But is there anything else that
10    you can think of that's unique to this particular
11    litigation that I'm not thinking of that might be
12    appropriate to be placed into the leadership
13    structure?
14              MR. AYLSTOCK:  Your Honor, we had discussed
15    internally amongst the plaintiffs the potential for a
16    law briefing committee.  And regardless of whether the
17    Court would appoint one, I would imagine there's some
18    legal briefers that will rise to the floor, but that
19    was the only thing in addition to what Your Honor
20    mentioned.
21              THE COURT:  Okay, excellent.  Thank you.
22              MR. MOSKOWITZ:  Judge, I have something, if
23    you don't mind.  Adam Moskowitz from the Moscowitz law
24    firm.  I'm the six cases you had mentioned from the
25    Southern District of Florida which are a class action.
```

1    We asked for medical monitoring.  We thought this was

2    a very unique case, very similar to Chris Seeger, who

3    is here as my co-lead counsel in an MDL in New Jersey,

4    where we can help people immediately.  And we didn't

5    know if that should be a separate track.  The MDL in a

6    footnote, footnote 4, said it would be up to the

7    transferee judge.  We can put that in our papers if

8    you'd like, however you'd like to handle that.  But we

9    think that may be something unique in this case

10   because the government is spending so much on hearing

11   now, over a billion dollars, and there's a medical

12   monitoring program we think that could work.  That

13   certainly is for a later date, but that would be

14   something maybe to think about in the leadership

15   structure about having a track for medical monitoring

16   in addition to the personal injury track.

17            **THE COURT:**  Are those cases here now?

18            **MR. MOSKOWITZ:**  They are, Your Honor, they

19   were transferred here.  And we have the NCAA and the

20   NFL cases, which are huge successes, which both

21   involved national medical monitoring programs.  And

22   Mr. Seeger did a wonderful job in the NFL, and the

23   Hagens Berman firm did a wonderful job in the NCAA

24   case, and those both have been found approval, and

25   they've really helped the people immediately.  When we

1  traveled the country the last four or five months to

2  try to find out how can we help our veterans, and

3  we've talked to the ATA and different programs, and

4  there are programs set up which can help -- to try to

5  help those types of research programs.

6       The VA is an overmanned -- or they're

7  overworked and understaffed, so we thought maybe that

8  would be a separate track.  And we argued that to the

9  MDL, and they said that would be left up to Your

10  Honor, so we'd just throw that up.

11       The Aylstock firm has been wonderful the last

12  few days hosting us, and we'd just throw that out as a

13  possible suggestion.  It's in the Defendant's

14  statement, so we would throw that out to Your Honor.

15       **THE COURT:**  I will give that further thought.

16       **MR. MOSKOWITZ:**  Thank you very much.

17       **THE COURT:**  Let me turn now to some of the

18  pleading issues, and first the issue of direct filing.

19       We did have a direct filing order in *Abilify*,

20  and many courts in MDLs do have such orders.  I

21  imagine the Plaintiffs are most likely fine with this

22  practice.  My question would probably be directed more

23  to the Defense about whether you are in agreement with

24  the direct filing process.  I do believe it promotes

25  economy and eliminates some of the delays that we can

1    encounter when cases are transferred from other

2    districts.

3           In the *Abilify* MDL -- and the defense agreed

4    to it -- we entered the order, and there was a

5    stipulation that direct filing would not constitute a

6    *Lexecon* waiver by either side, it would not constitute

7    a determination certainly by the Court that

8    jurisdiction or venue was proper in this district, it

9    would not impact any choice of law questions including

10   the applicable statute of limitations that would

11   otherwise apply to an individual case.

12          But what I recall from that MDL on this issue

13   is we had short form complaints that were allowed --

14   in addition to a master complaint, there were short

15   form complaints, and in those short form complaints

16   the plaintiffs were required tos identify the proper

17   venue for that case otherwise.

18          But I would ask, Ms. Branscome, for you to

19   give this some thought, discuss it with your clients.

20   What time frame would you require in order to let me

21   know if you have any objection to a direct file order?

22   And you can speak from counsel table, that's fine, I

23   appreciate it.

24          **MS. BRANSCOME:**  Thank you, Your Honor.  I

25   think I could get an answer back to you really in the

1  very near term.  What I would like to do is, if Your

2  Honor is contemplating the direct filing order

3  following in general terms what was used in the

4  *Abilify* case, I just would like some time to review

5  the specifics of it.

6        So, if Your Honor has a preference -- I mean,

7  I think this would be a matter of days, so if there's

8  a specific date by which you would like an answer, I

9  will get you an answer.  I just want to look at the

10  specifics behind that.

11        **THE COURT:**  That gets me what I need.  I will

12  enter an order -- as I always do after these case

13  management conferences, I will reduce what we've

14  discussed to writing, and it will be filed in an

15  order, and I'll give you a deadline there in that

16  order.

17        So we do have the issue of a master and short

18  form complaints.  I can't imagine anyone is going to

19  have a problem with that process.  It certainly

20  streamlines the process.

