Exhibit D

**129 Yale L.J. 2**

**Yale Law Journal**
October, 2019

**Article**

Nora Freeman Engstrom [a1]

Copyright © 2019 by The Yale Law Journal Company, Inc.; Nora Freeman Engstrom

# THE LESSONS OF *LONE PINE*

**ABSTRACT.** Over the past three decades, *Lone Pine* orders have become a fixture of the mass-tort landscape. Issued in large toxic-tort cases, these case-management orders require claimants to come forward with prima facie injury, exposure, and causation evidence by a date certain--or else face an early and unceremonious dismissal. So far, the orders have been mostly heralded as an inventive and efficient way to streamline and expedite the resolution of complex cases. They are, many believe, an antidote to the assertion of dubious filings. Yet it's not so simple. This Article identifies and analyzes various drawbacks associated with *Lone Pine* orders, including their inconsistent application, incompatibility with formal procedural rules, and insistence on using a binary screen to address a question that is, at bottom, insusceptible to a binary resolution. Given these problems, it ultimately concludes that courts ought to scale back their use of this potent procedural device.

But that's just the half of it. *Lone Pine* orders are not just important because of what they do. They are also important because of where they sit: squarely at the intersection of broader currents that are quietly transforming contemporary civil litigation. These currents include the rapid and seemingly insatiable growth of multidistrict litigation, the durable embrace of managerial judging, the counterrevolution against federal litigation, the ever-more-preliminary disposition of claims, and both the formal and informal customization of procedural mechanisms. Weaving these seemingly disparate currents together, this study offers fresh insights to deepen--and, in places, complicate--our understanding of these profoundly influential phenomena.

**ARTICLE CONTENTS**

INTRODUCTION 5
I.          ORIGINS, THUMBNAIL SKETCH, AND CURRENT USE 12
            A. *Lore v. Lone Pine* 13
            B. Prevalence and Legality 15
            1. Prevalence 16
            2. Legality 18
            C. Further Defining *Lone Pine* Orders and Distinguishing Them from Plaintiff Fact Sheets 19
II.         MASS TORTS AND THE PERSISTENT PROBLEM OF NONMERITORIOUS CLAIMS 22
            A. Mass Torts and Nonmeritorious Claiming 23
            B. Five Conditions Conducive to Groundless Claiming 27
            C. Consequences 33
III.        *LONE PINE* ORDERS: A NORMATIVE PERSPECTIVE 34
            A. On the Plus Side of the Ledger 34
            B. A More Critical Look: Problems with the *Lone Pine* Mechanism 36
            1. Inconsistency and Unpredictability 37
            a. Whether to Issue a *Lone Pine* Order 37
            b. Timing: Pre- or Post-Discovery? 40
            c. Content: What Should a *Lone Pine* Order Say? 41
            2. Out of Step with the Formal Procedural Scheme 42
            a. At Odds with Rule 56 43
            b. At Odds with Other Rules, Too 45
            3. Specific Causation Is Not Susceptible to Easy Resolution 46
IV.         A POSSIBLE PATH FORWARD 52

    A. *Lone Pine* Orders Ought to Be Cautiously Utilized      53

    B. Plaintiff Fact Sheets Can Fulfill Many of the Aims of *Lone Pine* Orders but at Lower Cost      57
and with Fewer Drawbacks

V.        THE LARGER LESSONS OF *LONE PINE*      60

    A. Managerial Judging (Still)      60

    B. Of Stop Signs, Friction Points, and the Ever-Accelerated Adjudication of Claims      65

    C. The (Formal) Customization of Civil Procedure      70

    D. The (Informal) Customization of Civil Procedure: Assessing Ad Hocery      71

CONCLUSION      75

## *5 INTRODUCTION

Since their invention in 1986, *Lone Pine* orders have become a popular feature of the mass-tort landscape. Though they vary on the specifics, these case-management orders generally require each plaintiff swept into a mass-tort proceeding to supply prima facie evidence of injury, exposure, and causation--all by a set date, under penalty of dismissal. Authorized by Federal Rule of Civil Procedure 16--and specifically Rule 16(c)(2)(L), which permits courts to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties ... or unusual proof problems" [1] -- the orders act as a "procedural sieve." [2] By putting plaintiffs' claims to an early test and purging those who don't make the grade (or extinguishing the entire case, if all plaintiffs' submissions fall short), *Lone Pine* orders, it is said, help courts zero in on (and, ideally, address) gaps in the plaintiffs' evidence. This early scrutiny can, in turn, save defendants time, money, and aggravation; conserve scarce judicial resources; expedite the resolution of claims; deter the filing of groundless suits; and safeguard the integrity of trial processes. Indeed, to their many enthusiastic supporters, *Lone Pine* orders are an elegant means to achieve the aim of the Federal Rule of Civil Procedure 1: the "just, speedy, and inexpensive determination" of unwieldy and wickedly complex disputes. [3]

That, at least, is part of the story. Even standing alone, this story is worthy of inquiry. A bill that would codify and even *mandate* the use of *Lone Pine* orders in multidistrict litigation (MDL) recently passed in the House of Representatives, [4] and the Civil Rules Committee also appears to have *Lone Pine* in its **\*6** sights. [5] Furthermore, even prior to receiving official approbation, *Lone Pine* orders have already been issued over ninety-five times. [6] And they have played a role in many of the nation's most prominent mass-tort cases--cases that have, collectively, resolved the claims of hundreds of thousands of people.

But, in fact, the full story of *Lone Pine* is further reaching--and also more interesting--than the above would suggest. Indeed, even if one views *Lone Pine* orders in isolation, the picture is richer and more nuanced than reflected in the current commentary: whereas the present literature views *Lone Pine* orders as mostly uncontroversial and generally beneficial, they come with large and weighty drawbacks, which, as we shall see, must be tallied and assessed. [7] Further, to the extent one broadens the aperture and views *Lone Pine* orders not in isolation but through a wider lens, the picture grows still more revealing. A wider perspective reveals that this obscure mechanism is born of--and intertwined with--broad currents that are collectively coursing through and quietly remaking contemporary civil litigation. These trends include such seemingly disparate developments as the unrelenting rise of managerial judging, the counterrevolution against federal litigation, the accelerated disposition of claims, and both the formal and informal customization of procedural mechanisms. By offering a deeper account of "*Lone Pine* orders," then, I not only seek to inform our views on, and courts' use of, this particular case management device. I also aim to enrich our understanding of these influential and subtly related phenomena.

A study of *Lone Pine* orders pays other dividends, too. The payoff comes because these orders are often (though not exclusively) part and parcel of mass-tort MDLs. Thus, a study of the *Lone Pine* mechanism compels us to consider the particular procedural context in which these orders are often issued.

**\*7** Once second fiddle to Rule 23 class actions, MDLs--invented in 1968 and authorized by 28 U.S.C. § 1407--are enjoying their star turn. [8] As recently as 1991, MDLs accounted for only about 1 percent of pending civil cases. [9] Now, that figure has swelled to 37 percent, and mass-tort MDLs, the site of *Lone Pine* activity, comprise a staggering 95 percent of that total and encompass some 124,000 individual lawsuits. [10]

Transferee judges are tasked with managing these unruly actions, and, by all accounts, the assignment is immensely--almost absurdly--challenging. The numbers alone are daunting: as of May 2019, transferee judges were overseeing twenty-two "large" MDLs, each comprised of over one thousand separate actions. [11] Some MDLs are enormous: the asbestos liability litigation, for example, consolidated over 192,000 individual lawsuits. [12] Transferee judges' basic job description is internally inconsistent: judges are supposed to move cases along en masse and, at the same time, respect each plaintiff's personalized interest in a claim that is, and was, large enough to make it into federal court in the first instance. [13] And the judges--who are working alongside small and mostly inexperienced **8** staffs, under intense time pressure, and often in the glare of intense public scrutiny--are supposed to do all that in a context where targeted procedural rules are vague or nonexistent; state ethics rules are generally either unhelpful or utterly beside the point; the underlying substantive law tends to vary, giving rise to vexing choice-of-law problems; and the claims themselves are, almost without exception, fiercely contested and technically complex. [14] Thrown into this maelstrom, transferee judges have understandably improvised. [15] They have, as a Center for Judicial Studies report recently concluded, "largely on their own ... developed disparate approaches" and, using these homemade mechanisms, disposed of tens of thousands of cases "without the benefit of rules or a set of best practices." [16] Exhibiting this freewheeling, improvisational spirit, transferee judges have in recent years worked outside of accepted channels to slash attorneys' fees, [17] reached across jurisdictional boundaries to coordinate **9** with state-court counterparts, [18] appointed advisory panels of scientific experts, [19] and engineered settlement agreements that are "unorthodox," to put it mildly. [20]

In the academic community, this improvisation is, by turns, criticized and celebrated. Critics insist that the ad hoc nature of these judge-made mechanisms--which pop up not just in MDLs, but in a wide variety of cases and contexts--are *themselves* problematic, as they are inconsistent with traditional conceptions of judging, likely to erode litigants' sense of procedural justice, unlikely to take third parties' interests into account, arguably undemocratic, insensitive to separation-of-powers concerns, susceptible to arbitrary or abusive action, and, at bottom, "incompatible with the rule of law." [21] Critics also lament that *when* judges improvise, their decisions almost invariably suffer from a lack of consistency, predictability, and horizontal equity (a problem we see vividly here). [22]

 **10** On the other hand, one person's willy-nilly "ad hocery" is another's commendable customization. [23] In other contexts (including with regard to alternative dispute resolution (ADR), where we famously *want* the "forum to fit the fuss"), we believe that bespoke procedures are a *good* thing, attuned to the interests of parties and conducive to settlement. [24] There is something of a "'rulemakers' intent" argument in favor of tailoring: the Advisory Committee is on record espousing the view that, particularly in complex cases, "flexibility" is desirable, [25] while the Federal Judicial Center's *Manual for Complex Litigation* goes further, to "encourage[]" judges "to be innovative and creative to meet the needs of their cases." [26] And, of course, defenders of ad hoc procedures have one final and powerful retort: what, really, is the alternative, and who is to say that it would not be appreciably worse? [27]

In the midst of this back-and-forth, however, there are two apparent--and crucial--points of consensus. The first is that, given the billions of dollars at stake, the scores of litigants affected, and the gaps and challenges described above, scholars ought to be doing more. We ought to be getting under the hood of MDLs to critically examine how these mechanisms--responsible for the adjudication **11** and resolution of more than a third of federal civil claims in this country [28] --actually work. [29] Second, there is a growing sense that, rather than casting aspersions from on high, we ought to be rolling up our sleeves to offer grounded and practical guidance. [30] This study of *Lone Pine* orders is part of that broader project, and it seeks to advance both aims. By canvassing and categorizing courts' current use of the *Lone Pine* mechanism, charting the normative landscape, and offering concrete suggestions regarding how these orders ought to be utilized (and not utilized) going forward, this Article seeks to assist transferee judges while pointing the way toward fruitful future inquiry.

The remainder unfolds as follows. Collectively, Parts I and II offer background and context. Part I recounts *Lone Pine* orders' invention, details their contemporary operation, and distinguishes these orders from plaintiff fact sheets, another popular device that routinizes the collection of information regarding individual plaintiffs. This discussion highlights that *Lone Pine* orders are, to a large extent, justified by courts' worries that nonmeritorious claims are seeping into aggregate actions. Addressing that concern head-on, Part II assembles what we know, and do not know, about groundless claiming in the mass-tort ecosystem and also maps where these claims are apt to be found.

Part III then catalogs *Lone Pine* orders' advantages and disadvantages. As noted, the "pro" side of the ledger has been well fleshed out by *Lone Pine* orders' many supporters. It is fairly well established that by winnowing out noncolorable claims, *Lone Pine* orders can conserve court and party resources, hasten case resolution, safeguard the integrity of trial processes, and, sometimes, benefit "deserving" plaintiffs--who might otherwise have to share court time, counsel table, or settlement funds with those with dodgy entitlements.

By contrast, the "con" side of the ledger has been inadequately explored. Canvassing drawbacks, Part III finds that three are most pressing. First, because *Lone Pine* orders are issued pursuant to judges' amorphous "managerial" authority, *Lone Pine* orders are all over the map in terms of when they are issued, what they say, and how much they demand. This inconsistency gives rise to predictability and horizontal-equity problems and potentially opens the door to arbitrary  **\*12**  or abusive decision-making. Second, *Lone Pine* orders are out of step with various procedural safeguards--and, worse, turn some protections embedded within Rules 11, 37, and 56 on their head. Third, and finally, prototypical *Lone Pine* orders demand answers to questions of specific causation, despite the fact that, in most toxic-tort cases, specific causation is stubbornly unsusceptible to a binary, yes/no inquiry.

Given this mixed bag, Part IV offers a path forward. In so doing, Part IV rejects an all-or-nothing approach. It neither concludes that *Lone Pine* orders ought to be outlawed nor affirms their uncritical acceptance. Rather, Part IV draws on both Part II's mapping of the ways nonmeritorious claims seep into the mass-tort ecosystem and Part III's inventory of problems associated with this procedural device to suggest that *Lone Pine* orders may be utilized, but sparingly. In particular, *Lone Pine* orders should be available only when (1) procedures explicitly sanctioned by rule or statute are unavailable or are patently insufficient, and (2) substantial evidence casts doubt upon plaintiffs' entitlement to relief and/or the plaintiffs have displayed a marked and unjustifiable lack of diligence in prosecuting the action. Furthermore, Part IV contends that, for judges justifiably eager to identify and purge dubious claims, another mechanism--plaintiff fact sheets-- offer many of the benefits courts associate with *Lone Pine* orders but without several of the drawbacks identified above.

Finally, Part V steps back to uncover the lessons of *Lone Pine* and situate those lessons among larger trends that are fundamentally reshaping contemporary civil litigation. These include the rise of muscular managerial judging, which burst onto the scene in the early 1980s and is still going strong in its fourth decade; the counterrevolution against federal litigation and the concomitant move toward ever-more-preliminary case disposition; an apparent transformation in courts' conception of reciprocal discovery, which, ominously, echoes a previous transformation in courts' conception of--and tolerance for--the civil trial; the fracturing of transsubstantive procedure; and the gradual, though controversial, expansion of ad hoc procedural decision-making. Anchored in a particular and somewhat esoteric case-management mechanism, this final Part canvasses these larger trends, reveals a common thread that connects these seemingly disparate developments, and surfaces concrete lessons to inform future analysis.

## I. ORIGINS, THUMBNAIL SKETCH, AND CURRENT USE

Part I offers a primer on *Lone Pine*. Section I.A tells an origin story and revisits the case where, with little fanfare, *Lone Pine* orders made their debut. Section I.B inventories the orders' contemporary use, including their purpose, prevalence,  **\*13** and legality. Finally, by juxtaposing *Lone Pine* orders with another procedural device--plaintiff fact sheets--Section I.C further clarifies what *Lone Pine* orders are and are not.

### A. *Lore v. Lone Pine*

*Lone Pine* orders originated and draw their name from an unpublished order issued by Judge William T. Wichmann in an otherwise-obscure 1985 New Jersey state case, *Lore v. Lone Pine Corp.* [31]  In *Lone Pine*, six families, three individuals, and one corporation sought compensation for damage allegedly caused by contamination oozing from the Lone Pine landfill. [32] Located in central New Jersey, the landfill (now a Superfund site) operated for two decades before it was eventually shuttered in 1979. [33]  In filing the lawsuit, plaintiffs claimed that during the landfill's extended operation, its operators carelessly accepted and stored millions of gallons of bulk liquid chemical waste. Over time, plaintiffs asserted, the waste bled from the landfill to pollute local water. The polluted water, in turn, depressed property values and also caused plaintiffs to suffer a number of maladies, including allergies and rashes. [34]

In initiating suit in the spring of 1985, plaintiffs cast the net broadly. They named some 464 defendants in their complaint, including the Lone Pine Corporation, which operated the landfill (and subsequently went belly up), eleven municipalities, one school district, and an array of generators and haulers of toxic material.[35] As of November 1985, however, it became clear that the suit had stalled. Judge Wichmann learned at a management conference that "few defendants"--out of the 464 named--"had been served."[36] Then, at the next management conference on January 31, 1986, defense counsel informed the court that the Environmental Protection Agency (EPA) had issued a report which summarized sixteen studies concerning the landfill and "cataloged and evaluated all the  *14  information available on the ... location of the resulting pollution."[37] That report undercut certain elements of the plaintiffs' assertions. In particular, the EPA found that the contamination that was the target of plaintiffs' complaint was, in fact, "confined to the landfill and its immediate vicinity."[38] This finding was problematic for plaintiffs because some of those alleging contamination-related injury lived some distance away. In fact, one plaintiff's home was located twenty miles from the landfill, and two more supposedly contaminated properties were each located two miles from it "in different directions."[39]

Faced with this contradictory information, and clearly losing patience, Judge Wichmann entered a novel case-management order. That order required plaintiffs to submit documentation to the court detailing, among other things, "(a) Facts of each individual plaintiff's exposure to alleged toxic substances at or from Lone Pine Landfill" along with "(b) Reports of treating physicians and medical or other experts, supporting each individual plaintiff's claim of injury and causation by substances from Lone Pine Landfill," all "on or before June 1, 1986."[40]

In response to Judge Wichmann's order, the plaintiffs cobbled together some information, but it was hardly comprehensive. As a defense lawyer put it: "With regard to the personal injuries, there is no evidence whatsoever of any toxic or chemical contamination of any of the bodies of the plaintiffs."[41] Judge Wichmann agreed, observing that plaintiffs' fillings were "woefully and totally inadequate."[42] He elaborated:

> The information submitted as to personal injury claims was so inadequate as to be deemed unbelievable and unreal. Plaintiffs merely listed a variety of illnesses such as allergies, itching, dryness of skin, and the like. No records were submitted to substantiate any physical problems, their duration or severity. No doctors' reports were provided.[43]

Sixteen months after the action was initiated, the court observed that "defendants were no better off" than when the suit was first filed.[44] With no headway  *15  made, on November 18, 1986, an exasperated Judge Wichmann dismissed all of plaintiffs' claims with prejudice.[45] "This Court," Judge Wichmann explained, "is not willing to continue the instant action with the hope that the defendants eventually will capitulate and give a sum of money to satisfy plaintiffs and their attorney without having been put to the test of proving their cause of action."[46]

### B. Prevalence and Legality

As the discussion above shows, *Lone Pine* orders originated in an exceptional case. They were born of a lawsuit that featured hundreds of litigants, seemingly dilatory lawyering on behalf of plaintiffs, and claims inching along under a cloud of suspicion, directly undercut by government study. What happened next is both practically and theoretically interesting. Writing separately, Jay Tidmarsh and Judith Resnik have both hit upon a dynamic I will dub the "contagious principle of exceptional procedure."[47] Novel solutions developed for one-off, once-in-a-career cases, they observe, have an uncanny way of worming their way into more ordinary cases.[48] In time, the extraordinary becomes the ordinary, and then, as judges "push the procedural envelope still farther out," the cycle starts again.[49]

 *16  Consistent with that principle, in the decades since Judge Wichmann's innovative ruling, courts around the country have taken the *Lone Pine* idea and run with it. According to the *Annotated Manual for Complex Litigation*, *Lone Pine* orders are "widely used in mass torts to isolate spurious claims."[50] Federal courts describe *Lone Pine* orders as a "common trial

management technique," [51] "routine," [52] and a tool being used "[w]ith increasing frequency," [53] while commentators explain that *Lone Pine* orders are "increasingly being required" [54] and witnessing "widespread use." [55]

### 1. Prevalence

To be sure, it is difficult to get a real handle on just how prevalent these orders are: neither the Federal Judicial Center nor the National Center for State Courts keeps tabs, and though a researcher could scour Westlaw to count how many times *Lone Pine* orders have been issued in "visible" judicial opinions, any **\*17** resulting study would be susceptible to critique and hardly definitive. [56] That said, when it comes to *Lone Pine* orders' acceptance and prevalence, two points are clear. First, courts in both the state and federal system have issued at least ninety-seven *Lone Pine* orders. [57] Second, these orders have played a role in many of the most prominent toxic-tort cases of all time, including many that read like the "Who's Who" of mass disaster. [58] These include litigation involving the Love Canal, [59] asbestos, [60] Vioxx, [61] Fosamax, [62] Rezulin, [63] Celebrex, [64] Zimmer NexGen **\*18** knee implants, [65] Baycol, [66] Avandia, [67] Fresenius, [68] and the Deepwater Horizon oil spill. [69]

### 2. Legality

The legality of these orders isn't much in doubt. Though no statute, Federal Rule of Civil Procedure, or Federal Rule of Evidence expressly permits--or even contemplates--*Lone Pine* orders, there is a strong consensus that courts issuing such orders do so within the bounds of their broad discretion. [70] In particular, it is said, such courts are either exercising their inherent authority or exercising authority bestowed by Federal Rule of Civil Procedure 16(c)(2)(L). That provision was added to the Rules in 1983 and authorizes courts to "adopt[] special procedures for managing potentially difficult or protracted actions that may involve complex issues, multiple parties, difficult legal questions, or unusual proof problems." [71] Accordingly, although certain federal appellate courts have ruled that, given particular circumstances, a *Lone Pine* order should not have issued (or should not have issued when it did), no federal appellate court--and only one state high court--has ruled that trial courts lack the authority to issue orders of **\*19** this kind. [72] Indeed, as a sign of *Lone Pine* orders' broad acceptance, in Texas, an appellate court has gone so far as to rule that, in *failing* to issue a *Lone Pine* order, the trial court abused its broad discretion. [73]

### C. Further Defining Lone Pine *Orders and Distinguishing Them from Plaintiff Fact Sheets*

Notwithstanding their legality and popularity, however, confusion continues to swirl around the *Lone Pine* mechanism. Part of this confusion stems from the fact that, though courts and commentators talk about "*Lone Pine* orders" as if they are definable things with clear characteristics and precise attributes, particulars often vary. As I discuss in Section III.B.1. below, courts disagree about which cases are prime candidates for entry of a *Lone Pine* order, when, in the lifecycle of a case an order should issue, and what, precisely, such an order should say. Exacerbating the uncertainty, *Lone Pine* orders are sometimes confused with another popular judicial invention: plaintiff fact sheets (PFSs)." [74] Here, then, it **\*20** makes sense to ensure that, to the extent possible, the two mechanisms are clearly defined and properly distinguished.

*Lone Pine* orders are case-management orders issued by trial courts in mass-tort cases, sometimes prior to and sometimes after the start of discovery. They typically require each plaintiff swept into an aggregate action to make three distinct evidentiary showings: (1) that she was exposed to the defendant's product or contaminant and the circumstances of this exposure, (2) that she has suffered, or is suffering, a bona fide impairment (and, often, the circumstances of her diagnosis), and (3) proof of causation-- which is to say, either an expert affidavit or expert report expressly connecting (1) with (2). [75] If a plaintiff fails to submit the requested information by the court-imposed deadline or if her submission is deficient, her suit may be dismissed with prejudice.

A plaintiff fact sheet is a standardized court-approved form, served on each plaintiff within an aggregate action that must be completed by a court-imposed deadline, often in lieu of tailored interrogatories. [76] Usually answered under oath, these forms require each plaintiff swept into an aggregate action to submit basic information about her background (including her education and employment), her injury, any past claims for compensation (whether via the tort system or otherwise), and the identity of her diagnosing physician. [77] Plaintiff fact sheets also typically include a blanket authorization, which, once signed by the plaintiff,

permits the defendant to collect the plaintiff's medical and employment records without running afoul of privacy laws. [78] If a plaintiff fails to complete the fact **\*21** sheet by the court-imposed deadline, or if her submission is deficient, as above, her suit may be dismissed with prejudice. [79]

An astute reader will notice that *Lone Pine* orders and plaintiff fact sheets share the same basic purpose: they both seek to standardize and expedite individual plaintiff-side discovery in aggregate actions. Both seek to identify and purge those plaintiffs with noncolorable claims. And to the extent that some claims remain following *Lone Pine* or fact-sheet processes, both seek to streamline and rationalize the ensuing litigation. [80]

But prototypical *Lone Pine* orders also differ from fact sheets in four crucial respects. First, *Lone Pine* orders typically inquire as to specific causation. They demand evidence that product or contaminant $x$ actually caused plaintiff's injury or ailment $y$. Plaintiff fact sheets do not. [81] Second, *Lone Pine* orders demand that plaintiffs supply information from qualified experts (sometimes from experts whose testimony would pass muster under *Daubert* and Rule of Evidence 702). [82] Plaintiff fact sheets, by contrast, demand information from only the plaintiff and only information that is easily obtainable or already in the plaintiff's possession. [83] Third, owing to their heavy reliance on notoriously pricey medical experts, *Lone Pine* orders are expensive; to enter a *Lone Pine* order is to impose a costly burden on plaintiffs. Fact sheets, by contrast, "offer plaintiffs' counsel an **\*22** easy and inexpensive opportunity to satisfy initial discovery obligations." [84] A final key difference, which lurks below the surface, is that plaintiff fact sheets are relatively uncontroversial, whereas, particularly within the plaintiffs' bar, *Lone Pine* orders' reception has been decidedly mixed. [85]

## II. MASS TORTS AND THE PERSISTENT PROBLEM OF NONMERITORIOUS CLAIMS

The most frequently cited justification for *Lone Pine* orders is that the orders help courts "to identify and cull potentially meritless claims." [86] Or, as one defense lawyer has more colorfully put it, the orders "represent salvation from the huddled masses of meritless plaintiffs' claims lying in wait for eventual settlement checks." [87] As these quotes indicate, at their core, *Lone Pine* orders seek to weed out noncolorable claims so those claims do not linger within, and thereby **\*23** bog down or contaminate, the mass-torts or MDL system. [88] As such, in order to understand the *Lone Pine* mechanism--and, certainly, in order to assess whether and how the mechanism ought to be targeted going forward (a question addressed in Part IV)--one must accompany a study of *Lone Pine* orders with an inquiry into what groundless claims look like, why mass torts may attract these claims in the first instance, and where, precisely, such claims are apt to exist. These are the questions to which we now turn. [89]

### A. Mass Torts and Nonmeritorious Claiming

Any discussion of fraudulent, frivolous, or otherwise nonmeritorious claiming must begin with the crucial point that, despite the persistence of claims to the contrary, all available evidence suggests that the majority of filed tort lawsuits are genuine and meritorious. The vast majority of federal judges--the individuals arguably in the best position to assess suits' validity--believe that "groundless litigation" is either "no problem" or is a "small" or "very small" problem. [90] And the limited evidence available generally bears out judges' assessments. [91]

**\*24** That said, the tort system consists of multiple "worlds." [92] And within the broader whole, there are two areas where some nontrivial number of claimants are seeking compensation without a valid entitlement to relief: car wreck cases, particularly those cases where the plaintiff complains of soft-tissue injuries (such as sprains, strains, contusions, and whiplash), and also mass-tort cases, the subject of our current inquiry. [93]

