Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC; Facebook*
*Operations, LLC; Facebook Payments, Inc.;*
*Facebook Technologies, LLC; Instagram, LLC;*
*Siculus, Inc.; and Mark Elliot Zuckerberg*

*Additional parties and counsel listed on*
*signature pages*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR-TSH<br><br>Honorable Yvonne Gonzalez Rogers<br><br>**DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6) PLAINTIFFS' PRIORITY CLAIMS ASSERTED IN AMENDED MASTER COMPLAINT**<br><br><br>**Hearing:**<br>Date:   TBD<br>Time:   TBD<br>Place:   Oakland, California<br>Judge:   Hon. Yvonne Gonzalez Rogers |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, at a hearing date and time to be determined in accordance with the Court's Case Management Order No. 5 (Dkt. 164), before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street in Oakland, California, Defendants Meta Platforms, Inc. f/k/a Facebook, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., and Mark Elliot Zuckerberg; TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC; Snap Inc.; and YouTube, LLC, Google LLC, and Alphabet Inc. (each a "Defendant," and collectively the "Defendants"), will and hereby do move this Court, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), for an order dismissing with prejudice all five claims identified by Plaintiffs as priority claims in the Amended Master Complaint (Dkt. 234-1) ("Master Complaint").

This Motion is based on the Memorandum of Points and Authorities submitted herewith, any Reply Memorandum or other papers submitted in connection with the Motion, the Master Complaint filed in this action, any matter of which this Court may properly take judicial notice, and any information presented at argument.

DATED:     April 17, 2023          By:   */s/ Phyllis A. Jones*
                                         Phyllis A. Jones

                                         *Attorneys for Defendants Meta Platforms,*
                                         *Inc. f/k/a Facebook, Inc.; Facebook*
                                         *Holdings, LLC; Facebook Operations, LLC;*
                                         *Facebook Payments, Inc.; Facebook*
                                         *Technologies, LLC; Instagram, LLC;*
                                         *Siculus, Inc.; and Mark Elliot Zuckerberg*

                                         *Additional parties and counsel listed on*
                                         *signature pages*

1

# TABLE OF CONTENTS

2

NOTICE OF MOTION AND MOTION ....................................................................................ii

3

TABLE OF CONTENTS ......................................................................................................iii

4

I.  INTRODUCTION .................................................................................................... 1

5

II.  BACKGROUND ...................................................................................................... 3

6

A.  Defendants' Interactive Communication Services ...................................... 3

7

1.  Facebook ......................................................................................... 3

8

2.  Instagram ......................................................................................... 5

9

3.  Snapchat .......................................................................................... 7

10

4.  TikTok ............................................................................................. 8

11

5.  YouTube .......................................................................................... 9

12

B.  Plaintiffs' Priority Claims ......................................................................... 11

13

III.  LEGAL STANDARDS ........................................................................................... 12

14

IV.  ARGUMENT ......................................................................................................... 13

15

A.  Plaintiffs Do Not Properly Plead Product Liability Claims Against Defendants. 13

16

1.  Plaintiffs' Product Liability Claims Fail Because They Challenge
     Interactive Communication Services, Not Products. ............................. 14

17

2.  Plaintiffs' Product Liability Claims Separately Fail Because Plaintiffs'
     Alleged Harms Flow From Intangible Information Or Ideas. .................. 17

18

a)  Product Liability Law Applies Only to *Tangible* Products, Not
     to Harm from Intangible Information or Ideas............................. 18

19

b)  Plaintiffs Allege Harm From Intangible Information and Ideas,
     Not a Tangible Product. ............................................................. 22

20

B.  Plaintiffs' Negligence-Based Product Liability Claims Fail For The Additional
     Reason That Plaintiffs Allege No Cognizable Duty Of Care. ............................ 27

21

1.  Plaintiffs Fail To Establish That Interactive Communication Services
     Owe A Duty Of Care For Content Publication Or Consumption. ........... 28

22

2.  Plaintiffs' Allegations Regarding The Purported Addictiveness Of
     Defendants' Services Do Not Create A Duty Of Care............................ 31

3. Plaintiffs Have Not Alleged A Legally Recognizable Special Relationship Between Defendants And Minors, And Defendants Thus Do Not Owe Minors A Heightened Duty Of Care. ................................... 33

4. Plaintiffs Fail To Establish A Duty Of Care To Prevent Harm Caused By Third-Party Criminal Actors Or Wrongdoers. ..................................... 35

C. Plaintiffs Fail To Adequately Allege Proximate Causation. ................................. 39

1. Plaintiffs Fail To Allege Any Causal Connection Between The Challenged Features Of Defendants' Services And Plaintiffs' Alleged Injuries. ................................................................................................. 40

2. Plaintiffs Fail To Allege A Causal Nexus Between Defendants' Conduct And The Alleged Harms Caused By The Unlawful Acts Of Third Parties. ......................................................................................... 43

D. Plaintiffs Fail To Allege A Claim For Negligence Per Se. ................................. 47

1. Plaintiffs' Negligence Per Se Claims Are Unavailable In Numerous States. ................................................................................................. 47

a) Plaintiffs' Claims Are Categorically Foreclosed In Many States. 48

b) Plaintiffs' Negligence Per Se Claims Would Require an Unprecedented Extension of Tort Law. ........................................ 51

2. Plaintiffs Fail To Plausibly Allege That Defendants Violated Either Of The Federal Statutes They Invoke. .......................................................... 53

a) Plaintiffs Fail to Allege a PROTECT Act Violation. ................... 53

(1) Plaintiffs Mischaracterize Section 2258A. ........................ 53

(2) Plaintiffs' PROTECT Act Allegations Are Entirely Conclusory. ........................................................................ 55

b) Plaintiffs Fail To Allege A COPPA Violation. ............................ 56

3. Plaintiffs Fail To Allege That Any Of Their Asserted Injuries Were Caused By Defendants' Alleged Statutory Violations, Which Also Deprives Them Of Article III Standing. ................................................. 59

V. CONCLUSION ............................................................................................................. 61

VI. APPENDIX ................................................................................................................. 66

iv

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.B. v. Salesforce.com, Inc.*,
  2021 WL 3616097 (S.D. Tex. Mar. 22, 2021) ..............................................................45

*Adams v. BRG Sports, Inc.*,
  2018 WL 4853130 (N.D. Ill. Oct. 5, 2018) ...................................................................42

*Alabama Dep't of Corr. v. Thompson*,
  855 So. 2d 1016 (Ala. 2003) .........................................................................................36

*Alexander v. Beech Aircraft Corp.*,
  952 F.2d 1215 (10th Cir. 1991) .....................................................................................65

*Alexander v. Montana-Dakota Utils. Co.*,
  2020 WL 6262101 (D. Mont. Oct. 23, 2020) ................................................................65

*Alm v. Van Nostrand Reinhold Co.*,
  480 N.E.2d 1263 (Ill. App. Ct. 1985) ...........................................................................65

*Anastasio v. Kahn*,
  2010 WL 114879 (E.D. Pa. Jan. 13, 2010) ...................................................................65

*Anderson v. TikTok Inc.*,
  2022 WL 14742788 (E.D. Pa. Oct. 25, 2022) ..........................................................25, 30

*Andres v. Young Men's Christian Ass'n*,
  64 Cal. App. 4th 85 (1998) ............................................................................................59

*Arbaugh v. Bd. of Educ., Cnty. of Pendleton*,
  591 S.E.2d 235 (W. Va. 2003) ......................................................................................65

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................12, 53, 55, 57

*Ass'n Unit of Owners of Bridgeview Condominium Ass'n v. Dunning*,
  69 P.3d 788 (Or. App. 2003) .........................................................................................65

*Avis Rent A Car System, LLC v. Johnson*,
  836 S.E.2d 114 (Ga. Ct. App. 2019) .............................................................................44

*Estate of B.H. v. Netflix, Inc.*,
  2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ......................................................... *passim*

*Bagelmann v. First Nat'l Bank*,
  823 N.W.2d 18 (Iowa 2012) ..........................................................................................65

*N.M. ex rel. Balderas v. Tiny Lab Prods.*,
  457 F. Supp. 3d 1103 (D.N.M. 2020) ...........................................................................57

v

*Banks v. ICI Ams., Inc.*,
  450 S.E.2d 671 (Ga. 1994)...........................................................................................65

*Barden v. Harpercollins Publishers, Inc.*,
  863 F. Supp. 41 (D. Mass. 1994) ...............................................................................65

*Barnes v. Birds Eye Foods, Inc.*,
  2011 WL 13362363 (W.D. Mich. Sept. 26, 2011)......................................................65

*Beasock v. Dioguardi Enterps., Inc.*,
  130 Misc. 2d 25 (N.Y. Sup. Ct. 1985) ..................................................................22, 65

*Beckman v. Match.com, LLC*,
  743 F. App'x 142 (9th Cir. 2018) ...............................................................................35

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)...................................................................................12, 17, 55

*Bell v. Alpha Tau Omega Fraternity, Eta Epsilon Chapter*,
  642 P.2d 161 (Nev. 1982) ...........................................................................................65

*Bentley v. Greensky Trade Credit, LLC*,
  156 F. Supp. 3d 274 (D. Conn. 2015) .........................................................................52

*Bhardwaj v. 24 Hour Fitness*,
  2002 WL 373563 (Cal. Ct. App. Mar. 8, 2002) ..........................................................65

*Bill v. Super. Ct.*,
  137 Cal. App. 3d 1002 (1982).....................................................................................29

*Birmingham v. Fodor's Travel Pubs., Inc.*,
  833 P.2d 70 (Haw. 1992) ......................................................................................20, 65

*Bittle v. Brunetti*,
  750 P.2d 49 (Colo. 1988) ......................................................................................50, 65

*In re Blackbaud, Inc.*,
  567 F. Supp. 3d 667 (D.S.C. 2021).............................................................................51

*Bland v. Roberts*,
  730 F.3d 368 (4th Cir. 2013)......................................................................................23

*Bob Godfrey Pontiac, Inc. v. Roloff*,
  630 P.2d 840 (Or. 1981).............................................................................................65

*Borgo v. Narragansett Elec. Co.*,
  275 A.3d 567 (R.I. 2022) ............................................................................................65

*Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*,
  513 P.2d 268 (Mont. 1973) .........................................................................................65

*Brandt v. Weather Channel, Inc.*,
    42 F. Supp. 2d 1344 (S.D. Fla. 1999) ..................................................................29

*Branham v. Ford Motor Co.*,
    701 S.E.2d 5 (S.C. 2010) ....................................................................................65

*Brooks v. Mentor Worldwide LLC*,
    985 F.3d 1272 (10th Cir. 2021)...........................................................................65

*Brown v. City of Valparaiso*,
    67 N.E.3d 652 (Ind. Ct. App. 2016).....................................................................65

*Brown v. USA Taekwondo*,
    483 P.3d 159 (Cal. 2021) .....................................................................................34

*Buchler v. State ex rel. Oregon Corr. Div.*,
    853 P.2d 798 (Or. 1993).................................................................................37, 44

*Bugoni v. Emp't Background Investigations, Inc.*,
    2020 WL 5994958 (D. Md. Oct. 9, 2020)............................................................65

*Burghart v. S. Corr. Entity*,
    2023 WL 1766258 (W.D. Wash. Feb. 3, 2023) ...................................................17

*Burrell v. Bayer Corp.*,
    260 F. Supp. 3d 485 (W.D.N.C. 2017) ................................................................14

*Buttrick v. Arthur Lessard & Sons*,
    260 A.2d 111 (N.H. 1969) ...................................................................................65

*United States ex rel. Cady v. EMD Serono, Inc.*,
    2010 WL 11579018 (C.D. Cal. May 28, 2010) ...................................................55

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018)...............................................................................60

*Carroll v. Am. Empire Surplus Lines Ins. Co.*,
    289 F. Supp. 3d 767 (E.D. La. 2017) ..................................................................35

*Casrell v. Altec Indus., Inc.*,
    335 So.2d 128 (Ala. 1976) ...................................................................................65

*Castine Energy Constr., Inc. v. T.T. Dunphy, Inc.*,
    861 A.2d 671 (Me. 2004) .....................................................................................65

*Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC*,
    400 S.W.3d 701 (Ark. 2012)................................................................................65

*Cervantes v. Countrywide Home Loans, Inc.*,
    656 F.3d 1034 (9th Cir. 2011).............................................................................13

vii

*Cervantes v. Health Plan of Nev., Inc.*,
  263 P.3d 261 (Nev. 2011) ........................................................................................65

*Chadbourne v. Kappaz*,
  779 A.2d 293 (D.C. 2001) .......................................................................................65

*Chattopadhyay v. BBVA Compass Bancshares, Inc.*,
  2019 U.S. Dist. LEXIS 241400 (N.D. Cal. Nov. 25, 2019) .....................................41

*Chauvin v. Sisters of Mercy Health Sys., St. Louis, Inc.*,
  818 So.2d 833 (La. Ct. App. 2002) .........................................................................65

*City of Chicago v. Beretta U.S.A. Corp.*,
  821 N.E.2d 1099 (Ill. 2004) ....................................................................................46

*Cline v. Prowler Indus., Inc.*,
  418 A.2d 968 (Del. 1980) ........................................................................................14

*Coastline Terminals of Conn., Inc. v. USX Corp.*,
  156 F. Supp. 2d 203 (D. Conn. 2001) .....................................................................65

*Coghlan v. Beta Theta Pi Fraternity*,
  987 P.2d 300 (Idaho 1999) .....................................................................................36

*Colgate v. JUUL Labs, Inc.*,
  345 F. Supp. 3d 1178 (N.D. Cal. 2018) ..................................................................32

*Coppola v. Smith*,
  935 F. Supp. 2d 993 (E.D. Cal. 2013) .....................................................................53

*Cordero Aloua v. Aurora Loan Servs., LLC*,
  2010 WL 2555648 (D. Nev. June 23, 2010) ...........................................................65

*Crosby v. Twitter, Inc.*,
  921 F.3d 617 (6th Cir. 2019) .........................................................................44, 45, 46

*Crouch v. Ruby Corp.*,
  2022 WL 16747282 (S.D. Cal. Nov. 7, 2022) .........................................................16

*Ctr. Chem. Co. v. Parzini*,
  218 S.E.2d 580 (Ga. 1975) ......................................................................................65

*Cuyler v. United States*,
  362 F.3d 949 (7th Cir. 2004) ............................................................................50, 65

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006) ................................................................................................60

*Darling v. Cent. Vt. Public Serv. Corp.*,
  762 A.2d 826 (Vt. 2000) ..........................................................................................65

*Das v. Bank of Am., N.A.*,
    186 Cal. App. 4th 727 (2010)................................................................................48, 65

*Davidson v. Time Warner, Inc.*,
    1997 WL 405907 (S.D. Tex. Mar. 3, 1997)...................................................20, 29, 65

*Deckard v. Bunch*,
    370 P.3d 478 (Or. 2016)................................................................................................65

*DeFilippo v. Nat'l Broad. Co.*,
    1980 WL 336092 (R.I. Super. June 8, 1980) ................................................18, 20, 26, 65

*Del Webb Cmtys., Inc. v. Partington*,
    652 F.3d 1145 (9th Cir. 2011).....................................................................................13

*Denson v. Nat'l Cas. Co.*,
    2023 WL 2672096 (S.C. Mar. 29, 2023) ....................................................................65

*Diller v. Ditech Fin., LLC*,
    2017 WL 2986247 (N.D. Cal. July 13, 2017)..............................................................65

*Doe v. Marion*,
    645 S.E.2d 245 (S.C. 2007).........................................................................................50

*Doe v. McKesson*,
    339 So. 3d 524 (La. 2022)......................................................................................48, 65

*Doe v. Mindgeek USA Inc.*,
    558 F. Supp. 3d 828 (C.D. Cal. 2021).........................................................................49

*Doe v. MySpace, Inc.*,
    474 F. Supp. 2d 843 (W.D. Tex. 2007)..................................................................28, 35

*Doe v. Twitter, Inc.*,
    555 F. Supp. 3d 889 (N.D. Cal. 2021) ..................................................................49, 56

*Doyle v. Clark*,
    254 P.3d 570 (Mont. 2011) .........................................................................................65

*Dyroff v. Ultimate Software Grp., Inc.*,
    2017 WL 5665670 (N.D. Cal. Nov. 26, 2017)..................................................... *passim*

*Eberhart v. Amazon.com, Inc.*,
    325 F. Supp. 3d 393 (S.D.N.Y. 2018).....................................................................16, 65

*Elias v. Hewlett-Packard Co.*,
    903 F. Supp. 2d 843 (N.D. Cal. 2012) ........................................................................41

*Elkins v. Acad. I, LP*,
    633 S.W.3d 529 (Mo. Ct. App. 2021)..........................................................................65

ix

*Engelhardt v. Rogers Grp., Inc.*,
  132 F. Supp. 2d 757 (E.D. Ark. 2001) ...................................................................65

*Ethridge v. Samsung SDI Co.*,
  2022 WL 1955680 (S.D. Tex. May 31, 2022) ........................................................33

*Everett v. Carter*,
  490 So.2d 193 (Fla. Dist. Ct. App. 1986) .........................................................44, 46

*Faber v. Ciox Health, LLC*,
  331 F. Supp. 3d 767 (W.D. Tenn. 2018).................................................................65

*In re Facebook, Inc.*,
  625 S.W.3d 85 (Tex. 2021)......................................................................................16

*Ferrari v. Nat. Partner, Inc.*,
  2017 WL 76905 (N.D. Cal. Jan. 9, 2017) ...............................................................41

*Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*,
  936 F. Supp. 2d 441 (D.N.J. 2013) .........................................................................14

*Fields v. Twitter, Inc.*,
  217 F. Supp. 3d 1116 (N.D. Cal. 2016) .............................................13, 43, 44, 45

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*,
  670 F. Supp. 115 (S.D.N.Y. 1987)...........................................................................65

*First Springfield Bank & Trust v. Galman*,
  720 N.E.2d 1068 (Ill. 1999) .......................................................................... *passim*

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019)............................................................................ *passim*

*Ford v. Monroe*,
  559 S.W.2d 759 (Mo. Ct. App. 1977)......................................................................44

*Foster v. Bridgestone Ams., Inc.*,
  2013 WL 489162 (S.D. Ala. Feb. 8, 2013) .......................................................14, 60

*Fox. v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*,
  576 So.2d 978 (La. 1991).........................................................................................36

*Gamache v. Airbnb, Inc.*,
  2017 WL 3431651 (Cal. Ct. App. Aug. 10, 2017)....................................................45

*Garcia v. Kusan, Inc.*,
  655 N.E.2d 1290 (Mass. App. Ct. 1995).................................................................65

*Gauthier v. Manchester Sch. Dist., SAU #37*,
  123 A.3d 1016 (N.H. 2015) .....................................................................................65

x

*Gavra v. Google Inc.*,
   2013 WL 3788241 (N.D. Cal. July 17, 2013) ................................................................. 36

*In re GE/CBPS Data Breach Litig.*,
   2021 WL 3406374 (S.D.N.Y. Aug. 4, 2021) .................................................................. 65

*Gersh v. Anglin*,
   353 F. Supp. 3d 958 (D. Mont. 2018) ........................................................................... 36

*In re Gilead Scis. Sec. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ....................................................................................... 55

*Gillingham v. Stephenson*,
   551 S.E.2d 663 (W. Va. 2001) ....................................................................................... 65

*Ginsberg v. Google Inc.*,
   586 F. Supp. 3d 998 (N.D. Cal. 2022) .......................................................................... 35

*Gonzalez v. Google, Inc.*,
   335 F. Supp. 3d 1156 (N.D. Cal. 2018) ............................................................. 12, 45, 46

*Gorran v. Atkins Nutritionals, Inc.*,
   464 F. Supp. 2d. 315 (S.D.N.Y. 2006) .......................................................................... 65

*Graves v. Warner Bros.*,
   656 N.W.2d 195 (Mich. Ct. App. 2002) ........................................................................ 46

*Green v. 712 Broadway, LLC*,
   2018 WL 2754075 (D.N.J. June 8, 2018) ...................................................................... 65

*Green v. ADT, LLC*,
   2016 WL 3208483 (N.D. Cal. June 10, 2016) ............................................................... 65

*Grieco v. Daiho Sangyo, Inv.*,
   344 So. 3d 11 (Fla. Dist. Ct. App. 2022) ...................................................................... 45

*Grossman v. Rockaway Twp.*,
   2019 WL 2649153 (N.J. Super. Ct. June 10, 2019) ...................................................... 15

*Grubb v. Do It Best Corp.*,
   279 P.3d 626 (Ariz. Ct. App. 2012) .............................................................................. 65

*Gutta v. Sedgwick Claims Mgmt. Servs., Inc.*,
   2023 WL 2709646 (D. Or. Mar. 29, 2023) .................................................................... 65

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
   613 F. Supp. 2d 108 (D. Me. 2009) ............................................................................... 65

*Hansen v. Eyre*,
   116 P.3d 290 (Utah 2005) .............................................................................................. 65

xi

*Heath v. La Mariana Apartments*,
    180 P.3d 664 (N.M. 2008) ..................................................................................65

*Hector v. Bank of N.Y. Mellon*,
    251 A.3d 1102 (Md. 2021) ................................................................................65

*Herceg v. Hustler Mag., Inc.*,
    565 F. Supp. 802 (S.D. Tex. 1983) ...............................................20, 29, 30, 65

*Hermosillo v. Leadingham*,
    13 P.3d 79 (N.M. Ct. App. 2000) ......................................................................36

*Herrick v. Grindr, LLC*,
    306 F. Supp. 3d 579 (S.D.N.Y. 2018) ...............................................................24

*Highmark Fed. Credit Union v. Hunter*,
    814 N.W.2d 413 (S.D. 2012) .............................................................................65

*Hill v. Danek Med., Inc.*,
    1998 WL 1048182 (E.D.N.C. Sept. 10, 1998) ..................................................65

*Hobbs v. Boy Scouts of Am., Inc.*,
    152 S.W.3d 367 (Mo. Ct. App. 2004) ...............................................................65

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ...........................................................................................44

*Howard v. Zimmer, Inc.*,
    299 P.3d 463 (Okla. 2013) ................................................................................65

*Hue v. Farmboy Spray Co.*,
    896 P.2d 682 (Wash. 1995) ...............................................................................14

*Ingrassia v. Lividikos*,
    54 A.D.3d 721 (N.Y. App. Div. 2008) ..............................................................44

*Intellect Art Multimedia, Inc. v. Milewski*,
    2009 WL 2915273 (N.Y. Sup. Ct. Sept. 11, 2009) ...........................................65

*In re iPhone Application Litig.*,
    2011 WL 4403963 (N.D. Cal. Sep. 20, 2011) ..................................................41

*Irrer v. Milacron, Inc.*,
    2007 WL 677899 (E.D. Mich. Mar. 6, 2007) ...................................................14

*Isgett ex rel. Isgett v. Wal-Mart Stores*,
    976 F. Supp. 422 (S.D. Miss. 1997) ..................................................................65

*Isham v. Padi Worldwide Corp.*,
    2007 WL 2460776 (D. Haw. Aug. 23, 2007) ..............................................16, 65

*Izzarelli v. R.J. Reynolds Tobacco Co.*,
  136 A.3d 1232 (Conn. 2016) ................................................................................................65

*Jackson v. Airbnb, Inc.*,
  2022 WL 16752071 (C.D. Cal. Nov. 4, 2022) ...............................................................16, 37

*Jacobs v. Meta Platforms, Inc.*,
  2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) ......................................14, 15, 16, 17

*Jacobsen v. Marin Gen. Hosp.*,
  192 F.3d 881 (9th Cir. 1999) ...............................................................................................27

*James v. Meow Media, Inc.*,
  300 F.3d 683 (6th Cir. 2002) ..................................................................................... *passim*

*Jane Doe No. 1 v. Uber Techs., Inc.*,
  79 Cal. App. 5th 410 (2022) ......................................................................................35, 37, 38

*Jane Doe No. 14 v. Internet Brands, Inc.*,
  2016 U.S. Dist. LEXIS 192144 (C.D. Cal. Nov. 14, 2016) ....................................34, 36

*Johns v. Suzuki Motor of Am., Inc.*,
  850 S.E.2d 59 (Ga. 2020) ....................................................................................................65

*Johnson v. Am. Motors Corp.*,
  225 N.W.2d 57 (N.D. 1974) .................................................................................................65

*Johnson v. Weinberger*,
  851 F.2d 233 (9th Cir. 1988) ...............................................................................................60

*Jones v. J.B. Lippincott Co.*,
  694 F. Supp. 1216 (D. Md. 1988) ................................................................................ *passim*

*Joseph v. Monroe*,
  419 A.2d 927 (Del. 1980) ....................................................................................................65

*Juliano v. Simpson*,
  962 N.E.2d 175 (Mass. 2012) ..............................................................................................65

*Kane v. Hartford Accident & Indem. Co.*,
  98 Cal. App. 3d 350 (1979) .................................................................................................44

*Kapps v. Biosense Webster, Inc.*,
  813 F. Supp. 2d 1128 (D. Minn. 2011) ................................................................................65

*Karst v. Shur-Co.*,
  878 N.W.2d 604 (S.D. 2016) ...............................................................................................65

*Kawczynski v. Am. Coll. of Cardiology*,
  2016 WL 2770552 (W.D. Wis. May 13, 2016) .............................................................20, 65

xiii

*Kennedy v. Providence Hockey Club, Inc.*,
  376 A.2d 329 (R.I. 1977) ...........................................................................................65

*Kimball v. Landeis*,
  652 N.W.2d 330 (N.D. 2002) .....................................................................................65

*Kochons v. Linden-Alimak, Inc.*,
  799 F.2d 1128 (6th Cir. 1986) ...................................................................................65

*L. Cohen & Co. v. Dun & Bradstreet, Inc.*,
  629 F. Supp. 1425 (D. Conn. 1986) ..........................................................................65

*Labega v. Joshi*,
  270 A.3d 378 (N.J. Super. Ct. App. Div. 2022) .......................................................65

*Langley v. Guiding Hands Sch., Inc.*,
  2021 WL 1212713 (E.D. Cal. Mar. 31, 2021) ..........................................................14

*Lawson v. Stow*,
  327 P.3d 340 (Colo. App. 2014) ................................................................................65

*Legal Tender Servs. PLLC v. Bank of Am. Fork*,
  506 P.3d 1211 (Utah App. Ct. 2022) ........................................................................65

*Lemmon v. Snap*,
  995 F.3d 1085 (9th Cir. 2021) ...................................................................................16

*Lewin v. McCreight*,
  655 F. Supp. 282 (E.D. Mich. 1987) .........................................................................65

*Lugo v. St. Nicholas Assocs.*,
  772 N.Y.S.2d 449 (2003) ...........................................................................................65

*M.L. v. Craigslist Inc.*,
  2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) .................................................28, 34

*Machlup v. Bowman*,
  2021 WL 5882102 (Ohio Ct. App. 2021) ..................................................................65

*Mahan v. Am-Gard, Inc.*,
  841 A.2d 1052 (Pa. 2003) ..........................................................................................44

*Maynard v. Snapchat, Inc.*,
  870 S.E.2d 739 (Ga. 2022) .........................................................................................16

*McKethean v. Washington Metro. Area Transit Auth.*,
  588 A.2d 708 (D.C. Ct. App. 1991) ...........................................................................44

*Meador v. Apple, Inc.*,
  911 F.3d 260 (5th Cir. 2018) .....................................................................................45

xiv

*Melnick v. TAMKO Bldg. Prods., Inc.*,
    469 F. Supp. 3d 1082 (D. Kan. 2020) ............................................................65

*Merrill v. Trump Ind., Inc.*,
    320 F.3d 729 (7th Cir. 2003).........................................................................32

*Merritt v. Countrywide Fin. Corp.*,
    2015 WL 5542992 (N.D. Cal. 2015)............................................................65

*Meyers v. Rieck*,
    983 N.W.2d 747 (Mich. 2022) ......................................................................65

*Miller v. City of Portland*,
    604 P.2d 1261 (Or. 1980)..............................................................................48

*Miller v. Gastronomy, Inc.*,
    110 P.3d 144 (Utah Ct. App. 2005) ..............................................................65

*Milwaukee Elec. Tool Corp. v. Super. Ct.*,
    15 Cal. App. 4th 547 (1993)..........................................................................15

*Mitchell v. Wells Fargo Bank*,
    355 F. Supp. 3d 1136 (D. Utah 2018) ..........................................................65

*Modisette v. Apple Inc.*,
    30 Cal. App. 5th 136 (2018).....................................................27, 43, 45, 46

*Monnin v. Fifth Third Bank, N.A.*,
    658 N.E.2d 1140 (Ohio Ct. App. 1995) .............................................27, 54, 65

*Munhoven v. Northwind Marine, Inc.*,
    353 F. Supp. 2d 1072 (D. Alaska 2005) .......................................................65

