JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone:	(415) 512-4000
Facsimile:	(415) 512-4077

ROSE LEDA EHLER (State Bar No. 296523)
Rose.Ehler@mto.com
VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:	(213) 683-9100
Facsimile:	(213) 687-3702

LAUREN BELL (*pro hac vice*)
Lauren.Bell@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Avenue NW, Suite 500 E
Washington, DC 20001
Telephone:	(202) 220-1100
Facsimile:	(202) 220-2300

*Attorneys for Defendant Snap Inc.*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION, <br><br> THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | MDL No. 3047 <br><br> Case No. 4:22-MD-03047-YGR-TSH <br><br> Honorable Yvonne Gonzalez Rogers <br><br> **DEFENDANT SNAP INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF DEFENDANTS' JOINT MOTION TO DISMISS PURSUANT TO RULES 12(b)(1) AND 12(b)(6) PLAINTIFFS' PRIORITY CLAIMS ASSERTED IN AMENDED MASTER COMPLAINT (DKT. 237)** <br><br> **Hearing**: <br> Date:	TBD <br> Time:	TBD <br> Place:	Oakland, California <br> Judge:	Hon. Yvonne Gonzalez Rogers |

## I. INTRODUCTION

When the JPML created this MDL, it acknowledged that this Court "can address unique issues" for each Defendant through "separate motion[s]." Transfer Order, 4:22-MD-03047, Dkt. 1, at *2. Consistent with this Court's Case Management Order No. 5, Snap files this individual brief to highlight issues unique to Snap that should be considered in deciding whether Plaintiffs have stated a viable claim for relief against it. Case Management Order No. 5, Dkt. 164 at 2.

While Defendants' Joint Motion to Dismiss makes clear that Plaintiffs have failed to plead a claim against any Defendant, the pleading deficiencies are particularly pronounced as to Snap. Snapchat, the app offered by Snap, is fundamentally different from the other platforms involved in this litigation. Unlike these other platforms, Snapchat is primarily used for direct communication between people who already know each other in real life. As Plaintiffs' allegations concede, Snapchat does not open to a feed of algorithmically amplified and unvetted content, but rather to the user's own camera. Am. Master Compl. (AMC), Dkt. 234-1, ¶ 130 (alleging that only "Meta, TikTok, and YouTube use engagement-optimized algorithms to control users' main feeds"); *cf.* ¶¶ 227, 294, 615. Snapchat also does not have "like counts" (public counts displaying the number of users who signaled a positive reaction to a post) or other public vanity metrics. *Id.* ¶ 87 (describing "[t]he 'Like' feature on Facebook, Instagram, TikTok, and YouTube"). Indeed, far from encouraging minor users to create permanent content for public consumption, Snapchat messages (called "Snaps" or "Chats") are designed to be ephemeral—meaning that they disappear a short time after they are read or viewed. *Id.* ¶ 499. Snapchat's default ephemerality is designed to mirror real-life interactions: just as friends speaking in person do not typically record and broadcast their conversations, Snapchat messages allow friends to speak freely without the pressure that comes from interacting on traditional "social media" where most interactions are publicized and memorialized. *Id.* ¶ 444. Moreover, Snap has always made profiles for minor users, who must be 13 or older to access the app, private by default and not publicly searchable. *Id.* ¶ 139 (alleging only that other platforms previously had default public profiles that "le[ft] minors broadly exposed to adult strangers").

