[*Submitting Counsel on Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 4:22-md-03047-YGR<br><br>MDL No. 3047 |
| This Document Relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**<br><br>Judge Yvonne Gonzalez Rogers |

1

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS....................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................... iv

I.     INTRODUCTION ................................................................................ 1

II.    SUMMARY OF FACTUAL ALLEGATIONS...................................... 2

    A.    Defendants make products. ....................................................... 3

    B.    Defendants' products are defective. ......................................... 4

        1.    Defendants' products are designed to addict children and teens through defects that inflict serious mental health harms. ...................................... 4

        2.    Defendants' products lack meaningful age verification......................... 10

        3.    Defendants' products lack meaningful parental controls, making it impossible for parents to protect their children. ...................................... 11

        4.    Defendants' products connect children to predators and provide tools that foreseeably create a means for predators to groom and abuse kids. ....... 12

    C.    Defendants' products hurt kids—and Defendants know it. .......................... 14

    D.    Defendants failed to warn the public about their products' defects.............. 17

III.    LEGAL STANDARDS........................................................................ 18

IV.    ARGUMENT ...................................................................................... 20

    A.    Plaintiffs sufficiently plead product liability claims. .................................... 20

        1.    Products liability law applies to Defendants' defective apps................. 21

        2.    As digital product makers, Defendants cannot exempt themselves from products liability law........................................................................ 23

            a.    Tangibility is not a prerequisite to products liability.................... 24

            b.    There is no blanket exception for so-called "communication service providers."........................................................................ 27

        3.    The defective design features in Defendants' apps are nothing like content in books, shows, music, or games. ............................................. 29

        4.    Public policy confirms strict products liability is appropriate here. ....... 31

    B.    Plaintiffs sufficiently plead product-based negligence claims..................... 35

        1.    Defendants owe Plaintiffs a duty to design reasonably safe products and to warn about the risks posed by their products...................................... 35

            a.    Defendants foreseeably harmed Plaintiffs. ................................. 36

            b.    Defendants identify no reason for the Court to limit their duty. .. 38

               i.    Defendants ignore the traditional public policy factors, which compel a finding of duty here................................ 40

    ii. Plaintiffs do not seek a remedy that would infringe free expression.................................................................... 43

    iii. There is no special exemption in negligence for addiction.44

   c. Defendants owe a heightened duty of care to children................. 45

   d. Defendants' duty to Plaintiffs does not depend on the existence of a special relationship. ................................................... 46

  2. Plaintiffs sufficiently plead Defendants proximately caused Plaintiffs' injuries.  .................................................................... 49

  a. Plaintiffs allege facts supporting proximate cause for each Defendant. . 49

  b. Third-party conduct does not absolve Defendants of blame for their defective design choices......................................................... 52

 C. Plaintiffs sufficiently plead their negligence per se claim. .......................... 55

  1. COPPA and the PROTECT Act are proper bases for Plaintiffs' negligence per se claim. ........................................................... 56

  2. Plaintiffs' negligence per se claim is cognizable by this Court. ............. 58

  3. The vast majority of jurisdictions allow Plaintiffs' negligence per se claim.  ................................................................... 59

  4. COPPA and the PROTECT Act support a negligence per se claim. ...... 59

   a. COPPA ........................................................................ 60

    i. COPPA applies to Defendants because their apps are "directed to children." ....................................................... 60

    ii. COPPA applies to Defendants because they have "actual knowledge" that they collect personal information from children under 13................................................................ 63

    iii. Plaintiffs plausibly allege Defendants violated COPPA.... 64

   b. The PROTECT Act ........................................................ 67

 D. Snap's additional arguments should be rejected. ......................................... 71

  1. Snapchat has the same material defects as the other Defendants' products.  ................................................................... 71

   a. Snapchat uses an algorithmically generated feed. ...................... 73

   b. Snapchat has multiple features comparable to the "Like" button. 74

   c. Snapchat recommended that minors connect with adults and incentivized them to do so. ........................................................ 75

  2. Snap's additional legal arguments are meritless. ................................... 75

V. CONCLUSION ................................................................................. 76

APPENDIX ................................................................................................ 77

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*A.B. v. Salesforce.com, Inc.*, 2021 WL 3616097 (S.D. Tex. Mar. 22, 2021)................................. 54

4

*Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill.2d 386 (Ill. 1999) .............................................84

5

*A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814 (D. Or. 2022)..................... 20, 21, 27, 30, 31, 94

6

*ACI Worldwide Corp. v. KeyBank Nat'l Ass'n*, 2020 WL 1025418 (D. Mass. Feb. 28, 2020)......88

7

*Adams v. BRG Sports, Inc.*, 2018 WL 4853130 (N.D. Ill. Oct. 5, 2018) ...............................51, 52

8

*Adel v. Greensprings of Vt., Inc.*, 363 F. Supp. 2d 692 (D. Vt. 2005) ……………………...……92

9

*Air & Liquid Systems Corp. v. DeVries,* 139 S. Ct. 986 (2019).................................................. 1, 35

10

*Agric. Servs. Ass'n v. Ferry-Morse Seed*, 551 F.2d 1057(6th Cir. 1977) ......................................96

11

*Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215 (10th Cir. 1991).............................................85

12

*Alexander v. Montana-Dakota Utils. Co.*, 2020 WL 6262101 (D. Mont. Oct. 23, 2020) ………90

13

*Allen v. Delchamps*, 624 So. 2d 1065 (Ala. 1993)......................................................................... 77

14

*Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166 (Pa. 2000)....................................................... 40

15

*Am. Bus. Info., Inc. v. Egr*, 650 N.W.2d 251 (Neb. 2002)……………………………………..90

16

*Anastasio v. Kahn*, 2010 WL 114879 (E.D. Pa. Jan. 13, 2010) ....................................................95

17

*Anderson v. TikTok, Inc.*, 2022 WL 14742788 (E.D. Pa. Oct. 25, 2022) .................................... 44

18

*Andrewjeski v. Bimbo Foods Bakeries Distrib., LLC*, 2019 WL 2250068 (D. Kan. May 24, 2019)

19

………………………………………………..........………………………..........................86

20

*Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 214 W. Va. 677 (Va. 2003) ......................................99

21

*Ashton Park Trace Apts., LLC v. City of Decatur*, 2015 WL 12469074 (N.D. Ga. July 16,

22

2015)…………………………………………………………….…………...83

23

*Ass'n Unit of Owners of Bridgeview Condo. Ass'n v. Dunning*, 69 P.3d 788 (Or. App. 2003) .....94

24

*Back v. Wickes Corp.*, 375 Mass. 633 (1978)………………………………………............88

25

*Bacon v. Lascelles*, 678 A.2d 902 (Vt. 1996) ...............................................................................98

26

*Bagelmann v. First Nat. Bank*, 823 N.W.2d 18 (Iowa 2012) .......................................................85

27

*Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41 (D. Mass. 1994)………………........88

28

*Barhem v. Knickrehm*, 661 N.E.2d 1166 (Ill. App. Ct. 1996) ....................................................... 41

*Barnard v. Hyper Ice, Inc.*, 2023 WL 3432256 (C.D. Cal. Mar. 24, 2023).................................. 55

*Bartsch v. Costello*, 170 So. 3d (Fla. Dist. Ct. App. 2015)………………………………………..84

*Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024 (N.D. Cal. 2019) ................................................... 38

*Baten v. McMaster*, 967 F.3d 345 (4th Cir. 2020) ....................................................................... 18

*Beattie v. Beattie*, 786 A.2d 549 (Del. Super. Ct. 2001).............................................................. 22

*Bell v. Alpha Tau Omega Fraternity*, 98 Nev. 109 (1982)………………………………….……….91

*Bellamy v. Fed. Exp.*, 749 S.W.2d 31 (Tenn. 1988) .................................................................... 96

*Bentonville Sch. Dist. v. Sitton*, 643 S.W.3d 763 (Ark. 2022) .................................................... 32

*Berkeley Pump Co. v. Reed-Joseph Land Co*………………………………………………………80

*Bernier v. Raymark Indus., Inc.*, 516 A.2d 534 (Me. 1986)………………………………………...87

*Bhardwaj v. 24 Hour Fitness*, 2002 WL 373563,(Cal. Ct. App. Mar. 8, 2002) .............................81

*Bill v. Super. Ct.*, 137 Cal. App. 3d 1002 (Cal. Ct. App. 1982 ............................................... 44, 47

*Bittle v. Brunetti*, 750 P.2d (Colo. 1988)…………………………………………………………....82

*Birmingham v. Fodor's Travel Pubs. Inc.*, 833 P.2d 70 (Haw. 1992) ..................................... 30, 83

*Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560 (E.D.N.Y. 1999)

...................................................................................................................................... 41, 83

*Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. 2007) ............................................... 22

*Bolger v. Amazon.com, LLC*, 267 Cal. Rptr. 3d (Cal. Ct. App. 2020) …………………………….81

*Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268, 273 (Mont. 1973)........... 34, 90

*Brewer v. PACCAR, Inc.*, 124 N.E.3d 616 (Ind. 2019) ................................................................85

*Brickman v. Maximus*, 2022 WL 16836186 (S.D. Ohio May 2, 2022) .........................................93

*Brookes v. Lyft, Inc.*, 2022 WL 19799628 (Fla. Cir. Ct. Sept. 30, 2022)................ 22, 27, 28, 30,84

*Brooks v. Mentor Worldwide*, 985 F.3d 1272 (10th Cir. 2021)………………………………...…..86

*Brown v. City of Valparaiso*, 67 N.E.3d 652 (Ind. App. 2016) ....................................................85

*Brown v. USA Taekwondo*, 11 Cal. 5th 204 (Cal. 2021)....................................... 39, 40, 46, 48, 82

*Buchler v. State ex rel. Or. Corr. Div.*, 853 P.2d 798 (Or. 1993) ................................................. 47

*Buttrick v. Arthur Lessard & Sons, Inc.*, 260 A.2d 111 (N.H. 1969)………………………….…..91

*C.C. v. Harrison Cnty. Bd. of Educ.*, 859 S.E.2d 762 (W. Va. 2021) .............................................99

*C.U. v. Snap Inc.,* No. 22-cv-07347, ECF No. 11 at 7-8...................................................... 60, 67

*Cabiroy v. Scipione*, 767 A.2d 1078 (Pa. Super. 2001) ...................................................95

*Camara v. Agsalud*, 685 P.2d 794 (Haw. 1984)……………………………….……83

*Carrizales v. Rheem Mfg. Co.*, 589 N.E.2d 569 (Ill. App. Ct. 1991)........................................... 42

*Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767 (E.D. La. 2017)............. 46, 47

*Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 130–33 (Ala. 1976).........................................77

*Cerda v. RJL*, 443 S.W.3d 221 (Tex. Ct. App. 2013)........................................................97

*Cervantes v. Health Plan of Nevada, Inc.*, 263 P.3d 261 (2011)……………………….……...91

*Chadbourne v. Kappaz*, 779 A.2d 293, 297 (D.C. 2001)……………………………….……83

*Chancler v. Am. Hardware Mut. Ins.*, 109 Idaho 841 (1985)………………………….……83

*Chattopadhyay v. BBVA Compass Bancshares Inc.*, 2019 U.S. Dist. LEXIS 241400 (N.D. Cal. Nov. 25, 2019) ......................................................................................... 51

*City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2002) .................................. 48

*City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062 (W.D. Wash. Sept. 25, 2017).... .53, 54

*Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108 (C.D. Cal. 2021) …………………… 50

*Clift v. Narragansett Television L.P.*, 688 A.2d 805 (R.I. 1996)........................................ 43

*Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968 (Del. 1980) ......................................... 22

*Cline v. U.S.*, 2015 WL 13664121 (M.D. Tenn. May 20, 2015)………………………….……97

*Coastline Terminals v. USX*, 156 F. Supp. 2d 203, 210 (D. Conn. 2001)…………………….....82

*Commc'ns Grps., Inc. v. Warner Commc'ns, Inc.*, 527 N.Y.S.2d 341 (N.Y. Civ. Ct. 1988) ……....26

*Comptroller of Treasury v. Equitable Tr. Co.*, 464 A.2d 248 (Md. 1983)………………..……..88

*Colosimo v. Gateway Cmty. Church*, 424 P.3d 866 (Utah 2018)………………………………. 98

*Connell Solera, LLC v. Lubrizol Advanced Materials, Inc.*, 584 F. Supp. 3d (D. Colo. 2022)……………………………………………………………………...81

*Connes v. Molalla Transp.*, 817 P.2d (Colo. App. 1991)……………………………….…..82

*Covel v. Rodriguez*, 272 P.3d 705 (Okla. 2012)……………………………………….……94

*Cowan v. Yale*, 2023 WL 369947, at *3 (Conn. Super. Jan. 17, 2023)……………………..……82

1   *Crane v. Cedar Rapids*, 160 N.W.2d 838 (Iowa 1968) ....................................................85

2   *Creasy Sys. Consultants, Inc. v. Olsen*, 716 S.W.2d 35 (Tenn. 1986)…………………………..96

3   *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019)....................................................... 54

4   *Crouch v. Ruby Corp.*, 2022 WL 16747282 (S.D. Cal. Nov. 7, 2022) ................................ 29

5   *Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446 (R.I. 2013)………………………………..95

6   *Cuyler v. United States*, 362 F.3d 949 (7th Cir. 2004) .................................................... 84

7   *Daniel v. Armslist*, 386 Wis.2d 449, 482 (Wis. 2019) ..................................................... 99

8   *D.D. v. Meta Platforms, Inc.*, No. 22-cv-6205, ECF No. 10................................... 60, 67

9   *D.H. v. Meta Platforms, Inc.*, No. 22-cv-04888, ECF No. 24 .................................. 60, 67

10   *Davidson v. Time Warner, Inc.*, 1997 WL 405907 (S.D. Tex. Mar. 31, 1997) ........................... 30

11   *DeFilippo v. Nat'l Broad. Co.*, 1980 WL 336092 (R.I. Super. Ct. June 8, 1980.................... 30, 95

12   *Denson v. Nat'l Cas. Co.*, 886 S.E.2d 228 (S.C. 2023) .....................................................96

13   *Doe No. 14 v. Internet Brands, Inc.*, 2016 WL 11824793 (C.D. Cal. Nov. 14, 2016) ................. 48

14   *Doe One v. CVS Pharmacy, Inc.*, 348 F. Supp. 3d 967 (N.D. Cal. 2018) .................................... 75

15   *Doe v. McKesson*, 339 So.3d 524 (La. 2002)........................................................... 39, 41

16   *Doe v. MySpace Inc.*, 474 F. Supp. 2d 843 (W.D. Tex. 2007)........................................... 47

17   *Doe v. Roman Catholic Archbishop of L.A.*, 70 Cal. App. 5th 657 (Cal. Ct. App. 2021) ............ 42

18   *Doe v. Twitter*, 555 F. Supp. 3d 889 (N.D. Cal. 2021) ............................................... 22, 57

19   *Dongo v. Banks*, 448 A.2d 885 (Me. 1982)…………………………………..……………..87

20   *Drammeh v. Uber Techs. Inc.*, 2021 WL 2413242 (W.D. Wash. June 14, 2021)......................... 50

21   *Duffy v. Togher*, 887 N.E.2d 535 (Ill. App. Ct. 2008) ..................................................... 40

22   *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380 (Minn. Ct. App. 2004)…………………………..88

23   *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019)................................. 43, 48

24   *Elec. Const. & Maint. Co., Inc. v. Maeda Pac. Corp.,* 764 F.2d 619 (9th Cir. 1985) .................. 18

25   *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 857 (N.D. Cal. 2012) ................................ .76

26   *Elkins v. Acad. I*, 633 S.W.3d 529 (Mo. W. Dist. App. 2021)………………………….……..90

27   *Ellsworth v. Bishop Jewelry & Loan*, 742 S.W.2d 533 (Tex. Ct. App. 1987) ..............................97

28   *Errico v. LaMountain*, 713 A.2d 791 (R.I. 1998) ..........................................................95

*Erwin v. Roe*, 928 N.E.2d 609 (Ind. App. 2010) .................................................................. 85

*Eskridge v. Pac. Cycle, Inc.*, 556 F. App'x 182 (4th Cir. 2014)......................................99

*Est. of Alex ex rel. Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723 (N.D. Tex. 2018)... 23, 28, 97

*Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ........................... 20, 21

*Estate of French v. Stratford House*, 333 S.W.3d 546 (Tenn. 2011)...............................96

*Estate of Pinkham v. Cargill, Inc.*, 55 A.3d 1 (Me. 2012)...........................................87

*Ethridge v. Samsung*, 604 F. Supp. 3d 556 (S.D. Tex. 2022) ....................................... 46

*Ex parte Russell Cnty. Cmty. Hosp., LLC*, 291 So. 3d (Ala. 2019) ............................. 77

*Ezagui v. Dow Chem.*, 598 F.2d 727 (2d Cir. 1979) ................................................ 92

*Fabian v. LeMahieu*, 2019 WL 4918431 (N.D. Cal. Oct. 4, 2019) .............................. 40

*Farnsworth v. Steiner*, 601 P.2d 266, 271 (Alaska 1979)........................................ 77

*Feinman v. Kindred Healthcare*, 2013 WL 5918004 (D. Wyo. Nov. 1, 2013)...................100

*Ferrari v. Nat. Partner, Inc.*, 2017 WL 76905 (N.D. Cal. Jan. 9, 2017))......................... 76

*Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) ............................................. 54

*Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048 (N.D. Ill. 1993)................... 19, 33

*First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 670 F. Supp. 115 (S.D.N.Y. 1987)..........84

*Flanagan v. Mott*, 114 S.E.2d 331 (W. Va. 1960)..................................................99

*Fluor Corp. v. Jeppesen & Co.*, 170 Cal. App. 3d 468 (Cal. Ct. App. 1985)................................ 27

*Ford v. Philadelphia Hous. Auth.*, 848 A.2d 1038 (Pa. Commw. 2004).........................95

*Fouche v. Chrysler Motors Corp.*, 692 P.2d 345 (Idaho 1984) ................................... 52

*Gamache v. Airbnb, Inc.*, 2017 WL 3431651 (Cal. Ct. App. Aug. 10, 2017) .............................. 54

*Gaumer v. Rossville Truck & Tractor Co.*, 257 P.3d 292 (Kan. 2011)......................................... 86

*Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 930 (Colo. 1997)..............................82

*Gersh v. Anglin,* 353 F. Supp. 3d 958 (D. Mont. 2018)................................................. 48

*Ginsberg v. Google Inc.*, 586 F. Supp. 3d 998 (N.D. Cal. 2022)........................................ 47

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729 (Ky. 2011)...................86

*Gipson v. Kasey*, 150 P.3d 228 (Ariz. 2007)........................................................ 39

*Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011)................................ 63, 68

1   *Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644 (9th Cir. 2016) ................................ 58

2   *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156 (N.D. Cal. 2018) ................................................. 54

3   *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d.(S.D.N.Y. 2006)……………………………..…84

4   *Graham Packaging Co., LP v. Com.*, 882 A.2d 1076 (Pa. Commw. Ct. 2007)…………………..95

5   *Green v. ADT, LLC*, 2016 WL 3208483 (N.D. Cal. June 10, 2016)……………………………..…81

6   *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897 (Cal. 1978) ........................................ 19, 21

7   *Greyhound Comput. Corp. v. State Dep't of Assessments & Tax'n*, 320 A.2d 52 (Md. 1974)…....88

8   *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. Dist. Ct. App. 2022)...................................... 55

9   *Grisby v. Valve Corp.*, 2013 WL 12310666 (W.D. Wash., Mar. 13, 2013)………………………98

10   *Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807 (Md. 2001) ......................................... 37

11   *Grossman v. Rockaway Township*, 2019 WL 2649153 (N.J. Super. Ct. June 10, 2019).......... 28, 29

12   *Grubb v. Do It Best Corp.*, 279 P.3d 626, 628 (Ariz. Ct. App. 2012) ........................................... 77

13   *Guenther v. Lockheed Martin Corp.*, 972 F.3d 1043 (9th Cir. 2020) ..................................... 63, 68

14   *Gwinn v. Laird Superfood, Inc.*, 2022 WL 17363585 (S.D.N.Y. Dec. 1, 2022)........................... 32

15   *Hacala v. Bird Rides, Inc.*, 306 Cal. Rptr. 3d 900 (Cal. Ct. App. 2023)...................................... 48

16   *Hageman v. TSI*, 786 P.2d (Colo. App. 1989)…………………………………………………..82

17   *Hall v. Warren*, 632 P.2d 848 (Utah 1981)………………………………………………..…98

18   *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159 (Cal. Ct. App. 2014) .................................... 23, 28,81

19   *Heath v. La Mariana Apartments*, 180 P.3d 664 (N.M. 2008) ................................................ 92

20   *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802 (S.D. Tex. 1983) ......................................... 30, 44

21   *Herriott v. Allied-Signal, Inc.*, 801 F. Supp. 52 (N.D. Ill. 1992) ........................................84

22   *Highmark Fed. Credit Union v. Hunter*, 814 N.W.2d 413 (S.D. 2012)…………………..…96

23   *Hobbs v. Boy Scouts of Am., Inc.*, 152 S.W.3d 367 (Mo. Ct. App. 2004)……………..…….90

24   *Holbrook v. Prodomax Automation*, 2021 WL 4260622 (W.D. Mich. Sep. 20, 2021) ..... 22, 28, 88

25   *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103 (Tex. Ct. App. 2000)………………..…97

26   *Howard v. Zimmer*, 299 P.3d 463 (Okla. 2013)…………………………………………..94

27   *Huff v. Shopsmith, Inc.*, 786 So.2d 383 (Miss. 2001)…………………………………..…89

28   *Hurst v. U.S.*, 739 F. Supp. 1377 (D.S.D. 1990)…………………………………………96

*Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir. 2003) ........................................... 36, 38, 39, 47, 52, 76

*In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 3:19-md-2885 (N.D. Fl. 2019), ECF 705. .. 52

*In re Abilify (Aripiprazole) Prod. Liab. Litig.*, 2021 WL 3869752 (N.D. Fla. July 27, 2021)…....87

*In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 537 F. Supp. 3d 679 (D.N.J. 2021) .................................................................................................................... 51

*In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d (C.D. Cal. 2021)……………….....81

*In re Blackbaud, Inc., Data Breach Litig.*, 567 F. Supp. 3d 667, 672 (D.S.C. 2021) ………….....57

*In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104 (9th Cir. 2013) .................................... 18

*In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295 (N.D. Ga. 2019) .............................................................................................................................. 38,84

*In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021). ........................................................................ 28

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767 (N.D. Cal. 2019) .............................................................................................................................................38

*In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, (D.D.C. 2012)…………………………………………………………………………..…83

*In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 2664199 (S.D.N.Y. June 20, 2017) ….. 92

*In re GE/CBPS Data Breach Litig*, 2021 WL 3406374 (S.D.N.Y. 2021) ……..……………..… 92

*In re iPhone Application Litig.*, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011) ........................... 51

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020) .................................................................................. 36, 39, 41, 42, 44, 46, 53

*In re Juul Labs, Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal. 2020), ECF 405 ........................................................................................................ 52

*In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377 (N.D. Cal. Oct. 2, 2014) ...... 19, 58

*In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 233 F.R.D. 133 (S.D.N.Y. 2005) .............................................................................................................................................75

*In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005) .............................................................................................................................................19

*In re MyFord Touch Consumer Litig.*, 2016 WL 7734558 (N.D. Cal. Sept. 14, 2016)................ 23

*In re Nat'l Prescription Opiate Litg.*, 452 F. Supp. 3d 745 (N.D. Ohio 2020) ............................. 44

*In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888 (N.D. Cal. 2018) .................................. 76

*In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1996 WL 482977 (E.D. Pa. Aug. 22, 1996) .... 51

*In re Outlaw Labs.*, *LP Litig.*, 352 F. Supp. 3d 992 (S.D. Cal. 2018) ......................................... 18

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 1:14-cv-1748 (N.D. Ill. Apr. 2, 2018), ECF No. 2424 ............................................................................................................... 52

*In re Tylenol (Acetaminophen) Mktg, Sales Practices, and Prods. Liab. Litig.*, 2:13-md-02436 (E.D. Pa. 2013), ECF 47 ................................................................................................................. 52

*Insco v. Aetna Health & Life Ins.*, 673 F. Supp. 2d 1180 (D. Nev. 2009)………………….………90

*Isgett v. Wal-Mart*, 976 F. Supp. 422 (S.D. Miss. 1997)……………………………………...89

*Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138 (Ill. 2011) ........................................................84

*Jackson v. Airbnb, Inc.*, 2022 WL 16752071 (C.D. Cal. Nov. 4, 2022) ................................ 29, 47

*Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586 (Cal. Super. Ct. Mar. 10, 2023).............. 21, 28

*J'aire Corp. v. Gregory*, 24 Cal. 3d 799 (Cal. 1979) ................................................................. 38

*James v. Meow Media Inc.*, 300 F.3d 683 (6th Cir. 2002)......................................... 30, 37, 44, 86

*James v. Meow Media*, 90 F. Supp. 2d 789 (W.D. Ky. 2009) ....................................................... 44

*Jane Doe No. 1 v. Uber Techs, Inc.*, 79 Cal. App. 5th 410 (Cal. Ct. App.2022) ......................... 47

*Jane Doe No. 14 v. Internet Brands, Inc.,* 2016 WL 11824793 (C.D. Cal. Nov. 14, 2016).......... 47

*Janitscheck v. United States,* 45 F. App'x 809 (9th Cir. 2002).................................................... 56

*Jenkins v. T & N PLC*, 53 Cal. Rptr. 2d (Cal. Ct. App. June 5, 1996)…………………………...81

*Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d (Ga. 2020)…………………………………...84

*Johnson v. Am. Motors Corp.*, 225 N.W.2d 57 (N.D. 1974) ........................................................93

*Johnson v. The Raytheon Co.*, 2015 WL 12765871 (C.D. Cal. Nov. 16, 2015) ........................... 40

*Johnson v. U.S. Steel Corp.*, 192 Cal. Rptr. 3d (Cal. Ct. App. 2015)…………………………....81

*Jones v. Google LLC,* 56 F.4th 735 (9th Cir. 2022)..................................................... 56, 57, 82, 83

*Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216 (D. Md. 1988)................................................... 30

*Joseph v. Monroe*, 419 A.2d (Del. 1980)…………...……………………………………...83

*Juarez v. Boy Scouts of Am., Inc.* 81 Cal. App. 4th 377 (Cal. Ct. App. 2000)............................. 42

1  *Kalata v. Anheuser–Busch Cos.*, 144 Ill.2d 425 (1991) .............................................84

2  *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128 (D. Minn. 2011)………………...……89

3  *Karst v. Shur-Co.*, 878 N.W.2d 604, 609-10 (S.D. 2016) ...........................................96

4  *Kawczynski v. Am. Coll. Of Cardiology*, 2016 WL 2770552 (W.D. Wisc. May 13, 2016)........... 30

5  *Keck v. Dryvit Sys., Inc.*, 830 So. 2d 1 (Ala. 2002).........................................................22

6  *Kesner v. Superior Ct.*, 1 Cal. 5th 1132 (Cal. 2016) ......................................................42

7  *Kho v. Pennington*, 875 N.E.2d 208 (Ind. 2007) ........................................................85

8  *Kimberlin v. PM Transp.*, 563 S.E.2d 665 (Va. 2002) ...................................................98

9  *King v. Story's*, 54 F.3d 696, 697 (11th Cir. 1995)…..................................................77

10  *Kirsten v. California Pizza Kitchen, Inc.*, 2022 WL 16894503 (C.D. Cal. July, 29 2022)............81

11  *Koll v. Manatt's Transp.*, 253 N.W.2d 265 (Iowa 1977) ...............................................85

12  *Kurer v. Parke, Davis & Co.*, 679 N.W.2d 867 (Wis. Ct. App. 2004) ..............................99

13  *Land O' Lakes, Inc. v. DairyAmerica, Inc.*, 2017 WL 495644 (E.D. Cal. Feb. 6, 2017) .............. 49

14  *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021) ...……………..……2, 20, 21, 23, 28, 30, 36,78

15  *Legal Tender Servs. PLLC v. Bank of Am. Fork*, 506 P.3d 1211 (Utah App. Ct. 2022) ...............97

16  *Lemmon v. Snap, Inc.*, 2022 WL 1407936 (C.D. Cal. Mar. 31, 2022) ............................. 21, 55, 81

17  *Leslie Salt Co. v. St. Paul Mercury Ins. Co.*, 637 F.2d 657 (9th Cir. 1981) ........................... 19, 20

18  *Levitt v. Yelp! Inc.*, 765 F.3d 1123 (9th Cir. 2014) ....................................................... 18

19  *Lewin v. McCreight*, 655 F. Supp. 282 (E.D. Mich. 1987)……………………………...……88

20  *Locicero v. Interpace*, 266 N.W.2d 423 (Wis. 1978) ..................................................100

21  *Lombard v. Colo. Outdoor Ed. Ctr., Inc.*, 187 P.3d (Colo. 2008)…………………………...……82

22  *Loomis v. Amazon.com LLC*, 63 Cal. App. 5th 466 (Cal. Ct. App. 2021) ................................. 21

23  *Lopez v. United States*, 2018 WL 807357 (N.D. Cal. Feb. 9, 2018).................................. 38

24  *Lowe v. Cerner Corp.*, 2022 WL 17269066 (4th Cir. Nov. 29, 2022)..................................... 23, 98

25  *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959 (Okla. 2007)....................................... 36

26  *Lozar v. Birds Eye Foods*, 678 F. Supp. 2d 589 (W.D. Mich. 2009)……………………………88

27  *Lugo v. St. Nicholas Assocs.*, 772 N.Y.S.2d 449 (N.Y. 2003) …………………..………………..92

28  *Lyondell Petrochemical v. Fluor Daniel*, 888 S.W.2d 547 (Tex Ct. App. 1994)…………..……..97

*Lynnville Transp., Inc. v. Chao*, 316 F. Supp. 2d 790 (S.D. Iowa 2004) ........................ 32

*M.L. v. Craigslist Inc.*, 2020 WL 6434845 (W.D. Wash. Apr. 17, 2020) ..................................... 38

*Machlup v. Bowman*, 2021 WL 5882102 (Ohio Ct. App. 2021) ………………………….…..….94

*MacPherson v. Buick Motor Co.,* 111 N.E. 1050 (N.Y. 1916); ...................................... 1, 18

*Magna Tr. v. Illinois Cent. R.*, 728 N.E.2d 797 (Ill. 5th Dist. App. 2000) ...................................84

*Marabella v. NCL (Bah.), Ltd.*, 437 F. Supp. 3d 1221 (S.D. Fla. 2020) ...................................... 49

*Marquay v. Eno*, 662 A.2d 272 (N.H. 1995)…………………………………………….90

*Martifer-Silverado Fund I, LLC v. Zhongli Sci. & Tech. Grp. Co.*, 2020 WL 5500381 (N.D. Cal. Sept. 11, 2020) ................................................................................................................ 50

*Martin v. Schroeder*, 105 P.3d (Ariz. App. 2005)…………………………………………….80

*Martino v. Kiewit*, 600 F. App'x 908 (5th Cir. 2015)…………………………………..…….94

*Mary M. v. City of Los Angeles*, 54 Cal. 3d 202 (Cal. 1991) ........................................ 55

*Maryland v. Exxon Mobil Corp.,* 406 F. Supp. 3d 420 (D. Md. 2019) ........................................ 34

*Massee v. Thompson*, 90 P.3d 394 (Mont. 2004)…………………………………………...90

*Matomco Oil v. Arctic Mech.*, 796 P.2d 1336, 1339 (Alaska 1990) ............................................ 77

*Matter of Eighth Judicial District Asbestos Litigation, No. 36*, 105 N.Y.S.3d 353 (N.Y. 2019).. 31

*May v. Air & Liquid Sys. Corp.*, 129 A.3d 984 (Md. 2015)………………………………......87

*Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055 (9th Cir. 2018) ........................ 39, 40

*Maynard v. Snapchat, Inc.*, 883 S.E.2d (Ga. Ct. App. 2023)……………………………......84

*Maynard v. Snapchat, Inc.*, 870 S.E.2d 739 (Ga. 2022) ............................................ 22, 36, 82,84

*McClain v. Mariner Health Care*, 631 S.E.2d (Ga. App. 2006)…………………………….....84

*McClellan v. I-Flow Corp.*, 776 F.3d 1035 (9th Cir. 2015)........................................ 56, 94

*McCollum v. CBS 202*, Cal. App. 3d 989 (Cal. Ct. App. 1988)........................................ 37

*McCoy v. Walker*, 876 S.W.2d (Ark. Ct. App. 1994)………………………………….…….81

*McGary v. City of Portland*, 386 F.3d 1259 (9th Cir. 2004)........................................ 18

*McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59 (Wyo. 1989)……………………….......100

*Measurex Sys., Inc. v. State Tax Assessor*, 490 A.2d 1192 (Me. 1985)……………………..…87

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996)........................................................ 57

1   *Merrill v. Trump Ind., Inc.*, 320 F.3d 729 (7th Cir. 2003) ............................................................ 44

2   *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992 (N.D. Cal. Sept. 17, 2015)…………..…81

3   *McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996)……………………………..……....83

4   *Midwest Game v. M.F.A. Mill.*, 320 S.W.2d 547 (Mo. 1959)…………………………………………..90

5   *Modisette v. Apple Inc.*, 241 Cal. Rptr. 3d 209 (Cal. Ct. App. 2018) ........................................... 54

6   *Monnin v. Fifth Third Bank*, 103 Ohio App. 3d 213 (Ohio 1995) ................................................94

7   *Moody v. Or. Comm. Credit Union*, 505 P.3d 1047 (Or. Ct. App. 2022) ), *review allowed*, 512 P.3d

8      446 (Or. 2022)…………………………………………………………………………............……94

9   *Morse v. Conn. Cmty. for Addiction Recovery*, 2010 WL 4074949 (Conn. Super. Sept. 15,

10      2010)……………………………………………………………………………………...……………82

11   *Muncy v. Magnolia Chem.*, 437 S.W.2d 15 (Tex. Ct. App. 1968)…………………………..……97

12   *Munda v. Summerlin Life & Health Ins.*, 267 P.3d 771 (Nev. 2011)……………………………90

13   *Munhoven v. Northwind Marine, Inc.*, 353 F. Supp. 2d 1072, 1074 (D. Alaska 2005) ...............92

14   *Murphy v. Columbus McKinnon Corp.*, 982 N.W.2d 898 (Wis. 2022)…………………………..99

15   *Nation v. DOC*, 144 Idaho 177 (2007)……………………………………………………..………..83

16   *Nat'l Ink & Stitch, LLC v. State Auto Prop. & Cas. Ins.*, 435 F. Supp. 3d 679 (D. Md. 2020)…..88

17   *Neilson Bus. Equip. Ctr., Inc. v. Monteleone*, 524 A.2d 1172 (Del. 1987) ...................................26

18   *Ney v. Yellow Cab Co.*, 2 Ill.2d 74 (Ill. 1954) .............................................................................84

19   *NMP Corp. v. Parametric Tech. Corp.*, 958 F. Supp. 1536 (N.D. Okla. 1997)…………………..94

20   *NOLA 180 v. Harrah's Oper. Co.*, 94 So.3d 886 (La. Ct. App. 2012) ......................................... 44

21   *Normandy v. Am. Med. Sys., Inc.*, 262 A.3d (Conn. 2021)……………………………………..82

22   *Oksenholt v. Lederle Labs*, 294 Or. 213 (Or. 1982) ....................................................................94

23   *Olshansky v. Rehrig Int'l*, 872 A.2d 282 (R.I. 2005) ..................................................................95

24   *Orthopedic Equipment v. Eutsler*, 276 F.2d 455 (4th Cir. 1960) ...............................................98

25   *Osburn v. Danek Med.*, 520 S.E.2d 88 (N.C 2000) ....................................................................93

26   *Otten v. BNSF*, 2023 WL 1948626 (10th Cir. Feb. 13, 2023) ....................................................100

27   *Pac. Shores Props., LLC v. City of Newport Beach*, 730 F.3d 1142 (9th Cir. 2013).....................49

28   *Palermo v. LifeLink Found., Inc.*, 152 So. 3d 1177 (Miss. Ct. App. 2014)…………………....89

1    *Pan-Alaska, Etc. v. Marine Const. Design Co.*, 565 F.2d 1129 (9th Cir. 1978)...................... 33, 34

2    *Paul v. Watchtower Bible Tract Soc. of N.Y*, 819 F.2d 875 (9th Cir. 1987) ................................. 19

3    *Pedeferri v. Seidner Enters.*, 216 Cal. App. 4th 359 (Cal. Ct. App. 2013)............................ 45, 46

4    *Perry v. S.N.*, 973 S.W.2d 301 (Tex. 1998) ...................................................................................97

5    *Petersen v. Costco Wholesale Co., Inc.*, 2017 WL 187134 (C.D. Cal. Jan. 17, 2017) ................. 34

