Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a*
*Facebook, Inc.; Facebook Holdings, LLC; Facebook*
*Operations, LLC; Facebook Payments, Inc.;*
*Facebook Technologies, LLC; Instagram, LLC;*
*Siculus, Inc.; and Mark Elliot Zuckerberg*

*Additional parties and counsel listed on*
*signature pages*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR-TSH<br><br>Honorable Yvonne Gonzalez Rogers<br><br>**DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) PLAINTIFFS' PRIORITY CLAIMS UNDER SECTION 230 AND THE FIRST AMENDMENT**<br><br>**Hearing:**<br>Date:    TBD<br>Time:    TBD<br>Place:   Oakland, California<br>Judge:   Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, at a hearing date and time to be determined in accordance with the Court's Order Setting Briefing Schedule and Page Limits for Defendants' Motion to Dismiss Under Section 230 and the First Amendment (Dkt. 293), before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street in Oakland, California, Defendants Meta Platforms, Inc. f/k/a Facebook, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc., Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., and Mark Elliot Zuckerberg; TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC; Snap Inc.; and YouTube, LLC, Google LLC, and Alphabet Inc. (each a "Defendant," and collectively the "Defendants"), will and hereby do move this Court, under Federal Rule of Civil Procedure 12(b)(6), for an order dismissing with prejudice all five claims identified by Plaintiffs as priority claims in the Amended Master Complaint (Dkt. 234-1) ("Master Complaint").

Defendants base this Supplemental Motion on this Notice, the Motion and Memorandum of Points and Authorities submitted herewith, Defendants' Joint Motion to Dismiss (Dkt. 237) and any Reply Memorandum submitted therein, all other pleadings and papers on file in this action, and on such other arguments or evidence that may be submitted to the Court prior to the hearing.

DATED:        June 27, 2023          By:    */s/ Beth S. Brinkmann*
                                            Beth S. Brinkmann

                                            *Attorney for Defendants Meta Platforms,*
                                            *Inc. f/k/a Facebook, Inc.; Facebook*
                                            *Holdings, LLC; Facebook Operations, LLC;*
                                            *Facebook Payments, Inc.; Facebook*
                                            *Technologies, LLC; Instagram, LLC;*
                                            *Siculus, Inc.; and Mark Elliot Zuckerberg*

                                            *Additional parties and counsel listed on*
                                            *signature pages*

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................................ii

TABLE OF CONTENTS ....................................................................................................iii

I.      INTRODUCTION .................................................................................................. 1

II.     PROCEDURAL BACKGROUND........................................................................... 2

III.    ARGUMENT ......................................................................................................... 2

        A.      Section 230 of the Communications Decency Act Bars Plaintiffs' Priority
                Claims. ...................................................................................................... 2

                1.      Section 230 Immunizes Interactive Computer Service Providers from
                        Claims that Treat Them as Publishers of Content Provided By Others. ...... 2

                2.      Section 230 Immunity Bars Plaintiffs' Priority Claims. ........................... 4

                        a)      Defendants Provide Interactive Computer Services. ..................... 5

                        b)      Plaintiffs' Claims Treat Defendants as Publishers. ........................ 5

                                (1)     Plaintiffs' Product Liability Claims Would Impose
                                        Liability on Defendants as Publishers of User-Generated
                                        Content. ....................................................................... 6

                                (2)     Plaintiffs' Negligence Per Se Claim Would Impose
                                        Liability on Defendants as Publishers of User-Generated
                                        Content. ..................................................................... 12

                        c)      Plaintiffs' Claims Depend on Content Provided By Others. ........ 12

        B.      Plaintiffs' Claims Are Barred By the First Amendment....................................... 14

                1.      The First Amendment Precludes Tort Liability for Protected Speech,
                        Including Choices About Presenting and Disseminating Content. ........... 14

                2.      Plaintiffs' Claims Would Hold Defendants Liable for Protected Speech. 17

                3.      There Is No First Amendment Exception That Permits Plaintiffs'
                        Claims. ................................................................................... 22

                4.      The First Amendment Protects Speech By and To Minors...................... 23

IV.     CONCLUSION...................................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Booksellers Ass'n, Inc. v. Hudnut*,
　771 F.2d 323 (7th Cir. 1985)................................................................................................23

*Anderson v. City of Hermosa Beach*,
　621 F.3d 1051 (9th Cir. 2010)............................................................................................20

*Anderson v. TikTok, Inc.*,
　2022 WL 14742788 (E.D. Pa. Oct. 25, 2022).............................................................5, 6, 7

*Ashcroft v. Free Speech Coal.*,
　535 U.S. 234 (2002) ......................................................................................................21, 22

*Estate of B.H. v. Netflix, Inc.*,
　2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ..................................................................9, 18

*Barnes v. Yahoo!, Inc.*,
　570 F.3d 1096 (9th Cir. 2009)..........................................................................................3, 4, 5

*Barrett v. Rosenthal*,
　40 Cal. 4th 33 (2006) .............................................................................................................3

*Bartnicki v. Vopper*,
　532 U.S. 514 (2001) .............................................................................................................17

*Batzel v. Smith*,
　333 F.3d 1018 (9th Cir. 2003)..........................................................................................3, 10

*Bill v. Super. Ct.*,
　137 Cal. App. 3d 1002 (1982)..............................................................................................18

*Bland v. Roberts*,
　730 F.3d 368 (4th Cir. 2013)................................................................................................19

*Brandenburg v. Ohio*,
　395 U.S. 444 (1969) .............................................................................................................22

*Bride v. Snap Inc.*,
　2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ..............................................................5, 9, 14

*Brown v. Ent. Merchants Ass'n*,
　564 U.S. 786 (2011) ..................................................................................................... *passim*

*Callahan v. Ancestry.com Inc.*,
　2021 WL 783524 (N.D. Cal. Mar. 1, 2021)........................................................................14

iv

*Candy Lab Inc. v. Milwaukee Cnty.*,
   266 F. Supp. 3d 1139 (E.D. Wis. 2017).......................................................................21

*Carafano v. Metrosplash.com, Inc.*,
   339 F.3d 1119 (9th Cir. 2003)..............................................................................8, 10

*Cohen v. California*,
   403 U.S. 15 (1971).................................................................................................22

*Cohen v. Facebook, Inc.*,
   252 F. Supp. 3d 140 (E.D.N.Y. 2017) ........................................................................4

*Dangaard v. Instagram, LLC*,
   2022 WL 17342198 (N.D. Cal. Nov. 30, 2022)....................................................5, 26

*Davidson v. Time Warner, Inc.*,
   1997 WL 405907 (S.D. Tex. Mar. 31, 1997).......................................................15, 16

*DeFilippo v. Nat'l Broad. Co.*,
   446 A.2d 1036 (R.I. 1982) ......................................................................................15

*Doe II v. MySpace Inc.*,
   175 Cal. App. 4th 561 (2009)...............................................................................4, 9

*Doe v. MySpace, Inc.*,
   528 F.3d 413 (5th Cir. 2008)....................................................................................9

*Doe v. Reddit, Inc.*,
   2021 WL 5860904 (C.D. Cal. Oct. 7, 2021) .............................................................11

*Doe v. Snap, Inc.*,
   2022 WL 2528615 (S.D. Tex. July 7, 2022).........................................................5, 9, 10

*Doe #1 v. Twitter, Inc.*,
   2023 WL 3220912 (9th Cir. May 3, 2023) ...............................................................12

*Doe v. Twitter, Inc.*,
   555 F. Supp. 3d 889 (N.D. Cal. 2021) ...............................................................5, 8, 11

*Dyroff v. Ultimate Software Grp., Inc.*,
   934 F.3d 1093 (9th Cir. 2019).......................................................................... *passim*

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
   946 F.3d 1040 (9th Cir. 2019)...................................................................................3

*Erznoznik v. Jacksonville*,
   422 U.S. 205 (1975).................................................................................................23

*ETW Corp. v. Jireh Pub., Inc.*,
   332 F.3d 915 (6th Cir. 2003)...................................................................................18

*In re Facebook, Inc.*,
625 S.W.3d 80 (Tex. 2021) ...................................................................................4, 6

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) .................................................................................3, 5

*Fed. Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020) ...................................................................10

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016) ...........................................................8, 9, 10

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ............................................................................... *passim*

*G.G. v. Salesforce.com, Inc.*,
603 F. Supp. 3d 626 (N.D. Ill. 2022) .......................................................................13

*Gonzalez v. Google LLC*,
143 S. Ct. 1191 (2023) .............................................................................2, 26, 29

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021) ....................................................................................4, 7

*Herceg v. Hustler Mag., Inc.*,
814 F.2d 1017 (5th Cir. 1987) .................................................................................15

*Herrick v. Grindr, LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018) ......................................................................14

*Herrick v. Grindr, LLC*,
765 Fed. App'x 586 (2d Cir. 2019) ............................................................................8

*Hoffman v. Capital Cities/ABC, Inc.*,
255 F.3d 1180 (9th Cir. 2001) ..................................................................................20

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
515 U.S. 557 (1995) ...........................................................................................16, 19

*Jackson v. Airbnb, Inc.*,
2022 WL 16753197 (C.D. Cal. Nov. 4, 2022) ............................................................5

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) ............................................................................14, 25

*Kimzey v. Yelp!, Inc.*,
836 F.3d 1263 (9th Cir. 2016) .......................................................................... *passim*

