[*Submitting Counsel on Signature Page*]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 4:22-md-03047-YGR<br><br>MDL No. 3047 |
| This Document Relates to:<br><br>ALL ACTIONS | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' SUPPLEMENTAL MOTION TO DISMISS PURSUANT TO RULE 12(b)(6) PLAINTIFFS' PRIORITY CLAIMS UNDER SECTION 230 AND THE FIRST AMENDMENT**<br><br>Judge Yvonne Gonzalez Rogers |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ....................................................................................................... 2

      A.    Section 230 does not bar Plaintiffs' priority claims............................... 2

            1.    Section 230 bars claims that seek to impose derivative liability for
                  the content of third-party posts. ................................................... 3

            2.    Plaintiffs' claims do not seek to impose derivative liability for the
                  content of third-party posts. ......................................................... 7

                  a.    Counts 1-4 (products liability) do not treat Defendants as
                        the publishers of third-party content. .............................. 7

                        i.    Defendants' attempt to distinguish Lemmon misses
                              its mark.............................................................. 8

                        ii.   Defendants' out-of-circuit cases are inapposite. .............. 10

                        iii.  Plaintiffs seek to hold Defendants responsible for
                              their products' defective features, not third-party
                              content. .............................................................. 11

                  b.    Count 10 (negligence per se) does not treat Defendants as
                        the publishers of third-party content. .............................. 14

      B.    The First Amendment does not protect Defendants' conduct............................ 14

            3.    The First Amendment does not prevent liability for designing a
                  defective product – even when the defective product touches upon
                  speech. ................................................................................. 16

            4.    Defendants do not have a First Amendment right to distribute
                  dangerous products. ................................................................. 19

                  a.    Defendants are wrong that holding them liable for their
                        defective and dangerous products would interfere with free
                        expression............................................................... 19

                  b.    Defendants are wrong that Plaintiffs' claims would
                        unconstitutionally impinge on their editorial judgment................. 21

                  c.    Defendants fail to mount any viable First Amendment
                        defense to Plaintiffs' failure to warn and negligence per se
                        claims. ................................................................. 22

                  d.    The challenged features of Defendants' products do not
                        constitute protected speech. ......................................... 23

            5.    First Amendment questions cannot be resolved in Defendants'
                  favor on a motion to dismiss. ..................................................... 25

III.  CONCLUSION ................................................................................................ 25

# TABLE OF AUTHORITIES

Page

### Cases

*303 Creative LLC v. Elenis*,
143 S. Ct. 2298 (2023) ................................................................................................ 21

*A.M. v. Omegle.com, LLC*,
614 F. Supp. 3d 814 (D. Or. 2022) ..................................................................... 6, 7, 13

*Airbnb, Inc. v. City and County of San Francisco*,
217 F. Supp. 3d 1066 (N.D. Cal. 2016) .......................................................................... 8

*Allen v. Am. Cyanamid*,
527 F. Supp. 3d 982 (E.D. Wis. 2021) .................................................................. 19, 22

*Anderson v. City of Hermosa Beach*,
621 F.3d 1051 (9th Cir. 2010) ...................................................................................... 24

*Anderson v. TikTok, Inc.*,
2022 WL 14742788 (E.D. Pa. 2022) ...................................................................... 7, 11

*Assoc. Press v. United States*,
326 U.S. 1 (1945) .......................................................................................................... 22

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ............................................................................... passim

*Batis v. Dun & Bradstreet Holdings, Inc.*,
2023 WL 1870057 (N.D. Cal. Feb. 9, 2023) ......................................................... 16, 25

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ........................................................................................ 5

*Bill v. Superior Court*,
137 Cal. App. 3d 1002 (1982) ...................................................................................... 18

*Bland v. Roberts*,
730 F.3d 368 (4th Cir. 2013) ........................................................................................ 23

*Bride v. Snap, Inc.*,
2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ................................................................. 8

*Brown v. Entertainment Merchants Association*,
564 U.S. 786 (2011) ...................................................................................................... 20

*Burton v. E.I. du Pont de Nemours & Co.*,
994 F.3d 791 (7th Cir. 2021) ........................................................................................ 19

*Candy Lab Inc. v. Milwaukee County*,
266 F. Supp. 3d 1139 (E.D. Wis. 2017) ....................................................................... 20

*Carafano v. Metrosplash.com, Inc.*,
339 F.3d 1119 (9th Cir. 2003) ........................................................................................ 5

*CI Games S.A. v. Destination Films*,
2016 WL 9185391 (C.D. Cal. Oct. 25, 2016) .............................................................. 25

*City of Annapolis v. BP P.L.C.*,
2022 WL 4548226 (D. Md. Sept. 29, 2022) ................................................................. 22

# TABLE OF AUTHORITIES
### (continued)

**Page**

*City of Los Angeles v. Preferred Commc'ns, Inc.,*
    476 U.S. 488 (1986) .................................................................................. 25

*Clift v. Narragansett Television L.P.,*
    688 A.2d 805 (R.I. 1996) ........................................................................... 17

*Cohen v. California,*
    403 U.S. 15 (1971) ..................................................................................... 23

*Cohen v. Cowles Media Co.,*
    501 U.S. 663 (1991) ...................................................................... 16, 17, 20

*Cohen v. Facebook, Inc.,*
    252 F. Supp. 3d 140 (E.D.N.Y. 2017) ...................................................... 10

*Davidson v. Time Warner, Inc.,*
    1997 WL 405907 (S.D. Tex. Mar. 31, 1997) ............................................ 17

*DeFilippo v. NBC,*
    446 A.2d 1036 (R.I. 1982) ......................................................................... 17

*Doe #1 v. Twitter, Inc.,*
    2023 WL 3220912 (9th Cir. May 3, 2023) ................................................ 14

*Doe II v. MySpace Inc.* ("*MySpace II*"),
    96 Cal. Rptr. 3d 148 (Cal. Ct. App. 2009) ............................................... 11

*Doe v. Backpage.com, LLC,*
    817 F.3d 12 (1st Cir. 2016) .............................................................. 8, 10, 11

*Doe v. Internet Brands, Inc.,*
    824 F.3d 846 (9th Cir. 2016) .............................................................. passim

*Doe v. MySpace, Inc.* (*MySpace I*),
    528 F.3d 413 (5th Cir. 2008) ............................................................. 10, 11

*Doe v. Snap, Inc.,*
    2022 WL 2528615 (S.D. Tex. 2022) ......................................................... 11

*Dreamstime.com, LLC v. Google, LLC,*
    2019 WL 2372280 (N.D. Cal. June 5, 2019) ............................................. 22

*Durning v. Citibank, N.A.,*
    950 F.2d 1419 (9th Cir. 1991) ................................................................... 10

*Dyroff v. Ultimate Software Grp., Inc.,*
    934 F.3d 1093 (9th Cir. 2019) ............................................................ passim

*Edge v. City of Everett,*
    929 F.3d 657 (9th Cir. 2019) ..................................................................... 23

*Enigma Grp. USA, LLC v. Malwarebytes, Inc.,*
    946 F.3d 1040 (9th Cir. 2019) ..................................................................... 6

*Estate of B.H. v. Netflix, Inc.,*
    4:21-CV-06561-YGR, 2022 WL 551701 (N.D. Cal. Jan. 12, 2022) ................... 17, 18

*F.C.C. v. Pacifica Found.,*
    438 U.S. 726 (1978) ................................................................................... 21

**TABLE OF AUTHORITIES**
(continued)

Page

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
521 F.3d 1157 (9th Cir. 2008) ............................................................................. passim

*Federal Agency of News LLC v. Facebook, Inc.*,
432 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................................................................ 12

*Fields v. Twitter, Inc*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016) ................................................................... 8, 13

*Force v. Facebook, Inc.*,
934 F.3d 53 (2d Cir. 2019) ............................................................................... 10, 13

*FTC v. Accusearch Inc.*,
570 F.3d 1187 (10th Cir. 2009) ................................................................................ 13

*Gonzalez v. Google LLC*,
2 F.4th 871 (9th Cir. 2021), *vacated*, __ U.S. __, 143 S. Ct. 1191 (2023) ............................. 9, 10

*Greene v. Tinker*,
332 P.3d 21 (Alaska 2014) ....................................................................................... 16

*Henderson v. Source for Public Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) ..................................................................................... 10

*Herceg v. Hustler Magazine, Inc.*,
814 F.2d 1017 (5th Cir. 1987) ................................................................................... 17

*Herrick v. Grindr LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019) .......................... 11

*Hoffman v. Capital Cities/ABC, Inc.*,
255 F.3d 1180 (9th Cir. 2001) ................................................................................... 23

*HomeAway.com, Inc. v. City of Santa Monica*,
918 F.3d 676 (9th Cir. 2019) ............................................................................... passim

*In re Apple Inc. App Store Simulated Casino-Style Games Litig.*,
625 F. Supp. 3d 971 (N.D. Cal. 2022)), *perm. app. granted*, No. 22-80098
(9th Cir. Dec. 13, 2022) (ECF No. 9) ............................................................... 3, 5, 7, 8

*In re Factor VIII or IX Concentrate Blood Prods. Litig.*,
25 F. Supp. 2d 837 (N.D. Ill. 1998) ...................................................................... 17, 22

*Jackson v. Airbnb, Inc.*,
2022 WL 16753197 (C.D. Cal. Nov. 4, 2022) .................................................................... 8

*James v. Meow Media, Inc.*,
300 F.3d 683 (6th Cir. 2002) .................................................................................... 18

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ............................................................................. passim

*L.W. v. Snap Inc.*,
2023 WL 3830365 (S.D. Cal. June 5, 2023) ................................................................ 8, 9, 14

*Lemmon v. Snap, Inc.*,
995 F.3d 1085 (9th Cir. 2021) ............................................................................. passim

**TABLE OF AUTHORITIES**
(continued)

Page

*Magrey v. Franks*,
   No. CV-09-5004034-S (Conn. Super. Ct. Mar. 23, 2011)................................................ 24

*Marshall's Locksmith Service Inc. v. Google, LLC*,
   925 F.3d 1263 (D.C. Cir. 2019) ............................................................................................. 9

*Martinez v. Metabolife Int'l, Inc.*,
   113 Cal. App. 4th 181 (2003) ............................................................................................... 22

*McCollum v. CBS, Inc.*,
   249 Cal. Rptr. 187 (Ct. App. 1988) ..................................................................................... 17

