Pages 1 - 113

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Gonzalez , Judge

IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION,                     )
                                )   Case No. CV 22-03047-YGR
                                )
                                )
ALL ACTIONS.                    )
                                )
_____)


                        Oakland, California
                        Thursday, November 16, 2023

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

                LEIFF CABRASER HEIMANN & BERNSTEIN LLP
                275 Battery Street, 20th Floor
                San Francisco, CA  94111
           BY:  **LEXI J. HAZAM, ESQUIRE**

                LEIFF CABRASER HEIMANN & BERNSTEIN LLP
                250 Hudson Street, 8th Floor
                New York, NY 10013
           BY:  **KELLY MCNABB, ESQUIRE**

                SEEGER WEISS LLP
                55 Challenger Road
                Ridgefield Park, NJ 07660
           BY:  **CHRISTOHER SEEGER, ESQUIRE**

                MOTLEY RICE LLC
                One Corporate Center
                Hartford, CT 06103
           BY:  **MATHEW JASINSKI, ESQUIRE**


Reported By:    Pamela Batalo-Hebel, CSR No. 3593, RMR, FCRR
                Official Reporter

**APPEARANCES CONTINUED:**

For Plaintiffs:

                        COLORADO DEPARTMENT OF LAW
                        1300 Broadway, 6th Floor
                        Denver, CO 80203
                BY:  **BIANCA MIYATA,**
                     **SENIOR ASSISTANT ATTORNEY GENERAL**

                        OFFICE OF THE DEPUTY ATTORNEY GENERAL
                        455 Golden Gate, Suite 11000
                        San Francisco, CA 94102
                BY:  **MEGAN O'NEILL**
                     **DEPUTY ATTORNEY GENERAL**

For Meta Defendants:

                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars, Suite 3500
                        Los Angeles, CA  90067
                BY:  **ASHLEY SIMONSEN, ESQUIRE**

                        COVINGTON & BURLING LLP
                        620 Eighth Avenue
                        New York, NY  10018
                BY:  **PAUL W. SCHMIDT, ESQUIRE**

For TikTok Defendants:

                        KING & SPALDING LLP
                        1180 Peachtree Street, N.E., Suite 1600
                        Atlanta, GA  30309
                BY:  **GEOFFREY M. DRAKE, ESQUIRE**

                        FAEGRE DRINKER BIDDLE & REATH LLP
                        300 N. Meridian Street, Suite 2500
                        Indianapolis, IN  46204
                BY:  **ANDREA PIERSON, ESQUIRE**

For YouTube Defendants:

                        WILLIAMS & CONNOLLY LLP
                        680 Maine Avenue SW
                        Washington, DC 20024
                BY:  **ASHLEY HARDIN, ESQUIRE**

**APPEARANCES CONTINUED:**

Additional Speakers:  **THOMAS CARTMELL, ESQUIRE**
**JAMES CECCHI, ESQUIRE**
**DEREK LOESER, ESQUIRE**
**ANNE MARIE MURPHY, ESQUIRE**
**MICHAEL WEINKOWITZ, ESQUIRE**
**AELISH BAIG, ESQUIRE**
**LESLIE WEAVER, ESQUIRE**
**ARTHUR BRYANT, ESQUIRE**

| | |
|---|---|
| 1 | **Thursday - November 16, 2023**                              **11:01 a.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling 22-md-3047-YGR, In Re: Social |
| 5 | Media Adolescent Addiction/Personal Injury Products Liability |
| 6 | Litigation. |
| 7 | **THE COURT:**  Okay.  Good morning.  Before we get |
| 8 | started, Pam, can you hear me okay? |
| 9 | **THE COURT REPORTER:**  Yes, Your Honor, I can. |
| 10 | **THE COURT:**  So a bunch of things to do today, |
| 11 | obviously. |
| 12 | I am going to make an announcement, though, and that is |
| 13 | there are ongoing protests happening in San Francisco. |
| 14 | Apparently a number of lanes, if not all lanes, of the Bay |
| 15 | Bridge westbound were closed due to protesters.  Some lanes |
| 16 | were closed coming this way.  It may be that those protesters |
| 17 | may make their way to this federal building. |
| 18 | Hopefully it won't impact us in any way.  If it -- if we |
| 19 | are impacted and I tell you that you must leave the building, |
| 20 | you will go out of this -- those doors, and there are stairs |
| 21 | that are right behind this door, actually.  There will be CSOs. |
| 22 | Everybody should quickly just move and leave the building. |
| 23 | Okay?  It shouldn't be an issue.  Everybody knows you're in |
| 24 | here, and we'll proceed. |
| 25 | We have a number of students visiting the federal |

1    courthouse today.  They will be in here with us for about an

2    hour, so all you lawyers, please be on your best behavior and

3    show them the best of our profession.  Okay?

4        Good morning.

5        All right.  Let's start with the States Attorney General

6    cases.  I can -- and just as a reminder, our sign-in sheet will

7    reflect all of the lawyers who are here, so we aren't going to

8    waste any time going through who's here.  When you come to the

9    microphone, though, you do need to make sure to identify

10   yourself.

11       So I've got lawyers for the State Attorneys General.  Yes?

12       **MS. MIYATA:**  Good morning, Your Honor.  My name is be

13   Bianca Miyata from the State of Colorado, and I'm here today on

14   behalf of the States' plaintiffs.

15       **MR. SCHMIDT:**  Good morning, Your Honor.  Paul Schmidt

16   from Meta.

17       **THE COURT:**  Okay.  And so you're going to have -- that

18   mic needs to go up because you're tall and we can't hear you.

19       **MR. SCHMIDT:**  Thank you, Your Honor.

20       **THE COURT:**  With respect to the State Attorneys

21   General, their Complaint, I don't -- I have never anticipated

22   that I would appoint counsel for the Attorneys General, so I

23   know you would object, and I think you should object, but in my

24   view, you have all coordinated.  You have your own teams, and I

25   don't need to necessarily be involved in that.

```
1          I understand that there are going to be three of you who

2     will take the lead on behalf of the States, the 33, so that is

3     yourself, someone from California --

4               MS. MIYATA:  That's correct, Your Honor.

5               THE COURT:  And is that person here?

6               MS. MIYATA:  Yes, Your Honor.

7               THE COURT:  Is that Megan -- or who is that?

8               MS. MIYATA:  If I could invite my co-counsel to come

9     to the podium.

10              THE COURT:  Yes, please.

11              MS. O'NEILL:  Good morning, Your Honor.  Megan O'Neill

12    on behalf of the People of the State of California.

13              THE COURT:  Great.  Thank you.

14         And then is this Mr. Lewis?

15              MR. LEWIS:  Yes, Your Honor.  Chris Lewis on behalf of

16    the Commonwealth of Kentucky.

17              THE COURT:  Terrific.

18         So my view is that the next step in terms of rounds of

19    briefing is that we should deal with the States Attorney

20    General case first.

21         When can -- I'm assuming that there's not going to be an

22    answer that you're going to -- that the defendants, Meta

23    defendant, wishes to file a motion to dismiss?  Yes or no?

24              MR. SCHMIDT:  Yes, Your Honor.

25              THE COURT:  Okay.  I've taken a look at the Complaint
```

1    and the various causes of action.  They all seem to be

2    relatively the same.  They're just in 33 different states.

3        So what is the fastest that you can have a motion on file?

4            MR. SCHMIDT:  Well, I think what we'd request,

5    Your Honor, is if we're going to go first on the State AGs,

6    that we would slot them in around the time that we have

7    proposed for the local government briefing, which we proposed

8    the first brief on that being February 15th, if --

9            THE COURT:  Denied.

10           MR. SCHMIDT:  If that's too late, then we would ask

11   for January --

12           THE COURT:  It's too late.

13       So let me explain to you something so that you understand

14   where I'm coming from.

15       You see all these lawyers in this room?

16           MR. SCHMIDT:  Of course.

17           THE COURT:  Yeah.  That's all of you, and there's me.

18   You see one plus one.

19       I actually got some help.  That help starts in January,

20   and I have help for a few months, so you all are going to move

21   very quickly so that I can use the extra help that I got that

22   the -- I was able to get another law clerk, and we are going to

23   move fast because I don't know if I'll get a second law clerk

24   to deal with this case again.

25       So let me reask the question.  How fast can you get your

```
1   motion on file?

2          MR. SCHMIDT:  I would think the fastest we could get

3   it on file would be late December, early January, and we would

4   request early January.

5          THE COURT:  You can have late December.

6   December 22nd.

7          MR. SCHMIDT:  Thank you, Your Honor.

8          THE COURT:  How many pages do you want?

9          MR. SCHMIDT:  We haven't studied that question.  I

10  think what we'd probably ask for is at this point, something

11  broader that we could come in under, like 80 pages.  They're

12  complicated issues there, and there may be issues there -- I

13  think as Your Honor flagged, the claims are very similar, but

14  there are issues of unique state law on the consumer protection

15  type claims.

16         THE COURT:  Could you give me an example?

17         MR. SCHMIDT:  Well, just that the state -- consumer

18  protection statutes vary in terms of their requirements in some

19  instances.

20         THE COURT:  Do they or not?  Do you know?  I mean, I'm

21  taking that the State AGs -- have you all talked about the

22  overlap between the various claims?

23         MS. MIYATA:  Yes, we have, Your Honor.

24         THE COURT:  Okay.  So how much overlap is there and

25  how much -- just in general, how much variety?
```

| | |
|---|---|
| 1 | **MS. MIYATA:**  Your Honor, I believe there's significant |
| 2 | overlap in the States' claims.  While there may be -- there may |
| 3 | be wording or elements that are distinct for certain particular |
| 4 | states, in core, the States' claims regarding unfairness and |
| 5 | regarding deception, as well as the joint claim regarding |
| 6 | COPPA, are essentially similar. |
| 7 | **THE COURT:**  So I looked at -- and I'm -- I'm pulling |
| 8 | it up.  Have the -- has your firm done any analysis of the |
| 9 | elements of the various claims? |
| 10 | **MR. SCHMIDT:**  Yes, we have, Your Honor. |
| 11 | **THE COURT:**  Okay.  So what's the overlap? |
| 12 | **MR. SCHMIDT:**  I think -- |
| 13 | **THE COURT:**  That's why I'm asking.  So there are 33 |
| 14 | different states plus I now have the State of Florida, and I'll |
| 15 | ask you about that. |
| 16 | Is there anyone here from the State of Florida? |
| 17 | **MS. MIYATA:**  Not to my knowledge, Your Honor. |
| 18 | **THE COURT:**  Okay.  So there are 54 claims, but only -- |
| 19 | but 33 states; that is, some of the states have multiple |
| 20 | claims, some are, you know -- have deceptive practices versus |
| 21 | unfair acts or practices. |
| 22 | So you've looked at the elements.  They all seem to be in |
| 23 | one or two buckets.  That's why it seems to -- other than the |
| 24 | COPPA violation.  That's why I'm asking the question. |
| 25 | **MR. SCHMIDT:**  Yeah.  I think we view it consistent |

1    with what Your Honor just said, that there are three buckets.

2    There's the COPPA violations, is one bucket, and that is

3    entirely common across the states.  There's several arguments

4    we'd be making there.  And then there's the unfair bucket and

5    the misrepresentations bucket.

6        And those are common in terms of the allegations across

7    the state, which does allow us to have commonality in briefing,

8    but we have not conducted the 34, and we do think it probably

9    makes sense to include Florida in whatever we file.  We have

10   not conducted the 34-state analysis of are they identical on

11   reliance, for example, or elements like that.

12       And that's where -- that's what guides us in asking for a

13   little more pages, the possibility of there being some

14   variation that we'd want to address.  We could do that through

15   an appendix.

16           **THE COURT:**  By any chance, do you have a spreadsheet

17   that outlines the various elements and where there's overlap

18   versus not?

19           **MS. MIYATA:**  Your Honor, we do have such a

20   spreadsheet, but it is not ready for prime time to submit to

21   this Court.

22           **THE COURT:**  Okay.  So if they get a brief to me on

23   December 22nd -- gosh, that just seems like a long time.  It's

24   only one defendant.

25           **MR. SCHMIDT:**  It's one defendant.  It's a good number

1    of factual allegations that we need to take into account, and

2    then there are novel legal issues.

3        **THE COURT:**  How are there novel legal issues?  These

4    are standard claims, and you've had this Complaint since the

5    end of October.  You can't tell me that you haven't been

6    working on this already.

7        **MR. SCHMIDT:**  We have been looking at it, and we have

8    been analyzing it for sure, and we've been looking at in the

9    context of the broader litigation.  And to kind of elaborate on

10   the point I said earlier in terms of differences, there are

11   differences in terms of reliance.  There are differences in

12   terms of things like statutory safe harbors in different

13   states.  We would want to be able to address those fairly.

14       But we'll obviously work within whatever Your Honor

15   orders.

16       **THE COURT:**  Once a brief is filed, how much time do

17   the States need to respond?

18       **MS. MIYATA:**  Your Honor, we certainly do have -- well,

19   we are well coordinated.  We do have multiple levels of

20   approval required in the States in order for us to provide our

21   response.

22       I believe if the defendant has had, by my rough math, nine

23   weeks' opportunity by the end of December --

24       **THE COURT:**  I'm not sure that I'm going to give them

25   that much time.

```
 1              MS. MIYATA:  Okay.

 2              THE COURT:  I need to know how much time you need from

 3    the time the brief is filed.

 4              MS. MIYATA:  We would ask for six to eight weeks,

 5    Your Honor.

 6              THE COURT:  All right.

 7          And what are you asking for in response?

 8              MR. SCHMIDT:  In a reply, we'd probably request four

 9    weeks, Your Honor.

10              THE COURT:  Okay.  I'll give you dates later.

11          Is there anything else that we need to speak about in

12    terms of the State AGs' participation?

13              MS. MIYATA:  Not at this time from us, Your Honor.

14              THE COURT:  Okay.  Thank you.  All right.  Let's --

15              MR. SCHMIDT:  Your Honor, without wanting to

16    unreasonably prolong argument on this issue, may I just say one

17    more thing?

18              THE COURT:  You may.

19              MR. SCHMIDT:  We are faced with a range of claims, and

20    we have been trying to address the claims in turn.  This is one

21    that, based on our discussion with the State Attorneys General,

22    we had -- and obviously everything we discuss is subject to the

23    Court's approval, and now we have the Court's direction, but we

24    had understood that at least between the parties, there was no

25    rush to brief this which has informed where we have been
```

1    devoting our resources.

2         There are novel issues here in terms of COPPA that haven't

3    been briefed previously in this litigation in terms of the

4    details of --

5         **THE COURT:**  What if I took out COPPA?  If that's the

6    sticking point, then I could do this -- I am trying to get

7    something to me sooner because I don't want to waste resources.

8    I don't have the luxury of adding staff.

9         So we may do it then in -- in two waves, but, you know,

10   it's not as if, again, you don't -- you don't have and haven't

11   had for considerable period of time the COPPA claims.  The

12   COPPA claims were in the Master Complaint for the individual

13   defendants, so you've had this analysis before, or at least not

14   analysis, but you've been on notice for a year.

15        **MR. SCHMIDT:**  Yes.  It's a very different COPPA claim

16   from individuals than it is from State Attorneys General in

17   terms of what needs to be proven and the elements of the claim.

18   But I understand what Your Honor is saying.

19        There -- I wouldn't want to give the view that it becomes

20   much easier with COPPA out because there's a lot --

21   particularly what we struggled with in the briefing on the

22   personal injury cases is how do you, in the setting where

23   you've got these massive complaints, engage with the facts at

24   an appropriate level, and that's a challenge on both sides.

25   That's, frankly, more of a challenge on the consumer protection

1    sides.

2              **THE COURT:**  Yeah.  I don't understand your comment.

3          **MR. SCHMIDT:**  It's just -- and I'm sorry for not being

4    clear, Your Honor.  It's just that there's a lot of factual

5    allegations in the Complaint and tracking those factual

6    allegations where we're in a position where we can fairly say

7    we've addressed them in the way that's appropriate for the

8    Court, that takes some work.  That's all I'm trying to say,

9    Your Honor.

10             **THE COURT:**  Well, remember, on a motion to dismiss --

11         **MR. SCHMIDT:**  Yes.

12             **THE COURT:**  -- we aren't dealing with resolving

13   factual issues.

14         **MR. SCHMIDT:**  But we have to account for the factual

15   issues in terms of the legal arguments we make.  I agree with

16   Your Honor in terms, of course, we're taking the facts as pled,

17   but in terms of being able to address the legal impact of them,

18   that takes some time.  That was the point I was trying to make.

19         **MS. MIYATA:**  Your Honor --

20         **MR. SCHMIDT:**  But we'll look for Your Honor's

21   guidance.  I just wanted to take the opportunity to say that.

22         **MS. MIYATA:**  Apologies.

23       If I may, I believe the States' preference would be to

24   have COPPA briefed at the same time as the rest of the States'

25   claims, the concern being that if the UDAAP claims are briefed

1    prior to COPPA and then there is an adverse ruling to the

2    States later regarding the COPPA claim, then all of the

3    briefing regarding the UDAAP claims may have been an

4    inefficient detour of time for the Court.

