1    *LIST OF COUNSEL ON SIGNATURE PAGE*

2

3

4

5

6

7

8                IN THE UNITED STATES DISTRICT COURT

9            FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   **STATE OF ARIZONA**, *ex rel.* KRIS
     MAYES, ATTORNEY GENERAL;
12
     **THE PEOPLE OF THE STATE OF
13   CALIFORNIA**;
                                            **COMPLAINT FOR INJUNCTIVE AND
14   **STATE OF COLORADO**, *ex rel.* PHILIP J.   OTHER RELIEF**
     WEISER, ATTORNEY GENERAL;
15
     **STATE OF CONNECTICUT**;
16
     **STATE OF DELAWARE**, *ex rel.*
17   KATHLEEN JENNINGS,
     ATTORNEY GENERAL OF THE STATE OF
18   DELAWARE;

19   **STATE OF GEORGIA** *ex rel.*
     CHRISTOPHER M. CARR, ATTORNEY
20   GENERAL OF THE STATE OF GEORGIA;

21   **STATE OF HAWAI'I**, *ex rel.* ANNE E.
     LOPEZ, ATTORNEY GENERAL;
22
     **STATE OF IDAHO**, through ATTORNEY
23   GENERAL RAÚL R. LABRADOR;

24   **THE PEOPLE OF THE STATE OF
     ILLINOIS**;
25
     **STATE OF INDIANA**;
26
     **STATE OF KANSAS**, *ex rel.* KRIS W.
27   KOBACH, Attorney General;

28

**THE COMMONWEALTH OF KENTUCKY**;

**STATE OF LOUISIANA**;

**STATE OF MAINE**;

**OFFICE OF THE ATTORNEY GENERAL OF MARYLAND**;

**STATE OF MICHIGAN** *ex rel.* DANA NESSEL, ATTORNEY GENERAL;

**STATE OF MINNESOTA**, by its ATTORNEY GENERAL, KEITH ELLISON;

**STATE OF MISSOURI**, *ex rel.* ANDREW BAILEY, ATTORNEY GENERAL;

**STATE OF NEBRASKA** *ex rel.* MICHAEL T. HILGERS, ATTORNEY GENERAL;

**MATTHEW J. PLATKIN**, ATTORNEY GENERAL FOR THE **STATE OF NEW JERSEY**, AND **CARI FAIS**, ACTING DIRECTOR OF THE **NEW JERSEY DIVISION OF CONSUMER AFFAIRS**;

**THE PEOPLE OF THE STATE OF NEW YORK**, by LETITIA JAMES, ATTORNEY GENERAL OF THE STATE OF NEW YORK;

**STATE OF NORTH CAROLINA**, *ex rel.* JOSHUA H. STEIN, ATTORNEY GENERAL;

**STATE OF NORTH DAKOTA**, *ex rel.* DREW WRIGLEY, ATTORNEY GENERAL;

**STATE OF OHIO**, *ex rel.* ATTORNEY GENERAL DAVE YOST;

**STATE OF OREGON** *ex rel.* ELLEN F. ROSENBLUM, ATTORNEY GENERAL FOR THE STATE OF OREGON;

**COMMONWEALTH OF PENNSYLVANIA** BY ATTORNEY GENERAL MICHELLE A. HENRY;

**STATE OF RHODE ISLAND**;

1  **STATE OF SOUTH CAROLINA**, *ex. rel.*
   ALAN M. WILSON, IN HIS OFFICIAL
2  CAPACITY AS ATTORNEY GENERAL OF
   THE STATE OF SOUTH CAROLINA;
3
   **STATE OF SOUTH DAKOTA** *ex rel.*
4  MARTY J. JACKLEY, SOUTH DAKOTA
   ATTORNEY GENERAL;
5
   **COMMONWEALTH OF VIRGINIA**,
6  *ex rel.* JASON S. MIYARES,
   ATTORNEY GENERAL;
7
   **STATE OF WASHINGTON**, *ex rel.*
8  ROBERT W. FERGUSON, ATTORNEY
   GENERAL;
9
   **STATE OF WEST VIRGINIA**, *ex rel.*
10 PATRICK MORRISEY, ATTORNEY
   GENERAL; and
11
   **STATE OF WISCONSIN**,
12
                      **Plaintiffs**,
13
                         **v.**
14
   **META PLATFORMS, INC.**;
15
   **INSTAGRAM, LLC**;
16
   **META PAYMENTS, INC.**; and
17
   **META PLATFORMS TECHNOLOGIES,**
18 **LLC**,
19                 **Defendants**.
20
21
22
23
24
25
26
27
28

1

**TABLE OF CONTENTS**

2

Page

3

I.      SUMMARY OF THE CASE ................................................................. 1

4

II.     PUBLIC INTEREST ............................................................................. 4

5

III.    JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT ................... 4

6

IV.     RELEVANT TIMES ............................................................................ 5

7       V.      PLAINTIFFS ..................................................................................... 6

        VI.     DEFENDANTS .................................................................................. 6

8

VII.    TRADE AND COMMERCE IN THE FILING STATES ............................ 10

9

VIII.   META'S SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT ............... 11

10
        A.      To maximize profit, Meta's business model focuses on increasing young
                users' engagement. ...................................................................... 12

11
                1.      Meta monetizes young users' attention through data harvesting and
                        targeted advertising. ........................................................... 12

12
                2.      Meta specifically targets young users. ....................................... 14

13
                3.      Meta designs and deploys features to capture young users' attention
                        and prolong their time on its Social Media Platforms. ................. 19

14
        B.      Meta falsely represents that its Social Media Platform features are safe and
                not designed to induce young users' compulsive and extended use. ......... 23

15

16
                1.      Meta represents to the public that its Social Media Platforms are
                        designed to support young users' well-being. ............................ 24

                2.      Meta prioritizes maximizing engagement over young users' safety......... 25

17
                3.      Meta's Recommendation Algorithms encourage compulsive use,
                        which Meta does not disclose. ............................................... 28

18

19
                4.      The Recommendation Algorithms are harmful to young users'
                        mental health, notwithstanding Meta's representations to the
                        contrary. ......................................................................... 34

20

21
                5.      Meta's use of social comparison features such as "Likes" also
                        promotes compulsive use and mental health harms for young users. ....... 41

22
                6.      Meta's use of disruptive audiovisual and haptic notifications
                        interferes with young users' education and sleep. ....................... 51

23
                7.      Meta promotes Platform features such as visual filters known to
                        promote eating disorders and body dysmorphia in youth. ............ 56

24

25
                8.      Meta offers features that it claims promote connection between
                        friends, but actually serve to increase young users' time spent on
                        the Platform. .................................................................... 61

26
                9.      Through its Platform features, Meta discourages young users'
                        attempts to disengage, notwithstanding Meta's representations to
                        the contrary. .................................................................... 62

27

28

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3          10.    Meta knows its Platform features are addictive and harmful, but misrepresents and omits this information in public discourse. ............... 67

4          11.    Meta makes its Platforms and associated harmful features available to especially young and vulnerable users. ................................. 70

5

6    C.    Meta has misled its users and the public by boasting a low prevalence of harmful content on its Social Media Platforms—while concealing internal studies showing the high incidence of user harms. ................................ 73

7    D.    Meta's Platform features cause young users significant physical and mental harm, of which Meta is keenly aware. .................................... 80

8 IX.   META'S COPPA NONCOMPLIANCE ........................................ 105

9    A.    COPPA requires Meta to obtain verifiable parental consent for Instagram and Facebook users under the age of 13. ........................... 106

10

11    B.    Meta does not comply with COPPA with respect to Instagram. ...................... 107

12          1.    Meta possesses actual knowledge of children on Instagram and collects their personal information without obtaining parental consent. ............................................................................. 107

13          2.    Instagram is "directed to children." ........................................ 124

14          3.    Meta does not obtain verifiable parental consent before collecting personal information from users under the age of 13 on Instagram. ...... 136

15    C.    Meta does not comply with COPPA with respect to Facebook. ......................... 137

16          1.    Meta has actual knowledge of users under age 13 on Facebook. ........... 137

             2.    Facebook is "directed to children." ........................................ 138

17          3.    Meta does not obtain verifiable parental consent before collecting personal information from users under age 13 on Facebook. ................. 141

18 X.    META CONTINUES TO EXPAND AND INTRODUCE NEW PLATFORMS ......... 142

19 XI.   SUMMARY OF META'S DECEPTIVE AND UNFAIR OR UNCONSCIONABLE ACTS AND PRACTICES ................................ 143

20 CLAIMS FOR RELIEF ........................................................... 145

21 PRAYER FOR RELIEF .......................................................... 198

22

23

24

25

26

27

28

Complaint for Injunctive and Other Relief

# I.   SUMMARY OF THE CASE

1.    Over the past decade, Meta[1]—itself and through its flagship Social Media Platforms Facebook and Instagram (its Social Media Platforms or Platforms)—has profoundly altered the psychological and social realities of a generation of young Americans. Meta has harnessed powerful and unprecedented technologies to entice, engage, and ultimately ensnare youth and teens. Its motive is profit, and in seeking to maximize its financial gains, Meta has repeatedly misled the public about the substantial dangers of its Social Media Platforms. It has concealed the ways in which these Platforms exploit and manipulate its most vulnerable consumers: teenagers and children.[2] And it has ignored the sweeping damage these Platforms have caused to the mental and physical health of our nation's youth. In doing so, Meta engaged in, and continues to engage in, deceptive and unlawful conduct in violation of state and federal law.

2.    Meta's scheme involved four parts: (1) through its development of Instagram and Facebook, Meta created a business model focused on maximizing young users' time and attention spent on its Social Media Platforms; (2) Meta designed and deployed harmful and psychologically manipulative product features to induce young users' compulsive and extended Platform use, while falsely assuring the public that its features were safe and suitable for young users; (3) Meta concealed and suppressed internal data showing the high incidence of user harms on its Social Media Platforms, while routinely publishing misleading reports boasting a deceptively low incidence of user harms; and (4) despite overwhelming internal research, independent expert analysis, and publicly available data that its Social Media Platforms harm young users, Meta still refuses to abandon its use of known harmful features—and has instead redoubled its efforts to misrepresent, conceal, and downplay the impact of those features on young users' mental and physical health.

---

[1] The term "Meta" as used herein refers collectively to Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC, unless otherwise specified.

[2] The term "young users" as used herein refers to users of Meta's Platforms who are under 18 years of age when using the Platform(s).

3.     *First,* Meta's business model is based on maximizing the time that young users spend on its Social Media Platforms. Meta targets young users and incentivizes its employees to develop ways to increase the time that young users spend on its Platforms. The more time young users spend on Instagram and Facebook, the more Meta earns by selling advertising targeted to those users.

4.     *Second,* consistent with this business model, Meta has developed and refined a set of psychologically manipulative Platform features designed to maximize young users' time spent on its Social Media Platforms. Meta was aware that young users' developing brains are particularly vulnerable to certain forms of manipulation, and it chose to exploit those vulnerabilities through targeted features such as: (a) dopamine-manipulating recommendation algorithms; (b) "Likes" and social comparison features known by Meta to harm young users; (c) audiovisual and haptic alerts that incessantly recall young users to Meta's Social Media Platforms while at school and during the night; (d) visual filter features known to promote young users' body dysmorphia; and (e) content-presentation formats, such as infinite scroll, designed to discourage young users' attempts to self-regulate and disengage with Meta's Platforms.

5.     In promoting and marketing these features to young users, Meta deceptively represented that the features were *not* manipulative; that its Social Media Platforms were *not* designed to promote young users' prolonged and unhealthy engagement with social media; and that Meta had designed and maintained its Social Media Platforms to ensure safe experiences for young users. These representations, both express and implied, were false and misleading.

6.     *Third,* to assuage public concerns about harms to young users on Meta's Social Media Platforms, Meta routinely published profoundly misleading reports purporting to show impressively low rates of negative and harmful experiences by users of its Platforms. At the same time, Meta secretly maintained a parallel set of internal data showing shockingly *high* rates of harms experienced by users of its Social Media Platforms. By publishing the favorable Community Standard Enforcement Reports (CSER) data, while concealing the alarming Bad Experiences & Encounters Framework (BEEF) and Tracking Reach of Integrity Problems Survey

(TRIPS) data showing frequent user harms, Meta represented to the public that its Social Media Platforms were far safer for young users than they actually were.

7. *Fourth*, despite the strong and well-researched links between young people's use of Meta's Social Media Platforms and psychological and physical harm, Meta has continued to conceal and downplay its Platforms' adverse effects. Research has shown that young people's use of Meta's Social Media Platforms is associated with depression, anxiety, insomnia, interference with education and daily life, and many other negative outcomes. Internal studies that Meta commissioned (which were kept private until they were leaked by a whistleblower) reveal that Meta has known for *years* about the serious harms associated with young users' time spent on its Social Media Platforms. Nonetheless, Meta has continued to deny and downplay these harmful effects to the public and to promote its Platforms as safe for young users.

8. Finally, Meta has also flouted its obligations under the Children's Online Privacy Protection Act (COPPA) by unlawfully collecting the personal data of its youngest users without their parents' permission. Meta has marketed and directed its Social Media Platforms to children under the age of 13 and has actual knowledge that those children use its Platforms. But Meta has refused to obtain (or even to attempt to obtain) the consent of those children's parents prior to collecting and monetizing their personal data. Meta publicly denies what is privately discussed as an open secret within the company: that very young children are a known component of Meta's user base and business model. Nonetheless, Meta refuses to limit its collection and use of those children's personal information as required by law.

9. These exploitative and harmful acts and practices by Meta are unlawful. They constitute unfair and/or deceptive acts or practices under the state consumer protection statutes, violate COPPA, and further constitute unlawful acts under common law principles.

10. Now, instead of acknowledging and remedying the harms associated with these unlawful practices, Meta appears to be *expanding* the use of these practices into new Platforms and domains. This includes, for example, Meta's Virtual Reality (VR) Metaverse, where young users are immersed into Meta's new Horizon Worlds platform; Meta's communication Platforms like WhatsApp and Messenger; and other products, in which Meta uses evolving technology to

1  replicate the harmful strategies it honed through its experiments on the young users of Instagram

2  and Facebook.

3         11.    Arizona; the People of the State of California (California); Colorado; Connecticut;

4  Delaware; Georgia; Hawaiʻi; Idaho; the People of the State of Illinois, by and through Attorney

5  General Kwame Raoul (Illinois); Indiana; Kansas; Kentucky; Louisiana; Maine; Office of the

6  Attorney General of Maryland (Maryland); Michigan; State of Minnesota, by its Attorney

7  General, Keith Ellison (Minnesota); Missouri; Nebraska; Matthew J. Platkin, Attorney General

8  for the State of New Jersey, and Cari Fais, Acting Director of the New Jersey Division of

9  Consumer Affairs (New Jersey); New York; North Carolina; North Dakota, ex rel. Drew H.

10  Wrigley, Attorney General (North Dakota); Ohio; Oregon; Pennsylvania; Rhode Island; South

11  Carolina; South Dakota; Virginia; Washington; West Virginia; and Wisconsin (collectively, the

12  Filing States) seek to enjoin Meta's present and ongoing unlawful conduct that harms young users

13  and obtain any other remedies provided for under state or federal laws.

## II.    PUBLIC INTEREST

15         12.    This action is in the public interest of the Filing States. Meta has engaged in, and

16  will continue to engage in, the unlawful acts and practices set forth below. Meta's unlawful acts

17  and practices affect a significant number of consumers in the Filing States. These acts and

18  practices have caused and will continue to cause adverse effects to consumers in the Filing States.

## III.    JURISDICTION, VENUE AND DIVISIONAL ASSIGNMENT

### A.    Jurisdiction

21         13.    This Court has subject matter jurisdiction over the claims in this Complaint

22  pursuant to 28 U.S.C. § 1331 because they involve questions of federal law arising under

23  COPPA, 15 U.S.C. § 6501 *et seq.*; 16 C.F.R. §§ 312.4, 312.5, 312.9. This Court has supplemental

24  jurisdiction over the Filing States' state law claims pursuant to 28 U.S.C. § 1367(a), as all claims

25  alleged herein form part of the same case or controversy.

26         14.    This Court has general personal jurisdiction over Meta because each Defendant's

27  principal place of business is in California and each Defendant intentionally avails itself of the

28  California market so as to render the exercise of jurisdiction over it by courts in California

consistent with traditional notions of fair play and substantial justice. Cal. Civ. Proc. Code § 410.10.

15.     This Court has personal jurisdiction over Meta for the Filing States' COPPA claims because all Defendants have their principal place of business in Menlo Park, a city in this District. 15 U.S.C. § 6504(e)(2).

16.     Meta conducts business in this District through itself or its subsidiaries over which it exercises complete dominion and control. Meta and its subsidiaries operate as a common enterprise while engaging in the unfair, deceptive, and other unlawful acts and practices alleged below. Because Meta and its subsidiaries have operated as a common enterprise, this Court has jurisdiction over each entity individually and collectively.

**B.     Venue**

17.     Venue is proper in the Northern District of California under 28 U.S.C. § 1391 because all Defendants reside in this District. All Defendants have their principal place of business in Menlo Park, a city in this District. Moreover, a substantial part of the unlawful conduct complained of herein occurred in this District, where Meta's headquarters is located.

**C.     Divisional Assignment.**

18.     This case is properly assigned to the Oakland or San Francisco Divisions because the civil action arises in substantial part from events or omissions in San Mateo County. Civil L.R. 3-2(d). All Defendants' principal places of business are located in Menlo Park, a city in San Mateo County, where Meta's conduct was controlled and directed.

**IV.     RELEVANT TIMES**

19.     Meta's conduct is in continuing violation of the laws supporting the claims for relief in this Complaint, beginning at a time unknown to the Filing States, but no later than 2012, and such claims have continuously accrued through the present. This action is timely brought pursuant to the parties' Tolling Agreement signed by Meta's counsel on July 18, 2022, which

tolls all claims ripe as of December 20, 2021. This action is also timely brought pursuant to any applicable state statutes.[3]

## V.    PLAINTIFFS

20.    This action is brought by and through a coalition of the Filing States' Attorneys General.

21.    The Filing States bring this action pursuant to the authority conferred on the State Attorneys General by applicable federal and state law. The Attorneys General of the Filing States are authorized by COPPA to bring actions to enforce COPPA's provisions. 15 U.S.C. § 6504(a)(1). Pursuant to 15 U.S.C § 6504(a)(2), the Filing States notified the Federal Trade Commission (FTC) of this action. The Attorneys General are also authorized by their respective states' Unfair and Deceptive Acts and Practices statutes (UDAP Statutes) to enforce such statutes.[4] These state laws authorize the states to seek injunctive and other equitable relief, as well as, in some states, restitution, civil penalties, declaratory relief, attorneys' fees, expenses, and costs.

## VI.    DEFENDANTS

22.    The Defendants in this action include Meta Platforms, Inc. (Meta Platforms), Instagram, LLC (Instagram), Meta Payments, Inc. (Meta Payments), and Meta Platforms Technologies, LLC (Meta Technologies) (collectively, Meta).

---

[3] Cal. Bus. & Prof. Code § 17208; Cal. Civ. Proc. Code § 338(h); Colo. Rev. Stat. § 6-1-115; 815 ILCS 505/3; Ind. Code § 24-5-0.5-5(b); Mich. Comp. Laws §§ 445.911(9), 600.5805, 600.5813; Minn. Stat. § 541.05; Mo. Rev. Stat. §516.120; Neb. Rev. Stat. §§ 59-1612; 87-303.10; N.J. STAT. ANN. 2A:14-1.2; N.Y. C.P.L.R. §§ 213(9), 214(2); N.D. Cent. Code § 51-15-12; Ohio Rev. Code § 1345.07(E); S.C. Code Ann. § 39-5-150; Wis. Stat. § 100.18(11)(b)3.

[4] Ariz. Rev. Stat. §§ 44-1521 to -1534; Cal. Bus. & Prof. Code §§ 17203, 17204, 17205-17206.1, 17500, 17534.5, 17535, 17536; Colo. Rev. Stat. §§ 6-1-103, 107, 110, and 112; Conn. Gen. Stat. §§ 42-110m(a) and 42-110o(b); 6 Del. Code Ann. §§ 2513 and 2532; O.C.G.A. §§ 10-1-397(b)(2) and 10-1-397.1; Haw. Rev. Stat. § 480-20; 815 ILCS 505/3; Ind. Code § 24-5-0.5-4(c); K.S.A. § 50-623 et seq.; Ky. Rev. Stat. Chapter 367, et seq.; LA. REV. STAT. ANN. §§ 51:1401-1428; ME. REV. STAT. ANN. tit. 5, § 209; Mich. Comp. Laws §§ 445.905 and 445.910; Minn. Stat. §§ 8.01, 8.31, and 325D.44 et seq.; Mo. Rev. Stat. § 407.100; Neb. Rev. Stat. §§ 59-1608 et seq; 87-303.02 et seq.; N.J. STAT. ANN. § 56:8-1 to 227; N.Y. Exec. Law § 63(12); N.C.G.S. §§ 75-14 to 75-15.2; N.D. Cent. Code §§ 54-12-01, -17, and §§ 51-15-04, -07, -10, -11; Ohio Rev Code § 1345.02; O.R.S. § 646.632; 73 P.S. § 201-4; R.I. Gen. Laws §§ 6-13.1-5(a); S.C. Code Ann. § 39-5-10, et seq.; Va. Code §§ 59.1-201.1 to 203 and 205 to 207; Wash. Rev. Code §§ 19.86.080, .140; Wis. Stat. §§ 100.18(11)(a) and (d); and 165.25(4)(ar).

23.     Defendant Meta Platforms is a Delaware corporation with its principal place of business in Menlo Park, California. As relevant here, Meta Platforms, through itself or its subsidiaries, develops, markets, and operates Social Media Platforms and other internet-based Platforms and products including Facebook, Instagram, Messenger, and WhatsApp. Meta also develops, markets, and operates the VR Social Media Platform Horizon Worlds.

24.     Meta Platforms transacts or has transacted business in this District, the Filing States, and throughout the United States. At all times material to this Complaint, acting alone or in concert with its subsidiaries (identified below), Meta Platforms has advertised, marketed, and distributed its Social Media Platforms to consumers throughout the United States.

25.     Meta Platforms was formerly known as Facebook, Inc. until it changed its corporate name in October 2021. In 2004, Mark Zuckerberg founded the Social Media Platform The Facebook, while a student at Harvard University. At that time, Myspace was popular, along with websites like Friendster and Flickr. The Facebook spread among colleges via word of mouth and exclusive invitations and became more popular among young adults. Zuckerberg dropped out of Harvard to develop the Platform into a company, and it became known as Facebook.

26.     Facebook's popularity not only grew—it changed the entire landscape of the internet. In 2004, only 5% of U.S. adults used any social media platform. As of 2021, 69% of U.S. adults used Facebook *alone*.

27.     Following the success of Facebook, Meta Platforms expanded through a series of acquisitions. On April 9, 2012, Meta Platforms purchased Instagram reportedly for $1 billion. Meta Platforms acquired Instagram in part because it believed that if Instagram grew to a large scale, it could be very disruptive to Facebook.

28.     More importantly, Instagram was most popular among young users—a market where Meta was seeking to expand as Facebook's primary audience aged and the Platform lost its "cool" factor.

29.     By the end of 2016, Instagram grew to over 600 million users. By 2018, Instagram had revenues surpassing $10 billion, and it has been estimated to be valued at over $100 billion. An estimated 62% of teens in the United States regularly use Instagram.

1           30.     Meta Platforms has also expanded into virtual reality gaming, hardware, and

2 software, since acquiring the virtual reality headset creator Oculus in 2014.

3           31.     In October 2021, Facebook rebranded the company to "Meta," a move meant to

4 encapsulate that its subsidiaries and products went beyond the Facebook Platform and to

5 emphasize its work on the so-called "metaverse."

6           32.     As a result of acquisitions such as Instagram and Oculus, Meta Platforms has

7 continued to dominate the market of Social Media Platforms and apps, becoming the largest

8 social media company in the world. As of October 2023, Meta Platforms' market capitalization—

9 the value of the company—exceeded $800 billion.

10           33.     At all times material to this Complaint, Meta Platforms formulated, directed,

11 controlled, had the authority to control, or participated in the acts and practices set forth in this

12 Complaint.

13           34.     Defendant Meta Platforms currently operates its business primarily through its

14 subsidiaries. Meta Platforms' key subsidiaries include Instagram, Meta Payments, and Meta

15 Platforms Technologies.

16           35.     Defendant Instagram offers a mobile application that enables users to share content

17 such as photographs and videos online and over social networks. Instagram is a limited liability

18 company formed in Delaware, and shares its principal place of business in Menlo Park,

19 California, with Meta Platforms. Defendant Meta Platforms is the sole member or manager of

20 Instagram.

21           36.     Defendant Meta Payments is incorporated in the State of Florida and shares its

22 principal place of business in Menlo Park, California, with Meta Platforms. Meta Payments

23 processes payments made through Meta's Social Media Platforms. Meta Platforms directly owns

24 Meta Payments, its subsidiary.

25           37.     Defendant Meta Technologies is a Delaware limited liability company and shares

26 its principal place of business in Menlo Park, California, with Meta Platforms. Previously known

27 as Facebook Technologies, LLC, Meta Technologies has absorbed Meta's Oculus business

28

1   segment, which it acquired in 2014. Meta Technologies develops Meta's virtual reality

2   technology. Defendant Meta Platforms is the sole member or manager of Meta Technologies.

3         38.     As detailed in the allegations below, Meta Platforms, itself and through its

4   Defendant subsidiaries over which it exercises authority and control (collectively, Meta), has

5   engaged in, and continues to engage in, unfair, deceptive, and unlawful activity in the Filing

6   States and in this District.

7         39.     Meta operates as a common enterprise. All Defendants have their principal place

8   of business at Meta Platforms' corporate headquarters in Menlo Park, California. As discussed

9   below, senior executives at Meta Platforms, including Zuckerberg—Meta Platforms' CEO, board

10   chair, and controlling shareholder—exercise control over important policy and staffing decisions

11   relating to its Social Media Platforms.

12         40.     Meta also represents itself as a common enterprise. Meta's financial disclosures

13   describe Facebook, Instagram, Messenger, and WhatsApp, as Meta's "'family' of products," and

14   report revenue and expenses for the entire "family" together. Instagram's Terms of Use agreement

15   currently identifies "The Instagram Service" as "one of the Meta Products, provided to you by

16   Meta Platforms, Inc." Meta's supplemental terms of service for its "Meta Platforms Technologies

17   Products" is similarly styled as an agreement between Meta Platforms and the user. "Meta

18   Platforms Technologies Products" are defined to include its VR-related products, such as its Meta

19   Quest and Oculus virtual reality headsets, and Meta Horizon Worlds, its virtual reality Social

20   Media Platform. Meta Platforms also reports its revenue from its VR business segment in its

21   financial disclosures.

22         41.     Meta's corporate website represents the leaders of its subsidiaries as Meta's

23   "executives" alongside Zuckerberg and other Meta Platforms executives. For example, Adam

24   Mosseri is identified as "Head of Instagram" and is described as having "been at Meta" for more

25   than 11 years. Stephane Kasriel, the CEO of Meta Payments, is identified on Meta's website as

26   "the head of Commerce and Financial Technologies at Meta" who "oversees all commerce and

27   fintech work across Meta's technologies and platforms."

28

Complaint for Injunctive and Other Relief

42.     Employees of Instagram work on cross-family teams with employees who work on Meta's other applications. Some significant policy decisions are made in "cross-family review[s]."

43.     In addition to sharing a headquarters, Meta employees use shared email systems. For example, employees of Instagram, such as Instagram's Director of Data Science, have used @fb.com email addresses, and Mosseri has used @fb.com and @meta.com email addresses while Head of Instagram.

44.     Because Meta operates as a common enterprise, each Defendant is jointly and severally liable for the acts and practices alleged below.

## VII.     TRADE AND COMMERCE IN THE FILING STATES

45.     As described in this Complaint, Meta has engaged and continues to engage in conduct that constitutes, is in connection with, or affects "trade," "commerce," "advertising," "business," "merchandise," "occupation," "sale," "vocation," "consumer acts or practices," and/or "consumer transactions," as those terms are defined in the Filing States' UDAP Statutes.[5]

46.     Although users can establish accounts on Meta's Social Media Platforms without paying a fee, Meta does not provide its Platforms for free—rather, it charges its users by collecting their data and time, which Meta then converts into advertising dollars.

47.     For example, this is confirmed by Instagram's terms of use:

> We agree to provide you with the Instagram Service. . . . Instead of paying to use Instagram, by using the Service covered by these Terms, you acknowledge that we can show you ads that businesses and organizations pay us to promote on and off the Meta Company Products. We use your personal data, such as information about your activity and interests, to show you ads that are more relevant to you.

---

[5] Cal. Bus. & Prof. Code § 17200; Colo. Rev. Stat. §§ 6-1-106, 6-1-105; Conn. Gen. Stat. § 42-110b(a); 6 Del. Code Ann. § 2511(6); O.C.G.A. § 10-1-392(7), (10), (28); Haw. Rev. Stat. § 480-1; 815 ILCS 505/1(f); Ind. Code § 24-5-0.5-2(a)(1); K.S.A. § 50-624; Ky. Rev. Stat. § 367.110; La. Rev. Stat. Ann. § 51:1402(10); Me. Rev. Stat. Ann. tit. 5, § 206(3); Mo. Rev. Stat. §407.020 as defined in §407.010(7); Neb. Rev. Stat. § 59-1602; N.J. Stat. Ann. §. 56:8-1; N.C.G.S. § 75-1.1(a); N.D. Cent. Code § 51-15-02; Ohio Rev. Code § 1345.01; O.R.S. § 646.605(8); 73 P.S. § 201-2(3); R.I. Gen. Laws § 6-13.1-1(5); S.D.C.L. ch. 37-24; Va. Code § 59.1-198; Wash. Rev. Code § 19.86.010(2).

48.     Meta provides tools for businesses to advertise on its Platforms. Meta's "Campaign Ideas Generator" provides "campaign ideas, pre-made assets, and resources that are specific to your small business needs."

49.     Meta provides other features and tools so that it and its users can generate revenue and engage in commerce. For example, the Instagram Shopping feature allows small businesses and global brands alike to advertise and sell goods, which users can purchase directly through the Instagram Platform.

50.     Meta encourages and provides tools for users to engage in commerce themselves. Meta's creator monetization tools, for example, allow users to make money through Instagram and Facebook. Meta has also signaled that it is testing creator monetization tools on its Horizon Worlds Platform.

51.     Meta also allows direct advertising by users on its Instagram Platform. In November 2013, Meta created "Sponsored Posts," where Instagram users could use posts in their "Feed" to promote a specific product. As a result, many Instagram users (including young users) became "influencers," compensated by advertisers for promoting a product through their posts.

52.     In addition, in approximately June 2023, Meta began offering Meta Verified to Instagram and Facebook account holders within the United States. Account holders can purchase a Meta Verified subscription bundle that includes account verification with impersonation protections and access to increased visibility and support. Meta Verified is available on Instagram and Facebook for a monthly fee of $11.99 when a user subscribes from the web (Facebook account holders only) and $14.99 when a user subscribes in the Instagram or Meta apps.

## VIII.    META'S SCHEME TO EXPLOIT YOUNG USERS FOR PROFIT

53.     Meta has exploited young users of its Social Media Platforms, including by: (1) creating a business model focused on maximizing young users' time on its Platforms; (2) employing harmful and psychologically manipulative Platform features while misleading the public about the safety of those features; (3) publishing misleading reports purporting to show low rates of user harms; and (4) in spite of the overwhelming evidence linking its Social Media

1  Platforms to young user harms, refusing to address those harms while continuing to conceal and

2  downplay its Platforms' adverse effects.

3      **A.**    **To maximize profit, Meta's business model focuses on increasing young users'**

4              **engagement.**

5              **1.**    **Meta monetizes young users' attention through data harvesting and**

6                        **targeted advertising.**

7       54.    Meta's core business model across its Social Media Platforms is monetizing user

8  information and attention by increasing engagement, otherwise known as time spent, on its

9  Platforms. Meta is constantly striving to sustain and increase user engagement on its Platforms so

10  that it can sell more and better advertising opportunities to paying advertisers.

11       55.    Meta generates most of its revenue from advertisers, who are able to use targeted

12  advertising based on the personal data Meta collects for each user. As Meta's CFO David Wehner

13  indicated in a January 2019 earnings call:

14               In terms of our ability to continue to grow the advertising business,

15               it's about working to develop the best—the best products we can to
             enable advertisers to achieve their end business results. Targeting

16               obviously very is [sic] important in that.

17       56.    When Meta succeeds in maintaining a user's interest through its recommendation

18  algorithms—thus keeping the user on a Platform for a longer time—Meta can collect more data

19  on the user and serve the user more advertisements.

20       57.    Indeed, as Zuckerberg has confirmed, the company's core business model relies on

21  increasing the amount of time its users stay on the Platforms. Zuckerberg wrote, for example, that

22  he hoped to see time spent on Instagram increase by 10% between 2016 and 2021.

23       58.    Increasing the time spent on Meta's Platforms increases the effective delivery of

24  targeted ads—a pivotal factor in Meta's ability to generate revenue. In an April 2019 earnings

25  call, Meta's CFO noted, "we're relying on continuing to improve targeting. And so you've got—

26  the risk there is of course the headwinds that we talked about on the ad targeting front and how

27  that will play into U.S. growth as well."

28

59.     Advertisers can target their advertisements to Meta's users through user profiles that Meta develops based, in part, on the data Meta accumulates about the users.

60.     Advertisers can select from a variety of highly targeted user demographics (such as age, gender, and location) collected by Meta.

61.     Advertisers do not have long-term commitments to Meta's Platforms. Accordingly, Meta must continue to deliver ads in an effective manner to retain paying advertisers and maintain and increase its revenue.

62.     Meta has emphasized ad effectiveness as a top priority for future growth. As then-Chief Operating Officer Sheryl Sandberg told investors on a 2019 earnings call, "[o]ver time our systems will do a better job deciding where your ads should be placed and even helping you target. And so you're seeing us build tools in that direction as well."

63.     As Meta noted in its 2021 Annual Report to the SEC, "[t]he size of our user base and our users' level of engagement across our products are critical to our success." It noted that factors affecting Meta's revenue generation include (1) "user engagement, including time spent on [Meta's] products"; (2) increasing "user access to and engagement with [Meta's] products"; (3) Meta's ability "to maintain or increase the quantity or quality of ads shown to users"; (4) maintaining traffic to monetized features like the "Feed" and "Stories"; (5) the "effectiveness of [Meta's] ad targeting"; and (6) the degree to which users engage with Meta's ads.

64.     Meta's Recommendation Algorithms were designed with its business purpose in mind, namely, to capture users' attention and keep them engaged on the Platforms.

65.     These algorithms do not promote any specific message by Meta. Rather, the algorithms function on a user-by-user basis, detecting the material each individual is likely to engage with and then increasingly displaying similar material to maximize the time spent (and user data collected) on the Platforms.

66.     As a result, Meta's algorithm alters users' experiences on the Platform and draws unwitting users into rabbit holes of algorithmically curated material, as described by a Meta data scientist in a February 2021 internal email:

It's hard to clear out an interest once you've engaged with something on Explore . . . We're working with the Drebbel/Rabbithole[6] team to apply their tool. They've used it to understand how recommendations of civic content amplify partisanship; we can apply it to understand whether our algorithms are recommending more and more fashion content to people who may have only been a little bit interested.

67.  Meta's algorithms apply not only to material generated by users but also to advertisements. As Sandberg expressed in a 2019 earnings call, "[a]cross all of our platforms and formats, we're investing in AI [artificial intelligence] to make ads more relevant and effective. In Q4, we developed new AI ranking models to help people see ads they're more likely to be interested in."

**2.  Meta specifically targets young users.**

68.  Meta is financially motivated to attract and retain young users on its Social Media Platforms and has been for many years. As one Meta product designer summarized in an internal email, "[s]hort summary is the 'the [sic] young ones are the best ones.' You want to bring people to your service young and early."

69.  Meta is constantly collecting and reviewing data on young users' activity on its Platforms. As a Director of Product Management at Instagram stated in January 2020, he was "focused on getting a very clear understanding of our current US DAP [Daily Active People] and MAP [Monthly Active People] growth situation, opportunities, and challenges because 1) US Teens are our #1 cohort for both long-term growth of IG and FB Family incrementality."

70.  Moreover, any substantive changes to Meta's Platforms are viewed in light of their impact on young users. For example, Jenni Romanek, Vice President and Head of Analytics for Instagram, asked the following question about changes to the Instagram Platform: "We've said in the past we're teen first, but not teen only. However, are the tradeoffs we're making w[ith] all the complexity we're about to add to the app going to cause us to *not* be teen first for the next gen of teens?"

---

[6] Meta's Drebbel team, formerly known as the Rabbithole team, focuses on the concept of "preference amplification"—in laymen's terms, "going down a content rabbit hole"—within Meta's Platforms.

71. Since Facebook's inception, young users have been an important focus of its user base. When young users declined in the 2010s, Meta embarked on a concerted effort to "win back" the teen market to Facebook. This included an effort in the United States to emphasize the "social entertainment" market to win back teen users.

72. An email to Sandberg from 2016 reveals Meta's plan to "'win over' teens" by seeking to: "[g]et more teen-oriented creators"; "[g]et more teens connected to these creators"; and, importantly, regarding design of the product, "[s]treamline sharing and discovery of content" and "[i]nvest in Live for this segment."

73. Young user engagement was regularly tracked by Meta, including any successful (or unsuccessful) efforts to stave off its decline on Facebook. As an internal 2018 mid-year report noted, "Facebook's engagement and appeal among teens continue[d] to diminish," and Meta "no longer believe[d] that [it could] be successful by iterating through incremental improvements and stacking up small wins on Facebook" and adjusted its strategy. Meta planned to "reverse the negative decline in teen engagement on Facebook" by "focus[ing its] bets on early teens in markets where we have an acute teen problem (mostly the US & western markets) and will test new teen experiences for retention in the US first."

74. This concern over young user engagement (and its decline) naturally has extended to Instagram.

75. About 22 million teens log on to Instagram in the U.S. each day.

76. In recent years, Instagram has become Meta's most successful Social Media Platform in attracting and retaining young users.

77. Within approximately two years of its purchase by Meta, over 50% of teenagers in the United States used Instagram, and Meta is intensely focused on retaining this young user base.

78. In an internal document from August 2021, a Meta employee identified the fact that 13- and 14-year-olds constituted the "largest components of decline" in engagement as "the most concerning problem from a strategic POV: they are suppose[d] to be the future of IG."

79. According to internal Meta documents, hundreds of thousands of teen users spend more than five hours a day on Instagram.

15

80.     Instagram's Adult Classifier Model estimates that the following numbers of teenage users ages 13-17 in the Filing States used Instagram from July 2020 to June 2021:

| State | Daily Active Users | Monthly Active Users |
|---|---|---|
| Arizona | 383,405 - 434,575 | 493,510 - 582,893 |
| California | 2,148,402 - 2,680,451 | 2,642,133 - 3,374,235 |
| Colorado | 261,746 - 300,161 | 349,770 - 410,981 |
| Connecticut | 180,619 - 204,560 | 231,146 - 271,979 |
| Delaware | 51,223 - 61,428 | 67,600 - 82,719 |
| Georgia | 615,595 - 763,113 | 806,937 - 1,065,088 |
| Hawai'i | 79,952 - 93,124 | 99,075 - 120,647 |
| Idaho | 93,820 - 107,394 | 125,949 - 146,601 |
| Illinois | 623,387 - 747,760 | 819,715 - 994,684 |
| Indiana | 361,150 - 405,445 | 496,549 - 569,533 |
| Kansas | 146,545 - 168,727 | 205,196 - 239,975 |
| Kentucky | 250,799 - 278,479 | 345,732 - 398,455 |
| Louisiana | 250,953 - 293,318 | 358,303 - 412,329 |
| Maine | 56,755 - 66,832 | 78,294 - 92,154 |
| Maryland | 321,966 - 370,063 | 413,196 - 481,659 |
| Michigan | 468,156 - 563,293 | 638,779 - 770,061 |
| Minnesota | 261,181 - 296,118 | 346,087 - 400,661 |
| Missouri | 286,454 - 354,289 | 398,603 - 488,675 |
| Nebraska | 108,449 - 117,862 | 143,897 - 159,775 |
| New Jersey | 487,291 - 583,620 | 602,860 - 744,112 |
| New York | 881,994 - 1,090,071 | 1,152,233 - 1,430,783 |
| North Carolina | 577,827 - 669,721 | 770,142 - 898,767 |

16

| | | |
|---|---|---|
| North Dakota | 33,828 - 37,743 | 45,827 - 52,160 |
| Ohio | 591,475 - 714,620 | 802,184 - 967,219 |
| Oregon | 181,144 - 214,544 | 239,199 - 290,988 |
| Pennsylvania | 603,464 - 771,966 | 798,435 - 1,024,721 |
| Rhode Island | 52,113 - 62,035 | 68,474 - 85,592 |
| South Carolina | 263,682 - 306,022 | 366,599 - 434,134 |
| South Dakota | 39,582 - 44,318 | 55,022 - 62,492 |
| Virginia | 437,616 - 520,802 | 572,496 - 684,140 |
| Washington | 329,723 - 407,685 | 438,050 - 539,584 |
| West Virginia | 83,557 - 99,219 | 123,763 - 148,547 |
| Wisconsin | 268,240 - 314,742 | 366,708 - 426,114 |

81.    Instagram's Age Affinity Model estimates that the following numbers of young adult users ages 18-23 in the Filing States used Instagram from October 2022 to April 2023:

| State | Daily Active Users | Monthly Active Users |
|---|---|---|
| Arizona | 665,101 - 712,371 | 1,054,677 - 1,125,389 |
| California | 3,769,678 - 4,072,177 | 5,854,476 - 6,309,797 |
| Colorado | 418,867 - 452,259 | 669,578 - 718,952 |
| Connecticut | 286,679 - 304,136 | 450,584 - 482,759 |
| Delaware | 73,724 - 89,911 | 118,809 - 141,187 |
| Georgia | 893,673 - 1,013,407 | 1,446,095 - 1,636,243 |
| Hawaiʻi | 124,598 - 131,775 | 192,698 - 205,596 |
| Idaho | 144,593 - 154,390 | 225,000 - 242,872 |
| Illinois | 902,280 - 987,018 | 1,482,666 - 1,603,723 |
| Indiana | 521,867 - 576,182 | 857,309 - 929,832 |

17

| | | |
|---|---|---|
| Kansas | 225,889 - 242,498 | 374,826 - 405,231 |
| Kentucky | 325,228 - 352,406 | 541,929 - 582,467 |
| Louisiana | 362,142 - 402,087 | 582,647 - 643,125 |
| Maine | 78,799 - 88,189 | 129,118 - 141,548 |
| Maryland | 506,819 - 549,189 | 802,660 - 872,133 |
| Michigan | 697,372 - 754,541 | 1,133,488 - 1,234,188 |
| Minnesota | 359,714 - 388,601 | 585,737 - 627,194 |
| Missouri | 402,482 - 442,152 | 664,408 - 724,913 |
| Nebraska | 152,698 - 163,832 | 244,484 - 259,577 |
| New Jersey | 725,500 - 792,771 | 1,143,462 - 1,255,796 |
| New York | 1,655,901 - 1,825,652 | 2,668,218 - 2,950,251 |
| North Carolina | 881,181 - 962,161 | 1,402,667 - 1,532,331 |
| North Dakota | 58,368 - 65,142 | 91,158 - 100,256 |
| Ohio | 834,664 - 919,772 | 1,352,843 - 1,486,485 |
| Oregon | 306,348 - 339,973 | 494,310 - 544,457 |
| Pennsylvania | 922,018 - 1,041,426 | 1,472,696 - 1,642,531 |
| Rhode Island | 94,704 - 114,419 | 154,929 - 179,651 |
| South Carolina | 365,283 - 414,982 | 592,861 - 676,533 |
| South Dakota | 61,521 - 66,817 | 95,625 - 104,629 |
| Virginia | 709,714 - 777,234 | 1,130,402 - 1,226,955 |
| Washington | 542,150 - 593,771 | 867,527 - 954,847 |
| West Virginia | 106,206 - 121,057 | 176,445 - 200,890 |
| Wisconsin | 397,097 - 431,395 | 644,356 - 706,566 |

82.     As these tables show, teenagers and young adults are a substantial and critical

market for Meta's Platforms. Meta and its advertisers want to attract young people because they

18

1    are more likely to: (1) be influenced by advertisements; (2) become lifelong customers; and (3)

2    set trends that the rest of society emulates. To draw young people into its ecosystem and keep

3    them coming back, Meta employs technologies designed to maximize young users' time on, and

4    engagement with, its Social Media Platforms.

5        83.  And, because advertisers want to target ads to young users, Meta permits targeting

6    of advertising to teenagers based on their age, gender, and location. As one Meta employee

7    expressed in an August 2017 email, one of Meta's "Longer-term Focus Areas" was how to "get

8    teens to share their location with us so we can leverage that data for awesome product

9    experiences and also analytics around high schools."

10       84.  Meta has acknowledged the importance of its young user market by quantifying

11   those users' value to the company in internal correspondence. For example, an internal email

12   circulated in September 2018 showed Meta characterizing its youngest users in terms of their

13   "Lifetime Value (LTV)" to the company, defined as the cumulative total profit expected from a

14   user: "The lifetime value of a 13 y/o teen is roughly $270 per teen." That email went on to

15   caution that, "[t]his number is core to making decisions about your business," and, accordingly,

16   "you do not want to spend more than the LTV of the user."

17       85.  But externally, Meta has denied that it places a monetary value on young users. On

18   September 30, 2021, at a Senate subcommittee hearing, Senator Amy Klobuchar asked Meta

19   executive Antigone Davis what Meta believed the lifetime monetary value of young users was;

20   Davis responded, "[t]hat's just not the way we think about [it]." Davis also denied that Meta

21   "considered the profit value of developing products when [Meta] make[s] their decisions of how

22   those products look," testifying that this would be a "terrible business model."

23       **3.**  **Meta designs and deploys features to capture young users' attention and**

24          **prolong their time on its Social Media Platforms.**

25       86.  Acquiring young users helps secure Meta's profit stream over time. By capturing

26   users' attention and engagement when they are young, Meta ensures future engagement and

27   monetization as those young users grow up.

28

87.     Meta thus develops and implements features to attract young users and keep them engaged on its Social Media Platforms for as long as possible. These features include: engagement-based (as opposed to chronological) feeds; infinite scroll; push notifications; ephemeral content; and video-based content.

88.     Meta had originally displayed content on a user's "Feed" chronologically, i.e., in the order the content was posted by people the user elected to follow. Meta moved from chronological Feeds to engagement-based Feeds in 2009 (for Facebook) and 2016 (for Instagram).

89.     The engagement-based Feed is different and alters the users' experience. It algorithmically presents material to users based on several engagement components: posts with more "Likes," comments, and other indicia of user engagement are displayed to users first.

90.     This change was designed to prioritize material most likely to engage users for longer periods of time.

91.     In the fall of 2016, Instagram debuted its infinite scroll system.

92.     Infinite scroll is characterized by the partial display of additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation (without seeing the top portion of the next post in their Feed).

93.     The "teasing" of yet-to-be-viewed content continues indefinitely; as the user scrolls down the Feed, new content is automatically loaded and "teased."

94.     This "teasing" feature is intended to keep young users of the Platform engaged and continuing to scroll to the new content.

95.     In April 2015, Meta introduced a variety of "push notifications" to Instagram. Push notifications are auditory and visual cues to alert users when accounts they follow add new content.

96.     Push notifications allowed Instagram to draw its users back to the Platform at any time of day. Once push notifications were introduced, Meta sought to increase the number of these notifications, tracking "notification growth" and designing "new push campaign" tools to test their impact on user engagement.

97.     Meta also sought to increase engagement through making certain content available to users only temporarily—with notifications and visual design cues indicating that the content would soon disappear forever (ephemeral content).

98.     Ephemeral content leads young users to more frequently open Meta's Social Media Platforms so they do not "miss out" on any new content. This phenomenon is called "Fear of Missing Out," or "FOMO." Meta designed ephemeral content features in its Social Media Platforms to induce this sense of FOMO in young users.

99.     For example, on August 2, 2016, Meta introduced a feature to Instagram designed to show images and narratives for only a short amount of time before disappearing, known as the "Stories" feature. Meta released a similar feature to Facebook in 2017.

100.    The purpose of this feature was in large part to help drive teen engagement.

101.    An internal Meta document from 2018 states: "we've invested in FB stories—and have seen engagement more than double[;] teen original sharing [is] up for the first time since 2012."

102.    Another example is "Live," which gives users the ability to livestream videos to followers or the public.

103.    Meta launched Facebook Live on a limited basis to celebrities and other high-profile users in August 2015, with the feature being available to all users by April 2016. Instagram soon followed in November 2016.

104.    Live allows users to create video content in real time that their followers can watch and react to, often called "going Live."

105.    When an account goes Live, the Instagram Platform sends out a notification.

106.    Meta saw fairly quickly that the Live feature was successful among young users, including younger teens. As an internal highlights memo noted in February 2017, of the 9.2 million broadcasts per day, "[Meta] found that 35% of [Live] broadcasters are teens (early and late high school)."

107.    In addition to video-streaming offered through the Live feature, Meta has also designed and implemented several video features, including "IGTV," "Instagram Video," and

ultimately "Reels."[7] As with prior features, Meta focused on teen engagement with these video features.

108.    For instance, an internal email from April 2019 revealed that Meta's "Q2 stretch goal" was "2M[illion] hours of teen watch time" on IGTV.

109.    In 2020, when Meta introduced its short-form video feature, "Reels," to the U.S. market on Instagram, it was designed to compete with other platforms like TikTok that were growing in popularity. Reels were made available on Facebook in September 2021.

110.    Reels are algorithmically presented to users based on a number of factors, including the user's activity, the popularity of the content, and the viewer's connection to the creator.

111.    Reels display metrics such as Like counts, comments, and views in the video itself, which reduces the need for the user to navigate away from the video.

112.    The Reels feature is central to Meta's efforts to attract and retain young users. As noted in a presentation on engaging young users, Meta said that it was "investing heavily in Reels, Stories & Creators in an effort to generate more value for teens" on Instagram.

113.    As with other features Meta has deployed, young users are critical to Reels' success. One Meta employee put it best: "obviously teens are key to winniing [sic] in Reels."

114.    Meta's anxiety about the growth in popularity of video-based platforms like TikTok and Snapchat was evident in the rapidity with which Meta introduced Reels. Meta employees stated, with regard to Reels, that it was "scary the speed we are moving" and that introducing Reels was "purely opportunistic."

115.    Meta Data Scientist and current Director of Data Science ███████ reflected on Meta's introduction of Reels in an internal chat: "we either do things WAY TOO FAST without Data. Or do things WAY TO[O] SLOW becau[se] of Design/Principles."

---

[7] IGTV was revamped in October 2021 (in a shift to Instagram Video), and ultimately removed completely from the Platform in March 2022. Reels was merged with and superseded "Instagram Video" in June 2022.

116.    Meta's development of these engagement features disregarded its own internal research about how design choices cause compulsive use. In June 2018, an internal presentation called "Facebook 'Addiction'" acknowledged that although "habits can be changed by behavior regulation," "aspects of Facebook," including "mindless" consumption of a feed and the fact that "it is easy to keep scrolling and go on frequently" make it "difficult to limit one's use."

**B.    Meta falsely represents that its Social Media Platform features are safe and not designed to induce young users' compulsive and extended use.**

117.    Meta has misrepresented the impact of the features used by its Social Media Platforms that drive young users to spend extended time on the Platforms.

118.     While Meta consistently reassures parents, lawmakers, and users that its Social Media Platforms are suitable for young users and designed to promote their well-being, it continues to develop and implement features that it knows induce young users' extended, addictive, and compulsive social media use. These features include:

- Algorithmic recommendation and sequencing;
- Public display and quantification of engagement metrics such as Likes;
- Face and body image manipulation filters;
- Disruptive audiovisual and haptic alerts;
- Infinite scroll and autoplay formats;
- Permitting and encouraging users to create multiple accounts; and
- "Ephemeral" presentation of social content.

119.    Meta's own researchers have concluded that due to Meta's deliberate design choices, "the benefits and drawbacks for Instagram are closely linked." Instagram had the potential to positively affect its users by providing, among other things, a positive community and connection with others who shared identities, abilities, and interests—including isolated youth in marginalized racial, ethnic, and sexual minorities.[8] But due to Meta's deliberate design choices, the net result has been that young users are negatively affected by using Instagram compulsively.

---

[8] *See Social Media and Youth Mental Health: The U.S. Surgeon General's Advisory* 6, Dept. Health & Human Servs. (2023) ("[S]tudies have shown that social media may support the

1.   **Meta represents to the public that its Social Media Platforms are designed to support young users' well-being.**

120.    For years, Meta has claimed that its top priority is well-being, and that Instagram and Facebook are safe and age-appropriate Platforms for young users.

121.    Meta's public messaging is intended to convey that its Social Media Platforms are carefully designed to be safe and suitable for young users.

122.    Meta represents to the public, including investors and analysts, that it prioritizes safety. For example, during a public earnings call on January 29, 2020, Sandberg stated, "[we] have to keep people safe and give them control over their experience on our apps. And we are."

123.    Later that year, on October 29, 2020, Sandberg explained during a different public earnings call that "[w]hile we continue to invest in helping businesses, we are equally focused on keeping our platform safe."

124.    Other top executives made similar assurances through public appearances, statements to the media, and statements to lawmakers.

125.    As reported by Quartz, at a technology event in the spring of 2018, Instagram Director of Fashion Partnerships Eva Chen publicly stated that Meta's "entire focus is focusing on the wellbeing of the community" and that "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram."

126.    In June 2019, Mosseri (Head of Instagram) told CBS in an interview that teen well-being is a top priority. And two years later, in May 2021, Mosseri minimized Instagram's negative impact on teens, characterizing it to reporters as "quite small," as reported by the Wall Street Journal that September.

127.    In response to a "60 Minutes" exposé on Meta's Platforms and the harms they cause in October 2021, Meta itself prepared the following public statement: "Protecting our community is more important than maximizing our profits."

_____

mental health and well-being of lesbian, gay, bisexual, asexual, transgender, queer, intersex and other youths by enabling peer connection, identity development and management, and social support."), http://archive.today/QAytZ.

128. Meta has also sought to persuade lawmakers that its Platforms are safe for youth. On September 30, 2021, Meta executive Antigone Davis testified to Congress, "[w]e have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."

129. Meta has also sought to reassure the public that it prioritizes youth safety on its own blogs and Platform websites. On December 7, 2021, Mosseri wrote in a blog post entitled "Raising the Standard for Protecting Teens and Supporting Parents Online" that "[a]t Instagram, we've been working for a long time to keep young people safe on the app."

130. Similarly, Instagram's website characterized the Instagram app as a "safe and supportive community" for its users.

131. Likewise, a blog post from December 15, 2022 on about.instagram.com bears the title "Continuing to Keep Instagram Safe and Secure."

132. In early December 2022, Meta employees collaborated on an internal document regarding Meta's response to "Teen Well-being," listing the following "key messages to land" externally: "Instagram takes our responsibility for young people seriously. We want to keep them safe on the platform and promote their well-being," and "[w]e have substantial investments and launched meaningful changes to improve teen safety and [w]ell[-being]."

133. Through these and other public messages, Meta has intentionally created the false impression that its Platforms are safe for young users, and that Meta prioritizes safety over user engagement.

**2.    Meta prioritizes maximizing engagement over young users' safety.**

134. Meta denies that it seeks to maximize young users' engagement on its Social Media Platforms.

135. In 2018, Sandberg's talking points prepared for conversations with reporters included the claim that Meta "do[es] not optimize [its] systems to increase amount of time spent in News Feed" and "explicitly do[es]n't give [its] teams goals around time spent."

136. In 2021, Meta's Narrative Audit revealed that the company needed to counter widespread beliefs that its Social Media Platforms negatively affected well-being. To that end,

Zuckerberg's talking points for a 2021 congressional hearing included the following misleading statement: "The impact that our products have on the well-being of everyone is a top priority. It's not how much time you spend online, it's how you spend it." Zuckerberg denied that Meta designed its Platforms to be addictive in order to maximize time spent.

137.    Zuckerberg stated to Congress on March 25, 2021, that "it is a common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend" and "I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend."

138.    Meta has also claimed, in a statement published by Gizmodo on October 3, 2021, to "do internal research to ask hard questions and find out how we can best improve the experience for teens."

139.    These representations were false and misleading. Contrary to Meta's public statements, one of Meta's key goals is to induce young users to spend ever-increasing amounts of time on its Social Media Platforms.

140.    In fact, records of internal communications reveal that Meta has placed an "[e]mphasis on driving time spent" and expressed a commitment to "approach[ing] major moments (Awards Show, Olympics, etc.) with an explicit goal around moving time spent."

141.    For teen users specifically, time spent is a key data point that Meta closely tracks, including daily average use and the number of sessions for daily users.

142.    An internal "teen health scorecard" reported on these statistics and noted "worrying concerns" that teen consumption and production were declining in the United States, even though teen Monthly Active People had been maximized, or "saturated," above 100%.

143.    And in a December 2015 email, Zuckerberg listed one of Meta's goals for 2016 as seeing the "[t]ime spent [on the Platforms] increase[] by 12%" over the following three years. For Instagram specifically, Zuckerberg wrote that he hoped to see time spent on the Platform increase by 10% between 2016 and 2021.

144.    Meta worked zealously to pursue those goals. In February 2016, Mark Zuckerberg circulated an email to his executive team regarding "Opportunities for Teens and Sharing." In this

26

email, Zuckerberg analyzed how effective current and prospective Social Media Platform features were in garnering and maintaining teenage engagement.

145.    An April 2017 email revealed that Meta remained committed to its goal of increasing time spent on its Social Media Platforms:

> We have been investing effort in researching time spent to find opportunities. By comparing long-term tests that always or never auto-play videos, we find that auto-play increases overall time spent for some people and cannibalizes time spent for others. Using SmartScorer, we found that auto-play increases time spent for people with high inventory utilization and younger people (college and late high school), and decreases time spent for other people. This shows there is opportunity to grow time spent by personalizing auto-play rules in feed (details).

146.    An internal presentation titled "2017 Teens Strategic Focus" explicitly stated Meta's "goal: retain MAP [Monthly Active People] and DAP [Daily Active People], [and] grow teen time spent" by "rebuild[ing] social Facebook to work better for teens, including entertainment."

147.    The presentation further stated that in the U.S., Meta plans to "emphasize 'social entertainment' market opportunities to win back teen interaction." Meta noted that "we should bet big on Instagram Direct + stories to beat Snapchat" and that the goal would be "increase U.S. teen time spent." The presentation detailed how Meta planned to increase time spent by teens while teens are in school, including live broadcasts of high school sports.

148.    Similarly, an internal Meta planning document from November 2018 stated: "Winning schools is the way to win with teens because an individual teen's engagement is highly correlated with school MAP [Monthly Active People] penetration. Solving jobs related to school and building school network effects is a way to increase overall teen usage."

149.    A February 2019 email from Mosseri further confirmed Meta's ongoing efforts to maximize and commodify its users' time. In his email, Mosseri discussed certain feature improvements and concluded, "[c]ombining these performance wins led to higher time spent on profile by 0.7%, or ~5 seconds per DAP [Daily Active People]."

150.    Thus, notwithstanding Meta's public representations to the contrary, increasing young users' engagement was, and is, a core business objective for Meta.

### 3.    Meta's Recommendation Algorithms encourage compulsive use, which Meta does not disclose.

151.    Instagram and Facebook employ Recommendation Algorithms that curate content from the main feeds and other parts of the Platforms.

152.    The Recommendation Algorithms use data points, or "signals," harvested from individual users to choose and/or arrange each new piece of content to display to a user. Such signals include, but are not limited to, overt actions like Liking a post or following a page as well as such unconscious actions such as lingering on—but not otherwise engaging with—certain content or visiting but not following another user's page.

153.    Meta employs Recommendation Algorithms universally across its Social Media Platforms, including the Instagram Platform's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be guided by a user's text input in a search field).

154.    Meta designed its Recommendation Algorithms to maximize youth engagement in several ways but did not disclose these engagement-maximization features to the public—instead representing that these algorithms were intended to *benefit* the user.

155.    *First*, Meta designed the Recommendation Algorithms to present material to young users in an unpredictable sequence rather than displaying posts chronologically.

156.    Specifically, Meta's Recommendation Algorithms display content to young users through a sequencing method referred to by psychologists as "variable reinforcement schedules" or "variable reward schedules."

157.    As Dr. Mark D. Griffiths, Distinguished Professor of Behavioral Addiction at Nottingham Trent University, explains:

> The rewards [experienced on social media platforms]—which may be physiological, psychological and/or social—can be infrequent but even the anticipation of one of these rewards can be psychologically and/or physiologically pleasing. The rewards are what psychologists refer to as variable reinforcement schedules and

28

is one of the main reasons why social media users repeatedly check their screens. Social media sites are 'chock-ablock' with unpredictable rewards. Habitual social media users never know if their next message or notification will be the one that makes them feel really good. In short, random rewards keep individuals responding for longer and has been found in other activities such as the playing of slot machines and video games.[9]

158.    Because they do not work in a predictable pattern, these "variable reinforcement schedules" trigger a release of dopamine, a neurotransmitter released by the brain in response to certain stimuli. Dopamine, commonly "seen to be the 'pleasure chemical,'" is released in anticipation of a potential reward. However, dopamine neurons fire for only a relatively short period of time, and after dopamine is released, an "individual can become disheartened and disengaged."[10]

159.    As researchers Rasan Burhan and Jalal Moradzadeh explain, the variable reinforcement schedules baked into social media platforms like Instagram can lead to "addiction with dopamine implicated":

[T]he user can be kept in a loop. Essentially, that's how the social media apps exploit these innate systems. The way this comes about is through a term referred to as Variable Reward Schedules. This works by positive stimuli being provided at random intervals. By users checking their phones for notifications and updates at periodic intervals for something that could be intrinsically rewarding. Most of the time it's a neutral stimuli, but on occasion there may be a positive stimuli leading to the rewarding dopamine release hence keeping the user in the feedback loop.[11]

160.    In internal discussions, Meta employees discussed the fact that Meta's Recommendation Algorithms tend to pull young users into "negative spirals" and "feedback loops" whereby the algorithmic sequencing of content has detrimental effects on the well-being of young users. For example, in one internal communication discussing potential "[c]ontent

---

[9] Mark D. Griffiths, *Adolescent Social Networking: How Do Social Media Operators Facilitate Habitual Use?*, 36 Educ. & Health J. 66, 67 (2018), http://archive.today/cPgJ1 (internal references omitted).

[10] Rasan Burhan & Jalal Moradzadeh, *Neurotransmitter Dopamine (DA) and its Role in the Development of Social Media Addiction*, 11 J. Neurology & Neurophysiology 1, 1 (2020), http://archive.today/kxldL.

[11] *Id.* at 1-2.

policies" for the unlaunched "Instagram Youth" Platform, Meta employees expressed concern with the "well-being challenge" of "content on IG triggering negative emotions among tweens and impacting their mental well-being (and) our ranking algorithms taking [them] into negative spirals & feedback loops that are hard to exit from."

161.    By algorithmically serving content to young users according to variable reward schedules, Meta manipulates dopamine releases in its young users, inducing them to engage repeatedly with its Platforms—much like a gambler at a slot machine.

162.    Internal Meta documents reveal Meta knew its Recommendation Algorithms trigger intermittent dopamine releases in young users, whose developing brains are especially susceptible to such tactics.

163.    For example, a 2020 internal Meta presentation described Meta's efforts to study adolescent biology and neuroscience in order to "gain valuable unchanging insights to inform product strategy today," noting that "teens' decisions and behavior are mainly driven by emotion, the intrigue of novelty and reward." The document continued, "teens are insatiable when it comes to 'feel good' dopamine effects" and "IG has a pretty good hold on the serendipitous aspect of discovery through our Explore surface, recommendations and social graph. And every time one of our teen users finds something unexpected their brains deliver them a dopamine hit."

164.    Two years earlier, in June 2018, an internal presentation recognized that "[i]t may be a problem if Facebook seems rewarding [to users] based on the principle of unpredictability, while the inherent value of the reward is lacking." This includes "[n]otifications with little or no relevance, and that come at unpredictable times," "[p]rominent novel content that creates unwanted distractions," "[n]ews feed stories with seemingly 'random' content and unpredictable order," and "[o]ther use of unpredictable rewards, such as delays to load." The same document cautioned that dopamine "rewards available through Facebook may contribute to problems for some people."

165.    Nonetheless, and as illustrated above, as recently as 2020, Meta continued to intentionally design its Platforms to manipulate dopamine responses in its young users to

maximize time spent on its Platforms. Meta did not disclose that its algorithms were designed to capitalize on young users' dopamine responses and create an addictive cycle of engagement.

166.    *Second,* Meta uses data harvested from its users to target user engagement on an individual level via its Recommendation Algorithms—making continued engagement even more difficult for young users to resist.

167.    In a June 8, 2021 public blog post on Instagram's website, Mosseri stated that Meta collects and supplies its Recommendation Algorithms with thousands of "signals" across Instagram's Feed and Stories, including "[y]our activity" and "[y]our history of interacting with someone." Mosseri's post explained that the collection of "[y]our activity . . . helps us understand what you might be interested in . . ." and the collection of "[y]our history of interacting with someone . . . gives us a sense of how interested you are generally in seeing posts from a particular person."

168.    Similarly, Facebook's Vice President of Global Affairs wrote in Medium on March 31, 2021, about Facebook's Recommendation Algorithms: "The goal is to make sure you see what you find most meaningful—not to keep you glued to your smartphone for hours on end. You can think about this sort of like a spam filter in your inbox: it helps filter out content you won't find meaningful or relevant, and prioritizes content you will."

169.    Likewise, Meta's terms of service on data collection state that Meta uses user data to "[p]rovide, personalize and improve our Products," "[p]rovide measurement, analytics, and other business services," "[p]romote safety, integrity and security," "[c]ommunicate with you," and "[r]esearch and innovate for social good."

170.    In reality, though, Meta tracks and logs the behavior of millions of young users and utilizes that data to refine and strengthen the features that induce young users' compulsive Social Media Platform use.

171.    As young users engage with Meta's Social Media Platforms, they are unwittingly training Meta's Recommendation Algorithms to provide the particular flow of content, notifications, and features that will most effectively keep them online.

172.     Again, Meta does not disclose to consumers that it is weaponizing young users' data to capture and keep their attention.

173.     Meta admits in its Privacy Policy that it uses data provided by its young users for purposes other than facilitating meaningful social experiences, such as "improv[ing] our Products . . . includ[ing] personalizing features, content and recommendations, such as your Facebook Feed, Instagram feed, Stories, and ads."

174.     This includes using young users' data to "[t]est out new products and features to see if they work" and to "[g]et feedback on our ideas for products or features."

175.     But Meta's representations about its Recommendation Algorithms do not effectively apprise young users of the reality that Meta is harvesting vast amounts of personal data to train its Recommendation Algorithms to induce them to keep using the Platforms.

176.     *Third*, the Recommendation Algorithms increase young users' engagement by periodically presenting those users with psychologically and emotionally gripping content, including content related to eating disorders, violent content, content encouraging negative self-perception and body image issues, bullying content, and other categories of content known by Meta to provoke intense reactions.

177.     Meta's Recommendation Algorithms are optimized to promote user engagement. Serving harmful or disturbing content has been shown to keep young users on the Platforms longer. Accordingly, the Recommendation Algorithms predictably and routinely present young users with psychologically and emotionally distressing content that induces them to spend increased time on the Social Media Platforms. And, once a user has interacted with such harmful content, the Recommendation Algorithm feeds that user additional similar content.

178.     Meta uses the term "preference amplification" (sometimes referred to as falling into rabbit holes) to describe how its Recommendation Algorithms push categories of content that previously succeeded in provoking user engagement:

> [P]eople don't just fall into rabbit-holes (and we stopped using this term.) They have some preference that our models amplify (hence the term "preference amplification") - eg, follow accounts, like reels, etc. Then they tend to "drift" towards what the

rec[ommendation] sys[tem] shows them, which is further picked up
by the model, which makes the problem even worse.

179.    For example, in Meta's own internal research, Meta's Recommendation Algorithm
was shown to recommend content related to eating disorders when it received indications that the
user had engaged with content relating to eating disorders in the past.

180.    In a March 2021 internal investigation focusing on "eating disorder content on
Instagram," researchers created a "test user" profile, through which Meta's team followed
existing users with account names such as @st4rv_1ng (a stylization of the word "starving"),
@skinx_bones, @prettywhenimhungry, and @skinny_goals_.

181.    After the test user began following these accounts, Instagram's Recommendation
Algorithms generated a list of "Suggestions For You" (i.e., recommendations of accounts that the
user might want to follow, based on the kind of content that user has engaged with) that included
accounts related to anorexia, such as @milkyskinandbones, @skinny._.binge,
@_skinandbones__, and @applecoreanorexic.

182.    Similarly, an internal document from 2018 recognized that "seeing SSI [suicide
and self-injury] admissions on Instagram is significantly associated with increased time spent" on
the Platform.

183.    Again, though, Meta's public statements regarding its algorithms' amplification of
distressing and problematic content did not reflect Meta's true awareness of these problems.

184.    In fact, Meta has strongly denied that its Social Media Platforms amplify extreme,
distressing, or problematic content.

185.    For example, on September 30, 2021, Davis denied that Meta promotes harmful
content, such as content promoting eating disorders to youth, when she testified before Congress,
stating, "we do not direct people towards content that promotes eating disorders. That actually
violates our policies, and we remove that content when we become aware of it. We actually use
AI to find content like that and remove it."

186.    Similarly, an internal document from 2021 outlining Sandberg's prepared talking points for a meeting with Meta's clients included the statement, "we do not amplify extreme content."

187.    Likewise, in a June 8, 2021 post on the Instagram website, titled "Shedding More Light on How Instagram Works," Mosseri describes Meta's Recommendation Algorithms by providing examples of benign content recommendations (e.g., "if you're interested in dumplings you might see posts about related topics, like gyoza and dim sum . . ."). The post provides no accompanying examples or warnings disclosing that the Recommendation Algorithms also tend to suggest content that is dangerous or harmful for young users.

188.    The Instagram website also boasts that "[a]t Instagram, we have guidelines that govern what content we recommend to people" and specifies that Instagram "avoid[s] making recommendations that may be inappropriate for younger viewers . . . . We use technology to detect both content and accounts that don't meet these Recommendations Guidelines and to help us avoid recommending them. As always, content that goes against our Community Guidelines will be removed from Instagram."

189.    A parent or young user encountering these and similar communications by Meta could reasonably understand Meta to be representing that its Recommendation Algorithms do *not* promote content to young users that violates Meta's Recommendation Guidelines or is otherwise dangerous or inappropriate for young users.

190.    But as explained above, Meta does increase young users' engagement with its Platforms by periodically presenting them with psychologically and emotionally gripping content, including content related to eating disorders, violent content, content encouraging negative self-perception and body image issues, bullying content, and other categories of content known by Meta to provoke intense reactions from users.

**4.    The Recommendation Algorithms are harmful to young users' mental health, notwithstanding Meta's representations to the contrary.**

191.    Meta falsely represents that its Recommendation Algorithms are benign and designed for young users' well-being. For example, during a congressional hearing on March 25,

2021, Zuckerberg denied that Meta "make[s] money off creating an addiction to [its] platforms." At the same hearing, Zuckerberg stated that "the way we design our algorithms is to encourage meaningful social interactions" and denied that Meta's teams "have goals[] of trying to increase the amount of time that people spend [using Meta's Platforms]."

192.     Elsewhere, Meta has reiterated that its Recommendation Algorithms are optimized to yield "positive experience[s]" or "meaningful interactions" as opposed to maximizing "time spent" by users on the Platforms. For example, on September 30, 2021, Davis testified before Congress that Meta "made changes to our News Feed to allow for more meaningful interactions, knowing it would impact time spent" and that Meta did this "because we were trying to build a positive, more positive experience."

193.     But as described above, the Recommendation Algorithms are far from benign: they promote young users' compulsive social media use in a sophisticated and individualized manner and are designed to capture and retain young users' attention—often to the detriment of their mental and physical health.

194.     These harms are pervasive and often measurable.

195.     For example, Meta's Recommendation Algorithms recommend content that it categorizes as "Negative Appearance Comparison" or "NAC" content (meaning content with a tendency to cause users to feel worse about their body or appearance). This effect is especially pronounced on Instagram's Explore Feed. As one internal research paper stated:

> Pooled across all topics, seeing more unconnected content [i.e., content from accounts that a user has not chosen to follow] is associated with worse appearance comparison. Women who spend proportionally more time on Explore (where we promote unconnected content) also have higher levels of appearance comparison. . . . In a recent listening session, one creator described Explore as "a landmine for everything I want to avoid on IG" . . . because it triggers appearance comparison.

196.     This phenomenon is not unique to women. By July 2021, the problem of negative appearance comparison had become so prevalent that Meta researchers conducted a study on how its algorithms pushed the sort of content "landmine[s]" described above. The results were

published internally in a paper entitled "Negative Appearance Comparison (NAC): Amplified exposure to High-NAC content in IG Explore."

197.   In this study, Meta researchers used Drebbel, a proprietary "system for understanding the impact of our recommendation systems on bad societal outcomes," to "examine[] the consumption of High-NAC content on Explore and its associated outcomes." They described their methodology and findings as follows:

> To understand what happens, we examined how views of High-NAC content changed over time for both people who had amplified exposure on April 10th and people who did not . . . . Specifically, we compared trends in High-NAC content consumption prior to this time (prior to the week ending 3/20), and a week later (the week ending 4/17 onwards). Entering the state of amplified exposure was associated with a ~5-10% increase in consumption of High-NAC content that lasted about 6 weeks. Comparing High-NAC content consumption in the week prior (ending 3/20) and week following (ending 4/17), people consumed about 10.8% more High-NAC content. After an additional 4 weeks, people were still consuming about 4.8% more High-NAC content compared to before.

198.   The researchers further found that "[f]or people who did not have amplified exposure, High-NAC content consumption declined 5.7% in that same time period (3/20 vs. 4/17), by 5.4% after 4 weeks, and by 5.3% after an additional 2 weeks. As such, amplified exposure may still have a residual effect after 6 weeks." The researchers also concluded that "[a]fter entering the state of amplified exposure, teen girls consumed 14.9% more High-NAC content in the week following, compared to 13.1% for teen boys."

199.   Meta's researchers have observed that High-Negative Appearance Comparison content appears both in Instagram's Main Feed and in Explore, but that "17% of people see substantially more (at least 20 percentage points) High-NAC content in Explore than in Feed," and that "[i]t's worse for women and teen girls." The researchers stated that their "findings suggest that our algorithms may be increasing exposure to High-NAC content beyond the preferences that people have indicated."

200.   Meta employees recommended that reducing the rate of exposure to High-Negative Appearance Comparison content in Explore "even just to comparable levels [as] in their Feed (i.e., recommending High-NAC content at a rate similar to the amount that users already

36

choose to see), may reduce negative appearance comparison for a sizable fraction of people while minimizing unintended negative outcomes."

201.    Meta researchers also found that, for teens in the top 10% of High-Negative Appearance Comparison consumption, 57% of Instagram's recommendations in Explore were for High-Negative Appearance Comparison content. Meta employees characterized this phenomenon as Meta "choosing to show them a lot and potentially amplifying." The statistic is even higher for teen girls in that category: 70.96% of content they encountered in Explore was classified as High-Negative Appearance Comparison.

202.    Researchers at Meta have found that three in four U.S. teen girls "see 10%+ or more content that's problematic." Internal research has also concluded that "approximately 70% of teen girls may see 'too much' sensitive content," and that such content "is associated with more negative appearance comparison."

203.    For example, researchers concluded that a "majority of teen girls experience negative social comparison[12] and a significant share of them think IG makes it worse." Specifically, 68% of female teen users have experienced social comparison, and 26% of users who had experienced social comparison "thought IG made their social comparison experience worse."

204.    Meta knows that 13.5% of teen girls on Instagram say the Platform makes thoughts of suicide and self-injury worse, that 17% of teen girls on Instagram say the Platform makes eating issues worse, and that Meta makes body image issues worse for one in three teen girls.

205.    Meta does not adequately disclose to parents of young users, or to young users themselves, that young Instagram and Facebook users frequently receive recommendations for High-Negative Appearance Comparison content from the Platforms' Recommendation Algorithms. Nor does Meta disclose that exposing those young users to High-Negative

---

[12] Internal documents define Negative Social Comparison as "When someone feels bad about themselves after comparing themselves with others."

Appearance Comparison content on its Platforms tends to exacerbate physical and psychological problems for those young users.

206.    As one Meta employee acknowledged, body image struggles are especially difficult for teens: "Teens are a lot trickier because the[y] haven['] developed a sense of identity and so their self esteem is shakier."

207.    Instagram researchers (who are ultimately funded by and report to Meta) have also observed that "[s]ocial comparison exacerbates problems teens are dealing with" in that, "[a]lthough others' behaviors online can hurt, the self-scrutiny and anxiety associated with personal consumption patterns is more damaging to mental health."

208.    In particular, Instagram researchers noted that social comparison "[c]an cause or exacerbate a number of issues," including "body image, eating disorders, anxiety, loneliness, depression, envy, online aggression, [and] passive use."

209.    Meta's internal research from January 2019 also expressly linked negative social comparison to loneliness and loneliness with "higher negative affect."

210.    A March 2021 internal paper found that Instagram heavily emphasized content that promoted negative appearance comparison. Fashion and beauty, relationships, "[w]estern pop stars who emphasize their bodies," and images that "emphasize women's bodies generally (e.g., cleavage, swimwear)" are topics that are "likely to make viewers, especially teen girls, feel worse about their bodies"—especially when posted by celebrities and non-friends. The paper observed that "these topics comprise 1/4 of what people see on Instagram," and "1/3 for teen girls." Starkly, "[f]or every piece of friend content a teen girl sees, she sees 5x as many pieces of content from top accounts."

211.    Similarly, a June 2021 internal paper concluded that "the algorithm behind new-user top-account recommendations may be unintentionally amplifying negative social comparison . . . ."

212.    In an internal research document from 2022, Meta noted that "we primarily recommend top accounts to new users (78% of recs to new users are top accounts), and being

recommended more top accounts is associated with seeing more High-Negative Appearance Comparison content a month later."

213.     While Meta's external communications denied or obscured the fact that its Recommendation Algorithms promote High-Negative Appearance Comparison content to young users, Meta's internal research confirms that its Recommendation Algorithms operate in precisely that way.

214.     In addition to concealing the Recommendation Algorithms' tendency to recommend High-Negative Appearance Comparison content, Meta declined to change the algorithms to prevent them from frequently recommending High-Negative Appearance Comparison content to young users and align its practice with its representations to the public.

215.     Concerned Meta employees suggested that Instagram should decrease the frequency at which the Platform served users Negative Appearance Comparison content.

216.     In 2021, one Meta researcher suggested that Meta "could deprive users of content we believe is likely to cause negative appearance comparison and see where there is any topline impact on survey responses" regarding well-being.

217.     Regarding a proposal to limit Negative Appearance Comparison content on the Explore page, an employee noted that "this is some of the most engaging content in Explore, so this idea actively goes against many other teams' top-line measures."

218.     As Instagram researchers noted: "[y]oung people know that their own personal consumption patterns have a harmful impact on their self-esteem, but they don't adopt different patterns. In some cases, they can get addicted to things that make them feel bad."

219.     Meta promotes such problematic "personal consumption patterns" by using Recommendation Algorithms that suggest content tailored to the individual user, including psychologically distressing, harmful, and problematic content. But in its public communications with current and prospective users, Meta conceals these aspects of its Recommendation Algorithms.

220.     Meta understands the psychologically manipulative nature of its Platforms' functionality, has knowledge that its minimally constrained Recommendation Algorithms

promote harmful content, and is aware that users "wish[] Instagram [gave] them better control over what [content] they [see]."

221.   However, Meta does not effectively eliminate or reduce the Negative Appearance Comparison content that its Recommendation Algorithms push to young users (and girls in particular) on Instagram—even though Meta's researchers concluded that this was harmful to its users' well-being—because doing so would harm Meta's bottom line. As one employee put it, "we've done some early experimentation with the Drebbel team on additional enforcement for users who we detect to be in a rabbithole on Feed Recs. [In sum] we did see a meaningful drop in exposure with targeted demotion, but it came with a clear engagement cost . . . ."

222.   At the same time Meta was prioritizing engagement over safety (and in turn, increasing its profits), Meta continued to insist that user well-being (especially teen well-being) was its top priority, including through a January 2018 statement by Zuckerberg that the company was "focused on making sure Facebook isn't just fun to use, but also good for people's wellbeing," as reported by the Guardian.

223.   For example, on October 5, 2021, Zuckerberg reacted to former Facebook product manager Frances Haugen's whistleblower revelations and testimony to Congress—which sent Meta's stock price down over 10% in the six weeks following the initial revelations—by publicly stating in a post on his Facebook profile: "At the heart of these accusations is this idea that we prioritize profit over safety and well-being. That's just not true."

224.   Despite its knowledge that Meta's Recommendation Algorithms harm young users' health, Meta does not disclose these harms to young users or their parents in its public communications or in its user registration processes for its Social Media Platforms.

225.   Meta denies that its Recommendation Algorithms are designed to be addictive and that the algorithms promote emotionally distressing content, but Meta knows that it designs its algorithms to be addictive and to promote such content. Meta's misrepresentations and omissions regarding its Recommendation Algorithms' promotion and amplification of harmful content deprives users, including the parents of young users, of informed decision-making authority regarding whether and how to engage with Meta's Social Media Platforms.

**5.**    **Meta's use of social comparison features such as "Likes" also promotes**
**compulsive use and mental health harms for young users.**

226.    Meta's Social Media Platforms contain additional design features that exacerbate social comparison, such as the quantification and display of Like counts on each piece of content on Instagram and Facebook.

227.    Likes are a quick way for users to express validation or approval of other users' photos or videos, by clicking or tapping a heart icon or the iconic thumbs-up icon. Likes were developed by Meta between 2010 and 2013.

228.    Extensive internal studies have made Meta aware that the quantification and public display of Like counts on its Social Media Platforms is harmful to young users' mental health. Despite that knowledge, Meta has elected to publicly downplay its negative effects on young users rather than eliminating the feature for young users or truthfully disclosing its negative effects.

229.    Meta knows that social comparison is harmful to young users but good for Meta's bottom line. In emails exchanged in February 2021, Meta employees, including ██████, current Director of Data Science, and ██████, discussed how social comparison is valuable to Instagram's business model while simultaneously causing harm to teen girls. ██████ questioned, "[d]o we want social comparison or not?" He also noted that if Meta worked to eliminate social comparison on Instagram, Meta would likely lose users to other Platforms. A separate internal report observed that "social comparison was also associated with greater time spent" on Meta's Social Media Platforms.

230.    Meta knows that adolescents using its Social Media Platforms have a propensity to compare themselves to peers and that social comparison and the pressure to be perfect on Instagram have significant negative impacts on young users' mental health.

231.    Specifically, Meta's researchers stated that they were "confident of a causal link between [seeing] Like counts and social comparison."

41

232.    An internal Meta email from 2020 noted that "we know from previous internal and external research that social comparison is linked to multiple negative well-being outcomes (e.g., increased loneliness, worse body image, and negative mood or affect) . . . ."

233.    A January 2020 study that Meta conducted noted that "[s]ocial comparison is . . . higher among younger than older people. Younger people are more susceptible to peer influence and social comparison."

234.    Just three months later, Meta conducted another internal study that revealed that:

- "About 1 out of 10 people experience negative social comparison on Instagram *often or always*" (emphasis in original);

- "About 1 in 4 people think that Instagram makes social comparison worse";

- "People receive about 5% as many Likes on their own posts as those they see on IG"; and

- "Seeing high Like counts is associated with feeling worse (more negative, less positive comparison)."

235.    Researchers at Meta documented that appearance-based comparison on Instagram was worse for teenagers and young adults compared to older adults, and worse for female users across all age groups 60 and under. The highest rates of negative appearance-based comparison on Instagram were for teen girls, aged 13 to 18.

236.    In an internal presentation from 2021, Meta employee ███████ noted that teens suffered from "constant negative comparisons" on Instagram because Meta recommended triggering content to them and continued showing them Like counts.

237.    Meta is aware that "66% of teen girls on IG experience negative social comparison," along with "40% of teen boys."

238.    Further, Meta knows from its own internal research that being exposed to Like counts on Instagram results in more negative comparison among users.

239.    Researchers at Meta noted in October 2020 that "[w]ithin every examined demographic group, seeing posts with more extreme Like counts (1M+) was associated with feeling worse: more negative social comparison . . . ."

240.     The same researchers recommended implementing design changes that had been tested in Project Daisy, an internal experiment conducted by Meta in 2020 "where hiding Like counts [on Instagram posts] led to decreases in negative social comparison." The researchers' report recommended hiding Like counts for the entire Instagram Platform, as Meta's researchers had done for a subset of Instagram users in the Project Daisy experiment.

241.     Meta carried out two pilot versions of Project Daisy: Pure Daisy (wherein the Like counts on all posts except one's own were hidden) and Popular Daisy (wherein the Like counts on posts from certain highly followed accounts were visible, but the Like counts on the average users' posts were hidden).

242.     Both Daisy programs successfully "reduced the negative impact of seeing posts with many Likes."

243.     Pure Daisy was more effective than Popular Daisy, but both reduced users' experiences of negative social comparison. Young users reported that hiding Like counts made them care less about the number of Likes that their posts had received.

244.     Meta knew that "social comparison on Fb and IG is highest among teens and young adults" and that Project Daisy "had a statistically significant impact on reducing the frequency of 'like' comparison for teens."

245.     Approximately 30% of teen girls also felt that "Instagram made dissatisfaction with their body worse."

246.     An internal Meta email from August 2020 noted that Project Daisy's removal of Like counts resulted in "less social comparison" and that "negative social comparison decrease[d] more over time" for Project Daisy participants.

247.     Indeed, a March 2020 internal document recognized that hiding Like counts may be an effective intervention to reduce social comparison for users in the United States.

248.     While Meta gathered data through Project Daisy demonstrating that removing visible Like counts improved user well-being, Meta also carefully tracked the effects of different variants of Daisy on key engagement metrics related to sessions and daily active users, as well as their impact on Meta's advertising revenue.

43

249.     Despite validating that removing the public quantification of Likes from its Social Media Platforms would decrease negative social comparison, including for young users, Meta did not remove the default display of Like counts for content viewed by young users on its Social Media Platforms.

250.     Instead, after assessing the impact of Project Daisy on user engagement and revenue—including an estimated 1% negative effect on Meta's advertising revenue—Meta's leadership decided not to implement Project Daisy as a default setting on Instagram or Facebook.

251.     As of October 2023, Like counts on all users' posts remain visible by default on Instagram and Facebook.

252.     Rather than removing visible Like counts for all users by default (the design change that had been tested and validated in Project Daisy), users who wish to hide Like counts from posts in their Instagram or Facebook Feeds must navigate submenus of preferences to affirmatively opt in.

253.     Meta could have, at a minimum, hidden Like counts for young users of Instagram and Facebook, but it declined to do so. Instead, Meta continues to show young users Like counts for all content in its Social Media Platforms by default.

254.     Meta's senior leadership admits that social comparison is a critical issue with serious consequences for its users, particularly for Instagram. Mosseri wrote in an internal email, "I see social comparison as the existential question Instagram faces within the broader question of whether or not social media is good or bad for people." Because of Instagram's "focus on young people and visual communication," its emphasis on beauty and fashion content, and a "marketing look and feel often biasing too polished," Mosseri reasoned that "social comparison is to Instagram [what] election interference is to Facebook."

255.     Although Meta is aware that negative social comparison is a problem for teens, and that seeing high Like counts on others' posts makes users feel worse, Meta continues to quantify and display social statistics such as Likes on its Platforms by default.

256.    Exacerbating the negative effect of visible Like counts is Instagram's selective display of more "popular" posts—the kind most likely to induce negative social comparison among teen users—as Meta's own studies have found.

257.    An April 2020 study explained:

> [R]anking algorithms may prioritize posts with more feedback, since feedback is one signal of the posts people want to interact with. Altogether, this means that people are more likely to see their friends' highest-feedback posts. If people compare the feedback they receive on their posts to the feedback their friends receive, they may overestimate their friends' popularity and feel worse by comparison.

258.    Meta's internal documents acknowledged that "[y]oung people perceive Instagram as a popularity contest" and "[t]o a great extent, social pressure is something built-in to the Instagram experience." In other words, "[t]he quest to create the most perfect and popular images is the central task in the game of Instagram."

259.    Additionally, Meta's internal documents reflected that "the mechanics of Instagram amplify the impact of social comparison."

260.    Further still, an internal Meta document reported that while social comparison occurs "online and offline," it is "amplified" on Meta's Social Media Platforms, with 40% of U.S. users surveyed suffering from social comparison, and 5% indicating they had a chronic issue with social comparison.

261.    Rather than implementing the design changes tested in Project Daisy, Meta chose to continue displaying Like counts and to continue prioritizing the display of "popular" posts. This choice was made, notwithstanding that some inside Meta "HUGELY pushed for Daisy" to be implemented.

262.    In an internal email from April 2021, Instagram's Head of Public Policy Karina Newton noted, "we have continued to get the advice [from experts] that we should have Daisy on by default for teens."

263.    Instead, Meta effectively abandoned Project Daisy, calling it "extremely low on the long list of problems we need to solve."

264.  Internally, Meta employees noted that Daisy "got stuck in a political war b[e]tw[een]n Fidji [Simo, then-Head of Facebook] + Adam [Mosseri] + Mark [Zuckerberg]."

265.  When discussing Meta's decision not to implement Daisy, Meta employees acknowledged that Mosseri put Meta "in an awful position" because he "publicly talked about [Daisy], [and] all but promised we'd do this." Indeed, in the context of discussing whether Like counts should remain visible at WIRED's annual conference on November 8, 2019, Mosseri publicly stated that "[w]e will make decisions that hurt the business if they're good for people's well-being and health . . . ."

266.  Through this and other similar statements, Meta falsely represented that it was committed to removing public Like counts from Instagram if it learned that doing so would help its users' well-being.

267.  Meta's representations did not accurately characterize Meta's response to Project Daisy. Instead, when Meta learned that visible Like counts were harmful for user well-being but connected to higher advertising revenues, Meta elected to retain the visible Like counts at the expense of user well-being.

268.  Meta employees internally admitted that providing Daisy merely as an opt-in control did not make Instagram safer for young users. For example, on January 20, 2021, Meta researchers explicitly acknowledged in an internal chat that making Daisy available as an opt-in setting rather than a default setting "won't actually be effective at reducing [social comparison]" and that an opt-in option "is highly unlikely to be useful."

269.  An August 6, 2021, internal Meta document discussing Daisy research noted that "[t]eens in the opt-out condition were significantly less likely to feel worse about themselves because of the number of likes other people received on their Instagram posts." But the research summary also found that "[t]eens are more likely to keep like counts hidden when by default it was hidden. [W]hen daisy controls are opt-in, only 0.72% of people choose to hide like counts, but when they're opt-out, 35% leave their like counts hidden."

270.  Additionally, on October 6, 2020, a Meta employee acknowledged that "the vast majority of [users] will not change the [default Daisy Controls] setting, so to me, the decision to

1  not [implement] Daisy means the default should be no Daisy." In other words, Meta knows that
2  making Daisy available as an opt-in rather than a default setting means Meta has not
3  meaningfully implemented Daisy.

4          271.    In an internal chat, Meta employees stated that "opt-in" controls "have low
5  adoption," and that when it comes to "mak[ing] it easier for teens to do what is good for them" on
6  Instagram, opt-in controls are like putting "junk food on [a] desk with a sign 'hey you have a
7  choice to eat it or not. Junk food is bad for you.'"

8          272.    In the same conversation, Instagram's Head of Instagram Public Policy Programs
9  stated: "Would LOVE i[f] we'd consider some controls not to be opt-in." An internal presentation
10 from June 2018 acknowledged that default options lead to "low intentionality" in users and such
11 "aspects of Facebook can make regulation [of time spent] difficult." The presentation indicated
12 that "Facebook could provide people support to regulate habitual use" by "reconsidering defaults,
13 and providing support for setting and pursuing goals.

14         273.    In a separate internal communication discussing potential changes to Instagram,
15 Meta employees candidly observed that the "youngest Instagram users have the fewest skills and
16 least experience to successfully navigate social media." Despite Meta's awareness of opt-in
17 settings being ineffective in general, and its awareness that young Instagram users in particular
18 struggle to navigate social media, Meta declined to implement Project Daisy as a default for
19 young users, only making it available to young users as an opt-in setting.

20         274.    An internal Meta chat message recounted that Instagram's Head of Public Policy
21 Programs presented "really good arguments" for "making Daisy default for teens," but that
22 Mosseri "quickly" declined this proposal in July 2021, citing concerns that making Daisy a
23 default setting for teens would validate the external "perception that 'likes' are bad for young
24 people."

25         275.    Ironically, Mosseri publicly touted Meta's work on Project Daisy as evidence that
26 Meta was making Instagram safer. For example, in September 2019, a Meta employee sent
27 talking points to Mosseri in preparation for his Today Show appearance that included among the
28 "Key Messages" that "well-being is my #1 priority," conceding that "[i]f it means people will use

47

1  [Instagram] less, ok if it makes people safer" and that, specific to hiding Like counts, Meta was

2  "[w]illing to make changes that will reduce the amount of time people spend on Instagram if it

3  makes them safer."

4      276.   In January 2020, a Meta employee noted:

5          I'm at the social impact summit where there's now a fireside chat
6          with Fidji [Simo] and Adam Mosseri. When Adam asked what he's
        most excited for in 2020, he listed three things. (1) delivering on
7          our promises to lead in bullying, (2) getting daisy out the door, and
        (3) while acknowledging they aren't sure if this is what they'll
        prioritize, he thinks it will be social comparison. Check check
8          check. Sounds like we are prioritizing the right things.

9      277.   Referring to Meta's failure to deliver on its promises related to well-being

10  initiatives, another employee responded: "I just hope this is more real than the well-being priority

11  for the FB App!"

12      278.   Similarly, a February 2020 internal document noted that "[D]aisy was announced

13  last year and is expected to be the primary marketing focus this year."

14      279.   A "Company Narrative" document from March 2021 listed Daisy as a "key story"

15  to land externally regarding Meta's efforts to improve user well-being. But while Meta planned to

16  present that "story" to external audiences, internally, Meta's leaders were ignoring researchers'

17  advocacy around Daisy's benefit for user well-being.

18      280.   As Meta's employees discussed internally, efforts to address negative social

19  comparison problems on Instagram and Facebook are hindered by Meta's overriding focus on

20  performance metrics, user engagement, and company revenue: "[T]he hardest part about shipping

21  stuff in [social comparison] is going to be organizational—like anything we want to ship is

22  probably going to hurt another team's metrics."

23      281.   Internally, Meta employees noted that projects like Daisy "can easily be impeded

24  by other agendas."

25      282.   Internal Meta communications acknowledged that any efforts to improve teen

26  safety and well-being would need to be accompanied by "retaining our focus on teen

27  engagement" (i.e., the key metrics that drive Meta's revenue).

28  

48

283.    Publicly, Meta made misleading statements regarding why Daisy was not implemented, falsely representing that Daisy was not as effective as Meta hoped it would be and downplaying the negative impact on engagement and revenue as influencing Meta's decision to abandon Daisy.

284.    A May 26, 2021 Meta blog post, titled "Giving People More Control on Instagram and Facebook," claimed that although the company tested Daisy "to see if it might depressurize people's experience on Instagram," Meta had decided not to implement it as a default because "not seeing like counts was beneficial for some, and annoying to others."

285.    Similarly, Meta's prepared talking points regarding Project Daisy stated that Meta was implementing Daisy as an opt-in feature because "[f]or some people, hiding public like counts helped people focus less on the number and more on the content, [but] for others it didn't really matter much."

286.    In late August 2021, Dr. Kristin Hendrix, then Head of Research at Instagram, noted that Meta should respond to a reporter's query regarding Instagram and teen mental health issues as follows: "[w]e tried with Daisy - it was a hypothesis based on research but ultimately didn't have as strong an impact as we'd hoped; shows that this is all very individualized and nuanced so we made it optional; trying it now with Nudges."

287.    Additionally, in an interview with press in May 2021 about why Meta did not implement Daisy as a default setting, Mosseri stated "there was very little impact and the result was neutral," and, therefore, Meta made Daisy an opt-in feature.

288.    Through these and other public statements, Meta falsely represented that Project Daisy was not implemented by default in Instagram and Facebook because Meta lacked evidence that the Platform changes tested in Project Daisy were beneficial to the mental health and well-being of its users—or because the impact of removing visible Like counts was too "individualized" to be beneficial as a default setting applicable to a general audience.

289.    In reality, Meta had repeatedly tested, validated, and documented that removing visible Like counts as a default would be generally beneficial for its users' mental health and well-being.

290.     One Meta researcher noted that Daisy "is one of the clearest things (supported by research) that we can do to positively impact social comparison and well-being on IG and we should ship it."

291.     On the same email thread, another Meta researcher wrote that social comparison was "shown (repeatedly) [to be] among the top drivers of well-being on FB and IG" and that "Daisy is such a rare case where a product intervention can improve well-being for almost everyone that uses our products."

292.     Internal researchers at Meta found that Daisy led to less negative social comparison for some users and no effect for others—but it was associated with a "small dip in engagement and revenue."

293.     Meta also knew that Daisy had "received overwhelmingly positive responses from policy makers, press, and academics alike."

294.     Despite possessing overwhelming evidence that removing visible Like counts would be beneficial for its users' mental health and well-being, Meta buried it as an opt-in feature, crafting a narrative for external events that included the message that Meta "didn't conclusively see this was a better experience for everyone."

295.     In internal Meta documents from March 2020, Meta's own researchers expressed concern that "statements like 'Daisy didn't improve well-being' are misleading," including because Daisy objectively *did* cause statistically significant improvements according to certain reliable measures of user well-being, even if it did not yield significant improvements on every measure of well-being.

296.     Meta also took painstaking measures to "manage negative reactions about us 'walking back' our progress to address well-being," including delaying announcing Meta's decision on Daisy "to separate it from Mental Health Awareness Month and avoid conflating Daisy with direct ties to mental health," even though Meta knew Daisy had direct, positive impacts on youth mental health. An email from August 2020 noted that "the recommendation is to develop a comms plan to roll back Daisy."

297.    Upon information and belief, Meta's employees who work on well-being initiatives have a different definition of success than Meta's leadership does; while the well-being team advocates for Meta to adopt certain measures (such as Daisy), Meta's leadership resists implementing those changes.

298.    For example, Meta researchers repeatedly advocated for removing Likes from Facebook and Instagram based on research on the impact of Likes on social comparison. Yet, they continually faced resistance from the company's leadership. One Meta employee remarked that if the company refused to implement Daisy despite existing research on its positive effects on well-being, they were "doubtful" that Meta would implement "any broad product changes with the purpose of improving user well-being."

### 6.    Meta's use of disruptive audiovisual and haptic notifications interferes with young users' education and sleep.

299.    Meta's Social Media Platforms use incessant notifications that recall young users' attention back to the Social Media Platforms when they are engaging in unrelated activities, such as attending school.

300.    For example, by default, Instagram frequently delivers notifications to young users' smartphones, which Meta knows increases the amount of time and the frequency with which young users interact with Instagram.

301.    By default, Instagram employs a range of notifications when the application is installed on a smartphone. These include haptic alerts (vibration or pulse), banner notifications, sound notifications, badge notifications (persistently displayed red indicator encircling a number representing certain events that have not yet been viewed by the user), and email notifications.

302.    These notifications are disruptive for all users but are especially intrusive and harmful for young users, who are particularly vulnerable to distraction and psychological manipulation.

303.    Meta sends notifications to users, which trigger audiovisual and haptic alerts on users' smartphones, when other users on the Platform take any of the following actions:

- Following the user;

- Going Live (i.e., starting a live broadcast);
- Liking or commenting on the user's posts;
- Mentioning the user in a comment or tagging the user in a post; or
- Sending the user a message.

304.    Internal company documents outline Meta's strategy of pursuing "Teen Growth" by "leverag[ing] teens' higher tolerance for notifications to push retention and engagement."

305.    Meta knows that these notifications are psychologically harmful to young users, despite young users' high tolerance for notifications.

306.    For example, an internal Meta document discussing "Problematic Facebook Use" stated that "smartphone notifications caused inattention and hyperactivity among teens, and they reduced productivity and well-being."

307.    The alerts enabled by default on Instagram are designed by Meta to increase engagement by its users, including young users, by taking advantage of well-understood neurological and psychological phenomena, including the use of sounds and vibrations to trigger dopamine releases and other physiological responses.

308.    In June 2020, Meta's "research priorities" regarding youth on Instagram included studying the question: "[h]ow can notifications re-engage less active users with Instagram?"

309.    Meta has employed notifications across its Social Media Platforms to drive increased user engagement.

310.    Sean Parker, founding president of Meta, explicitly acknowledged this:

> The thought process that went into building these applications, Facebook being the first of them . . . was all about: "[h]ow do we consume as much of your time and conscious attention as possible?" That means that we need to sort of *give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post* or whatever. And that's going to get you to contribute more content and that's going to get you . . . more likes and comments. It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators—me, Mark [Zuckerberg], Kevin Systrom on Instagram, all of these people—understood this consciously. And we did it anyway.

311.     As Meta knows, young users are particularly susceptible to these techniques and find it hard to resist applications that send them frequent and persistent alerts.

312.     In a November 2019 internal presentation entitled "IG Notification Systems Roadshow," Meta's employees acknowledged that some of its users are "overloaded because they are inherently more susceptible to notification dependency." Despite acknowledging users' concerns that Instagram's push notifications had the potential to "constantly harm . . . mental health," the presentation did not propose any product changes to protect young users' mental health—and instead deferred the "harmful effect on teen usage" for further investigation.

313.     Researchers have documented how these notifications, including Likes on Instagram, have an impact on the brain similar to the effect of taking stimulating drugs:

> Although not as intense as [a] hit of cocaine, positive social stimuli will similarly result in a release of dopamine, reinforcing whatever behavior preceded it . . . . Every notification, whether it's a text message, a "like" on Instagram, or a Facebook notification, has the potential to be a positive social stimulus and dopamine influx.[13]

314.     Young users frequently re-open and re-engage with Instagram repeatedly throughout the day and at night when prompted to do so by the alerts and notifications they receive from Instagram on their smartphones.

315.     By sending notifications to young users, Meta causes young users' smartphones to produce audiovisual and haptic alerts that distract from and interfere with young users' education and sleep.

316.     Meta defaults young users into receiving notifications on Instagram and Facebook, despite its knowledge that "[i]n academic experiments, smartphone notifications caused inattention and hyperactivity among teens, and they reduced productivity and well-being."

317.     While users can technically disable notifications, Meta knows that requiring users to opt out of receiving notifications greatly reduces the likelihood that they will do so. In addition, many users reported that changing notification settings was "not . . . easy to do."

---

[13] Trevor Haynes, *Dopamine, Smartphone & You: A Battle for Your Time,* Harv. Univ. SITN Blog (May 1, 2018), https://archive.ph/9MMhY.

318.    An email chain from late 2017 and early 2018 including Mosseri and other Meta executives discussed significant declines in U.S. engagement metrics. In those emails, Meta employees discussed how reductions in notifications are associated with decreases in engagement metrics. One Meta employee expressly stated that the company faces a trade-off between "[p]reserving a better notification experience for people" and "[r]ecovering US DAP [Daily Active People] impact."

319.    In other words, Meta knows that when design changes to its Social Media Platforms cause more notifications to be sent to users, user engagement increases, and when design changes to its Social Media Platforms cause fewer notifications to be sent to users, user engagement decreases.

320.    In the same email thread, Facebook Chief Product Officer Chris Cox stated, "[i]f we think that the filtered [notification] experience is better for people, I feel strongly that we shouldn't revert this because a metric is down. The heart of the matter is that we need to get better at making the harder decisions where the metric isn't the main decision criteria: the experience is."

321.    Then-Vice President of Analytics Alex Schultz added, "fundamentally I believe that we have abused the notifications channel as a company."

322.    The final few emails on the chain from then-Facebook Product Management Director for Growth Andrew Bocking end the discussion—Meta chose to prioritize engagement over reducing notifications: "just got clear input from Naomi [Gleit] that US DAP [Daily Active People] is a bigger concern for Mark [Zuckerberg] right now than user experience," and "we just got a very clear and strong message from Mark that DAP [Daily Active People] (and specifically US DAP [Daily Active People]) is **extremely** important and we **must** change the trajectory from the negative one."

323.    An internal research document from March 2021 acknowledged that Meta's "current notification controls do not enable enough agency" in users.

324.    In fact, Meta has long known that "notifications with little or no relevance" to the user and "constant updates including Like counts" constitute "rewards [that] are unpredictable or

lacking in value." In June 2018, an internal presentation called "Facebook 'Addiction'" proposed that Meta reduce such notifications to curb problematic use in users.

325.    Even so, Instagram does not offer users a setting to permanently disable all notifications on Instagram at once. At most, users can opt to pause all notifications for up to 8 hours at a time. Users seeking to permanently disable all notifications must disable each category of notifications one by one.

326.    After users disable notifications, Meta pressures such users to reinstate notifications when they use Instagram. For example, Meta periodically sends a user the below nudge message after a user disables notifications on their smartphone and subsequently logs onto Instagram through a web browser:



327.    Upon information and belief, the wording of the "Turn On" and "Not Now" options is designed to pressure users, including young users, to revert to the default notification settings even after they have attempted to disengage from Instagram by turning those notifications off.

328.    Relatedly, Meta researchers know that its Social Media Platforms' features interfere with young users' sleep. As one data scientist noted: "honestly the only insight I see in

these charts is that teens are really into using IG at 11pm when they probably should be sleeping [sad face emoticon]."

329.     Through notifications and other features, Meta's Social Media Platforms are designed to maximize user time, addict and re-addict users (including young users), and effectively mandate that a user's experience is on Meta's revenue-maximizing terms, even when users attempt to modify their own behavior to reduce the time they spend on Instagram.

330.     Publicly, Meta touts its Social Media Platforms' time management "tools," creating the misleading impression that Meta's Social Media Platforms are designed to empower users' efforts to self-limit the duration and frequency of their social media use.

331.     For example, on August 1, 2018, Meta published a post online titled "New Time Management Tools on Instagram and Facebook" that described "new tools to help people manage their time on Instagram and Facebook" because Meta purportedly "want[s] the time people spend on Instagram and Facebook to be intentional, positive and inspiring."

332.     Meta's public representations concerning its time management tools are deceptive in light of Meta's choice to default users, including young users, into a barrage of smartphone alerts that incessantly recall them to the Social Media Platforms and then pressure young users to revert to those defaults when they attempt to opt out.

### 7.     Meta promotes Platform features such as visual filters known to promote eating disorders and body dysmorphia in youth.

333.     As referenced above, Meta also deceives the public by representing in its public communications that its Social Media Platforms do not allow content that promotes or encourages eating disorders—all while actively choosing to retain Platform features known by Meta to promote those very disorders, despite expert warnings about the resulting harms to young users.

334.     For example, on September 30, 2021, Meta executive Davis denied that Meta promotes harmful information, such as information that promotes eating disorders, when testifying before Congress, stating: "[w]e do not direct people towards content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and remove it."

335.    Davis also testified that for teen girls struggling with "loneliness, anxiety, sadness, and eating disorders," they "were more likely to say that Instagram was affirmatively helping them, not making it worse."

336.    Davis also testified that Instagram "work[s] with experts to help inform our product and policies" around eating disorders. Meta publishes this same statement in a section devoted to "[e]ating disorders" and "negative body image" in its "parent and guardian's guide to Instagram," which it makes available on its website.

337.    Generally, and as described above, Meta falsely represents to the public that Meta does not prioritize user engagement or Meta's profits over young users' safety.

338.    In contrast to its public claims, Meta's internal communications reveal that it prioritizes engagement and profits to the detriment of young users' well-being.

339.    One such example is Meta making visual filters that simulate facial plastic surgery available to young users on its Social Media Platforms.

340.    Meta's leadership (including Instagram's former Head of Policy Newton) came to understand that Meta was "actively encouraging young girls into body dysmorphia" with these filters. Meta leaders communicated these concerns about the "severe impacts" of these filters on users' mental health to Zuckerberg.

341.    Zuckerberg, however, dismissed these concerns, which were raised by multiple employees.

342.    In November 2019, Margaret Gould Stewart, Meta's then-Vice President of Product Design and Responsible Innovation, initiated an email conversation, with the subject "[Feedback needed] Plastic Surgery AR Effects + Camera Settings Policies," addressing recipients including Andrew Bosworth (Meta's Chief Technology Officer), Mosseri (Head of Instagram), Fidji Simo (then-Head of Facebook), and Newton.

343.    Gould Stewart described a "PR fire" in mid-October 2019, stemming from "selfie" camera filters on Meta's Platforms that simulated plastic surgery.

344.    This included public allegations that Meta was "allowing the promotion of plastic surgery," including to Instagram's youngest users.

345. Meta's initial response to the public backlash was to institute a temporary ban on the camera filters.

346. Gould Stewart recommended that this ban be made permanent.

347. Gould Stewart distributed a briefing memo to these senior leaders detailing the "significant concerns" raised by "global well-being experts . . . about the impact of these effects on body dysmorphia and eating disorders," especially for teenage girls.

348. In a separate communication, Gould Stewart urged Meta's leadership that "when it comes to products or technology that are used extensively by minors (under 18) I do believe we have an obligation to act more proactively in mitigating potential harm . . . ."

349. The briefing memo noted that a potential option to limit the filters to only users who were 18-years-old and older would not be effective because Instagram's age-gating procedures were inadequate, such that "minors will still have access to the filters, especially on IG." The document reminded Meta's senior leaders that academic researchers had demonstrated that "Facebook and Instagram use is associated with body image issues and anxiety among users and particularly among women and teenage girls." The document warned that long-term studies of the effects of such filters "likely will not be available before the potentially damaging impact to user wellbeing manifests."

350. Newton agreed with the recommendation to extend the ban, expressing concern that these filters were "actively encouraging young girls into body dysmorphia and enabling self-view of an idealized face (and very western definition of that face by the way) that can result in serious issues."

351. Newton further noted that "outside academics and experts consulted were nearly unanimous on the harm here."

352. A meeting with Zuckerberg to discuss the matter was then scheduled for April 2, 2020, and a "Cosmetic Surgery Effects Pre-Read" document was prepared and circulated in anticipation of that meeting.

353. The "pre-read" detailed Meta's consultation with "21 independent experts around the world," finding that "[t]hese extreme cosmetic surgery effects can have severe impacts on

58

both the individuals using the effects and those viewing the images." Experts told Meta that "[c]hildren are particularly vulnerable" to these impacts, in addition to "those with a history of mental health challenges [and] eating disorders[.]" The memo also included Meta's review of academic research on the negative effects of edited images on viewers' satisfaction with their own bodies, as well as anecdotal evidence that "editing one's own selfie images could activate desire for cosmetic surgery."

354.    In addition to noting the experts' "agree[ment] that these effects are cause for concern for mental health and wellbeing, especially" for women and girls, the memo noted that continuing the ban may have a "negative growth impact" on the company.

355.    On April 1, 2020, one day before this meeting was to take place, it was canceled.

356.    Rather than rescheduling the meeting, Zuckerberg vetoed the proposal to ban camera filters that simulated plastic surgery.

357.    Zuckerberg dismissed concerns about the filters (from the public, from experts, and from his own employees) as "paternalistic."

358.    Zuckerberg stressed that there was a "clear[] demand" for the filters, and wrongly asserted that he had seen "no data" suggesting that the filters were harmful.

359.    In reality, Zuckerberg was provided the "pre-read" document, detailing expert consensus on "the dangers these filters have in advancing unrealistic beauty standards and impacting mental health and body image," and he continued to receive information from colleagues summarizing the harmful nature of the plastic surgery filters.

360.    A follow-up memo sent to Zuckerberg before he gave a final order to end the ban noted that the cosmetic surgery filters could have disproportionate impacts for children and teen girls.

361.    After Zuckerberg rejected the proposal to permanently ban plastic surgery simulation camera filters, Gould Stewart wrote to Zuckerberg, "I respect your call on this and I'll support it, but want to just say for the record that I don't think it's the right call given the risks . . . I just hope that years from now we will look back and feel good about the decision we made here."

1      362.    Gould Stewart left Meta in November 2022.

2      363.    As of October 2023, these filters remain available on Instagram. While

Zuckerberg's decision to stand behind the harmful filters was made despite expert and Meta staff

opinion, Meta attempted to avoid press scrutiny and backlash in how it presented this decision.

364.    In addition to the plastic surgery filters, Meta offers other camera filters that it

knows result in negative appearance comparison. Internal studies show that with Stories, "sharing

or viewing more filtered selfies (i.e., that had a color filter or camera AR effect) was associated

with increased negative comparison." In 2021, Meta researchers recommended that Meta

"[p]rioritize authenticity," along with "fun/interactive filters over beautification," to facilitate

users "[m]aintaining [s]elf [e]steem."

365.    In fact, Meta conducted a focus group of girls and women ages 13 to 21 in a Bay

Area city who use Instagram and had issues with their self-confidence. This took place in March

2020, just a month before Zuckerberg rejected the proposal to permanently ban plastic surgery

simulation camera filters. Meta employees analyzing the focus group data concluded that "run of

the mill [camera] effects" as opposed to "silly" or "over the top" effects "were the most

problematic because they (1) were realistic . . . and (2) seemingly attainable[.]"

366.    A significant percentage of teen Instagram users who shifted their time to other

social media platforms reported that there was too much pressure to look perfect on Instagram.

367.    Despite this feedback from users, Meta persists in making beautification and other

camera filters available to young users, and has even discussed proposals to make "enhancement

filters" such as a "skin smoothing" effect a so-called "sticky setting," which would be

automatically applied when users opened the camera after having used the filter once.

368.    And although Meta knows from user feedback, internal research, and academic

experts that use of these types of filters on its Social Media Platforms was associated with body

image issues, body dysmorphia, and decrease in teen well-being, it continued to misrepresent to

the public that Instagram helped teen girls struggling with mental health and eating disorders.

Davis falsely denied to the public and lawmakers that Meta promotes and makes available content

1  associated with eating disorders, when in fact, Meta's own Platform features are associated with
2  body image issues related to eating disorders.

3     **8.     Meta offers features that it claims promote connection between friends, but**
4        **actually serve to increase young users' time spent on the Platform.**

5     369.    In 2016, Meta analyzed the effectiveness of several features that garner and
6  maintain teen engagement. This analysis included its "buddy lists" feature, which shows users
7  how recently their friends have been online (e.g., "Last active 14 minutes ago").

8     370.    Another Meta feature from 2016 that encourages young users to continuously
9  engage with Instagram is the "multiple accounts" function, which allows users to register up to
10 five accounts without having to log out of any one account to access another.

11    371.    This multiplies the number of unexhausted personalized Feeds vying for young
12 users' attention. Teen users with multiple accounts also have a higher probability of being
13 exposed to harmful content.

14    372.    Meta encourages teens to have multiple accounts and seeks to extract the
15 maximum value from those accounts. For example, in 2019, an internal chat indicated that Meta
16 hoped teens would "feel more comfortable sharing and engaging" with multiple accounts in order
17 to "drive up" engagement (Daily Active People) and signal to "younger teens who are coming
18 onto the platform" to do the same. Meta Data Scientist (and currently Director of Data Science at
19 Meta) _____ suggested that Meta should consider targeting those secondary accounts "with
20 more upsells." Instagram's Senior Director of Project Management _____ concluded that it
21 would be a "promising strategy" for Meta to "prioritize" and promote multiple accounts to teens
22 by "increas[ing] awareness and value of multiple accounts." An internal chat from July 2021
23 revealed that Meta uses its algorithms to "boost[]" teens in "suggested users," so that teens get
24 more followers and increase their time spent on the Platform. This practice was a longstanding
25 one at Meta, as a 2018 chat references "increasing engagement" of "teens by driving more
26 connections."

27
28

61

Complaint for Injunctive and Other Relief

**9.    Through its Platform features, Meta discourages young users' attempts to disengage, notwithstanding Meta's representations to the contrary.**

373.    Meta employs design features, including but not limited to infinite scroll, autoplay, push notifications, and ephemeral content, that work to override young users' attempts to disengage from Meta's Social Media Platforms. These tactics, which are wholly within Meta's control, make it difficult for young users to cease engagement with Meta's Platforms— independent of the content with which the users interact.

374.    Meta has long denied that its Social Media Platforms are designed to be addictive. In July 2018, Meta told the BBC that "at no stage does wanting something to be addictive factor into" the design process for its Platforms.

375.    On September 30, 2021, Davis testified before Congress that Meta does not build its Platforms to be addictive and disputed the addictive nature of Meta's Platforms.

376.    However, through its design features, Meta ensures that young users struggle to disengage from its Social Media Platforms.

377.    The infinite scroll system, for example, makes it difficult for young users to disengage because there is no natural end point for the display of new information. The Platforms do not stop displaying new information when a user has viewed all new posts from their peers. Instead, the Platform displays new content and suggests relevant information that has yet to be viewed, provoking the young users' FOMO.

378.    As the inventor of infinite scroll noted about the feature's addictive qualities, "[i]f you don't give your brain time to catch up with your impulses . . . you just keep scrolling."

379.    Meta also deploys the autoplay feature to keep young users engaged on its Platforms. An internal document from June 2018 warned that "stories or videos that autoplay" can constitute "cues for Facebook use that influence people's behavior based on automatic tendencies, when they don't want to be using Facebook."

380.    In August 2021, Meta notified its staff that YouTube turned off autoplay for users under the age of 18. The following chat ensued between two Meta researchers: "▮▮▮▮▮▮▮:

1   'Turning off autoplay for teens seems like a huge move! Imagine if we turned off infinite scroll

2   for teens.'                      : 'Yeah, I was thinking the same thing. Autoplay is HUGE.'"

3       381.    Much like infinite scroll, the autoplay feature encourages young users to

4   continuously engage on the Platform because it provides them with an ongoing supply of content.

5       382.    As commentators have observed, "it's the way Instagram encourages you to watch

6   Stories at every turn that makes them addicting":

7           Stories are the first thing you see when you open the app—they're
            housed at the top of the screen—but they also periodically show up
8           in the middle of scrolling through your feed . . . . And once you're
            watching one person's Story, you're automatically shepherded into
9           the next person's Story without ever even leaving the interface.

10      383.    Meta also designed Reels with the infinite scroll feature to maximize the amount

11  of time that users spend on the Platform.

12      384.    Facebook and Instagram Reels automatically and perpetually play as the user

13  swipes the screen up to the next video. The short-form nature of Reels discourages users from

14  navigating away or closing the app.

15      385.    Other aspects of Reels, including the placement of the Like, "comment," "save,"

16  and "share" buttons on top of the video, reduce or prevent interruption and keep the user

17  constantly viewing the video. Upon information and belief, Reels were designed by Meta to target

18  young users' categorically short attention spans and as an "aggressive and promising" solution to

19  "neutralize the threat" from TikTok in overtaking Meta in total user engagement.

20      386.    An email to Zuckerberg from May 2020 indicated "we are very worried about

21  Tiktok's growth so far and their trend-line projections which would have them overtaking

22  Instagram in the US in terms of total TimeSpent. Our current Lasso strategy is unfortunately not

23  working fast enough."

24      387.    Meta also uses design features, including ephemeral content, to induce a sense of

25  FOMO in young users and keep them engaged on the Platforms.

26      388.    Ephemeral content on Meta's Social Media Platforms is content temporarily made

27  available to users with notifications and visual design cues indicating that the content will soon

28  disappear.

389.     Meta designed ephemeral content features in its Social Media Platforms, such as Stories or Live, to induce a sense of FOMO in young users.

390.     Unlike content delivery systems which permit a user to view existing posts on a schedule convenient for the user, content released through Live is only available in real-time—such that a young user's failure to quickly join the livestream when it begins means that the user will miss out on the chance to view the content entirely.

391.     An executive summary circulated to Sandberg in 2016 regarding Live content indicated the goal "to drive substantial watch time via Live" and the "emphasis on partners to appeal to teens."

392.     Meta made significant investments in making content on Live appeal to young users and increase time spent on Meta's Platforms. For example, in an attachment sent to Sandberg in 2016, a Meta employee wrote that Meta planned to "incentivize top creators and experts to publish high quality and high frequency Live [content]," and that "Live content alone is likely not enough to beat YT [YouTube] watch time . . . ." Accordingly, the employee recommended, "[t]o drive substantial watch time via Live, we'll need to broaden the program beyond partner deals to allow a much broader set of partners to monetize[.]" The employee also noted that "this set of partners would generate 9.5M[illion] viewer hours/day and ~$203M[illion] in gross ad revenue" and that Meta would launch Live with "75-100 global partners, prioritized by . . . [e]mphasis on partners who appeal to teens and map to key topic areas," such as "digital stars w/teen focus[.]"

393.     Meta could make Live videos and Stories available for viewing days or weeks after they are created; instead, Meta chooses to use ephemeral content features to induce in its young users a sense of urgency or FOMO.

394.     Meta similarly designs its Messenger Platform with ephemeral content features: for example, users can enable Vanishing Mode in which messages disappear when the user exits that mode.

395.     Internal research found that FOMO-induced usage of Meta's Platforms results in harm to young users. For example, young girls are particularly vulnerable to bullying and harmful

64

1    interactions "potentially due to their unwillingness to limit interactions due to fear of missing out

2    on connections, their optimism, and (sometimes) lack of concern regarding their privacy online."

3         396.    An October 2019 internal presentation entitled "Teen Mental Health Deep Dive"

4    discussed the findings from a survey of over 2,500 teenagers who use Instagram on at least a

5    monthly basis.

6         397.    Among the researchers' conclusions was the finding that "[y]oung people are

7    acutely aware that Instagram can be bad for their mental health, yet are compelled to spend time

8    on the app for fear of missing out on cultural and social trends."

9         398.    Other Meta documents acknowledge this problem, noting that over half of

10    Instagram's teen users report struggling with FOMO.

11         399.    Nonetheless, Meta actively considers ways to leverage FOMO to induce young

12    users to spend more time on the app.

13         400.    For example, in 2021 a user experience researcher observed that direct messages

14    on Instagram "were not urgent (especially compared to other apps like Snapchat)" and "consisted

15    mainly of videos and memes from friends which could be watched at [a user's] leisure." The

16    researcher then noted that "we need to develop new products that increase the possibilities for

17    time-sensitive interactions on [Instagram] that can also be linked to Close Friends (e.g. Events,

18    ephemeral Memories, Birthdays)."

19         401.    Meta's use of ephemeral content features to cultivate FOMO and exploit

20    psychological vulnerabilities in young users belies Meta's deceptive statements that it prioritizes

21    young users' well-being.

22         402.    In fact, Meta was aware of the addictive qualities of its Platform features. In May

23    2020, Meta conducted an internal presentation called "Teen Fundamentals" highlighting certain

24    vulnerabilities of the teenage brain.

25         403.    The presentation discussed teen brains' relative immaturity, and teenagers'

26    tendency to be driven by "emotion, the intrigue of novelty and reward."

27         404.    The presentation asked how these characteristics "manifest . . . in product usage,"

28    noting that "the teenage brain happens to be pretty easy to stimulate" and that teens' desire for

novelty "manifests itself in three behaviors that especially lend themselves to social media - exploration, discovery and experiences."

405. With respect to exploration, the presentation stated that "slow or repetitive content is a buzzkill" for teens' "novelty seeking mind." It further described Instagram as "deliver[ing] [teens] a dopamine hit" every time a teen "finds something unexpected" on the app, fulfilling their brains' "insatiable" need for "'feel good' dopamine effects," to which "teen brains are much more sensitive."

406. Meta was thus well aware that "[t]een brains are much more sensitive to dopamine" compared to adult brains.

407. The presentation also noted that teens often go down "rabbit holes" because of the "especially 'plastic'" nature of their brains, and asked how Instagram could satisfy "teen[s'] insatiable appetite for novelty" through features on the app. The presentation further discussed teens' "increased sensitivity" and "concerns about being judged," along with teens' desire for reward, which "makes them predisposed to impulse, peer pressure, and potentially harmful risky behavior."

408. Because "[a]pproval and acceptance are huge rewards for teens," the presentation continued, "DMs, notifications, comments, follows, likes, etc. encourage teens to continue engaging and keep coming back to the app." The presentation noted that teens were turning to competitor Platforms to meet some of the needs discussed in the presentation, and it cautioned that Meta would "do well to think hard about how we can make IG an app tailored to the teenage mindset."

409. A different internal Meta document noted that Meta has the following "opportunities" to maximize teen engagement:

> [S]tronger paths to related interest content (i.e. suggestions for IGTV videos, a discovery surface for collections, etc.); for interest-related search results include people, places hashtags, collections, products and causes to facilitate browsing all we have to offer; invent new interaction types that produce a feeling of shared experience amongst friends such as co-creation, perspective sharing, games, etc.

66

410.   Many of Meta's design features—audiovisual and haptic alerts, infinite scroll and autoplay, ephemeral content features, quantification and display of Likes, and highly refined algorithmic sequencing of content feeds—overwhelm that dopamine sensitivity known by Meta to exist in young users' developing brains.

411.   These features induce young users' engagement with Meta's Platforms, and the effect of these use-inducing mechanisms is cumulative because they act in concert.

412.   By creating and refining these features, Meta has succeeded in making it difficult for young users to resist spending extended time on its Platforms.

413.   The features create a feedback loop that is integral to Meta's current business model.

### 10.   Meta knows its Platform features are addictive and harmful, but misrepresents and omits this information in public discourse.

414.   Meta understands the cyclical and harmful nature of its psychologically manipulative features, but persists in subjecting young users to those features, choosing to downplay and deny the harmful aspects of its Platforms instead of correcting those problems.

415.   During a congressional hearing on March 25, 2021, Zuckerberg stated he did not believe Meta's Platforms harm children. Instead, Zuckerberg suggested that Meta's Platforms are good for teens and adults alike because they "help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do."

416.   But Zuckerberg has long been aware that Meta's Social Media Platforms are harmful, especially for young users. In 2016, Zuckerberg participated in a Q&A at which a mother asked about "how her daughter feels worse about herself after using Instagram." After the event, Meta researcher ███████ sent an email to Zuckerberg stating, "thought you'd be interested in some of the relevant research our team's done on social comparison" showing that "4% of feed stories trigger negative social comparison" and 39% of Facebook users have felt negative social comparison in the past month.

417.   Likewise, in April 2019, Meta's own researchers directly told Zuckerberg that passive consumption of social media content, including scrolling, browsing, and watching videos,

67

is associated with negative effects on well-being. Due to emerging findings about this association, Meta employees recommended additional funding to study the issue, which was ultimately denied.

418.    In 2019 and 2020, Zuckerberg and Mosseri met multiple times with Jonathan Haidt, a New York University professor studying the effects of social media on teens' mental health. Haidt emphasized to Zuckerberg his concerns regarding Meta's Platforms and its effects on "teen girls, whose rates of depression and self-harm have increased the most." Zuckerberg's executive assistant and other Meta staff briefed him that Haidt planned to ask what the company was doing to study and address this issue. But the talking points Meta prepared did not include the company's adverse findings. Haidt recalled that "[i]t was not suggested to me that they had internal research showing a problem."

419.    At the March 25, 2021 congressional hearing, Zuckerberg was asked whether passive consumption of social media content, like that promoted by Instagram's infinite scroll, harmed children's mental health. Zuckerberg refused to give a yes or no answer, even though many Meta researchers had established that passive consumption of social media content harms mental health. Zuckerberg again played up the benefits of Meta's Platforms to the committee, stating that "[o]verall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely." Zuckerberg made this statement despite being given talking points on the negative effects of passive consumption on mental health to prepare for the congressional hearing.

420.    Meta employees admit that features like Reels and Stories encourage passive consumption. In one internal exchange, Meta employees deride a documentary that discusses problematic social media use ("The Social Dilemma") but go on to say that "Reels seems to be everything they denounce in the stupid documentary, and everything we know from our research: passive consumption of an endless feed, without any connection to the content creator." Meta knows that young users dislike passive consumption sessions on Meta's Platform.

421.    Meta's research about the negative impact of passive consumption is well known inside the company and to senior executives. Talking points provided to Sheryl Sandberg in advance of an interview with journalist Katie Couric provide responses to whether Facebook is designed to be addictive. Based on its own research, Meta found that "passive consumption – passively watching videos, [and] scrolling [is] not associated w[ith] well-being [and is] more negative psychologically" compared with "active engagement."

422.    An internal presentation on well-being from March 2019 showed that Meta knew that at least 36% of U.S. users surveyed indicated that they were struggling with loneliness (7% considered "chronic") and that while "people who are already feeling lonely" turn to Meta's Platforms to feel better, reducing use of Meta's Platforms "can improve loneliness."

423.    The same presentation shows that Meta knows social media can be helpful for youth well-being when the use is "moderate." But the same document concludes the "average net effect" of Meta's Platforms on its users is "slightly negative."

424.    Some Meta employees have recommended hiding and censoring specific information about teen mental health. In an internal chat from 2021, Meta employees suggest censoring terms such as "mental health" in internal documents that "might become public" to avoid scrutiny.

425.    In May 2021, Mosseri told reporters that the research he had seen suggested Instagram's effects on teen well-being are likely "quite small," as reported by the Wall Street Journal that September. Yet by that time, Mosseri had been apprised of many of the significant harms teens experienced from using Instagram.

426.    In September 2021, other Meta employees expressed criticism and concern towards the company for emphasizing that research into social media's impact is inconclusive, when in fact Meta had conducted research on this issue with more definitive findings. An employee stated that Meta's portrayal of the research as inconclusive would be akin to representations of tobacco companies, which similarly relied on uncertainty in scientific studies to deny that cigarettes caused cancer.

427.     Externally, Meta's leadership continued to be evasive about the company's research. On December 8, 2021, Mosseri told Congress, "I don't believe that research suggests that our products are addictive."

428.     As Newton acknowledged in an internal email from May 2021, "it's not 'regulators' or 'critics' who think [I]nstagram is unhealthy for young teens—it's everyone from researchers and academic experts to parents. [T]he blue print of the app is inherently not designed for an age group that don't [sic] have the same cognitive and emotional skills that older teens do."

429.     Through these and other misrepresentations to young users, Congress, and members of the public regarding the negative effect its Platform features have on young users' mental health—as well as Meta's purported prioritization of teen well-being and safety over profits—Meta deceives the public about the qualities, nature, and effects of its Social Media Platforms.

### 11.     Meta makes its Platforms and associated harmful features available to especially young and vulnerable users.

430.     Meta is aware that teens, preteens (also known as tweens), and even younger children use its Platforms, including Instagram, and has intentionally developed and marketed those Platforms towards these young users.

431.     Meta knows that it continues to harm young users because Meta's design features have clear and well-documented harms to young users.

432.     Meta's decision to expose young users to this combination of features and implementation of those features—knowing that they are effective because they are psychologically manipulative and knowing that they are harmful for young users—constitute unfair acts or practices that are impermissible under the law.

433.     Meta exposes users under age 13 to these psychologically manipulative design features.

434.     A study cited by Meta in response to a congressional inquiry shows that 81% of parents report that their children began using social media between the ages of 8 and 13.

435.    Meta knows that a significant portion of preteens (at least 11% of 9 to 11-year olds) use Instagram.

436.    Meta briefed Zuckerberg as early as 2017 that children under the age of 13 "will be critical for increasing the rate of acquisition when users turn 13," and recommended "focus[ing] on building [its Platforms] for tweens."

437.    Even though Instagram is nominally restricted to those who are 13 years and older, Meta is aware that many users lie about their age when they sign up for Instagram, that "users under 18 lie about their age far more often than adults," and that millions of its users are under the age of 13.

438.    Meta deceives the public regarding its policies when underage accounts are reported. If someone reports that an account belongs to an individual under the age of 13, Instagram's Help Center claims that "[w]e will delete the account if we can't verify the account is managed by someone over 13 years old." Meta also has prepared talking points stating that the company requires users "to prove they are over 13 in order to regain access to their account" after it has been reported as belonging to an underage user. Zuckerberg told Congress on March 25, 2021, "if we detect that someone might be under the age of 13, even if they lied, we kick them off."

439.    Meta also knows that teens can "opt-out of default settings or change their age at any point to gain more access to different features." However, even though Meta targets children under the age of 13, Meta employees go to great lengths to maintain plausible deniability that Meta is aware of children under the age of 13 on Instagram.

440.    For example, in 2018, Meta employees considered commissioning a study on bullying on Instagram. Instagram's director for communication regarding well-being and community initiatives, Fiona Brown, expressed concern that the study's survey would go to children under the age of 13 and that Meta would learn children under the age of 13 were being bullied on Instagram.

441.    Meta's interest in preteens is unsurprising as Meta has historically regarded children between the ages of 10 and 12 as a "valuable but untapped audience."

442.    Meta formed an internal team to study preteens and commissioned strategy papers to analyze the long-term business opportunities presented by preteens.

443.    In an internal presentation titled "[t]he internet wasn't built with young people in mind, but we're about to change that," Meta presented its vision of the future in which Meta would specifically design its Platforms tailored to children as young as six years old.

444.    Meta believes children to be such a strategically lucrative class of users that it also planned to create a new Instagram Platform for children under 13 called "Instagram Kids."

445.    News of Instagram Kids was leaked, however, before Meta released the Platform.

446.    After receiving intense scrutiny and backlash from State Attorneys General and Congress about Instagram's effect on young people's mental health, Meta "pause[d]" development of the Instagram Kids service.

447.    Nonetheless, Meta has made statements internally and publicly continuing to make the case for Instagram Kids and suggesting an intent to resume development and deployment of Instagram Kids in the future.

448.    Meta's external narrative around its proposed Platforms for users under age 13 was misleading because Meta claimed it would prioritize "safety and privacy" of kids under age 13 in versions of Instagram, including in a statement issued to the press and reported by CNBC on May 10, 2021, when internal documents reveal that Meta was focused on driving engagement of this age group and how to ensure these children would "age up" to Instagram and Facebook.

449.    ███████████ wrote to Mosseri in September 2021 that Meta should launch a Platform for users under age 13, despite external pushback, so that competitors are not in a superior position to "create habit with the next generation."

450.    ███████, Research Director for Instagram, wrote in February 2021 that the team was looking into "the top things kids find compelling," and that these insights would be used to inform a Platform for users under the age of 13.

451.    Internal Meta documents from July 2021 reveal that Meta did not "have any benchmarks for youth that allow us to discount what is developmentally appropriate for younger users in terms of time on media."

452. In the context of "Messenger Kids," the Meta messaging Platform that currently exists for kids under the age of 13, an employee noted studies from 2021 that found that "Messenger Kids is not entirely safe for children and benefits from proactive/retroactive monitoring."

453. Internally, Meta employees have noted that building more "youth protections" for Instagram including "strict default settings, data and personalization minimization for youth, age appropriate recommendation algorithms, . . . discoverability & recommendation restrictions [and] us[ing]/improv[ing] age models to enforce age restrictions" was a policy priority given pressure from regulators.

454. It was noted that these changes would help Meta "set the standard for what good compliance looks like" in light of changing, stricter laws.

455. Internal Meta documents acknowledge the contradiction between Meta's claims that it wants to be an industry leader on young users' well-being with Meta's lack of follow-through.

456. Historically, Meta has developed an external narrative that "we are not waiting for regulation to address concerns" and that Meta was "taking a number of steps to meet our responsibilities to our users and society."

457. In the meantime, young users, including users under the age of 13, continue to use the ordinary version of Instagram even though users under 13 years-old are nominally prohibited from doing so.

**C.    Meta has misled its users and the public by boasting a low prevalence of harmful content on its Social Media Platforms—while concealing internal studies showing the high incidence of user harms.**

458. Through its public representations, Meta has created the false impression that Facebook and Instagram are safe Platforms on which users rarely encounter harmful content. Those representations are misleading, in part because Meta's user experience surveys consistently reveal that harmful content is encountered by users on its Social Media Platforms far more frequently than Meta represents.

459.     In the face of criticism from parents, experts, and policymakers that its Social Media Platforms are harmful for young users, Meta has endeavored to persuade its users and the broader public that its Social Media Platforms are safe and suitable for young users.

460.     To that end, Meta regularly publishes Community Standard Enforcement Reports (CSER or Reports) that boast very low rates of its community standards being violated—while omitting from those reports Meta's internal user experience survey data showing high rates of users' actual encounters with harmful content on Meta's Platforms.

461.     The Reports, published quarterly, describe the percentage of content posted on Instagram and Facebook that Meta removes for violating Instagram and Facebook's Community Standards or Guidelines. Meta often refers to that percentage as its "prevalence" metric.

462.     Meta often amplifies the reach of the Reports and its "prevalence" metrics by announcing them through press releases, distributing them in advance to members of the press, and holding conference calls with the press to tout their release.

463.     Through Report-related talking points, Meta directs its employees to tout the "prevalence" metric as "the most important measure of a healthy online community."

464.     Meta has publicly represented that the "prevalence" statistics in the Reports are a reliable measure of the safety of its Social Media Platforms—even going so far as to assert that the CSER "prevalence" numbers were "the internet's equivalent" of scientific measurements utilized by environmental regulators to assess the levels of harmful pollutants in the air. For example, in a May 23, 2019 post on its website entitled "Measuring Prevalence of Violating Content on Facebook," Meta stated the following:

> One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We care most about how often content that violates our standards is actually seen relative to the total amount of times *any* content is seen on Facebook. This is similar to measuring concentration of pollutants in the air we breathe. When measuring air quality, *environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent* — a measurement of what percent of times someone sees something that is harmful. [Second emphasis added.]

465.    Zuckerberg told Congress on March 25, 2021 that Meta's "prevalence" numbers serve as a "model" for companies' transparency efforts.

466.    The Reports are intentionally used by Meta to create the impression that because Meta aggressively enforces its Community Standards—thereby reducing the "prevalence" of community-standards-violating content—Meta's Social Media Platforms are safe products that only rarely expose users (including young users) to harmful content and harmful experiences.

467.    That is a false equivalency which misrepresents the true frequency that its users experience harm on its Platforms. The "prevalence" of content which violates Meta's self-defined Community Standards is not the same as the actual "prevalence" of harmful content. Meta's direct quantification of users' experiences through its user experience surveys shows that harmful content is rampant on Instagram and Facebook.

468.    Meta uses several surveys to measure the experiences of its users on its Platforms, including youth and teen users, by asking about users' exposure to harmful content and experiences. Two of these surveys are the Tracking Reach of Integrity Problems Survey (TRIPS) and the Bad Experiences & Encounters Framework (BEEF). Both are rigorous surveys used by Meta to poll users about their exposure to and interactions with negative or harmful aspects of the Platforms. The surveys inquire about harmful content such as suicide and self-harm, negative comparison, misinformation, and other issues such as bullying, unwanted sexual advances, and hate speech or discrimination. An internal memo on research related to well-being on Instagram describes TRIPS as "our north star, ground-truth measurement."

469.    Periodic "Integrity Updates" circulated to Meta employees internally provide data from TRIPS surveys. For example, a TRIPS report from May 11, 2020, showed that an average of 19.3% of users on Instagram and 17.6% of users on Facebook reported witnessing hate speech or discrimination on the Platforms. In the same report, an average of 12.2% of Instagram users and 16.6% of Facebook users reported seeing graphic violence on the Platforms, and over 20% of users on both Platforms witnessed bullying and harassment. Each of these responses had increased from the prior month, including by as much as 3.6 percentage points for users reporting witnessing bullying and harassment on Instagram.

470.     These and other surveys show that Meta's users see harmful content and experience harmful interactions at high rates. A survey conducted by Meta in or around September 2020 found that 35% of Instagram users experienced some form of "aggression" in the previous 90 days, such as receiving a direct message containing offensive language or lies.

471.     Another internal research memo reported data from a 2018 study showing that "on a daily basis, 5.1 million users" of Instagram "are exposed to SSI-related [suicide and self-injury] content each day."

472.     Nevertheless, Meta publicly represents that Instagram and Facebook are safe because Meta enforces its Community Standards.

473.     For example, the third quarter 2019 Report touts Meta's "Progress to Help Keep People Safe." Likewise, the second quarter 2023 Report states that "[w]e publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe."

474.     Each of the Reports—whether they contain an express representation about safety—create the net impression that harmful content is not "prevalent" on Meta's Platforms and that the Platforms are therefore safe for users, including young users.

475.     Internal Meta documents show that Meta intended the Reports to create that exact impression.

476.     In March 2021, Meta conducted an internal Meta "Company Narrative Audit" (Audit) that suggested ways the company could improve its standing with the public. The Audit identified several "narratives" that the company should try to combat.

477.     For example, Meta employees identified as a concerning "external narrative" the notion that "Facebook allows hateful and harmful content to proliferate on its platform." As a way of combatting that narrative, the document suggested that the company could tell its own "Key Story" about its Platforms by directing the public to the Reports.

478.     In particular, the Audit suggested that Meta should publicize that: "Every three months we publish our Community Enforcement Standards Report to track our progress and demonstrate our continued commitment to making Facebook and Instagram safe and inclusive."

The Audit recommended that the company direct that message to "consumers" and "customers," among other audiences.

479. Consistent with that effort, internal communications show that Meta encouraged employees to frame the Reports to advertisers as an external "measure for platform safety" that "illustrate[s] the efforts we are making to keep our platforms safe."

480. The impression that the Reports create—that Meta's Platforms are safe and users only rarely encounter harmful content—is false and misleading.

481. Meta's third quarter 2021 Report estimated that on Instagram, "less than 0.05% of views were of content that violated our standards against Suicide & Self-Injury." That representation created the impression that it was very rare for users to experience content relating to suicide and self-injury on Instagram.

482. But Meta's contemporaneous internal survey data showed that during 2021, 6.7% of surveyed Instagram users had seen self-harm content within the last seven days. For users between 13 and 15 years of age, 8.4% had seen content relating to self-harm on Instagram within the last seven days.

483. In other words, while a reader of the CSER Reports could reasonably understand that self-harm content on Instagram is rarely encountered by users—far less than 1% of the time—in reality, Meta knew from its user experience surveys that self-harm content is commonly encountered on Instagram.

484. Teens are often exposed to harmful content at higher rates than the general population. In August 2021, internal data showed that teens were exposed to content that Meta considered harmful, which a Meta employee colloquially referred to as "bad thing problems," on Instagram approximately twice as much as adults.

485. In many instances teen girls experience harms on Instagram, including inappropriate interactions from adults (such as solicitation or requesting nude photos), at higher rates than boys. In the 2021 internal survey of Instagram users, 9.5% of girls aged 13 to 15 reported seeing content related to suicide or self-injury in the past seven days, compared to 8.2% of boys in that age group.

486.    User surveys also show that certain Platform surfaces, in particular Explore, are known to have higher instances of integrity issues. Meta's algorithms show users more High-Negative Appearance Comparison content on Explore than in Feed, and this difference is greater for women and teen girls.

487.    Thus, the frequency with which users—particularly Instagram's youngest users—encounter self-harm-related content on Instagram vastly exceeds the impression Meta created through its Reports.

488.    A similar discrepancy exists in Meta's measurement of bullying and harassing content.

489.    Meta's research from 2021 found that "[u]nwanted interactions are seen as common on Instagram" amongst teen users 13 to 17 years old. In October 2021, Meta found that on Instagram, teens were exposed to harmful content, especially in the areas of bullying and harassment, at higher rates than the general user population.

490.    The third quarter 2021 Report concluded that only "0.05-0.06%" of views on Instagram were of content that violated Meta's standards on bullying and harassment. This representation created the impression that it was very rare for users to experience bullying or harassment on Instagram.

491.    Again, Meta's contemporaneous internal user survey data told a different story. Among surveyed Instagram users, 28.3% witnessed bullying on the Platform within the last seven days and 8.1% were the target of bullying on the Platform within the last seven days.

492.    Among 13- to 15-year-olds, 27.2% reported witnessing bullying within the last seven days. Among users aged 16 to 17, that figure was 29.4%.

493.    When asked whether they had been the target of bullying on Instagram, 10.8% of 13 to 15-year-olds said they had been targeted as recently as the last week.

494.    Additional Meta survey data concluded that "experiencing and seeing bullying [is] hard to avoid" on Instagram. "A large proportion of [Instagram] users . . . expect to personally experience and see bullying on Instagram."

495.   Meta's own research concludes that bullying and harassment are some of the most upsetting experiences on Instagram, yet Meta knows that this content is the most common form of "objectionable content" on Instagram, with about 3% of Daily Active People seeing bullying on any given day. But Meta's interventions are inadequate—Meta acknowledges that it deletes less than 10% of reported bullying.

496.   Contrary to the third quarter 2021 Report's representation that harassment on Instagram was rare, Meta's contemporaneous internal survey showed that 11.9% of all survey respondents said they had received unwanted sexual advances on Instagram within the last seven days.

497.   Among 13- to 15-year-olds, 13% reported that they had received unwanted sexual advances within the last seven days. For 16- to 17-year-olds, that figure was 14.1%.

498.   Despite the picture that the Reports created, Instagram users in general—and young people in particular—regularly encountered content related to self-harm, bullying, and harassment on Instagram. Meta affirmatively misrepresented that fact through its Reports.

499.   Meta's Reports similarly misrepresented the frequency that its users experienced harmful content on Facebook. For example, in its Report for the fourth quarter of 2020, Meta represented that only about 0.05% of views of content on Facebook were of violent and graphic content. However, Meta's internal survey data of Facebook users during that period showed approximately 10 to 13% of surveyed users reported seeing graphic violence content on the Platform. In contrast to the misleading image that Meta created of graphic violence being exceedingly rare on Facebook, Meta knew that a substantial portion of Facebook users reported encountering graphic violence on the Platform.

500.   Meta's leadership has long been aware of the scope of harmful content and experiences on Facebook and Instagram and the associated data the company publishes in its Reports. Senior leadership is provided advance notice of the data to be published in the Reports and the trends from prior reports.

501.   Relatedly, Zuckerberg's public statements about "prevalence" of harmful content creates a misleading picture regarding the harmfulness of Meta's Social Media Platforms.

Zuckerberg and other company leaders focus on "prevalence" metrics in public communications because those metrics create a distorted picture about the safety of Meta's Social Media Platforms.

502.    Meta's leadership team understands the disparity between Meta's public Reports and its internal survey results.

503.    Meta's most senior leadership—including Zuckerberg, Sandberg, Cox, and Mosseri—were personally notified of this critical disconnect in Meta's public-facing safety representations two years ago.

504.    On October 5, 2021, Arturo Bejar, formerly Meta's Director of Site Integrity, who was at that time serving as a consultant for Meta, emailed Zuckerberg, Sandberg, Cox, and Mosseri voicing concerns that the company's focus on Community Standards enforcement obscured the full extent of the harms users experienced on Instagram.

505.    Bejar highlighted the "gap between Prevalence and TRIPS" and urged Zuckerberg and Meta's other senior leaders to move beyond "driving down prevalence" since "prevalence" did not accurately capture the amount of harmful content users experienced, and to instead focus on developing ways to effectively reduce users' harmful experiences on the Platform.

506.    Even after Bejar's email, Meta continued to issue and publicize the Reports—despite knowing they vastly under-represented the frequency of users' experiences with harmful content on Instagram and Facebook.

507.    On information and belief, Meta issued the Reports and made other public statements to minimize the public's awareness of the harmful experiences that are widespread on Instagram and Facebook—particularly for young users.

**D.    Meta's Platform features cause young users significant physical and mental harm, of which Meta is keenly aware.**

508.    Increased use of social media platforms, including those operated by Meta, result in physical and mental health harms particularly for young users, who experience higher rates of

1    major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health

2    concerns.[14]

3          509.    Social media use among young users began a dramatic increase in the United

4    States in 2012 when Meta acquired Instagram to expand its youth appeal. Instagram increased

5    from 50 million users in 2012 to over 500 million users by 2016, with a significant share of its

6    user base composed of young users.

7          510.    As Meta focused on designing features to increase time spent on its Platforms,

8    heavy consumers of social media began to exhibit worse mental health outcomes than light

9    consumers.[15]

10          511.    Hours spent on social media and the internet have become more strongly

11    associated with poor psychological health (such as self-harm behaviors, depressive symptoms,

12    low life satisfaction, and low self-esteem) than hours spent on electronic gaming and watching

13    TV.[16] Making matters worse, heavier social media use has led to poorer sleep patterns (e.g., later

14    sleep and wake times on school days and trouble falling back asleep after nighttime awakening)

15    and poorer sleep quality.[17]

---

[14] *See, e.g.*, Jonathan Haidt & Jean Twenge, Social Media and Mental Health: A Collaborative Review (unpublished manuscript, on file with New York University), *available at* tinyurl.com/SocialMediaMentalHealthReview (last visited Oct. 23, 2023); Jacqueline Nesi et al., *Handbook of Adolescent Digital Media Use and Mental Health*, Cambridge Univ. Press (2022).

[15] *See, e.g.*, Jean Twenge & W. Keith Campbell, *Digital Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets*, 90 Psychiatric Q. 311 (2019).

[16] Jean Twenge & Eric Farley, *Not All Screen Time Is Created Equal: Associations with Mental Health Vary by Activity and Gender*, 56 Soc. Psychiatry & Psychiatric Epidemiology 2017 (2021).

[17] Holly Scott et al., *Social Media Use and Adolescent Sleep Patterns: Cross-Sectional Findings from the UK Millennium Cohort Study*, 9 BMJ Open 1 (2019); Garrett Hisler et al., *Associations Between Screen Time and Short Sleep Duration Among Adolescents Varies by Media Type: Evidence from a Cohort Study*, 66 Sleep Med. 92 (2020).

512. Such sleep interference in turn causes or exacerbates symptoms of depression and anxiety.[18] Lack of sleep also has negative physical effects, including interfering with the antibody response to vaccines.[19]

513. These physical and mental harms are particularly acute for young users, who are less able to self-regulate the time they spend on social media platforms. When companies like Meta design platforms to exploit young users' psychological vulnerabilities, the harms are compounded. Researchers call this a positive feedback loop: those who use social media habitually are less able to regulate their behavior; that habitual use, in turn, can lead back to more social-media use; and restarting the cycle, that additional use makes it even harder to regulate the problematic behavior.[20]

514. Young users are at a formative stage of development where they are both especially vulnerable to excessive social media use and especially sensitive to its ensuing impacts. Research indicates that going through puberty while being a heavy social media user interferes with a sensitive period for social learning.[21] Heavy use of social media in this sensitive developmental period can have negative impacts on long-term life satisfaction.[22]

---

[18] Megan A. Moreno & Anna F. Jolliff, *Depression and Anxiety in the Context of Digital Media*, *in* Handbook of Adolescent Digital Media Use and Mental Health 227 (2022); *see also, e.g.,* Huges Sampasa-Kanyinga et al., *Use of Social Media is Associated With Short Sleep Duration in a Dose-Response Manner in Students Aged 11 to 20 Years*, 107 Acta Paediatrica 694, 694-700 (2018).

[19] Karine Spiegel et al., *A Meta-analysis of the Associations Between Insufficient Sleep Duration and Antibody Response to Vaccination*, 33 Current Biology 998 (2023).

[20] Maria T. Maza et al., *Association of Habitual Checking Behaviors on Social Media with Longitudinal Functional Brain Development*, 177 JAMA Pediatrics 160 (2023).

[21] *See, e.g.*, Amy Orben et al., *Windows of Developmental Sensitivity to Social Media*, 13 Nature Comm. 1649 (2022).

[22] *Id.*

515.     Young users—who are particularly attuned to FOMO—often feel an extra need to be connected at night and frequently wake up throughout the night to check social media notifications.[23] Socializing at night makes it harder for young users to sleep.[24]

516.     Young users who use social media for more than five hours per day are three times more likely than non-users to not sleep enough,[25] contributing to associated physical and mental health impacts.

517.     Children who use social media for more than five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users.[26]

---

[23] Anushree Tandron et al., *Sleepless Due to Social Media? Investigating Problematic Sleep Due to Social Media and Social Media Sleep Hygiene*, 113 Computers in Human Behavior 106487 (2020).

[24] Regina J.J.M. van den Eijnden et al., *Social Media Use and Adolescents' Sleep: A Longitudinal Study on the Protective Role of Parental Rules Regarding Internet Use Before Sleep*, 18 Intl. J. Envtl. Res. Pub. Health 1346 (2021).

[25] Sampasa-Kanyinga et al., *supra* note 18; *see also* Marian Freedman & Michael G. Burke, *Social Media and Sleep Duration-There Is a Connection!*, 35 Contemp. Pediatrics J. (2018).

[26] Twenge & Farley, *supra* note 16.

518.    Beginning with Instagram's rise in popularity in 2012, the Centers for Disease Control and Prevention (CDC) observed in its Youth Risk Behavior Study the percentage of high school students "who experienced persistent feelings of sadness or hopelessness" skyrocket over the subsequent decade.[27]



519.    Over this same time period, there has also been an increase in youth hospitalization rates for suicidal ideation and suicide attempts. In 2008, prior to the rise of Instagram, hospital visits for suicidal ideation and attempts represented only 0.66% of visits among all age ranges. By 2015, as Instagram's popularity grew, that share had almost doubled, with suicidal ideation and attempts accounting for 1.82% of all visits, with the highest rates of increase among youth ages 12 to 17 years old.[28]

[27] *Youth Risk Behavior Survey, Data Summary & Trends Report: 2011-2021*, at 61, Ctrs. for Disease Control & Prevention (2023), archive.ph/NYuQX.

[28] Gregory Plemmons et al., *Hospitalization for Suicide Ideation or Attempt: 2008-2015*, 141 Pediatrics 1, 4-5 (2018); *see also* Brett Burstein et al., *Suicidal Attempts and Ideation Among Children and Adolescents in US Emergency Departments, 2007-2015*, 173 JAMA Pediatrics 598, 598-600 (2019).

84



Figure. Associated Changes in Pediatric Emergency Department (ED) Visits for Suicide Attempts (SA) and Suicidal Ideation (SI)

For children age 5 to younger than 18 years and overall pediatric emergency department visits for all children age younger than 18 years over time. Error bars indicate 95% CI.

520. The youth mental health crisis fueled by social media platforms has been particularly detrimental for girls and young women.

521. Immediately before Instagram's rise in popularity and usership, major predictors for the mental health well-being of U.S. girls and young women were stable or trending down.

85

522.    Beginning with Instagram's rise in popularity in 2012, however, the rates of suicides, self-poisonings, major depressive episodes, and depressive symptoms among girls and young women jumped demonstrably.[29]



FIGURE 1.  Indicators of poor mental health among U.S. girls and young women, 2001–2018[a]

[a] Standard deviations are within means at the generational level, not at the individual level, and thus should not be used to calculate individual-level effect sizes.
[b] Source: Centers for Disease Control and Prevention. Suicide rates among 12- to 14-year-old girls.
[c] Source: Spiller et al. (14). Self-poisoning among 13- to 15-year-old girls.
[d] Source: Twenge et al. (11). Major depressive episode among 14- to 15-year-old girls.
[e] Sources: Keyes et al. (8) and Twenge et al. (9). Depressive symptoms among eighth-grade girls.

523.    Particularly concerning is the rise of suicidal ideation among girls over the time period that Instagram has surged. According to the CDC's Youth Risk Behavior Survey, in 2011, 19% of high school girls seriously considered attempting suicide. By 2021, that figure reached 30%:[30]

---

[29] Jean Twenge, *Increases in Depression, Self-Harm, and Suicide Among U.S. Adolescents After 2012 and Links to Technology Use: Possible Mechanisms*, 2 Psychiatric Res. Clinical Prac. 19 (2020).

[30] *Youth Risk Behavior Survey*, *supra* note 27.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



21
22    524.    This increase in suicidal ideation among girls has been matched by an increase in
23 suicide attempts. In just the one decade of Instagram's rising popularity, there was a 30% increase
24 in the rate of high school girls who attempted suicide: [31]
25
26
27
        _____
28    [31] *Id.*



525.    Increased rates of suicidal ideation and attempts have led to an overall higher rate of completed suicide among young girls. Indeed, in 2013 alone—the year after Instagram's surge in popularity among young users—the suicide rate for 13-year-old girls jumped by around 50%.[32]

526.    This youth mental health crisis fueled by social media platforms like Instagram only stands to worsen. The COVID-19 pandemic has exacerbated excessive social media use. The increase in consumption of digital and social media by young users during this time is linked to an increase in "ill-being" and media addiction.[33] Instagram users between 13- and 15-years-old reported to Meta that COVID-19 led to more isolation and extra time spent online, which in turn led to more reports of bullying and feeling left out.

527.    Meta is not only fully aware that the worsening youth mental health crisis is fueled by social media platforms, but has long known that its Platforms are directly contributing to this crisis.

---

[32] Haidt & Twenge, *supra* note 14, at 316.

[33] Laura Marciano et al., *Digital Media Use and Adolescents' Mental Health During the Covid-19 Pandemic: A Systematic Review and Meta-Analysis,* 9 Front Pub. Health 793868 (2021).

528.     Based on multiple internal studies, Meta has known for years that the way it designs its Social Media Platforms causes young users to compulsively use its Platforms, thereby exponentially exposing young users to mental health harms. An internal research summary concluded that teens suffer the most from problematic use of Meta's Platforms because "younger people generally have more problems with self-regulation."

529.     Meta's design choices and practices take advantage of and contribute to young users' susceptibility to addiction. They exploit psychological vulnerabilities of young users through the false promise that meaningful social connection lies in the next story, image, or video and that ignoring the next piece of social content could lead to social isolation.

530.     Internally, Meta employees recognized this explicitly, while deliberately avoiding an external narrative using the word "addiction." In 2020, a Meta employee noted that "[t]he feedback, essentially, is that (1) teens feel addicted to IG and feel a pressure to be present, (2) like addicts, they feel that they are unable to stop themselves from being on IG, and (3) the tools we currently have aren't effective at limiting their time on the ap[p]" but was "cautious about calling it an addiction[.]"Another employee wrote back: "Totally agree, we would never want to say that!"

531.     Meta has conducted detailed internal research that demonstrates the mental health impacts of its Platforms on young users, notably a "Teen Mental Health Deep Dive" that surveyed over 2,500 young users in the U.S. and U.K.

532.     Through this "Teen Mental Health Deep Dive," Meta identified that young users are coping with a variety of emotional issues, including not having "enough friends" or having friends "who aren't really their friends" (52%), having "to create a perfect image" and not being "honest about feelings" (67%), wanting to "hurt [or] kill themselves" (14%), feeling "down, sad, []depressed[,] [a]lone, or lonely (62%), and feeling "not good enough [or] [a]ttractive" (70%).

533.     The broad takeaway from Meta's "Teen Mental Health Deep Dive" was that "[s]ocial media amplifies many of the age-old challenges of being a teenager. The always-on nature of social media means that teens' social lives have infiltrated into every part of life without

a break." More specifically, Meta's research confirmed that its Social Media Platforms are among the worst in harming young users.

534.   Meta has found that Instagram specifically impacted young users, with one in five teens stating that Instagram makes them feel worse about themselves.

535.   Elaborating further, over 50% of teens responded that Instagram use led to them feeling "not good enough," with 26% of teens reporting such feelings in the past month and 24% reporting the feelings started on Instagram.

536.   Meta knows that "[t]eens blame Instagram for increases in the rates of anxiety and depression among teens." Instagram's deliberate design features, such as "comparisons of followers and like counts," exploit teens' vulnerability to social comparison, creating a negative feedback loop that leads to mental health harm including self-esteem, anxiety, and insecurity issues.

537.   Meta also knows that although "young people are acutely aware that Instagram can be bad for their mental health," they feel "compelled to spend time on the app" because Meta has designed its Platforms to exploit young users' "fear of missing out on cultural and social trends."

538.   These problems are not confined to Instagram but implicate Facebook as well. When Facebook was rolled out to college campuses from 2004 to 2006, researchers compared the rollout at particular colleges to the subsequent mental health of those colleges' students. After Facebook arrived on campus, students at the college suffered from worse mental health: they used mental-healthcare services more, their academic performance suffered, and so did their job prospects.[34]

539.   An internal Meta presentation from March 2019 recognized that 55% of Facebook's users in the U.S. suffered from problematic use which Meta described as "serious" and as having "negative impacts on sleep, relationships, work, or lives," and that 3.1% of its users suffered from "severe" problematic use. Another internal Meta post in July 2018 showed that problematic use was highest among teens and people in their twenties:

---

[34] *See* Press Release, MIT Sloan School of Management, Academic Study Reveals New Evidence of Facebook's Negative Impact on the Mental Health of College Students (Sept. 27, 2022), http://archive.today/tv6Ff.



Problematic use is highest among teens and people in their 20s, consistent with previous findings that younger people generally have more problems with self-regulation. This is also consistent with Crystine's research on time control.

Problematic use is highest among teens and people in their 20s.

540.     This same study found that Facebook users experiencing problematic use were more likely to share sleep-related content, "which is unsurprising given that sleep problems are one of the indicators of problematic use."

541.     The July 31, 2018 study titled "Problematic Facebook use: When people feel like Facebook negatively affects their life" also found that self-reported problematic users spend longer periods of time on Facebook and return to it more frequently, with "a greater proportion of their sessions online late at night."

542.     Meta knows that many of the negative mental health impacts of its Platforms originate from or are exacerbated by their interference with sleep. As data scientists and researchers summarized when discussing sleep internally at Meta, "the only insight I see in these charts is that teens are really into using IG [Instagram] at 11pm when they probably should be sleeping. . . ." and "it is true that negative impacts on sleep is one possible outcome of problematic social media use (or even non-problematic use)."

543.     By February 2019, the connection between social media use and problems surrounding sleep were conveyed to Meta management when Meta employees informed Sandberg

91

that "when social media use displaces sleep in adolescents (via nighttime social media use), it is negatively correlated to indicators of mental health."

544.    In November 2021, and in response to a forthcoming Wall Street Journal article discussing problematic use of Meta Platforms, a member of Meta's PR team brainstormed a response to the forthcoming exposure "that FB researchers found that problematic use is a significant problem facing users, brought forward recommendations, those recommendations were then ignored, and [Meta] disbanded the team in 2019."

545.    Another Meta employee suggested that the PR team review a "one-pager" to help manage the response, including Meta's new external narrative that "time spent is a poor proxy for measuring problematic use."

546.    A 2021 Meta study reinforced these conclusions when finding teens suffer the most from negative comparison spirals "during longer sessions that happen in evening hours as they have more time to spend on app with fewer interruptions."

547.    The harms of sleep disturbance and negative social comparison spirals present dangers to young users not only in isolation but also because they reinforce each other, as illustrated by the following Meta graphic:



548.    Meta knows that emotional exhaustion (caused by lack of sleep) is a factor that impacts whether teen users go down an unhealthy path of social comparison.

549.   In addition to these mental health impacts, Meta has known since as early as 2015 that Instagram's design created anxiety in teens. Instagram Research Manager ████████ noted that Instagram "[p]rofile anxiety is real" for teens, because "the mechanics of Profile are in direct conflict with the everyday moments [teens] want to share." ████ further noted that Meta's features such as Like are inherently flawed towards superficial connections.

550.   Furthermore, Meta knows that "the always-on nature of social media" means that "teens have few ways to escape negative experiences when they occur," such as bullying and harassment.

551.   As a Meta researcher internally noted, there is "very likely" a "funnel" from Instagram's content to appearance comparison, to body image issues, and to depression.

552.   As Meta's Platforms disturb sleep, fuel adverse mental health consequences, facilitate social comparison, cause anxiety, and fail to prevent bullying and harassment, this combination has a dangerous effect on young users. Meta has known that Instagram's features hold tremendous capacity to cause or exacerbate thoughts of suicide and self-injury in vulnerable teens. Meta's research estimated that, on Instagram, "the vast majority of people who admit and promote SSI [suicide and self-injury] are teens (45%-60%)."

553.   In an internal Meta survey in or around 2021, 6% of teen girls in the U.S. and 13% of teen girls in the U.K. "traced their desire to self-harm/commit suicide to Instagram."

554.   Meta knows that its Platforms worsen rather than alleviate thoughts of suicide and self-injury. Fifteen percent of Instagram users told Meta that they thought the Platform made thoughts of suicide or self-injury worse.

555.   In February 2019, an internal Meta research presentation noted that "those with lived experiences of SSI [suicide and self-injury] say they limit their time on Instagram when they're in a crisis [and] rather than using Instagram as a source of support during a crisis, users pull back from the app, saying it is stressful[,] overwhelming[, and] triggering."

556.   Knowledge of Meta's negative impact on young users' mental health and well-being has been shared with other Meta top leaders.

557.    As internal researchers told Zuckerberg, teens and younger users suffer from worse well-being and mental health. Social media, he was also told, "can and does attenuate or exacerbate a user's experience with mental health issues."

558.    Indeed, Zuckerberg's staff informed him that "a sizable proportion of [Instagram] users (under a third) think we make issues related to mental health worse."

559.    In addition to Zuckerberg, Sandberg and Mosseri have also received repeated briefings about the harms young users face on Meta's Social Media Platforms.

560.    Therefore, Meta's leadership not only knows that young users are particularly susceptible to poor mental health, but also know that Meta's Social Media Platforms make the problems they suffer from worse.

561.    Externally, Meta downplays the harm its design features cause young users. Rebuffing claims of addiction, Meta developed talking points for press interviews that mischaracterized its design features as "empower[ing] users by giving them insights and controls."

562.    Similarly, even though Meta knows that its Platforms are harmful to teenagers' mental health, Meta externally characterizes Instagram as a source of support for teens struggling with thoughts of suicide and self-injury and mental health issues generally, including in Mosseri's December 8, 2021 congressional testimony.

563.    In August 2021, Instagram's spokesperson Stephanie Otway exchanged messages with Mosseri regarding reporter Jeff Horwitz's forthcoming story "that essentially argues that IG's design is inherently bad for teenage girls (leads to SSI [suicide and self-injury], poor mental health, [and] dysphoria)," further noting that Horwitz's "arguments [are] based on our own research so [they] are difficult to rebut" and that she was "mostly worried about the fallout from the article . . . [and] that our own research confirmed what everyone has long suspected[.]"

564.    Meta takes great effort to distance itself from the reality that Meta's Platforms are harmful for teen mental health. For example, when M.R., a 14-year-old, committed suicide after being exposed to suicide and self-injury content on Instagram, Meta sent an executive to a U.K. coroner's court to deny that its Platform played any role in M.R.'s suicide—even though an

94

1  internal document had found a palpable risk of "similar incidents" because its algorithmic

2  Platform features were "[l]eading users to distressing content."

3  565. During an official inquest investigating the role that social media platform content

4  played in M.R.'s death, and as reported by the Guardian on September 30, 2022, a Meta executive

5  said that such content was "safe" for children to see. The coroner rejected this claim, finding

6  instead in his October 13, 2022 report that M.R. "died from an act of self-harm whilst suffering

7  from depression and the negative effects of on-line content" that she had not sought out, but that

8  the Platforms' algorithms had pushed on her.

9  566. The coroner's inquest report continued:

10  > The platform operated in such a way using algorithms as to result,
   > in some circumstances, of binge periods of images, video clips and
11  > text some of which were selected and provided without requesting
   > them. These binge periods . . . are likely to have had a negative
12  > effect on [M.R.] . . . In some cases, the content was particularly
   > graphic, tending to portray self-harm and suicide as an inevitable
13  > consequence of a condition that could not be recovered from. The
   > sites normalised her condition focusing on a limited and irrational
14  > view without any counterbalance of normality.

15  567. The coroner further observed that "[t]here was no age verification when signing up

16  to the on-line platform" and that M.R.'s parents "did not have access, to the material being

17  viewed or any control over that material." Unsurprisingly, M.R. was under the age of 13 when

18  she began using Instagram.

19  568. Internally, while Meta employees brainstormed how to respond to stories about

20  M.R. that painted Meta in a negative light, it was noted that "in terms of improvements [around

21  promoting suicide that] we can make, most are on the product side." Meta executive Davis

22  clarified in the same email thread that Meta had not actually made changes to Instagram to

23  address suicide and self-injury. These statements acknowledge Meta's role in exacerbating

24  suicide and self-injury in teens based on how Meta designed its Platforms, as well as Meta's lack

25  of meaningful work to address the issue. Internally, Meta closely studies its own role in

26  exacerbating suicide and self-injury in teens.

27  569. Meta employees have expressed frustration about their leadership's refusal to take

28  their research and concerns about suicide and self-injury and Instagram seriously. For example, in

1    2019, Head of Global Communications for Instagram Kristina Schake wrote to Newton about

2    "the SSI [suicide and self-injury] escalation for Molly [Cutler]'s review. When I'm asked I'm

3    going to be very honest about how Adam [Mosseri] dismissed our concerns and told us we were

4    over reacting and thrashing engineers, as well as FB security not listening to us or understanding

5    the differences in IG versus FB." Newton responded in agreement: "Yeah, I'm done being told

6    we're overreacting."

7        570.    Similarly, in 2019, former Vice President of Global Affairs Nick Clegg wrote to

8    Zuckerberg, Sandberg, Mosseri, and Cox: "[O]ur present policies and public stance on teenage

9    self harm and suicide are so difficult to explain publicly that our current response looks

10   convoluted and evasive."

11       571.    Additionally, following BBC articles regarding M.R., Instagram, and eating

12   disorder and suicide content impact on teens, in January 2019, Meta crafted a press statement

13   which said: "Because self-harm is a complicated and nuanced issue, especially for those that are

14   suffering, we have worked with experts to ensure that our approach reflects that complexity and

15   nuance. This is why we allow content that consists of self-harm or eating disorder admission . . .

16   [and] we send support resources to the account holder."

17       572.    Approximately one week later, Meta executive Nicola Mendelsohn pushed back

18   on this external narrative, internally emailing Clegg and Sandberg: "No experts will come out and

19   speak on our behalf around the fact that we leave things up so that we can help people with self-

20   harm tendencies . . . . I would urge us to think again about why we are allowing this imagery to

21   stay up—it is truly horrific."

22       573.    A related internal email addressed to Sandberg noted, "[r]ight now, if someone

23   types in an IG search, it returns a grid of photos with no captions. This does not make[] sense for

24   hashtags pertaining to violence, self-injury, or other areas where our policies rely upon the

25   caption to determine if an image is violating . . . . IG's product is essentially violating our content

26   policies by displaying self-injury images without captions." This internal email implicitly

27   recognized that Meta's public statement regarding the nuance of certain suicide and self-injury

28   content allowed to remain on Instagram was misleading because Meta displayed such content to

96

users in the Explore page without captions that colored the context or would allow users to seek self-help resources.

574.    Meta similarly downplayed the issue of compulsive use on its Platform. It attempted to frame "the public narrative" on such use by promoting the concepts of "intentional" or "meaningful" time spent on its platforms. However, Meta acknowledged internally that it does not "have in-app educational and control upselling tools supporting meaningful and intentional use of [Instagram]."

575.    In addition to downplaying statements about the harms of its Platforms, Meta also mischaracterizes platform features as helpful to well-being when in fact they are designed to fail.

576.    To illustrate, Meta knows that its features contribute to teens struggling with the amount of time they spend on Meta's Social Media Platforms such as Instagram. Meta researchers noted that "[t]eens talk about the amount of time they spend on Instagram as one of the 'worst' aspects of their relationship to the app." Meta researchers observed that in conversations, teens had "an addicts' narrative about their use" and "wish[ed] they could spend less time caring about it, but they can't help themselves."

577.    While Meta adopted so-called "time management" tools, in reality, those tools cannot effectively counteract the overwhelming power of features like infinite scroll, autoplay, and other use-inducing features.

578.    In 2018, Meta launched "Daily Limit," a feature it claimed would enable users to restrict the amount of time they spend on Instagram each day. Despite the feature's name, it does not enable users to restrict the amount of time they spend on the app.

579.    Instead, Daily Limit serves a pop-up notification whenever a user reaches the maximum amount of time they wish to spend on Instagram each day. But this feature was designed so that the user can easily dismiss the notification and return to using Instagram unimpeded.

580.    Moreover, the Daily Limit pop-up notification invites the user to reconsider their preferred time limit. Upon information and belief, similar to nudges described above (where, if a user turns their notifications off, Meta nudges the user to turn notifications back on), Meta

designed the Daily Limit feature to regularly tempt users, especially young users, to revert to harmful, time-maximizing settings each and every time the user reaches their chosen limit.

581.    In December 2021—just one day before Mosseri was scheduled to appear before Congress, and shortly after a whistleblower thrust the well-being issues Meta causes teens onto the national stage—Instagram launched the "Take a Break" tool. Take a Break sends users a pop-up notification when they have spent more than a specified period of time scrolling without interruption.

582.    As with the Daily Limit notification, the Take a Break notification is easily dismissed for a quick return to more infinite scrolling.

583.    As one Meta employee rhetorically asked, "if we are spending so much time on 'taking a break nudge' how are we actually going to solve for mental health needs of our users?"

584.    Meta-retained experts admonished Meta of the shortcomings of the Take a Break tool. Once the whistleblower report was no longer front-page news, Meta further watered down the Daily Limit tool: while users could initially select a Daily Limit as low as ten minutes, in February 2022, Meta quietly raised the minimum to 30 minutes.

585.    Meta employees have internally acknowledged that Meta's time spent tools are ineffective because they are not adopted by a large portion of Instagram users and that Meta was considering removing these tools altogether. In March 2020, ███████ noted that only 1.4% of Daily Active People (Instagram users who access the Platform daily) have a time spent reminder set and that 25% of these people hit their time spent in a given day.

586.    Internal documents reveal that Meta has been presented with various proposals to mitigate its Platforms' harms to young users. But time and again, Meta either implemented insufficient half-measures or failed to act—in multiple instances at the direction of senior leaders.

587.    In 2020, ███████ indicated in an internal email that Meta "will not focus on problematic use for the foreseeable future." Newton, then Head of Public Policy, responded that she believed user adoption of time spent tools is low in part because "we did no in-app education about it and haven't evolved or improved it over time," reflecting that Meta did not meaningfully commit to promoting the time spent feature. Meta employees on the email weighed in about

Meta's proposal to remove the time spent tool, also noting that a new feature regarding "away mode" and Take a Break had been deprioritized in 2020.

588.　In designing its Daily Limit and Take a Break features, Meta could have provided young users with robust tools that, once enabled, empowered young users to effectively self-regulate their use of Meta's Social Media Platforms.

589.　But instead of being able to *set it and forget it*, young users who make what can be a difficult choice to limit their daily use or take a break must make this difficult decision over and over again. Meta's design choices make the proverbial wagon that much easier for young users to fall off.

590.　Upon information and belief, Meta does so because it does not want its users to avail themselves of tools that could help protect them from the addictive nature of Meta's Platforms.

591.　Moreover, Meta has repeatedly made misleading statements regarding its own internal research on user harms on its Platforms.

592.　For example, Meta claims that it conducts research to make its Platforms safer for teens. During congressional testimony on September 30, 2021, Davis stated that "we conduct this research [about young people's experiences on Instagram] . . . to minimize the bad and maximize the good." But, as Meta employees internally noted, and as discussed further below, Meta's well-being research is often not actually implemented into its Platforms, and Meta executives have ignored or refused to fund requests to do so.

593.　As another example, in August 2021, Senators Richard Blumenthal and Marsha Blackburn wrote to Zuckerberg with detailed questions concerning the nature and findings of Meta's research on "the effects of social media platforms on kids' well-being." The senators specifically asked whether Meta's research had "ever found that its platforms and products can have a negative effect on children's and teens' mental health or well-being." Meta's letter in response failed to disclose its own studies demonstrating that the answer was yes.

594.     Beginning in September 2021, the Wall Street Journal published a series of articles based on documents leaked by whistleblower Haugen, which detailed Meta's knowledge of the harms associated with using Meta's platforms.

595.     Meta—at the direction of its highest officers—publicly downplayed the results of the company's own research. Meta criticized its researchers' methods and conclusions, and the company crafted statements that sidestepped the negative experiences that its research showed many teen users—especially teen girls—had on its platforms.

596.     For instance, in a September 26, 2021, blog post, Meta's Vice President of Research Pratiti Raychoudhury suggested that some of the presentations relied upon by the Wall Street Journal used "shorthand language . . . and d[id] not explain the caveats on every slide" because they were "created for and used by people who understood the limitations of the research."

597.     In private, however, senior leaders lauded this research. Just weeks before the Wall Street Journal began reporting, Instagram's Head of Research Dr. Hendrix told Mosseri and others that the Hard Life Moments research—which revealed that some Instagram users experiencing certain mental health struggles believed the Platform exacerbated those issues—was "one of our more robust studies with a solid methodology."

598.     Meta's response to the articles also contained misleading statements about the substance of the research. Raychoudhury's September 26, 2021, post claimed that "research shows that on 11 of 12 well-being issues, teenage girls who said they struggled with those difficult issues also said that Instagram made them better rather than worse."

599.     However, in an internal chat the day after the post was made, a Meta researcher noted problematic aspects of this public statement: "I suppose it's technically accurate, [but] [l]eading with '[Instagram] makes things better in 11 out of 12 areas' sounds a bit optimistic . . . . In the case of problematic use, technically teen girls said [Instagram] makes it better, but it's like 35% (better) vs. 33% (worse)."

600.     More broadly, and as the New York Times reported in October 2021, Meta's external response to the leaks "angered some employees who had worked on the research." As one researcher noted, the company was in effect "making a mockery of the research."

601.     In a group chat on October 5, 2021, Dr. Hendrix reported that she was "working through a lot of very raw emotions" from some of the company's researchers, noting that "[a] couple of them have expressed that they may resign." Dr. Hendrix also indicated that some of Meta's researchers "stand with [whistleblower Haugen]" and that there are "rumblings that [Haugen's] being lauded."

602.     In addition to downplaying and criticizing the leaked research, Meta also worked to prevent further revelation of its research documenting Instagram's harms to teens. In an internal chat in August 2021, an Instagram research manager noted that the company was "locking down access to some of the extra sensitive pieces of work." In the same conversation, the manager instructed a researcher to "make sure that any of our shareable deliverables or insights docs that you own on the mental well-being space are locked down."

603.     In September 2021, Dr. Hendrix similarly urged researchers not to go to the press regarding Meta's "research and how we use the insights." That month, Meta also considered a comprehensive content-sharing proposal for the company's internal research on well-being, which would prevent some research from being accessed by many of Meta's employees.

604.     Yet, on September 30, 2021, when Senator Blackburn asked Davis in a congressional hearing how Meta was "restricting access to data internally" and whether Meta's "policies changed since the Wall Street Journal articles," Davis responded, "not that I'm aware of certainly."

605.     Meta knows that its Social Media Platforms caused, and continue to cause, harm to young users.

606.     Meta also knows that "[t]argeted product interventions could flip the switch" of negative mental health outcomes for its users. Such changes could include, for example, "[p]ersonalized time-out mindfulness breaks" from Instagram and making "fun filters" such as cat-ear filters more prominent, "rather than filters designed around beautification."

607.    Nevertheless, Meta repeatedly failed to implement changes over the years to address these ongoing harms.

608.    In 2017, Facebook's former Vice President for User Growth publicly stated that he prohibits his own children from using Facebook, and Meta researchers wrote in a public post that they were "worrie[d] about [their] kids' screen time."

609.    Other employees have reported personally experiencing the negative effects of even short periods of using Meta's Platforms. One employee wrote in 2019:

> [I] do often find myself spending 10 or 15 minutes perusing content on FB, scanning through a bunch of content that grabs my attention because we've set up an incentive structure that rewards content with catchy headlines, but then when [I] close the app, [I] feel slightly worse about myself because [I] don't feel that [I] got any meaningful value out of that time. [S]o it feels like this is negatively contributing to my wellbeing in a way that we don't really have codified in our framework today. [I] suspect many others fall into this same category.

610.    As a Meta employee wrote in an internal document in 2018, "[Instagram] could stand to prioritize wellbeing higher than it currently is. I've heard reasonable arguments to prioritize other goals ahead of user wellbeing and safety, but I sometimes think that's dangerous."

611.    Instead of listening to its employees' concerns and prioritizing user well-being and safety, Meta disbanded its responsible innovation team, which was devoted to addressing "the potential downsides of its products."

612.    Meta executives also ignored or declined requests to fund proposed well-being initiatives and strategies that were intended to reduce the Platforms' harmful features.

613.    For example, in April 2019, David Ginsberg, then Meta's Vice President of Research, emailed Zuckerberg proposing investments in well-being on Instagram and Facebook. Ginsberg recommended the investment because "there is increasing scientific evidence (particularly in the US . . . ) that the average net effect of [Facebook] on people's well-being is slightly negative."

614.    As Ginsberg explained, Meta has a "deep understanding around three negative drivers that occur frequently on [Facebook] and impact people's well-being: [p]roblematic

1   use . . . , [s]ocial comparison . . . , [and] [l]oneliness." Ginsberg noted that if the investment was

2   not approved, these initiatives would remain under- or unstaffed.

3       615.    Nevertheless, Susan Li, a high-level member of Meta's finance department,

4   responded that Meta's leadership team declined to fund this initiative.

5       616.    In September 2019, Fidji Simo, Head of Facebook, stated to Adam Mosseri, Head

6   of Instagram, that with respect to improving well-being on both Platforms, "the main problem is

7   that we need to increase investment."

8       617.    And in September 2020, ███████, Director of Data Science at Instagram,

9   recognized in an internal chat that Meta faced "two workstreams": "1. Keep regulators away,

10  keep teens engaged" and "2. Make teens safe." ███████ further relayed the belief among some in

11  the company that "we only really have bandwidth for 1."

12      618.    In July 2021, Cox was provided an internal summary report defining and analyzing

13  problematic use on Meta's Facebook, Instagram, and virtual reality Platforms. The report

14  acknowledged that Meta had "no dedicated product focus to problematic use" and that the

15  company did not know whether any of the changes it had previously made actually "have had an

16  effect on problematic use." The report further noted that "Facebook and Instagram currently are

17  not aligned in their approach, and there are several more high impact problematic use product

18  ideas that are not currently prioritized."

19      619.    In August 2021, Meta employees working on well-being efforts reached out to

20  executives Cox and Clegg to identify well-being priorities. They wrote:

21              After considering 1,000+ well-being topics, we selected the top
                topics that key experts and policy stakeholders advocate are
22              important for us to focus on, and where we are currently
                underinvested: problematic use, bullying + harassment,
23              connections, SSI [suicide and self-injury]. These topics are also
                highly aligned with what teens want Facebook and Instagram to
24              prioritize.

25      620.    The message noted that, as of August 2021, Meta was "not on track to succeed for

26  [these] core well-being topics," due in part to a lack of "central ownership" and "minimal current

27  staffing." The message's "core minimal ask" was two-fold: "[e]stablishing a central cross-

28

1   [f]amily team" to maintain accountability and follow-through on well-being initiatives, and

2   "[a]ccelerating work around [p]roblematic [u]se."

3        621.    Clegg ultimately forwarded the request to Zuckerberg, recommending "additional

4   investment to strengthen our position on wellbeing across the company." Clegg endorsed this

5   approach because politicians worldwide had raised "concerns about the impact of our products on

6   young people's mental health." He also noted that a "US policy elites survey" revealed "concerns

7   about the potential impacts of AR/VR on young users, particularly with regard to time spent on

8   the devices and the potential for harmful actors to target children." Clegg concluded that while

9   Meta had a "strong program of research," it "need[s] to do more and [is] being held back by a

10   lack of investment on the product side which means that [it is] not able to make changes and

11   innovations at the pace required to be responsive to policymaker concerns."

12        622.    In subsequent emails, Cox stated that it was "very low-likelihood that Mark

13   [Zuckerberg] chooses to fund more here."

14        623.    In fact, Zuckerberg ignored Clegg's request for months—causing alarm among

15   Meta's leadership. In September 2021, in the aftermath of significant media coverage of Meta's

16   harmful effects on young people, Raychoudhury emailed Clegg, saying, "I feel even more

17   convinced that we need to make more progress on well-being on the product side."

18        624.    Mosseri shared that sentiment. In an October 2021 exchange discussing Clegg's

19   well-being plans (to which Zuckerberg had still not responded), Mosseri complained to Emily

20   Dalton Smith, Meta's Vice President of Product Management, "I'm really worried about this . . .

21   We've been talking about this for a long time but have made little progress."

22        625.    While Dalton Smith acknowledged that Meta had made progress on researching its

23   Platforms' harmful impacts, Dalton Smith further explained that the company's "biggest gap is

24   getting this research into product roadmaps," and noted that "[w]e got 0 new [w]ell-being funding

25   for 2022."

26        626.    In November 2021, Clegg sent a follow-up email to his August 2021 inquiry,

27   stating "[t]his investment is important to ensure we have the product roadmaps necessary to stand

28   behind our external narrative of well-being on our apps, and soon in the metaverse." Clegg

104

1  explained that "[a] number of us have met and agreed upon a revised investment proposal," which

2  was "scaled back" from the original request.

3  627.    Naomi Gleit, Meta's Head of Product, responded to Zuckerberg in support: "Mark

4  [for what it's worth] this is my #1 'below the line' project to fund on Social Impact." Gleit further

5  noted that the proposal had been pared back to seek only personnel for a cross-family team (XFN)

6  and not engineers (ENG).

7  628.    Susan Li responded, "I'll defer to Mark [Zuckerberg] on the decision here," and

8  stated that "XFN heads are running even more constrained than ENG."

9  629.    Just as Zuckerberg ignored Clegg's pleas for more well-being funding for months,

10  Bejar, former Meta Director of Site Integrity and former consultant to Meta, testified in 2023 that

11  Zuckerberg ignored his appeals for Meta to prioritize user well-being and engage in a "culture

12  shift" to ensure teen safety on its Platforms. As Bejar further testified, Meta "know[s] about

13  harms that teenagers are experiencing in its product, and they're choosing not to engage about it

14  or do meaningful efforts around it."

15  630.    Despite the direct, personal experience of Meta's employees of the harms of

16  Meta's design and features, Meta's own internal studies documenting the harmful effects of these

17  features, the opinions of many external experts and whistleblowers, and the voices of Meta's

18  young users themselves who "expect [Meta] to take collaborative action" to support mental well-

19  being, Meta has persisted in developing and deploying features that exploit young users'

20  psychological vulnerabilities and significantly harm young users in its pursuit of profit.

21  ### IX.    META'S COPPA NONCOMPLIANCE

22  631.    The Children's Online Privacy Protection Act of 1998 (COPPA) protects the

23  privacy of children by requiring technology companies like Meta to obtain informed consent from

24  parents prior to collecting the personal information of children online.

25  632.    Meta routinely violates COPPA in its operation of Instagram and Facebook by

26  collecting the personal information of children on those Platforms without first obtaining (or even

27  attempting to obtain) verifiable parental consent, as required by the statute.

28

Complaint for Injunctive and Other Relief

**A.** **COPPA requires Meta to obtain verifiable parental consent for Instagram and Facebook users under the age of 13.**

633.     COPPA prohibits social media companies like Meta from collecting personal information from children without first obtaining verifiable parental consent if: (a) the operator of the social media platform has actual knowledge that it is collecting personal information from a child; or (b) the operator's service is directed to children. 15 U.S.C. § 6502(a)(1).

634.     Meta's operation of Instagram and Facebook is subject to COPPA's verifiable parental consent requirement under both of the two statutory triggers: (a) Meta routinely obtains actual knowledge that users on Instagram and Facebook are under 13 years old; and (b) Meta targets children as users of Instagram and Facebook, making the Platforms directed to children. *See* 16 C.F.R. § 312.2.

635.     The term "child" is defined by 15 U.S.C. § 6501(1) to mean an individual under the age of 13. The terms "child," "children," "under-13 user(s)," "U13 users," and "child-users" herein refer to children under the age of 13.

636.     "Verifiable parental consent" requires, at a minimum, providing a child's parent with notice of Meta's "personal information collection, use, and disclosure practices" and further requires Meta to obtain the parent's authorization for Meta to collect, use, or disclose the child's information. Both of these requirements must be completed before Meta may collect a child's information. 15 U.S.C. § 6501(9).

637.     Meta does not obtain—or even attempt to obtain—verifiable parental consent before collecting the personal information of children on Instagram and Facebook. "Personal information" is defined by statute and regulation to mean "individually identifiable information about an individual collected online," including the child's name, address, email address, personal identifiers, geolocation information, and photographs or videos of the child, among other categories of information. 15 U.S.C. § 6501(8); 16 C.F.R § 312.2. Meta collects personal information in these categories from all registered users of Instagram, including children.

638.     Instead of obtaining verifiable parental consent, Meta relies on Instagram's and Facebook's nominal bans on under-13 users to avoid any responsibility under COPPA to its

106

1  under-13 users and their parents. But Meta's own records reveal that it has actual knowledge that

2  Instagram and Facebook target and successfully enroll children as users. Meta is not exempt from

3  COPPA.

4       639.    COPPA empowers State Attorneys General to bring suit against companies that

5  violate the verifiable parental consent requirement. COPPA permits State Attorneys General to

6  obtain injunctive relief, damages, restitution, and other relief on behalf of residents of their States.

7  15 U.S.C. § 6504(a)(1).

8       640.    COPPA also requires the FTC to promulgate regulations consistent with the

9  statute's verifiable parental consent requirement as well as the "actual knowledge [of a] child"

10  and "directed to children" statutory triggers. 15 U.S.C. § 6502(b). The FTC has promulgated such

11  regulations as the Children's Online Privacy Protection Rule. *See* 16 C.F.R. § 312.1 *et seq.*

12  (COPPA Rule) (last promulgated Jan. 17, 2013).

13       641.    Under COPPA and the COPPA Rule, Meta is subject to COPPA's "verifiable

14  parental consent" requirement—but Meta flouts its obligations under COPPA with respect to its

15  operation of Instagram and Facebook.

16      **B.**    **Meta does not comply with COPPA with respect to Instagram.**

17          **1.**    **Meta possesses actual knowledge of children on Instagram and collects**

18              **their personal information without obtaining parental consent.**

19       642.    Meta is subject to COPPA's verifiable parental consent requirement, among other

20  reasons because it collects the personal information of users under the age of 13 on Instagram

21  despite having "actual knowledge that it is collecting personal information from [children]." 15

22  U.S.C. § 6502(a)(1).

23       643.    Publicly, for example in congressional testimony provided by Meta executive

24  Antigone Davis on September 30, 2021, Meta has downplayed its actual knowledge of under-13

25  users on Instagram by pointing out that its terms of service nominally disallow use of Instagram

26  by under-13 users—and that, in recent years, Meta has prompted users to self-report that they are

27  at least 13 years old.

28

644.     Despite Meta's efforts to avoid its responsibilities under COPPA by attempting to maintain willful ignorance of its users under the age of 13, Meta routinely obtains actual knowledge of under-13 users on Instagram.

645.     Within the company, Meta's actual knowledge that millions of Instagram users are under the age of 13 is an open secret that is routinely documented, rigorously analyzed and confirmed, and zealously protected from disclosure to the public.

646.     Meta's extensive internal records documenting its actual knowledge of its under-13 Instagram users and collection of data from those users include the following: (1) charts boasting Instagram's penetration into 11- and 12-year-old demographic cohorts; (2) an internal report presented to Zuckerberg regarding the four million under-13 users on Instagram; (3) emails and policies documenting Meta's mishandling of known under-13 user accounts; (4) discussions among Meta's researchers taking pains to avoid uncovering Instagram's under-13 users through their studies; (5) documents admitting that Instagram's registration process regularly elicits false self-reported ages from its under-13 users; and (6) data from Meta's age-estimation algorithms confirming that millions of individual Instagram accounts belong to children under the age of 13.

647.     As an internal Meta document from 2018 acknowledges: "we do very little to keep U13s off our platform."

**a.     Internal charts boast Meta's successful penetration into 11- and 12-year-old demographic cohorts.**

648.     Despite its public-facing claims that users under the age of 13 are not allowed on Instagram, including in congressional testimony provided by Meta executive Davis in September 2021, Meta's private internal documents reveal that Meta has coveted and pursued the under-13 Instagram user demographic for years.

649.     For example, one internal Meta presentation contains a chart depicting Instagram's Monthly Active People Penetration, showing approximately 20-60% penetration in the 11- to 13-year-old age cohorts:



650.    In this chart, Meta recorded its knowledge that 20-60% of 11- to 13-year-old users in particular birth cohorts had actively used Instagram on at least a monthly basis. Rather than identifying this trend as a problem to be addressed, Meta described it as "penetration" into those known and purposefully demarcated age cohorts—a term denoting the company's successful reach into otherwise untapped markets.

651.    In a related chart, Meta tracked Daily Active People by Time from 2013 to 2018:



652.    The chart reveals that in 2016, approximately 20% of users from the 2004 birth year cohort (i.e., Instagram users who were 12 years old at that time) used Instagram on at least a daily basis.

653.    The Daily Active People by Time chart describes the daily and continuously increasing use of Instagram by under-13 users again as "penetration," signaling that Meta not only knows users under the age of 13 are on Instagram, but desires and intends such use.

654.    The chart also illustrates that users' daily habitual use of Instagram often begins when users are too young to legally consent to Meta's collection of their personal information—then continues to increase year after year as the users become teens and adults.

655.    Similarly, in July 2021, Meta internally circulated a "youth dashboard" providing "insights into participation and engagement of youth (broken down by U13, 13-17 and 18+) across the Family of Apps" in the United States.

656.    Despite possessing actual knowledge of Instagram users under the age of 13 and documenting that knowledge in internal charts, Meta refuses to obtain verifiable parental consent as required by COPPA for users under the age of 13.

110

**b. An internal report informed Zuckerberg of four million users under the age of 13 on Instagram.**

657.     In January 2018, Zuckerberg received a report that included information on under-13 users on Instagram, in advance of a meeting with the Youth Team.

658.     That report explained that Meta "can estimate that there were 4M[illion] people under 13 in 2015 on IG [in the US]. This represents around 30% of all 10-12 year[] old[s] in the US."

659.     Through this report and other internal and external sources of information, Meta and Zuckerberg acquired and confirmed their actual knowledge of users under 13 on Instagram. Indeed, Meta and Zuckerberg knew that roughly a third of all 10- to 12-year-olds in the United States were using Instagram and sharing personal information with Meta through that Platform.

660.     Despite Meta's actual knowledge and documentation of under-13 Instagram users and data collection from under-13 users in the 2018 report, Meta did not obtain verifiable parental consent for its ongoing collection of personal information from those users.

661.     Meta's awareness of the market for under-13 users is extensive. Meta knows, and has reviewed and cited external data showing that 81% of "children start[] using social media between the ages of 8 and 13," that "93% of 6-12 year olds in the US have access to tablets or smartphones, and 66% have their own device."

662.     In a document discussing how to secure teen and under-13 engagement with Meta's Platforms, Meta noted that its own research found "children first get a smart phone (average age 10.3) and then a social media account (average age 11.4)" and "the largest percentage (39%) got their first account between ages 10 and 12."

663.     Statistics tracking digital technology usage by children under the age of 13 were also presented to Meta's board of directors, showing Meta's continued effort to build products to attract children to its Platforms.

664.     Externally, Meta denies that it strives to attract underage users to its Platforms. For example, in September 2021, in response to a Wall Street Journal article regarding underage users on Instagram, Meta provided a written statement claiming that "[l]ike all technology companies,

1    of course we want to appeal to the next generation, but that's entirely different from the false

2    assertion that we knowingly attempt to recruit people who aren't old enough to use our apps."

3              c.    **Emails and policies document Meta's mishandling of known accounts**

4                    **for users under the age of 13.**

5    665.    Meta also acquired actual knowledge of specific under-13 user accounts through

6    external complaints regarding users under the age of 13 on Instagram. In such cases, Meta

7    frequently elected to continue retaining and collecting data from those accounts without obtaining

8    verifiable parental consent as required by COPPA.

9    666.    In February 2018, after learning of a potential under-13 user, Meta employees

10   exchanged emails discussing how to contact the user's mother. One Meta employee suggested

11   telling the mother that if her daughter was under 13, "we can keep her account up if you would

12   like to take control over the account and update the bio accordingly." A Meta product policy

13   manager acknowledged that Meta had "done something similar like this in the past" to "coach[]"

14   a parent or parents to keep their under 13-year-old children's accounts online.

15   667.    "Coaching" or offering parents ways to keep accounts open for their children

16   under the age of 13 does not satisfy Meta's obligation to obtain verifiable parental consent under

17   COPPA for the collection and use of the child's personal information. Meta's "coaching" does

18   not provide parents with the notices required by COPPA, including notices of what personal

19   information Meta is collecting from their children, nor does it satisfy COPPA's requirement to

20   ensure that the person providing consent is actually the parent of the child.

21   668.    In another email thread, Meta employees discussed why a 12-year-old girl's four

22   accounts were not deleted, despite complaints from the girl's mother stating her daughter was 12

23   years old and requesting the accounts to be taken down. The employees concluded that "the

24   accounts were ignored" in part because representatives of Meta "couldn't tell for sure the user

25   was underage."

26   669.    In this instance and many others, Meta did not meaningfully enforce its nominal

27   age restriction on Instagram, despite its external claims to the contrary, including in Davis's

28

1    September 30, 2021 congressional testimony, in which she stated that "we will remove [underage

2    accounts]."

3            670.    Upon information and belief, Meta did not promptly delete the personal data of

4    these and other under-13 users upon obtaining actual knowledge that the user was under the age

5    of 13, and instead retained and used some or all of the underage user's personal data, without first

6    obtaining verifiable parental consent.

7            671.    Additionally, Meta has a policy of automatically ignoring certain external reports

8    that Instagram users are under 13 years old. After Meta receives a report that an Instagram user is

9    under 13 years old, Meta's policy is to allow the user to continue using their Instagram account

10   and disregard the report if the account does not contain a user bio or photos.

11           672.    While Meta ignores reports that users are under 13, Meta continues collecting

12   personal information from those users without obtaining or even seeking parental consent.

13           673.    In 2021, Meta received over 402,000 reports of under-13 users on Instagram via its

14   underage reporting webform and in-app underage reporting process. But Meta's records show that

15   fewer than 164,000—far fewer than half of the reported accounts—were "disabled for potentially

16   being under the age of 13" that year.

17           674.    Despite receiving reports of users under the age of 13, Meta continually failed to

18   prioritize effective age gates and COPPA compliance. For example, Meta chose not to build a

19   classifier to detect minors under 13. This type of work was often sidelined and received neither

20   adequate resources nor adequate leadership support.

21           675.    In sum, after Meta failed to effectively exclude under-13 users from using

22   Instagram, Meta acquired actual knowledge that specific children were on Instagram when

23   concerned parents, siblings, teachers, and community members *told* Meta about individual

24   children on Instagram. Still, Meta declined to remove many of those children's accounts and

25   instead elected to continue unlawfully collecting personal information from those children.

26           676.    Between the first quarter of 2019 and the second quarter of 2023, Meta received

27   over 1.1 million reports of under-13 users on Instagram via its underage reporting webform and

28   in-app underage reporting process. These processes were only a few of many ways that Meta

1   acquired actual knowledge of under-13 users on its Social Media Platforms. Despite this actual

2   knowledge, Meta disabled only a fraction of those accounts and routinely continued to collect

3   children's data without parental consent.

4       677.    Similarly, Meta routinely mishandled and failed to disable Instagram accounts that

5   were "linked" to Facebook accounts where Meta had actual knowledge that Facebook users were

6   under the age of 13.

7       678.    Meta collects information that identifies accounts on its various Social Media

8   Platforms that belong to the same individual user. For example, Meta collects email addresses

9   from users when they set up new Facebook and Instagram accounts. Meta instructs its Instagram

10   and Facebook users to provide an email address "that only you can access." In or around

11   September 2020, Meta released a feature called "Accounts Center," which allows users to link

12   their accounts on Facebook, Instagram, and Messenger using a single sign on.

13       679.    On information and belief, Meta also provided its users with other ways to link

14   their Facebook and Instagram accounts before September 2020, including as early as 2017. For

15   example, an internal memo from June 2017 proposes suggesting friends to Facebook users using

16   their followers on Instagram, "[f]or Instagram users we can match to Facebook accounts (either

17   through linking or inference)."

18       680.    As with Instagram, Meta routinely learns that users of its Facebook Platform are

19   under 13 from sources including reports from concerned parents, siblings, friends, and teachers.

20       681.    But even after acquiring actual knowledge that Facebook users are under 13 years

21   old, Meta has neither promptly disabled those users' linked accounts on Instagram nor obtained

22   parental consent for those users.

23       682.    For example, from September 2020 to December 2021, when Meta obtained actual

24   knowledge that Facebook users were under 13 and placed their Facebook accounts into an "age

25   checkpoint," Meta continued collecting personal information from the users' linked Instagram

26   accounts in their "Accounts Center" and failed to seek parental consent. Externally, however,

27   Meta claimed in a July 27, 2021 post, titled "How Do We Know Someone Is Old Enough to Use

28

1    Our Apps?," that it used a users' age stated to either Platform to gate users' access to both

2    Platforms.

3         683.    Upon information and belief, even after Meta obtains actual knowledge that a

4    Facebook user is under 13 years old, Meta neither stops collecting personal information from

5    Instagram accounts that are connected to the same email address (without being officially

6    "linked" through Meta's "Accounts Center"), nor does it obtain parental consent for those users.

7         684.    Meta knows that its failure to take action after learning of under-13 users

8    jeopardizes its compliance with the law: an internal Meta report reveals that "our basic COPPA

9    compliance is at risk when product does not prioritize checkpointing and disabling u13s. We also

10   do not yet cross-enforce against u13s discovered on IG who have hard-linked FB accounts."

11        685.    Meta deceives the public regarding its policies when underage accounts are

12   reported. If someone reports that an account belongs to an individual under the age of 13, Meta

13   claims on its Instagram Help Center that "we will delete the account if we can't verify the account

14   is managed by someone over 13 years old." Meta also has prepared talking points stating that the

15   company requires users "to prove they are over 13 in order to regain access to their account" after

16   it has been reported to belong to an underage user. Zuckerberg told Congress on March 25, 2021,

17   "if we detect that someone might be under the age of 13, even if they lied, we kick them off."

18        686.    In practice, and as detailed above, Meta employees often do not take action unless

19   they can verify that the account actually belongs to an underage user. This results in underage

20   accounts remaining on the Platform despite having been reported to Meta as belonging to users

21   under the age of 13. As a matter of policy, Meta employees generally do not take action if the

22   reported account does not contain a user bio or photos.

23        687.    And while Meta has developed talking points to claim that it "promptly delete[s]"

24   underage accounts after they are reported, in reality, Meta at times has a backlog of 2-2.5 million

25   under 13 accounts awaiting action—and permits the collection of data from those accounts until

26   Meta can evaluate the reported account.

27

28

688.   Internal documents from April 2021 recognize that "[a]ge verification (for under 13) has a big backlog and demand is outpacing supply" because of the "lack of [staffing] capacity."

### d.   Meta's researchers discussed strategic exclusion of 10- to 12-year-old Instagram users.

689.   Meta employees tasked with conducting quantitative research related to users of Instagram routinely encountered the problem of how to conduct research into Instagram's user base without revealing the fact that millions of Instagram users are under the age of 13.

690.   One approach Meta's researchers employed was to purposely *exclude* Instagram's under-13 users from their studies, in order to avoid creating a paper trail documenting the company's unlawful collection of personal data from children.

691.   In February 2018, while discussing research on bullying on Instagram, Meta employee Fiona Brown cautioned: "we just want to make sure to be sensitive about a couple of Instagram-specific items. For example, will the survey go to under 13 year olds? Since everyone needs to be at least 13 years old before they create an account, we want to be careful about sharing findings that come back and point to under 13 year olds being bullied on the platform."

692.   Similarly, in February 2021, Meta researcher ████████████ noted that she was "not includ[ing] younger kids (10-12 yos) in this research" that involved studying "child-adult sexual-related content/behavior/interactions," explaining that there "are definitely kids this age on IG" but that she was "concerned about risks of disclosure since they aren't supposed to be on IG at all."

693.   In 2021, Meta contracted with a vendor, Answer Lab, to conduct a survey of preteens. Meta instructed Answer Lab to not inform Meta employees if any of the preteen survey subjects were on Instagram, so that Meta "as a company won't be made aware of under 13." However, despite Meta's efforts to shield itself from this knowledge, it learned that several of the preteen subjects were active on Instagram.

694.     An internal Meta presentation titled "User Trends" from 2021 reveals that Meta has completed studies on the privacy needs of tweens while building products for that target group.

695.     Meta possesses survey data from 2020 indicating that, out of 3,983 children responding, 22% of child respondents aged 6 to 9 and 35% of child respondents aged 10 to 12 had used Instagram.

696.     In May 2021, Meta received external research conducted on social media platforms including Instagram and Facebook; this research, provided by an organization called Thorn, revealed that of children ages 9-12, 45% used Facebook and 40% used Instagram daily.

697.     In 2021, a Meta researcher asked a clarifying question regarding Meta's "Youth Platform study from the Tween perspective": "in the screener, we will ask the parents if their U13 child is on IG/FB/WA in order to terminate them then. What happens to kids who slip through the screener and then say they are on IG during the interviews?" Newton, Head of Public Policy, responded "we're not collecting user names right?" Upon information and belief, even when Meta learns of specific children on Instagram through *interviews with the children*, Meta takes the position that it still lacks actual knowledge of that it is collecting personal information from an under-13 user because it does not collect user names while conducting these interviews. In this way, Meta goes through great lengths to avoid meaningfully complying with COPPA, looking for loopholes to excuse its knowledge of users under the age of 13 and maintain their presence on the Platform.

698.     When Meta acquired actual knowledge of under-13 users on Instagram from its internal researchers, Meta did not obtain verifiable parental consent for those under-13 users, and instead focused on ensuring that the research did not accurately reveal the fact of the under-13 users.

> **e.     Meta knows that Instagram's lack of effective age-gating elicits false self-reports of children's ages.**

699.     For most of its history, up until December 2019, Instagram did not require new users to disclose their age or date of birth in order to create an Instagram account. During that

1    time, Meta did not require users to take even the minimal step of self-attesting that they were over

2    the age of 13. Instead, for over seven years, under-13 users faced no practical obstacles to

3    creating accounts on Instagram.

4        700.    Unsurprisingly, millions of users under age 13 created Instagram accounts during

5    this period, a fact that was routinely discussed within Meta and was reported up to Zuckerberg.

6        701.    Internally, Meta researchers noted that it was bad practice not to collect ages from

7    users on sign up.

8        702.    Eventually, in response to pressure from regulators and the public, Meta purported

9    to implement an age gate as part Instagram's account registration process—but the term "gate"

10   was a misnomer because it did not prevent under-13 users from creating and using Instagram

11   accounts.

12       703.    To the contrary, Meta initially designed its age gate in a way that prompted all

13   users, including children under the age of 13, to provide an age over 13. Specifically, Meta's

14   sign-up page contained a drop-down menu that automatically generated a date and year of birth

15   representing the user to be 13 years old. The design of the age gate signaled to children the

16   specific date that they could affirm to advance through the registration process, even though the

17   date automatically populated by Instagram was not their actual date of birth.

18       704.    Meta knew that its use of a sign-up page automatically generating a date 13 years

19   prior to the date of registration aided under-13 users in misrepresenting their age in order to

20   access Instagram.

21       705.    "[E]ncourag[ing] children to falsify their ages to gain access" is impermissible

22   under COPPA. *See COPPA July 2020 Guidance* § H(3).[35]

23       706.    Meta only recently changed Instagram's sign-up page to automatically generate

24   the instant date and year, rather than a date 13 years prior.

25       707.    Meta's adoption of an age gate that permits the user to enter *any* date of birth,

26   regardless of its accuracy, still does not prevent under-13 users from using Instagram.

27   _____

28        [35] *Complying with COPPA: Frequently Asked Questions*, Fed. Trade Comm'n (July
     2020), https://archive.ph/PEj8q (hereinafter "July 2020 COPPA Guidance").

708. Instagram's current age gate allows users under age 13 to make several attempts at entering a date of birth which would yield an age of over 13, thus permitting the user to create an account. Instagram only temporarily blocks an underage user's renewed attempts for a mere 12 hours before permitting them to try again.

709. In sum, Meta's age gate efforts for Instagram have long been ineffective: first, Instagram utilized no age gate for several years, then implemented an age gate that defaulted to an entry of ages over 13, and now uses an age gate that still depends on an under-13 user to correctly self-report their own age, without any verification.

710. In an email from 2020 (after Meta implemented its age gate), Mosseri acknowledged to Zuckerberg that "Instagram doesn't know the age of many of its users," showing that the "age-gate" did not apply to all Instagram users.

711. Meta knows that its age limits "are unenforced." Nonetheless, Meta externally touts its age-gating as an effective means to keep children under the age of 13 off Instagram and Facebook.

712. While testifying before Congress on September 30, 2021, Meta executive Davis stated: "if we see someone trying to, repeatedly, change the [birth] date to get past that [age screen], we actually will restrict their ability to access the app." But Meta only locks such a user out for a mere 12 hours before they can try to access Instagram again.

713. Internal Meta documents reveal that the company is aware that because of these intentional design choices, under-13 users routinely supply a false date of birth when registering for Instagram.

714. For example, in a December 2017 internal chat, an Instagram employee noted that "roughly 90%" of users claiming to be 13 years old had misrepresented their age.

715. In February 2021, when responding to an email regarding user retention among young people, a Meta employee explained, "[W]e know that stated age = 13 contains a lot of misrepresenters (presumably, those younger than 13)."

716. As recently as March 2020, Meta researchers proposed surveying and studying 10- to 12-year-olds on Instagram about bullying. The rationale to include this age group was that

Meta knew that under-13 users "just create their own IG accounts" despite the nominal ban for this age group on the Platform. Upon information and belief, Meta gained knowledge of specific under-13 users when it conducted this anti-bullying research. Upon information and belief, Meta did not delete or disable these under-13 accounts after surveying the users.

717. In January 2021, in an internal chat with Director of Data Science ███, a Meta employee noted that, for purposes of internal planning and strategy, Meta could not rely on the "stated" age of users who claim to be 13 years old because "they lie about it a TON."

718. And in 2021, Meta employee ███ stated that internal data "suggests only 40% of labeled 15yo actually report a "Teen Stated Age" (it's even lower for 13yos)," which confirms that "[t]eens indeed very rarely give their proper age." Meta knows that its age-gating is ineffective and that more than half of its teen users lied about their age.

719. Among other Meta employees, Mosseri possesses actual knowledge that use of Instagram by under-13 users is the status quo. As he explained in an internal chat in November 2021, "Tweens want access to Instagram, and they lie about their age to get it now. We'd like it if they aged up from an age appropriate version to the full [version]of Instagram, so the explicit strategy, which is on pause, is to let them download the main app and cater the experience to their age."

720. While Mosseri's message used the word "pause" and while Meta may well have "paused" the efforts to make Instagram appropriate for children, Meta's practice for tweens continues to be to "let them download the main app," anticipating that they will later "age up" to being teenagers, exactly as Mosseri had described.

721. And Meta internally acknowledges that its infrastructure perpetuates 11- and 12-year-olds use of Meta's Platforms. In an email from 2017, Zuckerberg expressly stated that Meta chose not to "build a whole separate product" for 11- and 12-year-olds because children in this age group "aren't so different from 13 or 14 year olds, and we thought if we built a much more restrictive product, they wouldn't want to use it."

722.    In the same 2017 email, Zuckerberg noted that because "kids are getting their first devices at 7, 8 or 9," Meta was choosing to build a different product targeted instead at that even younger group of under-13 users.

723.    In other words, Meta knows that 11- and 12-year-olds have used and will continue to use the version of Instagram that nominally excludes them. While Meta externally claimed that it built under-13 products for kids and tweens in a September 27, 2021 post on Instagram's website entitled "Pausing 'Instagram Kids' and Building Parental Supervision Tools," internally it recognizes that the under-13 products were truly directed to the younger age group of 7- to 9-year-olds (not tweens) with the expectation that tweens would continue to lie about their age to access the unrestricted adult version of Instagram.

724.    In a 2022 research document, Meta noted that tweens and teens "deal[t] with bad actors [on Instagram] in different ways," using a 13- to 14-year-old age bucket to capture "tweens," showing that Meta knows that users who claim to be 13 or 14 often actually include users under the age of 13.

725.    Meta has access to, and chooses not to use, feasible alternative age verification methods that would significantly reduce or eliminate the number of underage users on Meta's Social Media Platforms, for example, by requiring young users to submit student IDs upon registration.

726.    Internal communications reveal that Meta has strategically chosen to eschew effective age verification designs in favor of user growth and retention of Instagram's youngest users.

727.    In December 2017, an Instagram employee indicated that Meta had a method to ascertain young users' ages but advised that "you probably don't want to open this pandora's box" regarding age verification improvements.

728.    Similarly, Meta has expressed concerns that any efforts to exclude "u13 age liars" could "impact growth" —i.e., Meta's bottom line. In an internal email from 2019, Davis asked Nick Clegg to "clarify with product leadership whether goal for age collection is to implement

1    measures needed to identify and remove u13 age liars, which may impact growth, or whether we

2    are waiting to test growth impact before committing to anything."

3        729.    Externally, Meta misleads the public by claiming, in a March 17, 2021 post on

4    Instagram's website, that "we know that young people can lie about their date of birth. We want

5    to do more to stop this from happening," and by developing talking points stating that "we are

6    continuously looking for better ways to identify and remove underage accounts." But internal

7    documents show that Meta consistently avoids research and projects that could unearth the

8    existence of users under the age of 13—because it would impact Meta's bottom line.

9        730.    Rather than excluding under-13 users from Instagram, Meta could alternatively

10   comply with COPPA by obtaining informed parental consent after providing notice to parents of

11   its intent to collect and use children's personal information. Meta chooses not to do so.

12       731.    Despite knowing that its lack of age gates and later implementation of minimal age

13   gate designs have allowed users under age 13 onto Instagram, Meta does not obtain verifiable

14   parental consent before collecting the personal information of those users who routinely register

15   for, and provide their personal information to, Instagram.

16           **f.    Data from Meta's age-estimation algorithms confirms that millions of**

17                   **individual accounts belong to children under age 13.**

18       732.    Because Meta knows that the self-reported ages of its youngest users are

19   inaccurate, Meta maintains additional repositories of user age data generated by Meta's "age

20   modeling algorithms" (or age models) that calculate each user's age based on sources of

21   information that are more reliable than mere self-disclosures provided by children. These

22   calculated ages are referred to internally as "modified" ages, "estimated" ages, or "imputed" ages.

23       733.    Meta creates and retains records reflecting the estimated ages of all of its users, as

24   determined by those age-modeling algorithms, sometimes referred to as "age affinity."

25       734.    Upon information and belief, when Meta internally tracks users' ages for purposes

26   of planning and strategy, Meta internally modifies the "stated" age of users to yield "modified"

27   ages (i.e., Meta's best estimate of the users' actual ages based on data collected from their use of

28   Meta's Platforms).

735.    An internal presentation from September 2019, entitled "How are Teens doing on IG," included historic data representing daily active users of Instagram in the United States according to Meta's "Age Affinity model." The presentation included usage trends in demographics identified as "13 y" and "<13 y" from March 2018 through July 2019. Meta's use of its Age Affinity model to track "<13 y" users of Instagram in the United States is one of many ways that Meta employees acquired actual knowledge that under-13 users were using Instagram and that Meta was therefore collecting their user data.

736.    In 2021, Mosseri "green lighted u13 modeling," approving the development of an age model specifically designed to identify users under the age of 13.

737.    As recently as September 2021, ███████ instructed Meta employees to use stated ages for purposes of "privacy" and modeled ages for purposes of "engagement" (i.e., increasing users' engagement with Instagram and thereby increasing Meta's revenue). Meta does not use stated ages for engagement because Meta knows that stated ages are not accurate. Meanwhile, Meta publicly maintains that it does not allow under-13 users on its Platforms, relying primarily on its faulty age-collection at sign-up.

738.    Davis internally took issue with Meta's practice of cherry-picking the contexts in which it used stated ages and modeled ages. In September 2020, she wrote that Meta "need[s] leadership to support the basic principle that if we're using a signal to predict age for business purposes, it should be used to enforce on age."

739.    On information and belief, Meta employees review Meta's age-modeling data—both through aggregate reports summarizing users' ages and on the basis of individual user accounts.

740.    On information and belief, some of Meta's age-estimation algorithms and related reporting methods have artificially imposed a minimum "floor" on predicted user ages, preventing the algorithm from reporting an under-13 age for a particular user, even when the user is in fact under 13 years of age.

741.    On information and belief, other age-estimation algorithms and related reporting methods used by Meta presently and/or historically do *not* prevent the algorithm from reporting

1   an age under 13 for a particular user; such algorithms and reports can and do accurately report to

2   Meta employees that individual users of Instagram are under 13 years of age.

3          742.    On information and belief, through its possession of and review of estimated age

4   data, Meta employees have frequently acquired actual knowledge that individual users of

5   Instagram are under 13 years of age and that the personal information of under-13 users on

6   Instagram is being collected by Meta.

7          743.    Meta externally claimed, through congressional testimony provided by Mosseri on

8   December 8, 2021, that "we train our technology to identify if people are above or below 18 using

9   multiple signals,"—including birthday posts—and that Meta is building new technology to do the

10  same for users under 13. But internal documents reveal that Meta sometimes limits such age-

11  modeling to users over the age of 13.

12         744.    Former Meta Director of Site Integrity and former consultant to Meta Bejar

13  testified that Meta does not meaningfully utilize birthday posts to identify users who claim to be

14  over 13 years old but are not. In fact, Meta's internal reporting mechanism for using birthday

15  posts is complicated which prevents most reports from reaching "completion," or the point where

16  a person successfully submits a report to Instagram.

17         745.    Despite Meta's actual knowledge, acquired through its possession and review of

18  estimated age data and/or acquired through other sources, that Meta collects personal information

19  of users under the age of 13 in the ordinary course of its operations, Meta does not obtain

20  verifiable parental consent for under-13 users.

21              **2.     Instagram is "directed to children."**

22         746.    Independent of Meta's "actual knowledge" of users under age 13, Meta is also

23  subject to COPPA's verifiable parental consent requirement because Instagram, or a portion

24  thereof, is "directed to children." *See* 15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2.

25         747.    The FTC promulgated regulations implementing Section 6502(b) of COPPA,

26  including 16 C.F.R. § 312.2, which defines website or online service "directed to children" as one

27  "that is targeted to children." The regulation lists factors for determining whether an online

28

service, or a part thereof, is directed to children and therefore subject to the statute's "verifiable parental consent" requirement. These factors include:

> subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children, language or other characteristics of the Web site or online service, as well as whether advertising promoting or appearing on the Web site or online service is directed to children. The Commission will also consider competent and reliable empirical evidence regarding audience composition, and evidence regarding the intended audience.

16 C.F.R. § 312.2.

748.    An online service is "directed to children" if it "targets children as one of its audiences - even if children are not the primary audience."[36] Even if a website claims to target teenagers or adults, "in reality, [the] site may attract a substantial number of children under 13, and thus may be considered [to be] . . . 'directed to children' . . . ."[37]

749.    Under COPPA and applicable regulations, Instagram is "directed to children" considering the following facts: (1) Instagram's "audience composition" includes millions of users under the age of 13; (2) advertising that promotes Instagram and appears on Instagram is directed to children; (3) Meta's design of the Instagram registration process allows children to use Instagram; (4) internal communications reveal that under-13 users are an "intended audience" of Instagram; (5) subject matter, characters, activities, music, and other content on Instagram are child-oriented; and (6) models and celebrities on Instagram are children and/or child-oriented.

> **a.    Instagram's audience composition includes millions of users under the age of 13.**

750.    Under 16 C.F.R. § 312.2, empirical evidence regarding audience composition is relevant to determining whether an online service, or a portion thereof, is directed to children.

751.    Meta's own records reveal that Instagram's audience composition includes millions of children under the age of 13.

---

[36] July 2020 COPPA Guidance, *supra* note 35.

[37] *Id.*

752.     As alleged above, the Daily Active People and Monthly Active People Penetration charts reveal that a substantial proportion of American children had used Instagram on a monthly or daily basis when they were under 13 years of age.

753.     Additionally, Zuckerberg was briefed in 2018 on the fact that there were "4m[illion] people under 13 in 2015 on IG [in the US]," a figure representing "around 30% of all 10-12 years old in the US."

754.     Another empirical indicator of the huge number of under-13 users on Instagram is the number of under-13 users *reported* to Meta, including reports by concerned parents, teachers, and siblings of users under the age of 13. Even assuming some, but not all of the under-13 users on Instagram are reported to Meta, the underage reports nonetheless provide some indication that Instagram's audience contains a substantial number of children under the age of 13. Between the first quarter of 2019 and the second quarter of 2023, Meta received over 1.1 million reports of users under age 13 on Instagram via its underage reporting webform and in-app underage reporting process.

755.     There are millions of under-13 users on Instagram today.

756.     The sheer number of under-13 users of Instagram composing Instagram's audience demonstrates that Instagram is, in fact, targeted to children.

757.     On information and belief, Meta possesses competent and reliable empirical evidence, and such evidence is corroborated by external sources, reflecting the generally known fact that there are millions of under-13 users on Instagram.

> **b.     Advertising that promotes Instagram and appears on Instagram is directed to children.**

758.     Under 16 C.F.R. § 312.2, whether "advertising promoting or appearing on . . . the online service is directed to children" is relevant to determining whether an online service, or a portion thereof, is directed to children.

759.     Meta's ads promoting Instagram feature and are directed to children—and ads that Meta hosts on Instagram are also child-directed.

760.    Meta has published advertising campaigns for Instagram featuring actors who appear to be children or teens, as shown in the below screenshot from a television commercial for Instagram that aired in April 2023:



761.    Meta also posted an advertisement for Instagram on YouTube in October 2021, featuring one or more individuals who appear to be children or teens, as depicted in the following screenshot:



762.    These advertisements and others by Meta related to Instagram were directed to children and teens and featured individuals who appeared to be children or teens.

763.    And Meta displays advertisements within Instagram that feature children and are directed to children.

764.    For example, according to Meta's Ad Library website, an advertisement promoting the children's television show "Dinosaur Train" and the "PBS KIDS Prime Video Channel" was run on Instagram and Facebook in July 2023, as depicted in the following screenshot:



765.    Also according to Meta's Ad Library website, an advertisement featuring children's cartoon characters "the Minions" was run on Instagram in July 2023, as depicted in the following screenshot:



766.     Meta's practice of hosting advertisements targeting children is another way that Instagram is directed to children.

**c.     Meta's design of the Instagram registration process allows children under 13 to use Instagram.**

767.     As set forth in detail above, Instagram first utilized no age gate for several years, then implemented an age gate that defaulted to a user age of 13 or above, then implemented an age gate that depends on children to self-report their own age. Meta is aware that because of these intentional design choices, under-13 users routinely supply a false date of birth when registering for Instagram.

768.     Meta has access to, and chooses not to use, alternative feasible age verification methods that would significantly reduce or eliminate the number of underage users on Meta's

1    Social Media Platforms, for example, by requiring young users to submit student IDs upon
2    registration.

3        769.    Instagram's decision not to use effective age verification that would exclude
4    under-13 users is one way that it effectively targets and welcomes under-13 users onto the
5    Platform.

6        770.    Because Meta does not effectively exclude users under the age of 13 from
7    Instagram, Meta's external narrative regarding its COPPA compliance and age verification is
8    misleading, including inaccurate public statements by Zuckerberg himself. This has been
9    acknowledged by Meta's own employees. While discussing Zuckerberg's congressional
10   statements in March 2021, Software Engineer ████████████████ noted: "Oof. This
11   statement that mark made isn't accurate: 'And we have additional systems that try to determine
12   what someone's age might be so if we detect that someone might be under the age of 13, even if
13   they lied, we kicked them off.' We don't have u13 models today."

14       **d.    Users under age 13 are an "intended audience" of Instagram.**

15       771.    Under 16 C.F.R. § 312.2, "evidence regarding the intended audience" of an online
16   service is relevant to determining whether an online service, or a portion thereof, is directed to
17   children. A platform is "directed to children" if it targets children as "one of its audiences—even
18   if children are not the primary audience."[38]

19       772.    Meta's internal communications show users under age 13 are an intended audience
20   of Instagram.

21       773.    An internal email from 2020 between Mosseri and ████████████████, then
22   Facebook Engineering Director—Youth Team, states that Meta explicitly intended for its users
23   under age 13 to "age up" from Messenger Kids (Meta's product that is designed and marketed to
24   children under the age of 13) to the full Instagram Platform "*in their tweens years* as they get a
25   cellular phone," before these users were nominally allowed on Instagram (emphasis added). The

26

27

28       _____
         [38] July 2020 COPPA Guidance, *supra* note 35.

                                          130

same email emphasized the importance of "solidifying [Meta's] dominance in the youth space" to

secure a new generation of Instagram users.

774.    Additionally, Research Director for Instagram ███████ wrote to Davis in 2021 that

"Instagram is investing in experiences targeting youth aged roughly 10- to 12," noting that

"research among this population is very sensitive." In another email from 2021, ████████ wrote:

"we are spinning up a cross-company Youth initiative that spans Instagram and Messenger Kids .

. . . Youth has been an umbrella term we're using for ages 6+ up through late teens/early 20's

[sic]."

775.    In that same year, ████████, ████████ and others internally discussed Meta's use of

stated ages provided by children as a "proxy" to study children under the age of 13, noting Meta's

internal language code:

- Young kids (0-5)
- Kids (6-9)
- Tweens (10-12)
- Early teens (13-15)
- Later teens (16+)

776.    In an internal presentation from July 2021, Meta employees asked "what approach

should we take to profile with tweens" and "how do tweens want to curate content/identity" in the

dual context of IG Youth and the main Instagram Platform among a host of other tween specific

inquiries (such as what close friendships mean for tweens).

777.    In 2021, Meta employees also discussed their engagement in "new

experiences/teen engagement work" for "under 13 users" over instant messaging.

778.    For example, in February 2021, ████████ noted that Meta was working to recruit

"Gen Alpha before they reach teenage years" to Instagram. A Meta researcher noted in November

2020 that Meta was studying "where can IG best meet the needs and desires of Gen Alpha." Gen

Alpha is the generation with birth years beginning in the 2010s (in 2020, this would have

included children aged 10 and under).

779.     Consistent with this strategy, Meta has extensively studied the habits and attitudes of users under age 13 toward Instagram, through confidential surveys, focus groups, and other internal studies.

780.     In March 2020, Meta internally circulated a study called "Beyond the Individual User: Understanding our Products through the Household Ecosystem." In this study, Meta compiled data from surveys that Meta conducted with families containing at least one parent, one teen, and one preteen (a child under the age of 13). Meta collected information about how teens encourage their siblings who are under 13 years old to use social media, in order to gain perspective on how to target children under the age of 13 to use Instagram.

781.     In an internal chat from January 2021, ████████ discussed ways that Meta could utilize its teen users to recruit pre-teens (under the age of 13) to use Instagram.

782.     In November 2020, Meta employees discussed how to ensure that Instagram retained a market share of children under the age of 13 (whom they referred to as "future teens").

783.     As early as 2016, internal Meta documents reveal Zuckerberg's implicit intent to increase teen engagement on Meta's Platforms by building experiences for "under-13s."

784.     In October 2021, a Meta employee acknowledged that Meta had previously built experiences for users under the age of 13.

785.     In 2020, two Meta researchers submitted a proposal to study friendships and how they change over time. This included studying tweens ages 10 to 12 years old who use Instagram.

786.     Researcher ████████ suggests this research is valuable because "[r]ecent teen studies and competitive analyses have identified that close friend relationships are a prominent priority of young users. The presence of close friends and engagement between friend groups is a known driver of application adoption and daily usage and value - which also happens to be the primary focus of IG Growth and inherent priority for Sharing Experiences and Threads."

787.     At times, Meta even publicly acknowledges that focusing on Instagram users under age 13 is a part of its business strategy.

788.     For example, in September 2018, Meta released a "guide" for parents, urging them to allow their children to join Instagram, lest the children risk "social marginalization."

1  Commentators noted that the guide suggested that children under the age of 13 already use

2  Instagram, and the guide indicated that Instagram did not collect ages of users at time of signup.

3       789.    Meta explicitly lists "pre-teens" in financial review documents within its

4  discussions of "Meta themes."

5       790.    In September 2021, in an internal chat including Newton (Instagram Head of

6  Public Policy), Mosseri (Head of Instagram), Dr. Hendrix (Head of Research at Instagram), and

7  Otway (Instagram's spokesperson), Otway warned the team that reporter Jeff Horwitz possessed

8  Meta's "marketing research that 'indicates a tolerance for or even desire to recruit users in the

9  sub-13 range to the current IG platform.'"

10      791.    On information and belief, Meta pursues children as Instagram users because, in

11 the short term, children generate revenue for Instagram by consuming Instagram advertising for

12 extended periods of time, and in the long term, Meta strives to retain and profit from those same

13 users as they "age up" into teen and eventually adult users of Meta's Platforms .

14      792.    Despite its widespread efforts to secure the market of users under the age of 13,

15 externally, Meta denies that it designs Instagram to appeal to children; for example, Davis

16 testified to Congress on September 30, 2021 that Meta's Platforms are not designed for children

17 12 and under.

18      793.    Meta's communications expressing its intent to reach under-13 users are one way

19 that it reveals itself to be "directed to children."

20          e.    **Subject matter, characters, activities, music, and other content on**

21              **Instagram are child-oriented.**

22      794.    Under 16 C.F.R. § 312.2, "subject matter, visual content, use of animated

23 characters or child-oriented activities and incentives, music or other audio content" are relevant to

24 determining whether an online service, or a portion thereof, is directed to children.

25      795.    Instagram publicly hosts thousands of accounts and pages on its Platform that

26 include child-oriented subject matter, characters, activities, music, and other categories of content

27 for children.

28

796.     To list only a few representative examples, Meta has admitted that it hosts the following accounts or pages on Instagram. Each such account or page on Instagram is child-oriented because it hosts images and videos relating to a character, product, or brand that is specially made for and/or marketed to children:

| Instagram Page | URL |
| --- | --- |
| Bluey | https://www.instagram.com/officialblueytv/ |
| DC Super Hero Girls | https://www.instagram.com/dcsuperherogirls/ |
| Disney Junior | https://www.instagram.com/disneyjunior/ |
| Dr. Seuss | https://www.instagram.com/drseuss/ |
| Dragon Ball Super | https://www.instagram.com/dragonballsuper/ |
| Hasbro | https://www.instagram.com/hasbro/ |
| Hello Kitty | https://www.instagram.com/hellokitty/ |
| Hot Wheels | https://www.instagram.com/hotwheelsofficial/ |
| JoJo Siwa | https://www.instagram.com/itsjojosiwa/ |
| Lego | https://www.instagram.com/lego/ |
| Mickey Mouse | https://www.instagram.com/mickeymouse/ |
| Miraculous Ladybug | https://www.instagram.com/miraculous/ |
| Monster High | https://www.instagram.com/monsterhigh/ |
| My Little Pony | https://www.instagram.com/mylittlepony/ |
| Nick Jr. | https://www.instagram.com/nickjr/ |
| Nickelodeon | https://www.instagram.com/nickelodeon/ |
| Paddington Bear | https://www.instagram.com/paddingtonbear/ |
| Patrick Star | https://www.instagram.com/officialpatrickstar/ |
| PAW Patrol | https://www.instagram.com/pawpatrol/ |
| PBS Kids | https://www.instagram.com/pbskids/ |
| Peppa Pig | https://www.instagram.com/officialpeppa/ |
| Pokemon | https://www.instagram.com/pokemon/ |

134

| | |
|---|---|
| Rugrats | https://www.instagram.com/rugrats/ |
| Sesame Street | https://www.instagram.com/sesamestreet/ |
| Sonic the Hedgehog | https://www.instagram.com/sonicthehedgehog/ |
| SpongeBob SquarePants | https://www.instagram.com/spongebob/ |
| Teenage Mutant Ninja Turtles | https://www.instagram.com/tmnt/ |
| Thomas & Friends | https://www.instagram.com/thomasandfriends/ |
| Transformers | https://www.instagram.com/transformersofficial/ |

797.    These and thousands of other child-oriented parts of Instagram are "a part []of" an online service that "is directed to children."[39]

798.    Meta's maintenance and/or promotion of thousands of child-oriented pages on Instagram is one of the ways that Meta causes Instagram to be "directed to children."

### f.    Models and celebrities on Instagram are children and/or child-oriented.

799.     Under 16 C.F.R. § 312.2, the "age of models, presence of child celebrities, [and] celebrities who appeal to children" are relevant to determining whether an online service, or a portion thereof, is directed to children.

800.    Meta hosts, maintains, and promotes thousands of accounts on Instagram that are dedicated to displaying images and videos of child models, child celebrities, and other child-oriented celebrities.

801.    As a representative example, Instagram currently hosts the Instagram account of JoJo Siwa, a popular celebrity among tweens. JoJo Siwa is now over the age of 13 but she has maintained an active public Instagram account since she was approximately 8 years old.

802.    When confronted with evidence that JoJo Siwa—then and now a popular celebrity among tweens—had been active on Instagram since she was eight years old, and had Instagram followers who were minors, Mosseri's response was: "I don't want to hear it."

---

[39] *See* 16 C.F.R. § 312.2.

803.     Thousands of pages on Instagram feature child celebrities and child-oriented celebrities which are directed to children.

804.     Similarly, Meta is aware that Instagram contains influencer accounts belonging to children under the age of 13 (but technically owned by their parents or agents) that are child directed.

805.     In an email exchange from 2019 discussing Meta's response to a New York Times exposé on child influencer accounts, a Meta employee wrote "Branded content for under 13 is happening on IG." The employee then discusses three types of under-13 influencers/actors (on accounts run by parents) on IG, with references to specific accounts. The employee acknowledges that branded content posted by child influencers under the age of 13 (such as video game reviews) appeals to children under 13.

### 3.     Meta does not obtain verifiable parental consent before collecting personal information from users under the age of 13 on Instagram.

806.      Despite Meta's "actual knowledge" of under-13 users and the fact that Instagram is "directed to children," Meta does not obtain verifiable parental consent, as required by COPPA, before collecting the personal information of its child users.

807.     To obtain verifiable parental consent, Meta would need to (1) first provide notice to the parent of the company's "personal information collection, use, and disclosure practices," then (2) obtain the parent's authorization for the company to "collect[], use, and disclos[e], as applicable . . . personal information and the subsequent use of that information"—all in conformity with the COPPA regulations and all prior to the child's information being collected. 15 U.S.C. § 6501(9).

808.     On information and belief, Meta does not provide sufficient notice on its Instagram websites or Platform, through a prominently posted link or directly to parents, about what information it collects from children, how it uses such information, its disclosure practices, and parents' rights to review or delete their children's information.

809.     Meta has admitted that it does not provide parents with such notice and does not obtain verifiable parental consent with respect to child users on Instagram.

810. Meta nonetheless collects "personal information" from all registered users of Instagram, including all users under the age of 13 on Instagram, without first obtaining verifiable parental consent.

811. Meta collects "personal information" of children through Instagram including, but not limited to, geolocation information, persistent identifiers of the child, unique device identifiers, photos and videos of the child, and other individually identifiable information about each user under the age of 13.

**C. Meta does not comply with COPPA with respect to Facebook.**

812. Under COPPA, Meta is also required to obtain verifiable parental consent with respect to users under the age of 13 on Facebook including because (1) Meta has "actual knowledge" of under-13 users on Facebook; and (2) Facebook, or a portion thereof, is directed to children.

**1. Meta has actual knowledge of users under age 13 on Facebook.**

813. Like with Instagram, the prevalence of under-13 users on Facebook—and Meta's collection of those users' personal information—is an open secret within Meta.

814. On information and belief, Meta possesses and confirms its actual knowledge that it collects the personal information of children on Facebook through the same categories of information alleged above with respect to Instagram, including (i) internal communications and data revealing the existence of under-13 users on Facebook; (ii) internal communications revealing that Facebook's weak age-gating process effectively and predictably allows children onto Facebook; and (iii) data generated by Meta's age-estimation algorithms confirming that millions of individual Facebook accounts belong to children under age 13.

815. In January 2018, Zuckerberg received a report in advance of a meeting to discuss underage users on Meta's Platforms. The report noted that "Facebook is likely U13's first social media app," but that the company needed to "figure out our tweens strategy" for Facebook.

816. Other internal communications incidentally discuss Facebook's under-13 users that were known to Meta's employees.

817.    In a 2020 internal "Case Study" reviewing "FB Dating," a dating service within Facebook, Meta employee ███████ reported that there were multiple "confirmed minors" using FB Dating, including two who "admitted in conversation to being under 12" and one "in the third grade." The study expressed concern that "individuals who were paired with minors" on FB Dating reacted negatively to learning that they were interacting with children—which, according to the document, posed a risk of "serious reputation damage to Facebook."

818.    Meta possesses data from 2020 indicating that, out of 3,989 children surveyed, 31% of child respondents aged 6-9 and 44% of child respondents aged 10 to 12-years-old had used Facebook.

819.    Meta is also aware that its registration process for Facebook does not prevent users under the age of 13 from creating Facebook accounts—and that it allows them onto the Platform despite nominally prohibiting them.

820.    Meta employs a similar policy of ignoring certain reports of under-13 users on Facebook as it does for Instagram. When Meta receives a report that a Facebook user is under 13 years old, Meta automatically ignores the report and continues collecting the child's personal information if there are no photos associated with the account.

821.    Upon information and belief, Meta has confirmed its knowledge of specific under-13 user accounts through its review of data generated by Meta's age-estimation algorithms confirming that millions of individual Facebook accounts belong to children under the age of 13.

    2.    Facebook is "directed to children."

822.    Upon information and belief, Facebook is "directed to children" including because internal communications reveal that children are an intended audience of Facebook and because Facebook maintains and promotes thousands of pages and accounts that are child-oriented.

823.    Employees within Meta routinely exchange communications revealing that children are an intended audience of Facebook.

824.    ███████ stated in an internal chat in May 2021 that "the reality is that kids are using phones from younger ages" and "[I]'d prefer FB to own the market which has builds with safety in mind" "as opposed to someone else."

138

825.   Similarly, a 2018 report to Zuckerberg emphasized that the company needed to "figure out our tweens strategy" for Facebook.

826.   An internal presentation titled "2017 Teens Strategic Focus" outlines Meta's plans to "win back" the teen market by specifically targeting the under-13 market. The presentation has slides documenting the following information about users under the age of 13: "significant tablet usage starts at 3-4," "Smartphones dominate from age 10," and "Social identity is an Unmet need Ages 5-11." Another stated goal was to build an under-13 Platform to "grow [Monthly Active People], [Daily Active People] and time spent among U13 kids."

827.   While developing IG Youth and Messenger Kids for children under the age of 13, Max Eulenstein, a Vice President Co-Head of Product at Instagram, noted in November 2020 that his team was meeting with Zuckerberg to "highlight data showing why IG Youth could help with the tween market for FACEBOOK."

828.   Additionally, thousands of Facebook pages and accounts are child-oriented, including because they feature child-oriented subject matter, characters, activities, and music, as well as child models, child celebrities, and celebrities who appeal to children.

829.   And Meta has published advertising campaigns designed to encourage more children to use its Social Media Platforms like Facebook. Meta touts the alleged safety of those Platforms. In a recent television ad, Meta claimed that it "build[s] technology that gives you more

139

1    control and helps keep you safe" including through "tools that can protect—so you can connect."

2    This advertisement featured children, as shown in the screenshot below:



16      830.    Similarly, Meta permits advertisements to be displayed within Facebook that

feature children and are directed to children.

      831.    According to Meta's Ad Library website, an advertisement promoting the PBS

Kids television show "Wild Kratts" and the "PBS KIDS Prime Video Channel" was run on

Facebook in July 2023, as depicted in the following screenshot:

140



832.     Because Facebook is targeted to children, Meta is required to obtain verifiable parental consent for its collection of personal information from users under the age of 13.

   **3.     Meta does not obtain verifiable parental consent before collecting personal information from users under age 13 on Facebook.**

833.     Despite being required under COPPA to obtain verifiable parental consent, Meta does not obtain—or even attempt to obtain—verifiable parental consent before collecting the personal information of children on Facebook.

834.     On information and belief, Meta also does not provide sufficient notice on its Facebook websites or Platform, through a prominently posted link or directly to parents, about what information it collects from children, how it uses such information, its disclosure practices, and parents' rights to review or delete their children's information.

835. The "personal information" of children collected by Meta through Facebook includes, but is not limited to, geolocation information, persistent identifiers of the user, unique device identifiers, photos and videos of the children, and other individually identifiable information about each child-user.

## X. META CONTINUES TO EXPAND AND INTRODUCE NEW PLATFORMS

836. Meta has indicated, both publicly and internally, that it plans to expand its presence in the Virtual Reality (VR) arena.

837. Virtual Reality is a new way to interact with computers wherein a user's body is virtually placed into a 3D digital world that they can control by moving their body as though in the real world.

838. Meta first ventured into virtual reality when, in 2014, it purchased VR headset manufacturer Oculus. Meta has since developed a flagship VR Social Media Platform called "Horizon Worlds."

839. In May 2022, the organization SumOfUs (now called Eko), released a report documenting the harms it found on Horizon Worlds, including harassment and abuse.

840. On March 8, 2023, the Center for Countering Digital Hate published a report about bullying, sexual harassment of minors, and harmful content on Horizon Worlds.

841. As of April 2023, Meta made Horizon Worlds available to young users between the ages of 13 to 17.

842. The Filing States have attempted to investigate Meta's actions in the VR space, specifically by issuing Civil Investigative Demands on June 7, 2023, requesting information about minors on Horizon Worlds, including users under age 13.

843. To date, Meta has not responded to the Filing States' requests for information and documents on this topic.

844. Upon information and belief, Meta is developing and deploying new features on its nascent virtual reality Platforms such as Horizon Worlds, which users may link to their accounts on Facebook and Instagram.

845.     Upon information and belief, Meta's conduct in the VR space may create harm to minors such that it constitutes violations of states' consumer protection laws and yield further violations under COPPA.

## XI.     SUMMARY OF META'S DECEPTIVE AND UNFAIR OR UNCONSCIONABLE ACTS AND PRACTICES

### A.     Deceptive Acts and Practices

846.     Meta engaged in the following deceptive acts and practices, with the intent that consumers rely on the deceptive acts and practices:

a. Meta misrepresented, directly or indirectly, expressly or by implication, that its Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

b. Meta misrepresented, directly or indirectly, expressly or by implication, that its Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c. Meta misrepresented, directly or indirectly, expressly or by implication, through the publication of CSER reports and intentional omission of material BEEF and TRIPS data from those reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d. Meta misrepresented, directly or indirectly, expressly or by implication that it prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e. Meta misrepresented, directly or indirectly, expressly or by implication that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

143

    f.  Meta misrepresented, directly or indirectly, expressly or by implication that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data;

    g.  Meta has made other false and deceptive representations, including as set forth in paragraphs 1 through 835.

**B.    Unfair and/or Unconscionable Acts and Practices**

847.    Meta engaged in unfair and unconscionable acts and practices, including the following unfair and/or unconscionable acts and practices, in connection with young users' use of and/or addiction to Meta's Social Media Platforms:

    a.  Meta targeted its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users;

    b.  Meta utilized Social Media Platform features that unfairly and/or unconscionably harm young users independently of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of "Likes," and disruptive alerts, all of which were unfairly and/or unconscionably utilized by Meta to extract additional time and attention from young users whose developing brains were not equipped to resist those manipulative tactics;

    c.  Meta designed, developed, and deployed disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly and/or unconscionably exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

    d.  Meta algorithmically served content to young users, according to "variable reinforcement schedules," thereby manipulating dopamine releases in young users,

144

unfairly or unconscionably inducing them to engage repeatedly with its products—much like a gambler at a slot machine; and

e.  Meta collected the personal information of under-13 users of Instagram and Facebook without first obtaining verifiable parental consent, which violated COPPA and the COPPA Rule.

848.  Meta's deployment of manipulative and harmful features, both on their own and especially in combination, for use by young users are unfair and/or unconscionable acts or practices.

849.  At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Social Media Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them, and persisted in exploiting young users' psychological vulnerabilities. Meta's acts and practices alleged herein are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

850.  Meta's acts and practices alleged herein, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are offensive to public policy, as defined by statute and common law. The protection of minors from the harms of addiction and related afflictions are well-established objectives underlying public policy in the Filing States; Meta's acts and practices alleged herein, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are therefore offensive to public policy.

## CLAIMS FOR RELIEF

### COUNT I: COPPA VIOLATIONS BY META

**(15 USC § 6501 *et seq.*; 16 C.F.R. § 312.1 *et seq.*)**

851.  The Filing States reallege and incorporate herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

145

852. Meta has repeatedly collected, used, or shared personal information about children under the age of 13 and continues to systematically do so.

853. Meta has failed and continues to fail to provide direct notice to parents about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Sections 312.4(b) and 312.4(c) of the COPPA Rule, 16 C.F.R. § 312.4(b)-312.4(c).

854. Meta has failed and continues to fail to provide sufficient notice on its Social Media Platforms about the information it collects from children and how it uses such information, and its disclosure practices are in violation of Section 312.4(d) of the COPPA Rule, 16 C.F.R. § 312.4(d).

855. Meta has failed to obtain verifiable parental consent prior to collecting or using any personal information of children, in violation of Section 312.5 of the COPPA Rule, 16 C.F.R. § 312.5.

856. Under 16 C.F.R. § 312.9, a violation of COPPA constitutes an unfair or deceptive act or practice, in violation of 15 U.S.C. § 45.

857. The Filing States have reason to believe that Meta has violated COPPA and the COPPA Rule with respect to residents of each filing state.

858. Under 15 U.S.C § 6504, the Attorneys General of the Filing States are empowered to bring a civil action to:

    a. Enjoin practices which violate COPPA and the COPPA Rule;

    b. Enforce compliance with the COPPA Rule;

    c. Obtain damages, restitution, and other compensation; and

    d. Obtain such other relief as the Court may consider appropriate.

859. Absent injunctive relief by this Court, Meta is likely to continue to violate the COPPA Rule.

1   **COUNT II: VIOLATIONS OF THE ARIZONA CONSUMER FRAUD ACT, ARIZ. REV.**

2   **STAT. §§ 44-1521 to -1534**

3       860.    The State of Arizona incorporates and realleges each of the paragraphs 1 through

4   850 as if fully set forth herein.

5       861.    The conduct described in the preceding paragraphs of this Complaint constitutes

6   deception, deceptive or unfair acts or practices, fraud, false pretenses, false promises,

7   misrepresentations, or concealment, suppression or omission of material facts with intent that

8   others rely on such concealment, suppression or omission, in connection with the sale or

9   advertisement of merchandise in violation of Ariz. Rev. Stat. §§ 44-1521 to -1534.

10      862.    While engaging in the acts and practices alleged in this Complaint, Meta knew or

11  should have known that its conduct was of the nature prohibited by Ariz. Rev. Stat. § 44-1522,

12  subjecting it to enforcement and penalties as provided in Ariz. Rev. Stat. § 44-1531(A).

13      863.    With respect to the concealments, suppressions, or omissions of material fact

14  described above, Meta did so with intent that others rely on such concealments, suppressions, or

15  omissions.

16      864.    With respect to the unfair acts and practices described above, these acts and

17  practices caused or were likely to cause substantial injuries to consumers that were not reasonably

18  avoidable by consumers and were not outweighed by countervailing benefits to consumers or to

19  competition.

20

21  **COUNT III: FALSE OR MISLEADING STATEMENTS BY META IN VIOLATION OF**

22  **BUSINESS AND PROFESSIONS CODE SECTION 17500 (BY THE PEOPLE OF THE**

23  **STATE OF CALIFORNIA)**

24      865.    The People of the State of California (California) reallege and incorporate herein

25  by reference each of the allegations contained in the preceding paragraphs 1 through 859 as

26  though fully alleged in this cause of action.

27      866.    From a date unknown to California and continuing to the present, Meta has

28  engaged in and continues to engage in acts or practices that constitute violations of California

Business and Professions Code section 17500 *et seq*., by making or causing to be made untrue or misleading statements with the intent to induce members of the public to use Meta's platforms when such statements were likely to mislead members of the public about the nature and safety of Meta's platforms. Meta's untrue or misleading representations include, but are not limited to, the representations described in paragraph 846.

867.    At the time the untrue or misleading representations were made, Meta knew or by the exercise of reasonable care should have known that the representations were untrue or misleading.

## COUNT IV: UNFAIR COMPETITION BY META IN VIOLATION OF BUSINESS AND PROFESSIONS CODE SECTION 17200 (BY THE PEOPLE OF THE STATE OF CALIFORNIA)

868.    California realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 859 and 865 to 867 as though fully alleged in this cause of action.

869.    From a date unknown to California and continuing to the present, Meta has engaged in and continues to engage in unlawful, unfair, or fraudulent acts or practices, which constitute unfair competition within the meaning of Section 17200 of the Business and Professions Code. Meta's acts of unfair competition include, but are not limited to, the following:

870.    Meta has committed unlawful business practices by violating California Business and Professions Code section 17500 *et seq*., as alleged in Count III;

871.    Meta has made deceptive representations, directly or indirectly, expressly or by implication, regarding its Social Media Platforms, including, but not limited to, those described in paragraph 846.

872.    Meta has engaged in unfair acts and omissions with regard to its Social Media Platforms, as described in paragraphs 847-850.

873.    Meta has engaged in the acts and practices alleged in Count I, which violated COPPA and the COPPA Rule.

148

**COUNT V: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(e)**

874.    Colorado realleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

875.    In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its Platforms, including but not limited to statements made to reporters, statements made to the public via Meta's website, and statements provided in testimony to Congress, such as through the means described in paragraphs 846.a. through 846.g., Meta knowingly and/or recklessly made false representations regarding the characteristics, uses, benefits, and/or alterations of its Platforms.

876.    Such representations include, but are not limited to, those set forth in paragraphs 846.a. through 846.g. These and other false statements by Meta were material to consumers' decisions regarding their usage of Meta's Platforms. These representations also had the capacity to deceive consumers and were intended to induce young consumers' use of the Platforms.

877.    The deceptive acts or practices alleged herein constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(e).


**COUNT VI: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(g)**

878.    Colorado realleges and incorporates by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

879.    Through the acts and omissions described above, including but not limited to those set forth in paragraphs 846.a. through 846.g., Meta represented that its Social Media Platforms met a particular standard, quality, and grade of safety appropriate for its young users that Meta knew or should have known they did not meet.

880.    For example, as detailed above, Meta made specific representations regarding the safety of its Platforms in its "Community Standards Enforcement Reports," which described the

1    percentage of content posted that Meta removed for violating its Community Standards. In its

2    Reports and accompanying statements made on its website, to reporters, and to Congress, Meta

3    promoted this "prevalence" metric as a reliable measure of the safety of its Social Media

4    Platforms. Meta represented that because it aggressively enforced its Community Standards—

5    thereby reducing the "prevalence" of Community-Standards-violating content—its Social Media

6    Platforms were safe products for young users, and only rarely exposed young users to harmful

7    content and harmful experiences.

8        881.    But Meta knew or should have known the "prevalence" of content which violated

9    its Community Standards was not the same as the actual "prevalence" of harmful content on its

10   Social Media Platforms. Meta knew or should have known that the prevalence of harmful

11   content—as reflected in Meta's own internal research and assessments—was significantly higher

12   than the public-facing prevalence metrics Meta reported to consumers. Meta thus knew that its

13   Social Media Platforms did not meet the standard, quality, and/or grade necessary to make it safe

14   for young users, despite its representations to the contrary.

15       882.    The representations alleged herein constitute separate violations of the Colorado

16   Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately

17   and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(g).

18

19   **COUNT VII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE**

20   **COLORADO CONSUMER PROTECTION ACT, COLO. REV. STAT. § 6-1-105(1)(u)**

21       883.    Colorado realleges and incorporates by reference each of the allegations contained

22   in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

23       884.    In numerous instances in connection with the advertising, marketing, promotion,

24   and other representations regarding its Platforms, including but not limited to statements made to

25   reporters, statements made to the public via Meta's website, and statements provided in testimony

26   to Congress, such as through the means described in paragraphs 846.a. through 846.g., Meta

27   failed to disclose material information to consumers regarding its Social Media Platforms. Such

28   information includes but is not limited to the fact that these Platforms were designed to induce

150

1    compulsive and extended use, the effects of which are particularly harmful for young users, and

2    that harmful content on the Platforms was more prevalent than what Meta represented to

3    consumers.

4         885.    Meta knew this information at the time it advertised, promoted, and/or sold its

5    Platforms but failed to disclose it. Meta made these and other material omissions with an intent to

6    induce young users to use its Social Media Platforms.

7         886.    The material omissions alleged herein constitute separate violations of the

8    Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both

9    separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(u).

10

11   **COUNT VIII: DECEPTIVE AND UNFAIR ACTS OR PRACTICES BY META IN**

12   **VIOLATION OF THE COLORADO CONSUMER PROTECTION ACT,**

13   **COLO. REV. STAT. § 6-1-105(1)(rrr)**

14        887.    Colorado realleges and incorporates by reference each of the allegations contained

15   in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

16        888.    Through the above-described acts and omissions, including but not limited to the

17   acts and omissions described in paragraphs 847 through 850, Meta knowingly and/or recklessly

18   engaged in unfair, unconscionable, deceptive, deliberately misleading, false, and/or fraudulent

19   acts and/or practices.

20        889.    At all relevant times, Meta knew of the mental and physical harms suffered by

21   young users of its Social Media Platforms. Meta deliberately misled consumers regarding these

22   harms and exploited the vulnerabilities of young users to maximize engagement. Such conduct

23   led to, among other things, young users' compulsive and unhealthy use of, and addiction to, the

24   Social Media Platforms.

25        890.    Meta's acts and omissions alleged herein offend public policy, fall in the

26   penumbra of conduct generally recognized under common-law theories of products liability, and

27   are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing

28   decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

891. Meta's acts and omissions alleged herein are also likely to cause, and have caused, substantial injury to consumers that could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts and omissions, nor can they do so in the future, for numerous reasons, including but not limited to Meta's misrepresentations and failure to disclose the dangerous nature of its Social Media Platforms, and Meta's use of psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those features.

892. The deceptive and/or unfair act or practices engaged in by Meta as recited above constitute separate violations of the Colorado Consumer Protection Act. By engaging in the acts and practices alleged herein, both separately and as taken together, Meta violated Colo. Rev. Stat. § 6-1-105(1)(rrr).

## COUNT IX: VIOLATIONS OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONNECTICUT GENERAL STATUTES § 42-110b *et seq.*

893. At all relevant times, Meta was engaged in trade or commerce in Connecticut pursuant to Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b(a).

894. The State of Connecticut realleges and incorporates herein by reference each allegation contained in the preceding paragraphs 1 through 850.

895. The State of Connecticut alleges that the aforesaid acts and practices in paragraph 846 constitute deceptive acts or practices in violation of Conn. Gen. Stat. § 42-110b(a).

896. The State of Connecticut alleges that the aforesaid acts and practices of Meta in paragraphs 847 through 850 offend public policy pertaining to the protection of minors from the harms of addiction as well as protecting the privacy and safety of minors online as embodied in COPPA.

897. The State of Connecticut alleges that the aforesaid acts and practices of Meta in paragraphs 847 to 850 are oppressive, unethical, immoral, and unscrupulous.

898. Meta's conduct substantially harmed Connecticut consumers in that Meta's unfair acts and omissions caused young Connecticut users' compulsive and unhealthy use of and

152

1  addiction to Meta's Social Media Platforms which resulted in mental and physical harms, as

2  alleged in paragraphs 847 through 850.

3       899.    Meta's acts and practices, as described herein, therefore constitute unfair acts or

4  practices in violation of Conn. Gen. Stat. § 42-110b(a).

5       900.    Meta knew, or should have known, that its conduct was unfair or deceptive in

6  violation of Conn. Gen. Stat. § 42-110b, and as a consequence Meta is subject to civil penalties of

7  not more than $5,000 per violation pursuant to Conn. Gen. Stat. § 42-110o(b).

8

9  **COUNT X: VIOLATIONS OF THE DELAWARE CONSUMER FRAUD ACT (Delaware**

10  **CFA), 6 Del. Code Ann. § 2513 *et seq.***

11       901.    The State of Delaware, *ex rel.* Kathleen Jennings, Attorney General, incorporates

12  and realleges each of the paragraphs 1 through 859.

13       902.    Meta and each Defendant at all relevant times were "person[s]" as defined under

14  the Delaware CFA. Specifically, Meta and each Defendant were corporations, businesses, or

15  partnerships.

16       903.    Meta conducted "sale[s]" of "merchandise" as defined by the Delaware CFA

17  during all relevant times.

18       904.    Meta created and disseminated "advertisements" as defined by the Delaware CFA

19  during all relevant times.

20       905.    Meta intentionally and purposefully sold and transacted in merchandise and

21  advertisement within the State of Delaware at all relevant times.

22       906.    The State of Delaware alleges that Meta's acts and omissions described in

23  paragraphs 1 to 850 of this Complaint constitute violations of the Delaware CFA, including 6 Del.

24  Code Ann. § 2513(a).

25       907.    Meta acted, used, and/or employed deception, fraud, false pretense, false promise,

26  misrepresentation, unfair practice, and/or the concealment, suppression, or omission of material

27  fact with intent that others rely upon such concealment, suppression, or omission, in connection

28

153

with the sale, lease, receipt, or advertisement of merchandise, by engaging in the conduct described in paragraph 846.

908.    Meta engaged in unfair practices because its actions described in paragraphs 847-850 caused or were likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.

909.    Meta's violation of various laws and regulations, including the Children's Online Privacy Protection Rule (COPPA) constituted a substantial injury to the consumers and constituted an unfair practice as defined by the Delaware CFA.

910.    Meta has willfully engaged in the acts and practices described in this Complaint in violation of the Delaware CFA because it knew or should have known that its conduct was a violation of the Delaware CFA.

## COUNT XI: VIOLATIONS OF THE DELAWARE DECEPTIVE TRADE PRACTICES ACT (Delaware DTPA), 6 Del. Code Ann. § 2531 *et seq.*

911.    The State of Delaware, *ex rel.* Kathleen Jennings, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

912.    The Delaware DTPA, 6 Del. Code Ann. § 2531 *et seq*., prohibits a business from engaging in conduct which creates a likelihood of confusion or of misunderstanding.

913.    Meta and each Defendant are "person[s]" engaged in a business, trade or commerce in the State of Delaware within the meaning of § 2531 of the Delaware DTPA.

914.    As described in paragraphs 1 to 850 of the Complaint, Meta has engaged in conduct which created the likelihood of confusion or misunderstanding.

915.    Meta represented that its goods and/or services had approval, characteristics, ingredients, uses, benefits, or quantities that they did not have in violation of 6 Del. Code Ann. § 2532 (a)(5).

916.    Meta advertised goods or services with intent not to sell them as advertised in violation of 6 Del. Code Ann. § 2532(a)(9).

917.     Meta engaged in a series of conduct, described in paragraph 846 which similarly create a likelihood of confusion or of misunderstanding. 6 Del. Code Ann. § 2532(a)(12).

918.     Meta's actions constituted willful violations of the Delaware DTPA because they knew or should have known that its conduct was prohibited by that statute.

## COUNT XII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390 *et seq.*

919.     The State of Georgia, by and through Christopher M. Carr, Attorney General of the State of Georgia, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

920.     Prior to initiating this proceeding under the Georgia Fair Business Practices Act (FBPA), the State of Georgia, by and through the Attorney General and his designees, complied with O.C.G.A. § 10-1-397(c).

921.     The State of Georgia, by and through the Attorney General, is authorized pursuant to O.C.G.A. § 10-1-397(b)(2) to initiate this action, which may be brought in federal district court pursuant to O.C.G.A. § 10-1-397.1.

922.     Meta's consumer acts or practices are or were conducted in "trade" or "commerce," as those terms are defined in O.C.G.A. § 10-1-392(a)(28) of the FBPA, in whole or in part in the State of Georgia.

923.     Meta and each Defendant are or were during all relevant times engaged in the conduct of "consumer acts or practices," as that term is defined in O.C.G.A. § 10-1-392(a)(7) of the FBPA, in whole or in part in the State of Georgia.

924.     While engaged in consumer acts or practices in trade or commerce, Meta is using, has used, and/or is about to use the following deceptive methods, acts, and practices in whole or in part in the State of Georgia, including through the means described in paragraph 846.

925.     Meta's aforesaid methods, acts, and practices are deceptive and are thus unlawful under the FBPA, including O.C.G.A. § 10-1-393(a) and (b).

926.     The State of Georgia, by and through the Attorney General, is authorized to bring this action whether or not any person has actually been misled by Meta's deceptive methods, acts, and practices.

## COUNT XIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF GEORGIA FAIR BUSINESS PRACTICES ACT, O.C.G.A. § 10-1-390 *et seq.*

927.     The State of Georgia, by and through Christopher M. Carr, Attorney General of the State of Georgia, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

928.     Prior to initiating this proceeding under the FBPA, the State of Georgia, by and through the Attorney General and his designees, complied with O.C.G.A. § 10-1-397(c).

929.     The State of Georgia, by and through the Attorney General, is authorized pursuant to O.C.G.A. § 10-1-397(b)(2) to initiate this action, which may be brought in federal district court pursuant to O.C.G.A. § 10-1-397.1.

930.     Meta's consumer acts or practices are or were conducted in "trade" or "commerce," as those terms are defined in O.C.G.A. § 10-1-392(a)(28) of the FBPA, in whole or in part in the State of Georgia.

931.     Meta is or was during all relevant times engaged in the conduct of "consumer acts or practices," as that term is defined in O.C.G.A. § 10-1-392(a)(7) of the FBPA, in whole or in part in the State of Georgia.

932.     While engaged in consumer acts or practices in trade or commerce, Meta is using, has used, and/or is about to use unfair methods, acts, and practices in whole or in part in the State of Georgia, that cause, have caused, and/or are likely to cause young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms, including by the means described in paragraphs 847 through 850.

933.     At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Social Media Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them,

156

1   and persisted in its use of manipulative and harmful features to exploit young users'

2   psychological vulnerabilities.

3       934.    Meta's methods, acts, and practices alleged herein have caused, continue to cause,

4   and/or are likely to cause substantial injury to consumers including physical and mental harms as

5   well as significant risks to the health and safety of consumers—especially young users.

6       935.    The substantial injury suffered by consumers due to Meta's methods, acts, and

7   practices could not be reasonably avoided. Young users could not have reasonably avoided

8   injuries resulting from Meta's acts and practices, including because Meta misrepresented and

9   failed to disclose the dangerous nature of its Social Media Platforms and because Meta utilized

10  psychologically manipulative engagement-inducing features, knowing that young users are

11  especially susceptible to those psychologically manipulative tactics.

12      936.    The substantial injury that Meta's methods, acts, and practices alleged herein have

13  caused, continue to cause, and/or are likely to cause consumers is not outweighed by

14  countervailing benefits to consumers or competition.

15      937.    Meta's methods, acts, and practices alleged herein are immoral, unethical,

16  oppressive, and unscrupulous, including because they constitute knowing decisions causing

17  unnecessary and unjustified harm to young users for Meta's financial gain.

18      938.    The Georgia legislature has expressed a public policy goal of protecting youth

19  from the harms of addiction and related afflictions and unhealthy use of the internet. Meta's

20  methods, acts, and practices alleged herein, including Meta's actions taken to encourage young

21  users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are therefore

22  offensive to public policy.

23      939.    Meta's aforesaid methods, acts, and practices as a result are unfair and thus are

24  unlawful under the FBPA, including O.C.G.A. § 10-1-393(a) and (b).

25      940.    The State of Georgia, by and through the Attorney General, is authorized to bring

26  this action whether or not any person has actually been misled by Meta's unfair methods, acts,

27  and practices.

28

Complaint for Injunctive and Other Relief

## COUNT XIV: UNFAIR OR DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE HAWAI'I UNFAIR AND DECEPTIVE ACTS OR TRADE PRACTICES ACT, HAW. REV. STAT. CHAPTER 480

941.    The State of Hawai'i realleges and incorporates herein by reference each of the allegations contained in the paragraphs 1 through 850 as though fully alleged in this cause of action.

942.    The State of Hawai'i alleges that the aforementioned acts and practices by Meta constitute deceptive acts or practices in violation of the Hawai'i Unfair and Deceptive Acts or Trade Practices Act (HIUDAP), *Haw. Rev. Stat.* (HRS) § 480-1 *et seq.*

943.    The State of Hawai'i alleges that the aforesaid acts and practices of Meta in paragraphs above are unfair because they offend public policy and are oppressive, unethical, immoral, unscrupulous, and/or substantially injurious.

944.    Meta's unfair or deceptive acts or practices described above constitute multiple, separate violations of the HIUDAP.

945.    Meta's violations of the HIUDAP justify penalties of up to $10,000, per Defendant, for each violation pursuant to HRS § 480-3.1.

## COUNT XV: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.*

946.    The People of the State of Illinois reallege and incorporate herein by reference each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause of action.

947.    In numerous instances in the course of trade or commerce, including through the means described in the allegations in paragraphs 53-835 above, Meta engaged in the following deceptive acts, practices, and omissions, with the intent that consumers rely on the deceptive acts, practices, and omissions:

a. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

b. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c. Misrepresenting, directly or indirectly, expressly or by implication, through the publication of CSER reports and intentional omission of material BEEF and TRIPS data from those reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d. Misrepresenting, directly or indirectly, expressly or by implication, that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e. Misrepresenting, directly or indirectly, expressly or by implication, that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

f. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data; and

g. Making other false and deceptive representations, as set forth in the allegations in paragraphs 53-835 above.

948.   By engaging in the acts and practices alleged herein, Meta engaged in unfair and deceptive acts or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and

1   Deceptive Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in

2   relevant part:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact, or the
> use or employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act", approved August 5,
> 1965, in the conduct of any trade or commerce are hereby declared
> unlawful whether any person has in fact been misled, deceived or
> damaged thereby.

## COUNT XVI: UNFAIR ACTS OR PRACTICES BY META

## IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE

## BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.*

949.    The People of the State of Illinois reallege and incorporate herein by reference each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause of action.

950.    Meta, in the course of trade or commerce, engaged in unfair acts and practices that caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms, including by:

    a.   Targeting its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users;

    b.   Utilizing Social Media Platform features that unfairly harm young users independently of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of Likes, and disruptive alerts, all of which were unfairly utilized by Meta to extract additional time and attention from young users whose developing brains were not equipped to resist those manipulative tactics;

160

c.  Designing, developing, and deploying disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

d.  Algorithmically serving content to young users according to "variable reinforcement schedules," thereby manipulating dopamine releases in young users, unfairly inducing them to engage repeatedly with its products—much like a gambler at a slot machine; and

e.  Collecting the personal information of under-13 users of Instagram and Facebook without first obtaining verifiable parental consent.

951.    Meta's deployment of manipulative and harmful features, both on their own and especially *in combination*, for use by young users is an unfair act or practice.

952.    At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them, and persisted in exploiting young users' psychological vulnerabilities. Meta's acts and practices alleged herein are immoral, unethical, oppressive, and unscrupulous, including because they constitute knowing decisions causing unnecessary and unjustified harm to young users for Meta's financial gain.

953.    Meta's acts and practices alleged herein also have caused and continue to cause substantial injury to consumers that could not be reasonably avoided. Young users could not have reasonably avoided injuries resulting from Meta's acts and practices, including because Meta misrepresented and failed to disclose the dangerous nature of its Social Media Platforms and because Meta utilized psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those psychologically manipulative tactics.

954.    Meta's acts and practices, including Meta's actions taken to encourage young users' compulsive and unhealthy use of and addiction to its Social Media Platforms, are offensive to public policy, as defined by statute and common law. The Illinois legislature has expressed a

161

1  public policy goal of protecting youth from the harms of addiction and related afflictions. *See,*

2  *e.g.*, Juvenile Court Act of 1987, Article IV ("Addicted Minors"), 705 ILCS 405/4-1 *et seq.*;

3  Juvenile Drug Court Treatment Act, 705 ILCS 410 (recognizing public policy goal of reducing

4  juvenile addiction to drugs); Illinois Gambling Act, 230 ILCS 10 *et seq.* (recognizing policy

5  issues related to "[c]ompulsive gambling" and prohibiting minors from casino gambling). The

6  protection of minors from the dangers of addiction is a well-established objective underlying

7  public policy in Illinois; Meta's acts and practices alleged herein, including Meta's actions taken

8  to encourage young users' compulsive and unhealthy use of and addiction to its Social Media

9  Platforms, are therefore offensive to public policy.

10      955.    In addition, the public policy of protecting youth's private information and

11  requiring parental consent prior to collecting this information is established in COPPA and the

12  COPPA Rule.

13      956.    By engaging in the acts and practices alleged herein, Meta engaged in unfair acts

14  or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and Deceptive

15  Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in relevant

16  part:

> Unfair methods of competition and unfair or deceptive acts or
> practices, including but not limited to the use or employment of
> any deception fraud, false pretense, false promise,
> misrepresentation or the concealment, suppression or omission of
> any material fact, with intent that others rely upon the
> concealment, suppression or omission of such material fact, or the
> use or employment of any practice described in Section 2 of the
> "Uniform Deceptive Trade Practices Act", approved August 5,
> 1965, in the conduct of any trade or commerce are hereby declared
> unlawful whether any person has in fact been misled, deceived or
> damaged thereby.

162

**COUNT XVII: CONDUCT VIOLATIVE OF THE ILLINOIS UNIFORM DECEPTIVE TRADE PRACTICES ACT BY META, IN VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *et seq.***

957.    The People of the State of Illinois reallege and incorporate herein by reference each of the allegations contained in paragraphs 1-850 above as though fully alleged in this cause of action.

958.    Section 2 of the Illinois Uniform Deceptive Trade Practices Act provides, in relevant part, that a person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:

    a.   represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have (815 ILCS 510/2(a)(5));

    b.   represents that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another (815 ILCS 510/2(a)(7)); and

    c.   engages in any other conduct which similarly create a likelihood of confusion or misunderstanding (815 ILCS 510/2(a)(12)).

959.    Specifically, Meta, in the course of trade or commerce, engaged in conduct described in Sections 2(a)(5), (7), and (12) of the Uniform Deceptive Trade Practices Act, 815 ILCS 510.2(a)(5), (7), & (12) by:

    a.   Representing that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

    b.   Representing that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c.   Representing, through the publication of CSER reports and intentional omission of material BEEF and TRIPS data from those reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d.   Representing that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e.   Representing that Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

f.   Representing that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data; and

g.   Making other false and deceptive representations, as set forth in the allegations in paragraphs 53-835 above.

960.    By engaging in the acts and practices alleged herein, Meta engaged in unfair or deceptive acts or practices declared unlawful under Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act (Illinois Consumer Fraud Act), 815 ILCS 505/2, which states in relevant part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, *or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act", approved August 5, 1965,* in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby. (emphasis added).

164

## COUNT XVIII: UNFAIR OR DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE INDIANA DECEPTIVE CONSUMER SALES ACT, IND. CODE § 24-5-0.5-3(a), -3(b)(1), AND -3(b)(2)

961.    The State of Indiana realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

962.    The Deceptive Consumer Sales Act (DCSA) regulates unfair, abusive, and/or deceptive acts, omissions, and/or practices between a supplier and consumer when engaging in consumer transactions. Ind. Code § 24-5-0.5 *et seq.*

963.    Under the DCSA, a consumer transaction includes services and other intangibles. Ind. Code § 24-5-0.5-2.

964.    In supplying Indiana consumers with products and services, Meta was and remains involved in consumer transactions in Indiana, as defined by Ind. Code § 24-5-0.5-2.

965.    Meta regularly engages in or solicits consumer transactions with Indiana consumers. As such, Meta is a supplier pursuant to Ind. Code § 24-5-0.5-2.

966.    Meta has engaged in unfair, abusive, and/or deceptive acts, omissions, and/or practices affecting Indiana consumers, in violation of Ind. Code § 24-5-0.5-3(a), in connection with consumers transactions as detailed throughout this Complaint, including but not limited to the misrepresentations, unfair and deceptive acts, omissions and practices identified in Section XI above.

967.    Meta has engaged in unfair, abusive, and/or deceptive acts, omissions, and/or practices affecting Indiana consumers, in violation of Ind. Code § 24-5-0.5-3(a), in connection with consumers' transactions as detailed throughout this Complaint, including but not limited to the conduct in violation of the Children's Online Privacy Protection Act, 15 USC § 6501 et seq.; 16 C.F.R. § 312.1 et seq., as set forth in Count I above.

968.    Meta has engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-1.5-3(b)(1), by misrepresenting that its products and/or services had performance, characteristics, uses, and/or benefits they did not have, which Meta knew or

reasonably should have known that they did not have, as detailed throughout this Complaint, including but not limited to the misrepresentations identified in Section XI(A) above.

969.    Meta has engaged in deceptive acts affecting Indiana consumers in violation of Ind. Code § 24-5-1.5-3(b)(2), by misrepresenting that its products and/or services were of a particular standard, quality, grade, style, or model when they were not, and which Meta knew or reasonably should have known they were not, as detailed throughout this Complaint, including but not limited to the misrepresentations identified in Section XI(A) above.

970.    Each of Meta's unfair and deceptive acts, omissions and practices constitutes a separate violation of the DCSA actionable by the Attorney General of the State of Indiana.

## COUNT XIX: KNOWING VIOLATIONS OF THE INDIANA DECEPTIVE CONSUMER SALES ACT AND INCURABLE DECEPTIVE ACTS, IND. CODE § 24-5-0.5-1 *et seq.*

971.    The State of Indiana realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

972.    Meta committed the acts alleged in this Complaint with knowledge of their deceptive nature, and therefore committed knowing violations of the DCSA, subjecting it to penalties under Ind. Code § 24-5-0.5-4(g).

973.    The unfair and deceptive acts asserted in this Complaint are incurable deceptive acts and were committed by Meta as part of a scheme, artifice, or device with intent to defraud or mislead, subjecting Meta to penalties under Ind. Code § 24-5-0.5-8.

## COUNT XX: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT, K.S.A. § 50-626

974.    The State of Kansas, *ex rel.* Kris W. Kobach, Attorney General, realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

975.    Meta is or was during all relevant times a "supplier" who in the ordinary course of business, solicits, engages in or enforces "consumer transactions," whether or not dealing directly

166

with the consumer, as those terms are defined in K.S.A. § 50-624 of the Kansas Consumer Protection Act (KCPA).

976.     In numerous instances, in connection with a consumer transaction, Meta engaged in deceptive acts or practices as alleged and described herein, specifically including the conduct described in paragraphs 1 through 850, in violation of K.S.A. § 50-626.

977.     Each of Meta's deceptive acts or practices as alleged herein, constitute a separate violation of K.S.A. § 50-626.

## COUNT XXI: UNCONSCIONABLE ACTS OR PRACTICES BY META IN VIOLATION OF THE KANSAS CONSUMER PROTECTION ACT, K.S.A. §50-627

978.     The State of Kansas, *ex rel*. Kris W. Kobach, Attorney General, realleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

979.     Meta is or was during all relevant times a "supplier" who in the ordinary course of business, solicits, engages in or enforces "consumer transactions," whether or not dealing directly with the consumer, as those terms are defined in K.S.A. § 50-624 of the Kansas Consumer Protection Act (KCPA).

980.     Meta's acts or practices, as alleged and described herein, specifically including the conduct described in paragraphs 1 through 850, are unconscionable, in violation of K.S.A. § 50-627.

981.     Each unconscionable practice alleged herein, constitutes a separate violation of K.S.A. § 50-627.

## COUNT XXII: VIOLATIONS OF KENTUCKY CONSUMER PROTECTION ACT, KY. REV. STAT. CHAPTER § 367 *et seq.*

982.     The Commonwealth of Kentucky, realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

983. Meta and each Defendant is or was during all relevant times "persons" conducting "trade" or "commerce" as those terms are defined in Ky. Rev. Stat. §§ 367.110 - 367.300 of the Kentucky Consumer Protection Act (KYCPA).

984. The Commonwealth of Kentucky alleges that the aforesaid acts and practices of Meta constitute unfair, false, misleading, or deceptive acts or practices in violation of the KYCPA, including Ky. Rev. Stat § 367.170.

985. Kentucky consumers have suffered harm and loss as a result of Meta's violations of the KYCPA.

986. Meta has willfully engaged in the acts and practices described in this Complaint in violation of the KYCPA. Accordingly, the Commonwealth seeks the imposition of civil penalties pursuant to Ky. Rev. Stat. § 367.990 for each and every violation of the KYCPA in addition to other relief sought herein.

987. The Commonwealth believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts, and practices described herein. The Commonwealth believes that Kentucky consumers are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

## COUNT XXIII: VIOLATIONS OF LOUISIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, LA. REV. STAT. ANN. §§ 51:1401 to 1428

988. The State of Louisiana incorporates and realleges each and every allegation in paragraphs 1 through 850 as if fully set forth herein.

989. The Louisiana Unfair Trade Practices and Consumer Protection Law (Louisiana Consumer Protection Law) prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce. LA. REV. STAT. ANN. § 51:1405(A).

990. At all relevant times, Meta has engaged in the conduct of "trade" or "commerce" as those terms are defined by LA. REV. STAT. ANN. § 51:1402(10).

991.     Meta has engaged in unfair and deceptive acts or practices in violation of the Louisiana Consumer Protection Law as described in the preceding paragraphs and summarized in Section XI of the Complaint.

992.     Each unfair and deceptive act or practice constitutes as a separate violation of the Louisiana Consumer Protection Law.

**COUNT XXIV: VIOLATIONS OF THE MAINE UNFAIR TRADE PRACTICES ACT, ME. REV. STAT. ANN. tit. 5, § 207**

993.     Maine realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs as though fully alleged in this cause of action.

994.     In numerous instances in connection with the advertising, marketing, promotion, and other representations regarding its products, including but not limited to statements made to the public through reporters and through statements provided in testimony to Congress, Meta made deceptive representations, directly or indirectly, expressly or by implication, with the intent that consumers rely on the deceptive representations, including but not limited to the representations set forth in paragraph 846. Each deceptive act or practice alleged herein is an intentional violation of the Maine Unfair Trade Practices Act, ME. REV. STAT. ANN. tit. 5, § 207.

995.     Moreover, each violation of COPPA alleged herein is an intentional violation of the Maine Unfair Trade Practices Act, ME. REV. STAT. ANN. tit. 5, § 207.

**COUNT XXV: VIOLATION OF THE MICHIGAN CONSUMER PROTECTION ACT, MICH. COMP. LAWS § 445.901 *et seq.***

996.     The State of Michigan, by and through Attorney General Dana Nessel, realleges and reaffirms each and every allegation set forth in the preceding paragraphs as if fully restated herein.

997.     The State of Michigan brings this claim under the Michigan Consumer Protection Act (MCPA), asserting claims under § 3(1) of the MCPA, Mich. Comp. Laws §§ 445.903(1),

169

1   which protects Michigan residents against "[u]nfair, unconscionable, or deceptive methods, acts,

2   or practices in the conduct of trade or commerce."

3        998.    The Attorney General has provided sufficient notice and is authorized to bring this

4   claim pursuant to Mich. Comp. Laws § 445.905 and 445.911, as well as her *parens patriae*

5   authority.

6        999.    At all relevant times, Meta was engaged in the conduct of trade or commerce as

7   that term is defined at Mich. Comp. Laws § 445.902(1)(g).

8        1000.   The allegations set forth above comprise violations of the following subsections of

9   the MCPA, Mich. Comp. Laws § 445.903(1):

10       (a) Causing a probability of confusion or misunderstanding as to the source, sponsorship,

11           approval, or certification of goods or services.

12       (b) Representing that goods or services have sponsorship, approval, characteristics,

13           ingredients, uses, benefits, or quantities that they do not have or that a person has

14           sponsorship, approval, status, affiliation, or connection that he or she does not have.

15       (e) Representing that goods or services are of a particular standard, quality, or grade, or

16           that goods are of a particular style or model, if they are of another.

17       (s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the

18           consumer, and which fact could not reasonably be known by the consumer.

19       (bb) Making a representation of fact or statement of fact material to the transaction such

20           that a person reasonably believes the represented or suggested state of affairs to be other

21           than it actually is.

22       (cc) Failing to reveal facts that are material to the transaction in light of representations of

23           fact made in a positive manner.

24       1001.   Specifically, Meta violated § 3(1)(a) by knowingly and intentionally causing

25   confusion about its services' approval through, inter alia, the publication of CSER reports and

26   intentional omission of material BEEF and TRIPS data from those reports, and through other

27   communications, suggesting that the incidence or prevalence of negative or harmful user

28   experiences on Meta's Social Media Platforms was lower than it actually was.

1002.   For the same reason, Meta violated § 3(1)(b) by misrepresenting its goods or services' characteristics, uses, and benefits by, inter alia, knowingly and intentionally publishing CSER reports and making intentional omission of material BEEF and TRIPS data from those reports, and through other communications, suggesting that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was.

1003.   Meta violated § 3(1)(s) by failing to reveal the above-described material facts and other known or suspected realities regarding the negative or harmful user experiences on Meta's Social Media Platforms, which misled consumers and could not have been reasonably known by them, in part because consumers lack access to Meta's internal data and metrics.

1004.   Meta violated § 3(1)(bb) through representations and statements of fact material to users' decision to use Meta's Social Media Platforms by routinely publishing misleading reports boasting a deceptively low incidence of user harms, deceptively representing that targeted features of its platforms are not manipulative or otherwise designed to promote young users' prolonged and unhealthy engagement with social media, and misrepresenting that its platforms are designed and maintained to ensure safe experiences for young users.

1005.   Meta violated § 3(1)(cc) by making representations of fact in a positive manner, i.e., making statements through published reports and otherwise to the effect that targeted features of its platforms are not manipulative or otherwise designed to promote young users' prolonged and unhealthy engagement with social media, and that its platforms are designed and maintained to ensure safe experiences for young users. It failed to reveal facts material to the users' transaction with Meta by intentionally omitting certain data from its statements and reports that would have suggested the incidence or prevalence of negative or harmful user experiences attendant to use, the revealing of which would have been material to users' decision to engage with the platforms.

1006.   Individual consumers have suffered damages as a result of Meta's conduct. Again, all of the allegations regarding Meta's practices apply to tens of thousands of Michigan residents.

1007.   Meta's violations of the MCPA were persistent, knowing, and willful.

## COUNT XXVI

## DECEPTIVE TRADE PRACTICES

## MINN. STAT. § 325D.43 *et seq.*

1008.   The State of Minnesota, by its Attorney General, Keith Ellison, re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 above as though fully alleged in this cause of action.

1009.   Minnesota Statutes section 325D.44, subdivision 1 provides in part:

> A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

> (5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

> (7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; and

> (14) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.[40]

1010.   Meta and each Defendant are "persons" within the meaning of Minnesota Statutes section 325D.44.

1011.   Meta's Social Media Platforms are a "good" or "service" within the meaning of Minnesota Statutes section 325D.44.

1012.   In numerous instances in the course of business, vocation, or occupation, Meta violated Minnesota Statutes section 325D.44, subdivision 1(5), 1(7), and 1(14) by representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have, representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, and engaging in deceptive acts, practices, and omissions that caused a likelihood of confusion or of

---

[40] Pursuant to 2023 Minn. Laws ch. 57, art. 4, section 6, Minn. Stat. § 325D.44, subd. 1(13) is to be re-codified as Minn. Stat. § 325D.44, subd. 1(14). For simplicity, the State of Minnesota refers to this provision as Minn. Stat. § 325D.44, subd. 1(14), though this provision has been in effect for the full relevant time period and continues through the present.

172

misunderstanding among Minnesota consumers in connection with its advertising, marketing, promotion, and other representations regarding its goods or services. Those acts, practices, and omissions include, but are not limited to:

a. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

b. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

c. Misrepresenting, directly or indirectly, expressly or by implication, through the publication of CSER reports and intentional omission of material BEEF and TRIPS data from those reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

d. Misrepresenting, directly or indirectly, expressly or by implication, that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

e. Misrepresenting, directly or indirectly, expressly or by implication, that Meta prevents under-13 from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook;

f. Misrepresenting, directly or indirectly, expressly or by implication, that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data; and

g. Making other false and deceptive representations set forth in this Complaint.

1013.   Due to Meta's deceptive acts, practices, and omissions described in this Complaint, consumers are suffering, have suffered, and will continue to suffer substantial injury.

1014.   Meta's acts, practices, and omissions described in this Complaint constitute multiple separate violations of Minnesota Statutes section 325D.44, subdivision 1.

## COUNT XXVII

### UNFAIR OR UNCONSCIONABLE ACTS

### MINN. STAT. § 325D.43 *et seq.*

1015.   The State of Minnesota, by its Attorney General, Keith Ellison, re-alleges and incorporates herein by reference each of the allegations contained in paragraphs 1 through 850 above as though fully alleged in this cause of action.

1016.   Minnesota Statutes section 325D.44, subdivision 1(13) prohibits any person from engaging in "unfair methods of competition" or "unfair or unconscionable acts or practices." Minn. Stat. § 325D.44, subd. 1(13).[41]

1017.   "[A]n unfair method of competition or an unfair or unconscionable act or practice is any method of competition, act, or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers."[42]

1018.   In numerous instances in the course of business, vocation, or occupation, Meta violated Minnesota Statutes section 325D.44, subdivision 1(13) by engaging in unfair or unconscionable acts, practices, and omissions that were unethical, oppressive, or unscrupulous and/or substantially injurious to consumers. Those acts, practices, and omissions include, but are not limited to:

---

[41] 2023 Minn. Laws ch. 57, art. 4, sect. 6 (to be codified at Minn. Stat. § 325D.44, subd. 1(13)), took effect on August 1, 2023. Therefore, the relevant time for the State of Minnesota's claim under Count XXVII pursuant to Minn. Stat. § 325D.44, subdivision 1(13) began on August 1, 2023, and continues through the present.

[42] 2023 Minn. Laws ch. 57, art. 4, sect. 17 (to be codified at Minn. Stat. § 325F.69, subd. 8); *see* 2023 Minn. Laws ch. 57, art. 4, sect. 7 (to be codified at Minn. Stat. § 325D.44, subd. 2(b)).

a. Meta's targeting its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users;

b. Meta utilizing Social Media Platform features that unfairly and/or unconscionably harm young users independent of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of "Likes," and disruptive alerts, all of which were unfairly and/or unconscionably utilized by Meta to extract additional time and attention from young users whose developing brains were not equipped to resist those manipulative tactics;

c. Meta designing, developing, and deploying disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly and/or unconscionably exploited young users' psychological vulnerabilities and cultivated a sense of "fear of missing out" in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms;

d. Meta algorithmically serving content to young users, according to "variable reinforcement schedules," thereby manipulating dopamine releases in its young users, unfairly or unconsciably inducing them to engage repeatedly with its products— much like a gambler at a slot machine; and

e. Meta's deployment of manipulative and harmful features, both on its own and in combination, for use by young users.

1019.   These acts, practices, and omissions caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms. At all relevant times, Meta had a thorough understanding of the mental and physical harms and addiction suffered by young users of its Platforms. Instead of taking adequate measures to mitigate these damaging effects, Meta turned a blind eye to them, and persisted in exploiting young users' psychological vulnerabilities. Meta's acts, practices, and omissions alleged herein are unethical, oppressive, and unscrupulous,

175

1    including because they constitute knowing decisions causing unnecessary and unjustified harm to

2    young users for Meta's financial gain.

3         1020.   Meta's acts, practices, and omissions alleged herein also have caused and continue

4    to cause substantial injury to consumers that could not be reasonably avoided. Young users could

5    not have reasonably avoided injuries resulting from Meta's acts, practices, and omissions,

6    including because Meta misrepresented and failed to disclose the dangerous nature of its Social

7    Media Platforms and because Meta utilized psychologically manipulative engagement-inducing

8    features, knowing that young users are especially susceptible to those psychologically

9    manipulative tactics.

10        1021.   Due to Meta's unfair and unconscionable acts, practices, and omissions described

11   in this Complaint, consumers are suffering, have suffered, and will continue to suffer substantial

12   injury.

13        1022.   Meta's unfair and unconscionable acts, practices, and omissions described in this

14   Complaint constitute multiple separate violations of Minnesota Statutes section 325D.44,

15   subdivision 1(13).

16

17   **COUNT XXVIII: UNFAIR AND DECEPTIVE ACTS OR PRACTICES BY META IN**

18   **VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT (MO. REV.**

19   **STAT. § 407.020)**

20        1023.   Missouri realleges and incorporates herein by reference each of the allegations

21   contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of

22   action.

23        1024.   The Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. §407.020.1

24   prohibits every "act, use or employment by any person of any deception, fraud, false pretense,

25   false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of

26   any material fact in connection with the sale or advertisement of any merchandise in trade or

27   commerce."

28

Complaint for Injunctive and Other Relief

1025.   At all relevant times, Meta was engaged in trade or commerce in Missouri pursuant to the MMPA.

1026.   Missouri alleges that the aforesaid acts and practices of Meta summarized in Paragraph 846 constitute acts or practices involving misrepresentations, deception, or the concealment, suppression, or omission of material fact in violation of Mo. Rev. Stat. §407.020.1.

1027.   Missouri alleges that the aforesaid acts and practices of Meta summarized in Paragraphs 847 through 850 constitute unfair practices that are unethical, oppressive, or unscrupulous and present a risk of or cause substantial injury to consumers in violation of Mo. Rev. Stat. §407.020.1.

1028.   Each unlawful act or practice alleged herein constitutes a separate violation of the Missouri Merchandising Practices Act.

## COUNT XXIX: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

1029.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1030.   The Nebraska Consumer Protection Act (NE CPA) prohibits deceptive acts or practices in the conduct of any trade or commerce. Neb. Rev. Stat. § 59-1602.

1031.   As described in preceding paragraphs and summarized in Section XI.A of the Complaint, Meta has engaged in deceptive acts or practices in violation of the NE CPA.

1032.   Each deceptive act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXX: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA CONSUMER PROTECTION ACT

1033.    The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1034.   The Nebraska Consumer Protection Act (NE CPA) prohibits unfair acts or practices in the conduct of any trade or commerce. Neb. Rev. Stat. § 59-1602.

1035.   As described in preceding paragraphs and summarized in Section XI.B of the Complaint, Meta has engaged in unfair acts or practices in violation of the NE CPA.

1036.   Each unfair act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXXI: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT

1037.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1038.   The Nebraska Uniform Deceptive Trade Practices Act (NE UDTPA) specifies multiple practices, which when conducted in the course of business, constitute deceptive trade practices. Neb. Rev. Stat. § 87-302(a).

1039.   Meta's actions, as described in preceding paragraphs and summarized in Section XI.A, constitute deceptive trade practices in violation of Neb. Rev. Stat. §§ 87-302(a)(2), 87-302(a)(5), 87-302(a)(7), 87-302(a)(9), and 87-302(a)(14).

1040.   Each deceptive act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

## COUNT XXXII: UNCONSCIONABLE ACTS OR PRACTICES BY META IN VIOLATION OF THE NEBRASKA UNIFORM DECEPTIVE TRADE PRACTICES ACT

1041.   The State of Nebraska realleges and incorporates herein each of the allegations contained in paragraphs 1 through 850 as though fully alleged in this cause of action.

1042.   The NE UDTPA prohibits unconscionable acts or practices by a supplier in connection with a consumer transaction. Neb. Rev. Stat. § 87-303.01.

1043.   As described in preceding paragraphs and summarized in Section XI.B, Meta is a supplier and has engaged in unconscionable trade practices in connection with a consumer transaction in violation of Neb. Rev. Stat. § 87-303.01.

1044.   Each unconscionable act or practice, as alleged herein, constitutes a separate violation of the NE CPA and the NE UDTPA.

**COUNT XXXIII: VIOLATIONS OF THE NEW JERSEY CONSUMER FRAUD ACT, N.J. STAT. ANN. §§ 56:8-1 to 227**

1045.   New Jersey realleges and incorporates by reference each and every factual allegation in the paragraphs above as if the same were fully set forth herein.

1046.   As set forth above and at all relevant times, Meta engaged in and continues to engage in commercial practices pursuant to the New Jersey Consumer Fraud Act (CFA), N.J. STAT. ANN. §§ 56:8-1 to 227.

1047.   These commercial practices were and continue to be made in connection with the sale and advertisement of merchandise.

1048.   These commercial practices constitute unconscionable or abusive commercial practices in violation of the CFA.

1049.   These commercial practices constitute acts of deception, fraud, false pretense, false promise, and misrepresentation in violation of the CFA.

1050.   These commercial practices knowingly conceal, suppress, and omit material facts with the intent that consumers relied upon the concealed, suppressed, and omitted material facts.

1051.   The conduct described in Count I is conclusively presumed to be to be an unlawful act in violation of the CFA. N.J. STAT. ANN. § 56:8-4b.

1052.   These commercial practices were and continue to be material to the sale and advertisement of merchandise.

1053.   While engaging in the acts and practices alleged in this Complaint, Meta knew or should have known that that its conduct was of the nature prohibited by N.J. STAT. ANN. § 56:8-2,

179

subjecting itself to enforcement and penalties as provided in N.J. STAT. ANN. §§ 56:8-8, 11, 13, 14, and 15.

1054.   Each unlawful practice alleged herein constitutes a separate violation of the CFA.

**COUNT XXXIV: VIOLATION OF N.Y. GENERAL BUSINESS LAW § 349**

1055.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1056.   New York General Business Law (GBL) § 349 provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] are . . . unlawful."

1057.   At all relevant times, Meta has been engaged in business, trade or commerce in New York within the meaning of GBL § 349.

1058.   Meta engaged in deceptive practices in providing its Social Media Platforms, as set forth above.

1059.   The Attorney General of the State of New York timely provided Meta with the pre-litigation notice required by GBL § 349(c).

1060.   By engaging in the acts and practices described above, all of which were material, Meta has engaged in and continues to engage in deceptive practices in violation of GBL § 349(a).

**COUNT XXXV: VIOLATION OF N.Y. GENERAL BUSINESS LAW § 350**

1061.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1062.   New York General Business Law (GBL) § 350 prohibits "false advertising in the conduct of any business."

1063.   At all relevant times, Meta has been engaged in business in New York within the meaning of GBL § 350.

1064.   Meta made representations and/or omissions of fact that were materially misleading, and thereby made false advertisements, in the course of advertising, marketing, promotion, and other representations regarding its Social Media Platforms, as set forth above.

1065.   The Attorney General of the State of New York timely provided Meta with the pre-litigation notice required by GBL § 349(c).

1066.   By engaging in the acts and practices described above, all of which were material, Meta has engaged in and continues to engage in false advertising in violation of GBL § 350.

## COUNT XXXVI: REPEATED AND PERSISTENT FRAUD IN VIOLATION OF N.Y. EXECUTIVE LAW § 63(12)

1067.   The Attorney General of the State of New York realleges and incorporates by reference each and every allegation in the paragraphs above as if the same were fully set forth herein.

1068.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . . . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable by the Attorney General of the State of New York.

1069.   At all relevant times, Meta has engaged in the carrying on, conducting or transaction of business in New York within the meaning of New York Executive Law § 63(12).

1070.   Meta engaged in repeated and/or persistent fraud in violation of New York Executive Law § 63(12) in the course of its advertising, marketing, promotion, and other representations regarding its Social Media Platforms in New York State, including those discussed in Section XI.A above.

1071.   By engaging in the acts and practices described above, Meta has engaged in and continues to engage in repeated fraudulent acts or persistent fraud in violation of New York Executive Law § 63(12).

1

## COUNT XXXVII: REPEATED AND PERSISTENT ILLEGALITY IN VIOLATION OF

2

## N.Y. EXECUTIVE LAW § 63(12)

3       1072.   The Attorney General of the State of New York realleges and incorporates by

4   reference each and every allegation in the paragraphs above as if the same were fully set forth

5   herein.

6       1073.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts or . .

7   . persistent fraud or illegality in the carrying on, conducting or transaction of business" actionable

8   by the Attorney General of the State of New York.

9       1074.   At all relevant times, Meta has engaged in the carrying on, conducting or

10  transaction of business in New York within the meaning of New York Executive Law § 63(12).

11      1075.   Meta engaged in repeated and/or persistent illegality in violation of New York

12  Executive Law § 63(12) through its violations of: (i) 15 USC § 6502(a); (ii) 16 C.F.R. §§

13  312.4(b)-(d) and 312.5; (iii) N.Y. Gen. Bus. Law § 349; and/or (iv) N.Y. Gen. Bus. Law § 350.

14      1076.   By engaging in the acts and practices described above, Meta has engaged in and

15  continues to engage in repeated illegal acts or persistent illegality in violation of New York

16  Executive Law § 63(12).

17

18

## COUNT XXXVIII: VIOLATION OF FTC ACT § 5 IN VIOLATION OF N.Y.

19

## EXECUTIVE LAW § 63(12)

20      1077.   The Attorney General of the State of New York realleges and incorporates by

21  reference each and every allegation in the paragraphs above as if the same were fully set forth

22  herein.

23      1078.   New York Executive Law § 63(12) makes "repeated fraudulent or illegal acts

24  or…persistent fraud or illegality in the carrying on, conducting or transaction of business"

25  actionable by the Attorney General of the State of New York.

26      1079.   Section 5(a) of the Federal Trade Commission Act prohibits "unfair or deceptive

27  acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1).

28

182

1080.   An act or practice is unfair if it causes or is likely to cause substantial injury to consumers, which is not reasonably avoidable by consumers, and such substantial injury is not outweighed by countervailing benefits to consumers or to competition. 15 U.S.C. § 45(n).

1081.   At all relevant times, Meta has engaged in carrying on, conducting or transaction of business in New York within the meaning of New York Executive Law § 63(12).

1082.   Meta has engaged in repeated illegality by committing unfair acts and practices in the design, advertising, promotion, marketing, and distribution of Social Media Platforms including but not limited to those discussed in section XI.B above.

1083.   Meta's conduct has caused and is likely to cause substantial injury to consumers in New York and throughout the United States that cannot be reasonably avoidable and is not outweighed by countervailing benefits.

1084.   By engaging in the acts and practices described above, which include violations of Section 5(a) of the Federal Trade Commission Act, Meta has engaged in and continues to engage in repeated illegal acts or persistent illegality in violation of New York Executive Law § 63(12).

## COUNT XXXIX: VIOLATIONS OF THE NORTH CAROLINA UNFAIR OR DECEPTIVE TRADE PRACTICES ACT, N.C.G.S. § 75-1.1
### (BY STATE OF NORTH CAROLINA)

1085.   The State of North Carolina incorporates and re-alleges paragraphs 1 through 850 as if they were fully set forth herein.

1086.   The North Carolina Unfair or Deceptive Trade Practices Act prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C.G.S. § 75-1.1(a).

1087.   Meta has committed unfair or deceptive acts or practices in violation of N.C.G.S. § 75-1.1(a) as described in this Complaint, including but not limited to:

a.   Targeting its Social Media Platforms to young users, despite understanding the risks of psychological and physical harms, including compulsive and unhealthy use of or addiction to its Social Media Platforms.

b.  Designing its Social Media Platforms to exploit young users' psychological vulnerabilities with engagement-inducing features including but not limited to infinite scroll, ephemeral content display, autoplay, and disruptive audiovisual and vibration notifications, producing compulsive, prolonged, or unhealthy use by young users.

c.  Failing to comply with the Children's Online Privacy Protection Act, 15 U.S.C. § 6501 *et seq*., as alleged in Count I, in violation of public policy.

d.  Falsely, deceptively, or misleadingly representing, directly or indirectly, expressly or by implication, that:

   i.  Meta's Social Media Platforms are not psychologically or physically harmful for young users, while Meta knew young users experienced such harms.

   ii.  Meta's Social Media Platforms are not designed to induce young users' compulsive, prolonged, or unhealthy use, when they are in fact so designed.

   iii.  The incidence of negative or harmful user experiences on Meta's Social Media Platforms is low, while omitting Meta's knowledge regarding the heightened extent users encountered such experiences.

   iv.  Meta prioritized young users' health and safety, when in fact Meta subordinated young users' health and safety to the goal of maximizing profits by prolonging time spent on its Social Media Platforms.

   v.  Users under 13 are excluded from Meta's Social Media Platforms, when Meta knew that its policies and practices were insufficient to exclude such users.

1088.  Meta's above-described unfair or deceptive acts and practices have been in or affecting commerce in North Carolina.

## COUNT XL: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF N.D. CENT. CODE §51-15-02 (BY NORTH DAKOTA)

1089.  The State of North Dakota, *ex rel*. Drew H. Wrigley, Attorney General, incorporates and realleges paragraphs 1 through 850 as if they were fully set forth herein.

184

1090.   In numerous instances, in connection with the sale or advertisement of merchandise, as defined by N.D. Cent. Code § 51-15-01, Meta engaged in unlawful and deceptive acts or practices by making misrepresentations or false promises, directly or indirectly, expressly, impliedly, or by omission of material facts, with the intent that others rely thereon, including the misrepresentations set forth in Section XI.A above, in violation of N.D. Cent. Code §51-15-02.

1091.   Each of Meta's deceptive acts or practices, misrepresentations, or false promises, as alleged herein, constitutes a separate violation of N.D. Cent. Code §51-15-02.

### COUNT XLI: UNLAWFUL ACTS OR PRACTICES BY META IN VIOLATION OF N.D. CENT. CODE §51-15-02 (BY NORTH DAKOTA)

1092.   The State of North Dakota, *ex rel*. Drew H. Wrigley, Attorney General, incorporates and realleges paragraphs 1 through 850 as if they were fully set forth herein.

1093.   Meta's acts, uses, or employments of acts or practices, in connection with the sale or advertisement of any merchandise, as alleged and described herein, including specifically in Section XI.B above, are unconscionable or caused, or are likely to cause, substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, and constitute violations of N.D. Cent. Code §51-15-02.

1094.   Each of Meta's unlawful acts or practices, as alleged herein, constitute a separate violation of N.D. Cent. Code §51-15-02.

### COUNT XLII: VIOLATIONS OF OHIO CONSUMER SALES PRACTICES ACT – UNFAIR OR DECEPTIVE ACTS OR PRACTICES - OHIO REVISED CODE § 1345.02

1095.   Ohio realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

1096.   Meta and each Defendant are "suppliers," as they engaged in the business of effecting "consumer transactions" by soliciting "consumers" either directly or indirectly for

185

1  services, including access to Meta's Social Media Platforms in exchange for users' personal data

2  and time, for a purpose that was primarily for personal, family, or household use, as those terms

3  are defined by Ohio Rev. Code §1345.01(A), (C), and (D).

4      1097.   In numerous instances in connection with the advertising, marketing, promotion,

5  and other representations regarding its products, including through the means described in Section

6  XI, paragraphs 846 through 850, Meta committed unfair or deceptive acts or practices in violation

7  of the Ohio Consumer Sales Practices Act (CSPA), Ohio Rev. Code §1345.02(A), by making the

8  deceptive representations, directly or indirectly, expressly or by implication, with the intent that

9  consumers rely on the deceptive representations, including, but not limited to, the representations

10  outlined in Section XI, paragraphs 846 through 850.

11      1098.   Further, Meta committed unfair or deceptive acts or practices in violation of the

12  CSPA, Ohio Rev. Code §1345.02(A), by engaging in unfair acts and omissions that caused young

13  users' compulsive and unhealthy use of, and addiction to, Meta's Social Media Platforms. At all

14  relevant times, Meta had a thorough understanding of the mental and physical harms and

15  addiction suffered by young users of its Platforms. Instead of taking adequate measures to

16  mitigate these damaging effects, Meta knowingly persisted in exploiting young users'

17  psychological vulnerabilities. Meta's acts and omissions constitute knowing decisions causing

18  unnecessary and unjustified harm to young users for Meta's financial gain. Meta's unfair acts

19  include, but are not limited to, the acts outlined in Section XI, paragraphs 846 through 850.

20      1099.   Each unfair or deceptive act or practice engaged in by Meta as recited above

21  constitutes a separate violation of the CSPA.

22      1100.   The acts or practices described above have been previously determined by Ohio

23  courts to violate the CSPA, Ohio Rev. Code §1345.01 *et seq*. Meta committed said violations

24  after such decisions were made available for public inspection pursuant to Ohio Rev. Code

25  §1345.05(A)(3).

186

**COUNT XLIII: VIOLATIONS OF OHIO CONSUMER SALES PRACTICES ACT –
UNCONSCIONABLE CONSUMER SALES ACTS OR PRACTICES - OHIO REVISED
CODE §1345.03**

1101.   Ohio realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

1102.   Meta knowingly designed platforms that ignored the damaging effect said platforms have on young users' psychological vulnerabilities. Meta made immoral, unethical, oppressive and unscrupulous decisions that prioritized Meta's financial gain at the expense of its young users' mental health.

1103.   Meta's conduct, acts or omissions, as described herein, constitute unconscionable acts and practices in violation of the CSPA, O.R.C. 1345.03(A).

1104.   Each unconscionable act or practice engaged in by Meta as recited above constitutes a separate violation of the CSPA.

1105.   The acts or practices described above have been previously determined by Ohio courts to violate the CSPA, Ohio Rev. Code §1345.01, *et seq*. Meta committed said violations after such decisions were made available for public inspection pursuant to Ohio Rev. Code §1345.05(A)(3).

**COUNT XLIV: VIOLATIONS OF OREGON'S UNLAWFUL TRADE PRACTICES ACT
(UTPA), O.R.S. § 646.607(1)**

1106.   The State of Oregon, *ex rel*. Ellen F. Rosenblum, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

1107.   Meta employed unconscionable tactics in violation of O.R.S. § 646.607(1) when, acting in the course of its businesses, vocations, or occupations, Meta engaged in acts and omissions in connection with selling or disposing of goods or services that caused young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

1108.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1109.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1110.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State of Oregon would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLV: VIOLATIONS OF OREGON'S UTPA, O.R.S. § 646.608(1)(e)**

1111.   The State of Oregon, *ex rel.* Ellen F. Rosenblum, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 and Count XLIV as if fully set forth herein.

1112.   Meta, acting in the course of its businesses, vocations, or occupations, violated O.R.S. § 646.608(1)(e) when Meta expressly and by implication made false or misleading representations that its goods or services have characteristics, uses, benefits or qualities that the goods or services do not have. The representations relate to Meta's Social Media Platforms, including but not limited to those representations described in paragraph 846.

1113.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1114.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1115.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLVI: VIOLATIONS OF OREGON'S UTPA, O.R.S. § 646.608(1)(t)**

1116.   The State of Oregon, *ex rel*. Ellen F. Rosenblum, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 and Counts XLIV and XLV as if fully set forth herein.

1117.   Meta, acting in the course of its businesses, vocations, or occupations, violated O.R.S. § 646.608(1)(t) when Meta failed to disclose concurrent with tender or delivery of Meta's Social Media Platforms known material defects and material nonconformities resulting in young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

1118.   Meta's violations of the UTPA set forth herein were willful because Meta knew or should have known that its conduct violated the UTPA.

1119.   Pursuant to O.R.S. §§ 646.632, 646.636, and 646.642, the State of Oregon seeks a permanent injunction against Meta; restitution for consumers; civil penalties up to $25,000 per willful violation; and costs, reasonable expenses, and attorneys' fees.

1120.   Meta and each Defendant was served with a notice in writing that identified the alleged unlawful conduct and the relief the State would seek. Neither Meta nor any Defendant executed and delivered a satisfactory assurance of voluntary compliance as provided in O.R.S. § 646.632(2).

**COUNT XLVII: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)**

1121.   The Commonwealth of Pennsylvania realleges and incorporates herein by reference each of the paragraphs 1 through 850 as if fully set forth herein.

1122.   At all relevant times set forth herein, Meta has engaged in trade and commerce pursuant to 73 P.S. § 201-2(3) of the UTPCPL, in connection with its sale and advertisement of merchandise.

1123.   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce as defined by subclauses (i) through (xxi) of Section 201-2(4) of

189

the UTPCPL are declared unlawful, and whenever the Attorney General has reason to believe that any person is using or is about to use any method, act, or practice declared unlawful, Section 201-4 of the UTPCPL authorizes the Attorney General to bring an action against such person to restrain these methods, acts, or practices.

1124. The acts and practices described in paragraphs 1 through 850 constitute deceptive acts or practices, as prohibited by section 201-3 of the UTPCPL as defined by subclauses 201-2(4)(ii), (vii), and (xxi) of section 201-2(4) as follows:

    a. Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services, 73 P.S. § 201-2(4)(ii);

    b. Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another, 73 P.S. § 201-2(4)(vii); and

    c. Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

1125. The Commonwealth of Pennsylvania alleges that all of the practices described above were performed willfully. Accordingly, and pursuant to section 201-8 of the UTPCPL, the Commonwealth of Pennsylvania seeks the imposition of civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each violation of the UTPCPL in addition to other relief sought, as appropriate.

1126. The Commonwealth of Pennsylvania believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restitution and civil penalties for violation of the law. The Commonwealth of Pennsylvania believes that citizens of the Commonwealth of Pennsylvania are suffering and will continue to suffer harm unless the acts and practices complained of herein are permanently enjoined.

**COUNT XLVIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW (UTPCPL)**

1127.   The Commonwealth of Pennsylvania realleges and incorporates herein by reference each of the paragraphs 1 through 850 as if fully set forth herein.

1128.   At all relevant times set forth herein, Meta has engaged in trade and commerce pursuant to 73 P.S. § 201-2(3) of the UTPCPL, in connection with its sale and advertisement of merchandise.

1129.   Unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce as defined by subclauses (i) through (xxi) of section 201-2(4) of the UTPCPL are declared unlawful, and whenever the Attorney General has reason to believe that any person is using or is about to use any method, act, or practice declared unlawful, section 201-4 of the UTPCPL authorizes the Attorney General to bring an action against such person to restrain these methods, acts, or practices.

1130.   The acts and practices described in paragraphs 1 through 850 constitute unfair methods of competition or unfair or deceptive acts or practices, as prohibited by section 201-3 of the UTPCPL as defined by subclause 201-2(4)(xxi) of section 201-2(4) as follows: Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding, 73 P.S. § 201-2(4)(xxi).

1131.   The Commonwealth of Pennsylvania alleges that all of the practices described above were performed willfully. Accordingly, and pursuant to section 201-8 of the UTPCPL, the Commonwealth of Pennsylvania seeks the imposition of civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each violation of the UTPCPL in addition to other relief sought, as appropriate.

1132.   The Commonwealth of Pennsylvania believes that the public interest is served by seeking before this Court a permanent injunction to restrain the methods, acts and practices described herein, as well as seeking restitution and civil penalties for violation of the law. The Commonwealth of Pennsylvania believes that citizens of the Commonwealth of Pennsylvania are

191

1  suffering and will continue to suffer harm unless the acts and practices complained of herein are

2  permanently enjoined.

3

4  **COUNT XLIX: VIOLATIONS OF RHODE ISLAND DECEPTIVE TRADE PRACTICES**

5  **ACT, R.I. GEN. L. §§ 6-13.1-1 TO 6-13.1-10**

6  　　　1133.　The State of Rhode Island incorporates and realleges each of the paragraphs 1

7  through 850 as if fully set forth herein.

8  　　　1134.　The Rhode Island Deceptive Trade Practices Act (RI DTPA) makes unfair

9  methods of competition and unfair or deceptive acts or practices in the conduct of any trade or

10  commerce unlawful. R.I. Gen. Laws § 6-13.1-2.

11  　　　1135.　The RI DTPA defines "unfair methods of competition and unfair and deceptive

12  acts or practices" as, among other things, "conduct that . . . creates a likelihood of confusion or of

13  misunderstanding," "any other methods, acts, or practices that mislead or deceive members of the

14  public in a material respect," and "any act or practice that is unfair or deceptive to the consumer."

15  R.I. Gen. Laws § 6-13.1-1(6)(xii), (xiv), (xiii).

16  　　　1136.　Any person, firm, or corporation who violates the RI DTPA is liable for a civil

17  penalty up to $10,000 for each violation. R.I. Gen. Laws § 6-13.1-8.

18  　　　1137.　Meta's acts or practices enumerated in the foregoing paragraphs have been in the

19  conduct of trade or commerce, directly or indirectly, in Rhode Island.

20  　　　1138.　As alleged herein, Meta made representations including that Meta's Social Media

21  Platforms are not designed to harm young users or to induce compulsive use, that Meta's Social

22  Media Platforms are less addictive than they actually are, that the incidence of negative user

23  experiences was lower than it actually was, that Meta was not prioritizing profit maximization

24  over young users' well-being when it was, that Meta effectively excluded under-13 users when its

25  safeguards were insufficient, that Meta complied with federal laws and regulations related to the

26  exclusion of under-13 users when it did not, and that Meta did not collect user data for the

27  purpose of causing addiction to its Social Media Platforms when it had such a purpose. These

28  representations constitute conduct that creates a likelihood of confusion or misunderstanding and

1 that deceive and mislead members of the public regarding Meta's Social Media Platforms. R.I.
2 Gen. Laws § 6-13.1-1(6)(xii), (xiii), (xiv).

3    1139.   Similarly, as alleged herein, Meta is engaging in unfair acts to consumers,
4 including implementing psychologically manipulative, engagement-inducing features that harm
5 consumers and targeting young users despite knowing their specific vulnerability to compulsive
6 and unhealthy platform use. These unfair acts constitute conduct that is especially unfair to
7 younger users. R.I. Gen. Laws § 6-13.1-1(6)(xiii).

8    1140.   Meta's acts or practices, both past and continuing, are immoral, unethical,
9 oppressive, unscrupulous, and substantially injurious to Rhode Island consumers. Pursuant to R.I.
10 Gen. Laws § 6-13.1-2 and § 6-13.1-5, the acts, practices, representations, and omissions of Meta
11 described herein are unlawful, violate the prohibition against unfair or deceptive acts or practices
12 found in RI DTPA, and restraint of these practices is in the public interest.

13

14 **COUNT L: VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES**
15 **ACT, S.C. CODE ANN. SECTION 39-5-10 *et seq*.**

16    1141.   The State of South Carolina realleges and reaffirms each and every allegation set
17 forth in all preceding paragraphs as if fully restated in this section.

18    1142.   The State of South Carolina brings this claim under the South Carolina Unfair
19 Trade Practices Act (SCUTPA), asserting a claim under sections 39-5-50 and 39-5-110 of the
20 South Carolina Code.

21    1143.   Section 39-5-10 *et seq*. of the South Carolina Code prohibits unfair or deceptive
22 acts or practices in the conduct of any trade or commerce.

23    1144.   Meta's acts and practices as described in this Complaint constitute "trade" or
24 "commerce" within the meaning of SCUTPA.

25    1145.   Meta engaged in unfair and/or deceptive acts or practices within the meaning of
26 Section 39-5-20 of the South Carolina Code through, inter alia, acts and omissions that caused
27 young users' compulsive and unhealthy use of and addiction to Meta's Social Media Platforms.

28

Complaint for Injunctive and Other Relief

1146.   Meta's misrepresentations are deceptive because they have the capacity to mislead a substantial number of consumers.

1147.   An act or practice may be unfair if it offends public policy; is immoral, unethical, oppressive, unconscionable, or causes injury to consumers. Meta's acts or practices as alleged in this Complaint are unfair.

1148.   Meta's unfair and deceptive conduct related to addicting young users to its Platforms affects the public interest. Moreover, Meta's acts or practices regarding South Carolina as alleged herein are capable of repetition.

1149.   Meta knew or reasonably should have known that its conduct violated SCUTPA and therefore is willful for the purposes of section 39-5-110 of the South Carolina Code, justifying civil penalties.

1150.   The State of South Carolina seeks all remedies available under SCUTPA including, without limitation, the following:

a.   Injunctive and other equitable relief pursuant to section 39-5-50(a) of the South Carolina Code;

b.   Restoration of all ascertainable losses under section 39-5-50(b) of the South Carolina Code to any person or entity who suffered them as a result of Meta's conduct;

c.   Civil penalties in an amount up to $5,000.00 per violation with every unfair or deceptive act or practice by Meta constituting a separate and distinct violation; and

d.   Costs and attorneys' fees pursuant to section 1-7-85 of the South Carolina Code.

**COUNT LI: VIOLATIONS OF VIRGINIA CONSUMER PROTECTION ACT, VA. CODE §§ 59.1-198 TO 59.1-207**

1151.   The Commonwealth of Virginia, *ex rel*. Jason S. Miyares, Attorney General, incorporates and realleges each of the paragraphs 1 through 850 as if fully set forth herein.

1152.   Meta is or was during all relevant times a "supplier" of "goods" and/or "services" in connection with "consumer transactions" as those terms are defined in § 59.1-198 of the Virginia Consumer Protection Act (VCPA).

194

1153.   The Commonwealth of Virginia alleges that the aforesaid acts and practices of Meta, including but not limited to those described in paragraph 846, constitute violations of the VCPA, including Virginia Code § 59.1-200(A)(5), (6), and (14).

1154.   Individual consumers have suffered losses as a result of Meta's violations of the VCPA.

1155.   Meta has willfully engaged in the acts and practices described in this Complaint in violation of the VCPA.

1156.   Pursuant to Va. Code §§ 59.1-203, 205, and 206, the Commonwealth of Virginia seeks a permanent injunction against Meta restraining future VCPA violations; restitution for consumers for monies acquired by means of any VCPA violations; and civil penalties, costs, reasonable expenses, and attorneys' fees.

## COUNT LII: DECEPTIVE ACTS OR PRACTICES IN VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE § 19.86.020

1157.   Washington realleges and incorporates herein by reference each of the allegations contained in the preceding paragraph 1 through 850 as though fully alleged in this cause of action.

1158.   Meta engaged in deceptive acts or practices affecting Washington consumers, including young users, parents of young users, and Meta advertisers, and in violation of Wash. Rev. Code. § 19.86.020 by making representations, directly or indirectly, expressly or by implication, regarding its Social Media Platforms, including but not limited to the following: (a) that Meta's Social Media Platforms are not psychologically or physically harmful for young users and children and are not designed to induce compulsive and extended use by young users and children; (b) that Meta's Social Media Platforms are not addictive and/or are unlikely to result in psychological or physical harm for young users and children; (c) that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms is lower than it actually is; (d) that Meta prioritized young users' and children's health and safety over maximizing profits; (e) that Meta does not allow the promotion of harmful material on its Social Media Platforms; (f) that under-13 users are effectively excluded by Meta from using Instagram

195

1 and/or Facebook; (g) that Meta's collection of user data was not for the purpose of increasing

2 users' use of the Social Media Platforms; and (h) other deceptive representations.

3      1159.   Meta's conduct as described herein occurred in trade or commerce within the

4 meaning of the Washington Consumer Protection Act, Wash. Rev. Code. § 19.86.010(2), directly

5 or indirectly affecting the people of the State of Washington.

6      1160.   Meta's deceptive acts or practices affected the public interest in that they impacted

7 numerous Washington consumers and other consumers.

8      1161.   Meta's deceptive acts or practices are likely to continue without relief from this

9 Court.

10      1162.   Based on the above deceptive acts or practices, the State of Washington is entitled

11 to relief under the Washington Consumer Protection Act including injunctive relief and restitution

12 pursuant to Wash. Rev. Code. § 19.86.080, civil penalties pursuant to Wash. Rev. Code.

13 § 19.86.140 for each and every violation of Wash. Rev. Code. § 19.86.020, and reimbursement of

14 the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code.

15 § 19.86.080.

16

17 **COUNT LIII: UNFAIR ACTS OR PRACTICES BY META IN VIOLATION OF THE**

18 **WASHINGTON CONSUMER PROTECTION ACT, WASH. REV. CODE § 19.86.020**

19      1163.   Washington realleges and incorporates herein by reference each of the allegations

20 contained in the preceding paragraph 1 through 850 as though fully alleged in this cause of action.

21      1164.   Meta engaged in unfair acts or practices affecting Washington consumers,

22 including young users, parents of young users, and Meta advertisers, and in violation of Wash.

23 Rev. Code. § 19.86.020 by (a) encouraging or facilitating young users' and children's compulsive

24 and unhealthy use of and addiction to Meta's Social Media Platforms; (b) downplaying,

25 minimizing, denying, or otherwise ignoring instances of harm suffered by young users and

26 children on Meta's Social Media Platforms; (c) downplaying, minimizing, denying, or otherwise

27 ignoring the association between harms and the use of Meta's Social Media Platforms by young

28 users and children; (d) targeting its Social Media Platforms to young users and children while

designing its Social Media Platforms to include features psychologically and physically harmful to young users and children—including Meta-designed and -deployed features known to promote compulsive, prolonged, and unhealthy use; (e) adopting design choices that have the capacity to harm young users, including infinite scroll, ephemeral content features, autoplay, and disruptive alerts; (f) designing, developing, and/or deploying disruptive audiovisual and vibration notifications and alerts and ephemeral features to induce young users and children to spend more time using the Social Media Platforms; and (g) algorithmically exploiting "variable reinforcement schedules," inducing young users and children to over-engage with Meta's products.

1165. Meta's conduct as described herein occurred in trade or commerce within the meaning of the Washington Consumer Protection Act, Wash. Rev. Code. § 19.86.010(2), directly or indirectly affecting the people of the State of Washington.

1166. Meta's unfair acts or practices affected the public interest in that they impacted numerous Washington consumers and other consumers.

1167. Meta's unfair acts or practices are likely to continue without relief from this Court.

1168. Based on the above unfair acts or practices, the State of Washington is entitled to relief under the Washington Consumer Protection Act including injunctive relief and restitution pursuant to Wash. Rev. Code. § 19.86.080, civil penalties pursuant to Wash. Rev. Code. § 19.86.140 for each and every violation of Wash. Rev. Code. § 19.86.020, and reimbursement of the costs of this action, including reasonable attorneys' fees, pursuant to Wash. Rev. Code. § 19.86.080.

**COUNT LIV: DECEPTIVE ACTS OR PRACTICES BY META IN VIOLATION OF WISCONSIN'S DECEPTIVE TRADE PRACTICES ACT, WIS. STAT. § 100.18(1)**

1169. Wisconsin realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs 1 through 850 as though fully alleged in this cause of action.

1170. In numerous instances, with the intent to sell, distribute, or increase the consumption of its products and/or services, Meta directly or indirectly made, published, or

placed before the public, representations that were untrue, deceptive, or misleading, including but not limited to the following representations by Meta:

    a.  that Meta's Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed;

    b.  that Meta's Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality;

    c.  representing, through the publication of CSER reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was;

    d.  that Meta prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms;

    e.  that under-13 users are effectively excluded by Meta from using Instagram and/or Facebook when in fact Meta was aware that its policies and practices were insufficient to exclude all under-13 users from the Platforms; and

    f.  that Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data.

    1171.  Each deceptive act or practice alleged herein, constitutes a separate violation of the Wisconsin Deceptive Trade Practices Act. By engaging in the acts and practices alleged herein, Meta engaged in deceptive acts or practices declared unlawful under Wis. Stat. § 100.18(1).

**PRAYER FOR RELIEF**

A.  On the Filing States' joint COPPA claim, pursuant to 15 U.S.C. § 6504(a)(1) and as authorized by the Court's own equitable powers, the Filing States request that the Court:

1.    Enter a permanent injunction to stop ongoing violations and prevent future violations of the COPPA Rule by Meta;

2.    Make such other orders as may be necessary to enforce Meta's compliance with the COPPA Rule;

3.    Award the Filing States damages, restitution, and other compensation;[43] and

4.    Award other and additional relief the Court may determine to be just and proper.

B.  On the Filing States' individual claims set forth in paragraphs 860 through 1171, each State respectfully requests that the Court:

    1.   For Arizona:

        a.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(1), issue a permanent injunction in accordance with Ariz. R. Civ. P. 65(d)(1), enjoining and restraining (a) Meta, (b) its officers, agents, servants, employees, attorneys, and (c) all persons in active concert or participation with anyone described in part (a) or (b) of this paragraph, directly or indirectly, from engaging in deceptive, misleading, or unfair acts or practices, or concealments, suppressions, or omissions, that violate the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A), including specific injunctive relief barring Meta from engaging in the unlawful acts and practices set forth above;

        b.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(2), order Meta to restore to all persons in interest any monies or property, real or personal, which may have been acquired by any means or any practice in this article declared to be unlawful;

        c.  Pursuant to Ariz. Rev. Stat. § 44-1528(A)(3), order Meta to disgorge all profits, gains, gross receipts, or other benefits obtained as a result of its unlawful acts alleged herein;

---

[43] Maine does not join in the request for monetary relief on the Filing States' joint COPPA claim.

d.   Pursuant to Ariz. Rev. Stat. § 44-1531, order Meta to pay to the State of Arizona a civil penalty of up to $10,000 for each willful violation by each Defendant of Ariz. Rev. Stat. § 44-1522;

e.   Pursuant to Ariz. Rev. Stat. § 44-1534, order Meta to reimburse the State of Arizona for its costs and attorneys' fees incurred in the investigation and prosecution of Meta's activities alleged in this Complaint;

f.   Pursuant to Ariz. Rev. Stat. § 44-1201, require Meta to pay pre-judgment and post-judgment interest to the State of Arizona and all consumers;

g.   Award the State such further relief the Court deems just and proper under the circumstances.

2.  For California:

a.   With respect to the state law claims set forth by California, pursuant to California Business and Professions Code sections 17203 and 17535, order that Meta, its successors, agents, representatives, employees, and all persons who act in concert with them be permanently enjoined from committing any acts which violate California Business and Professions Code sections 17200 and 17500, including, but not limited to, the acts and practices alleged in this Complaint; pursuant to California Business and Professions Code section 17536, award the People of the State of California civil penalties of $2,500 for each violation of California Business and Professions Code section 17500, as proved at trial; pursuant to California Business and Professions Code section 17206, award the People of the State of California civil penalties of $2,500 for each violation of California Business and Professions Code section 17200, as proved at trial (which are cumulative to the penalties awarded pursuant to section 17536); pursuant to California Business and Professions Code section 17206.1, award the People of the State of California additional civil penalties of $2,500 for each violation of California Business and

200

Professions Code section 17200 against one or more disabled persons, as
proved at trial; make such orders or judgments, pursuant to California
Business and Professions Code sections 17203 and 17535, as may be
necessary to prevent the use or employment by Meta of any act or practice
that violates California Business and Professions Code sections 17200 or
17500, or as may be necessary to restore to any person in interest any
money or property which Meta may have acquired either directly or
indirectly from such persons by means of any practice that violates
California Business and Professions Code sections 17200 or 17500; and
award the People of the State of California all other relief to which they are
legally entitled under California law.

3.  For Colorado:

   a.  An order and judgment declaring Meta's conduct to be in violation of the
       Colorado Consumer Protection Act, Colo. Rev. Stat. §§ 6-1-105(1)(e), (g),
       (u), and (rrr).

   b.  An order and judgment to enjoin and prevent the use and employment of
       the deceptive trade practices described in this Complaint and which are
       necessary to completely compensate the State of Colorado, its institutions,
       and any person injured by means of any such practice. Such relief shall
       include a judgment in an amount to be determined at trial for restitution,
       disgorgement, or other equitable relief, including injunctive relief, pursuant
       to Colo. Rev. Stat. § 6-1-110(1).

   c.  An order permanently enjoining Meta and anyone in active concert or
       participation with Meta with notice of such injunctive orders, from
       engaging in any deceptive trade practices as defined in and proscribed by
       the Colorado Consumer Protection Act and as set forth in this Complaint,
       pursuant to Colo. Rev. Stat. § 6-1-110(1).

201

d.  An order requiring Meta to forfeit and pay civil penalties pursuant to Colo. Rev. Stat. § 6-1-112(1)(a).

e.  An order requiring Meta to pay the costs and expenses of this action incurred by the Attorney General, including, but not limited to, expert costs and attorneys' fees, pursuant to Colo. Rev. Stat. § 6-1-113(4).

f.  Any such further orders as the Court may deem just and proper to effectuate the purposes of the Colorado Consumer Protection Act.

4.  For Connecticut:

a.  With respect to the state law claims set forth by the State of Connecticut, pursuant to the Connecticut Unfair Trade Practices Act (CUTPA), Connecticut General Statutes (Conn. Gen. Stat.) § 42-110b *et seq.,* award the State of Connecticut: (1) civil penalties for each willful violation of CUTPA committed by Meta up to $5,000 per violation pursuant to Conn. Gen. Stat. § 42-110o; (2) damages and restitution for Connecticut consumers, pursuant to Conn. Gen. Stat. § 42-110m; (3) disgorgement, pursuant to Conn. Gen. Stat. § 42-110m; (4) injunctive and other equitable relief, pursuant to Conn. Gen. Stat. § 42-110m; (5) costs and attorney's fees, pursuant to Conn. Gen. Stat. § 42-110m; and (6) other remedies as the Court may deem appropriate under the facts and circumstances of the case.

5.  For Delaware:

a.  With respect to the Delaware CFA claim set forth by the State of Delaware in Count X pursuant to 6 Del. Code Ann. §§2522, 2523 and 2526, a permanent injunction enjoining Meta from violating the Delaware CFA, award to the state civil penalties of up to $10,000 per violation for each willful violation of § 2513 of the Delaware CFA, the exact number of violations to be proven at trial; award all sums necessary to restore to any consumers the money or property acquired from them by Meta in connection with violations of § 2513 of the Delaware CFA; award to the

202

1   State its costs as well as attorneys' fees, and all other remedies and relief

2   available at law and equity that this Court deems fit.

3   b. With respect to the Delaware DTPA claim set forth by the State of

4   Delaware in Count XI pursuant to 6 Del. Code Ann. §§ 2532 and 2533 and

5   award to the state a permanent injunction enjoining Meta from violating the

6   Delaware DTPA, civil penalties of up to $10,000 per violation for each

7   willful violation of § 2532 of the Delaware DTPA, the exact number of

8   violations to be proven at trial; award all sums necessary to restore to any

9   consumers the money or property acquired from them by Meta in

10  connection with violations of § 2532 of the Delaware DTPA; award to the

11  State its costs as well as attorneys' fees, and all other remedies and relief

12  available at law and equity that this Court deems fit.

13  6. For Georgia:

14  a. Declaring that Meta has violated the FBPA by engaging in the unlawful

15  acts and practices alleged herein;

16  b. Permanently enjoining Meta from engaging in the unfair and/or deceptive

17  acts and practices alleged herein;

18  c. Permanently enjoining Meta from violating the FBPA;

19  d. Ordering that Meta pay restitution to any person or persons adversely

20  affected by Meta's actions in violation of the FBPA;

21  e. Assessing a civil penalty against Meta in the amount of $5,000.00 per

22  violation of the FBPA;

23  f. Assessing attorneys' fees and costs against Meta; and

24  g. Granting such other and further relief as the Court deems just and

25  appropriate.

26  7. For Hawai'i:

27  a. Declaring that Meta has violated HIUDAP by engaging in the unlawful

28  acts and practices alleged herein;

203

1                  b.   Permanently enjoining Meta from engaging in any acts that violate

2                      HIUDAP, including, but not limited to, the unfair or deceptive acts or

3                      practices alleged herein;

4                  c.   Assessing civil penalties against Meta in the amount not exceeding

5                      $10,000.00 for each and every violation of HIUDAP pursuant to HRS §

6                      480-3.1;

7                  d.   Awarding the State's reasonable attorneys' fees and costs pursuant to HRS

8                      § 480-14 (c) for violations of HIUDAP;

9                  e.   Pre- and post-judgment interest; and

10               f.   Awarding such other relief as this Court deems just and equitable.

11        8.   For Illinois:

12                  a.   Find that Meta violated Section 2 of the Consumer Fraud Act, 815 ILCS

13                      505/2, by engaging in unlawful acts and practices including, but not limited

14                      to, the unlawful acts and practices alleged herein;

15                  b.   Enter a permanent injunction pursuant to 815 ILCS 505/7 to prevent future

16                      violations of the Consumer Fraud Act;

17                  c.   Order Meta to pay penalties up to $50,000 per unfair or deceptive act or

18                      practice and an additional amount of $50,000 for each act or practice found

19                      to have been committed with the intent to defraud, as provided in Section 7

20                      of the Consumer Fraud Act, 815 ILCS 505/7;

21                  d.   Order Meta to pay monetary relief, including restitution to Illinois

22                      consumers, and disgorgement of revenues pursuant to 815 ILCS 505/7;

23                  e.   Order Meta to pay all costs of the State of Illinois in bringing this action

24                      pursuant to 815 ILCS 505/10;

25                  f.   Award any other and additional relief as the Court may determine to be just

26                      and proper.

27        9.   For Indiana:

28

      a.  Pursuant to Ind. Code § 24-5-0.5-4(c)(1), permanently enjoin Meta from engaging in acts or omissions alleged in this Complaint that violate the Indiana Deceptive Consumer Sales Act, Ind. Code § 24-5-0.5-1 *et seq.*;

      b.  Pursuant to Ind. Code § 24-5-0.5-4(c)(2), order Meta to pay restitution to aggrieved Indiana consumers;

      c.  Pursuant to Ind. Code § 24-5-0.5-4(c)(4), order Meta to pay costs, awarding the Office of the Attorney General its reasonable expenses incurred in the investigation and prosecution of this action;

      d.  Pursuant to Ind. Code § 24-5-0.5-4(g), order Meta to pay civil penalties for Meta's knowing violations of Ind. Code § 24-5-0.5-3(a) and Ind. Code §§ 24-5-0.5-3(b)(1) and (2), payable to the State of Indiana, in the amount of five thousand dollars ($5,000.00) per violation;

      e.  Pursuant to Ind. Code § 24-5-0.5-8, order Meta to pay civil penalties for Meta's incurable deceptive acts, payable to the State of Indiana, in the amount of five hundred dollars ($500.00) per violation; and

      f.  Pursuant to Ind. Code § 24-5-0.5-4(c), all other just and proper relief, including but not limited to equitable relief such as disgorgement of revenues from any ill-gotten gains.

10. For Kansas:

      a.  Permanently enjoin Meta, pursuant to K.S.A. 50-632 from engaging in any acts that violate the KCPA, including, but not limited to, the deceptive and unconscionable acts or practices alleged herein;

      b.  Order Meta to pay civil penalties in the amount of $10,000.00, pursuant to K.S.A. 50-636(a), for each violation of the KCPA;

      c.  Order Meta to pay all expenses and investigation fees, pursuant to K.S.A. 50-632(a)(4); and

      d.  Such other relief as the Court deems just and equitable.

11. For Kentucky:

a. Disgorgement and restitution pursuant to Ky. Rev. Stat.§ 15.020, Ky. Rev. Stat.§ 367.110 through Ky. Rev. Stat.§ 367.990, and common law;

b. Injunctive and other equitable relief pursuant to Ky. Rev. Stat. § 15.020, Ky. Rev. Stat. § 367.190, and common law;

c. Civil penalties pursuant to Ky. Rev. Stat.§ 367.990(2);

d. Costs and attorneys' fees pursuant to Ky. Rev. Stat. § 367.110 through Ky. Rev. Stat.§ 367.990, Ky. Rev. Stat.§ 48.005(4), and common law; and

e. Other remedies as the Court may deem appropriate under the facts and circumstances of the case.

12. For Louisiana:

a. An order declaring Meta's conduct to be in violation of LA. REV. STAT. ANN. § 51:1405;

b. Issuing a permanent injunction prohibiting Meta from engaging in future unfair and deceptive trade practices pursuant to LA. REV. STAT. ANN. § 51:1407;

c. Ordering Meta to pay civil penalties for each and every violation of the Louisiana Consumer Protection Law pursuant to LA. REV. STAT. ANN. § 51:1407;

d. Ordering Meta to pay all costs and reasonable attorneys' fees for the prosecution and investigation of this action; and

e. Ordering any other additional relief as the Court may deem just and proper.

13. For Maine:

a. An order pursuant to ME. REV. STAT. ANN. tit. 5, § 209 to permanently enjoin and restrain the use of the unfair or deceptive methods, acts, or practices which are unlawful under ME. REV. STAT. ANN. tit. 5, § 207 as described in this Complaint;

<table>
<tr><td>1</td><td></td></tr>
</table>

1         b.  An order pursuant to ME. REV. STAT. ANN. tit. 5, § 209 requiring Meta to

2              forfeit and pay civil penalties for each intentional violation of the Maine

3              Unfair Trade Practices Act;

4         c.  An order requiring Meta to pay the costs and expenses of this action

5              incurred by the Attorney General, including, but not limited to, expert costs

6              and attorneys' fees, pursuant to ME. REV. STAT. ANN. tit. 5, § 209 and ME.

7              REV. STAT. ANN. tit. 14, § 1522(1)(A); and

8         d.  Any such further orders as the Court may deem just and proper to

9              effectuate the purposes of the Maine Unfair Trade Practices Act.

10    14. For Michigan:

11         a.  The Attorney General for the State of Michigan seeks a permanent

12              injunction against Meta restraining future violations of the MCPA and

13              other law; a civil fine of $25,000 per violation; a declaratory judgment that

14              the conduct comprising MCPA violations described above are unlawful;

15              restitution and monetary damages of not less than $250.00 per consumer

16              damaged by the MCPA violations described above; costs and reasonable

17              attorneys' fees; and any other relief this Court considers just and proper.

18    15. For Minnesota:

19         a.  With respect to the state law claims set forth by the State of Minnesota,

20              award judgment against Meta, jointly and severally, as follows:

21               i.  Declaring that Meta's actions and omissions, as described in this

22                   Complaint, constitute multiple, separate violations of Minnesota

23                   Statutes section 325D.44, subdivision 1;

24               ii.  Permanently enjoining Meta and its employees, officers, directors,

25                   agents, successors, assignees, affiliates, merged or acquired

26                   predecessors, parents or controlling entities, subsidiaries, and all

27                   other persons acting in concert or participation with them from

28

207

1  engaging in conduct in violation of Minnesota Statutes section

2  325D.44, subdivision 1;

3        iii.   Awarding judgment against Meta for restitution, disgorgement,

4  and/or damages for Minnesota consumers under Minnesota Statutes

5  section 8.31, the *parens patriae* doctrine, the general equitable

6  powers of this Court, and any other authority;

7        iv.   Awarding judgment against Meta for civil penalties pursuant to

8  Minnesota Statutes section 8.31, subdivision 3, for each separate

9  violation of Minnesota Statutes section 325D.44, subdivision 1;

10        v.   Awarding the State of Minnesota its costs, including litigation

11  costs, costs of investigation, and attorneys' fees, as authorized by

12  Minnesota Statutes section 8.31, subdivision 3a; and

13        vi.   Granting such further relief as provided by law or equity or as the

14  Court deems appropriate and just.

15  16. For Missouri:

16       a.   An order declaring Meta's conduct to be in violation of the Missouri

17  Merchandising Practices Act (MMPA), Mo. Rev. Stat. §407.020;

18       b.   An order permanently enjoining Meta and anyone in active concert or

19  participation with Meta with notice of such injunctive orders, from

20  engaging in any unlawful practices as defined in and proscribed by the

21  MMPA and as set forth in this Complaint, pursuant to Mo. Rev. Stat.

22  §407.100.1;

23       c.   An order to prevent the employment and recurrence of the unlawful acts

24  and practices described in this Complaint, including disgorgement, or other

25  equitable relief, including injunctive relief, pursuant to Mo. Rev. Stat.

26  §407.100.3;

27       d.   An order an order of restitution, payable to the State of Missouri, as may be

28  necessary to restore to any person who has suffered any ascertainable loss

1       as a result of Meta's unlawful practices, pursuant to Mo. Rev. Stat.

2       §407.100.4;

3    e.  An order requiring Meta to pay an amount equal to ten percent of any

4       restitution awarded, pursuant to Mo. Rev. Stat. §407.140.3;

5    f.  An order requiring Meta to pay civil penalties pursuant to Mo. Rev. Stat.

6       §407.100.6;

7    g.  An order requiring Meta to pay the Attorney General's costs and fees of

8       investigating and prosecuting this action, including, but not limited to,

9       expert costs and attorneys' fees, pursuant to Mo. Rev. Stat. §407.130; and

10    h.  Any such further orders as the Court may deem just and proper to

11       effectuate the purposes of the MMPA.

12  17. For Nebraska:

13    a.  Permanently enjoining Meta, its agents, employees, and all other persons

14       and entities, corporate or otherwise, in active concert or participation with

15       any of them, pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303.05, from

16       engaging in conduct described in the Complaint to be in violation of the

17       Consumer Protection Act and Uniform Deceptive Trade Practices Act;

18    b.  Permanently enjoining Meta, its agents, employees, and all other persons

19       and entities, corporate or otherwise, in active concert or participation with

20       any of them, pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303.05, from

21       violating the Consumer Protection Act, Uniform Deceptive Trade Practices

22       Act, and any amendments thereto;

23    c.  Ordering Meta to pay restitution, pursuant to Neb. Rev. Stat. §§ 59-1608(2)

24       and 87-303.05(1), to any person or persons adversely affected by Meta's

25       acts or practices in violation of the Nebraska Consumer Protection Act and

26       Nebraska Uniform Deceptive Trade Practices Act;

27    d.  Ordering Meta to pay the State a civil penalty in the amount of two

28       thousand ($2,000.00) dollars per violation, pursuant Neb. Rev. Stat. §§ 59-

1614 and 87-303.11, for each and every violation of the Consumer
Protection Act and Uniform Deceptive Trade Practices Act;

e.  Ordering Meta to pay the State's costs and attorneys' fees in this matter,
pursuant to Neb. Rev. Stat. §§ 59-1608 and 87-303(b); and

f.  Granting such further relief as the Court may deem just and appropriate.

18. For New Jersey:

a.  With respect to the state law claims set forth by New Jersey, pursuant to
the Consumer Fraud Act (CFA), N.J. STAT. ANN. §§ 56:8-1 to 227, award
New Jersey: (1) the maximum statutory civil penalties for each violation of
CFA committed by Meta of $10,000 for the first violation and $20,000 for
each second and subsequent violation, pursuant to N.J. STAT. ANN. §§
56:8-13 and 14; (2) damages and restitution for New Jersey consumers
under N.J. STAT. ANN. § 56:8-8; (3) injunctive and other equitable relief,
pursuant to N.J. STAT. ANN. § 56:8-8; (4) treble damages under N.J. STAT.
ANN. § 56:8-19; (5) costs and attorneys' fees pursuant to N.J. STAT. ANN. §
56:8-11; and (6) any other remedies as the Court may deem appropriate
under the facts and circumstances of the case.

19. For New York:

a.  Permanently enjoining Meta from violating the laws of the State of New
York, including New York Executive Law § 63(12) and New York General
Business Law §§ 349 and 350;

b.  Directing Meta to make full restitution to consumers and pay damages
caused, directly or indirectly, by the fraudulent, deceptive, and illegal acts
complained of herein plus applicable pre-judgment interest;

c.  Directing Meta to pay a civil penalty of $5,000 for each violation of New
York General Business Law Article 22-A, pursuant to New York General
Business Law § 350-d;

210

1          d.   Directing such other equitable relief as may be necessary to redress Meta's

2              violations of New York law;

3          e.   Directing Meta to produce an accounting of profits and to disgorge all

4              profits resulting from the fraudulent and illegal practices alleged herein;

5          f.   Awarding the Attorney General of the State of New York its costs; and

6          g.   Granting such other and further relief as the Court deems just and proper.

7     20. For North Carolina:

8          a.   Permanently enjoin Meta from engaging in the unfair or deceptive acts and

9              practices described herein and from engaging in any other acts and

10              practices with the same purpose or effect, pursuant to N.C.G.S. § 75-14;

11          b.   Enter any other permanent relief necessary to remedy the effects of Meta's

12              unfair or deceptive conduct, pursuant to N.C.G.S. § 75-14;

13          c.   Award the State of North Carolina the disgorgement of profits from Meta's

14              unfair or deceptive acts and practices;

15          d.   Award the State of North Carolina civil penalties, pursuant to N.C.G.S.

16              § 75-15.2;

17          e.   Award the State of North Carolina its costs, including a reasonable

18              attorney's fee, incurred by the investigation and litigation of this matter,

19              pursuant to N.C.G.S. § 75-16.1;

20          f.   Award the State of North Carolina any and all other legal and equitable

21              relief as the Court may determine to be just and proper.

22     21. For North Dakota:

23          a.   Find that Meta engaged in acts or practices that violate N.D. Cent. Code

24              §51-15-02;

25          b.   Permanently enjoin Meta from engaging in any acts or practices that

26              violate N.D. Cent. Code §51-15-02, including the unlawful acts or

27              practices alleged herein, pursuant to N.D. Cent. Code §51-15-07;

28

c.  Award for the benefit of the state of North Dakota civil penalties of up to $5,000 for each violation of N.D. Cent. Code §51-15-02, pursuant to N.D. Cent. Code §51-15-11;

d.  Award all sums necessary to prevent Meta's use or employment of unlawful practices, and restore to persons any money or property that may have been acquired by means of a practice violating N.D. Cent. Code § 51-15-02, pursuant to N.D. Cent. Code §51-15-07;

e.  Award, to the Attorney General, reasonable attorneys' fees, investigation fees, costs, and expenses of the investigation and prosecution of this action, pursuant to N.D. Cent. Code §51-15-10; and

f.  Award such other relief as this Court deems just and equitable.

22. For Ohio:

a.  Issue a declaratory judgment that each act or practice complained of herein violates the CSPA, Ohio Rev. Code §1345.01 *et seq*., in the manner set forth in the Complaint;

b.  Issue a permanent injunction enjoining Meta, its agents, employees, successors or assigns, and all persons acting in concert and participation with them, directly or indirectly, through any corporate device, partnership, or other association, under these or any other names, from engaging in the acts and practices of which Ohio complains and from further violating the CSPA, Ohio Rev. Code §1345.01 *et seq*.;

c.  Assess, fine and impose upon Meta a civil penalty of up to $25,000.00 for each separate and appropriate violation of the CSPA described herein pursuant to Ohio Rev. Code §1345.07(D);

d.  Grant Ohio its costs incurred in bringing this action, including but not limited to, the cost of collecting on any judgment awarded;

e.  Order Meta to pay all court costs associated with this matter; and

f.   Grant such other relief as the Court deems to be just, equitable, and appropriate.

23. For Oregon:

a.   Entering a permanent injunction to prevent Meta from future violations of Oregon's UTPA, pursuant to O.R.S. § 646.636;

b.   Awarding civil penalties up to $25,000 for each willful violation of O.R.S. § 646.607 and O.R.S. § 646.608, pursuant to O.R.S. § 646.642; and

c.   Awarding reasonable attorneys' fees and costs of the investigation, preparation, and litigation, pursuant to O.R.S. § 646.632(8) and O.R.C.P. 68.

24. For Pennsylvania:

a.   Declaring Meta's conduct as described herein above to be in violation of the UTPCL;

b.   Permanently enjoining Meta and all other persons acting on its behalf, directly or indirectly, from violating the UTPCL;

c.   Directing Meta to make full restitution, pursuant to section 201-4.1 of the UTPCL, to all consumers who have suffered losses as a result of the acts and practices alleged in this Complaint and any other acts or practices which violate the UTPCL;

d.   Directing Meta to pay to the Commonwealth of Pennsylvania civil penalties of One Thousand and 00/100 Dollars ($1,000.00) for each instance of a past or present violation of the UTPCL;

e.   Requiring Meta to pay the Commonwealth of Pennsylvania's investigative and litigation costs in this matter; and

f.   Granting such other general, equitable and/or further relief as the Court deems just and proper.

25. For Rhode Island:

a.   Enter an order permanently enjoining Meta from engaging in any of the
     acts or practices described herein and any further violation of the RI
     DTPA;

b.   Declare the acts or practices described herein to be unlawful under the RI
     DTPA;

c.   Order Restoration to any person in interest any moneys or property, real or
     personal, that may have been acquired by means of any act or practice
     described herein;

d.   Order Meta to pay the State of Rhode Island's costs and attorneys' fees;

e.   Order Meta to pay a civil penalty of up to ten thousand dollars
     ($10,000.00) per violation of the Deceptive Trade Practices Act as
     provided by R.I. Gen. Laws § 6-13.1-8; and

f.   Order any other relief that the Court deems appropriate.

26. For South Carolina:

a.   Permanently enjoin Meta, pursuant to section 39-5-50(a) of the South
     Carolina Code from engaging in any acts that violate SCUTPA, including,
     but not limited to, the unfair or deceptive acts or practices alleged herein;

b.   Order Meta to restore to all persons and entities all ascertainable losses
     suffered as a result of Meta's violations of SCUTPA;

c.   Order Meta to pay civil penalties in the amount of $5,000.00, pursuant to
     section 39-5-110(a) of the South Carolina Code, for each and every willful
     violation of SCUTPA;

d.   Order Meta to pay attorneys' fees and costs pursuant to section 1-7-85 of
     the South Carolina Code for violations of SCUTPA;

e.   Pre- and post-judgment interest; and

f.   Such other and further relief as this Court deems just and equitable.

27. For Virginia:

214

1     a. Pursuant to Virginia Code § 59.1-203, enter a permanent injunction against

2        Meta restraining future VCPA violations;

3     b. Pursuant to Virginia Code § 59.1-206(A), award to the Commonwealth of

4        Virginia civil penalties of up to $2,500.00 per violation for each willful

5        violation of § 59.1-200 of the VCPA, the exact number of violations to be

6        proven at trial;

7     c. Pursuant to Virginia Code § 59.1-205, award all sums necessary to restore

8        to any consumers the money or property acquired from them by Meta in

9        connection with violations of § 59.1-200 of the VCPA;

10     d. Pursuant to Virginia Code § 59.1-206(D), award to the Commonwealth of

11        Virginia its costs, reasonable expenses incurred in investigating and

12        preparing the case, up to $1,000.00 per violation of § 59.1-200 of the

13        VCPA, the exact number of violations to be proven at trial, as well as the

14        Commonwealth of Virginia's attorneys' fees; and

15     e. Award any such other and additional relief as this Court deems just and

16        proper.

17   28. For Washington:

18     a. Adjudge and decree that Meta has engaged in the conduct complained of

19        herein;

20     b. Adjudge and decree that the conduct complained of in the Complaint

21        constitutes unfair or deceptive acts or practices in violation of the

22        Washington Consumer Protection Act, Wash. Rev. Code. § 19.86;

23     c. Issue a permanent injunction enjoining and restraining Meta and its

24        representatives, successors, assigns, officers, agents, servants, employees,

25        and all other persons acting or claiming to act for, on behalf of, or in active

26        concert or participation with Meta from continuing or engaging in the

27        unlawful conduct complained of herein;

28

d.  Assess civil penalties, pursuant to Wash. Rev. Code. § 19.86.140, of up to $7,500 per violation against Meta for each and every violation of Wash. Rev. Code. § 19.86.020 alleged herein;

e.  Assess an enhanced civil penalty of $5,000, pursuant to Wash. Rev. Code. § 19.86.140, against Meta for each and every violation of Wash. Rev. Code. § 19.86.020 alleged herein that target or impact specific individuals, groups of individuals, or communities based on demographic characteristics, including but not limited to sex and age;

f.  Order Meta to pay restitution and/or other monetary relief;

g.  Disgorge Meta of money, property, or data (including any algorithms developed using such data) acquired by Meta as a result of the conduct complained of herein;

h.  Award the State of Washington the costs of bringing this action, including reasonable attorney's fees; and

i.  Award any other and additional relief as the Court may determine to be just and proper.

29. For Wisconsin:

a.  An order and judgment declaring Meta's conduct to be in violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18(1);

b.  An order and judgment requiring Meta to restore any pecuniary losses suffered by any person because of Meta's acts or practices in violation of Wis. Stat. § 100.18(1);

c.  An order and judgment permanently enjoining Meta, its successors, assigns, officers, directors, agents, dealers, servants, employees, representatives, solicitors, and all persons acting or claiming to be acting on its behalf, pursuant to Wis. Stats. §§ 100.18(11)(a) and (d) from making further false, deceptive, or misleading representations;

216

d.  An order and judgment imposing civil forfeitures against Meta in the amount of not less than $50 nor more than $200 for each violation of Wis. Stat. § 100.18(1) pursuant to Wis. Stat. § 100.26(4), consumer protection surcharges pursuant to Wis. Stat. § 100.261, plus all applicable assessments and costs;

e.  An order and judgment awarding the State of Wisconsin the expenses of investigation and prosecution of this action, including attorneys' fees, pursuant to Wis. Stat. § 100.263; and

f.  Any such other and further relief as justice and equity may require.

1    Dated: October 24, 2023                    Respectfully submitted,

2

3    **KRIS MAYES**                            **ROB BONTA**

4    Attorney General                          Attorney General
     State of Arizona                          State of California

5
     */s/ Vince Rabago*                        */s/ Bernard Eskandari*
6    Vince Rabago (AZ No. 015522 CA No.        Nicklas A. Akers (CA SBN 211222)
     167033) *pro hac vice app. forthcoming, if*  Senior Assistant Attorney General
7    *required*                                Bernard Eskandari (CA SBN 244395)
     Chief Counsel - Consumer Protection and  Supervising Deputy Attorney General
8    Advocacy Section                          Megan O'Neill (CA SBN 343535)
     Nathan Whelihan (AZ No. 037560) *pro hac*  Joshua Olszewski-Jubelirer
9    *vice app. forthcoming, if required*      (CA SBN 336428)
     Assistant Attorney General                Marissa Roy (CA SBN 318773)
10   Arizona Attorney General's Office         Deputy Attorneys General
     2005 North Central Avenue                 California Department of Justice
11   Phoenix, AZ 85004                         Office of the Attorney General
     Phone: (602) 542-3725                     455 Golden Gate Ave., Suite 11000
12   Fax:    (602) 542-4377                    San Francisco, CA 94102-7004
     Vince.Rabago@azag.gov                     Phone: (415) 510-4400
13   Nathan.Whelihan@azag.gov                  Fax: (415) 703-5480
14                                             Bernard.Eskandari@doj.ca.gov

15   *Attorneys for Plaintiff State of Arizona*
16                                             *Attorneys for Plaintiff the People of the State*
                                               *of California*
17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Injunctive and Other Relief

1   **PHILIP J. WEISER**
Attorney General
2   State of Colorado

3    _/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
4   *pro hac vice app. forthcoming, if required*
Senior Assistant Attorney General
5   Lauren M. Dickey, CO Reg. No. 45773
First Assistant Attorney General
6   Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
7   Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
8   Colorado Department of Law
Ralph L. Carr Judicial Center
9   Consumer Protection Section
1300 Broadway, 7th Floor
10  Denver, CO 80203
Phone: (720) 508-6651
11  bianca.miyata@coag.gov

12
*Attorneys for Plaintiff State of Colorado, ex*
13  *rel. Philip J. Weiser, Attorney General*

14
**WILLIAM TONG**
15  Attorney General
State of Connecticut

16
*/s/ Lauren H. Bidra*
17  Lauren H. Bidra (CT Juris No. 440552)
Special Counsel for Media and Technology
18  *Pro hac vice app. forthcoming, if required*
Matthew Fitzsimmons (CT Juris No.
19  426834)
Chief Counsel
20  *Pro hac vice app. forthcoming, if required*
Connecticut Office of the Attorney General
21  165 Capitol Avenue
Hartford, Connecticut 06106
22  Phone: 860-808-5306
Fax: 860-808-5593
23  Lauren.Bidra@ct.gov
Matthew.Fitzsimmons@ct.gov
24

25  *Attorneys for Plaintiff State of Connecticut*

26

27

28

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

/s/ Dashiell Raj Radosti
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk
Director of Consumer Protection
Dashiell Radosti (DE Bar 7100*), pro hac
vice app. forthcoming, if required*
Deputy Attorney General,
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Dashiell.Radosti@delaware.gov

*Attorneys for Plaintiff State of Delaware*


**CHRISTOPHER M. CARR**
Attorney General
State of Georgia

*/s/ Melissa M. Devine*
Melissa M. Devine (GA Bar No. 403670),
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of the State
of Georgia
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334
Phone: (404) 458-3765
Fax: (404) 651-9108
mdevine@law.ga.gov

*Attorneys for Plaintiff State of Georgia*

1

**ANNE E. LOPEZ**
Attorney General
2 State of Hawai'i

3
/s/ *Bryan C. Yee*
4 BRYAN C. YEE (HA JD No. 4050)
Supervising Deputy Attorney General
5 CHRISTOPHER T. HAN (HA JD No.
11311), *pro hac vice app. forthcoming, if*
6 *required*
7 Deputy Attorney General
Department of the Attorney General
8 Commerce and Economic Development
Division
9 425 Queen Street
10 Honolulu, Hawai'i 96813
Phone: (808) 586-1180
11 Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov
12
13 *Attorneys for Plaintiff State of Hawai'i*

14 **RAÚL R. LABRADOR**
15 Attorney General
State of Idaho
16
By:    /s/ *Nathan Nielson*
17 Stephanie N. Guyon (ID Bar No. 5989)
18 *pro hac vice app. forthcoming, if required*
Nathan H. Nielson (ID Bar No. 9234)
19 *pro hac vice app. forthcoming, if required*
Deputy Attorneys General
20 Attorney General's Office
P.O. Box 83720
21 Boise, ID 83720-0010
22 (208) 334-2424
stephanie.guyon@ag.idaho.gov
23 nathan.nielson@ag.idaho.gov
24
*Attorneys for Plaintiff State of Idaho*
25

26

27

28

**KWAME RAOUL**
Attorney General
State of Illinois

By:    /s/ *Susan Ellis*
**Susan Ellis**, Chief, Consumer Protection
Division (IL Bar No. 6256460)
**Greg Grzeskiewicz**, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
**Jacob Gilbert**, Deputy Chief, Consumer
Fraud Bureau (IL Bar No. 6306019)
**Daniel Edelstein**, Supervising Attorney,
Consumer Fraud Bureau (IL Bar No.
6328692)
**Adam Sokol**, Senior Assistant Attorney
General, Consumer Fraud Bureau (IL Bar
No. 6216883)
**Hanan Malik**, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No.
6316543)
**Emily María Migliore**, Assistant Attorney
General, Consumer Fraud Bureau (IL Bar
No. 6336392)
**Kevin Whelan**, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No.
6321715)
**Office of the Illinois Attorney General**
100 W. Randolph Street
Chicago, Illinois 60601
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Daniel.Edelstein@ilag.gov
Adam.Sokol@ilag.gov
Hanan.Malik@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov
*(pro hac vice applications forthcoming, if*
*required)*

*Attorneys for Plaintiff the People of the State*
*of Illinois*

1
2  **THEODORE E. ROKITA**
   Attorney General
   State of Indiana
3
4  */s/ Scott L. Barnhart*
   Scott L. Barnhart (IN Atty No. 25474-82)
5  *pro hac vice app. forthcoming, if required*
   Chief Counsel and Director of Consumer
6  Protection
   Corinne Gilchrist (IN Atty No. 27115-53)
7  *pro hac vice app. forthcoming, if required*
   Section Chief, Consumer Litigation
8  Mark M. Snodgrass (IN Atty No. 29495-49)
   *pro hac vice app. forthcoming, if required*
9  Deputy Attorney General
   Office of the Indiana Attorney General
10 Indiana Government Center South
   302 West Washington St., 5th Floor
11  Indianapolis, IN 46203
12 Telephone: (317) 232-6309
   Scott.Barnhart@atg.in.gov
13 Corinne.Gilchrist@atg.in.gov
   Mark.Snodgrass@atg.in.gov
14
15 *Attorneys for Plaintiff State of Indiana*
16
17 **KRIS W. KOBACH**
   Attorney General
18 State of Kansas
19 */s/  Sarah M. Dietz*
   Sarah Dietz, Assistant Attorney General
20 (KS Bar No. 27457), *pro hac vice app.*
   *forthcoming, if required*
21 Office of the Kansas Attorney General
   120 SW 10th Avenue, 2nd Floor
22 Topeka, Kansas 66612
   Telephone: (785) 296-3751
23 sarah.dietz@ag.ks.gov
24
25 *Attorney for Plaintiff State of Kansas*
26
27
28

**DANIEL J. CAMERON**
Attorney General
Commonwealth of Kentucky

 */s/ J. Christian Lewis*
J. CHRISTIAN LEWIS (KY Bar No.
87109), *Pro hac vice app. forthcoming, if required*
PHILIP HELERINGER (KY Bar No.
96748), *Pro hac vice app. forthcoming, if required*
GREGORY B. LADD (KY Bar No. 95886),
*Pro hac vice app. forthcoming, if required*
ZACHARY RICHARDS (KY Bar No.
99209), *Pro hac vice app. forthcoming, if required*
ASSISTANT ATTORNEYS GENERAL
1024 CAPITAL CENTER DRIVE
SUITE 200
FRANKFORT, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
GREG.LADD@KY.GOV
ZACH.RICHARDS@KY.GOV
PHONE: (502) 696-5300
FAX: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

221

**JEFF LANDRY**
Attorney General
State of Louisiana

*/s/ Arham Mughal*
Arham Mughal (LA Bar No. 38354), *pro hac vice app. forthcoming, if required*
L. Christopher Styron (LA Bar No. 30747), *pro hac vice app. forthcoming, if required*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
MughalA@ag.louisiana.gov
StyronL@ag.louisiana.gov

*Attorneys for State of Louisiana*


**AARON M. FREY**
Attorney General
State of Maine

/s/ Brendan F.X. O'Neil
Brendan F.X. O'Neil, Maine Bar No. 9900, *pro hac vice app. forthcoming, if required*
Michael Devine, Maine Bar No. 5048
Laura Lee Barry Wommack, Maine Bar No. 10110
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
brendan.oneil@maine.gov
michael.devine@maine.gov
lauralee.barrywommack@maine.gov

*Attorneys for Plaintiff State of Maine*


**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No. 9012190379), *pro hac vice app. forthcoming, if required*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No. 1112090003), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney General of Maryland*


**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*

1

2

**KEITH ELLISON**
Attorney General
State of Minnesota

3

4

*/s/ James Van Buskirk*
JAMES VAN BUSKIRK (MN Bar No.
0392513), *pro hac vice app. forthcoming, if
required*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 757-1150
james.vanbuskirk@ag.state.mn.us

5

6

7

8

9

10

*Attorney for Plaintiff State of Minnesota, by
its Attorney General, Keith Ellison*

11

12

**ANDREW BAILEY**
Attorney General
State of Missouri

13

14

By: */s/ Michael Schwalbert*
Michael Schwalbert, MO Bar #63229,
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

15

16

17

18

19

20

21

*Attorney for Plaintiff State of Missouri, ex
rel. Andrew Bailey, Attorney General*

22

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Michaela J. Hohwieler*
Michaela J. Hohwieler (NE #26826)
Assistant Attorney General
*pro hac vice app. forthcoming, if required*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice app. forthcoming, if required*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*pro hac vice app. forthcoming, if required*
Chief, Deputy Attorney General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov

*Attorneys for Plaintiff New Jersey Division
of Consumer Affairs*

23

24

25

26

27

28

Complaint for Injunctive and Other Relief

**LETITIA JAMES**
Attorney General
State of New York

/s/ *Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy
Attorney General, Economic Justice
Division (NY Bar No. 4348744)
Christopher.D'Angelo@ag.ny.gov
Kim Berger, Chief, Bureau of Internet and
Technology (NY Bar No. 2481679)
Kim.Berger@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of
Internet and Technology (NY Bar No.
2848323)
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney
General (NY Bar No. 5773676)
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney
General
28 Liberty Street
New York, NY 10005
(212) 416-8262
*Pro hac vice applications forthcoming, if
required*

*Attorneys for Plaintiff the People of the State
of New York*

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

/s/ *Kevin Anderson*
Kevin Anderson (N.C. Bar No. 22635), *pro
hac vice app. forthcoming, if required*
Senior Counsel
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine McGhee
Senior Deputy Attorney General
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North
Carolina*

Complaint for Injunctive and Other Relief

| | |
|---|---|
| 1 | **DREW H. WRIGLEY** |
| 2 | Attorney General |
| | State of North Dakota |
| 3 | |
| | By: /s/ Elin S. Alm |
| 4 | Elin S. Alm (ND Bar No. 05924) |
| | *pro hac vice app. forthcoming, if required* |
| 5 | Assistant Attorney General |
| | Parrell D. Grossman (ND Bar No. 04684) |
| 6 | Director, Consumer Protection and Antitrust |
| | Division |
| 7 | Office of Attorney General |
| 8 | 1720 Burlington Drive, Suite C |
| | Bismarck, ND 58504-7736 |
| 9 | Telephone (701) 328-5570 |
| | ealm@nd.gov |
| 10 | pgrossman@nd.gov |
| 11 | |
| | *Attorneys for Plaintiff State of North Dakota,* |
| 12 | *ex rel. Drew H. Wrigley, Attorney General* |

**DAVE YOST**
Attorney General
State of Ohio

 /s/ Kevin R. Walsh
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999)
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031
*(pro hac vice application forthcoming, if required)*

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost,*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

 /s/ Jordan M. Roberts
Jordan M. Roberts (Oregon Bar No. 115010), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:     (971) 673-1880
Facsimile:     (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen F. Rosenblum, Attorney General for the State of Oregon*

225

Complaint for Injunctive and Other Relief

MICHELLE A. HENRY
Attorney General
Commonwealth of Pennsylvania

/s/ Timothy R. Murphy
TIMOTHY R. MURPHY
Senior Deputy Attorney General (PA Bar No. 321294)
Email: tmurphy@attorneygeneral.gov
JONATHAN R. BURNS
Deputy Attorney General (PA Bar No. 315206)
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530
*(pro hac vice application forthcoming, if required)*

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

PETER F. NERONHA
Attorney General
State of Rhode Island

/s Stephen N. Provazza
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice app. forthcoming*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

ALAN WILSON
Attorney General
State of South Carolina

/s/ Anna C. Smith
C. HAVIRD JONES, JR.
Senior Assistant Deputy Attorney General
JARED Q. LIBET
Assistant Deputy Attorney General
ANNA C. SMITH (SC Bar No. 104749),
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
CLARK C. KIRKLAND, JR.
Assistant Attorney General
**OFFICE OF THE ATTORNEY GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

MARTY J. JACKLEY
Attorney General
State of South Dakota

/s/ Jessica M. LaMie
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice app. forthcoming, if required*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Section Chief
Joelle E. Gotwals (VSB No. 76779), *pro hac vice app. forthcoming, if required*
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:     (804) 786-8789
Facsimile:     (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of Virginia*
*ex rel. Jason S. Miyares, Attorney General*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Joseph Kanada*
Joseph Kanada (WA Bar No. 55055), *pro hac vice app. forthcoming, if required*
Alexandra Kory
Rabi Lahiri
Gardner Reed
Alexia Diorio
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Joe.Kanada@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**PATRICK MORRISEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267), *pro hac vice app. forthcoming, if required*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

Complaint for Injunctive and Other Relief

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ R. Duane Harlow
R. DUANE HARLOW
Assistant Attorney General
WI State Bar #1025622, *pro hac vice app*
*forthcoming, if required*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-2950
harlowrd@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

* *In compliance with Civil Local Rule 5-1(i)(3), the filer of this document attests under penalty of perjury that all signatories have concurred in the filing of this document.*

228