Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.,*
*Instagram, LLC, Meta Payments, Inc.,*
*Meta Platforms Technologies, LLC, Facebook*
*Payments, Inc., Siculus, Inc., Facebook*
*Operations, LLC, and Mark Elliot Zuckerberg*

*Additional parties and counsel listed on*
*signature pages*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| *People of the State of California, et al.*, <br><br> v. <br><br> *Meta Platforms, Inc.*, *Instagram, LLC, Meta Payments, Inc.*, *Meta Platforms Technologies, LLC* <br> _____ <br><br> *Office of the Attorney General, State of Florida, Department of Legal Affairs*, <br><br> v. <br><br> *Meta Platforms, Inc.*, *Instagram LLC* <br> _____ <br><br> IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | MDL No. 3047 <br><br> Case Nos. 4:23-cv-05448-YGR <br><br> 4:23-cv-05885-YGR <br><br> 4:22-md-03047-YGR-PHK <br><br> Honorable Yvonne Gonzalez Rogers <br><br> **META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS** <br><br> **Hearing:** <br> Date:  TBD <br> Time:  TBD <br> Place:  Oakland, California <br> Judge:  Hon. Yvonne Gonzalez Rogers |

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE THAT, at a hearing date and time to be determined in accordance with the Court's Case Management Order No. 6 (4:22-md-3047, Dkt. No. 451), before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street in Oakland, California, Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Facebook Payments, Inc., Siculus, Inc., and Facebook Operations, LLC (each a "Defendant," and collectively the "Defendants"), will and hereby do move this Court, under Federal Rule of Civil Procedure 12(b)(2) and/or 12(b)(6), for an order dismissing with prejudice Count I of the Multistate Complaint in part, and Counts II–LIV of the Multistate Complaint in their entirety; the Florida Complaint in its entirety; and Counts 7, 8, and 9 of the Personal Injury Second Amended Master Complaint in their entirety.[1]

This Motion is based on the Memorandum of Points and Authorities submitted herewith, any Reply Memorandum or other papers submitted in connection with the Motion, the Multistate Complaint, Multistate Complaint, and Personal Injury Second Amended Master Complaint, any matter of which this Court may properly take judicial notice, and any information presented at argument.

DATED:        December 22, 2023        By:    */s/ Phyllis A. Jones*
_____

Phyllis A. Jones

*Attorney for Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Facebook Payments, Inc., Siculus, Inc., Facebook Operations, LLC, and Mark Elliot Zuckerberg*

*Additional counsel listed on signature pages*

---

[1] Per the Court's Order, Defendant Mark Zuckerberg has filed a separate motion to dismiss the claims against him in his personal capacity.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................. 4

LAW & ARGUMENT ..................................................................................................... 5

I.      THE COMPLAINT'S "CHILD-DIRECTED" COPPA THEORY FAILS. ...................... 7

        A.      "Child-Directed" Has a Specific Meaning Under the COPPA Statute and Rule. .. 7

        B.      The States Have Not Alleged That Instagram and Facebook Are "Directed to
                Children" As That Term Is Used In COPPA. ........................................................ 9

                1.      The "child-oriented activities and incentives" factor supports the
                        conclusion that Instagram and Facebook are general audience services. ... 9

                2.      The "age of models" factor supports the conclusion that Facebook and
                        Instagram are general audience services. .................................................. 12

                3.      The "advertising" factor supports the conclusion that Instagram and
                        Facebook are general audience services. ................................................... 13

                4.      The "audience composition" factor supports the conclusion that Facebook
                        and Instagram are general audience services. ........................................... 14

                5.      The "intended audience" factor supports the conclusion that Instagram and
                        Facebook are general audience services. ................................................... 16

                6.      The States' allegations regarding the registration process for Facebook and
                        Instagram further confirm that they are general audience services. ......... 17

                7.      Additional factors ignored by the States further reinforce that Facebook
                        and Instagram are general audience services. ........................................... 18

        C.      Endorsing the States' Child-Directed Theory Would Have Serious Consequences.
                ................................................................................................................................. 19

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

II.    SECTION 230 LARGELY BARS THE STATES' CONSUMER PROTECTION
       CLAIMS. ...................................................................................................... 19

       A.    Section 230 Bars the Vast Majority of the States' Claims that Instagram's and
             Facebook's Designs Constitute Unfair or Unconscionable Business Practices.... 19

       B.    Section 230 Bars the States' Claims That Meta Omitted or Failed To Provide
             Warnings Regarding Instagram and Facebook's Design Features. ...................... 23

III.   THE STATES FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR
       DECEPTION. .............................................................................................. 25

       A.    Representations About the "Safety" of Meta's Services And Several Other
             Challenged Statements Are Non-Actionable Statements of Opinion, Not
             Misstatements of Fact. ............................................................................ 26

       B.    The States Fail to Establish That Alleged Misrepresentations Were False or
             Misleading Under the Heightened Pleading Requirements of Rule 9(b). ............ 29

       C.    The States Fail to Establish That the Alleged Misrepresentations Were Material to
             Users. ................................................................................................. 33

       D.    The States' Claims Fail Insofar as They Are Premised on Alleged
             Misrepresentations to Congress. ............................................................... 35

IV.    THE STATES FAIL TO ALLEGE UNFAIR BUSINESS ACTS OR PRACTICES. ..... 38

       A.    The States' Claims Brought Pursuant to the Terms of Section 5 of the FTCA
             Should Be Dismissed. ............................................................................. 39

       B.    The Remaining States' Claims Should Also Be Dismissed................................ 46

V.     THE STATES' CONSUMER PROTECTION CLAIMS FAIL BECAUSE THE
       RELEVANT CONSUMER PROTECTION LAWS DO NOT APPLY TO META'S
       ALLEGED CONDUCT.................................................................................. 49

VI.    THE STATES' CLAIMS FOR RESTITUTION FAIL AS A MATTER OF LAW. ....... 54

VII.   THE PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION CLAIMS
       FAIL....................................................................................................... 56

A.  The Count 7 Claims Fail Because the Relevant State Consumer Protection Laws Do Not Apply to Plaintiffs' Claims. .................................................................... 56

B.  Count 7 Fails for the Same Reasons the States' Deceptive Practices Claims Fail. ................................................................................................................................. 59

C.  Count 7 Also Fails Because Plaintiffs Do Not Allege Actual Reliance. .............. 60

D.  Count 7 Further Fails Because Plaintiffs Do Not Allege An Ascertainable Loss. 63

VIII.  THE PERSONAL INJURY PLAINTIFFS' COMMON LAW CONCEALMENT AND MISREPRESENTATION CLAIMS LIKEWISE FAIL....................................................... 64

IX.  FLORIDA'S CLAIMS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION. ..................................................................................................................... 66

CONCLUSION ......................................................................................................................... 69

# TABLE OF AUTHORITIES

CASES                                                                                         Page(s)

*In re: Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.,*
   2023 WL 8527415 (N.D. Ill. Dec. 8, 2023) ...............................................................69

*Adrian Trucking, Inc. v. Navistar, Inc.,*
   609 F. Supp. 3d 728 (N.D. Iowa 2022).....................................................................60

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
   486 U.S. 492 (1988).....................................................................................................35

*Am. Fin. Servs. Ass'n v. F.T.C.,*
   767 F.2d 957 (D.C. Cir. 1985)...............................................................................42, 45

*Am. Orthodontics Corp. v. Epicor Software Corp.,*
   746 F. Supp. 2d 996 (E.D. Wis. 2010).......................................................................37

*Amado v. Procter & Gamble Co.,*
   2023 WL 3898984 (N.D. Cal. June 8, 2023)..............................................................29

*Anderson v. TikTok,*
   637 F. Supp. 3d 276 (E.D. Pa. 2022) .................................................................*passim*

*Andriesian v. Cosm. Dermatology, Inc.,*
   2015 WL 1638729 (D. Or. Mar. 3, 2015)...................................................................27

*In re Arizona Theranos, Inc. Litig.,*
   2023 WL 3246811 (D. Ariz. May 4, 2023) ................................................................33

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)......................................................................................................6

*Avakian v. Wells Fargo Bank, N.A.,*
   827 F. App'x 765 (9th Cir. 2020) ..........................................................................6, 29

*Ayala v. American Home Mortg. Servicing, Inc.,*
   2011 WL 3319543 (D. Utah June 8, 2011).................................................................58

*Azoulai v. BMW of N. Am. LLC,*
   2017 WL 1354781 (N.D. Cal. Apr. 13, 2017)............................................................27

*Barber v. Unitus Cmty. Credit Union,*
   2023 WL 34697 (D. Or. Jan. 3, 2023) .......................................................................49

*Barnes v. Yahoo!, Inc.,*
   570 F.3d 1096 (9th Cir. 2009) ...................................................................................20

*Bevers v. D.R. Horton, Inc.*,
  2011 WL 294369 (D. Nev. Jan. 26, 2011) ...................................................................60

*Block v. Seneca Mortg. Servicing*,
  221 F. Supp. 3d 559 (D.N.J. 2016) ............................................................................33

*Boud v. SDNCO, Inc.*,
  2002 UT 83, 54 P.3d 1131 .........................................................................................60

*Bride v. Snap Inc.*,
  2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) .......................................................20, 24

*Brown v. Louisiana-Pac. Corp.*,
  820 F.3d 339 (8th Cir. 2016) .....................................................................................61

*Browning v. Am. Honda Motor Co.*,
  2022 WL 824106 (N.D. Cal. Mar. 18, 2022) .............................................................29

*Buelow v. Plaza Motors of Brooklyn, Inc.*,
  2017 WL 2813179 (E.D. Cal. June 29, 2017) ............................................................67

*Bumpers v. Cmty. Bank of N. Va.*,
  367 N.C. 81 (2013) .....................................................................................................60

*Camacho v. Auto. Club of S. California*,
  142 Cal. App. 4th 1394 (2006) ..................................................................................46

*Campfield v. State Farm Mut. Auto. Ins. Co.*,
  532 F.3d 1111 (10th Cir. 2008) .................................................................................61

*Castaneda v. Amazon.com, Inc.*,
  --- F. Supp. 3d ---, 2023 WL 4181275 (N.D. Ill. June 26, 2023) ..............................26

*Catrett v. Landmark Dodge, Inc.*,
  253 Ga. App. 639 (2002) ............................................................................................53

*Cenatiempo v. Bank of Am., N.A.*,
  333 Conn. 769, 219 A.3d 767 (2019) ...................................................................36, 51

*Cheatham v. ADT Corp.*,
  161 F. Supp. 3d 815 (D. Ariz. 2016) .........................................................................27

*Cheval Int'l v. Smartpak Equine, LLC*,
  2016 WL 1064496 (D.S.D. Mar. 15, 2016) ...............................................................61

*Cicero v. Am. Satellite, Inc.*,
  2011-Ohio-4918 ..........................................................................................................61

*City of Chicago v. Purdue Pharma L.P.*,
  2021 WL 1208971 (N.D. Ill. Mar. 31, 2021) .............................................................37

*Clark v. Eddie Bauer LLC*,
    371 Or. 177 (2023) ........................................................................................................61

*Clarkson v. Orkin Exterminating Co.*,
    761 F.2d 189 (4th Cir. 1985) ........................................................................................27

*Colgate v. JUUL Labs, Inc.*,
    402 F. Supp. 3d 728 (N.D. Cal. 2019) ..........................................................................39

*Com., by Creamer v. Monumental Properties, Inc.*,
    459 Pa. 450, 329 A.2d 812 (1974) ................................................................................40

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
    648 Pa. 604 (2018) ........................................................................................................27

*Cooke v. Allstate Mgmt. Corp.*,
    741 F. Supp. 1205 (D.S.C. 1990) ..................................................................................27

*Coyoy v. City of Eloy*,
    859 F. App'x 96 (9th Cir. 2021) ......................................................................................6

*Crowhorn v. Nationwide Mut. Ins. Co.*,
    2002 WL 1767529 (Del. Super. Ct. July 10, 2002) ......................................................33

*Crum v. SN Servicing Corp.*,
    2021 WL 3514153 (S.D. Ind. Aug. 10, 2021) ..............................................................47

*Cullen v. Netflix, Inc.*,
    2013 WL 140103 (N.D. Cal. Jan. 10, 2013) ............................................................30, 32

*D'Agostino v. Maldonado*,
    216 N.J. 168 (2013) ......................................................................................................63

*Dabush v. Mercedes-Benz USA, LLC*,
    378 N.J. Super. 105 (App. Div. 2005) ..........................................................................63

*Dahl v. Messmer*,
    719 N.W.2d 341 (N.D. 2006) ........................................................................................27

*Daimler AG v. Bauman*,
    571 U.S. 117 (2014) ................................................................................................66, 67

*Damon v. Groteboer*,
    937 F. Supp. 2d 1048 (D. Minn. 2013) ........................................................................56

*Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*,
    557 F.2d 1280 (9th Cir. 1977) ......................................................................................67

*Davis v. Byers Volvo*,
    2012 WL 691757 (Ohio App. 4 Dist. 2012) ................................................................33

*Davis v. Byers Volvo*,
  2012-Ohio-882 .................................................................................................27

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ...............................................................43, 44, 46

*de Dios v. Gerard Roof Prod., LLC*,
  2018 WL 6016952 (C.D. Cal. Sept. 4, 2018) ...........................................30

*Dedloff v. Whole Foods Mkt. Grp., Inc.*,
  2023 WL 5428501 (E.D. Mo. Aug. 23, 2023) ..........................................33

*Dennis Simmons, D.D.S., P.A. v. Mod. Aero, Inc.*,
  603 N.W.2d 336 (Minn. Ct. App. 1999) ..............................................56, 62

*Di Teresi v. Stamford Health Sys., Inc.*,
  149 Conn. App. 502 (2014) ...............................................................63

*DIRECTV, Inc. v. Shouldice*,
  2003 WL 23200255 (W.D. Mich. Oct. 20, 2003) ......................................52

*Doshier v. Twitter, Inc.*,
  417 F. Supp. 3d 1171 (E.D. Ark. 2019) ...............................................68

*Duran v. Maxim Healthcare Servs., Inc.*,
  2018 WL 5915644 (C.D. Cal. Mar. 9, 2018) ............................................9

*Durell v. Sharp Healthcare*,
  183 Cal. App. 4th 1350, 108 Cal. Rptr. 3d 682 (2010) .............................46

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019) ...........................................................20

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) .........................................................................35

*Edlow v. RBW, LLC*,
  688 F.3d 26 (1st Cir. 2012) ...............................................................61

*Elias v. Hewlett-Packard Co.*,
  903 F. Supp. 2d 843 (N.D. Cal. 2012) ..............................................26, 28

*Erickson v. Bos. Sci. Corp.*,
  846 F. Supp. 2d 1085 (C.D. Cal. 2011) ................................................29

*F.T.C. v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) .......................................................3, 41, 42

*F.T.C. v. Verity Int'l Ltd.*,
  443 F.3d 48 (2d Cir. 2006) ...............................................................34

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021) .................................................................................23, 24

*Facebook, Inc. v. K.G.S.*,
    294 So. 3d 122 (Ala. 2019) ..................................................................................68

*Fayne v. Vincent*,
    301 S.W.3d 162 (Tenn. 2009) ..............................................................................57

*Fed. Trade Comm'n v. Quincy Bioscience Holding Co.*,
    646 F. Supp. 3d 518 (S.D.N.Y. 2022) .............................................................33, 37

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1119 (N.D. Cal. 2016) ...............................................................23

*Fink v. Time Warner Cable*,
    810 F. Supp. 2d 633 (S.D.N.Y. 2011) ..................................................................38

*In re Ford Motor Co. Sec. Litig.*,
    381 F.3d 563 (6th Cir. 2004) ...............................................................................27

*Foti Fuels, Inc. v. Kurrle Corp.*,
    2013 VT 111 (2013) .............................................................................................57

*Free Speech Coal., Inc. v. Colmenero*,
    --- F. Supp. 3d ---, 2023 WL 5655712 (W.D. Tex. Aug. 31, 2023) .....................20

*FTC v. Direct Mktg. Concepts, Inc.*,
    569 F. Supp. 2d 285 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010) ............42

*G & G Closed Cir. Events, LLC v. Castillo*,
    327 F. Supp. 3d 1119 (N.D. Ill. 2018) .................................................................53

*Gault v. Thacher*,
    367 F. Supp. 3d 469 (D.S.C. 2018) ......................................................................61

*Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*,
    255 F. App'x 775 (5th Cir. 2007) ........................................................................67

*Georgalis v. Facebook, Inc.*,
    324 F. Supp. 3d 955 (N.D. Ohio 2018) ...............................................................68

*Get Oil Out! Inc. v. Exxon Corp.*,
    586 F.2d 726 (9th Cir. 1978) ...............................................................................10

*In re Gilead Scis. Sec. Litig.*,
    536 F.3d 1049 (9th Cir. 2008) .............................................................................22

*In re GlenFed, Inc. Sec. Litig.*,
    42 F.3d 1541 (9th Cir. 1994) (*en banc*) ..............................................................29

*Glob. Hookah Distribs. v. Avior, Inc.*,
    401 F. Supp. 3d 653 (W.D.N.C. 2019) ................................................................26

*Gold v. Lumber Liquidators, Inc.*,
    2015 WL 7888906 (N.D. Cal. Nov. 30, 2015) ...................................................30

*Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.*,
    492 N.Y.S.2d 318 (Sup. Ct. 1985)......................................................................64

*Goodyear Dunlop Tires Operations, S.A. v. Brown*,
    564 U.S. 915 (2011)............................................................................................67

*Google, Inc. v. Hood*,
    96 F. Supp. 3d 584 (S.D. Miss. 2015).................................................................20

*Graham v. RRR, LLC*,
    202 F. Supp. 2d 483 (E.D. Va. 2002)..................................................................27

*Greater Hous. Transp. Co. v. Uber Techs., Inc.*,
    155 F. Supp. 3d 670 (S.D. Tex. 2015).................................................................27

*Gullen v. Facebook.com, Inc.*,
    2016 WL 245910 (N.D. Ill. Jan. 21, 2016).........................................................68

*GxG Mgmt., LLC v. Young Bros. & Co.*,
    457 F. Supp. 2d 47 (D. Me. 2006)......................................................................61

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
    105 Wash. 2d 778 (1986)....................................................................................52

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*,
    2021 WL 4306018 (N.D. Cal. Sept. 22, 2021)...................................................49

*Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*,
    328 F.3d 1122 (9th Cir. 2003) ............................................................................68

*Harrison v. Facebook, Inc.*,
    2019 WL 1090779 (S.D. Ala. Jan. 17, 2019)......................................................68

*Haskins v. Symantec Corp.*,
    654 Fed. Appx. 338 (9th Cir. 2016).....................................................................61

*Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*,
    403 S.C. 623 (2013)............................................................................................53

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984)............................................................................................68

*Henderson v. Gandy*,
    270 Ga. App. 827, 608 S.E.2d 248 (2004).....................................................37, 53

*Henderson v. U.S. Fid. & Guar. Co.*,
  346 N.C. 741, 488 S.E.2d 234 (1997) ................................................................41

*Herrick v. Grindr, LLC*,
  765 F. App'x 586 (2d Cir. 2019) ..............................................................23, 24

*Hoosier Contractors, LLC v. Gardner*,
  212 N.E.3d 1234 (Ind. 2023) ................................................................61

*Hussain v. Citizens Fin. Grp., Inc.*,
  2019 WL 490091 (N.J. Super. Ct. App. Div. Feb. 8, 2019) ........................34

*Indian Hills Civic Ass'n v. Indian Lake Prop. Owners Ass'n, Inc.*,
  637 S.W.3d 622 (Mo. Ct. App. 2021) ................................................52

*Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*,
  192 N.J. 372 (2007) ................................................................63

*In re Intel Corp. Sec. Litig.*,
  2019 WL 1427660 (N.D. Cal. Mar. 29, 2019) ........................................6

*Jackson v. Airbnb, Inc.*,
  2022 WL 16753197 (C.D. Cal. 2022) ..............................................23, 62

*Jefferson Loan Co. v. Session*,
  397 N.J. Super. 520 (App. Div. 2008) ..............................................48

*Johnston v. Stephan*,
  97 Va. Cir. 115 (2017) ................................................................61

*Karlsson v. Mangan*,
  735 F. App'x 456 (9th Cir. 2018) ........................................................9

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ........................................................29, 30

*Keshish v. Allstate Ins. Co.*,
  2012 WL 12887075 (C.D. Cal. Oct. 19, 2012) ......................................66

*Kesling v. Hubler Nissan, Inc.*,
  997 N.E.2d 327 (Ind. 2013) ........................................................27

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ........................................................6, 9

*Kindred Studio Illustration & Design, LLC v. Elec. Commc'n Tech.*,
  LLC, 2018 WL 6985317 (C.D. Cal. Dec. 3, 2018) ......................................45

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005) ........................................................6

*Kottle v. Nw. Kidney Centers*,
  146 F.3d 1056 (9th Cir. 1998) ....................................................................................35

*Kugler v. Romain*,
  58 N.J. 522 (1971) .....................................................................................................48

*Kwikset Corp. v. Superior Ct.*,
  51 Cal. 4th 310 (2011) ..............................................................................................34

*L.W. v. Snap Inc.*,
  --- F. Supp. 3d ---, 2023 WL 3830365 (S.D. Cal. 2023)...........................................23

*Laccinole v. Assad*,
  2016 WL 868511 (D.R.I. Mar. 7, 2016) ....................................................................61

*Leszanczuk v. Carrington Mortg. Servs., LLC*,
  21 F.4th 933 (7th Cir. 2021) ......................................................................................42

*Liston v. King.com, Ltd.*,
  254 F. Supp. 3d 989 (N.D. Ill. 2017) .................................................................36, 52

*Ludlow v. Lowe's Companies, Inc.*,
  2014 WL 12580233 (D. Haw. Jan. 17, 2014) ............................................................27

*In re Lyft Inc. Sec. Litig.*,
  484 F. Supp. 3d 758 (N.D. Cal. 2020) .......................................................................27

*MacNaughton v. Young Living Essential Oils*,
  LC, 67 F.4th 89 (2d Cir. 2023) ..................................................................................27

*People ex rel. Madigan v. United Const. of Am., Inc.*,
  981 N.E.2d 404 (Ill. App. 2012) ................................................................................33

*Mahindra & Mahindra Ltd. v. FCA US LLC*,
  2021 WL 323253 (E.D. Mich. Feb. 1, 2021) .............................................................27

*Marinos v. Poirot*,
  308 Conn. 706 (2013) .................................................................................................63

*Matchett v. BSI Fin. Servs.*,
  2021 WL 3473062 (D. Utah Aug. 6, 2021) ...............................................................58

*McElroy v. Boise Cascade Corp.*,
  632 S.W.2d 127 (Tenn. Ct. App. 1982) .....................................................................60

*Morgan v. Blue Cross & Blue Shield of Kentucky, Inc.*,
  794 S.W.2d 629 (Ky. 1989) .......................................................................................41

*Morris v. Princess Cruises, Inc.*,
  236 F.3d 1061 (9th Cir. 2001) ...................................................................................27

*Motogolf.com, LLC v. Top Shelf Golf, LLC,*
  528 F. Supp. 3d 1168 (D. Nev. 2021) .................................................................61

*N. Bottling Co. v. Henry's Foods, Inc.,*
  474 F. Supp. 3d 1016 (D.N.D. 2020) .............................................................33, 61

*Naiser v. Unilever U.S., Inc.,*
  975 F. Supp. 2d 727 (W.D. Ky. 2013) .................................................................26

*Nelson v. Cheney,*
  224 Neb. 756, 401 N.W.2d 472 (1987) ...............................................................66

*NetScout Systems, Inc. v. Gartner, Inc.,*
  334 Conn. 396 (2020) ..........................................................................................27

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.,*
  350 F. Supp. 2d 160 (D. Me. 2004) .....................................................................46

*Newcal Indus., Inc. v. Ikon Off. Sol.,*
  513 F.3d 1038 (9th Cir. 2008) .............................................................................26

*Newcomb v. Cambridge Home Loans, Inc.,*
  861 F. Supp. 2d 1153 (D. Haw. 2012) ................................................................66

*In re OnStar Cont. Litig.,*
  278 F.R.D. 352 (E.D. Mich. 2011) ......................................................................33

*In re Optical Disk Drive Antitrust Litig.,*
  2011 WL 3894376 (N.D. Cal. Aug. 3, 2011) ........................................................6

*Otis-Wisher v. Fletcher Allen Health Care, Inc.,*
  951 F. Supp. 2d 592 (D. Vt. 2013) ......................................................................60

*Park Rise Homeowners Ass'n, Inc. v. Res. Const. Co.,*
  155 P.3d 427 (Colo. App. 2006) ..........................................................................27

*Parziale v. HP, Inc.,*
  445 F. Supp. 3d 435 (N.D. Cal. 2020) .................................................................45

*Paul v. Providence Health Sys.-Or.,*
  237 Or. App. 584 (2010) ......................................................................................64

*People v. Johnson & Johnson,*
  77 Cal. App. 5th 295 (2022) ................................................................................33

*Perfect 10, Inc. v. CCBill LLC,*
  488 F.3d 1102 (9th Cir. 2007) .............................................................................19

*Perkins v. LinkedIn Corp.,*
  53 F. Supp. 3d 1190 (N.D. Cal. 2014) .................................................................62

*Phillips v. Double Down Interactive LLC*,
    173 F. Supp. 3d 731 (N.D. Ill. 2016) ...............................................42, 43, 45

*Pirozzi v. Apple Inc.*,
    913 F. Supp. 2d 840 (N.D. Cal. 2012) ...................................................61

*Plastic Packaging Corp. v. Sun Chem. Corp.*,
    136 F. Supp. 2d 1201 (D. Kan. 2001) ...................................................66

*Prudential Ins. Co. of Am. v. Jefferson Assocs.*,
    896 S.W.2d 156 (Tex. 1995) ................................................................60

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976) .............................................................................10

*Ralls v. Facebook*,
    221 F. Supp. 3d 1237 (W.D. Wash. 2016) ............................................68

*Rep. Bank & Trust Co. v. Bear, Stearns & Co., Inc.*,
    707 F. Supp. 2d 702 (W.D. Ky. 2010) ..................................................66

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
    62 P.3d 142 (Colo. 2003) .....................................................................33

*Ristic v. Mach. Zone, Inc.*,
    2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) .......................................43

*Rodio v. Smith*,
    123 N.J. 345 (1991) .............................................................................27

*State ex rel. Rosenblum v. Living Essentials, LLC*,
    371 Or. 23 (2023)................................................................................34

*Russell v. Wilson*,
    991 So. 2d 745 (Ala. Civ. App. 2008) .................................................60

*Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*,
    297 Neb. 682, 900 N.W.2d 909 (2017)................................................41

*Saunders v. Mich. Ave. Nat'l Bank*,
    278 Ill.App.3d 30713, 214 Ill.Dec. 1036, 662 N.E.2d 602 (1996) .......43

*Schellenbach v. GoDaddy.com, LLC*,
    321 F.R.D. 613 (D. Ariz. 2017) ...........................................................61

*Schmaltz v. Nissen*,
    431 N.W.2d 657 (S.D. 1988) ...............................................................60

*Seismic Reservoir 2020, Inc. v. Paulsson*,
    785 F.3d 330 (9th Cir. 2015) .................................................................5

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) ............................................................46

*State ex rel. Shikada v. Bristol-Myers Squibb Co.*,
   152 Haw. 418 (2023) ....................................................................................33

