# EXHIBIT A

E-SERVICE
71723994
Jan 02 2024
02:11PM
File & ServeXpress

**FILED**
Superior Court of California
County of Los Angeles

**JAN 02 2024**

David W. Slayton, Executive Officer/Clerk of Court

By: A. Morales, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| AMY NEVILLE; AARON NEVILLE; JAIME PUERTA; MARIAM HERNANDEZ; CINDY CRUZ-SARANTOS; BRIDGETTE NORRING; JAMES MCCARTHY; KATHLEEN MCCARTHY; SAMANTHA MCCARTHY; MATTHEW CAPELOUTO; CHRISTINE CAPELOUTO; PERLA MENDOZA; SAMUEL CHAPMAN; DR. LAURA ANN CHAPMAN BERMAN; JESSICA DIACONT; E.B.; AND P.B., | Case No.: 22STCV33500 <br><br> ORDER SUSTAINING IN PART AND OVERRULING IN PART DEFENDANT'S DEMURRER TO PLAINTIFFS' SECOND AMENDED COMPLAINT |
|               Plaintiffs, <br> v. <br><br> SNAP, INC., <br><br>               Defendant. | Hearing Date: October 18, 2023 <br> Hearing Time: 11:00 a.m. <br> Dept.: 7 |

Plaintiffs assert[1] that the conduct of defendant Snap, Inc. ("Snap"), a social media company, has resulted in the foreseeable deaths of (and a serious personal injury to) their children. The law of the State of California provides, or should provide, them with a

---

[1] Six other cases, asserting similar claims, are related, and assigned to this department.

- 1 -

remedy for their alleged losses, they say. Snap disagrees. Snap claims that none of plaintiffs' allegations, even if true, constitute a "cause of action." Alternatively, Snap claims that for one or more other reasons apparent from the face of plaintiffs' operative complaint, their lawsuit should be dismissed. Now before the court is Snap's demurrer to the operative complaint.

Both sides contend that the law is clear and the legal path forward obvious. Not so. The depth of disagreement is revealed by the parties' inability jointly to label Snap's social media presence and activities: "service," "app," "product", "tool," "interactive course of conduct," "platform," "website," "software" or something else. What *is* clear and obvious is that the law is unsettled and in a state of development in at least two principal regards: (1) whether "section 230" (a federal statute) immunizes Snap from potential legal liability under the specific allegations asserted and (2) whether concepts of strict products liability — usually applicable to suppliers of tangible products — already do or now should extend to specified alleged conduct of Snap.

### Overview of the Case

Snap operates Snapchat, a social media app for smartphones that allows users to send text, picture, and video messages, called "snaps," to other users. (Second Amended Complaint (July 20, 2023) ("SAC") ¶ 19, 33.) Plaintiffs' SAC is voluminous and detailed: 216 pages and 991 separately numbered paragraphs. Its tenor is captured in the first paragraph:

> This case is about a social media product, Snapchat, that has caused thousands of American teens to die from fentanyl overdoses. Despite Snap promoting and portraying Snapchat as a "goofy" app for kids to use to send each other silly pictures, its known common use is an "open air drug market." As detailed below, Snap and Snapchat's role in illicit drug sales to teens was the foreseeable result of the designs, structures, and policies Snap chose to implement increase its revenues. Worse, as the predictable use of Snapchat for drug sales—and deaths from fentanyl poisoning—took off, Snap not only failed to make feasible changes to Snapchat to make the app safer for kids, but it also engaged in a concerted corporate campaign to delay and dissuade legal action. Snap falsely claimed it was taking meaningful and effective steps to protect kids and when using the app, lying to regulators and to grieving parents.

Although Snap has not yet formally responded to the allegations, it is clear from its demurrer papers that it vehemently denies them. It asserts that it abhors the criminal behavior of drug dealers who sold fentanyl to these minors; that it is on the frontlines to stop drug dealers from engaging in this illegal conduct; that it has expended tremendous financial and human capital resources to that end; and that it has worked closely and cooperatively with law enforcement. More generally it contends that it promotes and protects user safety for its 390 million daily users, and specifies some of its practices and policies in furtherance of that goal. (Snap not only denies the allegations but seeks monetary sanctions from plaintiffs' counsel for their allegedly asserting allegations that they know are false — a motion the court has set out for hearing in the future.)

**Plaintiffs' Legal Claims**

Because this is a demurrer, which examines the legal sufficiency of *allegations*, the court cites extensively to the SAC. The SAC claims that plaintiffs are parents of children who allegedly purchased illicit drugs from other Snapchat users. The plaintiff parents allege that unknowingly, their children purchased drugs that contained fentanyl, a synthetic opioid that can be lethal in small doses. (SAC, ¶ 24.) Except for A.B., the child of plaintiffs E.B. and P.B., who survived a near-fatal fentanyl overdose, plaintiffs' children died of fentanyl poisoning after ingesting the drugs they obtained from other Snapchat users. (*Id.* at ¶ 17.)

According to plaintiffs: Snapchat is specifically chosen by children, teens and young adults for drug distribution because of how Snap designs, markets, distributes, programs and operates Snapchat (SAC, ¶ 2); Snapchat's many data-deletion features and functions made it foreseeable, if not intended, that Snapchat would become a haven for drug trafficking (*Id.* at ¶ 3); the combination of practices and multiple features Snap chose to build into its Snapchat product—such as ineffective age and identify verification, facilitating easy creation of multiple, fake accounting, connecting kids with strangers and drug dealers "in-app" through the "quick add" features and a live mapping feature makes Snap an inherently dangerous product for young users (*Id.* at ¶ 13); Snap was on notice that Snapchat was facilitating an enormous number of drug deals (*Id.* at ¶ 14); Snap

knowingly aided and abetted drug distribution to kids through its platform (*Id.* at ¶ 15); fentanyl is highly toxic, is widely abused and has resulted in about 175 deaths per day in the United States (*Id.* at ¶¶ 23-32); Snapchat has evolved into a digital open-air drug market, Snap has targeted minor users and misrepresented the safety of Snapchat, and Snapchat is a "product" (*Id.* at ¶¶ 33-88); Snap has ineffective age verification and parental controls, Snapchat's automatic message deletion feature facilitates illicit drug sales and is unreasonably dangerous, Snapchat's screenshot notification and blocking features discourage reporting illicit drug sales and are unreasonably dangerous, Snapchat's "quick add" feature facilitates drug dealers' targeting of minors with drug menus and solicitations and is unreasonably dangerous, Snapchat's "stories" feature facilitates drug dealers' engagement with minors and is unreasonably dangerous, Snapchat's "snap map" feature provides drug dealers with unique tools to evade detection and is unreasonably dangerous, Snapchat's reporting mechanisms are defective, and Snapchat's "my eyes only" feature facilitates illicit drug sales and is unreasonably dangerous because it serves as a self-destructing vault to evade law enforcement (*Id.* at ¶¶ 89-182); Snap relies on misleading messaging and attempts to spin, control, and manage public outrage on Snapchat's status as an open-air drug market, Snap's role in the drug trade has been reported to Snap within the media and law enforcement since at least 2017, Snap ignored years' worth of grieving parents' warnings and requests for product modifications, Snap convinced grieving parents that they had no legal recourse, rather than make meaningful changes to its product, Snap pursued a more than two year strategy of false assurances and misdirection (*Id.* at ¶¶ 183-268); Snap's re-direction product modifications are ineffective (*Id.* at ¶¶ 269-276); and Snap actively frustrates law enforcement efforts to prosecute criminals who sell illegal drugs on Snapchat (*Id.* at ¶¶ 277-290).  Plaintiff-specific allegations are found in the SAC at paragraphs 299 through 719.

- 4 -

Plaintiffs disavow[2] any claim based upon Snap's activities as a publisher of the third-party (drug seller) content. That is, plaintiffs do not contend that Snap is liable for failing to eliminate or otherwise moderate some or all of the third-party drug sellers' content. Instead, plaintiffs' sole focus, they say, is on (1) *Snap's* alleged independent tortious conduct and (2) Snapchat (a "feature-packed social media app.") as a defective *product*. (Plaintiffs' Opposition to Defendant Snap's Demurrer (Aug. 17, 2023) ("Opposition") 3.)

So focusing, plaintiffs assert:

Snap developed and launched Snapchat for the express purpose of encouraging and enabling lewd, illicit, and illegal conduct (SAC ¶¶ 54-61, 1342, 723, 893). Snap marketed and designed Snapchat to encourage and incentivize young users to engage in inherently risky behavior and in a manner that prevented them from appreciating and/or recognizing the risks Snap itself created (SAC ¶¶ 34, 41, 65-72, 134-139, 141-143, 145-149, 156-159, 162-168, 177-182, 246, 723, 885). Snapchat's artificial intelligence targets young users with drug advertisements (SAC ¶¶ 789, 146-158, 307-308, 324, 349-350, 382-383, 393, 414-415, 428, 444, 496-497, 529-531, 568-569, 603-605, 679-690) and affirmatively matches them to Snapchat drug dealers (SAC ¶¶ 49, 133-148, 245, 247, 307, 349, 382, 414, 418, 444, 496, 529, 568, 613, 626, 680, 687, 695, 705, 723, 911, 963). Snap designed features to ensure accessibility by minors even where parents object and attempt to keep their children away from Snapchat (SAC ¶¶ 48, 89-95, 102-112), prevents parents and law enforcement from being able to monitor and protect those children, and implements product changes and updates intended to render third party monitoring software ineffective (SAC ¶¶ 106-108, 121-122, 170-174, 196, 223, 457, 468, 533, 619, 642-643, 748, 942(b).) Finally, Snap knowingly assisted the drug dealers who flocked to Snapchat by designing several unique tools and mechanisms to destroy and otherwise prevent the preservation of data. (SAC ¶¶ 60, 114-116, 119-120, 125-126, 130, 297-298, 431, 452, 546, 577-579).

(Opposition, 3.)

Plaintiffs have "allege[d] more than 21 specific design defects including a defective age verification system, defective parental controls and reporting mechanisms, use of

---

[2] The sincerity, *vel non*, of their disavowal is not relevant. The issue is the legal sufficiency of plaintiffs' allegations, not their intentions. Footnote seven, below, comments on "artful pleading" and "*Lemmon*-lingo."

inherently dangerous products in connection with minor users, creating and sending harmful notifications and communications, defective data retention policies or cooperate [*sic*, "cooperation?"] with parents and law enforcement, the random and/or discriminatory matchmaking between minors and adult strangers, defective system for implementing limits on product downloads and account usage, and more. (SAC ¶¶ 293-296, 731-754, 790, 869-870.)" (Opposition, 13.)  Plaintiffs allege that Snapchat was also defective due to inadequate warnings.  (SAC ¶¶ 104-105, 112, 143, 160-166, 177, 221, 263, 271-272, 294, 761-781.)

———————

Plaintiffs state their legal claims and theories in the form of 16 "counts," thus warranting a comment on vocabulary.  To be sustained, a demurrer must dispose of the entire complaint or an entire "cause of action."  (Code Civ. Proc., § 430.50, subd. (a); *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 113.)  A challenge to less than an entire cause of action in a pleading must be made by a motion to strike, not demurrer.  (*Olson v. Hornbrook Community Services Dist.* (2019) 33 Cal.App.5th 502, 522, fn. 9.)  Unlike our colleagues in the federal courts, California state court judges have no "line-item veto" of allegations on a demurrer.

Snap has made no motion to strike.

There is diversity of language commonly used in the California Superior Court to describe a plaintiff's claim for relief and confusion surrounds the terms "cause of action" and "counts."  (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 860, fn.1 [terms "cause of action" and "counts" often used "imprecisely and indiscriminately"].)  Technically, a cause of action refers to a "primary right" of a plaintiff, a corresponding "primary duty" of a defendant, and a wrongful act by the defendant constituting a breach of that duty.  (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 904.)  A cause of action is to be distinguished from both the relief sought (e.g., specific performance vs. damages) and "the legal theory on which liability for that injury is premised: Even where there are multiple legal theories upon which recovery may be

- 6 -

1    predicated, one injury gives rise to one claim for relief." (*Ibid.,* emphasis and internal
2    quotes omitted.)  The distinction — legal theory versus true cause of action — matters
3    when it comes to applying rules of claim preclusion, motions for summary adjudication,
4    and, as noted, demurrers.

5         In practice, parties often use "cause of action" or "count" to describe a legal theory
6    even though multiple "counts" stating various legal theories may all be directed to the
7    same "cause of action."  (Edmon & Karnow, Cal. Practice Guide: Civil Procedure Before
8    Trial (The Rutter Group 2023) ¶ 6:107.)  For example, California recognizes a cause of
9    action for wrongful death, which may be pursued, based upon the facts, under legal
10   theories ("counts") of negligence or strict product liability.

11        Here, plaintiffs purport to assert 16 counts. (SAC, ¶¶ 720-991.)   The court
12   understands plaintiffs intend to describe by each count a separate legal theory relating to
13   one or more true causes of action.  Snap appears to share that understanding as its
14   demurrer is asserted to each such count (which Snap calls a cause of action.)  The court
15   will employ plaintiffs' language (and will substitute Arabic for Roman numerals).  Plaintiffs'
16   counts are:

17        Count 1: Strict product liability (design defect)
18        Count 2: Strict product liability (failure to warn)
19        Count 3: Risk benefit test (defective design)
20        Count 4: Negligence (design defect)
21        Count 5: Negligence (failure to warn)
22        Count 6: Negligence
23        Count 7: Negligence per se
24        Count 8: Tortious interference with parental rights
25        Count 9: Public nuisance
26        Count 10: Aiding and abetting
27        Count 11: Fraudulent concealment and misrepresentation
28        Count 12: Fraudulent misrepresentation
29        Count 13: Negligent misrepresentation

Count 14: Wrongful death

Count 15: Survival action

Count 16: Loss of consortium and society

Plaintiffs seek compensatory and punitive damages and declaratory and injunctive relief. It appears to the court that the SAC actually asserts three causes of action in the technical sense: wrongful death, personal injury, and public nuisance. And it alleges multiple legal theories ("counts") applicable to one or more of the causes of action, several of which are sub-species of negligence and fraud. As the court understands it, "aiding and abetting" is neither a cause of action nor an independent legal theory, but a method of extending and imposing liability upon an entity for the acts of another. (CACI No. 3610.) The court understands the count denominated "loss of consortium and society" to be a purported cause of action applicable to spouses, not parents, although a parent asserting a wrongful death action may seek, as a species of damages, "loss of society" of a deceased minor child. (CACI Nos. 3920, 3922.) The claim for "tortious interference with parental rights" is asserted under Virginia law (Opposition, 33), and is discussed further below.

### The Nature of a Demurrer

A demurrer is not in any sense a test of the truth of any allegation or denial. Should the case proceed, there are other phases of the proceedings where the truth or falsity of allegations and denials are tested — principally trial, where the parties have the opportunity to present to a factfinder information that meets the strictures of the Evidence Code.

The demurrer proceeding is far more limited. A demurrer raises one or more of eight potential legal objections to a pleading. The grounds for the objection must "appear[] on the face" of the complaint or "from any matter of which the court is required to or may take judicial notice." (Code Civ. Proc., §§ 430.10, 430.30, subd. (a).) Less abstractly, a demurrer asks: assuming for argument that all of the factual allegations *are* true, do those allegations constitute a "cause of action" — meaning, do they allege an invasion of a legally protected interest for which the law, under one or more legal theories asserted,

provides appropriate relief? If so, the case proceeds. If not, normally the court provides an opportunity for the plaintiffs to make additional or different allegations ("leave to amend") if the plaintiffs request. Otherwise, the court dismisses some or all of the case.

Here, however, plaintiffs have made clear they do not seek leave to amend should the court find Snap's demurrer, or any part of it, has merit. They choose to stand on their pleading.

In assuming the truth of the allegations of the SAC for the analysis of the demurrer, the court does not employ a "plausibility" test as would be the case in federal court under the analogous procedure to test the sufficiency of allegations in a complaint. (*Bell Atlantic Corp. v. Twombly* (2007) 550 U.S. 544, 556-557; *Ashcroft v. Iqbal* (2000) 556 U.S. 662, 678-679 [district court disregards legal conclusions, determines whether factual allegations "plausibly give rise to an entitlement for relief"].) Instead, under California procedure, "[a]s a general rule in testing a pleading against a demurrer[,] the facts alleged in the pleading are deemed to be true, however improbable they may be." (*Del E. Webb Corp. v. Structural Materials Co.* (1981) 123 Cal.App.3d 593, 604.)

## ANALYSIS

### Snap's Section 230 Challenge

Snap demurs "[t]o all causes of action alleged in the SAC — which are based on content created and exchanged by third parties — [and which] are barred as a matter of law under Section 230 of the Communications Decency Act." (CDA) (Snap's Demurrer to Plaintiffs' Second Amended Complaint (Aug. 3, 2023) ("Demurrer") 2.) Snap invokes section 230 of title 47 of the United States Code ("section 230"), a federal statute promulgated in 1996 that has generated an extensive jurisprudence. Federal circuit courts of appeal, federal district courts, and state courts, including California state courts, have considered and applied section 230 in a variety of factual circumstances.

### What law must this court apply?

As a state court, this court is bound by the United States Supreme Court's interpretation of federal statutes (*Mullaney v. Woods* (1979) 97 Cal.App.3d 710, 719), but

"the decisions of federal district and circuit courts, although entitled to great weight, are not binding on state courts even as to issues of federal law." (*Alan v. Superior Court* (2003) 111 Cal.App.4th 217, 229; *Felisilda v. FCA US LLC* (2020) 53 Cal.App.5th 486, 497.) By contrast, this court must apply a binding precedent of the California Court of Appeal. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d. 450, 455-456.) Likewise, the California Court of Appeal is bound by the California Supreme Court's interpretation of federal questions in the absence of a contrary decision of the United States Supreme Court and despite contrary holdings of other federal courts. (*People v. Greenwood* (1986) 182 Cal.App.2d 729, 734.) But when appellate decisions of the California Court of Appeal are in conflict, "the court exercising inferior jurisdiction can and must make a choice between the conflicting decisions." (*Auto Equity*, at p. 456.)

The United States Supreme Court has not yet construed the immunizing reach of section 230 with respect to the claims plaintiffs assert here, namely, (1) for the allegedly tortious independent conduct of a social media company (independent, that is, of "publishing" third-party conduct), and (2) for providing a defective social media platform "product." As to the first, there was anticipation in early 2023 that the court would decide whether section 230 immunizes social media platforms for the act of recommending third-party content users. But it did not. "We therefore decline to address the application of the section 230 to a complaint that appears to offer little, if any, plausible claim for relief." (*Gonzalez v. Google LLC* (2023) 598 U.S 617, 622.)

**The statute**

Section 230(c)(1) provides:

Treatment of publisher or speaker: No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

These are, it has been famously (and at this point monotonously) said, "the twenty-six words that created the internet." At least dozens if not hundreds of courts, academics, and other commentators have by now explained that the provision was designed, in 1996, to protect then-fledgling internet companies from incurring liability when millions of users

posted content and when the companies made moves to police that content.[3]  Much of the judicial and academic analysis has focused on an issue that is not involved in this case, namely, the potential liability of a social media company for its decision to remove or *not* to remove certain third-party content from its site.  It seems clear that such decisions are in the sweet spot of a traditional publisher's discretion and section 230 immunizes those decisions from tort liability.  Plaintiffs' theories here do not purport to hold Snap liable for failing to remove some or all of the drug sellers' third-party content from Snapchat.

Congress expressed its intention with respect to the preemptive effect of section 230 on state law with a classic "consistent/inconsistent" construct:

> Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.  No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

(47 U.S.C. § 230(e)(3).)  This construct kicks back to the courts to decide whether a state's law including its tort common law is or is not consistent with section 230 — exactly what this court is doing now.

And Congress also expressed its five policy goals in enacting section 230 in subdivision (b):

> It is the policy of the United States—
> (1)    to promote the continued development of the Internet and other interactive computer services and other interactive media;
> (2)    to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

---

[3] A few examples from the enormous literature in the academic and popular press discussing the history and purpose of section 230 include an article by section 230's preeminent historian, Kosseff, *A User's Guide to Section 230, and a Legislator's Guide to Amending It (or Not)* (2022) 37 Berk. Tech. L.J. 757; Klapper, *Reading Section 230* (2022) 70 Buffalo L.Rev. 1237; Weintraub & Moore, *Section 230* (2020) 4 Geo. L. Tech Rev. 625; and Rozenshtein, *Interpreting the ambiguities of Section 230* (Oct. 26, 2023) Brookings Institute <bookings.edu/articles/interpreting-the-ambiguities-of-section-230/> (as of Dec. 26, 2023).

(3)    to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

(4)    to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

(5)    to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

(47 U.S.C § 230(b).)[4]

### Construing the statute

What do the twenty-six words mean — specifically, to be "treated as a publisher or speaker" — and how do they apply here?  Snap's demurrer advocates for the broadest possible construction: it asserts that it is immunized from any claim "based on" the third-party content.  "No matter how the claims are styled, if the alleged harm *flows from* the content provided by third parties, Section 230 applies."  (Demurrer, 14, emphasis supplied.)  Snap's "based on"/"flows from" test is a "but for" test; if the plaintiffs would have no claim but for the presence of the drug sellers' third-party content on Snap's platform, then section 230 immunizes Snap.  If Snap is correct, the court's work is done:

---

[4] These policy statements are in some tension.  A free market "unfettered by state or federal regulation" is inconsistent with "vigorous enforcement of federal criminal laws." The related policy goals of "removing disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access" and "encourag[ing] the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet" may be illusory if any "state or federal regulation" is off the table.  This tension and other drafting oddities of the CDA may be attributable to the legislative genesis of the final Telecommunications Act of 1996, of which the Communications Decency Act (and section 230) was a part.  The congressional conference committee, faced with a Senate version sponsored by Senator Exon and a House version sponsored by Representatives Cox and Wyden, "rather than taking the logical step of choosing between the Exon and Cox-Wyden proposals, included both provisions as part of a single 'Communications Decency Act,' with the Cox-Wyden proposal as an added final section to Exon's original legislation." (Rozenshtein, *supra*, <bookings.edu/articles/interpreting-the-ambiguities-of-section-230/> (as of Dec. 26, 2023).)

the demurrer must be sustained and the case dismissed because plaintiffs' claims surely would not exist but for the presence of the drug sellers' content.

But Snap has cited no binding California authority so holding, and at least some federal authority upon which Snap relies says otherwise. The CDA does not declare "a general immunity from liability deriving from third-party content." (*Barnes v. Yahoo!, Inc.* (9th Cir. 2009) 570 F3d 1096, 1100) (*Barnes*).) Moreover, it seems clear that a "but for"/ "based on"/"flows from" test is not consistent with a plain meaning analysis of the words Congress chose to employ. If Congress had intended to immunize all interactive computer services from liabilities "based on" third-party content, there are straightforward elocutions to express that intention.[5] But that is neither what Congress did nor what Congress could have done consistent with the policy statements in subdivision (b) of section 230. Instead, Congress chose to invoke words of art drawn from common law defamation-liability distinctions between "publishers" and "speakers," on the one hand, and, apparently, "distributors" on the other.

Again, why those words and why in 1996?

At common law, including in New York state in 1996, publishers were held to a higher standard than distributors over defamatory or other illegal content on the theory they did, or at least reasonably could, exercise editorial control. Distributors, on the other

---

[5] For example, see the clarity of Congressional intent regarding immunities for firearm manufacturers in the Protection of Lawful Commerce in Arms Act, title 15 of United States Code, sections 7901-7903. "A qualified civil liability action may not be brought in any Federal or State court." (15 U.S.C. § 7902(a).) A "qualified civil liability action" means "a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party." (§ 7903(5)(A).) The phrase "qualified product" means "a firearm (as defined in subparagraph (A) or (B) of section 921(a)(3) of title 18), including any antique firearm (as defined in section 921(a)(16) of such title), or ammunition (as defined in section 921(a)(17)(A) of such title), or a component part of a firearm or ammunition, that has been shipped or transported in interstate or foreign commerce." (§ 7903(4).)

hand, were liable only when they knew or should have known that the publication contained illegal content. It is universally accepted by knowledgeable persons, including the members of the California Supreme Court, that Congress's decision to use the publisher/distributor distinction for section 230 was in response to a New York decision, *Stratton Oakmont, Inc. v. Prodigy Services Co.* (N.Y. Sup.Ct. 1995) 1995 WL 323710 (*Stratton Oakmont*), applying New York law. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 44 (*Barrett*).) An early Internet case, *Stratton Oakmont* held that because the defendant had exercised some editorial control — removing offensive content and automatically screening for offensive language — over the third-party content, it was properly treated as a publisher and not a mere distributor. Section 230(c)(1) overruled, as it were, the *Stratton Oakmont* decision by eliminating common law strict liability for acting like a publisher by posting, or removing some of, a third-party's false statement.[6]

An early federal appellate decision, *Zeran v. America Online, Inc.* (4th Cir. 1997) 129 F.3d 327, had an outsized influence on the interpretation of section 230. According to the California Supreme Court (among other courts), *Zeran* rejected the notion of any distinction between publisher and distributor liability, instead finding that Congress intended to broadly shield all providers from liability for publishing information received from third parties. (*Barrett, supra,* 40 Cal.4th at p. 53.) The *Barrett* court explained, "We agree with the *Zeran* court, and others considering the question, that subjecting Internet service providers and users to defamation liability would tend to chill online speech." (*Id.* at p. 56; see also *Hassell v. Bird* (2018) 5 Cal.5th 522, 556-558 (conc. opn. of Kruger, J.) [*Zeran*'s broad reach did not, however, prevent the Ninth Circuit's conclusion in *Barnes,* namely, that section 230 did not immunize Yahoo for alleged promissory estoppel because the claim did not seek to hold Yahoo liable as a publisher or speaker of third-party content].)

---

[6] Note the odd, if not perverse incentives imposed upon an Internet company based on *Stratton Oakmont.* If a company removes offensive third-party material, it might face publisher defamation liability, whereas if it does not remove offensive third-party material, it might retain common law immunity as a mere distributor.

1    In federal courts — in the Ninth Circuit at least — the broad section 230 immunity
2    of *Zeran* and its progeny retains vitality. Snap repeatedly directs the court to the Ninth
3    Circuit's decision in *Dyroff v. Ultimate Software Group, Inc.* (9th Cir. 2019) 934 F.3d 1093
4    (*Dyroff*) as a case on all fours with our case. There, the defendant, Ultimate, operated a
5    social networking site designed to permit anonymous postings and communications
6    among users. A user, Wesley Greer, a recovering heroin addict, conducted a Google
7    search to purchase heroin and was directed to Ultimate's website. He posted to a group
8    title, "where can i score heroin in Jacksonville, fl." Ultimate's website sent Greer an email
9    notifying him that another user posted a response and provided a hyperlink and URL
10   directing his response. The response was posted by Hugo Margenat-Castro, an Orlando-
11   based heroin dealer who regularly used Ultimate's website to sell heroin. Greer obtain
12   Castro's telephone number from Ultimate's website, made contact with Castro, and
13   purchased heroin from him that contained fentanyl. Greer suffered a fentanyl overdose
14   and died. (*Id.* at pp. 1094-1095.)

15   Greer's mother, Dyroff, sued Ultimate. The district court held that section 230
16   immunized Ultimate. The Ninth Circuit affirmed. Employing the Ninth Circuit's three-part
17   *Barnes* test (*Barnes, supra,* 570 F.3d at pp. 1100-1101), the court held that (1) Ultimate
18   was an interactive computer service and (2) plaintiff sought to treat it as a publisher or
19   speaker of (3) information provided by another information content provider. To the key
20   second point, the court found that Ultimate was not an information content provider (i.e.,
21   a publisher or speaker of content) by virtue of its website utilizing content-neutral website
22   functions. (*Dyroff, supra,* 934 F.3d at p. 1097.) Although Dyroff argued that Ultimate's
23   website-recommendation algorithms and push notification system constituted the
24   creation of content, the Court disagreed and reasoned the website features were "tools
25   meant to facilitate the communication and content of others," but were not actually
26   content. (*Id.* at p. 1098.)

27   Snap cites other decisions in accord with the broadly immunizing holding in *Dyroff*.
28   These include *Force v. Facebook, Inc.* (2d Cir. 2019) 934 F.3d 53, cert. den., 140 S.Ct.
29   2761 (2020) (*Force*), which held that Section 230 immunizes claims based on "friend-

suggestion algorithms [applying] such factors as the users' common membership in Facebook's online 'groups,' geographic location, attendance at events, spoken language, and mutual friend connections on Facebook," and *Jackson v. Airbnb, Inc.* (C.D. Cal. 2022) 2022 WL 16753197 *1, in which the trial court granted Snap's motion to dismiss the case that alleged Snapchat had allowed users to engage in sales and purchase of unlawful guns — "exactly the sort of case for which Section 230 provides an impenetrable shield."

Some federal appellate and trial courts have disagreed with *Zeran* and its progeny's broad immunity construction of section 230. Analyzing the words of the statute, these authorities explain that "publisher" — the word Congress chose — has (and in 1996 had) at least two meanings: (1) one who is in the business of publishing — and under this expansive view of the word, any activity customarily undertaken by a publisher, even making recommendations about (but not literally publishing) third-party content, is immunized by section 230 — and (2) the meaning ascribed by the common law of defamation, as expressed by *Stratton Oakmont*. The plain meaning of the words of section 230 and the context in which it was promulgated, namely, to overrule *Stratton Oakmont*, support the view that the better reading is the more limited one. Some powerful judicial voices, some in dissent, have so explained.

A principal expression of a narrower reading of Section 230 is found in Chief Judge Katzmann's influential concurrence and dissent to the majority opinion in *Force*. He wrote:

> Suppose that you are a published author. One day, an acquaintance calls. "I've been reading over everything you've ever published," he informs you. "I've also been looking at everything you've ever said on the Internet. I've done the same for this other author. You two have very similar interests; I think you'd get along." The acquaintance then gives you the other author's contact information and photo, along with a link to all her published works. He calls back three more times over the next week with more names of writers you should get to know.
>
> Now, you might say your acquaintance fancies himself a matchmaker. But would you say he's acting as the *publisher* of the other authors' work?
>
> Facebook and the majority would have us answer this question "yes." I, however, cannot do so. For the scenario I have just described is little different from how

Facebook's algorithms allegedly work. And while those algorithms do end up showing users profile, group, or event pages written by other users, it strains the English language to say that in targeting and recommending these writings to users—and thereby forging connections, developing new social networks—Facebook is acting as "the *publisher* of ... information provided by another information content provider."

He further explained:

> Another way to consider the [section 230] immunity question is to "look ... to what the duty at issue actually requires: specifically, whether the duty would necessarily require an internet company to monitor[, alter, or remove] third-party content." [HomeAway.com, Inc. v. City of Santa Monica (9th Cir. 2019) 918 F.3d 676, 682.] Here, too, the claims regarding the algorithms are a poor fit for statutory immunity. The duty not to provide material support to terrorism, as applied to Facebook's use of the algorithms, simply requires that Facebook not actively use that material to determine which of its users to connect to each other. It could stop using the algorithms altogether, for instance. Or, short of that, Facebook could modify its algorithms to stop them introducing terrorists to one another. None of this would change any underlying content, nor would it necessarily require courts to assess further the difficult question of whether there is an affirmative obligation to monitor that content.

(*Force*, *supra*, 934 F.3d at pp. 76-77.)

Judge Kaufmann's opinion influenced Judges Berzon and Gould in their respective concurrence and dissent in *Gonzalez v. Google, Inc.* (9th Cir. 2021) 2 F.4th 871, 913, 919 (revd. *Twitter, Inc. v. Taamaneh* (2023) 598 U.S. 471.) Judge Berzon wrote:

> I concur in the majority opinion in full. I write separately to explain that, although we are bound by Ninth Circuit precedent compelling the outcome in this case, I join the growing chorus of voices calling for a more limited reading of the scope of section 230 immunity. For the reasons compellingly given by Judge Katzmann in his partial dissent in Force v. Facebook [citations omitted], if not bound by Circuit precedent I would hold that the term "publisher" under section 230 reaches only traditional activities of publication and distribution — such as deciding whether to publish, withdraw, or alter content — and does not include activities that promote or recommend content or connect content users to each other. I urge this Court to reconsider our precedent en banc to the extent that it holds that section 230 extends to the use of machine-learning algorithms to recommend content and connections to users.

And Judge Gould wrote:

- 17 -

Although Section 230 arguably means that Google and YouTube cannot be liable for the mere content of the posts made by ISIS, that provision in no way provides immunity for other conduct of Google or YouTube or Facebook or Twitter that goes beyond merely publishing the post. Here, Plaintiffs allege that Google's "Services" include not just publishing content, but also "use of Google's infrastructure, network, applications, tools and features, communications services," and other specialized tools like "Social Plugins" and "Badges." Similar allegations are made about other platforms' tools and procedures. I would affirm in part to the extent the district court applied Section 230 immunity to YouTube or other platforms simply carrying the posts from ISIS on its platform, but not to the extent that it amplified and in part developed the terrorist message by encouraging similar views to be given to those already determined to be most susceptible to the ISIS cause.

(Id. at p. 919.)

Justice Clarence Thomas expressed reservations about courts' broad reading of immunity flowing from section 230 in his statement respecting the denial of certiorari in *Malwarebytes, Inc. v. Enigma Software Group USA, LLC* (2020) ____ U.S. ____ [141 S. Ct. 13]. Agreeing with the court's denial of certiorari in that case, Justice Thomas wrote separately to explain "why, in an appropriate case, we should consider whether the text of this increasingly important statute [section 230] aligns with the current state of immunity enjoyed by Internet Platforms." (141 S. Ct. at p. 14.) Explaining what he considered the "modest understanding" of how section 230 altered the *Stratton Oakmont* rule, he decried the "far cry from what has prevailed in court. Adopting the too-common practice of reading extra immunity into statutes where it does not belong [citations omitted], courts have relied on policy and purpose arguments to grant sweeping protection to Internet Platforms." (*Id.* at p. 15.) He cited with approval 1. R. Smolla, Law of Defamation (2d ed. 2019) § 4:86, p. 4-380 ("[C]ourts have extended the immunity in § 230 far beyond anything that plausibly could have been intended by Congress.") (*Ibid.*)

- 18 -

Limitations on the breadth of section 230 immunity are found in reported decisions deriving from the (1) distinctions between a defendant's independent *conduct* as opposed to only posting third-party *content* and/or (2) when the interactive computer service involvement with the third-party content rises to the level of "development" or even partial creation of that content. A prime example is *Lemmon v. Snap, Inc.* (9th Cir. 2021) 995 F.3d 1085 (*Lemmon*). The Ninth Circuit rejected section 230 immunity for a wrongful-death claim alleged arising from the SnapChat "Speed Filter" feature, which the Ninth Circuit did not characterize as "third-party content."[7] Another example is *Lee v. Amazon* (2022) 76 Cal.App.5th 200, reversing the trial court's determination that section 230 immunized the defendant against liability for listing a third-party cosmetic manufacturer's content without the warning required by Proposition 65. The Court of Appeal explained that plaintiffs sought to hold Amazon liable for "violation of its own independent [state law] obligations." (*Id.* at pp. 252, 254-255.) California courts "must be careful not to exceed the scope of [section 230] immunity provided by Congress." (*Id.* at pp. 258, 260.)

In *Doe v. Internet Brands, Inc.* (9th Cir. 2016) 824 F3d 846, the Ninth Circuit reversed the trial court's order dismissing the claim of an aspiring model who used a social networking website for people in the modeling industry. She claimed to have been raped by two individuals who used the website, "Model Mayhem," as part of a scheme to lure her to a fake audition. The question, according to the Ninth Circuit, was "whether the CDA bars Jane Doe's negligent failure to warn claim under California law." (*Id.* at p. 851.) The court distinguished the line of authority premised on treating the website proprietor as a publisher. "Jane Doe's claim is different … [she] attempts to hold Internet Brands

---

[7] The *Lemmon* distinction, in turn, has resulted in courts confronting claims of "artful pleading" — the notion that clever plaintiffs' counsel plead a defendant's conduct (not immunized) but are actually asserting content-based claims (immunized). So, too, here: Snap argues plaintiffs' disavowal of liability based on the drug sellers' content is indeed mere artful pleading. "Such attempts to use 'Lemmon lingo' do not overcome Section 230." (Snap's Reply in Support of Demurrer (Sept. 21, 2023) ("Reply") 2.)

1    liable for failing to warn her about information it obtained from an outside source about
2    how third parties targeted and lured victims through Model Mayhem. The duty to warn
3    allegedly imposed by California law would not require Internet Brands to remove any user
4    content or otherwise affect how it publishes or monitors such content." (*Ibid.*)

5    In *A.M. v. Omegle.com, LLC* (D. Or. 2022) 614 F.Supp.3d 814 (*A.M.*), plaintiff, who
6    was an 11-year-old girl in 2014, alleged that she was, at that time, sexually abused by an
7    adult man, Ryan Fordyce, through the defendant's online "chat room." Fordyce allegedly
8    forced A.M. to send pornographic images and videos of herself to him, perform for
9    Fordyce and his friends, and recruit other minors for Fordyce to abuse. He allegedly
10   threatened that if she did not comply, he would release the videos and pictures and A.M.
11   would be arrested. (*Id.* at p. 817.) Among A.M.'s legal claims were theories of negligence
12   and strict liability for defective product design and warnings. Relying on *Barnes*, the
13   district court identified the question to be answered: "courts must ask whether the duty
14   that the plaintiff alleges the defendant violated derives from the defendant's status or
15   conduct as a 'publisher or speaker." (*A.M., supra*, 614 F.Supp.3d at p. 819 [quoting
16   *Barnes, supra*, 570 F.3d at pp. 1101-1102].) "Here, Plaintiff's complaint adequately
17   pleads a product liability lawsuit as to claims one through four. Omegle could have
18   satisfied its alleged obligation to Plaintiff by designing its product differently — for
19   example, by designing a product so that it did not match minors and adults. Plaintiff is
20   not claiming that Omegle needed to review, edit or withdraw any third-party content to
21   meet this obligation ... Because this products liability case does not rest on Defendant's
22   publication of third-party content, I find that Section 230 immunity does not apply...."
23   (*A.M.,* at p. 821; but see *In re Social Media Adolescent Addiction/Personal Injury Products*
24   *Liability Litigation* (N.D. Cal. 2023) ___ F.Supp.3d ___ [2023 WL 7524912 *15] [section
25   230 immunizes defendants from allegations that they recommended adult accounts to
26   adolescents, distinguishing *A.M.* on the basis that "at the time the matching occurred, the
27   'content' or conversation did not exist"].)

28   In *Liapes v. Facebook, Inc.* (2023) 95 Cal.App.5th 910 (*Liapes*), the Court of
29   Appeal reversed the trial court's sustaining of the defendant's demurrer which was

premised, in part, on immunity under section 230. The 48-year-old female plaintiff alleged that the defendant's social media website did not provide women and older people equal access to insurance ads in violation of state law prohibiting business discrimination. Facebook allowed advertisers to target their ads through a "Lookalike Audience" tool, whereby advertisers provided to Facebook a list of users "who they believe are the type of customers they want to reach." (*Id.* at p. 917.) Facebook then applied its own analysis and algorithm to identify a larger audience that resembled the sample audience; the resulting audience was eligible to receive the ads. (*Ibid.*) The Court of Appeal concluded that Facebook's activities made it a content provider, not merely a publisher of third-party content. "Because the algorithm ascertains data about a user and then targets ads based on the user's characteristics, the algorithm renders Facebook more akin to a content developer." (*Id.* at p. 930.)[8]

### Rulings re: Section 230

The court agrees with Snap that it, as an "interactive computer service," cannot be liable as a publisher of the third-party drug sellers' content. But the allegations of the SAC do not purport to impose liability upon Snap for publishing or failing to moderate the drug sellers' content (i.e., to "treat Snap as a publisher") but instead on account of its alleged

---

[8] The *Liapes* court did not cite *Doe II v. MySpace Inc.* (2009) 175 Cal.App.4th 561. In *Doe II*, plaintiffs, minor teenage girls, alleged they were sexually assaulted by men they met through the defendant's Internet social networking site. The *Doe II* court concluded that plaintiffs' allegations that MySpace "should have implemented 'readily available and practicable age-verification software' or set the default security settings on the Julie Does' accounts to 'private'" were "precisely" allegations going to MySpace's status as a publisher, explaining that plaintiffs "want MySpace to ensure that sexual predators do not again access to (i.e., communicate) with minors on its Website. That type of activity — to restrict or make available certain material — is expressly covered by section 230." (*Id.* at pp. 565, 573.) That court also found that plaintiffs' allegations that MySpace "allowed the attackers to channel information in profiles, search and browse profiles for particular characteristics and then us the results of those queries to locate, contact and eventually sexually assault the Julie Does" did not cause MySpace to become a "content provider." (*Id.* at pp. 574-575.) As noted, on that point, *Liapes* holds otherwise.

independent tortious conduct — independent, that is, of the drug sellers' posted content.[9] The allegations assert conduct beyond "incidental editorial functions" for which a publisher may still enjoy section 230 immunity. (See, *Batzel v. Smith* (9th Cir. 2003) 333 F.3d 1018, 1031.) Additionally, the court finds that the alleged attributes and features of Snapchat cross the line into "content" — as the *Liapes* and *Lee* courts found, too. The court rejects, as did the Ninth Circuit in *Barnes*, Snap's assertion of "general immunity" under its "based on"/"flows from"/"but for" reading of the scope of section 230.

Recall, Snap demurs to "[a]ll causes of action alleged in the SAC — which are based on content created and exchanged by third parties — [as] barred as a matter of law under Section 230 of the Communications Decency Act." (Demurrer, 2.) The demurrer is overruled on that ground as to counts 1, 2, 3, 4, 5, 6, 7, 8, 9, 11, 12, 13, 14, 15, 16.

The demurrer is sustained without leave to amend on this ground as to count 10 for "aiding and abetting." Paragraph 931 of the SAC makes clear that plaintiffs seek to impose liability upon Snap because it "encouraged and assisted each of the above-referenced Snapchat Drug Dealers in their use of Snap's unique product features to sell deadly counterfeit pills...." Unlike their other counts, which focus on Snap's alleged independent tortious acts, count 10 is too intimately tied to Snap's publication of the drug sellers' third-party content to operate outside the zone of section 230 immunity.[10]

### Snap's Strict Product Liability Challenge: Counts 1, 2, and 3

---

[9] It is an unremarkable proposition that California law recognizes that independent tortious conduct can combine to cause an indivisible harm. A "defendant's negligence is a legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious." (*Uriell v. Regents of University of California* (2015) 234 Cal.App.4th 735, 746-747.) California law permits a factfinder to allocate fault or responsibility among joint tortfeasors. (Civ. Code § 1431.2; CACI No. 406.)

[10] In so ruling, the court treats count 10 as an independent legal theory which, as noted earlier, it is not. That said, whether sustained as a demurrer or dealt with later as a motion in limine, plaintiffs may not proceed on their aiding and abetting theory on account of section 230 immunity.

1    Once again, vocabulary. "'Products liability' is the name currently given to the area
2    of law involving the liability of those who supply goods or products for the use by others
3    to purchasers, users and bystanders for losses of various kinds resulting from so-called
4    defects in those products." (*Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th
5    22, 30.)  "One may seek recovery in a products liability case on theories of both
6    negligence and strict liability." (*Id.* at pp. 30-31, page number omitted.)

7    "Strict liability" is the term used to describe legal responsibility for certain activities
8    that arises irrespective of the care undertaken by the defendant to avoid the harm.  This
9    is in contrast to negligence liability, which requires that a defendant breach a duty of
10   reasonable care.  Examples of strict liability include harms arising from defendants'
11   engaging in "ultrahazardous activities" such as blasting with explosives, crop dusting,
12   testing rocket motors, using blowtorches near oil and the like.  Irrespective of the amount
13   of care employed, including utmost care, liability attaches for harm caused by the activity
14   due to its ultrahazardous character.  Another species of strict liability arises with respect
15   to injuries caused by domestic animals with known dangerous propensities (from which
16   the so-called "one free dog bite" rule derives.)  These examples of strict liability have
17   nothing to do with products.

18   And then, relevant to this case, there is "strict *products* liability," which is a cross-
19   over subspecies both of "product liability" and "strict liability."  Generally, strict product
20   liability rules allow victims who are hurt by defective products to pursue claims for
21   compensation without showing the defendant's negligence or intentional wrongdoing.
22   California law recognizes strict products liability for three types of defects: manufacturing
23   defects, design defects, and warning defects. (This case asserts no manufacturing defect
24   theory.)

25   Strict liability for product design defects can arise under two prongs: either because
26   the product's design fails to perform as safely as an ordinary consumer would have
27   expected it to perform ("the consumer expectation test") or because the risks attendant
28   to the design of the product outweigh the benefits of that design ("the risk-benefit" test).
29   The two prongs are not mutually exclusive.  (*Demara v. The Raymond Corp.* (2017) 13

1  Cal.App.5th 545, 554.)    (This case does not assert a claim under the consumer
2  expectation test.)

3      Strict liability for product warning defects likewise can arise under two prongs:
4  because warnings were non-existent or existed but were inadequate.    (*Anderson v.*
5  *Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.)

6      The development of strict products liability in the U.S. is a long and storied history,
7  with California jurisprudence playing a pivotal role.  It is judge-made law deriving from
8  decisions of Justice Benjamin Cardozo in *MacPherson v. Buick Motor Co.* (1916) 217
9  N.Y. 382 (reducing the role of privity of contract in warranty claims) and Justice Robert
10 Traynor's concurrence in *Escola v. Coca Cola Bottling Co. of Fresno* (1944) 24 Cal.2d
11 453 (*Escola*).  Justice Traynor there observed, "[a]s handicrafts have been replaced by
12 mass production with its great markets and transportation facilities, the close relationship
13 between the producer and consumer of a product has been altered…. The consumer no
14 longer has the means or skill enough to investigate for himself the soundness of a
15 product." (*Id.* at p. 467.) Three years earlier, in 1941, Dean William Prosser had urged
16 the case for imposition of strict liability upon the manufacturers of defective products in
17 his *Handbook of the Law of Torts* treatise.

18     Then came *Greenman v. Yuba Power Products, Inc.* (1963) 59 Cal.2d 57
19 (*Greenman*) in which Justice Traynor returned to his *Escola* theme but now in a majority
20 opinion.  He famously explained, "[a] manufacturer is strictly liable in tort when an article
21 he places on the market, knowing that it is to be used without inspection for defects,
22 proves to have a defect that causes injury to a human being…  The purpose of such
23 liability is to insure that the costs of injuries resulting from defective products are borne
24 by the manufacturers that put such products on the market rather than by injured persons
25 who are powerless to protect themselves." (*Id.* at pp. 62-63.) The *Greenman* rule was
26 quickly adopted in several other jurisdictions and embodied in section 402A of the
27 Restatement Second of Torts.  In 1997, the American Law Institute adopted a new
28 element of the Restatement Third of Torts, entitled "Products Liability," and the general
29 rule of strict products liability was set out in section 1 thereto.

Strict products liability arose in the early- and mid-20th century from the perceived inability of the law of warranty and negligence to provide an adequate means of redress for injuries arising in a new kind of industrialized economy. That economy was characterized by mass production, the introduction of wholesale intermediaries in supply chains, and the expansion of product advertising. Makers and users of products had an increasingly attenuated relationship. Redress for injury arising from product defect, rooted in legal theories of warranty (requiring of privity of contract and immunizing defendants via warranty disclaimers) and negligence (with its virtually unattainable requirement to establish someone's unreasonable conduct somewhere in a complex multi-level production process), required rethinking. The question presented was who should bear the costs of such harms: an innocent purchaser or the product supplier who had means and motivation to eliminate defects, and the ability to spread that cost widely via the mechanism of price and the securing of insurance?[11]

Plaintiffs' SAC implies similar questions now about Snapchat and its place in society and the economy.

---

The SAC purports to state legal theories for strict product liability under counts 1, 2 and 3. As pleaded, counts 1 and 3 are duplicative; both assert strict products liability claims for design defect under the risk-benefit prong. (See, e.g., SAC ¶¶ 728, 730-731, 750, 753, 789, 798.) Count 2 asserts a claim for strict products liability for failure to warn.

Snap demurs to these counts on the ground that Snapchat is "is a service, not a 'tangible product.'" (Demurrer, 1-2.) Plaintiffs assert otherwise: "Snapchat is a product under California law." (Opposition, 11.) The parties in their papers compare and contrast

---

[11] Histories of the development of strict product liability law include Graham, *Strict Products Liability at 50: Four Histories* (2014) 98 Marq. L.Rev. 555; Note, *A Broken Theory: The Malfunction Theory of Strict Products Liability and the Need for a New Doctrine in the Field of Surgical Robotics Note* (2019) 104 Minn. L.Rev. 3245; and Rothstein & Coleman, *Differentiating Strict Product Liability's Cost-Benefit Analysis From Negligence* (2023) 56 Loyola L.A. L.Rev. 637.

issues of "product versus service" and "tangibility" drawn from the definition of "product" found in section 19(a) of the Restatement Third of Torts, Products Liability: "A product is tangible personal property distributed commercially for use or consumption."

The tangible product versus (intangible) service test is a false dichotomy as applied to Snapchat, at least as Snapchat is described in the SAC. As noted, even the parties struggle to find language with which to categorize Snapchat,[12] but neither "product" nor "service" are up to the job. Snap's reliance on the Restatement definition falls short for several reasons. First, because that definition was drafted long before the applicable technology existed and does not account for an item with Snapchat's characteristics and functionalities; second, because as to "computer software" (probably the most apt category), the Restatement Third reporters found "no cases on point" (Rest.3d Torts, Products Liability, § 19, com. d) — again speaking to the obsolescence of the definition; and third, notwithstanding "tangibility," the definition opens the door to treat intangible items as products "such as electricity" when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property.[13]

Snap's arguments rely heavily on tangibility — a concept the court finds unhelpful to the analysis. Under the Restatement's definition, "tangibility," *viz.*, perceptibility to the

---

[12] The court agrees with Snap that its calling Snapchat its "flagship product" in its 2022 annual report, and its counsel at argument referring to Snapchat as a product before correcting herself, is not dispositive.

[13] There are, of course, computer software cases since the promulgation of the Third Restatement 25 years ago. They go both ways. On the one hand, for example, is *Quinteros v. InnoGames* (W.D. Wash. 2022) 2022 WL 898560 (online computer game was not a "product" as defined under Washington State law [collecting cases]). On the other side of the ledger are, for example, *Brookes v. Lyft Inc.* (Cir. Ct. Fla. 2022) 2022 WL 19799628 (Lyft's ride-sharing software application is a product for purposes of Florida products liability law]; *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation, supra,* 2023 WL 7524912 (motion to dismiss denied to permit "more fulsome analysis than the global approaches" take by counsel; the court analyzes whether the various functionalities of defendants' platforms are products); and *A.M., supra,* 614 F.Supp.3d at p. 817 (although it is not clear that the defense raised the "not a product" defense).

touch, appears to the court as merely another way of describing a service — something offered for use or consumption that one cannot perceive by touch.  It adds nothing to the product versus service binary.  What's more, even in 1998, the American Law Institute noted that intangibility *per se* does not answer the question given that the context of the distribution and use of an item may be sufficiently analogous to the distribution and use of tangible personal property for it to be subject to strict products liability.[14]

The parties' analyses, relying on the false dichotomy of product versus service and on tangibility, fall far short of the weighty social and economic issues embedded in the question of the applicability of strict liability principles, questions with which Justices Cardozo and Traynor, and Dean Prosser, earlier struggled.

**Ruling Re: "Not A Tangible Product"**

The court sees the issue as follows: is Snapchat, with its features, functionalities, and its place in our society and economy in 2023, something (pick your descriptor: product, service, interactive platform, app, website, software, tool) for which strict products liability does or should apply?  Or, using the 25-year-old Third Restatement's formulation, is the context of Snapchat's distribution and use sufficiently analogous to the distribution and use of tangible personal property to warrant its being treated under the law of strict products liability?

The court's answer is: not enough information yet to tell, and the question cannot be resolved on demurrer.  Accordingly, the court overrules Snap's demurrer to counts 1, 2, and 3 on the ground that Snapchat is not a tangible product. The court will permit the parties to create a factual record as the characteristics, functionalities, distribution, and uses of Snapchat.  The court has no doubt that it will revisit later whether California strict

---

[14] The unhelpfulness of the tangibility test is further revealed by considering whether Snapchat, to the extent it exists as a collection of electrons flitting among silicon atoms, has mass and thus could potentially be "tangible" by a profoundly sensitive measuring device.  The answer, absurdist and theoretical, is "yes."  An electron weighs 9.11  x  10e-28  grams.  (Encyclopedia Britannica (2023) Electron <britannica.com/science/electron> [as of Dec. 27, 2023].)

- 27 -

products liability law does or should apply in this case, but it will do so on a developed factual record.

### Snap's Challenges to Negligence: Counts 4, 5, 6, 7

In California, a plaintiff states a claim for negligence by alleging the existence of a legal duty, a breach of that duty, harm caused by the breach, and resulting damages. (*Ladd v. County of San Mateo* (1996) 12 Cal.4th 913, 917.)  Civil Code section 1714, subdivision (a) establishes a general duty for "everyone" to exercise ordinary care and skill in their property or person.  Failure to do so imposes responsibility for resulting injury except where the injured person willfully or for want or ordinary care brought the injury upon himself or herself.[15]

Snap asserts that under the facts as alleged, it is evident that California law recognizes an exception to the general rule of duty based on public policy.  Snap invokes the considerations identified by the California Supreme Court in *Rowland v. Christian* (1968) 69 Cal.2d 108 which, when balanced together, justify a departure from the fundamental principal embodied in section 1714, subdivision (a).  These include the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.  (*Id.* at pp. 112-113.)

The court disagrees with Snap: the allegations of the SAC are sufficient to establish the duty of reasonable care and do not establish as a matter of law an exception under public policy.  The California Supreme Court stated, "As we have explained, however, in the absence of a statutory provision establish an exception to the general rule of [section 1714, subdivision (a)], courts should create one only where clearly

---

[15] In the modern era, California employs a comparative negligence regime to reduce a plaintiff's damages attributable to his or her own fault in bringing about harm.

1    supported by public policy." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 771
2    (internal quotes omitted).)  Once again, however, the question of duty is not resolved for
3    all time.  On a factual record, where the court has the ability to appropriately weigh the
4    competing policy factors, the question of the existence of duty may well come up again.

5        Snap also asserts that the SAC fails to allege causation.  The court disagrees.
6    "The element of causation requires there to be a connection between the defendant's breach
7    and the plaintiff's injury." (*Coyle v. Historic Mission Inn Corp.* (2018) 24 Cal.App.5th 627,
8    645.)  "A substantial factor in causing harm is a factor that a reasonable person would
9    consider to have contributed to the harm.  It must be more than a remote or trivial factor.
10   It does not have to be the only cause of the harm." (CACI No. 430.)  The SAC alleges
11   causation sufficiently to survive attack by demurrer.

12       Snap demurs to count 6 (negligent failure to warn) on the basis that "the danger of
13   buying illegal drugs online is obvious, so no warning is required." (Demurrer, 2.)  The
14   SAC, however, alleges that the harm arose from a non-obvious danger, namely, the
15   presence of fentanyl in the drugs purchased by the minors.  The SAC does not allege an
16   obvious danger for which no warning is required.

17       With respect to count 7 (negligence per se), plaintiffs allege, "At all relevant times,
18   Snap had an obligation to comply with applicable statutes and regulations governing the
19   sale and distribution of illegal drugs to minors and distribution of controlled substances to
20   Americans more generally."  (SAC, ¶ 879.)  Plaintiffs do not identify the statutes or
21   regulations. The negligence per se doctrine is codified in Evidence Code section 669.
22   Under this doctrine, the plaintiff "borrows" statutes or regulations to establish a duty of
23   care and a standard of care.  Proof of violation of the statute or regulation raises a
24   presumption of negligence which then may be rebutted by evidence showing justification
25   or an excuse for the violation. (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 584;
26   *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 263.)

27       Snap's demurrer is premised on "failure to state facts sufficient to constitute a
28   cause of action" but does not demur on the grounds of uncertainty.  (Code Civ. Proc., §
29   430.10, subds. (e)-(f).)   The demurrer on this ground is overruled.  Even were the

demurrer based on uncertainty, it would be overruled. The statutes and regulations at issue may be ascertained through the discovery process. Plaintiffs' negligence per se theories may be subject to later challenge once the statutes and regulations are identified.

### Rulings re: Negligence Challenges

Snap's demurrers to counts 4, 5, 6, and 7 are overruled.

### Snap's Challenge to Tortious Interference with Parental Rights: Count 8

Plaintiff Jessica Diacont, a resident of Virginia, asserts Snap tortiously interfered with her custodial rights and parental relationship arising from the death of her child, Jacob. (SAC, ¶¶ 900-909.) She invokes Virginia state law[16]; in the heading of count 8, she refers to the Virginia Code Annotated, section 1-240.1.[17] She explains in her Opposition that the Virginia Supreme Court recognized the tort of interference in parental rights in *Wyatt v. McDermott* (Va. 2012) 725 S.E.2d 555. She is correct. Borrowing from extant Florida law, the Virginia Supreme Court stated the elements of this common law tort including, as relevant here, that "a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights." (*Id.* at p. 562.)

Plaintiff Diacont's theory apparently is not that the death of Jacob was the interference at issue; it was the denial of the mother's parental ability to prevent access to the Snapchat. (Opposition, 33.) Nowhere, however, does Diacont allege that Jacob's access to Snapchat was without her consent.

---

[16] It is not clear whether the court would apply Virginia law and neither side briefs the court on the choice-of-law question. For purposes of this demurrer only, the court will assume that Virginia law applies.

[17] This section reads, "A parent has a fundamental right to make decisions concerning the upbringing, education, and care of the parent's child."

1    **Ruling re: Count 8**

2    Assuming for argument that the Virginia law applies in this California proceeding,

3    the court sustains Snap's demurrer without leave to amend for failing to state facts

4    constituting a cause of action.

5    ### Snap's Challenge to Public Nuisance: Count 9

6    A claim for public nuisance requires allegations, among others, that the defendant,

7    by acting or failing to act, caused a "condition" that was harmful to health and that the

8    condition affected a substantial number of people at the same time.  It is an offense

9    against the exercise of rights common to the public. (*People ex rel. Gallo v. Acuna* (1997)

10   14 Cal.4th 1090, 1103.)  A "public right," the California Supreme Court explained with

11   citation to section 821B of the Second Restatement of Torts, "is common to all members

12   of the general public.  It is collective in nature and not like the individual right that everyone

13   has not to be assaulted or defamed or defrauded or negligently injured." (*Id.* at p. 1104.)

14   The essence of plaintiffs' claims is that Snap's conduct resulting in the death (or

15   serious injury) to their specific children.  While the SAC asserts that a substantial number

16   of other children have also died or been so injured, the rights involved are not "public

17   rights" designed to be vindicated by the law of nuisance.  They are personal in nature.

18   **Ruling re: Count 9**

19   The court sustains Snap's demurrer without leave to amend.

20   ### Snap's Challenges to Fraud, Concealment and Misrepresentation:

21   ### Counts 11, 12 and 13

22   In California, a claim for fraudulent misrepresentation or concealment requires

23   pleading (a) misrepresentation (false representation, concealment or nondisclosure); (b)

24   knowledge of falsity (scienter); (c) intent to defraud, i.e., to induce reliance; (d) justifiable

25   reliance; and (e) resulting damage. (*Engalla v. Permanente Medical Group, Inc.* (1997)

26   15 Cal.4th 951, 974.)  Negligent misrepresentation does not include the element of intent

27   to deceive. (*Moncada v. West Coast Quartz Corp.* (2013) 221 Cal.App.4th 768, 781.)

28   The pleading requirements for fraud require particularity and specificity: how, when,

29   where, to whom, and by what means the representations were tendered. (*Lazar v.*

*Superior Court* (1996) 12 Cal.4th 631, 645.)  Witkin explains, "The effect of this rule is twofold: (a) general pleading of the legal conclusion of "fraud" is insufficient; the facts constituting the fraud must be alleged; and (b) every element of the cause of action for fraud must be alleged in the proper manner (i.e., factually and specifically), and the policy of liberal construction of the pleadings [citation omitted] will not ordinarily be invoked to sustain a pleading defective in any material respect." (5 Witkin, Cal. Procedure (6th ed. 2023) Pleading, § 707.)

Snap asserts that plaintiffs have failed to meet the particularity and specificity requirements; plaintiffs assert they have and direct the court to footnotes 26 and 27 of their Opposition, citing specific paragraphs of the SAC.

The court finds that the allegations contained in paragraph 942, subsections (a) through (*l*), at a minimum, are sufficiently particular and specific to meet the pleading standard.  The allegations of reliance likewise are sufficient.  Given that a demurrer must eliminate an entire cause of action, these allegations are sufficient to overcome the demurrer.

In so finding, the court has in mind the Court of Appeal's explanation in *West v. JPMorgan Chase Bank, N.A.* (2013) 214 Cal.App.4th 780, 793 (*West*) (cleaned up): "We enforce the specificity requirement in consideration of its purposes.  The first purpose is to give notice to the defendant with sufficiently definite charges that the defendant can meet them. [Citations omitted.]  The second is to permit a court to weed out meritless fraud claims on the basis of the pleadings; thus, the pleadings should be sufficient to enable the court to determine whether, on the facts pleaded, there is any foundation, prima facie at least, for the charge of fraud."

Here, the SAC has sufficiently apprised Snap of the allegations of fraud, concealment, and misrepresentation (which may or may not be supplemented by information obtained in discovery).  "Prima facie" — meaning assuming the allegations are true — the court finds the SAC meets the "any foundation" test of *West*.

**Ruling re: Fraud, Concealment and Misrepresentation**

The court overrules Snap's demurrer to counts 11, 12 and 13.

## Snap's Challenges to Counts 14, 15 and 16

### Rulings

Snap's demurrer to count 14 (wrongful death) and 15 (survival action) are overruled. The allegations are sufficient to state causes of action for wrongful death and survival under California law.

Snap's demurrer to count 16 ("loss of consortium and society") is sustained without leave to amend because California law recognizes no cause of action for parents of minors. This ruling does not affect any entitlement under law for the recovery of damages under a recognized legal theory.

## Snap's Statute of Limitations Challenges

Snap asserts that some of plaintiffs Chapmans' and Diacont's claims are time-barred by California (or Virginia's[18]) two-year statute of limitations. Plaintiffs respond by invoking the delayed discovery rule. (*Fox v. Ethicon Endo-Surgery, Inc.* (2005) 35 Cal.4th 797, 803.) On reply, Snap argues that the delayed discovery allegations in the SAC are "implausible." (Reply, 20.) Plausibility, however, is not the test on demurrer in the California state courts.

### Rulings

Snap's demurrers, as presented, based on the statute of limitations are overruled. To the extent Virginia law applies to a claim and such law provides a defense under a statute of limitations, the matter may be raised later on a motion for summary judgment.

## CONCLUSION

Snap's demurrers to counts 1, 2, 3, 4, 5, 6, 7, 11, 12, 13, 14 and 15 are overruled.

Snap's demurrers to counts 8, 9, 10 and 16 are sustained without leave to amend (recall, plaintiffs do not seek leave to amend.)

---

[18] Again, neither side briefs the court on the applicability of Virginia law including whether Virginia recognizes a delayed discovery rule.

1    Snap is ordered to file its answer to the SAC within 30 days of service of this order.

3    Dated: January 2, 2024

LAWRENCE P. RIFF
JUDGE OF THE SUPERIOR COURT

- 34 -