**COVINGTON**

BEIJING BOSTON BRUSSELS DUBAI FRANKFURT
JOHANNESBURG LONDON LOS ANGELES NEW YORK
PALO ALTO SAN FRANCISCO SEOUL SHANGHAI WASHINGTON

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
T +1 424 332 4800

By CM/ECF

January 15, 2024

The Honorable Yvonne Gonzalez Rogers
United States District Judge
Ronald V. Dellums Federal Building & United States Courthouse
1301 Clay Street
Oakland, CA 94612

Re:  *In re Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, MDL No. 3047

Dear Judge Gonzalez Rogers:

Defendants respectfully ask the Court to set early deadlines in the personal injury cases for the parties' disclosure of general causation experts and for filing and adjudicating Rule 702 motions concerning the admissibility of those experts' testimony.[1]  The cases in this MDL raise legal and scientific issues that require this Court to rule on never-before-litigated theories of liability.  Chief among them is whether each Plaintiff can meet their burden of proving that particular features of Defendants' services (characterized by Plaintiffs as "design" features) caused them to become addicted to those services and, in turn, that this addiction caused a wide array of resulting harms, from lost sleep to eating disorders to suicide.  Meeting this burden requires Plaintiffs to prove both: (1) general causation—that the particular challenged features of Defendants' services are capable of causing a medically-recognized condition of addiction that, in turn, caused the range of harms that Plaintiffs allege; and (2) specific/individual causation—that a given Plaintiff's use of the specific features of Defendants' services caused that specific Plaintiff to become addicted to those services and, in turn, sustain a cognizable injury.  *E.g., In re Hanford Nuclear Rsrv. Litig.*, 292 F.3d 1124, 1133 (9th Cir. 2002).  Because the causation question will require an analysis of complex scientific issues outside jurors' common knowledge, Plaintiffs' proof must include reliable and relevant scientific expert testimony admissible under Rule 702.[2]

Adjudicating Rule 702 general causation challenges early, and *before* the parties complete fact and expert discovery unrelated to the topic of general causation, furthers one of the purposes of multi-district litigation: "promot[ing] the just and efficient conduct of [MDL] actions."  28 U.S.C. §1407.  Mass tort MDLs often follow this case management strategy, which aligns with the recent amendments to Rule 702 that confirm the district court's role as the gatekeeper for proffered expert testimony.  Further, because Defendants are not seeking a stay of discovery pending resolution of Defendants' Rule 702 challenges to Plaintiffs' general causation experts,

---

[1] The parties are submitting proposed Discovery Plans to Judge Kang on January 19. Defendants' plan will include a proposal prioritizing the general causation issue.

[2] *See, e.g., In re Onglyza (Saxagliptin) & Kombiglyze XR (Saxagliptin & Metformin) Prod. Liab. Litig.*, 2022 WL 3050665, at *7 (E.D. Ky. Aug. 2, 2022) ("[C]ase law in all 50 states . . . requires the plaintiff in cases involving complex issues of medical causation to present expert testimony").

implementing this proposal will not prejudice Plaintiffs' ability to proceed in prosecuting their cases.

I.  **The Question of General Causation Is Common to All Cases and Particularly Well Suited for Early Adjudication in this MDL.**

The rationale for addressing Rule 702 general causation challenges early in the schedule is particularly strong in this MDL. *First*, this MDL was created with the recognition that it would be the best forum to address "overarching issues of general causation." JPML Order at 2 (Oct. 6, 2022). In fact, two of Plaintiffs' lead counsel urged this point to the JPML in arguing for an MDL. JPML Response Br. of Plaintiff Doffing at 6 (Aug. 30, 2022) (the actions "will share factual questions regarding general causation"); JPML Response Br. of Plaintiff Westwood at 2 (Sept. 2, 2022) ("These cases deal with . . . similar science showing a causal connection.").

Plaintiffs' Master Complaint puts general causation front and center by repeatedly invoking claims about the alleged impacts of Defendants' services on brain development and mental health. *See, e.g.*, Second Amend. Master Compl. ¶¶ 64-67 (invoking claims about brain development and function to justify addiction claims); *id.* ¶¶ 70-73 (discussing alleged impact of social media on dopamine levels); *id.* at 16 n.37, 18 n.41 (discussing scientific literature related to the science of addiction); *id.* ¶ 96 (claiming that scientific studies demonstrate that social media platforms can have a detrimental effect on the psychological health of their users); *id.* ¶ 97 (claiming that compulsive use of Defendants' products "can entail a variety of behavioral problems"); *id.* ¶ 117 (claiming that "Defendants' apps have triggered depression, anxiety, eating disorders, self-harm, and suicidality among thousands of children").

*Second*, the scientific questions at the heart of these cases renders them well-suited for resolution through prioritized Rule 702 challenges to Plaintiffs' general causation experts. Plaintiffs bear the burden of providing reliable and relevant scientific evidence to prove that the specific features they challenge cause both addiction and the specific disparate resulting injuries they allege (*e.g.*, depression, anxiety, eating disorders, suicidality, suicide, etc.). And Rule 702 was recently amended "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule," underscoring the value of early resolution of the key MDL-wide issue that will arise under this Rule. Fed. R. Evid. 702 (2023 Comm. Notes). This burden presents significant challenges for Plaintiffs that this Court will be obligated to address, regardless of the schedule on which this case proceeds. *See, e.g.*, *In re Viagra/Cialis*, 424 F. Supp. 3d 781, 790 (N.D. Cal. 2020) ("The focus of the reliability inquiry is on the principles and methodology an expert uses" and "both unsound methods and unjustified extrapolations from existing data can require exclusion of an expert's testimony.").

Notwithstanding broad cultural discussion around social media use, the scientific literature does not establish that using Defendants' services causes mental health disorders like "addiction." Plaintiffs even acknowledge that "social media addiction" is not recognized by *The Diagnostic and Statistical Manual of Mental Disorders*, version 5 text rev. (DSM-5-TR), which is the standard classification of mental health disorders used by mental health professionals for the diagnosis and treatment of mental health disorders. *See* MDL 3047, Dkt. No. 1-13 (*C.N. et al. v. Meta Platforms, Inc., et al.*, Complaint), at ¶ 256 (alleging only that "[a]ddictive use of social media by minors is

psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 [DSM-5]" (emphasis added)). The absence of support for the core theories alleged here raises significant questions—for the Court to resolve—about whether Plaintiffs can marshal reliable expert testimony that the "design" features about which they complain are capable of causing a medically recognized condition of "addiction."[3]

Even if Plaintiffs could overcome that hurdle, they must then offer reliable and relevant expert testimony that the "design" of the Defendants' specific features/tools caused each of their ensuing harms *independent of potentially harmful third-party content* presented through the online platform. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.* ("*In re Soc. Media*"), ___ F. Supp. 3d ___, 2023 WL 7524912, at *13 (N.D. Cal. Nov. 14, 2023) (barring Plaintiffs' challenge to "design defects directly target[ing] defendants' roles as publishers of third-party content"). The vast majority of studies focus on exposure to third-party posted content and time spent consuming such content—not the *design* choices or features of the platforms. Setting aside the Section 230 and First Amendment concerns created by experts opining on harms resulting from viewing third-party content, the existing scientific literature recognizes that any purported causation evidence is "weak" and "inconsistent."[4] For example, the authors of one literature review of 16 studies found that "the available evidence *falls short of the standard of proof* required to identify digital technology use as a putative environmental cause of adolescent mental health problems."[5] The authors of another analysis of 23 studies determined that "the evidence *is still too weak* to promote a uniform interpretation of the correlation between time spent on digital technologies and well-being outcomes."[6] Numerous recent studies substantiate these conclusions, reporting insufficient evidence to establish a causal connection between social media and adolescent mental health.[7] Even the studies Plaintiffs cite in their Master Complaint concede

---

[3] *See Vaughn v. Hobby Lobby Stores, Inc.*, 2021 WL 2008469, at *8 (W.D. La. May 19, 2021) (excluding expert diagnosis because it "does not follow the DSM-5 criteria"); *United States v. Sampson*, 2016 WL 11726919, at *18 (D. Mass. Sept. 2, 2016) (excluding expert diagnosis of psychopathy because it was not a disorder listed in the DSM-5); *United States v. Weis*, 891 F. Supp. 2d 1007, 1011 (N.D. Ill. 2012) (excluding diagnosis of "Self-Defeating Personality Disorder" because there was insufficient support in either the DSM or scientific literature).

[4] Valkenburg et al., "Social Media Use and Its Impact on Adolescent Mental Health: Umbrella Review of The Evidence." Current Opinions in Psychology vol. 44:58-68 (2022).

[5] Candice L Odgers et al., "Annual Research Review: Adolescent mental health in the digital age: facts, fears, and future directions." Journal of child psychology and psychiatry, and allied disciplines vol. 61(3) (2020): 336-348 (emphasis added).

[6] Orben, Teenagers, Screens, and Social Media: A Narrative Review of Reviews and Key Studies (2020).

[7] *See, e.g.*, Jensen et al., "Young Adolescents' Digital Technology Use and Mental Health Symptoms: Little Evidence of Longitudinal or Daily Linkages" (2019) ("In our longitudinal study of adolescents followed intensively over time on their mobile devices we found little evidence to support a linkage, correlational or causal, between adolescents' digital technology usage and mental health symptoms."); Steinsbekk et al., Social media behaviors and symptoms of anxiety and depression. A four-wave cohort study from age 10–16 years (2023) (finding "no prospective (continued…)

meaningful limitations.[8]

An extensive report from the National Academies of Sciences, Engineering, and Medicine ("NAS") overviewing existing research recently confirmed the uncertainty in the scientific literature. NAS, *Social Media and Adolescent Health* (2023 Prepublication), *available at* https://doi.org/10.17226/27396. Both sides could find selective quotes in this report to support their arguments, with the report recognizing that some *content* accessed on social media might be harmful, while concluding that "there are also several ways in which social media improves the lives of youth." *Id.* at xvi. But the report's ultimate conclusion was unambiguous: the scientific literature "***did not support the conclusion that social media causes changes in adolescent health at the population level***." *Id.* at 92 (emphasis added).

These examples highlight the substantial issues that Plaintiffs must address to meet their evidentiary burden on general causation. They also underscore the value of addressing general causation early in this litigation, avoiding potentially unnecessary and protracted litigation that expends Court and party resources on claims that may not have basic evidentiary support on a threshold element that cuts across all cases.

## II. Early Resolution of General Causation Challenges Promotes Judicial Efficiency, With No Prejudice to Plaintiffs.

Defendants, therefore, ask the Court to set early dates for: (1) disclosure of the parties' general causation experts;[9] (2) depositions of the parties' general causation experts; and (3) Rule

---

relations between social media use and symptoms of anxiety and depressive disorders—in either direction."); Panayiotou et al., Social Media Use Among the Least Influential Factors in Adolescent Mental Health: Results from a Panel Network Analysis (2022) (concluding that "the time spent interacting with social media is among the least influential factors within adolescent mental health, functioning, and social life."); Kreski et al., Social Media Use And Depressive Symptoms Among United States Adolescents (2021) (finding "no overall association[] between daily social media use and depressive symptoms").

[8] *See* Karim et al, Social Media Use and Its Connection to Mental Health (2020) ("[I]t is not possible to conclude that the use of social networks causes mental health problems.") (cited in Master Complaint at 26 n.80); Tiggemann & Slater, NetTweens: The Internet and body image concerns in preteenage girls (2014) ("[T]he present study was correlational in design and thus firm causal conclusions cannot be drawn.") (cited in Second Amend. Master Compl. at 28 n.87); McLean et al., Photoshopping the Selfie: Self Photo Editing and Photo Investment Are Associated with Body Dissatisfaction in Adolescent Girls (2015) (stating that "[t]he cross-sectional nature of the analyses preclude conclusions being drawn about the direction of relationships observed") (cited in Second Amend. Master Compl. at 100 n.424).

[9] Defendants submit that only limited discovery, if any should be needed for Plaintiffs to prepare expert reports on the issue of general causation, which is based on scientific questions presented by the complaint. Defendants have proposed general causation expert deadlines in their Discovery Plan that allow time for such limited discovery on this issue. This would allow the Court to address this issue before the parties are able to complete a substantial portion of broader fact discovery.

702 challenges and adjudication of the admissibility of those experts' opinions. This process would yield meaningful efficiencies. If Plaintiffs cannot proffer admissible expert testimony on general causation, that will effectively end or at least substantially narrow this MDL. And if Plaintiffs present admissible evidence, the Court will have resolved a critical question that it would otherwise have to address later.

Addressing the threshold topic of general causation early is consistent with the *Manual for Complex Litigation,* which states: "[i]ssues to be taken up early in the litigation may include . . . whether the facts and expert evidence support a finding that the products or acts in question have the capacity to cause the type of injuries alleged." Ann. Manual Complex Lit. § 22.634 (4th ed.). Recognizing these efficiencies, a number of MDL courts, including as recently as last month, have prioritized adjudicating general causation evidentiary challenges under Rule 702. This practice has been applied by several courts in this District,[10] by MDL courts that are coordinating with parallel California state court JCCPs,[11] and by courts around the country.[12]

In nearly all of the above-referenced MDLs, courts have phased discovery, with discovery limited in the first phase to issues relating to general causation and other discovery occurring later only if the plaintiffs' general causation experts survived Rule 702 challenges. Here, guided by the Court's directive that discovery in this MDL is open, Defendants do not propose that early discovery be limited to general causation. Instead, without imposing limitations on other discovery, Defendants propose that the Court set a date to address and adjudicate Rule 702 challenges to general causation experts before the parties brief the balance of their Rule 702 challenges (*e.g.*, on specific/individual causation or other expert issues) and other dispositive motions.[13] Plaintiffs are free, before the deadline for Defendants' Rule 702 motions, to identify and take whatever targeted discovery they feel is necessary to inform the issue of general causation. Discovery can be structured and timed to align with a prioritized general causation focus while discovery on other issues is ongoing, as Defendants will propose to Judge Kang in their January 19 submission. Plaintiffs, therefore, have no viable claim that they would be prejudiced in any way by Defendants' proposal.

---

[10] *In re Viagra/Cialis*, 424 F. Supp. 3d 781, 799 (N.D. Cal. 2020) (Seeborg, C.J.); *In re Viagra/Cialis*, No. 3:16-md-02691, ECF No. 1021 at 2 (N.D. Cal. Apr. 8, 2020); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.*, 3:05-md-01699, ECF No. 1098 at 1-4 (N.D. Cal. Mar. 16, 2007) (Breyer, J.).

[11] *In re Onglyza*, 2022 WL 3050665, at *14; *In re Incretin Mimetics Prods. Liab. Litig.*, No. 3:13-md-02452, ECF No. 325 at 1 (S.D. Cal. Feb. 18, 2014).

[12] *See In re Mirena IUD Prod. Liab. Litig.*, 713 F. App'x 11, 14 (2d Cir. 2017); *In re Nexium (Esomeprazole) Prods. Liab. Litig.*, No. 2:12-ml-2404, ECF No. 89 at 7 (C.D. Cal. Mar. 11, 2013); *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.,* 2:01-md-01407, ECF No. 340 at 1 (W.D. Wash. Mar. 22, 2002); *Avila v. Willits Envl. Remediation Trust*, 633 F.3d 828, 836 (9th Cir. 2011); *In re Acetaminophen Prod. Liab. Litig.*, 1:22-md-3043, 2023 WL 8711617 (S.D.N.Y. Dec. 18, 2023).

[13] *In re Zantac (Ranitidine) Products Liab. Litig.*, 644 F. Supp. 3d 1075, 1098 (S.D. Fla. 2022) (following this practice).

Dated: January 15, 2024

Respectfully submitted,

*/s/ Ashley Simonsen*

Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com

Emily Johnson Henn (State Bar. No. 269482)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800
Email: ehenn@cov.com

Isaac D. Chaput (State Bar. No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: + 1 (415) 591-6000
Facsimile: +1 (415) 591-6091
Email: ichaput@cov.com

Gregory L. Halperin, *pro hac vice*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018

Telephone: + 1 (212) 841-1000
Facsimile: +1 (212) 841-1010
Email: ghalperin@cov.com

*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC;Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

**KING & SPALDING LLP**

*/s/ Geoffrey Drake*

Geoffrey M. Drake
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: + 1 (404) 572-4600
Facsimile: + 1 (404) 572-5100
Email: gdrake@kslaw.com

**FAEGRE DRINKER LLP**

*/s/ Andrea Roberts Pierson*

Andrea Roberts Pierson
Faegre Drinker LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000
Email: andrea.pierson@faegredrinker.com

*Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**

*/s/ Lauren Gallo White*

Lauren Gallo White

Wilson Sonsini Goodrich & Rosati
lwhite@wsgr.com
Samantha A. Machock
smachock@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Brian M. Willen
Wilson Sonsini Goodrich & Rosati
bwillen@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Christopher Chiou
Wilson Sonsini Goodrich & Rosati
cchiou@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

**WILLIAMS & CONNOLLY LLP**

*/s/ Joseph Petrosinelli*

Joseph G. Petrosinelli, *pro hac vice*
jpetrosinelli@wc.com
Ashley W. Hardin, *pro hac vice*
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Tel.: 202-434-5000

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

**MUNGER, TOLLES & OLSON LLP**

*/s/ Jonathan Blavin*

Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP

8

560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Lauren A. Bell, *pro hac vice*
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

*Attorneys for Defendant Snap Inc.*

## ATTESTATION

I, Ashley Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: January 15, 2024   By: */s/ Ashley Simonsen*
Ashley Simonsen