

VIA ECF  January 15, 2024
Honorable Yvonne Gonzalez Rogers
U.S.D.C., Northern District of California
Oakland Courthouse
1301 Clay Street, Courtroom 1, 4th Fl.
Oakland, CA 94612

> *In Re: Social Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, **4:22-md-03047-YGR**:
> Plaintiffs' Opposition to Request to "Prioritize" General Causation

Dear Judge Gonzalez Rogers:

In accordance with CMO 7, Plaintiffs respectfully submit this letter brief in opposition to Defendants' proposal to "prioritize" discovery and *Daubert* motions on general causation.

Discovery in this MDL is open.[1] The same is true in the JCCP, which is looking to the MDL to ensure timely completion of discovery on all common issues. Phasing discovery is not the norm and "prioritizing" general causation issues makes no sense here. Instead, Defendants' proposal threatens to bog the parties down in disputes over what is to be "prioritized" and how. Moreover, front-loading general causation issues in the MDL could unnecessarily complicate coordination with the JCCP, where Judge Kuhl expressed skepticism of any isolated, early resolution of general causation issues.

The more efficient and useful path forward is the tried-and-true process used in countless MDLs,[2] which is to proceed with all common discovery without artificial sequencing or structuring, and then use bellwether cases to tee up and test the sufficiency of the evidence (including any *Daubert* challenges) in the context of real-world facts and with the benefit of a complete discovery record.

### 1. Prioritization of Individual Issues Is Not the Norm and Leads to Inefficiency

Discovery and pretrial scheduling issues are guided by two main concerns: efficiency and fairness. *Spectra-Physics Lasers, Inc. v. Uniphase Corp.*, 144 F.R.D. 99, 101 (N.D. Cal. 1992) (party requesting phasing must show it "will promote judicial economy or that no party will be prejudiced"). Frontloading one or more issues, as Defendants propose, is "not the norm" and "seldom results in efficient case management." *Dean v. Pfizer, Inc.*, 2020 WL 12032895, at *2 (S.D. Ind. Dec. 9, 2020) (denying request to bifurcate general causation issues in drug product liability case).

Attempts to structure discovery by issue raise "myriad disputes whether certain information, search terms, interrogatories, or deposition questions are sufficiently relevant to one [issue] and not the other."

---

[1] **Ex. A** (Tr. 11/16/23 CMC) at 70:14-70:16.

[2] *E.g.*, *In re Vioxx Prod. Liab. Litig*. (MDL 1657), 2012 WL 6045910, at *2 (E.D. La. Dec. 4, 2012) (after "reasonable period for discovery," first bellwether case tried less within year of MDL formation); *In re Proton-Pump Inhibitor Prod. Liab. Litig.*, No. 2:17-md-2789 (D.N.J. May 18, 2018), ECF No. 209 (denying motion to consider general causation before fact discovery in individual cases) (**Ex. B**); *In re Hair Relaxer Mktg. Sales Pract. and Prod. Liab. Litig.*, No. 1:23-cv-00818 (N.D. Ill. July 27, 2023) ECF No. 146 (denying request to prioritize general causation discovery; ordering "traditional fact discovery") & ECF No. 168 (ordering single deadline for generic and case-specific discovery) (**Ex. C**).

*Dean*, 2020 WL 12032895, at *3.[3] The inefficiencies are particularly great "where discovery cannot be so neatly divided among issues" or "where discovery is expected to be wide-ranging and arduous no matter if the parties attempt to focus on only one alleged discrete issue first." *Dean*, 2020 WL 12032985, at *3.

Similarly, pre-discovery speculation that a plaintiff ultimately may not carry their burden on an issue exists in virtually any case. It does not justify interfering with the ordinary course of discovery. *See Gonzalez.*, 2007 WL 661914, at *2 (claim "that much of plaintiffs' case might fall away" after *Daubert* was mere speculation; it is "preferable to allow fact and expert discovery to proceed on all issues") (emphasis in original). As Judge Kennelly observed when he rejected a request to prioritize general causation in *In re Testosterone Replacement Therapy Prod. Liab. Litig.* ("*TRT MDL*"), such requests unfairly ask the court "to make sort of a preliminary indication, [that] yes, this is kind of a weak case and so I should do it this way." **Ex. D**, *TRT MDL*, MDL No. 2545, Tr. Oct. 24, 2014 Hrg. at 43:15-22 (expressing "visceral discomfort" with prioritizing general causation).

As set forth below, Defendants' request to "prioritize" general causation will not produce any efficiencies. This is not a case in which general causation evidence and issues can be readily isolated from the rest of the case. Nor is it a case that cries out for early testing of causation given the multitude of studies already cited in the Master Complaint and the considerable evidence already available that Defendants knew and intended that their designs would drive more and more use—"engagement"—for their platforms and were leading to "problematic use" and severe mental health problems for children. Moreover, drawing an artificial line between an issue to be "prioritized" and other issues in the case will generate disputes and obstruct and delay full disclosure as Defendants try to pick and choose what limited discovery they deem relevant to general causation.

Defendants' request should be denied, and Plaintiffs should be permitted to continue with full, complete, and timely discovery of the facts that Defendants have kept out of sight for so many years.

## 2. Prioritizing General Causation Is Inefficient and Threatens MDL/JCCP Coordination

Defendants' proposal should be denied because "prioritizing" general causation will burden the Court and the parties with discovery disputes and undermine coordination with the JCCP.

Where, as here, "there is no neat line dividing information relevant to general causation and to specific causation," efforts to prioritize discovery will "undoubtedly lead[] to myriad disputes whether certain information, search terms, interrogatories, or deposition questions are sufficiently relevant to one [issue] and not the other." *Dean*, 2020 WL 12032895, at *3. Indeed, the likelihood of "increased costs based on an increased potential for discovery disputes" is a principal reason courts reject efforts to structure discovery by issue. *Gonzalez*, 2007 WL 661914, at *1, *2 ("setting an earlier deadline, even on one issue, will likely result in increased costs for all involved"); *Metformin MDL*, 2023 WL 2324769, at *1 n.3 (D.N.J. Mar. 2, 2023) (discovery phasing "would overly complicate discovery and invite case management problems, such as disputes concerning the appropriate scope of discovery for each stage").

The likelihood of disputes here is high. The whole premise of Defendants' proposal to "prioritize" general causation is that front-loading the issue allegedly would save costs if Defendants prevail on *Daubert* motions. Even putting aside that this argument rests on wholly unsupported assumptions and

---

[3] *See also Gonzalez v. Texaco, Inc.*, 2007 WL 661914, at *1 (N.D. Cal. Feb. 28, 2007) ("phased discovery would lead to increased costs based on an increased potential for discovery disputes"); *In re Metformin Mktg. & Sales Pract. Litig.* ("*Metformin MDL*"), 2023 WL 2324769, at *1 & n.3 (D.N.J. Mar. 2, 2023) (phasing "would overly complicate discovery and invite case management problems, such as disputes concerning the appropriate scope of discovery for each stage").

speculation about fact and expert evidence yet to be developed, Defendants' cost savings calculus makes sense only if Defendants intend to aggressively <u>limit</u> what constitutes discovery relevant to general causation. But, as explained below, this is not a case in which there is some limited set of evidence of causation. Rather, evidence relevant to whether and how Defendants' chosen designs impact user behavior by increasing the frequency and duration of use and the social, emotional, and mental attachments to use is reasonably expected to come from nearly all major divisions within Defendants' businesses. This is because, as laid out in detail in the Master Complaint, increasing "engagement" was and is a core business goal driving virtually all design, investment, marketing, safety, compliance, and sales decisions and functions at each of Defendants' companies. It is this wholly expected and intended effect on user engagement that, Plaintiffs contend and will prove at trial, leads to injurious addictive, compulsive, and "problematic" use and the cascade of additional mental and physical injuries alleged in this MDL (e.g., depression, anxiety, body dysmorphia, eating disorders, suicide ideation). Plaintiffs' choices about what to explore in discovery and how to prove their case should not be constrained by any artificial division between "prioritized" discovery on general causation and other "non-priority" issues.

"Prioritizing" general causation also should be denied because it could complicate coordination with the JCCP proceeding. When Judge Kuhl was informed of Defendants' intent to ask this Court to "prioritize" general causation issues, she was skeptical that general causation could be isolated. **Ex. E** (Tr. 12/7/23 JCCP Status Conf.) 39:6-16. As importantly, Judge Kuhl emphasized that the Court will not plan "around trying to determine general causation." *Id*. Judge Kuhl noted that the current plan to coordinate JCCP and MDL discovery might need to be revisited "if discovery in federal court is not proceeding in the way that [] deadlines [set in the JCCP] can be met." *Id*. at 7:17-24. Thus, far from creating efficiencies, "prioritizing" general causation in the MDL risks complicating coordination with the JCCP.

### 3. General Causation Is Not Readily Isolated From Other Issues

Based on a draft position statement provided to Plaintiffs in December, Defendants' prioritization proposal appears to rely on rulings in certain drug injury and/or toxic tort cases. As noted above, however, multiple courts have <u>rejected</u> prioritization of general causation in such cases. And the claims here raise very different issues that preclude isolating and prioritizing "general causation."

First, in a drug injury or toxic tort case, the alleged cause of the injury typically is a chemical compound that exists and can be studied separate and apart from the defendant's business. Fact and expert discovery on whether the chemical is capable of causing a given injury can be targeted and discrete.[4]

Here, Plaintiffs' claims implicate multiple defects in the <u>design</u> of Defendants' platforms, not the biological effects of isolated compounds in Defendants' product. Moreover, Plaintiffs allege the design defects at issue were integral to each Defendants' business objectives—namely, that each Defendant intentionally included the challenged design features in their platforms in order to expand the number of users and increase the length, frequency, and depth of use—and that they did so despite knowing that increased use and "engagement" would predictably cause children to use the platforms addictively, compulsively, or "problematic[ally]." *E.g.*, Plaintiffs' Second Amended Master Complaint (ECF No. 494) ("MC") ¶¶ 19, 323-26, 391A, 486, 558, 755-59. As such, much of the evidence about whether the design defects are <u>capable</u> of causing the injuries alleged will come from Defendants' <u>own</u> files and studies,

---

[4] *See, e.g.*, *In re Meridia Prod. Liab. Litig.* ("*Meridia MDL*"), 328 F. Supp. 2d 791, 798 (N.D. Ohio 2004). Phasing of general causation has been permitted in such cases because it is necessary to determine whether a specific contaminant or ingredient is capable of causing the injuries alleged and when a chemical's effect can be examined separate and apart from other issues in the case. *See, e.g.*, *In re Onglyza & Kombiglyze XR Prod. Liab. Litig.*, 2022 WL 3050665, at *3 (E.D. Ky. Aug. 2, 2022).

rather than from external medical and scientific literature. And the evidence at issue will not be limited to science departments. Instead, it will include evidence from many different facets of Defendants' business explaining <u>why</u> each Defendant believed these designs would, as intended, help them drive more and more "engagement." What user engagement targets were Defendants' design teams given, and why did Defendants believe they were attainable? What cost-benefit analyses did Defendants use in choosing to implement these designs, and what data did Defendants rely on to determine whether the designs were increasing engagement as desired? What did Defendants tell their advertising customers about who their audiences were and why a platform was effective in keeping youth "engaged"? An illusory division between general causation and other liability issues risks allowing Defendants—rather than Plaintiffs—to dictate how Plaintiffs will prove up their case and threatens to prejudice Plaintiffs if general causation is tested without complete discovery of Defendants' business decisions, practices, and data.

Second, as Judge Kuhl observed, this is not "the type of case where general causation is going to be able to be pulled apart from specific causation." **Ex. E** at 39:6-16. As Judge Kuhl recognized, when injuries involve behavioral science questions (e.g., psychology, sociology, and similar disciplines), there is no useful distinction between general and specific causation. *Id.* ("we're talking about mental illness here and not a physical change in the body like mesothelioma or diabetes."); *see also Couture v. Bd. of Educ. of Albuquerque Pub. Sch.*, 2007 WL 9734358, at *12 (D.N.M. Mar. 28, 2007) (distinguishing admissibility of psychiatrist's testimony as "soft science" from admissibility of general causation testimony in pharmaceutical cases). Plaintiffs allege Defendants' platforms cause addictive, compulsive, and "problematic" use through the combined manipulation and exploitation of adolescents' neurobiology, psychology, and developmental social needs. *E.g.*, MC ¶¶ 76-90. Thus, Plaintiffs' claims are not limited to a clinical diagnosis of addiction and the chain of causation includes both hard and social sciences— e.g., what triggers dopamine releases and how social comparison impacts youth behavior. Thus, this case is different from the drug injury and toxic tort cases where the division between general and specific causation has developed to address the "unique" challenges in those cases[5]—and has been held <u>unnecessary</u> outside of that limited context.[6]

The inability to isolate the issue of general causation is yet another reason why this Court should follow the tried-and-true process of using bellwether cases to test core issues, rather than artificially examining one supposed element in the abstract, as Defendants urge.[7]

### 4. Prioritizing General Causation Assumes an Unsupported Merits Conclusion

As other courts have observed, a request to "prioritize" the issue of general causation effectively asks the Court to assume the likelihood that the defendant will prevail on an eventual *Daubert* and/or

---

[5] *Meridia MDL*, 328 F. Supp. 2d at 798 (two-step general and specific causation framework was developed to address "unique challenge" toxic tort claims present to "classical conception of causation.").

[6] *See, e.g.*, *Burgess v. Codman & Shurtleff, Inc.*, 2016 WL 4570370, at *3 (E.D. Ten. Aug. 30, 2016) (plaintiff not required to separately prove generic causation in product liability claim not involving toxic tort); *Holcombe v. U.S.*, 516 F. Supp. 3d 660, 678-79 (W.D. Tex. 2021) (two-step causation framework inapplicable where causation could be shown through epidemiology, economics, sociology, and psychology); *accord Saccheti v. Gallaudet Univ.*, 344 F. Supp. 3d 233 at 249 n. 9 (D.D.C. Oct. 29, 2018) (acknowledging plaintiff was not required to establish general causation outside of toxic tort context).

[7] A unified discovery plan may also facilitate settlement. *See, e.g., In re Nat'l Prescription Opiate Litig.*, 2019 WL 3843082, at *1 (N.D. Ohio Aug. 15, 2019) (recognizing bellwether process as essential for "information gathering that would facilitate valuation of cases to assist in global settlement").

summary judgment motion. Otherwise, "prioritization" imposes all of the costs of attempts to structure discovery (disputes, motions, and risks of prejudice) without any of the benefits of likely early resolution of claims. *Gonzalez*, 2007 WL 661914, at *2; **Ex. D** (TRT MDL Tr.) at 43:23-44:14.

Here, Defendants' request for "prioritization" of general causation is premised on entirely self-serving—and entirely <u>untested</u>—arguments about what the current literature says about the connection between Defendants' platforms and the mental health of the children who use them. We respectfully submit that the Court should reject Defendants' transparent effort to ask the Court to pre-judge the evidence yet to be laid out under the bright lights of discovery—all before the pleadings are even settled.

This is not a case in which Plaintiffs rely on conclusory allegations of causation. To the contrary, the Master Complaint cites dozens of studies linking Defendants' designs and platforms to the types of injuries the MDL Plaintiffs claim. MC ¶¶ 96-124. Indeed, the nation's leading public health officer—the United States Surgeon General—has advised that "[c]hildren and adolescents who spend more than 3 hours a day on social media face double the risk of mental health problems including experiencing symptoms of depression and anxiety. This is concerning as a recent survey showed that teenagers spend an average of 3.5 hours a day on social media." https://www.hhs.gov/surgeongeneral/priorities/youth-mental-health/social-media/index.html. Moreover, much of what has driven this MDL, the JCCP, and the years of investigations by Congress and the states—and now lawsuits by 44 states—are the revelations from Defendants' own files that they knew their platforms were harming kids through addiction, compulsive use, and "problematic" use—all as a result of the choices Defendants made in how to design and run their platforms. MC ¶¶ 19, 323-26, 331, 364-391A, 441-42, 486, 540, 755-59.

In short, even without the benefit of discovery, there is ample evidence that Defendants' platforms are hurting kids because of the compulsive, addictive, and unhealthy "engagement" Defendants' designs induce by manipulating the still-developing brains and social skills of children. "Prioritizing" general causation will be a fruitless exercise that, at best, will yield a battle of the experts for juries to resolve. *See, e.g.*, *Apple iPod iTunes Antitrust Litig.*, 2014 WL 4809288, at *6, 10 (N.D. Cal. Sept. 26, 2014) (a "battle of the [] experts" is not properly resolved on *Daubert*).[8]

**4.  Conclusion**

For all of the above reasons, Plaintiffs request that the Court deny Defendants' proposal to "prioritize" discovery and resolution of general causation issues.

Respectfully submitted,

*/s/ Christopher A. Seeger*
Christopher A. Seeger

---

[8] Even if Plaintiffs were unable to proffer reliable evidence linking Defendants' design defects to the alleged injuries, Plaintiffs' claims for violation of consumer protection laws (Count 7), fraudulent concealment and misrepresentation (Count 8), negligent concealment and misrepresentation (Count 9), and violations of 18 U.S.C. §§ 2255 and 2252 (Counts 12 & 14) would remain.