Pages 1 - 147

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA              )
ADOLESCENT ADDICTION/PERSONAL     )
INJURY PRODUCTS LIABILITY         )
LITIGATION,                       )
                                  )   **NO. C 22-md-03047-YGR (PHK)**
                                  )
_____    )

                          San Francisco, California
                          Thursday, January 25, 2024

APPEARANCES:

For Plaintiffs:
                    SEEGER WEISS LLP
                    1515 Market Street - Suite 1380
                    Philadelphia, Pennsylvania  19102
               BY:  **CHRISTOPHER AYERS, ATTORNEY AT LAW**

                    LIEFF, CABRASER, HEIMANN
                       & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California 94111
               BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    401 9th Street NW - Suite 630
                    Washington, D.C. 20004
               BY:  **PREVIN WARREN, ATTORNEY AT LAW**


          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**




Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

**APPEARANCES:   (CONTINUED)**

                        MORGAN & MORGAN
                        220 W. Garden Street, 9th Floor
                        Pensacola, Florida 32502
                    BY:  **EMILY C. JEFFCOTT, ATTORNEY AT LAW**

For Plaintiff State of New Jersey:
                        NEW JERSEY OFFICE OF THE
                        ATTORNEY GENERAL
                        Division of Law
                        124 Halsey Street
                         Box 45029
                    BY:  **THOMAS HUYNH, ASSISTANT ATTORNEY**
                        **GENERAL**

For Defendant Meta:
                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars - Suite 3500
                        Los Angeles, California 90025
                    BY:  **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        Sales Force Tower
                        415 Mission Street - Suite 5400
                    BY:  **ISAAC D. CHAPUT, ATTORNEY AT LAW**

For Defendant Snap:
                        MUNGER, TOLLES & OLSON LLP
                        560 Mission Street - 27th Floor
                        San Francisco, California  94105
                    BY:  **JONATHAN H. BLAVIN, ATTORNEY AT LAW**

For Defendant TikTok:
                        FAEGRE DRINKER BIDDLE & REATH LLP
                        90 S. 7th Street - Suite 2200
                        Minneapolis, Minnesota 55402
                    BY:  **AMY R. FITERMAN, ATTORNEY AT LAW**

                        FAEGRE DRINKER BIDDLE & REATH LLP
                        300 North Meridian Street - Suite 2500
                        Indianapolis, Indiana 46204
                    BY:  **ANDREA PIERSON, ATTORNEY AT LAW**

                        KING & SPALDING LLP
                        1180 Peachtree Street
                        Atlanta, Georgia 30309
                    BY:  **GEOFFREY DRAKE, ATTORNEY AT LAW**

1    **APPEARANCES**:    (CONTINUED)

2    For Defendant YouTube:

                           WILSON, SONSINI, GOODRICH & ROSATI
3                          633 West Fifth Street - 15th Floor
                           Los Angeles, California 90071
4                    BY:   **MATTHEW DONOHUE, ATTORNEY AT LAW**

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - January 25, 2024**                                    **1:05 p.m.** |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Please remain seated and come to order. |
| 5 | The Honorable Peter H. Kang presiding. |
| 6 | Now calling 22-md-3047-YGR, Rodriguez v. Meta Platforms, |
| 7 | Incorporated. |
| 8 | Counsel, please approach the podiums and state appearances |
| 9 | when speaking. |
| 10 | **MR. WARREN:**  Good afternoon, Your Honor.  Previn |
| 11 | Warren for the personal injury school district and local |
| 12 | government entity plaintiffs. |
| 13 | **THE COURT:**  Good afternoon. |
| 14 | **MR. WARREN:**  Good afternoon. |
| 15 | **MS. SIMONSEN:**  Good afternoon, Your Honor.  Apologies. |
| 16 | I thought we might all be doing appearances.  Ashley Simonsen |
| 17 | from Covington & Burling for the Meta defendants. |
| 18 | **THE COURT:**  Okay.  And if anybody else is going to be |
| 19 | speaking on specific issues, for the folks on Zoom, please come |
| 20 | to the podium. |
| 21 | Thank you for your submissions and proposed discovery |
| 22 | plans and your reports. |
| 23 | So -- and I assume everybody has seen my order on the |
| 24 | protective order.  So just out of curiosity, anybody planning |
| 25 | on appealing?  Is that in the works? |

1          **MR. WARREN:**  I don't think we've reached agreement on

2     that, but I doubt it.

3          **THE COURT:**  All right.

4                    (Pause in proceedings.)

5          **THE COURT:**  Okay.  So I thought, just for ease of

6     agenda, just going through the report and then the proposed

7     discovery plan in order because that seems to make sense, but

8     if there's something that you want to talk about, at the top

9     that's not reflected in either, I'm happy to prioritize any

10    issue, in case there's something pressing that we need to

11    discuss right away.

12         **MR. WARREN:**  That works.

13         **THE COURT:**  So just want to double-check.  The

14    30(b)(6) depos, Snap, those are definitely going forward.

15    There's no problem?  I see they were scheduled.  They're all

16    set.  Nothing to talk about.

17         **MR. BLAVIN:**  That's correct, Your Honor.

18        Jonathan Blavin on behalf of Defendant Snap.

19        That's correct, Your Honor.  They are scheduled.

20         **THE COURT:**  And then so I guess next is ESI order.

21    So are you two ready to do the long march?

22         **MR. WARREN:**  I'm not, but I will hand it off to the

23    person that is.

24         **MS. SIMONSEN:**  Likewise, Your Honor.

25         **MR. AYERS:**  Good afternoon.  Christopher Ayers, Seeger

**PROCEEDINGS**

 1  Weiss, on behalf of the plaintiffs.

 2          **THE COURT:**  Good afternoon.

 3          **MS. FITERMAN:**  Good afternoon, Your Honor.  Amy

 4  Fiterman on behalf of the TikTok defendants.

 5          **THE COURT:**  Good afternoon.  And if I could find the

 6  chart.

 7          **MR. AYERS:**  If I may, Your Honor, since we filed the

 8  chart, the joint chart, the parties were able to reach

 9  resolution on Issues 9 and Issues 10.

10          **THE COURT:**  Great.

11          **MR. AYERS:**  And so those are off the Court's plate.

12  Thank you.

13          **THE COURT:**  Great.

14          **MR. AYERS:**  Thank you.

15                    (Pause in proceedings.)

16          **THE COURT:**  I'm sorry.  Give me your names again.

17          **MR. AYERS:**  Sure.  Chris Ayers on behalf of the

18  plaintiffs.

19          **MS. FITERMAN:**  Amy Fiterman on behalf of the

20  defendants, specifically, TikTok.

21          **THE COURT:**  Gotcha.  All right.  So let's start.

22      The questions I had -- I'll be issuing an order after

23  this, of course, proposed, with my final language for Issue 1

24  just to the parties.  And I'm probably going to mix and match

25  some of the language from both parties on Issue 1.  So we can

 1    take a look at that.

 2        On issue -- that's on, I guess, Issue 1, "Search

 3    Methodologies."  I don't have any questions there.

 4        On Issue 1, Part -- Section 9, the "Hit Reports."

 5        I'll try to speak up.

 6        So normally, I would expect the hit report just to have

 7    the number of hits per document and maybe the total out of the

 8    total number of documents the report was run against.

 9        Why do you need families and all the other -- all the

10    other information in the hit report?

11        Again, the general purpose of the hit report, I think is

12    to see whether or not the search terms were so overbroad or

13    expansive that it hit on too many documents.

14        **MR. AYERS:**  Yeah.  Thank you, Your Honor.

15        There's a couple of more key components to a hit report

16    that would provide more substantive information to allow the

17    parties to appropriately meet and confer related to the scope

18    of the search terms, and so having information related to the

19    unique hits.

20        And so oftentimes, you might -- just the number of hits

21    will let you know that it's culling, you know,

22    10,000 documents.  But what you won't understand is that by

23    removing that search term how many unique hits you're losing,

24    so how many total documents you're not going to be culling that

25    other search terms won't also hit.

1    And so having the ability to have -- breakdown not only
2    the total documents that are hit by that search term, but the
3    total number of unique documents that other search terms won't
4    also be hitting is a key component to it, as well as then
5    understanding the family members that go along with it.
6    Oftentimes -- oftentimes, when you're talking about total
7    documents versus family members that are hit versus -- because
8    these -- because the review process is being conducted in a
9    full-family production, it's useful to have -- to understand
10   how many total documents are being -- the family members
11   together with the parent document that are going to be
12   reviewed.
13   Oftentimes -- because when you're looking at this and then
14   you have the duplication process on top of it, because that way
15   you can actually break down.  So when you're talking about
16   total documents, maybe like 10,000 documents, well, then once
17   you know that you're talking about unique documents, which may
18   be only a thousand documents that are unique, and then of
19   that -- of that set, you're really -- after deduplication
20   you're only talking about 500 documents that actually need to
21   be removed.
22   And then of that 5,000, you're really only talking about
23   parent documents that are pulling in or -- or other family
24   members that are -- so really, now all of a sudden, you're
25   really talking about a number of, like, 300 documents in this

1    example.  And so the burden of really reviewing that 300

2    documents for production is not very substantial compared to

3    that original number of just pure hits of 10,000.

4        So it just gives you additional metrics in the ability for

5    the parties to confer about, to hopefully reach resolution on,

6    and to avoid bringing these issues -- bringing disputes over

7    search terms to Your Honor.

8        **MS. FITERMAN:**  Your Honor, the plaintiffs put far more

9    into hit reports than hit reports are actually meant to do, are

10   putting far more emphasis on what they can or can't do, just

11   based on the level of detail that they're asking for.

12       We've got four different defendants here who maintain

13   their documents in different ways.  We'll be collecting them

14   differently.  And so our proposal takes a much more holistic

15   approach to the real purpose behind a hit report, and we also

16   note that specifically the request for deduplication across

17   custodians and data sources oftentimes isn't even possible,

18   depending on how the documents have been collected and those

19   reports are run.

20       So just from a feasibility perspective, extra burden that

21   really isn't going to get us anywhere, the defendants are

22   proposing what is very standard language to use on hit reports.

23       **THE COURT:**  How much of a burden is it to include

24   unique hits, unique document hits in the report?

25       **MS. FITERMAN:**  I think the concern there, Your Honor,

1    is regarding the deduplication efforts and trying to identify

2    what truly is a unique hit.  I can't --

3         THE COURT:  Let me stop you there.  I understood you

4    to mean unique hits, not as to deduplication.  Or is it -- did

5    that go to deduplication or whether it was a document that came

6    up in another search as opposed to two of the same documents

7    that came up in one search?

8         MR. AYERS:  Thank you, Your Honor.  Chris Ayers on

9    behalf of plaintiffs.

10        Yes, the unique hits is about how -- is about the

11   particular documents that that search term that's at issue will

12   hit as opposed to other search terms that may be are agreed

13   upon.  And so it isolates how many unique documents would be

14   lost if you remove that search term from the collection.  So it

15   does not have to do specifically with deduplication.

16        MS. FITERMAN:  Okay.

17        THE COURT:  That definition of unique hits, does that

18   help allay your concern about deduplication?

19        MS. FITERMAN:  I think that makes sense, Your Honor,

20   yes.

21        THE COURT:  Okay.  So -- all right.

22        But as I understand, Mr. Ayers, your request for family

23   members would implicate deduplication -- some form of

24   deduplication; right?

25        MR. AYERS:  Well, no, the family members also wouldn't

1   necessarily do deduplication.

2       How we -- how the parties have agreed to -- in the ESI

3   protocol and is common practice is for full-family productions,

4   that meaning that within the family of documents, the parents

5   and the children, if any of one of those documents hits a --

6   hits a search term or has relevant and responsive information,

7   then the whole family would be produced.

8       And so by providing the information related to the new

9   kids -- on the children and the parent, we provide additional

10  information about the number of documents that are going to be

11  reviewed and processed, and it's a helpful metric.

12      But I will say if -- if it's a choice, which is more

13  important, understanding the unique documents that hits the

14  search term is a more valuable metric, while -- while in

15  numerous cases I've -- we've had hit reports that provide for

16  those metrics, and even more information such as unique

17  identifiers, which we've removed from this requirement because

18  that way you can really track the document when it has a unique

19  identifier.  But we've removed and agreed not to push on that.

20      But the unique -- the unique hits is a really valuable

21  metric as well as the children.  But, I mean, if Your Honor is

22  trying to split the baby, then I would suggest that we -- that

23  we get the unique document hits.

24          **THE COURT:**  I'm not splitting babies here.

25              (Laughter.)

1          **THE COURT:**  So if you use what you've called the

2    "industry standard hit reports," does that not include family

3    member identification?

4          **MS. FITERMAN:**  It can.

5          **THE COURT:**  Okay.

6          **MS. FITERMAN:**  It can.

7          **THE COURT:**  Then that gives me no burden there; right?

8          **MS. FITERMAN:**  Well, I think, Your Honor, the point is

9    just that we want to do this just as close to what industry

10   standard is, and the level of detail that plaintiffs have been

11   asking for we think goes beyond that.  But if they're looking

12   for unique identifiers, then we can do whatever the tools can

13   do but not beyond that; that's the point.

14         **THE COURT:**  All right.  So I'll still think about it a

15   little bit, but what I'm inclined to do is do essentially A and

16   B in the plaintiffs' proposal, that is document hits and unique

17   document hits, as you've defined "unique."

18         **MR. AYERS:**  Understood.

19      And, Your Honor, I just want to indicate that the standard

20   technologies that the defendants plan to use have the

21   capabilities to provide all of this information.  It's normal

22   course in many litigations that I have done, and have provided

23   no burden or other obstacles.

24      So the idea that it's not standard is not quite accurate

25   because it is very standard.  I've done it in numerous

**PROCEEDINGS**

1    litigations.  But -- and the technology that they use have

2    these full capabilities to provide unique hits as well as

3    unique family members and to break it down like that.

4        I just wanted to provide that extra input.

5        **THE COURT:**  Does the tool you're using have the

6    capability of providing just by selecting providing families

7    and unique family members?

8        **MS. FITERMAN:**  The defendants at this point haven't

9    all indicated what tools they'll be using for that, so there

10   could be difference between that.

11       But I think as long as we're agreeing that the tool can do

12   it and the burden isn't there, that it's doable as long as it

13   isn't overburdening the parties and slowing the process down.

14       **THE COURT:**  All right.  Again, I'm inclined to accept

15   A and B, and here's my proposal -- is if in meet and confers on

16   whether search terms need to be modified or not, there is a

17   dispute that implicates a need-to-know family members for a

18   particular numbers of family members for search terms, I would

19   hope you could come to agreement on a case-by-case basis at

20   that point for additional exchange of information.

21       **MS. FITERMAN:**  Thank you, Your Honor.

22       **MR. AYERS:**  Thank you, Your Honor.

23       **THE COURT:**  Okay.  So on the proposal on TAR --

24   substantively, I didn't see a huge difference between the

25   parties' proposal.  There's maybe a little more detail in the

 1  defense propose, so I'm just inclined to adopt the Defense

 2  proposal, but I'll hear from whoever wants to talk to -- talk

 3  to the point.

 4       **MR. AYERS:**  If I may Your Honor, Christopher Ayers on

 5  behalf of the plaintiffs.

 6       TAR -- TAR is -- can be extremely valuable and -- tool for

 7  identification of responsive information.  In fact, it can be

 8  far superior to search terms.  You know, research has indicated

 9  that TAR, when done cooperatively and transparently, can reach

10  as much as 80 percent of responsive material, whereas search

11  terms oftentimes will miss 80 percent of responsive material

12  and only cull roughly 20, 25 percent because it's a much more

13  superior concept.

14       However, TAR, as a tool, is -- it follows the -- follows

15  the notion of garbage in, garbage out in the sense that you

16  need a sophisticated TAR protocol to talk about not only just

17  the disclosure of the tool that's going to be used, but you

18  need really, you -- need to be done transparently,

19  cooperatively, about how that tool is going to be trained.

20       And this is why, when TAR is used, Courts have required

21  the parties to set forth a TAR protocol to really specify

22  transparently of how the tool is going to be used, how it's

23  going to be trained, with what documents.  And generally,

24  Courts have required that they be done cooperatively and in a

25  transparent way.

**PROCEEDINGS**

1          What defendants are contemplating is that there is not a

2     TAR protocol that the parties engage in, there is not a

3     transparent nature of -- through cooperation of how it's going

4     to be trained, the disclosure of what -- how was it trained,

5     any type of even the disclosure, rather than even having

6     plaintiff input, there's not going to be a TAR protocol.

7          What they plan to do is just disclose the tool.  But the

8     tool alone does not provide the plaintiffs with enough

9     resources and enough insight into the actual training.  And so,

10    if it's not trained properly, it's not going to work.  It

11    really is -- it follows the notion of garbage in, garbage out.

12    And so if it's not trained properly, it's not going to identify

13    responsive information.

14         You're not going to get the 80 percent responsive rate.

15    You're going to get something much lower.  You're going to miss

16    the substantial documents.  So this is why Courts have required

17    cooperation, transparency, and a separate protocol spelling out

18    how TAR would be used.

19         And so our provision requires that it not just be

20    disclosed, but that the parties cooperatively use it --

21    particularly here, where the defendants are proposing to use a

22    mix of search methodologies.  So they propose to use search

23    terms in combination with TAR, which if done improperly and not

24    appropriately, what you're getting is -- is you're getting

25    search terms which will cull 25 percent of responsive

1   information, and then you're applying TAR to that.  So now

2   you're getting 80 percent of 20 percent.  Right?

3       And so if it's not done transparently, what we're going to

4   get is going to be a small fraction of responsive information

5   that defendants have and possess.

6       **MS. FITERMAN:**  Your Honor, Amy Fiterman on behalf of

7   the defendants.

8       All culling through the discovery process, if not done

9   properly, will reach poor results.  Both sides agree on that.

10       However, what plaintiffs have proposed is to insert

11   themselves into the obligations and responsibilities of each of

12   the defendants to follow both the Federal Rules as well as the

13   ESI guidelines that this Court set out.

14       And so the defendants' position is that we are willing to

15   be transparent.  We're willing to identify the fact that TAR is

16   being used, the tools that are being used, which will inform

17   the plaintiffs as to what those tools can do and how they work.

18       But as far as negotiating a specific protocol and having

19   the plaintiffs be in the business of how the defendants are

20   identifying those documents goes too far and, we submit, is

21   contrary to what the Federal Rules and the ESI guidelines

22   require.

23       **THE COURT:**  Okay.  So for purposes of this ESI order,

24   nobody has presented me with a proposed TAR protocol at all.

25   So there is no TAR protocol for purposes of this order.

1    Parties are free to try to negotiate a separate TAR

2    protocol if you want; and if you really think it's that

3    important, you can certainly file a motion later on, if you

4    reach impasse on the issue, to see, you know, if I can

5    essentially issue a TAR order based on a protocol that you

6    propose.

7        But for purposes of this ESI order, I don't think the

8    language in defendants' proposal precludes a TAR protocol being

9    negotiated and at least discussed separately.

10       Did I miss some language in there that precludes that?

11       **MR. AYERS:**  It doesn't -- I would say it's

12   obviously -- defendants' language is silent on a TAR protocol,

13   but it certainly --

14       **THE COURT:**  Now, you've heard me say it's open-ended.

15   Right?

16       **MR. AYERS:**  But it certainly doesn't contemplate the

17   sharing of the transparent process of how they're going to use

18   it.

19       **THE COURT:**  This is where I want you to negotiate and

20   discuss more, because there may be a compromise here between

21   the parties on how much information to disclose over and beyond

22   what this particular ESI order is going to require, and you're

23   certainly free to try to negotiate a further exchange of

24   additional information.

25       I assume -- and maybe I'm assuming incorrectly -- the

1    defendants individually have not each decided which TAR tool

2    they're going to use, or have they all decided which one

3    they're going to use?

4            MS. FITERMAN:  They have not decided.  And, in fact,

5    not all defendants have decided if they are going to use TAR.

6            THE COURT:  So to that extent, also, I think, trying

7    to talk about the details of a TAR protocol or whether I

8    should -- whether you should agree to one, whether I should

9    enter one, is a little premature, until they've identified one

10    to you at least.  And -- or at least you can start the

11    discussion about trying to negotiate one.

12        But I think -- I don't want to hold up the ESI order for

13    what could be a separate -- sounds like a separate issue.

14            MR. AYERS:  Understood, Your Honor.  And that's why

15    our plaintiffs' language did suggest, if a party does plan to

16    use TAR, that they would go through this process of disclosure

17    and negotiating a TAR protocol without spelling out that.  But

18    I understand Your Honor's --

19            THE COURT:  The order is not going to preclude it or

20    require it; it's up to you between counsel, as a strategic

21    matter, to decide whether it's something you want to pursue or

22    not.

23            MR. AYERS:  Thank you, Your Honor.

24            THE COURT:  All right.  Let's see.

25        On validation I have no questions on, but I'll give the

 1    parties a chance to say anything, if they want, on their

 2    respective proposals.

 3         **MR. AYERS:**  Sure.

 4        Validation quality control metrics are super important in

 5    the context of when search methodologies are being used.  And

 6    they're common practice to, you know, require them.

 7        Technology -- technology advanced tools, however cutting

 8    edge they may be, will not yield a successful outcome unless

 9    their use is driven by people who understand the circumstances

10    and requirements of the case, guided by thoughtful and

11    well-defined methodologies, and unless their results are

12    measured for accuracy.

13        Recall must be the standard upon which validation is

14    measured.  Recall is the most important search and review

15    metric.  It's about knowing, with a high level of confidence,

16    how well your search and review process is working to find

17    responsive information.  Recall is what tells us that.  Recall

18    is the percentage of the total responsive documents in a

19    document population that search or review processes actually

20    find.

21        And so what the plaintiffs' validation metric language

22    does is it sets recall as the goal.  Now, it doesn't spell out

23    how and what validation each party will conduct, but it sets

24    out the goal that recall, an appropriate level of recall,

25    end-to-end recall, will be the goal that the parties seek to.

1   And that must be the standard.

2   Providing for a wall between -- to understand -- between a

3   party -- the opposing party and understanding what validation

4   and quality control metrics would be used, is inappropriate.

5   So defendants' language where they set only upon a showing

6   of good cause would the plaintiffs be able to understand what

7   validation the defendants did, is just inappropriate.  There

8   should be transparent quality control measures set in place.

9   And this is exactly what -- what Judge Gonzalez Rogers

10   and -- stated in the *In Re: Lithium Ion Batteries Antitrust*

11   *Litigation*, where she granted the plaintiffs' request to

12   incorporate a provision regarding quantitative sampling of

13   documents returned by disputed search terms in the search

14   protocol.

15   **THE COURT:**  What's the burden of providing at least

16   just the recall numbers to the other side?

17   **MS. FITERMAN:**  Well, the problem, Your Honor -- Amy

18   Fiterman on behalf of defendants.

19   The defendants' issue with plaintiffs' language here is

20   that the plaintiffs are inserting themselves into the discovery

21   process, again, that is the responsibility of the defendants.

22   And so --

23   **THE COURT:**  Well, let's -- getting divorced a little

24   bit from the exact language here.

25   The concept of sharing recall numbers to the other side,

1    is that problematic?  It seems to be not a fairly burdensome

2    request.

3              MS. FITERMAN:  It's something, I think that each

4    defendant would have to assess and discuss further with the

5    plaintiffs because plaintiffs' proposal goes far beyond that.

6         So if we're just talking about the recall issue, that may

7    be something that the parties can reach agreement on.  But in

8    the large scheme of where the plaintiffs are trying to go with

9    this validation, it goes far beyond that, which is the concern.

10             THE COURT:  I'm trying to take this in baby steps.

11        So can the defendants agree that part of what they

12   consider to be reasonable additional information would be at

13   least the actual recall numbers from their production?

14             MS. FITERMAN:  We may need each defendant to come up.

15        I'm trying to speak on behalf of all of the defendants

16   here today, but that's a very defendant-specific question, and

17   I don't want to speak out of turn for any of the defendants.

18        So we can confer and follow-up later.

19             THE COURT:  As a -- I mean, it seems to me, that

20   should be a number that should be able to be spit out by your

21   tool; right?  So why don't you confer with your codefendant

22   group and tell me if somebody objects to at least sharing

23   recall.

24             MS. FITERMAN:  Would you like me to do that now?

25             THE COURT:  Yes.

1          MS. FITERMAN:  Okay.  Thank you.

2                    (Pause in proceedings.)

3          MS. FITERMAN:  On that one issue, Your Honor, we can

4    agree.

5          THE COURT:  Okay.  See?  Compromise is possible.

6                    (Laughter.)

7          THE COURT:  Here is where I'm inclined to go with

8    this:  Is "define request for additional information" to

9    include the recall data for each production.

10         All right.  So at least you'll have the metric for the

11   actual production that was given to you.  And then, from there,

12   expect the parties, if there is a dispute over that, whether

13   that number is appropriate or not, then you can have further

14   meet and confers on -- to follow that up -- because it's so

15   speculative whether the recall rate is going to be, you know,

16   satisfactory to plaintiffs or not.

17         MR. AYERS:  That's right, Your Honor.

18         Could I ask that there be disclosure of the actual

19   validation procedures that were employed to reach the recall?

20         THE COURT:  Why don't you wait to see the recall.

21   Because what if there's no dispute?  What if the recall numbers

22   are so robust that --

23         MR. AYERS:  Well, the problem is if we don't

24   understand what was done to actually reach that number, just

25   the disclosure of the methodology being used would provide

 1   insight as to the accuracy of the recall number being used.

 2       I mean, if they used a -- if they used some, you know,

 3   methodology that wasn't well accepted within the community, or

 4   was proven to be inaccurate and not -- and not a methodology

 5   that should be used to actually reach recall, calculate recall,

 6   then that number would have less meaning, and we would have

 7   further questions without -- without understanding that.

 8       So we're not necessarily inserting ourselves into that

 9   process, but we're just asking for a reasonable amount of

10   disclosure so that we can understand what was done and what the

11   result was.

12       THE COURT:  So you're asking for them to identify how

13   they got the recall number?

14       MR. AYERS:  Yes.

15       THE COURT:  Again, it's usually just spit out by the

16   e-discovery tool, if I'm understanding --

17       MR. AYERS:  Usually, after a certain sampling of

18   documents and how that was done.

19       THE COURT:  Is that difficult to give them?

20       MS. FITERMAN:  Your Honor, what I heard Mr. Ayers to

21   say was that they want a window into the entire validation

22   procedure and process, that we need to disclose that as if

23   we're going to be using validation procedures that are subpar,

24   which is what defendants object to.

25       All of these defendants have highly sophisticated

1    well-respected vendors who are assisting them in this

2    collection.  And, again, it's -- we're inching towards putting

3    the plaintiffs right into our obligations and responsibilities.

4        We're fine producing the recall numbers, but letting them

5    dig in behind and understand and offer input and opinions into

6    the validation procedures themselves is what the defendants

7    object to.

8        **THE COURT:**  Again, tell me if I'm misunderstanding the

9    way the tools work, but if you query the tool to give you the

10   recall number, if defendants were to disclose to you, "We

11   queried the tool to give us the recall number, and this is the

12   tool we used," is that -- isn't that enough for you to at least

13   have a basis to decide whether the recall number was produced

14   by a reliable tool?

15       **MR. AYERS:**  Well, part of the -- part of the

16   product -- the recall is a product of a procedure of sampling a

17   certain number of documents, both from the null set, which are

18   the non-hits -- nonresponsive documents are relevant, but

19   non-hits versus the documents that were -- had hit a search

20   term.

21       And so it's this combination of the sampling and

22   understanding whether you had a statistically significant

23   sample size of that document.  So it's really just the metrics

24   on how the recall was calculated.  And this isn't inserting

25   that a -- plaintiffs into the process.  Rather, it's just not,

1   meaning that the discovery process isn't a black box upon

2   which -- that there's no insight to.

3       The parties shouldn't have the ability to do whatever they

4   want and just hand over documents.  They need -- there should

5   be disclosure about the methodologies being used on both -- to

6   actually cull the documents -- right? -- by the search term

7   "TAR," et cetera, but also how to validate that shouldn't be

8   also a black box behind which there's no insight to unless

9   there's a problem, because we won't know unless we have a

10  better sense of the sample size, the ability of how that was

11  done, as well as how that reached the result.

12      And that's all information available to them by the tool

13  and can be provided with the same time.  This was the corpus,

14  these are the samples we tested, and this was the result.  It's

15  all there available for them from the tool.  It's just

16  providing, instead of just the recall number, providing this

17  additional information.

18          **THE COURT:**  Again, sort of -- when you query the tool

19  to give you a recall number, do you set certain parameters?

20          **MS. FITERMAN:**  Yes, Your Honor.  And the recall

21  disclosure typically happens at the end of the completion of a

22  review process.  So what Mr. Ayers is suggesting is some kind

23  of iterative process where they're going to be understanding

24  how we're doing validation and offering opinions as to whether

25  it's proper or adequate or not.

**PROCEEDINGS**

1       But that's not how this works.  And so if the tools are

2   industry standard tools, the vendors are doing what the vendors

3   are supposed to be doing -- which there's no suggestion that

4   they're not here.  This is operating from a position of

5   mistrust before any process has started whatsoever, and seeking

6   what we would consider discovery on discovery before any issues

7   have come up.

8       And so, Your Honor, respectfully, we think that disclosing

9   the recall numbers during the process when that's appropriately

10  supposed to happen is adequate, and if there are questions that

11  come up after that, we're certainly willing to discuss and meet

12  and confer.  We've already disclosed, you know, tools and

13  vendors, so there really is the transparency there that the

14  plaintiffs are looking for.

15      **THE COURT:**  Well, it's your phrasing of requested

16  additional information regarding the validation methods, so if

17  that additional information doesn't include the parameters used

18  to get the recall number, what would it include?

19      **MS. FITERMAN:**  Well, I think we have to wait and see

20  what -- there's -- it's -- it is unclear exactly how far the

21  plaintiffs want to dig in behind all of this when, again, under

22  the Federal Rules, under the *Sedona Principles*, it's a

23  defendants' responsibility to do this level of validation and

24  make sure that their production is adequate and proper.

25      And plaintiffs are asking for us to prove that to them and

 1  show them all of that before there's even been any concern that

 2  that isn't happening.

 3      **THE COURT:**  All right.  Here's where I'm inclined --

 4  everybody agrees you're going to disclose the recall data

 5  results itself, the recall numbers themselves.

 6      I do expect, if those numbers somehow are -- seem

 7  inappropriate to the plaintiffs -- I assume there's going to

 8  meet and confers on these issues, and I would encourage the

 9  parties to be as fulsome in their exchanges of information to

10  avoid unnecessary motions practice.

11      And if that means disclosing the parameters used to get

12  those recall numbers and that would satisfy plaintiffs, that's

13  certainly one way to avoid unnecessary motions practice.

14      Do you understand, Ms. Fiterman?

15      **MS. FITERMAN:**  I do understand.  Thank you, Your

16  Honor.

17      **THE COURT:**  All right.  And I assume plaintiffs will

18  not seek to take unnecessary discovery on discovery, Mr. Ayers?

19      **MR. AYERS:**  That's correct.

20      I mean, we don't view this as discovery on discovery, but

21  we certainly don't plan to take unnecessary discovery on

22  discovery.

23      So I would just ask that, to the extent there is

24  additional information that would be shared, that we don't --

25  that the Court not accept defendants' language upon requiring a

1   showing of good cause for the sharing of any other additional

2   information, other than the recall which Your Honor covered.

3         THE COURT:  That's -- I didn't say this, but I was

4   inclined to strike that phrase anyway.  So I expect everybody

5   to be operating in good faith here when raising disputes and

6   requests for information.  So obviously, don't abuse the

7   ability to ask for information on behalf of the plaintiffs,

8   Mr. Ayers.

9         MR. AYERS:  Understood, Your Honor.  Thank you.  We

10  won't.

11        THE COURT:  Okay.  We're already on Issue 3.  Here we

12  go.

13      So this raises kind of a -- just a formatting comment I

14  had.  I know I didn't ask for redlines, but I did ask for the

15  competing language to be lined up.  And it took me a while to

16  realize, especially on the first subparagraph here, (e).  The

17  only dispute appears to be that phrase "or linked internal or

18  nonpublic documents."  Is that right?

19      Every -- you both agree on the rest of the language in

20  that?

21        MS. FITERMAN:  Amy Fiterman on behalf of defendants.

22      I'm sorry, Your Honor.  Which issue are we on?  I thought

23  you said we were moving to Issue 3, so --

24        THE COURT:  Yeah.  Collection of hyperlinks and

25  production of families.  Am I on the wrong page?

 1           **MR. AYERS:**  This is Chris Ayers on behalf of

 2     plaintiffs.

 3        Yes, you're on the correct --

 4           **THE COURT:**  Production components?

 5           **MR. AYERS:**  -- correct, production components dealing

 6     with the production of hyperlinks.

 7        And you are correct that with respect to (e), the dispute

 8     relates to whether embedded files and linked internal and

 9     nonpublic documents are considered part of the family.

10           **THE COURT:**  Right.  So -- go ahead.

11           **MS. FITERMAN:**  I'm sorry, Your Honor.

12        Actually, the issue there, Your Honor, is the inclusion of

13     "linked," so hyperlink.  So plaintiffs are trying to identify

14     hyperlinks as part of family relationships, so the same as an

15     embedded file or an attachment, and that is what the defendants

16     have an issue with.

17        The tools that can be used to extract hyperlinks at this

18     point in time don't do that family association.  There is not

19     that linking that's done when -- if a hyperlink can be

20     identified in the first instance, it can't be produced like

21     that.  So this is one of those objections that defendants have

22     that is purely a technical issue that the plaintiffs are asking

23     for something that the tools do not currently do.

24           **MR. AYERS:**  If I may, Your Honor?

25        It's -- there are technological tools, including most of

1    the -- three of the four defendants use the Google Suite.  The

2    Google Vault does actually allow for and provide for the --

3    actually, the extraction of the linked documents when they're

4    collecting the e-mail.  So there is that.

5        But significantly, with respect to this subparagraph (e),

6    we're talking about the family relationship.  We specifically

7    indicate that that is subject to paragraph 13 below, which is

8    13 -- which deals with the actual production of hyperlinks, so

9    however the Court ultimately decides on the production of

10    hyperlinks.

11        But what (e) is doing is it establishes that -- the linked

12    documents are modern attachments, and so to the extent that

13    they are ultimately produced, whether initially or after the

14    fact through a process that the parties -- where we request,

15    you know, certain linked documents within the documents and

16    they get produced -- that they are family members and that they

17    would be produced as full families, whether initially or after

18    the fact through that ultimate process.

19        If it's not as a family, then those linked documents could

20    just -- despite us asking for the linked documents to be

21    pulled, it wouldn't be produced with, you know, proper metadata

22    showing they are family members or they won't be produced in

23    sequence so we understand that they are, in fact, family

24    members.

25        Numerous courts have held that modern attachments are

1   within family documents, are within the -- of the family are

2   modern attachments, as just if you actually attached it.

3       The issue isn't whether they're family members.  The issue

4   is ultimately 13, dealing with 13 below, which talks about how

5   the parties are going to get -- how the parties are going to

6   produce linked documents, whether they're going to do it

7   initially or whether they're going to do it subsequently, after

8   the production, pursuant to, you know, various identification

9   of documents --

10      **THE COURT:**  Before we get to Part 13, on this subpart

11  (e), Ms. Fiterman, if I understand correctly, the only thing

12  plaintiffs are asking for is that the family relationships

13  between e-mails and hyperlinked documents just be maintained.

14      Is that -- am I understanding --

15      **MR. AYERS:**  That's correct.

16      **THE COURT:**  Not -- and that the actual methodology

17  from production be handled in the next paragraph 13.

18      Is that objectionable as they've clarified it?

19      **MS. FITERMAN:**  It is objectionable, Your Honor,

20  because to the extent that any defendants are using tools that

21  can extract hyperlinks in the first instance, when they extract

22  those hyperlinks, there is not a family connection that's

23  contained within that.

24      So being asked to produce it, unless it's a manual effort

25  which is what the defendants are proposing, which is the

1  plaintiffs receive a document, they see a link within the

2  document, they ask a defendant to go retrieve that link, that

3  then we can identify that that link was related to those

4  documents.

5      But when links are simply being pulled out in the

6  collection effort in the first place, that is where the family

7  connection, the tool doesn't allow that to the extent --

8  depending on the tool being used.

9      And so that's -- the defendants' position is that

10 plaintiffs are asking us to do something that the tool itself

11 just simply can't do, in the first instance, if we're

12 collecting hyperlinks, you know, before -- you know, ultimate

13 production.

14     Additionally, it's -- numerous courts have also determined

15 that hyperlinks are not akin to attachments because --

16     **THE COURT:**  I'm well aware of the split of authority

17 on the issue.

18     **MS. FITERMAN:**  Yes, Your Honor.

19     And part of that is because when Mr. Ayers represents that

20 there's a link and it's in the documents so it's clearly an

21 attachment, a link may go out to a folder that contains

22 hundreds and hundreds of documents.  And so -- and those

23 documents can be changed over time because they're their own

24 beast.

25     And so trying to -- asking the defendants to do this in

 1  the first instance, when we're producing documents on the front

 2  end, from our perspective, is not possible.

 3          **MR. AYERS:**  If I may, Your Honor.

 4      We're not -- (e) is not requesting that they do this in

 5  the first instance, when they're producing the documents.

 6      Paragraph 13, which deals with the production of

 7  hyperlinks and how those will be produced, will deal with that.

 8  And -- when we move to that next.

 9      All (e) is doing is basically saying that modern

10  attachments are attachments, and that there are family members,

11  and so, whenever they're produced, they're going to be produced

12  and maintained as a family.  And so even if it's subsequent,

13  doing this process that -- a process that both parties

14  proposed, ultimately, that there be a process after the

15  productions are made where there is an identification of

16  documents that have links in them, and how those documents are

17  produced.

18      So all (e) is doing is saying whenever hyperlinks

19  documents are produced, that the family relationship is going

20  to be maintained.

21          **MS. FITERMAN:**  That's not how the defendants are

22  reading (e).  It's listed "production components."

23      And so if they're asking us to produce hyperlinks in the

24  first instance when documents are first produced as opposed to

25  after production, and there's a conversation about asking for

1    hyperlinks, those are two different things.

2        So we may be talking past each other, but that's our

3    concern.

4            MR. AYERS:  And it is subject, just for clarity -- and

5    this is something we have discussed in the meet and confers

6    related to plaintiffs' proposal.

7        We do specifically reference paragraph 13 below, which

8    suggests that to the extent that the hyperlinked documents are

9    family members, that is still subject to paragraph 13 below

10   which talks about how those documents will ultimately be

11   collected and matched and produced.

12           THE COURT:  So do we even need this paragraph (e)?

13           MR. AYERS:  We do.

14           MS. FITERMAN:  From our perspective, no, Your Honor.

15           THE COURT:  What is it doing that is not going to be

16   covered by what's in 13?

17           MR. AYERS:  Well, 13 just talks about how linked

18   documents will necessarily be produced.  But (e) is talking

19   about the family relationship being maintained.  So they are

20   addressing two different things.  That's why they work

21   together.

22       And E is also addressing other family -- just the family,

23   the -- necessarily of the production of family members with

24   children and how those are produced.

25           THE COURT:  So it did sound to me like you're kind of

 1  still talking past each other about when in the -- your, the

 2  defendants', processing of documents, this maintenance and

 3  preservation of family relationships has to occur.  And what

 4  I'm hearing plaintiffs say is it doesn't have to occur kind of

 5  at some burdensome, early time.  It just has to occur by the

 6  time they get the documents.

 7      Is that correct?

 8      **MR. AYERS:**  So if the process -- I mean, we're going

 9  to get to 13, which if -- we have a difference of opinion on.

10      But if the Court -- if there's an after-the-fact process,

11  like an initial document gets in, there's not something where

12  we identify documents that have links in them.  At the time

13  when they produce the linked documents that are -- the link to

14  the parent, that the family relationship will be maintained and

15  preserved at that time.

16      **MS. FITERMAN:**  Your Honor, what the defendants are

17  saying is that the tools don't make those links.  So within the

18  ESI protocol itself, we have certain metadata we've agreed to

19  provide, and obviously, attachments to e-mails or the family

20  connection is maintained.

21      Our position is -- and when we get to paragraph 13 on

22  hyperlinks, the plaintiffs are proposing that defendants do

23  export hyperlinked files in the first instance if they're using

24  those tools.  And so that is an issue that we're going to run

25  into, and it's setting us up to not being able to comply with

**PROCEEDINGS**

 1  the ESI protocol in the first instance if the tool simply won't

 2  do it.

 3      **THE COURT:**  I'm trying to resolve (e) before we move

 4  to 13.  All right.  Keep talking about 13.

 5      So their language, plaintiffs' language in 13 says --

 6  starts with the hyperlinked documents, blah-blah-blah.  It says

 7  "do not need to be produced in the first instance as part of

 8  the same family group" -- right? -- "as the document residing

 9  at the location which the hyperlink points."

10      So I don't --

11      **MS. FITERMAN:**  Right after that, Your Honor, it says,

12  "Unless a party can export files during collection using Google

13  Vault for which Defendants Google, Snap, and TikTok already

14  have licenses for and use" --

15      **THE COURT:**  Stop there.  You're telling me your tools

16  don't do that, so the "unless" doesn't apply to you.

17      **MS. FITERMAN:**  Two different things, Your Honor.  I

18  apologize.  Whether any of the defendants are using these tools

19  to extract hyperlinks is one question.

20      But even those tools have limits, and what plaintiffs are

21  asking us to do with regard to the attachments in the family,

22  those tools cannot do at this moment.  That's the issue.

23      So they can -- if the defendant is using the tool and all

24  of the defendants are doing something differently and there are

25  certain documents and communications where there is no tool to

**PROCEEDINGS**

1    extract hyperlinks, but where there is a tool and the defendant

2    is using it, those tools still have limits and one of those

3    limits is that family association in addition to others.

4        So to the extent that a defendant is using that particular

5    tool, it should just be limited to what that tool can do in the

6    normal course.  You can't make a tool do something it can't.

7            **THE COURT:**  I think, according to the proposal in the

8    briefing, it sounded like plaintiffs think the tools can do

9    that, so there seems to be a disconnect here.

10           **MR. AYERS:**  Well, the tools, as reflected by the

11   documents that Google has published to the public about the

12   capabilities of Google Vault allow for -- in the initial

13   collection of documents to automatically extract linked

14   documents that are stored within the same, you know, Google

15   environment.  And so those documents can automatically be

16   extracted and culled for production.

17           **THE COURT:**  But can -- when they do that, can they

18   maintain the fam- -- can they populate the metadata to maintain

19   the family relationship?

20       That's what you're asking for it to do.

21           **MR. AYERS:**  What I'm asking for is there to be -- the

22   family relationship be maintained.  I do not have -- I can

23   provide that information to Your Honor, but I do not have

24   the -- I do not know, off the top of my head, whether they, as

25   counsel's suggesting, they're not capable of maintaining the

1    family relationship.  It seems from my reading of the document

2    that they could.

3        It seems that, like, they're extracting -- they're taking

4    the parent and then extracting the linked document, and they're

5    being produced together in sequence.  So they are being

6    produced -- they are being collected together, and that -- they

7    could be produced together in the family environment.

8        Whether there needs to be some further, you know, task to

9    fill the metadata or not, and whether it automatically fills, I

10   do not know.  I do know that they do -- are able to extract it

11   so they are collected together at one time.  And that's

12   something that -- the reason why plaintiffs proposed that in

13   this paragraph is because to do it after the fact, plaintiff --

14   after it's collected, plaintiffs can't, you know,

15   automatically, through their technologies, cull those

16   documents.

17       We can try to match it up with document names.  We can

18   obviously e-mail or send requests to -- of Bates numbers to the

19   defendants and ask them to then do their investigation and

20   produce the linked documents to us.  But after collection, this

21   processability of this unique ability to actually use the

22   technology available to them to automatically pull them is

23   lost.

24       And so that's why we incorporated this procedure, that

25   they don't have to do it initially, unless they can do it

 1   automatically without this manual effort as the technology

 2   allows.  Whether that automatically populates the metadata to

 3   maintain and preserve the parent-child relationship, I'm not

 4   quite certain.

 5        But I do know that for authentification [sic] and for a

 6   variety of reasons, having the parent and child relationship

 7   preserved is really critical to understand when you're

 8   examining a witness, for instance, understanding that these are

 9   the linked documents, the attachments, to that parent e-mail,

10   for instance.

11        And so having them as a group, will save a lot of time and

12   energy during -- and disputes later on when we get to

13   depositions and we get to introducing evidence about the

14   authentity [sic] of the actual attachments, if they're being

15   produced and the relationship is being preserved.

16        It becomes critical down the record, particularly when you

17   get to trial, deposition, summary judgment, those issues of

18   making sure that the attachments are authenticated and

19   preserved within the parent.

20        **THE COURT:**  With respect to the Google tool and the

21   Microsoft tool, are you -- I mean, have you investigated --

22   you're sure none of them can -- they may be able to extract the

23   hyperlinked document, but they can't -- neither of them can

24   maintain or add to the metadata to indicate the family

25   relationship?

1          **MS. FITERMAN:**  Your Honor, I can speak as to TikTok,

2    who -- we have investigated this.  And, yes, we have been told

3    that the link isn't the -- being able to associate the

4    hyperlink with another particular document, that has to be a

5    manual process; it's not done automatically.  And I could --

6    you know, other tools -- but our understanding is that's,

7    across the board, that's the level of the technology right now.

8    It's very new technology.

9          Your Honor, if I might, this -- this only underlines why

10   the defendants' position on this is the more reasonable

11   position in that what the defendants are proposing is that if

12   the plaintiffs get documents that have hyperlinks in them, they

13   come back to the defendants and ask if we can go identify

14   specific hyperlinks.

15         One, this greatly reduces volume.  If we are having to

16   pull hyperlinks, if we're going to use these tools, that has to

17   be done in the initial collection.  And so that's before search

18   terms have been run, that's before any other culling has

19   happened.

20         So the volume that is going to -- that's going to increase

21   if we have to pull all of those hyperlinks, at the initial

22   stage, when plaintiffs may have no interest in 90 percent of

23   those is why we have proposed that once we produce the

24   documents, if they ask us to go back, we're willing to go back

25   and identify those hyperlinks.

1    And if we can access those hyperlinks -- we're doing it

2    right now in the first set of requests for production that

3    plaintiffs have served on both TikTok and Meta.  In fact,

4    TikTok received 75 requests for production related to either

5    going back and collecting hyperlinks or collecting a document

6    that was otherwise identified in another document that had been

7    produced.

8    So it's working.  And we propose that that's a process

9    that we continue with.  And that means that defendants who

10   haven't acquired these tools yet or who aren't using these

11   tools in this capacity yet aren't forced to start using tools

12   in a way they have not been using these tools, and that we

13   avoid the limits that these tools necessarily have.  It also

14   keeps the families connected because that's a manual process

15   that we can then identify what those links were associated

16   with.

17       **THE COURT:**  I mean, at the end of the day, doesn't

18   that get you the information the plaintiffs want and in an

19   actually more robust manner because it's now manually checked?

20       **MR. AYERS:**  Yes and no, Your Honor.

21   So having the documents culled in the initial -- extracted

22   using these technologies that there's no dispute they have and

23   they use, omits this other big -- this other problem with

24   hyperlinked documents.  Oftentimes there'll be an e-mail that

25   says, "Check this out.  Here this is."  And then there's a

1    link.

2        That e-mail is not going to identify any -- hit on any

3    potential search term, though that linked document certainly

4    will.  And so having the -- these documents, the linked

5    documents extracted in the first instance when search terms are

6    applied, makes sure that search terms are being applied as they

7    normally would, traditionally, in the sense of applying across

8    the family.

9        In the -- after the fact, one of the problems with

10   defendants' proposals, even after the fact, even after if you

11   take away this initial culling, is first they apply an

12   arbitrary 500 documents per defendant, when --

13           **THE COURT:**  We're not even there yet.

14           **MR. AYERS:**  Right.  I know, but then there's also this

15   other thing that plaintiff proposes that, it's not only about

16   pulling the linked documents that are identified in a produced

17   document, but it's the opposite.

18       If we find -- if there's a document that we know is a

19   collaborative document -- collaborative document that they will

20   then go out and potentially search for -- search the custodians

21   for e-mail traffic related to that cooperative collaborative

22   document that was produced that we didn't get e-mail traffic on

23   because it likely could have been here are revisions, here are

24   this, because we're losing that family metric.

25       So if we are going to not cull and extract using

1    technologies that they already have, then we do need this

2    other -- this process after the fact of being able to identify

3    and -- able to identify the e-mail traffic -- right? -- the

4    parent of certain of these collaborative documents.

5        And so you need it both ways.  You need to be able to

6    manually go and cull the linked documents that are embedded and

7    are attached to the parents that were produced, but also look

8    for the parent of some of these collaborative documents to

9    understand some of the e-mail traffic related to those

10   collaborative documents as well.

11       **THE COURT:**  I didn't hear an objection to doing the

12   reverse search for e-mails relating to an otherwise responsive

13   document.

14       Is there an objection to doing that?

15       **MS. FITERMAN:**  Your Honor, I have to admit that

16   75 percent of what Mr. Ayers was saying, I don't think, quite

17   honestly, it makes any sense in relation to what we're talking

18   about here.

19       And so, no, I don't agree.  And additionally -- thank you.

20       Additionally, for Mr. Ayers to suggest that the defendants

21   have and use these tools is just flat out incorrect, and we've

22   shared as much.

23       But my steady folks in the back have just informed me --

24   which is what I presumed as well, is that backlinking to

25   e-mails is not possible with these tools.

1    And this goes to an issue that Mr. Ayers is making a lot

2   of presumptions and suppositions about what these tools do when

3   he already indicated he didn't even know if the tools could do

4   associations to families when we have repeated in three

5   different meet and confers that they cannot.

6    And so this is a lot of plaintiff supposing what these

7   tools can do when we've been very clear about, one, who's

8   actually using the tools; and two, what can the tools do.

9    And so it's a much cleaner process to do it the way that

10  defendants have proposed, and that's a very well-accepted

11  process when it comes to hyperlinks.

12    **MR. AYERS:**  If -- Your Honor, I may.

13    Just for the purpose of the meet and confers, defendants

14  have not actually made those representations.  So this is --

15  they continue to not reveal certain information on these meet

16  and confers.  But not only did we have the counsel, we had

17  their technical personnel, and yet they remained silent about,

18  you know, this information that, you know, they're now relaying

19  to the Court.

20    I will say our proposal for after production is spelled

21  out, we lay out in our proposal there's a sub (i), and then

22  also a sub (2) -- sub (ii).  And that second one deals with

23  this issue of the documents -- of whether these collaborative

24  documents and being able to, you know, provide a search -- and

25  you can search them through Doc ID, and there's various methods

 1   for it, but the idea is is that if they're not going to be

 2   culled and produced in the first instance, the extracted, then

 3   we do need this process to deal with both of those scenarios

 4   with linked documents.

 5           **THE COURT:**  All right.  So first of all -- I mean, the

 6   record in front of me is that the tools cannot give you the

 7   family relationships automatically.  So I -- you know, with --

 8   unless -- I mean, you're always free, I guess, later on to show

 9   me -- show the other side that this is wrong; but it sounds

10   like automatically populating and establishing the family

11   relationships in the metadata doesn't seem to be possible

12   technologically at this point.

13       So your proposal is trying to avoid manual populating of

14   those fields.  Defendants are proposing to do that for you.  I

15   just -- I don't see the problem there.  I mean, it doesn't seem

16   like there's a technological fix to getting automatic family

17   relationships into the production.

18       On the issue of collaborative documents and other

19   documents, presumably, those will be produced; right?

20       And presumably, you will have e-mails from the authors and

21   the people who were on those collaborative documents.  And I've

22   got to assume, with the number of document requests being

23   served here, that will include the e-mails that should attach

24   at least some versions of those documents.  Not every e-mail is

25   going to say, "See this" or "Check this out."

**PROCEEDINGS**

1      So I think it's speculative whether, you know, you're

2   going to even be missing any e-mails that are relevant or

3   substantive in any way; right?

4      Because if it's truly a collaborative document and they're

5   just trading it back and forth in links, the document is a

6   substantive piece of evidence -- right? -- and piece of

7   discovery, not the cover e-mail that says, "Check this out."

8          **MR. AYERS:**  Certainly, the document is a substantive

9   evidence, but the e-mails themselves discussing about who and

10  when -- and who and when edits and certain revisions are made

11  could be very important when it comes times to --

12          **THE COURT:**  Wouldn't that be in the metadata of the

13  document itself?

14          **MR. AYERS:**  No, it will not.

15          **THE COURT:**  If it's a collaborative document --

16          **MR. AYERS:**  My understanding --

17          **THE COURT:**  -- tracked changes type -- most

18  collaborative tools for Word documents, for example, do track

19  different authors and different changes.

20      Tell me if I'm wrong.

21          **MR. AYERS:**  My understanding, based on the

22  representations of counsel, when we're discussing various

23  metadata, is that Google Documents does not work the same way

24  as Microsoft Word, in our experience, indicating the various

25  authors; that oftentimes it only indicates the last-in-time

1    editor of the document as well as the last-in-time of those

2    edits.  So you wouldn't necessarily get that metadata in the

3    produced document, and so if you didn't -- weren't -- didn't

4    have a way to do that.

5        And while we're -- all we're asking for is a process in

6    order to get that, if that situation does come around, is that

7    we're not just left with identifying linked documents of a --

8    produced, but we can do the inverse of trying to see if a

9    collaborative document we know has been e-mailed around that

10   we're not seeing -- that we have a very good understanding

11   would have been, based on our knowledge and experience, that we

12   can have a process in place to actually identify, to go back

13   and look to see if this document was actually e-mailed and who

14   was involved, because that information would not be included in

15   the Google Document's metadata necessarily, based upon what was

16   represented by the technical personnel during the meet and

17   confers.

18        **MS. FITERMAN:**  If I might, Your Honor, and then we can

19   move on.

20        Mr. Ayers is just, again, presuming and supposing that

21   things can happen that we don't believe can happen.  And this

22   is no different than if we produced a Word document that was in

23   somebody's, you know, desk site and wasn't attached to an

24   e-mail, how do we go back and figure out every place that that

25   particular document was ever e-mailed back and forth by

**PROCEEDINGS**

1  somebody?

2      That's not something that can be done.  That's the reason

3  that we collect e-mail messages.  We don't collect documents

4  and then try to figure out every time somebody might have

5  e-mailed that document.

6      So while I'm sure Mr. Ayers would like that, this just --

7  we're just -- we're not talking about things that are in the

8  realm of possibility right now.  And we've gone far afield, I

9  think, of whether -- you know, how and when we produce

10 hyperlinks, which is the subject of Issue 3.

11          **THE COURT:**  Just so I'm clear and the record is clear,

12 you're representing to the Court in your investigation, the

13 tools are incapable of doing backlinking searches?

14          **MS. FITERMAN:**  Correct.

15          **THE COURT:**  Okay.  Submitted on this issue?  Anything

16 more to say?

17          **MR. CHAPUT:**  Isaac Chaput, Your Honor, from Covington

18 on behalf of the Meta defendants.

19      I just wanted to make one point clear because there are

20 representations both in plaintiffs' filing and today --

21          **THE COURT:**  Slow down for the court reporter.

22          **MR. CHAPUT:**  Absolutely.  Sorry, Your Honor.

23      -- some representations about tools that Meta does or does

24 not use.  And I just wanted the record to be clear that Meta

25 does not use or license the Microsoft Purview Premium

1  eDiscovery product.  So it's just off the table for us.

2      And Purview Premium, just so it's clear, is an all-in-one

3  e-discovery solution, so you can't layer that on top of

4  existing solutions either.

5      I just wanted that point to be clear.  Thank you, Your

6  Honor.

7          **THE COURT:**  All right.  Issue 4, redactions.

8      So, again, this goes to one of my earlier comments.  It

9  took me a while figuring out -- it looks like the parties -- it

10 got misnumbered, but Plaintiffs' C is Defendants' B, and

11 they're the same; right?  Am I reading that correctly?

12     Or, no, C is C -- C is C.  D is E.  You agree on E?  It

13 looks like you agree on most of F., most or lots of G, and all

14 of H.  Is that...

15         **MR. AYERS:**  That seems right, Your Honor.

16         **MS. FITERMAN:**  Yes, Your Honor.

17         **THE COURT:**  Okay.  I probably should have asked for

18 some kind of, like, italicizing where you actually disagree,

19 so...

20     All right.  So just so the record's clear, it looks like

21 you agree on large parts of A.

22     Everything in B, except for the first sentence in

23 plaintiffs' proposal.

24     You agree on all of C.

25     You agree on all of D, except the differences, "applicable

 1  law" versus "applicable U.S. law."

 2      You agree on all of E.

 3      You agree on all of F, except for the phrase "and

 4  produced" before the word "natively."

 5      And you agree with most of the first sentence of G, except

 6  for the phrase "marks made in track changes."

 7      And you agree on all of H.

 8      Did I --

 9          **MS. FITERMAN:**  No, Your Honor.  I'm sorry.

10          **THE COURT:**  Where did I get it wrong?

11          **MS. FITERMAN:**  Amy Fiterman for the defendants.

12      If you go to Section A, Your Honor, the first issue is the

13  definition of PII, and that's at the very end of Section A.

14          **THE COURT:**  Okay.

15          **MS. FITERMAN:**  Plaintiffs have linked that to, one,

16  Federal Rule of Civil Procedure 5.2, and then have excluded

17  types of PII that they suggest may otherwise be relevant or

18  responsive.

19      The defendants' position is that PII should not be limited

20  to FRCP 5.2.  There is sensitive information that could be in a

21  document, including information, addresses, personal e-mail,

22  phone numbers that isn't contemplated by 502.

23      And then specifically there shouldn't be an exclusion for

24  information that is otherwise, quote, relevant or responsive.

25      Relevance is not the test when we're talking about

1   redacting PII, it's to keep certain information private.  And

2   so the defendants need the ability to make those redactions in

3   accordance with -- for security and for privacy protection

4   reasons.

5       I think we all have a good understanding of what PII is by

6   this point in time.  And the plaintiffs are trying to restrict

7   what the defendants can identify as PII.  All that we're doing,

8   it doesn't mean that a document isn't going to be produced.

9   It's a question of what needs to be redacted within that

10  document.

11      And if the plaintiffs have a concern over what was

12  redacted, they certainly can ask and we can discuss it.  But at

13  the first instance, the defendants can't be left guessing about

14  what the plaintiffs believe is relevant or responsive, and

15  whether or not something should be redacted or not.  It's

16  usually quite clear what we need to redact for privacy

17  concerns.

18      **MR. AYERS:**  Yes, Your Honor.  So we have a -- the

19  multiple-tier, very-detailed protective order that has been

20  before the Court and -- multiple times.  Confidential

21  information generally is protected by a confidentiality order.

22  Redaction is not necessary or even appropriate the majority of

23  the time.

24      However, plaintiffs are willing to accept and except from

25  the general no redaction policy of certain categories of

 1    information -- obviously, privileged and that information.

 2         But when we get down to PII, there's -- we're agreeable to

 3    limitations on the PII that can be redacted.  Obviously, phone

 4    numbers, personal addresses, e-mails -- certain personal e-mail

 5    addresses, those things we can easily meet and confer about.

 6         But when it comes down to information that's relevant and

 7    responsive, independently to the claims and allegations in this

 8    litigation, we have significant COPPA allegations.  We have

 9    allegations relating to personal injury and damages.

10         And so information related to a user's age, so the year of

11    birth -- the ages, years of birth, illnesses, injuries, medical

12    diagnosis, that information can very much be independently

13    relevant and should not be redacted -- should not be -- the

14    protective order covers and protects all of that information

15    from any type of disclosure to the public or otherwise.

16         And obviously, they follow -- the parties should conform

17    to Federal Rule of Civil Procedure 5.2 about what information

18    is actually filed with the Court.  But when it comes to

19    redaction, it's unnecessary.  The PO -- the PO, obviously, in

20    place perfectly protects that information; however, there are

21    these categories of information -- perfectly willing to

22    accommodate.  But if it has independent legal significance, if

23    it's independently relevant to these claims, that information

24    shouldn't be redacted in the first instance.

25             **THE COURT:**  All right.

1          **MS. FITERMAN:**  We disagree, Your Honor.  When we're

2    talking about users' ages, years of birth, things of that --

3    that's not limited to plaintiffs in this case.  In fact, it

4    most likely won't be plaintiffs'.  If it's in defendants'

5    documents, it's likely going to be other individuals who have

6    no part of this litigation and presumably may not want any part

7    of this litigation, or having their own private information

8    provided to other parties, regardless of whether a protective

9    order is in place.

10         PII redactions have been happening for years, and

11   protective orders are always in place in -- almost always in

12   place in civil litigation.  There still needs to be an extra

13   layer of protection for redaction.  And to the extent that the

14   plaintiffs received these documents and believed that something

15   has been redacted in error because they can see the totality of

16   the document and what was being discussed, the defendants are

17   always willing to go back and address that to determine if

18   there's something that was redacted that the plaintiffs believe

19   that they should have access to, and we can discuss that.

20         But as an initial matter, the defendants have to have the

21   ability to protect the privacy of information that's within

22   their documents.

23          **THE COURT:**  Do you -- does your argument extend to the

24   ages and years of birth of non-plaintiffs or non-parties to the

25   case?

1        **MR. AYERS:**  The PI -- personal injury plaintiffs, are

2   not the only plaintiffs in the litigation.  There's also school

3   districts, government organizations, as well as the attorneys

4   general, who may have a view on this; but there's certainly

5   more than just individual plaintiffs at issue.

6        And so when you're talking about the -- talking about the

7   allegations revolving about the defendants' systematic systemic

8   failures to age gate related to our claims, these -- their

9   ability to try to redact and remove relevant responsive

10  information about their failure to age gate or -- permitting

11  children under the age of 13 to use, their knowing about them

12  using the platform, that's relevant information.  The PO

13  protects any interest of non-parties that they have in this

14  litigation.

15       No one can see this information.  They want to designate

16  certain of that information highly confidential.  We can -- if

17  it falls within that, so be it, if it's confidential.  But the

18  bottom line is that redaction of relevant information should

19  never be permitted.

20       Relevancy redaction -- and we're going to get to that in

21  the next bullet -- but this falls within relevancy redaction.

22  They're highly disfavored in courts all across the nation,

23  including this district, is that -- ever -- the redaction of

24  relevance should never be permitted.  I'm sure that Thomas may

25  have some additional thoughts.

1          **MR. HUYNH:**  Thomas Huynh for the state attorneys

2    general.  Thank you, Your Honor.

3          And with regards to this, yes, the state attorneys general

4    take the position -- with regards to the age information,

5    including the date of birth of children across the nation, the

6    states attorneys general takes the position that it is highly

7    relevant for our COPPA claims, especially as we're, you know,

8    interrogating and also investigating to what extent age gating

9    is appropriate, to what extent the platforms are directed

10   towards children, and to what extent they're engaging in proper

11   moderation and viewing or sorting out of the children.

12         So for us, like, all that information would be

13   appropriate.  And in our meet and confers with defendants, we

14   have discussed the potential for, say, redacting the last name

15   or the first name of the child in order to mitigate these

16   privacy concerns.  But with regards to a user's information and

17   their dates of birth and their ages, we find it to be highly

18   relevant to our COPPA claims.  So we would urge Your Honor to

19   allow for that to be excluded from redactions.

20         **THE COURT:**  What's the -- what's the problem with

21   redacting the last name?

22         **MS. FITERMAN:**  Well, because, Your Honor, we have

23   certain obligations to protect privacy, and these are one --

24   these are individual notions that, you know, redactions are

25   happening.  Again, if the plaintiffs see something and say,

**PROCEEDINGS**

1   "Can you unredact this?  We think this is important.  We want

2   to see what this is," then that can be done.

3        But on the initial piece of us having to make those

4   subjective -- the defendants having to make those subjective

5   decisions about what we should or shouldn't redact gets to be

6   overly burdensome and is going to slow down the process of

7   review.

8        So we suggest that it simply isn't necessary, that we be

9   allowed -- that defendants be allowed to make the redactions

10  that would normally be made for PII.  And if the plaintiffs

11  have an issue with that, they can be negotiated on a

12  document-by-document basis.

13       I would also add, Your Honor, that with regard to the

14  states attorneys general, I am happy to have counsel for Meta

15  come up and address that issue because right now none of the

16  other defendants are producing documents that are going to be

17  going to the states attorney general in this litigation.

18       **MR. AYERS:**  Sure.  If I may, Your Honor.

19       The issues -- the issue -- it's kind of -- what's being

20  set forth is this process where they redact and then we have to

21  fight to unredact.  It actually -- I mean, it takes this issue

22  and turns it on its head.

23       Courts have refused to permit relevancy redactions for the

24  purpose that having redactions, in the first instance, delays

25  production substantially because of the redaction process and

1    the expense of redaction, often many months.

2        And so this idea that they should redact and then we

3    should come forward and have to unredact sets forth -- just is

4    a time-consuming, burdensome process on both ends, both the

5    delay of getting information that should be properly protected

6    under a protective order, and then the process of then having

7    to meet and confer and have a dispute before Your Honor about

8    unredacting relevant responsive information when they can

9    easily anonymize the data without having to release personal

10   information.

11       The year of birth itself is not personal identif- -- maybe

12   the full date.  We're permitting the redaction of the month

13   or -- and day of the birthday, as well as the age of whether

14   someone is, you know, 12, 11, 10.  We're not asking for -- is

15   not sensitive personal identifying information of any sort.

16       So -- and when there's injuries that are related to the

17   causation and the injury that's actually occurred caused by the

18   actual defendants, that obviously -- that should not be

19   redacted in any sense of the term.  And so limiting this

20   information to the actual Federal Rules 5.2 would appropriately

21   further discovery in this -- in this case.

22       **THE COURT:**  Okay.  But it does sound like there is

23   room for agreement that certain types of PII can be redacted

24   without objection; is that -- right?  You just haven't nailed

25   that down, exactly what those subcategories are?

PROCEEDINGS

1          **MR. AYERS:**  Well, I think we have.  Well, from the

2     plaintiffs' perspective, I think we have.  We were permitting

3     the redaction of certain potential -- certain PII, with the

4     exception of the things that -- the items that are enumerated

5     there, including, you know --

6          **THE COURT:**  It says "e.g.," so --

7          **MR. AYERS:**  Well, stuff that is obviously otherwise

8     relevant or, you know, responsive.  And so if we weren't -- so

9     if we had it -- and so the reason we included that language is

10    because we know that we do have a sense for the type of

11    information that's responsive to our --

12         **THE COURT:**  What I was going to -- earlier I think you

13    said you don't have an objection to them redacting, like, home

14    addresses and -- I forgot what it -- like driver's license

15    numbers and things like that.  Is that --

16         **MR. AYERS:**  No.  No, Your Honor.

17         **THE COURT:**  Okay.

18         **MR. CHAPUT:**  Isaac Chaput, Your Honor, for the Meta

19    defendants.

20       Just on the piece that was raised by the state attorneys

21    general, Meta is happy to confer further with the state AGs

22    regarding ages or years of birth; we do understand that that

23    could potentially be relevant to their claims.

24       In addition to the items that Your Honor just mentioned

25    that I think are appropriate for redaction, that could include

PROCEEDINGS

1  also e-mail addresses and phone numbers of non-plaintiffs to

2  the litigation.

3       THE COURT:  Okay.  Don't be surprised if in my order I

4  order you all to meet and confer further on this to put some

5  more definition of what everybody agrees can be redacted and

6  see if we can narrow the dispute even more before you come

7  back.  Okay.

8       MS. FITERMAN:  Your Honor, there were two other issues

9  within redactions.

10      THE COURT:  Before we get to that, Madam Reporter, do

11 you need a break?

12            (The official reporter responds.)

13      THE COURT:  Why don't we take a break now since we're

14 switching issues.

15                 (Recess taken at 2:22 p.m.)

16            (Proceedings resumed at 2:36 p.m.)

17      THE CLERK:  Please remain seated and come to order.

18 Court is back in session, the Honorable Peter H. Kang

19 presiding.

20      THE COURT:  Moving on.  Is there anything else on

21 redactions that we really need to talk about, in the interest

22 of time?

23      MR. AYERS:  Yes, Your Honor.  There's at least one

24 other item.  I mean, in D --

25      THE COURT:  Sure.

1          **MR. AYERS:**  -- you reference that the one difference

2    of language in D. -- there's one significant difference here

3    that the Court did not mention is that there's a difference of

4    opinion of whether redact- -- prohibited -- that are required

5    under applicable law versus permitted under applicable law.

6          Obviously, there are numerous -- there are numerous laws

7    that potentially permit, you know, redaction, but the question

8    is whether there are actually like laws that require there be

9    redactions.  And plaintiffs are -- plaintiffs are willing to

10   obviously allow for redactions of information that are required

11   to be redacted under various U.S. laws for protective orders,

12   but not that may be permitted too.

13         There's obviously the protective order in place that

14   protects various information that would adequately protect that

15   information.  But if certain information is required, then

16   plaintiffs would allow that and agree to that.

17         **MS. FITERMAN:**  Amy Fiterman on behalf of defendants,

18   Your Honor.

19         Defendants' only position here is that not every specific

20   law that, in order to comply with it, is going to, you know, in

21   black letter is going to say you must redact some information.

22   It's just -- it's an allowance for that if there is certain

23   information that defendants feel they need to redact, on

24   privacy or other grounds, that they be permitted.

25         **MR. AYERS:**  And I think privacy -- PII and other

1    privacy-permitted redactions are specified under categ- --

2    subsection (a), which obviously spells out the various -- four

3    different categories of information that may be redacted.

4       And so I think the scope of the redactions is significant

5    here of any redactions that may be permitted is just -- is

6    inappropriate.

7       **THE COURT:**  Okay.  I'll take that under advisement.

8       Okay.  Why the difference between law and U.S. law?  Is

9    that substantive?

10       **MS. FITERMAN:**  I think, Your Honor, just from the

11    defendants' perspective, just for consistency across, you know,

12    wherever, however these documents are being produced and the

13    laws under which the various defendants are operating, we're

14    providing for that allowance.

15       **MR. AYERS:**  We believe that foreign laws shouldn't be

16    dictating what redactions should be made to documents in the

17    United States litigation.

18       **THE COURT:**  I tend to agree with that.

19       All right.  So you'll see my final ruling on that.

20       And then --

21       **MS. FITERMAN:**  Your Honor, I apologize.  I don't mean

22    to interrupt you.

23       Just one additional matter under G, and it's the last

24    issue on redactions.

25       You'll see the language that starts, "Where possible, any

```
 1   occurrences," and down to "regarding auto date."  And it's
 2   regarding to replacement of certain information in redacted
 3   documents.
 4           THE COURT:  Yeah.
 5           MS. FITERMAN:  The defendants' position just simply is
 6   on this that this is logistically extremely difficult, if not
 7   possible in certain situations.  And defendants shared that
 8   position and perspective with the plaintiffs during the meet
 9   and confers.
10           But this is just overly burdensome language that, in some
11   instances, either is going to be logistically, you know, near
12   impossible or is going to slow an entire process down, and
13   gives us -- and there's very little benefit to it.
14           MR. AYERS:  Your Honor, Chris Ayers on behalf of the
15   plaintiffs.
16           This language here is well-accepted and -- across the
17   country in various ESI protocols.  The problem here is when
18   you're redacting information, you're going into that document
19   and you're redacting it.  And so if there's auto- -- autofill
20   date, time, et cetera, you're changing the metadata and you're
21   changing the accuracy of the underlying information.
22           And so it fundamentally changes the substantive
23   information, particularly when documents are being generated,
24   prepared, and being used.  Given that the scope of this
25   litigation is over many years, you know, going in and having --
```

1    having that information changed and not preserved is a problem.

2    And so what this does and what is accepted and -- in ESI

3    protocols that are used across the country is it provides for

4    the fact that this issue is obviously addressed, and so

5    you're -- so what the receiving party understands, the date and

6    the time and when this -- of the original document and not have

7    that information changed and manipulated due to the redaction

8    process.

9    **THE COURT:**  My admittedly limited past experience and

10   understanding is if the documents are exported and loaded onto

11   Relativity, that the auto-changing of dates and all that, that

12   doesn't -- is not disabled but it -- that can't happen because

13   you're basically pulling the document over onto the Relativity

14   platform, which is intended to preserve the metadata as it

15   existed in the original document.

16   Is that -- is my understanding of how Relativity or

17   similar platforms work?

18   **MS. FITERMAN:**  Your Honor, I'm not going to be able to

19   get to that level of detail with you in Relativity; and you may

20   be smarter on that than I am, as you are many, many other

21   things.  So I'm going to defer on that, unless somebody else

22   amongst the defense teams knows that.

23   Our position is that this level of work, once we've pulled

24   it over, slows redaction workflows, and that's what we're

25   trying to avoid.  So whether it can or can't be done, we're not

1   saying that it absolutely can't be done.  We're saying that it

2   makes it logistically difficult and slows process, which really

3   isn't necessary.

4        In addition to the fact that we will -- we've made

5   representations that we will make every effort to leave e-mail

6   headers unredacted where we can and where header information

7   isn't disclosing privileged information.

8        So the defendants are going to be making every attempt not

9   to redact information that it -- isn't absolutely necessary to

10  be redacted.  And in addition, there's language in this section

11  too that gets into issues related to assertion of privilege in

12  a privilege log.  And we have a separate privilege log that we

13  are negotiating with the plaintiffs, and defendants would

14  assert that this language in the ESI protocol is not necessary.

15       **MR. BLAVIN:**  Thank you, Your Honor.  Jonathan Blavin

16  on behalf of Snap.

17       And I apologize for going back to an issue, but I just

18  want to briefly put this on the record.

19       At least for Snap, there may be certain custodians who are

20  based in Europe and there may be obligations under European

21  law, including the GDPR, with respect to redactions of personal

22  information before that data is transmitted to the United

23  States.  So I just wanted to make that clear so Your Honor is

24  aware of that when considering these issues.

25       **MR. AYERS:**  If I may, not having to go back, but the

**PROCEEDINGS**

 1   idea that European laws, even the GDPR, would be applicable in

 2   the United States is just completely inaccurate.  Numerous

 3   courts that have dealt with this issue have rejected that

 4   approach.  They have held that GDPR does not apply in U.S.

 5   litigation.

 6       Even if it did, there's a litigation exception within the

 7   GDPR for allowing the disclosure of this information.  It's

 8   been tried -- this idea of redactions due to GDPR and U.S.

 9   litigation has been litigated numerous times.  I've litigated

10   it numerous times.  And the Courts have routinely uniformly

11   rejected this idea that foreign laws be applicable in the

12   United States, even GDPR.

13           THE COURT:  Okay.  I understand the issue.

14       Since we're talking about G, the defendants want to --

15   instead of the phrase "or other user-entered data which are

16   visible," blah-blah-blah, want to make that "marks made and

17   track changes."

18       Am I reading that correctly?  That dispute correctly?

19           MS. FITERMAN:  Yes.

20           THE COURT:  What's the -- is there really a

21   substantive dispute there?

22           MR. AYERS:  I don't think there should be.  It's just

23   the fact that this information, when it's being processed,

24   should be visible and made sure that none of -- no hidden

25   content remains hidden during the processing of those

1    documents.

2           **MS. FITERMAN:**  I think the defendants were just trying

3    to be more clear.  We just added more things in that the

4    plaintiffs had omitted.

5           **THE COURT:**  Okay.  Well, I actually think there's

6    probably a meeting of the minds there.  Okay.  So you'll see my

7    final decision on that when I issue the order.

8       We're finally done with redactions.

9           **MR. AYERS:**  Yes, Your Honor.

10          **THE COURT:**  My question on Issue 5 was:  What is the

11   import of the proposed defendant footnote?

12          **MS. FITERMAN:**  Let me get there, Your Honor.  I

13   apologize.

14      I don't know that that's in dispute, Your Honor.  I think

15   we have that footnote but -- and plaintiffs did not.  But I

16   think there was just a clarification.  I don't have Sections 6

17   to 11 right in front of me.  I think the real dispute here was

18   over 12.

19          **MR. AYERS:**  That footnote is very much in dispute.

20   It's -- we do not include that language.  There's no reason --

21   Your Honor, there's no reason to exclude databases and other

22   structured data from the requirements of Section 6 through 11.

23      Obviously, defendants should be required to identify their

24   databases and other structured data sources.

25          **THE COURT:**  So my -- I read that to mean the phrase

**PROCEEDINGS**

1    "noncustodial" modifies the rest of that sentence.  Is that an

2    incorrect reading?

3        So in other words, all these -- this is -- does not apply

4    to noncustodial data like databases; in other words, all of

5    that is supposed to be examples of noncustodial data.

6        Is that a misreading of the footnote?

7            **MS. FITERMAN:**  No.

8            **THE COURT:**  So if it's noncustodial data -- well, what

9    do you mean by noncustodial data?

10           **MS. FITERMAN:**  Noncustodial data would be data that is

11   in, for example, a database that isn't owned by an individual

12   employee.  So when we typically think of custodial data, we

13   think of data that's either in G Suite or documents that have

14   been created by individuals.

15       Noncustodial data would be, obviously, structured data and

16   databases and other -- again, we've got four different

17   defendants; they maintain their data in lots of different ways.

18   And so the term "custodial/noncustodial" can get difficult as

19   we navigate through different systems and how they're

20   maintained.  But the traditional definition of noncustodial

21   data is what we're using here.

22           **MR. AYERS:**  Your Honor, this exception in this

23   footnote is sweeping, and it essentially guts the entire ESI

24   protocol in its application across to the defendants.  The

25   defendants have a host of noncustodial data sources, including

1    their databases, their proprietary -- their proprietary

2    platforms and systems.

3        And so all of those systems would be exempt from duties

4    to -- to disclose and identify those -- those data sources,

5    where it would be searched, exempt from the search

6    methodologies and validation procedures that, Your Honor, we

7    just went over.

8        And so significant, significant amounts of data that's

9    relevant and responsive to plaintiff -- to this litigation,

10   plaintiffs' request for production of documents are going to be

11   located in noncustodial sources.  I've never seen a footnote

12   like in this any U.S. -- in any ESI protocol that's been

13   entered anywhere in the country.

14       I've never seen it before.  It's never been proposed

15   because it is fundamentally overly burden- -- it's prejudicial

16   to the opposing party here in this -- who just exempted from

17   disclosure, exempted from the search methodologies and

18   disclosure of how you're going to obtain this information.

19       What we're dealing with here is some of the most

20   technologically advanced parties in the world; right?

21       They invent the software and the systems that are used

22   through a variety of other corporations and stuff throughout

23   the world.  They are the most sophisticated.  They use their

24   own proprietary systems and softwares, and this would give

25   them, again, the opportunity to keep those systems behind a

1    wall that the plaintiffs would not know about.

2        And how the information from them is gathered and is

3    produced would not be pursuant to this ESI protocol that we're

4    all entering into in good faith.

5        So essentially it would gut this whole thing.  And so

6    that's why the plaintiffs propose language that would make sure

7    that the systems are disclosed, and that the parties

8    disclose -- discuss what information is contained this them and

9    how that information would be produced.

10       Significantly, the language in plaintiffs' protocol that

11   says that they'll meet and confer in good faith and attempt to

12   reach agreement on the data to be produced and the form and

13   scope of the production, that's language that Meta -- that Meta

14   had agreed to in the privacy litigation MDL, 2843, and that's

15   ECF 416.

16       So this idea that they shouldn't be able to -- required to

17   meet and confer about it, disclose this information, and confer

18   with the parties is just not what is done in major litigations

19   throughout this country, or any litigation that I'm aware of.

20           **MS. FITERMAN:**  Your Honor, if I might.  I apologize.

21           **THE COURT:**  Go ahead.

22           **MS. FITERMAN:**  That's just not correct.  And Mr. Ayers

23   is misrepresenting the defendants' positions.

24       The whole point is that to the extent -- we've spent a

25   year actually going through extensive meet and confers with the

1    plaintiffs with regard to where data resides and what kind of

2    information it houses, and have identified, you know --

3    defendants have identified certain nonstructured data.

4        We're talking about user data here.  That's, you know,

5    potentially plaintiff user accounts that we're talking about.

6    All we're saying is that we've got a separate section here

7    where we're talking about -- about structured data, and that

8    we're identifying structured data separately from, you know,

9    separately from custodial data.

10       It does not in any way mean that the defendants believe

11   that they do not have an obligation, if certain information is

12   requested and that information is housed within certain

13   structured data, that that isn't disclosed and then negotiated

14   as to how that can be -- how that can be produced.  So that is

15   not what the -- this particular footnote is suggesting here.

16   It's just treating it in a separate location.

17       **THE COURT:**  All right.  Explain to me how data that is

18   accessible by, say, your client, employees of your client is

19   noncustodial to your client.

20       **MS. FITERMAN:**  Yeah, and that's the terminology issue,

21   maybe, that we're struggling with, Your Honor.

22       So it's custodial to the client, but oftentimes, when we

23   discuss, quote/unquote, custodial data, we're talking about

24   data that resides with a particular employee.

25       Oftentimes, when we talk about agreeing to search terms

**PROCEEDINGS**

1    and custodians, we're talking about employees who have certain

2    data and then we reach agreement on who those custodians will

3    be.  So that is the traditional way that we talk about

4    custodial and noncustodial data.

5         Oftentimes, there's gray space.  And the defendants are

6    certainly willing to discuss that, but this is in the most

7    traditional sense of what that looks like.  And for some

8    defendants, that will be more important to other defendants --

9    depending on how their data is stored, and that's going to look

10   very different across defendants.

11        **THE COURT:**  Okay.  I'm not inclined to include your

12   footnote because if it's data accessible and under the control

13   of your client, it's potentially within the scope of discovery,

14   in which case we can't exempt it under some presumably

15   future-to-be-debated definition of what noncustodial means.

16        **MS. FITERMAN:**  We weren't proposing to exempt it

17   entirely from the protocol, Your Honor.

18        **THE COURT:**  6 through 11 that's --

19        **MS. FITERMAN:**  We were proposing to treat it

20   separately in Section 12.

21        **THE COURT:**  Let me put it this way:  To the extent

22   there is something that the defendants believe is truly

23   noncustodial data that needs to be dealt with separately, I

24   certainly -- I'll direct the parties to meet and confer on that

25   if somehow it doesn't fit within the confines of the ESI

1  protocol or what you otherwise informally agreed to.

2  All right?

3       I don't think an exemption like this -- essentially, it

4  sounds like it's inviting future disputes over what's being

5  exempted or not.  I don't feel comfortable carving out an

6  exemption like that.

7       All right.  Let's go to e-mail threading, Issue 6.

8       My initial take on the proposals is -- Mr. Ayers, tell me

9  if I'm wrong -- the plaintiffs are trying to define essentially

10  what constitutes an e-mail thread by defining who the people

11  are on it and the same subject matter and all that.

12       Is that what the intent of your subs little i through

13  little Roman iv are?

14       **MR. AYERS:**  Yes.  It defines what an appropriate

15  e-mail thread should be in the sense that these technologies,

16  as much as it's pushed that they're well accepted and uniform,

17  they're not.

18       Numerous courts have not permitted e-mail threading.  Have

19  allowed e-mail threading during the review process, but every

20  responsive e-mail that is otherwise part of it should be

21  produced separately.  And that's generally what is well

22  accepted and done is that they can do it during the review

23  process, but then all the embedded e-mails within the chain are

24  then produced.

25       We are willing -- the plaintiffs are willing to agree to

1    allow the defendants to use e-mail threading, to produce the

2    complete e-mail thread and not having to produce those other

3    e-mails that are in the chain; however, there needs to be real

4    safeguards within that that are going to be applied, stuff that

5    can be done through their software if it's done appropriately.

6        And that's making sure that, you know, there are no

7    frolicking detours within the e-mail chain itself -- right? --

8    with people being added and subtracted within the chain, that

9    we lose those lesser-inclusive e-mails, that if there is a

10    lesser e-mail where someone -- oftentimes, you'll see this when

11    you're doing collaborative e-mails, where people will write

12    "Response: see below," and then it will have various responses

13    and edit the below e-mail.

14        So what this does is plaintiffs make various categories of

15    information that should stay the same.  So the people that are

16    on the e-mail chain have to be the same.  So the "to," "from,"

17    "BCC," all the people, depending on where they are within

18    the -- they can change where they fit within the "BCC" or "CC"

19    or "from" and "to."  But all those people need to be the same.

20    There's needs to be unity in that.  The e-mail chain, there

21    can't be a deviation or alteration of the actual bodies or

22    texts of those -- of the e-mails.

23        And then with respect to attachments, that there needs to

24    be -- then with respect to where there is an attachment

25    introduced, that that e-mail be separately produced with that

1  attachment to maintain that family relationship so you

2  understand which e-mail within that chain was -- the e-mail

3  was -- the attachment was attached to.  That obviously is very

4  critically important with respect to foundation during

5  deposition, at trial, all this stuff, to understand when an

6  attachment, and who attached a certain document, and things

7  like, and those are done.

8      These are all issues that were discussed during the meet

9  and confer that defendants did not oppose.  It's all that

10  during the meet and confer that they did not oppose and they

11  did not indicate they could not do.

12      In fact, when there was something that they said they

13  couldn't do, we removed that.  But yet the defendants still

14  oppose including this language that really creates the

15  safeguards and guardrails on the use of this technology which

16  is not well accepted and necessarily uniform to make sure that

17  we are not losing substantive information that's responsive to

18  our information, to our -- to this litigation, to our document

19  requests.

20      THE COURT:  Well, the answer to my question is:  Yes,

21  this is an attempt to define what a thread is.

22      MR. AYERS:  Yes.

23      THE COURT:  What's wrong with trying to define what a

24  thread is?

25      MS. FITERMAN:  Your Honor, Amy Fiterman on behalf of

1    defendants.

2        Your Honor, the commercial software that is used to do

3    e-mail threading is very well known, well accepted.  And the

4    vendors that are being used by both the plaintiffs and the

5    defendants understand what the capability of those threading

6    tools are.

7        To the extent -- what plaintiffs have put here is not

8    consistent with what the commercially available software can

9    do.  And so rather than go through a whole litany of things in

10   plaintiffs' definition that doesn't necessarily comport with

11   how the software works, defendants are suggesting simply that

12   we use very clear language that say we'll do the threading.

13       And that, if at some point, if they want to request

14   something, that we may produce a less-inclusive copy.  But to

15   use the ESI protocol to define what the tools can do from

16   defendants' perspective is improper.  Again, the tools are the

17   tools.  And if we're willing to disclose what tools we're using

18   to do the e-mail threading and nobody has any questions about

19   what those capabilities are, this should be very

20   straightforward.

21       Different defendants may be using different threading

22   tools, and so we don't want to have one definition that isn't

23   exact to any of the tools.  So better to use this language that

24   allows for threading, and then the tools are going to do what

25   they do.

**PROCEEDINGS**

1     The language that the defendants have proposed here

2   actually comes from the model ESI order in the Western District

3   of Washington, and so we thought that it was a very appropriate

4   way to address this issue, as other courts have done.

5          **THE COURT:**  Are you -- I just want to make the record

6   clear.

7     Are you telling me that you've investigated and you're

8   representing to the Court that the tools are incapable of doing

9   threading according to these parameters?

10          **MS. FITERMAN:**  Not -- I think what the -- no.  The

11   defendants are saying that the language is inaccurate.  And so

12   rather than nitpick over --

13          **THE COURT:**  Inaccurate in what way?

14          **MS. FITERMAN:**  In various ways.  And it's going to

15   depend on which tool it is.

16     So, for example, Mr. Ayers was talking about attachments.

17   I think, all of the tools are going to, if there's a

18   separate and unique attachment, that's -- you know, that's

19   going to be separate.

20     So, you know, if we want to get into specifics about every

21   last little piece of this that isn't allowed through the --

22          **THE COURT:**  It's only four parameters; right?

23     So it sounds like there's agreement that if, in an e-mail

24   thread, one of the e-mails in the thread has an attachment,

25   your tools treat that as a separate thread and produce it

 1  separately --

 2          **MS. FITERMAN:**  Correct.

 3          **THE COURT:**  -- which is what plaintiffs want; right?

 4  So why oppose that?

 5          **MS. FITERMAN:**  Well, because -- well, as to

 6  little (i), Your Honor, it says, "All participants in any

 7  role," so -- you can read that.

 8      With regard to little (i), most of the commercial software

 9  that we use is using conservative logic and they are preserving

10  different branches of a thread with different attachments and

11  different groups of recipients.  So -- but potentially it may

12  suppress lesser included e-mails if participants are added to a

13  chain as long as all recipients are reflected.

14      So this gets really technical, Your Honor.  And we've

15  addressed all of these issues with the plaintiffs.  And our

16  proposal is:  If you're okay with the threading tool that we're

17  using and we provide you with the parameters that those tools

18  have, that should be adequate, that we shouldn't list this out

19  specifically because we think that the nuance of this is lost

20  in some of this language.

21          **THE COURT:**  Well --

22          **MS. FITERMAN:**  And we're not using all of the same --

23  we're not -- the defendants are not all using the same

24  threading tools.

25          **THE COURT:**  Regardless of the tool, let's look at

1  little Roman ii.

2      I mean, if the subject lines changes in the thread, you're

3  telling me all the tools would treat that differently?

4      I mean, I would assume any of the tools would if -- once a

5  subject lines changes, would decide that that's no longer the

6  same thread.

7      **MS. FITERMAN:**  Well, Your Honor, it's going to depend

8  on the header and recipient information, body content.

9  Oftentimes, it's the content that the tools are using.  So --

10  as opposed to the -- as opposed to the subject lines.

11      So, no, that isn't -- that isn't clear.  And we have been

12  very clear with the plaintiffs as to what tools the defendants

13  are using and what those tools can do.

14      So it's just a simple question of if the tool can't do it

15  or the tool does it in a different way, we don't want language

16  in the ESI protocol that isn't accurate and doesn't allow us to

17  use a well-respected tool that's industry standard.

18      We're happy to go back and -- I have a strong feeling,

19  Your Honor, that we're going to be going back and meeting and

20  conferring on a lot of topics, as you've suggested.  And so

21  we're willing, Your Honor, if there is a way to find compromise

22  in this, if it's important that we have all of the specifics

23  within the protocol, to make sure that it's compliant with what

24  all of the tools do, and doesn't leave room for an allegation

25  that we've somehow violated the protocol by using the threading

 1    tool we're using, defendants are more than happy to go back and

 2    discuss this with plaintiffs.

 3             THE COURT:  Have they disclosed all the tools they're

 4    using --

 5             MR. AYERS:  No.

 6             THE COURT:  -- to plaintiffs?

 7             MR. AYERS:  No.  No, the -- Your Honor, we have had

 8    multiple meet and confers over this.  They've had their

 9    technical personnel on the call.  They have not disclosed the

10    tool that they used for hyper-threading.

11         That said, we went over these four different categories.

12    Their technical personnel that were on the phone, that talked

13    extensively on this subject, did not oppose any of this and say

14    that any of these things are not possible.  One -- and so if

15    I -- if I just -- if I just may, Your Honor.

16         You know, we're agreeing to this because we -- these are

17    the safeguards that are appropriate.  If they want to -- they

18    are the most technologically advanced companies in the world.

19    If they can't use the software that's capable of making sure

20    that near duplicates and changes and alterations that are in

21    the chain to make sure -- they shouldn't be used.  It shouldn't

22    be used.

23         And this is part of our point.  If they can't guarantee

24    that we're not going to have -- that they're not going to

25    basically remove substantive responsive information from their

 1    production through the use of this e-mail threading tool, then

 2    it shouldn't be used and that -- all of the embedded e-mails

 3    should be produced in the first instance.

 4            THE COURT:  All right.  So if it's been intuited

 5    correctly, I'm going to order you, probably, to meet and confer

 6    on this because it sounds to me like there is room to reach

 7    agreement on the language to put in the safeguards that you

 8    want.  And if -- I would -- well, I order the plaintiffs to

 9    certainly -- the defense to identify at least the commercial

10    tools that they're using for threading to plaintiffs so that

11    plaintiffs can do their own investigation as to what those

12    tools can and can't do, along those lines, and to cooperate on

13    that.

14        And when you do meet and confer on these issues, I

15    definitely want the technical people on the calls as well

16    because the techies know how these things works better than

17    lawyers.  Okay?

18            MS. FITERMAN:  Thank you, Your Honor.

19        And we did have the technical people on -- yeah.

20            THE COURT:  In future, the -- going forward.

21            MS. FITERMAN:  Okay.  Understood.

22            THE COURT:  All right.

23        All right.  Issue 7, deduplication.  So there appears to

24    be some agreement on using things like the MD5 hash and SHA

25    hash value.

**PROCEEDINGS**

1    I guess, the disputes are from what I can tell, Mr. Ayers,

2    you had proposed language that the defendants did not agree to;

3    is that -- am I reading kind of the way this worked out?

4         **MR. AYERS:**  For the most part, yes.  There are a

5    couple of deviations where the defendants had certain language

6    that the plaintiffs did not have either.

7         **THE COURT:**  All right.

8         **MR. AYERS:**  Such as -- we specified that there should

9    be the use of MD5 hash values or the SHA hash values.  They

10   indicate that they should use industry standard technologies

11   and then they provide those as just mere examples.

12       And the problem with that is, is that there are a

13   multitude of hash algorithms out there that really don't

14   provide for the proper deduplication of exact duplicates.

15   They -- the values will ultimately use near -- get -- they will

16   remove near duplicates, close, but not -- not exact.

17       And these hash values, MD5 hash values and the SHA hash

18   values, are industry standard.  They've been used.  They're

19   routinely required to be used.  And, in fact, defendants

20   indicated that they have -- with their technical personnel,

21   would not and didn't indicate that they would use anything

22   other than these technologies.

23       So we just specified that given that they're not using

24   anything else, that we specify that these are the technologies

25   that should be used because of those are the -- those are the

PROCEEDINGS

1   industry standard and nothing else really is.

2           **THE COURT:**  What's the problem with that?

3           **MS. FITERMAN:**  Just two small things, Your Honor.

4   One, when it comes to using a particular MD5 or SHA, there are

5   certain defendants that have custom systems where they may

6   deduplicate in other ways, and so as long as, you know -- and

7   any other defendant who wants to get up and speak to their own

8   specifics, I think the concern was, as long as that -- it's

9   compliant with industry standard, whether it's specifically MD5

10  or something else, as long as there's no dispute and we're

11  willing to, you know, address, you know, how it's being done,

12  if -- you know -- and so flexibility when it comes to four

13  different defendants who have different systems, we're just

14  trying to make --

15          **THE COURT:**  Let me stop you right there.

16      Why don't you just confer with your codefendants right now

17  and see if anybody is planning to use something other than MD5

18  or SHA hash values, because if they're not, this is not an

19  issue.

20          **MR. CHAPUT:**  Isaac Chaput on behalf of the Meta

21  defendants.

22      I want to be -- start off to make one thing perfectly

23  clear.  Meta is not seeking to exclude near duplicates without

24  first conferring with plaintiffs.  So if we're going near near

25  duplicates, we will confer.

1    We do, however, need some flexibility in terms of how we

2    go about identifying exact duplicates.  And the industry

3    standard deduplication technology that we would use

4    incorporates a hash value, an MD5 or a SHA hash value, as one

5    aspect, but there are other layers that might be involved.

6    So, for example, bit by -- bit-for-bit identity is not

7    actually the industry standard.  So to use an e-mail as an

8    example, e-mails might have different time stamps for the

9    sender and the recipient due just to how it was processed, and

10    so that would not get -- those would get processed as near

11    duplicates, but not exact duplicates if you went for

12    bit-for-bit identity.

13    And that's what plaintiffs are asking for.  So they're

14    getting two copies of exactly the same e-mail even though they

15    are actually substantively exactly the same e-mail.

16    As another example, PDFs generate new nonidentical

17    binaries each time they're collected due to certain time stamps

18    being embedded in the binary even though, again, the content is

19    exactly the same.

20    And so the technology is looking at the actual content of

21    the document, along with certain reliable metadata to determine

22    whether there's actually an exact duplicate in any particular

23    circumstance.  So it's a combination of content and metadata

24    and hash and -- so, again, it's -- there's just some

25    flexibility that's needed here so that we're not producing,

1   you know, five copies of the same PDF to plaintiffs that are,

2   in fact, substantively exactly the same.

3           THE COURT:  What's the problem with that?

4           MR. AYERS:  The problem for that is it provides a

5   whole lot of room for error.  It provides a lot of room for --

6   and these files wouldn't be reviewed substantively so you'd be

7   omitting changes in the -- changes in the documents that

8   wouldn't get produced.

9       And Mr. Chaput's example -- nothing wrong with that.

10  There's nothing wrong with it.  If there -- if the bit-for-bit

11  somehow drew in some exact duplicates by error.

12      But what about the inverse -- which is the more likely

13  scenario, which has happened, from my experience, in numer- --

14  when you're not using the industry standard, which is -- are

15  these technologies, and doing a bit-for-bit -- doing a

16  bit-for-bit comparison to make sure that they're exact is that

17  what you're doing is you're actually omitting slight variations

18  of documents, the different things that are -- whether there's

19  handwriting -- whether there's handwriting on a handwritten

20  draft or something, there's comments.

21      The idea is, is that, yes, Mr. Chaput suggests that

22  defendants, in their proposal, they would meet and confer over

23  near duplicates, but if they're not using the right technology,

24  they won't know that these are near duplicates that are

25  being -- because this is automated.

1        What they're suggesting is they know of a near duplicate.

2   But if they're not using the right technology, then -- then

3   we're not going to -- then we won't know.  They won't know.  We

4   won't know.

5        And if they do end up producing another -- an extra

6   document, then so be it.  I mean, it's not the -- it's not the

7   worst thing in the world for them to produce two of the same

8   document rather than it's a bigger -- it's a bigger issue to

9   omit responsive relevant information, alternatively -- that are

10  near duplicates being omitted and excepted from the production.

11       There is a issue --

12       **THE COURT:**  Let me stop you there.

13       Mr. Chaput, it slows -- it speeds up your production if

14  you just use the hash values and then produce -- doesn't it? --

15  instead of doing the extra layer that -- of content review that

16  you're talking about.

17       **MR. CHAPUT:**  Well, so, the -- the deduplication

18  happens before review.  And so the issue is, if we're pulling

19  in these functionally exact duplicates, both copies are going

20  to end up getting reviewed.  And so that's where the burden

21  comes in, in addition to storage costs, processing costs.

22       As an example of how conservative this software is, Meta

23  has a work chat function.  And those work chats, when you

24  collect them from two different custodians, even though they're

25  substantively the same because it's a thread between two

**PROCEEDINGS**

1  different people, those are picked up as near duplicates and

2  not exact duplicates.

3       We think it would be reasonable and sensible for us to

4  agree that we only produce one of those since they're

5  substantively identical.  But that's the sort of thing that

6  we're willing to meet and confer with plaintiffs about

7  because -- because the system, again, is processing that

8  example as a near duplicate instead of an exact.

9            **THE COURT:**  Have you disclosed to plaintiffs what tool

10  you're using?

11           **MR. CHAPUT:**  I don't believe we've disclosed the

12  specific tool, no, Your Honor.

13           **THE COURT:**  Okay.  Well, I order you to disclose -- I

14  mean, to have a substantive discussion about the

15  capabilities -- because there may not be a dispute here if he

16  knows what tool you're using and what's it capable of doing.

17       You should have more discussions along those lines to

18  share that kind of information because...

19       Anyway -- so you put the plaintiffs in the position they

20  don't know the capability of the tool.  They're relying on your

21  description of what it can and can't do.  That's the problem

22  here; right?  And so I'm trying to see if we can reach

23  agreement but there's an information void on that side of this.

24           **MR. CHAPUT:**  Thank you, Your Honor.  We're happy to

25  confer further on this.

1            **MR. AYERS:**  Your Honor, there's just one other piece

2      to this deduplication that I just want to raise to your

3      attention -- it was touched on Mr. Chaput -- is that e-mails --

4            **THE COURT:**  Yeah.

5            **MR. AYERS:**  The hash values, the algorithm, the hash

6      value algorithms do not work over e-mail.  They just

7      fundamentally -- just over e-mail, it's a different methodology

8      that needs to be used.  And this is methodology -- something

9      that defendants omit from their proposed -- proposed language

10     is that to properly deduplicate e-mail, you need to look at the

11     actual data fields.

12            You need to look at the from, to, CC, BCC, subject, date

13     sent, time sent, body, the hash values of all of the

14     attachments.  These are all things that, when I spoke to the

15     technical personnel on the call, they indicated they're -- they

16     can do, their software can do to do that in a concatenated

17     analysis.

18            But they still won't agree to it, even though they can do

19     it.  And this is critical, because when it comes to e-mail, the

20     hash values just don't work and so you will, without any

21     necessarily intent, omit near duplicates, omit things -- BCC

22     and things like that because it just fundamentally doesn't

23     work.  And that is well accepted that it doesn't work on

24     e-mails.  So that's why in ESI protocol after ESI protocol

25     that's entered in- -- across the country, they include the

**PROCEEDINGS**

 1  specifications of what needs to be included for e-mail.

 2         THE COURT:  Okay.  Anything further on deduplication?

 3                  (No response.)

 4         THE COURT:  All right.  Let's move on to system files.

 5     It looks like the parties agree on almost all the language

 6  except the plaintiffs' phrase, quote, or are not themselves

 7  responsive or contain responsive data, blah-blah-blah, up to

 8  "user data."

 9     Was it -- did I compare visually the two proposals

10  correctly?

11         MS. FITERMAN:  That's correct, Your Honor.

12         MR. AYERS:  Yes, Your Honor.

13         THE COURT:  Okay.  So, Mr. Ayers, why is that phrase

14  necessary?

15         MR. AYERS:  Sure.  So to get to -- just to start off

16  with, with respect to system files, these are -- these are

17  obviously -- most -- they should be -- these are

18  non-responsive, irrelevant system files that kind of --

19         THE COURT:  I know what system files are.

20         MR. AYERS:  Okay.  And so the De-NIST is the -- the

21  De-NIST list is really the standard.  And that's generally all

22  that's generally required.  The defendants here propose a whole

23  litany of other systems that are -- that can be substantive

24  relevant information.

25     So to accommodate -- to accommodate defendants' inclusion

**PROCEEDINGS**

1   of all this other stuff that is not industry standard, we

2   included a requirement that they themselves are not responsive

3   or contain responsive information so that -- so that we are

4   sure that, you know, because this information is going to be

5   automatically omitted from the review process.

6        And so if that's the case, we'll never know if they're

7   removing automatically substantive, relevant information.  So

8   if they know that it's substantive and relevant, it shouldn't

9   be excluded through the system files.

10        So we're trying to do everything we can to be

11   accommodating and reach agreement to allow them to exclude

12   these additional types of files, but we need the assurances

13   that this stuff isn't going to be independently relevant and

14   responsive in this litigation.

15        We could just agree to do -- to do the -- the NIST hash

16   set list, which is the standard, and end it there; but we are

17   trying to accommodate the defendants.

18        **MS. FITERMAN:**  Actually, Your Honor, I'm going defer

19   to Meta's counsel because this is a Meta-specific issue.

20        **THE COURT:**  All right.

21        **MR. CHAPUT:**  Isaac Chaput for Meta, Your Honor.

22        File type exclusions, as Your Honor is probably well

23   aware, commonly ordered as fair of ESI orders and protocols.

24   And the issue with plaintiffs' responsiveness language is that

25   in order to determine if something is responsive, we have to

 1  review it which completely defeats the purpose of having the

 2  file type extension exclusions in the first place.  And so we

 3  can't cull it from review based -- if there's this

 4  responsiveness escape hatch that plaintiffs are asking for.

 5            THE COURT:  Do you have a response to that?

 6            MR. AYERS:  There's certain of these -- information

 7  that potentially could be aggregate -- individual or aggregate

 8  user data that could be responsive.  If the defendants know or

 9  have reason or have potential -- or have reason to know that

10  there's potentially relevant information in any of these files,

11  then they shouldn't be automatically excluded in that they

12  should be reviewed.

13            And so the idea is if they have an understanding that

14  there's certain of these things that would be potentially

15  relevant, then those should be omitted from this automatic and

16  they should be reviewed.  And so it should be done with care.

17  If they do want to automatically exclude these things, then

18  plaintiffs are willing to allow them to do so if they exercise

19  reasonable care in how they apply this.

20            But just categorically to omit all of these files without

21  any consideration of whether they would include responsive or

22  relevant information is just inappropriate, and it hasn't been

23  done in any other litigation that Meta has been in -- that I

24  can see from their ESI protocols -- or otherwise across the

25  country.  The De-NIST list is the set list.

1        So we're willing to compromise with them, but if they

2    insist on this language being omitted, then we would have to

3    just -- then it should just be the standard NIST hash list set.

4        **THE COURT:**  Mr. Chaput, what's the problem with having

5    Meta make a determination before review whether or not Meta

6    believes or has reason to believe that any of these -- or these

7    specific files that you come across might have or would

8    reasonably be expected to have responsive information?

9        **MR. CHAPUT:**  The issue, Your Honor, is that these file

10   types almost always are system junk files that have zero

11   relevance.

12       **THE COURT:**  Then you don't have a reasonable basis to

13   believe or suspect they even have responsive information in

14   them?

15       **MR. CHAPUT:**  I agree, Your Honor.  My concern is if

16   the ESI protocol suggests that there might be a reason to

17   believe, then we have an obligation to identify each and every

18   one of these types of junk files.

19       So I mean, candidly, Your Honor, what we might end up

20   doing with these types of files is producing them without

21   reviewing for relevance.  And if plaintiffs really want

22   voluminous junk files, we can produce them, but it just has to

23   be with the understanding that we're not necessarily going to

24   be reviewing them for responsiveness.

25       **THE COURT:**  Well -- okay.  I understand your position.

**PROCEEDINGS**

 1   I don't think anybody wants parties producing junk files that

 2   are nothing but zeros and ones.

 3       So I understand the positions.  You'll see my order on it.

 4           MR. CHAPUT:  Thank you, Your Honor.

 5           THE COURT:  Issues 9 and 10 are resolved, and we're

 6   finally done with the long march; correct?

 7           MR. CHAPUT:  We are.  Thank you, Your Honor.

 8           MR. AYERS:  Thank you very much, Your Honor.

 9           THE COURT:  All right.  Going back to the discovery

10   report.

11       This is more of a curiosity thing.  Where do things stand

12   on the plaintiffs' fact sheet?

13       Are you nearing completion on this with Judge Kuhl?

14           MS. HAZAM:  Your Honor, Lexi Hazam for plaintiffs.

15           MS. PIERSON:  Good afternoon, Your Honor.  Andrea

16   Pierson, Faegre Drinker, for the defendants.

17           MS. HAZAM:  And I can advise, Your Honor, that, in

18   fact, the plaintiff fact sheet has now been submitted to both

19   Judge Kuhl and to Judge Gonzalez Rogers.

20           THE COURT:  Great.

21           MS. HAZAM:  So we're awaiting the Court's order on

22   that.

23           THE COURT:  All right.  And let's see.

24       Law enforcement sharing, who wants to talk about that?

25           MR. HUYNH:  Thomas Huynh for the state AGs.

1          **MR. CHAPUT:**  Isaac Chaput for the Meta defendants.

2          **THE COURT:**  All right.  So I'm going to read to you my

3    text order from December 12th, which says (as read):

4               "Preceding each DMC" -- and this is before the

5          previous DMC -- "the parties shall file a joint

6          status report which shall address, among others

7          things, discovery issues which the parties are still

8          meeting and conferring on..."

9          As of December 12th, you were still -- there were meet and

10   confers on this law enforcement sharing issue, but it was never

11   raised at the prior discovery management conference.  This is

12   the first time I'm hearing of it.

13         And so I'm tempted to ask why, but really my directive is

14   to be complete in your reports to me on discovery issues that

15   are coming up.  Okay?

16         **MR. CHAPUT:**  Understood, Your Honor.

17         From Meta's perspective, it had been raised.  We asked the

18   state AGs for authority, and we didn't receive any.  And so

19   since it was not raised in the context of the last discovery

20   conference, we had a similar understanding to Your Honor.

21         **MR. HUYNH:**  Briefly, Your Honor.  Thomas Huynh for the

22   state AGs.

23         With regards to our position, we note that on 11/29/2023,

24   we raised it with defense counsel.  So we were discussing it,

25   but there was a concern that it was not yet ripe yet for

**PROCEEDINGS**

1  raising it for the Court, which is why we didn't, but we

2  understand the area --

3      **THE COURT:**  The order is very clear that issues you're

4  meeting and conferring on I want to know about.  Right?

5      So I'm going to give you some guidance on this issue.  I

6  know you have a dispute on it and -- somebody asked for a

7  briefing schedule.  I think my standing order on discovery is

8  very clear on how to handle -- raise discovery disputes

9  formally with me.  You submit the brief, and then I'll -- the

10  letter brief and I'll look at it, and then I'll set the

11  schedule for any further briefing or hearing after that.

12      But I will tell you, I've done some research on this

13  issue, along with my staff.  I haven't seen a lot of good

14  authority allowing free sharing of documents that are otherwise

15  confidential under protective order with third parties who are

16  not parties to the Court.  They're free to intervene and

17  they're free to come in and ask for permission, but the whole

18  purpose of a protective order is, in fact, to keep the

19  documents under the control of this Court or under its

20  protective order.  All right?

21      So you've got authority that tells me I -- you know, if I

22  have to do otherwise, I'm willing to read it in the brief.

23  Okay?

24      **MR. HUYNH:**  Thank you, Your Honor.  Thomas Huynh for

25  the state attorneys general.

**PROCEEDINGS**

1    We would just briefly note that this came out, like, after

2   the discovery statement was submitted.  But in *D.C. v. Meta*,

3   2023-CAB-6550, the D.C. court actually did enter a law

4   enforcement provision with respect to Meta Platforms.  So we

5   will submit the brief and provide you with our authority, Your

6   Honor.

7         **THE COURT:**  Provide me the authority, and I guarantee

8   you I'll read it and I'll read your letter briefs -- assuming

9   you can't come to an agreement otherwise on the issue, which

10  I'm assuming you can.

11        **MR. CHAPUT:**  We're happy to confer further with the

12  state AGs.  And if it's necessary, we will submit a letter

13  briefing following Your Honor's protocols.

14        **THE COURT:**  Okay.  Let's talk about the proposed --

15  and the discovery plan.

16        **MR. CHAPUT:**  Thank you, Your Honor.

17        **MR. HUYNH:**  Thank you, Your Honor.

18        **THE COURT:**  Who is going to talk about those?

19        **MS. SIMONSEN:**  Good afternoon, again, Your Honor.

20  Ashley Simonsen for the Meta defendants.

21        **MS. HAZAM:**  Lexi Hazam for plaintiffs again.  And

22  various of us will speak to the issues in here, so we'll wait

23  for Your Honor to specify where you'd like to begin.

24        **THE COURT:**  Okay.  Well, let's see.  Well, you can

25  expect an order on the ESI protocol shortly after this hearing.

1   I'm not going to hold myself to a particular date, but it won't

2   go too long.

3       And I'll wait for you to tell me you're going to give me a

4   privilege log protocol, a deposition protocol, a source code

5   order.

6       On bellwether, I -- you're meeting with Judge Gonzalez

7   Rogers tomorrow; correct?

8           **MS. HAZAM:**  We are, Your Honor.  And, in fact, we have

9   alerted her to our desire to discuss the matter with her in the

10  case management conference statement submitted by the parties,

11  both the process and the timing of a potential bellwether

12  order.

13          **THE COURT:**  You should definitely raise it with her,

14  and I'm sure she'll talk about it with you tomorrow and give

15  you guidance on that.

16      It will affect discovery at some stage and you can come

17  back to me on that.  But until she's given you guidance on

18  where to go with bellwethers and all that -- I know you're

19  talking about it with Judge Kuhl as well.  I don't think

20  there's anything for me to do on bellwethers at this time; is

21  that --

22          **MS. HAZAM:**  Understood, Your Honor.

23          **MS. SIMONSEN:**  We agree, Your Honor.

24          **THE COURT:**  Discovery plan.

25      So let's talk about the bigger issue first.  Discovery

1    scheduling and cutoffs -- sorry, I made you all change.

2        So I know you've teed up the issue of prioritizing

3    causation in the personal injury -- for the personal injury

4    plaintiffs with Judge Gonzalez Rogers.  I'm sure -- she may

5    give you guidance on that tomorrow, but she's going to decide

6    that issue at some point.

7        Until she decides that issue, the case is not prioritized

8    and the causation is not prioritized.  So I'm going to set

9    schedules for discovery on that basis, that there's no

10   prioritization, but I have your proposal.

11       So if she does prioritize causation, if the contours of

12   that part of the case change, come back to me at the next DCM

13   or whatever the next succeeding DCM is after she makes that

14   decision to then prioritize, and then we'll revise or

15   reconsider the schedule and the dates.  All right?  But for

16   now, I'm going to set deadlines assuming no causation

17   prioritization, that we're just going forward.

18       So if I understand correctly -- and maybe I'll use the

19   chart.  Looking at the side-by-side chart on page 15 which I

20   found very helpful.

21           MS. HAZAM:  Your Honor, that chart is -- if there is

22   phasing --

23           THE COURT:  Yeah, well, this is --

24           MS. HAZAM:  -- or prioritization by --

25           THE COURT:  Okay.

```
 1            MS. HAZAM:  It's the -- it starts on the bottom of

 2   page 10.  That is the parties' chart --

 3            THE COURT:  There you go.

 4            MS. HAZAM:  -- of their respective positions without

 5   prioritization.

 6            THE COURT:  Right.  Sorry.  Wrong side-by-side chart.

 7       Okay.  First off, I think you do need to do initial

 8   disclosures so I'm going to set a date for that.  I don't think

 9   this is the kind of case where -- I mean, the fact sheets are

10   going to replace, maybe all of it -- all the initial

11   disclosures, but there have to be initial disclosures.

12       The other deadlines I think you have already agreed to.

13       The bellwether order, again, I think that's something to

14   raise with Judge Gonzalez Rogers.

15       Conceptually, I am going to order a date for substantial

16   completion of production of documents.  In the interim, I think

17   that's both useful and it's necessary to make sure people are

18   working towards a closing date.

19       So this is on plaintiffs -- think they can get this case

20   ready to go by spring of 2025?  It's your burden of proof.

21            MS. HAZAM:  I'm sorry, Your Honor.  Excuse me.

22       Plaintiffs for what deadline?

23            THE COURT:  I mean, according to you, everything is

24   done by March 2025; right?

25            MS. HAZAM:  Yes.  Yes.  Absolutely.
```

PROCEEDINGS

```
 1              THE COURT:  And so you want to -- presumably, you'll
 2    be going to trial sometime in early 2025.
 3              MS. HAZAM:  Exactly.  Well, not -- early might be an
 4    exaggeration, given --
 5              THE COURT:  Q2 or Q3.  I mean, sometime in, like, mid-
 6    to --
 7              MS. HAZAM:  Exactly.
 8              THE COURT:  Mid-2025, depending on --
 9              MS. HAZAM:  Exactly, Your Honor.
10              THE COURT:  -- Judge Gonzalez Rogers's availability.
11         So you're -- but are you ready -- you're representing here
12    you're ready to, with the party with the burden of proof, to
13    get your case together and get it ready under that schedule?
14              MS. HAZAM:  We absolutely are, Your Honor.
15              THE COURT:  All the plaintiffs are?  State AGs?
16              MR. HUYNH:  Thomas Huynh for the state AGs.
17         Yes, Your Honor.
18              THE COURT:  All right.  I'll give you one shot to tell
19    me why you need two years of fact discovery.
20              MS. SIMONSEN:  Absolutely, Your Honor.
21         So we are proposing a fact discovery cutoff of February
22    2026, and that's in light of -- we've already seen extensive
23    discovery served on the defendants by the plaintiffs, including
24    over 600 requests for production served around the Christmas
25    holidays.
```

**PROCEEDINGS**

1    And I think it's notable that the plaintiffs, in their

2  discovery plan sections, state that that is just early

3  discovery that they consider to be circumscribed to kickstart

4  efficient discovery.  So that is -- the inference from that is

5  that there is a great deal of additional discovery coming.

6    And although it may be the case that ultimately Your Honor

7  may agree with defendants in terms of objections to some of

8  that discovery, it will, of course, take time to sort those

9  objections out with the volume of discovery that these

10  plaintiffs are serving.

11    And I think, Your Honor, the unreasonableness of their

12  proposal is revealed by their proposed case schedule in the

13  event that general causation staging is ordered.  Under that

14  proposed schedule, plaintiffs' proposed scheduled, fact

15  discovery would close in June of 2025, which is around

16  seven months later than under their primary proposal.  But

17  defendants' general causation staging proposal merely involves

18  moving earlier in time defendants' challenges to plaintiffs'

19  experts on one discrete issue.  It does not change the scope or

20  sequencing of discovery at all.

21    And plaintiffs' request for a discovery cutoff under that

22  plan of June 2025, while still nine months too early --

23  defendants would submit -- is an implicit acknowledgement that

24  more than 10 months is going to be needed to complete fact

25  discovery in these cases.

**PROCEEDINGS**

1      The other point I think it's important to appreciate here,

2  understanding that no bellwether order has yet been entered, is

3  that there will be extensive discovery of the personal injury

4  and the school district plaintiffs that's not accounted for in

5  this discovery plan because the parties do agree that that will

6  flow from what Judge Gonzalez Rogers does with respect to

7  setting bellwether trial dates and selecting bellwethers for

8  discovery, workup, and trial.

9      And I think it's particularly important to highlight that

10  we don't have even a plaintiff fact sheet implementation order

11  entered in the MDL yet.  There is one entered in the JCCP but,

12  based on the sequence of events that have to occur before

13  meaningful PFS data is received -- which is a prerequisite to

14  selecting plaintiffs for bellwether discovery, workup, and

15  trial -- we don't expect to receive meaningful PFS data in the

16  JCCP until June of 2025.

17      That's not to mention the defendant fact sheets, which are

18  going to require the production of very complex structured data

19  that the plaintiffs have requested.  No defendant fact sheet

20  implementation order has even been entered the JCCP.

21      And, Your Honor, it would be surprising to me if we were

22  even done with plaintiff fact sheets and defendant fact sheets

23  in the JCCP, leaving aside the MDL, by the date that plaintiffs

24  are proposing for the close of all fact discovery in the MDL.

25      So I think -- the other point I think I would like to just

note is that the plaintiffs are proposing -- essentially, if you take into account their proposals on limitations to discovery, they're proposing -- assuming they take the maximum hours of depositions that they are proposing, that would be 390 full days of depositions of the defendants.

If you assume that they are going to propose the same number of plaintiffs for bellwether discovery workup that they've proposed in the JCCP, and that each of those plaintiffs has approximately five depositions associated with each of them, that's another 330 days of plaintiff depositions; 720 days just of depositions and there are only 300 days left until November 15th when they propose that all fact discovery concludes.

So we would submit to Your Honor that it's simply not practical, particularly given the types of discovery that the plaintiffs have not only said that they are seeking but have actually already started seeking.  And again, although defendants will, I expect, be objecting to much of that discovery, those objections will take time to be resolved.

So for all of those reasons, Your Honor, two years is an eminently reasonable period of time where we're talking about a case of this complexity, four different defendant groups, five different social media applications.  We have three sets of plaintiffs in this MDL who are suing the defendants, and we also are, through these proceedings, coordinating with

discovery in the JCCP, where there is another two sets of
plaintiffs, personal injury and school district plaintiffs.

So for all of those reasons, Your Honor, I think two years
is an eminently reasonable amount of time to target for the
completion of discovery in these cases.

**MS. HAZAM:**  Your Honor, if I may respond?

**THE COURT:**  Yep, please respond.

**MS. HAZAM:**  Lexie Hazam on behalf of plaintiffs.

You just heard quite a few assumptions laid out there by
defendants, I think, in a sort of parade of horribles scenario.
I don't think many, if any, of those assumptions are warranted.

I think that the schedule that plaintiffs have proposed is
both more efficient and faster in honoring both Courts'
expressed desire to get these cases to trial quickly in
compliance with Federal Rule 1.

I would note that the entire premise of defendants'
prioritization proposal was to supposedly be more efficient and
to get there faster, and, yet, our proposal, without that
prioritization, is well over a year faster.

I would also note that I think our discovery on the
defendants has been mischaracterized here.  It is not in any
way unusually voluminous thus far.  It is a good start on
discovery.  About half or more of the requests actually specify
a specific document that we are either asking them to produce
by title or by Bates number, or we're asking them to produce

**PROCEEDINGS**

1  some associated documents.

2      I would note that with regard to bellwethers, we obviously

3  need to consult with Judge Gonzalez Rogers and gain her

4  guidance as to how she wants to set up that process.  I don't

5  think any assumptions can be made about schedule or numbers,

6  but what I can say is that the PFS process should be well

7  underway in the JCCP in March, and that the plaintiffs were

8  invited by defendants to match the schedule of the JCCP, and

9  said yes, even though our order will be entered later.  We

10  remain willing to do that.

11      So, essentially, I think our schedule is eminently doable.

12  It honors the public health urgency of this case and

13  the Court's expressed wishes, and I think defendants' is a

14  recipe for undue delay and multiplication of disputes.

15          **THE COURT:**  All right.

16      So you'll get a written order on this, but -- on the

17  assumption that, again, that any discovery schedule I enter is

18  consistent with an overall case schedule that you get from

19  Judge Gonzalez Rogers.  I mean, she could go, you know, a

20  fast-track route and set you to trial for November of this

21  year.  Doubtful.  But she could also set you for trial

22  January of 2026.  I don't know -- right? -- and I'm not

23  predicting anything.

24      But I'm going to set a discovery schedule -- as I said at

25  the last DMC, I do want you to get the case prepared

**PROCEEDINGS**

1    regardless.  And it's -- part of my job is to keep the trains

2    running; right?

3         So the schedule you're going to see from me is going to be

4    more consistent with the proposal the plaintiffs have made in

5    terms of timing and cutoffs.  There may be some tweaks there,

6    but I think -- I'm willing to reconsider those both if

7    causation gets changed and prioritized, and, of course, if the

8    overall case schedule somehow doesn't fit with what I'm

9    ordering.

10        So, please, obviously come back with me -- come back to me

11   if there's a disconnect there.

12        **MS. SIMONSEN:**  Thank you, Your Honor.

13        If I may, to the extent that Your Honor intends to enter a

14   schedule that is more consistent with plaintiffs' timeline, the

15   defendants would request a deadline for plaintiffs to serve all

16   written discovery within eight weeks of entry of the plan.  In

17   order for us to have any possibility of meeting a deadline

18   anywhere close to what the plaintiffs have proposed for the

19   close of fact discovery, we will need to know the universe of

20   documents that they are requesting and information that they're

21   seeking through interrogatories and requests for admission as

22   soon as possible.  It is going to be a huge amount of

23   coordination to pull all of those materials, and so we would

24   ask that you set that deadline.

25        **THE COURT:**  They've already served RFPs, and I assume

1    they're going to serve another set of RFPs once they see some

2    more documents.  I don't know what the timing of that is going

3    to --

4         **MS. HAZAM:**  Yes, Your Honor, that is -- excuse me.

5    Lexi Hazam for plaintiffs.

6         That is typically how discovery works.  You get some

7    documents and then you request more based on what you've seen.

8    So we won't even have defendants' documents in any significant

9    number within eight weeks from today.  So we vehemently oppose

10   that proposal and believe that it would just lead to the

11   reopening of discovery in an inefficient matter.

12        **THE COURT:**  Have you served interrogatories on the

13   defendants?

14        **MS. HAZAM:**  We have not.  We are being conservative

15   about that but intend to start doing so very shortly.

16        **THE COURT:**  I don't think I'm going to set a hard

17   deadline.  It behooves the plaintiffs to, certainly, not delay

18   serving other written discovery.  You've already served

19   requests for production.  It also behooves plaintiffs not to

20   delay serving, say, a second round of document requests, and

21   certainly going -- issuing third-party subpoenas.

22        And I assume, if I set the schedule and you say you're

23   going to be ready, that you're going to take the -- you know,

24   take the efforts to make sure you meet the deadlines that are

25   being set.

1          **MS. HAZAM:**  Understood, Your Honor.

2          **MS. SIMONSEN:**  Your Honor, I would ask at least for a

3    substantial completion of the service of written discovery.

4    You know, the plaintiffs themselves have acknowledged that

5    defendants Meta, TikTok, and Snap already made initial

6    productions of documents, which were part of months-long

7    inquiry by the attorneys general into the exact conduct by

8    defendants at issue in this case.

9          So they already have a huge volume of documents -- over

10   65,000 documents.  So the notion that they're in a position to

11   need extensive additional discovery before they can determine

12   what they -- what additional discovery they need to take from

13   the defendants is a little surprising to hear.

14         We've, you know, heard from the JCCP plaintiffs that they

15   think that they could go to trial against Meta based on the

16   documents that they already have from us, and so I think

17   it's -- if the defendants are going to be constrained to such a

18   short period of time to complete discovery, there need to be

19   some limitations, not just the assumed exercise of good faith

20   on the part of plaintiffs in terms of when they need to serve

21   their discovery.

22         And we would submit also -- I don't know if Your Honor's

23   going to get to it -- limitations on discovery.

24         **THE COURT:**  Not there yet.

25         **MS. HAZAM:**  Your Honor, if I may, the documents

**PROCEEDINGS**

1  produced to date are, of course, simply documents that the

2  defendants had produced in response to investigations, not by

3  the plaintiffs here before you today as individual and school

4  district plaintiffs, but moreover, they are very uneven in

5  their productions.  There is a body of documents from Meta that

6  is in the 40,000s.  There is one document from Google.  There

7  are less than 1,000 documents from Snap.

8      We are going to be meeting with Your Honor on a regular

9  basis each month.  We can check in on the status of document

10  requests, but we do not think we should be setting deadlines

11  for them now, in contravention to normal practice in MDLs and

12  the rules.

13          **THE COURT:**  Again, unless there -- unless I see some

14  foot-dragging by plaintiffs in issuing their subsequent

15  discovery requests, I don't think I need to, at this point, set

16  any hard deadlines for that.  But, again, I caution plaintiffs,

17  you know, no dilly-dallying on getting your document requests

18  and other written discovery out.  Okay?

19          **MS. HAZAM:**  Understood, Your Honor.

20          **THE COURT:**  All right.

21          **MS. SIMONSEN:**  I think, Your Honor, it -- just one

22  additional point, maybe guidance that Judge Kuhl issued to the

23  plaintiffs in the JCCP when they were requesting a similarly

24  early trial date, which is:  With such an early requested trial

25  date, which aligns generally with the fact discovery cutoff

1  these plaintiffs are requesting, that they are going to have to

2  be extremely targeted in their discovery.

3       And I must simply put on the record that with the

4  discovery cutoff of November of this year and the volume of

5  requests already served, we will, as defendants, need to

6  reserve the right to assert burden objections on the ground

7  that simply getting that many documents produced by that time

8  may simply not be feasible, and certainly is not proportional

9  to the needs of the case.

10       **THE COURT:**  I assume you will assert all reasonable

11  good faith objections as to burden.  And if it is truly

12  burdensome and if the objection is disputed, you can certainly

13  come back to me and explain why it's burdensome.

14       I don't know if anybody in the room has ever litigated in

15  the ITC, or in Marshall, Texas, but in those venues, we

16  finish -- those venues finish fact discovery in roughly

17  six months in highly complicated, technical cases.  So I have

18  every confidence that the parties here can meet the deadline

19  here, which is more than six months.

20       **MS. JEFFCOTT:**  Good afternoon, Your Honor.  Emily

21  Jeffcott.  I'm JCCP colead for the plaintiffs, and I did want

22  to correct one point.

23       Yesterday in a conference, we did disclose that we would

24  be willing to do a Meta-only trial as the first trial; however,

25  we did not state that we would be willing to do it on the

1  documents that have been produced thus far.  Certainly,

2  additional discovery needs to move forward, the discovery

3  that's been issued, and going down the line.  And we fully

4  support, obviously, the schedule that's been proposed by the

5  MDL plaintiffs in this case.

6      Thank you.

7          **THE COURT:**  Thank you.  Thank you.

8      Oh, and I should say, if the schedules I set somehow

9  conflict with the JCCP schedule that Judge Kuhl enters, you

10 have to let me know, too, because I want to be not only

11 sensitive to the interplay with the schedule that

12 Judge Gonzalez Rogers sets, but also the other case, because we

13 did all reach consensus.  I think, everybody agrees, all the

14 parties agree should be coordinating across both, and I'm kind

15 of unofficially helping discovery that -- to the extent it

16 overlaps in the both cases too.

17         **MS. HAZAM:**  Understood, Your Honor.

18         **MR. DRAKE:**  Geoffrey Drake, King & Spalding, for the

19 TikTok defendants.  If I could just add one additional point on

20 top of Ms. Simonsen.

21     The proposed schedule by the plaintiffs also includes just

22 a matter of a few months between the close of the fact

23 discovery period and the close of the expert discovery period

24 which overlaps, of course, from November 15th to March 1,

25 Thanksgiving, holidays, and the like.

**PROCEEDINGS**

1    I think, given the amount of expert workup that will be

2    necessary in this case, that seemed, in and of itself, overly

3    ambitious.  And I just wanted to add that point perhaps on top

4    as Your Honor is adjudicating and determining what an

5    appropriate schedule would be on the plaintiffs' relative

6    track.

7         **THE COURT:**  So with no phase-in, defendants wanted

8    five months between fact discovery and expert discovery -- and

9    expert discovery.  And if I'm doing the math right, plaintiffs

10    proposed...

11         **MR. DRAKE:**  Three and a half.

12         **THE COURT:**  Three and a half months -- I'm sorry --

13    with some overlap is what you're saying -- right? -- because --

14    actually, three and a half months between the end of fact

15    discovery and the end of -- close of expert discovery.  So the

16    difference is six weeks.

17         **MR. DRAKE:**  Inclusive, of course, of the holidays.

18    It's always difficult to get the experts scheduled during that

19    time period.  But I thought that was -- that might be an area

20    where some additional time could be helpful.

21         **THE COURT:**  This raised a point that I was going to

22    make which is, you know, between experienced counsel like this,

23    I would have thought at least on that issue you could have

24    reached a compromise on six weeks' delta between the end of

25    fact discovery and expert discovery.  But you've teed it up for

 1  me, so I'm going to decide.

 2          MR. DRAKE:  Thank you.

 3          THE COURT:  I take your point about the holidays, so

 4  thank you for that.

 5          MR. DRAKE:  Thank you.

 6          MR. DONOHUE:  Good afternoon, Matthew Donohue for the

 7  Google defendants.

 8      Just a couple of quick points.  One is the Court -- if the

 9  Court is inclined to enter a schedule similar to what

10  plaintiffs have proposed, we just would like to mention that we

11  think that there should be a more reasonable date set for the

12  initial disclosures.  Plaintiffs, I believe they're proposing

13  tomorrow, which is obviously not reasonable at this point.

14          THE COURT:  That can't happen.

15          MR. DONOHUE:  So we think -- ideally, though, we think

16  there should be some meet and confer about the appropriate

17  scope of disclosures because even if plaintiffs don't think the

18  conversations we've had so far are sufficient that they don't

19  need any initial disclosures, I think it should at least narrow

20  the scope.  So we would propose that the parties should meet

21  and confer about the timing and scope of initial disclosures.

22          MR. WARREN:  Your Honor, may I respond?

23          THE COURT:  Sure.

24          MR. WARREN:  Previn Warren for the plaintiff.

25      Your Honor, we fully recognize that tomorrow is not a

1    workable deadline for defendants' initial disclosures.  By the

2    same token, defendants have been on notice of this lawsuit for

3    a year.

4        The information we are looking for primarily relates to

5    the witnesses that would be ordinarily disclosed in a

6    litigation of this size -- really any civil litigation under

7    Rule 26(a)(1).

8        "Who knew what?"  That is information we're entitled to,

9    and we're entitled to it very, very soon.  I'm never opposed to

10   meeting and conferring with my friends on the other side.  By

11   the same token, there isn't a whole lot to say at this

12   juncture.  We just need a list of who knew what, and I think

13   we're entitled to get that promptly.

14       I did want to ask Your Honor for clarification on the

15   initial disclosures.  My understanding is that the plaintiffs'

16   fact sheets that are going to be produced by the plaintiffs,

17   they're very robust in nature.  They effectively give

18   defendants all of the information that would be covered by

19   Rule 26.

20       So I just wanted clarity that there isn't an expectation

21   we do something other than that.  By contrast, I think it's

22   clear the defendants' fact sheet does not address who knew

23   what, nor does it address the insurance issue that's covered in

24   Rule 26(a)(1), and those would be the things that we'd be

25   asking for.

1        **THE COURT:**  Certainly -- I mean, there probably won't

2    be dispute on this, but if plaintiffs provide the plaintiffs'

3    fact sheets and state, either through a pleading or on the

4    record, that those are also the initial disclosures.

5        **MR. WARREN:**  That's no problem at all.

6        **THE COURT:**  If the defendants have a dispute with

7    that, then they can raise it with you.

8        **MR. WARREN:**  That's certainly no problem.

9        **MR. HUYNH:**  Judge, if I may quickly.

10       **THE COURT:**  Sure.

11       **MR. HUYNH:**  Thomas Huynh for the state attorneys

12   general.

13       With regard to the initial disclosures on the Rule 26, we

14   note that with regards to Meta, we agreed to waive them.  We're

15   just wondering if Your Honor's order would mean that we would

16   still need to do additional disclosures vis-a-vis Meta if we

17   are waiving them.

18       **THE COURT:**  So I was going to ask about that

19   separately.  Okay.

20       So Meta -- would Meta's initial disclosures to the state

21   AGs be different?  If they were provided, would they be

22   different from the initial disclosures provided to the other

23   plaintiffs?

24       **MS. SIMONSEN:**  I'd obviously want to think about that

25   a bit more, but I think they would be substantially similar

1  because the claims in the issues across these sets of

2  plaintiffs are -- overlaps substantially, if not entirely.

3        **THE COURT:**  Right.

4        **MS. SIMONSEN:**  If we were required to serve initial

5  disclosures on the state attorneys general in addition to the

6  personal injury and school district plaintiffs, we believe it

7  would be absolutely appropriate for the states attorneys

8  general to serve them on us.  We had proposed, as an

9  alternative to initial disclosures, that a date be set for the

10  disclosure of witnesses for trial.

11        And with -- and the reason for that is because, you know,

12  we do recognize that that's the one element of the initial

13  disclosures that perhaps hasn't yet entirely been provided by

14  virtue of, for instance, the document productions to date.

15  Although, I will submit that with the volume of documents

16  produced, they probably have a pretty good idea of who our

17  witnesses may be.

18        But if Your Honor isn't going to set such a deadline for

19  the disclosure of witnesses, then we would need initial

20  disclosures from the state attorneys general as well.

21        **MR. WARREN:**  Your Honor, Previn Warren for the

22  personal injury plaintiffs.

23        Couple points, if I may.  First of all, just in the

24  interest of clarity for the record, the personal injury, school

25  district, local government plaintiffs have not reached any

**PROCEEDINGS**

```
 1   agreement with Meta to waive initial disclosures.  We don't
 2   think that's appropriate.
 3        I have no idea who Meta's witnesses will be at all.
 4   Granted, they've produced some documents to the attorneys
 5   general that have been reproduced here.  That's a far cry from
 6   understanding who knew what.  Not only does Rule 26(a) provide
 7   for witnesses that are pertinent to the claims the plaintiffs
 8   are asserting, it also provides for disclosure of the witnesses
 9   that would support the defendants' affirmative defenses, as to
10   which we are really just in the process of learning.
11        So we don't really think that the disclosure of trial
12   witnesses two years from now is an appropriate substitute for
13   telling us who knew what within the next week, which is really
14   what we would ask for in terms of the timing of the 26(a)(1)
15   disclosures from the defendants.
16        THE COURT:  Mr. Huynh, if Meta is going to be
17   providing substantially the same initial disclosures to the
18   other coplaintiffs, what's the point of waiving?
19        MR. HUYNH:  Your Honor, Thomas Huynh for the state
20   attorneys general.
21        We tried to waive in order to increase efficiency so that
22   we wouldn't have to do, I guess, an initial set of disclosures
23   to Meta as a defendant.
24        To the extent, though, Your Honor is inclined to provide
25   initial disclosures, I can take that back with my group and
```

**PROCEEDINGS**

1  then we can try and see among the 33 jurisdictions how to

2  organize and also provide those initial disclosures.

3       **THE COURT:**  If I order you to provide initial

4  disclosures, you're going to provide initial disclosures.

5       **MR. HUYNH:**  Of course, Your Honor.

6            (Laughter.)

7       **THE COURT:**  You'll see it in my order, but I'm

8  inclined to require everyone to exchange initial disclosures

9  across the entirety of all the cases.

10       **MS. SIMONSEN:**  We would request more than one week to

11  prepare those, given that we had been meeting and conferring

12  about the possibility of waiving them and had at least one

13  plaintiff group that was agreeing to waive them.  So one week

14  is certainly not enough time.  We would submit --

15       **THE COURT:**  That's going to be our next question.  So

16  I know they want them right away, and we want more than a week.

17       How much time do the defendants propose that they think

18  they need?

19       **MS. SIMONSEN:**  May I confer briefly with my

20  codefendants?

21            (Conferring.)

22       **MS. SIMONSEN:**  Apologies.  Ashley Simonsen for the

23  Meta defendants.

24       We believe a deadline of four weeks from today would be

25  doable for the defendants.

1       **MR. HUYNH:**  Thomas Huynh for the state attorneys

2  general.

3       Your Honor, we conferred with our relative other states,

4  and we were under the impression that because we would be

5  waiving, it would be pretty burdensome for us to provide these

6  initial disclosures.

7       And we'd just note for Your Honor that to the extent that

8  Meta does want the initial disclosures, we would ask for

9  basically a reason for why, since we are the prosecuting agency

10  of a law enforcement agency and the burden -- or rather, the

11  large proportion of the evidence and the witnesses are going to

12  be with Meta, not with us.

13       **THE COURT:**  So I don't think there's any exception in

14  Rule 26 for a party not to give initial disclosures just

15  because they're a government agency.  And so to the extent you

16  don't know who the witnesses are because they're under the

17  control of the defendants then you don't list them in your own

18  initial disclosures.

19       I mean, typically, I've seen parties incorporate by

20  reference the other side's initial disclosures or other

21  people's initial disclosures.  But certainly the rule is pretty

22  clear on its face:  You're only required to disclose the things

23  that you know that are what people who are -- I forget the

24  exact terminology -- who are, you know, known or reasonably

25  believe or have information relevant to -- I'm misquoting but

1    you understand what I'm saying.

2        So I don't think it's going to be burdensome for you to

3    put together initial disclosures.  And I -- again, there's no

4    exception in the rule for government agencies.

5            MR. HUYNH:  Thomas Huynh for the state attorneys

6    generals.

7        In that case, Your Honor, with regards to our Rule 26

8    disclosures from Meta, we would then suggest that perhaps there

9    might be two tracks since we don't want to prejudice our other

10   plaintiffs with regards to the initial disclosures.

11       So the six -- I believe defendant said six weeks?

12           THE COURT:  Four weeks.

13           MS. SIMONSEN:  Four weeks.

14           MR. HUYNH:  Four weeks might be acceptable, then, for

15   the two of us.  But at the same time, we don't want to delay

16   the other plaintiffs when it comes to initial disclosures.

17           THE COURT:  Is that -- can you take four weeks and

18   we're all on the same schedule?

19           MR. HUYNH:  For us, yes.

20           MR. WARREN:  That's absolutely fine, Your Honor.

21           THE COURT:  Okay.  Done.  Four weeks it is, initial

22   disclosures.  That will be my order.

23       But that's making a verbal order.  You're ordered --

24   everybody is ordered to provide initial disclosures four weeks

25   from today.

1    Ms. Fox, what date is that?

2        **THE CLERK:**  Four weeks from today?  Court days or

3   regular days?

4        **THE COURT:**  Calendar days.

5        **MS. SIMONSEN:**  If I may briefly, Your Honor, I'm a

6   little unclear on how that's going to work for the plaintiffs,

7   because what they're representing is that their plaintiff fact

8   sheets are going to be essentially substitutes for their

9   initial disclosures.  But plaintiff fact sheet data won't even

10  start to be produced at the absolute earliest in late March,

11  I believe, and that assumes that the plaintiffs are able to

12  access their accounts.

13    The plaintiffs' lawyers in the JCCP have represented that

14  the vast majority of their clients will need an additional step

15  to take place in the PFS process before they can even access

16  their accounts such that they can answer the plaintiff fact

17  sheets.

18    I would assume it might be similar for these plaintiffs,

19  and so I think, if it's going to be until probably later than

20  March that the plaintiffs are providing their initial

21  disclosures in the form of plaintiff fact sheets, it would seem

22  fair that the defendants should have the same amount of time to

23  provide their initial disclosures to the plaintiffs.

24        **THE COURT:**  Okay.  Do you need six weeks or more?

25        **MR. WARREN:**  If I may briefly respond.  Previn Warren

1    for the plaintiffs.

2         The plaintiffs' fact sheet process is working itself out

3    in the JCCP.  It's going to be an extensive amount of

4    information.  The PFS process has been heavily negotiated.

5         As I indicated, I think the initial disclosures we would

6    provide would essentially be a placeholder referencing that,

7    kind of a down payment on the PFSs that would get filed.  It's

8    unfortunately just very different in kind to the information we

9    need from the defendants, which is simply:  Who are the

10   witnesses; who are the employees; and what do they know?

11        That's information the defendants have been sitting on

12   since the outset of this litigation over a year ago.  There

13   really isn't a need -- there isn't any other process that's

14   going to subsume that that justifies any kind of delay.

15        So we're happy to provide what's essentially a placeholder

16   initial disclosures in four weeks, and then the PFS process

17   will --

18             THE COURT:  Let me stop you there.  I mean, your

19   initial disclosures should be as complete as you can reasonably

20   make them at the time you're making them; right?

21        So to the extent your clients have information that

22   belongs in initial disclosure, I think you're obligated to put

23   it.  You can't just have a blank placeholder.  If you got --

24   you've got time to pull together at least some information.

25             MR. WARREN:  Your Honor, it's simply not possible

 1  given the number of individual plaintiffs and the counsel we'd

 2  have to interface with.  We do have a process that is literally

 3  for the purpose of providing this information to the defendants

 4  and having a new initial disclosure process insert itself into

 5  that, I think, would be very disruptive to the efficiencies

 6  that we've tried very hard to create around the sharing of this

 7  information.

 8      **THE COURT:**  All right.  So is counsel correct that you

 9  probably won't get -- start actually issuing PFSs until late

10  March?

11      **MR. WARREN:**  I believe something along that timeline

12  is correct, yes.

13      **THE COURT:**  What about school districts?

14      **MR. WARREN:**  There's a separate school district

15  plaintiff fact sheet process that's getting worked through

16  right now.

17      **THE COURT:**  But in terms of just numerosity, there's

18  fewer school districts than there are individual plaintiffs,

19  aren't there?

20      **MR. WARREN:**  No, Your Honor, actually that's not

21  correct; there's over 600.

22      **MS. SIMONSEN:**  And, Your Honor, the plaintiff fact

23  sheet has not even been agreed to in the school district cases

24  in the JCCP.  That is a whole other set of discovery that's

25  going to need to take place again before the close of fact

**PROCEEDINGS**

1    discovery that I haven't even touched on in that massive amount

2    of discovery I previously referenced.

3        I would also point out, Your Honor, that these plaintiffs'

4    lawyers have also had their clients for quite some time as

5    we've progressed through pleadings challenges, and their

6    plaintiff fact sheets will not contain their list of witnesses

7    that they expect to rely on for purposes of trial.

8        If we are going to be expected to begin identifying those

9    individuals in our disclosures in four weeks, then by the same

10    token, the plaintiffs should.

11        If, on the other hand, the plaintiffs want additional time

12    so that they can complete the plaintiff fact sheet process, it

13    would make sense in turn for our initial disclosures, the

14    defendants' initial disclosures, to similarly be delayed.

15        **MR. WARREN:**  Your Honor, if I may, I'm very concerned

16    about the false equivalence here.  We are not asking for trial

17    witnesses through the Rule 26(a) disclosures.  And it's true

18    the PFS is not going to identify trial witnesses.

19        The purpose of both processes is to identify persons who

20    are knowledgeable and possess potentially relevant information.

21    That's what's at issue here.  So there isn't any sense that,

22    you know, we're withholding the trial witness list and the

23    defendants are producing it.  That's really not what's going on

24    here.

25        I will say the parties are just not going to be evenly

1  situated on all scores when it comes to some of these issues.

2      The PFS process has been designed using a centralized

3  platform that the parties have all spent a lot of time agreeing

4  on and working with so that the information can be ingested

5  into one place that can be summarized and downloaded for use in

6  bellwether selection and analyzed.

7      It has been a very extensive and successful effort in the

8  JCCP.  Attempting to replicate that in a less efficient, less

9  technologically sophisticated way through 26(a) disclosures

10  really doesn't inure to the benefit of the defendants at all.

11  I doubt they would even have a chance to read, you know,

12  thousands of those documents when, just weeks later, they would

13  are getting it all in ingestible, usable data.

14      THE COURT:  Are you planning to start issuing PFSs on

15  a rolling basis or are they going to just come in one final

16  batch?

17      MR. WARREN:  I believe there will actually be

18  deadlines for when the PFSs have to be submitted into MDL

19  centrality upon on the entry of the PFS implementation order.

20      THE COURT:  But what's the estimated first such

21  deadline?

22      MR. WARREN:  I don't know that off the top of my head,

23  but I'm sure one of my counsel do.  It will be soon.  It will

24  be, you know, a couple of months, I believe.

25      Am I correct?

1          **MS. SIMONSEN:**  Your Honor, that -- that's not correct.

2     There are a series of steps, as I mentioned, that have to take

3     place before plaintiff fact sheets can start to be produced.

4     And since the JCCP PFS implementation order has been entered,

5     there has been time for those steps to play out.  There needs

6     to be time for those same steps to play out in the MDL.

7          So although we appreciate that plaintiffs are saying

8     they're going to try to produce plaintiff fact sheet data by

9     March, there is this interim step where they identify -- where

10    it is determined which plaintiffs they can't access their

11    account information for through publicly available tools that

12    the defendants provide.

13         After that, the defendants need to investigate to try to

14    identify the accounts that belong to those plaintiffs.  That

15    then has to be confirmed by the plaintiffs.  And for those

16    plaintiffs, defendants have then agreed to produce certain

17    information that would be in lieu of the information that the

18    plaintiffs could otherwise obtain through publicly available

19    tools.

20         And I think, again, that's just the personal injury

21    plaintiffs.  We aren't even close to having a PFS

22    implementation order for the school districts.  And I think

23    that really what all of this underscores is just how

24    unrealistic that November 2024 proposal plaintiffs made is by

25    more than a year because it's going to take a lot of time to

**PROCEEDINGS**

1  complete the plaintiff fact sheet process.  It's going to take

2  more time to complete the defendant fact sheet process.  Again,

3  large volumes of structured data that these plaintiffs are

4  requesting for every single one of the hundreds of plaintiffs

5  in these two sets of cases.

6      That -- it's not even just the volume of plaintiffs, it's

7  that process of producing structured data that is very time

8  intensive and burdensome on the defendants.  And we have to --

9  that's just plaintiffs' side discovery before we get into

10 identifying plaintiffs for bellwether workups.

11     At the same time, we're going to be doing defense

12 discovery, but there simply, I submit, is not time to complete

13 fact discovery in these cases anywhere close to the timeline

14 that these plaintiffs are proposing.

15         **MR. WARREN:**  Your Honor, may I?

16     I believe we're now slipping through many different

17 issues, retracting on some things that have already been

18 discussed.

19     There really isn't a dispute between the parties right now

20 about the plaintiffs' fact sheet process.  We've been working

21 efficiently and effectively on that, primarily in the JCCP, but

22 also to some extent, in the MDL.  It is going to be voluminous.

23 It is going to be daunting, and there will be a lot of data

24 involved.

25     My point simply is that we shouldn't short-circuit that by

1   interjecting some other process that's going to involve

2   thousands of static PDFs, nor do I think it has any bearing on

3   defendants' obligation to tell the plaintiffs who knew what,

4   which is something only they know and have withheld from

5   telling us, and would like to withhold telling us for another

6   two years, which would be incredibly prejudicial to our ability

7   to efficiently meet the deadlines that we're shooting for.

8        We are attempting to be intentional, targeted, and smart

9   about our discovery.  Defendants routinely seem to mention the

10  number of RFPs.  Well, the reason there's a lot of RFPs is

11  because we are going in surgically for the things that we need.

12  It's very easy to serve just one RFP that asks for all

13  documents on all things.

14       We are not doing that -- especially given that defendants

15  don't want to produce hyperlinked documents in the ordinary

16  course, we have to serve RFPs asking for those.  And we've

17  already served over a dozen to that effect to ask for this

18  document linked in this document; right?  So that, of course,

19  is going to increase the number of RFPs, but that -- that

20  doesn't increase the burden in any material way.

21           **THE COURT:**  I'm going to stop you there because we're

22  going to lose our court reporter.  So in the interest of time,

23  unless there's some critical issue or argument somebody needs

24  to make on initial disclosure deadlines, I'm going to stick

25  with four weeks.

PROCEEDINGS

```
 1          MR. HUYNH:  Judge, Thomas Huynh for the state
 2   attorneys general.
 3      Just a quick question:  Can we consolidate all the
 4   jurisdictions to one filing as opposed to having every
 5   jurisdiction file its own separate filing?
 6          THE COURT:  If they're all making the same disclosure,
 7   however you format it is up to you.
 8          MR. HUYNH:  Understood.  Thank you, Your Honor.
 9          THE COURT:  If they're not making the same disclosure,
10   then I think that deserves a separate disclosure.
11          MR. HUYNH:  Understood, Your Honor.  Thank you.
12          MR. WARREN:  Your Honor, I just want to be clear on
13   your anticipated ruling.  You're asking that -- the thousands
14   of personal injury and school district plaintiffs to serve
15   initial disclosures identifying all the relevant witnesses and
16   everything else?
17          THE COURT:  No.  If you want to refer to the plaintiff
18   fact sheets as substituting for them or supplementing them
19   later -- okay, I'll remind everyone.
20      Everyone here has an ongoing duty to supplement their
21   initial disclosures as the case is going on.  And so
22   preemptively, what I'm allowing you to do -- which is
23   unusual -- is to preemptively commit yourself to supplementing
24   your initial disclosures at the earliest possible time through
25   the plaintiff fact sheet process.
```

1        **MR. WARREN:**  Thank you, Your Honor.  Thank you.

2        **THE COURT:**  All right.  All right.  Okay.

3     Discovery limits, interrogatories.  So I've read the

4  competing proposals.

5     Who is going to speak to interrogatories?

6        **MR. WARREN:**  Your Honor, Previn Warren for the

7  plaintiffs.

8        **THE COURT:**  Okay.  So across the plaintiffs, I mean, I

9  assume, similar to documents -- there are going to be some

10 common interrogatories that you would serve on all defendants;

11 right?

12       **MR. WARREN:**  Yes, Your Honor.

13       **THE COURT:**  Okay.  And then, presumably, there will be

14 a smaller number of individual interrogatories that each

15 plaintiff group might want to serve on an individual

16 defendant -- right? -- on top of those?

17       **MR. WARREN:**  Your Honor, I can't say whether it would

18 be smaller or larger.  I don't know that at this point.

19       **THE COURT:**  Okay.  So -- and on the flip side, the

20 defendants are going to have essentially common interrogatories

21 to all the state attorneys general; right?

22       **MS. SIMONSEN:**  The Meta defendants do anticipate that

23 what they serve will be consistent.

24       **THE COURT:**  Let me ask -- I mean, maybe people can't

25 tell me -- is there an anticipation that there will be more

1    defendants named in the course of this case on the state AGs'

2    case or are we really only talking about Meta for purposes of

3    discovery planning here?

4         **MS. SIMONSEN:**  I certainly can't speak to that, Your

5    Honor.

6         **MR. HUYNH:**  Thomas Huynh for the state attorneys

7    general.

8       We're not able to speak to that at this moment.

9         **THE COURT:**  Okay.  So, again, this is an issue.  I

10   mean, plaintiffs basically wanted something like 65 rogs; the

11   defendants wanted something like 40.  I can't believe you

12   couldn't find a number between 65 and 40 that you could

13   compromise on.

14        **MR. WARREN:**  Your Honor, the personal injury

15   plaintiffs and defendants have -- you know, are trying to meet

16   in the middle and are in the process of meeting and conferring.

17   We've asked for 50 per defendant, they've asked for 40 per

18   defendant.  I think we're both able to infer what a midpoint

19   might be, and we've proposed that to the defendant and are

20   awaiting their response.  But that does leave the separate

21   issue of the state attorneys general.

22        **MS. SIMONSEN:**  And, Your Honor, we just haven't had a

23   chance, all defendants, to speak to our clients about that

24   proposal.  I think the critical point is that, from our

25   perspective, all of the interrogatories served should be served

1    by all three sets of plaintiffs.  And so if there is a

2    45-interrogatory limit, it should apply to all three sets of

3    plaintiffs:  The personal injury plaintiffs, the school

4    district plaintiffs, and the state AGs.

5           **THE COURT:**  I'm going to get to that.

6        So if you are still meeting and conferring, with all

7    due -- you know, all deliberate speed, try to -- I mean, again,

8    you're close to each other in the numbers, you should be able

9    to reach an agreement.

10        But for interrogatories and I think for requests for

11   admission, where it's a common set -- right? -- so all

12   plaintiffs are going to ask the same interrogatory of all the

13   defendants, there should be a number for that.

14        And if the plaintiffs feel like they need, per plaintiff

15   group, a limited number of other interrogatories to serve on

16   each or some or one individual defendant -- right? -- then you

17   can talk about that and kind of come up with a proposal.

18        So I was thinking something like, and these are just

19   numbers -- right? -- you know, X number for -- X number of

20   common interrogatories for all plaintiffs; right?  And then Y

21   number of additional interrogatories for just the personal

22   injury plaintiffs.  Y number of -- Z number of additional

23   interrogatories for just the state AG plaintiffs; right?

24        All right.  And that way, we avoid the issue of

25   duplication across different service and different -- and it

 1   gets more consolidated.  So I want you to coordinate on that;

 2   right?

 3       Similarly if -- I guess it's not going to happen on the

 4   defense side.  If there were more than Meta in the state AG

 5   cases, I was going to order you to do same thing, so -- but not

 6   an issue.

 7       Similar approach on the RFA limits.  Okay?  I don't want

 8   there to be open-ended -- because RFAs can be abused just by

 9   serving voluminous numbers of them; right?  So see if you can

10   come up with a number that you can all agree to.

11       Similarly kind of common RFAs and then specific, if you

12   need to, a limited number of additional RFAs per subgroup of

13   plaintiff.  Okay?

14       **MR. WARREN:**  Thank you, Your Honor.

15       I think it would help to have a little early guidance from

16   you.  The rules don't specify a limit for our phase, so it's

17   hard to find a midpoint between 100 and infinity.  So if you

18   have some sense of where the Court would come out, that might

19   help orient the parties.

20       **THE COURT:**  I think, one rule of thumb that I think is

21   easy to use is kind of gauging the number of RFAs to be roughly

22   equal to the number of interrogatories.

23       And I get it, on RFAs, if you need to use them to

24   authenticate documents later, and they're truly just document

25   authentication, hopefully you can do that by stipulation.  But

 1    if you need those kinds of RFAs, come back to me and ask for

 2    leave to serve extra ones.  All right?

 3         **MR. WARREN:**  Thank you, Your Honor.

 4        I believe the defendants have already indicated that they

 5    would not include RFAs concerning authenticity and

 6    admissibility within the scope of any numerical limit, although

 7    I don't want to speak for them.

 8         **THE COURT:**  Okay.  Are you still meeting and

 9    conferring on deposition limits and timing and all that or do

10    you need me to decide that for you?

11         **MS. SIMONSEN:**  We did discuss this morning a potential

12    compromise on the number of depositions -- excuse me -- on the

13    hours limitation on depositions.  The plaintiffs most recently

14    proposed 14 hours.  The defendants have proposed a 10-hour

15    limit.  And the plaintiffs have proposed a compromise on that.

16        I think we'll need to further meet and confer to see if we

17    can reach that agreement.

18         **THE COURT:**  Okay.

19         **MS. SIMONSEN:**  I think the larger issue, though, of

20    whether we're going to go with -- I think the plaintiffs have

21    proposed 40 depositions per defendant, plus 10 that can be

22    allocated to any particular defendant, plus 25 per defendant by

23    the AGs, versus 140 hours, which is roughly 20 depositions,

24    that the defendants would propose the plaintiffs collectively

25    get to take.

 1      We certainly, I think, could continue to meet and confer.

 2 And I think with Your Honor's guidance about the need for the

 3 three sets of plaintiffs to work together to find commonality

 4 across discovery requests, if the plaintiffs can come back to

 5 us and, as a group of three sets of plaintiffs, negotiate with

 6 us on those types of limits, I think that could probably go a

 7 long way toward potentially reaching an agreement here.

 8      **MR. AYERS:**  With respect to the state attorneys

 9 general asking for some additional set of depositions --

10 obviously that's only with respect to Meta.  It's not with

11 respect to the other three.

12      And so the deposition limit with respect to the other

13 three is set, what we proposed, at 40 depositions, plus this

14 kind of floating 10 that can be applied to either one because

15 not all of the defendants are identical.

16      Obviously Meta just recently consolidated and used to be

17 two different platforms with two sets of -- two sets of

18 different parties that are responsible for a lot of the time

19 period -- right? -- that goes back to the early 2000s.  So it

20 makes sense that there would be certain floating to allow for

21 the plaintiff groups to take -- to be able to take additional

22 depositions depending on what's necessary as discovery.

23      But we're also talking about multinational corporations

24 with offices around the world, with thousands of employees,

25 producing tons of ESI every day.  The idea that we'd be limited

1    to a set of essentially 140 hours over 10 depositions -- over

2    10-hour depositions which is essentially 14 depositions of a

3    defendant is just not in the scope of reality of what type of

4    discovery we need to take in this litigation.

5         **THE COURT:**  I hear you're meeting and conferring to

6    come to a number that you can agree to.

7         So in the interest of time, because I think we're going to

8    lose our court reporter, keep meeting and conferring.  I do

9    agree that the plaintiffs -- similar to my approach on common

10   interrogatories and common RFAs, the depositions should be

11   common- -- commonly taken by the plaintiffs of a particular

12   defendant or defendant witness.

13        And you can try to negotiate whether it's a small amount

14   of hours or days or an individual plaintiff group to take an

15   individual, you know -- extra deposition here or there, that

16   obviously should be -- there should be allowance for that in

17   your negotiations.  But I do encourage you to come up with

18   some -- because it sounds like -- again, if they're asking for

19   40, and you're roughly agreeing to 20, you should be able to

20   come up with a number that both can agree to in terms of

21   numbers of depositions.

22        **MS. SIMONSEN:**  Your Honor, we're glad to keep meeting

23   and conferring.

24        I do want to flag that, of course, our proposals on

25   limitations were based on our proposed discovery schedule and

 1   with a completion of fact discovery anywhere close to what

 2   plaintiffs are proposing, I'm not sure that it's going to be

 3   realistic for us to be making the same proposal that we made,

 4   which was premised on the type of discovery schedule.  But we

 5   will go back and meet and confer and see if we can reach an

 6   agreement.

 7           THE COURT:  Sometimes you need to double-track

 8   depositions; right?

 9           MS. SIMONSEN:  Understood.  It would be a lot of

10   double-tracking.

11           THE COURT:  Well, maybe not.  They don't -- certainly

12   there's no requirement that you take every available deposition

13   that are in the numerical limits.  These are limits, they're

14   not minimums.

15           MS. SIMONSEN:  Understood, Your Honor.

16           MR. AYERS:  And, Your Honor, we are obviously

17   agreeable to continue to meet and confer.

18       I just want to at least just mention that obviously the

19   limitations and restrictions that defendant posed with respect

20   to 30(b)(6) limitations are also just not in the realm of what

21   would be necessary with just 21 total --

22           THE COURT:  Okay.  You raise a -- so reach agreement

23   on -- negotiate -- if you can reach agreement on 30(b)(6)s too,

24   do that.  But if you can't -- it seems to me, until you've

25   exchanged topics and actual notices, you don't know how many

**PROCEEDINGS**

1    30(b)(6) depositions there are going to be; you don't know how

2    many designees there's going to be.  Until you actually see the

3    topics, it's a little bit speculative so -- not that I want to

4    talk about deposition scheduling constantly, but if you can't

5    reach an agreement for now on how to handle 30(b)(6)

6    depositions in terms of limits and all that -- I assume those

7    are not going to be the first depositions you take -- maybe

8    they are; right?  But if you can't reach agreement, come back

9    to me and we'll try to figure it out.

10       But it seems to me exchanging even draft proposed topics

11   for the 30(b)(6) depositions might help because that would give

12   the defendants an indication of how many people, how many

13   designees they're going to need to tee up to address each of

14   the issues.

15       **MR. AYERS:**  Thank you, Your Honor.

16       We'll meet and confer.

17       **MS. SIMONSEN:**  Your Honor, the one note I would make

18   is that both sides do seem to agree in the plan that the

19   deposition limits that are set will apply to both 30(b)(6) and

20   non-30(b)(6) fact witnesses.  I understand there's a dispute

21   about within that how many will be allocated to 30(b)(6), but I

22   just wanted that to be clear.

23       I see my co-counsel here is waiting to say something.

24       **MR. DONOHUE:**  Thank you.  Matthew Donohue for the

25   Google defendants.

 1          And I'll be brief because I understand the Court isn't

 2     planning to enter any numerical requirements today.

 3          But we'd just like to mention that we think that there are

 4     some distinctions, possibly, between the parties as far as the

 5     scope of the claims and the burden involved, and so we think

 6     there might be some reasons for different numerical limits as

 7     to different parties.  But if we're going to go back and meet

 8     and confer, we can deal with that then.

 9          **THE COURT:**  I assume the plaintiffs are going to be

10     reasonable in accommodating different limits if it's justified.

11          **MR. DONOHUE:**  Thank you.

12          **THE CLERK:**  Right.  Mr. Ayers?

13          **MR. AYERS:**  Right.  We're going to meet and confer and

14     we'll be very reasonable in how we meet and confer and our

15     positions that are taken.

16          One comment in respect to the 30(b)(6)s that were just

17     mentioned.  What we -- the parties agreed upon is that each

18     notice -- that we'll be able to serve discrete -- multiple

19     30(b)(6)s on discrete topics, and that each notice would count

20     as a deposition.

21          **THE COURT:**  If that's what you've agreed to, that's

22     fine.

23          **MR. AYERS:**  If they designate, for instance, multiple

24     witnesses per -- on a particular topic, that those wouldn't

25     count -- those wouldn't start chipping away at the total

1   number.

2         MS. SIMONSEN:  In candor, Your Honor, I think -- I'm

3   just going to want to go back and confirm exactly what our

4   position is in light of the changes, but we're glad to meet and

5   confer on that point.

6         I would also just -- in response to counsel for Google's

7   comment, the Meta defendants would submit that, given the

8   allegations that are applicable to all of the defendants and

9   the claims asserted against all of the defendants, we don't see

10  that there's a need for a differentiation between them in terms

11  of the discovery.

12        THE CLERK:  Raise that in the -- I assume you're all

13  meeting and conferring together and not kind of in -- maybe

14  you're meeting and conferring in separate caucus, I don't know,

15  but you can certainly raise that in the discussions.  I'm sure

16  you'll reach consensus on that.

17        That last thing on depositions is the issue about

18  depositions of the state attorney generals.  I wasn't

19  100 percent sure whether these are -- there's a dispute over

20  whether you could or couldn't take the depositions of a

21  30(b)(6) designee of the state attorneys general, or if you're

22  actually seeking to depose the state attorney general of each

23  of the plaintiff states.

24        MS. SIMONSEN:  Your Honor, we -- I understand that you

25  may not have noticed where this was in our report, but what we

**PROCEEDINGS**

1   explained is that by saying "depositions of the state attorneys

2   general" what we mean is that includes other state agencies.

3      We don't expect to take our proposed number of

4   depositions, 140 hours, of the state attorneys general office

5   of each state.  But we do need the ability -- these are --

6   these are individual parties, 34 of them -- including Florida,

7   which has now been transferred -- who have chosen to sue Meta

8   in this case.

9      They are parties.  They are, therefore, subject to

10   discovery.  We expect there to be -- as there have in other

11   MDLs, asserting analogous types of claims by state attorneys

12   general, we expect there to be discovery that we would need to

13   take of numerous state agencies.  And, for that reason, we will

14   require depositions of the state attorneys general.  Now --

15      **THE COURT:**  Those would be 30(b)(6)s of the agency or

16   the office or --

17      **MS. SIMONSEN:**  They would not necessarily be 30(b)(6)

18   depositions; there could be non-30(b)(6) depositions.  But

19   regardless, there needs to be discovery of these parties who

20   have chosen to sue us in these cases.

21      And the state attorneys general originally seemed to

22   recognize that in proposing that we would get 20 depositions

23   of -- their proposal was all 34 state attorneys general, which

24   doesn't really make sense because you're not -- that's not even

25   accounting for one deposition for each one.

1        Our proposal is reciprocal with what we're proposing in

2   terms of the plaintiff depositions of defendants.  And so we

3   would propose that those -- those depositions do need to

4   happen.  And to the extent that the state attorneys general are

5   taking the position in this discovery plan, one hour before it

6   was due last Friday, that there should be no discovery of state

7   attorneys general, if Your Honor is remotely inclined to

8   indulge that notion, we would ask for the opportunity to brief

9   that.

10        **THE CLERK:**  I'm not remotely inclined to indulge that

11   notion.

12        **MR. HUYNH:**  Judge, Thomas Huynh for the state

13   attorneys generals.

14        So with regards to the depositions of the state attorneys

15   generals, we would note, as an initial matter, that we don't

16   actually represent the other state agencies that might comprise

17   our state, other than our client agency in specific states.

18        So with the example of New Jersey, New Jersey represents

19   the Division of Consumer Affairs in this matter.  We don't

20   represent Bureau of Securities, or the Division of Child

21   Protection and Permanency.  There's a series of other

22   third-party agencies that exist that would fall into the

23   purview of defendants' depositions that don't actually -- or

24   aren't actually represented by us and they would be third-party

25   subpoenas.

1      So they should not -- for depositions.  So they should not

2   be counted in that amount, and they should not be served on the

3   state attorneys generals because we don't actually represent

4   those state agencies.

5      We'd also note that, with regards to serving -- with

6   regards to our position on this, so we had originally met and

7   conferred on the 16th about this matter.  And we had raised the

8   idea of 20 depositions globally to us, but then upon reflection

9   and also after that discussion, we had concerns about what the

10  depositions would be reaching to, including these other

11  third-party state agencies that we simply aren't representing.

12     We also have concerns that these depositions would

13  constitute more or less a deposition upon a law firm since, for

14  example, with New Jersey, the division of law represents the

15  Division of Consumer Affairs.  But we are, for all intents and

16  purposes, a prosecuting agency or law enforcement as well as a

17  law firm.  So it would be akin to serving, say, a deposition

18  notice on myself or on another AAG or another attorney as

19  opposed to on, like, a fact witness.

20     We would note that with regards to this, there is case law

21  that discusses depositions of prosecuting agencies.  And

22  although it's from the Eight Circuit, it's *Shelton v. Am.*

23  *Motors Corp.*, 805 F.2d 1323 to 1327, and that's the

24  Eighth Circuit, 1986.

25     Although it's from a different circuit, it has been often

**PROCEEDINGS**

1    cited in the Northern District of California for saying about

2    the test, about whether or not you can serve a deposition upon

3    a law firm.

4        And that test is (as read):

5            "Where no other means exist to obtain the

6        information than to depose opposing counsel, the

7        information sought is relevant and nonprivileged, and

8        the information is crucial to the preparation of the

9        case."

10       Your Honor, we submit that until Meta meets that burden,

11   it should be allowed to provide any depositions upon state

12   attorneys generals because we're functioning as law firms and

13   also as prosecuting agencies.

14       And with regards to serving of depositions on us, it is

15   strongly disfavored, and they bear the burden of showing that's

16   necessary, given that test.

17       **MS. SIMONSEN:**  Your Honor, the state attorneys general

18   are suing on behalf of the states.  And so they are not suing

19   on behalf of the Office of the State Attorney General.  They

20   are suing on behalf of the states, who are the parties to these

21   cases.

22       And for that reason, we are entitled as defendants to

23   discovery of state agencies that may have relevant information.

24   We're not trying to depose the State Attorney General's office.

25       **THE COURT:**  In the interest of time, the substantive

**PROCEEDINGS**

1  issue of whether those depositions should go forward or not is

2  not germane to the issue of scheduling and coming up with

3  limits and numbers of depositions because I don't agree that

4  there should be a blanket prohibition on taking depositions of

5  state agencies and state parties of the case, certainly.

6      If there -- if, you know, the defendants decide to do so

7  and can show a good reason why it's within the scope of

8  discovery.  So just in terms of scheduling -- not scheduling --

9  setting limits and numbers of depositions, are you still

10 talking or are you done and do I just need to decide?

11     **MS. SIMONSEN:**  We certainly would be prepared, Your

12 Honor, to discuss further with the state attorneys general if

13 they're open to discussing the possibility of actual

14 depositions taking place on the state AGs.

15     **MR. HUYNH:**  Thomas Huynh for the state attorneys

16 general.

17     Your Honor, we're still open to conferring with defendants

18 about this.  But we would still try to understand, like, better

19 what they're seeking in these depositions, especially given our

20 concerns about third-party state agencies not being represented

21 by us and also concerns about them potentially serving --

22     **THE COURT:**  If the state agencies aren't represented

23 by you then isn't it incumbent on them to just serve the

24 subpoenas and confer with counsel for those other state

25 agencies?

PROCEEDINGS

1          **MR. HUYNH:**  That would our position, Your Honor.

2          **THE COURT:**  But that doesn't affect the goal here in

3     this order of just trying to set numbers and timing.

4          I mean, presumably, if there are valid objections to a

5     deposition on the merits, down the line, that gets raised

6     later.  It doesn't get raised at the time of figuring out just

7     how many depositions they could take, assuming they could go

8     forward.

9          **MR. HUYNH:**  Your Honor, we're, of course, open to

10    conferring with Meta on this and trying to get a better

11    understanding of it, and trying to set a schedule as well as

12    numbers to the extent it can be done.

13         **THE COURT:**  All right.  So, please, I direct everyone

14    to keep meeting and conferring on this; otherwise, I'm just

15    going to start setting some hard and fast numbers.

16         **MR. HUYNH:**  Understood.  Thank you, Your Honor.

17         **MS. SIMONSEN:**  Understood, Your Honor.

18         I did want to note that our understanding is that these

19    deposition limits don't apply to third-party discovery, which

20    is something we haven't --

21         **THE COURT:**  I didn't see that.  I didn't see any

22    third-party limit to it.  Since third parties aren't really

23    represented here, it's hard to set limits on that.

24         But, again, I admonish all parties not to abuse the

25    third-party discovery process.  And Rule 45 certainly

**PROCEEDINGS**

 1  admonishes the courts to be more solicitous of third parties.

 2  So keep that in mind when you're issuing new third-party

 3  subpoenas.

 4      All right.  I think I've finished the long march through

 5  the proposed discovery plan.  Is there anything left to

 6  discuss?

 7          **MR. AYERS:**  I don't think so, Your Honor.

 8          **MS. SIMONSEN:**  Nothing from the defendants, Your

 9  Honor.  Thank you.

10          **THE COURT:**  And I thank Madam Court Reporter for

11  giving us the time and energy to go through a long hearing.

12      I thank counsel for your time and efforts to prepare for

13  today, and I'm sure you'll have equally productive discussions

14  with Judge Gonzalez Rogers tomorrow.

15      So I will be issuing an order on the ESI.  I'll be issuing

16  an order which in some part will be telling you just to go back

17  and meet and confer on some things on the other -- just things

18  like discovery limits and all that.

19      So I think I owe you two orders.  Is there anything else I

20  owe you after this?

21          **MR. AYERS:**  I think that's it, Your Honor, from the

22  plaintiffs.

23          **THE COURT:**  Okay.  All right.

24      Last call.  Anything else to talk about?

25          **MS. SIMONSEN:**  No.  Thank you very much for your time,

PROCEEDINGS

1    Your Honor.  We very much appreciate it.

2             **MR. AYERS:**  Thank you very much.

3             **THE CLERK:**  We're off the record in this matter.

4    Court is adjourned.

5             (Proceedings adjourned at 4:31 p.m.)

6                      ---oOo---

7

8             **CERTIFICATE OF REPORTER**

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11

12   DATE:   Tuesday, January 30, 2024

13

14

15

16

17   _____
         Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
18            Official Reporter, U.S. District Court

19

20

21

22

23

24

25