1    *LIST OF COUNSEL ON SIGNATURE PAGE*

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              OAKLAND DIVISION

11

12

13   | *People of the State of California, et al.* | MDL No. 3047 |

| *v.* | Case Nos. 4:23-cv-05448-YGR |
14
|      |              4:23-cv-05885-YGR |

15   *Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC*

16   ---------------------------------------------

17   *Office of the Attorney General, State of Florida, Department of Legal Affairs*

     **STATES' OPPOSITION TO META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT AND FLORIDA ATTORNEY GENERAL COMPLAINT**
18
         *v.*

19   *Meta Platforms, Inc., Instagram LLC*
     Date: TBD
20   ---------------------------------------------   Time: TBD
     Place: Oakland, California
21                                                   Judge: Honorable Yvonne Gonzalez Rogers

22   IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

23

24

25   THIS DOCUMENT RELATES TO:
     4:23-cv-05448, 4:23-cv-05885

26

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION AND BACKGROUND...........................................................................1

STANDARD OF REVIEW ...............................................................................................4

ARGUMENT ....................................................................................................................5

I.    The States' COPPA claim should not be dismissed.............................................5

    A.    Meta's motion is procedurally improper.....................................................6

    B.    The States sufficiently plead that Meta's Platforms are directed to children. ......................................................................................................7

        1.    Meta misconstrues the States' COPPA claim. ...............................8

        2.    The States adequately allege children are an intended audience of the Platforms.....................................................9

        3.    The States adequately allege empirical evidence of audience composition. .......................................................................10

        4.    The States adequately allege that Meta's Platforms feature child-oriented subject matter, characters, activities, music, and other content. ...........................................................10

        5.    The States adequately allege child-directed advertising promoting and appearing on the Platforms. ...................................12

        6.    The States adequately allege the Platforms' use of child models and celebrities who appeal to children. ...........................13

        7.    The States adequately allege child-oriented activities and incentives.......................................................................14

    C.    Endorsing the States' child-directed theory will not have dire consequences............................................................................14

II.    Section 230 does not bar the States' claims. ....................................................14

    A.    Meta is not acting as a publisher of third-party content, as contemplated under Section 230. .............................................................15

    B.    This Court has previously held Section 230 does not bar claims based on numerous Platform features. ......................................................17

    C.    Section 230 does not bar the States' additional claims based on Meta's addictive features. .......................................................................19

        1.    Section 230 does not bar the States' claims based on Meta's features designed to keep users on its Platforms..........................19

        2.    Section 230 does not bar the States' claims based on Meta's features designed to lure users back onto its Platforms. ...............21

III.    The States adequately allege that Meta engaged in deceptive acts and practices.......................................................................23

i

1

**TABLE OF CONTENTS**
(continued)

2

Page

3      A.    Meta's misrepresentations are actionable statements of fact. ................. 25

4      B.    The States adequately plead deception under any pleading standard. ...... 26

5            1.    The States adequately plead that Meta's stated policy
                  regarding users under thirteen is deceptive because the
                  policy does not reflect Meta's actual conduct. ............................ 27

6      2.    The States adequately plead that Meta's emphasis on its
            CSER reports as the primary measure of online safety

7            deceptively omits less favorable data. ........................................... 28

8            3.    The States adequately plead that Meta misled the public
                  about its reasons for abandoning Project Daisy. ......................... 29

9      C.    Where necessary, the States readily allege Meta's misstatements are

10     material. ............................................................................................................. 29

11     D.    Meta can be held liable for its deceptive statements before
            Congress. ........................................................................................................... 32

12  IV.   The States sufficiently plead unfair and unconscionable business acts and
         practices. ...................................................................................................................... 34

13     A.    The States sufficiently plead that Meta violated Section 5 of the
            FTCA. ................................................................................................................. 35

14           1.    The States sufficiently plead substantial injury. .......................... 36

15           2.    The States sufficiently plead that their alleged injury was
                  not reasonably avoidable. .............................................................. 36

16           3.    The States sufficiently plead that Meta's conduct is not
17                 outweighed by countervailing benefits. ........................................ 38

18     B.    The States sufficiently plead that Meta violated their unfairness or
            unconscionability laws. .................................................................................... 39

19  V.    The States adequately plead conduct taking place in connection with trade
         and commerce and consumer transactions. .......................................................... 43

20  VI.   The States are entitled to restitution. ..................................................................... 45

21  VII.  The Middle District of Florida has personal jurisdiction over Meta
         Platforms, Inc. and Instagram, LLC. ..................................................................... 47

22  CONCLUSION .................................................................................................................. 50

23

24

25

26

27

28                                                      ii

# TABLE OF AUTHORITIES

Page(s)

## <u>Cases</u>

*A.M. v. Omegle.com, LLC*,
  614 F. Supp. 3d 814 (D. Or. 2022) .................................................................................. 16, 21

*Aungst v. Roberts Constr. Co.*,
  625 P.2d 167 (Wash. 1987) ..................................................................................................... 5

*Avery v. Indus. Mortg. Co.*,
  135 F. Supp. 2d 840 (W.D. Mich. 2001) ............................................................................. 46

*Azoulai v. BMW of N. Am. LLC*, No.,
  2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ..................................................................... 26

*B&G Foods N. Am., Inc. v. Embry*,
  29 F.4th 527 (9th Cir. 2022) ................................................................................................. 33

*Balistreri v. Pacifica Police Dep't*,
  901 F.2d 696 (9th Cir. 1988) .................................................................................................. 6

*Ballagh v. Fauber Enters., Inc.*,
  773 S.E.2d 366 (Va. 2015) .................................................................................................... 26

*Horizon Bank v. Huizar*,
  178 N.E.3d 326 (Ind. Ct. App. 2021) ................................................................................... 41

*Barnes v. Yahoo!, Inc.*,
  570 F.3d 1096 (9th Cir. 2009) ................................................................................. 15, 16, 19

*BBL, Inc. v. City of Angola*,
  809 F.3d 317 (7th Cir. 2015) .................................................................................................. 4

*Beardsall v. CVS Pharmacy, Inc.*,
  953 F.3d 969 (7th Cir. 2020) ................................................................................................ 30

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................................................ 4

*Block v. Seneca Mortg. Servicing*,
  221 F. Supp. 3d 559 (D.N.J. 2016) ....................................................................................... 30

*Brown v. Google LLC*,
  2021 WL 6064009 (N.D. Cal. Dec. 22, 2021) ................................................................ 43, 46

*Brownlow v. McCall Enters.*,
  888 N.W.2d 295 (Mich. Ct. App. 2016) ............................................................................... 30

iii

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Caldor, Inc. v. Heslin*,
   577 A.2d 1009 (Conn. 1990) ................................................... 30

*Camping Unlimited for the Developmentally Disabled v. Brown & Brown of Garden City, Inc.*,
   2022 WL 395312 (N.D. Cal. Feb. 9, 2022) ................................... 9

*In re New Motor Vehs. Canadian Exp. Antitrust Litig.*,
   350 F. Supp. 2d 160 (D. Me. 2004) .......................................... 40

*Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*,
   973 P.2d 527 (Cal. 1999) ................................................ 1, 39

*Clark v. Prudential Ins. Co.*,
   736 F. Supp. 2d 902 (D.N.J. 2010) .......................................... 47

*Cliffdale Assocs., Inc.*,
   103 F.T.C. 110 (1984) ....................................................... 26

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
   194 A.3d 1010 (Pa. 2018) .................................................... 25

*Commonwealth. v. TAP Pharm. Prods., Inc.*,
   885 A.2d 1127 (Pa. Commw. Ct. 2005) ....................................... 46

*Connick v. Suzuki Motor Co.*,
   174 Ill.2d 482 (Ill. 1996) ..................................................... 1

*Conway v. CitiMortgage, Inc.*,
   438 S.W.3d 410 (Mo. 2014) .................................................. 33

*Cooke v. Allstate Mgmt. Corp.*,
   741 F. Supp. 1205 (D.S.C. 1990) ............................................ 26

*Creamer v. Monumental Props, Inc.*,
   329 A.2d 812 (Pa. 1974) ..................................................... 31

*Crowhorn v. Nationwide Mut. Ins. Co.*,
   2002 WL 1767529 (Del. Super. Ct. July 10, 2002) ........................... 30

*Crum v. SN Servicing Corp.*,
   2021 WL 3514153 (S.D. Ind. Aug. 10, 2021) ................................. 40

*Davis v. HSBC Bank Nev., N.A.*,
   691 F.3d 1152 (9th Cir. 2012) ............................................... 37

*Day v. AT&T Corp.*,
   74 Cal. Rptr. 2d 55 (Cal. Ct. App. 1998) .................................... 24

*Dedloff v. Whole Foods Mkt. Grp.*,
   No. 22-01340, 2023 WL 5428501 (E.D. Mo. Aug. 23, 2023) ................. 30

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Dermansky v. Young Turks, Inc.*,
  No. 23-cv-05868-SB-SK, 2023 WL 8884364 (C.D. Cal. Nov. 3, 2023) ................................ 4, 6

*Doe v. Internet Brands, Inc.*,
  824 F.3d 846 (9th Cir. 2016) ............................................................ 15, 18, 20, 21, 22

*Dyroff v. Ultimate Software Grp., Inc.*,
  934 F.3d 1093 (9th Cir. 2019) .................................................................................. 22

*E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ................................................................................................. 32

*Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*,
  752 So. 2d 582 (Fla. 2000) ....................................................................................... 48

*Fair Hous. Council v. Roommates.com*,
  521 F.3d 1157 (9th Cir. 2008) .................................................................................. 19

*Fink v. Time Warner Cable*,
  810 F. Supp. 2d 633 (S.D.N.Y. 2011) ...................................................................... 35

*Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*,
  261 F. Supp. 2d 837 (E.D. Mich. 2003) ................................................................... 43

*FTC v. Accusearch, Inc.*, No. 06-CV-105-D,
  2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ........................................................... 36

*FTC v. Neovi, Inc.*,
  604 F.3d 1150 (9th Cir. 2010) .................................................................................. 37

*FTC v. Pantron I Corp.*,
  33 F.3d 1088 (9th Cir. 1994) .................................................................................... 31

*FTC v. Quincy Bioscience Holding Co., Inc.*,
  646 F. Supp. 3d 518 (S.D.N.Y. 2022) ...................................................................... 30

*FTC v. R. F. Keppel & Bro.*,
  291 U.S. 304 (1934) ................................................................................................. 41

*FTC v. Sperry & Hutchinson Co.*,
  405 U.S. 233 (1972) ............................................................................................ 35, 41

*FTC v. Wellness Sup. Net., Inc.*, No. 10-04879,
  2014 WL 644749 (N.D. Cal. Feb. 19, 2014) ............................................................ 31

*Gordon v. Rosenblum*,
  393 P.3d 1122 (Or. 2017) ......................................................................................... 42

*Haeberle v. St. Paul & Marine Ins. Co.*,
  769 S.W.2d 64 (Ky. Ct. App. 1989) ......................................................................... 46

v

# TABLE OF AUTHORITIES
**(continued)**

**Page**

*Hall v. Walter*,
  969 P.2d 224 (Colo. 1998)..................................................................................... 40

*HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*,
  805 F. Supp. 2d 1115 (D. Colo. 2011)...................................................................... 1

*Henderson v. Gandy*,
  608 S.E. 2d 248 (Ga. 2005) .................................................................................... 33

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ................................................................................ 32

*Holley v. Coggin Pontiac, Inc.*,
  259 S.E.2d 1 (N.C. Ct. App. 1979)......................................................................... 31

*Horizon Bank v. Huizar*,
  178 N.E.3d 326 (Ind. Ct. App. 2021) ..................................................................... 41

*Ideal Toy Corp.*,
  64 F.T.C. 297 (1964) .............................................................................................. 38

*In re Apple Inc. Sec. Litig.*, No. 19-02033
  2020 WL 2857397 (N.D. Cal. June 2, 2020)......................................................... 33

*In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*,
  295 F. Supp. 3d 927 (N.D. Cal. 2018) .................................................................... 25

*In re Generic Pharms. Pricing Antitrust Litig.*,
  338 F. Supp. 3d 404 (E.D. Pa. 2018) ...................................................................... 37

*In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 18-02828,
  2020 WL 1495304 (D. Or. Mar. 27, 2020).............................................................. 32

*In re Netopia, Inc.*, No. C-04-03364 RMW,
  2005 WL 3445631 (N.D. Cal. Dec. 15, 2005)......................................................... 6

*In re New Motor Vehs. Canadian Exp. Antitrust Litig.*,
  350 F. Supp. 2d 160 (D. Me. 2004) ........................................................................ 40

*In re OnStar Cont. Litig.*,
  278 F.R.D. 352 (E.D. Mich. 2011) ......................................................................... 30

*In re Takata Airbag Prod. Liab. Litig.*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020).................................................................... 25

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009)........................................................................................... 45

*In re Toyota Motor Corp. Unintended Acc. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
  754 F. Supp. 2d 1145 (C.D. Cal. 2010) .................................................................. 25

vi

## TABLE OF AUTHORITIES
### (continued)

Page

*IUE AFL-CIO Pension Fund v. Herrmann*,
  9 F.3d 1049 (2d Cir. 1993) ..................................................................... 49

*Kearns v. Ford Motor Co.*,
  567 F.3d 1120 (9th Cir. 2009) ..................................................................... 5

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ................................................................... 4, 11

*Kindred Studio Illustr. & Design, LLC v. Elec. Commc'n Tech., LLC,* No. CV 18-7661,
  2018 WL 6985317 (C.D. Cal. Dec. 3, 2018) ............................................. 39

*Klem v. Wash. Mut. Bank*,
  295 P.3d 1179 (Wash. 2013) ............................................................... 35, 40

*Koch v Royal Wine Merchs., Ltd.*,
  847 F. Supp. 2d 1370 (S.D. Fla. 2012) .................................................. 48, 49

*Kugler v. Romain*,
  279 A.2d 640 (N.J. 1971) .................................................................... 41, 42

*LeGrand v. Abbott Labs.*,
  655 F. Supp. 3d 871 (N.D. Cal. 2023) ...................................................... 24

*Lemmon v. Snap*,
  995 F.3d 1085 (9th Cir. 2021) ............................... 15, 16, 19, 20, 21, 22

*Leon v. Rite Aid Corp.*,
  774 A.2d 674 (N.J. Super. Ct. App. Div. 2001) ....................................... 30

*Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*,
  850 N.W.2d 682 (Minn. 2014) ................................................................... 5

*Loomis v. Slendertone Distribution, Inc.*,
  420 F. Supp. 3d 1046 (S.D. Cal. 2019)..................................................... 34

*Maeda v. Kennedy Endeavors, Inc.*,
  407 F. Supp. 3d 953 (D. Haw. 2019)......................................................... 5

*McCann Real Equities Series XXII, LLC. v. David McDermott Chevrolet, Inc.*,
  890 A.2d 140 (Conn. App. Ct. 2006) ...................................................... 43

*McGinity v. Procter & Gamble Co.*,
  69 F.4th 1093 (9th Cir. 2023) ................................................................... 4

*Meyers v. Cornwall Quality Tools*,
  674 A.2d 444 (Conn. App. Ct. 1996) ...................................................... 26

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) ........................................................... 26, 27

**TABLE OF AUTHORITIES**
(continued)

Page

*Morgan v. Blue Cross & Blue Shield of Kentucky, Inc.*,
  794 S.W.2d 629 (Ky. 1989) ................................................... 31

*Morris v. Princess Cruises, Inc.*,
  236 F.3d 1061 (9th Cir. 2001) ............................................... 26

*Mullen v. GLV, Inc.*, No. 18-01465
  2018 WL 3218693 (N.D. Ill. July 2, 2018) .............................. 25

*N. Bottling Co. v. Henry's Foods, Inc.*,
  474 F. Supp. 3d 1016 (D.N.D. 2020)....................................... 30

*Nationwide Ins. Co. v. Patterson*,
  331 S.E.2d 490 (Va. 1985) .................................................... 26

*NetChoice, LLC v. Bonta*, No. 22-cv-08861,
  2023 WL 6135551 (N.D. Cal. Sep. 18, 2023) ........................... 39

*New Mexico v. Tiny Lab Prods.*,
  448 F. Supp. 3d 1263 (D.N.M. 2020).......................... 47, 48, 49

*Nieberding v. Barrette Outdoor Living, Inc.*,
  302 F.R.D. 600 (D. Kan. 2014) ............................................. 30

*Orkin Exterm. Co. v. FTC*,
  849 F.2d 1354 (11th Cir. 1988) ............................................. 37

*Owens v. DRS Auto. Fantomworks, Inc.*,
  764 S.E.2d 256 (Va. 2014) .................................................... 30

*Parziale v. HP, Inc.*,
  445 F. Supp. 3d 435 (N.D. Cal. 2020)..................................... 39

*People v. Debt Resolve, Inc.*,
  387 F. Supp. 3d 358 (S.D.N.Y. 2019) ...................................... 5

*People v. Johnson & Johnson*,
  292 Cal. Rptr. 3d 424 (Cal. Ct. App. 2022).............................. 30

*People v. Lann*,
  587 N.E.2d 521 (Ill. App. Ct. 1992) ....................................... 46

*Phillips v. Double Down Interactive LLC*,
  173 F. Supp. 3d 731 (N.D. Ill. 2016)................................. 37, 38

*Pinnacle Armor, Inc. v. United States*,
  648 F.3d 708 (9th Cir. 2011) .................................................. 4

*Raad v. Wal-Mart Stores, Inc.*,
  13 F. Supp. 2d 1003 (D. Neb. 1998) ....................................... 35

viii

1

## <u>TABLE OF AUTHORITIES</u>
**(continued)**

2

<u>Page</u>

3

*Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*,
   119 F.3d 935 (11th Cir. 1997) ........................................................................... 47, 48, 49

4

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
   62 P.3d 142 (Colo. 2003)............................................................................................... 30

5

6

*Ristic v. Machine Zone*, No. 15-cv-8996,
   2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) ..................................................... 37, 38

7

*Robinson v. Toyota Motor Credit Corp.*,
   775 N.E.2d 951 (Ill. 2002)............................................................................................. 38

8

9

*Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*,
   900 N.W.2d 909 (Neb. 2017) ....................................................................................... 31

10

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
   737 F. Supp. 2d 380 (E.D. Pa. 2010) .......................................................................... 40

11

12

*Showpiece Homes Corp. v. Assurance Co. of Am.*,
   38 P.3d 47 (Colo. 2001)................................................................................................. 40

13

*Sigman v. Stevens-Norton, Inc.*,
   425 P.2d 891 (Wash. 1967) ............................................................................................. 5

14

15

*Solum v. Certainteed Corp.*,
   147 F. Supp. 3d 404 (E.D.N.C. 2015) ........................................................................ 35

16

*Soule v. Hilton Worldwide, Inc.*,
   1 F. Supp. 3d 1084 (D. Haw. 2014).............................................................................. 4

17

18

*State ex rel. Brady v. Publishers Clearing House*,
   787 A.2d 111 (Del. Ch. 2001) ........................................................................................ 5

19

*State ex rel. Horne v. AutoZone, Inc.*,
   275 P.3d 1278 (Ariz. 2012) ........................................................................................... 30

20

21

*State ex rel. Shikada v. Bristol-Myers Squibb Co.*,
   526 P.3d 395 (Haw. 2023).............................................................................................. 35

22

*State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*,
   755 N.W.2d 583 (Neb. 2008) ....................................................................................... 35

23

24

*State ex rel. Stovall v. DVM Enters.*,
   62 P.3d 653 (Kan. 2003)................................................................................................. 41

25

*State Farm Fire & Cas. Co. v. Huynh*,
   962 P.2d 854 (Wash. Ct. App. 1998)...................................................................... 34, 43

26

27

*State of Fla. ex rel. Shevin v. Exxon Corp.*,
   526 F.2d 266 (5th Cir. 1976) .......................................................................................... 1

28

## TABLE OF AUTHORITIES
### (continued)

**Page**

*State of Fla., Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare Corp.*,
  420 F. Supp. 2d 1288 (S.D. Fla. 2005) ........................................................................ 5

*State v. Google LLC*, No. CV 2020-006219,
  2022 WL 223907 (Ariz. Super. Ct. Jan. 21, 2022)...................................................... 44

*State v. Minn. Sch. of Bus., Inc.*,
  935 N.W.2d 124 (Minn. 2019) ............................................................................... 46, 47

*Stevens v. Motorists Mut. Ins. Co.*,
  759 S.W.2d 819 (Ky. 1988)......................................................................................... 1

*Sutton v. Viking Oldsmobile Nissan, Inc.*,
  611 N.W.2d 60 (Minn. Ct. App. 2000).......................................................................... 31

*Tiismann v. Linda Martin Homes Corp.*,
  637 S.E.2d 14 (Ga. 2006) ....................................................................................... 5, 26

*Toyota Motor Corp. Litig.*, No. 10-02151,
  2012 WL 12929769 (C.D. Cal. May 4, 2012) ............................................................... 25

*Ulbrich v. Groth*,
  78 A.3d 76 (Conn. 2013) .......................................................................................... 35

*United Mine Workers v. Gibbs*,
  383 U.S. 715 (1966).................................................................................................... 49

United Mine Workers of Am. v. Pennington,
  381 U.S. 657 (1965) ................................................................................................... 32

*United Transp. v. BNSF Ry. Co.*,
  710 F.3d 915 (9th Cir. 2013) ....................................................................................... 4

*Van Dusen v. Barrak*,
  376 U.S. 612 (1964)..................................................................................................... 47

*Walker v. Fleetwood Homes of N.C., Inc.*,
  653 S.E.2d 393 (N.C. 2007) ....................................................................................... 35

*Weaver v. Champion Petfoods USA Inc.*,
  3 F.4th 927 (7th Cir. 2021) ......................................................................................... 30

*Weiss v. Cassidy Dev. Corp.*, No. 206766
  2003 WL 22519650 (Va. Cir. Ct. Aug. 18, 2003) ........................................................ 30

*Wille v. Sw. Bell Tel. Co.*,
  549 P.2d 903 (Kan. 1976)........................................................................................... 41

*Williams v. Amazon, Inc.*,
  573 F. Supp. 3d 971 (E.D. Pa. 2021) .......................................................................... 25

x

**TABLE OF AUTHORITIES**
(continued)

Page

*Williams v. Edwards*,
   717 N.E.2d 368 (Ohio Ct. App. 1998).................................................. 43

*Williams v. Gerber Prods. Co.*,
   552 F.3d 934 (9th Cir. 2008) .................................................. 23

*XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*,
   214 F. Supp. 3d 179 (E.D.N.Y. 2016) .................................................. 26

*York v. InTrust Bank, N.A.*,
   962 P.2d 405 (Kan. 1998).................................................. 30

*Zeeman v. Black*,
   273 S.E.2d 910 (Ga. Ct. App. 1980).................................................. 33

*Zeiger v. WellPet LLC*,
   304 F. Supp. 3d 837 (N.D. Cal. 2018).................................................. 25

*Zeran v. Am. Online, Inc.*,
   129 F.3d 327, 332 (4th Cir. 1997) .................................................. 19

**Statutes**

15 U.S.C. § 45(n) .................................................. 36, 40

15 U.S.C. § 6501 *et seq.*.................................................. 7

15 U.S.C. § 6502 .................................................. 7

15 U.S.C. § 6502(a) .................................................. 47

15 U.S.C. § 6502(a)(1) .................................................. 5

15 U.S.C. § 6504(a)(1) .................................................. 48

15 U.S.C. § 6504(e)(2) .................................................. 47, 48

47 U.S.C. § 230 .................................................. 14

815 Ill. Comp. Stat. 505/2 .................................................. 38

Ariz. Rev. Stat. Ann. § 44-1522.................................................. 30, 33

Ariz. Rev. Stat. Ann. § 44-1522(C) .................................................. 35

Cal. Civ. Code § 1798.99.29.................................................. 39

Colo. Rev. Stat. § 6-1-105(1)(e) .................................................. 30

xi

# TABLE OF AUTHORITIES
### (continued)

**Page**

Colo. Rev. Stat. § 6-1-105(1)(g) ................................................. 30

Colo. Rev. Stat. § 6-1-105(1)(rrr) ................................................ 40

Colo. Rev. Stat. § 6-1-105(1)(u) ................................................. 30

Colo. Rev. Stat. § 6-1-105(3) ..................................................... 40

Colo. Rev. Stat. § 6-1-110(1) ..................................................... 46

Conn. Gen. Stat. Ann. § 42-110b(a)............................................. 30

Del. Code Ann. tit. 6 § 2513(a) .................................................. 30

Del. Code Ann. tit. 29, § 2520(5) ............................................... 46

Del Code Ann. tit. 29 § 2520(a)(5) ............................................. 45

Del Code Ann. tit. 29 § 2520(a)(9) ............................................. 46

Del. Code Ann. tit. 29, § 2522(a) ............................................... 46

Ga. Code Ann. § 10-1-392(a)(7) ................................................. 44

Ind. Code § 24-5-0.5-3(a)......................................................... 40

Ind. Code § 24-5-0.5-2(a).......................................................... 45

Kan. Stat. Ann. § 50-623(b)....................................................... 41

Kan. Stat. Ann. § 50-626........................................................... 30

Kan. Stat. Ann. § 50-626(b)(1) ................................................... 30

Kan. Stat. Ann. section §50-626(b)(2) .......................................... 30

Kan. Stat. Ann. section §50-626(b)(3) .......................................... 30

Kan. Stat. Ann. section §50-627 ................................................. 41

Kan. Stat. Ann. section §50-627(b)............................................... 41

Michigan Comp. Laws Ann. § 445.903(1)(s) ................................. 30

Michigan Comp. Laws Ann. § 445.903(bb) .................................... 30

Michigan Comp. Laws Ann. § 445.903(cc)..................................... 30

Minn. Stat. § 325D.44, subdivs. 1(13), 2(b) ................................. 41

Minn. Stat. § 325F.69, subdiv. 8 ................................................ 41

xii

# TABLE OF AUTHORITIES
**(continued)**

**Page**

Mo. Ann. Stat. § 407.020(1) ......................................................................... 30

N.D. Cent. Code § 51-15-02 .......................................................................... 30

N.D. Cent. Code § 51-15-07 .......................................................................... 46

N.Y. Exec. Law § 63(12) ............................................................................... 46

N.Y. Gen. Bus. Law § 349 ............................................................................. 46

Neb. Rev. Stat. § 59-829 ................................................................................ 31

N.J. Stat. Ann. § 56:8-2 ........................................................................... 30, 42

Or. Rev. Stat. § 646.605(9) ........................................................................... 42

Or. Rev. Stat. § 646.605(9)(a) ....................................................................... 42

R.I. Gen. Laws § 6-13.1-5(a) ........................................................................ 46

Va. Code § 59.1-205 ...................................................................................... 46

## Rules

Fed. R. Civ. P. 8(a)(2) ..................................................................................... 4

Fed. R. Civ. P. 9(b) ......................................................................................... 4

Fed. R. Civ. P. 12(b)(6) ................................................................................ 4, 6

Fed. R. Civ. P. 12(d) ....................................................................................... 4

## Regulations

16 C.F.R. § 312.2 ..................................................................... 5, 7, 8, 9, 12, 18

16 C.F.R. § 312.3 ............................................................................................ 7

64 Fed. Reg. 59888 (Nov. 3, 1999) ................................................................ 7

78 Fed. Reg. 3972, (Jan. 17, 2013) ................................................................ 7

78 Fed. Reg. 3984 (Jan. 17, 2013) ................................................................. 7

Mo. Code Regs. Ann. tit. 15, § 60-8.020 ...................................................... 41

**TABLE OF AUTHORITIES**
(continued)

Page

**Other Authorities**

FTC, *Complying with COPPA: Frequently Asked Questions* ........................................... 8

FTC Policy Statement on Unfairness, *appended to Int'l Harv. Co.*,
104 F.T.C. 949 (1984) ........................................................................................... 36

FTC Policy Statement on Deception, *appended to Cliffdale Assocs., Inc.*,
103 F.T.C. 110, 174 (1984) ................................................................................. 26

Restatement (Second) of Torts, § 531 (Am. L. Inst. 1977) ........................................... 34

Restatement (Third) of Restitution and Unjust Enrichment § 1 .................................... 45

S. Rep. No. 103-130 ..................................................................................................... 41

S. Rep. No. 104-230 ..................................................................................................... 15

141 Cong. Rec. 22,045 (1995) ..................................................................................... 15

xiv

**INTRODUCTION AND BACKGROUND**

Meta crafted addictive social media platforms that caused substantial and pervasive harms to a generation of young users. It also repeatedly misled the public about those harms. Through this action, 34 States seek to hold Meta accountable for unfairly and deceptively designing, operating, and marketing Facebook and Instagram to ensnare and addict young users. The States seek to stop Meta from capitalizing on young users' developing brains and unique vulnerabilities to subvert and exploit their autonomy, and to mitigate the devastating harms that Meta has caused to youth throughout the country. To do so, the States have invoked their consumer protection laws, which must be liberally construed to effectuate their purpose of protecting the public,[1] and pursuant to which the States have "wide discretion" in matters of enforcement and determining the public interest. *See, e.g.*, *State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268–69 (5th Cir. 1976).

Meta rejects these well-established principles, instead espousing unreasonably narrow interpretations of the States' consumer protection laws. It also glosses over the variations among *different* State consumer protection laws and thus cannot meet its burden to show why each State's claims fail under the relevant statute and case law.[2] Meta further fails to grapple with the widespread and interconnected scheme of unfair and deceptive tactics that the States plead in their Complaint, instead inappropriately disaggregating each allegation and recasting the States' allegations as a series of unrelated events. Moreover, Meta repeatedly raises factual disputes, inviting this Court to inappropriately weigh the evidence at the motion-to-dismiss stage. Meta's

---

[1] *See, e.g., Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 973 P.2d 527, 540 (Cal. 1999) (California's Unfair Competition Law "was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." (cleaned up)); *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011 ("The [Colorado Consumer Protection Act] should be liberally construed to serve its broad purpose and scope."); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1996) (The Illinois Consumer Fraud and Deceptive Business Practices Act "should be liberally construed."); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (The Kentucky Consumer Protection Act "has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts.").

[2] While the States have attempted to respond to Meta's overly generalized arguments, should the Court be inclined to dismiss any particular State's consumer protection claims, the affected States respectfully request the opportunity to submit additional briefing on the requirements of their statutes.

1

Motion to Dismiss fails to show that any of the States' claims should be dismissed at this early stage.

The States' claims against Meta under their consumer protection laws[3] are twofold. *First,* Meta designed and deployed features it knew were harmful to young users. *Second,* Meta misled the public and concealed what it knew about that harm. The States also bring a claim under the Children's Online Privacy and Protection Act ("COPPA"), alleging that Meta impermissibly collects the data of children under 13 without obtaining prior consent from their parents. *See, e.g.*, Multistate Attorneys General Complaint, ECF 73-2 ("Compl.") ¶¶ 637–38.[4]

Meta's arguments fail for six reasons. *First,* Meta does not challenge and therefore concedes that the States adequately allege Meta has actual knowledge of users under 13 on its platforms. Thus, the COPPA claim may proceed. In any case, Meta misconstrues the law when it asserts that its platforms are not directed to children. Meta neglects that under COPPA, a website may be directed to children even if only a portion is directed to children and even if it appeals to multiple audiences. And the States' allegations, which support almost every factor relevant to whether a website is "directed to children," state a plausible claim under COPPA.

*Second,* Meta's attempt to utilize Section 230 as a complete shield against the States' unfairness and deception claims is unavailing. The States' unfairness claims focus on Meta's role as the product designer, marketer, and promoter of its platforms, and on its wrongful conduct related to the platforms' design features. They do not seek to hold Meta liable as a publisher or speaker of third-party content; thus, Section 230 does not apply. Nor does Section 230 provide immunity for Meta's deceptive statements and omissions, which again concern Meta's *own* conduct, not that of third-party content providers.

*Third,* the States adequately plead their deception claims. Meta repeatedly told the public that its platforms were safe when it knew they were not. Meta also said its recommendation algorithms were meant to create meaningful experiences, when in fact they were designed to

---

[3] The States' relevant consumer protection laws are set forth in a compendium in Appendix A.

[4] *People of the State of California, et al. v. Meta Platforms, Inc., et al.*, N.D. Cal. No. 4:23-cv-05448, ECF 73-2 (filed Oct. 24, 2023).

1    maximize time spent on the platforms. Meta similarly said that when it discovered under-13 users
2    on the platforms, it removed them, but it regularly failed to do so. And Meta said that users saw
3    and experienced harmful content at vastly lower rates than its own data showed. Meta now asks the
4    Court to evaluate these statements in a vacuum, rather than considering the statements in the overall
5    context of its pervasive pattern of deceit.

6    *Fourth,* the Complaint sufficiently alleges that Meta acted unfairly to capitalize on young
7    users' vulnerabilities and encourage compulsive and harmful use of the platforms. Meta developed
8    Instagram and Facebook to become even *more* addictive over time by continually adding or
9    modifying features to capture more and more of young users' attention—in turn causing greater
10   and greater harm. The States' allegations plausibly show that this conduct constitutes unfair acts or
11   practices, not everyday business activities as Meta claims.

12   *Fifth,* the States sufficiently allege that, where States have "trade and commerce"
13   requirements under state law, Meta has engaged in business activities that met those requirements.
14   Trade and commerce encompass a wide variety of business activities, even those *affecting*
15   commerce. The States adequately allege Meta has engaged in such activities by offering access to
16   its platforms in exchange for the valuable consideration of consumers' data and attention, which
17   Meta uses to generate profits through advertising.

18   *Finally,* Meta asks this Court to preclude the States from seeking restitution as a remedy.
19   Meta disregards that restitution in the context of a State's civil enforcement action is an equitable
20   remedy that flows from the broad, remedial purposes of state consumer protection laws. The States
21   need not prove causation or allege harm to every consumer for a court to award restitution.

22   In addition, Meta's challenges are largely based on its misapprehension of the States'
23   pleading burden at this juncture, repeatedly asking this Court to prematurely determine disputed
24   issues of fact, and its misconstruction of COPPA and the States' consumer protection laws
25   themselves. For these reasons, the States respectfully ask this Court to deny Meta's Motion to
26   Dismiss.

27

28

**STANDARD OF REVIEW**

"When deciding whether a pleading states a plausible claim for relief, [the Court is] required by Rule 12(b)(6) to consider a complaint's factual allegations 'together with all reasonable inferences' from those allegations." *United Transp. v. BNSF Ry. Co.*, 710 F.3d 915, 930 (9th Cir. 2013). At this stage, the Court should "accept[] all factual allegations in the complaint as true and constru[e] them in the light most favorable to the nonmoving party." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1096 (9th Cir. 2023) (cleaned up).

Rule 12 provides for dismissal where a complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "By its plain terms, Rule 12(b)(6) does not provide a mechanism for dismissing only a portion of a claim." *Dermansky v. Young Turks, Inc.*, No. 23-cv-05868-SB-SK, 2023 WL 8884364, at *2 (C.D. Cal. Nov. 3, 2023) (cleaned up); *see also BBL, Inc. v. City of Angola*, 809 F.3d 317, 325 (7th Cir. 2015) ("A motion to dismiss under Rule 12(b)(6) doesn't permit piecemeal dismissals of parts of claims; the question at this stage is simply whether the complaint includes factual allegations that state a plausible claim for relief.").

"Generally, district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018). Otherwise, the motion is converted to one for summary judgment. Fed. R. Civ. P. 12(d). The non-moving party "is not required to 'demonstrate' anything in order to survive a Rule 12(b)(6) motion to dismiss." *Pinnacle Armor, Inc. v. United States*, 648 F.3d 708, 721 (9th Cir. 2011). Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (cleaned up).

Allegations of fraud are governed by Rule 9(b), which requires that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Claims of unfair conduct that sound in fraud are sometimes reviewed under the Rule 9(b) standard. *See, e.g., Soule v. Hilton Worldwide, Inc.*, 1 F. Supp. 3d 1084, 1090 (D. Haw. 2014). But as to unfair conduct, "where fraud

4

1    is not an essential element of a claim, only allegations ('averments') of fraudulent conduct must

2    satisfy the heightened pleading requirements of Rule 9(b)." *Id.* (quoting *Kearns v. Ford Motor Co.*,

3    567 F.3d 1120, 1126 (9th Cir. 2009)) (holding claims of unfair business practices that did not sound

4    in fraud were subject to ordinary notice-pleading standard of Rule 8(a).[5]

5                                   **ARGUMENT**

6    **I.       The States' COPPA claim should not be dismissed.**

7            Meta has violated, and continues to violate, COPPA by collecting children's personal

8    information without first obtaining parental consent. Compl. ¶ 632. The States allege that Meta is

9    subject to COPPA, 15 U.S.C. § 6502(a)(1), and its associated regulations (the "COPPA Rule"), 16

10   C.F.R. § 312.2, on two independent grounds: (1) Meta had actual knowledge that it was collecting

11   personal information from children on Instagram and Facebook ("Social Media Platforms" or

12   "Platforms"), and (2) those Platforms, or portions thereof, are "directed to children." Compl.

13   ¶¶ 642–835.

14           Meta moves to dismiss the States' "theory" that its Platforms are directed to children.

15   Meta's Motion to Dismiss, ECF 517 ("MTD") at 7. Meta does not move to dismiss the COPPA

16   _____

17   [5] Six States specifically contest the application of Rule 9(b) to their claims of deception, with
     authority from their respective state courts applying Rule 8 to consumer protection claims or

18   otherwise noting that these claims do not sound in fraud. *See State ex rel. Brady v. Publishers
     Clearing House*, 787 A.2d 111, 114–118 (Del. Ch. 2001) (rejecting Rule 9(b)'s heightened

19   pleading standard for evaluating claims under the Delaware Consumer Fraud Act and Delaware
     Uniform Deceptive Trade Practices Act); Ex. A, Order Denying Defendants' Motion to Dismiss,

20   *State v. Elite Integrated Med., LLC*, No. 2020-cv-340369, at *3 (Ga. Super. Ct. Sept. 8, 2021)
     (holding that under the Georgia Fair Business Practices Act the State equivalent of Rule 9(b) does

21   not apply to State actions); *Tiismann v. Linda Martin Homes Corp.*, 637 S.E.2d 14, 17 (Ga. 2006)
     (elements of State causes of action—unlike private causes of action—do not analogize to those in

22   common law fraud); *Maeda v. Kennedy Endeavors, Inc.*, 407 F. Supp. 3d 953, 974–75 (D. Haw.
     2019) (recognizing that negligent misrepresentation claims need not satisfy Rule 9(b)); *Graphic

23   Commc'ns. Local 1B Health & Welfare Fund A v. CVS Caremark Corp.*, 850 N.W.2d 682, 692
     (Minn. 2014) (applying Rule 8 pleading standard to consumer protection claim brought under

24   Minn. Stat. § 8.31); *People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 364–65 (S.D.N.Y. 2019)
     (holding that claims under General Business Law § 349 and Executive Law § 63(12) are not

25   subject to Rule 9(b)); *State of Fla., Off. of Atty. Gen., Dep't of Legal Affs. v. Tenet Healthcare
     Corp.*, 420 F. Supp. 2d 1288, 1310–11 (S.D. Fla. 2005) (finding Rule 9(b) inapplicable to claim

26   brought under Florida Deceptive and Unfair Trade Practices Act); *compare Aungst v. Roberts
     Constr. Co.*, 625 P.2d 167, 168 (Wash. 1987) (recognizing that the Washington Consumer

27   Protection Act "created a cause of action not previously known to the common law"), *with
     Sigman v. Stevens-Norton, Inc.*, 425 P.2d 891, 895 (Wash. 1967) (explaining the nine elements of

28   common law fraud in Washington, almost none of which overlap with consumer deception
     claims).

claim itself, and concedes that the States adequately plead that Meta had actual knowledge it collected children's data. *See* MTD at 7 n.8.

The Court should deny the motion. Meta concedes that the COPPA claim should proceed, and the Court need not rule on the issue of whether the States adequately plead the "theory" that Meta's Platforms are directed to children. Rule 12(b)(6) applies to "claims." It is not an appropriate vehicle to dismiss portions of claims, and Meta cites no authority to the contrary. To the extent the Court considers Meta's "theory" argument, the States sufficiently allege that Meta's Platforms are directed to children.

### A.     Meta's motion is procedurally improper.

Meta moves to dismiss the COPPA claim *only* to the extent the claim is premised on Meta's Platforms being "directed to children., *see* MTD at 1, 7, but agrees that the remainder should proceed.

As set forth above, Rule 12 provides for dismissal where a complaint "fail[s] to state a *claim* upon which relief can be granted." Fed. R. Civ. P. 12(b)(6) (emphasis added). "Rule 12(b)(6) 'does not provide a mechanism for dismissing only a portion of a claim.'" *Dermansky*, 2023 WL 8884364, at *2. Meta's attempt to carve out one portion of the States' COPPA claim at this early juncture thus fails as a procedural matter. *See In re Netopia, Inc*., No. 04-03364 RMW, 2005 WL 3445631, at *3 (N.D. Cal. Dec. 15, 2005) ("[A] cause of action either fails totally or remains in the complaint under [Rule] 12(b)(6).").

Because Meta concedes that the COPPA claim should proceed—and because Meta cites no basis for the Court to dismiss only a portion of that claim[6]—the motion should be denied.

---

[6] To the extent Meta relies on cases explaining that dismissal under Rule 12(b)(6) may be based on the "lack of a cognizable legal theory," *see, e.g.*, *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988), these cases are inapposite. Meta does not assert the State's COPPA claim is not "cognizable," or that there is *no* cognizable COPPA theory; it argues only that the Court should disallow any claim (and thus, presumably, any discovery) that Meta was subject to COPPA because its Platforms were directed to children. For the reasons set forth above, this issue is not appropriate for disposition at the pleading stage.

6

1

2
    **B.**    **The States sufficiently plead that Meta's Platforms are directed to**
3
           **children.**

4
    Meta's motion also fails on the merits because the States sufficiently plead that Meta's
5
Platforms are directed to children. Meta's motion mischaracterizes the scope and application of
6
COPPA, misapprehends the States' allegations, introduces extrinsic information, and disputes the
7
States' *factual* allegations, which is improper on a motion to dismiss.

8
    In 1998, Congress enacted COPPA to protect the safety and privacy of young children
9
online. 15 U.S.C. § 6501 *et seq.* COPPA and the COPPA Rule prohibit covered operators from
10
collecting, using, or disclosing the personal information of children under the age of 13 without
11
first obtaining parental consent. *See* 15 U.S.C. § 6502; 16 C.F.R. § 312.3. As relevant here, the
12
operator of a website or online service is subject to COPPA if either the website or online service,
13
or a *portion* of the website or online service, is "directed to children." 16 C.F.R. § 312.2. Whether
14
a website or online service—or a portion thereof—is "directed to children" is a fact-intensive
15
inquiry that considers the service's: (1) "subject matter," (2) "visual content," (3) "use of animated
16
characters or child-oriented activities and incentives," (4) "music or other audio content," (5) "age
17
of models," (6) "presence of child celebrities or celebrities who appeal to children," (7) "language
18
or other characteristics of the . . . service," (8) "whether advertising promoting or appearing on
19
the . . . service is directed to children," (9) "competent and reliable empirical evidence regarding
20
audience composition," and (10) "evidence regarding the intended audience." *Id.*

21
    When determining whether a website or service is directed to children, courts should
22
consider the "totality of the circumstances," with "no single factor" determinative. 78 Fed. Reg.
23
3972, 3984 (Jan. 17, 2013). Not every factor need be present. *See* 64 Fed. Reg. 59888, 59893 (Nov.
24
3, 1999) ("[T]he overall character of the site—and not just the presence or absence of one or more
25
factors—[] determin[es] whether a website is directed to children.").

26
    In addition, a website or online service may be directed to multiple audiences at once. So
27
long as children under the age of 13 are targeted as an audience of the website or service
28
(determined using the "directed to children" factors), the site or service is "directed to children"

and COPPA applies. *See* 16 C.F.R. § 312.2; Federal Trade Commission, *Complying with COPPA: Frequently Asked Questions* (COPPA FAQs), D.4, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions ("mixed audience" is a subset of the "directed to children" category).

In this case, the States have set forth detailed factual allegations plausibly showing that the Instagram and Facebook Platforms—including the portions of those Platforms consisting of thousands of child-directed pages and accounts—are child-directed. Compl. ¶¶ 746–805, 822–32. In arguing to the contrary, Meta misconstrues the States' claim and ignores the myriad factual allegations showing that Meta directed its Platforms to children.

### 1.    Meta misconstrues the States' COPPA claim.

The States allege that Meta violated COPPA because the Instagram and Facebook Platforms both as a whole, *as well as portions thereof*, are child-directed. *See* Compl. ¶¶ 746, 795–805, 812, 822, 828. However, Meta addresses the Platforms only as a whole, and ignores the States' allegations that portions of the Platforms—certain accounts and pages—were directed to children. Even if Instagram and Facebook as a whole were general audience services as Meta claims (MTD at 7–8[7]), and they are not, the portions of those Platforms that are directed to children would trigger COPPA obligations with which Meta has not complied.

For example, the States allege that Instagram and Facebook maintain and promote thousands of pages and accounts that "feature child-directed subject matter, characters, activities, and music, as well as child models, child celebrities, and celebrities who appeal to children." Compl. ¶¶ 795–96, 828. The Complaint identifies numerous examples, including social media pages dedicated to children's cartoons (*e.g.*, Peppa Pig, Bluey, and Disney Junior Instagram pages), performers popular with children (*e.g.*, JoJo Siwa), and children's books and toys (*e.g.*, Dr. Seuss and Lego Instagram pages). *Id.* at ¶ 796. The Complaint further alleges that the Platforms target children with child-directed ads featuring popular animated children's television and movie

---

[7] Meta's suggestion that the FTC has determined that Facebook is a "general audience service"—based on a footnote to an FTC Statement of Basis from over a decade ago—is misplaced. At the very least, the FTC's statement was made without the benefit of the allegations in the Complaint showing, among other things, the intended and actual child audience.

characters promoting children's television shows and games. *Id.* at ¶¶ 763–65, 831. These allegations are made in the context of, and are supported by, allegations of Meta's broader scheme to induce and exploit young users' attention on Facebook and Instagram, *id.* at ¶¶ 54–116, including allegations that obtaining young users has been a core pillar of Meta's business strategy, *id.* at ¶ 134–50, and allegations that this strategy has been successful, with millions of under-13 users on the Instagram and Facebook Platforms, *see id.* at ¶ 696.

The States' allegations cover nearly every child-directed factor enumerated in the COPPA Rule. At this stage of the proceeding, the Court need not weigh the extensive list of child-directed factors; where, as here, the Complaint contains allegations supporting the factors in a multi-factor test, the motion to dismiss must be denied. *See Camping Unlimited for the Developmentally Disabled v. Brown & Brown of Garden City, Inc.*, No. 21-cv-05495-BLF, 2022 WL 395312, *4 (N.D. Cal. Feb. 9, 2022) (denying motion to dismiss claim based on multi-factor "totality of the circumstances" inquiry because court could not "conclude that these factors were not present as a matter of law").

### 2.    The States adequately allege children are an intended audience of the Platforms.

The Complaint alleges that a core pillar of Meta's business strategy was obtaining under-13 users for Facebook and Instagram: such users were "critical for increasing the rate of acquisition," Compl. ¶ 436, and were coveted and pursued, *id.* at ¶¶ 68, 436, 773–93, 823–27. Meta's internal data on under-13 "penetration" emphasize this goal: Meta meticulously tracks the size of the under-13 cohort on Instagram, viewing greater usage as a success. *Id.* at ¶¶ 648–56 (documenting Meta's internal charts on "penetration" within 11- to 13-year-old age group).

Meta ignores these allegations. Meta incorrectly argues that a website or service may either be directed to parents, or directed to children, but not both. *See* MTD at 10. That is untrue: COPPA contemplates that a service may be directed to multiple audiences at once, such as parents *and* children. *See* 16 C.F.R. § 312.2.

Next, Meta argues that unrelated allegations describing its use of an ineffective age gate demonstrate that children are not part of Meta's intended audience. *See* MTD at 16–17. As the

9

Complaint explains, however, the design of Meta's age gate encouraged underage children to sign up for accounts. Compl. ¶¶ 702–09. Meta's argument, which runs directly counter to these allegations, should be rejected.

### 3. The States adequately allege empirical evidence of audience composition.

The States' allegations concerning audience composition are more than sufficient. The Complaint not only alleges that Instagram and Facebook have millions of under-13 users in the United States, but also that these users comprise approximately 40–45% of all 9- to 12-year-old children in the United States. Compl. ¶ 696; *see also* ¶¶ 648, 658.

Meta's attempts to undermine the States' allegations are meritless. Meta's claim that "the Complaint does not contain any allegations" of Facebook's audience composition, *see* MTD at 14, is demonstrably false. *See* Compl. ¶ 696. And Meta's repeated claim that more than 99% of Instagram users are teens or adults, s*ee* MTD at 1, 15: (1) improperly relies on extrinsic materials, including the transcript of a quarterly earnings call, for a purported fact that is subject to reasonable dispute, and (2) is simply bad math, as it compares the number of under-13 users in the *United States* in 2015 to the number of total users *worldwide* in 2022.[8]

### 4. The States adequately allege that Meta's Platforms feature child-oriented subject matter, characters, activities, music, and other content.

The States allege that Instagram and Facebook display and promote thousands of accounts and pages that showcase child-oriented subject matter, characters, activities, music, and content. Compl. ¶¶ 795–98, 800, 805, 822, 828. The Complaint identifies numerous examples, including social media pages dedicated to children's cartoons (*e.g.*, Peppa Pig, Bluey, and Disney Junior Instagram pages), performers popular among children (*e.g.*, the JoJo Siwa Instagram page), children's books and toys (*e.g.*, Dr. Seuss and Lego Instagram pages), and child "influencers" paid to review video games and promote other under-13 content. *Id.* The States expressly allege that

---

[8] Meta makes the puzzling claim that one of the (many) audience composition figures the States cite is a "non-empirical" estimate. MTD at 15 n.21. The States disagree. Regardless, whether this figure reflects "empirical" evidence is ultimately a question of fact that cannot be resolved at this stage of the litigation.

these pages display "images and videos relating to a character, product, or brand that is specially made for and/or marketed to children." *Id.* Meta's argument—that these pages are not, in fact, child-directed—is flawed in three respects.

*First,* Meta improperly asks the Court to conclude—at the pleadings stage—that pages dedicated to children's toys, children's cartoons, and celebrities popular with children are in fact intended for and consumed by "nostalgic" adults hoping to revisit brands from their childhoods, or the parents of children with whom these brands are popular. MTD at 11–12. Nothing in the Complaint supports these arguments. Meta's request for inferences to be implausibly bent in its favor stands the motion-to-dismiss standard on its head, underscoring that the parties have—at most—a factual dispute that cannot be disposed of on a motion to dismiss.

*Second*, under the guise of "incorporation by reference," Meta asks the Court to adopt Meta's own summary and analysis of the content of certain Instagram accounts. *See* MTD at 9 n.10. As a threshold matter, the Court should reject Meta's request for incorporation by reference, which seeks to incorporate every communication ever posted to several Instagram accounts identified in the Complaint. These accounts are not referenced "extensively," and do not "form the basis" of the claim that Meta unlawfully collected data from children; they are merely cited as examples of pages promoting children's brands. *See Khoja*, 899 F.3d 988 at 1003–04 (rejecting argument that a single reference in a 67-page complaint is sufficiently "extensive" to constitute incorporation).[9] Similarly, Meta's request for judicial notice is inappropriate because the material "only serve[s] to dispute facts stated in a well-pleaded complaint." *Id.* at 1003.

Moreover, even if these Instagram pages were properly before the Court, the Court should reject Meta's characterization of this cherry-picked, extrinsic material as "plainly not directed to children," MTD at 10–11, as even a cursory review of these accounts reveals abundant child-directed material. These materials include the Bluey Instagram account's posting of a video from the children's animated television show, the PBS Kids Instagram account's posting of a video

---

[9] The Court should reject Meta's request to incorporate the "Hot Wheels" and "Dr. Seuss" materials for the additional reason that they were posted *after* the Complaint was filed.

showing how to play a Wild Kratts card game, with child subjects demonstrating gameplay, and the Lego Instagram account's announcement of World Play Day, which told users to prepare "for a day of Play Missions [and] games."[10] The Parties merely dispute the child-targeting *character* of these pages; Meta's request to "incorporate" or "notice" snippets of those pages cannot resolve that dispute at this stage of the case.

*Third*, Meta's motion ignores these allegations. Meta's argument rests on the faulty proposition that a website or service cannot be directed to both adults and children. MTD at 10. Under COPPA a service may be directed to multiple audiences at once, such as parents *and* children. *See* 16 C.F.R. § 312.2.

Furthermore, Meta's suggestion that the Complaint fails to address the "subject matter" factor entirely, MTD 1, 18, is belied by the States' extensive allegations concerning the thousands of child-oriented Facebook and Instagram accounts and pages that include child-oriented subject matter. Compl. ¶¶ 822, 828. And allegations that Meta's successful investments in channels attractive to young users—yielding "thousands of Facebook pages and accounts [that] are child-oriented" and "feature child-oriented subject matter, characters, activities, and music, as well as child models, child celebrities, and celebrities who appeal to children," *id.* at ¶¶ 71–72, 828—are sufficient to show the plausibility of Facebook's child-directed nature.

### 5.    The States adequately allege child-directed advertising promoting and appearing on the Platforms.

The Complaint contains detailed allegations of child-directed advertising promoting and appearing on Meta's Platforms, including both descriptions and images of example advertisements. Compl. ¶¶ 763–66, 830–31. For example, the Complaint describes several advertisements that appeared on Instagram and Facebook that featured animated characters from popular children's television shows and movies, and invited users to stream the children's shows on a channel called "PBS *KIDS* Prime Video." *Id.* at ¶¶ 764, 831 (emphasis added). The Complaint also describes advertisements promoting Instagram and Facebook that depicted individuals who appeared to be

---

[10] *See* https://www.instagram.com/p/Cxv4T4RuJub/ (Bluey); https://www.instagram.com/p/C1aK9H2PPmU/ (PBS Kids); and https://www.instagram.com/p/CyQEXNjRvpg/ (Lego).

children or teens, including an ad touting Facebook's safety that depicted a child holding a smartphone. *Id.* at ¶¶ 759–62, 829.

In response, Meta disagrees with the States' factual allegation that the advertisements identified in the Complaint do, in fact, target and appeal to children, and asks the Court to adjudicate the actual and intended audiences of the ads. MTD at 13. Meta's argument is improper at this stage in the proceeding.

Meta's alternative argument—that the States' allegations are deficient because they describe only three advertisements, MTD at 14—is meritless. The Complaint makes clear that these advertisements are merely examples. Compl. ¶ 762. Moreover, Meta cites no authority for its view that a complaint must identify any certain number of child-directed advertisements.

### 6. The States adequately allege the Platforms' use of child models and celebrities who appeal to children.

The Complaint alleges that Instagram hosts thousands of accounts created by, and dedicated to images and videos of, "celebrities who appeal to children," such as the singer JoJo Siwa. Compl. ¶¶ 800, 803, 804. The Complaint also alleges that Instagram hosts accounts that feature "influencers" under the age of 13 who are being paid by marketers to promote their products. *Id.* at ¶¶ 804–05. In internal discussions, Meta employees both identified specific child-influencer accounts on Instagram and acknowledged that those influencers were posting content that appealed to children under the age of 13, like video game reviews. *Id.* In addition, the Complaint alleges that Meta's ads promoting Instagram and Facebook depicted individuals who appeared to be children or teens. These allegations support the "child models" and "celebrities who appeal to children" factors.

Meta's response—that JoJo Siwa and other models in its ads are older than 13, MTD at 12–13, 18—misses the point. Celebrities need not be under the age of 13 to "appeal to children." In any event, the Complaint alleges that JoJo Siwa has maintained an active public Instagram account since she was approximately eight years old. Compl. ¶ 801. Moreover, Meta does not dispute that the States' allegations concerning child influencers are plausible.

13

1

2

       **7.**       **The States adequately allege child-oriented activities and incentives.**

3

The Complaint alleges that Meta has designed Instagram and Facebook such that the

4

primary activities of those Platforms are oriented towards young users, including those under the

5

age of 13. The States allege, for example, that browsing one's personalized feed is particularly

6

attractive to young users based on the infinite scroll feature, Compl. ¶¶ 377–78, that using Reels is

7

a particularly attractive activity for young users, *id.* at ¶¶ 384–85, and that young users find

8

interacting with ephemeral content particularly attractive, *id.* at ¶¶ 388–91. The States also allege

9

that young users find incentives around social rewards—such as engagement with the "Like"

10

button, a prominent part of the Platforms—particularly compelling. *Id.* at ¶¶ 227, 230–31, 258.

11

Meta's discussion of the activities and incentives factors ignores these allegations.

12

       **C.**       **Endorsing the States' child-directed theory will not have dire consequences.**

13

Meta's argument that "practically all websites and online services could be deemed child-

14

directed" under the States' theory "simply because their audience includes a small percentage of

15

children," MTD at 19, grossly mischaracterizes the States' allegations. The States' claim relies in

16

part on the substantial percentage of children nationwide using Meta's Platforms—approximately

17

40–45% of all 9 to 12-year-olds in the country, Compl. ¶ 696—which is not the case for "practically

18

all websites and online services," MTD at 19. Moreover, audience composition is only one of the

19

many child-directed factors the States allege, which, in the totality of the circumstances,

20

demonstrate that Meta's Platforms, and portions of these Platforms, are directed to children.

21

**II.**       **Section 230 does not bar the States' claims.**

22

The States' claims against Meta are not barred by Section 230 of the Communications

23

*Decency Act,* 47 U.S.C. § 230. Section 230 provides a narrow immunity from claims that seek to

24

impose liability on interactive computer service providers by treating them as the publisher or

25

speaker of information provided by third parties. The States' claims do not do that. Instead, the

26

States seek to impose liability on Meta for its own actions and public statements; for its own

27

deceptive and manipulative conduct; and for its own design of features that do not depend on the

28

14

content of third parties. Section 230's legislative history, and its longstanding objective of protecting children, reveals no intent for the law to insulate internet service providers from liability for their own business activities or choices. Instead, the law merely empowered those providers to self-regulate and take action against harmful online material without fear of liability from third-party content. 141 Cong. Rec. 22,045 (1995); *see* S. Rep. No. 104-230, at 194 (1996). This Court should not endorse Meta's reliance on Section 230 to evade responsibility for the harms it is causing through its Platforms' design features and through its own deceptive conduct about those features.

### A.    Meta is not acting as a publisher of third-party content, as contemplated under Section 230.

Section 230 provides a narrow exception from liability for "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). Because the States seek to hold Meta liable for its role as the product designer and promoter of its Platforms, rather than as the publisher of third-party content shown on those Platforms, Meta cannot avail itself of this provision.

A claim does not treat a defendant as a publisher under the second prong of the *Barnes* test merely because publication is relevant to the claim. Instead, to fall within Section 230, the claim must impose on the defendant a duty to make "changes to the content posted by the website's users." Order Denying in Part and Granting in Part Defendants' Motion to Dismiss, ECF 430 ("MTD Order") at 11 (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016)) (cleaned up). Claims that seek to hold a defendant liable for its own actions—rather than impose liability on a defendant based on its role as a publisher of content provided by others—do not implicate Section 230, even if they involve publication in some way. *See* MTD Order at 11–12 (discussing Snap's "creation of [a] filter" and Internet Brands' "failure to warn about [an] advertisement while holding information indicating that it was likely fake and dangerous"). Said differently, while publishing content can be said to be a "but-for cause" of everything an internet company (such as Meta) does, that does not mean that the States' claims seek to hold Meta responsible in its capacity as a publisher. *Lemmon v. Snap*, 995 F.3d 1085, 1092 (9th Cir. 2021).

1    Indeed, a claim does not run afoul of Section 230 unless it is "based on 'behavior that is *identical*

2    *to* publishing or speaking.'" MTD Order at 11 (quoting *Barnes*, 570 F.3d at 1107).

3        While this Court previously declined to consider whether Meta operates as a publisher

4    across-the-board with regard to the Personal Injury and School District Plaintiffs ("PISD

5    Plaintiffs") collective products liability claims, there are principled reasons why the Court could

6    consider Meta's conduct addressed in the States' consumer protection claims in their totality.

7    Unlike products liability claims, which are necessarily predicated on specific defects and harms

8    flowing from those defects, the States' claims are based on a constellation of acts which, viewed

9    both individually and holistically, constitute an unfair trade act or practice. It is therefore

10   appropriate for the Court to conduct a Section 230 analysis as to the States' claims in a similarly

11   holistic fashion. The States allege that Meta violated their consumer protection laws by unfairly

12   designing its Platforms to addict young users and by specifically targeting young users despite

13   knowing that the Platforms are especially harmful to them. *See, e.g.*, Compl. ¶ 847. These claims

14   are based on Meta's role as the designer of its Platforms and the unfairness found in the architecture

15   and fabric of the Platforms themselves, not in the content that is displayed in a particular user's

16   account. *See Lemmon*, 995 F.3d at 1093.

17       Accordingly, to comply with its duty to refrain from unfair and deceptive trade practices,

18   Meta would not need to alter third-party content or otherwise engage in publication activities.[11]

19   Instead, it would need to change only its own marketing, product development, and design

20   decisions. *See A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 820 (D. Or. 2022) (holding Section

21   230 inapplicable to claim of harm to youth which would require website to merely "change its

22   design and warnings"). Section 230 thus does not apply to the States' unfairness and deception

23   claims.

24

25

26   ───────────────
     [11] Meta contends in a footnote that safe harbor provisions of some States' consumer protection laws
     for publishers of deceptive third-party content should similarly apply to exempt them from liability
27   here. MTD at 23 n.27. To the extent Meta has adequately raised this argument, which the States
     contend it has not, the safe harbor provisions do not apply because the Complaint does not seek to
28   hold Meta liable for the publication of deceptive third-party communications.

1

2

3

**B.      This Court has previously held Section 230 does not bar claims based on numerous Platform features.**

4

Even under this Court's conduct-specific approach—analyzing Meta's conduct with regard

5

to each product feature—the States' claims survive Section 230 review. Meta overstates the

6

potential preclusive effect of Section 230 for three reasons.

7

*First,* Meta does not seek to dismiss under Section 230 the States' allegations regarding

8

Instagram's "multiple accounts" function, which allows users to register and access up to five

9

accounts at a time without logging out of any account. Compl. ¶¶ 370–72. Thus, the States' claims

10

regarding this feature should move forward.

11

*Second,* the Court has already held that Section 230 does not bar PISD Plaintiffs' products

12

liability claims based on numerous features that do not implicate Meta's conduct as a speaker or

13

publisher. *See* MTD Order at 14–16. The States' claims can therefore move forward regarding (1)

14

offering appearance-altering filters, Compl. ¶¶ 333–68, (2) hindering users' ability to self-restrict

15

time on the Platforms, *id.* at ¶¶ 578-590, and (3) omitting material facts pertaining to the Platforms,

16

*e.g., id.* at ¶¶ 414–29. And with respect to filters and time management tools, Meta concedes these

17

claims can proceed, as it has not moved to dismiss them. *See* MTD at 19–25.

18

Despite the Court's previous conclusion that Section 230 allowed PISD Plaintiffs' claims

19

for failure to warn regarding dangerous Platform features to proceed, Meta now urges the Court to

20

hold the opposite regarding the States' omission claims. MTD at 25. Meta misconstrues the scope

21

of the States' omissions allegations as merely repackaged failure to warn claims about Meta's

22

recommendation algorithms or other features. But the States' claims concern Meta's broader

23

pattern of deceit, which included a multitude of omissions of internal research and knowledge that

24

belie Meta's carefully crafted public narrative around safety. In any case, Meta's role as a publisher

25

or speaker is not implicated where Meta can address its duty to warn users of risks of harm without

26

changing what it publishes on its Platforms or even how users publish it. MTD Order at 20. Meta's

27

duty to fully disclose known risks about its Platforms to consumers arises from its knowledge about

28

17

1  a material fact: the risk of harm to youth who use Meta's Platforms. *See Internet Brands*, 824 F.3d

2  at 849.

3      *Third,* Meta paints with too broad a brush when it argues that this Court previously barred

4  all claims related to "Likes" and notifications. Instead, this Court held that Section 230 bars claims

5  regarding notifications alerting users to "Likes." MTD Order at 18. The States' claim regarding

6  Meta's display of total "Like" counts, and Meta's extended study of the effect of that display

7  through Project Daisy, is distinct and more nuanced. The States argue that Meta knew that its design

8  choice to display a calculated total of "Likes" on a user's post contributed to negative social

9  comparison, which was most keenly felt by young users. Compl. ¶¶ 226–98. Despite knowing that

10  removing "Like" counts from a user's standard view would improve youth well-being, Meta

11  retained the harmful feature. *Id.* at ¶¶ 242, 249. Meta also knew that its Platform design made it

12  difficult for users to independently choose to hide their own "Like" counts, even if they wished to

13  do so, yet it made no changes. *Id.* at ¶¶ 250–52. The States' claim rests on Meta's design decisions

14  to tabulate and display a total of "Like" counts and to obscure options for users to proactively hide

15  those counts for their own well-being—not on notifications regarding "Likes." Accordingly,

16  Section 230 and this Court's prior order do not bar this claim.

17      *Finally,* Meta misconstrues COPPA and the States' claims when it argues that interpreting

18  COPPA to impose liability based on content posted by third parties would be inconsistent with

19  Section 230. MTD at 10. As this Court has recognized, liability under COPPA is not based on the

20  content published by third parties or on Meta's role as a publisher or speaker of information

21  provided by a third party. MTD Order at 20. Instead, it arises from Meta's collection of children's

22  personal information without parental consent. Similarly, applying COPPA's "directed to children"

23  factors does not implicate Section 230: observing child-targeting third-party content on a Platform

24  can inform whether the Platform is "directed to children" without in any way seeking to hold the

25  provider liable for the act of publishing that content. Moreover, the States argue that Meta's own

26  advertisements promoting, or appearing on, its Platforms are directed to children. Compl. ¶¶ 759,

27  798, 800, 822, 829; 16 C.F.R. § 312.2. Thus, Section 230 does not shield Meta from the States'

28  COPPA claims.

**C.      Section 230 does not bar the States' additional claims based on Meta's addictive features.**

Meta relies on the Court's prior order to argue that Section 230 precludes claims challenging certain features designed to keep users on their Social Media Platforms and lure them to return. MTD at 21–23. This argument fails because features such as algorithmic recommendations, infinite scroll, autoplay, and ephemeral design do not implicate traditional publishing functions, and are dangerous regardless of the content they display.

**1.      Section 230 does not bar the States' claims based on Meta's features designed to keep users on its Platforms.**

Section 230 does not bar challenges to features designed to keep users on Meta's Platforms, such as its recommendation algorithms, infinite scroll, and autoplay, because those features do not implicate traditional publishing functions.

This Court previously held that Meta's use of "algorithms to determine whether, when, and to whom" content is published constitutes a "traditional editorial function[] . . . essential to publishing." MTD Order at 19. But the Ninth Circuit has not expanded the meaning of publication to include promoting, marketing, or boosting content as Meta attempts to do through its recommendation algorithms. The fact that some publishers may, at times, *also* engage in this conduct does not make it part of the core publisher function described by Section 230 and clarified by the Ninth Circuit. "Publication" is a strictly defined concept involving "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," including reproducing material for publication and editing for style and technical fluency, altering content, and postponing content. *Barnes*, 570 F.3d at 1102; *see also Lemmon*, 995 F.3d at 1091; *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157, 1170–71 (9th Cir. 2008); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997).

The dangers created by Meta's recommendation algorithms, which detect material an individual is likely to engage with and then increasingly display that material to maximize time spent on the Platforms, do not depend on the type of content the recommendation algorithms suggest. Imagine the recommendation algorithms suggesting to a young user video after video of

19

puppies playing. No one would argue that puppy videos are dangerous content. But the algorithmic sequencing of the content according to dopamine-manipulating "variable reward schedules," Compl. ¶¶ 156–61, could still be harmful to that young user by causing them to stay up too late watching those videos, leading to sleep deprivation, or causing them to be distracted by those videos during school.

In *Lemmon*, for example, the Ninth Circuit concluded that Section 230 did not bar a challenge to Snap's speed filter, which allowed users to take videos of themselves while the filter displayed the speed they were moving in real time. 995 F.3d at 1091–93. This feature was inherently dangerous because it encouraged users to drive at unsafe speeds, not because it encouraged users to post specific content. *Id.* The court therefore held that the claim did not seek to hold Snap responsible as a publisher or speaker, but merely sought to hold Snap liable for its own conduct: the creation of the unsafe speed filter. *Id.* at 1093. Like the speed filter, Meta's recommendation algorithms represent an "'unreasonable and negligent' design decision[]" and are inherently dangerous. *Id.* at 1091. This is so regardless of what content the recommendation algorithms promote or recommend.

Because the States' unfairness claims regarding the recommendation algorithms are based on their status as a content-neutral feature, Meta could "take reasonable measures to design" safer Social Media Platforms "without altering the content that [its] users generate." *Id.* at 1092. Meta would not need to remove or alter any content that appeals to young users, prohibit third parties from posting additional content, or stop young users from seeking out that content. Instead, Meta could limit the manner in which its Platforms promote or market that content to a young user at one time. Therefore, the States' claims addressing the recommendation algorithms "'ha[ve] nothing to do with' [Meta's] editing, monitoring, or removing of the content that its users generate," *id*. (quoting *Internet Brands*, 824 F.3d at 852), and so are not barred by Section 230.

The Court also held that addressing Meta's infinite scroll and autoplay features "would necessarily require defendants to publish less third-party content." MTD Order at 16. But Meta *could* change these features without publishing less third-party content. If Meta were to eliminate infinite scroll, this would not prohibit any third-party user from posting an unlimited number of

20

photos, videos, and other content to Meta's Platforms at any time for all users to see immediately on the creator's profile. The only difference is that users might see that content displayed over multiple pages in their feed. Similarly, if Meta were to eliminate the autoplay feature, no videos would be barred from the Platforms. Users would just need to press the play button to start the videos. In other words, Meta "could . . . satisf[y] its alleged obligation" by "designing its product differently." *Omegle, LLC*, 614 F. Supp. 3d at 819.

> ### 2. Section 230 does not bar the States' claims based on Meta's features designed to lure users back onto its Platforms.

Nor does Section 230 bar challenges to features that aim to draw users back to Meta's Platforms, such as ephemeral design features—including videos that are shown once while livestreamed or those that disappear after 24 hours—and notifications of third-party content.

The States do not allege claims related to the nature of specific content selected for ephemeral display or sent via ephemeral messages, but rather with Meta's design choice to make any "content available to users only temporarily." Compl. ¶ 97. The States argue that Meta's use of ephemeral design features is inherently dangerous because they cultivate the "fear of missing out" (FOMO) "and exploit psychological vulnerabilities in young users." *Id.* at ¶ 401. Meta exploits FOMO to develop young users' compulsive need to continually check the Platforms to the detriment of their mental and physical well-being. This harm stems not from any content but rather from Meta's design features. Therefore, much as in *Lemmon*, Meta's ephemeral design features are distinct from Meta's role as a publisher. 995 F.3d at 1092.

In its previous order, the Court read ephemeral design features to be "[e]ditorial decisions" about "the length of content published and how long to publish content." MTD Order at 18. But the States' claims do not implicate Meta's decisions to post or remove content. Meta could address the harm caused by the ephemeral design features without changing user-posted content or investigating the nature of the content. *Internet Brands*, 824 F.3d at 851–52. Meta could disable the automatic "disappearing" aspect, which would not require Meta to monitor or remove any content. Users could still view content and a creator could still choose to post a video and delete it after a desired period of time, even if that setting was no longer the default. In this way, ephemeral design

features are akin to that of the speed filter at issue in *Lemmon*. Here, as there, the feature at issue does not derive from Meta's "editing, monitoring, or removing" of user-generated content. *Lemmon*, 995 F.3d at 1092. Accordingly, Section 230 does not bar the States' unfairness claims based on ephemeral design features.

Similarly, Meta's use of notifications of third-party content is not immune under Section 230. The Court previously relied on *Dyroff* to hold that Section 230 bars design defect claims based on notifications made "to alert users to third-party content." MTD Order at 18. There, Section 230 immunized a website operator against liability based on a notification sent to the decedent that directed him to a post about purchasing heroin. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). To address that harm, the operator would have needed to monitor or remove third-party content. But here, the States do not allege harm resulting from the content giving rise to the notifications, nor from the content of the notifications themselves. Rather, the harm occurs as the result of Meta's content-neutral use of frequent and disruptive notifications to capitalize on young users' desire for "'[a]pproval and acceptance.'" Compl. ¶ 408. Meta's design and use of "disruptive audiovisual and vibration notifications and alerts" encourage young users to keep coming back to the Platforms, even causing them to frequently wake up throughout the night to check social media notifications. *Id.* at ¶¶ 408, 515, 847(b)–(c). And Meta intentionally makes it difficult for users to disable notifications. *Id.* at ¶¶ 317, 323, 325–26. This conduct reduces user control over their own viewing experience independent of content or Meta's role as a publisher. Meta's notification design choices are inherently unfair because they are designed to override young users' autonomy and continually draw them back into the Platforms.

Moreover, the States' claims do not implicate Meta's decisions to post or remove content. Meta could address the harm caused by notifications without changing user-posted content or investigating the nature of the content. *Internet Brands*, 824 F.3d at 851–52. Meta could make the settings easier to navigate so users could exercise more control over their notifications. Meta could also adjust the frequency with which it pushes notifications. Such changes do not affect users' ability to post or view content, nor do they require Meta to monitor or delete any content. Therefore, Section 230 does not bar claims regarding notifications of third-party content.

### III.    The States adequately allege that Meta engaged in deceptive acts and practices.

The States plead a multifaceted scheme of statements and omissions by Meta that has misled consumers about the true harm, addictiveness, and COPPA non-compliance of its Platforms, as well as its own responsibility for these defects. Meta seeks dismissal of statements in isolation, but the States' claims must be evaluated according to the framing of the Complaint, not Meta's desired revision. And the appropriate inquiry is whether the many statements and omissions pleaded in the Complaint "contribute[] to the deceptive context . . . as a whole," even if they may not be actionable individually. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008).

The States allege that Meta engaged in deceptive acts and practices in violation of their consumer protection laws in five broad categories.[12] *First*, Meta created the false perception that its Platforms are not designed to induce extended or compulsive use,[13] when in reality they are so designed.[14] *Second*, Meta made misleading statements and omissions about the harmfulness and addictive nature of its Platforms,[15] in disregard of its own internal research and data.[16] *Third*, Meta publicized and promoted the prevalence metrics in its Community Standards Enforcement Reports ("CSER"), while omitting material and less favorable data on the prevalence of harmful experiences as set out in its Bad Experiences & Encounters Framework ("BEEF") and Tracking Reach of Integrity Problems Survey ("TRIPS") data.[17] *Fourth*, Meta misrepresented that it prioritized young users' health and safety over maximizing profits.[18] But in reality it subordinated the former to the

---

[12] Compl. ¶ 846; *see also, e.g., id.* at ¶¶ 122–33, 222, 829; Florida Attorney General Complaint, ("FL Compl."), *State of Florida v. Meta Platforms, Inc., et al.,* N.D. Cal. No. 4:23-cv-05885, ECF. 1 (filed Oct. 24, 2023), ¶¶ 45–72.

[13] *See* Compl. ¶ 846(a), (f); *see also, e.g., id.* at ¶¶ 135–37, 167–69, 191–92, 330–31, 374–75, 574.

[14] *See, e.g., id.* at ¶¶ 57, 66-116, 140–71, 376–413.

[15] *See id.* at ¶ 846(b); *see also, e.g., id.* at ¶¶ 120–33, 185–88, 265–66, 284–87, 294, 334–36, 375, 415, 419, 425, 427, 562–65, 571, 592–93, 596, 598, 829.

[16] *See, e.g., id.* at ¶¶ 179–82, 195–212, 228–47, 256–60, 262, 268–74, 290–92, 295, 312, 349–54, 364–66, 419, 428, 469–71, 482–86, 489, 491–500, 531–60, 584–85, 597, 599, 613–14, 618, 621.

[17] *See id.* at ¶ 846(c); *see also id.* at ¶¶ 458–507.

[18] *See id.* at ¶ 846(d); *see also, e.g., id.* at ¶¶ 85, 123, 125–27, 136, 222–23, 265, 275, 448.

23

latter, including by declining to invest in health and safety initiatives that would impact its bottom line.[19] *Fifth,* Meta claimed that it prevents under-13 users from using its Platforms when it was aware that a significant number of users under 13 can easily circumvent its porous age-gate, while employees look the other way.[20] Together the statements and omissions in the Complaint show a complex, multifaceted scheme of deception.

In any case, the States' claims of deception can proceed even were the Court to disregard some statements, so long as there remain some actionable predicates for deception. *See, e.g.*, *LeGrand v. Abbott Labs.*, 655 F. Supp. 3d 871, 893–94 (N.D. Cal. 2023). The States adequately plead many predicate statements that are actually false or misleading as well as predicate omissions—which Meta declines to address at all[21]—sufficiently under each of their State laws.

Because the States' deception claims survive, it is inappropriate to separately evaluate every single statement as detailed in Meta's lengthy appendix. As a preliminary matter, Meta does not explain the rationale behind its conclusory designations sufficiently to allow the States to respond, nor are these generic categories grounded in caselaw across the States. Indeed, Meta's arguments and appendix underscore why it is generally inappropriate to rule on the deceptive character of claims at the motion-to-dismiss stage, except in a "rare situation." *Williams*, 552 F.3d at 939. The States have more than met their burden for pleading deception, and Meta's specific objections to the States' deception claims are meritless.

---

[19] *See, e.g., id.* at ¶¶ 57, 63, 84, 248–50, 280–82, 322, 339–63, 610–30.

[20] *See id.* at ¶ 846(e); *see also, e.g., id.* at ¶¶ 434–40, 646–88, 695, 713–19.

[21] Meta misapprehends the States' allegations of deceit as "premised on Meta's failure to provide warnings about its algorithms or other 'engagement-inducing features.'" MTD at 25. To be clear: this is not just a failure-to-warn case. Meta's omissions contributed to the overall deceptive nature of its conduct. *See, e.g., Day v. AT&T Corp.*, 74 Cal. Rptr. 2d 55, 60 (Cal. Ct. App. 1998) ("A perfectly true statement couched in such a manner that it is likely to mislead or deceive the consumer, such as by failure to disclose other relevant information, is actionable."). This includes, for example, Meta's many omissions of internal research and knowledge that would have detracted from Meta's public narrative regarding safety on its Platforms. Meta addresses none of these omissions in its motion or the attached appendix.

24

**A.    Meta's misrepresentations are actionable statements of fact.**

Meta distorts both the law and the States' claims in an attempt to escape liability for its misrepresentations. As an initial matter, whether Meta's statements constitute puffery is not a suitable inquiry at this stage in the case, as "[s]tate and federal courts are united in the principle that [this] determination . . . is a question of fact to be resolved by the finder of fact except in the unusual case where the answer is so clear that it may be decided as a matter of law." *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010, 1024 (Pa. 2018); *see also, e.g.*, *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1004–05 (N.D. Cal. 2018).

Meta cannot meet that heavy burden here. Courts frequently decline to dismiss deception claims surrounding a product's safety. *See, e.g.*, *Williams v. Amazon, Inc.*, 573 F. Supp. 3d 971, 974–75 (E.D. Pa. 2021) (tattoo kit is "safe"); *Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837, 851 (N.D. Cal. 2018) (dog food is "safe" and "pure"). This is especially true where, as here, a defendant makes representations of safety despite its knowledge of specific safety problems. *See, e.g.*, *Mullen v. GLV, Inc.*, No. 18-01465, 2018 WL 3218693, at *2 (N.D. Ill. July 2, 2018); *Toyota Motor Corp. Litig.*, No. 10-02151, 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012). And a misstatement that may be "puffery when viewed in isolation" can "cross the line . . . to active misrepresentations" when assessed in conjunction with allegations of such knowledge, *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) (cleaned up), or against the background of a broader "deceptive context," *Williams*, 552 F.3d at 939 n.3; *see also In re Toyota Motor Corp. Unintended Acc. Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1177 (C.D. Cal. 2010) (no puffery where statements part of a "campaign" to promote focus on "safety").

Meta's misleading and incomplete representations must similarly be read alongside the States' allegations that Meta knew of the specific ways in which its Platforms harmed and addicted young users. They must also be viewed against the backdrop of Meta's overall scheme of misleading statements and omissions regarding how it designed its Platforms, those Platforms' dangerous qualities, and the company's choice to prioritize profits over the mental health of its

25

young users.[22] In stark contrast, many of the cases on which Meta relies involve isolated assertions that a product is "safe."[23] Further, Meta ignores the critical fact that its cases do not involve actions brought by attorneys general to enforce consumer protection laws, *see* MTD at 27–28, which generally do not require a showing of reliance and involve a lower burden of proof than common law fraud. *See, e.g.*, *Ballagh v. Fauber Enters., Inc.*, 773 S.E.2d 366, 368 (Va. 2015); *Tiismann v. Linda Martin Homes Corp.*, 637 S.E.2d 14, 17 (Ga. 2006).

Meta also incorrectly contends that other statements are non-actionable opinions or puffery. *See* MTD at 28. Yet those statements—many of which were made by Meta's high-level officers—provide concrete and objective information about the internal workings of the company. Even if phrased as opinions, they are actionable because they either were "not honestly held" or could be "reasonably interpret[ed] . . . as implied statements of fact." FTC Policy Statement on Deception, *appended to Cliffdale Assocs., Inc.*, 103 F.T.C. 110, 174 (1984) (hereinafter "FTC Policy Statement").[24] This is so, in part, because the relevant parties were on unequal terms with uneven access to information. *See, e.g.*, *Nationwide Ins. Co. v. Patterson*, 331 S.E.2d 490, 493 (Va. 1985). And, in any case, this highly factual determination—which involves inquiry into "the subject matter, the form of the statement, the surrounding circumstances, and the respective knowledge of the parties," *Meyers v. Cornwall Quality Tools*, 674 A.2d 444, 450 (Conn. App. Ct. 1996)—is, again, inappropriate on a motion to dismiss.

### B.    The States adequately plead deception under any pleading standard.

The States detail the many misrepresentations and omissions that contribute to Meta's scheme of deception. Although the Ninth Circuit recently questioned applying Rule 9(b) to state

---

[22] *See supra* notes 12–20. Meta's safety-related statements also provide evidence that its omission of information regarding the design of, and incidence of harmful experiences on, its Platforms was material.

[23] *See generally Morris v. Princess Cruises, Inc.*, 236 F.3d 1061 (9th Cir. 2001); *Azoulai v. BMW of N. Am. LLC*, No. 16-00589, 2017 WL 1354781 (N.D. Cal. Apr. 13, 2017); *XYZ Two Way Radio Serv., Inc. v. Uber Techs., Inc.*, 214 F. Supp. 3d 179 (E.D.N.Y. 2016); *Cooke v. Allstate Mgmt. Corp.*, 741 F. Supp. 1205 (D.S.C. 1990).

[24] The Statement is also available from the FTC's website: https://archive.ph/mQJlN.

deception claims, *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1019 n.11 (9th Cir. 2020)—particularly salient here where many state courts do not treat deception claims as sounding in fraud[25]—this Court need not resolve this question because the States adequately plead deception under either Rule 8 or Rule 9(b). Meta suggests that all allegedly deceptive statements must be matched to allegations demonstrating their actual falsity, but the States need only show that these statements are likely to mislead when read in context. *Moore*, 966 F.3d at 1017.

1. **The States adequately plead that Meta's stated policy regarding users under thirteen is deceptive because the policy does not reflect Meta's actual conduct.**

The States plead that Meta is aware that it does not follow its own age-gating policies to delete an account if it "can't verify" age. Compl. ¶¶ 680–88. The States plead specific instances where Meta had actual knowledge of under-13 accounts that it did not delete, such as an email where a Meta employee told a mother that her 12-year-old daughter's four accounts were not deleted because Meta "couldn't tell for sure." *Id.* at ¶ 668. The States also allege that Meta routinely ignored reports of under-13 users when there was no bio or photo associated. *Id.* at ¶ 671. Between the first quarter of 2019 and the second quarter of 2023, Meta received over 1.1 million reports of under-13 accounts. *Id.* at ¶ 676. Of the 402,000 reports that Meta received in 2021, 60% of the associated accounts were not disabled. *Id.* at ¶ 673. Employees at Meta know that age-gates can be easily circumvented, noting that "roughly 90%" of users claiming to be 13 years old misrepresent their age. *Id.* at ¶¶ 713–19. Despite this knowledge, employees admit that Meta "do[es] very little to keep U13s off our platform."[26] *Id.* at ¶ 647. Accordingly, the States sufficiently allege that Meta does not follow its own policy to delete an account *unless* age is verified.

Meta cannot deny its knowledge and inaction—indeed, Meta does not challenge the States' COPPA claims on the basis of its actual knowledge. Instead, Meta argues that it can both be true that there are under-13 users on the Platform and that Meta removes them upon discovery. MTD at 30. Yet, the States plead examples showing the opposite. Compl. ¶ 668. Meta further argues that

---

[25] *See supra* note 5.

[26] The States refer to under-13, while Meta's internal documents use various terms, including U13.

delays and errors do not render its policy deceptive because Meta never claimed to detect every under-13 user "instantaneously and without error." MTD at 30. That misapprehends the deception claim. As alleged, Meta misled the public because its public statements were contradicted by its pervasive inaction, not any isolated errors.

> **2.** **The States adequately plead that Meta's emphasis on its CSER reports as the primary measure of online safety deceptively omits less favorable data.**

The States allege precisely how Meta creates a false impression that encountering harmful content is rare on its Platforms by publishing only favorable data from its CSER reports while omitting relevant data from its TRIPS and BEEF reports. Meta emphasizes the prevalence metrics in its CSER reports—measuring the percentage of content that Meta removes for violating its community standards—as "the most important measure of a healthy online community," Compl. ¶ 463, even going so far as to compare its CSER metrics to objective scientific measures like the concentration of pollutants in the air, *id.* at ¶ 464. This is profoundly misleading. *Id.* at ¶ 468. For example, in the third quarter of 2021, Meta reported that only 0.05–0.06% of views were of content that Meta determined to be bullying or harassment, whereas 28.3% of users polled at the same time reported witnessing bullying on the Platform. *Compare id.* at ¶¶ 491–92, *with id.* at ¶ 490. In the same time frame, Meta determined that less than 0.05% of views were of what Meta determined to be suicide or self-injury content, whereas 6.7% of users reported witnessing self-harm content. *Compare id.* at ¶ 481, *with id.* at ¶ 482. Meta is aware of the discrepancies between its user-generated TRIPS and BEEF data and its self-generated CSER data, *id.* at ¶¶ 502–05, and the relevance of the user-generated data to the measure of online well-being, *see, e.g.*, *id.* at ¶ 468. Despite this, Meta misrepresents the prevalence metrics in its CSER reports as an "objective" measure of online safety, MTD at 31, while omitting less favorable BEEF and TRIPS data that it knows is also relevant to understanding online safety.

Meta claims a "mismatch" between the CSER metrics and TRIPS and BEEF data, *id.* at 31–32, suggesting that because the two sets of data are logically compatible, it could not have been deceptive for Meta to publish the CSER data while concealing the BEEF and TRIPS data. But this

again misapprehends the States' deception claim. The BEEF and TRIPS data do not show CSER metrics to be false, but the discrepancies underscore, rather than refute, the false impression Meta creates about the reliability of CSER's metrics for online safety.

### 3. The States adequately plead that Meta misled the public about its reasons for abandoning Project Daisy.

The States allege that Project Daisy, a proposal to remove "Like" counts from a user's default view, is one of several examples where Meta misled the public about its commitment to safety over profits. When Meta had the opportunity to implement Project Daisy—shown to have "statistically significant impact" on reducing negative social comparison among teens—it buried the project. Compl. ¶ 244. Meta represented that it made this decision because Project Daisy had "very little impact." *Id.* at ¶ 287. But actually, Meta's experts "HUGELY pushed" for Project Daisy as a "default for teens" because they had determined Daisy to be remarkably effective. *Id.* at ¶¶ 261–62. Indeed, one Meta researcher noted that Project Daisy "is one of the clearest things (supported by research) that we can do to positively impact social comparison and well-being on [Instagram]." *Id.* at ¶ 290. Nonetheless, Project Daisy was projected to damage Meta's revenue, *id.* at ¶ 250, and got "stuck in a political war" among Meta's leadership, *id.* at ¶ 264.

Meta argues that there is no deception in statements that acknowledge that Project Daisy had some success, but that again misapprehends the States' deception claim. The States allege that Meta misled the public not about Project Daisy's results, but its reasons for rejecting the feature, underscoring Meta's misleading narrative that it prioritizes user safety over profits.

### C. Where necessary, the States readily allege Meta's misstatements are material.

Meta broadly misapprehends "materiality" as applicable to the States' consumer protection claims, and—to the extent the concept even applies—the States readily allege it throughout the Complaint.

Materiality is a legal element of only a minority of the States' deception claims. Meta misidentifies 20 of the 28 States it asserts require materiality. The plain text of these States' laws

do not require materiality or reserve the requirement for only certain claims.[27] Materiality is a common law fraud concept, which is usually eschewed in public enforcement of state consumer protection laws.[28] In support of its erroneous point, Meta cites cases that are inapposite and outdated,[29] or that construe only one sub-type of each State's deception claims.[30] For a handful of

[27] California; Delaware (Count XI); Indiana; Kentucky; Louisiana; Minnesota; Nebraska; New York (Counts XXXVI); North Carolina; North Dakota; Pennsylvania; South Carolina, Virginia; and Wisconsin do not contain any express materiality element. Arizona, Delaware (Count X), and Missouri require only deceptive *omissions*, not affirmative misrepresentations, to be material. Ariz. Rev. Stat. Ann. § 44-1522; *accord, e.g.*, *State ex rel. Horne v. AutoZone, Inc.*, 275 P.3d 1278, 1281 (Ariz. 2012) (distinguishing omission from act); Del. Code Ann. tit. 6 § 2513(a) (similar); Mo. Ann. Stat. § 407.020(1) (similar). New Jersey Stat. Ann. section 56:8-2 (Count XXXIII) contains similar language; there, omission and misrepresentation claims require materiality, but affirmative "deception" claims do not require "that the misrepresentation was of a material fact." *Leon v. Rite Aid Corp.*, 774 A.2d 674, 678 (N.J. Super. Ct. App. Div. 2001). Colorado requires materiality for certain omissions, Colo. Rev. Stat. § 6-1-105(1)(u) (Count VII), but not other prongs, including subsections (1)(g) and (1)(rrr) (Counts VI and VIII). Kansas Stat. Ann. section 50-626 (Count XX) requires materiality for some prongs, but not others, such as section 50-626(b)(1). *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 615 (D. Kan. 2014). Michigan Comp. Laws Ann. section 445.903 requires materiality only for subsections (1)(s), (bb), and (cc), not the other prongs also cited in Count XXV. While Connecticut's statute does not include an express materiality requirement, Connecticut courts have construed the statute to include one, assessed from the perspective of consumers "acting reasonably under the circumstances." *Caldor, Inc. v. Heslin*, 577 A.2d 1009, 1013 (Conn. 1990) (interpreting Conn. Gen. Stat. Ann. § 42-110b(a)). Meta concedes that Washington and Oregon do not require materiality. MTD at 34 n.38.

[28] *See supra* Section III.A at 26.

[29] *See People v. Johnson & Johnson*, 292 Cal. Rptr. 3d 424, 450 (Cal. Ct. App. 2022) (merely "assuming without deciding that a materiality standard is implicit"); *Dedloff v. Whole Foods Mkt. Grp.*, No. 22-01340, 2023 WL 5428501, at *5 (E.D. Mo. Aug. 23, 2023) (interpreting inapplicable private action provision of Missouri law); *N. Bottling Co. v. Henry's Foods, Inc.*, 474 F. Supp. 3d 1016, 1028 (D.N.D. 2020) (finding Lanham Act similar to N.D. Cent. Code § 51-15-02 only in that both "generally require some sort of misrepresentation"); *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021) (discussing inapplicable private action provision and citing *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 972–73 (7th Cir. 2020), which does not interpret Wisconsin law); *compare In re OnStar Cont. Litig.*, 278 F.R.D. 352, 376 (E.D. Mich. 2011) (relying on outdated precedent that Michigan Consumer Protection Act ("MCPA") incorporates all elements of common law fraud), *with Brownlow v. McCall Enters.*, 888 N.W.2d 295, 306 (Mich. Ct. App. 2016) (holding MCPA claim need not plead "all elements of fraud," and courts should look to common law only to interpret "technical term[s]"); *compare Weiss v. Cassidy Dev. Corp.*, No. 206766, 2003 WL 22519650, at *2 (Va. Cir. Ct. Aug. 18, 2003) (relying on outdated precedent that Virginia Consumer Protection Act ("VCPA") incorporates all common law "elements of fraud"), *with Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014) (clarifying VCPA "extends considerably beyond fraud" by eliminating common law elements).

[30] *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003) (noting that some Colo. Rev. Stat. section 6-1-105(1)(e) (Count V) claims require that false representations "have the capacity or tendency to attract consumers," but not relevant to Colorado's Counts VI–VIII); *Crowhorn v. Nationwide Mut. Ins.* Co., No. 00C-06-010, 2002 WL 1767529, at *9 (Del. Super. Ct. July 10, 2002) (not relevant to Delaware's Count XI); *York v. InTrust Bank,*

30

States, Meta cites no case requiring materiality, instead misconstruing case law to incorrectly assert that those statutes adopt all the elements of Section 5 of the Federal Trade Commission Act ("FTCA").[31] As consumer protection laws must be liberally construed to protect consumers, *see, e.g., supra* note 1, the Court should reject Meta's invitation to read into them a broad requirement of materiality, particularly in these public enforcement actions.[32]

Regardless, the States allege material misrepresentations throughout the Complaint. The focus of Meta's deception—deceiving users and their parents about the safety, addictiveness, and mental health risks of its Platforms, is material as a matter of law and common sense. *See, e.g.*, FTC Policy Statement, *supra* note 24 (explaining that claims or omissions are presumptively material "if they significantly involve health, safety, or other areas with which the reasonable consumer would be concerned"); *FTC v. Wellness Sup. Net., Inc.*, No. 10-04879, 2014 WL 644749, at *17 (N.D. Cal. Feb. 19, 2014) (finding materiality requirement was met because all of the claims significantly involved consumer health). Moreover, "express claims" are presumed material, as are those where the company "knew, or should have known . . . the claim was false." FTC Policy Statement, *supra* note 24; *see also FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095–96 (9th Cir. 1994).

---

[31] *N.A.*, 962 P.2d 405, 420 (Kan. 1998) (not relevant to Kansas's Count XX beyond theories under Kan. Stat. Ann. section 50-626(b)(2)–(3)); *Block v. Seneca Mortg. Servicing*, 221 F. Supp. 3d 559, 594 (D.N.J. 2016) (not relevant to New Jersey's "deception" prong); *FTC v. Quincy Bioscience Holding Co., Inc.*, 646 F. Supp. 3d 518, 526 (S.D.N.Y. 2022) (same for New York's Counts XXXVI).

[31] *See Morgan v. Blue Cross & Blue Shield of Kentucky, Inc.*, 794 S.W.2d 629, 632 (Ky. 1989) (simply noting that court compared Kentucky law to the FTCA in deciding it was not void for vagueness); *Holley v. Coggin Pontiac, Inc.*, 259 S.E.2d 1, 10 (N.C. Ct. App. 1979) (holding that FTCA decisions "are not controlling" for North Carolina) (citation omitted); *Creamer v. Monumental Props, Inc.*, 329 A.2d 812, 818 (Pa. 1974) (merely noting that Pennsylvania courts "*may*" look to FTCA decisions) (emphasis added and citation omitted). And for Nebraska, Defendants incorrectly cite to an antitrust case, *Salem Grain Co., Inc. v. Consol. Grain & Barge Co.*, 900 N.W.2d 909, 922 (Neb. 2017), and underlying statute, Neb. Rev. Stat. § 59-829, that explicitly apply to antitrust actions and not consumer protection actions, such as those at issue in this complaint.

[32] *Cf. Sutton v. Viking Oldsmobile Nissan, Inc.*, 611 N.W.2d 60, 64 (Minn. Ct. App. 2000), *vacated on other grounds,* 623 N.W.2d 247 (Minn. 2001) (declining to read materiality into Minnesota Consumer Fraud Act). Moreover, regardless of the relationship between their statutes and the FTCA, Louisiana and South Carolina are not aware of any court in their states having held that materiality is an element of their claims.

1    Further, at the pleading stage, Meta would need to establish that the few misrepresentations

2    it challenges are immaterial as a matter of law, which it cannot. Materiality is a question of fact,

3    generally not subject to a motion to dismiss. *Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1107 n.7 (9th

4    Cir. 2013). Meta's failure to meet its burden is compounded because users make innumerable

5    decisions daily about when and how to use Meta's Platforms that are materially influenced by

6    Meta's deception. Compl. ¶¶ 54, 163, 589.

7    Finally, Meta primarily disputes the materiality of its express false statements regarding its

8    goals to increase the amount of time users spend on its Platforms. MTD at 34. Of course, as alleged,

9    these statements were in service of Meta's broader scheme to mislead users and their parents that

10   Meta's Platforms were not designed to induce compulsive or extended use. Compl. ¶ 846(a). At the

11   pleading stage, it is more than plausible that parents would find it important to know that Meta's

12   employees were instructed to design and operate its Platforms with a goal of increasing the time

13   that users would spend on them. Meta's other similarly half-hearted challenge to just two

14   statements, made in a footnote, also fails to meet its burden, particularly at the motion-to-dismiss

15   stage.[33]

16       **D.    Meta can be held liable for its deceptive statements before Congress.**

17   Meta urges that its deceptive Congressional testimony is immunized by First Amendment

18   protections and is wholly unconnected to "trade or commerce." MTD at 35–37. Not so.

19   *First*, Meta fails to articulate why its statements warrant First Amendment protection under

20   the *Noerr* doctrine or more generally. *See generally E.R.R. Presidents Conf. v. Noerr Motor*

21   *Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657

22

23   [33] MTD at 35 n.39. In any case, Meta's express false statement that it does not calculate a lifetime
     value for young teens, Compl. ¶¶ 84–85, furthered Meta's deception that it "prioritized young users'
24   health and safety over maximizing profits," *id.* at ¶ 846(d). Meta's express false denial that it
     restricted access to its research after a whistleblower released internal research on "harms
25   associated with its platforms," *id.* at ¶ 594, is also presumptively material and plausibly understood
     as a representation that Meta had no further research on those harms it wanted to hide. Meta waived
26   any challenge to other misstatements by only checking boxes in its appendix, in excess of its page
     limit. *See In re Intel Corp. CPU Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 18-02828, 2020 WL
27   1495304, at *25 (D. Or. Mar. 27, 2020), *aff'd*, No. 22-35652, 2023 WL 7211394 (9th Cir. Nov. 2,
     2023).

28

(1965). In fact, Meta's Motion ignores the three-step analysis used to determine *Noerr*'s applicability and fails to provide any support for the idea that it was lobbying Congress or that its testimony was in service of "protected petitioning activity." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022). At a minimum, the States' allegations that Meta's Congressional testimony was false and in service of a larger deceptive scheme directed to the public, *see, e.g.,* Compl. ¶¶ 136–37, 333–37, 429, 685, require an analysis of whether Meta's conduct falls into the "sham" exception to *Noerr*. *See B&G Foods*, 29 F.4th at 536 (directing courts in non-antitrust *Noerr* cases to create "analogous [sham exception] standards suitable to each case's context").

Consequently, whether, and to what extent, *Noerr* applies in a non-antitrust context is a fact intensive inquiry generally not ripe for adjudication at the motion-to-dismiss stage. As this Court has recognized, this is particularly true where, as here, defendants argue for a novel expansion of *Noerr* on an "underdeveloped factual record" and with "abbreviated legal arguments." *In re Apple Inc. Sec. Litig.*, No. 19-02033, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

*Second*, Meta similarly fails to support its barebones contention that all congressional testimony, regardless of content, intent, or impact, is inherently unactionable under 22 different States' consumer protection laws.[34]

Meta cites cases that have nothing to do with legislative testimony and stand for the unremarkable proposition that the deceptive statements must not be private or wholly unrelated to business interests. *See, e.g.*, *Henderson v. Gandy*, 608 S.E. 2d 248, 252 (Ga. 2005) (statements must have connection to "public consumer marketplace"), *aff'd* 623 S.E.2d 465 (Ga. 2005). Meta also does not even attempt to grapple with each State's own interpretation of these clauses or persuasively argue why its highly public statements touting its Platforms do not fall within the larger ambit of trade or commerce. *See, e.g.,* Ariz. Rev. Stat. Ann. § 44-1522 (a violation only has to be "in connection with" the consumer transaction); *Zeeman v. Black*, 273 S.E.2d 910, 915 (Ga. Ct. App. 1980) (noting the general requirement that a consumer transaction occur in the "context of the ongoing business"); *Conway v. CitiMortgage, Inc.*, 438 S.W.3d 410, 414 (Mo. 2014) (the

---

[34] Whether Meta's Platforms and conduct are within trade or commerce as a whole is addressed in Section V.

violation must simply have "a relationship" with the sale). Some states, like Washington, take an

even broader approach finding that any "acts done for the purpose of increasing profits are within

the sphere of trade [or] commerce." *State Farm Fire & Cas. Co. v. Huynh*, 962 P.2d 854, 862

(Wash. Ct. App. 1998). These standards reflect the remedial nature of the statutes and the

corresponding directives, found in nearly all states, that the statutes be liberally construed. *See*

*supra* note 1.

Importantly, the States have sufficiently cleared this low hurdle by alleging that Meta's

statements to Congress fall within their respective state statutes. The Complaint repeatedly

grounds these statements by placing them within a larger scheme to "deceive[] the public" and

influence press coverage. *See, e.g.*, Compl. ¶¶ 136-37, 333-37, 429, 438, 562, 685. The States

also allege that the statements were made with the purposes of maintaining or increasing business

revenues by allaying users' concerns. *See, e.g.*, *id.* at ¶¶ 1, 222–23, 333–38. Further, the Court can

reasonably infer from the States' Complaint that Meta knew, or even intended, that its high-

profile congressional testimony would be widely disseminated and relied upon by the public at

large.[35]

## IV.    The States sufficiently plead unfair and unconscionable business acts and practices.

The States sufficiently plead unfair and unconscionable business acts and practices in

violation of the States' consumer protection laws, whether assessed under the standard articulated

by Section 5 of the FTCA, the *Sperry* factors test, or any particular interpretation of those standards

adopted by individual States' caselaw. Meta not only mischaracterizes and oversimplifies the

variations among State law, but also incorrectly reframes the Complaint as implicating design

decisions applicable to all users, rather than Meta's decisions to specifically target, subvert, and

exploit young users' autonomy and choice. Further, the arguments Meta raises would require the

Court to adjudicate disputes of fact and thus are inappropriate for a motion to dismiss. *See, e.g.*,

*Loomis v. Slendertone Distribution, Inc.*, 420 F. Supp. 3d 1046, 1085–86 (S.D. Cal. 2019).

_____

[35] An analogy may be found in the common law tort of negligent misrepresentation where liability
attaches if the defendant, as alleged here, "intends or has reason to expect" the deceived party will
rely on the misrepresentation. Restatement (Second) of Torts, § 531 (Am. L. Inst. 1977).

Meta initially contends that the States' claims amount to an impermissible attempt to hold it liable for "*without more*, designing a product or service in a way that makes the product or service more appealing to users." MTD at 39 (emphasis added). However, Meta misapprehends the case law, which illustrates merely that a bare assertion of a profit motive, accompanied by no additional allegations, is insufficient to state an unfair trade practice claim. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 647 (S.D.N.Y. 2011); *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 413 (E.D.N.C. 2015). Unlike those cases, the States' Complaint catalogs a comprehensive scheme to manipulate young users into excessive use of Meta's Platforms despite the company's own extensive knowledge of those Platforms' harmfulness. These claims are far beyond simply alleging a desire to increase profits or to make a more attractive product.

### A.    The States sufficiently plead that Meta violated Section 5 of the FTCA.

Meta's narrow reading of Section 5 of the FTCA and its argument that dozens of States are *required* to adopt that narrow construction is incorrect,[36] and Meta oversimplifies significant variations among the States' laws. Notably, many of these laws are *less* restrictive than the FTCA,[37] including because some follow the "cigarette rule," also known as the *Sperry* factors test, which is generally broader than the FTCA.[38] Regardless of which test each State actually follows, the States

---

[36] Maine did not bring an unfairness claim, *compare* MTD at 40 n.47, *with* Compl. Count XXIV, and Meta is incorrect that the highest court of North Dakota has found its UDAP law to be "identical or materially similar" to the FTCA, MTD at 41, n.48 (citing no North Dakota case law).

[37] Several States are *guided* by the FTCA, but their unfairness jurisprudence is expressly broader. *See, e.g.*, Ariz. Rev. Stat. Ann. § 44-1522(C) (stating that courts *may* use the FTCA as a *guide* in interpreting the Arizona Consumer Fraud Act); *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013) ("Although we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA.").

[38] *See FTC v. Sperry & Hutchinson Co.* 405 U.S. 233, 244 n.5 (1972). This test considers whether a practice offends public policy; is immoral, unethical, oppressive, or unscrupulous; or is substantially injurious to consumers. *See, e.g.*, *Ulbrich v. Groth*, 78 A.3d 76, 100 (Conn. 2013); *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007); *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 526 P.3d 395, 422–23 (Haw. 2023); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 590–91 (Neb. 2008) (adopting *Raad v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003, 1014 (D. Neb. 1998)). All three factors are present here, where Meta's acts offend public policy—including as codified in COPPA—to protect minors from harms encountered on the Internet; Meta's exploitation of young users' unique vulnerabilities in order to increase those users' engagement with products known to harm them is immoral, unethical,

sufficiently plead an unfair act or practice. Under Section 5 in particular, the States adequately plead that Meta's unfair acts or practices: (1) caused or are likely to cause substantial injury to its young users; (2) are not reasonably avoidable by young users; and (3) are not outweighed by countervailing benefits to young users or competition.

### 1.    The States sufficiently plead substantial injury.

Here, Meta both misleadingly cherry-picks FTC guidance excerpts and again mischaracterizes the Complaint, which clearly alleges that Facebook and Instagram's features cause young users significant physical and mental harm.[39] The FTC has promulgated guidance that "[u]nwarranted health and safety risks may also support a finding of unfairness." FTC Policy Statement on Unfairness, *appended to Int'l Harv. Co.*, 104 F.T.C. 949, 1073 (1984) (respondent distributed free-sample razor blades in a way that they could come into the hands of small children). Thus, monetary harm is not a dispositive component of "substantial injury," MTD at 42, and the States sufficiently plead "concrete" harm to the mental and physical health of Meta's young users. *See FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007) (sale of consumer phone records led to "host of emotional harms that are substantial and real and cannot fairly be classified as either trivial or speculative."), *aff'd*, 570 F.3d 1187 (10th Cir. 2009).

### 2.    The States sufficiently plead that their alleged injury was not reasonably avoidable.

Meta's argument that the States do not adequately plead that the injury alleged "was not reasonably avoidable by consumers themselves," 15 U.S.C. § 45(n), blatantly disregards the Complaint's allegations that Meta deliberately designed its Platforms to promote young user addiction, including by deploying design features that subvert and exploit young user autonomy

---

and unscrupulous; and, as discussed below, Meta has substantially injured its young users.

[39] *See, e.g.*, Compl. ¶¶ 195–206, 508, 510–19, 522–26, 528, 530–44, 546–47, 549–55, 557–58, 563–66, 568–69, 573–74, 576, 585, 594, 597, 599, 606, 608–10, 613–14, 617–21, 623–25 (negative body image); ¶¶ 207–18 (negative social comparison to teen peers); ¶¶ 340–54, 357–61, 365–66 (body image and eating disorders).

1   and choice.[40] The Complaint focuses on Meta's business plan to target and addict children, not the

2   public at large, as Meta implies. *See, e.g.*, MTD at 43 ("[T]he States do not allege that users of

3   Instagram and Facebook had no choice but to use Meta's services—nor could they.").

4        Meta's features—such as alerts that deliver dopamine hits and facilitate addiction, repeated

5   and sudden interruptions to the lives of young users at all hours of the day and night, and other

6   "variable" rewards[41]—intentionally work together to entrap and ensnare young users so that they

7   cannot reasonably avoid use of Meta's Platforms. Given the onslaught of features purposefully

8   designed to exploit young users' vulnerabilities and addict them, it is not "reasonably possible" for

9   young users to avoid Meta's Platforms under the circumstances. *Davis v. HSBC Bank Nev., N.A.*,

10  691 F.3d 1152, 1169 (9th Cir. 2012). Young users lack a "free and informed choice" about use of

11  Meta's Platforms, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010), and do not have "reason

12  to anticipate the impending harm and the means to avoid it," *Orkin Exterm. Co. v. FTC*, 849 F.2d

13  1354, 1365 (11th Cir. 1988) (cleaned up).

14       Meta's arguments that certain features such as "Take a Break" and "Daily Limit" provide

15  user choice inappropriately cabin certain Complaint allegations instead of viewing the Complaint

16  as a whole. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 435–36 (E.D.

17  Pa. 2018). Meta completely disregards the Complaint's allegations about young users' addictive

18  and compulsive use—use which Meta itself created and perpetuated using troves of individualized

19  user data—which obscures any meaningful "choice" that features such as "Take a Break" and the

20  "Daily Limit" putatively provide (given that they are so easily dismissed). MTD at 44. The

21  Complaint discusses these features in order to demonstrate that Meta has purposefully designed

22  them to inhibit young users' choices regarding the time they spend on its Platforms.[42]

---

24  [40] *See, e.g.,* Compl. ¶¶ 100–01, 106, 112–14, 116.

25  [41] *See, e.g.*, Compl. ¶¶ 57–58, 66–73, 78–81, 83–84, 88–89, 100–101, 106, 112–14, 116, 166–71,
26  178–82, 378–380, 382, 391–92, 395–98, 400, 402–09, 436, 439, 441–44, 448–52.

27  [42] *See* Compl. ¶¶ 579–90 (Daily Limit is "designed" to be "easily dismiss[ed] and to
    "tempt . . . young users to revert to harmful, time-maximizing settings," and Meta's "design
28  choices" for both features make it more difficult for young users "to effectively self-regulate").

Moreover, contrary to Meta's assertion, an injury arising from an unfair practice is not reasonably avoidable merely because an alternative product or service exists. MTD at 42–43. Meta conspicuously relies on cases interpreting only *one* State's consumer protection law in making this remarkable assertion. *Id.* And its reliance on cases such as *Philips v. Double Down Interactive LLC* and *Ristic v. Machine Zone, Inc.* is further misplaced: the cases apparently relate to *adult*—rather than youth—use of an online casino game and videogame. *See Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016); *Ristic*, No. 15-cv-8996, 2016 WL 4987943, at *2– 4 (N.D. Ill. Sept. 19, 2016).[43] Meta again misses the mark by disregarding the Complaint's allegations of Meta's aggressive strategy to make its Platforms a near-ubiquitous fixture amongst young users—as opposed to one of many online videogames or casino games—and Meta's choice to target and addict *young* users by purposefully exploiting their vulnerabilities, *see* Compl. ¶¶ 73- 77, 696.

Finally, with respect to "claims predicated on purported COPPA violations," Meta inaptly focuses on under-13 users "lying" about their age, characterizing this as "reasonably avoidable." MTD at 45. The occurrence of millions of under-13 users on Meta's Platforms demonstrates it is not "reasonably avoidable." *See* Compl. ¶¶ 631–835. Further, Meta disregards that laws such as COPPA exist in order to protect young children from making "choices" they are not mature enough to make, such as whether to sign up for Facebook or Instagram without the consent of a parent. *See, e.g., Ideal Toy Corp.,* 64 F.T.C. 297, 310 (1964) (treating children as a vulnerable class).

### 3.    The States sufficiently plead that Meta's conduct is not outweighed by countervailing benefits.

With no examples or further elaboration, Meta suggests that the States fail to show that the Platforms' harms to young users are not outweighed by countervailing benefits. MTD at 45. The States' Complaint sufficiently pleads an array of serious harms that compulsive Instagram and

---

[43] Moreover, Illinois disputes Meta's reading of these cases to mischaracterize its unfairness standard. Illinois follows *Sperry. See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002). In fact, The *Phillips* court applied the *Sperry* test in analyzing unfairness. *See Phillips*, 173 F. Supp. 3d at 742 (citing *Robinson*, 775 N.E.2d 951). The Phillips court failed to analyze all of the Sperry factors, in particular the immoral and unethical factors, which this Court should include in its analysis. *See* 815 Ill. Comp. Stat. 505/2; MTD at 39 n.47.

Facebook use engender, and it specifically addresses the negative "net effect" of the Platforms on young users, [44] including by Meta's own account. [45] As such, the cases Meta cites in which complaints did *not* contain particularized allegations that the act or practice was not "outweighed by countervailing benefits to consumers or competition" are not germane. MTD at 45 (citing *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 446–47 (N.D. Cal. 2020); *Kindred Studio Illustr. & Design, LLC v. Elec. Commc'n Tech., LLC*, No. CV 18-7661, 2018 WL 6985317, at *7 (C.D. Cal. Dec. 3, 2018)).

### B.    The States sufficiently plead that Meta violated their unfairness or unconscionability laws.

Meta separately analyzed the unfair or unconscionable acts or practices claims of eight States in its Motion. MTD at 46–49. Meta's arguments fail substantively and also mischaracterize the relevant laws. Whatever the applicable standard, these States adequately plead that Meta engaged in unfair or unconscionable acts or practices under their respective laws, as stated above in Section IV.A, and as described below.

*<u>California</u>*: California plausibly alleges unfairness under any of the three tests used in California. Recognizing that California's Unfair Competition Law is "intentionally framed in its broad, sweeping language," courts have broad equitable authority to address the "innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech*, 973 P.2d at 540 (cleaned up). Meta challenges California's unfairness claim under only one of the three tests articulated by California courts, focusing on an overly narrow reading of the *Cel-Tech* factor least applicable to Meta's misconduct, arguing that it is not prohibited or regulated by California law. Indeed, California's legislature has "declare[d]" its intent to regulate "[b]usinesses that develop and provide online services, products, or features that children are likely to access." Cal. Civ. Code § 1798.99.29

---

[44] *See* Compl. ¶ 119 ("[D]ue to Meta's deliberate design choices, the net result has been that young users are negatively affected by using Instagram compulsively."); *see also id.* at ¶ 423 ("[An internal] document concludes the 'average net effect' of Meta's Platforms on its users is 'slightly negative.'").

[45] Compl. ¶ 613 (discussing internal email in which Meta employee states "there is increasing scientific evidence (particularly in the US . . . ) that the average net effect of [Facebook] on people's well-being is slightly negative").

(challenged in *NetChoice, LLC v. Bonta*, No. 22-cv-08861, 2023 WL 6135551 (N.D. Cal. Sep. 18, 2023) (pending appeal)). Further, even if the legislature were silent on this issue, its "mere failure to prohibit an activity does not prevent a court from finding it unfair." *Cel-Tech*, 973 P.2d at 542. Here, as alleged, California's unfairness claim aligns with declared legislative policy and also meets the more applicable FTCA and *Sperry* factors.

**_Colorado_**: Contrary to Meta's claim, Colorado's Consumer Protection Act ("CCPA") has long recognized unfairness and unconscionability claims.[46] Colo. Rev. Stat. § 6-1-105(1)(rrr). The enumerated deceptive trade practices in the CCPA were intended to be in addition to, rather than exclusive of, the types of unfair trade practices actionable at common law or under other statutes. *See* Colo. Rev. Stat. § 6-1-105(3) (eff. 2007-2019); s*ee also Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001), *as modified on denial of reh'g* (Jan. 11, 2002) (citing *Sperry,* 405 U.S. at 240).

Colorado law does not define an "unfair" or "unconscionable" act or practice for the purposes of section 6-1-105(1)(rrr). But the factors articulated in *Sperry* and the FTC's more recent unfairness test set forth in 15 U.S.C. § 45(n) are instructive. *Klem,* 295 P.3d at 1186–87 (Washington law); *see also Hall v. Walter*, 969 P.2d 224, 233 (Colo. 1998) (using Washington law as a model). The Complaint satisfies the *Sperry* factors by alleging that Meta's business practices are within the penumbra of statutorily prohibited conduct by contravening COPPA's legislative purpose. Further, the States allege Meta's business practices are unscrupulous. *See, e.g.*, Compl. ¶¶ 68–84, 140–49, 304–08. And Meta's practices have caused substantial injury to youth in Colorado and nationwide. Even if the Court declines to apply the *Sperry* test, the Complaint's allegations meet the FTC's unfairness test for the reasons stated in Section IV.A.

**_Indiana_**: Meta's claim that Indiana courts "do not permit free-standing unfair practices claims under the Deceptive Consumer Sales Act" is false. MTD at 47. Effective July 1, 2014, the Indiana legislature expanded the scope of the State's law, to prohibit a supplier from committing

---

[46] Meta misconstrues the significance of *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 408 (E.D. Pa. 2010) and *In re New Motor Vehs. Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 180 (D. Me. 2004). Both cases, which were issued by out-of-state courts, predate the legislature's enactment of language leaving no doubts as to whether a claim based solely on unfair or unconscionable practices may proceed.

"an unfair, abusive, *or* deceptive act, omission, or practice." Ind. Code § 24-5-0.5-3(a) (emphasis added). The opinion Meta cites merely stated that the court would read the provision broadly; it did not discuss whether an "unfair act" could be brought without a corresponding deceptive act. *Crum v. SN Servicing Corp.*, No. 1:19-cv-02045, 2021 WL 3514153, at *2 (S.D. Ind. Aug. 10, 2021); *see also Horizon Bank v. Huizar*, 178 N.E.3d 326, 338 (Ind. Ct. App. 2021) ("Huizar's DCSA claim [of unfair and abusive acts] can stand independently of his failed FDCPA claim.").

**Kansas**: Although Meta argues none of the statutory examples identified in Kan. Stat. Ann. section 50-627 support a claim of unconscionability, MTD at 47, the Kansas Consumer Protection Act "shall be construed liberally to promote the . . . protect[ion of] consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. § 50-623(b). Section 50-627 does not exhaustively list unconscionable conduct. *Id.* § 50-627(b) ("[T]he court shall consider circumstances . . . such as, *but not limited to* the following . . . .") (emphasis added); *State ex rel. Stovall v. DVM Enters.,* 62 P.3d 653, 657 (Kan. 2003); *Wille v. Sw. Bell Tel. Co.*, 549 P.2d 903, 906–07 (Kan. 1976) (additional factors include "an overall imbalance in the obligations and rights imposed by the bargain"; "exploitation of the underprivileged, unsophisticated, uneducated and the illiterate"; and "inequality of bargaining or economic power"). But even if Section 50-627's list was exhaustive, Meta violated subsections b(1) and b(6) when it exploited young users and misrepresented the safety of its Platforms.

**Minnesota**: Minnesota courts' evaluation of unfairness and unconscionability is modeled after the "cigarette rule" standard used by the FTC before it was amended in 1994 to the current substantial unjustified injury test. Minn. Stat. §§ 325D.44, subdivs. 1(13) and 2(b); 325F.69, subdiv. 8. Meta inaccurately characterizes Minnesota's law as following the FTC's current unfairness standard. *See* S. Rep. No. 103-130, at 13 (1993). Minnesota's law is thus adequately addressed by Section IV.A.

**Missouri**: For the reasons articulated above in Section IV.A, Missouri clearly states a claim. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.020; *Sperry*, 405 U.S. at 243 (quoting *FTC v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 313 (1934)). Moreover, the States' Complaint clearly articulates

1    examples of Meta's conduct that is unethical, oppressive, or unscrupulous and presents a risk of, or

2    causes, substantial injury to consumers.[47]

3    **_New Jersey_**: Meta selectively quotes *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971) to

4    state that "unconscionability [under the New Jersey Consumer Fraud Act (NJCFA)] must be

5    equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and

6    the like." MTD at 48. But *Kugler*'s reference to "equated" does not mean that New Jersey cannot

7    bring both misrepresentation and unconscionability claims. Unconscionability under the NJCFA

8    "is an amorphous concept obviously designed to establish a broad business ethic," and should be

9    interpreted "liberally so as to effectuate the public purpose," and to ensure that "agreement[s]

10   ha[ve] resulted from real bargaining between parties who had freedom of choice and understanding

11   and ability to negotiate in a meaningful fashion." 279 A.2d at 651–52. Indeed, "the Legislature

12   intended to broaden the scope of responsibility for unfair business practices by stating in Section 2

13   that the use of any of the described practices is unlawful '*whether or not* any person (the consumer)

14   has in fact been *misled*, deceived or damaged thereby.'" *Id.* at 652 (emphasis added); *see also* N.J.

15   Stat. Ann. § 56:8-2.

16   **_Oregon_**: Meta claims that Oregon does not allege any conduct that is "remotely comparable

17   to the 'unconscionable tactics'" listed in Or. Rev. Stat. section 646.605(9). MTD at 49. But

18   "unconscionable tactics" pursuant to section 646.607(1) are not limited to the conduct enumerated

19   in section 646.605(9). *See Gordon v. Rosenblum*, 393 P.3d 1122, 1129–30 (Or. 2017). Even if they

20   were so limited, the States' Complaint adequately alleges that Meta encouraged and targeted

21   children and teens to use its Platforms, while simultaneously obfuscating from the public details

22   regarding the Platforms' dangers and harmful design choices.[48] Meta thus facilitated young users'

23   addiction and compulsive use and subverted young users' autonomy, constituting an

24   unconscionable tactic as defined by section 646.605(9)(a). *See* Or. Rev. Stat. § 646.605(9)(a)

25   ("[u]nconscionable tactics" include "[k]nowingly tak[ing] advantage of a customer's physical

26   infirmity, ignorance, illiteracy or inability to understand the language of the agreement").

27   [47] *See, e.g.,* Compl. ¶¶ 68–84, 140–49, 157–82, 304–28, 436–52.

28   [48] *See, e.g.,* Compl. ¶¶ 68–84, 140–49, 195–219, 304–08, 414–29.

Further, Meta's argument regarding "selling" or "disposing of" its Platforms fails for the reasons discussed below in Section V.

**V.    The States adequately plead conduct taking place in connection with trade and commerce and consumer transactions.**

The States plead conduct that took place in connection to trade and commerce and consumer transactions. Meta's argument to the contrary mischaracterizes the States' claims as solely focused on the downloading of an application. MTD at 53. Meta also does not meaningfully grapple with the particularities of each State's consumer protection laws, including how each State's courts interpret those statutes.

Despite courts' uniform consensus that consumer protection laws are to be construed broadly to protect consumers, *see supra* note 1, Meta espouses inappropriately narrow interpretations of "consumer transaction" and "trade or commerce," as those terms are used in those laws. *See* MTD at 49. "[T]he definition of trade or commerce focuses on the conduct of a business providing consumer goods, property or service rather than upon the occurrence of a specific transaction between the plaintiff and the defendant. . . . There is no requirement that consumer goods be sold or purchased." *Florists' Transworld Delivery, Inc. v. Fleurop-Interflora*, 261 F. Supp. 2d 837, 849 (E.D. Mich. 2003) (cleaned up). The term "trade and commerce" encompasses "acts done for the purpose of increasing profits." *Huynh*, 962 P.2d at 862. Meta's offering of a free application clearly occurs in the conduct of trade and commerce because that act forms an essential or primary element of its business model and revenue-generating activities. *Cf. McCann Real Equities Series XXII, LLC. v. David McDermott Chevrolet, Inc.*, 890 A.2d 140, 163–64 (Conn. App. Ct. 2006) (no violation for "activities that are incidental to an entity's primary trade or commerce"). Meta derives billions of dollars annually from its operation of the Platforms in accordance with the scheme described in the Complaint. Compl. ¶ 29.

Moreover, a "consumer transaction" does not require a transfer of money. *Williams v. Edwards*, 717 N.E.2d 368, 373 (Ohio Ct. App. 1998) ("[T]he fact that no money changed hands has no bearing on the applicability of the [Consumer Sales Practices Act] . . . ."). Here, the relevant bargained-for exchange is consumers' personal data rather than dollars, a proposition that courts

43

have increasingly accepted in the modern era, in which technology companies frequently derive their profits from the monetization of consumer data. *See, e.g., Brown v. Google LLC,* No. 20-CV-03664-LHK, 2021 WL 6064009, at *17 (N.D. Cal. Dec. 22, 2021); *State v. Google LLC*, No. CV 2020-006219, 2022 WL 223907, at *13–14 (Ariz. Super. Ct. Jan. 21, 2022). Meta's own valuation of user data also demonstrates that it views consumers' exchange of personal data for its "free" services as a quid pro quo, *see, e.g.*, Compl. ¶¶ 46–47, 84, further supporting the conclusion that this kind of exchange is indeed for "valuable consideration," as Meta concedes is the relevant criterion. MTD at 53 n.55.

Even acts done to *encourage* consumer transactions are sufficient in some States. *See, e.g.,* Ga. Code Ann. § 10-1-392(a)(7). Meta's argument regarding Georgia's Fair Business Practices Act ignores both this broad definition of "consumer acts and practices" in the statute and the fact that users can purchase goods and services through Meta's Platforms via Instagram Shopping. *See* Compl. ¶ 49. More generally, consumers' provision of data to Meta in exchange for access to its Platforms—so that Meta can show multitudes of effectively targeted advertisements and sponsored posts to those consumers for goods and services—is, in itself, a consumer transaction, and also makes additional consumer transactions more likely; otherwise, sellers would not pay for the advertisements.[49]

Meta also misunderstands the core of the States' Complaint by focusing solely on the downloading of its Platforms. The States put forth numerous contentions regarding conduct that occurred before and after any such download: the continued consumer use of Meta's Platforms; Meta's collection and monetization of consumer data in exchange for the offer and sale of advertising space; and many other unfair and deceptive acts done in order to increase profits. These claims involve conduct occurring in trade or commerce or in the context of ongoing consumer transactions.

Finally, Meta's reliance on *Indiana v. TikTok, Inc.* is misplaced. This state trial court opinion is out of step with the weight of authority, as discussed above, and, in any case, is not

---

[49] Compl. ¶¶ 3, 47–49, 51, 54, 57–60, 82–83, 173.

determinative for States with different statutory language. *See* MTD Ex. A, Order Granting Defendants' Motion to Dismiss, Case No. 02D02-2212-PL-400 (Allen Super. Ct. Nov. 29, 2023) (hereinafter "Indiana Order").[50] Further, the court erred, as a matter of Indiana law, in imposing an extratextual requirement for a consumer to have exchanged money for use of a social media application, in order for that exchange to qualify as a "consumer transaction." Indiana Order at 14. Indiana's Deceptive Consumer Sales Act contains no such requirement, and Meta either "sells" or "disposes of" access to its Platforms to consumers for consideration (in the form of valuable personal data), as required by the statute. Ind. Code § 24-5-0.5-2(a). The court's interpretation of Indiana's consumer protection law was inappropriately narrow, particularly in view of the modern reality that technology companies such as Meta derive their profits in large part from monetizing consumer data, and its reasoning should not be adopted here.

## VI.    The States are entitled to restitution.

Meta moves to dismiss certain States' claims for restitution by arguing that these States must allege loss of "money or property" and have failed to do so. MTD at 54–56.[51] Not only is this false, but many of the cited State laws are not so limiting.

The States allege that Meta profited at the direct expense of consumers by selling "Meta Verified" subscriptions for $11.99 or $14.99 in exchange for features including "increased visibility and support." Compl. ¶ 52. Children who, as a consequence of Meta's deception and their addiction, pay Meta to use these services are entitled to the return of this money. On this basis alone, Meta's request should be denied.

Additionally, restitution is not as limited as Meta suggests. It is a flexible remedy, permitting not only the restoration of a harmed party but also divestiture of a wrongdoer's gains. *See* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. A (2011). Meta characterizes many of the State laws too narrowly—even where the statutes are required to be

---

[50] This matter is currently on appeal before the Indiana Court of Appeals. *See State v. TikTok, Inc.*, No. 23A-PL-03110.

[51] Meta also incorrectly cites to *In re Tobacco II Cases* for this proposition: the case does not include the stated quotation. *See In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009).

interpreted broadly in order to protect consumers[52]—and excludes allegations supporting

additional kinds of restitution. Meta also selectively quotes around, or simply ignores, statutory

language showing restitution may cover more than just the pecuniary value consumers provided

to Meta.[53]

The Complaint includes a number of allegations that could justify restitution under State

laws. The States allege, for example, that Meta obtained and monetized user data and time spent

on its Platforms as part of and in furtherance of its unlawful scheme involving youth. Compl.

¶¶ 8, 58–59, 63, 632. Various State laws permit restitution for Meta's total profits from its

wrongdoing, which would apply to Meta's revenue from advertising towards children harmed by

its conduct.[54] Additionally, it has been held under various State laws that user data, or other non-

pecuniary interests, may be appropriate for restitution.[55] Meta's one-size-fits-all analysis is

inappropriate given the breadth of State law in this area.

Where Meta does assess States individually, it misunderstands the laws. MTD at 55–56

n.57. The Delaware Deceptive Trade Practices Act expressly authorizes its Attorney General

through her delegate to seek restitution in this context. Del. Code Ann. tit. 29, §§ 2520(a)(5),

---

[52] *See supra* note 1.

[53] *See* Colorado (Colo. Rev. Stat. § 6-1-110(1), which Meta quotes without comment, does not suggest it is limited to loss of money or property); Delaware (Del Code Ann. tit. 29 § 2520(a)(5), (9) providing broader restitution powers); New York (citing only to N.Y. Gen. Bus. Law § 349, despite N.Y. Exec. Law § 63(12) including unqualified restitution authority); North Dakota (ignoring that under N.D. Cent. Code § 51-15-07, "the court may make an order or judgment as may be necessary to prevent the use or employment by a person of any unlawful practices"); Pennsylvania (*Commonwealth. v. TAP Pharm. Prods., Inc.*, 885 A.2d 1127, 1139 (Pa. Commw. Ct. 2005) (no requirement that "the damages sought arise from payments made directly to a defendant")); Rhode Island (R.I. Gen. Laws § 6-13.1-5(a) provides for "any . . . other relief that may be appropriate").

[54] Minnesota (*State v. Minn. Sch. of Bus., Inc.*, 935 N.W.2d 124, 139 (Minn. 2019) (restitution "aimed as much (or more) at preventing the wrongdoer from profiting from its misdeeds as it is to make the injured party whole")); Illinois (*People v. Lann*, 587 N.E.2d 521, 524 (Ill. App. Ct. 1992) ("Although restitution may benefit aggrieved consumers, the remedy flows from the basic policy that those who engage in proscribed conduct or practices surrender all profits flowing therefrom.")); Kentucky (*Haeberle v. St. Paul & Marine Ins. Co.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989)).

[55] California (*Brown v. Google LLC*, No. 20-CV-03664-LHK, 2021 WL 6064009, at *18 (N.D. Cal. Dec. 22, 2021)); Virginia (Va. Code § 59.1-205 (providing restitution for intangible property)); Michigan (*Avery v. Indus. Mortg. Co.*, 135 F. Supp. 2d 840, 845 (W.D. Mich. 2001) ("losses" under relevant statute do not need to be monetary in nature)).

1    2522(a). And Minnesota's Supreme Court has noted that, where the Attorney General is enforcing

2    under *parens patriae* authority, as he is here, restitution may be an appropriate remedy. *See*

3    Compl. Count XXV; *Minn. Sch. of Bus., Inc.*, 935 N.W.2d at 133.

4        These States adequately allege that they are entitled to restitution from Meta. Dismissing

5    an individual remedy at this stage of the proceeding is inappropriate and premature. *See, e.g.,*

6    *Clark v. Prudential Ins. Co.*, 736 F. Supp. 902, 926–27 (D.N.J. 2010) (determining availability

7    of restitution was "premature" on a motion to dismiss). Meta's argument, limited to quotations of

8    the text of over 20 different State laws, each with different common law, ignores these allegations

9    and does not accurately or meaningfully discuss the laws of *any* State. It should not be given any

10   weight.

11   **VII.  The Middle District of Florida has personal jurisdiction over Meta Platforms,
         Inc. and Instagram, LLC.**

12       Meta's[56] motion to dismiss the Florida claims for lack of personal jurisdiction must be

13   denied because the Florida district court has personal jurisdiction over Meta stemming from

14   Florida's claim for relief under COPPA, 15 U.S.C. § 6502(a). COPPA authorizes nationwide

15   service of process, thereby providing the basis for personal jurisdiction by the Florida district court.

16   15 U.S.C. § 6504(e)(2);[57] *see Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d

17   935, 942 (11th Cir. 1997) (RICO); *New Mexico v. Tiny Lab Prods.*, 448 F. Supp. 3d 1263, 1268

18   (D.N.M. 2020) (COPPA).

19

20       In the Eleventh Circuit personal jurisdiction exists when a federal statute authorizes

21   nationwide service of process.[58] In *BCCI Holdings*, the Eleventh Circuit found personal jurisdiction

22   where a RICO claim was brought in the Southern District of Florida against U.S. banks with

23   principal places of business outside of Florida. 119 F.3d at 948. The Court applied a two-part

24   ---

24   [56] References to "Meta" and "the Meta Defendants" in Section VII refer to Meta Platforms, Inc.
     and Instagram, LLC.

25

26   [57] 15 U.S.C. § 6504 (e)(2) states: "Service of Process. In an action brought under subsection (a),
     Process may be served in any district in which the defendant—(A) is an inhabitant; or (B) may be
27   found."

28   [58] This Court, as the MDL transferee court, should apply the law of the transferor forum. *See Van
     Dusen v. Barrak*, 376 U.S. 612, 639–40 (1964).

1  analysis to examine personal jurisdiction: (1) does the applicable statute potentially confer

2  jurisdiction over the defendant, and (2) does the exercise of jurisdiction comport with due process

3  under the Fifth Amendment. *Id.* at 942. The Eleventh Circuit found personal jurisdiction because

4  the RICO statute provides for service in any judicial circuit in which the defendant is found and the

5  defendants are domestic corporations doing business in the United States. *See id.; Koch v Royal*

6  *Wine Merchs., Ltd.*, 847 F. Supp. 2d 1370, 1374–75 (S.D. Fla. 2012).

7         With similar language to RICO, COPPA provides for service of process in any district

8  where the defendant may be found, which authorizes nationwide service of process, thereby

9  satisfying the first prong of the test for personal jurisdiction. 15 U.S.C. §§ 6504(a)(1), 6504(e)(2);

10  *BCCI Holdings*, 119 F.3d at 942; *Tiny Lab*, 448 F. Supp. 3d at 1269 (applying the *BCCI Holdings*

11  analysis to a claim under COPPA). The second prong requires the court to consider limits imposed

12  on federal courts under the Fifth Amendment. *BCCI Holdings*, 119 F.3d at 942. The Court should

13  examine Meta's "aggregate contacts with the nation as a whole rather than [its] contacts with the

14  forum state." *Id.* at 947. It is Meta's burden to show that its liberty interests have been infringed

15  and litigation in Florida would be "so gravely difficult and inconvenient" that it will be at a "severe

16  disadvantage."[59] *Id.* at 948; *Koch*, 847 F. Supp. 2d at 1375. Only in "highly unusual cases" will the

17  inconvenience to the defendant preclude the exercise of the court's jurisdiction based on a statutory

18  right to nationwide service of process. *BCCI Holdings*, 119 F.3d at 947; *Tiny Lab*, 448 F. Supp. 3d

19  at 1271. The Meta Defendants are global corporations servicing "[h]undreds of millions of people"

20  throughout the United States. MTD at 4. Thus, even if Meta does not have sufficiently significant

21  contacts with Florida to establish long arm jurisdiction under state law,[60] Meta's aggregate contacts

---

[59] Only if a defendant has established that his liberty interests have been infringed will a court engage in balancing the burdens imposed on the individual defendant against the federal interest involved in the litigation. *BCCI Holdings*, 119 F.3d at 946. While this Court need not engage in a balancing of interests because the Meta Defendants fail to show or even allege constitutionally significant inconvenience, the following factors from *BCCI Holdings* all weigh in favor of litigating in the Middle District of Florida: the federal interest in protecting the privacy of children advanced by COPPA, the relationship between nationwide service of process and the advancement of COPPA's policies, and the connection between jurisdiction in Florida and Florida's vindication of the federal rights afforded by COPPA. *Id.* at 947–48.

[60] See *Execu-Tech Bus. Sys., Inc. v. New Oji Paper Co. Ltd.*, 752 So. 2d 582, 584 (Fla. 2000) (personal jurisdiction found under Florida's long-arm statute over Japanese company who only

1   within the United States and its far-reaching activities beyond the borders of its resident state clearly

2   establish that appearing in the third-most populous state would not be a constitutionally significant

3   inconvenience to Meta. *See, e.g.*, *Tiny Lab*, 448 F. Supp. 3d at 1272 (finding exercise of jurisdiction

4   is constitutional where defendants' activities affecting children reach all 50 states and have a

5   significant impact beyond California).[61]

6       Where a statute provides for nationwide service of process, as here, personal jurisdiction

7   over pendent state claims exists, even if personal jurisdiction would not be available for these

8   claims under the long-arm statute, provided that the state claims and statutory claim are derived

9   from a common nucleus of operative facts. *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049,

10  1056 (2d Cir. 1993) (citing *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)); *Koch*, 847

11  F. Supp. 2d at 1378. As Florida's COPPA and Florida Deceptive and Unfair Trade Practices Act

12  ("FDUTPA") claims arise "out of the same nucleus of operative fact," the Florida district court may

13  assert personal jurisdiction over Meta for the FDUTPA claim even if personal jurisdiction is not

14  otherwise available. *Koch*, 847 F. Supp. 2d at 1378.

15      Personal jurisdiction in Florida exists under the COPPA nationwide service of process

16  analysis even though the Florida Complaint does not allege this basis for personal jurisdiction. *See,*

17  *e.g.*, *id.* at 1374 (applying the RICO nationwide service of process analysis even when both parties

18  limited their discussion to Florida's long-arm statute); *see also Tiny Lab,* 448 F. Supp. 3d at 1267

19  (finding that COPPA's basis for personal jurisdiction exists despite the state's failure to allege the

20  statutory basis for personal jurisdiction). A plaintiff is entitled to take advantage of the federal

21  statute's nationwide service of process provision provided that the asserted federal claim is "not

22  wholly immaterial or insubstantial." *BCCI Holdings*, 119 F.3d at 942; *IUE AFL-CIO*, 9 F.3d at

23

24  ---

made foreign sales and had no offices or sales in Florida, but who committed tortious acts violative
of Florida's Deceptive and Unfair Trade Practices Act against the national market, of which Florida
was included).

25

26  [61] In fact, Meta acknowledged the convenience of litigating in the Middle District of Florida by
naming the Middle District as a potential district for centralizing this multidistrict litigation. *In*
27  *Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, N.D. Cal.
MDL No. 3047, ECF 1 (Oct. 5, 2022)

28

49

1056–57. As Meta fails to argue, much less establish, that Florida's COPPA claim is "wholly immaterial or insubstantial," Florida is entitled to rely on COPPA's statutory provision for personal jurisdiction and does not need to satisfy Florida's long-arm statute.

### CONCLUSION

For the foregoing reasons, the Court should deny Meta's Motion to Dismiss the Multistate Attorneys General Complaint and the Florida Attorney General Complaint.

50

Dated:  February 5, 2024                    Respectfully submitted,

**KRISTIN K. MAYES**                        **ROB BONTA**
Attorney General                            Attorney General
State of Arizona                            State of California

*/s/ Laura Dilweg*                          */s/ Megan O'Neill*
Laura Dilweg (AZ No. 036066 CA No. 260663)  Nicklas A. Akers (CA SBN 211222)
Consumer Protection Section Chief Counsel    Senior Assistant Attorney General
Nathan Whelihan (AZ No. 037560),            Bernard Eskandari (CA SBN 244395)
*pro hac vice*                              Supervising Deputy Attorney General
Assistant Attorney General                  Megan O'Neill (CA SBN 343535)
Arizona Attorney General's Office           Joshua Olszewski-Jubelirer
2005 North Central Avenue                   (CA SBN 336428)
Phoenix, AZ 85004                           Marissa Roy (CA SBN 318773)
Phone: (602) 542-3725                       Deputy Attorneys General
Fax:   (602) 542-4377                       California Department of Justice
Laura.Dilweg@azag.gov                       Office of the Attorney General
Nathan.Whelihan@azag.gov                    455 Golden Gate Ave., Suite 11000
                                            San Francisco, CA 94102-7004
*Attorneys for Plaintiff State of Arizona, ex rel.*   Phone: (415) 510-4400
*Kristin K. Mayes, Attorney General*        Fax: (415) 703-5480
                                            megan.oneill@doj.ca.gov

**PHILIP J. WEISER**                        *Attorneys for Plaintiff the People of the State*
Attorney General                           *of California*
State of Colorado

*/s/ Bianca E. Miyata*
Bianca E. Miyata (CO Reg. No. 42012),
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey (CO Reg. No. 45773)
First Assistant Attorney General
Megan Paris Rundlet (CO Reg. No. 27474)
Senior Assistant Solicitor General
Elizabeth Orem (CO Reg. No. 58309)
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

States' Opposition to Meta's Motion to Dismiss (4:23-cv-05448; 4:23-cv-05885)

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Ashley H. Meskill
(CT Juris No. 444377), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov
Ashley.Meskill@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Dashiell Raj Radosti*
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk, *pro hac vice*
Director of Consumer Protection
Dashiell Radosti (DE Bar 7100*)*, *pro hac vice*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Dashiell.Radosti@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**ASHLEY MOODY**
Attorney General
State of Florida

*/s/ Victoria Ann Butler*
Victoria Ann Butler (FL Bar No. 861250),
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Telephone: (813) 287-7950
Victoria.butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3861
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Donna.valin@myfloridalegal.com

Karen E. Berger (FL Bar No. 72991)
*pro hac vice*
Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600
Karen.berger@myfloridalegal.com

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

**CHRISTOPHER M. CARR**
Attorney General
State of Georgia

*/s/ Melissa M. Devine*
Melissa M. Devine (GA Bar No. 403670),
*pro hac vice*
Assistant Attorney General
Office of the Attorney General of the State of
Georgia
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334
Phone: (404) 458-3765
Fax: (404) 651-9108
mdevine@law.ga.gov

*Attorneys for Plaintiff State of Georgia*

**ANNE E. LOPEZ**
Attorney General
State of Hawaiʻi

*/s/ Christopher T. Han*
Bryan C. Yee (HI JD No. 4050),
*pro hac vice*
Supervising Deputy Attorney General
Christopher T. Han (HI JD No. 11311),
*pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawaiʻi 96813
Phone: (808) 586-1180
Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**RAÚL R. LABRADOR**
Attorney General
State of Idaho

By:     */s/ Nathan Nielson*
Nathan H. Nielson (ID Bar No. 9234),
Stephanie N. Guyon (ID Bar No. 5989)
pro hac vice
Deputy Attorneys General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
nathan.nielson@ag.idaho.gov
stephanie.guyon@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

53

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Daniel Edelstein*
Susan Ellis, Chief, Consumer Protection Division (IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud Bureau (IL Bar No. 6306019)
Daniel Edelstein, Supervising Attorney, Consumer Fraud Bureau (IL Bar No. 6328692), *pro hac vice*
Kevin Whelan, Supervising Attorney, Consumer Fraud Bureau (IL Bar No. 6321715), *pro hac vice*
Matthew Davies, Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6299608), *pro hac vice*
Adam Sokol, Senior Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6216883)
Emily María Migliore, Assistant Attorney General, Consumer Fraud Bureau (IL Bar No. 6336392)
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Daniel.Edelstein@ilag.gov
Kevin.Whelan@ilag.gov
Adam.Sokol@ilag.gov
Emily.Migliore@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82), *pro hac vice*
Chief Counsel and Director of Consumer Protection
Corinne Gilchrist (IN Atty No. 27115-53), *pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49), *pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/   Sarah M. Dietz*
Sarah M. Dietz
(KS Bar No. 27457), *pro hac vice*
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
Email: sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

54

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

/s/ *J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice app. forthcoming*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**LIZ MURRILL**
Attorney General
State of Louisiana

/s/ *Arham Mughal*
Arham Mughal (LA Bar No. 38354),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
MughalA@ag.louisiana.gov
StyronL@ag.louisiana.gov

*Attorneys for State of Louisiana*


**AARON M. FREY**
Attorney General
State of Maine

/s/ *Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Laura Lee Barry Wommack, Maine Bar No. 10110, *pro hac vice*
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov
lauralee.barrywommack@maine.gov

*Attorneys for Plaintiff State of Maine*

55

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No.
9012190379), *pro hac vice*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No.
1112090003), *pro hac vice*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney
General of Maryland*


**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ James Van Buskirk*
James Van Buskirk (MN Bar No. 0392513),
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 757-1150
james.vanbuskirk@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its
Attorney General, Keith Ellison*


**ANDREW BAILEY**
Attorney General
State of Missouri

By: */s/ Michael Schwalbert*
Michael Schwalbert, *pro hac vice*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.
Andrew Bailey, Attorney General*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Colin P. Snider*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-2682
Email: colin.snider@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008), *pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017), *pro hac vices*
Assistant Section Chief, Deputy Attorney General
Gina F. Pittore (NJ Bar No. 323552019), *pro hac vice*
Verna J. Pradaxay (NJ Bar No. 335822021), *pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021), *pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Gina.Pittore@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs State of New Jersey and the New Jersey Division of Consumer Affairs*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State of New York*

57

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

*/s/ Kevin Anderson*
Kevin Anderson (N.C. Bar No. 22635),
*pro hac vice*
Senior Counsel
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine S. McGhee
Senior Deputy Attorney General
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**DREW H. WRIGLEY**
Attorney General
State of North Dakota

By: */s/ Elin S. Alm*
Elin S. Alm, *pro hac vice*
(ND Bar No. 05924)
Assistant Attorney General
Christopher G. Lindblad, *pro hac vice*
(ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov
clindblad@nd.gov

*Attorneys for Plaintiff State of North Dakota, ex rel.
Drew H. Wrigley, Attorney General*

**DAVE YOST**
Attorney General
State of Ohio

*/s/ Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney
General Dave Yost*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

*/s/ Jordan M. Roberts*
Jordan M. Roberts (Oregon Bar No. 115010),
*pro hac vice*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:     (971) 673-1880
Facsimile:     (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen
F. Rosenblum, Attorney General for the
State of Oregon*

58

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Timothy R. Murphy*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

__*/s/ Stephen N. Provazza*_____
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Clark C. Kirkland, Jr. (CA SBN 272522)
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South
Carolina, ex rel. Alan M. Wilson, in His
Official Capacity as Attorney General of the
State of South Carolina*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Jessica M. LaMie*
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**PATRICK MORRISEY**

59

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Section
Chief
Joelle E. Gotwals (VSB No. 76779),
*pro hac vice*
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:      (804) 786-8789
Facsimile:      (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of*
*Virginia ex rel. Jason S. Miyares, Attorney General*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Joseph Kanada*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Joe.Kanada@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ R. Duane Harlow*
R. Duane Harlow
Assistant Attorney General
WI State Bar #1025622, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-2950
harlowrd@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*