Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.,*
*Instagram, LLC, Meta Payments, Inc.,*
*Meta Platforms Technologies, LLC, Facebook*
*Payments, Inc., Siculus, Inc., Facebook*
*Operations, LLC, and Mark Elliot Zuckerberg*

*Additional parties and counsel listed on*
*signature pages*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR-PHK<br><br>Honorable Yvonne Gonzalez Rogers<br><br>**DEFENDANTS' MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT**<br><br>**<u>Hearing:</u>**<br>Date:    TBD<br>Time:    TBD<br>Place:   Oakland, California<br>Judge:  Hon. Yvonne Gonzalez Rogers |

1

## NOTICE OF MOTION AND MOTION

2    PLEASE TAKE NOTICE THAT, at a hearing date and time to be determined in accordance with

3    the Court's Case Management Order No. 6 (4:22-md-3047, Dkt. No. 451), before the Honorable Yvonne

4    Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of

5    California, located at 1301 Clay Street in Oakland, California, Defendants Meta Platforms, Inc. f/k/a

6    Facebook, Inc., Facebook Holdings, LLC, Facebook Operations, LLC, Facebook Payments, Inc.,

7    Facebook Technologies, LLC, Instagram, LLC, Siculus, Inc., and Mark Elliot Zuckerberg; TikTok Inc.,

8    ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC; Snap Inc.; and YouTube, LLC, Google

9    LLC, and Alphabet Inc. (each a "Defendant," and collectively the "Defendants"), will and hereby do move

10    under Federal Rule of Civil Procedure 12(b)(6) for an order dismissing with prejudice the School District

11    and Local Government Entity Plaintiffs' Master Complaint (Dkt. 504) in its entirety.

12    This Motion is based on the Memorandum of Points and Authorities submitted herewith, any Reply

13    Memorandum or other papers submitted in connection with the Motion, the School District and Local

14    Government Entity Plaintiffs' Master Complaint filed in this action, any matter of which this Court may

15    properly take judicial notice, and any information presented at argument.

16

17    DATED:      February 5, 2024        By:   */s/ Phyllis A. Jones*

18                                               Phyllis A. Jones

19

20                                               *Attorney for Defendants Meta Platforms,*
                                                 *Inc., Instagram, LLC, Meta Payments, Inc.,*
21                                               *Meta Platforms Technologies, LLC,*
                                                 *Facebook Payments, Inc., Siculus, Inc.,*
22                                               *Facebook Operations, LLC, and Mark*
                                                 *Elliot Zuckerberg*
23

24                                                *Additional counsel listed on*
                                                 *signature pages*
25

26

27

28

# **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ................................................................................. 1

II.    BACKGROUND ................................................................................... 3

III.   ARGUMENT ........................................................................................ 5

     A.    The School Districts' Negligence and Nuisance Claims Fail for Several Threshold Reasons.................................................................................................... 5

        1.    Section 230 Bars the School Districts' Claims. ........................................ 5

        2.    The First Amendment Bars the School Districts' Claims. .......................16

        3.    The School Districts' Claims Are Barred by the Derivative Injury Rule..20

        4.    The School Districts' Claims Fail Because They Do Not Adequately Allege Proximate Causation....................................................................................25

     B.    The School Districts Fail To State a Claim for Public Nuisance. ........................30

        1.    The School Districts' Sweeping Theory of Public Nuisance Represents an Unwarranted Expansion of a Traditionally Limited Common-Law Tort. ............................................................................................................30

     C.    The School Districts Have Not Alleged Interference with a Public Right............37

        1.    The School Districts Allege, at Most, Interference with Private Rights. ..38

        2.    Defendants' Services Do Not Equally Affect the Rights of All Members of the Community. ..................................................................................42

     D.    The School Districts Have Not Adequately Alleged "Special Injury."................44

        1.    The School Districts are not claiming injury as a result of their exercise of a public right that belongs to them.....................................................45

        2.    The School Districts' alleged injuries are not different in kind from those allegedly suffered by other members of the public. ........................46

     E.    The School Districts' Negligence Claim Fails as a Matter of Law. ....................47

        1.    The School Districts Fail to Allege a Cognizable Legal Duty.................47

        2.    The Economic Loss Doctrine Separately Bars the School Districts' Negligence Claims....................................................................................57

IV.   CONCLUSION ....................................................................................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abad v. G4S Secure Sols. (USA), Inc.*,
   293 So. 3d 26 (Fla. 4th DCA 2020) ...................................................................55

*ACLU v. Johnson*,
   4 F. Supp. 2d 1029 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999) ...........................18

*ACLU v. Mukasey*,
   534 F.3d 181 (3d Cir. 2008) .........................................................................18

*Adkins v. Thomas Solvent Co.*,
   487 N.W.2d 715 (Mich. 1992)........................................................................40

*Allegheny Gen. Hosp. v. Philip Morris, Inc.*,
   228 F.3d 429 (3d Cir. 2000) .........................................................................46

*Anchorage v. Integrated Concepts & Res. Corp.*,
   2015 WL 926219 (D. Alaska Mar. 4, 2015)............................................................57

*Anderson v. TikTok, Inc.*,
   637 F. Supp. 3d 276 (E.D. Pa. 2022)..................................................................16

*Arias v. Dyncorp*,
   738 F. Supp. 2d 46 (D.D.C. 2010), *aff'd*, 752 F.3d 1011 (D.C. Cir. 2014) ...........................21

*Arriaga v. New England Gas Co.*,
   483 F. Supp. 2d 177 (D.R.I. 2007).....................................................................46

*Ashburn v. Anne Arundel Cty.*,
   510 A.2d 1078 (Md. 1986) ...........................................................................52

*Ashley Cnty., Ark. v. Pfizer, Inc.*,
   552 F.3d 659 (8th Cir. 2009) .........................................................................25

*Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.*,
   241 F.3d 696 (9th Cir. 2001) ...................................................................*passim*

*Atl. Richfield Co. v. Cnty. of Montgomery*,
   294 A.3d 1274 (Pa. Commw. Ct. 2023)................................................................26

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009) ......................................................................6, 8

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003) .......................................................................14

*Bennett v. Spear*,
   520 U.S. 154 (1997) ...................................................................................22

*Bill v. Super. Ct.*,
   137 Cal. App. 3d 1002 (1982) .............................................................. 49, 57

*In re Boeing 737 MAX Pilots Litig.*,
   638 F. Supp. 3d 838 (N.D. Ill. 2022)................................................... 57, 58

*Boynton v. Burglass*,
   590 So. 2d 446 (Fla. 3d DCA 1991) ................................................ 48, 49, 50

*Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co.*,
   226 F. Supp. 2d 557 (D.N.J. 2002) ...........................................................58

*Bride v. Snap Inc.*,
   2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ......................................... 9, 16

*Brown v. City of Valparaiso*,
   67 N.E.3d 652 (Ind. Ct. App. 2016).........................................................40

*Brown v. Ent. Merchs. Ass'n*,
   564 U.S. 786 (2011) ...................................................................................18

*Brown v. USA Taekwondo*,
   11 Cal. 5th 204 (2021)........................................................................ 48, 49

*Bryant v. Atl. Car Rental, Inc.*,
   127 So.2d 910 (Fla. 2d DCA 1961) ..........................................................27

*Buckley v. Alkasmikha*,
   2001 WL 637452 (Mich. Ct. App. May 25, 2001) ............................................25

*Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.*,
   273 F.3d 536 (3rd Cir. 2001) .....................................................................34

*Carden v. Gen. Motors Corp.*,
   509 F.3d 227 (5th Cir. 2007) ....................................................................16

*Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*,
   753 S.E.2d 846 (S.C. 2014) .......................................................................44

*In re Certified Question*,
   740 N.W.2d 206 (Mich. 2007).................................................................55

*Cincinnati v. Beretta USA Corp.*,
   768 N.E.2d 1136 (Ohio 2002).................................................................34

*City & Cnty. of San Francisco v. Philip Morris, Inc.*,
   957 F. Supp. 1130 (N.D. Cal. 1997) ........................................................20

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
    491 F. Supp. 3d 610 (N.D. Cal. 2020)..................................................................35

*City of Arcadia v. Dow Chem. Co.*,
    No. CV 18-10139-MWF, 2021 WL 3206806 (C.D. Cal. Apr. 13, 2021) .............................41

*City of Chicago v. Beretta U.S.A. Corp.*,
    821 N.E.2d 1099 (Ill. 2004)..............................................................................*passim*

*City of College Park v. 2600 Camp Creek, LLC*,
    666 S.E.2d 607 (Ga. Ct. App. 2008) ..............................................................40

*City of Huntington v. AmerisourceBergen Drug Corp.*,
    609 F. Supp. 3d 408 (S.D.W. Va. 2022) ......................................................32, 34

*City of Modesto Redevelopment Agency v. Superior Ct.*,
    119 Cal. App. 4th 28 (2004) ..........................................................................34, 41

*City of Perry v. Procter & Gamble Co.*,
    188 F. Supp. 3d 276 (S.D.N.Y. 2016) ..............................................................32

*City of Philadelphia v. Beretta U.S.A., Corp.*,
    126 F. Supp. 2d 882 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002) ......................32, 34

*City of Philadelphia v. Beretta U.S.A. Corp.*,
    277 F.3d 415 (3d Cir. 2002) ..........................................................21, 22, 23, 33

*City of San Diego v. U.S. Gypsum Co.*,
    30 Cal. App. 4th 575 (1994) ..........................................................................34, 41

*Cnty. of Cook v. Philip Morris, Inc.*,
    817 N.E.2d 1039 (Ill. Ct. App. 2004)..............................................................21

*Cnty. of York v. Tracy*,
    558 N.W.2d 815 (Neb. 1996)..........................................................................40

*Cohen v. Facebook, Inc.*,
    252 F. Supp. 3d 140 (E.D.N.Y. 2017)..............................................................6

*Com. Bank/Penn. v. 1st Union Nat'l Bank*,
    911 A.2d 133 (Pa. Super. Ct. 2006) ..............................................................52, 53

*Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*,
    853 S.E.2d 698 (N.C. 2021)..........................................................................41, 44

*Commonwealth v. S. Covington & C. St. Ry. Co.*,
    205 S.W. 581 (Ky. 1918)..............................................................................25

*Coyne v. Am. Tobacco Co.*,
    183 F.3d 488 (6th Cir. 1999) ........................................................................21, 22

*Crawford v. Deutsche Bank AG*,
    244 F. Supp. 2d 615 (E.D. Va. 2003) ................................................................................ 58

*Crosby v. Twitter, Inc.*,
    921 F.3d 617 (6th Cir. 2019) ......................................................................................... 29

*Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C.*,
    929 F. Supp. 2d 460 (W.D. Pa. 2013) ............................................................................. 58

*D'Ambra v. Peak Bldg. Corp.*,
    680 A.2d 939 (R.I. 1996) ................................................................................................ 27

*Dangaard v. Instagram, LLC*,
    2022 WL 17342198 (N.D. Cal. Nov. 30, 2022) ............................................................... 5

*Daniel v. Armslist, LLC*,
    926 N.W.2d 720 (Wis. 2019) .......................................................................................... 7

*Dart v. Craigslist, Inc.*,
    665 F. Supp. 2d 961 (N.D. Ill. 2009) ............................................................................ 7, 8

*Davidson v. Apple, Inc.*,
    2017 WL 3149305 (N.D. Cal. July 25, 2017) ............................................................. 2, 31

*DeFilippo v. Nat'l Broad. Co., Inc.*,
    1980 WL 336092 (R.I. Super. Ct. June 8, 1980) ............................................................ 57

*Delfino v. Agilent Techs., Inc.*,
    145 Cal. App. 4th 790 (2006) ........................................................................................ 57

*State ex rel. Dema Realty Co. v. McDonald*,
    121 So. 613 (La. 1929) (La. 1929) ................................................................................ 40

*Detroit Bd. of Educ. v. Celotex Corp.*,
    196 Mich. App. 694 (1992) ............................................................................................ 32

*Detroit Bd. of Educ. v. Celotex Corp.*,
    493 N.W.2d 513 (Mich. Ct. App. 1992) ......................................................................... 34

*Doe II v. MySpace Inc.*,
    175 Cal. App. 4th 561 (2009) ..................................................................................... 8, 12

*Doe v. MySpace, Inc.*,
    528 F.3d 413 (5th Cir. 2008) ........................................................................................... 8

*Doe v. Snap, Inc.*,
    2022 WL 2528615 (S.D. Tex. July 7, 2022), *aff'd*, 2023 WL 4174061 (5th Cir. June
    26, 2023) ............................................................................................................. 8, 13, 14

*Dunn Bus Serv. v. McKinley*,
    178 So. 865 (Fla. 1937) ............................................................................................26

*Duquesne Light Co. v. Pa. Am. Water Co.*,
    850 A.2d 701 (Pa. Super. Ct. 2004) ............................................................ 37, 40, 45

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ............................................................. 5, 11, 14, 50

*E. Me. Med. Ctr., et al v. Teva Pharma. USA, Inc., et al.*,
    Case No. BCD-CIV-2022-00025 ..................................................................46

*Engert v. Stanislaus Cnty.*,
    2015 WL 3609315 (E.D. Cal. June 8, 2015) ............................................................31

*Estrella v. Brandt*,
    682 F.2d 814 (9th Cir. 1982) ............................................................................41

*Everett v. Carter*,
    490 So.2d 193 (Fla. Dist. Ct. App. 1986) ............................................................29

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021) ............................................................................16

*Fair Housing Council of San Fernando Valley v. Roommates.Com*,
    521 F.3d 1157 (9th Cir. 2008) ............................................................................14

*Fayetteville Ark. Hosp. Co., LLC, et al. v. Amneal Pharma., LLC, et al.*,
    Case No. 72CV-20-156 ..................................................................47

*Fields v. Twitter, Inc.*,
    217 F. Supp. 3d 1116 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) ........... 12, 13, 15

*In re Firearm Cases*,
    126 Cal. App. 4th 959 (2005) ............................................................ 34, 35, 41

*Flynn v. Nickerson Cmty. Ctr.*,
    177 A.3d 468 (R.I. 2018) ............................................................ 48, 49, 50

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ............................................................ 10, 11, 14

*People ex rel. Gallo v. Acuna*,
    929 P.2d 596 (Cal. 1997) ............................................................................40

*Gamache v. Airbnb, Inc.*,
    No. A146179, 2017 WL 3431651 (Cal. Ct. App. Aug. 10, 2017) ......................................28

*Ganim v. Smith & Wesson Corp.*,
    780 A.2d 98 (Conn. 2001) ............................................................ 21, 23, 34

*Georgia Dep't of Transp. v. Owens*,
    330 Ga. App. 123 (2014) ..................................................................................26

*Giddings & Lewis, Inc. v. Indus. Risk Insurers*,
    348 S.W.3d 729 (Ky. 2011) ...............................................................................57

*Gonzalez v. Google, Inc.*,
    335 F. Supp. 3d 1156 (N.D. Cal. 2018) ............................................................29

*Gonzalez v. Google LLC*,
    2 F.4th 871 (9th Cir. 2021) ................................................................................10

*Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*,
    120 Nev. 777 (2004) ..........................................................................................26

*Graves v. Warner Bros.*,
    656 N.W.2d 195– 01 (Mich. Ct. App. 2002) ....................................................29

*Gray v. Derderian*,
    371 F. Supp. 2d 98 (D.R.I. 2005) .....................................................................47

*Grieco v. Daiho Sangyo, Inc.*,
    344 So.3d 11 (Fla. Dist. Ct. App. 2022) ........................................ 28, 52, 53, 54

*Grossman v. Rockaway Twp.*,
    2019 WL 2649153 (N.J. Super. Ct. June 10, 2019) ............................................9

*Gushlaw v. Milner*,
    42 A.3d 1245 (R.I. 2012) ............................................................................49, 52

*Herrick v. Grindr LLC*,
    765 F. App'x 586 (2d Cir. 2019) ......................................................... 12, 13, 16

*Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*,
    199 A.3d 1034 (R.I. 2019) .................................................................................58

*Hodgkins ex rel. Hodgkins v. Peterson*,
    355 F.3d 1048 (7th Cir. 2004) ...........................................................................18

*Hoery v. United States*,
    64 P.3d 214 (Colo. 2003) (en banc) ..................................................................40

*Holmes v. Sec. Inv. Prot. Corp.*,
    503 U.S. 258 (1992) ............................................................................. 20, 21, 24

*Horzepa v. City of Waterbury*,
    No. CV156027853, 2016 WL 1710810 (Conn. Super. Ct. Apr. 12, 2016) ............32

*State ex rel. Hunter v. Johnson & Johnson*,
    499 P.3d 719 (Okla. 2021) .......................................................................*passim*

*Hydro-Mfg., Inc. v. Kayser-Roth Corp.*,
    640 A.2d 950 (R.I. 1994)................................................................45

*Ileto v. Glock Inc.*,
    349 F.3d 1191 (9th Cir. 2003) ...........................................34, 35

*Independence Cty. v. Pfizer, Inc.*,
    534 F. Supp. 2d 882 (E.D. Ark. 2008) ................................32

*Indianapolis–Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*,
    929 N.E.2d 722 (Ind. 2010) ................................................57

*Int'l Bhd. Of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*,
    196 F.3d 818 (7th Cir. 1999) ..............................................24

*ITP, Inc. v. OCI Co.*,
    865 F. Supp. 2d 672 (E.D. Pa. 2012).................................58

*Jackson v. Airbnb, Inc.*,
    2022 WL 16753197 (C.D. Cal. Nov. 4, 2022).....................5

*James v. Meow Media, Inc.*,
    300 F.3d 683 (6th Cir. 2002) ...............................16, 19, 49

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    584 F. Supp. 3d 1161 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023) .....................58

*Jane Doe No. 1 v. Backpage.com, LLC*,
    817 F.3d 12 (1st Cir. 2016)............................................8, 12

*Jane Doe No. 1 v. Uber Techs., Inc.*,
    79 Cal. App. 5th 410 (2022) ...........................................50, 51

*Jefferson v. Qwik Korner Mkt., Inc.*,
    28 Cal. App. 4th 990 (1994) ...............................................54

*John Doe v. Grindr Inc.*,
    — F. Supp. 3d —, 2023 WL 9066310 (C.D. Cal. Dec. 28, 2023)................................*passim*

*John Rocchio Corp. v. Pare Eng'g Corp.*,
    201 A.3d 316 (R.I. 2019).....................................................54

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    497 F. Supp. 3d 552 (N.D. Cal. 2020)........................23, 35, 41, 42, 44

*Kathleen R. v. City of Livermore*,
    87 Cal. App. 4th 684 (2001) ................................................7

*Kennedy Krieger Inst., Inc. v. Partlow*,
    191 A.3d 425 (Md. 2018) ....................................................52

*Kesner v. Super. Ct.*,
  1 Cal. 5th 1132 (2016)......................................................................................47

*Kimzey v. Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ................................................................. 7, 8, 14

*Knight v. Merhige*,
  133 So. 3d 1140 (Fla. 4th DCA 2014) ...............................................................54

*Kuciemba v. Victory Woodworks, Inc.*,
  14 Cal. 5th 993 (2023)........................................................................... 52, 54, 55

*Kumaraperu v. Feldstead*,
  237 Cal. App. 4th 60 (2015) ...............................................................................27

*Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*,
  191 F.3d 229 (2d Cir. 1999), *as amended* (Aug. 18, 1999)............................20, 21

*Lanser v. Riddle*,
  No. 4FA1103117CI, 2013 WL 10408619 (Alaska Super. Ct. July 1, 2013)...................40, 46

*In re Lead Paint Litig.*,
  924 A.2d 484 (N.J. 2007) .......................................................30, 32, 33, 34, 35, 40

*Linda R.S. v. Richard D.*,
  410 U.S. 614 (1973)............................................................................................21

*Long Beach Mem'l Med. Ctr. v. Kaiser Found. Health Plan, Inc.*,
  71 Cal. App. 5th 323 (2021) ...............................................................................47

*M.L. v. Craigslist Inc.*,
  2020 WL 6434845 (W.D. Wash. Apr. 17, 2020)..................................................50

*MacDonald v. State*,
  281 Cal. Rptr. 317 (1991)...................................................................................50

*Estate of Madden v. Sw. Airlines, Co.*,
  2021 WL 2580119 (D. Md. June 23, 2021)..........................................................55

*Marder v. Lopez*,
  450 F.3d 445 (9th Cir. 2006) ..............................................................................51

*Marshall's Locksmith Serv. Inc. v. Google, LLC*,
  925 F.3d 1263 (D.C. Cir. 2019) ..........................................................................13

*Matthews v. Williford*,
  318 So.2d 480 (Fla. Dist. Ct. App. 1975)............................................................27

*McGehee v. Norfolk & S. Ry. Co.*,
  147 N.C. 142 (1908).............................................................................................25

*McKay ex rel. McKay v. Boyd Const. Co.*,
   571 So. 2d 916 (Miss. 1990) ........................................................................40

*In re McKinsey & Co. Nat'l Prescription Opiate Consultant Litig.*,
   2023 WL 4670291 (N.D. Cal. July 20, 2023) .............................................46

*Meland v. Weber*,
   2 F.4th 838 (9th Cir. 2021) ........................................................................21

*Melton v. Boustred*,
   183 Cal. App. 4th 521 (2010) ...............................................................26, 51

*In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*,
   379 F. Supp. 2d 348 (S.D.N.Y. 2005) ......................................................32

*Miami Herald Publ'g Co. v. Tornillo*,
   418 U.S. 241 (1974) ...................................................................................17

*Mike v. Borough of Aliquippa*,
   421 A.2d 251 (Pa. Super. 1980) ...........................................................27, 29

*Modisette v. Apple Inc.*,
   241 Cal. 3d 209 ............................................................................ 29, 48, 53

*Moran v. Fed. Nat'l Mortg. Ass'n*,
   No. 12-212, 2012 WL 2919529 (E.D. Va. July 17, 2012) .......................40

*Murray v. ILG Techs., LLC*,
   378 F. Supp. 3d 1227 (S.D. Ga. 2019) .....................................................57

*Nelson v. Aurora Equip. Co.*,
   909 N.E.2d 931 (2009) ..............................................................................47

*NetChoice, LLC v. Bonta*,
   --- F. Supp. 3d ---, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) .......... 17, 18, 19

*NetChoice, LLC v. Griffin*,
   2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ................................ 16, 17, 18, 19

*NetChoice, LLC v. Yost*,
   --- F. Supp. 3d ---, 2024 WL 104336 (S.D. Ohio Jan. 9, 2024) ............... 17, 18, 19

*Noble v. L.A. Dodgers, Inc.*,
   168 Cal. App. 3d 912 (1985) .....................................................................27

*O'Handley v. Padilla*,
   579 F. Supp. 3d 1163 (N.D. Cal. 2022) ....................................................17

*Olivia N. v. Nat'l Broad., Co.*,
   126 Cal. App. 3d 448 (1981) ...............................................................56, 57

*Orlando Sports Stadium, Inc. v. State ex rel. Powell*,
   262 So. 2d 881 (Fla. 1972) ........................................................................40

*Oulla v. Velazques*,
   831 S.E.2d 450 (S.C. Ct. App. 2019) ........................................................48

*Overcash v. S.C. Elec. & Gas Co.*,
   614 S.E.2d 619 (S.C. 2005) ........................................................ 32, 33, 41

*Pac. Indem. Co. v. Whaley*,
   572 F. Supp. 2d 626 (D. Md. 2008) ...........................................................58

*Packingham v. North Carolina*,
   582 U.S. 98 (2017) .....................................................................................56

*Page v. Niagara Chem. Div. of Food Mach. & Chem. Corp.*,
   68 So. 2d 382 (Fla. 1953) ..........................................................................46

*Paroline v. United States*,
   572 U.S. 434 (2014) ...................................................................................25

*Penelas v. Arms Tech., Inc.*,
   1999 WL 1204353 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct.
   App. 2001) ................................................................... 21, 23, 34, 36

*People v. ConAgra Grocery Prods. Co.*,
   17 Cal. App. 5th 51 (2017) ..................................................................41, 42

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985) ...................................................................................21

*Pompano Horse Club et al. v. State*,
   93 Fla. 415 (1927) .....................................................................................33

*Price v. Blaine Kern Artista, Inc.*,
   111 Nev. 515 (1995) ..................................................................................29

*Price v. Travis*,
   149 Va. 536 (1927) ....................................................................................26

*PSINet, Inc. v. Chapman*,
   362 F.3d 227 (4th Cir. 2004) .....................................................................18

*Ray v. Mayor of Baltimore*,
   59 A.3d 545 (Md. 2013) ........................................................................40, 45

*Regents of Univ. of Calif. v. Super. Ct.*,
   4 Cal. 5th 607 (2018) .................................................................................50

*Reno v. ACLU*,
    521 U.S. 844 (1997) ...........................................................................................18

*Rickards v. Sun Oil Co.*,
    41 A.2d 267 (N.J. Sup. Ct. 1945) .....................................................................26

*Rincon Band of Luiseno Mission Indians v. Flynt*,
    70 Cal. App. 5th 1059 (2021) ...........................................................................45

*Roberie v. VonBokern*,
    No. 2004-SC-000250-DG, 2006 WL 2454647 (Ky. Aug. 24, 2006)....................40

*Roche v. Ugly Duckling Car Sales, Inc.*,
    879 A.2d 785 (Pa. Super. 2005) ........................................................................52

*Rowland v. Christian*,
    69 Cal. 2d 108 (1968) ........................................................................................54

*Ruiz v. ConAgra Foods Packaged Foods LLC*,
    606 F. Supp. 3d 881 (E.D. Wis. 2022) ..............................................................55

*Russo v. Town of Greenwich*,
    No. CV 96 0154836 ............................................................................................44

*S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*,
    346 S.E.2d 324 (S.C. 1986) ...............................................................................52

*Sand Creek Partners, L.P. v. Finch*,
    647 N.E.2d 1149 (Ind. Ct. App. 1995) ..............................................................25

*Sanders v. Acclaim Ent., Inc.*,
    188 F. Supp. 2d 1264 (D. Colo. 2002) ..............................................................49

*Saunders v. Baseball Factory, Inc.*,
    361 So. 3d 365 (Fla. 4th DCA 2023) .................................................................49

*Se. Booksellers Ass'n v. McMaster*,
    371 F. Supp. 2d 773 ..........................................................................................18

*Seebold v. Prison Health Servs.*,
    57 A.3d 1232 (Pa. 2012).....................................................................................52

*Sewell v. Racetrac Petroleum, Inc.*,
    245 So. 3d 822 (Fla. 3d DCA 2017) ..................................................................52

*Sheen v. Wells Fargo Bank, N.A.*,
    12 Cal. 5th 905 (Cal. 2022).................................................................................58

*Sheen v. Wells Fargo Bank, N.A.*,
    290 Cal. Rptr. 3d 834 (Cal. 2022) .....................................................................57

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ................................................................................16

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*,
    2023 WL 7524912 ............................................................................*passim*

*In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*,
    903 F. Supp. 2d 942 (S.D. Cal. 2012) ....................................................58

*State Dep't of State Hosps. v. Superior Ct.*,
    61 Cal. 4th 339 (2015).............................................................................26

*State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*,
    919 A.2d 1116 (Del. 2007) .....................................................................24

*State v. Lead Indus., Ass'n, Inc.*,
    951 A.2d 428 (R.I. 2008).....................................................................*passim*

*Steele v. Rogers*,
    306 S.C. 546 (Ct. App. 1992) .................................................................26

*Taylor v. Louisiana Pac. Corp.*,
    165 F.3d 36 (9th Cir. 1998) ....................................................................31

*Terracon Consultants W., Inc. v. Mandalay Resort Grp.*,
    206 P.3d 81 (Nev. 2009).........................................................................58

*Texas v. Am. Tobacco Co.*,
    14 F. Supp. 2d 956 (E.D. Tex. 1997) .....................................................32

*Tioga Public School District v. United States Gypsum Co.*,
    984 F.2d 915 (8th Cir. 1993) ..............................................................*passim*

*Toyo Tire N. Am. Mfg., Inc. v. Davis*,
    299 Ga. 155 (2016)..................................................................................25

*TS & C Invs., L.L.C. v. Beusa Energy, Inc.*,
    637 F. Supp. 2d 372 (W.D. La. 2009) ....................................................57

*Turner v. Chevron U.S.A., Inc.*,
    2008 WL 4570271 (C.D. Cal. Oct. 14, 2008).........................................16

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ...........................................................................*passim*

*Union Pac. R.R. Co. v. Sharp*,
    330 Ark. 174 (1997) ................................................................................26

*United Food & Com. Workers Unions, Emps. Health & Welfare Fund v. Philip Morris, Inc.*,
223 F.3d 1271 (11th Cir. 2000).............................................................................21

*United States v. Texas*,
599 U.S. 670 (2023) .............................................................................................21

*Walmart, Inc. v. Reeves*,
671 S.W.3d 24 (Ky. 2023).....................................................................................52

*Wayne County v. Tenn. Solid Waste Disposal Control Bd.*,
756 S.W.2d 274 (Tenn. Ct. App. 1988)................................................................40

*Weerahandi v. Shelesh*,
2017 WL 4330365 (D.N.J. Sept. 29, 2017) ..........................................................6

*Welsh v. Metro. Dade Cty.*,
366 So. 2d 518 (Fla. 3d DCA 1979) ....................................................................47

*Whaley v. Park City Mun. Corp.*,
190 P.3d 1 (Utah Ct. App. 2008) .........................................................................40

*White v. Lee*,
227 F.3d 1214 (9th Cir. 2000) .............................................................................20

*Wiener v. Southcoast Childcare Ctrs., Inc.*,
88 P.3d 517– 24 (Cal. 2004*)* ..............................................................................29

*Winter v. Facebook, Inc.*,
2021 WL 5446733 (E.D. Mo. Nov. 22, 2021)........................................................6

*Wit v. United Behav. Health*,
79 F.4th 1068 (9th Cir. 2023) ..............................................................................22

*Yokum v. Funky 544 Rhythm & Blues Cafe*,
248 So.3d 723 (La. Ct. App. 2018) ......................................................................25

*Young v. Facebook, Inc.*,
2010 WL 4269304 (N.D. Cal. Oct. 25, 2010) ......................................................50

*Zamora v. Columbia Broad. Sys.*,
480 F. Supp. 199 (S.D. Fla. 1979) ...........................................................49, 56, 57

*Zeran v. America Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) .................................................................................9

**Statutes**

47 U.S.C. § 230(c)(1)..............................................................................................5

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cal. Civ. Proc. Code § 731 ................................................................................44

Ga. Code Ann. § 41-2-2 ....................................................................................44

Ind. Code. Ann. § 32-30-6-7(b) ........................................................................44

Mont. Code Ann. § 27-30-102(1) ......................................................................40

Wash. Rev. Code Ann. § 7.48.130 .....................................................................41

**Other Authorities**

57A Am. Jur. 2d Negligence § 397.....................................................................25

58 Am. Jur. 2d Nuisances § 183 ........................................................................44

First Amendment .........................................................................................*passim*

65 C.J.S. Negligence § 187 ...............................................................................25

Donald Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CIN. L. REV.
741, 831 (2003) .........................................................................................31

38 Fla. Jur 2d, Nuisances § 18 ..........................................................................26

Restatement (Second) of Torts § 821B(1).............................................. 37, 44, 45, 49

Restatement (Third) of Torts Liab. For Econ. Harm § 8 (2020). ........................*passim*

## I.      INTRODUCTION

Plaintiffs—school districts and local governments (the "School Districts") located in 17 different states[1]—ask this Court to create near-limitless liability, making the providers of online communications services liable not only to any individual who has had a negative experience online, but also to other entities, like the School Districts, who come into contact with these individuals.  The School Districts allege that using Defendants' online communications services has caused students to become distracted, disruptive, or otherwise more difficult to educate.  As a result, the School Districts allege, they have incurred increased costs for things like confiscating cell phones, remediating acts of vandalism by students, hiring and training employees to deal with mental health and other issues, modifying curricula, disciplining students, and investigating and prosecuting crimes.  Extending tort liability beyond the alleged victims (students) to third parties who allegedly incurred costs to render aid to those alleged victims (school districts and local governments) would be an unwarranted expansion of the law.  As one state's highest court recently explained, accepting the School Districts' theory would create undounded liability: "will a sugar manufacturer or the fast food industry be liable for obesity, will an alcohol manufacturer be liable for psychological harms, or will a car manufacturer be liable for health hazards from lung disease to dementia or for air pollution."  *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 731 (Okla. 2021).

*First*, the School Districts' claims are barred in substantial part by Section 230 and the First Amendment.  The gist of the School Districts' claim is that certain features of Defendants' services—*e.g.*, algorithmic sequencing of content, infinite scrolling of content, ephemeral content features, autoplaying content, and use of content notifications and "Likes"—promote students' compulsive, prolonged, and unhealthy use of Defendants services.  This Court has already held that Section 230 bars claims based on those features—a conclusion that applies equally to the School Districts' claims.  The First Amendment bars claims based on third party content and the manner in which Defendants' services organize and

---

[1] Those 17 states are:  Alaska, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, New Jersey, Nevada, North Carolina, Pennsylvania, Rhode Island, South Carolina, and Virginia.

Because the vast majority of the complaints—more than 90%—were filed by school districts or boards of education, Defendants refer to plaintiffs collectively as "School Districts."

1  display that content, including claims that Defendants employ deficient age verification features or

2  parental controls.

3      *Second*, the School Districts' public nuisance and negligence claims are entirely derivative of

4  harms they claim were suffered by others and, in any event, fail to allege proximate causation.  In every

5  instance, the School Districts' alleged injuries flow from harms allegedly inflicted upon adolescent users

6  (or caused by them), including the same personal-injury plaintiffs whose claims against Defendants are

7  already before this Court.  Under settled law, those who incur increased expense as a result of harms

8  inflicted by alleged tortfeasors on third parties may not recover against those alleged tortfeasors for

9  expenses they have incurred related to those third-party harms.

10      Relatedly, the School Districts fail to allege proximate causation, which requires a reasonably close

11  connection between wrongdoing and harm.  Intervening acts stand between Defendants' conduct and the

12  School Districts' injuries—not just independent acts of the individual adolescents but also, in virtually

13  every case, those of ***other*** third parties.  For example, while the School Districts seek damages for their

14  remediation of vandalism committed by young people who allegedly watched "challenge" videos on

15  Defendants' services, both the conduct of those young people and that of the third parties who posted the

16  challenge videos are the immediate causes of the School Districts' alleged harms.

17      *Third*, the School Districts' public nuisance claims also fail because they would expand the law of

18  public nuisance in a dramatic and unwarranted fashion.  The law of nuisance is traditionally limited to the

19  context of land use and environmental harms, and the vast majority of courts (as well as the most recent

20  Restatement) recognize that nuisance law is ill-suited to addressing harms arising from the otherwise

21  lawful distribution of products or services.  As a federal court sitting in diversity addressing questions of

22  state law, this court "should opt for the interpretation [of state common law] that restricts liability, rather

23  than expands it, until the [state's highest court] decides differently."  *Davidson v. Apple, Inc.*, 2017 WL

24  3149305, at *18 (N.D. Cal. July 25, 2017).  Likewise, a necessary element of a public nuisance action is

25  an interference with a ***public*** right—*i.e.*, the right to resources shared by the public at large, like air, water,

26  or public rights of way.  The harms to students alleged here, by contrast, do not affect all members of the

27  public (or even all youth) equally.  If anything, they involve only the private rights of students not to be

28  negligently injured.  Under established law, this is so no matter how many students are allegedly affected.

---

2

What is more, the school district plaintiffs' nuisance claims fail because they have not adequately alleged any "special injury,"—*i.e.*, an injury different in kind than the harms allegedly suffered by other members of the public—as they concede is required.

*Fourth*, the School Districts' negligence claims fail because—even assuming that Defendants owe duties to individual users of their services—they do not owe duties to school districts or local government entities to protect them from incurring increased expenses relating to the alleged harms, all of which are experienced by or caused by third parties.  Finally, the negligence claims also fail in large part because the economic loss doctrine prevents recovery for purely economic injuries, which constitute most of the harms the School Districts allege.

## II.    BACKGROUND

On December 18, 2023, the School Districts filed their Master Complaint.  Dkt. No. 504 ("Compl.").   The School Districts' factual allegations regarding Defendants' services and alleged wrongdoing are materially indistinguishable from the allegations made in the Personal Injury Master Complaint.  *Compare, e.g.*, Compl. ¶ 9 ("Defendants wrote code designed to … create compulsive use of their platforms."), *with* Personal Injury Second Am. Master Compl. ("PI SAC") ¶ 12 (same).  Like the personal injury plaintiffs, the claims here are dependent upon and derivative of third-party content.  In particular, the School Districts allege that certain features of Defendants' services lead to "compulsive use" and harmed the mental health of adolescents, including:

- Recommendation algorithms that "predict how the [third-party] content is likely to affect a specific users' engagement," Compl. ¶ 96;

- A lack of "robust age verification, effective parental controls, and effective parental notifications" to limit the exposure of third-party content, *id.* ¶ 104;

- "[F]ailing to place default limits on the length and frequency of" sessions in which users interact with third-party content, *id.* ¶ 105, through use of features such as "endless scrolling," *id.* at 176;

- "[S]trategically timing and clustering notifications" of third-party content, *id.* ¶ 106, "including 'Likes,' 'Hearts,' or other forms of approval," *id.* ¶ 115;

- Failing to "limit and prevent child sexual exploitation, sextortion, and distribution of known Child Sexual Assault Material ('CSAM')," *id.* ¶ 107;

- Time-limited or "ephemeral" content," *id.* ¶ 418, and

- Promoting "viral challenges" that allegedly result in "property damage" and other harms, *id.* ¶ 109.

*See also* PI SAC ¶ 845 (listing these same features). The harms the School Districts allege that Defendants' services cause young people match the claims of the personal-injury plaintiffs. *Compare* Compl. ¶ 19 (alleging that the services cause "addiction, compulsive use, anxiety, depression, eating disorders, body dysmorphia, self-harm, sexual exploitation, suicidal ideations, other serious diseases and injuries, and suicide itself"), *with* PI SAC ¶ 18 (same).

Unlike the personal-injury plaintiffs, however, the School Districts do not allege that **they** were harmed by their use of Defendants' services. Instead, they seek to recover costs they allegedly incurred to address the adverse effects that Defendants' services allegedly had on their students or adolescents in their community (who are themselves actual or potential personal-injury plaintiffs). In particular, the School Districts allege that they "are forced to divert human and financial resources to address social media-related student behavior or mental health issues." Compl. ¶ 195. These expenditures include, *e.g.*, "increasing resources and increasing staff time to confiscate cell phones," "[h]iring additional counselors, staff, and personnel in response to increased mental health and behavioral issues," "repair[ing] property damaged as a result of students' addiction to social media," "add[ing] additional information technology resources in an attempt limit students' access to social media," "[i]nvesting in physical barriers (such as magnetic pouches) to keep students from accessing social media," "[d]eveloping new and revised teaching plans to address students' altered learning habits," "[p]roviding additional learning support to address students' declining achievement," "address[ing] student discipline issues," and "[t]raining teachers to help students with their mental health." *Id.* ¶ 212.

Similarly, the Local Governments allege that they have incurred added costs "as first responders, providing youth mental health services." *Id.* ¶ 234. These costs include "provid[ing] additional mental health resources to minors," "[h]iring additional counselors, staff, and personnel" and "train[ing] [them] to identify exhibiting symptoms of mental health issues," "prosecut[ing] crimes that result from use of

Defendants' platforms," investing further resources in "community-based services such as outpatient therapy, behavioral health services, after school programs, and other similar services and programming," and "repair[ing] property damage."  *Id.* ¶ 248.

### III.     ARGUMENT

**A.     The School Districts' Negligence and Nuisance Claims Fail for Several Threshold Reasons.**

For four threshold reasons, the School Districts' public nuisance and negligence claims fail as a matter of law.  *First*, as this Court has already recognized, Section 230 bars the claims in substantial part. *Second*, the First Amendment bars the School Districts' claims insofar as they seek to impose liability on Defendants for the exercise of editorial discretion in organizing and displaying content generated by third parties.   *Third*, the School Districts' claims are entirely derivative of injuries allegedly suffered by students, and settled common law principles prohibit third parties from seeking to recover from alleged tortfeasors costs that they incurred in rendering aid to the tortfeasors' alleged victims.  *Fourth*, the direct connection required to establish proximate causation is absent here, where in virtually every case the immediate causes of the School Districts' alleged injuries include (1) the third parties who post allegedly problematic content, communicate directly with students, *etc.* and (2) the students who misbehave, vandalize property, *etc.*

### 1.     Section 230 Bars the School Districts' Claims.

Section 230 of the Communications Decency Act states that "[n]o provider … of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Section 230 applies here because (1) Defendants are "provider[s] ... of an interactive computer service," and (2) the School Districts' claims seek to hold Defendants liable by treating them as a "publisher or speaker" of (3) content provided by someone else. *Id.*; *see Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019).

Each of the Defendants is an "interactive computer service" within the scope of Section 230.  *See, e.g.*, *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2023 WL 7524912, at *8 (N.D. Cal. Nov. 14, 2023 ("*Soc. Media*"); *Dangaard v. Instagram, LLC*, 2022 WL 17342198, at *4 (N.D. Cal. Nov. 30, 2022) (Facebook and Instagram); *Jackson v. Airbnb, Inc.*, 2022 WL 16753197, at *1 (C.D. Cal.

Nov. 4, 2022) (Snap); *Winter v. Facebook, Inc.*, 2021 WL 5446733, at *4 (E.D. Mo. Nov. 22, 2021) (TikTok); *Weerahandi v. Shelesh*, 2017 WL 4330365, at *6 (D.N.J. Sept. 29, 2017) (YouTube).  This Court has also held that several categories of allegations, virtually identical to those made in the School Districts' Complaint are barred because they seek to hold Defendants liable as publishers of third-party content.[2]

a)      The Court's Prior Section 230 Rulings Apply to the School Districts'
Claims.

This Court has already held that several broad categories of allegations against Defendants, which are substantively identical to or repeated verbatim in the School Districts' complaint, are barred by Section 230.  *See Soc. Media*, 2023 WL 7524912, at *1.  Specifically, this Court held that Section 230 bars allegations based on: (1) Defendants' "[u]se of algorithms to promote addictive engagement"; (2) "[n]ot providing a beginning and end to a user's 'Feed'"; (3) the "[t]iming and clustering of notifications of third-party content"; (4) "[f]ailing to put [d]efault protective limits to the length and frequency of sessions"; (5) "[f]ailing to institute [b]locks to use during certain times of day (such as during school hours or late at night[)]"; (6) "[r]ecommending minor accounts to adult strangers"; (7) "[l]imiting content to short-form and ephemeral content, and allowing private content"; and (8) "[p]ublishing geolocating information for minors."  *Id.* at *13 (quotation marks omitted).

The title of the School Districts' claims does not change this analysis.  In applying Section 230 to a claim, "what matters is not the name of the cause of action," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101–02 (9th Cir. 2009).  Section 230 "is implicated not only by claims that explicitly point to" content created by others, "but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing" that content.  *Cohen v. Facebook, Inc.*, 252

---

[2] Defendants maintain that *all* of the School Districts' theories of harm are barred by Section 230, including all allegations regarding allegedly inadequate parental notifications or age verification, appearance-altering filters and lenses, and rewards generated by Defendants and related notifications. Defendants preserve their challenge to these allegations based on Section 230 but limit the discussion of them here based on this Court's November 14, 2023 order in the personal injury cases.

F. Supp. 3d 140, 156 (E.D.N.Y. 2017).  No amount of "creative pleading" allows plaintiffs to "advance the same basic argument that the statute plainly bars." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265–66 (9th Cir. 2016).

These principles apply equally to public nuisance claims in cases involving subjects ranging from guns and prostitution to obscenity, where the alleged nuisance is derived from the defendant's publication of third-party content. *See, e.g.*, *Daniel v. Armslist, LLC*, 926 N.W.2d 720, 726 (Wis. 2019) (dismissing public nuisance claim for "negligently, recklessly, and/or intentionally facilitat[ing] the sale of vast quantities of guns' to prohibited purchasers" because "provision of a forum for third parties to post and view firearms advertisements" was within defendant's  "role as a publisher of third-party content"); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 962–70 (N.D. Ill. 2009) (dismissing public nuisance claims based on allegations "that Craigslist knowingly 'arranges' meetings for the purpose of prostitution and 'directs' people to places of prostitution" because these "allegations plainly treat Craigslist as the publisher or speaker of information created by its users"); *Kathleen R. v. City of Livermore*, 87 Cal. App. 4th 684, 691–702 (2001) (dismissing under Section 230 public nuisance claim that defendant "knowingly allow[ed] its computers to be used to access obscenity and matter harmful to minors").  Section 230 similarly bars claims, like those brought here, from governmental entities that seek to "recoup the money" they have spent as a result of alleged harms caused by protected publishing activities. *See, e.g.*, *Dart*, 665 F. Supp. 2d at 963, 969 (Section 230 barred sheriff department from seeking nuisance liability for expenditures in combating prostitution allegedly caused by Craigslist listings).

> **b)**     **The School Districts' Claims Treat Defendants as Publishers Under Section 230.**

Many of the School Districts' claims allege specifically that Defendants publish harmful content, including "challenge" videos that allegedly encourage bad or dangerous behaviors, bringing them within the core of Section 230's protection. *See Soc. Media*, 2023 WL 7524912, at *16 (Section 230 bars claims that would require "changing the way defendants' publish third-party content").  Many of the School Districts' other claims allege harm to individual users from features of Defendants' services that this Court has held are protected by Section 230.  Because Section 230 bars individual users' claims that those features harmed them, it likewise bars the School Districts' claims to have expended resources to respond

to those harms.  *See, e.g.*, Compl. ¶¶ 1–6, 212, 248; *Dart*, 665 F. Supp. 2d at 963, 969.  Adding another step in the causal chain does not change the fact that these claims would "inherently require[] the court to treat [Defendants] as the 'publisher or speaker' of content provided by another."  *Barnes*, 570 F.3d at 1101–02.  Indeed, in the absence of the following core protected publisher functions, the School Districts' remaining allegations cannot support their sweeping public nuisance theories.

   ***Intentional and Harmful Acts of Third Parties.***  Section 230 bars the School Districts' claims that third parties have misused Defendants' services to engage in "sexual exploitation," "spread ... CSAM," and transmit "threats."  *See, e.g.*, Compl. ¶¶ 19, 107, 524, 661, 674, 805, 923.  Defendants' "Terms of Service prohibit criminal activity and therefore their platforms cannot be said to encourage such activity."  *Soc. Media*, 2023 WL 7524912, at *38 n.72.  These kinds of communications between users—which Defendants prohibit and work to prevent—are "prototypical" user-provided content, *Kimzey*, 836 F.3d at 1266, and Section 230 bars attempts to hold websites liable for publishing or otherwise facilitating such content.  *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 21 (1st Cir. 2016) ("[C]ourts have rejected claims that attempt to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others."); *Doe v. MySpace, Inc.*, 528 F.3d 413, 420–22 (5th Cir. 2008) (Section 230 barred claims that minors would not have been assaulted but for MySpace's "failure to implement measures … that would have prevented" online communications and offline assaults); *Doe II v. MySpace Inc.*, 175 Cal. App. 4th 561, 573 (2009) (Section 230 barred claims that plaintiffs were sexually assaulted by third parties they met and communicated with using social networking site); *John Doe v. Grindr Inc.*, — F. Supp. 3d —, 2023 WL 9066310, at *4 (C.D. Cal. Dec. 28, 2023) (Section 230 barred claims where website's alleged "defect" was to "ma[ke] it easier … for other users to communicate" with plaintiff and commit offline sexual assault); *Doe v. Snap, Inc.*, 2022 WL 2528615, at *14 (S.D. Tex. July 7, 2022) (Section 230 barred claims whose "crux" was "that Snapchat designed its product with features that allegedly created the opportunity for [another user] to send illicit messages to Doe"), *aff'd*, 2023 WL 4174061 (5th Cir. June 26, 2023).

   The same is true of the School Districts' claims of "bullying and harassment" or "cyberbullying" resulting from Defendants' services, *see, e.g.*, Compl. ¶¶ 151, 198, 239, 987, 994.  Allegations that Defendants furnished online communication tools that some users have used to direct objectionable or

harmful messages at others fall squarely within Section 230's protections. *See Bride v. Snap Inc.*, 2023 WL 2016927, at \*1, 6 (C.D. Cal. Jan. 10, 2023) (Section 230 barred claims that anonymous messaging apps promoted "bullying and harassment" because "[d]efendants did not create or develop the harassing and explicit messages that led to the harm suffered by [p]laintiffs; the sending users did"), *appeal filed*, No. 23-55134 (9th Cir. Feb. 14, 2023); *Grossman v. Rockaway Twp.*, 2019 WL 2649153, at \*2, 13–14 (N.J. Super. Ct. June 10, 2019) (Section 230 barred claims that plaintiff "was a victim of pervasive and persistent bullying" on Snapchat because they were predicated on Snap's alleged negligence "in enforcing or monitoring the content of *third-party users*"); *Zeran v. America Online, Inc.*, 129 F.3d 327, 328, 335 (4th Cir. 1997) (Section 230 barred claims based on offensive and "defamatory messages posted by an unidentified third party").

***Recommendation Algorithms and Content Delivery.*** The School Districts repeatedly allege that Defendants display harmful content to their users. They allege that Defendants use algorithms that recommend content, including content that allegedly harms users, to "achieve maximum engagement," leading to compulsive use that disrupts school activities and causes mental health problems. *See, e.g.*, Compl. ¶ 190 (alleging that "Meta, TikTok, and YouTube use engagement-optimized algorithms to control users' main feeds," including promoting specific "posts" involving a "challenge"); *id.* ¶ 622 (alleging that Snapchat "include[s] recommendations based on suggestions made by an algorithm"); *see also, e.g.*, *id.* ¶¶ 175, 339, 738, 890. They also allege that certain "challenge" videos viewed by users harmed the School Districts by "direct[ing] destruction or theft of [government] property." *Id.* ¶ 212(c); *see also, e.g.*, *id.* ¶ 184 (alleging online challenge "incentivized youth to post videos of them vandalizing school bathrooms"); *id.* ¶ 186 (alleging that "[a]s a result" of a specific "challenge," "soap dispensers were stolen, mirrors broken, and sinks ripped off of walls of school bathrooms nationwide").[3] They allege that Defendants showed users content that upset them or encouraged them to imitate dangerous behavior, including behavior that allegedly occurred at school. *See, e.g.*, *id.* ¶ 389 (alleging that Meta's algorithms

---

[3] Notably, with the exception of one anecdote, this is the only explanation the School Districts provide for their alleged property damages. *See, e.g.*, *id.* ¶¶ 6, 22, 32, 109, 187, 209, 212(b)–(c), 212(h), 241, 248(k), 787–788, 792, 973(r), 990, 999–1000, 1023(r). Therefore, Section 230 bars all of their claims to the extent they rely on these allegations.

"amplify extreme material"); *id.* ¶ 661 (alleging that "Snapchat's algorithm has recommended inappropriate sexual content"); *id.* ¶ 834 (alleging that TikTok's algorithms "direct TikTok users to malign videos promoting depression, suicidality, eating disorders and negative body image"); *id.* ¶ 916 (alleging Google's algorithms "promote[] ... 'challenge' videos").

Finally, the School Districts allege that Defendants displayed third-party content that caused users to compare themselves negatively to that content, including because the content was edited using filters, lenses, or other tools. *See, e.g.*, *id.* ¶ 87 (alleging that "Defendants' platforms create an unnatural environment of constant social comparison due to filters and other features"); *id.* ¶ 89 (alleging that users "make false comparisons between their real-life appearances and the appearances in the feed" of third-party content, including because this third-party content incorporates "filters"); *id.* ¶ 457 (alleging that "[h]eavily edited and unrealistic beauty, modeling, fitness, talent, and success-related posts are highly amplified by Meta's algorithms"); *id.* ¶ 882 (alleging that YouTube "promot[es] misleadingly idealized portrayals from influencers and others").[4]

Section 230 bars all claims based on displaying allegedly objectionable third-party content, even where plaintiffs allege that service providers' algorithms recommend such content. *Soc. Media*, 2023 WL 7524912, at *13, 15 (Section 230 bars allegations that Defendants "[u]se [ ] algorithms to promote addictive engagement" because Defendants' "use of algorithms to determine whether, when, and to whom to publish third-party content ... are traditional editorial functions that are essential to publishing" (cleaned up)); *id.* at *16 ("Because plaintiffs do not show how the conduct at issue is distinct from determinations of what to publish and how, or that the alleged duty could be met other than by changing the way defendants' publish third-party content, Section 230 bars the claim as to the recommendation algorithms."); *Gonzalez v. Google LLC*, 2 F.4th 871, 896 (9th Cir. 2021) (platform's use of algorithms promoting ISIS content "does not expose it to liability for content posted by a third party"), *vacated on other* grounds, 143 S. Ct. 1191 (2023); *Force v. Facebook, Inc.*, 934 F.3d 53, 59, 71 (2d Cir. 2019) (Section

---

[4] While this Court has held that the personal injury plaintiffs plausibly alleged "that children are harmed simply by creating and then seeing their own altered images" without "posting or publication," *Soc. Media*, 2023 WL 7524912, at *12, these allegations state specifically that users were harmed because they *viewed* edited content created and posted by other users.

230 barred allegations that Facebook displayed and recommended posts by terrorist organizations supporting violence); *M.P. v. Meta Platforms, Inc.*, — F. Supp. 3d —, 2023 WL 5984294, at *1, 4 (D.S.C. Sept. 14, 2023) (Section 230 barred claims that Facebook's algorithms directed mass shooter to materials advocating racism and violence) ; *Dyroff*, 934 F.3d at 1098 (Section 230 barred claim based on service's "algorithms" used to "analyze user posts" and "recommend" third-party content).  That is because allegations that "algorithms make [certain] content more 'visible,' 'available,' and 'usable'" treat services as publishers.  *Force*, 934 F.3d at 59, 70–71 (Section 230 barred allegations that Facebook displayed and recommended posts by terrorist organizations supporting violence).

***Allegedly Deficient Age Verification, Parental Controls, and Reporting Processes.***  Section 230 bars the School Districts' claims about purportedly inadequate age verification, parental controls, or abuse-reporting features that are premised on harms allegedly caused by Defendants' publication of third-party content.[5]  For example, the School Districts allege that "[t]he lack of effective ... age-based controls" exposed users to "the harm of other addictive design features."  Compl. ¶ 104; *see also, e.g.*, *id.* ¶ 593 (alleging that "[t]he lack of effective age verification" and "parental controls ... compounds the effect of design feature harms to children"); *id.* ¶ 867 (alleging that "ineffective age verification feature" exposes users to harm "from other platform features").  Indeed, the School Districts repeatedly connect the absence of age verification and parental controls to *specific* alleged features (and associated harms) involving third-party content that this Court has expressly held are protected by Section 230—including connections between adults and minors; autoplay of content; algorithmic content recommendations; and content ephemerality, all of which are barred by Section 230.  The School Districts thus allege that the lack of "meaningful age verification" or "parental consent" allow users to access "recommendation systems designed to induce endless interaction with algorithmically tailored user experiences."  *Id.* ¶ 357.  The School Districts also allege that inadequate age verification on YouTube allows users to be exposed to YouTube's "autoplay feature" (which is otherwise disabled for users 13–17).  *Id.* ¶¶ 867–868.  Similarly,

---

[5] While this Court ruled that the personal injury plaintiffs' allegations based on deficient age verification and parental controls were not barred in their entirety because they might involve harms that are "distinct from [those] caused by consumption of third-party content on defendants' platforms," the Court indicated that such claims would be barred to the extent they alleged "harm caused by consumption of third-party content on defendants' platforms."  *Soc. Media*, 2023 WL 7524912, at *12.

the School Districts allege that "by failing to age-restrict its Discover feature, Snapchat's algorithm has recommended inappropriate sexual content to adolescent users." *Id.* ¶ 661.  The School Districts further allege that these alleged deficiencies "enable predators to identify, connect to, and exploit children," *id.* ¶ 556; *see also id.* ¶ 661, by, among other things, allowing adult users to lie about their ages and connect with children, *id.* ¶ 533 ("the absence of effective age verification measures, as described above, allows predators to lie about their ages and masquerade as children, with obvious dangers to the actual children on Meta's platforms"); *id.* ¶ 719 (same as to TikTok).  The School Districts also allege that "Snapchat's parental controls are ill-equipped to mitigate the risks" allegedly posed by content ephemerality, as "parents are unable to view Snaps their children send or receive." *Id.* ¶ 630; *see also id.* ¶ 722 (same as to TikTok).  As to reporting features, the School Districts allege that Defendants do not provide sufficient processes to identify and remove illegal images. *Id.* ¶¶ 8, 107 381, 955.

Under established law, Section 230 bars claims based on the alleged lack of effective safety features for minors, including age verification, to target the publication of third-party content. *See, e.g.*, *Doe*, 528 F.3d at 420–21 (claims barred by Section 230 where plaintiff "assert[ed] that they only [sought] to hold MySpace liable for its failure to implement measures that would have prevented" sexual predators from communicating with minors on its website, including "age verification software," because such "allegations are merely another way of claiming that MySpace was liable for publishing the communications"); *Herrick v. Grindr LLC*, 765 F. App'x 586, 591 (2d Cir. 2019) (claims barred by Section 230 because "Grindr's alleged lack of safety features 'is only relevant to [plaintiff's] injury to the extent that such features would make it more difficult for his former boyfriend to post impersonating profiles or make it easier for Grindr to remove them'" (quotation marks omitted)); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1126 (N.D. Cal. 2016) ("[R]egardless of how plaintiffs have organized their complaint, their theory of liability is inherently tied to content."), *aff'd*, 881 F.3d 739 (9th Cir. 2018); *Doe II v. MySpace, Inc.*, 175 Cal. App. 4th 561, 574–75 (2009) (tort claims based on a duty to restrict access to minors' MySpace profiles barred by Section 230); *Jane Doe No. 1*, 817 F.3d at 21 ("[C]ourts have rejected claims that attempt to hold website operators liable for failing to provide sufficient protections to users from harmful content created by others.").  Likewise, by alleging that Defendants had a duty to create parental controls that would "notify parents when their children's use becomes excessive … or

becomes otherwise problematic," due to protected publishing activities, the School Districts violate Section 230's protections.  Compl. ¶ 376.

*Allowing Users to Share Geolocation Data.*  The same analysis applies to the School Districts' claims based on allowing users to share their locations permits Defendants to "exploit [that] data," causes users "anxiety" when viewing their friends' locations, and "encourages predators to locate nearby children" to harm them.  *See, e.g.*, Compl. ¶¶ 91, 399, 571, 615–616, 808–809, 857(c).  Those allegations fall within the scope of Section 230 because "limiting publication of geolocation data provided by users … inherently targets the publishing of third-party content and would require defendants to refrain from publishing such content."  *Soc. Media*, 2023 WL 7524912, at *13; *see also Herrick*, 765 F. App'x at 590 ("location information" provided by third parties is content that falls within Section 230); *John Doe*, 2023 WL 9066310, at *3 (same); *Marshall's Locksmith Serv. Inc. v. Google, LLC*, 925 F.3d 1263, 1270–71 (D.C. Cir. 2019) (similar).

*Short-Form and Ephemeral Content.*  Section 230 bars the School Districts' claims based on allowing users to post short-form videos, *see, e.g.*, Compl. ¶¶ 407, 742, 777, 882, as well as those based on allowing users to send "ephemeral" content, *see, e.g.*, *id.* ¶¶ 293, 418, 596, 664–665.  Defendants cannot be held liable for "provid[ing] short-form and ephemeral content" because "[e]ditorial decisions such as determining the length of content published and how long to publish content are 'traditional editorial functions.'"  *Soc. Media*, 2023 WL 7524912, at *15; *see also Fields*, 217 F. Supp. 3d at 1124 ("choices about what content can appear on the website and in what form … fall within the purview of traditional publisher functions"); *L.W. v. Snap Inc.*, — F. Supp. 3d —, 2023 WL 3830365, at *4 (S.D. Cal. June 5, 2023) (dismissing claim based on private messages sent via Snapchat); *Doe*, 2022 WL 2528615, at *14 (similar).

*Private Content.*  Section 230 likewise bars the School Districts' claims based on allowing users to transmit and share content privately, *see, e.g. id.* ¶¶ 284, 537, 666–667, 810, 814, 821, which the School Districts allege conceals harmful "communications," including "CSAM."  Section 230 bars allegations regarding "private messaging" because these features "fall within the publishing umbrella."  *Soc. Media*, 2023 WL 7524912, at *15; *see also Fields*, 217 F. Supp. 3d at 1228–29 ("[A] number of courts have applied [Section 230] to bar claims predicated on a defendant's transmission of nonpublic messages");

*L.W.*, 2023 WL 3830365, at \*4 (dismissing claim challenging Snapchat's "ephemeral design features"); *Doe*, 2022 WL 2528615, at \*14 (similar).

**Comments, Likes, and Reactions.**  Section 230 bars the School Districts' claims that features of Defendants' services such as "'Likes,' 'Hearts,' or other forms of approval" transmitted by third parties "serve as the reward and are purposefully delivered in a way to create stronger associations and maximize addiction."  Compl. ¶ 115; *see also, e.g.*, *id.* ¶¶ 120, 179, 401, 601, 774, 886.  The School Districts admit that these features are "forms of approval" transmitted by others—in other words, communications from third parties about other third-party content.  *Id.* ¶ 115; *see also, e.g.*, *id.* ¶ 876 ("receiving a 'Like' shows others' approval and activates the brain's reward region").  Section 230 bars allegations "where notifications are made to alert users to third-party content," including "notifications that someone has commented on or liked a user's post."  *Soc. Media*, 2023 WL 7524912, at \*15.  That same reasoning applies here, including to the likes, reactions, and comments themselves.  In fact, a feature that allows users to "post comments and respond to comments posted by others" is "[t]he prototypical service qualifying for [Section 230] immunity."  *Kimzey*, 836 F.3d at 1266 (cleaned up); *see also Dyroff*, 934 F.3d at 1098 (Section 230 protects "tools meant to facilitate the communication and content of others"); *Fair Housing Council of San Fernando Valley v. Roommates.Com*, 521 F.3d 1157, 1172–73 (9th Cir. 2008) (Section 230 barred allegations regarding feature that allowed users to post comments).  The School Districts' attempts to hold Defendants liable for providing users the means to create and share their own content by responding to other users' speech would undermine Section 230's purpose of protecting platforms from lawsuits that "could threaten the freedom of speech."  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003) (cleaned up).

**Recommendation of Users' Accounts to Other Users.**  Section 230 bars the School Districts' claims based on tools that allow users to view other users' accounts and recommend those accounts to others.  Compl. ¶ 635; *see also, e.g. id.* ¶¶ 285, 532, 724.  "[R]ecommending one user's profile to another is publishing of third-party content, which is entitled to Section 230 immunity."  *Soc. Media*, 2023 WL 7524912, at \*14; *see also Force*, 934 F.3d at 66–67 (Section 230 bars allegations regarding "'connections' or 'matches' of information and individuals"); *L.W.*, 2023 WL 3830365, at \*4 (claim based on Snapchat's "Quick Add" friend recommendations tool was barred by Section 230); *Grindr Inc.*, 2023 WL 9066310,

at *3 (Section 230 barred claim that user recommendation feature connected minor plaintiff to adult users who sexually assaulted him; "Grindr's match function relies on and publishes a user's profile and geolocation data, which is third-party content generated by the user").

***Lack of Default Time Restrictions.***  Section 230 bars the School Districts' claims based on an alleged failure to implement "default protective limits to the length and frequency of use sessions" or "blocks to use at certain times of day for minor users such as during school hours." *See, e.g.*, Compl. ¶¶ 8, 105, 176.  Section 230 bars allegations that Defendants failed to implement "[d]efault protective limits to the length and frequency of session" or "[b]locks to use during certain times of day (such as during school hours or late at night" because imposing such liability "would necessarily require defendants to publish less third-party content." *Soc. Media*, 2023 WL 7524912, at *13.

***Endless Content Feeds and Autoplay.***  Section 230 also bars the School Districts' claims based on display of "endless" feeds of third-party content, including content that "automatically play[s] as users scroll." *See, e.g.*, Compl. ¶¶ 106, 176, 400, 407, 622, 738, 778, 847.  Section 230 bars allegations based on "[n]ot providing a beginning and end to a user's 'Feed,'" including "'autoplay' as used on the various platforms." *Soc. Media*, 2023 WL 7524912, at *13 & n.16.

***Failure to Warn.***[6]  Finally, Section 230 bars claims that Defendants failed to provide warnings regarding the protected publishing functions discussed above.  *See, e.g.*, Compl. ¶¶ 27–28, 265, 558, 650, 824, 957.  Section 230 bars failure-to-warn claims where the "theory of liability is inherently tied to content" and the dissemination of content.  *Fields*, 217 F. Supp. 3d at 1126.  Any other rule would allow plaintiffs to evade Section 230 by repackaging impermissible claims challenging protected publisher functions as an omission claim.  For that reason, courts have consistently dismissed failure-to-warn claims where, as here, the claims are "inextricably linked" to a service's protected publisher functions, i.e., the

---

[6] This Court addressed a similar argument in its November 14, 2023 order in the personal injury cases and its statements at the November 16, 2023 case management conference.  *See* Dkt. 457, Nov. 16, 2023 Case Mgmt. Conf. Tr. 26:8–29:13.  Defendants include this argument here to preserve all rights and in light of this Court's statement in its February 2, 2024 ruling on Defendants' Motion to Certify Interlocutory Appeal that the Court "has yet to rule on the claims of both the state attorneys general and the school districts and the related motions," and the possibility of "overlap" between such motions.  *See* Dkt. No. 590 at 5.

"alleged failure to edit, monitor, or remove" third-party content. *Herrick*, 765 F. App'x at 591; *see also, e.g.*, *Bride*, 2023 WL 2016927, at *7 (Section 230 barred failure-to-warn claim because it was "predicated on allegations concerning activity immunized by Section 230"); *John Doe*, 2023 WL 9066310, at *5 ("defective warning claims" barred by Section 230 as they were "not materially different from the product liability claims … as they also rely on published content from App users"); *L.W.*, 2023 WL 3830365, at *7–8 (same); *In re Facebook, Inc.*, 625 S.W.3d 80, 93–94 (Tex. 2021) (holding failure to warn claim barred by Section 230; "a warning about third-party content is a form of editing, just as much as a disclaimer printed at the top of a page of classified ads in a newspaper would be"); *Anderson v. TikTok, Inc.*, 637 F. Supp. 3d 276, 280–81 (E.D. Pa. 2022) (same), *appeal filed*, No. 22-3061 (3d Cir. Nov. 10, 2022).[7]   Accordingly, the School Districts' failure to warn allegations would treat Defendants as publishers of third-party content and are equally barred by Section 230.

### 2.    The First Amendment Bars the School Districts' Claims.

The First Amendment prohibits civil claims that would impose liability on constitutionally protected speech and those who disseminate it. *See Snyder v. Phelps*, 562 U.S. 443, 451 (2011); *accord James v. Meow Media, Inc.*, 300 F.3d 683, 695 (6th Cir. 2002).   The School District's claims repeatedly violate this principle.[8]   Online service providers like Defendants "are in the business of delivering curated compilations of speech created, in the first instances, by others," and their "decisions about what speech to permit, disseminate, prohibit, and deprioritize ... fit comfortably within the Supreme Court's editorial-judgment precedents." *NetChoice LLC*, 34 F.4th at 1213–14.   Accordingly, courts have consistently held

---

[7] Outside the context of Section 230, courts have held that where an underlying product defect claim is preempted by federal law, a failure-to-warn claim related to that defect is necessarily also preempted. *See, e.g.*, *Turner v. Chevron U.S.A., Inc.*, 2008 WL 4570271, at *3 (C.D. Cal. Oct. 14, 2008) (where "the defect claim is preempted" and the "Plaintiff's failure to warn claim is inextricably tied to his defect claim, this claim is also preempted" (citing *Irving v. Mazda Motor Corp.*, 136 F.3d 764, 770 (11th Cir. 1998) ("Because Plaintiff's defective-design claim is preempted . . . there [i]s no defect about which to warn"))); *see also Carden v. Gen. Motors Corp.*, 509 F.3d 227, 233 (5th Cir. 2007) (same), *abrogated on other grounds by Williamson v. Mazda Motor of Am., Inc.*, 562 U.S. 323 (2011).

[8] Defendants maintain that all of the School Districts' theories of harm are barred by the First Amendment, including claims regarding recommendation algorithms and content delivery; comments, reactions, and filters; all notifications and metrics; and short-form and ephemeral content.   Defendants also maintain that the First Amendment bars any claims that Defendants are liable for failing to warn their users of the alleged dangers of any aspects of their services that are protected by the First Amendment.   Defendants preserve their challenge to these claims based on the First Amendment but limit our discussion of them here based on this Court's November 14, 2023 order in the personal injury cases.

that the First Amendment bars liability for how online services disseminate or curate third-party content. *See, e.g.*, *id.* at 1210 (when services "like Facebook, Twitter, YouTube, and TikTok … 'disclos[e],' 'publish[],' or 'disseminat[e]' information, they engage in 'speech within the meaning of the First Amendment.'" (citation omitted)); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1186–87 (N.D. Cal. 2022) (First Amendment protects "decisions about what content to include, exclude, moderate, filter, label, restrict, or promote"), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *1–2, 17 (W.D. Ark. Aug. 31, 2023) (First Amendment barred attempt to mandate age verification and parental consent); *NetChoice, LLC v. Yost*, --- F. Supp. 3d ---, 2024 WL 104336, at *1, 9 (S.D. Ohio Jan. 9, 2024) (same); *NetChoice, LLC v. Bonta*, --- F. Supp. 3d ---, 2023 WL 6135551, at *8, 13 (N.D. Cal. Sept. 18, 2023) (First Amendment barred attempt to mandate age verifications or limits on all accounts).

This protection extends to "the exercise of editorial control and judgment" over publication of third-party speech, *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974), including by online services that present user-generated content, *NetChoice, LLC*, 34 F.4th at 1203–04, 1210. Like a traditional "newspaper or a news network," interactive communication services such as Defendants "make[] decisions about what content to include, exclude, moderate, filter, label, restrict, or promote, and those decisions are protected by the First Amendment." *O'Handley*, 579 F. Supp. 3d at 1186–87. Defendants therefore "ha[ve] important First Amendment rights that would be jeopardized by a Court order telling [them] what content moderation policies to adopt and how to enforce those policies." *Id.* at 1188. This protection prevents mandating certain age verification or parental control procedures, as multiple recent decisions regarding state statutes that would impose similar requirements have ruled. *See Griffin*, 2023 WL 5660155, at *1–2, 17; *Bonta*, 2023 WL 6135551, at *8, 13; *Yost*, 2024 WL 104336, at *1, 9.

**Allegedly Deficient Age Verification and Parental Controls.**[9]   The First Amendment bars the School Districts' claims based on a lack of age verifications that would limit users' access to speech on

---

[9] This Court addressed similar arguments in its November 14, 2023 order in the personal injury cases. Defendants include this argument here to preserve all rights and in light of this Court's statement in its February 2, 2024 ruling on Defendants' Motion to Certify Interlocutory Appeal that the "Court has yet

the Defendants' services.  Age verification mandates violate the First Amendment because the invasive data collection they require from *all* users inevitably deters and "den[ies] access" to protected speech, even for "adults."  *Reno v. ACLU*, 521 U.S. 844, 876 (1997).  Federal courts have thus consistently invalidated attempts to require internet services to limit access to content based on a user's age.  *See, e.g.*, *ACLU v. Mukasey*, 534 F.3d 181, 196–97 (3d Cir. 2008) (age verification would "deter[]" "users who are not willing to access information non-anonymously" "from accessing the desired information"); *PSINet, Inc. v. Chapman*, 362 F.3d 227, 236–37 (4th Cir. 2004) (same); *ACLU v. Johnson*, 4 F. Supp. 2d 1029, 1033 (D.N.M. 1998), *aff'd*, 194 F.3d 1149 (10th Cir. 1999) (same); *Se. Booksellers Ass'n v. McMaster*, 371 F. Supp. 2d 773, 782–84 (same).  These longstanding principles very recently have been deployed to reject arguments exactly like those asserted in this case.  Within the past six months, three federal district courts (including the Northern District of California) have held that it would be unconstitutional to require Defendants to impose the types of age verification and parental control systems that the School Districts advocate for in this case.  *See Griffin*, 2023 WL 5660155, at *1–2, 17; *Bonta*, --- F. Supp. 3d ---, 2023 WL 6135551, at *8, 13; *Yost*, --- F. Supp. 3d ---, 2024 WL 104336, at *1, 9.

For these same reasons, these courts, like many others before them, held that the First Amendment bars the School Districts' claims based on a lack of broad parental controls to limit minor users' access to speech on their services.  Courts and governments lack "the power to prevent children from hearing or saying anything without their parents' prior consent," and the Supreme Court has explained that such laws functionally "impose governmental authority, subject only to a parental veto."  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011); *see also id.* at 802 (similar); *Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1064 (7th Cir. 2004) ("To condition the exercise of First Amendment rights on the willingness of an adult to chaperone is to curtail them.").

In *NetChoice, LLC v. Griffin*, the court preliminarily enjoined an Arkansas law that would require age verification and parental consent for minor users of "social media" services.  2023 WL 5660155, at *1–2, 17.  The court explained that the age verification requirement would likely deter adults from using

---

to rule on the claims of both the state attorneys general and the school districts and the related motions," and the possibility of "overlap" between such motions.  *See* Dkt. No. 590 at 5.

these services, chilling their speech, and that Arkansas failed to justify restricting minors' access to the "vast quantities of constitutionally protected speech" available on the regulated services. *Id.* Similarly, in *NetChoice, LLC v. Bonta*, the court preliminarily enjoined a California law that would require that online services "[e]stimate the age of child users with a reasonable level of certainty" or "apply child-appropriate data and privacy protections to all users." 2023 WL 6135551, at *8, 12–13 (cleaned up). The court explained that the age "estimation" requirement was "likely to exacerbate" privacy issues and would have a "potentially vast chilling effect" because it was "at the very least, a 'substantially excessive'" restriction in service of "reduc[ing] the amount of harmful content displayed to children." *Id.* at *13 (quoting *Hunt v. City of Los Angeles*, 638 F.3d 703, 717 (9th Cir. 2011)). And in *NetChoice, LLC v. Yost*, the court temporarily restrained an Ohio law that would require certain online services to bar users under 16 from their platforms absent parental consent. 2024 WL 104336, at *1–2, 9. The court explained that the law "appears to be exactly th[e] sort of law" that impermissibly limits access to speech, and that "[f]oreclosing minors under sixteen from accessing all content on [covered] websites ... absent affirmative parental consent, is a breathtakingly blunt instrument for reducing social media's harms to children." *Id.* at *8–9.

While these cases concerned challenges to state statutes, the same First Amendment protections apply to bar state-imposed tort liability. *See Soc. Media*, 2023 WL 7524912, at *17; *James,* 300 F.3d at 697 ("We cannot adequately exercise our responsibilities to evaluate regulations of protected speech, even those designed for the protection of children, that are imposed pursuant to a trial for tort liability."); *cf. Griffin*, 2023 WL 5660155, at *15 (noting vagueness concerns such that "companies will err on the side of caution," which may "unnecessarily burden minors' access to constitutionally protected speech"). If anything, the threat to speech is greater when liability is imposed in tort, given that the uncertainty concerning what constitutes sufficient age verification procedures or parental controls may force services to be even more restrictive, thereby imposing a greater burden on speech.

***Rewards and Notifications Generated by Defendants.*** The First Amendment bars the School Districts' allegations that Defendants create and notify their users of various "awards that reward users' level of engagement," allegedly driving addictive use and other harms. Compl. ¶ 574; *see also, e.g.*, *id.* ¶¶ 595, 599, 601–605, 812. "[T]he timing and clustering of notifications *of defendants' content* to increase

addictive use … is entitled to First Amendment protection" and "[t]here is no dispute that the content of the notifications themselves, such as awards, are speech."  *Soc. Media*, 2023 WL 7524912, at *18.  The Court's prior holding applies equally to the tort claims here, regardless of their names.  *See White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000) ("[I]n the First Amendment context, courts must 'look through forms to the substance.'" (quoting *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963)).

### 3.  The School Districts' Claims Are Barred by the Derivative Injury Rule.

Through their negligence and public nuisance claims, the School Districts seek compensation for their alleged "increased expenditures of financial and human resources to combat the youth mental health crisis" allegedly "caused by students' social media compulsive use and addiction."  Compl. ¶¶ 24, 87. These alleged injuries flow entirely from harms allegedly suffered by minor users of Defendants' platforms.  Put another way, "without any injury to [their students or residents], [the School Districts] would not have incurred the additional expenses" that form the basis of their claims.  *Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.* ("*Wash. Hosp. Dists.*"), 241 F.3d 696, 702 (9th Cir. 2001) (citation omitted) (dismissing claims, including public nuisance, against tobacco companies for increased health expenses of beneficiaries' smoking-related illnesses).  Such derivative injuries are too "indirect and as a consequence too remote, as a matter of law, to support recovery."  *Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir. 1999), *as amended* (Aug. 18, 1999) (similar).

#### a)  Claims Derivative of Third-Party Harms Are Not Cognizable.

The School Districts' claims do not result directly from any of Defendants' alleged conduct. Rather, their harms derive from the alleged harms suffered by third parties—their students and residents. But a "plaintiff who complain[s] of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts ... stand[s] at too remote a distance to recover" because there is no "direct relation between the injury asserted and the injurious conduct alleged."  *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268-69 (1992). This direct injury requirement "wisely limit[s]" recovery "to those situations where the chain of causation leading to damages is not complicated by the intervening agency of third parties ... from whom the plaintiffs' injuries derive."  *Laborers Loc. 17*, 191 F.3d at 240.  State common law principles hold the same.  *See, e.g.*, *City & Cnty. of San Francisco v. Philip Morris, Inc.*, 957 F. Supp.

1130, 1141 (N.D. Cal. 1997) ("[D]irect tort recovery is not available for indirect economic injury resulting

from negligent acts against third persons.").[10]

Similarly, an "alleged injury must be 'direct' to constitute an injury sufficient to support standing"

under Article III.[11]  *Coyne v. Am. Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999); *see also Linda R.S. v.*

*Richard D.*, 410 U.S. 614, 618 (1973) (A "'direct' relationship between the alleged injury and the claim

sought to be adjudicated … is a prerequisite of standing.").[12]  The "irreducible elements of Article III

standing" include that the plaintiff must have "suffered an 'injury in fact'" that is "concrete and

particularized" and "affect[s] the plaintiff in a personal and individual way."  *Meland v. Weber*, 2 F.4th

838, 844 (9th Cir. 2021) (internal quotation marks and citations omitted).  "[T]he injury in fact

test … requires that the party seeking review be himself among the injured."  *Arias v. Dyncorp*, 738 F.

Supp. 2d 46, 49, 52 (D.D.C. 2010), *aff'd*, 752 F.3d 1011 (D.C. Cir. 2014) (provinces had no standing

where their claimed "environmental injuries [were] derivative of the injuries allegedly suffered by the

individual plaintiffs").  Accordingly, where a plaintiff "seek[s] damages not for any personal injuries, but

---

[10] While these principles were articulated in *Holmes* in the context of federal RICO statute, *see Laborers Loc. 17*, 191 F.3d at 234, "[t]he proximate cause test for federal antitrust and RICO standing is the common law proximate cause test," *Wash. Hosp. Dists.*, 241 F.3d at 707.  Accordingly, courts have applied the *Holmes* principles to dismiss state common law tort claims.  *See, e.g.*, *United Food & Com. Workers Unions, Emps. Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 & n.7 (11th Cir. 2000) (noting "the principles of proximate cause in federal RICO and antitrust cases are borrowed largely from the general common law of proximate cause," and applying *Holmes* to dismiss state tort and conspiracy claims); *Laborers Loc. 17*, 191 F.3d at 242 (the *Holmes* "principles also apply in general terms to the fraud and special duty causes of action asserted by plaintiffs under New York common law"); *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 423 (3d Cir. 2002) (applying *Holmes* to proximate cause analysis of state negligence claims); *Cnty. of Cook v. Philip Morris, Inc.*, 817 N.E.2d 1039, 1042-48 (Ill. Ct. App. 2004) (applying the *Holmes* "'direct-injury' test" to dismiss Illinois tort claims).

[11] "Under Article III, a case or controversy can exist only if a plaintiff has standing to sue—a bedrock constitutional requirement … applied to all manner of important disputes."  *United States v. Texas*, 599 U.S. 670, 675 (2023); *see also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 804 (1985) ("Standing to sue in any Article III court is, of course, a federal question which does not depend on the party's prior standing in state court.").

[12] State courts applying similar principles of common law standing have concluded that "where the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them."  *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 119–120 (Conn. 2001) (municipality had no standing to assert nuisance, negligence, and other state law claims against firearms manufacturers that were "too derivative of the injuries of … imposed in the first instance on the victims of handgun violence"); *see also, e.g.*, *Penelas v. Arms Tech., Inc.*, 1999 WL 1204353, at *2 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001) (county had no standing to bring state tort claims, including negligence and nuisance claims, because "the damages it seeks are purely derivative of damages suffered by third parties").

rather for the injury to others," the plaintiff's claimed injury is "not direct or particularized." *Coyne*, 183 F3d at 495 (dismissing claims, including negligence, against tobacco companies brought by individuals on behalf of the state seeking compensation for increased public health expenditures to care for residents with tobacco-related illnesses).[13]

Applying these principles, state and federal courts have repeatedly dismissed claims brought by plaintiffs seeking to recoup the costs of addressing the injuries of third parties allegedly harmed by a defendant's misconduct and the alleged public nuisances caused by those underlying harms—ranging from specific medical expenses to broad health and social services costs.  For example, in *City of Philadelphia v. Beretta U.S.A. Corp.*, the Third Circuit held that the plaintiff city's negligence and nuisance claims against firearms manufacturers were not cognizable because the city's alleged damages, which included "emergency medical services" and preventive "educational programs," "ar[o]se only because of the use of firearms to injure or threaten City residents."  277 F.3d 415, 419, 425 (3d Cir. 2002). In *Washington Hospital Districts*, the Ninth Circuit concluded that the plaintiff hospitals' derivative harms included unreimbursed treatment costs as well as harms incurred "as potential purchasers" of "less harmful tobacco and nicotine delivery products ... whose development the Tobacco Firms allegedly conspired to suppress."  241 F.3d at 704.  "Had such less harmful products been available, the Hospital Districts' patients might have used them, and in turn might have suffered from fewer tobacco-related diseases, with the result that the Hospital Districts might have incurred lower tobacco-related treatment costs.  This is the very essence of a derivative injury."  *Id.*

The mischief worked by accepting the School Districts' attenuated theory of harm would be limitless.  Under the same theory of harm, school districts could sue parents for failing to enforce disciplinary measures for their children, leading to decreased academic outcomes for students, poor mental health, and increased behavioral problems that cause the school districts to incur the same types of increased costs that the School Districts allege.  Nor would the School Districts themselves be safe from

---

[13] In addition, Article III standing requires the claimed injury to "be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Bennett v. Spear*, 520 U.S. 154, 167 (1997).  Injuries that are derivative of third-party harms are too remote to establish "a causal connection between the injury and the defendant's challenged conduct."  *Wit v. United Behav. Health*, 79 F.4th 1068, 1083 (9th Cir. 2023).

similar claims.  A university could seek compensation from school districts for schools' failure to adequately prepare students for a college curriculum, leading the university to incur costs to adjust its curriculum to address the remedial needs of their ill-prepared new entrants.  Where "there is no direct link between the alleged misconduct of the [Defendants] and the [School Districts'] claimed damages," the School Districts' claims are not cognizable.  *Wash. Hosp. Dists.*, 241 F.3d at 703.

> **b)  The School Districts May Not Recover Indirect Damages Based Upon Their Students' or Residents' Injuries.**

The School Districts' claims are premised on the allegedly increased operational costs the School Districts have devoted to "combatting students' addiction to social media" and "address[ing] the youth mental health crisis that Defendants have caused."  Compl. ¶¶ 3, 5.  Those alleged harms are entirely contingent on alleged injuries suffered by users of Defendants' services.  The School Districts' theory of harm could have occurred only if (1) individual minors first chose to use Defendants' services; (2) at least some of those users allegedly developed addictions to those services; (3) those "addictions" resulted in negative impacts to the users' mental and physical health; and (4) those health issues led to behavioral or other problems (5) in ways that resulted in increased expense on the part of the School Districts.  These claims are no different from other rejected claims seeking compensation for similar costs incurred to address individuals' alleged personal injuries.  *See, e.g.*, *City of Philadelphia*, 277 F.3d at 425; *Ganim*, 780 A.2d at 120-30; *Penelas*, 1999 WL 1204353, at *1-2.[14]

---

[14] Defendants are aware of a recent contrary federal case—*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020)—but this Court should not adopt that court's erroneous reasoning, which is in conflict with the weight of authority.  That court held that school districts' alleged damages resulting from students' use of smokeless tobacco products were not derivative because costs, including "hiring and training staff," and the "development of programs and materials to address e-cigarette use," were distinct from those suffered by the students themselves.  *Id.* at 621.  But that is not the relevant question.  Derivative injuries will almost always be "distinct" from the underlying injuries.  For example, the city's alleged harms in *City of Philadelphia* were "different from the damages suffered by direct victims" of gun violence.  277 F.3d at 425.  The determinative question is whether the plaintiff's injuries would not have resulted without the underlying injuries.  The *Juul* court recognized that this was the case, holding that the plaintiffs' "damages *would not have been incurred but for* defendants' scheme to defraud and create a youth market" resulting in a "youth e-cigarette crisis" harming individual students.  497 F. Supp. 3d at 577, 621 (emphasis added).  The court's finding that the harms were nevertheless not derivative was incorrect.  Where the amount of a plaintiff's damages is dependent on the harm suffered by another, "[t]his is the very essence of a derivative injury."  *Wash. Hosp. Dist.*, 241 F.3d at 704.

Dismissing the School Districts' derivative claims would also serve the efficiency and fairness interests the Supreme Court identified in *Holmes*. 503 U.S. at 269-70. *First*, the complexity of ascertaining the damages attributable to Defendants (if any) "weigh[s] heavily, if not dispositively, in favor of barring plaintiffs' actions." *Wash. Hosp. Dists.*, 241 F.3d at 702; *see Holmes*, 503 U.S. at 269. The School Districts' damages are necessarily speculative and would require "proof, ultimately, of how [individual minor users] themselves would have changed their behavior in the absence of [Defendants'] wrongdoing." *Wash. Hosp. Dists.*, 241 F.3d at 702. The School Districts' alleged harms result from individual users' behavioral and health issues, making it virtually impossible to disentangle increased expenses attributable to Defendants from those attributable users' own independent conduct—let alone from those attributable to myriad other causes, including the recent COVID-19 pandemic and its massive disruption to schools.

*Second*, and relatedly, "recognizing claims of the indirectly injured" school districts and local governments runs the risk of duplicative recovery and would force the Court "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts." *Holmes*, 503 U.S. at 269. The personal injury plaintiffs assert tort claims premised on the same underlying conduct that the School Districts challenge. Thus, the difficulty of determining the amount of the School Districts' damages attributable to Defendants' conduct is multiplied by the added question of how to apportion damages between the School Districts and the personal injury plaintiffs.

*Third*, the School Districts effectively seek to sidestep a proper inquiry into the viability of claims regarding the underlying harms that individual users of Defendants' services (*i.e.*, actual or potential personal injury plaintiffs) allegedly suffered—claims that, "had they sued directly, [those users] might not be entitled to recover." *State of Sao Paulo of Federative Republic of Brazil v. Am. Tobacco Co.*, 919 A.2d 1116, 1123 (Del. 2007). "[T]he way to establish this is through tort suits [by the users], rather than through litigation in which the plaintiffs seek to strip their adversaries of all defenses." *Int'l Bhd. Of Teamsters, Loc. 734 Health & Welfare Tr. Fund v. Philip Morris Inc.*, 196 F.3d 818, 823 (7th Cir. 1999) (dismissing union trust fund's derivative antitrust and RICO claims against tobacco companies). This Court need not entertain duplicative litigation seeking to compensate the School Districts for purported indirect harms wholly contingent on the alleged direct harms to parties who are already bringing their own claims.

1

2

### 4. The School Districts' Claims Fail Because They Do Not Adequately Allege Proximate Causation.

The School Districts' claims also fail for the related reason that the School Districts do not allege that Defendants were the proximate cause of their purported harms. Even accepting this Court's ruling that the personal injury plaintiffs adequately alleged proximate causation, the connection between Defendants' conduct and the injuries *the School Districts* allege is too attenuated and indirect. In stark contrast to the personal-injury plaintiffs, the School Districts' alleged harms consist of, for example, increased "staff[ing]" and employee "train[ing]" costs, "increase[d] resources to repair property damage," "investigat[ing] and prosecut[ing] crimes," "updat[ing] student handbooks and policies," "creating educational materials," "develop[ing] new and revised teaching plans," and "confiscat[ing] cell phones and other devices" from students. Compl. ¶ 1023. Any connection between Defendants' communications services and those harms are, as a matter of law, too remote to establish liability.

Proximate causation is an essential element of the School Districts' negligence[15] and public nuisance[16] claims. As such, "liability cannot be predicated on a prior and remote cause which merely

---

[15] Proximate causation is universally recognized as an element of negligence. *See, e.g.*, *Paroline v. United States*, 572 U.S. 434, 446 (2014) ("Proximate cause is a standard aspect of causation in ... the law of torts"); *see also* 65 C.J.S. Negligence § 187 ("Proximate cause is one of the three elements that a plaintiff must prove to succeed in a negligence action."); 57A Am. Jur. 2d Negligence § 397 (liability in tort requires that the defendant's "breach was at the proximate cause of the plaintiff's injury.").

[16] *See, e.g.*, *Ashley Cnty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 666, 668 (8th Cir. 2009) (affirming dismissal of public nuisance claim where allegations failed to establish proximate causation); *Toyo Tire N. Am. Mfg., Inc. v. Davis*, 299 Ga. 155, 158 (2016) ("Causation is an essential element of nuisance, trespass, and negligence claims. To establish proximate cause, a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury."); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1113 (Ill. 2004) ("elements of a public nuisance claim" include "proximate cause"); *Sand Creek Partners, L.P. v. Finch*, 647 N.E.2d 1149, 1152 (Ind. Ct. App. 1995) ("[O]ne claiming damages from a public nuisance [must] demonstrate that the agency as operated has more than a mere tendency to, or increased likelihood of, causing an injury. The alleged nuisance must cause injury as a reasonable and natural result of its operation."); *Commonwealth v. S. Covington & C. St. Ry. Co.*, 205 S.W. 581, 583 (Ky. 1918) ("The injurious consequences or nuisance complained of should be the natural, direct, and proximate cause of defendant's acts to render him liable for maintaining a public nuisance, for it is a good defense that the tortious act was committed by other or third parties; and if the injurious results flow from acts done by others operating on the alleged nuisancer's acts, so as to produce such results, then he is not liable."); *Yokum v. Funky 544 Rhythm & Blues Cafe*, 248 So.3d 723, 737 (La. Ct. App. 2018) ("Where recovery is based on a defendant's use of property that causes damage to a neighbor, the injured neighbor must establish causation between the defendant's action or inaction and the damage resulting from the defendant's act or omission."); *Buckley v. Alkasmikha*, 2001 WL 637452, at *2 (Mich. Ct. App. May 25, 2001) ("A nuisance claim does not obviate a plaintiff's obligation to prove causation."); *McGehee v. Norfolk & S. Ry. Co.*, 147 N.C. 142, (1908) ("That defendant maintained a public nuisance on its premises does not make it liable to plaintiff to do so. The maintenance of the nuisance must be the

---

furnishes the condition or occasion for an injury resulting from an intervening unrelated and efficient cause, even though the injury would not have resulted but for such a condition or occasion."  *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 451 (R.I. 2008) (quoting *Clements v. Tashjoin*, 168 A.2d 472, 475 (R.I. 1961) (cleaned up)).

A "'proximate cause' is one that directly causes, or contributes directly to causing, the result, ***without any independent efficient cause intervening*** between the cause and the result of injury."  *Dunn Bus Serv. v. McKinley*, 178 So. 865, 868 (Fla. 1937) (citing *Fla. E. Coast Ry. Co. v. Wade*, 43 So. 775 (Fla. 1907));[17] *see also, e.g.*, *Union Pac. R.R. Co. v. Sharp*, 330 Ark. 174, 181 (1997) (defining proximate causation as "that which in a natural and continuous sequence, unbroken by any efficient intervening cause, produce[d] the injury, and without which the result would not have occurred"); *Georgia Dep't of Transp. v. Owens*, 330 Ga. App. 123, 130 (2014) (similar).  Thus, if "the degree of connection between the [defendant's] conduct and the [plaintiff's] injury" is too attenuated or indirect, proximate causation is absent.  *State Dep't of State Hosps. v. Superior Ct.*, 61 Cal. 4th 339, 353 (2015).

Proximate causation "is essentially a policy consideration that limits a defendant's liability to foreseeable consequences that have a reasonably close connection with both the defendant's conduct and the harm which that conduct created."  *Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 120 Nev. 777, 784 (2004).  "As a matter of practical necessity, legal responsibility must be limited to

---

proximate cause of his injury."); *Rickards v. Sun Oil Co.*, 41 A.2d 267, 269 (N.J. Sup. Ct. 1945) ("The doctrine of proximate cause applied equally to cases founded in negligence and in nuisance."); *Atl. Richfield Co. v. Cnty. of Montgomery*, 294 A.3d 1274, 1286–88 (Pa. Commw. Ct. 2023), *appeal denied*, 2023 WL 8042530 (Pa. Nov. 20, 2023) (rejecting argument by local government that "the usual standard of proximate causation" is "irrelevant to a public nuisance claim"); *Steele v. Rogers*, 306 S.C. 546 (Ct. App. 1992) (noting that the plaintiff bringing negligence and public nuisance claims had to establish that the defendant's conduct was the proximate cause of plaintiff's injuries); *Price v. Travis*, 149 Va. 536, 547 (1927) (overturning lower court finding for plaintiff in public nuisance case where "the railing or fence [alleged to be a public nuisance] was not the proximate cause of the plaintiff's injury, but an independent supervening force apparently, without the knowledge of the defendant, caused the unsafeness of the sidewalk, from which the injury resulted"); *Melton v. Boustred*, 183 Cal. App. 4th 521, 542 (2010) ("The elements 'of a cause of action for public nuisance include the existence of a duty and causation.'" (quoting *In re Firearm Cases*, 126 Cal. App. 4th 959, 988 (2005)); *Lead Indus.*, 951 A.2d at 450 ("Causation is a basic requirement in any public nuisance action; such a requirement is consistent with the law of torts generally." (collecting cases)); 38 Fla. Jur 2d, Nuisances § 18 ("In order to establish nuisance, a causal connection must exist between the defendants and the nuisance complained of." (citing Am. Jur. 2d, Nuisances § 65)).

[17] Unless otherwise noted, all emphases added and all citations and quotations omitted.

---

those causes which are so close to the result, or of such significance as causes, that the law is justified in making the defendant pay." *Kumaraperu v. Feldstead*, 237 Cal. App. 4th 60, 68 (2015).  Thus, proximate causation may not be established by "remote condition[s] or conduct."  *See, e.g.*, *Matthews v. Williford*, 318 So.2d 480, 481 (Fla. Dist. Ct. App. 1975); *see also supra* Part III.A.3.

Any link between Defendants' services and the School Districts' alleged harms would be precisely the sort of attenuated and remote condition that cannot constitute proximate causation.  For example, the School Districts claim "financial harm" arising from "challenge[]" videos—*i.e.*, third party posts encouraging vandalism of school facilities or self-harm.  Compl. ¶¶ 183-87.  Yet in every case, the immediate causes of the School Districts' harm include (1) the third party who created and posted the "challenge" and (2) the student who criminally vandalized school property or otherwise chose to participate in the challenge.  The School Districts admit as much, conceding that harm based on "vandalism" and "property damage" is "***caused by minors acting out***."  *Id.* ¶ 1000.  Similarly, it is individual students, not Defendants, who violate schools' device policies, create "classroom disruptions," "skip[] class," bully their peers, or start fights.  *See id.* ¶ 994.

Likewise, the School Districts claim that Defendants' services "connect strangers, including adult predators, with adolescent users," *id.* ¶ 532, which in turn leads to "mental health and behavioral issues" in certain students, which in turn leads to the School Districts making more "resource expenditures," *id.* ¶ 212; *see also id.* ¶ 248 (seeking damages based on alleged need to "investigate and prosecute crimes" and "threats").  In such circumstances, the independent acts of the third-party "predators" and other criminals, and not Defendants' services, are the immediate cause of any harm to *students*.  *See, e.g.*, *Noble v. L.A. Dodgers, Inc.*, 168 Cal. App. 3d 912, 917 (1985) (no causation where plaintiffs were assaulted in defendant's parking lot—"the direct cause of each plaintiff's injury was the conduct of the person or persons who struck [plaintiff]"); *Mike v. Borough of Aliquippa*, 421 A.2d 251, 256–57 (Pa. Super. 1980) ("intervening criminal act of a third party" generally breaks the chain of causation); *Bryant v. Atl. Car Rental, Inc.*, 127 So.2d 910, 910–11 (Fla. 2d DCA 1961) (noting that a car's owner is not liable for harms caused by a "youth" who stole and "negligently drove the vehicle" because of "the lack of reasonable foreseeability and the independent intervening cause," even when the owner left the car "unattended with key in the ignition"); *D'Ambra v. Peak Bldg. Corp.*, 680 A.2d 939, 941 (R.I. 1996) ("[A] defendant 'was

not bound to anticipate mischievous or wrongful acts on the part of others, and hence was not bound to guard against them.'" (quoting *Mahogany v. Ward*, 17 A. 860, 862 (R.I. 1889))).  The same conclusion applies *a fortiori* to the School Districts' claims, which flow indirectly through and from alleged harm to adolescents.

The Illinois Supreme Court's reasoning in *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004), is instructive.  There, local governments sued gun sellers, arguing that the defendants' sale of firearms that ended up in the hands of bad actors constituted an actionable public nuisance.  The court rejected that argument, holding that it was not foreseeable "that the aggregate effect of numerous sales transactions occurring over time and in multiple different locations operated by businesses with no ties to each other [would] result in the creation of a public nuisance." *Id.*  The court concluded:

> [T]he alleged public nuisance is not so foreseeable to the dealer defendants that their conduct can be deemed a legal cause of a nuisance that is the result of the aggregate of the criminal acts of many individuals over whom they have no control.

*Id.* at 1138 (quoting *People ex rel. Spitzer v. Sturm, Ruger & Co., Inc.*, 761 N.Y.S.2d 192, 202 (App. Div. 2003) (cleaned up)); *see also Gamache v. Airbnb, Inc.*, No. A146179, 2017 WL 3431651, at *2 (Cal. Ct. App. Aug. 10, 2017) (rejecting public nuisance claim against Airbnb on proximate causation grounds because the immediate causes of the alleged harms were renters and landlords).

At bottom, the School Districts' claims turn to a significant extent on allegations that Defendants' services made it possible for third parties to commit criminal or tortious acts, which in turn caused harm to students, which in turn caused Plaintiffs to incur increased expenses.  As the U.S. Supreme Court has explained, imposing liability under these circumstances "would run roughshod over the typical limits on tort liability":

> [B]ad actors … are able to use platforms like defendants' for illegal—and sometimes terrible—ends.  But the same could be said of cell phones, email, or the internet generally.  Yet, we generally do not think that internet or cell service providers incur culpability merely for providing their services to the public writ large.

*Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498–99, 503 (2023); *see also Grieco v. Daiho Sangyo, Inc.*, 344 So.3d 11, 27 (Fla. Dist. Ct. App. 2022) (holding that "it was not objectively reasonable for [third party's]

criminal conduct to be foreseeable as a matter of law to establish ... proximate cause," "[e]ven though the risk" of this conduct "is within the boundless realm of conceivable possibilities").

Defendants' interactive communication services are used overwhelmingly for lawful and beneficial purposes. Each day, hundreds of millions of users access Defendants' services, engaging in billions of actions. *See* Compl. ¶¶ 14, 267, 569, 683, 848. That a small fraction of those users may encourage or commit destructive or disruptive acts does not render Defendants the proximate cause of any resulting harms. *See Taamneh*, 598 U.S. at 498-502; *see also Crosby v. Twitter, Inc.*, 921 F.3d 617, 625–26 (6th Cir. 2019) ("With the 'highly interconnected' nature of social media, the internet, and 'modern economic and social life'—we expect Defendants' websites to cause some 'ripples of harm' that would 'flow far beyond the defendants' misconduct," but "Defendants do not proximately cause all these potential ripples." (quoting *Fields v. Twitter, Inc.*, 881 F.3d 739, 749 (9th Cir. 2018)); *id.* at 625 ("Twitter ... do[es] not proximately cause everything that an individual may do" on Twitter nor can Defendants "foresee how every viewer will react" on the service); *Gonzalez v. Google, Inc.*, 335 F. Supp. 3d 1156, 1178 (N.D. Cal. 2018), *aff'd in relevant part*, 2 F.4th 871 (9th Cir. 2021) ("While [the complaint] includes detailed allegations regarding the alleged use of YouTube by ISIS and its affiliates, [it] does not allege any facts plausibly connecting the general availability of YouTube with the [ISIS terrorist] attack itself."); *Modisette v. Apple Inc.*, 241 Cal. 3d 209, 226(2018) (even assuming "use of the iPhone while driving" was generally foreseeable and resulted in car collision, "the gap between Apple's design of the iPhone and the [plaintiffs'] injuries is too great for the tort system to hold Apple responsible.").[18]

In sum, as a matter of law, Defendants' alleged conduct is not the proximate cause of the School Districts' alleged injuries. In every case, the immediate causes of the School Districts' injuries are the third-party students whose conduct the School Districts remediated. What is more, to a substantial extent,

---

[18] Even more fundamentally, intentionally harmful acts of third parties are generally held not to be foreseeable. Defendants have "much less reason to anticipate acts on the part of others which are malicious and intentionally damaging than those which are merely negligent." W. Prosser, The Law of Torts § 33, at p.201 (5th ed. 1984); *see also Wiener v. Southcoast Childcare Ctrs., Inc.*, 88 P.3d 517, 623–24 (Cal. 2004*); Everett v. Carter*, 490 So.2d 193, 195 (Fla. Dist. Ct. App. 1986); *City of Chicago,* 821 N.E.2d at 1135–36; *Graves v. Warner Bros.*, 656 N.W.2d 195, 200–01 (Mich. Ct. App. 2002); *Price v. Blaine Kern Artista, Inc.,* 111 Nev. 515, 519 (1995); *Mike v. Borough of Aliquippa*, 421 A.2d 251, 256–57 (Pa. Super. 1980).

the School Districts' alleged injuries flow from the wrongful conduct of *other* third parties who allegedly post harmful content or otherwise communicate with students in an allegedly harmful manner.  The degree of connection between Defendants' conduct and the injuries alleged by the School Districts is more tenuous and remote than that in the personal-injury plaintiffs' case, and it is insufficient to establish proximate causation.

### B.   The School Districts Fail To State a Claim for Public Nuisance.

Even setting aside those threshold defects, the School Districts' public nuisance claims fail for multiple reasons.  *First*, most jurisdictions restrict public nuisance claims to the land use context, and the overwhelming weight of authority rejects application of nuisance law to address allegedly widespread social problems caused by the distribution of lawful products or services.  *Second*, the School Districts do not allege interference with a *public* right, as required to state a claim for public nuisance.  *Third*, the School Districts acknowledge that they must plead a "special injury," but they fail to do so.

### 1.   The School Districts' Sweeping Theory of Public Nuisance Represents an Unwarranted Expansion of a Traditionally Limited Common-Law Tort.

The School Districts attempt to use the law of public nuisance to hold communications services responsible for an alleged nationwide decline in youth mental well-being.  Doing so requires an expansive theory of public nuisance that would run roughshod over centuries-old common-law tort principles.  The traditional, majority rule is that public nuisance is limited to the context of land use and environmental harms.  *See In re Lead Paint Litig.*, 924 A.2d 484, 495 (N.J. 2007) ("[E]ssential to the concept of a public nuisance tort … is the fact that it has historically been linked to the use of land by the one creating the nuisance.").  Even where some courts have been willing to expand public nuisance beyond land use, courts across the country—as well as the Restatement—recognize that it is ill-suited for alleged harms arising from the otherwise lawful distribution of products or services.  *See, e.g.*, *City of Chicago*, 821 N.E.2d at 1116 (affirming dismissal of public nuisance claims because there is no "public right to be free from the threat that some individuals may use an otherwise legal product … in a manner that may create a risk of harm"); Restatement (Third) of Torts Liab. For Econ. Harm ("Third Restatement") § 8 (2020), cmt. g (liability for "[m]ass harms caused by dangerous products" "has been rejected by most courts, and is

excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue").

The School Districts would go even one step further: they would apply public nuisance not to the lawful distribution of a tangible product but to a communication service, asserting liability for disseminating expressive content.  No court has ever applied the law of public nuisance to such circumstances.  As a federal court sitting in diversity, this Court should not be at the vanguard of expanding state common law but should instead interpret the law as it currently exists.  *See Davidson v. Apple, Inc.*, 2017 WL 3149305, at *18 (N.D. Cal. July 25, 2017) ("[A] federal court sitting in diversity '***should opt for the interpretation that restricts liability, rather than expands it***, until the [state's highest court] decides differently.'"); *Engert v. Stanislaus Cnty.*, 2015 WL 3609315, at *32 (E.D. Cal. June 8, 2015) ("A federal court sitting in diversity cannot be expected to create new doctrines expanding state law."); *Taylor v. Louisiana Pac. Corp.*, 165 F.3d 36 (9th Cir. 1998) ("We have previously noted that, '[a]s a federal court ruling on state law, we feel no duty to be in the vanguard in changing the state law.'").

If the School Districts' theory were to prevail, public nuisance law "would become a monster that would devour in one gulp the entire law of tort," *Tioga Public School District v. United States Gypsum Co.*, 984 F.2d 915, 921 (8th Cir. 1993), and would "allow[] courts to manage public policy matters that should be dealt with by the legislative and executive branches," *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 731 (Okla. 2021).  The Court should reject the School District's theory.

### a)      Most Jurisdictions Limit Public Nuisance Claims Either to Use of Land or Interference with Land.

For centuries, the tort of public nuisance has required a clear nexus to the use of land or real property, as both courts and scholars have recognized.  *See id.* ("[Public nuisance] has historically been linked to the use of land by the one creating the nuisance."); Donald Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CIN. L. REV. 741, 831 (2003) ("[W]hen one reads hundreds of nuisance cases from medieval times to the present, one is struck by the reality that public nuisance almost always involves land.").  As the New Jersey Supreme Court explained,

> The link to land may arise either because the nuisance is on that person's land, as in a mosquito pond, or because an activity conducted on that land interferes with a right of the general public, as in a stream-polluting

business....   In either case, public nuisance has historically been tied to conduct on one's own land or property as it affects the rights of the general public.

*In re Lead Paint*, 924 A.2d at 495–96.

Modern courts continue to follow this rule, "signaling a clear national trend to limit public nuisance to land or property use." *Johnson & Johnson*, 499 P.3d at 730.[19]   For example, in a case involving the sale and distribution of guns, the Illinois Supreme Court observed that "in the over-100-year history of public nuisance law in Illinois, a public nuisance has been found to exist only when one of two circumstances was present: either the defendant's conduct in creating the public nuisance involved the defendant's use of land, or the conduct at issue was in violation of a statute or ordinance." *City of Chicago*, 821 N.E.2d at 1117.   The Court rejected the plaintiff's attempt "to expand the law of nuisance to encompass a third circumstance—the effect of lawful conduct that does not involve the use of land." *Id.*

In discussing "the elements necessary to establish a public nuisance," the Rhode Island Supreme Court similarly observed in a case about lead paint that "[a] common feature of public nuisance is the

---

[19] *See, e.g.*, *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 472 (S.D.W. Va. 2022) ("Consistent with the Restatement of Torts, the West Virginia Supreme Court has only applied public nuisance law in the context of conduct that interferes with public property or resources."); *Overcash v. S.C. Elec. & Gas Co.*, 614 S.E.2d 619, 622 (S.C. 2005) (dismissing public nuisance claim that did not involve injury to "real or personal property"); *Detroit Bd. of Educ. v. Celotex Corp.*, 196 Mich. App. 694, 711 (1992) ("the [public nuisance] cases almost universally concern the use or condition of property"); *Independence Cty. v. Pfizer, Inc.*, 534 F. Supp. 2d 882, 890 (E.D. Ark. 2008) ("Because Defendants are not landowners, Plaintiffs cannot succeed on their public nuisance claim."); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, 379 F. Supp. 2d 348, 417 (S.D.N.Y. 2005) ("'A nuisance arises from the use of property, either actively or passively, in an unreasonable manner.' … Plaintiffs' nuisance claims must be dismissed because plaintiffs seek to recover from defendants in their capacity as manufacturers, and not as property owners or users."); *City of Perry v. Procter & Gamble Co.*, 188 F. Supp. 3d 276, 291 (S.D.N.Y. 2016) ("The parties do not cite, and the Court is not aware of, any cases applying Iowa law that recognize a nuisance claim arising out of the sale or use of a product as opposed to the use of property"); *Texas v. Am. Tobacco Co.*, 14 F. Supp. 2d 956, 973 (E.D. Tex. 1997) ("[T]he Court is unwilling to accept the state's invitation to expand a claim for public nuisance beyond its ground in real property."); *City of Philadelphia v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 907–08 (E.D. Pa. 2000) ("Nuisances are those wrongs which arise from the 'unreasonable, unwarrantable, or unlawful use' of one's real or personal property."), *aff'd*, 277 F.3d 415 (3d Cir. 2002); *Tioga Pub. Sch. Dist. No. 15 of Williams Cnty., State of N.D. v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) ("North Dakota cases applying the state's nuisance statute all appear to arise in the classic context of a landowner or other person in control of property conducting an activity on his land in such a manner as to interfere with the property rights of a neighbor."); *Horzepa v. City of Waterbury*, No. CV156027853, 2016 WL 1710810, at *2 (Conn. Super. Ct. Apr. 12, 2016) ("To successfully plead a public nuisance cause of action, 'a plaintiff must prove ... the use of the land was unreasonable or unlawful.'" (quoting *Burton v. Dominion Nuclear Connecticut, Inc.*, 300 Conn. 542, 561 (2011))).

---

occurrence of a dangerous condition at a specific location." *Lead Indus.*, 951 A.2d at 452. Accordingly, that court "recognized that ... to date, the actions for nuisance in this jurisdiction have been related to *land*." *Id.* (emphasis in original). While noting that, unlike with private nuisance, public nuisance claims do not necessarily require interference with the plaintiff's land, they do "originate on a defendant's land ... or an activity conducted on a defendant's land." *Id.* Thus, even though lead paint caused widespread harm to children—and inherently affected the ***plaintiff's*** property—because it had no connection to the ***defendant's*** use of its own land or property, it was not a public nuisance. *See id.* at 453–55.

The School Districts do not allege that they were harmed by Defendant's use of land or property—nor could they. *See City of Chicago*, 821 N.E.2d at 1111 ("The mere fact that defendants' conduct in their plants, offices, and stores puts guns into the stream of commerce does not state a claim for public nuisance based on their use of land. It is the presence and use of the guns within the city of Chicago that constitutes the alleged nuisance, not the activities at the defendants' various places of business."). For this reason alone, their public nuisance claims fail in most jurisdictions.[20]

### b) Public Nuisance Law Does Not Extend to the Marketing or Dissemination of Consumer Products or Services.

Even where public nuisance law is not strictly limited to cases involving land use, courts have squarely rejected its application to claims like those brought by the School Districts. Courts have repeatedly declined to extend public nuisance law to redress harms in cases involving allegedly dangerous products or services. *See, e.g.*, *City of Chicago*, 821 N.E.2d at 1116 (declining to allow public nuisance claims for the risk that use of an otherwise "legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality)" could cause harm). Indeed, five of the six state supreme courts to have considered

---

[20] Of the jurisdictions with school district or local government plaintiffs in the MDL, only California and Indiana have expressly departed from this majority rule, though their public nuisance claims still fail for the reasons discussed immediately below. Courts applying Illinois, New Jersey, Rhode Island, South Carolina, Pennsylvania, and Florida law have limited public nuisance to land or property use (or land use plus outright illegal activity or specific scenarios addressed by statute). *See City of Chicago*, 821 N.E.2d at 1117; *In re Lead Paint*, 924 A.2d at 495–96, *Lead Indus.*, 951 A.2d at 452; *Overcash*, 614 S.E.2d at 622; *City of Philadelphia*, 126 F. Supp. 2d at 907–08; *Pompano Horse Club et al. v. State*, 93 Fla. 415, 456 (1927) ("[A] public nuisance ... is an unlawful use of one's own property in such way as to cause material annoyance, discomfort or hurt to the public."). While courts in Alaska, Colorado, Georgia, Kentucky, Louisiana, Maryland, North Carolina, Nevada, and Virginia have not directly addressed the issue, there is no reason to believe they would depart from the longstanding majority rule.

the type of expansion of public nuisance law advocated by the School Districts have rejected it.[21]   The reasoning of these decisions applies with even greater force to Defendants' communication services, which are even further removed from the traditional bounds of nuisance law.

As the Oklahoma Supreme Court recently explained in a suit involving the opioid crisis, permitting "nuisance liability for manufacturing, marketing, or selling products" would have widespread adverse consequences: "will a sugar manufacturer or the fast food industry be liable for obesity, will an alcohol manufacturer be liable for psychological harms, or will a car manufacturer be liable for health hazards from lung disease to dementia or for air pollution[?]" *Hunter*, 499 P.3d at 731.   Numerous other decisions likewise recognize that the public nuisance doctrine is not intended to address alleged adverse consequences flowing from the use of products or services.[22]   The latest Restatement of Torts agrees, confirming that public nuisance law remains limited to its traditional bounds:

---

[21] *See Ganim*, 780 A.2d at 131–32 (Connecticut); *City of Chicago*, 821 N.E.2d at 1116 (Illinois); *In re Lead Paint*, 924 A.2d at 501–02 (New Jersey); *Lead Indus.*, 951 A.2d at 456-57 (Rhode Island); *Hunter*, 499 P.3d at 730 (Oklahoma).  The Ohio Supreme Court came out the other way on a motion to dismiss in a case brought by a city related to gun violence, *Cincinnati v. Beretta USA Corp.*, 768 N.E.2d 1136, 1141, 1143 (Ohio 2002), but in the more than 20 years since that decision, the Ohio Supreme Court has cited it only to support the proposition that a plaintiff's burden at the pleading stage is low.  There are no School District Plaintiffs from Ohio in the MDL.

[22] *Detroit Bd. of Educ. v. Celotex Corp.*, 493 N.W.2d 513 (Mich. Ct. App. 1992) ("We agree and hold that manufacturers, sellers, or installers of defective products may not be held liable on a nuisance theory for injuries caused by the defect.  To hold otherwise would significantly expand, with unpredictable consequences, the remedies already available to persons injured by products, and not merely asbestos products."); *City of Phila. v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 909 (E.D. Pa. 2000) ("Nuisance is inapplicable to suits based on the design and distribution of products."); *City of Huntington v. AmerisourceBergen Drug Corp.*, 609 F. Supp. 3d 408, 474 (S.D. W.Va. 2022) ("If suits of this nature were permitted any product that involves a risk of harm would be open to suit under a public nuisance theory."); *Camden County Board of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3rd Cir. 2001) ("[N]o New Jersey Court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products placed in the stream of commerce."); *Penelas v. Arms Tech., Inc.*, 1999 WL 1204353, at *4 (Fla. Cir. Ct. Dec. 13, 1999) ("Public nuisance does not apply to the design, manufacture, and distribution of a lawful product.  A separate body of law (strict product liability and negligence) has been developed to apply to the manufacture and design of products."), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001).

The weight of authority from California courts likewise rejects the School Districts' expansive application of public nuisance law.  *See In re Firearm Cases*, 126 Cal. App. 4th 959, 991 (2005) (agreeing with "cogent policy reasons against extending nuisance liability in this context [to manufacturers of allegedly dangerous products]"); *City of Modesto Redevelopment Agency v. Superior Ct.*, 119 Cal. App. 4th 28, 39–40 (2004) ("[T]he law of nuisance is not intended to serve as a surrogate for ordinary products liability."); *City of San Diego v. U.S. Gypsum Co.*, 30 Cal. App. 4th 575, 586 (1994) ("City cites no California decision, however, that allows recovery for a defective product under a nuisance cause of action.  Indeed, under City's theory, nuisance 'would become a monster that would devour in one gulp the entire law of tort.'" (quoting *Tioga*, 984 F.2d at 921)).  The Ninth Circuit's opinion in *Ileto v. Glock Inc.*, 349 F.3d

---

34

> [P]roblems caused by dangerous products might once have seemed to be matters for the law of public nuisance because the term 'public nuisance' has sometimes been defined in broad language that can be read to encompass anything injurious to public health and safety. The traditional office of the tort, however, has been narrower than those formulations suggest, and contemporary case law has made clear that its reach remains more modest.

Third Restatement § 8, cmt. g (2020).  The Restatement's admonition was a clear rebuke of those minority of decisions that had allowed "unsound claims of public nuisance to be brought on facts outside the traditional ambit of the tort."  *Id.*, cmt. b; *see also In re Lead Paint*, 924 A.2d at 501  ("[W]ere we to conclude that plaintiffs have stated a claim, we would necessarily be concluding that the conduct of merely offering an everyday household product for sale can suffice for the purpose of interfering with a common right as we understand it.  Such an interpretation would far exceed any cognizable cause of action."); *Hunter*, 499 P.3d at 725 ("Applying the nuisance statutes to lawful products as the State requests would create unlimited and unprincipled liability for product manufacturers; this is why our Court has never applied public nuisance law to the manufacturing, marketing, and selling of lawful products.").[23]

The Rhode Island Supreme Court's *Lead Industries* decision once again is instructive.  While recognizing "the severity of the harm that thousands of children in Rhode Island have suffered as a result of lead poisoning," the Court held that "public nuisance law simply does not provide a remedy for this harm."  *Lead Indus.*, 951 A.2d at 435.  Noting that "[t]he law of public nuisance never before has been applied to products," the Court explained that "giving a green light to a common-law public nuisance cause of action today will … likely open the courthouse doors to a flood of limitless, similar theories of public nuisance, not only against these defendants, but also against a wide and varied array of other

---

1191, 1214 (9th Cir. 2003) is inconsistent with the later-decided California cases, and California courts have expressly rejected its reasoning.  *See In re Firearm Cases*, 126 Cal. App. 4th at 990 ("We find the views expressed by the dissenters to the denial of rehearing *en banc* in *Ileto* instructive.").  Respectfully, this Court (Orrick, J.) erred in relying on *Ileto* to allow a public nuisance claim.  *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 646–47 (N.D. Cal. 2020); *see also infra* Part III.B.2.a.

[23] Several motion to dismiss decisions from the opioid litigation reflect the "unsound" approach criticized by the Third Restatement.  *See, e.g.*, *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610 (N.D. Cal. 2020).  Notably, however, in the *only* appellate decision from the opioid litigation, the Oklahoma Supreme Court rejected the plaintiff's attempt to "eras[e] the traditional limits on nuisance liability."  *Hunter*, 499 P.3d at 731.

commercial and manufacturing enterprises and activities." *Id.* at 457 (quoting *Sturm*, 761 N.Y.S.2d at 196).

While Defendants respectfully disagree with this Court's conclusion that certain features of their services are subject to product liability law, it would be especially incongruous to allow duplicative public nuisance liability for those same features here. *See, e.g.*, *supra* n.22 and accompanying text. Moreover, concerns about the unwarranted expansion of the nuisance doctrine are even more acute where, as here, the claims involve alleged harms not from tangible products but from intangible information disseminated on communications services. Nuisance would become the universal tort for the Internet age, imposing wide-ranging liability on providers of digital communications services for all manner of harms. The result would be not only chaotic disruptions of otherwise lawful and often beneficial economic activities but also chilling effects on free expression and communication. *See supra* Part III.A.1-2.

Ultimately, the clear consensus is that questions of allegedly widespread social ills and complex issues of public policy should be decided by the political branches, not courts. *See* Third Restatement § 8, cmt. g ("[T]he best response is to address the problems at issue through legislation that can account for all the affected interests."); *Lead Indus.*, 951 A.2d at 436 ("The County's frustration cannot be alleviated through litigation as the judiciary is not empowered to 'enact' regulatory measures in the guise of injunctive relief. The power to legislate belongs not to the judicial branch of government, but to the legislative branch."); *Hunter*, 499 P.3d at 731 ("The district court's expansion of public nuisance law allows courts to manage public policy matters that should be dealt with by the legislative and executive branches; the branches that are more capable than courts to balance the competing interests at play in societal problems."); *City of Chicago*, 821 N.E.2d at 1121 ("It seems that plaintiffs seek injunctive relief from this court because relief has not been forthcoming from the General Assembly. We are reluctant to interfere in the lawmaking process in the manner suggested by plaintiffs."); *Penelas*, 778 So. 2d at 1045 (similar). This is especially true where the issues presented would amount to an unprecedented expansion of tort law into a new area. The School Districts seek to expand public nuisance far beyond its traditional bounds to regulate the distribution of online communications services. This Court should decline to do so.

2.      **The School Districts Have Not Alleged Interference with a Public Right.**

Even if public nuisance law were broad enough to encompass the types of claims the School Districts allege, they have not sufficiently alleged that Defendants' conduct interfered with any ***public*** rights.  As a result, "however grave the problem of [youth mental health issues], public nuisance law simply does not provide a remedy for this harm" against Defendants.  *Lead Indus.*, 951 A.2d at 435.

"A public right is one common to all members of the general public."  Restatement (Second) of Torts ("Second Restatement") § 821B(1) cmt. g.  "[A] public right is ***the right to a public good, such as 'an indivisible resource shared by the public at large, like air, water, or public rights of way***.'"  *Lead Indus.*, 951 A.2d at 448; *Hunter*, 499 P.3d at 726 (same).[24]  Public "rights" are not coextensive with the public "interest," which "is a far broader category."  *Lead Indus.*, 951 A.2d at 448.  For example, "while it is in the public interest to promote the health and well-being of citizens generally, there is no common law public right to a certain standard of medical care or housing."  *Id.*

Public rights are also distinct from private rights, such as the "right that everyone has not to be … defrauded or negligently injured."  Second Restatement § 821B(1), cmt. g.  A private right is personal to each individual and does not depend on whether others are affected.  *Id.*  Such a private right does not become a "public right" simply by "aggregat[ing] [the] private rights [of] a large number of injured people."  *Lead Indus.*, 951 A.2d at 448 (citing Second Restatement § 821B cmt. g).

Because the right not to be negligently injured is a private right, courts have routinely rejected public nuisance claims premised on personal injuries allegedly caused by a product, even where a product allegedly injures many people:

> [T]he manufacture and distribution of products ***rarely, if ever, causes a violation of a public right*** as that term has been understood in the law of public nuisance. … [A]ny harm they cause … is not an actionable violation of a public right.  ***The sheer number of violations does not transform the harm from individual injury to communal injury***.

*Lead Indus.*, 951 A.2d at 448; *see Hunter*, 499 P.3d at 726–27 (same).  Thus, no matter how widespread the use of a product or service, the number of people allegedly affected, or the "substantial damages" allegedly incurred by the government as a result, claims based on manufacturing, promoting, or

---

[24] "Oklahoma's nuisance statute codifies the common law."  *Hunter*, 499 P.3d at 724.

distributing an allegedly dangerous product, as alleged here, do not implicate a public right.  *Lead Indus.*, 951 A.2d at 440, 453–54; *Hunter*, 499 P.3d at 727.

By the same token, there is no "public right" to be free from the consequences of others' allegedly harmful use of products and services.  Relying on the Restatement, courts have held that an assertion that there is a right to be free from harms resulting from misuse of a product "is merely an assertion, on behalf of the entire community, of the ***individual right*** not to be assaulted [or negligently injured]."  *City of Chicago*, 821 N.E.2d at 1116; *see id.* ("We are … reluctant to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it.").  To permit such an "unprecedented expansion of the concept of public rights" would "permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products."  *Id.*; *see also Hunter*, 499 P.3d at 727 (no "public right to be free from the threat that others may misuse or abuse prescription opioids" because, to do so "would hold manufacturers, distributors, and prescribers potentially liable for all types of use and misuse of prescription medications").

The School Districts have not alleged interference with a public right because they allege, at most, interference with the private rights of only a subset of the community.

         **a)**      **The School Districts Allege, at Most, Interference with Private Rights.**

The School Districts allege interferences with rights to "public health" and "safety," but their factual allegations make plain that the rights allegedly interfered with are not public rights "like air, water, or public rights of way," *Lead Indus.*, 951 A.2d at 448, but private rights.  This is evident by the fact that the School Districts' allegations are in great part lifted nearly verbatim from the ***personal injury*** plaintiffs' Master Complaint.  *See* PI SAC ¶¶ 100, 135, 137.  The School Districts allege that children are "uniquely susceptible to addictive features in digital products"—which affect the "same neural reward network as non-social rewards and drug addiction"—because of minors' comparatively undeveloped "frontal lobes."  *See, e.g.*, Compl. ¶¶ 9, 81, 757.  As a result, the School Districts allege minor social media users suffer harms, including lower self-esteem due to "social comparisons," body dysmorphia, sleep disruptions, anxiety, depression, withdrawal from in-person relationships and activities, and poor academic performance.  *E.g.*, Compl. ¶¶ 19, 87–89, 134–182.  Those are like the alleged injuries in *Lead Industries*

and *Hunter*, which were held to be interferences with private rights.  *Lead Indus.*, 951 A.2d at 454 ("[t]he right of an individual child not to be poisoned by lead paint is" a "nonpublic" right);[25] *Hunter*, 499 P.3d at 727 ("The damages the State seeks are not for a communal injury but are instead more in line with a private tort action for individual injuries sustained from use of a lawful product and in providing medical treatment or preventive treatment to certain, though numerous, individuals.").

Even where the School Districts allege an interference with the "right to a public education," it is clear that they are not alleging any interference with the public's ***access*** to public education, but disruptions to individual students' performance in school.  *E.g.*, *id.* ¶ 207 (alleging that social media use among middle and high school students causes "reduced sleep time and quality," "poor academic performance," "distract[ed] students during class or study time and causing procrastination on school assignments," which "undermine[s] students' rights to public education"); *id.* ¶ 209 (alleging that social media causes students to skip school); *id.* ¶ 914 ("Sleep deprivation also interferes with Plaintiffs' operations as additional resources must be diverted or expended to address children's inability to focus, learn, follow directions, and interact positively with other students and teachers when they are sleep deprived."); *id.* ¶ 993 ("Students are suffering from depression, stress, and anxiety, which are serious obstacles to learning.").  These are the same types of harms alleged in *Lead Industries*.  951 A.2d at 436–37 (no interference with a public right even though lead paint "may lead to permanent learning disabilities, reduced concentration and attentiveness and behavior problems, problems which may persist and adversely affect the child's chances for success in school and life").  As that case and the Restatement make clear, they are private injuries, not interferences with public rights.

It is hard to conceive of harms more private, and more distinct from individual to individual, than anxiety, depression, sleep disturbances, poor academic performance, and personal body-image issues.  *See Soc. Media Cases*, JCCP No. 5255, 2023 WL 6847378, *20 (Cal. Super. Ct. Oct. 16, 2023) (explaining how each user's experience varies when using Defendants' platforms).  These harms are entirely unlike either the rights to public resources (e.g., air, water) or access to public property and rights-of-way that

---

[25] *Lead Indus.*, 951 A.2d at 437 ("[B]ecause they are young, children's growing bodies have a tendency to absorb more lead, and their brains and nervous systems are more sensitive to the lead.").

are the traditional province of public nuisance law, *see supra* Part II. The School Districts cannot convert these private rights into public ones merely by alleging that many students have suffered them, or that their downstream consequences include the expenditure of public funds to address them. *See, e.g.*, *Hunter*, 499 P.3d at 727 (refusing to extend public nuisance law to recognize "a public right to be free from the threat that others may misuse or abuse prescription opioids—a lawful product"); *City of Chicago*, 821 N.E.2d at 1116 (no "public right to be free from the threat that some individuals may use an otherwise legal product" such as " a cell phone … in a manner that may create a risk of harm to another");[26] Compl. ¶¶ 193, 974.

The Court should therefore dismiss the School Districts' public nuisance claim. The vast majority of the jurisdictions that govern the various School Districts' claims look to the Restatement in defining or interpreting their states' public nuisance law,[27] or the law of the states is otherwise consistent with the Restatement.[28]  And when five of the six state supreme courts to consider expanding public nuisance to

---

[26] The School Districts include a single allegation that "Defendants have interfered with a right common to the general public by diverting tax dollars into projects required to abate the nuisance caused by the Defendants' conduct, rather than having that tax money spent on other public programs and services." Compl. ¶ 995.  But, the School Districts have not asserted (and cannot assert) a public nuisance claim on behalf of taxpayers, *see infra* Part III.B.3, and in any event, there is no recognized "public right" redressable through public nuisance law to have one's tax dollars spent on one particular "program" or "service" instead of another.  Even if there were, *no* private plaintiff could maintain a public nuisance on that basis because he or she could not show special injury different in kind than the injury to all other taxpayers.  *See infra* Part IV.B.3.  And *Lead Industries*, *Hunter*, and *City of Chicago* all involved allegations that the government spent money addressing the alleged harms, but that expenditure did not suffice to implicate a public right.  *See, e.g.*, *City of Chicago*, 821 N.E.2d at 1106 (city and county sought "compensation for the costs of emergency medical services, law enforcement efforts," judicial costs in prosecuting criminal use of firearms, and "costs of treatment of victims of gun violence").

[27] *See Lanser v. Riddle*, No. 4FA1103117CI, 2013 WL 10408619, at *5 (Alaska Super. Ct. July 1, 2013); *People ex rel. Gallo v. Acuna*, 929 P.2d 596, 604 (Cal. 1997); *Hoery v. United States*, 64 P.3d 214, 218 n.5 (Colo. 2003) (en banc); *Orlando Sports Stadium, Inc. v. State ex rel. Powell*, 262 So. 2d 881, 884 (Fla. 1972); *City of College Park v. 2600 Camp Creek, LLC*, 666 S.E.2d 607, 608–09 (Ga. Ct. App. 2008); *Brown v. City of Valparaiso*, 67 N.E.3d 652, 660 (Ind. Ct. App. 2016); *Roberie v. VonBokern*, No. 2004-SC-000250-DG, 2006 WL 2454647, at *4 (Ky. Aug. 24, 2006), as modified (Dec. 21, 2006); *Ray v. Mayor of Baltimore*, 59 A.3d 545, 557 (Md. 2013); *Adkins v. Thomas Solvent Co.*, 487 N.W.2d 715, 719–20 (Mich. 1992); *McKay ex rel. McKay v. Boyd Const. Co.*, 571 So. 2d 916, 922 (Miss. 1990); *Cnty. of York v. Tracy*, 558 N.W.2d 815, 823–24 (Neb. 1996); *In re Lead Paint Litig.*, 924 A.2d at 496; *Duquesne Light Co. v. Pa. Am. Water Co.*, 850 A.2d 701, 706 (Pa. Super. Ct. 2004); *Wayne County v. Tenn. Solid Waste Disposal Control Bd.*, 756 S.W.2d 274, 283-84 (Tenn. Ct. App. 1988); *Whaley v. Park City Mun. Corp.*, 190 P.3d 1, 6 (Utah Ct. App. 2008); *Moran v. Fed. Nat'l Mortg. Ass'n*, No. 12-212, 2012 WL 2919529, at *4 (E.D. Va. July 17, 2012).

[28] *See State ex rel. Dema Realty Co. v. McDonald*, 121 So. 613, 615 (La. 1929) (La. 1929) (public nuisance has a "general effect upon the public"); Mont. Code Ann. § 27-30-102(1) ("A public nuisance is one which affects, at the same time, an entire community or neighborhood or any considerable number of persons,

---

40

similar types of claims have declined to do so, and the Restatement clearly rejects it, this Court, sitting in diversity, should find that state public nuisance law should not be expanded to cover alleged invasion of the private rights at issue here.[29]

The School Districts undoubtedly will cite to lower court decisions allowing public nuisance claims based on guns, lead paint, opioids, and smokeless tobacco products.  For the most part, those decisions were trial court level decisions that were not affirmed by any appellate court.  *T-Mobile USA*, 908 F.3d at 586 ("an *intermediate state appellate court decision* is a 'datum for ascertaining state law'"); *Estrella v. Brandt*, 682 F.2d 814, 817 (9th Cir. 1982) (a federal court is "not free to reject a state judicial rule of law merely because it has not received the sanction of the state's highest court, but it must ascertain from all available data what the state law is and apply it").  For example, in California, the School Districts likely will point to *People v. ConAgra Grocery Prods. Co.*, 17 Cal. App. 5th 51 (2017) and *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 648 n.75 (N.D. Cal. 2020), as supportive of their claims.  But, not only are those cases inconsistent with other California appellate decisions, *see City of Arcadia v. Dow Chem. Co.*, No. CV 18-10139-MWF (SPx), 2021 WL 3206806, at *13 (C.D. Cal. Apr. 13, 2021) ("[P]romotion of a product for hazardous use cannot form the basis of a non-representative public nuisance claim."); *In re Firearm Cases*, 126 Cal. App. 4th 959, 988–89 (2005) (same); *City of Modesto Redev. Agency v. Superior Ct.*, 119 Cal. App. 4th 28, 39–40 (2004) (law of nuisance not intended to redress claims for defective products); *City of San Diego v. U.S. Gypsum*, 30 Cal. App. 4th 575, 586 (1995) (same), the reasoning of those cases is not persuasive.  The *ConAgra* court's holding that "residential housing … is a shared community resource" sufficient to constitute a public right,

---

although the extent of the annoyance or damage inflicted upon individuals may be unequal."); *Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 853 S.E.2d 698, 726 n.42 (N.C. 2021) ("The real reason on which the rule denying individual recovery of damages [for public nuisances absent special damages or invasion of some right not considered merged in the general public right] is based—and the only one on which the policy it reflects could be justified—is that a purely public right is of such a nature that ordinarily an interference with it produces no appreciable or substantial damage … ." (alteration in original) (quoting *Hampton v. N.C. Pulp Co.*, 27 S.E.2d 538 (N.C. 1943))); *Overcash v. S.C. Elec. & Gas Co.*, 614 S.E.2d 619, 622 (S.C. 2005) ("We conclude the special or particular injury requirement necessary for an individual to maintain a cause of action for public nuisance is satisfied only by injury to the individual's real or personal property.  For the protection of the person, South Carolina has well developed tort-based doctrines which can redress wrongs resulting in personal injuries sustained by an individual."); Wash. Rev. Code Ann. § 7.48.130.

[29] *See supra* Part III.B.1.b. & n.21.

---

17 Cal. App. 5th at 112, finds no support in the law of California, and is directly contrary to the learned and thorough analysis of public rights under the Restatement performed in *Lead Industries*, *Hunter*, *City of Chicago*, and others.  In any event, the School Districts do not sufficiently allege interference with a shared community resource here.  *See infra* at Part III.B.2.b.  The *JUUL* opinion is likewise unpersuasive because it did not grapple with any of the arguments made herein by Defendants as to why the School Districts' claims do not implicate public rights.  The *JUUL* court simply rejected, without in-depth analysis, defendants' assertions that harms resulting from student use of smokeless tobacco products were individual and not recognized public rights.  497 F. Supp. 3d at 648.   Furthermore, the claimed injuries in those cases are distinguishable from the alleged facts here because guns, lead paint, opioids, and tobacco products cause harm to individuals in a relatively uniform manner, and operators in these industries are subject to a relatively uniform set of regulations.  In contrast, the School Districts' alleged harms are predicated on their students' alleged use of Defendants' online communications services.  As discussed below, and as the Master Complaint itself demonstrates, individuals' experiences on online communication services are highly variable and dependent on each individual's actual usage and experience of the platforms.  *See, e.g.*, Compl. ¶¶ 75, 81, 894.  Using the blunt instrument of public nuisance is thus particularly ill-suited to the types of claims asserted here.

      **b)**    **Defendants' Services Do Not Equally Affect the Rights of All Members of the Community.**

Where truly "public" rights are at issue, an interference affects the rights of the entire community, even if the damage to affected individuals may be unequal.[30]   Although the School Districts allege conclusorily that Defendants have interfered with the public rights of "students, teachers, and employees of Plaintiffs and their schools, and the residents of Plaintiffs' local communities, including minors," Compl. ¶ 974, the facts pled make clear that any "rights" to health, safety, or public education at issue are the rights of ***students*** only.  Teachers' and others' jobs are alleged to be harder, *id.* ¶¶ 23, 196, 975, but there are no factual allegations that teachers, educators, or other adults' rights to health, safety, or education are at issue.  Indeed, the foundation of the School Districts' Master Complaint is the alleged

---

[30] *See supra* Part III.B.2.

"*youth* mental health crisis," which the School Districts reference **more than 80 times**.[31]  *See* Compl. ¶ 83 ("Everyone innately responds to social approval ... but some demographics, in particular teenagers, are more vulnerable to it than others.") (quotations and citation omitted).

Even then, the School Districts do not allege a collective injury to students, but a highly individualized one.  They complain that minors find it nearly impossible to curb social media consumption because advertisements and content suggestions target each minor's own individual likes and tastes so specifically.   The School Districts allege, for example, that underlying algorithms "'develop[] dynamically' to predict which posts will hold *the user's* attention," by "determin[ing] which 'signals' are more important to *individual users*."   *E.g.*, Compl. ¶ 894; *see also id.* at ¶¶ 75, 81 (describing alleged effects of social media use on "the brain" of "an *individual*").  The School Districts allege that those customized experiences can lead to various harms.  *See, e.g., id.* ¶ 458 ("[I]ndividuals who are more likely to engage in self-comparison are likewise more likely to suffer harm when using social media."); *id.* ¶ 612 ("losing a [Snap] Streak can cause feelings of betrayal for some users").  But none of this amounts to interference with the right to a public resource.

Contrast the interference allegedly caused by Defendants' services with an interference with the right to a public resource.  If an entity dumps toxic waste into a lake, thereby rendering it unusable, the entire community's use is affected.[32]   The interference the School Districts allege is nothing like that. Millions of users, including minors, use the service appropriately and beneficially every day.  Others do not use the services at all.  Because they cannot claim that use of Defendants' services affects the rights

---

[31] *See, e.g.*, Compl. at i ("Defendants have targeted *school-aged children* as a core market"; "*Children* are uniquely susceptible to harm from Defendants' platforms"; "Defendants … fuel addictive use by *children*"; "Defendants' Conduct has created a *youth mental health crisis*.").

[32] While any resulting damages may be unequal, the interference with the right to use the lake is the same for all—no one can use it.  A fisherman may suffer damage because he cannot make a living, whereas a swimmer may simply be inconvenienced.  Some members of the community may not be users of the lake and will not be personally affected at all.  The point is that, whomever attempted to exercise his/her right to use the public lake, for whatever reason, would be prevented from exercising his/her right to do so.

1    of all members of the community equally or in the same manner, the School Districts have not alleged a

2    public nuisance.[33]

3            **3.    The School Districts Have Not Adequately Alleged "Special Injury."**

4            The school district plaintiffs may bring public nuisance claims only as private plaintiffs,[34] and only

5    then if they can adequately plead that they have suffered "special injury"—that is, an injury different in

6    kind than the harms allegedly suffered by other members of the public.[35]   Despite their acknowledgement

7    that they must plead special injury, Compl. ¶ 989, they have not adequately done so.   The School Districts

8    allege as injuries that they have had to spend time and resources hiring and training additional personnel

9    for disciplinary and mental health issues; policing cell phone usage; developing new instructional

10   materials and revising handbooks and policies; and repairing property damage resulting from social media

11   "challenges."[36]   These are not cognizable "special injuries" for two reasons:[37]   School Districts do not sue

---

[33] *See, e.g.*, *Russo v. Town of Greenwich*, No. CV 96 0154836 S, 1998 WL 552383, at *3 (Conn. Super. Ct. Aug. 20, 1998) ("[T]he plaintiff must show that the harmful condition had a tendency to create danger upon members of the general public, not just members of the [public-school] system.").

[34] 58 Am. Jur. 2d Nuisances § 183 ("Actions for public nuisance are aimed at the protection and redress of community interests, and therefore, as a general rule, *only public prosecutors authorized by statute* may sue for a public nuisance on behalf of the community, with a limited exception for suits by private individuals in exceptional circumstances."); *see also, e.g.*, Cal. Civ. Proc. Code § 731 (only "the *district attorney* or *county counsel* of any county in which the nuisance exists, or … the *city attorney* of any town or city in which the nuisance exists" may bring "a civil action … in the name of the people of the State of California to abate a public nuisance."); *Carnival Corp. v. Historic Ansonborough Neighborhood Ass'n*, 753 S.E.2d 846, 852  (S.C. 2014) ("While a public nuisance cause of action can be used to remedy harms suffered by the public generally, typically only the State may assert this cause of action.  A private person may bring a private civil suit for a public nuisance only if he suffered a special injury to his real or personal property."); Ga. Code Ann. § 41-2-2 ("district attorney, solicitor-general, city attorney, or county attorney on behalf of the public" may bring public nuisance claim); Ind. Code. Ann. § 32-30-6-7(b) (counties, cities, or towns may bring public nuisance claim).   Defendants are not aware of any court allowing a school district to sue in a representative capacity for public nuisance without showing special injury.  *See In re JUUL Labs*, 497 F. Supp. 3d at 649–50.

[35] Second Restatement § 821C cmt. b ("The private individual can recover in tort for a public nuisance only if he has suffered harm of a different kind from that suffered by other persons exercising the same public right.  It is not enough that he has suffered the same kind of harm or interference but to a greater extent or degree.").

[36] *See, e.g.*, Compl. ¶¶ 973, 1001.

[37] In North Carolina, the school district plaintiffs may have standing as private parties even absent a special injury, but they may only seek to *abate* the alleged nuisance.  *See Comm. to Elect Dan Forest v. Emps. Pol. Action Comm.*, 853 S.E.2d 698, 726 n.42 (N.C. 2021).  Plaintiffs here explicitly seek damages, for which they lack standing in every jurisdiction for the reasons given herein.

for injuries experienced while exercising *their* public rights, and the alleged injuries are not unique to them.[38]

### a)   The School Districts are not claiming injury as a result of their exercise of a public right that belongs to them.

The School Districts allege that the public rights to "health, safety, peace, comfort, and convenience, and/or right to public education" are at issue.  Compl. ¶ 974.  But a school district cannot be said to enjoy a "right" to education, health, or safety.[39]  These rights belong, if to anyone, to individuals, not institutions.  The alleged interference is with the *students'* right to education, health, or safety.  *See, e.g.*, *id.* at ¶ 978 ("Defendants have … substantially interfered with the health, safety, peace, comfort, convenience, and/or right to public education of *Plaintiffs' students*, employees, residents, schools, and communities.").  But the students are not plaintiffs in this case, and the School Districts have not (and cannot) sue on their behalf.  *See supra* n.34.[40]

What the School Districts actually assert is that it now costs them more to *provide* public education.  But a school district has no right to educate students in a vacuum—free from the mental and physical consequences that arise from a global pandemic, hunger, inadequate sleep, abuse, neglect, or any number of other external factors that have made classroom learning more difficult and educating students costlier.  *See Rincon Band of Luiseno Mission Indians v. Flynt*, 70 Cal. App. 5th 1059, 1102 (2021) (tribes were not seeking to protect "community rights" impaired by illegal gaming operations but their own economic interests to provide the same gaming operations).

---

[38] The claims of the eight "counties, district attorneys and municipalities" are likewise limited to abatement unless they too plead special injury.  *See* Second Restatement § 821C (special injury requirement applies to *any* public nuisance suit seeking damages); *Ray v. Mayor & City Council of Baltimore*, 59 A.3d 545, 557 (Md. 2013) (adopting Restatement § 821C); *Duquesne Light Co. v. Pennsylvania Am. Water Co.*, 850 A.2d 701, 706 (Pa. Super Ct. 2004) (same); *Hydro-Mfg., Inc. v. Kayser-Roth Corp.*, 640 A.2d 950, 958 (R.I. 1994) (same).

[39] *See* Second Restatement § 821B cmt. g (public nuisance is one that "interfere[s] with those who come in contact with it *in the exercise of a public right*").

[40] *See* Compl. ¶ 39 ("This Complaint is filed on behalf of Plaintiff school districts, counties, district attorneys and municipalities… .").

45

### b)   The School Districts' alleged injuries are not different in kind from those allegedly suffered by other members of the public.

The School Districts allege that they are harmed by "students' compulsive use of, and addiction to, social media" because they provide mental health services to youth.  Compl. ¶¶ 194, 197, 237-40.  But this just underscores that the School Districts' alleged injuries are derivative of the injuries allegedly suffered by the students themselves.  *See supra* Part III.A.3.

Nor—taking the Complaint's allegations as true—are the School Districts' alleged injuries different in kind or degree from those other members of the public would suffer.  Under the School Districts' theory, other individuals and institutions that interact with youth—including private schools, mental-healthcare providers, hospitals, employers, and parents and caregivers—would have the same injuries.  *See In re McKinsey & Co. Nat'l Prescription Opiate Consultant Litig.*, 2023 WL 4670291, at *8 (N.D. Cal. July 20, 2023) ("That the injuries are similar among [plaintiffs] and others exposed to opioids means that they are not different in kind to confer the Plaintiffs with special standing to bring a public nuisance claim.").[41]  The Complaint acknowledges as much.  *See* Compl. ¶¶ 237–40 (citing community behavioral health centers and local hospitals, only some of which are supported by local governments).

Courts routinely dismiss public nuisance suits brought by private plaintiffs under similar circumstances.  *See, e.g.*, *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) (affirming dismissal of hospitals' claim against tobacco companies for unreimbursed health care costs because "the Hospitals [were] one of numerous parties in the public harmed by [the defendant's conduct]" and remedying the alleged nuisance "[was] more properly [the] task for public officials"); *E. Me. Med. Ctr., et al v. Teva Pharma. USA, Inc., et al.*, Case No. BCD-CIV-2022-00025 (Ex. A) at *10  (Me. Super.

---

[41] *See also Lanser*, 2013 WL 10408619, at *6 (finding no special injury because plaintiff's "exposure to the odors [arising from the alleged nuisance] while he is working is not sufficiently different in kind from the injury suffered by [his] neighbors"); *Arriaga v. New England Gas Co.*, 483 F. Supp. 2d 177, 187 (D.R.I. 2007) ("[I]t does not appear that the plaintiffs have suffered 'special damages' that are separate and distinct from those suffered by others … [a]s already noted, the possibility that the ***degree*** of harm suffered by the plaintiffs might be greater than the degree of harm suffered by other members of the public would not establish that the plaintiffs' harm is separate and distinct." (emphasis in original)); *Page v. Niagara Chem. Div. of Food Mach. & Chem. Corp.*, 68 So. 2d 382, 384 (Fla. 1953) ("The same fumes, dust and gases which the plaintiffs allege are objectionable to them, would also affect the members of the general public in that area … [t]he fact that plaintiffs might be affected to a greater degree would not, under the above decisions, entitle them to injunctive relief.").

Ct. Feb. 13, 2023) (dismissing plaintiff-hospitals' public nuisance claims because their alleged injuries were indistinguishable from those of "other institutions … that serve the public welfare, such as first responders or individuals who do business with or care for opioid-affected persons"); *see also Fayetteville Ark. Hosp. Co., LLC, et al. v. Amneal Pharma., LLC, et al.*, Case No. 72CV-20-156 (Ex. B) at *4  (Ark. Cir. Ct. Dec. 16, 2022).  This Court should do the same.

### C.   The School Districts' Negligence Claim Fails as a Matter of Law.

The School Districts' negligence claim fails because they do not adequately plead that Defendants owed them any cognizable legal duty.  Moreover, the economic loss doctrine—which bars tort recovery for purely economic losses in the majority of relevant states—bars recovery of expenditures the School Districts' allegedly made in responding to adolescent behavioral and mental-health changes.

### 1.   The School Districts Fail to Allege a Cognizable Legal Duty.

"[T]he concept of duty" limits the "potentially infinite liability which would follow from every negligent act."  *Kesner v. Super. Ct.*, 1 Cal. 5th 1132, 1143 (2016) (quotation omitted).  The School Districts must plead a "legally cognizable duty [that] runs ***from the defendant to the plaintiff***."  *Gray v. Derderian*, 371 F. Supp. 2d 98, 104 (D.R.I. 2005) (quoting *Kenney Mfg. Co. v. Starkweather & Shepley, Inc.*, 643 A.2d 203, 206 (R.I.1994) (emphasis added).[42]  In other words, "the relationship between the parties … is the touchstone of a duty analysis.  *Nelson v. Aurora Equip. Co.*, 909 N.E.2d 931, 939 (2009) ("no duty exists because no relationship exists").  The relationship between the School Districts and Defendants here is simply too attenuated to establish any legal duty.

The School Districts contend that Defendants owed them a duty because the School Districts had a foreseeable "interest in providing an adequate education, public facilities, mental health, counseling, and other social and disciplinary services" that Defendants impeded by "inflicting severe mental health harms on minors" and by "targeting adolescents."  Compl. ¶¶ 1016–17; *see also id.* ¶ 1018 (alleging Defendants

---

[42] *See also Welsh v. Metro. Dade Cty.*, 366 So. 2d 518, 521 (Fla. 3d DCA 1979) ("To sustain any cause of action predicated on negligence, as here, the plaintiff must plead and prove [among other things] … the existence of a duty on the part of the defendant to protect the plaintiff from the injury or damage of which he complains."); *Long Beach Mem'l Med. Ctr. v. Kaiser Found. Health Plan, Inc.*, 71 Cal. App. 5th 323, 336 (2021) (negligence requires the "violation of a legal duty owed by the defendant to the person injured" (cleaned up)).

"failed to act as a reasonable person would" by "designing, developing, producing, operating, promoting, distributing, and marketing their social media platforms to minors to attract and addict adolescents").  The School Districts do not allege that any of their purported harms resulted directly from their own use of Defendants' services.  In effect, the School Districts' negligence claim is premised on duties Defendants purportedly owed to individual users of Defendants' services, not to the School Districts themselves.  *See id.* ¶¶ 30 (alleging duty premised on Defendants' purported conduct "purposefully addicting children"); 1017 (alleging duty premised on "targeting adolescents"); 1023 (alleging injuries relating to "investigat[ing] and prosecut[ing] crimes," "threats made against schools, students, and members of the community," and "repair[ing] property damage").  This is not a viable theory of duty.

Moreover, the duty the School Districts allege revolves around addressing alleged harms to third parties (*i.e.*, the students or community members who used Defendants' services) and addressing harms caused by third parties (*e.g.*, Compl. ¶ 1023(n) [crimes], 1023(r) [property damage]).  These are the same types of "attenuat[ed]" and "remote" connections that courts have found insufficient in similar cases where a plaintiff sought to tie injury to a harm directly caused by a third party.  *Modisette*, 30 Cal. App. 5th at 147, 154.  That remoteness distinguishes this case from the Court's prior ruling, which recognized that "manufacturers of products" owe a duty to "*users*" of those products.  *Soc. Media*, 2023 WL 7524912, at *34.[43]  In fact, as this Court observed, "[i]n general, entities do not owe a duty to prevent harm by third parties."  *Id.* at *35.[44]

If the School Districts' theory of boundless duty to indeterminate third parties were correct, *they themselves*—local governments and educational institutions that tout their responsibility for and effect on

---

[43] This Court concluded that the personal-injury plaintiffs had adequately alleged a duty grounded in product liability law because "manufacturers of products owe such duties to users," but did not consider whether the duty those plaintiffs alleged exists outside of the product liability context.  *Soc. Media*, 2023 WL 7524912 at *34–35 (N.D. Cal. Nov. 14, 2023).

[44] This Court was not alone.  *See, e.g.*, *Brown v. USA Taekwondo*, 11 Cal. 5th 204, 211 (2021) (no general duty "to control the conduct of another, nor to warn those endangered by such conduct"); *Boynton v. Burglass*, 590 So. 2d 446, 448 (Fla. 3d DCA 1991) ("Florida courts have long been loath[] to impose liability based on a defendant's failure to control the conduct of a third party."); *Oulla v. Velazquez*, 831 S.E.2d 450, 458 (S.C. Ct. App. 2019) ("[O]ur supreme court has rejected the idea that one who undertakes a duty to render services to another should recognize a duty to third persons.") (citing *Miller v. City of Camden*, 329 S.C. 310, 315 n.2 (1997)); *Flynn v. Nickerson Cmty. Ctr.*, 177 A.3d 468, 477 (R.I. 2018) ("Ordinarily in Rhode Island, no legal duty exists 'to control a third party's conduct to prevent harm to another individual.'" (quoting *Santana v. Rainbow Cleaners, Inc.*, 969 A.2d 653, 658 (R.I. 2009))).

children's development, education and mental health, *see, e.g.*, Compl. ¶¶ 4, 30—would owe *that same duty* to all individuals, businesses, and other entities with whom their citizens and students interact.  The School Districts would face being haled into court every time any of their constituents caused injury as a result of purported mental illness, behavioral changes, or poor academic performance theoretically traceable to some defect in the community, including, for example, lack of educational opportunity, crime due to insufficient policing, or a denial of public benefits.   Courts have correctly rejected similarly overbroad expansions of tort law for decades because it would stifle expression and have no limiting principle.  *E.g.*, *Bill v. Super. Ct.*, 137 Cal. App. 3d 1002, 1011 (1982) (defendants owed no duty to plaintiff injured by a third party allegedly incited to violence by defendants' broadcast because no duty existed "to control the conduct of another, nor to warn those endangered by such conduct"); *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 200-01 (S.D. Fla. 1979) (finding broadcasting companies owed no duty to "to avoid making 'violent' shows available for voluntary consumption" that allegedly led to the killing of a minor's neighbor after he became "involuntarily addicted" to "extensive viewing of television violence").[45]

### a)   No "Special Relationship" or Misfeasance Exists That Would Justify a Finding of Duty.

Courts have imposed a duty to protect from third-party harm in the narrow circumstance when the parties are in a "special relationship"—something akin to "parents and children, colleges and students, employers and employees, common carriers and passengers, and innkeepers and guests." *Brown*, 11 Cal. 5th at 209, 216; *see Boynton*, 590 So. 2d at 448; *Flynn*, 177 A.3d at 477.  Indeed, most states limit "special relationships" to certain defined relationships, generally only when a plaintiff is *physically* dependent on a defendant or is subject to the defendant's control, or where the defendant has affirmatively acted to place a plaintiff in peril.  Second Restatement § 314A (1965); Third Restatement §§ 37, 40 (2012).[46]  The law

---

[45] *James v. Meow Media, Inc.*, 300 F.3d 683, 694 (6th Cir. 2002) (finding websites, video game manufacturers, and movie producers owed no duty to students shot and killed by classmate); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1273 (D. Colo. 2002) (finding video game makers and movie producers owed no duty under Colorado law to survivors of school shooting victim because "[c]ourts around the country have rejected similar claims brought against media or entertainment defendants").

[46] *See also, e.g.*, *Gushlaw v. Milner*, 42 A.3d 1245, 1256–58 (R.I. 2012) (no special relationship without ability and opportunity to "control" third party); *Saunders v. Baseball Factory, Inc.*, 361 So. 3d 365, 370 (Fla. 4th DCA 2023) ("A special relationship typically arises [only] in narrow circumstances where the

governing special relationships thus creates a duty of care only "to a limited community, not the public at large." *Regents of Univ. of Calif. v. Super. Ct.* ("*Cal. Regents*"), 4 Cal. 5th 607, 621 (2018); *see also Taamneh*, 598 U.S. at 500 (characterizing online services' relationship with particular users as "highly attenuated").

Regardless of which jurisdictions' law applies, no such relationship exists between Defendants and the School Districts.  In fact, the School Districts plead no relationship at all with Defendants.[47] Accordingly, it is no surprise that the School Districts also do not (and could not) allege that they are dependent on Defendants or that Defendants have "control over [their] welfare." *Cal. Regents*, 4 Cal. 5th at 621 (quoting *Giraldo v. Dep't of Corr. & Rehab.*, 168 Cal. App. 4th 231, 246 (2008)).  To the contrary, the School Districts' duty allegations focus on Defendants' provision of online communications services to *third parties*—individual users of Defendants' services who are the School Districts' citizens and students, and who are present or potential litigants in their own right.  Those allegations do not establish a special relationship between these Defendants and the School Districts.  A ruling to the contrary would untenably expand tort law, making businesses of all varieties liable to any third party who is harmed by a user of their products or services.

In some states, like California, a duty to protect against third-party harms can also arise when a defendant has engaged in misfeasance—"affirmatively 'created a peril' that foreseeably leads to the plaintiff's harm." *Jane Doe No. 1 v. Uber Techs., Inc.*, 79 Cal. App. 5th 410, 424 (2022).[48]  This exception, too, is inapplicable.  Misfeasance liability attaches only when the third-party actions that caused plaintiff's

---

relationship places the defendant in a superior position to control the risk[.]"); *MacDonald v. State*, 281 Cal. Rptr. 317, 327 (1991) (citing cases); *Boynton*, 590 So. 2d at 448; *Flynn*, 177 A.3d at 477.

[47] In any event, courts have consistently—and properly—refused to recognize special relationships between online services and users, even when the users are minors.  *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) ("[N]o special relationship [exists] between Facebook and its users." (citing *Klayman v. Zuckerberg*, 753 F.3d 1354, 1359–60 (D.C. Cir. 2014))); *Young v. Facebook, Inc.*, 2010 WL 4269304, at *5 (N.D. Cal. Oct. 25, 2010) (Facebook has no duty to "condemn all acts or statements that inspire, imply, incite, or directly threaten violence against anyone"); *M.L. v. Craigslist Inc.*, 2020 WL 6434845, at *13 (W.D. Wash. Apr. 17, 2020) (there is no "general duty" for website operators "to ensure that their website does not endanger minors").

[48] Third Restatement § 37 ("An actor whose conduct has not *created a risk of physical or emotional harm* to another has no duty of care to the other unless a court determines that one of the affirmative duties provided [herein] is applicable.").

injuries are a "necessary component" of a defendant's conduct. *Id.* at 427.[49]  Defendants' online services are overwhelmingly used for lawful purposes.  While some users of Defendants' services may abuse them, that abuse is not a "necessary component" of Defendants' business model.  *Id.*

Moreover, this Court has already rejected misfeasance liability in the context of the personal-injury complaint. *Soc. Media*, 2023 WL 7524912, at *36 n.67.  The Court recognized that misfeasance liability "requires affirmative wrongdoing on the part of the defendant—generally in the form of directing or encouraging a third party to commit an unlawful act, acting in concert with another tortfeasor, or giving substantial assistance to another's tortious conduct—to subject that defendant to a duty of care." *Id.* (quoting Dkt. 237).[50]

The Court ruled that the personal-injury plaintiffs' allegations were insufficient to show misfeasance.  *Id.* at *38 (citing *Ziencik v. Snap, Inc.*, 2023 WL 2638314, at *5 (C.D. Cal. Feb. 3, 2023), and *Dyroff v. Ultimate Software Grp., Inc.*, 2017 WL 5665670, at *15 (N.D. Cal. Nov. 26, 2017), for the proposition that "merely operating a website or web-based platform used by malicious third parties is insufficient to constitute misfeasance").  In particular, the Court concluded that Defendants' prohibition of criminal conduct in their terms of service sufficed to show that Defendants were not engaged in encouraging affirmative wrongdoing necessary to make a misfeasance showing.  *Id.*

So, too, here.  *See* Compl. ¶ 254 n.292.[51]  The School Districts' additional allegations offer no reason to depart from the personal-injury ruling of no misfeasance.  To the contrary, the only material difference between the two complaints is that the School Districts' theory requires even more causal steps between Defendants' actions and the alleged injuries.

---

[49] *See also Melton v. Boustred*, 183 Cal. App. 4th 521, 535 (2010) (party host was not liable for violence inflicted at party because it was not a "necessary component" of the party even though the host advertised the party as "out-of-control" and it was foreseeable that drunken attendees would become violent).

[50] The Court also recognized that Illinois law imposes an even higher standard to prove misfeasance, *i.e.*, that a defendant must "giv[e] substantial assistance or encouragement to third party" for such misfeasance liability to attach.  *Soc. Media*, 2023 WL 7524912, at *36 n.66 (citing *Vesely v. Armslist LLC*, 762 F.3d 661 (7th Cir. 2014)) (cleaned up).

[51] Because the Master Complaint refers to the Defendants' terms of service (*see* Compl. ¶ 254 n.292), which are central to Plaintiff's claim, and no party disputes the authenticity of those terms, they are incorporated by reference in the Master Complaint.  *See Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006).

**b)      The Alleged Harms Were Not Reasonably Foreseeable.**

Nor were the School Districts' alleged harms reasonably foreseeable.  At best, the School Districts are mere "bystanders" to interactions between adolescents—third parties to this action—and Defendants' services, making any subsequent alleged harms to the School Districts unforeseeable.  *See* Part IV.A.1.

A defendant's liability for negligence is limited to risks and plaintiffs that are reasonably foreseeable.  *See* Third Restatement § 7, cmt. j (acknowledging "widespread use" of foreseeability as an aspect of the duty of reasonable care, despite the Restatement's disagreement with such an approach).[52] But while foreseeability *limits* the scope of tort duty, foreseeability on its own is an insufficient basis for *imposing* a duty.  *See, e.g.*, *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324, 325 (S.C. 1986) ("Foreseeability itself does not give rise to a duty."); *Seebold v. Prison Health Servs.*, 57 A.3d 1232, 1249 n.26 (Pa. 2012) (holding that foreseeability "is not alone determinative of the duty question"); *Ashburn v. Anne Arundel Cty.*, 510 A.2d 1078, 1083 (Md. 1986) ("The fact that a result may be foreseeable does not itself impose a duty in negligence terms").

To determine whether a plaintiff and injury are foreseeable, some states apply a three-factor test, considering: (1) the foreseeability of harm to the plaintiff; (2) the degree of certainty that the plaintiff suffered an injury; and (3) the closeness of the connection between the defendant's conduct and the injury suffered.  *Kuciemba,* 14 Cal. 5th at 1021 (citing *Rowland v. Christian*, 69 Cal. 2d 108 (1968)); *Gushlaw*, 42 A.3d at 1256–57.  In other states, "courts must look at whether it was *objectively reasonable to expect the specific danger* causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility."  *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. 4th DCA 2022) (emphasis added); *see also Com. Bank/Penn. v. 1st Union Nat'l Bank*, 911 A.2d 133, 139 (Pa. Super. Ct. 2006)

---

[52] *See also, e.g.*, *Roche v. Ugly Duckling Car Sales, Inc.*, 879 A.2d 785, 790 (Pa. Super. 2005) ("[A] duty arises only when one engages in conduct which foreseeably creates an unreasonable risk of harm to others."); *Walmart, Inc. v. Reeves*, 671 S.W.3d 24, 29 (Ky. 2023) (harm committed by a third party is foreseeable if a sufficiently similar harm occurred sufficiently close in time such that the second occurrence was anticipated); *Kennedy Krieger Inst., Inc. v. Partlow*, 191 A.3d 425, 440–41 (Md. 2018) (explaining that foreseeability is the principal determinant of common-law duty in personal injury cases); *Kuciemba v. Victory Woodworks, Inc.,* 14 Cal. 5th 993, 1021 (2023); *Sewell v. Racetrac Petroleum, Inc.*, 245 So. 3d 822, 825 (Fla. 3d DCA 2017) ("[t]he touchstone for determining whether a duty exists is foreseeability"; where a person's conduct creates a "'foreseeable zone of risk' posing a general threat of harm to others, a legal duty will ordinarily be recognized to ensure that the underlying threatening conduct is carried out reasonably").

(bank's knowledge that bad actors opened accounts to perpetrate fraud schemes were too "vague and attenuated" to establish that the "harm in this specific case" was "foreseeable in the first instance").

Under any of the applicable standards, the injuries the School Districts allege—which resulted from intervening acts of third parties or of the School Districts themselves in response to third parties—are not a foreseeable result of Defendants' provision of online communication services. *See Modisette*, 30 Cal. App. 5th at 147 ("placing a product in the stream of commerce, without more, is insufficient to create a legal duty on the part of the seller"). Indeed, the *Modisette* court declined to find Apple owed a duty in analogous circumstances despite allegations related to a "body of studies and data that demonstrate the compulsive/addictive nature of smartphone use." *Id.* at 140. The School Districts do not allege that the purportedly "wrongful conduct by the [Defendants] was directed toward [them]" or that they were "the persons who were directly affected by Defendants' conduct"; instead, the School Districts are "mere bystanders." *Soc. Media Cases*, 2023 WL 6847378, at *25-26.

Thus, it is not "objectively reasonable" to expect Defendants to foresee "the specific danger" that the School Districts claim caused their injuries. *See Grieco*, 344 So. 3d at 23. Similarly, although "it might be that bad actors … are able to use [online communication services] for illegal—and sometimes terrible—ends," "the same could be said of cell phones, email, or the internet generally." *Taamneh*, 598 U.S. at 489, 499, 501 n.14, 503-04. Knowledge that such use may occur does not render its results foreseeable, because creating a rule that imposes liability "merely for knowing that … wrongdoers were using [defendants'] services and failing to stop them" would "run roughshod over the typical limits on tort liability." *Id.* at 503.

Under even the most plaintiff-friendly interpretation, the School Districts' allegations are that (1) Defendants designed and provided online services; (2) the some members of the public used those services, (3) use of those services had deleterious effects on some members of the public's mental health or behavior, (4) the deterioration of some members of the public's mental health or behavior then resulted in misconduct, distraction, or poor performance at school, and (5) the School Districts had to expend or divert resources to address that third-party conduct. The outcomes of such Rube Goldberg sequences are not reasonably foreseeable. That distinguishes this case from the personal injury plaintiffs' claims, which

this Court characterized as "a foreseeable result of the *at-issue conduct—i.e.*, defendants' "design choices … which caused plaintiffs' injuries." *Soc. Media*, 2023 WL 7524912, at \*40 (emphasis added).

At best, the injuries that the School Districts assert fall only barely "within the realm of … conceivable possibility"—not the sort of dangers it is "objectively reasonable to expect." *Grieco*, 344 So. 3d at 23. The attenuated relationship between Defendants' creation of online services and the School Districts' alleged harms cannot justify Defendants' liability to the School Districts. *Jefferson v. Qwik Korner Mkt., Inc.*, 28 Cal. App. 4th 990, 996 (1994) ("[O]n a clear judicial day, you can foresee forever" but if "the law imposed a duty to protect against every conceivable harm, nothing could function.").

### c) Imposing a Duty Here Would Violate Public Policy and Chill Expression.

Even if some legal basis existed to recognize that Defendants owed the School Districts a duty, public policy counsels against imposing one. Third Restatement § 7(b) ("[W]hen an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification."). Imposing a legal duty of the type the School Districts suggest would reach far beyond foreseeable victims of negligence and impose outsized burdens on businesses and the courts. And the public policy in favor of free speech similarly counsels against a finding of duty.

**a.** "A duty of care will not be held to exist even as to foreseeable injuries … where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society as to outweigh the compensatory and cost-internationalization values of negligence liability."[53] *Kuciemba*, 14 Cal. 5th at 1025; *see Knight v. Merhige*, 133 So. 3d 1140, 1150–51 (Fla. 4th DCA 2014) ("Here, a public policy reason militates for a finding of no legal duty even assuming that a … foreseeability analysis leads to the conclusion that the shootings were a foreseeable result of the [defendants'] conduct."); *John Rocchio Corp. v. Pare Eng'g Corp.*, 201 A.3d 316, 323 (R.I. 2019) (rejecting as "absurd" a duty to "a third party [that] is unidentifiable and unforeseeable at the time of the alleged negligence"). The social utility of

---

[53] In California, whether there should be an exception to the general duty of care is determined by weighing the factors set forth in *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968). The first three of the seven *Rowland* factors concern foreseeability. *Id.* As discussed in Part III.C.1.b, Plaintiffs' alleged injuries were not foreseeable. The remaining four *Rowland* factors concern public policy. *Id.*

Defendants' services is significant and broadly recognized.  *See Taamneh*, 598 U.S. at 502–03 (recognizing that "billions of people" transmit information through social media).

Of primary concern is whether the proposed duty would "throw open the courthouse doors to a deluge of lawsuits that would be both hard to prove and difficult to cull early in the proceedings," or would lead to the "dramatic expansion of liability" for businesses that would lead to "absurd results."  *See Kuciemba*, 14 Cal. 5th at 1031 (declining to impose a duty on California businesses to prevent the spread of COVID-19 despite the foreseeability of transmission); *Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26, 31 (Fla. 4th DCA 2020) (affirming dismissal of negligence action, reasoning that plaintiffs "fail[ed] to provide any sort of limitation on the legal duty they seek to impose," and concluding that the failure "would have severe public policy implications."); *In re Certified Question*, 740 N.W.2d 206, 213–15, 219–21 (Mich. 2007) (public policy precluded finding that the employer owed a duty to protect non-employees from exposure to asbestos where—under the laws of multiple states including Georgia and New York—recognition of such duty would "create a potentially limitless pool of plaintiffs").  The School Districts' theory of duty would do just that, dramatically expanding the liability of providers of online communications services and exposing them to tenuous claims from unpredictable and potentially unbounded categories of plaintiffs.  Under their theory, such providers are liable not just to their users for changes in their mental health and behavior allegedly attributed to use of their services, but to third parties that have allegedly expended resources in response to those changes.

That theory proves too much.  The duty the School Districts urge the Court to approve could easily be expanded to ensnare providers of any product or service, rendering those providers liable not just to users of those products and services but to any and all bystanders who were allegedly affected by those users' conduct.  Potential defendants would have no way to ameliorate any foreseeable harm because this theory of duty would make all harm, no matter how tenuously connected even to otherwise lawful conduct, foreseeable.  *See Estate of Madden v. Sw. Airlines, Co.*, 2021 WL 2580119, at *7 (D. Md. June 23, 2021) ("the class of foreseeable third-party plaintiffs suggested by [p]laintiffs offers few clear limiting principles" and the "'floodgates' consequence of imposing a duty here therefore weighs against such an imposition."); *Ruiz v. ConAgra Foods Packaged Foods LLC*, 606 F. Supp. 3d 881, 889 (E.D. Wis. 2022) (public policy precluded an employer's alleged duty to protect an employee's spouse from COVID-19

because expanding the duty that far would also allow "a neighbor, a houseguest, or someone [the employee] drove with in a vehicle" or even someone farther afield to hold the employer liable).

**b.** Further counseling against subjecting Defendants to the School Districts' novel theory of duty is that it would curtail Defendants' and their users' freedom of speech. Defendants' services serve an important First Amendment purpose. *See Taamneh*, 598 U.S. at 502–03; *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). "The dramatic expansion of liability [P]laintiffs' suit envisions has the potential to destroy businesses" beyond the Defendants' here. *Olivia N. v. Nat'l Broad., Co.*, 126 Cal. App. 3d 448, 495 (1981). For example, news organizations and publishers that publish distressing news could face liability on the same theory of duty the School Districts assert here—namely, that such news has a negative mental health effect on minor viewers. *See id.*

In *Zamora*, the minor plaintiff and his parents sued three broadcasting companies after the child allegedly became addicted to violent television after a decade of exposure allegedly culminating in the child killing his neighbor. 480 F. Supp. at 200. In that negligence action, plaintiffs alleged that the broadcasting networks were liable for the child's "sociopathic personality" and inability to lead a normal life. *Id.* In holding that imposing a duty would be against public policy, the court adopted this reasoning:

> To impose the suggested broad legal duty upon publishers of nationally circulated magazines, newspapers and other publications, would not only be impractical and unrealistic, but would have a staggering adverse effect on the commercial world and our economic system. For the law to permit such exposure to those in the publishing business … would open the doors to a liability in an indeterminate amount for an indeterminate time to an indeterminate class.

*Id.* at 202 (citing *Yuhas v. Mudge*, 322 A.2d 824 (1974) (internal citations omitted).

In *Olivia N.*, the plaintiff sued NBC for negligence after other minors—allegedly influenced by a violent scene in a movie NBC had broadcast—attacked her. 126 Cal. App. 3d at 491–92. Plaintiff argued, among other things, that NBC should have known that susceptible persons might act in response to its broadcast. *Id.* The court rejected that argument, holding that the network's decision to air the film was protected by the First Amendment. To expand NBC's liability to encompass the viewers' actions would mean that "television networks would become significantly more inhibited in the selection of controversial

materials if liability were to be imposed on a simple negligence theory." *Id.* at 494. "First Amendment freedoms" could not long survive amid such a "pall of fear and timidity." *Id.*

As the *Zamora* and *Olivia N.* courts recognized, making Defendants legally answerable to third parties for their users' behavior would "provide no recognizable standard for [social media platforms] to follow," ignore variable impositions of such a standard, and chill both Defendants' own First Amendment rights and the public's ability to use Defendants' platforms to exercise their own First Amendment rights. *Zamora*, 480 F. Supp. at 202–03. Courts therefore have declined to impose duties limiting entities that disseminate expressive content because of the "great burden on society" those putative duties would impose. *Olivia N.*, 126 Cal. App. 3d at 494; *DeFilippo v. Nat'l Broad. Co., Inc.*, 1980 WL 336092, *3 (R.I. Super. Ct. June 8, 1980); *Bill*, 137 Cal. App. 3d at 1014; *see also Delfino v. Agilent Techs., Inc.*, 145 Cal. App. 4th 790, 816 (2006) (declining to hold defendant responsible for transmission of threats online by third party using defendant's computer because such a duty "might have a significant chilling effect upon Internet free speech").

### 2. The Economic Loss Doctrine Separately Bars the School Districts' Negligence Claims.

The School Districts' negligence claims also seek damages for purely economic losses, such as the need to spend money on additional instruction, counseling, student discipline, and monitoring. In the majority of relevant jurisdictions, the economic loss doctrine—the rule that negligence claims cannot rest on economic losses without plausible allegations of physical injury or property damage—bars those claims entirely or limits the duty of care to plaintiffs who can show some special relationship with a defendant.[54]

---

[54] Plaintiffs' negligence claims seeking purely economic losses are barred under the laws of Alaska, California, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Nevada, New Jersey, Pennsylvania, Rhode Island, and Virginia. *See Anchorage v. Integrated Concepts & Res. Corp.*, 2015 WL 926219, at *1 (D. Alaska Mar. 4, 2015) (the economic loss doctrine "generally bars tort recovery for purely economic losses"); *Sheen v. Wells Fargo Bank, N.A.*, 290 Cal. Rptr. 3d 834 (Cal. 2022) (economic loss rule functions to bar claims in negligence for pure economic losses); *Murray v. ILG Techs., LLC*, 378 F. Supp. 3d 1227 (S.D. Ga. 2019) (under Georgia's economic loss rule, contracting parties are not allowed to bring negligence claims for pure economic losses against one another unless some special relationship between the parties exists); *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838 (N.D. Ill. 2022) (under Illinois law, economic loss doctrine requires physical damage to property to bring negligence or strict liability claim); *Indianapolis–Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010) ("economic loss rule provides that a defendant is not liable under a tort theory for any purely economic loss caused by its negligence"); *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 746 (Ky. 2011) ("the economic loss rule applies to a negligent misrepresentation claim just as it does to negligence and strict product liability claims"); *TS & C Invs., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp.

The doctrine is an outgrowth of the rule that parties have no duty to protect others against purely economic losses, *see Sheen v. Wells Fargo Bank, N.A*., 12 Cal. 5th 905, 922 (Cal. 2022), and "is designed to place a check on limitless liability for [defendants]," *Crown Coal & Coke Co. v. Powhatan Mid-Vol Coal Sales, L.L.C.*, 929 F. Supp. 2d 460, 476 n.2 (W.D. Pa. 2013); *see also In re Boeing 737 MAX Pilots Litig*., 638 F. Supp. 3d 838, 856 (N.D. Ill. 2022) ("A tortfeasor is not an insurer for the economic losses suffered by the people inconvenienced by his negligent action.").

To overcome this doctrine, a complaint must "adequately allege why the economic loss doctrine does not apply." *In re Sony Gaming Networks & Customer Data Sec. Breach Litig*., 903 F. Supp. 2d 942, 962 (S.D. Cal. 2012). The School Districts have not done so. The injuries of which the School Districts complain relate to the costs of confiscating products, communicating with parents, investigating policy violations, monitoring and disciplining students, developing programming, and modifying curricula. Compl. ¶ 1023. All these injuries, which the School Districts themselves characterize as a purported need to "[e]xpend, divert, and increase resources" (*id.*), are quintessentially economic, and so they are not redressable in tort in states where the economic loss doctrine is available.

---

2d 372 (W.D. La. 2009) (under the economic loss rule, parties may not recover for "negligent acts where there is no contractual relationship between the parties and there has been no physical damage to plaintiffs or their property"); *Pac. Indem. Co. v. Whaley*, 572 F. Supp. 2d 626, 628 (D. Md. 2008) ("The economic loss doctrine 'prohibits a plaintiff from recovering in tort for purely economic losses—losses that involve neither a clear danger of physical injury or death, nor damage to property other than the product itself.'" (citation omitted)); *Terracon Consultants W., Inc. v. Mandalay Resort Grp*., 206 P.3d 81, 87 (Nev. 2009) ("The economic loss doctrine draws a legal line between contract and tort liability that forbids tort compensation for certain types of foreseeable, negligently caused, financial injury." (quotation marks and citation omitted)); *Bracco Diagnostics Inc. v. Bergen Brunswig Drug Co*., 226 F. Supp. 2d 557, 562 (D.N.J. 2002) ("The economic loss doctrine prohibits plaintiffs from recovering in tort economic losses to which their entitlement only flows from a contract." (quotation marks omitted)); *ITP, Inc. v. OCI Co.*, 865 F. Supp. 2d 672, 680 (E.D. Pa. 2012) ("Pennsylvania law provides that no cause of action exists for negligence that results solely in economic damages unaccompanied by physical or property damage." (quotation marks and citation omitted)); *Hexagon Holdings, Inc. v. Carlisle Syntec Inc*., 199 A.3d 1034, 1042 (R.I. 2019) ("The economic loss doctrine provides that a plaintiff is precluded from recovering purely economic losses in a negligence cause of action." (quotation marks and citation omitted)); *Crawford v. Deutsche Bank AG*, 244 F. Supp. 2d 615, 616 (E.D. Va. 2003) ("Virginia law is clear that, absent privity of contract, the economic loss rule prevents a plaintiff from maintaining a negligence action against an individual to recover purely economic losses."). In Florida, courts routinely find that the duty requirement precludes negligence claims predicated on economic harm. *In re Jan. 2021 Short Squeeze Trading Litig*., 584 F. Supp. 3d 1161, 1189 (S.D. Fla. 2022) (collecting cases), *aff'd*, 76 F.4th 1335 (11th Cir. 2023).

## IV.    CONCLUSION

For the foregoing reasons, the School Districts' claims should be dismissed in their entirety with prejudice.

Dated: February 5, 2024                    Respectfully submitted,


**COVINGTON & BURLING LLP**

*/s/ Phyllis A. Jones*
Paul W. Schmidt, *pro hac vice*
  pschmidt@cov.com
Phyllis A. Jones, *pro hac vice*
  pajones@cov.com
Christian J. Pistilli (*pro hac vice* pending)
  cpistilli@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

Emily Johnson Henn (State Bar No. 269482)
  ehenn@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*


**KING & SPALDING LLP**

*/s/ Geoffrey M. Drake*
Geoffrey M. Drake, *pro hac vice*
  gdrake@kslaw.com

TaCara D. Harris, *pro hac vice*
 tharris@kslaw.com
David Mattern, *pro hac vice*
 dmattern@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: + 1 (404) 572-4600
Fascimile: + 1 (404) 572-5100

**FAEGRE DRINKER LLP**

*/s/ Andrea Roberts Pierson*
Andrea Roberts Pierson, *pro hac vice*
 andrea.pierson@faegredrinker.com
Amy Fiterman, *pro hac vice*
 amy.fiterman@faegredrinker.com
Faegre Drinker LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: +1 (317) 237-1000

*Attorneys for Defendants TikTok Inc., ByteDance
Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

**MUNGER, TOLLES & OLSEN LLP**

 */s/ Jonathan H. Blavin*
Jonathan H. Blavin (State Bar No. 230269)
 Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA  94105-3089
Telephone:  (415) 512-4000
Facsimile:  (415) 512-4077

Rose L. Ehler (State Bar No. 296523)
 Rose.Ehler@mto.com
Victoria A. Degtyareva (State Bar No. 284199)
 Victoria.Degtyareva@mto.com
Ariel T. Teshuva  (State Bar No. 324238)
 Ariel.Teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor

Los Angeles, CA  90071-3426
Telephone:  (213) 683-9100
Facsimile:  (213) 687-3702

Lauren A. Bell, *pro hac vice*
  Lauren.Bell@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW,
Suite 500 E
Washington, D.C. 20001-5369
Telephone:  (202) 220-1100
Facsimile:  (202) 220-2300

*Attorneys for Defendant Snap Inc.*


**WILLIAMS & CONNOLLY LLP**

 /s/ *Joseph G. Petrosinelli*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC, Google
LLC, and Alphabet Inc.*


**WILSON SONSINI GOODRICH & ROSATI
Professional Corporation**

 /s/ *Brian M. Willen*
Brian M. Willen, *pro hac vice*
Wilson Sonsini Goodrich & Rosati
  bwillen@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Lauren Gallo White (State Bar No. 309075)
Wilson Sonsini Goodrich & Rosati
  lwhite@wsgr.com

Andrew Kramer (State Bar No. 321574)
  akramer@wsgr.com
Carmen Sobczak (State Bar No. 342569)
  csobczak@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA  94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

Christopher Chiou (State Bar No. 233587)
Wilson Sonsini Goodrich & Rosati
  cchiou@wsgr.com
Matthew K. Donohue (State Bar No. 302144)
  mdonohue@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

*Attorneys for Defendants YouTube, LLC,*
*Google LLC, and Alphabet Inc.*

DEFENDANTS' MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT

## ATTESTATION

I, Phyllis A. Jones, hereby attest, pursuant to N.D. Cal. Civil L.R. 5–1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:        February 5, 2024        By:    */s/ Phyllis A. Jones*
                                                      Phyllis A. Jones