# EXHIBIT A

*[Parties and Counsel Listed on Signature Pages]*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR (PHK)<br><br>**JOINT STATUS REPORT ON DISCOVERY FOR FEBRUARY 22, 2024, DISCOVERY MANAGEMENT CONFERENCE**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

Pursuant to Case Management Order No. 1 (ECF 75) and Case Management Order No. 6 (ECF 451), the Parties submit this agenda and joint statement in advance of the February 22, 2024 Discovery Management Conference ("DMC").

I.   **Status of Discovery**

   A.  **Update on Additional Discovery Propounded Since Last DMC**

Since the January DMC, the Personal Injury and Local Government Entity and School District ("PI/SD") Plaintiffs have served the TikTok Defendants with an additional seven requests for production of documents. *See* ECF 548 (reporting prior discovery propounded).

The PI/SD Plaintiffs have also propounded Rule 30(b)(6) Notices of Deposition to all Defendants regarding ESI, corporate structure, and litigation holds and document retention.

### B. Update on New Dates for Rule 30(b)(6) Deposition of Snap

As reported in the January DMC status report (ECF 548), the Personal Injury ("PI") Plaintiffs propounded a Rule 30(b)(6) Notice of Deposition to Defendant Snap with respect to its deletion of certain user accounts. The Parties initially scheduled the deposition to take place on January 31, 2024, as to certain of the topics, and on February 29, 2024, as to others. The Parties rescheduled the depositions to take place on February 28, 2024, and March 1, 2024, respectively.

## II. Parties' Progress in Meeting Discovery Deadlines

### A. Initial Disclosures

The Parties (PI/SD Plaintiffs, AG Plaintiffs, and Defendants) are on track to serve initial disclosures by the February 22, 2024, deadline, in accordance with Discovery Management Order No. 2 (ECF 606).

### B. Defendants' Responses & Objections to Plaintiffs' December 2023 RFPs

In December 2023, the PI/SD Plaintiffs, in coordination with the JCCP PI/SD Plaintiffs, served 175 requests for production ("RFPs") on Meta, 232 RFPs on TikTok, 116 RFPs on Google and YouTube, and 121 RFPs on Snap. Of those, 108 requests are identical and were served on all Defendants, with extensions granted such that responses and objections are currently due on February 26, 2024. The PI/SD Plaintiffs have categorized those common requests into the following issues: organization and finance, features and warnings, health and safety, user demographics and targeting, marketing and lobbying, and student safety. Defendants expect to begin rolling productions of documents in response to these common RFPs after serving their responses and objections, conferring with Plaintiffs, and negotiating custodians and search methods.

TikTok served written responses and objections to TikTok-specific "go get" requests on January 8, 2024, and following meet and confer, served amended responses and objections to these requests on February 9, 2024. With that service, the TikTok Defendants also produced 353 documents responsive to the Set 1 requests, and will complete the remaining production related to Set 1 by the end of February. Meta served written responses and objections to Meta-specific "go get" requests on February 9, 2024,

and has committed to produce substantially all "go get" documents responsive to the requests by the end of February.

### C. Personal Injury Plaintiff Fact Sheet

On January 29, the Court issued an Implementation Order Governing Adoption of the Plaintiff Fact Sheet for PI Plaintiffs ("PFS Implementation Order"). ECF 596. Pursuant to that order, all PI Plaintiffs in this MDL "must serve verified, written responses to the PFS and applicable Appendices, together with any responsive documents and applicable executed authorizations, . . . within 105 days from the date of this order" (i.e., by May 13, 2024).[1] Subsequently, on February 8, 2024, the Court issued Case Management Order No. 10 ("CMO 10"), which advanced this deadline to April 1, 2024, and set a mid-April deadline for the selection of 12-15 PI bellwether Plaintiffs.

During a February 14, 2024 conference in the JCCP on the PI Defendant Fact Sheet, Judge Kuhl indicated that she will set later deadlines in the JCCP for the PI Plaintiffs to complete PFSs, for Defendant to complete Defendant Fact Sheets for the PI cases, and for the selection of bellwether PI Plaintiffs. Judge Kuhl asked the JCCP Parties to meet and confer and propose deadlines within the next few weeks.

### D. Personal Injury Defendant Fact Sheets

As ordered by Judge Kuhl, on January 31, 2024, Defendants sent Plaintiffs their counter-proposal to Plaintiffs' proposed Defendant Fact Sheet for the PI cases.[2] The Parties held an informal discovery conference with Judge Kuhl on February 7, 2024, during which Plaintiffs made a counter-proposal that narrowed the personal injury DFS further to focus on data points Plaintiffs view as important for bellwether selection while reserving the right to seek further plaintiff-specific discovery from Defendants for cases in the bellwether pool. The Parties held a second informal discovery conference with Judge Kuhl on February 14, 2024. The Parties in the JCCP are close to reaching agreement on the DFS and hope to have a final version next week.

---

[1] Defendants' Additional Position: The PI Plaintiffs confirmed at the February 6, 2024 conference that they could serve completed PFSs within sixty days.

[2] Plaintiffs' Additional Position: Plaintiffs had provided their proposed Defendant Fact Sheet to Defendants on November 21, 2023.

Defendants and the PI Plaintiffs in the MDL have agreed to meet and confer regarding what DFS data could be produced in time to inform bellwether selection by this Court's April 15, 2024, date (ECF 604).

### E. School District and Government Entity Plaintiff Fact Sheets

On February 7, 2024, the Parties attended a Case Management Conference in the JCCP and requested that Judge Kuhl expedite the process for finalizing the School District and Government Entity ("SD/GE") PFS. To that end, the Parties each submitted their proposed School District PFS on February 8, 2024 and a joint statement in support of their respective positions on February 9, 2024. Judge Kuhl held an informal discovery conference on February 14, 2024 to work through the Parties' outstanding disputes. Per this Court's CMO 10, dated February 8, the MDL Plaintiffs shall submit all PFSs by April 1, 2024. Judge Kuhl indicated that she will set a mid-May deadline for the completion of SD/GE PFSs in the JCCP to ensure there is time for the SD/GE Plaintiffs to complete a more comprehensive PFS (to facilitate case assessment). Accordingly, the Parties negotiated a PFS that they expect to be completed by all SD/GE Plaintiffs in the JCCP by May 2024, with a subset of questions to be answered by the MDL SD/GE Plaintiffs by April 1, 2024.

To avoid confusion and to facilitate the collection and segregation of data through MDL Centrality, the Parties in the MDL will propose (1) a School District MDL PFS (SD PFS) to be answered by April 1, 2024 and (2) a School District Supplemental Plaintiff Fact Sheet (SD SPFS) (that includes the questions that the parties agreed would be answered after April 1, 2024 in the MDL, during the conference with Judge Kuhl).

**<u>Defendants' Additional Position:</u>**

The Parties agree that the SD SPFS be answered by all non-Bellwether School Districts by October 1, 2024. The Parties disagree, however, about the deadline by which the 12-15 Bellwether School District Plaintiffs will submit the SD SPFS. Defendants propose May 1; Plaintiffs propose August 15.

It is Defendants' position that the 12-15 MDL Bellwether School Districts who are actively litigating their claims under a compressed time schedule (urged by Plaintiffs) should be able to provide

the basic information requested by the SD SPFS by May 1. An additional 4.5 months from April 1 to complete approximately 8 supplemental questions is unwarranted and would unfairly infringe upon an already short discovery schedule. Defendants further note that all 333 JCCP School Districts are required to complete the full SD PFS—including the supplemental questions—by May 16.

**Plaintiffs' Additional Position:**

Plaintiffs propose the following schedule:

| DATE | EVENT |
|------|-------|
| 4/1/2024 | School District Plaintiffs produce SD PFS per ECF 604, 606. |
| 8/15/024 | 12 School District Plaintiffs selected as Bellwethers in February. 2024 pursuant to ECF 604 produce SD SPFS. |
| 10/1/2024 | Non-Bellwether School District Plaintiffs that filed SD PFS on 4/1/2024 file a SD SPFS. |

The schedule above accomplishes the following: (1) follows the Court's prior Order requiring Plaintiffs to answer a SD PFS by April 1 to assist in bellwether pool selection (Step 1); (2) provides Defendants and the Court with the additional information for the 24 School District Plaintiffs in advance the Bellwether selection in February 2025 (Step 2); (3) minimizes the heavy burden on the Non-Bellwether Plaintiffs while at the same time providing information to the Defendants and the Court to facilitate case valuation.

**III. Ripe Discovery Disputes**

**A. ESI Order**

As directed by the Court during the January DMC, the Parties met and conferred on February 15 regarding the outstanding disputed ESI protocol issues identified in their January 12, 2024, Joint Chart of ESI Order Disputes (ECF 534-1). As announced during the January 25 DMC, the Parties have reached agreement on the following disputes: Issue 9 (Custodians and Data Sources), Issue 10 (Exception Files). The Parties will be prepared to discuss the status of the ESI Order at the DMC, including any additional agreements reached prior to then.

### B.  Privilege Log Protocol

Pursuant to Discovery Management Order No. 2, at 2 (ECF 606), on February 12, 2024, the Parties submitted their competing privilege log protocols and respective position statements for this Court's consideration.  *See* ECF 608.  The Parties are prepared to discuss at the DMC.

### C.  Deposition Protocol

As of the filing of this statement, the Parties continue to meet and confer on a proposed deposition protocol and will submit an agreed-to protocol, or their disputes should agreement not be reached, on February 20, 2024.  *See* ECF 606.

## IV. Discovery Issues that Do Not Currently Require Court Action: Proposed Limitations on Discovery

As a compromise, the Parties have agreed that Plaintiffs as a group (including the JCCP plaintiffs) shall be limited to serving no more than forty-five (45) interrogatories and forty five (45) requests for admission on each Defendant,[3] with the State Attorneys General as a group being permitted to serve an additional eight (8) interrogatories and eight (8) request for admission on the Meta Defendants (as a group).  [4]

### A.  PI/SD Plaintiffs' Position

#### 1.    Defendant-Facing Discovery Limits

As a result of changes in Defendants' positions, despite the Court's instruction (*see* ECF 606), the Parties are further apart, not closer to agreement. In the January 20, 2024, Joint Report, Defendants had proposed a limit 140 hours of depositions of each Defendant (including 30(b)(6) depositions, including a limitation of 10 hours per fact witness and no more than 30 depositions per Defendant.  *See* ECF 548-1, at 20-21. Plaintiffs had proposed a limit of 40 depositions per Defendant, plus 10 additional

---

[3] Defendants' agreement to this compromise was and remains contingent upon the understanding that each "Defendant" for purposes of these limitations refers to each Defendant group (i.e., the Meta Defendants, the TikTok Defendants, Snap, and the YouTube Defendants).

[4] The State Attorneys General reserve the right to meet and confer with the other Defendants if/when a State Attorney General files an action associated with this MDL against a Defendant and to seek additional discovery from those other Defendants.

depositions to be split amongst all Defendants, with a 14-hour limit per witness to be split amongst all Plaintiffs. After Plaintiffs made several requests to further meet and confer, the Parties did so on February 15.

Defendants disclosed for the first time on that meet and confer that they had materially changed their position and would not be negotiating from their previous proposal. Instead, Defendants proposed just 100 hours total of both fact and Rule 30(b)(6) deposition time per Defendant, limited to just 7 hours per witness. Using Defendants' newly-proposed 7-hour limit (which is entirely insufficient given the three Plaintiff groups involved), this amounts to a total of just 14 total depositions per Defendant. Using Defendants' prior 10-hour proposal, this would amount to just 10 depositions for both fact and Rule 30(b)(6) witnesses, collectively—less than the default deposition limits under the Federal Rules applicable to any ordinary case, despite this being a litigation mass tort MDL.

Plaintiffs, in contrast, came to the February 15 meet and confer in good faith, prepared to compromise and reach agreement. Plaintiffs were, and still are, willing to agree to a limit of not more than 35 depositions per Defendant for both fact and Rule 30(b)(6) witnesses (the halfway point between the two sides' prior proposals), with an additional 12 depositions of Meta in light of the AGs' claims against Meta. Notably, Plaintiffs were, and still are, also willing to agree to a 12 hour limit on each deposition to be split amongst all Plaintiffs (again the halfway point between the Parties' prior positions).

Plaintiffs' compromise proposal is extremely reasonable in light of the scope and complexity of this litigation, as well as consistent with limits in other large MDLs, and should be entered by the Court. *See, e.g., In re: Juul*, 19-md-02913 (WHO) (Case Management Order No. 10: Deposition Protocol Order Dkt. No. 573) (the plaintiffs had no limits to the number of depositions or days of depositions, limited to twelve (12) hours to be split among MDL and JCCP plaintiffs); *In re: 3M Combat Arms Earplug Products Liability Litigation,* Case No. 3:19-md-2885 (MCR)(GRJ)(N.D. Fla.) (Pretrial Order No. 13 Deposition Protocol Dkt. No. 554) (the plaintiff had 40 days of fact and Rule 30(b)(6) depositions); *In re: Xarelto (Rivaroxaban) Products Liability Litigation*, 2:14-md-02592 (EEF)(MBN) (E.D. La) (Pretrial Order No. 23 (Deposition Guidelines) Dkt. No. 2283) (the plaintiffs limited to fifty (50) depositions of the defendant); *In re: Philips Recalled CPAP, Bi-Level PAP, and Mechanical Ventilator*

*Products Litigation*, 2:21-mc-01230 (JFC)(W.D. Pa) (Stipulated Deposition Protocol and [Proposed] Order Dkt. 920-1) (the plaintiffs are limited to sixty (60) depositions of the defendants).

Defendants blame the Court's entry of a December 2024 fact discovery cut-off for their changes in position moving the Parties further apart. But Plaintiffs proposed a fact discovery deadline of November 2024 in the Parties' January 20 Joint Statement, so the Parties now have more time to complete fact discovery than Plaintiffs had proposed. In addition, after indicating at the last hearing that it would enter a scheduling order similar to that proposed by Plaintiffs—and after Judge Gonzalez Rogers set the fact discovery deadline—this Court issued an Order noting it was "disappointed that the Parties were unable to reach compromise on these limits previously, for example where the PI/SD Plaintiffs proposed fifty interrogatories and the Defendants proposed forty interrogatories as the limit. Experienced counsel are expected not to waste Court and Party resources over disputes such as this." ECF 606 at 3-4. Plaintiffs took this guidance to heart in moving off of their prior positions and meeting Defendants' halfway, while Defendants instead moved the goalposts. And at the same time Defendants complain that there is not enough time to allow more than 400 hours of depositions of Defendants collectively (57 depositions at 7 hours each, or 40 at 10 hours each), they propose to take up to *1080 hours* of depositions of the PI/SD Plaintiffs collectively (154 depositions at 7 hours each), and at least *4480 hours* of depositions of all Plaintiffs collectively[5] (over 600 depositions). Defendants cannot credibly propose that they have the bandwidth to take many hundreds of depositions of Plaintiffs in the time allotted but that they can only handle defending 14 each. Put simply, there is no justification for Defendants' proposal to unfairly limit Plaintiffs' ability to take effective discovery of Defendants.

Defendants' complaint about the timing of Plaintiffs' proposed compromises regarding discovery limits is not well-taken. Plaintiffs made several attempts to meet and confer regarding the discovery limits well in advance of this joint report's deadline, and when Defendants ultimately agreed to a meet and confer, one day before the filing of this statement, Plaintiffs conveyed that they had come to the call willing to compromise based on the Parties' prior positions. Given those positions, which were generally

---

[5] This includes the 100 hours of depositions Defendants have proposed to take of each of the states to have sued.

not far apart, this could not mean anything other than the "meeting in the middle" Plaintiffs have in fact proposed. Defendants in contrast walked back their prior positions, so if anyone can complain of surprise, it is Plaintiffs. Defendants are in effect complaining that Plaintiffs moved towards them while they went the other direction.

### 2.    Bellwether Plaintiff-Facing Discovery Limits

At the time of the submission of the Joint Statement Regarding Bellwether Protocol on February 2, 2024, (ECF 592 and (errata) ECF 595), Defendants proposed a two-tiered system consisting of "Core" and "Non-Core" discovery, which Plaintiffs opposed. Both Parties also outlined their positions on deposition limits for bellwether plaintiffs.[6] On February 8, 2024, the Court issued Case Management Order 10 (ECF 604) setting a Pretrial Schedule that did not include a distinction between "Core" and "Non-Core" discovery, and set the end of fact discovery for December 20, 2024. The Court did not address discovery limits applicable to the bellwether plaintiffs.

### a.    Deposition Limits

Regarding deposition limits for bellwether cases, he PI/SD Plaintiffs previously proposed a limit of 4 individual fact-specific depositions for PI Plaintiffs, and 6 individual fact-specific depositions for SD Plaintiffs. *See* ECF 592 and (errata) ECF 595. Defendants proposed 6 depositions or 30 hours of questioning by Defendants for PI Plaintiffs and 8 depositions or 40 hours of questioning for SD Plaintiffs. *Id.*[7] The PI/SD Plaintiffs further proposed a cap of 3 hours of questioning total for minor witnesses, while Defendants proposed 4 hours with 1 additional hour of questioning per additional Defendants named. Defendants further requested 1 additional minute of questioning for every minute of follow-up questioning conducted by Plaintiffs. The Parties agree to a 5 hour limit for depositions of treating providers.

During the Parties' February 15 meet and confer on discovery limits, Defendants changed their prior proposal, again moving the two sides further apart rather than closer together. Defendants proposed

---

[6] Bellwether, case-specific written-discovery limits were not addressed in the Parties' prior submission.

[7] The Parties agreed to 10 additional hours of questioning specific to 30(b)(6) witness depositions of school district representatives.

a limit of 40 hours of questioning by Defendants (up from 30) per bellwether case, with each deposition limited to 7 hours and an additional minute of questioning for every minute of direct questioning conducted by Plaintiffs.; Defendants also changed their proposal regarding minor witnesses to d(define them as only those under the age of 16.

Plaintiffs came to the February 15th meet and confer prepared to propose the following in an attempt to meet Defendants halfway based on Defendants' prior proposals:

- **Personal Injury Bellwether Plaintiffs**
    - o **5** individual fact depositions or **25 hours** (limit of **7 hours** per deposition)
    - o Cap of **3 hours** for minor witnesses[8] in single Defendant cases, cap of **4 hours** for minor witnesses in multi-Defendant cases, with Defendants allotting the time amongst themselves
- **School District Bellwether Plaintiffs**
    - o **6** individual fact depositions or **32 hours** (limit of **7 hours** per deposition)
    - o Additional **10 hours** of questioning for 30b6 depositions (as agreed by the Parties)

These limits represent a fair compromise between the Parties that allows for sufficient discovery of Bellwether Plaintiffs in an efficient manner to meet the Court's pre-trial deadlines.  Plaintiffs note that with a Bellwether pool of 24 Plaintiffs, the number of depositions taken of Bellwether Plaintiffs collectively (132) is line with those taken of Defendants collectively, under the PI/SD Plaintiffs' proposed deposition limits (160).

**b.     Interrogatories and Requests for Admission**

In the proposed Bellwether Trial Protocol ((ECF 592 and (errata) ECF 595), Defendants did not propose that they should be entitled to any number of interrogatories or requests for admission directed to Bellwether Plaintiffs.  During the February 15 meet and confer, Defendants proposed limitations of 25 interrogatories and 25 requests for admission that Defendants could collective propound on each bellwether Plaintiffs and each State Attorney General.

---

[8] The accepted (and legal) definition of a minor is under 18 years old, and Plaintiffs maintain that meaning should apply here as well.

10

As Plaintiffs explained to Defendants, the norm in mass-tort MDLs is that Plaintiff Fact Sheets are used in lieu of traditional written discovery.[9]  The Plaintiff Fact Sheet that the PI Plaintiffs in this MDL will complete by April 1, 2024 is a 43-page document with over **100** detailed questions about Plaintiffs' medical, educational, and social media use background, which Plaintiffs answer under penalty of perjury, as is the case with interrogatory responses. *See* PFS, Exhibit A.  Pursuant to the PFS, Plaintiffs will also be providing records in their possession as well as authorizations for Defendants to gather additional records on Plaintiffs. In short, the large bulk of Plaintiffs' discovery will be completed through the fact sheet process. Defendants' request to propound 25 RFAs or interrogatories on top of the fact sheets, would be inefficient, duplicative, and unnecessary.  Nonetheless, in an attempt at compromise, the PI Plaintiffs proposed Defendants collectively be limited to 5 interrogatories and 5 RFAs for each bellwether Plaintiffs.

### B.  States Attorneys' General Position

*Numerical Limits on Depositions of State Attorneys General*: The State Attorneys General propose that, should any deposition of the State Attorneys General be permissible, all Defendants named by the State Attorneys General may collectively take no more than one deposition of each State Attorney General.

As discussed in Section IV.A.2 below, any depositions of State agencies are not depositions of the State Attorneys General and thus are not included in the numerical limit set forth above.

---

[9] *See* Manual for Complex Litigation § 22.83 (4th ed.); *Guidelines and Best Practices for Large and Mass-Tort MDLs*, at 10; *also Plaintiff Fact Sheets in Multidistrict Litigation Proceedings: A Guide for Transferee Judges*, Federal Judicial Center and Judicial Panel on Multidistrict Litigation, 2019 at 1; *see, e.g.*, *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 460 F.3d 1217, 1224 (9th Cir. 2006); (explaining the Plaintiff's Fact Sheet protocol was adopted "in lieu of interrogatories to streamline the process"); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 493 (E.D. Pa. 2008), *aff'd sub nom. In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009); *Ford v. Saint-Gobain Performance Plastics Corp.*, 2020 WL 837984, at *1 (N.D.N.Y. Feb. 20, 2020); *E.E.O.C. v. Princeton Healthcare Sys.*, 2012 WL 1623870, at *25 (D.N.J. May 9, 2012); *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 2011 WL 4478484, at *1 (E.D. La. Sept. 23, 2011); *Puldon v. Am. Med. Sys., Inc.*, 2021 WL 9697680, at *1, n.1 (S.D. Fla. Sept. 28, 2021); *Wilson v. C.R. Bard, Inc.*, 2020 WL 2574652, at *2 (E.D.N.C. May 21, 2020); *In re Bard IVC Filters Prods. Liab. Litig.*, 2021 WL 1616101, at *5 (D. Ariz. Apr. 26, 2021).

Further, the State Attorneys General maintain that depositions of the State Attorneys General will ultimately be impermissible in this matter, including because they will inevitably seek privileged information, such as protected attorney work product. Nevertheless, the State Attorneys General provide the numerical limit set forth above in response to the Court's direction to set such a limit without prejudice to the ability of the State Attorneys General to raise objections to the depositions at a later time. *See* Discovery Management Order No. 2, at 4 (ECF 606).

Numerical Limits on Interrogatories on State Attorneys General: The State Attorneys General propose that all Defendants named by the State Attorneys General may collectively serve no more than 20 interrogatories on the State Attorneys General as a whole ("General Interrogatories"), along with no more than 5 additional interrogatories on each State Attorney General, where the additional interrogatories are limited to state-specific information ("State-Specific Interrogatories").

Numerical Limits on Requests for Admission on State Attorneys General: The State Attorneys General propose that all Defendants named by the State Attorneys General may collectively serve no more than 20 requests for admission on the State Attorneys General as a whole ("General Requests for Admission"), along with no more than 5 additional requests for admission on each State Attorney General, where the additional Requests for Admission are limited to state-specific information ("State Specific Requests for Admission").

\*     \*     \*

These proposed numerical limits on discovery of the State Attorneys General appropriately reflect the limited nature of the information the State Attorneys General possess regarding issues that will be the subject of discovery in this case, particularly outside the context of privileged communications and attorney work product.

If any Defendant is named by the State Attorneys General after discovery of the State Attorneys General has commenced, the State Attorneys General agree to meet and confer with any such Defendant regarding whether additional discovery of the State Attorneys General is warranted.

Numerical Limits on Discovery of Defendants Named by the State Attorneys General: The State Attorneys General join the PI/SD Plaintiffs' proposal for numerical limits on common depositions of Defendants, as those limits apply to any Defendant named by the State Attorneys General. In addition

to any common depositions, the State Attorneys General propose that there be an additional 12

depositions on each Defendant named by the State Attorneys General.  The PI/SD Plaintiffs agree to this

proposal.

These modest additions to the limits on common depositions of Defendants are necessary to

ensure that the State Attorneys General can obtain adequate discovery into their unique claims,

including pursuant to the Children's Online Privacy Protection Act ("COPPA"), while still coordinating

with PI/SD Plaintiffs to conduct discovery efficiently.

### C. Defendants' Position

Defendants outline below the updated proposed discovery limitations they proposed to Plaintiffs

during the Parties' February 15 meet-and-confer, in light of recent developments regarding the case

schedule.  Defendants' prior proposals were made in connection with their proposed Discovery Plan,

which proposed a two-year period to complete fact discovery.  The Court has now entered a schedule

that allows only ten months to complete fact discovery.  Defendants' updated proposals for limitations

on discovery of Defendants take into account this truncated schedule.  These proposals reflect

Defendants' good-faith effort to be realistic about and responsive to the amount of discovery that can be

completed in such a short timeframe.  After Defendants presented these proposals to Plaintiffs during the

Parties' February 15 meet-and-confer and asked Plaintiffs for their responsive proposal, Plaintiffs

refused to provide one, either expressly or impliedly.

Defendants' updated proposal also takes into account recent information regarding the limited

number of Bellwether Plaintiffs permitted by the applicable Case Management Order.  Defendants'

original proposal contemplated a total of fifty PI and SD Bellwether Plaintiffs.  As ordered, there will be

just 12-15 PI Bellwether Plaintiffs and 12-15 SD Bellwether Plaintiffs.  Moreover, Defendants' original

proposal contemplated certain limitations as to "core" discovery for a Discovery Pool as well as

additional discovery, down the road, with respect to the narrower set of Plaintiffs ultimately selected for

Bellwether trials.  The Case Management Order now-entered eliminates this two-step process, and

Defendants' present proposal accounts for the fact that all discovery of the Bellwether Plaintiffs must be

taken in one step.  Defendants' proposed aggregate number of depositions of PI and SD Bellwether

Plaintiffs is less than half of Defendants' initial position. The requested discovery is necessary to test complex and individualized issues, including with respect to causation, for each Bellwether Pool Plaintiff.

Given the Parties are still in the process of meeting and conferring, Defendants asked Plaintiffs to limit this submission to a straightforward statement of the Parties' current positions on discovery limitations. They refused. Then, the afternoon this Statement was due, Plaintiffs shared for the first time their specific compromise proposal and lengthy accompanying write-up above, depriving Defendants of any meaningful opportunity to respond to their position or to correct the misleading assertions in their write-up above. Plaintiffs then added another paragraph hours before midnight, falsely implying that Defendants refused or were delayed in conferring with them. Defendants will be prepared to respond in good faith to Plaintiffs' proposal during the Parties' continuing conferrals; remain committed to resolving as many disagreements as possible to avoid burdening the Court; and will update the Court on the status of the Parties' negotiations at the February 22, 2024 DMC.

### 1. Depositions

_Numerical/Hours Limits on Depositions of Defendants:_

During the Parties' February 15 meet-and-confer, Defendants proposed that Plaintiffs as a group (including the JCCP plaintiffs) may take up to a cumulative total of one hundred (100) hours of depositions of each Defendant,[10] inclusive of current/former employees and Rule 30(b)(6) depositions. (The Meta Defendants are prepared to agree to a higher cumulative total limit of one hundred and forty (140) hours.) Each deposition shall be limited to no more than seven (7) hours total, with Defendants

---

[10] Each "Defendant" for purposes of these limitations refers to each Defendant group (i.e., the Meta Defendants, the TikTok Defendants, Snap, and the YouTube Defendants). The deposition limits set forth herein do not apply to expert witnesses, and exclude records custodians that may be necessary for authentication of business records. Defendants reserve the right in the course of conferrals to propose additional provisions applicable to deposition limitations, such as having each deposition count as a minimum number of hours towards the total hour allowance.

reserving the right to seek less time for specific witnesses on a showing of good cause.[11]  The 100-hour allowance does not include time spent on direct or re-cross; one (1) minute of re-cross shall be permitted for every one (1) minute of direct examination conducted of that witness.  The State Plaintiffs may only participate in the depositions of Defendants specifically named by the State Plaintiffs.  Defendants look forward to continuing to confer with Plaintiffs in an attempt to reach agreement.

*Numerical/Hours Limits on Depositions of State Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that Defendants named by the State Plaintiffs may collectively take no more than a cumulative total of one hundred hours of each State Plaintiff, including state agencies.  Each deposition shall be limited to no more than seven (7) hours total.  The 100-hour allowance does not include time spent on direct or re-cross; one (1) minute of re-cross shall be permitted for every one (1) minute of direct examination conducted of that witness.

*Numerical/Hours Limits on Depositions of PI/SD Bellwether Discovery Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that for each of the 24-30 PI and SD cases in the Bellwether Pool, Defendants shall be limited to up to forty (40) hours of depositions (with one additional minute of questioning for every minute of follow-up questioning by Plaintiffs, if any).

In addition, for each SD Bellwether Pool case, Defendants may notice up to 10 hours of depositions pursuant to Fed. R. Civ. P. 30(b)(6) in addition to the fact-witness individual capacity depositions.

The duration of each deposition shall be in accordance with Fed. R. Civ. P. 30(d), except that for minor witnesses under the age of 16, Defendants shall be limited (absent a showing of good cause) to four (4) hours of questioning in single-Defendant cases (with an additional 1 hour for each additional Defendant in multi-Defendant cases); and for treating providers, Defendants shall be limited (absent a

---

[11] The YouTube and Snap Defendants further reserve the right to advocate for modifications of discovery limitations as to Defendants, including depositions and other discovery, proportional to the number of cases in which a Defendant is named in the event discovery on each Defendant becomes disproportionate with respect to the cases at issue.

showing of good cause) to 5 hours of questioning, in both cases with one additional minute of questioning for every minute of follow-up questioning by Plaintiffs, if any.

### 2. Interrogatories

*Numerical Limits on Interrogatories on State Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that any Defendants named in the State Plaintiffs' cases be limited to serving on each State Plaintiff, including state agencies, the same number of interrogatories that Plaintiffs as a group are limited to serving on each Defendant.[12]

*Numerical Limits on Interrogatories on PI/SD Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that for each of the 24-30 PI and SD cases in the Bellwether Discovery Pool, Defendants shall be limited (absent a showing of good cause) to serving no more than twenty-five (25) interrogatories on each PI and SD Bellwether Discovery Plaintiff.

### 3. Requests for Admission

*Numerical Limits on Requests for Admission on State Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that any Defendants named in the State Plaintiffs' cases be limited to serving on each State Plaintiff, including state agencies, the same number of requests for admission that Plaintiffs as a group are limited to serving on each Defendant.

*Numerical Limits on Requests for Admission on PI/SD Plaintiffs:*

During the Parties' February 15 meet-and-confer, Defendants proposed that for each of the 24-30 PI and SD cases in the Bellwether Pool, Defendants shall be limited (absent a showing of good cause) to serving no more than twenty-five (25) requests for admission on each PI and SD Bellwether Discovery Plaintiff.

---

[12] The Meta Defendants, which are the only Defendants currently named in State Plaintiffs' cases, anticipate that each State Plaintiff would be served with substantially the same written discovery.

## V. Discovery Issues that Do Not Currently Require Court Action: Discovery on State Agencies

### A. State Attorneys' General Position

After hearing oral argument from the Parties, the Court decided the issue of party discovery of state agencies in its Discovery Management Order No. 2 Following Discovery Management Conference on January 25, 2023 (ECF 606).  The Court stated that "the AG Plaintiffs confirmed that they are separate entities from the state agencies whose Rule 30(b)(6) depositions would likely be noticed" and "by definition, such depositions are not depositions of the lawyers of the State AGs' own offices nor are they depositions 'of the State AGs,' but rather are depositions of third parties." *Id.* at 4 (emphasis added). To the extent Meta seeks productions or testimony from state agencies, it should do so by serving third party subpoenas on those state agencies, at which point "counsel for those state agencies [may] enter an appearance on behalf of any such agencies to raise objections." *Id.*

To the extent Meta seeks the Court to reconsider this decision, the State Attorneys General object to Meta's inclusion of substantive legal argument on this issue in this joint Discovery Management Conference statement as premature and inconsistent with the Court's procedure for raising discovery disputes in its Standing Order for Discovery in Civil Cases, Section H. The State Attorneys General are willing to continue to meet and confer with Meta regarding its request for reconsideration of the Court's decision. However, because Meta has included substantive legal argument here, the State Attorneys General respond briefly below.

The mere fact that an Attorney General's Office is a part of a state or represents an agency in other matters does not make every state agency a party to this case or provide the Attorneys General access to every other state agency's records.  *See, e.g.*, *People ex rel. Lockyer v. Superior Ct.*, 19 Cal. Rptr. 3d 324, 338 (Cal. Ct. App. 2004) ("Each agency or department of the state is established as a separate entity, under various state laws or constitutional provisions."); *id.* at 337 ("The People, by prosecuting this [enforcement] action, are not deemed to have possession, custody or control over documents of any state agency. Such documents must be obtained by a subpoena."); Del. Code Ann. tit. 29, § 2508(b) ("The [Delaware] Attorney General shall not have this right of access for purposes of discovery in any civil actions brought by or on the relation of the Attorney General other than for the

17

books, papers, records, and documents of the Department of Justice."). That such agencies may be represented by other attorneys in the State Attorney General's office if Meta serves subpoenas does not make those agencies parties to this case. *See United States v. Am. Express Co.*, No. 10-CV-04496, 2011 WL 13073683, at *3 (E.D.N.Y. July 29, 2011) ("State Attorneys General have no more power to acquire documents from the non-party agencies than any law firm representing a client.").

Indeed, courts have routinely denied attempts to serve on state attorneys general party discovery requests that seek access to state agency information in enforcement actions. *See, e.g.*, *id.* at *2–3 (granting State Attorneys General motion for protective order against party discovery of state agencies) ; *Colorado v. Warner Chilcott Holdings Co. III, Ltd.*, No. 05-CV-2182, 2007 WL 9813287 (D.D.C. May 8, 2007) (denying defendant's motion to compel party discovery of state agencies). Unlike the federal government, states generally have a divided executive, where "State Attorneys General are independent, elected officials pursuant to the States' constitutions," who are "to operate independently of the State Governors." *Am. Express Co.*, 2011 WL 13073683, at *2.  State agencies, which are generally controlled by Governors, "are neither subject to common executive control nor interrelated with the State Attorneys General, and so should not be aggregated together for discovery purposes." *Id.* Particularly in a case like this, where the State Attorneys General do not seek to obtain restitution measured by the expenditures of state agencies, Meta cannot meet its burden to make a "strong showing" that the Court may disregard the States' sovereignty by aggregating for discovery governmental entities that are defined by State Constitutions and legislatures to be separate and distinct. *Warner Chilcott Holdings*, 2007 WL 9813287, at *4.

Meta's position ignores the Court's order and incorrectly treats the State Attorneys General and their respective state agencies as undifferentiated entities, and should be rejected.

### B.  Meta's Position

With substantial completion of document production a mere seven months away, the State Plaintiffs insist that Meta can obtain documents from agencies within the States on whose behalf the

AGs bring suit only via "third-party subpoenas." Jan. 25, 2024 DMC Hr'g Tr. 141:24-25.[13]  However, the state agencies will inevitably be represented by the very AGs already representing the State Plaintiffs in these proceedings.  *See, e.g.*, Fla. Stat. Ann. § 16.015 (the Attorney General's "Department of Legal Affairs shall be responsible for providing all legal services required by any department."); *People ex rel. Sklodowski v. Illinois*, 162 Ill. 2d 117, 127 (1994) ("The Illinois Constitution of 1970 requires the Attorney General to represent the State, and this duty extends to the representation of State agencies" (citation omitted)); *Sleepy Eye v. Comm'r of Hum. Servs.*, 572 N.W.2d 766, 772 (Minn. Ct. App. 1998) ("By statute, the attorney general must represent state agencies." (citing Minn. Stat. § 8.06)).  Requiring Meta to serve numerous third-party subpoenas on those state agencies not only would be inconsistent with clear law, but also risks significantly delaying document productions, prejudicing Meta's right to discover information in the Plaintiff-States' sole possession.

Courts across the country and in this Circuit have squarely held that an attorney general, as "the law firm to the State," must "respond to and produce discovery on behalf of the State . . . *including its agencies*." *Washington v. GEO Grp.*, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018) (emphasis added); *see also United States v. Nat'l Broad. Co.*, 65 F.R.D. 415, 419–20 (C.D. Cal. 1974) ("[T]he Department [of Justice] is not the 'plaintiff.'  The Department of Justice is the plaintiff's counsel.  The plaintiff is the Government of the United States."); *Compagnie Francaise d'Assurance v. Phillips Petrol. Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984) ("When a government agency is a plaintiff, it has been held that the complaining agency may be required to produce the documents of another agency." (citations omitted)).  So too here.  The plaintiffs in the multi-State complaint are the States, not the AGs.  *See* Complaint ¶ 21 ("The Filing States bring this action pursuant to the authority conferred on the State Attorneys General by applicable federal and state law."); *see also id.* ¶ 11 (defining the "Filing States"

---

[13] Meta disagrees that the Court "decided the issue of party discovery of state agencies" in DMO No. 2.  There, the Court rejected the State Plaintiffs' request for a protective order barring any depositions of the State Plaintiffs' offices or other state agencies, noting that it was "premature."  *See* ECF 606 at 4.  The Court observed that the State AGs asserted during argument that they are distinct from other state agencies.  But because the State AGs informed Defendants of this position approximately an hour before the deadline to submit the last DMC statement, Defendants did not have the opportunity to present to them the authority presented here that the State AGs are statutorily required to represent those state agencies, let alone that the State AGs have brought suit in the name of the States, not their own offices.

as, *e.g.*, "Arizona"). And the State AGs have entered appearances in their capacity as the States' chief legal officers. *E.g.*, ECF 88 (entering appearance as "counsel for State of North Carolina"). Thus, the AGs must respond to discovery requests aimed at the agencies constituting the State governments.

Meta is committed to continuing to meet and confer with the AGs in an attempt to resolve this dispute.

## VI. Discovery Issues that Do Not Currently Require Court Action: Law Enforcement Sharing Provision

The State Attorneys General and Defendants have agreed on a law enforcement sharing provision.

## VII. Discovery Issues that Do Not Currently Require Court Action: School District Preservation

### A. Defendants' Position

Starting on April 27, 2023, the SD/GE Plaintiffs and Defendants have exchanged numerous letters and held multiple conferences to discuss Plaintiffs' preservation obligations. The Parties have reached agreement on all preservation issues except one: the scope of custodial file preservation.

In short, under Plaintiffs' definition of custodial files, documents relevant to their liability theory are expressly preserved, while documents that may support Defendants' case are placed at risk of widespread loss through the application of routine document retention policies.

Plaintiffs submit that they need only preserve custodial documents[14] for the following:

> [I]ndividuals, administrators, departments, committees, and boards whose primary responsibility and role is to address issues concerning student use of social media, including to provide health and physical safety supports for students, including policy development, enforcement, treatment, funding and information technology support.

(Jan. 25, 2024, Pltf. Preservation Letter, attached as Exhibit B). Plaintiffs' defined scope of preservation in this expansive mass tort litigation is both unduly narrow and, more to the point, self-serving, as it

---

[14] Defendants appreciate that Plaintiffs have agreed to produce other forms of "go get" documents outside of custodial files. The fact remains, however, that Plaintiffs' definition of custodial file preservation is unduly narrow and self-serving.

would necessarily exclude broad categories of documents directly relevant to the defenses in this litigation. By way of example, documents regarding the following subject matters would all fall outside of Plaintiffs' insufficient preservation proposal: (i) policies, programs and services related to bullying and harassment, school violence, drug and alcohol abuse, mental health and behavioral disorders, and other conditions or circumstances that may bear on student mental health; (ii) policies and procedures relating to permissible use of technology platforms other than social media applications; and (iii) funding and training related to mental health counseling and social and emotional learning programs. Defendants maintain that Plaintiffs must preserve documents related to all individuals who may have information relevant to the claims *and* defenses in these cases (including individuals who have responsibilities related to the above-identified issues), as well as those who address social media use, including by providing health and physical safety support to students in relation to social media and developing policy in relation to social media.

Regarding preservation, the Northern District of California ESI Guidelines provide:

The proportionality standard set forth in Fed. R. Civ. P. 26(b)(1) should be applied to…preservation…consider[ing] factors that include the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

(N.D. Cal. ESI Guidelines). Here, 139 individual SD/GE Plaintiffs (and another 333 in the companion JCCP) allege that "Local Governments and School Districts across the nation—including the Plaintiff school districts, counties, and municipal governments—are battling an unprecedented mental health crisis among the children they serve." (Plaintiffs' Master Complaint (Local Government and School District) ("SD/GE Complaint") at ¶ 1). They describe the alleged public nuisance as "substantial and unreasonable" and that "it has caused and continues to cause significant harm to local governments, school districts, and the community…" (*Id.* at ¶ 971). In fact, they allege that "[t]he youth mental health crisis is infecting all aspects of education and the ability of young people to participate productively as members of their local communities…" (*Id.* at ¶ 990) (emphasis added). And, the SD/GE Plaintiffs allege 18 broad categories of activity that they must undertake to address the crisis,

including the following activities that fall outside the Plaintiffs' definition of custodial file preservation: finances, (*id.* at ¶ 973.a.); personnel, (*id.* at ¶ 973.b.); confiscation of cell phones and other devices, (*id.* at ¶ 973.c.); discipline, public safety, and property damage, (*id.* at ¶ 973.e., n., o., and r.); mental health resources, services, and curricula, (*id.* at ¶ 973.a., b., and h.); educational plans and support, (*id.* at ¶ 973.l. and m.); and, GE Plaintiffs' departments of health and human services, and community-based services, (*id.* at ¶ 973.p. and q.).

Relative to the elements identified in the ESI Guidelines, the issues of importance (and discovery related thereto) that are at stake in the litigation are far broader than the categories of individuals and subdivisions that have a "primary responsibility and role…[in]…student use of social media," even in light of Plaintiffs' further inclusive language. (*See* Pltf. Preservation Letter). Moreover, the SD/GE Plaintiffs are educational institutions and local government entities that should be treated like any other corporate litigant and whose resources should be able to bear the weight of routine document preservation. For instance, Plaintiffs point to Broward County (Florida) Public Schools as serving approximately 250,000 students and employing approximately 31,000 staff members, including 11,000 clerical and support staff, with a 2023 – 2024 budget of $3.129 billion.[15] And the amount in controversy, while undeveloped, is likely large considering the vast array of activity the SD/GE Plaintiffs contend they have (and will continue) to undertake to abate the alleged nuisance. (*See* SD/GE Complaint at ¶ 973). Thus, the purported burden or expense that Plaintiffs have allegedly incurred or will incur either monetarily or in coordinating such preservation obligations across a large and diverse inventory of plaintiffs, which can be tailored to the individual needs of a particular school district rather than a "one-size-fits-all" approach, does not outweigh the likely benefit of preserving relevant evidence as defined in the SD/GE Plaintiffs' own Complaint.

Defendants submit that, at this time, they are not seeking any particular form of relief and, instead, are notifying the Court of the status of the Parties' ongoing meet and confer efforts. At this time, Defendants simply believe that these preservation principles should be considered as part of a

---

[15]https://www.browardschools.com/cms/lib/FL01803656/Centricity/Domain/13447/FY24%20Budget%20Book%202PH%209-8-23.pdf at 1-17.

holistic approach to the SD/GE Plaintiffs' discovery obligations that Defendants will continue to evaluate in the context of SD PFSs, the bellwether selection process, extra-PFS discovery of both the discovery pool and potentially beyond, and possible spoliation motions that may arise in the context of more detailed discovery of the pool cases. Accordingly, Defendants appreciate the Court's guidance on any future dispute that may arise with respect to the School District Plaintiffs' preservation obligations.

### B.  School District Plaintiffs' Position

The GE Plaintiffs understand their obligations regarding preservation and have advised Defendants on multiple occasions that they are taking reasonable steps to preserve potentially discoverable information and will continue to do so as appropriate. Despite this, Defendants believe Plaintiffs could do more. Although Defendants raise the issue here as a potential dispute, they have not articulated, now or previously, what relief they would seek from the Court on this issue. In a letter dated January 25, 2024, Plaintiffs asked Defendants to clarify if there was still a dispute and, if so, to explain what relief they intended to seek and to provide their availability for a meet and confer. The next time Plaintiffs heard from Defendants on this issue was when they received Defendants' draft of this joint statement.

There are over 140 school district cases on file in this MDL and 400 in the companion JCCP. The plaintiff school districts vary greatly in size, sophistication, resources, organizational structure, and potential sources of ESI. For example, plaintiff Broward County (Florida) Public Schools serves approximately 250,000 students and employs approximately 31,000 staff members, including 11,000 clerical and support staff. By contrast, several plaintiff school districts serve fewer than 1,000 students with much fewer staff.  In the discussions regarding school districts' preservation obligations, Defendants have consistently treated all school districts alike, insisting on a uniform response to all preservation-related matters. This includes the ESI sources subject to preservation.

Defendants insist that all plaintiff school districts "must preserve documents related to all individuals who may have information relevant." But that is not the standard. As Defendants point out, preservation is guided by standards of proportionality and reasonableness. Defendants' insistence that

school district plaintiffs preserve the custodial files of essentially every employee is not proportionate or reasonable. Indeed, the Northern District's Model ESI Checklist clearly envisions preservation of something less than all of a party's employees. *See* ESI Checklist, at § I (discussing identification of an appropriate number of custodians for purposes of preservation), https://www.cand.uscourts.gov/filelibrary/1118/ESI_Checklist-12-1-2015.pdf). "[L]itigants are not generally required to preserve all electronic records." *Doe LS 340 v. Uber Techs., Inc.*, Case No. 23-md-03084-CRB (LJC), 2024 WL 107929 (N.D. Cal. Jan. 9, 2024). What is reasonable and proportionate for one plaintiff may not be for another. Defendants' one-size-fits-all approach to preservation simply does not work. And contrary to Defendants' suggestion, the fact that some of the school district plaintiffs are sophisticated entities that have encountered a need to preserve ESI previously has no impact on their discovery obligations in this litigation.

Furthermore, Defendants' suggestion that Plaintiffs have not agreed to preserve information potentially relevant to Defendants' defenses is wrong. As explained in Plaintiffs' August 30, 2023 letter, the "GE Plaintiffs' preservation principles are not intended to preclude Defendants … from pursuing discovery of other possible causes of the mental health crisis among students, including …. 'trends in student mental health unrelated to social media.'" Exhibit C (Plaintiffs' August 30, 2023 letter) at 3. The letter further clarified that Plaintiffs' approach to preservation would include "the preservation of information regarding the 'provision of student health services,' whether for substance abuse, bullying, social justice issues, or others [and] 'funding for mental health services.'" Exhibit C (Plaintiffs' August 30, 2023 letter) at 3-4. Next, Plaintiffs "agreed to preserve policies and procedures, including disciplinary policies related to students 'usage of electronic devices' and 'social media,'" as well as "student handbooks, codes of conduct, and disciplinary policies regardless of whether they pertain to social media platforms or electronic device usage." Exhibit C (Plaintiffs' August 30, 2023 letter) at 5. Defendants' concerns are, thus, without merit.

Lastly, Defendants make the vague assertion that "these preservation principles should be considered as part of a holistic approach to the SD & GE Plaintiffs' discovery obligations." Plaintiffs are unsure what relief, if any, Defendants would seek on this point. For the avoidance of doubt, Plaintiffs disagree with Defendants' demands regarding the scope of potential ESI sources to be preserved, as

discussed herein, and disagree with any suggestion of "extra-PFS discovery" or other discovery beyond the PFS for non-bellwether GE plaintiffs at this stage.

To the extent that Defendants seek an order compelling GE Plaintiffs to preserve potential sources of relevant ESI in accordance with the principles of proportionality and reasonableness, Plaintiffs are already doing that.

**VIII.    Discovery Issues that Do Not Currently Require Court Action: Source Code Order**

The Parties request more time to address this issue with the benefit of early discovery into the Parties' claims and defenses. The Parties continue to meet and confer and have agreed, subject to the Court's approval, to vacate the March 1, 2024 deadline to meet and confer and the March 15, 2024, deadline to submit a stipulated source code protocol. The Parties will advise the Court within 60 days if they reach an impasse on the need for or discoverability of source code.

Respectfully submitted,

DATED: February 16, 2024              By:  */s/ Lexi J. Hazam*

LEXI J. HAZAM
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
T: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656

cseeger@seegerweiss.com

Counsel to Co-Lead Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

Liaison Counsel

MATTHEW BERGMAN
GLENN DRAPER
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org
glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
T: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
T: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR

26

NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com
CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
T: (646) 666-8908
carrie@cagoldberglaw.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
T: 202-780-3014
awalsh@alexwalshlaw.com

27

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205.855.5700
fu@dicellolevitt.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212.213.8311
hnappi@hrsclaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

*Attorneys for Individual Plaintiffs*

**PHILIP J. WEISER**
Attorney General
State of Colorado

 _/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773
First Assistant Attorney General
Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

 _/s/ Megan O'Neill_
Nick A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Supervising Deputy Attorney General
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Bernard.Eskandari@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

**DANIEL J. CAMERON**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Gregory B. Ladd (KY Bar No. 95886),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
GREG.LADD@KY.GOV
ZACH.RICHARDS@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

COVINGTON & BURLING LLP

By: */s/ Ashley M. Simonsen*
Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings,
LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC;
Instagram, LLC; Siculus, Inc.; and Mark Elliot
Zuckerberg*

FAEGRE DRINKER LLP
By: */s/ Andrea Roberts Pierson*
Andrea Roberts Pierson, *pro hac vice*
Amy Fiterman, *pro hac vice*
FAEGRE DRINKER LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000
Email: andrea.pierson@faegredrinker.com
Email: amy.fiterman @faegredrinker.com

GEOFFREY DRAKE, *pro hac vice*
David Mattern, *pro ha vice*
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel.: 404-572-4600
Email: gdrake@kslaw.com
Email: dmattern@kslaw.com

31

1

2    *Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

3    MUNGER, TOLLES & OLSEN LLP
4    By: */s/ Jonathan H. Blavin*
     Jonathan H. Blavin, SBN 230269
5    MUNGER, TOLLES & OLSON LLP
     560 Mission Street, 27th Floor
6    San Francisco, CA 94105-3089
     Telephone: (415) 512-4000
7    Facsimile: (415) 512-4077
8    Email: jonathan.blavin@mto.com

9    Rose L. Ehler (SBN 29652)
     Victoria A. Degtyareva (SBN 284199)
10   Laura M. Lopez, (SBN 313450)
     Ariel T. Teshuva (SBN 324238)
11   MUNGER, TOLLES & OLSON LLP
     350 South Grand Avenue, 50th Floor
12   Los Angeles, CA 90071-3426
     Telephone: (213) 683-9100
13   Facsimile: (213) 687-3702
14   Email: rose.ehler@mto.com
     Email: victoria.degtyareva@mto.com
15   Email: Ariel.Teshuva@mto.com

16   Lauren A. Bell (*pro hac vice forthcoming*)
17   MUNGER, TOLLES & OLSON LLP
     601 Massachusetts Ave., NW St.,
18   Suite 500 E
     Washington, D.C. 20001-5369
19   Telephone: (202) 220-1100
     Facsimile: (202) 220-2300
20   Email: lauren.bell@mto.com

21   *Attorneys for Defendant Snap Inc.*

22   WILSON SONSINI GOODRICH & ROSATI
     Professional Corporation
23   By: */s/ Brian M. Willen*
     Brian M. Willen
24   WILSON SONSINI GOODRICH & ROSATI
     1301 Avenue of the Americas, 40th Floor
25   New York, New York 10019
     Telephone: (212) 999-5800
26   Facsimile: (212) 999-5899
     Email: bwillen@wsgr.com

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lauren Gallo White
Samantha A. Machock
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
Email: smachock@wsgr.com

Christopher Chiou
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: cchiou@wsgr.com

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

WILLIAMS & CONNOLLY LLP
By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
jpetrosinelli@wc.com
Ashley W. Hardin
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone.: 202-434-5000
Fax: 202-434-5029

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

## **ATTESTATION**

I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.


Dated: February 16, 2024

By: /s/ *Ashley M. Simonsen*
ASHLEY M. SIMONSEN

JOINT STATUS REPORT ON DISCOVERY FOR FEBRUARY 22, 2024 DISCOVERY MANAGEMENT CONFERENCE
4:22-md-03047-YGR