Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.,*
*Instagram, LLC, Meta Payments, Inc.,*
*Meta Platforms Technologies, LLC, Facebook*
*Payments, Inc., Siculus, Inc., Facebook*
*Operations, LLC, and Mark Elliot Zuckerberg*

*Additional counsel listed on signature pages*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| *People of the State of California, et al.*, <br> v. <br> *Meta Platforms, Inc.*, *Instagram, LLC, Meta Payments, Inc.*, *Meta Platforms Technologies, LLC* <br><br> *Office of the Attorney General, State of Florida, Department of Legal Affairs*, <br> v. <br> *Meta Platforms, Inc.*, *Instagram LLC* <br><br> IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION <br><br> THIS DOCUMENT RELATES TO: <br><br> ALL ACTIONS | MDL No. 3047 <br><br> Case Nos. 4:23-cv-05448-YGR <br><br> 4:23-cv-05885-YGR <br><br> 4:22-md-03047-YGR-PHK <br><br> Honorable Yvonne Gonzalez Rogers <br><br> **META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS** <br><br> **Hearing:** <br> Date:  April 19, 2024 <br> Time:  9:30 AM <br> Place:  Oakland, California <br> Judge:  Hon. Yvonne Gonzalez Rogers |

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

LAW & ARGUMENT .................................................................................................................... 1

I.     THE "CHILD-DIRECTED" COPPA CLAIM SHOULD BE DISMISSED................................ 1

     A.     The State's Procedural Objections Are Unavailing. ....................................... 1

     B.     The States Misapply the Child-Directed Standard. ....................................... 2

          1.     The States Cannot Establish That the Services "As A Whole" Are Child-Directed. ................................................................................... 2

          1.     The States Cannot Establish That "Portions" of the Services Are Child-Directed. 5

II.     SECTION 230 LARGELY BARS THE CONSUMER PROTECTION CLAIMS. ..................... 7

     A.     Section 230 Bars the Vast Majority of the States' Claims that the Design of the Instagram and Facebook Services Constitute Unfair or Unconscionable Business Practices. ............ 7

          1.     The States' Allegations About Instagram's and Facebook's Overall Design Fail.. 7

          2.     The States' Allegations About Particular Features Fail. ....................................... 8

          3.     The States' Unpled Claims About Particular Features Fail. ............................... 11

     B.     Section 230 Bars the States' Claims That Meta Omitted or Failed To Provide Warnings Regarding Instagram and Facebook's Design Features. ................................................. 12

III.     THE STATES FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS. ..................... 14

     A.     Meta's Opinions About the "Safety" of Its Services Are Not Actionable. ...................... 15

     B.     The States Fail to Establish That Alleged Statements Were False or Misleading............ 17

     C.     The States Fail to Establish That the Alleged Misrepresentations Were Material. .......... 19

     D.     The States' Claims Fail Insofar as They Are Premised on Statements to Congress......... 20

IV.     THE STATES FAIL TO ALLEGE UNFAIR BUSINESS ACTS OR PRACTICES.................. 22

     A.     Claims Based on or Guided by Section 5 of the FTCA Should Be Dismissed. ............... 23

     B.     To the Extent the *Sperry* Test Applies, Claims Based on It Should Be Dismissed.......... 25

     C.     The Remaining Unfairness Claims Should Be Dismissed. ............................................. 25

V.     THE STATES' CONSUMER PROTECTION CLAIMS FAIL BECAUSE THEY DO NOT APPLY TO META'S ALLEGED CONDUCT. ........................................................................ 29

ii

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

VI.    THE STATES' CLAIMS FOR RESTITUTION FAIL AS A MATTER OF LAW....................32

VII.   THE PI PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL. .....................................35

     A.     The Count 7 Claims Fail Because the State Laws Do Not Apply to Plaintiffs' Claims... 35

     B.     Count 7 Fails for the Same Reasons the States' Deceptive Practices Claims Fail. ..........36

     C.     Count 7 Also Fails Because Plaintiffs Do Not Allege Actual Reliance. .........................36

     D.     Count 7 Fails Because PI Plaintiffs Do Not Allege An Ascertainable Loss. ...................37

VIII.  THE PI PLAINTIFFS' COMMON LAW CONCEALMENT AND MISREPRESENTATION CLAIMS LIKEWISE FAIL.................................................................................................39

IX.    FLORIDA'S CLAIMS SHOULD BE DISMISSED FOR LACK OF JURISDICTION.............39

CONCLUSION.................................................................................................................................40

# TABLE OF AUTHORITIES

CASES                                                                                              Page(s)

*Abbott v. Golden Grain Co.*,
    2023 WL 3975107 (E.D. Mo. June 13, 2023) ............................................................... 38

*Action Auto Glass v. Auto Glass Specialists*,
    134 F. Supp. 2d 897 (W.D. Mich. 2001) ...................................................................... 30

*Action Embroidery Corp. v. Atl. Embroidery, Inc.*,
    368 F.3d 1174 (9th Cir. 2004) ...................................................................................... 40

*Ahern v. Apple Inc.*,
    411 F. Supp. 3d 541 (N.D. Cal. 2019) .......................................................................... 15

*Amado v. Procter & Gamble Co.*,
    2023 WL 3898984 (N.D. Cal. June 8, 2023) ................................................................. 17

*Anderson v. Apple Inc.*,
    500 F. Supp. 3d 993 (N.D. Cal. 2020) .......................................................................... 11

*In re Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ................................................................. 36

*Azoulai v. BMW of N. Am. LLC*,
    2017 WL 1354781 (N.D. Cal. Apr. 13, 2017) ............................................................... 16

*B&G Foods N. Am., Inc. v. Embry*,
    29 F.4th 527 (9th Cir. 2022) ......................................................................................... 21

*Baker v. Twitter, Inc.*,
    2023 WL 6932568 (C.D. Cal. Aug. 25, 2023) ............................................................... 12

*Ballagh v. Fauber Enterprises, Inc.*,
    773 S.E.2d 366 (Va. 2015) ............................................................................................ 19

*Bank v. Huizar*,
    178 N.E.3d 326 (Ind. Ct. App. 2021) ............................................................................ 27

*Barber v. Unitus Cmty. Credit Union*,
    2023 WL 34697 (D. Or. Jan. 3, 2023) ........................................................................... 29

*Barnes v. Yahoo!, Inc.*,
    570 F.3d 1096 (9th Cir. 2009) ............................................................................ 8, 9, 12

*Bride v. Snap Inc.*,
    2023 WL 2016927 (C.D. Cal. Jan. 10, 2023) ....................................................... 13, 14

*In re Bristol-Myers Squibb Sec. Litig.*,
  312 F. Supp. 2d 549 (S.D.N.Y. 2004) ........................................................................ 18

*Brown v. Google*, 2021 WL 6064009 (N.D. Cal. Dec. 22, 2021)..................................31, 34

*Brownlow v. McCall Enterprises, Inc.*,
  888 N.W.2d 295 (Mich. Ct. App. 2016) ..................................................................... 19

*Cesnik v. Edgewood Baptist Church*,
  88 F.3d 902 (11th Cir. 1996) ...................................................................................... 2

*Chiste v. Hotels.com L.P.*,
  756 F. Supp. 2d 382 (S.D.N.Y. 2010) ........................................................................ 20

*City of Chicago v. Purdue Pharma L.P.*,
  211 F. Supp. 3d 1058 (N.D. Ill. 2016).......................................................................... 25

*City of New York v. Lead Indus. Ass'n, Inc.*,
  190 A.D.2d 173 (N.Y. App. Div. 1993)....................................................................... 36

*Clark v. Prudential Ins. Co. of Am.*,
  736 F. Supp. 2d 902 (D.N.J. 2010) ............................................................................. 34

*Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*,
  194 A.3d 1010 (Pa. 2018)............................................................................................ 16

*In re Conventry Healthcare, Inc. Sec. Litig.*,
  2011 WL 1230998 (D. Md. Mar. 30, 2011) ................................................................ 36

*Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*,
  911 F.2d 242 (9th Cir. 1990) ....................................................................................... 15

*Crum v. SN Servicing Corp.*,
  2021 WL 3514153 (S.D. Ind. Aug. 10, 2021) ............................................................ 27

*Cullen v. Netflix, Inc.*,
  2013 WL 140103 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir. 2015)...................... 18

*Daghlian v. Devry Univ., Inc.*,
  2007 WL 5625508 (C.D. Cal. Dec. 10, 2007) ............................................................ 26

*Davis v. HSBC Bank Nevada, N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ...............................................................................22, 24

*de Dios v. Gerard Roof Prod., LLC*,
  2018 WL 6016952 (C.D. Cal. Sept. 4, 2018) ............................................................. 14

*Del Webb Communities, Inc. v. Partington*,
  652 F.3d 1145 (9th Cir. 2011) ..................................................................................... 22

*DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman*,
    64 A.3d 579 (N.J. App. Div. 2013) ................................................................ 19

*Dermansky v. Young Turks, Inc.*,
    2023 WL 8884364 (C.D. Cal. Nov. 3, 2023) ................................................... 2

*DIRECTV, Inc. v. Shouldice*,
    2003 WL 23200255 (W.D. Mich. Oct. 20, 2003) .......................................... 30

*Dispazio v. Oakleaf Waste Mgmt.*,
    2011 WL 1026094 (Conn. Super. Ct. Feb. 18, 2011) ..................................... 25

*Doe v. Internet Brands, Inc.*,
    824 F.3d 846 (9th Cir. 2016) ................................................................... 13, 14

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ............................................................ 8, 9, 10

*Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
    365 U.S. 127 (1961) ...................................................................................... 20

*Elias v. Hewlett-Packard Co.*,
    903 F. Supp. 2d 843 (N.D. Cal. 2012) .......................................................... 15

*In re Facebook, Inc.*,
    625 S.W.3d 80 (Tex. 2021) ..................................................................... 13, 14

*Fed. Agency of News LLC v. Facebook, Inc.*,
    432 F. Supp. 3d 1107 (N.D. Cal. 2020) ........................................................... 9

*Fields v. Twitter, Inc.*,
    200 F. Supp. 3d 964 (N.D. Cal. 2016) ...................................................... 7, 12

*Force v. Facebook, Inc.*,
    934 F.3d 53 (2d Cir. 2019) ............................................................................ 10

*Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary
    Workers*,
    542 F.2d 1076 (9th Cir. 1976) ...................................................................... 20

*FTC v. Accusearch, Inc.*,
    2007 WL 4356786 (D. Wyo. Sept. 28, 2007) ............................................... 23

*FTC v. Google LLC and YouTube LLC*,
    Case No. 1-19-cv-02642 (D.D.C. Sept. 10, 2019) ................................. 3, 6, 32

*FTC v. Neovi, Inc.*,
    604 F.3d 1150 (9th Cir. 2010) ...................................................................... 22

*Gengo v. Jets Stadium Dev., LLC,*
    2018 WL 4144686 (D.N.J. Aug. 30, 2018), *aff'd*, 776 F. App'x 86 (3d Cir. 2019).........................28

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008) ........................................................................................24

*In re GlenFed, Inc. Sec. Litig.,*
    42 F.3d 1541 (9th Cir. 1994) (en banc).........................................................................17

*Gold v. Lumber Liquidators, Inc.,*
    2015 WL 7888906 (N.D. Cal. Nov. 30, 2015) ..............................................................14

*Haddad v. Merck & Co.,*
    2022 WL 17357779 (C.D. Cal. Aug. 11, 2022)..............................................................37

*In re Hard Disk Drive Suspension Assemblies Antitrust Litig.,*
    2021 WL 4306018 (N.D. Cal. Sept. 22, 2021) ..............................................................29

*Hauter v. Zogarts,*
    534 P.2d 377 (Cal. 1975).................................................................................................36

*Herrick v. Grindr, LLC,*
    306 F. Supp. 3d 579 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019).........................13, 14

*In re HIV Antitrust Litig.,*
    2023 WL 3006572 (N.D. Cal. Apr. 18, 2023) ..............................................................27

*Hodsdon v. Mars, Inc.,*
    891 F.3d 857 (9th Cir. 2018) ..........................................................................................26

*Indiana v. TikTok, Inc.,*
    2023 WL 8481303 (Ind. Super. Nov. 29, 2023) ...........................................29, 30, 31, 32

*In re Insulin Pricing Litig.,*
    2024 WL 416500 (D.N.J. Feb. 5, 2024)........................................................................28

*Jones v. Corus Bankshares, Inc.,*
    701 F. Supp. 2d 1014 (N.D. Ill. 2010)...........................................................................36

*Kearney v. Foley & Lardner, LLP,*
    590 F.3d 638 (9th Cir. 2009) ..........................................................................................21

*Keegan v. Am. Honda Motor Co.,*
    838 F. Supp. 2d 929 (C.D. Cal. 2012)...........................................................................14

*Keshish v. Allstate Ins. Co.,*
    2012 WL 12887075 (C.D. Cal. Oct. 19, 2012)..............................................................39

*Kimzey v. Yelp! Inc.,*
    836 F.3d 1263 (9th Cir. 2016) ........................................................................................11

vii

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY
GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

*Klayman v. Zuckerberg*,
   753 F.3d 1354 (D.C. Cir. 2014) ..................................................................................... 11

*Korea Supply Co. v. Lockheed Martin Corp.*,
   29 Cal. 4th 1134, 63 P.3d 937 (2003) .......................................................................... 34

*Kugler v. Romain*,
   58 N.J. 522 (1971)............................................................................................................ 28

*L.W. through Doe v. Snap Inc.*,
   __F. Supp. 3d__, 2023 WL 3830365 (S.D. Cal. June 5, 2023) ...................................... 14

*Lemmon v. Snap, Inc.*,
   995 F.3d 1085 (9th Cir. 2021) .......................................................................................... 9

*Levitt v. Yelp! Inc.*,
   2011 WL 5079526 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) ...................... 11

*M.P. v. Meta Platforms, Inc.*,
   2023 WL 5984294 (D.S.C. Sept. 14, 2023)................................................................... 10

*M.T. v. Saum*,
   7 F. Supp. 3d 701 (W.D. Ky. 2014) ................................................................................ 38

*Manistee Town Ctr. v. City of Glendale*,
   227 F.3d 1090 (9th Cir. 2000) ....................................................................................... 21

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*,
   93 Conn. App. 486 (2006)......................................................................................... 30, 31

*Metro Cable Co. v. CATV of Rockford, Inc.*,
   516 F.2d 220 (7th Cir. 1975) ......................................................................................... 21

*Munning v. Gap, Inc.*,
   238 F. Supp. 3d 1195 (N.D. Cal. 2017)......................................................................... 38

*NCC Sunday Inserts, Inc. v. World Color Press, Inc.*,
   692 F. Supp. 327 (S.D.N.Y. 1988)................................................................................. 14

*NetChoice, LLC v. Bonta*,
   2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ............................................................. 26

*In re Netopia, Inc.*,
   2005 WL 3445631 (N.D. Cal. Dec. 15, 2005)................................................................. 2

*In re New Motor Vehicles Canadian Exp. Antitrust Litig.*,
   350 F. Supp. 2d 160 (D. Me. 2004)............................................................................... 26

*Newcal Indus. Inc. v. Ikon Office Sol.*,
   513 F.3d 1038 (9th Cir. 2008) .................................................................................. 15, 36

*Office of the Attorney General, State of Florida v. Meta Platforms, Inc.*,
  Case No. 4:23-cv-05885 (N.D. Cal.)................................................................................. 40

*In re ON24, Inc. Sec. Litig.*,
  2023 WL 7449838 (N.D. Cal. July 7, 2023)...................................................................... 15

*Owens v. DRS Auto. Fantomworks, Inc.*,
  764 S.E.2d 256 (Va. 2014) ................................................................................................ 19

*Parziale v. HP, Inc.*,
  445 F. Supp. 3d 435 (N.D. Cal. 2020)............................................................................... 24

*Paul v. Providence Health Sys.-Oregon*,
  237 Or. App. 584 (2010), *aff'd*, 351 Or. 587, 273 P.3d 106 (2012) ................................ 38

*People by James v. N. Leasing Sys., Inc.*,
  267, 133 N.Y.S.3d 389 (N.Y. Sup. Ct. 2020), *aff'd*, 142 N.Y.S.3d 36 (2021).................. 19

*People v. Ernst & Young, LLP*,
  114 A.D.3d 569, 980 N.Y.S.2d 456 (2014) ....................................................................... 34

*People v. Johnson & Johnson*,
  77 Cal. App. 5th 295 (2022) .............................................................................................. 20

*Phillips v. Double Down Interactive LLC*,
  173 F. Supp. 3d 731 (N.D. Ill. 2016)............................................................................22, 23

*Pullman v. Alpha Media Pub., Inc.*,
  2013 WL 1286144 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 624 F. App'x 774 (2d Cir. 2015).................. 28

*In re Quality Sys., Inc. Sec. Litig.*,
  865 F.3d 1130 (9th Cir. 2017) ........................................................................................... 36

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
  62 P.3d 142 (Colo. 2003)................................................................................................... 26

*Ristic v. Mach. Zone, Inc.*,
  2016 WL 4987943 (N.D. Ill. Sept. 19, 2016) ...............................................................22, 24

*Robey v. PVH Corp.*,
  495 F. Supp. 3d 311 (S.D.N.Y. 2020) ............................................................................... 38

*Sanders v. The RealReal, Inc.*,
  2021 WL 1222625 (N.D. Cal. Mar. 31, 2021)...................................................................... 4

*Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*,
  737 F. Supp. 2d 380 (E.D. Pa. 2010)................................................................................. 26

*Sonner v. Premier Nutrition Corp.*,
  971 F.3d 834 (9th Cir. 2020) ............................................................................................. 35

ix

*Southland Sod Farms v. Stover Seed Co.*,
   108 F.3d 1135 (9th Cir. 1997) ................................................................. 16

*Sparkman v. Comerica Bank*,
   No. 23-CV-02028-DMR, 2023 WL 5020269 (N.D. Cal. Aug. 4, 2023) .......................... 35

*Stanford Health Care v. Trustmark Servs. Co.*,
   No. 22-CV-03946-RS, 2023 WL 2743581 (N.D. Cal. Mar. 31, 2023)............................ 35

*State ex rel. Stovall v. DVM Enterprises, Inc.*,
   275 Kan. 243 (2003)........................................................................ 27

*Swartz v. KPMG LLP*,
   476 F.3d 756 (9th Cir. 2007) ............................................................... 14

*In re Takata Airbag Prod. Liab. Litig.*,
   462 F. Supp. 3d 1304 (S.D. Fla. 2020)...................................................... 16

*Tiismann v. Linda Martin Homes Corp.*,
   637 S.E.2d 14 (Ga. 2006) .................................................................. 19

*In re Toyota Motor Corp.*,
   2012 WL 12929769 (C.D. Cal. May 4, 2012) .................................................. 16

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145 (C.D. Cal. 2010)...................................... 16

*Tuosto v. Philip Morris USA Inc.*,
   No. 05CIV.9384(PKL), 2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ........................... 21

*Turf Lawnmower Repair, Inc. v. Bergen Rec. Corp.*,
   139 N.J. 392 (1995)........................................................................ 28

*United States v. Dunkel*,
   927 F.2d 955 (7th Cir. 1991) .............................................................. 12

*Vess v. Ciba-Geigy Corp. USA*,
   317 F.3d 1097 (9th Cir. 2003) ............................................................. 14

*Vigil v. Gen. Nutrition Corp.*,
   2015 WL 8056178 (S.D. Cal. Dec. 4, 2015) ................................................. 17

*Waller v. Hewlett-Packard Co.*,
   295 F.R.D. 472 (S.D. Cal. 2013)........................................................... 20

*White v. Lee*,
   227 F.3d 1214 (9th Cir. 2000) ............................................................. 20

*Williams v. Amazon, Inc.*,
   573 F. Supp. 3d 971 (E.D. Pa. 2021)....................................................... 16

x

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY
GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    2017 WL 3727318 (N.D. Cal. Aug. 30, 2017) ................................................. 17

*Zeiger v. WellPet LLC*, 304 F. Supp. 3d 837 (N.D. Cal. 2018) ................................................. 16

*In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*,
    601 F. Supp. 3d 625 (C.D. Cal. 2022) .................................................... 36, 37

*Ziencik v. Snap, Inc.*,
    2024 U.S. Dist. LEXIS 12105 (C.D. Cal. Jan. 19, 2024) ...............................29, 31, 35

**Statutes**

15 U.S.C. § 6501(10) ........................................................................... 5

15 U.S.C. § 6504(e)(1) ........................................................................ 39

15 U.S.C. § 6504(e)(2) ........................................................................ 39

28 U.S.C. § 1391(b) ........................................................................... 39

Ariz. Rev. Stat. Ann. § 44-1522 ............................................................... 32

Arizona Consumer Fraud Act .................................................................... 32

Cal. Civ. Code § 1798.99.29 ................................................................... 26

California Age-Appropriate Design Code Act ..................................................... 26

Colorado Antitrust Act ........................................................................ 27

Del. Code Ann. tit. 6, § 2523 ................................................................. 33

Del Code Ann. tit. 29 § 2520 .................................................................. 33

Federal Trade Commission Act Section 5 .................................................... *passim*

Fla. Stat. § 48.193(1)(a) (2023) ............................................................. 39

Ga. Code Ann. § 10-1-392(a)(7) ................................................................ 30

Ga. Code Ann. § 10-1-392(a)(10) ............................................................... 30

Indiana Deceptive Consumer Sales Act .......................................................... 29

Md. Code Ann., Com. Law § 13-303(1) ........................................................... 35

N.D. Cent. Code § 51-15-07 .................................................................... 33

N.J. Stat. Ann. § 56:8-2 ...................................................................... 28

N.Y. Gen. Bus. Law § 349(b) ................................................................................................ 33

Or. Rev. Stat. § 646.605(9)(a) ............................................................................................... 29

R.I. Gen. Laws § 6-13.1-5(a) ................................................................................................ 33

**Other Authorities**

16 C.F.R. § 312.2(1) ............................................................................................................... 6

16 CFR § 312.2 .................................................................................................................... 3, 6

16 CFR § 312.4(d) .................................................................................................................. 5

144 Cong. Rec. S12741-04 ..................................................................................................... 5

64 Fed. Reg. 59893 ................................................................................................................ 5

71 Fed. Reg. 13247, 13252 (Mar. 15, 2006) ........................................................................ 3

17 Am. Jur. 2d Consumer Protection § 280 ......................................................................... 20

xii

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY
GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

**INTRODUCTION**

The States' Opposition fails to overcome the Complaints' deficiencies identified in Meta's Motion. The States' COPPA claim requires impermissibly and implausibly treating general audience internet services as "child directed" based on a small fraction of third-party content.  And permitting the States' consumer protection claims would run roughshod over this Court's prior rulings regarding the reach of Section 230.  The Court has already held that the very features that lie at the core of the States' claims—such as the design of algorithms that recommend content and other features that determine whether and how content is displayed—are barred.  Moreover, the States fail to identify even a single case from any jurisdiction holding that, without more, designing a service in a way that makes the service more appealing to users—*i.e.*, makes more people want to use it or makes people want to use it more frequently—constitutes an unfair business practice.  Punishing businesses for allegedly seeking to increase use of the businesses' services would be an unprecedented and unwarranted expansion of state consumer protection law.  For these reasons, and the additional reasons explained below, the Court should grant Meta's Motion.

**LAW & ARGUMENT**

**I.     THE "CHILD-DIRECTED" COPPA CLAIM SHOULD BE DISMISSED.**

The States' procedural objections to Meta's motion to dismiss their "child-directed" COPPA claim are meritless. And the Attorney Generals' Opposition ("AG Opp.") (ECF 599) does not overcome Meta's showing that they have failed to plead that Instagram or Facebook (or "portions thereof") are "child-directed."

**A.     The State's Procedural Objections Are Unavailing.**

Meta's motion is procedurally proper because it seeks to dismiss an entire cause of action.  COPPA provides two distinct causes of action.  First, it provides that it is unlawful "for an operator of [an] online service" that is "directed to children to collect personal information from a child in a manner that violates the [COPPA] regulations." 15 U.S. Code § 6502.  Second, it provides that it is unlawful for "any operator that has actual knowledge that it is collecting personal information from a child[] to collect personal information from a child in a manner that violates the regulations."  *Id.*  Those causes of action operate independently from one another and the proof required to establish a violation of each is entirely different.  The Opposition itself recognizes this, describing the States' child-directed claim as an "independent

ground" for applying COPPA, separate from their "actual knowledge" claim.  *See* AG Opp. 5.

Here, the States assert **both** claims, and the Complaint clearly distinguishes between the allegations supporting each claim, *see* Compl. ¶¶ 642–745 (actual knowledge); *id.* ¶¶ 746–805 (child-directed).  Those are two distinct causes of action, and so it is appropriate to seek dismissal of just one of them.  Indeed, by combining two separate causes of action in a single count, the States have acted in "complete disregard of the principle that separate, discrete causes of action should be [pled] in separate counts."[1]

### B.    The States Misapply the Child-Directed Standard.

While the States assert that Instagram and Facebook "both as a whole, as well as portions thereof, are child-directed," AG Opp. 8, they have not adequately pled and cannot establish either.

1.    <u>The States Cannot Establish That the Services "As A Whole" Are Child-Directed.</u>

As Meta's Motion showed, each of the factors set forth in the COPPA rules supports the conclusion that Instagram and Facebook are not child-directed "as a whole."  *See* Motion to Dismiss ("Mot.") 9–19.

**Subject Matter**.  The States do not dispute that the "subject matter" of Facebook and Instagram— services that facilitate the sharing of user-generated content and social connections online—is appealing to **all ages**, and is not specifically directed to children.  Instead, the States engage in a sleight of hand, pointing to a tiny fraction of allegedly child-oriented content that third parties have made available on Instagram.  But the presence of some child-oriented user-generated content does not establish that these services are child-oriented, and interpreting COPPA to impose liability based on content posted by third parties would be inconsistent with Section 230.  *See id.* 9–12.

FTC guidance (although non-binding) recognizes this distinction between an individual creator who posts content directed to children and the service on which the creator posts.  Specifically, the COPPA FAQs contemplate that a creator may post child-directed content on a "platform that hosts a wide variety of user-generated content," and make clear that the platform itself nonetheless remains "general audience."

---

[1] *Cesnik v. Edgewood Baptist Church*, 88 F.3d 902, 905 (11th Cir. 1996).  The cases cited by the States are not to the contrary. In *Dermansky v. Young Turks, Inc.*, 2023 WL 8884364, at *1 (C.D. Cal. Nov. 3, 2023), the plaintiff asserted a single cause of action, and the defendant moved to dismiss as to some but not all of the factual circumstances allegedly supporting the claim.  *Id.* at *1 (C.D. Cal. Nov. 3, 2023) (seeking dismissal of copyright claim as to some but not all alleged acts of infringement).  Similarly, in *In re Netopia, Inc.*, 2005 WL 3445631 at *3 (N.D. Cal. Dec. 15, 2005), the defendants sought only to dismiss certain *allegations*, not an entire cause of action.

COPPA FAQ D.2.   The FTC also recognized this distinction in its settlement with YouTube, acknowledging that YouTube is a "general audience … user-generated video-sharing platform," despite the presence of some child-directed content on its service.[2]  In short, the States fail to allege that the subject matter of Instagram or Facebook themselves is child-directed, and their scattershot allegations regarding a small amount of content posted by third parties on the services do not change this fact.

**Language and Visual and Audio Content**.  The Opposition makes no effort to dispute Meta's showing that the Complaint does not contain any allegations whatsoever concerning the "visual content, … music or other audio content, or language or other characteristics of" Instagram and Facebook themselves.  16 CFR § 312.2; Mot. 18.

**Intended Audience**. The States do not dispute that Facebook and Instagram's terms of service prohibit users under the age of 13.  Despite this, the States argue that children are an intended audience of these services based on allegations that Meta ***as a company*** sought to reach children, studied their online habits, and monitored data concerning potential under-13 users.[3]  AG Opp. 9. But Meta addressed these very allegations in its Motion, and the States do not respond.  Mot. 16.  For example, the Opposition quotes allegations about the "acquisition" and "pursu[it]" of under-13 users, despite Meta showing that the cited allegations related specifically to Meta's efforts to develop ***separate***, COPPA-compliant services (such as Instagram Youth and Messenger Kids) for users under 13.  AG Opp. 9.

**Audience Composition**.  The States also do not address the core problem with their "audience composition" allegations.  The Opposition merely points to allegations that Facebook and Instagram have "millions" of users under the age of 13, AG Opp. 10, without any consideration of how this figure compares to Facebook and Instagram's ***total*** user base.  But the relevant question under COPPA is not whether some children may use the service despite Meta's bar against doing so; it is whether the ***composition*** of a service's audience suggests that the service is child-directed.  *See* 16 CFR § 312.2 (child-

---

[2] *See* Stipulated Order for Permanent Injunction and Civil Penalty Judgment (ECF 5), *FTC v. Google LLC and YouTube LLC*, Case No. 1-19-cv-02642 (D.D.C. Sept. 10, 2019).

[3] To the extent the States rely on allegations that Meta monitored the size of the "under-13 cohort" on Instagram (AG Opp. 9), those allegations are at most relevant to the claim that Meta had actual knowledge of the collection of personal information from children, and not plausibly tied to the child-directed factors.

directed test considers "reliable empirical evidence regarding audience composition"). Because there is no allegation that a significant ***proportion***—or any specific percentage—of Facebook or Instagram users are under 13, this factor cuts decisively against the States. *See, e.g.*, 71 Fed. Reg. 13247, 13252 (Mar. 15, 2006) (recognizing that a service may be "general audience" even though it "attract[s] a substantial number of children under the age of 13").

**"Child-Oriented" Content**.  The States rely on wholly conclusory allegations to argue that "child-oriented" content is prevalent across Facebook and Instagram. They claim that the services hosted and "promote[d] thousands" of (largely unspecified) child-oriented accounts and pages, and also "invest[ed] in [unspecified] channels" that "yielded" those accounts.  AG Opp. 10, 12.  But even if this third-party content were relevant to the question whether Instagram or Facebook are themselves child-directed, there is no factual support for ***any*** of these conclusions in the Complaint.  *See* Mot. 9.

The Complaint does not identify a single "child-oriented" Facebook account.  While the States criticize Meta for failing to show that the small number of Instagram accounts they reference are "intended for and consumed" entirely by adults, rather than children, AG Opp. 11, that is not Meta's burden.  Mot. 9–10.[4]  The States' allegations do not suffice, among other reasons, because even a cursory examination of the specific accounts referenced in the Complaint demonstrates that the content of the accounts is plainly ***not*** directed to children.[5]  Nor do the States respond to the fact that the simple presence of brands, characters, or content posted by third parties that may be popular with children is not enough to render a service child-directed.  *Id.*

---

[4] The States misconstrue COPPA when they assert that "a service may be directed to multiple audiences at once, such as parents and children."  AG Opp. 9. In fact, COPPA sharply distinguishes between child-directed services, on the one hand, and "general audience" services, on the other.  *See* Mot. 7–9.  To be sure, the COPPA Rules contemplate "mixed audience" services, but "the 'mixed audience' category is a subset of the 'directed to children' category, and a general audience site does not become 'mixed audience' just because some children use the site or service."  COPPA FAQ D.4.

[5] The Court may properly consider the account content identified by Meta because it is incorporated by reference into the Complaint. The States specifically identify the accounts by name and list their URLs, and rely on them extensively to support their allegations that Instagram hosts numerous "child-oriented" accounts. Because the States put these accounts at issue, nothing requires the Court to blind itself to their content in judging the adequacy of the States' allegations. *E.g.*, *Sanders v. The RealReal, Inc.,* 2021 WL 1222625, at *4-5 (N.D. Cal. Mar. 31, 2021) (incorporating by reference documents relied on in complaint).

4

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

**"Child-Directed" Advertising**.  The States argue that Meta cannot dispute their characterization of "child-directed" advertisements promoting and appearing on Facebook and Instagram.  But the States are not entitled to rely on snippets of advertisements while disregarding the full context and limitations of what they show.  *Khoja*, 899 F.3d at 1002–03 (plaintiffs may not "select[] only portions of a document that support their claims, while omitting portions … that weaken—or doom—their claims").  And the States do not dispute what that context actually shows: video advertisements concerning topics such as teen parental controls, privacy and security checkups, and video features.  None of the cited advertisements supports the conclusion that either Facebook or Instagram is directed to children.  More broadly, the States fail to address how three advertisements that briefly depict images of children could possibly give rise to an inference that Facebook and Instagram "as a whole" are child-directed.  *See* Mot 14.

**Child Celebrities**.  The States' contention that Meta does not dispute that their allegations concerning child influencers and celebrities, AG Opp. 13, is incorrect. As Meta noted in its Motion, the Complaint identifies only a ***single account*** featuring an alleged "child-celebrity."  The States' remaining allegations consist of nothing more than vague assertions about unnamed Instagram accounts posting unspecified content that "appeal[s] to children under the age of 13." *Id*.  There is no basis to credit those allegations, much less find them sufficient to support the States' child-directed theory.

      1.    The States Cannot Establish That "Portions" of the Services Are Child-Directed.

In an attempt to salvage their claims, the States argue that "portions" of Instagram and Facebook are child-directed.  AG Opp. 5, 8.  For three separate reasons, that argument fails.

*First*, the States are wrong to label the third-party accounts and pages they identify as "portions" of the Facebook and Instagram services. While COPPA contemplates that a "portion" of a website or service may be directed to children, 15 U.S.C. § 6501(10), user-created accounts and pages are not "portions" of the Facebook and Instagram services for purposes of COPPA.  Rather, a "portion" must be a separate area created by the service for children, such as a designated "Kids Club" or "Kids Zone" on a website or a "Kids Shows" tab in a video app.[6]

---

[6] *E.g.*, 144 Cong. Rec. S12741-04 (if "site has a special area for children, then that portion of the site will (continued…)

*Second*, the States are wrong that they can sidestep the child-directed standard simply by framing their claim as limited to "portions" of Facebook and Instagram.  The COPPA Rule is clear that the same multifactor test governs whether a website or online service, or a "portion thereof," is directed to children.  *See* 16 CFR § 312.2 ("In determining whether a web site or online service, or a portion thereof, is directed to children, the [FTC] will consider" the statutory list of factors).  While the Complaint sets forth scattershot allegations regarding a handful of accounts, the States never apply the COPPA Rule's multifactor test to any specifically identified account, page, or other "portion" of Instagram or Facebook.[7]

*Third*, it is clear that the operator of a "general audience" service is ***not*** subject to COPPA merely because an individual account holder posts child-directed content.  COPPA FAQ D.2.  Rather, the operator of "a general audience platform that hosts a wide variety of user-generated content" need only comply with COPPA vis-à-vis that account if it "has actual knowledge that [the account's] content is directed to children."  *Id.*  Nowhere do the States allege that Meta had such "actual knowledge" as to any specific account or page referenced in the Complaint.  And, in any event, the States' claims should be limited to only those "portions" (if any) as to which the Court finds the States' allegations sufficient.

The FTC's COPPA settlement with YouTube is instructive. While the FTC recognized YouTube as a "general audience" service, it imposed liability based on the allegations that YouTube had actual knowledge that some of its most popular "channels"—separate sites or services from which YouTube collected personal information—were directed to children.[8]  No such allegations have been made against Meta: the complaint does not assert that the allegedly child-directed accounts are among the most popular on Instagram or Facebook, that Meta had actual knowledge any Instagram or Facebook account was child-

---

be considered to be directed to children"); 64 Fed. Reg. 59893 ("[I]f a general audience site has a distinct children's 'portion' or 'area,' then the operator would be required to provide the protections of the Rule for visitors to that portion of the site."); *see* 16 CFR § 312.4(d) (explaining how notice requirements apply to "[a]n operator of a general audience Web site or online service that has a separate children's area").

[7] For example, while the States assert that several accounts are dedicated to "children's cartoons" or feature "popular animated … characters," AG Opp. 8–9, the use of "animated characters" is just one among the many factors set forth in the COPPA Rules, *see* 16 C.F.R. § 312.2(1).

[8] *See, e.g.*, Complaint (ECF 1) ("YT Comp.") ¶ 5, *FTC v. Google LLC and YouTube LLC*, Case No. 1-19-cv-02642 (D.D.C. Sept. 4, 2019).

directed, or that the accounts are akin to individual "channels" that operate as separate websites or online services.  YT Compl. ¶ 20.  Moreover, unlike the States, the FTC engaged in "[a]n assessment of the[] [COPPA Rule] factors" as to each of the channels at issue.  *Id.* ¶ 28.

## II.     SECTION 230 LARGELY BARS THE CONSUMER PROTECTION CLAIMS.

### A.     Section 230 Bars the Vast Majority of the States' Claims that the Design of the Instagram and Facebook Services Constitute Unfair or Unconscionable Business Practices.

As explained in the Motion, the States' unfair and unconscionable practices claims are barred by Section 230 because they seek to hold Meta liable for quintessential decisions about whether and how to publish third-party content.  Mot. 19–23.  Indeed, the Court has already found that the individual features challenged by the States are not actionable under Section 230.  *See* Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Prior Order") (ECF 430) 16–19.  Nothing in the States' Opposition overcomes this straightforward application of the law and the Court's prior order.[9]

#### 1.     The States' Allegations About Instagram's and Facebook's Overall Design Fail.

The States first argue that this Court should apply a "holistic" approach to Section 230 by focusing on the "overall design" of Facebook and Instagram.  This ignores that the Court has already applied Section 230 to bar allegations relating to individual alleged defective features of Facebook and Instagram.  AG Opp. 16.  But in any event, whether the challenged design features are viewed "holistically" or individually, the States' claims are barred by Section 230.  *See* Mot. 19–21 (analyzing States' allegations as a whole); *id.* 21–22 (analyzing specific features).

As the States put it in their Opposition, the core of their claims is that Meta violated consumer protection law by "unfairly designing its Platforms to addict young users and by specifically targeting young users despite knowing that the Platforms are especially harmful to them."  AG Opp. 16.  But those allegations based on "design" and "targeting" directly challenge Meta's decisions related to its publishing of third-party content to these users—such as the design of algorithms that organize content for users and other decisions about whether and how content is displayed to users.  As courts have explained, and this

---

[9] Meta does not seek to dismiss these claims under Section 230 to the extent they are predicated on alleged violations of COPPA.  *See* Mot. 19.

Court has already held, the "structure and operation of a website," including "features that are part and parcel of the overall design and operation of the website … reflect choices about what content can appear on the website and in what form and thus fall within the purview of traditional publisher functions." *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 972 (N.D. Cal. 2016) (cleaned up).  At bottom, the States take issue with how Meta publishes third-party content and want Meta to do it differently—by forcing Meta to change the order in which third-party content is displayed, the manner in which it is presented, and how users are alerted to it.  That is precisely what Section 230 forbids.  *See* Prior Order 16–19 (Section 230 extends to "editorial decisions and functions ancillary to the decision to make content available").

2.    The States' Allegations About Particular Features Fail.

The States next argue that their challenges to specific features of Facebook and Instagram are not barred by Section 230.  To start, this argument is predicated on an overly narrow interpretation of Section 230, under which its protections would depend on whether Meta needs to "alter" any third-party content to comply with the duties the States seek to impose under consumer protection law.  AG Opp. 16.  But courts, including this one, have rejected that cramped view of Section 230, recognizing that immunity also applies where imposing liability for a claim would "requir[e] defendants to change ***how*** they publish such content."  Prior Order 17 (emphasis added); *see also, e.g.*, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).[10]  The States also disregard the Court's prior order, which held that Section 230 barred materially identical challenges to these precise features.  While the States occasionally attempt to manufacture distinctions between the features they challenge and the ones the Court has ruled on, their argument largely boils down to the contention that the Court misapplied the law or committed errors in its prior order.  The States' attempted distinctions fail and the Court's prior order controls:

***Infinite scroll and autoplay.***  The Court previously found that challenges to the design of the infinite scroll and autoplay features "would necessarily require defendants to publish less third-party content" and "inherently limit what defendants are able to publish."  Prior Order 16.  The States simply

---

[10] For some challenged features, the States' assertion is simply not true; disabling content's ephemerality, for instance, would alter it.  *See* Prior Order 16 (so finding).  For the other challenged features, the States' claims necessarily depend on Meta's alleged decisions regarding whether and how to display third-party content; changing Meta's algorithms, for example, would change the sequencing of content—a traditional publishing decision.  *See id.* 18–19 (so finding).

8

disagree, contending that "Meta *could* change these features without publishing less third-party content," because this change would only limit what "users might **see**," not "prohibit any third-party user from **posting**."  AG Opp. 20–21 (second and third emphases added).  But that misses the Court's point and is irrelevant.  Section 230 protects decisions about how to publish user content (in the States' words, those regarding what "users might see"), not just users' ability to post it.  *See, e.g.*, *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009) (Section 230 precludes liability when "the duty that the plaintiff alleges the defendant violated derives from the defendant's status or conduct as a 'publisher or speaker'").

      ***Ephemeral content features.***  The Court previously found that the ephemerality of third-party content is also covered by Section 230.  *See* Prior Order 16.  The States again disagree, arguing that Meta can be forced to disable ephemerality without changing the underlying content.  *See* AG Opp. 21–22.  But the Court already dispensed with that argument, finding that "determining the length of content published and how long to publish content are 'traditional editorial functions' immune under Section 230, where exercised with regard to third-party content."  Prior Order 16 (citing *Barnes*, 570 F.3d at 1102).  *Lemmon v. Snap, Inc.* (which the Court already considered) does not suggest a different conclusion, contrary to what the States argue: the "speed filter" at issue there was found to be independent of third-party content and Snap could have satisfied its obligations "without altering the content that Snapchat's users generate."  *Id.* 12 (quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092 (9th Cir. 2021)).  Here, the States' claims would force Meta to **remove** ephemeral content, **alter** the content to be non-ephemeral, or **prohibit** Meta from publishing ephemeral third-party content in the future—actions protected by Section 230.  *See, e.g.*, *Lemmon*, 995 F.3d at 1091 ("'[P]ublication' generally involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." (cleaned up)).

      ***Notifications***.  The Court previously found that notifications regarding third-party content are protected by Section 230.  Prior Order 18 (citing *Dyroff*, 934 F.3d at 1093).[11]  To dispute this, the States argue that the Court misread and misapplied the Ninth Circuit's decision in *Dyroff*.  AG Opp. 22.  They

---

[11] As the Motion pointed out, notifications regarding Meta's own content are shielded by the First Amendment.  *See* Mot. 22 (citing Prior Order 22 (so finding)).  The States did not respond to this point in their brief, conceding that they do not seek to impose liability on that basis and/or that these allegations would not be actionable.

9

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

argue that their challenge is to the design of the notifications—that they are allegedly too frequent and disruptive—which does not require Meta to "monitor or remove content." *Id.*  But again, this argument improperly challenges Meta's publishing decisions about when and how to publish third-party content by providing users with notifications about such content.  *See, e.g.*, *Fed. Agency of News LLC v. Facebook, Inc.*, 432 F. Supp. 3d 1107, 1118 (N.D. Cal. 2020) (Koh, J.) (citing *Dyroff* to hold that "notifications" are entitled to Section 230 protection because they "are tools meant to facilitate the communication and content of others").  The Court correctly applied Section 230 (including *Dyroff*) to reject this argument, which is not materially different from the arguments already made by the Personal Injury ("PI") Plaintiffs.  *See* ECF 337 at 12 ("liability for these defective 'tools,' would not hold Defendants responsible for publishing anything, or require them to monitor the legality of third-party content" (citation omitted)).  The Court correctly rejected that mistaken framing then and should do so again now.

    ***Algorithms***.  The Court previously found that, "to the extent plaintiffs challenge defendants' use of algorithms to determine whether, when, and to whom to publish third-party content, Section 230 immunizes defendants" because "these are traditional editorial functions that are essential to publishing." Prior Order 18–19.  The States argue that the Court ignored Ninth Circuit precedent in making this finding because content recommendation algorithms "promot[e], market[], or boost[] content," which the States assert is not protected by Section 230.  AG Opp. 19.  But choosing—or "promoting," "boosting," or any other synonym—which content to show is at the heart of what Section 230 protects.  *E.g.*, *Dyroff*, 934 F.3d at 1098 (finding algorithmic recommendations protected); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (rejecting "contention that Facebook's use of algorithms renders it a non-publisher"); *M.P. v. Meta Platforms, Inc.*, 2023 WL 5984294 (D.S.C. Sept. 14, 2023) (Section 230 barred challenges to "algorithms and internal architecture of social media sites").  And none of the purportedly contrary precedent cited by the States concerned content algorithms.

    ***Likes.***  The Court previously found that "notifications that someone has commented on or liked a user's post" are shielded by Section 230.  Prior Order 18.  As Meta explained, "[t]hat reasoning" applies whether the "Like" is presented with an alert-style notification or by displaying the information on the post itself.  *See* Mot. 22.  The States respond that Section 230 does not apply to their claims to the extent they challenge Meta's alleged choice to display ***total*** "Like" counts for users.  AG Opp. 18.  But the States

10

offer no reason why Section 230's applicability would depend on whether Meta displays Likes individually or tallies them up.  Likes are user-generated content: as the States themselves allege, Likes are a "way for users to express validation or approval" of third-party content.  Compl. ¶ 227.  Accordingly, Meta's decision whether and how to display that third-party content (including total Like count) is protected by Section 230.  Courts, including the Ninth Circuit, have repeatedly held that the aggregation of user reactions in this manner is covered by Section 230.  *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1270 (9th Cir. 2016) ("We fail to see how Yelp's rating system, which is based on rating inputs from third parties and which reduces this information into a single, aggregate metric is anything other than user-generated data."); *Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("[A] website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online."); *Levitt v. Yelp! Inc.*, 2011 WL 5079526, at *7 (N.D. Cal. Oct. 26, 2011), *aff'd*, 765 F.3d 1123 (9th Cir. 2014) (similar).

### 3.   The States' Unpled Claims About Particular Features Fail.

After Meta explained in its Motion to Dismiss why each feature the States challenge is shielded from liability, the States changed tack in their Opposition, arguing that an entirely new set of features is also at issue.  *See* AG Opp. 17.  The States now assert unfair or unconscionable practices claims based on (1) the ability of users to have multiple Instagram accounts, (2) appearance-altering filters, and (3) users' inability to self-restrict time on the services.  *Id.*  They say that Meta "concedes" these allegations can proceed because it did not move to dismiss them.  *Id.*

The most basic flaw in the States' argument is that their Complaint does not plead challenges to these features as part of their unfair practices claims.  Those claims explicitly include a list of challenged features (all of which Meta addressed in its Motion) and none of these newly added features are on that list.  *See* Compl. ¶¶ 847–50 (collecting allegations to support these claims); *id.* ¶ 847(b)–(e) (listing challenged features).  The new features the States point to in their brief, by contrast, are pulled from stray allegations throughout the Complaint, with no nexus drawn to this set of claims.  For instance, the "multiple accounts" allegation the States cite appears in three paragraphs that are nearly 500 paragraphs removed from the States' unfair practices allegations.  *See* AG Opp. 17 (citing Compl. ¶¶ 370–72).  The States' "attempt to rewrite the [complaint] in their Opposition [to survive a motion to dismiss] is not

11

plausible," and the Court should reject it.  *Anderson v. Apple Inc.*, 500 F. Supp. 3d 993, 1023 (N.D. Cal. 2020).  Meta had no reasonable and fair notice that the States would single out these features scattered across the Complaint when they explicitly listed other features as the basis for their unfair practices claims. The Court should dismiss the claims based on what the States actually pled.[12]

If the Court is inclined to consider these newly asserted features, Section 230 bars liability for permitting users to have multiple accounts.  As another court in this District has explained, "decisions regarding the structure and operation of a website—***such as permitting users to register under multiple screen names***—reflect choices about what content can appear on the website and in what form and thus fall within the purview of traditional publisher functions."  *Fields*, 217 F. Supp. 3d at 972 (emphasis added).  Permitting users to open accounts (or multiple accounts) is analogous to traditional publishing functions because it is inseparable from choices about how and to whom content is published.  *See, e.g.*, *id.* at 972 (holding that liability on this basis would violate Section 230 because it concerns "granting permission to post (through the provision of Twitter accounts) instead of for allowing postings that have already occurred"); *Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 295 (D.N.H. 2008) (holding that Section 230 covers "a feature that allowed a single individual to post under multiple screen names" and that holding otherwise would "eviscerate Section 230 immunity" (cleaned up)).[13]

### B.  Section 230 Bars the States' Claims That Meta Omitted or Failed To Provide Warnings Regarding Instagram and Facebook's Design Features.

Just as Section 230 bars claims challenging how Meta publishes third-party content, it also bars claims seeking to hold Meta liable for omissions regarding the manner in which it publishes third party content.  Such omission claims still seek to hold Meta liable as a publisher.  *See, e.g.*, *Barnes*, 570 F.3d at 1101–02 (in applying Section 230, "what matters is not the name of the cause of action," but "whether the

---

[12] *See Baker v. Twitter, Inc.*, 2023 WL 6932568, at *3 (C.D. Cal. Aug. 25, 2023) (Rule 8 and "basic common sense call for pleadings that do not require the Court to immediately recall what was alleged in paragraph 97 in order to understand why one bolded sentence in a half-page-long block quote in paragraph 223 is false or misleading …. Lead Plaintiff is reminded that '[j]udges are not like pigs, hunting for truffles buried in' overlong complaints." (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991)).

[13] Meta recognizes that the Court previously ruled that claims based on appearance-altering filters and the lack of options to self-restrict time are not barred by Section 230 or the First Amendment.  *See* Prior Order 14–15, 21–22.  While Meta respectfully disagrees with those rulings, and preserves its arguments as applied to the States' claims, Meta does not seek to relitigate those rulings here.

cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another.").

The States' omission claims seek to hold Meta liable for failing to disclose "the risk of harm to youth who use Meta's Platforms." AG Opp. 18. Because, for the reasons discussed above, this risk of harm derives from the publication of third-party content, any warning about this publication would also be a publishing function.[14] *See Bride v. Snap Inc.*, 2023 WL 2016927, at *6 (C.D. Cal. Jan. 10, 2023) ("Had those third-party users refrained from posting harmful content, Plaintiffs' claims that Defendants falsely advertised and misrepresented their applications' safety would not be cognizable. Accordingly, the nature of Plaintiffs' legal claim does not alter the court's conclusion, whether based on negligence or false advertising."). These warnings would essentially amount to editorial commentary about the nature of the underlying content or how it is presented, which is squarely within the traditional role of a publisher. *Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579, 591 (S.D.N.Y. 2018), *aff'd*, 765 F. App'x 586 (2d Cir. 2019) ("[R]equiring [an interactive computer service] to post a warning at the outset or along with each profile is no different than requiring [the service] to edit the third-party content itself."); *In re Facebook, Inc.*, 625 S.W.3d 80, 93 (Tex. 2021) ("[A]ny liability [for a claim of omission] would be premised on second-guessing of [the service's] 'decisions relating to the monitoring, screening, and deletion of [third-party] content.'"). Imagine, for example, a preface to a short-story compilation book that warns of the disturbing nature of the stories or how they are ordered. Only the publisher could elect to include such a preface.

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016), is inapposite. There, bad actors allegedly contacted the plaintiff offline after viewing her modeling profile on the defendant's website, as part of a scheme to lure her to sham auditions and sexually assault her. In that case, (1) the bad actors did

---

[14] The States dispute that their omission claims are "merely repackaged failure to warn claims about Meta's recommendation algorithms or other features" because they also purport to allege "a multitude of omissions of internal research and knowledge that belie Meta's … narrative around safety." AG Opp. 17. This "internal research and knowledge" concerns Meta's research into and knowledge about the alleged harmful content to which users may be exposed. Meta's alleged failure to disclose this information thus essentially amounts to a failure to inform—*i.e.*, "warn"—users about this alleged harmful content. No matter how the States frame it, the "multitude of omissions" they allege all fall within the same broad theme of allegedly failing to disclose (*i.e.*, warn about) allegedly known risks. *See Bride v. Snap Inc.*, 2023 WL 2016927, at *7 (C.D. Cal. Jan. 10, 2023) (dismissing false advertising claims "for the same reason as Plaintiffs' failure to warn claims: … they are all predicated on allegations concerning activity immunized by Section 230").

13

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

not post anything to the website, (2) the plaintiff was not lured by any post on the website, and (3) the

defendant did not learn of the predators' activity from any monitoring of posts on the website, but instead

from an outside source. *Id.* at 851.  In other words, the plaintiff's claims did not relate to the publication

of any third-party content whatsoever, and thus liability "would not require [defendant] to remove any

user content or otherwise affect how it publishes or monitors such content." *Id.*  In contrast, here the

alleged omissions directly relate to how Meta publishes third-party content. *See supra* Part II.A; *see also*

*Herrick*, 306 F. Supp. 3d at 592 (distinguishing *Internet Brands* on this basis); *In re Facebook*, 625 S.W.3d

at 95 (same); *Bride*, 2023 WL 2016927, at *7 (same); *L.W. through Doe v. Snap Inc.*, __ F. Supp. 3d __,

2023 WL 3830365, at *7 (S.D. Cal. June 5, 2023) (same).[15]

## III.    THE STATES FAIL TO ALLEGE ACTIONABLE MISREPRESENTATIONS.

In addition to their omission claims being barred by Section 230, the States' deceptive practices

claims fail for several independent reasons.  In their Opposition, the States accuse Meta of seeking

dismissal of certain statements in isolation, without considering their alleged "complex, multifaceted

scheme of deception" as a whole.  AG Opp. 23–24. But Rule 9(b) requires that claims sounding in fraud—

as the States' deception claims unquestionably do[16]— must plead the "time, place, and specific content of

---

[15] The States criticize Meta for supposedly urging the Court to "hold the opposite" from its ruling in the Prior Order regarding the PI Plaintiffs' failure-to-warn claims (despite themselves repeatedly urging the Court to "hold the opposite" of its prior Section 230 rulings).  AG Opp. 17.  As the Court noted in its February 2, 2024 ruling on Defendants' Motion to Certify Interlocutory Appeal, however, it "has yet to rule on the claims of ... the state attorneys general" regarding this issue.  *See* ECF 590 at 5.

[16] Six States dispute the application of Rule 9(b) to their claims of deception by relying on standards from their respective state courts.  *See* AG Opp. 5 n.5.  But the Rule 9(b) pleading standard is a federal procedural rule that applies in federal court as a matter of federal law, regardless of the state-law pleading standards.  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102–03 (9th Cir. 2003) ("[W]hile a federal court will examine state law to determine whether the elements of fraud have been pled sufficiently to state a cause of action, the Rule 9(b) requirement that the *circumstances* of the fraud must be stated with particularity is a federally imposed rule."); *NCC Sunday Inserts, Inc. v. World Color Press, Inc.*, 692 F. Supp. 327, 330 (S.D.N.Y. 1988) ("[I]t is federal law which governs procedural issues of state law raised in federal court, and Rule 9(b) is a procedural rule."); *de Dios v. Gerard Roof Prod., LLC*, 2018 WL 6016952, at *3 (C.D. Cal. Sept. 4, 2018) (similar).  Moreover, "[i]n cases where fraud is not a necessary element of a claim, a plaintiff may choose nonetheless to allege in the complaint that the defendant has engaged in fraudulent conduct," in case which Rule 9(b) would apply. *Vess*, 317 F.3d at 1103.  And because the issue is one of federal law, the Ninth Circuit's interpretation of Rule 9(b) is binding on this Court with respect to all claims.  *See Gold v. Lumber Liquidators, Inc.*, 2015 WL 7888906, at *12 (N.D. Cal. Nov. 30, 2015) ("Regardless of whether federal courts in New York and Illinois apply Rule 9(b) to their state consumer protection statutes, federal courts in California are bound to apply Ninth Circuit precedent, which applies rule 9(b) to [consumer protection claims].");  *Keegan v. Am. Honda Motor Co.*, 838 F. Supp. 2d 929, 957 (C.D. Cal. 2012) (similar).

14

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

the false representations as well as the identities of the parties to the misrepresentations." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007); *see also* Mot. 6, 29. Generalized, conclusory allegations about a "scheme of deception" and the like do not suffice. Meta thus focused its Motion on those specific representations that could even possibly satisfy the threshold Rule 9(b) showing. This does not mean Meta has ignored their broader context—to the contrary, the broader context demonstrates that Meta's statements were matters of opinion rather than fact, were not false or misleading, would not be material to reasonable consumers, and/or were made in the context of protected petitioning activity or not as part of a consumer transaction. *See* Mot. 25–37.

### A. Meta's Opinions About the "Safety" of Its Services Are Not Actionable.

The States claim that Meta "made misleading statements … about the harmfulness and addictiveness of its Platforms" and "misrepresented that it prioritized young users' health and safety over maximizing profits." AG Opp. 23. The allegations underlying these claims relate to statements Meta allegedly made regarding the "safety" of its services or its prioritization of user "safety."[17] The States fail to establish that these statements—either in isolation or in aggregate—are anything other than non-actionable, non-quantifiable statements of opinion or generalized aspirations (as opposed to statements of fact). *See* Mot. 26–28; *see also* Appx A (chart setting forth legal standard on state-by-state basis).

As an initial matter, the States argue that it is inappropriate to decide whether Meta's statements constitute non-actionable opinion statements at this stage. But "the determination of whether an alleged representation 'is a statement of fact' or instead 'mere puffery' is a legal question that may be resolved on a Rule 12(b)(6) motion." *Newcal Indus. Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1053 (9th Cir. 2008).[18] For this reason, the case law is filled with examples of courts dismissing such claims at the pleading stage. *E.g.*, *In re ON24, Inc. Sec. Litig.*, 2023 WL 7449838, at *11 (N.D. Cal. July 7, 2023) (granting motion to dismiss "on the grounds of puffery"). The Court can readily determine here as a matter of law that Meta's

---

[17] *E.g.*, Compl. ¶ 122, 123, 125, 127–31, 133, 136, 169, 222–23, 265, 448, 473, 478, 592, 829.

[18] *See also Cook, Perkiss & Liehe, Inc. v. N. California Collection Serv. Inc.*, 911 F.2d 242, 245 (9th Cir. 1990) ("District courts often resolve whether a statement is puffery when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) and we can think of no sound reason why they should not do so."); *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 555 (N.D. Cal. 2019) ("Whether a statement is puffery or a representation of fact is a question of law that can be properly decided on a motion to dismiss.") (collecting cases)).

alleged statements regarding "safety" or its prioritization of safety are "[g]eneralized, vague, and unspecified assertions … upon which a reasonable consumer could not rely." *Elias v. Hewlett-Packard Co.*, 903 F. Supp. 2d 843, 854–55 (N.D. Cal. 2012) (granting motion to dismiss).

The States do not dispute that to be an actionable misrepresentation that can form the basis of a consumer protection claim, "a statement must be 'specific and measurable' and capable of being proven true or false." *Azoulai v. BMW of N. Am. LLC*, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017) (quoting *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1135, 1145 (9th Cir. 1997)); Mot. 26–27.  As courts have regularly held, "there is nothing 'specific and measurable' about the word 'safely.'" *Id.*; *see also* Mot. 27–28 (collecting cases).  The States insist that Meta's safety representations must be considered in context, and cite to a minority of decisions where statements regarding "safety" were found to be actionable.  AG Opp. 25.  But comparing those cases to this one demonstrates that they are the exceptions that prove the rule.

For example, several of the States' cases involved fundamental vehicle defects that rendered the car dangerous to drive and thus ***objectively*** not "safe" under any definition of the word.  *See In re Toyota Motor Corp.*, 2012 WL 12929769, at *18 (C.D. Cal. May 4, 2012) (holding that "[a]dvertising a car as safe and reliable when it actually has a safety-related defect that may ***render it unable to stop*** is not 'within the tolerable range of commercial puffery,'" but comparing to the usual case where "general claims of 'a superior safety profile' were mere puffery" (emphasis added)); *see also In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1310, 1318 (S.D. Fla. 2020) (car with exploding airbags was objectively not safe to drive); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1177 (C.D. Cal. 2010) (car with faulty brakes was objectively not safe to drive).  Similarly, in *Zeiger v. WellPet LLC*, whether dog food was "safe" to consume, as opposed to contaminated with toxins that could cause serious health problems, could be objectively measured and proven false.  304 F. Supp. 3d 837, 842, 851 (N.D. Cal. 2018); *see also Williams v. Amazon, Inc.*, 573 F. Supp. 3d 971, 973–75 (E.D. Pa. 2021) (temporary tattoo kit that caused "permanent and disfiguring burns"

was not safe).[19]

By contrast, the concept of "safety" here, in the context of a novel communication service where Meta must balance the competing goals of fostering free expression and restricting sensitive content, are squarely matters of opinion upon which reasonable people can disagree. *See supra* Part II. This case is thus a far cry from cars that cannot stop, dog food that is toxic, or a tattoo kit that causes disfigurement. Instead, it is akin to *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017), which the States failed to address in their Opposition. *See* Mot. 28. There, even though Yahoo allegedly knew about and did not disclose the risks of data breaches, representations about prioritizing the safety of users' information were not actionable. 2017 WL 3727318, at *26. Ultimately, whether the steps Yahoo had taken to keep user data safe were sufficient was a matter of opinion and a non-measurable statement of a generalized goal. The same is equally true here.

### B.    The States Fail to Establish That Alleged Statements Were False or Misleading.

For many of their core theories of alleged deception, the States fail to reconcile the fundamental "mismatch between the representations at issue and the evidence that allegedly debunks them." *Amado v. Procter & Gamble Co.*, 2023 WL 3898984, at *9 (N.D. Cal. June 8, 2023).[20]

***Deletion of Under-13 Accounts***. The States allege that Meta fails to abide by its stated policy of deleting accounts of under-13 users because a portion of those accounts ***reported*** to be of under-13 users were not disabled. AG Opp. 27 (citing Compl. ¶ 673). But a "report" of an under-13 account does not mean that the user is ***actually*** under 13. The States' claim appears to hinge on the distinction between whether Meta deletes an account if it "can't verify" the age of the user or does so only when it ***can*** verify

---

[19] The *Williams* court also acknowledged many cases finding claims of "safety" to be non-actionable statements of opinion, 573 F. Supp. 3d at 974–75, but nonetheless held otherwise because of the Pennsylvania Supreme Court's recent opinion in *Commonwealth by Shapiro v. Golden Gate Nat'l Senior Care LLC*, 194 A.3d 1010 (Pa. 2018)—a case involving *objectively* disprovable "statements promising to provide food, water, and clean linens" to nursing home residents, *id.* at 1024.

[20] Rule 9(b) requires that the States "must set forth an explanation as to why the statement or omission complained of was false or misleading." *In re GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1548 (9th Cir. 1994) (en banc). Further, a "mismatch" between the representation and the alleged underlying facts renders the claim implausible under the standards of Rule 8 as well. *See Vigil v. Gen. Nutrition Corp.*, 2015 WL 8056178, at *6 (S.D. Cal. Dec. 4, 2015) ("When it comes to the *plausibility analysis*, the essential inquiry depends upon a comparison of the match 'between the representations at issue and the evidence that allegedly debunks them.'" (emphasis added)). Because the adequacy of the States' pleading is governed by federal law, *see supra* n.16, this argument applies equally to the claims of *all* States.

17

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

the user is under 13.  Even if this is a real discrepancy, the States fail to show how it would be material to users.  *See infra* Part III.C.

**_Prevalence of Harmful Content_**.  The States concede that the "BEEF and TRIPS data do not show CSER metrics to be false" and that "the two sets of data are logically compatible."  AG Opp. 28–29.  This concession is fatal to their claim that CSER data are supposedly misleading because Meta does not also disclose the BEEF and TRIPS data.  As the States acknowledge, CSER concerned the percentage of *views* of content that *actually violated* Meta's content standards, whereas BEEF and TRIPS concerned the percentage of *users* who *self-reported* having seen content that they perceived as falling into certain categories.  *See* Mot. 31–32; AG Opp. 28.  A user can report having seen a single instance of harmful content even if the dozens or hundreds of other posts they viewed were not objectionable.

*Cullen v. Netflix, Inc.*, 2013 WL 140103 (N.D. Cal. Jan. 10, 2013), *aff'd*, 600 F. App'x 508 (9th Cir. 2015)—which the States failed to address—is directly on point.  *See* Mot. 30.  There, the plaintiff's allegations that a certain percentage of *titles* on Netflix failed to include closed captioning did not controvert Netflix's claim that a certain percentage of "viewing coverage" was captioned.  *Id.* at *7.  The court thus dismissed the claim both under the Rule 9(b) requirement to plead how the misrepresentation was misleading and for failing to show that "members of the public are likely to be deceived."  *Id.*

Unable to meaningfully overcome this discrepancy, the States fall back on Meta's statement that CSER is "the most important measure of a healthy online community."  AG Opp. 28 (citing Compl. ¶ 463).  This is a classic example of a non-actionable statement of opinion.  *See supra* Part III.A.  Whether CSER is the "most important" metric, rather than BEEF or TRIPS or some other metric, is not a measurable statement of objective fact.  *See In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 559 (S.D.N.Y. 2004) (statement that new drug was "one of the most important advances in cancer medicine" was "non-actionable opinion, personal or corporate optimism and puffery").

**_Project Daisy_**.  The States argue that their claim is "not about Project Daisy's results, but [Meta's] reasons for rejecting the feature."  AG Opp. 29.  As alleged in the Complaint, the reason Meta represented for not adopting Project Daisy was that it "ultimately didn't have as strong an impact as we'd hoped."  Compl. ¶ 286.  The Complaint, however, does not contain any non-conclusory allegations suggesting that Meta's stated reason was false.  While the States allege that Meta estimated Project Daisy would have an

estimated 1% negative effect on advertising revenue, *id.* ¶ 250, they offer nothing to plausibly suggest that this was the actual reason for the decision not to implement Project Daisy.

### C.     The States Fail to Establish That the Alleged Misrepresentations Were Material.

Courts in at least 19 states asserting deceptive practices claims have recognized that materiality is an essential element of the claim, and another eight states generally follow the standards under Section 5 of the Federal Trade Commission Act ("FTCA"), which requires materiality.  Mot. 33–34 & nn. 36–37, 47–48; *see* Appx. B (chart setting forth materiality standard on state-by-state basis).  Nonetheless, 20 States contest whether they must plead materiality.  AG Opp. 29–30.  Some argue simply that the "plain text" of their statutes does not include a materiality requirement, ignoring on-point case law.  *Id.* at 29–30 & n. 27.[21]  The States also contend in conclusory fashion that materiality is "usually eschewed in public enforcement actions," a point that is addressed by only two cases, neither of which discusses whether materiality is required.  *See id.* 26, 30 & n. 28.[22]  Relatedly, some States cite to cases stating that consumer protection statutes do not have the same elements as common-law fraud, but do not address whether those statutes require materiality.  *Id.* at 30 n. 29.[23]  Other States with multiple deceptive practices causes of action argue that the cases cited by Meta only apply to one of their claims, without providing any authority

---

[21] California, Delaware, Indiana, Kentucky, Louisiana, Minnesota , Nebraska, New York, North Carolina, North Dakota, Pennsylvania, South Carolina, and Virginia all make this argument—but none cites to any case law saying there is no materiality requirement or controverting the cases Meta cited.  Arizona cites to a case that discusses the difference between acts and omissions, but it does not say materiality is not required for affirmative acts.  Michigan and Kansas concede that at least some prong of their statutes require materiality.  Connecticut concedes that its courts have construed its statute to include a materiality requirement.  Only New Jersey and Kansas cite to cases that hold that at least some prongs of their statutes do not require materiality.  *See* AG Opp. 30 n. 27; *but see DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman*, 64 A.3d 579, 587 (N.J. App. Div. 2013) ("Under the CFA, '[t]he misrepresentation has to be one which is material to the transaction ... made to induce the buyer to make the purchase.'").

[22] *See Ballagh v. Fauber Enterprises, Inc.*, 773 S.E.2d 366, 368 (Va. 2015) (holding that the burden of proof under Virginia's statute is by the preponderance of the evidence rather than by clear and convincing evidence, but saying nothing about materiality); *Tiismann v. Linda Martin Homes Corp.*, 637 S.E.2d 14, 17 (Ga. 2006) (noting in *dicta* that public enforcement actions need not show "whether or not any person has actually been misled," but saying nothing about materiality).

[23] *See, e.g.*, *Brownlow v. McCall Enterprises, Inc.*, 888 N.W.2d 295, 307 (Mich. Ct. App. 2016) (holding that claim does not require knowledge of falsity, but saying nothing about materiality); *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014) (holding that claim does not require knowledge or intent to deceive, but "*still requires proof, in misrepresentation cases, of the elements of reliance* and damages" (emphasis added)).

19

for why their other claims should be treated differently.  *Id.* at 30–31 n. 30.[24]  Finally, some States cite cases stating that FTCA decisions are merely persuasive rather than controlling, but provide no basis to actually depart from the FTCA materiality requirement.  AG Opp. 31 n. 31.

In any event, whether the element is articulated as "materiality" or as a requirement that "members of the public [be] likely to be deceived," the concept is essentially the same—to be deceptive, a representation must have a tendency to mislead consumers, *i.e.*, to induce them to act differently than they otherwise would.[25]  Under this standard, statements by Meta regarding increasing the amount of time users spent on its services are plainly not material.  Reasonable people would not avoid Meta's services merely upon learning that Meta wants people to use its services—just as customers would not choose to avoid a restaurant merely because they learn that the owner wants patrons to eat there more frequently.

### D.  The States' Claims Fail Insofar as They Are Premised on Statements to Congress.

The States' claims based on statement made to Congress should be dismissed.  *First*, as an initial matter, the States are wrong to suggest that Meta made false statements to Congress.  *Second*, the States (and PI Plaintiffs) are wrong to assert that the *Noerr-Pennington* doctrine does not apply to testimony given to Congress.  Under *Noerr*, "attempts to lobby and petition a governmental body … are absolutely immune" from liability.  *Franchise Realty Interstate Corp. v. San Francisco Loc. Joint Exec. Bd. of Culinary Workers*, 542 F.2d 1076, 1080 (9th Cir. 1976).  While the doctrine "originally arose in the antitrust context, it is based on and implements the First Amendment right to petition and therefore … applies equally in all contexts."  *White v. Lee*, 227 F.3d 1214, 1231 (9th Cir. 2000).

---

[24] *See, e.g.*, *People by James v. N. Leasing Sys., Inc.*, 267, 133 N.Y.S.3d 389, 403 (N.Y. Sup. Ct. 2020), *aff'd*, 142 N.Y.S.3d 36 (2021) (New York Executive Law § 63(12) applies to "*materially* misleading representations" (emphasis added)).

[25] *See Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472, 485 (S.D. Cal. 2013) ("For liability to attach under [consumer protection] statutes, it is necessary to show only that members of the public are likely to be deceived... . This is a question, ultimately, *of the materiality of the alleged misrepresentation.*" (emphasis added)); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 403 (S.D.N.Y. 2010) ("To determine whether an act or practice is materially misleading, a court looks to whether it could 'mislead a reasonable consumer acting reasonably under the circumstances.'"); *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 327 (2022) (assuming that "a materiality standard is implicit in the likelihood of deception standard applicable in *all* fraudulent and deceptive advertising cases"); 17 Am. Jur. 2d Consumer Protection § 280 ("A solicitation may be likely to mislead, for purposes of deception, by virtue of the net impression it creates ..., if it involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."); *see also id.* § 283 ("materiality of an alleged misrepresentation or deception is a required element" in deceptive practices claims).

20

While the States suggest that the "sham" exception to *Noerr* precludes dismissal here because the "testimony was [allegedly] false" (which Meta denies), AG Opp. 33, they are mistaken. *Noerr* itself involved a "fraudulent" publicity campaign designed to influence legislative action. *Eastern R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 133 (1961). And since that time, courts have repeatedly reaffirmed that when "activities occur in a legislative or other non-adjudicatory governmental setting," *Noerr-Pennington* applies even to "'conduct that can be termed unethical,' **such as [alleged] deception and misrepresentation**."[26]

In the context of petitioning directed at legislative bodies, the sham exception applies only narrowly, where the defendant "caused [] harm" to the plaintiff "by 'abus[ing] ... the publicity/lobbying process.'" *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 536 (9th Cir. 2022) (quoting *Manistee Town Ctr. v. City of Glendale*, 227 F.3d 1090, 1095 (9th Cir. 2000)). Because the States do not allege any facts even remotely suggesting that they (or their citizens) were harmed by an abuse of process—as opposed to Meta's allegedly false statements—the sham exception is plainly inapplicable. *E.g.*, *Manistee Town Ctr.*, 227 F.3d at 1095 (dismissing complaint where "the facts alleged by [plaintiff] do not place defendants' actions within the 'sham' exception"); *see Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 647 (9th Cir. 2009) ("[W]hen a plaintiff seeks damages ... for conduct which is prima facie protected by the First Amendment, the danger that the mere pendency of the action will chill the exercise of First Amendment rights requires more specific allegations than would otherwise be required.").

The Court should also reject the PI Plaintiffs' implausible suggestion that Meta's testimony to Congress is not petitioning activity. PI Opp. 10. As the very transcript incorporated by reference in their Complaint makes clear, potential legislative action directly implicating social media companies was the focus of the hearings. *See, e.g.*, PI SAC ¶ 370 & nn. 488-89.

*Third*, the States fail to establish that statements made to Congress are within "trade or commerce" or in connection with a "sale," "advertisement," or "consumer transaction," as is typically required. *See*

---

[26] *Metro Cable Co. v. CATV of Rockford, Inc.*, 516 F.2d 220, 228 (7th Cir. 1975); *see Tuosto v. Philip Morris USA Inc.*, No. 05CIV.9384(PKL), 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007) ("*Noerr–Pennington* protection has been extended to all advocacy intended to influence government action, including to allegedly false statements") (collecting cases).

21

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

Mot. 36–37; Appx. D.  On this point, the States spend much of their Opposition attempting to shift their burden onto Meta, arguing that Meta "does not even attempt to grapple with each State's own interpretation of these clauses," AG Opp. 33, when the States offer no interpretations of the statutes that would contradict their plain statutory text.  The States cherry-pick some cases that use language possibly suggesting a somewhat looser connection to trade or commerce, but even these cases require conduct that is "in connection with" a consumer transaction, is in the "context of the ongoing business," has a "relationship" with a sale, or is done "for the purpose of increasing profits."  AG Opp. 33–34 (citing cases).  While the States claim that Meta fails to "persuasively argue why its highly public statements [to Congress] … do not fall within the larger ambit of trade or commerce," it is the ***States*** that fail to explain how responses to questions by Congress are within the ambit of commercial transactions.

## IV.    THE STATES FAIL TO ALLEGE UNFAIR BUSINESS ACTS OR PRACTICES.

Beyond being barred by Section 230, the States' unfair practices claims are fundamentally flawed on their own terms.  The States' claims attempt to transform the ordinary business practice of allegedly attempting to increase user engagement (allegedly to increase profits) into an unfair practice.  In doing so, they would expose virtually every business—large and small—to this dramatic new form of liability.

The States would do so even though courts across have rejected using unfair trade practices claims seeking to impose liability on businesses for seeking a profit.  *See* Mot. 38–39 (collecting cases).  They would do so despite courts explicitly rejecting their theory that allegations of "addiction" to digital services render the practices unfair.  *See Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016); *Ristic v. Mach. Zone, Inc.*, 2016 WL 4987943, at *4 (N.D. Ill. Sept. 19, 2016).  And they would do so despite being unable to cite a ***single*** case that permitted similar claims to proceed in ***any*** of the jurisdictions at issue (let alone all).  The scattered cases the States cite on individual elements or issues concern allegations far different from the novel theory here—such as annual credit card fees that were not disclosed or a website that issued unverified checks from users that was abused by "fraudsters and con artists."  *See Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152 (9th Cir. 2012); *FTC v. Neovi, Inc.*, 604 F.3d 1150 (9th Cir. 2010).  When interpreting state law, "[f]ederal courts should hesitate prematurely to extend the law in the absence of an indication from the state courts or the state legislature that such an extension would be desirable."  *Del Webb Communities, Inc. v. Partington*, 652 F.3d 1145, 1154 (9th Cir.

22

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

2011) (cleaned up).  That is particularly true here, where the States urge a California federal court to markedly expand liability for businesses across most of the country.

**A.    Claims Based on or Guided by Section 5 of the FTCA Should Be Dismissed.**

As the States concede, many of the unfair practices laws are identical to or guided by Section 5 of the FTCA.  AG Opp. 34–36; *see* Appx. C (chart setting forth jurisdictions that follow FTCA standards).  For the claims guided by Section 5, the States offer no reason to depart from that analysis.[27]

**_Substantial injury_**.  The States do not dispute that "substantial injury" under Section 5 generally requires monetary harm or that they do not allege such harm.  *See* Mot. 42.  Accordingly, for their claims to survive, they would have to fit into a narrow band of non-monetary harms that are sufficiently severe and concrete.  *See id.*  The States point to two specific categories of alleged emotional harms: (1) negative body image issues and eating disorders and (2) negative social comparison to peers.  *See* AG Opp. 36 n.39.  But those are precisely the types of intangible harm that do ***not*** qualify.[28]  The States' only case did not address comparable harms: it concerned unauthorized dissemination of phone records and found the emotional harm sufficient because it stemmed from safety risks from abusers and stalkers and was coupled with economic harm.  *FTC v. Accusearch, Inc.*, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007).

**_Not reasonably avoidable_**.  The allegations that use of Facebook and Instagram are not reasonably avoidable fail as a matter of law.  Mot. 42–44.  That is so at least because using them is voluntary, there are any number of readily available alternatives, and the States plead themselves out of the claim by alleging that Meta provides tools that indisputably help users avoid using the services.  *See id.*

The States first respond that Meta "ignores" its allegations of "addiction."  AG Opp. 37.  But a

---

[27] The States argue that "many of these laws are less restrictive than the FTCA," but provide only two examples (Arizona and Washington) and admit that even those two states are "guided by" Section 5 of the FTCA.  *See* AG Opp. 35 & n.37.  That is what Meta's Motion argued.  Mot. 39–40 n.47.  The States never explain what they believe is different the laws of Arizona or Washington, nor do they point to any cases bearing on these allegations.  *See* AG Opp. 35 n.37.  Separately, Meta's Motion pointed out that North Dakota's statute is similar to the FTCA.  *See* Mot. 41 n.48.  The States argue that Meta did not cite any caselaw on the subject.  AG Opp. 35 n.36.  But the two statutes employ substantially similar language, and the States do not dispute that the Section 5 analysis is applicable to North Dakota.

[28] *See* FTC, Unfair, Deceptive, and Abusive Practices – Federal Trade Commission Act/Dodd-Frank Act (June 2022), available at https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/7/vii-1-1.pdf (explaining that "[e]motional impact and other more subjective types of harms will not ordinarily make a practice unfair").

consumer is free to not use the service in the first place, before its allegedly "addictive" features can have any effect. A consumer is also able to use alternative services—a fact the States do not dispute. As Meta pointed out, multiple courts have rejected the States' "addiction" theory of reasonable avoidance. *See Phillips*, 173 F. Supp. 3d at 743 (dismissing claims that casino video games "exploit the psychological triggers associated with gambling and addiction" because the plaintiff "could have picked other forms of entertainment, or even sought to play online games on a different platform or website"); *Ristic*, 2016 WL 4987943, at *4 (dismissing claims that video game "use[d] psychological triggers that prompt regular consumers, as well as addicts, to continue wagering"). The States take issue with these cases—the most analogous either Party has cited—because they come from one state and apply to all users (not just minors). But both cases applied principles applicable to the analysis more broadly (not specific to Illinois) and neither turned on the age of the plaintiff. Tellingly, the States cannot point to a single case cutting the other way, or one that held there is a special exception to the reasonably-avoidable requirement for minors.

In response to Meta's point that the States allege that Meta has given users tools to limit their time on the services—the "Take a Break" and "Daily Limit" tools—the States contend that "addictive" use renders the tools ineffective. But the question is whether users could have reasonably avoided or mitigated the alleged harm, and the presence of tools helping facilitate their choice to do so demonstrates that they can. *See Davis*, 691 F.3d at 1168–69 ("An injury is reasonably avoidable if consumers have reason to anticipate the impending harm and the means to avoid it, or if consumers are aware of, and are reasonably capable of pursuing, potential avenues toward mitigating the injury after the fact." (cleaned up)).

Finally, to the extent the claims are predicated on COPPA, the States barely respond to Meta's argument that a user intentionally lying that he or she is at least 13 years old (to avoid Meta's bar on under-13 use) is "reasonably avoidable" because it is a volitional choice by the user. *See* Mot. 45. The States say, citing a single 1964 FTC order that does not bear on allegations like these, that children are not mature enough to make certain choices. AG Opp. 38. But the legal question here is whether the user can reasonably avoid the harm ***caused by the defendant***. Holding companies liable for alleged harms to users arising from the ***users' own*** volitional misrepresentations would turn consumer protection law on its head.

***Not outweighed by countervailing benefits***. The Opposition confirms that the States only plead conclusory allegations that the alleged harm outweighs the meaningful societal benefits of Facebook and

Instagram.  *See* AG Opp. 38–39 ("The States' Complaint sufficiently pleads an array of serious harms."). Those allegations are insufficient under basic pleading principles, *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008), and fail to state a claim, *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 446–47 (N.D. Cal. 2020) (conclusory allegations of countervailing benefits are insufficient).

### B.    To the Extent the *Sperry* Test Applies, Claims Based on It Should Be Dismissed.

The States contend that an unspecified group of states follow the *Sperry* test (or "cigarette rule") that the FTC has since abandoned, rather than current Section 5 law.  AG Opp. 35 & n.38.[29]  They argue in a conclusory footnote that the test is satisfied but quickly move on to arguing that the Court can apply the Section 5 test and deny dismissal on that basis.  Meta agrees that modern Section 5 law is the appropriate framework for these claims; the Court should proceed on that basis.

If the Court is inclined to rule on the States' cursory argument, the three *Sperry* factors are addressed in substance in Meta's Motion (and this Reply) because they overlap with the Section 5 analysis. *First*, the States have not identified a single public policy that they argue is offended in any state at issue— let alone in *all* states.  *Second*, the States have not adequately alleged that the actions here are "immoral, unethical, oppressive, or unscrupulous."  As Meta explained in its Motion, courts have resisted attempts to transform ordinary business practices like allegedly trying to increase users or engagement (even for profit) into consumer protection violations.  *See* Mot. 38–39.  In addition, under this test, "a practice is immoral, unethical, oppressive, or unscrupulous when said conduct leaves the consumer little choice but to submit," *City of Chicago v. Purdue Pharma L.P.*, 211 F. Supp. 3d 1058, 1075 (N.D. Ill. 2016), so the States' claims would fail for the same reasons that the reasonably-avoidable prong is not satisfied.  *See supra* Part IV.A.  *Third*, the alleged harms do not create a substantial injury to consumers for the reasons explained in the Motion and above.  *See* Mot. 42; *supra* Part IV.A.

### C.    The Remaining Unfairness Claims Should Be Dismissed.

**_California_**.  As Meta explained, under any of the three tests courts use for California unfair

---

[29] Illinois is the only state that the States explicitly argue follows *Sperry*.  *See* AG Opp. 38 n.43.  The States also cite cases from Connecticut, North Carolina, Hawaii, and Nebraska that applied this test.  *Id.* 35 n.38.  They do not elaborate or say if they believe other states should be included.  And, in any event, many cases that apply the *Sperry* test nonetheless look to the modern Section 5 test for guidance.  *See, e.g.*, *Dispazio v. Oakleaf Waste Mgmt.*, 2011 WL 1026094, at *18 (Conn. Super. Ct. Feb. 18, 2011).

business practices claims, the States have not stated a claim.  Mot. 46.[30]  The States fail to identify any policy or law that satisfies the tethering test.  The only thing they point to is the introductory provision of the California Age-Appropriate Design Code Act, which states broadly that "children should be afforded protections … by online products and services."  Cal. Civ. Code § 1798.99.29 (intended effective date January 1, 2023).  To start, it is telling that the States invoke an unconstitutional statute—and it is a strong indication that their claims likewise regulate protected speech and are constitutionally suspect.  *See NetChoice, LLC v. Bonta*, 2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) (finding the statute violates the First Amendment and enjoining it).  An unconstitutional statute cannot be the predicate for an unfair practices claim.  *Daghlian v. Devry Univ., Inc.*, 2007 WL 5625508, at *8 n.40 (C.D. Cal. Dec. 10, 2007) ("Plaintiff cannot enforce an unconstitutional statute indirectly by invoking the UCL.").  And it certainly cannot be applied **retroactively** to impose liability based on conduct occurring prior to its effective date.

Even setting these defects aside, the States point only to the precatory section's purpose declarations, not any operative provision imposing legal requirements.  That introductory section discusses child protection in broad terms without any operative rules and, consequently, provides no yardstick by which to judge whether conduct is prohibited.  *See, e.g.*, *Hodsdon v. Mars, Inc.*, 891 F.3d 857, 866 (9th Cir. 2018) ("To determine whether something is sufficiently 'tethered' to a legislative policy for the purposes of the unfair prong, California courts require a close nexus between the challenged act and the legislative policy")  (collecting examples of mismatched vague policy goals and specific acts).

**_Colorado._**  The cases in the Motion explained that Colorado law does not support a standalone unfairness claim.  *See Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 408 (E.D. Pa. 2010) (noting the "absence of any case from Colorado allowing an unfair trade practice claim to proceed"); *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 180 (D. Me. 2004) (citing *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142 (Colo. 2003)) (noting that "[a]lthough the word 'unfair' appears in" decisions about and the text of the CCPA, the court "found no Colorado case where the court applied the term substantively to

---

[30] The States claim that Meta only applies the tethering test, but Meta explained that the FTC-based test and balancing test also required dismissal.  Mot. 46.  The States fail to address the balancing test.

26

broaden the CCPA's reach to unfair, in addition to deceptive, practices"). None of the States' authority contradicts these holdings. *See* AG Opp. 40.[31]

**_Indiana._**  Indiana does not permit standalone unfairness claims untethered from misrepresentations or unlawful acts. Mot. 47. The States respond that "[t]he opinion Meta cites … did not discuss whether an 'unfair act' could be brought without a corresponding deceptive act." AG Opp. 41. But that opinion was clear: Indiana courts "conflate the three words" of unfair, abusive, and deceptive, and "[t]he Court will follow the lead of the state courts by reading" this language "to include any act that is misleading to consumers or otherwise prohibited at law." *Crum v. SN Servicing Corp.*, 2021 WL 3514153, at *2 (S.D. Ind. Aug. 10, 2021). Contrary to the States' suggestion, this case interpreted the current version of the statute, not the pre-2014 amendment version. And the States' purportedly contradictory authority does not support their argument: it held only that an Indiana consumer protection claim could be brought even when a Fair Debt Collection Practices Act claim could not (there, because the defendant did not qualify as a debt collector). *See Bank v. Huizar,* 178 N.E.3d 326, 337 (Ind. Ct. App. 2021).

**_Kansas._**  The States do not dispute that "there must be some element of ***deceptive bargaining conduct*** present" for an act to qualify as "unconscionable" under Kansas law. *See State ex rel. Stovall v. DVM Enterprises, Inc.*, 275 Kan. 243, 251 (2003) (emphasis added) (cleaned up). That alone is fatal, as Meta's motion explained. Mot. 47. The States argue in conclusory terms that two subsections of the act are at issue. AG Opp. 41. But, even if the argument were sufficiently developed (it is not), as *Stovall* explains, both subsections relate to deceptive conduct, and so cannot rescue the ***unfair*** practices claim.

**_Minnesota._**  Meta's motion correctly pointed out that the Minnesota claim could be dismissed for substantially the same reasons as the claims under Section 5. Mot. 47. The States apply a combination

---

[31] The States contend in a footnote that these cases predate a statutory amendment that left "no doubts as to whether a claim based solely on unfair or unconscionable practices may proceed." *Id.* 40 n.46. If they are referring to subsection (1)(rrr), a court in this district recently rejected the argument that it created a standalone unfairness claim under Colorado consumer protection law—and reinforced that such claims are not cognizable. *See In re HIV Antitrust Litig.*, 2023 WL 3006572, at *2 (N.D. Cal. Apr. 18, 2023) ("Nearly all [specific CCPA provisions] are examples of deceptive practices. Indeed, subsection (rrr) is the only provision to even reference 'unfair' conduct, and that provision itself is an elucidation of what constitutes a 'deceptive trade practice.' … [The provisions indicate that they] proscribe only ***deceptive*** conduct and that nondeceptive *unfair* trade practices are actionable only if brought under other statutory or common law causes of action such as the Colorado Antitrust Act." (citations omitted)).

27

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

of the *Sperry* test and the substantial injury prong of the modern Section 5 test.  AG Opp. 41.  As a result, the same considerations discussed above require that this claim be dismissed.

**_Missouri._**  Meta's motion correctly pointed out that the Missouri claim could be dismissed for substantially the same reasons as the claims under Section 5.  Mot. 47–48.  The States' Opposition provides no argument to save the claim other than their general FTCA argument.  AG Opp. 41–42.

**_New Jersey._**  New Jersey courts have repeatedly held that for acts to be "unconscionable" under state law, they must be deceptive (or a similar formulation).  *Kugler v. Romain*, 58 N.J. 522, 544 (1971) ("[U]nconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like.").[32]  The States respond that "*Kugler*'s reference to 'equated' does not mean that New Jersey cannot bring both misrepresentation and unconscionability claims."  AG Opp. 42.  But, regardless of what other claims are brought, an unconscionability claim under New Jersey law *requires* deception or a similar concept—and therefore fails for the same reasons as the deception claims.  *See* Mot. 48.  Indeed, in precisely this situation, another court applying New Jersey law dismissed deceptiveness claims and then held, citing *Kugler*, that "Plaintiff's allegations of an 'unconscionable business practice' fail *for the same reason*."  *Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1286144, at *5 n.3 (S.D.N.Y. Mar. 28, 2013), *aff'd*, 624 F. App'x 774 (2d Cir. 2015) (emphasis added).[33]

**_Oregon._**  The States do not adequately respond to the two bases for dismissal in Meta's Motion.  *First*, Oregon law limits its consumer protection statute to "selling, renting or disposing" services, and inarguably Facebook and Instagram are not alleged to be sold, rented, or disposed of to consumers.  Mot. 48.  The States respond by referencing their argument about the parties' "consumer transaction" dispute.  *See* AG Opp. 42. But the two are different:  regardless of whether the provision of Facebook and Instagram involves a "consumer transaction," Oregon has limited its law further still.  The States have no response

---

[32] *See Turf Lawnmower Repair, Inc. v. Bergen Rec. Corp.*, 139 N.J. 392, 414 (1995) ("The capacity to mislead … is the prime ingredient of all types of consumer fraud." (cleaned up)); *In re Insulin Pricing Litig.*, 2024 WL 416500, at *34 (D.N.J. Feb. 5, 2024) (same); *Gengo v. Jets Stadium Dev., LLC*, 2018 WL 4144686, at *5 (D.N.J. Aug. 30, 2018), *aff'd*, 776 F. App'x 86 (3d Cir. 2019) ("Although the CFA does not define unconscionable commercial practices … the business practice in question must be 'misleading.'" (cleaned up)).

[33] The States misread another portion of New Jersey law to claim that deception is not required.  The provision merely states that the law applies "whether or not any person *has in fact* been misled, deceived or damaged," not that deceptive conduct is not required.  N.J. Stat. Ann. § 56:8-2 (emphasis added).

to this more specific argument and do not cite any Oregon law on this point.

*Second,* while the list of unconscionable acts under Oregon law is not exhaustive, courts have explained that "there is nothing to suggest the OUTPA is intended to cover … conduct that is not, in any manner, similar to conduct specified in the statute," *In re Hard Disk Drive Suspension Assemblies Antitrust Litig.*, 2021 WL 4306018, at *18 (N.D. Cal. Sept. 22, 2021), and that "it is clear from the examples that unconscionable trade tactics require an allegedly offending business to trick customers in some way such that the customers enter into a transaction with the offending business," *Barber v. Unitus Cmty. Credit Union*, 2023 WL 34697, at *2 (D. Or. Jan. 3, 2023) (cleaned up).  As the Motion explained, there is nothing similar to these enumerated acts alleged here.  Mot. 48–49.  In response, the States point to only one provision: Or. Rev. Stat. § 646.605(9)(a).  AG Opp. 42.  But that provision relates to unequal bargaining power in contract negotiations, and thus is not relevant here.

## V.      THE STATES' CONSUMER PROTECTION CLAIMS FAIL BECAUSE THEY DO NOT APPLY TO META'S ALLEGED CONDUCT.

The States fail to state a claim under the consumer protection laws of 17 states because Meta's users do not pay to use its services.  *See* Mot. 49–54.  Their Opposition cannot remedy this core defect.

*First*, the States do not dispute that the reasoning in *Indiana v. TikTok, Inc.*—which considered whether a state consumer protection act could applied to a free social media service—would require dismissal under Indiana, Kansas, Virginia, and Ohio law, all of which limit consumer protection claims to conduct that occurs "in connection with a consumer transaction."  Mot. 50 (describing materially identical consumer protection laws of these States); *see also* AG Opp. 44–45.  Instead, the States argue that the *TikTok* court erred in finding that an exchange of money is necessary for a "consumer transaction."  AG Opp. 45.  To the contrary, the court in *TikTok* correctly applied well-established principles of statutory interpretation to conclude that a "consumer transaction" under the Indiana Deceptive Consumer Sales Act required an exchange of money.  *See Indiana v. TikTok, Inc.*, 2023 WL 8481303, at *6 (Ind. Super. Nov. 29, 2023) ("[T]he State does not identify any authority for the proposition that 'lease,' 'assignment,' or 'award by chance' should be construed as not involving an exchange of money, such that *ejusdem generis* would support the State's broad interpretation of the term 'other disposition.'") (italics in original).

The States also argue that *TikTok* is "out of step with the weight of" authority.  But none of the

29

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

inapposite authority cited by the States speaks to the dispositive issues in that case (or this one). *See infra*. Moreover, a recent decision applying California law demonstrates that *TikTok* decision was far from aberrational. In *Ziencik v. Snap, Inc.*, 2024 U.S. Dist. LEXIS 12105 (C.D. Cal. Jan. 19, 2024), the court dismissed consumer protection claims against Snap, holding that users of Snapchat are not "consumers" because "they did not purchase Snap's services." *TikTok* is directly on point and consistent with cases addressing the application of consumer protection law to the use of free social media services.

*Second*, contrary to the States' claim, it is they who do "not meaningfully grapple with the particularities of each State's consumer protection laws." AG Opp. 43 (citing only six cases from a handful of jurisdictions and the text of just one State consumer protection statute (Georgia)).[34] Notably, four of the six cases the States cite are from jurisdictions Meta did not include in its motion on this ground—Arizona, California, Ohio, and Washington—and thus interpreted provisions not at issue here. Attached hereto as Appendix C is a chart establishing the requirement of a consumer transaction or a connection to trade or commerce in each of the 17 States put at issue by Meta's motion.

The only two cases addressing consumer protection statutes from jurisdictions included in Meta's motion cited by the States do not support the their argument. The States cite a quotation from the Western District of Michigan's decision in *Action Auto Glass* that "[t]here is no requirement that consumer goods be sold or purchased" under the Michigan Consumer Protection Act ("MCPA"). AG Opp. 43. However, the *Action Auto Glass* decision concerned the question whether a business competitor had standing under the MCPA and held that a competitor does not itself need to purchase goods or services from its rival in order to bring suit.[35] That fact pattern has no relevance here.

---

[34] The States' emphasis on the word "encourage" in Ga. Code Ann. § 10-1-392(a)(7), which Meta addressed in its motion, *see* Mot. 53, does nothing to alter the analysis. The Georgia statute defines "[c]onsumer acts or practices" to mean "acts or practices intended to *encourage consumer transactions*." Ga. Code Ann. § 10-1-392(a)(7) (emphasis added). "Consumer transactions," in turn, is defined to mean "the *sale, purchase, lease, or rental of goods, services, or property*, real or personal, primarily for personal, family, or household purposes." Ga. Code Ann. § 10-1-392(a)(10) (emphasis added). Because the use of a free service is not a "sale, purchase, lease, or rental," it is not a "consumer transaction" as defined in § 10-1-392(a)(10). Accordingly, the fact that "consumer acts or practices" includes conduct that "encourages" consumer transactions does not help the States' claims.

[35] *Action Auto Glass v. Auto Glass Specialists*, 134 F. Supp. 2d 897, 903 (W.D. Mich. 2001) ("[A]llowing business competitors to maintain actions under the MCPA is consistent with the intended purpose of

(continued…)

*McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486 (2006) similarly provides no support for the States' argument.  In that case, the Connecticut appellate court upheld a directed verdict for defendant on the grounds that "a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce."  *Id.* at 523.[36]  That holding does not speak to the question whether provision of a free service qualifies as "trade or commerce" under Connecticut law, let alone the law of any other jurisdiction.

*Third*, the States' argument that "the relevant bargained-for exchange is consumers' personal data," AG Opp. 43–44, cannot save their claims.  The States engage in no analysis of how the text of ***any*** state consumer protection statute supports their theory in the context of Meta providing a service that users do not pay to use.  To the contrary, the relevant statutes require either: (1) a "consumer transaction," Mot. 49–51; *see also TikTok*, 2023 WL 8481303 at *6;[37] or (2) are limited to actions "in the conduct of any trade or commerce,"[38] which requires "the sale of assets or services," "advertising [or] offering for sale" (or other materially similar language).[39]  None of these definitions apply to a service users access and use for free.  The fact that Meta—like virtually every web page operator—collects information from visitors does not convert that free-of-charge use into a commercial transaction.  *See* Mot. 50–53; *TikTok*, 2023 WL 8481303 at *6 (rejecting argument that provision of user data constitutes a "sale or other disposition"); *Ziencik*, 2024 U.S. Dist. LEXIS 12105, at *16 (rejecting argument that "exchanging personally identifiable information for use of a free social networking application" made users "consumers").

---

protecting consumers … [W]here a competitor makes allegedly false statements about a competitor's product or business practices, the ultimate resulting harm is to the consumer, who may be swayed into purchasing an inferior product or paying more for the same product."); *see DIRECTV, Inc. v. Shouldice*, 2003 WL 23200255, at *4 (W.D. Mich. Oct. 20, 2003) ("[T]he MCPA does make clear that the defendant's acts must have occurred as part of an effort to further the sale or lease of goods or services to consumers.").

[36] The *McCann* ruling was a limitation on claims that could be brought under the Connecticut consumer protection statute—holding that activities incidental to an entity's primary trade or business were *not* actionable—and was not an affirmative description of what activities *could* support a claim.  *See McCann*, 93 Conn. App. at 523.  The States' argument that all activities within an entity's primary trade or commerce are actionable under Connecticut law, *see* AG Opp. 43, misstates the court's holding.

[37] *See* Mot. 50 (Indiana, Kansas, Virginia, and Ohio consumer protection statutes all limit claims to conduct that occurs "in connection with a consumer transaction"); *see also* Appx. C.

[38] *See* Mot. 51 n. 53 (citing statutes); *see also* Appx. C.

[39] *See* Mot. 51-52, n. 54 (citing statutory definitions of "trade and commerce"); *see also* Appx. C.

31

The States cite two cases in support of their user data argument, both of which interpreted statutory provisions not at issue here and neither of which supports their theory. *Brown v. Google* involved California's Unfair Competition law, which "provides a cause of action to any 'person who has suffered injury in fact and has lost money or property as a result of the unfair competition.'" 2021 WL 6064009, at *14 (N.D. Cal. Dec. 22, 2021). That case did ***not*** address whether users permitting their data to be collected constituted "trade or commerce," a "consumer transaction," or any other statutory language relevant to the jurisdictions included in Meta's motion.[40]

Similarly, *State v. Google* addressed the Arizona Consumer Fraud Act, a statute with materially different language from those at issue in Meta's motion. *See* 2022 WL 223907, at *5 (Ariz. Super. Jan. 21, 2022) ("The Act addresses only deceptive or unfair practices employed 'in connection with' the sale or advertisement of merchandise"); *see also* Ariz. Rev. Stat. Ann. § 44-1522 (prohibiting deceptive or unfair acts or practices "in connection with the sale or advertisement of any merchandise" and omitting any limitation regarding "trade or commerce" or "consumer transaction"). Further, the alleged fraudulent conduct in that case involved "selling and advertising Google products, including smartphones," *Google*, 2022 WL 223907 at *11, and thus was predicated on a pecuniary transaction.

Finally, the States are wrong that Meta's interactions with advertisers could support their claims. The "advertising" in question is not advertising by Meta for any of its services, but third party content displayed on Meta's services. *See, e.g.*, Compl. ¶¶ 46-49. The alleged advertising thus is not a "consumer transaction" between Meta and its users. *See generally* Appx. D. Nor is it "advertising … of … services" that the States challenge as unfair or deceptive.[41] Accordingly, such allegations cannot support the States' claims. *TikTok*, 2023 WL 848130,3 at *6 (rejecting argument that DCSA should apply to TikTok "because [it] profit[s] from consumers who use the platform"; DCSA "limited to the regulation of consumer transactions and does not include all profit-generating activities").

## VI.    THE STATES' CLAIMS FOR RESTITUTION FAIL AS A MATTER OF LAW.

The States' claims for restitution fail because they do not allege any loss of money or property by

---

[40] Further, unlike in *Brown*, the States do not allege that Meta's users suffered any economic injury because of their agreement to permit Meta to collect user data. *See Brown*, 2021 WL 6064009 at *15.

[41] *See* Mot. 52 n. 54 (citing statutory definitions of "trade and commerce").

32

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

users of Meta's services that could be restored to those users.  As a preliminary matter, the Opposition does not cite or otherwise address whether restitution is available in this case under the consumer protection laws of nine states—Indiana, Arizona, Georgia, Missouri, Nebraska, New Jersey, South Carolina, Washington, and Wisconsin.  *Compare* Mot. 56–57, *with* AG Opp. 46–47.  Accordingly, Meta's motion with respect to these States is effectively unopposed.

Further, the States' argument that they can seek restitution based on "Meta's revenue from advertising towards children," AG Opp. 46, ignores the text of the relevant consumer protection statutes, which only permit courts to "restore" any "money or property" (or materially similar language).  *See* Mot. 54, 55 n. 56 (citing statutory language); ; *see also* Appx. E (chart setting forth requirements to obtain restitution on a state-by-state basis).  The authority the States cite from a handful of jurisdictions does not support the States' argument that "restitution may cover more than just the pecuniary value consumers provided to Meta."  AG Opp. 46.  For example, the States cite Delaware and New York statutory provisions that describe the general enforcement powers of the Attorneys General, *see id.* at 46 n. 53 (citing Del Code Ann. tit. 29 § 2520(a)(5), (9) and N.Y. Exec. Law § 63(12)), but those sections do not speak to the scope of remedies authorized under the specific consumer protection laws at issue here, nor do their broad descriptions of the Attorney Generals' enforcement powers overcome the specific statutory language limiting relief to that "which may be necessary to restore to any person in interest any money or property . . . which may have been acquired by means of any practice declared to be unlawful," Del. Code Ann. tit. 6, § 2523; *see also* N.Y. Gen. Bus. Law § 349(b).

The States selectively quote the **North Dakota** statute, which states that "the court may make an order or judgment as may be necessary to prevent the use or employment by a person of any unlawful practice," but it is clear this language authorizes ***injunctive*** relief.[42]

Similarly, the States claim that the **Rhode Island** statute "provides for 'any … other relief that may be appropriate,'" AG Opp. 46 n. 53 (citing R.I. Gen. Laws § 6-13.1-5(a)), but that language—a

---

[42] *See* N.D. Cent. Code § 51-15-07 ("[T]he attorney general may seek and obtain … an injunction prohibiting that person from continuing the unlawful practice or engaging in the unlawful practice…. The court may make an order or judgment as may be necessary to prevent the use or employment by a person of any unlawful practices or which may be necessary to restore to any person in interest any money or property that may have been acquired.").

general statement that the Attorney General may seek relief authorized by the statute—does nothing to alter or expand the scope of relief authorized in § 6-13.1-5(c), which is limited to "orders or judgments that may be necessary to restore to any person in interest any moneys or property, real or personal, that may have been acquired by means of any practice in this chapter declared to be unlawful."  And the Pennsylvania case the States cite, *Com. ex rel. Pappert v. TAP Pharm. Prod., Inc.*, recognized that to seek restitution the State would have to show a pecuniary loss caused by the defendant's conduct.  *See* 885 A.2d 1127, 1139–40 (Pa. Commw. Ct. 2005) ("Hence, if the Court were to conclude that the Defendants' conduct constitutes a violation of the Law, and the Commonwealth ***establishes the loss of money as a result of the conduct***, the Commonwealth may prevail in its claims.") (emphasis added)).

The remedy the States describe—untethered from any pecuniary loss suffered by Meta's users—is disgorgement, an equitable remedy distinct from restitution.  *See, e.g.*, *People v. Ernst & Young, LLP*, 114 A.D.3d 569, 569, 980 N.Y.S.2d 456, 457 (2014) ("Disgorgement is distinct from the remedy of restitution because it focuses on the gain to the wrongdoer as opposed to the loss to the victim"); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1148, 63 P.3d 937, 946 (2003) (discussing distinction between restitution and disgorgement).[43]  But the States have not made any showing that such a remedy is authorized by State consumer protection statutes that limit "additional orders or judgments" to those necessary to "restore" to any person in interest "money or property … acquired by means" of the allegedly unlawful conduct, or materially similar language.  *See* Mot 55 n. 56 (citing statutory language).

Finally, the States are wrong that it would be "premature" to dismiss their restitution claims.  AG Opp. 47.  The lone case the States cite held that "[i]t would be premature to reject [plaintiff's] request for restitution at this stage in the litigation" because the plaintiff alleged "that she was a ***direct victim of [defendant's] unfair competition, and that [defendant] may have unfairly obtained monies from her***

---

[43] The authority the States cite in support of their assertion that "user data, or other non-pecuniary interests[] may be appropriate for restitution," AG Opp. 46, do not support their argument.  In *Brown v. Google*, the court held that plaintiffs' restitution claims survived a motion to dismiss because they had alleged that "Google's conduct caused a 'diminution of the value of [Plaintiffs'] private and personally identifiable data and content'" on the theory that such diminution in value could be quantified.  *Brown*, 2021 WL 6064009 at *18.  The States make no such allegations here.  And *Avery v. Indus. Mortg. Co.*, the other case the States cite, did not address the scope or availability of restitution.  *See* 135 F. Supp. 2d 840, 843 (W.D. Mich. 2001) (discussing definition of "actual damages" under provision of Michigan Consumer Protection Act permitting private cause of action).

34

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

*that should be restored.*"   *Clark v. Prudential Ins. Co. of Am.*, 736 F. Supp. 2d 902, 925 (D.N.J. 2010) (emphasis added).  That fact pattern has no relevance here—as discussed above, the States do ***not*** allege that Meta's users suffered pecuniary losses that could be restored.  And contrary to the States' argument, courts in this Circuit routinely dismiss claims for restitution at the motion to dismiss stage.[44]

## VII.   THE PI PLAINTIFFS' CONSUMER PROTECTION CLAIMS FAIL.

### A.   The Count 7 Claims Fail Because the State Laws Do Not Apply to Plaintiffs' Claims.

The PI Plaintiffs' claims under state consumer protection laws, like the States' claims, fail for the reasons discussed above—those statutes on their face do not apply to Meta's alleged conduct because Meta's users do not pay to use its platforms.  The PI Plaintiffs' Opposition relies on identical arguments and authority as the States' Opposition on this ground, and cites to the States' brief throughout.  *See* Plaintiffs' Opposition to the Mot. ("PI Opp.") (ECF 600) 2–5.  Those arguments fail for the reasons discussed above.  *See supra* Part V.  Further, the PI Plaintiffs make no meaningful effort to address how the specific statutory language of any state's consumer protection law applies to their claims here.  For example, their appendix includes the conclusory assertion that "Plaintiffs' provision of data to Defendants in exchange for access to their platforms are 'sales'" under Maryland's consumer protection statue, PI Opp. 25, but ignores that the statutory definition of "sale" (which Plaintiffs do not cite) is limited to "[t]he sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, or consumer services," Md. Code Ann., Com. Law § 13-303(1).  The PI Plaintiffs similarly fail to explain how the consumer protection statutes of Vermont, Alabama, or Texas apply to their claims here—all of which limit private causes of actions to "consumers."  *See* Mot. 58; *see also Ziencik*, 2024 U.S. Dist. LEXIS 12105  (holding that users of Snapchat are not "consumers" because "they did not purchase Snap's services").[45]

---

[44] *See, e.g.*, *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844-45 (9th Cir. 2020) (holding consumer-plaintiff was not entitled to equitable restitution for violations of UCL and CLRA and affirming grant of motion to dismiss claims for restitution); *Stanford Health Care v. Trustmark Servs. Co.*, No. 22-CV-03946-RS, 2023 WL 2743581, at *4 (N.D. Cal. Mar. 31, 2023) (dismissing restitution claim under consumer protection law because "[w]hile restitution may be an available remedy under the UCL generally, it is inapplicable under the facts pleaded in the SAC") (emphasis added); *Sparkman v. Comerica Bank*, No. 23-CV-02028-DMR, 2023 WL 5020269, at *12 (N.D. Cal. Aug. 4, 2023) (dismissing claim for restitution "because the funds that [plaintiff] lost were taken by unspecified third parties, not Defendants").

[45] The PI Plaintiffs' conditional request for further briefing should be denied.  *See* PI Opp. 2 n. 4  Meta specifically identified the statutory limitations in each State's consumer protection statute that bar their claims.  *See* Mot. 56–59.  The PI Plaintiffs are not entitled to a do-over if they do not prevail.

35

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

### B.     Count 7 Fails for the Same Reasons the States' Deceptive Practices Claims Fail.

The PI Plaintiffs base their consumer protection claims based solely on a theory of deceptive omissions, not affirmative misrepresentations or unfair practices.  *See generally* PI Opp. 5–14.  These alleged omissions fail to state a claim for the same reasons the States' omission-based claims fail.  The PI Plaintiffs argue that their omission claims are not barred by Section 230 because they are based on knowledge of the ways that the services allegedly harm children, not publishing conduct, *id.* at 5—but the ways in which they allege the services harm children **is** through publishing conduct.  *See supra* Part II.B.  As for Meta's alleged statements regarding safety, PI Plaintiffs assert that they are not matters of opinion by citing to a series of securities fraud cases (in addition to some of the same vehicle defect cases the States cited).  PI Opp. 7–8.  Like the vehicle cases, *see supra* Part III.A, and unlike Meta's alleged statements about "safety," these securities cases all dealt with the circumstance where **objectively disprovable** claims were made about the financial health of a company.[46]  Financial solvency is a numeric metric that basic accounting can assess.  By contrast, concepts of "safety"—especially in the context of communications services where the competing goals of fostering free expression and restricting sensitive content must be balanced—are squarely matters of opinion upon which reasonable people can disagree.  *Newcal*, 513 F.3d at 1053 ("a statement that is quantifiable … may be an actionable statement of fact while a general, subjective claim about a product is non-actionable puffery"); *supra* Part III.A.[47]

### C.     Count 7 Also Fails Because Plaintiffs Do Not Allege Actual Reliance.

The PI Plaintiffs fail to allege that they actually relied upon Meta's alleged omissions because they

---

[46] *See Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027–28 (N.D. Ill. 2010) (statement that company's balance sheet was "fortress-like" was actionable when the company knowingly lacked adequate reserves and had stopped originating loans); *In re Conventry Healthcare, Inc. Sec. Litig.*, 2011 WL 1230998, at *12 (D. Md. Mar. 30, 2011) (statement that health care plan was "fundamentally sound" was actionable when it knew it could not process new claims and had dwindling reserves); *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *16 (N.D. Cal. June 2, 2020) (statement that "business in China was very strong last quarter" was actionable because company admitted that "'saw' troubling signs coming out of China ... that were 'particularly bad in November'"); *see also In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) (defendants "did not just describe the pipeline in subjective or emotive terms. Rather, they provided a concrete description of the past and present state of the pipeline.").

[47] Like the vehicle defect cases, *City of New York v. Lead Indus. Ass'n, Inc.*, 190 A.D.2d 173, 176 (N.Y. App. Div. 1993) (involving objectively unsafe lead paint), and *Hauter v. Zogarts*, 534 P.2d 377, 381 (Cal. 1975) (involving a golf machine with representation that "the ball will not hit the player," which "factually describes an important characteristic of the product"), are inapposite.  *See supra* Part III.A.

36

do not "plead some facts 'to establish that they would have been aware of the [omitted facts], if [they] were disclosed.'" *In re ZF-TRW Airbag Control Units Prod. Liab. Litig.*, 601 F. Supp. 3d 625, 767 (C.D. Cal. 2022). This is fatal to their claims in at least 21 states. *See* Mot. 60–62; *see also* Appx. F (chart setting forth reliance requirement on a state-by-state basis).

The PI Plaintiffs' Opposition largely misses the point. They argue that under Rule 9(b), they need not plead the specific time, place, and content of the alleged omission, and that reliance can be presumed when the alleged omission concerns a material fact. PI Opp. 11–14. But even accepting these points, they still must plead *some facts* demonstrating that they would have been aware of the disclosure had it been made. *ZF-TRW*, 601 F. Supp. 3d at 767. Plaintiffs argue that "it is reasonable to infer that Plaintiffs would have become aware of the truth, had it been disclosed, given the intense media attention that whistleblower Frances Haugen received when she shared Meta's internal studies and other documents with the Wall Street Journal." But tellingly, no Plaintiff alleges that *they themselves* actually saw this Wall Street Journal story at the time, or would have seen similar coverage even if it had occurred.

Moreover, the information that they allege Meta should have disclosed is essentially the same information that they allege *was* in fact disclosed by the Wall Street Journal in 2021. *See* PI SAC ¶ 377. Yet *dozens* of Plaintiffs here allege that they have *continued to use Meta's services up to the present*, when clearly they now are aware of the information that they allege Meta failed to disclose. *See, e.g.*, *Booker* SFC at 4; *Garceau* SFC at 4; *B.B.* SFC at 4; *Keiser* SFC at 4; *Koisol* SFC at 4; *Jansky* SFC at 4. This fact alone belies any plausible showing of actual reliance. *See Haddad v. Merck & Co.*, 2022 WL 17357779, at *8 (C.D. Cal. Aug. 11, 2022) ("Plaintiffs' claims [] fail because they continued to take Singulair after the omission was cured."). In short, the fact that Plaintiffs did not change their behavior when the allegedly withheld information was disclosed effectively disproves PI Plaintiffs' conclusory assertions that they would have changed their behavior had Meta revealed the same information earlier.

### D.    Count 7 Fails Because PI Plaintiffs Do Not Allege An Ascertainable Loss.

Meta's Motion explained that Count 7 fails under the law of at least 18 states because the PI Plaintiffs do not allege an ascertainable loss resulting from the alleged misrepresentations or unfair practices. *See* Mot. 63–64; *see also* Appx. G (chart setting forth ascertainable loss requirement on a state-by-state basis). The Opposition concedes almost the entirety of this issue. *First*, PI Plaintiffs narrow their

counterargument to a single type of alleged loss: cost of medical treatments and lost earnings or earning capacity (addressed below).  PI Opp. 14.  *Second*, they concede that "Plaintiffs do not allege that Defendants' failure to meet their expectations is an injury unto itself."  *Id.*  *Third*, they implicitly concede that they spent no money to use Meta's services.  *See id.* 15–16.  *Fourth*, they concede that the claims are solely based on alleged misrepresentations or omissions.  *Compare* Mot. 59 (characterizing claim this way), *with* PI Opp. 2 (characterizing it similarly), *id.* 5 (relying on this framing to overcome Section 230).  As these concessions underscore, the PI Plaintiffs fail to allege ascertainable loss.

To save the claim, the PI Plaintiffs focus only on costs of medical treatment and lost earnings or earning potential.  As an initial matter, not all PI Plaintiffs allege that they underwent hospital stays, were provided compensable medical treatment, or lost wages or earning potential.  The Court at a minimum should hold, based on the representation that these are the only ascertainable losses they put forward, PI Plaintiffs without these alleged losses cannot pursue Claim 7.

But there is a more fundamental problem with Plaintiffs' theory.  "An ascertainable loss occurs when a consumer receives less than what was promised."  *Munning v. Gap, Inc.*, 238 F. Supp. 3d 1195, 1200 (N.D. Cal. 2017) (cleaned up) (applying New Jersey law).  Claim 7 is predicated entirely on alleged misrepresentations and/or omissions.  Accordingly, "[t]he question is whether plaintiffs have adequately pleaded any ascertainable loss *as a result of defendant's alleged misrepresentation*."  *Paul v. Providence Health Sys.-Oregon*, 237 Or. App. 584, 602 (2010), *aff'd*, 351 Or. 587, 273 P.3d 106 (2012) (emphasis added) (cleaned up).[48]  Yet here, the PI Plaintiffs do not identify any ascertainable loss that *resulted from the alleged misrepresentations*.  In fact, one of the PI Plaintiffs' cases explains this point.  There, the plaintiffs were in a bus accident and alleged that statements by the bus company about bus safety were misleading.  *M.T. v. Saum*, 7 F. Supp. 3d 701, 703 (W.D. Ky. 2014).  Although the court said that the

---

[48] *See also, e.g.*, *Abbott v. Golden Grain Co.*, 2023 WL 3975107, at *4 (E.D. Mo. June 13, 2023) ("The ascertainable loss element incorporates Missouri's 'benefit of the bargain' common law fraud remedy .... The benefit of the bargain is the difference between the value of the product as represented and the actual value of the product as received." (cleaned up)); *Robey v. PVH Corp.*, 495 F. Supp. 3d 311, 318 (S.D.N.Y. 2020) (In misrepresentation cases, courts "have required plaintiffs to establish that they suffered an ascertainable loss either by demonstrating that they suffered an 'out-of-pocket' loss [such as repair costs], or that they lost the 'benefit-of-their-bargain' by purchasing a product that was ultimately worth less than the product that was promised." (cleaned up)).

plaintiffs' personal injuries may be compensable, it held that the alleged ***misleading statements*** did not

"cause" those injuries.  *Id.* at 706.  None of Plaintiffs' cases addresses a materially similar situation, and

most did not involve alleged misrepresentations ***at all***.

## VIII.   THE PI PLAINTIFFS' COMMON LAW CONCEALMENT AND MISREPRESENTATION CLAIMS LIKEWISE FAIL.

As with their consumer protection claims, the PI Plaintiffs all but concede that their common law

misrepresentation claims are based solely on a theory of omissions, rather than affirmative

misrepresentations.  The claims fail for the same reasons as their deceptive practices claim:  (1) their

omission claims are barred by Section 230, (2) they do not adequately allege reliance on any omissions,

(3) alleged omissions in the context of the statements  about "safety" are non-actionable opinions, and

(4) alleged omissions in the context of statements to Congress are protected by the First Amendment.  *See*

Mot. 65–66.  The PI Plaintiffs' Opposition on this point largely rehashes arguments made elsewhere, PI

Opp. 16–20, which are unavailing for the reasons discussed above.  *Supra* Parts II.B, III.A, III.D, VII.C.

Finally, in at least 18 states, a claim for "negligent omissions" is not cognizable.  *See, e.g.*, *Keshish*

*v. Allstate Ins. Co.*, 2012 WL 12887075, at *4 (C.D. Cal. Oct. 19, 2012) ("[T]he tort of negligent

misrepresentation extends only to affirmative statements," not "negligent nondisclosure or

concealment."); *see also* Appx. H (chart listing jurisdictions).

## IX.   FLORIDA'S CLAIMS SHOULD ALSO BE DISMISSED FOR LACK OF JURISDICTION.

Florida does not dispute that its allegations do not establish specific or general personal jurisdiction

under the Constitution.  Mot. 66–69.  Instead, Florida argues that its COPPA claims give the Middle

District of Florida personal jurisdiction over Meta because COPPA contains a provision authorizing

nationwide service of process.  AG Opp. 47; 15 U.S.C. § 6504(e)(2).  This argument fails for two reasons.

*First*, Florida alleged in its complaint only that "Meta is subject to the jurisdiction of Florida courts

under § 48.193(1)(a), Fla. Stat. (2023)"; it did not allege that personal jurisdiction was based on 15 U.S.C.

§ 6504(e)(2).  *See* FL Compl. ¶ 18 (alleging that Meta "intentionally avails itself to the ***Florida*** market"

(emphasis added)).  At a minimum, Florida should be required to re-plead—at which time, Meta would

move to dismiss the COPPA claim on grounds of improper venue.

Under COPPA, venue is appropriate only where the "defendant resides" or where "a substantial

39

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS

part of the events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(b); *see* 15 U.S.C. § 6504(e)(1).  Florida does not allege that Meta resides in Florida—nor could it.  And the Complaint lacks well-pled allegations that a substantial part of the events or omissions giving rise to the COPPA claim occurred in Florida.  *See* Mot. 66–69.  Thus, venue for the COPPA claims is not proper in Florida.

*Second*, even if Florida needed to establish only minimum contacts with the United States in order for this Court to exercise jurisdiction over its COPPA claims, that would not establish jurisdiction over Florida's consumer protection claim.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004) ("Personal jurisdiction must exist for each claim asserted against a defendant.").  Florida's opposition makes no attempt to argue that otherwise.  Indeed, the Opposition waives any argument that applying Florida's long-arm statute to authorize jurisdiction over the named Meta defendants would be consistent with the due process protections of the Fourteenth Amendment.  Accordingly, at a minimum, Count II of Florida's complaint should be dismissed.

The doctrine of pendent personal jurisdiction does not change this result.  That discretionary doctrine may be applied only where the pendent claim "arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  *Action Embroidery Corp.*, 368 F.3d at 1180.  Here, Florida's COPPA claim does not arise out of the same nucleus of operative facts as its consumer protection claims.  Florida's COPPA claims are narrowly focused on two questions: (1) whether Instagram and Facebook are directed to children and (2) whether Meta had "actual knowledge" of under-13 users.  Complaint (ECF 1) ¶¶ 79–107, *Office of the Attorney General, State of Florida v. Meta Platforms, Inc.*, Case No. 4:23-cv-05885 (N.D. Cal.).  By contrast, its consumer protection claims focus on (1) a broad array of "design features" that allegedly "induce young users' harmful, extended and compulsive social media use" and (2) allegedly deceptive statements by Meta regarding the safety of its services and its commitment to the well-being of users.  *Id.* ¶¶ 26–78.

## CONCLUSION

The States' claims, as well as the PI claims asserted in Counts 7 through 9, should be dismissed.

Dated: March 1, 2024                    Respectfully submitted,


                                        **COVINGTON & BURLING LLP**

                                        _/s/ Phyllis A. Jones_
                                        Paul W. Schmidt, _pro hac vice_
                                          pschmidt@cov.com
                                        Phyllis A. Jones, _pro hac vice_
                                          pajones@cov.com
                                        Christian J. Pistilli, _pro hac vice_
                                          cpistilli@cov.com
                                        COVINGTON & BURLING LLP
                                        One CityCenter
                                        850 Tenth Street, NW
                                        Washington, DC 20001-4956
                                        Telephone: + 1 (202) 662-6000
                                        Facsimile: + 1 (202) 662-6291

                                        Emily Johnson Henn (State Bar No. 269482)
                                          ehenn@cov.com
                                        COVINGTON & BURLING LLP
                                        3000 El Camino Real
                                        5 Palo Alto Square, 10th Floor
                                        Palo Alto, CA 94306
                                        Telephone: + 1 (650) 632-4700
                                        Facsimile: +1 (650) 632-4800

                                        _Attorneys for Defendants Meta Platforms, Inc.,_
                                        _Instagram, LLC, Meta Payments, Inc., Meta Platforms_
                                        _Technologies, LLC, Facebook Payments, Inc., Siculus,_
                                        _Inc., Facebook Operations, LLC, and Mark Elliot_
                                        _Zuckerberg_

META'S REPLY IN SUPPORT OF MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT; FLORIDA ATTORNEY
GENERAL COMPLAINT; AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS