## IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
## TWENTIETH JUDICIAL DISTRICT, DAVIDSON COUNTY, PART IV

|  |  |
|---|---|
| STATE OF TENNESSEE ex rel. JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER,<br><br>    Plaintiff,<br><br>v.<br><br>META PLATFORMS, INC. and INSTAGRAM, LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>No. 23-1364-IV<br><br>JURY DEMAND |

### ORDER ON DEFENDANTS' MOTION TO DISMISS

On October 24, 2023, State of Tennessee, *ex rel*. Jonathan Skrmetti, Attorney General and Reporter ("State"), filed this Civil Enforcement Action ("Complaint") against Defendants Meta Platforms, Inc. and Instagram, LLC ("Meta" or "Defendants"). The Complaint contains two claims:  1) unfairness under the Tennessee Consumer Protection Act; and 2) deception under the Tennessee Consumer Protection Act.[1] Both claims are based on the State's theory that the social media platform Instagram is unfairly and deceptively addictive and harmful, particularly to young people.

On December 14, 2023, Defendants filed a motion to dismiss to the Complaint pursuant to Rule 12.02(2) and 12.02(6) of the Tennessee Rules of Civil Procedure. Defendants assert that the Complaint does not contain allegations sufficient to establish personal jurisdiction over either defendant; that Section 320 of the Communications Decency Act prohibits the State from imposing liability on Defendants; that the First Amendment to the United States Constitution prohibits the State from imposing civil liabilities on Defendants for their role in disseminating user content; and

---

[1] The State's lawsuit is part of a multi-state civil law enforcement effort involving several other states.

4) the Complaint fails to state a claim for relief under the Tennessee Consumer Protection Act. The State responded in opposition on January 17, 2024. The motion to dismiss came before the Court for hearing on Friday, March 1, 2024.

## I. <u>Factual Allegations</u>

Both Meta and Instagram are Delaware corporations with principal places of business in Menlo Park, California. Instagram is a subsidiary of Meta. Meta owns, operates and controls several social technology services, including multiple social media platforms. Through its mobile application and website, Instagram offers consumers the opportunity to connect with friends, follow accounts, and explore various interests. On Instagram, consumers interact with different surfaces, which include the main Feed and Stories that display content posted by accounts the consumer follows. The Explore surface suggests new content to consumers; the Reels surface focuses on short-form videos; and the Direct Messaging surface allows consumers to send messages to one another. Instagram presents a customized display to each consumer based on the interests and preferences they express on Instagram, along with other data in Meta's possession.

To fully access Instagram, consumers must create an account. As part of the account creation process, consumers enter a contract with Meta. By entering that contract, users agree to comply with Instagram's Terms of Use ("Terms"). The Terms state, *inter alia*, that Instagram is a Meta product. Thus, the Terms constitute an agreement between the consumer and Meta. Consumers do not pay money to use Instagram. Instead, in exchange for the right to use Instagram, consumers agree to terms that power Meta's advertising business.

Meta's business model has made Meta one of the largest and most profitable advertising companies in the world. Meta reported earning $116.6 billion in revenue in 2022, with $23.2 billion in net income. Meta capitalizes on its ability to offer highly targeted, data-informed

advertising opportunities, including opportunities based on consumers' locations. Consumers are served targeted advertisements during their sessions on Instagram, and consumers see advertisements several times per minute. The advertisements Meta displays on Instagram are interwoven into most, if not all, of Instagram's surfaces. Viewing advertisements is a core part of the Instagram experience. Given this business model, Meta is motivated to maximize the time consumers spend on Instagram. The more time a consumer spends on Meta's platforms, the more advertising opportunities Meta can sell, and the more data Meta collects about the consumer. The increase in consumer time spent therefore significantly increases the profits Meta can make from the consumer.

Consumers under eighteen ("Young Users") are Meta's prized demographic and increasing Young Users' time spent on its platforms is one of Meta's goals. Meta pursues Young Users because Meta's advertising customers value that audience, as Young Users are more likely influenced by advertisements, may become lifelong customers, and set trends society emulates. Instagram is Meta's most popular application with the Young Users demographic.

Instagram is popular among young Tennesseans. According to Meta's internal metrics, from July 2020 to June 2021, over 475,000 Tennessee teens used Instagram monthly and over 350,000 Tennessee teens used Instagram daily. Between October 2022 and April 2023, over 500,000 young adults in Tennessee used Instagram daily and over 800,000 young adults in Tennessee used Instagram monthly.

Meta closely tracks Instagram's performance in Tennessee, including following metrics for Instagram usage in Tennessee, the amount of time Tennessee teens spend on Instagram per day, the percentage of Tennessee teens on Instagram, the ratio of Tennessee teen daily versus monthly active users, Tennessee teen monthly active user story participation rates, the amount of

feed media daily active Tennessee teens consume per day on Instagram, the amount of stories that daily active Tennessee teens consume per day on Instagram, the percentage of Facebook Android monthly active users on Instagram, and the reduction in active users over a two month period. As of 2020, Meta determined that Instagram had fully saturated the market for Tennesseans under 35 years of age. That same year, Meta found that it had fully entered the teenage market in Tennessee.

In 2019, Meta conducted interviews with young consumers in Memphis to study that population's experience on Instagram. Meta started the Teen Ecosystem Understand project in 2020 to study Young Users in order to deliver insights that would allow Meta to make Instagram increasingly irresistible to Young Users. The Teen Ecosystem Understand and Consumer Market Research projects were two of many Meta initiatives to study Young Users and capture more of their time and attention.

The State argues that Instagram is not reasonably avoidable for many Young Users because it is highly addictive and designed to exploit Young Users' biologically limited capacity for self-control. The State alleges that Instagram harms Young Users by, *inter alia*, negatively impacting their metal well-being and impairing their healthy development. Despite having overwhelming evidence showing that Instagram is addictive, the State asserts that Meta made decisions that facilitated Young Users' addiction to Instagram.

The State further alleges that Meta misled the public, including Tennesseans, about the addictive nature of the Instagram platform and the risks Instagram presents to its consumers, particularly Young Users in three general ways. First, the State asserts that Meta knew that Instagram was harmful for consumers, and particularly Young Users, but it did not share that information with the public. Secondly, the State asserts that Meta created the façade that Instagram is a safe platform where harmful content is rarely encountered. Thirdly, the State asserts that Meta

4

misled the public through misrepresentations about its commitment to well-being related products and features.

By allegedly designing and deploying Instagram in a manner that overwhelmed consumers' free and informed choice regarding how much time to spend on the Instagram platform and by allegedly deceiving consumers through statements, conduct, silence and action that Instagram is a safer platform than it is in reality, the State alleges Meta violated the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-104(a)&(b).

## II. Standards

A defendant may challenge the Court's exercise of personal jurisdiction through a motion to dismiss pursuant to Rule 12.02(2) of the Tennessee Rules of Civil Procedure. Although not required to do so, the defendant may support his or her motion with affidavits or other materials. *See Baskin v. Pierce & Allred Constr., Inc.*, 676 S.W.3d 554, 566 (Tenn. 2023)(citing *Crouch Ry. Consulting, LLC v. LS Energy Fabrication, LLC*, 610 S.W.3d 460, 470 (Tenn. 2020)). If the defendant does so, then the plaintiff must also submit affidavits or other materials to carry its burden. *See id.* "[T]he submission of matters outside the pleadings does not convert the Rule 12.02(2) motion to dismiss into a motion for summary judgment." *Id.*

"When a defendant challenges the state's exercise of personal jurisdiction in this manner, the plaintiff bears the burden of establishing a prima facie case for personal jurisdiction over the defendant." *Id.* (citing *Crouch*, 610 S.W.3d at 470). This Court's decision regarding the exercise of personal jurisdiction over the defendant is a question of law. *See id.*

> When evaluating whether the plaintiff has established a prima facie case for personal jurisdiction, the trial court must accept the plaintiff's factual allegations as true and resolve all factual disputes in the plaintiff's favor. [*Crouch*, 610 S.W.3d at 470]; [*State v. NV Sumatra Tobacco Trading Co.*, 403 S.W.3d 726, 739 (Tenn. 2013)]. However, the court may disregard "allegations that are controverted by more reliable evidence and plainly lack credibility, conclusory allegations, or

5

farfetched inferences." *Crouch*, 610 S.W.3d at 470 (citing [*First Cmty. Bank, N.A. v. First Tenn. Bank, N.A.*, 489 S.W.3d 369, 382 (Tenn. 2015)]. Ultimately, the court must determine whether the factual allegations in the plaintiff's complaint and any supporting materials establish, with reasonable particularity, sufficient contacts between the defendant and Tennessee. *First Cmty. Bank*, 489 S.W.3d at 383.

*Id.*

A motion to dismiss for failure to state a claim tests the legal sufficiency of the Complaint, admitting the truth of all relevant and material factual averments contained in the Complaint. *See Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). "[A] motion filed under Rule 12.02(6) tests 'the legal sufficiency of the complaint, not the strength of the plaintiff's proof or evidence.'" *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 426 (Tenn. 2011). In deciding a motion to dismiss, courts are required to construe the complaint liberally, treating all factual allegations as true and considering all reasonable inferences in the plaintiff's favor. *See Webb*, 346 S.W.3d at 427; *Tigg v. Perelli Tire Corp.*, 232 S.W.3d 28, 31-32 (Tenn. 2007). However, "courts are not required to accept as true assertions that are merely legal arguments or 'legal conclusions' couched as facts." *Webb*, 364 S.W.3d at 426 (quoting *Riggs v. Burson*, 941 S.W.2d 44, 47-48 (Tenn. 1997)). Unless it appears from the pleadings and the applicable law that the plaintiff can prove no set of facts that would entitle the plaintiff to relief on his/her claim, a motion to dismiss for failure to state a claim should be denied. *See Bell ex rel. Snyder v. Icard, Merrill, Cullis, Timm, Furen & Ginsburg, P.A.*, 986 S.W.2d 550, 554 (Tenn. 1999).

## III. Discussion

Defendants assert that their motion to dismiss should be granted for four core reasons: 1. The State fails to allege sufficient facts to support personal jurisdiction; 2) the State's claims would impose liability on Meta by treating it as a publisher of third-party content on Instagram, which is

barred by Section 230 of the Communications Decency Act; 3) the State seeks to hold Meta liable for the allegedly harmful consequences of user speech that Meta organizes and disseminates on Instagram, which is barred by the First Amendment; and 4) the Complaint fails to state a claim under the TCPA.

### *Personal Jurisdiction*

The authority of courts to exercise personal jurisdiction over non-resident defendants is restricted by the Due Process Clause of the Fourteenth Amendment. *See Gordon v. Greenview Hosp., Inc.*, 300 S.W.3d 635, 646 (Tenn. 2009). When a question regarding personal jurisdiction arises, courts are required to ascertain whether it is "fair and substantially just to both parties to have the case tried in the state where the plaintiff has chosen to bring the action." *Id.* "The plaintiff bears the ultimate burden of demonstrating that the trial court may properly exercise personal jurisdiction over a defendant." *Id.* at 643.

Tennessee's long-arm statute permits the courts of this state to exercise jurisdiction upon "any basis not inconsistent with the constitution of this state or of the United States." Tenn. Code Ann. § 20-2-214(a)(6); *Wall Transp., LLC v. Damiron Corp.*, No. M2014-00487-COA-R3-CV, 2014 WL 7263778, at *3 (Tenn. Ct. App. Dec. 19, 2014). In order for a non-resident defendant to be subject to personal jurisdiction in Tennessee, the defendant must have "certain minimum contacts . . . such that the maintenance of a suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)(quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Those minimum contacts with the forum state may create two types of personal jurisdiction: 1) general personal jurisdiction, which requires a defendant to have continuous and systematic contact with the forum state; or 2) specific personal jurisdiction,

which focuses only on "deliberate" and "significant" contacts in the forum state from which the claims at issue arise. *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 678-79 (6th Cir. 2012).

For general personal jurisdiction to attach, a non-resident defendant's contacts with Tennessee must be so continuous and systematic as to render them essentially at home in Tennessee, and they must comply with traditional notions of fair play and substantial justice. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). A corporation's state of organization and principal place of business are paradigm bases for general jurisdiction. *See First Cmty. Bank N.A.*, 489 S.W.3d at 385. Merely "doing business" in the forum state is not sufficient to subject a non-resident defendant to jurisdiction there. *See id.* at 386.

Specific jurisdiction exists when a defendant has minimum contacts with the forum state and the cause of action arises out of those contacts. *See NV Sumatra Tobacco Trading Co.*, 403 S.W.3d at 744. "[C]ertain 'single or occasional acts' in the forum state may be sufficient to render a non-resident corporation subject to personal jurisdiction 'with respect to those acts, though not with respect to matters unrelated to the forum.'" *Id.* at 385 (quoting *Goodyear*, 564 U.S. at 923). Determining whether a forum state may exercise specific jurisdiction over a non-resident defendant requires a two-part analysis: 1) whether the defendant's activities in the state that give rise to the cause of action constitute sufficient minimum contacts with the forum state, and, if so 2) whether the exercise of jurisdiction over the non-resident defendant is fair. *See id.* at 388.

"It is well established that, in order for a nonresident defendant's contacts with the forum state to be sufficient to give rise to personal jurisdiction there, those contacts must arise out of the defendant's own purposeful, deliberate actions directed toward the forum state." *Id.* at 389 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985)).

> This "purposeful availment" requirement ensures that a defendant will not be
> [hailed] into a jurisdiction solely as a result of "random," "fortuitous," or

"attenuated" contacts, or of the "unilateral activity of another party or a third person." Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. Thus where the defendant "deliberately" has engaged in significant activities within a State, or has created "continuing obligations" between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by "the benefits and protections" of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King*, 471 U.S. at 475-76.

A defendant's connections with the forum state must not only be intentional, but also substantial enough to give rise to jurisdiction. *See Walden v. Fiore*, 571 U.S. 277, 284-85 (2014). This requires the Court to consider "the quantity of the contacts, their nature and quality, and the source and connection of the cause of action with those contacts." *Sumatra*, 403 S.W.3d at 759-60. Furthermore, in performing the minimum contacts analysis, courts must look to "the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Walden*, 571 U.S. at 285. A defendant's contacts with the plaintiff "cannot be the only link between the defendant and the forum." *Id.*

The State is not asserting that Meta is subject to general personal jurisdiction in Tennessee. The State's TCPA claims arise from its allegations that 1) Meta engineered dangerous product features into Instagram; and 2) Meta materially misrepresented Instagram's safety to the public. Broadly speaking, the State argues that this Court has specific jurisdiction over Meta because Meta chose to 1) make Instagram available in Tennessee; 2) enter contracts with hundreds of thousands of Tennesseans; 3) analyze Instagram's performance in Tennessee across several highly-granular metrics; 4) promote its brand in Tennessee; 5) study Tennessee consumers; and 6) deliver Tennessee-specific advertisements to Tennesseans. The Court now turns to the due process

analysis to determine whether Meta has such minimum contacts with Tennessee to warrant the exercise of specific jurisdiction over it.

To establish the necessary minimum contacts, Meta must either purposefully direct its activities toward Tennessee or purposefully avail itself of the privileges of conducting activities in Tennessee; the claim must arise out of or relate to Meta's Tennessee-related activities; and the exercise of jurisdiction must be reasonable. *See AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1208 (9th Cir. 2020)(citation omitted); *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968). "If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995).

"'[P]urposeful availment' is something akin to a deliberate undertaking to do or cause an act or thing to be done in [Tennessee] or conduct which can be properly regarded as a prime generating cause of the effects resulting in [Tennessee], something more than a passive availment of [Tennessee] opportunities." *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891 (6th Cir. 2002)(quoting *Khalaf v. Bankers & Shippers Ins. Co.*, 273 N.W.2d 811, 819 (Mich. 1978)). The State argues that Meta delivers Tennessee consumers a highly interactive and customized online experience in Tennessee. Through its consumers' assent to Instagram's terms of service ("TOS"), Meta collects data from its consumers, including locational data, such as a consumer's GPS, Bluetooth signals, nearby Wi-Fi access points, beacons, and cell towers. Meta then uses that data to deliver its consumers a customized experience on Instagram.

Meta capitalizes on its ability to offer highly targeted, data-informed advertising opportunities, including opportunities based on consumers' locations. Consumers are served targeted advertisements during their sessions on Instagram, and consumers see advertisements

several times per minute. Viewing advertisements is a core part of the Instagram experience. The more time a consumer spends on Meta's platforms, the more advertising opportunities Meta can sell, and the more data Meta collects about the consumer. Thus, the time a consumer time spends on Instagram significantly affects the profits Meta can make from the consumer.

Purposeful availment is met where a defendant "anticipated, desired, and achieved a substantial [forum state] viewer base." *Mavrix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1230 (9th Cir. 2011). A court may "hold [a defendant] answerable . . . for the contents of a website whose economic value turns, in significant measure, on its appeal to [forum residents]." *Id.*; *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 781 (1984). All manner of Tennessee entities - from Graceland to Dollywood, the Nashville Zoo to the Tennessee Aquarium, the Memphis Grizzlies to the Tennessee Titans, the *Knoxville News Sentinel* to *The Tennessean* - advertise on Instagram to reach a Tennessee audience and expand their business in Tennessee. Meta profits through its sale of Tennessee-targeted advertising opportunities.

The fact that these advertisements, among others, target Tennesseans indicates that Meta knows, either actually or constructively, about its Tennessee consumer base, and Meta exploits that base for commercial gain by selling the ability for advertisers to show their Tennessee-based advertisements to Tennessee consumers on Instagram. Hundreds of thousands of young adults consume Instagram in Tennessee. *See* Compl., ¶ 82. This is a substantial viewer base. *See id.*, ¶ 92. A platform targets a forum if it "'continuously and deliberately exploit[s]' the forum's market for commercial gain, by operating 'a website whose economic value turns, in significant measure, on its appeal to [forum residents].'" *AMA Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1220 (Gould, J. dissenting)(quoting *Mavrix Photo, Inc.*, 647 F.3d at 1230).

11

Specific jurisdiction is insufficient to support personal jurisdiction for all claims but will support jurisdiction for a claim "sufficiently related to the defendant's activities in the state." *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 426 (7th Cir. 2010). Whether a claim is sufficiently related to a forum turns on "whether the relationship between the plaintiff's claim and the defendant's contacts with the state made it fair to call the defendant into court there." *Id.* at 427. Here, the Complaint alleges that Meta used irresistible design features to capture an ever-increasing amount of Young Users' time and data, for the benefit of Meta's business. *See* Compl., ¶ 5. Thus, viewing advertisements is a core part of the Instagram experience, and the more time a consumer spends on Instagram, the more advertising opportunities Meta can sell and the more data Meta collects about the consumer.

Under Meta's business model, consumers agree to Instagram's TOS, which explain that Meta shows consumers ads that businesses and organizations pay Meta to promote. Advertisers tell Meta their business goal and the kind of audience they want to see their ads. Meta then uses consumers' personal data to create categories and charges advertisers to show ads to that category. In this way, Meta also custom tailors a consumer's ad experience on Instagram. Meta is motivated to maximize the time users spend on Instagram, because the more time a user spends on Instagram, the more advertising opportunities Meta can sell and the more profits Meta makes from the consumer in the form of advertising dollars.

Because advertisers wish to reach Young Users, Young Users are the prized demographic. Many of Meta's advertisers are willing to pay Meta for the opportunity to reach Young Users in a specific geographical market, such as Tennessee. As such, Meta is motivated to increase Young Users' time spent on Instagram. The State alleges that Meta designs Instagram to make it addictive to Young Users in order to ensure they will spend more time on Instagram, thereby economically

benefitting Meta. Young Users' consumption of Instagram allegedly harms Young Users by negatively impacting their mental well-being and impairing their healthy development. These allegations demonstrate the nexus between the State's claims and Meta's Tennessee-related contacts.

Additionally, the State alleges that Meta used its research to develop sophisticated tools that hook consumers to Instagram and that Meta allegedly deceived consumers about the results of its research in various ways. The Complaint alleges that Meta conducted some of that research in Memphis, Tennessee. Additionally, the Complaint alleges that Meta engaged *The Tennessean*'s editorial board to provide a positive, forward-looking message related to Meta's impact in Tennessee. This Tennessee-specific conduct relates to the State's claims that Meta offers a harmful product in Tennessee and misleads Tennesseans about its product's safety. As such, this litigation relates to Meta's Tennessee-related conduct.

Before concluding the analysis, the Court must determine whether an exercise of specific jurisdiction over Meta would offend traditional notions of "fair play and substantial justice." *Burger King*, 471 U.S. at 476. This requires to Court to analyze the "burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in efficiently resolving controversies, and the shared interest of the states in furthering fundamental substantive social policies." *uBID, Inc.*, 623 F.3d at 432. This case involves alleged violations of the Tennessee Consumer Protection Act. As such, most of these factors counsel in favor of allowing this Court to exercise specific personal jurisdiction over Meta. Furthermore, the burden on Meta of defending a lawsuit in Tennessee is minimal. Meta reports earnings in the billions and has a broad enough reach to

operate its services on a global scale. The relationship between Meta, the State, and this litigation is close enough not to offend due process.

For the foregoing reasons, the Court determines that it has specific personal jurisdiction over Meta on the claims brought by the State related to Meta's Tennessee-related conduct. The motion to dismiss is respectfully denied on this ground.

### *Communications Decency Act*

Meta seeks to dismiss the Complaint pursuant to Section 230 of the Communications Decency Act, which directs that "[n]o provider or user of an interactive computer service shall be treated as a publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). "Section 230 of the Communications Decency Act . . . , titled 'Protection for private blocking and screening of offensive material,' was passed by Congress in 1996." *Social Media Cases*, Nos. JCCP 5225, 22STCV21355, 2003 WL 6847378, at *9 (Cal Super. Ct. Oct. 13, 2023).

Through Section 230, "Congress intended to create a blanket immunity from tort liability for online republication of third party content." *Id.* at *30 (citation omitted). "Section 230(c)(1) shields defendants who operate certain internet services from liability based on content created by a third party and published, displayed, or issued through the use of the defendant's services." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 155 (E.D.N.Y. 2017). By enacting Section 230, "Congress sought to prevent state and federal laws from interfering with the free exchange of information over the internet." *Daniel v. Armslist, LLC*, 386 Wis. 2d 449, 464 (2019); 47 U.S.C. § 230(e)(3). Section 230 is to be construed broadly. *See Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016).

The necessary components of an immunity claim under Section 230(c)(1) are: 1) the defendant is a provider or user of an interactive computer service; 2) the claim is based on information provided by another information content provider; and 3) the claim treats the defendant as the publisher or speaker of third-party content that forms the basis of the claim. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009), *as amended* (Sept. 28, 2009); *Cohen*, 252 F. Supp. 3d at 155-56 (citing *FTC v. LeadClick Media, LLC*, 838 F.3d 158, 173 (2d Cir. 2016)). "Where a defendant establishes these requirements based on the face of a complaint, a motion to dismiss may be granted." *Cohen*, 252 F. Supp. 3d at 156.

Here, the first element is satisfied, because both Meta and Instagram are providers of an interactive computer service, as that term is defined by the Communications Decency Act. *See* 47 U.S.C. § 230(f)(2); *Doe v. MySpace*, 528 F.3d 413, 420-22 (5th Cir. 2008)(social networking site is an interactive computer service under Section 230). As such, whether Section 230 provides immunity to Meta and Instagram under the facts alleged here turns on the second and third elements. "Practically speaking, the second and third factor tend to overlap in significant ways." *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022). The second prong focuses on whether the State's claims stem from Meta's "status or conduct as a publisher or speaker." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, No. 4:22-md-03047-YGR, -- F. Supp. 3d --, 2023 WL 7524912, at *9 (N.D. Cal. Nov. 14, 2023)(quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021)(quoting *Barnes*, 570 F.3d at 1107)). "A claim meets this prong where the claim is based on 'behavior that is *identical to* publishing or speaking.'" *Id.* (quoting *Barnes*, 570 F.3d at 1107)(emphasis in original).

> Critically, Section 230 does not create immunity simply because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm. The issue is whether the defendant's alleged duty to the plaintiff could "have been satisfied

> without changes to the content posted by the website's users and without conducting a detailed investigation."

*Id.* (quoting *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016)).

Publishing constitutes "deciding whether to publish or to withdraw from publication third-party content." *Lemmon*, 995 F.3d at 1092. It also includes "editorial decisions and functions ancillary to the decision to make content available." *In re Social Media*, 2023 WL 7524912, at *10.

> Thus, publishing has been found to involve reviewing and editing, such as reviewing material submitted for publication, perhaps editing it for style or technical fluency, and deciding whether to exclude material. In general, it is any conduct rooted in the common sense and common definition of what a publisher does.

*Id.* (internal quotations and citations omitted).

Section 230 also protects tools that filter, pick, choose, digest, and organize content. *See* 47 U.S.C.(f)(4)(A)-(C). Algorithms used to recommend content to users are protected by Section 230, because "tools meant to facilitate the communication and content of others" constitute publishing. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

> Given the complexity with which online platforms function, it is not always clear whether a platform is merely acting as an interactive services provider and publisher of another's content, or if the platform's involvement or intervention in the posting or presentation of that content crosses the line into what courts generally refer to as "development."

*Id.* (quoting *Kimzey v. Yelp!, Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016)). If a platform provides "'neutral tools' for the creation or dissemination of content[,]" then Section 230 immunity applies. *In re Social Media*, 2023 WL 7524912, at *10 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1172 (9th Cir. 2008)). However, if the platform "materially alters the content," then "the tool is not neutral, and Section 230 does not bar liability." *Id.* (quoting *Roommates.Com*, 521 F.3d at 1174-75).

The State alleges that Instagram is not reasonably avoidable for many Young Users because Meta designed it to be highly addictive and to exploit Young Users' biologically limited capacity for self-control through an array of Instagram features such as notifications, ephemerality, auto-play and infinite scroll. Meta notifies Young Users when another user follows them, likes their content, comments on their content, tags them, mentions them, sends them a message, or goes live. *See* Compl., ¶ 129. Ephemeral content is only available on a temporary basis and not on a schedule convenient for the consumer. *See id.*, ¶ 136. The Stories feature displays user-created images, videos, and narratives for a maximum twenty-four hours before the content disappears. *See id.*, ¶ 137. Live gives users the ability to livestream videos during a specific session, after which the video is typically no longer available. *See id.*, ¶ 138.

Instagram partially displays additional content at the bottom of the user's screen, which allegedly makes it difficult for Young Users to disengage, because there is no natural end point to the display of new information. *See id.*, ¶ 147. Similar to infinite scroll, Stories show automatically and continuously play content, encouraging Young Users to remain on Instagram. *See id.*, ¶ 152. Videos on Reels automatically and perpetually play as the consumer swipes the screen up to the next video. Additional aspects of Reels, including the placement of the like, comment, save, and share buttons on top of the video allegedly reduce or prevent interruption and keep the consumer constantly viewing videos. *See id.*, ¶ 155.

The State alleges that Young Users' compulsive use of Instagram causes lack of sleep and related health outcomes, diminished in-person socialization skills, difficulty maintaining attention, increased hyperactivity, self-control challenges, increased depression and anxiety, and interruption of various brain development processes. *See* Compl., ¶¶ 187-89, 192.

The Superior Court of California in *Social Media Cases* was presented with litigation against five companies operating social media platforms including Facebook, Instagram, YouTube, TikTok, and Snapchat. The plaintiffs alleged that, as children or minor teenagers, they became addicted to the social media platforms as a result of the platforms' allegedly manipulative features that sought to maximize the time they spent on the sites and thereby maximize the platforms' advertising revenue. *See Social Media Cases*, 2023 WL 6847378, at *1. The plaintiffs alleged that, "as a result of their addiction, they suffered depression and anxiety, engaged in self-harm, became suicidal, and developed eating disorders." *Id.*

> For example, the Master Complaint alleges that TikTok is designed with "continuous scrolling," a feature of the platform that "makes it hard for users to disengage from the app," (Mast. Compl., ¶ 567) and that minor users cannot disable the "auto-play function" so that a "flow-state" is induced in the minds of the minor users (Mast. Compl., ¶ 590). The Master Complaint also alleges that some Plaintiffs suffer sleep disturbances because "Defendants' products, driven by IVR algorithms, deprive users of sleep by sending push notifications and emails at night, prompting children to re-engage with the apps when they should be sleeping." (Mast. Comp., ¶ 107 [also noting that disturbed sleep increases the risk of major depression and is associated with "future suicidal behavior in adolescents"].)

*Id.* at *31. "[T]he Master Complaint alleges harm from 'filters' and 'rewards' offered by Defendants. Plaintiffs allege, for example, that Defendants encourage minor users to create and post their own content using appearance-altering tools provided by Defendants that promote unhealthy 'body image issues.'" *Id.*

The court in *Social Media Cases* determined that the plaintiffs' claims were not barred by Section 230, "because the alleged wrongdoing does not 'treat[ ] [the provider] as the publisher or speaker of any information provided by another information content provider.'" *Id.* at *32 (quoting 47 U.S.C. § 230(c)(1)). Rather, the court determined the plaintiffs' allegations were "based on the allegedly addictive qualities of the interactive features of Defendants' social media

sites[,]" which did not fall within the blanket immunity of Section 230, because "Defendants are allegedly liable for their own actions, not for the content of third-party postings." *Id.*

"Section 230 does not bar a claim based on features of a social media site that have an adverse effect on users apart from the content of material published on the site." *Id.* at *30. "So long as providers are not punished for publishing third-party content, it is consistent with the purposes of Section 230 to recognize a common law duty that providers refrain from actions that injure minor users by inducing frequency and length of use of a social media platform to the point where a minor is addicted and can no longer control the information they receive from that platform." *Id.* at *32. "The duty to design a reasonably safe product is fully independent of [the platform's] role in monitoring or publishing third-party content." *Id.* at *33 (quoting *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1092-93 (9th Cir. 2021)).

*Social Media Cases* is instructive here. The State's claims based on the interactive operational features of Instagram[2] do not seek to require that Meta publish or de-publish any third-party content posted on Instagram. Rather, the features themselves allegedly operate to addict and harm Young Users, regardless of the particular third-party content viewed by the Young Users. Although the Complaint contains allegations that could be read as seeking to hold Defendants liable for publishing third-party content, it also contains allegations that the harms to consumers complained of are caused by Meta's design and operation of Instagram. Viewing the Complaint in the light most favorable to the State, the State's Complaint sufficiently alleges that it was Meta's design of Instagram itself that caused Young Users to become addicted and to suffer harm as a

---

[2] The State's allegations concerning Instagram features that maximize Young Users' engagement do not challenge algorithms that decide what content to publish.

result.[3] Because it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims, the motion to dismiss Count 1 of the Complaint premised on Section 230 must be denied. *See Snyder*, 986 S.W.2d at 554.

For its deception claim, the State alleges that, by misrepresenting Instagram's safety, the incidence of harmful experiences on Instagram, and the efficacy of Instagram's well-being related platform features, Defendants engaged in deceptive practices prohibited by the TCPA. The State further alleges that Defendants failed to disclose the harms associated with Instagram in general and with certain Instagram features, which Defendants knew had a harmful effect on consumers' mental health and well-being. By allegedly downplaying the risks of Instagram use, Defendants purportedly led reasonable consumers to believe that Instagram is a safer platform than it really is.

Some of the State's deception claim could be construed as being based on specific third-party content (i.e., cyberbullying, harassment, self-harm, negative appearance and social comparison-provoking content, unwanted advances). These allegations could be interpreted as being premised on Meta's role as a publisher, which would be prohibited under Section 230. The Complaint could also be construed as being based on conduct other than the publishing of third-party content, such as failing to disclose or misrepresenting platform features allegedly known to risk harm to Young Users. Under the latter interpretation, liability is alleged to arise "from [Defendants'] knowledge, based on public studies or internal research, of the ways that their products harm" their consumers. *In re Soc. Media*, 2023 WL 7524912, at *16. As such, Section 230 immunity would not apply "because these adverse effects that allegedly should have been

---

[3] It could very well be that a jury finds that Young Users became addicted to Instagram because of the third-party content posted thereon. However, this Court's task when presented with a motion to dismiss is to test the legal sufficiency of the Complaint, not the strength of the State's proof. *See Webb*, 346 S.W.3d at 426.

disclosed result from Meta's own conduct, not from any particular content displayed." *Social Media Cases*, 2023 WL 6847378, at *46.

Viewing the Complaint in the light most favorable to the State, it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims. *See Snyder*, 986 S.W.2d at 554. Accordingly, the motion to dismiss Count 2 of the Complaint premised on Section 230 is respectfully denied.

### *First Amendment*

"The Free Speech Clause of the First Amendment . . . can serve as a defense in state tort suits." *Snyder v. Phelps*, 562 U.S. 443, 451 (2011). "[A]s a general matter, . . . government has no power to restrict expression [of speech] because of its message, its ideas, its subject matter, or its content." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790-91 (2011)(citation omitted). "[A] State possesses legitimate power to protect children from harm . . . but that does not include a free-floating power to restrict the ideas to which children may be exposed." *Id.* at 794-795 (citations omitted). "'Speech that is neither obscene as to youths nor subject to some other legitimate proscription cannot be suppressed solely to protect the young from ideas or images that a legislative body thinks unsuitable for them.'" *Id.* at 795 (quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 213-214 (1975)).

Under the First Amendment, the acts of dissemination, disclosing and publishing information are considered speech. *See In re Social Media*, 2023 WL 7524912, at *17 (citing *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 570 (2011); *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001)); *Newspaper Printing Corp. v. Galbreath*, 580 S.W.2d 777, 779 (Tenn. 1979)(First Amendment provides the freedom to publish constitutionally protected speech "as the publisher sees fit."). "It is undisputed that the First Amendment generally protects a publisher from liability

where that publisher organized, compiled, and disseminated information that then harmed the plaintiff." *Social Media Cases*, 2023 WL 6847378, at *38. However, "the mere fact that the conduct at issue involves or includes speech does not necessarily shield a defendant from liability." *Id.* at *36.

While the Complaint could be read to allege that consumers were harmed by third-party content found on Instagram, it is undisputed that there is no single type of content viewed by all consumers. Rather, the particular content viewed is custom tailored to each consumer. As such, the allegedly addictive and harmful features of Instagram are alleged to work regardless of the third-party content viewed. To this end, the Complaint can be read to allege that it is the design and the way Instagram functions that makes it addictive and thus harmful to consumers, especially Young Users, or that certain design features (such as filters) directly harms Young Users, especially young women, not the content itself. Under this interpretation, Defendants cannot be analogized to mere publishers of information. *See id.* at *38 ("Design features of the platforms (such as endless scroll or filters) cannot readily be analogized to mere editorial decisions made by a publisher."). Viewing the Complaint in the light most favorable to the State, it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its claims. Accordingly, the motion to dismiss Count 1 of the Complaint premised on the First Amendment is respectfully denied.

"Liability for failure to warn about specific third-party content could be interpreted as premised on Meta's role as publisher in violation of both Section 230 and the First Amendment." *Id.* at *46. However,

> [i]f a potential user were deterred from consuming content on Meta's platforms due to a warning about possible addiction, the deterrence would not be based on a government sanction of the content on the platforms. Therefore, the First

Amendment is not implicated by failure to provide warnings concerning potential harms from features created by Defendants to maximize minors' usage.

*Social Media Cases*, 2023 WL 6847378, at *47. "Similarly, the First Amendment does not bar a claim of failure to warn of potential injuries from Meta's social media platform design." *Id.*

Some of the State's deception claim allegations could be construed as being based on specific third-party content (i.e., cyberbullying, harassment, self-harm, negative appearance and social comparison-provoking content, unwanted advances). These allegations could be interpreted as being premised on Meta's role as a publisher, which would be prohibited under the First Amendment. However, the Complaint could also be construed as being based on conduct other than the publishing of third-party content, such as failing to disclose or misrepresenting platform features allegedly known to risk harm to Young Users. Under the latter interpretation, liability is alleged to arise from Defendants' knowledge of the ways their products allegedly harm consumers, especially Young Users.

The First Amendment does not protect Defendants from liability for their own failure to warn, as the adverse effects that allegedly should have been disclosed result from Defendants' own conduct, not from any particular third-party content displayed. Stated differently, Meta's potential liability springs from its capacity as a creator of features designed to maximize engagement for Young Users, not from its role as publisher. Taking the allegations in the Complaint in the light most favorable to the State, it appears from the Complaint's factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its deception claims.

Defendants assert that, to the extent the State identifies any misrepresentations made by Meta, as opposed to any omissions or failure to disclose, those statements are protected by the First Amendment. More specifically, Defendants assert that, to the extent the State's deception claim

23

is based on statements made to Congress in response to questioning,[4] it is barred by the First

Amendment under the *Noerr-Pennington* doctrine. *See* Compl., ¶¶ 340-43, 362-65, 369-72, 377-

82.

> The *Noerr-Pennington* doctrine acknowledges that the right to petition the
> government is a freedom that is protected by the Bill of Rights. *See Eastern R.R.*
> *Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961).
> Under the *Noerr-Pennington* doctrine, civil actions are barred where the activity
> challenged under federal statute or state law consists of "petitioning legislatures,
> administrative bodies, and the courts," even if the defendant's actions had an
> "anticompetitive or otherwise injurious purpose or effect." *Hamilton v. Accu-Tek*,
> 935 F. Supp. 1307, 1316-17 (E.D.N.Y. 1996); *see United Mine Worker of Am. v.*
> *Pennington*, 381 U.S. 657 (1965). *Noerr-Pennington* has also been applied to bar
> liability in state common law tort claims, including negligence and products
> liability claims, for statements made in the course of petitioning the government.
> *See Hamilton*, 935 F. Supp. at 1317.

*Tuosto v. Phillip Morris USA Inc.*, No. 05 Civ. 9384(PKL), 2007 WL 2398507, at *5 (S.D.N.Y.

Aug. 21, 2007).

> There are two exceptions to the protective reach of the *Noerr-Pennington* doctrine:
> the "mere sham" exception and the "unethical" exception. *See id.* Statements made
> in the course of petitioning Congress are considered a "mere sham" when the actor
> making the statements does not have a true interest in the outcome of the effort to
> influence government because the effort "is a mere sham to cover what is actually
> nothing more than an attempt to interfere directly with the business relationships of
> a competitor." *Noerr*, 365 U.S. at 144; *see, e.g., Oregon Natural Res. Council v.*
> *Mohla*, 944 F.2d 531, 535 (9th Cir. 1991). The "unethical" exception denies *Noerr-*
> *Pennington* protection to statements made while petitioning the government "where
> the political activity involved illegal, corrupt or unethical means." *Hamilton*, 935
> F. Supp. at 1317.

*Id.* "Notwithstanding the 'unethical' and 'mere sham' exceptions, *Noerr-Pennington* protection

has been extended to all advocacy intended to influence government action, including to allegedly

false statements." *Id.* (citations omitted).

---

[4] The alleged statements were made in response to questions from Congress in part to persuade Congress of the public benefits of Meta's services and concerned potential efforts by Congress to pass legislation. *See* Defs.' Reply, pp. 19-20 n.10.

The question of whether there should be absolute immunity for conduct including intentional misrepresentations or fraud should be analyzed under the sham exception. *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 614 (N.D. Cal. 2020); *Kearney v. Foley & Lardner, LLP*, 590 F.3d 638, 645 (9th Cir. 2009); *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006). "Whether or not an otherwise non-actionable statement falls within the sham exception is generally a question of fact not appropriate for resolution on a motion to dismiss." *Id.* Additionally, while the *Noerr-Pennington* doctrine provides immunity from liability for simply petitioning government, the doctrine does not foreclose use of communications to government as evidence of, *inter alia*, knowledge, intent, or state of mind. *See In re Tylenol (Acetaminophen) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 181 F. Supp. 3d 278, 306 (E.D. Pa. 2016).

Regarding the State's claim that Meta created the false impression that Instagram is a safe platform where users were unlikely to experience significant harm and where users' mental health is protected *see* Compl., ¶ 24, Defendants assert that Meta's statements regarding safety or the prioritization of safety are statements of opinion entitled to First Amendment protection. "[S]tatements of opinion are protected by the First Amendment unless they 'imply a false assertion of fact.' Even seemingly factual statements 'are protected by the First Amendment if they cannot reasonably be interpreted as stating actual facts about their target.'" *Berry v. Schmitt*, 688 F.3d 290, 303 (6th Cir. 2012)(quoting *Standing Comm. v. Yagman*, 55 F.3d 1430, 1438 (9th Cir. 1995)).

> "[A] company has a duty to disclose hard information but not soft information unless other criteria are met." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 913 (M.D. Tenn. 2019)(quoting *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008)). "Hard information is typically historical information or other factual information that is objectively verifiable. Such information is to be contrasted with 'soft' information, which includes predications and matters of opinion." *Id.* (quoting *Zaluski*, 527 F.3d at 572). With regard to soft information, "a defendant may choose silence or speech based on the then-known factual basis,

but it cannot choose half-truths." *Id.* (quoting *In re Ford* [*Motor Co. Sec. Litig.*], 381 F.3d [563,] 569 [(6th Cir. 2004)]; *see also City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 675 (6th Cir. 2005)("the protections for soft information end where speech begins.")(internal citation omitted). "Thus, once a company has chosen to speak on an issue – even an issue it had no independent obligation to address – it cannot omit material facts related to that issue so as to make its disclosure misleading." *Weiner*, 365 F. Supp. 3d at 913 (citation and internal quotations omitted).

*St. Clair Cnty. Emps. Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-cv-00988, 2023 WL 195370, at *4 (M.D. Tenn. Jan. 20, 2021).

The question of whether alleged misrepresentations or omissions are material is a mixed question of law and fact that courts generally reserve for the trier of fact. *See id.* at *6; *Helwig v. Vencor, Inc.*, 251 F.3d 540, 563 (6th Cir. 2001). "The courts are also more inclined to send close cases to the jury when the representation at issue relates directly to . . . safety." *Ladd by Ladd v. Honda Motor Co., Ltd.*, 939 S.W.2d 83, 100 (Tenn. Ct. App. 1996).

For the foregoing reasons, the motion to dismiss Count 2 of the Complaint on the grounds of First Amendment protection is respectfully denied.

## *TCPA*

The TCPA is to be interpreted and construed "in accordance with interpretations of 15 U.S.C.A. § 45(a)(1) by the Federal Trade Commission and the federal courts." *Tucker v. Sierra Builders*, 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)(citing Tenn. Code Ann. § 47-18-115). One purpose of the TCPA "is to provide additional, supplementary state law remedies to consumers victimized by unfair or deceptive business acts or practices that were committed in Tennessee in whole or in part." *Id.*; Tenn. Code Ann. §§ 47-18-102(2). "[T]he TCPA is explicitly remedial, and Tennessee courts are therefore required to construe it liberally to protect consumers in Tennessee and elsewhere." *Id.*

The TCPA specifically enumerates 62 unfair or deceptive acts or practices that are prohibited and deemed unlawful under the statute. *See* Tenn. Code Ann. § 47-18-104(b). A deceptive act or practice is "one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact." *Tucker*, 180 S.W.3d at 116. An unfair act is "an act or practice [that] causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." *Id.* at 116-17. While these standards are legal matters for a court to determine, "whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Id.* at 116.

Defendants argue that the State's TCPA claims fail because 1) the Complaint does not allege that any unfair or deceptive acts or practices occurred in Davidson County; 2) the TCPA exempts entities that engage in the dissemination of information; 3) the Complaint does not allege any acts or practices affecting the conduct of any trade or commerce; and 4) the alleged deceptions or misrepresentations identified are not statements of fact and/or the Complaint does not allege their materiality.

The Attorney General may bring a TCPA action or proceeding in any court of competent jurisdiction "in the county where the alleged unfair or deceptive act or practice took place, is taking place, or is about to take place, or in the county in which such person resides, has such person's principal place of business, conducts, transacts, or has transacted business[.]" Tenn. Code Ann. § 47-18-108(a)(4); Tenn. Code Ann. § 47-18-114. The Complaint alleges that Davidson is a county in which alleged violations took place and where Defendants have conducted or transacted business. *See* Compl., ¶¶ 35, 84-89, 95. Taking the allegations in the Complaint in the light most favorable to the State, these allegations are sufficient to survive the motion to dismiss.

The TCPA does not apply to

[a] publisher, broadcaster, or other person principally engaged in the preparation or dissemination of information or the reproduction of printed or pictorial matter, who has prepared or disseminated such information or matter on behalf of others without notification from the attorney general that the information or matter violates or is being used as a means to violate this part[.]

Tenn. Code Ann. § 47-18-111(a)(2).

Defendants argue that Meta is principally engaged in the dissemination of information as described in this section; thus, it is exempt from the TCPA. This exemption applies in cases where a plaintiff seeks to hold a defendant liable for publishing third-party content and disseminating that information on behalf of others. As discussed more thoroughly above, the State's Complaint can be interpreted as seeking to hold Meta liable for its own misconduct, not for the third-party content Meta disseminates on others' behalf.

The TCPA is limited to unfair or deceptive acts or practices that affect the conduct of any trade or commerce. *See* Tenn. Code Ann. § 47-18-104(a). "'Trade,' 'commerce,' or 'consumer transaction' means the advertising, offering for sale, lease or rental, or distribution of any goods, services, or property, tangible or intangible, real, personal, or mixed, and other articles, commodities, or things of value wherever situated." Tenn. Code Ann. § 47-18-103(24). Thus, the TCPA guards against unfair or deceptive acts or practices that affect the advertising or distribution of services and other things of value wherever situated. Unfair or deceptive acts or practices affecting the conduct of any trade or commerce include "engaging in any . . . act or practice which is deceptive to the consumer or to any other person[.]" Tenn. Code Ann. § 47-18-104(b)(27). An exchange of money or transfer of valuable consideration is not a requirement written into the TCPA.

The Complaint alleges that Meta engages in trade and commerce by offering advertisements and providing Instagram in Tennessee. *See* Compl., ¶ 397. Meta allegedly employs unfair and deceptive tactics, such as designing and featuring Instagram in a manner that induces compulsive use, to fuel its collection of data from consumers, which it allegedly monetizes by selling targeted advertising. Allegedly, Meta intentionally exploits the developmental nature of Young Users' brains, causing them to spend more time on Instagram and creating an obstacle to their free choice. *See id.*, ¶ 402. Defendants also allegedly deprive consumers of free and informed choice regarding Instagram by withholding important information about and misrepresenting the degree to which Instagram induces compulsive use, the negative impact Instagram has on mental health, the efficacy of Instagram's well-being features, and the frequency of harmful experiences on Instagram. *See id.*, ¶¶ 404, 411-12. These allegations meet the definition of unfair or deceptive acts or practices affecting the conduct of any trade or commerce under the TCPA.

Defendants argue that the Complaint fails to allege deceptive practices or misrepresentations. Defendants contend that many of the identified statements are not statements of fact and, thus, cannot serve as the basis of a TCPA claim. The TCPA does not define "unfair" or "deceptive." Thus "the standards to be used in determining whether a representation is 'unfair' or 'deceptive' under the TCPA are legal matters to be decided by the courts." *Tucker*, 180 S.W.3d at 116. "However, whether a specific representation in a particular case is 'unfair' or 'deceptive' is a question of fact." *Id.* "Misrepresentations that would not be actionable as common-law fraud may nevertheless be actionable under the provisions of the . . . TCPA." *Id.* at 115. "The TCPA applies to any act or practice that is unfair or deceptive to consumers." *Id.* (citing Tenn. Code Ann. §§ 47-18-104(a), -104(b)(27)).

Although Tennessee courts have not had many opportunities to construe the terms "unfair" and "deceptive" under the TCPA, the Federal Trade Commission and the federal courts have developed a substantial and finely honed body of law construing these terms in the context of the FTC Act. The General Assembly has instructed us to look to the federal understanding of these terms in interpreting them in the TCPA. Tenn. Code Ann. § 47-18-115. Accordingly, we may look to the federal law defining these key terms to determine how they should be applied in this case.

The concept of deceptiveness is a broader, more flexible standard of actionable merchant misconduct than the traditional remedy of common-law fraud. A deceptive act or practice is one that causes or tends to cause a consumer to believe what is false or that misleads or tends to mislead a consumer as to a matter of fact. Thus, for the purposes of the TCPA and other little FTC acts, the essence of deception is misleading consumers by a merchant's statements, silence, or actions. JONATHAN SHELDON & CAROLYN L. CARTER, UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.2.3.1, at 118-19 (5th ed. 2001) [hereinafter UNFAIR AND DECEPTIVE ACTS AND PRACTICES].

The concept of unfairness is even broader than the concept of deceptiveness, and it applies to various abusive business practices that are not necessarily deceptive. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.3.1, at 156. In the 1994 legislation reauthorizing the Federal Trade Commission, Congress undertook to codify the Commission's policy statement on unfairness by stating that an act or practice should not be deemed unfair "unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C.A. § 45(n).

To be considered "substantial," consumer injury must be more than trivial or speculative. *Tungate v. MacLean-Stevens Studios, Inc.*, 714 A.2d 792, 797 (Me. 1998); *Legg v. Castruccio*, 100 Md. App. 748, 642 A.2d 906, 917 (1994). Substantial injury usually involves monetary injury or unwarranted health and safety risks. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.2, at 154. Consumer injury will be considered substantial if a relatively small harm is inflicted on a large number of consumers or if a greater harm is inflicted on a relatively small number of consumers. *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988).

Even if an act or practice causes or is likely to cause substantial injury, it will not be considered unfair unless the injury is not reasonably avoidable by consumers themselves. Consumers cannot reasonably avoid injury when a merchant's sales practices unreasonably create or take advantage of an obstacle to the free exercise of consumer decision-making. Practices that unreasonably interfere with consumer decision-making include (1) withholding important information from consumers, (2) overt coercion, or (3) exercising undue influence over a highly susceptible class

of consumers. UNFAIR AND DECEPTIVE ACTS AND PRACTICES § 4.3.2.3, at 155.

*Tucker*, 180 S.W.3d at 116-17.

Company statements of opinion or puffery are "evaluated in context to determine if they convey more than just a generalized optimism." *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at *14 (M.D. Tenn. Dec. 18, 2017). "[V]ague statements not subject to verification by proof are generally deemed non-actionable puffery. But 'opinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable.'" *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 674 (6th Cir. 2005)(quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999))(emphasis omitted); *see also Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989)("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.").

Whether an alleged misrepresentation or omission is material is a mixed question of law and fact. *See St. Clair Cnty. Emps. Ret. Sys.*, 2021 WL 195370, at *6. "A claim is considered material if it 'involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding a product.'" *Kraft, Inc v. FTC*, 970 F.2d 311, 322 (7th Cir. 1992)(quoting *Matter of Cliffdale Assocs.*, 103 F.T.C. 110, 1984 WL 565319, at *37 (FTC Mar. 23, 1984)). "A presumption of materiality is applied 'with three types of claims: (1) express claims; (2) implied claims where there is evidence that the seller intended to make the claim; and (3) claims that significantly involve health, safety, or other areas with which reasonable consumers would be concerned.'" *State ex rel. Slatery v. HRC Med. Ctrs., Inc.*, 603 S.W.3d 1, 24 (Tenn. Ct. App. 2019)(quoting *Kraft*, 970 F.2d at 322-23).

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). "[C]ontext must inform determinations of materiality." *St. Clair Cnty. Emps. Ret. Sys.*, 2021 WL 195370, at *6; *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 478 ("[A]s we have said and the Supreme Court has made clear, context matters when analyzing materiality."). Given these principles and viewing the Complaint in the light most favorable to the State, the Court declines to dismiss the Complaint at this early stage, as a reasonable juror might conclude that Defendants' statements or omissions were actionable material misrepresentations.

Defendants assert that the State's allegations regarding the Bad Experiences and Encounters Framework ("BEEF") do not establish that the challenged statements regarding the Community Standard Enforcement Reports ("CSERs") are false or misleading. Defendants assert that the CSERs measure the prevalence of community-standards-violating content (i.e., the percentage of views that were of content violating Meta's community standards) whereas BEEF reports the percentage of users who self-report having seen content that falls into certain inherently subjective categories. Stated differently, BEEF does not address the same metrics as the CSERs; thus, Defendants contend BEEF does not contradict the CSERs.

The Complaint alleges that the CSERs create the impression that Instagram is a safe platform on which harmful content is rarely encountered. *See* Compl., ¶ 289. The Complaint claims that Meta uses misleading terminology in the CSERs, which tout the prevalence of community-standards-violating conduct, rather than the higher prevalence of harmful content. *See id.*, ¶¶ 293-94. The Complaint alleges that Meta exploits that confusion to inflate the CSERs'

significance to consumers. *See id.*, ¶¶ 292, 295, 297. The Complaint further alleges that Meta's internal surveys, such as BEEF, make it clear that harmful content is much more prevalent on Instagram than the CSERs suggest. The Complaint alleges that a former Meta executive testified under oath that Meta intentionally uses the CSERs to create a misleading picture of the harmfulness of Meta's platforms. *See id.*, ¶¶ 315-23.

At this stage in the proceedings, the Court must take the State's factual allegations as true and consider all reasonable inferences in its favor. *See Webb*, 346 S.W.3d at 427. Whether the BEEF survey undermines the CSERs is a factual question for resolution at a later stage in the proceedings. *See FTC v. Wyndham Worldwide Corp.*, 10 F. Supp. 3d 602, 631 (D.N.J. 2014) *aff'd*, 799 F.3d 236 (3d Cir. 2015)("[T]he impression that a reasonable consumer would have had after reading the privacy policy seems to involve fact issues that the Court cannot resolve at this juncture."); *FTC v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008)("The meaning of an advertisement, the claims or net impressions communicated to reasonable consumers, is fundamentally a question of fact.").

As it appears from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its TCPA claims, the motion to dismiss the Complaint on the grounds of failure to state a claim is respectfully denied.

## IV. Conclusion

Defendants have sufficient minimum contacts with Tennessee for this Court to exercise specific personal jurisdiction over them. At this stage of the proceedings, the Court must view the Complaint in the light most favorable to the State. Because the allegations in the Complaint can be construed as being based on conduct other than the publishing of third-party content, Section 230 immunity and First Amendment protections do not bar the Complaint. Additionally, it appears

from the factual allegations and the applicable law that the State could prove a set of facts that would entitle it to relief on its TCPA claims.

> [I]t must be remembered that we are addressing the standard in assessing the sufficiency of a single document filed at the very beginning of a case – the complaint. Our motion-to-dismiss jurisprudence reflects the principle that this stage of the proceedings is particularly ill-suited for an evaluation of the likelihood of success on the merits or of the weight of the facts pleaded, or as a docket-clearing mechanism.

*Webb*, 346 S.W.3d at 437. "The prima facie case . . . is an evidentiary standard, not a pleading requirement." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).

For these and the foregoing reasons, the Court respectfully denies the motion to dismiss filed by Meta Platforms, Inc. and Instagram, LLC.

**IT IS SO ORDERED.**

RUSSELL T. PERKINS, CHANCELLOR

cc:    Matthew D. Janssen, Esq.
       Brian T. Phelps, Esq.
       Christopher A. Dunbar, Esq.
       Keaton Murphy, Esq.
       Robert E. Cooper, Esq.
       Jessalyn H. Zeigler, Esq.
       Courtney A. Hunter, Esq.
       Gregory L. Halperin, Esq.
       Christian J. Pistilli, Esq.


MAILED
3/13/24