# Exhibit A

[*Parties and Counsel Listed on Signature Pages*]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR (PHK)<br><br>**JOINT STATUS REPORT ON DISCOVERY FOR MARCH 21, 2024, DISCOVERY MANAGEMENT CONFERENCE**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

Pursuant to Case Management Order No. 1 (ECF 75) and Case Management Order No. 6 (ECF 451), the Parties submit this agenda and joint statement in advance of the March 21, 2024 Discovery Management Conference ("DMC").

**I.      Status of Discovery and Parties' Progress in Meeting Discovery Deadlines**

For purposes of this section, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State Attorneys General ("State AGs").

**A.      Update on Number of RFPs Served and Documents Produced**

Since the February DMC, the Meta Defendants have served the State AGs with 45 requests for production of documents ("RFPs") on February 27, 2024.

In addition, the Personal Injury and Local Government Entity and School District ("PI/SD") Plaintiffs have served Meta an additional set of RFPs (containing 100 requests).

In response to RFPs propounded by the PI/SD Plaintiffs in this litigation, to date Meta has produced 18 documents responsive to Plaintiffs' initial requests.  These documents were produced in addition to the approximately 48,900 documents previously produced by Meta, per the Court's December 29, 2022, Order to produce documents from State investigations.  *See* ECF No. 125.  Meta produced those Court-ordered documents to the PI/SD plaintiffs in two productions—44,693 documents in January 2023 and 4,238 documents in December 2023.  Plaintiffs and Meta have stated their current positions on search methods and custodians below.  *See infra* Section I.B.  Meta is meeting and conferring with Plaintiffs regarding their requests and expects to begin its review of custodial and non-custodial collections in the coming weeks.

TikTok has produced 66 documents since the prior DMC Statement was submitted on February 16, 2024.  TikTok also produced 352 documents between February 1 and February 15, 2024.  Per the Court's December 29, 2022, Order to produce documents from State investigations, *see* ECF No. 125, TikTok produced approximately 17,000 documents, producing approximately 2,000 documents in January 2023 and 15,000 documents in December 2023.

Snap has produced 24 documents (in response to a Rule 30(b)(6) deposition notice) (in addition to the nearly 900 documents it produced between December 2022 and November 2023).  YouTube has produced no documents as of the date of this statement, but YouTube anticipates making an initial production in the next several days.

## B.     Update on Status of Discussing Search Methods and Custodians

<u>Plaintiffs' Position</u>

In accordance with Rule 26(f), this District's ESI Guidelines and Rule 26(f) Checklist, and Paragraphs 5, 8-9, and 10 of the ESI Protocol to be entered, Plaintiffs have sought disclosures from each Defendant regarding those current and former employees and internal departments, divisions, committees, or teams likely to possess potentially relevant information and a complete list of custodial, non-custodial, and third-party data sources likely to possess potentially relevant information, as well as disclosures of Defendants' search methodology, including search terms if Defendants intend to use same. Defendants have yet to substantively respond. Given the discovery schedule, the Parties should not wait until the ESI Protocol is entered to exchange this critical information to jump start discovery.

To that end, Plaintiffs have sought Meta's consent for the States Attorney General to share with the PI/SD Plaintiffs lists of custodians and search terms provided in responses to interrogatories and demands for statements under oath served as part of the States Attorney General's pre-complaint investigation. Meta has indicated it is considering the request.

In Plaintiffs' view, the importance of expediting the disclosure of custodians and search terms/methods is magnified by several Defendants' reluctance to separately collect and produce readily identifiable documents—often termed "go gets." Plaintiffs' initial requests focused in significant part on certain highly relevant materials that Plaintiffs expected Defendants could collect now, without the delays inherent in negotiations over custodians and search terms. To date, Meta has agreed to collect such documents only where they are highly specified, such as by title and date. And even then, Meta has not agreed to look for documents with presumably similar titles. For example, Plaintiffs specifically requested documents with the titles "Integrity and Relevance Big Backtest H1 2021" and "Facebook Surface Prevalence (Aug 2021)," but Meta has not agreed to look for documents of the same variety for different months or years—*e.g.*, in "H1 202**2**" or for "(**Oct** 2021)," etc. Instead, Meta has only agreed only to produce these additional documents if they hit upon search terms run against particular custodians' files—*i.e.*, only if the parties are successful in an imperfect guessing game. While Plaintiffs have suggested Meta look for indices, even if reports are not maintained in an index, Meta should attempt to locate documents like these by asking the personnel most knowledgeable to provide the documents with which they are familiar. This extends to a significant number of requests for documents identified by category—for example, Meta's terms of service in place over time, "Bad Experience & Encounters Framework (BEEF) surveys," "Negative Appearance Comparison (NAC) studies," "Guardrail Agreements," and more. Search terms run against what happens to have been attached to an email in custodians' inboxes are unlikely to capture these records in a comprehensive way. Plaintiffs will continue to meet and confer with Meta but hope it will engage with its personnel to locate complete

collections of these documents. As for Snap and YouTube, they have, in general, responded to "go get" requests by simply offering to meet and confer.[1]

Defendants' Position

Defendants are fully complying with Rule 26(f) and the pending ESI Protocol,[2] and already made the majority of disclosures Plaintiffs now seek—including detailed lists of potentially relevant data sources—in connection with the Parties' 50+ hours of negotiations over a draft preservation order, ESI protocol, and privilege protocol.  With respect to custodians and search terms, Defendants are working expeditiously on an accelerated timeline to be in a position to propose an initial list as early as the end of this month or the beginning of next month (for Meta, TikTok, and Snap).  The Meta Defendants expect the State AGs to be prepared to share the same information on that same timeline, with the understanding (shared by all Defendants) that the Bellwether PI/SD Plaintiffs will share the same information shortly after those Plaintiffs are identified/selected.  The State AGs fail to explain why they should be held to a different standard in terms of ESI conferrals and timing for the disclosure of custodians and search terms than the standard to which Plaintiffs collectively are seeking to hold Defendants.[3]  Finally, and as Plaintiffs note, the Meta Defendants are considering the PI/SD Plaintiffs'

---

[1] As the State Attorneys General and the Meta Defendants continue to have fundamental differences regarding the scope of RFPs, it is unlikely that the State Attorneys General will be prepared to exchange custodians and search terms by the end of this month, as Meta seeks below in Defendants' position statement.  Presently, custodians and search terms are not ripe issues to bring before the Court, as the State Attorneys General and Meta have not had the opportunity to meet and confer on those issues.  Furthermore, the dispute over whether state entities, other than the attorneys general, are subject to party discovery remains outstanding.  The outcome of that dispute will dictate which custodians are appropriate for the State Attorneys General to put forth.

[2] As Plaintiffs are aware, the ESI Protocol states that this District's Rule 26(f) Checklist is to be only a "guide" in the Parties' discussions.  *See* ESI Protocol ¶ 5.

[3] The State AGs cite "fundamental differences regarding the scope of RFPs" that the Meta Defendants served on the State AGs on February 27, 2024, *supra* note 1, but as shown by the Parties' discussion in Section III(H) below, Plaintiffs and Defendants also have fundamental differences regarding the scope of RFPs Plaintiffs have served on Defendants.  The State AGs cannot have it both ways; they joined the PI/SD Plaintiffs' request for an accelerated fact discovery period and need to move expeditiously to ensure the Meta Defendants get the discovery they need before the December 20, 2024 fact discovery cut-off.

request of last Friday that they share any custodian lists and search terms previously provided in connection with the State AGs' pre-complaint investigation.

Contrary to Plaintiffs' suggestion, Defendants have been fully cooperative in responding to Plaintiffs' RFPs served to date, including with respect to the initial requests that Plaintiffs have termed "go-gets." Defendants have responded and objected where appropriate to clarify or correct requests labeled by Plaintiffs as "go-gets" where the requests actually seek subject-matter categories of documents, or require custodial collections and search terms.

As Defendants have repeatedly informed Plaintiffs, many of the requests that Plaintiffs term "go-get" requests are in fact broad categorical requests for "all" categories of specified or unspecified documents. For example, Plaintiffs' Request 2 to Meta seeks:

> All Backtests conducted to assess the impact on users of changes to the Facebook Platform or Instagram Platform, including the reports titled 'Integrity and Relevance Big Backtest H1 2021' and 'H1 2021 Net Misinfo Impact.'

Similarly, Request 4 seeks "All Surface Prevalence studies, including a copy of the report titled 'Facebook Surface Prevalence (Aug 2021).'" Request 8 seeks only a broad category of documents without naming any document specifically: "All Guardrail Agreements concerning Integrity projects, initiatives, goals, or proposed product changes." And Request 15 seeks "All Privacy Cross Functional Reviews (PFXN), Survey Reviews, and Research Reviews for Integrity research proposals." Despite informing Plaintiffs that these types of requests are not in fact "go-gets" and require substantial collections, Plaintiffs continue to insist that their initial requests seek easily identifiable documents. That is not the case.

At this stage, Defendants are searching for and, if found, producing specific documents that are identified by name in Plaintiffs' RFPs (including those identified in the requests excerpted above), or certain documents hyperlinked in already-produced documents. Where documents can be identified by speaking with persons most knowledgeable to collect them, Defendants will do so. But where Plaintiffs seek large categories of documents by subject matter or generic name—such as all "Negative Appearance Comparison studies" referenced by Plaintiffs above—such broad requests do not seek easily

identifiable documents and should be **_and will be_** handled along with other such categorical requests in the course of Defendants' custodial and non-custodial document collection, review, and production processes.

Contrary to Plaintiffs' arguments above, Meta in fact has made reasonable efforts to see if some of the broad categories of documents that Plaintiffs purport to identify could be collected in one place, including via search terms over custodial documents and, where possible and appropriate, targeted collections. To that end, for example, at Plaintiffs' request, Meta undertook efforts to determine whether an index of "backtests" existed such that the Parties could examine the index, and thereby could identify possibly relevant backtest reports that could be collected and reviewed. Meta over the years has run hundreds of thousands of tests of various aspects of its platforms, some of which included a backtest component and some that did not. But after inquiry, no index was located describing the subject of each such test, let alone stating for which tests there was a backtest component. Moreover, there is no reason to believe that all backtest reports, or documents bearing the term "Surface Prevalence" in their titles, will be relevant. At this point, Meta believes that the path to locating reports of any relevant backtests will be through the custodial documents of relevant individuals who asked for particular tests to be run and presumably received back reports of the results.[4] To the extent such documents are located during Meta's collection process, and when reviewed are determined to be relevant, they will be produced.

### C. Update on To-Be-Propounded 30(b)(6) Deposition Notices

In accordance with the Court's guidance, the PI/SD Plaintiffs met and conferred with Defendants on potential topics that may comprise future 30(b)(6) Deposition Notices. During this meet and confer, the PI/SD Plaintiffs previewed for all Defendants what topics are priorities for the PI/SD Plaintiffs and answered clarifying questions on the same. As the discovery process evolves and Plaintiffs receive more information through the already-noticed 30(b)(6) depositions, written discovery, and RFPs, the

---

[4] Another of Plaintiffs' examples of a request they describe as a "go-get" is Meta's terms of service. Plaintiffs' concern regarding that particular request was not even in Plaintiffs' initial set of supposed "go-get" requests and was not raised with Meta until Plaintiffs sent their initial draft of this DMC Statement on March 11. Meta submits that topics requiring a conferral should be raised initially with counsel rather than being discussed for the first time in a draft DMC Statement.

PI/SD Plaintiffs will continue to refine and determine what topics to proceed with notices on, and what the timing for those notices may be. The Parties remain willing and available to meet and confer on these issues as discovery progresses. Meta has requested to meet and confer with the States regarding any additional 30(b)(6) topics the States may believe are necessary.

### D. Plaintiff Fact Sheets

Substantially-complete PI/SD Plaintiff Fact Sheets are due on April 1, 2024. *See* ECF 604. The 12-15 Bellwether School District and Local Government Entity ("SD/GE") Plaintiffs will submit their School District Supplemental Plaintiff Fact Sheets by June 1, 2024, with the remaining SD/GE Plaintiffs submitting their School District Supplemental Plaintiff Fact Sheets by October 1, 2024. *See* ECF 675.

## II. Ripe Discovery Disputes

### A. Deposition Protocol

On February 28, 2024, the Parties submitted a Joint Statement Re: Deposition Protocol Dispute and proposed Deposition Protocols, ECF 649, as well as a redline comparing the two proposed Deposition Protocols, ECF 651. The Parties continue to meet and confer in an attempt to reach agreement on the remaining disputes. The Parties are prepared to address any remaining disputes at the March 18, 2024 hearing on the deposition protocol dispute.

### B. Need for Source Code Protocol

The Court ordered the Plaintiffs to submit a protocol to obtain Source Code data by March 15, 2024. The Plaintiffs, however, do not intend to seek Source Code at this juncture. The Parties have met and conferred and are in the process of negotiating a Stipulation and [Proposed] Order Regarding Source Code for the Court, which as drafted by Plaintiffs currently reserves Plaintiffs' rights to seek information from Defendants related to their Source Code.

### C. Clarification re Discovery Limitations

The Parties seek clarification on one issue regarding the Court's recent Order Governing Discovery Limitations. ECF 672. Specifically, the Parties seek clarification of the shared 240-hour deposition limit for all Plaintiff groups against Defendants. The Parties agree that, as to the Meta Defendants only, the 240-hour deposition limit ordered by the Court should be shared by all three

Plaintiffs, including the PI/SD Plaintiffs and the State AG Plaintiffs. This understanding is consistent with the discussion regarding deposition limits at the February DMC, *see* Transcript, DMC (Feb. 22, 2024), 15:5–24, 26:8–12, and will promote cooperation and efficiency among all Plaintiff groups. The Parties respectfully ask the Court to modify the Order Governing Discovery Limitations (ECF 671) to conform to this understanding; a [Proposed] Order with this modification is attached hereto as Exhibit A.

### D. Discovery of State Agencies

On March 11, lead trial counsel for the State AGs and Meta met and conferred, and did not reach agreement on this issue. The Parties sent their joint submission to the Court via email on March 11, with a follow-up email on March 12 to correct a technical transmission error. On March 15, the parties submitted letter-briefing on their outstanding dispute over whether the state entities identified by Meta in the Parties' March 11 joint submission are subject to Party discovery. The State AGs respectfully request that oral argument on this issue be heard at the March 21, 2024 DMC.

## III. Discovery Issues that Do Not Currently Require Court Action

### A. Privilege Log Protocol – Metadata Plus Topic Log

The Parties continue to meet and confer on the dropdown menu of topics for the metadata-plus topic privilege log.

### B. Privilege Log Protocol—Law Enforcement Communications

At the February 22, 2024 DMC, this Court provided verbal guidance regarding outstanding disputes laid out in the Parties' position statements and competing draft protocols. ECF 608. The Parties met and conferred on March 1, provided a Joint Status Report to the Court on March 6 (ECF 670), and held a further meet and confer on March 8, 2024.

The Parties agree that the State AGs are exempted from logging attorney communications about this or related litigation post-dating the filing of their Complaint. Defendants agree that the State AGs may not log any pre-filing communications related to the investigation conducted jointly by all 50 state attorneys general in anticipation of filing a complaint in this matter, but subject to certain limitations and caveats, discussed below.

State AG's Position:

At the February 22 DMC, this Court noted that exclusions from logging should include "the exclusion applies to communications that **post-date** the filing of the complaint." 2/22 DMC Tr. at 75:23-76:1 (emphasis added). Further, in response to State AG's concerns about having to log investigatory communications with AG offices filing in state courts, this Court noted that all such communications would not need to be logged as they pertained to "Related Litigation." DMC Tr. at 76:10-24. However, the Court did not specifically address **pre-filing** investigatory communications with AG offices that declined to file suit, whether in this MDL action or in state court. With regards to pre-litigation multistate investigations, the Court inquired as to the scope of time "between the investigation and an MDL filing or first complaint filing," DMC Tr. at 74:24-25, and whether exclusion of logging as to "just third-party or nonparty law enforcement officials with a time cutoff," DMC Tr. at 75:19-20, would sufficiently reduce the burden on the State AGs.

Since the DMC, the Meta Defendants have served forty-five (45) RFPs upon each of the 35 State AGs. These requests include, for example, "All Communications between Plaintiff and any federal, state, or local official, agency, body, actor, or political subdivision Relating to Young Users' use of Social Media Platforms, Young Users' Mental Health and Wellbeing, and/or any of the conduct and harms alleged in the Complaint (including depression, anxiety, sleep disturbances, suicide, self-harm, compulsive use, and addiction)." *See, e.g.* Meta RFP to New Jersey at 6. Such a broad request would require the logging of communications between each of the State AGs who filed suit in the MDL and other states that are either (1) not a party to this matter, having filed suit in their respective state court, or (2) not a party to this matter, having declined to file suit following the multistate investigation.

These communications are privileged under the attorney-client, work product, and/or common interest doctrines. The State AGs are in the process of responding and objecting to these RFPs. However, as worded, this request may require the State AGs to log all communications with states that participated in the investigation but that declined to file suit. The pre-suit investigation included Government Counsel and Outside Counsel from all fifty (50) states and some additional US territories. Certain state attorneys general filed suit in this MDL (State AGs), while others chose to file in their

respective state courts (State Court Attorneys General) and the remainder declined to file suit altogether (Non-Filing Attorneys General). Regardless of their current litigation posture, all state attorneys generals nevertheless exchanged communications during the investigative phase pursuant to a Common Interest Agreement. State attorneys general are permitted to utilize a broad range of discovery tools in their investigations prior to filing suit, which differs substantially from the ordinary course of discovery for private litigants, where discovery is unavailable prior to filing suit. See, e.g. *Lewis v. Younger*, 653 F.2d 1258, 1259 (9th Cir. 1980) (citing *Younger v. Jensen*, 605 P.2d 813, 817-19 (1980)). It would be unduly burdensome to separate communications between State AGs, State Court Attorneys General, and Non-Filing Attorneys General. The emails exchanged during the investigation included materials that would be presumptively privileged, as they discussed potential litigation strategy in anticipation of filing suit. Defendants have not been able to articulate any theory under which these pre-suit investigative communications would not be presumptively privileged. Moreover, without an applicable exclusion, logging pre-suit investigatory communications would unduly burden state attorneys general and chill future multistate investigations, as the Non-Filing Attorneys General will not be able to have their interests adequately protected in such circumstances.

Logging of investigatory communications amongst the State AGs and the Non-Filing Attorneys General is overly burdensome and not proportional to the needs of this case. *See, e.g. Uniloc USA, Inc. v. Apple Inc.*, No. 19-cv-01692-EJD, 2020 U.S. Dist. LEXIS 197778 at *6-7 (N.D. Cal. Oct. 23, 2020) (denying Defendant's request for an order compelling production of documents and preparation of a privilege log, on the grounds that Defendant failed to justify the significant effort required to review "internal, litigation-focused documents" which were not likely to contain non-privileged materials). Upon initial review, one individual custodian possessed at least 2,500 emails during the pendency of the pre-filing investigation, which was publicly announced on November 18, 2021, and dates back to at least January 2020 in some states. Extrapolating further, each custodian—anywhere from one custodian to over ten custodians—in every state may be in possession of roughly the same number of annual emails spanning the duration of the investigation. This would require logging hundreds of thousands of emails.

The State AGs have proposed language narrowly tailored to exclude pre-suit investigatory communications, based upon privilege log protocols in litigation involving similarly situated state

attorneys general, and are prepared to narrow the scope of the exclusions to the period of time articulated which encompasses the pre-filing investigation.  The State AGs thus request clarification that this Court intended to exclude from logging any and all communications between the State AGs, State Court Attorneys General, and Non-Filing Attorneys General during the period encompassing the pre-suit investigation that culminated in this matter and related litigation.  The State AGs will continue to meet and confer with the Meta Defendants regarding this dispute and hope to reach a resolution without court involvement.

Defendants' Position:

Defendants do not oppose an exclusion from privilege logging for the State AGs pre-filing communications regarding their pre-suit investigations, regardless of whether those communications were with attorneys general that ultimately filed an action. Defendants do not agree, however, to exclude from logging the State AGs' communications with "agencies" or other entities whose status as "Parties" is in dispute (*see supra* Section II.D and the Meta Defendants' and State AGs' separately-submitted joint letter-brief on this issue), because no privilege may attach to shield from discovery the communications of those agencies and entities.  To the extent the Court determines that such agencies are "Parties," Defendants agree that communications between the State AGs and such agencies need not be logged. Defendants agree to meet and confer with the State AGs on specific language to be used in the privilege log protocol.

### C.     ESI Protocol

The Parties finalized the ESI Protocol and filed it with the Court on March 15, 2024.

### D.     Plaintiffs' Initial Disclosures

For purposes of this topic, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State AGs.

Defendants' Position:

On January 25, 2024 the parties appeared for a DMC where, among other topics, the Court and Parties discussed the deadline for service of Rule 26(a)(1) initial disclosures.  In requiring Plaintiffs to serve such disclosures (over Plaintiffs' objections to having to do so at all), the Court stated: "[Y]our initial disclosures should be as complete as you can reasonably make them at the time you're making

them . . . .  So to the extent your clients have information that belongs in initial disclosure, I think you're obligated to put it.  You can't just have a blank placeholder."  (1/25/24 Tr. at 121--122.)

Thereafter, on February 22, 2024, the PI/SD Plaintiffs served their Rule 26(a)(1) Initial Disclosures on Defendants.  A single Initial Disclosure was served on behalf of all 228 PI Plaintiffs; this disclosure included: no case- or plaintiff-specific information (e.g., "the name . . . of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses"); no "computation of each category of damages claimed by" any plaintiff; and no documents or other "materials bearing on the nature and extent of injuries" that any plaintiff alleges suffering.  *See* Fed. R. Civ. P. 26(a)(1)(A)(iii).  A single Initial Disclosure was also served on behalf of 113 SD/LG Plaintiffs, which omitted the same categories of information. While a dozen or so school districts served individual disclosures, they, too, failed to include any substantive information required by Rule 26(a)(1).

Accordingly, on March 6, Defendants sent correspondence to the PI/SD Plaintiffs addressing this issue and setting forth the bases upon which Defendants believe Plaintiffs' Initial Disclosures are deficient under both the requirements of Rule 26(a)(1) and the Court's directives.  Defendants requested that Plaintiffs promptly serve a case-specific initial disclosure for each Plaintiff that meets the requirements of Rule 26(a)(1) and the Court's directives, including with currently available damages calculations.  Plaintiffs' response, received on March 11, ignores entirely their failure to serve individual disclosures and points to the Court's statement on January 25 that Plaintiffs "may incorporate by reference their Plaintiff Fact Sheets"—a statement that did not invite Plaintiffs to serve, as they ultimately did, a single blank placeholder disclosure for hundreds of Plaintiffs.

Plaintiff Fact Sheets are due on April 1 (*see* further discussion below).  Defendants' letter emphasized their need to receive complete PFS information by that date (at the latest) for all Plaintiffs and further requested, by April 10, supplemental Initial Disclosures furnishing the information omitted from those originally served. (To be clear, to the extent Plaintiffs are suggesting their PFSs can serve as substitutes for or fully satisfy their obligations under Rule 26(a)(1), Defendants disagree, consistent with this Court's instruction to Plaintiffs at the January DMC and Rule 26(a).)  Plaintiffs' compliance with

these obligations is essential: the current schedule sets a deadline two weeks after the April 1 PFS date for the parties to identify bellwether discovery pools for the Court. Defendants' ability to meaningfully identify bellwether picks hinges upon Defendants' receipt of the information required in the PFS and under Rule 26(a)(1). Discovery in this MDL must be two ways, and Plaintiffs' failure to provide information required by the Federal Rules would be highly prejudicial.

PI/SD Plaintiffs' Position:

Plaintiffs strenuously disagree that the PI/SD Plaintiffs' initial disclosures are deficient. Defendants' argument to the contrary relies on a selective misreading of this Court's instructions regarding the PI/SD Plaintiffs' initial disclosures and Plaintiff Fact Sheets ("PFS"). In addition, Defendants' interpretation of the record would undermine the intended efficiency of the PFS process.

During the January 25, 2024 DMC this Court stated that Plaintiffs' initial disclosures must contain "information that belongs in initial disclosure." Jan. 25, 2024 Discovery Hr'g Tr. at 121:21-22. Defendants quote that sentence, but omit the crucial context from later in the hearing wherein this Court clarified that Plaintiffs' initial disclosures can "refer to the plaintiff fact sheets as substituting for [the initial disclosures] or supplementing them later." *Id.* at 128:17-19. The Court then elaborated: "Everyone here has an ongoing duty to supplement their initial disclosures as the case is going on. And so preemptively, what I'm allowing you to do -- which is unusual -- is to preemptively commit yourself to supplementing your initial disclosures at the earliest possible time through the plaintiff fact sheet process." *Id.* at 128:20-25. The Court formalized this guidance in Discovery Management Order No. 2, which provides: "In their initial disclosures, the PI and SD Plaintiffs may incorporate by reference their Plaintiff Fact Sheets (to be served on or before April 1, 2024)." Dkt. 606 (DMO No. 2) at 2.

Defendants' argument that the PI/SD Plaintiffs' initial disclosures do not include "case- or plaintiff-specific information" is thus entirely beside the point. Where relevant, the initial disclosures "incorporate by reference [the] Plaintiff Fact Sheets (to be served on or before April 1, 2024)." Those PFSs will contain the plaintiff-specific information that will give Defendants the information to which they are entitled under Rule 26(a)(1) at this preliminary juncture. As for damages, Defendants ignore that the required computation of damages "may not need to be detailed early in the case before all

relevant documents or evidence has been obtained by the plaintiff," particularly where expert testimony is required for establishing damages. *See Silvagni v. Wal-Mart Stores, Inc.*, 320 F.R.D. 237, 241 (D. Nev. 2017); *Spin Master, Ltd. v. Zobmondo Ent., LLC*, 2011 WL 13127349, at *7 (C.D. Cal. Sept. 15, 2011). In any event, this information will also be included in Plaintiffs' forthcoming PFSs. *See, e.g.*, Dkt. 551-2 (PFS) at 14 ("Damages"), 21 ("Authorization of Release for Insurance Records"), 22 (documents relating to medical billing and lost wages). Finally, Defendants' formalistic complaint that the PI Plaintiffs and SD Plaintiffs should have served hundreds of separate, identical initial disclosures—rather than two consolidated initial disclosures, one for each set of Plaintiffs—finds no support in the law. Indeed, this demand would be inefficient and confusing for all Parties. Unsurprisingly, Defendants cite nothing at all to back up their insinuation that this common approach to initial disclosures in multi-party mass tort cases is improper.

Defendants acknowledge above that the PFSs—which will contain the information Defendants seek and which Plaintiffs incorporated into their initial disclosures—"are due on April 1," but their arguments would render that deadline a nullity. Defendants say that earlier disclosure of this information is necessary to allow them "to meaningfully identify bellwether picks," but neither the Court nor the Parties ever contemplated that disclosure would be used in this way, and Judge Gonzalez Rogers already ruled that the two-week period between the April 1 PFS deadline and the April 15 bellwether pool identification deadline was sufficient. Dkt. 604 (CMO No. 10) at 1–2, 4.

Simply put, the PI/SD Plaintiffs have complied with their disclosure obligations, and they will continue to do so over the course of this litigation. Defendants are not entitled to make an end-run around the PFS process. The Court should ignore this sideshow.

### E.    Defendants' Initial Disclosures

For purposes of this topic, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State AGs.

<u>Plaintiffs' Position:</u>

On February 22, 2024, the parties exchanged Rule 26 Initial Disclosures. In a letter dated March 11, 2024, Plaintiffs raised obvious deficiencies in Defendants' Initial Disclosures. Specifically, Defendants have disclosed an unrealistically low number of individuals who are likely to have discoverable information in support of their defenses: just four for Meta, five for Snap, six for YouTube,

and eight for TikTok. The initial disclosures inexplicably omit individuals who have publicly discussed relevant matters as company representatives for the Defendants, such as CEO Mark Zuckerberg (for Meta), CEO Evan Spiegel (for Snap), CEO Sou Chew (for TikTok), Vice President and Head of Public Policy Michael Beckerman (for TikTok), or Vice President of Government Affairs and Public Policy Leslie Miller (for YouTube). Further, Defendants only disclosed three of the thirty-one custodians associated with 1000+ documents of those Defendants have produced thus far in the litigation. It is inconceivable that such individuals are not "likely to have discoverable information . . . that [Defendants] may use to support [their] claims or defenses." Fed. R. Civ. P. 26(1)(A)(i). Defendants' contention that Plaintiffs claim the Initial Disclosures are deficient because they "failed to identify witnesses that Plaintiffs already know about" is disingenuous. Certainly, Plaintiffs know about some high-profile individuals that they expected to see listed in an Initial Disclosure, but Plaintiffs have no way of knowing the universe of individuals Defendants intend to use to support their defenses—, whether they are custodians Plaintiffs we are aware of or are entirely new individuals— absent the Initial Disclosure process. Of course, a party cannot use a witness "to supply evidence on a motion, at a hearing, or at a trial" if it did not identify that witness in its initial disclosures. Fed. R. Civ. P. 37(c)(1). Accordingly, Plaintiffs have notified Defendants of this deficiency and reserved all rights under Rules 26 and 37.

       <u>Defendants' Position:</u>

       Plaintiffs first raised Defendants' initial disclosures as a topic for this Statement on March 8, 2024—after the Parties' agreed-upon deadline to exchange proposed topics had passed, and Defendants had proposed Plaintiffs' initial disclosures as a proposed topic.  They then waited until March 11, 2024—the same date Plaintiffs provided Defendants with their initial draft of the above section of this Statement—to articulate their specific concerns.  And these concerns were raised by Plaintiffs only in response to the letter Defendants had sent Plaintiffs on March 6, 2024 identifying deficiencies in Plaintiffs' own initial disclosures.  *See supra* Section III(B).  Nevertheless, Plaintiffs' argument—which appears to be that Defendants' initial disclosures are inadequate because they failed to identify witnesses that Plaintiffs already know about—is illusory and self-defeating.

Each Defendant served initial disclosures that identified, among other things, several employees that each Defendant "may use to support its . . . defenses." FRCP 26 (a)(1)(A)(i). That Plaintiffs can identify more current and former employees of Defendants (such as Defendants' CEOs) is not surprising given the documents Defendants have already produced and the amount of information pertinent to Plaintiffs' allegations that exists in the public domain. But those arguments do not render Defendants' initial disclosures deficient under Rule 26, which does not require a party to identify every individual who could potentially have discoverable information. Indeed, the purpose of initial disclosures is, in part, to provide notice to Plaintiffs of those individuals upon whom Defendants intend to rely to support their defenses. If Plaintiffs are aware of current and former employees beyond those included in Defendants' initial disclosures, as they claim to be, Plaintiffs are already on notice of such individuals and suffer no prejudice from Defendants not identifying them in their initial disclosures. Defendants also plainly recognize their obligation to supplement their disclosures under Rule 26(e) and will do so as appropriate as the litigation progresses, and to the extent they determine they may rely on additional employees to support their defenses.

### F.     Initial Already-Propounded 30(b)(6) Deposition Notices

For purposes of this topic, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State AGs.

On February 12, 2024 the PI/SD Plaintiffs propounded Rule 30(b)(6) Notices of Deposition to all Defendants regarding ESI, corporate structure, litigation holds, and document retention. Each of the Defendants communicated generalized objections to the Notices. Additionally, each of the Defendant groups met and conferred individually with the PI/SD Plaintiffs, or is scheduled to do so in the near future on their respective Notices. The Meta Defendants have indicated to the PI/SD Plaintiffs that they are amenable to setting a date for the deposition(s) in early/mid April, dependent upon witness(es)' schedules and upon their forthcoming written responses and objections addressing the points raised in the Parties' meet-and-confer. The TikTok Defendants similarly indicated that they are amenable to selecting deposition dates in late April and that written responses to the Notice are forthcoming. The PI/SD Plaintiffs have not yet received any indication of potential dates for these 30(b)(6) depositions for the YouTube Defendants, although YouTube anticipates serving written responses and objections to the

30(b)(6) notice and proposing dates.  At the time of the drafting of this submission, the PI/SD Plaintiffs have not yet met and conferred with Snap to discuss potential dates for these 30(b)(6) depositions, but a meet-and-confer is scheduled to occur on March 15.  The PI/SD Plaintiffs have also not yet received any Defendant's complete objections and positions in writing, but all Defendants have indicated such objections are forthcoming.  The Parties remain willing and available to continue the meet and confer process.

### G. Plaintiffs' Request for Production of the TikTok Zoom/Video Archive

For purposes of this topic, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State AGs.

Plaintiffs' Position:

TikTok possesses a highly relevant video archive of recorded Zoom meetings, but to date has not produced this archive or information that would help the parties decide which recordings are relevant. TikTok refuses to produce this information even though it produced several Zoom recordings to State AGs and was recently ordered by a North Carolina state court to produce a list of all Zoom meetings held between November 20, 2017, and December 12, 2023, which number in the tens of thousands. "These meetings showed that TikTok employees and executives are fully aware of many of the harms their product causes to minors, that they have been warned that their publicly touted plans to reduce those harms are ineffective, and that TikTok puts its profits over minors' health."[5] The trial court's order issued after it reviewed a compilation of these videos.[6]

On February 1, 2024, the PI/SD Plaintiffs propounded a Ninth Set of RFPs, seeking, in significant part, recordings from and information about TikTok's Zoom video archive, including information already produced to the State AGs. On March 4, 2024, TikTok served objections and responses that indicated it would not provide much of this information. For example, TikTok refused to

---

[5] State's Response to Petition for Writ of Supersedeas, *North Carolina ex rel. Stein v. TikTok, Inc.*, No. P23-839 (N.C. App. 2024), 2024 WL 87773, at *5–6.

[6] *Id*. at *6. Although TikTok claims it is "improper and fundamentally misleading" to describe these recordings as a video archive, this is not Plaintiffs' characterization but that of State Attorneys General; by our lights, this characterization is apt. *See, e.g.*, *id*. at *2 ("TikTok possesses an archive"; "TikTok refused to meaningfully search its Zoom archive").

search for and produce any documents sufficient to identify the recordings, including their organizers, participants, dates held, or meeting topics (TT Response to RPF-9, No. 237). TikTok also refused to produce any document, communications, and transcripts or *recordings of Zoom meetings provided to the State Attorneys General* (TT Response to RFP-9, 234-235). When the parties conferred on March 6, TikTok refused to produce any video or transcripts of Zoom recordings until the parties could agree on custodians—an objection Plaintiffs believe is improper and will result in unnecessary delay. To date, TikTok has not produced the video compilation shown to the North Carolina trial court (RFP-9, No. 238), or an unredacted copy of the complaint (and documents cited therein) in *State of Nevada v. TikTok, Inc.*, No. A-24-886-127-B (filed January 30, 2024). What's more, TikTok has yet to produce even intermediate information about these videos that Plaintiffs seek so that the parties can engage in a meaningful and informed discussion about the scope of the videos to be produced in this litigation.

TikTok previews its argument that the Zoom video archive and a corresponding list of that archive may include (it believes) irrelevant information, but its argument misapprehends Plaintiffs' request and fails to come to grips with a fundamental deficiency with TikTok's objections. Plaintiffs' requests, by their terms, focus on information relevant to this case. *See*, *e.g.*, RFP-9, No. 234-36 (addressing recordings that related to the allegations in the Master Complaint and State AG actions). The issue, however, is that TikTok is hamstringing Plaintiffs' ability to negotiate a production of the relevant Zoom video recordings by stonewalling Plaintiffs' sensible request that TikTok produce the same list of archived materials that it has already been ordered to produce to State AGs.

This list is key. It is, essentially, an easily exportable list of metadata about the recorded Zoom meetings, with details such as the identity of the meeting organizer, date, time, duration, name of the meeting, and other information. *Se*e TikTok Inc.'s Petition for Writ of Supersedeas, *North Carolina ex rel. Stein v. TikTok, Inc.*, No. P23-839 (N.C. Ct. App. Dec. 20, 2023), 2023 WL 9021153, at *12-13; *see also Apple Inc. v. Samsung Elecs. Co.*, 2013 WL 4426512, at *2-3 (N.D. Cal. Aug. 14, 2013) ("Courts regularly require parties to produce reports from dynamic databases"). Without this information, Plaintiffs cannot identify custodians or ensure that all relevant Zoom meeting videos or transcripts are produced; and without it, Plaintiffs are hard-pressed to understand how TikTok could demonstrate its

compliance with Rule 34. Fed. R. Civ. P. 34(b)(2)(C) (requiring party to specify withheld materials); *see also* N.D. Cal. Rule 26(f) Checklist, Section I.

TikTok has instead offered to decide unilaterally which videos might be relevant here. But Plaintiffs have good reason to be concerned that relevant information will not be identified, both because the parties disagree on the scope of discovery (see *infra* at III.G) and because TikTok's proposed "relevancy review" would leave Plaintiffs in the dark about what is being withheld. For example, TikTok has suggested it may cull relevant information based on the *organizers* or *hosts* of Zoom videos. But an organizer or host could simply be a secretary or assistant rather than a more senior employee. Important meetings, then, may be excluded simply because of who sent an invite. TikTok also insists that meeting *participants* would not be relevant custodians, but that makes even less sense. And even if a video repository were analogous to email, the analogy wouldn't help TikTok because no court would permit a party to claim that only one person on an email thread counts as a custodian. Still, the analogy does not hold—producing a comparable list of emails would obviously be burdensome in ways that clicking a button to export Zoom metadata is not; plus, emails are more easily subject to searches using custodians and keywords, whereas the Zoom meetings do not contain searchable text nor is the organizer necessarily the person who called the meeting. Lastly, TikTok's suggestion that relevant information can be based on the *title* of a meeting is hardly indicative of whether the recording itself includes relevant information or was attended by a custodian; the title could just be "[Organizer's] Zoom meeting."

For these reasons, the parties should be negotiating a production of Zoom videos and related information from a common understanding of what the archive contains—and to do that, and to avoid further delay, TikTok should immediately produce the same list that it was ordered to produce to State AGs. On March 15, the parties held a productive meet and confer on these issues, and Plaintiffs remain hopeful that, at minimum, the parties may be able to narrow this dispute themselves if they are able to exchange further information. Plaintiffs are perplexed by TikTok's eleventh-hour statements regarding trust or civility, as they do not reflect the cordial and constructive conferences that the parties have held to date. If the parties remain at an impasse, Plaintiffs anticipate moving to compel and, if necessary, may notice a 30(b)(6) deposition on the topic of TikTok's recorded Zoom meetings.

**TikTok's Position:**

TikTok is mindful of the Court's rules and practices governing discovery disputes, intends to follow them, and does not believe this issue merits the Court's attention at this time given the parties continued meet and confer efforts.  Nevertheless, because Plaintiffs have raised the issue in this statement, TikTok asserts that Plaintiffs' representation of TikTok's position above is misplaced and misleading and their requests of TikTok for certain information around video recordings is improper.  TikTok's offer to produce Zoom recordings made by agreed-upon custodians that are responsive to Plaintiffs' other 240 document requests is eminently reasonable, consistent with the Federal Rules and how ESI discovery is conducted in every other complex litigation, and is the only sensible path forward.

First, Plaintiffs' description of these meeting recordings as a "video archive" is improper and fundamentally misleading from a discovery perspective.  Rather, thousands of individual TikTok employees have, on many occasions, recorded video meetings.  These meetings once recorded reside with Zoom in its cloud storage.  This is not a stand-alone "archive."  The videos consist of more than 98,000 individually recorded meetings of TikTok's and its affiliate's employees, among themselves and/or third parties, addressing a myriad of topics not limited to the TikTok platform available in the United States or even the TikTok platform generally.  These meetings are not limited in time, scope, geographic location, or otherwise.  They encompass meetings recorded by any employee for any reason while on the Zoom platform.  They are no different in that respect than any data created by or associated with a given employee that resides on TikTok or third-party systems (i.e., Google docs, gmail). The "list" that Plaintiffs request was generated through a Zoom tool and does not exist in the ordinary course of business at TikTok.  It provides limited information identifying the host of the meeting (whether that is the actual host or someone who set up the meeting on behalf of someone else), the topic (if described beyond "John Doe Zoom meeting") and other technical data about the file.

Second, Plaintiffs' requests and current position are not consistent with the Federal Rules.  As an example, Plaintiffs' RFP #236 requests "[a]ll recordings, or transcripts of recordings, of Zoom meetings not produced to the State of North Carolina in response to either of the two Civil Investigative Demands described in the Application for Enforcement of Civil Investigative Demand in *North Carolina ex rel.*

*Stein v. TikTok, Inc.*, 23CV030646-910 (N.C. Sup. Ct., Wake County) that relate to any of the facts, allegations, and claims set forth in the Master Complaint(s) filed in the MDL and any Complaint filed in the JCCP." That alone is overbroad and not tailored even to the RFPs propounded to date by the Plaintiffs. Even more egregious, rather than allow TikTok to manage its own discovery processes by identifying relevant, responsive data sources and custodians and by producing the same, Plaintiffs seek to insert themselves into these processes by requesting an index/list of all Zoom recordings that exist across the entire company with no limit on time, scope, topic or participant.[7]   Plaintiffs' request for information on more than 98,000 recorded Zoom meetings (many of which exceed an hour in length) is overbroad and disproportionate to the needs of this case. Plaintiffs do not limit their request to Zoom recordings relevant to their claims; they seek information related to *all recordings*.

The Federal Rules do not allow plaintiffs to obtain "lists" of entire ESI or custodial collections just so they can look over their adversary's shoulder and confirm discovery obligations are satisfied. It is a defendant's obligation to conduct a reasonable and diligent investigation for relevant and responsive information and to produce the same to the extent it is not privileged or otherwise objectionable (with such objection being clearly stated). The Federal Rules have no requirement that any defendant affirmatively or physically "demonstrate" to its opponent its compliance with Rule 34 outside signing discovery responses to confirm the same.  In fact, Fed. R. Civ. P. 34(b)(2)(C) only requires that a party disclose if they are withholding otherwise responsive information.  And the Federal Rules do not require a defendant to disclose information that is not relevant or responsive.  Here, Plaintiffs want to prevent TikTok from making the determination of what is relevant or responsive in the first instance.  They suggest that is their responsibility.  And that is plainly wrong.

To be clear, TikTok has never denied that some of the 98,000+ Zoom recordings may be relevant to the claims and defenses in this litigation and responsive to the Plaintiffs' voluminous RFPs.[8] Furthermore, TikTok has never suggested it will not either produce responsive videos or identify a

---

[7] *See* Request for Production #237: "Documents sufficient to identify all recordings in TikTok's Zoom archive or any other similar archive."

[8] TikTok does, however, dispute the misleading characterization of some of these recordings quoted by the Plaintiffs.

burden or proportionality argument for why it will not produce the same. However, Plaintiffs suggest all the videos and the list are "highly relevant" to this civil case by blindly parroting language from one State Attorney General filing in a matter in which they have no first-hand experience (presumably, given it is a confidential investigation). This determination is TikTok's to make in the first instance. And, reasonableness and proportionality must enter the discussion under the Federal Rules. To reasonably limit the scope of Plaintiffs' request to a more tailored universe, TikTok has offered to work with Plaintiffs to identify and produce a set of non-privileged Zoom recorded meetings that were hosted by agreed-upon custodians and that are responsive to Plaintiffs' extensive discovery requests—roughly 240 to date—in this litigation. TikTok remains willing to discuss alternative methods for identifying and producing relevant recordings as well. TikTok's position on this matter is squarely within its obligations under the Federal Rules and is the only reasonable path forward. The culling of data through custodial sources is a standard process in every complex litigation, particularly in a case such as this involving what will surely be the production of millions of pages of discovery (including videos) under an aggressive timetable and will result in no unnecessary delay. Plaintiffs have not articulated how the production of an unfiltered list (including information on meeting host and topic, if identified) of even a pared-down set of recordings is "relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b). At base, Plaintiffs have asked for an index of electronic files in TikTok's possession—without regard to whether those files are relevant to any claim or defense. This would be akin to a request for an index of all documents that TikTok gathered from its custodians in this litigation; or an index of all documents that hit on certain search terms, prior to review for relevancy. Plaintiffs are not entitled to such information. *See O'Donnell/Salvatori Inc. v. Microsoft, Corp.*, 339 F.R.D. 275, 276-66 (W.D. Wash. 2021) (citing and discussing cases that hold that "a party's agreement to run search terms does not waive its right to review the resulting documents for relevance" under Rule 26); *Catholic Mut. Relief Soc. of Am. V. Arrowood Indem. Co.*, No. 17-cv-3141 (JRT/LIB), 2019 WL 4897189 (D. Minn. May 24, 2019) (holding that plaintiff was not entitled to "physically review the archived boxes and document files identified as search term 'hits' of [defendant's] archive index[,]" despite a finding that defendant's Rule 34 certification was deficient). Why should Plaintiffs be entitled to such a list solely with respect to Zoom meeting recordings? Plaintiffs provide no support for their

1    request beyond citing to an unreasoned North Carolina state court opinion that is on appeal, where the

2    Federal Rules and notions of proportionality did not apply.  Plaintiffs' request for the unfiltered list of

3    Zoom recordings is a quintessential fishing expedition and should be rejected. *See Mora v. Zeta*

4    *Interactive Corp.*, Case No. 1:16-cv-00198-DAD-SAB, 2017 WL 1187710, at \*4-6 (E.D. Cal. Feb. 10,

5    2017) (rejecting TCPA plaintiffs' request for production of "all of the call logs" in Defendants' system

6    as "a fishing expedition," and determining how to narrow "the scope of Defendants' [relevant] call logs

7    that should be produced"); *see also Jones v. Sunbelt Rentals, Inc.*, Case No. 22-cv-05954-AMO (PHK),

8    2023 WL 6215295, at \*5, 9 (N.D. Cal. Sept. 22, 2023) (noting 2015 amendment to Rule 26(b)(1)

9    "intended to restrict, not broaden, the scope of discovery" and to "encourage judges to be more

10    aggressive in identifying and discouraging discovery overuse").

11         It cannot be overstated that it is TikTok's job in the first instance to identify information

12    responsive to Plaintiffs' requests.  If TikTok identifies otherwise responsive information it objects to

13    producing, the Parties may have a discovery dispute ripe for resolution.  So far, that hasn't occurred.

14    Plaintiffs attempt to skip that entire step—based on an assumption that TikTok either cannot or will not

15    fulfill its obligations under the Rules—and decide for TikTok what it must produce, whether

16    proportionate, reasonable or not.  This is an overreach that cannot be entertained.  TikTok genuinely

17    hopes that the parties can reach a resolution on this matter guided by the rules under which we all

18    operate.  To the extent the parties cannot resolve this dispute, TikTok will be prepared to address

19    through this Court's standing procedure on discovery disputes.

20         With respect to Plaintiffs' requests for a "video compilation" and unredacted copy of a Nevada

21    Complaint, both issues are still under consideration and will be the subject of further meet and confer.

22         Finally, Plaintiffs convey an open distrust for TikTok to fulfill its discovery obligations in an

23    honest or adequate fashion.  That is baseless and entirely inappropriate.  There is no place for incivility

24    in these proceedings.

25    **H.**    **Defendants' Scope Objections as to Discovery**

26    For purposes of this topic, "Plaintiffs" refers to the PI/SD Plaintiffs and not the State AGs.

27    <u>Plaintiffs' Position:</u>

28

In the District Court's order resolving the motion to dismiss Plaintiffs' five priority claims, it found that Section 230 of the Communications Decency Act barred certain product features from forming the basis of design defect claims (*e.g.*, "[t]iming and clustering notifications of *defendants' content* to increase addictive use"), while it did not bar others (*e.g.*, "[n]ot using robust age verification").  ECF No. 430 at 16, 14. At the same time, the District Court held that Section 230 was *not* a bar to Plaintiffs' failure-to-warn claims, stating that Defendants' "duty arises not from their publication of conduct, but from their knowledge . . . of the ways that their products harm children" and their alleged failure to "provid[e] warnings for *any and all* of the alleged defects." *Id.* at 20. *See also id.* at n.60 (emphasis added). Lest there be any confusion that, notwithstanding Section 230, all features Plaintiffs allege are defective are indeed at issue in this litigation, the District Court specifically clarified as much at a November 2023 hearing. 11/16/23 Hr'g Tr. (ECF No. 457) at 28:9 ("Plaintiffs are correct."), 29:13 ("[P]laintiffs have it right at this point."). Then, in seeking certification of the District Court's dismissal order under 1292(b), Defendants specifically raised the specter of discovery on these product features in light of Plaintiffs' failure-to-warn claims. ECF No. 473 at 7 (arguing that "if the Ninth Circuit held that Section 230 bars Plaintiffs' failure-to-warn claims to the same extent as the design defect claims, it would confirm that discovery on topics such as Defendants' alleged use of algorithms to promote addiction engagement, timing and clustering notifications, and frequency and length of use is unnecessary"). The District Court denied 1292(b) certification.

Nevertheless, Defendants' are now objecting to producing exactly the documents they acknowledged would appropriately fall with the scope of discovery based on the District Court's dismissal order. Notably, these documents would also be relevant to the claims of J.C.C.P. plaintiffs, because a general negligence claim has survived in that action. From a practical perspective, since discovery in this action is coordinated with the J.C.C.P. plaintiffs, the scope of claims in those actions should matter here. Furthermore, there are additional, non-priority claims pending in this action that have not been ruled upon at all yet, and for which these documents may be relevant—for example, misrepresentation claims and state Unfair or Deceptive Acts or Practices (UDAP) claims.

Despite the above, Defendants now argue that Section 230 "must have some limiting effect on discovery." Not so. Appropriate discovery is based on whether the information sought is "relevant to

any party's claim or defense," Fed. R. Civ. P. 26(b)(1), not the number of claims a party brings. Here, the District Court has held that, while Defendants cannot be held liable directly for their design of certain features, they can be held liable for failing to warn about the effects of those features. As Defendants acknowledged in their 1292(b) briefing, discovery relevant to these failure-to-warn claims is, for all intents and purposes, the same as discovery relevant to the design defect claims. More precisely, Plaintiffs must be permitted an opportunity to understand, *inter alia*, how Defendants' product features caused the harms for which they did not warn their users, how and when Defendants learned about those harms, and why Defendants chose not to warn their users.

Moreover, Defendants' authorities do not actually suggest any general principle of law that dismissal of certain claims on Section 230 grounds should necessarily reduce a defendant's discovery burden. In *Fair Housing Council v. Rommmates.Com*, the Ninth Circuit did *not* weigh in on discovery at all. 521 F.3d 1157 (9th Cir. 2008). The court simply observed that Section 230 protected websites "from having to fight costly and protracted legal battles." *Id.* at 1175. And, indeed, Defendants would have been protected from a "protracted legal battle" here had the District Court dismissed all of Plaintiffs' claims on Section 230 grounds. But the District Court held that Section 230 was not the shield Defendants had claimed.[9]

Returning to discovery in this matter, Meta, like the other Defendants, states in its general objections to Plaintiffs' production requests that it "will only search for and produce documents related to product features as to which the Court has upheld claims concerning those features as not barred by . . . Section 230." Then, in response to a request seeking "analyses of the actual or estimated amount of time that Children and Teens spend using Your Platform . . . during school hours," Meta refuses to produce any documents, because, among other reasons, it "seeks information concerning time spent

---

[9] As for the Tenth Circuit's decision 24 years ago in *Ben Ezra, Weinstein, & Co. v. AOL*, the court did indeed state that Section 230 "gives online service providers some protection from discovery burdens," but it certainly did not suggest any discovery formula. 206 F.3d 980, 986 (10th Cir. 2000). The Tenth Circuit simply observed that where a trial court had allowed limited discovery to adjudicate Section 230 immunity and the trial court concluded the plaintiff had not shown why additional discovery was necessary to respond to a summary judgment motion, it did not abuse its discretion in denying the plaintiff a request to defer ruling on summary judgment and allow additional discovery. *Id.* at 987. Ultimately, unlike here, the court dismissed all of the plaintiffs' claims under Section 230. *Id.* at 984.

whether or not related to the Features." Meta's Response to RFP No. 174. But, as discussed above, the District Court made clear that all aspects of Defendants' products and conduct that Plaintiffs allege increase addictive use are at issue in this litigation. Defendants' complaint that Plaintiffs have not connected features like Defendants' failure to block access during school hours to their failure-to-warn theory lacks merit. Setting aside that the District Court has already recognized the connection, it is obvious:  evidence regarding Defendants' knowing decision to enable compulsive use during school hours has clear relevance to the claim that they failed to warn of their products' purposeful design to addict young users. Moreover, under any general standard of relevance, in a case about youth addiction, analyses of the amount of time youth spend on platforms while they should be focused on school are relevant. While Plaintiffs continue to meet and confer with Defendants, Plaintiffs believe this issue is clear cut and expect to brief the issue if Defendants do not change their view.

    <u>Defendants' Position:</u>

    As Plaintiffs admit, in the order on Defendants' motion to dismiss Plaintiffs' five priority claims, the District Court held that Section 230 of the Communications Decency Act and the First Amendment barred Plaintiffs' design defect claims as to many of the features that Plaintiffs allege caused them harm. ECF No. 430 at 14 and 16.[10]  Nevertheless, Plaintiffs continue to seek broad, full-scale discovery into all such features, and have asked Defendants to collect and produce countless numbers of documents concerning such features, without yet offering or agreeing to any limitation or scaling-back based on the fact that the design defect claims relating to those features have been dismissed.

    To illustrate using the example raised by Plaintiffs above:  the District Court very clearly dismissed design defect claims that were based on an alleged defect for failing to block usage during school hours or other times of day.  Op. at 16 ("the following alleged design defects directly target defendants' roles as publishers of third-party content and are barred by Section 230: … Failing to

---

[10]   The features as to which Judge Gonzalez Rogers held Plaintiffs' claims barred include: 1) use of engagement-based algorithms; 2) endless feed/scroll; 3) timing and clustering of notifications; 3) failure to limit session length and frequency by default or to institute time-of-day blocks; 4) inability to disable auto-play function; 5) account recommendations; 6) the ability to create multiple accounts; 7) rewards; 8) publishing of geolocation information; 9) limiting content to short-form and ephemeral (disappearing) content; and 10) allowing private chat functions.

institute '[b]locks to use during certain times of day (such as during school hours or late at night'")'. Yet notwithstanding this dismissal, Plaintiffs continue to seek full-scale discovery on this issue, seeking (among other discovery) huge quantities of data concerning usage by platform users during school hours and at night, by demographic and by geography. Relatedly, Plaintiffs have requested "All analyses of the actual or estimated amount of time that Children and Teens spend using Your Platform while on school property, during school hours, or during school-sponsored academic or extracurricular activities, and all Documents referenced in and Communications concerning the same," and also have requested "All Documents concerning any plans or efforts . . . to increase or promote usage of Your Platform by Children or Teens during school hours or during or in connection with school activities (including academic and extra-curricular activities)."

Plaintiffs argue here that unabated discovery on these dismissed defects is warranted because of their failure-to-warn claims. But the District Court's dismissals under Section 230 of the underlying design defect claims must have some limiting effect on discovery if the "immunity from suit" provided by that statute is to have any meaning. *See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174-75 (9th Cir. 2008) (en banc) (Section 230 "protect[s] websites not merely from ultimate liability, but [also] from having to fight costly and protracted legal battles"); *see also, e.g., Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000) (recognizing that "§ 230 gives online service providers some protection from discovery burdens"). [11] Plaintiffs can contend otherwise only by insisting that discovery "relevant to [a] failure-to-warn claim" is necessarily "the same as discovery relevant to [a] design defect claim,"[12]

---

[11] Plaintiffs' reliance on pending non-priority claims that have not been ruled on in the MDL is misplaced. The MDL Court stayed discovery prior to its initial motion to dismiss rulings, and did not state that discovery is otherwise open as to claims not yet addressed. Plaintiffs' suggestion that Your Honor should speculate as to how the MDL Court will rule on yet-to-be-addressed claims, in order to decide whether requested "documents may be relevant" to some aspect of these claims (if any survive dismissal), simply highlights that this dispute is not yet ripe.

[12] Defendants' 1292(b) briefing does not express agreement with Plaintiffs' (incorrect) assertion. Instead, Defendants there explained that an interlocutory Ninth Circuit decision addressing their Section 230 and First Amendment defenses could either obviate discovery entirely or otherwise "confirm" the extent to which discovery "is unnecessary" in this case. Dkt. 473 at 7.

27

1   notwithstanding that those claims have different elements, and without taking proper account of how the

2   MDL Court's ruling applies to the failure-to-warn claims.

3       Plaintiffs should start by explaining why they need such discovery in order to prove the elements

4   of the failure-to-warn claims that survived dismissal.  For example, Plaintiffs should explain why the

5   discovery they seek regarding the absence of school- or night-time blocks on the platforms–the alleged

6   "defect" of which they complain–helps to demonstrate that such a "defect" was unclear to users,

7   necessitating a warning that such blocks were not in place.  Without such an explanation, the District

8   Court's order of dismissal is effectively a nullity, and Defendants accordingly objected in their

9   responses and objections to producing limitless full-scale discovery on dismissed features. Nevertheless,

10  Defendants are fully prepared to engage in a meet-and-confer process with Plaintiffs to see whether

11  agreements can be reached with respect to narrowed discovery relevant to failure-to-warn claims on

12  certain dismissed features as to which such claims might be plausible.[13]

13      Defendants emphasize that the Parties have only begun meeting and conferring over this issue,

14  which is not yet ripe for this Court's consideration.  Moreover, in addition to the non-priority claims

15  motion to dismiss, there are still other pending dispositive motions before the Court, which could further

16  narrow the scope of Plaintiffs' claims.  If the Court dismisses or narrows any other of Plaintiffs' claims,

17  Defendants reserve their rights to object to Plaintiffs' discovery requests on that basis.

---

[13] Plaintiffs also invoke Judge Kuhl's order overruling Defendants' demurrer as to Plaintiffs' negligence claim, but that ruling was premised on Judge Kuhl's understanding that she could not sustain Defendants' demurrer as to only a "portion of a cause of action."  *Social Media Cases*, 2023 WL 6847378, at *8 (Cal. Super. Ct. Oct. 13, 2023); *see also id.* at *34 (denying demurrer because *some* of "Plaintiffs allegations," such as those that "do not challenge algorithms that decide what content to publish" "do not seek to hold Defendants liable for injury caused by" protected publisher-type activity).
In any event, Judge Kuhl and Judge Gonzalez Rogers have agreed that all defensive discovery will, at least in the first instance, be handled by the MDL Court, which is bound by the MDL Court's motion to dismiss ruling, not Judge Kuhl's demurrer order.  Moreover, Judge Kuhl has not ruled that the allegedly defective features are all subject to discovery, and in fact stated that while she would not opine on whether challenges to particular features were barred by Section 230 in her demurrer ruling, those issues would be appropriately addressed at the discovery stage.  *See* November 7, 2023 JCCP CMC Tr. 22:15-21 ("[I]nsofar as you're looking for guidance on discovery, my firm view is that discovery issues are best solved in the context of a particular discovery request.").

### I.     Discovery Limitations with Respect to Former Employees

The Parties dispute whether the 240-hour deposition limit ordered by the Court in the Order Governing Discovery Limitations, ECF 672, applies to depositions of all former employees of each Defendant group (Defendants' position), or to former employees of each Defendant group represented and produced for deposition by a Defendant (Plaintiffs' position).  The Parties will meet and confer on this issue and report any resolution or remaining disputes in the next DMC Statement.

### J.     Parties' Compliance With "Lead Counsel" Meet-and-Confer and Attestation Requirement

During the February DMC, the Court instructed the Parties to be mindful of Judge Kang's Standing Order on Discovery, which instructs the Parties to engage in a final meeting of "lead trial counsel" at the end of the meet and confer process if disputes remain prior to submitting a letter to the Court identifying the matters remaining in a dispute with descriptions of the same. Given the complex nature of this action, the highly technical nature of the issues and discovery disputes in play, and that "lead trial counsel" may not yet be chosen for any side, the Parties have attempted to comply with this requirement by putting forth—for the PI/SD Plaintiffs, at least one of the Court-appointed Co-Lead Attorneys; for the State AGs, at least one of the representatives of the three States leading the State AG Coalition (California, Colorado, Kentucky); and for each of the Defendants, at least one attorney who is knowledgeable about that specific discovery dispute from among the 2-3 counsel in leadership positions from each law firm representing that Defendant.  On each of these calls, there have been at least two attorneys more than 100 miles apart from one another, and the Parties have engaged in the final meet and confers via video conference.

Going forward, the PI/SD Plaintiffs anticipate satisfying the Court's requirement  of lead counsel's presence at final meet and confers through (1) attendance by at least one of the individually named Co-Leads (Lexi Hazam and Previn Warren) (2) attorneys from the Co-Leads' law firms (Motley Rice and Lieff Cabraser Heimann & Bernstein) that are not individually named Co-Leads; but possess decision-making authority and/or (3) members of the Plaintiffs' Steering Committee - Leadership (the top tier of leadership under Co-Lead Counsel) who are most knowledgeable on certain Defendant-specific discovery disputes and have decision-making authority, as appropriate.

1   Respectfully submitted,

2   DATED: March 15, 2024              By:  */s/ Previn Warren*

3                                   LEXI J. HAZAM

4                                   **LIEFF CABRASER HEIMANN &**
                                  **BERNSTEIN, LLP**

5                                   275 BATTERY STREET, 29TH FLOOR
                                  SAN FRANCISCO, CA 94111-3339

6                                   Telephone: 415-956-1000
                                  lhazam@lchb.com

7

8                                   PREVIN WARREN
                                  **MOTLEY RICE LLC**

9                                   401 9th Street NW Suite 630
                                  Washington DC 20004

10                                   T: 202-386-9610

11                                   pwarren@motleyrice.com

12                                   Co-Lead Counsel

13                                   CHRISTOPHER A. SEEGER
                                  **SEEGER WEISS, LLP**

14                                   55 CHALLENGER ROAD, 6TH FLOOR
                                  RIDGEFIELD PARK, NJ 07660

15                                   Telephone: 973-639-9100
                                  Facsimile: 973-679-8656

16                                   cseeger@seegerweiss.com

17                                   Counsel to Co-Lead Counsel

18

19                                   JENNIE LEE ANDERSON

20                                   **ANDRUS ANDERSON, LLP**
                                  155 MONTGOMERY STREET, SUITE 900

21                                   SAN FRANCISCO, CA 94104
                                  Telephone: 415-986-1400

22                                   jennie@andrusanderson.com

23                                   Liaison Counsel

24

25                                   MATTHEW BERGMAN
                                  GLENN DRAPER

26                                   **SOCIAL MEDIA VICTIMS LAW CENTER**
                                  821 SECOND AVENUE, SUITE 2100

27                                   SEATTLE, WA 98104
                                  Telephone: 206-741-4862

28                                   matt@socialmediavictims.org

glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
T: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
T: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com
CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
T: (646) 666-8908
carrie@cagoldberglaw.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS &**
**OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100

OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
T: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205.855.5700
fu@dicellolevitt.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Tel: 212.213.8311
hnappi@hrsclaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

*Attorneys for Individual Plaintiffs*

**PHILIP J. WEISER**
Attorney General
State of Colorado

  _/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773
First Assistant Attorney General
Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

  _/s/ Megan O'Neill_
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Supervising Deputy Attorney General
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Megan.Oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

**DANIEL J. CAMERON**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Gregory B. Ladd (KY Bar No. 95886),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
GREG.LADD@KY.GOV
ZACH.RICHARDS@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

COVINGTON & BURLING LLP

By: */s/ Ashley M. Simonsen*
Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.*
*f/k/a Facebook, Inc.; Facebook Holdings,*
*LLC; Facebook Operations, LLC; Facebook*
*Payments, Inc.; Facebook Technologies, LLC;*
*Instagram, LLC; Siculus, Inc.; and Mark Elliot*
*Zuckerberg*

FAEGRE DRINKER LLP
By: */s/ Andrea Roberts Pierson*
Andrea Roberts Pierson, *pro hac vice*
FAEGRE DRINKER LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000
Email: andrea.pierson@faegredrinker.com
Email: amy.fiterman @faegredrinker.com

Amy R. Fiterman, *pro hac vice*
FAEGRE DRINKER LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: +1 (612) 766-7768
Facsimile: +1 (612) 766-1600
Email: amy.fiterman@faegredrinker.com

Geoffrey Drake, *pro hac vice*
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel.: 404-572-4600
Email: gdrake@kslaw.com
Email: dmattern@kslaw.com

David Mattern, *pro ha vice*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone: +1 (202) 626-2946
Email: dmattern@kslaw.com

*Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

MUNGER, TOLLES & OLSEN LLP
By: */s/ Jonathan H. Blavin*
Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
Email: jonathan.blavin@mto.com

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Laura M. Lopez, (SBN 313450)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: rose.ehler@mto.com
Email: victoria.degtyareva@mto.com
Email: Ariel.Teshuva@mto.com

Lauren A. Bell (*pro hac vice forthcoming*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

Email: lauren.bell@mto.com

*Attorneys for Defendant Snap Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
By: */s/ Brian M. Willen*
Brian M. Willen
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email: bwillen@wsgr.com

Lauren Gallo White
Samantha A. Machock
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
Email: smachock@wsgr.com

Christopher Chiou
WILSON SONSINI GOODRICH & ROSATI
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: cchiou@wsgr.com

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

WILLIAMS & CONNOLLY LLP
By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli
jpetrosinelli@wc.com
Ashley W. Hardin
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone.: 202-434-5000
Fax: 202-434-5029

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

*Attorneys for Defendants YouTube, LLC, Google LLC, and Alphabet Inc.*

## **ATTESTATION**

I, Previn Warren, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: March 15, 2024

By: */s/ Previn Warren*

# **Exhibit A**

[*Parties and Counsel Listed on Signature Pages*]

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS FILING RELATES TO:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR (PHK)<br><br>Honorable Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang<br><br>**[PROPOSED] MODIFIED ORDER GOVERNING DISCOVERY LIMITATIONS** |

The Court hereby ORDERS the following limitations on discovery, pursuant to the Parties' Stipulation above and the Court's Discovery Management Order No. 3 (ECF 667).

**Interrogatories and Requests for Admission**

1. Plaintiffs as a group (including the JCCP Plaintiffs)[1] are allotted a combined total of up to 45 Interrogatories for each of the four main Defendant groups (*i.e.*, Meta, TikTok, Snap, and YouTube). The State AGs are further allotted a combined total of eight (8) additional Interrogatories for the Meta Defendants.

---

[1] "Plaintiffs" refers to the MDL Personal Injury ("PI") Plaintiffs, MDL School District and Local Government Entity ("SD") Plaintiffs (together with the PI Plaintiffs, the "PI/SD Plaintiffs"), the MDL State Attorneys General ("State AGs"), and the JCCP Plaintiffs.

2.   Plaintiffs as a group (including the JCCP Plaintiffs) are allotted a combined total of up to 45 Requests for Admission ("RFAs") for each of the four main Defendant groups (*i.e.*, Meta, TikTok, Snap, and YouTube).[2]  The State AGs are further allotted a combined total of up to eight (8) additional RFAs for the Meta Defendants.

3.   The Meta Defendants are allotted a combined total of up to 32 identical Interrogatories for each State AG.  The Meta Defendants are further allotted a combined total of up to six (6) additional State-specific Interrogatories for each State AG.

4.   The Meta Defendants are allotted a combined total of up to 32 identical RFAs for each State AG.  The Meta Defendants are further allotted a combined total of up to six (6) additional State-specific RFAs for each State AG.

5.   Defendants are allotted a combined total of up to fifteen (15) Interrogatories for each bellwether SD Plaintiff, ten (10) interrogatories for each minor (under age eighteen) bellwether PI Plaintiff, and seven (7) interrogatories for all other bellwether PI Plaintiffs.  Defendants are further allotted a combined total of up to 15 RFAs for each bellwether PI Plaintiff and 17 RFAs for each bellwether SD Plaintiff.

**Depositions**

6.   Plaintiffs as a group (including the JCCP Plaintiffs) are allotted a combined total of up to 240 hours for fact and Rule 30(b)(6) depositions with respect to each of the four main Defendant groups (*i.e.*, Meta, Snap, TikTok, and YouTube).  The State AGs are allotted up to an additional 48 hours for such depositions of the Meta Defendants.  The length of any such deposition shall not exceed twelve hours per deponent.  The Parties shall meet and confer in advance of each deposition regarding estimated time lengths.

7.   Hours allotments for fact and Rule 30(b)(6) depositions with respect to the State AGs shall be set forth in a separate, further order.

---

[2] The limitations on RFAs set forth in this Order do not include any RFAs that may be needed for purposes of authentication (to the extent the Parties are not able to stipulate to the authentication of documents through other means).

8. Defendants are allotted a combined total of up to 30 hours for fact depositions of each bellwether PI Plaintiff and a combined total of up to 35 hours for depositions of each bellwether SD Plaintiff. Defendants are allotted a combined total of up to ten (10) hours for Rule 30(b)(6) depositions of each bellwether SD Plaintiff. Depositions of minor bellwether PI Plaintiffs (where minors are those persons under age eighteen (18)) shall be limited to a maximum of three (3) hours in single-defendant cases and a maximum of four (4) hours in multi-defendant cases. Depositions of treating providers in any given bellwether PI case may not exceed five (5) hours of questioning by the Defendants.

9. Depositions of all other witnesses in any given bellwether PI case may not exceed seven (7) hours of questioning by the Defendants, and depositions of all other witnesses in any given bellwether SD case may not exceed ten (10) hours of questioning by the Defendants. The Parties shall meet and confer in advance of each deposition regarding estimated time lengths.

10. For good cause shown, a Party may seek an expansion or contraction of the discovery limits set forth above on a case-by-case basis or in a specific instance. Any Party seeking an expansion or contraction of the hours limit for a particular deposition shall meet and confer with the other side in advance of the deposition and, if the Parties are unable to agree on the requested expansion or contraction, the Party seeking the modification may raise the dispute with the Court in accordance with the Court's procedures for resolving discovery disputes. However, nothing in this agreement shall be used to delay or alter the ordered limitations of a properly noticed deposition should the dispute not be resolved before the date of the noticed deposition.

**IT IS SO ORDERED.**

Dated: _____                    _____

                                            MAGISTRATE JUDGE PETER H. KANG