Phyllis A. Jones (*pro hac vice*)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC, Facebook Payments, Inc., Siculus, Inc., Facebook Operations, LLC, and Mark Elliot Zuckerberg*

*Additional parties and counsel listed on signature pages*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

ALL ACTIONS

MDL No. 3047

Case No. 4:22-md-03047-YGR-PHK

Honorable Yvonne Gonzalez Rogers

**DEFENDANTS' REPLY ISO MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT**

**<u>Hearing:</u>**
Date: TBD
Time: TBD
Place: Oakland, California
Judge: Hon. Yvonne Gonzalez Rogers

# TABLE OF CONTENTS

Page

I. INTRODUCTION ..... 1
II. ARGUMENT ..... 2
A. Section 230 Bars the School Districts' Claims. ..... 2
1. The School Districts' Claims Are Not Exempt from Section 230. ..... 2
2. The School Districts' Claims Treat Defendants as Publishers. ..... 3
B. The First Amendment Bars the School Districts' Claims. ..... 7
C. The School Districts' Claimed Harms Are Impermissibly Derivative. ..... 9
D. The School Districts' Claims Fail Because They Do Not Allege Proximate Causation. ..... 13
E. The School Districts Fail To State a Claim for Public Nuisance. ..... 16
1. The School Districts' Theory Represents an Unwarranted Expansion of Public Nuisance Law. ..... 16
2. The School Districts Have Not Alleged Interference with a Public Right. ..... 20
3. The School Districts Have Not Adequately Alleged "Special Injury." ..... 24
F. The School Districts' Negligence Claim Is Not Cognizable. ..... 26
1. The School Districts Fail to Plead Any Duty Owed by Defendants. ..... 26
2. The Economic Loss Doctrine Bars Economic Damages Claims. ..... 30
III. CONCLUSION ..... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Akin v. Bd. of Ed. of Riverside Unified Sch. Dist.*, 262 Cal. App. 2d 161 (1968) ....29

*Alaska v. Purdue Pharma L.P.*, No. 3AN-17-09966CI, 2018 WL 4468439 (Alaska Super. Ct. July 12, 2018) ....26

*Alaska v. Walgreen Co.*, Case No. 3AN-22-06675-CI (Alaska Super. Ct. Mar. 1, 2024)....20, 21

*Ass'n of Wash. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001) ....9, 10, 12, 13

*Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189 (2017)....14

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009) ....6

*Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641 (E.D. Wis. 2021)....3

*In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838 (N.D. Ill. 2022) ....14

*Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412 P.3d 751 (Colo. App. 2015) ....14

*Brown v. Entm't Merchants Ass'n*, 564 U.S. 786 (2011)....8

*Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245 (D.N.J. 2000) ....14

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 680 F. Supp. 2d 780 (E.D. La. 2010)....30

*Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136 (Ohio 2022)....10

*City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610 (N.D. Cal. 2020) ....3

*City of Bos. v. Smith & Wesson Corp.*, 2000 WL 1473568 (Mass. Super. Ct. July 13, 2000) ....10

*City of Chicago v. Beretta U.S.A. Corp.*,
821 N.E.2d 1099 (Ill. 2004) ........................................................................ *passim*

*City of Philadelphia v. Beretta U.S.A. Corp.*,
277 F.3d 415 (3d Cir. 2002)........................................................................10

*Cox v. Eberle Assocs.*,
2019 WL 5598317 (E.D. Va. Oct. 30, 2019) ........................................................14

*Daniel v. Armslist, LLC*,
926 N.W.2d 710 (Wis. 2019)........................................................................2

*Dart v. Craigslist, Inc.*,
665 F. Supp. 2d 961 (N.D. Ill. 2009) ................................................................3

*Davidson v. Apple, Inc.*,
2017 WL 3149305 (N.D. Cal. July 25, 2017).......................................................17

*Dep't of Agric. & Consumer Servs. v. Bogorff*,
35 So. 3d 84 (Fla. Dist. Ct. App. 2010) ..........................................................16, 17

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ........................................................................6

*Essington v. Monroe Cnty. Transit Auth.*,
302 A.3d 219 (Pa. Commw. Ct. 2023) ..............................................................14

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
91 F.4th 511 (1st Cir. 2024)....................................................................10, 12

*In re Firearm Cases*,
126 Cal. App. 4th 959 (2005) ......................................................................18

*Franklin v. Benock*,
722 N.E.2d 874 (Ind. Ct. App. 2000)..............................................................14

*Fraser v. Mint Mobile, LLC*,
2022 WL 1240864 (N.D. Cal. Apr. 27, 2022) .....................................................14

*Ganim v. Smith & Wesson Corp.*,
780 A.2d 98 (Conn. 2001) ..........................................................................10

*Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*,
120 Nev. 777 (2004) ................................................................................14

*Grieco v. Daiho Sangyo, Inc.*,
344 So. 3d 11 (Fla. 4th DCA 2022)................................................................27

*Hacala v. Bird Rides, Inc.*,
90 Cal. App. 5th 292 (2023) .......................................................................27

*Herrick v. Grindr LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018)....................2

*Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*,
199 A.3d 1034 (R.I. 2019)....................30

*Hodgkins ex rel. Hodgkins v. Peterson*,
355 F.3d 1048 (7th Cir. 2004)....................8

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992)....................10, 13

*Howarth v. State, Pub. Def. Agency*,
925 P.2d 1330 (Alaska 1996)....................14

*State ex rel. Howes v. W.R. Peele, Sr. Tr.*,
876 F. Supp. 733 (E.D.N.C. 1995)....................24

*State ex rel. Hunter v. Johnson & Johnson*,
499 P.3d 719 (Okla. 2021).................... *passim*

*Ileto v. Glock Inc.*,
349 F.3d 1191 (9th Cir. 2003)....................3, 18, 19

*Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*,
929 N.E.2d 722 (Ind. 2010)....................30

*J'Aire Corp. v. Gregory*,
24 Cal. 3d 799 (1979)....................28

*Jackson v. Alto Experience, Inc.*,
No. 23-CV-22319-RAR, 2024 WL 580354 (S.D. Fla. Feb. 12, 2024)....................14

*James v. Meow Media*,
300 F.3d 683 (6th Cir. 2002)....................8

*In re Jan. 2021 Short Squeeze Trading Litig.*,
584 F. Supp. 3d 1161 (S.D. Fla. 2022)....................30

*Johnson v. 3M*,
563 F. Supp. 3d 1253 (N.D. Ga. 2021)....................26, 30

*Johnson v. Avis Rent A Car Sys., LLC*,
311 Ga. 588 (2021)....................14

*Johnson v. Wal-Mart Stores, Inc.*,
588 F.3d 439 (7th Cir. 2009)....................13

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*,
497 F. Supp. 3d 552 (N.D. Cal. 2020).................... *passim*

*In re JUUL Labs*,
No. 13:9-md-2913-WHO, Dkt. 740 .......... 25

*Kathleen R. v. City of Livermore*,
87 Cal. App. 4th 684 (2001) .......... 3

*Kesner v. Super. Ct.*,
1 Cal. 5th 1132 (2016) .......... 28

*In Re Kia Hyundai Vehicle Theft Litigation*,
2023 WL 8126870 (C.D. Cal. Nov. 17, 2023) .......... 22

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) .......... 6

*City of Gary ex rel. King v. Smith & Wesson Corp.*,
801 N.E.2d 1222 (Ind. 2003) .......... 18, 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
29 Cal. 4th 1134 (2003) .......... 14

*Kuciemba v. Victory Woodworks, Inc.*,
14 Cal. 5th 993 (2023) .......... 27, 28

*Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*,
24 F. Supp. 2d 755 (W.D. Ky. 1998) .......... 14

*L.W. v. Snap Inc.*,
2023 WL 3830365 (S.D. Cal. June 5, 2023) .......... 2, 6

*Lab. Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*,
191 F.3d 229 (2d Cir. 1999) .......... 10, 12

*In re Lead Paint Litig.*,
924 A.2d 484 (2007) .......... 16, 19

*Matthews v. Williford*,
318 So. 2d 480 (Fla. Dist. Ct. App. 1975) .......... 14

*Mayor of Balt. v. Monsanto Co.*,
No. CV RDB-19-0483, 2020 WL 1529014 (D. Md. Mar. 31, 2020) .......... 26

*McCain v. Fla. Power Corp.*,
593 So. 2d 500 (Fla. 1992) .......... 28

*Meador v. Apple, Inc.*,
911 F.3d 260 (5th Cir. 2018) .......... 13

*Meadows v. Diverse Power, Inc.*,
296 Ga. App. 671 (2009) .......... 14

*Mellen v. Lane*,
377 S.C. 261 (Ct. App. 2008) ....................................................................................14

*N.L.R.B. v. Semco Printing Center, Inc.*,
721 F.2d 886 (9th Cir. 1983) ..................................................................................4, 9

*Nat'l Ass'n of the Deaf v. Harvard Univ.*,
377 F. Supp. 3d 49 (D. Mass. 2019) ..........................................................................3

*In re Nat'l Prescrip. Opiate Litig.*,
589 F. Supp. 3d 790 (N.D. Ohio 2022)......................................................................19

*In re Nat'l Prescription Opiate Litig.—West Boca*,
452 F. Supp. 3d 745 (N.D. Ohio 2020)................................................................17, 26

*Netchoice, LLC v. Bonta*,
2023 WL 6135551 (N.D. Cal. Sept. 18, 2023) ...........................................................7

*NetChoice, LLC v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)............................................................8

*NetChoice, LLC v. Yost*,
— F. Supp. 3d —, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) ..............................8

*In re Paraquat Prods. Liab. Litig.*,
2022 WL 451898 (S.D. Ill. Feb. 14, 2022) ................................................................19

*Patton v. Bickford*,
529 S.W.3d 717 (Ky. 2016)........................................................................................14

*Penelas v. Arms Tech., Inc.*,
1999 WL 1204353 (Fla. Cir. Ct. Dec. 13, 1999) ........................................................10

*Pennsylvania v. Monsanto Co.*,
269 A.3d 623 (Pa. Commw. Ct. 2021) .......................................................................26

*Perkins v. Entergy Corp.*,
756 So. 2d 388 (La. App. 1999)..................................................................................14

*Phillips v. Cricket Lighters*,
841 A.2d 1000 (Pa. 2003)...........................................................................................28

*Pittway v. Collins*,
973 A.2d 771 (Md. 2009) ...........................................................................................14

*PPG Indus., Inc. v. Bean Dredging*,
447 So. 2d 1058 (La. 1984) ........................................................................................30

*Ray v. Mayor of Balt.*,
59 A.2d 545 (Md. 2013) .............................................................................................24

*Sanders v. Acclaim Ent., Inc.*,
188 F. Supp. 2d 1264 (D. Conn. 2002)....................9

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Litig.*,
2023 WL 7524912 (N.D. Cal. Nov. 14, 2023) .................... *passim*

*In re StarLink Corn Prods. Liab. Litig.*,
212 F. Supp. 2d 828 (N.D. Ill. 2002)....................26

*State v. Lead Indus., Ass'n, Inc.*,
951 A.2d 428 (R.I. 2008).................... *passim*

*State ex rel. Stein v. EIDP, Inc.*,
No. 20 CVS 5612, 2023 WL 2326101 (N.C. Super. Ct. Mar. 2, 2023)....................26

*Stender v. BAC Home Loans Servicing LP*,
2013 WL 832416 (N.D. Ind. Mar. 6, 2013)....................30

*Taylor v. La. Pac. Corp.*,
165 F.3d 36 (9th Cir. 1998) ....................18

*There to Care, Inc. v. Comm'r of Ind. Dept. of Revenue*,
19 F.3d 1165 (7th Cir. 1994) ....................9, 11

*Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*,
110 So. 3d 399 (Fla. 2013)....................30

*Twitter, Inc. v. Taamneh*,
598 U.S. 471 (2023)....................15

*United States v. Tedder*,
2008 WL 544448 (E.D. Cal. Feb. 26, 2008)....................18

*V.V. v. Meta Platforms, Inc.*,
2024 WL 678248 (Conn. Super. Ct. Feb. 16, 2024)....................4, 7

*Walsh v. Nev. Dep't of Human Res.*,
471 F.3d 1033 (9th Cir. 2006) ....................4

*Williamson v. Liptzin*,
141 N.C. App. 1 (2000) ....................14

*Wiltz v. Bayer CropScience, Ltd. P'ship*,
645 F.3d 690 (5th Cir. 2011) ....................30

*Wozniak v. YouTube, LLC*,
— Cal. Rptr. 3d —, 2024 WL 1151750 (Cal. Ct. App. Mar. 15, 2024) ....................7

**Constitutional Provisions**

First Amendment .......... *passim*

U.S. Const. Art. VI, cl. 2.......... 29

**Other Authorities**

Restatement (Third) of Torts Liab. for Econ. Harm § 8 .......... 1, 19, 20

Restatment (Second) of Torts § 821B.......... 16, 20, 21

Restatement (Second) of Torts § 821C.......... 24, 25

Section 230.......... *passim*

## I.    INTRODUCTION

The School Districts ask this Court to permit nuisance and negligence claims in 17 states primarily on the grounds that one federal judge allowed different claims to proceed against manufacturers who allegedly marketed tobacco products illegally to children. *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 575 (N.D. Cal. 2020) ("*JUUL*"). Notwithstanding the factual distinctions between this case and *JUUL*, that case is out of step with the overwhelming and far more applicable state appellate authority rejecting the dramatic expansion of tort law the School Districts urge. The School Districts make no attempt to reconcile *JUUL* with that authority and, with just one exception, do not cite any authority from any state appellate court supporting the radical expansion of nuisance law they advocate. They certainly do not cite cases that have extended nuisance law to hold online communication services liable to third-party school districts for the alleged harm those services cause to students. Moreover, the Restatement contains a clear admonition against such "unsound claims of public nuisance" that stray beyond "the traditional ambit of the tort." Third Restatement § 8 cmt. b. As a federal court sitting in diversity, this Court should follow the approach of the majority of state supreme courts and reject the School Districts' invitation to create sweeping new law.

The School Districts also fail to grapple with the unworkable consequences of their broad theory. Under their approach, any content disseminator—or, indeed, the provider of nearly any product or service used by minors—could be sued in tort by school districts or others on the theory that their product or service affects mental health or academic performance.

The School Districts' claims fail for additional reasons. *First*, they fail to offer any cogent reason why this Court's prior rulings in the personal injury cases regarding Section 230 and the First Amendment should not apply equally here. *Second*, their Opposition—in which they refer to themselves as "first responders" in the very first sentence—confirms that their injuries are impermissibly derivative of injuries allegedly suffered by their students and too remote from Defendants' purported misconduct. *Third*, they identify no basis for this Court to impose a duty on Defendants to protect school districts from third-party (including criminal) harms. For these and the further reasons explained below, Defendants' motion should be granted.

# II. ARGUMENT

## A. Section 230 Bars the School Districts' Claims.

### 1. The School Districts' Claims Are Not Exempt from Section 230.

The School Districts effectively concede that Section 230 bars their claims as to the bulk of the challenged conduct. They make no effort to reconcile their allegations with Section 230, but rather argue that their claims should be categorically excluded from the statute's scope. *See* Opp. 7. The Court, however, already rejected this "all or nothing" approach and applied "a conduct-specific approach" that assesses whether each aspect of the challenged conduct constitutes publishing activity protected by the statute. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Litig.* ("*Soc. Media*"), 2023 WL 7524912, at *11 (N.D. Cal. Nov. 14, 2023). This analysis applies equally to public nuisance claims, which by their very nature—and as described by the School Districts themselves—"look[] to the actions, choices, and affirmative conduct of the defendant." Opp. 8.

The School Districts fail to distinguish the cases dismissing public nuisance claims on Section 230 grounds. *See* Mot. 7 (collecting cases). They argue that these cases sought to impose liability "for the act of publication alone" while the School Districts target Defendants' "design, development, production, operation, promotion, distribution, and marketing of their social media platforms to attract and addict minors." Opp. 9–10 (citing Compl. ¶ 970). But the Court already rejected that very argument; the "alleged design defects" the School Districts challenge "directly target defendants' roles as publishers," and "are barred by Section 230." *Soc. Media*, 2023 WL 7524912, at *13; *see* Mot. 7–16.[1]

Contrary to the School Districts' assertion (Opp. 9–10), Section 230 bars public nuisance claims even where plaintiffs do not allege that they have themselves used the defendant's service or been exposed to harmful content, as was equally the case in all of the cited cases. Mot. 7; *see Daniel v. Armslist, LLC*,

[1] Similarly meritless is the School Districts' contention that the Court should disregard some of Defendants' cases because they "involv[ed] allegations that defendants failed to adequately monitor user activity." Opp. 10. In each of those cases, plaintiffs challenged features that are identical to the features the School Districts challenge here, and Section 230 barred the claims based on those allegations. *See Herrick v. Grindr LLC*, 306 F. Supp. 3d 579, 584 (S.D.N.Y. 2018) (lawsuit targeted "Grindr's algorithmic sorting and filtering software," as well as features that recommend accounts to users, allow sending private messages, and allow sharing geolocation information); *L.W. v. Snap Inc.*, 2023 WL 3830365, at *1 (S.D. Cal. June 5, 2023) (lawsuit targeted Snapchat's "ephemeral" messaging and "Quick Add" features).

926 N.W.2d 710, 714 (Wis. 2019) (Section 230 barred claim asserted by family of shooting victim alleging third party used defendant's website to buy murder weapon); *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 961–63 (N.D. Ill. 2009) (Section 230 barred claim alleging third parties used defendant's website to facilitate prostitution, draining resources of plaintiff sheriff); *Kathleen R. v. City of Livermore*, 87 Cal. App. 4th 684, 690, 697–98 (2001) (Section 230 barred claim alleging taxpayers were harmed by minors viewing obscene materials on library computer). Courts have routinely held that Section 230 bars claims based on the publication of content that allegedly encourages or leads to real-world harm, such as terrorism, including where the plaintiffs are not users of the defendants' services. Mot. 10–11.

Against this long line of case law, the School Districts point to a lone decision from Wisconsin. Opp. 9 (citing *Bauer v. Armslist, LLC*, 572 F. Supp. 3d 641 (E.D. Wis. 2021)). But *Bauer* expressly relied on the Seventh Circuit's idiosyncratic view of Section 230, which is much narrower than that of this Circuit, and ultimately dismissed the nuisance claim on other grounds anyway. *Compare Bauer*, 572 F. Supp. 3d at 659 (acknowledging that unlike other circuits, including the Ninth, "the Seventh Circuit … has expressly held that § 230 does not create immunity"), *with Soc. Media*, 2023 WL 7524912, at *8 (recognizing that Section 230 provides "immunity" from suit (citing *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009))).[2] The in-Circuit public nuisance cases cited by the School Districts are even further afield. None involved an "online communication service" or even mentioned Section 230.[3]

**2. The School Districts' Claims Treat Defendants as Publishers.**

The School Districts concede in their Opposition, as they must, that if Section 230 applies to their claims (which it does), this Court already held it bars allegations regarding features that allow users to (1) share their locations, (2) create or share short-form videos, (3) send "ephemeral" content, (4) transmit and share content privately, (5) connect with other users, and (6) consume content through "endless" content feeds and autoplay. Opp. 13. The Court should dismiss the School Districts' claims to the extent they

---

[2] *See Nat'l Ass'n of the Deaf v. Harvard Univ.*, 377 F. Supp. 3d 49, 66 n.7 (D. Mass. 2019) ("Plaintiffs' reliance on the Seventh Circuit opinions that decline to read Section 230 as providing broad immunity for website operators is misplaced … in view of the First Circuit's controlling pronouncements.").

[3] *See JUUL*, 497 F. Supp. 3d at 575 (e-cigarettes); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1196–98 (9th Cir. 2003) (firearms); *City & Cnty. of S.F. v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 630 (N.D. Cal. 2020) (prescription drugs).

rely on these allegations. The School Districts also wholly ignore their allegations regarding the intentional and harmful acts of third parties, and so have "effectively abandoned" these parts of their claims. *Walsh v. Nev. Dep't of Human Res.*, 471 F.3d 1033, 1037 (9th Cir. 2006).[4] And where they do not concede or waive the issue, the School Districts fail to adequately defend any of the remaining allegations at issue.

***Intentional and Harmful Acts of Third Parties.*** The School Districts nowhere defend their many allegations that third parties misused Defendants' services to engage in "sexual exploitation," "spread … CSAM," transmit "threats," and engage in "bullying and harassment." Mot. 8, citing, *e.g.*, Compl. ¶¶ 19, 107, 151, 198, 524, 661, 674, 805, 923, 987, 994. They likewise ignore the wealth of caselaw holding that such allegations are barred by Section 230. *See* Mot. 8–9 (collecting cases).[5]

***Recommendation Algorithms.*** The School Districts' Complaint belies their argument that their allegations targeting Defendants' "use of algorithms" are somehow "distinct from determinations of what to publish and how." Opp. 14.[6] For example, the School Districts *repeatedly* allege property damage resulting from Defendants alleged display and promotion of specific "challenge" videos posted by third parties that allegedly "direct destruction or theft of school [or government] property." Mot. 9; Compl. ¶ 212(c).[7] The School Districts cannot evade this conclusion by asserting that Defendants' goal in publishing content is to "maximize user attention." Opp. 14. The Court already held that "defendants' use of algorithms to determine whether, when, and to whom to publish third-party content … are

---

[4] Defendants have not conceded that any of the allegations in this case survive Section 230. Their Motion stated that "*all* of the School Districts' theories of harm are barred by Section 230," and preserved the argument for appeal. Mot. 6 n.2. *See N.L.R.B. v. Semco Printing Center, Inc.*, 721 F.2d 886, 893 (9th Cir. 1983) (incorporating argument from prior brief preserved issues on appeal).

[5] *See also V.V. v. Meta Platforms, Inc.*, 2024 WL 678248, at *1–2, 11 (Conn. Super. Ct. Feb. 16, 2024) (Section 230 barred claims asserting, e.g., that plaintiff was bullied through app's "direct messaging feature" and sent "inappropriate photographs").

[6] All emphasis has been added and internal citations and quotations omitted unless noted.

[7] *See also, e.g.*, Compl. ¶ 184 (alleging online challenge "incentivized youth to post videos of them vandalizing school bathrooms"); *id.* ¶ 186 (similar). The School Districts also rely heavily on allegations that Defendants' algorithms displayed content that upset users or encouraged them to imitate dangerous behavior. Mot. 9–10; *see, e.g.*, Compl. ¶ 389 ("extreme material"); *id.* ¶ 661 ("inappropriate sexual content"); *id.* ¶ 834 ("malign videos promoting depression, suicidality, eating disorders and negative body image"); *id.* ¶ 916 (harmful "'challenge' videos").

traditional editorial functions that are essential to publishing," notwithstanding Plaintiffs' claim that Defendants' goal is "to promote addictive engagement." *Soc. Media*, 2023 WL 7524912, at *13–16.

***Filtered and "Comparison" Content.*** The School Districts also ignore their own allegations stating the School Districts were harmed because users *viewed* and compared themselves to filtered content that third parties posted. Mot. 10 & n.4; *see, e.g.*, Compl. ¶ 89 (alleging users "make false comparisons between their real-life appearances and the appearances in the feed" of third-party content, including content incorporating "filters"); *id.* ¶ 457 (alleging "[h]eavily edited and unrealistic beauty, modeling, fitness, talent, and success-related posts are highly amplified by Meta's algorithms); *id.* ¶ 882 (similar as to YouTube). These allegations fall outside the School Districts' narrow reference to allegations that users were harmed when they used a filter but ***did not post*** the image. Opp. 12. Further, the School Districts allege harms caused by "comparison" content that is not alleged to involve filters at all, such as "talent" and "success-related posts" and "beauty, modeling, fitness," or "influencer[]" content. *See, e.g.*, Compl. ¶¶ 457, 882. The School Districts do not defend, and so forfeit, these allegations.

***Age Verification and Parental Controls.*** Claims of deficient age verification and parental controls are barred to the extent they allege "harm caused by consumption of third-party content." *Soc. Media*, 2023 WL 7524912, at *12. The School Districts' Complaint alleges just that. *E.g.*, Compl. ¶ 357 (alleged lack of "meaningful age verification" or "parental consent" allow users to access algorithmic "recommendation systems"); *id.* ¶¶ 533, 556, 661 (alleging that inadequate age verification and parental controls expose users to harms from third-party predators). Numerous courts have held that Section 230 bars claims based on the alleged lack of effective safety features to protect minors from harms caused by publishing activities. Mot. 12 (collecting cases). The School Districts attempt to get around this clear standard by focusing on generalized allegations about harms caused by third-party content, but such creative pleading does not change the Section 230 analysis, which clearly bars the School Districts' claims to the extent they allege "harm caused by consumption of third-party content."[8]

---

[8] The School Districts' argument that these functions are not protected by Section 230 because they operate "*before* any content is exchanged" between users is meritless. Opp. 12 (quoting *A.M. v. Omegle.com, LLC*, 614 F. Supp. 3d 814, 821 (D. Or. 2022)). The quoted language from *Omegle* refers to the plaintiff's challenge to a feature that "connects individuals … before any content is exchanged between them." *Omegle*, 614 F. Supp. 3d at 820–21. As this Court recognized, the alleged harm here by contrast flows

***Reporting Processes.*** Contrary to the School Districts' assertion (Opp. 13), Defendants' Motion explains that claims regarding abuse-reporting features are barred where they are premised on allegations that Defendants do not provide sufficient processes to identify and remove illegal images. Mot. 12 (citing Compl. ¶¶ 8, 107, 381, 955). Established caselaw bars claims of harm premised on Defendants' failure to remove third-party content as a result of deficient reporting processes or otherwise. Mot. 12; *see, e.g.*, *L.W.*, 675 F. Supp. 3d at 1096 ("By definition, Snap's failure to remove CSAM distributed on Snapchat by third parties … involve[s] 'reviewing … and deciding whether to publish or to withdraw from publication third-party content'" (quoting *Barnes*, 570 F.3d at 1102–03)); *Soc. Media*, 2023 WL 7524912, at *14 n.20 (stating that *L.W.* "carefully applied *Barnes* and other precedent and held that the specific feature upon which plaintiffs based their claim was indistinguishable from publishing").

***Comments, Likes, and Reactions.*** The School Districts offer no support for their allegations regarding comments. *See* Mot. 14. Nor is one possible, as the Ninth Circuit has held that a feature that allows users to "post comments and respond to comments posted by others" is "[t]he prototypical service qualifying for [Section 230] immunity." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (cleaned up); *Soc. Media*, 2023 WL 7524912, at *15 ("notifications that someone has commented on or liked a user's post" "alert users to third-party content"). Therefore, Section 230 bars the allegations that comments harm users because they allow users to convey "negative" messages, *see, e.g.*, Compl. ¶¶ 424, 747, 935, or to express approval of certain content, *see, e.g.*, *id.* ¶¶ 120, 451, 781. The School Districts' allegations regarding "'Likes,' Hearts,'" and other features that allow users to react to specific content are likewise barred. Mot. 14; *see, e.g.*, Compl. ¶¶ 115, 120, 179, 401, 601, 774, 886. The School Districts admit that they allege these features cause harm precisely because third parties use them to communicate a message—their "approval" of specific content. Opp. 12–13. Section 230 protects "tools meant to facilitate the communication and content of others." *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019).

---

from publishing third-party content. *Soc. Media*, 2023 WL 7524912, at *14 (holding that *Omegle* does not apply to allegations that "Defendants recommend existing third-party content (profiles) to users").

***Lack of Default Time Restrictions.*** This Court has already held that Section 230 bars allegations that Defendants failed to implement "[d]efault protective limits to the length and frequency of sessions" or "[b]locks to use during certain times of day[,] such as during school hours or late at night" because imposing such liability "would necessarily require defendants to publish less third-party content." Mot. 15; *Soc. Media*, 2023 WL 7524912, at *13. The School Districts' assertion that "Defendants could … satisfy their alleged duty" as to time restrictions "without changes to the publication of third-party content," Opp. 14, flatly contradicts that order.

***Failure to Warn.*** The School Districts cite this Court's prior ruling that similar failure-to-warn allegations did not target Defendants' publishing conduct. Opp. 8. Courts have consistently held that Section 230 bars failure-to-warn claims where the "theory of liability is inherently tied to content" and its dissemination. Mot. 15–16 (collecting cases).[9] Defendants reassert this argument here to preserve it.

**B. The First Amendment Bars the School Districts' Claims.**

The School Districts do not dispute that the First Amendment prohibits claims, including nuisance claims, that impose liability on Defendants for disseminating protected speech. Mot. 16–17 (collecting cases). Nor do the School Districts dispute that Defendants "are in the business of delivering curated compilations of speech created, in the first instances, by others," or that the First Amendment protects their "decisions about what speech to permit, disseminate, prohibit, and deprioritize." Mot. 16 (quoting *NetChoice LLC v. Att'y Gen., Fla*, 34 F.4th 1196, 1213–14 (11th Cir. 2022)); *see id.* 17 (collecting cases).

***Allegedly Deficient Age Verification and Parental Controls.*** The School Districts' desired mandate of age verification—which would be required of *all* users (including adults)—would inevitably deter and "den[y] access" to protected speech. Mot. 17. Such mandates are routinely held unconstitutional, and three federal courts recently rejected attempts to impose similar requirements.[10]

---

[9] Since the Motion was filed, this principle has been affirmed in two more cases. *See V.V.*, 2024 WL 678248, at *10 ("allegations of failure to warn of an application's potential danger do not remove the 'publisher' status," so Section 230 bars such claims); *Wozniak v. YouTube, LLC*, — Cal. Rptr. 3d —, 2024 WL 1151750, at *11–12 (Cal. Ct. App. Mar. 15, 2024) (Section 230 barred failure-to-warn claim because to hold otherwise "would allow essentially every state cause of action otherwise immunized by section 230 to be pleaded as a failure to warn of such information published by a defendant").

[10] *See Netchoice, LLC v. Bonta*, 2023 WL 6135551, at *10–18 (N.D. Cal. Sept. 18, 2023) (noting that any age verification measure beyond self-reporting "generally requires either documentary evidence of age or

The School Districts' Complaint seeks to impose requirements that are even more invasive, such as "connecting new users to parents' accounts, credit card verification, verification by presentation of an identification card (or other government-issued document), or linking a verified undergraduate or professional email." Compl. ¶ 352. Courts have repeatedly rejected attempts to require these kinds of measures. Mot. 18 (collecting cases). Likewise, while the School Districts argue that they do not ask Defendants to "bar access to young users without parental consent," Opp. 17, the allegations in their Complaint do exactly that, *see*, *e.g.*, Compl. ¶ 351 (alleging Meta has failed to "prevent" underage users "from using its products"); *id.* ¶¶ 590, 712, 864 (similar as to Snap, TikTok, and YouTube); *id.* ¶ 357 (alleging Meta failed to require "parental consent" before creating account); *id.* ¶¶ 648, 712, 838 (similar as to Snap, TikTok, and YouTube). These are precisely the types of efforts courts have rejected. *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 795 n.3 (2011) (rejecting requirement to cut off access to minors "*without their parents' prior consent*");[11] *see also Hodgkins ex rel. Hodgkins v. Peterson*, 355 F.3d 1048, 1064 (7th Cir. 2004).[12] As this Court has recognized, the First Amendment bars governmental restraints on speech regardless of whether they are imposed by legislation or in the context of tort claims. *Soc. Media*, 2023 WL 7524912, at *17 ("[T]he First Amendment … can serve as a defense in state tort suits." (quoting *Snyder v. Phelps*, 562 U.S. 443, 451(2011)); *see* Mot. 19 (collecting cases).[13]

… facial recognition"); *NetChoice, LLC v. Griffin*, 2023 WL 5660155, at *1, 17 (W.D. Ark. Aug. 31, 2023) (noting that "[s]elf-reporting one's age (a common industry practice) is not sufficient" under the challenged law, and that prospective users "must submit age-verifying documentation before accessing a social media platform"); *NetChoice, LLC v. Yost*, — F. Supp. 3d —, 2024 WL 555904, at *1–2, *12–14 (S.D. Ohio Feb. 12, 2024) (parental consent requirement for under-16 users "appears to be exactly th[e] sort of law" that impermissibly limits access to speech).

[11] Contrary to the School Districts' assertion, the Supreme Court in *Brown assumed* that "perhaps … a state has the power to *enforce* parental prohibitions," but it did not hold that states have the power to require parental consent by default. *Brown*, 564 U.S. at 795 n.3. Indeed, the Court made clear its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* at 802.

[12] The School Districts' conjecture about Defendants' purported views on hypothetical federal legislation that has not been enacted and is not at issue in this litigation is irrelevant to the constitutional validity of the School Districts' claims in this case. *See* Opp. 15 n.6. The School Districts' attempt to divert attention from the defects in their own claims underscores the weakness of their position.

[13] If anything, the First Amendment concerns are *more* acute here given the risk that courts will restrict speech through free-wheeling tort liability rather than a tailored law drafted by the political branches. *See James v. Meow Media*, 300 F.3d 683, 697 (6th Cir. 2002) ("[T]he regulation of protected speech should

***Awards and Notifications of Defendants' Content.*** As the School Districts acknowledge, this Court has held that "awards" and "notifications" of Defendants' content are "speech" protected by the First Amendment and that the First Amendment likewise protects "the timing and clustering of notifications" of this content. Opp. 18; *Soc. Media*, 2023 WL 7524912, at *18. As alleged in the Complaint, the challenged "awards" communicate specific information, such as announcing that a user "achieve[ed] engagement milestones or perform[ed] certain activities," Compl. ¶ 602, that two users have engaged in a specific pattern of communication, *id.* ¶ 604, or that "the popularity" of an account's "content" has reached a certain threshold, *id.* ¶ 812. Because these awards "convey ideas" and information about users' activities, they are protected by the First Amendment. *There to Care, Inc. v. Comm'r of Ind. Dept. of Revenue*, 19 F.3d 1165, 1167 (7th Cir. 1994).[14]

***Failure to Warn.*** Defendants' Motion expressly stated that they "maintain that all of the School Districts' theories of harm are barred by the First Amendment, including … any claims that Defendants are liable for failing to warn their users of the alleged dangers of any aspects of their services that are protected by the First Amendment." Mot. 16 n.8. The argument is preserved.[15]

**C. The School Districts' Claimed Harms Are Impermissibly Derivative.**

On the very first page of the Opposition, the School Districts tout that they are "***the first responders*** in the health crisis caused by Defendants' social media platforms." Opp. 1; *see also* Compl. ¶¶ 160, 203. In so doing, the School Districts concede that their theory of harm is derivative—i.e., that they incurred "several categories of massive financial harm," Opp. 19, to ***treat*** and ***respond*** to ***their students'*** alleged injuries from their alleged addictions to Defendants' services. *See* Mot. 23. This dependence on third party injury is "the very essence of a derivative injury" that is not cognizable. *Ass'n of Wash. Hosp. Dists.*

be directed in the first instance to the legislative and executive branches of state and federal governments, not the courts."); *Sanders v. Acclaim Ent., Inc.*, 188 F. Supp. 2d 1264, 1281 (D. Conn. 2002) (courts are "particularly wary of governmental restrictions … that rest on a common law concept of the most general and undefined nature" (cleaned up)).

[14] For this reason, the School Districts cannot compare these communications to shouts of "BINGO!," "21," or "three peaches!," which "do not convey ideas." *There to Care, Inc.*, 19 F.3d at 1167.

[15] Because Defendants repeated and preserved the First Amendment arguments made in the personal injury briefing regarding all of the challenged features, any implication that they have waived these arguments is unfounded. *See Semco Printing Center, Inc.*, 721 F.2d at 893.

*v. Philip Morris Inc.* ("*Wash. Hosp. Dists.*"), 241 F.3d 696, 704 (9th Cir. 2001). And it is precisely the kind of purported harm that the authorities cited in Defendants' Motion have repeatedly rejected. *See* Mot. 21–23 & n.12 (discussing, inter alia, *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 422–25 (3d Cir. 2002); *Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 119–20 (Conn. 2001); *Penelas v. Arms Tech., Inc.*, 1999 WL 1204353, at *2 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001)).[16]

The School Districts do not address this ample authority. Instead, their primary response, as is the case throughout the Opposition, is to overly rely on a single decision, *JUUL*, that is contrary to the overwhelming weight of authority. As Defendants explained in their Motion, *see* Mot. 23 n.14, the *JUUL* court erred in concluding that injuries are not derivative if they are "distinct" from the third-party injuries from which they flow. 497 F. Supp. 3d at 621. That principle, if accepted, would swallow the longstanding proscription against derivative injuries, which will almost always be in some ways "distinct" from the underlying harms because they are experienced by different people or entities. As the Ninth Circuit held, the determinative question is not whether the injuries are distinct but whether, "without any injury to [a third party]," the plaintiffs would "have incurred the additional expenses" that form the basis of their claims. *Wash. Hosp. Dists.*, 241 F.3d at 702. Such is the case here. "[T]hat some of plaintiffs' damages are different from the damages suffered by direct victims … makes them no less derivative." *City of Philadelphia*, 277 F.3d at 419, 425 (city's "costs associated with preventing and responding to … handgun violence," including "police services, emergency medical services and educational programs" were derivative since they "ar[o]se only because the use of firearms to injure or threaten City residents"); *see Lab. Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 241 (2d Cir. 1999) (insurer

[16] The Opposition suggests these principles do not apply outside the RICO context. Opp. 21. But the "test for federal antitrust and RICO standing is the common law proximate cause test." *Wash. Hosp. Dists.*, 241 F.3d at 707 (discussing *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268–69 (1992)); *see* Mot. 21 n.10, n.12. Accordingly, numerous courts—including cases cited in the Opposition—have applied *Holmes* to dismiss common law tort claims. *See City of Bos. v. Smith & Wesson Corp.*, 2000 WL 1473568, at *4-5 (Mass. Super. Ct. July 13, 2000) (applying *Holmes* "direct injury test" to public nuisance and negligence claims); *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1148–49 (Ohio 2022) (same); *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 535–37 (1st Cir. 2024) (same).

claims dismissed as derivative even though smokers could not bring RICO actions).[17]

Even assuming this construction of the law were correct, *JUUL* would still be inapposite.  That case concerned companies engaged in allegedly ***illegal*** activity (targeting tobacco products to people under 21), which posed a clear physical threat to students (including "acute and chronic pulmonary injuries, cardiovascular conditions," "cancer," and "deaths") solely traceable to students' use of defendants' products.  Three Vill. Cent. Sch. Dist. Compl. ("TVC") ¶¶ 10, 62, *JUUL*, No. 3:19-MD-02913 (N.D. Cal.), ECF No. 543.  Here, by contrast, no law prohibits offering interactive communication services to high schoolers, and there is no plausible allegation that ***all*** students who use communication services suffer mental health problems—let alone mental health problems traceable solely to the use of those services.  Unlike tobacco, which has never been shown to have any ***positive*** health impacts, the School Districts do not dispute that some students derive positive mental health benefits from Defendants' services.

In addition, the school districts in *JUUL* did not allege that they incurred any direct costs related to the ***treatment*** or ***care*** of tobacco-induced illnesses allegedly suffered by students.  Instead, the alleged costs stemmed from efforts to deter students from illegally using e-cigarettes at school, including "physical alterations to [school] properties to address and deter further e-cigarette use," training staff to "recognize the e-cigarette devices when they see them," and developing "programs" to "discourage … students from e-cigarette use."  *JUUL*, 497 F. Supp. 3d at 620–21; TVC ¶¶ 599–600.  That distinction matters because any particular school district could have incurred those costs even if its students suffered no harms from e-cigarettes.  Accordingly, the *JUUL* court concluded that "[e]ven if the consumers in the end are unable to prove" their claims or recover any damages for their harms, "that would not undercut the damages

---

[17] The *JUUL* court also erred in other ways.  For example, the *JUUL* court concluded that the plaintiffs' public nuisance claims were cognizable even as applied to product liability theories, relying heavily on the opioid MDL court's prior order, which predicted that the Oklahoma Supreme Court would endorse a product-based theory of public nuisance.  *See JUUL*, 497 F. Supp. 3d at 647 (citing *In re Nat'l Prescription Opiate Litig.- Muscogee (Creek) Nation*, 2019 WL 2468267, (N.D. Ohio Apr. 1, 2019), which "reject[ed] [the] similar argument that no Oklahoma Supreme Court precedent has affirmed the viability of the kind of public nuisance claim alleged based on the case law discussed above").  With regard to Oklahoma law, that ruling has been overruled by *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719 (Okla. 2021).

sought by the [school districts]" for the costs they incurred in preventing teens from using a product they could not legally purchase or use. *JUUL*, 497 F. Supp. 3d at 621.

In contrast, the majority of the alleged harms suffered by the School Districts arose from the costs of directly ***treating*** students for the alleged mental health and academic harms some of their students allegedly experienced. For example, the School Districts allegedly have had to "expend[], divert[], and increas[e] resources to develop additional mental health resources" to treat students' mental health issues allegedly caused in part by the students' use of Defendants' platforms.[18] Compl. ¶ 212(p); *see also, e.g.*, *id.* ¶ 212(k) ("[h]iring additional mental health personnel"); ¶ 212(q) ("[t]raining teachers to help students with their mental health" and "staff to identify students and youth exhibiting symptoms of mental health issues"); ¶ 238 ("offer[ing] … outpatient therapy, behavior health services"). Similarly, the School Districts allege they have expended costs to increase educational resources to treat students' "poorer academic performance" allegedly caused by their use of Defendants' platforms. *Id.* ¶¶ 160, 212(i)-(j). Thus, even under the *JUUL* court's erroneously narrow construction of improper derivative harms, the core of the School Districts' alleged harms fall within that category.[19]

Indeed, the School Districts' description of themselves as "first responders" and the "main providers [of] mental health services" for children, Compl. ¶¶ 200, 234; Opp. 1, is akin to the medical providers at issue in *Washington Hospital Districts.* Accordingly, the costs the School Districts allegedly incurred to treat their students are also directly analogous to the costs that were at issue in *Washington Hospital Districts*, 241 F.3d 696, and *Laborers Local 17*, 191 F.3d 229, which—as the School Districts concede—involved "unreimbursed costs for treating patients suffering from tobacco-related illnesses." Opp. 21 (quoting *Wash. Hosp. Dists.*, 241 F.3d at 700). As in those cases, the School Districts' costs are

---

[18] As separately discussed, any such injuries to the School Districts' students also undoubtedly had other causes. *See infra* Part II.D.

[19] The Complaint also includes a smattering of allegations regarding costs incurred for measures that may be to some extent preventative. *See, e.g.*, Compl. ¶¶ 212(a), (h). Notwithstanding *JUUL*, which runs counter to the weight of authority, even these alleged harms are derivative and not cognizable for the reasons explained above. *See supra* at 9–11. In any event, at a minimum, where the School Districts' alleged harm "flows only from prior harm inflicted upon [their students]," that harm is "derivative." *Estados Unidos Mexicanos*, 91 F.4th at 537. (The Opposition incorrectly cites this case as a Ninth Circuit opinion. *See* Opp. 20.)

"wholly dependent on actual damages suffered by *users* of" Defendants' platforms. *JUUL*, 497 F. Supp. 3d at 621. Because "there is no direct link between the alleged misconduct of the [Defendants] and the [School Districts'] claimed damages," the School Districts' claims are not cognizable. *Wash. Hosp. Dists.*, 241 F.3d at 703. In light of these well-established principles, the Court should give little weight to *JUUL*.

The School Districts' derivative-injury claims also flout the *Holmes* Court's efficiency and fairness concerns. 503 U.S. at 269–70. Rather than address these concerns, the School Districts merely assert in a footnote that their damages are "easily computable." Opp. 21 n.8 (alteration adopted). But even if the reasoning in *Holmes* contained an exception for computable damages (it does not), disentangling the School Districts' purported expenses attributable to Defendants from those attributable to other causes—like the disruption from the COVID-19 pandemic—would be impossible.[20]

**D. The School Districts' Claims Fail Because They Do Not Allege Proximate Causation.**

Even if the School Districts' alleged harms are not impermissibly derivative, the Opposition confirms that the School Districts do not allege the requisite causal connection between their alleged harms and Defendants' alleged conduct. By focusing entirely on foreseeability, the School Districts ignore Defendants' showing that their claimed injuries are too remote and attenuated as a matter of law.[21]

The School Districts do not dispute that proximate causation is a necessary element of negligence and public nuisance claims. *See* Mot. 25–26. But they misstate the requirements of proximate causation by suggesting that its sole "linchpin" or "touchpoint" is "foreseeability." Opp. 22–23. In support of that contention, the School Districts again rely heavily on *JUUL* and other non-precedential and non-binding trial court decisions. But those cases are out of line with the balance of authority and misinterpret applicable law.[22] *See* Mot. 23 n.14, 34 n.22, 41–42. For example, the relevant portion of the *JUUL*

---

[20] Moreover, the personal injury plaintiffs assert tort claims premised on the same conduct challenged here, so the risk of double recovery is significant.

[21] The School Districts assert that "proximate cause is … rarely resolvable on a motion to dismiss." Opp. 21–22. But where, as here, the plaintiffs have not pleaded the required causal connection between the defendants' conduct and the purported harms, the plaintiffs' claims are legally deficient and should be dismissed. Numerous decisions are in accord. *E.g.*, *Johnson v. Wal-Mart Stores, Inc.*, 588 F.3d 439, 445 (7th Cir. 2009); *Meador v. Apple, Inc.*, 911 F.3d 260, 263, 267 (5th Cir. 2018).

[22] The School Districts cite to four unpublished trial-court opinions regarding opioids. Opp. 23. Two of those decisions dispense with the issue of proximate causation without any real analysis. The other two

opinion on proximate causation—which the School Districts quote in full, *see* Opp. 23—merely concludes, without citation, that proximate causation was adequately pleaded because the school boards' injuries were reasonably foreseeable. *See* 497 F. Supp. 3d at 664–65. But as the Supreme Court has made clear, "foreseeability alone does not ensure the ***close connection*** that proximate cause requires." *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 202–03 (2017). To carry their burden of adequately pleading proximate cause, the School Districts' allegations must show that their alleged harms are not "too remote from [Defendants' allegedly] unlawful conduct." *Id.* at 202. This is a "well established principle of the common law," *Fraser v. Mint Mobile, LLC*, 2022 WL 1240864, at *2 (N.D. Cal. Apr. 27, 2022), including across the relevant jurisdictions here.[23] The School Districts' unrepresentative sampling of trial-court opinions does not call into question foundational principles of proximate causation outlined by appellate courts applying the law of jurisdictions at issue. *See, e.g.*, *Lead Indus.*, 951 A.2d at 451; *City of Chicago*, 821 N.E.2d 1099.

The School Districts ignore Defendants' showing that any link between Defendants' services and the School Districts' alleged harms would be precisely the sort of attenuated and remote connection that cannot constitute proximate causation. For example, they make no effort to explain how Defendants are

---

decisions arose under the laws of jurisdictions not at issue. All are contrary to the weight of authority.

[23] *Howarth v. State, Pub. Def. Agency*, 925 P.2d 1330, 1333 (Alaska 1996); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1166 (2003); *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412 P.3d 751, 762 (Colo. App. 2015), *cert. denied*, 2016 WL 490249 (Colo. Feb. 8, 2016); *Matthews v. Williford*, 318 So. 2d 480, 481 (Fla. Dist. Ct. App. 1975); *Jackson v. Alto Experience, Inc.*, No. 23-CV-22319-RAR, 2024 WL 580354, at *6 (S.D. Fla. Feb. 12, 2024); *Johnson v. Avis Rent A Car Sys., LLC*, 311 Ga. 588, 593 (2021); *Meadows v. Diverse Power, Inc.*, 296 Ga. App. 671, 672–73 (2009); *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099, 1138 (Ill. 2004); *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d 838, 853 (N.D. Ill. 2022); *Franklin v. Benock*, 722 N.E.2d 874, 880–81 (Ind. Ct. App. 2000); *Patton v. Bickford*, 529 S.W.3d 717, 731 (Ky. 2016); *Ky. Laborers Dist. Council Health & Welfare Tr. Fund v. Hill & Knowlton, Inc.*, 24 F. Supp. 2d 755, 761–62 (W.D. Ky. 1998); *Perkins v. Entergy Corp.*, 756 So. 2d 388, 410–13 (La. App. 1999), *aff'd*, 782 So. 2d 606 (La. 2001); *Pittway v. Collins*, 973 A.2d 771, 787–88 (Md. 2009); *Camden Cnty. Bd. of Chosen Freeholders v. Beretta U.S.A. Corp.*, 123 F. Supp. 2d 245, 264 (D.N.J. 2000); *Goodrich & Pennington Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 120 Nev. 777, 784 (2004); *Williamson v. Liptzin*, 141 N.C. App. 1, 11 (2000); *Essington v. Monroe Cnty. Transit Auth.*, 302 A.3d 219, 239–40 (Pa. Commw. Ct. 2023), *appeal denied*, No. 405 MAL 2023, 2024 WL 264012 (Pa. Jan. 23, 2024); *Mellen v. Lane*, 377 S.C. 261, 281 (Ct. App. 2008); *Cox v. Eberle Assocs.*, 2019 WL 5598317, at *5 (E.D. Va. Oct. 30, 2019); *State v. Lead Indus., Ass'n, Inc.*, 951 A.2d 428, 451 (R.I. 2008).

the proximate cause of "financial harm" arising from "challenge[]" videos; nor could they, given that the immediate causes of the School Districts' harm include the third parties who created and posted the videos and the students who criminally vandalized school property or otherwise chose to participate in the challenge. *See* Mot. 27. Similarly, the School Districts seek to recover monies purportedly spent to address mental health issues arising out of Defendants' services that allegedly "connect strangers, including adult predators, with adolescent users," but the Opposition does not address the critical intervening role of those adult strangers. *See id.* at 27–28. As the Supreme Court recently explained, even if "bad actors … are able to use platforms like defendants' for illegal—and sometimes terrible—ends," providers of those services do not "incur culpability" for the wrongdoing of those bad actors. *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 498–99, 503 (2023).[24]

The Illinois Supreme Court's decision in *City of Chicago v. Beretta U.S.A. Corp*, 821 N.E.2d 1099 (Ill. 2004), is directly on point.[25] There, the court held that defendants cannot "be deemed a legal cause of a nuisance that is the result of the aggregate of the criminal acts of many individuals over whom they have no control." *Id.* at 1138; *see Lead Indus.*, 951 A.2d at 451 ("agreeing with the Illinois Supreme Court['s]" approach to causation in nuisance case). Likewise, the School Districts' alleged harms flow from the independent wrongful conduct of "predators," those who criminally vandalize school facilities, and other bad actors over whom Defendants have no control.

Even *JUUL* provides little support for the School Districts' attenuated causation theory. There, the school district plaintiffs alleged that their students were injured as a result of the defendants' own unlawful marketing. By contrast, the School Districts' alleged harms flow through independent wrongful third-party conduct—that of "predators," vandals, and other bad actors over whom Defendants have no

---

[24] The School Districts suggest that *Taamneh* is not applicable because it was "not about proximate cause[.]" Opp. 24. While the case arose in the specific context of the Anti-Terrorism Act, the Supreme Court's holding that online communication services cannot be held liable for the conduct of bad actors on those platforms rested on the same tort principles underlying causation jurisprudence and is therefore highly instructive here. *See Taamneh*, 598 U.S. at 498–503.

[25] The School Districts strain to cabin *City of Chicago* to "facts specific to that case and public policy determinations under Illinois law." Opp. 25. But the legal principle articulated by the Illinois Supreme Court is directly applicable here and, as noted above, the public policy against imposing liability on remote causes is in no way unique to Illinois. *See supra* at 14 & n.23.

control. Defendants thus cannot be deemed a legal cause of the School Districts' alleged harms.

**E. The School Districts Fail To State a Claim for Public Nuisance.**

**1. The School Districts' Theory Represents an Unwarranted Expansion of Public Nuisance Law.**

**a) The School Districts Provide No Reason to Depart from the Majority Rule Requiring a Nexus to Land Use.**

The School Districts argue that public nuisance claims do not require a nexus to land, relying primarily on the Restatement. Opp. 28–29. But they fundamentally misunderstand the rule articulated in the Restatement, conflating it with an entirely ***different*** rule that Defendants invoked in their Motion. The Restatement comments that "[u]nlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land." Second Restatement § 821B cmt. h. This means that a public nuisance does not necessarily require an interference with the ***plaintiff's*** enjoyment of land. It says nothing about whether public nuisances must arise from the ***defendant's*** use of land. *See* Mot. 33; *Lead Indus.*, 951 A.2d at 453–55 (lead paint was not a public nuisance because it had no connection to ***defendant's*** use of its own land, even though lead paint caused widespread harm to children and inherently affected ***plaintiff's*** property). The New Jersey Supreme Court explained the Restatement's rule this way:

> [P]ublic nuisance has historically been tied to ***conduct on one's own land*** or property as it affects the rights of the general public. This is not to say that the focus for public nuisance, like private nuisance, involves an interference by defendant with a particular plaintiff's use and enjoyment of his own land. *See* Restatement (Second) of Torts § 821B comment h (1979). Rather, the nuisance, traditionally ***arising on the defendant's land***, must instead involve an interference with a public right.

*In re Lead Paint Litig.*, 924 A.2d 484, 495–96 (2007);[26] *accord Lead Indus.*, 951 A.2d at 452 ("public nuisance typically *arises on a defendant's land* and interferes with a public right." (citing *In re Lead Paint*, 924 A.2d at 495–96, and Second Restatement § 821B));[27] *Dep't of Agric. & Consumer Servs. v. Bogorff*, 35 So. 3d 84, 89 (Fla. Dist. Ct. App. 2010) ("To be a public nuisance, *property* must cause 'inconvenience

---

[26] The intermediate New Jersey appellate court decision cited by the School Districts, *see* Opp. 29, *predated* the New Jersey Supreme Court's clear holdings in *In re Lead Paint.*

[27] The School Districts have no basis for asking this Court to reject the Rhode Island Supreme Court's decision in favor of a non-precedential Rhode Island trial court opinion that is plainly inconsistent with *Lead Industries*. Opp. 29.

or damage to the public generally.'");[28] *see also* Mot. 32–33 nn. 19–20. The School Districts' reliance on the Restatement—and the vast majority of the cases in their Appendix D, which do nothing more than "adopt" the Restatement—does not support their argument.[29]

The School Districts also criticize Defendants' citations to cases in jurisdictions other than the 17 at issue here. But those cases illustrate that a connection to the defendant's land is a public-nuisance requirement in the vast majority of jurisdictions nationwide—which can and should inform the Court's analysis as to the nine at-issue jurisdictions that have not squarely addressed the question either way. *See* Mot. 33 n.20. Notably, with just one exception, the School Districts do not cite a single case from the 17 jurisdictions—or ***any*** jurisdiction—stating that public nuisances need ***not*** arise from the defendant's use of land.[30] In light of the majority rule requiring such a connection, the School Districts provide no basis for the Court to depart from the fundamental principle that "a federal court sitting in diversity 'should opt for the interpretation that restricts liability, rather than expands it.'" *Davidson v. Apple, Inc.*, 2017 WL 3149305, at *18 (N.D. Cal. July 25, 2017).

**b) The School Districts Provide No Reason to Extend Public Nuisance Law to Online Communication Services.**

The School Districts also provide no basis to depart from the majority rule that public nuisance law does not apply to claims involving allegedly defective products—much less to claims involving the design of online communications services. *See* Mot. 33–36. The School Districts do not cite even a single

---

[28] *In re Nat'l Prescription Opiate Litig.—West Boca*, 452 F. Supp. 3d 745 (N.D. Ohio 2020) ("*West Boca*") is not to the contrary. The court there held only "that Florida nuisance law does not require an interference with the use and enjoyment of property"; it did not address whether a connection with the defendant's land is required. *Id.* at 775. The School Districts also criticize Defendants for citing in a footnote a dissenting opinion by the Florida Supreme Court chief justice from a 1927 case, Opp. 28, but the quoted language was and remains a true statement of law, as more recent cases like *Bogorff* confirm.

[29] In *City of Chicago*, the Court ultimately held that "a public nuisance has been found to exist only when one of two circumstances was present: either the defendant's conduct in creating the public nuisance involved the defendant's use of land, or the conduct at issue was in violation of a statute or ordinance." *Id.* at 1117. Thus, while a misuse of land was not required if the conduct violated a statute or ordinance, the Court declined "to expand the law of nuisance to encompass a third circumstance—the effect of lawful conduct that does not involve the use of land." *Id.*

[30] Defendants acknowledged in their Motion that Indiana is a minority state that does not require a nexus to the defendant's use of land. *See* Mot. 33 n.20.

appellate decision from state courts in ***any*** of the 17 jurisdictions expressly authorizing a public nuisance claim involving the distribution of lawful products[31]—let alone lawful online communications services. "[A]s a federal court ruling on state law," this Court should not "be in the vanguard in changing the state law." *Taylor v. La. Pac. Corp.*, 165 F.3d 36 (9th Cir. 1998).

The School Districts rely primarily on *Ileto v. Glock Inc.*, 349 F.3d 1191 (9th Cir. 2003), and *JUUL*. As an initial matter, both rested on an erroneous interpretation of California law that has been rejected by the California Court of Appeal. *In re Firearm Cases*, 126 Cal. App. 4th 959, 990 (2005) (*Ileto* decision "'is not California law.'") (quoting *Ileto v. Glock, Inc.*, 370 F.3d 860, 862 (9th. Cir. 2004) (Callahan, J., dissenting from denial of reh'g en banc)); *see also* Mot. 34 n.22.[32] In any event, both cases are distinguishable—the guns and e-cigarettes in those respective cases were not alleged to be defective in and of themselves, but rather liability purported to turn solely on the way that these products were illegally disseminated within the community (either to people under the legal age for tobacco use or as part of an illegal black market for guns). *Ileto*, 349 F.3d at 1214 ("[T]he alleged nuisance is not premised on the legal manufacture and design of the guns."); *JUUL*, 497 F. Supp. 3d at 646 (product nuisance claims were not premised "on any alleged defect in JUUL products"). By contrast, the School Districts' claims turn on the allegation that Defendants' services are defectively designed. *E.g.*, Compl. ¶ 85 ("Defendant[s] deliberately designed, developed, engineered, and implemented dangerous features in their platforms."); *see id.* ¶¶ 8–10, 65, 68, 87, 104–09, 119, 121, 134, 136, 144, 177, 183, 187, 190; Opp. 30 ("School Districts' claims are premised on Defendants' platform designs…."); *id.* at 4 ("Defendants knowingly designed their social media platforms to hook young users").[33]

---

[31] The Indiana Supreme Court allowed a public nuisance claim against gun manufacturers and distributors that allegedly "intentionally and willingly suppl[ied] the demand for illegal purchase of handguns." *City of Gary ex rel. King v. Smith & Wesson Corp*., 801 N.E.2d 1222 (Ind. 2003). It did not directly address the issue of whether public nuisance law can extend to the lawful distribution of products.

[32] While this Court is generally bound by the Ninth Circuit, if a Ninth Circuit opinion has been rendered no longer good law, the Court is not obliged to follow it. *See United States v. Tedder*, 2008 WL 544448, at *3 (E.D. Cal. Feb. 26, 2008) (district court not bound by Ninth Circuit decisions that are no longer good law, even if they have not been expressly overruled). In any event, *Ileto* speaks only to California law, and would be precedential only for California claims—none of which will serve as bellwether plaintiffs.

[33] The School Districts argue that "[t]he relevant question is whether a claim sounds in product liability based solely on a product defect or sounds in public nuisance." Opp. 30. Their claims clearly sound in

Moreover, the Restatement recently criticized cases like *JUUL* and *Ileto* for allowing "unsound claims of public nuisance to be brought on facts outside the traditional ambit of the tort." *See* Third Restatement § 8 cmt. g. As several state supreme courts have concluded in thoroughly analyzed, leading decisions—applying public nuisance "to lawful products … would create unlimited and unprincipled liability for product manufacturers." *Hunter*, 499 P.3d at 725; *see also Lead Indus.*, 951 A.2d at 435 ("The law of public nuisance never before has been applied to products."); *City of Chicago*, 821 N.E.2d at 1116 (2004) ("We are also reluctant to recognize a public right so broad and undefined that the presence of any potentially dangerous instrumentality in the community could be deemed to threaten it."); *In re Lead Paint*, 924 A.2d at 501 (similar); *see also* Mot. 34 n. 22.

The School Districts have no real answer to these authorities. Their only response to *Hunter* is to brush it aside because there are no Oklahoma plaintiffs. Opp. 32. They ignore that, in its analysis, the Oklahoma Supreme Court joined many other states in following the Restatement and surveyed public nuisance law across the country, including in jurisdictions at issue here, to chronicle the growing nationwide "trend" against recognizing ill-defined nuisance claims that do not "address discrete, localized problems." 499 P.3d at 726–27, 730 (citing cases from, inter alia, Illinois, New Jersey, and Rhode Island); *see also In re Paraquat Prods. Liab. Litig.*, 2022 WL 451898, at *11 (S.D. Ill. Feb. 14, 2022) (citing *Hunter* approvingly and dismissing public nuisance claims involving sale of non-pharmaceutical products under, inter alia, Florida, Indiana, and Pennsylvania law).[34] The School Districts also cite several non-precedential trial court decisions from the opioid litigation, but ignore that *Hunter* is the only high court decision on public nuisance arising from the opioid litigation. Mot. 35 n.23. They cherry-pick language from *Lead Industries*, *In re Lead Paint*, and *City of Chicago*, while ignoring the central holdings and analyses of those cases. *Id.* And they do not address the Third Restatement, which has made clear that

---

product liability, as borne out by the fact that their allegations mirror those of the Personal Injury Plaintiffs, whose *primary theory* was based on product liability. *See also* Compl. ¶ 134 ("The result of Defendants' *destructive design choices* has been a crisis in children's mental health.").

[34] Contrary to the School Districts' assertion, the MDL court in the opioid litigation noted that Oklahoma law is "different and inapplicable" to *Ohio law*, not to the laws of the 17 states at issue here. *In re Nat'l Prescrip. Opiate Litig.*, 589 F. Supp. 3d 790, 815 (N.D. Ohio 2022). And, as discussed, Ohio is in the minority of the state supreme courts to consider this issue. *See* Mot. 34 n.21.

"problems caused by dangerous products" are not "matters for the law of public nuisance," whose "reach remains more modest." Third Restatement § 8 cmt. g.

In short, five of the seven state supreme courts that have considered the type of expansion of public nuisance law advocated by the School Districts have rejected it.[35] So too has the Restatement, which the School Districts themselves acknowledge has been adopted by the vast majority of jurisdictions. *See* Opp. App'x D; Mot. 40 n.27. This Court should do the same.

**2. The School Districts Have Not Alleged Interference with a Public Right.**

The School Districts' arguments that they have adequately pled interference with public rights have been repeatedly rejected, including in the seminal cases on the issue—*Lead Industries*, *Hunter*, and *City of Chicago*. Because those cases apply the Restatement, they are instructive regardless of whether a given School District is located in those states, and they are dispositive for Illinois and Rhode Island.

Public rights are "collective in nature" and involve rights to "indivisible resources"—the air we breathe, the water we drink, the waterways we navigate, the public roads on which we travel. Mot. 37; *Lead Indus.*, 951 A.2d at 448; *Hunter*, 499 P.3d at 726. The School Districts never mention this definition and make no effort to show how their allegations meet it. They claim that Defendants unreasonably interfered with a purported public right to collective "health," but when the Restatement speaks of interferences with the "public health," it speaks in terms of contagions or spread of disease—because conduct that allows the spread of disease interferes with the public's right to access and enjoy public resources or public spaces.[36] Contrary to the School Districts' positions (Opp. 9), designing and marketing a website or app is nothing like spreading a contagious disease or maintaining explosives and does not interfere with any "public goods" or the public's ability to use public spaces.[37] *See Alaska v. Walgreen*

---

[35] *See* Mot. 34 n.21. While Defendants acknowledged *City of Gary* elsewhere in their Motion, Mot. 33 n.20, they inadvertently left it out of their description of state supreme court holdings in footnote 21.

[36] Second Restatement § 821B cmt. a (examples of hog pens, keeping diseased animals, malarial ponds, sewer systems, and unlawful practice of medicine that may lead to a failure to maintain sanitary methods to prevent the spread of disease).

[37] The School Districts repeatedly invoke the public right to "safety," *e.g.*, Opp. 33, 35, but they make no attempt to show how any right to safety is implicated by Defendants' alleged conduct. Nevertheless, the alleged conduct here is nothing like the examples of interferences with the "public safety" provided by the Restatement, which include keeping fireworks or vicious dogs, explosives, blasting, and dilapidated

*Co.*, Case No. 3AN-22-06675-CI at 6 (Alaska Super. Ct. Mar. 1, 2024) (attached as Ex. A) ("While [other opioid] cases cited by Plaintiff may state that they follow the Restatement's definition of public nuisance, none of those cases indicate how the Restatement's illustrations of public health nuisances are even remotely similar to the act of distributing lawful medication.").

Even assuming that the School Districts sufficiently alleged interference with public health, they are unable to point to any allegations suggesting that the purported interference equally affects the rights of all members of the community—as required for pleading a cognizable claim for public nuisance. Mot. 42–43. To the contrary, they cannot make that showing because, even if use of Defendants' services impacted access to or enjoyment of any indivisible resource, the School Districts concede that billions of people, including minors, safely use the services every day and admit that only a small percentage of adolescent users experience any negative effect. *E.g.*, Compl. ¶ 305.[38] *See Alaska v. Walgreen Co.* (Ex. A) (if a public "right is violated, it has actual and potential effects on the rights of every single person"; finding no public right violated by manufacturing, marketing, or selling of prescription opioids).

The School Districts also contend interference with a public right by invoking "the right to a public education," Opp. 34, but they do not cite a single case that has recognized a public right to education redressable through public nuisance law, nor any cases that allow a School District to assert such a right on behalf of the general public.[39] They claim that such a right is "expressly recognized in many jurisdictions" and cite various state constitutional provisions, *id.*, but those constitutional provisions (which the School Districts never quote or explain) require states to provide a system of public education. In other words, they create duties the states owe to their citizens, and at most, such provisions could be

buildings. Second Restatement § 821B cmt. a.

[38] The School Districts refer to the Restatement's comment that "[i]n many cases the interests of the entire community may be affected by a danger to even one individual." Opp. 35. They fail to note that the Restatement was speaking of a contagion or conflagration: "the threat of communication of smallpox to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic; and a fire hazard to one adjoining landowner may be a public nuisance because of the danger of a conflagration." Second Restatement § 821B cmt. g. Again, this language makes *Defendants'* point and does nothing to establish that the School Districts have pled interference with a public right.

[39] *JUUL* only considered the school districts' allegation that the defendants interfered with the right to health and safety; it declined to consider the alleged right to education. *See* 497 F. Supp. 3d at 648 n.75.

read to grant citizens a right of access to education.  *See* Opp. App'x E.  The School Districts do not plead that Defendants interfered with access to education.  Mot. 39.

The School Districts assert that they "clear th[e] hurdle" of establishing an unreasonable interference with a public right for two reasons: (i) "the seriousness of the harm here" and (ii) "the widespread impact of Defendants' conduct on society."  Opp. 32; *see also id.* 35.  But courts have consistently held that those arguments are insufficient to implicate ***public*** rights and that the existence of a "public health crisis" that touches many people does not transform private rights into public rights.  Mot. 37–42; *Lead Indus.*, 951 A.2d at 436, 448 (acknowledging that "lead poisoning constitutes a public health crisis that has plagued and continues to plague this country, particularly its children," but finding no public right implicated, explaining "[t]hat which might benefit (or harm) 'the public interest' is a far broader category than that which actually violates 'a public right'")); *City of Chicago*, 821 N.E.2d at 1116 (despite "the very real problem of violent crime" in the city, no public right at issue); *Hunter*, 499 P.3d at 723 (no public right despite "severity of the harm that thousands of Oklahoma citizens have suffered because of opioids").

The School Districts cite only three cases—all from California—in support of their argument that they have alleged interference with a public right, but none helps them.  Defendants already explained why the *JUUL* and *ConAgra* decisions are not persuasive.  Mot. 41–42.  As noted, *JUUL* contains no analysis under California law at all, but simply quotes a New York trial court order on a motion to dismiss—which, in turn, says only that the public right to health was implicated because plaintiffs alleged "a crisis of epidemic proportions [that] has affected a considerable number of persons."  497 F. Supp. 3d at 648; Opp. 36.  As *Lead Industries*, *Hunter*, and *City of Chicago* demonstrate, however, allegations involving a "public health crisis"—however widespread or serious—do not, on their own, establish interference with public rights.  Lastly, *In Re Kia Hyundai Vehicle Theft Litigation*, 2023 WL 8126870, at *8 (C.D. Cal. Nov. 17, 2023), supports ***Defendants*** because it concerns allegations of interference with the indivisible resource of public rights of way: "it is the interference with ***the use of public roads*** that invokes the public right necessary to state a public nuisance claim in each of the seven states."  *Id.*

The School Districts try to distinguish Defendants' authorities, but they cite no persuasive contrary authority, and their attempts to run away from *Hunter*, *City of Chicago*, and *Lead Industries* fall flat.  First,

the School Districts ignore *Hunter* because no School District Plaintiff is from Oklahoma, Opp. 26 n.16, but that is irrelevant. Its analysis is instructive in interpreting the laws of the at-issue states because they all follow the Restatement or have laws consistent with it. *Hunter* is also persuasive because the state's theory of public nuisance was similar to the School Districts'—allegations that opioid manufacturers' conduct in making and promoting a dangerous product constituted a public nuisance that caused many people injury and created "an opioid drug epidemic." *Id.* at 720-21. But, "[h]owever grave the problem of opioid addiction is … public nuisance law does not provide a remedy for this harm." *Id.* at 723.

Second, the School Districts try to distinguish *City of Chicago* by misquoting it. They assert that it "explicitly acknowledged a right to public health, citing the Second Restatement § 821B, concerning the existence of 'a public right, as opposed to an individual right, to be free from the threat of illegal conduct by others.'" Opp. 37. The entirety of that quote is, "***we question whether there is*** a public right, as opposed to an individual right, to be free from the threat of illegal conduct by others." 821 N.E.2d at 1114. The court answered its own question in the negative, concluding "that ***there is no authority*** for the unprecedented expansion of the concept of public rights to encompass the right asserted by plaintiffs," and declining to "break new ground by creating such precedent." *Id.* at 1116.

Lastly, the School Districts' only response to *Lead Industries* is to criticize Defendants for "glaz[ing] over the critical distinction between the facts of that case and those alleged here." Opp. 37. Defendants did the opposite, showing the similarities between the allegations in *Lead Industries* and those pleaded here. Mot. 38–39. *Lead Industries* involved "a public health crisis that has plagued … this country, particularly its children." 951 A.2d at 436. It involved claims, just like here, that manufacturers made and distributed a product that was alleged to cause harm to certain people, that "defendants failed to warn … of the hazardous nature of lead and … concealed these hazards from the public or misrepresented that they were safe." *Id.* at 440. The product at issue in *Lead Industries* allegedly had a greater injurious impact on children than adults and led to "permanent learning disabilities, reduced concentration and attentiveness and behavior problems, problems which may persist and adversely affect the child's chances for success in school and life," and sometimes led to "comas, convulsions, and even death." 951 A.2d at 437. Yet despite the "serious" and "widespread" nature of the harms, no public right was involved. *Id.*

The School Districts point out that children primarily ingested lead paint in their homes and not at school. Opp. 37. Whether or not that is true, the critical factor in *Lead Industries*, and here, is that the alleged offending conduct was provision of a product or service that is used by "individual consumers" and allegedly caused personal injuries, not interferences with public goods or resources. Moreover, the School Districts' allegations are not that students are exposed to harm from Defendants' services ***because*** they are "in public spaces" or that they cannot use public spaces safely because of the services. Opp. 37. Rather, they claim harm from the use of services including—if not primarily—in the privacy of students' homes and other private places. Compl. ¶¶ 228, 1020.

**3. The School Districts Have Not Adequately Alleged "Special Injury."**

**a) The School Districts Must Plead Special Injury to Seek Either Damages or Abatement.**

While acknowledging that they must plead special injury to seek damages, Opp. 38 n.33, the School Districts incorrectly contend that they are public entities who may seek abatement without alleging a special injury. The School Districts did not plead that they are "public agencies empowered to represent the state or a political subdivision." *Id*. Even if they had, the Restatement is clear that, in order to seek abatement as a public entity, the entity must have "***authority***" to do so. Second Restatement § 821C(2)(b). The School Districts cite no authority—and Defendants are aware of none—for the proposition that they are so authorized . Mot. 44 n.34. The authorities cited in Defendants' opening brief make clear that ***only*** the enumerated entities may bring a claim for abatement absent a special injury, and school districts are not among them. Mot. 44 n.34.[40] In the absence of state law or authority authorizing any School District to sue for abatement without pleading special injury, this Court should not permit it.

**b) The School Districts Failed to Plead Special Injury.**

The School Districts failed to plead special injury. First, they have not shown that they suffered any injury in the exercise of their public rights. This is not a "conflation" of special injury with the

[40] *See also Ray v. Mayor of Balt.*, 59 A.2d 545, 549 (Md. 2013) (only "proper governmental agenc[ies]" may seek abatement of public nuisance without showing special injury); *State ex rel. Howes v. W.R. Peele, Sr. Tr.*, 876 F. Supp. 733, 741 (E.D.N.C. 1995) ("A state may summarily abate a public nuisance, as doing so is within its police power.").

"separate concept" of public rights. Opp. 39. The School Districts are private plaintiffs and therefore must show injury in the exercise of ***their*** public rights. It is not sufficient to assert that students, or the community at large, allegedly suffered injury in exercising their public rights because the School Districts do not, and cannot, sue in a representative capacity.[41]

The School Districts' only answer is to again cite *JUUL*. But, while *JUUL* found that the school districts had adequately alleged special injury, the court did not address the requirement that plaintiffs must show injury in the exercise of their own rights because the parties did not raise it.[42] The School Districts cannot escape the fact that the rights with which Defendants allegedly interfered—even if the Court finds them to be "public" rights—were those of students. The School Districts do not—and cannot—allege that Defendants interfered with ***their*** exercise of rights to health, safety, or education, and thus they have not pleaded special injury. Mot. 44–45 & n.35.

Second, the School Districts also failed to plead an injury different in kind or degree from the remaining public. The thrust of their Master Complaint is that they have had to spend money to treat or prevent alleged injuries to students from use of Defendants' services. They assert that they are the "first responders" to the "youth mental health crisis" and are a primary source of treatment for youth. Opp. 1, 3, 27, 38. That is the essence of a derivative injury. *Supra* Part II.C; Mot. 46. The School Districts' alleged injuries are therefore not different in kind than the injuries to the students; they are an extension of them. Opp. 39–40. ***None*** of the examples of special injury provided by the Restatement include those who were harmed only because they paid for the treatment or prevention of harm to others. Second Restatement § 821C.[43]

[41] The School Districts argue that *Rincon* supports them because the court noted that "Tribes, just like any other governmental entity, would have authority to address any alleged nuisance presented by banked card games within their own communities," Opp. 40, but tribes are sovereigns that can sue in a representative capacity, and the School Districts are not.

[42] The *JUUL* defendants argued that there was no public right implicated because the injuries were to private rights, and that the school districts had not shown a special injury different in kind and degree, but they did not argue lack of special injury because the school districts were not exercising their own public rights. *In re JUUL Labs*, No. 13:9-md-2913-WHO, Dkt. 740 at 18-20 (attached as Ex. B).

[43] *JUUL* is out of step with the Restatement, and its holding on special injury is based on the faulty premise that the school districts' injuries were distinct from, rather than derivative of, the students' injuries, *see supra* at 10–11, and because it did not consider (because it was not raised) the foundational requirement

**F. The School Districts' Negligence Claim Is Not Cognizable.**

**1. The School Districts Fail to Plead Any Duty Owed by Defendants.**

**a) The School Districts Have No Support for the Duty Alleged.**

The School Districts do not dispute that they seek to recover for third-party harms—both harms purportedly ***experienced*** by third-party users of Defendants' services and harms (like crime and property damage) allegedly ***caused*** by third parties. Nor do they attempt to argue that they have pleaded a "duty [that] runs ***from the defendant to the plaintiff.***" Mot. 47 (quoting *Gray v. Derderian*, 371 F. Supp. 2d 98, 104 (D.R.I. 2005). Rather, they make the conclusory argument that because courts "in the JUUL and opioid litigations" recognized a duty, the same result should follow here. Opp. 49. Not so.

As an initial matter, the *JUUL* and *West Boca* decisions that the School Districts cite analyze only five states' laws (Arizona, California, Florida, Pennsylvania, and New York).[44] And neither court cited binding authority from ***any*** state that recognizes the duty alleged here. *JUUL*, 497 F. Supp. 3d at 655–59; *West Boca*, 452 F. Supp. 3d at 785–87. Indeed, the *West Boca* decision does not concern school districts at all. And unlike the marketing of tobacco products to minors, the distribution of Defendants' services to students is not in itself illicit. Rather, Defendants' services serve the vital purpose of connecting individuals for communication and free expression. *See supra* Part II.C.

The School Districts also make no viable argument why Defendants owe them a duty to prevent harms caused by third parties. They concede that they cannot allege "a 'special relationship' with Defendants as a general matter." Opp. 45 n.39. Instead, the School Districts contend that their claims are

---

of special injury that the plaintiff be injured in the exercise of its own public rights, *see supra* n.43. Most of the other cited cases are not about special injury at all. *See Alaska v. Purdue Pharma L.P.*, No. 3AN-17-09966CI, 2018 WL 4468439, at *4 (Alaska Super. Ct. July 12, 2018); *State ex rel. Stein v. EIDP, Inc.*, No. 20 CVS 5612, 2023 WL 2326101, at *7 (N.C. Super. Ct. Mar. 2, 2023); *Pennsylvania v. Monsanto Co.*, 269 A.3d 623, 648–52 (Pa. Commw. Ct. 2021); *Mayor of Balt. v. Monsanto Co.*, No. CV RDB-19-0483, 2020 WL 1529014, *9 (D. Md. Mar. 31, 2020). The remaining cases involve injury to private plaintiffs resulting directly from alleged interference with their exercise of public rights. *In re StarLink Corn Prods. Liab. Litig*., 212 F. Supp. 2d 828, 848 (N.D. Ill. 2002) (dissemination of contaminated corn specially injured corn farmers by increasing farming costs and depressing corn prices); *Johnson v. 3M*, 563 F. Supp. 3d 1253, 1340-41 (N.D. Ga. 2021), *aff'd sub nom. Johnson v. 3M Co.*, 55 F.4th 1304 (11th Cir. 2022) (cost of remediating contaminated land specially injured the affected farmers).

[44] None of the Plaintiff School Districts are in Arizona.

premised wholly on "Defendants' own harmful actions." Opp. 51. But among the injuries the School Districts allege are "[e]xpend[ing], divert[ing], and increas[ing] resources" to "investigate and prosecute crimes," "investigate threats made against schools, students, and members of the community," and "repair property damages." Compl. ¶ 1023(n), (o), (r). These allegations all reflect third-party acts—the School Districts nowhere allege that *Defendants themselves* committed "crimes," made "threats," or "damage[d]" their "property." Nor do the School Districts explain why their theorized duty by Defendants to provide different age verification, parental controls, filters, or CSAM reporting would run to third parties like schools, rather than simply to users. Opp. 11–13. And despite their argument to the contrary, the School Districts have not pleaded any new facts that should alter this Court's prior analysis and rejection of *Hacala v. Bird Rides, Inc.*, 90 Cal. App. 5th 292 (2023). *See In re Soc. Media*, 2023 WL 7524912, at *38.

**b) The School Districts' Alleged Injuries Were Not Foreseeable.**

The School Districts argue that because Defendants marketed their services to teenagers, ***any*** increased expense to School Districts resulting from students' use of Defendants' services was foreseeable. That is not the law. For a duty to exist, it is not enough for an alleged injury to be "within the realm of … conceivable possibility"; rather, it must be "objectively reasonable to expect the specific danger causing the plaintiff's injury." *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. 4th DCA 2022). In other words, the alleged conduct and injury must be closely connected. *Kuciemba v. Victory Woodworks, Inc.*, 14 Cal. 5th 993, 1021 (2023) (citing *Rowland v. Christian*, 69 Cal. 2d 108 (1968)).

The School Districts identify several alleged injuries, Opp. 2, but offer only conclusory allegations tying them to Defendants' conduct. For example, they complain that they must "investigate and respond to threats to schools and students," Opp. 3, but they do not allege any facts that Defendants' conduct increased such threats; they only claim that the individuals making the threats chose to disseminate them on Defendants' services instead of (or in addition to) by phone or some other communication method. If such allegations suffice to support a duty, then the School Districts could assert a duty whenever any technological innovation requires schools to adapt to new methods of communication.

The School Districts argue that a duty may be recognized based on the foreseeability of their harms, but they are wrong. *See* Opp. 44. In, *JUUL*, the recognition of duty hinged on defendants' illegal marketing and sale of products containing addictive chemicals that resulted in "reasonably predictable

harm" from an "illicit youth market." *See JUUL*, 497 F. Supp. 3d at 657–58. The court cited the "unquestionable" "need" to prevent the ***illegal*** act of "youth vaping" as justification for treating secondary effects of underage vaping as foreseeable. *Id.* at 657. In contrast to tobacco use by minors, which is capable of causing directly traceable physical injuries, the School Districts concede that only a small portion of people who legally use Defendants' services report any negative effects, and that alleged injuries could have been caused by a number of other factors as well. *E.g.*, Compl. 202 (increase in students seeking mental health services coincided with the COVID-19 pandemic). There is thus no "unquestionable" need to treat harms allegedly resulting from the legal use of communications services (that hundreds of millions of people safely use every day) as foreseeable.

Traditionally, defendants can be held liable for harms caused by third parties only where defendants have a special relationship with either the plaintiff or the third party. Seemingly to sidestep this requirement (because, as noted, they concede they do not meet it), the School Districts' theory is that liability arises because they have a close relationship with the third party. Opp. 50. The cases they cite do not support that novel theory. In four such cases, the defendants' products or conduct allegedly caused the plaintiffs' injuries directly. *Kesner v. Super. Ct.*, 1 Cal. 5th 1132, 1145–58 (2016); *Phillips v. Cricket Lighters*, 841 A.2d 1000, 1010 (Pa. 2003); *J'Aire Corp. v. Gregory*, 24 Cal. 3d 799, 804 (1979); *McCain v. Fla. Power Corp.*, 593 So. 2d 500, 503 (Fla. 1992). Here, unlike in those cases, the School Districts' injuries exist either as a further consequence of their reactions to their students' alleged injuries or because the students themselves caused the injuries to schools. *See supra* Part II.C–D. No state authority has recognized that this kind of derivative, second-step injury is sufficiently foreseeable to justify a duty.

**c) Public Policy Weighs Against Creating a Duty.**

As the California Supreme Court has explained, "[m]eaningful limits on tort liability, along with the incentives they set, are crucial to the functioning of our economy and of our courts." *S. Cal. Gas Leak Cases*, 7 Cal. 5th 391, 414 (2019). Regardless of factual scenario, courts decline to craft new legal duties that would open the floodgates of litigation. *See Kuciemba*, 14 Cal. 5th at 1031. Imposing a freewheeling duty on online communication services to prevent School Districts from being impacted by their students' use of legal communication tools would do just that.

The School Districts attempt to wave away these concerns by emphasizing that their claims involve

Defendants' alleged "targeting [of] youth and schools." Opp. 48. But plenty of products and services are geared towards students, yet the normal tort rules still apply. Indeed, if the School Districts' theory of duty were correct, they could sue the makers of any product or service that teens use.

This case is further afield from *JUUL* because claims against a manufacturer of vaping products do not implicate the First Amendment, but claims against social media services plainly do. Accordingly, the public policy concerns of imposing such an expansive duty are further heightened given the First Amendment protections afforded to Defendants' services. Rendering a communication service liable for alleged harm caused by the speech it publishes—not just to users of its service, but to bystanders allegedly affected by those users' conduct—would impermissibly chill both Defendants' and users' First Amendment rights. The School Districts nowhere meaningfully address any of the authority cited in the Motion that counsels against subjecting Defendants to liability of this nature. Mot. 56–57.

Rather, the School Districts ineffectively attempt to evade the First Amendment by arguing that their claims are not content-based. The plaintiffs in *Zamora* similarly sought to side-step the First Amendment by predicating their claims on defendants' alleged failure to use ordinary care to prevent the plaintiff from being "impermissibly stimulated, incited and instigated to duplicate" "unspecified violence projected periodically over television." 480 F. Supp. 199, 200, 206 (S.D. Fla. 1979). But the *Zamora* court gave this argument little weight, holding that "the imposition of such a generally undefined and undefinable duty would be an unconstitutional exercise … giv[ing] birth to a legal morass through which broadcasting would have difficulty finding its way." *Id.* at 206. Similarly, the School Districts do not, and could not, dispute that Defendants operate online communication services that publish and disseminate speech created by others, or that such activities are protected by the First Amendment. *See supra* Part II.B.

Nor can the School Districts overcome Defendants' First Amendment protections using state constitutional rights to education, which, as discussed above, guarantee, at most, a student's right of access. *See supra* at 21–22; *see also* U.S. Const. Art. VI, Cl. 2 (pursuant to the Supremacy Clause, First Amendment rights trump any state right that may be construed as inconsistent); *Akin v. Bd. of Ed. of Riverside Unified Sch. Dist.*, 262 Cal. App. 2d 161, 168–69 (1968) (schools free to impose regulations provided that the[y] … do[] not unreasonably infringe upon the exercise of a constitutional right").

The School Districts' proffered duty would drastically expand the potential class of plaintiffs and claims in a manner that would also tread on well-recognized First Amendment protections. Public policy counsels against the imposition of such a duty.

**2. The Economic Loss Doctrine Bars Economic Damages Claims.**

The School Districts' attempt to save their negligence claim from the economic loss doctrine is unavailing. First, they concede that 12 of the 13 states listed by Defendants recognize the doctrine. And they are wrong about the remaining state: Louisiana. Plaintiffs rely on *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 680 F. Supp. 2d 780 (E.D. La. 2010), Opp. 52, but the Fifth Circuit rejected that district court's conclusion one year later.[45] The argument that the other 12 states would not apply the economic loss doctrine here fares no better. Opp. 52. For example, the case law does not support Plaintiffs' argument that contractual privity is necessary in some states.[46]

The School Districts are correct that the economic loss doctrine does not apply to physical harm or property damage. Opp. 53. But they do not dispute that most of their asserted losses—money spent on counseling, training, education programming, communicating with community members, etc.—are economic in nature. Compl. ¶ 1023. The economic loss rule thus applies to most of their asserted losses.[47]

**III. CONCLUSION**

The School Districts' claims should be dismissed in their entirety with prejudice.

[45] *Wiltz v. Bayer CropScience, Ltd. P'ship*, 645 F.3d 690, 698–703 (5th Cir. 2011). Louisiana courts also routinely reject tort claims seeking economic losses based on identical policy justifications as those underlying the economic loss rule. *See id*. at 695–98; *see also PPG Indus., Inc. v. Bean Dredging*, 447 So. 2d 1058, 1061–62 (La. 1984).

[46] *See Johnson v. 3M*, 563 F. Supp. 3d 1253, 1303 (N.D. Ga. 2021); *Hexagon Holdings, Inc. v. Carlisle Syntec Inc.*, 199 A.3d 1034, 1042 (R.I. 2019); *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 736 (Ind. 2010); *see also Stender v. BAC Home Loans Servicing LP*, 2013 WL 832416, at *4 (N.D. Ind. Mar. 6, 2013). The School Districts are correct that the doctrine is limited to product liability claims in Florida. Opp. 52 n.46 (citing *Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Companies, Inc.*, 110 So. 3d 399, 407 (Fla. 2013)). But "since *Tiara*, courts have continued to recognize that [Florida's] duty requirement precludes most negligence claims predicated on economic harm alone," leading to the same practical result as if the economic loss doctrine applied. *In re Jan. 2021 Short Squeeze Trading Litig.*, 584 F. Supp. 3d 1161, 1188 (S.D. Fla. 2022), *aff'd*, 76 F.4th 1335 (11th Cir. 2023).

[47] The School Districts' argument regarding the independent duty exception fails because no independent duty exists.

Dated: March 25, 2024

Respectfully submitted,

**COVINGTON & BURLING LLP**

*/s/ Phyllis A. Jones*

Paul W. Schmidt, *pro hac vice*
pschmidt@cov.com
Phyllis A. Jones, *pro hac vice*
pajones@cov.com
Christian J. Pistilli (*pro hac vice* pending)
cpistilli@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

Emily Johnson Henn (State Bar No. 269482)
ehenn@cov.com
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

**KING & SPALDING LLP**

*/s/ Geoffrey M. Drake*

Geoffrey M. Drake, *pro hac vice*
gdrake@kslaw.com
TaCara D. Harris, *pro hac vice*
tharris@kslaw.com
David Mattern, *pro hac vice*
dmattern@kslaw.com
King & Spalding LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309

Telephone: + 1 (404) 572-4600
Fascimile: + 1 (404) 572-5100

**FAEGRE DRINKER LLP**

*/s/ Andrea R. Pierson*

Andrea Roberts Pierson, *pro hac vice*
andrea.pierson@faegredrinker.com
Amy Fiterman, *pro hac vice*
amy.fiterman@faegredrinker.com
Faegre Drinker LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: +1 (317) 237-1000

*Attorneys for Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

**MUNGER, TOLLES & OLSEN LLP**

*/s/ Jonathan H. Blavin*

Jonathan H. Blavin (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Rose L. Ehler (State Bar No. 296523)
Rose.Ehler@mto.com
Victoria A. Degtyareva (State Bar No. 284199)
Victoria.Degtyareva@mto.com
Ariel T. Teshuva (State Bar No. 324238)
Ariel.Teshuva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

Lauren A. Bell, *pro hac vice*
Lauren.Bell@mto.com
MUNGER, TOLLES & OLSON LLP

601 Massachusetts Ave., NW,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

*Attorneys for Defendant Snap Inc.*

**WILLIAMS & CONNOLLY LLP**

*/s/ Joseph G. Petrosinelli*
JOSEPH G. PETROSINELLI, *pro hac vice*
jpetrosinelli@wc.com
ASHLEY W. HARDIN, *pro hac vice*
ahardin@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

**WILSON SONSINI GOODRICH & ROSATI**
**Professional Corporation**

*/s/ Brian M. Willen*
Brian M. Willen, *pro hac vice*
Wilson Sonsini Goodrich & Rosati
bwillen@wsgr.com
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Lauren Gallo White (State Bar No. 309075)
Wilson Sonsini Goodrich & Rosati
lwhite@wsgr.com
Andrew Kramer (State Bar No. 321574)
akramer@wsgr.com
Carmen Sobczak (State Bar No. 342569)
csobczak@wsgr.com
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099

Christopher Chiou (State Bar No. 233587)
Wilson Sonsini Goodrich & Rosati

cchiou@wsgr.com
Matthew K. Donohue (State Bar No. 302144)
mdonohue@wsgr.com
633 West Fifth Street
Los Angeles, CA 90071-2048
Telephone: (323) 210-2900
Facsimile: (866) 974-7329

*Attorneys for Defendants YouTube, LLC and Google LLC*

34

DEFENDANTS' REPLY ISO MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT

**ATTESTATION**

I, Phyllis A. Jones, hereby attest, pursuant to N.D. Cal. Civil L.R. 5–1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: March 25, 2024 By: */s/ Phyllis A. Jones*

Phyllis A. Jones

35

DEFENDANTS' REPLY ISO MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT