Pages 1 - 81

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

| | |
|---|---|
| IN RE:  SOCIAL MEDIA | ) |
| ADOLESCENT ADDICTION/PERSONAL | ) |
| INJURY | ) |
| PRODUCTS LIABILITY LITIGATION | )  **NO. 22-MD-03047 YGR (PHK)** |
| _____ | ) |

San Francisco, California
Monday, April 22, 2024

**APPEARANCES:**

For Plaintiffs:

           MOTLEY RICE LLC
           401 9th Street NW, Suite 630
           Washington, DC  20004
   BY:  **PREVIN WARREN**
       **ATTORNEY AT LAW**

           LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
           275 Battery Street, 29th Floor
           San Francisco, California 94111
   BY:  **LEXI J. HAZAM**
       **ATTORNEY AT LAW**

           BEASLEY ALLEN LAW FIRM
           218 Commerce Street
           Montgomery, Alabama 36104
   BY:  **JOSEPH G. VanZANDT**
       **ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Kelly Shainline, CSR No. 13476, RPR, CRR
             Official Stenographic Reporter

**APPEARANCES**:   (CONTINUED)

For Plaintiffs:

                        SEEGER WEISS LLP
                        55 Challenger Road, 6th Floor
                        Ridgefield Park, New Jersey  07660
             BY:  **AUDREY C. SIEGEL**
                  **ATTORNEY AT LAW**

                        LEVIN SEDRAN AND BERMAN LLP
                        510 Walnut Street, Suite 500
                        Philadelphia, Pennsylvania  19106
             BY:  **MICHAEL M. WEINKOWITZ**
                  **ATTORNEY AT LAW**

For Plaintiff the People of the State of California:
                        CALIFORNIA DEPARTMENT OF JUSTICE
                        OFFICE OF THE ATTORNEY GENERAL
                        455 Golden Gate Avenue, 11th Floor
                        San Francisco, California 94102
             BY:  **MEGAN M. O'NEILL**
                  **JOSHUA OLSZEWSKI-JUBELIRER**
                  **DEPUTY ATTORNEYS GENERAL**

For Plaintiff the Commonwealth of Kentucky:
                        KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                        COMMONWEALTH OF KENTUCKY
                        Office of Consumer Protection
                        1024 Capital Center Drive, Suite 200
                        Frankfort, Kentucky 40601
             BY:  **J. CHRISTIAN LEWIS**
                  **ASSISTANT ATTORNEY GENERAL**

For Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.;
Facebook Holdings, LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC;
Siculus, Inc.; and Mark Elliot Zuckerberg:
                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars, Suite 3500
                        Los Angeles, California 90067
             BY:  **ASHLEY M. SIMONSEN**
                  **ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        Salesforce Tower
                        415 Mission Street, Suite 5400
                        San Francisco, California 94105
             BY:  **ISAAC D. CHAPUT**
                  **ATTORNEY AT LAW**

**APPEARANCES**:   (CONTINUED)

For Defendant Snap Inc.:

                        MUNGER, TOLLES & OLSON LLP
                        355 South Grand Avenue, 35th Floor
                        Los Angeles, California 90071
            BY:  **FAYE PAUL TELLER**
                 **ATTORNEY AT LAW**

For Defendants TikTok Inc. and ByteDance Inc.:

                        KING & SPAULDING
                        1700 Pennsylvania Avenue NW
                        Washington, D.C.  20006
            BY:  **DAVID P. MATTERN**
                 **ATTORNEY AT LAW**

For Defendants YouTube, LLC, and Google LLC:

                        WILSON, SONSINI, GOODRICH & ROSATI
                        953 E. 3rd Street, Suite 100
                        Los Angeles, California 90013
            BY:  **MATTHEW K. DONOHUE**
                 **ATTORNEY AT LAW**

**Monday - April 22, 2024**                                    **1:13 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE CLERK:**  Now calling 22-MD-3047, In Re:  Social Media Adolescent Products Litigation.

Counsel, when speaking please approach the microphones and state your appearance for the record.

**THE COURT:**  Good afternoon.

**ALL:**  Good afternoon, Your Honor.

**THE COURT:**  All right.  Shall we turn to the ripe disputes first?  We'll just take them in order unless somebody has a different order they want to suggest.

All right.  I don't know if anybody needs to be heard on the first one.  On the state agency issue, obviously no oral argument today.  I don't know, I was going to say by a show of hands, does anybody feel the need for more oral argument on that issue?

**MR. LEWIS:**  Your Honor, Chris Lewis on behalf of the States' Attorney General.  The States' Attorney General, if Your Honor would like, would like to add additional argument just in that with the complexity and the short briefing that was allowed, I think there are many states that feel they need a little more color on the applicable law in the matter.

**THE COURT:**  Does every state feel that way or some of the 35 states.

```
 1            MR. LEWIS:  Some of the 35 states.

 2            THE COURT:  Do you know which ones those are?

 3            MR. LEWIS:  I don't know off the top of my head.

 4            THE COURT:  Are we hearing an echo?

 5            MR. LEWIS:  We are.

 6            THE COURT:  Yeah.

 7            THE CLERK:  I'm not sure where it's coming from.

 8            THE COURT:  All right.  Do you have a rough sense of

 9   how many are --

10            MR. LEWIS:  I know we heard from at least eight

11   directly.  I think there are others.

12            THE COURT:  All right.  Well, why don't we do this:

13   By Wednesday -- if you already know who they are, by Wednesday

14   file a notice on the docket with a statement from all the

15   states, and it can be a chart just giving me, you know, in the

16   chart which states want more oral -- want another oral argument

17   on this and which states are happy to rest on the current

18   record.

19            MR. LEWIS:  We can do that, Your Honor.

20            THE COURT:  And then depending on the number of states

21   that are asking for oral argument, my worry is that it may be

22   too many people to argue at the next DMC, and I don't want to

23   do a marathon DMC if I can avoid it so I may set a separate

24   hearing.  But it's only like -- I heard you, it's eight, so

25   it's not one or two.  If it was one or two, I was going to say
```

1  we'd do it at the next DMC; but if it's going to be eight plus,

2  I'm probably going to set a separate hearing.

3      **MR. LEWIS:**  That works, Your Honor.  We'll take

4  another poll and make sure everyone is still where they were

5  weeks ago.

6      **THE COURT:**  Okay.  Now, I'm not asking for oral

7  argument and I'm perfectly happy and willing to decide this on

8  the current record; but if people feel the need for it, I'm not

9  going to bar them from doing another oral argument.

10     Tell everybody else, tell the other State agents I'm not

11  going to hear hours and hours and hours from each state either.

12  So it's going to be, you know, short and to the point for each

13  state.

14     **MR. LEWIS:**  Understood.

15     **THE COURT:**  Okay.

16     **MS. SIMONSEN:**  Your Honor, just to -- Ashley Simonsen

17  for Meta defendants from Covington & Burling.

18     Our position is that with discovery proceeding so quickly,

19  it is important, obviously, that we get this issue resolved.

20  We've already had a fair amount of argument on this issue.  We

21  had extensive state-specific briefing.  So our position is

22  additional argument is not needed and it's something that, you

23  know, the parties could devote the time they'd otherwise devote

24  to preparing for that argument on, you know, responding to the

25  voluminous discovery requests that we have in this case.

1          So for that reason we would submit that it's not

2    necessary; and that if it is held, it be held as promptly as

3    possible so that we can actually take the discovery that we

4    need from the State Attorneys General depending on Your Honor's

5    ruling on the merits.

6          **THE COURT:**  Got it.  Well, I certainly hope there

7    won't be many more than eight states; and states that are

8    concerned about the issue, all parties are -- should understand

9    that the more argument it's going to be, the longer it's going

10   to take for me to get the transcript and take all that into

11   account.

12         **MR. LEWIS:**  Understood.

13         Your Honor, would this be something you'd entertain remote

14   argument on?

15         **THE COURT:**  Nope.  If a state wants argument, they've

16   got to come here.

17         **MR. LEWIS:**  I understand.

18         **THE COURT:**  Okay.

19         **MR. LEWIS:**  Thank you, Your Honor.

20         **MS. SIMONSEN:**  And just a final note to point out that

21   we certainly need to reserve the right to put forth our case

22   for the prejudice that we've suffered as a result of the really

23   lengthy delay we've already experienced in being able to take

24   discoveries from the AGs.  We're already a few months into

25   discovery in a very short time frame where it's been delayed by

1  virtue of this dispute so, of course, we reserve the right to

2  seek that relief, if needed, in light of this additional delay

3  to hear the issue.

4      **THE COURT:**  I don't think anything has stopped you

5  from serving subpoenas on the state agents, has it?  Have I

6  stopped you?

7      **MS. SIMONSEN:**  We have served requests for production

8  on all of the state Attorneys General.  If we had to serve the

9  subpoenas on every single agency, of course that would

10  essentially give plaintiffs' exactly what they're asking for,

11  which we say is improper because these are actually agencies

12  represented by and should be represented by the Attorneys

13  General themselves.  So our view is, you know, we do need

14  resolution of this issue in order to move forward.

15      **THE COURT:**  Not exactly my question.  Has anybody

16  stopped you from serving subpoenas on the state agencies?

17      **MS. SIMONSEN:**  Only the lengthy and very cumbersome

18  process involved.  And the whole, obviously, reason that we're

19  requesting the relief we are is that we believe it's

20  appropriate to serve them on the states themselves, which we

21  have done, and we've proceeded with meet and confers with the

22  states.  In those meet and confers, we've also not been able to

23  get very far.  The states haven't provided us with search terms

24  and custodians yet on our RFPs.

25      So there are a lot -- a lot of reasons why things are

 1  getting very delayed; and from our perspective, it's on the

 2  AG's end, and I just want to make sure we're clear on the

 3  record that we do reserve the right cure that prejudice down

 4  the road.

 5        **THE COURT:**  Clear on the record.  There's nothing

 6  barring you from serving those subpoenas; correct?

 7        **MS. SIMONSEN:**  I suppose not, except that technically

 8  it would be improper to serve third-party subpoenas if these

 9  are, in fact, you know, parties to a case and a different

10  standard applies to those discovery requests, and it's our

11  position that they are proper parties to the case.

12        **THE COURT:**  All right.  Anything further on state

13  agencies at this time?

14        **MR. LEWIS:**  Only that likely we will provide a unified

15  pleading for the states and unified oral argument.  I don't

16  know that each individual state will come, but we will be

17  arguing on behalf of those states that have raised the issues.

18        **THE COURT:**  I mean --

19        **MR. LEWIS:**  Just for logistics.

20        **THE COURT:**  Okay.  Well, if you want to -- I

21  definitely -- you mean some states are going to argue on behalf

22  of other states?  Is that what's going to happen?

23        **MR. LEWIS:**  Correct.

24        **THE COURT:**  Okay.  Why didn't you do the briefing that

25  way?  I suggested that two DMCs ago, that you kind of

1  consolidate the briefing instead of giving me 35 separate

2  briefs.

3          MR. LEWIS:  I think the 35 separate briefs were

4  because the individuals in those states are the subject matter

5  experts on what that relationship is between the Attorney

6  General's office and its state agencies.  So we wanted to defer

7  to them to actually do that drafting.

8      Now that we have that, I think it's easy for us as the

9  leads to --

10         THE COURT:  Okay.  I mean, if that -- certainly if

11  that makes it more efficient.  Like I said, I'm not going to

12  give you tons of time for this argument.

13         MR. LEWIS:  Certainly.

14         THE COURT:  Okay.  It might help, then, if you

15  indicate who's going to argue on behalf of each state then, if

16  I need to figure out if we need the big courtroom or if we can

17  do it in here, for example.

18         MR. LEWIS:  We can do that, Your Honor.

19         THE COURT:  All right.  So by Wednesday.

20         MR. LEWIS:  Thank you.

21         THE COURT:  All right.  Next, confidentiality

22  designations.  Who's -- Ms. Simonsen, you're speaking to that I

23  assume.

24         MS. SIMONSEN:  Yes.

25         THE COURT:  So who's speaking to this?

1          **MS. HAZAM:**  Good afternoon, Your Honor.  Lexi Hazam on

2   behalf of the individual and school district plaintiffs.

3          **THE COURT:**  Okay.  So why do these specific 35

4   documents matter?

5          **MS. HAZAM:**  They matter because we think the

6   designations of them were improper.  They are almost all -- I

7   think all, perhaps -- except perhaps one -- documents that are

8   at least partially unsealed in our master complaint and are

9   highly relevant to the case, and yet they remain with highly

10  confidential designations, or at least they did until we were

11  informed late on Friday that Meta would be changing the

12  designations on about one-third of them.

13         **THE COURT:**  Okay.  So this kind of goes to the

14  procedural question, which is:  Did you get to the point of

15  lead counsel meet and confer on these documents?

16         **MS. HAZAM:**  There has been meet and confer.  We were

17  waiting for Meta to respond to our letter and initial e-mails

18  regarding it with their position on each of the documents.  We

19  had provided the standard chart that listed the documents, our

20  basis for the challenge, had a column for their response.  We

21  got that response on Friday evening.

22         The concern, I think, before Your Honor today is the more

23  general one of whether we can proceed with confidentiality

24  challenges and, if need be, bring disputes that can't be

25  resolved to the Court, which we very much believe we can and

1  should do consistent with the protective order which says that

2  any party may do so at any time.

3      **THE COURT:**  Right.  So here's my guidance, and I

4  already read what Meta said on this point:  I don't want to be

5  resolving tons of motions that are unnecessary for changing the

6  confidentiality designation for documents that ultimately don't

7  really matter all that much.

8      All right.  So when I asked you why these 35 documents

9  matter, all you told me was that because some of them were

10  partially redacted.  You didn't give me any reason why any of

11  them are important to the substance of the case.

12      **MS. HAZAM:**  I can do so, Your Honor.  They were --

13      **THE COURT:**  Let me finish.  Okay?

14      If you're going to -- this is a discovery dispute,

15  confidentiality challenges are a discovery dispute.  So you're

16  more than welcome to follow my discovery procedures on this,

17  but I'm going to emphasize my guidance I've given in previous

18  DMCs and my standing order.  There better be a good reason for

19  bringing this to me and there better be a good reason why

20  counsel and then lead counsel can't work most, if not all, of

21  these things out.

22      All right.  I'm going to be very disappointed if you can't

23  work it out.  Because whether it's designated as confidential

24  or highly confidential, you have the documents.  It's not

25  impeding your ability to litigate your case; right?  It's just

```
 1    a matter of how you treat it in terms of confidentiality.
 2         This is not the kind of case where I would expect the
 3    individual plaintiffs to be actively participating in the
 4    process prosecution of the case with counsel.  I could be
 5    wrong; right?  But, in other words, I don't think this is a
 6    case where you need to show highly confidential documents that
 7    you think are public to your clients in order to confer with
 8    them on legal strategy.  All right?
 9         So this is not an issue that I think the parties ought to
10    be spending considerable time and considerable Court time on,
11    so -- but it's a discovery dispute and parties can have
12    reasonable disputes, and I have a whole procedure for that and
13    you know what the procedure is.  All right?
14         MS. HAZAM:  Understood, Your Honor.  I think --
15         THE COURT:  Let me finish.
16         MS. HAZAM:  Sorry.
17         THE COURT:  However, the party challenging a
18    confidentiality designation -- this goes for everybody; all
19    right? -- if you're going to do that, you need to show -- you
20    have the burden of showing to me why it matters for this
21    particular document to be brought to my attention, why it
22    matters for the case.  All right?
23         If it's a take-out menu that was incorrectly designated as
24    confidential and you can't for some reason reach agreement on
25    that and you still decide to bring it to me in a motion, I'm
```

 1  going to look very -- I'm going to look very hard at the party

 2  who decided to waste everybody's time bringing that kind of

 3  motion.  Do I make myself clear on this?

 4           **MS. HAZAM:**  Yes, you do.  Understood, Your Honor.

 5           **THE COURT:**  Okay.

 6           **MS. HAZAM:**  I do want to clarify that I believe we're

 7  here today because Meta has a request that we not be permitted

 8  to proceed under any circumstances prior to a summary judgment

 9  motion on designation disputes.

10           **THE COURT:**  And you won on that issue; right?

11           **MS. HAZAM:**  Understood.

12           **THE COURT:**  You follow -- if it's a -- confidential

13  designation is essentially a discovery dispute, and I have a

14  whole procedure for that.  You understand what the procedure

15  is, and I've given you the guidance on that, so...

16           **MS. HAZAM:**  Thank you, Your Honor.

17       I also just want to state for the record that these are

18  documents that are highly relevant and crucial to our case.

19  That's why they're in our master complaint.  They are the basis

20  for key allegations.

21       They also are documents that we need to share with our

22  experts, and there are additional burdens under the protective

23  order for us to do so if they remain designated as a highly

24  confidential matter at this point.

25       So that's one of the reasons for coming forward with a

```
 1   very select group of documents.  We do not intend to get

 2   anywhere near the take-out menu.

 3         THE COURT:  Okay.  So -- and no overdesignations of

 4   confidentiality.  And to the extent you already produced

 5   documents prior to the case and marked them as highly, highly

 6   confidential in connection with a preinvestigation thing and

 7   you need to go back and double-check them, I would highly

 8   recommend that the defendants do that.  Because, you know,

 9   it's -- there's one thing to designate it as confidential or

10   highly confidential for the purposes of investigation but

11   you're under a different order now.  All right?

12         MS. SIMONSEN:  Understood, Your Honor.

13      And we have gone back and redesignated everything we

14   previously produced.

15         THE COURT:  All right.

16         MS. SIMONSEN:  I do want to be clear that were not

17   asking that plaintiffs never be allowed to bring a

18   confidentiality challenge.  It's precisely what Your Honor had

19   ordered, which is that only in connections with documents they

20   actually need to use in the litigation for a purpose.

21      We did ask during the conferral why they needed to use

22   these documents.  They did not have an explanation aside from

23   they're allowed to challenge confidentiality.

24      We have worked diligently to look at their challenges and

25   assure them that we will meet and confer with them on any
```

1    challenges that they bring understanding that we're on a very

2    tight timeline.  And we are looking at these documents case by

3    case, but obviously there are times when an oversight may be

4    made.

5        With respect to counsel's representation that all of these

6    documents but one were partially unsealed, we're talking about

7    two or three words that may have -- we may have agreed to

8    unseal here and there to the extent that the plaintiffs include

9    a very short excerpt in their master complaint.  It was not the

10   entirety of the document, and the entirety of the documents

11   that we're maintaining is highly confidential is because of

12   material elsewhere in the document, not the two or three words

13   or sentences that we may have agreed the plaintiffs could use

14   in their master complaint.

15       **MS. HAZAM:**  Your Honor, if I may just briefly respond.

16       It is often quite a bit more than a few words; and to us,

17   the fact that those documents were designated highly

18   confidential until the filing of the complaint would suggest --

19   at which point Meta agreed to have then become completely

20   public straight from highly confidential would suggest that

21   some of those designations are not proper under the protective

22   order.  We have made them on a very individualized basis and

23   not painted with a broad brush.

24       To also be clear, Meta has taken the position, this is the

25   issue that's before you, that we should not be able to proceed

1    to any kind of motion practice on these disputes.

2         While we intend to do so very conservatively and exhaust

3    fully the meet-and-confer process and be very judicious about

4    that, that is not consistent with the protective order and we

5    believe would only foster overdesignation and inefficiency of

6    postponing all of the disputes until the end just before a

7    motion without the Court's guidance as to what is proper and

8    improper.

9         **THE COURT:**  Okay.  But you already won.  You just won

10   on the issue.  I already said you can file a motion.

11        **MS. HAZAM:**  Thank you.

12        **THE COURT:**  So I don't know why you're still arguing

13   about that.

14        **MS. SIMONSEN:**  And I already just clarified that it is

15   not our position that they can never bring a confidentiality

16   challenge.

17        I do just want to clarify, we did not fully undesignate

18   the documents they cited in their complaint.  We undesignated

19   the excerpts, not the full documents.

20        **THE COURT:**  You both know what you did and what you

21   didn't do, and you're not going to make -- you're not going to

22   resolve it on the record here; right?  So I urge you to work

23   these -- this is the kind of thing good lawyers should be able

24   to work out.  Right?

25        So as I sad, you don't need to show me your work product,

1    how you would use the document.  You do need to show why it's

2    important to the case in some way and substantively relevant.

3    Okay?

4         **MS. SIMONSEN:**  Yes, Your Honor.

5         **THE COURT:**  All right.  And, again, no

6    overdesignation, no overburdening the Court with unnecessary

7    motion practices.  Do I make myself clear?

8         **MS. SIMONSEN:**  Yes.

9         **MS. HAZAM:**  Yes, Your Honor.

10        **THE COURT:**  And please use the meet-and-confer process

11   as much as you can.

12        All right.  Any more on that issue?

13        **MS. HAZAM:**  No, Your Honor.

14        **MS. SIMONSEN:**  No, Your Honor.

15        **THE COURT:**  All right.  Next issue, litigation hold.

16   Who's going to speak to this?

17        **MR. WARREN:**  Good afternoon, Your Honor.  Previn

18   Warren for the plaintiffs.

19        **THE COURT:**  All right.  So let me ask you.  Tell me if

20   I'm wrong but, as I understand, you've gotten a number of

21   custodians identified by the defendants.

22        **MR. WARREN:**  That's true.

23        **THE COURT:**  You've gotten your own counterdesignation

24   of proposed custodians that you've identified.

25        **MR. WARREN:**  That's true.

1       **THE COURT:**  There's, according to the defendants, some

2    custodians or people who've been identified through the ESI

3    meet-and-confer process.

4       **MR. WARREN:**  There are some.

5       **THE COURT:**  Okay.  And then you've already started

6    taking at least the Snap depos and you've got some others in

7    the pipeline that -- where you're going into 30(b)(6) questions

8    about team and leaders and structure and things like that.

9       **MR. WARREN:**  To the extent the defendants have allowed

10   us to take depositions on those topics, yes.

11      **THE COURT:**  Okay.  So there is a universe of

12   custodians that have been identified to you through those

13   processes; and as I understand, your main concern is even with

14   all that, there may be some larger number of potential

15   custodians out there whose documents you're missing or you're

16   missing in some way.

17      **MR. WARREN:**  Well, that's a fair -- that's a fair

18   synopsis, yeah.

19      **THE COURT:**  Oaky.  So -- but we don't know -- this

20   kind of goes to something I've said at earlier DMCs.  We don't

21   know how big the problem is; right?  You're guessing that

22   there's 3,000 other potential custodians out there that you

23   missed, and they're saying, "Well, it could be two."  Right?

24   And so we don't know.

25      So here's what I'm going to do -- all right? -- by Friday

1  the defendants have to give the plaintiffs just the number of

2  people who've been given litigation hold notices for each -- on

3  behalf of each defendant, just the number -- all right? -- and

4  the dates those notices went out.

5      If it turns out, as your hypothetical guessing in the DMC

6  status report said, if it turns out it's 50 people and you've

7  already identified 48, maybe there's no issue.  But if it turns

8  out it's 8,000 people and you've only identified, you know,

9  maybe 100 through this other process, maybe there's an issue.

10  So we don't know the scope of the issue yet.  All right?

11      I do take the defendants' point that cautious counsel are

12  probably going to overpublish the litigation hold notices;

13  right?  So the sheer difference in the numbers is not alone

14  going to be all that dispositive to me, but at least it helps

15  us to identify whether there's even a problem here.  All right?

16  And we'll know by Friday is what I want to do; right?

17      If there is still a problem after Friday, why don't you

18  file a joint letter -- discovery letter brief by mid next week

19  because I already know the issue; right?  You just have to

20  update me on what the number problem is if you think there

21  still is one, and get me a letter brief by mid next week.

22          **MR. WARREN:**  Your Honor, may I request a clarification

23  on that?

24          **THE COURT:**  Sure.

25          **MR. WARREN:**  Okay.  Thank you.

1  So, first, I think it would be helpful to understand to

2  make sure that the number we're provided are individuals on a

3  lit hold for this case.

4  **THE COURT:**  Oh, yeah.  Yeah.  Yes.

5  **MR. WARREN:**  I take it that's the point of the dates.

6  Okay.  Because, you know, there's lots of other litigations

7  that these defendants are on.

8  Would it be workable from the Court's perspective to

9  simply have that number and those dates submitted directly to

10  the Court so that we can maybe skip a step if you're already

11  apprised of the issue and you get the denominator?

12  **THE COURT:**  Sure.

13  **MS. SIMONSEN:**  Your Honor, if I may, I don't think

14  this is going to be helpful at all in illuminating a potential

15  issue.  I can say that for Meta there will be a large number of

16  individuals on our lit hold, and that's because we have taken a

17  very overly cautious approach.  It's not going to inform them

18  at all of whether we missed key custodians.

19  We have a very limited time to complete discovery.  We

20  produced 50,000 documents to plaintiffs.  They have the names

21  of folks in connection with the state AGs' multiyear

22  investigation involved in the exact issues they are suing on.

23  We've given them the names of 52 -- 48 custodians.  They came

24  back with 52 they said they wanted.  We've already agreed to

25  add 18.

1          I do want to note just one additional item, Your Honor,

2     which is that we have produced organizational charts,

3     essentially reporting line information, for all 66 custodians

4     that we've agreed to use with all of their direct reports and

5     all of their reports going up to Mark Zuckerberg, identifying

6     the teams that they were on.

7          They have every potential piece of information they could

8     need to identify potential custodians, and it simply isn't

9     going to be helpful or resolve the issue for us to disclose the

10    sheer number of people on our litigation hold.

11         We're happy to continue conferring with plaintiffs.  We've

12    got another conferral scheduled with them I believe for

13    tomorrow or Wednesday to talk about the custodians that we told

14    them we wouldn't agree to add that they wanted on the basis

15    that we believe they have cumulative information of other

16    custodians, and we identified for them exactly who those other

17    custodians are.

18         And we invited them to come back to us, as is their burden

19    under the law after we've identified custodians, to tell us why

20    they believe those individuals are likely to have unique

21    information.

22         And this is an unusual case where they have so much

23    information from this multiyear, multistate Attorney General

24    investigation that, really, the parties are not on so different

25    a playing field in terms of identifying the folks that they are

 1    interested in.

 2        I would also note that as of this morning, they've already

 3    managed to notice the depositions of 32 witnesses.  I think

 4    particularly with respect to Meta, and other defendants may

 5    feel the same way and are free to speak to this, it's just not

 6    going to be helpful to produce that number and it's going to

 7    lead to more letter briefing on an issue that, again, is going

 8    to distract from -- we need to get these documents out the door

 9    to them.

10        **THE COURT:**  Let me ask you.  Do you know roughly how

11    many people have gotten a litigation hold notice?  Just

12    roughly.

13        **MS. SIMONSEN:**  I don't have the number in my head.  I

14    know that it's significantly greater than 52, and 66 at this

15    point is the number of custodians we've agreed to use.

16        **THE COURT:**  All right.  So specific to Meta, why -- I

17    guess, why do you actually need -- will a list of -- I'm just

18    going to pick a number -- like, will a list of thousands of

19    people who got the litigation hold help you in any way?

20        **MR. WARREN:**  Yes.

21        **THE COURT:**  How?

22        **MR. WARREN:**  I think we've now scoped the problem;

23    right?  Step one was:  Is there actually a large denominator of

24    people who got the hold?  And now we know the answer is yes.

25        We don't have an org chart for every one of the defendants

1    TikTok hasn't produced that, for example, so --

2         **THE COURT:**  Let's stick with Meta first because you

3    made an argument specific to that.

4         **MR. WARREN:**  Fair enough.

5         With respect to Meta, the issue we're facing is Meta

6    provides custodians and we provide other custodians, and they

7    say, "Well, the ones we've handpicked already had similar

8    documents, so you don't need these other ones."

9         And that puts in an impossible situation of not actually

10   getting the universe of the material and not knowing which of

11   those custodians is going to wind up being -- having the --

12   having the information that's the most probative for our case

13   and understanding what the outer bounds of that are will just

14   drive efficiency in this process.

15        Let us know who the potential custodians are, and then

16   it's incumbent on us to actually make educated, informed

17   guesses about who is going to have that information presented

18   to defendants.

19        Right now we're working from ground up, you know, largely

20   on information that we never requested in the first place that

21   was developed through the AG investigation.  I understand it's

22   been produced to us.  You know, that's not really information

23   the plaintiffs ever, like, requested in that way.  We don't

24   know what requests they were, you know, targeted towards when

25   they were produced.

1    You know, the notion that we are already far along in the

2    process and have everything we need to resolve this I don't

3    think carries water.

4    You know, we haven't even received any of the custodial

5    files for, you know, those that we have charted.  I understand

6    that there's still time on that clock, but it is early days and

7    I think the case law is clear that part of the utility of

8    getting the names and titles of people on custodial lists is to

9    make the ESI process more efficient.  And the *Canada* case from

10    the District of Nevada says that pretty clearly.

11    Also, this information just isn't privileged, and the main

12    argument they've advanced is that it is.  Well, it's not.

13    There's case after case in this court saying that the names and

14    titles and the dates on which litigation holds were sent is not

15    privileged material, it's not attorney-work product.  So we're

16    simply asking -- and there's simply no burden.  They have a

17    list.  If we just get the list, it will take the dispute off

18    the table, put us in a position to make more informed choices

19    about the custodians that we want to press for.

20    **MS. SIMONSEN:**  Your Honor, the plaintiffs did request

21    these documents.  It was the first thing they asked for when

22    we -- when this MDL was created.  They asked for the Meta and

23    TikTok defendants, and Snap and YouTube to the extent it

24    applied to them, to reproduce all the documents that they had

25    produced to the Attorneys General in underlying investigations

that they represented we're investigating.  I don't know if
they used the words "nearly identical," but they acknowledged
that it was substantially overlapping investigations.

In addition, the documents that we reproduced to them were
the documents that Judge Gonzalez Rogers identified as being
responsive to the issues in these cases by reviewing the CIDs
in response to which we produced the documents.

On the point about knowing the names or titles, I heard
Your Honor merely to order us preliminarily to produce the
number of people on the litigation hold.  The names are clearly
privileged protective work product information.  Outside of a
situation where there is some kind of belief that the
preservation process hasn't been complied with, that is
protected work product information, particularly when there are
reasonable alternative, cooperative ways for the parties to get
at the information.

And that's exactly what we have here.  We've been working
very closely with the plaintiffs.  We've identified 66
custodians we'll agree to use.  We've heard from them on the
ones that they want to add.

And, furthermore, we are under the law, and this is the
*Emerson vs. Iron Mountain Information Management Services* case.
Under the law, what we have to do as a producing party is
select the custodians we deem most likely to possess responsive
ESI and search their electronic records and tell the other side

1    which custodians and search terms we used.

2        We have an obligation to identify the folks with the most

3    responsive, relevant information, and we've done that.  Letting

4    plaintiffs know the sheer number of people on our litigation

5    hold, many of whom are not the ones with the most relevant

6    information, which is something they contest through the

7    documents and extensive information they have about our

8    custodians, isn't going to be productive toward resolving this

9    dispute.

10        So for all of those reasons, we would submit, Your Honor,

11   we need to be moving forward with actually getting that list of

12   custodians pinned down, which I think we're nearly -- we should

13   be nearly about to do with a conferral this week so that we can

14   get their documents, review them, and get them out the door.

15        If this process drags on any longer with plaintiffs

16   considering X -- you know, dozens of additional names when we

17   haven't even identified them as people with highly -- you know,

18   highly likely to have relevant information, it's not going to

19   advance the process.

20            **MR. WARREN:**  May I, Your Honor?

21            **THE COURT:**  Okay.

22            **MR. WARREN:**  I don't mean to cut you off.

23            **THE COURT:**  No, if you have a reply, go ahead.

24            **MR. WARREN:**  I do have a reply.

25        This is an issue with respect to all four defendants, and

 1   there is a process that's been working somewhat more

 2   effectively with Meta than with the other defendants.  For

 3   Snap, for example, we only have 15 custodians.  That does not

 4   leave -- and we don't have a voluminous AG investigative

 5   production as Meta is asserting.  You know, there wasn't any

 6   such thing in Snap.

 7        We have relatively very, very little, numbering more in

 8   the hundreds than in the thousands.  I don't want to

 9   misrepresent an exact number, but it's substantially less than

10   we have with Meta.  So there is a live issue there.

11        As far as, you know, slowing things down, they can produce

12   these lists to us this afternoon.  We can review them, you

13   know, over the next four days and get back to them by -- in a

14   week.  I mean, this can be very, very tight and quick, and I'm

15   happy to represent that we will meet deadlines along that line

16   if that's the issue.

17        Simply put, the case law does not indicate that this

18   material is privileged.  *Doe vs. Uber*, *In Re: eBay Antitrust*

19   *Litigation*, *Thomas vs. Cricket*, uniformly say that while the

20   content of the litigation hold notices themselves is

21   privileged, something we're not seeking, the names and titles

22   and dates of the litigation hold is not privilege material.  So

23   that's just not a valid legal basis on which to withhold this

24   material.

25        **MS. SIMONSEN:**  If I may respond on that point,

1  Your Honor.

2      Again, it is only in the context of where there's a

3  dispute about whether preservation has been sufficient that

4  Courts have allowed the production of names. *Personal Web*

5  *Technologies LLC vs. Google*, the Court denied discovery into

6  not only all dates of litigation holds in terms of when they

7  were circulated, but also the recipients of such notices.  And

8  we cite a number of other cases in our briefing for that point.

9  So these are privileged and protected.

10      **THE COURT:**  All right.  So, first, there's not going

11  to be a 30(b)(6) deposition on this issue.  I think it should

12  be -- if it's going to get resolved, it's going to get resolved

13  through the exchange of lists.

14      For each of the other defendants, does anybody have an

15  estimate of how many -- just the number of how many

16  custodians -- people, not custodians -- received litigation

17  hold notices?  I mean, that's the same question I asked Meta.

18      Unless, Ms. Simonsen, you know.

19      **MS. TELLER:**  Your Honor, this is Faye Paul Teller from

20  Munger, Tolles & Olson for Snap.

21      I don't have the exact number for you.  I can give you a

22  magnitude, which that it's a multiple of what has been

23  discussed in this case.

24      I just wanted to note for Snap in particular that the

25  number of custodians we've suggested has been highlighted.

1    I would also note that I haven't checked the numbers, but

2  in plaintiffs' own briefing, they talk about the size of Snap

3  as compared to Meta.  It's about a 30th of the size, so I don't

4  think that should be entirely surprising.

5    We are in the process of meeting and conferring on this.

6  We disclosed a list of 15 people on the 8th.  We haven't yet

7  conferred but not because we haven't said we're available.  I

8  believe we have time on the calendar on Friday.

9    And as has been discussed quite a bit, there's a

10  deposition for Snap scheduled next Wednesday in which we will

11  have a witness who will be prepared to talk about the various

12  departments and in some cases individuals within Snap working

13  on these issues.

14    **THE COURT:**  Okay.  Can I hear from the other

15  defendants in terms of just the numerosity question?

16    **MR. MATTERN:**  Good afternoon, Your Honor.  David

17  Mattern on behalf of the TikTok defendants.

18    I don't have an exact number in mind right now, but I

19  think it's in the hundreds.  It reflects we're a more recent

20  company.

21    And, similar to Meta, we've already produced 17,000

22  documents to plaintiffs, and we'll likewise be putting up a

23  30(b)(6) deponent in a week that will be able to speak to

24  topics about organizational structure.

25    **MR. DONAHUE:**  Matt Donahue from Wilson Sonsini for the

1  YouTube defendants.

2      I also -- unfortunately, I don't have a number offhand.  I

3  don't know what it is, but it would be some number larger than

4  what the current custodial discussions are, but we don't think,

5  again, that's necessarily representative.

6      **THE COURT:**  Multiples larger or just like a handful

7  larger?

8      **MR. DONAHUE:**  I -- honestly, I don't know that

9  standing here today.

10     **THE COURT:**  All right.

11     **MR. DONAHUE:**  I think we're still -- I think there may

12 still be discussions going on about the custodians too --

13     **THE COURT:**  All right.

14     **MR. DONAHUE:**  -- so it's a moving target.

15     **THE COURT:**  Okay.  So on the privilege issue, I agree

16 that the names, titles, and dates, that's not privilege

17 information.  It's what would show up on a privilege log.  So,

18 for example, if this were a case where documents that postdate

19 the complaint still had to be logged on a privilege log, you'd

20 be putting exactly that information on a privilege log.  All

21 right?

22     So I'm going to rule against you, Ms. Simonsen, on the

23 privilege issue.  So the names, titles, and dates of the

24 litigation holds, that information, which is just what you'd

25 see in a privilege log, is not -- is not privileged and needs

1    to be disclosed.

2         Now that I understand the scope and the numbers, we can

3    avoid my approach of trying to take this piecemeal.  By

4    Wednesday I want the defendants to produce, you can do it in

5    privilege log format, the names, titles, and dates of the

6    litigation hold notices that those people -- that your

7    employees got.

8         **MS. SIMONSEN:**  Your Honor, respectfully, I mean, I

9    just have to make the record.

10        This is a very different situation from a privilege log.

11   With a privilege log we're producing responsive documents and

12   then we're identifying who was communicating with whom on them.

13        The disclosure of the individuals we've identified as

14   likely to have responsive information for purposes of

15   preservation clearly reflects attorney work product, and that's

16   like cases like *Personal Web Technologies* and the others we

17   cited have held that the names are themselves privilege.

18        And I would submit, Your Honor, that particularly with

19   respect to Meta, I did not hear counsel even respond to any of

20   the points I made about why for Meta this shouldn't have to

21   happen; and for that reason, I believe that for Meta the list

22   and the people on it should not have to be disclosed.  We have

23   gone above and beyond.

24        **THE COURT:**  On that point it's up to the plaintiffs.

25   They've committed to finish their review within a week and not

delay the custodian discussion because of the disclosure of

these lists.  Right?  I'm going to hold you to that.

        **MR. WARREN:**  As you should, Your Honor.

        **THE COURT:**  All right.  So -- and if they can't make

good use of the list because, as you said, it's too voluminous

or it doesn't give the information, that's up to them.  Right?

They're the ones saying they need it; right?

        And so I'm not going to substitute my judgment for them

because I haven't seen it -- right? -- and I don't know what

use they're going to make of it.  You know, I'm, frankly, a

little skeptical that having a list of thousands of people is

going to help advance the ball significantly.

        But, you know, as long as you don't delay the custodian

discussion, I'm going to order this.  All right?

        And I understand you want to preserve your arguments for

the record, but I just don't think that simply the names,

titles, and dates are privileged information.

        **MS. SIMONSEN:**  Understood, Your Honor.

        Just for my client, I have to state that we're going to

need to take back whether we need to raise that with

Judge Gonzalez Rogers just because we do believe it is

privilege and protected.  We'll, of course, take Your Honor's

ruling in mind, but I just did want to note that given our

position and where we believe the case law is on this issue and

the fact that the plaintiffs have not pointed to a single

1    concern with our preservation to date, which is the only

2    circumstance in which courts have allowed production of the

3    names of folks on the litigation hold.

4         **MR. WARREN:**  Your Honor, that is not the only

5    circumstance in which courts have allowed the production of

6    this material, and I'll leave it there.  I just disagree as a

7    matter of law.

8         **THE COURT:**  Okay.

9       All right.  Anything further on this issue?

10        **MR. WARREN:**  No, Your Honor.

11        **MS. TELLER:**  Your Honor, Faye Paul Teller from Munger

12   Tolles for Snap.

13      Just one logistical question.

14        **THE COURT:**  Yeah.

15        **MS. TELLER:**  Bearing in mind somebody in our office is

16   going to have to put together this list, I don't think the

17   names by Wednesday is a problem.  I am a little worried about

18   making sure that we have accurate titles just in terms of some

19   people might have multiple titles.  And so I don't know whether

20   we need to provide all of those and the dates, that perhaps we

21   provide the names on Wednesday and by Friday provide some of

22   the additional information you've suggested.

23        **MR. WARREN:**  I have no problem with that, Your Honor,

24   provided that we get a week from when they actually do the

25   thing Your Honor has ordered them to do.

 1          **MS. TELLER:**  That's fair, Your Honor.

 2          **THE COURT:**  That's why I encourage discussion among

 3    counsel to reach agreement, so...

 4          **MR. WARREN:**  Thank you, Your Honor.

 5          **MR. MATTERN:**  Your Honor, David Mattern for the TikTok

 6    defendants.

 7       I don't want to reargue but just note so the record's

 8    clear that the TikTok defendants want to preserve the same

 9    objection that Ms. Simonsen articulated.

10       Thank you.

11          **MS. SIMONSEN:**  If I may make just one additional point

12    for the record.

13          **THE COURT:**  Sure.

14          **MS. SIMONSEN:**  I just want to point to the cases that

15    plaintiff cited and explain to Your Honor that they were all in

16    the context of a case where there was a question about

17    preservation.

18       In the *Doe vs. Uber Technologies* case, plaintiffs alleged

19    that Uber was not meeting its document preservation obligations

20    under the --

21                  (Official Reporter clarification.)

22          **MS. SIMONSEN:**  In *Uber*, the plaintiffs alleged that

23    Uber was not meeting its document preservation obligations

24    under the Court's protective order, and that is why the Uber

25    plaintiffs requested and the Court granted an order requiring

1    Uber to disclose the identities of its litigation hold

2    recipients in a situation where preservation was at issue.

3         In the *Cohen case*, the *Cohen vs. Trump* case that they

4    cite, in a prior decision had permitted limited discovery

5    concerning a litigation hold based on potential spoliation

6    issues.

7         In the *Canada*, there was likewise a concern, quote,

8    "whether defendants disabled all automatic deletions once the

9    litigation hold was in place."

10        So in all of these circumstances, it's clear that this is

11   protected work product information.  If the plaintiff can point

12   to some reason to believe that preservation was improperly

13   conducted, then that may be a basis to overcome the attorney

14   work product that otherwise applies to the identity of the

15   individuals on a litigation hold, but they haven't done that

16   here.

17        And so for that reason, at a minimum, Your Honor, I would

18   ask that you return to your original holding, which was to give

19   them a number of individuals on the custodian list.  I think

20   that we probably could get comfortable with that from a

21   privilege and work product perspective without having to delay

22   proceedings with a potential objection in light of the case law

23   and these points that we made.

24        **THE COURT:**  No.  I mean, two points to that.  I've

25   already ruled, so I'm not going to rerule and reconsider that.

1    And I just -- what I don't understand is your argument

2    that if they're not privileged in one context, how are they

3    privileged?  Either documents are privileged or they're not;

4    right?  It doesn't depend on the context.

5    And so while I understand your attempt to distinguish

6    those cases, if they're not privileged, they're not privileged.

7    **MS. SIMONSEN:**  Well, it's not the documents that are

8    not privileged.  It's the identity of the individuals that we

9    as lawyers through analysis --

10    **THE COURT:**  If the information is not privileged in

11    one context, I fail to see how its privileged in another.

12    **MS. SIMONSEN:**  Because the individuals on a document

13    that is determined to be responsive is simply almost

14    administrative information about who's on the communication.

15    **THE COURT:**  No.  The cases cited by plaintiffs are all

16    in the litigation hold disclosure context; right?

17    **MS. SIMONSEN:**  But in those cases there was a dispute

18    about whether preservation had been adequately undertaken, and

19    that is not being alleged here.

20    **THE COURT:**  But, again, if the litigation hold

21    recipients is not privileged in that context, I fail to see how

22    its privileged in this context.

23    **MS. SIMONSEN:**  I think the issue is that it's probably

24    addressed in those cases under a work product standard; and so,

25    of course, in the work product standard, it can -- the

1  protection can be overcome.  That's why it's not a privilege

2  issue; it's a work product issue.

3       **THE COURT:**  I think you're confusing the fruits of

4  your work product, which is like a brief or something that you

5  produce to the other side, versus the actual work product how

6  you got there.

7       Simply providing the names, dates, and titles of the

8  people gives the plaintiffs no information on what method, what

9  work analysis you did to get the names onto the list.  That's

10  your work product, not the results of your work product.  A

11  brief is not -- is work product in the sense -- in the broader

12  sense that you're trying to argue, but that's -- you don't

13  waive work product by filing a brief.

14       **MS. SIMONSEN:**  Right.  But the individuals on a

15  custodian list do reflect the attorney work product in terms of

16  the analysis that we would do --

17       **THE COURT:**  What you write in a brief reflects your

18  attorney analysis on what to argue in a case.

19       **MS. SIMONSEN:**  But that's always the case with respect

20  to briefing; right?  I mean, we're working on behalf of our

21  clients.  But the underlying thinking and thought process that

22  went into the brief or the prior drafts would obviously not be.

23  Those would be protected privilege communications.

24       **THE COURT:**  I'm not asking you to submit prior drafts

25  of your litigation hold notices or even the prior drafts of the

1    lists of people who could be on your litigation hold recipient

2    list.

3            MS. SIMONSEN:  Well, I think I've made our points,

4    Your Honor --

5            THE COURT:  I think, yes.

6            MS. SIMONSEN:  -- and cited to the case law that

7    supports it.  I appreciate --

8            THE COURT:  I'm sure plaintiffs will brief the issue

9    well to Judge Gonzalez Rogers if it gets that far.

10           MS. SIMONSEN:  Thank you, Your Honor.

11           THE COURT:  All right.  Next issue is submission of

12   the joint deposition status chart; is that right?

13           MS. SIMONSEN:  Yes, Your Honor.

14           THE COURT:  All right.

15                   (Pause in proceedings.)

16           THE COURT:  All right.  So why do you want it filed on

17   the docket?  What's the purpose of that?

18           MS. HAZAM:  Your Honor, there's obviously a strong

19   presumption in favor of public access, and the defendants here

20   would need to demonstrate good cause, specific prejudice, or

21   harm that would result from merely listing their --

22           THE COURT:  I understand.

23           MS. HAZAM:  -- employees' names and titles in this

24   chart.

25           THE COURT:  Right, but why do you want it on the

1  docket?

2          **MS. HAZAM:**  These employees I think are important to

3  the case overall, to the understanding of who played important

4  roles at these companies; and if they are going to be required

5  to be listed in a chart to the Court, we believe that like most

6  filed documents, you would have to meet a burden to seal that

7  document, and I don't think that burden can be met here.

8          And to be clear, Your Honor, plaintiffs are not asserting

9  that any adult plaintiff or adult witness related to a

10  bellwether plaintiff's name should be sealed either presuming

11  that there isn't associated confidential info about their

12  conditions or treatment, which there would not be.

13          And for the same reasons, we don't believe that there's

14  any basis in this chart that is being filed with the court and

15  would normally be subject to public access should be sealed

16  either.  We don't believe that the standard required under the

17  cases is met.

18          **THE COURT:**  What's the harm in filing it on the

19  docket?

20          **MS. SIMONSEN:**  Your Honor, this is obviously purely an

21  administrative filing.  It's not a merits-related filing.  And

22  in those circumstances, what we need to do is show some kind of

23  good cause to protect the identity of the parties.  And I think

24  by pointing out that these are -- they're highly sensitive

25  issues involved in these cases, such that disclosing the

1    identity of the individuals that these plaintiffs have targeted

2    for depositions could lead to harassment.

3        It's a highly high-profile matter, and it is for that

4    reason that Judge Gonzalez Rogers granted our motion to seal to

5    redact the names of all employees with the exception of some

6    very high-level employees, such as the CEO of Meta, in our

7    master complaint.  And I believe that that was with plaintiffs'

8    consent, so it's a little surprising that now they're taking

9    this position.

10        I share Your Honor's curiosity about why it is that they

11    want this if not for some reason that is tangential to the

12    merits of the litigation.

13        At some point if these folks do get deposed and they

14    become witnesses in the case and filings are made that need to

15    reference their depositions, you know, that's a different

16    situation where the person has actually been deposed and we can

17    see if they're offering testimony highly relevant to the merits

18    of the case.

19        At this point, they're just anticipated deponents, and we

20    want to protect the privacy rights of these individuals at

21    least until the time that they're actually deposed.

22        And for that reason, we think we've met the good cause

23    standard, particularly in this case where this is just a chart,

24    it's an administrative chart to facilitate the Court

25    encouraging the parties to schedule depositions in, you know,

1    an expeditious manner.

2        And for that reason, we would submit that submitting them

3    by e-mail every month is perfectly acceptable.  There's no

4    reason that it needs to be on the public docket at this time.

5        **MS. HAZAM:**  Your Honor, if I may respond.

6        With regard to the plaintiffs' master complaint, actually

7    the large majority of the defendants' employees names that were

8    cited in that complaint were unsealed.  There are two or three

9    names of low-level employees who, of course, were not intended

10   to be deposed at that point in time that we did agree to keep

11   sealed; but, otherwise, the employees' names in that complaint

12   are public.

13       The kind of potential harm that Ms. Simonsen is conjuring

14   for Your Honor today is entirely speculative at this point.

15   There is no record to suggest that any harm will ensue.

16       The standard set forth in various Ninth Circuit cases,

17   including *Kamakana*, *Phillips*, *The Center for Auto Safety*, is a

18   good cause means demonstrating specific prejudice or harm that

19   would result.

20       We don't think that has been demonstrated here, and we

21   think these employees as persons that we intend to depose in

22   this case, honoring Your Honor's guidance that we should not

23   put them on the chart unless we are virtually certain we want

24   to depose them, are relevant to the case and have value as

25   publicly accessible information in the absence of any standard

being met here.

**THE COURT:**  Are you standing up because you want to add something to this or --

**MS. HAZAM:**  Sure.  I'm sorry.  The state AGs are welcome to --

**MR. OLSZEWSKI-JUBELIRER:**  No.  My apologies.

Josh Olszewski-Jubelirer for the People of the State of California.

The state AGs join in the PI/SD plaintiffs position and add -- excuse me -- that the state AGs are public officials, we're accountable to our constituents, and so we have an interest in providing transparency over the litigation of this case and how we're performing our public duties.

I will add -- excuse me -- we have some concerns over the practicalities of an order requiring that the list be sent by e-mail and not filed on the public docket.

The defendants have raised concerns about, you know, whether those individuals' names can be disclosed.  As my colleague mentioned, many of the names are disclosed in our publicly filed complaints, and so we would need some clarification.

It's not clear to me the implication of the defendants' position.  Are they -- would they wish to seal the names of those deponents if we need to discuss disputes over their depositions in a discovery management conference statement?

 1          I think the request that's been made so far has no -- the

 2     blanket request and suggestion that the good cause standard has

 3     been met I think is unwarranted when we get down to the

 4     specifics of these individuals and the lack of evidence to

 5     support that request.

 6          **MS. SIMONSEN:**  Your Honor, I think we can cross that

 7     bridge when we come to it.  At this point this is just a list

 8     of individuals they plan to depose.  We could meet and confer

 9     about which names we're willing to redact and which we're not,

10     but I would submit that it's just a lot administratively

11     simpler at this point to submit it by e-mail.

12          We have a lot of more important things to do between now

13     and September 20th on the substantial completion deadline than

14     file motions to seal certain names on a spreadsheet of

15     potential deponents.

16          So for that reason, again, we repeat that we would very

17     much think it would make sense and we have shown good cause

18     to -- for this administrative filing, simply submit it by

19     e-mail.

20          I also just want to note that I think the names in the

21     complaint were sort of a mix of high-level employees and

22     lower-level employees.  I don't know that for certain, and I

23     want to double check; but, you know, I think there probably are

24     a sufficient number of people on the list that they've noticed

25     that we would treat the same way we treated the employees whose

names we asked to redact in the complaint.

So for that reason, I just think we're going to save a lot of time and energy if we just submit this -- agree to submit this list by e-mail, cross the bridge with respect to other disputes at a later time.

MS. HAZAM:  Your Honor, I think this is creating a false hurdle for us to go over here.  We do not have any basis for sealing something that would otherwise be public here. There has been no showing, far from good cause shown, here.

And these are relevant witnesses to the case.  They are generally higher-level witnesses.  So to say that we will save ourselves trouble is to set up a false comparator because the comparator in Ms. Simonsen's rendering of things is we have to go through partial motions to seal.  There shouldn't be any sealing here; and if there isn't any, there's no burden whatsoever.  It's just a public filing, which is what we intend to do with the names of the plaintiffs and our witnesses.

MS. SIMONSEN:  We've shown good cause for the same reason that we showed good cause when we got the names of certain employees redacted in the complaint, which plaintiffs agreed with.  So I don't understand the repeated point that we haven't shown good cause.

These are not all high-level executives.  It hasn't been shown that they're all highly relevant to the case yet; right? It's plaintiffs' conclusion that they are.  That's what they

1    want to explore.  And so we would take the same position with

2    respect to certain names on this list.

3        We have shown good cause by citing the case law that is

4    the type of case law that we cited when we moved to redact

5    certain names in the master complaint that

6    Judge Gonzalez Rogers granted.

7        So I think we've shown good cause.  The question is:

8    Just, you know, do we want to -- does Your Honor need us to go

9    through that administrative burden for every time we file one

10    of these lists on the public docket or can we just submit them

11    by e-mail every month?

12        **MS. HAZAM:**  Your Honor, I don't think there was any

13    showing of good cause when it came to the complaint.  There was

14    an agreement to a very small number of names.  I think it was

15    two out of many names that were mentioned in that complaint,

16    and it was not based on good cause.  No such showing was made.

17        We agreed because at that point those two were very

18    low-level employees.  We had not gotten to the point of

19    deciding who we might want to depose, as we have here.  We have

20    taken the step of committing to depose these plaintiffs

21    understanding that Your Honor does not want us to remove them

22    from the list.

23        So I simply do not believe that there is any showing here.

24    It's entirely speculative.  These are witnesses whose

25    admissions may be party admissions in their testimony, and we

certainly shouldn't be in a situation where their names have

been disclosed, say, in our complaint or other documents but

somehow have to be sealed here and figuring out what the future

implications of that are in coming filings.

          **THE COURT:**  Okay.

          **MS. LADDON:**  Your Honor, I'm not --

          **THE COURT:**  Did you stand up because you want to say

something?

          **MS. LADDON:**  Just very briefly, Your Honor.

          **THE COURT:**  Sure.

          **MS. LADDON:**  Very briefly.

    Good morning -- good afternoon, rather.  Tarifa Laddon for

the TikTok defendants.

    And we, of course, agree with the remarks that Meta's

counsel's made, but I do have to make very clear for the record

that at least for TikTok the harm is not speculative,

Your Honor, at all.

    We have a list of about 14 names the plaintiffs have

provided to us that they -- of individuals that they want to

depose.  These are not all high-ranking executives.  These are

a lot of just regular folks who are going about their day and

doing their jobs.

    And at least at TikTok we have had actual situations where

people receive threats and people's lives, regular everyday

people lives, are upended because the public has found out that

1   they're working for the company and involved in certain

2   projects, and that is specifically what we're trying to avoid

3   here.

4        This is essentially a discovery management document that

5   the Court has ordered us to produce.  It's almost akin to a

6   meet-and-confer document, to be honest with you, about

7   individuals that they wish to depose for the Court's use and

8   ensuring that the process of noticing and taking depositions

9   goes quickly and expeditiously.

10        We do not file on the docket notices of deposition in the

11   ordinary course of litigation.  Those are usually served

12   between counsel, and so I just wanted to make it clear that at

13   least for TikTok, Your Honor, this is not a speculative harm.

14   This is a harm that we take very seriously and we're concerned

15   for our employees.

16        **MS. HAZAM:**  Your Honor, if I may, because that

17   interjected new information.

18        I certainly do not hear counsel saying that that's as a

19   result of anything in this case.  I don't believe it to be.  I

20   know none of the details.  This is new information; but, again,

21   this is simply a list of employee names, titles, and defendant

22   who they work for.

23        **THE COURT:**  Okay.  So point number one, continue to

24   send the full chart to me by e-mail because I don't -- right?

25   But I'm also going to order that a redacted version of the

chart get filed promptly jointly sometime after the DMC
statement is filed, and you can work on that cooperatively.

I don't want -- you're going to redact from the chart that
gets filed addresses, e-mail addresses, any other personally
identifying -- I don't think there is any, but any other
personally identifying information, I doubt there's phone
numbers, but anything.  So that the only thing that should be
on the chart is the person's name and their title essentially,
and probably the company they work for; right?

Because most of that -- I would assume for the large
majority of these people, that's probably up there on LinkedIn
or and the web somewhere anyway, but I don't want anything
personally identifying them or how to contact them on the
public filing.  Okay?

**MS. HAZAM:**  I understand, Your Honor.

**MS. SIMONSEN:**  Understood, Your Honor.

The issue is not that merely knowing that the person works
for the company is going to compromise their safety.  It's that
the plaintiffs have identified them as being involved in the
types of issues that the plaintiffs are suing the defendants
for.  That is what puts their safety at risk.

And on the point about showing good cause, it is true that
plaintiffs previously agreed with us to redact certain names
from the complaint; but of course Judge Gonzalez Rogers has an
independent obligation to ensure that anything she allows to be

1    redacted is consistent with the law.  We did --

2              **THE COURT:**  On that point, in the meet-and-confer

3    process and putting together the joint redacted version list,

4    if there are specific individuals that a defendant thinks ought

5    to be redacted even as to their names or their title or one

6    or -- one or either or more information, I encourage and order

7    the parties to work that out.

8         So if it's a sufficiently low-level person or you have

9    specific information that one person has for some reason, you

10   know, received harassing, you know, contacts in the past

11   because of this case or because of some other case, you know,

12   I'm sure you can work out if there needs to be full redaction

13   of one or two individuals, if it need be if you can show it;

14   and if you can't, I hope it doesn't come to a dispute, but you

15   can try to raise it with me.  But this is something you should

16   be able to work out.  But without their contact information

17   within the public filing, that should address most of the

18   concerns.

19        And to the plaintiffs, while their names and who they work

20   for is probably enough, the risk of harm here is that once I

21   allow any kind of personal identifying information to be filed

22   in the public docket, you can't unring that bell.  And so if

23   there is harm potentially here for harassment or some kind of

24   untoward contact from third parties or people out there in the

25   public, I can't cure that after the fact by order -- if I allow

1    the personally identifying information to be filed.

2         So as a precautionary measure and using my discretion, I

3    want all that redacted in the public filings.  Okay?

4         **MS. HAZAM:**  Understood, Your Honor.  In fact,

5    plaintiffs are quite agreeable to redacting contact

6    information, addresses, e-mails, phone numbers, et cetera.

7         I will say that defendants have not provided any specific

8    allegations of threats that people have faced.  Certainly if

9    they come forward and do so, we are all ears to that.

10        I do want to make clear that many of these names are

11   already in the public realm associated with many of the

12   allegations of this complaint if not in the complaint itself.

13        **THE COURT:**  In which case I'm sure there won't be any

14   dispute as to filing the unredacted -- the redacted but, you

15   know, unredacted as to names of those people.

16        **MS. HAZAM:**  Thank you, Your Honor.

17        **MS. SIMONSEN:**  Thank you, Your Honor.

18        **THE COURT:**  All right.  That concludes all the ripe

19   discovery disputes and we're done; right?

20        **MS. SIMONSEN:**  I don't believe we are, Your Honor.

21        **THE COURT:**  All right.  So I'm going to turn to there

22   was a -- even though it's under the not currently required

23   Court action, there is actually a request -- let's see... it

24   says implied request on the TikTok Zoom video dispute.

25        Who's going to speak to that?

1        Enter your appearances.

2        **MR. WEINKOWITZ:**  Mike Weinkowitz on behalf of the

3    plaintiffs.

4        **MS. LADDON:**  Tarifa Laddon with Faegre Drinker on

5    behalf of TikTok.

6        **THE COURT:**  So I'm told in your report here, the open

7    issues will be ripe to be heard by the May DMC hearing, and the

8    parties will file a letter brief pursuant to my standing order.

9        Just so you're all clear, since this is an issue as to

10   TikTok alone, I don't want to take up time at the DMC on this.

11       So you file the letter brief if you still haven't resolved

12   it.  Once I get the letter brief, I'll set a separate

13   hearing --

14       **MR. WEINKOWITZ:**  Thank you, Your Honor.

15       **THE COURT:**  -- for this issue.  Okay?  But

16   hopefully -- hopefully you can work it out.

17       **MR. WEINKOWITZ:**  We're still talking.

18       **MS. LADDON:**  That's right.  I have every confidence,

19   Your Honor.

20       **THE COURT:**  All right.  And then the next -- yeah, the

21   next -- this is under unripe issues that you're still

22   requesting it is Number G, "Meet and Confers Regarding RFPs

23   TikTok."

24       Plaintiffs request the Court instruct the parties that

25   failure to comply with Rule 34 may waive objections and that

1    they should endeavor to memorialize its positions in writing in

2    advance of attorney conferences or have the corporate client

3    present at each such conference to facilitate the parties'

4    negotiations.

5         So if a party has properly objected to a document request,

6    then there's no waiver by failing to not memorialize it either

7    before or after a meet and confer.  I mean, you don't suddenly

8    waive an objection by not memorializing it later after a meet

9    and confer.  So that -- I know of no law that says that.

10        **MR. WEINKOWITZ:**  Your Honor, I think our only concern

11   is that in the request to produce, we are getting a litany of

12   boilerplate-type objections, and we have no idea whether or not

13   documents are being withheld based on a specific objection

14   because there's a ton of objections.  And we can't get any

15   clarity on whether or not, based on that objection, a

16   document's being withheld; based on this objection, a

17   document's being withheld.

18        And under Rule 34(1)(c), that's a requirement.  We have --

19   the plaintiffs have a right under Rule 34 to know precisely

20   which documents are being withheld based on precisely which

21   objections.

22        And that's our request, which is simply that they go back

23   and they redo their RFPs so that we can tell what's being

24   withheld based on the specific objection that is being

25   asserted.

1              **MS. LADDON:**  Your Honor, I'm surprised to see this in

2      here because the reality is we've been meeting and conferring a

3      ton.  They served, I think, 300 RFPs.  We've responded.  We've

4      had, what, six hours of meet and confers, and we've resolved

5      most of the disputes.  I don't see a bunch of substantive

6      disputes here before Your Honor needing to be resolved.

7          So the meet-and-confer process is working.  We're all

8      showing up in good faith, and we're trying to figure out what

9      they really need.  When they think -- when we think their

10     requests are overbroad, if they think our objections are

11     confusing or overbroad, we're working out in the

12     meet-and-confer process and complying with all the requirements

13     under the rules.  So I don't know why this is really in here.

14             **MR. WEINKOWITZ:**  Your Honor, that was utterly

15     unresponsive to what I just raised, which is we are getting a

16     slew of objections and we have no idea whether documents are

17     being withheld based on individual objections.

18         I can discuss the meet and confers separately, which I do

19     have some issues with; but on that particular issue, I have no

20     idea whether or not documents are being withheld based on an

21     objection; and under Rule 34, I think we're entitled to have

22     that so that we have an idea as to what is being withheld.

23             **THE COURT:**  I assume in the meet and confers you're

24     trying to explain to them which documents are being withheld or

25     not --

1          **MS. LADDON:**  Yes.

2          **THE COURT:**  -- based on your objections.

3          **MS. LADDON:**  Yes, and we've explained what we're

4    producing and what we are withholding.  That's been part of the

5    meet-and-confer process this whole time.

6          **MR. WEINKOWITZ:**  It remains unclear and unanswered.

7    We are having discussions in the meet and confers about

8    specific requests, but we do not now for any of the requests

9    when an objection is lodged whether a document is being

10   withheld based on that objection.  We have nothing about that.

11   I wouldn't have raised it and brought it here, Your Honor, if

12   we had the information.

13         **MS. LADDON:**  We're happy to continue meeting and

14   conferring if there's specific examples that counsel can sit

15   down and show us where we're not complying with the rules, but

16   we've been, I think, exhaustively meeting and conferring and

17   explaining exactly what we're producing and exactly what we're

18   not.  But we're happy to continue to meet and confer; and if

19   this raises to the level of an actual ripe dispute that we need

20   to go through, we're happy to brief it more.  But I just -- I

21   don't see the problem.

22         **MR. WEINKOWITZ:**  I don't hear that the defense -- that

23   TikTok is indicating that they're not doing what I'm saying,

24   and I have specific examples that I could show you, Your Honor,

25   if you'd like.

1    I simply would like the defendants if they're going to

2   object based on whatever objection they lay out in the request

3   to produce to tell me whether or not they are or not

4   withholding documents.  Very simple.

5    And I'm not hearing that they're not doing that.  I'm

6   hearing that they want to meet and confer repeatedly over and

7   over again.

8    I'm laying out the problem, and I'm just asking for a

9   solution to the problem, which is a very reasonable solution.

10    **MS. LADDON:**  We have been meeting and conferring over

11  300 very broad requests.  We will continue to do so.  We will

12  look at our discovery responses; and now that we know a little

13  bit more what they're asking now that we've spent all this time

14  together in meet and confer, we're happy to meet and confer

15  further to see if there needs to be some amendment.  But we've

16  been very clear in terms of what we're producing and what we're

17  withholding.

18    **THE COURT:**  Is there a specific category of documents

19  you're afraid that they're withholding based on an objection?

20    **MR. WEINKOWITZ:**  The issue is, is I have no idea what

21  they're withholding based on any of the objections that they're

22  asserting.

23    **THE COURT:**  Yeah, but do you have any -- that doesn't

24  answer my question.  Is there a specific category or type of

25  document you think they're withholding based on their

1    objections that you're trying to ferret out?

2         **MR. WEINKOWITZ:**  I'm trying -- I'm -- I can't answer

3    that question, Your Honor, because I have no idea what they're

4    withholding.  That's the problem.  I don't know whether they're

5    withholding a document based on any of the objections that

6    they're asserting because they simply won't tell me.

7         And I can tell you that this issue was just recently

8    ordered -- the defendants in both the hair relaxer and the

9    opioids case were specifically ordered to identify the

10   documents that they were withholding based on an objection.

11        Right now I can't answer your question because they won't

12   identify any documents that they are, in fact, withholding

13   based on any of the objections that they're asserting.

14        **THE COURT:**  Okay.  But --

15        **MR. WEINKOWITZ:**  I just can't answer it.

16        **THE COURT:**  What I'm hearing -- what I heard from

17   counsel for TikTok is that -- tell me if I'm wrong -- you said

18   that you were telling him what you were going to produce.

19        **MS. LADDON:**  Yeah, and we've said -- we've said when

20   we're not producing documents in response to a request.

21        **MR. WEINKOWITZ:**  They have not indicated specifically

22   which objections they are withholding documents on.  They just

23   haven't done it.

24        If you look at the way they respond to the RFPs, we have a

25   series of objections and then we have an answer, but it doesn't

1    tell me whether they're withholding the documents based on any

2    of those objections at all.

3        I can't answer your question because they have not given

4    me the information.

5            **THE COURT:** Have you started producing any documents?

6            **MS. LADDON:** Yeah. We've produced, what, 17,000 last

7    year and another -- is it 500, 700 that we produced?

8            **THE COURT:** From your review of the documents they've

9    produced, do you have a suspicion that they're withholding some

10   category or swath of documents?

11           **MR. WEINKOWITZ:** First of all, Your Honor, the

12   documents that they produced last year were documents that they

13   had produced to the state AGs.

14           **THE COURT:** I know.

15           **MR. WEINKOWITZ:** So that's a whole separate set of

16   documents.

17       They have produced documents in response to what we call

18   the go-fetch RFP1 where we say "Go get this individual

19   document," and they have been responsive to that. I will give

20   them credit on that.

21       So I have no -- no specific -- on that set, I have no

22   suspicion that they have withheld any documents on that set.

23   I'm talking about the rest of the sets. Sets 2 to Set 9, they

24   set out a series of objections. They do not tell me whether

25   they're withholding those documents. I can't even have a

1  suspicion because they don't tell me anything at all.

2      **THE COURT:**  Okay.  What I'm hearing is a willingness

3  to continue to meet and confer on this issue.  It sounds to me

4  like -- I mean, in normal practice as documents get produced,

5  the receiving party reviews them and they make reference to

6  other documents that weren't produced and you go back to the

7  producing party and say, "Hey, what about these?"  I mean,

8  that's kind of -- you expect some of that.  Right?

9      Now, you would expect the producing party to be fulsome in

10  its production and not prompt that but that, unfortunately,

11  does happen.  Right?

12      All I can say is this is unripe because you still need

13  to -- apparently the plaintiffs don't understand what you're

14  actually withholding on the basis of your objections.  So

15  you've got to tell them that at some level.  You think you've

16  already told them that you've got to make it either clearer or

17  in some way make it more categorical.  I don't know what it is

18  that they don't think they're understanding.

19      On the plaintiffs' side, you know, you've got to go

20  through the meet-and-confer process and, you know, if you

21  really think that they're somehow hiding some documents from

22  you, I mean, the standing order is clear.  You elevate it to

23  lead counsel and you file a brief on it and explain to me in

24  more detail than we just don't know because that's not -- I

25  mean, that really -- anybody who serves discovery requests says

```
 1   "I don't know what I don't have."  Right?
 2        But you need to explain to me why -- especially after
 3   you've had time to review the documents, why you think that
 4   there really is -- especially if they've made representations
 5   as to what they're producing and what they're not, why that
 6   there's something being hidden from you based on the basis of
 7   these objections.
 8        MR. WEINKOWITZ:  Your Honor, I understand that, but
 9   the problem is that we got -- we have a series of 20 or 30
10   objections.
11        THE COURT:  I hear your complaint, but my
12   understanding is that -- you're -- she's been -- allegedly the
13   representation is made that she's been meeting and conferring
14   trying to explain what the objections are and what the
15   documents being produced in light of the objections are.  I
16   assume that's what you're doing.
17        MS. LADDON:  That's what our team's been doing.  It's
18   been my colleague who couldn't be here today because of the
19   Passover holiday, so I wasn't personally in all the meet and
20   confers but I've gotten the full update, and my understanding
21   is that that's exactly what we've been doing.
22        We've been responding to document requests.  We've been
23   clear about what we're producing, what we're not producing, and
24   we've been showing up to every meet and confer and talking in
25   good faith about these very issues.
```

1          **THE COURT:**  Okay.  So the risk is on you.  If you

2      don't provide sufficient answers to plaintiffs' questions as to

3      what somehow they think you're still hiding the ball in some

4      way and not explaining what you're producing and what you're

5      not producing, then they're free to escalate it to a lead

6      counsel meet and confer and then file a motion on it, but then

7      the burden is on you to show why there's been a violation here.

8          Again, I'm not going to -- you know, I'm not going to look

9      kindly on unnecessary motion practice, especially where it

10     looks like you haven't sufficiently met and conferred.  I'm not

11     hearing there's really good communication here, so I would

12     encourage better communication on this issue.

13         **MR. WEINKOWITZ:**  Your Honor, we're having another

14     issue with meet and confers with TikTok that I'd like to

15     explain.

16         And what's happening is, is we will get a set of requests

17     to -- answers to requests to produce, and we will write them a

18     deficiency letter, and then it will take some time in order to

19     set up a meet and confer.  And then when we finally do get a

20     meet and confer, we get -- and our deficiency letters are very

21     clear as to which requests we want to talk about.  We get on

22     the meet and confer, and I go "Number 165, what's your position

23     on 165?  You won't produce any documents."

24         And they say to me "We have to go back to the client."

25         "166?"

1          "We have to go back to the client."

2          "168?"  This is repeatedly over and over again.

3      What's happening is it appears that what's going on in

4  these meet and confers is a lot of slow walking.  They're

5  coming to the meet and confers without being prepared, without

6  a position on whether or not they will or won't produce a

7  document when it's raised, and then we have another two weeks

8  that goes by when we don't hear back about what the client's

9  position is.  And I have to write five e-mails and six e-mails.

10  And then right now there are a series of requests to produce

11  that I am still waiting to hear from weeks ago.

12      I get that we asked for a very aggressive schedule.  I get

13  it, but that doesn't mean that the meet-and-confer process can

14  be used to really delay the production of documents and over

15  and over again not give us an answer.  We need an answer,

16  Your Honor.

17          **THE COURT:**  My standing order at Section H,

18  subsection (1) says (as read):

19          "Counsel for all parties involved in the dispute

20      shall undertake reasonably diligent efforts to confer and

21      attempt to negotiate a resolution of the dispute."

22      I assume no good lawyer here is going to be in contempt of

23  one of my orders, so I encourage everybody to do that.

24      Paragraph (2) of Section H of my standing order says (as

25  read):

1        "Only after counsel and the parties have communicated

2    in those efforts but remain unable to resolve the dispute,

3    any party may demand a meeting of lead trial counsel for

4    the parties involved in the dispute at issue.  To resolve

5    the discovery dispute, such meetings shall occur within

6    10 business days of the demand."

7    If you have communicated in those efforts but remain

8    unable to resolve the dispute, it is your right under my

9    standing order to demand the meet-and-confer lead counsel.

10   So your comments about slow walking, I'm not crediting

11   whether that's happening or not, but my standing order is

12   specifically designed to avoid unnecessary delay in the

13   resolution of discovery disputes.  So I'm not going to

14   countenance arguments to me that the other side is slowing down

15   discovery when I give you -- I give all parties in my court

16   specific guidance on how to get expeditious rulings on

17   discovery disputes.  All right?

18            **MR. WEINKOWITZ:**  Understood, Your Honor.

19       **THE COURT:**  All right.  And you understand my

20   admonition as to being prepared on meet and confers?

21       **MS. LADDON:**  I do 100 percent.  And we take issue with

22   counsel's characterization of the meet-and-confer process and

23   100 percent stand by our participation pursuant to Your Honor's

24   orders.

25       **THE COURT:**  I encourage good and effective

1  communication in meet and confers in trying to work things out,

2  so I take what you're saying but I'll hold you to it too.

3  Okay?

4          **MR. WEINKOWITZ:**  Thank you, Your Honor.

5          **THE COURT:**  All right.  If I understand the e-mail

6  that I received, the final unripe but ripe dispute, I guess,

7  that hasn't been resolved is deposition topic seeking source

8  code adjacent information but only with respect to TikTok; is

9  that right?

10          **MR. MATTERN:**  Good afternoon, Your Honor.  David

11  Mattern on behalf of the TikTok defendants.

12      Yes.  Our understanding is that plaintiffs have not

13  withdrawn this dispute as to TikTok although they've withdrawn

14  it as to Snap; and as noted in the DMC, it was not raised as to

15  Meta and YouTube who reserve all their rights.

16          **THE COURT:**  Okay.  So is it still really a dispute as

17  to TikTok?

18          **MR. WEINKOWITZ:**  Yes, it is a dispute as to TikTok,

19  Your Honor, and is --

20          **THE COURT:**  Okay.

21          **MR. WEINKOWITZ:**  I can hand you up a copy of the

22  notice so that you can see precisely what the topics are.

23          **THE COURT:**  Well, I already -- I mean, is it on what

24  they're calling the source code adjacent information?

25          **MR. WEINKOWITZ:**  That's correct, Your Honor.

 1          **THE COURT:**  All right.  I don't need to see the

 2   notice.  I understand what that is.  Unless you --

 3          **MR. WEINKOWITZ:**  No, no.  I'm saying I wanted to put

 4   the topics in front of you so that you could see precisely what

 5   the topics say, but that's fine.  They just simply won't

 6   produce a witness.

 7          **THE COURT:**  Okay.  Why won't you produce a witness?

 8          **MR. MATTERN:**  Yeah.  As Your Honor will recall, the

 9   parties agreed not to seek source code discovery at this time,

10   and I believe what plaintiffs said at the last DMC when this

11   was discussed was unless and until defendants put it at issue,

12   which we have not.

13        The reason that -- so that's, I think, why we think this

14   is premature.  If there is a point where they want to cross the

15   bridge to seek source code discovery, only then would it be

16   appropriate to have conversations about where that information

17   is stored.

18        But although I realize that they've characterized this as

19   what they're calling the source code adjacent, but it's not.

20   What they're seeking and as identified by, like, Getlab and

21   GitHub, they're seeking information about the repositories

22   where source code is stored.

23        They want description about how the source code was

24   changed, which is, again, a description about the source code.

25   They want information about comments or versions of source

 1    code.

 2         This is all stuff that there's a patent protective order

 3    that lists out and defines as highly confidential source code

 4    information the very information that they're seeking here.  So

 5    it's our view that it's more appropriate to defer this until we

 6    come to the time when there is source code, you know,

 7    discovery.

 8              THE COURT:  So on that point, I have a -- I'm not

 9    going to -- I haven't gone back through the transcripts.  I

10    have a memory of somebody on the plaintiffs' side telling me,

11    maybe it was Mr. Previn, that we weren't seeking a source code

12    protocol at this time because they weren't -- the plaintiffs

13    weren't seeking source code, but they used the phrase "but that

14    doesn't stop us.  We still reserve the right to seek source

15    code adjacent information."

16         Tell me --

17              MR. WEINKOWITZ:  That's, correct, Your Honor.  That

18    was --

19              THE COURT:  Tell me if I'm wrong from the defense

20    side.

21              MR. MATTERN:  That's correct.  It was Mr. Warren that

22    noted that.  And in the response, we also noted that we didn't

23    understand what source code adjacent meant and thought that it

24    was something that would -- that was ambiguous and would need

25    to be clarified.

1        **THE COURT:**  Okay.  So -- but if the only issue is

2   whether the current protective order covers the confidentiality

3   of what they're calling the discovery on source code adjacent

4   information, then you're free to come up with either a source

5   code protocol or an amendment to the protective order, if you

6   want, to cover source code related, you know, even more highly

7   confidential information using the patent protective order as a

8   template, but that doesn't -- that doesn't mean that it's

9   premature.  I don't think they waive the right to take this

10  discovery.

11       **MR. MATTERN:**  No.  I think that's -- certainly the

12  protective order is one component, but I think the broader

13  point is they said they weren't seeking source code discovery

14  at this point, so putting up an ESI witness to talk about

15  preservation of source code seems premature.

16       Those conversations would be better had if plaintiffs get

17  to the point that they think that source code discovery is

18  appropriate and only after having those conversations.  And

19  this would be something not only TikTok but the other

20  defendants who this issue has not been raised for.  You know,

21  premature to raise it now when plaintiffs have said that

22  they're not seeking this kind of discovery and premature to

23  raise it --

24       **THE COURT:**  I mean, to the extent they said they

25  weren't seeking it, they said that they could seek it later.  I

 1    mean, again, I don't think there was a complete waiver for

 2    purposes of this case ever by the plaintiffs to seek even what

 3    you're calling source code discovery; right?  They kept open

 4    that possibility later, and it's up -- I mean, it's up to the

 5    party taking the discovery to time which discovery they want to

 6    take; right?  I mean, unless there's a court order like barring

 7    it, like if it's a phasing or bifurcating of a discovery.

 8         **MR. MATTERN:**  I'm with you there, Your Honor, that

 9    there wasn't a waiver, but our point is that they've said that

10    even at the last DMC they're not taking source code discovery

11    now and so it's premature to put up a witness on us now.

12         **THE COURT:**  What you're calling source code discovery,

13    they're calling source code adjacent discovery, so you're not

14    really talking to each other.

15         So whatever bucket you want to put it in, again, there's

16    nothing to stop them from taking even what you're calling

17    source -- they can say today "We've changed our minds and we

18    want to start taking discovery on source code."  I don't

19    think -- there's no procedural way to object to that, is there?

20         **MR. MATTERN:**  I think, Your Honor, yes, we would say

21    that it's not relevant to their claims and not proportionate.

22    I mean, yes, those would be our objections.

23         **MR. WEINKOWITZ:**  I can assure counsel that we're

24    actually not looking for the discovery or a deposition on the

25    actual source code.  That is not the topics.  The topic is:

1  Where do they store versions of their tools?  Where do they

2  store versions of their algorithms and their versions of their

3  source code?  How do they describe it?  How do they revise it?

4  What documents exist without actually getting into the actual

5  source code?  We have not crossed that bridge.  This is a

6  different bridge.

7          **MR. MATTERN:**  I think, one, this is to our point about

8  why this is premature, and this is something the parties should

9  continue having meet and confers on.

10      But, two, at least as plaintiffs have briefed this in

11  their statement, what they want information on is how we -- was

12  GitHub and, like, similar programs, which is repositories, as

13  you know, for source code.

14      What they asked for is information about comments to

15  source code, about how it was modified.  They're really asking

16  more for descriptions of source code.

17      I take Mr. Weinkowitz's representation, though, that he

18  says that they're not really asking for source code

19  information, and so I think it's -- the parties should simply

20  continue to meet and confer about this to see if we can narrow

21  it to a universe of information that we think is appropriate

22  and that wouldn't encroach on the source code production.

23          **THE COURT:**  Okay.  So it's clearly not ripe.  You

24  haven't completed the meet-and-confer process, but you've

25  asked -- I think you've at least implicitly, if not directly,

asked for guidance on this issue.  So, again, I don't think a

prematureness argument is going to work here because there's

no -- they never waived the ability to take discovery on source

code, even source code itself, not -- and, again, I've just got

a memory that somebody asked for source code.  You kept open --

it was very clear once or twice to say "We still want to take

source code adjacent discovery."

And I understand what you thought that meant and what they

thought it meant.  You know, talk it out in the meet-and-confer

process, but I don't think you're going to prevail on a

prematureness argument at this point because there was no --

there's no timing of the discovery issue here on source code in

any event.

**MR. MATTERN:**  I appreciate that, Your Honor.  I think

to reframe it, I think our dispute is over the meaning of

"adjacency."  And so what I think is premature is this dispute

because we're not having a meeting of the minds about what

"adjacent" even means.

And it seems like I've just heard Mr. Weinkowitz say that

they don't want discovery into what we would consider to be

source code information.  So maybe it would make sense to

continue to discuss this issue to see if we can find a path

forward, which, again, is why we did not think this dispute was

ripe for inclusion for this DMC.

**THE COURT:**  So continue to meet and confer, and

 1   however you describe the subject of the discovery sought,

 2   whether -- you know, the description of it isn't going to

 3   resolve the issue, whether you call it source code or you call

 4   it source code adjacent.  It's whether -- you know, whether --

 5   I mean, unless there's a privilege reason or some other really

 6   good reason to refuse a witness, I don't understand how you

 7   can't -- how you can force the other side to say, "Well, you

 8   can't take discovery at this time on this issue because I don't

 9   think you should."  That doesn't work.  It doesn't work that

10   way.

11       **MR. MATTERN:**  But I don't think plaintiffs have said

12   that they want to take source code discovery at this point.  In

13   fact, I think Mr. Weinkowitz has said a few minutes ago that

14   was not the intent.

15       **THE COURT:**  The way you framed what you think they're

16   asking for is you think it's source code discovery; right?  And

17   so it -- my point is even if you're right, and I'm not saying

18   you're right, but even if you want to characterize it as source

19   code discovery because it's too close to the actual source code

20   to be what they would call source code adjacent -- right? -- it

21   doesn't matter at the end of the day because they didn't waive

22   the ability to take source code discovery.  That's my point.

23       **MR. WEINKOWITZ:**  And, Your Honor, just may I respond?

24       **THE COURT:**  Yeah.

25       **MR. WEINKOWITZ:**  I just would encourage -- I was going

1    to hand this up, but the topics are very, very specific and

2    they're designed around not getting at the source code but

3    information about the source code, and it also includes

4    modifications, revisions, or changes to the tools and the

5    platform and the algorithm.

6        We don't want to know what the code looks like.  We just

7    want information for where is this stored, what are the

8    documents that are generated, what is the decision-making

9    that's made to change when there's a change in the platform.

10   That's what these topics are about.

11       They're labeling it as just source code.  First of all,

12   you're right, we didn't waive any source code information.  But

13   they're making it specific to source code, and it's not

14   specific to source code.

15       And, you know, I'm not sure what else we're going -- I'll

16   meet -- we'll meet and confer, but the topics are very, very

17   clear, and they're just not willing to give us a witness.

18       **THE COURT:**  I encourage the parties to meet and confer

19   and try to clarify the scope of what this discovery is and

20   whether it's putting aside whether it's premature or not, you

21   know, whether it's proportional -- right? -- whether, you know,

22   it's not overly burdensome, those are the issues that you can

23   certainly try to mitigate and try to avoid future disputes on.

24       **MR. MATTERN:**  Yes.  Thank you, Your Honor.

25       **THE COURT:**  All right.

1          **MR. WEINKOWITZ:**  Thank you, Your Honor.

2          **THE COURT:**  All right.  So I think going -- when I

3    went through the unripe disputes, I think I picked up most.  Is

4    there more unripe fruit to pick?

5          **MR. CHAPUT:**  Your Honor, Isaac Chaput on behalf of the

6    Meta defendants from Covington & Burling.

7          Just one very brief update that was not in the DMC

8    statement because it had not yet arisen at that time, but we

9    wanted to flag it for Your Honor, which is that tomorrow Meta

10   defendants and plaintiffs will be filing a joint letter brief

11   on disputes relating to plaintiffs' 30(b)(6) deposition notice

12   directed to Meta.  Those were not flagged in the DMC statement

13   because they had not yet ripened or crystallized at the time

14   that statement was filed.

15         **THE COURT:**  Okay.  All right.  So you've gone through

16   all the meet and confers, and you still can't resolve the

17   30(b)(6) issue?

18         **MR. CHAPUT:**  We have endeavored to resolve the issues

19   we thought that we might be able to, which is why we hadn't

20   flagged it previously, but it appears we have not.

21         **THE COURT:**  Okay.  Thank you for that update.  And

22   that will be filed tomorrow?

23         **MR. CHAPUT:**  That is our expectation at present, yes,

24   Your Honor.

25         **THE COURT:**  Okay.  A couple places in the status

1   report at least I saw some confusion or discussion as to when

2   is a dispute ripe versus unripe.

3        All right.  So I'll make it very easy.  It's ripe when

4   you've gone through all the meet and confer, including lead

5   counsel meet and confer -- right? -- and it's ready to be

6   briefed or has already been briefed.  Right?  Maybe overripe at

7   some point.  But it's certainly ripe at that time.  It's

8   unripe -- right? -- if you haven't completed all the

9   meet-and-confer processes.  Right?

10       Now, you certainly are free to -- and I think you've been

11  doing this -- in the unripe section, you can tell me, you know,

12  the only thing left to do is the meet and confer of lead trial

13  counsel -- right? -- or, as you've said, "We're still

14  continuing to meet and confer."  Right?  That's fine.  That's

15  part of why you -- it's a status report, so I'm asking for

16  that.

17       But the question of whether to flag it to me as ripe or

18  unripe, the dividing line I think is pretty easy.  If you've

19  finished all the final meet and confers to lead trial counsel

20  and the only thing left to do is file the brief or you've

21  already filed the brief, then it's ripe.

22            **MR. WARREN:**  Your Honor, may I ask a point of

23  clarification --

24            **THE COURT:**  Sure.

25            **MR. WARREN:**  -- on the operation of your standing

 1    order?

 2        We just want to make sure that when one party invokes H(2)

 3    of your standing order and asks for that meeting of lead trial

 4    counsel, when it happens, if one party is unsatisfied and feels

 5    like the meet-and-confer process has expired and they're not

 6    getting anywhere, that party would like to proceed with letter

 7    briefing or presenting the dispute as ripe rather than having

 8    the other party sort of essentially hold the process hostage by

 9    saying, "No, no, no.  Let's meet and confer and try again.

10    Let's meet and confer and try again."  Because that's the

11    concern we have, is that that can go on indefinitely and

12    prevent the party seeking relief from actually -- from actually

13    getting it.

14        **THE COURT:**  So, again, I'll read paragraph H(2) from

15    my standing order.  The condition is only after counsel for the

16    parties have communicated in those efforts but remain unable to

17    resolve the dispute, any party may demand a meeting of lead

18    trial counsel.

19        What's the condition?  Only after counsel and the parties

20    have communicated in those efforts but remain unable to resolve

21    the dispute.  Have you communicated in those efforts and been

22    unable to resolve the dispute?  Then you can ask for a meet and

23    confer of lead trial counsel.

24        **MR. WARREN:**  Yes, Your Honor, but the question is at

25    the meeting of lead trial counsel --

1          **THE COURT:**  Yes.

2          **MR. WARREN:**  -- if at that meeting the dispute is not

3    resolved, then what?

4          **THE COURT:**  Okay.  Lead counsel meetings shall occur

5    within 10 business days of the demand, and then now we go to

6    paragraph H(3) (as read):

7               "Within five business days of the in-person meeting

8          of lead trial counsel referred to above, the parties shall

9          file" -- "jointly file a detailed letter with the Court."

10         No exceptions there.

11         **MR. WARREN:**  Perfect.

12         **THE COURT:**  Five-day deadline.

13         **MR. WARREN:**  That's all we needed to hear.  Thank you.

14         **THE COURT:**  I thought -- I thought it was pretty

15   clear.

16         **MR. WARREN:**  It was to us, Your Honor, but I think

17   there is sometimes a desire to extend the meet-and-confer

18   process even among lead trial counsel and say "Let's try

19   again."

20         **THE COURT:**  As I said, based on long experience

21   fighting discovery battles, I fashioned my standing order in a

22   way to avoid -- well, to help expedite rulings on discovery

23   disputes to help parties reach their resolutions efficiently.

24         **MR. WARREN:**  Thank you.

25         **THE COURT:**  Questions, Ms. Simonsen?

1          **MS. SIMONSEN:**  No.  We appreciate the clarification

2     that we should follow Your Honor's order, which is how we had

3     been interpreting what a ripe dispute is.

4          **THE COURT:**  Okay.  Now, I also point out that I think

5     I have in here that you -- the parties are free to jointly

6     withdraw a dispute even after the letter brief is filed.

7     Right?  So things can change and people can -- there's nothing

8     in here barring voluntary continuing meet and confers --

9     right? -- even of lead trial counsel after the letter brief has

10    been filed or after the formal meet and confer of lead trial

11    counsel, and I would certainly encourage, like I would in a

12    settlement conference, you know, I certainly encourage parties

13    to keep talking, if they can, to work things out.

14         **MR. WARREN:**  Yes, Your Honor.  And, in fact, I think

15    you saw that the parties were able to take some issues off the

16    board in advance of today.

17         **THE COURT:**  I'm very appreciate of that.

18         **MS. SIMONSEN:**  And we understand, Your Honor, just to

19    clarify, that the parties can agree to forgo the letter

20    briefing and instead tee something up as ripe in the DMC

21    statement, which is how we've been approaching the disputes to

22    date.  For instance, some of the issues that we argued earlier

23    today, we didn't letter brief, but that was because the parties

24    agreed that they were ripe.  Otherwise we understand that the

25    parties are to letter brief the dispute.

1          **THE COURT:**  So that's right.  I was -- you remind me I

2     was going to give you more clarification on that.

3          So timing-wise -- right? -- there is -- there's going to

4     be over -- so there's going to be a period of time when you've

5     completed all the meet and confers, even the meet and confers

6     of lead trial counsel, and you can either brief it in the DMC

7     or brief it in a letter brief because the timing of both, like,

8     are -- like fall right within each other.  So the question is:

9     Where do you do it?

10         So basically it's got to be in the DMC.  At least a status

11    report on it has to be in the DMC even if it's not fully

12    briefed in the DMC because I need to know that it's a ripe

13    dispute and what the dispute is -- right? -- which you've been

14    doing.  So -- and tell me "We either have or we will have a

15    letter brief on this."  Right?

16         Use your discretion on whether you want to tee it up in

17    the DMC joint status report.  If it's something that's purely

18    or, you know, primarily administrative or procedural, like

19    "Should we file that chart on the docket," I would encourage

20    you to brief it fully because that's probably less than a page

21    of briefing to tee it up in the DMC.

22         But if the dispute is of such complexity that you're

23    citing a lot of law and you're basically approaching the page

24    limits that you -- that would fall in the discovery letter

25    brief page limits -- right? -- then don't fill the DMC status

1  report with something that probably more appropriately

2  requires -- because it's -- it must be of complexity or

3  substance that it requires full briefing in a letter brief.

4       **MR. WARREN:**  Thank you, Your Honor.

5       And point of clarification.  For example, the litigation

6  hold issue in this one, that would have been appropriate letter

7  brief versus a DMC statement?

8       **THE COURT:**  Probably, yeah.  Yeah.  You briefed it as

9  if it were the letter brief here, which is fine for today's

10  purposes, but going forward, I mean, use your discretion.

11  Certainly if it's like a really discreet issue, like even if

12  it's of some substance but it's discreet and it's short enough,

13  you can certainly -- again, if that timing works out, you can

14  brief it in the DMC status report.

15       **MR. WARREN:**  Thank you, Your Honor.

16       **THE COURT:**  All right.

17       **MR. WARREN:**  And I'll just represent for plaintiffs,

18  our preference will be presenting disputes to you that are

19  substance via letter brief in part because it just creates

20  clarity with your standing order.

21       **THE COURT:**  Yeah.  Okay.

22       All right.  I think I've given all the clarifications I

23  was supposed to give today.

24       Anything further?  I know I skipped a bunch of unripe

25  issues, but I didn't see any request for guidance in the ones I

1   skipped.

2          MS. SIMONSEN:  Nothing from defendants.  Thank you

3   very much, Your Honor.

4          THE COURT:  Okay.  Anything from the plaintiffs' side?

5          MR. WARREN:  No, nothing from plaintiffs' side.

6          THE COURT:  All right.  We are adjourned till the next

7   DMC, which is actually coming up pretty shortly because of the

8   way the DMC next month got scheduled.  So hopefully next

9   month's DMC will be short.  All right.

10         THE CLERK:  We're off the record in this matter.

11         THE COURT:  Oh, can we go back on the record?

12         THE CLERK:  We're back on the record in this matter.

13         THE COURT:  So I noted -- or my clerk noted -- for the

14  state agency filings, there was a set of letter briefs filed

15  and then a corrected set of letter briefs filed, and I think

16  one had the attestation and the other didn't.

17      And so I think Docket Number 736 was essentially replaced

18  by Docket Number 738.  Will the parties agree we can simply

19  terminate as moot Docket 736?

20         MS. SIMONSEN:  Your Honor, I just simply don't know

21  the answer off the top of my head, and I can check with a

22  colleague quickly.

23         THE COURT:  Okay.

24         MS. SIMONSEN:  He has confirmed.  Yes, the defendants

25  are comfortable with that.

1    THE COURT:  The state AG side, is that okay?

2    MR. LEWIS:  Yes.

3    THE COURT:  Okay.  So you will see that on the docket.

4 We will resolve or terminate the first filing Docket 736 as

5 moot.

6    Now we can go off the record.

7    THE CLERK:  We're off the record in this matter.

8         (Proceedings adjourned at 2:42 p.m.)

9              ---oOo---

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:    Tuesday, April 23, 2024

8

9

10

11    _____

12          Kelly Shainline, CSR No. 13476, RPR, CRR
                     U.S. Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25