**Pages 1 - 115**

                        UNITED STATES DISTRICT COURT

                       NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION                      )
                                )  **NO. 22-MD-03047 YGR (PHK)**
                                )
_____)

                             San Francisco, California
                             Monday, May 6, 2024


              **REPORTER'S TRANSCRIPT OF HYBRID PROCEEDINGS**


**APPEARANCES:**

For Plaintiff State of Colorado:
                         COLORADO DEPARTMENT OF LAW
                         1300 Broadway, Sixth Floor
                         Denver, Colorado 80203
                  BY:    **BIANCA MIYATA**
                         **SENIOR ASSISTANT ATTORNEY GENERAL**


For Plaintiff State of Arizona:
                         ARIZONA ATTORNEY GENERAL'S OFFICE
                         2005 North Central Avenue
                         Phoenix, Arizona 85004
                  BY:    **NATHAN E. WHELIHAN**
                         **ASSISTANT ATTORNEY GENERAL**


For the State of New Jersey:
                         NEW JERSEY OFFICE OF
                           THE ATTORNEY GENERAL
                         124 Halsey Street, Fifth Floor
                         Newark, New Jersey 07101
                  BY:    **MANDY K. WANG**
                         **DEPUTY ATTORNEY GENERAL**


           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              Official U.S. Reporter, CSR No. 7445

```
 1   APPEARANCES:   (CONTINUED)

 2   For the State of Pennsylvania:
                         PENNSYLVANIA OFFICE OF ATTORNEY GENERAL
 3                       15th Floor Strawberry Square
                         Harrisburg, Pennsylvania 17120
 4               BY:  JONATHAN R. BURNS
                      DEPUTY ATTORNEY GENERAL
 5

 6   For the State of Connecticut:
                         CONNECTICUT OFFICE OF THE ATTORNEY
 7                        GENERAL
                         165 Capitol Avenue
 8                       Hartford, Connecticut 06106
                 BY:  KRISLYN M. LAUNER
 9                    ASSISTANT ATTORNEY GENERAL

10   For Plaintiff State of California:
                         CALIFORNIA DEPARTMENT OF JUSTICE
11                       OFFICE OF THE ATTORNEY GENERAL
                         1515 Clay Street, Suite 2000
12                       Oakland, California 94612
                 BY:  JOSHUA OLSZEWSKI-JUBELIRER
13                    DEPUTY ATTORNEY GENERAL

14
     For Defendant Meta:
15                       COVINGTON & BURLING LLP
                         1999 Avenue of the Stars, Suite 3500
16                       Los Angeles, California 90025
                 BY:  ANSEL F. CARPENTER, ATTORNEY AT LAW
17                    ASHLEY M. SIMONSEN, ATTORNEY AT LAW

18                       COVINGTON & BURLING LLP
                         620 Eighth Avenue
19                       New York, New York 10018
                 BY:  GREGORY L. HALPERIN, ATTORNEY AT LAW
20

21   For Defendant Snap:
                         MUNGER, TOLLES & OLSON LLP
22                       560 Mission Street, 27th Floor
                         San Francisco, California  94105
23               BY:  NATALIE G. MOYCE, ATTORNEY AT LAW
                      (Appearing Remotely Via Zoom)
24

25
```

| | |
|---|---|
| 1 | **<u>Monday - May 6, 2024</u>**                                    **<u>1:47 p.m.</u>** |

2                        **P R O C E E D I N G S**

3                             ---o0o---

4          **THE CLERK:**  Court is now in session.  The Honorable

5    Peter H. Kang presiding.

6          **THE COURT:**  Good afternoon.

7          **ALL:**  Good afternoon, Your Honor.

8          **THE CLERK:**  Now calling 22-MD-3047, In Re Social Media

9    Adolescent Addiction and Personal Injury Products Liability

10   Litigation.

11       Counsel, when speaking, please approach the podiums and

12   state your appearance for the record.

13         **THE COURT:**  All right.  So we're here on the dispute

14   over state agency discovery.  Should we just go alphabetically,

15   or do you have a different plan in mind for addressing the

16   issues?

17         **MS. MIYATA:**  Your Honor, Bianca Miyata for the

18   State AGs.

19       We did think it made sense to go in a particular order,

20   kind of on a spectrum for how states are structured with their

21   representation.  If given the choice, we'd prefer to start with

22   Arizona, then go to New Jersey, Pennsylvania, Connecticut, and

23   then California.

24         **THE COURT:**  Any objection to that plan?

25         **MR. CARPENTER:**  Ansel Carpenter from Covington &

 1    Burling for the Meta defendants.

 2         No objection to any order that the AGs want.

 3              THE COURT:  Okay.  Let's start with Arizona, then.

 4         MS. MIYATA:  Thank you, Your Honor.

 5         MR. WHELIHAN:  Good afternoon, Your Honor.  Nathan

 6    Whelihan on behalf of the Arizona Attorney General's Office.

 7              THE COURT:  Good afternoon.

 8         Okay.  So let me just pull up the chart.  I just want to

 9    confirm, because it's been a few weeks, the chart.

10         So I just want to confirm this is -- I'm referencing the

11    chart which was submitted.  I think it's Exhibit 1 to

12    Docket 738, the chart of agencies and which ones are going to

13    be represented by the respective Attorney General's Office.

14         So why don't you tell me, if you've got the chart in front

15    of you.

16         MR. WHELIHAN:  I do have the chart in front of me.

17              THE COURT:  Is the chart still accurate with regard to

18    the Arizona agencies?

19         MR. WHELIHAN:  Yes, Your Honor.

20              THE COURT:  All right.  So then at least my first

21    question, Meta cites Arizona state law that says the Arizona

22    Attorney General's Office -- well, put it the other way --

23    agencies, except for three exceptions, which I'll get to, are

24    prohibited from employing legal counsel from outside the

25    Arizona AG's Office.

1    And so among -- putting aside the exceptions, on the

2    chart, you have the Department of Education for Arizona in

3    Category 1.

4          **MR. WHELIHAN:**  Yes.

5          **THE COURT:**  But they're not one of the exceptions from

6    that statute.  So I don't understand that.

7          **MR. WHELIHAN:**  Correct.  If I may address that,

8    Your Honor.

9          First of all, I believe Meta's counsel slightly

10   mischaracterizes the prohibition that agencies not be

11   represented outside the Attorney General's Office.  The

12   prohibition is on certain agencies not being allowed to expend

13   state funds to hire legal counsel or otherwise go outside of

14   their office to pay for legal counsel.  So there's a slight

15   distinction there.

16         But the reason that the Arizona Department of Education

17   and also, I believe, the Governor's Office of Budgeting and

18   Strategic Planning are not on the list or are on the other side

19   of the list are because the Governor's Office -- Strategic

20   Budgeting and Planning is actually part of the

21   Governor's Office functionally in Arizona.

22         And then the Department of Education presents a sort of

23   unique present circumstance in Arizona, where the Arizona

24   Department of Education, the elected superintendent of that,

25   who heads that department, is himself a former attorney general

of the state and an attorney.  He has brought lawsuits against

the Attorney General of Arizona and the Governor of Arizona in

their official capacities.  So I think arising out of that

conflict, sort of a special exemption was granted to the

Department of Education.

Our Criminal Divisions within our office have also

indicted former employees of the Department of Education in

relation to fraud and misappropriation of state funds in

relation to the distribution of educational funds.

So the present reality on the ground is that that

department, for any kind of litigation matters, is not at all

represented by any agency counsel sections within our office.

**THE COURT:**  Okay.  Well, do you disagree with that

representation of the exemption for the Department of Education

of Arizona?

**MR. CARPENTER:**  So a few points, Your Honor.

First, we think we correctly characterized the statute.

It does prohibit those agencies, which, as you pointed out, do

not include these three, from employing outside legal counsel

or making expenditures.

There are also other statutes we cite that say that the

Attorney General is the chief legal officer for the state and

has charge of that.  And that's not cabined to certain

agencies.  It includes the ones we've been talking about.

In terms of counsel's point about the conflicts, I don't

believe that counsel has represented that any conflicts would

matter in this case.  And as I believe Your Honor knows from

the briefing, courts have rejected arguments about -- this sort

of argument that conflicts may exist when they're only

speculative, including the *Generic case* that we cite, which

applied it specifically to the Arizona Attorney -- or to the

State of Arizona and held that all state agencies are subject

to party discovery when the AG brings suit.

**THE COURT:**  Okay.  You didn't quite answer my

question, though.

Counsel for the AG -- Arizona AG represented that there's

some new exemption that allows the Arizona Department of

Education to exempt itself from the statute you've cited.  Is

that correct or not?

**MR. CARPENTER:**  I'm not aware of it, and I did not see

it in the briefing, Your Honor.

**THE COURT:**  I didn't either.

So where does that special exemption for the Department of

Education arise from?

**MR. WHELIHAN:**  A bit of a political question,

Your Honor.  It didn't make our briefing due to the one-page

limit on the briefing.  We wanted to include something on it,

but we felt that wasn't -- the chart spoke for itself.

The simple reality is that we don't represent them at this

time for litigation purposes.  So...

1          **MR. CARPENTER:**  Your Honor, if I may.

2          **THE COURT:**  Sure.

3          **MR. CARPENTER:**  I think if it didn't make the briefing

4    and we didn't have a chance to respond to it, then the Court

5    should deem it waived.

6          **THE COURT:**  Well, okay.  I'll give you a chance.

7      Is there a statute that was passed that grants the

8    Department of Education an exemption from --

9          **MR. WHELIHAN:**  There is no --

10         **THE COURT:**  Let me --

11         **MR. WHELIHAN:**  Sorry.  Excuse me.  I'm sorry.

12         **THE COURT:**  -- that grants Arizona the exemption from

13   Arizona Revised Statute Section 41-192?

14         **MR. WHELIHAN:**  My understanding of the matter is that

15   it's more of an *ad hoc* exemption from the Governor's Office.

16         **THE COURT:**  I see.  Okay.  Is there anything in

17   writing between the Arizona Attorney General's Office and the

18   Arizona Department of Education confirming that the Arizona

19   Attorney General's Office will not represent the Arizona

20   Department of Education in this matter in the future, no matter

21   what happens?

22         **MR. WHELIHAN:**  There is -- not to my knowledge.  And,

23   no, I don't think there would be a writing of the manner that

24   you describe, in any case.

25         **THE COURT:**  Anything close to that that addresses --

```
 1          MR. WHELIHAN:  Not that I'm aware of.

 2          THE COURT:  -- failure to -- or refusal or failure,

 3   whatever it is, non-representation of the Department of

 4   Education by the Attorney General's Office?

 5          MR. WHELIHAN:  Not that I'm aware of, Your Honor.

 6          THE COURT:  Okay.  So, thank you for that.

 7       So is the Arizona Governor's Office of Strategic Planning

 8   and Budgeting a separate agency from the Arizona

 9   Governor's Office?  What's your position?

10          MR. WHELIHAN:  My understanding is that's also a

11   little bit of a weird -- a unique circumstance.  It is

12   organized under the Department of Administration, is my

13   understanding; but functionally, it is staffed by and provided

14   representation by the Governor's Office.  There's no -- it's a

15   quirk of the way it was set up, is my understanding from --

16          THE COURT:  Hypothetically, if I were to rule in your

17   favor and find that they need to be subpoenaed, would they be

18   covered by a subpoena to the Arizona Governor's Office?

19          MR. WHELIHAN:  I believe, technically, they are a

20   separate agency, and so there might need to be two subpoenas

21   there.  But the counsel who would be representing them would be

22   the same -- my understanding is it would be the same counsel

23   who is employed by -- in the Governor's Office.

24          THE COURT:  Okay.  So if, technically, they're a

25   separate agency from the Governor's Office, then they don't get
```

1    the benefit of the exemption from the statute for outside

2    counsel; correct?

3        **MR. WHELIHAN:**  Returning to the issue, I don't believe

4    the statute is, strictly speaking, sort of an exemption from a

5    situation, but it's an exemption from spending money.  So

6    they're not spending money -- they're not spending any state

7    money to procure the legal counsel.  They're using the legal

8    counsel of the Governor.  It's a bit of a fine distinction, but

9    I believe there is a distinction.

10        **THE COURT:**  Well, okay.  You've got to take a position

11    one way or the other.  Right?  Either they are part of the

12    Governor's Office, in which case they get the benefit of the

13    exemption under the statute from the prohibition on

14    expenditures for other counsel; or they are not part of the

15    Governor's Office's, in which case they don't get the benefit

16    of that.  But if you win on the merits, then it requires two

17    subpoenas.  So pick one.

18        **MR. WHELIHAN:**  I believe, practically speaking, they

19    are covered by the exemption under the Governor's Office.

20        **THE COURT:**  Meta's view?

21        **MR. CARPENTER:**  Your Honor, as counsel just said,

22    they're housed within a different department.  When the

23    legislature said "Governor's Office," I think it meant what it

24    had called the Governor's Office in other statutes, not other

25    agencies.

1      **THE COURT:**  This wasn't briefed and I didn't expect it

2   to be briefed, but does anybody have any legal authority for

3   whether the Arizona Governor's Office of Strategic Planning and

4   Budgeting has been found to be part of the Arizona Governor's

5   Office in any precedent anywhere?  Anybody aware of that?

6      **MR. WHELIHAN:**  This was something I came across in my

7   own research, trying to figure out how these agencies are

8   situated.  I know that our office doesn't represent them.

9      My office's understanding, the agency counsel sections of

10  my office who handle representations of the agencies we do

11  represent in response to requests for specific help -- requests

12  for legal advice, my understanding is that -- my office's

13  understanding is that they are covered by the Governor's Office

14  and we do not represent them.

15     **MR. CARPENTER:**  I don't have any legal authority for

16  you, Your Honor.

17     **THE COURT:**  Okay.  Going back, I forgot to ask this.

18     On the Arizona Department of Education, has the Arizona

19  Department of Education been involved in the investigations

20  leading to this lawsuit?

21     **MR. WHELIHAN:**  No, Your Honor.  The Department of

22  Education nor any of the departments have been involved in any

23  part of this investigation.  None of them have any say in this

24  matter.  None of them are directly implicated or interested in

25  this matter.

1          **THE COURT:**  Just so I'm a hundred percent clear

2     because I want to make sure, when you said the chart is

3     accurate, so for purposes of this matter, the Arizona

4     Attorney General's Office is or will be representing the

5     Department of Child Safety, Department of Health Services, the

6     Office of Economic Opportunity, and the State Board of

7     Education?

8          **MR. WHELIHAN:**  With the exception -- I would take

9     exception with the idea that we represent them in this matter.

10    As of now, we don't represent any of them in this matter.

11         The question that we answered -- the question that we

12    understood ourselves to be answering when we filled out the

13    chart was:  If a subpoena were received by one of these

14    agencies, would someone in our office represent those agencies?

15         And the answer is yes, if Meta or someone else was to

16    serve a subpoena on these agencies, not absolutely, but in

17    all -- in all relative certainty, these agencies would likely

18    receive that subpoena, approach a separate division within our

19    office responsible for representing agencies, and that agency

20    would take an outside counsel-type relationship with the

21    department to respond to that subpoena in response to the

22    request from that department.

23         **THE COURT:**  Those agencies have had some notice of

24    this current dispute, have they not?  You've not communicated

25    with them in any way?

1          **MR. WHELIHAN:**  Not to my knowledge, Your Honor.  This

2     case was brought entirely by -- you know, I'm a member of the

3     Consumer Protection and Advocacy Section within

4     the Attorney General's Office.  At no point in time did I

5     coordinate or did anyone else that I'm aware of coordinate with

6     any of the outside agencies.

7          We have independent authority, and we're an independent

8     executive agency that pursued this claim.  We have -- we are

9     not representing any of these agencies, whether or not in this

10     matter or at this point in time.

11          **THE COURT:**  So the arguments that you're advancing

12     would block the discovery directly to those agencies; and

13     therefore, you're arguing on their -- I mean, you're advancing

14     their interests in this matter, aren't you, whether you're

15     actually formally representing them?

16          **MR. WHELIHAN:**  I don't think that we're -- we are

17     advancing the interests of the consumers of the State of

18     Arizona, the young users of Meta's platforms.  To the extent

19     that we benefit society, we aim to benefit society, we aim to

20     benefit those users, there may be some ancillary benefits that

21     flow to other state agencies.  But we are not representing any

22     of the interests of any of the other state agencies directly

23     or --

24          (Stenographer interrupts for clarification of the record.)

25          **MR. WHELIHAN:**  -- not representing any of the

 1   interests of any of the outside third-party state agencies

 2   directly.

 3       We don't intend to seek any civil penalties that would

 4   flow to them.  We don't have any damages that we attribute to

 5   them.

 6           **THE COURT:**  Really, with regard to this current

 7   discovery dispute --

 8           **MR. WHELIHAN:**  Yes.

 9           **THE COURT:**  -- the arguments you're advancing align

10   with and advance the interests of these agencies, don't they?

11           **MR. WHELIHAN:**  You're saying that the --

12           **THE COURT:**  For this discovery dispute, not the case

13   as a whole.

14           **MR. WHELIHAN:**  I'm not prepared to speak to what their

15   interests are.  All of these agencies are independent agencies,

16   either controlled by the Governor's Office or their own elected

17   officials or their own boards.  Their interests are their own.

18       And they -- to the extent they wish to assert their

19   interests in response to this discovery dispute, that would be

20   a bit of a theoretical exercise were they to be involved.  To

21   my knowledge, none of them are aware of this discovery dispute;

22   so I don't know what their interest would be.

23           **THE COURT:**  A question for Meta.  The document

24   requests that you're trying to -- that are the basis for this

25   dispute, did they list out the agencies as part of the

1  definition of "You" who should be responding to the document

2  requests?

3       **MR. CARPENTER:**  I believe so, Your Honor, but I'll

4  need to double-check.

5     They did.

6       **THE COURT:**  Could you hand up a copy if you've

7  got one?

8       **MR. HALPERIN:**  Your Honor, I'll check my binder and

9  see if I have one.  I'm not positive I do.

10      **THE COURT:**  If you don't have one, then maybe

11  e-mail one to the PHK P.O. box.  That wasn't in the materials

12  that was -- and I didn't expect it.  It'd just be nice to see

13  whether the document requests named the agencies at issue or

14  not.

15     So on the -- maybe you know.  If the document requests

16  named the agencies at issue, I'm a little surprised they didn't

17  get any notice of this discovery dispute.

18     But if you're not here -- if you're saying the arguments

19  you're making don't even align with their interests, shouldn't

20  counsel for the agencies have shown up?

21      **MR. WHELIHAN:**  Your Honor, the way the State of

22  Ariz- -- the way that the Attorney General's Office of Arizona

23  brings these matters, we don't bring them in coordination with

24  any of the other agencies.

25      **THE COURT:**  Not my question.  The discovery --

```
 1   according to counsel for Meta, the discovery requests -- the
 2   reason we have this dispute is it named who Meta believes
 3   should be responding to the discovery requests, including the
 4   agencies.  Let's take that as a given.
 5           MR. WHELIHAN:  Okay.
 6           THE COURT:  Assume you don't dispute that.  All right?
 7   Let's assume that that is the case.  And if it's not the case,
 8   I'm going to be very upset at Meta for making that
 9   representation.
10       But assuming that the document request lists or names the
11   agencies, I mean, shouldn't -- I'm surprised that, just as a
12   matter of at least courtesy, you wouldn't have given the
13   agencies a heads-up that this dispute -- I mean, we've been
14   arguing about this issue and having multiple hearings on this
15   issue, and I am surprised that you didn't let the agencies
16   know.  And if you did let the agencies know, I'm surprised they
17   didn't show up to advance their own interests if you're taking
18   the position that you're not advancing their interests here.
19           MR. WHELIHAN:  Meta's original set of 45 RFPs that
20   were served upon us were so broad as to include every part of
21   the state in the "You," I believe.  Their more recent RFPs
22   served last Friday did specify the nine agencies they
23   identified for Arizona.
24       They treat the nine agencies, in the most recent RFPs
25   propounded on Friday, as parties.  We dispute the idea that
```

1    those agencies are parties.  We have no normal course of

2    business, course of proceeding that would inform any of these

3    agencies of our consumer protection actions.  It would really

4    be an unprecedented and un- -- it's just something we don't do.

5        So I understand your point.  I take your point that it

6    might be common courtesy to let these agencies know; but if we

7    were to let these know -- whether or not agency counsel

8    represents these agencies in other contexts, to reach out to

9    the Governor's Office or to other agencies and tell them that

10   Meta is telling us that they are parties in a dispute we don't

11   believe they're parties to, I'm not sure what the -- I'm not

12   sure where that would go, ultimately.

13       **THE COURT:**  All right.  So let me make one thing

14   absolutely clear.  You raise a point.  I'm not here to decide

15   whether these non-parties are parties to the case.  That is not

16   the dispute in front of me.

17       And everyone should be absolutely clear, the issue in

18   front of me, before me is whether the parties to the case have

19   control under *Citric Acid* such that they are obligated to go

20   get the documents from these non-parties.

21       Whether anybody is arguing that some unnamed party is

22   actually a party for purposes of the case, that is not --

23   (a) it's not a discovery dispute so it shouldn't be presented

24   to me; (b) it's not something I need to decide, nor do I think

25   it's appropriate for me to decide with respect to Rule 34 and

1    *Citric Acid*; and (c) when we talk about whether these other

2    agencies are, quote, parties to the case, I want to be

3    absolutely clear, I'm only and you should only be referencing

4    that in connection with whether discovery is available from

5    them under the control test for *Citric Acid*, not for any other

6    purposes in the case.  So I just want to make that clear.

7        Is there any dispute as to what we're actually here to

8    decide?

9        **MR. CARPENTER:**  We agree, Your Honor, that that's the

10   question.

11       **THE COURT:**  Okay.  So is it a hundred percent clear,

12   whether it's a political decision or whatever, but just as

13   refers to this case, the Arizona Attorney General's Office will

14   not, never be representing the Board of Regents, the

15   Commerce Authority, the Department of Education, the

16   Governor's Office, or the Governor's Office of Strategic

17   Planning and Budgeting in this matter, no matter what?

18       **MR. WHELIHAN:**  Yes, Your Honor, in all reasonable

19   likelihood, that's correct.

20       **THE COURT:**  Okay.  Your brief argued that the decision

21   in *Generic Pharmaceuticals* led to some later meet and confer

22   that then led to an agreement to find that the Arizona Attorney

23   General's Office had complied with its obligations and was not

24   required to produce records from any other agencies.  There's

25   no citation to that, and so I don't see that in the record

1    before me.

2         **MR. WHELIHAN:**  Understood, Your Honor.  That was just

3    the result of conversations with our antitrust counsel, trying

4    to get a back on on what ultimately happened in that case.

5         **THE COURT:**  But whether parties later negotiated away

6    a discovery dispute doesn't vitiate or undermine or somehow

7    reverse the district judge's opinion in that case; correct?

8         **MR. WHELIHAN:**  Correct.

9         **THE COURT:**  Okay.  And just so I'm clear, I asked

10   about the Department of Education, but do any of the other --

11   or were any of the other agencies we talked about -- the

12   Governor's Office, the Office of Strategic Planning and

13   Budgeting, Board of Regents, or Commerce Authority -- were any

14   of them at all involved in investigating or preparing this

15   case?

16        **MR. WHELIHAN:**  Not at all, Your Honor, no.

17        **THE COURT:**  Well, you've answered all my questions

18   about Arizona.  In the interest of time, please don't repeat

19   arguments in the briefing.  So if there's anything more you

20   want to let me know about, now is your chance.

21        **MR. WHELIHAN:**  Thank you, Your Honor, if I could.

22        Briefly, I appreciate the clarification that we really are

23   here just to talk about the *Citric Acid* question.  I was a

24   little bit uncertain on that based on the RFPs propounded by

25   Meta.

1   To speak to the *Citric Acid* question of whether our office

2   has the right on demand -- right to obtain documents on demand

3   from these third-party state agencies, I think the fundamental

4   principle -- and I'm trying not to --

5   (Stenographer interrupts for clarification of the record.)

6   **MR. WHELIHAN:**  -- the fundamental question in Arizona

7   is -- centers on whether or not the Arizona Attorney General

8   has the statutory authority granted to her to do something like

9   that.

10  Article 5, Section 9, of the Arizona Constitution states

11  that the powers and duties of the Attorney General shall be as

12  prescribed by law.

13  The cases we cited in our brief are settled law that show

14  that that means that the Arizona Attorney General possesses the

15  powers -- only those powers granted to her by statute.  She

16  doesn't have any common law authority.  She doesn't have any

17  extra-statutory authority of any kind.  So even if there's an

18  affirmative statute that grants powers to someone, if that

19  statute doesn't specifically grant them to the

20  Attorney General, we can't make the argument that she has those

21  powers.

22  So I think the inquiry and the question of -- in order to

23  answer the question of whether or not we have the right to

24  obtain documents upon demand, the inquiry really has to focus

25  on whether there is an affirmative statute granting the

1    Attorney General the power to do so.

2         And I think the answer to that question is a

3    straightforward answer.  There is no statute that gives the

4    Attorney General a broad, general power -- or specific power in

5    this instance, in this matter -- to access or compel the

6    production of documents in the control and possession of these

7    independent agencies.

8         So the argument that Meta has advanced that the absence of

9    a prohibition somehow serves to empower the Attorney General

10   just doesn't make sense in Arizona.  And I think that is really

11   the crux of the issue in Arizona.  We don't have that

12   authority.

13        And what that means functionally for this case is that if

14   we were to be ordered to produce documents on behalf of any of

15   the nine state agencies, whether or not we represent them, we

16   would be left in a position where we really would have no good

17   option or way to do so.  We would be left in kind of the same

18   position that Meta is in, only worse, because, you know, our

19   options would be to either serve a public records request on

20   the agencies, in which case the documents that were produced

21   would not be usable as evidence; we could try to serve

22   subpoenas of our own, but we don't think that we have the

23   statutory authority to do that.  It would be unprecedented.

24        We would anticipate --

25             **THE COURT:**  Let me stop you.

1  I mean, in *Generic Pharmaceuticals*, your office was found

2  to have control over other state agencies.  So it's not

3  unprecedented.

4  **MR. WHELIHAN:**  But we never had to get those

5  documents, and that's why we pointed that out in the brief,

6  what you raised earlier.  I know there's no decision -- it

7  didn't overturn a decision.  It was just explaining that we

8  never had to actually go and do it.

9  And so it's something that, for the sake of efficiency,

10  for the sake of moving this forward -- you know, our office

11  very much believes that it's important to move this case

12  forward with all due speed; and if there's an order that we

13  have to produce documents, kind of stand in Meta's shoes and

14  get these documents from third-party agencies, it's going to

15  cause significant delay, significant waste, and significant

16  inefficiency.

17  So for that reason, you know, it's just not a readily

18  doable thing for the Arizona Attorney General.

19  **THE COURT:**  Let me ask, Mr. -- it's "WELL Ih Han"?

20  **MR. WHELIHAN:**  "WHEEL Ih Han."

21  **THE COURT:**  Whelihan.  Sorry.

22  Are you a member of the Bar of the State of California?

23  **MR. WHELIHAN:**  I am.  Inactive.

24  **THE COURT:**  Okay.  So you're an active member of the

25  Bar of the State of California.

1    Were you admitted *pro hac* in this case?

2        **MR. WHELIHAN:**  Yes.

3        **THE COURT:**  Okay.  So what Arizona statute empowers

4    the Arizona Attorney General to enter *pro hac vice* motions in

5    federal court in California?

6        **MR. WHELIHAN:**  I am not aware of one, Your Honor.

7        **THE COURT:**  So, but yet you're doing it; right?

8        **MR. WHELIHAN:**  Yes.

9        **THE COURT:**  And you're not -- you would not concede

10   that you were somehow exceeding the authority of the Arizona

11   Attorney General by appearing as counsel in this case; correct?

12       **MR. WHELIHAN:**  No, Your Honor.

13       **THE COURT:**  Despite the absence of an expressly

14   authorizing statute; correct?

15       **MR. WHELIHAN:**  Certainly, Your Honor.

16       **THE COURT:**  Right.

17   More generally, an attorney who is representing a client

18   in federal court has an obligation under the Federal Rules of

19   Civil Procedure to do a reasonable search for and produce

20   documents in response to document requests under Rule 34 and

21   Rule 26; correct?

22       **MR. WHELIHAN:**  And we're glad to do that, Your Honor,

23   for the documents that we have control of.

24       **THE COURT:**  Right.  Well, that's the point.

25   You would agree that a client has control over documents

1    in their attorney's possession; correct?

2           **MR. WHELIHAN:**  Yes, Your Honor.

3           **THE COURT:**  Okay.  Here, it's a slightly different

4    situation because you are both a party and a legal service

5    provider at the same time; correct?

6           **MR. WHELIHAN:**  If you're looking at our office as a

7    whole, then, yes, we are a legal service provider.  Parts of

8    our office provide legal services to some of these agencies,

9    yes.

10          **THE COURT:**  Yeah.  So in the situation for those

11    agencies such as the Arizona Department of Health Services,

12    which your office is representing if a subpoena were issued or

13    is representing --

14          **MR. WHELIHAN:**  Yes.

15          **THE COURT:**  -- for purposes of this case, you would

16    have an obligation, in fact, under the Federal Rules of Civil

17    Procedure, as counsel here, to go search for and obtain

18    documents from your client; correct?

19          **MR. WHELIHAN:**  Our position, Your Honor, is that what

20    would happen there is that department would have its own

21    interests.  They -- if they were to push back against the

22    production, we wouldn't have any reasonable way to compel them

23    to do so.  They would be represented by agency counsel sections

24    within our office, and then my section would be forced into the

25    position of arguing things like burden and the scope and the

1   search terms against another part of my own office on behalf of

2   their representation of a third-party state agency.  And I

3   don't think that kind of situation lends itself to any kind of

4   efficiency or timely discovery.

5       Meta knows better the questions it wants to ask of these

6   agencies.  They propounded 45 very broad -- well, some of them

7   are very broad -- requests for production.  It's difficult for

8   us to discern -- some of them, on their face, are very clear

9   what they're asking for and where we would get it.  Some of

10  them would require, you know, a more targeted approach.  We

11  don't think Meta wants to ask all, now, 49 questions of all

12  nine agencies they identified that they are interested in.

13      So for the sake of efficiency and for the sake of moving

14  this case forward, Meta stands in a much better position than

15  we would to compel production and to get the documents that

16  they wanted from these third-party agencies.

17          THE COURT:  Not really an answer to my question.

18      For purposes of this case --

19          MR. WHELIHAN:  Yes.

20          THE COURT:  -- assuming -- well, as counsel for, for

21  example, the Department of Health Services, you'd have an

22  obligation as counsel to obtain documents from your client,

23  just like any counsel has an obligation to obtain documents

24  from their clients in response to document requests.

25          MR. WHELIHAN:  I would say that the Department -- I

1  don't represent them.  They're not -- the Attorney General's

2  Office is not representing that agency in this matter.  So --

3          **THE COURT:**  Okay.  The --

4          **MR. WHELIHAN:**  Or the state as a whole.

5      We represent the Attorney General's Office bringing a suit

6  under the Arizona Consumer Fraud Act and the COPPA statute for

7  the office.  We're not bringing it on behalf of any of these

8  agencies.  These agencies aren't involved in the

9  decision-making process.  Yes.

10         **THE COURT:**  I'm not talking about -- I don't care

11 about the merits part of the case.  I'm talking about this

12 discovery dispute.  Right?

13     So for purposes of this discovery dispute, the agency --

14 for example, the Department of Health Services -- you must

15 represent them under Arizona law; no?

16         **MR. WHELIHAN:**  They can represent themselves, or they

17 can get counsel to represent them, as long as they don't spend

18 state funds on that counsel.

19         **THE COURT:**  Okay.  But you put them in Column 3,

20 saying that you were going to represent them if it came to

21 that.

22         **MR. WHELIHAN:**  We did that in the interest of being

23 the most forthcoming with the Court.  We could have put them in

24 the middle column, saying that:  Well, it depends on the

25 situation.

1    Theoretically, these agencies could decide not to -- if

2    they get a subpoena, they can respond to it without approaching

3    our office; but when I spoke with agency counsel, they said

4    they would; so I put them in the column of we would.

5        **THE COURT:**  I expect you to be forthcoming with

6    the Court.  So I appreciate that.

7        But, I mean -- okay.  Stepping back, you agree that in

8    litigation, counsel has an obligation, when they receive a

9    document request from an opposing party, to go get documents

10   from their client.

11       **MR. WHELIHAN:**  Yes, I agree with that.

12       And I would say that those agencies are not a client at

13   this point in time.  They're not a client for this matter.

14       They come to us with -- they want advice.  They come to us

15   and they're a client for that purpose.  And another part of the

16   office handles them, and they have the same kind of

17   attorney-client relationship that an agency would have if they

18   would go out and hire a private third-party law firm.

19       It would be like asking counsel for Meta to produce

20   documents from clients that they represent in other matters.

21   We don't expect them to do that because they're not

22   representing those clients here.

23       **THE COURT:**  But the difference -- that analogy --

24   again, it's like I said, you're both a party and a legal

25   services provider.  There would be ethical problems with a

1    private firm that was itself a party to a case then trying to

2    represent another party, which is -- that's why the -- I

3    understand the argument you're making, but I think the analogy

4    doesn't hold up because of the unique posture of this case,

5    where you've got your office both here essentially wearing two

6    hats at the same time.

7         Okay.  All right.  Anything further on Arizona?

8              MR. CARPENTER:  Yeah.  If I could just briefly respond

9    to a little bit of that.

10             THE COURT:  Sure.

11             MR. CARPENTER:  And I'm mindful of the Court's

12   admonition not to retread the briefing, and so I'm --

13             THE COURT:  I've read the briefs.

14             MR. CARPENTER:  Thank you.  Yes, Your Honor.

15        Just a few points.  One is just to clarify my earlier

16   comments about *Citric* and control.

17        We have argued in the course of this that because the

18   state, we think, is the party in sum and substance, state

19   agencies are subject to discovery on that basis.

20        But I understand that today what we're focused on, what

21   the latest round of briefing is focused on is how state

22   statutes are set up and how the *Citric* control test interacts

23   with that.

24        The second point I want to --

25             THE COURT:  Let me stop you there.

1    So, again, you may have tried to argue that or taken that

2    position in your document requests, that because the state and

3    the agencies are somehow -- what did you say? -- are in sum and

4    substance the same thing, that's not part of the *Citric* test,

5    is it?  There's nothing under *Citric* that tells me I need to

6    decide that issue; correct?

7         **MR. CARPENTER:**  So I think that that's what we argued

8    in earlier sets of briefing on this.  And *Citric* didn't address

9    a situation like this, but courts, as we cited in those briefs,

10    have taken that tack.  Now, another is what we're doing today,

11    which is to look at the statutory frameworks for access.

12    But a number of courts have held that when the AG sues on

13    behalf of the state, that is a suit by the state; and so

14    because state agencies are just a part of a state, they are

15    subject to party discovery on that basis.

16         **THE COURT:**  That's not the law in the Ninth Circuit,

17    is it?

18         **MR. CARPENTER:**  I'm not aware of a Ninth Circuit case

19    saying that, but I don't think that *Citric* disagrees with it.

20    *Citric* just says if there's a legal right to obtain, then you

21    have possession, custody, or control.

22    And one way that they would have a legal right to obtain

23    is if the state were the party before Your Honor today, which

24    we believe they are; and because of that, state agencies, as a

25    part of a state, their documents can be obtained.

1    **THE COURT:**  I'm not here to decide whether agencies

2    are parties to this suit.  If you want to join them as parties,

3    you've got to file a motion for joinder with Judge Gonzalez

4    Rogers.

5    **MR. CARPENTER:**  Understood, Your Honor.  I just wanted

6    to make clear our position on that issue.

7    **THE COURT:**  I want to make clear the scope of what I'm

8    deciding here.

9    **MR. CARPENTER:**  Understood.

10    **THE COURT:**  Okay.  Anything further?

11    **MR. CARPENTER:**  Counsel also referenced that it would

12    be more efficient for us to propound document requests to all

13    of the 270-something agencies at issue.

14    **THE COURT:**  You mean subpoenas?

15    **MR. CARPENTER:**  Yes, Your Honor.  Apologies.

16    Third-party subpoenas.

17    As courts, I think, have recognized, it is much more

18    burdensome to do that.  It is much more efficient for the

19    Attorney General to simply exercise the authority that it's

20    given to carry out its role advising and representing state

21    agencies and to go get those documents from the state agencies

22    themselves.

23    I think counsel also said at some point that "It would be

24    represented by our office but a different section."

25    I'm not aware of any court ever endorsing the idea that

because the Attorney General's Office has decided to divide itself into different sections, it can then cordon off the documents that would otherwise be properly discoverable.

Finally, I think that counsel referenced that we hadn't cited any statutes or cases in our briefs saying that the Arizona Attorney General has access to state agency documents for these purposes.

We don't think we need a statute saying that because, as the decisions we've cited say, what courts are looking at instead is, under the state statutory framework, does the Attorney General have the authority, or maybe even the obligation, to represent the state and is there a statute that would otherwise prohibit them from accessing the documents?

So just as with the PHV example or any number of other examples, we don't think we need to point to a very specific statute that says that thing, and I think courts have agreed with us.

**MR. WHELIHAN:**  Thank you.

Two things, Your Honor.

First, I think, counsel said we can't -- well, he used the phrase "can't cordon off the different divisions and sections."

I think it's ethical rules; it's the rules of being an attorney.  There are times when there are conflicts, and parts of our office represent agencies in ways that conflict with other parts of the office and we have to set up ethical walls.

1    That's just the nature of the way the office is structured and

2    built.  So, you know, I'll make that point.

3        And then the cases cited, the *Generic Pharmaceuticals*

4    matter, there was that ruling in Arizona that we have control

5    of the documents.  As a preliminary matter, we think that that

6    was held wrongly even in that case; but if you're -- for one

7    thing; but also, that matter was in an antitrust context.

8        I think we can distinguish the consumer protection context

9    slightly here because in the antitrust context and in some of

10   the other contexts in the cases cited by Meta, the harms

11   alleged in those cases were more directly tied to harms that

12   were caused to the agencies.  Right?

13       So if there's an antitrust, if there's a price-fixing or

14   there's collusion that results in AHCCCS -- that's

15   A-H-C-C-C-S -- the Arizona Medicaid agency, paying too much for

16   a drug and that's what we are alleging as the Attorney

17   General's Office, it's a little bit more fair to require us to

18   prove and to show the documents that show that they're being

19   overcharged.  Right?

20       In this matter, we allege no harm to any of these agencies

21   individually or generally.  Some benefit will flow to these

22   agencies by virtue of what we are hoping to achieve for the

23   users themselves, for the Arizona consumers.  But we're not

24   saying that the Department of Public Safety -- or, excuse me --

25   the Department of Child Protection has been harmed X amount of

dollars or that Meta has been overcharging them or that Meta has been causing them to take more children out of people's homes.  So in this case, we don't have that same causal connection.

            **THE COURT:**  Under Arizona law, if, at the end of all this, monetary relief is awarded in some form to your client, is any of that money allocated or shared in any way by any of the other agencies?

            **MR. WHELIHAN:**  Under the statutes of the Arizona Consumer Fraud Act, there's a couple of different revolving funds.  Civil penalties would go to the Consumer Protection -- Consumer Protection/Consumer Fraud Revolving Fund.  That fund is generally used to fund our office.  Restitution, although we've already forgone that, there's a different fund for that.  There's different funds that they would go to.  None of the funds directly go to any of these agencies.

            **THE COURT:**  Does the rest of the money go to some general fund, or how does the rest of the money --

            **MR. WHELIHAN:**  The way it works is that -- well, again, it's different for each of the funds.  It's rather complicated.  But the main fund for, say, civil penalties, we use it to fund our own office.  We use it to fund the Criminal Division, so on and so forth.

        By statute, that money -- I believe it is any amount over $5 million can be swept by the legislature in certain

1    circumstances.  So it's theoretically possible that some of the

2    money could go to the general fund, but it's not -- that's not

3    normally where it would go, but it is theoretically possible.

4         **THE COURT:**  Counsel, you admit that the burden is on

5    Meta to show control here?

6         **MR. CARPENTER:**  Yes, Your Honor.

7         **THE COURT:**  And you haven't cited and I haven't seen

8    anything from Meta arguing or showing that Arizona has injected

9    documents or information from these other agencies into this

10    case; so I assume there is none.  Correct?

11         **MR. CARPENTER:**  Correct, Your Honor.  But I think that

12    is part of what we would want to learn in discovery.  And

13    I think if that issue goes anywhere, it goes to relevance.  But

14    it doesn't affect the threshold legal question of whether those

15    documents are subject to the AG's possession, custody, or

16    control.

17         **THE COURT:**  Well, I mean, your colleague has argued

18    that the *Generic Pharmaceuticals* case is distinguishable on the

19    basis that in that case, documents and information from the

20    other agencies were injected into the merits of the claims and

21    were relevant in some way, came up in some way on the merits of

22    the case.  You agree that's not the situation here?

23         **MR. CARPENTER:**  That is not the situation here, but I

24    don't think that that's a distinction that matters for present

25    purposes.  *Generic*'s reasoning didn't depend on that.  It's

1    true that, as a factual matter, the agencies that they chose to

2    look into there were ones that had to do with drug overpayment.

3    But, again, I think that would be an issue in this case of

4    which are relevant and which aren't, which can be litigated in

5    the ordinary course of discovery.  But *Generic*'s reasoning just

6    looked at Arizona's statutory framework, the AG's authorities,

7    how they interact with it, and ruled that there is control.

8       **THE COURT:**  In the Third Circuit and in Pennsylvania,

9    one of the factors that those courts look to for control is

10   practical ability to access the documents; is that right?

11       **MR. CARPENTER:**  My understanding is that, yes, in some

12   circuits, sometimes they also look at practical ability.

13       **THE COURT:**  And is practical ability a factor

14   available in the Ninth Circuit?

15       **MR. CARPENTER:**  Under Ninth Circuit law, it is legal

16   right to obtain.  Now, it wouldn't surprise me if the AG also

17   did have a practical ability to obtain a lot of these

18   documents.  But our briefing is focused solely on the legal

19   right test and applied the same factors that *Shelby County* and

20   *Generic* and other cases have applied.

21       **THE COURT:**  Anything further?

22       **MR. WHELIHAN:**  I don't think so, Your Honor.

23       **THE COURT:**  Submitted?

24       **MR. WHELIHAN:**  Thank you.  Yes, Your Honor.

25       **MR. HALPERIN:**  Your Honor, just as a matter of

housekeeping, I have e-mailed to Your Honor the RFPs served,
both the first and second set.  The definition of "Plaintiff"
and "You" specifically identifies the agencies.

    **THE COURT:**  Okay.  Thank you.  Thank you for that.

    Just since you're up here, is that true for all the states
that we're concerned with for purposes of this dispute?

    **MR. HALPERIN:**  Yes, it is, Your Honor.  We have sent
you, for all 35 states, the RFPs.  The first set is identical
across the agency -- or across the states, rather.  The second
set has individual RFPs, but the definition of "Plaintiff" and
"You" is the same.

    **THE COURT:**  Okay.  So submitted as to Arizona.
Remind me who's next.

    **MR. WHELIHAN:**  New Jersey.  I'm sorry.

    **MS. WANG:**  Mandy Wang on behalf of the New Jersey
Attorney General and the New Jersey Division of Consumer
Affairs.

    **THE COURT:**  Good afternoon.

    **MS. WANG:**  Good afternoon, Your Honor.

    **THE COURT:**  Okay.  So Meta has cited law -- I think
you may have cited law as well -- that under New Jersey state
law, the Attorney General is the sole legal adviser to agencies
in New Jersey.  Is everybody agreed that that's the law in
New Jersey?

    **MS. WANG:**  Yes, Your Honor.

1          **THE COURT:**  Okay.  And I believe if we look at the

2     chart -- one, two -- three of the New Jersey agencies are in

3     what are called Category 3, which is that your office would

4     represent them in the event of a subpoena; and then -- one,

5     two -- two are in the middle category, which is it depends.

6          Given the New Jersey statute, how can it depend?

7          **MS. WANG:**  So if it's possible to clarify the state

8     organizational structure a little further.

9          The New Jersey Constitution, Article V, Section IV, allows

10    for the Governor to create principal departments within the

11    executive branch.  And so, many of the agencies that Meta has

12    identified are these top-level agencies.  The Department of Law

13    and Public Safety, of which the Attorney General is the head,

14    is also one of these top-level agencies.  None of the agencies

15    that Meta has identified fall underneath the AG's control in

16    that vertical structure.

17         And so we have asserted that only those agencies that

18    are -- that fall under that vertical structure, which includes

19    my client, the Division of Consumer Affairs, which is the

20    agency that has brought suit in this case, is the only

21    appropriate party for which Meta may seek discovery.  And all

22    of the other agencies are either top-level agencies or

23    subdivisions of those other principal departments.

24         **THE COURT:**  Okay.  That didn't answer my question,

25    though.

1    So you've got two agencies from New Jersey that are in the

2    middle category.  I misspoke before.  Actually, it's -- one,

3    two, three, four, five, six -- seven agencies that are in the

4    Category 3 that you will represent.

5        So I'm curious as to the New Jersey Economic Development

6    Authority and the Office of the Governor, why they're in

7    Category 3 if New Jersey law requires the New Jersey

8    Attorney General to be the sole legal adviser to all agencies

9    in New Jersey.

10        **MS. WANG:**  So the statutes that promulgated these

11    agencies, for some of them, the agencies are given expressly

12    the autonomy to either choose whether to retain the AG's Office

13    or to retain their own counsel.  That's set out in these

14    statutes.  And we didn't include the full list of statutes in

15    our one-pager, given the space.

16        But for the Economic Development Authority, it is

17    Title 34, Chapter 1B-4, which establishes the Economic

18    Development Authority underneath the Department of the

19    Treasury.  And the Office of the Governor is also a

20    constitutionally created entity.  And so those two, you know,

21    they just have the carve-out to have discretion to choose.

22        **THE COURT:**  Okay.  Have you been in contact with

23    either of those two agencies to determine whether they've

24    decided to rely on the Attorney General's Office for New Jersey

25    if they -- assuming however discovery goes forward in this

1    case?

2        **MS. WANG:**  We have not contacted them about

3    representation.

4        **THE COURT:**  Okay.  Same question.  The document

5    requests listed all the New Jersey agencies that are an issue

6    here?

7        **MS. WANG:**  So in Meta's first set of RFPs, they listed

8    not only the eight or nine agencies that were originally

9    provided, but they also listed the legislature.  And then

10   I think -- I believe in the second set of RFPs, they removed

11   the legislature.

12       **THE COURT:**  Okay.  And even as a courtesy, you didn't

13   think to contact these other agencies?

14       **MS. WANG:**  While it is true that we are able to

15   facilitate discovery as a courtesy, I would defer to the

16   co-leads, but I believe we offered that and I think that that

17   process was not -- was not chosen for whatever reason.  I mean,

18   we did offer to facilitate.

19       **THE COURT:**  Okay.  But that's not really -- who did

20   you offer that to?  The agencies?

21       **MS. WANG:**  To Meta.

22       **THE COURT:**  Okay.  That wasn't my question.

23       Your office, even as a courtesy, didn't reach out to any

24   of these agencies to even alert them as to this discovery

25   dispute?

1        **MS. WANG:**  No, because for New Jersey, it is very

2   clear that the Division of Consumer Affairs is the only

3   appropriate party for first-party discovery.

4        **THE COURT:**  So, similar question, then.  If you

5   prevail today, then these agencies are relieved from Rule 34

6   discovery in this case; right?

7        **MS. WANG:**  Yes.

8        **THE COURT:**  So the arguments and positions you're

9   advancing advance the interests of these agencies; correct?

10       **MS. WANG:**  Not necessarily.

11       **THE COURT:**  Okay.

12       **MS. WANG:**  The only party that we're -- or the only

13   agency that we're advancing is the Division of Consumer

14   Affairs.

15       **THE COURT:**  Okay.  But the agencies -- the New Jersey

16   agencies stand to benefit from the arguments you're making

17   today; no?

18       **MS. WANG:**  They could, but that's a theoretical

19   possibility.  And none of the agencies have expressed any

20   position on this.

21       **THE COURT:**  Well, Rule 34 discovery is treated

22   somewhat differently from Rule 45 discovery, isn't it?

23       **MS. WANG:**  Yes.  Correct.

24       **THE COURT:**  It's one of the reasons you're fighting

25   over this issue, isn't it?

 1          **MS. WANG:**  Yes.

 2          **THE COURT:**  So the agencies, as a practical matter, do

 3     stand to benefit from the arguments you're making today; no?

 4          **MS. WANG:**  Yes, Your Honor.  But, again, we would

 5     argue that it is, rather, the question of legal control as to

 6     whether we're able to obtain those documents on demand.

 7          **THE COURT:**  Same question I had for Arizona.  In

 8     New Jersey, if there is monetary relief of some kind awarded to

 9     the State of New Jersey at the end of all this, how does that

10     get allocated at the end of the day?

11          **MS. WANG:**  I'm not 100 percent sure on the specifics,

12     but I believe it would go into a general fund but specifically

13     earmarked for consumer protection, which, again, would be the

14     Division of Consumer Affairs.

15          **THE COURT:**  Well, similar to what was represented with

16     Arizona, is it possible the legislature or some other procedure

17     could allocate the funds differently from the general fund and

18     steer them to one of these agencies, for example?

19          **MS. WANG:**  I don't have a lot of visibility into that

20     process, Your Honor.  Sorry.

21          **THE COURT:**  Okay.  And are or were any of the listed

22     New Jersey agencies involved in investigating this action?

23          **MS. WANG:**  No.  Only the Division of Consumer Affairs,

24     Your Honor.

25          **THE COURT:**  So for Meta -- you said the Division of

1    Consumer Affairs for New Jersey?

2            **MS. WANG:**  Yes.

3            **THE COURT:**  Is that part of the -- that's underneath

4    the AG's Office?

5            **MS. WANG:**  Correct.  It's organized under the

6    Department of Law and Public Safety.

7            **THE COURT:**  And so is there any dispute that document

8    requests served to your client would encompass the Division of

9    Consumer Affairs for the State of New Jersey?

10           **MS. WANG:**  That would be appropriate.

11           **THE COURT:**  Same question I had with Arizona.  Since

12   it's Meta's burden -- you haven't cited any -- is there any

13   information from any of these agencies that New Jersey has

14   injected into this case?

15           **MR. CARPENTER:**  So, a few responses.

16       First is to what the Court's question is of if there's a

17   document or something that we're looking at, the answer is no,

18   but I think that's part of the reason we would be wanting

19   discovery.  And I think that if there are issues of relevance

20   or if there are issues of, well, some agency is so tangentially

21   related that there's a proportionality issue, that's what can

22   be dealt with in the ordinary course of discovery.

23       And I think when you look at the cases analyzing this

24   issue, I don't believe any of them have -- cases like *Shelby*

25   and *Generic*, there was no showing there, necessarily -- for

example, in *Shelby* -- that the particular agency would have had a document.  Instead, the courts looked at the statutory framework.

> **THE COURT:**  All right.  Anything further on New Jersey?

> **MS. WANG:**  No, Your Honor.

> **MR. CARPENTER:**  Just a few very brief points, if I could once again, to respond to some of that.

I agree that the statute says that the AG is the sole attorney, and the New Jersey Supreme Court, I think, has gone even stronger and said that they exclusively control all litigation.  I think that that's stronger language than even some of the cases we've cited have used and made positive findings.

I also think that -- Your Honor asked this question both of Arizona and of New Jersey.  I do think it's true that they are aligning their interests with the agencies right now in this dispute because they're trying to shield them from discovery they would otherwise be subject to.

And, finally, I just want to clean up one thing I said earlier about the Third Circuit's right to control test.  It is true that some courts have employed a practical right to obtain test.  In the Third Circuit, as I understand it, the test is a legal control one; and as I think I said earlier, in *Generic*, that was the only question, was legal right to obtain.

1          **MS. WANG:**  Your Honor, if I may.

2          **THE COURT:**  Sure.

3          **MS. WANG:**  Well, as we've provided in our one-pager,

4    our position is that control over litigation is not the same

5    thing as control over documents of agencies.

6          **THE COURT:**  Okay.  I understand the argument.

7      Anything further?

8          **MS. WANG:**  No, Your Honor.

9          **MR. CARPENTER:**  Nothing for Meta.

10         **THE COURT:**  Okay.  Since we're down two out of five,

11   why don't we take a short break so people can stretch their

12   legs.

13         **THE CLERK:**  We're off the record right now.

14                    (Recess taken at 2:43 p.m.)

15                    (Proceedings resumed at 2:57 p.m.)

16         **THE CLERK:**  Recalling 22-3047, In Re Social Media

17   Adolescent Addiction and Personal Injury Products Liability

18   Litigation.

19         **THE COURT:**  Remind me who's next.

20         **MR. BURNS:**  Good afternoon, Your Honor.  Jonathan

21   Burns from the Pennsylvania Office of Attorney General.

22         **THE COURT:**  Good afternoon.

23      Okay.  So under Pennsylvania state law, Meta cites a

24   statute that says that the Attorney General shall represent all

25   agencies in litigation; correct?

 1          **MR. BURNS:**  That is dependent on certain factors.  So

 2   under the Commonwealth Attorneys Act, we are able to represent

 3   these agencies, but it is a matter of efficiency.

 4          So when an issue comes before us, a legal issue that needs

 5   to be responded to, the Office of Attorney General would meet

 6   with the -- with the agencies and then determine, based on what

 7   the specific request is, who is in a better position to

 8   represent themselves.

 9          So it's the ability to represent if it would be in the

10   efficiency of that particular legal issue or representation.

11          **THE COURT:**  Because the statute as quoted to me and as

12   I looked it up, 71 Pennsylvania Statute 732-204 doesn't appear

13   to have that efficiency carve-out that you're talking about.

14   It says fairly unequivocally that the Attorney General shall

15   represent all agencies.

16          **MR. BURNS:**  I believe later in that piece of 204 is

17   where it says that it's based on determination of efficiency.

18   That is a block piece of the paragraph.

19          **THE COURT:**  Okay.

20          **MR. BURNS:**  And it's closer towards the end of the

21   paragraph.

22          **THE COURT:**  Okay.

23          **MR. BURNS:**  I can represent to you, there is no

24   requirement for the Office of Attorney General to represent our

25   agencies.  As you know, they're independent agencies.  They

have their own legal counsel.  So it really comes down to the
efficiency of who is better suited to represent the agency.

      **THE COURT:**  Okay.  Just to update this, so for the --
one, two, three, four, five -- six Pennsylvania agencies listed
in the chart that's Exhibit 1 to Docket 738, I think you put
them all in the Category 2 column.  Is that still accurate, or
does that need to be updated?

      **MR. BURNS:**  That is still accurate, Your Honor.

      **THE COURT:**  Meta also cites and relies on a statute
that says that your office shall have the right to access at
all times the books and papers of any Commonwealth agency
necessary to carry out your office's duties under the Act.

    That's separate and apart from whether there's litigation
pending.  It would have covered that, but it's not limited to
litigation?

      **MR. BURNS:**  So that -- yes, Your Honor.  That issue
was discussed in the *Generic Pharms* litigation.  The
determination in that case -- and I can say that we disagree
with the holding of that case.  But even under *Generic Pharms*,
the question there is the "shall" portion of the statute
relates to our investigation of those agencies.  So we would
be -- where we investigate those agencies, then that would give
us access to those documents.

    And in *Generic Pharms*, what was held was because it was --
that Pennsylvania necessarily put the issue of the agencies

1    being misled and that they relied on those misrepresentations,

2    that they then needed to respond as part of the discovery

3    process.

4         **THE COURT:**  In *Generic Pharmaceuticals*, the court,

5    I think, rejected the argument that that statute Section 73208

6    should be limited only to investigations; correct?

7         **MR. BURNS:**  What they -- what they said was it's --

8    it's correct that they said it was not limited to

9    investigations; but then they went on to say that "necessary,"

10   in that particular situation, was specifically because

11   Pennsylvania has put into the suit the relevance of the

12   documents from the agencies that paid for the generic drugs.

13       So as Meta had stated earlier in the argument today, that

14   is not an issue here.  We have not put into this case the

15   relevance of these agencies.  We're seeking a benefit on behalf

16   of the Pennsylvania consumers, not the agencies.

17        **THE COURT:**  So same question I asked your colleagues.

18   Have any of the listed Pennsylvania agencies been involved in

19   any way in the investigation of this case?

20        **MR. BURNS:**  No, sir.

21        **THE COURT:**  And I guess for Meta, you would admit that

22   you haven't put in any evidence and you're not relying on any

23   evidence from these other agencies that the Pennsylvania

24   Attorney General has injected into this case; correct?

25        **MR. CARPENTER:**  So it's certainly not in the

1    complaints.  We don't yet have evidence from them because

2    discovery hasn't occurred.  I mean, we take them at their word

3    for right now, but I think that that just underscores that

4    discovery is appropriate.

5        I also think that the question of whether a particular

6    document was put in -- I tried to explain before why that

7    wasn't relevant, and I think there's another point to make

8    there, which is that the agencies themselves may well have

9    relevant documents, given the subject matter of these cases.

10        So just to take a few examples, if an agency has documents

11    showing, for example, the effects or alleged effects of Meta's

12    platforms -- apologies, Your Honor.  I'll slow down -- the

13    alleged effects of Meta's platforms on teens, then those would

14    potentially be relevant, and we'd like to conduct discovery

15    into them.

16        If, for example --

17        **THE COURT:**  Well, but, I mean, what the Pennsylvania

18    AG and the other AGs are saying is you can take that discovery

19    by subpoena; you don't need to get it through Rule 34.  I don't

20    think they're arguing you're not entitled to issue discovery to

21    the agencies.  It's just the procedure by which you're trying

22    to get it.

23        **MR. CARPENTER:**  Yes, Your Honor.  And I think what

24    courts have recognized is that that's much more burdensome.  As

25    the Court stated earlier, third-party and party discovery vary

```
 1    in meaningful respects.  And I think what courts have said --
 2    for example, we cited a Texas District Court case, a Voting
 3    Rights Act case in our papers.  What that court explained is
 4    that party discovery only flowing one way, especially in a case
 5    like this, is just fundamentally inequitable.  It's not the way
 6    the rules are meant to work.  It would be much more burdensome
 7    for us to have to serve third-party discovery on all of them.
 8         THE COURT:  I think I said Rule 34 and 45 could vary.
 9    I don't think I said meaningful respects.  They do vary,
10    though.
11         All right.  Same question I had for your colleagues.  In
12    Pennsylvania, how would any monetary relief, if any, be
13    allocated at the end of all this?
14         MR. BURNS:  In Pennsylvania, there is a generic civil
15    penalties fund.  My understanding is that if the
16    Attorney General recovers sums of money, most of that money or
17    all of that money would be flagged to go back to the
18    Attorney General, but there's no prohibition of it going to
19    other parts of the Commonwealth.
20         THE COURT:  Well, on behalf -- well, with respect
21    to -- not "on behalf."  With respect to these Pennsylvania
22    agencies, are the arguments you're advancing in alignment with
23    their interests?
24         MR. BURNS:  I -- I would say in relation to --
25    tangentially, they could be.  We don't -- we don't a hundred
```

 1    percent know.

 2         To sort of preemptively answer one of your other

 3    questions, we have not met with them.  We do not know at this

 4    point.  Because of Pennsylvania's efficiency method, we take --

 5    we decide to narrow the scope to the extent that it is possible

 6    before we would have those interactions with the agencies; and

 7    then once we have those interactions, we can decide who is

 8    going to respond.

 9         So I do not know how or if it would benefit them.  We

10    haven't had those conversations.

11         I can say that we are representing our own interests here

12    in the sense that if we were forced to respond on their

13    behalf -- and we do not have control of these documents under

14    *Citric Acid* -- we would now then be placed in a situation where

15    we cannot produce the documents and theoretically could be

16    subject to some type of sanction because the agency is

17    unwilling to produce the documents and we have no ability to

18    force them to produce those documents.  So that's an interest

19    of our own.

20              **THE COURT:**  I don't understand your hypothetical.  You

21    say "if we were forced to respond on their behalf and we do not

22    have control under *Citric Acid*."  But how would you be forced

23    to respond on their behalf if you don't have control?  In other

24    words, the only time you would be required to respond to the

25    document request, not a subpoena, on behalf of the agencies is

1    if the Court found you had control; no?

2         **MR. BURNS:**  That is accurate, Your Honor.  And to that

3    I would say we do not have control of the documents.

4         **THE COURT:**  I understand that's your argument.  That's

5    what I'm here to decide.

6         **MR. BURNS:**  Right.  Right.

7         **THE COURT:**  Okay.  Well, you talked about what if

8    they -- what if the agencies were to refuse to work with you to

9    get the documents.  I mean, clients can fight with their

10   lawyers on whether or not to produce the documents or not; but

11   the lawyers -- ultimately, you, as counsel in this case -- have

12   an obligation under the Federal Rules of Civil Procedure to do

13   what you can to do a reasonable search and produce documents in

14   discovery, kind of in the generic federal case.

15        **MR. BURNS:**  And that would be true if they were our

16   clients, but at this point, they are not.

17        **THE COURT:**  I guess my point is, if the Court were to

18   find that there is control, your concern that somehow the

19   agencies would refuse to work with you on the document

20   collection and production process, there are procedures in

21   federal court for, you know, obstreperous clients; right?

22        **MR. BURNS:**  I'm saying it's their legal right to -- to

23   not have us represent them; and so, therefore, they would not

24   be our client.  And then we would have --

25        **THE COURT:**  That wasn't my hypothetical.  If I were to

find there were control -- right? -- your concern in that
instance would be that somehow they would refuse to work with
you, even if I found control.  In other words, if I don't find
control, then you don't have to go and talk to them directly;
right?  The only time you have to go try to get the documents
in response to the document request is if I find control;
right?

      **MR. BURNS:**  I believe that's correct, yes.

      **THE COURT:**  Right.  I mean, putting aside whether in
the future Meta serves a subpoena, for purposes of the Rule 34
document requests, the only time you need to go talk to the
agencies to try to collect documents is if I ultimately rule,
hypothetically, that you had control; right?

      **MR. BURNS:**  Correct.

      **THE COURT:**  Okay.  And then you had raised the concern
that they may -- in that case, the agencies in that
hypothetical, over whom I found you have control, would somehow
refuse to give you the documents.  But there are procedures in
this court for dealing with clients who are obstreperous about
discovery; right?

      **MR. BURNS:**  I would say -- and we might be going in
circles here.  But if you found that we had control, that
infers that they are our client.

    And if they then said, "We are not your client; we have
the ability to not be your client," now we are stuck in this

1  catch-22 where we have an order from you saying that we have

2  control under *Citric Acid* because they are our client but they

3  have the ability to say that they are not.

4         **THE COURT:**  I don't think -- I don't need to make a

5  finding that they're your client for purposes of *Citric Acid*,

6  do I?  I mean, *Citric Acid* just -- I mean, that may be one of

7  the -- that may be a factor; right?  It may lead to that.  But

8  the factors to finding control are -- there's many factors;

9  right?  It isn't -- I don't -- I suppose, does it flow directly

10 if they are a client?

11        **MR. BURNS:**  Could you say that again?

12        **THE COURT:**  Does the issue of control, is it

13 determined definitively if they are your client?  Let's assume

14 there's a case, hypothetically, where an agency says, "Yes, we

15 are your client."  Is there then control?

16        **MR. BURNS:**  I do not know the answer to that.

17        **THE COURT:**  Okay.  Well, again, I think I asked one of

18 your colleagues this question.  Assuming they were your client,

19 you'd have an obligation under the federal rules to go get the

20 documents from your client; right?

21        **MR. BURNS:**  Correct.

22        **THE COURT:**  So that's a legal right to -- it's a legal

23 basis on which to get the documents from your client; right?

24        **MR. BURNS:**  Sure.  Yes.

25        **THE COURT:**  And it's not unheard of in the annals

1  of federal litigation that sometimes clients don't want to be

2  forthcoming with their documents, even with their own

3  attorneys; right?

4          **MR. BURNS:**  I believe that happens in situations.

5          **THE COURT:**  Right, unfortunately.  And the courts are

6  not powerless to enforce and work with counsel and try to

7  figure out ways to resolve the issue to get the clients to

8  start complying with their discovery obligations; right?

9          **MR. BURNS:**  I believe that's true.

10         **THE COURT:**  Okay.  So while I understand the concern

11  that you may end up in some hypothetical potential situation

12  where an agency in Pennsylvania may not be all that

13  cooperative, you're not without recourse, I guess is my

14  question, I mean; right?  That's an eventuality which

15  (a) hasn't happened; but (b) there are ways to address it.

16  Right?

17         **MR. BURNS:**  I think this is the problem with

18  hypotheticals because it's very hard for me to know the

19  parameters of whether or not we would be able to respond or

20  what the Court would be --

21         **THE COURT:**  You're the one who raised --

22         **MR. BURNS:**  -- able to do.

23         **THE COURT:**  -- the hypothetical.  You raised the

24  hypothetical --

25         **MR. BURNS:**  I was the one that raised it.

1          **THE COURT:**  -- problem that they may not comply.

2          **MR. BURNS:**  And I immediately regretted it,

3    Your Honor.

4          **THE COURT:**  Okay.  All right.  I did look at the

5    document requests that were e-mailed to the Court, and they do

6    list the agencies and the definition of who should be

7    responding to the document requests, the "You."  And I take

8    your representation you haven't communicated even the fact that

9    those document requests exist to the agencies.

10         Under your view of, I guess, really, the law of ethics and

11   professional responsibility, as soon as those document requests

12   named those agencies as part of the universe of people who

13   should be responding to the document requests, did that trigger

14   your obligation to at least notify them and start advising them

15   as counsel?

16         **MR. BURNS:**  I don't believe so, not -- I don't believe

17   there would be an ethical obligation there, Your Honor.

18         Again, we are working to narrow the scope of these

19   discovery requests --

20         **THE COURT:**  Right.

21         **MR. BURNS:**  -- in the process.

22         There is the efficiency element in Pennsylvania.  So we

23   would notify them at the point where we believe that there was

24   an obligation for them to be responding.

25         And at this point, they're not parties to the litigation,

```
 1    and we don't believe that they should be respond- -- or that
 2    they are required to be responding to these -- to these
 3    discovery requests.
 4              THE COURT:  Well, maybe not responding directly,
 5    but -- okay.  So let's flip the hypothetical.  And I know you
 6    want to avoid hypotheticals, but bear with me on this one.
 7         Let's say Pennsylvania served a document request on Meta
 8    and, in that document request, defined "You" to include not
 9    just Meta here but, let's say Meta -- Meta's corporate
10    subsidiary in Australia.  Right?  You would be fine if Meta's
11    counsel never contacted Meta Australia and at least alerted
12    them to the fact that they were potentially at issue in this
13    dispute, especially if a motion to compel were filed?
14              MR. BURNS:  At -- well, I would say at the point where
15    a motion to compel would be filed, we would be beyond the stage
16    that we are currently at right now in this litigation.  Once we
17    know the scope of the discovery, we certainly will contact
18    those agencies and make sure that they know what the
19    obligations are, based on this Court's order.
20              THE COURT:  Okay.  Check my notes.
21                   (Pause in proceedings.)
22              THE COURT:  All right.  Response from Meta.
23              MR. CARPENTER:  Thank you, Your Honor.
24         First point is, on the issue of the state having an
25    obligation to represent agencies, the statute does say "shall."
```

1    The subsection that counsel is referring to does not say that

2    the two get together and mutually decide, and it certainly

3    doesn't give discretion to the agency.  What it says, by its

4    plain text, is that the Attorney General can decide that

5    someone else can represent the agency.

6        The second thing is, on the special statute that

7    Pennsylvania has about access to documents by the AG, I believe

8    the Court was correct that *Generic* rejected the view that it

9    was about investigations only.  There's certainly nothing in

10   the text that cabins it only to investigations.  All it says,

11   what *Generic* said and what the case *Generic* cited from the

12   Pennsylvania Supreme Court said was that any time it's

13   necessary to comply with their obligations under the organic

14   statute.

15       I think it is -- and I think with that, we're good for me.

16           **THE COURT:**  Okay.  Anything further?

17           **MR. BURNS:**  My response to the efficiency retort from

18   Meta's counsel is that, yes, the statute does say that,

19   ultimately, we do have that decision to make; but we would do

20   that based on the facts that were in front of us at that

21   particular time in conjunction with the agency.  That's the

22   practice in Pennsylvania.  It's not a unilateral decision.

23           **THE COURT:**  All right.  Just so I'm clear, that

24   process by which the Attorney General reaches that decision,

25   that's not expressly in the statute.  That's just how the

```
 1    Attorney General implements the statute.  Is that correct?
 2              MR. BURNS:  Correct, Your Honor.
 3              THE COURT:  Okay.  Anything further for Pennsylvania?
 4              MR. BURNS:  Nothing further.
 5              THE COURT:  Submitted as to Pennsylvania.
 6         Is Connecticut next?
 7              MS. LAUNER:  Good afternoon, Your Honor.  Krislyn
 8    Launer, Assistant Attorney General from the State of
 9    Connecticut.
10              THE COURT:  Good afternoon.
11         All right.  As I've been doing, I start with the chart.
12         So Meta cites law from Connecticut that the Connecticut
13    Attorney General exclusively provides legal services for
14    Connecticut agencies.  Is that correct, in your view?
15              MS. LAUNER:  No, Your Honor.  I believe Meta
16    mischaracterizes our Attorney General's authority statute.
17              THE COURT:  Okay.
18              MS. LAUNER:  The statute does say that the
19    Attorney General shall represent agencies as his duties -- as
20    the duties of his office require, and he does have supervision
21    over civil lawsuits, but whether or not that's representation
22    by the Attorney General's Office or somebody else is to be
23    determined.  The Attorney General does have the authority to
24    allow state agencies to hire outside counsel.
25              THE COURT:  So Connecticut Statute 3, dash -- is it 25
```

1    or 125?

2              MS. LAUNER:  125.

3         THE COURT:  -- 125, the language there says

4    the Attorney General shall appear for the Governor and boards,

5    et cetera, in all actions.

6         So where is the -- is there a part of that statute I'm

7    missing?

8              MS. LAUNER:  The end of that sentence does say "as the

9    duties of his office require."

10        THE COURT:  Okay.  So, okay.  Going back to the chart,

11   then, all but one of the Connecticut agencies are in what you

12   used as Category 2.  Is that still accurate?

13             MS. LAUNER:  Yes, Your Honor.

14        THE COURT:  Okay.  And for the moment, put aside the

15   Connecticut Department of Consumer Protection.  Well, let me

16   just close the loop on that.

17        So is there any dispute that the document requests served

18   to date would apply not just to the Attorney General's Office

19   but also to the Department of Consumer Protection?

20             MS. LAUNER:  Yes, Your Honor, there is a dispute.

21        THE COURT:  Okay.

22             MS. LAUNER:  We do not have control over the agency's

23   records.  We do not have the ability to access them or produce

24   them.  Admittedly, the Department of Consumer Protection does

25   have a unique relationship with the Attorney General's Office

1   under Connecticut General Statutes 42-110m, simply in that the

2   Department of Consumer Protection Commissioner authorizes the

3   state to bring suits for violation of the Connecticut Unfair

4   Trade Practices Act.  However, we do not consider them to be a

5   client, nor are they a named party to those particular cases.

6   They are not involved in any way other than reviewing

7   complaints and giving their authorization.

8        **THE COURT:**  So has the Connecticut Department of

9   Consumer Protection been involved in the investigation or

10   prosecution of this matter?

11        **MS. LAUNER:**  No, Your Honor.

12        **THE COURT:**  Their only involvement was reviewing the

13   draft complaint?

14        **MS. LAUNER:**  Correct.

15        **THE COURT:**  Well, what does that entail?  What does

16   "reviewing the draft complaint" mean?  That could be a

17   monthslong process or it could be a one-day process.

18        **MS. LAUNER:**  That is correct, Your Honor, it could be

19   either way.  The Department of Consumer Protection gets a copy

20   of the complaint.  They review it.  They determine whether or

21   not they feel that the Connecticut Unfair Trade Practices Act

22   has been violated.  If they deem that it has been violated,

23   they give us the authority to file suit.

24        **THE COURT:**  In this case, how long did that process

25   take?

1          MS. LAUNER:  To the best of my knowledge, it was less

2     than a week.

3          THE COURT:  Other than the transmission of the draft

4     complaint one way and the authorization the other, were there

5     any other communications between anyone in your office and the

6     Department of Consumer Protection about this case?

7          MS. LAUNER:  We had let them know the status of the

8     case simply as a courtesy.  The Attorney General's Office has

9     sole decision-making in this litigation.  So it simply is a

10    courtesy, we've let them know what's going on.

11         THE COURT:  And even in the prefiling stage, there

12    were no communications other than the transmission of the draft

13    complaint one way and the authorization the other way?

14         MS. LAUNER:  To the best of my knowledge.  I cannot

15    say with certainty, but to the best of my knowledge, the

16    complaint was their first interaction.

17         THE COURT:  Well, that's first.  But my question is:

18    Was there a dialogue between your office and the Department of

19    Consumer Protection?

20         MS. LAUNER:  I do not know.  I know that they were not

21    involved in the investigation, but as far as a dialogue, I do

22    not know.

23         THE COURT:  Okay.  And just so the record's clear,

24    were any of the other listed Connecticut agencies involved in

25    any way in the investigation of this matter?

1          **MS. LAUNER:**  No, none whatsoever.

2          **THE COURT:**  And same question I asked your colleagues.

3    Have you contacted any of the listed Connecticut agencies

4    concerning this current discovery dispute?

5          **MS. LAUNER:**  No, Your Honor.

6          **THE COURT:**  Okay.  And under Connecticut law, how are

7    damages allocated if any are awarded or any monetary relief is

8    awarded at the end of all this?

9          **MS. LAUNER:**  As Your Honor is aware, at this point in

10   time, we are not seeking -- or flat-out, we are not seeking

11   damages.  However, if damages were awarded, it would be a

12   question for the legislature but, more likely than not, would

13   go into a general fund.

14         **THE COURT:**  And how do you handle the ruling in

15   *Generic Pharmaceuticals* for Connecticut?

16         **MS. LAUNER:**  First of all, Your Honor, we do not

17   believe that the court in *Generic*s said that the

18   Attorney General's Office has control over documents of state

19   agencies.  The Court did say that the Attorney General has

20   broad authority.  However, the Court cited to Connecticut

21   General Statute 3125 which lays out, as we discussed, the

22   Attorney General's duties as they relate to legal matters and

23   his attorney-client relationship with state agencies.  The

24   statute is only relative to legal representation and not the

25   daily affairs or records.

1      The Court also cited to *Connecticut Commission on Special*

2 *Revenue vs. Connecticut Freedom of Information Commission.*  The

3 quote cited, when read in a vacuum, may lead one to think that

4 the Attorney General has control over state agencies.  However,

5 when read as a whole, as it should be, you understand that this

6 case, just like the statute, is referring to the

7 Attorney General's attorney-client relationship with state

8 agencies.  The Attorney General does not have broad authority

9 over state agencies but, rather, broad authority over legal

10 matters involving the state.

11      Additionally, in *Generics*, opposing counsel was seeking

12 relevant information.  The state agencies listed by Meta that

13 are in Connecticut cannot, arguably, be related -- said to have

14 related information to this case.

15      **THE COURT:**  What part of the *Citric Acid* test is

16 determined by relevancy?

17      **MS. LAUNER:**  Your Honor, I was referring to

18 the Court's holding in *Generics*.

19      **THE COURT:**  Yeah.

20      **MS. LAUNER:**  The Court found that the agencies that

21 opposing counsel was seeking documents from were relevant in

22 that case.

23      **THE COURT:**  I've got the opinion in front of me.  I

24 don't see where -- in the Connecticut section, where there's a

25 finding that control is dependent on the relevancy of the

1  documents sought.

2        **MS. LAUNER:**  Your Honor, I believe it's in the broad

3  holding, not in the Connecticut-specific section.

4        **THE COURT:**  Okay.  Well, under *Citric Acid*, is

5  relevancy a factor?

6        **MS. LAUNER:**  No.

7        **THE COURT:**  Is lack of relevancy a factor?

8        **MS. LAUNER:**  No.

9        **THE COURT:**  Under Connecticut rules of professional

10  responsibility, the document requests listed the Connecticut

11  agencies as targets of the document requests.

12      Once your office received those requests, as a matter of

13  the law of ethics in Connecticut, were you then obligated to

14  inform the agencies that they were at least potentially part of

15  this dispute?

16        **MS. LAUNER:**  At this point in time, no, Your Honor, I

17  don't think that we are required to let them know, nor do

18  I think it would be efficient or appropriate for us to let them

19  know.  I don't think running into their offices, claiming fire,

20  when it's something that we're trying to prevent in the first

21  place, would be an effective use of anybody's time.

22      We are trying to prevent a court's ruling that we have

23  control because we simply don't.  And to have them focus their

24  time and worry about an issue that may not even be an issue

25  just simply wouldn't be efficient.

1          THE COURT:  I didn't really ask about whether you were

2     going to run in and yell "fire."  But putting that aside, you,

3     among others of your colleagues, make the virtual veto

4     argument --

5          MS. LAUNER:  Yes.

6          THE COURT:  -- which I actually don't entirely

7     understand because we're only talking about discovery here, not

8     merits -- prosecution of the merits of the case.

9       How does a finding of control for discovery give any

10    agency a virtual veto over the case?

11         MS. LAUNER:  Finding that the Attorney General's

12    Office has control over these state agencies would essentially

13    override the power of the Governor.  The Governor controls

14    state agencies.  He appoints the commissioners of state

15    agencies.  Those commissioners answer to him.  They do not

16    answer to the Attorney General, nor do we have any control over

17    who's in those positions or those agencies.  That power rests

18    with the Governor.

19         THE COURT:  Well, but that's really independent agency

20    argument.  Focusing on the "virtual veto" --

21         MS. LAUNER:  Correct.

22         THE COURT:  -- phrase that you've used, again, how

23    does -- maybe I'm just not following -- how does a virtual veto

24    flow from a discovery finding that there's control for purposes

25    of Rule 34?

1          **MS. LAUNER:**  If we have control over them, that would

2    take control away from the Governor.

3          **THE COURT:**  Does *Citric Acid* require me to find that

4    the Attorney General's Office has operational control over the

5    other agencies?

6          **MS. LAUNER:**  Control or the right to demand documents,

7    the legal right to demand documents --

8          **THE COURT:**  Okay.

9          **MS. LAUNER:**  -- which we don't.

10         **THE COURT:**  Well, I know that's your position.  But,

11   in other words, saying that your office would be taking away

12   control of these agencies from the Governor just because you

13   can get documents from them, I don't understand how that's a

14   virtual veto.

15         **MS. LAUNER:**  It implies that we have control at all

16   over the agency.

17         **THE COURT:**  You have control over the documents, not

18   the agency.

19         **MS. LAUNER:**  To access the agency's records would be

20   control over the agency.

21         **THE COURT:**  Does that mean every time an outside

22   lawyer accesses documents from a client, they have control --

23   they, operationally, control the client and somehow take away

24   control of that client from its board of directors?

25         **MS. LAUNER:**  Well, they have a legal right to demand

those documents if they're representing them in a party

capacity.

      **THE COURT:**  Right.  And so the only reason I would be

finding that you have an obligation to go get the documents is

if I found control; right?

    But you're arguing that that would give them a virtual

veto and take power away from the Governor.  I don't see how

that flows, because what you're essentially arguing is that

every time an outside lawyer goes into a client, it somehow

divests the board of directors and the CEO of control of the

company.  That doesn't seem to follow.

      **MS. LAUNER:**  I don't believe that's what I'm arguing.

I'm saying the Attorney General's Office doesn't have control

over those agencies, which is everything about the agency.

      **THE COURT:**  Okay.  I just -- what is the veto over?

What is the virtual veto over?  I don't understand what the

phrase "virtual veto" is referring to then.  What is being

vetoed?

      **MS. LAUNER:**  The Governor's power.

      **THE COURT:**  That's not the way you phrased it in the

briefing, but okay.

    Okay.  So your view is that the virtual veto is not over

your office's independent responsibility to the state.  It's a

virtual veto over the Governor's ability to control other

agencies?

1     MS. LAUNER:  Well, our office's independent

2  responsibility to the state, as well as being independent from

3  the Governor, yes, we're independent from the agency.

4     THE COURT:  I don't see -- what is being vetoed?

5     MS. LAUNER:  The Governor's authority.

6     THE COURT:  Does the Governor have the authority to

7  order an agency to refuse compliance with a federal court order

8  to find documents?

9     MS. LAUNER:  No, Your Honor.

10     THE COURT:  What we're talking about here is

11  discovery -- right? -- not operations of the agencies.

12     MS. LAUNER:  Right.

13     THE COURT:  What is it that the Governor is unable to

14  do with the agencies simply because hypothetically I were to

15  find control and access?  I just don't understand what's being

16  vetoed.  I could see if you took the position the Governor has

17  the power and the authority to defy court orders and refuse and

18  order agencies not to produce documents, but I don't hear --

19  you're not arguing that.

20    So what's being vetoed?

21     MS. LAUNER:  It's an issue with the separation of

22  powers, the fact that the Governor is an independently elected

23  official, the Attorney General is an independently elected

24  official.  They have different responsibilities.  The

25  Attorney General's responsibilities are independent from that

1    of the Governor.  And the agencies answer to the Governor.

2          **THE COURT:**  But if you were right, then every time

3    there's any kind of independent agency, there could never be

4    control then, even in the most egregious facts.

5          **MS. LAUNER:**  Your Honor, if they are a party to a

6    case, then, yes, the Attorney General --

7          **THE COURT:**  We don't get to the control issue if

8    they're a party; right?  The control only goes to when you're

9    trying to get discovery from non-parties; right?

10         So hypothetically, assume the most egregious facts where

11   there is absolutely control.  Under your theory, because --

12   your argument, because these are independent agencies and the

13   Governor has independent authority to govern them, even with

14   control, that there's a veto of the Governor's power?

15         **MS. LAUNER:**  I don't see how the Attorney General has

16   control over those agencies in that circumstance.

17         **THE COURT:**  Again, I don't think I need to find that

18   they have control over the agencies.  They have control -- a

19   right to access the documents.

20         **MS. LAUNER:**  Correct.  Correct.  I apologize.  I'm

21   using those phrases synonymously.

22         **THE COURT:**  But I don't think they're synonymous.

23   Right?  In other words, the way you're phrasing it implies that

24   *Citric Acid* requires me to find that your office, the Attorney

25   General's Office has some kind of operational or legal control

1    over the agency as a whole.  That's not the test; right?

2         MS. LAUNER:  That is not the test, no.  But the

3    documents are the agency's documents that we do not have a

4    legal right to access.

5         THE COURT:  We talked about the statute and the

6    Attorney General's representation of agencies.  Meta cites

7    the -- I'm going to mispronounce it -- the *Bysiewicz* case from

8    Connecticut, which at least the quote says:  The authority to

9    perform legal services on behalf of agencies is conferred

10   exclusively on the Attorney General.

11        How does that square with your argument about what the

12   statute allows?

13        MS. LAUNER:  Your Honor, I do apologize.  I'm not

14   familiar with that case as a whole.

15        As with the other cases cited by Meta, they are, again,

16   cited in a vacuum such that the Attorney General does have

17   authority over the legal affairs, but that does not require the

18   Attorney General to act as the attorney in any given situation.

19   The Attorney General can authorize outside counsel.

20        THE COURT:  Okay.  Meta's response?

21        MR. CARPENTER:  Thank you, Your Honor.

22        I'll start with the virtual veto concern.  I had also

23   understood it differently in all of the states' briefing,

24   including when states in other cases have raised it.  The

25   virtual veto concern, as we had understood it, is the idea that

because a state agency can refuse discovery, it can somehow
veto the case.

I agree with Your Honor's inclination that it doesn't make
much sense, to begin with.  And we've cited cases calling it,
quote, speculative, conclusory, and unpersuasive.

This new argument about vetoing some aspect of the
Governor's power I also don't think holds water for the reasons
Your Honor said but, also, for the additional one that if we're
talking simply about production of documents in litigation,
that is, as we've been discussing, a core power of the
Attorney General, and it doesn't diminish the Governor's
authority at all.

Second, to move to the statutory framework and the
language of the cases we've been talking about, we think we
correctly characterize it.  The statute says that it's
exclusive.  The *Bysiewicz*, I believe, case that Your Honor
cited says that the authority is conferred exclusively on the
Attorney General.  And I believe I even heard counsel say that
they have authority over, quote, legal affairs for the state.

On the issue of the Consumer Protection Department, while
we think that all of the agencies at issue there's a fairly
clear case that there's control, that one stands out in
particular based on the fact that they authorized it and also
based on the fact that in the Attorney General's briefing
before Your Honor today, they said that they're asserting the

1    attorney-client privilege.  To now claim that there is no

2    attorney-client relationship I think would not be equitable.

3        On counsel's comments on *Generic*, *Generic*, as I read it,

4    is quite clear.  It is a finding of control.  It is a finding

5    of a legal right to obtain.  That is the only test it is

6    employing.  And in the part analyzing Connecticut, it looks

7    purely to the statutory and case law framework and finds that

8    there is a legal right to obtain based just on that, without

9    qualification.

10        On the issue of relevance, we agree that this isn't -- the

11    relevance of the possible request is not before Your Honor

12    today.  That, again, can be litigated during ordinary

13    discovery, as we are doing right now with their RFPs against

14    us.

15        I believe that I heard counsel reference the concern that

16    a few states have raised that each agency controls its own

17    records.  Just to be clear, *Generic* rejected that argument too

18    and held that just because an agency has responsibility for its

19    own records, maintaining them, keeping them in its files,

20    doesn't mean that there isn't a right to access under the

21    statutory framework.

22        And finally, I was also going to clarify what Your Honor

23    raised, which is that there doesn't need to be operational

24    control over the entire agency.  We've never argued that, and

25    none of the cases require it.

1        **THE COURT:**  As with the other states we talked about,

2   in fact, just to close the loop, is it correct that with regard

3   to all the states here, you haven't -- Meta is not relying on

4   evidence that the AG's office has injected from these agencies

5   into this case?

6        **MR. CARPENTER:**  Correct.  We don't know of any

7   evidence they've injected because all we have are their

8   complaints and what they've chosen to reveal.

9        **THE COURT:**  If the Connecticut Department of -- let me

10  get it right -- Consumer Protection authorized the suit and

11  you've been keeping them informed about the case, at least as a

12  courtesy, why didn't they show up here to advance their own

13  interests?

14       **MS. LAUNER:**  Because they are not a party to this

15  case, Your Honor.

16       **THE COURT:**  Third parties show up to oppose discovery

17  all the time.

18       **MS. LAUNER:**  They have not been served with a

19  subpoena.  They would be here if this was a Rule 45 issue.  It

20  is not at this time.

21       **THE COURT:**  Well, I assume you've told them that Meta

22  is taking the position that the Rule 34 document request

23  reached them.

24       **MS. LAUNER:**  I do not know how much they know about

25  discovery at this point, Your Honor.

**THE COURT:** All right. Anything further from the state?

**MS. LAUNER:** Just quickly in response.

Because case law cited by Meta says that the Attorney General has authority over legal affairs does not require the Attorney General to represent these agencies in any given situation.

Additionally, because we may assert attorney -- or would assert attorney-client privilege over communications with the Department of Consumer Protection, again, does not make them a party to this case. A client and a party are not necessarily the same thing. Someone can be your client or an agency can be your client and still not a party subject to Rule 34 discovery.

And finally, there is no statute in Connecticut giving the Attorney General control over records of any of these agencies.

**THE COURT:** Just so I'm clear, you said "would assert." You are, in fact -- in the brief, you are asserting privilege as between your office and the Department of Consumer Protection; correct? You don't say "would"; you say "are."

**MS. LAUNER:** If they were served with a subpoena, we would.

**THE COURT:** Documents are privileged -- communications are privileged, regardless of whether there's a subpoena served or not. They either are or are not privileged. What's your view? Are they or are they not privileged?

1      **MS. LAUNER:**  Then correct, yes, we are asserting

2  attorney-client privilege.  But, again, just because they're

3  our client does not make them a party.

4      **THE COURT:**  Again, I'm not deciding whether they're a

5  party to the case.

6      **MS. LAUNER:**  I know.

7      **THE COURT:**  I know we're using that as shorthand.  But

8  I just want to make clear, I'm not deciding whether they're a

9  party.  I'm deciding whether there's control under *Citric Acid*,

10  which doesn't require a finding or joining anybody as a party

11  for purposes of the case as a whole.

12   Okay.  Anything further?

13      **MS. LAUNER:**  No, Your Honor.

14      **THE COURT:**  Anything further from Meta?

15      **MR. CARPENTER:**  Very quickly, if I can, Your Honor.

16      **THE COURT:**  Sure.

17      **MR. CARPENTER:**  First, I agree they do unequivocally

18  say that those communications would be privileged, subject to

19  the attorney-client privilege.

20   And, second, as the case law we cited in our brief shows,

21  if they are, in fact, a client, they should be -- they should

22  be subject to party discovery, recognizing you're not deciding

23  if they're a party based on that admission alone.

24      **THE COURT:**  Okay.  Anything further?

25      **MS. LAUNER:**  Your Honor, attorney-client privilege is

```
 1  based upon the relationship between the attorney and the
 2  client, not the client and litigation.  Simply because somebody
 3  is our client does not -- and we could assert attorney-client
 4  privilege does not mean that they must respond to discovery in
 5  these circumstances.
 6          THE COURT:  Okay.  By asserting attorney-client
 7  privilege with respect to the Department of Consumer
 8  Protection, you are taking the position that they are a client;
 9  right?
10          MS. LAUNER:  They are a client, yes.
11          THE COURT:  Okay.  And not just generically a client.
12  They are a client for purposes of this litigation; correct?
13          MS. LAUNER:  Potentially.
14          THE COURT:  Well, you're advancing their interests, in
15  fact, all the agencies' interests, but you're advancing
16  specifically their interests by resisting this argument about
17  control, aren't you?
18          MS. LAUNER:  We are advancing the interests of the
19  People of the State of Connecticut.
20          THE COURT:  Okay.  But you can also -- you don't have
21  to -- it's not an exclusive.  You can be advancing the
22  interests of the People of the State of Connecticut and, at the
23  same time, be advancing the interests of the Department of
24  Consumer Protection.
25          MS. LAUNER:  If they tangentially are advanced, then,
```

 1  yes, possibly, but that is not the intent.

 2          **THE COURT:**  All right.  Anything further on

 3  Connecticut?

 4          **MS. LAUNER:**  No.  Thank you.

 5          **MR. CARPENTER:**  I think this one's been adequately

 6  addressed, Your Honor.  Thank you.

 7          **THE COURT:**  Submit on Connecticut.

 8      Last one, California.

 9          **MR. OLSZEWSKI-JUBELIRER:**  Good afternoon, Your Honor.

10  Josh Olszewski-Jubelirer for the People of the State of

11  California.

12          **THE COURT:**  Good afternoon.

13      Okay.  So let's start where we've been starting on all the

14  others.  Let's start with the chart.

15      So all the California entities in the chart, which is

16  Exhibit 1 to Docket 738, they're all at least listed in

17  Category 2.  Is that still accurate?

18          **MR. OLSZEWSKI-JUBELIRER:**  Yes, Your Honor.

19          **THE COURT:**  And Meta cites California statute,

20  the Government Code Section 11040 that states, according to

21  them, that California agencies must consent -- must get the

22  consent of the Attorney General if they want to hire or retain

23  either their in-house counsel or outside counsel for

24  litigation.  Do you agree with that?

25          **MR. OLSZEWSKI-JUBELIRER:**  So let me walk the Court

1    through how that --

2         **THE COURT:**  Answer my question first.  Do you agree

3    that that's the law in California?

4         **MR. OLSZEWSKI-JUBELIRER:**  I agree that 11040 is one of

5    the statutes that governs this situation.  And specifically,

6    there are some agencies that -- let me take a quick step back.

7         All agencies have the ability to use in-house counsel or

8    hire outside counsel to represent themselves.  For some

9    agencies, they need to obtain the consent of the

10   Attorney General in order to represent themselves using

11   in-house counsel or private outside counsel for the purpose of

12   litigation.  Some agencies do not need the Attorney General's

13   consent.

14        **THE COURT:**  For the agencies listed by Meta, are they

15   all in the consent bucket?

16        **MR. OLSZEWSKI-JUBELIRER:**  No, Your Honor.

17        **THE COURT:**  Which ones do not need the

18   Attorney General's consent to hire other counsel?

19        **MR. OLSZEWSKI-JUBELIRER:**  The Department of Education

20   does not need the Attorney General's consent, and that's

21   Government Code 11041.

22        **THE COURT:**  Okay.  Any other California agencies that

23   do not need the Attorney General's consent to hire -- use

24   in-house counsel or hire outside counsel?

25        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, not under, to my

1    knowledge, under this statutory scheme.

2         I will say -- I'm happy to continue on, on this path.  But

3    I will say, whether or not the Attorney General would represent

4    an agency in responding to a subpoena is really not

5    determinative of control under *Citric Acid*.  Attorneys do not

6    have legal control over all of their client's documents.  They

7    do not have the ability to obtain their client's documents on

8    demand.  And they certainly do not have the ability to obtain a

9    client's documents on demand in order to respond to discovery

10   in a litigation where the client is not a party.

11        None of these agencies are parties to this litigation the

12   People brought -- the California Attorney General brought on

13   behalf of the People of the State of California.  *Lockyer* is

14   very clear on this point.  And whether or not other lawyers --

15            **THE COURT:**  Let me stop.

16        Okay.  You said attorneys do not have the ability to

17   obtain their client's documents on demand in order to respond

18   to discovery in litigation?

19            **MR. OLSZEWSKI-JUBELIRER:**  That's right, Your Honor.

20            **THE COURT:**  What's your understanding of your

21   obligation as counsel under Federal Rule of Civil Procedure 34?

22            **MR. OLSZEWSKI-JUBELIRER:**  The obligation under Rule 34

23   runs to the party, Your Honor.  The party has the obligation to

24   produce the documents.  The attorney works with the party to

25   determine what the appropriate scope of the search would be,

1    and the party authorizes or, as Your Honor points out, does not

2    authorize whatever search.  The obligation is on the party to

3    respond to discovery.

4         **THE COURT:**  What's your understanding of your

5    obligation to the Court under Rules 1 and 26 as counsel?

6         **MR. OLSZEWSKI-JUBELIRER:**  The obligation under Rule 26

7    is, in responding to discovery, the attorney needs to sign

8    responses that represent the factors under Rule 26.

9         When a party responds to interrogatories, for example,

10   those interrogatories are not verified by the attorney.

11   They're verified by a client.  The client is responding to

12   discovery, not the attorney.

13        **THE COURT:**  So you're saying under Rule 34, an

14   attorney has no obligation to go search for documents from its

15   client?

16        **MR. OLSZEWSKI-JUBELIRER:**  What I'm saying, Your Honor,

17   is that the party has the obligation to search for the

18   documents.  The attorney, in the course of the representation,

19   determines what the scope of that search is with the client,

20   and the client authorizes a search or doesn't authorize a

21   particular search.  The client controls the documents, not the

22   attorney.  I should say, the party controls the documents in

23   the context of Rule 34.

24        **THE COURT:**  Well, okay.  That's a given.  But are you

25   taking the view that a client can simply refuse to search and

produce documents and their counsel is powerless to do anything
to get the documents from their client and has no obligation to
the Court to try to get the documents from their client?  Is
that your view of how the Federal Rules of Civil Procedure
work?

    **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, my view is that
the party has the obligation to produce the documents and to
conduct whatever reasonable search is appropriate.

    The Court could take measures against the party, but it is
really the party that controls the documents and has the
obligation to respond to discovery.

    **THE COURT:**  So, in your view, an attorney has no
professional responsibility to try to get the documents from
their client?  They're able to sit on their hands -- the lawyer
is able to sit on their hands and say "I don't have to do
anything further if the client tells me I'm not going to get
the documents."  Is that your view of how discovery works in
federal court?

    **MR. OLSZEWSKI-JUBELIRER:**  I think, Your Honor, the
client may be subject to sanctions if they refuse, after a
motion to compel, to produce documents subject to a court
order.

    The attorney has the obligation to represent their client
appropriately and to inform the client, if they have a legal
obligation to search and produce documents, to do that search

1    and to work with the client to develop that search.  But it is

2    the client that has the control over the documents, the party.

3        **THE COURT:**  So if the Court were to find that a lawyer

4    could simply do nothing in response to an obstreperous client,

5    could just sit back and let the client refuse to produce

6    documents, you don't think the Court has the ability or the

7    power to sanction that lawyer?

8        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I'm honestly

9    struggling a little bit with what the -- what the lawyer would

10   have done wrong in this case.

11       The issue is, the party has the obligation to produce the

12   documents.  If the party refuses to comply with discovery, they

13   may be subject to sanctions.  The lawyer has the obligation to

14   inform the party of that outcome.  But it's really the party

15   who has the obligation to respond to discovery.

16       **THE COURT:**  An attorney has their own independent

17   responsibility, as an officer of the court, to try to get the

18   documents from their client; right?

19       **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, an attorney has

20   an obligation to -- if they have an obligation to try to get

21   documents from the client is not the question under

22   *Citric Acid*.  It is not --

23       **THE COURT:**  Do they or do they not have an obligation,

24   as an officer of the court and under their duties under the

25   ethics rules, to try to get the documents from their clients in

1    response to discovery requests?

2        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, they have an

3    obligation under the rules of professional responsibility to

4    represent their client appropriately, to inform the client what

5    the obligations of the rules of discovery provide for, what

6    reasonable search would be required.

7        **THE COURT:**  In the hypothetical where the client --

8    and you're saying the client can get sanctioned.  The reason

9    the client is getting sanctioned is because the lawyer had the

10   right and the obligation to get the documents; right?

11   Otherwise --

12       **MR. OLSZEWSKI-JUBELIRER:**  Do not have the right to get

13   the documents.

14       **THE COURT:**  There wouldn't be any sanctions otherwise.

15       **MR. OLSZEWSKI-JUBELIRER:**  Because -- no.  My

16   apologies, Your Honor.

17       If the client is being sanctioned it's because the client,

18   the party, has refused to produce the documents.

19       **THE COURT:**  And the reason they're getting sanctioned

20   is because their view that their lawyer has no right to get the

21   documents is incorrect; right?

22       **MR. OLSZEWSKI-JUBELIRER:**  No.  Your Honor, they would

23   be sanctioned because they need to produce the documents and

24   they're not producing the documents.

25       **THE COURT:**  Because they should have listened to their

lawyer and let the lawyer come in and get the documents; right?

      **MR. OLSZEWSKI-JUBELIRER:**  Yes.  Exactly, Your Honor. And that is the party's decision, not the attorney having the unilateral right to go and search through a client's documents and certainly not, Your Honor, to search through a client's documents in order to respond to discovery in which the client is not a party to the case.

      **THE COURT:**  Putting aside whether they're a party to the case or not, I'm troubled by your view here.  The reason a party is sanctioned for refusing to hand over or even allow their lawyer to get documents is because they are wrong, because the lawyer has the right, in fact, the duty and obligation to go get the documents; right?

      **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the reason they would be subject to sanctions is because they are not producing the documents.

      **THE COURT:**  Because their lawyer has the right and duty and obligation to this Court to go get the documents in accordance with the Federal Rules of Civil Procedure; right?

      **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, because the lawyer has the obligation to represent the client and, as part of that representation, to try to get the documents from the client.  But the client controls the documents and determines what they will produce.

      **THE COURT:**  And the sanctions are there to enforce and

1    reinforce the fact that the lawyer should have and has the

2    obligation to get the documents in the first place.

3         **MR. OLSZEWSKI-JUBELIRER:**  The sanctions, Your Honor,

4    would run against the party.  These agencies are not parties to

5    this case.

6         **THE COURT:**  But what I'm talking about is whether the

7    lawyer has an obligation and a right to get the documents.  The

8    only reason the party is being sanctioned is because the lawyer

9    has that obligation.

10        **MR. OLSZEWSKI-JUBELIRER:**  The lawyer does not have the

11   right to get the documents.  They may have the obligation to

12   try to get the documents.

13        **THE COURT:**  Okay.  I understand your argument.  I'm

14   troubled by your views of how discovery runs under the Federal

15   Rules of Civil Procedure and what you think lawyers can do and

16   sit on their hands and not do.

17        Okay.  Have you or anyone in your office communicated with

18   any of the listed agencies as to whether they are requesting

19   exemption from the statutory scheme so they can get consent to

20   hire different lawyers?

21        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, there's a

22   process by which the Attorney General's Office would -- when an

23   agency receives a subpoena, there's a process by which they

24   would have this discussion with the Attorney General's Office,

25   either request representation from the Attorney General's

 1    Office or request that they use their own in-house counsel or

 2    hire a private outside counsel.

 3        No subpoenas have been served on these agencies, and

 4    therefore, that process has not occurred.

 5            THE COURT:  Have any of these listed California

 6    agencies been involved in the investigation of this matter?

 7            MR. OLSZEWSKI-JUBELIRER:  No, Your Honor, they have

 8    not.

 9            THE COURT:  Your briefing relies on *Lockyer*.  You

10    would agree *Lockyer* is not applying the *Citric Acid* test?

11            MR. OLSZEWSKI-JUBELIRER:  Your Honor, *Lockyer*,

12    I think, answers the questions under the *Citric Acid* test.

13            THE COURT:  Please answer the Court's question before

14    you make your argument.

15        *Lockyer* is not applying the *Citric Acid* test; correct?

16            MR. OLSZEWSKI-JUBELIRER:  Your Honor, *Lockyer* does not

17    cite *Citric Acid*.  I think the relevant issues are whether --

18    whether the People, the plaintiff in this action, encompassed

19    the agencies -- *Lockyer* says no -- and whether -- very

20    specifically, whether the People have control over those

21    documents --

22            THE COURT:  Is this --

23            MR. OLSZEWSKI-JUBELIRER:  -- from those agencies.

24            THE COURT:  -- Court bound by California state law for

25    discovery purposes?

1          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the Court is

2   bound by California state law to the extent the Court is making

3   decisions about what California state substantive law allows

4   the Attorney General to do.

5          **THE COURT:**  California discovery rules, is that

6   substantive law?

7          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the ruling in

8   *Lockyer*, I think, goes to the question of who are parties under

9   California law when the Attorney General brings an enforcement

10  action --

11         **THE COURT:**  Again, answer my question.

12      Is California -- are California discovery rules

13  substantive law?

14         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the discovery

15  rules are not substantive law, but the underlying ruling about

16  who has control is substantive law.

17         **THE COURT:**  I'll ask you again.  Did the *Lockyer* court

18  examine *Citric Acid* and apply and analyze the control test?

19         **MR. OLSZEWSKI-JUBELIRER:**  The *Lockyer* court does not

20  cite *Citric Acid*, as I said, Your Honor; but the *Lockyer* court

21  is very clear that the People do not have custody or control

22  over the documents of state agencies in this posture when

23  they're bringing an enforcement action.

24      I will say, Your Honor, the other two -- two of the other

25  cases that we cite, *Warner Chilcott* and *American Express*, do

1    also expressly apply *Citric Acid*'s legal control test, and they

2    both find that there's no control.

3        If I can step through them really briefly, *American*

4    *Express* takes on the exact same argument that Meta is making

5    here.  *American Express* says when the Attorney General is

6    bringing an enforcement action, even if the Attorney General

7    might represent some state agencies in responding to a

8    subpoena, that attorney-client relationship does not give the

9    Attorney General control over those agencies' documents.

10        In *Warner Chilcott*, which is a case where the -- a

11    multistate enforcement action, just like this one, where the

12    California Attorney General was a party, for the purposes of

13    the discovery, involved in the enforcement action, *Warner*

14    *Chilcott* also finds that the Attorney General does not have

15    control over state agency documents.  The argument there was

16    quite similar to the one -- the argument that Meta is making

17    here.  The argument there was that by virtue of the

18    Attorney General's role as the chief law enforcement officer,

19    therefore, they must have control over state agency documents,

20    and the Court rejected that.

21        **THE COURT:**  *Lockyer* is not binding on this Court;

22    correct?

23        **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I think *Lockyer*

24    is the definitive representation of who are parties in an

25    enforcement action under 17200 and 17500, the same statutes

1    here, and whether the plaintiff, the party, has control over

2    those documents.

3        THE COURT:  Well, *Lockyer* is a Court of Appeals --

4    District Court of Appeals decision.  It's not a California

5    Supreme Court decision; right?

6        MR. OLSZEWSKI-JUBELIRER:  Your Honor, my understanding

7    of how the federal courts are bound by state law is that the

8    federal court is -- needs to predict what the state court would

9    do in the situation.  Right?

10       We know what the state court will do.  This is the

11   definitive decision under California state law on this issue.

12       THE COURT:  Are you advocating that I engage in some

13   kind of Erie doctrine, as if I'm sitting in diversity, and

14   figure out what California law is here?

15       MR. OLSZEWSKI-JUBELIRER:  I think we know what

16   California law is because *Lockyer* says what California law is.

17       THE COURT:  *Lockyer* says what California law is in the

18   Fourth Appellate District, which is not even the district I sit

19   in if we were looking geographically; correct?

20       MR. OLSZEWSKI-JUBELIRER:  Your Honor, my understanding

21   is the Court of Appeals' decisions are binding on all lower

22   courts in California.

23       THE COURT:  Am I a lower court in the California state

24   system?

25       MR. OLSZEWSKI-JUBELIRER:  You're not, Your Honor.

1          **THE COURT:**  I forget if I've asked.  Under California

2     law, how would monetary relief, if any, be awarded or allocated

3     at the end of all this?

4          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, there are two

5     forms of monetary relief here.

6          One is civil penalties.  California law is very specific

7     on this.  This is Business and Professions Code 17206,

8     I believe.  And it says civil penalties -- my apologies,

9     Your Honor.  17206, paragraph (c)(4) (as read):

10              "The aforementioned funds" -- the civil

11         penalties -- "shall be for the exclusive use by the

12         Attorney General, the district attorney, the county

13         counsel, and the city attorney for the enforcement of

14         consumer protection laws."

15         So civil penalties are paid into -- half of the civil

16    penalties are paid to the treasurer of the county where the

17    judgment is entered, half go to the general fund, and they are

18    all for the exclusive use of the Attorney General for consumer

19    protection and enforcement.

20         There's also a disgorgement remedy.  That's a new statute,

21    Government Code 12527.6.  And those disgorged funds go into a

22    special fund, which is for the exclusive use of compensating

23    consumers.  It's designed to compensate consumers, to provide

24    restitution to them in cases brought by the Attorney General

25    where the defendant does not have the ability to pay and

1     satisfy all the restitution that would be ordered in those

2     cases.

3                    **THE COURT:**  Okay.  Response from Meta?

4                    **MR. CARPENTER:**  Thank you, Your Honor.

5          Just to clear up some of the statutory issues, as we said

6     in our brief, under California state law, the AG has charge of

7     all legal matters.  All but one, the Department of Education,

8     of the agencies we're talking about here today are

9     affirmatively prohibited from hiring other counsel unless the

10    AG signs off on it.

11         I think that's partially important -- important, in part,

12    because if we're talking about a right to control, the AG can

13    then exercise that right to take over the litigation and can

14    decline to exercise its discretion not to.

15         On the *Lockyer* point, yes, *Lockyer* did not apply a right

16    to obtain test, didn't apply the *Citric Acid* test.  *Lockyer*

17    began and ended its analysis by asking whether the two agencies

18    were created as separate, and that is all.

19         On *Warner Chilcott* and *American Express*, which counsel

20    also referenced, I think those are just misreadings of those

21    cases.  The relevant part of *Warner Chilcott* didn't apply the

22    right to obtain test.  Much like *Lockyer*, the relevant part

23    said because they're created separately and not under the same

24    executive control, which as we talked about earlier is not

25    required, there was no control under that court's test.

1     There's another part of that case counsel may be
2   referencing that had to do with accessing some very specific
3   Medicaid data where the Court looked at a particular statutory
4   scheme, but that's different than what we're dealing with here.
5   The part of that opinion we're fighting over didn't analyze it,
6   nor did *American Express*.  It, once again, said they're under,
7   quote, common executive control and didn't look at all at the
8   statutory framework or what courts like *Generic* and *Shelby*
9   *County* have done in the years since those decisions were
10  decided more than a decade ago.

11        **MR. OLSZEWSKI-JUBELIRER:**  If I may respond,
12  Your Honor.

13        **THE COURT:**  Sure.

14        **MR. OLSZEWSKI-JUBELIRER:**  A few points.

15     So, first of all, I think perhaps we're talking past each
16  other a little bit on *Warner Chilcott* and *American Express*.
17  Your Honor, I'm sure, has read the cases.  I'm quite confident
18  there are different sections in those opinions.

19     One section is about whether the agencies are parties.  We
20  take Your Honor's instruction that you're not deciding the
21  agencies as being parties.  I think the section that counsel is
22  referring to is in that section about whether they're separate
23  entities.

24     Both of those cases also go on to say the question that
25  the Court is deciding here, whether the Attorney Generals have

control over documents at those agencies; and both of those
cases expressly apply the legal control test and say that the
AGs do not have legal control over those documents.

To take another point that Meta's counsel referred to,
Meta's counsel said all these cases just talk about whether
those agencies are separate entities from the Attorney
General's Office.  And I think *Citric Acid* is quite instructive
on this point.

Citric Acid itself says, in referring to the *International
Union* case that *Citric Acid* built on and in that case itself,
says these two entities are separate entities and there's
nothing that expressly gives the target of discovery the legal
right to obtain the documents of this other non-party on
demand.

And that is really the test.  All of these agencies are
separate from the Attorney General's Office.  They are not
controlled by the Attorney General.  They are controlled by
separately, independently elected officers:  the Governor,
the superintendent of public instruction, other officials.  The
Attorney General does not have control over those agencies and
does not have control over their documents.

If I could return really briefly to the virtual veto
discussion that was being done in the prior argument, we also
raise this concern.  The concern, Your Honor, is that we, as
the attorneys prosecuting this case, do not have the ability,

1   the legal right to obtain documents from these agencies on

2   demand.  If they refuse to produce those documents, we,

3   the People of the State of California, the party that's here,

4   we, as the attorneys, potentially would be subject to sanctions

5   to try to get document -- for our inability to produce

6   documents that we -- that we just don't have the ability to

7   force those agencies to produce those documents.

8        It's exactly what *Citric Acid* said it was trying to avoid

9   by adopting the legal control test.  You don't want, under the

10  Rules of Civil Procedure, to order a party to produce documents

11  that they cannot obtain on demand, that they don't have a legal

12  right to obtain on demand from non-parties.  That's exactly

13  what *Citric Acid* said the legal control test is trying to

14  avoid.

15       **THE COURT:**  Again, if that's what you mean by "virtual

16  veto," I still don't really understand it because it's

17  circular.  You're assuming that you don't have control over the

18  documents and don't have a right to access, which means then

19  there is no control in *Citric* and then there's no obligation to

20  get them; right?

21       But the only reason you would be required to get them,

22  hypothetically, is if the Court found there is a legal right to

23  access and there is a right to -- in other words, the control

24  test is satisfied.

25       And so in your hypothetical, again, if the obstinate

1  client or party in this case, non-party agency in this case

2  refused to somehow cooperate with you, despite a court order

3  saying, "Go get the documents," you are not powerless.  You can

4  come to court and ask for orders and sanctions.  And there are

5  all sorts of ways available to you as counsel to essentially

6  work with the Court to persuade your client to comply with

7  their discovery obligations; no?

8          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, those

9  non-parties, as you mentioned, Your Honor, are not parties.

10  And so the concern about the virtual veto is that the

11  Attorney General would be put in a situation where the

12  Attorney General, as the representative of the party, the

13  plaintiff, would be obligated to try to get documents from an

14  agency that they don't control, that they cannot obtain those

15  documents on demand.

16      Your Honor, if the Court ordered --

17          **THE COURT:**  Again, if the Court hypothetically found

18  there's no ability and there's no control, then there's no

19  asking for the documents; right?  You don't even get there.

20  It's circular, or it's -- I don't know.  It's -- in other

21  words, the only reason counsel would be required to go to the

22  non-party to get documents is because the Court found there was

23  control under *Citric Acid*.

24          **MR. OLSZEWSKI-JUBELIRER:**  And there is not control

25  under *Citric Acid*, right.

1          **THE COURT:**  But to combine the two irreconcilable

2     parts of a hypothetical into one doesn't make sense.  In other

3     words, if the Court finds there's control, then as counsel,

4     you'd be obligated to go get the documents; right?

5          **MR. OLSZEWSKI-JUBELIRER:**  We would be obligated to try

6     to get the documents.  But as I explained, Your Honor, we do

7     not have the ability to get those documents.

8          **THE COURT:**  Again, you go to the non-party and say,

9     "Look, the Court has ordered, found control -- we don't think

10    the Court's right -- but found control, and therefore we need

11    to get the documents from you."

12         And I don't see where veto comes in.  The concern is

13    somehow the agency would say, "No, we're not going to let you

14    get our documents.  We're just going to refuse."

15         You, as counsel to the party in this case -- and, again,

16    in this hypothetical, the only way it gets there is if

17    the Court has found control -- would come to court.  You have

18    all sorts of avenues available to get the Court to work with

19    you to convince the agency to produce the documents; no?

20         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, we've gone,

21    I think, a little bit far down a hypothetical road.  I'm not

22    certain that the Court -- I'm not certain what the Court's

23    ability would be to sanction a non-party, who is not a party to

24    the litigation, for refusing to give documents which they don't

25    have a legal right --

1          **THE COURT:**  If the Court found that there is control

2     and ordered you to go to some agency and get the documents, are

3     you saying I don't have the ability, then, to -- on the basis

4     of that order, to sanction that third party?  They're subject

5     to the discovery under -- in this hypothetical; right?  There's

6     been a finding that there's control and that they're subject to

7     the discovery.  And so if they're subject to the discovery,

8     then they're subject to the sanction power of the Court.

9          **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, they would be

10     subject to discovery only in the sense that the party who's

11     actually the party, we, would be subject to discovery to try to

12     get documents from somebody else.

13          **THE COURT:**  That's what all control cases are about.

14     That's what all *Citric Acid* cases -- it's always a third-party

15     who's not a party to the case; right?

16          So the only reason -- they're not a party to the case.  So

17     the only reason that somebody is going to the non-party to get

18     documents is because some court has found that there is a legal

19     right to access them from the non-party.  And so the non-party

20     could try to say, "Well, I'm going to refuse."

21          But I just don't see the hypothetical -- I still don't see

22     where the veto is, I guess.  I'm not sure who's being vetoed

23     and that's being vetoed.

24          **MR. OLSZEWSKI-JUBELIRER:**  I think the veto -- and to

25     be frank, Your Honor, this actually comes from a case that Meta

cited in the prior -- that they relied on in the prior letter
briefing.

     **THE COURT:**  Well, your colleagues all used the phrase
"virtual veto" --

     **MR. OLSZEWSKI-JUBELIRER:**  Yes.

     **THE COURT:**  -- as a concern.

     **MR. OLSZEWSKI-JUBELIRER:**  Absolutely.

     **THE COURT:**  I still don't understand what's being
vetoed and what the concern is.

     **MR. OLSZEWSKI-JUBELIRER:**  So just to explore this
really briefly, it comes from a case where the Court was
deciding whether, when the U.S. Government brings an antitrust
enforcement action -- in this case, against AT&T -- the Court
said:  Well, DOJ is part of the executive branch.  In this
particular situation, AT&T has contracts with literally every
agency of the Government.  We'll say in this massive antitrust
action, in this particular case, party discovery is appropriate
as to executive agencies, but it is not appropriate as to
independent agencies that are not subject to the direct control
of the president -- FTC, FCC, those sorts of agencies --
because the concern is -- and bringing it back to the state
situation, the Attorney General of the State of California has
an independent authority to bring these consumer protection
enforcement actions.  If, in bringing such an action, every
single agency that they don't control -- or in the *AT&T* case,

1    FCC, FTC -- could refuse to produce documents and, therefore,

2    subject the actual party, who's the party in the case, the

3    U.S. Government -- or here, the People of the State of

4    California represented by the Attorney General -- to sanctions

5    for their failure to produce documents from some agency they

6    don't control.  It would be a veto over their independent

7    ability to bring that enforcement action.

8        The Attorney General would need to get buy-in from all

9    these agencies that they don't control before bringing an

10   action and saying:  Can we agree that you would give documents,

11   that you would be subject to party discovery in advance?

12       But that's not how the California Constitution works,

13   the Court in *AT&T* said that's not how the federal Constitution

14   works, because the Attorney General is independently elected,

15   does not control these agencies, and has to have the ability to

16   pursue his independent authority to enforce the consumer

17   protection laws.

18       **THE COURT:**  So the virtual veto argument is

19   hypothetical.  In other words, none of the California agencies

20   have refused to cooperate in discovery here; right?

21       **MR. OLSZEWSKI-JUBELIRER:**  None of the California

22   agencies are subject to discovery here.  None of -- no

23   subpoenas have been served on them.  The RFPs --

24       **THE COURT:**  Let me rephrase it.

25       You haven't asked and, therefore, you have no idea whether

1    any of these California agencies would refuse to cooperate

2    voluntarily in discovery; right?

3         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I don't.  But

4    the point is, under *Citric Acid*, just trying to get them to

5    cooperate voluntarily is not enough for control.  We don't have

6    the ability to force them to give us documents.

7         **THE COURT:**  Although if they all voluntarily

8    cooperated, we'd moot this entire dispute; right?

9         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I think that's

10   an important point and one I did want to mention.  We could

11   have mooted this entire dispute if Meta just served Rule 45

12   subpoenas months ago.

13        I do just want to make one point about the practicalities.

14   There is another MDL that's pending currently in the Northern

15   District of California.  That's the In Re Google Play Store

16   Antitrust Litigation.  It's 3:21-MD-2981.  That involves a

17   multistate enforcement action by 37 State Attorneys General.

18   And the same dispute came up in that case.

19        Google, who's the defendant in that case, asked the

20   Attorneys General:  We want to get some information from all

21   your state agencies.  The State Attorneys General had the same

22   position we do here.  Rule 45 is the only appropriate way to do

23   that.  And Google avoided this entire dispute; they went ahead

24   and served their subpoenas.  In that case, they served

25   subpoenas on four California state agencies, including one of

1    the ones that is on Meta's list here, the Department of Public

2    Health.  None of those agencies were represented by the

3    Attorney General's Office in responding to those subpoenas.

4         **THE COURT:**  Well, you heard me ask Meta's counsel, and

5    you should confirm, they voluntarily chose not to serve Rule 45

6    subpoenas and, instead, chose this way.  And everybody is fully

7    aware of the fact discovery cutoffs and deadlines here; and I

8    don't think -- I certainly don't have the power to extend any

9    fact discovery deadlines based on arguments of delay and time

10   taken to enforce subpoenas.  So that's an issue they'd have to

11   take up with Judge Gonzalez Rogers if it became one.

12        But that was their -- that was their choice.  That's why

13   we're here.  So I hear what you're saying, but they've made

14   that tactical choice here, and they may -- if I rule against

15   them, they may live to regret it.

16        Turning to you --

17        **MR. CARPENTER:**  Thank you.

18        **THE COURT:**  -- on that note.

19        **MR. CARPENTER:**  Yes, a good note to turn on.

20        On the virtual veto concern, I think it's sufficiently

21   addressed by the cases we cite in the briefing, like I said

22   before, for the most part.

23        But just to say, once again, a state choosing to decline

24   valid federal discovery orders doesn't do anything to stop the

25   state AG from filing suit in the first place.  And both the AG

1    and Your Honor would have any number of tools to compel

2    compliance.  I also think it would be surprising to me if the

3    California government decided to start doing that, I guess is

4    the way I would put it.

5        On the two federal cases that counsel referenced, I think

6    they speak for themselves.  They didn't employ the legal right

7    to obtain test, and I think that's just there in their text.

8        On the point that we could have mooted it, just to be

9    clear, I mean, we're not dealing with four agencies here.

10   We're dealing with many hundreds because 35 separate

11   Attorneys General brought suit.  But I think what a lot of the

12   cases we've cited show is that third-party discovery is often

13   not an adequate substitute for party discovery, especially in

14   situations like this.

15       Finally, to just return to the virtual veto concern for

16   one second, it doesn't affect -- or at least shouldn't

17   affect the legal right to obtain test, even if the Court were

18   persuaded by it.  It has nothing to do with whether the AG

19   practically can obtain them.

20       To the extent it's a practical concern -- and we don't

21   think it's a concern at all -- we agree it's both

22   speculative and not very -- we agree with the courts that have

23   said it's both speculative and not very persuasive.

24       But to the extent it's a concern and to the extent we're

25   concerned about practicalities, I think what many cases,

including the one that I referenced earlier about the Voting

Rights Act out of Texas, have recognized is that there actually

is a practical problem here; and it would be with states having

the ability to prevent otherwise valid discovery through party

discovery means just by housing those documents in different

agencies, which was the concern in the Voting Rights Act in

Texas.

I think with that, nothing further from us on California.

**THE COURT:** Okay. Yeah. On the -- I just want to --

this is really more of a -- well, maybe it's a question too.

No one's -- I mean, the list of agencies from whom Meta

wants to take discovery, nobody forces you to take discovery

from all of them. That's what you chose; right?

**MR. CARPENTER:** Correct, Your Honor. But I think it's

fair to think that all of them -- we didn't choose every agency

in government. We chose them based on the ones we think may

potentially have relevant information, and I would submit that

we should be able to determine that through the ordinary course

of discovery.

**THE COURT:** I mean, for example, you could have

prioritized -- there was nothing stopping you from serving at

least a few subpoenas to prioritize the agencies you really

wanted to go after first; right? You could have prioritized a

few agencies. In other words, it doesn't have to be done as an

all-or-nothing thing; right?

1          **MR. CARPENTER:**  I think with the number we're dealing

2    with and with the speed of the suit, party discovery is more

3    efficient just as a general matter; and so it made sense that

4    we would do that with this number, given the number of AGs

5    who've sued.

6          **THE COURT:**  You understood you made the tactical

7    choice not to serve the subpoenas, even a subset of the

8    subpoenas that you could prioritize earlier in the case; right?

9          **MR. CARPENTER:**  That's right, Your Honor.

10          **THE COURT:**  Okay.

11          **MR. OLSZEWSKI-JUBELIRER:**  Just one really brief point,

12    Your Honor.

13          The *Google* case that I was referring to, Google -- there's

14    a case management statement where Google, describing its

15    dispute, Google says that they informed the Attorneys General

16    that they were planning to serve over a hundred subpoenas to

17    state agencies immediately after that dispute arose.

18          So I certainly agree with Your Honor's point that they

19    could have served subpoenas on a subset of agencies that they

20    were really interested in getting documents from.  They could

21    have done that while they're still litigating this dispute over

22    who is subject to party discovery.  They made a tactical choice

23    to not go down that route and get that discovery more directly.

24          **THE COURT:**  Yeah.  The only -- I point out, your

25    colleagues may not be happy with you raising an antitrust MDL

 1    case as something to look at when they're trying to distinguish

 2    the *Generic Pharmas* case on that basis.  That was an antitrust

 3    case.

 4         **MR. OLSZEWSKI-JUBELIRER:**  Your Honor, I think the

 5    point I'm trying to make here is just that it's not completely

 6    impractical, in a large enforcement, multistate enforcement

 7    action, to serve subpoenas.  I think the core issue is we don't

 8    have control over these documents.

 9         **THE COURT:**  Anything further on California from either

10    side?

11         **MR. CARPENTER:**  Nothing from Meta.

12         **MR. OLSZEWSKI-JUBELIRER:**  Nothing from the People,

13    Your Honor.

14         **THE COURT:**  All right.  Submitted on California.

15    So, and as I understand it, all the states that have not

16    asked for oral argument are resting on the pleadings; right?

17         **MS. MIYATA:**  That's right, Your Honor.

18    Bianca Miyata from the State of Colorado for the

19    State AGs.

20    However, there are three brief points that the judge --

21    that the Court brought up today and that Meta has had an

22    opportunity to address that I would like to touch on very

23    briefly --

24         **THE COURT:**  Okay.

25         **MS. MIYATA:**  -- with the Court's indulgence.

          **THE COURT:**  Okay.  But Colorado didn't ask for oral

argument.

          **MS. MIYATA:**  That is correct, Your Honor; but these

are directly responsive to, I think, questions that the Court

has posed of my five sister states today.

          **THE COURT:**  I'm teasing.  You can go ahead.

          **MS. MIYATA:**  Thank you.  I appreciate that.

     One question that the Court has asked my colleagues today

is whether or not we represent the client agencies' interests

in this matter.  And when I say "the client agencies," I should

better say the state agencies' interests.

     To provide an abundance of clarity, we do not do so,

either in this dispute or in this action generally.  There are

a couple limited exceptions.  I think my colleague from

New Jersey touched upon the unique relationship with their

Division of Consumer Affairs.  I believe that there is another

state in our coalition, Hawaii, who also has a similar unique

relationship.  But generally speaking, we are not here today to

speak for the state agencies.

     And absent an attorney-client relationship with those

agencies, we do not have an obligation to notify them of

discovery received that may purport to demand their documents.

In fact, it would be improper.

          **THE COURT:**  We'll move to the attorney-client.

          **MS. MIYATA:**  Please.

1          **THE COURT:**  You would agree that the arguments being

2     advanced by the State AGs are aligned with the interests of the

3     state agencies?  Whether they're intended to or not, they are

4     aligned with the interests of the state agencies?

5          **MS. MIYATA:**  Your Honor, I actually could not speak to

6     that.  I am not aware of the priorities advanced by our state

7     agencies, nor am I familiar with their particular clients'

8     goals.

9          **THE COURT:**  Would you admit that the arguments

10    presented by the state AGs, if they prevail, would inure to the

11    benefits of the state agencies?

12         **MS. MIYATA:**  Again, I can't speak to that.  I think

13    that may be true for some agencies, but it may not be true for

14    others.

15         **THE COURT:**  Then why are you fighting if it wouldn't

16    advance any interest?

17         **MS. MIYATA:**  Well, Your Honor, I think we are not in a

18    position to be -- this goes back, I think, to the question of

19    control.

20         And I don't want to belabor the arguments that the Court's

21    already read in briefs and already heard from my colleagues.

22    But the Attorneys Generals' Offices do not have control under

23    *Citric Acid*.  I think you've read, in 35 various single-page

24    letter briefs, that we don't have control over these state

25    agency documents, either under *Citric Acid* or even considering

a practical ability test, which we heard suggested today.

The parties discussed that there are no statutes that grant the Attorney Generals' Offices legal access to those documents and much -- when they represent those client agencies. And there are certainly no statutes that grant the Attorney Generals' Offices access to client agency documents when acting in their separate, independent enforcement capacity, which is something different and delineated in many states by statute. There are these two different ways in which the Attorney General may operate.

**THE COURT:** Okay. So you said something that, again, I -- you said that there's no statute that grants the AGs' counsel's access to documents, even when they represent those client agencies.

**MS. MIYATA:** I think -- if I may restate what I believe I said.

I don't believe that there are statutes that grant the Attorney Generals' Offices legal access to the documents, by which I mean access upon demand. While the attorneys who represent those clients may certainly advise their clients about what to produce, there's a difference between that and the Attorney General, when acting in its separate enforcement capacity of the consumer protection laws, having the legal right to demand production of those documents from client agencies.

1          **THE COURT:**  So just so I'm clear, because we had this

2     discussion with your colleague for California --

3          **MS. MIYATA:**  Correct.

4          **THE COURT:**  -- when, hypothetically, an

5     Attorney General is representing an agency in federal court, do

6     not the Federal Rules of Civil Procedure give the

7     Attorney General the legal basis to get documents from their --

8     in that hypothetical, the state agency client?

9          **MS. MIYATA:**  I would say that the Rules of Civil

10    Procedure give that attorney the very serious obligation to

11    advise and guide the client as to what their obligations are

12    under the Federal Rules of Civil Procedure and to engage with

13    the Court with candor about the extent to which those

14    conversations have taken place.

15        I would not agree that the attorney has the independent

16    ability to somehow retrieve those documents from the client

17    against the client's will, should that situation ever

18    transpire, which we hope it does not.

19         **THE COURT:**  But, again, the purpose of the Court's

20    enforcement procedures or enforcement powers in that case is to

21    vindicate the attorney's right to go in and get the documents.

22         **MS. MIYATA:**  Your Honor, respectfully, I would see

23    that rule and its purpose perhaps a little bit differently.

24        My understanding is that the purpose of that rule is to

25    ensure that the party can engage in litigation and fulfill its

1   obligations, not necessarily to vindicate the attorney's

2   particular relationship or role when it comes to the client.

3       And that is not to make light of the attorney's very

4   serious obligation and role that they play in this system of

5   counseling the client, vigorously -- vigorously persuading the

6   client about what the client's obligation is to provide those

7   documents.

8       But ultimately, the decision as to how to comply with

9   those rules and to what extent the client wishes to produce

10   documents remains the client, as we are the adviser and the

11   guide.  We do not serve in the client's stead.

12         **THE COURT:**  Well, I mean, again, we serve as the

13   adviser and guide.  We do not serve what?  In the client's?

14         **MS. MIYATA:**  I would hesitate to say that as -- I

15   don't think that as a -- when I serve as the representative of

16   a client, I do not direct or control that client.  I advise

17   that client as to their obligations under the rules of

18   this Court and the law.

19         **THE COURT:**  You don't think, as a litigation counsel,

20   you have no legal ability to get documents from your client in

21   response to discovery?

22         **MS. MIYATA:**  I do not believe that I have legal

23   control under *Citric Acid* over my client.

24       Of course -- and I will point out, that being a

25   hypothetical, because in this capacity I represent the state's

1　enforcement arm; I am not representing a client agency.

2　　　　**THE COURT:**  All right.  Well, I understand your

3　arguments.  I already made clear my views on this when I spoke

4　with your colleague for California.  So, go ahead.

5　　　　**MS. MIYATA:**  Thank you, Your Honor.

6　　　If I may turn to another point, Meta -- I think there have

7　been questions brought up during the course of these arguments

8　regarding cases where courts have held that Attorney General

9　Offices may have had control over agency documents.  And I'd

10　just like to highlighting that those are different cases with

11　different facts where agencies were involved in a way that

12　nobody has alleged here.  It's not in the complaint.  It's not

13　something Meta has alleged.

14　　　And I want to turn back to some of the comments that were

15　made about those particular documents when you inquired of Meta

16　about whether it was entitled to Rule 34 discovery.  And they

17　said:  Well, you know, there may potentially be some relevant

18　information that the agencies might know about that the

19　Attorney Generals' Offices, you know, may have considered in

20　drafting their complaint.

21　　　That's not sufficient under Rule 34 here.  Just because

22　Meta is curious about what agencies may have known is not

23　enough to get over that bar.

24　　　And I just want to point the Court back to its order in

25　February.  I think, as the Court's well aware, the parties have

1    been discussing this issue for the past four or five months

2    now.  And back in February, the Court noted that party

3    discovery couldn't be had of agencies that the Attorney

4    General Office didn't represent acting in its enforcement

5    capacity.

6         And that remains true these many months later.  So we ask

7    the Court to consider that in entering its ruling today.

8              **THE COURT:**  Okay.

9              **MR. HALPERIN:**  I'll be brief, Your Honor, and I'll

10   address both points.

11        First, with respect --

12             **THE COURT:**  For the record, enter your appearance.

13             **MR. HALPERIN:**  I apologize, Your Honor.  Greg Halperin

14   from Covington & Burling on behalf of Meta.

15        I'll start with the point that's been raised again and

16   again through the five individual states and again here, that

17   the AGs don't have an ability to get documents from the

18   agencies.

19        *U.S. vs. AT&T*, it's 461 F.Supp. at 1334, Note 58,

20   expressly rejected that argument, saying, quote (as read):

21             ". . . defendants have even less influence over

22        the agencies, and as the entities which have been

23        sued, they are entitled to their discovery rights

24        irrespective of the effect on inter-departmental

25        relationships."

1      That's the exact retort to the argument we've heard again

2  and again, that the AGs don't have an ability with the Court's

3  order to get the documents.  We, as Meta, have even less of an

4  ability.

5      Turning to the second argument, this idea that all we want

6  is curiosity over the documents and that somehow antitrust

7  cases are different from this one.  To be sure, the AGs have

8  not brought suit on behalf of agencies; they're not seeking

9  damages on behalf of agencies.  But that doesn't make the

10  discovery we're seeking any less relevant or entitle us to it

11  any less.

12      At paragraph 508 of their complaint, the AGs say that (as

13  read):

14          "Increased use of social media platforms,

15      including those operated by Meta, result in physical

16      and mental health harms, particularly for young

17      users."

18  We're seeking discovery from the physical and mental

19  health agencies of the states.

20      At paragraph 315 (as read):

21          "By sending notifications to young users, Meta

22      causes young users' smartphones to produce

23      audiovisual and haptic alerts that distract them and

24      interfere with young users' education and sleep."

25  We're seeking discovery from the Departments of Education.

1       On and on through their complaint, the allegations that

2   the states are making here put squarely at issue, just like

3   they did in the antitrust cases, the discovery we're seeking

4   from these agencies.  So we just don't think it's relevant that

5   this isn't an antitrust case.

6       **THE COURT:**  Okay.  Everybody agrees relevance of the

7   discovery is not germane to the control issue under

8   *Citric Acid*, though; correct?

9       **MR. HALPERIN:**  Absolutely, Your Honor.

10      **MS. MIYATA:**  That's right, Your Honor, without

11  prejudice to being later -- being able to later raise that

12  objection.

13      **THE COURT:**  Not in front of me today for the purpose

14  of this --

15      **MS. MIYATA:**  Correct.

16      **THE COURT:**  -- current dispute; right?

17      Okay.  Anything further from the states or Meta?

18      **MS. MIYATA:**  One thing in response to paragraphs 508

19  and 315, Your Honor, and then we'll rest, which would be that

20  the fact that the States -- the State Attorneys General have

21  alleged harm to consumers and that those consumers may

22  ultimately be serviced by particular state agencies doesn't

23  necessarily mean that the State Attorneys General are alleging

24  harm to those agencies.

25      And that's a critical distinction here that also goes to

1   the very purpose and the heart of the Consumer Protection Act.

2   We are allowed, in our protective capacity, to allege harms to

3   individuals, and those harms may take various forms.

4          **THE COURT:**  Anything further?

5          **MR. HALPERIN:**  No, Your Honor.

6          **THE COURT:**  All right.  I want to thank you all,

7   counsel, for a very long argument today.

8      I want to thank Madam Court Reporter for putting up with

9   us as well.

10      And I want to commend -- I think at least one counsel here

11   is a fairly junior attorney, and I want to commend everyone,

12   but particularly that lawyer, for a job well done and well

13   presented.

14      So thank you all for today, and an order will issue in due

15   course.

16          **MS. MIYATA:**  Thank you, Your Honor.

17          **MR. HALPERIN:**  Thank you, Your Honor.

18          **THE CLERK:**  We're off the record in this matter.

19   Court is in recess.

20            (Proceedings adjourned at 4:37 p.m.)

21                ---o0o---

22

23

24

25

1

2                          <u>**CERTIFICATE OF REPORTER**</u>

3              I certify that the foregoing is a correct transcript

4       from the record of proceedings in the above-entitled matter.

5

6       DATE:  Wednesday, May 8, 2024

7

8

9

10      _____

11              Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
           CSR No. 7445, Official United States Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25