21        Mr. Aylstock, do you envision any type of

22  issue with master and short form pleadings?

23        **MR. AYLSTOCK:**  None whatsoever, Your Honor.

24  There is some sort of preliminary corporate structure

25  type discovery, maybe initial disclosures that would

1  help us with that, and so we'd need a little time to
2  make sure that we get off the ground right with that
3  master complaint, but I would think a master complaint
4  with a master answer as well, and then the short form
5  complaints can just adopt that.
6          **THE COURT:**  That issue -- I'm going to talk
7  about the discovery in a moment, but the issue of --
8  are you talking about the membership?
9          **MR. AYLSTOCK:**  Yes.  There's several
10  different corporate entities surrounding Aearo Tech
11  and the merger or buyout or whatever it was by 3M, and
12  we still don't really understand the relationship of
13  that nor the members, which are very important for
14  jurisdiction.
15          **THE COURT:**  I know Ms. Branscome mentioned in
16  chambers that there may be some of that information in
17  their removal papers, so you might look at that and
18  see if you can glean any from there.  But beyond that
19  -- and I'll talk more about this in a moment -- I have
20  asked the Defense to present sort of a corporate
21  structure to be prepared for that in the near future.
22          **MS. BRANSCOME:**  If I may, Your Honor, may I
23  address the master complaint and short form complaint?
24          **THE COURT:**  Yes.
25          **MS. BRANSCOME:**  So I've seen MDLs structured

1   and a number of personal injury MDLs structured in a

2   number of different ways with respect specifically to

3   an answer.

4        So I have been in another MDL in which the

5   defendants did not formally answer a complaint until

6   either a case was selected for the bellwether process

7   or we actually got closer to what was actually

8   selected for the bellwether trial.

9        So I don't know what Your Honor is

10  contemplating here.  I think we would be open to the

11  concept of a master complaint with short form

12  complaints.  There are certain pieces of information

13  that we would want to be in the short form complaint.

14        I think the reference to what would be the

15  proper jurisdiction if it was remanded is an important

16  piece of information.  There are other pieces of

17  information that we would want to see in that.

18        So I don't know what Your Honor is

19  contemplating, though, in terms of the time frame for

20  a master answer or the level of detail for a master

21  answer.  So that was the one thing that I would flag,

22  as we would need a sufficient amount of time to answer

23  the complaint and, depending on the level of detail of

24  the master, it may be appropriate to hold off on the

25  answer.

1    **THE COURT:**  I would anticipate, once

2  leadership is established, that you all would work

3  together and then propose something to me both in

4  terms of the master and the short form.  And again, we

5  did this in *Abilify*.

6    As far as the timing of the answer, I had not

7  given thought to delaying that.  My first thought that

8  comes to mind is your two defenses that, as we

9  discussed in chambers and I'm going to discuss with

10  everyone else in just a few moments -- I don't mean to

11  sound so cryptic -- but that if those are going to be

12  addressed on the front end, they would need to be

13  formally raised in terms of either a motion to dismiss

14  or at least as a defense.  Anyway, just preliminary

15  thoughts on that.

16    **MR. AYLSTOCK:**  We would be -- whoever the

17  Court appoints, obviously we would be happy to work on

18  the timing of it, but I think it would be the

19  Plaintiffs' pretty firm position that we not defer

20  indefinitely or way down the road that master answer

21  because I think that really shapes the litigation.

22    **THE COURT:**  Thank you.

23    Just another point to confirm, the Minnesota

24  cases, Judge Tunheim had *sua sponte* severed the cases

25  that had multi-party/multi-plaintiff cases.

1          Does anyone know if those have been -- were

2     those transferred as individual actions?  Were they

3     refiled?  Just something I was curious about.  I saw

4     that they had been severed and those plaintiffs had

5     been directed to refile.  I wasn't sure if they

6     actually had.

7          **MR. AYLSTOCK:**  I don't know, Your Honor.

8          **THE COURT:**  That's all right.

9          **MR. AYLSTOCK:**  I'm being told that the

10    Plaintiffs were not directed to refile those cases, so

11    they were just severed.  But I don't have personal

12    knowledge.

13         **THE COURT:**  Well, maybe not directed -- that

14    might have been too strong.  But they were not

15    automatically refiled, were they?  So they were

16    severed and then just given an individual case number,

17    is that how --

18         **MR. TRACEY:**  [Indicating affirmatively.]

19         **THE COURT:**  Okay.  Then I misread something.

20         **MR. AYLSTOCK:**  I think that's right, Your

21    Honor.  We can certainly confirm that.

22         **THE COURT:**  And that would make sense.  I

23    think I may have misread a description of how that

24    took place and misinterpreted it, so thank you for

25    that clarification.

1            And Ms. Branscome, Ms. Jacobs was telling me
2   the direct filing order in *Abilify* is Document No.
3   106, if you need that.
4            **MS. BRANSCOME:**   Thank you.
5            **THE COURT:**   And it's also available on the
6   public website.
7            We have a case, it's the *Bennett* case, that
8   names eight plaintiffs, Bennett being one of those
9   plaintiffs, that originated in Delaware state court,
10  and then it was removed to the District Court of
11  Delaware and then transferred here by the JPML, and
12  that was on April 15th.
13           Interestingly, the cases were filed as
14  separate actions in state court.  But when they were
15  removed, they were docketed in the District Court as a
16  single multi-plaintiff action.  So that happened after
17  the removal.  And so they transferred here as a
18  multi-plaintiff case.  And we're talking -- it's eight
19  plaintiffs, but nonetheless they're joined.
20           I don't know if we have counsel here who
21  represents those --
22           **MR. AYLSTOCK:**   Mr. Tracey is here, Sean
23  Tracey, Your Honor.
24           **THE COURT:**   Mr. Tracey, I'm inclined to agree
25  with Judge Tunheim.  I'm inclined to agree that the

1    plaintiffs' claims in these cases arise from different

2    factual circumstances or factual predicates.  And

3    that's what he found in those Minnesota cases.

4          Would you like an opportunity to brief that?

5    Do you want those cases to remain?  I could do what

6    apparently he did, Judge Tunheim, and just sever them

7    and assign them their own case numbers so you wouldn't

8    have to refile them.  But if you feel strongly about

9    this, then I would give you an opportunity to brief

10   that if you think they should remain joined.

11         **MR. TRACEY:**  Your Honor, as you can imagine,

12   this is a subject that we have been talking about

13   intensively over the past couple of days with my

14   co-counsel.  The issue of, when you're going to have

15   tens of thousands of cases, how to manage these on our

16   end is important to us for a whole host of reasons.

17         We didn't reach any consensus yesterday about

18   the issue, although it was talked about, so maybe if

19   we could get some time to maybe put together a

20   coherent response to that.

21         **THE COURT:**  All right.  Does Defense have a

22   position in regards to the joinder?

23         **MS. BRANSCOME:**  We do, Your Honor.  We think

24   that they should be individually -- either originally

25   filed as individual plaintiffs or we would be fine

1    with Your Honor *sua sponte* severing any of the
2    multi-plaintiff cases that get transferred in.  There
3    are a few others that I don't believe have been
4    transferred into the MDL that were not in Minnesota.
5    Judge Tunheim obviously split those apart and from
6    then on my understanding is everything filed in
7    Minnesota has been an individual plaintiff.  But it is
8    our position that they should be individually filed.
9           In terms of a burden on the plaintiffs being
10   sort of an explanation for why you should have
11   multi-plaintiff cases, we think that could be handled
12   with dealing with short-form complaints, things of
13   that nature that deal with how to address a large
14   volume.  That should not be the deciding factor over
15   whether or not multi-plaintiff cases are appropriate
16   in a personal injury litigation.
17          **THE COURT:**  Thank you.
18          Mr. Aylstock, go ahead.
19          **MR. AYLSTOCK:**  Obviously the issue of
20   consolidation for trial came up in *Abilify* and it
21   wasn't ultimately ruled upon --
22          **THE COURT:**  Way too early for the C word.
23          *[Laughter]*
24          **MR. AYLSTOCK:**  It may be an issue later on.
25   I think a separate issue and a little bit different is

1    filing multi-plaintiff complaints.  Obviously some
2    states in state court allow that, encourage it,
3    whatever.
4        **THE COURT:**  That's why it was odd that in
5    Delaware they were filed individually and then joined
6    at removal.
7        **MR. AYLSTOCK:**  Right.
8        **THE COURT:**  It sounds to me like this is
9    probably not something I'm going to do *sua sponte*.  I
10   think I'm going to require briefing.
11       I don't know that -- I guess we could start
12   with these eight in terms of briefing.
13       **MR. AYLSTOCK:**  Some of it, Your Honor, in the
14   *Actos* MDL, my partner, Neil, was heavily involved in
15   dealing with the clerk there, the clerk of court, and
16   Judge Doherty allowed some mult-plaintiff filings, at
17   least initially, without any determination whatsoever
18   as to whether or not they would be permissible for
19   trial, but if perhaps they could be grouped by
20   judicial district or something like that.  And I'm
21   happy to meet and confer, or whoever is appointed --
22       **THE COURT:**  It's a pleading issue, though.
23   You have to satisfy the rule.
24       **MR. AYLSTOCK:**  Well, certainly.  And that's
25   why, you know, we would like an opportunity to brief

```
1    that.  But it certainly has been done in other MDLs of
2    large volume, and I think it's something that's maybe
3    a little premature quite yet, but we would like the
4    opportunity to discuss it further and brief it if
5    necessary.
6         THE COURT:  All right.  Certainly I'll give
7    you an opportunity, and I won't sua sponte take any
8    action on those cases at this time.
9         MR. AYLSTOCK:  Thank you, Your Honor.
10        THE COURT:  But I most likely won't delay in
11   having this scheduled for briefing because it's likely
12   to continue to come up, it sounds like.
13        MS. BRANSCOME:  Your Honor, if I may ask one
14   point of clarification on that?
15        THE COURT:  Yes.
16        MS. BRANSCOME:  Just from the Defendant's
17   perspective, we would ordinarily be the moving party
18   to move to sever a multi-plaintiff complaint.  But if
19   I'm at least understanding what I'm hearing from
20   Plaintiffs counsel, perhaps you all have not landed on
21   a firm position of whether they are advocating for
22   multi-plaintiff complaints.
23        So as a procedural matter I just wanted to
24   seek Your Honor's clarification.  Should we be the
25   instigating party, or is there -- could we perhaps
```

1  wait and get a firm response from Plaintiffs if they

2  intend to pursue multi-plaintiff complaints?

3        **THE COURT:**   I guess I understood from -- and

4  maybe I was reading too much into it -- I was thinking

5  you were going to pursue multi-party complaints.   I

6  mean, we already have one with eight.

7        **MR. AYLSTOCK:**   Yeah, and I think we are, Your

8  Honor, given the volume of litigation.   Obviously a

9  lot of it has to do with making sure it's convenient

10  to the clerk and the Court and understandable.   And at

11  least in the *Actos* MDL I think the determination was

12  made that this is part of the MDL courts' inherent

13  power to, again without saying they should be

14  consolidated for trial, manage the litigation in a way

15  that's most efficient consistent with Rule 1.

16        So we would like the opportunity to at least

17  brief it and maybe discuss the efficiencies of it with

18  Ms. Bajzik.

19        **THE COURT:**   All right.   Even if it's

20  efficient -- I'm not ruling -- but even if it's more

21  efficient, that doesn't necessarily satisfy the rule.

22        So I think I'm going to ask you all, Ms.

23  Branscome, to file a motion, unless you are in

24  agreement with -- and it sounds like you're not --

25  then in my order following the CMC I will give you a

1    time frame for filing that motion, and then you all
2    will be able to respond.

3            **MR. AYLSTOCK:**   Thank you.

4            **THE COURT:**   I discussed with Mr. Aylstock and
5    Ms. Branscome this morning the issue of, again, the
6    military and its participation -- I put that in quotes
7    -- in this lawsuit.  I feel certain that the military
8    is aware of this litigation.

9            There is a statute that speaks to litigation
10   where the government has an interest and notification.
11   I don't believe that statute requires a formal notice
12   and an opportunity to intervene in this litigation.
13   The statute, for those who are interested, is 28
14   U.S.C. 517.

15           I'm not aware of anything else that would
16   pertain to notice to the military, but I do believe
17   there are sort of multiple layers involving
18   potentially the military, obviously not the least of
19   which is discovery.  And I just think everyone should
20   continue to be -- and I will continue to be -- very
21   focused on the military's interest in this litigation.
22   And if at any time anyone believes that the military
23   is indispensable or they are potentially a third
24   party, I would want to be notified of that immediately
25   if that's on anyone's horizon.

1          I will do what I can to assist in the efforts

2    to gain the military's cooperation in discovery.  I've

3    had this issue in some other cases involving military

4    aircraft accidents with Navy pilots.  It's a

5    complicated process, to say the least, to gain access

6    to documents as well as depositions of individuals who

7    you want to speak to and gain information from about

8    the performance of their official duties.

9          There is a Supreme Court case, *Touhy v. Ragen*

10   from the '60s, that basically gave the government

11   agencies protection in this area, and numerous

12   governmental regulations followed that case.  And you

13   simply cannot issue a subpoena, I guess is the point.

14   There are steps and hoops that you have to go through.

15   Not understanding that process can result in

16   significant delay in litigation.

17          We have in our district an Assistant United

18   States Attorney who is very knowledgeable -- she works

19   on the civil side of the U.S. Attorney's Office --

20   very knowledgeable regarding *Touhy*, the case and the

21   regulations, and what it takes to gain access to

22   government documents and individuals for deposition.

23          I have asked her if she would be willing to

24   make a presentation to us on that issue, and she has

25   agreed to do so, so long as our U.S. Attorney is in

1    agreement, and I have no doubt that he will be when I

2    speak with him.  I just haven't had a chance to do so

3    yet.  I spoke to Mr. Aylstock and Ms. Branscome about

4    that this morning, and they both felt that would be

5    helpful.

6          Now, some of you sitting here in the

7    courtroom or on the telephone, you may be

8    knowledgeable and experienced enough to present that

9    information yourself to us.  I don't know.

10          Are there any takers, anybody who want to

11    join Ms. Butler in making that presentation?

12          *[No response.]*

13          It won't be mandatory to attend.  Leadership

14    will be required to attend, but otherwise it would be

15    just if you are interested in attending that

16    presentation.  I obviously don't have a date for it at

17    this time but it is on my to-do list.

18          I got a little ahead of myself in talking

19    about the discovery.  Let me go back to pleadings for

20    another item.  Service of process, we discussed this,

21    Ms. Branscome and Mr. Aylstock and I discussed this, a

22    way of potentially simplifying service of process.

23          Ms. Branscome, I don't want to misstate what

24    you have shared with me about your client's preference

25    in this regard, so could I ask you to share that with

1    everyone.

2         **MS. BRANSCOME:**  Certainly, Your Honor.

3    Although -- well, the past practice -- so many in this

4    room are aware of it because they've dealt with us

5    directly on it -- is that we have not waived service

6    and we have not accepted service by emails coming to

7    counsel, but we have directed plaintiffs to submit the

8    formal waiver of service form under the federal rules

9    to our process server.

10        In the very beginning we did accept those

11   waiver forms by email, but the volume quickly became

12   high, and we have asked that those be directed to our

13   process server CSC.  We have signed all of those.

14   There may be a few that are still outstanding, but we

15   have made that a routine practice.

16        We think that it would make sense and we

17   could work with leadership counsel to come up with

18   some type of process that would not require formal

19   service on the company through the traditional means,

20   but we do have some concerns about accepting service

21   by email through counsel even if we set up an

22   independent email account, which my understanding was

23   done in the *Abilify* litigation.

24        My client has had past experience in other

25   MDLs where on the front end that seemed like a good

1   idea and efficient for everyone, but the consequence

2   was it was very difficult for my client to track the

3   cases individually in terms of even quite simply

4   logistics like assigning numbers to them, file numbers

5   that then allow us to continue to track the cases as

6   they move forward.

7          And so that was a concern that I had

8   expressed to Your Honor in chambers and would echo

9   here about having an order that would satisfy service

10  just by simply sending it to an email address.  But I

11  do think we could come up with a procedure that

12  perhaps would satisfy my client's concerns but also

13  expedite the process in some way.

14          **THE COURT:**  All right, very good.  I'm hoping

15  you'll be able to confer about that and come to an

16  agreement or stipulation about the service in some

17  abbreviated form that the Defendant is comfortable

18  with.

19          In the interest of judicial economy and

20  avoiding needless waste of resources in any

21  litigation, not just in MDL, but I always start out by

22  looking to see if there's something that is

23  potentially dispositive, an issue that needs to be

24  addressed early on in the litigation as opposed to the

25  very end of the litigation after a great deal of time

1   and money has been spent only to see a case disposed

2   of on a legal issue.

3           So it seems to me that we don't have any

4   issue here of general causation.  I don't think

5   there's any question that, if you have defective

6   earplugs -- and that's an "if" -- that that can result

7   in hearing loss if they don't perform as designed or

8   anticipated, expected.  We don't have that type of an

9   issue here.

10          I'm aware of the two defenses that they have

11  raised and are raising in this litigation, and my

12  thought was let's address those early on in the

13  litigation.  And they are factual, no doubt, but

14  they're not factual in the sense that we have to wait

15  to get into specific individual cases to address them.

16          I raised the very general possibility of even

17  a trial on those defenses, obviously after a period of

18  discovery.  The military discovery will be very

19  important in this regard to these two defenses.

20          The defenses, as you all know, are the

21  combatant activity defense and the government

22  contractor defense.  But I'm just putting this out

23  there for you all to be thinking about and just making

24  you aware that it's something I'm thinking about and

25  it's something that we'll be talking about more as we

1   move forward and, again, once leadership is put into
2   place.  The same will be true for potentially class
3   issues, they may proceed on a separate or different
4   track.  Again, yet to be determined.

5        Does anyone wish to speak to that issue of
6   front loading something in the litigation that in the
7   Court's view should be addressed earlier rather than
8   later?  Anyone?  Mr. Aylstock?

9        **MR. AYLSTOCK:**  Your Honor, with regard to
10  these defenses you noted that they are issues of fact,
11  obviously an issue of fact there will be a summary
12  judgment motion if it's appropriate.  And so while we
13  are interested in advancing this litigation and
14  dealing with some preliminary issues as soon as
15  possible, the Plaintiffs do feel that we need
16  discovery, we need an opportunity to brief that, and
17  in the context of a summary judgment can certainly be
18  dealt with and ultimately it will be decided by the
19  trier of fact.

20       So we're not necessarily opposed to that, but
21  we'd like the opportunity to think about it and brief
22  it, if it's even an available defense after discovery.
23  I think there's some question as to whether discovery
24  will even reveal -- but there is that -- we may be
25  moving for summary judgment on those defenses.

1          THE COURT:  Right.

2          MR. AYLSTOCK:  So it may not be an issue at

3     all.  So I think until we get down the road a little

4     bit --

5          THE COURT:  I don't want to deal -- I follow

6     you.  I don't want to deal with it in each individual

7     case.  I mean, there's defenses in every one of these

8     potentially thousands of cases.  I think it's

9     something that -- if there's discovery and then

10    there's summary judgment practice following that

11    discovery and summary judgment, if it's a motion filed

12    by the Defense and it's denied, then that issue can

13    just move on with that individual case, I suppose.

14         Because these defenses -- and Ms. Branscome,

15    correct me if I'm wrong, but I don't see these

16    defenses as plaintiff-specific really in any way.

17         MS. BRANSCOME:  From our perspective, Your

18    Honor, we do think there may be some merit to

19    separating out the two affirmative defenses that, as

20    you recognize, if they were granted would be

21    dispositive.  We don't view them as case-specific.

22    They don't turn on an individual plaintiff's

23    experience or causation of injury.

24         We do -- and I raised this earlier with Your

25    Honor -- we do have some concern about them proceeding

1    too quickly only insofar as discovery from the
2    government will be an essential portion of the Court's
3    analysis for both sides.  We need to understand the
4    full picture for these defenses.
5            That being said, I think Your Honor would be
6    well within your authority to structure that being
7    potentially -- you know, we may proceed with
8    case-specific discovery in some form, but we could
9    prioritize discovery that would be related to the
10   defenses, conduct that discovery, and then Your Honor
11   could render decisions on those affirmative defenses,
12   which we do think that there is some efficiency to
13   that.
14           One minor point I wanted to address, Your
15   Honor, when you stated that there may be not a general
16   causation defense.  It's my understanding of the
17   Plaintiffs' claims that they're also claiming that the
18   earplugs "as designed" cause -- or allow for hearing
19   damage.
20           So, while I do actually think, Your Honor, it
21   may not make sense to separate out general causation
22   from specific causation, I did want to at least
23   clarify the record on that that we do think there will
24   be a general causation defense.
25           But I think in terms of we're looking at sort

1    of broad scale procedural adjustments, I think the

2    place to target that would be the combatant activity

3    defense and the government contractor defense.  I

4    think there is a way for that to make this more

5    efficient.

6              **THE COURT:**  All right.  Thank you.

7              Anything else, Mr. Aylstock?

8              **MR. AYLSTOCK:**  Just to remind the Court that

9    those two defenses, to the extent they apply at all,

10   only apply to the military servicemen and women.

11             **THE COURT:**  Sure.

12             **MR. AYLSTOCK:**  And we have plaintiffs that

13   those wouldn't even apply to.

14             **THE COURT:**  Good point.

15             **MR. AYLSTOCK:**  So I do think that the

16   discovery really is coextensive as it relates to the

17   liability to some of these defenses, so I don't think

18   general discovery needs to be bifurcated and so forth.

19             **THE COURT:**  Well, it's going to be managed,

20   though.

21             **MR. AYLSTOCK:**  Absolutely, and sequenced.

22             **THE COURT:**  You can't be going in ten

23   different directions at one time.

24             **MR. AYLSTOCK:**  Correct.

25             **THE COURT:**  All right.  Along the lines of

1    what Ms. Branscome --

2          Yes, sir?

3          **MR. YANCHUNIS:**  Excuse me, Your Honor.  Good

4    morning.  My name is John Yanchunis.  Mr. Moskowitz

5    opened the door back with the discussion of the class

6    issues.  I am one of several lawyers who filed a class

7    case in the District of Columbia that has been

8    transferred here.

9          My only reason to rise is not to hear myself

10   speak, but is to mention that local Rule 23.1 requires

11   the filing of a motion for class certification within

12   90 days of filing a pleading.  That would obviously be

13   something that would concern those of us who have got

14   those class cases, and to discuss the suspension of

15   that until we can come up with a case management order

16   that would address how the class cases will proceed.

17         **THE COURT:**  Could you spell your last name,

18   please.

19         **MR. YANCHUNIS:**  Yes, ma'am.

20   Y-a-n-c-h-u-n-i-s.  I'm a partner with the law firm of

21   Morgan & Morgan based in Tampa.

22         **THE COURT:**  That makes good sense.  And I

23   overlooked that rule in speaking about the class

24   issues, and so I will agree to that.  I'll issue

25   something that will stay that or toll the time for

1    filing your class certification motion until such time

2    as it makes sense in the context of this litigation.

3              **MR. YANCHUNIS:**   Thank you, ma'am.

4              **THE COURT:**   Thank you.

5              Ms. Branscome, you mentioned the claim that

6    "as designed" the earplugs caused the injuries that

7    are complained of in this case.  And in that regard, I

8    am considering a science day.  And I spoke to Mr.

9    Aylstock and Ms. Branscome about this.  They seemed to

10   -- particularly Ms. Branscome seemed to think that

11   that would be helpful.

12             And I am all about, you know, hit me with

13   some knowledge, educate me.  So I'm seriously

14   considering that and just letting you all know that

15   I'll be most likely pursuing that at some point, as

16   well as -- and this will sort of segue into the next

17   topic -- as well as a technology day/data day.

18             And this may be something that you all -- I'm

19   sure there is a wealth of knowledge and experience

20   here in this courtroom of individuals in the

21   electronically stored information area and technology

22   assisted review.  I know enough to know the acronyms

23   now.  I know what those letters stand for.

24             So it may be that you're able to put together

25   a team of attorney experts both from the defense and

1    the plaintiff side that can make that presentation.

2          Judge Jones does not need the presentation.

3    He could probably make the presentation.  He is

4    extremely well versed in this area.  But for myself, I

5    think that it would be very helpful for me to have you

6    all put something together, and so I'll be asking for

7    that in the future as well.

8          Speaking of ESI protocol, it is my intent,

9    just as soon as we get leadership in place, to

10   schedule a multi-day Rule 26(f) conference for the

11   parties in this case.

12         My vision for this is for all -- obviously

13   leadership would attend, defense counsel would attend.

14   I would like your e-discovery vendors to attend as

15   well, and from the defense standpoint for sure, some

16   in-house IT personnel that understand your client's

17   computer or data infrastructure and architecture.

18         Following that conference, then I'm going to

19   hold a Rule 16 conference, at which time you'll

20   present your Rule 26(f) report to the Court orally.

21   There may also be a filing as well, but I'm going to

22   ask you to appear and present how your conference was

23   held and what information was gathered as part of that

24   conference, and then that will help me going forward

25   in establishing a plan for you all in terms of

1     discovery and case management.

2          But in addition to the computer systems and

3     how you are going to collect and store the data in

4     this massive litigation, I also have asked Ms.

5     Branscome to come to that conference prepared with

6     sort of her corporate infrastructure as far as

7     personnel and the different corporations and sort of

8     how they fit together or don't fit together, but a

9     corporate organizational chart, if you will.  I've

10    also asked that included in that that she begin to

11    identify relevant pertinent custodian positions that

12    we can begin thinking about.

13         As part of the 26(f) conference -- and I'll

14    reduce this to a written order, but I also want y'all

15    to begin thinking about a phased privilege review.  I

16    do not want --

17         And Judge Jones, would you like to add

18    anything about the necessity or importance of that

19    type of a process being put into place early on?

20         **JUDGE JONES:**  No.  I'll just echo that I

21    think we ought to address privilege issues, if there

22    are a number of them, as early as possible, rather

23    than delaying them.  And I'll probably be involved in

24    that issue, so I think that would make the most sense.

25         **THE COURT:**  Right.  And this will require the

1    producing party to adhere to a steady and disciplined
2    review process, and the opposing party will receive
3    the privilege log and responsive material as soon as
4    available.  And then if there's court review
5    necessary, that will proceed as well.

6            What happened in *Abilify* -- and again,
7    lessons learned -- but what happened in *Abilify* is
8    really this unfortunately sort of came later in the
9    process, and poor Judge Jones was just inundated with
10   -- I don't remember how many -- how massive the
11   privilege log was, but it was all at one time.  There
12   was not really a rolling, steady process of this
13   privilege review.  And so we want to avoid that in
14   this litigation.  That would not be manageable.

15           And so Judge Jones is correct, he will be
16   involved in the privilege review process, and so I'll
17   ask -- he'll be present for the Rule 16 conference
18   following your Rule 26 conference, and we'll talk more
19   about that after you all have had an opportunity to
20   discuss it.

21           I'll also be asking you, as part of that
22   conference, to discuss a deposition protocol, to the
23   extent you feel that would enhance or benefit the
24   litigation.

25           And also it occurred to me that it would

1    probably be helpful to have the presentation by

2    Ms. Butler, the Assistant U.S. Attorney that I spoke

3    of, sooner rather than later, even before your Rule

4    26(f) conference, so that you are armed with that

5    information when you are discussing discovery and

6    servicemember depositions and military personnel

7    depositions.  And then I'll also ask, as part of that

8    conference, that you discuss profile forms, fact

9    sheets, and early vetting and a process for that.

10         Also, as you've seen in the position papers

11   that were submitted, there is an issue of Plaintiffs'

12   request or need for discovery of information in other

13   litigation, and that specifically being the *Moldex I*,

14   the *Moldex II*, and then the *qui tam* case in which

15   Moldex was the relator in that case.  And that's

16   something else that you will be discussing at that

17   conference.  But this needs to be moved on quickly

18   because it may take some time to get this information,

19   particularly the *qui tam*.

20         But I think I might even -- I'm thinking as

21   I'm talking -- I'm going to ask, Ms. Branscome, you

22   all to -- and Mr. Morriss -- to speak with Mr.

23   Aylstock and Ms. Miller soon, I mean, in the next week

24   or so, and I'll give you a deadline or window in the

25   order that I'm going to write, but talk about this and

1    see if there is anything that can be produced sooner
2    rather than later without any contest about it.  If
3    there is an issue, then I need to know what that issue
4    is and hear from you all on it.  But it seems to me
5    that some of this information is going to be
6    discoverable, and I don't know how much of it at this
7    point.  And to the extent there's an agreement, then I
8    don't need to get involved.  But it needs to be
9    produced -- we don't need to take duplicative
10   discovery in this litigation.
11          Once discovery gets underway, one practice in
12   *Abilify* that I will adopt and incorporate into this
13   litigation is regular discovery conferences, and we
14   typically do those by telephone.  Unless there is a
15   need or you just would like to come visit Pensacola,
16   we do those by telephone.  And we have those dates set
17   in advance, and it's on a recurring regular schedule.
18   I try to do those myself.  Judge Jones is always
19   welcome.  If I can't do those, then he would handle
20   them himself.
21          So calendaring -- and I'm about at the end of
22   my agenda, but calendaring in deadlines, dates that I
23   have identified -- and I haven't set dates, but
24   matters that need deadlines would be our next couple
25   of case management conferences.  Your Rule 26(f)

1    conference, the Rule 16 conference following that.

2    And that might be one of those case management

3    conferences.

4         And even before that -- I'm sorry, I should

5    have started with the leadership hearing or oral --

6    not oral argument, it's not really an argument -- the

7    oral presentations on leadership.  Science and

8    technology day.  And then we will establish deadlines

9    for the master and short form complaints and profile

10   forms and fact sheets but probably after your Rule 26

11   conference, something you'll discuss there.

12        All right.  Well, I'll conclude by first

13   asking if anyone has anything they would like to add

14   or ask me?

15            *[No response.]*

16        Anyone on the telephone have anything?

17            *[Participant hangs up.]*

18        I guess not.  You can take a lot of liberties

19   on the phone.

20        Judge Jones, anything from you?

21        **JUDGE JONES:**  Well, the only thing that I

22   would like to add based on what I've heard here today,

23   one of the challenges I see in this case is going to

24   be the discovery from the military, from the

25   government.  And I would encourage the parties as soon

1    as possible to put their heads together, think about

2    those issues and come up with a plan.  And that

3    certainly will be one of the things we discuss at the

4    Rule 16 conference, but I see that as a real roadblock

5    down the road.  And there are ways to navigate around

6    it through cooperation among the parties and, as you

7    suggested, cooperation with the government, but I

8    think that's something that really needs to be

9    addressed.

10            **THE COURT:**  I agree.  As we've said -- and

11   one thing I did not mention in regards to the military

12   and my statement or offer to do everything I can to

13   assist in gaining their cooperation, I think it would

14   be helpful if I asked the military or the Department

15   of Justice -- I'm not sure who I'm going to ask yet --

16   but to establish a liaison for this litigation,

17   someone within whichever agency it is that we can

18   communicate with and coordinate with.  And again, I'm

19   not sure who I'm even going to ask that of yet, but

20   I'm going to figure it out.

21            **MS. BRANSCOME:**  If it is helpful to Your

22   Honor, unless there are a number of claims that I

23   don't know about, based on what we understand of the

24   product sales, the two primary portions of the

25   military that are implicated are the Army and the

1   Marines.  There is some potentially in the Air Force,
2   so I don't mean to exclude that, but I thought that
3   might be helpful to Your Honor, if you're evaluating
4   that, we would anticipate the significant amount of
5   discovery would come from the Army, just to put that
6   on your radar.
7        **THE COURT:**  Thank you.  And it may be someone
8   within the Department of Defense or in the specific
9   branch of the military.  I'm going to, again, give
10  that more thought and ask some questions.
11       **MR. AYLSTOCK:**  Our understanding, Your Honor,
12  is that the special agent in charge of the
13  government's investigation of the issues that form --
14       **THE COURT:**  In the *qui tam*?
15       **MR. AYLSTOCK:**  -- in the *qui tam* is a matter
16  of public record, and that may be a good place to
17  start.
18       **THE COURT:**  Certainly.
19       **MS. BRANSCOME:**  Our perspective on that is
20  that there may be discovery that's important in this
21  case.  The *qui tam*, although there are some issues
22  that do overlap, it came from a slightly different
23  direction, so I don't know -- and it may be that that
24  individual could be the proper liaison, but I would
25  simply flag that.  I think the issues are not a

1    perfect overlap such that it's just a clean reference

2    to whoever was involved in the *qui tam* knowing what we

3    would be after.  In fact, there were some specific

4    issues in the *qui tam* that were carved out related to

5    design elements that would be critical potentially in

6    this case.

7           **MR. AYLSTOCK:**  He or she may just be a good

8    place to start, because obviously that individual

9    would have more information than most.

10          **THE COURT:**  Okay, thank you.

11          Anyone else?

12          *[No response.]*

13          Well, I will close by saying how honored I am

14   by this assignment and how much I look forward to

15   working with all of you in this very interesting and

16   obviously complex and challenging litigation.  Thank

17   you all for coming.  I hope you've enjoyed our city.

18          **MR. AYLSTOCK:**  Thank you, Judge.

19          **(Proceedings concluded at 10:43 a.m.)**

20                   --------------------

21   *I certify that the foregoing is a correct transcript*
     *from the record of proceedings in the above-entitled*
22   *matter.  Any redaction of personal data identifiers*
     *pursuant to the Judicial Conference Policy on Privacy*
23   *are noted within the transcript.*

24   *s/Donna L. Boland*                    *4-23-2019*
     *Donna L. Boland, RPR, FCRR*              *Date*
25   *Official Court Reporter*