Generally, in mass-tort cases, some injury victims will have suffered a bona fide impairment at the hands of an at-fault defendant. But, sensing a payday, other individuals (no one knows how many) are also apt to be sucked in, typically claiming that they have sustained an injury that is, in fact, either nonexistent, grossly exaggerated, or unrelated to the instant defendant's conduct. [94] The problem is well known and broadly acknowledged. [95] But it goes by different names. Referencing that Iowa cornfield of the silver screen, some call it the "Field **\*25** of Dreams" problem, i.e., "if you build it, they will come." [96] Others refer

to the dynamic in terms of "elasticity." [97] And Judge Jack Weinstein dubs it the "vacuum cleaner" effect. [98] Whatever you call it, though, it helps to home in on the particular conduct underlying the claims' initiation. Homing in, it appears that those initiating noncolorable claims most often use one of three on-ramps into the aggregate action. These include: (1) misdiagnosis, (2) defendant manipulation, and (3) double-dipping. [99]

The first on-ramp, *misdiagnosis*, refers to a medical diagnosis of the claimant's injury that is fabricated or otherwise distorted. [100] Misdiagnosis has plagued numerous headline-grabbing mass torts. For example, in the *Silica* MDL (discussed in more detail below), transferee Judge Janis Graham Jack concluded that the diagnoses underlying the claims of roughly ten thousand plaintiffs were unreliable and merely "manufactured for money." [101] The fen-phen litigation was similarly afflicted. There, the lead lawyer for the fen-phen class alleged that a stunning seventy percent of class claimants had diagnoses for severe **\*26** heart-valve damage that were "medically unfounded and unjustified because the claimant doesn't have the condition." [102] The silicone breast implant litigation, which made waves in the mid-1990s, was much the same: a few dozen physicians who set up "cursory" assembly-line processes to diagnose women with a constellation of vague ailments that were, according to one leading authority, "beyond the fringe." [103] Misdiagnosis also played a significant role in asbestos litigation, particularly among those seeking compensation for asbestosis, a lung disease that is notoriously difficult to identify. [104]

*Defendant manipulation* provides the second major on-ramp. It refers to the initiation of claims against a defendant who is not liable, generally because the tortfeasor actually responsible for the plaintiff's injury is unavailable or unattractive or, alternatively, the injury arose "naturally," so no culpable tortfeasor does or could exist. [105] Examples are again plentiful. In *Vioxx*, one of plaintiffs' lead lawyers recently explained that, of the roughly 48,000 claimants in the MDL, "there were a couple thousand claims of people that didn't take Vioxx, they couldn't produce a medical record that they even took the drug." [106] In the recent **\*27** *Deepwater Horizon* litigation, some lawyers capitalized on the settlement's objective but flexible definition of a compensable claim to advertise to local businesses that they could "be compensated for losses that are unrelated to the spill." [107] Or, in the course of asbestos litigation, legal observers got a behind-the-scenes glimpse into how defendant manipulation may occur when a document came to light that revealed that some claimants were apparently being coached to "remember" coming into contact with the products of only certain (and solvent) manufacturers. [108]

The third on-ramp, *double-dipping*, refers to the initiation of inconsistent claims against multiple tortfeasors. An example, once again, can be found in *Silica*. There, some six thousand plaintiffs sought funds from both silica and asbestos manufacturers. They claimed (in separate filings) that they were suffering from silicosis or, alternatively, asbestosis, despite the fact that the two diseases have different sources of exposure, look "vastly different" on x-rays, and are very rarely found in the same individual. [109] Another example came to the fore in a 2014 bankruptcy opinion concerning Garlock, a producer of asbestos-containing gaskets. In a withering opinion, Bankruptcy Judge George Hodges noted that, though Garlock was "a relatively small player in the asbestos tort system," the company had been named as a defendant in a whopping 20,000 mesothelioma cases. [110] Why? The court attributed Garlock's outsized liability to the fact that "the last ten years of its participation in the tort system was infected by the manipulation of exposure evidence by plaintiffs and their lawyers," who aimed their fire at the then-solvent Garlock rather than the actually culpable (but bankrupt) tortfeasors. [111]

### B. Five Conditions Conducive to Groundless Claiming

The above presents a puzzle: why is it that, in general, groundless tort suits are rare, whereas two areas--soft-tissue auto claims and mass-tort claims--stand as exceptions to that rule? To untangle the puzzle, it helps to consider what characteristics soft-tissue injury and (many) mass-tort claims have in common. That **\*28** inquiry, I suggest, yields the following powerful insight: groundless claiming is most apt to proliferate when (1) injuries are hard to discern; (2) specific causation is contestable; (3) defendants have a diminished incentive or capacity to scrutinize claims prior to payment; (4) filing rates are unusually high; and, perhaps most importantly, (5) restraints typically imposed by the contingency fee are relaxed or altogether inoperative. This insight both is important in its own right and ought to inform the deployment of *Lone Pine* orders (and also other disciplinary devices) going forward.

First, both the soft-tissue auto cases and the more serious claims that have vexed the mass-tort world present similar (and similarly challenging) questions of injury verification. In the former, soft-tissue injuries do not show up on x-rays, impeding

verification efforts. Indeed, as insurance executives lamented more than a half century ago: "No one can say that some 'whiplash' claims are not genuine. This is the sad part of our plight for there appears to be no absolutely sure way of separating the fake from the real." [112]  The mass-tort realm is similar. On some occasions, as with silicone-gel breast-implant litigation, the "injury" (described as aches, pains, or fatigue) may be impossible to verify. [113]  More often, some damage will be at least theoretically susceptible to proof, typically with x-rays or echocardiograms. But reliably interpreting these scans has proven difficult, generating frequent disputes as to whether a given impairment does or does not exist. In *Silica*, for example, experts disagreed as to whether particular "shadows" on x-rays were sufficient to trigger a positive diagnosis. [114]  In fen-phen, patients' echocardiograms were frequently "open to divergent interpretations." [115]  And when it comes to asbestosis, a chief ailment associated with asbestos exposure, leading expert Dr. John Parker explained that diagnosis "is the eye, the retina, and the brain of the person classifying the film who reaches the ultimate decision." [116]

Second and relatedly, in both the soft-tissue and mass-tort realms, specific causation is often contestable. Because soft-tissue injuries are not visible, it is **\*29** tough to establish not only *whether* an injury was sustained but also *when* it was sustained. It follows, then, that it is nearly impossible to say whether the asserted injury predated, postdated, or resulted from the accident at issue. Raising the same concern, illnesses in the mass-tort realm often have complex and contestable etiologies, a point to which I return in Section III.B.3.

A third commonality between the soft-tissue and mass-tort contexts is that defendants (or their insurers) have a reduced incentive or capacity to scrutinize claims. Most of the time, defendants demand particularized evidence to support a claim prior to payment, minimizing the plaintiff's capacity and incentive to fabricate facts or exaggerate injuries. [117]  Once again, however, soft-tissue auto and mass-tort claims are different. For their part, soft-tissue claims tend to be small, often resolved for a few thousand dollars. Facing such nuisance-value demands, insurers would be foolish to fund thorough investigations into each claim's validity, and traditionally, they have not. [118]  Meanwhile, mass torts tend to feature sizable payouts. But the sheer number of claims may overwhelm a defendant's finite investigative resources and, in so doing, effectively and predictably shield claims from individualized scrutiny. [119]  Indeed, a powerful but perverse positive feedback loop may develop, as the bigger an MDL or state-court consolidation gets, the less individualized scrutiny each claim will realistically receive, creating incentives for ever more claims to be filed.

Fourth, both the auto- and mass-tort realms display abnormally high rates of claiming. In most areas of the tort-law ecosystem, only a minute fraction of those accidentally injured ever seek third-party compensation. [120]  Indeed, "[o]ne of the most remarkable features of the tort system"-- and one of the most durable **\*30** findings about the tort system--is just how few plaintiffs there are in proportion to the incidence of tortious injury. [121]

Yet auto-accident and mass-tort claims are again exceptional. The best study of U.S. claim initiation found that "individuals injured in motor vehicle accidents were ... ten times as likely as those injured in other circumstances to actually make some attempt to obtain compensation from someone they regarded as responsible for the accident." [122]  The mass-tort context is, by all accounts, similar. [123]  Whether due to eye-catching publicity as initial plaintiffs notch their first victories; aggressive attorney advertising (which may "normalize" the act of claiming or educate the public about the compensatory opportunity); the widespread use of for-profit claim generators who identify and actively recruit "eligible" plaintiffs; the low cost and de minimis risk associated with submitting one new claim into an existing aggregative mechanism; claimants' sometimes rational fear that they ought to file now (lest the statute of limitations run down or the defendants' resources run dry); and or personal-injury (PI) lawyers' less stringent screening (discussed below), mass-tort cases appear to feature exceptionally high rates of claim initiation. [124]

**\*31**  Finally, and crucially, both soft-tissue-auto and mass-tort cases arise in contexts where typical restraints imposed by the contingency fee are either wholly inoperative or substantially relaxed. Generally, PI lawyers are paid via contingency fees. As such, lawyers are paid--and also typically reimbursed for out-of-pocket expenses--if and only if the case is won. This payment structure usually gives lawyers a powerful incentive to rigorously evaluate cases prior to acceptance. Consistent with expectations, the evidence shows that, in most areas of PI practice, plaintiffs' attorneys are choosy. Most PI lawyers vet cases carefully and reject the majority (often, the vast majority) of would-be claimants who seek their services. [125]

There are, however, two familiar corners of the PI marketplace that upend typical screening patterns. The first is the soft-tissue auto accident realm, where research shows that some lawyers are not particularly selective. Cognizant that they are investing little in each claim's development--and also no doubt aware of insurers' cost constraints when it comes to their willingness or ability to conduct thorough investigations into claims' validity--some lawyers engage in only the most cursory of pretention reviews and represent at least some individuals with dubious entitlements to relief. [126]

The mass-tort realm also deviates from the typical model. Part of this departure stems from capacity: rigorous screening is both time consuming and costly. In the mass-tort realm, the sheer volume of claimants, all seeking representation more or less simultaneously (often in response to the same stimuli and sometimes all facing the same statute of limitations), may overwhelm a PI lawyer's capacity to perform requisite checks. At the same time, as compared to the "typical" PI lawyer, a mass-tort lawyer's incentive to screen is also much reduced. Generally, accepting a new client poses a degree of risk and entails a nontrivial investment, creating a powerful incentive for attorneys to represent only those with meritorious claims. By contrast, once the mass tort is in full swing, costs are essentially fixed, while rewards depend largely on claim volume--meaning, bluntly, the more the merrier. [127]

**\*32**  This general calculation will skew still further toward client acceptance if the marginal client's claim is added as a "tag-along" after the Judicial Panel on Multidistrict Litigation has already created an MDL. [128]  If so, individually retained counsel will sign up the client and stand to benefit handsomely if the client's claim is satisfactorily resolved. But because the Plaintiffs' Steering Committee (PSC) assumes day-to-day responsibility for litigating the case, the individually retained lawyer's obligation--and particularly her obligation to invest her own time and money into the claim's development--is typically de minimis. [129]  Beyond all that, mass-tort lawyers may rationally decide it is *advantageous* to cast the net broadly, both because defendants reportedly feel more "pressure" to settle when up against a lawyer with a large "volume of cases" [130] and because coveted and remunerative positions on the PSC are sometimes doled out based on the size of the lawyer's case inventory. [131] In such an environment, lawyers have little reason to be selective--and, as Judge Jack Weinstein explains, some will choose to "suck up good and bad cases, hoping that they can settle in gross." [132]

**\*33  C. Consequences**

The upshot of all of the above is that, more so than in other areas, judges overseeing mass torts are justified in scrutinizing claims' validity. In fact, the above analysis permits us to identify, with some precision, those occasions where particular scrutiny may be warranted. Scrutiny may be especially justified in those mass-tort cases where (1) plaintiffs' injuries are difficult to verify; (2) specific causation is contestable, and even exposure to the defendant's product or contaminant is neither evident, documented, nor obvious; and (3) claim volumes are exceptionally high.

Taken together, the first two prongs highlight that, when it comes to the potential for spurious claiming, not all mass torts are alike. If a mass tort follows on the heels of a restaurant fire, building collapse, plant explosion, ferry wreck, railroad accident, or airline crash, the plaintiffs will generally be identifiable. We will generally be able to figure out who was or was not a passenger on the ill-fated flight or ferryboat. For the most part, such plaintiffs will also have suffered traumatic "bright blood" injuries-- often, the easiest injury to identify and verify: death. The risk of overclaiming is low, and the need for special processing is virtually nonexistent. [133]  On the other hand, to the extent exposure is uncertain, diagnosis is debatable, and specific causation is contestable, courts may be justified in taking a closer look.

The third prong, regarding claim volume, is also crucial. When there are just a few--or a few dozen or even a few hundred-- claimants, typical defense- and plaintiff-side screens are apt to be operational and effective. On the other hand, when there are thousands or tens of thousands of claimants, that volume might well overwhelm the defendant's investigatory resources. The numbers may, themselves, indicate that there has been aggressive and undiscerning plaintiff recruitment. And the crush of claimants may blunt the contingency-fee lawyer's ability and incentive to vet claims before acceptance.

**\*34  III. *LONE PINE* ORDERS: A NORMATIVE PERSPECTIVE**

Part II dissected the problem of nonmeritorious claiming in the mass-tort ecosystem--essentially, it analyzed the problem *Lone Pine* orders seek to address. Part III assesses the *Lone Pine* "cure," evaluating first the advantages and then the disadvantages associated with this peculiar case-management mechanism.

### A. On the Plus Side of the Ledger

Up until now, *Lone Pine* orders have been mostly lauded by commentators. [134] According to these observers, *Lone Pine* orders have several advantages, though benefits vary some depending on how and when the orders are utilized. Sometimes, as in *Lore v. Lone Pine* itself, the entry of a *Lone Pine* order results in the dismissal of all claims and, in so doing, spells a swift and decisive end to an entire litigation. Assuming the court gets it "right," these orders promote judicial economy, preserve defendant and judicial resources, safeguard the integrity of trial processes, and allay concerns that MDLs (or their state-court counterparts) are a repository of--or breeding ground for--dubious filings. [135]

On other occasions, at least some plaintiffs will be able to muster enough information to satisfy the court, and the litigation will carry on after the order's entry. In these instances, the *Lone Pine* process still pays dividends. For one, the **\*35** process is apt to precipitate the dismissal of at least some claims. Among other benefits, these dismissals conserve the defendant's resources; promote a timely assessment of the defendant's liability exposure; and benefit the remaining plaintiffs, who might otherwise have to share court time, counsel table, and conceivably even settlement funds with those with dubious entitlements. [136] Further, to the extent that the *Lone Pine* order precipitates winnowing, the litigation that survives the order's entry is apt to be smaller, less cumbersome, and more manageable than it would have been in the order's absence. Last but not least, plaintiffs' submissions filed in response to the orders generate particularized information. This information can itself expedite case processing and resolution. Using plaintiffs' submissions, for example, the parties and the court can assign plaintiffs into various "baskets" based on relevant criteria (e.g., diagnosis, diagnosing physician, exposure pathway); identify potential gaps in plaintiffs' evidence; and, finally, tailor additional discovery (and potentially the filing of *Daubert* or Rule 56 motions) to address--or exploit--those gaps. Further, by giving the parties and the court a sharper assessment of the character and quality of relevant claims, *Lone Pine* orders can promote settlement discussions [137] and aid in the tricky but crucial selection of representative bellwethers. [138]

Finally, some courts--and particularly, it seems, MDL transferee courts--reserve the *Lone Pine* order's entry until the end of litigation, when discovery has concluded, the dust has settled, and the ink is dry, or nearly dry, on a global settlement. [139] These "twilight" orders are directed not at all plaintiffs but rather **\*36** at those who decline to participate in the voluntary settlement program. [140] These orders, too, have tangible benefits. Twilight orders can act as a filter, in that they ensure that only those who can actually make out a prima facie case get a return ticket back to the transferor court. [141] Additionally, by imposing a heavy burden on those--but only those--who decline to settle, the orders can facilitate broader and more comprehensive settlements and, in so doing, promote the efficient and ostensibly consensual resolution of disputes. [142]

### B. A More Critical Look: Problems with the Lone Pine *Mechanism*

The discussion above, like most of the existing literature, paints a fairly rosy portrait. Yet there are also drawbacks that need to be inventoried and tallied. I have hinted at two already: (1) *Lone Pine* orders typically demand the filing of a costly expert report, so to enter a *Lone Pine* order is to impose a heavy financial burden on plaintiffs, and (2) the "twilight" orders touted above may operate not merely to *promote* settlement but, rather, to *strongarm* claimants to accede to a settlement agreement that they would rather refuse. [143] The remainder of Part III **\*37** identifies three further problems, which, particularly when added to the concerns above, collectively muddy the normative landscape. [144]

### 1. Inconsistency and Unpredictability

One problem with *Lone Pine* orders is that they are highly variable. Commentators refer to "*Lone Pine* orders" often in laudatory terms. Yet there is strikingly little agreement about which cases are appropriate for entry of a *Lone Pine* order, when during a case the order ought to issue, and what, exactly, it ought to say. This variability gives rise to familiar problems of unpredictability, inconsistency, and a lack of horizontal equity. Further, as Abbe Gluck has noted, "[t]he assumption that a litigant can walk into

any federal courtroom in the country and know that the same procedures will apply to her case is an animating principle of the FRCP." [145] The variability that attends the *Lone Pine* mechanism undermines that bedrock principle.

### a. Whether to Issue a *Lone Pine* Order

The first question that confronts courts is case selection: which cases are appropriate for a *Lone Pine* order's entry? Here, there is variability along three dimensions: numerosity, articulable suspicion, and whether *Lone Pine* orders are generally appropriate or only appropriate in exceptional circumstances.

In terms of numerosity, courts tend to agree that *Lone Pine* orders are only justified in cases featuring many litigants, under the theory that "party numerosity presents unique case management challenges." [146] Hewing to that line, courts have generally declined to issue *Lone Pine* orders in single-plaintiff **\*38** cases, [147] and *Lone Pine* orders appear most frequently in cases that feature hundreds or thousands of litigants. [148] But there has been play in the joints. For example, a federal court in Mississippi recently issued a *Lone Pine* order despite the fact that there were "only" forty-nine plaintiffs. [149] In 2008, a federal court in New Mexico issued a *Lone Pine* order in a case with twenty-eight plaintiffs. [150] In 2013, a New York court issued one in a case with only fifteen plaintiffs. [151] And in *Miller v. Metrohealth Medical Center*, [152] *Schelske v. Creative Nail Design, Inc.*, [153] and *Asarco LLC v. NL Industries, Inc.*, [154] courts issued *Lone Pine* orders in cases with two or fewer plaintiffs.

Next, there is disagreement concerning articulable suspicion and, in particular, whether suspicion concerning plaintiffs' claims is a prerequisite or merely a plus factor. On this score, judges tend to agree that if they are skeptical of plaintiffs' claims--and particularly if credible evidence directly undercuts plaintiffs' key assertions (as in *Lore v. Lone Pine* itself)--this skepticism militates in favor **\*39** of an order's entry. [155] Conversely, courts agree that if there is no reason to be wary, that fact ought to counsel against an order's issuance. [156] But courts disagree on the crucial question of whether a *Lone Pine* order should *ever* issue absent gaps or anomalies in plaintiffs' evidence. [157]

Finally, courts disagree as to whether *Lone Pine* orders are broadly permissible or permissible only in "exceptional circumstances" when, for example, the defendant is able to demonstrate that traditional filtering mechanisms (such as those that Rules 12(b)(6) and 56 provide) have been exhausted or are otherwise insufficient. [158] Taking the latter tack, numerous courts suggest that *Lone Pine* orders are "extraordinary procedure [s]" [159] and both are and ought to be orders of last resort. On this view, *Lone Pine* orders should be issued only when "existing procedural devices explicitly at the disposal of the parties by statute and federal rule have been exhausted or where they cannot accommodate the unique issues of [the] litigation." [160] But other courts disagree. Indeed, some have gone so far **\*40** as to deem the issuance of a *Lone Pine* order customary or, as the Third Circuit recently put it, "routine." [161]

### b. Timing: Pre- or Post-Discovery?

Just as there is disagreement concerning whether a case merits entry of a *Lone Pine* order, there is disagreement concerning when such an order ought to issue. On one end of the continuum, some courts enter *Lone Pine* orders early in the litigation, before plaintiffs have had any opportunity to conduct discovery. [162] In fact, several courts and commentators *define Lone Pine* orders as "pre-discovery" orders. [163] Other courts weigh the posture of a case--including whether discovery has or has not commenced--as one of several factors that bear on an order's propriety. On this view, the further along the litigation is, the more appropriate a *Lone Pine* order may be. [164] Going a step further, other courts insist that prediscovery orders are not merely disfavored: they are outright impermissible. [165] Finally, as noted above, numerous courts--and particularly MDL transferee **\*41** courts--reserve the order's entry until the tail-end of litigation, when a comprehensive settlement agreement is inked and individual plaintiffs face a choice of whether to acquiesce to that settlement, or instead pursue further litigation back in the transferor court. [166]

### c. Content: What Should a *Lone Pine* Order Say?

Last, but not least, if a court decides to issue a *Lone Pine* order, it must decide precisely how much information to demand. There is, again, variance. Some so-called *Lone Pine* orders, which really resemble the plaintiff fact sheets described above, are bare-bones, requiring each plaintiff to divulge information about her diagnosis and when, where, and how she was exposed to the defendant's product or contaminant. This information is generally in a responsible plaintiff's possession or can be easily obtained. In the *Avandia* MDL, for example, the court merely required plaintiffs to provide their names, addresses, and dates of birth; proof of Avandia usage; proof of qualifying injury (identified from a court-provided list); and information concerning the time that elapsed between the onset of injury and the discontinuation of product use. [167]

Most orders, however, are more demanding. They require plaintiffs to color in the causal arrow: to proffer expert evidence (which, depending on the court, may have to pass muster under *Daubert* and Federal Rule of Evidence 702 [168] ) to **\*42** support a clear connection between the plaintiff's injury and the defendant's allegedly tortious conduct. [169] Taking this tack, for example, a 1997 *Lone Pine* order from a state court in Oklahoma required each plaintiff to supply an "affidavit of a physician or other expert, which shall include ... [a] differential diagnosis which establishes that the physician or expert has formed an opinion that, more probably than not, the plaintiffs' illness did not have some etiology other tha[n] exposure to [the toxin at issue]." [170] In the *Fosamax* MDL--where the "twilight" order was issued late in the litigation--the transferee court required nonsettling plaintiffs to present "a case-specific expert discovery report from a qualified medical expert attesting that the injury Plaintiff suffered was caused by Fosamax." [171] Or, in a 1991 case out of Montana, the court issued an order requiring plaintiffs to submit expert affidavits identifying "the precise injuries, illnesses, or conditions suffered ...; the particular chemical or chemicals that, in the opinion of the physician, caused each injury, illness, or condition; and the *scientific and medical bases* for the physician's opinions." [172]

### 2. Out of Step with the Formal Procedural Scheme

A further concern is that *Lone Pine* orders are not just innovative; they don't just operate in the interstices of existing rules. Rather, they stand in tension with--and permit courts to make end-runs around--certain procedural requirements.

### \*43  a. At Odds with Rule 56

Most notably, *Lone Pine* orders--and particularly prediscovery *Lone Pine* orders--extinguish claims while depriving plaintiffs of the procedural and substantive protections embedded within Rule 56. Numerous courts have recognized this oddity and the temptation it may supply. Thus, for example, the Eleventh Circuit recently cautioned that *Lone Pine* orders "should not be used as (or become) the platforms for pseudo-summary judgment motions." [173] Colorado's intermediate court recently declined defendants' invitation to supplant the procedures set forth in Rule 56 with "ad hoc procedures not otherwise provided for under Colorado law." [174] And, in unusually blunt language, a dissenting appellate court judge in California has chided his colleagues for affirming the dismissal of plaintiffs' case for failure to comply with a *Lone Pine* order, dubbing the termination "a bastardized process which had the purpose and effect of summary judgment but avoided the very procedures and protections the Legislature deemed essential." [175] However expressed, the worry is that, by using a homemade mechanism (i.e., a *Lone Pine* order) to extinguish plaintiffs' well-pleaded complaint, a trial court may deprive plaintiffs of crucial safeguards that Rule 56 would otherwise furnish.

One such safeguard involves the proper allocation of the burden of production. It is black-letter law that when a party moves for summary judgment, she must show that there is "no genuine dispute as to any material fact" and that she "is entitled to judgment as a matter of law," recognizing that the court will view all facts and resolve all doubt in favor of the nonmoving party. [176] The burden is allocated to the movant because Rule 56 makes continued litigation--the slow march to trial--the default. If a party seeks to halt her opponent's slow march, Rule 56 establishes that she bears the initial burden of doing so. *Lone Pine* orders, **\*44** by contrast, relieve defendants of any such responsibility. In so doing, they jettison Rule 56's "protective requirement" that "the moving party carry the initial burden to prove that a claim lacks evidentiary support." [177]

A second safeguard involves plaintiffs' access to discovery. Generally, a court cannot grant a movant's motion for summary judgment without giving the non-movant a reasonable opportunity to conduct discovery. [178] As utilized by many courts,

however, *Lone Pine* orders demand showings similar to what would be demanded via summary judgment. But plaintiffs' discovery rights are infringed or nullified. [179]

Finally, and perhaps of gravest concern, a trial judge can use a *Lone Pine* order to terminate a case while insulating herself from meaningful appellate review. Typically, a trial judge who extinguishes a claim prior to trial (whether pursuant to Rule 12(b) or Rule 56) has her determination reviewed de novo. [180] The appellate court reviews the matter from scratch and gives no deference to the lower court. [181] By contrast, when a trial judge terminates a case using a *Lone Pine* order, that determination is typically made under Rule 16(f)(1)(C), which authorizes a trial court to issue "any just order[] ... if a party or its attorney fails to obey a ... pretrial order." [182] As such, the trial court's decision is not reviewed de novo; instead, it is reviewed for abuse of discretion, the most deferential standard, second only to no review at all. [183]

**\*45  b. At Odds with Other Rules, Too**

*Lone Pine* orders also resemble, but distort, other procedural requirements. For instance, to the extent the orders impose on plaintiffs the onus of assembling adequate proof to support their claims soon after initiating suit, *Lone Pine* orders-- and particularly those issued prior to discovery-- echo Rule 11. (Given this resemblance, certain courts have justified their decisions to issue, or affirm the issuance of, *Lone Pine* orders by reference to Rule 11's requirements. [184]) But *Lone Pine* orders impose a more exacting burden on plaintiffs than Rule 11. While Rule 11 mandates prefiling reflection, it stops short of requiring counsel to certify that, at the time of filing, any particular allegation *has* evidentiary support. To the contrary, Rule 11(b)(3) merely requires counsel to certify, "if specifically so identified," that the allegations "will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." [185] According to the Advisory Committee, this latitude is necessary because "sometimes a litigant may ... need discovery ... to gather and confirm evidentiary support for the allegations." [186] Thus, while prediscovery *Lone Pine* orders essentially require plaintiffs to have prima facie evidence at the outset, Rule 11, quite emphatically, does not. [187]

**\*46**  So, too, *Lone Pine* orders (or, more accurately, dismissals for failure to comply therewith) in some ways function as a discovery sanction. As such, the *Lone Pine* process mirrors Rule 37, which authorizes a range of penalties for noncompliance with court-ordered discovery, up to and including dismissal with prejudice. [188] But again, there is a conspicuous discrepancy between *Lone Pine* and Rule 37: the former tends to make dismissal with prejudice the ho-hum go-to penalty for noncompliance, while, per Rule 37, it is "well settled" that dismissal with prejudice is a "drastic penalty which should be imposed only in extreme circumstances." [189] In fact, a Rule 37 dismissal is seen as such a harsh punishment that it is to be preceded by consideration of less severe penalties [190] and accompanied by a finding that the recalcitrant party's conduct noncompliance results from willfulness or bad faith. [191] A *Lone Pine* dismissal, of course, entails no such findings and contains no such protections.

### *3. Specific Causation Is Not Susceptible to Easy Resolution*

A third and final problem with *Lone Pine* orders is that, as noted above, most courts use the orders to probe contested questions of specific causation. Like the order imposed in the *Love Canal* litigation, courts require plaintiffs to supply "[r]eports or affidavits of a physician or other qualified expert demonstrating that each injury ... was, in fact, caused by the plaintiff's exposure to chemicals at or from the old Love Canal landfill." [192] Or, as in *Simeone v. Girard City Board of Education*, a court may require plaintiffs to

**\*47**  [p]rovide sworn statements from experts that to a reasonable degree of medical probability, the [plaintiffs] illnesses, injuries, and conditions were caused by the exposure; and

[p]rovide sworn statements from experts that to a reasonable degree of medical probability, the [plaintiffs'] illnesses, injuries, and conditions could not have been caused but for that exposure. [193]

In so doing, *Lone Pine* orders demand an unrealistic level of certainty.

Specific causation is mass torts' Achilles heel. [194] The problem is that, to prevail under the formal law, a plaintiff must show that the defendant caused her harm by the preponderance of the evidence. [195] However, except on those rare occasions when exposure to a toxic agent manifests as a "signature disease"--as diethylstilbestrol (DES) exposure while in utero (sometimes) manifested as vaginal adenocarcinoma, thalidomide exposure while in utero (sometimes) manifested in limb reduction, Agent Orange exposure (sometimes) manifested in chloracne, asbestos exposure (sometimes) manifested as asbestosis or mesothelioma, and fen-phen use (sometimes) manifested as Primary Pulmonary Hypertension--we, as a society, lack the ability to trace a particular substance to a particular individual's illness or injury. [196] We are reasonably good at assessing general causation (i.e., that a defendant's toxic agent has the capacity to cause a **\*48** particular disease), though assembling relevant evidence often requires significant effort, ample time, and considerable expense. [197] But except for signature diseases, specific causation remains stubbornly speculative--regardless of whether the matter is assessed in a generalized or specialized tribunal, even when exposure and injury are not at issue, and even when the plaintiff's case is otherwise strong. [198]

The obstacles are seemingly insurmountable. Toxins do not usually leave tell-tale scars. And because they operate at a microscopic or submicroscopic level, there is no eye witness to relevant "events." [199] Compounding the difficulty, epidemiological statistics--which constitute the gold standard of available evidence--can, if the stars align, offer evidence concerning the "excess risk" created by the toxic agent as against the "background risk" that confronts the population as a whole, which, again if the stars align, may support a statistical inference that the toxic agent was or was not more-likely-than-not responsible for the plaintiff's condition. [200] But, at least currently, epidemiology simply cannot go further or say more. [201]

The *Vioxx* litigation, which made headlines in the early 2000s, provides a vivid example of how these dynamics play out in practice. There, general causation was quickly established. It was basically uncontested that Vioxx--a prescription-grade pain reliever marketed by Merck and prescribed to some twenty **\*49** million Americans--significantly increased one's odds of suffering a heart attack or stroke. [202] Based on authoritative studies, experts calculated that, in the United States, tens of thousands of individuals who took Vioxx (maybe as many as 139,000), suffered cardiac events that they would not have suffered absent Vioxx exposure. [203] But who? When considering the enormous universe of Vioxx users and, within it, the sizable cohort of users who suffered a time-consistent cardiac event, no one--not Merck's experts, not plaintiffs' experts, and not independent experts--could reliably distinguish among those for whom Vioxx was a but-for cause (i.e., those who died or had a stroke or heart attack because of their Vioxx use) and those who would have suffered that same fate absent Vioxx exposure. [204]

In cases like *Vioxx*, offering truly satisfying evidence of specific causation is virtually impossible. So, what to do? Many options are available, and have been thoroughly vetted and much discussed. [205] But the reality--though it is infrequently acknowledged-- is that, when confronted with *Vioxx*-like situations, what courts and litigants *have done* is to gather as much information as possible and then, if the litigation has legs, fashion rough and sensible compromises. [206] **\*50** If plaintiffs are able to clear a series of hurdles--including, often, that they amass sufficient credible evidence of general causation to survive a *Daubert* challenge and, thereafter, a motion for summary judgment and, after that, notch some victories in a handful of bellwethers-- mass-tort cases tend to settle. [207] And they tend to settle using grids, matrices, or point systems whereby compensation to those who qualify (i.e., those who satisfy the settlement agreement's sometimes onerous eligibility requirements) will rise or fall based on, among other things, the observed likelihood that the claimant's injury was actually caused by the defendant's tortious conduct. [208]

**\*51** Thus, to return to *Vioxx*, after the court denied defendant's motion for summary judgment and the parties conducted a series of bellwether trials, some of which plaintiffs won and some of which defendant won, the sprawling litigation ultimately settled for $4.85 billion after months of hard bargaining. [209] The settlement agreement itself contained strict eligibility requirements that gestured toward specific causation: a plaintiff was entitled to payment if and only if she could show that she suffered a qualifying injury (defined as a heart attack, sudden cardiac death, or an ischemic stroke) while taking, or within weeks or months of having taken, a sufficient quantity of Vioxx. [210] Then, for those qualifying, the *amount* of payment rose or fell based, in part, on injury severity and claimant-specific causation-related determinants such as whether the claimant smoked, had a family history of heart disease, or had certain defined preexisting conditions. [211]

The crucial point is that, in *Vioxx*, and often in mass torts, through the alchemy of private administration, the vexing on/off switch of specific causation under the formal law yields to an informal system that is explicitly probabilistic and sensitive to scientific uncertainty. [212]   In the system that results, cut points are smoothed and softened. And for those who satisfy the settlement agreement's sometimes stringent eligibility requirements, payment becomes proportionate rather than binary--a question of "more or less," rather than "all or none."   **52**  Though surely imperfect, the informal system that has developed is stable, relatively efficient, morally defensible, reasonably equitable, and broadly consistent with tort's twin aims of deterrence and compensation. [213]

*Lone Pine*, which engrafts a binary filter onto a question that is not susceptible to a yes-or-no answer, represents a sharp departure from all of that. The burden that results is unrealistic, and the exercise is onerous and unrewarding. [214]   Indeed, perhaps recognizing just what a weighty burden *Lone Pine* orders impose, one commentator arguably says too much, suggesting that *Lone Pine* orders are "particularly well suited to chemical exposure cases, where causation may be difficult for plaintiffs to prove" since "even if the chemical is identified, linking the injury to the plaintiffs' [toxic] exposure may be virtually impossible." [215]

## IV. A POSSIBLE PATH FORWARD

Mass-toxic-tort cases are complicated and sprawling. Further, as Part II showed, some mass torts with certain definable features can become magnets for nonmeritorious claims. Judges need to have appropriate tools to identify and extinguish these groundless claims as early, easily, and efficiently as possible. The   **53**  question, though, is what those tools ought to be and how they can be fashioned to minimize their potential for abuse. That is the matter to which I now turn.

In Section A, I draw upon the lessons above to offer guidance to courts. Relying in part on the *Digitek* factors, I propose that *Lone Pine* orders ought to be exceptional and utilized only when (1) other procedures explicitly sanctioned by rule or statute are practically unavailable or patently insufficient; and (2) substantial evidence casts doubt upon some or all plaintiffs' entitlement to relief and/or some or all plaintiffs have displayed a marked and unjustifiable lack of diligence in pursuing the action. In Section B, I observe that, for courts justifiably eager to facilitate particularized fact-finding, plaintiff fact sheets offer many of the benefits courts associate with *Lone Pine* orders but come with few of the attendant disadvantages.

### A. Lone Pine *Orders Ought to Be Cautiously Utilized*

Given the problems outlined above, it is tempting to say that *Lone Pine* orders ought to be outlawed. That step, however, is difficult to justify. As the Ninth Circuit has observed: "[n]o basis appears for us to cordon off one type of order--a *prima facie* order on exposure and causation in toxic-tort litigation--from the universe of case management orders that a district court has discretion to impose." [216]   *Lone Pine* orders are, it seems, here to stay. But whether to cabin their use is another matter entirely.

To assess whether or not to issue a *Lone Pine* order, in recent years, roughly a dozen courts have applied a five-factor test, first developed by transferee Judge Goodwin in 2010 in the midst of the *Digitek* litigation. [217]   Pursuant to these *Digitek* factors, in deciding whether to issue a *Lone Pine* order, courts consider

> **54**  (1) the posture of the action, (2) the peculiar case management needs presented, (3) external agency decisions impacting the merits of the case, (4) the availability and use of other procedures explicitly sanctioned by federal rule or statute, and (5) the type of injury alleged by plaintiffs and its cause. [218]

Judge Goodwin's invention marks an admirable first step, but the factors' adoption has been spotty, and the test provides insufficient guidance. (Indeed, some of the variability discussed in Section III.B.1 may be seen as a testament to the *Digitek* factors' shortcomings.) Some factors are underspecified: *how exactly* should the court assess the "case management needs presented"? Others are undertheorized: by what metric should the court evaluate the type of injury alleged and its cause--and why in the world should that matter? Other factors are unduly circumscribed: why should a court consider whether "external agency

decisions impact[] the merits of the case" but ignore other credible evidence that casts doubt on the plaintiffs' contentions? Beyond that, the *Digitek* factors represent a totality-of-the-circumstances test, and, as is common with such tests, courts have struggled with how much weight to accord each factor, impairing consistency and predictability. [219]

Rather than adhere to the *Digitek* factors as written, I suggest that courts blend certain factors and harden them into prerequisites. In particular, courts ought to combine factors (2) and (4) to establish that *Lone Pine* orders (i.e., case management orders that demand particularized, prima facie evidence of injury, exposure, and specific causation) should be utilized only when other procedures explicitly sanctioned by rule or statute are unavailable or are patently insufficient, given the litigation's particular case-management needs. At the same time, courts ought to expand *Digitek* factor (3) to fashion a second hard limit, namely that *Lone Pine* orders may be utilized only when substantial evidence casts doubt upon at least some plaintiffs' entitlement to relief and/or at least some plaintiffs have displayed a marked and unjustifiable lack of diligence in prosecuting the action.

Some courts have already embraced the first restriction--that *Lone Pine* orders should be orders of last resort. [220] This restriction is also consistent with  **\*55**  how courts utilize and, according to the Supreme Court, are supposed to utilize, their interstitial authority. [221]  Generally, the formal rules are, and are supposed to be, the go-to; interstitial or inherent authority is supposed to be a backstop. [222]  Applying that familiar principle here means that *Lone Pine* may be in the toolkit, but it should be an instrument used only when formally sanctioned mechanisms are not practically available or have been tried but fail. [223]

The second guidepost looks to *Lone Pine* orders' articulated purpose: "to identify and cull potentially meritless claims and streamline litigation in complex cases." [224]  Starting there, it directs courts to evaluate whether (a) substantial, credible evidence casts doubt upon at least some plaintiffs' entitlement to relief and/or (b) in prosecuting the action, at least some plaintiffs have displayed a marked and unjustifiable lack of diligence. [225]  Subpart (a) echoes but expands on the third *Digitek* factor, which directs courts to consider whether external agency decisions impact the merits of the case. Expansion is necessary because, on some occasions, there is reason to be dubious of plaintiffs' claims. But the skepticism derives not from a governmental study but, rather, some other compelling fact or circumstance--such as, for instance, the fact that certain plaintiffs alleging  **\*56**  injury did not live in the contaminated area, [226]  were not yet born, [227]  or evidence an unfortunate "habit" of dismissing cases as soon as those cases start to draw scrutiny. [228]  Subpart (b)--lack of diligence--is not a factor courts currently address. But it lurks behind several courts' orders, including *Lore v. Lone Pine* itself. [229]  And such consideration is warranted, as the orders, as they exist, in part, to expedite litigation and promote judicial economy. [230]  They may be used, therefore, when the litigation stalls due to plaintiffs' dilatory conduct.

Finally, drawing on *Digitek* factor (1), when imposing *Lone Pine* orders, courts ought to remain mindful of the action's posture and relative maturity and seek to "strike a balance between efficiency and equity." [231]  In operation, this balance will--and should--typically tilt against prediscovery *Lone Pine* orders, as, for the reasons explained above, prediscovery orders resemble orders issued pursuant to Rule 56 but deprive plaintiffs of crucial safeguards that Rule 56 otherwise affords.

### **\*57**  *B. Plaintiff Fact Sheets Can Fulfill Many of the Aims of* Lone Pine *Orders but at Lower Cost and with Fewer Drawbacks*

Above, I suggest that courts ought to harden certain factors into prerequisites. In so doing, I advocate cabining courts' discretion and also limiting their reliance on, and issuance of, *Lone Pine* orders. But that does not mean I support a restriction on defendants' ability to engage in particularized fact-finding. Rather, the point is that another vehicle offers many, if not all, of the legitimate benefits *Lone Pine* orders supply with few of the attendant disadvantages.

It is and ought to be uncontroversial that, even in mass-tort cases, defendants are entitled to claimant-specific discovery. In nonaggregate actions, plaintiffs must produce relevant information; there is little basis to relieve plaintiffs of that burden simply because a claim is consolidated. [232]  Beyond that, the requirement is broadly beneficial: knowing who has suffered which injury and based on what evidence helps litigants and the court assess the litigation's strength, composition, and character.

Plaintiff fact sheets, in the words of leading defense lawyer Sheila Birnbaum, offer "a relatively clear and objective snapshot of the merits underlying each claim," making them an efficient vehicle to obtain this valuable information.[233] Plaintiff fact sheets can inquire as to the following:

> (1) Cognizable Injury - Identification of the plaintiff's injury, illness, or condition, including basic information regarding the diagnosis and treatment thereof;

> (2) Exposure - Underlying facts or data relied upon when forming the opinion that the plaintiff was exposed, or was likely exposed, to the defendant's product or toxic agent;

> (3) Past Claiming - When warranted, whether the plaintiff has previously sought compensation for the instant injury, illness, or condition, and the precise compensation sought and obtained.

 **\*58** These inquiries demand that the plaintiff supply information that she should already have in her possession, or that she could have in her possession with modest effort. And, crucially, all three zero in on the three areas--(1) misdiagnosis, (2) defendant manipulation, and (3) double-dipping--that, as discussed in Part II, appear to constitute the bulk of overclaiming activity.

Further, though fact sheets are less expensive, expansive, and demanding than *Lone Pine* orders, in the past they have effectively culled meritless claims. According to the Federal Judicial Center, of sixty-six recent product-liability MDLs with plaintiff fact sheets, a solid majority (fifty-five percent) "included evidence (including show-cause orders) of activity to dismiss cases when substantially complete PFS had not been filed."[234]

*Silica* provides a useful example. Early in that MDL, transferee Judge Janis Graham Jack ordered each plaintiff to submit a fairly bare-bones fact sheet to "develop the factual basis for the claims of each plaintiff."[235] In particular, plaintiffs had to specify their "diagnosis and pertinent medical and diagnostic information, as well as the results of B-reads [diagnostic interpretations] of chest x-rays."[236] Once submitted, however, the fact sheets revealed several suspicious patterns, including the fact that the over nine thousand plaintiffs were under the day-to-day care of approximately eight thousand different physicians but were *diagnosed with silicosis* by only a dozen practitioners.[237] Fact sheets in hand, the defendants began deposing the handful of doctors who had supplied the diagnoses at issue, and once under oath, the doctors essentially recanted, and plaintiffs' case promptly crumbled.[238] At the end of the day, commentators agreed that Judge Jack's decision to require fact sheets was key to "uncovering diagnostic irregularities" and bringing that litigation to a swift and decisive end.[239]

In other contexts, plaintiff fact sheets have been similarly effective. In the *Phenylpropanolamine* litigation, for example, the trial court was able to use fact sheets to weed out more than 850 claims that had otherwise languished on the **\*59** court's docket.[240] In the *Welding Fumes* MDL, transferee Judge Kathleen O'Malley required each plaintiff to provide a fact sheet certifying that she had been examined by a licensed physician and that the physician had diagnosed her with a qualifying manganese-induced neurological disorder.[241] Taking cues from *Silica*, the fact sheets also inquired as to whether "the medical conclusion by the above-named doctor [was] made at a screening."[242] This no-frills order reportedly cut the number of pending cases in half.[243] And in the *Avandia* litigation, described above, the court's so-called *Lone Pine* order--which was more accurately described as a straightforward plaintiff fact sheet-- prompted the termination of roughly half of the two thousand cases then pending.[244]

To be sure, fact sheets are only useful to the extent that they are narrowly tailored. Scattershot or expansive disclosures are wasteful, intrusive, and self-defeating.[245] Likewise, to be beneficial, fact sheets must be completed fully, truthfully, and expeditiously. To promote accuracy and accountability, courts should require that plaintiffs sign fact sheets under oath, possibly in the physical presence of their lawyers (who might be asked to attest, in writing, that they have discussed each submission with each client).[246] To deter dithering, prevarication, **\*60** and gamesmanship, courts ought to impose firm deadlines, specify

procedures for addressing deficiencies, and set clear consequences for noncompliance.[247] Indeed, bringing us full circle, courts might choose to ratchet up those consequences, with a first step being that, after being afforded a reasonable opportunity to cure any deficiencies, noncompliant plaintiffs will face entry of a *Lone Pine* order, and those who fail to comply with *that* order will see their claims dismissed with prejudice.[248]

## V. THE LARGER LESSONS OF *LONE PINE*

Stepping back, the foregoing study imparts a number of lessons that help us to better understand contemporary complex litigation in the United States, the way it is evolving, and fertile sites of future inquiry.

### A. Managerial Judging (Still)

First, courts' use of *Lone Pine* orders illustrates, and offers further evidence of, what Judith Resnik has famously dubbed "managerial judging."[249] In her seminal 1982 article, Resnik observed that, over the preceding few years, judges had "departed from their earlier attitudes" characterized by "[d]isengagement **\*61** and dispassion" and had instead adopted "a more active, 'managerial' stance."[250] No longer content to sit passively and resolve discrete issues served up by litigants, managerial judges, she wrote, were getting off the sidelines and starting to take upon themselves the larger and more amorphous task of controlling the pace, content, and character of litigation.[251]

Reflecting both hands-on management and seat-of-the-pants improvisation, *Lone Pine* orders are a product of this era (recall, they were invented in 1986, and they took hold soon thereafter), and they embody it. After all, when a judge issues a *Lone Pine* order, she is no disengaged or passive umpire. Instead, she reaches around the written rules to insert herself into the (traditionally binary, litigant-driven) discovery process. In so doing, she compels plaintiffs to supply the precise information that *she* has identified as important, at a specific time *she* has chosen as convenient, and in the precise form that *she* has set forth. Further, if she is dissatisfied with the plaintiffs' submission, she will dismiss claims, sometimes entire cases, outside the auspices of Rules 12, 37, or 56. A lesson of *Lone Pine* is that, for better or worse, well into its fourth decade, the "managerial judge" remains a central fixture of the American legal landscape. And echoing an observation made by Peter Schuck, the mass-tort realm gives judges an arguably unprecedented opportunity to flex their managerial might.[252]

Two larger lessons follow. The first is straightforward: MDL judges' penchant for heavy-handed management is neither a coincidence nor a surprise, as the MDL system is specifically engineered to promote hands-on intervention. To see why, one need only to grasp three facts. First, unlike generally within the federal system (who are assigned to cases randomly), transferee judges are *chosen*--they are handpicked by the Judicial Panel on Multidistrict Litigation **\*62** (JPML)--and the numbers are such that only a small minority of contenders gets tapped.[253] Second, judges are not indifferent to that selection. To the contrary, MDLs are seen as plum assignments, and district court judges clamor for the opportunity.[254] Indeed, eighty percent of judges who have handled one MDL want another, and seventy percent of judges who have not yet been assigned an MDL hope to get the nod.[255] Third, judges are, it is widely believed, chosen *specifically for* their managerial abilities. As Elizabeth Chamblee Burch has observed: the JPML "has exhibited a historic commitment to awarding new proceedings to active case managers."[256] This adds up to the following: in MDLs, the table is set for management, and it is no surprise that management is served. The important corollary is that, absent some change in the factors above, MDLs will, for better or worse, continue to feature assertive supervision.

The second lesson speaks to judicial management more broadly and, in particular, the normative valence of this specific flavor of judicial oversight. For a long time, judicial management has been, by turns, lauded and criticized. Some suggest that early and muscular judicial intervention is broadly beneficial. According to these proponents, assertive judicial management preserves scarce resources,[257] expedites adjudication,[258] reduces lawyer-client agency costs,[259] and even improves the "quality of justice."[260] Critics paint a darker portrait. They contend that, rather than improving the quality of justice, active judicial management actually diminishes it by, among other things, eroding consistency and **\*63** horizontal equity,[261] subjecting litigants to arbitrary or abusive power,[262] limiting party autonomy,[263] inhibiting transparency,[264] and impairing procedural

justice.[265] Critics also note that, rather than reducing transaction costs, muscular management may, in fact, increase transaction costs, perhaps considerably.[266]

Few, however, have raised questions regarding judicial management's potential *partiality*. In particular, many have picked up on the obvious and uncontroversial fact that, in the course of management, a judge can influence the case's substantive outcome: by granting latitude here while withholding it there, the judge might delay or accelerate settlement or induce a party to settle on more or less favorable terms.[267] But there has been little discussion of a subtly different **\*64** dynamic: the very act of heavy-handed management *itself* may, on average and over time, tilt the playing field.[268]

A study of *Lone Pine* orders--one peculiar management device--raises that provocative possibility. After all, *Lone Pine* orders are not symmetric. They are approvingly described as a "weapon" that defendants can wield--or, more accurately, induce courts to wield--against plaintiffs.[269] Other pretrial management techniques "eliminate[] entirely some theories or lines of inquiry" and, as such, also presumably benefit defendants at the expense of their plaintiff-side adversaries.[270] Meanwhile, researchers have suggested that certain trial-based management techniques, such as the imposition of rigid time limits,[271] the decision to admit written (rather than live) testimony,[272] and bifurcation,[273] may do much the same. To be sure, none of this proves that management, in the aggregate, has a substantive valence. Nor (it ineluctably follows) can we say that managerial judging skews the playing field toward this or that side.[274] But another **\*65** lesson of *Lone Pine* is that such skewing is plausible, and that prospect merits empirical and theoretical inquiry going forward.[275]

### B. Of Stop Signs, Friction Points, and the Ever-Accelerated Adjudication of Claims

Next, *Lone Pine* orders fit into, and elucidate, larger, interlocking stories of both plaintiff retrenchment and the ever-more-preliminary disposition of claims. On the former, as noted above, *Lone Pine* orders are not symmetric; they impose burdens on--and only on--plaintiffs. Seen in this light, *Lone Pine* orders are a part of, and help to illustrate, a larger story of what Stephen Burbank and Sean Farhang dub the "counterrevolution against federal litigation."[276]

Over the past four decades, courts and policymakers have radically altered the law's fabric, but they have not done so by curtailing or erasing substantive rights.[277] They have instead done so quietly, fraying and tearing holes in the fabric of private enforcement.[278] This retrenchment is seen just about everywhere, and it has affected just about everything, including *Lujan*'s and *Lyons*'s restrictive conception of Article III standing;[279] *Daubert*'s imposition of gatekeeping requirements on expert testimony;[280] the Supreme Court's reflexive enforcement **\*66** of even lopsided arbitration agreements;[281] statutory and court-created limitations on class certification;[282] "*Twiqbal*'s" imposition of heightened pleading standards;[283] Rule 26's revised proportionality requirement;[284] and the capacious expansion of summary judgment following the *Celotex* trilogy.[285]

As Arthur Miller has observed, the immediate effect of these myriad changes has been clear: to transform the "uncluttered pretrial process envisioned by the original drafters of the Federal Rules into a morass of litigation friction points."[286] The broader effect is equally obvious: the changes above have, collectively, increased the cost and risk associated with filing claims and asserting one's substantive rights.[287]

In erecting yet another "procedural stop sign" that plaintiffs must clear, courts' acceptance of *Lone Pine* orders ought to be seen as a new verse in this now-familiar tune.[288] Intriguingly, though, the verse is in a new register, for a lesson of *Lone Pine* is that for all of our fretting about how Congress, the Supreme Court, and the Rules Committee have erected stop signs and friction points, with far less fanfare, obscure trial-judge-made procedures may be doing much the same.

At the same time, *Lone Pine* orders signal a different, though related, trend: a move toward ever-more-preliminary case disposition. For a long time, trial was **\*67** the main event. As one observer put it over a half century ago: "The heart of the judicial process is the trial .... All that precedes the trial is but preparation. All that follows is but the correction of error."[289] Consistent with that lofty perspective, in 1938, when the Rules made their debut, roughly twenty percent of federal cases made it

to trial, and a solid majority (sixty-three percent) of adjudicated terminations consisted of trial verdicts. [290] Pretrial adjudication was not exactly unheard of, but it was undeniably rare. [291]

By the late 1980s, however, that had changed. The trial rate dipped below six percent. [292] Whereas, in 1975, more than twice as many cases were resolved by trial as were resolved by summary judgment, by 1988 the two had flipped. In terms of case terminations, summary judgment had started to eclipse trial. [293] Fueled, some say, by *Celotex Corp. v. Catrett* and its progeny, which liberalized Rule 56, litigation's center of gravity had crept forward in time, from trial to the pretrial period. [294] It was *discovery*, not trial--the *deposition*, not the cross-examination--that became the focal point of American civil litigation. [295]

**\*68**  Fast-forward another forty years to the present. Now, civil trials are all but extinct. [296] Federal courts' resolved-by-summary-judgment as compared to resolved-by-trial ratio, which, as of 1975, was skewed toward the latter, is now skewed heavily toward the former, perhaps on the order of 6:1. [297] Further, it may be that history is repeating itself, but with a twist. Just as we "evolved past" the civil trial in favor of (supposedly cheaper and easier) pretrial adjudication in the last century, might it be that now we are on the verge of "evolving past" full-  **\*69**  throated discovery, in favor of (supposedly cheaper and easier) court-ordered submissions, albeit only from plaintiffs? Just as trial has vanished, in other words, might it be that discovery is also disappearing, or at least in eclipse?

Further, in the latter decades of the last century, we came to accept that trial *had* to be limited. Worried about bulging caseloads and a sharp uptick in protracted proceedings, we collectively gave up on the "day-in-court" ideal. [298] Instead, we set about constructing an elaborate procedural architecture to, in the frank words of the Federal Courts Study Commission, "ration[] access to the court." [299] Might it be that today we are undergoing a similar conceptual metamorphosis and starting to construct similarly restrictive mechanisms, but now, the resource we are rationing and curtailing is not trial but, rather, more preliminary fact-gathering? Like trial in the days of yore, could it be that access to reciprocal discovery is starting to be viewed, not as a right that is freely given and broadly available but, instead, as a benefit that must be doggedly earned by first convincing the court of a claim's legitimacy? [300]

**\*70  *C. The (Formal) Customization of Civil Procedure***

Third, *Lone Pine* orders offer a window into the quiet (formal) customization of American civil procedure. In the United States, we continue to cling to the notion that our procedural rules are transsubstantive: the same rules, many insist, apply to all cases, regardless of the size or the nature of claims. [301] Indeed, many believe that the one-size-fits-all nature of our Rules is the key to the Rules' genius; their transsubstantive nature is "one of the major achievements of the Federal Rules of Civil Procedure," [302] in part because generally applicable procedures supply a crucial bulwark against "interest group politics." [303]

Yet as we have seen, *Lone Pine* orders are not transsubstantive. They are almost exclusively reserved for, and issued in, mass-tort cases. [304] And in terms of *non*transsubstantive procedure, *Lone Pine* orders are hardly alone. Federal rules are positively littered with entitlement-specific requirements, the vast majority of which impose extra burdens on particular plaintiffs. Per Federal Rule of Civil Procedure 9(b), plaintiffs asserting federal fraud claims must plead those claims with particularity. [305] Owing to the Prison Litigation Reform Act, prisoners seeking relief must clear onerous requirements, [306] and different rules govern habeas proceedings, too. [307] Securities plaintiffs have to overcome hurdles imposed by the Private Securities Litigation Reform Act of 1995. [308] Admiralty and maritime  **\*71**  claims face special restrictions. [309] Patent plaintiffs confront both cramped joinder rules and limited venue provisions. [310] Many courts impose a separate set of procedures in their adjudication of FOIA claims and social security appeals, though, like *Lone Pine*, they do so in the shadow of formal processes. [311] Different intervention rules govern certain federal environmental suits. [312] And on top of all of that, components of Federal Rules 4, 4.1, 5.2, 12, 23.1, 26, and 71.1 all deviate, in one way or another, from the transsubstantive script. [313]

*Lone Pine* orders help to show that, though many continue to insist that our procedural rules are transsubstantive, the reality is that the transsubstantive ship has, for better or worse, sailed. [314] What is left, then, is a second-order debate, where we consider

not whether to *retain* transsubstantive procedure but, instead, whether to jettison or modify the tailored rules we already have or, alternatively, whether we would be wise to create ever more case- and substance-specific procedural requirements. [315]

### D. The (Informal) Customization of Civil Procedure: Assessing Ad Hocery

Finally, *Lone Pine* orders are not just nontranssubstantive. They are simultaneously a species of ad hoc procedure and, as such, tee up urgent questions concerning the relative merit and outer limits of judicial innovation. As noted at the **\*72** outset, ad hoc procedure--that is, judge-made procedure "designed to address a procedural problem that arises in a pending case or litigation"-- is much discussed and hotly debated. [316] Indeed, ad hoc procedure's propriety is arguably the biggest question currently brewing in civil-procedure scholarship. [317] To this point, however, much of the debate is broad-brush and acontextual. Ad hoc procedure is, by turns, celebrated or condemned, but often in a one-size-fits-all format. [318]

Breaking with that mode, this study considers a *particular* judicial innovation. This perspective gives us leverage to evaluate not the overarching question of whether ad hoc procedure (writ large) is good or bad, as that determination implicates idiosyncratic value judgments and depends on as-yet-unresolved empirical questions. [319] Rather, it provides leverage on a question that is equally important but somewhat more tractable: *when precisely* might procedural innovation cause particular concern? Specifically addressing that question, the above study suggests that such innovation is most worrisome on two occasions: when it permits trial courts to (1) evade traditional institutional constraints and/or (2) subvert the limits imposed by formal law. [320]

Regarding institutional constraints, in their adjudication of civil claims, trial courts are traditionally hemmed in on three sides. They are limited by juries who, per the Seventh Amendment, are supposed to have the final say. [321] They are limited by precedent, which, under the doctrine of stare decisis, is supposed **\*73** to guide and cabin court discretion. [322] And they are limited, of course, by appellate review. [323]

In issuing a *Lone Pine* order, however, a trial judge can effectively bypass all three. The jury is a nullity; the whole point of a *Lone Pine* order is that, if the plaintiffs' submissions aren't up to snuff, the case will be dismissed. Precedent does little: though some appellate courts have weighed in to bless the *Lone Pine* mechanism, no appellate court has (so far) set up detailed guideposts to cabin or channel its use. Lastly, as noted in Part III, when trial courts issue *Lone Pine* orders--even when they extinguish claims or entire cases for deficient submissions--the exercise is reviewed not de novo (as a pretrial termination is typically reviewed) but rather under the extremely deferential abuse-of-discretion standard. [324] *Lone Pine* orders, in other words, are judge-made inventions that endow trial judges with freedom that they would not otherwise possess. Trial judges can, consequently, use the orders to aggrandize their own power at the expense of other institutional actors. [325]

While liberating trial courts from institutional constraints, *Lone Pine* orders also permit courts to dodge the limits imposed by formal law. When courts exercise ad hoc authority, they often operate in clear "decision-spaces" carved out by statute or procedural or evidentiary rule--or at least in the interstices of such authority. When issuing *Lone Pine* orders, however, courts do not operate within an existing rule, save the essentially unbounded authority of Rule 16. [326] Further, as explained in Section III.B.2, their actions sometimes circumvent specific requirements. On some occasions, courts reach the *same result* as they would under the formal law (i.e., the termination of a plaintiff's claim for insufficient evidence, as under Rule 56, or the dismissal of the claim with prejudice for noncompliance with what is essentially a discovery order, as under Rule **\*74** 37(b)(2)(A)(v)). But judges reach that result in a *manner* that departs from the law's command and, in fact, in a way that denies one party otherwise-applicable procedural protections.

This matters because, to the extent that a court can effectively deprive one party or another of procedural protections simply by improvising and cloaking the improvisation in Rule 16 or inherent authority, trouble ensues. [327] Such judicial improvisation frustrates the legitimate expectations of parties, as litigants cannot know ex ante whether the formal rule (with protections) or the improvised rule (without the protections) will apply. It raises separation-of-powers concerns because if Congress has spoken to a procedural question, it is supposed to have the final say. [328] It impairs consistency, predictability, and horizontal equity because, as long as judges are making it up as they go along, two even similarly situated decision-makers may decide cases differently. [329] Particularly when the judicial improvisation is unilateral rather than bilateral (and the court's action effectively strips formal procedural protections from one party, rather than both), the action raises weighty questions concerning due process, impartiality,

and fundamental fairness. And stepping back, if we permit courts simply to bypass rules whenever the rules seem cumbersome, antiquated, or just don't "fit," we will potentially stunt legitimate procedural reform efforts. [330]

The lesson, then, is that moving forward, when assessing the promise and pitfalls of ad hoc procedure, it may be useful to evaluate this flavor of judicial discretion along two distinct axes. First, notwithstanding the procedural innovation, is the trial judge still subject to traditional intrabranch institutional constraints (i.e., juries, precedent, or meaningful appellate review)? To the extent that those constraints remain, concerns are alleviated. To the extent that those constraints are minimized or sidelined, concerns become more acute. Second, is **\*75** the judge (purposefully or not) using ad hoc authority to circumvent the formal law? In particular, is the judge achieving the same ends as she might under the formal law but, by using a tool that is homespun rather than prefabricated, depriving a party of rights or protections that the formal law would otherwise afford? [331] To the extent the judicial action circumvents formal requirements, and particularly to the extent the effect of the circumvention is to deprive only one party of procedural protections, due-process and rule-of-law concerns become more acute.

**CONCLUSION**

Mass torts pull some plaintiffs with nonmeritorious claims out of the proverbial woodwork. Once swept into the litigation, these nonmeritorious claims impose discernable costs. They clog courts, waylay settlements, and divert scarce resources away from those with genuine entitlements and urgent financial need. Understandably, judges overseeing complex litigation want these questionable claims *gone*. Casting about for a way to hasten the claims' identification and speedy elimination, numerous judges have, in recent years, settled on the *Lone Pine* mechanism. This, too, is understandable. *Lone Pine* orders are legal, permissible, and enthusiastically lauded by commentators. Yet as I explain above, **\*76** these orders have disadvantages that ought to give courts pause, particularly since there is another cheaper and more-narrowly tailored mechanism that appears to offer similar advantages but comes with fewer drawbacks.

One aim of this Article, then, has been to limit courts' reliance on and issuance of *Lone Pine* orders. But this Article has other ambitions, too. Most notably, this Article has sought to show that *Lone Pine* orders have not taken root in isolation. Rather, they sit at the intersection of broad currents that are coursing through the contemporary civil justice system. Moving fast and seemingly picking up speed, these currents--the rise of managerial judging, the counterrevolution against federal litigation, the move toward ever-more-preliminary case disposition, a provocative (and still only potential) transformation in courts' conception of reciprocal discovery, the fracturing of transsubstantive procedure, the rise in ad hoc procedural innovation, and, as discussed in the Introduction, the recent, dizzying growth of big MDLs--are, even considered individually, inadequately understood. By pulling back the curtain on an obscure mechanism that sits at the crossroads of these currents, this study seeks to enrich our understanding of these broad, controversial, and consequential phenomena.

**Footnotes**

[a1]   Professor of Law and Deane F. Johnson Faculty Scholar, Stanford Law School. I am grateful to Amos Espeland, Alyssa Picard, Sam Pokross, and the researchers at the Stanford Law School library for indefatigable research assistance. I am also indebted to Elizabeth Chamblee Burch, Robin Effron, David Freeman Engstrom, John Freeman, Abbe Gluck, Mark Green, Alexi Lahav, Mark Lemley, David Marcus, Francis McGovern, David Noll, John Rabiej, Robert Rabin, Teddy Rave, Judith Resnik, Judge Jack Weinstein, Margaret Williams, John Fabian Witt, and Diego Zambrano, as well as participants at the Brooklyn Law School, Stanford Law School, and University of Virginia Faculty Workshops for helpful feedback on previous drafts. I am finally grateful to Samuel Issacharoff and the NYU Center on Civil Justice for kick-starting my research into this topic. All errors are mine alone.

[1]   FED. R. CIV. P. 16(c)(2)(L).

[2]   Scott A. Steiner, Note, *The Case Management Order: Use and Efficacy in Complex Litigation and the Toxic Tort*, 6 HASTINGS W.-NW. J. ENVTL. L. & POL'Y 71, 86 (1999).

3    FED. R. CIV. P. 1.

4    Among other things, the bill provides that, within forty-five days of transferring a personal injury action into an MDL, "counsel for a plaintiff ... shall make a submission sufficient to demonstrate that there is evidentiary support ... for the factual contentions in plaintiff's complaint regarding the alleged injury, the exposure to the risk that allegedly caused the injury, and the alleged cause of the injury." Fairness in Class Action Litigation and Furthering Asbestos Claim Transparency Act of 2017, H.R. 985, 115th Cong. § 105.

5    *See Meeting of the Advisory Committee on Civil Rules*, ADVISORY COMM. ON CIVIL RULES 471, 475 (Nov. 7, 2017), https://www.uscourts.gov/sites/default/files/2017-11-CivilRulesAgendaBook_0.pdf [https://perma.cc/LC3C-A5VR].

6    *See* Nora Freeman Engstrom & Amos Espeland, *Lone Pine Orders: A Critical Examination and Empirical Analysis*, 168 U. PA. L. REV. ONLINE 91 (2020) (manuscript t on file with author).

7    Many judges have voiced concerns about, as one put it, the "untethered use of the *Lone Pine* process." *In re* Digitek Prods. Liab. Litig., 264 F.R.D. 249, 257 (S.D. W. Va. 2010). However, few commentators have offered critiques. The primary exceptions are two thoughtful student notes: John T. Burnett, Note, *Lone Pine Orders: A Wolf in Sheep's Clothing for Environmental and Toxic Tort Litigation*, 14 J. LAND USE & ENVTL. L. 53 (2018); and Michelle Sliwinski, Note, *Addressing the Fissures in Causation Claims: A Case Against the Use of* Lone Pine *Orders as Procedural Hurdles in Hydraulic Fracturing Litigation*, 7 GEO. WASH. J. ENERGY & ENVTL. L. 77 (2016).

8    For the uninitiated, 28 U.S.C. § 1407 (2018) authorizes the Judicial Panel on Multidistrict Litigation to transfer like cases from all federal courts to one "transferee" judge for pretrial processing.

9    Judith Resnik, *''Vital'' State Interests: From Representative Actions for Fair Labor Standards to Pooled Trusts, Class Actions, and MDLs in the Federal Courts*, 165 U. PA. L. REV. 1765, 1772 (2017).

10   An individual lawsuit may consolidate the claims of dozens or hundreds of individual plaintiffs, and so the above figures understate the litigation's size. For that fact, as well as the thirty-seven and ninety-five percent figures, see ELIZABETH CHAMBLEE BURCH, MASS TORT DEALS: BACKROOM BARGAINING IN MULTIDISTRICT LITIGATION 9-10 (2019). For the 124,000 figure, see *Table S-19: Cases Transferred by Order of the Judicial Panel on Multidistrict Litigation, Cumulative from September 1968 Through September 30, 2017*, JUD. PANEL ON MULTIDISTRICT LITIG. (Sept. 30, 2017), https://www.uscourts.gov/sites/default/files/data_tables/jb_s19_0930.2017.pdf [https://perma.cc/82WA-23W5]. Finally, because claims consolidated into MDLs take an especially long time to resolve, the proportion of *pending* federal cases within the MDL system eclipses the proportion of *filed* federal cases within the system in any given year. *See* Margaret S. Williams, *The Effect of Multidistrict Litigation on the Federal Judiciary over the Past 50 Years*, 53 GA. L. REV. 1245, 1271 (2019).

11   *See MDL Statistics Report--Distribution of Pending MDL Dockets by District*, JUD. PANEL ON MULTIDISTRICT LITIG. (May 15, 2019), https://www.jpml.uscourts.gov/sites/jpml/files/Pending_MDL_Dockets_By_District-May-15-2019.pdf [https://perma.cc/AZ55-ZJK9].

12   *See id.* (reporting the total actions in MDL No. 875).

13   *See, e.g.,* *In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1231 (9th Cir. 2006) (acknowledging that "the court must figure out a way to move thousands of cases toward resolution on the merits while at the same time respecting their individuality"). An open--but key--question is what the aim of this group treatment should be,

and, in particular, whether a transferee judge's objective ought to be to resolve all claims or merely to conduct pretrial proceedings and ready the claims for remand and eventual trial back at the transferor court. *See* BURCH, *supra* note 10, at 27-28 (quoting transferee judges with radically different perspectives, as one declared "I view my job in this MDL [a]s to bring every single one of the cases that was transferred here to a resolution," while another explained "the assignment is to manage the pretrial proceedings as an Article III judge and, when finished, suggest remand to the court of origin for trial").

14    For the classic articulation of the procedural, ethical, and choice-of-law problems endemic to mass-tort litigation, see generally Jack B. Weinstein, *Ethical Dilemmas in Mass Tort Litigation*, 88 NW. U. L. REV. 469 (1994). For an example of public scrutiny, see Jan Hoffman, *Can This Judge Solve the Opioid Crisis?*, N.Y. TIMES (Mar. 5, 2018), https://www.nytimes.com/2018/03/05/health/opioid-crisis-judge-lawsuits.html [https://perma.cc/9YR5-AXEH]. For time constraints, see Transcript of Proceedings at 4, 13, *In re* Nat'l Prescription Opiate Litig., MDL No. 2804 (N.D. Ohio Jan. 9, 2018) (quoting MDL transferee Judge Polster as observing that for every delay in the opioid litigation's resolution, tens of thousands of Americans will die).

15    Indeed, Abbe Gluck, who recently conducted interviews with experienced transferee judges, reports that "[t]he recurring comment" among her interviewees was that "the very hallmark of the MDL is the ability to deviate from traditional procedures." Abbe R. Gluck, *Unorthodox Civil Procedure: Modern Multidistrict Litigation's Place in the Textbook Understandings of Procedure*, 165 U. PA. L. REV. 1669, 1689 (2017); *accord* BURCH, *supra* note 10, at 120 (explaining that it is "expected" that a transferee judge will fashion his own "'MDL common law'"); David L. Noll, *The Rule of Law in Multidistrict Litigation*, 118 MICH. L. REV. (forthcoming 2019) (manuscript at 1), https://papers.ssrn.com/abstract=3371952 (explaining that, in MDLs, "judges and lawyers devise ad hoc solutions to problems of organization, settlement, and management").

16    CTR. FOR JUDICIAL STUDIES, DUKE LAW SCH., STANDARDS AND BEST PRACTICES FOR LARGE AND MASS-TORT MDLS xii (2014) [hereinafter 2014 DUKE REPORT].

17    *See, e.g.*, 🔖*In re* Vioxx Prods. Liab. Litig., 574 F. Supp. 2d 606 (E.D. La. 2008), *reconsidered in part*, 650 F. Supp. 2d 549 (E.D. La. 2009); *In re* Zyprexa Prods. Liab. Litig., 424 F. Supp. 2d 488, 495 (E.D.N.Y. 2006).

18    *See, e.g.*, *Meeting of the Advisory Committee on Civil Rules*, ADVISORY COMM. ON CIVIL RULES 92 (Nov. 1, 2018), https://www.uscourts.gov/sites/default/files/2018-11_civil_rules_agenda_book_0.pdf [https://perma.cc/538W-7BNW] (describing the experience of a transferee judge who "recently sat on the bench for three days with a state-court judge at a Daubert hearing").

19    Howard M. Erichson, *Mass Tort Litigation and Inquisitorial Justice*, 87 GEO. L.J. 1983, 1983 (1999) (discussing the appointment of independent experts).

20    Howard M. Erichson & Benjamin C. Zipursky, *Consent Versus Closure*, 96 CORNELL L. REV. 265, 274-92 (2011) (critiquing the "controversial" *Vioxx* settlement).

21    Noll, *supra* note 15, at 6; *see* Pamela K. Bookman & David L. Noll, *Ad Hoc Procedure*, 92 N.Y.U. L. REV. 767 (2017); Jonathan T. Molot, *An Old Judicial Role for a New Litigation Era*, 113 YALE L.J. 27 (2003); Todd D. Peterson, *Restoring Structural Checks on Judicial Power in the Era of Managerial Judging*, 29 U.C. DAVIS L. REV. 41, 47 (1995); Judith Resnik, *Failing Faith: Adjudicatory Procedure in Decline*, 53 U. CHI. L. REV. 494, 548 (1986); Jay Tidmarsh, *Pound's Century, and Ours*, 81 NOTRE DAME L. REV. 513, 558-59 (2006). Robert Bone would add that when judges improvise, they are apt to make poor decisions, owing to "bounded rationality constraints, information access obstacles, and strategic interaction effects." Robert G. Bone, *Who Decides? A Critical Look at Procedural Discretion*, 28 CARDOZO L. REV. 1961, 1986 (2007). Alexandra Lahav offers two additional drawbacks: (1) when judges improvise, they add (perhaps unnecessarily) to their already-heavy workloads, and (2) the fact that procedure is up for grabs may incentivize litigants to engage in undesirable strategic behavior. Alexandra D. Lahav, *Procedural*

*Design*, 71 VAND. L. REV. 821, 879 (2018). For examples of ad hoc procedures outside the MDL context, see *id.* at 879; Shirin Sinnar, *Procedural Experimentation and National Security in the Courts*, 106 CALIF. L. REV. 991, 1050-53 (2018); and Elizabeth G. Thornburg, *The Managerial Judge Goes to Trial*, 44 U. RICH. L. REV. 1261 (2010).

22      *See* Nora Freeman Engstrom, *The Trouble with Trial Time Limits*, 106 GEO. L.J. 933, 979 (2018); *infra* Section III.B.1 (describing the inconsistent application of *Lone Pine* orders and how this inconsistency impairs predictability and horizontal equity).

23      For a defense of procedural experimentation, see, for example, Steven S. Gensler, *Judicial Case Management: Caught in the Crossfire*, 60 DUKE L.J. 669, 700-01 (2010); Maurice Rosenberg, *Judicial Discretion of the Trial Court, Viewed from Above*, 22 SYRACUSE L. REV. 635, 642 (1971); and Jack B. Weinstein, *After Fifty Years of the Federal Rules of Civil Procedure: Are the Barriers to Justice Being Raised?*, 137 U. PA. L. REV. 1901, 1911 (1989).

24      *See, e.g.*, Tia Schneider Denenberg & Richard V. Denenberg, *The Future of the Workplace Dispute Resolver*, DISP. RESOL. J., June 1994, at 48, 57 (proposing that the guiding principle in determining an appropriate dispute resolution process should be to make "the forum fit the fuss"); Francis E. McGovern, *Toward a Functional Approach for Managing Complex Litigation*, 53 U. CHI. L. REV. 440, 491 (1986) ("Both the litigation management and ADR movements suggest that significant benefits can be achieved if judges and attorneys become active in tailoring procedures to meet the needs of individual disputes.").

25      FED. R. CIV. P. 16 advisory committee's notes to 1983 amendment ("[T]he Committee felt that flexibility and experience are the keys to efficient management of complex cases.").

26      FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION 3 (4th ed. 2004). Elsewhere, the *Manual* exhorts judges to "tailor case-management procedures to the needs of the particular litigation." *Id.* § 10.1; *accord* ADVISORY COMM. ON CIVIL RULES & THE WORKING GRP. ON MASS TORTS, REPORT ON MASS TORT LITIGATION, *reprinted in* 187 F.R.D. 293, 307 (1999) [hereinafter ADVISORY COMM. REP.] (concluding an ambitious study of mass-tort litigation with a plea for flexibility and experimentation).

27      *See* Alvin K. Hellerstein et al., *Managerial Judging: The 9/11 Responders' Tort Litigation*, 98 CORNELL L. REV. 127, 177 (2012) ("For those who question whether the judge exceeded his authority in managing a nonclass mass tort litigation, it is unclear what alternative he might have embraced.").

28      *See* Gluck, *supra* note 15, at 1672.

29      Until recently, MDLs were mostly ignored in the academic literature. *See* Andrew D. Bradt, *''A Radical Proposal'': The Multidistrict Litigation Act of 1968*, 165 U. PA. L. REV. 831, 847 (2017) ("Compared to the class action, MDL was, until recently and with notable exceptions, relatively underemphasized in academic literature."); Gluck, *supra* note 15, at 1676 ("[T]here is relatively little academic work on the MDL ....").

30      *See* 2014 DUKE REPORT, *supra* note 16, at ii (exhorting commentators to "begin to build a compendium" of procedural best practices); John G. II Heyburn & Francis E. McGovern, *Evaluating and Improving the MDL Process*, 38 LITIG. 26, 32 (2012) (reporting experienced lawyers' belief that "transferee judges need more guidance").

31      🚩 No. L-33606-85, 1986 WL 637507 (N.J. Super. Ct. Law Div. Nov. 18, 1986).

32 For more on the plaintiffs, see Paul D'Ambrosio, *Pollution Claims Against Lone Pine Rejected*, ASBURY PARK PRESS, Nov. 19, 1986, at A1.

33 For more on the landfill, see Leo H. Carney, *Lone Pine Landfill Called Peril to Aquifers*, N.Y. TIMES, Aug. 28, 1983, at NJ11; and *Once a Wilderness, Now a Wasteland*, N.Y. TIMES, Aug. 28, 1983, at NJ11.

34 ⚑ *Lone Pine*, 1986 WL 637507, at *1; D'Ambrosio, *supra* note 32, at A1.

35 D'Ambrosio, *supra* note 32, at A1.

36 ⚑ *Lone Pine*, 1986 WL 637507, at *1.

37 *Id.*

38 ⚑ *Id.* at *3.

39 *Id.*

40 *Id.* at *1-2. Judge Wichmann subsequently gave the plaintiffs an extension until August 19, 1986. Sue Epstein, *Judge Dismisses Landfill Suit, Claiming Residents Failed to Prove Damage*, STAR-LEDGER (Newark), Nov. 19, 1986, at 42.

41 ⚑ *Lone Pine*, 1986 WL 637507, at *4.

42 Epstein, *supra* note 40, at 42 (quoting Judge Wichmann).

43 ⚑ *Lone Pine*, 1986 WL 637507, at *3.

44 *Id.*

45 ⚑ *Id.* at *4.

46 *Id.*

47 Here, of course, I offer a spin on the title of Wex S. Malone's classic piece, *Damage Suits and the Contagious Principle of Workmen's Compensation*, 12 LA. L. REV. 231 (1951).

48 *See* Judith Resnik, *Procedural Innovations, Sloshing Over: A Comment on Deborah Hensler,* A Glass Half Full, a Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation, 73 TEX. L. REV. 1627, 1631-34 (1995); Jay Tidmarsh, *Civil Procedure: The Last Ten Years*, 46 J. LEGAL EDUC. 503, 503, 512 (1996). Examples of this dynamic abound. A particularly vivid one involves trial time limits. Trial time limits were invented in 1977, in the midst of a seemingly interminable civil trial--an "antitrust battle royale" that pitted two corporate giants against one another and comprised approximately 30,000 factual allegations. Engstrom, *supra* note 22, at 941. Then, for

a number of years thereafter, trial time limits were-- true to their initial form--utilized only in complex and protracted civil cases. *Id.* But in time, courts relaxed those restrictions and started "to impose time limits not just in [the] small subset of complex, protracted cases, but in the full run of litigation," including, even, criminal trials. *Id.* at 942-43. Following a similar script, active case management, which originated in the 1950s in order to simplify complex antitrust litigation, has, slowly but surely, made its way into general practice. *See* Gluck, *supra* note 15, at 1681; Tidmarsh, *supra*, at 506. Even certain discovery practices, now enshrined in the formal rules, trace their lineage "back to complex litigation, where managerial judges and lawyers had often created systems of voluntary information exchange as a means of facilitating the movement of vast quantities of information in a reasonable time frame." Tidmarsh, *supra*, at 509.

49    Tidmarsh, *supra* note 48, at 503; *accord* Resnik, *supra* note 48, at 1632 ("[I]nnovations in large cases affect what happens in small, so-called 'ordinary' cases."); *id.* at 1634 ("What judges and lawyers perceive to be useful in one arena will *not* remain a procedure only for the 'extraordinary.'").

50    DAVID F. HERR, ANNOTATED MANUAL FOR COMPLEX LITIGATION § 11.34, at 61 (4th ed. 2017).

51    Arias v. DynCorp, 752 F.3d 1011, 1014 (D.C. Cir. 2014).

52    *In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., 687 F. App'x 210, 214 (3d Cir. 2017); *accord In re* Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 743 (E.D. La. 2008) (suggesting that, since their 1986 invention, "Lone Pine orders have been routinely used by courts to manage mass tort cases"), *aff'd*, 388 F. App'x 391 (5th Cir. 2010).

53    *In re* Fosamax Prods. Liab. Litig., No. 06 MD 1789(JFK), 2012 WL 5877418, at *2 (S.D.N.Y. Nov. 20, 2012).

54    John H. Beisner & Jessica D. Miller, *Litigate the Torts, Not the Mass: A Modest Proposal for Reforming How Mass Torts Are Adjudicated*, WASH. LEGAL FOUND. 19 (2009), https://s3.us-east-2.amazonaws.com/washlegal-uploads/upload/beisner09.pdf [https://perma.cc/ZNM6-UP3X].

55    David R. Erickson & Justin W. Howard, *Fighting for a* Lone Pine *Order in Complex Toxic Tort Litigation*, SHOOK, HARDY & BACON LLP 7 (2007), https://www.shb.com/~/media/files/professionals/ericksondavid/fightingforalonepineorder.doc; *accord* Eduardo C. Robreno, *The Federal Asbestos Product Liability Multidistrict Litigation (MDL-875): Black Hole or New Paradigm?*, 23 WIDENER L.J. 97, 138 (2013) (observing that courts are entering *Lone Pine* orders in a "growing number of cases"); Bolch Judicial Inst., *Guidelines and Best Practices for Large and Mass-Tort MDLs*, DUKE LAW SCH. 95 (2d ed. 2018) [hereinafter *2018 Duke Guidelines*], https://judicialstudies.duke.edu/wp-content/uploads/2018/09/MDL-2nd-Edition-2018-For-Posting.pdf [https://perma.cc/M9PU-RX7S] ("[C]ourts are increasingly using Lone Pine orders ...."); Amy Schulman & Sheila Birnbaum, *From Both Sides Now: Additional Perspectives on "Uncovering Discovery,"* ADVISORY COMM. ON CIVIL RULES 8 (2010), https://www.uscourts.gov/sites/default/files/amy_schulman_and_sheila_birnbaum_from_both_sides_now.pdf [https://perma.cc/D8X3-GEHN] (stating that *Lone Pine* orders are being issued "with increasing frequency").

56    The problem is that Westlaw captures only the tip of any litigation iceberg, and when it comes to what subset of material Westlaw captures, there is bound to be variation over time and across space, confounding any effort to identify "trends." *See* David Freeman Engstrom, *The Twiqbal Puzzle and Empirical Study of Civil Procedure*, 65 STAN. L. REV. 1203, 1209 n.24, 1214-16 (2013). Further, even if we were to know the numerator (how many *Lone Pine* orders have been issued), we would not know the denominator (how many toxic-tort cases have, since 1986, been prime candidates for an order's entry).

57     I have so far identified ninety-seven *Lone Pine* orders, issued by both state and federal courts. For a discussion of how those orders were located and categorized, see Engstrom & Espeland, *supra* note 6, at 10-11.

58     BURCH, *supra* note 10, at 127 (reporting that, in her very large dataset of recent product liability MDLs, the majority featured *Lone Pine* orders); Elizabeth Chamblee Burch, *Nudges and Norms in Multidistrict Litigation: A Response to Engstrom*, 129 YALE L.J.F. 64, 68 (2019) ("Using a dataset of products-liability MDLs that settled over the course of fourteen years, I found that judges in sixteen of thirty-four proceedings issued *Lone Pine* orders, or 47%.").

59     *In re* Love Canal Actions, 547 N.Y.S.2d 174, 179 (Sup. Ct. 1989), *aff'd as modified*, 555 N.Y.S.2d 519 (App. Div. 1990).

60     *In re* Asbestos Prods. Liab. Litig. (No. VI), 718 F.3d 236, 241 (3d Cir. 2013).

61     *In re* Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 745 (E.D. La. 2008), *aff'd*, 388 F. App'x 391 (5th Cir. 2010).

62     *In re* Fosamax Prods. Liab. Litig., No. 06 MD 1789(JFK), 2012 WL 5877418, at *4-5 (S.D.N.Y. Nov. 20, 2012).

63     Pretrial Order No. 370, *In re* Rezulin Prods. Liab. Litig., No. 00 Civ. 2843(LAK), 2005 WL 1105067 (S.D.N.Y. May 9, 2005); Pretrial Order, *In re* N.Y. Rezulin Prods. Liab. Litig., Master Index No. 752,000/00 (N.Y. Sup. Ct. Aug. 11, 2004).

64     Pretrial Order No. 29, *In re* Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig., No. M:05-CV-01699-CRB (N.D. Cal. Aug. 1, 2008).

65     Case Management Order No. 11, *In re* Zimmer NexGen Knee Implant Prods. Liab. Litig., No. 1:11-cv-05468, 2016 WL 3281032 (N.D. Ill. June 10, 2016).

66     *In re* Baycol Prods. Liab. Litig., No. MDL 1431 MJD/JGL, 2004 WL 626866, at *1 (D. Minn. Mar. 18, 2004).

67     Pretrial Order No. 121, *In re* Avandia Mktg., Sales Practices and Prods. Liab. Litig., No. 2007-MD-1871, 2010 WL 4720335 (E.D. Pa. Nov. 15, 2010).

68     Pretrial Order No. 17, *In re* Fresenius Prods. Liab. Litig., No. 13-02428-DPW (D. Mass. Jan. 26, 2017).

69     *In re* Oil Spill by the Oil Rig "Deepwater Horizon," MDL No. 2179, 2016 WL 614690, at *5, *12 (E.D. La. Feb. 16, 2016); *In re* Oil Spill by the Oil Rig "Deepwater Horizon," MDL No. 2179, 2014 WL 12692765 (E.D. La. July 17, 2014).

70     *See In re* Digitek Prods. Liab. Litig., 264 F.R.D. 249, 256 (S.D.W. Va. 2010) (recognizing that "no federal rule or statute requires, or even explicitly authorizes, the entry of Lone Pine orders").

71     FED. R. CIV. P. 16(c)(2)(L). *See, e.g.*, McManaway v. KBR, Inc., 265 F.R.D. 384, 385 (S.D. Ind. 2009) ("*Lone Pine* orders are permitted by Rule 16(c)(2)(L) of the Federal Rules of Civil Procedure."); Ramos v. Playtex Prods., Inc.,

Nos. 08 CV 2703, 08 CV 2828, 08 CV 3352, 2008 WL 4066250, at *6 (N.D. Ill. Aug. 27, 2008) (same); *cf.* McMunn v. Babcock & Wilcox Power Generation Grp., 896 F. Supp. 2d 347, 351 (W.D. Pa. 2012) (citing, instead, Rule 16(c)(2)(A), which authorizes courts to adopt procedures for the purpose of "formulating and simplifying the issues and eliminating frivolous claims or defenses"). In state courts, authority to issue *Lone Pine* orders is said to emanate from a range of sources, including courts' inherent authority. *See, e.g.*, Cottle v. Superior Court, 5 Cal. Rptr. 2d 882, 886 (1992), *modified* (Mar. 20, 1992).

72  For a case where the appellate court reversed the entry of a *Lone Pine* order as premature, see Adinolfe v. United Techs. Corp., 768 F.3d 1161, 1168 (11th Cir. 2014). As noted in the text, Colorado's high court has held that Colorado rules "do not allow" *Lone Pine* orders. Antero Res. Corp. v. Strudley, 347 P.3d 149, 151 (Colo. 2015). At least two intermediate courts have also cast doubt on the Lone Pine mechanism. Downie v. Atrium Med. Corp., No. 2013-CV-00155, 2014 WL 8102958, at *1 (N.H. Super. Ct. July 28, 2014) (observing that "no New Hampshire court has ever issued a Lone Pine order" and stating that "it is, at best, questionable if the Court even has the discretion to enter a Lone Pine order"); Simeone v. Girard City Bd. of Educ., 872 N.E.2d 344, 355 (Ohio App. Ct. 2007) (questioning whether *Lone Pine* orders are authorized "under Ohio law").

73  *In re* Mohawk Rubber Co., 982 S.W.2d 494, 499 (Tex. App. 1998) (conditionally granting the defendant's petition for a writ of mandamus and directing the trial court to issue a *Lone Pine* order).

74  For example, in *Silica*, described in more detail below, the court required plaintiffs to complete "Fact Sheets" supplying basic information. *In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 576 (S.D. Tex. 2005). Yet, subsequent cases have inaccurately described these fact sheets as *Lone Pine or*ders. *See, e.g.*, Abbatiello v. Monsanto Co., 569 F. Supp. 2d 351, 353 n.3 (S.D.N.Y. 2008); *In re* Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 743 (E.D. La. 2008). Conversely, in *Avandia*, the court issued a self-described *Lone Pine* order that, more accurately, required the completion of fact sheets. *See infra* note 244 and accompanying text. For information about fact sheets' popularity, see Margaret S. Williams et al., *Plaintiff Fact Sheets in Multidistrict Litigation: Products Liability Proceedings 2008-2018*, FED. JUD. CTR. 3 (Mar. 2019), https://www.fjc.gov/sites/default/files/materials/49/PFS%20in%20MDL.pdf [https://perma.cc/LA5M-TTLZ] (reporting that fact sheets were ordered in eighty-one percent of recent product liability MDLs with more than one hundred actions); *see also* Elizabeth J. Cabraser & Katherine Lehe, *Uncovering Discovery*, 12 SEDONA CONF. J. 1, 8 n.40 (2011) (explaining that the use of fact sheets to "replac[e] formal interrogatories with supposedly less onerous, more fact-oriented formats is now a common practice in mass tort multidistrict litigation").

75  Brian R. Martinotti, *Complex Litigation in New Jersey and Federal Courts: An Overview of the Current State of Affairs and a Glimpse of What Lies Ahead*, 44 LOY. U. CHI. L.J. 561, 572 (2012) ("*Lone Pine* orders typically require plaintiffs to provide case-specific expert reports establishing ... that their injuries are caused by the defendant's conduct--and the scientific basis for the experts' opinions."); Williams et al., *supra* note 74, at 2 ("*Lone Pine* orders are a case-management tool requiring production by the plaintiff of an expert affidavit identifying case-specific evidence of causation.").

76  FED. JUD. CTR., MANUAL FOR COMPLEX LITIGATION § 22.83 (4th ed. 2004) (describing plaintiff fact sheets as "questionnaires directed to individual plaintiffs" that are served "[i]n lieu of interrogatories"); *2018 Duke Guidelines*, *supra* note 55, at 10 ("[Fact sheets] are court-approved, standardized forms that seek basic information about plaintiffs' claims."). Just as there are plaintiff fact sheets, there are defendant fact sheets, which compel the defendant to provide basic information that it has in its possession regarding the claimant or her claim. For more on defendant fact sheets, see Williams et al., *supra* note 74, at 3-4.

77  *See* 2014 DUKE REPORT, *supra* note 16, at 14-15 (defining fact sheets and providing examples); Williams et al., *supra* note 74, at 3 (summarizing findings upon a review of 116 plaintiff fact sheets).

78    Williams et al., *supra* note 74, at 2 (reporting that studied plaintiff fact sheets "frequently required medical or other types of releases").

79    *Id.* at 6 ("In 55% of proceedings in which PFS were ordered, there was some docket activity related to dismissal of cases for failure to submit substantially complete forms."); *see, e.g.*, *In re* Gen. Motors LLC Ignition Switch Litig., No. 14-MD-2543 (JMF), 2017 WL 9772106, at *1 (S.D.N.Y. June 16, 2017) (dismissing the claims of thirteen plaintiffs with prejudice, due to plaintiffs' "continued failure to submit PFSs as required" by court order); *In re* Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig., No. 2:14-mn-02502-RMG, 2015 WL 12844447, at *2 (D.S.C. June 19, 2015) (dismissing the claims of eight plaintiffs for failure to complete plaintiff fact sheets); *see also In re* Roundup Prods. Liab. Litig., No. 3:16-md-02741-VC, at 4 (N.D. Cal. Sept. 26, 2018) (explaining that plaintiffs who fail to submit timely fact sheets will be subject to dismissal).

80    Furthermore, it should be clear that the two devices are not mutually exclusive. A court might issue a plaintiff fact sheet at one point in the litigation and a *Lone Pine* order at another point in the litigation. *See* Williams et al., *supra* note 74, at 2.

81    *Id.* (reporting on a study of 116 plaintiff fact sheets issued in MDLs centralized between 2008 and 2018 and explaining that "[n]one of the PFS covered in this report required expert testimony or sworn statements to be submitted as part of the PFS process").

82    *See infra* note 168 and accompanying text.

83    1 CHARLES S. ZIMMERMAN, PHARMACEUTICAL & MEDICAL DEVICE LITIGATION § 13:3 (Dec. 2018 update) (explaining that plaintiff fact sheets demand "standardized information that plaintiffs' counsel have or should have readily available").

84    *MDL Proceedings: Eliminating the Chaff*, U.S. CHAMBER INST. FOR LEGAL REFORM 17 (Oct. 2015), https://www.instituteforlegalreform.com/uploads/sites/1/MDL_Proceedings_web.pdf [https://perma.cc/AA27-68DZ] [hereinafter *MDL Proceedings*].

85    Plaintiff fact sheets have been endorsed by RAND and also by the Bolch Judicial Institute at Duke Law School. *See* STEPHEN J. CARROLL ET AL., THE ABUSE OF MEDICAL DIAGNOSTIC PRACTICES IN MASS LITIGATION: THE CASE OF SILICA xiii, 28 (2009) (suggesting that fact sheets "help ensure adherence to defensible diagnostic practices and allow defendants to more rapidly evaluate and value claims"); *2018 Duke Guidelines*, *supra* note 55, at 10 (specifying, as Best Practice 1C(v): "In large mass-tort MDLs, a court should, on the parties' request, consider issuing a case management order approving plaintiff ... fact sheets"). In addition, leading plaintiff-side lawyers have expressed at least tepid support. *See, e.g.*, Ctr. on Civil Justice, *MDL at 50--The 50th Anniversary of Multidistrict Litigation, Panel 1: Theory of Aggregation: Class Actions, MDLs, Bankruptcies, and More* at 27:41-27:57, N.Y.U. SCH. OF LAW (Oct. 12, 2018) [hereinafter Seeger Statement] (statement of Chris Seeger, Seeger Weiss LLP), https://www.law.nyu.edu/centers/civiljustice/2018-early-fall-conference-mdl-at-50 [https://perma.cc/BZN7-U9UE] ("I don't see a major problem with a plaintiff at some point early on in the case coming up with some basic documentation, like a medical record showing you were on the drug or a medical record indicating that you have at least suffered the type of injury that's at issue."). *But cf.* Burch, *supra* note 58, at 79-80 (raising numerous concerns about plaintiff fact sheets, including that fact sheets "lack standardization" and "can be out of step with the formal procedural scheme").

86    🔖 Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007).

87    Rachel B. Weil, *Knee Implant MDL Judge Enters Aggressive Lone Pine Order*, DRUG & DEVICE L. (June 23, 2016), https://www.druganddevicelawblog.com/2016/06/10720.html [https://perma.cc/2XUH-54B3]; *accord* Michelle Yeary, *Lone Pine by Any Other Name ...*, DRUG & DEVICE L. (Feb. 5, 2019),

Case 4:22-md-03047-YGR   Document 143-4   Filed 02/24/23   Page 33 of 57

https://www.druganddevicelawblog.com/2019/02/lone-pine-by-any-other-name.html [https://perma.cc/9XKW-KAS3] (explaining that *Lone Pine* orders "help clean house").

88    *See Meeting of the Advisory Committee on Civil Rules*, ADVISORY COMM. ON CIV. RULES 149 (Apr. 10, 2018) [hereinafter Apr. 10, 2018 Rules Report], https://www.uscourts.gov/sites/default/files/2018-04-civil-rules-agenda-book.pdf [https://perma.cc/4VK9-V927] (observing that courts issue *Lone Pine* orders in response to an "abiding concern" that many MDL claimants "don't really have claims").

89    Portions of this analysis are adapted from Nora Freeman Engstrom, *Retaliatory RICO and the Puzzle of Fraudulent Claiming*, 115 MICH. L. REV. 639, 650-65 (2017).

90    According to a 2005 Federal Judicial Center study, eighty-five percent of U.S. district court judges surveyed believe that "groundless litigation" is either "no problem" or is a "small" or "very small" problem. Only three percent of district court judges surveyed believe that it is a "large" or "very large" problem. David Rauma & Thomas E. Willging, *Report of a Survey of United States District Judges' Experiences and Views Concerning Rule 11, Federal Rules of Civil Procedure*, FED. JUD. CTR. 4 tbl.1 (2005), https://www.fjc.gov/sites/default/files/2012/rule1105.pdf [https://perma.cc/8EB6-W7C8].

91    In the medical malpractice context, for example, the best evidence suggests that the majority of filed claims involve both a bona fide error and a verifiable injury. David M. Studdert et al., *Claims, Errors, and Compensation Payments in Medical Malpractice Litigation*, 354 NEW ENG. J. MED. 2024, 2024 (2006); *see also* HERBERT M. KRITZER, LET'S MAKE A DEAL: UNDERSTANDING THE NEGOTIATION PROCESS IN ORDINARY LITIGATION 75 (1991) ("[T]here is no evidence to support contentions that large numbers of [frivolous] cases actually lead to litigation."); Stephen N. Subrin & Thomas O. Main, *The Fourth Era of American Civil Procedure*, 162 U. PA. L. REV. 1839, 1887 (2014) ("[T]here is no evidence that frivolous litigation is or has been a serious problem."). For further discussion of groundless litigation, see generally Sachin S. Pandya & Peter Siegelman, *Underclaiming and Overclaiming*, 38 LAW & SOC. INQUIRY 836 (2013).

92    Nora Freeman Engstrom, *When Cars Crash: The Automobile's Tort Law Legacy*, 53 WAKE FOREST L. REV. 293, 308-09 (2018).

93    For more on the auto accident context, and particular auto claimants' assertions of fabricated or grossly exaggerated soft-tissue injury claims, see Engstrom, *supra* note 89, at 641, 660-61. *See also* STEPHEN CARROLL ET AL., THE COSTS OF EXCESS MEDICAL CLAIMS FOR AUTOMOBILE PERSONAL INJURIES 10, 18, 22-23 (1995) (estimating that "59% of the costs submitted in support of soft injury [auto accident] claims is excess"); INS. RES. COUNCIL, FRAUD AND BUILDUP IN AUTO INJURY INSURANCE CLAIMS 3, 29 (2015) ("Claims with the appearance of fraud and buildup were more likely to experience sprains and strains as their most serious injuries ...."); Herbert I. Weisberg & Richard A. Derrig, *Fraud and Automobile Insurance: A Report on Bodily Injury Liability Claims in Massachusetts*, 9 J. INS. REG. 497, 537 (1991) (reporting that only a sizable minority of studied automobile claims that involved only strains and sprains "were judged apparently valid").

94    No one knows what percentage of mass-tort claims are groundless. *See* Engstrom, *supra* note 89, at 655. Adding to the uncertainty, the incidence of such claims undoubtedly varies from case to case, based in part on the factors discussed below, including whether injuries are discernable, whether specific causation is contestable, and whether the action features hundreds, thousands, or tens of thousands of claims. *See infra* Section II.C.

95    *See* Francis E. McGovern, *Resolving Mature Mass Tort Litigation*, 69 B.U. L. REV. 659, 688 (1989) ("[M]ature mass torts generate an overabundance of plaintiffs ... including a substantial number of false positive claims."); Peter H. Schuck, *Mass Torts: An Institutional Evolutionist Perspective*, 80 CORNELL L. REV. 941, 961 (1995) (quoting plaintiffs' lawyer Paul D. Rheingold) ("[M]ass tort actions attract, and mass tort settlements encourage and pay, a large number of claims that are insubstantial--or, in the words of one experienced plaintiffs' lawyer, 'junk.'"); Douglas

G. Smith, *The Myth of Settlement in MDL Proceedings*, 107 KY. L.J. 467, 472 (2019) (noting the "recognized fact that many claims in MDL proceedings lack merit"); Perry Cooper, *Defendants' Gripes with MDLs, and What to Do About Them*, BLOOMBERG L. (Oct. 26, 2017), https://news.bloomberglaw.com/class-action/defendants-gripes-with-mdls-and-what-to-do-about-them [https://perma.cc/6BQG-WQ3L] (quoting leading plaintiffs' attorney Chris Seeger as agreeing "that cases that truly have no merit are a real problem in MDLs").

96    Apr. 10, 2018 Rules Report, *supra* note 88, at 149; *accord* BURCH, *supra* note 10, at 129 ("[A]s soon as the Panel coordinates a proceeding, some lawyers may flood it with dubious claims--build it and they will come."); Mark Herrmann, *To MDL or Not to MDL? A Defense Perspective*, 24 LITIG. 43, 45 (1998) ("In an MDL, as in the *Field of Dreams*: 'If you build it, they will come.'").

97    ADVISORY COMM. REP., *supra* note 26, at 298-99 ("The Working Group finds that some mass torts have an 'elastic' characteristic by which the very identification of a potential mass tort or the subsequent processes of aggregation generate claims that otherwise might not have been filed."); Francis E. McGovern, *An Analysis of Mass Torts for Judges*, 73 TEX. L. REV. 1821, 1840 (discussing "elasticity").

98    Weinstein, *supra* note 14, at 494-95. In past work, I have referred to a variant of the problem in terms of "oversubscription." Engstrom, *supra* note 89, at 655-60. When speaking of "oversubscription," however, I referred only to "fraudulent" claiming, and I defined a fraudulent claim narrowly, as a claim where "the plaintiff or his or her lawyer has actual or constructive knowledge that some material element of the claim is not as it is portrayed." *Id.* at 649. Here, by contrast, I refer to all kinds of groundless litigation, regardless of whether the litigation is fraudulently, frivolously, or innocently initiated.

99    These on-ramps will sometimes merge, meaning a plaintiff's claim may fit into more than one category. For example, certain *Silica* claims were the product of both misdiagnosis and double-dipping, while certain asbestos claims were the product of both misdiagnosis and defendant manipulation. *See In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 589-603 (S.D. Tex. 2005) (discussing double-dipping and misdiagnosis of silicosis and asbestosis).

100   Apr. 10, 2018 Rules Report, *supra* note 88, at 160 (observing that a "key problem" that many commentators had raised regarding MDLs "is the proliferation of claims by those who ... have not suffered injury").

101   *In re Silica*, 398 F. Supp. at 635-36.

102   Robert Lenzner & Michael Maiello, *The $22 Billion Gold Rush*, FORBES (Mar. 24, 2006, 8:20 PM) (quoting claimant-side lawyer Michael Fishbein), http://www.forbes.com/forbes/2006/0410/086.html [https://perma.cc/8SKZ-4TH6]. Supporting Fishbein's conclusion, a Duke University cardiologist called in to review claimants' echocardiograms chillingly concluded: "Thousands of people have been defrauded into believing that they have valvular heart disease when in fact they do not." *Id.* (quoting court-appointed cardiologist Dr. Joseph Kisslo). For further discussion, see *In re Diet Drugs Prods. Liab. Litig.*, 226 F.R.D. 498, 514 (E.D. Pa. 2005).

103   Lester Brickman, *The Use of Litigation Screenings in Mass Torts: A Formula for Fraud?*, 61 S.M.U. L. REV. 1221, 1275-76 (2008) (describing "cursory examinations on an assembly line basis"); Gina Kolata & Barry Meier, *Doctors, Lawyers and Silicone: A Special Report*, N.Y. TIMES (Sept. 18, 1995) (quoting Dr. Barry Arnason, Chairman of Neurology, Univ. of Chicago Sch. of Med.), https://www.nytimes.com/1995/09/18/us/doctors-lawyers-silicone-special-report-implant-lawsuits-create-medical-rush.html [https://perma.cc/2EBD-QRPX].

104   For more on asbestos-related diagnostic difficulties, see *infra* note 196 and accompanying text. For how certain litigants, lawyers, and physicians leveraged those difficulties to seek unjustified payment, see, for example, *Raymark Industries, Inc. v. Stemple*, No. 88-1014-K, 1990 WL 72588, at *1-2, *11 (D. Kan. May 30, 1990) (concluding that the diagnostic procedures that supported some six thousand tire workers' claims amounted to a "professional farce!"); R. B.

Reger et al., *Cases of Alleged Asbestos-Related Disease: A Radiologic Re-Evaluation*, 32 J. OCCUPATIONAL MED. 1088, 1088-89 (1990) (reviewing 439 filed asbestos claims and finding that at most 3.6 percent of claimants actually had conditions consistent with asbestos exposure).

105    *See* Apr. 10, 2018 Rules Report, *supra* note 88, at 160 (observing that a "key problem" that bedevils MDLs "is the proliferation of claims by those who really don't have claims because they haven't used the product").

106    Seeger Statement, *supra* note 85.

107    Philip Sherwell, *BP Oil Spill: Louisiana Makes a Dash for BP's Cash*, DAILY TELEGRAPH (Aug. 2, 2013) (quoting a solicitation letter by lawyer Kevin McLean), https://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/10218968/BP-oil-spill-Louisiana-makes-a-dash-for-the-cash.html [https://perma.cc/2QHM-QQ85].

108    Engstrom, *supra* note 89, at 657-58.

109    *In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 595, 628-29 (S.D. Tex. 2005); *see also id.* at 603 (observing that finding an individual suffering from both asbestosis and silicosis is rarer than a golfer hitting "a hole-in-one").

110    *In re* Garlock Sealing Techs., LLC, 504 B.R. 71, 82 (Bankr. W.D.N.C. 2014).

111    *Id.*

112    E.A. Cowie, *The Economics of "Whiplash," in* THE CONTINUING REVOLT AGAINST "WHIPLASH" 35, 35 (James D. Ghiardi ed., 1964).

113    *See* MARCIA ANGELL, SCIENCE ON TRIAL: THE CLASH OF MEDICAL EVIDENCE AND THE LAW IN THE BREAST IMPLANT CASE 152, 193 (1997) (describing vague diagnoses of fatigue, muscle aches, and insomnia); Brickman, *supra* note 103, at 1231 (discussing physicians' "unverifiable" diagnoses).

114    *In re Silica*, 398 F. Supp. 2d at 625, 630-31 (quoting Dr. John Parker).

115    Lenzner & Maiello, *supra* note 102.

116    Joint Appendix Volume I of VII at 1132, CSX Transp., Inc. v. Peirce, No. 13-2325 (4th Cir. June 20, 2014) (testimony of Dr. John Parker). For this reason, Dr. Parker noted, there is "disagreement between readers." *Id.*

117    Engstrom, *supra* note 89, at 663.

118    Stephen Carroll & Allan Abrahamse, *The Frequency of Excess Auto Personal Injury Claims*, 3 AM. L. & ECON. REV. 228, 234 (2001) ("[B]ecause [soft-tissue injuries] are often not costly injuries, claims based on them may not attract close attention or generate demands for verification. Hence, they present an opportunity to pursue a claim for a nonexistent injury."). In recent years, some insurers have become fed up with perceived abuses and have started to scrutinize such claims with more care. *See* Engstrom, *supra* note 89, at 675-76.

119    *See* CARROLL ET AL., *supra* note 93, at 24 (discussing this dynamic); Engstrom, *supra* note 89, at 663 (offering examples).

120    Overall, only about ten percent of Americans seek redress when accidentally injured, and only about two percent actually file suit. DEBORAH R. HENSLER ET AL., COMPENSATION FOR ACCIDENTAL INJURIES IN THE UNITED STATES 122 fig.5.2 (1991), https://www.rand.org/content/dam/rand/pubs/reports/2006/R3999.pdf [https://perma.cc/M4LX-M6GA].

121    Michael J. Saks, *Do We Really Know Anything About the Behavior of the Tort Litigation System--And Why Not?*, 140 U. PA. L. REV. 1147, 1183 (1992); *accord* Richard L. Abel, *The Real Tort Crisis--Too Few Claims*, 48 OHIO ST. L.J. 443, 447 (1987).

122    HENSLER ET AL., *supra* note 120, at 121-23.

123    There is no study of mass-tort victims' propensity to seek third-party compensation. But leading experts share the view that mass-tort litigation "appears to stimulate a higher rate of claiming than is associated with ordinary personal injuries." Deborah R. Hensler, *A Glass Half Full, a Glass Half Empty: The Use of Alternative Dispute Resolution in Mass Personal Injury Litigation*, 73 TEX. L. REV. 1587, 1598 (1995); *accord* Francis E. McGovern, *Looking to the Future of Mass Torts: A Comment on Schuck and Siliciano*, 80 CORNELL L. REV. 1022, 1024 (1995) (observing that, in the mass tort context, the "trend" is "overclaiming rather than underclaiming").

124    For discussion of certain of these dynamics, see ADVISORY COMM. REP., *supra* note 26, at 302-04; McGovern, *supra* note 97, at 1828; and Thomas E. Willging, *Appendix C: Mass Torts Problems & Proposals: A Report to the Mass Torts Working Group*, FED. JUD. CTR. 20 (Jan. 1999), https://www.fjc.gov/sites/default/files/2012/MassTApC.pdf [https://perma.cc/Q4HB-QXS3]. *See also In re* Mentor Corp. Obtape Transobturator Sling Prods. Liab. Litig., MDL Docket No. 20044:08-MD-2004 (CDL), 2016 WL 4705827, at *1 n.2 (M.D. Ga. Sept. 7, 2016) (suggesting that an "onslaught of lawyer television solicitations" fueled the MDL's "explosion" from twenty-two cases to 850 cases); Paul M. Barrett, *Need Victims for Your Mass Lawsuit? Call Jesse Levine*, BLOOMBERG BUSINESSWEEK (Dec. 13, 2013, 9:41 PM EST), https://www.bloomberg.com/news/articles/2013-12-12/mass-tort-lawsuit-lead-generator-jesse-levine-has-victims-for-sale [https://perma.cc/7564-TMYM] (discussing companies that identify clients for mass tort litigation); Matthew Goldstein & Jessica Silver-Greenberg, *How Profiteers Lure Women into Often-Unneeded Surgery*, N.Y. TIMES (Apr. 14, 2018), https://www.nytimes.com/2018/04/14/business/vaginal-mesh-surgery-lawsuits-financing.html [https://perma.cc/J8CU-7XM2] (describing the "growing industry" that identifies and aggressively recruits plaintiffs to assert vaginal mesh claims, even going so far as to "coax[]" women into subjecting themselves to unnecessary invasive surgery).

125    *See* HERBERT M. KRITZER, RISKS, REPUTATIONS, AND REWARDS 67-95 (2004) (discussing screening).

126    *See* Nora Freeman Engstrom, *Sunlight and Settlement Mills*, 86 N.Y.U. L. REV. 805, 834-35 (2011) (discussing these dynamics).

127    *See* RICHARD A. NAGAREDA, MASS TORTS IN A WORLD OF SETTLEMENT 16 (2007) ("Having invested in the development of a valuable array of generic assets, a plaintiffs' law firm will have every reason to search for the one thing that stands between it and the maximizing of its return from that investment: additional clients. In economic terms, the goal is to spread the fixed costs of generic assets over ever more units ...."); Deborah R. Hensler & Mark A. Peterson, *Understanding Mass Personal Injury Litigation: A Socio-Legal Analysis*, 59 BROOK. L. REV. 961, 1045 (1993) ("[A]fter the initial investment in the litigation has been made, plaintiffs' attorney firms have incentives to identify many more claimants so that they can spread their costs across this client pool[] and maximize their fees."); McGovern,

*supra* note 123, at 1026. Some lawyers, of course, will resist these incentives and will instead make a name for themselves by representing fewer clients with particularly valuable claims.

128  McGovern, *supra* note 123, at 1026 ("The traditional filtering function of plaintiffs' lawyers--selecting only those cases for the tort system that will individually justify punishment--has evaporated .... The incentive has changed; the more the better.").

129  There are "thousands of tag-along" cases added to existing MDLs each year. Heyburn & McGovern, *supra* note 30, at 30. For a discussion of tag-along cases, see Martin H. Redish & Julie M. Karaba, *One Size Doesn't Fit All: Multidistrict Litigation, Due Process, and the Dangers of Procedural Collectivism*, 95 B.U. L. REV. 109, 121-22, 125 (2015). For the responsibilities of individually retained counsel, see Judith Resnik et al., *Individuals Within the Aggregate: Relationships, Representation, and Fees*, 71 N.Y.U. L. REV. 296, 308-21 (1996).

130  *See* Francis E. McGovern, *The Tragedy of the Asbestos Commons*, 88 VA. L. REV. 1721, 1732 (2002).

131  NAGAREDA, *supra* note 127, at 224 (observing that, within an MDL, "the firm's body count will tend to enhance its influence"); Jaime Dodge, *Facilitative Judging: Organizational Design in Mass-Multidistrict Litigation*, 64 EMORY L.J. 329, 350 (2014) (observing that "highly coveted leadership positions are appointed, in part, based upon the size of counsel's inventory").

132  Weinstein, *supra* note 14, at 495.

133  *See* McGovern, *supra* note 97, at 1826 (recognizing that mass-tort claims involving "discrete disasters" have been handled "without major difficulty"); Jack B. Weinstein, *Preliminary Reflections on the Law's Reaction to Disasters*, 11 COLUM. J. ENVTL. L. 1, 7 (1986) (noting that such claims have been handled "relatively effectively"). To be sure, to say there is a small risk of overclaiming is not to say there is no risk of overclaiming, and, in the past, even accidents like those above have not been wholly immune. *See, e.g.*, McGovern, *supra* note 123, at 1024 (discussing the 1981 Hyatt Skywalk collapse case where "more people filed claims than there were people who could have possibly been in virtually every hotel in Kansas City").

134  *E.g.*, D. ALAN RUDLIN, 1 TOXIC TORTS PRACTICE GUIDE § 15:9 (2018) (concluding that the orders "provide a useful method to achieve efficiency and economy for both toxic tort defendants and the judiciary"); Franklin P. Brannen, Jr. & James J. Ward, *Efficiency in a Complex World:* Lone Pine *After a Quarter Century*, FOR DEF., Mar. 2011, at 45, 50 (concluding that "a Lone Pine order is both good practice and good sense"); Michelle M. Bufano, *Food for Thought: The Importance of the Early Disposition of Baseless Claims in New Jersey Products Liability Mass Tort Litigation*, N.J. LAW., Aug. 2011, 36, 37 (purporting to weigh the "benefits and disadvantages" of Lone Pine orders, finding "the benefits ... outweigh the risks," and concluding that the orders are "an extremely valuable tool, the use of which should be widely embraced"); Cal R. Burnton, *Narrowing the Field in Mass Torts: The* Lone Pine *Solution*, 19 NO. 3 ANDREWS PROD. LIAB. LITIG. REP. 15, at *1, *7 (Apr. 10, 2008) (concluding a study of *Lone Pine* with the declaration "*Lone Pine* orders provide an efficient mechanism to get to the heart of the matter and indeed separate the wheat from the chaff"); Steiner, *supra* note 2, at 88 (declaring that "the advantages of Lone Pine Orders in toxic tort cases far outweigh the disadvantages" and concluding that "[i]n the interests of justice, the imposition of the Lone Pine Order in toxic tort cases is, therefore, imperative"); *2018 Duke Guidelines*, *supra* note 55, at 104 (encouraging transferee judges to "consider using *Lone Pine*" orders as they prepare to remand cases back to the transferor court); *MDL Proceedings*, *supra* note 84, at 19 (encouraging courts to expand the order's use "at the outset of litigation").

135  To get it "right," the judge's determination must reflect a correct determination of the facts and the law and also reflect a correct application of the law to the facts. To the extent there are false positives or false negatives, any advantage dissipates.

136     *See* Cooper, *supra* note 95 (explaining that, even if the defendant is confident it will never have to pay nonmeritorious claims (because any eventual settlement will include a rigorous screen, *see infra* note 210 and accompanying text), defendants still suffer to the extent nonmeritorious claims are included in the litigation, as their inclusion "affect[s] share price and shape[s] company decisionmaking").

137     *See* Case Management Order at 2, Modern Holdings, LLC v. Corning, Inc., No. 5:13-cv-405-GFVT (E.D. Ky. Sept. 28, 2015) (declaring that *Lone Pine* orders "promote speedy settlements").

138     *See* Eldon E. Fallon et al., *Bellwether Trials in Multidistrict Litigation*, 82 TUL. L. REV. 2323, 2344 (2008) (noting that, in order for a bellwether trial to be useful, it must be representative, and, in order to select a representative bellwether, one must "know what types of cases comprise the MDL").

139     *See* Engstrom & Espeland, *supra* note 6, at 15 (reporting data suggesting that roughly a quarter of all analyzed *Lone Pine* orders were issued in the "twilight stage of litigation" and that these orders were often entered "after the lead plaintiffs' attorneys has hammered out a tentative settlement agreement and were, often in concert with the defendant, trying to corral the remaining plaintiffs to opt in"); *see also, e.g.*, Plaintiff Executive Committee's Reservation of Rights and Statement Concerning FMCNA's Motion for Entry of *Lone Pine* Case Management Order at 1, *In re* Fresenius Prods. Liab. Litig., No. 1:13-md-2428 (D. Mass. Nov. 22, 2017) ("The Plaintiffs Executive Committee ('PEC') does not oppose [the defendant's] motion for entry of a *Lone Pine*-style case management order in order to effectuate the proposed settlement program where, as expressly stated in its pleading, the defendant's proposed order is applicable only to those plaintiffs who do not opt in to the global settlement program.").

140     *See, e.g.*, Case Management Order No. 17, *In re* Fresenius Prods. Liab. Litig., MDL No. 2428 (D. Mass. Jan. 26, 2017).

141     *2018 Duke Guidelines*, *supra* note 55, at 104 (explaining that twilight orders "weed out truly meritless cases" and, in so doing, "ensure that the transferor courts receive only viable cases").

142     *See* Brian Amaral, *Judge Wants More Info from Fresenius Dialysis Patients*, LAW360 (Dec. 14, 2016), https://www.law360.com/articles/872889/judge-wants-more-info-from-fresenius-dialysis-patients [https:// perma.cc/W6U4-3JFF] (quoting defense counsel as stating that Judge Woodlock's *Lone Pine* order, issued at the twilight of the *Fresenius* litigation, would "encourage some plaintiffs to settle").

143     The strongarm concern becomes more acute to the extent that the settlement agreement "encourages" PI lawyers to recommend settlement to all their clients and subsequently withdraw from the representation of any client who declines to participate in the settlement program. These withdrawal provisions are ethically dubious but apparently quite common. *See* BURCH, *supra* note 10, at 118, 127; Elizabeth Chamblee Burch, *Monopolies in Multidistrict Litigation*, 70 VAND. L. REV. 67, 99-100 (2017) (describing the recommendation and attorney-withdrawal mechanisms in the *Fosamax*, *Vioxx*, *Propulsid*, and *Pelvic Mesh* settlement agreements). In such a situation, a claimant who prefers not to settle is put in an untenable position: she may grudgingly acquiesce to the settlement or, alternatively, reject it, which means she has limited time to comply with a *Lone Pine* order with no lawyer to assist her in finding a qualified expert or in compiling requisite proof. Facing, on the one hand, capitulation to a settlement she did not ask for and does not want or, alternatively, the prospect of dismissal for failing to compile evidence she cannot realistically compile, one can hardly feel confident that the choice is authentic rather than coerced. For more on this strong-arm concern, see BURCH, *supra* note 10, at 33, which observes that in the *Yasmin/ Yaz* MDL, the *Lone Pine* order was used as a cudgel to "fortif[y] attorneys' efforts to herd plaintiffs" into the global settlement; and *id.* at 106, which explains that, after the settlement is inked, "both sides use Lone Pine orders to send a pointed message to nonsettling plaintiffs: accept the deal or prepare for what may be a short-fused evidentiary burden." For further discussion, see generally Burch, *supra* note 58. For a broader theoretical discussion of the serious problems that attend inauthentic consent, see Erichson & Zipursky, *supra* note 20, at 301-04; and Owen M. Fiss, *Against Settlement*, 93 YALE L.J. 1073 (1984). *See also* MODEL CODE OF

JUDICIAL CONDUCT R. 2.6(B) ("A judge may encourage parties to a proceeding and their lawyers to settle matters in dispute but shall not act in a manner that coerces any party into settlement.").

144    *See generally* Burch, *supra* note 58 (discussing the use of *Lone Pine* orders to coerce plaintiffs into accepting settlements).

145    Gluck, *supra* note 15, at 1687.

146    Adkisson v. Jacobs Eng'g Grp., Inc., No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531, at *5 (E.D. Tenn. July 29, 2016).

147    *See, e.g.,* Ramirez v. E.I. DuPont De Nemours & Co., No. 8:09-cv-321-T-33TBM, 2010 WL 144866, at *2 (M.D. Fla. Jan. 8, 2010) (finding defendant's motion for a Lone Pine order in a case with single plaintiff and single defendant "patently unwarranted"). For additional examples, see Smith v. Atrium Med. Corp., No. 14-418, 2014 WL 5364823, at *2 (E.D. La. Oct. 21, 2014); and Kamuck v. Shell Energy Holdings GP, LLC, No. 4:11-CV-1425, 2012 WL 3864954, at *3-5 (M.D. Pa. Sept. 5, 2012).

148    *E.g.,* Acuna v. Brown & Root Inc., 200 F.3d 335, 337, 340-41 (5th Cir. 2000) (upholding a *Lone Pine* order in a case involving 1,600 plaintiffs); Abner v. Hercules, Inc., No. 2:14cv63-KS-MTP, 2014 WL 5817542, at *3 (S.D. Miss. Nov. 10, 2014) (finding that case management needs favored the entry of a *Lone Pine* order because the proceeding involved "more than 400 Plaintiffs"); *In re* Fosamax Prods. Liab. Litig., No. 06 MD 1789(JFK), 2012 WL 5877418, at *2 (S.D.N.Y. Nov. 20, 2012) (entering an order in an MDL involving approximately one thousand cases); Tatum v. Pactiv Corp., No. 2:06CV83-LES, 2007 WL 60931, at *1 (M.D. Ala. Jan. 8, 2007) (entering a *Lone Pine* order in a case with "approximately 1,425 plaintiffs"); *see also* Mark D. Feczko et al., Lone Pine *or* Folk Lore*? A Survey of Case Developments Regarding Lone Pine Orders in Oil and Gas Litigation*, 35 ENERGY & MIN. L. INST. 5, § 5.04(1)(b) (2014) (conducting an informal study and finding that the majority of *Lone Pine* orders involve cases with one hundred or more parties).

149    Ashford v. Hercules, Inc., No. 2:15cv27-KS-MTP, 2015 WL 6118387, at *2 (S.D. Miss. Oct. 16, 2015).

150    Wilcox v. Homestake Mining Co., No. CIV 04-534 JC/WDS, 2008 WL 4697013, at *1 (D.N.M. Oct. 23, 2008).

151    Baker v. Anschutz Expl. Corp., No. 11-CV-6119 CJS, 2013 WL 3282880, at *1, *4 (W.D.N.Y. June 27, 2013).

152    Nos. 1:13 CV 1465, 1:13 CV 1466, 2014 WL 12589121, at *1 (N.D. Ohio Mar. 31, 2014) (two plaintiffs).

153    933 P.2d 799, 802 (Mont. 1997) (two plaintiffs).

154    No. 4:11-CV-00864-JAR, 2013 WL 943614, at *3 (E.D. Mo. Mar. 11, 2013) (one plaintiff).

155    *See, e.g.,* Russell v. Chesapeake Appalachia, LLC, 305 F.R.D. 78, 84 (M.D. Pa. 2015) ("[C]ourts considering *Lone Pine* orders have considered the defendant's ability to produce evidence demonstrating the plaintiff's claims as dubious."). As discussed in more detail in Section IV.A *infra*, some courts consider this question but do so narrowly, assessing only whether there are "external agency decisions impacting the merits of the case." *In re* Digitek Prods. Liab. Litig., 264 F.R.D. 249, 256 (S.D. W. Va. 2010).

156    *See supra* note 155 and *infra* note 217.

157    For the harder-edged position, see, for example, ⚑ *McManaway v. KBR, Inc.*, 265 F.R.D. 384, 388 (S.D. Ind. 2009), where the court explained that "[a] Lone Pine order should issue only ... after the defendant has made a clear showing of significant evidence calling into question the plaintiffs' ability to bring forward necessary medical causation and other scientific information."

158    ⚑ Trujillo v. Ametek, Inc., No. 3:15-cv-1394-GPC-BGS, 2016 WL 3552029, at *2 (S.D. Cal. June 28, 2016) ("Courts have differed on whether the use of *Lone Pine* orders should be considered 'routine,' ... or 'exceptional.'") (citations omitted).

159    Armendariz v. Bd. of Comm'rs, 17cv339-WJ-LF, 2018 WL 377199, at *2 (D.N.M. Jan. 11, 2018) ("extraordinary procedure"); ⚑ Manning v. Arch Wood Prot., Inc., 40 F. Supp. 3d 861, 868 (E.D. Ky. 2014) (same).

160    Nolan v. Exxon Mobil Corp., No. CV 13-439-JJB-EWD, 2016 WL 1213231, at *11 (M.D. La. Mar. 23, 2016) (quoting ⚑ *In re Digitek*, 264 F.R.D. at 259); *see, e.g.*, Hostetler v. Johnson Controls, Inc., No. 3:15-CV-226-JD-MGG, 2017 WL 359852, at *4, *6 (N.D. Ind. Jan. 25, 2017) (calling the entry of a *Lone Pine* order a "dramatic imposition" that "should be issued only in exceptional cases"); ⚑ *Manning*, 40 F. Supp. 3d at 868 (rejecting entry of an order absent a showing "that existing procedural devices provided by the federal rules have either been exhausted or shown to be ineffective").

161    *In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., 687 Fed. Appx. 210, 214 (3d Cir. 2017); *see also supra* notes 52-55 and accompanying text (describing the commonplace use of *Lone Pine* orders).

162    Engstrom & Espeland, *supra* note 6, at 19 (reporting data suggesting that thirty-eight percent of all analyzed *Lone Pine* orders were issued prior to discovery); *accord* M. Bernadette Welch, *Propriety and Application of* Lone Pine *Orders Used to Expedite Claims and Increase Judicial Efficiency in Mass Tort Litigation*, 57 A.L.R.6th 383, 383 (2010) ("Many courts dealing with complex mass tort litigation have turned to using *Lone Pine* case management orders in the prediscovery phase of litigation ...."); *see, e.g.*, ⚑ Acuna v. Brown & Root, Inc., 200 F.3d 335, 340-41 (5th Cir. 2000); Modern Holdings, LLC v. Corning Inc., No. 13-405-GFVT, 2015 WL 6482374, at *1 (E.D. Ky. Oct. 27, 2015); Ashford v. Hercules, Inc., No. 2:15cv27-KS-MTP, 2015 WL 6118387, at *3-4 (S.D. Miss. Oct. 16, 2015); Asarco LLC v. NL Indus., Inc., No. 4:11-CV-00864-JAR, 2013 WL 943614, at *3 (E.D. Mo. Mar. 11, 2013); ⚑ Burns v. Universal Crop Prot. All., No. 4:07CV00535 SWW, 2007 WL 2811533, at *2 (E.D. Ark. Sept. 25, 2007).

163    *See, e.g.*, ⚑ Steering Comm. v. Exxon Mobil Corp., 461 F.3d 598, 604 n.2 (5th Cir. 2006); ⚑ *Acuna*, 200 F.3d at 340; *Modern Holdings, LLC*, 2015 WL 6482374, at *1; Jill Gustafson & Eric C. Surette, Lone Pine *Order in Complex Litigation Case*, 28 FED. PROC., L. ED. § 64:56 (Mar. 2019); James Bilsborrow, *The* Lone Pine *Order: What All Tort Plaintiffs Can Learn from Recent Hydrofracking Decisions*, SIDEBAR 4 (Winter 2014), http://www.garfieldhecht.com/wp-content/uploads/2014/03/2014WinterNLDnewsletter_final.pdf [https://perma.cc/GN9A-BTFP].

164    *See infra* notes 217-219 and accompanying text (discussing the *Digitek* factors); *see also* Adkisson v. Jacobs Eng'g Grp., Inc., No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531, at *4 (E.D. Tenn. July 29, 2016) ("[G]enerally, Lone Pine orders are disfavored ... where no meaningful discovery has taken place.").

165 *See, e.g.*, Roth v. Cabot Oil & Gas Corp., 287 F.R.D. 293, 300 (M.D. Pa. 2012); Simeone v. Girard City Bd. of Educ., 872 N.E. 2d 344, 351 (Ohio Ct. App. 2007).

166 *See* Burch, *supra* note 58, at 67 (finding, in the MDL context, that "*Lone Pine* orders appear almost exclusively *post*-settlement--not as pre-settlement sieves, but as an additional means to urge non-settling plaintiffs to settle"); Engstrom & Espeland, *supra* note 6, at 14 (reporting data suggesting that roughly a quarter of all analyzed Lone Pine orders were issued in the "twilight stage of litigation").

167 *In re* Avandia Mktg., Sales Practices & Prods. Liab. Litig., No. 2007-MD-1871, 2010 WL 4720335, at *1 (E.D. Pa. Nov. 15, 2010). The court demanded evidence of specific causation only if the plaintiff suffered a qualifying injury after "more than one year after cessation of Avandia usage." *Id.* at 2. Much later in the litigation, the court ratcheted up these requirements and compelled certain plaintiffs to provide case-specific expert reports. *See 2018 Duke Guidelines*, *supra* note 55, at 105 n.283*; see also In re* Oil Spill by the Oil Rig "Deepwater Horizon," MDL No. 2179, 2014 WL 11692765 (E.D. La. July 17, 2014) (ordering bare-bones disclosures).

168 Some courts have held that plaintiffs' submissions need not be "sufficient to survive a *Daubert* challenge." *In re* Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 744 (E.D. La. 2008), *aff'd*, 388 F. App'x 391 (5th Cir. 2010); *see also, e.g.*, Abner v. Hercules, Inc., No. 2:14-CV-63-KS-MTP, 2017 WL 4236584, at *9 (S.D. Miss. Sept. 25, 2017). Other courts, by contrast, have dismissed plaintiffs' claims because their *Lone Pine* submissions did not satisfy Federal Rule of Evidence 702 and *Daubert*. *See, e.g.*, Avila v. Willits Envtl. Remediation Tr., 633 F.3d 828, 833-34, 836-40 (9th Cir. 2011).

169 *See* Engstrom & Espeland, *supra* note 6, at 17 (reporting data suggesting that approximately three-quarters of analyzed Lone Pine orders "required at least some plaintiffs to offer expert testimony ... regarding specific causation"); *see also* Steven Boranian, *Lone Pine Order Reversed: Rocky Mountain Low*, DRUG & DEVICE LAW (May 1, 2015), https://www.druganddevicelawblog.com/tag/lone-pine-order [https://perma.cc/9V45-7X2Z] ("They come in various forms, but *Lone Pine* orders most often require that the plaintiff submit ... a certification from a medical expert stating that the use or exposure caused the plaintiff's injury.").

170 William A. Ruskin, *Prove It or Lose It: Defending Against Mass Tort Claims Using Lone Pine Orders*, 26 AM. J. TRIAL ADVOC. 599, 609 (2003) (quoting Wilson v. Public Serv. Co. of Okla., No. CJ-96-564 (Tulsa Cty. Dist. Ct. 1997)).

171 *In re* Fosamax Prods. Liab. Litig., No. 06 MD 1789(JFK), 2012 WL 5877418, at *1 (S.D.N.Y. Nov. 20, 2012).

172 Eggar v. Burlington N. R. Co., No. CV 89-159-BLG-JFB, 1991 WL 315487, at *4-5 (D. Mont. Dec. 18, 1991), *aff'd sub nom.* Claar v. Burlington N. R.R. Co., 29 F.3d 499 (9th Cir. 1994).

173 Adinolfe v. United Techs. Corp., 768 F.3d 1161, 1168 (11th Cir. 2014).

174 Strudley v. Antero Res. Corp., 350 P.3d 874, 883 (Colo. App. 2013), *aff'd*, 347 P.3d 149, 159 (Colo. 2015) (reiterating that "[i]f a Lone Pine order cuts off or severely limits the litigant's right to discovery, the order closely resembles summary judgment, albeit without the safeguards supplied by the Rules of Civil Procedure").

175    ⚑ Cottle v. Super. Ct., 5 Cal. Rptr. 2d 882, 897 (Ct. App. 1992) (Johnson, J., dissenting), *modified* (Mar. 20, 1992).

176    FED. R. CIV. P. 56(a); ⚑ Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

177    *Strudley*, 350 P.3d at 883.

178    *See, e.g.,* ⚑ Jones v. City of Columbus, 120 F.3d 248, 253 (11th Cir. 1997) ("The law in this circuit is clear: the party opposing a motion for summary judgment should be permitted an adequate opportunity to complete discovery prior to consideration of the motion.").

179    A relatively high proportion of analyzed *Lone Pine* orders were entered prior to discovery. *See* Engstrom & Espeland, *supra* note 6, at 19 (reporting data suggesting that thirty-eight percent of *Lone Pine* orders are entered prior to discovery). Other courts have declined to issue prediscovery orders, citing this concern. *See, e.g.,* Adkisson v. Jacobs Eng'g Grp., Inc., No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531, at *6 (E.D. Tenn. July 29, 2016) (denying defendant's motion because "issuing a Lone Pine order at this juncture would" require plaintiffs "to set forth the same level of proof that a motion for summary judgment would require but without the benefit of first conducting discovery"); ⚑ Morgan v. Ford Motor Co., No. 06-1080 (JAP), 2007 WL 1456154, at *8 (D.N.J. May 17, 2007) (same).

180    *See, e.g.,* ⚑ Ellis v. England, 432 F.3d 1321, 1325 (11th Cir. 2005); ⚑ Edwards v. Marin Park, Inc., 356 F.3d 1058, 1061 (9th Cir. 2004).

181    36 C.J.S. *Federal Courts* § 640.

182    FED. R. CIV. P. 16(f)(1)(C); *see, e.g.,* ⚑ *In re* Oil Spill by the Oil Rig "Deepwater Horizon," No. MDL 2179, 2016 WL 614690, at *7 (E.D. La. Feb. 16, 2016). Sometimes, courts fashion the dismissals as coming under Rule 37 or 41(b), but, for our purposes, the effect (appellate review for abuse of discretion) remains the same.

183    *See* ⚑ *In re* Vioxx Prods. Liab. Litig., 388 F. App'x 391, 397 (5th Cir. 2010) ("A district court's adoption of a Lone Pine order and decision to dismiss a case for failing to comply with a Lone Pine order are reviewed for abuse of discretion."); Welch, *supra* note 162, at § 2 ("Review of a *Lone Pine* order is subject to an abuse of discretion standard, and courts, in large part, have been found to have wide discretion in their use of Lone Pine orders."); *see, e.g.,* ⚑ Acuna v. Brown & Root Inc., 200 F.3d 335, 340 (5th Cir. 2000) (reviewing for abuse of discretion); ⚑ Atwood v. Warner Elec. Brake & Clutch Co., 605 N.E.2d 1032, 1037 (Ill. App. Ct. 1992) (same). For the fact that "[a]buse of discretion is the most deferential standard of review available with the exception of no review at all," see *In re South Dakota Microsoft Antitrust Litigation*, 657 N.W.2d 668, 678 (S.D. 2003).

184    In *Acuna v. Brown & Root, Inc.*, the Fifth Circuit declared that Lone Pine orders "essentially require[] that information which plaintiffs should have had before filing their claims pursuant to Fed. R. Civ. P. 11(b)(3)." 200 F.3d at 340. Not surprisingly, other courts have taken that idea and run with it. *See, e.g.,* ⚑ McMunn v. Babcock & Wilcox Power Generation Grp., Inc., 896 F. Supp. 2d 347, 351 (W.D. Pa. 2012) (citing *Acuna* while issuing a prediscovery *Lone Pine* order on the theory that the order "essentially required that information which plaintiffs should have had before

filing their claims pursuant to Fed. R. Civ. P. 11(b)(3)"). But, as explained above, *Acuna*'s description simultaneously undersells the demands of many *Lone Pine* orders and oversells the demands of Rule 11.

185  FED. R. CIV. P. 11(b)(3).

186  FED. R. CIV. P. 11 advisory committee's note to 1993 amendments; *accord* ⚑Rotella v. Wood, 528 U.S. 549, 560 (2000) (recognizing that Rule 11(b)(3) offers litigants "flexibility" by "allowing pleadings based on evidence reasonably anticipated after further investigation or discovery").

187  Of course, if evidentiary support is not obtained after a reasonable opportunity to conduct discovery, the party may not persist with the unsupported allegation. *See* FED. R. CIV. P. 11 advisory committee's note to 1993 amendments.

188  *See* FED. R. CIV. P. 37(b)(2)(A)(v).

189  ⚑Salahuddin v. Harris, 782 F.2d 1127, 1132 (2d Cir. 1986) (citing ⚠Israel Aircraft Indus. Ltd. v. Standard Precision, 559 F.2d 203, 208 (2d Cir. 1977)).

190  *See* SEC v. Razmilovic, 738 F.3d 14, 24 (2d Cir. 2013) ("[D]ismissal ... should be ordered only when the district judge has considered lesser alternatives." (quoting ⚑S. New England Tel. Co. v. Glob. NAPs Inc., 624 F.3d 123, 144 (2d Cir. 2010))); 2 DISCOVERY PROCEEDINGS IN FEDERAL COURT § 22:25 (3d ed. 2019) ("The district court normally must consider less severe sanctions before entering an order dismissing an action or entering a default judgment as a sanction for abuse of discovery.").

191  *See* ⚑Agiwal v. Mid Island Mortg. Corp., 555 F.3d 298, 302 (2d Cir. 2009) ("[D]ismissal with prejudice is a harsh remedy to be used only in extreme situations, and then only when a court finds willfulness, bad faith, or any fault by the non-compliant litigant.") (quotation marks omitted); 8B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 2284 (3d ed. 2018 update) ("If the failure is because of inability to comply ... the action should not be dismissed ... and less severe sanctions are the most that should be invoked.").

192  James P. Muehlberger & Boyd S. Hoekel, *An Overview of Lone Pine Orders in Toxic Tort Litigation*, 71 DEF. COUNS. J. 366, 371-72 (2004).

193  ⚑Simeone v. Girard City Bd. of Educ., 872 N.E.2d 344, 351 (Ohio Ct. App. 2007). For the varying levels of certainty and specificity different courts demand, see Engstrom & Espeland, *supra* note 6, at 17-19.

194  *See* PETER H. SCHUCK, AGENT ORANGE ON TRIAL: MASS TOXIC DISASTERS IN THE COURTS 185 (1987) (referring to specific causation as "the most troublesome, least tractable feature of mass toxic tort cases").

195  Once a plaintiff overcomes that threshold, even if she barely clears it, she is entitled to a full recovery, even if the jury is only 50.01 percent convinced that defendant's toxic agent caused the harm at issue. *Id.*

196  For more on signature diseases, see Michael D. Green, *Causation in Pharmaceutical Cases*, SL038 ALI-ABA 139, 166 (Aug. 18-19, 2005). The repeated caveats reflect the fact that, even when a toxic agent causes a signature disease, it often causes nonsignature diseases, too. Thus, for example, asbestos manifests as asbestosis and mesothelioma (both signature) as well as lung cancer (nonsignature), and DES manifests in DES daughters as vaginal adenocarcinoma (signature) as well as a host of other ailments "many of them ... quite common in the general population." News Release, Nat'l Inst.

of Health, *Women Exposed to DES in the Womb Face Increased Cancer Risk* (Oct. 5, 2011), https://www.nih.gov/news-events/news-releases/women-exposed-des-womb-face-increased-cancer-risk [https://perma.cc/2QUD-B4MV].

197   *See* ADVISORY COMM. REP., *supra* note 26, at 311 ("When large populations have experienced the exposure, it is possible, at considerable expense and usually after a lengthy period of time, to develop reliable epidemiological evidence to support or refute the causal claim.").

198   For how these problems persist, even in specialized tribunals, see Nora Freeman Engstrom, *A Dose of Reality for Specialized Courts: Lessons from the VICP*, 163 U. PA. L. REV. 1631, 1699-1700 (2015).

199   ⚑ Cottle v. Superior Court, 5 Cal. Rptr. 2d 882, 902 (Ct. App. 1992) (Johnson, J., dissenting).

200   Michael D. Green et al., *Reference Guide on Epidemiology*, *in* ANNOTATED REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 333, 384 (Michael J. Jaks et al. eds., 2d ed. 2000) (explaining that some courts use "relative risk" and, in particular, a "relative risk greater than 2.0" to support an inference "that an individual plaintiff's disease was more likely than not caused by the implicated agent").

201   The Advisory Committee on Civil Rules concluded as much in its ambitious 1999 study: "Legal rules demand a level of certainty that science cannot deliver immediately and often cannot deliver at all." ADVISORY COMM. REP., *supra* note 26, at 311; *accord* Green, *supra* note 200, at 384-85 (acknowledging that "specific causation, is beyond the domain of the science of epidemiology"); Noah Smith-Drelich, *Performative Causation*, 93 S. Cal. L. Rev. 379 (2020) (manuscript at 3) (on file with author) (observing that the law demands "evidence of specific causation that science cannot often supply"); Willging, *supra* note 124, at 10-11 ("Even when science provides a clear answer that a product has the capacity to cause particular types of injuries, those scientific findings do not determine whether a plaintiff's exposure to a product was the proximate cause of this plaintiff's injuries.").

202   Eric J. Topol, *Failing the Public Health--Rofecoxib, Merck, and the FDA*, 351 NEW ENG. J. MED. 1707, 1708 (2004) (reporting that Vioxx caused "an excess of 16 myocardial infarctions [heart attacks] or strokes per 1000 patients").

203   *FDA, Merck, and Vioxx: Putting Patient Safety First?: Hearing Before the S. Comm. on Fin.*, 108th Cong. 14, 26, 125 (2004) (testimony of David J. Graham, Associate Director for Science, FDA) (estimating that Vioxx caused between 88,000 and 139,000 excess cardiac events in the United States).

204   *See* Samuel Issacharoff, *Private Claims, Aggregate Rights*, 2008 SUP. CT. REV. 183, 216.

205   Some suggest that, given these challenges, tort's approach to causation ought to be made explicitly and unapologetically probabilistic. *E.g.*, Glen O. Robinson, *Probabilistic Causation and Compensation for Tortious Risk*, 14 J. LEGAL STUD. 779 (1985). Some go further and argue that we ought to scratch all reliance on causation, including, even, of the general sort. *E.g.*, Margaret A. Berger, *Eliminating General Causation: Notes Towards a New Theory of Justice and Toxic Torts*, 97 COLUM. L. REV. 2117 (1997). Others favor discarding not causation but tort law itself, in favor of a "national administrative scheme." *E.g.*, Troyen A. Brennan, *Causal Chains and Statistical Links: The Role of Scientific Uncertainty in Hazardous-Substance Litigation*, 73 CORNELL L. REV. 469 (1988); Weinstein, *supra* note 14, at 566. Still others caution (rightly, in my view) that such a scheme would be no panacea. *E.g.*, Anita Bernstein, *Formed by Thalidomide: Mass Torts as a False Cure for Toxic Exposure*, 97 COLUM. L. REV. 2153, 2171 (1997); Robert L. Rabin, *Some Thoughts on the Efficacy of a Mass Toxics Administrative Compensation Scheme*, 52 MD. L. REV. 951 (1993).

206   If plaintiffs' claims do not stand up to scrutiny (because, for example, plaintiffs fail to assemble sufficient evidence of general causation), courts can--and will--extinguish the litigation, using traditional mechanisms. *See, e.g.*, ⚑ *In re Lipitor Mktg., Sales Practices & Prods. Liab. Litig. (No. II)* MDL 2502, 892 F.3d 624, 647 (4th Cir. 2018) (affirming the

transferee court's grant of summary judgment, thus terminating the *Lipitor* litigation); *In re* Zoloft Prods. Liab. Litig., 858 F.3d 787 (3d Cir. 2017) (affirming the transferee court's grant of summary judgment, thus terminating the *Zoloft* litigation); ⚑ Meridia Prods. Liab. Litig. v. Abbott Labs., 447 F.3d 861 (6th Cir. 2006) (affirming the transferee court's grant of summary judgment, thus terminating the *Meridia* litigation); *see also* BURCH, *supra* note 10, at 108 (reporting on a large dataset of recent product liability MDLs and finding that, in the dataset, sixty-two percent of transferee judges had ruled on summary judgment motions prior to the "first reported private aggregate settlement[]"); Paul D. Rheingold, *Multidistrict Litigation Mass Terminations for Failure to Prove Causation*, 17 MASS TORTS LITIG. 24, 25 (2019) ("A newer generation of MDL judges appear to have come to accept evaluating the merits of the cases as one of their responsibilities as an MDL transferee judge. They act just as they would if an individual case was assigned to them and the defendant sought summary judgment on a preemption defense or a failure of expert proof examined through a *Daubert* hearing.").

207   BURCH, *supra* note 10, at 24.

208   *See* PAUL D. RHEINGOLD, LITIGATING MASS TORT CASES § 9:13 (2018 ed.) (explaining that mass torts settle using grids or matrices and that, when the parties establish these grids, they often vary payments based on "the strength of causation" so that "a more serious injury with less proof of causation might get no more on a grid than a lesser injury with better causal relation"); Erichson & Zipursky, *supra* note 20, at 308 ("[L]awyers often establish a matrix of settlement values to take into account the most salient factors that can be efficiently compared across claimants. Depending on the nature of the claims, the matrix may include disease category, severity of injury, age, risk factors, length of exposure, proof, and other items relevant to determining how much of the settlement each claimant will receive."); Hensler, *supra* note 123, at 1614-15 (observing that mass-tort settlements tend to take the form of a "grid or matrix" which award claimants "different cash values on the basis of evidence of causation, disease, or injury severity"); Paul D. Rheingold, *Mass Torts--Maturation of Law and Practice*, 37 PACE L. REV. 617, 632 (2017) (same, while adding the more recent invention of point systems "where the claimant may obtain or lose points, depending on factors felt to be significant to determining damages"); *see, e.g., In re* Diet Drugs Prods. Liab. Litig., 226 F.R.D. 498, 502 (E.D. Pa. 2005) (explaining that the initial settlement agreement that resolved the fen-phen litigation entitled claimants to differentiated payments based, in part, on whether they had "factors that would make it difficult for them to prove that their [valvular heart disease] was caused solely by the use of [diet drugs]"); Georgene M. Vairo, *Georgine, the Dalkon Shield Claimants Trust, and the Rhetoric of Mass Tort Claims Resolution*, 31 LOY. L.A. L. REV. 79, 135 (1997) (explaining that the Dalkon Shield settlement grid offered discounted sums to those "with good medical proof of Dalkon Shield use and good medical proof of a Dalkon Shield associated injury, but whose medical records revealed serious alternative causation problems").

209   *See* Nora Freeman Engstrom, Legal Ethics: The Plaintiffs' Lawyer 476-83 (2019) (unpublished manuscript) (on file with author).

210   Vioxx Claims Administrator Court Report No. 29, July 27, 2010, at 33 [hereinafter Vioxx Report]. It bears emphasis that eligibility requirements are often rigorous. In *Vioxx*, only 33,075 claimants out of 48,362 satisfied the criteria. *Id.* at 23. *But see* NAGAREDA, *supra* note 127, at 150-51 (explaining that, in the early years of fen-phen settlement, eighty-five percent of claims were paid "without any real check on their legitimacy," that subsequent events demonstrated that some of those claims were invalid, and that payments to those with invalid claims depleted the funds available for those "with real heart valve problems").

211   Vioxx Report, *supra* note 210, at 17.

212   As Nathaniel Donahue and John Witt observe, the resulting dynamic in some ways echoes our experience with contributory negligence, the dusty tort doctrine that long barred a plaintiff from recovering for her injuries if her negligence, however slight, contributed to her predicament. There, for decades, observers of the tort system recognized that the formal law imposed an unjustifiably harsh burden. Nathaniel Donahue & John Fabian Witt, *Tort as Private Administration*, 105 Cornell L. Rev. 1093 (2020). But observers also recognized that the harshness of the formal law was mitigated by juries who, behind closed doors, softened the law's rough edges, by reducing, but not eliminating,

recovery for negligent plaintiffs. *See* Charles L. B. Lowndes, *Contributory Negligence*, 22 GEO. L.J. 674, 674 (1934) (discussing juries' "notorious" inability to "perceive contributory negligence"). Here, by contrast, it is not juries but sophisticated settlement systems that have "displaced the binary law of causation with statistical aggregation in private administration." Donahue & Witt, *supra* (manuscript at 44).

213 The alternative, of course, is to insist that a tortfeasor ought to escape liability simply because it was lucky enough to manufacture a substance that manifested in a nonsignature, rather than signature, disease. On the other side of the coin, a hardline position would also mean that a DES daughter diagnosed with vaginal adenocarcinoma would obtain a full recovery, but her sister who miscarried or developed breast cancer (also powerfully associated with DES), ought to walk away empty-handed, since we cannot *know* that DES caused those latter maladies. *See* News Release, Nat'l Inst. of Health, *supra* note 196. As noted in the text, a proportionality rule promotes efficient deterrence because it gives firms incentives to take optimal care, whereas, when general causation is shown, a rule of no liability (because no *particular* plaintiff can show she was more-likely-than-not harmed by the defendant) creates wholly inadequate incentives. *See* Louis Kaplow, *Information and the Aim of Adjudication: Truth or Consequences?*, 67 STAN. L. REV. 1303, 1337 (2015); William M. Landes & Richard A. Posner, *Causation in Tort Law: An Economic Approach*, 12 J. LEGAL STUD. 109, 123-24 (1983); David Rosenberg *The Causal Connection in Mass Exposure Cases: A "Public Law" Vision of the Tort System*, 97 HARV. L. REV. 849, 866 (1984).

214 *See* Cottle v. Superior Court, 5 Cal. Rptr. 2s 882, 902 (Ct. App. 1992) (Johnson, J., dissenting) (chastising the majority for affirming the case's dismissal pursuant to a *Lone Pine*-style order, while noting that "what the trial court sought was an *impossibility* ...--evidence a given toxic or combination of toxics was the *cause in fact* of a given disease or other condition in a specific individual"); *see also* Richard J. Lippes, *Toxic Torts: A Plaintiff's Perspective*, *in* TOXIC TORT LITIGATION 3, 43 (Richard J. Lippes & Barbara Wrubel eds., 1991) (observing that, in some cases, *Lone Pine* orders impose an "unrealistic" burden).

215 Ruskin, *supra* note 170, at 604.

216 Avila v. Willits Envtl. Remediation Tr., 633 F.3d 828, 833-34 (9th Cir. 2011).

217 *In re* Digitek Prods. Liab. Litig., 264 F.R.D. 249, 256 (S.D.W. Va. 2010); *see, e.g.*, Armendariz v. Santa Fe Cty. Bd. of Comm'rs, No. 17cv339-WJ-LF, 2018 WL 377199, at *2 (D.N.M. Jan. 11, 2018); Marquez v. BNSF Ry. Co., No. 17-CV-01153-CMA-MEH, 2017 WL 3390577, at *2 (D. Colo. Aug. 8, 2017); Hostetler v. Johnson Controls, Inc., No. 3:15-CV-226-JD-MGG, 2017 WL 359852, at *5-7 (N.D. Ind. Jan. 25, 2017); Adkisson v. Jacobs Eng'g Grp., No. 3:13-CV-505-TAV-HBG, 2016 WL 4079531, at *3 (E.D. Tenn. July 29, 2016); Nolan v. Exxon Mobil Corp., No. CV 13-439-JJB-EWD, 2016 WL 1213231, at *10 (M.D. La. Mar. 23, 2016); Russell v. Chesapeake Appalachia, L.L.C., 305 F.R.D. 78, 83 (M.D. Pa. 2015); Abner v. Hercules, Inc., No. 2:14cv63-KS-MTP, 2014 WL 5817542, at *2 (S.D. Miss. Nov. 10, 2014); Smith v. Atrium Med. Corp., No. 14-418, 2014 WL 5364823, at *1 (E.D. La. Oct. 21, 2014); Manning v. Arch Wood Prot., Inc., 40 F. Supp. 3d 861, 863-64 (E.D. Ky. 2014); Kamuck v. Shell Energy Holdings, No. 4:11-CV-1425, 2012 WL 3864954, at *4 (M.D. Pa. Sept. 5, 2012); Roth v. Cabot Oil & Gas Corp., 287 F.R.D. 293, 298 (M.D. Pa. 2012).

218 *Digitek*, 264 F.R.D. at 256.

219 Bone, *supra* note 21, at 2016-17 (canvassing problems with multifactor balancing tests).

220 *E.g.*, Arnold v. BNSF Ry. Co., No. 3:18-CV-1931-L, 2019 WL 1493160, at *6 (N.D. Tex. Apr. 4, 2019) ("*Lone Pine* orders are normally used as a last resort or procedural option, when all other procedural options have been exhausted."); Hagy v. Equitable Prod. Co., No. 2:10-cv-01372, 2012 WL 713778, at *4 (S.D. W. Va. Mar. 5, 2012) ("[G]iven a choice

between a '*Lone Pine* order' created under the court's inherent case management authority and available procedural devices such as summary judgment, motions to dismiss, motions for sanctions and similar rules, I believe it more prudent to yield to the consistency and safeguards of the mandated rules." (quoting *Digitek*, 264 F.R.D. at 259)); *see supra* Section III.B.1.a.

221   *See* Chambers v. NASCO, Inc., 501 U.S. 32, 50 (1991) (cautioning that "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power" and emphasizing that a court should rely on its inherent power only when "neither the statute nor the Rules are up to the task").

222   *See* Dal Pozzo v. Basic Mach. Co., 463 F.3d 609, 614 (7th Cir. 2006) (explaining that a court's inherent authority is "to be exercised sparingly" and only when the formal rules are patently inadequate (quoting Zapata Hermanos Sucesores, S.A. v. Hearthside Baking Co., 313 F.3d 385, 390-91 (7th Cir. 2002)); F.J. Hanshaw Enters., Inc. v. Emerald River Dev., Inc., 244 F.3d 1128, 1136-37 (9th Cir. 2001) (observing that "it is preferable that courts utilize the range of federal rules and statutes dealing with misconduct and abuse of the judicial system" before they act pursuant to ad hoc, unwritten, or inherent authority).

223   It bears emphasis: if a judge concludes an entire litigation--or, alternatively, a batch of claims--lacks merit, expressly sanctioned mechanisms exist to terminate those individual claims or the broader litigation. *See supra* note 206 and accompanying text.

224   Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007).

225   If only a subset of claims engenders suspicion or only a subset of plaintiffs have displayed a lack of diligence, then the order should demand disclosures from only that claimant population.

226   Avila v. Willits Envtl. Remediation Tr., 633 F.3d 828, 834 (9th Cir. 2011).

227   *In re* Love Canal Actions, 547 N.Y.S.2d 174, 178-79 (Sup. Ct. 1989), *aff'd as modified*, 555 N.Y.S.2d 519 (App. Div. 1990).

228   *In re* Fosamax Prods. Liab. Litig., No. 06 MD 1789(JFK), 2012 WL 5877418, at *3 (S.D.N.Y. Nov. 20, 2012).

229   *See supra* notes 43-44 and accompanying text. In one recent case, for example, the court granted a *Lone Pine* order while lamenting the case's "chronically stagnant posture." Modern Holdings, L.L.C. v. Corning, Inc., No. 5:13-cv-405-GFVT, at 5 (E.D. Ky. Sept. 28, 2015) (order entering a *Lone Pine* order). In another, a court granted a *Lone Pine* order in a case with only two plaintiffs where those plaintiffs had failed to offer even partial responses to interrogatories, plaintiffs' counsel had been a no-show at a scheduled status conference, and, as the court noted in exasperation, "[a]lmost 11 months [had] passed since this case was originally filed and Plaintiffs [had] failed to articulate" any connection between their injuries and the defendants' product. Miller v. Metrohealth Med. Ctr., Nos. 1:13 CV 1465, 1:13 CV 1466, 2014 WL 12589121, at *2 (N.D. Ohio Mar. 31, 2014).

230   Baker v. Chevron USA, Inc., No. 1:05-CV-227, 2007 WL 315346, at *1 (S.D. Ohio Jan. 30, 2007).

231 *In re* Vioxx Prods. Liab. Litig., 557 F. Supp. 2d 741, 744 (E.D. La. 2008), *aff'd*, 388 F. App'x 391 (5th Cir. 2010). Note, however, that even when contemplating a "twilight" order, a court, in my view, ought to adhere to the guideposts above. In so doing, when assessing (under the second guidepost) whether (a) substantial, credible evidence casts doubt upon plaintiffs' (or certain plaintiffs') entitlement to relief and/or (b) in prosecuting the action, the plaintiffs (or certain plaintiffs) have displayed a marked and unjustifiable lack of diligence, a plaintiff's refusal to acquiesce to a global settlement should inform neither prong of the analysis.

232 *2018 Duke Guidelines*, *supra* note 55, at 9 (recognizing that "[i]n non-MDL cases, plaintiffs are required to produce information about their claims from the outset, and that requirement should not change simply because a claim becomes part of an MDL proceeding," and accordingly specifying, as Best Practice 1C(iv): "At an early juncture, individual claimants should be required to produce information about their claims").

233 Schulman & Birnbaum, *supra* note 55, at 6; Smith, *supra* note 95, at 25 (extolling the virtues of plaintiff fact sheets, which "require early disclosure of key information"); *2018 Duke Guidelines*, *supra* note 55, at 10 ("Fact sheets are one of the most useful and efficient initial mechanisms for obtaining individual discovery in large mass-tort MDLs.").

234 Williams et al., *supra* note 74, at 4; *see supra* note 79 and accompanying text (offering exemplars).

235 CARROLL ET AL., *supra* note 85, at 7.

236 *Id.* at x. A B-reading is a specialized interpretation of a chest x-ray. *See* Office of Env't, Health, Safety, and Sec., *Chest X-Ray B-Reading*, ENERGY.GOV, https://www.energy.gov/ehss/chest-x-rays [https://perma.cc/FR3Q-MAAP].

237 *See In re* Silica Prods. Liab. Litig., 398 F. Supp. 2d 563, 580 (S.D. Tex. 2005).

238 One physician who had diagnosed 3,617 plaintiffs with silicosis admitted: "I can't diagnose silicosis on the basis of the chest x-ray ... and I didn't intend to." *Id.* at 581. Others said much the same. *See id.* at 587-89.

239 CARROLL ET AL., *supra* note 85, at xi.

240 *See In re* Phenylpropanolamine (PPA) Prods. Liab. Litig., 460 F.3d 1217, 1226 n.4 (9th Cir. 2006).

241 *See* Brickman, *supra* note 103, at 1293-94.

242 *See id.* at 1294.

243 Beisner & Miller, *supra* note 54, at 22; Schulman & Birnbaum, *supra* note 55, at 10.

244 GlaxoSmithKline LLC's Reply in Further Support of Motion for a Lone Pine Case Management Order at 4, *In re* Avandia Litig. (Phila. Ct. C.P. Jan. 28, 2011) (No. 080202733).

245 *See* Cabraser & Lehe, *supra* note 74, at 8 n.40 (describing some bloated fact sheets that span for "20 pages or more"); Burch, *supra* note 58, at 82 (describing some unnecessarily invasive and unduly burdensome fact sheets that "span forty-eight pages (with forms and all), exceed 100 questions, and seek fifteen years of medical history, ten years of

employment history, and information on everything from divorces to children's names, addresses, and birthdays"); *see also* Schulman & Birnbaum, *supra* note 55, at 7 ("[D]efendants should be judicious in seeking truly relevant data.").

246    This requirement would admittedly increase transaction costs. The increase would be negligible for personal injury lawyers with "traditional" practices, as those lawyers already meet with clients face to face. KRITZER, *supra* note 125, at 113. But the burden would be acutely felt by high-volume practitioners (those with hundreds or thousands of clients), because those practitioners may have difficulty meeting individually with all their clients, particularly if the clients are scattered over a large geographic area. However, imposing such a burden may nevertheless make sense. All lawyers (including those who practice law at scale) are already legally obliged to communicate with all their clients. *See* MODEL RULES OF PROF'L CONDUCT r. 1.4 (AM. BAR ASS'N 2018) (imposing a duty of reasonable communication); *id.* r. 1.3 cmt. 2 ("A lawyer's work load must be controlled so that each matter can be handled competently."). And, it is precisely the clients of high-volume practices that might merit individualized attention and scrutiny. After all, for reasons described in Part II, these clients likely have not cleared a rigorous front-end screen, and they have quite possibly come to the firm via aggressive and undiscerning client recruitment. *See* Rheingold, *supra* note 206, at 25 (discussing the rise of online recruiters). Using fact sheets to push lawyers to engage in what is essentially a mid-case screen may therefore be worthwhile. Two further notes: Any physical presence or individualized discussion requirement would, of course, not apply to pro se clients. The oath requirement is borrowed from FED. R. CIV. P. 33(b)(3) and breaks no new ground. *See* HERR, *supra* note 50, § 40.52, at 756.

247    This admonition echoes Duke's Standards and Best Practices, which encourages courts to "articulate clear expectations and impose clear timelines ... together with clear procedures and timelines for addressing deficiencies." *2018 Duke Guidelines*, *supra* note 55, at 13. In terms of "gamesmanship," plaintiffs' lawyer Elizabeth Cabraser reports that some defense lawyers have cynically used "shotgun 'deficiencies' (including typographical errors, failure to provide information as to questions marked 'N/A,' missing middle initials, etc.) to prolong the process and ... to set up motions for dismissal." Cabraser & Lehe, *supra* note 74, at 7 n.40. Courts should be alert to, and show no tolerance for, such abusive tactics.

248    Applying the guideposts above, such a court would be within its rights to issue a *Lone Pine* order because (1) the order would be issued after another mechanism is tried but fails, and (2) a plaintiff's failure to answer simple questions regarding her claim might fairly generate suspicion regarding the claim's validity.

249    Judith Resnik, *Managerial Judges*, 96 HARV. L. REV. 374, 374 (1982).

250    *Id.* at 376. For the traditional judicial role, see Abram Chayes, *The Role of the Judge in Public Law Litigation*, 89 HARV. L. REV. 1281, 1286 (1976), noting that "[t]he judge was a neutral umpire, charged with little or no responsibility for the factual aspects of the case or for shaping and organizing the litigation for trial."

251    *See* Resnik, *supra* note 249, at 376-77. For more on "managerial judging," see generally Robert F. Peckham, *A Judicial Response to the Cost of Litigation: Case Management, Two-Stage Discovery and Alternative Dispute Resolution*, 37 RUTGERS L. REV. 253 (1985) [hereinafter Peckham, *Judicial Response*]; Robert F. Peckham, *The Federal Judge as a Case Manager: The New Role in Guiding a Case from Filing to Disposition*, 69 CALIF. L. REV. 770 (1981) [hereinafter Peckham, *Federal Judge as Case Manager*]; and Todd D. Peterson, *Restoring Structural Checks on Judicial Power in the Era of Managerial Judging*, 29 U.C. DAVIS L. REV. 41, 63-76 (1995).

252    *See* Peter H. Schuck, *Judicial Avoidance of Juries in Mass Tort Litigation*, 48 DEPAUL L. REV. 479, 490 (1998) ("In no area of litigation is managerial judging more obvious and central than in mass torts.").

253    *See* Gluck, *supra* note 15, at 1693.

254    *See* Elizabeth Chamblee Burch, *Remanding Multidistrict Litigation*, 75 LA. L. REV. 399, 417 (2014) (observing that judges "campaign" to be assigned (citation omitted)); Gluck, *supra* note 15, at 1698 ("Being selected by the JPML ... is a mark of prestige. It is a way ... for life-tenured federal judges ... effectively to rise in their own ranks.").

255    BURCH, *supra* note 10, at 30.

256    *Id.* at 107; *see also* Gluck, *supra* note 15, at 1693-94, 1699 (observing the same, based on interviews with experienced transferee judges); *cf.* Bradt, *supra* note 29, at 907 (observing that the MDL statute was successfully engineered to empower judges who were "believers in active case management").

257    FED. R. CIV. P. 16 advisory committee's note to 1983 amendments (declaring that "when a trial judge intervenes personally at an early stage to assume judicial control over a case ... the case is disposed of ... more efficiently and with less cost and delay than when the parties are left to their own devices").

258    *Id.*

259    E. Donald Elliott, *Managerial Judging and the Evolution of Procedure*, 53 U. CHI. L. REV. 306, 330-32 (1986).

260    William W. Schwarzer, *Managing Civil Litigation: The Trial Judge's Role*, 61 JUDICATURE 400, 405-06 (1978).

261    *See* Thornburg, *supra* note 21, at 1300 (contending that managerial decisions "vary from judge to judge and case to case").

262    *See* WORKING PAPERS AND SUBCOMMITTEE REPORTS, 1 FED. COURTS STUDY COMM. 55 (1990), https://www.law.berkeley.edu/wp-content/uploads/2019/03/Federal-Courts-Study-Committee-1990-Working-Papers-and-Reports-Vol-I.pdf [https://perma.cc/45XK-J38X] ("[P]retrial management decisions are made without any procedural safeguards .... Each judge is free to consult his or her own conception of the importance and merit of the case and the proper speed with which it should be disposed. This, in turn, promotes arbitrariness.").

263    Peterson, *supra* note 21, at 81 (suggesting that hands-on case management may "significantly limit party autonomy").

264    *See* Thornburg, *supra* note 21, at 1287-88, 1291-93 (observing that a frequently-heard criticism of judicial management is that "it leads to a loss of transparency as more decisions are made off the record or in chambers").

265    Jonathan T. Molot, *How Changes in the Legal Profession Reflect Changes in Civil Procedure*, 84 VA. L. REV. 955, 1024 (1998).

266    FED. COURTS STUDY COMM., *supra* note 262, at 52 ("Many critics challenge the empirical claim that managerial judging increases efficiency and reduces costs."). In challenging the efficiency claim, critics tend to point to a 1996 RAND report. It found that intense pretrial management was, as one might predict, "associated with ... significantly reduced time to disposition," but, at the same time (and ominously, for management's supporters), also associated with substantially higher cost. JAMES S. KAKALIK ET AL., AN EVALUATION OF JUDICIAL CASE MANAGEMENT UNDER THE CIVIL JUSTICE REFORM ACT 54-55 (1996).

267    *See, e.g.*, Peterson, *supra* note 21, at 81 (recognizing that, with his managerial decisions, "[a] district judge can substantially determine the outcome of a case, including the amount and terms of the settlement"); Thornburg, *supra* note 21, at 1270 ("[M]anagerial decisions have the ability to affect the outcome of litigation, yet vary depending on

the identity and attitudes of the individual judge."). Indeed, to the extent there was ever doubt regarding this premise, it was shattered by a conference on managerial judging conducted at Yale Law School in the fall of 1985. There, the roughly fifty participating judges were divided into separate groups and given the same hypothetical case. The judges handled the case quite differently:

Based on her intuition that the case had little merit, one trial judge would have required thousands of plaintiffs to file individual, verified complaints--a move that would have made it all but impossible for the plaintiffs' lawyer to pursue the cases. On the other hand, another trial judge confronting exactly the same hypothetical case would have ordered the defendants to create a multi-million dollar settlement fund.

Elliott, *supra* note 259, at 317 (citing Deborah Graham, *ADR Conference Airs Hopes--and Some Doubts*, LEGAL TIMES, Oct. 14, 1985, at 4).

268    *Cf.* FED. COURTS STUDY COMM., *supra* note 262, at 93 n.153 (recognizing, in passing, that heavy-handed judicial management, may "disfavor certain classes of cases"); Thornburg, *supra* note 21, at 1311 (raising the possibility that managerial decisions could "systematically, rather than randomly, skew settlements and trial outcomes").

269    Ruskin, *supra* note 170, at 611.

270    Peckham, *Judicial Response*, *supra* note 251, at 262 (conceding that "in limiting the scope of discovery, setting schedules, and narrowing issues" the managerial judge may "eliminate[] entirely some theories or lines of inquiry"); *accord* Elliott, *supra* note 259, at 315 ("When a managerially-minded judge limits discovery to certain issues or selects a trial date only a few months away, the judge forecloses the development of issues.").

271    Engstrom, *supra* note 22, at 972-74 (suggesting that, depending on how time is allocated, trial time limits risk "systematically biasing the civil justice system" toward defendants).

272    Thornburg, *supra* note 21, at 1306 ("Decisions to require evidence ... in the form of written narratives or summaries ... ha[ve] the potential to disadvantage the party with the burden of proof.").

273    Jennifer M. Granholm & William J. Richards, *Bifurcated Justice: How Trial-Splitting Devices Defeat the Jury's Role*, 26 U. TOL. L. REV. 505, 513-14 (1995) (collecting empirical evidence suggesting that bifurcation advantages defendants); Thornburg, *supra* note 21, at 1302 n.210 (same).

274    One could imagine that, to the extent there is a slant, it is plaintiffs who benefit, as case management appears to reduce the time to disposition. *See* KAKALIK ET AL., *supra* note 266, at 52-54. And conventional wisdom generally holds that faster disposition benefits those who initiate suit. *See* Paul R. J. Connolly & Saundra Smith, *The Litigant's Perspective on Delay: Waiting for the Dough*, 8 JUST. SYS. J. 271, 271-72 (1983); *see also* Peckham, *Federal Judge as Case Manager*, *supra* note 251, at 774 (suggesting that pretrial management "cuts costs" and, in so doing, "helps equalize the financial position of the parties").

275    A point Donald Elliott made in 1986 thus remains true: "One of the crying research needs in civil procedure is for empirical studies of how managerial judging actually works in practice." Elliott, *supra* note 259, at 326.

276    *See generally* STEPHEN B. BURBANK & SEAN FARHANG, RIGHTS AND RETRENCHMENT: THE COUNTERREVOLUTION AGAINST FEDERAL LITIGATION (2017).

277   There are limited exceptions. *E.g.*, Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 119 Stat. 2095 (2005) (codified at 15 U.S.C. §§ 7901-7903 (2018)) (shielding many manufacturers and sellers of firearms from civil liability).

278   *See* BURBANK & FARHANG, *supra* note 276, at 16 ("The counterrevolution's strategy was to leave substantive rights in place while retrenching the infrastructure for their private enforcement."); Jack B. Weinstein, *Procedural Reform as a Surrogate for Substantive Law Revision*, 59 BROOK. L. REV. 827, 836 (1993) (observing that "many of the recent procedural reforms appear ... to be surrogates for direct curtailment of substantive rights").

279   Lujan v. Defs. of Wildlife, 504 U.S. 555, 566-71 (1992); City of Los Angeles v. Lyons, 453 U.S. 1308, 1312 (1981).

280   Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592-93 (1993).

281   *E.g.*, Epic Sys. Corp. v. Lewis, 138 S. Ct. 1612 (2018); Am. Express Co. v. Italian Colors Rest., 570 U.S. 228 (2013); AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011).

282   Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.); Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338 (2011); Amchem Prods., Inc. v. Windsor, 521 U.S. 591 (1997).

283   Ashcroft v. Iqbal, 556 U.S. 662, 677-78 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).

284   Craig B. Shaffer, *Deconstructing "Discovery About Discovery*," 19 SEDONA CONF. J. 215, 229 (2018) (discussing the "renewed emphasis on proportionality in Rule 26(b)(1)").

285   Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986).

286   Arthur R. Miller, *Simplified Pleading, Meaningful Days in Court, and Trials on the Merits: Reflections on the Deformation of Federal Procedure*, 88 N.Y.U. L. REV. 286, 309 (2013).

287   *See id.* at 304 (explaining that the actions above have "impaired both access to the federal courts for many citizens and the enforcement of various national policies"). Perhaps not surprisingly, during this period, plaintiffs' fortunes dimmed considerably. In 1985, civil plaintiffs in federal court prevailed about seventy percent of the time. By 2017, that figure had fallen to thirty percent. Alexandra D. Lahav & Peter Siegelman, *The Curious Incident of the Falling Win Rate: Individual vs System-Level Justification and the Rule of Law*, 52 U.C. DAVIS L. REV. 1371, 1373 & n.1 (2019) (calculating the plaintiff win rate in "adjudicated" cases).

288   Arthur R. Miller, *What Are Courts for? Have We Forsaken the Procedural Gold Standard?*, 78 LA. L. REV. 739, 746, 802, 806 (2018) (discussing "procedural stop signs").

289   Sidney Post Simpson, *The Problem of Trial*, *in* DAVID DUDLEY FIELD CENTENARY ESSAYS 141, 142 (Alison Reppy ed., 1949).

290  Stephen C. Yeazell, *The Misunderstood Consequences of Modern Civil Process*, 1994 WIS. L. REV. 631, 633 n.3, 636. The sixty-three percent figure includes bench trials, jury trials, and directed verdicts.

291  *See* Subrin & Main, *supra* note 91, at 1845-46.

292  Marc Galanter, *The Vanishing Trial: An Examination of Trials and Related Matters in Federal and State Courts*, 1 J. EMPIRICAL LEGAL STUD. 459, 465 fig.2 (2004).

293  In 1975, roughly 4 percent of federal civil cases were resolved by summary judgment, while more than 8 percent were terminated during or after trial. In 1988, roughly 7 percent of federal civil cases were resolved by summary judgment, whereas 5 percent were terminated during or after trial. *Compare* Joe S. Cecil et al., *A Quarter-Century of Summary Judgment Practice in Six Federal District Courts*, 4 J. EMPIRICAL LEGAL STUD. 861, 882 fig.1 (2007) (offering summary judgment statistics), *with* Galanter, *supra* note 292, at 465 fig.2 (offering trial statistics).

294  Galanter, *supra* note 292, at 484-85 n.52, 485 (noting the trend and sketching the contours of the debate regarding whether the *Celotex* trilogy bears responsibility); *see also* Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Clichés Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U. L. REV. 982, 1076 (2003) (tracing the "growing judicial affinity for pretrial dispositions"); Yeazell, *supra* note 290, at 639 (writing in 1994 and calling attention to the "quiet revolution in the process of civil litigation in the United Sates," which "moved from a trial-based procedure to one centered on the events that occur instead of trial and which typically head off trial").

295  *See* John H. Langbein, *The Disappearance of Civil Trial in the United States*, 122 YALE L.J. 522, 551 (2012) ("In a procedural system ever more oriented to pretrial resolution, the deposition has in important respects replaced the trial as the primary occasion for probing sworn testimony about matters of fact."). For further discussion of the ascendance of the pretrial period, see Miller, *supra* note 294, at 984; Subrin & Main, *supra* note 91, at 1851; and Yeazell, *supra* note 290, at 637-39.

296  Engstrom, *supra* note 22, at 935-36 (compiling civil trial rates which, these days, generally hover between .05 percent and 1 percent).

297  The 6:1 ratio is a very rough and unscientific estimate, cobbled together from various sources. For the paucity of reliable data, see Langbein, *supra* note 295, at 568. For the best estimates available, see Cecil et al., *supra* note 293, at 882 fig.1, which reports that, in 2000, the summary judgment termination rate was roughly 8%; Patricia M. Wald, *Summary Judgment at Sixty*, 76 TEX. L. REV. 1897, 1915 (1998), which reports that, in calendar year 1996 in the U.S. District Court for the District of Columbia, 3% of cases were terminated by trial, whereas 22% of cases were terminated by summary judgment; and Memorandum from Joe Cecil and George Cort, Fed. Judicial Ctr., to Hon. Michael Baylson 1-2 (June 15, 2007), which reports that, in 2006, motions for summary judgment were filed in 17% of terminated cases and that 60% of these motions were granted (yielding a termination rate of approximately 10%), though some of those motions were filed or granted only in part. For the comparable trial data across all federal district courts, compare *Table C-4*, ADMIN. OFF. U.S. CTS. (2000), https://www.uscourts.gov/sites/default/files/statistics_import_dir/c04sep00.pdf [https://perma.cc/F464-222T], with *Table C-4*, ADMIN.OFF. U.S. CTS. (2006), https://www.uscourts.gov/sites/default/files/statistics_import_dir/C04Dec06.pdf [https://perma.cc/EX87-XBN7], which report that, in 2000, 2.2% of civil cases reached trial and, in 2006, 1.4% of civil cases reached trial--though recognize that not all cases that reached trial were terminated *by* trial and also that Table C-4 reflects a notoriously expansive definition of what constitutes a trial. For how expansive, see Nora Freeman Engstrom, *The Diminished Trial*, 86 FORDHAM L. REV. 2131, 2139-40 (2018), which offers evidence that Table C-4 overstates traditional trial activity, possibly by a factor of two. Combining these sources suggests a resolved-by-summary-judgment compared to a resolved-by-trial ratio of roughly 7.3:1 in 1996 (in the U.S. District Court for the District of Columbia, per Wald), 3.6:1 in 2000 (Cecil's summary judgment rate divided by Administrative Office C-4 figures), and 7.3:1 in 2006 (Cecil & Cort summary judgment rate divided by the C-4 figures). A crude average of these data suggests a 6:1 summary-judgment-to-trial resolution rate. But there is also reason to believe

that the percentage of cases resolved by trial is trending down, while the percentage of cases resolved by summary judgment is trending up. Thus, if we trust Cecil and Cort's estimate for 2006 (sampling 28,748 motions across eleven circuits, but including motions granted only in part), the current federal court ratio may exceed 7.3:1. A final note is that state courts have not embraced summary judgment to the same extent as federal courts. In the former, summary judgment grants remain quite rare. *See Civil Justice Initiative: The Landscape of Civil Litigation in State Courts*, NAT'L CTR. FOR ST. CTS. iv (2015), https://www.ncsc.org/~/media/Files/PDF/Research/CivilJusticeReport-2015.ashx [https://perma.cc/BP76-RMLH] (explaining that "[s]ummary judgment is a much less favored disposition in state courts compared to federal courts" and that a recent review of state court litigation revealed that, in state courts, summary judgment motions resolved only approximately 1% of claims).

298   *See* Ortiz v. Fibreboard Corp., 527 U.S. 815, 846 (1999) ("[It is] our deep-rooted historic tradition that everyone should have his own day in court." (quoting Martin v. Wilks, 490 U.S. 755, 762 (1989))).

299   FED. COURTS STUDY COMM., *supra* note 262, at 47 (observing that "judges have developed techniques for rationing access to the court"); *accord* Miller, *supra* note 294, at 1044-45 (describing how courts and policymakers came to accept and espouse the view that "only meritorious cases" ought to make it to trial); *see* Engstrom, *supra* note 22, at 935, 955-58 (tracing judges' conceptual evolution).

300   The conviction that access to discovery needs to be *earned*, in fact, lurks behind several defendants' pro-*Lone Pine* arguments. *See, e.g.*, Marquez v. BNSF Ry. Co., No. 17-CV-01153-CMA-MEH, 2017 WL 3390577, at *1 (D. Colo. Aug. 8, 2017) (summarizing the defendant's argument as follows: in the absence of a *Lone Pine* order, the plaintiff's "boilerplate Complaint would subject [the defendant] to overly burdensome and prejudicial discovery"); Brief for Colorado Civil Justice League as Amici Curiae Supporting Petitioners, Antero Res. Corp. v. Strudley, 347 P.3d 149 (Colo. 2015) (No. 13SC576), 2014 WL 10475257, at *7 (stating that *Lone Pine* orders "recognize that complex product liability cases and toxic exposure cases can become immensely burdensome, unreasonably expensive and utterly unwieldy if plaintiffs pursue full discovery without baseline evidence supporting their theory of the case"); *see also* Miller v. Metrohealth Med. Ctr., No. 1:13 CV 1465, 2014 WL 12589121, at *1 (N.D. Ohio Mar. 31, 2014) (entering a *Lone Pine* order in order to "prevent needless expense and time consuming discovery ... where the plaintiff has not offered any substantive information as to the basis for his or her claim").

Supreme Court decisions and Rules Committee action arguably support the notion that discovery may be next on the chopping block. On the former, the Court's decisions in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009), were justified, in part, by reference to the high cost of civil discovery and the Court's stated desire to spare defendants that expense. And both decisions' effect has been to reduce the number of cases that, in fact, survive motions to dismiss and therefore reach the discovery phase of litigation. *See* Stephen B. Burbank & Stephen N. Subrin, *Litigation and Democracy: Restoring a Realistic Prospect of Trial*, 46 HARV. C.R.-C.L. L. REV. 399, 405 (2011); Brooke D. Coleman, *The Efficiency Norm*, 56 B.C. L. REV. 1777, 1790 (2015); Theodore Eisenberg & Kevin M. Clermont, *Plaintiphobia in the Supreme Court*, 100 CORNELL L. REV. 193, 204-12 (2014). On the latter, in recent years, the Rules Committee has repeatedly and "dramatic[ally]" revised Rule 26. These revisions have, collectively, given judges more control over discovery and "set limitations" on discovery's availability. Miller, *supra* note 294, at 1013.

301   Brief of Law Professors as Amici Curiae in Support of Respondents at 14, China Agritech, Inc. v. Resh, 138 S. Ct. 1800 (2018) (No. 17-432) ("[A]ll of the Federal Rules of Civil Procedure are transsubstantive."); Louis Kaplow, *Multistage Adjudication*, 126 HARV. L. REV. 1179, 1233 (2013) ("The Federal Rules of Civil Procedure are widely regarded to be a largely transsubstantive set of legal rules; exceptions, such as Rule 9 on pleading special matters, are few.").

302   Margaret B. Kwoka, *Judicial Rejection of Transsubstantivity: The FOIA Example*, 15 NEV. L.J. 1493, 1496 (2015).

303    Paul D. Carrington, *"Substance" and "Procedure" in the Rules Enabling Act*, 1989 DUKE L.J. 281, 303 (internal quotation marks omitted).

304    *See* Engstrom & Espeland, *supra* note 6, at 16 (collecting relevant statistics).

305    ⚑ FED. R. CIV. P. 9(b).

306    Pub. L. No. 104-134, 110 Stat. 1321, 1321-77 (1996).

307    ⚑ 28 U.S.C. § 2254 (2018).

308    Pub. L. No. 104-67, 109 Stat. 737 (1995).

309    FED. R. CIV. P. tit. XIII, A-F.

310    28 U.S.C. § 1400(b) (2018) (providing that civil actions for patent infringement may only be initiated "in the judicial district where the defendant resides, or where the defendant has committed acts of infringement and has a regular and established place of business"); 35 U.S.C. § 299 (2018) (curtailing patent plaintiffs' ability to join "accused infringers").

311    For FOIA, see generally Kwoka, *supra* note 302, which describes substance-specific rules used in FOIA litigation. For Social Security appeals, and particularly pro se appeals, see Lois Bloom & Helen Hershkoff, *Federal Courts, Magistrate Judges, and the* Pro Se *Plaintiff*, 16 NOTRE DAME J.L. ETHICS & PUB. POL'Y 475, 492 (2014).

312    Kwoka, *supra* note 302, at 1498.

313    *See* FED. R. CIV. P. 26(a)(1)(B) (exempting nine types of proceedings from initial disclosures); David Marcus, *The Past, Present, and Future of Trans-Substantivity in Federal Civil Procedure*, 59 DEPAUL L. REV. 371, 376, 413 & n.262 (2010).

314    Some have already said as much. *See, e.g.*, Miller, *supra* note 286, at 370 (contending that transsubsantivity exists "in name only"); Linda Silberman, *Judicial Adjuncts Revisited: The Proliferation of Ad Hoc Procedure*, 137 U. PA. L. REV. 2131, 2131 (1989) (contending that "transsubstantive rulemaking in fact has been eroded").

315    For why we may benefit from still more procedural tailoring, see, for example, Robert G. Bone, *Making Effective Rules: The Need for Procedure Theory*, 61 OKLA. L. REV. 319, 333 (2008); and Stephen N. Subrin, *The Limitations of Transsubstantive Procedure: An Essay on Adjusting the "One Size Fits All" Assumption*, 87 DENV. U. L. REV. 377 (2010).

316    For the definition, see Bookman & Noll, *supra* note 21, at 772-73. Abbe Gluck describes it perhaps more vividly as "when judges make procedure in common law fashion." Gluck, *supra* note 15, at 1671. For those criticizing and celebrating ad hoc procedure, see *supra* notes 21 and 23, respectively.

317    *See* Gluck, *supra* note 15, at 1687 (dubbing the question "one of the field's most central debates").

318    *See supra* notes 21, 23 and accompanying text.

319    One big question, for example, is whether ad hoc procedure increases the expense of litigation. Some say it does. *See, e.g.*, Tidmarsh, *supra* note 21, at 558. But the evidence is inconclusive. *See* Bone, *supra* note 21, at 1976.

320    *Cf.* Tobias Barrington Wolff, *Managerial Judging and Substantive Law*, 90 WASH. U. L. REV. 1027, 1069 (2013) (addressing a similar question and concluding that a judge's use of ad hoc procedure ought to be measured, not by the metrics identified above, but by whether the improvised device promotes or subverts the "goals of the underlying substantive law").

321    *See* Molot, *supra* note 21, at 69 (summarizing the Founders' conception of the Seventh Amendment).

322    WILLIAM E. NELSON, AMERICANIZATION OF THE COMMON LAW 20-21 (1975) (explaining that the "doctrine of precedent" was historically "viewed as a means of controlling judges' discretion and restraining their possible arbitrary tendencies").

323    *See* Peterson, *supra* note 21, at 47 ("The framers relied on precedent, appellate review, and the institution of the jury trial to provide substantial checks upon the arbitrary exercise of power by federal trial court judges.").

324    *See supra* notes 180-183 and accompanying text.

325    In so doing, courts' actions lend support to a claim Stephen C. Yeazell made in his classic 1994 piece, *The Misunderstood Consequences of Modern Civil Process*. There, Yeazell observed that "the past seventy-five years" had witnessed a reshuffling of "the power relationships of civil litigation" as trial courts had come to claim ever-greater power, relative to their appellate-side counterparts. Yeazell, *supra* note 290, at 631.

326    For discussion of the expansive scope of Rule 16, see Gluck, *supra* note 15, at 1688, which quotes a judge as acknowledging that Rule 16 "'means nothing,' because it could accommodate virtually anything."

327    For this reason, in other contexts, appellate courts have long held that "inherent powers cannot be exercised in a manner that contradicts an applicable statute or rule." *In re* Atl. Pipe Corp., 304 F.3d 135, 143 (1st Cir. 2002); *see also, e.g.*, Atchison, Topeka & Santa Fe Ry. Co. v. Hercules Inc., 146 F.3d 1071, 1074 (9th Cir. 1998) ("[D]istrict courts have inherent power to control their dockets, but not when its exercise would nullify the procedural choices reserved to parties under the federal rules."); G. Heileman Brewing Co. v. Joseph Oat Corp., 871 F.2d 648, 652 (7th Cir. 1989) ("Obviously, the district court, in devising means to control cases before it, may not exercise its inherent authority in a manner inconsistent with rule or statute."); Samuel P. Jordan, *Situating Inherent Power Within a Rules Regime*, 87 DENV. U. L. REV. 311, 319 (2010) ("Inherent power may be used legitimately ... to fill gaps in formal procedural rules or illegitimately to avoid constraints imposed by those rules.").

328    Jordan, *supra* note 327, at 315-16.

329    *Id.* at 317 ("Supplementation of the formal rules from a source that is undefined and unknowable in advance ... leads to results that are less uniform and less predictable.").

330    *Id.* at 318-19.

331    As an illustration, consider the unfortunately-named recent procedural innovation: the "hot-tubbing" of experts. For the uninitiated, "hot-tubbing" is a judicial invention recently imported from Australia. It describes a procedure whereby both sides' experts offer their opinions simultaneously, in the presence of counsel. The judge actively participates in the exchange, and the experts are permitted to ask each other questions and probe weaknesses in one another's testimony. The idea is that, by permitting freer, less-scripted exchange, the procedure will more efficiently elicit testimony, narrow the range of uncertainty, and promote candor and accuracy.

Applied to the above framework, one may note that hot-tubbing is an ad hoc procedure that has developed outside the Rules, and one may further observe that it stands in some tension with traditional adversarial processes. But, one may simultaneously conclude that (1) it is a procedure that extends, rather than circumvents, formal requirements (namely, Federal Rule of Evidence 611 gives courts "control over the mode and order of examining witnesses ... so as to ... make those procedures effective for determining the truth and avoid wasting time," while Rule of Evidence 614(b) empowers courts to examine witnesses); (2) it is bilateral rather than unilateral (it changes the rules of the game for both parties simultaneously); and (3) so long as counsel can still engage in some cross-examination of her opponent's expert, the procedure does not wholly deprive either party of rights or protections that the formal law would otherwise afford. Thus, as compared to the issuance of a *Lone Pine* order, say, the hot-tubbing of experts ought to cause us lesser concern. For more on hot-tubbing, see generally Adam Elliott Butt, *Concurrent Expert Evidence in U.S. Toxic Harms Cases and Civil Cases More Generally: Is There a Proper Role for "Hot Tubbing"?*, 40 HOUS. J. INT'L L. 1 (2017); and Jack Zouhary, *Jumping in--A Different Approach to Expert Evidence*, FED. LAW., May 2015, at 22.

**End of Document**                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.