*Murray v. ILG Techs., LLC*,
    378 F. Supp. 3d 1227 (S.D. Ga. 2019)...................................................22, 65

*Nation v. State Dep't of Corr.*,
    158 P.3d 953 (Idaho 2007) ...........................................................................65

*Nguyen v. SXSW Holdings, Inc.*,
    580 S.W.3d 774 (Tex. Ct. App. 2019) ..........................................................44

*NOLA 180 v. Harrah's Operating Co.*,
    94 So. 3d 886 (La. Ct. App. 2012) ...............................................................32

*Ogle v. Caterpillar Tractor Co.*,
    716 P.2d 334 (Wyo. 1986) ............................................................................65

*Olson v. Owens-Corning Fiberglas Corp.*,
    556 N.E.2d 716 (Ill. App. Ct. 1990) .............................................................65

xv

*In re Optical Disk Drive Antitrust Litig.*,
  2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ...............................................................12

*In re Orthopedic Bone Screw Prods. Liab. Litig.*,
  1996 WL 482977 (E.D. Pa. Aug. 22, 1996) ..................................................................41

*Otten v. BNSF Ry. Co.*,
  2023 WL 1948626 (10th Cir. Feb. 13, 2023) ...............................................................65

*Ozeran v. Jacobs*,
  2018 WL 1989525 (C.D. Cal. Apr. 25, 2018) ..............................................................53

*Packingham v. North Carolina*,
  137 S. Ct. 1730 (2017) ...................................................................................................1

*Palermo v. LifeLink Found., Inc.*,
  152 So. 3d 1177 (Miss. Ct. App. 2014) ........................................................................65

*Perry v. S.N.*,
  973 S.W.2d 301 (Tex. 1998) ............................................................................50, 52, 65

*Pirozzi v. Apple Inc.*,
  913 F. Supp. 2d 840 (N.D. Cal. 2012) ..........................................................................37

*Pitts v. Genie Indus., Inc.*,
  921 N.W.2d 597 (Neb. 2019) ........................................................................................65

*U.S. ex. rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*,
  444 F.3d 462 (6th Cir. 2006) .........................................................................................39

*Polt v. Sandoz, Inc.*,
  462 F. Supp. 3d 557 (E.D. Pa. 2020) ............................................................................65

*Powell v. Tosh*,
  929 F. Supp. 2d 691 (W.D. Ky. 2013) ..........................................................................65

*Pruitt v. Oliver*,
  331 So. 3d 99 (Ala. 2021) .............................................................................................65

*Pullen v. West*,
  92 P.3d 584 (Kan. 2004) ...............................................................................................65

*In re Qualcomm Antitrust Litig.*,
  2023 WL 121983 (N.D. Cal. Jan. 6, 2023) ...................................................................13

*Quinteros v. InnoGames*,
  2022 WL 898560 (W.D. Wash. Mar. 28, 2022) .................................................... *passim*

*R. B. J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*,
  315 N.W.2d 284 (N.D. 1982) ........................................................................................65

xvi

*Radford v. Wells Fargo Bank*,
    2011 WL 1833020 (D. Haw. May 13, 2011) ............................................................65

*Raymaker v. Am. Fam. Mut. Ins. Co.*,
    718 N.W.2d 154 (Wis. Ct. App. 2006) ..................................................................65

*Resol. Tr. Corp. v. Dean*,
    854 F. Supp. 626 (D. Ariz. 1994) ..........................................................................65

*Riggs v. Apple, Inc.*,
    2017 WL 4018064 (Cal. Super. Ct. Aug. 24, 2017) ..............................................45

*Rindlisbaker v. Wilson*,
    519 P.2d 421 (Idaho 1974) ....................................................................................65

*Rivera v. Philip Morris, Inc.*,
    209 P.3d 271 (Nev. 2009) ......................................................................................65

*Robinson v. Big Mouth, Inc.*,
    2017 WL 11725906 (D. Md. Sep. 26, 2017) ....................................................14, 65

*Rodgers v. Christie*,
    795 F. App'x 878 (3d Cir. 2020) .................................................................. *passim*

*Rodriguez v. Suzuki Motor Corp.*,
    996 S.W.2d 47 (Mo. 1999) .....................................................................................65

*Rudes v. Gottschalk*,
    324 S.W.2d 201 (Tex. 1959) ..................................................................................48

*Ruiz v. S. Pac. Transp. Co.*,
    638 P.2d 406 (N.M. Ct. App. 1981) .......................................................................65

*Safari Club Int'l v. Rudolph*,
    862 F.3d 1113 (9th Cir. 2017) ................................................................................59

*Sailola v. Mun. Servs. Bureau*,
    2014 WL 3389395 (D. Haw. July 9, 2014) .......................................................48, 65

*Sakon v. Pepsico, Inc.*,
    553 So.2d 163 (Fla. 1989) .....................................................................................29

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ......................................................... *passim*

*In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*,
    288 F. Supp. 3d 1087 (D.N.M. 2017) ....................................................................40

*Santana v. Rainbow Cleaners*,
    969 A.2d 653 (R.I. 2009) .......................................................................................36

xvii

*Savina v. Sterling Drug, Inc.*,
  795 P.2d 915 (Kan. 1990) ....................................................................................65

*Scheele v. Rains*,
  874 N.W.2d 867 (Neb. 2016) ...............................................................................65

*Scoggins v. Floyd Healthcare Mgmt. Inc.*,
  2016 WL 11544774 (N.D. Ga. June 10, 2016) ....................................................65

*Seismic Reservoir 2020, Inc. v. Paulsson*,
  785 F.3d 330 (9th Cir. 2015) ...............................................................................12

*In re Sept. 11 Litig.*,
  280 F. Supp. 2d 279 (S.D.N.Y. 2003) ..................................................................14

*Shanks v. Upjohn Co.*,
  835 P.2d 1189 (Alaska 1992) ...............................................................................65

*Sheldon v. Kettering Health Network*,
  40 N.E.3d 661 (Ohio Ct. App. 2015) ...................................................................65

*Sheldon v. Ruggiero*,
  202 A.3d 241 (Vt. 2018) .......................................................................................65

*Shoemaker v. Funkhouser*,
  856 S.E.2d 174 (Va. 2021) ...................................................................................65

*Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*,
  641 F. App'x 849 (11th Cir. 2016) ..................................................................16, 65

*Skinner v. Tel-Drug, Inc.*,
  2017 WL 1076376 (D. Ariz. Jan. 27, 2017)........................................................65

*Smith v. Hansen*,
  914 S.W.2d 285 (Ark. 1996) ................................................................................37

*Smith v. Linn*,
  563 A.2d 123 (Pa. Super. 1989) .....................................................................20, 65

*Snyder v. ISC Alloys, Ltd.*,
  772 F. Supp. 244 (W.D. Pa. 1991) .......................................................................65

*Sorge v. State*,
  762 A.2d 816 (Vt. 2000) .......................................................................................36

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016) ..............................................................................................60

*St. Luke Hosp., Inc. v. Straub*,
  354 S.W.3d 529 (Ky. 2011) ............................................................................49, 65

*Stachniewicz v. Mar-Cam Corp.*,
  488 P.2d 436 (Or. 1971)......................................................................................52

*Star Furniture Co. v. Pulaski Furniture Co.*,
  297 S.E.2d 854 (W. Va. 1982)..............................................................................65

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*,
  528 F. Supp. 3d 686 (W.D. Ky. 2021)...................................................................34

*Stephenson by Coley v. S.C. Johnson & Son, Inc.*,
  339 A.D.2d 402 (NY. Ct. App. 1997).....................................................................45

*Stevens v. MTR Gaming Grp., Inc.*,
  788 S.E.2d 59 (W. Va. 2016)................................................................................32

*Estate of Strever v. Cline*,
  924 P.2d 666 (Mont. 1996)..................................................................................46

*Swenson Trucking & Excavating, Inc. v. Truckweld Equip. Co.*,
  604 P.2d 1113 (Alaska 1980)...............................................................................65

*Tansy v. Dacomed Corp.*,
  890 P.2d 881 (Okla. 1994)...................................................................................65

*Taupier v. Davol, Inc.*,
  490 F. Supp. 3d 430 (D. Mass. 2020)...................................................................14

*Taveras v. Resorts Int'l Hotel, Inc.*,
  2008 WL 4372791 (D.N.J. Sept. 19, 2008)............................................................32

*In re Taxotere (Docetaxel) Prods. Liab. Litig.*,
  2020 WL 375597 (E.D. La. Jan. 23, 2020).............................................................40

*Taylor & Co. v. Bank of Am. Corp.*,
  2014 WL 3557672 (W.D.N.C. June 5, 2014)..........................................................65

*Taylor v. Intuitive Surgical, Inc.*,
  389 P.3d 517 (Wash. 2017)..................................................................................65

*Terenkian v. Republic of Iraq*,
  694 F.3d 1122 (9th Cir. 2012)..............................................................................12

*Thomas v. Uzoka*,
  290 S.W.3d 437 (Tex. Ct. App. 2009)....................................................................65

*Thorne v. Pep Boys Manny Moe & Jack Inc.*,
  980 F.3d 879 (3d Cir. 2020).................................................................................65

*Ticknor v. Choice Hotels Int'l, Inc.*,
  265 F.3d 931 (9th Cir. 2001)..........................................................................33, 51

xix

*Tingler v. Graystone Homes, Inc.*,
    834 S.E.2d 244 (Va. 2019)....................................................................................65

*Transunion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ...............................................................................59, 60

*Turek v. Saint Elizabeth Cmty. Health Ctr.*,
    488 N.W.2d 567 (Neb. 1992)..............................................................................65

*United States v. Bohannon*,
    506 F. Supp. 3d 907 (N.D. Cal. 2020) ................................................................54

*United States v. DiTomasso*,
    81 F. Supp. 3d 304 (S.D.N.Y. 2015) ..................................................................54

*United States v. Meals*,
    21 F.4th 903 (5th Cir. 2021)................................................................................54

*United States v. Miller*,
    982 F.3d 412 (6th Cir. 2020)...............................................................................54

*United States v. Wilson*,
    13 F.4th 961 (9th Cir. 2021)................................................................................54

*Univ. of Denver v. Whitlock*,
    744 P.2d 54 (Colo. 1987) ...................................................................................36

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ...........................................................................................60

*Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*,
    2019 WL 3503109 (N.D. Cal. Aug. 1, 2019).........................................12, 13, 61, 63

*Veridian Credit Union v. Eddie Bauer, LLC*,
    295 F. Supp. 3d 1140 (W.D. Wash. 2017) ........................................................65

*Vesely v. Armslist LLC*,
    762 F.3d 661 (7th Cir. 2014)..................................................................35, 37, 38

*Walt Disney Prods., Inc. v. Shannon*,
    276 S.E.2d 580 (Ga. 1981) .................................................................................29

*Warzynski v. Empire Comfort Sys.*,
    401 S.E.2d 801 (N.C. Ct. App. 1991) ................................................................65

*Watters v. TSR, Inc.*,
    904 F.2d 378 (6th Cir. 1990)......................................................................... *passim*

*Way v. Boy Scouts of Am.*,
    856 S.W.2d 230 (Tex. Ct. App. 1993) ...........................................19, 25, 29, 65

*Webb v. Green Tree Servicing, LLC*,
    2012 WL 2065539 (D. Md. June 7, 2012) .......................................................................65

*Weinberg v. Advanced Data Processing, Inc.*,
    147 F. Supp. 3d 1359 (S.D. Fla. 2015) ............................................................................65

*Weirum v. RKO Gen., Inc.*,
    15 Cal. 3d 40 (1975) ........................................................................................................36

*Wells Fargo Bank, N.A. v. Jenkins*,
    744 S.E.2d 686 (Ga. 2013) ...............................................................................................65

*West v. Caterpillar Tractor Co.*,
    336 So. 2d 80 (Fla. 1976) .................................................................................................65

*Westerback v. Harold F. LeClair Co., Inc.*,
    735 N.E.2d 1256 (Mass. Ct. App. 2000) ..........................................................................44

*Wiener v. Southcoast Childcare Ctrs., Inc.*,
    88 P.3d 517 (Cal. 2004) ...................................................................................................46

*Wilson v. Midway Games, Inc.*,
    198 F. Supp. 2d 167 (D. Conn. 2002) ..................................................................21, 24, 65

*Winter v. G.P. Putnam's Sons*,
    938 F.2d 1033 (9th Cir. 1991) .................................................................................. *passim*

*Word v. Potomac Elec. Power Co.*,
    742 A.2d 452 (D.C. 1999) ................................................................................................65

*Wright v. Brooke Grp. Ltd.*,
    652 N.W.2d 159 (Iowa 2002) ..........................................................................................65

*Ziencik v. Snap, Inc.*,
    2023 WL 2638314 (C.D. Cal. 2023) ......................................................................... *passim*

*In re Zofran (Ondansetron) Prod. Liab. Litig.*,
    2017 WL 1458193 (D. Mass. Apr. 24, 2017) ...........................................................12, 39

**Statutes and Regulations**

15 U.S.C. § 6501 ...............................................................................................11, 47, 56

15 U.S.C. § 6502 ........................................................................................................ *passim*

15 U.S.C. § 6504 ...............................................................................................................49

15 U.S.C. § 6505 ...............................................................................................................49

16 C.F.R. § 312.2 ....................................................................................................... *passim*

18 U.S.C. § 2255 ..................................................................................................49

18 U.S.C. § 2258A ............................................................................................ *passim*

18 U.S.C. § 2258B ...............................................................................47, 53, 55 56

47 U.S.C. § 230 .............................................................................................1, 12

Ark. Code Ann. § 16-116-202..............................................................................65

Conn. Gen. Stat. § 52-572n ..................................................................................14

Del. Code Ann. tit. 18, § 7001 .............................................................................65

Ill. Comp. Stat. § 5/13-213 ...................................................................................65

Ind. Code § 34-6-2-114 .........................................................................................65

Ind. Code § 34-20-1-1 ...........................................................................................65

La. Rev. Stat. Ann. § 9:2800.52 ...........................................................................14

Md. Code Ann., Cts. & Jud. Proc. § 5-115 ..........................................................65

Minn. Stat. § 604.101 ............................................................................................65

Mont. Code Ann. § 27-1-719 ................................................................................65

N.J. Rev. Stat. § 2A:58C-1....................................................................................14

Ohio Rev. Code Ann. § 2307.71 ......................................................................14, 65

Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of
   2017, Pub. L. No. 115-126, 132 Stat. 318 (2017)...........................................49

Tenn. Code Ann. § 29-28-102...............................................................................65

Wash. Rev. Code § 7.72.010.................................................................................14

Wyo. Stat. Ann. § 34.1-2.A-216 ..........................................................................65

**Court Rules**

Fed. R. Civ. P. 8 ....................................................................................................39

Fed. R. Civ. P. 9 ....................................................................................................55

Fed. R. Civ. P. 12 ........................................................................................... *passim*

**Secondary Sources**

57A Am. Jur. 2d Negligence .................................................................................................39

63 Am. Jur. 2d Prods. Liab. ............................................................................................15, 39

Dan B. Dobbs, The Law of Torts (2d ed. July 2022 Update) .......................................48, 52

Modern Tort Law: Liab. & Litig. (2d. ed May 2022 Update) ...........................................47

Owen & Davis on Prod. Liab. (Mary J. Davis, ed., 4th ed., May 2022 Update) ...............22

Restatement (Second) of Torts (1965) ................................................................... *passim*

Restatement (Third) of Torts: Phys. & Emot. Harm (2010) ........................................ *passim*

Restatement (Third) of Torts: Prods. Liab. (1998) ................................................... *passim*

W. Prosser, The Law of Torts (5th ed. 1984) .....................................................................46

**Other Authorities**

*Child safety policy*, YouTube (2023),
    https://support.google.com/youtube/answer/2801999?hl=en&ref_topic=9282679......................38

*Child Sexual Exploitation, Abuse and Nudity*, Meta (2023),
    https://transparency.fb.com/policies/community-standards/child-sexual-
    exploitation-abuse-nudity/ ..........................................................................................38

*Community Guidelines: Minor Safety*, TikTok (2023),
    https://www.tiktok.com/community-guidelines?lang=en#31 .........................................38

*Community Guidelines*, Snap (2023),
    https://values.snap.com/privacy/transparency/community-guidelines ...........................38

*Complying with COPPA: Frequently Asked Questions*, FTC (July 2020),
    https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-
    asked-questions ............................................................................................................58

*Sale of illegal or regulated goods or services policies*, YouTube (2023),
    https://support.google.com/youtube/answer/9229611?hl=en .......................................38

*Terms and Policies: Community Guidelines*, Instagram (2023),
    https://help.instagram.com/477434105621119 ..............................................................38

*TikTok Terms of Service*, TikTok (2019),
    https://www.tiktok.com/legal/page/us/terms-of-service/en ..........................................38

# I.      INTRODUCTION

The nation is engaged in an important conversation about adolescent mental health.  Now Plaintiffs seek to commandeer that conversation with a broad expansion of state tort law that would have this Court erroneously apply product liability law to cover content publication and online speech.  Plaintiffs' Master Complaint is but the most recent in a long series of cases asking courts to impose product liability rules on speech and technologies that communicate it, including book publishing, movie and television distribution, video games, and, more recently, online services.  Time and again, however, courts have rejected such attempts to transform the body of law governing dangerous "products" into a tool to regulate how information is disseminated.  For good reason: such claims are unsupported by any precedent anywhere and threaten to chill all manner of protected expression.  This Court should likewise reject Plaintiffs' attempts to treat the "vast democratic forums of the Internet" as tangible consumer products, and to attack as defective the editorial and publication choices of "websites integral to the fabric of our modern society and culture."  *Packingham v. North Carolina*, 137 S. Ct. 1730, 1735, 1738 (2017).

The Master Complaint identifies five "priority" claims: four product liability claims and one for negligence per se.  Even without considering Defendants' threshold defenses under Section 230 of the Communications Decency Act, 47 U.S.C. § 230 *et seq.*, and the First Amendment to the United States Constitution (which Defendants will brief after the Supreme Court rules in *Gonzalez v. Google LLC*), Plaintiffs' priority claims fail as a matter of law.

Plaintiffs' four priority product liability claims seek to hold Defendants liable for alleged "design" defects and failure to warn about these alleged defects.  But Defendants offer users only services—highly customizable ways to communicate, receive, and interact with content.  By definition, services are not "products" subject to product liability law.  Moreover, Plaintiffs do not allege that their perceived harms arise from any tangible features of Defendants' offerings (there are none), but from the content communicated through Defendants' online services and from the manner in which that content is presented.  For decades, courts have uniformly rejected similar efforts to expand product liability law, recognizing that such law is ill-suited for regulating expression and publication.

The two negligence-based product liability claims fail for the additional reason that Plaintiffs have not alleged a cognizable duty.  Publishers have no duty to protect their audience from the effects of content publication or consumption.  Accordingly, courts have uniformly refused to impose an analogous duty of care on online services with respect to third-party content.  And there is no legal duty to prevent "addictive" online services.  No court has created a duty of the type Plaintiffs allege here in cases involving video game makers, magazine publishers, or television producers, and there is no basis for one here.  That some users are minors—and that some, but not all, minor users allege harm—does not alter the analysis because Defendants do not have any legally cognizable special relationship with those users.

All of Plaintiffs' product liability claims fail for yet another reason: Plaintiffs have not adequately alleged that the purported defects in Defendants' online services proximately caused their injuries.  The Master Complaint fails to link Plaintiffs' alleged injuries to the supposed defects in Defendants' services.  And Plaintiffs' generalized assertions that the alleged defects are theoretically capable of causing harm do not suffice.  Courts have repeatedly held that defendants do not proximately cause all potential harms that plaintiffs allege could flow from their services.  Moreover, for many of the most severe alleged harms the generalized allegations show that independent acts by third parties, such as sexual predators, drug dealers, and cyberbullies, were the cause of any such harms, not Defendants' services.

Plaintiffs' negligence per se priority claim also fails.  That claim is predicated on alleged violations of two federal statutes that Congress declined to make privately enforceable and that no court has ever ruled could be the basis for negligence per se.  Plaintiffs fail to plausibly allege violations of the predicate federal statutes, that any purported violation proximately caused any of the injuries alleged, or that any Plaintiff suffered a personal injury tied to these supposed violations.  Plaintiffs' threadbare legal conclusions are not enough to state a claim under Rule 12(b)(6) or to confer standing under Article III of the Constitution.

Defendants sympathize with adolescents who are struggling with mental health issues, but Plaintiffs' attempts to hold Defendants liable for their alleged injuries fail as a matter of law.  The Court should dismiss Plaintiffs' priority claims.

2

## II.    BACKGROUND

### A.    Defendants' Interactive Communication Services[1]

Defendants operate five of the many online interactive communication services in widespread use today: Facebook, Instagram, Snapchat, TikTok, and YouTube.  Billions of people use these services every day to connect and communicate with others online.  Am. Master Complaint (Dkt. 234-1) ("MC") ¶¶ 181, 210, 216, 449, 559, 702.  While they differ in various ways, Defendants' services allow users to connect and communicate with each other and operate as mediums of expression that host, arrange, and help disseminate around the globe a diverse array of user-generated content—including videos, photographs and other images, music and other audio recordings, and writings.  *See, e.g., id.* ¶¶ 187, 216, 447, 555, 692.  Users access the services without payment, and every user's experience is unique, reflecting Defendants' publication and editorial choices about the content to prioritize, which some Defendants make based on the user's own choices and activities.  *See, e.g., id.* ¶¶ 76, 227, 493, 585, 747–50.

The Master Complaint acknowledges that these services "help people stay connected to people they care about" and reveal "all of the good humanity is capable of." *Id.* ¶ 370(g), (p).  Each Defendant strives to "keep people safe" on their services by "amplify[ing] the good and mitigat[ing] the bad." *Id.* ¶ 370(f)–(g).  To do so, these services have hired teams of safety and security professionals, adopted "robust set[s] of content policies," and created programs to enable parents and guardians to monitor activity on the service, among other things.  *See id.* ¶¶ 370(i) & (q), 522, 577–78.

#### 1.    Facebook

Defendant Meta owns and operates Facebook.[2]  Facebook is the world's most used social networking service, encompassing personal and professional profiles, business and creator pages, and

---

[1] For purposes of this Motion To Dismiss only, Defendants accept as true non-conclusory factual allegations in the Master Complaint.  But for the avoidance of doubt, Defendants dispute and do not concede the accuracy of Plaintiffs' claims and allegations—including about the nature of Defendants' businesses and responsibility for purported harms—which they expressly reserve the right to challenge in any later phase of litigation.

[2] The Master Complaint improperly lumps various distinct entities under the umbrella term "Meta," and alleges that "Meta" is responsible for operating the Facebook and Instagram services that are at

shared-interest groups, all featuring content created by Facebook's almost three billion monthly users. *Id.* ¶¶ 187, 190.  To access the Facebook service, users must register for an account.  *See id.* ¶¶ 240–41.  At the time of registration, users must provide their birthday and verify that they are at least 13 years old.  *Id.* ¶¶ 329, 331–32, 369(c).  If a potential user discloses that they are not yet 13 on the sign-up page, "they are informed that they cannot create an account."  *Id.* ¶ 332.  Facebook will remove users that it knows are under the age of 13.  *See id.* ¶ 337.

The exponential growth in Facebook's user base has been accompanied by a corresponding explosion in the amount and kind of user-generated content and communication on the service. Facebook users have long had the option to correspond with their "friends" on the service, starting with "the Wall," which was a "fancy electronic" upgrade to "the whiteboard that students often mount on their doors to leave and receive messages."  *Id.* ¶ 193 (quotation marks omitted).  In that spirit, users could create and post written messages on their contacts' individual profiles.  *Id.*  The service then enabled users to comment on others' posts, and "like" photos, status updates, and comments.  *See, e.g.*, *id.* ¶¶ 199, 203, 205.  Facebook later expanded opportunities for direct messages between users through Facebook Messenger and Facebook Chat.[3]  *Id.* ¶¶ 197, 203.

Facebook users have been able to share a larger variety of visual content over the years.  Rather than confine users to "a single profile picture," Facebook became the first "photo hosting website" to allow users to upload an "unlimited amount of photos."  *Id.* ¶¶ 193–94.  Still images gave way to videos, and today Facebook users are able to upload videos of various lengths and styles.  *See id.* ¶¶ 196, 204, 208.

As the volume of user content increased on Facebook, so did Facebook's efforts to publish navigable and safe content for users.  Facebook introduced "the Newsfeed" to organize content so that users do not need to embark on "a click-powered treasure hunt" for updates on each other's profiles.

issue here.  MC ¶¶ 32–33.  Each of the distinct "Meta" entities reserve their rights and defenses, including as to whether they are properly named defendants.

[3] In 2017, Facebook launched Messenger Kids, a messaging service designed for children ages 6 to 12 to communicate with each other.  MC ¶ 207.  Messenger Kids accounts must be linked to a parent or guardian's account so they can readily monitor these exchanges.  *Id.* ¶¶ 207, 350.  Messenger and Messenger Kids are separate services.  *Id.* ¶¶ 33, 172.

4

1    *Id.* ¶¶ 195, 265.  In 2009, the Newsfeed stopped displaying user-generated content chronologically and

2    began ordering content by "Top Stories."  *Id.* ¶¶ 200, 265.  In this "engagement-based" system, "posts

3    that received the most likes and comments were highlighted first."  *Id.* ¶ 265.  In 2018, Facebook began

4    presenting content to prioritize "meaningful social interaction" between users.  *Id.*  The algorithm

5    prioritizes content of likely interest to an individual user, such as content generated by the user's

6    connections.  *Id.*; *see also id.* ¶ 273.

7        Facebook "invest[s] heavily in security and privacy" to "keep[] [its] community safe."  *Id.*

8    ¶ 370(d)–(f), (h), (k)–(n).  Facebook has hired tens of thousands of people to work on safety, privacy,

9    and security.  *Id.* ¶ 370(i) & (q).  These experts have built a number of tools, including "industry leading

10    AI," that help identify risks on the service.  *See id.* ¶ 390.  As part of this investment, Facebook has

11    adopted "a number of measures" to "protect minors specifically" on the service.  *Id.* ¶¶ 370(b) & (m),

12    390.  Facebook now makes "private" by default the profiles for users known to be under 16, such that

13    the minor's permission is necessary for the profile to be viewed and interacted with, *id.* ¶¶ 139, 400;

14    and takes steps to prevent underage users from viewing "certain content that may be inappropriate" for

15    them, *id.* ¶ 370(b).  These actions are supported by a "robust set of content policies" that help Facebook

16    "keep bad content" off the service, including child sexual abuse material ("CSAM").  *Id.* ¶¶ 146, 37(q).

17    Facebook has created tools for users to report content that violates its policies, including harmful

18    images or videos, *see id.* ¶ 149 & n.143, and also employs advanced technologies—such as "PhotoDNA

19    and other hash-matching technolog[ies]"—to combat the proliferation of CSAM and report it to the

20    National Center for Missing and Exploited Children ("NCMEC"), *id.* ¶¶ 148 & n.141, 416.  Facebook

21    strives to "get in front" of these issues by continually investing in safety and security.  *Id.* ¶ 370(i), (j)

22    & (q).

23          **2.**     **Instagram**

24        Defendant Meta owns and operates Instagram.  Instagram is a communication service on which

25    billions of users worldwide create, edit, and share photos, videos, and other content with each other.

26    *Id.* ¶¶ 181, 210, 216, 239.  Users must register for an account to access the service.  *See id.* ¶¶ 240–41.

27    As of 2019, potential new users must provide their birthday to create an Instagram account.  *Id.* ¶ 330.

28

Potential U.S. users that disclose they are under 13 are informed that they cannot create an account. *Id.* ¶ 332. Instagram will remove users that it knows are under the age of 13. *Id.* ¶ 337.

In its early days, Instagram was exclusively a "photo-sharing app." *Id.* ¶ 221. Users could edit and post "still images," "follow" other users to see their updates, and engage with that content by liking or commenting on the photos shared. *Id.* The service also included a number of "filters" for users to enhance and edit their photos. *Id.*; *see also id.* ¶ 314. Since then, Instagram has expanded such that users can express themselves through additional visual mediums, including temporary posts ("Stories"), short videos ("Reels"), live videos ("Instagram Live"), and hour-long video productions ("IGTV"). *Id.* ¶¶ 224, 229, 233, 236, 294. Users may incorporate music or moving images known as GIFs into their pictures and videos, and add video-specific filters to their content. *Id.* ¶¶ 224, 237. Instagram offers users an opportunity to communicate with each other by "liking" pictures and videos, posting comments, and exchanging private messages. *Id.* ¶¶ 221, 225, 228, 286, 403.

As Instagram's user base has grown, so too has the amount of user-generated content on the service. *Compare id.* ¶ 210, *with id.* ¶ 181. In March 2016, to organize the increasing volume of available content, Instagram changed its early centralized chronological feed available on its "Home" pane, *see id.* ¶¶ 221, 275, to adopt an "engagement-based ranking algorithm" that prioritizes content of likely interest to the individual user, *id.* ¶ 227. This "user-specific Feed" includes "photos and videos posted by Instagram users that the user has elected to 'follow,' as well as recommended photos and videos." *Id.* To help users discover content they also may enjoy, Instagram provides recommendations through its "Explore" pane. *Id.* ¶ 275. Users help organize this content by adding "hashtags," or tags to their posts, to describe what their posts contain. *Id.* ¶¶ 222, 295.

Meta is committed to safety, privacy, and security on Instagram. *See supra* p. 5; *see also* MC ¶ 370. Instagram has instituted several safety, privacy, and security measures to protect minors. *Id.* ¶ 370(b). For example, Instagram takes measures to prevent minors from viewing "inappropriate" content, *id.*; now makes "private" by default the profiles for users known to be under 16, *id.* ¶¶ 139, 401; and prohibits certain advertisers from targeting advertisements (such as those involving alcohol) at minors, *id.* ¶ 384. Instagram also employs content policies, reporting tools, and advanced

technologies in its effort to eliminate policy-violating or inappropriate content from the service and, in the case of CSAM, report it to NCMEC.  *Id.* ¶¶ 148, 149 & n.143, 416.

### 3.   Snapchat

Defendant Snap Inc. owns and operates Snapchat.  *Id.* ¶¶ 35, 438.  Snapchat is a camera and communications service where users communicate with friends and family using text, photos, and short videos.  *See id.* ¶ 438 ("[P]ictures are used for talking.").  Snapchat is typically used for communications between small groups of people who already know each other in real life.  Snapchat opens to a camera rather than a feed of content, and its best-known feature—the "Snap"—is used to create and send audiovisual messages between friends, which by default disappear from the service after they are sent.  *Id.* ¶ 444.  This default ephemerality feature is designed to mirror real-life interactions.  Just as friends talking in person do not typically record their conversations, Snapchat does not record user interactions and instead affords users a digital way to "to show a more authentic, unpolished, and spontaneous side of themselves," without permanent and publicly viewable posts.  *Id.* The profiles of minor users are private by default and users must be 13 years old to create an account.[4] *Id.* ¶ 463.

Snap also offers a variety of tools that users can employ to enhance and edit photos and videos before sending them to friends through the service.  Users have the ability to "draw and color on Snaps and add a short text caption before sending," to edit their images using "custom-designed lenses and filters" (like puppy dog ears or silly glasses and hats), and to supplement their photos and videos with images and GIFs.  *Id.* ¶¶ 445, 470, 513–14, 516.  These features are designed to be conversation starters and encourage users to stay in touch with friends when they cannot be together in person.  Whereas a shy person might feel hesitant to send regular text messages just to say hello, sharing a funny Snapchat filter or starting a Snap Streak gives Snapchat users an easy way to stay connected to the people in their lives.

---

[4] The "Snapkidz" feature allowed children under the age of 13 to "take filtered photos, draw on them, save them locally on their devices, send them to others, and upload them to other apps."  MC ¶ 462. Those users could not upload those photos onto Snapchat.  *Id.*  The feature was discontinued in 2016. *Id.* ¶ 463.

Since October 2013, users have been able to compile photos and videos into "Stories" available for 24 hours, which by default are viewable only by a user's friends. *Id.* ¶ 491. Snap also recently introduced "Spotlight," a feature that "allows users to make videos that anyone can view," not just a user's contacts. *Id.* ¶ 496. The app does not open to Stories, Spotlight or any other feed of content, and videos on Spotlight are moderated by Snap before appearing. *Id.* ¶¶ 130, 496.

Snap takes precautions to support minors' safety while using the service. For example, Snapchat uses "technology to identify known illegal images and videos of" child sexual abuse material, which it then "reports to NCMEC." *Id.* ¶ 537; *see also id.* ¶ 542 (discussing additional safety technology in development). Snapchat also empowers users to report harmful images or videos. *Id.* ¶ 535. And through Snapchat's "Family Center," a parent or guardian can install Snapchat on their phone and then link to the minor's account to see "who the child user is communicating with." *Id.* ¶ 522.

### 4. TikTok

Defendant TikTok Inc. operates TikTok.[5] TikTok is a service that billions of people use to create and share short-form videos, as well as view and interact with videos of other users. In its "initial iteration," TikTok enabled "users to lip sync pop music," *id.* ¶ 563, and to create "videos of themselves . . . dancing, or goofing around to popular songs and movie scenes, and then post them," *id.* ¶¶ 558–59.

Decisions by third-party users about what to post or engage with are key to the TikTok service. Users create and post videos "for other users to see," and they may attach music, videos, or pictures to content "they post on TikTok." *Id.* ¶¶ 558, 594. Users may interact with "friends and celebrities who use filters" and use similar filters on their videos. *Id.* ¶¶ 652, 649. Users may also "create and post in TikTok certain types of videos" of themselves participating in "online challenges or dares" or "viral

---

[5] The allegations in the Master Complaint and this Joint Motion relate to the TikTok app (*id.* ¶¶ 554–55), which is operated in the United States by TikTok Inc. Although Plaintiffs also named ByteDance Ltd., ByteDance Inc., TikTok Ltd., and TikTok LLC, the Master Complaint does not allege that these four other entities operate TikTok. While this Joint Motion addresses cross-cutting issues consistent with the Court's guidance for this phase of briefing, these entities expressly reserve their rights and defenses, including as to whether they are properly named defendants or subject to personal jurisdiction.

pranks," which can also be found on different services.  *Id.* ¶¶ 632–33, 125.  In addition to these posts, users may "generat[e] ephemeral photos or videos" such as by "post[ing] expiring 'Stories'" or "sharing one of their own [posts]" through TikTok Now.  *Id.* ¶¶ 626–28.  As on other services, TikTok users may also follow others' accounts, or "like, share, or reshare videos that others have created or posted." *Id.* ¶¶ 558, 589, 630, 631.  One place where TikTok displays third-party content to users is "its 'For You' page (or 'FYP')" where users may choose to "watch[] and engag[e] with a video" on the FYP, to which TikTok's algorithm then "responds."  *Id.* ¶¶ 584, 589.

TikTok is committed to the safety of users, and has taken numerous steps to help protect minors. Users must be at least 13 to register for an account on TikTok.[6]  *Id.* ¶¶ 567, 571, 574.  As Plaintiffs acknowledge, TikTok has created and rolled out a series of tools to help protect users—including minors—on its service.  For example, TikTok created "TikTok for Younger Users," which provides users under the age of 13 a "limited app experience" and these users cannot "share their videos, comment on others' videos, message with users, or maintain a profile or followers."  *Id.* ¶ 574.  TikTok also created "Family Pairing" whereby parents or guardians can "link their accounts to their children's accounts and enforce certain controls (such as screen time limits and restriction of 'content that may not be appropriate for all audiences')."  *Id.* ¶ 577.  And TikTok introduced various tools to encourage users to take breaks, "such as a 'Take a Break' reminder and time-limit caps," and features to remind users who report overuse that "a limit can be set on the user's watch time."  *Id.* ¶¶ 624, 642.

### 5.   YouTube

Defendant Google owns and operates YouTube, a video-sharing service with millions of user-created "channels" offering a vast array of "video content about virtually any topic imaginable."  *Id*. ¶¶ 629, 697, 702.  YouTube is, in effect, the world's largest video library, and users can watch this vast array of content on computers, mobile devices, or even their home televisions.  *Id.* ¶ 692 (describing YouTube as "the new Saturday morning cartoons").  Every month, billions of users worldwide post or view billions of hours of videos through the service.  *Id.* ¶¶ 692, 697, 702, 719, 756, 775.

---

[6] TikTok offers "TikTok for Younger Users," which is a "limited app experience" for users under the age of 13.  MC ¶ 574.  Users of TikTok for Younger Users cannot "share their videos, comment on others' videos, message with users, or maintain a profile or followers."  *Id.*

In addition to the sheer amount and variety of material available to watch, what distinguishes YouTube from television is YouTube's ability to suggest videos tailored to each user's potential tastes and preferences. *Id*. ¶¶ 747–53. Users can look for videos by entering queries in a search bar, the same way a Google search helps users search the web more generally. *Id*. ¶ 693. Users can also choose to follow certain "channels" and receive notifications from YouTube that those channels have posted new videos. *Id*. ¶ 730. In addition, via algorithmic tools, YouTube users are presented with curated selections of videos that may be of interest to them, based in part on their search and viewing history. *Id*. ¶¶ 747–53. For example, YouTube's systems sort content depending on whether it is appropriate "for kids." *Id*. ¶ 24. This combination of search and recommendation allows users to find the videos they want to see within YouTube's massive library. *See id.* ¶¶ 747, 752. YouTube's current algorithms rely on numerous "signals" to arrange and suggest videos, including a viewer's YouTube search and watch history, sharing activity, and likes and dislikes. *Id.* ¶¶ 747–50.

YouTube is not typically a forum for direct communication between users. YouTube has no direct message function, and the only avenues for user-to-user communications come from the ability to "like" or post comments on other people's videos. But those functions require the user to create an account and be logged into it. *Id*. ¶¶ 719–20. Otherwise, users can access YouTube, but only as a platform for watching other people's videos and reading the comments associated with them. *Id.* ¶ 720. For such users, YouTube offers little or none of the interactions typical of "social media."

YouTube takes steps to protect children on its service. Users are not allowed to create a regular YouTube account—and thus to upload videos or post comments—until they are 13. *See id*. ¶¶ 720, 730. YouTube maintains a separate version of YouTube called "YouTube Kids" with limited content that is directed to children and can be accessed by those minors through their parent or guardian's account. *Id*. ¶¶ 705, 781. In addition, YouTube's autoplay feature is turned off by default for users ages 13–17. *Id.* ¶ 722; *cf.* ¶ 734. YouTube "has strict policies and robust operations in place to tackle content and behavior that is harmful or exploitative to children." *Id.* ¶ 785. Among other things, YouTube offers tools for users to report other users who may violate its policies and it prohibits "images, videos, and comments that put children at risk, 'including areas such as unwanted sexualization, abuse, and harmful and dangerous acts.'" *Id.* ¶¶ 786, 811. When it becomes aware of

such content, YouTube "may place an age restriction" on videos.  *Id.* ¶ 787.  Google also employs a proprietary technology—"CSAI Match"—intended to combat child sexual abuse imagery content online by "identify[ing] known [child sexual abuse imagery] contraband being promoted, shared, and downloaded" on the service.  *Id.* ¶ 799.

### B.    Plaintiffs' Priority Claims

On February 14, 2023, Plaintiffs filed their Master Complaint alleging eighteen causes of action (Dkt. 136), and they identified five priority claims, *see* Notice of Priority Claims at 1 (Dkt. 131).  On April 14, 2023, Plaintiffs filed an Amended Master Complaint (Dkt. 234-1), which alleges the same eighteen causes of action and five priority claims and is the subject of the instant Motion To Dismiss.[7]

The first four priority claims—Counts 1–4 of the Master Complaint—allege product liability claims for defective design and failure to warn under both strict liability and negligence theories.  *See* MC ¶¶ 832–914.  These claims allege that each Defendant "defectively designed its respective products to addict minors and young adults," *id.* ¶ 837, and thus "encourage[d] unhealthy, addictive engagement and compulsive use" among minors, *id.* ¶ 862.  Each alleged defect relates to how Defendants present content (a term used more than 220 times in the Master Complaint); how users access content; or how users can, or are encouraged to, communicate with one another.  For example, Plaintiffs challenge "engagement-optimized algorithms" that prioritize content that Defendants believe users are more likely to find engaging, *id.* ¶ 130; the timing of Defendants' "notifications" to users about content they might be interested in, *id.* ¶¶ 3, 79; users' ability on certain Defendants' services to share content such as "likes, comments, views, and follows" with one another, *id.* ¶¶ 86, 404; and the availability of features like filters that "allow users to engage in selective self-presentation" of their own image when creating content, *id.* ¶ 314.

The fifth priority claim—Count 10 of the Master Complaint—alleges negligence per se.  *See id.* ¶¶ 1000–20.  This claim is predicated on Defendants' alleged failure to comply with two federal statutes: the PROTECT Our Children Act ("PROTECT Act"), 18 U.S.C. §§ 2258A, 2258B, and the

---

[7] In this Motion, Defendants refer to the "Amended Master Complaint" as simply the "Master Complaint" except when the distinction is material.

Child Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq.*  *See* MC ¶¶ 1004, 1006, 1010.

Following the Court's direction, this Motion To Dismiss addresses overarching legal issues that require dismissal of the five priority claims.  This Motion does not address other claims in the Master Complaint or Plaintiff-specific issues based on the Short-Form Complaints.  *See* Case Management Order No. 3, at 2–3 (Dkt. 111); *see also* Dec. 14, 2022 Case Management Conference Tr. at 9:4–13, 19:10–21 (Dkt. 123).  This Motion also does not present Defendants' arguments that Plaintiffs' claims are barred by the First Amendment or Section 230, given the Court's preference for deferring briefing on those issues until after a ruling by the Supreme Court in *Gonzalez v. Google LLC*.  *See* Case Management Order No. 3, at 2–3; Dec. 14, 2022 Case Management Conference Tr. at 9:16–21, 16:2–14.  Defendants will work with the Court and Plaintiffs regarding a schedule for addressing the First Amendment and Section 230 defenses promptly after the Supreme Court's ruling in *Gonzalez v. Google, LLC*, and for addressing remaining issues after a decision on this Motion.

### III.   LEGAL STANDARDS

On Rule 12(b)(6) motions, claims are subject to dismissal based on a dispositive legal issue, *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015), or for failure to plead "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  *Twombly* and *Iqbal* apply with equal force to Rule 12(b)(1) motions challenging the existence of Article III standing on the face of the complaint.  *See Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1131 (9th Cir. 2012).  These well-established pleading standards apply in an MDL proceeding.  *See In re Zofran (Ondansetron) Prod. Liab. Litig.*, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017) ("The creation of an MDL proceeding does not suspend the requirements of the Federal Rules of Civil Procedure, nor does it change or lower the[m].");  *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing consolidated complaint in MDL for failure to satisfy Rule 8 where plaintiffs' allegations were merely "possible" rather than "plausible").

Courts routinely dismiss claims under Rule 12(b)(6) on the bases set forth below—e.g., in the absence of a "product" subject to product liability law, *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701,

12

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

at *1, *3 (N.D. Cal. Jan. 12, 2022), *appeal docketed*, No. 22-15260 (9th Cir. Feb. 23, 2022); where the allegations fail to establish a legal duty owed to the plaintiff, *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *2, *14 (N.D. Cal. Nov. 26, 2017), *aff'd*, 934 F.3d 1093 (9th Cir. 2019); where the complaint fails to adequately allege proximate causation, *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1126–27 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018); and where a federal statute undergirding a claim for negligence per se does not create a private right of action, *Venture Gen. Agency, LLC v. Wells Fargo Bank, N.A.*, 2019 WL 3503109, at *6–7 (N.D. Cal. Aug. 1, 2019), *aff'd*, 829 F. App'x 837 (9th Cir. 2020).

Rule 12(b)(6) dismissal is also proper where, as here, the complaint advances "novel" theories of state law that lack "any basis in case law" from the relevant state. *In re Qualcomm Antitrust Litig.*, 2023 WL 121983, at *18 (N.D. Cal. Jan. 6, 2023). Plaintiffs in a "federal forum are not entitled to trailblazing initiatives under state law." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1043 (9th Cir. 2011) (alterations omitted) (quoting *Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 262–63 (1st Cir. 1997)). Thus, federal courts "should hesitate prematurely to extend the law in the absence of an indication from the state courts or the state legislature that such an extension would be desirable." *Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145, 1154 (9th Cir. 2011) (alterations omitted) (quoting *Torres v. Goodyear Tire & Rubber Co.*, 867 F.2d 1234, 1238 (9th Cir. 1989)).[8]

## IV.    ARGUMENT

### A.    Plaintiffs Do Not Properly Plead Product Liability Claims Against Defendants.

Plaintiffs' product liability claims target as purported "design defects" the ways that users are able to access, create, view, interact with, or display user-generated content through Defendants' services, as well as the editorial practices Defendants use to organize and display that content. For example, Plaintiffs challenge the extent to which users of certain Defendants' services are able to share "likes, comments, views, and follows," MC ¶¶ 86, 404; attack users' ability to add a "filter" or "geotag" to content they share, *id.* ¶¶ 88, 314; demand that Defendants erect barriers—including by requiring

---

[8] Although Defendants address the law of all fifty states in this Motion, the claims of the individual Plaintiffs filed to date do not implicate the law of every state. If Plaintiffs can establish that they have stated a claim under the law of a given state, the parties will need to address which, if any, Plaintiff has asserted claims under that state's law.

13

government ID—before a user can receive or share content, *id.* ¶¶ 134–36, 192; and challenge how Defendants' editorial rules "rank[] photos and videos" to organize, recommend, or display user-generated content, *id.* ¶¶ 81, 200.

No state's product liability law permits these sorts of claims. Courts and the Restatement of Torts have uniformly held that product liability law applies only to harms caused by tangible products. In so doing, they have rejected attempts to extend product liability law to either: (1) *services*, like those provided by Defendants, regardless of whether those services implicate intangible items; or (2) harm caused by *intangible items*, such as information or ideas, regardless of whether the defendant is providing a "service." Plaintiffs' claims run afoul of both of these product liability bars. Plaintiffs' claims should be dismissed.[9]

### 1. Plaintiffs' Product Liability Claims Fail Because They Challenge Interactive Communication Services, Not Products.

To state a product liability claim, a plaintiff must allege injuries caused by a "product" as that term is understood in product liability law. *See* Restatement (Third) of Torts: Products Liability § 19 cmt. a (1998) ("Restatement (Third)") (a plaintiff's "complained-of injury" must be "caused by a defect in something within" the "definition of 'product'"). That is true regardless of whether a plaintiff seeks to recover under strict liability or negligence.[10] Plaintiffs' product liability claims necessarily fail

---

[9] At a minimum, the Court should dismiss Plaintiffs' strict and negligence product liability claims for states that do not recognize those distinct liability theories. **Alabama**, **Delaware**, **Massachusetts**, **Michigan**, **North Carolina**, and **Virginia** do not recognize strict product liability claims. *See Foster v. Bridgestone Ams., Inc.*, 2013 WL 489162, at *3 (S.D. Ala. Feb. 8, 2013); *Cline v. Prowler Indus., Inc.*, 418 A.2d 968, 974 (Del. 1980); *Taupier v. Davol, Inc.*, 490 F. Supp. 3d 430, 437 (D. Mass. 2020); *Irrer v. Milacron, Inc.*, 2007 WL 677899, at *2 (E.D. Mich. Mar. 6, 2007); *Burrell v. Bayer Corp.*, 260 F. Supp. 3d 485, 494 (W.D.N.C. 2017); *In re Sept. 11 Litig.*, 280 F. Supp. 2d 279, 306 (S.D.N.Y. 2003) (applying Virginia law). Similarly, **Connecticut**, **Louisiana**, **New Jersey**, **Ohio**, and **Washington** do not recognize negligence product liability claims. *See* Conn. Gen. Stat. § 52-572n; La. Rev. Stat. Ann. § 9:2800.52; N.J. Rev. Stat. § 2A:58C-1 *et seq*; *Fid. & Guar. Ins. Underwriters, Inc. v. Omega Flex, Inc.*, 936 F. Supp. 2d 441, 447 (D.N.J. 2013); Ohio Rev. Code Ann. § 2307.71(B); Wash. Rev. Code § 7.72.010(4); *Hue v. Farmboy Spray Co.*, 896 P.2d 682, 686 n.10 (Wash. 1995) (en banc).

[10] *See* MC ¶ 914 (the four product liability claims are "pled on a product theory" as distinct from a "non-product theory"); *see also, e.g.*, *Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023) (distinguishing a "negligent design claim"—which requires a "product"—from "an ordinary negligence claim"); *Langley v. Guiding Hands Sch., Inc.*, 2021 WL 1212713, at *14 (E.D.

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

because Facebook, Instagram, Snapchat, TikTok, and YouTube are not products that Defendants manufacture. They are online services that, among other things, are employed by users to communicate with each other or to interact with other users' content.

Product liability law addresses "the liability of those who supply goods or products . . . for losses of various kinds resulting from so-called defects in those products." 63 Am. Jur. 2d Prods. Liab. § 1. The Third Restatement defines a "product" as "tangible personal property distributed commercially for use or consumption." Restatement (Third) § 19(a).[11] The Third Restatement removes any doubt about whether product liability law applies to services by expressly stating that "[s]ervices, even when provided commercially, are not products." *Id.* § 19(b). Indeed, "[c]ourts are unanimous in refusing to categorize commercially-provided services as products." *Id.* § 19 cmt. f.

Every court to consider whether Defendants offer "products" governed by product liability law has held that they do not. For example, in *Grossman v. Rockaway Township*, a New Jersey court rejected product liability claims premised on allegations that Snapchat contributed to the suicide of a minor, including allegations that "Snapchat's [purported] product is designed to be addictive" and that Snapchat was "not sufficiently designed" to "enforce age restrictions." 2019 WL 2649153, at *4 (N.J. Super. Ct. June 10, 2019) (internal citations omitted). The court explained that "[n]o persuasive or other authority has been presented to this Court to support the conclusion that Snap's role of involvement in the events of this case constitute a 'product' rather than a 'service.'" *Id.* at *15.

Other courts have reached the same result—both as to Defendants' services and as to other services that connect users or permit them to exchange content. *See, e.g.*, *Jacobs v. Meta Platforms,*

---

Cal. Mar. 31, 2021) (dismissing "negligent product liability" claim as allegations concerned a "service" rather than "a 'product'"); *Robinson v. Big Mouth, Inc.*, 2017 WL 11725906, at *1 (D. Md. Sep. 26, 2017) ("Negligence and strict products liability law does not recognize a cause of action for alleged harm stemming from an intangible expression" as distinguished from a tangible "product."); *Milwaukee Elec. Tool Corp. v. Super. Ct.*, 15 Cal. App. 4th 547, 557 (1993) (negligent product liability requires a "product").

[11] This definition of "product" followed directly from the Second Restatement, which also identified as "products" only "tangible items, such as tires, automobiles, and insecticides." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991) (citing Restatement (Second) of Torts § 402A (1965)). For that reason, "whether we look to the Second or Third Restatement makes little difference here." *Rodgers v. Christie*, 795 F. App'x 878, 879, 879 n.3 (3d Cir. 2020); *see also, e.g.*, *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1277 (D. Colo. 2002) (similar).

*Inc.*, 2023 WL 2655586, at \*4 (Cal. Super. Ct. Mar. 10, 2023) (dismissing product liability claim; "as a social media platform that connects its users, Facebook is more akin to a service than a product"); *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at \*1, \*4 (C.D. Cal. 2023) ( "Snapchat allows its users to communicate with one another by sending and receiving messages through mobile phone and web applications" and "Snapchat is more like a service than a product, and services are not subject to the laws of strict products liability"); *In re Facebook, Inc.*, 625 S.W.3d 85, 80 n.1 (Tex. 2021) (noting trial court's dismissal of product liability claim on the ground that "Facebook is not a 'product'"); *Jackson v. Airbnb, Inc.*, 2022 WL 16752071, at \*9 (C.D. Cal. Nov. 4, 2022) (online "platform that connects users . . . is more akin to a service than to a product"); *Quinteros v. InnoGames*, 2022 WL 898560, at \*1, \*7 (W.D. Wash. Mar. 28, 2022) (website and mobile app that enabled "interaction between online players . . . over chat and other message systems" offered a service, "not a product").  As one court explained, media that facilitate the "expression of ideas" are "generally . . . treated as services," not products.  *Isham v. Padi Worldwide Corp.*, 2007 WL 2460776, at \*7 (D. Haw. Aug. 23, 2007).[12]

The conclusion that Defendants provide services, not products, is hardly surprising. Defendants' services are analogous to other services provided for decades—such as networking groups facilitating member interaction; book-of-the-month clubs deciding what literature to send subscribers; museums organizing and displaying art; and newspaper reviews suggesting music, movies, or other

---

[12] Courts applying **New York** and **Georgia** law—the states identified by Plaintiffs for their priority claims—have also refused to apply product liability law to online services.  *See, e.g.*, *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 397–400 (S.D.N.Y. 2018) (applying New York law) (as an "online marketplace," "Amazon is better characterized as a provider of services" such that "products liability will not apply" (alteration omitted) (quoting *Milau Assocs. v. N. Ave. Dev. Corp.*, 42 N.Y.2d 482 (1977))); *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 854 (11th Cir. 2016) (applying Georgia law) (claims concerning a data breach in a computer network concerned "a service and not a product").  The decision in *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739 (Ga. 2022), does not suggest otherwise.  *Maynard* did *not* analyze or decide whether Snapchat's "speed filter" feature—or Snapchat more broadly—constituted a "product" subject to product liability law.  That issue was not presented in the briefing before the Georgia Supreme Court or the Georgia lower courts—and the decision did not discuss either Restatement, the Ninth Circuit's seminal decision in *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991), or its progeny.  *See* Restatement (Third) § 19(a) cmt. d (describing *Winter* as a "leading case" on the scope of product liability law).  Likewise, in *Lemmon v. Snap*, 995 F.3d 1085 (9th Cir. 2021), the Ninth Circuit "did not address whether Snapchat (a photosharing application) was 'a product' for purposes of California tort law."  *Jacobs*, 2023 WL 2655586, at \*3.

media that readers may find interesting.  Defendants are not aware of a *single* court decision concluding that services like these constitute "products" subject to product liability law.  *Cf. Crouch v. Ruby Corp.*, 2022 WL 16747282, at *9 (S.D. Cal. Nov. 7, 2022) (online matchmaking company "do[es] not sell products on their website, they sell a service").

The Court is "not bound to accept as true" Plaintiffs' "legal conclusion" that Defendants' services are products.  MC ¶ 3; *see also Twombly*, 550 U.S. at 555; Restatement (Third) § 19 cmt. a ("[W]hether something is, or is not, a product is a question of law for the Court.").  That Defendants have at times colloquially described their services as "products" in other contexts (MC ¶¶ 171–80) is irrelevant to the legal question whether such services are subject to product liability law.  *See, e.g.*, *Burghart v. S. Corr. Entity*, 2023 WL 1766258, at *3 (W.D. Wash. Feb. 3, 2023) ("Despite the fact that services are often presented [by businesses] as 'products' to purchase, they are not considered products." (cleaned up)); *Jacobs*, 2023 WL 2655586, at *3 n.1, *4 ("[T]he use by Facebook of the term 'product' does not resolve the question of whether Facebook represents a 'product' for the purposes of [product liability] analysis"; for purposes of that analysis, "Facebook is more akin to a service than a product.").

Because product liability law has no application to services like Defendants' interactive communication services, all of Plaintiffs' product liability claims fail and should be dismissed.

### 2. Plaintiffs' Product Liability Claims Separately Fail Because Plaintiffs' Alleged Harms Flow From Intangible Information Or Ideas.

Product liability law addresses injuries caused by "*tangible* personal property," Restatement (Third) § 19(a) (emphasis added), not by *intangible* information and ideas.  That is true even when the intangible expression is related to a tangible product.  *See id.* § 19 cmt. d (even when a "tangible medium such as a book, itself clearly a product, *delivers* the information, the plaintiff's grievance in such cases is with the information, not with the tangible medium" (collecting cases)).

Plaintiffs' claims fail because they allege no injuries from tangible products.  The Master Complaint alleges that some or all of Defendants' services are defective in four primary ways: they (1) provide users ways to express their views on other users' content—such as by "liking," commenting, or sharing each other's content—or provide ways for users to curate their own expression

17

using editing tools like filters and overlays, *see, e.g.*, MC ¶¶ 84, 314, 630; (2) make it easier for users to connect with one another, which some users abuse to transmit or elicit allegedly harmful or inappropriate content, *see, e.g., id.* ¶¶ 133–55, 164–65; (3) use "age verification" and "parental control[ ]" measures to restrict access to content that are too easily subverted by users who misrepresent their age, *see, e.g., id.* ¶¶ 60, 134, 141; and (4) use "engagement-optimized algorithms" or other mechanisms to decide how to prioritize the content the services publish. *Id.* ¶ 130; *see also id.* ¶¶ 3, 79, 81, 200. Because these purported defects involve information and ideas—not a tangible item—Plaintiffs' claims should be dismissed.

> **a)** **Product Liability Law Applies Only To *Tangible* Products, Not To Harm From Intangible Information Or Ideas.**

"[P]roducts liability law is geared to the tangible world." *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991). In *Winter*, the Ninth Circuit held that product liability law does not permit a plaintiff to sue a book publisher for injuries allegedly resulting from the information in a book. *Id.* at 1034. In so holding, the court drew "a line between physical products and intangible ideas," *id.* at 1036 n.4—rejecting the arguments that product "liability can be imposed for such things as ideas which have no physical properties at all," *id.*, and that product liability law can regulate "[a] publisher's role in bringing ideas and information to the public," *id.* at 1037 n.8.

This tangibility requirement ensures that product liability law does not lead to "significant constitutional problems under the First Amendment that ought to be avoided." *James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002). Any other rule would "seriously inhibit those who wish to share thoughts and theories," raising the "disturbing . . . prospect that we might be deprived of the latest ideas." *Winter*, 938 F.2d at 1035. Put another way, eliminating the "distinction between tangibles and non-tangibles as they relate to the term 'product'" could "create a chilling effect on the first amendment rights of others, in that broadcasters might, out of fear of litigation, undertake sweeping self-censorship. Such self-censorship, might result in suppression of protected speech, in which the public has an undeniable right to hear or see." *DeFilippo v. Nat'l Broad. Co.*, 1980 WL 336092, at *2–3 (R.I. Super. June 8, 1980) (cleaned up), *aff'd*, 446 A.2d 1036 (R.I. 1982); *see also Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1217–18 (D. Md. 1988) (noting importance of tangibility requirement to

18

1   avoid "chill[ing] expression and publication").[13]  The tangibility requirement is thus critical to "avoid

2   applying the common law [of product liability] in a way that would bring the[se] constitutional

3   problems to the fore." *Watters v. TSR, Inc*., 904 F.2d 378, 383 (6th Cir. 1990).

4        This Court applied these principles in *Estate of B.H. v. Netflix, Inc.*, when it dismissed a product

5   liability claim against Netflix, a web- and app-based video streaming service.  2022 WL 551701, at *1,

6   *3.  Similar to many of the allegations in the Master Complaint, the plaintiffs alleged that Netflix used

7   "sophisticated, targeted recommendation systems to push" "traumatic content"—there, a television

8   series called *13 Reasons Why*—"on unsuspecting and vulnerable children," leading to "profound

9   psychological harm" and "suicides."  Am. Compl. ¶¶ 14–15 & p.14, *Estate of B.H.*, No. 4:21-CV-

10  06561-YGR (N.D. Cal. Sept. 22, 2021), ECF No. 22.  The plaintiffs premised their product liability

11  claim on Netflix's alleged "content-delivery systems, recommendation algorithms, and other means of

12  targeting children," not on Netflix's "manufacture or creation" of the offending content itself.  *Id.* ¶ 79;

13  *see also* Hr'g Tr. 4:9–17 (Jan. 11, 2022), *Estate of B.H.*, ECF No. 85 (plaintiffs' argument) ("[T]his

14  case in our view is not about the content of the show, but it's about the individualized algorithmic

15  targeting, and it's the targeting of vulnerable children. . . . [T]he content of the show could certainly be

16  swapped out for a different show providing that that same show—whatever show is at issue causes

17  harm to the vulnerable child.").  In granting Netflix's motion to dismiss, this Court applied *Winter* and

18  confirmed that product liability law does not extend to "books, movies, or other forms of media."

19  *Estate of B.H.*, 2022 WL 551701, at *3 (citing *Winter*, 938 F.2d at 1034–36).  The role allegedly played

20  by Netflix's recommendation algorithms did not alter this analysis.  *See id.* at *1 (granting Netflix's

21  motion for the reasons stated "on the record on January 11, 2022"); Hr'g Tr. 12:1–5 (Jan. 11, 2022),

22  *Estate of B.H.*, ECF No. 85 (explaining that both "the content *and dissemination* of a show . . . cannot

23  be pursued under a strict liability claim" (emphases added)).

24       Numerous courts have applied the tangibility requirement to reject product liability claims

25  asserted against publishers, authors, distributors, and others involved with virtually all forms of media,

26  including in cases involving minors.  Thus, courts have rejected product liability claims against:

27  ─────────────────────

28  [13] This constitutional-avoidance concern that courts have invoked to define the scope of product liability law is distinct from the First Amendment challenge Defendants will later assert to these claims.

19

- The publisher, author, and endorser of articles and advertisements featured across a sixteen-page shooting-sports supplement read by a child who died in a shooting accident, *Way v. Boy Scouts of Am.*, 856 S.W.2d 230, 232, 238 (Tex. Ct. App. 1993) (plaintiff "alleges the ideas and information contained in the magazine encouraged children to engage in activities that were dangerous. These are intangible characteristics, not tangible properties.");

- The television network that aired an episode of the "Tonight Show" showing a hanging, which a child later imitated, *DeFilippo*, 1980 WL 336092, at *1–2 ("The distinction between tangibles and non-tangibles" means "the television program in this case was not a product.");

- A magazine publisher after a child died by hanging while imitating a practice described in an article, *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803–04 (S.D. Tex. 1983) (product liability law "is limited to the physical properties of books, not the material communicated," and "First Amendment considerations . . . argue against the liability of a publisher for a reader's reactions to a publication");

- A travel guide publisher after a swimmer was injured at a beach that the travel guide advised was safe, *Birmingham v. Fodor's Travel Pubs., Inc.*, 833 P.2d 70, 79 (Haw. 1992) (holding that the "Guide is not a 'product'" after finding the Ninth Circuit's decision in *Winter* "persuasive");

- The publisher and authors of cardiology treatment guidelines after deficiencies in the guidelines allegedly caused two deaths, *Kawczynski v. Am. Coll. of Cardiology*, 2016 WL 2770552, at *2 (W.D. Wis. May 13, 2016) ("The focus of products liability law is on tangible items, not intangible ideas or abstract concepts such as the guidelines at issue here.");

- A medical textbook publisher after a student was injured by a treatment described in the book, *J.B. Lippincott*, 694 F. Supp. at 1217–18 ("No case has extended [product liability] to the dissemination of an idea or knowledge in books or other published material.");

- The publisher of a diet book after a reader died of diet-related complications, *Smith v. Linn*, 563 A.2d 123, 126 (Pa. Super. 1989) ("No appellate court in any jurisdiction has held a book to be a product for purposes of [product liability law.]"), *aff'd*, 587 A.2d 309 (Pa. 1991);

- The artist and record label behind a song recording that allegedly caused a listener to commit an act of violence, *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at *14 (S.D. Tex. Mar. 3, 1997)

20

(noting that "product liability theory does not encompass the content of a publication" and the plaintiffs "were not harmed by any physical properties of the audio tape"); and

- The creator of a "parlor game" that allegedly addicted a minor and "came to dominate his mind to such an extent that he was driven to suicide," *Watters*, 904 F.2d at 379; *see id.* at 381 ("[T]he doctrine of strict [product] liability has never been extended to words or pictures.").

Courts addressing more modern technologies—such as video games, internet transmissions, and online recommendation algorithms—have reached the same conclusion, dismissing product liability claims against:

- The creator of an allegedly "psychologically addictive" "mobile app" because it was "not a product," *Quinteros*, 2022 WL 898560, at *7;

- The creator of a video game, Mortal Kombat, who allegedly "designed" the game "to addict players" and "specifically targeted a young audience, intending to addict them to the game," *Wilson*, 198 F. Supp. 2d at 170; *see id.* at 174 (rejecting plaintiff's argument that "technological advances," including the "interactive nature of the game," made it "fall outside the 'intangible' category that is demarcated in the case law");

- The creators and distributors of movies and video games that allegedly inspired minors to commit acts of violence, *Sanders*, 188 F. Supp. 2d at 1269–70; *see id.* at 1277 (claim based on how minors "interpreted and reacted" to movies and video games "stems from the intangible thoughts, ideas and messages contained within" them, which "are not products");

- Operators of "internet sites" allegedly responsible for a minor's mental breakdown, *James*, 300 F.3d at 687; *see id.* at 701 ("words and images purveyed . . . [via] electrical pulses through the internet" are "not sufficiently 'tangible' to constitute products" (citing *Winter*, 938 F.2d at 1036));

- The creator of an "algorithm" used to generate information and recommendations about whether to release criminal defendants prior to trial, *Rodgers v. Christie*, 795 F. App'x 878, 879–80 (3d Cir. 2020); *see id.* (the algorithm's "information, guidance, ideas, and recommendations" are not "tangible personal property"); and

- Defendants themselves, including Snap, since "courts have rejected the idea that non-tangible objects like apps can be 'products,'" *Ziencik*, 2023 WL 2638314, at *1.

21

This is the consistent view across the nation.  *See* 2 Owen & Davis on Prod. Liab. § 17:28 (Mary J. Davis, ed., 4th ed., May 2022 Update) (courts have "unanimously opposed extending products liability law to . . . intangible thoughts, ideas, and messages contained within games, movies, and website materials").  Courts and legislatures in at least twenty-nine states have (1) adopted the Restatement definition of a "product," which, as discussed, distinguishes "tangible" products (subject to product liability law) from intangibles like information, ideas, and content (not subject to that law); (2) relied on *Winter*'s distinction between "the tangible world" and "intangibles such as ideas and expression," 938 F.3d at 1034; or (3) otherwise made clear that product liability law does not extend to claims challenging services or the presentation of intangible information or content.  *See generally* Part VI (Appendix *infra*).

Courts in other states (and the District of Columbia) have not directly addressed whether product liability law can be extended to claims against a defendant presenting intangible information or content.  But in the absence of contrary authority, there is no basis for a federal court sitting in diversity to create new state product liability law based on speculation that a state would reject the uniform nationwide approach on this issue—especially given that these states generally follow the Restatements on product liability issues.  *See generally* Part VI (Appendix *infra*).  Indeed, Defendants are not aware of any decision that departs from the tangibility requirement as recognized in *Winter* and the Restatements.[14]

> **b)**     **Plaintiffs Allege Harm From Intangible Information And Ideas, Not A Tangible Product.**

Plaintiffs' product liability claims fit squarely within the uniform case law described above refusing to extend product liability law to intangibles like "ideas and information."  *Winter*, 938 F.2d

---

[14] The law in **New York** and **Georgia** is not to the contrary.  Neither state extends its product liability law to harms stemming from ideas and information.  *See Beasock v. Dioguardi Enterps., Inc.*, 130 Misc. 2d 25, 29–30 (N.Y. Sup. Ct. 1985) (defendant's "publications themselves" could not "serve as the basis for the imposition of liability under a theory of . . . strict products liability" (citing *Walter v. Bauer*, 439 N.Y.S.2d 821, 823 (N.Y. Sup. Ct. 1981))); *Murray v. ILG Techs., LLC*, 378 F. Supp. 3d 1227, 1249 (S.D. Ga. 2019) (applying Georgia law) (doubting that "Plaintiffs could establish that their products liability claims involve a 'product,'" where plaintiffs alleged that defendant's bar-exam software malfunctioned and erroneously informed them that they had failed the bar exam), *aff'd*, 798 F. App'x 486 (11th Cir. 2020).

at 1037 n.8.  From the outset of this litigation, Plaintiffs have stated their intent to attempt to plead around the fact that their claims implicate expressive content.  But the Master Complaint makes clear that Plaintiffs' claims cannot avoid content: their alleged defects relate to how content is featured by Defendants; their pleaded harms are necessarily related to specific content; and even their allegations of addiction necessarily relate to content.  Their claims as pled thus clearly fail under every state's requirement that product liability claims be limited to claims involving tangible property—not intangible websites or mobile applications disseminating equally intangible information and content.

The Master Complaint alleges four categories of defects in Defendants' services.  None involves a tangible item.  They instead concern intangible information, ideas, and content.

The first category of alleged "design defects" concerns how users can create or view messages, images, or other content generated by third parties online.  For instance, Plaintiffs allege that a virtual "like" feature can make certain online services addictive, *see* MC ¶ 70, but a "like" is a virtual message sent from one user to another, expressing support for earlier content.  *Cf. Bland v. Roberts*, 730 F.3d 368, 385–86 (4th Cir. 2013) (Facebook "likes" are both "pure speech" and "symbolic expression").  Similarly, the allegation that "friends and even complete strangers can deliver (or withhold) . . . likes, comments, views, and follows" on certain services, MC ¶¶ 86, 404, also attacks content.  The presence of photo or video "filters," *id.* ¶¶ 88, 314–15, is determined by the user in deciding how to personalize their own content.  The same is true of features that "allow users to geotag the location where a photo was taken or from where a post is being made," *id.* ¶ 407—the sort of information (like dates and signatures) that artists and authors often choose to include on their canvases, manuscripts, and films.  None of these purported defects is a proper target of product liability law.  *See, e.g.*, *Grossman*, 2019 WL 2649153, at *4, *15 (allegations that Snapchat permits a "user to develop messages or graphic overlays that accompany photographs" did not mean that "Snap's actions qualify [as] or constitute a product"); *Watters*, 904 F.2d at 381 (product liability law "has never been extended to words or pictures").  Plaintiffs also cannot state a product liability claim based on information that Defendants make available on their services, such as information about "a user's . . . activity levels."  MC ¶ 471; *see Rodgers*, 795 F. App'x at 880 (holding that the presentation of "information," including via an "algorithm" or "formula," is not a product).

23

The second category of alleged "defects" challenges the manner in which users are able to exchange content with one another through certain services, which some users abuse to transmit or elicit allegedly harmful or inappropriate content.  *See* MC ¶¶ 133–55, 164–65.  For instance, Plaintiffs allege that it can be a "defect" for an online service to "recommend[] connections between users" and for users to be able to exchange "messages and interactions."  *Id.* ¶ 135.  These purported defects, again, do not concern a tangible product; to the contrary, claims related to a user's decision to create a "profile" on an online service, or to send messages to other users, concern "expressive content."  *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 584 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019); *see also, e.g.*, *Quinteros*, 2022 WL 898560, at *2, *7 (online game through which users could exchange messages, which some users abused to engage in "harassment" of plaintiff, was "not a product").

The third category of alleged "defects" challenges Defendants' parental controls and age-verification procedures, and thus concern *who* can access intangible information, messages, and content through Defendants' services.  *See* MC ¶¶ 134, 136, 192, 346.  These alleged defects, too, fail to implicate a "product" under product liability law, as the resulting alleged injuries derive entirely from the intangible "words and images" and other information that Defendants allegedly should have "prevented from reaching minors."  *James*, 300 F.3d at 697, 701.  Plaintiffs allege that the provider of the speech at issue "target[ed]" a particular audience, *Wilson*, 198 F. Supp. 2d at 170, 174; "disseminat[ed]" content to persons ill-suited to receive it, *Watters*, 904 F.2d at 380–81; or used algorithms to direct content at minors, *Estate of B.H.*, 2022 WL 551701, at *3.  But those allegations do not change intangible information and ideas into a tangible product and do not save the claims from dismissal.

The fourth category of alleged "defects" concerns Defendants' editorial choices regarding the display of information and content on their services.  Plaintiffs challenge how Defendants' services "algorithmically rank[] photos and videos," thereby "dictat[ing] which posts users w[ill] see."  MC ¶¶ 81, 200.  Plaintiffs also challenge the *timing* of these editorial functions, such as whether an interactive communication service may "at times delay [presenting] a video," *id.* ¶ 79; might show content only in "ephemeral, disappearing posts," *id.* ¶ 229; might "deliver[] . . . notifications" about

24

third parties' communications in a "burst" rather than contemporaneously, *id.* ¶ 79; or might deliver "incessant notifications" rather than spacing them out, *id.* ¶ 3.  Product liability law does not, however, extend to the roles played by publishers or distributors with respect to when, how, or whether to display intangible information, ideas, or content.  *See, e.g.*, *Way*, 856 S.W.2d at 239 (contention that publisher's "magazine was dangerous in the design of its content," after stories and articles featured in a sixteen-page supplement allegedly led to a shooting accident, was "without merit" because "the magazine and supplement are not products"); *see also Dyroff*, 934 F. 3d at 1098 ("recommendations and notifications . . . are tools meant to facilitate the communication and content of others").  The fact that some of those choices involve the use of algorithms makes no difference.  Such algorithms do not make the alleged defects any more tangible or take Defendants' activities out of the realm of publication and dissemination of content.  To the contrary, an "'algorithm' or 'formula,'" and the presentation of "information, guidance, ideas, and recommendations," are not "tangible personal property" and thus "are not 'products.'"  *Rodgers*, 795 F. App'x at 879–80; *see also Anderson v. TikTok Inc.*, 2022 WL 14742788, at *4 (E.D. Pa. Oct. 25, 2022) (an "algorithm [i]s a way to bring [content] to the attention of those likely to be most interested in it" "thus promoting the work of others"), *appeal docketed*, No. 22-3061 (3d Cir. Nov. 10, 2022); *Force v. Facebook, Inc.*, 934 F.3d 53, 70 (2d Cir. 2019) (allegations about algorithms that "suggest third-party content to users based on what Facebook believes will cause the user to use Facebook as much as possible" do "not describe anything more than Facebook vigorously fulfilling its role as a publisher").

More broadly, Plaintiffs' alleged harms are based on the intangible information and content they claim they were exposed to through use of the services.  Indeed, in many instances, Plaintiffs expressly identify the type of content they allege is harmful.  *See, e.g.*, MC ¶ 114 (discussing body image content); *id.* at ¶ 257 n.303 (noting article discussing alleged harm from "suicide videos"); *id.* ¶¶ 278–79 (discussing "suicide and self injury content"); *id.* ¶ 610 (allegations that service "recommended more videos related to eating disorders, suicide, and self-harm"); *id.* ¶ 762 (referencing video that allegedly "encouraged suicide").  And the "compulsive use" that Plaintiffs allege, *id.* ¶ 76, is necessarily allegedly "compulsive use" of Defendants' services to view information and content.  Tellingly, Plaintiffs do not—and cannot—allege that absent *any* content, the services would still be

allegedly "addictive" or harmful.  *See, e.g.*, *Estate of B.H.*, 2022 WL 551701, at *3 (dismissing product liability claim premised on Netflix's "dissemination" of content that allegedly harmed minor users; no authority "support[s] the application of strict [product] liability to content" and "[w]ithout the content, there would be no claim").

Plaintiffs at times conflate purportedly harmful "design" features with allegedly harmful content itself.  For example, Plaintiffs target dangerous "[o]nline challenges or dares" or "viral pranks" found on different services.  MC ¶¶ 125–32, 633.  Yet Plaintiffs acknowledge that "online challenges" take the form of "certain types of videos" created, posted, and shared by third-party users on various online services, where any alleged harm stems from users deciding to imitate the *content* in those recordings—*e.g.*, they decide to perform the routine or prank that another user recorded themselves performing.  *See id.* ¶¶ 125–26, 632–34, 731.  These allegations are even further removed from any tangible design feature; indeed, they fail to concern any feature at all—outside of the basic fact that Defendants' services publish content.  There is no basis in law for the imposition of product liability arising from the publication or hosting of an "online challenge."  *See, e.g.*, *DeFilippo*, 1980 WL 336092, at *2 (holding that "an activity which is watched for entertainment or information is not a 'product,'" and finding no product liability claim existed for broadcasting a stunt that, when mimicked, resulted in the death of a minor).

In short, all of Plaintiffs' alleged "defects," and related theories of harm, improperly attempt to extend product liability law to Defendants' "role in bringing ideas and information to the public." *Winter*, 938 F.2d at 1037 n.8.  But just as book publishers or distributors of movies or video games cannot be held liable under product liability theories for their decisions to make public certain words or images, neither can online service providers like Defendants be held liable for purported "defects" related to the communication of intangible information, messages, pictures, and other content.  *See supra* Part IV.B.2.a.  The Court should reject Plaintiffs' attempt to expand product liability law beyond what any state's law recognizes.

**B.** **Plaintiffs' Negligence-Based Product Liability Claims Fail For The Additional Reason That Plaintiffs Allege No Cognizable Duty Of Care.**

Even if the Court does not dismiss Plaintiffs' strict liability claims, it should dismiss Plaintiffs' negligent design and negligent failure to warn claims because the Master Complaint does not allege any recognized legal duty, an "essential element" of negligence.[15] *Jacobsen v. Marin Gen. Hosp.*, 192 F.3d 881, 885 (9th Cir. 1999); *see Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 143 (2018); *see also* Restatement (Second) of Torts § 284(b) (1965) ("Restatement (Second)") ("Negligent conduct" includes "a failure to do an act which is necessary for the protection or assistance of another and which the actor is under a duty to do."); Restatement (Third) of Torts: Phys. & Emot. Harm § 40 cmt. e.

Plaintiffs seek to impose liability on Defendants simply for making user-generated content available (the vast majority of which is innocuous), for permitting teens to use Defendants' services to receive and share information, or for failing to prevent harms caused by third parties. No state recognizes the sprawling and potentially limitless duties necessary to support these theories. To the contrary, courts across the country—including this Court—consistently dismiss claims against interactive communication services, publishers, game designers, and other entities premised on the types of duties Plaintiffs allege here. *See*, *e.g.*, *Dyroff*, 934 F.3d at 1101; *Watters*, 904 F.2d at 379, 384; *James*, 300 F.3d at 694; *Estate of B.H.*, 2022 WL 551701, at *3–4 & n.7; *Sanders*, 188 F. Supp. 2d at 1268–69, 1275.

This Court should likewise find that Plaintiffs have failed to establish any cognizable duty of care and dismiss Plaintiffs' negligent design and negligent failure to warn claims. *First*, imposing the legal duties asserted by Plaintiffs would undermine communication services' ability to publish ideas and information—as courts nationwide have found. *Second*, there is no duty to prevent "social media addiction," as confirmed by the numerous cases that have rejected a duty to prevent or warn against purported "addictiveness." *Third*, Defendants owe no generally applicable heightened duty of care to minor users. And *fourth*, there is no generally recognized duty to protect Plaintiffs from harm caused

---

[15] As discussed, claims for negligent design and negligent failure to warn are not cognizable as a matter of law in **Connecticut**, **Louisiana**, **New Jersey**, **Ohio**, or **Washington** state. *See supra* n. 9.

by third parties, and Plaintiffs have not alleged (and could not allege) any exceptions to this rule, such as a special relationship between Plaintiffs and Defendants.

### 1. Plaintiffs Fail To Establish That Interactive Communication Services Owe A Duty Of Care For Content Publication Or Consumption.

States have consistently rejected efforts to impose any duty of care between online services and their users. *Dyroff*, 934 F.3d at 1099, 1101; *Estate of B.H.*, 2022 WL 551701, at *3–4 & n.7; *M.L. v. Craigslist Inc.*, 2020 WL 6434845, at *13 (W.D. Wash. Apr. 17, 2020), *report and recommendation adopted*, 2020 WL 5494903 (W.D. Wash. Sept. 11, 2020); *Doe v. MySpace, Inc.*, 474 F. Supp. 2d 843, 851 (W.D. Tex. 2007), *aff'd*, 528 F.3d 413 (5th Cir. 2008) (describing social networking site that "serves as a medium for personal expression"). As the Ninth Circuit explained, "[n]o website could function if a duty of care was created when a website facilitates communication, in a content-neutral fashion, of its users' content." *Dyroff*, 934 F.3d at 1101. These rulings are consistent with a long line of cases holding that media companies, video game creators, interactive communication services, and other publishers do not owe tort-law duties to their users or to the public at large. To impose a duty would "stretch the concepts of foreseeability and ordinary care to lengths that would deprive them of all normal meaning." *Watters*, 904 F.2d at 379, 381 (rejecting argument that manufacturer of Dungeons & Dragons had "duty to warn that the game could cause psychological harm in fragile-minded children"). And it would risk "burden[ing]" a defendant's "rights to freedom of expression." *Sanders*, 188 F. Supp. 2d at 1273, 1275 (collecting cases from "[c]ourts around the country [that] have rejected similar claims brought against media or entertainment defendants").

Plaintiffs have long sought to impose tort liability on new forms of media—television, film, and video games—without success.

*Television Broadcasting and Movies*. Courts have repeatedly declined to find that television broadcasters or filmmakers owe a duty for harms purportedly stemming from watching (and over-consuming) material they air. MC ¶ 467. In *Zamora*, for example, plaintiffs claimed television broadcasters had "impermissibly stimulated, incited and instigated" a child to replicate the atrocities he viewed on television. 480 F. Supp. at 200. The court rejected their claim, explaining that imposing such a purported duty had "no valid basis and would be against public policy." *Id.* at 202. *Zamora*

28

observed that courts are particularly unsuited to impose those obligations because they "lack[] the legal and institutional capacity to identify isolated depictions of violence, let alone the ability to set the standard for media dissemination of items containing 'violence' in one form or the other." *Id.* at 203.

Likewise, in *Walt Disney*, a court rejected an effort to hold television broadcasters liable in tort for broadcasting a children's television program that invited the plaintiff "to do something posing a foreseeable risk of injury to children of tender years." *Walt Disney Prods., Inc. v. Shannon*, 276 S.E. 2d 580, 581 (Ga. 1981). The court reasoned that "[t]o hold otherwise would, as the saying goes, open the Pandora's box; and it would, in our opinion, have a seriously chilling effect on the flow of protected speech through society's mediums of communication." *Id.* at 583; *see also Brandt v. Weather Channel, Inc.*, 42 F. Supp. 2d 1344, 1345–46 (S.D. Fla. 1999), *aff'd*, 204 F.3d 1123 (11th Cir. 1999); *Davidson*, 1997 WL 405907, at *13; *McCollum*, 202 Cal. App. 3d at 996, 1005; *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1005 (1982).

*Video Games*. Courts have similarly declined to find that video game makers owe a duty to those playing their games, including where plaintiffs alleged the same harm here—addictiveness. *See* MC ¶ 100 n.86 (citing research on the "addictive use of social media and video games"); *see also, e.g.*, *James,* 300 F.3d at 687 (no duty owed by internet websites, video game makers, or movie producers after classmate killed students); *Sanders*, 188 F. Supp. 2d at 1273 (rejecting claim that video game makers and movie producers owed duty because "[c]ourts around the country have rejected similar claims brought against media or entertainment defendants"); *see also Quinteros*, 2022 WL 898560, at *4 ("Plaintiff has not cited any duty of Defendants to protect Plaintiff from alleged harassment by third parties in a video game.").

*Publishers of "Pranks" or "Dangerous" Content*. Courts have also rejected duty arguments based on purportedly dangerous content replicated by others. *Compare* MC ¶¶ 634, 771, *with Way,* 856 S.W.2d at 237, 239 (publication of firearms supplement "did not create a duty on the part of appellees to either refrain from publishing the supplement or add warnings about the danger of firearms and ammunition"), *and Herceg*, 565 F. Supp. at 803 (magazine publisher owed no duty to reader in connection with publishing a description of a practice that allegedly prompted plaintiffs' deceased son/brother to hang himself), *and Sakon v. Pepsico, Inc.*, 553 So.2d 163, 166 (Fla. 1989) (per curiam)

29

(Pepsico had no duty after a 14-year-old was injured attempting to replicate a stunt from a Pepsi commercial).

In fact, courts have rejected duties in suits based on injuries from activities that are almost identical to the "online challenges or dares" or "viral pranks" asserted here.  MC ¶¶ 125–32, 633.  For instance, in *Herceg*, plaintiffs sued Hustler Magazine "in tort and under the wrongful death statute" based on Hustler's publication of "an inflammatory article on the practice of 'autoerotic asphyxiation' . . . which caused the death of plaintiffs' son and brother."  565 F. Supp. at 803.  The court dismissed the case, finding "no legal basis for defendant's duty with respect to the content of its publications."  *Id.*  There is no meaningful difference between Hustler's role as a publisher in *Herceg* and Defendants' alleged role as to "online challenges" or "viral pranks" in this case.  *Cf. Anderson*, 2022 WL 14742788, at *1, *4 (dismissing claims based on "videos in which users strangle themselves with household items and then encourage others to record themselves doing the same" that the plaintiff allegedly followed, and noting "[a]lthough Anderson recasts her content claims by attacking Defendants' 'deliberate action' taken through their algorithm, those 'actions,' however 'deliberate,' are the actions of a publisher").

Plaintiffs cannot escape these basic limitations on tort duties by characterizing their claims as challenging "algorithmic" "design."  These allegations boil down to criticisms of Defendants' editorial decisions about the type, amount, and timing of third-party content on their services.  For instance, Plaintiffs allege that Defendants "algorithmically rank[] photos and videos," including "novel, aversive, and alarming images," which purportedly results in a "dopamine reward loop,"  MC ¶ 82, and "encourage" users to create "dangerous" and "viral" challenge videos, *id.* ¶¶ 125–32.  These allegations target the *type* of content Defendants publish.  Plaintiffs also claim Defendants "designed and engineered" their services "to methodically, but unpredictably, space out dopamine-triggering rewards."  *Id.* ¶ 77.  Those allegations criticize the *timing* of content publication.  Plaintiffs allege that "Defendants' respective product features work in combination to create and maintain a user's 'flow-state.'"  *Id.* ¶ 89.  But this contention really relates to the *amount* of content published by Defendants.

In a similar vein, Plaintiffs fault Defendants for failing to remove or identify harmful content.  *See*, *e.g.*, *id.* ¶ 137.  For example, Plaintiffs allege that Defendants' services display dangerous "[o]nline

challenges or dares" or "viral pranks." *Id.* ¶¶ 125–132, 633.  But Plaintiffs do not allege that all online challenges are dangerous or that the "broader ecosystem" of online challenges, *id.* ¶ 129, is inherently dangerous.  Even for "dangerous challenges," Plaintiffs acknowledge that they take the form of content that third parties create, post, and share: "people recording themselves doing something difficult, which they share online to encourage others to repeat," and "users who post videos of themselves carrying out the challenges." *Id.* ¶ 125.  Finally, the alleged harms identified by Plaintiffs—anxiety, bullying, eating disorders, or injuries from a "viral prank"—all require holding Defendants responsible for Plaintiffs' exposure to third-party content.  *See id.* ¶¶ 17, 18, 126, 771.  When claims cannot be divorced from the publishing of expressive content, courts refuse to impose a duty of care on the publisher.

In sum, courts have uniformly refused to impose a duty of care on content publishers related to content consumption, overuse, or other potential harms.  This Court should do the same.

### 2.     Plaintiffs' Allegations Regarding The Purported Addictiveness Of Defendants' Services Do Not Create A Duty Of Care.

Plaintiffs also allege that Defendants failed "to design a safe product" because their services are addictive.  *See*, *e.g.*, *id.* ¶¶ 76–90, 878 (alleging "Defendants designed their apps to attract and addict youth"); *id.* ¶¶ 1, 2, 877–79, 884, 886–87, 889, 903.  But none of these allegations identifies a legally recognized duty.  For the same reasons that the law does not recognize publisher duties, the law does not impose generic duties to prevent or "design" for activities that many users engage with safely.  Nor does it impose a duty to warn users about the purportedly "addictive" potential of such activities.  A contrary rule would risk limitless duties on apps, websites, and online services—from television streaming ("binge watching"), to all games (like playing Candy Crush or Pokémon), to online shopping ("shopaholics"), to sports betting or stock trading services—because most pose some theoretical risk of overuse or overconsumption.

For good reason, courts have rejected "addictiveness" claims, as doing so would expand tort law and require tailored remedies that courts are ill-suited to fashion.  The cases recognize that imposing any duty to prevent or warn about alleged "addictiveness" of content would provide "no recognizable standard for [the industry] to follow."  *Zamora*, 480 F. Supp. at 202 (no duty by broadcasting companies to prevent minor from "duplicat[ing] the atrocities he viewed on television"

31

where he purportedly became "involuntarily addicted to and 'completely subliminally intoxicated' by the extensive viewing of television violence"); *Watters*, 904 F.2d at 379, 381, 384 (rejecting claims that game maker owed a duty not to publish and duty to warn about "psychological harm in fragile-minded children," because it would stretch tort concepts of "ordinary care to lengths that would deprive them of all normal meaning," and fault the defendant "for putting its game on the market without attempting to ascertain the mental condition of each and every prospective player").

Plaintiffs cannot sidestep this reality by pointing to other, inapt industries. Plaintiffs, for example, analogize Defendants' services to "feeding coins into [slot] machines." MC ¶ 4. But courts have declined to impose a duty on casinos and slot machine manufacturers, as liability would "in effect, have no limit." *Taveras v. Resorts Int'l Hotel, Inc.*, 2008 WL 4372791, at *4 (D.N.J. Sept. 19, 2008) (casino not liable for excessive gamblers, as this would require "impos[ing] a duty on shopping malls and credit-card companies to identify and exclude compulsive shoppers"); *Stevens v. MTR Gaming Grp., Inc.*, 788 S.E.2d 59, 66 (W. Va. 2016) (rejecting claim where customer embezzled money, exhausted all family funds to gamble, and committed suicide); *NOLA 180 v. Harrah's Operating Co.*, 94 So. 3d 886, 889 (La. Ct. App. 2012) (casino operators have no duty to identify and exclude "problem gamblers"); *Merrill v. Trump Ind., Inc.*, 320 F.3d 729, 732–33 (7th Cir. 2003) (riverboat casino owed no duty to prevent plaintiff from gambling).

Plaintiffs also compare Defendants to the cigarette industry, but this comparison fares no better. MC ¶¶ 2, 55. Cigarettes contain an identifiable chemical component—namely, nicotine—alleged to make them addictive and hazardous when ingested. *E.g.*, *Colgate v. JUUL Labs, Inc.*, 345 F. Supp. 3d 1178, 1187 (N.D. Cal. 2018) (plaintiffs' theory of liability was, specifically, that "nicotine is an addictive drug"). Here, by contrast, Plaintiffs challenge a patchwork of intangible features across different communication services that display a wide variety of third-party content (which itself is highly individualized)—not a particular chemical or additive. Moreover, even Plaintiffs acknowledge that Defendants' services can be used in innocuous and even beneficial ways. *See supra* Part II.A; *see, e.g.*, MC ¶ 106 (acknowledging social media may address loneliness or depression); *id.* ¶ 4 (alleging that over a third, but not all or even a majority, of 13- to 17-year-olds report some overuse); ¶ 370(g), (p). And the intangible features that Plaintiffs challenge are used to publish content. No court has ever

32

imposed a duty to prevent "addiction" on publishers in similar circumstances.  This Court should not either: federal courts sitting in diversity "must take the law as [they] find it—not how [they] might imagine that it might or should evolve." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 941 (9th Cir. 2001).

Simply put, conclusory allegations about "addictiveness" do not plead a cognizable duty, and Plaintiffs' claims fail for this reason as well.

**3.      Plaintiffs Have Not Alleged A Legally Recognizable Special Relationship Between Defendants And Minors, And Defendants Thus Do Not Owe Minors A Heightened Duty Of Care.**

As noted above, states have rejected efforts to impose any duty of care—much less a "heightened" duty of care—on online services as to their users.  *See supra* Part IV.B.1 (citing cases). Plaintiffs cannot avoid this rule by premising their claims only on harm to minors.  MC ¶¶ 62–75, 879, 880 (alleging minors are "uniquely susceptible" to harm).  This theory has not succeeded with any other media, and there is no reason for a different result here.  The *only* circumstance where courts find a duty as to minors is when a "special relationship" exists between the defendant and a minor.  *See* Restatement (Second) § 314A; Restatement (Third) of Torts: Phys. & Emot. Harm §§ 37, 40.  The Master Complaint fails to plead any such allegations.

To start, Plaintiffs do not plausibly allege a "special relationship" between minor users and Defendants.  Most states limit "special relationships" to certain defined relationships, often when one party exercises *physical* control over the other:  a carrier and its passengers, an innkeeper and its guests, a land possessor and its invitees, an employer and its employees, a school and its students, a landlord and its tenants, and a custodian and those in its custody.  *Id*.  States have not expanded these "special relationships" past these defined categories.  *See, e.g.*, *Ethridge v. Samsung SDI Co.*, 2022 WL 1955680, at *3 (S.D. Tex. May 31, 2022) (only "special relationships" recognized by Texas law are those "between a parent and child, master and servant, or independent contractor and contractee under special circumstances" (quoting *Van Horn v. Chambers*, 970 S.W.2d 542, 546 (Tex. 1998)), *appeal docketed*, No. 23-40094 (5th Cir. Feb. 13, 2023)).  Plaintiffs do not and cannot allege that they fall into one of the well-recognized categories of "special relationships" with Defendants, such as parent-child

33

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

or common carrier-passenger, or that Defendants' intangible online services exercised any physical control over Plaintiffs.

In the handful of states that have not rigidly defined special relationships, courts have cabined the concept to circumstances in which a defendant had actual control over a plaintiff. *E.g.*, *State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 528 F. Supp. 3d 686, 698 (W.D. Ky. 2021) (courts look for "an ability to control in a manner that would be meaningful in the prevention of the harm that actually occurred . . . such that its exercise would restrict the person's ability to cause the harm" (quoting *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 852, 853 (Ky. 2005)); *Brown v. USA Taekwondo*, 483 P.3d 159, 169 (Cal. 2021) (describing "special relationships" as "involving dependence or control, and who by virtue of those relationships have reason to expect the defendant's protection"). Plaintiffs plead no facts to plausibly allege this type of control.

Instead, Plaintiffs' duty theory arises from their simple use of Defendants' services. MC ¶¶ 875, 877 (alleging Defendants' services are dangerous "when used by youth" or to "ordinary consumers such as Plaintiffs"); ¶ 879 (alleging heightened duty to minors for "social media usage"). But the mere fact that someone uses an online service cannot create a "special relationship." As Plaintiffs acknowledge, *millions* of users can voluntarily and easily create accounts on Defendants' services. *See, e.g.*, MC ¶¶ 158, 187, 210, 449, 554, 703. There is nothing "special" about such a relationship that millions of users can create (or leave) at will. *See Dyroff*, 934 F.3d at 1101 ("[N]o special relationship [exists] between Facebook and its users."). Courts have repeatedly declined to find "special relationships" between users and a wide variety of online services:

- **Networking websites.** *Jane Doe No. 14 v. Internet Brands, Inc.*, 2016 U.S. Dist. LEXIS 192144, at \*11–12 (C.D. Cal. Nov. 14, 2016) (no special relationship between operator of networking website and users, and thus no duty to warn where two men carried out a criminal scheme using the website); *Craigslist Inc.*, 2020 WL 6434845, at \*13 ("[P]laintiff cites no authority, and the undersigned is aware of none, supporting the proposition that craigslist has a general[] duty to ensure that their website does not endanger minors").

- **Social media platforms.**  *Dyroff*, 934 F.3d at 1100–01; *MySpace, Inc.*, 474 F. Supp. 2d at 851 (MySpace had no duty to protect an underage user from sexual assault by a third party she met through the online service under Texas law).

- **Rideshare apps.**  *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 423 (2022) (finding no special relationship between Uber and plaintiff-passenger that would give rise to a duty to warn or protect from third-party assaults).

- **Online Marketplaces.**  *Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014) (applying Illinois law to find no duty of care and no special relationship between Armslist.com, a website that facilitates private gun sales, and the decedent-plaintiff, who was killed by a gun illegally purchased from the site); *Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 774 (E.D. La. 2017) (no special relationship between defendant Airbnb and plaintiff, and thus no duty, where plaintiff was injured when a staircase collapsed in a house rented through the Airbnb website); *Ginsberg v. Google Inc.*, 586 F. Supp. 3d 998, 1009 (N.D. Cal. 2022) ("Google does not owe a general duty to the public base[d] on its operation of the Play Store.").

- **Other Websites.**  *James*, 300 F.3d at 694 (applying Kentucky law and finding no "special relationship," and therefore no duty, between defendant internet websites, video game manufacturers, and movie producers and students shot and killed by classmate).

So too here.  There are no allegations that support a special relationship between Defendants and Plaintiffs, and Plaintiffs' claims of any "heightened" duty of care fail as a matter of law.

> ### 4.    Plaintiffs Fail To Establish A Duty Of Care To Prevent Harm Caused By Third-Party Criminal Actors Or Wrongdoers.

Finally, Plaintiffs' claims fail because they purport to impose a duty on Defendants to prevent harm to users caused by third-party criminal actors or wrongdoers.  *See, e.g.*, MC ¶¶ 125–55, 886, 902 (claiming Defendants should have prevented or warned about risks of cyberbullying, online harassment, or sexual misconduct by third parties).  Negligence claims cannot be based on allegations that defendants facilitated or failed to warn plaintiffs of potential harm from third parties.  It is well established that online services do not owe any duty to protect plaintiffs from harmful third-party conduct.  *See Beckman v. Match.com, LLC*, 743 F. App'x 142, 143 (9th Cir. 2018) (Mem.) (Match.com

35

had no duty to warn under Nevada law because plaintiff had no "special relationship" with the website); *Gavra v. Google Inc.*, 2013 WL 3788241, at *3 (N.D. Cal. July 17, 2013) ("Google has assumed no affirmative duty to protect Plaintiffs from extortion."); Restatement (Second) §§ 315, 302B; Restatement (Third) of Torts: Phys. & Emot. Harm §§ 37, 40.  And Plaintiffs have not plausibly alleged the only exceptions to this rule: the existence of a "special relationship," or that Defendants engaged in misfeasance or other affirmative conduct that increased the risk of harm to Plaintiffs.  Accordingly, Defendants owe no duty of care to prevent harm to Plaintiffs by third parties.

*First*, Plaintiffs do not allege a "special relationship" between Defendants and Plaintiffs, or between Defendants and third-party wrongdoers.[16]  *See supra* Part IV.B.3; *see also e.g.*, *Dyroff*, 934 F.3d at 1101 ("We decline to create such a [special] relationship."); *Jane Doe No. 14*, 2016 U.S. Dist. LEXIS 192144, at *11–12 ("[T]he Court easily concludes that Internet Brands did not have a special relationship with [the third-party criminal actors].").  To the extent Plaintiffs' claims are premised on third-party harm, they fail for this reason alone.

*Second*, Plaintiffs do not plausibly allege affirmative conduct or misfeasance—that is, the creation of risk—by Defendants related to wrongdoing by third parties.  In the states that recognize it, affirmative conduct or misfeasance gives rise to a duty when "the defendant is responsible for making the plaintiff's position worse, *i.e.*, defendant has created a risk."  *Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 49 (1975); *see also* Restatement (Second) § 302B; Restatement (Third) § 37.[17]  But a

---

[16] Where potential liability is premised on a defendant's omission, or a failure to act, all 50 states and the District of Columbia require a "special relationship" between either (i) the defendant and the plaintiff or (ii) the defendant and the third-party bad actor to establish a duty of care by the defendant. This concept is codified in both the Second and Third Restatement—which many states have adopted outright; other states have articulated their own, similar common-law standards. *See*, *e.g.*, Restatement (Second) §§ 315, 302B; Restatement (Third) §§ 37, 40; *Ala. Dep't of Corr. v. Thompson*, 855 So. 2d 1016, 1022 (Ala. 2003); *Univ. of Denver v. Whitlock*, 744 P.2d 54, 58–60 (Colo. 1987) (en banc); *Coghlan v. Beta Theta Pi Fraternity*, 987 P.2d 300, 311 (Idaho 1999); *Fox. v. Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.*, 576 So.2d 978, 981 (La. 1991); *Hermosillo v. Leadingham*, 13 P.3d 79, 82 (N.M. Ct. App. 2000); *Santana v. Rainbow Cleaners*, 969 A.2d 653, 658 (R.I. 2009); *Sorge v. State*, 762 A.2d 816, 819 (Vt. 2000).

[17] This standard requires *affirmative wrongdoing* on the part of the defendant—generally in the form of directing or encouraging a third party to commit an unlawful act, acting in concert with another tortfeasor, or giving substantial assistance to another's tortious conduct—to subject that defendant to a

---

"[d]efendant's creation and operation of a communication platform . . . does not by itself create a risk of third-party misuse as a matter of law." *Ziencik*, 2023 WL 2638314, at *5; *see also Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 851–52 (N.D. Cal. 2012). Rather, the defendant must *actively encourage* a third party to commit the unlawful act. *See, e.g.*, *Vesely*, 762 F.3d at 666 (citing Restatement (Second) § 302B); *Jane Doe No. 1*, 79 Cal. App. 5th at 427 (third party's actions must be a "necessary component" of defendant's business); *Jackson v. Airbnb, Inc.*, 2022 WL 16752071, at *7 (C.D. Cal. Nov. 4, 2022) (creating opportunity for criminal conduct does not constitute misfeasance, where "[n]one of Airbnb's actions increased risk" of third-party shooting and "[m]ost of the allegations of Airbnb's failures are conclusory claims that the app is 'negligently designed' and that Airbnb took no 'reasonable safety measures'"); *Dyroff*, 2017 WL 5665670, at *15 (website's use of neutral tools and functionalities is not misfeasance); *Buchler v. State ex rel. Or. Corr. Div.*, 853 P.2d 798, 805 (Or. 1993) ("[M]ere 'facilitation' of an unintended adverse result, where intervening intentional criminality of another person is the harm-producing force, does not cause the harm so as to support liability for it."); *Smith v. Hansen*, 914 S.W.2d 285, 289–90 (Ark. 1996) (requiring "encouragement to third parties by one in a position of some control or authority over them" (citing Restatement (Second) § 876).

The Master Complaint does not plead any misfeasance or affirmative conduct by Defendants. Plaintiffs' conclusory assertions that Defendants "created safety concerns" or "created or increased the risk of abuse" are insufficient. MC ¶¶ 886, 892; *see also id.* ¶¶ 133–55 (alleging third parties caused sexual predation, exploitation, or other harm). And "simply enabling consumers to use a legal service is far removed from encouraging them to commit an illegal act." *Vesely*, 762 F.3d at 666 (emphasis omitted) (citing Restatement (Second) § 302B). Plaintiffs must allege facts to establish that Defendants acted in concert with or encouraged specific criminal actors. They do not, nor could they: criminal acts

duty of care. *See, e.g.*, *Gersh v. Anglin*, 353 F. Supp. 3d 958, 969 (D. Mont. 2018) ("[L]iability may follow when an individual 'authorized' or 'directed' 'specific tortious activity.'"). Merely *enabling* or *facilitating* unintended harm by a third party, on the other hand, does not amount to misfeasance, and no duty is triggered in these instances. *Dyroff*, 2017 WL 5665670, at *15 (a platform's use of the neutral tools and functionalities on its website does not amount to misfeasance), *aff'd*, 934 F.3d 1093; *Vesely v. Armslist LLC*, 762 F.3d 661, 666 (7th Cir. 2014) (there must be more than "simply *enabling* consumers to use a legal service" to establish affirmative wrongdoing) (emphasis in original) (citing Restatement (Second) § 302B)).

violate the Terms of Service governing the use of each of Defendants' services.  *See, e.g.*, MC ¶¶ 644, 659 & n.744 (linking to *TikTok Terms of Service*, TikTok (2019), https://www.tiktok.com/legal/page /us/terms-of-service/en, which prohibit users from using TikTok to "intimidate or harass another, or promote sexually explicit material, violence or discrimination," or to encourage "criminal offence, dangerous activities or self-harm").[18]  Numerous courts have declined to find that interactive services owed plaintiff-users a duty of care for purportedly creating a risk of harm as it relates to third-party wrongdoing.  Providing widely-used communication services does not encourage specific third-party actors to commit crimes.  *Dyroff*, 934 F.3d at 1101; *Ziencik*, 2023 WL 2638314, at *5; *Vesely*, 762 F.3d at 666; *Jane Doe No. 1*, 79 Cal. App. 5th at 427.

Because Plaintiffs do not allege that Defendants engaged in any affirmative conduct or misfeasance related to wrongdoing by third parties, Plaintiffs cannot establish the necessary element of duty in third-party-harm cases.

---

[18] The terms of use for each Defendant's services prohibit the third-party misconduct alleged in the Master Complaint.  *E.g.*, *Child Sexual Exploitation, Abuse and Nudity*, Meta (2023), https://transparency.fb.com/policies/community-standards/child-sexual-exploitation-abuse-nudity/ (Facebook does "not allow content or activity that sexually exploits or endangers children."); *Terms and Policies: Community Guidelines*, Instagram (2023), https://help.instagram.com/477434105621119 (Instagram does not allow "sharing sexual content involving minors" or "buying or selling non-medical or pharmaceutical drugs."); *Community Guidelines: Minor Safety*, TikTok (2023), https://www.tiktok.com/community-guidelines?lang=en#31 (TikTok "prohibit[s] activities that perpetuate the abuse, harm, endangerment, or exploitation of minors on TikTok," and forbidding conduct and content related to "[s]exual exploitation of minors," "[g]rooming behaviors," "abuse," "[s]exual harassment," and "trade of drugs or other controlled substances."); *Community Guidelines*, Snap (2023), https://values.snap.com/privacy/transparency/community-guidelines ("Don't use Snapchat for any illegal activity.  This includes promoting, facilitating, or participating in criminal activity, such as buying, selling, exchanging, or facilitating sales of illegal or regulated drugs, contraband (such as child sexual abuse or exploitation imagery), weapons, or counterfeit goods or documents.  It also includes promoting or facilitating any forms of exploitation, including human trafficking or sex trafficking."); *id.* ("We prohibit bullying or harassment of any kind.  This extends to all forms of sexual harassment . . . ."); *Child safety policy*, YouTube (2023), https://support.google.com/youtube/answer/2801999?hl=en&ref_topic=9282679 ("YouTube doesn't allow content that endangers the emotional and physical well-being of minors," including "[s]exually explicit content featuring minors," "content that sexually exploits minors," and "[c]yberbullying and harassment involving minors."); *Sale of illegal or regulated goods or services policies*, YouTube (2023), https://support.google.com/youtube/answer/9229611?hl=en (YouTube does not allow selling "[c]ontrolled narcotics and other drugs."); *see also* MC ¶¶ 784–86 (recognizing that Google's guidelines prohibit endangering, exploiting, or abusing minors).

### C.      Plaintiffs Fail To Adequately Allege Proximate Causation.

But even if the Court were to rule that Plaintiffs have adequately alleged a "duty" not to offer various features of their online services, Plaintiffs' claims still would fail because neither the Master Complaint nor the accompanying Short-Form Complaints allege the required causal connection between any of these features and any Plaintiff's alleged injuries.[19]

"The creation of an MDL proceeding does not suspend the requirements of the Federal Rules of Civil Procedure, nor does it change or lower the[m]." *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *5; *see also U.S. ex rel. Pogue v. Diabetes Treatment Ctrs. of Am., Inc.*, 444 F.3d 462, 468 (6th Cir. 2006) ("Pretrial proceedings in MDL cases operate pursuant to . . . the Federal Rules of Civil Procedure."). Here, Plaintiffs fall far short of Federal Rule of Civil Procedure 8's requirement to plead causation. At best, the Master Complaint generally alleges that Defendants' services include various features that are theoretically capable of causing harm, but Plaintiffs do not link these risks to any injuries actually experienced by any individual Plaintiff. Nor do Plaintiffs cure this pleading defect in their Short-Form Complaints.[20] To the contrary, by Plaintiffs' own design, the Short-Form Complaints are devoid of any allegations that any individual Plaintiff even used the allegedly defective features of Defendants' services, let alone any allegations connecting an individual Plaintiff's alleged harms to any of those features.[21]

---

[19] *See* 63 Am. Jur. 2d Prods. Liab. § 485 ("[T]o establish a strict liability claim [based on defective design]," the plaintiff's harms must be a "direct and proximate result of the alleged defect."); *id.* § 932 ("[E]stablishing a claim for the failure to provide adequate warnings [in strict products liability] generally requires that the plaintiff show . . . that such failure was a proximate cause of injuries to the plaintiff."); *id.* § 937 (listing "essential elements to be proved in an action for products liability based upon negligence," including "direct or proximate causation resulting in an injury"); *id.* (explaining availability of "negligence liability for the failure to warn when damages proximately result from a failure to provide adequate warnings"); 57A Am. Jur. 2d Negligence § 719 ("In order for negligence consisting of a violation of a statute or ordinance to be actionable" under negligence per se claim "it must be the proximate or legal cause of an injury.").

[20] This defect is true as to all of the Short-Form Complaints because all use the same pleading form, which does not call for any details regarding the features each Plaintiff used or how the Plaintiff's alleged injuries are connected to any platforms or features.

[21] Plaintiffs may argue that they are not required to show proximate causation between their alleged injuries and the challenged features of Defendants' services under the Court's March 3, 2023 Case

39

Moreover, many of the Master Complaint's allegations of such theoretical harms make clear that the harms are attributable to third-party bad actors who abused Defendants' services to engage in behaviors that Defendants' terms of service specifically prohibit. *See supra* p. 38 n.18. This is the case for many of the most severe harms alleged in the Master Complaint—including sexual exploitation and abuse, cyberbullying, and communications from sexual predators and drug dealers. *See supra* Part IV.B.4. While the Court can and should dismiss Plaintiffs' claims in their entirety for failure to plead proximate causation, it should at the very least dismiss the claims that are overtly premised on third-party misconduct. *See, e.g., In re Santa Fe Nat. Tobacco Co. Mktg. & Sales Pracs. & Prods. Liab. Litig.*, 288 F. Supp. 3d 1087, 1251, 1256, 1277 (D.N.M. 2017) (dismissing MDL plaintiffs' claims "to the extent that they are premised on" certain legal theories).

### 1. Plaintiffs Fail To Allege Any Causal Connection Between The Challenged Features Of Defendants' Services And Plaintiffs' Alleged Injuries.

The operative pleadings[22] do not sufficiently allege a causal connection between Defendants' interactive communication services and any of the harms allegedly suffered by Plaintiffs. The Master Complaint alleges generally that Plaintiffs (1) used Defendants' services and (2) experienced a variety of injuries. *See, e.g.*, MC ¶ 90 ("[D]efective features like the ones just described can cause or contribute to (and, with respect to Plaintiffs, have caused and contributed to) the following injuries in young people: eating and feeding disorders; depressive disorders; anxiety disorders; sleep disorders; trauma- and stressor-related disorders; obsessive-compulsive and related disorders; disruptive, impulse-control, and conduct disorders; suicidal ideation; self-harm; and suicide."). But merely alleging that certain features exist and that Plaintiffs suffered injury is not enough to plausibly allege causation—each

---

Management Order permitting Plaintiffs to use their chosen Short-Form Complaint template. *See* Case Management Order No. 5, at 3 (Dkt. 164). But Plaintiffs' choice as to what to include in their Short-Form Complaints cannot excuse their failure to comply with Rule 8, and Defendants do not understand this Court's earlier ruling to address, much less prejudge, whether the information contained in Plaintiffs' pleadings survive a motion to dismiss on proximate-causation grounds.

[22] The operative pleadings for each Plaintiff consist of the Master Complaint and that Plaintiff's individual Short-Form Complaint. *See In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 2020 WL 375597, at *2 (E.D. La. Jan. 23, 2020) ("[E]ach complaint in an MDL 'consists of the master complaint and the individual short-form complaint, taken together.'" (quoting *In re Zofran (Ondansetron) Prods. Liab. Litig.*, 2017 WL 1458193, at *6)).

Plaintiff must plead "a sufficient nexus" showing *how* their injuries were caused by particular features. *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 857 (N.D. Cal. 2012); *see Ferrari v. Nat. Partner, Inc.*, 2017 WL 76905, at *6 (N.D. Cal. Jan. 9, 2017) (complaint must "provide supporting facts that 'explain how the particular design' of the product caused Plaintiff's alleged harm"). Plaintiffs do not include a single allegation attempting to link the alleged injuries to any individual Plaintiff, or even to identify which Plaintiffs used which features of the various services.

Plaintiffs' conclusory assertion that "social media" generically or features of some Defendants' online services may be linked to addiction or various mental and physical harms are not adequate to plead the required nexus. *See, e.g.*, MC ¶¶ 96, 117. These allegations—which lump all of Defendants' services together without accounting for the significant differences among them—do not support the claim that Plaintiffs were injured by any individual Defendant's service, let alone by the specific features or characteristics of those services on which Plaintiffs' premise their claims. *See In re iPhone Application Litig.*, 2011 WL 4403963, at *8 (N.D. Cal. Sep. 20, 2011) ("The Mobile Industry Defendants persuasively argue that, by lumping all eight of them together, Plaintiffs have not stated sufficient facts to state a claim for relief that is plausible against one Defendant."); *Chattopadhyay v. BBVA Compass Bancshares, Inc.*, 2019 U.S. Dist. LEXIS 241400, at *10 (N.D. Cal. Nov. 25, 2019) ("It is not sufficient to 'lump[] [defendants] together in a single, broad allegation.'" (quoting *Gauvin v. Trombatore*, 682 F. Supp. 1067, 1071 (N.D. Cal. 1988)); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1996 WL 482977, at *12 & n.9 (E.D. Pa. Aug. 22, 1996) (dismissing claims where Plaintiffs alleged, "[a]s a direct and proximate result of the tortious conduct of all defendants described herein, all plaintiffs have suffered and will continue to suffer severe physical injuries and associated mental and emotional injuries," and rejecting "one-size-fits-all allegations of causation").

Trying to apply Plaintiffs' generalized allegations to any particular Defendant shows just how deficient they are. For example, Plaintiffs allege that Meta uses "algorithmic ranking" on Facebook and Instagram to prioritize content users are more likely to be interested in, so as to "maximize user engagement." MC ¶ 274. But Plaintiffs do not tie their serious alleged injuries to the mere fact that some of them might have been engaged users of Facebook and Instagram; indeed, those alleged injuries could only have come about as the result of the specific third-party conduct and content Plaintiffs might

have engaged with or otherwise encountered on those services.   Likewise, Plaintiffs allege that "ByteDance's design of the 'LIVE Gifts' and 'Diamonds' rewards greatly increases the risk of adult predators targeting adolescent users for sexual exploitation, sextortion, and CSAM"; that "TikTok's defective features enable predators to communicate privately with youth, with virtually no evidence of what was exchanged"; and that "TikTok does not have any feature to allow users to specifically report CSAM."  *Id.* ¶¶ 665–67.  But they make no allegations that these theoretical risks materialized and actually caused an injury to any Plaintiffs.[23]  Plaintiffs also allege that various YouTube features—such as (a) "Up Next," which suggests videos, (b) its like, comment, and notification features, which inform users about new videos and allow them to give feedback on videos they watch, or (c) "YouTube Shorts," which allow users to create and view short-form videos of 60 seconds or less—make it easier and more enjoyable to access third-party videos.  They contend that, as a result, users may spend more time watching videos on YouTube.  *See id.* ¶¶ 729–30, 732, 735–59.  But to the extent any harm is alleged in connection with such features, it results from the third-party content that YouTube's features display, not from those features themselves.  Finally, Plaintiffs allege that certain Snapchat features— such as push notifications or features that "reward" users for communications on the app—lead to compulsive use of Snapchat.  *See id.* ¶¶ 468–69, 472–74, 477, 480, 485, 488.  But Plaintiffs do not allege any facts linking these features to their alleged serious harms, such as eating disorders, self-harm, or suicide.  *See* Snap Supp. Brief, Section III.B.2.

Nor do Plaintiffs include sufficient detail in the Short-Form Complaints to compensate for the Master Complaint's defects.   The Short-Form Complaints identify only which service(s) each individual Plaintiff claims to have used and which type(s) of personal injury they allegedly experienced; they fail to specify which allegedly defective features of each service any Plaintiff used or even which Defendants' service allegedly caused the injuries at issue.  *See Adams v. BRG Sports, Inc.*, 2018 WL 4853130, at *3–4 (N.D. Ill. Oct. 5, 2018) ("[T]he short-form complaints say nothing about whether or how defendants' negligence . . . caused plaintiffs' injuries.  The bottom line is that

---

[23] TikTok is aware of no prior or current complaint (or Short-Form Complaint) in the MDL alleging that harm was caused by these TikTok features.

the individual short-form complaints are deficient in their current form because they do not include any causation allegations, let alone adequate causation allegations.").

In short, neither the Master Complaint nor the Short-Form Complaints contain a single allegation connecting any individual Plaintiff's alleged injuries to their use of a particular Defendant's service or feature thereof. This defect is fatal to their pleadings, and the fact that this is an MDL proceeding does not change the analysis. Billions of people use some or all of Defendants' services. Not holding Plaintiffs to their Rule 8 burden would invite legions of potential plaintiffs who have experienced any sort of harm to file claims without considering whether there is any link between their use of a service or feature and their injury.

## 2. Plaintiffs Fail To Allege A Causal Nexus Between Defendants' Conduct And The Alleged Harms Caused By The Unlawful Acts Of Third Parties.

Not only does the Master Complaint fail to plead a causal link between Defendants' services and Plaintiffs' injuries, its allegations establish that many of Plaintiffs' most severe alleged harms are attributable to the criminal and tortious actions of third parties. *See, e.g.*, MC ¶¶ 133–55, 399–401, 404, 408, 430, 523–31, 536, 541, 547, 550, 657–58, 661–62, 665–67, 688, 789–90, 793, 818. For example, the Master Complaint alleges that predators and other bad actors may use direct-messaging and voice- and video-calling features to exchange sexually explicit messages with minors, engage in "sextortion," or otherwise abuse them. *See, e.g., id.* ¶¶ 143, 444, 501, 525–26, 530, 666. Similarly, the Master Complaint alleges that sexual predators can find minors using location features to commit in-person abuse. *See, e.g., id.* ¶¶ 408, 507, 657. The Master Complaint also seeks to hold Defendants liable for cyberbullying committed by third parties using such services. *See id.* ¶¶ 17, 441, 500.

All of these allegations share the same fatal defect: to establish liability, Plaintiffs rely entirely on harms attributable to the intentional and harmful acts of third-party sexual predators, drug dealers, and other bad actors. The Master Complaint does not contain any plausible allegations that Defendants incentivized this reprehensible behavior. Instead, as explained above, every one of the Defendants explicitly forbids such uses of its services. *See supra* p. 38 n.18.

While Plaintiffs may argue that Defendants' services made it "possible" for these third parties to commit their criminal acts, this does not suffice to plead proximate causation. *Modisette*, 30 Cal.

43

App. 5th at 154; *see also Fields*, 881 F.3d at 749–50 (affirming Rule 12(b)(6) dismissal of claims for lack of proximate cause where Twitter allegedly "facilitated [an] organization's growth and ability to plan and execute terrorist acts" on Twitter); *Crosby v. Twitter, Inc.*, 921 F.3d 617, 623 (6th Cir. 2019) ("proximate cause prevents liability where there is not a sufficient link between the defendant's conduct and the plaintiff's injuries" (citing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)). Proximate causation requires "some direct relation between the injury asserted and the injurious conduct alleged," *Holmes*, 503 U.S. at 268—and courts have made clear that merely providing communication tools is not enough, *Fields*, 881 F.3d at 749–50.[24]

Defendants' interactive communication services are used overwhelmingly for lawful and beneficial purposes.  That those services may be abused by a small fraction of their user base does not as a matter of law render Defendants the proximate cause of harms flowing from the misconduct of these third parties.  *See, e.g.*, *Crosby*, 921 F.3d at 625–26 ("With the 'highly interconnected' nature of social media, the internet, and 'modern economic and social life'—we expect Defendants' websites to cause some 'ripples of harm' that would 'flow far beyond the defendant's misconduct,'" but "Defendants do not proximately cause all these potential ripples."); *id*. at 625 & n.4 ("Courts appear to be unanimous" on the point that "Defendants do not proximately cause everything that an individual may do after viewing th[e] endless [third-party] content.").  Holding otherwise would be equivalent to finding a cellular service provider liable for a criminal conspiracy because bad actors used cell phones to perpetrate their crimes.

---

[24] The numerous decisions rejecting liability for merely providing interactive services that are misused by wrongdoers are consistent with the established principle that an intervening criminal act by a third party is often a superseding cause of the alleged harm, breaking any causal chain.  *See, e.g.*, *Kane v. Hartford Accident & Indem. Co.*, 98 Cal. App. 3d 350, 360 (1979); *McKethean v. Washington Metro. Area Transit Auth.*, 588 A.2d 708, 716–17 (D.C. Ct. App. 1991); *Everett v. Carter*, 490 So.2d 193, 195 (Fla. Dist. Ct. App. 1986); *Avis Rent A Car System, LLC v. Johnson*, 836 S.E.2d 114, 118 (Ga. Ct. App. 2019); *First Springfield Bank & Trust v. Galman*, 720 N.E.2d 1068, 1071–72 (Ill. 1999); *Westerback v. Harold F. LeClair Co., Inc.*, 735 N.E.2d 1256, 1258 (Mass. Ct. App. 2000); *Ford v. Monroe*, 559 S.W.2d 759, 762 (Mo. Ct. App. 1977); *Ingrassia v. Lividikos*, 54 A.D.3d 721, 724 (N.Y. App. Div. 2008); *Buchler*, 853 P.2d at 804–05; *Mahan v. Am-Gard, Inc.*, 841 A.2d 1052, 1061 (Pa. 2003); *Nguyen v. SXSW Holdings, Inc.*, 580 S.W.3d 774, 791 (Tex. Ct. App. 2019).

Recognizing "the seemingly boundless litigation risks that would be posed by extending" liability to online services in these circumstances, *Fields*, 881 F.3d at 749, multiple courts have found proximate causation lacking where plaintiffs attempt to hold online services liable for third-party misconduct.[25] *See, e.g., Crosby*, 921 F.3d at 625–26 (no proximate cause for state common law negligence and federal Anti-Terrorism Act claims as "there is not a sufficient link between Defendants' conduct (of allegedly providing social media platforms to ISIS) and Plaintiffs' injuries" by third party); *Fields*, 881 F.3d at 749 (no proximate cause where Twitter allegedly "facilitated the organization's growth and ability to plan and execute terrorist acts" by providing "Twitter accounts and direct messaging services"); *Gamache v. Airbnb, Inc.*, 2017 WL 3431651, at *2–3 (Cal. Ct. App. Aug. 10, 2017) (no proximate cause where plaintiffs alleged "Airbnb facilitated short-term rentals at their building," which caused "parties, smoking, and additional noise," as the "direct cause of the harm" was third-party users' conduct); *A.B. v. Salesforce.com, Inc.*, 2021 WL 3616097, at *1, 5 (S.D. Tex. Mar. 22, 2021) (no proximate cause where plaintiffs alleged that Salesforce provided "targeted solutions that were critical to Backpage's growth and success," and that "Salesforce knowingly assisted, supported, and facilitated sex trafficking," because while "trafficking was . . . facilitated by the tools . . . provided by Salesforce,'" "[m]ere 'facilitation' does not satisfy" the proximate cause standard); *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1161, 1178 (N.D. Cal. 2018) (no proximate cause where plaintiffs alleged "YouTube provides ISIS with a 'unique and powerful tool of communication' that enables it to achieve its program of terrorism and motivate others to carry out more terrorist attacks"), *aff'd in relevant part*, 2 F.4th 871 (9th Cir. 2021).[26]

---

[25] Although, for the reasons stated earlier, Defendants' interactive communication services are not products, *see supra* Part IV.A, cases involving manufacturers of physical products similarly hold that the manufacturers are not liable when third parties use their products to break the law and harm others. *See, e.g.*, *Stephenson by Coley v. S.C. Johnson & Son, Inc.*, 339 A.D.2d 402 (NY. Ct. App. 1997) (aerosol can manufacturer not proximate cause of third party's intentional misuse of can as blowtorch); *Grieco v. Daiho Sangyo, Inv.*, 344 So. 3d 11, 27 (Fla. Dist. Ct. App. 2022) (manufacturer of dust-removal product was not proximate cause of car crash where third party intentionally used product to become intoxicated).

[26] *See also, e.g.*, *Modisette*, 30 Cal. App. 5th at 140, 154 (no proximate cause where plaintiffs alleged that third party who caused crash was distracted while using the "'FaceTime' application on an Apple iPhone . . . during operation of his motor vehicle," because no "reasonable jurors would identify

Further, though foreseeability is a factor that can be considered as part of proximate causation, courts have held that in the context of online services with hundreds of millions of users who engage in hundreds of millions or even billions of acts per day on the platforms, it is not legally foreseeable that a small fraction of those acts may result in specific unlawful misconduct, even if potential misuse generally may be foreseen by the platform operators. *See, e.g.*, *Crosby*, 921 F.3d at 625 ("Twitter . . . do[es] not proximately cause everything that an individual may do" on Twitter nor can Defendants "foresee how every viewer will react" on the service); *Gonzalez*, 335 F. Supp. 3d at 1178 ("While [the complaint] includes detailed allegations regarding the alleged use of YouTube by ISIS and its affiliates, [it] does not allege any facts plausibly connecting the general availability of YouTube with the [Paris] attack itself."); *Modisette*, 30 Cal. App. 5th at 155 (Even assuming "use of the iPhone while driving" was generally foreseeable resulting in car accident, "the gap between Apple's design of the iPhone and the [plaintiffs'] injuries is too great for the tort system to hold Apple responsible.").[27]

For this reason, courts repeatedly have held that Plaintiffs cannot plead around the requirement of proximate causation by arguing that their injuries are attributable to Defendants' failure to implement design changes that would have prevented bad actors from using their platforms. For example, in *Crosby*, the court rejected the plaintiff's claim that Twitter could have used "a content-neutral algorithm" to "prevent ISIS from 'rapidly connect[ing] and reconnect[ing]' with its supporters" on

---

[Apple's conduct] as being actually responsible for the ultimate harm to Plaintiffs"); *Meador v. Apple, Inc.*, 911 F.3d 260, 267 (5th Cir. 2018) (refusing to hold "that Texas law would regard a smartphone's effect on a user as a substantial factor in the user's tortious acts"); *Riggs v. Apple, Inc.*, 2017 WL 4018064, at *3–4 (Cal. Super. Ct. Aug. 24, 2017) ("The chain of causation . . . is far too attenuated for a reasonable person to conclude that Apple's conduct is or was a substantial factor in causing plaintiffs' harm.").

[27] More generally, courts refuse to find that criminal and other intentionally harmful acts are foreseeable. As a leading treatise explains, "[t]here is normally much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely negligent." W. Prosser, The Law of Torts § 33, at p.201 (5th ed. 1984). Several state courts have explicitly incorporated this principle into their law. *See, e.g., Wiener v. Southcoast Childcare Ctrs., Inc.*, 88 P.3d 517, 623–24 (Cal. 2004) ("[I]t is difficult if not impossible in today's society to predict when a criminal might strike" and "if a criminal decides on a particular goal or victim, it is extremely difficult to remove his every means for achieving that goal."); *Everett v. Carter*, 490 So.2d 193, 195 (Fla. Dist. Ct. App. 1986); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1135–36 (Ill. 2004); *Graves v. Warner Bros.*, 656 N.W.2d 195, 200–01 (Mich. Ct. App. 2002); *Estate of Strever v. Cline*, 924 P.2d 666, 672 (Mont. 1996).

Twitter.  921 F.3d at 620.  Similarly, in *Modisette*, the court rejected the plaintiff's theory that "Apple had wrongfully failed to implement in the iPhone 6 Plus a safer alternative design that would have automatically prevented drivers from utilizing FaceTime while driving at highway speed."  30 Cal. App. 5th at 140.

Put simply, it is not Defendants, but the third-party bad actors who bear legal responsibility for causing the most severe harms alleged in the Master Complaint.  The allegations against Defendants fail to state a claim for all of Plaintiffs' priority claims, and at minimum those overtly based on third-party misconduct.

### D.      Plaintiffs Fail To Allege A Claim For Negligence Per Se.

Plaintiffs' final priority claim is negligence per se, which is based on alleged violations of two federal statutes: the child-pornography reporting requirements of the PROTECT Act (18 U.S.C. §§ 2258A, 2258B); and the personal-information collection requirements of COPPA (15 U.S.C. §§ 6501–06, 16 C.F.R. § 312.2).  *See* MC ¶ 1001.  Both statutes establish detailed federal regulatory regimes that eschew any private civil liability or right of action.  The law of numerous states categorically forecloses Plaintiffs' claims, and for the rest adopting Plaintiffs' theory would require a substantial and unwarranted expansion of state tort liability.  Indeed, no case has ever recognized a negligence per se claim based on alleged violation of either statute.  Apart from that, Plaintiffs fail to plausibly allege that any Defendant violated the PROTECT Act or COPPA or that Plaintiffs suffered any personal injury plausibly caused by Defendants' alleged statutory violations.  Plaintiffs' negligence per se allegations thus not only fail to state a claim, they do not satisfy the bedrock requirements of Article III standing.

### 1.      Plaintiffs' Negligence Per Se Claims Are Unavailable In Numerous States.

Where it applies, negligence per se allows a plaintiff to rely on a statutory violation to "establish[] the first two elements of negligence: duty and breach of duty."  1 Modern Tort Law: Liability and Litigation § 3:79 (2d ed. May 2022 Update).  As with any other negligence claim, the plaintiff must additionally plead and prove causation and damages—*i.e.*, that the individual plaintiff was injured as a result of the alleged statutory violation.  *See* Restatement (Second) § 288B cmt. b (defendant's "conduct must still be a legal cause of the harm to the plaintiff"); Restatement (Third) of

47

Torts: Phys. & Emot. Harm § 14, cmt. h (2010) ("[T]he plaintiff needs to show that the defendant's negligence was a factual cause of the plaintiff's injury and the injury was within the defendant's scope of liability.").[28]

In applying negligence per se, state courts do not automatically import every regulatory regime into tort law.  When courts decide to extend negligence per se to a new statute, they are "exercising their common-law authority to develop tort doctrine" based on the application of existing tort principles.  Restatement (Third) of Torts: Phys. & Emot. Harm § 14, cmt. c (2010).  As such, the court must decide whether, in making "its own judicial rules, to adopt and apply to the negligence action the standard of conduct provided by . . . a criminal enactment or regulation."  Restatement (Second) § 286; *accord Rudes v. Gottschalk*, 324 S.W.2d 201, 205 (Tex. 1959) (recognizing that "the power of adopting or rejecting standards rests with the civil courts").  Simply put: "When the statutes are not enacted for the purpose of determining civil liability, there is no requirement that courts do so." *Miller v. City of Portland*, 604 P.2d 1261, 1264 (Or. 1980); *see also* Dan B. Dobbs, The Law of Torts §§ 150, 158 (2d ed. July 2022 Update) (noting courts' resistance to creating new affirmative duties through negligence per se).

### a) Plaintiffs' Claims Are Categorically Foreclosed In Many States.

Applying these standards, different state courts have adopted a variety of rules to limit the reach and expansion of negligence per se claims.  Plaintiffs' claims are categorically barred in the vast majority of states:

- **Louisiana** "has rejected a negligence per se theory" entirely.  *Doe v. McKesson*, 339 So. 3d 524, 545 n.10 (La. 2022).  Similarly, "**Hawaii** law does not recognize a negligence per se cause of action

---

[28] State law varies as to a statute's precise impact on the duty and breach elements of a negligence claim.  While some states treat the duty created by an underlying statute as conclusive proof of a tort-based duty (provided that the court first determines the statute can give rise to negligence per se), **Arkansas**, **California**, **Illinois**, **Maine**, **Maryland**, **Massachusetts**, **Nebraska**, **Nevada**, **North Dakota**, **Rhode Island**, **Texas**, **Utah**, **Vermont**, **Washington**, and **West Virginia** all treat negligence per se as merely creating an "evidentiary presumption that affects the standard of care in a cause of action for negligence."  *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 737–38 (2010) (citation omitted); *see also generally* Part VI (Appendix *infra*).

for violation of a statutory standard," and courts dismiss negligence per se claims on that basis. *Sailola v. Mun. Servs. Bureau*, 2014 WL 3389395, at *9 (D. Haw. July 9, 2014).

- **Kentucky's** negligence per se doctrine does not extend to claims predicated on violation of a federal law.  *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534, 534 n.14 (Ky. 2011).

- **Florida**, **Iowa**, **Maine**, **Mississippi**, **Missouri**, **New York**, **North Carolina, North Dakota**, **Ohio**, **South Dakota**, and **Utah** do not allow negligence per se claims predicated on federal statutes that lack a private right of action.  *See generally* Part VI (Appendix *infra*).  Plaintiffs' negligence per se claim fails in these states because Congress has not created or authorized any private right of action to enforce either the reporting requirements of the PROTECT Act or COPPA.  *See Doe v. Mindgeek USA Inc.*, 558 F. Supp. 3d 828, 843 (C.D. Cal. 2021) ("Section 2258A does not provide for a private right of action"); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 926 (N.D. Cal. 2021) (same), *abrogated on other grounds by Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022); *Jones v. Google LLC*, 56 F.4th 735, 739 (9th Cir. 2022) ("COPPA does not authorize a private right of action.").

- Similarly, **Arkansas**, **Colorado**, **Connecticut**, **Georgia**, **Idaho**, **Indiana**, **Kansas**, **Montana**, **Nebraska**, **Nevada**, **New Jersey**, **South Carolina**, **Tennessee**, **West Virginia**, and **Wisconsin** require that the underlying statute indicate some legislative intent, express or implied, to impose private civil liability.  *See generally* Part VI (Appendix *infra*).  That, too, bars the claims here.  Not only is there no civil liability at all of the PROTECT Act's reporting requirements, Congress specifically chose to exclude those provisions from the private civil remedy it created for victims of various *other* federal child pornography laws.  *See* 18 U.S.C. § 2255; Protecting Young Victims from Sexual Abuse and Safe Sport Authorization Act of 2017, Pub. L. No. 115-126, § 102, 132 Stat. 318, 319 (2017) (creating new civil remedies for various child trafficking, abuse, and pornography crimes but omitting §§ 2285A and 2258B).  As for COPPA, Congress deliberately provided solely for governmental—and not private—enforcement.   The statute entrusts enforcement authority only to the FTC, 15 U.S.C. §§ 6502(c), 6505(a), (d); certain other industry-specific regulators, *see id.* § 6505(b); and State Attorneys General, *see id.* § 6504(a).  In both

statutes, there is clear legislative intent not to have private enforcement, which rules out Plaintiffs' claims under all of these states' laws as well.

- **Arizona**, **California**, **Colorado**, **Illinois**, **Massachusetts**, **Minnesota**, **New Hampshire**, **Oregon**, **Pennsylvania**, **Texas**, **Utah**, **Vermont**, and **Virginia** allow negligence per se claims only if the statute at issue defines or clarifies a duty that has already been recognized at common law. *See generally* Part VI (Appendix *infra*). This requirement also precludes any negligence per se claim here. By invoking the PROTECT Act and COPPA, Plaintiffs seek to enforce statutory duties that have no common law antecedent. Plaintiffs identify no common law duty to report illegal content on an internet site, much less to a non-governmental entity like NCMEC, or to obtain parental consent before collecting certain information from minors. These statutes do not prescribe the care an actor must follow when acting; instead, they prescribe new affirmative duties *to act*—precisely the sorts of duties the common law has traditionally eschewed and that courts have rejected when similarly asked to expand negligence per se beyond its common law roots. *See, e.g.*, *Cuyler v. United States*, 362 F.3d 949, 952, 954 (7th Cir. 2004) (rejecting negligence per se claim based on Illinois child abuse reporting statute because "Illinois common law did not impose . . . a tort duty running to" the child at issue, and "the mere fact that a statute defines due care does not in and of itself create a duty enforceable by tort law" (emphasis omitted)); *Perry v. S.N.*, 973 S.W.2d 301, 306–09 (Tex. 1998) (no negligence per se claim based on alleged violation of Texas child abuse reporting statute given, among other things, the "absence of a relevant common law duty"); *Bittle v. Brunetti*, 750 P.2d 49, 59 (Colo. 1988) (rejecting negligence per se claim based on violation of ordinance requiring removal of ice and snow from public sidewalks because "property owners have no common law duty" requiring such removal); *Doe v. Marion*, 645 S.E.2d 245, 248–50 (S.C. 2007) (holding that child-abuse reporting statute did "not create a private cause of action for negligence per se" (italics omitted)). Plaintiffs' effort to dramatically expand the scope of the common law through negligence per se claims predicated on the PROTECT Act and COPPA therefore fails under these states' laws, as well.

- In **New Mexico**, **Ohio**, and **Wyoming**, negligence per se claims can only be based on statutes that impose definite standards of care and only insofar as adjudication of such claims would not require a fact-finder to consider multiple factors in assessing whether the defendant satisfied its duties. *See generally* Part VI (Appendix *infra*).[29]  Plaintiffs' negligence per se claims cannot proceed in these states because the PROTECT Act and COPPA contain numerous complex—and often indeterminate—provisions that do not establish a definite standard of care and would require a fact-finder to assess whether Defendants acted reasonably. *See, e.g.*, 18 U.S.C. § 2258A(a) (under the PROTECT Act, service providers must report "*apparent* violations" of child pornography statutes "as soon as *reasonably* possible after obtaining *actual knowledge*" of those violations (emphases added)); 16 C.F.R. § 312.2 (identifying factors relevant to determining if an online service is directed to children, including its subject matter, visual or audio content, language or other characteristics); 16 C.F.R. § 312.4 (under COPPA, "[a]n operator must make *reasonable* efforts" to provide notice to parents, and such notice must be "clearly and understandably written" (emphasis added)).

### b) Plaintiffs' Negligence Per Se Claims Would Require an Unprecedented Extension of Tort Law.

Even where state doctrine does not categorically forbid a court from relying on these federal statutes for a negligence per se claim (as it does in nearly every state), this Court should not endorse Plaintiffs' effort to significantly expand the boundaries of existing state tort law.  Federal courts "must take the law as [they] find it—not how [they] might imagine that it might or should evolve." *Ticknor*, 265 F.3d at 941; *see supra* Part III.  It is not the role of a federal court, sitting in diversity, to expand state tort law to new theories of liability, much less as to dozens of states at once.  *See supra* Part IV.B.2.

A measured approach is especially warranted here.  Plaintiffs assert negligence per se claims under the laws of dozens of states based on federal statutes that have *never* before been used to support

---

[29] Several states, including **Alaska**, **Delaware**, and the **District of Columbia**, have a similar, somewhat softer, limitation that a statute can only be the basis for a negligence per se claim if it establishes a sufficiently specific standard of care. *See generally* Part IV (Appendix *infra*).

such claims.  Defendants are unaware of a single case that has ever allowed a negligence per se claim to proceed under either the PROTECT Act or COPPA.  In fact, Defendants have identified only one case that asserted a similar claim, which the court dismissed.  *See In re Blackbaud, Inc.*, 567 F. Supp. 3d 667, 672, 683–86 (D.S.C. 2021) (dismissing pursuant to Rule 12(b)(6) negligence per se claim based on COPPA).  That is unsurprising given that, as discussed above, the federal statutes at issue (1) impose duties "unknown to the common law," a circumstance in which "courts usually refuse to recognize a tort claim" through negligence, Dan B. Dobbs, The Law of Torts § 158 (2d ed. July 2022 Update); and (2) were deliberately designed by Congress to not be enforceable through private civil claims.[30]

In short, Plaintiffs' negligence per se claims seek to create new state law and authorize tort liability that is inconsistent with both existing common law principles and federal law.  Deciding whether to impose such new forms of liability is a policy decision that should be left to state courts to evaluate, not decided in the first instance by a federal court as to dozens of jurisdictions at once.  *See, e.g.*, *Stachniewicz v. Mar-Cam Corp.*, 488 P.2d 436, 438 (Or. 1971) (explaining that, before adopting a statutory standard as negligence per se, "it is proper for the court to examine preliminarily the appropriateness of the standard as a measure of care for civil litigation under the circumstances presented"), *overruled in part on other grounds by Davis v. Billy's Con-Teena, Inc.*, 587 P.2d 75 n.4 (Or. 1978); *Bentley v. Greensky Trade Credit, LLC*, 156 F. Supp. 3d 274, 290 (D. Conn. 2015) ("[T]he Court is . . . 'under no compulsion to adopt the requirements of the enactment as the standard of conduct in a negligence action' if the statute does not provide for civil liability."); *Perry*, 973 S.W.2d at 305 n.4, 309 (recognizing that adopting a statutory standard into the common law "is a matter of judicial

---

[30] As to COPPA in particular, the statute has an express preemption clause that specifically bars state-law liability for activities regulated by COPPA where that liability would be "inconsistent with the treatment of those activities or actions under" COPPA.  15 U.S.C. § 6502(d).  Given that Congress decided to leave enforcement of the statute solely to government officials, allowing negligence per se claims based on alleged COPPA violations would be inconsistent with Congress's treatment of those activities.  Defendants recognize that the Ninth Circuit has held that COPPA's preemption provision does not bar claims alleging violations of state law that would also violate COPPA.  *Jones*, 56 F.4th at 741.  But *Jones* did not involve a claim of negligence per se, which presents a different issue: rather than an independent state-law claim that is "consistent with" COPPA, plaintiffs' negligence per se theory seeks to append a private cause of action directly to COPPA, circumventing Congress's choices about how COPPA violations are to be policed.  In any event, Defendants believe that *Jones* was wrongly decided and raise this preemption argument to preserve it.

1
2
discretion" and declining to find negligence per se cause of action based on a child abuse reporting statute, citing decisions from other states reaching the same conclusion).

### 2.  Plaintiffs Fail To Plausibly Allege That Defendants Violated Either Of The Federal Statutes They Invoke.

Even if the PROTECT Act or COPPA could in theory be a basis for Plaintiffs' claims in some states, Plaintiffs fail to plausibly allege that any Defendant violated either statute.  Rule 8 can "not be satisfied by allegations that do little more than parrot the statutory language" of a given cause of action. *Landers v. Quality Commc'ns, Inc.*, 771 F.3d 638, 643 (9th Cir. 2015); *accord Ozeran v. Jacobs*, 2018 WL 1989525, at *7 (C.D. Cal. Apr. 25, 2018) (dismissal of negligence per se claim warranted where plaintiff fails to "allege how Defendants have violated the [statutes] that he cites"), *aff'd*, 798 F. App'x 120 (9th Cir. 2020); *Coppola v. Smith*, 935 F. Supp. 2d 993, 1017 (E.D. Cal. 2013) (dismissing negligence per se claim where the complaint "does not contain factual allegations that demonstrate a violation of the particular statute relied upon, nor does it allege [plaintiff] fits within the class intended to be protected by the statutes").  Plaintiffs' claims for purported violations of the PROTECT Act and COPPA are exactly the sorts of "threadbare recitals" that the Supreme Court and Ninth Circuit have rejected.  *Iqbal*, 556 U.S. at 678.

### a)  Plaintiffs Fail to Allege a PROTECT Act Violation.

Plaintiffs first allege that Defendants violated the PROTECT Act by failing to report child pornography to NCMEC under Section 2258A and failing to minimize the number of employees who had access to visual depictions of reported child pornography under Section 2258B(c).  MC ¶¶ 1004, 1006.  These wholly conclusory allegations do not plead an actionable violation of the statute.

### (1)  Plaintiffs Mischaracterize Section 2258A.

As an initial matter, the Master Complaint repeatedly misstates the law, suggesting that Defendants violate Section 2258A by failing to perform actions that the statute does not require.

*First*, Plaintiffs claim that Defendants "fail[] to monitor [their] product[s] for CSAM."  *Id.* ¶ 415.  But even if that conclusory assertion were taken as true (and it is not),[31] it is not a violation of Section 2258A, which expressly states that "[n]othing in this section shall be construed to require a provider to," among other things, "monitor any user, subscriber, or customer of that provider" or "affirmatively search, screen, or scan for" child pornography or other material that might potentially trigger the reporting requirements.  18 U.S.C. § 2258A(f)(1), (3); *see also, e.g.*, *United States v. Wilson*, 13 F.4th 961, 964 (9th Cir. 2021) ("Electronic communication service providers are not required 'affirmatively [to] search, screen, or scan' for apparent violations on their platforms of federal child pornography laws." (citation omitted)); *accord United States v. Meals*, 21 F.4th 903, 907 (5th Cir. 2021) (same); *United States v. Miller*, 982 F.3d 412, 424 (6th Cir. 2020) (same).  Plaintiffs' failure-to-monitor allegations therefore cannot support a negligence per se claim.

*Second*, Plaintiffs claim that "each of the Defendants intentionally designed its respective products in an attempt to limit and avoid its reporting requirements under this statute."  MC ¶ 1005; *see id.* ¶¶ 422, 537, 668.  While that bare assertion too is unsupported by any alleged facts, nothing in the PROTECT Act requires providers to structure or design their services in a way that makes it easier to detect, report, or remove certain material.  *See United States v. Bohannon*, 506 F. Supp. 3d 907, 914 n.3 (N.D. Cal. 2020) ("Microsoft must report information to NCMEC when it has actual knowledge of child pornography, *see* 18 U.S.C. § 2258A, but is not required to maintain a sophisticated system for obtaining such knowledge.").

*Third*, Plaintiffs claim that Defendants failed to report *suspected* child pornography to NCMEC. *See* MC ¶ 1004 ("Each of the Defendants failed to meet the requirements of 18 U.S.C. § 2258A by not reporting to NCMEC the violations of child pornography laws that they *suspected* to be in existence within its respective products" (emphasis added)); *id.* ¶ 1077 (similar).  But failing to report *possible* child pornography is not a violation.  Section 2258A is clear: the obligation to report exists only when a provider has "*actual knowledge*" of "facts and circumstances" indicating an "apparent violation" of

---

[31] Plaintiffs' threadbare conclusions ignore the policies Defendants have in place prohibiting CSAM; the significant investments they have made to identify and remove CSAM from their services; and the tools they provide users to report such content—all of which are acknowledged (begrudgingly) in the Master Complaint.  MC ¶¶ 146, 148 & n.141, 149 & n.143, 370, 390, 416, 535, 537, 786, 799, 811.

federal criminal statutes involving child pornography. 18 U.S.C. § 2258A (emphasis added); *see also, e.g.*, *United States v. DiTomasso*, 81 F. Supp. 3d 304, 306 (S.D.N.Y. 2015) ("[O]bligations of section 2258A are triggered only when an internet service provider . . . obtains 'actual knowledge' of such trafficking"), *aff'd*, 932 F.3d 58 (2d Cir. 2019). Any effort by Plaintiffs to impose reporting obligations on Defendants that exceed those actually provided by Section 2258A cannot, as a matter of law, be the basis for a claim of negligence per se.

### (2)     Plaintiffs' PROTECT Act Allegations Are Entirely Conclusory.

In the few places where the Master Complaint tracks the actual requirements of the PROTECT Act, Plaintiffs' allegations are entirely "conclusory, unwarranted deductions of fact, or unreasonable inferences" that the Court should not "accept as true." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008). Plaintiffs assert that Defendants "violat[ed] . . . 18 U.S.C. § 2258A" by "knowingly fail[ing] to report massive amounts of material in violation of" federal child pornography laws. MC ¶¶ 420, 669, 806. But this bald legal conclusion is not supported by a single *fact* alleged in the Master Complaint. Plaintiffs have not identified any instance of known child pornography that any Defendant allegedly failed to report to NCMEC. Plaintiffs similarly allege no facts whatsoever supporting the conclusory assertion that "[e]ach of the Defendants also failed to minimize the numbers of its respective employees with access to visual depictions of Plaintiffs in violation of 18 U.S.C. § 2258B(c)." *Compare* MC ¶¶ 1006, 1079, *with* 18 U.S.C. § 2258B(c)(1). Reciting the elements or language of a given statute and baldly asserting that Defendants violated them is precisely the approach to pleading that the Supreme Court rejected in *Twombly* and *Iqbal*. *See Iqbal*, 556 U.S. at 664.

Plaintiffs even quote Defendants' statements asserting that they *do* report child pornography in compliance with the PROTECT Act. MC ¶¶ 416, 537, 673, 799. Simply asserting that those statements are "misleading" or "false"—an accusation unaccompanied by any factual allegations—is an "unwarranted deduction[] of fact" entitled to no presumption of truth. *Gilead*, 536 F.3d at 1055; *see also, e.g.*, *United States ex rel. Cady v. EMD Serono, Inc.*, 2010 WL 11579018, at *2 (C.D. Cal. May 28, 2010) (a "bare assertion" that certifications submitted by defendant are false, "unaccompanied by

supporting factual allegations, is insufficient to withstand a motion to dismiss"); *cf.* Fed. R. Civ. P. 9(b).

Plaintiffs' pleading deficiencies are especially pronounced in light of the safe harbor created by Section 2258B(a).  That provision expressly bars any "civil claim or criminal charge against a provider" of a communication service "arising from the performance of the reporting or preservation responsibilities" under Section 2258A or 2258B from being brought "in any Federal or State court"— unless the provider "(1) engaged in intentional misconduct; or (2) acted, or failed to act—(A) with actual malice; (B) with reckless disregard to a substantial risk of causing physical injury without legal justification; or (C) for a purpose unrelated to the performance of any responsibility or function under this section, sections 2258A, 2258C, 2702, or 2703."  18 U.S.C. § 2258B(a), (b).  Congress thus specifically immunized providers like Defendants from liability (including under state law) for failing to report even known child pornography, absent highly egregious circumstances.  *See, e.g.*, *Doe v. Twitter, Inc.*, 555 F. Supp. 3d at 926 ("Section 2258B creates a safe harbor that prohibits the imposition of criminal or civil liability based on failure to report unless the failure was the result of intentional or reckless conduct.").

Plaintiffs' only effort to respond to this statutory protection is yet another threadbare recital. *See* MC ¶¶ 1068–77 (under PROTECT Act cause of action, alleging, without more, that Defendants' violations were "intentional," "reckless," and "with actual malice"); *cf. id.* ¶ 1019 (similar, with respect to negligence per se cause of action).  Not only do these assertions improperly lump the different Defendants together, they simply are not supported by any factual allegations that even begin to make such inflammatory and serious charges plausible.  Plaintiffs cannot overcome Congress's carefully crafted protections for service providers like Defendants through unsubstantiated legal conclusions.

### b)      Plaintiffs Fail To Allege A COPPA Violation.

Plaintiffs similarly have failed to adequately allege any COPPA violation.  COPPA regulates when and how operators of online services may collect, use, or disclose personal information about children.  The statute defines "child" as an individual under the age of 13, 15 U.S.C. § 6501, reflecting Congress's decision not to generally regulate the use of online services by, or to limit the related collection of personal information from, older minors.  COPPA does not prohibit providers from

56

offering services to those under 13 or even from collecting information from them.  Instead, the Act makes it "unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, to collect personal information from a child in a manner that violates" regulations promulgated by the FTC.  15 U.S.C. § 6502(a).  The FTC, in turn, has enacted regulations that allow the collection of personal information if the child's parents have notice and provide consent.  16 C.F.R. § 312.4.  But these notice and consent requirements are triggered only if the relevant service is specifically "directed to children" or the operator has, in the case of a specific individual, "actual knowledge that it is collecting personal information from a child."  15 U.S.C. § 6502; *see also* 16 C.F.R. § 312.2.

The Master Complaint alleges that Defendants violated COPPA by (1) failing to provide "direct notice to parents that described each Defendant's respective practices regarding the collection, use, or disclosure of children's personal information," (2) failing to "ensure parents received such notice on their websites and applications so that parents could provide informed consent," and (3) failing to "obtain verifiable parental consent before any collection, use, or disclosure of personal information from children."  MC ¶ 1010.  These allegations do not state a claim.  They simply parrot the requirements of the relevant COPPA regulations, *see* 16 C.F.R. §§ 312.4(a)–(c), 312.5(a)(1), and are thus not entitled to any presumption of truth.  *See Iqbal*, 556 U.S. at 664; *Landers*, 771 F.3d at 643.

Moreover, as discussed, any alleged failure to provide parents with notice and obtain their consent would violate COPPA only if the relevant operator "ha[d] actual knowledge that it is collecting personal information from a child."  15 U.S.C. § 6502(a).  But the operative pleadings lack any factual allegations that support, much less make plausible, that conclusion.  Plaintiffs do not allege a single instance in which any Defendant collected personal information from someone whom it actually knew to be under 13 without that child's parental consent (or failed to get consent for any information collected on the separate child-directed versions of their services).  Without any concrete allegation of "actual knowledge," there is no COPPA violation.  *See, e.g.*, *N.M. ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1116 (D.N.M. 2020) (dismissing COPPA claim for failure to plausibly allege that defendant had actual knowledge).

Beyond that, the facts alleged in the Master Complaint identify conduct that is entirely *compliant* with COPPA.  For example, Plaintiffs fault Defendants for allowing "users to self-report their age," MC ¶ 59, and argue that Defendants should adopt additional age-verification measures to keep children under 13 off their services altogether, such as "age estimation algorithms," *id*. ¶ 1002; *see id.* ¶¶ 59–60, 327–48 (Meta); *id.* ¶ 461 (Snap); *id.* ¶¶ 574–76 (TikTok); *id.* ¶¶ 718–26 (YouTube). But COPPA does not require operators to exclude users under age 13 or implement specific measures to ascertain—much less verify—users' ages.  To the contrary, the statute contemplates (and permits) the use of websites and online services by those under the age of 13.  *Cf.* 15 U.S.C § 6502(b)(3) (allowing website operators to "terminate service provided to a child" in certain conditions).  The FTC has further made clear that COPPA "does not require operators to ask the age of visitors"—and explained that an operator "that chooses to screen its users for age in a neutral fashion may rely on the age information its users enter, even if that age information is not accurate." *Complying with COPPA: Frequently Asked Questions*, Fed. Trade Comm'n (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions (cited in MC ¶ 56 n.20).  Plaintiffs' allegations that Defendants allow users to self-report their ages thus point to no COPPA violation; if anything, they underscore Defendants' efforts to act consistently with COPPA by avoiding collection of data from users known to be under 13.

Plaintiffs also point to the fact that Defendants have offered modified versions of their services specifically for children.  *See* MC ¶ 256 (Messenger Kids); *id.* ¶¶ 462–63 (SnapKidz); *id.* ¶ 574 (TikTok for Younger Users); *id.* ¶ 705 (YouTube Kids).  But not only is there no allegation that Plaintiffs ever used these versions of Defendants' services, there is also no allegation that these child-focused services failed to comply with the parental notice and consent provisions of COPPA.  In fact, the opposite is true:  for example, Meta's Messenger Kids and YouTube Kids both require substantial parental notice and consent because accounts on those services must be linked to a parent's account.  *Id.* ¶¶ 207, 350, 730, 761–62.  Nothing about the mere *existence* of child-focused services plausibly alleges that Defendants somehow violated COPPA in connection with their general services.  Plaintiffs cannot premise a negligence per se claim on conduct that does not violate the underlying statute.

3. **Plaintiffs Fail To Allege That Any Of Their Asserted Injuries Were Caused By Defendants' Alleged Statutory Violations, Which Also Deprives Them Of Article III Standing.**

Apart from their failure to allege substantive violations of federal law, Plaintiffs' negligence per se claims fail because Plaintiffs have alleged no injury traceable to any Defendant's purported violations of COPPA or the PROTECT Act. A statutory violation "in the air" is not enough to state a negligence per se claim. Instead, Plaintiffs must both allege proximate cause (as with any negligence claim) and also that the injury "resulted from an occurrence the enactment was designed to prevent." *Safari Club Int'l v. Rudolph*, 862 F.3d 1113, 1120 (9th Cir. 2017) (applying California law); *see also, e.g.*, Restatement (Second) § 286.

The Master Complaint alleges that Plaintiffs' injuries consist of "emotional distress, diagnosed mental health conditions, loss of income and earning capacity, reputational harm, physical harm, past and future medical expenses, and pain and suffering." MC ¶ 1014. But Plaintiffs do not even try to explain how any of these alleged injuries could have resulted (much less did result) from Defendants' purported violations of the specialized reporting and data-collection provisions of the PROTECT Act and COPPA. There is nothing beyond the most general and conclusory allegation of causation. *Id.* ¶¶ 1014–15.

These pleading defects are exacerbated by the fact that the operative pleadings do not identify even a single Plaintiff who claims to be affected by the alleged statutory violations. "Negligence per se only applies if the person suffering the [harm] was one of the class of persons for whose protection the statute, ordinance, or regulation was adopted." *Andres v. Young Men's Christian Ass'n*, 64 Cal. App. 4th 85, 92 (1998); *see* Restatement (Second) § 286. Plaintiffs have offered no such allegations as to either the PROTECT Act or COPPA. No Plaintiff has alleged that any Defendant knowingly failed to report CSAM relating to or personally affecting that person. Nor do the pleadings identify anyone who claims to have had their personal information knowingly collected by any of the Defendants when they were under the age of 13. This leaves a fatal absence at the heart of Plaintiffs' claim: Plaintiffs fail to plead that they suffered "the kind of harm" the statutes were designed to prevent and that their harms arose from "the particular hazard" at which the statutes were aimed. Restatement

59

(Second) § 286.  *See, e.g.*, Dkt. 178 at 5–6 (Short-Form Complaint alleging negligence per se against all Defendants, with no explanation of alleged wrongful conduct at issue or how it affected or injured Plaintiff).

While these failures require dismissal for failure to state a claim under Rule 12(b)(6), they also raise significant constitutional concerns.  Personalized injury fairly traceable to the defendant's specific alleged wrongdoing is a bedrock requirement of Article III standing.  "Under Article III, federal courts do not adjudicate hypothetical or abstract disputes."  *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  Accordingly, "Art[icle] III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant.'"  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.,* 454 U.S. 464, 472 (1982) (citation omitted); *see also, e.g.*, *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) ("A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct . . . ." (citation omitted)).  In short, if "the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve."  *TransUnion*, 141 S. Ct. at 2203 (citation omitted).

"Plaintiffs must maintain their personal interest in the dispute at all stages of litigation," *id.* at 2208—including at the pleading stage, where "the plaintiff must 'clearly . . . allege facts demonstrating' each element" of Article III standing, *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (alteration in original) (citation omitted); *see also, e.g.*, *Johnson v. Weinberger*, 851 F.2d 233, 235 (9th Cir. 1988) ("When '[s]peculative inferences' are necessary . . . to establish either injury or the connection between the alleged injury and the act challenged, standing will not be found." (alteration in original) (citation omitted)).  And "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek." *Transunion*, 141 S. Ct. at 2208; *see also, e.g.*, *California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018).

Under these principles, Plaintiffs cannot proceed with their negligence per se claims.  As discussed, not a single plaintiff has come forward with any allegation of personal injury arising from any Defendant's alleged failure to properly report CSAM or any Defendant's alleged failure to get parental consent before collecting personal information from those under 13.  As far as the operative

pleadings reveal, therefore, Plaintiffs seek to have this Court resolve an abstract controversy about the scope and availability of negligence per se liability—one that would "convert the judicial process into 'no more than a vehicle for the vindication of the value interests of concerned bystanders.'" *Valley Forge*, 454 U.S. at 473 (citation omitted).  This is not a "case or controversy" that this Court is constitutionally permitted to adjudicate.

## V.    CONCLUSION

Defendants respectfully request that Plaintiffs' priority claims (Counts 1–4 and Count 10 of the Master Complaint) be dismissed with prejudice.


Dated: April 17, 2023                          Respectfully submitted,



**COVINGTON & BURLING LLP**

*/s/ Phyllis A. Jones*
Beth S. Brinkmann (State Bar No. 129937)
  bbrinkmann@cov.com
Mark W. Mosier, *pro hac vice*
  mmosier@cov.com
Paul W. Schmidt, *pro hac vice*
  pschmidt@cov.com
Phyllis A. Jones, *pro hac vice*
  pajones@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

Emily Johnson Henn (State Bar No. 269482)
  ehenn@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800

61

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

**KING & SPALDING LLP**

*/s/ Geoffrey M. Drake*

Geoffrey M. Drake, *pro hac vice*
  gdrake@kslaw.com
Albert Q. Giang (State Bar No. 224332)
  agiang@kslaw.com
David Mattern, *pro hac vice*
  dmattern@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: + 1 (404) 572-4600
Facsimile: + 1 (404) 572-5100

**FAEGRE DRINKER LLP**

*/s/ Andrea Roberts Pierson*

Andrea Roberts Pierson, *pro hac vice*
  andrea.pierson@faegredrinker.com
Amy Fiterman, *pro hac vice*
  amy.fiterman@faegredrinker.com
Faegre Drinker LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000

*Attorneys for Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC*

**MUNGER, TOLLES & OLSEN LLP**

*/s/ Jonathan H. Blavin*

Jonathan H. Blavin (State Bar No. 230269)
  Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP

62

560 Mission Street, 27th Floor
San Francisco, CA  94105-3089
Telephone:  (415) 512-4000
Facsimile:  (415) 512-4077

Rose L. Ehler (State Bar No. 296523)
  Rose.Ehler@mto.com
Victoria A. Degtyareva (State Bar No. 284199)
  Victoria.Degtyareva@mto.com
Ariel T. Teshuva  (State Bar No. 324238)
  Ariel.Teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702

Lauren A. Bell, *pro hac vice*
  Lauren.Bell@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW,
Suite 500 E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300

*Attorneys for Defendant Snap Inc.*

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**

 */s/ Brian M. Willen*
Brian M. Willen, *pro hac vice*
Wilson Sonsini Goodrich & Rosati
bwillen@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Lauren Gallo White (State Bar No. 309075)
Wilson Sonsini Goodrich & Rosati
lwhite@wsgr.com
Carmen Sobczak (State Bar No. 342569)
csobczak@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA  94105

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

Telephone: (415) 947-2000
Facsimile: (415) 947-2099

Christopher Chiou (State Bar No. 233587)
Wilson Sonsini Goodrich & Rosati
cchiou@wsgr.com
Matthew K. Donohue (State Bar No. 302144)
mdonohue@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

*Attorneys for Defendants YouTube, LLC,
Google LLC, and Alphabet Inc.*

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

1

**ATTESTATION**

2          I, Phyllis A. Jones, hereby attest, pursuant to N.D. Cal. Civil L.R. 5–1, that the concurrence to

3   the filing of this document has been obtained from each signatory hereto.

4

5   DATED:          April 17, 2023          By:   */s/ Phyllis A. Jones*

                                                  Phyllis A. Jones

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

# VI.   APPENDIX

| State | Authority |
|---|---|
| AL | **Not a product:** *Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 130–33 (Ala. 1976) (Alabama courts look to the Second Restatement on product liability issues, which "has been adopted in most jurisdictions of these United States"). |
| | **Negligence per se:** *See, e.g.*, *Pruitt v. Oliver*, 331 So. 3d 99, 113 (Ala. 2021) (following approach similar to Restatement without elaboration). |
| AK | **Not a product:** *Munhoven v. Northwind Marine, Inc.*, 353 F. Supp. 2d 1072, 1074 (D. Alaska 2005) ("The Alaska Supreme Court . . . has often relied on the Restatement (Third) of Torts. The Restatement defines a product as 'tangible personal property distributed commercially for use or consumption.'"); *see also, e.g.*, *Swenson Trucking & Excavating, Inc. v. Truckweld Equip. Co.*, 604 P.2d 1113, 1116 (Alaska 1980). |
| | **Negligence per se:** No negligence per se absent a specific statutory standard of care. *See Shanks v. Upjohn Co.*, 835 P.2d 1189, 1201 (Alaska 1992) (no negligence per se where "there is the potential for confusion in using these statutes to define the standard of care"). |
| AZ | **Not a product:** *Grubb v. Do It Best Corp.*, 279 P.3d 626, 628 (Ariz. Ct. App. 2012) ("Arizona courts follow [the Third] Restatement absent controlling Arizona law to the contrary" (alteration and citation omitted)). |
| | **Negligence per se:** No negligence per se absent both a private right of action and an underlying common law duty. *See Resol. Tr. Corp. v. Dean*, 854 F. Supp. 626, 643 (D. Ariz. 1994) (where statute lacks "an implied private cause of action," a plaintiff cannot use negligence per se to "impose on the defendants a duty unknown in Arizona common law"); *see also Skinner v. Tel-Drug, Inc.*, 2017 WL 1076376, at *3–4 (D. Ariz. Jan. 27, 2017). |
| AR | **Not a product:** Ark. Code Ann. § 16-116-202(4) ("'Product' means any *tangible* object or goods produced, excluding real estate and improvements located thereon." (emphasis added)); *see also, e.g.*, *Engelhardt v. Rogers Grp., Inc.*, 132 F. Supp. 2d 757, 760, 759–60 & n.7 (E.D. Ark. 2001). |

| | |
|---|---|
| | **Negligence per se:** No negligence per se absent legislative intent to impose private civil liability.  *See Cent. Okla. Pipeline, Inc. v. Hawk Field Servs., LLC*, 400 S.W.3d 701, 712 (Ark. 2012) (no negligence per se where the court could "discern no legislative intent for a private cause of action to arise under" the statute).  And violation of a statute is only evidence of negligence, not negligence per se.  *Id.* |
| CA | **Not a product:** *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at *22 (N.D. Cal. 2015) ("California courts continue to require a link to a physical good when finding [strict product] liability." (citing *Cronin v. J.B.E. Olson Corp.*, 8 Cal. 3d 121, 130 (1972))), *aff'd*, 783 F. App'x 717 (9th Cir. 2019); *see also, e.g.*, *Ziencik v. Snap, Inc.*, 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023); *Green v. ADT, LLC*, 2016 WL 3208483, at *3 (N.D. Cal. June 10, 2016); *Bhardwaj v. 24 Hour Fitness*, 2002 WL 373563, at *6 (Cal. Ct. App. Mar. 8, 2002); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991). |
| | **Negligence per se:** No negligence per se absent an underlying duty at common law.  *Diller v. Ditech Fin., LLC*, 2017 WL 2986247, at *4 n.3 (N.D. Cal. July 13, 2017) (Gonzalez Rogers, J.) ("[N]egligence per se only 'delineates a specific manner, based upon statute or regulation, in which a *breach* of duty may be identified' but is 'irrelevant if no duty has first been established.'" (citations omitted)).  And "negligence per se is not a separate cause of action, but creates an evidentiary presumption."  *Das v. Bank of Am., N.A.*, 186 Cal. App. 4th 727, 737–38 (2010) (citation omitted). |
| CO | **Not a product:** *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) (dismissing products liability claims as "thoughts, ideas, images and messages contained in video games and movies" are not "products," and concluding that the Third Restatement's "distinction . . . between tangible and intangible" items also applies in jurisdictions that have adopted only the Second Restatement). |
| | **Negligence per se:** Negligence per se requires consideration of, among other factors, (i) legislative intent to impose private civil liability and (ii) the existence of an underlying duty at common law.  *See Bittle v. Brunetti*, 750 P.2d 49, 59 (Colo. 1988) (no negligence per se |

| | |
|---|---|
| | where "the ordinance in question did not expressly provide for imposition of civil liability on violators" and there was "no common law duty to" engage in the activity required by the ordinance); *see also Lawson v. Stow*, 327 P.3d 340, 350 (Colo. App. 2014). |
| CT | **Not a product:** *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 171–73, 181–82 (D. Conn. 2002) ("[I]ntangible thoughts, ideas and messages contained within games, movies, and website materials are not products for the purposes of strict product liability[.]" (citation omitted)); *see also, e.g.*, *L. Cohen & Co. v. Dun & Bradstreet, Inc.*, 629 F. Supp. 1425, 1430–31 (D. Conn. 1986); *Izzarelli v. R.J. Reynolds Tobacco Co.*, 136 A.3d 1232, 1238–43 (Conn. 2016). |
| | **Negligence per se:** No negligence per se based on federal statute where claim would "contravene the clear legislative intent of the statute not to allow for damages based on violation of its provisions." *Coastline Terminals of Conn., Inc. v. USX Corp.*, 156 F. Supp. 2d 203, 210–11 (D. Conn. 2001). |
| DE | **Not a product:** Del. Code Ann. tit. 18, § 7001 ("'Product' means any *tangible* article, including attachments, accessories and component parts and accompanying labels, warnings, instructions and packaging." (emphasis added)). |
| | **Negligence per se:** No negligence per se based on regulations that "contain[ ] no sufficiently specific statement" of duty. *See, e.g.*, *Joseph v. Monroe*, 419 A.2d 927, 931 (Del. 1980). |
| DC | **Not a product:** *Word v. Potomac Elec. Power Co.*, 742 A.2d 452, 459 (D.C. 1999) ("This court has recognized the principles of strict [product] liability in tort set forth in" the Second Restatement.). |
| | **Negligence per se:** No negligence per se absent a specific statutory standard of care. *See Chadbourne v. Kappaz*, 779 A.2d 293, 297 (D.C. 2001) (no negligence per se where statute "does not contain the kind of specific guidelines that would allow one to determine whether the statute has been violated without resorting to a common law reasonable care analysis."). |
| FL | **Not a product:** *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 324–25 (S.D.N.Y. 2006) (applying Florida law) ("Florida law adopts the theory of products liability set forth in |

68

| | |
|---|---|
| | Section 402A of the Second Restatement of Torts," such that "[t]he intangible qualities of a book"—"the ideas and expressions—are not products for purposes of products liability law" (citing *Cardozo v. True*, 342 So.2d 1053, 1056 (Fla. 2d Dist. Ct. App. 1977))), *aff'd*, 279 F. App'x 40 (2nd Cir. 2008); *see also, e.g.*, *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 670 F. Supp. 115, 118 n.5 (S.D.N.Y. 1987) (applying Florida law), *aff'd*, 869 F.2d 175 (2d Cir. 1989); *West v. Caterpillar Tractor Co.*, 336 So. 2d 80, 87 (Fla. 1976). |
| | **Negligence per se:** "Florida courts have refused to recognize a private right of action for negligence *per se* based on an alleged violation of a federal statute that does not provide for a private right of action." *Weinberg v. Advanced Data Processing, Inc.*, 147 F. Supp. 3d 1359, 1365 (S.D. Fla. 2015) (citations omitted). |
| GA | **Not a product:** *Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d 59, 63 (Ga. 2020) (Georgia courts look to the Second Restatement as persuasive authority on product liability issues); *Banks v. ICI Ams., Inc.*, 450 S.E.2d 671, 673–74 & n.4 (Ga. 1994) (relying on a draft of Third Restatement); *Ctr. Chem. Co. v. Parzini*, 218 S.E.2d 580, 582 (Ga. 1975) (relying on the Second Restatement); *see also Murray v. ILG Techs., LLC*, 378 F. Supp. 3d 1227, 1249 (S.D. Ga. 2019) (doubting that "Plaintiffs could establish that their products liability claims involve a 'product,'" where plaintiffs alleged that defendant's bar-exam software malfunctioned and erroneously informed them that they had failed the bar exam), *aff'd*, 798 F. App'x 486 (11th Cir. 2020); *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 854 (11th Cir. 2016) (applying Georgia law). |
| | **Negligence per se:** "[A] claim for negligence per se . . . fails if the statute or regulation establishing the claimed legal duty does not provide a cause of action for damages for its violation." *Scoggins v. Floyd Healthcare Mgmt. Inc.*, 2016 WL 11544774, at *41 (N.D. Ga. June 10, 2016); *see also Wells Fargo Bank, N.A. v. Jenkins*, 744 S.E.2d 686, 687–88 (Ga. 2013) (no negligence per se based on the GLBA because it lacks a private right of action). |
| HI | **Not a product:** *Birmingham v. Fodor's Travel Pubs., Inc.*, 833 P.2d 70, 79 (Haw. 1992) ("We find the reasoning of the Ninth Circuit in *Winter* to be persuasive.  Therefore, we hold that the |

| | |
|---|---|
| | [defendant's travel guide] is not a 'product' . . . .")); *see also, e.g.*, *Isham v. Padi Worldwide Corp.*, 2007 WL 2460776, at *7 (D. Haw. Aug. 23, 2007); *Radford v. Wells Fargo Bank*, 2011 WL 1833020, at *16 (D. Haw. May 13, 2011). |
| | **Negligence per se:** "Hawaii law does not recognize a negligence per se cause of action for violation of a statutory standard." *Sailola v. Mun. Servs. Bureau*, 2014 WL 3389395, at *9 (D. Haw. July 9, 2014) (dismissing negligence per se claim). |
| ID | **Not a product:** *Rindlisbaker v. Wilson*, 519 P.2d 421, 428 (Idaho 1974) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se absent legislative intent to impose private civil liability. *See Nation v. State Dep't of Corr.*, 158 P.3d 953, 966 (Idaho 2007) (no negligence per se based on statute that "does not create a substantive right to bring a negligence suit" where "it is clear that the legislature did not intend to create a cause of action."). |
| IL | **Not a product:** 735 Ill. Comp. Stat. § 5/13-213(a)(2) ("'[P]roduct' means any *tangible* object or goods distributed in commerce, including any service provided in connection with the product." (emphasis added)); *see also, e.g.*, *Melnick v. TAMKO Bldg. Prods., Inc.*, 469 F. Supp. 3d 1082, 1107 (D. Kan. 2020) (applying Illinois law); *Olson v. Owens-Corning Fiberglas Corp.*, 556 N.E.2d 716, 719 (Ill. App. Ct. 1990); *Alm v. Van Nostrand Reinhold Co.*, 480 N.E.2d 1263, 1267 (Ill. App. Ct. 1985). |
| | **Negligence per se:** No negligence per se absent an underlying duty at common law. *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004) ("[O]nly if the Illinois common law of torts imposed on [defendants] a duty of care to the [plaintiff] would the Illinois notification statute specify the level of care that they owed."). And "in Illinois the violation of a statutory standard of care is prima facie evidence of negligence rather than negligence per se." *Id.* |
| IN | **Not a product:** *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220 (10th Cir. 1991) (applying Indiana law) (concluding that Indiana would follow "the reasoning of the Sixth Circuit" in concluding that a "'product' means any *tangible* object or goods produced," such that a handbook's "instructions themselves are not a product" (quoting *Kochons v. Linden-* |

70

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

| | |
|---|---|
| | *Alimak, Inc.*, 799 F.2d 1128, 1134–35 (6th Cir. 1986) (emphasis added))); *see also* Ind. Code §§ 34-6-2-114(a), 34-20-1-1 (product liability actions are limited to an "item or good that is personalty at the time it is conveyed by the seller to another party" which causes "physical harm"). |
| | **Negligence per se:** No negligence per se absent legislative intent to impose private civil liability. *See Brown v. City of Valparaiso*, 67 N.E.3d 652, 659 (Ind. Ct. App. 2016) (no negligence per se based on federal statute where the court found that Congress did not intend to create a private right of action because, in part, the statute "contain[ed] an enforcement mechanism and remedies for violation of the duty."). |
| IA | **Not a product:** *Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002) (adopting Third Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se based on a federal statute lacking a private right of action. *See Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 27 (Iowa 2012) ("[I]t would be inconsistent with the lack of a private right of action *under* [a federal statute] to authorize a negligence action based upon a duty that exists only *because of* the [statute]"). |
| KS | **Not a product:** *Savina v. Sterling Drug, Inc.*, 795 P.2d 915, 923 (Kan. 1990) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** "Kansas law limits negligence per se to violations of a statute for which the legislature intended to create a private cause of action." *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1280 (10th Cir. 2021); *see also Pullen v. West*, 92 P.3d 584, 593 (Kan. 2004). |
| KY | **Not a product:** *James v. Meow Media, Inc.*, 300 F.3d 683, 699–701 (6th Cir. 2002) (applying Kentucky law) (product liability claims under Kentucky law cannot extend to "video game cartridges, movie cassette[s], and internet transmissions," which are "not sufficiently 'tangible' to constitute products"); *see also, e.g.*, *Watters v. TSR, Inc.*, 904 F.2d 378, 381 (6th Cir. 1990) (applying Kentucky law); *Powell v. Tosh*, 929 F. Supp. 2d 691, 714 (W.D. Ky. 2013). |

| | |
|---|---|
| | **Negligence per se:** "Violations of federal laws and regulations and the laws of other states do not create a cause of action based on [Kentucky's negligence per se statute]." *St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 534 & n.14 (Ky. 2011). |
| LA | **Not a product:** *Chauvin v. Sisters of Mercy Health Sys., St. Louis, Inc.*, 818 So.2d 833, 837 (La. Ct. App. 2002) (Louisiana law "closely approximat[es the] common law states following the Restatement (Second) of Torts § 402A"). |
| | **Negligence per se:** No negligence per se *at all*; courts assess violation of a statute as part of the duty/risk analysis. *Doe v. McKesson*, 339 So. 3d 524, 545 (La. 2022). |
| ME | **Not a product:** *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 613 F. Supp. 2d 108, 125–26 & n.89 (D. Me. 2009) (relying on the Second and Third Restatements to expound Maine product liability law), *aff'd in part, rev'd on other grounds sub nom. Anderson v. Hannaford Bros. Co.*, 659 F.3d 151 (1st Cir. 2011). |
| | **Negligence per se:** No negligence per se based on a federal statute lacking a private right of action. *See Castine Energy Constr., Inc. v. T.T. Dunphy, Inc.*, 861 A.2d 671, 675 (Me. 2004). And "violation of a safety statute or regulation is merely evidence of negligence, not negligence per se." *Id.* |
| MD | **Not a product:** Md. Code Ann., Cts. & Jud. Proc. § 5-115(a)(4) ("'Product' means a *tangible* article, including attachments, accessories, and component parts, and accompanying labels, warnings, instructions, and packaging." (emphasis added)); *see also, e.g., Bugoni v. Emp't Background Investigations, Inc.*, 2020 WL 5994958, at *13 (D. Md. Oct. 9, 2020); *Robinson v. Big Mouth, Inc.*, 2017 WL 11725906, at *1 (D. Md. Sep. 26, 2017); *Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1217 (D. Md. 1988). |
| | **Negligence per se:** "Maryland does not recognize the negligence *per se* doctrine." *Webb v. Green Tree Servicing, LLC*, 2012 WL 2065539, at *6 (D. Md. June 7, 2012). But under its similar "Statute or Ordinance Rule," violation of a statute is merely "evidence of negligence." *Hector v. Bank of N.Y. Mellon*, 251 A.3d 1102, 1115–16 (Md. 2021). |

| MA | **Not a product:** *Garcia v. Kusan, Inc.*, 655 N.E.2d 1290, 1293 (Mass. App. Ct. 1995) ("[T]here is no legal support for imposing liability on . . . a 'product' where the seller does not provide a tangible item . . . ."); *see also, e.g.*, *Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 45 (D. Mass. 1994). |
| --- | --- |
|  | **Negligence per se:** "[V]iolation of a statute . . . is only 'some evidence' of the defendant's negligence" and "[a] duty of care must already exist before a plaintiff can use a defendant's statutory violation to support a claim of tort liability." *Juliano v. Simpson*, 962 N.E.2d 175, 179–80 (Mass. 2012) (second alteration in original) (citations omitted). |
| MI | **Not a product:** *Lewin v. McCreight*, 655 F. Supp. 282, 283 (E.D. Mich. 1987) (no product liability action existed against a book publisher "for failure to warn of 'defective ideas' in the books it publishes"). |
|  | **Negligence per se:** "[V]iolation of a safety or penal statute creates a rebuttable presumption of negligence' rather than establishing negligence per se." *Meyers v. Rieck*, 983 N.W.2d 747, 754 n.4 (Mich. 2022) (citation omitted); *see also Barnes v. Birds Eye Foods, Inc.*, 2011 WL 13362363, at *5 (W.D. Mich. Sept. 26, 2011). |
| MN | **Not a product:** Minn. Stat. § 604.101 ("[P]roduct" means "*tangible* personal property" (emphasis added)); *see also Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1146 (D. Minn. 2011) ("This is the doctrine of strict liability as set forth in Restatement (Second) of Torts § 402A, which Minnesota has adopted."). |
|  | **Negligence per se:** No negligence per se absent an underlying duty at common law. *See Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128, 1152 (D. Minn. 2011) ("[A] state-law tort claim must be premised on 'the type of conduct that would traditionally give rise to liability under state law *even if the [statute] had never been enacted*.'" (citation omitted)). |
| MS | **Not a product:** *Palermo v. LifeLink Found., Inc.*, 152 So. 3d 1177, 1181 (Miss. Ct. App. 2014) (looking to the Second and Third Restatements on product liability issue). |

| | |
|---|---|
| | **Negligence per se:** No negligence per se based on a federal statute that "provide[s] no private cause of action." *Isgett ex rel. Isgett v. Wal-Mart Stores*, 976 F. Supp. 422, 430 (S.D. Miss. 1997). |
| MO | **Not a product:** *Hobbs v. Boy Scouts of Am., Inc.*, 152 S.W.3d 367, 372 (Mo. Ct. App. 2004) (adopting Third Restatement's definition of "product" (citing Restatement (Third) § 19)); *see also, e.g.*, *Rodriguez v. Suzuki Motor Corp.*, 996 S.W.2d 47, 65 (Mo. 1999). |
| | **Negligence per se:** No negligence per se based on a federal statute absent evidence that Congress "inten[ded] to create both a private right and a private remedy." *Elkins v. Acad. I, LP*, 633 S.W.3d 529, 538 (Mo. Ct. App. 2021). |
| MT | **Not a product:** *Alexander v. Montana-Dakota Utils. Co.*, 2020 WL 6262101, at *2 (D. Mont. Oct. 23, 2020) (applying Montana law) ("MDU's tracking system does not qualify as a 'product' because it is not a *physical* good that has passed through the stream of commerce or changes hands from seller to buyer." (emphasis added)); *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268, 272 (1973); *see also* Mont. Code Ann. § 27-1-719 (limiting strict liability for defective products to "physical harm"). |
| | **Negligence per se:** Negligence per se can only be premised on a statute that "allows a private right of action. . . . if the statute in question may be enforced only by the state, a private individual may not attempt to recover for violation of the statute under a negligence per se claim." *Doyle v. Clark*, 254 P.3d 570, 577 (Mont. 2011) (citations omitted), *superseded by statute on other grounds*, M. R. Civ. P. 6(a). |
| NE | **Not a product:** *Pitts v. Genie Indus., Inc.*, 921 N.W.2d 597, 614 (Neb. 2019) (looking to Third Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se based on any statute that "does not grant a private right of action for its violation." *See Turek v. Saint Elizabeth Cmty. Health Ctr.*, 488 N.W.2d 567, 572 (Neb. 1992) (citation omitted).  And violation of a statute is only evidence of negligence, not negligence per se.  *Scheele v. Rains*, 874 N.W.2d 867, 872 (Neb. 2016). |

| NV | **Not a product:** *Rivera v. Philip Morris, Inc.*, 209 P.3d 271, 276 (Nev. 2009) (adopting Second Restatement on product liability issue). |
|---|---|
| | **Negligence per se:** "[A]bsent evidence of legislative intent to impose civil liability [courts] shall not conclude that a violation of a statute is negligence per se." *Bell v. Alpha Tau Omega Fraternity, Eta Epsilon Chapter*, 642 P.2d 161, 162 (Nev. 1982); *see also Cordero Aloua v. Aurora Loan Servs., LLC*, 2010 WL 2555648, at *4 (D. Nev. June 23, 2010) (no negligence per se based on statute that "does not create an express or implied private right of action."). And violation of a statute is only evidence of negligence, not negligence per se. *Cervantes v. Health Plan of Nev., Inc.*, 263 P.3d 261, 264 n.4 (Nev. 2011). |
| NH | **Not a product:** *Buttrick v. Arthur Lessard & Sons*, 260 A.2d 111, 113 (N.H. 1969) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** "If no common law duty exists, the plaintiff cannot maintain a negligence action, even though the defendant has violated a statutory duty." *Gauthier v. Manchester Sch. Dist., SAU #37*, 123 A.3d 1016, 1019 (N.H. 2015) (citation omitted). |
| NJ | **Not a product:** *Rodgers v. Christie*, 795 F. App'x 878, 879–80 (3d Cir. 2020) (applying New Jersey law) ("[A]n 'algorithm' or 'formula'" or the presentation of "information, guidance, ideas, and recommendations" are not "tangible personal property" and thus "are not 'products.'"). |
| | **Negligence per se:** No negligence per se absent legislative intent to impose private civil liability. *Green v. 712 Broadway, LLC*, 2018 WL 2754075, at *6 (D.N.J. June 8, 2018) ("Under New Jersey law, 'a claim of negligence *per se* is supported by the violation of a statute or regulation, but only when that statute or regulation "serve[s] to impose direct tort liability on [the person who offends it.]"'" (alterations in original) (citation omitted)). And violation of a statute is only evidence of negligence, not negligence per se. *See Labega v. Joshi*, 270 A.3d 378, 389 (N.J. Super. Ct. App. Div. 2022) |
| NM | **Not a product:** *Ruiz v. S. Pac. Transp. Co.*, 638 P.2d 406, 412 (N.M. Ct. App. 1981) (looking to Second Restatement on product liability issue). |

| | |
|---|---|
| | **Negligence per se:** "[A] negligence-per-se instruction is appropriate only if the statute or regulation defines the duty with specificity" and not "'where duties are undefined, or defined only in abstract or general terms,' leaving it to the jury to evaluate the factual circumstances of the particular case to determine whether the defendant acted reasonably . . . ." *Heath v. La Mariana Apartments*, 180 P.3d 664, 666 (N.M. 2008) (citation omitted). |
| NY | **Not a product:** *Beasock v. Dioguardi Enters., Inc.*, 130 Misc. 2d 25, 29–30 (N.Y. Sup. Ct. 1985) (holding that defendant's "publications themselves" could not "serve as the basis for the imposition of liability under a theory of . . . strict products liability" (citing *Walter v. Bauer*, *infra*, 439 N.Y.S.2d 821 (N.Y. Sup. Ct. 1981))); *see also, e.g.*, *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 670 F. Supp. 115, 118 n.5 (S.D.N.Y. 1987), *aff'd*, 869 F.2d 175 (2d Cir. 1989); *Eberhart v. Amazon.com, Inc.*, 325 F. Supp. 3d 393, 397–400 (S.D.N.Y. 2018); *Intellect Art Multimedia, Inc. v. Milewski*, 2009 WL 2915273, at *7 (N.Y. Sup. Ct. Sept. 11, 2009). |
| | **Negligence per se:** No negligence per se based on a federal statute lacking a private right of action. *See In re GE/CBPS Data Breach Litig.*, 2021 WL 3406374, at *10 (S.D.N.Y. Aug. 4, 2021) ("Plaintiff's negligence *per se* claim is not viable under New York law because Section 5 does not provide a private right of action; instead, the FTCA confers exclusive enforcement authority on the Federal Trade Commission. . . . [A]llowing Plaintiff's negligence *per se* claim to proceed based on a violation of the FTCA would be inconsistent with the legislative scheme." (citations omitted)) (citing cases); *Lugo v. St. Nicholas Assocs.*, 772 N.Y.S.2d 449, 454–55 (2003), *aff'd*, 18 A.D.3d 341 (N.Y. App. Div. 2005). |
| NC | **Not a product:** *Warzynski v. Empire Comfort Sys.*, 401 S.E.2d 801, 803 (N.C. Ct. App. 1991) (looking to Second Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se based on federal statute lacking a private right of action. *See Taylor & Co. v. Bank of Am. Corp.*, 2014 WL 3557672, at *3–4 (W.D.N.C. June 5, 2014) (dismissing negligence per se claim based on alleged violations of federal statutes |

| | |
|---|---|
| | lacking a private right of action); *Hill v. Danek Med., Inc.*, 1998 WL 1048182, at *3 n.1 (E.D.N.C. Sept. 10, 1998) (similar). |
| ND | **Not a product:** *Johnson v. Am. Motors Corp.*, 225 N.W.2d 57, 66 (N.D. 1974) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se based on a federal statute lacking a private right of action. *R. B. J. Apartments, Inc. v. Gate City Sav. & Loan Ass'n*, 315 N.W.2d 284, 290 (N.D. 1982) ("The separation-of-powers doctrine and principles of federalism militate against the adoption of the federal statute as the standard of care in a state negligence action when no private cause of action, either explicit or implicit, exists in the federal statute.").  And violation of a statute is only evidence of negligence, not negligence per se.  *Kimball v. Landeis*, 652 N.W.2d 330, 336 (N.D. 2002). |
| OH | **Not a product:** Ohio Rev. Code Ann. § 2307.71(A)(12)(a) ("'Product' means … any object, substance, mixture, or raw material that constitutes *tangible* personal property . . . [and] is intended for sale or lease to persons for commercial or personal use." (emphasis added)). |
| | **Negligence per se:** No negligence per se based on a federal statute lacking a private right of action.  *See Sheldon v. Kettering Health Network*, 40 N.E.3d 661, 674 (Ohio Ct. App. 2015) ("[U]tilization of HIPAA as an ordinary negligence 'standard of care' is tantamount to authorizing a prohibited private right of action for violation of HIPAA itself."); *Monnin v. Fifth Third Bank, N.A.*, 658 N.E.2d 1140, 1149 (Ohio Ct. App. 1995).  Additionally, no negligence per se absent a definite statutory standard of care that "is so specific that the only determination necessary by the jury is to find but a single fact."  *Machlup v. Bowman*, 2021 WL 5882102, at *4 (Ohio Ct. App. 2021) (citation omitted). |
| OK | **Not a product:** *Tansy v. Dacomed Corp.*, 890 P.2d 881, 884 (Okla. 1994) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** *See, e.g.*, *Howard v. Zimmer, Inc.*, 299 P.3d 463 (Okla. 2013) (following approach similar to Restatement without elaboration). |

77

| | |
|---|---|
| OR | **Not a product:** *Ass'n Unit of Owners of Bridgeview Condominium Ass'n v. Dunning*, 69 P.3d 788, 800 (Or. App. 2003) (adopting Second Restatement's definition of "products"). |
| | **Negligence per se:** No negligence per se absent an underlying duty at common law.  *See Deckard v. Bunch*, 370 P.3d 478, 483 n.6 (Or. 2016) ("When a negligence claim otherwise exists, and a statute or rule defines the standard of care expected of a reasonably prudent person under the circumstances, a violation of that statute or rule establishes a presumption of negligence."); *see also Bob Godfrey Pontiac, Inc. v. Roloff*, 630 P.2d 840, 845 (Or. 1981); *Gutta v. Sedgwick Claims Mgmt. Servs., Inc.*, 2023 WL 2709646, at *5 (D. Or. Mar. 29, 2023). |
| PA | **Not a product:** *Anastasio v. Kahn*, 2010 WL 114879, at *3 (E.D. Pa. Jan. 13, 2010) (products liability requires "the passing of possession of some tangible object"); *see also, e.g., Snyder v. ISC Alloys, Ltd.*, 772 F. Supp. 244, 251 (W.D. Pa. 1991); *Smith v. Linn*, 563 A.2d 123, 126 (Pa. Super. Ct. 1989), *aff'd*, 587 A.2d 309 (Pa. 1991); *cf. Thorne v. Pep Boys Manny Moe & Jack Inc.*, 980 F.3d 879, 891 (3d Cir. 2020) (applying Pennsylvania law) (strict liability for defective products in Pennsylvania requires physical harm to user or consumer or their property). |
| | **Negligence per se:** No negligence per se absent an underlying duty at common law.  *See Polt v. Sandoz, Inc.*, 462 F. Supp. 3d 557, 569 (E.D. Pa. 2020) ("[W]here there is no preexisting tort duty, negligence per se does not operate to impose a new duty."). |
| RI | **Not a product:** *DeFilippo v. Nat'l Broad. Co.*, 1980 WL 336092, at *2 (R.I. Super. Ct. June 8, 1980) ("[A]n activity which is watched for entertainment or information is not a 'product' within the meaning of § 402A.  Perhaps this is so because all courts allowing recovery in strict liability have done so only in cases where the plaintiffs have shown a defect in a *tangible* item or where they have shown that the *tangible* item was unreasonably dangerous." (emphases added)), *aff'd*, 446 A.2d 1036 (R.I. 1982); *see also, e.g., Kennedy v. Providence Hockey Club, Inc.,* 376 A.2d 329, 333 (R.I. 1977). |

| | |
|---|---|
| | **Negligence per se:** "[V]iolation of a statute does not constitute negligence *per se*; however, such a violation is admissible as evidence of negligence and can be used to establish a duty." *Borgo v. Narragansett Elec. Co.*, 275 A.3d 567, 575 (R.I. 2022). |
| SC | **Not a product:** *Branham v. Ford Motor Co.*, 701 S.E.2d 5, 14 (S.C. 2010) (adopting Third Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se "[i]f the Court determines the General Assembly did not intend the statute create a private right of action, and there is no underlying common-law duty owed by the defendant to the plaintiff." *Denson v. Nat'l Cas. Co.*, 2023 WL 2672096, at *4 (S.C. Mar. 29, 2023). |
| SD | **Not a product:** *Karst v. Shur-Co.*, 878 N.W.2d 604, 609–10 (S.D. 2016) (looking to the Second and Third Restatements on product liability issue). |
| | **Negligence per se:** A federal statute "does not establish a duty in a negligence case" where it "does not create a private right of action." *Highmark Fed. Credit Union v. Hunter*, 814 N.W.2d 413, 417–18 (S.D. 2012). |
| TN | **Not a product:** Tenn. Code Ann. § 29-28-102(5) (expressly defining the term "product" as "any *tangible* object or goods produced." (emphasis added)); *see, e.g.*, *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1135 (6th Cir. 1986) (applying Tennessee law) (instruction manual for a personnel hoist is not a product; "'Product' means any tangible object or goods produced," and "the warnings and instructions themselves" could not constitute "a 'product.'" (quoting Tenn. Code Ann. § 29-28-102(5)). |
| | **Negligence per se:** No negligence per se absent legislative intent to impose private civil liability. *See Faber v. Ciox Health, LLC*, 331 F. Supp. 3d 767, 778–79 (W.D. Tenn. 2018) ("'[T]he determination of whether negligence *per se* claims are actionable under a *certain* statute has been found to be 'analytically related' to whether an implied private right of action exists under a legislative enactment.' . . . [T]he Court is not convinced that Tennessee law permits a private action based upon a violation of the immense federal regulatory framework that is HIPAA." (citations omitted)), *aff'd*, 944 F.3d 593 (6th Cir. 2019). |

79

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

| | |
|---|---|
| TX | **Not a product:** *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803 (S.D. Tex. 1983) ("The Court is aware of no court which has held that the content of a magazine or other publication is a product within the meaning of § 402A of the Second Restatement of Torts. Rather, they have held to the contrary."); *see also, e.g.*, *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at *14 (S.D. Tex. Mar. 3, 1997); *Way v. Boy Scouts of Am.*, 856 S.W.2d 230 (Tex. Ct. App. 1993). |
| | **Negligence per se:** No negligence per se absent an underlying duty at common law. *See Perry v. S.N.*, 973 S.W.2d 301, 309 (Tex. 1998) (courts must consider "whether the statute is the sole source of any tort duty from the defendant to the plaintiff or merely supplies a standard of conduct for an existing common law duty."). And "[n]egligence *per se* is not a separate cause of action that exists independently of a common-law negligence cause of action." *Thomas v. Uzoka*, 290 S.W.3d 437, 445 (Tex. Ct. App. 2009). |
| UT | **Not a product:** *Legal Tender Servs. PLLC v. Bank of Am. Fork*, 506 P.3d 1211, 1220 (Utah App. Ct. 2022) (concluding that a website payment portal "does not qualify as . . . a product for purposes of a product liability claim," because it is neither "a movable good" nor "an item of 'tangible personal property'" (quoting Restatement (Third) § 19)). |
| | **Negligence per se:** Several limitations. *First*, no negligence per se based on a "federal statute which lack[s] a private right of action." *Mitchell v. Wells Fargo Bank*, 355 F. Supp. 3d 1136, 1157 (D. Utah 2018). *Second*, courts suggest that negligence per se can only be based on statutes dealing "with dangerous instrumentalities." *Id.* at 1158. *Third*, no negligence per se absent an underlying duty at common law. *See Miller v. Gastronomy, Inc.*, 110 P.3d 144, 148–49 (Utah Ct. App. 2005). *Fourth*, violation of a statute is evidence of negligence, not negligence per se. *Hansen v. Eyre*, 116 P.3d 290, 293 (Utah 2005). |
| VT | **Not a product:** *Darling v. Cent. Vt. Public Serv. Corp.*, 762 A.2d 826, 828 (Vt. 2000) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** Rejects negligence per se approach in favor of the "prima facie negligence" doctrine, which requires an underlying duty at common law. *Sheldon v. Ruggiero*, |

80

DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

| | |
|---|---|
| | 202 A.3d 241, 249 (Vt. 2018) ("Where a plaintiff seeks to use a safety statute as the standard of care under the prima facie negligence rule, there must be an existing duty recognized by the common law."); *see also id.* at 248 n.6 ("This 'prima facie negligence' doctrine is different from the negligence per se rule."). |
| VA | **Not a product:** *Shoemaker v. Funkhouser*, 856 S.E.2d 174, 178 (Va. 2021) (looking to Second Restatement on product liability issue). |
| | **Negligence per se:** "[N]egligence per se only exists 'where there is a common-law cause of action.'"  *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 261 n.18 (Va. 2019) (citation omitted). |
| WA | **Not a product:** *Quinteros v. InnoGames*, 2022 WL 898560, at *7 (W.D. Wash. Mar. 28, 2022) (applying Washington law) (dismissing claim against creator of allegedly "psychologically addictive" "mobile app" game because it was "not a product"); *see also Taylor v. Intuitive Surgical, Inc.*, 389 P.3d 517, 523 (Wash. 2017) (explaining that Washington law "closely mirrors the Restatement (Second) of Torts § 402A"). |
| | **Negligence per se:** "[V]iolation of a statute or the breach of a statutory duty is not considered negligence *per se*" but rather "as evidence of negligence."  *Veridian Credit Union v. Eddie Bauer, LLC*, 295 F. Supp. 3d 1140, 1151 (W.D. Wash. 2017). |
| WV | **Not a product:** *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854, 856 (W. Va. 1982) (looking to California law and Second Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se absent legislative intent to impose civil liability. *See Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 591 S.E.2d 235, 239 (W. Va. 2003) (courts must consider "legislative intent, express or implied, to determine whether a private cause of action was intended" (citation omitted)).  And violation of a statute is evidence of negligence, not negligence per se. *Gillingham v. Stephenson*, 551 S.E.2d 663, 670 (W. Va. 2001). |
| WI | **Not a product:** *Kawczynski v. Am. Coll. of Cardiology*, 2016 WL 2770552, at *2 (W.D. Wis. May 13, 2016) ("The focus of products liability law is on tangible items, not intangible ideas or abstract concepts . . . ." (citing Restatement (Third) § 19)). |

81

| | |
|---|---|
| | **Negligence per se:** No negligence per se absent "some expression of legislative intent that the statute become a basis for the imposition of civil liability." *Raymaker v. Am. Fam. Mut. Ins. Co.*, 718 N.W.2d 154, 159 (Wis. Ct. App. 2006) (citation omitted). |
| WY | **Not a product:** Wyo. Stat. Ann. § 34.1-2.A-216, Editors' Notes ("This Article does not purport to change the development of the relationship of the common law, with respect to products liability, including strict liability in tort (as restated in Restatement (Second) of Torts, § 402A (1965)), to the provisions of this Act."); *see also Ogle v. Caterpillar Tractor Co.*, 716 P.2d 334, 341 (Wyo. 1986) (adopting Second Restatement on product liability issue). |
| | **Negligence per se:** No negligence per se absent a simple and definite statutory standard of care.  *Otten v. BNSF Ry. Co.*, 2023 WL 1948626, at *11 (10th Cir. Feb. 13, 2023) ("[N]egligence per se should not be applied to the violation of a regulation" where "the facts of the specific case 'represent a conglomeration of circumstances' such that a jury would have to make multiple findings to assess the applicability of the regulation." (quoting *Short v. Spring Creek Ranch, Inc.*, 731 P.2d 1195, 1198 (Wyo. 1987))). |