These distinctions are critical to assessing whether Plaintiffs have stated a viable claim against Snap.  For all of their priority claims, Plaintiffs must plead that they have suffered physical or serious emotional harms and connect those alleged harms to specific Snapchat features.  *See, e.g.*, *Garland v. Orlans, PC*, 999 F.3d 432, 439–40 (6th Cir. 2021).  Plaintiffs have failed to do so.  Where Plaintiffs have alleged any severe physical or emotional injuries connected to interactions on Snapchat, those harms stem from intentional misconduct by third-party bad actors that cannot be legally attributed to Snap.  Once all of the allegations pertaining to third-party bad actors are stripped away, the Master Complaint's allegations against Snap consist of nothing more than arguments that various Snapchat features (*e.g.*, push notifications when a friend sends a message, an icon signaling that two friends are on a "streak" in communicating with each other, or the ability to decorate photos and videos with filters) are appealing to minors, or at most, cause some combination of stress, anxiety, or purportedly compulsive use—none of which is sufficiently severe to be cognizable.  Finding Snap liable based on Plaintiffs' theory of harm would be akin to holding any communications provider liable because it has created a medium that people enjoy using to stay in touch with friends.  *See Taveras v. Resorts Int'l Hotel, Inc.*, 2008 WL 4372791, at *4 (D.N.J. Sept. 19, 2008) (rejecting theory based on inciting compulsive use because it "would, in effect, have no limit" and "impose a duty on shopping malls and credit-card companies to identify and exclude compulsive shoppers").  For these reasons, and those in the Joint Motion to Dismiss, Plaintiffs' priority claims against Snap should be dismissed.

## II.  BACKGROUND

While Plaintiffs attempt to plead an amorphous theory of "addiction" to "social media" generally, the Master Complaint's specific allegations make clear that there are important differences among the platforms at issue in this litigation.  Although the Master Complaint begins with more than 30 pages of allegations that Plaintiffs claim are "applicable to all Defendants," AMC at p. 12, Plaintiffs concede that Snapchat does not have many of the core "social media" features that they emphasize in the Master Complaint.  For instance, Plaintiffs concede that Snapchat does not use "engagement-optimized algorithms to control users' main feeds."  *Id.* ¶ 130 (asserting this allegation only against the other Defendants).  Nor does Snapchat have publicly viewable "Likes."  *Id.* ¶ 87.

And the profiles of minor users have always been private by default on Snapchat. *Id.* ¶¶ 138–39.[1] When ruling on the Joint Motion to Dismiss, the Court should thus ignore the misleading subheading claiming that paragraphs 54–180 of the Master Complaint contain "allegations applicable to all Defendants" and review only the allegations actually asserted against Snap.

The Snap-specific allegations make clear that Snapchat is fundamentally different from the other platforms. As described in the Master Complaint, Snapchat is "'a camera application that was created to help people communicate through short videos and images.'" *Id.* ¶ 438. Its "central and defining feature, the 'Snap,' allows users to send and receive ephemeral, or 'disappearing,' audiovisual messages" to their friends in private conversations. *Id.* ¶ 444. Snaps disappear by default after being opened to "allow users to show a more authentic, unpolished, and spontaneous side of themselves." *Id.* Unlike other platforms, which focus on broadcasting content to many users at once and open to a feed of algorithmically promoted content, Snapchat is used primarily for one-on-one or small group messaging among friends (more akin to one-on-one text messaging or group chats). Snapchat does not open to a feed of content created by others, but rather to the user's own camera. *Cf. id.* ¶ 130. This camera-forward design is intentional and reflects the way that the vast majority of users engage with Snapchat: rather than continuously scrolling streams of recommended, unmoderated content created by others, Snapchat users are encouraged to engage in direct communication by sharing snapshots of their life with people they already know.

Even as Snap has added new features, it has remained dedicated to its core focus on privacy rather than public performance and response. Since October 2013, users have been able to compile photos and videos into Snapchat "Stories" available for 24 hours, which by default are viewable only by a user's friends. *Id.* ¶ 491. There are no "likes" for Stories or even public view counts (only the poster of the Story can see who has viewed it). *Id.* ¶ 492. Snap's recently introduced

---

[1] In the original version of the Master Complaint, Plaintiffs falsely asserted that all Defendants have publicly viewable "Like" counts and default public profiles for minors that allegedly "supply sexual predators with detailed background information about children." *See* Master Compl., Dkt. 138 ¶¶ 86–87, 134, 138–39. After receiving a letter from Snap explaining why these allegations were inconsistent with their obligations under Federal Rule of Civil Procedure 11, Plaintiffs amended the Master Complaint to make clear that Snap does not, in fact, have these features. *See* AMC ¶¶ 86–87, 134, 138–39.

feature "Spotlight," which "allows users to make videos that anyone can view," also does not include public "like counts." *Id.* ¶ 496.  As noted, Snapchat does not open to Stories, Spotlight, or any other feed of content, and videos on Spotlight are moderated by Snap.  *Id.* ¶¶ 130, 496.[2]

Because many of the traditional "social media" features emphasized in the Master Complaint do not exist on Snapchat, the Snap-specific section of that Complaint largely focuses on alleged "rewards" that users get for communicating on the app, like Charms or Snap Streaks, which are viewable only to the two people involved in the conversation and encourage the direct peer-to-peer communications for which Snapchat is best known.  *Id.* ¶¶ 476–77, 480–81.  The Master Complaint also alleges that Snapchat users receive a "Snapscore," which correlates to how often they use Snapchat.  *Id.* ¶ 471.  Likewise, the Master Complaint references alleged "custom-designed lenses and filters" that users can apply to their Snaps (the most popular of which have included puppy dog ears, rainbows coming out of mouths, or effects to make it look like the user is experiencing certain exaggerated emotions).  *Id.* ¶ 513.  Without acknowledging the positive aspects of these features—for example, that a shy teenager who is otherwise reluctant to reach out and stay connected to friends may find it easier to do so to share a funny Snap filter—Plaintiffs contend that these features cause "compulsive use" or "anxiety."  *Id.* ¶¶ 468–87.  But, aside from conclusorily asserting that all "social media" is capable of causing a broad array of alleged harm, *e.g.*, *id.* ¶¶ 5, 15, 18, the Master Complaint does not tie these features to the severe emotional and physical harms necessary to support Plaintiffs' priority claims.[3]

Plaintiffs also devote a number of paragraphs to alleged harms that can be caused by third

---

[2] Many of the wrongful death plaintiffs in this action passed away before Spotlight was introduced in November 2020.  *See* AMC ¶ 496.

[3] Plaintiffs also frequently provide examples of conduct relevant only to one Defendant but include conclusory assertions that these actions can be attributed to each of the four separate companies who operate the apps at issue in this case.  *See, e.g.*, AMC ¶ 99 (alleging that "[e]ach Defendant has long been aware of" research demonstrating social media is addictive but "chose to ignore or brush it off" yet citing no examples involving Snap); ¶ 128 (similar); ¶ 150 (similar); ¶ 85 & n.52 (alleging that "Defendants' apps addict young users by preying on their already-heightened need for social comparison and interpersonal feedback-seeking," but citing a study that does not address Snapchat); ¶ 88 & nn.60–61 (similar); ¶¶ 89 n.64, 90 n.65 (similar, citing two studies that do not address Snapchat).

parties who abuse Snapchat's communication tools, such as child exploitation, bullying, or drug dealing. *Id.* ¶¶ 500–01, 504–05, 507, 523–25, 528–30. While Plaintiffs' original Master Complaint incorrectly alleged that Snapchat had default public profiles for minors that "suppl[ied] sexual predators with detailed background information" and "put children at risk of being approached and befriended by sexual predators," Master Compl. ¶¶ 138–39, following a Rule 11 letter from Snap, Plaintiffs amended to make clear that Snapchat does *not*, in fact, have these features. AMC ¶¶ 138–39. The Master Complaint acknowledges that Snapchat profiles for minors have always been private by default and, thus, Snapchat cannot be alleged to be designed to increase the risk of predators or other bad actors learning which users are minors and meeting them for the first time.

## III.  ARGUMENT

### A.  Plaintiffs Cannot Rely on Allegations Applicable to Other Defendants to Plead a Claim Against Snap

Under Rule 8, "Plaintiffs must identify what action each Defendant took that caused Plaintiffs' harm, without resort to generalized allegations against Defendants as a whole." *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018) (quotation marks and citation omitted); *see also* Case Management Order No. 1, Dkt. 75 at 4 (ordering that the "[M]aster Complaint shall provide facts concerning each individual defendant and that defendants' purported liability"). This is because there must be a "sufficient nexus" or connection between the alleged injuries and each defendant's conduct. *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 857 (N.D. Cal. 2012). Accordingly, courts consistently have held that to survive a motion to dismiss, a complaint must connect its alleged harms to *specific acts* of a *specific defendant*. *See, e.g.*, *id.* at 857 (dismissing claim where "plaintiffs did not allege a sufficient nexus" between the specific alleged defect and the resulting harm because "they failed to explain how" this defect caused the harm); *Ferrari v. Nat. Partner, Inc.*, 2017 WL 76905, at *6 (N.D. Cal. Jan. 9, 2017) (complaint must "provide supporting facts that 'explain how the particular design' of the product caused Plaintiff's alleged harm"). In ruling on the Joint Motion to Dismiss, therefore, the Court should disregard the generalized allegations that seek to homogenize Snap and other Defendants and focus only on the allegations actually asserted against Snap.

### B. The Specific Allegations as to Snap Allege Only Harms Resulting from Third-Party Content or Non-Cognizable Harms, and Thus Fail to State a Claim

While Plaintiffs' allegations fail to state a claim against any Defendant, the pleading deficiencies as to Snap are particularly acute. All of Plaintiffs' priority claims require allegations of physical or *severe* emotional harm. *See* Restatement (Second) of Torts § 402A (strict products liability requires "physical harm . . . caused to the ultimate user or consumer, or to his property"); *Jimenez v. Superior Ct.*, 29 Cal. 4th 473, 482 (2002) ("[R]ecovery under the doctrine of strict liability is limited solely to 'physical harm to person or property.'"); The Law of Torts § 390 (2d ed.) ("[M]ost courts hold that the plaintiff can recover [under negligence law] only if a normally constituted person would suffer, and the plaintiff in fact suffered severe distress.").[4] But in the only instances where Plaintiffs have alleged physical or sufficiently serious emotional injuries connected to interactions on Snapchat, those theories of harm are tied to injuries allegedly caused by third-party bad actors who abused Snapchat to commit intentional, wrongful conduct; such harms caused by third parties cannot be attributed to Snap as a matter of law. For the remaining challenged Snapchat features, Plaintiffs' only theories of harm are based on allegations of compulsive use, anxiety, stress, or other general negative feelings—none of which are actionable under negligence or strict product liability theories.

### 1. To the Extent Plaintiffs Allege Any Severe Harms as to Snap, These Harms Are Caused by Third Parties and Cannot Be Attributed to Snap

Apart from some conclusory passing references to filters and challenges (which are implausible on their face, *see* n.7, *infra*), the only sufficiently severe injuries at all related to Snapchat in the Master Complaint are alleged to be caused by third parties' criminal or otherwise

---

[4] *See also* 38 Am. Jur. 2d § 11 (requiring "severe emotional distress that manifested itself through severe mental or physical symptoms"); Restatement (Third) of Torts § 47 (2012) (requiring "serious emotional harm"); *see also, e.g.*, *Burgess v. Superior Ct.*, 2 Cal.4th 1064, 1072 (1992); *Sibley v. St. Albans School*, 134 A.3d 789, 797-98 (D.C. Ct. App. 2016); *Florida Dept. of Corrections v. Abril*, 969 So.2d 201, 206 (Fla. 2007); *Hamilton v. Powell, Goldstein, Frazer, & Murphy*, 252 Ga. 149, 150 (1984); *Lanier v. President and Fellows of Harvard College*, 490 Mass. 37, 44 (2022); *Johnson v. State*, 37 N.Y.2d 378, 381–82 (Ct. App. 1975); *Philibert v. Kluser*, 360 Or. 698, 702 (2016); *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993).

wrongful misuse of the app and therefore cannot be attributed to Snap as a matter of law.[5]  *See, e.g.*, AMC ¶¶ 499-501 (alleging that Snaps "can lead to sexual exploitation"); ¶¶ 528–29 (alleging that Snapcash, a now-defunct "peer-to-peer mobile payment service," "enabled CSAM and other sexual exploitation"); ¶ 530 (alleging that in-app voice and video calling "allows predators to call and video chat with minors in private" and "prey on the child's vulnerabilities"); ¶¶ 504–05 (alleging that My Eyes Only, which allows users to protect content "in a special tab that requires a passcode," "increases the risk that Snapchat's adolescent users . . . will be targeted and sexually exploited and/or trafficked by child predators"); ¶ 506–07 (alleging that Snap Map "provides strangers with [minors'] locations, exposing [them] to potential harm").[6]  As explained in the Joint Motion to Dismiss, merely creating the alleged "conditions" that allow third-party criminal conduct to occur does not suffice to plead liability.  *See* Joint Motion to Dismiss ("Joint Motion"), Dkt. 237 at 43–47.  Because the types of severe harms necessary to support Plaintiffs' priority claims are only linked to Snapchat via third-party misuse of the platform, Plaintiff cannot hold Snap liable for these claims.

### 2. The Snap-Specific Allegations Do Not Allege the Severe Emotional or Physical Harms That Are Legally Required

#### (a) *Allegations of Stress or Anxiety Are Not Legally Cognizable*

For nearly all of the remaining challenged Snapchat features, Plaintiffs at most allege anxiety, stress, or other emotional harms that do not rise to an actionable level.  As the Sixth Circuit explained in *Garland*, in surveying the Restatement and state common law, "a general allegation of emotional harm like anxiety or distress falls 'short of cognizable injury as a matter of general tort law,' because 'liability [for emotional harm] arises' '*only* where it is extreme.  A bare anxiety allegation says nothing about severity.  Someone who feels slightly nervous has not suffered the

---

[5] Moreover, Snapchat does not even have many of the features Plaintiffs allege lead to such third-party harms.  For example, as Plaintiffs recognized in amending their Master Complaint, Snapchat does not have default public profiles for minors and thus does not supply predators with detailed background information on minors they do not know.  AMC ¶¶ 138–39.

[6] Plaintiffs also allege that some of these features (*i.e.*, Snap Map) cause "feelings of sadness and anxiety."  AMC ¶ 507.  These allegations are insufficient to state a claim for the reasons stated herein.  *See* Section III.B.2.a, *infra*.

type of severe emotional harm cognizable at common law.  Were that so, 'everyone would have standing to litigate about everything.'"  999 F.3d at 439–40 (alteration in original) (citing Restatement (Second) of Torts § 46 cmt. j; *Brunett v. Convergent Outsourcing, Inc.*, 982 F.3d 1067, 1068 (7th Cir. 2020)); *see also Scherr v. Hilton Hotels Corp.,* 168 Cal. App. 3d 908, 911 (1985) (creating "stressful" experience is "insufficient to cause legally cognizable harm, for the stress has not yet ripened into disabling shock"); *Callahan v. Ancestry.com Inc.*, 2021 WL 2433893, at *4 (N.D. Cal. June 15, 2021) (for negligence claim, "mental anguish . . . alone . . . is not injury in fact"); *Pennell v. Global Trust Management, LLC*, 990 F.3d 1041, 1045 (7th Cir. 2021) ("Nor does stress by itself with no physical manifestations and no qualified medical diagnosis amount to a concrete harm" for negligence claim).

Yet, for most of the Snapchat features highlighted in the Master Complaint, Plaintiffs allege only that they cause generalized emotional harms, such as stress, anxiety, sadness, or other "negative" feelings.  For instance, Plaintiffs conclusorily allege that Snapchat's Charms feature "exacerbates social-comparison harms and undermines self-esteem," AMC ¶ 477; that "Snap Streaks contribute to feelings of social pressure and anxiety," "feelings of betrayal," and "'negative' feelings," *id.* ¶ 485; and that Snap Map "causes feelings of sadness and anxiety for some users," *id.* ¶ 507.  Snap strongly disagrees with these assertions.  But even accepting them as true for purposes of this motion, none of these alleged harms connected to Snapchat are sufficiently severe to be cognizable and thus cannot support Plaintiffs' claims.[7]

---

[7] Plaintiffs' limited attempts to link particular Snapchat features and attributes—namely, lenses, filters, and "challenges"—to more severe alleged harms—body dysmorphia and physical injuries—also fail.  AMC ¶¶ 132, 497, 513–19.  The operative pleadings contain no allegations that *any* Plaintiff has ever used or encountered any of these features on Snapchat, let alone been harmed by them.  Indeed, Plaintiffs do not even allege that any particular challenge videos, much less dangerous ones, were ever on Snapchat's content feeds, Spotlight and Discover.  The absence of specific allegations about challenges on Snapchat's content feeds makes sense given that, as Plaintiffs acknowledge, Snap moderates its content feeds, making videos depicting dangerous challenges less likely to proliferate.  *Id.* ¶¶ 496–97.  And the only study about body dysmorphia linked to Snapchat filters and lenses that Plaintiffs cite does not conclude those features cause dysmorphia or affect self-esteem; rather, it only finds that the use of filters and lenses may be associated with increased acceptance of cosmetic surgery.  *Id.* ¶ 515 n.649.

### *(b)* *Allegations of "Addiction" Are Legally Insufficient*

Likewise, the only harm alleged as to the vast majority of the remaining challenged Snapchat features is that they cause addiction or compulsive use. For example, Plaintiffs allege that push notifications—notices sent to the user's phone when, for example, someone sends them a message—lead to compulsive use of Snapchat. *See id.* ¶¶ 468–69, 488. Plaintiffs make similar allegations regarding certain features that "reward" users for communicating with friends (Snapscores, Snap Streaks, Trophies, and Charms); features that permit users to decorate their photos or videos (Stickers, emojis, animations); Stories (which allows users to share content with their friends); and Snap's curated or moderated content feeds (*e.g.*, Spotlight), which Plaintiffs do not claim are the central feature of the app, *id.* ¶ 444. *See id.* ¶¶ 468, 472–74, 477, 478, 480, 482, 485, 492, 495–96. For yet other features, Plaintiffs do not even allege that they lead to addiction, focusing instead only on how the features allegedly make Snapchat more appealing to younger users. *See, e.g.*, *id.* ¶ 457 (Snap's use of "bright colors" and "cartoonish designs" appeals to younger users); ¶ 462 (SnapKidz "normalized and acclimatized children to using Snapchat").[8]

As explained in the Joint Motion to Dismiss, however, courts have consistently rejected arguments that businesses can be held liable simply for offering popular services that some people overuse, finding that this theory of liability would, "in effect, have no limit." *Taveras*, 2008 WL 4372791, at *4. Indeed, if this theory of liability were accepted, anyone from Hollywood studios to apparel companies could be held liable for people's "addiction" to things like television or shopping. Of course, that is not the law. *See, e.g., Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 200, 202-03 (S.D. Fla. 1979) (rejecting liability where plaintiff alleged minor "bec[a]me involuntarily addicted to and 'completely subliminally intoxicated' by the extensive viewing of television violence offered by the three defendants"); *Watters v. TSR, Inc.*, 904 F.2d 378, 381, 384 (6th Cir. 1990) (rejecting plaintiff's attempt to impose liability on maker of parlor game Dungeons & Dragons, holding that there was "no way of knowing" if the minor "would not have committed

---

[8] Features of this sort are present in products and services across the technology and entertainment industries. Accepting Plaintiffs' theories of liability regarding such features would create boundless litigation risks and liability. *See, e.g.*, *Modisette v. Apple Inc.*, 30 Cal. App. 5th 136, 152 (2018) (rejecting duty for common features given "potentially sweeping implications").

suicide" but for his compulsive playing of the game); *Stevens v. MTR Gaming Grp., Inc.*, 237 W. Va. 531, 538 (2016) (finding "no duty of care . . . exist[ed] on the part of manufacturers of video lottery terminals, or the casinos in which the terminals [were] located, to protect users from compulsively gambling"); *see also* Joint Motion at 31–33 (collecting authorities).  Thus, these allegations also cannot support Plaintiffs' claims against Snap.

## IV.     CONCLUSION

For the reasons stated herein, and those in Defendants' Joint Motion to Dismiss, Snap respectfully requests that this Court dismiss Plaintiffs' priority claims against Snap.

DATED:  April 17, 2023

MUNGER, TOLLES & OLSON LLP
JONATHAN H. BLAVIN
ROSE LEDA EHLER
VICTORIA A. DEGTYAREVA
LAUREN BELL

By:     */s/ Jonathan H. Blavin*
JONATHAN H. BLAVIN
Attorneys for Defendant SNAP INC.