6    *Petroski v. N. Ind. Pub. Serv. Co.*, 354 N.E.2d 736 (Ind. Ct. App. 1976) ......................................85

7    *Pierce v. Pac. Gas & Elec. Co.*, 166 Cal. App. 3d 68 (Cal. Ct. App. 1985)................................. 31

8    *Phillips v. Medtronic, Inc.*, 754 F. Supp. 2d 211, 216 (D. Mass. 2010)…………………...….…88

9    *Pirozzi v. Apple*, 913 F. Supp. 2d 840 (N.D. Cal. 2012)............................................................ ..47

10    *Pitts v. Genie Indus., Inc.*, 921 N.W.2d 597 (Neb. 2019)…………………………………….…90

11    *Polt v. Sandoz, Inc.*, 462 F. Supp. 3d 557 (E.D. Pa. 2020)...............................................................96

12    *Porter v. Johnes*, 319 F.3d 483 (9th Cir. 2003) ……………………………………………..….49

13    *Powell v. Tosh*, 929 F. Supp. 2d 691 (W.D. Ky. 2013) *recons. granted in part on other grounds*,

14        2013 WL 1878934 (W.D. Ky. May 3, 2013)…………………………………………...…86

15    *Pullen v. West,* 92 P.3d 584 (Kan. 2004) …………………………………………………… 86

16    *Price v. Blood Bank*, 790 A.2d (Del. 2002)………………………………………………….…83

17    *Pulte Home v. Simerly*, 746 S.E.2d 173 (Ga. App. 2013)…………………………………..….…82

18    *Rindlisbaker v. Wilson*, 519 P.2d 421 (Idaho 1974)…………………………………………….…83

19    *Rodgers v. Christie*, 795 F. App'x 878 (3d Cir. 2020)…………………………………………….…90

20    *Quinteros v. InnoGames*, 2022 WL 898560 (W.D. Wash. Mar. 28, 2022) ...................... 30, 47, 99

21    *Quiroz v. ALCOA*, 416 P.3d (Ariz. 2018)……………………………………………..……….…80

22    *Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d (Del. 2018).......................... 22, 81,83

23    *Ransome v. Wisconsin Elec. Power Co.*, 275 N.W.2d  (Wis. 1979) .............................................99

24    *Resol. Tr. Corp. v. Dean*, 854 F. Supp. (D. Ariz. 1994) ............................................................ 80

25    *Regents of Univ. of Cal v. Superior Ct.*, 4 Cal. 5th  (Cal. 2018)............................................ 40, 42

26    *Risenhoover v. England*, 936 F. Supp. 392 (W.D. Tex. 1996) ...................................................... 43

27    *Rodgers v. Christie*, 795 F. App'x 878 (3d Cir. 2020)............................................................ 34, 91

28    *Rodriguez-Suris v. Montesinos*, 123 F.3d 10 (1st Cir. 1997)............................................ 20

*Rowland v. Christian*, 69 Cal. 2d 108 (Cal. 1968)................................................................ 40

*RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d (9th Cir. 1985)………………………………..…….80

*S.P. v. Cnty. of San Bernardino*, 2020 WL 3051360 (C.D. Cal. Mar. 24, 2020) ......................... 53

*Safari Club Int'l v. Rudolph*, 862 F.3d 1113 (9th Cir. 2017) ......................................................... 66

*Saloomey v. Jeppesen & Co.*, 707 F.2d 671 (2d Cir. 1983) ........................................................... 20

*Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002)..................... 30, 37, 79,81

*Sanders v. City of Fresno*, 2006 WL 1883394 (E.D. Cal. July 7, 2006)...................................... 41

*Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347 (Tenn. 2008)........................................ 37

*Savina v. Sterling Drug, Inc.*, 795 P.2d 915 (Kan. 1990) ………………………………..…….86

*Scandinavian Airline Sys. v. United Aircraft Corp.*, 601 F.2d 425 (9th Cir. 1979) ......................19

*Scoggins v. Floyd Healthcare Management Inc.*, 2016 WL 11544774 (N.D. Ga. June 10, 2016)………………………………………………………………………………...…83

*Scurlock Marine, Inc. v. W.W. Patterson Co.*, 1997 WL 472510 (E.D. La. Aug. 15, 1997)……..87

*Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587 (E.D. La. 2007) ...................... 31, 87

*Schriner v. Pa. Power & Light Co.*, 501 A.2d 1128 (Pa. Super. Ct. 1985)...................................95

*Schueler v. Ad Art, Inc.*, 472 P.3d 686 (Nev. Ct. App. 2020) ........................................... 33, 34, 90

*Sewell v. Racetrac Petroleum, Inc.*, 245 So.3d 822 (Fla. Dist. Ct. App. 2017) ........................... 36

*Shanks v. Upjohn Co.*, 835 P.2d 1189 (Alaska 1992) ................................................................... 91

*Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194 (E.D.N.Y. 2010) ………………………………………………………………......………………….…92

*Shirley v. Glass*, 308 P.3d 1 (Kan. 2013) ………………………………………..83, 86

*Sheldon v. Kettering Health Network*, 40 N.E.3d 661 (Ohio App. 2015) .....................................93

*Sheldon v. Ruggiero*, 2018 VT 125 (Vt. 2018) ............................................................................98

*Shoemaker v. Funkhouser*, 856 S.E.2d 174 (Va. 2021) ...............................................................98

*Short v. Ultramar Diamond* 46 F. Supp. 2d 1199, 46 F. Supp. 2d (D. Kan. 1999)…………...…83

*Sierra-Bay Fed. Land Bank Ass'n v. Sup. Ct.*, 227 Cal. App. 3d 318 (Cal. Ct. App. 1991) …………………………………………………………………………....58, 79, 81

*Sims v. United States*, 2020 WL 3273040 (W.D. Mo. June 17, 2020).........................................46

*Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213 (D. Haw. 2010)……………………………..83

*Smith v. Central Maine Power Co.*, 988 A.2d 968 (Me. 2010)…………………………..............87

*Smith v. Linn*, 563 A.2d 123 (Pa. Super. 1989)....................................................................... 30

*Smith v. Triad of Ala.*, 2015 WL 5793318, at *11-*13 (M.D. Ala. Sept. 29, 2015).......................91

*Sparacino v. Andover Controls Corp.*, 592 N.E.2d 431 (Ill. App. 1992) ....................................23

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ...................................................... 60

*Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656 (Minn. 2004)……………………..89

*Stang v. Hertz Corp.*, 497 P.2d 732, 734 (N.M. 1972)  ..................................................... 92

*Stanton v. Astra Pharm.*, 718 F.2d 553 (3d Cir. 1983) ......................................................95

*Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854 (W. Va. 1982) ..............................99

*State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 528 F. Supp. 3d 686 (W.D. Ky. 2021)........... 46

*State Stove Mfg. Co. v. Hodges*, 189 So.2d 113 (Miss. 1966)……………………………………..89

*Steinle*, 230 F.Supp.3d 994 (N.D. Cal. 2017) ................................................ 53

*Steinmetz v. Clendenning*, 906 N.W.2d 183 (Wis. Ct. App. 2017)................................................99

*Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852 (9th Cir. 2019)....................................... 52

*Stephenson ex rel. Coley v. S.C. Johnson & Son, Inc.*, 658 N.Y.S.2d 636 (N.Y. App. Div. 1997)...

..........................................................................................................................................55

*Stevens v. MTR Gaming Group Inc.*, 237 W.Va. 531 (W. Va. 2016)...................................... 44

*Swix v. Daisy Mfg. Co.*, 373 F.3d 678 (6th Cir. 2004).......................................................... 46

*Sys. Corp. v. DeVries*, 139 S. Ct. 986 (2019).......................................................... 35

*Sys. Design & Mgmt. Info., Inc. v. Kansas City Post Off.*, 788 P.2d 878 (Kan. Ct. App. 1990) .... 34

*T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526 (Ky. 2006)…………………….......87

*Taamneh v. Twitter*, 598 U.S. ___, 2023 WL 3511531, at *15 (U.S. May 18, 2023) ………...…27

*Taamneh v. Twitter, Inc.*, No. 3:17-cv-4107 (N.D. Cal. May 16, 2018), ECF 55 ....................... 27

*Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla. 1994) ............................................. 94

*Taveras v. Resorts Int'l Hotel, Inc.*, No. 07-4555, 2008 WL 4372791 (D.N.J. Sept. 19, 2008).... 44

*Taylor v. Intuitive Surgical, Inc.*, 389 P.3d 517 (Wash. 2017) .......................................................98

*Thompson v. Summers*, 567 N.W.2d 387 (S.D. 1997).........................................................96

*Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 265 n.23 (Va. 2019) .......................................98

*Torres v. Xomox Corp.*, 49 Cal. App. 4th 1 (Cal. Ct. App. 1996) .................................................. 55

*Towe v. Sacagawea, Inc.*, 347 P.3d 766 (Or. 2015) ........................................................................ 35

*Town of Montezuma v. Downs*, 685 N.E.2d 108 (Ind. App. 1997) .................................................85

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ................................................................... 60

*Travelers Indem. v. Conn. Light & Power*, 2008 WL 2447351 (Conn. Super. Ct. June 4, 2008)……………………………………………………………………………………..82

*Trent v. Brasch Mfg. Co.*, 477 N.E.2d 1312 (Ill. App. Ct. 1985)................................................... 32

*Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160 (9th Cir. 2012)............ 40

*United States ex rel. Pogue v. Diabetes Treatment Ctrs.*, 444 F.3d 462 (6th Cir. 2006) …………49

*United States v. Bohannon*, 506 F. Supp. 3d 907 (N.D. Cal. 2020)............................................... 70

*United States v. Meals*, 21 F.4th 903 (5th Cir. 2021).................................................................... 70

*United States v. Rosenow*, 50 F.4th 715 (9th Cir. 2022)................................................................ 70

*United States v. Wilson*, 13 F.4th 961 (9th Cir. 2021) .................................................................. 57

*U.S. Aviation Underwriters v. Nat'l Ins. Underwriters*, 344 N.W.2d 532 (Wis. App. 1984) ........97

*Utah Local Gov't Trust v. Wheeler Mach. Co.,* 199 P.3d 949 (Utah 2008) .................................97

*Utz v. Running & Rolling Trucking*, 32 So. 3d 450 (Miss. 2010)……………………….……..89

*Vega v. E. Courtyard Assocs.*, 117 Nev. 436 (2001)……………………………………..…….90

*Vesely v. Armslist LLC*, 762 F.3d 661 (7th Cir. 2014) .................................................................. 47

*Vickers v. Hanover Const.*, 125 Idaho 832 (1994)……………………………………..………..83

*Walt Disney Prods., Inc. v. Shannon*, 276 S.E.2d 580 (Ga. 1981)...............................................44

*Walton v. Potlatch*, 781 P.2d 229 (Idaho 1989)……………………………………..…………..83

*Warzynski v. Empire Comfort Sys.*, 401 S.E.2d 801 (N.C. Ct. App. 1991) ..................................93

*Watters v. TSR, Inc.*, 904 F.2d 378 (6th Cir. 1990)................................................ 30, 37, 43, 44, 86

*Way v. Boy Scouts of America*, 856 S.W.2d 230 (Tex. Ct. App. 1993)................................... 30, 37

*Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40 (Cal. 1975) .................................................................. 43

*Wells Fargo v. Jenkins*, 293 Ga. 162, 164 (2013)……………………………………..………..82

*White v. Caterpillar*, 867 P.2d 100, 109 (Colo. App. 1993)……………………………………..82

*Wickersham v. Ford Motor Co.*, 194 F. Supp. 3d 434 (D.S.C. 2016) ............................... 23, 28, 96

*Williams v. Wal-Mart*, 99 So. 3d 112 (Miss. 2012)……………………………………...…..89

*Wilson v. Midway Games*, 198 F. Supp. 2d 167 (D. Conn. 2002) .................................... 30, 80, 82

*Wren v. Sullivan Elec.*, 797 F.2d 323 (6th Cir. 1986) .................................................... 96

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991) ........................ 20, 22, 26, 78, 79,81

*Word v. Potomac Elec. Power Co.*, 742 A.2d (D.C. 1999)……………………………......…83

*Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159 (Iowa 2002) ............................................. 85

*Wyke v. Polk County Sch. Bd.*, 129 F.3d 560 (11th Cir. 1997) ....................................... 32

*Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199 (S.D. Fla. 1979) ......................... 37, 43, 44

*Ziencik, v. Snap, Inc.*, 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) ............................ 29, 47, 79,81

*Zimmerman v. U.S.*, 171 F. Supp. 2d 281 (S.D.N.Y. 2001) …………………………...……… 92

**Treatises**

**5**7A Am. Jur. 2d Negligence § 656 .......................................................................**56**

5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1357 (3d ed. 1969) ...............18

*American Law of Products Liability* § 10:58 (3d ed. May 2023 update) ........................................46

*Dobbs' Law of Torts* § 478 Dan B. Dobbs et al., (2d ed., June 2020 Update) ...............................36

Rest. 2d Torts ("Rest. 2d. Torts") §§ 7, 290, 315, 402A(1), 431, 433 (1965) ........................*passim*

Rest. 3d Torts ("Rest. 3d Torts"): Prods. Liab. §§ 7, 19(a), 37 (1998) ....................................*passim*

**Statutes and Regulations**

15 U.S.C. § 6502(a) ......................................................................................... 73, 75

15 U.S.C. § 6502(b) ....................................................................................... 77

16 C.F.R. §§ 312.1-.13 ..................................................................................... 73

16 C.F.R. § 312.2 ......................................................................................... 73

16 C.F.R. §§ 312.1-.13 ..................................................................................... 73

16 C.F.R. §§ 312.4(a), 312.5(a) ........................................................................... 77

18 U.S.C. § 2258A(a) ....................................................................................... 80

18 U.S.C. § 2258A(b) ....................................................................................... 67

18 U.S.C. § 2258A(f) ....................................................................................... 68

PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:22-MD-03047-YGR

18 U.S.C. § 2258B(a), (b) ........................................................................... 55, 57

18 U.S.C. §§ 2258A(a)(1)(A)(i), 2258A(a)(2)(A), 2258A(a)(1)(B)............................................. 81

Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501, *et seq* ................ *passim*

Children's Online Privacy Protection Rule, 78 Fed. Reg. 3972, 3984 (Fed. Trade Comm'n Jan. 17,

   2013) ............................................................................................... 65

Del. Code Ann. tit.18 § 7001……………………………………………………………………81

Fed. R. Civ. P. 8(a)(2) .............................................................................. 49

35 Ill. Comp. Stat. 110/3-25 (2020) .............................................................84

735 Ill. Comp. Stat. Ann. 5/13-213(a)(2)......................................................84

Ga. Stat. Ann. § 51-1-6...............................................................................82

Kansas Product Liability Act, K.S.A. 60–3301 et seq .................................... 86

Minn. Stat. Ann. § 604.101(1)(c); § 604.101(4)……………………………………89

O.C.G.A. § 51-1-6…………………………………………………………………83

Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today ("PROTECT")

   Act, 18 U.S.C. §§ 2258A, 2258B...................................................... 55, 67, 68, 69

**Other Authorities**

Black's Law Dictionary 1412 (10th ed. 2014) ............................................................. 3

Sen. Richard Bryan Statement 144 Cong. Rec. S11657 (Oct. 7, 1998)......................................... 66

*Challenges and Solutions for Protecting Our Children from Violence and Exploitation in the 21st*

   *Century: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*,

   110th Cong. 607 (2008) ....................................................................... 68

Charles E. Cantu,  *A Continuing Whimsical Search for the True Meaning of the Term "Product"*

   *in Products Liability Litigation*, 35 ST. MARY'S L.J. 341 (2004), ........................................... 31

W. Jonathan Cardi, *The Hidden Legacy of Palsgraf: Modern Duty Law in Microcosm*,  91 B.U. L.

   Rev. 1873 (2011)............................................................................... 40

FTC, *Children's Online Privacy Protection Rule: Not Just for Kids' Sites* (Apr. 2013), ("*COPPA*

   *April 2013 Guidance*") ................................................................ 64, 65, 66

FTC, *Complying with COPPA: Frequently Asked Questions* (July 2020) .................................. 60

FTC, *Privacy Online: A Report to Congress* (June 1998) ........................................................ 66

John J. Fossett, *The Development of Negligence in Computer Law,* 14 N. Ky. L. Rev. 289 (1987) ................................................................................................................................... .1

*Jones v. Google*, No. 21-16291 (9th Cir. May 20, 2023), ECF No. 76 (Brief for Amicus Curiae Fed. Trade Comm'n) ……………………………………………………………..57, 66

David Lannetti *Toward a Revised Definition of "Product" under the Rest. 3d Torts: Products Liability*, 55 Bus. Law. 799 (2000), ...................................................................... 24

David Nercessian & Reuben Mancha, *From Automation to Autonomy: Legal and Ethical Responsibility Gaps in Artificial Intelligence*, 37 Mich. Tech. L. Rev. 55 (2020) .................. 33

K.G Orphanides, *On YouTube, a network of pedophiles is hiding in plain sight*, Wired UK (Feb. 20, 2019) .............................................................................................................. 71

Remarks on Signing the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, 1 Pub. Papers 398, 400 (Apr. 30, 2003) ("PROTECT Act Signing Statement") ................................................................................................................. 68

Catherine Sharkey, *Products liability in the Digital Age:  Online Platforms as 'Cheapest Cost Avoiders'*, 73 Hastings L.J. 1327 (2022)………………………………………………...1

1

## I.   __INTRODUCTION__

2      Defendants design social media apps that target kids but are not safe for them to use. Each

3  product at issue here exploits the way young brains work, causing compulsive use and addiction

4  and leading to dramatic increases in rates of anxiety, depression, self-harm, eating disorders, and

5  suicide among kids. Each Defendant has also thwarted parents' efforts to protect their children from

6  these severe injuries tied to use of Defendants' products.

7      Plaintiffs are some of the children and families whom Defendants have harmed. They bring

8  straightforward "priority claims" for products liability and products-based negligence to recover

9  for these harms. In response, Defendants essentially contend that tort law should be consigned to

10 products that existed in the twentieth century, resulting in no remedy for their wrongdoing and the

11 serious injuries their products cause.

12     But Defendants are mistaken: "The law of torts has adapted during the past century to the

13 impact of such major inventions as electric light and power, the telephone, radio, radar, television,

14 the automobile, the airplane, nuclear power, and all kinds of complex industrial machinery."[1] As

15 then-Judge Cardozo put it, application of fundamental tort principles must keep up with "whatever

16 the needs of life in a developing civilization require them to be." *MacPherson v. Buick Motor Co.,*

17 111 N.E. 1050, 1053 (N.Y. 1916); *see also, e.g., Air & Liquid Systems Corp. v. DeVries,* 139 S. Ct.

18 986 (2019) (applying basic tort principles to a novel duty-to-warn question). Ultimately, "product

19 liability is a microcosm of how the common law evolves over time, specifically to respond to new

20 societal risks . . . ."[2]

21     Defendants disregard these bedrock principles and at each stage seek to cabin tort law to an

22 overly narrow interpretation of its past applications: in their myopic view of what constitutes a

23 product; their constrained notion of duty of care; their inflexible approach to proximate causation;

24 and their rigid view of negligence per se. Defendants' hidebound approach would mean that

25 Defendants—those best able to ensure the safety of their products and warn users—would have a

26

27 [1] John J. Fossett, *The Development of Negligence in Computer Law,* 14 N. Ky. L. Rev. 289, 290 (1987) (citing Levin, Automation and the Law of Torts, 9 Prac. Law. 83 (1963)).

28 [2] Catherine Sharkey, *Products liability in the Digital Age:  Online Platforms as 'Cheapest Cost Avoiders',* 73 Hastings L.J. 1327, 1333-34 (2022).

1   green light to escape any tort liability for their wrongful conduct and the widespread and serious

2   harm it causes. But Defendants' misfeasance is not beyond tort law's concern just because it occurs

3   in a digital setting. Because Defendants fail to show as a matter of law that they cannot be held

4   accountable in tort for harms caused by their apps, their motion to dismiss should be denied.

5   **II.    SUMMARY OF FACTUAL ALLEGATIONS**

6         Rather than contend with the specific, detailed allegations in the Complaint, Defendants

7   move to dismiss a version of the pleadings they have conjured to suit their purposes.[3] Defendants

8   whistle past vast swaths of the Complaint discussing the defective and unreasonably unsafe design

9   features of their apps. They ignore allegations concerning Defendants' awareness of those unsafe

10  features and the harms they have caused Plaintiffs. And they disregard allegations describing how

11  Defendants have acknowledged, over and over again, that their apps are in fact products.

12        For example, Defendants recast *their own* misrepresentations as either truthful or as

13  Plaintiffs' own arguments.[4] Similarly, they misread the pleadings to insist that the core of this case

14  is the content hosted on Defendants' products rather than the products themselves.[5] Defendants'

15  attempt to reframe the narrative should be rejected: the well-pleaded allegations, which are

16  summarized below, must be accepted as true at this stage. *See Lemmon v. Snap, Inc.*, 995 F.3d

17  1085, 1087 (9th Cir. 2021).

18

19  [3] As used herein, "MTD" refers to Defendants' Joint Motion to Dismiss Plaintiffs' Priority
20  Claims (ECF No. 237). "MC" and "Complaint" refer to Plaintiffs' Amended Master Complaint
    (ECF No. 234-1).

21  [4] For example, Defendants brazenly claim "[t]he Master Complaint *acknowledges* that these
    services 'help people stay connected to people they care about' and reveal 'all of the good
22  humanity is capable of.'" MTD at 3 (emphasis added). But those statements are actually quotes
    from Mark Zuckerberg (MC ¶ 370(g), (p)) that the Complaint cites as Meta's "intentionally
23  *misleading* talking points" that "omitted key facts and misrepresented its products in service of an
    overall message touting the safety of its products for children." MC ¶ 367 (emphasis added).
24  Defendants similarly misattribute disputed statements of Meta executives to Plaintiffs at least
    fourteen other times. *See* MTD at 3, lines 4-5; 15-17; p. 5, lines 4, 8-11, 15-16, 20-22; p. 6, lines
25  22-24, 27 (citing MC ¶¶ 265, 370, 384, 390).

26  [5] Defendants claim the term "content" is "used more than 220 times in the Master Complaint."
    MTD at 11. That misleading statistic is irrelevant and inflated, as it includes nearly two dozen
27  URL links that happen to include the word "content," *e.g.* MC ¶ 808 n.872, article titles that
    happen to use the word "content," *e.g. id.* ¶ 294 n.356, and dozens of quotes *from Defendants*
28  using the word "content," *e.g. id.* ¶ 280.

1

### A.    <u>Defendants make products.</u>

Each of Defendants' social media applications comprises a set of standardized interactive software that is mass-produced, mass-marketed, and made available directly to consumers. *See* MC ¶ 171. Just as consumers can go to a hardware store to buy a table saw off the shelf, they can go to Apple's App Store or the Google Play Store to download Defendants' apps. *See id.* ¶ 835. Tellingly, Defendants refer to their apps as "products" in internal documents. *Id.* ¶¶ 176-77; *see also id.* ¶ 180 (quoting a Meta employee as saying "I'm anxious about whether FB the product is good for the world."). The apps are built by "product teams" supervised by "product managers." *See id.* ¶ 175. Those product teams describe their actions in the language of products—speaking of "packaging" and "shipping" "products." *See id.* ¶ 178. Outside their corporate campuses, Defendants market their apps as products, *id.* ¶ 179, and describe them as such to investors, *id.* ¶ 172, and in sworn testimony to Congress, *id.* ¶¶ 173-74. In both commercial reality and Defendants' own admissions, the applications at issue are mass-produced and mass-distributed products.

Moreover, in the ways that matter, these products take tangible form. *See* Black's Law Dictionary 1412 (10th ed. 2014) (defining "tangible personal property" as "[c]orporeal personal property of any kind; personal property that can be seen, weighed, measured, felt, touched, or in any other way perceived by the senses"). Users interact with the products by physically touching them on smartphones and tablets—including using special "swipe" combinations to access features. *See id.* ¶¶ 290, 617, 735. And many methods of interaction on Defendants' apps are consciously patterned off traditional physical engagement—for example, sending a "Like" by pressing a "thumbs up" button, "poking" other users, or "waving" at them. *See id.* ¶¶ 258, 284. The products themselves are integrated into the physical world, behaving differently based on a user's physical location and device sensors. *See id.* ¶¶ 242, 252, 493, 509, 516, 711; *see also id.* ¶¶ 407 (Meta's geotagging); 506-508 (Snapchat's snap map); 656 (TikTok's geotagging). They are designed to prompt physical behaviors by users, such as continuous scrolling and compulsive checking. *See id.* ¶¶ 116, 247, 448, 474-75, 480-84, 493, 592, 620, 731-33. Some can even measure physical reactions as specific as a child's heartbeat. *Id.* ¶ 459.

Like the products that led to the formulation of product liability law, Defendants' products are placed in the stream of commerce without any expectation that consumers can inspect them to identify defects. *See id.* ¶ 171. Indeed, Defendants' products are a black box to their users, who cannot examine the design of their underlying algorithms. *See id.* ¶¶ 245, 263, 546, 684, 715. Users—including Plaintiffs—therefore depend on Defendants to design their products in a safe way and to warn of foreseeable product dangers.

### B.   Defendants' products are defective.

The Complaint includes over 830 paragraphs that detail the multiple, distinct defects in Defendants' products—and why those defects (alone and in concert) make Defendants' products unreasonably dangerous to the children who use them. The Complaint explains the unique characteristics of each product and how the defects at issue may manifest in different ways. For purposes of concision only, the summary below highlights representative examples of how certain defects function in Defendants' products.

### 1.   Defendants' products are designed to addict children and teens through defects that inflict serious mental health harms.

Defendants' products are defective due to their incorporation of manipulative design features that are intentionally designed to control dopamine levels in young brains. *See, e.g.*, MC ¶¶ 77-79, 227, 261, 265, 274-75, 439, 468, 591-92, 717, 727-30. These defective features include endless feeds that induce a "flow state," intermittent variable rewards that increase usage, trophies that reward extreme periods of extended use, social metrics that exploit reciprocity, and incessant notifications that create insecurity and encourage repetitive account checking. *See, e.g.*, *id.* ¶¶ 3, 77, 82-83, 85, 89, 283-84, 289, 292, 294, 467-69, 474-79, 480-87, 493-95, 591-92, 614-20, 626-29, 727-733. Through these design features, Defendants' products overstimulate the reward center of the brain, reinforcing compulsive use. *See, e.g.*, *id.* ¶¶ 3, 12, 74, 77-82.

**Flow State Design**: Each Defendant has implemented flow-state design features in order to prevent users from exiting the app. For example, when a user scrolls through Facebook or Instagram Reels, video clips automatically play and restart once they have ended. *Id.* ¶ 289. Snap's Stories feature runs on "Auto-Advance," which automatically starts a new story after the previous one has

ended. *Id.* ¶ 493. Users cannot disable the auto-play function on TikTok's For You Page ("FYP"), meaning that if a user doesn't proceed from a video, it will continue to play on an infinite loop. *Id.* ¶ 615.  Similarly, YouTube's recommended videos, Up Next, and Shorts run on an endless loop. *Id.* ¶¶ 731-35. The effect of this, as the House Committee on Oversight and Reform observed in a letter to YouTube's CEO, is that "the onus [is] on the child to stop their viewing activity, rather than providing a natural break or end point. Without that natural stopping point, children are likely to continue watching for long periods of time." *Id.* ¶ 734.

The "flow state" Defendants cultivate creates a disorienting experience of time and facilitates protracted engagement for all users, to which children are particularly vulnerable. Compared to adults, children's capacity for impulse control is often underdeveloped, rendering them more susceptible to this engineered mind-state and predisposing them to dependency on Defendants' products. *See id.* ¶¶ 72, 80. That problem is heightened by the apps' strategic use of intermittent rewards, a form of behavioral conditioning that incentivizes users to endlessly scroll in pursuit of a dopamine release, overriding their inclination to participate in other activities. *See id.* ¶¶ 77-82; *see also infra*.

**Intermittent Variable Rewards**: Defendants' applications employ intermittent variable rewards ("IVR") and other similar slot-machine style features to strategically and unpredictably space out rewards that trigger dopamine release. *Id.* ¶¶ 77-79. Defendants' apps withhold and then release rewards based on algorithmic schedules that are personalized to but hidden from each user, and that are designed to intensify a user's craving and sustain their use of the product. *See id.* For instance, TikTok may withhold a video it knows a user will enjoy until the moment right before the user intends to log out. *Id.* ¶ 79. Instagram's notification algorithm may hold back "Likes" on a user's posts to maximize engagement and then release them in a massive burst of notifications later. *Id.* IVR techniques are particularly effective and perilous for young users, given their reduced executive functions and lack of impulse control due to incomplete brain maturation. *Id.* ¶ 80.

**Social Metrics and Validation**: Defendants also exploit the psychological phenomenon of "reciprocity" to capitalize on the vulnerabilities of children and adolescents. *Id.* ¶ 83. Kids have a heightened need for peer approval, and a less stable sense of self, than adults. *Id.* ¶¶ 63, 85. When

a kid receives a message, notification, or "like," they feel more obliged to respond promptly than an adult user. *Id.* ¶¶ 83, 85, 124. Failure to respond can cause the user to feel guilty, leading to increased anxiety and insecurity. *See id.* ¶¶ 83, 85.

Defendants intentionally designed their products to capitalize on this feeling of social obligation because it leads users to compulsively engage with the apps. *See id.* ¶¶ 76, 83, 85, 124. For example, Instagram and Snapchat automatically tell a sender when their message is seen, instead of letting the recipient avoid disclosing whether it was viewed. *Id.* ¶ 84. This makes the recipient feels more obligated to respond immediately. *Id.* Similarly, TikTok's "Duet" feature— which enables users to post a video side-by-side with another TikTok user's video—is designed to encourage users to react to the videos of TikTok content creators. *Id.* ¶ 631. This is intended to elicit a reciprocal response from the creator of the original video, thereby inducing them to return to the app. *Id.*

Defendants' exploitation of the reciprocity phenomenon is made possible by their apps' promise of validation through social reward mechanisms. These include the "Like" feature on Facebook, Instagram, TikTok, and YouTube, as well as Snapchat's Charms, Snapscore, and Snap Streak features. *Id.* ¶¶ 76, 85-87, 470-87. All of these product design choices incentivize minors to compulsively seek social validation through the apps' seemingly objective metrics. *See id.* ¶¶ 74, 76, 85-87, 124. What the apps actually offer young people is the possibility of powerful stimuli that trigger the release of dopamine in the developing brain's reward center. *See id.* ¶¶ 80-82, 85-86. Notably, repeated exposure to these dopamine triggers leads to neuroadaptation, by which children require more and more indicia of social validation (that are only available through Defendants' apps) to obtain the same level of dopamine release.  *Id.* ¶¶ 72-73, 124.

**Filters and Lenses**: Meta, Snap, and TikTok have each designed filters and lenses that "allow users to engage in selective self-presentation by altering their appearance in photos and videos. These filters allow facial structure alteration, body slimming, skin lightening, skin tanning, blemish clearing, the artificial overlap and augmentation of makeup, and other beautification 'improvements.'" *Id.* ¶ 314; *see also id.* ¶ 513-14, 649. A robust body of evidence—both external

and internal to Defendants—has linked these features to mental health harms. *See id.* ¶¶ 315-17, 515, 650-53. "As one psychodermatologist has summed it up, 'these apps subconsciously implant the notion of [the user's] imperfection and ugliness, generating a loss of confidence.'" *Id.* ¶ 317.

**Push Notifications**: Defendants' products all deploy push notifications (i.e., notifications generated by the apps and sent to users) to incentivize users who have not been on the app for even a brief period to return. *See, e.g., id.* ¶¶ 103, 292-93, 483, 488, 628-29, 730. This creates a cycle in which users feel compelled to continuously check the app or risk missing out on perceived social rewards, thereby reinforcing their dependence on the product. *See, e.g., id.* ¶¶ 374, 468-69, 626-29, 730. This manipulative technique is particularly detrimental to teenagers, who are highly susceptible to developing compulsive patterns of product use because of their underdeveloped impulse control and heightened desire for social recognition. *Id.* ¶¶ 80, 85. Meta even sends push notifications in the middle of the night, disrupting children's sleep, which is associated with poor health outcomes. *Id.* ¶ 293. Meta's "growth hackers" advised the company to "be very aggressive with our notifications to create a habit." *Id.* ¶ 374.

Snapchat also deploys push notifications to repeatedly prompt users to open the app and increase their overall time using the product. The efficacy of Snap's manipulation techniques is attributable, in part, to the fact that its self-destructing messages foster a sense of urgency to engage with the app. *Id.* ¶ 469. As these messages vanish within a brief ten-second window, users are compelled to respond instantly. *Id.* Meta also capitalizes on users' desire to engage with ephemeral content, ensuring that its Stories disappear after just 24 hours of posting. *Id.* ¶ 294. Likewise, TikTok's "TikTok Now" feature demands that a user post a photo or video within three minutes of being notified, in order to view their friends' posts and avoid being marked "late." *Id.* ¶ 628. And YouTube sends notifications to kids when accounts they subscribe to post a new video, incentivizing them to immediately view the content. *Id.* ¶ 730. Such practices contribute to habitual and excessive use of the platform by youth. *See, e.g., id.* ¶¶ 80, 292-93, 468-69, 626-29, 730.

**Account Deletion Barriers**: Another defective feature of Defendants' products is the series of significant and manipulative obstacles users face when they try to delete their accounts. *See, e.g.,*

*id.* ¶¶ 358-63 (Meta); 489-90 (Snapchat); 638-48 (TikTok); 774-77 (YouTube). These barriers stand in stark contrast to the ease with which such accounts can be created. *See, e.g.*, *id.* ¶ 240-41, 358 (Meta); 489 (Snapchat); 567, 638, (TikTok); 774 (YouTube). Meta and YouTube's intricate account deletion process involves navigating at least six different pages. *Id.* ¶¶ 359, 777. TikTok requires users to enter a validation code when deleting their account, which is sent to the email or phone number entered during account creation. *Id.* ¶¶ 567-68, 646.

Most Defendants also exploit kids' vulnerability to reciprocity when they try to delete their accounts. Meta and Snap warn that a user will no longer be able to connect with their friends upon account deletion. *Id.* ¶¶ 361, 489. Google links its user's YouTube account to their general Google account, then threatens to revoke access to the user's email, photos, and digital media purchased through Google Play if a user attempts to delete their YouTube account. *See id.* ¶ 776.

Even if a child manages to "delete" their account, Defendants actually maintain the account for a predetermined period, allowing the user to easily succumb to addictive impulses and regain access by simply logging back in, without needing to create a new account. *See id.* ¶¶ 360 (Meta); 489 (Snapchat); 640 (TikTok); 777 (YouTube). Requiring minors to endure a protracted account deletion process that involves multiple steps, alternatives, and enticements is a calculated strategy to dissuade kids from quitting. *See id.* ¶¶ 358-63 (Meta); 489-90 (Snapchat); 647 (TikTok); 774-77 (YouTube). Additionally, retaining deactivated accounts for a specified duration increases the likelihood that addicted users will relapse and return to the app. *See id.* ¶¶ 363; 647.

**Usage-Maximizing Algorithms**: Each Defendant uses algorithms to control how their products look, feel, and behave for any given user—for Meta, TikTok, and YouTube, to control the main feed users see, and for Snap, to control certain side feeds. *See id.* ¶¶ 130, 493, 496. Defendants' products take in vast quantities of user data—far more than any reasonable consumer would understand is being absorbed. *See id.* ¶¶ 76 (all Defendants); 198-99, 242, 250-52 (Meta); 509 (Snapchat); 585-91 (TikTok); 711 (YouTube). They "learn" users' demographics. *See id.* ¶ 250-52, 747. They learn what a user clicks on. *See id.* ¶¶ 207, 242, 589-91, 747. They learn how long a user reads or watches a post. *See id.* ¶¶ 242, 589-91, 747. They learn what a user hovers their mouse

over—and for how long they do so. *See id.* ¶ 250. They learn what users don't engage with—what posts fail to draw attention or engagement. *See id.* ¶ 250, 509, 589-91, 747. They learn what times of day users access the product. *See id.* ¶ 242. They learn the physical location where users access the product. *See id.* ¶¶ 242, 252, 509, 289; 656, 711. They learn what other devices are connected to the Wi-Fi networks users are using. *See id.* ¶¶ 242, 711. In sum, they learn, based on a staggering number of variables and datapoints, information sufficient to target users with laser precision. *See id.* ¶¶ 242, 250-52, 493, 509, 585, 589, 711, 747. Using all this data, Defendants' recommendation algorithms are then optimized to maximize the amount of time users spend on Defendants' products. *See id.* ¶¶ 250, 509, 585-91, 747-749. By design, these recommendation algorithms function as "an addiction engine." *See id.* ¶ 755.

This defect has powerful synergistic effects with other defects. For example, in conjunction with social metrics such as "Likes," usage-optimized algorithms turn the social experience of America's adolescents into a massive, quantifiable popularity contest. *See*, *e.g.*, *id.* ¶ 355 (internal Meta documents observing that "[w]hen today's parents were teens, social comparison was much more limited both in terms of scope and scale. Teens today compare themselves to many more people, much more often, and about more parts of life than their parents did during their adolescence."). Defendants' algorithms reinforce social comparison harms by pushing photos and videos edited by defective filters and lenses. When push notifications draw users onto Defendants' apps late in the night, the algorithms will keep users on well after the initial notification is viewed, interfering with sleep. *See id.* ¶¶ 103, 292-93, 483, 488, 628-29, 730.  In short, Defendants' recommendation algorithms exacerbate every other product defect discussed in the Complaint.

Beyond their tendency to promote overconsumption, Defendants' usage-optimized algorithms can psychologically harm users. One known defect of usage-optimized algorithms is that they tend to promote whatever triggers strong reactions because such reactions lead to greater engagement. *See id.* ¶¶ 271, 596, 601, 771. Former Google engineers told the *Wall Street Journal* that "[t]he algorithm doesn't seek out extreme videos . . . but looks for clips that data show are already drawing high traffic and keeping people on the site. Those videos often tend to be

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

sensationalist." *Id.* ¶ 757. Because "[o]utrage equals attention," algorithms geared towards maximizing attention push the extreme and outrageous. *See id.* ¶¶ 278, 281, 309, 560, 597-605, 757-59.

### 2.    Defendants' products lack meaningful age verification.

Defendants do not dispute that current federal law prohibits them from collecting personally identifiable information about children under the age of 13, absent verifiable consent from their parents. *See* MTD at 56-57 (acknowledging that the Children's Online Privacy Protection Act generally prohibits collecting personal information from children under the age of 13 and noting that consent by parents is an exception); *see also* MC ¶ 56 (same). Nonetheless, Defendants' products lack any effective mechanism to verify their users' age. *See id.* ¶¶ 327-57 (Meta); 461-66 (Snapchat); 566-76 (TikTok); 692, 721-26 (YouTube). Instead, the products rely on self-reporting for age verification during account creation. *Id.* But Snap has publicly acknowledged that this approach is "effectively useless" in preventing minors from creating accounts and TikTok knows that many users under the age of 13 report inaccurate birthdates. *Id.* ¶¶ 464, 570. Meta and Snap routinely allow minors to misrepresent their age and take no action to verify the age of their users or enforce age limitations. *Id.* ¶¶ 332-34, 463. As to YouTube and TikTok, anyone with Internet access, irrespective of age, can access their apps without creating an account. *Id.* ¶¶ 569, 705, 719.

Defendants' products lack effective age verification for the simple reason that Defendants actively want children to use their platforms. Indeed, Defendants target minors through their marketing strategies. *Id.* ¶ 256 (describing Meta's "major investment in youth" through targeted research and product development for children as young as six); *id.* ¶ 709 (YouTube's own promotion to advertisers as the "leader in reaching children age 6-11"); *id.* ¶ 460 (highlighting Snap's collaboration with child-focused advertisers targeting children); *id.* ¶ 677 (describing TikTok's advertising strategy to target minors).

Defendants' marketing strategies have proven to be highly effective. Survey evidence has shown widespread use of their products among minors. Ninety-three percent of tweens use YouTube, 13% of children aged 8-12 use Snapchat, and over one-third of TikTok users are 14 or

younger. *Id.* ¶¶ 464, 555, 709. Meta's internal research confirmed that 24% of children aged 7-9 and 38% of tweens aged 10-12 have at least one social media account. *Id.* ¶ 341; *see also id.* ¶ 341 (discussing use of Meta's products among children). Defendants are well aware that underage users are a pervasive presence on their products. Indeed, Meta and YouTube have trained their algorithms to track user age. *Id.* ¶¶ 334, 725. Despite this knowledge, Defendants did not change their products' design to include adequate age verification mechanisms.

### 3.   Defendants' products lack meaningful parental controls, making it impossible for parents to protect their children.

Each Defendant has designed its product in ways that make it exceedingly difficult for parents and guardians to safeguard their children from harm. For one, the products' lack of effective age verification means children can bypass parental consent simply by lying about their age or using the app without an account. MC ¶ 352; *infra* p. 64. And parents are not given the tools that would allow them to effectively limit their childrens' use of Defendants' products.

For example, Defendants' apps either fail entirely to offer features that would let parents limit their kids' engagement or daily usage, or such features are easily circumvented. *See id.* ¶¶ 722 ("children can use YouTube without logging into any account or by logging in but misreporting their age");  578 ("youth can easily evade the protections of [TikTok's] 'Family Pairing' feature by creating anonymous accounts" and there is "no protection when a child accesses TikTok through a web browser."); 350 (Meta does not allow parents to implement maximum daily usage limitations); 522 (describing the inadequacies of Snapchat's "Family Center"). Similarly, certain Defendants prevent parents from supervising their minor users' contact with adults. On Facebook, children can place their parents on a "restricted list" of people who are unable to view their stories. *Id.* ¶ 352. Snapchat's Family Center leaves parents and guardians unable to block minors from sending private messages to adults, or control their use of Snapchat's geolocation feature. *Id.* ¶ 522. Other apps have similar design defects. *See id.* ¶¶ 352 (Instagram); 579-81 (TikTok).

Defendants have failed to implement numerous effective parental controls that could address the risks children face when using their products. *See id.* ¶ 141 (describing defects). Among the available parental controls that Defendants could but, in most cases, do not implement are:

requiring children's accounts to be linked to their parents' account, prohibiting minors from creating multiple accounts, implementing age verification to prevent access by children under 13 without verifiable parental consent, enabling parents to restrict usage during certain hours and impose maximum daily usage limitations, alerting parents about their childrens' interactions with adult accounts, alerting parents when child sexual abuse material ("CSAM") is found on a minor's account, and requiring parental approval before allowing minors to follow new accounts or add unknown users. *See id.* ¶¶ 141 (all Defendants); 327-57 (Meta); 350 (Meta); 461-66 (Snapchat); 520-22 (Snapchat); 566-82 (TikTok); 718-26 (YouTube); 845 (all Defendants). Given the clear dangers posed by their products to children, Defendants' unwillingness to incorporate effective, easily implemented parental controls demonstrates prioritization of maximizing use over youth safety. As a result, Defendants have knowingly left countless children vulnerable to a wide range of harms. *See, e.g.*, *id.* ¶¶ 141; 351-53 (Meta); 503 (Snapchat); 601 (TikTok); 718-21 (YouTube).

Finally, Defendants' purported measures to safeguard children via "kid-friendly" products such as TikTok for Younger Users and YouTube for Kids, alongside supposed enhanced parental controls, do little to mitigate the risks to children from using Defendants' applications. *See id.* ¶¶ 705, 574. Instead, they appear designed to lure in children, making kids reliant on the apps from a young age and perpetuating the very harm Defendants purport to prevent. *See id.* ¶¶ 574, 705.

### 4. Defendants' products connect children to predators and provide tools that foreseeably create a means for predators to groom and abuse kids.

Defendants' design choices have facilitated child sexual exploitation on a shocking scale. As one nonprofit focused on child exploitation reported to Meta, "one-quarter of [minor] participants (25%) [in its study] reported having had an online sexual interaction with someone they thought was 18 or older," and that "[n]either blocking nor reporting [offenders] protects minors from continued harassment." MC ¶ 155 (last alteration in MC). Meta conducted "[a]n internal study" which similarly found that, *every day*, "500,000 underage Instagram accounts 'receive IIC'—which stands for 'inappropriate interactions with children.'" *Id.* ¶ 405. Yet company insiders reacted with a shrug: "'Child Safety [was] explicitly called out as a nongoal . . . . So if we do something here, cool. But if we can do nothing at all, that's fine, too.'" *Id.* (alteration in MC).

Defendants' products facilitate child sexual exploitation through various defective features that help predators connect with a large pool of potential victims. *Id.* ¶ 133-34. First, the absence of effective age verification measures allows predators to lie about their ages and masquerade as children. *See id.* ¶¶ 136 (all Defendants); 400 (Meta); 466 (Snapchat); 576 (TikTok); 720 (YouTube). Second, certain Defendants' connection recommendation algorithms function as a digital matchmaking service for pedophiles and children. *See id.* ¶¶ 509 (Snapchat), 658 (TikTok). For example, internal research by Meta revealed that "80% of 'violating adult/minor connections' on Facebook were the result of [Meta's] friends recommendation system." *Id.* ¶ 399. Third, certain Defendants allow or encourage children to make their profiles public, "supply[ing] sexual predators with detailed background information about children, including their friends, activities, interests, and even location." *Id.* ¶ 138. Armed with this information, pedophiles can groom children who do not suspect "that their posts, friends, pictures, and general online sharing represent[] a windfall of information that a predator could use to sexually exploit or abuse them." *Id.*

Fourth, while Snapchat does not have public user profiles, it provides pedophiles—who, again, can pose as minors and whose profiles may be "recommended" to children—with a wealth of information with which to groom children. *See id*, ¶¶ 466, 506-07. For example, all users, including children, are automatically opted into the "Snap Map" feature. *Id.* ¶¶ 506-07. This feature allows a child to publicly share their physical location and then displays it on an "activity-level-based, color-coded heatmap." *Id.* Snapchat draws predators a literal map of where they can find the kids they have friended. *Id.*

Fifth, certain Defendants provide mechanisms in their products that enable cash payments or gifts between children and adult strangers—which unsurprisingly enables sexual abuse. TikTok in particular encourages this by pairing livestream videos with means to provide cash or cash equivalents to children, meaning that "Livestreams on [TikTok] are a popular place for men to lurk and for young girls—enticed by money and gifts—to perform sexually suggestive acts." *Id.* ¶ 665 (alteration in MC). This creates "the digital equivalent of going down the street to a strip club filled

with 15-year-olds." *Id.* Other Defendants have also used systems which enable such gifts or transfers. *See id.* ¶¶ 528 (Snapchat), 740 (YouTube).

Finally, Defendants' products are designed in ways that allow pedophiles to conceal and exchange CSAM, including to support "sextortion" schemes where "a predator threatens to circulate the sexual images of the minor unless the predator is paid to keep the images under wraps." *Id.* ¶ 143; *see also id.* ¶¶ 145, 532. Each Defendants' CSAM takedown and reporting system is fundamentally broken. *See id.* ¶¶ 149-50 (all Defendants); 153 (all Defendants); 409-10 (Meta); 535-39 (Snapchat); 667 (TikTok); 799-800 (YouTube).  Despite actual knowledge of the presence of CSAM on their products (or willful blindness to the same), Defendants do not effectively take CSAM down and report it to law enforcement. *See, e.g.*, *id.* ¶¶ 409-10, 413-16, 418, 424, 427 (Meta); ¶¶ 523-37 (Snapchat); ¶¶ 667-72 (TikTok); ¶¶ 799-802, 810-11 (YouTube).

**C.     Defendants' products hurt kids—and Defendants know it.**

The Complaint alleges how Defendants' apps target, exploit, and injure kids.  "Adolescents and children are central to the Defendants' business models" because *"*[t]hese age groups are highly connected to the Internet, more likely to have social media accounts, and more likely to devote their downtime to social media usage." MC ¶ 11. To "maximiz[e] youth engagement to drive advertising revenue[,]" Defendants "deliberately embedded in their products an array of design features" that "[b]orrow[] heavily from the behavioral and neurobiological techniques used by slot machines and exploited by the cigarette industry[.]" *Id.* ¶ 2. As Meta has internally acknowledged, its products are addictive by design—"'[n]o one wakes up thinking they want to maximize the number of times they open Instagram that day. But that's exactly what our product teams are trying to do.'" *Id.* ¶ 302. "[D]riving sessions incentivize us to make our product more addictive, without providing much more value." *Id.* ¶ 301. "We only cared about things like time spent, open links, etc. That's what we optimized for. That's what we used to define success and failure. And that's the problem." *Id.* ¶ 272 (alteration omitted).

The same sentiment has been echoed by two of Defendants' former top-level executives— Sean Parker, Facebook's first President, and Eric Schmidt, longtime CEO and Chairman of Google.

*See id.* ¶ 261; 690. Mr. Schmidt has publicly expressed that social media products "play into the addiction capabilities of every human" for the purpose of "maximizing revenue" by "maximiz[ing] engagement." *Id.* ¶ 690. Mr. Parker's assessment is more scathing—he has said that he and Mark Zuckerberg sought to "exploit[] a vulnerability in human psychology" to entrap users in a "social-validation feedback loop" with the goal of "consum[ing] as much of your time and conscious attention as possible[.]" *Id.* ¶ 261. "The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway." *Id.* (alteration in MC). "God only knows what it's doing to our children's brains." *Id.*

Emerging evidence confirms what Defendants have long understood: their product designs harm children. "Teenagers know they are addicted to Defendants' products: 36% admit they spend too much time on social media." *Id.* ¶ 93. "Of the teens who use at least one social media product 'almost constantly,' 71% say quitting would be hard. Nearly one-third of this population—and nearly one-in-five of *all* teens—say quitting would be 'very hard.'" *Id.* "[T]he more teens use Defendants' apps, the harder it is to quit." *Id.* ¶ 94. "Teens who say they spend too much time on social media are almost twice as likely to say that giving up social media would be hard, compared to teens who see their social media usage as about right." *Id.*

Recent surveys confirm that young people identify "social media [as] the main reason youth mental health is getting worse." *Id.* ¶ 95. From 2010 to 2020, "there was a 40% increase in high school students reporting persistent sadness and hopelessness, and a 36% increase in those who attempted to take their own lives." *Id.* ¶ 5; *see also id.* ¶ 118 ("The share of kids who … created a suicide plan increased by 44%"). "By 2019, one-in-five children aged 3-17 in the United States had a mental, emotional, developmental, or behavioral disorder." *Id.* ¶ 121. There has been a reported 57% increase in youth suicide rates from 2007 to 2019. *See id.* ¶ 5. Similarly, reports detail a 117% rise in emergency room visits among youth for anxiety disorders and 44% for mood disorders from 2007 to 2016. *Id.* ¶ 120. Young people have overwhelmingly tied this decline in mental health to social media—"[a]bout twice as many of the surveyed youth believed that social media is the main reason for declining mental health than the next likely cause, and over *seven times* more believed it to be the main cause rather than drugs and alcohol." *Id.* ¶ 95.

Likewise, researchers searching for the cause of the crisis have found links between social media and eating disorders (*see id.* ¶¶ 110, 112), body image issues (*see id.* ¶¶ 102, 104-05, 108, 115), sleep disturbances (*see id.* ¶¶ 103, 105), anxiety (*see id.* ¶¶ 105, 109), depression (*see id.* ¶¶ 105-06, 109), loss of self-esteem (*see id.* ¶ 114), lower neural sensitivity to social anticipation (*see id.* ¶ 116), and suicide and self-harm (*see id.* ¶¶ 107, 111). As Meta itself summarized in internal documents, "[t]he best external research indicates that Facebook's impact on people's well-being is negative[.]" *Id.* ¶ 376 (first alteration in MC). Public health advocates have cited issues with Defendants' products and urged them to change design features to avoid harming children. *See id.* ¶¶ 102 (Meta); 515 (Snapchat); 618 (TikTok); 762 (YouTube); 764 (YouTube). Industry insiders have done the same—for example, one industry thought leader expressed concern to YouTube that its algorithm functioned as "an addiction engine." *Id.* ¶ 755. YouTube made clear it had no intention to change its algorithm—as the insider explained, "the algorithm works as intended: 'it makes a lot of money.'" *Id.* The Surgeon General also has observed that compulsive use of these products is a problem—"[y]ou have some of the best designers and product developers in the world who have designed these products to make sure people are maximizing the amount of time they spend on these platforms. And if we tell a child, use the force of your willpower to control how much time you're spending, you're pitting a child against the world's greatest product designers." *Id.* ¶ 7. Children versus Big Tech is "just not a fair fight." *Id.*

Defendants know their apps are addictive and cause harm. *See, e.g.*, 76-87 (all Defendants); 96-124 (all Defendants); 282-305 (Facebook and Instagram); 306-26 (Instagram); 467-97 (Snapchat); 583-674 (TikTok); 727-77 (YouTube). Even Meta's own research documents the deleterious psychological and physical effects of its products. "Meta understands that 'teens feel addicted to IG and feel a pressure to be present' but 'like addicts, they feel that they are unable to stop themselves from being on IG.'" *Id.* ¶ 299. It coined a euphemism for this—"problematic use." *Id.* ¶ 298. Meta's research found that "'[a]ll problematic users were experiencing multiple life impacts,' including loss of productivity, sleep disruption, relationship impacts, and safety risks." *Id.* ¶ 99, fn. 84.

1
2
3
4
5
6
7
8

Moreover, Meta's researchers found that "[w]e make body issues worse for 1 in 3 teen girls[.]" *Id.* ¶ 308. "Comparisons on Instagram can change how young women view and describe themselves, they noted, changing a girl's self-perception from 'multi-dimensional' and 'centered' to 'not in control,' 'dark,' 'boxed in,' 'low esteem,' and 'anxious.'" *Id.* ¶ 311. "The researchers' conclusions were stark: '[m]ental health outcomes related to this can be severe,' and can include 'eating disorders,' 'body dysmorphia,' 'body dissatisfaction,' 'depression,' and 'loneliness.'" *Id.* This research, and the dozens of other comparable studies outlined in the Complaint, underscores that Defendants knew of the risks of their products. *See id.* ¶¶ 96-124 (discussing studies).

9

**D.      Defendants failed to warn the public about their products' defects.**

10
11
12
13

None of the Defendants warn kids or parents about the known dangers arising from the foreseeable use of their products. MC ¶¶ 431-36 (Meta); 543-50 (Snap); 675-76, 683-88 (TikTok); 812-18 (YouTube). Instead, Defendants have sought to suppress the truth about their products. *See, e.g.*, *id.* ¶ 826.

14
15
16
17
18
19
20
21
22
23
24

Consider the case of Molly Russell, a 14-year-old who took her own life as a direct consequence of defects with Meta's products. *See id.* ¶ 279 (describing official findings by coroner). Meta sent an executive to a U.K. coroner's court to deny that its product played any role in Molly's suicide—even though its internal research had found a palpable risk of "similar incidents" because algorithmic product features were "[l]eading users to distressing content." *Id.* ¶¶ 279-80 (alteration in MC). Meta has also run national advertisement campaigns designed to persuade parents that its algorithms actually function as safety features, rather than machines that induce eating disorders and a host of other harms. *See id.* ¶ 390. Indeed, each Defendant has similarly hid the truth or, at a minimum, failed to warn the public about the harmful defects built into their products. *Id.* ¶¶ 244-82, 303-05, 364-91, 431-37 (Meta); 501-02, 522, 540, 543-53 (Snapchat); 578, 659, 675-89 (TikTok); 713-14, 772-73, 786-87, 797-803, 812-19 (YouTube).

25
26
27

An especially disturbing consequence of Defendants' denialism is that certain Defendants have rolled back safety features designed to mitigate mental health harms, in order to avoid the

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

appearance of inconsistency between their public and private positions. As one Meta employee explained:

> [T]ime and time again I've seen promising interventions from integrity product teams, with strong research and data support be prematurely stifled or severely constrained by key decision makers—often based on fears of public and policy stakeholder responses. Similarly (though even more concerning), I've seen already built & functioning safeguards being rolled back for the same reasons[.]

*Id.* ¶ 304 (alteration in MC). By sacrificing safety for the sake of public relations, Defendants have added immeasurably to the human cost of America's youth mental health epidemic. *See id.* ¶ 5.

## III.    LEGAL STANDARDS

Federal Rule of Civil Procedure 8(a)(2) requires only that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" The factual allegations thus need only "suggest that the claim has at least a plausible chance of success." *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (quoting *In re Century Aluminum Co. Secs. Litig.*, 729 F.3d 1104, 1107 (9th Cir. 2013)). Plaintiffs' 281-page Master Complaint easily clears this bar.

As shown below, Plaintiffs' claims are grounded in precedent. Even if any aspect of Plaintiffs' claims were novel, this would not weigh in favor of dismissal on the pleadings. The Ninth Circuit (and others) caution that courts should be "especially reluctant" to dismiss supposedly "novel" theories because "it is important that new legal theories be explored and assayed in the light of actual facts rather than a pleader's suppositions." *Elec. Const. & Maint. Co., Inc. v. Maeda Pac. Corp.,* 764 F.2d 619, 623 (9th Cir. 1985) (quoting 5B Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 1357 (3d ed. 1969));[6] *see McGary v. City of Portland*, 386 F.3d 1259, 1270 (9th Cir. 2004) (dismissing "novel legal theor[ies]" on pleadings disfavored where they "can best be assessed after factual development."); *Baten v. McMaster*, 967 F.3d 345, 368 (4th Cir. 2020), *as amended* (July 27, 2020) (same); *In re Outlaw Labs., LP Litig.*, 352 F. Supp. 3d 992, 1008 (S.D. Cal. 2018) (that a claim "does not fall within the four corners of []prior case law does not justify dismissal under Rule 12(b)(6)").

---

[6] *See also Fed. Prac. & Proc.* § 1357 (3d ed. April 2023 update) (same).

PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:22-MD-03047-YGR

Nor should federal courts deny relief to litigants in diversity cases "merely because no one has presented an identical claim in a state court." *Leslie Salt Co. v. St. Paul Mercury Ins. Co*., 637 F.2d 657, 661 (9th Cir. 1981). A federal court sitting in diversity is "task[ed]" with making a "conscientious prediction" of what rule the highest court of the state would adopt. *In re Lithium Ion Batteries Antitrust Litig*., 2014 WL 4955377, at *8 (N.D. Cal. Oct. 2, 2014). This ensures that litigants who must protect their rights in federal courts after removal (and here, after centralization for multidistrict litigation) do not face an unfairly "inhospitable forum for claims not identical to those resolved in prior cases." *Paul v. Watchtower Bible Tract Soc. of N.Y*, 819 F.2d 875, 879 (9th Cir. 1987). "[A] policy by the federal courts never to advance beyond existing state court precedent would vest in defendants the power to bar the successful adjudication of plaintiffs' claims in cases involving novel issues; defendants could ensure a decision in their favor simply by removing the case to federal court." *Id.*; *see also In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 379 F. Supp. 2d 348, 364 (S.D.N.Y. 2005) (MDL court citing *Watchtower* and predicting holdings on state laws, reasoning a "plaintiff is entitled to the same treatment [they] would receive in state court—no more, and no less").

When such an *Erie* prediction involves product liability claims, federal courts consider whether "the purposes of the doctrine would be defeated or diluted" by limiting claimants' rights. *Scandinavian Airline Sys. v. United Aircraft Corp.*, 601 F.2d 425, 428 (9th Cir. 1979). This involves considering the "risk distribution principle," a "fundamental policy behind the [strict liability] doctrine" that ensures "the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by injured persons who are powerless to protect themselves." *Id.* (quoting *Greenman v. Yuba Power Prods., Inc.*, 377 P.2d 897, 901 (Cal. 1978)). Federal courts considering this and related public policy factors may anticipate that state courts would apply strict liability to products beyond traditional tangible goods. *See, e.g.*, *Firkin v. U.S. Polychemical Corp.*, 835 F. Supp. 1048, 1051 (N.D. Ill. 1993) (predicting Illinois would consider labels products rather than services based on "the social policy justifications underlying the adoption of strict liability, rather than a dictionary definition of the term product");

*see also Rodriguez-Suris v. Montesinos*, 123 F.3d 10, 13 (1st Cir. 1997) (considering, *inter alia*, "policy considerations identified in state decisional law").

## IV.   ARGUMENT

Although Defendants attack all of Plaintiffs' priority claims, they target each on strikingly narrow grounds that fail to engage with Plaintiffs' claims as pled. Defendants make products, and Plaintiffs challenge the design features of these products, not the communications they facilitate. Defendants' obligations as product-makers, the foreseeability of Plaintiffs' alleged harm, and Defendants' actual knowledge of the same all required Defendants to design reasonably safe apps and warn the public about the risks they posed.  Defendants were likewise subject to statutory duties to their young users.  In denying their obligations under these long-established common law principles, Defendants seek an unprecedented blanket immunization from the consequences of the harm they have caused. Defendants' motion to dismiss should be denied.

### A.   Plaintiffs sufficiently plead product liability claims.

For nearly as long as computer software has existed, courts have treated software as a "product" in circumstances similar to those here. Defendants never seriously engage with the factors courts consider when resolving this issue, nor do they apply those factors and cases to the product-defect claims Plaintiffs actually allege. Instead, Defendants attack the strawman that Plaintiffs are seeking to regulate ideas, content, and other kinds of "intangible expression." But Plaintiffs' claims target the design features of Defendants' apps that lead to compulsive use or addiction, not the content or expression shared on those apps. The former are products; the latter are not. *Compare, e.g., Saloomey v. Jeppesen & Co.*, 707 F.2d 671, 677 (2d Cir. 1983) (mass-produced navigational chart was a product), *with Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035 (9th Cir. 1991) (encyclopedia was "pure thought and expression"). That is the distinction recognized by the Ninth Circuit in *Lemmon*, 995 F.3d at 1092, and by the court in *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 820 (D. Or. 2022). It is the same distinction this Court implicitly recognized in *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022). Plaintiffs respectfully ask the Court to reject Defendants' misguided approach and allow Plaintiffs to prosecute the claims they actually pleaded.

1

### 1.   Products liability law applies to Defendants' defective apps.

Plaintiffs' claims are founded on a bedrock principle of products liability law: manufacturers should be liable for harms caused by their defectively designed products. *See Loomis v. Amazon.com LLC*, 63 Cal. App. 5th 466, 475-6 (2021) (noting the California Supreme Court established strict products liability to ensure manufacturers bear the cost of harms caused by their defective products (citing *Greenman*, 377 P.2d 897)). Plaintiffs' contention is straightforward: Defendants make digital products that are defectively designed to hook young users. Plaintiffs' claims target the design features of Defendants' apps that lead to this compulsive use and addiction. They do *not* target the content, let alone the ideas, shared on those apps.

Start with *Lemmon*. The plaintiffs there alleged Snap was liable for a dangerous and unsafe "speed filter" feature in Snapchat. 995 F.3d at 1088-90. The Ninth Circuit, in rejecting Snap's claim of immunity under Section 230, found it "apparent" from the complaint that the plaintiffs sought to hold Snap accountable for violating a duty that "'springs from' its distinct capacity as a products designer[,]" as distinct from any role Snap may have as a publisher of third-party content. *Id.* at 1092. Consequently, the court treated Snap as a "products manufacturer" accused of "negligently designing a product." *Id*. at 1092-93 (citation omitted).[7] On remand, the district court denied Snap's second motion to dismiss and permitted the plaintiffs to proceed on a negligent design claim against Snap as a "product designer" and "product manufacturer." *Lemmon v. Snap, Inc.*, 2022 WL 1407936, at *6-7 (C.D. Cal. Mar. 31, 2022) (quoting *Lemmon*, 995 F.3d at 1092).

In *Omegle*, too, a dispute over the applicability of Section 230 required the court to parse the nature of the underlying claims. *See* 614 F. Supp. 3d at 818-21. In doing so, the court reasoned it "does not matter" that content was sent between users on the defendant's website; "[w]hat matters for the purposes of [the plaintiffs'] claims" is the "warnings or design of the product at issue." *Id.* at 820. The court clarified the distinction between defective product design and objectionable

---

[7] The conclusion by one court that *Lemmon* only "referenced the term 'product' generally and in the context of the CDA" thus misses the mark. *See Jacobs v. Meta Platforms, Inc.*, 2023 WL 2655586, at *3 (Cal. Super. Ct. Mar. 10, 2023). It was precisely because the plaintiffs alleged Snap had violated its duty as a products manufacturer that the Ninth Circuit rejected Snap's argument that it was being sued over content on Snapchat. *See Lemmon*, 995 F.3d at 1092.

content by explaining that, under the plaintiffs' theory, "Omegle would not have to alter the content posted by its users—it would only have to change its design and warnings." *Id.* (distinguishing *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889 (N.D. Cal. 2021)).

In *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739 (Ga. 2022), the Georgia Supreme Court highlighted why Defendants' apps are products. The court held Snapchat had a duty as a "manufacturer" to "exercise reasonable care . . . to reduce the reasonably foreseeable risks of harm presented by [its] product." *Id.* at 745 (cleaned up). Although the claim in that case was based in negligence, the court observed that "the same test is used to assess breach of the manufacturer's design duty . . . for purposes of a strict-liability claim or . . . for purposes of a negligence claim." *Id.* at 746. Snapchat was a "product," and Snap could be held liable under products liability law because it "could reasonably foresee that the product's design" created a safety risk. *Id.* at 747-48.

Other cases likewise recognize products liability law applies when a plaintiff alleges harm caused by a software's design defect, rather than by information delivered or services facilitated by the software.[8] *See Winter*, 938 F.2d at 1036 (computer software may be a product); *Brookes v. Lyft, Inc.*, No. 50-2019-CA-4782, 2022 WL 19799628, at *4 (Fla. Cir. Ct. Sept. 30, 2022) (products liability law applied to "the design of the [ride share] application itself"); *Holbrook v. Prodomax*

---

[8] Defendants are wrong that strict liability theories are unavailable to plaintiffs bringing products liability actions under the laws of Alabama or Delaware. *See* MTD at 14 n.9. In **Alabama**, products liability actions are governed by judicial doctrine that provides for modified strict liability. *See Bodie v. Purdue Pharma Co.*, 236 F. App'x 511, 517-18 n.9 (11th Cir. 2007) (Alabama Extended Manufacturers' Liability Doctrine (AEMLD) "is comparable to a defective product action grounded in strict liability," though noting differences); *Keck v. Dryvit Sys., Inc.*, 830 So. 2d 1, 5 (Ala. 2002) ("The AEMLD is a judicially created accommodation of Alabama law to the doctrine of strict liability for damage or injuries caused by allegedly defective products."). In **Delaware**, the UCC preempts strict products liability claims only insofar as they are based on the sale, lease, or bailment of goods, but claims involving nonsale transactions, like those here, are not preempted. *See Cline v. Prowler Indus. of Maryland, Inc.*, 418 A.2d 968, 971 (Del. 1980); *Beattie v. Beattie*, 786 A.2d 549, 559 (Del. Super. Ct. 2001) ("The Court has extended the doctrine of strict liability to those who distribute defective products in nonsale transactions which are neither leases nor bailments where the products are provided to others as a means of promoting either the use or consumption of such products or some other commercial activity."). Likewise, Delaware allows negligence-based product liability claims. *Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1260 (Del. 2018). Strict liability is unavailable under the products liability laws of **Massachusetts**, **Michigan**, **North Carolina**, and **Virginia**; however, negligence theories are cognizable in those states.

*Automation Ltd.*, 2021 WL 4260622, at \*4-6 (W.D. Mich. Sep. 20, 2021) (plaintiff may assert design defect claim relating to the programming of software in manufacturing tool that is "basically a computer"); *Est. of Alex ex rel. Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) (denying motion to dismiss in case alleging design defect for 911 dialing software on cell phone), *rev'd on other grounds*, 776 F. App'x 205 (5th Cir. 2019); *Wickersham v. Ford Motor Co.*, 194 F. Supp. 3d 434, 440 (D.S.C. 2016) (software algorithm was "better understood as the product"); *In re MyFord Touch Consumer Litig.*, 2016 WL 7734558, at \*1, 24 (N.D. Cal. Sept. 14, 2016) (certifying products liability class alleging that defect in Ford's "infotainment" software "caused driver distraction, which in turn raises safety concerns"), *on recons. in part*, 2016 WL 6873453 (N.D. Cal. Nov. 22, 2016); *Hardin v. PDX, Inc.*, 227 Cal. App. 4th 159, 170 (2014) ("Hardin's theory is that *PDX's software program*, not the information it produces, is the defective product. PDX has not argued, let alone shown, that Hardin cannot prevail under that theory.") (emphasis in original).[9]

These cases make good sense. No one would say that a lawsuit over a defectively designed radio that turns on intermittently and unexpectedly and at maximum volume, at all hours of the night, is a suit about musical content. The claim is that the product's features, not the music it plays, are defective. So too here: the defective nature of Defendants' software—and  consequently Defendants' liability—"springs from" the design of its features and Defendants' role as product designers, not third-party content. *Lemmon*, 995 F.3d at 1092. Plaintiffs allege that, if Defendants' apps did not include features that lead to addiction, compulsive use, and other harms, Plaintiffs would not have been injured *even if* the same content remained on the apps. *E.g.*, MC ¶ 238.

### 2.  <u>As digital product makers, Defendants cannot exempt themselves from products liability law.</u>

Defendants barely address the case law above. Instead, Defendants seek to exempt their apps from products liability law on two equally erroneous grounds. As shown below, a defective

---

[9] Other courts have assumed without elaboration that software and algorithms can be considered a product subject to product liability law. *See, e.g.*, *Lowe v. Cerner Corp.*, 2022 WL 17269066, at \*3-12 (4th Cir. Nov. 29, 2022) (vacating summary judgment on negligent design claim); *Sparacino v. Andover Controls Corp.*, 592 N.E.2d 431, 435 (Ill. App. 1992) (granting summary judgment, but treating defendant's software as a product that could be subject to product liability law).

item does not need to satisfy a rigid "tangibility" requirement in order to be treated as a "product." Likewise, there is no exemption from tort law for self-described "communication service providers" that manufacture and distribute defective software.

### a. Tangibility is not a prerequisite to products liability.

Defendants lean heavily on their argument that tangibility is the *sine qua non* of product liability, and unless software is found to be tangible—and they argue it is not—then the claim cannot proceed. *See* MTD at 17-22. But Defendants concede that the vast majority of jurisdictions look to the Restatements on this issue,[10] and the Restatements reject the premises of their argument. Under either the Second or Third Restatement, Defendants' apps are products. Whether or not they are "tangible" is beside the point: "[t]here is no rational basis to distinguish [these] application[s] just because [they] involve[] enhanced technology from . . . any tangible object designed and distributed by an entity that causes harm due to a defective design." *Brookes*, 2022 WL 19799628, at *5 (discussing Lyft app).

The Second Restatement makes no mention of tangibility. Instead, this groundbreaking text extends strict products liability to "*any* product" that causes "physical harm . . . to the ultimate user or consumer" and "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." Restatement (Second) of Torts ("Rest. 2d. Torts") § 402A(1) (1965) (emphasis added). The comments clarify this rule encompasses "*any* product which, if it should prove to be defective, may be expected to cause physical harm to the consumer or his property." *Id.* at cmt. b (emphasis added). The Complaint explains in detail how the design of Defendants' apps causes foreseeable physical harm to underage consumers who use them as intended by Defendants. This situation fits comfortably within the Second Restatement's "broad definition" of a product. *See* David W. Lanetti, *Toward a Revised Definition of "Product" under the Rest. 3d Torts: Products Liability*, 55 Bus. Law. 799, 816 & n.102, 818 (2000).

---

[10] MTD at App. 66-82 (acknowledging same for Alabama, Alaska, Arizona, Colorado, Washington, D.C., Florida, Georgia, Idaho, Iowa, Kansas, Louisiana, Maine, Mississippi, Missouri, Minnesota, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, North Dakota, Oklahoma, Oregon, Rhode Island, South Carolina, South Dakota, Texas, Utah, Vermont, Virginia, Washington, West Virginia, Wisconsin, and Wyoming). These and all other jurisdictions are addressed in Plaintiffs' Appendix. *See infra* pp. 77-100.

The Third Restatement confirms that items that are not clearly tangible should be considered products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property[.]" Restatement (Third) of Torts: Products Liability ("Rest. 3d Torts: Prods. Liab.") § 19(a) (1998). Consider the "context" of the "distribution" of Defendants' apps. The apps are made by "product designers" and overseen by "product managers," *see* MC ¶¶ 7, 175; they are marketed directly to consumers (particularly youth), *id.* ¶¶ 156, 171, 235, 253, 432, 523, 544, 561, 676, 678, 705, 737; and they are "package[d]" and "ship[ped]" to the public, *id.* ¶ 178, via retail channels called "stores," *id.* ¶¶ 240, 835. This is "sufficiently analogous" to the "context of the[] distribution" of "tangible personal property." Rest. 3d Torts: Prods. Liab. § 19(a).

Likewise, the analogy to tangible property holds with respect to the "context" of the "use" of Defendants' apps. *Id.* Consumers store Defendants' apps on their personal electronic devices and use them for personal purposes. *E.g.*, MC ¶¶ 240, 465, 835-36. There is no functional difference between downloading an app from the App Store and using it on your phone, and buying a container from the Container Store and using it on your countertop.

Defendants' claim that "tangibility" is the beginning and end of the analysis is belied by the Third Restatement's application of its test to electricity—which, like the code at the heart of Defendants' apps—is imperceptible to the naked eye. The Third Restatement states that, "[o]nce the electricity passes through the customer's meter, it is considered a product in the stream of commerce, and is subject to strict liability." Rest. 3d Torts: Prods. Liab § 19 at cmt. d (citations omitted). Defendants' apps are no different. Once they are downloaded onto a consumer's devices, they are products in the stream of commerce.

In any event, by design, Defendants' apps *do* have very tangible manifestations to their users. Defendants design their apps to be visually stimulating, to make noises and vibrate, and to prompt Plaintiffs and other users to pick up their devices to swipe, click, and flick the user interface, including to use some of the apps' most damaging and addictive features. *E.g.* MC ¶¶ 284, (describing Instagram's heart-shaped "Like" button users physically "tap"); 290 ("a user tap to view" comments on Instagram); 292 (Meta's push notifications manipulate users to "click or tap through the product"); 470 (Snap gives users the ability to "draw and color" on images); 516 (Snap

extends into the physical world by including stamps that, inter alia, show the speed a user is traveling and the current temperature in the user's location); 617 (TikTok's FYP allows users to "swipe" upwards on its endless stream); 735 (YouTube Shorts allow users to "swipe[] up on their smartphones"). And Defendants *track* their users' physical interactions with the apps. For instance, Meta tracks how long a child "hovers" on an image before touching it. *Id.* ¶ 250. Similarly, Snap targets ads to users based, in part, on physical reactions such as children's heartbeats. *Id.* ¶ 459.

Finally, the Restatement analyses are buttressed by the fact that many courts "may draw an analogy between the treatment of software under the Uniform Commercial Code and under products liability law." Rest. 3d Torts: Prods. Liab. § 19 cmt. D. "Under the Code, software that is mass-marketed is considered a good," not a service. *Id.*; *see, e.g.*, *RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (computer software was a "good" rather than a service under the California Commercial Code); *Commc'ns Grps., Inc. v. Warner Commc'ns, Inc.*, 527 N.Y.S.2d 341, 344 (N.Y. Civ. Ct. 1988) ("[I]t seems clear that computer software . . . is considered by the courts to be a tangible, and movable item, not merely an intangible idea or thought and therefore qualifies as a 'good' under Article 2 of the UCC."); *Neilson Bus. Equip. Ctr., Inc. v. Monteleone*, 524 A.2d 1172, 1174 (Del. 1987) (holding that software was a good, not a service, and rejecting argument that "intangibles" are categorically excluded as goods under the UCC).

Defendants' failure to apply the Restatements is telling. *See* MTD at 13-27. Defendants instead rely on statements from the Ninth Circuit that products liability is "geared to the tangible world." *Id.* at 18 (quoting *Winter*, 938 F.2d at 1034). But *Winter* must be read in context: the court was rejecting the plaintiffs' argument that *ideas* can be products. 938 F.2d at 1036 n.4 (rejecting argument that "liability can be imposed for such things as ideas which have no physical properties at all"). Moreover, Defendants ignore the parts of *Winter* that undermine their position. For instance, *Winter* observed that injury in a products liability case "does not have to be caused by impact from the physical properties of the item." *Id.* "In other words, the injury does not have to result because a compass explodes in your hand, but can result because the compass malfunctions and leads you over a cliff." *Id.* In keeping with this apt analogy, *Winter* even pointed to "[c]omputer software" as an example of a "highly technical tool" whose defect supports product liability. *Id.* at

1036; *accord* Rest. 3d Torts: Prods. Liab. § 19 reporters' note cmt. a; Rest. 2d Torts § 402A, cmt. c. The Third Restatement endorses that approach, recognizing that *Winter* suggested "that computer software might be considered a product for purposes of strict products liability in tort" and further cataloging the "numerous commentators [who] have discussed the issue and urged that software [] be treated as a product." Rest. 3d Torts: Prods. Liab. § 19, cmt. d; *see Brookes*, 2022 WL 19799628, at *4 (discussing Section 19, comment d and holding that products liability applies to claims "aris[ing] from the defect in Lyft's application").

In sum, Defendants never engage with the factors for determining whether their apps may be products subject to product liability law, offering the Court no guidance beyond their assertions that intangibles cannot be products and their apps are intangibles. That oversimplification is belied by the Restatements and relevant case law, which support Plaintiffs' product liability claims.

### b.    There is no blanket exception for so-called "communication service providers."

In the ordinary course of running their businesses, Defendants regularly acknowledge the simple truth: they make products. *See* MC ¶¶ 171-80 (cataloging the many public and private statements of Defendants that they make, sell, market, and ship "products"). But in this litigation, Defendants run from those admissions—insisting they are "communication service providers" to which product liability cannot extend. *See* MTD at 13-17. Defendants cannot invoke the (undefined) phrase "communication service provider" like a talismanic incantation to ward off products liability. Labels adopted in litigation do not determine whether the subject of a tort claim is properly characterized as a "product" or a "service" for purposes of that claim. *See Fluor Corp. v. Jeppesen & Co.*, 170 Cal. App. 3d 468, 475 (1985). Similarly, the uncontested and unanalyzed use of terms like "interactive service provider" in certain cases proves nothing.[11]

---

[11] *See, e.g.*, *Lemmon*, 995 F.3d at 1091 (recognizing that "interactive computer service" provider may have distinct liabilities as product designer and publisher); *Omegle*, 614 F. Supp. 3d at 819-20 (same); *cf. Taamneh v. Twitter*, 598 U.S. ___, 2023 WL 3511531, at *15 (U.S. May 18, 2023) (using term "communication-providing services" adopted by both parties, where question of whether defendants' platforms were products was not at issue). *See also Taamneh v. Twitter, Inc.*, No. 3:17-cv-4107 (N.D. Cal. May 16, 2018), ECF 55 ¶¶ 189-96, 517.

1    Importantly, whether a defendant *also* provides services is a separate question from whether
2    particular claims are targeted at a product. *See Lemmon*, 995 F.3d at 1092-93 ("The duty to design
3    a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-
4    party content."). A Florida court recently analyzed the product/service distinction in exactly this
5    way, in a summary judgment ruling holding that Lyft's ridesharing app is a product for purposes of
6    Florida's product liability law. *Brookes*, 2022 WL 19799628 at *4-5. There, a pedestrian injured by
7    a Lyft driver sued Lyft, claiming its app was dangerously defective, distracted the driver, and caused
8    the accident. *Id.* at *1. Lyft argued that because its app facilitated a transportation service, Florida's
9    product liability law did not apply. *Id.*

10    The trial court disagreed. *Id.* at *4-5. Looking to the Third Restatement's definition of
11    "product," the court reasoned Lyft was properly characterized as a product for purposes of the
12    plaintiff's claim because she was challenging specific "design choices," such as "how, when and
13    with what frequency the Lyft application requires . . . the driver's attention." *Id.* at *4. The court
14    also rejected Lyft's request for special treatment, declaring that "Lyft should be responsible for any
15    harm caused by its digital application in the same way the designer of any defective physical
16    product is held accountable." *Id.* at *3. After all, "Lyft is the designer and distributor of the
17    application, Lyft's role is not akin to a doctor exercising his/her professional medical judgment and
18    expertise in selecting the appropriate implant and the surgery inserting the implant to the patient."
19    *Id.*; *see Lemmon*, 995 F.3d at 1092 (stating that Snap's alleged liability "'springs from' its distinct
20    capacity as a product designer"); *accord Hardin*, 227 Cal. App. 4th at 170; *Holbrook*, 2021 WL
21    4260622, at *5-6; *Est. of Alex*, 313 F. Supp. 3d at 732; *Wickersham*, 194 F. Supp. 3d at 440.

22    Most of the cases Defendants cite declined to address whether a social media app was a
23    product. *Jacobs v. Meta Platforms* declined to consider whether "algorithms or related features,
24    such as newsfeeds . . . may be considered 'products'" because "this was not specifically alleged."
25    2023 WL 2655586, at *4. *In re Facebook, Inc.* noted that whether Facebook is a product or service
26    was not before the court. 625 S.W.3d 80, 85 n.1 (Tex. 2021). *Grossman v. Rockaway Township* did
27    not reach "a definitive conclusion about whether Snap qualifies as a product, implicating product
28    liability, or service." 2019 WL 2649153, at *15 (N.J. Super. Ct. June 10, 2019). In fact, *Grossman*

1   supports Plaintiffs' position. In distinguishing the plaintiff's claims from those at issue in *Maynard*,

2   the court noted that no particular defective design features had been identified, and implied it would

3   allow a claim alleging "affirmative conduct by Snapchat in the interface of the application's design"

4   to proceed under products liability law. *Id.* at *10.

5       Defendants' remaining authorities are inapposite or include only unanalyzed statements that

6   an app is a service. The issue in *Crouch v. Ruby Corp.*, 2022 WL 16747282, at *7-9 (S.D. Cal. Nov.

7   7, 2022), for example, was whether the defendant's match-making website was an "interactive

8   website" when assessing the purposeful-direction element of specific jurisdiction. The case

9   concerned sex-discrimination claims, not product liability, and whether the website was a "product"

10  was not before the court. *See id.* at *9. In *Jackson v. Airbnb, Inc.*, 2022 WL 16752071, at *9 (C.D.

11  Cal. Nov. 4, 2022), the court agreed that Airbnb "is 'a marketplace' and not a product." But Airbnb,

12  as alleged by plaintiffs in that case, is fundamentally different than Defendants' apps: it connects

13  would-be renters with would-be landlords, much like a brick-and-mortar rental or travel agency.

14  *Jackson*'s holding cannot be read to cover *all* apps, regardless of their structure, design, purpose,

15  or features. Finally, while *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *4 (C.D. Cal. 2023),

16  concluded that Snapchat "is more like a service than a product," its cursory discussion relies entirely

17  on one case concerning video game content, which is inapposite for the reasons discussed below.

18         **3.      The defective design features in Defendants' apps are nothing like
                     content in books, shows, music, or games.**

19

20         Rather than address the authorities recognizing that software and smartphone apps can be

21  products, Defendants invoke a litany of inapt analogies to content in books, shows, music, or games.

22  In each case, however, the plaintiffs' grievances were with the information, ideas, or expression

23  conveyed. Because the alleged defect was the content, not any product, products liability was

24  unavailable. That is *not* the case here—Plaintiffs allege that their injuries flow from multiple defects

25  structured into each of the Defendants' apps.

26         Take *Estate of B.H. v. Netflix, Inc.*, a case foundational to Defendants' argument. *See* Tr.

27  113:5-12 (Nov. 19, 2022). That case is readily distinguishable because the plaintiffs there alleged

28  harm caused by "the content of [a] show." 2022 WL 551701, at *3. Similarly, in *James v. Meow*

*Media Inc.*, the claims were premised on—indeed, *depended* on—"violent features" in movies, video games, and internet sites. 300 F.3d 683, 701 (6th Cir. 2002). These and nearly every case Defendants cite determined that the root cause of plaintiffs' injury was thoughts, expressions, and ideas in television shows and movies,[12] books and publications,[13] musical content,[14] or games.[15]

None of these cases are on point. Plaintiffs do not seek to hold Defendants liable for the content uploaded by their users; nor do they allege such content is itself somehow a "product." Instead, Plaintiffs raise the more straightforward claim that Defendants designed their apps defectively. *Cf. Brookes*, 2022 WL 19799628, at *4 (contrasting the "thoughts, expressions, and ideas" at issue in *Quinteros* and *James* with the "tangible properties of websites").

*Lemmon* and *Omegle*—which like this case concerned particular features of social media networking apps and websites—undermine Defendants' proposed analysis. Those cases reasoned that the plaintiffs' claims sounded in products liability because the harm alleged could have been avoided through changes to the design of the product or by added warnings—without altering any particular content. *See Lemmon*, 995 F.3d at 1092; *Omegle*, 614 F. Supp. 3d at 819-20. Here, too, the defects alleged concern particular design features in Defendants' apps that manipulate young users into problematic levels of use, independent of content shared. *See supra* § II.B (discussing specific design defects in Defendants' apps).

Another way to approach this issue is to look at the remedy. Plaintiffs seek to change how

---

[12] *DeFilippo v. Nat'l Broad. Co.*, 1980 WL 336092, at *1 (R.I. Super. Ct. June 8, 1980) (dangerous stunt performed on a television); *Sanders v. Acclaim Entertainment, Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002) (violent content in movies alleged to cause Columbine shooting).

[13] *Way v. Boy Scouts of Am.*, 856 S.W.2d 230 (Tex. App. 1993) (sport shooting supplement); *Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802 (S.D. Tex. 1983) (magazine article); *Birmingham v. Fodor's Travel Pubs. Inc.*, 833 P.2d 70 (Haw. 1992) (travel guide), *Kawczynski v. Am. Coll. Of Cardiology*, 2016 WL 2770552 (W.D. Wisc. May 13, 2016) (cardiology guidelines); *Jones v. J.B. Lippincott Co.*, 694 F. Supp. 1216, 1216 (D. Md. 1988) (treatment in a medical textbook); *Smith v. Linn*, 563 A.2d 123, 124 (Pa. Super. 1989) (diet plan in book).

[14] *Davidson v. Time Warner, Inc.*, 1997 WL 405907 (S.D. Tex. Mar. 31, 1997) (song lyrics)

[15] *Watters v. TSR, Inc.*, 904 F.2d 378, 379 (6th Cir. 1990) (Dungeons & Dragons role-playing game using "booklets" and literature); *Quinteros v. InnoGames*, 2022 WL 898560 (W.D. Wash. Mar. 28, 2022) (verbal abuse on web-based video game); *Wilson v. Midway Games*, 198 F. Supp. 2d 167 (D. Conn. 2002) (Mortal Kombat video game); *Sanders*, 188 F. Supp. 2d 1264 (violent content of video games alleged to cause Columbine shooting).

Defendants' algorithms and other features are designed to optimize minors' use, to the detriment of their health. They do *not* seek to change what content Defendants choose to leave up or take down from their apps (with the notable exception of CSAM, which of course is illegal contraband). Finally, because Plaintiffs' claims target the design of Defendants' apps rather than the content their apps make available, Defendants' arguments about a "chilling effect" on the sharing of information, expression, or ideas is a red herring. *See* MTD at 18. The concerns about "self-censorship" raised in *James* and *Watters* are unique to cases that target content, and they do not apply here. *See Omegle*, 614 F. Supp. 3d at 820.

### 4.   Public policy confirms strict products liability is appropriate here.

Defendants' arguments fail for an even more basic reason: they ignore the contextual approach traditionally favored by courts, which weighs principles from the Restatements and other public policy concerns espoused in state law. In closer calls over whether something is a "product," courts impose strict products liability where public policy favors it. *See, e.g.*, *Matter of Eighth Judicial District Asbestos Litigation, No. 36*, 105 N.Y.S.3d 353, 358 (N.Y. 2019) ("our case law has not focused on creating an exhaustive list of the product's physical characteristics but has instead focused on [its] potential dangers," and ultimately on "principles of reasonableness and public policy" (citations omitted)); *Pierce v. Pac. Gas & Elec. Co.*, 166 Cal. App. 3d 68, 83 (1985) (considering policy grounds for applying strict liability to electricity as a product under California law). In doing so, courts often rely on the policy principles articulated in the Restatement. *See, e.g.*, *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 600-601 (E.D. La. 2007) (pairing a state-court decision defining software as a moveable good with the Restatement's policy factors to determine that strict liability was available); Rest. 3d Torts: Prods. Liab. § 19, reporters' note cmt. a (collecting cases).[16] These policy considerations include:

> (1) the public interest in life and health; (2) the invitations and solicitations of the manufacturer to purchase the product; (3) the justice of imposing the loss on the

---

[16] *See also* Charles E. Cantu, *A Continuing Whimsical Search for the True Meaning of the Term "Product" in Products Liability Litigation*, 35 ST. MARY'S L.J. 341, 347-48 (2004) ("[C]ourts had generally rejected a primary dictionary definition, and instead adopted a policy-based technique to determine whether the transaction before them deserved" protection under products liability law.).

1
2
3
4

> manufacturer who created the risk and reaped the profit; (4) the superior ability of the commercial enterprise to distribute the risk of injury as a cost of doing business; (5) the disparity in position and bargaining power that forces the consumer to depend entirely on the manufacturer; (6) the difficulty in requiring the injured party to trace back along the channel of trade to the source of the defect in order to prove negligence; and (7) whether the product is in the stream of commerce.

5
6

Rest. 3d Torts: Prods. Liab. § 19, reporters' note cmt. a. These considerations weigh in favor of treating Defendants' apps as products and imposing strict liability.

7
8
9
10
11
12
13
14
15
16

*First*, the public has a particularly high interest in protecting the life and health of children. *See, e.g.*, *Wyke v. Polk County Sch. Bd.*, 129 F.3d 560, 573 (11th Cir. 1997) ("Society as a whole has a strong interest in ensuring the health and well-being of its children."); *Bentonville Sch. Dist. v. Sitton*, 643 S.W.3d 763, 769 (Ark. 2022) (acknowledging "an unquestionable substantial public interest in the health, welfare, and safety of . . . school-age children"); *Lynnville Transp., Inc. v. Chao*, 316 F. Supp. 2d 790, 798 (S.D. Iowa 2004) ("The courts have found there is a particularly compelling public interest in protecting the health and well-being of . . . children."). The Complaint sets forth with precision the alarming nature of the youth mental health crisis in the United States, as well as how it is inextricably linked to the proliferation of Defendants' apps. MC ¶¶ 6, 14-18, 101-03, 106-09, 111-13.

17
18
19
20
21
22
23

*Second*, Defendants regard kids and teens as an important—if not their primary—target demographic and market to them aggressively. MC ¶¶ 54-55 (all Defendants); 254-58, 390 (Meta); 207, 391 (Facebook); 235-36 (Instagram); 455, 457-60, 544 (Snapchat); 561, 563-65, 679-81 (TikTok); 704, 707-10-, 737-738 (YouTube). "Having invited and solicited the use" of their products by children and teens, Defendants "should not be permitted to avoid responsibility, when the expected use leads to injury and loss." *Gwinn v. Laird Superfood, Inc.*, 2022 WL 17363585, at *5 (S.D.N.Y. Dec. 1, 2022) (citations omitted).

24
25
26
27
28

*Third*, it is fair and just to expect Defendants, who "created the risk and reaped the profit," to bear the costs of their defectively designed apps. *See Trent v. Brasch Mfg. Co.*, 477 N.E.2d 1312, 1315 (Ill. App. Ct. 1985). Defendants have earned billions of dollars from the addiction-causing features of their apps. MC ¶¶ 214 (Meta: $50.3 billion in 2021 ad revenue); 451 (Snapchat: $4.6 billion in 2022 revenue, 99% attributable to ads); 562 (TikTok: $11 billion in projected 2022 ad

revenue); 716 (YouTube: $29 billion in 2021 ad revenue). In fact, Defendants have deliberately exacerbated their products' addictive features in pursuit of higher profits. *See id.* ¶¶ 264-71 (Meta); 467-69, 473-75, 482-78 (Snap); 583-90, 621-22, 625 (ByteDance); 727-33 (Google).

*Fourth*, Defendants have a superior ability to distribute the risk (i.e., are the "least cost avoider"). Defendants are some of the world's largest and most powerful companies. *See, e.g.*, *id.* ¶¶ 181, 263 (Meta); 449 (Snap); 554 (ByteDance); 702 (Google). Plaintiffs, meanwhile, are teenagers and their families. This weighs in favor of applying products liability law. *Firkin*, 835 F. Supp. at 1052 (holding defendant strictly liable for harm caused by inaccurate warning label because it "is a commercial enterprise and the plaintiff is an individual"); *see also, e.g.*, *Schueler v. Ad Art, Inc.*, 472 P.3d 686, 699 (Nev. Ct. App. 2020) (explaining that the defendant had "the occasion to spread costs," which weighed in favor of finding that custom-made sign was a "product"); *see also* David Nercessian & Ruben Mancha, *From Automation to Autonomy: Legal and Ethical Responsibility Gaps in Artificial Intelligence*, 37 Mich. Tech. L. Rev. 55, 78 (2020) (technology companies "are in the best position to avoid the potential for harm in the first place and subsequently to pass on and spread the cost of compensating victims for their injuries").

*Fifth*, there is a vast disparity in bargaining power between Defendants and the users of their apps. *See, e.g.*, MC ¶ 263. The designs of Defendants' apps are invisible and inaccessible to Plaintiffs, who can only observe the displays that are their output. *Id.* ¶¶ 263, 493, 585, 715, 864. Defendants constantly and remotely update their apps, often unbeknownst to the consumer, who usually cannot reject a change without rejecting the product entirely. *Id.* ¶¶ 200-02, 227-29, 265, 443, 465, 628, 701, 735, 750. Given that consumers, particularly children, do not have the ability to investigate for themselves the safety of the apps but Defendants can, Defendants should be subject to products liability. "To allow a manufacturer to insulate itself from liability for harm caused by a defective product (which it built, designed and placed into the stream of commerce) . . . would defeat the policy and purpose of strict products liability which is to protect the consumer, who is oftentimes unwary or unable to protect himself[,] and to place the liability on those who are responsible for the harm and best able to absorb the loss." *Pan-Alaska, Etc. v. Marine Const. Design*

*Co.*, 565 F.2d 1129, 1137 (9th Cir. 1978).[17]

*Sixth*, the "complexity" and "secretiveness" of Defendants' products and their designs materially hinder the Plaintiffs' ability to know all of Defendants' tortious conduct. *See, e.g.*, *Brandenburger*, 513 P.2d at 273; *Schueler*, 472 P.3d at 699. As discussed above, Defendants' products are "constantly updated" without telling consumers what has changed, why, or who is responsible. *See, e.g.*, MC ¶¶ 200-02 (Facebook); 227-29 (Instagram); 263, 265 (Facebook and Instagram); 443, 448, 465, 493 (Snapchat); 628 (TikTok); 701, 735, 750 (YouTube).

*Finally*, Defendants have placed their defective apps into the stream of commerce, distributing them through retail channels like the Apple App Store and Google Play Store. *Id.* ¶¶ 240, 835-36. The mass-marketed nature of the apps supports imposing liability. Courts may analogize to the UCC, under which "software that is mass-marketed is considered a good." Rest. 3d Torts: Prods. Liab. § 19 cmt. d.[18] This factor distinguishes the pretrial risk-assessment model at issue in *Rodgers v. Christie*, which was deemed not a product in part because it was not commercially distributed and used. 795 F. App'x 878, 879–80 (3d Cir. 2020).

Even if it were a close question under either Restatement whether Defendants' apps were products with respect to Plaintiffs' claims, public policy would weigh heavily in favor of treating them as products. But Plaintiffs respectfully submit that it is not a particularly close question. Cases alleging similar software design defects—*Lemmon, Omegle, Maynar*d, *Brookes*—apply products-

---

[17] *See also Petersen v. Costco Wholesale Co., Inc.*, 2017 WL 187134, at *7 (C.D. Cal. Jan. 17, 2017) (finding that "policy considerations" weigh in favor of products liability; "consumers . . . are not typically qualified to assess for themselves whether a product is defective. Strict liability law instead shifts the burden to corporations to ensure that the products they provide to consumers are safe.") (citation omitted); *Maryland v. Exxon Mobil Corp.,* 406 F. Supp. 3d 420, 459 (D. Md. 2019) ("[T]here is no reason why a party injured by a defective and unreasonably dangerous product, which when placed on the market is impliedly represented as safe, should bear the cost of that injury when the seller of the product is in a better position to take precautions and protect against the defect.") (citation omitted); *Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268, 273 (Mont. 1973) (adopting strict liability, noting "the consumer does not have the ability to investigate for himself the soundness of the product" but the "manufacturer can anticipate some hazards and guard against their recurrence") (citation omitted).

[18] The Restatement (and its cited cases) reference Article 2 of the UCC. *Id.* (citing, *e.g.*, *Sys. Design & Mgmt. Info., Inc. v. Kansas City Post Off*, 788 P.2d 878, 881 (Kan. Ct. App. 1990) (referencing Article 2 specifically)). Article 9 of the UCC, dealing with secured transactions, defines the term "goods" differently. UCC § 9-102.

liability law to the plaintiffs' claims. Defendants thus cannot establish that no state would permit a product-liability claim based on their defective apps.

### B.    Plaintiffs sufficiently plead product-based negligence claims.

With respect to Plaintiffs' negligence product liability claim, Defendants challenge only two elements, duty and proximate cause.  Both challenges fail in light of the law and Plaintiffs' robust allegations.

### 1.    Defendants owe Plaintiffs a duty to design reasonably safe products and to warn about the risks posed by their products.

Because Defendants' apps are products, *see supra* § IV.A, Defendants owe Plaintiffs the same duties all product makers owe to product users: the duty to design reasonably safe products and the duty to warn about risks posed by their products. As to the former, "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons … caused by the defect." Rest. 3d Torts: Prods. Liab. § 1. As to the latter, the duty to warn about unsafe products is a matter of "basic tort-law principles." *Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986, 993 (2019). This is especially true where, as here, children use the products at issue. *See* Rest. 2d Torts § 290, cmt. k.

Defendants do not seriously dispute that product makers owe these duties. Rather, they attack Plaintiffs' negligence-based product liability claims on the grounds that Defendants are *not* product makers, but "media companies, video game creators, interactive communication services, and . . . publishers" that owe *no* "tort-law duties to their users or the public at large." MTD at 28. This begs the same question answered above (are Defendants' apps products?), and it elicits the same answer. As the Complaint's extensive allegations make clear, this is a case about Defendants' *product*-design choices.[19] *See, e.g.*, MC ¶¶ 76-90.

Defendants point out that most states treat duty as an element of negligence and a question of law to be decided by the Court.[20] *See* MTD at 27. While that is true, foreseeability informs the

---

[19] Plaintiffs also plead non-product negligence in the alternative (Count V), MC ¶¶ 914-938, which is not presently before the Court. Not. of Priority Claims, ECF No. 131 (Feb. 14, 2023).

[20] There are some nuances. Under Oregon law, for example, there is typically no freestanding duty, only a fact question of foreseeability. *Towe v. Sacagawea, Inc.*, 347 P.3d 766, 774-75 (Or. 2015).

1    existence and scope of a defendant's duty, and "often is a question left for the jury to decide." *Ileto*

2    *v. Glock Inc.*, 349 F.3d 1191, 1204 (9th Cir. 2003). Dismissal is improper where allegations

3    regarding foreseeability "are more than sufficient to raise a factual question as to whether the

4    defendants owed the plaintiffs a duty of care." *Id.*

5         Once again, that inquiry must look to the Complaint, not Defendants' effort to rewrite the

6    allegations. Plaintiffs do not target expressive content. *Contra* MTD at 28-31, 35-38. They seek to

7    hold Defendants liable for the foreseeable harm their dangerously defective products caused

8    Plaintiffs. The law is clear that the "duty to refrain from designing a product that poses an

9    unreasonable risk of injury or harm" is distinct from any role a social media company may have as

10   a publisher of third-party content. *Lemmon*, 995 F.3d at 1092 (citing Dan B. Dobbs et al., *Dobbs'*

11   *Law of Torts* § 478 (2d ed., June 2020 Update)). Just like any other manufacturer, app designers

12   have "a duty . . . to use reasonable care in selecting from alternative designs to reduce reasonably

13   foreseeable risks of harm posed by [their] products." *Maynard*, 870 S.E.2d at 743.

14        Defendants' obligation to avoid causing harm to their users is particularly acute in this case,

15   given that Defendants purposefully targeted their harmful products at children, including Plaintiffs.

16   This and the other public policy factors courts consider when asking if there is a reason to stray

17   from the default rule of imposing a duty on tortfeasors do not support Defendants in this case. And

18   Defendants are simply wrong that the Court must find the existence of a "special relationship"

19   between Defendants and their consumers before it can apply normal tort law principles to

20   Defendants' design decisions. Accordingly, Defendants' motion to dismiss Plaintiffs' product-

21   based negligence claims should be denied.

22                      a.      **Defendants foreseeably harmed Plaintiffs.**

23        In most jurisdictions, foreseeability is the sole or predominant consideration of the duty

24   analysis. *See, e.g.*, *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007) ("The most

25   important consideration in determining the existence of a duty of care is foreseeability of harm to

26   the plaintiff."); *Sewell v. Racetrac Petroleum, Inc.*, 245 So.3d 822, 825 (Fla. Dist. Ct. App. 2017)

27   (similar); *but cf. JUUL I*, 497 F. Supp. 3d at 655 ("Some jurisdictions give more weight to the

28   foreseeability of harm than others."). Plaintiffs respectfully submit that foreseeability is not a close

question here—particularly given the Court's obligation in this posture to accept Plaintiffs' factual allegations as true. Dozens of academic articles have found that "compulsive use of Defendants' apps leads to negative mental and physical outcomes for kids." MC ¶ 101; *see also id.* ¶¶ 18, 96-117. Moreover, the risks of addiction, compulsive use, and attendant harms were not only foreseeable, they were actually foreseen.[21] *See, e.g.*, MC ¶¶ 96-124 (all Defendants); 282-326,431-37 (Meta); 515, 529, 532, 539-41, 543-53 (Snap); 583-86, 662, 665, 675-89 (TikTok); 729-32, 812-19 (YouTube).

Defendants return again to their media cases. In addition to being off-point because they address content censorship, not product defects, *see supra* p. 31, these cases are inapplicable on the issue of foreseeability because they involved unforeseeable—often erratic, idiosyncratic—harm. *Zamora* noted that television networks would not likely anticipate their shows would inspire a teen to commit murder. 480 F. Supp. at 202. *Watters* explained that it was not "foresee[able] that players of [Dungeons & Dragons] would become more susceptible to murder or suicide than non-players" (though it made clear Kentucky *did* "impose[] a general duty on manufacturers and suppliers to warn of dangers known to them" but not to reasonably anticipated users). 904 F.2d at 381. *McCollum v. CBS, Inc.* held it was unforeseeable that an album would prompt suicide where there were no allegations of "real time" or "dynamic interaction with" the victim. 202 Cal. App. 3d 989, 1005 (1988). Similarly, a publisher could not foresee that a reader would accidentally discharge his gun in *Way v. Boy Scouts of America*, 856 S.W.2d 230, 235-36 (Tex. Ct. App. 1993). Finally, in *Meow Media* and *Sanders*, the court noted that the shooter's reactions to the defendants' games and movies "was simply too idiosyncratic to expect the defendants to have anticipated it." *Meow Media*, 300 F.3d at 693 (reaction was "simply impossible to predict"); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1272-73 (D. Colo. 2002) ("speculative possibility" that movies and videos games "had the potential to stimulate an idiosyncratic reaction in the mind of some disturbed individuals").

---

[21] The seriousness of these harms further weighs in favor of establishing a duty, because "the degree of foreseeability needed to establish a duty is inversely proportional to the magnitude of the foreseeable harm." *Satterfield v. Breeding Insulation Co.*, 266 S.W.3d 347, 365 (Tenn. 2008); *see also Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807, 842 (Md. 2001) ("legal scholars have long agreed that the *seriousness* of potential harm, as well as its probability, contributes to a duty to prevent it.").

In sharp contrast to those cases, Defendants here had every reason to believe their users' mental health would be harmed because they had a decade of studies that said so. *See, e.g.*, MC ¶¶ 96, 99-116, 365, 375, 515, 612.  To hold Defendants did not have a duty, or that their duty does not extend to foreseeable product users, would "create perverse incentives for businesses . . . to turn a blind eye and ignore known . . . risks." *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1325 (N.D. Ga. 2019). Not surprisingly, this Court has already held that one of the Defendants, Facebook, owes its users a duty of care. *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019); *accord In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019).

In any event, Defendants' disputes about foreseeability are premature. While the ultimate question of duty is for the Court, foreseeability is typically for the jury. *Ileto*, 349 F.3d at 1204-05; *see also, e.g.*, Restatement (Third) of Torts: Liability for Physical and Emotional Harm ("Rest. 3d Torts: Phys. & Emot. Harm") § 7, cmt. j (2010) ("[C]ourts should leave such determinations to juries unless no reasonable person could differ on the matter."). Defendants' cases mostly involve summary judgment; the one exception lacked plausible factual allegations.[22] Given the robust allegations in the Complaint, foreseeability "is better presented to the Court on a fully developed record than at this preliminary stage in the litigation." *Lopez v. United States*, No. 17-cv-04386-MEJ, 2018 WL 807357, at *6 (N.D. Cal. Feb. 9, 2018).

### b. Defendants identify no reason for the Court to limit their duty.

Once a general duty has been established, courts may consider whether there is a compelling reason to limit the defendant's duty under the circumstances. Such limitations are reserved for "exceptional cases." Rest. 3d Torts: Phys. & Emot. Harm § 7(b); *see also J'aire Corp. v. Gregory*, 24 Cal. 3d 799, 808 (1979) (describing a finding of no duty as an "absolute rule" that carries the "drastic consequence" of barring recovery in all similar cases). A categorical finding that there is no duty "should be explained and justified based on articulated policies or principles that justify

---

[22] *See M.L. v. Craigslist Inc.*, No. C19-6153, 2020 WL 6434845, at *13 (W.D. Wash. Apr. 17, 2020) *report and recommendation adopted*, 2020 WL 5494903 (W.D. Wash. Sept. 11, 2020) (plaintiff provided "no factual basis or argument" and cited no cases in support of "bald" assertion of common law duty, focusing instead on alleged statutory duty).

exempting these actors from liability or modifying the ordinary duty of reasonable care." Rest. 3d Torts: Phys. & Emot. Harm § 7, cmt. j; *see also Gipson v. Kasey*, 150 P.3d 228, 233 (Ariz. 2007) ("When a court or legislature adopts a no-duty rule, it generally does so based on concerns that potential liability would chill socially desirable conduct or otherwise have adverse effects."). It is only when "clear considerations of policy" justify "carving out an entire category of cases" that a court will excuse a defendant from an otherwise applicable duty. *Id.*; *see also, e.g.*, *Mayall ex rel. H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1060-61 (9th Cir. 2018) (courts should only create an exception to the general duty where it is clearly supported by public policy) (citations omitted); *Doe v. McKesson*, 339 So.3d 524, 541 (La. 2002) (Crain, J., concurring in part) (explaining that a no-duty rule "contemplates whether an entire category of defendants should be excluded from liability" and is "a policy-driven decision that considers various moral, social, and economic factors"); *Gipson*, 150 P.3d at 234 (describing a no-duty rule as a "blanket" rule "insulat[ing] persons . . . from tort liability").

Importantly, it is the "social value" of the conduct at issue in this case—not the social value of Defendants' businesses "generally"—that is relevant to this analysis. *Ileto*, 349 F.3d at 1205-06. In *Ileto*, for example, the Court limited its evaluation to the "social value of the defendants' interest" in distributing guns in a manner designed to encourage easy access by convicted felons and the mentally ill, "when the defendants have the knowledge and the means to distribute guns in a manner that would reduce the risk of access and use by prohibited persons." *Id.* (cleaned up). *Compare In re Juul*, 497 F. Supp. 3d at 655-59 (concluding that duty of care existed under Arizona, California, Florida, Pennsylvania, and New York law where defendants' promotion to teens resulted in reasonably foreseeable harm and public policy weighed in favor of imposing a duty) *with Brown v. USA Taekwondo*, 11 Cal. 5th 204, 221 (2021) (explaining that policy considerations might support limiting a duty). Here, as shown below, there is no social value attributable to Defendants' conduct that would support a finding of no duty. Analysis of the relevant policy considerations dictates the opposite conclusion.

### i.   *Defendants ignore the traditional public policy factors, which compel a finding of duty here.*

States regularly consider a set of "public policy" factors, in addition to foreseeability, when evaluating whether to limit a party's obligation to prevent harm from its actions. California uses eight factors which, to the best of Plaintiffs' knowledge, include all significant factors from other jurisdictions. *Compare Rowland v. Christian,* 69 Cal. 2d 108, 112-13 (Cal. 1968), *and e.g.*, *Mayall on Behalf of H.C. v. USA Water Polo, Inc.*, 909 F.3d 1055, 1060-61 (9th Cir. 2018) (citing same), *with, e.g.*, *Duffy v. Togher*, 887 N.E.2d 535, 546-47 (Ill. App. Ct. 2008) (Illinois), *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1169 (Pa. 2000) (Pennsylvania);[23] W. Jonathan Cardi, *The Hidden Legacy of Palsgraf: Modern Duty Law in Microcosm*, 91 B.U. L. Rev. 1873, 1875 (2011) (offering a 51-jurisdiction overview of how different states analyze duty issues, which center on the core policy concerns reflected in the *Rowland* factors). Defendants do not materially contest that Plaintiffs fail to establish a duty under any factor other than foreseeability.[24] Plaintiffs address those other factors briefly in the interest of completeness:

1.   *The degree of certainty that the plaintiff suffered injury.* With the arguable exception of Snap, *see supra* pp. 70-71, Defendants concede that Plaintiffs have alleged serious injuries. MTD at 41 (acknowledging Plaintiffs' "serious alleged injuries"), 42 (acknowledging "alleged serious harms, such as eating disorders, self-harm, or suicide"). The degree of certainty factor weighs in favor of a duty when it is "quite unlikely" the fact of injury will be disputed. *Johnson v. The Raytheon Co.*, No. CV-15-0132-MWF, 2015 WL 12765871, at *6 (C.D. Cal. Nov. 16, 2015).

---

[23] Plaintiffs note that federal courts have taken several different approaches with respect to whether the *Rowland* factors articulate an exception to the general rule or whether courts must analyze them proactively. *See, e.g.*, *Fabian v. LeMahieu*, No. 19-cv-54-YGR, 2019 WL 4918431, at *12 (N.D. Cal. Oct. 4, 2019). The California Supreme Court, however, recently addressed those approaches, holding that "everyone is responsible for an injury caused to another by his want of ordinary care or skill" absent an express statutory provision to the contrary or when "clearly supported by public policy." *Brown II*, 483 P.3d at 167 (citing and explaining *Rowland*, 69 Cal. 2d 108 (Cal. 1968 )).

[24] As such, Defendants have waived arguments to that effect. *Cf., e.g.*, *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 672 F.3d 1160, 1166 n.8 (9th Cir. 2012) ("Arguments raised for the first time in a reply brief are waived." (cleaned up)).

2. *The closeness of the connection between the defendants' conduct and the injury.* "[A] closely connected type of injury is likely to be foreseeable." *Regents of Univ. of Cal v. Superior Ct..*, 4 Cal. 5th 607, 630-31 (2018). As explained above and in the proximate cause section which follows, the harms caused by Defendants' apps were not only foreseeable, but foreseen. This weighs heavily against finding an exception to Defendants' duties of care. *See Barhem v. Knickrehm*, 661 N.E.2d 1166, 1171 (Ill. App. Ct. 1996) ("While the elements of proximate cause and duty are separate, it is sometimes difficult to separate the two concepts, as foreseeability is a determining factor in each."); *Doe v. McKesson*, 339 So.3d at 532 (explaining that while Louisiana does not recognize a "duty to protect others from the criminal activities of third persons," it does recognize  a "duty not to negligently cause a third party to commit a crime that is a foreseeable consequence of negligence").

3. *The moral blame attached to the defendants' conduct.* Plaintiffs' allegations illustrate a practice that targets and preys upon some of the most vulnerable members of our society, in knowing disregard of the harm Defendants' products will cause. Imposing a duty to act with reasonable care is appropriate because such conduct is traditionally viewed as morally blameworthy. *See, e.g.*, *In re Juul*, 497 F. Supp. 3d at 655-56 (targeting children for addictive vape products had "strong moral blame" and "social utility" favored prevention of youth addiction); *Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris, Inc.*, 36 F. Supp. 2d 560, 580-585 (E.D.N.Y. 1999) ("decades long scheme to deceive the American public and its health providers concerning the addictive characteristics and health hazards of their tobacco products" and conspiracy "to deprive smokers of safer or less addictive tobacco products" "entails moral opprobrium of extraordinary proportion")

4. *The extent of the burden to the defendant and consequences to the community of imposing a duty of care.* Holding Defendants to their duty of care would not meaningfully burden Defendants. Many of the dangerous product features Plaintiffs complain of could be made safer, in whole or in part, through reasonably feasible, cost-effective means. *See, e.g.*, MC ¶ 845 (listing examples of such changes). On the other hand, the community would suffer if the Court declines to hold that Defendants have a duty to design safe products. *See Sanders v. City of Fresno*, No. CIV

F 05-0469, 2006 WL 1883394, at *15 (E.D. Cal. July 7, 2006) (finding a duty of care and noting that "the Court does not see that an undue burden will be placed on the community if [defendant] is held to the normal duty of care of a manufacturer."). Millions of American children use Defendants' products. MC ¶¶ 91-92; *see Doe v. Roman Catholic Archbishop of L.A.*, 70 Cal. App. 5th 657, 682 (2021) (finding that the enormous reach of the Roman Catholic Church and the degree to which the Church was enmeshed in American childhood carried with it a legal responsibility to carry out abuse prevention programming). Finally, the community benefits Defendants claim their products offer would not be impacted by introducing adequate age verification features and warnings, or by removing defects that encourage addiction. *See Carrizales v. Rheem Mfg. Co.*, 589 N.E.2d 569, 578 (Ill. App. Ct. 1991) ("[T]he addition of an appropriate warning … would have been only a slight burden to defendant but would have served public policy in protecting the unsuspecting."). If the Court recognizes Defendants' responsibility to their users to design safe products and warn users of risks, Defendants would not have to alter or remove any content.

5. *The availability, cost, and prevalence of insurance for the risk involved.* Defendants have earned billions of dollars in revenue from the addiction-causing features of their apps, MC ¶¶ 214 (Meta); 451 (Snapchat); 562 (TikTok); 716 (YouTube), leaving Plaintiffs "no reason to doubt [Defendants'] ability to obtain coverage for the negligence liability under consideration." *Regents of Univ. of Cal.*, 4 Cal. 5th at 633. Additionally, consistent with the least cost avoider principle, it will be more efficient for the social media industry to purchase liability insurance than for individual families to bear the risk of harm. *Kesner v. Superior Ct.*, 1 Cal. 5th 1132, 1151-58 (2016) (applying least cost avoider principle to reject cost of insurance argument).

6. *The policy of preventing future harm.* Public policy strongly favors curbing Defendants' use of harmful, addictive design features and preventing future harm to children. *See, e.g., In re JUUL*, 497 F. Supp. 3d at 656 (finding that this factor weighed in favor of imposing a duty because "there is a strong policy in favor of preventing future harm and curbing teen vaping"). Indeed, "our greatest responsibility as members of a civilized society is our common goal of safeguarding our children, our chief legacy, so they may grow to their full potential and can, in time, take our places in the community at large." *Juarez v. Boy Scouts of Am., Inc.* 81 Cal. App. 4th

377, 407 (2000) (finding the public policy weighed in favor of imposing a duty on defendants to carry out abuse prevention programming).

### ii.    Plaintiffs do not seek a remedy that would infringe free expression.

Instead of addressing the factors courts use to assess whether an exception to the standard duty of care is available, Defendants seek a new, sweeping rule that courts should not impose "any duty of care between online services and their users." MTD at 28. This is based on the faulty premise that Defendants only provide "services" and that Plaintiffs' claims target third party content or Defendants' actions as publishers.

Plaintiffs do not demand that Defendants change the content they host. Instead, Plaintiffs claim specifically that they would not have been harmed by the content on Defendants' platforms but for the alleged design defects. *See* MC ¶¶ 3, 12, 74, 77-83, 85, 89, 127-132, 227, 261, 265, 274-75, 283-84, 289, 292, 294, 467-69, 474-79, 480-87, 493-95, 591-92, 614-20, 626-29, 717, 727-733. Consider again the analogy of the defective radio that turns on and blasts music in the middle of the night. The defect is the product, not the content. Plaintiffs' detailed allegations of how each Defendant encoded its app with addictive, manipulative features that foreseeably harm children distinguishes *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019), where the Ninth Circuit found a website owed no duty to its users because it was alleged only to "facilitate[] communication" of user content. So, too, numerous decisions affirm media defendants' duties where claims are based on the companies' own conduct in how they carry out their business, rather than any communication itself. *See, e.g.*, *Weirum v. RKO Gen., Inc.*, 15 Cal. 3d 40, 43-48 (1975) (dangerously designed radio contest was basis for liability); *Clift v. Narragansett Television L.P.*, 688 A.2d 805, 811 (R.I. 1996) (television station could be liable for conducting interview in way that interfered with police efforts). This is sensible, given that "[p]ractically every tort claim involves some form of communication." *Risenhoover v. England*, 936 F. Supp. 392, 405 (W.D. Tex. 1996).

The cases cited by Defendants are inapplicable as they almost uniformly concern publishers' liability for the content they publish. *E.g.*, *Zamora v. Columbia Broad. Sys.*, 480 F.

Supp. 199, 201 (S.D. Fla. 1979); *Watters*, 904 F.2d at 381. In *Zamora*, for example, the court decided that television broadcasters had no duty to prevent a viewer from becoming so disturbed by violent content that he killed his neighbor. 480 F. Supp. at 202-03. This was not actionable because, among other things, it would have forced a television station to determine what could and could not be aired. *Id.* at 204-06; *see also Walt Disney Prods., Inc. v. Shannon*, 276 S.E.2d 580, 582 (Ga. 1981) (similar); *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1011 (Ct. App. 1982) (similar). Defendants' other cases largely turn on similar reservations about the "chilling effect" of limiting expressive decisions—concerns that are not at play here. *See Meow Media*, 90 F. Supp. 2d at 818-19 (quoting *Watters*, 715 F. Supp. at 822).[25]

Finally, Defendants' focus on references in the complaint to "online challenges" and "viral pranks" misdescribes the crux of Plaintiffs' claims: the functionality of Defendants' apps and their failure to warn users of the risks associated with their use. *See* MTD 29-31. Injuries from online challenges and viral pranks are an outgrowth of the underlying addiction caused by the designs of Defendants' apps. MC ¶¶125 ("Dangerous 'viral' challenges are one particularly pernicious result of the defective design of Defendants' apps"); 127 ("these injuries and deaths are a foreseeable consequence of Defendants' addictive product designs"); *see also id.* ¶¶ 126, 128-132. This is fundamentally different than cases based on a purported duty to avoid describing activities a child conceivably might replicate. *Cf. Herceg v. Hustler Mag., Inc.*, 565 F. Supp. 802, 803 (S.D. Tex. 1983) (adult magazine publisher had no duty with respect to the content of its publications).[26]

### iii.     There is no special exemption in negligence for addiction.

Defendants' argument that courts do not impose a duty of care for addictive products is also incorrect. It is well-established that a plaintiff can state a negligence claim based on a product being addictive. *See, e.g.*, *In re JUUL*, 497 F. Supp. 3d at 655 (duty of care where targeting and addicting

---

[25] The others involve casinos, a carefully regulated industry in which permitting the tort claim at issue would subvert a preexisting regulatory scheme. *See Taveras v. Resorts Int'l Hotel, Inc.*, No. 07-4555, 2008 WL 4372791, at *4 (D.N.J. Sept. 19, 2008); *NOLA 180 v. Harrah's Oper. Co.*, 94 So.3d 886, 889 (La. Ct. App. 2012); *Merrill v. Trump Ind., Inc.*, 320 F.3d 729, 732 (7th Cir. 2003); *Stevens v. MTR Gaming Group Inc.*, 237 W.Va. 531 (W. Va. 2016).

[26] *Anderson v. TikTok, Inc.*, No. CV 22-1849, 2022 WL 14742788, at *4 (E.D. Pa. Oct. 25, 2022), also cited by Defendants, dismissed claims solely on Section 230 grounds.

youth created a foreseeable risk of harm to school districts); *In re Nat'l Prescription Opiate Litg.*, 452 F. Supp. 3d 745, 785-87 (N.D. Ohio 2020) (duty of care where defendant distributed addictive opioids because the toll on the city was foreseeable).

Defendants argue that harm from addiction to a product gives rise to a duty only when the product involves a chemical or additive known to be addictive. MTD at 31-33. Neither the Restatement nor, to the best of Plaintiffs' knowledge, any court has limited the definition of harm in such a restrictive way. *See* Rest. 2d Torts, § 7, cmt. b ("[Harm is] also the detriment resulting . . . from acts or conditions which impair [] physical, emotional, or aesthetic well-being . . . .").

Defendants' argument appears based solely on their factual contention that their products pose only "some theoretical risk of overuse or overconsumption," *id.* at 31. But Plaintiffs allege far more than a "theoretical risk" of addiction, and their allegations control. The Complaint includes allegations that scientists have observed social media addiction (and its related harms) since at least 2008, MC ¶ 100, and that beginning in at least 2014, research revealed the physical and mental risks associated with compulsive use of Defendants' products. *Id.* ¶¶ 101-02. The Complaint details additional research that reiterates the association of frequent social media use with an increase in, among other things, anxiety, depression, eating disorders, and self-injurious behavior (including suicide). *Id.* ¶¶ 103-17. Indeed, Meta employees considered those exhibiting "[p]roblematic use" akin to "addicts[.]" *Id.* ¶ 299. And scientific studies as well as Meta's internal research have for years confirmed that teens were addicted to Defendants' products. *Id.* ¶¶ 103-17, 299-301. These detailed allegations place an unbridgeable gulf between this case and the slippery-slope hypotheticals Defendants use to bolster their argument. *See* MTD at 31 ("binge watching;" "shopaholics"). As pled, the risk of addiction is actual, not "theoretical," and it fits within the types of harm subject to a duty of reasonable care.

### c.    <u>Defendants owe a heightened duty of care to children.</u>

The duty of reasonable care Defendants owe Plaintiffs is heightened because Plaintiffs are children (or, in tragic circumstances, their estates). *See generally* Rest. 2d Torts § 290, cmt. k (reasonable person should consider traits of particular classes, like children, when acting). Contrary to Defendants' arguments, MTD at 33-35, this additional care does not hinge on the existence of a

"special relationship" because it deals with what a defendant's existing duty *requires*, not whether that duty *exists*. *See, e.g.*, *Pedeferri v. Seidner Enters.*, 216 Cal. App. 4th 359, 370 (2013) (when plaintiffs seek to hold defendant liable for misfeasance, "the additional 'special relationship' element . . . does not apply"); *see also infra* § IV.B.1.d; Rest. 2d Torts § 315 (plaintiff must only plead special relationship if defendant does not otherwise owe duty).

Whether a greater degree of care is required for children depends on the foreseeability of harm to them. *See Swix v. Daisy Mfg. Co.*, 373 F.3d 678, 686-88 (6th Cir. 2004) (applying reasonable-child standard in a products-liability case). A higher degree of care is particularly applicable when defendants target children with their products and marketing. As Judge Orrick held in *JUUL*, "there is strong 'moral blame' attached to . . . targeting school children with a dangerous product" and "there is also a strong policy in favor of preventing future harm" to children. 497 F. Supp. 3d at 656. Consistent with this principle, courts recognize routinely that, when corporations market to children, they owe a duty of care that is sensitive to how children behave, think, and feel. *See, e.g.*, *Sims v. United States*, No. 4:20-cv-00127-SRB, 2020 WL 3273040, at *3 (W.D. Mo. June 17, 2020) (finding a heightened duty of care where "Plaintiff was a minor and participated in an activity organized and supervised by Defendant"); *see also* Richard E. Kaye, *American Law of Products Liability* § 10:58 (3d ed. May 2023 update) ("In marketing a product, a supplier can be expected to take precautions for the safety of children and others who may be affected by a child's actions . . . .").

**d.** **Defendants' duty to Plaintiffs does not depend on the existence of a special relationship.**

Defendants argue that foreseeability does not matter for claims where, according to Defendants, Plaintiffs seek to hold them liable based on the conduct of a third party. *See* MTD 35-38. But a "special relationship" is only required where the problem is nonfeasance—defendants' *failure to prevent* third-party conduct. *See Pedeferri*, 216 Cal. App. 4th at 370; *cf.* MTD at 36 n.16 (seemingly conceding that the "special relationship" analysis applies only to nonfeasance). Here, the problem is misfeasance—Defendants' social media apps *actively contributed* to that conduct. Plaintiffs' claim is not that Defendants "ha[d] a legal duty to take action," as in the many inapposite

nonfeasance cases Defendants cite. *See, e.g.*, *Brown*, 11 Cal. 5th at 209.[27] Instead, Plaintiffs claim Defendants made concerted, ongoing, conscious design choices and are responsible for the foreseeable consequences of those choices. Plaintiffs' allegations regarding specific harmful design features that affirmatively worsened their positions, and the foreseeability of the risks created by those features, distinguish this case from Defendants' cited authority where misfeasance was not established. *Compare Ileto*, 349 F.3d at 1204-1205 (finding that defendants owed plaintiffs a duty of reasonable care because, as here, their business plan relied on purposely feeding the conditions that led to plaintiffs' harms at the hands of a third party, and the risk of harm was foreseeable), *with Jackson*, 2022 WL 16752071, at *7 (finding that defendant had not engaged in misfeasance because "[n]one of Airbnb's actions increased risk, nor did they stop others from stepping in").[28]

---

[27] *See also State Farm Fire & Cas. Co. v. Amazon.com, Inc.*, 528 F. Supp. 3d 686, 700 (W.D. Ky. 2021); *Ethridge v. Samsung*, 604 F. Supp. 3d 556, 560 (S.D. Tex. 2022); *Carroll v. Am. Empire Surplus Lines Ins. Co.*, 289 F. Supp. 3d 767, 772 (E.D. La. 2017); *Ginsberg v. Google Inc.*, 586 F. Supp. 3d 998, 1009 (N.D. Cal. 2022); *Doe v. MySpace Inc.*, 474 F. Supp. 2d 843, 851 (W.D. Tex. 2007), *aff'd*, 528 F.3d 413 (5th Cir. 2008); *Jane Doe No. 14 v. Internet Brands, Inc.,* No. CV 12-3626-JFW, 2016 WL 11824793, *5 (C.D. Cal. Nov. 14, 2016); *Jane Doe No. 1 v. Uber Techs, Inc.*, 79 Cal. App. 5th 410, 423 (2022); *Vesely v. Armslist LLC*, 762 F.3d 661, 665 (7th Cir. 2014).

[28] Defendants' remaining cases are far more comparable to *Jackson* than *Ileto*. *See Pirozzi v. Apple*, 913 F. Supp. 2d 840, 851-52 (N.D. Cal. Dec. 20, 2012) (finding that plaintiffs did not allege any affirmative action by defendants that placed plaintiffs at a greater risk of harm for stolen information); *Ziencik, v. Snap, Inc.*, No. CV 21-7292-DMG, 2023 WL 2638314, *5 (C.D. Cal. Feb. 3, 2023) (acknowledging that a duty may arise when a defendant engages in risk-causing conduct but finding that plaintiff only alleged the creation of a communication program, not other actions creating a "risk of third-party misuse'); *Buchler v. State ex rel. Or. Corr. Div.*, 853 P.2d 798, 805 (Or. 1993) (explaining that it was inappropriate to impose a duty where the means by which defendants facilitated a harm were just one of many possible means available and thus no "unreasonable" risk was created); *Quinteros*, 2022 WL 898560, *4 (W.D. Wash. Mar. 28, 2022) (finding that creators of online video game were "not alleged to have done anything" to increase risk of harm to players); *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1011 (Cal. Ct. App. 1982) (finding no duty on part of movie producers to protect against or warn of violence by third parties at screenings of film at theaters through the U.S., where plaintiff alleged no "affirmative act . . . which created an undue risk of harm" and no special relationship under California law); *Vesely*, 762 F.3d at 665 (finding that defendant permitted the use of its website to purchase weapon that killed plaintiff's sister "and nothing more. It did not invite [the parties to the sale] to break the law."); *Jane Doe No. 1 v. Uber Techs, Inc.*, 79 Cal. App. 5th 410, 423 (2022) (finding that defendants did not engage in misfeasance because cause of harm was not a "necessary component" of defendants' business model, nor did they encourage the conduct at issue).

Courts hold that defendants have a duty of care, regardless of the existence of a "special relationship," when a defendant "contributed to the risk of harm that resulted in plaintiffs' injuries."[29] *Hacala v. Bird Rides, Inc.*, 306 Cal. Rptr. 3d 900, 920-22 (Ct. App. 2023) (distinguishing between misfeasance and nonfeasance and concluding that a scooter rental business owed a duty to a plaintiff who was injured when she tripped over a scooter that a third party left in a public thoroughfare). Importantly, a defendant's contribution to risk does not need to rise to the level of involvement described in *Gersh v. Anglin*, where the court held that the owner of a website could be liable for "anti-Semitic[,] misogynistic" harassment by his followers because he was so involved in their actions—providing contact information, sample messages, and direct encouragement—as to be himself engaged in their tortious activity.  353 F. Supp. 3d 958, 967-69 (D. Mont. 2018). Indeed, rather than asking "'whether an actor's failure to exercise reasonable care entails the commission or omission of a specific act,'" the "proper question" is "'whether the actor's entire conduct created a risk of harm.'" *Brown,* 11 Cal. 5th at 215 n.6 (quoting Rest. 3d Torts: Phys. & Emot. Harm § 37, cmt. c); *see also City of Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1144 (Ohio 2002) (concluding that a duty existed and "the 'special relationship' rule is not determinative" because "the issue is whether appellees are themselves negligent by manufacturing, marketing, and distributing firearms in a way that creates an illegal firearms market that results in foreseeable injury," not "whether appellees owe appellant a duty to control the conduct of third parties")*.*

Here, the Complaint is replete with examples of Defendants' conduct creating a risk of harm. *See, e.g.*, MC ¶¶ 129-32 (Defendants encouraged and promoted dangerous challenges); *id.* ¶¶ 137-39, 142, 145, 147-55 (Defendants' platforms defectively designed to encourage sexual exploitation and predation). The defective features that harmed Plaintiffs are Defendants' own handiwork, were unleashed by Defendants despite years of studies highlighting their dangers, and

---

[29] This affirmative misfeasance distinguishes the conduct at issue here from the (summary judgment) cases, like *Dyroff*, that Defendants rely on, where defendants simply took no affirmative action that foreseeably could cause harm. 934 F.3d at 1100-01 (no misfeasance and no duty); *Doe No. 14 v. Internet Brands, Inc.*, 2016 WL 11824793, at *4-*5 (noting that this case involves nonfeasance and there was no duty created by defendant's failure to warn members of risk that it did not create or worsen).

1   can be remediated without removing any content or otherwise controlling the actions of third

2   parties. Accordingly, responsibility for Plaintiffs' injuries rests squarely with Defendants.

3   **2.   Plaintiffs sufficiently plead Defendants proximately caused Plaintiffs'
        injuries.**

4
5   Defendants make two arguments about proximate cause, both unavailing. Defendants first

6   claim with the wave of a hand that Plaintiffs' allegations are too "generalized and conclusory."

7   MTD at 41. This is baseless: Plaintiffs cite independent studies from numerous sources showing

8   that each Defendant's products cause the injuries at issue in this litigation. Defendants then argue

9   that third parties solely caused some of Plaintiffs' injuries. But this disregards Plaintiffs' extensive

10  allegations that Defendants' design choices foreseeably harmed Plaintiffs. That is all that is

11  required, even setting aside that questions about intervening causation are usually for the jury. Put

    simply, Plaintiffs adequately allege proximate cause for all claims.[30]

12  **a.   Plaintiffs allege facts supporting proximate cause for each
        Defendant.**

13
14  Rule 8 requires only a "short and plain statement of the claim." Fed. R. Civ. P. 8(a)(2). This

15  is a minimal requirement. *See Land O' Lakes, Inc. v. DairyAmerica, Inc.*, 2017 WL 495644, at *5

16  (E.D. Cal. Feb. 6, 2017) (citing *Porter v. Johnes*, 319 F.3d 483, 494 (9th Cir. 2003)). There is no

17  "ultra-heightened pleading standard to allege causation." *Marabella v. NCL (Bah.), Ltd.*, 437 F.

18  Supp. 3d 1221, 1228 (S.D. Fla. 2020). Indeed, the Ninth Circuit has cautioned that "[c]ausation is

19  an intensely factual question that should typically be resolved by a jury." *Pac. Shores Props., LLC

20  v. City of Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).[31]

21  Defendants' claim that Plaintiffs' Complaint is nevertheless too "generalized" is belied by

22  Plaintiffs' detailed factual allegations that set forth the causal link between each Defendant's

23  products and the harm to Plaintiffs, discussing at length *how* specific defects in each of Defendants'

24  products cause Plaintiffs' injuries, including via features that addict young users, promote self-

25  _____

26  [30] Plaintiffs' arguments with respect to proximate causation support their negligence- as well as
    strict liability-based priority claims.

27  [31] Defendants' cases are not to the contrary; indeed, they are not about Rule 8 at all. *Zofran*
    addresses the heightened pleading standard under Rule 9(b); *Pogue* is about mandamus. *See In re
28  Zofran (Ondansetron) Prod. Liab. Litig.*, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017);
    *United States ex rel. Pogue v. Diabetes Treatment Ctrs.*, 444 F.3d 462, 467 (6th Cir. 2006).

PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:22-MD-03047-YGR

destructive behavior, and contribute to body image issues and other mental and physical disorders. *See* MC ¶¶ 181-437 (Meta); 438-553 (Snap); 554-689 (ByteDance); 690-819 (Google). *Cf. Martifer-Silverado Fund I, LLC v. Zhongli Sci. & Tech. Grp. Co.*, 2020 WL 5500381, at *5 (N.D. Cal. Sept. 11, 2020) (denying a motion to dismiss fraud claims because the allegations, which attributed conduct to the defendants both collectively and individually, were sufficient to provide adequate notice of the claims). Plaintiffs support those allegations with dozens of studies (some conducted by Meta)[32] showing the nexus between Defendants' defective products and Plaintiffs' injuries. *See* MC ¶¶ 96-124.[33] Defendants also ignore that Plaintiffs' contention is that the defective features in each of Defendants' apps work in concert to cause injury. *E.g.*, MC ¶¶ 2-3, 14, 142, 277, 315, 319, 618, & 765. The defective features in Defendants' products were not designed to be used in isolation; predictably, that is not how they caused harm. Plaintiffs are not obliged to plead how specific increments of their injury trace back to specific features. *See, e.g.*, *Clark v. Am. Honda Motor Co.*, 528 F. Supp. 3d 1108, 1116 (C.D. Cal. 2021) (plaintiffs' complaint only needed to identify "interrelated systems and components" and fact of resulting symptoms).

This is more than courts require to plead causation, particularly where much of the relevant "information [is] in the Defendants' control" prior to discovery. *See Drammeh v. Uber Techs. Inc.*, 2021 WL 2413242, at *3 (W.D. Wash. June 14, 2021) (holding that the complaint provided sufficient detail for defendants to determine the substance of the claims against them and noting

---

[32] *See, e.g.*, MC ¶ 298-300 (Meta study investigating problematic Facebook use, concluding that "teens feel addicted to IG and feel a pressure to be present;" also, "like addicts, they feel that they are unable to stop themselves from being on IG." A study into Instagram user behaviors similarly found that "high time spent users do tend to be disproportionately younger users"); *id.* ¶ 321 (Meta research acknowledging that body image comparisons are formed in part by Instagram's filters); *id.* ¶ 280 (internal Meta research warning of a risk of teen suicide as a result of their algorithmic product features).

[33] These studies analyze various, significant aspects of Defendants' products, and all find a direct link between Defendants' addiction-causing design choices and physical and mental harm that Plaintiffs suffer. *See, e.g.*, MC ¶ 106 (study showing how limiting use of Instagram, Facebook, and Snapchat to only 10 minutes per day resulted in "significant reductions in loneliness and depression over three weeks"); *id.* ¶ 111 (longitudinal study finding children and adolescents addicted to Facebook were more likely to engage in self-injurious behavior, such as cutting and suicide); *id.* ¶ 515 (study finding Snapchat filters make it "one of the worst social media products for the mental health" and body image of children and adolescents, leading researchers to coin the term "Snapchat Dysmorphia").

that further information was in defendants' control); *accord In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 537 F. Supp. 3d 679, 721 (D.N.J. 2021) (refusing to dismiss master complaint based on a lack of individual causation, and noting that certain information was within the control of defendants). Plaintiffs' allegations also distinguish this case from those Defendants cite, in which the plaintiffs offered no theory of causation. *See, e.g.*, *Chattopadhyay v. BBVA Compass Bancshares Inc.*, 2019 U.S. Dist. LEXIS 241400, at *10 (N.D. Cal. Nov. 25, 2019) (dismissing when there were only "two paragraphs" about relevant defendants, "both of which lump[ed] them together with other defendants without specifying any particular acts allegedly done by [the relevant defendants].").[34]

In addition to relying on inapposite cases, Defendants also attempt to relitigate the Court-approved Short-Form Complaint. Defendants do not get a second bite at that apple. Consistent with the Court's order (ECF No. 177), Plaintiffs' Short-Form Complaints identify each product a Plaintiff used and for how long, the Plaintiff's injuries, and which claims are brought against which Defendants, as well as incorporate the Master Complaint's causation allegations tying the defects in each product to their use. *See id.* at 9, 12-16. No more is required at this time. *See, e.g.*, *Allergan*, 537 F. Supp. 3d at 721 (discussing causation when there are short form and master complaints and holding "the lack of potentially individualized factual allegations of Plaintiffs, such as causation of individual Plaintiffs' injuries, will not be a ground for dismissal").

Defendants' sole citation does not change that outcome. In *Adams v. BRG Sports, Inc.*, the court acknowledged it had not clearly articulated the information needed in the short-form complaints; it was therefore no surprise that they required amendment.[35] 2018 WL 4853130 at *1, 3 (N.D. Ill. Oct. 5, 2018). By contrast, this Court has explicitly approved Plaintiffs' Short-Form

---

[34] *See also, e.g.*, *In re iPhone Application Litig.*, 2011 WL 4403963, at *8 (N.D. Cal. Sept. 20, 2011) (complaint did not "identify what action each Defendant took that caused Plaintiffs' harm" and failed to state facts for a claim of relief that was plausible against *one* Defendant); *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 1996 WL 482977, at *12 (E.D. Pa. Aug. 22, 1996) (dismissing complaing where there was only "a single [causation] allegation covering all of the fifteen or so claims in the complaint.").

[35] In *Adams*, the master complaint contained far less detailed and thorough causation allegations, in the unique procedural context of a non-MDL mass tort. 2018 WL 4853130 at *1, 3.

Complaint and rejected Defendants' efforts to extract granular detail from each Plaintiff at this stage. *See* ECF No. 164 at 3 (plaintiffs may "be required to provide the type of information the defendants are requesting if the case proceeds past dispositive motions"). The approach taken in the Court-approved Short-Form Complaint has been used successfully in countless other mass torts MDLs, including by the presiding judge in *Adams*. *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, No. 1:14-cv-1748 (N.D. Ill. Apr. 2, 2018), ECF No. 2424. None have required heightened and burdensome pleading-stage causation allegations for individual plaintiffs. *See id.* (short form complaint requiring the identification of the product at issue, as well as the dates of use, the plaintiff's injuries, and which claims were being brought). *See generally*, ECF No. 153-3 at 1 n.1 (citing *In re Juul Labs, Inc., Mktg., Sales Practices, and Prods. Liab. Litig.*, No. 19-md-02913-WHO (N.D. Cal. 2020), ECF No. 405; *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, No. 3:19-md-2885 (N.D. Fl. 2019), ECF No. 705; *In re Tylenol (Acetaminophen) Mktg, Sales Practices, and Prods. Liab. Litig.*, 2:13-md-02436 (E.D. Pa. 2013), ECF No. 47).

**b.      Third-party conduct does not absolve Defendants of blame for their defective design choices.**

Defendants' second proximate cause argument seeks to absolve social media companies for liability in the subset of cases involving third-party wrongful conduct, such as the cases in which adults used Defendants' platforms to exploit children sexually. But "[t]he conduct of a defendant can lack reasonable care insofar as it foreseeably combines with or permits the improper conduct of . . . a third party." Rest. 3d Torts: Phys. & Emot. Harm § 19. Whether third parties *also* contributed to (some) Plaintiffs' harms is thus a red herring. Even in such cases, Plaintiffs need only allege foreseeability and that Defendants' conduct was a substantial factor in bringing about the harm. *See e.g.*, *Ileto*, 349 F.3d at 1206 (reversing a dismissal, noting that both the harm and the intervening act were foreseeable); *see also* Rest. 2d Torts §§ 431, 433 (explaining that negligent conduct is a legal cause of harm if it is a substantial factor, and defining substantial factor). Plaintiffs do not need to show that any "defendant's negligence [was] the sole factor, or even the primary factor" that caused each of their injuries, merely that it was a "substantial factor." *Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 855 (9th Cir. 2019) (internal quotation marks omitted) (quoting

*Fouche v. Chrysler Motors Corp.*, 692 P.2d 345,348 (Id. 1984)). Thus, the only question at this stage is whether Plaintiffs allege Defendants' actions were a substantial factor in causing Plaintiffs' injuries. *See id.*

Plaintiffs meet this bar easily, alleging in detail which defective product features lead to injuries for claims in which a third party *also* contributes to Plaintiffs' harm. For instance, Defendants' products have wholly inadequate parental control features with easy work-arounds for minor children to avoid parental oversight. *See e.g.*, MC ¶ 141. Additionally, Plaintiffs make allegations specific to each Defendant's product's unique features that facilitate and contribute to sexual exploitation and CSAM dissemination. *See e.g., id.* ¶ 198, 399 (describing Meta's "People You May Know" feature); 504-12, 528-29 (describing Snapchat's "My Eyes Only," "Snap Map," and "Quick Add," and "Snapcash" features); 658, 662, 665 (describing TikTok's "Your Private Videos," "Post-in-Private" and "LIVE Gifts" and "Diamonds" features); 788-93 (describing YouTube's features that promote underage sexual content). And most Defendants made minors' profiles public by default until recently, which supplied predators with background information (e.g., list of friends, activities, interests, and locations), making it easier for them to groom and abuse children. *Id.* ¶¶ 138; *see id.* ¶¶ 164-67, 412-30; *see also id.* ¶¶ 154-55, 393-96, 399 (discussing instances where outside organizations approached Defendants with information about how their products enable child exploitation).

Defendants are responsible for these defective features, not any third party. *See, e.g., In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 664-65 (N.D. Cal. 2020)*.* Put another way, "given the extensive facts of [Defendants'] knowledge" of the harmful nature of the defects in its products, "it is facially plausible that the involvement of third parties, even criminals, was reasonably foreseeable." *City of Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017); *see also In re JUUL Labs*, 497 F. Supp. 3d at 664-65; *Steinle*, 230 F. Supp. 3d at 1034 (denying motion to dismiss, finding that proximate cause was sufficiently pled); *S.P. v. Cnty. of San Bernardino*, 2020 WL 3051360, at *7 (C.D. Cal. Mar. 24, 2020) (holding that allegations were sufficient to establish proximate causation at the motion to dismiss stage).

Unable to justify these dangerous and defective product features, Defendants claim a body of law categorically immunizes social media companies from responsibility where third parties are involved. This is inaccurate, and the cases they cite are distinguishable. Defendants' reliance on *Crosby v. Twitter, Inc.*, 921 F.3d 617 (6th Cir. 2019), and *Fields v. Twitter, Inc.*, 881 F.3d 739 (9th Cir. 2018) is particularly off-point. Those cases were brought under the Anti-Terrorism Act, which requires a more stringent showing of causation than state tort law. *See Fields*, 881 F.3d at 748 (noting that the statutory language "by reason of" requires more than foreseeability); *see also City of Everett*, 2017 WL 4236062, at *6 (distinguishing cases applying heightened causation standard). Likewise, *Modisette v. Apple Inc.*, 241 Cal. Rptr. 3d 209 (Cal. Ct. App. 2018), is inapposite because its proximate cause analysis was premised on a prior determination that an exception to the general duty of care should be created for claims based on distracted driving from cellphone use. As discussed above, it would be improper to create a similar carveout here. *See supra* § IV.A.4.

Furthermore, the connection between the defendants' actions and the plaintiffs' harm in those cases was far more attenuated than it is here. The plaintiffs in *Crosby* alleged that social media companies hosted ISIS videos, enabling the "self-radicaliz[ation]" of a domestic terrorist. 921 F.3d at 625. But they alleged no facts demonstrating that the perpetrator viewed such videos on defendants' platforms, or that ISIS was responsible for the shooting. *Id.* at 625-26.[36] Given these gaps, the court dismissed the claim. Notably, however, it recognized that, under different facts, social media companies *could* be held liable for "proximately caus[ing] a terrorist attack through their social media platforms." *Id.* at 625. The connections here are far more direct than those in *Crosby* or Defendants' other cases: Plaintiffs allege that they used specific apps, that particular

---

[36] So too in *Fields*, 881 F.3d at 750, and *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156,1178 (N.D. Cal. 2018) ("While the TAC includes detailed allegations regarding the alleged use of YouTube by ISIS and its affiliates, the TAC does not allege any facts plausibly connecting the general availability of YouTube with the attack itself."). Similarly, the relationship between Plaintiffs, the third parties who harmed them through Defendants' products, and Defendants is far more direct than in *A.B. v. Salesforce.com, Inc.*, where the defendant did not play a role "in designing or sanitizing the ads on Backpage," one of "the key factors that the Plaintiffs have argued caused the actual injury." 2021 WL 3616097 at *5 (S.D. Tex. Mar. 22, 2021). And in *Gamache v. Airbnb, Inc.*, the plaintiffs did not allege any particular features of Airbnb encouraged the challenged nuisance. 2017 WL 3431651 at *2 (Aug. 10, 2017) (cited by Defendants despite its noncitable status).

features of these apps were defective because they made it easy for adult users to harm kids, and that adults did use those allegedly defective features to harm kids.

Defendants make two final arguments in passing about cases involving third party conduct, but neither is persuasive. That most social media users do *not* sexually assault children does not somehow let Defendants off the hook for their substantial role in causing these harms. *See e.g.*, *Mary M. v. City of Los Angeles*, 54 Cal. 3d 202, 217-18 (1991) (even though assaults by police officers are "fortunately uncommon," city can be held liable for foreseeable "risk of such tortious conduct"). And having terms of use that tell adults not to harm minors does not exculpate Defendants when their defective designs allow adults to do exactly that. *See Lemmon*, 2022 WL 1407936, at *9-10 (regardless of warnings, Snap can be held liable for product that was designed to encourage illegal activity); *see also Maynard*, 870 S.E.2d at 744 (Snap can be held liable for defects in its product even though terms of use forbid using Snapchat "for any illegal or unauthorized purpose"). Moreover, even if any of these arguments created a close call, the question of whether a defendant's conduct is a substantial factor in creating a plaintiff's injury or whether a third party broke the chain of causation is a fact-intensive inquiry typically reserved for the jury, *Barnard v. Hyper Ice, Inc.*, 2023 WL 3432256, at *3-4 (C.D. Cal. Mar. 24, 2023) (*citing Torres v. Xomox Corp.*, 49 Cal. App. 4th 1,19 (1996)), or in a rare cases decided on summary judgment after discovery, *see Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11 (Fla. Dist. Ct. App. 2022) (appeal from summary judgment); *Stephenson ex rel. Coley v. S.C. Johnson & Son, Inc.*, 658 N.Y.S.2d 636 (App. Div. 1997) (same).

### C.      Plaintiffs sufficiently plead their negligence per se claim.

Statutory violations support an action for negligence per se when (1) the statute is "designed to protect against the type of accident the [defendant's] conduct causes" and (2) the plaintiff is "within the class of persons the statute is designed to protect." Rest. 3d Torts: Phys. & Emot. Harm § 14. Here, Defendants violated at least two relevant statutes: the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501, *et seq*., and the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today ("PROTECT") Act, 18 U.S.C. §§ 2258A, 2258B.

1
2
Plaintiffs plead facts showing violations of each statute—either of which, standing alone, supports Plaintiffs' negligence per se claim.

3
4
        Defendants protest that Plaintiffs' claim is inconsistent with federal law; however, courts routinely allow negligence per se claims based on federal statutes that have no express private right of action. *See* Rest. 3d Torts: Phys. & Emot. Harm § 14, reporters' note, cmt. A (dispelling myth of state court "resistance" to using federal laws for state law duty of care); *see also, e.g.*, *McClellan v. I-Flow Corp.*, 776 F.3d 1035, 1041 (9th Cir. 2015) (considering Oregon negligence per se claim and rejecting argument that "allowing a jury to look to [a federal statute] to establish certain standards of care will create an obstacle to accomplishing the goals Congress envisioned in passing the [statute]."); *Janitscheck v. United States*, 45 F. App'x 809, 811 (9th Cir. 2002) (under Alaska law, violation of OSHA regulation established negligence per se); *see generally*, 57A Am. Jur. 2d Negligence § 656 (describing violation of a statute as negligence). And, as explained below, the Ninth Circuit has recently credited the ability of private litigants to bring state law claims that are consistent with the duties set forth in COPPA. *See Jones v. Google LLC*, 56 F.4th 735, 741 (9th Cir. 2022). Defendants also argue that this Court should not be permitted to address "novel" issues of state law, which completely misconstrues the role of a federal MDL court sitting in diversity. Defendants' remaining arguments ignore or distort Plaintiffs' allegations, raising factual disputes that cannot be resolved at this stage.

5
6
7
8
9
10
11
12
13
14
15
16
17
18

19
20
### 1.     COPPA and the PROTECT Act are proper bases for Plaintiffs' negligence per se claim.

21
22
        Defendants are mistaken that Plaintiffs seek to "authorize tort liability that is inconsistent with . . . federal law." MTD at 52. As to COPPA, that argument is directly contradicted by the Ninth Circuit's recent decision in *Jones*, 56 F.4th at 741, which Defendants distort out of recognition. *See* MTD at 52 n.30. *Jones* held that COPPA does not bar "state-law causes of action that are parallel to, or proscribe the same conduct forbidden by, COPPA." 56 F.4th at 741. In seeking to hold Defendants liable for breaching the duty of care established by COPPA, Plaintiffs' negligence per se claim by definition seeks to "proscribe the same conduct forbidden by" that

23
24
25
26
27
28

1
2
statute, *id.*, and is "consistent with COPPA's substantive requirements," *id.* at 737 (emphasis removed).

3
4
5
6
7
8
9
10
11
12
Notably, *Jones* rejected as "nonsensical" the argument Defendants advance here: that COPPA evinces a "clear congressional intent to create an *exclusive* remedial scheme for enforcement of COPPA requirements."[37] *Id.* at 741; *see* MTD at 49-50. Even the FTC does not agree that "[t]he statute entrusts enforcement only to the FTC" and other government regulators. MTD at 49. Indeed, the FTC has expressly rejected that position: "The expansive interpretation of the preemption clause urged by Google would have the 'perverse effect' of granting immunity 'to an entire industry that, in the judgment of Congress, needed more stringent regulations,' not less." Br. for Amicus Curiae Federal Trade Commission in Support of Neither Party ("FTC *Jones* Amicus") at 13, *Jones v. Google*, No. 21-16291 (9th Cir. May 20, 2023), ECF No. 76 (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487 (1996)); *see also id.* at 11-12.

13
14
15
16
17
18
19
20
21
22
As for the PROTECT Act, Defendants' initial assertion that "there [is] no civil liability at all [for] the PROTECT Act's reporting requirements," MTD at 49, is belied pages later when Defendants acknowledge that the PROTECT Act *does* allow civil claims "for failing to report [] known child pornography," subject only to specified immunities. *Id.* at 56 (citation omitted). Defendants are right on page 56 and wrong on page 49. The statute is clear: in the case of "intentional, reckless, or other misconduct," there may be "a civil claim or criminal charge against a provider . . . arising from the performance of the reporting or preservation responsibilities," and such claims may be brought "in any Federal or State court." 18 U.S.C. § 2258B(a), (b); *accord United States v. Wilson*, 13 F.4th 961, 964 n.1 (9th Cir. 2021).[38]

23
24
25
[37] Unlike *Jones*, the District of South Carolina case cited by Defendants is not binding authority. MTD at 52 (citing *In re Blackbaud, Inc., Customer Data Breach Litigation*, 567 F. Supp. 3d 667, 672, 683-86 (D.S.C. 2021)). In any event, the court there simply found that the plaintiffs *in that case* were not "within the class [COPPA] seeks to protect." *Blackbaud*, 567 F. Supp. 3d at 685.

26
27
28
[38] Defendants cite *Doe v. Twitter*, 555 F. Supp. 3d 889 (N.D. Cal. 2021), and *Doe v. Mindgeek*, 558 F. Supp. 3d 828 (C.D. Cal. 2021). MTD at 49. Neither address whether the PROTECT Act can form the basis for negligence per se under state law. Instead, they address only whether there is a private right of action in the act itself. Defendants' motion attempts to collapse these two questions, but as explained *supra* p. 56, the existence of a federal right of action is distinct from civil liability

1

### 2.  Plaintiffs' negligence per se claim is cognizable by this Court.

2

As explained above, Plaintiffs seek the straightforward application of existing state tort law

3

to Defendants' violations of federal law. By contrast, what Defendants urge as a "measured

4

approach," MTD at 51, would subvert this Court's appointed role in a federal MDL. Defendants'

5

bald declaration that "[i]t is not the role" of an Article III court sitting in diversity to decide "new

6

theories of liability" under state law, *id.*, is incorrect. As this Court has explained, it is "[t]he Court's

7

task . . . to make a conscientious prediction of what rule a state high court would adopt in the case

8

before it." *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *8 (N.D. Cal. Oct. 2,

9

2014). A federal court does this to "promote uniformity in the law and reduce the possibility that

10

similar lawsuits may achieve different results solely by virtue of having been filed in the courts of

11

different sovereigns." *Id.* at *7.

12

Defendants' contention that a dearth of caselaw precludes a federal court from deciding

13

newly presented issues of state law is also incompatible with binding authority from the Ninth

14

Circuit. *See Gonzales v. CarMax Auto Superstores, LLC*, 840 F.3d 644, 649-50 (9th Cir. 2016)

15

("we are not precluded from affording relief even when the state Supreme Court and state

16

legislature fail to provide a clear rule" and even when "there are currently no published opinions

17

from any [state] appellate courts" on the issue). Finally, Defendants are incorrect in asserting that

18

an MDL court should stay its hand because an issue may affect "dozens of states." MTD at 51. This

19

is, again, inconsistent with this Court's precedent. *See In re Lithium Ion Batteries Antitrust Litig.*,

20

2014 WL 4955377, at *8 (predicting whether 16 states would adopt the federal approach to antitrust

21

standing). In short, the Court should reject Defendants' do-nothing approach.

22

23

24

25

---

under states' negligence per se doctrine. *See, e.g.*, *Sierra-Bay Fed. Land Bank Ass'n v. Sup. Ct.*,

26

227 Cal. App. 3d 318, 333 (1991) (explaining that under California's negligence per se law, "it is the tort of negligence, and not the violation of the statute itself, which entitles a plaintiff to recover

27

civil damages. In such circumstances the plaintiff is not attempting to pursue a private cause of action for violation of the statute; rather, he is pursuing a negligence action and is relying upon the

28

violation of a statute, ordinance, or regulation to establish part of that cause of action").

### 3.     The vast majority of jurisdictions allow Plaintiffs' negligence per se claim.

Thirty-five states and the District of Columbia recognize negligence per se claims based on violations of federal statutory law or apply similar presumptions to statutory violations. *See infra* pp. 77-100. Of these 36 jurisdictions, 25 recognize stand-alone negligence per se claims.[39] Three allow negligence per se based on a statutory violation where the legislative scheme impliedly allows private relief.[40] The other eight jurisdictions treat statutory violations as prima facie evidence of negligence or apply a presumption of negligence to such violations.[41] Thus, Defendants' assertion that Plaintiffs' negligence per se claims are "categorically barred in the vast majority of states[,]" MTD at 48, is wrong.[42]

### 4.     COPPA and the PROTECT Act support a negligence per se claim.

"An actor is negligent if, without excuse, the actor violates a statute that is designed to protect against the type of accident the actor's conduct causes, and if the accident victim is within the class of persons the statute is designed to protect." Rest. 3d Torts: Phys. & Emot. Harm § 14. As demonstrated by the detailed allegations in the Complaint, and as explained below, Plaintiffs are within the class of persons that COPPA and the PROTECT Act were designed to protect, and Defendants have violated their obligations under these statutes. In violation of COPPA's provisions, each Defendant knowingly collects information and data about millions of elementary and middle schoolers, without parental notice and consent. *See* MC ¶¶ 54, 59-60, 347, 779, 1010.

---

[39] Alabama, Alaska, Arizona, Colorado, Connecticut, Delaware, D.C., Georgia, Idaho, Indiana, Iowa, Kansas, Minnesota, Mississippi, Missouri, Nevada, New Mexico, North Carolina, Oklahoma, Oregon, South Dakota, Tennessee, Texas, Virginia, and Wyoming.

[40] Florida, New York, and Wisconsin.

[41] California, Illinois, Maine, Michigan, Rhode Island, Utah, Vermont, and West Virginia.

[42] Fifteen states do not recognize negligence per se as a standalone tort, though they do allow Plaintiffs to point to violations of federal law as evidence of negligence or to establish the standard of care. These are Arkansas, Hawaii, Kentucky, Louisiana, Maryland, Massachusetts, Montana, Nebraska, New Hampshire, New Jersey, North Dakota, Ohio, Pennsylvania, South Carolina, and Washington. Plaintiffs acknowledge that an individual plaintiff will not be able to assert a negligence per se claim if applicable choice-of-law rules dictate that one of these twelve states' substantive laws apply. However, this will not be a barrier for most plaintiffs, given that the vast majority of states do recognize negligence per se as a standalone claim. Accordingly, and in keeping with the Master Complaint's function as a tool of administrative convenience, the court should not dismiss the negligence per se count from the Master Complaint.

1
2
3

And, in violation of the PROTECT Act, each Defendant failed to report known CSAM, stymying efforts to report rather than complying with its statutory obligations to protect children. *Id.* ¶¶ 146, 149-50, 153, 409-10, 532, 535, 538-39, 667-69, 799-802.

4
5
6
7
8
9
10
11
12
13
14
15
16

These violations are not "abstract controvers[ies]" or mere "statutory violations 'in the air.'" MTD at 59, 61. They have caused Plaintiffs significant and concrete harms, sufficient to assert a claim for negligence per se. As laid out below, the data Defendants illicitly collected allowed their defective apps to target and harm Plaintiffs with laser precision. And Defendants' decision to actively ignore and obstruct attempts to report CSAM enabled the sexual abuse of certain Plaintiffs. MC ¶¶ 133-55, 1014-19; *see, e.g.*, *C.U. v. Snap Inc.,* No. 22-cv-07347, ECF No. 11 at 7-8; *D.H. v. Meta Platforms, Inc.*, No. 22-cv-04888, ECF No. 24 at 8; *D.D. v. Meta Platforms, Inc.*, No. 22-cv-6205, ECF No. 10 at 8. As a result of these violations, Plaintiffs suffered, among other injuries, "emotional distress, diagnosed mental health conditions, [past and future] medical expenses, loss of income and earning capacity, pain and suffering, and reputational harm." MC ¶ 1017; *see also id.* ¶ 1014. These are all harms "traditionally recognized as providing a basis for a lawsuit in American courts." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2200 (2021) (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)).

17

### a.   **COPPA**

18
19
20
21
22

Defendants have built elaborate machines that take in shocking levels of user information—such as whether a child's heart beats faster when they look at an ad, MC ¶ 459—to maximize usage of their products, and in turn maximize their revenues. *Id.* ¶¶ 13, 54, 242, 452, 569, 585, 589, 684, 711, 715. Defendants obtained this data in violation of COPPA for users under the age of 13, including many Plaintiffs.

23
24

### i.    ***COPPA applies to Defendants because their apps are "directed to children."***

25
26
27

COPPA's requirements apply to websites that are "directed to children," 15 U.S.C. § 6502(a), a provision Defendants essentially ignore by focusing solely on "actual knowledge," MTD 57. The FTC has explained the phrase "directed to children" in implementing regulations

28

1  known as the COPPA Rule. *See* 16 C.F.R. §§ 312.1-.13.[43] Its guidance about the statute, and its
2  own regulations, is authoritative.

3      A website is "directed to children" if it "targets children as one of its audiences - even if
4  children are not the primary audience." *COPPA July 2020 Guidance* § H(2); *see also* 16 C.F.R.
5  § 312.2 (definition of "Web site or online service directed to children," paragraph (1)). A fact-
6  intensive, totality-of-the-circumstances analysis governs, including, *inter alia*, "use of animated
7  characters or child-oriented activities and incentives," "music or other audio content," "age of
8  models," "presence of child celebrities or celebrities who appeal to children," "whether advertising
9  promoting or appearing on the Web site or online service is directed to children," and "empirical
10 evidence regarding audience composition, and evidence regarding the intended audience." *COPPA
11 July 2020 Guidance* §§ D(1), H(5); 16 C.F.R. § 312.2. Even if a website intends to target teenagers,
12 not children, "in reality, [the] site may attract a substantial number of children under 13, and thus
13 may be considered [to be] . . . 'directed to children' . . . ." *COPPA July 2020 Guidance* § H(2).
14 Child-directed sites cannot feign ignorance by nominally banning users under 13. Indeed, if a
15 website is "directed to children," it cannot avoid COPPA compliance by using an age screen to
16 "block children from participating altogether." *COPPA July 2020 Guidance* § D(6).

17     Each of the Defendants' apps "targets children as one of its audiences" and, therefore, is a
18 child-directed site:[44]

19     **Meta**: Meta has conducted focus groups with tweens to explore changes to Facebook and
20 Instagram. *See, e.g.*, MC ¶ 258. Meta developed features like "pok[es]" and "waves" to "'[p]rovide
21 light conversation starters that tweens can use to test the reciprocity of an interaction.'" *Id.* ¶ 258.

[43] The FTC has persuasively explained the COPPA Rule in administrative guidance. *See* FTC, *Complying with COPPA: Frequently Asked Questions* (July 2020), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions ("*COPPA July 2020 Guidance*"); and FTC, *Children's Online Privacy Protection Rule: Not Just for Kids' Sites* (Apr. 2013), https://www.ftc.gov/business-guidance/resources/childrens-online-privacy-protection-rule-not-just-kids-sites ("*COPPA April 2013 Guidance*").

[44] Defendants' apps do not fall within COPPA's narrow exception for "mixed audience" sites because, as described infra § IV.C.4.a.iii, they have implemented sham, intentionally deficient age-screens rather than the neutral age-screens required by the exception; they collect user data even if users identify themselves as under 12; and they collect data even when users have not completed an age-screen. 16 C.F.R. § 312.2; *COPPA July 2020 Guidance* §§ D, H.

It has featured children—including fifth graders—in its ads. *See id.* ¶¶ 390-391. It knows "up to 10 to 15% of even 10 year-olds in a given cohort may be on Facebook or Instagram." *Id.* ¶ 389. Internal studies found "Instagram's perceived user base included middle schoolers." *Id.* ¶ 343. Its algorithms inundate "tween and teen users" with content predicted to appeal to them. *See, e.g.*, *id.* ¶ 312. Its Reels feature targets those with very short attention spans—children. *See id.* ¶ 289.

**Snap**: Snap tailors every aspect of Snapchat to children by using bright colors, cartoonish designs, and other features that appeal to younger audiences. *Id.* ¶¶ 439, 457. For example, Snap developed "Stickers" for users to decorate the pictures or videos they post. *Id.* ¶ 478. Money from advertisers targeting young children has poured in—"[b]rands like candy manufacturer Sour Patch Kids, children's toy store ToysRUs, and sugary beverage seller Kool-Aid have all run successful advertising campaigns through Snapchat[.]" *Id.* ¶ 460. The effect is that "13% of children ages 8-12 use Snapchat." *Id.* ¶ 464.

**TikTok**: "The initial iteration of TikTok allowed users to lip sync pop music by celebrities who appealed primarily to teens and tweens (e.g., Selena Gomez and Ariana Grande)." *Id.* ¶ 563. Its song library labeled folders with names attractive to young kids (e.g., "Disney" and "school"), and included in those folders songs from movies like The Lion King, Toy Story, and other kid-oriented television shows and movies. *Id.* ¶ 563. In 2019, the FTC concluded that TikTok is directed to children, and ByteDance agreed to pay a civil penalty to settle alleged COPPA violations. *See id.* ¶ 572-73. Since the FTC's determination, the key aspects of TikTok's structure that appeal to children have remained. "In July 2020, TikTok reported that more than one-third of its 49 million daily users in the United States were 14 or younger." *Id.* ¶ 555.

**YouTube**: Google has "boasted" to advertisers like Mattel and Hasbro "that YouTube 'is today's leader in reaching children age 6-11;' 'the new 'Saturday Morning Cartoons;' 'unanimously voted as the favorite website of kids 2-12;' 'the #1 website regularly visited by kids;' and used by '93% of tweens.'" *Id.* ¶¶ 707-09. "Many of YouTube's most-viewed videos are kid-focused, and the most subscribed and highest paid YouTubers are children." *Id.* ¶ 710. "[A] video aimed at toddlers[] is the most viewed video in the history of YouTube—and it and five other child-focused videos make up the top ten YouTube videos of all time." *Id.* "Child creators also dominate top-

1   earner lists year after year." *Id*. Google uses images of children in its ads. *Id*. ¶¶ 737-38. It designed
2   its YouTube Shorts feature to exploit children's short attention spans. *See id*. ¶ 739. "In 2019, the
3   FTC and New York Attorney General alleged in a federal complaint that Google and YouTube
4   violated COPPA by collecting personal information from children without verifiable parental
5   consent." *Id*. ¶ 779. Google paid a record $170 million to settle these claims. *Id*. ¶ 779 n. 852.

***ii.***     ***COPPA applies to Defendants because they have "actual***
***knowledge" that they collect personal information from***
***children under 13.***

8   COPPA also applies to websites that have "actual knowledge that [they are] collecting
9   personal information from a child." 15 U.S.C. § 6502(a). "[T]he FTC has said that an operator has
10  actual knowledge of a user's age" if its site "asks for - and receives - information from the user that
11  allows it to determine the person's age." *COPPA April 2013 Guidance*. A child's response to an
12  initial age screener does not end the website's duties. If an operator "later determines that a
13  particular user is a child under age 13, COPPA's notice and parental consent requirements will be
14  triggered." *COPPA July 2020 Guidance* § A(12). Furthermore, websites cannot "encourage
15  children to falsify their ages to gain access." *Id*. § H(3).

16  This information-focused definition of actual knowledge makes sense. Willful blindness is
17  a form of actual knowledge, *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011),
18  and "actual knowledge can be proved through inference from circumstantial evidence," *Guenther*
19  *v. Lockheed Martin Corp.*, 972 F.3d 1043, 1054 (9th Cir. 2020) (internal quotation marks and
20  citation omitted). As such, companies cannot escape the reach of federal statutes "by deliberately
21  shielding themselves from clear evidence of critical facts that are strongly suggested by the
22  circumstances." *Glob.-Tech Appliances,* 563 U.S. at 766.

23  Plaintiffs allege that each Defendant has actual knowledge of its users' ages. Defendants
24  make their money "by selling to others the ability to micro-target advertisements to incredibly
25  narrow slices of the public." MC ¶ 13. They could not do that without knowing their users' real
26  ages. Even at this early stage, Plaintiffs are able to allege that two Defendants—Meta and
27  YouTube—estimate real user ages based on the data they collect. *Id*. ¶¶ 334 (identifying "the
28  'teen_non_teen' model or the 'dim_ig_age_prediction_adult_classifier'" as Meta real-age

estimators); 725-26 ("Google engineers have publicly admitted YouTube's algorithm tracks user age," which independent watchdogs have confirmed). These are clear indicia of actual knowledge.

For Snap and TikTok, the same inference is plausible. Snap, for example, admits in securities filings that it relies "heavily on our ability to collect and disclose data, and metrics to our advertisers so we can attract new advertisers and retain existing advertisers." *Id.* ¶ 452. The kinds of advertisers that take advantage of this include advertisers who are obviously attempting to reach children—like toy stores. *Id.* ¶ 460. The obvious inference from these allegations is that Snap and TikTok have the same kind of knowledge through algorithmic targeting of user ages that Meta and Google have. *See id.* ¶¶ 13, 459, 585; *see also id.* ¶¶ 562, 569, 589 (describing TikTok's advertising, data collection, and targeting efforts). Plus, the FTC's information-focused definition of actual knowledge simply asks if a platform "asks for - and receives - information from the user that allows it to determine the person's age." *COPPA April 2013 Guidance*. Plaintiffs plausibly allege that Defendants ask for and receive information that allows them to determine many users are 13 or younger. MC ¶ 1099.

Defendants cannot escape their knowledge—and certainly not on a motion to dismiss—by pointing to the fact that children signing up for their product do exactly what one would expect: lie about their age. Meta, Snap, and TikTok structure their products' age screen to encourage children to lie. MC ¶¶ 332, 335-37, 463, 565, 567-68, 575. And Meta, Snap, and TikTok employees or executives have admitted they are not fooled—Facebook's age screen, for example, shows it has "more people who say they are born in the early 90's than exist in the population." *Id.* ¶ 342; *see also id.* ¶¶ 464 (Snap admitting its age verification is "effectively useless"), 570 (ByteDance knows its under-13 users give inaccurate birthdays). YouTube and TikTok do not even bother requiring account sign-in before they start collecting user data. *Id.* ¶¶ 569, 722. Moreover, what a child says at account signup is not the end of the inquiry. If a website "later determines that a particular user is a child under age 13, COPPA's notice and parental consent requirements will be triggered." *COPPA July 2020 Guidance* § A(12).

### iii.    Plaintiffs plausibly allege Defendants violated COPPA.

Because COPPA applies to Defendants' apps, they must (a) obtain verifiable parental

consent before collecting, using, or disclosing "personal information from a child" under thirteen and (b) provide parents with detailed notice about what such data is being collected from their children. 15 U.S.C. § 6502(b); 16 C.F.R. §§ 312.4(a), 312.5(a). Child-directed sites must "presume all users are children and . . . provide COPPA protections accordingly." Children's Online Privacy Protection Rule, 78 Fed. Reg. 3972, 3984 (Fed. Trade Comm'n Jan. 17, 2013).

In violation of the duties embodied in COPPA and its implementing regulations, none of the Defendants obtain parental consent before obtaining personal information from children under the age of 13. MC ¶¶ 333, 347, 452, 461-64, 520, 568, 779, 1010. By collecting children's personal information without parental consent, Defendants also fail to provide appropriate notice to parents, as proper notice must assure that Defendants "will not collect, use, or disclose" a child's personal information "if the parent does not provide . . . consent." 16 C.F.R. § 312.4(c)(ii); *see also id.* § 312.4(a) ("it shall be the obligation of the operator to provide notice and obtain verifiable parental consent prior to collecting, using, or disclosing personal information from children"). Defendants' large-scale violation of COPPA affected many Plaintiffs, who used Defendants' products while they were under the age of 13 despite Defendants failing to obtain their parents' consent.

Defendants' age screening procedures do not relieve them of their COPPA obligations. *Contra* MTD at 58. Rather than protecting children, Defendants' age screens are configured to protect Defendants' commercial interests in acquiring young users. The age screens accept confirmation that users are over 13, but disregards evidence that users are under 13. For example, if a user attempts to create a Facebook or Instagram account with a birthday indicating they are under 13, they will be shown a message saying they cannot do so. MC ¶ 332. But users can immediately restart the account creation process and input an eligible birthday. *Id.* Snapchat also allows users to simply enter a new birthday if they are denied an account because they are under 13. *Id.* ¶ 463. Similarly, while TikTok offers a COPPA-compliant product for users under 13, it allows children to easily delete their age-restricted accounts and use a fake birthday to create a new, unrestricted account on the same phone. *Id.* ¶ 574-75. Google goes a step further and allows users to change their birthday in their account settings after creating an account, with no deletion or new sign-up required. *Id.* ¶ 720. Furthermore, some Defendants only recently implemented even these

deficient age-screening procedures. Instagram did not ask for users' age until 2019 and grandfathered in existing users until 2021. *Id.* ¶ 330. TikTok allows children to use its product (and provide data to ByteDance) as "guest[s]" who are not subject to any age screen at all. *Id.* ¶ 569.

COPPA's legislative history makes clear that Plaintiffs are squarely within the class of persons the act is designed to protect, and the foregoing statutory violations caused Plaintiffs precisely the type of harms the act is intended to avoid. COPPA's principal sponsor explained that the act was intended "(1) to enhance parental involvement in a child's online activities in order to protect the privacy of children in the online environment; (2) to enhance parental involvement to help protect the safety of children in online fora such as chatrooms, home pages, and pen-pal services in which children may make public postings of identifying information; (3) to maintain the security of personally identifiable information of children collected online; and (4) to protect children's privacy by limiting the collection of personal information from children without parental consent." 144 Cong. Rec. S11657 (Oct. 7, 1998) (statement of Sen. Richard Bryan); *see* FTC *Jones* Amicus at 3-4 (expressly crediting this statement as a summary of COPPA's purpose).

Similarly, the introduction of COPPA was spurred by an FTC report that raised the alarm about the amount of personal information being collected from children on the Internet. *See* FTC, *Privacy Online: A Report to Congress*, at iii (June 1998).[45] The report warned that lack of data protection made children vulnerable to abusive corporate practices and crimes such as predation. *Id.* at 5. The same practices and harms are at issue here. Defendants illegally obtain data from kids under 13 to power their "addiction engine[s]" and hook young kids on their apps. MC ¶ 755; *see also id.* ¶¶ 11-13, 198, 242, 249-51, 267, 452, 452, 496, 585, 589. Defendants then use this constant supply of user data to feed the most harmful features of their apps: algorithmic recommendation systems that dictate these Plaintiffs' experiences and connect them with predators, the social feedback and IVR mechanisms that keep Plaintiffs returning to Defendants' products, the filters that warp Plaintiffs' body images, and the advertising sales that keep the whole system churning. *See id.* Plaintiffs are thus members "of the class of persons [COPPA] was intended to protect"

---

[45] https://www.ftc.gov/sites/default/files/documents/reports/privacy-online-report-congress/priv-23a.pdf

whose injuries "resulted from an occurrence [COPPA] was designed to prevent." *Safari Club Int'l v. Rudolph*, 862 F.3d 1113, 1120 (9th Cir. 2017) (citation omitted).

### b.   **The PROTECT Act**

Congress passed the PROTECT Act "to reduce the proliferation of online child sexual exploitation[,] to prevent the online sexual exploitation of children," 18 U.S.C. § 2258A(a)(1)(A), and to "prevent the future sexual victimization of children." 18 U.S.C. § 2258A(b). This last goal was particularly important.[46] As the Presidential signing statement for the original iteration of the PROTECT Act observed, "[o]bscene images of children . . . incite abuse, raise the dangers to children, and will not be tolerated in America."[47] Multiple Plaintiffs in this MDL have been victimized by CSAM on one or more of Defendants' platforms and specifically allege violations of the PROTECT Act.[48] They are unquestionably within the class of persons the PROTECT Act was designed to protect. CSAM cannot thrive on platforms where there is consistent vigilance. By contrast, when the reporting of CSAM is avoided and undercut, it creates an increased and wholly foreseeable risk of increased CSAM exploitation.

The act imposes a clear standard of conduct: whenever a website provider has "actual knowledge" of "*any* facts or circumstances" from which there is even "an *apparent* violation of" child pornography laws, the provider "shall" file a report with the CyberTipline of the National Center for Missing & Exploited Children ("NCMEC"). 18 U.S.C. §§ 2258A(a)(1)(A)(i), 2258A(a)(2)(A), 2258A(a)(1)(B) (emphases added). These obligations are intentionally broad.

---

[46] *See Challenges and Solutions for Protecting Our Children from Violence and Exploitation in the 21st Century: Hearing Before the Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary*, 110th Cong. 607 (2008) (legislative goal of "protect[ing] America's] children . . . from violence and exploitation") (statement of Sen. Joseph R. Biden, Chairman, Subcomm. on Crime and Drugs of the S. Comm. on the Judiciary).

[47] Remarks on Signing the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003, 1 Pub. Papers 398, 400 (Apr. 30, 2003) ("PROTECT Act Signing Statement"), https://www.govinfo.gov/content/pkg/PPP-2003-book1/pdf/PPP-2003-book1-doc-pg398.pdf

[48] *See, e.g.*, *C.U*, No. 22-cv-07347, ECF No. 11 at 7-8 (Snap); *D.H.*, No. 22-cv-04888, ECF No. 24 at 8 (Meta & Snap); *D.D.*, No. 22-cv-6205, ECF No. 10 at 8 (Meta, Snap, & TikTok). To date, no MDL Plaintiff has alleged injury as a result of any CSAM on YouTube. This should not result in dismissal of the negligence per se count against Google, given that the count is also predicated on its violation of the duties set forth in COPPA.

Moreover, as discussed above with respect to COPPA, "actual knowledge" can be satisfied through a showing of "willful blindness" and proved through "inference from circumstantial evidence." *Supra* at p. 63 (citing *Guenther*, 972 F.3d at 1054, and *Glob.-Tech Appliances*, 563 U.S. at 766). While the PROTECT Act does not require a provider to affirmatively search to gain actual knowledge of CSAM, 18 U.S.C. § 2258A(f), it does not countenance a provider having actual knowledge but obstructing attempts to act on it or denying its existence.

Plaintiffs allege that Defendants have not "report[ed] to NCMEC the violations of child pornography laws that they suspected to be in existence within [their] respective products." MC ¶ 1004. That is a clear violation of the PROTECT Act, which requires the reporting of "apparent" violations that Defendants know about or towards which they are willfully blind.[49]

Plaintiffs provide detailed explanations of how each Defendant has tried to "limit and avoid" its reporting duties, opting for willful blindness and the minimization of costs instead of compliance and the maximization of child safety. For example, Plaintiffs allege that their "reports of CSAM, and requests to remove and take down such material from Defendants' products, often fall on deaf ears," with Defendants frequently ignoring requests until legal correspondence is sent. *Id.* ¶ 150; *see also id.* ¶¶ 1004-06. Plaintiffs also allege how each specific Defendant has turned a blind eye to rampant CSAM on its products, despite actual knowledge of its existence:

**Meta:** Plaintiffs plausibly allege that "Meta knowingly fails to report massive amounts" of CSAM. *Id.* ¶ 420; *see also id.* ¶ 409. Meta has failed to report videos and images that were flagged as suspicious, including "violent paedophilic cartoons" and "a video of an apparent sexual assault on a child."[50] *Id.* ¶ 395. Meta uses a bespoke definition of CSAM that is "wholly illegitimate," *id.* ¶ 409, and has "instructed content moderators to 'err on the side of an adult'" when they are unsure

---

[49] Remarkably, Defendants contend that awareness of "suspected" CSAM is not enough to trigger reporting duties. MTD at 54-55. Of course it is. To "suspect" something means "to believe that something is true, especially something bad." Macmillan Dictionary Online, "Suspect," https://www.macmillandictionary.com/us/dictionary/american/suspect_1 (last visited May 29, 2023) (providing as first example of usage "Teachers should call social services if they suspect child abuse.").

[50] MC ¶ 357 ("Plaintiffs have found that Meta declined to respond to reports filed through its online reporting tool, citing technical issues.")

about the age of someone depicted in a graphic image. *Id.* ¶ 413. Meta thus avoids reporting CSAM of which it has actual knowledge by speciously denying that it is CSAM at all. In addition, Meta often ignores or unreasonably delays external CSAM reports, takedown requests, and even law enforcement inquiries. *Id.* ¶¶ 150 & n.144, 409, 416. Former employees claim that Meta devotes inadequate resources to tracking and combatting CSAM because its executives instead prioritize "return on investment." *Id.* ¶ 414; *see also id.* ¶¶ 412-13 425-26, 428. All of this is more than enough to allege actionable violations of § 2258A for purposes of negligence per se.

**Snap:** Because of its signature "disappearing" messages feature, Snapchat has been known since its 2011 launch as "the sexting app." *Id.* ¶ 444. Not surprisingly, CSAM is pervasive on Snapchat. *Id.* ¶¶ 500, 523-24, 526, 531-32. Pre-teens and teens ages 12-17 are routinely sent unwanted, sexually explicit photos through the app. *Id.* ¶ 500. From 2014 to 2018, Snapchat users also could make "peer-to-peer" payments for private content using "Snapcash," which predators predictably used to pay for users to send, receive, and save CSAM. *Id.* ¶¶ 528-29. Snap is aware of these problems. *Id.* ¶¶ 531-32, 539 & n.664. Nonetheless, to this day, Snap maintains features that thwart or make it impossible for users—and, in turn, Snap—to report CSAM created or sent through Snapchat's disappearing and direct messaging features. *Id.* ¶¶ 535-36. Snap has turned a blind eye to its CSAM reporting obligations, and maintained these features despite their facilitation of CSAM, "because removing them would significantly diminish Snapchat's popularity and negatively impact profits." *Id.* ¶ 539.

**ByteDance:** CSAM is pervasive on TikTok, a problem exacerbated by multiple product features. *Id.* ¶¶ 654, 658, 662, 665-72. One such feature, "TikTok LIVE," has been described as "the digital equivalent of going down the street to a strip club filled with 15-year-olds." *Id.* ¶ 665. Plaintiffs allege facts that plausibly support the inference that Bytedance willfully ignores its CSAM reporting obligations.  *See id.* ¶¶ 669-71. Bytedance does not permit users to specifically report CSAM, and does not respond even when abuse is reported. *Id.* ¶¶ 667-71. For instance: "One user searched for and contacted multiple TikTok employees to sound the alarm that CSAM was being created and shared within TikTok's 'Post-in-Private' accounts. This user did not receive a

single response to her concerns." *Id.* ¶ 672. As a result, children are repeatedly exploited on TikTok. *Id.* ¶¶ 658, 662, 665, 667-672, 1000-06.

**Google:** Plaintiffs allege CSAM is no less pervasive on YouTube. *See id.* ¶¶ 788-93 (citing K.G Orphanides, *On YouTube, a network of pedophiles is hiding in plain sight*, Wired UK (Feb. 20, 2019), https://www.wired.co.uk/article/youtube-pedophile-videos-advertising). For example, YouTube includes "images and videos of children showing their exposed buttocks, underwear, and genitals." *Id.* ¶ 788. When predators want to see child exploitation, YouTube delivers. *Id.* ¶¶ 790-93. CSAM on YouTube racks up millions of views—so much so that Google *monetizes* it by displaying advertisements from major brands before the videos or alongside the CSAM. *Id.* ¶¶ 790, 792, 794. Plaintiffs allege that Google "routinely fails to flag CSAM and regularly fails to adequately report known content to NCMEC and law enforcement." *Id.* ¶ 800; *see id.* ¶¶ 799-811. YouTube also lacks any effective mechanism by which users can report CSAM, *id.* ¶¶ 810-11, 1000-06, and reporting is completely unavailable on YouTube's mobile platform. *Id.* ¶ 811.

These reporting failures fall squarely within the ambit of the PROTECT Act. To be clear, Plaintiffs do not argue that the PROTECT Act obligates Defendants to "search[] through their users' data to learn [of CSAM violations]," *United States v. Meals*, 21 F.4th 903, 907 n.2 (5th Cir. 2021), or "maintain a sophisticated system for obtaining" actual knowledge of CSAM violations, *United States v. Bohannon*, 506 F. Supp. 3d 907, 914 n.3 (N.D. Cal. 2020). Instead, the PROTECT Act component of Plaintiffs' negligence per se claim rests on Defendants' response to actual or apparent CSAM violations as to which Defendants already had abundant actual knowledge. *See United States v. Rosenow*, 50 F.4th 715, 730 (9th Cir. 2022) ("Mandated *reporting* is different than mandated *searching*."). Plaintiffs allege that Defendants knew of reportable information and obstructed all attempts to act, in violation of the duty prescribed by the PROTECT Act.

All of this is sufficient to satisfy Rule 8. Indeed, these allegations support Plaintiffs' claim that each Defendant's violation of its CSAM reporting duties constitutes intentional, malicious, or reckless conduct for which § 2258B permits a private civil action under state tort law.

1

### D.      Snap's additional arguments should be rejected.

2

Snap acknowledges that the "nation is engaged in an important conversation about

3

adolescent mental health." MTD at 1. But rather than take Plaintiffs' injuries seriously, Snap

4

trivializes them. Eating disorders and suicidality are, in Snap's telling, only "general negative

5

feelings." Snap Br. at 6. A child victim experiencing serious emotional trauma is merely

6

"[s]omeone who feels slightly nervous." *Id.* at 7. Such descriptions cannot be squared with

7

Plaintiffs' Complaint. *See, e.g.*, MC ¶¶ 440, 500-01, 504-05, 509-10, 513-15, 517, 534-36. There

8

is, moreover, no merit to Snap's insistence that its product is "fundamentally different" from those

9

of its fellow Defendants. Snap Br. at 1, 3. Snapchat may not have a "Like" button, but it has

10

numerous, comparable features that exploit child psychology in functionally identical ways. And

11

even if Snapchat opens to a camera rather than a video feed, that makes no difference; an

12

algorithmically curated video feed essentially no different from its co-Defendants is still one click

13

away (what Snapchat calls "Spotlight"). *See* MC ¶ 496 ("Spotlight functions and appears nearly

14

identical to TikTok").

15

Ultimately, there simply is nothing remarkable or unique about Snapchat that should single

16

it out for dismissal.[51] Like the other Defendants, Snap has developed and marketed a highly

17

addictive product to kids, reaped extraordinary profits from kids' widespread use of that product,

18

and turned a blind eye to the tragedies that have resulted.

19

#### 1.      Snapchat has the same material defects as the other Defendants' products.

20

21

Snap insists that Snapchat is a benign messaging platform "designed to mirror real-life

22

interactions[.]" Snap Br. at 1. It does not cite anything for this proposition, which does not square

23

with its users' experiences or Plaintiffs' complaint: Snap utilizes augmented-reality lenses to distort

24

how young people present and view themselves, fomenting an epidemic of body dysmorphia and

25

eating disorders. MC ¶¶ 513-15, 519. It allows adult strangers to message and physically geolocate

26

children, permitting widespread, largely untraceable, and entirely foreseeable grooming and

27

---

28

[51] Snap's motion references a Rule 11 letter. *See* Snap Br. at 5. It had no merit; Plaintiffs made three small changes to their complaint to avoid a superfluous dispute. *See* ECF No. 234.

PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:22-MD-03047-YGR

1    exploitation. *See* MC ¶¶ 506-12. And notwithstanding Snap's claims that it is "different," Snap Br.

2    at 1, 3, it pairs those problems with the same addictive and unsafe mechanism that powers products

3    like Instagram Reels and TikTok's "For You Page"—an algorithmically curated feed designed to

4    maximize child usage at the expense of child safety. *See* MC ¶¶ 496-97. This is nothing like friends

5    speaking in person. *Contra* Snap Br. at 1.

6         Snapchat shares additional defects with the other Defendants' social media products:

7    - Snapchat is marketed to children and lacks meaningful age verification or parental
         controls. *See* MC ¶¶ 54-55, 141, 446, 450, 452, 455, 457-59, 461-63, 520-22. As of
8         2021, "13% of children ages 8-12 use Snapchat," even though they are supposedly
         prohibited from creating accounts. *Id*. ¶ 464.
9

10   - Snapchat uses design features—Snapscores, Snap Streaks, and Snap Awards—that
         reward users who maximize their usage and punish those who do not. *See id.* ¶¶ 467-
11        87. These features psychologically manipulate children to use the product for hours
         every day, causing anxiety if they fail to sufficiently engage and leading to product
12        addiction. *See id.*

13   - Snapchat's Stories, Spotlight, and Discover features all display continuous video
         feeds that make it difficult for kids to stop using the product, manipulating them into
14        more frequent and longer use and exacerbating their addiction. *See id.* ¶¶ 491-97.
         After Snap introduced Spotlight in 2021, "user time spent on the product increased
15        by over 200%." *Id.* ¶ 496.

16
     - Snapchat uses lenses and filters that undermine adolescents' and teenagers' self-
17        image. *See id.* ¶¶ 513-19. A 2017 study found Snapchat is one of the worst social
         media products for teenage and adolescent mental health, second only to Instagram.
18        *Id.* ¶ 515. Researchers even coined the term "Snapchat Dysmorphia" to refer to the
         "sense of unattainable perfection" triggered by Snapchat. *Id.*
19

20   - Snapchat provides a medium for predators to prey on kids. *See id.* ¶¶ 523-42.
         Features like Quick Add and Snap Map allow adult strangers to communicate
21        directly with, and even identify the physical location of, minor victims. *See id.* ¶¶
         506-12, 540. And the ephemeral nature of Snaps (and the unreviewable nature of
22        the My Eyes Only folder) make it difficult, if not impossible, for parents to report
         illicit material received by kids from adults. *Id*. ¶¶ 504-05, 522, 535-36.[52]
23

24        The severe harms Snapchat inflicts on kids are set forth in a section of the Complaint

25
     ─────────────────────
26   [52] It is not merely that this was foreseeable; *Snap knew about these problems and did nothing to
     stop them*. Commentators have called Snapchat one of the go-to products for sexual predators.
27   MC ¶ 527. In 2019, a petition signed by over 100,000 parents urged Snap to do more to protect
     children from sexual abuse and exploitation on its platform. *Id.* ¶ 532. Yet it took Snap until 2022
28   to implement parental controls, and these remain woefully inadequate. *See id.* ¶ 521-22. For
     example, they do not prevent a child from communicating with adult users. *Id.* ¶ 522.

detailing how all Defendants' defective social media products work, *id.* ¶¶ 96-155, as well as 116 paragraphs devoted specifically to Snapchat, *id.* ¶¶ 438-553. Together, these sections explain how Snap's pernicious design choices exploit children's need for social approval, manipulate them into addiction, and foreseeably lead to severe physical and emotional harm. *See id.* ¶¶ 64-155, 467-542. Snap's misreading of the Complaint as alleging, at most, that Snapchat causes "some combination of stress, anxiety, or purportedly compulsive use" is meritless. Snap Br. at 2.

In Snap's telling, the Court should ignore the foregoing and dismiss Plaintiffs' claims based on three differences that set Snapchat apart from other Defendants' defective products: (1) it does not open to a "main feed[]" broadcasting content using "engagement-optimized algorithms," (2) it does not contain a feature called "Like[,]" and (3) it does not default minor accounts to a "public" setting. Snap Br. at 1-3. The first two of these differences are not really differences at all, and the third does not absolve Snap of its product's other defects.

### a. Snapchat uses an algorithmically generated feed.

Snap first attempts to distinguish Snapchat by claiming it "does not ***open*** to a feed" of algorithmically curated content. *Id.* at 1, 3 (emphasis added). This is hair-splitting: Snapchat uses algorithms that optimize for maximum usage to power its Stories, Discover, and Spotlight features, which operate in substantially the same manner as its competitors' products. *See* MC ¶¶ 493-97. Just like TikTok, Instagram, and YouTube, Snapchat's materially identical feature, Spotlight, broadcasts "an endless feed" of algorithmically amplified content to "300 million daily Snapchat users." *Id.* ¶ 496; *contra* Snap Br. at 1.

Snap notes that, to access Snapchat's continuous video feed, one must tap a (single) button after opening the app. *See* Snap Br. at 3. This is a distinction without a difference. It is irrelevant whether a minor user opens an app directly into an algorithmic feed, or that feed is one click away. Indeed, the one tap required by Snapchat does not appear to have any impact on Spotlight's functionality or popularity; according to Snap's CEO, "users spend[] more time on Spotlight than almost any other aspect of Snapchat." MC ¶ 497.

Spotlight's continuous video-feed has the same impact on kids as a feature like TikTok's "For You" page—namely, maximizing minor users' "flow-state." *See id.* ¶¶ 89, 493, 496. Indeed,

Snap's internal research indicates that Snapchat is "*more immersive*" that its competitors' apps, and users are therefore more likely than on other apps to keep watching videos. *Id.* ¶ 453 (emphasis added). So this difference between Snap and others makes Snapchat more defective, not less.

### b. Snapchat has multiple features comparable to the "Like" button.

Snap next attempts to distance its defective product from Facebook, Instagram, TikTok, and YouTube by arguing that Snapchat "does not have 'like counts' (public counts displaying the number of users who signaled a positive reaction to a post) or other public vanity metrics." Snap Br. at 1. This statement is incomplete: Snapchat uses features that employ the same psychological and behavioral techniques (and produce the same negative effects on adolescent and teenage users). For example:

> "Trophies" are emojis awarded for achieving engagement milestones or performing certain activities, such as increasing one's Snapscore, sending creative Snaps, or posting a live story. A user's "Trophies" are displayed in a "trophy box" viewable by their friends. Snap designed this feature to encourage users to share their videos and posts with the public, promote greater use of Snapchat, and deepen young users' addiction to and compulsive use of the product.

MC ¶ 475. Similarly: "Snap's Stories feature includes a running view count and list of viewers for each Story, both of which provide users with dopamine-triggering feedback that encourages users to make their Stories visible to everyone in order to increase the view count." *Id.* ¶ 492. And:

> Although Snap does not disclose precisely how Snapscores work, sending and receiving a Snap increases the score by one point. Interacting with other product features provides additional points. A user's Snapscore is visible on their profile, serves as a signifier of the user's "worth," and encourages users to further engage with Snapchat's features to increase their score. Snapscores are important to users, especially young users, because they operate as a form of social validation, similar to an Instagram "Like."

*Id.* ¶ 472.

In short, as the Complaint makes clear, product features like "Trophies," "Snapscores," and view counts function similarly to "Likes" on other apps—they provide users with an artificial social-validation signal. *Id*. ¶¶ 472, 474-75, 492. The Complaint, moreover, explains how these forms of feedback harm younger users in the same way "Likes" do. *See id.* ¶¶ 85-87. Snap's observation that Snapchat does not have a "Like" button is not a meaningful basis on which to differentiate its product.

c.   **Snapchat recommended that minors connect with adults and incentivized them to do so.**

Finally, Snap argues that it is different because it does not make minor users' profiles public by default. Snap Br. at 1. This is undoubtedly a positive design feature that other Defendants' platforms lack. But Snapchat has other design defects that put minors at risk just like their competitors' products. Snapchat is designed with "inadequate parental controls," and its "effectively useless" age verification feature allows children to create public accounts that are searchable by predators in the same way that a public account would be. MC ¶¶ 464, 506-07, 520-22; *see id.* ¶ 134.

And at least until the start of this litigation, Snap had one defective feature its competitors lacked: its "Quick Add" feature, which "recommends new, sometimes random friends, similar to Facebook's 'People You Might Know' Feature" *Id.* ¶ 509. That feature affirmatively recommended that adults add minors and rewarded minors for accepting such invitations by increasing their "Snapscores" when they did. *See id.* Snap revised that feature in late 2022 "to limit the friend suggestions promoted" to users aged 13 to 17, though this modification "still does not prohibit the connection of minors with adults." *Id.* ¶ 512. In short, while profiles on Snapchat are not "public-by-default," the product is still defective in other ways that easily and foreseeably allow predators to connect with minors.

2.   **Snap's additional legal arguments are meritless.**

Because the supposed differences between Snapchat and other defective social media products are illusory, Snap's legal arguments premised on those differences fail.

Snap's claim that Plaintiffs rely only on allegations directed at other Defendants is baseless. The Complaint refers to "Defendants" plural when the allegations are appropriately directed towards all Defendants. *See, e.g., In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 233 F.R.D. 133, 135 (S.D.N.Y. 2005) (denying motion for more definite statement because plaintiffs "specifically defined the term 'Defendants' to mean all defendants" and "[w]hen plaintiffs intended to refer to individual defendants, they did so by using modifiers"); *see also, e.g., Doe One v. CVS Pharmacy, Inc.*, 348 F. Supp. 3d 967, 980 (N.D. Cal. 2018) (rejecting similar argument,

noting it was "sufficiently clear from the complaint" that use of the collective noun meant that allegations applied to all defendants), *aff'd in part, vacated in part on other grounds*, 982 F.3d 1204 (9th Cir. 2020), *cert granted*, 141 S. Ct. 2882, *cert. dismissed*, 142 S. Ct. 480 (2021). And while Snap cites three cases holding that a plaintiff must specifically connect its general allegations to each named defendant, that's exactly what Plaintiffs here have done, through more than 100 allegations specifically about Snapchat. *See* MC ¶¶ 438-553; *see id.* ¶¶ 54-179.[53] These paragraphs describe a plausible nexus between Snap's defective product and Plaintiffs' general allegations.

Snap separately argues the Complaint fails to causally link any specific Snapchat feature to anything but general emotional harm. Snap Br. at 8. That mischaracterizes the pleadings. For example, Plaintiffs allege "Snapchat's lenses and filters change users' appearance and face, creating unrealistic, idealized versions that cause profound body image issues in teenagers, especially girls." MC ¶ 513. Plaintiffs also allege "Snapchat includes a number of features that promote and dramatically exacerbate sexual exploitation, the spread of CSAM, sextortion, and other socially maladaptive behavior that harms children." *Id.* ¶ 523. Plaintiffs similarly explain the links between Snapchat's defective features and Plaintiffs' harms throughout the Complaint. *Id.* ¶¶ 6, 76, 84, 86, 104 & n.94, 132, 439-40, 453-54, 467-542. And any given Snapchat feature cannot be viewed in isolation, as they interact with one another to cause harm. *See id.* ¶ 467.

Snap also rehashes the arguments made in the joint MTD that sexual exploitation caused by Snapchat was unforeseeable. Snap Br. at 6-7. As discussed above, those arguments are wrong on the law. *Supra* at § IV.B.1.a; *see Ileto*, 349 F.3d at 1208-09 (explaining that "where an intervening act by a third party was foreseeable, it does not amount to a superseding cause"). And they are wrong on the facts: Snap's trademark disappearing messages make it the "go-to product[] for sexual predators." MC ¶ 527.

## V.   **CONCLUSION**

Plaintiffs respectfully request that Defendants' Motion to Dismiss be denied.

---

[53] *See* Snap Br. at 5 (citing *In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 908 (N.D. Cal. 2018); *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 857 (N.D. Cal. 2012); *Ferrari v. Nat. Partner, Inc.*, 2017 WL 76905, at *6 (N.D. Cal. Jan. 9, 2017)).

**APPENDIX**

**51-Jurisdiction Survey As To The Meaning Of "Product" And**

**The Viability Of A Negligence Per Se ("NPS") Claim**

| AL | **Product:** Courts apply the Second Restatement to products liability claims. *See Casrell v. Altec Indus., Inc.*, 335 So.2d 128, 130–33 (Ala. 1976); *supra* § IV.A.2.a. Alabama reads the reference to "tangible personal property" in its sales tax statute to apply to "all software." *Ex parte Russell Cnty. Cmty. Hosp., LLC*, 291 So. 3d 52, 56 (Ala. 2019). <br><br> **NPS:** Negligence per se may be based on a federal statute that is not privately enforceable. *Allen v. Delchamps*, 624 So. 2d 1065, 1068 (Ala. 1993) (FDCA); *Smith v. Triad of Ala.*, 2015 WL 5793318, at \*11-\*13 (M.D. Ala. Sept. 29, 2015) (HIPAA); *see also King v. Story's*, 54 F.3d 696, 697 (11th Cir. 1995) (federal gun sale regulations). |
|---|---|
| AK | **Product:** Courts refer to the Third Restatement's definition of a product *See Munhoven v. Northwind Marine, Inc.*, 353 F. Supp. 2d 1072, 1074 (D. Alaska 2005); *supra* § IV.A.2.a. <br><br> **NPS**: Defendants misread the holding of *Shanks v. Upjohn Co.*, 835 P.2d 1189 (Alaska 1992). Once a trial court determines that the criteria for negligence in the Second Restatement are met, it has "limited discretion to refuse to give the [NPS] [jury] instruction only if it determines that the rule of law is so obscure, unknown, outdated, or arbitrary as to make inequitable its adoption as a standard of reasonable care . . . or where a statute is too vague or arcane to be used as a reasonable standard of care, or amounts to little more than a duplication of the common law tort duty to act reasonably under the circumstances." *Id.* (cleaned up). Not so here. *See supra* IV.D.4; *see, e.g., Matomco Oil v. Arctic Mech.*, 796 P.2d 1336, 1339 (Alaska 1990) (federal regulations on fuel tankers); *Farnsworth v. Steiner*, 601 P.2d 266, 271 (Alaska 1979) (FAA regs.). |
| AZ | **Product:** Courts generally apply the Third Restatement. *See Grubb v. Do It Best Corp.*, 279 P.3d 626, 628 (Ariz. Ct. App. 2012); *supra* § IV.A.2.a. Additionally, in evaluating whether something is a "product" subject to strict liability, Arizona courts apply a flexible, policy-driven analysis on a case-by-case basis. *Menendez v. Paddock Pool* |

| | |
|---|---|
| | *Const. Co.*, 836 P.2d 968,  972-74 (Ariz. Ct. App. 1991). Such factors warrant finding that Defendants' apps are products. *See supra* § IV.A.4.<br><br>**NPS**: While Arizona does not allow the use of negligence to impose a duty where none exists at common law, *Resol. Tr. Corp. v. Dean*, 854 F. Supp. 626, 643 (D. Ariz. 1994), federal statutes can create common law duties when—as is the case for Plaintiff's COPPA and PROTECT Act claims, see supra § IV.D.4—"a plaintiff is within the class of persons to be protected by the statute and the harm that occurred is the risk that the statute sought to protect against." *Quiroz v. ALCOA*, 416 P.3d 824, 829 (Ariz. 2018) (cleaned up); *Martin v. Schroeder*, 105 P.3d 577, 582 (Ariz. App. 2005) (federal Gun Control Act). This is true even when the statute has no private right of action. *Martin* 105 P.3d at 582 (Ariz. App. 2005). |
| AR | **Product:** Products liability statute is a "substantially verbatim" adoption of § 402A of the Second Restatement. *Berkeley Pump Co. v. Reed-Joseph Land Co.*, 653 S.W.2d 128, 131 (Ark. 1983); *supra* § IV.A.2.a. The statutory definition Defendants cite is consistent with that adoption—it applies to either (1) "any tangible object" *or* (2) "goods."  Ark. Stat. Ann. § 16-116-202; *McCoy v. Walker*, 876 S.W.2d 252, 254 (Ark. Ct. App. 1994) ("[T]he word 'or' is a disjunctive particle that marks an alternative, generally corresponding to 'either,' as 'either this or that.'"). Standardized, mass-produced software has been treated as a good for purposes of other statutes, and thus falls within the ambit of the Arkansas's statute. *See RRX Indus., Inc. v. Lab-Con, Inc.*, 772 F.2d 543, 546 (9th Cir. 1985) (Article 2 of UCC).<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| CA | **Product:** Courts have accepted that social media apps, software, and websites may be "products" under products liability law. *See, e.g.*, *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1087-1090, 1094 (9th Cir. 2021); *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035-36 (9th Cir. 1991); *Hardin v. PDX, Inc.*, 173 Cal. Rptr. 3d 397, 407 (Cal. Ct. App. 2014). |

Defendants cite two district court cases asserting that a "product" must be tangible, but they concern different items and do not control over the Ninth Circuit. *Merritt v. Countrywide Fin. Corp.*, 2015 WL 5542992, at *22 (N.D. Cal. Sept. 17, 2015) ("loans"); *Green v. ADT, LLC*, 2016 WL 3208483, at *3 (N.D. Cal. June 10, 2016) ("security system"). California courts embrace both the Second and Third Restatements when defining "product," *Jenkins v. T & N PLC*, 53 Cal. Rptr. 2d 643, 645-46 (Cal. Ct. App. 1996), *as modified* (June 5, 1996), *Johnson v. U.S. Steel Corp.*, 192 Cal. Rptr. 3d 158, 168 (Cal. Ct. App. 2015), and reject "wooden formalisms" when determining the scope of products liability, *Bolger v. Amazon.com, LLC*, 267 Cal. Rptr. 3d 601, 605 (Cal. Ct. App. 2020). *See supra* § IV.A.2.a. *Bhardwaj v. 24 Hour Fitness*, 2002 WL 373563, at *6 (Cal. Ct. App. Mar. 8, 2002) is not to the contrary; the fitness center there was a "service" and not the "supplier" of the gym equipment made available to its members. Defendants' treatment of *Ziencik v. Snap, Inc.*, 2023 WL 2638314 (C.D. Cal. Feb. 3, 2023) and *Winter*, 938 F.2d at 1034 is off-base because Plaintiffs are not suing about content.

**NPS:** NPS is an evidentiary presumption that can establish the standard of care in a cause of action for negligence, provided plaintiffs otherwise state a viable claim for negligence. *See* Cal. Evid. Code § 669; *Sierra–Bay Fed. Land Bank Ass'n v. Super. Ct.*, 227 Cal. App. 3d 318, 332-33 (Cal. Ct. App. 1991). This presumption applies regardless of whether a statute is privately enforceable. *E.g.*, *Kirsten v. California Pizza Kitchen, Inc.*, 2022 WL 16894503, at *9 (C.D. Cal., 2022) (FTC Act); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1142 (C.D. Cal. 2021) (HIPPA and FTC Act).

| CO | **Product:** Courts apply the Second Restatement. *Connell Solera, LLC v. Lubrizol Advanced Materials, Inc.*, 584 F. Supp. 3d 980, 985 (D. Colo. 2022); *supra* § IV.A.2.a. Defendants' citation to *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1279 (D. Colo. 2002) is inapposite because Plaintiffs are not suing about content. |

1
2
3
4
5
6
7
8
9
10
11
12

**NPS:** Colorado recognizes NPS if "the defendant violated the statutory standard and the violation was the proximate cause of the injuries sustained." *Lombard v. Colo. Outdoor Ed. Ctr., Inc.*, 187 P.3d 565, 573 (Colo. 2008). In particular, statutes "may define the standard of care . . . if (1) it was enacted for the public's safety, (2) it was intended to protect the class of persons of which the plaintiff is a member, and (3) it was enacted to prevent the type of harm suffered by the plaintiff." *Gerrity Oil & Gas Corp. v. Magness*, 946 P.2d 913, 930 (Colo. 1997); *see also, e.g.*, *Bittle v. Brunetti*, 750 P.2d 49, 57-58 (Colo. 1988) (articulating factors). Plaintiffs may bring NPS claims based on federal statutes and regulations, *White v. Caterpillar*, 867 P.2d 100, 109 (Colo. App. 1993) (fed. regulation for hazardous materials); *Connes v. Molalla Transp.*, 817 P.2d 567, 572 (Colo. App. 1991) (federal regulation regarding driver's employment record); *Hageman v. TSI*, 786 P.2d 452, 453 (Colo. App. 1989) (federal highway safety regulations).

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CT**

**Product:** Connecticut follows the Second Restatement but will also refer to the Third Restatement for guidance in applying the state's products liability act. *Normandy v. Am. Med. Sys., Inc.*, 262 A.3d 698, 704-05, 705 n.6 (Conn. 2021); *see also Travelers Indem. v. Conn. Light & Power*, 2008 WL 2447351, at *5 (Conn. Super. Ct. June 4, 2008) (finding electricity is a product based on Third Restatement, public policy factors, and precedent); *supra* § IV.A.2.a. Defendants' citation to *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 171–73, 181–82 (D. Conn. 2002) is inapposite because Plaintiffs are not suing about content.

**NPS:** Connecticut recognizes NPS even when the underlying statute does not "provide for a private right of action." *Coastline Terminals v. USX*, 156 F. Supp. 2d 203, 210 (D. Conn. 2001) (citation omitted); *see also Cowan v. Yale*, 2023 WL 369947, at *3 (Conn. Super. Jan. 17, 2023) (CSA); *Morse v. Conn. Cmty. for Addiction Recovery*, 2010 WL 4074949, at *15 (Conn. Super. Sept. 15, 2010) (Federal Confidentiality Statute). Defendants mistakenly quote a different section of *Coastline Terminals* for the contrary principle, but that section of *Coastline Terminals* cited a now-overruled interpretation

| | |
|---|---|
| | of Kansas law. *Compare Coastline Terminals*, 156 F. Supp. at 1200 (citing *Short v. Ultramar Diamond* 46 F. Supp. 2d 1199, 46 F. Supp. 2d 1199, 1200 (D. Kan. 1999)); *with Shirley v. Glass*, 308 P.3d 1, 7 (Kan. 2013). |
| DE | **Product:** Courts look to the Second Restatement. *See Ramsey v. Georgia S. Univ. Advanced Dev. Ctr.*, 189 A.3d 1255, 1260 (Del. 2018); *supra* § IV.A.2.a. The "sealed container defense" statute cited by Defendants, Del. Code Ann. tit. 18 § 7001 (2023), is inapplicable; Defendants are not middlemen selling a product in a sealed container and they had notice and knowledge of the alleged defects. *Id.* § 7001(a)(3) ("sealed container" means a "box, container, package, wrapping, encasement or housing . . . that covers a product"); (b)(2),(6) (no defense where seller had notice or knowledge); (b)(4) (no defense where the seller was the manufacturer or designer of the product). <br><br> **NPS:** The statutory basis of an NPS claim must contain a "specific statement" of duty, as the COPPA and PROTECT Act do, *see supra* § IV.D.4, rather than only "vague[]" requirements. *Joseph v. Monroe*, 419 A.2d 927, 931 (Del. 1980). An NPS claim may be based on a federal statute that is not privately enforceable. *See Price v. Blood Bank*, 790 A.2d 1203, 1212-13 (Del. 2002) (permitting NPS claim based on FDA protocol for screening donors). |
| DC | **Product:** DC applies the Second Restatement. *Word v. Potomac Elec. Power Co.*, 742 A.2d 452, 459 (D.C. 1999); *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F. Supp. 2d 48, 87-88 (D.D.C. 2012) (applying DC law to permit design defect claims based on software systems for mass transit); *supra* § IV.A.2.a. <br><br> **NPS:** The basis of an NPS claim must "set forth specific guidelines to govern behavior," as the COPPA and PROTECT Act do, *see supra* § IV.D.4. *Chadbourne v. Kappaz*, 779 A.2d 293, 297 (D.C. 2001) (quotation marks omitted). DC permits NPS claims on the basis of federal statutes; *see McNeil Pharm. v. Hawkins*, 686 A.2d 567, 578 (D.C. 1996) (FDCA and FDA regulations). |

| | | |
|---|---|---|
| 1<br>2<br>3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14 | FL | **Product:** Software can be a product. *Brookes v. Lyft Inc.*, 2022 WL 19799628, at \*2-3 (Fla. Cir. Ct. Sept. 30, 2022). Florida applies the Second Restatement to products liability claims. *Gorran v. Atkins Nutritionals, Inc.*, 464 F. Supp. 2d 315, 324–25 (S.D.N.Y. 2006); *supra* § IV.A.2.a. Defendants' citation to *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 670 F. Supp. 115 (S.D.N.Y. 1987) is inapposite because Plaintiffs are not suing about content.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable, and "legislative enactments play an important role in shaping standards of conduct." *Bartsch v. Costello*, 170 So. 3d 83, 87 (Fla. Dist. Ct. App. 2015) (citation omitted). "Proof that a defendant violated a statute" may be NPS where there is a "violation of a statute establishing a duty to take precautions to protect a particular class of persons from a particular type of injury" or "violation of a strict liability statute designed to protect a particular class of persons who are unable to protect themselves," both "constituting [NPS]." *Id.* at 86. |
| 15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | GA | **Product:** Software like Snapchat may be a defectively designed product. *Maynard v. Snapchat, Inc.*, 870 S.E.2d 739, 743 (Ga. 2022); *Maynard v. Snapchat, Inc.*, 883 S.E.2d 533, 535-36 (Ga. Ct. App. 2023); *see supra* pp. 22, 29, 34-35 (Defendants' cases predate *Maynard.*) Georgia treats the Second and Third Restatements as persuasive authority. *See Johns v. Suzuki Motor of Am., Inc.*, 850 S.E.2d 59, 63 (Ga. 2020); *see supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *E.g.*, *In re Equifax, Inc., Customer Data Security Breach Litig.*, 371 F. Supp. 3d 1150, 1176 (N.D. Ga. 2019) (FTC Act); *McClain v. Mariner Health Care*, 631 S.E.2d 435, 436-37 (Ga. App. 2006) (Medicare and Medicaid regulations); *Pulte Home v. Simerly*, 746 S.E.2d 173, 179 (Ga. App. 2013) (CWA)); *see generally* Ga. Stat. Ann. § 51-1-6. *Wells Fargo v. Jenkins*, 293 Ga. 162, 164 (2013), does not help Defendants. The statute there expressed a "Congressional policy statement" but did not create duties or impose a |

standard of conduct, in contrast to the statutes at issue here, *see supra* § 4.C. *Jones v. Google LLC*, 56 F.4th 735, 740 (9th Cir. 2022) (COPPA). Defendants are also wrong to rely on *Scoggins v. Floyd Healthcare Management Inc.*, 2016 WL 11544774, at \*41 (N.D. Ga. June 10, 2016), which simply says that O.C.G.A. § 51-1-6 does not confer a private right of action for any statutory violation. Georgia law indisputably recognizes that where the applicable statute (or regulation) confers a duty on the defendant, an injured plaintiff may state a negligence per se claim for violation of that duty under section 51-1-6. *See, e.g.*, *Ashton Park Trace Apts., LLC v. City of Decatur*, 2015 WL 12469074, at \*7 (N.D. Ga. July 16, 2015) (negligence per se applies when "a statute . . . recognizes a breach of duty but provides no separate cause of action").

| | |
|---|---|
| HI | **Product:** Courts recognize products liability claims for software. *Smallwood v. NCsoft Corp.*, 730 F. Supp. 2d 1213, 1235 (D. Haw. 2010) (holding plaintiff properly pleaded negligent design and failure to warn claims based on psychological dependency caused by defendant's video game). Defendants' citation to *Birmingham v. Fodor's Travel Pubs., Inc.*, 833 P.2d 70 (Haw. 1992) is inapposite because Plaintiffs are not suing about content.<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *Camara v. Agsalud*, 685 P.2d 794, 798 (Haw. 1984); *see supra* § IV.D.3. |
| ID | **Product:** Courts apply the Second Restatement. *Rindlisbaker v. Wilson*, 519 P.2d 421, 428 (Idaho 1974); *supra* § IV.A.2.a.<br><br>**NPS:** Idaho permits NPS claims on the basis of a federal statute that is not privately enforceable. *Chancler v. Am. Hardware Mut. Ins.*, 109 Idaho 841, 848 (1985) (OSHA); *Walton v. Potlatch*, 781 P.2d 229, 232 (Idaho 1989) (same); *Vickers v. Hanover Const.*, 125 Idaho 832, 835 (1994) (same). Defendants misread *Nation v. DOC*, 144 Idaho 177 (2007). The court confirmed that NPS may be established through violation of a statute and looked to the Public Records Act's lack of a private right of action as evidence that |

| | |
|---|---|
| | "the legislature created the act to allow public access and did not intend to prevent harm caused by public disclosure of private information." *Id*. at 190. |
| IL | **Product:** Illinois follows the Third Restatement. *Jablonski v. Ford Motor Co.*, 955 N.E.2d 1138, 1154 (Ill. 2011); *supra* § IV.A.2.a. The statute cited by Defendants defines "product" exclusively for purposes of a statute of repose. 735 Ill. Comp. Stat. Ann. 5/13-213(a)(2). And even when properly applied to determine timeliness of a suit, it does not apply to negligence-based products liability claims. *Herriott v. Allied-Signal, Inc.*, 801 F. Supp. 52, 57 (N.D. Ill. 1992). In the sales tax context, software is statutorily defined as "tangible personal property," "regardless of whether the statements, data, or instructions are capable of being perceived by or communicated to humans." 35 Ill. Comp. Stat. 110/3-25 (2020). <br><br>**NPS:** A statute can define the duty of care in a negligence action, regardless of whether it in and of itself establishes a duty, *Cuyler v. United States*, 362 F.3d 949, 952 (7th Cir. 2004), and even if it does not provide a private right of action, *see Magna Tr. v. Illinois Cent. R.*, 728 N.E.2d 797, 804-805 (Ill. 5th Dist. App. 2000); *Abbasi ex rel. Abbasi v. Paraskevoulakos*, 187 Ill.2d 386, 393 (Ill. 1999) (finding that there is no private right of action under a statute in part because it would "be identical to plaintiff's common law negligence action pending in the circuit court"). Furthermore, a violation of a statute or ordinance designed to protect human life is prima facie evidence of negligence, and a party injured by such a violation may recover "by showing that the violation proximately caused his injury and the statute or ordinance was intended to protect a class of persons to which he belongs from the kind of injury that he suffered." *Kalata v. Anheuser–Busch Cos.*, 144 Ill.2d 425, 434 (1991). Courts have adopted an expansive approach to this principle. *See Ney v. Yellow Cab Co.*, 2 Ill.2d 74, 76–79 (Ill. 1954) (finding that the violation of law dictating the proper method of parking a car was prima facie evidence of negligence because law was intended to further state's interest in "public welfare for protection of life, limb and property"). |

| | | |
|---|---|---|
| 1 | IN | **Product:** Indiana courts find the Third Restatement persuasive authority when interpreting the Indiana Product Liability Act. *See Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 624 (Ind. 2019) (Third Restatement). Indiana courts have also at times looked to the Second Restatement, notably to hold that electricity is a product "within the meaning of § 402A." *Petroski v. N. Ind. Pub. Serv. Co.*, 354 N.E.2d 736, 747 (Ind. Ct. App. 1976); *supra* § IV.A.2.a. *Alexander v. Beech Aircraft Corp.*, 952 F.2d 1215, 1220 (10th Cir. 1991) is inapposite because Plaintiffs are not suing about content.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Erwin v. Roe*, 928 N.E.2d 609, 619 (Ind. App. 2010) (federal Lead–Based Paint Hazard Reduction Act); *Town of Montezuma v. Downs*, 685 N.E.2d 108, 116 (Ind. App. 1997) (federal pipeline regulations). Defendants cite *Brown v. City of Valparaiso*, 67 N.E.3d 652, 659 (Ind. App. 2016) to argue that a private right of action is required, but the Indiana Supreme Court does not require this element. *Kho v. Pennington*, 875 N.E.2d 208, 212 (Ind. 2007) ("Indiana courts have a long and continuous history of recognizing negligence actions for statutory violations."). |
| | IA | **Product:** Courts apply the Third Restatement to products liability claims. *See Wright v. Brooke Grp. Ltd.*, 652 N.W.2d 159, 169 (Iowa 2002); *supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Crane v. Cedar Rapids*, 160 N.W.2d 838, 841 (Iowa 1968) (federal railroad legislation), *aff'd*, 395 U.S. 164, 165 (1969); *Koll v. Manatt's Transp.*, 253 N.W.2d 265, 270 (Iowa 1977) (OSHA standard). Defendants cite *Bagelmann v. First Nat. Bank*, 823 N.W.2d 18, 25 (Iowa 2012). While the Court pointed to the lack of a private right of action under the statute, it also relied on other cases that observed borrowers were not in the class the statute intended to protect. *Id.* at 25. The Court also noted: "The circumstance they present is not one where a legal duty (e.g., to manufacture a safe product) would otherwise exist under state law, and where federal law is only being invoked as a standard of conduct." *Id.* at 27. |

| KS | **Products**: Although the Kansas Product Liability Act, K.S.A. 60–3301 et seq., governs all products liability claims against "product sellers" and "manufacturers," it does not define product. "[T]he Kansas common law of product liability retains its essential vitality on all issues not settled by passage of the KPLA." *Gaumer v. Rossville Truck & Tractor Co.*, 257 P.3d 292, 300 (Kan. 2011). Courts look to the Second Restatement in products liability claims. *Savina v. Sterling Drug, Inc.*, 795 P.2d 915, 923 (Kan. 1990); *supra* § IV.A.2.a. Kansas recognizes conversion claims based on intangible personal property. *Andrewjeski v. Bimbo Foods Bakeries Distrib., LLC*, 2019 WL 2250068, *5 (D. Kan. May 24, 2019).<br><br>**NPS:** Plaintiffs may use a federal statute that is not privately enforceable to establish duty and breach of duty in a negligence claim. *Shirley v. Glass*, 308 P.3d 1, 6-8 (Kan. 2013) (federal firearm transfer statutes). Defendants cite one case that pre-dates *Shirley*, *Pullen v. West*, 92 P.3d 584, 593 (Kan. 2004), and one Tenth Circuit case that fails to mention *Shirley* and as a result incorrectly asserts that a statute can only provide the duty of care for a negligence claim if the legislature intended to create a private right of action. *Brooks v. Mentor Worldwide*, 985 F.3d 1272, 1279-80 (10th Cir. 2021). |
|----|----|
| KY | **Products**: Kentucky district courts predict that Kentucky courts would adopt the Third Restatement and, to determine whether an item is a product, ask if its "distribution and use is sufficiently analogous to the distribution and use of tangible personal property." *Powell v. Tosh*, 929 F. Supp. 2d 691, 713, 715 (W.D. Ky. 2013), *recons. granted in part on other grounds*, 2013 WL 1878934 (W.D. Ky. May 3, 2013); *see also Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 738 (Ky. 2011); *supra* § IV.A.2.a. Defendants' citations to *James* and *Watters* are inapposite because Plaintiffs are not suing about content. *See supra* § IV.A.3.<br><br>**NPS:** There is no standalone claim under Kentucky's negligence per se statute for violations of a federal standard, however a federal statutory violation is relevant to the |

| | |
|---|---|
| | existence of a negligence claim. *See T & M Jewelry, Inc. v. Hicks ex rel. Hicks*, 189 S.W.3d 526 (Ky. 2006); *supra* § IV.D.3. |
| LA | **Products**: Computer software "may be a product" for purposes of the Louisiana Products Liability Act. *Schafer v. State Farm Fire & Cas. Co.*, 507 F. Supp. 2d 587, 601 (E.D. La. 2007). Furthermore, Louisiana's products liability law is "almost identical" to § 402A of the Second Restatement. *Scurlock Marine, Inc. v. W.W. Patterson Co.*, 1997 WL 472510, at *3 (E.D. La. Aug. 15, 1997); *see supra* § IV.A.2.a. **NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| ME | **Products**: Maine's product liability statute is drawn directly from § 402A of the Second Restatement, and the courts refer to it when deciding product liability issue*, Bernier v. Raymark Indus., Inc*., 516 A.2d 534 (Me. 1986). But Maine has also adopted portions of the Third Restatement with regard to product defects. *Estate of Pinkham v. Cargill, Inc.*, 55 A.3d 1, 8-9 (Me. 2012); *supra* § IV.A.2.a. Maine reads the reference in its sales tax statute to "tangible personal property" to apply to generally available software. *Measurex Sys., Inc. v. State Tax Assessor*, 490 A.2d 1192, 1195–96 (Me. 1985). **NPS:** "Violation of a safety statute or regulation may be evidence of negligence but does not constitute [NPS]." *Smith v. Central Maine Power Co.*, 988 A.2d 968, 970 n.3 (Me. 2010) (citations omitted). Violation of a statute may be "prima facie" evidence of negligence insofar as "the jury may draw an inference of negligence from the violation." *Dongo v. Banks*, 448 A.2d 885, 889 (Me. 1982). |
| MD | **Products**: Maryland follows the Second Restatement. *May v. Air & Liquid Sys. Corp*., 129 A.3d 984, 997 (Md. 2015); *supra* § IV.A.2.a. Defendants' statutory cite for the definition of a "product" only defines the term for purposes of a "borrowing" statute "for product liability cases filed in the state by nonresidents whose claims are time-barred in the foreign jurisdiction where the claims arose." *In re Abilify (Aripiprazole) Prod. Liab. Litig*., 2021 WL 3869752, at *2 (N.D. Fla. July 27, 2021). Software is |

| | |
|---|---|
| | "tangible personal property" in the context of sales tax assessments. *Comptroller of Treasury v. Equitable Tr. Co.*, 464 A.2d 248, 260–61 (Md. 1983); *Greyhound Comput. Corp. v. State Dep't of Assessments & Tax'n*, 320 A.2d 52, 54–56 (Md. 1974); *see also Nat'l Ink & Stitch, LLC v. State Auto Prop. & Cas. Ins.*, 435 F. Supp. 3d 679, 684–85 (D. Md. 2020) (citing *Comptroller* and holding that ransomware attack on software caused "physical damage").<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| MA | **Product:** Products liability claims must be brought as UCC warranty claims and "must arise out of 'transactions in goods'" as defined by the UCC. *Phillips v. Medtronic, Inc.*, 754 F. Supp. 2d 211, 216 (D. Mass. 2010). "[A] coalescing majority of courts apply the UCC to software." *ACI Worldwide Corp. v. KeyBank Nat'l Ass'n*, 2020 WL 1025418, at *12 (D. Mass. Feb. 28, 2020). Additionally, under Massachusetts law a UCC warranty claim is "congruent in nearly all respects with the principles expressed in Restatement (Second) of Torts." *Back v. Wickes Corp.*, 375 Mass. 633, 640 (1978); *supra* § IV.A.2.a. Defendants' citation to *Barden v. Harpercollins Publishers, Inc.*, 863 F. Supp. 41, 45 (D. Mass. 1994) is inapposite because Plaintiffs are not suing about content.<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| MI | **Product:** Products liability actions are not limited to tangible items, and computer software can be a product. *Holbrook v. Prodomax Automation Ltd.*, 2021 WL 4260622, at *5-7 (W.D. Mich. Sept. 20, 2021) (holding that the computer programming for an assembly line constitutes a "product" for purposes of the Michigan Product Liability Statute and rejecting defendant's argument that "product" is limited to tangible personal property). Defendants' citation to *Lewin v. McCreight*, 655 F. Supp. 282 (E.D. Mich. 1987) is inapposite because Plaintiffs are not suing about content. |

| | |
|---|---|
| | **NPS:** Violation of a federal statute "creates a rebuttable presumption of negligence." *Lozar v. Birds Eye Foods*, 678 F. Supp. 2d 589, 600 (W.D. Mich. 2009) (permitting NPS claim based on CERCLA's general liability provision and RCRA). |
| MN | **Product:** Courts "rel[y] on Restatement (Third) of Torts when considering the law of products liability." *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 387 (Minn. Ct. App. 2004); *supra* § IV.A.2.a. Minnesota's high court has recognized—in the context of taxation of "products"—that a product can be intangible. *See Sprint Spectrum LP v. Comm'r of Revenue*, 676 N.W.2d 656, 663 (Minn. 2004) (citing prior holdings that electricity, cellular communications, and computerized legal research are products). Defendants' statutory cite for the definition of a "product" only defines the term "goods" for purposes of the economic loss rule, Minn. Stat. Ann. § 604.101(1)(c), and "does not alter the elements of a product defect tort claim[.]" *Id.* § 604.101(4). <br><br> **NPS:** Minnesota recognizes NPS, as Defendants acknowledge. However, Defendants mischaracterize *Kapps v. Biosense Webster, Inc.*, 813 F. Supp. 2d 1128 (D. Minn. 2011). The court held only that violation of a statute cannot be the sole grounds for recovery. *Id.* at 1151-52. |
| MS | **Product:** The principles of the Second Restatement are a "driving force in products liability," *Huff v. Shopsmith, Inc.*, 786 So.2d 383, 387 (Miss. 2001) (referring to *State Stove Mfg. Co. v. Hodges*, 189 So.2d 113 (Miss. 1966)), but courts also refer to the Third Restatement. *Palermo v. LifeLink Found., Inc.*, 152 So. 3d 1177, 1181 (Miss. Ct. App. 2014); *see supra* § IV.A.2.a. <br><br> **NPS:** NPS may be based on a federal statute that is not privately enforceable. *Williams v. Wal-Mart*, 99 So. 3d 112, 116 (Miss. 2012) (permitting NPS claim based on federal gun law); *Utz v. Running & Rolling Trucking*, 32 So. 3d 450, 476-477 (Miss. 2010) (fed. motor regul.). Defendants cite *Isgett v. Wal-Mart*, 976 F. Supp. 422 (S.D. Miss. 1997), but *Williams* and *Utz* are binding. |

| MO | **Product:** Courts apply the Third Restatement. *Hobbs v. Boy Scouts of Am., Inc.*, 152 S.W.3d 367, 372 (Mo. Ct. App. 2004); *see supra* § IV.A.2.a. <br><br> **NPS:** NPS may be based on a federal statute that is not privately enforceable. *Midwest Game v. M.F.A. Mill.*, 320 S.W.2d 547, 552 (Mo. 1959) (permitting NPS claim based on FDCA). Defendants cite *Elkins v. Acad. I*, 633 S.W.3d 529, 538 (Mo. W. Dist. App. 2021), but the statute at issue there expressly disclaimed any creation of tort liability. *Id.* at 534. |
|---|---|
| MT | **Product:** Courts apply the Second Restatement. *See Brandenburger v. Toyota Motor Sales, U.S.A., Inc.*, 513 P.2d 268, 274 (Mont. 1973); *supra* § IV.A.2.a. While Defendants cite *Alexander v. Montana-Dakota Utils. Co.*, 2020 WL 6262101, at *2 (D. Mont. Oct. 23, 2020), the court there held that the item at issue was not a product because it did not enter the stream of commerce, not because it wasn't a physical good. <br><br> **NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *Massee v. Thompson*, 90 P.3d 394, 401 (Mont. 2004); *see supra* § IV.D.3. |
| NE | **Product:** Courts look to the Third Restatement. *Pitts v. Genie Indus., Inc.*, 921 N.W.2d 597, 614 (Neb. 2019); *supra* § IV.A.2.a. Nebraska has read the reference to "tangible personal property" in its sales tax statute to apply to "delivery of online data electronically over telephone lines." *Am. Bus. Info., Inc. v. Egr*, 650 N.W.2d 251, 257 (Neb. 2002). <br><br> **NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| NV | **Product:** Courts look to the policy objectives of the Second and Third Restatements when evaluating what is a product, and are mindful of "allow[ing] the doctrine to adapt to technological advances[.]" *Schueler v. Ad Art, Inc.*, 472 P.3d 686, 692 (Nev. Ct. App. 2020); *id.* at 693 ("Other items, such as real property and electricity, are products when |

the context of their distribution and use is sufficiently analogous to [that] of tangible personal property."); *supra* § IV.A.2.a.

**NPS:** NPS may be based on a statute that is not privately enforceable. *Insco v. Aetna Health & Life Ins.*, 673 F. Supp. 2d 1180, 1192 (D. Nev. 2009); *see also Munda v. Summerlin Life & Health Ins.*, 267 P.3d 771, n.3 (Nev. 2011) (ERISA). In the absence of a private right of action, courts may look for "evidence of legislative intent to impose civil liability." *Bell v. Alpha Tau Omega Fraternity*, 98 Nev. 109, 111 (1982); *see Vega v. E. Courtyard Assocs.*, 117 Nev. 436, 440 (2001) (building code violation is NPS if plaintiff belongs to class of persons provision is intended to protect, and injury plaintiff suffered is of type provision was intended to prevent). Defendants misread *Cervantes v. Health Plan of Nevada, Inc.*, 263 P.3d 261, 264, n.4 (2011), in which the Nevada Supreme Court observed that "[NPS] is only a method of establishing the duty and breach elements of a negligence claim."

|      |      |
|------|------|
| NH   | **Product:** Courts apply the Second Restatement. *Buttrick v. Arthur Lessard & Sons, Inc.*, 260 A.2d 111, 113 (N.H. 1969); *supra* § IV.A.2.a.<br><br>**NPS:** "If a common law duty does exist and there is an applicable statute, the defendant . . . will be held to the statutory standard of conduct if the plaintiff is in a class the legislature intended to protect, and the harm is of a type the legislature intended to prevent." *Marquay v. Eno*, 662 A.2d 272, 277 (N.H. 1995) (citations omitted). |
| NJ   | **Product:** Defendants' authority confirms that the New Jersey Product Liability Act does not define "product" and that courts "often look to the Third Restatement in deciding issues related to the state's products liability regime." *Rodgers v. Christie*, 795 F. App'x 878, 879-880 (3d Cir. 2020). *Rodgers* did not address whether all apps or software are products or hold that physical tangibility is required. It recognized that a product could be either tangible or analogous to tangible property. But because plaintiff's claim was based on the "idea" behind a non-commercially-distributed pretrial risk assessment, it was not a product.  Here, Plaintiffs are not suing about ideas. |

| | |
|---|---|
| | **NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| NM | **Product:** Courts apply the Second Restatement. *See Stang v. Hertz Corp.*, 497 P.2d 732, 734, 737 (N.M. 1972); *supra* § IV.A.2.a.<br><br>**NPS:** "[W]hen a statute imposes a specific requirement, there is an absolute duty to comply with that requirement," although the statute must define a standard of conduct with "specificity"—as COPPA and the PROTECT Act do, *see supra* § IV.D.4. *Heath v. La Mariana Apartments*, 180 P.3d 664, 666 (N.M. 2008) |
| NY | **Product:** There is no clear definition of "product," but courts have looked to the Third Restatement for guidance. *See, e.g.*, *Matter of Eighth Judicial Dist. Asbestos Litig.*, 33 N.Y.3d 488, 494-96 (N.Y. 2019)*; supra* § IV.A.2.a. New York courts also treat software as a product or good subject to the UCC in disputes over software licensing agreements. *Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC*, 832 F. Supp. 2d 194, 199-200, 207-208 (E.D.N.Y. 2010) (collecting cases). *Beasock v. Dioguardi Enters., Inc.* is inapposite, as the court's decision turned on defendants' duty, not whether their publications were products. 130 Misc. 2d 25, 29–30 (N.Y. Sup. Ct. 1985). Furthermore, Plaintiffs are not suing about content.<br><br>**NPS:** NPS claims are permitted for violations of a federal statute where a private right of action can be implied. *Ezagui v. Dow Chem.*, 598 F.2d 727, 733 (2d Cir. 1979) (FDCA and NY law); *Zimmerman v. U.S.*, 171 F. Supp. 2d 281, 292–93 (S.D.N.Y. 2001) (federal-facilities child abuse reporting act); *In re Gen. Motors LLC Ignition Switch Litig.*, 2017 WL 2664199, at *10 (S.D.N.Y. June 20, 2017) (Motor Vehicle Safety Act). Defendants mischaracterize *In re GE/CBPS Data Breach Litig*, 2021 WL 3406374, at *10 (S.D.N.Y. 2021), which confirmed that New York permits a finding of NPS where the statute at issue reflects legislative intent, "express or implied*,*" to allow private recovery,  and *Lugo v. St. Nicholas Assocs.*, 772 N.Y.S.2d 449, 454-55 (N.Y. 2003) *aff'd by Lugo v. St. Nicholas Assocs.*, 18 A.D.3d 341 (N.Y. App. Div. 2005), |

| | |
|---|---|
| | which merely concluded that the ADA could not be the basis for NPS because it provided injunctive relief, rather than damages, for persons subjected to discrimination. |
| NC | **Product:** Courts refer to the Second Restatement in products liability cases. *See Warzynski v. Empire Comfort Sys.*, 401 S.E.2d 801, 803-04 (N.C. Ct. App. 1991); *supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Osburn v. Danek Med.,* 520 S.E.2d 88, 94, *aff'd*, 520 S.E.2d 54 (N.C 2000) (FDCA and FDA regulations). *Osburn* controls over the other federal decisions cited by Defendants. |
| ND | **Product:** Courts apply the Second Restatement. *See Johnson v. Am. Motors Corp.*, 225 N.W.2d 57, 58, 66 (N.D. 1974); *supra* § IV.A.2.a.<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| OH | **Product:** Plaintiffs' claims fall within OPLA because Defendants' products are "tangible," as discussed above. Ohio Rev. Code § 2307.71(A)(12); *supra* § IV.A.2.a. In the alternative, if Defendants' apps are not tangible products, then Plaintiffs can pursue other, non-product theories of negligence. *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 813 (N.D. Ohio 2022) (claim falling outside "definitional requirements of a 'product liability claim'" not precluded by OPLA). Plaintiffs' non-product negligence claim is not at issue in this motion.<br><br>**NPS:** Violation of a federal statute or regulation without a private right of action cannot be the basis of a standalone NPS claim but  can be used as evidence of negligence in a common law negligence claim.  *See Sheldon v. Kettering Health Network*, 40 N.E.3d 661, 672, 674 (Ohio App. 2015) (finding that Plaintiffs cannot substitute HIPAA for the duty and standard of care in a negligence action but acknowledging that it is "applicable" to the broader questions of negligence); *see also Brickman v. Maximus*, 2022 WL 16836186, at *7 (S.D. Ohio May 2, 2022) (explaining that the reasoning of *Sheldon* is that use of a statutory breach to define both duty *and* its breach essentially |

| | |
|---|---|
| | creates a private right of action).  In *Monnin v. Fifth Third Bank*, 103 Ohio App. 3d 213, 226-27 (Ohio 1995), the statute was not intended to protect the plaintiffs, did not define a clear set of guidelines, and failed to impose a "specific duty for the protection of others," unlike COPPA and the PROTECT Act.  *See supra* § IV.D.4.  Additionally, Defendants misrepresent *Machlup v. Bowman*, 2021 WL 5882102, at *4 (Ohio Ct. App. 2021), the full quote from which reads "the only determination necessary by the jury is to find but a single fact, *a violation of the statute*." (emphasis added) |
| OK | **Product:** Courts have adopted the Restatement (Second) for products liability cases. *See Tansy v. Dacomed Corp.*, 890 P.2d 881, 884 (Okla. 1994). Additionally, Oklahoma has recognized software to be a good in the context of sales under the UCC. *See NMP Corp. v. Parametric Tech. Corp.*, 958 F. Supp. 1536, 1542 (N.D. Okla. 1997). <br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Howard v. Zimmer*, 299 P.3d 463, 465, 467 (Okla. 2013) (FDCA); *Covel v. Rodriguez*, 272 P.3d 705, 714-17 (Okla. 2012) (federal motor carrier safety regulations). |
| OR | **Product:** Oregon recognizes that social media websites and apps are products subject to strict products liability. *See A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 819 (D. Or. 2022); *supra* pp. 21-22. In addition, courts follow the Second Restatement when determining whether something is a product. *Ass'n Unit of Owners of Bridgeview Condo. Ass'n v. Dunning*, 69 P.3d 788, 800 (Or. App. 2003); *supra* § IV.A.2.a. <br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Oksenholt v. Lederle Labs,* 294 Or. 213, 218 (Or. 1982) (federal drug regulations); *McClellan v. I-Flow*, 776 F.3d 1035, 1041 (9th Cir. 2015) (FDCA). In *Moody v. Or. Comm. Credit Union*, 505 P.3d 1047, 1053-54 (Or. Ct. App. 2022), *review allowed*, 512 P.3d 446 (Or. 2022), the court explicitly rejected the same "curious argument" Defendants make here regarding the necessity of an independent common-law negligence claim as a precondition for alleging NPS). |

| | | |
|---|---|---|
| PA | **Product:** Courts follow the Restatement (Second) of Torts in determining the definition of product. *Schriner v. Pa. Power & Light Co.*, 501 A.2d 1128, 1133 (Pa. Super. Ct. 1985) (electricity is product "within the meaning of § 402A"); *supra* § IV.A.2.a. Pennsylvania reads the reference to "tangible personal property" in its sales tax statute to apply to software "whether transmitted electronically or on a physical medium[.]" *Graham Packaging Co., LP v. Com.*, 882 A.2d 1076, 1087 (Pa. Commw. Ct. 2007). *Anastasio v. Kahn*, 2010 WL 114879, at *3 (E.D. Pa. Jan. 13, 2010), cited by Defendants, addresses the definition of "those who market by . . . lease or bailment," not the definition of a product. | |
| | **NPS:** Where there is an existing state tort duty, the violation of a federal statute can be the basis of an NPS claim, *Polt v. Sandoz, Inc.*, 462 F. Supp. 3d 557, 569 (E.D. Pa. 2020), including federal statutes that are not privately enforceable, *see Cabiroy v. Scipione*, 767 A.2d 1078, 1081-82 (Pa. Super. 2001) (FDCA); *Ford v. Philadelphia Hous. Auth.*, 848 A.2d 1038, 1055 n.14 (Pa. Commw. 2004) (federal lead paint regulations); *Stanton v. Astra Pharm.*, 718 F.2d 553, 564 (3d Cir. 1983) (FDA regs.). | |
| RI | **Product:** Courts follows § 402A of the Second Restatement for strict products liability claims. *Olshansky v. Rehrig Int'l*, 872 A.2d 282, 287 (R.I. 2005), *abrogated on other grounds by Cruz v. DaimlerChrysler Motors Corp.*, 66 A.3d 446 (R.I. 2013); *supra* § IV.A.2.a. Rhode Island's sales tax statute defines "tangible personal property" to include "prewritten computer software." R.I. Gen. Laws 44-18-16. Defendants rely on *DeFilippo v. Nat'l Broad. Co.*, 1980 WL 336092, at *2 (R.I. Super. Ct. June 8, 1980), which is inapposite because Plaintiffs are not suing about content. | |
| | **NPS:** A statutory violation "serves as prima facie evidence of liability," which entitles the plaintiff to recover so long as the evidence in its favor is of greater weight than rebutting evidence in favor of the defendant on the question of liability. *Errico v. LaMountain*, 713 A.2d 791, 794 (R.I. 1998) (cleaned up). | |

| | |
|---|---|
| SC | **Product:** Courts have treated software as analogous to tangible products in the context of products liability. *[allegedly defective]  See Wickersham v. Ford Motor Co.*, 194 F. Supp. 3d 434, 440 (D.S.C. 2016) ("[T]he algorithm [underlying the defendants' Restraint Control Module] is better understood as the product, or at least, a component thereof. . . . It is a system of information, much like a physical product may be a system of tubes, irons, wires, etc."). |
| | **NPS:** A statute can be used to establish the standard of care, if there is an underlying common law duty. *Denson v. Nat'l Cas. Co.*, 886 S.E.2d 228, 232-33 (S.C. 2023). |
| SD | **Product:** Courts have adopted § 402A of the Second Restatement for strict products liability claims, but also look to the Third Restatement for guidance. *Karst v. Shur-Co.*, 878 N.W.2d 604, 609-10 (S.D. 2016); *supra* § IV.A.2.a. |
| | **NPS:** NPS is viable for violations of a federal statute, and courts do not require that the statute contain a private right of action. *See Thompson v. Summers*, 567 N.W.2d 387, 392-94 (S.D. 1997) (federal and state hot air balloon reguls.); *Hurst v. U.S.*, 739 F. Supp. 1377, 1379-81 (D.S.D. 1990) (U.S. Corps of Engineers regulations). Defendants cite *Highmark Fed. Credit Union v. Hunter*, 814 N.W.2d 413 (S.D. 2012), but that case did not involve an NPS claim. |
| TN | **Product:** Tennessee's statutory definition of a product is identical to Arkansas's and supports Plaintiffs' position for the same reasons. *See supra* p. 78. Additionally, Tennessee recognizes software as "tangible personal property" in the context of sales tax. *See Creasy Sys. Consultants, Inc. v. Olsen*, 716 S.W.2d 35, 36-37 (Tenn. 1986). |
| | **NPS:** NPS is viable for violations of a federal statute, and courts do not require that the statute contain a private right of action. *Estate of French v. Stratford House*, 333 S.W.3d 546, 563 (Tenn. 2011) (fed. Nursing Home Reform Act); *Bellamy v. Fed. Exp.*, 749 S.W.2d 31, 34-35 (Tenn. 1988) (OSHA); *Wren v. Sullivan Elec.*, 797 F.2d 323, 325 (6th Cir. 1986) (OSHA); *Agric. Servs. Ass'n v. Ferry-Morse Seed*, 551 F.2d 1057, 1068 (6th |

| | |
|---|---|
| | Cir. 1977) (federal and state seed labeling laws); *Cline v. U.S.*, 2015 WL 13664121, at *9-10 (M.D. Tenn. May 20, 2015) (federal-facilities child abuse reporting act). |
| TX | **Product**: Courts have recognized software as a product in the context of products liability claims. *Est. of Alex ex rel. Coker v. T-Mobile US, Inc.*, 313 F. Supp. 3d 723, 732 (N.D. Tex. 2018) (design defect for 911 dialing software); *Hou-Tex, Inc. v. Landmark Graphics*, 26 S.W.3d 103, 107 n.2 (Tex. Ct. App. 2000) (software used to create graphic from technical data). <br><br> **NPS:** Violation of a statute can support an action for NPS. *See Perry v. S.N.*, 973 S.W.2d 301, 309 (Tex. 1998) (creating multi-factor test). Federal laws can also establish the standard of care in Texas. *See Martino v. Kiewit*, 600 F. App'x 908, 912 (5th Cir. 2015) (OSHA); *Lyondell Petrochemical v. Fluor Daniel*, 888 S.W.2d 547, 555 (Tex Ct. App. 1994) (OSHA); *Ellsworth v. Bishop Jewelry & Loan*, 742 S.W.2d 533, 535 (Tex. Ct. App. 1987) (federal gun law). *Muncy v. Magnolia Chem.*, 437 S.W.2d 15, 19 (Tex. Ct. App. 1968) (federal regulations about poison warnings). Texas courts also consider public policy, which favors statutory standards of care that protect children. *Cerda v. RJL*, 443 S.W.3d 221, 231 (Tex. Ct. App. 2013). |
| UT | **Product**: Courts look to the UCC's definition of "goods" as well as the Second and Third Restatements to differentiate between a good and a service. *Utah Local Gov't Trust v. Wheeler Mach. Co.,* 199 P.3d 949, 952 (Utah 2008) ("One commentator has suggested that product was undefined [in Utah's Product Liability Act] in order to encourage and accommodate development of product liability law and to allow for the expansion of what might qualify as a product."); *Legal Tender Servs. PLLC v. Bank of Am. Fork*, 506 P.3d 1211, 1219-20 (Utah App. Ct. 2022); *supra* § IV.A.2.a. While Defendants cite *Legal Tender Services*, that case concerned an "online payment portal" whose "predominant purpose" was to "facilitate financial transactions" between a seller and its customers. *Id.* at 1220. That is nothing like Defendants' apps. |

| | |
|---|---|
| | **NPS:** Violation of a statute, even in the absence of a private right of action or in the absence of a dangerous instrumentality, is prima facie evidence of negligence. *Hall v. Warren*, 632 P.2d 848, 850 (Utah 1981); *see also Colosimo v. Gateway Cmty. Church*, 424 P.3d 866, 882, n.82 (Utah 2018). |
| VT | **Product**: Courts apply the Second Restatement. *See Adel v. Greensprings of Vt., Inc.*, 363 F. Supp. 2d 692, 698 (D. Vt. 2005); *supra* § IV.A.2.a. <br><br> **NPS:** Violation of a statute, even in the absence of a private right of action, raises a rebuttable presumption of negligence, *Bacon v. Lascelles,* 678 A.2d 902, 907 (Vt. 1996), where there is "an existing duty recognized by the common law," *Sheldon v. Ruggiero*, 2018 VT 125, ¶ 25 (Vt. 2018). |
| VA | **Product**: Courts have treated software as a product in the context of products liability claims. *Lowe v. Cerner Corp.*, 2022 WL 17269066, at *5-10 (4th Cir. Nov. 29, 2022) (applying Virginia law; reversing lower court summary judgment on claim related to allegedly defectively designed software system used in hospital). Virginia looks to both the Second and Third Restatements in products liability cases. *Tingler v. Graystone Homes, Inc.*, 834 S.E.2d 244, 265 n.23 (Va. 2019) (Third Restatement); *Shoemaker v. Funkhouser*, 856 S.E.2d 174, 178 n.2 (Va. 2021) (Second Restatement); *supra* § IV.A.2.a. <br><br> **NPS:** NPS may be based on a federal statute that is not privately enforceable. *Orthopedic Equipment v. Eutsler*, 276 F.2d 455, 461 (4th Cir. 1960) (FDCA); *Kimberlin v. PM Transp.*, 563 S.E.2d 665, 669 (Va. 2002) (state and federal motor regulations). |
| WA | **Product:** Washington's statutory products liability law "closely mirrors the Restatement (Second)," and the Restatement's principles have informed its case law. *Taylor v. Intuitive Surgical, Inc.*, 389 P.3d 517, 523 (Wash. 2017); *supra* § IV.A.2.a. Additionally, software can be a product in the context of products liability claims. *Grisby v. Valve Corp.*, 2013 WL 12310666, at *6-7 (W.D. Wash., Mar. 13, 2013) (granting leave to amend where plaintiff failed to "assert that there was any defect in |

| | | |
|---|---|---|
| | | the games or other software that he downloaded" through online platform). *Quinteros* is inapposite because Plaintiffs are not suing about content, and the court's holding was explicitly limited to the facts "pled in this case." 2022 WL 898560, at *7.<br><br>**NPS:** There is no standalone claim; however a statutory violation is evidence that supports a negligence claim. *See supra* § IV.D.3. |
| | WV | **Product:** Courts are guided by the Second and Third Restatements in products liability cases. *Star Furniture Co. v. Pulaski Furniture Co.*, 297 S.E.2d 854, 856 (W. Va. 1982); *Eskridge v. Pac. Cycle, Inc.*, 556 F. App'x 182, 188 n.4 (4th Cir. 2014); *supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a statute that is not privately enforceable. *C.C. v. Harrison Cnty. Bd. of Educ.*, 859 S.E.2d 762, 772 (W. Va. 2021). "[A] rebuttable prima facie presumption of negligence arises on a showing that the statute was violated." *Flanagan v. Mott*, 114 S.E.2d 331, 335 (W. Va. 1960). Defendants cite *Arbaugh v. Bd. of Educ., Cnty. of Pendleton*, 214 W. Va. 677 (Va. 2003), which did not involve a NPS claim. |
| | WI | **Product:** Wisconsin has codified language from the Third Restatement, and continues to look to common law grounded in the Second Restatement as persuasive authority. *Murphy v. Columbus McKinnon Corp.*, 982 N.W.2d 898, 905-13 (Wis. 2022) (discussing development of common law and Wis. Stat. § 895.047); *see also Ransome v. Wisconsin Elec. Power Co.*, 275 N.W.2d 641, 650 (Wis. 1979) (relying on Second Restatement to find that electricity is product for purpose of products liability claim); *supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Daniel v. Armslist*, 386 Wis.2d 449, 482 (Wis. 2019). There must be evidence that "the legislature intended that a violation of th[e statute] . . . may form the basis for a private cause of action[.]" *Steinmetz v. Clendenning*, 906 N.W.2d 183 (Wis. Ct. App. 2017). Wisconsin courts have liberally applied this requirement to allow NPS for violations of federal laws. *Kurer v. Parke, Davis & Co.*, 2004 WI App 74, ¶ 20 (FDA reguls.); *U.S. Aviation* |

PLAINTIFFS' OPPOSITION
TO DEFENDANTS' MOTION TO DISMISS
CASE NO. 4:22-MD-03047-YGR

| | |
|---|---|
| | *Underwriters v. Nat'l Ins. Underwriters*, 344 N.W.2d 532, 534 (Wis. App. 1984) (federal aviation reguls.); *Locicero v. Interpace*, 266 N.W.2d 423, 427 (Wis. 1978) (federal motor carrier regulations). |
| WY | **Product**: Wyoming has adopted § 402A of the Second Restatement. *McLaughlin v. Michelin Tire Corp.*, 778 P.2d 59, 63-64 (Wyo. 1989); *supra* § IV.A.2.a.<br><br>**NPS:** NPS may be based on a federal statute that is not privately enforceable. *Feinman v. Kindred Healthcare,* 2013 WL 5918004, at *2 (D. Wyo. Nov. 1, 2013) (federal railroad crossing regulations). "If a positive and definite standard of care has been established by legislative enactment whereby a jury may determine whether there has been a violation thereof by finding a single issue of fact"—as COPPA and the PROTECT Act do, *see supra* § IV.D.4— "a violation is [NPS.]" *Otten v. BNSF*, 2023 WL 1948626, at *11 (10th Cir. Feb. 13, 2023). |

1    Dated: June 1, 2023                              Respectfully submitted,

2

3    */s/ Previn Warren*                              */s/ Lexi J. Hazam*
     PREVIN WARREN                                    LEXI J. HAZAM
4    **MOTLEY RICE LLC**                              **LIEFF CABRASER HEIMANN &**
     401 9th Street NW Suite 630                      **BERNSTEIN, LLP**
5    Washington DC 20004                              275 Battery Street, 29th Floor
     Telephone: 202-386-9610                          San Francisco, CA 94111-3339
6    pwarren@motleyrice.com                           Telephone: 415-956-1000
                                                       lhazam@lchb.com
7

8    */s/ Christopher A. Seeger*
     CHRISTOPHER A. SEEGER
9    **SEEGER WEISS, LLP**
     55 Challenger Road, 6th Floor
10   Ridgefield Park, NJ 07660
     Telephone: 973-639-9100
11   cseeger@seegerweiss.com                          ***Plaintiffs' Co-Lead Counsel***

12

13   ANDRE MURA                                       JAYNE CONROY
     **GIBBS LAW GROUP, LLP**                         **SIMMONS HANLY CONROY, LLC**
14   1111 Broadway, Suite 2100                        112 Madison Ave, 7th Floor
     Oakland, CA 94607                                New York, NY 10016
15   Telephone: 510-350-9717                          Telephone: 917-882-5522
16   amm@classlawgroup.com                            jconroy@simmonsfirm.com

17   EMILY C. JEFFCOTT                                JOSEPH G. VANZANDT
     **MORGAN & MORGAN**                              **BEASLEY ALLEN CROW METHVIN**
18   220 W. Garden Street, 9th Floor                  **PORTIS & MILES, P.C.**
     Pensacola, FL 32502                              234 Commerce Street
19   Telephone: 850-316-9100                          Montgomery, AL 36103
20   ejeffcott@forthepeople.com                       Telephone: 334-269-2343
                                                       joseph.vanzandt@beasleyallen
21   MICHAEL M. WEINKOWITZ
     **LEVIN SEDRAN & BERMAN, LLP**                   ALEXANDRA WALSH
22   510 Walnut Street, Suite 500                     **WALSH LAW**
     Philadelphia, PA 19106                           1050 Connecticut Ave, NW, Suite 500
23   Telephone: 215-592-1500                          Washington D.C. 20036
24   mweinkowitz@lfsbalw.com                          T: 202-780-3014
                                                       awalsh@alexwalshlaw.com
25

26                                                    ***Plaintiffs' Leadership Committee***

27

28

1

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
T: 210-448-0500
PBoldt@WattsGuerra.com

2

3

4

5

ROLAND TELLIS
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2333
rtellis@baronbudd.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS &**
**OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, Fl 32502
Telephone: 510-698-9566
mliu@awkolaw.com

6

7

8

9

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
T: (646) 666-8908
carrie@cagoldberglaw.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212.213.8311
hnappi@hrsclaw.com

10

11

12

13

EMMIE PAULOS
**LEVIN PAPANTONIO**
**RAFFERTY**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th Floor
New York, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

14

15

16

17

18

DIANDRA "FU" DEBROSSE
ZIMMERMANN
**DICELLO LEVITT**
505 20th St North, Suite 1500
Birmingham, Alabama 35203
Telephone: 205.855.5700
fu@dicellolevitt.com

RON AUSTIN
**RON AUSTIN LAW**
400 Manhattan Blvd.
Harvey LA, 70058
Telephone: (504) 227–8100
raustin@ronaustinlaw.com

19

20

21

22

RUTH RIZKALLA
**CARLSON LAW FIRM**
100 E. Central Texas Expy
Killeen, TX 76541
(254) 526-5688
RRizkalla@carlsonattorneys.com

23

24

25

*Plaintiffs' Steering Committee*

26

27

28

## <u>ATTESTATION</u>

I hereby attest pursuant to N.D. Cal. Civil L.R. 5–1 that the concurrence to filing of this document has been obtained from each signatory hereto.

DATED:        June 1, 2023                          By: <u>*/s/ Previn Warren*</u>
                                                                        Previn Warren