*Klayman v. Zuckerberg*,
753 F.3d 1354 (D.C. Cir. 2014) .................................................................................5

vi

*L.W. v. Snap Inc.*,
  2023 WL 3830365 (S.D. Cal. June 5, 2023) ................................................................ *passim*

*Lemmon v. Snap, Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ................................................................... 4, 5, 11, 12

*Lewis v. Google LLC*,
  461 F. Supp. 3d 938 (N.D. Cal. 2020) ........................................................................ 5

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019) ................................................................................. 8

*Mashaud v. Boone*,
  2023 WL 3875308 (D.C. Ct. App. June 8, 2023) ....................................................... 22

*McCollum v. CBS, Inc.*,
  202 Cal. App. 3d 989 (1988) ............................................................................. 15, 23

*Miami Herald Pub. Co. v. Tornillo*,
  418 U.S. 241 (1974) ....................................................................................... 16, 21

*Miller v. California*,
  413 U.S. 15 (1973) ................................................................................................ 22

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ............................................................................... 14, 15, 19

*Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) .................................................................................... 4

*NetChoice, LLC v. Att'y Gen., Fla.*,
  34 F.4th 1196 (11th Cir. 2022) ............................................................. 16, 17, 19, 21

*O'Handley v. Padilla*,
  579 F. Supp. 3d 1163 (N.D. Cal. 2022) ................................................................... 17

*Olivia N. v. Nat'l Broad. Co.*,
  126 Cal. App. 3d 488 (1981) ............................................................................. 15, 25

*Packingham v. North Carolina*,
  582 U.S. 98 (2017) ........................................................................................... 1, 17

*Perfect 10, Inc. v. CCBill LLC*,
  488 F.3d 1102 (9th Cir. 2007) .................................................................................. 3

*Powell's Books, Inc. v. Kroger*,
  622 F.3d 1202 (9th Cir. 2010) ........................................................................... 22, 24

*Reno v. ACLU*,
  521 U.S. 844 (1997) ....................................................................................... 17, 24

vii

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ........................................................................ 15, 25

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................................... 14, 22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) .................................................................................................. *passim*

*Thunder Studios, Inc. v. Kazal*,
    13 F.4th 736 (9th Cir. 2021) .............................................................................................. 22

*Turner Broad. Sys., Inc. v. FCC*,
    512 U.S. 622 (1994) ........................................................................................................... 16

*Twitter, Inc. v. Taamneh*,
    143 S. Ct. 1206 (2023) ...................................................................................................... 18

*United States v. Stevens*,
    559 U.S. 460 (2010) ........................................................................................................... 22

*United States v. Yung*,
    37 F.4th 70 (3d Cir. 2022) ................................................................................................. 22

*Virginia v. Black*,
    538 U.S. 343 (2003) ........................................................................................................... 22

*W. Watersheds Project v. Michael*,
    869 F.3d 1189 (10th Cir. 2017) ........................................................................................ 19

*Walt Disney Prods., Inc. v. Shannon*,
    276 S.E.2d 580 (Ga. 1981) .......................................................................................... 15, 25

*Watters v. TSR, Inc.*,
    715 F. Supp. 819 (W.D. Ky. 1989) ........................................................................ 15, 16, 23

*Wilson v. Midway Games, Inc.*,
    198 F. Supp. 2d 167 (D. Conn. 2002) ...................................................................... 14, 15, 23

*Winter v. Facebook, Inc.*,
    2021 WL 5446733 (E.D. Mo. Nov. 22, 2021) .................................................................... 5

*Zamora v. Columbia Broad. Sys.*,
    480 F. Supp. 199 (S.D. Fla. 1979) .................................................................... 15, 16, 23, 25

*Zeran v. Am. Online, Inc.*,
    129 F.3d 327 (4th Cir. 1997) .............................................................................................. 3

*Zhang v. Baidu.com Inc.*,
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ................................................................................. 16

**Statutes**

15 U.S.C. § 6501 ...................................................................................................................12

18 U.S.C. § 2258A ...............................................................................................................12

18 U.S.C. § 2258B ...............................................................................................................12

47 U.S.C. § 230 ............................................................................................................ *passim*

# I.   INTRODUCTION

Facebook, Instagram, Snapchat, TikTok, and YouTube are online services used by billions of people to communicate with each other "on topics as diverse as human thought." *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (cleaned up).  And that is the role for which Plaintiffs seek to hold Defendants liable:  their claims are based on the creation and dissemination of content by others—from videos about viral pranks and online challenges, to images that allegedly invite personal comparisons, to communications with other users.  Plaintiffs strain to avoid their dependence on such expressive material by purporting to target various "features" on Defendants' services that allegedly cause "addiction."  But Plaintiffs' alleged addiction is to consuming content, and the features they target are the means through which Defendants enable users to create and view that content.  Plaintiffs acknowledge as much by asserting that their harms ultimately arise from exposure to content.  *See* Pls. Opp. to Joint Mot. 43 (Dkt. 302) (conceding that Plaintiffs "*would not have been harmed by the content on Defendants' platforms but for the alleged design defects*" (emphases added)).  Plaintiffs' claims are barred by Section 230 and the First Amendment.

Section 230 provides immunity for interactive computer service providers against claims (product liability or otherwise) that seek to hold them liable for third-party content on their services and the manner in which that content is presented.  *See, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1099 (9th Cir. 2019).  Labeling such claims as challenging design "defects" does not remove them from Section 230—particularly where, as here, the alleged defects are inescapably linked to the publication of third-party content and Plaintiffs' alleged harms necessarily depend on the content they viewed.  Plaintiffs do not allege "addiction" to viewing blank boxes or white noise.  Courts routinely reject creative pleadings designed to evade Section 230, and this case should be no exception.

The First Amendment independently protects against state regulation of Defendants' dissemination and curation of third-party speech—both the content itself and Defendants' own judgments about whether, how, and when to publish it.  Courts have long eschewed efforts to impose liability on publishers of movies, television shows, music, and video games based on their role in broadcasting speech that allegedly harms its audience.  *See Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 790 (2011) ("the basic principles of freedom of speech and the press . . . do not vary when a new

1

DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

and different medium for communication appears").  Plaintiffs' efforts to expand state law to regulate online speech and the tools used to curate speech or make it more engaging are similarly barred.

Defendants greatly sympathize with minors struggling with mental health issues, and they work continuously to help provide safe online experiences for their users.  But Section 230 and the First Amendment prevent creating new state tort law to impose liability on interactive computer services for user content.  And for good reason—unleashing a flood of litigation on online services for disseminating and delivering user content would fundamentally alter the Internet, drastically restricting the flow of communications, information, and ideas.  The Court should dismiss the priority claims.

## II.      PROCEDURAL BACKGROUND

On April 17, 2023, Defendants moved to dismiss the five claims Plaintiffs identified as their "priority claims" (four product liability claims and a claim for negligence per se).  Joint Mot. (Dkt. 237).  At this Court's direction, Defendants did not brief Section 230 or the First Amendment until after the Supreme Court's ruling in *Gonzalez v. Google LLC*, 143 S. Ct. 1191 (2023) (per curiam).

Following the Supreme Court's ruling, the Court issued a schedule for Defendants to brief the Section 230 and First Amendment arguments.  This Supplemental Joint Motion thus seeks dismissal of the priority claims based on Section 230 as a threshold immunity requiring dismissal of those claims and the First Amendment as a second, independent bar to those claims.  Defendants reserve the right to assert these defenses to the non-priority claims when the Court permits such briefing.  The legal standard for this motion to dismiss, along with a summary of the factual background of the case and Plaintiffs' priority claims, is set out in Defendants' Joint Motion.  *See* Joint Mot. 3–12.

## III.      ARGUMENT

**A.      Section 230 of the Communications Decency Act Bars Plaintiffs' Priority Claims.**

**1.      Section 230 Immunizes Interactive Computer Service Providers from Claims that Treat Them as Publishers of Content Provided By Others.**

Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1).  That immunity applies if (1) the defendant is a "provider . . . of an interactive

computer service," and (2) the claim seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else.  *Id.*; *see Dyroff*, 934 F.3d at 1097.

Congress enacted Section 230 "to promote the free exchange of information and ideas over the Internet."  *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–1100 (9th Cir. 2009) (cleaned up); *see also Batzel v. Smith*, 333 F.3d 1018, 1026–27 (9th Cir. 2003) ("Congress wanted to encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce.").  The statute's findings "applaud[] the Internet as a 'forum for a true diversity of political discourse' that offers 'myriad avenues for intellectual activity' and provides 'a variety of political, educational, cultural, and entertainment services.'"  *Barrett v. Rosenthal*, 40 Cal. 4th 33, 56 (2006).

Section 230(c)(1) thus provides "broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (cleaned up); *see also Force v. Facebook, Inc.*, 934 F.3d 53, 64 (2d Cir. 2019) ("[T]he Circuits are in general agreement that the text of Section 230(c)(1) should be construed broadly in favor of immunity.").  Section 230 bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content."  *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997).  Section 230 has resulted in an Internet that "ha[s] flourished" with the development of new online services and technologies.  *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (quoting 47 U.S.C. § 230(a)(3)–(4)).  The Ninth Circuit has warned against the "potential for new liability that would upset, rather than 'preserve' the vibrant culture of innovation on the internet that Congress envisioned" in enacting Section 230.  *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1053 (9th Cir. 2019).

To prevent circumvention of Section 230(c)(1) immunity, Congress further specified that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).  Because Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles," *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1175 (9th Cir. 2008) (en banc), courts apply the immunity as early as possible, *see Dyroff*, 934 F.3d at 1101 (affirming

3

DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

motion to dismiss); *Gonzalez v. Google LLC*, 2 F.4th 871, 890 & n.8 (9th Cir. 2021), *vacated on other grounds*, 143 S. Ct. 1191; *see also Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250, 254–55 (4th Cir. 2009).

### 2.     Section 230 Immunity Bars Plaintiffs' Priority Claims.

In applying Section 230 to a claim, "what matters is not the name of the cause of action," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes*, 570 F.3d at 1101–02. Section 230 "is implicated not only by claims that explicitly point to" content created by others, "but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing" the content. *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017). No amount of "creative pleading" allows plaintiffs to "advance the same basic argument that the statute plainly bars." *Kimzey*, 836 F.3d at 1265–66.

Section 230 does not exempt "product liability" claims. To the contrary, "every published decision" has rejected efforts to evade Section 230 by recasting claims based on user content as based on a service's failure to "warn" or "protect" users "from the dangers posed by its [supposed] products." *In re Facebook, Inc.*, 625 S.W.3d 80, 93–95 (Tex. 2021); *see also Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 573 (2009) (Section 230 barred product liability claim). Plaintiffs suggest that *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021), supports such an exemption, but that is incorrect. *Lemmon* involved a "speed filter" that purportedly encouraged users to drive too fast—whether they posted or viewed content with the filter or not—creating an "independent[]" danger unrelated to the publication or transmission of any content. *Id.* at 1087, 1093–94. Section 230 did not bar that claim because the alleged defect, and the injury it caused, were "fully independent of Snap's role in monitoring or publishing third-party content." *Id.* at 1093; *see also id.* (plaintiffs "do not fault Snap in the least for publishing" content). But the court contrasted cases where "the plaintiff's claims, at bottom, depended on a third party's content, without which no liability could have existed," reaffirming that Section 230 bars "creative pleading" of such claims. *Id.* at 1094; *see also id.* at 1093 n.4.

Consistent with the Ninth Circuit's reasoning, courts have repeatedly recognized that *Lemmon* in no way precludes applying Section 230 to bar product liability claims—including claims based on

4

algorithmic "features"—where (as here) the "alleged design flaw" is "directly related to the posting of third-party content." *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 929–30 (N.D. Cal. 2021) (rejecting design defect claim that Twitter was "designed . . . to make it easy for child predators and sex traffickers" to prey on children), *aff'd in relevant part sub nom.*, *Doe #1 v. Twitter, Inc.*, 2023 WL 3220912 (9th Cir. May 3, 2023); *see, e.g.*, *L.W. v. Snap Inc.*, 2023 WL 3830365, at *5 (S.D. Cal. June 5, 2023) (distinguishing *Lemmon* and dismissing product liability claim as barred by Section 230); *Bride v. Snap Inc.*, 2023 WL 2016927, at *5–6 (C.D. Cal. Jan. 10, 2023) (same); *Anderson v. TikTok, Inc.*, 2022 WL 14742788, at *4 (E.D. Pa. Oct. 25, 2022) (same), *appeal docketed*, No. 22-3061 (3d Cir. Nov. 10, 2022); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (same), *aff'd*, No. 22-20543 (5th Cir. June 26, 2023); *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *2 (C.D. Cal. Nov. 4, 2022) (same).

Section 230 likewise bars Plaintiffs' claims here because they seek to hold Defendants liable as a publisher or speaker of content provided by someone else. *See*, *e.g.*, *Barnes*, 570 F.3d at 1101.

### a) Defendants Provide Interactive Computer Services.

Section 230 immunity applies to providers of "interactive computer service[s]," which courts have uniformly held include Defendants. *See, e.g.*, *Klayman v. Zuckerberg*, 753 F.3d 1354, 1357 (D.C. Cir. 2014) (Facebook); *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Facebook and Instagram); *Jackson*, 2022 WL 16753197, at *1 (Snap); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021) (TikTok); *Lewis v. Google LLC*, 461 F. Supp. 3d 938, 954 (N.D. Cal. 2020) (YouTube), *aff'd*, 851 Fed. App'x 723 (9th Cir. 2021).

### b) Plaintiffs' Claims Treat Defendants as Publishers.

In applying Section 230, "courts must ask whether the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker.' If it does, section 230(c)(1) precludes liability." *Barnes*, 570 F.3d at 1102 (citing 47 U.S.C. § 230(c)(1)). Courts are guided by "common sense and [the] common definition of what a publisher does." *Id.* Claims targeting a defendant's "reviewing, editing, and deciding whether to publish or to withdraw from publication" content treat it as a publisher. *Id.*; *see also Roommates.Com*, 521 F.3d at 1170–71 (publishing includes "any activity that can be boiled down to deciding whether to exclude material that

third parties seek to post online," which is "perforce immune"); *Anderson*, 2022 WL 14742788, at *4 (publication "involves decisions related to the monitoring, screening, arrangement, promotion, and distribution of [third-party] content"). Here, Plaintiffs claim harm from exposure to content and would treat Defendants as publishers; no amount of artful pleading can change that.

> (1)   *Plaintiffs' Product Liability Claims Would Impose Liability on Defendants as Publishers of User-Generated Content.*

Although Plaintiffs frame their claims as targeting various "features" of Defendants' services, the claims—and their alleged injuries—all depend on user content presented on the services. Indeed, many allegations in the Master Complaint expressly challenge specific forms of purportedly harmful content. *See, e.g.*, MC ¶ 88 ("'idealized' content" allegedly causes negative social comparisons); *id.* ¶ 114 ("thinspiration" and "fitspiration" content allegedly lowers users' self-esteem); *id.* ¶¶ 125–32 ("online challenges or dares" allegedly lead users to take risky actions); *id.* ¶¶ 316, 513–14 (edited images allegedly foster "unrealistic body image standards"); *id.* ¶ 500 (chat features allegedly allow users to "send photos depicting deviant behavior"); *id.* ¶¶ 351, 425, 504, 597, 612, 758 (users allegedly encounter "harmful content"). Claims based on Plaintiffs' exposure to such material on Defendants' services are barred by Section 230. *See, e.g.*, *Anderson*, 2022 WL 14742788, at *3 (dismissing claim alleging TikTok published and recommended "dangerous and deadly videos and challenges").

Plaintiffs cannot avoid that result with allegations focusing on Defendants' decisions, made through tools and other features, about whether, where, when, and how to present user content. Plaintiffs' own allegations make clear that imposing liability for such features would treat Defendants as publishers of the user-generated content on which Plaintiffs' alleged injuries ultimately depend. Pls. Opp. to Joint Mot. 43. Section 230 bars these claims. *See, e.g.*, *In re Facebook*, 625 S.W.3d at 94 (agreeing with the "unanimous view" that Section 230 bars "claims alleging that defectively designed internet products allowed for transmission of harmful third-party communications").

**Recommendation Algorithms and Content Delivery.** Plaintiffs argue that Defendants are liable under state law for trying to maximize engagement through algorithms. But the "engagement" Defendants allegedly "maximize" is engagement *with user-generated content*. Pls. Opp. to Joint Mot. 4–5; *see, e.g.*, MC ¶ 202 (Meta's "infinite scrolling"); *id.* ¶ 615 (TikTok's "For You Page"); *id.* ¶¶ 731–

35 (YouTube's "AutoPlay" features); *id.* ¶ 496 (Snap's "Spotlight").  And the algorithms Plaintiffs target are merely formulas that work to implement Defendants' decisions about whether, where, when, and how to suggest and present that content.  *See, e.g.*, *id.* ¶¶ 274, 295, 496, 589, 591, 693.

Plaintiffs' complaints about the algorithms would impose liability on Defendants as "publishers" of the content that such algorithms recommend.  They allege, for example, that "Google's algorithm makes it more likely for children to encounter harmful content by pushing them down 'rabbit holes,' which '[lead] viewers to incrementally more extreme videos or topics, which . . . hook them in.'"  *Id.* ¶¶ 758–59; *see also, e.g.*, *id.* ¶ 267 ("Meta's algorithms direct users to alarming and aversive material"); *id.* ¶ 271 (similar); *id.* ¶ 560 (TikTok's algorithm sends users "'ideal' body images and dangerous viral challenges"); *id.* ¶ 597 (similar); *id.* ¶ 523 ("Snapchat's algorithm has recommended inappropriate sexual content to adolescent users").

Controlling authority forecloses these claims.  In *Dyroff*, the Ninth Circuit held that Section 230 immunity applied to claims attacking a service's "algorithms" used to "analyze user posts" and "recommend" third-party content to users, including information leading to the purchase of unlawful heroin.  934 F.3d at 1098.  The court explained that "tools meant to facilitate the communication and content of others" fall within the scope of "publish[ing]" for purposes of Section 230.  *Id.*  A service is thus entitled to "full immunity regardless of the specific edit[orial] process" it uses to organize user content.  *Force*, 934 F.3d at 66–67 (service is a "publisher" of user-generated content when "it uses tools such as algorithms that are designed to match that information with a consumer's interests") (cleaned up); *see also Gonzalez*, 2 F.4th at 896 (platform's use of algorithms promoting ISIS content "does not expose it to liability for content posted by a third-party"); *L.W.*, 2023 WL 3830365, at *5 (using algorithms "to recommend content to users does not forfeit . . . entitlement to Section 230 immunity"); *Anderson*, 2022 WL 14742788, at *3 (Section 230 barred product design claims alleging TikTok's "algorithm 'recommend[s] inappropriate, dangerous, and deadly videos to users'" (emphases omitted)).  The text of Section 230 specifically reflects Congress's aim to protect tools that "filter," "pick," "choose," "digest," and "organize" content.  47 U.S.C. § 230(f)(4)(A)–(C).

Plaintiffs' complaints about features that automatically deliver new content to users would likewise impose liability by treating Defendants as publishers because those features "facilitate the

7

communication and content of others." *Dyroff*, 934 F.3d at 1098; *accord Kimzey*, 836 F.3d at 1070–71. Because "making information more available is, again, an essential part of traditional publishing," allegations that "algorithms make [certain] content more 'visible,' 'available,' and 'usable'" treat services as publishers of that content and are barred by Section 230. *Force*, 934 F.3d at 70 (emphasis omitted). Challenges to the "structure and operation of [a] website," including "features that are part and parcel of [its] overall design and operation," all "reflect choices about what content can appear on the website and in what form" and thus "fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1124 (N.D. Cal. 2016) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016)). That makes sense because "the nature of the alleged design flaw" is "directly related to"—and indeed, inseparable from—"the posting" of content provided by others. *Doe v. Twitter, Inc.*, 555 F. Supp. 3d at 930.

**Networking and Messaging Features Abused By Third-Party Wrongdoers.** The Master Complaint repeatedly alleges that Defendants are subject to liability because their networking and messaging features facilitate connections to and communications by bad actors who may harm minors. *See, e.g.*, MC ¶ 399 ("Facebook's 'People You May Know' feature helps predators connect with underage users"); *id.* ¶¶ 404, 430 (similar for Meta's messaging and location features); *id.* ¶¶ 507, 509 (similar for Snapchat's "Quick Add" and "Snap Map"); *id.* ¶¶ 656, 666 (similar for TikTok's messaging and location features); *id.* ¶ 789 (similar for "child predators" "commenting" on videos on YouTube).

Although Defendants prohibit and continuously work to prevent such abuse, Congress provided that state law cannot impose liability based on their alleged failure to do so. "'Connections' or 'matches' of information and individuals" constitute "publication" under Section 230. *Force*, 934 F.3d at 66–67; *see also, e.g.*, *L.W.*, 2023 WL 3830365, at *4 (claim that Snapchat "Quick Add" friend recommendations tool was "inherently dangerous" defect barred by Section 230). This includes a service recommending accounts because recommendations are based on information voluntarily provided by users, *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124–25 (9th Cir. 2003), including geolocation and mapping features, *see, e.g.*, *Herrick v. Grindr, LLC*, 765 Fed. App'x 586, 591 (2d Cir. 2019) (summary order); *accord Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1270–71 (D.C. Cir. 2019). And communication between users—regardless of the contents of

8

such communications—is "prototypical" user-provided content for which a service is protected by Section 230. *Kimzey*, 836 F.3d at 1266 (cleaned up); *see also Force*, 934 F.3d at 65 (providing Hamas a means "to communicate" and "bringing Hamas' message to interested parties . . . falls within the heartland of what it means to be the 'publisher'" (citation omitted)); *Bride*, 2023 WL 2016927, at *6 (dismissing product liability and negligence claims based on failing to stop "abusive messaging").

Plaintiffs cannot avoid Section 230 by alleging an absence of controls and measures that would have allegedly prevented such communication. Thus, in *Doe v. MySpace, Inc.*, 528 F.3d 413 (5th Cir. 2008), the Fifth Circuit rejected a similar argument that minor plaintiffs would not have been assaulted but for MySpace's "failure to implement measures that would have prevented . . . communicat[ion]" between plaintiffs and their abusers, including age verification. *Id.* at 420. Although those plaintiffs claimed their case was "predicated solely on [the defendant's] failure to implement basic safety measures to protect minors," the court held that was "merely another way of claiming" that MySpace "was liable for publishing the communications" between users and was therefore precluded by Section 230. *Id.* at 420–22; *see also Doe II*, 175 Cal. App. 4th at 569 (similar); *Doe v. Snap,* 2022 WL 2528615, at *14 (Section 230 barred claim that Snapchat "is negligently designed because the application fails to prevent underage users from creating accounts using false birthdays"); *Fields*, 217 F. Supp. 3d at 1124 ("the decision to furnish an account, or prohibit a particular user from obtaining an account, is itself publishing activity").[1]

Likewise, Plaintiffs' claim that Defendants failed to warn users about allegedly known dangers arising from alleged foreseeable abuse of their services by wrongdoers is "intertwined with Defendants' publishing activities and related allegations that they failed to monitor and edit third-party content," *L.W.*, 2023 WL 3830365, *8, and thus must be rejected under Section 230.

***Comments, Likes, and Reactions.*** State law also cannot impose liability on Defendants for tools that allow users to engage with or share content created or developed by others. *See MC* ¶ 76 ("likes, hearts, comments, shares, or reposts"); *id.* ¶ 205 (reactions); *id.* ¶ 315 (likes and comments);

---

[1] Plaintiffs claim that the process to delete an account on Defendants' services is difficult, MC ¶ 362, *see also* Pls. Opp. to Joint Mot. 7–8, but the harm alleged is from the content they encounter from continuing to use the services. Absent "content, there would be no claim." *Estate of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022).

*id.* ¶ 652 ("likes, comments, and other interactions"); *see also* Pls. Opp. to Joint Mot. 6.  A service that allows users to "post comments and respond to comments posted by others" is "[t]he prototypical service qualifying for [Section 230] immunity."  *Kimzey*, 836 F.3d at 1266 (cleaned up).  And Plaintiffs' effort to hold Defendants liable for providing the means by which users respond to user content would undermine a core purpose of the statute:  protecting against lawsuits that "could threaten the freedom of speech."  *Batzel*, 333 F.3d at 1027 (cleaned up); *see also Carafano*, 339 F.3d at 1122.

*Short-Form, Ephemeral, and Private Content.*  Plaintiffs similarly take issue with tools that allow users to create short-form videos, MC ¶¶ 208, 735, send "ephemeral" content, *id.* ¶¶ 229, 284, 469, 491–93, 579, 628, and make "harmful content" private, *id.* ¶¶ 504, 662.  These features implicate core decisions by Defendants as to the format and duration of content they present.  These are "choices about what content can appear on the website and in what form," all of which "fall[s] within the purview of traditional publisher functions."  *Fields*, 217 F. Supp. 3d at 1124 (cleaned up).  Indeed, all publishers provide *some* parameters as to the form of content they publish; a newspaper publishes written articles, not television programs, nor articles beyond a certain length.  Similarly, all publishers must decide the duration for which they will publish content, and to whom (if anyone) that content will be published.  *See, e.g.*, *L.W.*, 2023 WL 3830365, at *4 (dismissing claims focused on Snapchat's "ephemeral design features, specifically the disappearing messages"); *Doe v. Snap*, 2022 WL 2528615, at *14 (Section 230 barred claim Snapchat "is negligently designed . . . because [it] allows messages to automatically delete after a short period of time").  Likewise, Section 230 protects features that allow users to keep certain content private.  *See, e.g.*, *Fields*, 217 F. Supp. 3d at 1128–29 ("[A] number of courts have applied [Section 230] to bar claims predicated on a defendant's transmission of nonpublic messages.").

*Notifications and Metrics.*  Plaintiffs further allege harm from Defendants' use of notifications to alert users when others have engaged with their content or posted new content.  *See* MC ¶ 292 (Meta); *id.* ¶¶ 469, 488 (Snap); *id.* ¶ 628 (TikTok); *id.* ¶ 730 (YouTube).  Among other things, Plaintiffs complain about the frequency and timing of such notifications.  *See, e.g.*, *id.* ¶¶ 3, 79, 292.  But Section 230 bars these claims because "notifications" are "tools meant to facilitate the communication and content of others," and thus a provider "act[s] as a publisher of others' content" when supplying them.  *Dyroff*, 934 F.3d at 1098; *see Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118

10

(N.D. Cal. 2020) (same).  As Plaintiffs' own allegations make clear, they are not harmed by merely receiving a notification.  Rather, they are allegedly harmed because the notifications from Defendants' services purportedly "draw[] back users who are not presently using" the service, leading them to further engage with, or create more, content.  MC ¶ 292, *see also, e.g.*, *id.* ¶¶ 103, 293, 469, 628.

Section 230 similarly bars Plaintiffs' allegation that some Defendants track engagement between users and acknowledge "milestones" or "metrics" in their communications history.  *See id.* ¶¶ 475–87 (describing "Charms," "Trophies," and "Snap Streaks").  As the Ninth Circuit explained, imposing liability on interactive computer service providers for "reduc[ing]" certain "inputs from third parties . . . into a single metric" and furnishing that information to users would impermissibly treat providers as "publishers" under Section 230.  *Kimzey*, 836 F.3d at 1270.  Many online services and games offer "awards" for user engagement, but that does not somehow eliminate Section 230 immunity.  *Doe v. Reddit, Inc.*, 2021 WL 5860904, at *5 (C.D. Cal. Oct. 7, 2021) (provision of "Karma awards" did not strip service of immunity), *aff'd*, 51 F.4th 1137 (9th Cir. 2022), *cert. denied*, 2023 WL 3696135 (U.S. May 30, 2023).

***Filters and Other Effects.***  Plaintiffs challenge features that allow users to layer over, incorporate into, or otherwise alter user content, such as filters, lenses, stickers, emojis, GIFs, and images.  *See, e.g.*, MC ¶¶ 237, 314, 445, 478, 513–14, 649.  Again, however, the harms Plaintiffs allege are based not on those features in isolation, but on Plaintiffs' alleged consumption of content created with those features.  *See, e.g.*, *id.* ¶ 88 ("Defendants' apps provide a continuous stream of these filtered and fake appearances and experiences," which "encourage[s] harmful body image comparisons"); ¶ 315 (harm from "increased interaction and favorable responses to [] filter-edited photos"); ¶ 652 (comparing one's appearance to "filtered images" of "friends and celebrities who use filters"); ¶ 110 (viewing "others' [filtered] selfies" can lead to unrealistic beauty expectations).

Plaintiffs' allegations are thus "directly related to the posting of third-party content."  *Doe v. Twitter, Inc.*, 555 F. Supp. 3d at 930.  Their alleged harms stand in sharp contrast to those alleged in *Lemmon*, where no one claimed harm from content created using the speed filter, and plaintiffs "d[id] not fault Snap in the least for publishing" any such content.  995 F.3d at 1093.  *Lemmon* made clear that plaintiffs "would not be permitted under § 230(c)(1) to fault Snap" for harms caused by users'

11

reactions to third-party content using the filter, which "would treat Snap as a publisher of third-party content." *Id*. at 1093 n.4.  That is exactly what Plaintiffs seek to do here.[2]

(2)     *Plaintiffs' Negligence Per Se Claim Would Impose Liability on Defendants as Publishers of User-Generated Content.*

Plaintiffs' negligence per se claim is predicated on alleged violations of the reporting provisions of the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today ("PROTECT") Act regarding Child Sexual Abuse Material ("CSAM"), 18 U.S.C. §§ 2258A, 2258B and the Children's Online Privacy Protection Act ("COPPA"), 15 U.S.C. § 6501, *et seq*.  MC ¶ 1001. As Defendants have explained, this claim fails as a matter of law because, among other things, Plaintiffs have not pleaded violations of those federal statutes.  *See* Joint Mot. 47–60.

The claim would also run into Section 230 insofar as Plaintiffs do not plead injuries arising from the alleged statutory violations—*i.e.*, an alleged failure to *report* CSAM or to *obtain parental consent* prior to collecting personal information from individuals under 13.  Plaintiffs allege that, "[a]s a result of each of the Defendant's negligence per se, Plaintiffs suffered severe mental harm, leading to physical and mental injury, *from use of and exposure to Defendants' respective social media products*."  MC ¶ 1017 (emphases added).  Section 230 bars this attempt to expand the negligence per se claim beyond CSAM reporting or data collection, to instead cover alleged harms arising from the exposure to user-generated content viewed on Defendants' services—including (as the Ninth Circuit recently confirmed) from purported failure to remove CSAM.  *See Doe #1 v. Twitter, Inc.*, 2023 WL 3220912, at *2 ("the district court correctly ruled that section 230 precluded Plaintiffs from stating a viable claim for possession and distribution of child pornography"); *see also L.W.*, 2023 WL 3830365, at *4 (similar).

c)     **Plaintiffs' Claims Depend on Content Provided By Others.**

Plaintiffs do not (and cannot) allege that the content causing their alleged harms derives from anywhere other than users of Defendants' services.  *See* MC ¶¶ 181, 187, 210, 216, 447, 449, 563, 692.

---

[2] Even if some portion of Plaintiffs' claims could be read to allege harm from the filters, this would not justify imposing liability for filtered content received from other users.  And claims based on the direct use of filters are barred by the First Amendment (*see infra*) and independently fail as a matter of tort law for the reasons set forth in Defendants' prior Joint Motion.

The Master Complaint is replete with allegations about content as the basis for alleged harm.  *See, e.g.*, *id.* ¶ 18 (bemoaning "widespread consumption" of content); *id.* ¶ 210 (describing user-generated posts and photographs available on Facebook and Instagram); *id.* ¶ 444 (explaining that "'Snap' allows users to send and receive . . . messages"); *id.* ¶ 594 (describing tools users use when "they post on TikTok"); *id.* ¶ 692 (acknowledging users post "countless hours of video content" on YouTube).  And Plaintiffs *acknowledge*—as they must—that this content is provided by other users.  *See, e.g.*, *id.* ¶ 110 (noting research suggesting "investment in others' selfies (through likes and comments)" was associated with disordered eating); *id.* ¶¶ 125–26 (highlighting "[d]angerous viral challenges" that "typically involve people recording themselves doing something difficult, which they share online to encourage others to repeat"); *id.* ¶¶ 218, 319 (discussing body image content); *id.* ¶ 762 (referencing user-generated video that allegedly "encouraged suicide").

Plaintiffs do not allege that Defendants provided any of this content.  And Plaintiffs would have no intelligible claims without alleging harm from user content.  A lawsuit alleging addiction to an online service that provided access to no content could not be the basis for any of Plaintiffs' alleged injuries.  No matter how Plaintiffs may try to plead around Section 230, the user-generated content on Defendants' services—and its allegedly harmful nature—is the basis for Plaintiffs' claims to impose liability on Defendants by treating them as publishers of that content.  *Cf. G.G. v. Salesforce.com, Inc.*, 603 F. Supp. 3d 626, 638 (N.D. Ill. 2022) ("Although Plaintiffs try to frame their claims in terms of Salesforce's actions . . . Plaintiffs do not contend that they would have a claim against Salesforce regardless of what was posted to Backpage.").

Defendants' provision of tools allowing users to make or alter content, or to enable Defendants to more effectively disseminate that content to other users, does not change the origin of that content.  *See* 47 U.S.C. § 230(f)(3) (the "information content provider" is the "person or entity that is responsible, in whole or in part, for the creation or development of information").  The Ninth Circuit's decisions in *Kimzey* and *Dyroff* are dispositive.  *Kimzey* rejected claims that Yelp's star rating feature for establishments transformed individual users' ratings into Yelp's own content.  836 F.3d at 1270.  It further held that imposing liability for alleged promotion of such reviews through "downstream distribution" was barred by Section 230 because "proliferation and dissemination of content does not

13

equal creation or development of content." *Id.* at 1270–71. *Dyroff* confirmed that "features and functions" provided by interactive computer services, such as "algorithms," "recommendations[,] and notifications," are "tools meant to facilitate the communication and content of others," and not "content in and of themselves." 934 F.3d at 1098.[3] Because Plaintiffs allege harms arising from content supplied by users, and because providing users with tools to create or share such content does not transform user content into Defendants' own, Plaintiffs' claims are barred by Section 230.

### B. Plaintiffs' Claims Are Barred By the First Amendment.

Apart from Section 230, Plaintiffs' claims are barred by the First Amendment. Plaintiffs allege that Defendants' services are defective because of the allegedly harmful consequences of the speech they make available or the choices Defendants have made in disseminating it. But the First Amendment protects Defendants' judgments about what speech to present and how to present it—and it rules out Plaintiffs' effort to subject those judgments to state tort liability.

### 1. The First Amendment Precludes Tort Liability for Protected Speech, Including Choices About Presenting and Disseminating Content.

The First Amendment prohibits civil claims that would impose liability on constitutionally protected speech and those who disseminate it. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *accord James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002). Civil liability, after all, is "a form of regulation" that can create "hazards to protected freedoms markedly greater than those that attend reliance upon the criminal law." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 278 (1964) (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963)); *accord Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 178–79 (D. Conn. 2002) ("the State of Connecticut cannot provide a remedy, either by its

---

[3] Other courts have held the same. *See, e.g.*, *Force*, 934 F.3d at 70 ("arranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the 'develop[er]' or 'creat[or]' of that content"); *Bride*, 2023 WL 2016927, at *6 (rejecting argument that Snap became content developer "by designing applications in which posting users remain anonymous, thereby promoting bullying on their platforms"); *Callahan v. Ancestry.com Inc.*, 2021 WL 783524, at *6 (N.D. Cal. Mar. 1, 2021) ("Adding an interactive button and providing access on a different platform do not create content. They just add functionality."); *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 589 (S.D.N.Y. 2018) (service providers "may not be held liable for . . . "tools and functionality that are available equally to bad actors and the app's intended users"), *aff'd*, 765 Fed. App'x 586.

common law or by statute, that violates Midway's free speech rights").  Because the "fear of damage awards" can "be markedly more inhibiting than the fear of prosecution," *N.Y. Times*, 376 U.S. at 277, courts have recognized the "devastatingly broad chilling effect" of tort claims based on protected speech and routinely dismiss such claims, including at the pleadings stage.  *Watters v. TSR, Inc.*, 715 F. Supp. 819, 822 (W.D. Ky. 1989), *aff'd*, 904 F.2d 378 (6th Cir. 1990).

Numerous cases have applied the First Amendment to reject tort claims targeting speakers or publishers of material alleged to have harmed those exposed to it:

- *Herceg v. Hustler Mag., Inc.*, 814 F.2d 1017 (5th Cir. 1987): Barring claim by parents of minor who accidentally hanged himself after reading article describing similar act.

- *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989 (1988): Barring claims against publisher of heavy metal music where songs allegedly drove listener to suicide.

- *Olivia N. v. Nat'l Broad. Co.*, 126 Cal. App. 3d 488 (1981): Barring claims alleging minor was sexually assaulted by others imitating scene from television movie defendants aired.

- *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167 (D. Conn. 2002): Barring claim alleging addictive and violent nature of video game caused stabbing by minor.

- *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264 (D. Colo. 2002): Barring claims by victims of school shooting against publishers of violent video games.

- *Davidson v. Time Warner, Inc.*, 1997 WL 405907 (S.D. Tex. Mar. 31, 1997): Barring claims against distributors of rap album that allegedly inspired listener to kill police officer.

- *Watters v. TSR, Inc.*, 715 F. Supp. 819 (W.D. Ky. 1989): Barring claims that role-playing game exerted "mind control" resulting in player's suicide.

- *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199 (S.D. Fla. 1979): Barring claim alleging violent programming led minor to kill his neighbor.

- *DeFilippo v. Nat'l Broad. Co.*, 446 A.2d 1036 (R.I. 1982): Barring claim alleging minor killed himself emulating a simulated hanging from a television show.

- *Walt Disney Prods., Inc. v. Shannon*, 276 S.E.2d 580 (Ga. 1981): Barring claim that 11-year-old hurt himself copying activity he saw on Disney's television program.

15

DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

These courts recognized the serious threats to free expression that would result from imposing liability on the publication of allegedly harmful, but constitutionally protected, speech. *See Davidson*, 1997 WL 405907, at \*22 ("This self-censorship not only would affect broadcasters, who would be chilled into producing only the most mundane, least emotional material" but "would also prevent listeners from accessing important social commentary"); *see also, e.g.*, *Watters*, 715 F. Supp. at 822; *Zamora*, 480 F. Supp. at 203. Outside of a "few limited areas," such as defamation, incitement, fighting words, obscenity, and child pornography, the First Amendment's protections apply to speech, no matter "its subject matter, or its content . . . and has never included a freedom to disregard these traditional limitations.'" *Brown*, 564 U.S. at 790–91 (cleaned up).

These protections apply beyond the *creation* of speech. The First Amendment does not "require a speaker to generate, as an original matter, each item featured in the communication." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 570 (1995). It also protects the dissemination and curation of speech by others, including "the exercise of editorial control and judgment" over such content—whether by traditional publishers, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974), electronic media providers, *see Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 636 (1994), or by online services that present user-generated content, *NetChoice, LLC v. Att'y Gen., Fla.*, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022), *cert. pet'ns filed*, Nos. 22-277, 22-393; *see also Zhang v. Baidu.com Inc.*, 10 F. Supp. 3d 433, 439–40 (S.D.N.Y. 2014) ("When search engines select and arrange others' materials . . . they are engaging in fully protected First Amendment expression"). Simply put, "the presentation of an edited compilation of speech generated by other persons . . . fall[s] squarely within the core of First Amendment security." *Hurley*, 515 U.S. at 570. Thus, all such claims are prohibited; "[w]hether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1.

These constitutional protections fully apply here. "At their core," Defendants' services "collect speech created by third parties . . . and then make that speech available to others." *NetChoice*, 34 F.4th at 1203–04. That requires them to exercise "editorial judgment," including "arrang[ing] available content by choosing how to prioritize and display posts—effectively selecting which users' speech the viewer will see, and in what order, during any given visit to the site." *Id*. at 1204. No less than with

16

traditional media, when services "like Facebook, Twitter, YouTube, and TikTok" . . . 'disclos[e],' 'publish[],' or 'disseminat[e]' information, they engage in 'speech within the meaning of the First Amendment.'" *Id*. at 1210; *see also O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022) ("Twitter makes decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment."), *aff'd sub nom.*, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023).

Courts have repeatedly held that the First Amendment protects against legal actions that seek to dictate how online services disseminate or curate content. *See Reno v. ACLU*, 521 U.S. 844, 874–79 (1997) (invalidating law limiting dissemination of "indecent" and "offensive" speech to minors); *NetChoice*, 34 F.4th at 1210–12 (enjoining law restricting social media services' content moderation policies); *O'Handley*, 579 F. Supp. 3d at 1187–88 (dismissing tort claims because "Twitter has important First Amendment rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies"). The Supreme Court has admonished that courts "must exercise extreme caution before suggesting that the First Amendment provides scant protection" in this area. *Packingham*, 582 U.S. at 105.

### 2. Plaintiffs' Claims Would Hold Defendants Liable for Protected Speech.

These established First Amendment protections bar Plaintiffs' claims, which would hold Defendants liable for the dissemination and curation of speech. Whether Plaintiffs allege harm directly from specific objectionable content or cumulative harm from features that allegedly make speech too engaging or readily accessible, the claims necessarily would impose liability on Defendants based on constitutionally protected activity.

Despite Plaintiffs' assertions that this case is not about content, the Master Complaint is rife with allegations that Plaintiffs were "exposed to" a range of problematic content displayed on Defendants' services. *See supra* p. 7. These allegations unambiguously challenge speech and seek to impose liability on Defendants for alleged harms from Defendants' dissemination of it. That runs squarely into the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011) ("[C]reation and dissemination of information are speech within the meaning of the First Amendment."); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) ("[I]f the acts of 'disclosing' and

17

'publishing' information do not constitute speech, it is hard to imagine what does fall within that category." (cleaned up)); *ETW Corp. v. Jireh Pub., Inc.*, 332 F.3d 915, 925 (6th Cir. 2003) ("Publishers disseminating the work of others who create expressive materials also come wholly within the protective shield of the First Amendment.").

As with Section 230, Plaintiffs cannot evade the First Amendment by directing attention away from specific kinds of allegedly problematic content and toward allegedly defective "features" of Defendants' services.  Courts routinely reject similar efforts to disguise attacks on speech by focusing on how it is presented or recommended and the alleged effects of that presentation.  *See, e.g.*, *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1007 (1982) (rejecting argument that failure to warn claim did "not seek to impose liability on the basis of the content of the motion picture" because if showing the movie "attract[ed] violence-prone persons to the vicinity of the theater, it is precisely because of the film's content"); *Estate of B.H.*, 2022 WL 551701, at *3 & n.3 (allegations that algorithms manipulated viewers "into watching content that was deeply harmful to them" were about speech because "[w]ithout the content, there would be no claim" (cleaned up)).  So too here, the allegedly "addictive" or defective features of Defendants' services that Plaintiffs target are tools for creating, curating, and disseminating speech—and Plaintiffs' claims arise precisely because of how those tools purportedly are used to amplify, encourage, or present speech.  Indeed, without reference to the speech generated or made available through those features, Plaintiffs' alleged injuries are inexplicable.  Plaintiffs do not suggest that they would be harmed by an endless scroll of blank boxes or that tools used to alert users about approved public service announcements could have caused the adverse mental health outcomes they assert.

But even if Plaintiffs' allegations were not premised on specific kinds of harmful content, their effort to impose liability on Defendants based on how their tools facilitate publication and editorial choices would still be barred by the First Amendment.

**Recommendation Algorithms and Content Delivery.**  As discussed above, Plaintiffs allege that Defendants seek to "maximize engagement" by using algorithms that determine whether, where, when, and how to present specific content to users.  But these algorithms reflect choices about how to present and arrange speech, *see Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1227 (2023), and "fall squarely

within the core of First Amendment security," *Hurley*, 515 U.S. at 570.  The editorial choices of online services are no less protected than when a newspaper decides what story to run on its front page, a TV network arranges its primetime lineup, or a concert promoter picks which bands will play when and on what stages.  *See NetChoice*, 34 F.4th at 1204–05.  Plaintiffs' assertion that Defendants are liable for displaying or recommending speech, because doing so makes that material more appealing, engaging, or likely to be viewed, is to *describe* the First Amendment problem, not to escape it.

The same is true of features that allegedly cause users to view more content by curating new material to display or offering an "endless scroll" of content.  Like the algorithmic curation functions to which they are linked, these features reflect Defendants' expressive choices in "selecting which users' speech the viewer will see, and in what order."  *NetChoice*, 34 F.4th at 1204.  They are akin to similar choices made by publishers:  broadcasters air shows in a continuous fashion 24 hours a day, 7 days a week; a film festival might program marathon screenings lasting for days.  Plaintiffs' attacks on Defendants' tools—that they bring to users' attention speech that could be risky or disseminate "excessive" speech that gives users "too much" information—would "shackle the First Amendment in its attempt to secure the widest possible dissemination of information from diverse and antagonistic sources."  *N.Y. Times*, 376 U.S. at 266.  That Plaintiffs cannot draw a meaningful line between what amount of speech is "too much" and what supposedly would be acceptable underscores the constitutional problem.

***Comments, Reactions, and Filters.***  Plaintiffs target Defendants' tools that allow users to speak to one another, whether by endorsing or responding to content posted by others or otherwise creating or modifying their own expression (including with visual effects that change the look of images).  Imposing liability for enabling users to create new speech, or using tools that facilitate interactive speech, would violate the First Amendment.  *See W. Watersheds Project v. Michael*, 869 F.3d 1189, 1196 (10th Cir. 2017) ("If the creation of speech did not warrant protection under the First Amendment, the government could bypass the Constitution by simply proceeding upstream and damming the source of speech." (cleaned up)).  That some of these tools use symbols or emojis makes them no less protected.  *See Bland v. Roberts*, 730 F.3d 368, 385–86 (4th Cir. 2013) (Facebook's "like" button "constituted pure speech" and "symbolic expression").

Plaintiffs allege that these features make the process of creating or viewing content on Defendants' services more engaging, including by giving users incentives to create more content (and see more likes and comments), which leads, in Plaintiffs' view, to excessive use.  MC ¶¶ 70–74, 86, 124, 261, 519, 630.  This is a direct attack on speech:  "That the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers."  *Sorrell*, 564 U.S. at 578.  Whether through tort law or otherwise, the State cannot stop what some view as too much speech by imposing liability on tools that make speech possible or more likely.  *See id*. at 577 ("In an attempt to reverse a disfavored trend in public opinion, a State could not ban campaigning with slogans, picketing with signs, or marching during the daytime.").  And insofar as Plaintiffs focus on how such tools make engaging with speech more *interactive*, and thus more harmful in their view, the Supreme Court has expressly rejected that rationale for trying to evade the First Amendment.  *See Brown*, 564 U.S. at 798.

Similarly, Plaintiffs' challenge filters and photo-editing tools that generate content precisely because of the message they allegedly help convey (that young people "are only attractive when their images are edited," MC ¶ 315) and the "increased interaction and favorable responses" they generate, *id*. ¶ 321.  Such claims aim directly at protected expression, attacking "the process of creating a form of pure speech."  *Anderson v. City of Hermosa Beach*, 621 F.3d 1051, 1061 (9th Cir. 2010) (emphasis omitted).  The First Amendment bars this claim, just as it would bar analogous claims against magazines or fashion photographers that use camera and lighting effects, Photoshop, and other tools to publish idealized images of models or celebrities.  *See, e.g.*, *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1183 (9th Cir. 2001) (First Amendment protected magazine's use of "computer technology to alter famous film stills" for fashion photography spread).

***Notifications and Metrics.***  Plaintiffs complain that Defendants provide users information about their activity on the services, such as Snapchat letting users know they are on "streaks" of communicating with each other, MC ¶¶ 470–87, or services showing how many "views" a post has received, *id*. ¶¶ 236, 313, 633, or notifying users about new content or commentary on their posts, *id*. ¶¶ 285, 292, 488, 628, 730.  But dissemination of factual information is fully protected by the First Amendment.  *Sorrell*, 564 U.S. at 568–70.  And, as with the features above, Plaintiffs fault these messages primarily because they allegedly entice creators to generate and view more speech.  MC

20

¶¶ 124, 474.  The First Amendment precludes liability for such claims, just as it would prohibit claims seeking to limit audience applause or notes of encouragement because the positive feedback may compel artists to create or perform more.  *See Sorrell*, 564 U.S. at 577; *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002) ("First Amendment freedoms are most in danger when the government seeks to control thought or to justify its laws for that impermissible end.").[4]

   ***Short-Form and Ephemeral Content.***  Plaintiffs fault some Defendants for offering platforms for short videos, MC ¶¶ 208, 735, and others for facilitating "ephemeral" content, *id.* ¶¶ 229, 284, 469, 491–93, 579, 628.  But just as the First Amendment protects choices about the "size and content" of speech, *Tornillo*, 418 U.S. at 258, it protects choices to publish short videos rather than long ones and content that may disappear after a certain time.  *Cf. NetChoice*, 34 F.4th at 1210 (when a platform removes content, "it makes a judgment about whether and to what extent it will publish information to its users—a judgment rooted in the platform's own views about the sorts of content and viewpoints that are valuable and appropriate for dissemination on its site").  That is all the more so because Plaintiffs are challenging Defendants' choices about how to make speech engaging; they claim, for example, that presenting shorter videos can prevent users from becoming "bored by long videos."  MC ¶ 289.  Premising tort liability on such choices is akin to government regulation that would limit the distribution of music "singles" in favor of full albums or cap the number of levels in video games, lest such material encourage protracted consumption.  *See Sorrell*, 564 U.S. at 577–78 (First Amendment protects "catchy jingles" because "[t]hat the State finds expression too persuasive does not permit it to quiet the speech or to burden its messengers").

---

[4] Insofar as Plaintiffs suggest that these displays are not just factual, but work to create additional incentives for users to create or view content or communicate with one another, that would equally seek to impose liability on protected speech.  *See, e.g.*, *Candy Lab Inc. v. Milwaukee Cnty.*, 266 F. Supp. 3d 1139, 1146–47 (E.D. Wis. 2017) (holding that "augmented reality" mobile game, which "display[ed] card locations on a map on the user's phone, which the user must then physically navigate to and 'grab' using the phone's camera" qualifies as "protectable speech"); *cf. Brown*, 564 U.S. at 790 (video games are pure speech).

### 3.    There Is No First Amendment Exception That Permits Plaintiffs' Claims.

Plaintiffs identify no exception that would permit their claims to proceed without violating the First Amendment.  While Plaintiffs allege that Defendants should have known that some of the content conveyed through their services could harm some users, this case largely does not involve material that falls within the "narrowly limited classes of speech" that fall outside the First Amendment.[5]  *United States v. Stevens*, 559 U.S. 460, 468–69 (2010) (cleaned up).  Plaintiffs target Defendants' dissemination of depictions of "idealized" bodies, MC ¶¶ 88, 513, 736, digitally retouched images, *id.* ¶ 316, videos of "shocking bike race crashes," *id.* ¶ 758, images of "underage alcohol consumption, and illicit use of narcotics," *id.* ¶ 500, and "online challenges or dares," *id.* ¶¶ 125–32.  None of this is incitement or "fighting words," *Cohen v. California*, 403 U.S. 15, 20 (1971); *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969), "true threats," *Virginia v. Black*, 538 U.S. 343, 359–60 (2003), obscenity, *Miller v. California*, 413 U.S. 15, 24–26 (1973), or any other kind of unprotected speech.  *See Free Speech Coal.*, 535 U.S. at 253 ("The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it.").  Users have a right to receive this speech free from government incursion, and Plaintiffs' theories would impermissibly hold Defendants liable for disseminating it.  *See Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 743 (9th Cir. 2021) ("The First Amendment protects speech for the sake of both the speaker and the recipient."); *Powell's Books, Inc. v. Kroger*, 622 F.3d 1202, 1215 (9th Cir. 2010) ("By restricting the dissemination and use of non-obscene material, the statutes trench on the First Amendment rights of minors and adults alike.").

Plaintiffs' contentions that such speech may be psychologically distressing or damaging does not overcome the First Amendment's protections.   "Speech remains protected even when it may . . . inflict great pain." *Sorrell*, 564 U.S. at 576 (cleaned up).  "The First Amendment protects lots of speech that is substantially emotionally distressing." *United States v. Yung*, 37 F.4th 70, 77 (3d Cir. 2022); *see also, e.g.*, *Snyder*, 562 U.S. at 458 (First Amendment barred claim based on "outrageous" speech that inflicted severe emotional distress); *Mashaud v. Boone*, 2023 WL 3875308, at *11 (D.C.

---

[5] CSAM, for example, is not protected by the First Amendment.  But Section 230 immunity applies to claims of harm that would treat interactive computer service providers as publishers of CSAM, as discussed above.

Ct. App. June 8, 2023) ("A statute that prohibits speech indiscriminately based solely on its propensity for causing such distress is a constitutional nonstarter."); *McCollum*, 202 Cal. App. 3d at 1001–03 (lyrics protected even where they allegedly encouraged and caused plaintiff's suicide). "Any other answer leaves the government in control of all of the institutions of culture, the great censor and director of which thoughts are good for us." *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 330 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

The same is true of allegations that Defendants' services are "addictive" or psychologically manipulative. There is no First Amendment exception for "addictive" or "catchy" speech, *Sorrell*, 564 U.S. at 577–78, and courts have refused to limit First Amendment protection based on allegations about the psychological effects of speech, *see, e.g.*, *Brown*, 564 U.S. at 798 (rejecting argument that video games are less protected because they are "interactive"); *Wilson*, 198 F. Supp. 2d at 182 (First Amendment applied despite allegation that video game producer "intended to addict players, and knew or should have known that its conduct would bring about harm"); *Watters*, 715 F. Supp. at 820–21, 823 (same, despite allegation that minor "became totally absorbed by and consumed with the game to the point that he was incapable of separating the fantasies played out in the game from reality"); *Zamora*, 480 F. Supp. at 200 (same, despite allegations that minor had "become involuntarily addicted to and 'completely subliminally intoxicated' by the extensive viewing of television violence"). As the Supreme Court has made clear, "new categories of unprotected speech may not be added to the list by a legislature that concludes certain speech is too harmful to be tolerated." *Brown*, 564 U.S. at 791.

In sum, just as allegations of addiction or "mind control" do not give the government or private plaintiffs license to censor or penalize the dissemination of comic books, video games, or music videos, *Watters*, 715 F. Supp. at 821, such allegations do not justify suppressing speech here. To the contrary, "[i]f the fact that speech plays a role in a process of conditioning were enough to permit governmental regulation, that would be the end of freedom of speech." *Hudnut*, 771 F.2d at 330.

### 4. The First Amendment Protects Speech By and To Minors.

The Supreme Court has made clear that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. Jacksonville*, 422 U.S. 205, 214 (1975). "[O]nly in relatively narrow and well-defined circumstances

23

may government bar public dissemination of protected materials" to minors. *Brown*, 564 U.S. at 794 (quoting *Erznoznik*, 422 U.S. at 212–13). Thus, while an established category of unprotected speech (like obscenity) can be "adjust[ed]" to "ensure that a definition designed for adults is not uncritically applied to children," the Supreme Court has flatly rejected the idea that courts can create "wholly new categor[ies] of content-based regulation . . . only for speech directed at children." *Id.*

Indeed, Plaintiffs' claims are "the latest episode in a long series of failed attempts to censor [] entertainment for minors"—from dime novels, to movies, to comic books and violent video games— whether because they were thought to cause juvenile delinquency, foster a "'preoccupation with violence and horror' among the young," lead to increased crime, or "corrupt the young or harm their moral development." *Brown*, 564 U.S. at 797, 804. But because states do not have "free-floating power to restrict the ideas to which children may be exposed," *id.* at 794–95, courts have rejected efforts to restrict speech in the name of protecting children, *see id.* (invalidating law restricting minors' access to violent video games); *Reno*, 521 U.S. at 874 (invalidating law aimed at prohibiting dissemination of harmful speech to minors); *Powell's Books*, 622 F.3d at 1206–07 (invalidating laws prohibiting "luring" minors by providing them with sexually explicit materials). That is so even where certain experts have opined on a "significant risk" that certain kinds of speech "are particularly likely to cause children harm." *Brown*, 564 U.S. at 853 (Alito, J., dissenting). "Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them." *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213–14).

These principles apply even more strongly to tort suits. As the Sixth Circuit explained in addressing a case alleging that negligent distribution of harmful content to "impressionable youth" led to catastrophic violence, it is even *less* permissible for courts to restrict speech through free-wheeling tort liability than it would be for the political branches to draft a tailored law regulating it:

> We cannot adequately exercise our responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability. Crucial to the safeguard of strict scrutiny is that we have a clear limitation, articulated in the legislative statute or an administrative regulation, to evaluate. 'Whither our children,' . . . is an important question, but their guidance through the regulation of protected speech should be directed in the first instance to the legislative and executive branches of state and federal governments, not the courts.

*James*, 300 F.3d at 697; *see also Sanders*, 188 F. Supp. 2d at 1281 (noting courts are "particularly wary of governmental restrictions . . . that rest on a common law concept of the most general and undefined nature" (cleaned up)).  These concerns are especially acute when, as here, claims turn on speculation about the causal effects of speech on child development.  *Cf. Brown*, 564 U.S. at 799–800.

That is why courts apply the First Amendment to bar such claims.  In *Sanders*, for example, the plaintiffs asserted that two high school students, who were "fanatical and excessive consumers" of violent video games and sexually explicit movies, were conditioned by that material to see violence as "pleasurable and attractive."  188 F. Supp. 2d at 1268–70.  Dismissing claims against the game and movie distributors on First Amendment grounds, the court rejected the plaintiffs' argument that "the right to free speech of children may be restricted in a reasonable manner."  *Id*. at 1281; *accord Zamora*, 480 F. Supp. at 206 (rejecting argument that "unspecified 'violence' projected periodically over television . . . can provide the support for a claim for damages where a susceptible minor has viewed such violence and where he has reacted unlawfully"); *cf. Shannon*, 276 S.E.2d at 583 ("Although it can be said that what the defendants allegedly invited the child to do in this case posed a foreseeable risk of injury, it cannot be said that it posed a clear and present danger of injury.").  In short, "the First Amendment precludes censorship of programming content even where the restraint is designed to protect children."  *Olivia N.*, 126 Cal. App. 3d at 494.

Here, Plaintiffs seek to impose liability on protected speech and the choices Defendants make in disseminating that speech.  In Plaintiffs' view, such liability is warranted because that speech and the ways it is presented may distress *some* of the billions of users of Defendants' services—no matter that those same services and same speech-facilitating features benefit countless other (or even most) users, including many isolated and vulnerable minors.  Plaintiffs' anguish is not to be diminished, but their claims run into the "most basic" First Amendment principle: "government has no power to restrict protected expression because of its message, its ideas, its subject matter, or its content."  *Brown*, 564 U.S. at 790–91 (quoting *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002)).

## IV.   CONCLUSION

For the reasons set forth above and in Defendants' Joint Motion, Plaintiffs' priority claims should be dismissed.

Dated:  June 27, 2023                              Respectfully submitted,


                                                  **COVINGTON & BURLING LLP**

                                                  */s/ Beth S. Brinkmann*
                                                  Beth S. Brinkmann (State Bar No. 129937)
                                                    bbrinkmann@cov.com
                                                  Mark W. Mosier, *pro hac vice*
                                                    mmosier@cov.com
                                                  Paul W. Schmidt, *pro hac vice*
                                                    pschmidt@cov.com
                                                  Phyllis A. Jones, *pro hac vice*
                                                    pajones@cov.com
                                                  COVINGTON & BURLING LLP
                                                  One CityCenter
                                                  850 Tenth Street, NW
                                                  Washington, DC 20001
                                                  Telephone: + 1 (202) 662-6000
                                                  Facsimile: + 1 (202) 662-6291

                                                  Emily Johnson Henn (State Bar No. 269482)
                                                    ehenn@cov.com
                                                  COVINGTON & BURLING LLP
                                                  3000 El Camino Real
                                                  5 Palo Alto Square, 10th Floor
                                                  Palo Alto, CA 94306
                                                  Telephone: + 1 (650) 632-4700
                                                  Facsimile: +1 (650) 632-4800

                                                  *Attorneys for Defendants Meta Platforms, Inc.*
                                                  *f/k/a Facebook, Inc.; Facebook Holdings, LLC;*
                                                  *Facebook Operations, LLC; Facebook Payments,*
                                                  *Inc.; Facebook Technologies, LLC; Instagram,*
                                                  *LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

**KING & SPALDING LLP**

*/s/ Geoffrey M. Drake*

Geoffrey M. Drake, *pro hac vice*
  gdrake@kslaw.com
Albert Q. Giang (State Bar No. 224332)
  agiang@kslaw.com
David Mattern, *pro hac vice*
  dmattern@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: + 1 (404) 572-4600
Facsimile: + 1 (404) 572-5100


**FAEGRE DRINKER LLP**

*/s/ Andrea Roberts Pierson*

Andrea Roberts Pierson, *pro hac vice*
  andrea.pierson@faegredrinker.com
Amy Fiterman, *pro hac vice*
  amy.fiterman@faegredrinker.com
Faegre Drinker LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000


*Attorneys for Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC*


**MUNGER, TOLLES & OLSON LLP**

*/s/ Jonathan H. Blavin*

Jonathan H. Blavin (State Bar No. 230269)
  Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105
Telephone: + 1 (415) 512-4000
Facsimile: + 1 (415) 512-4077

Rose L. Ehler (State Bar No. 296523)
  Rose.Ehler@mto.com
Victoria A. Degtyareva (State Bar No. 284199)

27

Victoria.Degtyareva@mto.com
Ariel T. Teshuva  (State Bar No. 324238)
 Ariel.Teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA  90071
Telephone: + 1 (213) 683-9100
Facsimile: + 1 (213) 687-3702

Lauren A. Bell, *pro hac vice*
 Lauren.Bell@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW,
Suite 500 E
Washington, D.C. 20001
Telephone: + 1 (202) 220-1100
Facsimile: + 1 (202) 220-2300

*Attorneys for Defendant Snap Inc.*


**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**


 */s/ Brian M. Willen*
Brian M. Willen, *pro hac vice*
Wilson Sonsini Goodrich & Rosati
 bwillen@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: + 1 (212) 999-5800
Facsimile: + 1 (212) 999-5899

Lauren Gallo White (State Bar No. 309075)
Wilson Sonsini Goodrich & Rosati
 lwhite@wsgr.com
Andrew Kramer (State Bar No. 321574)
 akramer@wsgr.com
Carmen Sobczak (State Bar No. 342569)
 csobczak@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA  94105
Telephone: + 1 (415) 947-2000
Facsimile: + 1 (415) 947-2099

Christopher Chiou (State Bar No. 233587)
Wilson Sonsini Goodrich & Rosati
 cchiou@wsgr.com

28

Samantha Machock (State Bar No. 298852)
  smachock@wsgr.com
Matthew K. Donohue (State Bar No. 302144)
  mdonohue@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071
Telephone: + 1 (323) 210-2900
Facsimile: + 1 (866) 974-7329

*Attorneys for Defendants YouTube, LLC,*
*Google LLC, and Alphabet Inc.*

DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR

1

## ATTESTATION

2       I, Beth S. Brinkmann, hereby attest, pursuant to N.D. Cal. Civil L.R. 5–1, that the concurrence

3   to the filing of this document has been obtained from each signatory hereto.

4

5   DATED:       June 27, 2023              By:   */s/ Beth S. Brinkmann*
                                                  Beth S. Brinkmann
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL JOINT MOTION TO DISMISS PLAINTIFFS' PRIORITY CLAIMS
ASSERTED IN AMENDED MASTER COMPLAINT — CASE NO. 4:22-MD-03047-YGR