*Miami Herald Pub. Co. v. Tornillo*,
   418 U.S. 241 (1974) ............................................................................................................... 21

*NetChoice v. Att'y Gen., Fla.*,
   34 F.4th 1196 (11th Cir. 2022) ............................................................................................. 22

*NetChoice v. Paxton*,
   49 F.4th 439 (5th Cir. 2022) ................................................................................................. 22

*New York v. Ferber*,
   458 U.S. 747 (1982) ............................................................................................................... 21

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ............................................................................. 21

*Olivia N. v. NBC*,
   178 Cal. Rptr. 888 (Ct. App. 1981) ..................................................................................... 17

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ................................................................................................ 5

*Perry v. Merit Sys. Prot. Bd.*,
   582 U.S. 420 (2017) ............................................................................................................... 25

*Planned Parenthood Found. of Am., Inc. v. Newman*,
   51 F.4th 1125 (9th Cir. 2022) ............................................................................... 16, 17, 20

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ........................................................................................................ 23, 24

*Reno v. Am. C.L. Union*,
   521 U.S. 844 (1997) ............................................................................................................... 18

*Rumsfeld v. F.A.I.R.*,
   547 U.S. 47 (2006) ................................................................................................................. 23

*Sanders v. Acclaim Ent., Inc.*,
   188 F. Supp. 2d 1264 (D. Colo. 2002) ............................................................................... 17

*Snyder v. Phelps*,
   562 U.S. 443 (2011) ........................................................................................................ 18, 25

*Sorrell v. IMS Health Inc.*,
   564 U.S. 552 (2011) ............................................................................................................... 20

*There to Care, Inc. v. Comm'r of Ind. Dep't of Rev.*,
   19 F.3d 1165 (7th Cir. 1994) ............................................................................................... 24

**TABLE OF AUTHORITIES**
(continued)

Page

*Turner Broad. Sys., Inc. v. FCC,*
    512 U.S. 622 (1994)..........................................................................................21

*Twitter, Inc. v. Taamneh,*
    143 S. Ct. 1206 (2023)......................................................................................23

*United States v. O'Brien,*
    391 U.S. 367 (1968)..........................................................................................20

*Universal City Studios, Inc. v. Corley,*
    273 F.3d 429 (2d Cir. 2001).............................................................................25

*Vargas v. Facebook, Inc.,*
    2023 WL 4145434 (9th Cir. June 23, 2023) .......................................................3

*W. Va. State Bd. of Educ. v. Barnette,*
    319 U.S. 624 (1943)..........................................................................................24

*Watters v. TSR, Inc.,*
    715 F. Supp. 819 (W.D. Ky. 1989)..................................................................17

*Weirum v. RKO Gen., Inc.,*
    539 P.2d 36 (Cal. 1975).........................................................................16, 17, 18

*Western Watersheds Project v. Michael,*
    869 F.3d 1189 (10th Cir. 2017) ........................................................................20

*Williams v. Jackson,*
    No. 608603 (La. Dist. Ct. June 22, 2015) ........................................................24

*Wilson v. Midway Games, Inc.,*
    198 F. Supp. 2d 167 (D. Conn. 2002)...............................................................17

*Zacchini v. Scripps-Howard Broad. Co.,*
    433 U.S. 562 (1977)..........................................................................................17

*Zamora v. Columbia Broad. Sys.,*
    480 F. Supp. 199 (S.D. Fla. 1979) ...................................................................17

*Zeran v. America Online, Inc.,*
    129 F.3d 327 (4th Cir. 1997) ............................................................................10

*Zhang v. Baidu.com Inc.,*
    10 F. Supp. 3d 433 (S.D.N.Y. 2014) ...............................................................21

**Statutes**

18 U.S.C. § 2258A(a) .............................................................................................14

47 U.S.C. § 230(b) ....................................................................................................6

47 U.S.C. § 230(c) ...........................................................................................2, 4, 15

47 U.S.C. § 230(f) .....................................................................................................6

Cal. Health & Safety Code § 119311.......................................................................24

**Treatises**

Restatement (Third) of Torts: Phys. & Emot. Harm § 18, cmt. a (2010) ..............15

# TABLE OF AUTHORITIES
## (continued)

Page

### Other Authorities

Christopher Cox, *Section 230: A Retrospective* 15 (Nov. 2022) (working paper),
  https://www.thecgo.org/wp-content/uploads/2022/11/Section-230-Retrospective-Cox.pdf ........... 3

Helen Norton, *Manipulation and the First Amendment*, 30 Wm. & Mary Bill Rts. J. 221 (2021) ... 25

Oral Arg. Tr. 145, *Gonzalez v. Google LLC*, No. 21-1333 (2023) *available* at
  https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-1333_f2ag.pdf .. 10

Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495, 1496 (2013) ................................................... 25

### Pattern Jury Instructions

CACI 418 ............................................................................................................................................ 16

CACI 419 ............................................................................................................................................ 16

CACI 1204 .......................................................................................................................................... 16

CACI 1205 .......................................................................................................................................... 16

CACI 1220 .......................................................................................................................................... 16

CACI 1221 .......................................................................................................................................... 16

CACI 1222 .......................................................................................................................................... 16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

## I.     INTRODUCTION

This case is about conduct, not content—defects, not speech. Defendants designed defective social media products that harm kids. *E.g.*, MC ¶¶ 2-3. Plaintiffs seek to hold them accountable for doing so. *Id.* ¶ 20. Neither 47 U.S.C. § 230 nor the First Amendment bars Plaintiffs' claims.

Section 230 immunizes Defendants only from claims that would hold them liable for third-party speech and thereby require them to monitor user content. Plaintiffs' priority claims invoke no such duty. If Plaintiffs succeed, Defendants would have to compensate families, warn the public, and potentially fix features that make their products addictive and dangerous. MC ¶ 20. And they would have to abide by the federal statute that requires them to report child pornography. But Defendants could leave untouched the content that appears on their platforms. That ends the § 230 inquiry.

The First Amendment poses no greater obstacle. Here too, the distinction between conduct and content is paramount. The common law of torts can be used to hold companies liable for their own conduct—even if it implicates speech—without offending the First Amendment. The First Amendment limits common law tort claims only when they seek to suppress or compel the expression or dissemination of ideas, or when a plaintiff seeks recovery for offense or damage to reputation, such as through libel claims. Here, Plaintiffs are not targeting content or ideas, and their claims are for personal injury, not tortious speech. *Id.*

Defendants attempt to avoid responsibility for their conduct by mischaracterizing the Complaint as targeting speech, claiming that Plaintiffs' lawsuit is equivalent to failed attempts to censor comic books and video games. *See, e.g.*, ECF 320 ("MTD") at 23. That is misdirection. The Court must construe the allegations "in the light most favorable to the plaintiff[s]." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1098 n.1 (9th Cir. 2009). The allegations are clear: "Defendants defectively designed their platforms—in foreseeably unsafe ways and in dereliction of their basic duties of care—to induce harmful, unhealthy, and compulsive use by kids." MC ¶ 8.

Social media companies have long raised the specter that the enforcement of any legal guardrails will spell the end of free speech on the Internet. Those predictions have never come true. As the Ninth Circuit observed 15 years ago, "[t]he Internet has outgrown its swaddling clothes and no longer needs to be so gently coddled." *Fair Hous. Council of San Fernando Valley v.*

1   *Roommates.Com, LLC*, 521 F.3d 1157, 1175 n.39 (9th Cir. 2008). This Court should deny

2   Defendants' bid to immunize their defectively designed products from tort liability.

3   **II.   ARGUMENT**

4   **A.   Section 230 does not bar Plaintiffs' priority claims.**

5       Defendants seek immunity under § 230(c)(1), which directs that "[n]o provider or user of an

6   interactive computer service shall be treated as the publisher or speaker of any information provided

7   by another information content provider."[1] 47 U.S.C. § 230(c)(1). This provision confers immunity

8   only from claims holding platforms liable for unlawful third-party content. *See, e.g.*, *Roommates*, 521

9   F.3d at 1173-74; *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019). It *rejects*

10  immunity from claims holding platforms liable for *their own* actions—like the claims at issue here.

11  *E.g. Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021). Defendants ignore this distinction

12  in favor of a sweeping, atextual interpretation of § 230(c)(1) that would immunize them from liability

13  for their own conduct, merely because they are in the business of hosting third-party content.

14      That approach is incompatible with Ninth Circuit law, which has "consistently eschewed an

15  expansive reading of [§ 230] that would render unlawful conduct magically lawful when conducted

16  online." *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 683 (9th Cir. 2019) (cleaned

17  up). Given the Internet's "vast reach into the lives of millions," the Ninth Circuit has been "careful

18  not to exceed the scope of the immunity provided by Congress and thus give online businesses an

19  unfair advantage over their real-world counterparts, which must comply with laws of general

20  applicability." *Roommates*, 521 F.3d at 1164 n.15. Under that careful approach, § 230 "does not

21  provide a general immunity against all claims derived from third-party content." *Doe v. Internet*

22  *Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016) (citing *Barnes*, 570 F.3d at 1100). Thus, while

23  "[p]ublishing activity is a but-for cause of just about everything [Defendants are] involved in"—

24  indeed, "[w]ithout publishing user content, [Defendants] would not exist," *id.*—the statute does not

25  immunize against claims based on Defendants' conduct, where user content is a mere but-for cause

26  of harm. Defendants' § 230 defense should be rejected.

27

28  ---
[1] Section 230 has a second immunity provision that is not at issue here: "No provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of" objectionable content. 47 U.S.C. § 230(c)(2).

1.   **Section 230 bars claims that seek to impose derivative liability for the content of third-party posts.**

The history of § 230 has been extensively set forth by the Ninth Circuit. In short, it used to be that online companies who removed certain messages became liable for all of them, while providers who "ignore[d] problematic posts altogether escape[d] liability." *Roommates*, 521 F.3d at 1163. Congress changed that by enacting § 230, which "protect[s] websites against the evil of liability for failure to remove offensive content." *Id*. at 1174. Section 230 offers online platforms immunity for the character of third-party content as a way "to encourage voluntary monitoring for offensive or obscene material." *Barnes*, 570 F.3d at 1099-1100. As § 230's co-sponsor has observed, the statute was meant only to shield websites from being held "derivatively liable for the illegal acts of others." Christopher Cox, *Section 230: A Retrospective* 15 (Nov. 2022) (working paper), https://www.thecgo.org/wp-content/uploads/2022/11/Section-230-Retrospective-Cox.pdf.

In practical terms, this means § 230 "'protects websites from liability under state and local law for material posted on their websites by someone else.'" *Dyroff*, 934 F.3d at 1097 (alterations adopted) (quoting *Internet Brands*, 824 F.3d at 850); *see also In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971 (N.D. Cal. 2022), *perm. app. granted*, No. 22-80098 (9th Cir. Dec. 13, 2022) (ECF No. 9) ("Its applicability depends on whether the facts alleged attempt to hold a website liable for the bad acts of another."). If the claim seeks to hold the defendant liable for third-party content that appears on its platform, then the defendant is immunized, unless it "contribute[d] to the content's illegality." *Roommates*, 521 F.3d at 1171; *accord Vargas v. Facebook, Inc.*, 2023 WL 4145434, at *3 (9th Cir. June 23, 2023). However, § 230 "was not meant to create a lawless no-man's land on the Internet." *Roommates*, 521 F.3d at 1164. It does *not* immunize conduct of the platforms themselves. That is, if the claim seeks to hold the defendant liable for something *other* than what it has or hasn't published—like its "own acts" or omissions—then § 230 "does not apply." *Id.* at 1165.

Section 230(c)(1) has three prongs. It "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes*,

570 F.3d at 1100–1101 (footnote omitted). Plaintiffs do not dispute that Defendants' products satisfy the first of these prongs. To assess the second and third—whether Plaintiffs' claims "treat" Defendants "as the publisher or speaker of any information provided by another information content provider," 47 U.S.C. § 230(c)(1)—the Ninth Circuit "focus[es] on whether '*the duty* the plaintiff alleges' stems 'from the defendant's status or conduct as a publisher or speaker,'" *Lemmon*, 995 F.3d at 1091 (emphasis added) (quoting *Barnes*, 570 F.3d at 1107).

Section 230(c)(1) bars claims based upon duties that "would necessarily require an internet company to monitor third-party content." *HomeAway*, 918 F.3d at 682. *Barnes* illustrates this duty-based approach. The plaintiff asked Yahoo to remove explicit content about her posted by an ex. 570 F.3d at 1098. Yahoo failed to do so despite its assurances to the plaintiff, who then sued for negligent undertaking and promissory estoppel. *See id.* at 1099. The Ninth Circuit treated these causes of action differently, even though both stemmed from the unauthorized post. As to negligent undertaking, it held that Yahoo was immunized, because the "undertaking" Yahoo allegedly "failed to perform with due care" was simply the removal of indecent material. *Id.* at 1103. Avoiding liability for that claim would have "necessarily require[d]" Yahoo to monitor the legality of third-party content. *See HomeAway*, 918 F.3d at 682. But because liability for promissory estoppel was premised on Yahoo's promise to the plaintiff—*not* the content itself—that claim did not treat Yahoo as the publisher of that content. *Barnes*, 570 F.3d at 1107. *Barnes*'s distinct treatment of these claims demonstrates that § 230 immunity does not attach merely "because a cause of action would not otherwise have accrued but for the third-party content." *See HomeAway*, 918 F.3d at 682. Courts must "look instead to what the duty at issue actually requires." *Id.*

Section 230 cases in the Ninth Circuit organize neatly around this distinction. In *HomeAway*, § 230 did not preclude liability for a platform's facilitation of unlicensed short-term rentals because the platforms "face[d] no liability for the content of the bookings" themselves. 918 F.3d at 684. Likewise, in *Doe v. Internet Brands*, § 230 did not immunize a defendant from liability for failing to warn a plaintiff about the dangers posed by sexual predators. 824 F.3d at 851. As with the promissory estoppel claim in *Barnes*, "[t]he duty to warn . . . would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." *Id.* In *Roommates*, the

1    court had no trouble rejecting immunity where the defendant's "own acts" were at issue, namely,

2    "posting [a discriminatory] questionnaire and requiring answers to it." 521 F.3d at 1165. And in *In re*

3    *Apple*, § 230 did not bar the claim that Apple and other platforms could be held "responsible for their

4    own illegal conduct," namely, aiding in the exercise of illegal gambling by selling virtual "chips" that

5    could be used to place wagers in casino applications hosted in their app stores. 625 F. Supp. 3d at 994.

6    In each instance, the theory of liability sought to hold the platforms liable for their own conduct.

7         By contrast, in cases Defendants rely on like *Batzel*, *Carafano*, *Dyroff*, *Kimzey*, and

8    *Perfect 10*, the duty the defendant allegedly violated would have necessarily required monitoring and

9    de-publishing *specific* third-party content—an accusatory message, a fake dating profile, a post about

10   where to find drugs, a negative review of a business, and purloined images of models, respectively.

11   *See Batzel v. Smith*, 333 F.3d 1018, 1032 (9th Cir. 2003); *Carafano v. Metrosplash.com, Inc.*, 339

12   F.3d 1119, 1121 (9th Cir. 2003); *Dyroff*, 934 F.3d at 1095; *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1267

13   (9th Cir. 2016); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1108 (9th Cir. 2007). Likewise, in *In

14   re Apple*, the defendants could not be held liable for hosting allegedly "illegal" content (the gambling

15   apps) in their app stores.[2] *See* 625 F. Supp. 3d at 994-95. In all these cases, immunity was not created

16   by the act of publication, the presence of third-party content in the causal chain, or even the possibility

17   that the defendant "might" try to avoid liability through "monitoring or other publication activities."

18   *See HomeAway*, 918 F.3d at 682. Rather, immunity applied because of the claim's inherent demand

19   that the defendant review third-party content to ensure it wasn't defamatory, illegal, or otherwise

20   improper. *See Roommates*, 521 F.3d 1171-72.

21        *Lemmon* follows logically from the foregoing principles. In *Lemmon*, § 230 did not bar a

22   product-liability claim against Snap for features including "Snapchat's reward system" (a defect at

23   issue here, *see* MC ¶¶ 474-79). 995 F.3d at 1093. Consistent with *Barnes*, immunity did not attach

24   because the claim turned on Snapchat's design—its reward system and a filter that enabled users to

25   post their real-time speed—not the posts themselves. *Id*. at 1093-94. The Ninth Circuit explained that

---

[2] Unlike *In re Apple*, which was not a products liability case and in which the barred theories of liability turned on the unlawful nature of the "content" to which defendants "direct[ed] users" through "algorithms," 625 F. Supp. 3d at 994 (quotation marks omitted), Plaintiffs in this action point to dangerous defects in the products themselves that do not depend on the unlawfulness of any third-party content.

1    "the duty that Snap allegedly violated"—"to design a reasonably safe product"—was "fully

2    independent of Snap's role in monitoring or publishing third-party content." *Id*. at 1092-93. The court

3    reached this result even though the posts "could be described as a but-for cause of the . . . injuries"

4    and could be relevant to "proving causation." *Id*. at 1092, 1093 n.4 (alteration adopted).

5        In *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814 (D. Or. 2022), the defendant's website was

6    alleged to be defective because, by randomly pairing strangers for video chats, it became a magnet

7    for child predators like the one who matched with and abused the plaintiff. *Id*. at 817. The court found

8    *Lemmon* to be "[t]he most important case for resolving th[e] issue of Section 230 liability" in the

9    products liability context. *Id.* at 819. Applying *Lemmon*'s duty-based test, the court rejected § 230

10   immunity because, even though "it is clear that content was created," *id*. at 820, the claims did not

11   target the defendant's publication of that content, *id*. at 821. "In order to meet the obligation A.M.

12   seeks to impose on Omegle, Omegle would not have to alter the content posted by its users—it would

13   only have to change its design and warnings." *Id*. at 820.

14        Defendants attempt an end run around *Lemmon* and *Omegle* with a misreading of § 230's text,

15   implying that the statute affords blanket protection for "tools that 'filter,' 'pick,' 'choose,' 'digest,'

16   and 'organize' content." MTD at 7 (quoting 47 U.S.C. § 230(f)(4)(A)-(C)). But the statute includes

17   these verbs within the definition of "access software provider" (which is part of the definition of

18   "interactive computer service")—*not* the scope of § 230(c)(1) immunity. 47 U.S.C. § 230(f)(2), (4).

19   If Congress wanted to immunize the filtering, picking, and organizing of content by platforms, it

20   would have used those words in § 230(c)(1), instead of the word "publisher." Defendants' argument

21   also reads the statute contrary to its stated purpose, which is "maximiz[ing] *user* control over what

22   information is received," not maximizing a platform's control over what content it pushes. 47 U.S.C.

23   § 230(b)(3) (emphasis added)).

24        Defendants' interpretation also does not square with precedent. Immunity under § 230 does

25   not "follow[] whenever a legal duty 'affects' how an internet company 'monitors' a website."

26   *HomeAway*, 918 F.3d at 682. Indeed, the Ninth Circuit has held that "blocking and filtering decisions

27   . . . driven by anticompetitive animus" are not immunized under § 230(c)(2). *Enigma Grp. USA, LLC*

28   *v. Malwarebytes, Inc.*, 946 F.3d 1040, 1050 (9th Cir. 2019). That decision would make little sense if

§ 230(c)(1) foreclosed all claims that "'involve[] decisions related to the monitoring, screening, arrangement, promotion, and distribution of [third-party] content.'" MTD at 6 (quoting *Anderson v. TikTok, Inc.*, 2022 WL 14742788 *4 (E.D. Pa. 2022)).

> **2.    Plaintiffs' claims do not seek to impose derivative liability for the content of third-party posts.**

With this background in mind, the Court need ask only one question: Do Plaintiffs seek to hold Defendants derivatively liable for third-party content (as in *Dyroff* or *Kimzey*), or, instead, for their own wrongdoing (as in *Lemmon* or *HomeAway*)? The answer lies in the Complaint, which must be construed "in the light most favorable to the plaintiff[s]." *Barnes*, 570 F.3d at 1098 n.1.

> **a.    Counts 1-4 (products liability) do not treat Defendants as the publishers of third-party content.**

Plaintiffs allege Defendants breached their duty to design reasonably safe products by (1) incorporating features contrived to addict young people (e.g., flow-state interfaces, intermittent variable rewards, social validation metrics, filters and lenses, push notifications, account-deletion barriers, and usage-maximizing algorithms), MC ¶¶ 62-90; (2) utilizing insufficient age-verification and parental controls, *id.* ¶¶ 136, 141; and (3) adopting other mechanisms that (together with these defects) facilitate child sexual exploitation, *e.g.*, *id.* ¶¶ 133-34, 149-51. Plaintiffs also allege Defendants breached their legal obligation to warn the public about these defects. *Id.* ¶¶ 19-20, 167.

In other words, Plaintiffs seek to hold Defendants accountable for *their own legal responsibilities* as product designers, not the illegal acts of others or the impropriety of third-party content published on their platforms. *See In re Apple*, 625 F. Supp. 3d at 994; *Roommates*, 521 F.3d at 1165. The duties that Defendants allegedly violated do not spring from their "status or conduct as a publisher or speaker," *Barnes*, 570 F.3d at 1107, but from their "distinct capacity as a product designer," *Lemmon*, 995 F.3d at 1092. To avoid future liability, Defendants *would* have to change their own designs and warnings, but they *would not* have to remove any content posted by their users. *See Omegle*, 614 F. Supp. 3d at 820. To call this "creative pleading," MTD at 1, 4, is to insist that any action whatsoever by Defendants enjoys § 230 immunity because they publish others' content. The Ninth Circuit has rejected that position. *Internet Brands, Inc.*, 824 F.3d at 853.

         *i.*    ***Defendants' attempt to distinguish* Lemmon *misses its mark*.**

Defendants assert that § 230 did not bar the claim in *Lemmon* because "the alleged defect, and the injury it caused, were 'fully independent of Snap's role in monitoring or publishing third-party content.'" MTD at 4 (quoting *Lemmon*, 955 F.3d at 1093). That misreads *Lemmon*'s holding. In rejecting a but-for test, the Ninth Circuit repudiated the idea that the "alleged defect, and the injury," MTD at 4, must be fully independent from monitoring or publishing third-party content. *See Lemmon*, 955 F.3d at 1093 n.4. Instead, what matters is that the *duty* Defendants allegedly breached does not arise from monitoring or publication. As the full quote in *Lemmon* reveals, § 230 did not bar the plaintiffs' claims there—and does not bar Plaintiffs' claim here—because "[*t*]*he duty to design a reasonably safe product* is fully independent of Snap's role in monitoring or publishing third-party content." 995 F.3d at 1093 (emphasis added).

Defendants rely on *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116 (N.D. Cal. 2016), and a few other district court cases purporting to distinguish *Lemmon*. *See* MTD at 4-5. Unlike here, the plaintiffs in *Fields* sought to force Twitter to remove content, claiming that "Twitter should have imposed a blanket *ban* on pro-ISIS *content* by prohibiting ISIS affiliates from opening accounts at all." 217 F. Supp. 3d at 1123 (emphasis added). Similarly, the plaintiffs in *Jackson v. Airbnb, Inc.*, 2022 WL 16753197 (C.D. Cal. Nov. 4, 2022), alleged that Snap failed to "to disable[] accounts engaging in advertising and/or selling guns." *Id.* at *1. The claims in both cases treated the defendants as publishers because the duties they allegedly breached "would *require* [the] platform to censor, edit, or post third-party content." *In re Apple*, 625 F. Supp. 3d at 989 (emphasis in original).

Two recent district court cases cited by Defendants simply misapply binding Ninth Circuit precedent. The proposition in *Bride v. Snap, Inc.*, 2023 WL 2016927 (C.D. Cal. Jan. 10, 2023), that "'decisions about the structure and operation of a website are content-based decisions under [§] 230,'" traces back to the First Circuit, *id.* at *5 (quoting *Fields*, 217 F. Supp. 3d at 1124 (quoting *Doe v. Backpage.com, LLC*, 817 F.3d 12, 20 (1st Cir. 2016))), which has a "more expansive view of Section 230(c) preemption than the Ninth Circuit," *Airbnb, Inc. v. City and County of San Francisco*, 217 F. Supp. 3d 1066, 1073 (N.D. Cal. 2016) (discussing *Backpage*). *L.W. v. Snap Inc.*, 2023 WL 3830365 (S.D. Cal. June 5, 2023), makes the same error by insisting (contrary to the plaintiffs' allegations

there) that a duty not to design features that "facilitate[] sex crimes against children," *id.* at *1, is the same as a duty "to remove CSAM distributed . . . by third parties," *id.* at *4. Because these decisions confer § 230 immunity for platform conduct rather than third-party content, they cannot be squared with the reasoning or outcome in *Barnes*.

Defendants also place heavy reliance on *Dyroff*, *see* MTD at 7-8, 10, 13-14, and *Kimzey*, *see* MTD at 3-4, 8-11, 13, but neither changes how their motion should be resolved. As noted, the plaintiffs' theories of liability in each case would have necessitated different decisions about posting or not-posting specific, identifiable content. *Supra* at p. 5. Moreover, the plaintiffs in both cases relied exclusively on the third *Barnes* factor, arguing the defendants "created and developed" the information at issue. *See Dyroff*, 934 F.3d at 1097-99 (rejecting argument that defendant "became an information content provider" by recommending discussion group that connected decedent with drug dealer); *Kimzey*, 836 F.3d at 1268-70 (rejecting "threadbare allegations" that Yelp! fabricated negative reviews and "convoluted" theory that its rating system materially contributed to the reviews).[3] Here, Plaintiffs do not rely on the third *Barnes* factor, as they do not argue Defendants are "information content providers" whose product features are "content."

While neither *Dyroff* nor *Kimzey* speaks to the issue that matters—whether Plaintiffs' claims treat Defendants as "publishers or speakers" of content under the second *Barnes* prong—other Ninth Circuit cases do resolve that issue. As in *Internet Brands*, Plaintiffs' "failure to warn" claims do not attach liability to content, because "[a]ny alleged obligation to warn could have been satisfied without changes to the content posted by the website's users." 824 F.3d at 851; *e.g.*, MC ¶ 867 (Count 2), ¶ 905 (Count 4). And, as in *Lemmon*, Plaintiffs' "product defect" claims are content-neutral, because "[t]he duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content." 995 F.3d at 1093; *e.g.*, MC ¶ 840 (Count 1), ¶ 884 (Count 3).

In the absence of any other toehold in the Ninth Circuit, Defendants make passing reference to *Gonzalez v. Google LLC*, 2 F.4th 871 (9th Cir. 2021), *vacated*, __ U.S. __, 143 S. Ct. 1191 (2023). MTD at 7. That decision was vacated by the Supreme Court and therefore has "no precedential

---

[3] As in *Kimzey*, the plaintiffs in *Marshall's Locksmith Service Inc. v. Google, LLC*, 925 F.3d 1263 (D.C. Cir. 2019), *see* MTD at 8, did not dispute that their claims treated the defendant as the publisher or speaker of information. *See* 925 F.3d at 1268.

authority whatsoever." *Durning v. Citibank, N.A.*, 950 F.2d 1419, 1424 (9th Cir. 1991). In any event, it is no more persuasive than *Kimzey* or *Dyroff*. As in those cases, the *Gonzalez* plaintiffs principally attacked the third prong of the *Barnes* test, arguing that YouTube's recommendations of ISIS videos were "content created by Google" that aided and abetted terrorist attacks. *Gonzalez*, 2 F.4th at 890.

### ii. *Defendants' out-of-circuit cases are inapposite.*

Given the paucity of supportive Ninth Circuit decisions, Defendants venture afield. To be sure, there are various approaches in other circuits. But each traces its origins to "the seminal Fourth Circuit decision" in *Zeran v. America Online, Inc.*, 129 F.3d 327 (4th Cir. 1997). *Force v. Facebook, Inc.*, 934 F.3d 53, 63 (2d Cir. 2019); *see also Backpage*, 817 F.3d at 18, 20 (citing *Zeran*); *Doe v. MySpace, Inc.* (*MySpace I*), 528 F.3d 413, 418-19 (5th Cir. 2008) (same). In Defendants' telling, *Zeran* holds that § 230 "bars 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter content.'" MTD at 3 (quoting 129 F.3d at 330).

But Defendants completely ignore the Fourth Circuit's more recent decision in *Henderson v. Source for Public Data, L.P.*, 53 F.4th 110 (4th Cir. 2022), which aligns with the Ninth Circuit in clarifying that publishing "alone is not enough" to trigger § 230 immunity. *Id.* at 122. *Henderson* is as clear as *HomeAway*: "To be held liable for information 'as the publisher or speaker' means more than that the publication of information was a but-for cause of the harm." *Id.* (citing *HomeAway*, 918 F.3d at 682). That is, immunity arises *only* if liability is "based on the content of the speech published," *not* simply when the act of publishing is involved. *Id.* (quotation omitted); *see also id.* at 120-21 (a claim treats a defendant as the publisher when it "seeks to impose liability based on that information's improper content"). Defendants' failure to mention *Henderson* is inexcusable, given that Defendant Google has acknowledged—to the Supreme Court, no less—that it was correctly decided.[4] In light of *Henderson*, Defendants misplace their reliance upon cases they read to confer immunity under § 230 for anything that is or stems from the act of publishing.[5] MTD at 4, 7-9.

---

[4] *See* Oral Arg. Tr. 145, available at https://www.supremecourt.gov/oral_arguments/argument_transcripts/2022/21-1333_f2ag.pdf (Google's counsel: *Henderson*'s "test is correct").

[5] *See Force*, 934 F.3d at 65-66 (affirming *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140 (E.D.N.Y. 2017)); *Herrick v. Grindr LLC*, 306 F. Supp. 3d 579, 585 (S.D.N.Y. 2018), *aff'd*, 765

1

2

### iii.    Plaintiffs seek to hold Defendants responsible for their products' defective features, not third-party content.

3       Defendants argue that they are immunized from claims attacking defects in their
4  ***recommendation algorithms***. Defendants contend that these algorithms "merely . . . implement"
5  editorial decisions about "where, when, and how" to present content. MTD at 6-7. But Plaintiffs do
6  not allege (and certainly do not concede) that this is how Defendants' algorithms work. Plaintiffs take
7  issue with how Defendants' algorithms feed on metrics derived from users' interactions with content,
8  rather than the information conveyed therein. *See, e.g.*, MC ¶ 590 (explaining that a strong signal for
9  TikTok's algorithm is the amount of time someone spends watching a video, not the information
10 conveyed in the video). Such algorithms are not designed to curate information; they are designed to
11 maximize the duration and intensity of children's usage, untethered from that to which their attention
12 is directed. The algorithms accomplish this goal by measuring and exploiting every aspect of how
13 children use their products—from click patterns to location to social networks. MC ¶¶ 250, 265, 509,
14 585-91, 747-49. Plaintiffs' priority claims challenge how Defendants have automated attention
15 farming. They do not seek to change any content on Defendants' platforms. *See Lemmon*, 995 F.3d
16 at 1092 (that Snap could satisfy alleged duty without altering content showed that plaintiffs did not
17 seek to hold it liable as "publisher or speaker").

18       Likewise, holding Defendants responsible for their defective ***age-verification and parental***
19 ***controls***, *see* MC ¶¶ 141, 327-57, 461-66, 566-76, 692, 721-26, would not impose liability for third-
20 party content. For one thing, these gate-keeping functions occur *before* content can be exchanged.
21 *See Omegle*, 614 F. Supp. 3d at 821. For another, Plaintiffs allege that defective age verification and
22 parental controls harmed minors separate from any content viewed or communications exchanged,
23 by allowing Defendants to lure children into compulsive use and thwart parents' efforts to protect
24 their kids. *See, e.g.*, MC ¶¶ 351 (explaining how Meta fails to "notify parents when their child's use
25 becomes excessive [or] occurs during sleep time"), 722 (explaining that YouTube's disabling of
26 autoplay for users 13-17 is "virtually meaningless" given the product's lack of age verification).

27

28 F. App'x 586 (2d Cir. 2019); *Backpage*, 817 F.3d at 16; *MySpace I*, 528 F.3d at 41; *Anderson* , 2022
   WL 14742788 at *4; *Doe v. Snap, Inc*., 2022 WL 2528615, at *13 (S.D. Tex. 2022); *Doe II v.*
   *MySpace Inc*. ("*MySpace II*"), 96 Cal. Rptr. 3d 148, 156 (Cal. Ct. App. 2009).

1    Defendants' argument that inadequate "controls and measures" would not have injured Plaintiffs

2    absent the content or communications they were able to access, MTD at 9, is the but-for test the Ninth

3    Circuit has rejected.

4         Defendants assert that they are immune from claims that challenge **notifications and metrics**

5    designed to manipulate use, on the grounds that these features are "'tools meant to facilitate the

6    communication and content of others.'" MTD at 10 (quoting *Dyroff*, 934 F.3d at 1098). That's another

7    way of saying these features "are not content in and of themselves," *Dyroff*, 934 F.3d at 1098, an

8    argument aimed at the third *Barnes* prong.[6] More germane is the fact that liability for these defective

9    "tools," *id.*, would not hold Defendants responsible for publishing anything, or require them to

10   monitor the legality of third-party content.[7] *See HomeAway*, 918 F.3d at 682. Defendants again resort

11   to the inapplicable but-for test, urging that Plaintiffs "are allegedly harmed because the

12   notifications . . . lead[] them to further engage with, or create, more content." MTD at 11.

13        Defendants also invoke their but-for test for **filters and other effects** that allow users to alter

14   photos and videos, asserting that Plaintiffs' harms "are based not on those features in isolation but on

15   Plaintiffs' alleged consumption of content created with those features." MTD at 11. But here, as in

16   *Lemmon*, Plaintiffs do not fault Defendants for publishing altered photos; they fault Defendants for

17   supplying the filters, which trigger body dysmorphia by leading girls to idealize their filtered selfies,

18   while "reduc[ing] their self-compassion and tolerance for their own physical flaws." MC ¶¶ 649-653.

19        Defendants mischaracterize *Kimzey* in asserting they are immune from claims that target **likes**

20   **and other social-validation features**. MTD at 9-10. The full quote from that case states: "'The

21   prototypical service qualifying for [§ 230] immunity is an online messaging board (or bulletin board)

22   on which Internet subscribers post comments and respond to [others'] comments.'" *Kimzey*, 836 F.3d

23

---

24   [6] *Kimzey* does not support Defendants' claim that these features simply reduce "'inputs from third

25   parties . . . into a single, [aggregated] metric.'" MTD at 11 (quoting *Kimzey*, 836 F.3d at 1270

     (misquote corrected)), a factual proposition that misstates the Complaint's actual allegations, and

26   which this Court should therefore reject. An aggregate of user ratings as in *Kimzey*, *id.* at 1269, is

     entirely different from a wholly platform-generated metric like Snapscore, which "keeps a running

27   profile score based on a user's Snapchat activity levels." MC ¶ 471.

     [7] *Federal Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107 (N.D. Cal. 2020), is not to

28   the contrary. MTD at 10-11. In that case, the plaintiff sought to hold Facebook liable for *removing*

     the plaintiff's account and Facebook page. *See* 432 F. Supp. 3d at 1112.

at 1266 (quoting *FTC v. Accusearch Inc.*, 570 F.3d 1187, 1195 (10th Cir. 2009)). This is doubly irrelevant. First, whether Defendants' products "qualify" for § 230 immunity (the first *Barnes* prong) is a question altogether separate from whether § 230 in fact bars Plaintiffs' claims (the second and third). *See supra*, Part II.A.1. Second, resolution of that issue with respect to a libel claim brought against a "passive host of a forum for user reviews" has no bearing on this case. *Kimzey*, 836 F.3d at 1265. Plaintiffs' addiction claims are content-neutral and target Defendants' active conduct in building sophisticated social-validation features. *See, e.g.*, MC ¶ 79 (explaining how Instagram "will at times determine that a particular user's engagement will be maximized if the app withholds 'Likes' on their posts and then later delivers them in a large burst"). Because Plaintiffs do not seek to hold Defendants liable for the contents of any comments or responses, their claims are not barred by § 230.

Plaintiffs similarly do not seek to hold Defendants liable for any content created using ***short-form, ephemeral, or private product designs***. MTD at 10 (citing *Fields*, 217 F. Supp. 3d at 1124). Instead, they challenge the features themselves—which are designed to induce "flow state" (e.g. Meta's "Reels" and "YouTube Shorts"), MC ¶¶ 289-290 735-739; compel use (e.g. disappearing posts), *id.* ¶¶ 294, 469, 492, 626; and avoid CSAM-reporting requirements (e.g. "My Eyes Only)," *id.* ¶¶ 505, 536, 688. This is different than *Fields*, where the court rejected the plaintiffs' bid to hold Twitter liable for the *substance* of ISIS's private messages. *See* 217 F. Supp. 3d at 1128.

Defendants resist liability for ***features that facilitate connections*** on the ground that "'[c]onnections' or 'matches' of information and individuals' constitute 'publication' under [§] 230." MTD at 8 (quoting *Force*, 934 F.3d at 66-67). Again, however, Plaintiffs are not claiming Defendants breached any duty to "review, edit, or withdraw any third-party content" but that they should have designed their products differently, so as not to "match minors and adults." *Omegle*, 614 F. Supp. 3d at 819. This claim does not hold Defendants responsible for "communication between users" or "information voluntarily provided by users," MTD at 8, but instead for the design features themselves.

Finally, Defendants give short shrift to Plaintiffs' ***failure-to-warn*** claim, failing to cite any appellate cases in support of their argument. MC ¶¶ 895-913; *see* MTD at 4, 9. Plaintiffs allege that Defendants "failed to adequately warn Plaintiffs . . . of the known risks and harms of using its products," MC ¶ 167, including that "excessive use of [their] apps has severe and wide-ranging effects

1    on youth mental and physical health," *id.* ¶ 162. Plaintiffs do not allege that Defendants should have

2    warned them about harmful content. "Any alleged obligation to warn could have been satisfied

3    without changes to the content posted by the website's users." *Internet Brands*, 824 F.3d at 851.

### b.    Count 10 (negligence per se) does not treat Defendants as the publishers of third-party content.

6           Plaintiffs' negligence per se claim has two distinct components. *See* MC ¶¶ 1000-20. First,

7    Plaintiffs allege that "[e]ach Defendant has collected or used personal information from children

8    younger than age 13 in violation of COPPA" by, inter alia, "[f]ailing to obtain verifiable parental

9    consent" prior to "any collection, use, or disclosure of  personal information from children." MC

10   ¶ 1010; *see id.* ¶¶ 1002-03, 1007-20. This aspect of Plaintiffs' negligence per se claim has nothing to

11   do with, and thus does not seek to treat Defendants as the publishers of, the content on their platforms.

12          Second, Plaintiffs allege that Defendants violated 18 U.S.C. §§ 2258A and 2258B, part of the

13   PROTECT Act, which require Defendants to report known CSAM "to reduce the proliferation of

14   online child sexual exploitation." 18 U.S.C. § 2258A(a)(1)(A); MC ¶¶ 1000-20. Contrary to

15   Defendants' claims, MTD at 12, Plaintiffs clearly allege that, "[a]s a direct and proximate result of

16   each of the Defendant's respective statutory and regulatory violations, [they] suffered serious injuries

17   and/or sequelae thereto." MC ¶ 1014. Defendants rely on *Doe #1 v. Twitter, Inc*., 2023 WL 3220912

18   (9th Cir. May 3, 2023), an unpublished, non-precedential decision, and *L.W. v. Snap, Inc*. MTD at 12.

19   But those cases addressed different duties under different statutory provisions. *See Twitter*, 2023 WL

20   3220912, at *1 (claims under 18 U.S.C. §§ 1591(a), 1595(a), 2252A, and 2255); *L.W.*, 2023 WL

21   3830365, at *6 (claims under 18 U.S.C. §§ 1591(a) and 1595).

### B.    The First Amendment does not protect Defendants' conduct.

23          Defendants' First Amendment argument relies on the same faulty premise as their § 230

24   argument. Instead of accepting the allegations as pled, Defendants insist that Plaintiffs covertly seek

25   to regulate content, expression, and ideas. But, as stated above, Plaintiffs' priority claims are about

26   the dangerous designs of Defendants' products and their failure to warn of their products' risks to

27   children and youth. The priority claims do not require any Defendant to monitor or remove content.

28          Plaintiffs' tort claims are not barred by the First Amendment. Even assuming "the First

14

Amendment prohibits civil claims that would impose liability on constitutionally protected speech and those who disseminate it," MTD at 14, Plaintiffs' claims do not seek to impose liability on *any* speech—protected or otherwise, whether by platform users or Defendants themselves. Unlike in nearly every case Defendants cite, Plaintiffs do not seek to hold Defendants responsible for "improper content" appearing on the platforms, *see supra*, Part I.2.a., nor do Plaintiffs assert any content- or viewpoint-based "offense" tort, like libel, to which heightened scrutiny applies. And even Defendants acknowledge that the "'features and functions'" on their social media products (including "'algorithms,' 'recommendations[,] and notifications'") are "'not content in and of themselves.'"[8] MTD at 14 (quoting *Dyroff*, 934 F.3d at 1098). In short, the target of this case is simply not speech, let alone any particular ideas Defendants expressed or distributed.

Defendants appear to take the absolutist position that the First Amendment bars any claim that happens to involve expression. But that's not the law any more than Defendants' rejected "but-for" test is, as explained above. Tort claims routinely implicate speech. Were it otherwise, huge swaths of cases would be barred. Physicians speak when they misdiagnose conditions, but the First Amendment does not immunize malpractice. Newspapers speak when they break a promise not to reveal a source, but there is no constitutional right to do so. Even anodyne tort claims—a golfer negligently "failing to warn nearby golfers of an errant shot"—would be barred under Defendants' rule.[9]

There is no constitutional right to design a defective product, much less to knowingly addict children to that product. That Defendants claim to be in the publishing business is irrelevant: the right to "editorial judgment" does not broadly constitutionalize Defendants' unsafe product features. Nor are those features expressive conduct—the algorithmic "decisions" at issue here are made by *machines*, not humans; they have no communicative purpose and are not "speech."  Finally, even if any of these were close calls, the First Amendment is an affirmative defense that the Court should not resolve in Defendants' favor at this stage in the case, before discovery. *See, e.g.*, *Batis v. Dun &*

---

[8] To the extent Defendants do press the argument that their platforms' features are their own speech, that would defeat their bid for immunity under § 230, which states that Defendants "shall [not] be treated as the publisher . . . of any information provided by *another* information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). This is so because if it is their own speech, they are an "information content provider" under the statute. *See Roommates*, 521 F.3d at 1165.

[9] Restatement (Third) of Torts: Phys. & Emot. Harm § 18, cmt. a (2010).

15

*Bradstreet Holdings, Inc.*, 2023 WL 1870057, at *7 (N.D. Cal. Feb. 9, 2023). The Court should reject Defendants' unfounded effort to invoke the First Amendment to bar Plaintiffs' claims.

> ### 3.    The First Amendment does not prevent liability for designing a defective product – even when the defective product touches upon speech.

"[T]he First Amendment is not an all-purpose tort shield." *Greene v. Tinker*, 332 P.3d 21, 35 (Alaska 2014). It "does not sanction the infliction of physical injury merely because achieved by word, rather than act," *Weirum v. RKO Gen., Inc.*, 539 P.2d 36, 40 (Cal. 1975), and there is no "special immunity from the application of general laws" for those who engage in some activities that ordinarily receive First Amendment protection, *Cohen v. Cowles Media Co.*, 501 U.S. 663, 670 (1991). Defendants attempt an end run around this body of law by arguing that "[t]he First Amendment prohibits civil claims that would impose liability on constitutionally protected speech and those who disseminate it." MTD at 14. But this is circular: Defendants' tortious *conduct* is not constitutionally protected speech. *Planned Parenthood Found. of Am., Inc. v. Newman*, 51 F.4th 1125, 1134 (9th Cir. 2022) ("Invoking journalism and the First Amendment does not shield individuals from liability for violations of laws applicable to all members of society.").

Plaintiffs' priority claims allege that Defendants are liable for designing defective products (Counts 1 and 3), failing to warn about the dangers of their products (Counts 2 and 4), and failing to comply with federal safety statutes (Count 10), just as any product maker would be. No element of these claims implicates any First Amendment concerns, as illustrated by California's pattern jury instructions. *See, e.g.*, CACI 1204 (defendant is liable where its product's *design* was a substantial factor in causing the plaintiff's harm); *see also* CACI 418, 419 (negligence per se); CACI 1205 (strict liability, failure to warn); CACI 1220, 1221, and 1222 (negligent products liability). Defendants "have no special license to break laws of general applicability." *Newman*, 51 F.4th at 1134.

*Cowles* illustrates the interplay between common law claims like Plaintiffs' and the First Amendment. There, the Supreme Court held a newspaper could be liable in promissory estoppel for printing the name of a source whose identity it had promised to keep confidential. 501 U.S. at 670. Critical to the Court's analysis was the fact that promissory estoppel is a common law rule of general applicability, not one crafted to single out the press. *Id.* Holding the newspaper to its promises would

1  simply reaffirm that journalists, as well as others who engage in activity protected by the First

2  Amendment, have "no special privilege to invade the rights and liberties of others." *Id.*

3      Indeed, the common thread in the decades of cases running from *Cowles* to *Newman* is that

4  the First Amendment does not bar a tort claim provided it is not seeking to punish anyone for simply

5  expressing an idea. In *Weirum*, the California Supreme Court recognized that a dangerously designed

6  radio contest could give rise to liability "for the foreseeable results of a broadcast which created an

7  undue risk of harm to decedent," because the First Amendment is not a license to inflict physical

8  injury. 539 P.2d at 40. And in *Clift v. Narragansett Television L.P.*, the Rhode Island Supreme Court

9  held that the First Amendment allowed a television station to be held liable for interviewing a suicidal

10 man in a way that disrupted police efforts to talk him down. 688 A.2d 805, 811 (R.I. 1996). Those

11 cases, like this one, asked whether the defendants breached their ordinary duty of care, and had

12 nothing to do with preventing anyone from sending or receiving particular content. *See Zacchini v.*

13 *Scripps-Howard Broad. Co.*, 433 U.S. 562, 573-578 (1977) (permitting right of publicity tort claim

14 based on nature of injury despite "no doubt" broadcast was protected speech).

15     Defendants' cases are not to the contrary. Some do not deal with the First Amendment or

16 analogous claims at all.[10] The rest rejected liability only where the plaintiffs allegedly sought to hold

17 speakers liable for expressing dangerous ideas,[11] where defendants would have to alter what was

18

19

20

21

---

[10] *Estate of B.H. v. Netflix, Inc.* was resolved on tort grounds and did not reach Netflix's argument that the First Amendment "precluded [plaintiffs' civil claims] in their entirety." 4:21-CV-06561-YGR, 2022 WL 551701, at *4 (N.D. Cal. Jan. 12, 2022). *Herceg v. Hustler Magazine, Inc.* analyzed an incitement claim; the court declined to consider plaintiffs' negligence claim on procedural grounds. 814 F.2d 1017, 1025 (5th Cir. 1987).

[11] *McCollum v. CBS, Inc.*, 249 Cal. Rptr. 187 (Ct. App. 1988) (rejecting duty "to avoid the dissemination of ideas in artistic speech"); *Olivia N. v. NBC*, 178 Cal. Rptr. 888 (Ct. App. 1981) (rejecting liability for the "selection of controversial materials" in a TV broadcast); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1275 (D. Colo. 2002) (rejecting duty to "refrain from expressing the ideas contained in [videogame]"); *Wilson v. Midway Games, Inc.*, 198 F. Supp. 2d 167, 173 (D. Conn. 2002) (rejecting liability for "ideas and expressions" in video game); *Davidson v. Time Warner, Inc.*, 1997 WL 405907, at *12 (S.D. Tex. Mar. 31, 1997) (rejecting liability for "*ideas* contained in" rap album (emphasis in original)); *Watters v. TSR, Inc.*, 715 F. Supp. 819, 823 (W.D. Ky. 1989) (rejecting liability for "the ideas expressed in a speech or publication"); *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 206 (S.D. Fla. 1979) (same). While the same distinction also applies to *DeFilippo v. NBC*, 446 A.2d 1036 (R.I. 1982), that case is "weak precedent in light of" *Clift*, which articulated different standards for First Amendment challenges to tort claims. *See In re Factor VIII or IX Concentrate Blood Prods. Litig.*, 25 F. Supp. 2d 837, 843 (N.D. Ill. 1998).

1    expressed to avoid liability. *See Snyder v. Phelps*, 562 U.S. 443, 457 (2011) ("It was what Westboro

2    said that exposed it to tort damages."); *Reno v. Am. C.L. Union*, 521 U.S. 844, 868 (1997)

3    (invalidating "content-based blanket restriction on speech"). *James v. Meow Media, Inc.*, on which

4    Defendants rely heavily, is distinguishable on this ground: the plaintiff there sought to hold the

5    defendant liable for "the improper influence" of and the message "communicated" through particular

6    "protected speech." 300 F.3d 683, 696 (6th Cir. 2002). Plaintiffs allege that if Defendants fixed the

7    defective designs of their products that lead to addiction, compulsive use, and other harms, Plaintiffs

8    would not have been injured *even if* the same content remained on the apps. *E.g.*, MC ¶ 846.

9        Defendants ignore the line these cases draw between claims targeting ideas and claims

10   targeting something else, arguing that courts "reject . . . efforts to disguise attacks on speech by

11   focusing on how it is presented or recommended and the alleged effects of that presentation." MTD

12   at 18. But the two cases they cite do not suggest that at all. In *Bill v. Superior Court*, the plaintiffs

13   sought to compel the producers of a film to add a content warning and other security measures

14   specifically "because of the film's content, and for no other reason." 137 Cal. App. 3d 1002, 1007

15   (1982). Unlike *Bill*, this case would not require Defendants "to predict what particular expression will

16   cause [a particular] reaction," or more broadly speaking force Defendants to host or remove certain

17   content. *Cf. id.* at 1008-09. The danger here is instead created by defective product designs made to

18   manipulate dopamine levels in young brains, addict young users, and maximize engagement,

19   regardless of the specific content used to accomplish these goals. MC ¶¶ 66-90. Tellingly, Defendants

20   omit that *Bill* rejected their absolutist position, stating that "liability may exist for tortious conduct in

21   the form of speech." 137 Cal. App. 3d at 1009 (citing *Weirum*, 15 Cal. 3d at 48).

22       This Court in *B.H.* dismissed the claim against Netflix on similar grounds: the complaint

23   "concern[ed] the content" of the television show at issue.[12] 2022 WL 551701, at *2 (citing, *inter alia*,

24   *Bill*, 137 Cal. App. 3d at 1007). And like in *Bill*, this Court did not rest its decision entirely on the

25   First Amendment, *id.* at *4, as Defendants ask the Court to do here. Thus, far from being irrelevant,

---

[12] This is confirmed by the record in that case. *Contra* Defs.' Reply in Support of Joint MTD (ECF
No. 323) at 12 n.7. *See, e.g.*, Am. Compl., *Estate of B.H.*, No. 4:21-CV-06561-YGR (N.D. Cal.
Sept. 22, 2021), ECF No. 22, ¶¶ 6 (Netflix used "targeted recommendation systems to push *the
Show*" (emphasis added)), 32 (Netflix did "not reasonably warn of the risk that *the Show* could
cause suicide." (emphasis added)), 80 ("*The Show* posed serious health risks" (emphasis added)).

the distinction between defective product designs and defective ideas is the key to resolving this motion. The latter may be entitled to constitutional protection; the former are not.

### 4. Defendants do not have a First Amendment right to distribute dangerous products.

#### a. Defendants are wrong that holding them liable for their defective and dangerous products would interfere with free expression.

Defendants insist that, because Plaintiffs were "'exposed to' a range of problematic content" on Defendants' products, the *claims* are *about* that content. MTD at 17. This is analytical sleight-of-hand. As in past cases where speech was incidentally involved in a defendant's business, "[t]here is a clear distinction between the alleged conduct on which the plaintiffs' liability may rest"—here, the defective design of Defendants' products—"and the evidence used to establish the elements of the claims (the constitutionally protected conduct identified by the defendants)." *Allen v. Am. Cyanamid*, 527 F. Supp. 3d 982, 994 (E.D. Wis. 2021). In *Allen*, a lead paint manufacturer sought summary judgment on the basis that the plaintiffs were seeking to hold it liable for "truthful commercial speech, in the form of advertisements," and protected lobbying activity. *Id.* The court rejected that argument because the injury at issue was the harm from the "unreasonably dangerous" lead paint, *not* the protected speech. *Id.* In other words, where liability is arises from the defective product design, not the protected speech, the claim may move forward. *Id.* Moreover, the "protected speech," to the extent it is relevant, may be brought in "as evidence to show elements of an otherwise valid claim." *Id.*; *see Burton v. E.I. du Pont de Nemours & Co.*, 994 F.3d 791, 831 (7th Cir. 2021) ("The First Amendment does not bar the admission of any and all evidence that falls within its protection.").

Defendants claim that their products would not cause harm if they contained only "an endless scroll of blank boxes," MTD at 18, and argue that this means that Plaintiffs' claims are about content. MTD at 17. But that makes Plaintiffs' point: if the only way Defendants' products would not harm children is to strip their products of all content—an alternate universe divorced from Plaintiffs' actual pleadings—it shows that Plaintiffs' liability theories are not targeting any particular content or ideas. *E.g.*, MC ¶ 272 (citing Meta internal document admitting it "only care[s] about" and "optimize[s] for" metrics like "time spent, open links, etc.").

Because Plaintiffs' priority claims do not target content—let alone any particular ideas on

1   Defendants' products—Defendants' favored cases are readily distinguishable. *Sorrell v. IMS Health*

2   *Inc.*, 564 U.S. 552 (2011), involved a statute that was "directed at certain content[,] aimed at particular

3   speakers," *id.* at 567, and indeed "aimed at a particular viewpoint," *id.* at 564. The Court analogized

4   that case to impermissible claims seeking to "prohibit[] truthful, nonmisleading advertisements." *Id.*

5   at 578. Similarly, *Brown v. Entertainment Merchants Association* concerned efforts to regulate certain

6   "interactive" video games based on their "violent" and "disgust[ing]" nature. 564 U.S. 786, 798

7   (2011); *see also Candy Lab Inc. v. Milwaukee County*, 266 F. Supp. 3d 1139, 1146 (E.D. Wis. 2017)

8   (video game at issue conveyed ideas—e.g., its Wild West theme—and had "sufficient expressive

9   content" to merit protection). This case is different. Defendants could avoid tort liability by

10  abandoning their unsafe designs, while leaving up the same content. Plaintiffs seek to hold Defendants

11  liable not *because* of the content they host, but *regardless* of it. This distinction is dispositive.

12  *Compare Sorrell*, 564 U.S. at 571 (striking down "content- and speaker-based restrictions on the

13  availability and use of [certain] information"), *with Newman*, 51 F.4th at 1134 (journalists and other

14  entities that engage in protected speech can be held liable through generally applicable tort law that

15  is not facially unconstitutional).[13]

16        Finally, even assuming Plaintiffs' design defect claims would have "incidental effects" on

17  protected activity (which Plaintiffs dispute), the First Amendment does not bar them. *Cowles*, 501

18  U.S. at 669. It is black letter law that "the First Amendment does not prevent restrictions directed at

19  commerce or conduct from imposing incidental burdens on speech." *HomeAway*, 918 F.3d at 685.

20  This distinction between torts that are aimed at *ideas* and those that are aimed at *conduct* (but affect

21  speech) is analogous to the distinctions that apply to statutory restrictions on speech. "When 'speech'

22  and 'nonspeech' elements are combined in the same course of conduct, a sufficiently important

23  governmental interest in regulating the non-speech element can justify incidental limitations on First

24  Amendment freedoms." *United States v. O'Brien*, 391 U.S. 367, 376 (1968). The Surgeon General,

25  the President, and a chorus of health professionals have explained how Defendants' products have

26

---

27  [13] Defendants' out-of-circuit authority recognizes this same distinction. *See Western Watersheds*
28  *Project v. Michael*, 869 F.3d 1189 (10th Cir. 2017). Statutes that "apply specifically to the creation of speech" are subject to First Amendment scrutiny, *id.* at 1197, while generally applicable law (such as trespass) is not barred by the First Amendment, even when speech is affected. *Id.*

1  helped precipitate a nationwide youth mental health crisis and called for urgent action. MC ¶¶ 16-18.

2  "It is evident beyond the need for elaboration that a State's interest in safeguarding the physical and

3  psychological well-being of a minor is compelling." *New York v. Ferber*, 458 U.S. 747, 756–57

4  (1982) (cleaned up); *see F.C.C. v. Pacifica Found.*, 438 U.S. 726, 749 (1978) ("government's interest

5  in the well-being of its youth and in supporting parents' claim to authority in their own household

6  justified the regulation of otherwise protected expression") (cleaned up).

7       **b.    Defendants are wrong that Plaintiffs' claims would**
            **unconstitutionally impinge on their editorial judgment.**
8

9       Defendants also invoke a line of cases protecting "editorial control and judgment" over

10 content. MTD at 16. This is a red herring; Defendants' decisions about content are not at issue here.

11 In any event, the right to editorial discretion is a protection against compelled speech by the

12 government. In *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 261 (1974), the First Amendment

13 protected against a statute requiring newspapers to give equal space to political candidates. In *Turner*

14 *Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 637 (1994), it forbade a "must-carry" requirement that forced

15 cable television operators to carry certain broadcast signals. No compelled speech is at issue here:

16 Plaintiffs do not ask this Court to require Defendants to publish (or de-publish) anything.[14]

17       Insisting that they merely select and arrange content, Defendants cite *Zhang v. Baidu.com*

18 *Inc.*, 10 F. Supp. 3d 433, 439-40 (S.D.N.Y. 2014), a case concerning a search engine. MTD at 16.

19 Defendants quote from a paragraph describing *one* academic theory of the First Amendment's

20 protection of search-engine results. But the court went on to discuss a "contrast[ing]" theory and

21 declined to "resolve the scholarly debate." *Id.* at 439. Instead, the court dismissed the claims because

22 the plaintiffs attacked ideas: Baidu's "conscious decision to design its search-engine algorithms to

23 favor certain expression on core political subjects over other expression." *Id.* at 439-40.

24       Defendants argue based on other cases that social media platforms enjoy a constitutional right

25 to editorial discretion. But, again, these cases concern compelled speech. *See O'Handley v. Padilla*,

26 579 F. Supp. 3d 1163, 1188 (N.D. Cal. 2022) (declining to issue order "telling Twitter what content-

27

28 _____

[14] To the extent Defendants seek to rely on the Supreme Court's recent opinion in *303 Creative LLC v. Elenis*, that case, too, dealt with "compell[ed] speech" that both parties agreed was "expressive," "customized[,] and tailored." 143 S. Ct. 2298, 2309, 2313 (2023).

1    moderation policies to adopt and how to enforce those policies"); *NetChoice v. Att'y Gen., Fla.*, 34

2    F.4th 1196, 1210 (11th Cir. 2022) ("Laws that restrict platforms' ability to speak through content

3    moderation therefore trigger First Amendment scrutiny."). This case is about the design of the product

4    that contains the content, not the right to include or exclude any content—and thus implicates

5    fundamentally different questions. "The fact that the publisher handles news while others handle food

6    does not [] afford the publisher a peculiar constitutional sanctuary in which he can [act] with impunity

7    [to] violate laws regulating his business practices." *Assoc. Press v. United States*, 326 U.S. 1, 7 (1945);

8    *see also Dreamstime.com, LLC v. Google, LLC*, 2019 WL 2372280, at *2 (N.D. Cal. June 5, 2019)

9    (rejecting Google's First Amendment defense to unfair competition claim).[15]

10                        **c.      Defendants fail to mount any viable First Amendment defense to**
                                   **Plaintiffs' failure to warn and negligence per se claims.**
11

12           Defendants largely ignore the claims that do not fit their theory of the case. Their supplemental

13   motion to dismiss does not mention Plaintiffs' negligence per se claim in the First Amendment section

14   at all. That is because Defendants have no serious argument that either COPPA or the PROTECT

15   Act, or a negligence per se claim predicated on them, could be barred by the First Amendment.

16           Likewise, as they did with § 230, Defendants discuss Plaintiffs' failure to warn claim only in

17   passing, a tacit recognition that the First Amendment does not "provide[] immunity for defendants in

18   failure to warn cases." *Blood Prods. Litig.*, 25 F. Supp. 3d at 848; *see City of Annapolis v. BP P.L.C.*,

19   2022 WL 4548226, at *9 (D. Md. Sept. 29, 2022) (failure to warn claim does not on its face raise

20   First Amendment concerns); *see also Allen*, 527 F. Supp. 3d at 994 (First Amendment does not apply

21   to claims that seek to hold product manufacturer "liable for negligence or the production or sale of an

22   unreasonably dangerous product"); *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188

23   (2003) (rejecting applicability of anti-SLAPP statute and stating that defendant "cite[d] no authority

24   holding the First Amendment protects the manufacturer or seller of an unsafe product from liability

25   for injuries caused by defects in that product"). There is no constitutional right to mislead or provide

26

27   _____

28   [15] It bears mention that, even in the context of compelled speech, courts are split on whether these
     Defendants enjoy any right to editorial discretion. That much is clear by comparing *NetChoice v.*
     *Paxton*, 49 F.4th 439, 460 (5th Cir. 2022), a case omitted from Defendants' brief, with *NetChoice*, 34
     F.4th at 1212.

incomplete product information, and this Court can hold Defendants liable for such tortious activity.

> **d.    The challenged features of Defendants' products do not constitute protected speech.**

As discussed above, whether Defendants are engaged in speech does not answer the question of whether Plaintiffs' claims are barred by the First Amendment. But Defendants also are asking the Court to constitutionalize their business practices in a way no court has ever embraced.

**Nonspeech Conduct**: While expressive conduct is covered by the First Amendment, conduct is only expressive "where circumstances establish that an unmistakable communication is being made." *Edge v. City of Everett*, 929 F.3d 657, 668 (9th Cir. 2019). For that reason, a protestor wearing a jacket reading "Fuck the Draft" is entitled to First Amendment protection, *Cohen v. California*, 403 U.S. 15, 18 (1971), while a barista wearing a bikini to work is not, *Edge*, 929 F.3d at 669. Even though it is their burden to show a "great likelihood that their intended message will be understood by those who receive it," *id.*, Defendants have not even attempted to articulate what that message is, let alone why it merits constitutional protection.

The truth is that the defective features designed into Defendants' platforms do not communicate anything at all. Defendants openly admit that their product features are "tools." MTD at 18. But *defects* in tools used to create speech are not *themselves* speech.[16] And conduct is not shielded by the First Amendment just because it involves some spoken language. *Rumsfeld v. F.A.I.R.*, 547 U.S. 47 at 62 (2006). Take the "noisy sound truck" example the Supreme Court invoked in *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992). The noisy sound truck is "a mode of speech" that can be "used to convey an idea[.]" *Id.* But its "'nonspeech' element of communication"—that it is noisy—

---

[16] The image-altering filters made available by Defendants demonstrate this point—they are used by others to create speech but are themselves merely tools. *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180 (9th Cir. 2001), is not to the contrary. MTD at 20. Far from categorically immunizing the use of computer-altered photography techniques from all tort liability, that case narrowly held that a movie star's right of publicity and unfair competition claims failed the "actual malice" standard applicable to speech-based torts brought by public figures. *Id.* at 1189. Likewise, the cases Defendants cite do not provide absolute First Amendment immunity whenever communication "tools" are implicated. *Bland v. Roberts*, 730 F.3d 368, 385-86 (4th Cir. 2013), for example, held only that a public employee's *use* of a "like" button constituted protected speech in the context of a claim for employment retaliation. *See* MTD at 19. And *Twitter, Inc. v. Taamneh*, 143 S. Ct. 1206, 1227 (2023), addressed neither the First Amendment nor tort liability, but merely held Twitter could not be liable for aiding and abetting a terrorist attack through the operation of its algorithms.

1   does not have "a claim on the First Amendment." *Id.* Similarly, a slot machine is not a form of speech,

2   even though it makes noises and uses words and numbers. *There to Care, Inc. v. Comm'r of Ind.*

3   *Dep't of Rev.*, 19 F.3d 1165, 1167 (7th Cir. 1994).

4          One of Defendants' authorities, *Anderson v. City of Hermosa Beach*, 621 F.3d 1051 (9th Cir.

5   2010), provides a helpful illustration. The process of tattooing is protected pure speech, in part

6   because "both the tattooist and the person receiving [it]" express themselves through the tattoo. 621

7   F.3d at 1062.  But nobody would characterize the tattooist's failure to use a sterile needle as speech,

8   as evidenced by the many regulations preventing exactly that. *E.g.* Cal. Health & Safety Code §

9   119311.[17] Nor would the First Amendment protect against a tort claim for a "punitively affixed"

10  tattoo. *Anderson*, 621 F.3d at 1068 (Noonan J., concurring); *see also id.* at 1069 (no First Amendment

11  immunity from regulation to ensure tattoo parlors "do[] not attract minors"). The dangerous features

12  in Defendants' products—including psychological manipulation techniques patterned off slot

13  machines (MC ¶ 2)—are like the unsanitary needles. They are not speech, and Defendants' decision

14  to use them is their conduct alone. It is legally immaterial whether third parties may use these features

15  when communicating their own messages, just as it is legally immaterial that the unsterilized needle

16  is used to create a tattoo. *See id.* at 1068-69 (Noonan, J., concurring) (explaining that the panel held

17  only that "tattooing may be purely expressive, not that it always is.").

18          **Machine Speech**: Large portions of the activities Defendants claim as expression are done by

19  algorithms, not human editors. Defendants assume—without acknowledging the issue—that even

20  what they claim are content-agnostic algorithms must be treated as the equivalent of human speech.

21  But it is far from a foregone conclusion that the algorithms in this case or other artificial-intelligence

22  models, like ChatGPT, are entitled to First Amendment protection. The First Amendment protects the

23  freedom to think and speak as inalienable *human* rights. *W. Va. State Bd. of Educ. v. Barnette*, 319

24  U.S. 624, 642 (1943). Leading scholars have explained the deeply concerning consequences of

25  assuming machine speech is legally equivalent to, and deserving of the same constitutional rights as,

26

27  [17]  Indeed, garden-variety tort actions involving tattooing regularly proceed without the First
     Amendment posing an obstacle. *See, e.g.*, *Williams v. Jackson*, No. 608603 (La. Dist. Ct. June 22,
28  2015) (plaintiff's jury verdict for injuries caused by negligence in application of tattoo); *Magrey v.
     Franks*, No. CV-09-5004034-S (Conn. Super. Ct. Mar. 23, 2011) (jury verdict of no liability in case
     alleging negligence in application of tattoo).

1   human speech. Tim Wu, *Machine Speech*, 161 U. Pa. L. Rev. 1495, 1496 (2013); Helen Norton,

2   *Manipulation and the First Amendment*, 30 Wm. & Mary Bill Rts. J. 221, 223 (2021). And courts

3   have not treated computer code's functional elements as speech in other contexts. *Universal City*

4   *Studios, Inc. v. Corley*, 273 F.3d 429, 451 (2d Cir. 2001) (observing that using code to communicate

5   with a computer is "never protected"). There is no reason to depart from that approach here.

               **5.**    **First Amendment questions cannot be resolved in Defendants' favor on a motion to dismiss.**

8       While Plaintiffs respectfully submit that it is obvious from the pleadings that Defendants' First

9   Amendment defense fails, the First Amendment is an affirmative defense: the Court may only dismiss

10  if it is clear from the face of the complaint that the claim is barred. *Batis*, 2023 WL 1870057, at \*7.

11  A plaintiff need not plead facts to negate an affirmative defense. *Perry v. Merit Sys. Prot. Bd.*, 582

12  U.S. 420, 435 n.9 (2017). Because "all the circumstances of the speech" as revealed by "the whole

13  record" are relevant to whether a claim is barred by the First Amendment, *Snyder*, 562 U.S. at 460,

14  dismissal would be procedurally improper at this stage. *Cf. City of Los Angeles v. Preferred*

15  *Commc'ns, Inc.*, 476 U.S. 488, 495 (1986) (observing, outside of the tort context, that it would not be

16  appropriate to reach the merits of a First Amendment dispute at the motion to dismiss stage because

17  of the need for "fuller development of the disputed issues in the case."); *see also CI Games S.A. v.*

18  *Destination Films*, 2016 WL 9185391, at \*10 (C.D. Cal. Oct. 25, 2016).

19      By asking the Court to dismiss Plaintiffs' claims on the pleadings, Defendants ask to bend the

20  law beyond its breaking point: they want the Court to declare their products and conduct are speech

21  in a way no other court has recognized, while curtailing the ability of tort law to redress injuries in a

22  way no other court has done, all without a single interrogatory served or deposition taken, much less

23  a single factual finding made that implicates speech. The motion should be denied.

24  **III.**    **CONCLUSION**

25      For the foregoing reasons, the Court should deny Defendants' Joint Motion to Dismiss

26  Pursuant to Rule 12(b)(6) Plaintiffs' Priority Claims Under Section 230 and the First Amendment.

27

28

1    Dated: July 25, 2023                    Respectfully submitted,

2                                            */s/ Lexi J. Hazam*
                                             Lexi J. Hazam
3                                            Elizabeth J. Cabraser
                                             **LIEFF CABRASER HEIMANN &**
4                                            **BERNSTEIN, LLP**
                                             275 Battery Street, 29th Floor
5                                            San Francisco, CA 94111-3339
                                             Telephone: 415-956s-1000
6                                            lhazam@lchb.com
7

8                                            */s/ Christopher A. Seeger*
                                             Christopher A. Seeger
9                                            **SEEGER WEISS, LLP**
                                             55 Challenger Road, 6th Floor
10                                           Ridgefield Park, NJ 07660
                                             Telephone: 973-639-9100
11                                           Facsimile: 973-679-8656
                                             cseeger@seegerweiss.com
12

13

14                                           */s/ Previn Warren*
                                             Previn Warren
15                                           **MOTLEY RICE LLC**
                                             401 9th Street NW Suite 630
16                                           Washington DC 20004
                                             Telephone: 202-386-9610
17                                           pwarren@motleyrice.com
18
                                             ***Plaintiffs' Co-Lead Counsel***
19

20

21

22

23

24

25

26

27

28

1

## **<u>ATTESTATION</u>**

2      I hereby attest pursuant to N.D. Cal. Civil L.R. 5–1 that the concurrence to filing of this

3 document has been obtained from each signatory hereto.

4

DATED:      July 25, 2023                    By: /s/ *Lexi J. Hazam*

5                                                         Lexi J. Hazam

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28