5         **THE COURT:**  Okay.  Let's talk about Phase 2 on the

6    individual Complaints.  Who is going to address those topics?

7         **MR. SCHMIDT:**  That's still me, Your Honor, Paul

8    Schmidt.

9         **MS. HAZAM:**  Good morning, Your Honor.  Lexi Hazam on

10   behalf of the individual plaintiffs.

11        **THE COURT:**  I don't see the need in filing an Amended

12   complaint until we -- until briefing on the various issues is

13   resolved.

14        **MS. HAZAM:**  Plaintiffs would agree, Your Honor.

15   Plaintiffs would agree, Your Honor.

16        **MR. SCHMIDT:**  From the defense perspective,

17   Your Honor, that's something we've wanted the Court's guidance

18   on, and I hear what Your Honor just said on that.  That's

19   helpful guidance for us.

20        We've been studying the issues of what further pleadings

21   we've had, both the Court's suggestion about further work on

22   the Short Form Complaints and then the point Your Honor just

23   spoke to on the -- on the Master Complaint.

24        **THE COURT:**  And with respect to being efficient, it

25   seems to me, given that the States' Complaints deal with COPPA,

1  the unfair bucket, the misrepresentation bucket, that Claim No.

2  7 for unfair trade practices in violation of consumer

3  protection laws, that's similar; No. 8, fraudulent concealment

4  and misrepresentation, that's similar; 9, negligent concealment

5  and misrepresentation, that's similar.  It would seem that

6  those -- that those three claims could be briefed at the same

7  time efficiently.

8          MS. HAZAM:  Your Honor, plaintiffs would agree and, in

9  fact, suggested those claims be briefed at the same time that

10  the States brief their claims.

11         THE COURT:  Any problems with that?

12         MR. SCHMIDT:  No, Your Honor.  We wanted those briefed

13  earlier so that, I think, is consistent with what Your Honor is

14  contemplating.

15     There's a related issue which there have been claims

16  asserted against one firm against Mark Zuckerberg in his

17  personal capacity, and I think these overlap with some of these

18  claims, and we'd want the chance to brief those.

19         MS. HAZAM:  Plaintiffs would agree, Your Honor.

20         THE COURT:  And which case is that?

21         MR. SCHMIDT:  In some of the Short Form Complaints --

22  I believe there's about 20 right now -- they have added

23  allegations against Mark Zuckerberg in his personal capacity

24  that we've been waiting for the opportunity to address.  Those

25  are all claims filed by the Motley Rice firm.

1        **THE COURT:**  Okay.

2    Ms. Hazam, do you have anything to add in terms of timing?

3        **MS. HAZAM:**  The timing that Your Honor suggested

4    provisionally for the filing of the motion and then the timing

5    that the States suggested for the timing of the opposition

6    would be acceptable to individual plaintiffs for purposes of

7    these claims.

8        **THE COURT:**  All right.  What is going on -- give me an

9    update in terms of the Short Form Complaints.

10        **MS. HAZAM:**  The Short Form Complaints are filed in

11    accordance with the Court's prior orders implementing the Short

12    Form Complaint, and so they use that Short Form Complaint

13    entered by the Court and they follow the schedule that was

14    entered by the Court.  That is happening --

15        **THE COURT:**  I should have said something differently.

16    What is happening with the fact sheets?

17        **MS. HAZAM:**  So the parties spent many months

18    negotiating the form of a Plaintiff Fact Sheet and associated

19    orders and forms under the auspices of the JCCP court.

20    However, the MDL plaintiffs did participate in those

21    negotiations.

22    The parties have now agreed on the form of the Plaintiff

23    Fact Sheet and I believe on a number of the associated forms,

24    although there may be one or two remaining small disputes that

25    are before the JCCP judge.

1          It is plaintiffs' position that those same PFS and

2     accompanying forms could be entered by this Court.  We attached

3     to the status report the form of the PFS that was current at

4     that moment.  I believe there may have been some very small

5     changes, but plaintiffs would be prepared to submit the final

6     that has been agreed upon in the JCCP.

7          **THE COURT:**  Okay.  I don't remember seeing that, so I

8     will look at it.

9          And for the high school students, lawyers like to use

10    acronyms.  PFS means "Plaintiff Fact Sheet."  So we have one

11    big Complaint.  It's 300 pages.  It outlines everybody's

12    allegations, and then to the extent there's an individual

13    person who wants to bring a claim, they're saying, Yes, I sign

14    on to the big Master Complaint, and then they attach or they

15    disclose in these Plaintiff Fact Sheets their specific

16    information.  So that's what the lawyers are talking about.

17         And when they refer to this other acronym, JCCP, there is

18    a set of these cases also that were filed in the State of

19    California.  All of those cases were consolidated in front of

20    Judge Kuhl, who is a state court judge in Los Angeles, and

21    that's what they're talking about with respect to that issue.

22         Okay.  So do you have a docket number for me so that I can

23    take a look at that?

24         **MS. HAZAM:**  Yes.  It was an exhibit to the plaintiffs'

25    status report, but, Your Honor, we would be pleased to submit

1    the updated form if Your Honor so wishes.  I believe the

2    changes to it were quite minimal, but let me tell you what the

3    exhibit number was.

4            **MS. MCNABB:**  Your Honor, good morning.  Kelly McNaab

5    from Lieff Cabraser on behalf of the individual plaintiffs.

6        The Plaintiff Fact Sheet that was submitted to the Court

7    was Exhibit A to the agenda.  That fact sheet has now been, as

8    Ms. Hazam said, changed slightly to address some concerns that

9    were raised by a sample of plaintiffs that had --

10           **THE COURT:**  Can you hold on just a moment?  I'm

11   distracted with a security issue.  Just a minute.

12       Oh, sorry.  I thought -- we'll deal with that later.  Tell

13   them tentatively yes.

14       Okay.  My apologies.  Start again.

15           **MS. MCNABB:**  Okay.  Your Honor, Kelly McNaab, again,

16   for individual plaintiffs.

17       The fact sheet that was submitted to Your Honor is

18   Exhibit A to the agenda, so it's Docket No. 417-1.  That fact

19   sheet has subsequently been slightly modified to address some

20   issues that were raised in the JCCP after a sample of

21   plaintiffs completed that fact sheet.

22       It was important for Judge Kuhl that the plaintiffs who

23   would be completing the fact sheet actually understood the fact

24   sheet and could complete it.  As you said, lawyers like to use

25   complicated language and acronyms.

1        We are willing to submit and intend to submit that revised

2    fact sheet to Your Honor.

3        **MS. PIERSON:** Good morning, Your Honor. If I may,

4    Andrea Pierson, Faegre Drinker, on behalf of TikTok and

5    ByteDance.

6        It is accurate to say that a final Plaintiff Fact Sheet

7    was submitted to Judge Kuhl on November the 14th. That's a

8    slightly different document than the document that was attached

9    to the agenda, but I think it's important that the Court

10   understand a couple of things.

11       One is that the Plaintiff Fact Sheet is one of a series of

12   documents and orders that Judge Kuhl has entered, and the

13   Plaintiff Fact Sheet actually is not the first step in the

14   process.

15       To the contrary, Judge Kuhl had requested and the parties

16   submitted a series of forms that include, first, the plaintiffs

17   providing the known account user names and various pieces of

18   information that allowed the defendants to locate the accounts

19   at issue.

20       Second, the defendants identify any additional user

21   accounts that the defendant has reason to believe are or were

22   used by plaintiffs, along with specific information that a

23   plaintiff may use to confirm whether the accounts are actually

24   theirs.

25       After that happens, then the plaintiffs confirm whether

each account is registered to them, whether they have been able to access the account with good faith efforts, and whether they provide consent for the defendants to provide account downloads substantially similar to the downloads that are already available to them and are publicly available.  Then the defendants provide such downloads for inaccessible accounts where consent is provided.

There is both a Plaintiff -- Plaintiff Fact Sheet Implementation Order and a User Account Implementation Order that's part of the process in the JCCP.

And there is one outstanding dispute between the parties before Judge Kuhl that will be briefed next week and heard at the December 7th status conference.  The defendants anticipate a similar process in the MDL, although tweaks to some of the deadlines may be necessary to account for differences.

In addition, this Court's ruling earlier this week on the motion to dismiss has the potential to affect the information required of plaintiffs' fact sheet.  Accordingly, we intend to evaluate the need for such changes, if any, in light of the Court's ruling.

That's a long-winded way of saying, Your Honor, that the process is not yet completed in the JCCP, and what we submit to Your Honor may be different than what's submitted to Judge Kuhl.  We're in the process of evaluating that.  I just didn't want the Court to be led to believe that it's simply a

1  matter of reviewing the Plaintiff Fact Sheet that is attached

2  to the agenda.  There is actually still a fair amount of work

3  to be done between the parties, and we'll need to confer,

4  obviously, with the MDL plaintiffs about those documents before

5  they're submitted to the Court.

6          **MS. HAZAM:**  Your Honor, if I may, all of the

7  associated documents that counsel referred to are indeed the

8  ones I was meaning to refer to when I said "associated

9  documents" and "explained in the status report."

10         It is plaintiffs' view that we should not go back to the

11  drawing board on negotiating this PFS, which was a very lengthy

12  process that was judicially supervised.  And so while we are

13  happy to meet and confer with the defendants in the interests

14  of time, as Your Honor indicated earlier, we do not believe

15  that we should now have another process that lasts for many

16  months.

17         So we don't anticipate on our side that there should be

18  substantial changes and would like to have this process get

19  under way as it is in the parallel litigation.

20         **MS. PIERSON:**  And we agree, Your Honor.  We're not

21  saying something different.  We just want to clear that these

22  are not documents that can be wholesale adopted by this Court

23  without an opportunity at least to conform them to this

24  proceeding, but we don't anticipate that will take a great --

25  great deal of time.

1          **THE COURT:**  Okay.  So is this on the proposed form of

2     order?

3          **MS. HAZAM:**  It was not because Plaintiff Fact Sheet

4     was not quite complete at the time that the status report was

5     submitted to Your Honor.  That much is now complete.  I believe

6     the implementation order is also complete.  Those could be

7     proposed to Your Honor as a proposed order with the parties

8     meet and confer.

9          I would suggest, on behalf of plaintiffs, that there be a

10    deadline set for this so that this process does not become

11    drawn out.

12         **MS. PIERSON:**  As I mentioned, there's briefing on the

13    User Account Implementation Order that will be submitted next

14    week and will be discussed by Judge Kuhl at the hearing on

15    December the 7th.  So that document, which is a critical part

16    of the process, won't be complete until sometime after our

17    hearing with Judge Kuhl on December the 7th.

18         **MS. HAZAM:**  And, Your Honor, what I would suggest is

19    I'm sure we can have this done by the December 13th conference.

20    The dispute over the user account info form is a very limited

21    one that has already been discussed at length by the parties

22    and previewed to the Court in the JCCP, so I believe that we

23    could come back to court on the 13th with final forms.

24         **THE COURT:**  And what is the nature of the dispute?

25         **MS. PIERSON:**  There's a statutory issue under RUFADAA

1    that is currently being briefed that Judge Kuhl will decide.

2        **THE COURT:**  You have used an acronym, which I don't

3    know what it means.

4        **MS. PIERSON:**  I wish I could tell you.  I don't know

5    off the top of my head.

6        **MS. HAZAM:**  It's a California statute, Your Honor.

7    It's the Revised Uniform Fiduciary Access to Digital Assets

8    Act, and the dispute -- this is probably why the parties refer

9    to it with shorthand, but the dispute has to do, I believe --

10   and counsel can weigh in here as well, but I believe the

11   dispute has to do with whether that requires plaintiffs to be

12   doing things like having state -- official state

13   representatives at the point at which they fill out this user

14   account info form and/or death certificates in the case of

15   deceased plaintiffs, deceased minor plaintiffs of a certain

16   age.  That's a very limited subset of the plaintiffs to begin

17   with, and I believe this is an issue that would be promptly

18   resolved by Judge Kuhl.

19       **MS. PIERSON:**  We agree.  It's a narrow issue.  I can't

20   predict when Judge Kuhl will rule, but it will certainly be

21   sometime after December the 7th.

22       **THE COURT:**  Why?  Why wouldn't she just rule on the

23   papers?

24       **MS. PIERSON:**  I don't -- I don't know.  She may,

25   Your Honor.  That's possible.

1          **THE COURT:**  And when is it going to be fully briefed?

2          **MS. PIERSON:**  Next week.  I think that's right.  Yeah.

3      It may be later this week.  It may be -- November the 20th.

4      Sorry.  Our briefs are due on November the 20th, as I recall

5      it.

6          **THE COURT:**  No replies?

7          **MS. PIERSON:**  No.  Simultaneous briefing.

8          **THE COURT:**  So I'm correct.

9          **MS. PIERSON:**  You are, Your Honor, yes.

10         **THE COURT:**  Okay.  I'll talk to her about it.

11     All right.  So it seems to me then we should be able to

12     have the implementation order done by December 13th or at least

13     discussed on that day and issued shortly thereafter.

14     What else then needs to be done on the individual

15     Complaints?

16         **MS. HAZAM:**  Your Honor, with regards to Short Form

17     Complaints and Plaintiff Fact Sheets, I believe that that is

18     what needs to be done, and we now also have Your Honor's

19     guidance and await Your Honor's decisions regarding the dates

20     for the additional briefing on the individual plaintiffs'

21     Complaints.

22         **MR. SCHMIDT:**  If I may add something short to that,

23     Your Honor.

24     We do appreciate on the defense side -- I trust on both

25     sides -- getting Your Honor's ruling, and we've been studying

that pretty closely. It obviously gives us very good guidance
in terms of how to proceed.

I mentioned earlier that we do want to look at the
language in Your Honor's ruling on what happens with any
potential further practice regarding Short Form Complaints, and
we'll study that and come back to plaintiffs and come back to
the Court on that.

One other issue that I simply wanted to flag that was very
important to us in terms of understanding the Court's ruling is
we looked very closely at what Your Honor said about the
failure-to-warn claims in terms of how they fit. We understand
Your Honor's ruling to be that those claims are subject to the
same defect allegations that can proceed as to the other
product liability claims. I think Your Honor said that in
Footnote 60 and in the discussion of the product liability
section.

Your Honor did give us guidance on how we brief that
issue, and that's something we will take into account in our
future briefing. We did try to brief that issue in both our
opening brief, to which plaintiffs respond, and in our reply
brief, but that will obviously guide our future -- our future
briefing.

That failure-to-warn issue and the scope of that is an
issue that may implicate some of the further briefing down the
road, some of the next-round briefing.

1          **MS. HAZAM:**  Your Honor, plaintiffs fundamentally

2    disagree with that interpretation of the Court's ruling.  We

3    believe that the Court upheld and did not grant defendants'

4    motion to dismiss as the failure-to-warn claims, which are

5    Counts 2 and 4, and are not mentioned at the conclusion of

6    Your Honor's order.

7          Your Honor also stated on page 20 of the order not only

8    that defendants had not briefed the application of Section 230

9    to any of the failure-to-warn claims, which alone would be the

10   basis to deny the motion as to those claims, but "that the duty

11   arises not from their publication of content but from their

12   knowledge based on public studies or internal research of the

13   ways that their products harm children so they could warn for

14   any and all of the alleged defects."

15         **MR. SCHMIDT:**  And, Your Honor, I don't want to be in a

16   position of having heard Your Honor's early guidance of reading

17   random sentences out of Your Honor's order.  I think there's a

18   sentence before what counsel quoted that refutes that reading

19   of Your Honor's order.  Footnote 60 does.  The introduction of

20   the products section does, and if that's something we should

21   get further guidance on, we can do that, but that's a pretty

22   important issue from our perspective in terms of defining how

23   the cases proceed and even the further briefing potentially.

24         **MS. HAZAM:**  Your Honor, I would note that in our view,

25   Footnote 60 supports our understanding that the Court declined

1  to dismiss the failure-to-warn claims and, in fact, indicated

2  that the failure to warn could extend to features beyond those

3  that Your Honor put in the initial list of features that were

4  precluded under Section 230 so we also have a fundamentally

5  different interpretation of that footnote, and we believe that

6  the failure to warn is not about the source and the specific

7  defect but about warning that the platforms are unsafe and

8  cause health problems.

9          **THE COURT:**  Plaintiffs are correct.

10         **MR. SCHMIDT:**  Okay.  Then we may request leave to file

11  further briefing on that.  We'll study that, Your Honor, and we

12  may request.

13         **THE COURT:**  That's going to be a long way away.

14         **MR. SCHMIDT:**  Understood.

15         **THE COURT:**  You had an opportunity.  You failed to do

16  it, and we have lots of things to do before that.

17         **MR. SCHMIDT:**  In terms of our briefing, Your Honor, we

18  had understood this issue to be subsumed within the broader

19  arguments we were making, and then at page 4 and page 9 of our

20  Section 230 brief, we did say expressly that the

21  failure-to-warn claims failed for the same reasons that the

22  other claims failed.

23     When plaintiffs came back and said, We don't think

24  you've -- we disagree with your arguments, we don't think

25  you've addressed this enough, we then addressed it again in our

1    reply brief for close to a page on pages 8 to 9 of our reply

2    brief.  We did try to put it before the Court.

3        We obviously take Your Honor's reaction into account in

4    our future briefing, but it is something we did try to brief,

5    and we understood it to be subsumed within our briefing,

6    including with specific cases that said failure-to-warn claims

7    don't change the 230 analysis.

8            MS. HAZAM:  Your Honor, respectfully, plaintiffs

9    believe that this issue has been clearly decided by the Court

10   and that no further briefing is necessary.

11           THE COURT:  Like I said, this is -- that ship has now

12   sailed, and to the extent that we revisit it later, I'll make a

13   little note, but the plaintiffs have it right at this point.

14           MR. SCHMIDT:  Okay.  Thank you, Your Honor.  We'll

15   take that into account and think about how to proceed on that

16   basis.

17           THE COURT:  So with respect to the individual

18   Complaints, we've got -- the next set will be the

19   misrepresentation claims, and then there will be the balance of

20   the claims.  Is there any need to segregate that in any way?

21           MS. HAZAM:  Your Honor, from plaintiffs' perspective,

22   I don't believe there is, and in the interest of proceeding

23   efficiently and in light of the Court's staffing concerns, we

24   would be agreeable to going forward on the same schedule as for

25   Counts -- I think it's 7, 8 and 9 Your Honor specified earlier.

1          We had proposed those proceedings separately because we

2     believed that Counts 7, and 9 should happen concurrently with

3     the briefing on the State AGs' related claims, but given that

4     Your Honor has now put those -- the claims from the individual

5     plaintiffs that are similar on the same schedule as the State

6     AGs' briefing schedule, we would be fine with including the

7     others as well.

8          **MR. SCHMIDT:**  From the defense perspective,

9     Your Honor, we agree there is no need to segregate out the

10    claims other than 7, 8, and 9.  We would request more time to

11    brief that second tranche of claims other than 7, 8, and 9.

12         **THE COURT:**  So how is it that you would need more time

13    when you've got Covington, Munger, King & Spalding -- I never

14    get this right -- Faegre --

15         **MR. SCHMIDT:**  Faegre.  Sorry.

16         **THE COURT:**  Wilson Sonsini.  One, two, three, four,

17    five mega firms, and you're asking for more time.  Why?

18         **MR. SCHMIDT:**  It's ironic, but I could personally

19    testify to the fact that that adds time on our side.  Much in

20    the same way the State AGs have internal client review and

21    things like that, we do, too, and that takes longer.  We try to

22    put together a set of unified briefs for the Court that is

23    useful to the Court where it is not parsed out by defendant,

24    and to do that takes time working across those firms and

25    working with our clients.

1          **THE COURT:**  Well, you will need to figure out a way to

2     make it more efficient.

3          **MR. SCHMIDT:**  We have been trying, Your Honor.

4          **THE COURT:**  Sometimes shorter periods of time focus

5     attention.

6          **MR. SCHMIDT:**  I have had familiarity with that

7     experience, Your Honor, without withdrawing the request.

8          **THE COURT:**  Okay.

9        Anything else on the claims with respect to the

10    individuals?

11         **MS. HAZAM:**  Not with regards to pleadings or with

12    regards to Plaintiff Fact Sheets.  There were some other issues

13    raised in the status report, some of which go to school

14    district plaintiffs, some --

15         **THE COURT:**  I'm not asking about those.

16         **MS. HAZAM:**  Understood.

17         **THE COURT:**  Anything else with respect to this set

18    that you want to talk about?

19         **MS. HAZAM:**  Your Honor, plaintiffs have flagged for

20    the Court an issue with regards to what we would regard as

21    refreshing the production order previously by the Court of

22    productions made by various defendants to State AGs conducting

23    investigations into addiction issues.

24         **THE COURT:**  Let's talk about discovery later.

25         **MS. HAZAM:**  Okay.

1      **THE COURT:**  Anything else?

2      **MS. HAZAM:**  Other than the pending disputes that have

3    been submitted to Your Honor for hearing when Your Honor deems

4    appropriate with regards to the protective order and the

5    coordination order.

6      **THE COURT:**  So I'll want to talk to you about the

7    coordination order.

8      With respect to the protective order, I'm going to ask

9    that you take that back for reconsideration to Magistrate

10   Judge Kang, and that is because, again, we've got limited

11   resources here.  When the conflict arose with Judge Hixson, I

12   had to get a new magistrate judge.  There was a change because

13   Magistrate Judge Cisneros was needed in a different case.

14     Given that Judge Kang is going to be working on this, I'd

15   like him to look at it fresh, see if he can resolve your

16   disputes since he's the one that's going to be managing the

17   discovery, and then if you still can't resolve it with him,

18   then I'll look at it.  So I'm going to refer you back to him to

19   try to resolve that.  Okay?

20     **MR. SCHMIDT:**  Thank you, Your Honor.

21     **MS. HAZAM:**  Understood, Your Honor.

22     **THE COURT:**  Okay.  Let's talk about the school

23   district Complaints.

24     **MS. HAZAM:**  Thank you, Your Honor.  My colleague,

25   Chris Seeger, will handle that.

1          **THE COURT:**  Yeah.  Chris Seeger, you can -- just hold

2     on.  I don't need you up here yet.

3          I received a number of requests on the docket for people

4     who wanted to be appointed.  I don't know if any of them are

5     here.  If you are, I want you to raise your hand, and I have

6     something for you.

7          Thomas King.  Is Thomas King here or someone from his

8     firm?  Raise your hand or keep it raised, sir.  No?  Thomas

9     King?  No.  Okay.

10          The next one is Joseph Meltzer and Melissa Yates.  Not

11     here as well.

12          How about James France?  No.

13          Thomas Cartmell.  Okay.  We're going to give you

14     something.

15          Aelish Baig?  All right.  Give you that.

16          On the other side, Derek Loeser.  Okay.

17          Anne Marie Murphy.

18          Cecchi.

19          Ronald Johnson?

20          Okay.  Is there anyone else who -- hold on.  Is there

21     anyone else who's here who wants to apply to be on that

22     leadership?  Okay.  Stand up and give me your names.

23          **MR. WEINKOWITZ:**  Mike Weinkowitz.

24          **THE COURT:**  Mike Weinkowitz.

25          Okay.  Who else?

1          **MS. WEAVER:**  Leslie Weaver, Your Honor.

2          **THE COURT:**  Leslie Weaver.

3      Who else?

4          **MR. BRYANT:**  Arthur Bryant.

5          **THE COURT:**  Arthur Bryant.  Okay.

6      Anyone else?  All right.

7      Please fill out that form and raise your hand when you're

8  ready to turn it back in.

9      For the students, this is what we call a pop quiz for

10  lawyers.

11      All right.  Mr. Seeger, you can come to the mic now.  What

12  would you like to say?

13          **MR. SEEGER:**  I will admit, I'm a little nervous right

14  now.  I don't know where this is going.

15      Good morning, Judge.

16      So you may remember, a few months ago we tried to get out

17  ahead of this, maybe too far out ahead.

18          **THE COURT:**  So I can tell you that when I received

19  your information, I didn't know if this case was going to leave

20  the gate.

21          **MR. SEEGER:**  Correct.

22          **THE COURT:**  And so I had -- I was not focused on

23  anything else because the defendants were adamant that this

24  case should be thrown out.

25          **MR. SEEGER:**  Uh-huh.

1      **THE COURT:**  And I didn't know what -- whether it would

2   be thrown out and you would all be up at the Court of Appeal at

3   this point or what.

4      **MR. SEEGER:**  Yeah.

5      **THE COURT:**  So now I know.  It's not getting thrown

6   out.  And now I am going to engage on this topic.

7      **MR. SEEGER:**  Okay.

8      **THE COURT:**  And I'm going to engage a little more even

9   with respect to the current leadership, which we'll talk about.

10   But now I know that this thing's left the gate.

11      **MR. SEEGER:**  Yeah.

12      **THE COURT:**  So go ahead.

13      **MR. SEEGER:**  So it is our view that we're at a point,

14   as Your Honor seems to agree, that we should organize this.

15   Our view is it should be organized under the leadership that

16   you've already appointed as a subcommittee.  And that we wanted

17   to -- we thought we'd put together a mix of people that were

18   involved in all aspects of the litigation, like Mr. Weinkowitz,

19   for example, is involved in personal injury cases as well as

20   school district cases.  I think Mr. Cartmell as well.

21   Mr. Cecchi is only involved in school district cases.  So we

22   tried to find a mix.

23      And I'd like to just spend 30 seconds on why those names

24   as opposed to others.  They're all very good lawyers.  We

25   probably all know each other.

1   Mr. Cecchi has been very much involved in trying to help

2 organize since this came to our attention that school districts

3 were going to begin filing cases, and he's played a -- he

4 has -- in our view, he has shown himself to be a leader in the

5 sense that he's been organizing meetings, trying to keep the

6 group cohesive, represent positions, and getting to us on ideas

7 on how this might be organized.

8   Mike Weinkowitz is already a member of the PSC, Judge.

9   And Mr. Cartmell has an application before you, and the

10 Court may not remember this, but originally applied for a PSE

11 position, but he was engaged in JUUL and, in fact, engaged in a

12 trial, I believe in this court, involving a JUUL case, which

13 has now settled.

14   **THE COURT:**  So I have concerns about the bar always

15 picking the same people.

16   **MR. SEEGER:**  Understood.

17   **THE COURT:**  And that's what concerns me about some of

18 the recommendations, and I'm not going to just rubber stamp it.

19   So I understand that one of the -- well, on the positive

20 side, there's experience.  On the other side, there's plenty of

21 experience, and there's -- it's important to have a variety of

22 people at the table.

23   So one of the things that I'm asking -- and I'll go and

24 have those picked up again, as you did not get a copy of the --

25   **MR. SEEGER:**  No.

1          **THE COURT:**  I want to know how many cases they have in

2     the MDL.  It looks like some people have school districts

3     retained but not yet in the MDL.  I want to know their

4     geography.  And then I'm going to have some questions for them.

5          But what I'd like to know from the three of you, the

6     leaders that I appointed, is whether you have problems with any

7     of these individuals, whether you've got experience that

8     they're not team players, that they do not carry their weight,

9     but that's what I need to know.

10         So it's -- it's -- I got -- I have to take, given what's

11    going on, a very broad view on this.

12         So I will be back in touch.

13         **MR. SEEGER:**  Okay.

14         **THE COURT:**  Let's pick up those forms, and then we'll

15    start from the top.

16         Mr. Cartmell, come on forward.

17         **MR. CARTMELL:**  Good afternoon, Your Honor.  Thomas

18    Cartmell.

19         **THE COURT:**  I need your form.

20         **MR. CARTMELL:**  Okay.

21         **THE COURT:**  And do I have the forms back from

22    everybody at this point?

23         Sorry.  I have problems with your writing.  Is it Kansas

24    or --

25         **MR. CARTMELL:**  I'm sorry.  I actually didn't finish

1    filling that out, Your Honor.  I apologize.

2         I think we have cases in about every state.  There are

3    some states that we don't have cases involved as far as school

4    districts, but I don't know exactly today which those are.

5              **THE COURT:**  So currently you only have six, but you've

6    got, you say, 375 retained?

7              **MR. CARTMELL:**  Approximately 375.

8              **THE COURT:**  Okay.  And you're based in Kansas?

9              **MR. CARTMELL:**  I'm actually on the Missouri side in

10   Kansas City.

11             **THE COURT:**  Okay.  Do Missouri and Kansas follow the

12   Restatement or not?

13             **MR. CARTMELL:**  They do.

14             **THE COURT:**  What are your thoughts with respect to --

15   so I understand generally the school districts' cases are

16   public nuisance-like cases.

17             **MR. CARTMELL:**  Your Honor, we will have public

18   nuisance and negligence claims.

19             **THE COURT:**  Okay.  And in terms of your abilities,

20   what would you like me to consider?  And how much time would

21   you be personally putting into this as opposed to your firm?

22             **MR. CARTMELL:**  I would like you to consider my

23   relevant experience.  I heard what you said, and I get the idea

24   of you don't want always the same type of people.

25        I do think that the relevant experience I've had over the

last six years in opioids, working up and put -- putting

together the trial package for the Teva case.  In that case,

ended up representing about 100 government entities -- those

were actually counties and cities -- and pursuing a public

nuisance case there.

And then the JUUL case, obviously, sort of from soup to

nuts, being involved in every aspect of the JUUL case.  And

then being lead trial counsel with Sarah London from Lieff

Cabraser and Dena Sharp from Girard Sharp.  That experience, I

think, has given me valuable experience that I think can be

very helpful in this litigation.

The public nuisance cases are different and unique for a

whole lot of reasons, and I think going through that process

all the way from the very beginning of the case and through a

trial, although we settled the case short of a verdict, has

given me really relevant experience that -- that I would like

to offer this case.

I've worked with a lot of these people a lot over the

years, and I'm committed to working on this case as far as my

time versus others in my firm.  I'm committed to work on this

case a hundred percent of my time.  You know, I'm working on

the JCCP right now, but I've been working with both the MDL and

the JCCP, Your Honor.

THE COURT:  What is your role in the JCCP?

MR. CARTMELL:  So I'm helping actually with the

1    government entities there.  I'm the co-lead of the Meta

2    defendant, and I'm helping with the expert witnesses there.

3          **THE COURT:**  Okay.  So, again, for the high schoolers

4    in the room, we have these massive cases that extend across the

5    United States.  You can't have hundreds and hundreds of

6    lawyers.  It would just be chaos.

7          So the Court appoints a certain number of people to take

8    leadership roles, and that's what all these folks want me to

9    do.  They want me to appoint them.  That's why I'm asking them

10   these questions.

11         Okay.  In about five minutes, Mr. Elder, you just let me

12   know and then we'll take a short break so you all can go to

13   your next event.  Okay.

14         Why isn't the JCCP enough?  Why should you be in this

15   case, too?

16         **MR. CARTMELL:**  I feel like there is great

17   collaboration going on.  I think we personally are going to be

18   filing a lot cases in the MDL in the future.  And I think it

19   will foster, you know -- help foster collaboration between the

20   JCCP and the MDL, so I just feel like I want to help, you know,

21   lead the case against the government entities because, you

22   know, we represent so many clients, and we feel strongly that

23   these are very important cases.

24         And I will work in the JCCP, but I've talked with the JCCP

25   co-leads, as well as the co-leads from the MDL and was asked to

1    file an application here to work as the government entity

2    co-lead with Mr. Weinkowitz, who I've worked exclusively and

3    extensively with in the past, and so I would really appreciate

4    the opportunity to do it in the MDL as well, Your Honor.

5         **THE COURT:**  And how many people are already -- on the

6    steering committee here are also on the steering committee or

7    leads in the JCCP?  Is there any overlap at this point?

8         Maybe -- Mr. Seeger, do you know?  At the mic because my

9    court reporter is remote.

10        **MR. SEEGER:**  There is overlap, Your Honor.  I couldn't

11   tell you the names right now, but a lot of the firms that have

12   been appointed here have a colleague, a partner, who was also

13   involved in the JCCP as well.  And that was really maybe not

14   the smartest way but the way to sort of fully coordinate the

15   State JCCP with this case.

16        **THE COURT:**  All right.  Okay.

17        Mr. Cartmell, anything else you would want me to consider?

18        **MR. CARTMELL:**  I guess, Your Honor, I'd like -- you

19   know, I totally understand the idea that you want to give

20   opportunities to younger attorneys, to minorities, to women and

21   all that, and I -- you know, I'm a white male.  I obviously

22   can't help that, but I do feel strongly about helping --

23        **THE COURT:**  You should understand, I don't have

24   anything against white males.

25        **MR. CARTMELL:**  I know you don't.

1          **THE COURT:**  I'm married to one.

2          **MR. CARTMELL:**  I guess my point is this:  I feel like

3    all I can do is help with that, and I have committed to that

4    over my career, and I will commit to that here, if appointed,

5    Your Honor.  Thanks.

6          **THE COURT:**  The other issue, again, that I'm concerned

7    about is geographic, and that's why you saw that in there.

8    It's not just -- it's not just a question of experience; it's a

9    question of geography and other things as well.

10         So there's lots of issues that go into the question of

11   diversity.

12         All right.  Thank you, sir.

13         **MR. CARTMELL:**  I appreciate it.  Thanks, Your Honor.

14         **THE COURT:**  Mr. Weinkowitz.

15         Okay.  We are going to take a couple-minute break here.

16   The students are going to leave.

17         Thank you for coming in today.  I hope this was -- I hope

18   you found it helpful.

19                    (Recess taken at 11:58 a.m.)

20                 (Proceedings resumed at 12:00 p.m.)

21         **THE COURT:**  Okay.  All right.  Let's go back on the

22   record.

23         It is just a total coincidence that members of the court

24   had scheduled that high school group to come in today, so we

25   just thought, you know, this involves their lives, let's bring

1     them in here to listen.

2              **MR. WEINKOWITZ:**  The audience of expert witnesses.

3              **THE COURT:**  Okay.  So, Mr. Weinkowitz.

4              **MR. WEINKOWITZ:**  Good afternoon, Your Honor.  Michael

5     Weinkowitz, Levin, Sedran & Berman, in Philadelphia.

6         It's actually nice to appear in front of you.  If you'll

7     recall, the last time we did this, I was on the Zoom with

8     COVID.

9              **THE COURT:**  Yes.  Now I remember.

10             **MR. WEINKOWITZ:**  Thank you for the appointment to the

11    plaintiffs' leadership committee.  I appreciate that.

12        And I would like to thank the co-leads who had the trust

13    and confidence in recommending me to be a co-chair of the

14    government entity committee.

15        My firm currently has eight cases, as I've indicated on

16    the form.  We have about ten more cases that will be filed.

17    Those cases are located -- those school districts are located

18    in Pennsylvania and New Jersey.

19        In the JUUL litigation, I represented both plaintiff --

20    individual plaintiffs and school districts, the same school

21    districts.  The vast majority, as you heard, of that litigation

22    is resolved.

23        I was a member of the very diverse trial team that tried

24    the San Francisco Unified School District case in front of

25    Judge Orrick, with Mr. Cartmell and Ms. Hazam's partner, Sarah

1   London.  I was on the trial team, as I told you, in November of

2   2022.  I got the short straw of deposition designations, which

3   I thought went pretty well at trial, including not just the

4   ones that -- depositions that I, in fact, took.

5        My work in JUUL was co-chair of law and briefing and also

6   co-chair of the discovery committee, and that work included

7   both individual cases and the school district cases.  And I

8   think it's important to have somebody that's involved in both

9   aspects of the case for cohesion among those different

10  tranches.

11       Since you've appointed me to the plaintiffs' leadership

12  committee, I have -- the leads have asked me to do a number of

13  projects related to the school district cases.  I have

14  organized and finished, finally, a 50-state survey of nuisance

15  law.  Many of the lawyers in this firm and many of the -- in

16  this courtroom and many of the lawyers that are applying did

17  excellent work, and we have that finished, and hopefully that

18  will be good to go when the motions to dismiss are filed.

19       I've also --

20            **THE COURT:**  So you only need a week to respond.

21            **MR. WEINKOWITZ:**  Well, I do have a chart, Your Honor.

22       One of the other things that I've done is I've worked with

23  the school district attorneys in the JCCP, and I really do

24  think it's important that we coordinate between the two

25  jurisdictions so that we have overlap and we have some

1    efficiency between the two jurisdictions, and I think I've --
2    I've sort of done that.

3        The other thing I've done is we've put together a proposed
4    plaintiffs' fact sheet for the school districts.  We have sent
5    that over to the defendants, and that's in conjunction with the
6    JCCP.  That fact sheet was based, in large measure, on the JUUL
7    fact sheet.

8        **THE COURT:**  So address the fact that -- some of the
9    applicants have hundreds of cases.  You don't have very many.

10       **MR. WEINKOWITZ:**  That is correct.

11       **THE COURT:**  How should I weigh that?

12       **MR. WEINKOWITZ:**  Well, I represent two school
13   districts, the Freehold School District and another school
14   district in New Jersey that has a significant number of
15   students, so sometimes it's not the number, but it's also which
16   school districts you have.

17       The school districts represent thousands and thousands of
18   children and have multiple, multiple schools in those districts
19   in New Jersey.  So it's not necessarily the number.  It could
20   be the size, and it's -- what I would say is that my experience
21   in JUUL, from beginning to end, in different various areas, I
22   think, would lend itself to be on the committee and to lead
23   others in the committee.  But I don't have as many as others,
24   that's correct.

25       I think it's important to have LBGTQ+ representation on

1    the school district committee.  Schools are struggling to

2    balance children that are coming out and using social media as

3    an avenue for some good stuff, but they're also struggling with

4    the addiction in the day-to-day operation of the school.  I'm a

5    member of the LBGTQ+ community, and I think that I would bring

6    to the committee that perspective.

7         Unless you have any questions for me --

8         THE COURT:  So how much time have you given to the

9    underlying case, and, again, this is -- I don't have

10   information from you on the docket for this group that I pulled

11   off the -- for preparation in today's proceedings.  Remind me,

12   is it a law firm?  Is it you as an individual?  How much time

13   are you dedicating?

14        MR. WEINKOWITZ:  My firm is Levin, Sedran & Berman in

15   Philadelphia, Pennsylvania.  I am dedicating one hundred

16   percent of my time to this case.  I have a number of associates

17   and paralegals that help me, and we've been doing mass tort

18   cases for 50 -- 40, 50 years, going all the way back to the

19   diet drug days.  So one hundred percent of my time is dedicated

20   to this case, Your Honor.  Has been since you appointed me,

21   except for the little bit of a wrinkle when I went to trial in

22   the San Francisco Unified School District case before

23   Judge Orrick for six -- I think it was five weeks, Tom?  Five

24   weeks.

25        THE COURT:  From your perspective, when could you get

1    a Master Complaint on file?

2              MR. WEINKOWITZ:  We could get a Master Complaint on

3    file by December 18th, Your Honor, the date that we proposed.

4              THE COURT:  And will it look different from the

5    filings that I have?

6              MR. WEINKOWITZ:  Well, we are studying your order.

7    It's a long order, and we're trying to figure out strategically

8    how we would implement that order into a Master Complaint with

9    the idea that we would have to -- that the causes of action and

10   the way the school district cases are, they're quite different,

11   but it -- it would look similar but maybe slightly different.

12   Boy, that was a sort of obvious phrase.  But it -- it will be

13   similar, Your Honor.

14       And I think that the causes of action that would go into

15   the Master Complaint would probably be limited to negligence

16   and nuisance, and in the Short Form Complaint for the

17   government entities, I would propose that there would be -- if

18   any government entity wanted to bring a different cause of

19   action, just like a Short Form Complaint in personal injury,

20   they would be able to bring a separate cause of action in the

21   Short Form Complaint, and that what would be litigated in the

22   first instance on the motion to dismiss would be the nuisance

23   and the negligence claim.

24              THE COURT:  Okay.  Thank you.

25              MR. WEINKOWITZ:  Thank you, Your Honor.

1              **THE COURT:**  All right.  I have Anne Marie Murphy.

2              **MS. MURPHY:**  Good afternoon, Your Honor.  Anne Marie

3     Murray.  I'm a partner at Cotchett, Pitre & McCarthy.  I'm

4     joined by my partner, Karen Swope.  I'm in our Burlingame

5     office.  Ms. Swope is in our Seattle office.

6         And I would like to be considered for leadership in the

7     school district cases.  Our firm has decided that we are going

8     to be solely focused on representing the interests of the

9     school districts, which I think is of critical importance.  Not

10    suggesting that there's anything wrong with a decision by some

11    to participate in multiple tracks with the personal injury

12    claims as well as the school districts, but there are going to

13    be differences in the way that the cases are handled and worked

14    up.  There will be differences, for instance, with the expert

15    witness needs of the case.  And there will be differences of

16    opinion, probably, that need to be discussed, you know, in a

17    fair manner about which cases go first, which cases go first to

18    trial, etc.

19        And if -- so fortunately at the end of the day to get to

20    bellwether, so it would behoove the schools to have separate

21    representation or focused representation, and if we ever get to

22    a discussion about resolution of the case, that's where I think

23    there could be clear conflicts when a firm is trying to meet

24    both personal injury and school district claims.

25        I would also ask that the Court consider, as I think

1    Your Honor is doing, the diversity of the membership on the

2    school district committee or leadership panel, and that type of

3    inner diversity should be diversity in multiple different ways,

4    the makeup.  I would hope that we have, for instance, some

5    leadership for the school district cases, and I -- I could go

6    off on a sidetrack and I won't on why I think we have an

7    important role in and voice in the school district social media

8    issues.

9        And then I think that there should be some diversity also

10   in amount of experience and whether or not firms have had co --

11   they've been in leadership together on other cases and sort of

12   interlocking leadership between, for instance, opioids, JUUL

13   and this docket.

14       I've had cases in the JUUL docket as well as opioids, and

15   I bring to this proceeding the perspective of somebody who was

16   not in leadership, not that I have any gripes per se to air

17   today, but I would be very focused on best practices in MDL

18   proceedings, and those include making sure that there is a good

19   information flow to the firms that are not in the -- they have

20   not been selected in leadership so that they are able to fully

21   inform their own clients about developments in the case.  I

22   think that's of critical importance, and it can be lost in a

23   very large-scale docket like this one.

24       So I would be very honored if there is a place for me to

25   participate in the school district leadership.

1      We have seven cases on file representing eight plaintiffs:

2   The San Mateo Board of Education plus local school districts.

3   Currently filed cases are all here in or nearby in San Mateo

4   County.  And we have another at least two that we're going to

5   be filing, one of which is in Southern California.

6           **THE COURT:**  So you put on here that you think there

7   should be RICO or conspiracy claims.  Why?

8           **MS. MURPHY:**  We think that's supported.  We've pled

9   RICO, as have other firms.  That was a -- whether those claims

10  go forward is an issue that needs to be up for discussion once

11  the leadership is set.  We haven't had advanced discussions.

12  We are flexible about working properly with the others in

13  leadership to decide if those claims should or should not go

14  forward.

15          **THE COURT:**  If I appointed you, part of me feels like

16  that would make -- I've got California firms, so why should I

17  have a second?

18          **MS. MURPHY:**  Well, California is a big state.  We've

19  have had a role in social media litigation.  We are here local

20  to the Court here.  We're able to fully participate easily in

21  the proceedings and be available to -- for the case -- for the

22  case.  I also participated in another common benefit work on

23  the 50-state survey, and our work was specific to other states

24  not just -- not California.

25          **THE COURT:**  And what about any role in the JCCP?

1        **MS. MURPHY:**  No role in the JCCP.  We have no cases

2   currently filed in the JCCP.  We have we been fully focused on

3   this MDL proceeding.

4        **THE COURT:**  Anything else you want me to consider?

5        **MS. MURPHY:**  No, Your Honor.  Thank you for the

6   opportunity.

7        **THE COURT:**  Thank you.

8     James Cecchi.

9      **MR. CECCHI:**  May it please the Court, James Cecchi,

10  Carella Byrne, on behalf the School District of Chathams and a

11  variety of others.  Thank you, Your Honor, for giving us the

12  opportunity to speak today.

13      The skill set that I would emphasize that are highlighted

14  in my application -- I think one of the hallmarks of

15  representing the school districts -- and to your request to

16  Ms. Murphy, I only represent school districts.  I'm not in the

17  JCCP.  My clients' cases are only filed here.  We have other

18  cases on retainer.  We were awaiting Your Honor's decision to

19  file those additional Complaints to fully digest the opinion to

20  make sure we pled as best as we can.  And we anticipate other

21  clients, particularly from our opioids engagement, coming

22  onboard.

23      As Mr. Seeger indicated, I have been active in trying to

24  organize the group of lawyers on the plaintiffs' side who

25  represent school districts across the country.  I think one of

1    the attributes that I would bring to leadership here is the

2    ability to lead and get people with strong viewpoints and

3    perspectives to compromise, and I think that's particularly

4    important when you're representing local governments or school

5    districts.

6        There is an aspect -- and I learned this in opioids -- we

7    had one-hundred percent participation, and I was solely

8    responsible for bringing all of the subdivisions in New Jersey

9    onboard.  That involved a lot of collaborative, I'll call it,

10   politic work to get everybody to work together to compromise

11   and to see the bigger picture.  And I think I have that

12   school -- that capability.  I've been appointed in other cases,

13   sort of as the plaintiffs' liaison to bridge the gaps between

14   various plaintiffs' lawyers who have -- represent different

15   stakeholders.  So I think that's an important skill set I

16   bring.

17       I was an Assistant U.S. Attorney under Mike Chertoff, who

18   was a great mentor and teacher.  I think I have a great skill

19   set in terms of investigating doggedly the claims of my client.

20   That skill set, I think, was utilized well in the Volkswagen

21   case where I, with some of my colleagues who are here today,

22   developed the document destruction case against Bosch.  And

23   there's a lot of technology at issue here.  A lot of dogged

24   investigative work will take place.

25       My cases are all in New Jersey, Judge.  I think it's a

1    good thing to have a representative --

2              THE COURT:  Well, I already have Mr. Weinkowitz.

3              MR. CECCHI:  Are you from Jersey or Philly, Mike?

4              MR. WEINKOWITZ:  Philadelphia.

5              MR. CECCHI:  Philadelphia.

6              THE COURT:  Well, Pennsylvania and New Jersey is what

7    he put on his form in terms of his clients.

8              MR. CECCHI:  You know, Judge, I was going to talk to

9    him about representing a school district in New Jersey.  I

10   don't think that's appropriate.

11         But, no, we draw a line at the Raritan River.  South of

12   the Raritan is Philadelphia, Pennsylvania --

13             THE COURT:  You understand that most of the Northeast

14   will fit in Riverside County in California.

15             MR. CECCHI:  Yes.  But some of my clients, Judge, are

16   the most densely populated counties in the nation.  In fact,

17   northern New Jersey, if it were a state, would be the most

18   densely populated state.  Something like -- opioid clients who

19   are going to file these cases -- Essex County, New Jersey;

20   Bergen County, New Jersey -- have vastly more citizens than

21   many states, and their school districts are similarly sized.

22         So to answer one of your questions to one of my

23   colleagues, I think the Complaint, the Master Complaint, which

24   we've been thinking about -- and we have been working with

25   Mr. Weinkowitz and others on this survey -- is going to be

1    impacted, obviously, by Your Honor's decision, which we're

2    diligently digesting because there's product liability laws in

3    some states that as a result of the decision, those claims may

4    not be -- those public nuisance claims may not be as viable had

5    Your Honor ruled in a different way.  So we have to fully

6    digest that, integrated into the Amended Complaint.

7        The last thing I would want to say, Judge, I wanted to

8    point out some public service that I've been engaging in since

9    the year 2013.  And that is in 2013, Cory Booker was elected

10   Senator, and I created and formed his judicial selection

11   committee.  And the charge we were given was to make sure that

12   the candidates and bench look like the citizens they're

13   serving, and I'm proud to say I think we've succeeded, and I've

14   worked towards creating an incredible amount of diversity on

15   our bench, including the first Muslim American who became an

16   Article III judge.  We are in the process of moving another

17   candidate to the Third Circuit, who is a Muslim American.

18   We've moved the first Latinx through -- Latina through.  We

19   have more female judges in our district as a consequence of our

20   work than any other district, I think, in the nation, so I'm

21   proud of that background, and I think it represents my

22   commitment to diversity.

23       I thank Your Honor for considering my application.

24       **THE COURT:**  Thank you.

25       **MR. CECCHI:**  Thank you.

1          **THE COURT:**  Derek Loeser.

2          **MR. LOESER:**  Good afternoon, Your Honor.  Derek

3   Loeser.  There's lots of different ways to say it incorrectly

4   and yours was kind, so thank you.

5          I'm from Keller Rohrback, which is based in Seattle, and

6   I've submitted an application as well for a leadership

7   position.

8          Our first client in this case was the Seattle Public

9   School District.  They were the first school in the country,

10  the district in the country, to file a case against social

11  media companies, and they've really led the charge, encouraging

12  other schools to join.

13         We have five cases in the MDL.  We have 25 cases in the

14  JCCP.  And in looking at the numbers, there is now over 200

15  cases in the MDL, and there's about 280 school district cases.

16  And so all of the firms --

17         **THE COURT:**  I have 419.

18         **MR. LOESER:**  School district cases.

19         **THE COURT:**  School district cases, I don't know.

20  Total --

21         **MR. LOESER:**  That's how the numbers break down.  And

22  there are a number of firms, including mine, that is involved

23  in the JCCP.  My partner, Dean Kawamoto, shares a co-lead role

24  with Mr. Cartmell, and my firm has been doing a lot of work in

25  the JCCP in collaboration and with the MDL and for use in both

1    the MDL and the JCCP.

2         In terms of my own qualifications, Your Honor, this is not

3    a new type of case for me or my firm.  I've been very involved

4    in public nuisance litigation over a number of years.  I had a

5    significant amount of work in the opioid MDL, served on a

6    variety of committees, and think I might win the prize for the

7    most different types of committees in that case, and, really,

8    we applied the firm and its resources fully to that case.  I

9    was on the law and briefing committee, the expert committee,

10   led the litigation against one of the major defendants in that

11   case, which was successful.  Mallinckrodt was the defendant.

12   And also worked on the Wal-Mart case.  So a tremendous amount

13   was learned by my firm and by me in that litigation.

14        In the JUUL litigation, my partner, Dean Kawamoto, was

15   co-lead appointed by Judge Orrick, and he was primarily

16   responsible for the government cases.  And I supported him in

17   that role.  Took a deposition of the CEO of Altria, which was

18   used significantly at trial.

19        One of the unique things about my firm is when we get

20   appointed to a position, we fully support each other, and we

21   apply ourselves to make sure that the work is done well and is

22   done cooperatively, and I've worked with all of these lawyers

23   here and in the room, and I -- my firm prides itself and I

24   pride myself on getting along well with my colleagues and

25   working to find sensible solutions to complex problems.

1          One other experience, Your Honor, that I've flagged in my

2     application, which I think is important, I was appointed

3     co-lead counsel by Judge Chhabria in the Facebook-Cambridge

4     Analytica MDL.  That case was a massive undertaking, and it was

5     successful.  It recently -- Judge Chhabria recently granted

6     final approval of that settlement.  It was $725 million, which

7     is the most that Facebook has ever paid to resolve a class

8     action.

9          I think what's important about that case for this case is

10    the amount that I learned and my firm learned about how to

11    conduct discovery against a social media company, which is

12    complex.  The systems are complex.  It requires experts to

13    understand both what's produced but also how to get what's

14    produced.  And I think as Your Honor may know, that case was a

15    bit of a rocky road.  We fought against some defense tactics

16    that we thought and Judge Chhabria agreed were questionable and

17    inappropriate.  And so I think from that -- hopefully none of

18    that would happen here.  I get the sense from being in your

19    courtroom that that would probably be a mistake.  But it was a

20    tremendous learning experience for us and for our team for how

21    to keep going in the face of some very disruptive and difficult

22    practices.

23         So I know from litigating against a social media company

24    that they have some advantages when it comes to knowledge of

25    their systems, and you really got to ask the right questions

1    and you got to ask the right people and stick with it because

2    there's a lot of confusing, complex technical information

3    that's produced in response.

4        I think, Your Honor -- my reason for being here and

5    wanting to be involved starts with when we filed our first

6    case.  I have talked to all of the co-leads and many others

7    that you already have appointed -- and you've appointed a fine

8    group of lawyers -- about the need to have representation of

9    these school districts that is focused on them, that will take

10   care of their interests --

11           **THE COURT:**  And I don't disagree with that.

12           **MR. LOESER:**  Yeah.  And it's been a many-month

13   process, and I'm very happy -- and thank you so much,

14   Your Honor, for the opportunity to be here and talk about this

15   because my efforts in these conversations, which many of them

16   may have ultimately found perhaps a little redundant, was,

17   look, let's create something where the school districts are

18   taken care of, and I think Your Honor agrees with that, and I

19   would simply ask that I be included in that effort.

20           **THE COURT:**  Okay.  Thank you.

21           **MR. LOESER:**  Thank you, Your Honor.

22           **THE COURT:**  Aelish Baig.

23           **MS. BAIG:**  Good afternoon, Your Honor.  I'm Aelish

24   Baig with Robins, Geller, Rudman & Dowd.  Thank you for giving

25   us the opportunity to speak here today.

1        I think that the enormity of the task is certainly not

2    lost on me, not lost on most of those here.  Every aspect of

3    this litigation against multiple defendants is going to require

4    adequate staffing simultaneously, as we just heard today, and

5    most, if not all, aspects I have worked on in the opioid

6    litigation, many of them also in the JUUL, in the McKinsey

7    litigation.

8        Our firm was appointed to the plaintiffs' executive

9    committee in the opioid litigation.  I personally was appointed

10   in the JUUL and in the McKinsey litigation.  But in opioids,

11   for example, for the last six years, I was appointed to so many

12   committees there:  Law and briefing committee, the

13   bellwether -- bellwether briefing.  It was our clients that

14   were selected as some of those bellwethers for dispositive

15   motions so we had to brief that, the legal analysis that went

16   into selection of bellwethers.  We contributed on that front,

17   too.

18       We were on the expert committee.  We were also -- it was

19   our client who was selected as a bellwether and was tried in

20   front of Judge Breyer.  So I co-led that trial.  We took and

21   defended 40 depositions over the holidays with our colleagues,

22   Lieff Cabraser primarily, and others.  Jennie Anderson was also

23   involved in that and others at the table.  And we tried that

24   case for almost three months in front of Judge Breyer.

25       I gave --

1              **THE COURT:**  Which of the cases?

2              **MS. BAIG:**  So that was San Francisco Unified's case

3    against five opioid defendants.  It was against nine of them.

4    Four settled, you know, well in advance of trial.  It went --

5    it went to -- through opening statements and through the close

6    of evidence.

7              **THE COURT:**  This was the bench trial?

8              **MS. BAIG:**  This was the bench trial.  Against all five

9    defendants, settled with four of those, and the remaining

10   defendant, who did not settle, Walgreens, we achieved a verdict

11   against Walgreens.

12        I personally took and defended numerous of the witnesses

13   in that litigation, in the opioid litigation.  Our firm was

14   responsible for the litigation against one of the defendants,

15   Allergan.  I personally took the former CEO's deposition in

16   that litigation.

17        In JUUL and McKinsey, too, we litigated.  That was not

18   quite as long as the opioid litigation.  We just filed final

19   approval requests for settlement in McKinsey last night.

20        But also I wanted to touch upon the settlement -- the

21   settlement aspects that we were involved in in the opioid

22   litigation.  My partner, Paul Geller, was appointed to the

23   settlement committee.  I worked with him day in and day out on

24   that, on settlement implementation.  I would say that the

25   settlement in the opioid litigation -- and this is multiple,

multiple defendants nationally for more than $50 billion.  And
the implementation of that settlement was probably one of the
most complex in history.  We're still working on aspects of
that.

I think that all of this experience makes me a good
candidate to be on the PSC.  I work cooperatively,
collaboratively.  I work with many of these firms here on these
prior litigations.

I do think that diversity is important.  I am a mother of
two teenagers of color, and I have witnessed firsthand the
impacts of the defendants -- of the alleged misconduct against
defendants in our community generally and in their peer groups
and in communications with school systems.

We represent -- we filed the first action on behalf of a
municipality in this case, Bucks County Pennsylvania.  We also
filed, I think, the second school district case on behalf of
Broward, Florida, which is the largest -- sorry, the sixth
largest school district in the country.  We recently filed on
behalf of Miami-Dade Florida schools, which is the third
largest school district in the country.  We have also filed on
behalf of Marin County.

Your -- your pop quiz asked for what others have been
retained, had retention agreements, and I identified there's
one other Northern California entity that has been retained
with a signed retention agreement.  There are many others of

1    our clients who are still considering, some who wanted to see

2    what happened on Section 230, but many who I expect will be

3    filing in the future.  We represented many in opioids, in JUUL,

4    in McKinsey, including -- I provided a list in my letter.

5            Beyond that, I think I would just thank you, Your Honor,

6    for your consideration, and if you have any questions.

7            **THE COURT:**  No.  I'm good.  Thank you.

8            **MS. BAIG:**  Thank you.

9            **THE COURT:**  Okay.  Ms. Weaver.

10           **MS. WEAVER:**  Good afternoon, Your Honor.

11           I did not submit a form because we are not on file yet.

12   And so we were here today to try to -- I haven't retained

13   anybody, so not knowing where the process is, I don't want to

14   waste the Court's time.  If you're making a decision today,

15   we're not prepared.

16           **THE COURT:**  I'm not making a decision right this

17   minute.  I will make a decision quickly.  I'm going to send out

18   some emails to judges with whom people have -- in front of whom

19   they've appeared and get some feedback in terms of what other

20   judges think.

21           So you can submit something on the record, but I'm not

22   going to have another oral -- you won't have another oral

23   opportunity, so if you want to say something, now is the time

24   to do it.

25           **MS. WEAVER:**  I will be brief because that's only fair.

1   There are a lot of lawyers in this room that have filed in this

2   case earlier.

3        I do think there are a lot of talented lawyers in this

4   room, and I've worked with them, and I've learned from working

5   with them.

6        I think that in particular, my firm is very, very

7   selective.  We are small.  We are fierce.  That is why we have

8   not filed.  We have the benefit of Your Honor's order to review

9   now in the underlying case.  And when we put clients in cases,

10  we litigate them.

11       If we file in this case with the school district, I will

12  put all of my effort into making sure that we get something for

13  those clients.  School districts are overworked, underpaid,

14  under siege, and so particularly with regard to public

15  entities, when we represent them, we fight for them very hard,

16  and we try to figure out how to minimize the pain of

17  involvement in litigation like this.  So that's what I would

18  bring.

19       Also some level of diversity.  We're obviously committed

20  to it.  I know the Northern District has been fabulous in

21  thinking about diversity in appointment.  I've been gratified

22  to work with many of the lawyers that have benefited from the

23  efforts of the court here to do that.

24       So I would say if -- we have been speaking -- we have a

25  new office in Austin, Texas.  We're speaking to entities there.

1    We have an office -- obviously we're based in New York, and

2    then I'm here in Oakland.

3        So, again, I cannot speak to representation at this time.

4    I'm ill-prepared, and I apologize, Your Honor, but thank you

5    for the opportunity.

6            **THE COURT:**  All right.

7        Arthur Bryant.

8            **MR. BRYANT:**  Thank you, Your Honor.  Arthur Bryant

9    from Bailey Glasser.  I, too, don't have information to fill

10   out the form, for which I apologize.  I'm part of a team of

11   lawyers working on these cases that saw the applications come

12   in and asked me to come to this hearing to see whether we

13   should talk to lead counsel about proceeding, file our own

14   application, or how to proceed.  So I don't have the

15   information.

16       But who we are preparing to submit for leadership is Cyrus

17   Mehri of Mehri Skalet.  I understand he was here in the last

18   week on a different case.

19       Members of our team -- let me tell you about the members

20   of our team a little bit.  For Cyrus Mehri, he's with Mehri

21   Skalet in Washington, D.C.  He has been lead counsel in several

22   major class actions and MDLs involving race and sex

23   discrimination but also has been actively involved leading the

24   way for the school districts since the start.  He represents

25   the school districts in the opioid litigation in front of

Judge Polster.  He's just also representing the school

districts, I believe, in a settlement with McKinsey in front of

Judge Alsup, so he would be the person we would be promoting --

           **THE COURT:**  Judge Breyer?

           **MR. BRYANT:**  I'm sorry.  Judge Breyer.  I apologize.

He would be the person we would be promoting for the

leadership.

Other people on the team, Wayne Hogan, Terrell Hogan, in

Florida.  I know that we have signed up clients in Florida, but

I don't have the list in front of me to tell you.

I know we have already filed in the MDL on behalf of the

school district of Baltimore.

Terrell Hogan has great experience in MDLs and class

actions.  I know that they were one of the leaders in the

tobacco litigation.

Bailey Glasser is headquartered -- the firm I'm now

with -- is headquartered in Charleston, West Virginia in terms

of geographic diversity.  Ben Bailey, who would be the leader

of our team in the litigation, has been on the PSC for both --

I think it was the Toyota acceleration litigation and for the

Volkswagen diesel litigation, both out here.

My background is I -- I have never been in a proceeding

like this.  The people on my side know that.  I spent the last

35 years building a national public interest law firm called

Public Justice from literally me and the receptionist to 43

1    staff and 23 members, all of which, because it was a public

2    interest law firm, was financed, the vast majority of it, by

3    membership contributions from primarily plaintiffs' lawyers all

4    around the country.  So I know almost all of these people and

5    their firms from going to them and asking them to join and

6    support Public Justice and then working with them on

7    cutting-edge legal cases.

8        So while I've been involved in class actions and MDLs all

9    around the country, it's never been in positioning for

10   leadership positions because Public Justice wasn't involved in

11   that battle.  We were focused on the cutting-edge legal issues

12   in the case.  And what I can tell you is my role in this case

13   would be to do exactly that.  I have experience all around the

14   country from the trial courts to the U.S. Supreme Court.

15       I'm particularly -- was also asked to get involved in this

16   litigation because of its public interest impact and

17   possibilities and because I'm actually now representing a -- a

18   man in Australia, a billionaire in Australia named Andrew

19   Forrest, who -- fake ads are being run by cyber criminals on

20   Facebook, and he is so popular in Australia that people are

21   putting their life savings into ads that he has nothing do

22   with, and he has sued Facebook just to get them to stop people

23   from running ads with his name on it because it's harming so

24   many people.  So I've been involved in Section 230 research and

25   briefing and argument.

1        But I can tell you from Mr. Mehri's background and from

2    the rest of the team's background and certainly from my

3    background the sort of one absolutely unique thing is you would

4    be adding to the team -- adding to the leadership group with

5    significant experience in public interest litigation and

6    advancing -- making sure that the school districts are taken

7    care of, not just monetarily but the best way possible to

8    advance the public interests.

9        And I don't have the form, like I said, but I can go back

10    and have them submit the form through whatever process you'd

11    like.

12            THE COURT:  Okay.  So if you want to submit something,

13    no later than noon tomorrow Pacific.  Okay?

14            MR. BRYANT:  Yes, Your Honor.

15            THE COURT:  All right.

16        Mr. Weaver -- I think that's it; right?  Did I get

17    everybody?  I think so.

18        All right.  Mr. Weaver, question for you.

19        In terms of -- I'm sorry.  Seeger, not Weaver.

20        In terms of how the structure is currently operating, what

21    are you looking for or what can the structure manage without

22    being bulky, that is, efficient?  I'm looking for the efficient

23    size.

24            MR. SEEGER:  Yeah.  We know your views on that, Judge.

25    You've made that clear.

1          Well, two responses.  One is -- I want to make this

2     clear -- we see it as a subcommittee in some respect because

3     it's really, you know -- I think it's a sub-piece of the case

4     that is before you.

5          Secondly, the -- there -- it's a very high quality of

6     lawyers who just stood up here and have asked for the job.

7     Should the sub --

8               **THE COURT:**  It's a subcommittee, but their claims are

9     distinctly different from the other claims.  I mean, I don't

10    know what's going on with this notion of RICO or anything like

11    that, but public -- the public nuisance, right, is distinctly

12    different --

13              **MR. SEEGER:**  That's the one, yeah.

14              **THE COURT:**  -- from the -- from the -- from the other

15    18 claims that are in the Master Complaint.

16              **MR. SEEGER:**  Correct.  Yeah.

17         So -- you know, Judge, I guess the way we saw it -- let me

18    start there, because I'm not hedging on giving you a firm

19    answer to your question, but the way we saw it was not a very

20    large committee, frankly.  I -- if I had to throw out a number

21    without speaking to Prevan and Lexi, I think five or six is the

22    right number, which would then beg the question, well, if

23    you're asking for three co-chairs, that is very top heavy for a

24    subcommittee.

25         There are a lot of reasons for doing it.  I think each of

1    the three that spoke to you bring different skill sets and

2    would provide benefits for those reasons.  You know,

3    Mr. Cecchi's -- you heard his presentation about the work he's

4    done in trying to lead the informal committee that's been

5    around.  I think that's very valuable.

6         So that's kind of where I come out.  Five or six, I think,

7    is the right number.  And that doesn't mean that people that

8    wouldn't be appointed to the committee would be abandoned.  We

9    would still be communicating with people.  I communicate with

10   people throughout the country who haven't been appointed.  It's

11   our responsibility to do that.

12        **THE COURT:**  Okay.  All right.  Let's talk about

13   discovery.

14        This might be -- we may take a short break here.

15        Pam, would a short break be good for you?

16        **THE COURT REPORTER:**  Yes, Your Honor.

17        **THE COURT:**  Okay.  It's 12:41.  Fifteen minutes.

18   Okay?  Remember what I said last time.  Make sure you're back

19   here on the record in 15 minutes.

20        We'll stand in recess.

21                    (Recess taken at 12:42 p.m.)

22               (Proceedings resumed at 12:55 P.m.)

23        **THE COURT:**  Okay.  Discovery.  Anybody on the defense

24   side talking about discovery?

25        **MS. HAZAM:**  Lexi Hazam on behalf of plaintiffs.

1          **MS. SIMONSEN:**  Ashley Simonsen from Covington &

2    Burling on behalf of the Meta defendants.

3          **THE COURT:**  Go ahead.

4          **MS. HAZAM:**  Your Honor, there were a few issues

5    touching upon discovery in the parties' status report.  We can

6    take them in order.

7          One came -- the status report was, of course, submitted in

8    advance of Your Honor's order so there was discussion of the

9    discovery stay.  We noted in Your Honor's order that the Court

10   has indicated that that stay would be lifting, so I don't know

11   if you need us to further discuss that matter.

12         We also addressed in our status report plaintiffs' pending

13   requests for --

14         **THE COURT:**  Let me -- because I'll issue an order

15   after this, but discovery is lifted at this point.  The stay is

16   lifted.  I don't think that's a surprise.

17         Go ahead.

18         **MS. HAZAM:**  Thank you, Your Honor.  That was our

19   understanding.

20         We had also raised in our status report the issue of the

21   defendants refreshing the productions they had made last

22   January pursuant to the Court's Discovery Order No. 1.  Those

23   were productions of documents that had been produced to State

24   Attorneys General as part of their investigations into issues

25   akin to those in this case, namely, addiction of youth through

1    use of defendants' platforms.

2         We had asked the defendants to refresh those productions

3    in light of seeing various citations in the State AGs'

4    Complaints, both the one filed in the MDL and State AG

5    Complaints that had been filed in various state courts.

6         We have had meet-and-confers on that matter.  They have

7    been productive with two of the defendants.  I believe we

8    already have an agreement with regards to this with Defendant

9    Snap, who will be refreshing the production in short order.

10        We've had productive meet-and-confer with Defendant Meta

11   on this matter and I believe will reach an agreement that also

12   results in a refreshed production.

13        We are not there with the other two defendants.  To date,

14   Defendant TikTok has declined to agree to refresh the

15   production or to provide plaintiffs with unredacted copies of

16   other Complaints against TikTok, such as the Complaint pending

17   in Utah state court brought by the State AG for Utah, which

18   also deals with issues of youth mental health harms and

19   addiction to social media.  We are continuing to confer with

20   them on that.  I'm not sure if we have the final word; however,

21   thus far it has not been productive.  We note that with

22   discovery listed, we could simply propound discovery for this,

23   but we believe it should not be necessary in light of

24   Your Honor's former discovery order.

25        And then we have a request to YouTube.  It's more recent

1    and so have yet to engage in meet and confer.  We don't know if

2    YouTube through Google has made any such production.

3              **THE COURT:**  Lawyers for TikTok and YouTube, response.

4              **MS. PIERSON:**  Thank you, Your Honor.  Andrea Pierson

5    from Faegre Drinker on behalf of TikTok.

6         Your Honor, it's TikTok's position that discovery requests

7    at this juncture, particularly made in the informal way that

8    plaintiffs have made it simply by email, that they're premature

9    and that any requests for documents should come through a

10   formal process once that process begins.

11        Just to clarify the request before TikTok, Your Honor, on

12   November the 2nd, the plaintiffs requested that TikTok produce

13   all confidential documents, transcripts and the sealed

14   Complaint filed in the State of Utah, produced or created

15   within the AG investigations, and it's our view that that

16   request is overly broad, unduly burdensome, and premature, and

17   that it should be denied for three reasons.

18        First, as we noted, it's not been part of a formal

19   discovery request.  Instead this request was made by email

20   initially on November the 2nd.  There has been one

21   meet-and-confer on the substance of that.  That occurred

22   yesterday.

23        During that meet-and-confer, the scope of the plaintiffs'

24   request was -- was unclear, and the plaintiffs' lawyer told us

25   that they would clarify with leadership what the scope should

1    be.  We're waiting to hear back, but we're in the very early

2    stages of conferring with plaintiffs on that matter, and we

3    intend to continue.

4         THE COURT:  What is the problem with producing the

5    unredacted version of the Complaint?

6         MS. PIERSON:  The Complaint was filed by the Attorney

7    General in Utah under seal by the State.  There is a pending --

8         THE COURT:  Is there an objection to the Utah State AG

9    producing the unredacted version under a protective order?

10        MS. PIERSON:  Yes.

11        THE COURT:  On what grounds?

12        MS. PIERSON:  Your Honor, there is a process that's

13   happening currently in the Utah court to continue to maintain

14   the redacted portions of that Complaint under seal.  Subject to

15   the -- the jurisdiction and ruling of that court, until the

16   Complaint is unsealed, if and when it's ever unsealed in Utah,

17   it would be inappropriate to produce it in connection with this

18   litigation.

19        THE COURT:  Why?

20        MS. PIERSON:  There is material that that court is

21   considering as confidential and whether it should remain

22   confidential.  I'm not at liberty to talk about the material

23   that's contained in that redacted Complaint.

24        THE COURT:  If the Utah State Attorney General has no

25   objection to producing it under protective order to plaintiffs'

1    attorneys here, what is TikTok's objection?

2          **MS. PIERSON:**  TikTok will raise its own concerns with

3    respect to unsealing the Complaint and the contents of the

4    confidential --

5          **THE COURT:**  Well, unsealing the Complaint to the

6    public is very different.

7          **MS. PIERSON:**  Understood.

8          **THE COURT:**  I'm talking about a narrow production

9    under a protective order.

10          **MS. PIERSON:**  In the absence of a formal discovery

11    request and an analysis of whether the materials referenced in

12    that Complaint are relevant to this proceeding, we're not able

13    to agree to the production of that Complaint, even if it

14    remains highly confidential.

15          **MS. HAZAM:**  Your Honor, if I may --

16          **MS. PIERSON:**  I think the broader point, though,

17    Your Honor, from our perspective is this.  You may recall that

18    Your Honor considered a similar request from the plaintiffs

19    about a year ago, and at that time, Your Honor reviewed all of

20    the CIDs and the requests for documents.  There were over 279

21    requests for documents that Your Honor reviewed.

22          In response to that, Your Honor ordered that TikTok should

23    produce documents responsive to seven of those requests.

24          The request that's been made to my client is without

25    regard to the Court's order.  The plaintiffs characterize it as

a refresh, but the requests that we've been posed with is to
produce all of the documents produced in connection with any AG
investigation without that limitation.

And you may recall that your Discovery Order No. 1
identified four specific topics that you were looking for as
you reviewed the requests for documents to identify the seven
requests.  Keep in mind all of that happened, of course, before
Your Honor's order on the motion to dismiss, which narrowed the
claims against TikTok.

The present request that plaintiffs pose, as we understand
it, although as I said, we had what I thought was a productive
meet-and-confer yesterday that would result in -- in some
defining of the scope of the request to TikTok, which is
presently unclear to us, but as we understand the request
before TikTok today, it would require the Court to review
another 200 requests for documents and to consider the scope of
those in comparison to the Complaints as they exist after the
ruling on the motion to dismiss.

**THE COURT:**  All right.  Comments from YouTube.
Someone from Wilson Sonsini?

**MS. HARDIN:**  Ashley Hardin from Williams & Connolly,
actually, Your Honor.

YouTube has not produced any documents to a State Attorney
General in connection with an Attorney General investigation
into YouTube, so that's where the state of it is.  And as for

1    any inquiry by the plaintiffs, my understanding is that the

2    first inquiry we got was at 6:00 last night via email, but

3    that's the state of -- of YouTube.  And we, therefore, have not

4    engaged in any meet-and-confers with the plaintiffs because it

5    hasn't been necessary.

6            THE COURT:  Okay.

7            MS. HAZAM:  And, Your Honor, now it will not be

8    necessary.  That absolutely is correct that the request was

9    made last evening.  YouTube is differently positioned.  It did

10   not have prior productions and so the question was merely

11   whether it had any since, and I understand counsel's

12   representation that it has not.

13       If I may respond briefly to the statements with regards to

14   TikTok?

15           MS. HARDIN:  Thank you, Your Honor.

16           MS. HAZAM:  First, the meet-and-confer that has been

17   conducted with plaintiffs was conducted by Mr. Weinkowitz, who

18   is in the room today and could address it, but I want to make

19   it clear that the request was for documents that relate to

20   addiction to social media so it was confined to relevant

21   matters to this litigation.  And it was the same request that

22   plaintiffs made last year -- excuse me -- last January, I guess

23   it would be -- no.  I think it was last year, and then the

24   production was in January -- that were made pursuant to the

25   Court's order.  And so from our view, we should not have to

1   make a formal discovery request, but instead supplement --

2          **THE COURT:**  I think that the question is I -- look, I

3   looked at all of those things myself, and I ordered a very

4   limited and targeted production.  Has more been produced on

5   those -- on those particular -- or with respect to the topics

6   in the -- that I ordered, has more been produced to the

7   Attorneys General with regard to those topic areas?

8          **MS. PIERSON:**  Your Honor, I don't know the answer to

9   that question, but what I can tell you is that since

10  January 9th, TikTok has produced over 68,000 documents.  The

11  burden of what plaintiffs are asking without any formal

12  discovery requests would require TikTok to -- to review 68,000

13  documents --

14         **THE COURT:**  Did you not identify in the production to

15  the AGs which documents were responsive to which requests?

16         **MS. PIERSON:**  The -- the requests are different,

17  Your Honor.  There have been 200 new requests that have been

18  served and the 68,000 documents are in response to those --

19         **THE COURT:**  I don't think we're talking on -- you're

20  not -- we're not communicating.  You all go meet and confer,

21  and -- and then we can discuss it again.

22      I ordered a production with respect to very specific

23  requests.  To the extent that there were other productions

24  relative to those requests, they should be produced.  And I'm

25  not -- and there were numerous things that I did not order

1    production on, and I'm not suggesting you have to produce to

2    that.  But if there were ongoing productions with respect to

3    the ones that I ordered, they should be produced.  Do you

4    understand?

5         MS. PIERSON:  I do understand, Your Honor.  We would

6    ask, though, for the opportunity to both address this in terms

7    of formal discovery, as formal discovery proceeds.  We'll have

8    objections, of course, that --

9         THE COURT:  So -- do -- meet and confer.  And I'm not

10    particularly interested in boilerplate objections.  I have

11    already looked at the requests.  The productions have already

12    been made.  And you shall produce.

13         MS. PIERSON:  Understood, Your Honor.  Understood.

14    The clarification of knowing that it's limited to the

15    Court's prior request is helpful and not something we knew

16    before today based on the confers with the plaintiffs.

17         THE COURT:  Okay.  Well, again, go meet and confer.

18    I'm giving you guidance.  Do you understand?

19         MS. PIERSON:  I do.

20         THE COURT:  Okay.

21         MS. PIERSON:  I do.

22         THE COURT:  Anything else?

23         MS. HAZAM:  No, Your Honor.  I think we understand

24    your guidance as to that matter.

25         THE COURT:  And you should understand on the

1    plaintiffs' side, there were numerous -- in fact, the majority

2    I did not think were relevant to this litigation.

3         **MS. HAZAM:**  Understood, Your Honor.  We have limited

4    our requests to those that are responsive to addiction, to

5    social media, but I understand Your Honor's instructions.

6         **THE COURT:**  At least not as of December of last year.

7    All right.

8        What else do you have?

9         **MS. HAZAM:**  With regards to discovery, I think the

10   coordination order goes to discovery.  I think these were the

11   principal components of it, if your Court would like to discuss

12   that.

13        **THE COURT:**  All right.  And that coordination order, I

14   have to say I did not agree the last time I looked at it, which

15   was quite a while ago, with plaintiffs' perspective on what you

16   think Judge Kuhl had ordered.  Where does it -- where -- where

17   is it now with respect to Judge Kuhl, and what, if anything,

18   are the specific issues that are outstanding at this point?  I

19   mean, there has been no discovery until now --

20        **MS. HAZAM:**  Yes, Your Honor.

21        **THE COURT:**  -- other than what was previously ordered

22   in a limited way.

23        **MS. HAZAM:**  That's correct, Your Honor.  The order

24   that was issued by Judge Kuhl -- and my colleague, Kelly

25   McNaab, can speak further to this -- was issued, I believe, in

1   the form of a minute order, and it had three simple components

2   to it, which are what plaintiffs are seeking here from this

3   MDL, and it would simply be the mirror image of that order.

4       That order essentially said that documents that were

5   produced in the MDL would be produced in the JCCP, deemed

6   produced essentially.  And so plaintiffs have essentially

7   suggested that the reverse apply as well, that the parties seek

8   to avoid duplicative discovery, which we were tasked with doing

9   under the federal rules and we would want to include in any

10   such order.  And finally, the last provision is that discovery

11   should be coordinated, so --

12       **THE COURT:**  I think we can all agree that discovery

13   should be coordinated; right?

14       **MS. HAZAM:**  So the parties have --

15       **THE COURT:**  Hold on.

16       **MS. HAZAM:**  Sorry.  Excuse me.

17       **THE COURT:**  Correct?

18       **MR. DRAKE:**  Yes, Your Honor.  Geoffrey Drake, King &

19   Spalding, for the TikTok defendants.

20       I think we're all in agreement on the spirit of

21   coordination.  I think it's just a matter of a disagreement

22   about the details of a potential order, not really as much as

23   it relates to the JCCP, Your Honor, where, indeed, there is

24   great coordination going on.  As Mr. Seeger said, most of the

25   lawyers here are involved in that proceeding and most of the

1    lawyers in that proceeding are involved in this proceeding.

2        The intent of the coordination order in many respects,

3    Your Honor, perhaps relates to what may ensue as this

4    litigation unfolds.  At present, there are only four, I think,

5    lawsuits related to these issues that are pending in other

6    state courts around the country, three of which have been filed

7    by Mr. Bergman, who I don't see here today, and one by

8    Mr. Brewster -- I don't believe he's here today either -- and a

9    couple more that are pending with motions to remand on file in

10   Louisiana.

11       And we -- we thought now a good time to have the dialogue,

12   Your Honor, about how best to try to ensure that these other

13   state court cases get the benefit of this proceeding and the

14   discovery that happens here and also as a result, kind of agree

15   not to go beyond what's going on in this Court or try to end

16   run this Court in any way and that we just have a coordinated,

17   steady proceeding going forward.

18       **MS. HAZAM:**  Your Honor, that's news to us, that this

19   is the limited fashion in which the defendants are seeking the

20   order that they've submitted.

21       The way that related actions and coordinated actions are

22   defined in that order is much broader, would apply to the JCCP,

23   would also apply to the State AG actions pending in state

24   court.

25       Now, the proposed order, both plaintiffs' and defendants',

1    has no force unless it's adopted by the other court.  So unless

2    it's adopted by, for example, Judge Kuhl in the JCCP, it would

3    not govern.  The same would go for actions by State AGs.

4        We could carve out a discussion of solely those other few

5    actions that exist, but defendants' proposal was much broader

6    than that and had --

7            **THE COURT:**  As I understand, these are lead states who

8    filed in their own state court --

9            **MS. HAZAM:**  Exactly.

10           **THE COURT:**  -- right?

11           **MR. DRAKE:**  That's correct, Your Honor.  There's also

12   one, as Ms. Pierson discussed -- one AG action filed in a state

13   court by the State of Utah against TikTok, and then there are

14   four personal injury cases that are pending in various state

15   courts and of which I'm aware at least two school district

16   lawsuits that are currently subject to briefing on motions to

17   remand, although we believe those will ultimately be sent to

18   this MDL.

19       But Ms. Hazam is right, the order was not drafted to be

20   specific only to those particular lawsuits.  It was drafted to

21   concern all related actions.  And as Ms. Hazam points out

22   correctly, it's then up to whether Judge Kuhl wants to adopt

23   Your Honor's coordination order or not.  I'm of the view that

24   that would be helpful.  She may not agree with that.  And,

25   frankly, I do think that without it, we're still in a very good

1    spot in the JCCP with coordination.  I don't see a lot of

2    concerns there.  I know Your Honor and Judge Kuhl are speaking

3    regularly.

4        But I don't know where the litigation is going to go long

5    term.  And traditionally in these types of MDLs, we find it

6    helpful to try to hammer out what the details might be of a

7    coordination order early on and then leave it to those --

8    obviously those different state courts to make a decision about

9    whether to adopt a version of that order to help govern their

10   own proceeding.

11        **THE COURT:**  Okay.  So it appears -- has anything

12   happened that -- the filings that happened with respect to this

13   issue were in May.  We are now in November.  Since then, you've

14   received a ruling from Judge Kuhl on the first round of motions

15   to dismiss.  You've received a ruling from me on the first

16   round of motions to dismiss.

17        Where are we on the coordination?  Has it just -- did it

18   just stop in May?  And if it didn't just stop in May, where is

19   the most current articulation of any dispute so that I can look

20   at the specifics and perhaps -- I -- I'm not really prepared to

21   give you any answers because I don't have -- I don't know

22   what's in front of me that is current.

23        **MR. DRAKE:**  I might suggest, Your Honor, to that

24   point -- well, let me first answer your question more directly

25   and then make a suggestion.

1    Coordination has continued, as I understand it, to --

2    to -- to continue between the plaintiffs in the JCCP and the

3    plaintiffs in the MDL, along with the defendants, and as I

4    mentioned earlier, as I understand it, Judge Kuhl and

5    Your Honor have been in touch and are coordinating.  Nothing

6    further has --

7         **THE COURT:**  But we've not talked about this order.

8         **MR. DRAKE:**  Thank you, Your Honor.

9    The -- I believe Judge Kuhl took the view back in May that

10   a formal order in her court was not necessary and that she had

11   certain guiding principles.  Nothing further has happened on

12   that point since Judge Kuhl's issued that particular order that

13   I can recall.

14        **MS. MCNABB:**  Yes, Your Honor.  Kelly McNabb for the

15   individual plaintiffs.

16   The order that is operational right now in the JCCP is

17   Judge Kuhl's May 3rd, 2013 order, and coordination has been

18   proceeding under those guidelines that Judge Kuhl provided.

19        Nothing has changed in coordination.  We continue to

20   coordinate, as has been mentioned numerous times today.  The

21   coordination has -- is strong.  We are in constant

22   communication between the MDL and the JCCP, which clearly has

23   the largest number of actions filed.  There may be a few state

24   court actions and then there are the Attorney General state

25   court actions, which we don't foresee any issues coordinating

1    with those other state court actions outside of the JCCP.

2        So, again, plaintiffs' proposed order, which -- in front

3    of Your Honor right now was what we filed back in May is

4    plaintiffs' proposed order that mirrors what Judge Kuhl entered

5    in the JCCP, which has been working and -- both before the

6    order in May and subsequently, and then there's defendants'

7    proposed order which goes far beyond both Judge Kuhl's order

8    and any other prior coordination --

9            **THE COURT:**  She issued a minute order.

10           **MS. MCNABB:**  Correct, Your Honor.  And as --

11           **THE COURT:**  It's not -- it's not a fulsome, thorough

12   order.  It is just -- it was just a set of principles in a

13   minute order.

14           **MS. MCNABB:**  That's correct, Your Honor.

15       And as the guidelines and best practices that -- that

16   defendants have filed as Exhibit 1 and 2 in their submission to

17   Your Honor back in May suggest, that coordination can take a

18   variety of forms.  There is not one prescribed way.  The key

19   issue is communication and making sure that the parties are

20   communicating so that discovery does not include unnecessarily

21   duplicative requests and depositions, for example.

22       We believe that our proposed order does just that.  There

23   is no need to create procedural hurdles stripping away other

24   courts' authority to manage the cases before them or dictating

25   how plaintiffs in those other actions prosecute their cases,

1    which is what defendants' order would do.  That would massively

2    change how coordination has been effectively managed in the

3    cases thus far.

4             MR. DRAKE:  May I make --

5        THE COURT:  Thus far?  Discovery just opened so I

6    don't know what you mean by the term "thus far."

7        MS. MCNABB:  Although discovery has just opened,

8    Your Honor, we have been coordinating between the actions with

9    the protective order, for example, the preservation order, ESI

10   order.  There has been the prior productions.  There has been a

11   lot of coordination, although it has not been under, you know,

12   formal discovery requests.  There are, quote, first-day orders

13   that we have been working with, including the Plaintiff Fact

14   Sheet, which is a discovery mechanism used in mass tort cases,

15   and the parties have been able to do that.

16       THE COURT:  One of the issues appears to be whether

17   the JCCP plaintiffs should be required to obtain leave to serve

18   non-duplicative discovery in the JCCP by demonstrating good

19   cause as to why such discovery could not have been obtained in

20   the MDL.  Yes or no?  Is that still an issue?

21            MS. MCNABB:  Yes, that is an issue, Your Honor.

22            THE COURT:  All right.  Argument.

23            MS. MCNABB:  Your Honor, the -- the provision is from

24   defendants' proposed order in paragraph 11 and then there's a

25   couple other paragraphs, including 19, that deals with

1    depositions on that issue.

2         The first issue with that is we're talking about

3    non-duplicative discovery.  The plaintiffs or the parties, I

4    should say, generally in the JCCP are free to propound their

5    own discovery.  It's non-duplicative.

6         There may be reasons why in the JCCP certain discovery is

7    sought that's not sought in the MDL.  So what defendants'

8    proposed order would require is that plaintiffs -- plaintiffs

9    or defendants would have to first go to Judge Kuhl and say, We

10   want to propound discovery.  They would have to show that --

11   that they reviewed the materials that have already been

12   produced in the MDL -- no problem with that -- and determined

13   that the discovery was necessary to address issues unique to

14   the coordinated action.  I could see --

15        **THE COURT:**  You know what?  Let me hear from the

16   defense first.  And I say that because you're making an

17   argument in response, and I'd like to hear --

18        **MS. MCNABB:**  Okay.

19        **THE COURT:**  -- the need for why it is you're asking

20   for what you're asking.

21        **MR. DRAKE:**  Well, with respect -- again, Your Honor,

22   with respect to the JCCP itself, which the plaintiffs are

23   singularly focused on or not, so that seems to be a disconnect

24   between the two sides as we discuss the details of a

25   coordination order.  But with respect to any case outside of

1    the MDL, including the JCCP, the draft language in the

2    coordination order, which is pulled from many exemplars that we

3    have provided to the Court, contemplate that -- that -- that

4    the discovery that needs to take place as it relates to the

5    general liability issues takes place in this proceeding under

6    Your Honor's guidance.

7            **THE COURT:**  But the JCCP plaintiffs are not the same

8    plaintiffs as they are here.

9            **MR. DRAKE:**  That's correct.

10           **THE COURT:**  And they're not the same lawyers.

11           **MR. DRAKE:**  Well --

12           **THE COURT:**  There are some overlapping lawyers, but

13   they're not the same.

14           **MR. DRAKE:**  There are some non-overlapping lawyers,

15   yes, Your Honor.

16           **THE COURT:**  They are not identical.

17           **MR. DRAKE:**  That is correct.

18           **THE COURT:**  So why is it that I'm having non-identical

19   plaintiffs prohibited from serving discovery?

20           **MR. DRAKE:**  Well, they're not prohibited under the

21   proposed language of the order, Your Honor, from serving

22   discovery that's not duplicative of what happens.  They just

23   have to make a showing and articulate to the Court how it's

24   different from what's already going on here.

25           **THE COURT:**  How are they supposed to know that?

1    They're not litigating here.

2            **MR. DRAKE:**  Well, the co-lead counsel for the

3    plaintiffs in the MDL, two of them, are members of the steering

4    committee in this Court, so I believe that they do know --

5            **THE COURT:**  Okay.  You just said that the co-lead

6    counsels in the MDL are -- are --

7            **MR. DRAKE:**  The co-lead -- two of the co-lead counsel

8    in the JCCP are members of the plaintiffs' steering committee

9    in this proceeding.  They all -- we are all talking and we are

10   all coordinating around what kind of discovery is being served.

11   It's not happening in silos or secrecy.

12       And the point that we're trying to articulate here is that

13   in the JCCP, but also in all of these other cases that may be

14   filed around the country, that those judges and the plaintiffs

15   in those courts, in those cases, try to limit -- do not just

16   engage in discovery of a different scope that has occurred here

17   and specifically perhaps discovery that Your Honor has not

18   permitted.

19           **THE COURT:**  What?

20           **MR. DRAKE:**  Well, if Your Honor issues an order that

21   says discovery request X is not permissible under the scope of

22   these lawsuits in this Complaint, a plaintiff in another court

23   is free to serve that discovery under the coordination order if

24   it shows good cause and the need for that in that particular

25   case.  But, otherwise, Your Honor's orders would be

1    circumvented in the other cases, and that's the general purpose

2    of the coordination order.

3        My -- if I can go back, though, to my recommendation or

4    suggestion to Your Honor, I don't feel like the parties have

5    spoken clearly to one another in connection with preparing this

6    particular order.  And as Your Honor pointed out, I believe

7    there have been many developments, more cases have been filed,

8    etc., in the time since May.

9        Perhaps we could confer further on an appropriate path

10   forward that we could present to Your Honor in advance of the

11   December 13th conference and see if we can make some progress

12   on narrowing the disputes and seeing if we can offer something

13   that might be more constructive or appealing to the Court.

14       **MS. MCNABB:**  Your Honor, plaintiffs are happy to meet

15   and confer again, although we met and conferred about this

16   coordination order for months.

17       Plaintiffs are not going to agree to an elaborate order,

18   again, that strips authority from other courts or prohibits

19   parties from prosecuting or defending a case in the way that

20   they choose in other jurisdictions.

21       The other thing, if we -- if we set aside the JCCP, as

22   counsel has suggested we do, there are State AGs or -- and I

23   don't know the details of Mr. Bergman's three cases, but I

24   suspect those are quite different, and they are not part of

25   this litigation, and they will not have the luxury of having

1    seen what has been propounded or produced in this litigation.

2         THE COURT:  Have you all coordinated or met and

3    conferred with the AGs who are here as part of this discussion

4    on the coordination order?

5         If I could have perhaps Ms. Miyata come back.

6         And you can take the middle mic.

7         MS. MIYATA:  Thank you, Your Honor.

8         No, we have not been part of those conversations.

9         THE COURT:  Would it be useful to have you as part of

10   this conversation?

11        MS. MIYATA:  I think it would be useful to have us as

12   part of this conversation, but --

13        THE COURT:  Could you speak closer.

14        MS. MIYATA:  Yep.

15        I think it would be useful, Your Honor, but I should note

16   that we do not represent the states who have filed in their

17   respective state courts here so I can't give a position as to

18   their interests at this time.

19        THE COURT:  You mean the eight states who filed in

20   their own state courts?

21        MS. MIYATA:  Correct, Your Honor.

22        THE COURT:  Correct.  But you do represent 33 states.

23        MS. MIYATA:  That is correct.

24        THE COURT:  Which is a significant number.

25        MS. MIYATA:  That may be, Your Honor.

1              **THE COURT:**  All right.

2         Ordered to meet and confer.

3              **MR. DRAKE:**  Thank you, Your Honor.

4              **THE COURT:**  And to bring the States into the

5    conversation.

6         Let me just say that it seems to me that the defendants

7    are in the best position to understand not only what they

8    produced but the categories of information that they produced,

9    and when there's not identical counsel litigating across the

10   United States, it's not clear to me how they should be deemed

11   to have to comply with something that a court has issued when

12   they're -- when they're not part of this.

13        Now, if counsel's the same, I agree, they should know, and

14   they should be -- they should be efficient, and you all should

15   not have to duplicate effort when you have the same attorneys.

16   But the whole point of the MDL is to try to increase

17   efficiencies, so that's what I'm always going to look for,

18   without impacting the ability of people not here to do what

19   they think is best for their client, like the eight states AGs

20   who are not part of this litigation.

21        But if 33 State AGs agree to something, you still -- you

22   know, you've made progress because you're being efficient with

23   33, but that doesn't mean you don't have to address the other

24   eight on their own terms.

25        I just had your co-counsel up here arguing that what

1    happens in Utah should be the decision of the Utah court, not

2    this one.  So you can't have it both ways.

3         **MR. DRAKE:**  And just to be clear, Your Honor, we're

4    not asking to have it both ways, but what we're saying is and

5    how we envision the order is that the plaintiffs in these other

6    cases -- take Mr. Bergman's case, for example, against TikTok

7    in New York State, which alleges the same things that are

8    alleged in this Complaint.

9         He would get all of the documents that we produced in the

10   MDL court as a result of the coordination order and then there

11   would be a process that would prevent duplication of those

12   efforts.  Mr. Bergman, in that case, would have an opportunity

13   to participate in the depositions that are taken in this case.

14        That's the spirit of the order, and if that didn't come

15   across, Your Honor, we'll take a sharp pen to it and think

16   about how we can revise that.  But it's to enhance efficiency

17   for both sides.  It's not to limit what a plaintiff may be able

18   to get access to in a different court.  That's not the

19   intention of the order here or as the orders have been entered

20   in other MDLs.  The same is true for the JCCP.

21        **THE COURT:**  A response.

22        **MS. MCNABB:**  Your Honor, there will have to be a very

23   sharp pen taken to defense proposed order if that is indeed the

24   case.

25        Some of the provisions very much restrict what plaintiffs

```
1    are allowed to do in other jurisdictions.  And it's, again,

2    inappropriate for the coordination order to dictate how a

3    plaintiff can prosecute their case or what authority a court

4    has over its own turf.

5          THE COURT:  Okay.  I'm set to see you on the 13th; is

6    that right?

7          MS. MCNABB:  Correct, Your Honor.

8          THE COURT:  Any issue that I am going to address

9    substantively on the 13th has to be teed up no later than

10   December 6th, one week prior -- that would include this one --

11   if you want me to do something about it.

12         MR. DRAKE:  Yes, Your Honor.

13         MS. MCNABB:  Understood.

14         THE COURT:  Okay.  What else?

15         MS. HAZAM:  Your Honor, Lexi Hazam for individual

16   plaintiffs.

17       I don't believe --

18         THE COURT:  Hold on.  Hold on.

19       When do you meet with Judge Kuhl again?

20         MS. HAZAM:  There is a hearing on December 7th,

21   Your Honor.

22         THE COURT:  Okay.  So December 6th is good.  All

23   right.  Go ahead.

24         MS. HAZAM:  Your Honor, I don't believe plaintiffs

25   have further matters that haven't already been addressed by the
```

1    Court.  For example, the Court has indicated that the matter

2    with the protective order should be addressed with Magistrate

3    Judge Kang, which we understand.  So I -- I don't know that

4    plaintiffs have further matters.

5        We had included a section of our status report -- this was

6    a joint section -- that summarized the matters that are

7    currently before the magistrate judge.  If Your Honor would

8    like to address that, we could.

9        We also have flagged that an order regarding a

10   preservation of CCM has been entered into the JCCP and that the

11   parties have agreed to present it to this Court for entry also.

12   Those are not disputes but matters on which we wanted to inform

13   the Court.

14           **THE COURT:**  I appreciate the information but do not

15   intend to engage when I have another judicial officer who is

16   engaging.

17           **MS. SIMONSEN:**  And, Your Honor --

18           **THE COURT:**  Ms. Simonsen?

19           **MS. SIMONSEN:**  From defendants' perspective,

20   understanding the Court's direction, that discovery is now

21   open, I think it would be helpful just to hear some guidance

22   from the Court.  I think from defendants' perspective, having

23   just received Your Honor's order on Tuesday and received

24   additional guidance from Your Honor today with respect to the

25   scope of that order, for instance, as it relates to the failure

1    to warn claims, what we would submit would be in the interests
2    of efficiency would be for the parties to meet and confer about
3    the scope of discovery in these cases in light of that order
4    and come back to Your Honor when we see you on the 13th with
5    proposals in that regard so that we go about this very
6    thoughtfully and deliberately and think about a way to
7    structure discovery, go back it in an orderly fashion as the
8    cases proceed.
9        That is something that Judge Kuhl has referenced in the
10   JCCP proceedings, while also suggesting she would defer to this
11   Court when it comes to the structuring of defensive discovery,
12   and so with the benefit of both courts' orders, we would like
13   an opportunity to meet and confer and come back to Your Honor
14   with a proposal before discovery requests are served, for
15   example.
16       **MS. HAZAM:**  Your Honor, plaintiffs would respectfully
17   object to proceeding in that manner.  I don't think we agree
18   with that characterization of Judge Kuhl's approach,
19   necessarily.  But, in any event, we believe that the discovery
20   stay -- the Court has indicated it should be lifted and
21   discovery should proceed.  We spent a lot of time, both sides,
22   obviously, getting to this point.  We have every intent of
23   proceeding efficiently.  We think discovery disputes are best
24   addressed in the context of discovery when it happens.
25       **THE COURT:**  I agree.  And Judge Kang is going to deal

1    with it, and you should address it with him in the first

2    instance.

3        I am -- I am going to focus on the law and on the scope of

4    any claims that can proceed.  And given limited resources,

5    that's the reason why I have an excellent magistrate judge

6    helping me so that we can share the burden.

7        **MS. SIMONSEN:**  Understood, Your Honor.

8        I think what might make sense is for, again, the parties

9    to meet and confer and for Your Honor to direct us to go before

10   the new magistrate judge with a proposal on how discovery

11   should proceed, with an understanding that I know Judge Kuhl is

12   looking for direction on that front from this Court.  I -- I

13   will --

14       **THE COURT:**  I'll talk to Judge Kuhl.  I mean, at

15   this -- look, they're -- I don't know what they're going to do,

16   and it sounds to me from some of your colleagues no one is

17   particularly interested on your side in just giving over

18   discovery.  So it -- I think to the extent informal discovery

19   can occur, that's great, but if not, they need to issue

20   requests, and you need to respond, and your response may be

21   it's beyond the scope, and they're going to say no, it's within

22   the scope, and then Judge Kang will decide that.

23       **MS. SIMONSEN:**  Understood, Your Honor.  I think, just

24   to be clear, the Meta defendants and I understand the Snap

25   defendant as well, have been cooperating in good faith with

1    plaintiffs on their reproduction refresh request.

2        Meta has already produced 45,000 documents in these cases

3    and will be producing many thousands more under this refresh,

4    and so, you know, we're certainly not taking the position that

5    we're trying to stymie this.  All we are suggesting is that,

6    you know, the purpose of these coordinated proceedings being

7    brought together -- these proceedings being brought together is

8    to see if we can enhance efficiencies, find ways not only to

9    streamline the briefing, but also discovery --

10        **THE COURT:**  I don't disagree.  My only point is on

11    discovery issues, you need to go first to Magistrate

12    Judge Kang, and I'm going to focus on the legal issues.

13        **MS. SIMONSEN:**  Understood, Your Honor.  We will,

14    therefore, reach out to Magistrate Judge Kang after consulting

15    with the plaintiffs about a request to put into play some kind

16    of discovery plan, taking into account the efficiencies that

17    are to be gained from these coordinated proceedings, including

18    in conjunction with the JCCP.

19        **MS. HAZAM:**  Your Honor, I would simply say this sounds

20    like a solution in search of a problem.

21        We have not propounded discovery yet.  Discovery should

22    proceed in accordance with the federal rules, including Federal

23    Rule 1, which orders that it be efficient.

24        **THE COURT:**  You're also asking for a lot without

25    proceeding in the -- in accordance with the federal rules, so

1    on your side, you can't have it both ways either.

2         MS. HAZAM:  Understood, Your Honor.

3         THE COURT:  If you are going to try to have it both

4    ways, then we have to coordinate and you have to get along.

5         MS. HAZAM:  Understood, Your Honor.  I think our

6    understanding today is that the Discovery Order 1, Your Honor

7    has provided guidance as to its scope, and we plan to adhere to

8    that.  Anything else we would have to do through formal

9    discovery.

10         THE COURT:  Okay.  What else?

11         MS. HAZAM:  I don't believe plaintiffs have anything

12    further.

13         THE COURT:  All right.  Briefing.  Back to the

14    beginning.

15        Motions shall be brought by December 18th; oppositions,

16    February 5th; replies, February 26th.  One set of motions

17    relate to the State AG Complaints plus the related individual

18    Complaints.  I think that's Claims 7, 8, and 9.  A second set

19    of motions relates to the balance of the individual Complaints

20    and the Master Complaint.

21        I will say, no one is happy.  I am not happy, you are not

22    happy.  No one's happy.  Much sooner.  And you wanted much more

23    time.

24        I can tell you we will start working on these probably

25    sooner than we get the opposition so I would suggest that you

1    not ask for any extensions.  It may be to your detriment.  And

2    if you want to, you know -- if you can file your replies

3    sooner, then you should.

4        **MS. HAZAM:**  Your Honor, if I may, the one matter that

5    was addressed in the status report that I don't believe we

6    discussed, and Your Honor may want to hold it for another time,

7    but that would be the schedule for the briefing on the school

8    districts' Master Complaint.

9        **THE COURT:**  Well, I don't have a Master Complaint yet,

10   Ms. Hazam, so I'm not there yet.

11       **MS. HAZAM:**  Okay.  The parties had made proposals for

12   a schedule, which included a date for its filing.

13       **MR. SCHMIDT:**  And on that issue, Your Honor, we were

14   able to confer further since the submission of the parties'

15   respective positions on the school district issues.  We were

16   much closer, and I believe from further conferring, we can

17   reach agreement on outstanding issues, if that's agreeable with

18   Your Honor, and come back to Your Honor on that.

19       **THE COURT:**  I'm not following you.

20       **MR. SCHMIDT:**  We've talked -- we were not far apart on

21   the school district timetable and other school district

22   briefing cases.  We've since conferred, and we think we can

23   reach agreement, if we can have a little more time to confer

24   and present a proposal to the Court.

25       **THE COURT:**  Well, your proposals have not -- no.  Hold

1    on.  No.  Not yet.

2        So I understand -- and, again, I'll get a decision out

3    here, hopefully no later than Monday, with respect to

4    leadership on the school district cases.

5        The suggestion is that the school districts would be able

6    to file a Master Complaint by the 18th; is that right?

7        **MS. HAZAM:**  That's correct.  Both parties' schedules

8    reflect that opening date with a filing of the Master

9    Complaint.

10        **THE COURT:**  All right.  So the Master Complaint for

11    the school districts will be filed on December 18th, and you

12    all will flip flop.  Motions on that will be filed -- you will

13    have just filed your motions so you'll be free to work on this

14    one.  February 5th when you file that motion, any motions

15    relative to the school district Complaints.

16        Oppositions, March 4th; replies, March 25th.  You already

17    have your 50-state survey, so it should be easier to

18    accomplish.

19        With respect to the deadlines on the Short Form Complaints

20    and the implementation order, it's fine with me if you all want

21    to meet and confer on that.  I am less concerned about that

22    issue than I am the legal briefing, which is what I have to

23    deal with.

24        **MS. HAZAM:**  Understood, Your Honor.

25        **THE COURT:**  So meet and confer on that timing.  We'll

1    discuss that at the next case management conference.

2         Again, I want that meet-and-confer to be completed by

3    December -- or at least something to me on those topics by

4    December 6th.

5              MR. SCHMIDT:  Understood, Your Honor.

6              MS. MIYATA:  Your Honor, if I may ask a point of

7    clarification regarding the briefing schedule for the States.

8    I understand opposing counsel to have requested 80 pages for

9    that motion to dismiss, and I'm curious if the Court has made a

10   decision about page limits.

11             THE COURT:  What do you think?

12             MS. MIYATA:  In my opinion, 80 pages would be more

13   than is necessary.  I think we would suggest, assuming that the

14   States' opposition and the individual plaintiffs' opposition

15   briefs are running concurrently but will be two separate

16   briefs -- I think 40 to 50 pages would be appropriate.

17             THE COURT:  Well, they have to do both.

18             MS. MIYATA:  Understood --

19             THE COURT:  You're asking for the same pages for both

20   of you, which I don't think is fair.

21             MS. MIYATA:  But there is significant overlap in the

22   work they need to do for each particular set of claims.

23             THE COURT:  All right.

24        You can have your 80 pages.

25        You each get 50 pages to oppose, and so 80, 50, 50, 40

1   pages to reply.

2          **MR. SCHMIDT:**  Your Honor, to be sure I understand

3   that, Your Honor identified two separate sets of briefs we

4   would be filing.  The page limits Your Honor specified are per

5   set?

6          **THE COURT:**  No.  I don't -- well, we talked about 80

7   with respect to the State AG Complaints.

8          **MR. SCHMIDT:**  Yes, Your Honor.

9          **THE COURT:**  The Master Complaint for the school

10  districts will likely just have nuisance and maybe negligence.

11  Negligence you're going to deal with -- well, I assume -- well,

12  I don't know if it's going to be the same with respect to --

13  well, do you want to do it all in one?

14         **MR. SCHMIDT:**  No.  And I was actually asking something

15  a little different, which is -- I might have misunderstood what

16  the Court was saying, but as I understood Your Honor, on this

17  initial round of briefing due December 18th, it would be one

18  set of briefs that would address State Attorney General and

19  then the related specified Claims 7, 8, and 9 and then another

20  set of briefs that would address the balance of the personal

21  injury claims.

22         **THE COURT:**  No, you're right.  You're right.

23         **MR. SCHMIDT:**  That's where I was asking about the 80

24  pages, because Your Honor is correct, we did ask for 80 pages

25  as to the State AG claims.  And there is some overlap we could

1  work with then for those additional 7, 8, and 9 but it's very

2  different for the rest and --

3          THE COURT:  I agree.  It is different.

4          MS. HAZAM:  Your Honor, not to complicate things

5  further, but plaintiffs did want to clarify if Your Honor meant

6  to include the claims that certain plaintiffs have against Mark

7  Zuckerberg in the schedule that includes Counts 7, 8, and 9.  I

8  believe that was the Court's guidance earlier, and the parties

9  were agreeable to that, but I wanted to clarify.

10          THE COURT:  I didn't give guidance.  That was the

11  request.  Is that still the request?

12          MR. SCHMIDT:  Yes.  But we think those are unique

13  issues as to a unique defendant with questions that don't

14  relate to corporate liability but individual liability.  Those

15  are very different.  Those we would request to have as their

16  own set of briefing with their own set of defaults, Northern

17  District of California local rules page limits.

18          THE COURT:  Do I have any lawyer who's -- who has

19  those specific issues?

20          MS. HAZAM:  Yes.  My colleague, Matt Jasinski, can

21  address that matter.

22          MR. JASINSKI:  Good afternoon, Your Honor.  Mathew

23  Jasinski with Motley Rice.

24      We do have individual Complaints that name Mark

25  Zuckerberg, and we've happy to brief that in accordance with

1   whichever schedule the Court prefers.

2           THE COURT:  Well, that should -- that should be able

3   to be briefed pretty quickly.  I mean, they're very specific;

4   right?

5           MR. JASINSKI:  Yes, Your Honor.

6           THE COURT:  Great.  December 18th.  Typically the

7   opposition would be due in two weeks, but we'll extend that.

8           MR. JASINSKI:  I think, Your Honor, if it could be on

9   the same schedule, that would be very helpful.

10          THE COURT:  Why?  It wouldn't be helpful to me.  Why

11  would it be helpful?

12          MR. JASINSKI:  Well, Your Honor, it would be helpful

13  to us, obviously.  I want to take the Court's -- it would be

14  helpful to us because of all of the briefing, but having said

15  that, if Your Honor would prefer to accelerate that briefing,

16  we will comply with that.

17          THE COURT:  It means that we can work on something

18  while you all are working, too.  That's why I'm asking the

19  question.  Is there some reason that --

20          MR. JASINSKI:  I think if the deadline is

21  December 18th, we obviously have the holidays, so we would

22  appreciate --

23          THE COURT:  I agree.

24          MR. JASINSKI:  But if Your Honor would prefer the

25  brief come in sooner than the February 4th deadline on the

1  other brief, we'll comply with that.

2        **THE COURT:**  Opposition, January 16th; reply,

3  January 23rd.  That's -- that's a standard motion in this

4  district, and it's a very narrow issue.

5      Now, I'm not going to get you a response until I hear --

6  see the other arguments, but at least we can start working on

7  it.

8        **MR. JASINSKI:**  Very good.

9        **MR. SCHMIDT:**  Thank you, Your Honor.

10        **THE COURT:**  Okay.  Back to the page limits on the --

11  on the other claims.

12      So what I'm seeing is you've got negligence, negligent

13  undertaking, whatever that is, violations of then numerous acts

14  under Title 18.

15        **MS. HAZAM:**  Those relate to generally CCM claims,

16  Your Honor.

17        **THE COURT:**  And then wrongful death, survival action,

18  and loss of consortium.

19        **MS. HAZAM:**  Yes, Your Honor.

20        **MR. SCHMIDT:**  And on that point, Your Honor, one thing

21  we had built into our proposal was some period to confer on

22  what claims remain.  As we understood it during the argument on

23  the motion to dismiss, there was some suggestion that maybe not

24  all these claims would be pursued by plaintiffs.  We think that

25  would certainly be well taken.  And --

1          **THE COURT:**  All right.  So I think that that's

2     appropriate.  I don't know if they're -- I don't know what

3     they're thinking.  But plaintiffs by December 6th must file a

4     notice indicating whether any claims in the Master Complaint

5     are being withdrawn.

6          **MS. HAZAM:**  Understood.

7          **THE COURT:**  Given some of the rulings with respect to

8     the third-party content, I would like to know the answer to

9     that question.

10          **MR. SCHMIDT:**  Thank you, Your Honor;

11          **THE COURT:**  Okay.  All right.  Back to my question,

12     page limits on -- on the remaining claims.

13          **MR. SCHMIDT:**  On the remaining claims, I think the

14     defense would propose something equivalent to what I proposed

15     for the -- for the State AG claims, something in the order of

16     80 pages, with the view that we could come in considerably

17     below that --

18          **THE COURT:**  You never do.  That's the problem.

19          **MR. SCHMIDT:**  That's a fair point, Your Honor.

20          **THE COURT:**  Let's do this.  For now, 60, 60, 30.  Map

21     it out.  If you can give me some specific indication at the

22     next conference that you've outlined these arguments and you

23     need more than that, I'll consider it.

24          **MR. SCHMIDT:**  Thank you, Your Honor.

25          **THE COURT:**  All right.  But everyone should remember

1    Mark Twain's famous quote, right:  "I apologize.  I did not

2    have enough time to write you a short letter."

3        It takes time.  I understand it.  And I'm squishing you on

4    your time, but we need to move this thing forward.  And I need

5    to make sure I have enough time to help.

6        The other thing that you should know, I -- again, this

7    spring I'm going to try to really focus on trying to get

8    rulings out to you so that this whole process can move forward.

9    I was supposed to be in trial all next spring for three months.

10   That trial is now moved to June, so I'm in trial virtually the

11   entire summer.  I'm trying to get all of this done before that

12   happens on top of the four trials I have next summer -- I mean,

13   next -- in early 2024, including a trial with Google.

14       So a lot going on, and we're going to try to get, like I

15   said, some rulings out on these topics for you.  But that does

16   mean that you're going to have to get me stuff.

17           **MR. SCHMIDT:**  And we will do that, Your Honor.  The

18   Mark Twain quote is really well taken in this setting, and it

19   goes back to a comment Your Honor raised earlier.  We are doing

20   our best on the defense side to get Your Honor a single set of

21   briefs across the defendants that take into account every

22   defendant's view, and that's a tough process with four

23   different --

24           **THE COURT:**  It is a tough process.

25           **MR. SCHMIDT:**  -- four different clients, and it's

1    tough doing it in a streamlined way, and Your Honor had

2    feedback on how we briefed things before that we obviously want

3    to be mindful of.  That's why we've been asking, frankly, for

4    more time on some of these issues because it does let us

5    streamline more, but we understand where the Court is.

6            **THE COURT:**  I can appreciate that.  And as you know,

7    at least with respect to -- let me look at one of my other

8    charts here.  On the negligence per se, I recognize you ran out

9    of space, and so we'll deal with that at some other point, not

10   right now.  Because while I like charts, it's not helpful when

11   you're both citing the exact same case for the opposite

12   proposition.

13       And there's lots -- you know, there's lots of moving parts

14   on this thing.  But I understand my own calendar, too, which

15   you have less visibility into, and I understand what -- when my

16   resources are available and when they're not.  And we are more

17   hamstrung than you all are on that front.  So...

18           **MS. HAZAM:**  Your Honor, one remaining point that

19   relates to scheduling that I believe we could probably defer to

20   the December hearing and meet and confer about it, but just to

21   flag it, plaintiffs, mindful of the fact that there could be

22   some time before rulings issue, have asked defendants to

23   provide a statement of affirmative defenses before an answer

24   would be due to help us guide discovery in the interim.

25           **THE COURT:**  So there is an objection to that, from

1  what I've read.

2          **MS. HAZAM:**  Yes.

3          **THE COURT:**  And I'm not going to order them to do

4  that.  So I'm ordering them to focus on lots of other issues.

5  Their affirmative defenses are going to shift.

6      I have, from what I understand, the best products

7  liability plaintiffs lawyers in the country.  You know what the

8  general affirmative defenses are and you can make those

9  arguments to the magistrate judge but you're not operating in a

10  vacuum here.  So, no.

11          **MS. HAZAM:**  Understood, Your Honor.

12          **THE COURT:**  I'm not going to order it.

13          **MR. SCHMIDT:**  Thank you, Your Honor.

14          **THE COURT:**  Okay.  What else do we have out there?

15  Let me get on your calendar.  I will try to meet with you on a

16  monthly basis until this thing is well on its way.

17      I've given you a date in December.  Let me give you a date

18  in January, but I have to pull you up the calendar.

19  January will likely be at the end of the month because I will

20  be in trial.  Hold on.

21      How does January 31st look?

22          **MR. SCHMIDT:**  That works for the defense, Your Honor.

23          **MS. HAZAM:**  And it works for plaintiffs, Your Honor.

24          **THE COURT:**  All right.  Let me -- let me make sure

25  that I'm not double booking.

```
 1          Did you want to say something?

 2          MS. MIYATA:  No, Your Honor.  I just anticipated more

 3    dates were coming, so --

 4          THE COURT:  Does that work for you?

 5          MS. MIYATA:  Yes, Your Honor.

 6          THE COURT:  Our system can be very slow.

 7          By any chance, do you have my calendar up?

 8          THE CLERK:  Yes.

 9          THE COURT:  Do you see anything on the 31st other than

10    trial?

11          THE CLERK:  No, Your Honor.

12          THE COURT:  Okay.  So this is what I'll do.  I'm going

13    to set it for 2:30.  If I'm not in trial --

14          THE CLERK:  Actually, I apologize.  Do you have a 2:00

15    pretrial conference.  I'm so sorry.

16          THE COURT:  That's okay.

17          THE CLERK:  Wrong year.

18          THE COURT:  All right.  Hold on.

19          Okay.  January 26.  I can set it at 2:00.  That's a

20    Friday.  I know many of you are traveling from out of state, so

21    if I can move it to the morning, I will, but it is possible, in

22    fact, likely that I'll be in trial in the morning, which means

23    that you'll come in after my trial day.

24          MS. HAZAM:  That's fine with plaintiffs, Your Honor.

25          MR. SCHMIDT:  Fine with defendants, Your Honor.
```

1          **THE COURT:**  All right.

2          **MS. MIYATA:**  That works for us as well.

3          **THE COURT:**  So January 26th, that's Friday, at

4     2:00 p.m.  Let's say 2:30.  And then in February, same thing,

5     so we'll do Friday, February 23rd.

6          Does that work?

7          **MR. SCHMIDT:**  Yes for defendants, Your Honor.

8          **MS. MIYATA:**  That works for the States.

9          **MS. HAZAM:**  And for the plaintiffs.

10         **THE COURT:**  Okay.  February 23rd, again at 2:30.

11    Again, I'm supposed to be in trial, so come in after my trial

12    day, but if I'm not in trial, then we'll post a notice and try

13    to make it in the morning so that people can travel.  Okay?

14         Why don't we go ahead and just set the March one at about

15    the same time so February-- I mean, March 22nd, 2:30.  That way

16    it's on everyone's calendars.  Okay?

17         **MR. SCHMIDT:**  Thank you, Your Honor.

18         **MS. HAZAM:**  Thank you.

19         **THE COURT:**  Okay.  Fun times.

20         **MR. SCHMIDT:**  That's the word for it, Your Honor.

21         **MS. HAZAM:**  Can we invite the kids again?

22         **THE COURT:**  All right.  I will -- I'll issue a written

23    order with -- with these dates, some of the things that we've

24    talked about today.

25         And I will wish all of you a very happy and safe

1    Thanksgiving.  And I will see you in December.

2            **MR. SCHMIDT:**  Thank you, Your Honor.

3            **MS. HAZAM:**  Thank you, Your Honor.

4            **THE COURT:**  We're adjourned.

5                (Proceedings adjourned at 2:05 p.m.)

<u>CERTIFICATE OF REPORTER</u>

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:  Monday, November 19, 2023


_Pamela Batalo Hebel_
_____
Pamela Batalo Hebel, CSR No. 3593, RMR, FCRR
U.S. Court Reporter