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
   38 P.3d 47 (Colo. 2001) (en banc) ...............................................................47

*Singh v. Lenovo (United States) Inc.*,
   510 F. Supp. 3d 310 (D. Md. 2021) ..............................................................60

*Smajlaj v. Campbell Soup Co.*,
   782 F. Supp. 2d 84 (D.N.J. 2011) .................................................................61

*Solow v. Aspect Res., LLC*,
   2004 WL 2694916 (Del. Ch. Oct. 19, 2004) ................................................27

*Solum v. Certainteed Corp.*,
   147 F. Supp. 3d 404 (E.D.N.C. 2015) ..........................................................39

*Song v. Champion Petfoods USA, Inc.*,
   2020 WL 7624861 (D. Minn. Dec. 22, 2020) ...............................................26

*Spencer v. Hartford Fin. Servs. Grp., Inc.*,
   256 F.R.D. 284 (D. Conn. 2009) ..................................................................64

*State by Humphrey v. Philip Morris Inc.*,
   551 N.W.2d 490 (Minn. 1996) .....................................................................56

*State v. BTTR, LLC*,
   2023 WL 3183738 (R.I. Super. Apr. 24, 2023) ............................................33

*State v. McLaughlin*,
   235 A.3d 854 (Me. 2020) .............................................................................27

*State v. Moody's Corp.*,
   2012 WL 2149408 (Conn. Super. Ct. May 10, 2012) ...................................33

*State v. Tiktok, Inc.*,
   2023 WL 4305656 (Ind. Super. May 4, 2023) .............................................68

*State v. Weinschenk*,
   868 A.2d 200 (Me. 2005) .........................................................................33, 34

*State ex rel. Stovall v. DVM Enterprises, Inc.*,
   275 Kan. 243 (2003) ....................................................................................47

*Sun Bank, N.A. v. E.F. Hutton & Co.*,
   926 F.2d 1030 (11th Cir.1991) .....................................................................67

*Swartz v. KPMG LLP*,
    476 F.3d 756 (9th Cir. 2007) ..............................................................................29

*Tabler v. Panera LLC*,
    2019 WL 5579529 (N.D. Cal. Oct. 29, 2019)......................................................61

*In re Takata Airbag Prod. Liab. Litig.*,
    --- F. Supp. 3d. ---, 2023 WL 4925368 (S.D. Fla. June 20, 2023)......................64

*Teamsters Loc. 237 Welfare Fund v. AstraZeneca Pharms. LP*,
    136 A.3d 688 (Del. 2016) ....................................................................................63

*Thiedemann v. Mercedes-Benz USA, LLC*,
    183 N.J. 234 (2005) ..............................................................................................64

*Tietsworth v. Harley-Davidson, Inc.*,
    270 Wis. 2d 146 (2004) ........................................................................................27

*Tiismann v. Linda Martin Homes Corp.*,
    281 Ga. 137 (2006) ..............................................................................................60

*In re Tobacco II Cases*,
    207 P.3d 20 (Cal. 2009) ..............................................................................54, 60

*Transclean Corp. v. Bridgewood Servs., Inc.*,
    77 F. Supp. 2d 1045 (D. Minn. 1999)..........................................................33, 61

*Tucker v. Gen. Motors LLC*,
    58 F.4th 392 (8th Cir. 2023) ................................................................................27

*United Mine Workers of Am. v. Pennington*,
    381 U.S. 657 (1965) ..............................................................................................35

*Valley Children's Hosp. v. Athenahealth, Inc.*,
    2023 WL 6065800 (D. Mass. Sept. 18, 2023) ....................................................60

*Valley Nissan, Inc. v. Davila*,
    133 S.W.3d 702 (Tex. App. 2003)........................................................................64

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ....................................................................6, 29, 30

*Vigil v. Gen. Nutrition Corp.*,
    2015 WL 8056178 (S.D. Cal. Dec. 4, 2015).......................................................29

*Villalobos v. Atlanta Motorsports Sales, LLC*,
    355 Ga. App. 339 (2020) ....................................................................................27

*In Re Violin Memory Sec. Litig.*,
    2014 WL 5525946 (N.D. Cal. Oct. 31, 2014).......................................................6

*VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*,
   29 F. Supp. 2d 1253 (D. Kan. 1998) ................................................................27

*Walden v. Fiore*,
   571 U.S. 277 (2014) ..............................................................................67, 68

*Ward v. W. Cnty. Motor Co.*,
   403 S.W.3d 82 (Mo. 2013) .........................................................................48

*Washington v. Hyatt Hotels Corp.*,
   2020 WL 3058118 (N.D. Ill. June 9, 2020) .....................................................43

*Weaver v. Champion Petfoods USA Inc.*,
   3 F.4th 927 (7th Cir. 2021) .........................................................................33

*Weiss v. Cassidy Dev. Corp.*,
   63 Va. Cir. 76 (2003) ...............................................................................34

*In re Welding Fume Prods. Liab. Litig.*,
   2007 WL 1087605 (N.D. Ohio Apr. 9, 2007) .................................................65

*Wheeler v. Ford Motor Co.*,
   2022 WL 19692038 (N.D. Cal. May 26, 2022) ...............................................29

*In re White*,
   330 Mich. App. 476, 948 N.W.2d 643 (2019) ................................................55

*Wilson v. Century 21 Great W. Realty*,
   15 Cal. App. 4th 298 (1993) ......................................................................66

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
   214 F. Supp. 3d 179 (E.D.N.Y. 2016) ..........................................................27

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
   2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ................................................28

*Yocca v. Pittsburgh Steelers Sports, Inc.*,
   578 Pa. 479 (2004) ..................................................................................61

*York v. InTrust Bank, N.A.*,
   265 Kan. 271 (1998) ................................................................................33

*Young v. Toyota Motor Sales, U.S.A.*,
   472 P.3d 990 (Wash. 2020) ........................................................................34

*Zango, Inc. v. Kaspersky Lab, Inc.*,
   568 F.3d 1169 (9th Cir. 2009) ....................................................................20

*In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*,
   601 F. Supp. 3d 625 (C.D. Cal. 2022) ......................................................61, 62

*Zody v. Microsoft Corp.*,
  2012 WL 1747844 (N.D. Cal. May 16, 2012) ............................................................6

*In re Zofran (Ondansetron) Prod. Liab. Litig.*,
  2017 WL 1458193 (D. Mass. Apr. 24, 2017) ............................................................6

**STATUTES**

9 V.S.A. § 2453(a) ............................................................................................................57

815 ILCS 505/1(f) ......................................................................................................36, 52

815 ILCS 505/2 ....................................................................................................36, 40, 51

815 ILCS 505/7(a) ............................................................................................................55

815 ILCS 505/10b(3) ........................................................................................................23

Pa. Stat. Ann. § 201-9.2 ...................................................................................................63

73 Pa. Stat. Ann. § 201-2(3) .....................................................................................36, 52

73 Pa. Stat. Ann. § 201-3 ...................................................................................23, 36, 51

73 Pa. Stat. Ann. § 201-4.1 .............................................................................................55

15 U.S.C. [§§] 45, 52 and 55(a)(1) ..................................................................................40

15 U.S.C. 6502(a)(1) ..........................................................................................................7

15 U.S.C. § 45(a)(1) ..........................................................................................................41

15 U.S.C. § 45(n) ..................................................................................................41, 42, 45

15 U.S.C. § 6501 .................................................................................................................7

15 U.S.C. § 6501(10)(B) ...................................................................................................10

15 U.S.C. § 6502(a)(1) ........................................................................................................7

15 U.S.C. § 6502(b) ............................................................................................................7

28 U.S.C. § 1406 ...............................................................................................................69

47 U.S.C. § 230(c)(1) ........................................................................................................19

I.C. § 48-602(2) .................................................................................................................57

I.C. § 48-603 ......................................................................................................................57

Ala. Code § 8–19–10(a) ....................................................................................................63

Ala. Code § 8-19-3(4) ............................................................................................58

Ala. Code § 8-19-3(14) ..........................................................................................57

Ala. Code § 8-19-5 ................................................................................................57

Ala. Code § 8-19-10(a) ..........................................................................................58

Ariz. Rev. Stat. Ann. § 44-1522 ............................................................................37

Ariz. Rev. Stat. Ann. § 44-1522(C) .......................................................................39

Ariz. Rev. Stat. Ann. § 44-1523 ............................................................................23

Ariz. Rev. Stat. Ann. § 44-1528(2) ........................................................................55

Bus. & Com. Code Section 17.45(4) ......................................................................58

Bus. & Com. Code Section 17.50(a) ......................................................................58

Cal. Bus. & Prof. Code § 17203 ............................................................................55

Cal. Bus. & Prof Code § 17204 .............................................................................63

Colo. Rev. Stat. Ann. § 6-1-106 ............................................................................23

Colo. Rev. Stat. Ann. § 6-1-110(1) ........................................................................54

Conn. Gen. Stat. Ann. § 42-110b ....................................................................36, 51

Conn. Gen. Stat. Ann. § 42-110b(b) ......................................................................40

Conn. Gen. Stat. Ann. § 42-110c(a) ......................................................................23

Conn. Gen. Stat. Ann. § 42-110g(a) ......................................................................63

Del. Code Ann. tit. 6, § 2511(9) ............................................................................41

Del. Code Ann. tit. 6, § 2513 ................................................................................37

Del. Code Ann. tit. 6, § 2513(b)(1) ........................................................................23

Del. Code Ann. tit. 6, § 2523 ................................................................................55

Del. Code Ann. tit. 6, § 2533 ................................................................................56

Del. Code Ann. tit. 6, § 2534 (a)(2) .......................................................................23

Fla. Stat. Ann. § 501.204(2) ..................................................................................40

Ga. Code Ann. § 10-1-391(b) ................................................................................40

Ga. Code Ann. § 10-1-392(a)(7) .................................................................................53

Ga. Code Ann. § 10-1-392(a)(10) ...............................................................................53

Ga. Code Ann. § 10-1-393(a) .................................................................36, 51, 53, 54

Ga. Code Ann. § 10-1-396(2) .....................................................................................23

Ga. Code Ann. § 10-1-397(b)(2)(D) ...........................................................................55

Haw. Rev. Stat. Ann. § 480-2(b) ................................................................................40

Haw. Rev. Stat. § 481A-5(a)(2) ..................................................................................23

HRS § 480-2 .......................................................................................................36, 51

Idaho Code § 48-605(2) ..............................................................................................23

Idaho Code § 48-608 ...................................................................................................63

Ind. Code Ann. § 24-5-0.5-2 (1) ....................................................................49, 50, 51

Ind. Code Ann. § 24-5-0.5-3(a) .........................................................................49, 50

Ind. Code Ann. § 24-5-0.5-4(c)(2) ....................................................................54, 55

Iowa Code Ann. § 714H.4 ..........................................................................................23

Iowa Code Ann. § 714H.5 ..........................................................................................63

Kan. Stat. Ann. § 50-624 .....................................................................................50, 51

Kan. Stat. Ann. § 50-626 .....................................................................................37, 50

Kan. Stat. Ann. § 50-627(b) .......................................................................................47

Ky. Rev. Stat. Ann. § 367.200 ....................................................................................54

Ky. Rev. Stat. § 367.110(2) ..................................................................................36, 52

Ky. Rev. Stat. § 367.170 .......................................................................................36, 51

Ky. Stat. Ann. § 367.220(1) ........................................................................................63

La. Stat. Ann. § 51:1402(9) ..................................................................................36, 52

La. Stat. Ann. § 51:1405 .......................................................................................36, 51

La. Stat. Ann. § 51:1406(2) .........................................................................................23

La. Stat. Ann. § 51:1406(4) .........................................................................................40

La. Stat. Ann. § 51:1409(A) ........................................................................................63

Mass. Gen. Laws Ann. ch. 93A, § 1(b) ........................................................................57

Mass. Gen. Laws Ann. ch. 93A, § 2(a) ........................................................................57

Md. Code Ann., Com. Law § 13-101(i) ........................................................................59

Md. Code Ann., Com. Law § 13-104 ............................................................................23

Md. Code Ann., Com. Law § 13-303(1) ........................................................................59

Me. Rev. Stat. tit. 5, § 206(3) ................................................................................36, 52

Me. Rev. Stat. tit. 5, § 207 ....................................................................................36, 51

Me. Rev. Stat. tit. 5, § 207(1) ......................................................................................40

Me. Rev. Stat. tit. 5, § 213(1) ......................................................................................63

Mich. Comp. Laws Ann. § 445.903 ........................................................................36, 51

Minn. Stat. Ann. § 8.31 ..............................................................................................56

Minn. Stat. Ann. § 325D.44 ........................................................................................56

Minn. Stat. Ann. § 325D.46 ........................................................................................23

Minn. Stat. Ann. § 325F.69, subd. 8 ............................................................................47

Mo. Ann. Stat. § 407.010(7) ..................................................................................36, 52

Mo. Ann. Stat. § 407.020(1) ..........................................................................36, 37, 51

Mo. Ann. Stat. § 407.020.2(1) ....................................................................................23

Mo. Ann. Stat. § 407.025 ............................................................................................63

Mo. Ann. Stat. § 407.100(4) ........................................................................................55

N.C.G.S. § 75-1.1(c) ..................................................................................................23

N.C. Gen. Stat. Ann. § 75–1.1(a) ................................................................................41

N.D. Cent. Code § 51-15-02 ..................................................................................37, 41

N.D. Cent. Code § 51-15-03 ........................................................................................23

N.J. Stat. Ann. § 56:8-2 ........................................................................................23, 37

N.J. Stat. Ann. § 56:8-8 ..............................................................................................55

N.Y. Executive Law § 63(12) ................................................................................................41

N.Y. Gen. Bus. Law § 349 ....................................................................................................23

N.Y. Gen. Bus. Law § 349(b) ...............................................................................................55

Neb. Rev. Stat. Ann. § 59-1601(2) .................................................................................37, 52

Neb. Rev. Stat. Ann. § 59-1602 .............................................................................36, 41, 51

Neb. Rev. Stat. Ann. § 59-1608(2) .......................................................................................55

Ohio R.C. § 1345.01 ............................................................................................................50

Ohio R.C. § 1345.02(A) ...................................................................................................50, 51

Ohio Rev. Code Ann. § 1345.02(C) ....................................................................................40

Ohio Rev. Code Ann. § 1345.09 .........................................................................................63

Ohio Rev. Code § 1345.12(B) ..............................................................................................23

Or. Rev. Stat. 646.612(2) .....................................................................................................23

Or. Rev. Stat. Ann. § 646.605(9) .........................................................................................49

Or. Rev. Stat. Ann. § 646.607 .............................................................................................48

Or. Rev. Stat. Ann. § 646.638 .............................................................................................63

S.C. Code Ann. § 39-5-20 ...............................................................................................36, 51

S.C. Code Ann. § 39-5-20(b) ...............................................................................................40

S.C. Code Ann. § 39-5-40 ....................................................................................................23

S.C. Code Ann. § 39-5-50(b) ...............................................................................................55

S.C. Code Ann. § 39-5-140 ..................................................................................................63

38 Stat. 717 (1914), 15 U.S.C.A. 41 ....................................................................................40

Tenn. Code Ann. § 47-18-103(20) .......................................................................................57

Tenn. Code Ann. § 47-18-104 .............................................................................................57

Tex. Bus. & Com. Code Ann. § 17.45(6) ............................................................................57

Tex. Bus. & Com. Code Ann. § 17.46 9 ..............................................................................57

Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B) ..................................................................61

Utah Code § 13-11-3(2)(a)................................................................................................58

Utah Code § 13-11-4(1)...................................................................................................58

Va. Code Ann. § 59.1-199...............................................................................................23

Va. Code Ann. § 59.1-204...............................................................................................63

Va. Code Ann § 59.1-205................................................................................................56

Va. Code § 59.1-198..................................................................................................50, 51

VA Code § 59.1-200.................................................................................37, 38, 50, 56

Vt. Stat. Ann. tit. 9, § 2451a(1)......................................................................................58

Vt. Stat. Ann. tit. 9, § 2452............................................................................................23

Vt. Stat. Ann. tit. 9, § 2461(b)........................................................................................58

W. Va. Code § 46A-6-105..............................................................................................23

W. Va. Code § 46A-6-106..............................................................................................63

Wash. Rev. Code Ann. § 19.86.010................................................................................36

Wash. Rev. Code Ann. § 19.86.020..........................................................................36, 51

Wash. Rev. Code Ann. § 19.86.080(2)...........................................................................56

Wash. Rev. Code Ann. § 19.86.140................................................................................23

Wash. Rev. Code Ann. § 19.86.920................................................................................40

Wis. Stat. 100.18(9)(b)...................................................................................................23

Wis. Stat. § 100.18.........................................................................................................38

Wis. Stat. § 100.18(11)(d)..............................................................................................56

**OTHER AUTHORITIES**

16 C.F.R. § 312.2..............................................................................................................8

16 C.F.R. § 312.2(1)...................................................................................................8, 13

64 Fed. Reg. 59888, 59889 (Nov. 3, 1999)................................................................8, 17

71 Fed. Reg. 13247, 13252 (Mar. 15, 2006)..............................................................8, 19

78 Fed. Reg. 3972, 3982 (Jan. 17, 2013)...............................................................8, 18, 19

xxiv

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

78 Fed. Reg. 3972, 3984 (Jan. 17, 2013) ....................................................................8

37 Am. Jur. 2d Fraud and Deceit § 65 ......................................................................65

37 Am. Jur. 2d Fraud and Deceit § 106 ....................................................................66

37 Am. Jur. 2d Fraud and Deceit § 227 ....................................................................66

37 Am. Jur. 2d Fraud and Deceit § 238 ....................................................................65

*Frequently Asked Questions*, https://www.ftc.gov/business-
    guidance/resources/complying-coppa-frequently-asked-questions (last accessed Dec.
    8, 2023) ................................................................................................................8

FTC, *Unfair, Deceptive, and Abusive Practices – Federal Trade Commission Act/Dodd-
    Frank Act* (June 2022), available at https://www.fdic.gov/resources/supervision-and-
    examinations/consumer-compliance-examination-manual/documents/7/vii-1-1.pdf.........42

FTC, *Unfair, Deceptive, and Abusive Practices – Federal Trade Commission Act/Dodd-
    Frank Act* (June 2022), available at https://www.fdic.gov/resources/supervision-and-
    examinations/consumer-compliance-examination-manual/documents/7/vii-1-1.pdf;.........42

Restatement (Second) of Torts § 537 cmt. a ...............................................................65

## INTRODUCTION

The attorneys general of 34 States have sued Meta in this MDL, alleging that it (i) violated the Children's Online Privacy Protection Act of 1998 ("COPPA"), (ii) engaged in unfair or unconscionable business practices in violation of state consumer protection statutes, and/or (iii) made false or misleading statements in violation of state consumer protection law.  In addition, various personal injury plaintiffs have filed individual claims against Meta and other Defendants in this MDL asserting similar consumer protection and misrepresentation claims.  For the reasons explained below, all of these claims except one sub-set of the COPPA claim should be dismissed.

**ATTORNEY GENERAL COPPA CLAIMS.**  Each of the attorneys general alleges two distinct theories under COPPA:  (1) that Instagram and Facebook are not general audience services but instead are "child-directed" and (2) that Meta had "actual knowledge" that it was collecting the personal information of under-13 users.  While Meta denies that it had "actual knowledge" of the collection of personal information from children, it is not moving to dismiss the COPPA claim on this ground.  Rather, Meta challenges at this stage only the States' theory that Instagram and Facebook are child-directed services.

COPPA distinguishes between general audience services, on the one hand, and child-directed services, on the other.  While the rules implementing COPPA set forth various factors to be considered in making this determination, the States largely ignore those factors in their Complaint.  For example, they do not even allege that the "subject matter" of the services is child-directed.  Nor could they, because the sharing of photos and videos and communicating within one's social network are subject matters that have broad appeal to adults and teens.

Instead, the States rely largely on cherry-picked snippets from content created and posted by third parties.  In doing so, the States put undue weight on third-party content, rather than whether Instagram and Facebook themselves are directed to children.  In any event, the content cited in the Complaint on its face is intended for parents or general audiences and is not child-directed.

Finally, the States' assertions regarding the actual and intended audiences of Facebook and Instagram fail to support their claim.  Although the States point to the number of under-13 users allegedly on Instagram, they fail to grapple with the fact even accepting those allegations as true that Instagram's audience composition is 99%+ teens and adults.  Likewise, while the States attempt to point to snippets

from internal documents allegedly relating to Meta's efforts to reach the under-13 audience, they disingenuously omit that these discussions occurred in the context of separate efforts by Meta to develop distinct, COPPA-compliant services outside of Instagram and Facebook. That, along with the acknowledged fact that Meta's policies prohibit people under 13 from creating Instagram or Facebook accounts, confirms that people under 13 are not the intended audience of those services.

In short, under the governing COPPA rules, Instagram and Facebook are general audience services; the States fail plausibly to allege that either is "child-directed," and so that prong of their COPPA claim fails as a matter of law.

**ATTORNEY GENERAL CONSUMER PROTECTION CLAIMS.** Thirty attorneys general also assert consumer protection claims against Meta based on alleged misrepresentations or fraudulent omissions, and 28 of those attorneys general also assert consumer protection claims based on so-called "design features" of Instagram or Facebook that allegedly constitute unfair or unconscionable acts or practices. All of those claims fail for three overlapping reasons.

*First*, the States' claims are barred in substantial part by Section 230 of the Communications Decency Act ("Section 230"). The gist of the States' unfair practices claim is that certain features of Instagram and Facebook—*i.e.*, "infinite scroll, ephemeral content features, autoplay, quantification and display of 'Likes,' and disruptive alerts"—"promote compulsive, prolonged, and unhealthy use by young users." Multistate Compl. ¶ 847. This Court has already held that Section 230 bars claims based on precisely those features—a conclusion that applies to the States' claims.[2] Nor may the attorneys general repackage their challenges to these features as omission claims—*i.e.*, claims that Meta is liable under consumer protection law for failing to warn users about the alleged ill-effects of these features. Courts consistently dismiss failure-to-warn claims under Section 230 where, as here, the claims are "inextricably linked" to a service's "alleged failure to edit, monitor, or remove" third-party content.

*Second*, the States' misrepresentation claims fail. The crux of the States' misrepresentation theory is that Meta "falsely" represented that Instagram and Facebook are "safe" and/or that Meta "prioritizes"

---

[2] Meta acknowledges that Section 230 does not bar the States' unfair practices claim insofar as it is premised on alleged violations of COPPA.

safety.  It is well established, however, that generalized, subjective statements such as these are statements of opinion, and not the sort of factual statements that can form the basis for a deceptive practices claim.

Moreover, the States fail to meet their pleading burden regarding many of the specific statements they identify.  To state a deception claim, plaintiffs must explain why the alleged statement was false or misleading, and this Court must dismiss the claim where there is a "mismatch" between the challenged statement and the basis for the plaintiffs' assertion that the statement is false.  Many of the States' claims involve exactly such a mismatch.  To take just one example, the States point to statements that Meta removes accounts of users whom it determines to be under 13, and asserts that those statements were false because Meta had general knowledge that some unidentified set of under-13 users violated its terms of use to create accounts.  But the latter assertion is entirely consistent with the former, so the States' theory fails as a matter of law.  For these reasons, and the additional reasons identified below, the States' claims that Meta engaged in false or deceptive acts or practices should be dismissed in their entirety.

*Third*, neither of the States' unfair or unconscionable practices theories pass muster.  In addition to being substantially barred by Section 230, the States' claim that the design of Facebook and Instagram constitute unfair practices fails on the merits. At bottom, the States allege nothing more than that Meta designed and redesigned its services in ways that would make more users want to use them and/or make users want to use them more frequently.  No caselaw supports that dramatic expansion of the consumer protection laws—an expansion that, if accepted, would call into question the practices of virtually every business in America.

The States fare no better with their assertion that Meta's alleged collection of information regarding under-13 users in violation of COPPA constitutes an unfair practice.  As the States admit, Meta's terms of service expressly disallow under-13 users.  Thus, in every case of under-13 use, a decision was made to violate the service's terms of use and create an account.  Because any harms that flow from that decision are "reasonably avoidable by [users] themselves," *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010), this prong of the States' unfair practices claim likewise fails.

*Finally*, as explained further below, (1) the claims of several States fail because of specific decisions made by their legislatures in defining the scope of their consumer protection laws and (2) the States are not entitled to "restitution" as a matter of law.

**PRIVATE PLAINTIFF CLAIMS.**  At the Court's request, *see* Case Management Order No. 6 (4:22-md-3047, Dkt. No. 451), this motion also addresses the consumer protection and misrepresentation claims brought by certain Personal Injury Plaintiffs in this MDL.[3]  Specifically, this motion addresses (i) the consumer protection claims brought against Meta (as well as Snap, TikTok, and YouTube[4]) in Count 7, (ii) the common-law fraudulent concealment and misrepresentation claims asserted against Meta in Count 8, and (iii) the common-law negligent concealment and misrepresentation claims asserted against Meta in Count 9.  Those claims fail for substantially the same reasons that the States' consumer protection claims fail.  In addition, the Personal Injury Plaintiffs fail to plead ascertainable loss, as they must for the statutory consumer protection claims, or reliance, as they must for the misrepresentation claims.

## BACKGROUND[5]

Meta[6] operates Facebook and Instagram.  Multistate Compl. ¶ 23.  Hundreds of millions of people use these services, including many teenagers in the United States.  *Id.* ¶¶ 26, 29.  To use either Facebook or Instagram to connect and communicate with others, users must register an account; users access Meta's services without payment; and Meta's policies prohibit prospective users from doing so if they are under 13.  *Id.* ¶¶ 46, 437, 638, 703, 713, 737.  Facebook and Instagram allow users to connect and communicate

---

3 Certain other claims brought by the Personal Injury Plaintiffs are subject to a pleadings challenge in a separately filed motion.  *See* 4:22-md-3047, Dkt. No. 516.

4 Meta understands that those defendants will be filing joinders to the portion of its motion addressing Count VII.

5 For purposes of this Motion to Dismiss only, Defendants accept as true non-conclusory factual allegations in the Multistate Complaint, Florida Complaint, and Personal Injury Second Amended Master Complaint.  But for the avoidance of doubt, Defendants dispute and do not concede the accuracy of Plaintiffs' claims and allegations—including about the nature of Defendants' businesses and responsibility for purported harms—which they expressly reserve the right to challenge in any later phase of litigation.

6 For the sake of brevity, the Meta Defendants will be referred to in this brief collectively as "Meta."  This term refers to Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC, where relevant to the Multistate Complaint; it refers to Meta Platforms, Inc., and Instagram, LLC, where relevant to the Florida Complaint; and it refers to Meta Platforms, Inc., Facebook Payments, Inc., Siculus, Inc., Facebook Operations, LLC, and Instagram, LLC, where relevant to the Personal Injury Second Amended Master Complaint.  Each of the distinct "Meta" entities reserves its rights and defenses, including as to whether it is properly named as a defendant in each of these complaints.

with each other and host, arrange, and help disseminate a diverse array of user-generated content, including photos and videos.  *Id.* ¶¶ 35, 99, 102, 107.

The States allege that certain features of Facebook and Instagram constitute "unfair" or "unconscionable" business practices, including "infinite scroll, ephemeral content features, autoplay, quantification and display of 'Likes,' and disruptive alerts," as well as the fact that Meta "algorithmically served content to young users, according to 'variable reinforcement schedules.'"  *Id.* ¶¶ 847(b), 847(d).  The States also allege that Meta engaged in deceptive practices by failing to disclose that its services are allegedly "psychologically or physically harmful for young users," by representing that "the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was," by representing that "it prioritized young users' health and safety over maximizing profits," and by representing that it "prevents under-13 users from using Instagram and/or Facebook."  *Id.* ¶ 846.

Meta moves to dismiss the following complaints in this motion:

- "Multistate Complaint":  *State of Arizona, et al. v. Meta Platforms, Inc., et al.*, N.D. Cal. No. 4:23-cv-05448, Dkt. No. 1 (filed Oct. 24, 2023)

- "Florida Complaint:  *State of Florida v. Meta Platforms, Inc., et al.*, N.D. Cal. No. 4:23-cv-05885, Dkt. No. 1 (filed Oct. 24, 2023)[7]

- "Personal Injury Second Amended Master Complaint" (PI SAC):  *In re: Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, N.D. Cal. No. 4:22-md-3047, Dkt. No. 494 (filed December 15, 2023)

For the reasons that follow, Meta moves to dismiss:  Count I of the Multistate Complaint insofar as it alleges a COPPA "child-directed" claim, and Counts II–LIV in their entirety; the entirety of the Florida Complaint; and Counts 7, 8, and 9 of the PI SAC.

## LAW & ARGUMENT

On Rule 12(b)(6) motions, claims are subject to dismissal based on a dispositive legal issue, *Seismic Reservoir 2020, Inc. v. Paulsson*, 785 F.3d 330, 335 (9th Cir. 2015), or for failure to plead

---

[7] Florida's action was originally filed in the Middle District of Florida and then transferred to this MDL on November 8, 2023.  Because the Middle District of Florida lacks jurisdiction over Meta, Florida's claims should be dismissed.  *See infra* Section IX.

"sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Zody v. Microsoft Corp.*, 2012 WL 1747844, at *3 (N.D. Cal. May 16, 2012). These well-established pleading standards apply in an MDL proceeding. *See In re Zofran (Ondansetron) Prod. Liab. Litig.*, 2017 WL 1458193, at *5 (D. Mass. Apr. 24, 2017) ("The creation of an MDL proceeding does not suspend the requirements of the Federal Rules of Civil Procedure, nor does it change or lower the[m].")); *In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *9 (N.D. Cal. Aug. 3, 2011) (dismissing consolidated complaint in MDL for failure to satisfy Rule 8 where plaintiffs' allegations were merely "possible" rather than "plausible").

Claims that "sound in fraud" are subject to the heightened pleading standards of Rule 9(b). *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (applying Rule 9(b) to consumer protection claims); *see also Avakian v. Wells Fargo Bank, N.A.*, 827 F. App'x 765, 766 (9th Cir. 2020) ("[C]laims for unfair business practices, intentional misrepresentation, fraud, and negligent misrepresentation are all fraud-based claims, and must meet the heightened pleading requirements of Rule 9(b).").

It is appropriate for a court evaluating a Rule 12(b)(6) motion to consider a document outside of the complaint where the complaint references the document or where it "forms the basis" of plaintiffs' claims. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002-03 (9th Cir. 2018) (citation omitted); *see also Knievel v. ESPN*, 393 F.3d 1068, 1076-77 (9th Cir. 2005) (recognizing incorporation by reference doctrine "applies with equal force to internet pages as it does to printed material"). "[I]ncorporation by reference is a judicial doctrine that prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken or extinguish their claims." *In re Intel Corp. Sec. Litig.*, 2019 WL 1427660, at *6 (N.D. Cal. Mar. 29, 2019). Thus, "[w]here a document is referenced or incorporated by reference into a complaint, [t]he court may treat such a document as 'part of the complaint.'" *In Re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *6 (N.D. Cal. Oct. 31, 2014) (internal quotation marks omitted). And the Court need "not credit as true allegations in the complaint that are contradicted by" the incorporated documents. *Coyoy v. City of Eloy*, 859 F. App'x 96 (9th Cir. 2021).

I.      THE COMPLAINT'S "CHILD-DIRECTED" COPPA THEORY FAILS.

The States assert two theories under COPPA.  One of them—the State's allegation of a COPPA "child-directed" claim—can and should be dismissed based on the face of the Complaint because neither Instagram nor Facebook is "directed to children," as that term is defined under COPPA.  15 U.S.C. 6502(a)(1); 16 C.F.R. 312.2.  Applying the correct legal standards, both Instagram and Facebook are services directed to a "general audience," not child-directed services within the meaning of COPPA—and the Complaint fails to plead facts plausibly suggesting otherwise.

The Complaint excerpts from a selectively chosen handful of documents to suggest that Instagram and Facebook are child-directed.  But even a cursory review of those documents—which consist of little more than out-of-context screenshots, lists of supposedly "child-oriented" third-party accounts or pages plainly directed to *parents* and other adults (not children), misleading quotations from statements concerning children in other contexts, and incomplete statistics—shows exactly the opposite of what the States claim.  They demonstrate that Instagram and Facebook are general audience services that prohibit users under 13 and are without any specific child-directed designs, features or elements.

A.      "Child-Directed" Has a Specific Meaning Under the COPPA Statute and Rule.

Congress enacted COPPA in 1998, prohibiting in certain cases the collection of "personal information" from a "child" (defined as a person under 13) without verifiable parental consent.  15 U.S.C. § 6501 *et seq.*  Not every website or online service is subject to COPPA's requirements.  Rather, COPPA applies only (1) when a website or online service is "directed to children," as defined by the statute and COPPA regulations, or (2) when the operator of a website or service that is directed to a general audience has "actual knowledge" that it is collecting personal information from a child.  15 U.S.C. § 6502(a)(1).  Meta hereby moves to dismiss the Complaint's COPPA allegations insofar as they are based on the first theory, that Instagram or Facebook are directed to children.[8]

COPPA authorizes the United States Federal Trade Commission ("FTC") to adopt regulations implementing its requirements, and makes it unlawful to breach those regulations.  15 U.S.C. § 6502(b).

---

[8] While Meta disputes the State's allegations and denies that it had "actual knowledge" of the collection of personal information from children—or that the States will be able to meet their burden to show otherwise—Meta is not moving to dismiss the COPPA claim on this ground.

7

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

In 1999, the FTC promulgated a rule establishing several non-exhaustive factors that must be considered when determining whether a website or online service is "directed to children." *See* 16 C.F.R. § 312.2.; *Children's Online Privacy Protection Rule*, 64 Fed. Reg. 59888 (Nov. 3, 1999) ("COPPA Rule"). These factors include (1) "subject matter," (2) "visual content," (3) "use of animated characters or child-oriented activities and incentives," (4) "music or other audio content," (5) "age of models," (6) "presence of child celebrities or celebrities who appeal to children," (7) "whether advertising promoting or appearing on the . . . service is directed to children," and (8) "competent and reliable empirical evidence regarding audience composition" or "the intended audience." 16 C.F.R. § 312.2(1). As the FTC later clarified, this standard considers the "totality of the circumstances," and "no single factor will predominate over another in this assessment." 78 Fed. Reg. 3972, 3984 (Jan. 17, 2013). The FTC has also published informal guidance in the form of Frequently Asked Questions ("FAQs"), concerning its interpretation of COPPA. Although non-binding, these FAQs "represent the views of FTC staff."[9]

Since COPPA's enactment, the FTC has sharply distinguished between child-directed services, on the one hand, and "general audience" services, on the other. Thus, for example, when the FTC in 1999 published the initial COPPA Rule, it agreed with commentators that "operators of ***general audience (i.e., not child-directed)*** chat sites" should not be liable based on unsolicited content posted by third parties absent "actual knowledge" that the poster was under 13. 64 Fed. Reg. 59888, 59889 (Nov. 3, 1999) (emphasis added). Likewise, when the FTC amended the COPPA Rule in 2013, it expressly recognized that a new requirement imposed on child-directed sites "would not apply to uploading photos or videos on ***general audience sites such as Facebook*** or YouTube." 78 Fed. Reg. 3972, 3982 n.126 (Jan. 17, 2013) (emphasis added). The FTC also has made clear that a website or service may be "general audience" even if it "attract[s] a substantial number of children under the age of 13." 71 Fed. Reg. 13247, 13252 (Mar. 15, 2006). In other words, a "general audience" service that appeals broadly to a wide range of age groups does not become "child-directed" merely because it may have appeal to some people under-13.

---

[9] Federal Trade Commission, *Complying with COPPA: Frequently Asked Questions*, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions (last accessed Dec. 8, 2023).

**B.      The States Have Not Alleged That Instagram and Facebook Are "Directed to Children" As That Term Is Used In COPPA.**

While the COPPA Rule requires consideration of multiple factors and the totality of the circumstances in determining whether a service is "child-directed" or "general audience," the States entirely ignore many of the factors specified by the Rule.  The States' allegations (i) inappropriately focus not on the services that Meta operates (*i.e.*, Instagram and Facebook) but a cherry-picked selection of third-party content posted to those services, (ii) distort the significance of that third-party content, as made apparent from the materials they discuss (which are incorporated by reference in the Complaint[10]), and (iii) misleadingly point to efforts by Meta to develop entirely separate, distinct COPPA-compliant services expressly intended for the under-13 audience (such as Instagram Kids or Messenger Kids) to wrongly suggest that the general audience services of Instagram and Facebook are child-directed. As demonstrated below, each of the factors set forth in the COPPA Rule supports the conclusion that Instagram and Facebook are directed to a general audience—*i.e.*, are not child-directed.

**1.      The "child-oriented activities and incentives" factor supports the conclusion that Instagram and Facebook are general audience services.**

The States allege that Instagram and Facebook host "thousands" of accounts and pages featuring "child-oriented" content, celebrities, and influencers, but for several reasons, those allegations do not support their claim.

*First*, as to Facebook, the assertion is entirely conclusory.  The Complaint does not offer a single example or supporting allegation identifying any account or content on Facebook that is allegedly directed to children.  Allegations that simply "parrot the language" of the statutory factors, without more, are plainly insufficient.  *See Duran v. Maxim Healthcare Servs., Inc.*, 2018 WL 5915644, at *4 (C.D. Cal. Mar. 9, 2018); *see also Karlsson v. Mangan*, 735 F. App'x 456, 457 (9th Cir. 2018) (affirming dismissal of a claim based on allegations that "lack specificity, are devoid of particularity, and are comprised of vague and conclusory statements").

---

[10] The materials referenced in support of the States' COPPA claim are incorporated by reference into the Multistate Complaint, as the States both "refer[] extensively" to them and use them as "the basis of" their claims.  *Khoja*, 899 F.3d at 1002 (citation omitted); *see also* Meta's Request for Incorporation by Reference and Judicial Notice ("RJN").

*Second*, the States put undue weight on third-party content, rather than the question of whether Instagram and Facebook themselves are directed to children.  COPPA is clear that simply referring or pointing to child-directed third-party content does not make a general audience service like Instagram or Facebook child-directed.  *See* 15 U.S.C. § 6501(10)(B).  Similarly, the COPPA FAQs distinguish between (i) an individual creator who posts content directed to children and (ii) the service on which the creator posts.[11]  Indeed, interpreting COPPA to impose liability based on content posted by third parties would be inconsistent with Section 230.  *See infra* Section II; *see also Get Oil Out! Inc. v. Exxon Corp.*, 586 F.2d 726, 729 (9th Cir. 1978) ("It is our obligation to so construe federal statutes so that they are consistent with each other, as by this means congressional intent can be given its fullest expression."); *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976) ("[W]hen two statutes are capable of co-existence, it is the duty of the courts . . . to regard each as effective.") (quotation marks omitted).

For these reasons, Instagram and Facebook cannot be deemed child-directed merely because a user may be able to access some allegedly child-oriented content that a third party has chosen to post.  To find otherwise would transform a wide range of e-commerce sites, mobile app stores, and similar general audience webpages and services into child-directed sites, contrary to the purpose and express statutory language of COPPA.

*Third*, not all content that involves or appeals to children is child-directed.  Rather, the context for such content matters.  For example, the FTC has recognized that animated characters are not necessarily child-directed.  *See* COPPA FAQ D.3.  Likewise, content may (1) be popular across all ages, (2) have nostalgia appeal for adults, or (3) be directed to parents of young children—in which case, it is not child-directed.

An examination of the specific accounts and content created by third parties that are referenced in the Complaint demonstrates the point.  *See* Multistate Compl. ¶ 796.  In virtually every instance, the content of these accounts is plainly ***not*** directed to children:

---

[11] *See* COPPA FAQ D.2 (recognizing that a "platform that hosts a wide variety of user-generated content" may be "general audience" even though a creator may post "content . . . on the platform [that] is directed to kids").

● Many of the accounts relate to shows, characters, or networks that may be popular with children, such as Bluey, Disney Junior, Nickelodeon, Paw Patrol, PBS Kids, Peppa Pig, Rugrats, Sesame Street, and Thomas & Friends.  The purpose of these accounts, however, is **not** to allow children to watch programming or interact with characters or other content through Instagram or Facebook.  Rather, the accounts provide information **for parents** whose children may be interested in watching or engaging with this third-party content elsewhere—such as information on scheduling and streaming services where the content can be watched, background information to help parents decide if programming is appropriate for their children, and information relating to sponsored or branded merchandise that parents may wish to purchase for their children.

● Other accounts—such as Lego, Hot Wheels, Hello Kitty, Sonic the Hedgehog, and Transformers— are widely popular across all ages, and the content of the accounts reflects their popularity among adult users.  For example, the Hot Wheels Instagram account heavily promotes the brand's "Legend's Tour," a traveling custom car competition for adults competing to have their vehicles replicated as scaled down Hot Wheels models.[12]  The Lego account posts information about adult-oriented, multi-thousand piece Lego sets tied to brands such as Star Wars.[13]  And the Transformers account includes hundreds of posts marketing Transformers live action movies (all eight of which have carried a PG-13 rating), as well as branded clothing and content specifically designed for adults.[14]

● Finally, several listed accounts relate to characters and brands that are decades old and carry nostalgic appeal for many people over the age of 13—such as Mickey Mouse, Dr. Seuss, Teenage

---

[12] *See, e.g.,* Hot Wheels Official Account, https://www.instagram.com/p/CzcbCrZvLNp/?igshid=MzRlODBiNWFlZA== (published Nov. 19, 2023).

[13] *See, e.g.*, Lego Official Account, https://www.instagram.com/reel/Cx29nWrJ0T5/?igshid=MzRlODBiNWFlZA==
 (published Oct. 1, 2023).

[14] *See, e.g.*, Transformers Official Account, https://www.instagram.com/p/Ct_0wKIODvL/?igshid=MzRlODBiNWFlZA==
(published June 27, 2023).

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

Mutant Ninja Turtles, and Paddington Bear.  These accounts frequently post historic or nostalgic content that appeals to adults who grew up with these brands.[15]

At bottom, the States' apparent position—that the presence of any brands, characters, or content posted by third parties that may be popular with children is enough to render a service child-directed—would create untenable risk and line-drawing problems for millions of websites and online services, including mobile app stores, news publications and streaming programming services that are directed to a general audience but may feature content from third-party brands, developers or producers.  It would seemingly prohibit, for example, virtually all marketing of children's products to parents, given that the subject or brand at issue would be of interest to children.  Mickey Mouse would be accessible to people online only when they obtain verifiable parental consent—even if those people are teens or adults on websites and online services that prohibit children under 13.  COPPA should not be interpreted in a way that leads to such drastic and absurd results, especially given that no case law supports the States' interpretation, and that interpretation would pose serious danger to constitutionally protected speech.  *See infra* Section II.

### 2.   The "age of models" factor supports the conclusion that Facebook and Instagram are general audience services.

The States point to only three Meta advertisements to suggest that the services use "child[] or teen[]" actors.  Multistate Compl. ¶¶ 760–61.  Even setting aside the fact that teens by definition are not under 13, these three stray advertisements decisively undermine any suggestion that the "age of models" factor cuts in the States' favor.

---

[15] *See, e.g.,* Mickey Mouse Official Account, https://www.instagram.com/p/CyE0gNfNevy/?igshid=MzRlODBiNWFlZA==
 (published Oct. 6, 2023); Dr. Seuss Official Account,https://www.instagram.com/reel/CzEiCpHRXlA/?igshid=MzRlODBiNWFlZA==
 (published Oct. 31, 2023).

- The first advertisement features a woman and her teenage son, and promotes Instagram's teen parental controls by encouraging parents to visit Meta's Family Center and work together with their teenage children to implement tools that will create positive experiences on Instagram.[16]

- The second advertisement, concerning Instagram's "Reels" feature, includes a series of short videos (*i.e.*, Reels) featuring an adult man who juggles vegetables in different parts of the world. The excerpted screenshot shows the man juggling with another individual—potentially the man's child or sibling—and the remainder of the advertisement features the adult juggling in other locations.[17]

- The third advertisement is a thirty-second video depicting various images of adults, with one frame (that appears for a fraction of a second) that includes three children along with a person who may be their mother. The ad focuses on safety and security features that Meta has developed, including tools like "Privacy Checkup," "Security Checkup," and technology that Meta has deployed to detect potentially harmful content.[18]

Given that these are the only three alleged instances of Meta using child models, and the evident fact that none of those advertisements is child-directed, this factor does not even remotely support the conclusion that Instagram and Facebook are directed to children.

### 3. The "advertising" factor supports the conclusion that Instagram and Facebook are general audience services.

In determining whether a service is child-directed, another factor courts consider is "whether advertising promoting or appearing on the . . . service is directed to children." 16 C.F.R. § 312.2(1). Here, the Complaint identifies exactly three supposedly child-directed advertisements that appeared on Instagram or Facebook. *See* Multistate Compl. ¶¶ 765–66. It is plain from the face of the advertisements that they are directed at a general audience:

---

[16] Multistate Compl. ¶ 760; *see* Instagram Hockey April 2023 YouTube Ad, https://www.youtube.com/watch?v=gxy14wjki6s. *See also* RJN.

[17] Multistate Compl. ¶ 761; *see* We Are In The Making | Instagram, https://www.youtube.com/watch?v=iEqlzBrUWDA. *See also* RJN.

[18] Multistate Compl. ¶ 829; *see* https://www.ispot.tv/ad/bbGm/facebook-safe-and-secure-connections. *See also* RJN.

- Multistate Compl. ¶¶ 764, 831:  Two of the cited advertisements promoted the PBS Kids Prime Video Channel.  On their face, it is clear that the advertisements are intended for parents, not children.  They contain text promoting the PBS Kids Prime Video Channel—"The most PBS KIDS shows – All in one place! Streaming now" and "Learning adventures await."

- Multistate Compl. ¶ 765:  The final advertisement is for the mobile game "Minion Rush."  Aside from identifying Minions characters as "cartoons," the Complaint offers no support for the conclusory assertion that the advertisement was intended to "target[] children," as opposed to a general audience—including teen users, adults or users with children.

Even if these ads were in fact child-directed, the presence of these three ads that might appeal to children cannot, in the totality of the circumstances, give rise to an inference that Instagram and Facebook are child-directed.  Similarly, the three advertisements promoting Instagram and Facebook that the Complaint references—discussed in Section I.B.2 above—concern topics such as teen parental controls, privacy and security checkups, and video features. None supports the conclusion that either service is directed to children.

In short, the Complaints' factual allegations fall far short of suggesting that Instagram or Facebook contain any significant quantity of child-directed advertising.

### 4. The "audience composition" factor supports the conclusion that Facebook and Instagram are general audience services.

Under the COPPA Rule, "competent and reliable" evidence about the composition of a service's audience is relevant to the determination of whether the service is child-directed.  This factor, too, supports the conclusion that Instagram and Facebook are general audience services, not child-directed.

As to Facebook, the Complaint does not contain any allegations about its "audience composition"—let alone point to competent and reliable evidence.  The States' failure to plead that Facebook's audience is composed of children critically undermines its claim.

The States fare no better as to Instagram.  The Complaint alleges Instagram's "'audience composition' includes millions of users under the age of 13."  Multistate Compl. ¶ 749; *see also id.* ¶ 753 (citing an internal briefing from 2018 that an estimated "4 m[illion] people under 13" were "on [Instagram]" in 2015).  But "audience composition" refers to the volume and demographics of Instagram's

*entire* user base, including the ***percentage*** of users that are allegedly under 13.  The Complaint does not directly mention either element at all—presumably because the States are aware that, under any measurement they could offer, users under 13 would represent only a ***small fraction of a percent*** of Instagram's more than 2 billion monthly active users.[19]  As the FTC itself has acknowledged, a "service that is appealing to all ages" is not deemed child-directed "simply because some children may use the . . . service."[20]  While the COPPA Rule does not define a specific composition or percentage of users that may render a service child-directed, it simply cannot be the case that a service whose users are more than 99% teens and adults is child-directed.  Otherwise, the entirety of the internet would be "child directed."[21]

The Complaint also alleges that, between 2019 and mid-2023, Meta allegedly received approximately 1.1 million reports of underage users through Instagram's in-app and online reporting tools.  Multistate Compl. ¶ 754.  Again, however, this ***undermines*** any child-directed claim because it confirms that Instagram's Terms of Service expressly prohibit children under 13 from using Instagram, and that Meta encourages the reporting of underage users that violate those terms.  That only a miniscule percentage of Instagram's more than two billion accounts have been reported on this basis over a more than four-year period reinforces that Instagram's audience is comprised almost entirely of users over the age of 13.

---

[19] It is generally known and not disputed in this litigation that Instagram has over 2 billion monthly active users.  PI SAC ¶ 181 ("In 2022, two billion users worldwide were active on Instagram each month."); Transcript, Meta Platforms, Inc. Third Quarter 2022 Earnings Conference (October 26, 2022); available at https://s21.q4cdn.com/399680738/files/doc_financials/2022/q3/Meta-Q3-2022-Earnings-Call-Transcript.pdf (statement from Mark Zuckerberg that "Instagram has more than 2 billion monthly actives"); Multistate Compl. ¶ 29.  *See* Fed. R. Evid. 201.

[20] COPPA FAQ H.5 ("Importantly, 'mixed audience' sites or services are a subcategory of 'directed to children.'  In other words, a website or online service that is appealing to all ages and not specifically directed at children is not deemed 'mixed audience' simply because some children may use the site or service.").

[21] The Complaint also fails to meet the COPPA Rule's requirement to present "competent and reliable empirical evidence."  Instead, it simply declares that "millions" of underaged users are on Instagram, generally citing to an outdated and non-empirical estimate from five years ago (Multistate Compl. ¶ 753), but ignoring empirical evidence about the other side of the equation—that Instagram's total audience consists of over 2 billion users.

At bottom, the States ask the Court to find that Instagram is "directed to children" because Meta is aware that some children attempt to sign up to its service despite being prohibited from doing so. These allegations do not support a claim that Instagram is a child-directed site. Under the COPPA Rule, the relevant question is whether there is "competent and reliable" evidence about the **composition** of a service's audience that would suggest that service is child-directed, which itself is only one factor in the FTC's totality-of-the-circumstances standard. The Complaint's allegations—which demonstrate that well under 1% of Instagram's total active users are allegedly under 13—show that it is not.

### 5.    The "intended audience" factor supports the conclusion that Instagram and Facebook are general audience services.

While the Complaint selectively quotes internal Meta documents referencing efforts to "reach under-13 users" to suggest that children under 13 are the "intended audience" of Instagram and Facebook, Multistate Compl. ¶ 793, that suggestion is not supported by the well-pled allegations.

Under COPPA, the relevant question is **not** whether Meta as a company is interested in reaching children; it is whether two particular services—Instagram and Facebook—are child-directed. Thus, there is nothing improper—let alone unlawful—about the fact that Meta[22] allegedly (i) sought to "build[] experiences for "under-13s," *id.* ¶ 783, (ii) "lists 'pre-teens' in financial review documents," ¶ 789, (iii) conducted research regarding the under 13 audience, *e.g.*, *id.* ¶ 785, (iv) or (iv) sought to "figure out [a] tweens strategy," *id.* ¶ 825. As the Complaint itself recognizes, Meta was, during the relevant time-period, actively seeking to develop **separate**, COPPA-complaint services for under-13 users. *See, e.g.*, *id.* ¶ 444 (referencing Meta's efforts "to create a new Instagram Platform for children under 13 called 'Instagram Kids'"); *id.* ¶ 452 (referencing "'Messenger Kids', the Meta messaging Platform that currently exists for kids under the age of 13"). Indeed, if anything, the fact that Meta sought in 2017 to "**build an under-13 Platform**" to "grow [Monthly Active People], [Daily Active People] and time spent among U13 kids," *id.* ¶ 826 (emphasis added), or in 2020 to "develop[] IG Youth and Messenger Kids for children

---

[22] Prior to 2022, Meta was known as Facebook. Accordingly, many of the references to "Facebook" in the Complaint prior to 2022 relate to the company, not the specific service. *See, e.g.*, Compl. ¶ 815.

under the age of 13," *id.* 827, demonstrates precisely the opposite of what the States insinuate—that Facebook and Instagram themselves were ***not*** intended for children under 13.[23]

In short, rhetoric aside, the Complaint's factual allegations establish little more than that Meta sought to develop ***separate***, COPPA-compliant services such as Instagram Kids and Messenger Kids in the hopes that users of those services "would 'age up' to Instagram and Facebook," *id.* ¶ 448.  Accordingly, the States fail plausibly to allege that under-13 users were the intended audience for the Facebook and Instagram services themselves.

> **6.     The States' allegations regarding the registration process for Facebook and Instagram further confirm that they are general audience services.**

Plaintiffs assert that Instagram's "registration process" shows that the service is child-directed, *see* Multistate Compl. ¶ 749, but their own factual allegations demonstrate otherwise.

As the Complaint acknowledges, both Facebook and Instagram's terms of service prohibit users under 13 from creating accounts—despite the fact that COPPA does not require general audience sites to collect age at all.  *See* Multistate Compl. ¶ 643; 64 Fed Reg. 59888, 59892 (Nov. 3, 1999) (explaining that "COPPA does not require operators of general audience sites to investigate the ages of their site's visitors").  Accordingly, that Meta has chosen voluntarily to prohibit under-13 users from using Instagram and Facebook further reinforces the conclusion that children are not part of the intended audience for Facebook and Instagram.  By its very nature, an age gate is designed to ***prevent*** children from creating accounts, not to encourage or target them to do so.[24]  While the States suggest various ways that, in their opinion, Meta might have improved the effectiveness of its age gates, *e.g.*, Multistate Compl. ¶ 768

---

[23] The States' allegation—made "[]*on information and belief*"—that "children are an intended audience of Facebook" is especially weak.  Multistate Compl. ¶ 822 (emphasis added).  Despite having *thousands* of documents that Meta produced in a *multi-year* investigation preceding this Complaint, the States offer just three quotes, none of which plausibly suggests that Meta targeted children *for Facebook* as opposed as opposed to the other, COPPA-compliant services that the States themselves reference.  *See id.* ¶ 827 (referencing "IG Youth" and "Messenger Kids").

[24] This is particularly true given that the Complaint acknowledges that Meta *improved* the age gate for Instagram over time to reduce the likelihood that children would attempt to falsify their age.  Multistate Compl. ¶¶ 705–706.

17

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

(alleging that Meta could have required "young users to submit student IDs upon registration"), nothing in COPPA imposes those types of arbitrary and onerous requirements.

### 7. Additional factors ignored by the States further reinforce that Facebook and Instagram are general audience services.

The States entirely ignore multiple other factors set forth in the COPPA Rule. Their failure to allege facts relating to these factors decisively undercuts their theory that Instagram and Facebook are child-directed.

**Subject matter.** The States conspicuously fail to address the very first factor of the child-directed test—subject matter. Instagram and Facebook are services through which account holders can share photos and videos and communicate with friends and followers. Sharing user-generated content and interacting with social connections online is a subject matter appealing to ***all ages***, not specifically directed to children. Indeed, the FTC itself has recognized as much, pointing to Facebook (along with YouTube) as paradigmatic examples of "general audience" services that enable the "uploading [of] photos or videos." 78 Fed. Reg. at 3982 n.126.

***Visual content.*** The States do not allege that there is anything child-directed about the "visual content" of the Instagram or Facebook services—nor could they.

***Music or other audio content.*** The States do not allege that Instagram or Facebook use music or audio content at all—let alone that they use music or audio content that is directed to children.

***Child celebrities.*** The Complaint does not allege that Instagram or Facebook themselves use child celebrities, whether in advertising or otherwise. While the Complaint vaguely alleges that "thousands" of child celebrities and influencers who "appeal to children" maintain Instagram accounts, the only specific account identified in the Complaint is owned by a celebrity who the States acknowledge is ***over the age of 13***. Multistate Compl. ¶ 801 ("Instagram currently hosts the Instagram account of JoJo Siwa, a popular celebrity among tweens. JoJo Siwa is now over the age of 13. . . ."). In any event, as noted above, this ignores the distinction between Meta's services and the third parties who use those services. *See supra* I.B.1.

***Language.*** The States do not allege that Instagram or Facebook themselves use language directed to children—nor could they.

C.      **Endorsing the States' Child-Directed Theory Would Have Serious Consequences.**

Endorsing the States' theory that Instagram and Facebook are child-directed services based on the scant evidence presented in the Complaint would have serious implications for every website or online service operating today.  Under the States' interpretation of COPPA, practically all websites or online services could be deemed child-directed simply because their audience includes a small percentage of children, placing virtually the entire internet under regulation as child-directed services by COPPA.  As the FTC has recognized, that is not the law.  *See, e.g.*, 71 Fed. Reg. at 13252 (recognizing that "[g]eneral audience" webpages or services nonetheless "may attract a substantial number of children"); *see also* 78 Fed. Reg. at 3982, n. 126 (pointing to Facebook and YouTube as exemplar "general audience" services).

II.     **SECTION 230 LARGELY BARS THE STATES' CONSUMER PROTECTION CLAIMS.**

Section 230 of the CDA applies with full force to the States' consumer protection claims, and bars ***all*** of the States' unfair acts or practices claims aside from those predicated on alleged COPPA violations.[25]  Indeed, this Court has already ruled that Section 230 bars claims based on the very features challenged by the States as constituting unfair trade practices.  *See* 4:22-md-3047, Dkt. 430 (Order Granting in Part and Denying in Part Defendants' Motion to Dismiss).  Section 230 likewise bars the States' consumer protection claims insofar as they seek to hold Meta liable for failing to provide warnings regarding those features.[26]

A.      **Section 230 Bars the Vast Majority of the States' Claims that Instagram's and Facebook's Designs Constitute Unfair or Unconscionable Business Practices.**

Section 230 provides immunity for interactive computer service providers against any claims that seek to hold them liable for third-party content on their services and the manner in which that content is presented.  *See* 47 U.S.C. § 230(c)(1) ("No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."); *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (Section 230(c)(1) provides "broad

---

[25] *See infra* n.45.

[26] *See infra* n.28.

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

federal immunity to any cause of action that would make service providers liable for information originating with a third-party user." (internal quotation marks omitted)).

This Section 230 immunity applies with full force to state-law consumer protection claims.  *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 (9th Cir. 2009) (recognizing that Section 230 "provide[s] immunity from state unfair competition and false advertising actions" (citing *Perfect 10, Inc.*, 488 F.3d at 1118–19); *Bride v. Snap Inc.*, 2023 WL 2016927, at *6 (C.D. Cal. Jan. 10, 2023) ("[T]he nature of Plaintiffs' legal claim does not alter the court's conclusion, whether based on negligence or false advertising.").  This includes consumer protection claims asserted by State attorneys general. *See, e.g.*, *Free Speech Coal., Inc. v. Colmenero*, --- F. Supp. 3d ---, 2023 WL 5655712, at *26 (W.D. Tex. Aug. 31, 2023) ("The text of the CDA is clear:  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.' '[A]ny' state law necessarily includes those brought by state governments." (internal quotation marks and citation omitted)); *Google, Inc. v. Hood*, 96 F. Supp. 3d 584, 597 (S.D. Miss. 2015) (noting that Section 230 limits the attorney general's ability to prosecute Internet services), *vacated and remanded on other grounds*, 822 F.3d 212 (5th Cir. 2016) (noting that Section 230 may bar claims if the attorney general were to bring an enforcement action).

Section 230 immunity applies if (1) the defendant is a "provider . . . of an interactive computer service," and (2) the claim seeks to hold the defendant liable as a "publisher or speaker" of (3) content provided by someone else.  *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019). As this Court has already held, Meta is an interactive computer service provider.  *See* 4:22-md-3047, Dkt. 430 at 10.  Thus, the determinative question here is whether, under the overlapping second and third prongs of the test, the States' claims seek to hold Meta liable as a publisher or speaker of third-party content.  *See* 4:22-md-3047, Dkt. 430 at 12 (noting that the third prong overlaps with the second prong as a practical matter, and does not require further discussion) (citing *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022)).  Because the States' unfair or unconscionable business acts or practices claims overwhelmingly seek to hold Meta liable for its decisions about whether and how to publish third-party content—decisions about how much content to publish, how to arrange and present it, and for how long to publish it—the claims are almost all barred by Section 230. *See* Multistate Compl. ¶ 847(a)–(d); *see also Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009).

The States' claims that Meta designed its services "to promote compulsive, prolonged, and unhealthy use," Multistate Compl. ¶ 847(a), and "to extract additional time and attention from young users," *id.* ¶ 847(b), are foreclosed by Section 230.  *See also* Florida Compl. ¶ 26 ("To draw young people into its ecosystem and keep them coming back, Meta employs technologies designed to maximize their time on and engagement with its Social Media Platforms.").  In essence, this claim seeks to hold Meta liable for the volume of third-party content it publishes.  But this Court has previously recognized that such a claim "would inherently limit what defendants are able to publish" by "requir[ing] defendants to publish less third-party content."  *See* 4:22-md-3047, Dkt. 430 at 16 (dismissing Personal Injury Plaintiffs' claims premised on alleged failures to limit time, frequency, and time-of-day of use of social media services).  Notably, this Court has already examined each of the specific design features that the States allege led to excessive use and held that Section 230 bars challenges to all of them:

*Infinite scroll and autoplay.*  The States challenge the alleged "infinite scroll" and autoplay of content on Meta's services.  Multistate Compl. ¶¶ 847(b)–(c); *see id.* ¶ 377 ("The infinite scroll system . . . makes it difficult for young users to disengage [from the content] because there is no natural end point for the display of new information."); *id.* ¶ 381 ("Much like infinite scroll, the autoplay feature encourages young users to continuously engage on the Platform because it provides them with an ongoing supply of content."); *see also id.* ¶ 273; Florida Compl. ¶¶ 28, 32.  This Court has already held that the alleged defect of "[n]ot providing a beginning and end to a user's 'Feed' . . . would necessarily require defendants to publish less third-party content," and so was barred by Section 230.  *See* 4:22-md-3047, Dkt. 430 at 16.

*Ephemeral content features.*  The States also challenge "ephemeral"" publication of content, *see* Multistate Compl. ¶¶ 847(b)–(c), by which "content [is] temporarily made available to users with notifications and visual design cues indicating that the content will soon disappear," *id.* ¶¶ 387–88; *see* Florida Compl. ¶ 35.  This Court previously held that Section 230 immunizes features that "provide . . . ephemeral content" because "[e]ditorial decisions such as determining . . . how long to publish content are 'traditional editorial functions' immune under Section 230, where exercised with regard to third-party content."  4:22-md-3047, Dkt. 430 at 18.

*Notifications.*  The States next challenge allegedly "disruptive audiovisual and vibration notifications and alerts."  Multistate Compl. ¶ 847(b)–(c); *see* Florida Compl. ¶ 115 ("disruptive alerts").

This Court previously held that "where notifications are made to alert users to third-party content," Section 230 bars challenges to those features.  4:22-md-3047, Dkt. 430 at 18.  Moreover, as this Court has recognized, the States' claims regarding notifications about Meta's own content are foreclosed by the First Amendment.  *See* 4:22-md-3047, Dkt. 430 at 22 ("[T]he timing and clustering of notifications of *defendants' content* to increase addictive use is entitled to First Amendment protection.  There is no dispute that the content of the notifications themselves, such as awards, are speech." (citation omitted)).

**_Algorithms._**   The States also challenge "algorithmically served content," Multistate Compl. ¶ 847(d), or the use of algorithms to detect, "on a user-by-user basis," the "material each individual is likely to engage with and then increasingly displaying similar material," *id.* ¶ 65.  This Court previously held that "to the extent plaintiffs challenge defendants' use of algorithms to determine whether, when, and to whom to publish third-party content, Section 230 immunizes defendants," and that "[w]hether done by an algorithm or an editor, these are traditional editorial functions that are essential to publishing."  4:22-md-3047, Dkt. 430 at 18–19.

**_Likes._**  Finally, the States challenge the "quantification and display of 'Likes,'" Multistate Compl. ¶ 847(b), which "are a quick way for users to express validation or approval of other users' photos or videos, by clicking or tapping a heart icon or the iconic thumbs-up icon", *id.* ¶ 227; *see* Florida Compl. ¶¶ 33–34.  This Court has already held that Section 230 bars claims regarding "notifications [that] are made to alert users to third-party content, . . . includ[ing] notifications that someone has . . . liked a user's post."  4:22-md-3047, Dkt. 430 at 18.  That reasoning applies whether the fact that another user "Liked" a post is presented through an alert notification or by displaying that information on the post itself.

The States cannot plead around Section 230 by offering the bare and conclusory allegation that "Meta utilized Social Media Platform features that unfairly and/or unconscionably harm young users ***independently of any actions taken by third-party users*** of Meta's Platforms."  Multistate Compl. ¶ 847(b) (emphasis added).  As this Court has already recognized in dismissing personal injury claims based on challenges to these same features, it is not "required to accept as true" such wholly "conclusory" allegations.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  The States offer no factual

22

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

allegations that plausibly explain how Meta could fix these allegedly unfair design features without altering when, how, and to whom they publish third-party content.[27]

### B.    Section 230 Bars the States' Claims That Meta Omitted or Failed To Provide Warnings Regarding Instagram and Facebook's Design Features.

Section 230 likewise bars the States' claims that Meta's failure to provide warnings regarding these design features violate their consumer protection statutes. *See, e.g.*, Multistate Compl. ¶ 891. Section 230 bars failure-to-warn claims where the "theory of liability is inherently tied to content" and the dissemination of content. *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1119, 1126 (N.D. Cal. 2016). Any other rule would render Section 230 a dead letter, as plaintiffs could simply repackage impermissible claims involving alleged harm from third-party content as an omission claim. For that reason, courts have consistently dismissed failure-to-warn claims where, as here, the claims are "inextricably linked" to a service's "alleged failure to edit, monitor, or remove" third-party content. *Herrick v. Grindr, LLC*, 765 F. App'x 586, 591 (2d Cir. 2019); *see also, e.g.*, *Anderson v. TikTok*, 637 F. Supp. 3d 276, 280 (E.D. Pa. 2022) (Section 230 barred failure-to-warn claim premised "on the 'defective' manner in which Defendants published" third-party content); *In re Facebook, Inc.*, 625 S.W.3d 80 (Tex. 2021) ("Regardless of whether Plaintiffs' claims are couched as failure to warn, negligence, or some other tort of omission, any liability would be premised on second-guessing of [service's] 'decisions relating to the monitoring, screening, and deletion of [third-party] content . . . .'"); *L.W. v. Snap Inc.*, --- F. Supp. 3d ---, 2023 WL 3830365, at *7 (S.D. Cal. 2023) (similar); *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *1 (C.D. Cal. 2022) (similar). The same logic applies to consumer protection claims that are premised on the same theory of liability.

---

[27] Many of the States' consumer protection laws contain safe harbors that explicitly exempt publishers of third-party content from liability. These safe harbor provisions reinforce that Meta may not be held liable on the basis of third party content that it disseminates. *See, e.g.*, Ariz. Rev. Stat. Ann. § 44-1523; Colo. Rev. Stat. Ann. § 6-1-106; Conn. Gen. Stat. Ann. § 42-110c(a); Del. Code Ann. tit. 6, § 2513(b)(1); Del. Code Ann. tit. 6, § 2534 (a)(2); Ga. Code Ann. § 10-1-396(2); Haw. Rev. Stat. § 481A-5(a)(2); Idaho Code § 48-605(2); 815 ILCS 505/10b(3); Iowa Code Ann. § 714H.4; La. Stat. Ann. § 51:1406(2); Md. Code Ann., Com. Law § 13-104; Minn. Stat. Ann. § 325D.46; Mo. Ann. Stat. § 407.020.2(1); N.J. Stat. Ann. § 56:8-2; N.Y. Gen. Bus. Law § 349; N.C.G.S. § 75-1.1(c); N.D. Cent. Code § 51-15-03; Ohio Rev. Code § 1345.12(B); Or. Rev. Stat. 646.612(2); 73 Pa. Stat. Ann. § 201-3; S.C. Code Ann. § 39-5-40; Vt. Stat. Ann. tit. 9, § 2452; Va. Code Ann. § 59.1-199; W. Va. Code § 46A-6-105; Wash. Rev. Code Ann. § 19.86.140; Wis. Stat. 100.18(9)(b).

23

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

*See Bride*, 2023 WL 2016927, at *7 (dismissing statutory false advertising claims "for the same reason as Plaintiffs' failure to warn claims: because they are all predicated on allegations concerning activity immunized by Section 230").

As the court noted in *Herrick v. Grindr, LLC*, "requiring [an interactive computer service] to post a warning at the outset or along with each profile is no different than requiring [the service] to edit the third-party content itself."  306 F. Supp. 3d 579, 591 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019).  Moreover, "that the proposed warning would potentially operate at a general level, rather than be appended to specific posts, is not significant" because Section 230 "applies at both the individual and systemic or architectural level."  *Id.* at 592.

As these decisions make clear, the States' claims are barred by Section 230 insofar as they are premised on Meta's alleged "omissions" regarding the supposedly deleterious impacts of the challenged design features or its failure to provide warnings regarding those features.  For example, the States claim that Meta failed to provide "warnings disclosing that the Recommendation Algorithms . . . suggest content that is dangerous or harmful for young users."  Multistate Compl. ¶ 187.  In other words, the States seek precisely the sort of general architectural warning or disclosure that the court rejected in *Herrick*.  As in that case, the State's proposed warning here treats Meta "as publisher" because its theory of liability ultimately rests on Meta's alleged failure to "police or remove objectionable content."  *Herrick*, 306 F. Supp. 3d at 591; *see In re Facebook, Inc.*, 625 S.W.3d at 93 (Tex. 2021) ("All the actions Plaintiffs allege Facebook should have taken to protect them—***warnings***, restrictions on eligibility for accounts, removal of postings, etc.—are actions courts have consistently viewed as those of a "publisher" for purposes of section 230." (emphasis added)).

\* \* \*

In sum, Section 230 bars the State's consumer protection claims insofar as they allege that features of Facebook and Instagram—including "infinite scroll, ephemeral content features, autoplay, quantification and display of 'Likes,' and disruptive alerts," Multistate Compl. ¶ 847(b)—led to "compulsive, prolonged, and unhealthy use by young users," *id.* ¶ 847(a).  Section 230 likewise bars the States' claims insofar they allege that Meta omitted or failed to provide warnings regarding "the dangerous nature of its Social Media Platforms[] and Meta's use of psychologically manipulative engagement-

24

inducing features," *id.* ¶ 891.  While Section 230 does not bar the States' consumer protection claims insofar as they are based on (i) Meta's alleged collection of "the personal information of under-13 users of Instagram and Facebook without first obtaining verifiable parental consent," *id.* ¶ 847(e), or (ii) alleged false or misleading affirmative statements by Meta, those claims also fail for the reasons identified below.

## III.   THE STATES FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS OR DECEPTION.

Thirty States assert claims against Meta alleging deceptive acts under their consumer protection laws.[28]  As a threshold matter, for the reasons explained immediately above, the State's omissions claims are barred by Section 230 insofar as they are premised on Meta's failure to provide warnings about its algorithms or other "engagement-inducing features."  They also fail in whole or part for four additional reasons.  *First*, generic statements about the "safety" of Meta's services are non-actionable statements of opinion, not actionable misstatements of fact.  *Second*, the States fail to allege that Meta's representations were actually false or misleading under the pleading requirements of Rule 9(b).  *Third*, the States fail to allege that the challenged representations were material to consumers.  *Fourth*, the States cannot rely on alleged misstatements to Congress to support their claims.

---

[28] *See* **Arizona** (Multistate Compl. Count II, ¶¶ 861, 864), **California** (Multistate Compl. Count III, ¶ 866), **Colorado** (Multistate Compl. Count V, ¶ 875, Count VI, ¶ 879, Count VII, ¶ 884, Count VIII, ¶ 888), **Connecticut** (Multistate Compl. Count IX, ¶ 895), **Delaware** (Multistate Compl. Count X, ¶ 907, Count XI, ¶ 914), **Florida** (Florida Compl. Count I, ¶ 117), **Georgia** (Multistate Compl. Count XII, ¶ 924), **Hawai'i** (Multistate Compl. Count XIV, ¶ 942), **Illinois** (Multistate Compl. Count XV, ¶ 947, Count XVII, ¶ 958), **Indiana** (Multistate Compl. Count XVIII, ¶ 966, Count XIX, ¶ 972), **Kansas** (Multistate Compl. Count XX, ¶ 976), **Kentucky** (Multistate Compl. Count XXII, ¶ 984), **Louisiana** (Multistate Compl. Count XXIII, ¶ 991), **Maine** (Multistate Compl. Count XXIV, ¶ 994), **Michigan** (Multistate Compl. Count XXV, ¶ 1000), **Minnesota** (Multistate Compl. Count XXVI, ¶ 1012), **Missouri** (Multistate Compl. Count XXVIII, ¶ 1026), **Nebraska** (Multistate Compl. Count XXIX, ¶ 1030; Multistate Compl. Count XXXI, ¶ 1039), **New Jersey** (Multistate Compl. Count XXXIII, ¶ 1049), **New York** (Multistate Compl. Count XXXIV, ¶ 1058, Count XXXV, ¶ 1064, Count XXXVI, ¶ 1069), **North Carolina** (Multistate Compl. Count XXXIX, ¶ 1087), **North Dakota** (Multistate Compl. Count XL, ¶ 1090), **Ohio** (Multistate Compl. Count XLII, ¶ 1097), **Oregon** (Multistate Compl. Count XLV, ¶ 1112, Count XLVI, ¶ 1117), **Pennsylvania** (Multistate Compl. Count XLVII, ¶ 1124), **Rhode Island** (Multistate Compl. Count XLIX, ¶ 1133), **South Carolina** (Multistate Compl. Count L, ¶ 1145), **Virginia** (Multistate Compl., Count LI, ¶ 1153), **Washington** (Multistate Compl. Count LII, ¶ 1158); **Wisconsin** (Multistate Compl., Count LIV, ¶ 1170).

For the convenience of the Court, attached hereto as **Appendix A** is a chart identifying each alleged misrepresentation set forth in the Multistate Complaint, and the reasons that claims relating to those statements should be dismissed.

A.     **Representations About the "Safety" of Meta's Services And Several Other Challenged Statements Are Non-Actionable Statements of Opinion, Not Misstatements of Fact.**

The States' main theory of deception is that Meta claimed its services were "safe" for young users. *See, e.g.*, Multistate Compl. ¶ 133 ("Meta has intentionally created the false impression that its Platforms are safe for young users, and that Meta prioritizes safety over user engagement.").  The Complaint refers to a series of statements that include nothing more than the generalized claim that Instagram and Facebook are "safe" or that Meta prioritizes "safety" or "well-being."  *See, e.g., id.* ¶ 130 ("Instagram's website characterized the Instagram app as a 'safe and supportive community' for its users."); *see also id.* ¶¶ 122, 123, 125, 127–31, 136, 169, 222–23, 265, 448, 473, 478, 592, 829.  These references to the subjective, generalized concepts of "safety" and "well-being" are statements of opinion that cannot form the basis for a deceptive practices claim as a matter of law.

It is well established that deceptive acts or practices claims must be based on misstatements of ***fact***, capable of being proven false—not statements of opinion or what courts often call "puffery."  "Thus, a statement that is quantifiable, that makes a claim as to the 'specific or absolute characteristics of a product [or service],' may be an actionable statement of fact while a general, subjective claim about a product [or service] is non-actionable puffery."  *Newcal Indus., Inc. v. Ikon Off. Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008).[29]

---

[29] *See, e.g., Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854–55 (N.D. Cal. 2012) (under **California** law, "[g]eneralized, vague, and unspecified assertions constitute 'mere puffery' upon which a reasonable consumer could not rely, and hence are not actionable."); *Song v. Champion Petfoods USA, Inc.*, 2020 WL 7624861, at *10 (D. Minn. Dec. 22, 2020), *aff'd*, 27 F.4th 1339 (8th Cir. 2022) (under **Minnesota** law, statements are not actionable when they are "too vague to be proved or disproved"); *Castaneda v. Amazon.com, Inc.*, --- F. Supp. 3d ---, 2023 WL 4181275, at *7 (N.D. Ill. June 26, 2023) (under **Illinois** law, statements that are "not objectively verifiable" are not actionable); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 734 (W.D. Ky. 2013) (under **Kentucky** law, seller who "states an opinion or expresses a judgment about a thing as to which [both the buyer and seller] may each be expected to have an opinion and exercise a judgment" is not liable); *Glob. Hookah Distribs. v. Avior, Inc.*, 401 F.

(continued…)

Courts routinely dismiss misrepresentation claims based on statements regarding "safety" or the prioritization of safety. *See, e.g.*, *Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1068 (9th Cir. 2001) (representation that consumers "would be safely and adequately served" failed to state a claim because the statement "is devoid of any meaningful specificity"); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020) ("generalized assertions about Lyft's commitment to safety, its safety measures, and the role safety plays in the rideshare market" were non-actionable puffery); *Azoulai v. BMW of N. Am. LLC*, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017) ("[T]here is nothing 'specific and measurable' about the word 'safely.'"); *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements about "quality [and] safety" were nonactionable opinions); *Greater Hous. Transp. Co. v. Uber Techs., Inc.*, 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015) (statement that Uber is the "safest ride on the road" was "non-actionable puffery"); *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016) (similar, for statement about "mak[ing] Uber the safest experience"); *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205, 1216 (D.S.C. 1990) (a "judgment and opinion about safety" "is certainly not the kind of statement [the] law would support as fraudulent").

---

Supp. 3d 653, 659 (W.D.N.C. 2019) (under **North Carolina** law, "[t]he line between corporate optimism and material statements falls where the statements at issue were specific factual allegations that were not simply sales pitches but rather can be proven true or false" (internal quotation marks omitted)); *see also Cheatham v. ADT Corp.*, 161 F. Supp. 3d 815, 827 (D. Ariz. 2016) (**Arizona**); *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 333 (Ind. 2013) (**Indiana**); *Park Rise Homeowners Ass'n, Inc. v. Res. Const. Co.*, 155 P.3d 427, 436 (Colo. App. 2006) (**Colorado**); *Clarkson v. Orkin Exterminating Co.*, 761 F.2d 189, 191 (4th Cir. 1985) (**South Carolina**); *NetScout Systems, Inc. v. Gartner, Inc.*, 334 Conn. 396, 424 n.15 (2020) (**Connecticut**); *Solow v. Aspect Res., LLC*, 2004 WL 2694916, at *3 (Del. Ch. Oct. 19, 2004) (**Delaware**); *Villalobos v. Atlanta Motorsports Sales, LLC*, 355 Ga. App. 339, 346 n.1 (2020) (**Georgia**); *Ludlow v. Lowe's Companies, Inc.*, 2014 WL 12580233, at *12 (D. Haw. Jan. 17, 2014) (**Hawaii**); *VNA Plus v. Apria Healthcare Grp., Inc.*, 29 F. Supp. 2d 1253, 1265 (D. Kan. 1998) (**Kansas**); *State v. McLaughlin*, 235 A.3d 854, 859 (Me. 2020) (**Maine**); *Babb v. Regal Marine Indus.*, Inc., 179 Wash. App. 1036 (2014 ) (**Washington**); *Mahindra & Mahindra Ltd. v. FCA US LLC*, 2021 WL 323253, at *5 (E.D. Mich. Feb. 1, 2021) (**Michigan**); *Tucker v. Gen. Motors LLC*, 58 F.4th 392, 398 (8th Cir. 2023) (**Missouri**); *Rodio v. Smith*, 123 N.J. 345, 352 (1991) (**New Jersey**); *MacNaughton v. Young Living Essential Oils*, LC, 67 F.4th 89, 96 (2d Cir. 2023) (**New York**); *Dahl v. Messmer*, 719 N.W.2d 341, 345 (N.D. 2006) (**North Dakota**); *Davis v. Byers Volvo*, 2012-Ohio-882, ¶ 39 (**Ohio**); *Tietsworth v. Harley-Davidson, Inc.*, 270 Wis. 2d 146, 171-72 (2004) (**Wisconsin**); *Andriesian v. Cosm. Dermatology, Inc.*, 2015 WL 1638729, at *4 (D. Or. Mar. 3, 2015) (**Oregon**); *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 648 Pa. 604, 625–26 (2018) (**Pennsylvania**); *Graham v. RRR, LLC*, 202 F. Supp. 2d 483, 491 (E.D. Va. 2002) (**Virginia**).

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017), is particularly instructive. The plaintiffs in that multi-district litigation challenged Yahoo's statement that "protecting our systems and our users' information is paramount" as misleading because Yahoo allegedly knew and did not disclose the risks of a breach of users' personal data, and then did not disclose actual data breaches after they occurred. *Id.* at *2–4, 26. The court dismissed the consumer protection claims with respect to this statement because it "is a vague and 'all-but-meaningless superlative[]' regarding how Defendants' prioritize the safety of their systems and their users' information." *Id.* at *26 (citation omitted). The same is true here: Meta's generalized, unmeasurable statements regarding its prioritization of "safety" and "well-being" are not actionable misrepresentations as a matter of law.

Several of the other statements challenged by the States are also non-actionable statements of opinion. For example, the claim that Meta does not "amplify extreme content," Multistate Compl. ¶ 186, is not actionable because "extreme" is an unmeasurable matter of opinion. So too is the opinion that Instagram's effects on mental health are "quite small," *id.* ¶ 126, where "small" is a subjective adjective that means different things to different people. Moreover, the statement that "I don't *believe* that research suggests that our products are addictive," *id.* ¶ 427 (emphasis added), is on its face a statement of opinion, not of fact. Likewise, the statement that "the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits," *id.* ¶ 419, reflects an *opinion* on the overall weight of the research that is not rendered false by the alleged presence of other research purportedly reaching a different conclusion. And the statements that Meta conducts research to "find out how we can best improve the experience for teens" and "minimize the bad and maximize the good," *id.* ¶¶ 138, 592, and works to create "positive experience[s]" and "meaningful interactions" so that the services can be "intentional, positive and inspiring," *id.* ¶¶ 192, 331, consist entirely of what courts call puffery. None of these statements is actionable. [30]

---

[30] Because courts consider such "[g]eneralized, vague, and unspecified assertions" to be statements "upon which a reasonable consumer could not rely," *Elias*, 903 F. Supp. 2d at 854–55, these statements also are not material, which is a separate grounds for dismissal. *See infra* Section III.C.

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

**B.      The States Fail to Establish That Alleged Misrepresentations Were False or Misleading Under the Heightened Pleading Requirements of Rule 9(b).**

The States make sweeping, conclusory claims about Meta's alleged acts of deception.  But the actual, specific statements identified by the States almost invariably fall short of alleging false or misleading statements in compliance with the applicable pleading rules.

Because the States' deceptive practices claims "sound in fraud," they are subject to the heightened pleading standards of Rule 9(b).  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) (applying Rule 9(b) to consumer protection claims); *see also Avakian v. Wells Fargo Bank, N.A.*, 827 F. App'x 765, 766 (9th Cir. 2020) ("[C]laims for unfair business practices, intentional misrepresentation, fraud, and negligent misrepresentation are all fraud-based claims, and must meet the heightened pleading requirements of Rule 9(b).").  To plead these fraud-based claims with the particularity required by Rule 9(b), the States must plead the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations."  *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *see also Wheeler v. Ford Motor Co.*, 2022 WL 19692038, at *2 (N.D. Cal. May 26, 2022). [31]  Rule 9(b) also applies to omission-based claims.  *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1127 (9th Cir. 2009) ("[N]ondisclosure is a claim for misrepresentation in a cause of action for fraud, [so] it (as any other fraud claim) must be pleaded with particularity under Rule 9(b).");  *Browning v. Am. Honda Motor Co.*, 2022 WL 824106, at *13 (N.D. Cal. Mar. 18, 2022) (Rule 9(b) "requires Plaintiffs to 'describe the content of the omission and where the omitted information should or could have been revealed.'") (citation omitted); *Erickson v. Bos. Sci. Corp.*, 846 F. Supp. 2d 1085, 1093 (C.D. Cal. 2011) (same).

To plead a deception claim, the States also "must set forth an explanation as to why the statement or omission complained of was false or misleading."  *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (*en banc*).  In the Ninth Circuit, this requirement is not satisfied where there is a "mismatch between the representations at issue and the evidence that allegedly debunks them."  *Amado v. Procter & Gamble Co.*, 2023 WL 3898984, at *9 (N.D. Cal. June 8, 2023) (citation omitted); *see also Vigil v. Gen.*

---

[31] For some of the purported misrepresentations, the Complaint cites only to "talking points" or other internal documents without ever alleging if or when/where the statement was ever made publicly.  *See* Multistate Compl. ¶¶ 127, 135, 136, 186, 285, 286, 294, 438; Fla. Compl. ¶ 55.  These alleged misrepresentations fail to satisfy Rule 9(b) for this simple reason.

*Nutrition Corp.*, 2015 WL 8056178, at *6 (S.D. Cal. Dec. 4, 2015) ("When it comes to the plausibility analysis, the essential inquiry depends upon a comparison of the match 'between the representations at issue and the evidence that allegedly debunks them.'"); *Cullen v. Netflix, Inc.*, 2013 WL 140103, at *7 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir. 2015) ("Plaintiff has not alleged facts showing that Defendant's assertions and calculations turned out to be false" because "Plaintiff's presentation of his own calculation . . . does not contradict Defendant's claim").[32]  In other words, unless the States plausibly allege facts that would disprove the challenged statement, the claim must be dismissed.  Many of the States' deception claims falter under this rule:

**_Deletion of Under-13 Accounts_**.  According to the States, statements that Meta deletes user accounts if it discovers that they are operated by someone under age 13 were deceptive because Meta knows that under-13 users are on its services.  *Compare* Multistate Compl. ¶ 659 ("Meta and Zuckerberg acquired and confirmed their actual knowledge of users under 13 on Instagram.") *with id.* ¶ 685 ("Zuckerberg told Congress on March 25, 2021, 'if we detect that someone might be under the age of 13, even if they lied, we kick them off.'").  But these two facts are not contradictory—it can be true both that there are under-13 users on Instagram and that Meta removes them when it discovers them.

The States points to an instance where employees "couldn't tell for sure the user was underage," *id.* ¶ 668, and to the fact that there are sometimes delays in taking action caused by backlogs of reports needing verification, *id.* ¶ 686–87.  The States, however, do not allege that Meta ever claimed it could detect and remove every single under-13 user who lies about their age instantaneously and without error.

---

[32] This Court must apply Rule 9(b), as it had been interpreted by the Ninth Circuit, to all of the States' claims.  *See Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1104 (9th Cir. 2003); *de Dios v. Gerard Roof Prod., LLC*, 2018 WL 6016952, at *3 (C.D. Cal. Sept. 4, 2018) (challenges to "'pleading standards' [are] governed by federal law, which controls procedural matters in diversity cases" (citation omitted)); *Gold v. Lumber Liquidators, Inc.*, 2015 WL 7888906, at *12 (N.D. Cal. Nov. 30, 2015) (applying Rule 9(b) to consumer-protection claims arising out of New York and Illinois law because "this Court is . . . bound by the holding in *Kearns*").

Thus, these allegations do nothing to call into question the truthfulness of the assertion that Meta's policy is to delete individual under-13 users **when detected**.[33]

***Prevalence of Harmful Content***.   The States similarly fail to allege that Meta's statements regarding "the incidence or prevalence of negative or harmful user experiences on" Instagram and Facebook were deceptive.  *Id.* ¶ 846(c).  This claim rests on Meta's published Community Standard Enforcement Reports ("CSER"), which "describe the percentage of content posted on Instagram and Facebook that Meta removes for violating Instagram and Facebook's Community Standards or Guidelines." *Id.* ¶ 461.  The CSER allegedly show "very low rates of [Meta's] community standards being violated." *Id.* ¶ 460.  The States claim the CSER's rates are false because subjective user-surveys conducted by Meta—the Tracking Reach of Integrity Problems Survey ("TRIPS") and the Bad Experiences & Encounters Framework ("BEEF"), which "poll[ed] users about their exposure to and interactions with negative or harmful" content—purportedly showed higher rates of users self-reporting exposure to perceived harmful content.  *Id.* ¶¶ 468–69, 481–82.

Here, too, there is a fundamental "mismatch" between Meta's alleged representations and the evidence that purportedly debunks them because the CSER, on the one hand, and TRIPS and BEEF, on the other hand, involve entirely different data.  The CSER measures the percentage of ***views*** of content that violates Meta's content standards, whereas TRIPS and BEEF report the percentage of ***users*** who self-report having seen content they believe fall into certain inherently subjective and undefined categories of "harmful content."  Indeed, the States themselves acknowledge that the "prevalence" of violating content reported in the CSER "is not the same as the actual 'prevalence' of harmful content." *Id.* ¶ 467.  That admission defeats the claim—the TRIPS and BEEF data do not address the same objective prevalence data as the CSER, and therefore do not contradict it.  Put simply, users may report in a survey that they viewed what they describe as harmful content, even though that content may not—and often does not—

---

[33] The States also point to an alleged instance where an employee suggested to a parent that their child's account could be kept up if the parent "take[s] control over the account."  Multistate Compl. ¶ 666.  Of course, if an account is taken over by a parent, then the minor has been replaced by the parent and removed.

violate Meta's community standards.[34]   The States' allegations regarding TRIPS and BEEF therefore do nothing to establish that the challenged statements regarding the CSER are false or misleading.[35]   *See Cullen*, 2013 WL 140103, at *7 (misrepresentation-based consumer protection claims failed because "[a]t the heart of Plaintiff's claims . . . lies a discrepancy between the ways he and Defendant claim to calculate" the metric at issue, and thus the defendant's "statements . . . do not appear to be false").

     ***Project Daisy***.  The States also fail to allege falsity with respect to the representations made about Project Daisy, an initiative where Meta tested the impact of hiding "like" counts.  Multistate Compl. ¶¶ 240–41.  The States point to public statements where Meta said that Project Daisy "was beneficial for some, and annoying to others," that it "ultimately didn't have as strong an impact as we'd hoped," that "[f]or some people, hiding public like counts helped people focus less on the number and more on the content, [but] for others it didn't really matter much," and that "there was very little impact and the result was neutral."  *Id.* ¶¶ 284–87.  The States allege these representations were false because Project Daisy purportedly "reduced the negative impact of seeing posts with many Likes."  *Id.* ¶ 242.  But the States offer no allegations (beyond mere conclusions) demonstrating ***how*** effective Project Daisy was at reducing negative social comparison.  Meta did not say there was ***no*** impact, and in fact acknowledged publicly that hiding like counts "was beneficial to some."  *Id.* ¶ 284.  Thus, while Meta acknowledged there was ***some*** impact, it "didn't have as strong an impact as we'd hoped."  *Id.* ¶ 286.  The States' allegations that there was an impact from Project Daisy does not render false Meta's statements that the impact was not strong enough to warrant implementation or to outweigh other negative effects.  Moreover, because the States do not allege any specific metrics as to the effects of Project Daisy, claims that the impacts were

---

[34] For example, some users might categorize any self-harm or eating disorder content as harmful.  Yet, as the States acknowledge, Meta has publicly stated that its Community Standards "allow content that consists of self-harm or eating disorder admission."  Multistate Compl. ¶ 571 ("Because self-harm is a complicated and nuanced issue, especially for those that are suffering . . . we allow content that consists of self-harm or eating disorder admission.").

[35] Meta disputes the implication that its community standards are in any way inadequate, or that the TRIPS and BEEF data are better reflections of the prevalence of harmful content than the CSER.  Moreover, to the extent the States suggest that Meta's content moderation policies are insufficient, any such claim would clearly be barred by Section 230 and the First Amendment.  *See supra* Section II.

"little" versus "strong" are ultimately matters of opinion, not actionable statements of fact.  *See supra* at III.A.

### C.   The States Fail to Establish That the Alleged Misrepresentations Were Material to Users.

"Materiality is an essential element of a . . . deceptive acts violation."  *E.g.*, *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 152 Haw. 418, 443 (2023).  In addition to Hawaii, courts in at least 18 of the other relevant jurisdictions have likewise expressly adopted a materiality requirement.[36]  Moreover,

---

[36] *People ex rel. Madigan v. United Const. of Am., Inc.*, 981 N.E.2d 404, 409 (Ill. App. 2012) (**Illinois**; to state a claim, State must "demonstrat[e] that a defendant misrepresented a *material* fact" (emphasis added)); *State v. Weinschenk*, 868 A.2d 200, 206 (Me. 2005) (**Maine**; "An act or practice is deceptive if it is a *material* representation." (emphasis added)); *State v. Moody's Corp.*, 2012 WL 2149408, at *2 (Conn. Super. Ct. May 10, 2012) (**Connecticut**; State required to allege "that the misleading representation, omission, or practice was material"); *Fed. Trade Comm'n v. Quincy Bioscience Holding Co.*, 646 F. Supp. 3d 518, 526 (S.D.N.Y. 2022) (**New York** consumer protection law requires State to allege conduct that is "*materially* misleading" (emphasis added)); *State v. BTTR, LLC*, 2023 WL 3183738, at *8 (R.I. Super. Apr. 24, 2023) (**Rhode Island**; requiring State to prove that "the representation, omission, or practice is material"); *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 327 (2022) (**California;** assuming that "a materiality standard is implicit in the likelihood of deception standard applicable in all fraudulent and deceptive advertising cases"); *In re Arizona Theranos, Inc. Litig.*, 2023 WL 3246811, at *5 (D. Ariz. May 4, 2023) (**Arizona**; "[T]he ACFA broadly prohibits the misrepresentation or omission of any *material* fact in connection with the sale or advertisement of consumer goods and services." (emphasis added)); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003) (**Colorado**; "[A] false representation must either induce a party to act, refrain from acting, or have the capacity or tendency to attract consumers."); *Crowhorn v. Nationwide Mut. Ins. Co.*, 2002 WL 1767529, at *9 (Del. Super. Ct. July 10, 2002) (**Delaware**; "The CFA 'incorporates the principle that a negligent misrepresentation is sufficient to violate the statute,' and for a misrepresentation to be negligent it must be material."); *York v. InTrust Bank, N.A.*, 265 Kan. 271, 290 (1998) (**Kansas**; requiring "any oral or written representation, of exaggeration, falsehood, innuendo or ambiguity as to a *material* fact" (emphasis added)); *In re OnStar Cont. Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011) (**Michigan**; requiring that that "the defendant made a material misrepresentation that was false"); *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1095 (D. Minn. 1999) (**Minnesota**; requiring that "the deception is material because it is likely to influence buying decisions"); *Dedloff v. Whole Foods Mkt. Grp., Inc.*, 2023 WL 5428501, at *5 (E.D. Mo. Aug. 23, 2023) (**Missouri**; requiring "that the method, act, or practice declared unlawful by section 407.020 would cause a reasonable person to enter into the transaction that resulted in damages"); *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 594 (D.N.J. 2016) (**New Jersey**; "[t]he misrepresentation has to be one which is material to the transaction"); *N. Bottling Co. v. Henry's Foods, Inc.*, 474 F. Supp. 3d 1016, 1028 (D.N.D. 2020) (**North Dakota**; requiring that "the deception is material, in that it is likely to influence the purchasing decision"); *Davis v. Byers Volvo*, 2012 WL 691757, ¶ 29 (Ohio App. 4 Dist. 2012) (**Ohio**; to be deceptive, act must "concern a matter that is or is likely to be material to a consumer's decision"); *Weaver v.*

(continued…)

---

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

materiality is a necessary element of a deceptive practices claim under Section 5 of the of the Federal Trade Commission Act (FTCA).  *E.g.*, *F.T.C. v. Verity Int'l Ltd.*, 443 F.3d 48, 63 (2d Cir. 2006) ("the representation, omission, or practice [must be] material").  Thus, materiality is also a requirement in eight other jurisdictions that have adopted the FTCA or incorporate its terms.  *See infra* nn. 47–48.[37]  Accordingly, failure to plausibly allege that a purported misrepresentation was material is fatal for at least 27 of the 30 states asserting deceptive practices claims.[38]

"A misrepresentation is judged to be 'material' if 'a reasonable [person] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question.'" *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 332 (2011) (citation omitted); *see also Weinschenk*, 868 A.2d at 206 (representation considered material if it "involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product" (quoting *In re Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 165 (1984)); *Hussain v. Citizens Fin. Grp., Inc.*, 2019 WL 490091, at *5 (N.J. Super. Ct. App. Div. Feb. 8, 2019) ("A fact is material when the seller knows or should know it is important to the particular buyer's decision or when such fact would be important to the decision of a reasonable buyer.").

The States fail to allege that a number of the purported misrepresentations would actually have been material to a typical user.  In particular, the States point to public statements where Meta claimed that it does not have "goals around increasing the amount of time that people spend" on Instagram and Facebook.  Multistate Compl. ¶ 137; *see also id.* ¶¶ 135, 136, 168, 191, 192.  The States allege these representations were false because Meta does prioritize maximizing time spent.  But the States do not plausibly allege that users—who were not the target audience of these statements—would have changed

---

*Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (**Wisconsin**; "[A] label is deceptive if it is likely to mislead a reasonable consumer in a material respect."); *Weiss v. Cassidy Dev. Corp.*, 63 Va. Cir. 76 (2003) (**Virginia**; requiring "a false representation, of material fact").

[37] Those 8 States, not including those already cited above, are Florida, South Carolina, Georgia, Kentucky, Louisiana, Nebraska, North Carolina, and Pennsylvania.

[38] Oregon and Washington are the only States that expressly disclaim a materiality requirement.  *See State ex rel. Rosenblum v. Living Essentials, LLC*, 371 Or. 23, 38 (2023); *Young v. Toyota Motor Sales, U.S.A.*, 472 P.3d 990, 994-95 (Wash. 2020).  For Indiana, Meta is not aware of case law addressing the question either way, but respectfully submits that it would follow the majority rule.

34

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

their behavior if they knew that Meta had "goals around increasing the amount of time that people spend" on Instagram and Facebook—nor could they.  Thus, knowledge of the supposed fact that Meta wanted to increase the amount of time its users spend on Facebook and Instagram would not have been material to those users.[39]

### D.   The States' Claims Fail Insofar as They Are Premised on Alleged Misrepresentations to Congress.

Many of the supposed misrepresentations alleged in the Complaint were made not to consumers or in the course of any consumer transaction, but in testimony to Congress.  *See* Multistate Compl. ¶¶ 85, 185, 191, 192, 334, 335, 336, 368, 375, 419, 427, 438, 592, 593, 604, 643, 669, 685, 712, 743, 744, 792. Notwithstanding this fact, 30 state attorneys general each seek to separately police these statements to Congress by seeking separate penalties under their respective consumer protection statutes.   Those attempts fail as matter of law for at least two reasons.

*First*, the First Amendment bars claims based on efforts to petition the government, including Congressional testimony.  *See, e.g.*, *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965) (efforts to influence public officials are not illegal, "regardless of intent or purpose").   The *Noerr-Pennington* doctrine applies even to allegedly false statements made in legislative proceedings.  *See, e.g.*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500 (1988) ("[a] publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods"); *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 145 (1961) (defendant could not be liable for "attempt[ing] to bring about the passage of laws" even if it "deliberately deceived the public and public officials"); *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1060–62 (9th Cir. 1998) ("the sham exception is extraordinarily narrow" in the context of legislative proceedings).   For this reason alone, the States may not assert claims based on alleged misstatements made to Congress.

---

[39] Other facts for which it is not plausible to infer materiality include that Meta allegedly assesses a lifetime value for teenage users, Multistate Compl. ¶¶ 84–85, and that Meta allegedly restricts internal access to data in order to prevent leaks, *id.* ¶¶ 602–04.  Neither fact has any bearing on users or their experience with the services.

35

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

*Second*, statements made to Congress are not made within "trade or commerce" or in connection with a "sale," "advertisement," or "consumer transaction."  As discussed in more detail below, 13 states require actionable deceptive practices to be "in the conduct of any trade or commerce."[40]  *See, e.g.*, *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 789, 219 A.3d 767, 782 (2019) ("To successfully state a claim for [an Unfair Trade Practices Act] violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce."); *Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1005 (N.D. Ill. 2017) (Plaintiff must show "the deception occurred in the course of conduct involving trade or commerce.").  The statutory definitions of "trade or commerce" are broadly similar across these jurisdictions and generally mean, *e.g.*, "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value."  815 ILCS 505/1(f).[41]

---

[40] 815 ILCS 505/2 (**Illinois**); *see also* HRS § 480-2 (**Hawaii**) (same); S.C. Code Ann. § 39-5-20 (**South Carolina**) (same); Conn. Gen. Stat. Ann. § 42-110b (**Connecticut**) (same); Ky. Rev. Stat. § 367.170 (**Kentucky**) (same); La. Stat. Ann. § 51:1405 (**Louisiana**) (same); Me. Rev. Stat. tit. 5, § 207 (**Maine**) (same); Wash. Rev. Code Ann. § 19.86.020 (**Washington**) (same); Mo. Ann. Stat. § 407.020(1) (**Missouri**); Neb. Rev. Stat. Ann. § 59-1602 (**Nebraska**) (same); 73 Pa. Stat. Ann. § 201-3 (**Pennsylvania**) (same); 6 R.I. Gen. Laws Ann. § 6-13.1-2 (**Rhode Island**) (same); Ga. Code Ann. § 10-1-393(a) (**Georgia**) (same); Mich. Comp. Laws Ann. § 445.903 (**Michigan**) (same).

[41] *See also* Ky. Rev. Stat. § 367.110(2) ("'Trade' and 'commerce' means the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth."); La. Stat. Ann. § 51:1402(9) ("Trade and commerce" defined as "the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state."); Me. Rev. Stat. tit. 5, § 206(3) ("'Trade' and 'commerce' shall include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State."); Wash. Rev. Code Ann. § 19.86.010 ("'Trade' and 'commerce' shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington."); Mo. Ann. Stat. § 407.010(7) ("'Trade' or 'commerce', the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated."); 73 Pa. Stat. Ann. § 201-2(3) (""Trade" and "commerce" means the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value

(continued…)

---

Additionally, as discussed further below, Arizona, Missouri, New Jersey, North Dakota, and Delaware require the deceptive act to be "in connection with the sale or advertisement of any merchandise,"[42] and Kansas and Virginia require it to be "in connection with a consumer transaction."[43] *See infra* V. Other states, including Georgia, Illinois, New York, and Wisconsin, have elaborated in case law that the deceptive acts must be "consumer-oriented" or intended to induce consumer transactions or consumer reliance. *See, e.g.*, *Henderson v. Gandy*, 270 Ga. App. 827, 830, 608 S.E.2d 248, 253 (2004) (requiring that the representations be "intended to encourage consumer transactions"); *City of Chicago v. Purdue Pharma L.P.*, 2021 WL 1208971, at *4 (N.D. Ill. Mar. 31, 2021) (requiring "the defendant's intent that the plaintiff rely on the deceptive or unfair practice"); *Am. Orthodontics Corp. v. Epicor Software Corp.*, 746 F. Supp. 2d 996, 998 (E.D. Wis. 2010) (requiring representation to be made "with intent to induce . . . 'the public'"); *Fed. Trade Comm'n v. Quincy Bioscience Holding Co., Inc.*, 646 F. Supp. 3d 518, 526 (S.D.N.Y. 2022) (requiring that defendant's conduct be "consumer-oriented").

Here, the challenged statements made by Meta in response to questions from members of Congress were not made "in trade or commerce." None of those statements was directed at consumers, and none was made in the context of a consumer transaction.[44] Allowing multiple different state attorneys general to police such First Amendment-protected speech through state laws designed to protect consumers in commercial transactions would stretch these laws past their breaking point. For these reasons, statements made to Congress cannot form the basis of a claim for deceptive practices.

---

wherever situate[d], and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."); 6 R.I. Gen. Laws Ann. § 6-13.1-1(5) ("'Trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce directly or indirectly affecting the people of this state."); Neb. Rev. Stat. Ann. § 59-1601(2) (defining "trade or commerce" to mean "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska.").

[42] *See* Ariz. Rev. Stat. Ann. § 44-1522; Mo. Ann. Stat. § 407.020(1); N.J. Stat. Ann. § 56:8-2; N.D. Cent. Code § 51-15-02; Del. Code Ann. tit. 6, § 2513

[43] Kan. Stat. Ann. § 50-626; VA Code § 59.1-200.

[44] Because no user would have seen these statements in the context of such a transaction, they are also not material. *See supra* Section III.C.

37

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

1

## IV.   THE STATES FAIL TO ALLEGE UNFAIR BUSINESS ACTS OR PRACTICES.

2

Twenty-seven States assert claims against Meta for allegedly unfair or unconscionable acts or

3

practices claims.[45]  For the reasons explained above, those claims are barred in their entirety by Section

4

230 (except as to claims predicated on alleged COPPA violations).  *See supra* Section II.A.  In addition,

5

those claims should be dismissed for the independent reason that the States fail to allege that Meta engaged

6

in any "unfair" or "unconscionable" conduct.  In essence, the States allege that it was "unfair" for Meta

7

to make design decisions in a manner that made its services appealing to a wider audience or that

8

encouraged users to spend more time using its services.  If that were sufficient to establish an unfair

9

business practice, then virtually every company doing business in the United States could be held liable.

10

Unfairness cannot be established merely by alleging a service was designed or changed to encourage

11

consumers to use (or more frequently use) it.  Because that is ultimately all that the States allege here,

12

their unfair business practices claims should be dismissed.

13

"[I]t is well settled that business enterprises have a legitimate interest in seeking a profit."  *Fink v.*

14

*Time Warner Cable*, 810 F. Supp. 2d 633, 638, 647 (S.D.N.Y. 2011) (dismissing unfairness claim where

15

plaintiff alleged that defendant engaged in network management practices including "throttling" users

16

17

18

19

20

21

22

23

24

25

26

27

28

---

[45] *See* **Arizona** (Multistate Compl. Count II, ¶¶ 861, 864), **California** (Multistate Compl. Count IV, ¶ 869), **Colorado** (Multistate Compl. Count VIII, ¶ 888), **Connecticut** (Multistate Compl. Count IX, ¶ 899), **Delaware** (Multistate Compl. Count X, ¶ 908), **Florida** (Florida Compl. Count I, ¶ 114), **Georgia** (Multistate Compl. Count XIII, ¶ 932), **Hawai'i** (Multistate Compl. Count XIV, ¶ 943), **Illinois** (Multistate Compl. Count XVI, ¶ 950), **Indiana** (Multistate Compl. Count XVIII, ¶ 966), **Kansas** (Multistate Compl. Count XXI, ¶ 980), **Kentucky** (Multistate Compl. Count XXII, ¶ 984), **Louisiana** (Multistate Compl. Count XXIII, ¶ 991), **Maine** (Multistate Compl. Count XXIV, ¶ 995), **Minnesota** (Multistate Compl. Count XXVII, ¶ 1018), **Missouri** (Multistate Compl. Count XXVIII, ¶ 1027), **Nebraska** (Multistate Compl. Count XXX, ¶ 1035; Multistate Compl. Count XXXII, ¶ 1043), **New Jersey** (Multistate Compl. Count XXXIII, ¶ 1048), **New York** (Multistate Compl. Count XXXVIII, ¶ 1082), **North Carolina** (Multistate Compl. Count XXXIX, ¶ 1087), **North Dakota** (Multistate Compl. Count XLI, ¶ 1093), **Ohio** (Multistate Compl. Count XLII, ¶ 1097; Multistate Compl. Count XLIII, ¶ 1103), **Oregon** (Multistate Compl. Count XLIV, ¶ 1107), **Pennsylvania** (Multistate Compl. Count XLVIII, ¶ 1130), **Rhode Island** (Multistate Compl. Count XLIX, ¶ 1139), **South Carolina** (Multistate Compl. Count L, ¶ 1145), **Washington** (Multistate Compl. Count LIII, ¶ 1164).

**Virginia** and **Wisconsin** assert only deceptive acts or practices claims, and the statutes they invoke do not authorize unfair or unconscionable acts or practices claims.  *See* Virginia Code § 59.1-200; Wis. Stat. § 100.18.  Similarly, the consumer protection claim asserted by **Michigan** is based entirely on alleged deception, misrepresentations or omissions.  *See* Multistate Compl. ¶¶ 1000–05.

---

38

access to certain content, which according to plaintiffs was "motivated by a desire to maximize its profit") (*citing Kunert v. Mission Financial Services Corp.*, 110 Cal.App.4th 242, 265 (2003)).  "Simply put, a profit motive is not unfair or deceptive . . . ."  *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 413 (E.D.N.C. 2015) (dismissing unfair trade practices claim).  Here, the gist of the States' unfairness claims is that Meta sought to encourage more young users to use Facebook and Instagram for longer periods of time because "[a]cquiring young users helps secure Meta's profit stream over time."  Multistate Compl. ¶ 86; *see also, e.g.*, *id.* ¶¶ 1, 84, 86.  But Meta is not aware of a single case holding that, without more, designing a product or service in a way that makes the product or service more appealing to users—*i.e.*, makes more people want to use it or makes people want to use it more frequently—constitutes an unfair business practice.[46]  After all, the entire purpose of all commercial advertising is to increase the amount or frequency that a product or service is used.  Likewise, whenever a company redesigns a product or service, it does so in the hopes that the product or service will become more appealing to consumers, and thus be used by those consumers with greater frequency.  For this fundamental reason, the State's unfair or unconscionable business practices claims should be dismissed as a matter of law.

The States' claims are addressed further in two categories, depending upon whether (1) the State's standard for unfair or unconscionable business practices tracks that under the federal FTCA, or (2) the State's standard deviates in some potentially meaningful way from the FTCA.

### A.   The States' Claims Brought Pursuant to the Terms of Section 5 of the FTCA Should Be Dismissed.

Of the 27 States that assert unfair business acts or practices claims against Meta, the legislatures of 13 States have expressly indicated that their statutes are to be interpreted consistent with Section 5 of the FTCA.[47]  In five additional States, the statutory language is either identical or materially similar to the

---

[46] To be sure, courts have held that the targeting of minors with tobacco advertising constitutes an unfair business practice, but those decisions are premised on the fact that it is unlawful to sell or furnish tobacco product to persons under the age of 18 years.  *See, e.g.*, *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 760 (N.D. Cal. 2019).  By contrast, it is not unlawful to make interactive communications services available to persons under 18.

[47] These 13 States are: **Arizona** (*see* Ariz. Rev. Stat. Ann. § 44-1522(C) ("It is the intent of the legislature, in construing subsection A, that the courts may use as a guide interpretations given by the federal trade

(continued…)

commission and the federal courts to 15 United States Code [§§] 45, 52 and 55(a)(1).")); **Connecticut** (*see* Conn. Gen. Stat. Ann. § 42-110b(b) ("It is the intent of the legislature that in construing subsection (a) of this section, the commissioner and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5(a)(1) of the Federal Trade Commission Act (15 USC 45(a)(1)), as from time to time amended.")); **Florida** (*see* Fla. Stat. Ann. § 501.204(2) ("It is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [subsection] 5(a)(1) of the Federal Trade Commission Act.")); **Georgia** (*see* Ga. Code Ann. § 10-1-391(b) ("It is the intent of the General Assembly that this part interpreted and construed consistently with interpretations given by the Federal Trade Commission in the federal courts pursuant to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. Section 45(a)(1)), as from time to time amended.")); **Hawai'i** (*see* Haw. Rev. Stat. Ann. § 480-2(b) ("In construing this section, the courts and the office of consumer protection shall give due consideration to the rules, regulations, and decisions of the Federal Trade Commission and the federal courts interpreting section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.")); **Illinois** (*see* 815 Ill. Comp. Stat. Ann. 505/2 ("In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.")); **Louisiana** (*see* La. Stat. Ann. § 51:1406(4) ("The provisions of this Chapter shall not apply to: (4) Any conduct which complies with section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C., 45(a)(1)], as from time to time amended, any rule or regulation promulgated thereunder and any finally adjudicated court decision interpreting the provisions of said Act, rules and regulations.")); **Maine** (*see* Me. Rev. Stat. tit. 5, § 207(1) ("It is the intent of the Legislature that in construing this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 45(a)(1) of the Federal Trade Commission Act (15 United States Code 45(a)(1)), as from time to time amended.")); **Ohio** (*see* Ohio Rev. Code Ann. § 1345.02(C) ("In construing division (A) of this section, the court shall give due consideration and great weight to federal trade commission orders, trade regulation rules and guides, and the federal courts' interpretations of subsection 45 (a)(1) of the "Federal Trade Commission Act," 38 Stat. 717 (1914), 15 U.S.C.A. 41, as amended.")); **Pennsylvania** (*see Com., by Creamer v. Monumental Properties, Inc.*, 459 Pa. 450, 461–62, 329 A.2d 812, 817–18 (1974) ("The Consumer Protection Law has regularly been interpreted by the Commonwealth Court as being based on the Federal Trade Commission Act . . . . Indeed, in all relevant respects the language of section 3 of the Consumer Protection Law and section 5 of the FTC Act is identical." (citing 15 U.S.C.A. § 45(a)(1)))); **Rhode Island** (*see* 6 R.I. Gen. Laws Ann. § 6-13.1-3 ("It is the intent of the legislature that in construing §§ 6-13.1-1 and 6-13.1-2 due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to § 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), as from time to time amended.")); **South Carolina** (*see* S.C. Code Ann. § 39-5-20(b) ("It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a) (1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.")); **Washington** (*see* Wash. Rev. Code Ann. § 19.86.920 ("The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters.")).

40

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

FTCA, as recognized by the state's highest court.[48]   Further, New York's unfairness claim here is expressly predicated on a violation of Section 5 of the FTCA.[49]   The analysis for this total of 19 States' unfairness claims accordingly proceeds by reference to Section 5 of the FTCA:

Section 5 of the FTCA provides that "an unfair practice or act is one that" (1) "causes or is likely to cause substantial injury to consumers," (2) "which is not reasonably avoidable by consumers themselves," and (3) "not outweighed by countervailing benefits to consumers or to competition." *F.T.C. v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (quoting 15 U.S.C. § 45(n)), *as amended* (June 15, 2010), *amended*, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010).   The States have not adequately alleged any of those elements, so their unfair acts or practices claims must be dismissed.

---

[48] These five States are: **Delaware** (*see* Del. Code Ann. tit. 6, § 2511(9) ("'Unfair practice' means any act or practice that causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.")); **Kentucky** (*see Morgan v. Blue Cross & Blue Shield of Kentucky, Inc.*, 794 S.W.2d 629, 632 (Ky. 1989) ("The [Kentucky Supreme] Court . . . determined that the language of Section 5 of the Federal Trade Commission Act [15 U.S.C. § 45(a)(1) ] was comparable to Kentucky law." (citing *Dare to be Great, Inc. v. Com. of Ky, ex rel Hancock, Ky.*, 511 S.W.2d 224 (1974)))); **Nebraska** (*see Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 297 Neb. 682, 698, 900 N.W.2d 909, 922 (2017) ("Section 59-1602 states that '[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce shall be unlawful.' We have stated that § 59-1602 mirrors the language of 15 U.S.C. § 45(a)(1).")); **North Carolina** (*see Henderson v. U.S. Fid. & Guar. Co.*, 346 N.C. 741, 749, 488 S.E.2d 234, 239 (1997) ("Our statute is patterned after section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), and we look to federal case law for guidance in interpreting the statute."); *compare* N.C. Gen. Stat. Ann. § 75–1.1(a) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."), *with* 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful.")); **North Dakota** (*compare* N.D. Cent. Code Ann. § 51-15-02 ("The act, use, or employment by any person of any act or practice, in connection with the sale or advertisement of any merchandise, which is unconscionable or which causes or is likely to cause substantial injury to a person which is not reasonably avoidable by the injured person and not outweighed by countervailing benefits to consumers or to competition, is declared to be an unlawful practice."), *with* 15 U.S.C. § 45(n) ("The Commission shall have no authority under this section or section 57a of this title to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition.")

[49] Multistate Compl. Count XXXVII, ¶¶ 1077–84 ("Violation of FTC Act § 5 in Violation of N.Y. Executive Law § 63(12)).

***Substantial injury.***   The States do not plead the kind of "substantial injury" that is required to state an unfair act or practice claim.  15 U.S.C. § 45(n).  "Substantial injury" in this context "usually involves monetary harm."  FTC, *Unfair, Deceptive, and Abusive Practices – Federal Trade Commission Act/Dodd-Frank Act* (June 2022), available at https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/7/vii-1-1.pdf; *see also Am. Fin. Servs. Ass'n v. F.T.C.*, 767 F.2d 957, 972 (D.C. Cir. 1985) ("In elaborating the term 'substantial injury' in its Policy Statement, the Commission stated that in most cases substantial injury would involve monetary harm . . . ."); *FTC v. Direct Mktg. Concepts, Inc.*, 569 F. Supp. 2d 285, 299 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010) ("[I]n most cases 'substantial injury' involves monetary harm.").  The States do not allege that young users experienced any monetary harm as a result of the alleged conduct.  *See* Multistate Compl. ¶¶ 508–630 (allegations of harm).

To the extent non-monetary harms are cognizable, moreover, the harm must be comparably "concrete," *see Neovi*, 604 F.3d at 1157—an "[e]motional impact and other more subjective types of harms will not ordinarily make a practice unfair."  FTC, *Unfair, Deceptive, and Abusive Practices – Federal Trade Commission Act/Dodd-Frank Act* (June 2022), available at https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/7/vii-1-1.pdf.  Here, the States' allegations are focused largely on the sort of "emotional impacts"—such as "low life satisfaction," Multistate Compl. ¶ 511, "low self-esteem," *id.*, "feelings of sadness or hopeless," *id.* ¶ 518, "feeling left out," *id.* ¶ 526, "feeling 'down, sad, . . . alone, or lonely," *id.* ¶ 532 (alterations omitted), "feeling 'not good enough or attractive," *id.*, "feel[ing] worse about themselves," *id.* ¶ 534—that cannot give rise to an unfairness claim as a matter of law.

***Not reasonably avoidable.***   The second requirement to plead an unfair practices claim under Section 5 is that the injury alleged was "not reasonably avoidable" by the consumers themselves.  15 U.S.C. § 45(n).  This requirement "is *not* satisfied . . . if a consumer can avoid the defendant's practice by seeking an alternative elsewhere."  *Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016); *see also Leszanczuk v. Carrington Mortg. Servs., LLC*, 21 F.4th 933, 943 (7th Cir. 2021) (affirming dismissal of unfair act or practice claim because plaintiff could have avoided the fee by choosing a different mortgage servicer).

In *Phillips*, the plaintiff alleged that an online casino game violated Illinois' consumer protection statute because it was "designed . . . to exploit the psychological triggers associated with gambling and addiction." 173 F. Supp. 3d at 743. The court dismissed the claim as a matter of law, explaining that the plaintiff "could have picked other forms of entertainment, or even sought to play online games on a different platform or website," and thus that there "was no lack of meaningful choice." *Id.*; *see also id.* (plaintiff could have avoided the alleged harm either by "opting for alternative entertainment when she ran out of chips, or by stopping play and waiting a day for an additional allotment of free chips"). Other courts have reached the same conclusion in similar cases. For instance, in *Ristic v. Mach. Zone, Inc.*, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016), the court dismissed the plaintiff's consumer protection claim because the plaintiff "made a voluntary choice to purchase virtual gold in the Game of War app," notwithstanding the allegation that the app "use[d] psychological triggers that prompt regular consumers, as well as addicts, to continue wagering." *Id.*; *see also Saunders v. Mich. Ave. Nat'l Bank*, 278 Ill.App.3d 307, 312–13, 214 Ill.Dec. 1036, 1042, 662 N.E.2d 602, 608 (1996) (overdraft fee not unfair because plaintiff was free to select another bank); *Washington v. Hyatt Hotels Corp.*, 2020 WL 3058118, at *7 (N.D. Ill. June 9, 2020) (resort fee not unfair because plaintiff could have chosen different hotel or other lodging).

The Ninth Circuit's decision in *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1158, 1168–69 (9th Cir. 2012) likewise demonstrates that the States cannot overcome the "reasonably avoidable" prong. There, the plaintiff claimed that a credit card's annual fee was inadequately disclosed to him before he received the cardmember agreement after opening the account. *See id.* at 1168–69. While the agreement described the annual fee and the fact that the fee would be refunded if the account were closed within 90 days, the plaintiff argued that he could not have reasonably avoided the annual fee by canceling because doing so would negatively impact his credit score. *Id.* at 1169. The Ninth Circuit rejected that argument, holding that the fee was reasonably avoidable because the plaintiff had a choice between closing the card or not. *Id.*

Here, the States do not allege that users of Instagram and Facebook had no choice but to use Meta's services—nor could they. Like the plaintiffs in *Phillips* and *Ristic*, those users made the voluntary choice to use those services; they could instead have engaged in alternative forms of entertainment or used other

43

widely available interactive communications services.  Indeed, the States' own Complaint acknowledges this fact by alleging that young users started choosing ***not*** to spend time on Facebook when the service's "appeal among teens" was diminishing.  Multistate Compl. ¶ 73.  Allegations to the effect that teens wanted to spend "less time caring about [Instagram], but they can't help themselves," *id.* ¶ 576, do not save the unfair acts or practices claim.  It is not enough that users found it difficult or socially inconvenient to spend less time on Instagram—the question is not whether avoiding the injury "was convenient or costless, but whether it was reasonably possible."  *Davis*, 691 F.3d at 1169 (internal quotation marks omitted).

The States' allegations further belie any assertion that users lack meaningful choice by acknowledging that Meta provides users with tools that they can use to avoid the very features about which the States complain.  For example, the States allege that the infinite scroll feature is unfair, Multistate Compl. ¶ 847(b); Florida Compl. ¶ 115, but separately admit that Meta has provided Instagram users with the "Take a Break" tool that "sends users a pop-up notification when they have spent more than a specified period of time scrolling without interruption," Multistate Compl. ¶ 581.  The States allege that "the Take a Break notification is easily dismissed for a quick return to more infinite scrolling," Multistate Compl. ¶ 582, but that allegation necessarily includes the admission that each user ***chooses*** to dismiss that notification when prompted—*i.e.*, the notification "provid[ed] the means to avoid the alleged harm," *Davis*, 691 F.3d at 1169.

The States also allege that Meta's "Daily Limit" tool "serves a pop-up notification whenever a user reaches the maximum amount of time they wish to spend on Instagram each day," Multistate Compl. ¶ 579, but that the "feature was designed so that the user can easily dismiss the notification and return to using Instagram unimpeded," Multistate Compl. ¶ 579.  Again, that allegation necessarily admits both that users must ***choose*** to dismiss the notification, and that users who spend more time on Instagram than they originally "wished" were making the choice to do so—*i.e.*, they set a limit for themselves, which they chose to dismiss when that limit came around.  Similarly, the States allege that the quantification and display of "Likes" is unfair, Multistate Compl. ¶ 847(b), but separately admit that "users who wish to hide Like counts from posts in their Instagram or Facebook Feeds" can elect to do so, *id.* ¶ 252.  The fact that the user can choose whether to opt in or out of these various settings renders any harm allegedly resulting

44

from these features reasonably avoidable.  *Cf. Am. Fin. Servs. Ass'n*, 767 F.2d at 976 (finding consumers' ability to bargain over contractual provisions—compared to being provided boilerplate provisions—relevant to determining whether resulting injury was reasonably avoidable).

Finally, with respect to the portion of the unfair acts and practices claims predicated on purported COPPA violations, Multistate Compl. ¶ 847(e), the States admit that Meta's "terms of service nominally disallow use of Instagram by under-13 users," and that users who sign up for an account must "self-report that they are at least 13 years old," *id.* ¶ 643.  Every alleged COPPA violation is necessarily preceded by the choice of the under-13 user to lie about their age during the sign-up process, and thus was reasonably avoidable—the States do not and cannot allege that under-13 users had "no choice but to" sign up for accounts with Meta's services.  *Phillips*, 173 F. Supp. 3d at 743.

Because it is clear from the face of the States' Complaint that users were exercising choice about whether to spend time on Meta's services, and whether to avail themselves of tools that would have avoided certain of the allegedly unfair features about which the States complain, their unfair or unconscionable business acts and practices claims should be dismissed.

***Not outweighed by countervailing benefits.***  The final requirement to establish an unfair act or practice under Section 5 of the FTCA is that the act or practice "not [be] outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n).  Nowhere do the States offer specific, particularized allegations that those benefits are outweighed by the harms alleged, as they must to withstand a motion to dismiss.  *See Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 446–47 (N.D. Cal. 2020) (dismissing Florida unfair trade practices claim because a document "incorporated into the FAC[] contains a number of reasons for the [challenged] firmware updates that are allegedly beneficial to consumers and to competition," but "Plaintiff raises no allegations to refute these alleged benefits, or to show that they are outweighed by the injury he suffered").[50]

---

[50] The conclusory allegations offered by certain States to track the language of Section 5 of the FTCA—that "these acts and practices caused or were likely to cause substantial injuries to consumers that were not reasonably avoidable by consumers and were not outweighed by countervailing benefits to consumers or to competition," *see, e.g.*, Multistate Compl. ¶ 864—are insufficient.  *See Kindred Studio Illustration & Design, LLC v. Elec. Commc'n Tech.*, LLC, 2018 WL 6985317, at *7 (C.D. Cal. Dec. 3, 2018) (continued…)

45

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT;
AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**B.      The Remaining States' Claims Should Also Be Dismissed.**

For the reasons explained below, the unfair or unconscionable acts or practices claims of California, Colorado, Indiana, Kansas, Minnesota, Missouri, New Jersey, and Oregon should also be dismissed:

***California***.  The standard for an unfair business practices claim under California law "is currently in flux."  *Davis*, 691 F.3d at 1169.  Some courts apply a tethering test, under which any finding of unfairness must be tightly tethered "to some legislatively declared policy," whereas others "borrow[] the three-pronged test set forth in the FTC Act" or apply a vague "balancing test." *Id.* at 1170; *see Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1366, 108 Cal. Rptr. 3d 682, 696 (2010) (rejecting "vague" balancing test under which plaintiff must show that the alleged "conduct violates public policy[] and is 'immoral, unethical, oppressive, and unscrupulous'").

Under any of the possible tests, the Court should dismiss California's claim that various features of Instagram and Facebook constitute unfair practices.  As noted, there is no established legislative policy that prohibits or otherwise regulates the offering of interactive communications services to teenagers.  Thus, the design features challenged by the States do not violate any established public policy and are not tethered to any policy declared by the California legislature.  *See id.*  Moreover, as explained above, *see supra* Section IV.A, Meta's alleged conduct does not violate the test applicable under Section 5 of the FTCA.  *See Camacho v. Auto. Club of S. California*, 142 Cal. App. 4th 1394, 1403 (2006) (adopting the "section 5 test" discussed above).  For all these reasons, California's unfairness claim (Count IV) should be dismissed.

***Colorado.***  No case law supports Colorado's assertion of an unfair practices claim.  *See Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 408 (E.D. Pa. 2010) (noting the "absence of any case from Colorado allowing an unfair trade practice claim to proceed"); *see also In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 180 (D. Me. 2004) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo.

(dismissing FTCA Section 5 claim because conclusory allegation that alleged harm was "not outweighed by countervailing benefits to consumers or to competition" was insufficient).

46

2003)) (noting that "[a]lthough the word 'unfair' appears in" decisions about and the text of the CCPA, the court "found no Colorado case where the court applied the term substantively to broaden the CCPA's reach to unfair, in addition to deceptive, practices").[51]   For this reason, Count VIII should be dismissed.

**_Indiana._**   The Indiana courts likewise do not permit free-standing unfair practices claims under the Indiana Deceptive Consumer Sales Act.   Rather, they "conflate" the terms "unfair," "abusive," and "deceptive."   _Crum v. SN Servicing Corp._, 2021 WL 3514153, at *2 (S.D. Ind. Aug. 10, 2021).   Thus, as one recent federal court explained, Indiana state courts construe the Indiana Deceptive Consumer Sales Act to prohibit "any act that is **_misleading_** to consumers or otherwise prohibited at law."   _Id._ (citing _Gasbi, LLC v. Sanders_, 120 N.E.3d 614, 620 (Ind. Ct. App. 2019)) (emphasis added).   Indiana does not allege that the design features of Instagram and Facebook it challenges as unfair are "prohibited at law"—nor could it.   Count XVIII accordingly should be dismissed.

**_Kansas._**   Kansas' Consumer Protection Act is narrowly focused on consumer transactions.   _See infra_ Section V.   Thus, while it prohibits "unconscionable act[s]," none of the factors articulated in the statute bear any resemblance to Meta's alleged conduct here.   Kan. Stat. Ann. § 50-627(b).   Rather, unconscionability in Kansas requires "some element of **_deceptive_** bargaining conduct."   _State ex rel. Stovall v. DVM Enterprises, Inc._, 275 Kan. 243, 251 (2003) (emphasis added).   Under this standard, it is plain that Count XXI should be dismissed.

**_Minnesota._**   In Minnesota, "an unfair or unconscionable act or practice is any . . . act[] or practice that: (1) offends public policy as established by the statutes, rules, or common law of Minnesota; (2) is unethical, oppressive, or unscrupulous; or (3) is substantially injurious to consumers." Minn. Stat. Ann. § 325F.69, subd. 8.   For substantially the same reasons that the States cannot establish a claim under Section 5 of the FTCA, Count XXVII should be dismissed.

**_Missouri._**   In Missouri, an "unfair practice" is a practice that either (1) "[o]ffends any public policy as it has been established by the Constitution, statutes or common law of this state, or by the Federal Trade

---

[51] To the extent such a standalone unfairness claim is cognizable under Colorado law, it must be dismissed for the reasons set forth above.   _See Showpiece Homes Corp. v. Assurance Co. of Am._, 38 P.3d 47, 54 (Colo. 2001) (en banc), _as modified on denial of reh'g_ (Jan. 11, 2002) (noting that the Colorado Supreme Court "look[s] to Washington law" "in interpreting the CCPA"); _see also supra_ n. 47 (noting that Washington follows Section 5 of the FTCA).

Commission, or its interpretive decisions," or (2) that **both** is "unethical, oppressive, or unscrupulous and [] presents a risk of, or causes, substantial injury to consumers." *Ward v. W. Cnty. Motor Co.*, 403 S.W.3d 82, 84 (Mo. 2013), *as modified* (May 28, 2013).  For substantially the same reasons that the States cannot establish a claim under Section 5 of the FTCA, Count XXVIII should be dismissed.

> **_New Jersey._**  In New Jersey, the "standard of conduct that the term 'unconscionable' implies is lack of 'good faith, honesty in fact and observance of fair dealing.'" *Jefferson Loan Co. v. Session*, 397 N.J. Super. 520, 535 (App. Div. 2008).  "[I]n consumer goods transactions . . . unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like." *Kugler v. Romain*, 58 N.J. 522, 544 (1971).  Here, for substantially the reasons explained in Section III, *supra*, Count XXXIII should be dismissed.

> **_Oregon._**  Oregon law prohibits "any unconscionable tactic in connection with selling, renting or disposing of real estate, goods or services, or collecting or enforcing an obligation."  Or. Rev. Stat. Ann. § 646.607.  For two reasons, Oregon's claim under this provision should be dismissed.

> *First*, the claim has nothing to do with Meta's "selling" or "disposing of" Instagram or Facebook. As the States acknowledge, Meta does not sell those services to users; it makes them available for free. Multistate Compl. ¶ 46.  Nor could Oregon possibly argue that its claim involves the "disposing of" Instagram or Facebook.  *See, e.g.*, "Dispose of," *Merriam-Webster*, https://www.merriam-webster.com/dictionary/dispose%20of  (last accessed Dec. 22, 2023) (primary meaning of "dispose of" is "to get rid of" or "to deal with conclusively").

> *Second*, the statute's definition of "unconscionable tactics" is inapplicable to Oregon's claims on their face.  The statute defines "[u]nconscionable tactics" as including:

>> (a) Knowingly takes advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement;

>> (b) Knowingly permits a customer to enter into a transaction from which the customer will derive no material benefit;

>> (c) Permits a customer to enter into a transaction with knowledge that there is no reasonable probability of payment of the attendant financial obligation in full by the customer when due; or

>> (d) Knowingly takes advantage of a customer who is a disabled veteran, a disabled servicemember or a servicemember in active service, or the spouse of a disabled veteran, disabled servicemember or servicemember in active service.

Or. Rev. Stat. Ann. § 646.605(9).  While those the four items are not exclusive, "it is clear from the examples that unconscionable trade tactics require an allegedly offending business to trick customers in some way such that the customers enter into a transaction with the offending business."  *Barber v. Unitus Cmty. Credit Union,* 2023 WL 34697, at *2 (D. Or. Jan. 3, 2023) (internal quotation marks omitted); *see also In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *18 (N.D. Cal. Sept. 22, 2021) ("Although the list of 'unconscionable tactics' is not exclusive, there is nothing to suggest the OUTPA is intended to cover . . . conduct that is not, in any manner, similar to conduct specified in the statute.").  Because Oregon does not allege any conduct on the part of Meta that is remotely comparable to the "unconscionable tactics" identified in the statutory definition, Count XLIV should be dismissed.

## V.   THE STATES' CONSUMER PROTECTION CLAIMS FAIL BECAUSE THE RELEVANT CONSUMER PROTECTION LAWS DO NOT APPLY TO META'S ALLEGED CONDUCT.

The States do not allege harm resulting from conduct that took place in connection with a "consumer transaction," "trade or commerce," or other similar statutory language limiting the application of certain States' consumer protection laws to commercial transactions.  For this additional reason, the consumer protection claims of at least 17 States should be dismissed.

A recent decision by the Allen County, Indiana Superior Court in *State of Indiana v. TikTok, Inc. et al.* granting defendants' motion to dismiss is particularly instructive on this point.  In that case, the Indiana Attorney General brought suit against the owner of TikTok, alleging violations of the Indiana Deceptive Consumer Sales Act ("DCSA") based on representations defendants had made regarding content on TikTok.  *See* Ex. A, Order Granting Defendants' Motion to Dismiss, Case No. 02D02-2212-PL-400 at 2 (Nov. 29, 2023) ("Indiana MTD Order").  The DCSA limits its application to conduct that occurs "in connection with a consumer transaction."  Ind. Code Ann. § 24-5-0.5-3(a).  The statute defines "consumer transaction" to include "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible."  *Id.* § 24-5-0.5-2(1).  The *TikTok* court held that the DCSA did not apply on its face to defendants' alleged conduct, and granted defendants' motion to dismiss because—like users of Instagram and Facebook—users of TikTok do not pay to use the services.  *See* Ex. A, Indiana MTD Order at 13–14 ("No consumers in Indiana have exchanged money for

49

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

their use of TikTok.  *As the downloading of a free app is not a consumer transaction, the DCSA does not apply to this case*.") (emphasis added)).

In reaching its conclusion, the Indiana court rejected the argument that the phrase "other disposition" applied to users downloading TikTok for free, citing to the *ejusdem generis* canon of statutory construction for the principle that "other disposition" should be read consistent with the other activities listed in the definition of "consumer transaction"—all of which require an exchange of "money or other valuable consideration."  *Id.* at 14.  The court also rejected the State's argument that "the DCSA should apply to the TikTok defendants because they profit from consumers who use the platform," holding that the DCSA is limited to "the regulation of consumer transactions and does not include all profit-generating activities the defendants may benefit from."  *Id.* at 15.

The court's reasoning in *TikTok* applies with equal force to this case.  **Indiana**, **Kansas**, **Virginia**, and **Ohio** all limit claims under their consumer protection acts to conduct that occurs "in connection with a *consumer transaction*."  Ind. Code Ann. § 24-5-0.5-3(a) (emphasis added); Kan. Stat. Ann. § 50-626 (same); Va. Code § 59.1-200 (same); Ohio R.C. § 1345.02(A) (same).  The four statutes also contain materially similar definitions of "consumer transaction."  *See* Ind. Code Ann. § 24-5-0.5-2 (1); Kan. Stat. Ann. § 50-624 (defining "[c]onsumer transaction" to mean "*a sale, lease, assignment or other disposition for value* of property or services within this state . . . to a consumer") (emphasis added)); Va. Code § 59.1-198 (defining "consumer transaction" to include "[t]he advertisement, sale, lease, license or offering for sale, lease or license, of goods or services to be used primarily for personal, family or household purposes");[52] Ohio R.C. § 1345.01 (defining "consumer transaction" to mean "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family").

Here, the claims of Indiana, Kansas, Virginia, and Ohio all fail because the conduct for which they seek to hold Meta liable did not occur in connection with a "consumer transaction" between Meta and its

---

[52] The other components of "consumer transaction" as defined by the Act are not relevant on their face, including statements by a manufacturer regarding the intended use of a product, advertisement of "business opportunities," advertisement or sale of goods relating to finding employment, layaway agreements, advertisement or sale of goods and services to religious bodies, and transactions involving advertisement of legal services.  *See* Va. Code § 59.1-198.

users.  *See* Ind. Code Ann. § 24-5-0.5-2(1); Kan. Stat. Ann. § 50-624; Va. Code § 59.1-198; Ohio R.C. § 1345.02(A).  Instead, the States acknowledge that, as was dispositive in *TikTok*, "users can establish accounts on Meta's Social Media Platforms without paying a fee," Multistate Compl. ¶ 46, and do not allege that users must pay to use or access any of the social media at issue.  Indeed, the States allege that Meta's revenue is derived from advertising dollars, ***not*** from users paying to use its services.  *Id.*; *see also* Indiana MTD Order at 15 (rejecting argument that indirectly deriving advertising revenue from users satisfied the definition of "consumer transaction").  Therefore, the conduct at issue in the Complaint, which relates to alleged harms to users from ***time spent*** on Meta's platforms, *see, e.g.*, Multistate Compl. ¶¶ 53–116, 151–413, 508–630, does not involve a "consumer transaction" under Indiana, Kansas, Virginia, or Ohio law.

Other States' consumer protection laws contain similar language that confirms they do not apply to the conduct alleged in this case.  The consumer protection laws of 13 states—Illinois, Hawaii, South Carolina, Connecticut, Kentucky, Louisiana, Maine, Missouri, Nebraska, Pennsylvania, Rhode Island, Georgia, and Michigan—prohibit unfair methods of competition and/or unfair deceptive practices "in the conduct of any trade or commerce" (or materially identical language).[53]  Accordingly, for conduct to be actionable under these state consumer protection laws, the allegedly deceptive or unfair practice or act must occur within "trade or commerce."  *See, e.g.*, *Cenatiempo v. Bank of Am., N.A.*, 333 Conn. 769, 789 (2019) ("To successfully state a claim for [an Unfair Trade Practices Act] violation, the ***plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce*.") (emphasis added)).

The statutory definitions of "trade or commerce" are broadly similar across these jurisdictions and confirm that the consumer protection laws at issue do not apply to the conduct for which the States seek to hold Meta liable.  For example, the Nebraska Consumer Protection Act defines "trade or commerce" to

---

[53] 815 ILCS 505/2 (**Illinois**); *see also* HRS § 480-2 (**Hawaii**) (same); S.C. Code Ann. § 39-5-20 (**South Carolina**) (same); Conn. Gen. Stat. Ann. § 42-110b (**Connecticut**) (same); Ky. Rev. Stat. § 367.170 (**Kentucky**) (same); La. Stat. Ann. § 51:1405 (**Louisiana**) (same); Me. Rev. Stat. tit. 5, § 207 (**Maine**) (same); Wash. Rev. Code Ann. § 19.86.020 (**Washington**) (same); Mo. Ann. Stat. § 407.020(1) (**Missouri**); Neb. Rev. Stat. Ann. § 59-1602 (**Nebraska**) (same); 73 Pa. Stat. Ann. § 201-3 (**Pennsylvania**) (same); 6 R.I. Gen. Laws Ann. § 6-13.1-2 (**Rhode Island**) (same); Ga. Code Ann. § 10-1-393(a) (**Georgia**) (same); Mich. Comp. Laws Ann. § 445.903 (**Michigan**) (same).

mean "the sale of assets or services and any commerce directly or indirectly affecting the people of the State of Nebraska."  Neb. Rev. Stat. Ann. § 59-1601(2).   The Illinois Consumer Fraud and Business Practices Act similarly defines "trade or commerce" to mean "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value."  815 ILCS 505/1(f); *see also Liston v. King.com, Ltd.*, 254 F. Supp. 3d 989, 1005 (N.D. Ill. 2017) (Plaintiff must show "the deception occurred in the course of conduct involving trade or commerce.").   Other state consumer protection statutes contain materially similar definitions,[54] and courts have held that conduct occurs in "trade or commerce" when it involves a commercial transaction.  *See, e.g.*, *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 793 (1986) ("[defendant] and the [plaintiffs] were involved in a loan closing, which is a commercial transaction. As such, the transaction occurred in 'trade or commerce'"); *DIRECTV, Inc. v. Shouldice*, 2003 WL 23200255, at *4 (W.D. Mich. Oct. 20, 2003) ("the MCPA does make clear that the defendant's acts must have occurred as part of an effort to further the sale or lease of goods or services to consumers."); *Indian Hills Civic Ass'n v. Indian Lake Prop. Owners Ass'n, Inc.*, 637 S.W.3d 622, 632

---

[54] Ky. Rev. Stat. § 367.110(2) (**Kentucky**) ("'Trade' and 'commerce' means the advertising, offering for sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value, and shall include any trade or commerce directly or indirectly affecting the people of this Commonwealth."); La. Stat. Ann. § 51:1402(9) (**Louisiana**) ("Trade and commerce" defined as "the advertising, offering for sale, sale, or distribution of any services and any property, corporeal or incorporeal, immovable or movable, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of the state."); Me. Rev. Stat. tit. 5, § 206(3) (**Maine**) ("'Trade' and 'commerce' shall include the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this State."); Mo. Ann. Stat. § 407.010(7) (**Missouri**) ("'Trade' or 'commerce', the advertising, offering for sale, sale, or distribution, or any combination thereof, of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situated."); 73 Pa. Stat. Ann. § 201-2(3) (**Pennsylvania**) ("'Trade' and 'commerce' means the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situated, and includes any trade or commerce directly or indirectly affecting the people of this Commonwealth."); 6 R.I. Gen. Laws Ann. § 6-13.1-1(5) (**Rhode Island**) ("'Trade' and 'commerce' mean the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value wherever situate, and include any trade or commerce directly or indirectly affecting the people of this state.").

1
2
3
4
5
6
7

(Mo. Ct. App. 2021) ("'Commerce' under the MMPA is not so wide as to cover every economic interaction contemplable"); *Health Promotion Specialists, LLC v. S.C. Bd. of Dentistry*, 403 S.C. 623, 638 (2013) ("[I]t is clear the General Assembly intended for the SCUTPA to apply to business or consumer transactions."); *G & G Closed Cir. Events, LLC v. Castillo*, 327 F. Supp. 3d 1119, 1133–34 (N.D. Ill. 2018) ("[The] ICFA does not prohibit any deceptive acts or unfair practices that are in some nebulous way connected to trade or commerce.  If it did, ICFA's reach would be nearly endless, given the breadth of trade or commerce.").

8
9
10
11

Here, for the reasons stated above, the States have not adequately alleged that Meta is liable for conduct occurring in "trade or commerce" under these definitions, and their consumer protection claims fail for that reason.  Individuals downloading Meta's services for free is not activity occurring in "trade or commerce."[55]

12
13
14
15
16
17
18
19
20
21
22
23
24

Further, Georgia's Fair Business Practices Act, in addition to the "trade or commerce" limitation discussed above, applies only to "acts or practices in the conduct of **consumer transactions** and **consumer acts or practices** . . . ."  Ga. Code Ann. § 10-1-393(a) (emphasis added); *see also Henderson v. Gandy*, 270 Ga. App. 827, 829–30 (2004) ("[T]he scope of the FBPA is limited to acts in the conduct of consumer transactions and consumer acts or practices in trade or commerce."); *Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 642 (2002) ("To come within the FBPA, therefore, the deceptive activity must take place in the context of the consumer marketplace.").  The Act defines "[c]onsumer acts or practices" to mean "acts or practices intended to encourage **consumer transactions**."  Ga. Code Ann. § 10-1-392(a)(7) (emphasis added).  "Consumer transactions," in turn, is defined to mean "the **sale, purchase, lease, or rental** of goods, services, or property, real or personal, primarily for personal, family, or household purposes."  Ga. Code Ann. § 10-1-392(a)(10) (emphasis added).  Accordingly, Georgia's allegations fail to state a claim under the Act because the Complaint does not allege harms that took place in connection with any "sale, purchase, lease, or rental."  Again, Meta does not sell Instagram or Facebook to users, and

25
26
27
28

---

[55] Like the "other disposition" language the court in *TikTok* considered, the term "distribution" in the States' definitions of "trade or commerce" must be read in the context of the other activity described in the relevant statutory definitions to require an exchange of valuable consideration, and thus cannot rescue the States' claims here.  *See* Ex. A, Indiana MTD Order at 15.

those users do not purchase, lease, or rent those services from Meta.  Accordingly, Georgia has not alleged harm resulting from "acts or practices in the conduct of consumer transactions [or] consumer acts or practices."  Ga. Code Ann. § 10-1-393(a).

## VI.   THE STATES' CLAIMS FOR RESTITUTION FAIL AS A MATTER OF LAW.

The States' claims for restitution fail because they have not alleged facts that would permit the application of restitution under their respective consumer protection statutes.  The relevant statutes only permit restitution to "restore" any "money or property" that was acquired by the allegedly unlawful conduct—*i.e.*, to make consumers whole for any pecuniary loss they may have suffered.  *See, e.g.*, *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009) (explaining that restitution "operates only to return a person those ***measurable amounts which are wrongfully taken***") (citation and quotations omitted) (emphasis added)).  For example, Indiana's Deceptive Consumer Sales Act provides that the Court may "order the supplier to make ***payment of the money unlawfully received from the aggrieved consumers*** to be held in escrow for distribution to aggrieved consumers."  Ind. Code Ann. § 24-5-0.5-4(c)(2) (emphasis added).  Colorado's Consumer Protection Act provides that "[t]he Court may make such orders or judgments . . . which may be necessary to completely compensate or restore to the original position of any person injured by means of any such practice."  Colo. Rev. Stat. Ann. § 6-1-110(1).  Kentucky's Consumer Protection Act provides that "[t]he court may make such additional orders or judgments as may be necessary to restore to any ***person in interest any moneys or property***, real or personal, ***which may have been paid out as a result of any practice declared to be unlawful***."  Ky. Rev. Stat. Ann. § 367.200 (emphases added).

Other States have effectively identical restrictions on the availability of a restitution remedy.[56]  Two other

state statutes have no provision for a restitution remedy for violations.[57]

---

[56] *See* Ariz. Rev. Stat. Ann. § 44-1528(2) (**Arizona**) (Permitting the Court to "make such orders or judgments as may be necessary to . . . *restore to any person in interest any monies or property*, real or personal, which may have been acquired by means of any practice in this article declared to be unlawful, including the appointment of a receiver") (emphasis added); Cal. Bus. & Prof. Code § 17203 (**California**) (Permitting the Court to "make such orders or judgments . . . as may be necessary to restore to any *person in interest* any *money or property*, real or personal, which may have been acquired by means of such unfair competition.") (emphasis added); Del. Code Ann. tit. 6, § 2523 (**Delaware**) (Proving that "after a hearing may grant relief by issuing temporary restraining orders, preliminary or permanent injunctions, and such other relief . . . which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice declared to be unlawful by this subchapter"); Ga. Code Ann. § 10-1-397(b)(2)(D) (**Georgia**) (Providing that the Court "may enter or grant . . . [r]estitution to any person or persons adversely affected by a defendant's actions in violation of [the statute]"); 815 ILCS 505/7(a) (**Illinois**) ("The Court, in its discretion, may exercise all powers necessary, including but not limited to . . . restitution."); Ind. Code Ann. § 24-5-0.5-4(c)(2) (**Indiana**) (The Court may "order the supplier to make *payment of the money unlawfully received from the aggrieved consumers* to be held in escrow for distribution to aggrieved consumers.") (emphasis added); *In re White*, 330 Mich. App. 476, 483, 948 N.W.2d 643, 648 (2019) (**Michigan**) (under Michigan law, restitution is the restoration of actual amounts lost by the victim); Mo. Ann. Stat. § 407.100(4) (**Missouri**) (Providing that the Court "may enter an order of restitution . . . as may be necessary to restore to any person who has suffered any *ascertainable loss*, including, but not limited to, any moneys or property, real or personal, which may have been acquired by means of any method, act, use, practice or solicitation, or any combination thereof, declared to be unlawful by this chapter") (emphasis added); Neb. Rev. Stat. Ann. § 59-1608(2) (**Nebraska**) (Providing that the Court "may make such additional orders or judgments as may be necessary to restore to any *person in interest* any *money or property*, real or personal, which may have been acquired by means of any act prohibited in the Consumer Protection Act") (emphasis added); N.J. Stat. Ann. § 56:8-8 (**New Jersey**) (The Court "may make such orders or judgments . . . which may be necessary to restore to any *person in interest* any *moneys or property*, real or personal which may have been acquired by means of any practice herein declared to be unlawful.") (emphasis added); N.Y. Gen. Bus. Law § 349(b) (**New York**) (The Attorney General "may bring an action . . . to obtain restitution of any *moneys or property* obtained directly or indirectly by any such unlawful acts or practices.") (emphasis added); N.D. Cent. Code Ann. § 51-15-07 (**North Dakota**) ("The court may make an order or judgment . . . which may be necessary to restore to any *person in interest* any *money, or property* that may have been acquired by means of any practice in this chapter."); 73 Pa. Stat. Ann. § 201-4.1 (**Pennsylvania**) ("[T]he court may in its discretion direct that the defendant or defendants *restore to any person in interest any moneys or property*, real or personal, *which may have been acquired by means of any violation of this act*, under terms and conditions to be established by the court.") (emphasis added); 6 R.I. Gen. Laws Ann. § 6-13.1-5(c) (**Rhode Island**) ("The court may make any additional orders or judgments that may be necessary to restore to any person in interest any moneys or property, real or personal, that may have been acquired by means of any practice in this chapter declared to be unlawful . . . ."); S.C. Code Ann. § 39-5-50(b) (**South Carolina**) ("The court may make such additional orders or judgments as may be necessary to restore to *any person who has suffered any ascertainable loss* by reason of the use or employment of such unlawful method, act or practice, *any moneys or property*, real or personal, which may have been acquired by means

(continued…)

The States allege a variety of harms, primarily relating to mental health.  *See, e.g.*, Multistate Compl. ¶¶ 1–2, 6–7.  They do ***not***, however, allege any loss of money or property by users of Meta's services that could be restored to those users.  Accordingly, the States' claims for restitution should be dismissed.

## VII.   THE PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL.

### A.   The Count 7 Claims Fail Because the Relevant State Consumer Protection Laws Do Not Apply to Plaintiffs' Claims.

In Count 7 of the Personal Injury Second Amended Master Complaint, the Personal Injury Plaintiffs ("Plaintiffs") assert claims under the consumer protection statutes of "applicable state law."  PI SAC ¶ 958.  Of the state laws that potentially apply,[58] the consumer protection laws of 17 states do not apply for the reason explained above—those states' laws are limited to commercial transactions of a kind

---

of any practice declared to be unlawful in this article . . . .") (emphasis added); Va. Code Ann § 59.1-205 (**Virginia**) (The "court may make such additional orders or decrees as may be necessary to restore to any identifiable person *any money or property*, real, personal, or mixed, tangible or intangible, *which may have been acquired from such person by means of any act or practice declared to be unlawful* in § 59.1-200 or 59.1-200.1 . . . .") (emphasis added); Wash. Rev. Code Ann. § 19.86.080(2) (**Washington**) ("[t]he court may make such additional orders or judgments as may be necessary to *restore to any person in interest any moneys or property*, real or personal, *which may have been acquired by means of any act herein prohibited or declared to be unlawful* . . . .") (emphasis added); Wis. Stat. § 100.18(11)(d) (**Wisconsin**) ("The court may in its discretion, prior to entry of final judgment, make such orders or judgments as may be necessary to *restore to any person any pecuniary loss suffered because of the acts or practices involved in the action*, provided proof thereof is submitted to the satisfaction of the court.").

[57] While **Delaware** seeks restitution under its Deceptive Trade Practices Act, *see* Multistate Compl. ¶ 203, that Act does not independently authorize an action for restitution.  *See* Del. Code Ann. tit. 6, § 2533.

Similarly, **Minnesota** does not permit restitution in deceptive trade practices suits at all.  "[T]he sole statutory remedy for deceptive trade practices is injunctive relief."  *Damon v. Groteboer*, 937 F. Supp. 2d 1048, 1070 (D. Minn. 2013); *see also* Minn. Stat. Ann. § 325D.44.  Here, Minnesota seeks restitution not under its deceptive trade practices statute, § 325D.44, but instead under subdivision 3a of § 8.31, which outlines additional duties of the Attorney General.  *See* Minn. Stat. Ann. § 8.31.  However, Minnesota Courts have expressly rejected that statute as offering a damages remedy under the deceptive trade practices statute: "[S]ubdivision 3a specifically limits its relief to those statutes referred to in subdivision 1, and the DTPA is not included in that list."  *Dennis Simmons, D.D.S., P.A. v. Mod. Aero, Inc.*, 603 N.W.2d 336, 340 (Minn. Ct. App. 1999); *see also State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 496 (Minn. 1996) (noting that the deceptive trade practices statute is not included in Section 8.31).

[58] This brief only addresses the consumer protection laws of states in which at least one current Personal Injury Plaintiff asserting Count 7 against Meta claims to have primarily used Meta's platform(s).

not alleged here.[59]   The claims of Plaintiffs from these 17 states fail for that reason and the additional reasons discussed above.  *See supra* Section V.

In addition to the jurisdictions discussed above in connection with the Multistate Complaint, the consumer protection laws of eight other states that are potentially at issue in the personal injury MDL contain the same or similar limitations that bar Plaintiffs' claims.[60]

The consumer protection laws of **Tennessee**, **Texas**, **Alabama**, **Massachusetts**, **Vermont,** and **Idaho** all contain the "trade or commerce" limitation discussed above.[61]  And all contain materially similar definitions of "trade or commerce."[62]  The allegations in the Personal Injury Second Amended Complaint, which relate to the use of services that Plaintiffs do not pay for, do not involve "trade or commerce" within the meaning of these states' consumer protection laws.  *See, e.g.*, *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 19 (2013) ("the fact that the Legislature created broad categories of potential plaintiffs and defendants does not eliminate the threshold inquiry of whether the transaction was 'in commerce'"); *Fayne*

---

[59]  The 17 states are Indiana, Kansas, Virginia, Ohio, Illinois, Hawaii, South Carolina, Connecticut, Kentucky, Louisiana, Maine, Missouri, Nebraska, Pennsylvania, Rhode Island, Georgia, and Michigan.

[60]  Personal Injury Plaintiffs from 11 additional states—Alabama, Idaho, Iowa, Maryland, Massachusetts, Nevada, South Dakota, Tennessee, Texas, Utah, and Vermont—also bring claims under their states' consumer protection laws.

[61]  Tenn. Code Ann. § 47-18-104 (**Tennessee**); Tex. Bus. & Com. Code Ann. § 17.46 9 (**Texas**); Ala. Code § 8-19-5 (**Alabama**); Mass. Gen. Laws Ann. ch. 93A, § 2(a) (**Massachusetts**); 9 V.S.A. § 2453(a) (**Vermont**); I.C. § 48-603 (**Idaho**).

[62]  Ala. Code § 8-19-3(14) (**Alabama**) ("Trade or commerce includes but is not limited to, the advertising, buying, offering for sale, sale or distribution or performance of any service or goods, and any other article, commodity, or thing of value wherever situated and shall include any trade or commerce affecting the people of this state."); I.C. § 48-602(2) (**Idaho**) ("'Trade' and 'commerce' mean the advertising, offering for sale, selling, leasing, renting, collecting debts arising out of the sale or lease of goods or services or distributing goods or services, either to or from locations within the state of Idaho, or directly or indirectly affecting the people of this state."); Mass. Gen. Laws Ann. ch. 93A, § 1(b) (**Massachusetts**) ("Trade or commerce" defined as including, "the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services."); Tenn. Code Ann. § 47-18-103(20) (**Tennessee**) ('Trade,' 'commerce,' or 'consumer transaction' means the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated."); Tex. Bus. & Com. Code Ann. § 17.45(6) (**Texas**) ("'Trade' and 'commerce' mean the advertising, offering for sale, sale, lease, or distribution of any good or service, of any property, tangible or intangible, real, personal, or mixed, and any other article, commodity, or thing of value, wherever situated, and shall include any trade or commerce directly or indirectly affecting the people of this state.").

*v. Vincent*, 301 S.W.3d 162, 174 (Tenn. 2009) (recognizing that the Tennessee Consumer Protection Act "does not apply" if the defendant was not "engaged in the conduct of trade or commerce").  Accordingly, Plaintiffs fail to state a claim under the laws of these States for the reasons stated in Section V, *supra*.

Additionally, the consumer protection laws of **Vermont**, **Alabama**, and **Texas** all limit private causes of action to "consumers."  *See* Vt. Stat. Ann. tit. 9, § 2461(b) (providing a private cause of action to "[a]ny consumer who contracts for goods or services"); Ala. Code § 8-19-10(a) (providing that "[a]ny person who commits one or more of the acts or practices declared unlawful under this chapter and thereby causes monetary damage to a consumer . . . shall be liable to each consumer"); Bus. & Com. Code Section 17.50(a) ("A consumer may maintain an action . . . .").  The Alabama Trade Practices Act defines a "consumer" as "[a]ny natural person who ***buys goods or services*** for personal, family, or household use." Ala. Code § 8-19-3(4) (emphasis added).  The Vermont and Texas statutes contain similar definitions.[63] Because Plaintiffs do not pay to access Facebook or Instagram, they are not "consumers" within the meaning of these States' consumer protection laws and cannot pursue claims under these laws.

**Utah's** Consumer Sales Practices Act, like the consumer protection laws of Indiana, Kansas, Virginia, and Ohio, limits its application to "deceptive act[s] or practice[s] by a supplier in connection with a ***consumer transaction***."  Utah Code § 13-11-4(1) (emphasis added).  And like those states, the Utah Act defines "consumer transaction" to mean "a sale, lease, assignment, award by chance, or other written or oral transfer or disposition of goods, services, or other property, both tangible and intangible." Utah Code § 13-11-3(2)(a).  For the reasons explained in Section V, *supra*, Plaintiffs fail to state a claim under the Utah Act.  *See also Matchett v. BSI Fin. Servs.*, 2021 WL 3473062, at *2 (D. Utah Aug. 6, 2021) ("a supplier commits a deceptive act where it charges a consumer for a consumer transaction that has not previously been agreed to by the consumer"); *Ayala v. American Home Mortg. Servicing, Inc.*, 2011 WL 3319543, at *3 (D. Utah June 8, 2011) ("mortgage loan" not a "consumer transaction" because "it is not a sale or disposition of the funds or of the note").

---

[63] Vt. Stat. Ann. tit. 9, § 2451a(1) (**Vermont**) (defining "consumer" as "any person who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services not for resale . . . but for his or her use or benefit or the use or benefit of a member of his or her household . . . ."); Bus. & Com. Code Section 17.45(4) (**Texas**) (defining "consumer" as "an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services").

**Maryland's** Consumer Protection Act is limited to "[t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services."  Md. Code Ann., Com. Law § 13-303(1). The Act defines "sale" to include any "[s]ale of or offer or attempt to sell merchandise, real property, or intangibles for cash or credit; or . . . [s]ervice or offer for service which relates to any person, building, or equipment."  Md. Code Ann., Com. Law § 13-101(i).  "Service," as used in the definition of sale, is a narrowly defined term:  it is limited to any "[b]uilding repair or improvement service; . . . [s]ubprofessional service; . . . [r]epair of a motor vehicle, home appliance, or other similar commodity; . . . or [r]epair, installation, or other servicing of any plumbing, heating, electrical, or mechanical device." *Id.* § 13-101(j).  Plaintiffs' claims under the Maryland Act fail because they have not alleged any conduct that took place in connection with "[t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services."

## B.  Count 7 Fails for the Same Reasons the States' Deceptive Practices Claims Fail.

Plaintiffs' theory of liability under their consumer protection claims as pled in the Personal Injury Second Amended Complaint focuses on alleged misrepresentations and omissions related to the safety of Defendants' services.[64]  *See* PI SAC ¶ 964 (alleging liability for "false and misleading misrepresentations or omissions of material fact relating to the safety of [Defendants'] respective social media products"); ¶ 965 (alleging Defendants "communicated the purported benefits and safety of using its respective social media products while failing to disclose the serious harms related to use").  This theory fails for the same reasons the States' claims based on safety do.  *First*, to the extent Plaintiffs allege an omission or failure to warn of harmful content, or alleged harms caused by "engagement-inducing" features, the claims are barred by Section 230.  *See supra* Section II.  *Second*, the affirmative statements regarding safety that Plaintiffs allege are non-actionable statements of opinion.  *See, e.g.*, PI SAC ¶ 370(d) ("Then, there's keeping the community safe, which I think is really important."); ¶ 370(f) ("One of the most important responsibilities we have as a company is to keep people safe and stop anyone from abusing our service."); ¶ 370(m) ("[We] have to keep people safe and give them control over their experience on our apps.  And

---

[64] Count 7 is pled against all Defendants in the Personal Injury Second Amended Master Complaint, not just Meta.

we are."); ¶ 379 ("The safety and well-being of the teens on our platform is a top priority for the company."). These statements do not give rise to a deceptive practices claim.[65]  *See supra* Section III.[66] *Third*, as in the Multistate Complaint, a number of the statements alleged in the Personal Injury Second Amended Master Complaint were made to Congress, not to consumers.  *See, e.g.*, PI SAC ¶¶ 370(b), 370(c), 370(o), 370(p), 373, 379.  These statements are protected by the First Amendment and also were not made in "trade or commerce" or in connection with a "sale" or "consumer transaction."  *See supra* Section III.D.

### C.     Count 7 Also Fails Because Plaintiffs Do Not Allege Actual Reliance.

When misrepresentation-based claims are brought by individual plaintiffs, the consumer protection laws of at least 21 states require the plaintiff to allege that they actually relied on the misrepresentation or omission to their detriment.  *See, e.g.*, *In re Tobacco II Cases*, 46 Cal. 4th 298, 306 (2009) (plaintiff "proceeding on a claim of misrepresentation as the basis of his or her [**California** Unfair Competition Law] action must demonstrate actual reliance on the allegedly deceptive or misleading statements"); *Tiismann v. Linda Martin Homes Corp.*, 281 Ga. 137, 138 (2006) (under the **Georgia** statute, the plaintiff "must demonstrate that he was injured as the result of the reliance upon the alleged misrepresentation"); *Bumpers v. Cmty. Bank of N. Va.*, 367 N.C. 81, 88 (2013) ("a claim under [**North**

---

[65] In their Second Amended Master Complaint, Plaintiffs incorporate by reference many of the factual allegations in the Multistate Complaint.  To the extent they incorporate those allegations with any of the other defects described above—such as lack of materiality or failure to establish a mismatch between the representations and the facts—those claims also fail with respect to the Personal Injury Plaintiffs for the same reasons.  *See supra* Section III.

[66] *See also Russell v. Wilson*, 991 So. 2d 745, 748 (Ala. Civ. App. 2008) (**Alabama**) ("[A] buyer must demonstrate that a seller's statements as to the condition of the property were representations of fact and not mere statements of opinion amounting to nothing more than sales talk or mere puffery."); *Adrian Trucking, Inc. v. Navistar, Inc.*, 609 F. Supp. 3d 728, 750 (N.D. Iowa 2022) (**Iowa**) (similar); *Singh v. Lenovo (United States) Inc.*, 510 F. Supp. 3d 310, 330 (D. Md. 2021) (**Maryland**) (similar); *Valley Children's Hosp. v. Athenahealth, Inc.*, 2023 WL 6065800, at *5 (D. Mass. Sept. 18, 2023) (**Massachusetts**) (similar); *Bevers v. D.R. Horton, Inc.*, 2011 WL 294369, at *2 (D. Nev. Jan. 26, 2011) (**Nevada**) (similar); *Schmaltz v. Nissen*, 431 N.W.2d 657, 661 (S.D. 1988) (**South Dakota**) (similar); *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) (**Tennessee**) (similar); *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, 896 S.W.2d 156, 163 (Tex. 1995) (**Texas**) (similar); *Boud v. SDNCO, Inc.*, 2002 UT 83, ¶ 14, 54 P.3d 1131, 1135 (**Utah**) (similar); *Otis-Wisher v. Fletcher Allen Health Care, Inc.*, 951 F. Supp. 2d 592, 603 (D. Vt. 2013) (**Vermont**) (similar).

**Carolina**'s statute] stemming from an alleged misrepresentation does indeed require a plaintiff to demonstrate reliance on the misrepresentation in order to show the necessary proximate cause"); *Schellenbach v. GoDaddy.com, LLC*, 321 F.R.D. 613 (D. Ariz. 2017) ("Parties that do not actually rely on a false statement or material omission have no claim under the **Arizona** Consumer Fraud Act.") (emphasis added).[67]

Additionally, the requirements of Rule 9(b) apply to Plaintiffs' allegations of reliance. *See Haskins v. Symantec Corp.*, 654 Fed. Appx. 338 (9th Cir. 2016) ("Because Haskins's complaint did not allege that she read and relied on a specific misrepresentation by Symantec, she failed to plead her fraud claims with particularity as required by Rule 9(b)."); *Tabler v. Panera LLC*, 2019 WL 5579529, at *12 (N.D. Cal. Oct. 29, 2019) ("a plaintiff does not satisfy Rule 9(b) when the plaintiff generally identifies allegedly misleading statements but fails to specify which statements the plaintiff actually saw and relied upon"); *Pirozzi v. Apple Inc.*, 913 F. Supp. 2d 840, 850 (N.D. Cal. 2012) (requiring plaintiff to "specify [under Rule 9(b)] when she was exposed to the statements or which ones she found material to her decisions to purchase"). The same is true with omission claims. *See In re ZF-TRW Airbag Control Units Prod. Liab.*

---

[67] *See also Hoosier Contractors, LLC v. Gardner*, 212 N.E.3d 1234, 1239 (Ind. 2023) (**Indiana**); *GxG Mgmt., LLC v. Young Bros. & Co.*, 457 F. Supp. 2d 47, 50 (D. Me. 2006) (**Maine**); *Cicero v. Am. Satellite, Inc.*, 2011-Ohio-4918, ¶ 19 (**Ohio**); *Clark v. Eddie Bauer LLC*, 371 Or. 177, 191 (2023) (**Oregon**); *Yocca v. Pittsburgh Steelers Sports, Inc.*, 578 Pa. 479, 501 (2004) (**Pennsylvania**); *Edlow v. RBW, LLC*, 688 F.3d 26, 39 (1st Cir. 2012) (**Massachusetts**); *Brown v. Louisiana-Pac. Corp.*, 820 F.3d 339, 349 (8th Cir. 2016) (**Iowa**); *Cheval Int'l v. Smartpak Equine, LLC*, 2016 WL 1064496, at *12 (D.S.D. Mar. 15, 2016) (**South Dakota**); Tex. Bus. & Com. Code Ann. § 17.50(a)(1)(B) (**Texas**); *Motogolf.com, LLC v. Top Shelf Golf, LLC*, 528 F. Supp. 3d 1168, 1178 (D. Nev. 2021) (**Nevada**); *Johnston v. Stephan*, 97 Va. Cir. 115, 122 (2017) (**Virginia**). Some states do not frame the element explicitly in terms of "reliance," but still require, *e.g.*, "a direct causal connection between the misrepresentation and the plaintiff's defeated expectations." *Smajlaj v. Campbell Soup Co.*, 782 F. Supp. 2d 84, 100 (D.N.J. 2011) (**New Jersey**). In the context of a misrepresentation, this causation requirement necessarily means detrimental reliance. *See Motogolf.com*, 528 F. Supp. 3d at 1178 ("To meet the causation element, Motogolf must allege that it relied on the misrepresentation which caused the harm."). Thus, the analysis is the same for those states with such a causation requirement. *See also Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120 (10th Cir. 2008) (**Colorado**); *Gault v. Thacher*, 367 F. Supp. 3d 469, 485 (D.S.C. 2018) (**South Carolina**); *Transclean Corp. v. Bridgewood Servs., Inc.*, 77 F. Supp. 2d 1045, 1095 (D. Minn. 1999) (**Minnesota**); *N. Bottling Co. v. Henry's Foods, Inc.*, 474 F. Supp. 3d 1016, 1028 (D.N.D. 2020) (**North Dakota**); *Laccinole v. Assad*, 2016 WL 868511, at *7 (D.R.I. Mar. 7, 2016) (**Rhode Island**).

*Litig.*, 601 F. Supp. 3d 625, 767 (C.D. Cal. 2022) (requiring plaintiffs "to plead some facts 'to establish that they would have been aware of the [omitted fact], if it were disclosed'" (citation omitted)).

No Plaintiff has adequately alleged actual reliance.  In fact, no Plaintiff has alleged that he or she even saw any of the allegedly false statements (or statements that were allegedly misleading by omission). *See Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1190, 1220 (N.D. Cal. 2014) ("To make the reliance showing, . . . plaintiffs in misrepresentation cases must allege that they actually read the challenged representations."); *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d at 767 (omission claim failed to allege reliance because it did not "allege that Plaintiffs were exposed to the materials that should have included a disclosure of the Alleged Defect, or that they would have seen it had it been disclosed").  Most Plaintiffs do not even attempt to add any individualized allegations of reliance to their Short Form Complaint, including whether they actually saw any of the representations alleged in the Personal Injury Second Amended Master Complaint.  Those that do state only, in conclusory and passive terms, that, *e.g.*, "Had the omitted information been disclosed, the injuries that Plaintiff suffered would have been avoidable and avoided." *Baker* SFC, Ex. A (4:23-cv-01578).[68]  These allegations do not state which specific representations Plaintiffs actually saw, or whether they even saw any of them, or how they would have seen any of the disclosures.  Accordingly, the Count 7 claims of Plaintiffs from at least 21 states fail for this additional reason.

---

[68] *See also B.B.* SFC (4:23-cv-03032) (similar); *Booker* SFC (4:23-cv-01537) (similar); *C.G.* SFC (4:23-cv-01568) (similar); *C.S.* SFC (4:23-cv-01569) (similar); *Calvoni* SFC (4:22-cv-05873) (similar); *Cameron* SFC (4:23-cv-03266) (similar); *Cusato* SFC (4:23-cv-04961) (similar); *D.S.* SFC (4:23-cv-03402) (similar); *Dodd* SFC (4:23-cv-01583) (similar); *Dowdy* SFC (4:23-cv-01866) (similar); *Dyer* SFC (4:23-cv-01567) (similar); *Garceau* SFC (4:23-cv-04962) (similar); *H.D.* SFC (4:23-cv-01425) (similar); *Haas* SFC (4:23-cv-01565) (similar); *Hirka* SFC (4:23-cv-03906) (similar); *J.F.* SFC (4:23-cv-01846) (similar); *Jackson* SFC (4:23-cv-03774) (similar); *Jansky* SFC (4:23-cv-02026) (similar); *K.C.* SFC (4:23-cv-03179) (similar); *Keizer* SFC (4:23-cv-02972) (similar); *Koizol* SFC (4:23-cv-02244) (similar); *M.C.* SFC (4:23-cv-03398) (similar); *M.M.* SFC (4:23-cv-01615) (similar); *M.W.* SFC (4:23-cv-03824) (similar); *N.K.* SFC (4:23-cv-01584) (similar); *S.S.* SFC (4:23-cv-02024) (similar).

### D.     Count 7 Further Fails Because Plaintiffs Do Not Allege An Ascertainable Loss.

The consumer protection claims brought by Plaintiffs in at least 18 states should also be dismissed because they do not allege that they suffered an *ascertainable loss* of any money or property resulting from the alleged misrepresentations or unfair/unconscionable practices.[69]

For example, to bring a claim under the **Connecticut** Unfair Trade Practices Act, a plaintiff must plead "an ascertainable loss," which "is a deprivation, detriment [or] injury that is *capable of being discovered, observed or established*. . . .   [A] loss is ascertainable if it is *measurable* even though the precise amount of the loss is not known.'" *Marinos v. Poirot*, 308 Conn. 706, 714 (2013) (quoting *Service Road Corp. v. Quinn*, 241 Conn. 630, 638–39 (1997)) (emphasis added); *see also, e.g.*, *D'Agostino v. Maldonado*, 216 N.J. 168, 185 (2013) ("An ascertainable loss under the CFA is one that is quantifiable or measurable."). Plaintiffs' claimed expectation of "safety" on Meta's services is not sufficiently ascertainable to give rise to an unfair trade acts or practice claim. *See* PI SAC ¶¶ 282, 842; *see also Di Teresi v. Stamford Health Sys., Inc.*, 149 Conn. App. 502, 512 (2014) (dismissing Connecticut consumer protection claim where plaintiffs asserted a reasonable expectation that the defendant hospital would keep a patient safe from harm, because that "reasonable expectation is not measurable for purposes of sustaining a CUTPA violation, nor is the loss of that expectation"). Moreover, none of the Plaintiffs paid anything to use Meta's services, and so they certainly did not suffer any legally cognizable loss. *See Dabush v.*

---

[69] *See* Ala. Code § 8–19–10(a) (**Alabama**) (requiring showing of "monetary damage to another person"); Cal. Bus. & Prof Code § 17204 (**California**) ("Actions for relief pursuant to [the UCL] shall be [brought] . . . by a person who has suffered injury in fact and has lost money or property as a result of the unfair competition."); Conn. Gen. Stat. Ann. § 42-110g(a) (**Connecticut**); *Teamsters Loc. 237 Welfare Fund v. AstraZeneca Pharms. LP*, 136 A.3d 688, 693 (Del. 2016) (**Delaware**) ("[T]o bring a private cause of action for damages under the Delaware [Consumer Fraud] Act, a plaintiff must allege three elements: (1) a defendant engaged in conduct which violated the statute; (2) the plaintiff was a 'victim' of the unlawful conduct; and (3) a causal relationship exists between the defendant's unlawful conduct and the plaintiff's ascertainable loss."); Idaho Code § 48-608 (**Idaho**); Iowa Code Ann. § 714H.5 (**Iowa**); Ky. Stat. Ann. § 367.220(1) (**Kentucky**); La. Stat. Ann. § 51:1409(A) (**Louisiana**); Me. Rev. Stat. tit. 5, § 213(1) (**Maine**) ("Any person who purchases or leases goods, services or property, real or personal, primarily for personal, family or household purposes and thereby suffers any loss of money or property, real or personal . . . ."); Mo. Ann. Stat. § 407.025 (**Missouri**); *Int'l Union of Operating Eng'rs Loc. No. 68 Welfare Fund v. Merck & Co.*, 192 N.J. 372, 389 (2007) (**New Jersey**)); Ohio Rev. Code Ann. § 1345.09 (**Ohio**); Or. Rev. Stat. Ann. § 646.638 (**Oregon**); Pa. Stat. Ann. § 201-9.2 (**Pennsylvania**); 6 R.I. Gen. Laws Ann. § 6-13.1-5.2 (**Rhode Island**); S.C. Code Ann. § 39-5-140 (**South Carolina**); Va. Code Ann. § 59.1-204 (**Virginia**); W. Va. Code § 46A-6-106 (**West Virginia**).

63

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

1    *Mercedes-Benz USA, LLC*, 378 N.J. Super. 105, 117 (App. Div. 2005) (no ascertainable loss because

2    plaintiff did not pay extra for navigation system in car, and did not show that claimed delays due to

3    incorrect navigation instructions "cost him money or property").

4          Plaintiffs claim that, as a result of Meta's purported misrepresentations, they spent more time on

5    Meta's services than they otherwise would have, but the loss of time is not an ascertainable economic loss

6    that can be redressed through consumer protection law.  *See, e.g.*, *Valley Nissan, Inc. v. Davila*, 133

7    S.W.3d 702, 713 (Tex. App. 2003) ("claim for damages based on loss of time and energy and mental

8    anguish" falls outside deceptive trade practices act); *Goldberg v. Manhattan Ford Lincoln-Mercury, Inc.*,

9    492 N.Y.S.2d 318, 323 (Sup. Ct. 1985) (claim for "loss of time" does not support deceptive practices

10   claim); *Thiedemann v. Mercedes-Benz USA, LLC*, 183 N.J. 234, 242 (2005) ("subjective and intangible

11   disenchantment" not legally cognizable).  Rather, an "ascertainable" loss is typically "the difference in

12   value between the product as represented by the defendant and as actually received by the plaintiff."  *Paul*

13   *v. Providence Health Sys.-Or.*, 237 Or. App. 584, 602 (2010), *aff'd on other grounds,* 351 Or. 587 (2012).

14   Plaintiffs do not allege any such tangible, ascertainable loss—nor could they.

15   **VIII.   THE PERSONAL INJURY PLAINTIFFS' COMMON LAW CONCEALMENT AND**
     **MISREPRESENTATION CLAIMS LIKEWISE FAIL.**

16

17         The fraudulent misrepresentation (Count 8 of the Personal Injury Second Amended Master

18   Complaint) and fraudulent concealment (Count 9 of the Personal Injury Second Amended Master

19   Complaint) claims asserted against Meta should also be dismissed.

20         Courts have recognized that "the fundamental elements of fraud are substantially similar from state

21   to state."  *In re Takata Airbag Prod. Liab. Litig.*, --- F. Supp. 3d. ---, 2023 WL 4925368, at *12 (S.D. Fla.

22   June 20, 2023).  "Virtually every state requires that there be a misrepresentation made by the defendant,

23   that the defendant had knowledge that it was false, the defendant intended to induce the reliance of the

24   plaintiff, the plaintiff relied on the statement, and the plaintiff was injured as a result."  *Spencer v. Hartford*

25   *Fin. Servs. Grp., Inc.*, 256 F.R.D. 284, 301 (D. Conn. 2009).  Additionally, "there is general agreement in

26   all states that, '[t]o maintain an action for damages for [fraud] by reason of concealment, the following

27   elements must generally be present: [1] an actual concealment [2] of a material fact [3] with knowledge

28   of the fact concealed [4] with intent to mislead another into relying upon such conduct [5] followed by

actual reliance thereon by such other person having the right to so rely [6] with injury resulting to such person because of such reliance.'"   *In re Welding Fume Prods. Liab. Litig.*, 2007 WL 1087605, at *7 (N.D. Ohio Apr. 9, 2007) (quoting 37 Am. Jur. 2d Fraud and Deceit § 200 (May 2006)); *see also id.* ("As for 'the elements of negligent misrepresentation, a plaintiff must generally show that: [1] the defendant had a duty to exercise reasonable care in the giving of information; [2] the defendant supplied false information; [3] with a reasonable reliance by the plaintiff upon the information given; and [4] the plaintiff suffered damages proximately caused by the defendant's negligence.'" (quoting 37 Am. Jur. 2d Fraud and Deceit § 128 (Jan. 2007)).

In other words, regardless of whether pled under a theory of fraud or negligence, Plaintiffs in all states must allege (1) actual reliance on the misrepresentation or omission and (2) injury resulting from such reliance.   *See* Restatement (Second) of Torts § 537 cmt. a ("The recipient of a fraudulent misrepresentation can recover from the maker for his pecuniary loss only if he in fact relies upon the misrepresentation in acting or in refraining from action, and his reliance is a substantial factor in bringing about the loss."); 37 Am. Jur. 2d Fraud and Deceit § 238 ("[W]here redress is sought for fraudulent concealment, it must appear that the party seeking relief relied upon the one with whom he or she was doing business to disclose the true facts and circumstances relating to the transaction and that the suppression of such facts was an inducement which moved him or her to enter into the agreement").   For the reasons discussed above, Plaintiffs have not adequately alleged either reliance on or injury ***resulting from Meta's alleged misrepresentations or omissions***, and Counts 8 and 9 therefore fail.   *See supra* Section VII.C.

Counts 8 and 9 for fraudulent concealment and fraudulent misrepresentation also fail to state a claim for all of the same fundamental reasons that the alleged misrepresentations and omissions cannot support a consumer protection claim:  (1) a claim based on the omission of warnings about harmful third-party content is barred by Section 230, (2) statements about "safety" are opinions, not misrepresentations of fact,[70] (3) statements made to Congress are protected by the First Amendment (in addition to not

---

[70] *See* 37 Am. Jur. 2d Fraud and Deceit § 65 ("The principle is fundamental that fraud cannot be predicated upon the mere expression of an opinion.").

alleging reliance thereon), and (4) other statements or omissions in the Complaint would not be material[71] to users or are not actually false.[72]  *See supra* Sections II.B, III.

Finally, Plaintiffs' "negligent concealment" claim fails for an additional reason. "[T]he tort of negligent misrepresentation extends only to affirmative statements," not "negligent nondisclosure or concealment."  *Keshish v. Allstate Ins. Co.*, 2012 WL 12887075, at \*4 (C.D. Cal. Oct. 19, 2012) (cleaned up) (California law).  "Negligent misrepresentation is a species of fraud or deceit specifically requiring a 'positive assertion,'" such that an "'implied' assertion or representation is not enough." *Wilson v. Century 21 Great W. Realty*, 15 Cal. App. 4th 298, 306 (1993) (citations omitted).[73]

## IX.     FLORIDA'S CLAIMS SHOULD BE DISMISSED FOR LACK OF PERSONAL JURISDICTION.

Florida's claims fail for the additional reason that the Florida federal court in which the case was originally filed lacks jurisdiction over the Meta defendants (*i.e.*, Meta Platforms, Inc. and Instagram, LLC) named in that suit.

Florida's Complaint does not allege that the Florida courts would have general jurisdiction over those two Meta defendants—nor could it.  *See, e.g.*, *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (general jurisdiction typically exists only where corporation is headquartered or incorporated).  Thus, in order for a Florida court to assert jurisdiction, the plaintiff would need to establish specific jurisdiction.

Applying Florida's long-arm statute to authorize jurisdiction over the named Meta defendants would violate due process.  For a court to exercise specific jurisdiction, "the ***suit***" must "aris[e] out of or

---

[71] 37 Am. Jur. 2d Fraud and Deceit § 227 ("To constitute fraud, the matter misrepresented or concealed must be material.").

[72] 37 Am. Jur. 2d Fraud and Deceit § 106 ("It is fundamental in the law of fraud that a representation must be false to warrant a basis for relief.").

[73] *See also, e.g.*, *Newcomb v. Cambridge Home Loans, Inc.*, 861 F. Supp. 2d 1153, 1163 (D. Haw. 2012) ("As a preliminary matter, Plaintiff does not cite, nor has the Court found, any authority recognizing a claim for negligent concealment.  Moreover, concealment contemplates intentional behavior, not negligent behavior."); *Rep. Bank & Trust Co. v. Bear, Stearns & Co., Inc.*, 707 F. Supp. 2d 702, 714 (W.D. Ky. 2010) (tort of negligent misrepresentation "requires an affirmative false statement; a mere omission will not do"); *Nelson v. Cheney*, 224 Neb. 756, 761, 401 N.W.2d 472, 476 (1987) ("[W]e do not believe it wise or good public policy to adopt a theory of negligent concealment in the vendor/purchaser setting"); *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1207 n.2 (D. Kan. 2001) (noting that Kansas has not recognized the common law tort of "negligent omission").

relat[e] to the defendant's contacts with the ***forum***." *Id.* at 137 (emphasis added).  Thus, the "proper question is not where the plaintiff experienced a particular injury or effect but whether the defendant's conduct connects [the defendant] to the forum in a meaningful way." *Walden v. Fiore*, 571 U.S. 277, 290 (2014).

Here, Florida does not allege that the design decisions about which it complains were made in Florida.  Similarly, while Florida alleges that Meta made various misrepresentations, it does not allege that any of those statements targeted Florida in any way.  *See, e.g.*, *Sun Bank, N.A. v. E.F. Hutton & Co.*, 926 F.2d 1030 (11th Cir.1991) (no personal jurisdiction where allegedly fraudulent misrepresentations made over the telephone were not purposefully directed at Florida residents); *Gen. Retail Servs., Inc. v. Wireless Toyz Franchise, LLC*, 255 F. App'x 775, 794 (5th Cir. 2007) (no personal jurisdiction where defendants did not purposefully direct allegedly misleading marketing materials into Texas); *Buelow v. Plaza Motors of Brooklyn, Inc.*, 2017 WL 2813179, at *5 (E.D. Cal. June 29, 2017) (no personal jurisdiction where defendant "did not expressly aim its misrepresentations at California").  Indeed, its Complaint does not allege ***any*** suit-related conduct directed at Florida by Meta at all.

None of the Complaint's limited—and largely conclusory—allegations regarding Meta's supposed contacts with Florida establishes otherwise.  The Complaint first alleges Meta "makes payments to content creators" and "advertisers" in Florida.  FL Compl. ¶ 18.  In addition to being wholly conclusory, however, those allegations have no nexus with the claims that Florida asserts, and so are irrelevant.  *See, e.g.*, *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) ("specific jurisdiction is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction").  The allegation that Meta "operates a data center in Miami" suffers from the same infirmity—in addition to being untrue.[74]  And the bare allegation that a separate, non-defendant entity— Meta Payments, Inc.—is "incorporated in Florida" likewise does nothing to establish jurisdiction over

---

[74] *See* Declaration of Bradley W. Davis (Dec. 21, 2023) ¶ 4.  Meta respectfully submits that the Court need not consider this declaration because, even if true, the Complaint's allegation regarding a Miami data center does not establish specific jurisdiction.  To the extent the court disagrees, however, it may consider the declaration under Rule 12(b)(2).  *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285 (9th Cir. 1977) (courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction).

Meta Platforms, Inc. or Instagram, LLC.  *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003) ("It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes.").

Finally, personal jurisdiction cannot be established over those two defendants based on the unilateral decisions of individual Floridians to use Facebook or Instagram.  This is because a "relationship" justifying jurisdiction "must arise out of contacts that the defendant himself creates with the forum." *Walden*, 571 U.S. at 284; *see Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984) ("unilateral activity of another party or a third person" cannot create jurisdiction).

Applying this basic principle, numerous courts have held that they lack personal jurisdiction over out-of-state social media companies, notwithstanding the fact that their websites or apps were available to, and used by, residents of those states.  *See, e.g., State v. Tiktok, Inc.*, 2023 WL 4305656, at *10 (Ind. Super. May 4, 2023) (rejecting State's argument that TikTok was subject to personal jurisdiction in Indiana based on its "substantial" user base in Indiana); *Doshier v. Twitter, Inc.*, 417 F. Supp. 3d 1171, 1178 (E.D. Ark. 2019) ("Because the only facts alleged in the complaint that provide a link to Arkansas describe actions taken by plaintiffs, the Court declines to find specific personal jurisdiction over Twitter.").[75]

Were the rule otherwise, defendants in internet-related cases would be subject to personal jurisdiction in all fifty states, based on the conduct of users, not defendants.  The case law squarely rejects any such basis for establishing personal jurisdiction. *See Walden*, 571 U.S. at 285, 290.  Florida's

---

[75] *See also Harrison v. Facebook, Inc.*, 2019 WL 1090779, at *4 (S.D. Ala. Jan. 17, 2019) (general accessibility of Facebook's Web site or mobile application in a forum does not provide a sufficient connection to support jurisdiction), report and recommendation adopted, 2019 WL 1102210 (S.D. Ala. Mar. 8, 2019); *Georgalis v. Facebook, Inc.*, 324 F. Supp. 3d 955, 961 (N.D. Ohio 2018) ("Facebook's ubiquitous presence and numerous Ohio users, alone, do not constitute sufficient contacts"); *Ralls v. Facebook*, 221 F. Supp. 3d 1237, 1242–44 (W.D. Wash. 2016) (personal jurisdiction over Facebook did not exist "simply because a user avail[ed] himself of Facebook's services" in Washington); *Gullen v. Facebook.com, Inc.*, 2016 WL 245910, at *2 (N.D. Ill. Jan. 21, 2016) ("[T]he fact that its site is accessible to Illinois residents does not confer specific jurisdiction over Facebook."); *Facebook, Inc. v. K.G.S.*, 294 So. 3d 122, 136 n.11 (Ala. 2019) ("Focusing, as we must, on the suit-related contacts Facebook itself created with Alabama—not Facebook's contacts with K.G.S. or K.G.S.'s contacts with Alabama—we must conclude that there is an absence of suit-related conduct that creates a substantial connection with Alabama.").

allegations regarding its residents' access to Facebook and Instagram are therefore insufficient.  Its claims should be dismissed pursuant to 28 U.S.C. § 1406, whereupon they could be re-filed in this Court alongside the claims of 33 other state attorneys general.  *See, e.g.*, *In re: Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, 2023 WL 8527415, at *10 (N.D. Ill. Dec. 8, 2023) (MDL court dismissing claims filed in Missouri under 28 U.S.C. § 1406 because Missouri courts lacked personal jurisdiction over defendants).

## CONCLUSION

Meta respectfully requests Count I of the Multistate Complaint be dismissed insofar as it alleges a COPPA "child-directed" claim, and that Counts II–LIV of the Multistate Complaint be dismissed in their entirety with prejudice.  *See* Case No. 4:23-cv-05448, Dkt. No. 1.  In addition, Meta respectfully requests that the Florida Complaint be dismissed in its entirety with prejudice.  *See* Case No. 4:23-cv-05885, Dkt. No. 1.

Separately, Meta respectfully requests that Counts 7, 8, and 9 of the Personal Injury Second Amended Master Complaint be dismissed in their entirety with prejudice.  *See* Case No. 4:22-md-3047, Dkt. No. 494.

Dated: December 22, 2023                    Respectfully submitted,


                                            **COVINGTON & BURLING LLP**

                                            */s/ Phyllis A. Jones*
                                            Paul W. Schmidt, *pro hac vice*
                                              pschmidt@cov.com
                                            Phyllis A. Jones, *pro hac vice*
                                              pajones@cov.com
                                            Christian J. Pistilli (*pro hac vice* pending)
                                            COVINGTON & BURLING LLP
                                            One CityCenter
                                            850 Tenth Street, NW
                                            Washington, DC 20001-4956
                                            Telephone: + 1 (202) 662-6000
                                            Facsimile: + 1 (202) 662-6291

                                            Emily Johnson Henn (State Bar No. 269482)
                                              ehenn@cov.com

COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800

*Attorneys for Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Facebook Payments, Inc., Siculus, Inc., Facebook Operations, LLC, and Mark Elliot Zuckerberg*

META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS