UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Filing Relates to:<br><br>*All Actions* | MDL No. 3047<br><br>Case Nos.: 4:22-md-03047-YGR-PHK<br><br>**JOINT LETTER BRIEF REGARDING THE APPROPRIATE NUMBER OF CUSTODIANS AS TO SNAP INC.**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

Dear Judge Kang:

Pursuant to the Court's Standing Order for Discovery in Civil Cases, the PI/SD Plaintiffs and Defendant Snap Inc. respectfully submit this letter brief regarding a dispute concerning the appropriate number of custodians for Snap Inc.

Pursuant to the Discovery Standing Order and Civil Local Rule 37-1, the Parties attest that they repeatedly met and conferred by video conference, correspondence, and telephone before filing this brief. The final conferral was held on May 10, 2024 via videoconference and was attended by lead trial counsel for the Parties involved. Lead trial counsel have concluded that no agreement or negotiated resolution can be reached.

Dated: May 23, 2024

Respectfully submitted,
*/s/ Lexi J. Hazam*
LEXI J. HAZAM
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-339
Telephone: 415-956-1000

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

CHRISTOPHER A. SEEGER

i

**SEEGER WEISS, LLP**
55 Challenger Road, 6th floor
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656
cseeger@seegerweiss.com

Counsel to Co-Lead Counsel and Settlement Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: 415-986-1400
jenni@andrusanderson.com

Liaison Counsel

JOSEPH G. VANZANDT
**BEASLEY ALLEN CROW METHVIN PORTIS & MILES, P.C.**
234 Commerce Street
Montgomery, AL 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
220 W. Garden Street, 9th Floor
Pensacola, FL 32502
Telephone: 850-316-9100
ejeffcott@forthepeople.com

Federal/State Liaison Counsel

MATTHEW BERGMAN
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**

700 Broadway
New York, NY 10003
Telephone: 212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
Telephone: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 Madison Ave, 7th Floor
New York, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY, PSC**
2380 Grandview Drive
Ft. Mitchell, KY 41017
Telephone: 888-606-5297
semery@justicestartshere.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
Telephone: (646) 666-8908
carrie@cagoldberglaw.com

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY, PSC**
600 West Main Street, Suite 100

Louisville, KY 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th floor
New York, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212.213.8311
hnappi@hrsclaw.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, P.C.**
1500 Rosecrans Ave., Ste. 500
Manhattan Beach, CA 90266
Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

MELISSA YEATES
JOSEPH H. MELTZER
**KESSLER TOPAZ MELTZER & CHECK,
LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com
jmeltzer@ktmc.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205.855.5700
fu@dicellolevitt.com

*Attorneys for Plaintiffs*

/s/   Jonathan H. Blavin
Jonathan H. Blavin (SBN 230269)
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
Email: jonathan.blavin@mto.com

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: rose.ehler@mto.com
Email: victoria.degtyareva@mto.com
Email: Ariel.Teshuva@mto.com

Lauren A. Bell (*pro hac vice*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300
Email: lauren.bell@mto.com

*Attorneys for Defendant Snap Inc.*

**Plaintiffs' Position:** The Court should order Snap to provide 54 custodians. Snap instead proposes a total of 21 custodians—not because they are the only current or former employees who are likely to have relevant documents, but because Snap claims it is "smaller" than its co-defendants and should therefore produce fewer custodial files. Snap is not only one of the largest corporations in the world—with thousands of employees and a market cap of $27 billion—but its position is also divorced from the merits of the case. *See Kear v. Kohl's Dept. Stores, Inc.*, 2013 WL 3581671, at *3 (D. Kan. July 12, 2013) ("the size of a company is insufficient" to evade its discovery obligations). Here, Plaintiffs have demonstrated that the individuals identified are "reasonably likely to have relevant data and information in their custodial files," *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2019 WL 5388523, at *1 (N.D. Fla. Oct. 22, 2019), and absent their inclusion, there will be significant gaps in Snap's production.

Snap has forced Plaintiffs to identify custodians using extremely limited information; Snap has produced fewer than 1,000 documents to date (every other defendant has produced 20,000 or more) and until it produced its lit hold, Plaintiffs were not even aware of numerous roles within the company.[1] The parties met and conferred multiple times in an effort to reach agreement, but Snap has largely been unwilling to compromise, insisting that Plaintiffs accept its hand-picked custodians and refusing to budge above an arbitrary cap that, if accepted by the Court, would mean Snap is (i) providing 100 fewer custodians than Meta (127) and 35 fewer custodians than TikTok (56). Snap initially proposed 15 custodians, which it referred to as a "preliminary list."[2] Plaintiffs responded with a detailed letter identifying 23 additional custodians and the relevant information those custodians would provide. Snap agreed to accept 1 of Plaintiffs' suggestions and rejected the rest. Nonetheless, in an effort to compromise, Plaintiffs offered to remove 19 (of the 23) custodians but identified 20 others who would fill relevant gaps based on a review of Snap's litigation hold and testimony provided by Snap's 30(b)(6) witness on corporate structure, for a total of 45 custodians.[3] Snap again rejected all of Plaintiffs' proposals except D.L. (Appendix, Row 14).[4]

Snap's 30(b)(6) witness identified 12 core "function areas" within the company, including Engineering, Research (which includes user-modeling and personalization research), Product & Design (including Data Science), Communications, Global Security, Marketing, and Sales. Highly relevant Teams exist within certain of these function areas, such as Growth (divided among Core

---

[1] Snap placed 263 individuals on litigation hold, meaning it is proposing to provide 6% of its lit hold list as custodians.

[2] Snap initially indicated it would add to this "preliminary list" as RFPs were negotiated, but it now is proposing a final list of 19 custodians, despite the parties continuing to negotiate RFPs.

[3] Snap claims that Plaintiffs never proposed 54 custodians during conferrals and "assume[s]" Plaintiffs are only doing so now to drive up the overall number. But this is untrue; Plaintiffs identified custodians and were willing to forego some if Snap was willing to compromise on others. Because Snap has been wholly unwilling to compromise, Plaintiffs are seeking all of the individuals they have identified who are likely to possess relevant information.

[4] D.L. is the Senior Director of Snap's Growth Team, a department Snap never identified and Plaintiffs only learned about through Rule 30(b)(6) testimony. This demonstrates why Plaintiffs should not be saddled with Snap's hand-picked custodians. Because Snap has provided so little discovery to date, it is likely there are other key individuals Snap has not identified and Plaintiffs will not identify until they receive responsive document productions.

1

Growth, Growth, and Growth Analytics) and Product Management (with a Product Manager for each Named Feature). Snap identifies **no custodians** in Engineering, Product Design, Research (except one Product Researcher, who is in a different department), Data Science, Marketing, Sales, or from the Growth Analytics team. It identifies a single, high-level Product Management custodian (D.B.) who it claims is responsible for nearly all the Named Features, rejecting Product Managers (PMs) who worked directly with several features.

Snap's position is based on an arbitrary cap, not the facts of the case.[5] *See Sprint v. Comcast*, 2014 WL 1794552, at *5 (D. Kan. May 6, 2014) (a party's "unilateral[] and apparently arbitrary[] dermin[ation]" of a fixed number of custodians" is "clearly unreasonable" and fails to satisfy its discovery obligations."). Snap previously agreed to provide K.Z., its Advertising Product Manager, after agreeing to produce documents relating to certain advertising RFPs; it has since reneged on that agreement and removed K.Z. from its proposed list. Snap also previously agreed to identify and produce a marketing custodian, but its proposed list contains none. And Snap agreed to produce custodial files of Snap engineers if Plaintiffs agreed to reduce the number of such files requested. Plaintiffs complied, and Snap still refused to add any engineers.[6] Snap also claims that the average custodian it proposes has a tenure of six years, but this is misleading. The majority of custodians identified have not served in the relevant position for more than 2-3 years, meaning their custodial files are unlikely to contain much relevant historical information. For this reason, several of Plaintiffs' proposed custodians have longer tenure with the company, even if some positions overlap with those with shorter tenures. Indeed, Snap has identified a single custodian whose tenure spans the Relevant Time Period proposed by Snap (Jan. 2015 – Feb. 2023); Snap has rejected every custodian except one whose employment pre-dates 2015.

**Growth:** The Growth Team develops, designs, and implements critical features and strategies driving user engagement and retention, including: paid growth initiatives, registration and age verification, recommendation systems, story posting and viewing functionalities, and notification systems. The Growth Team is comprised of Growth, Core Growth Team, and an Analytics Team. Snap has proposed D.L., Director of Growth and one other custodian from the Growth Team, C.C. Snap proposes no custodians from the Growth Analytics Team.

**Engineering, and Marketing:** Essential custodians include those engaged in marketing, content, and engineering who design and implement key features like machine learning models, recommendation systems, user behavior analysis, and technical tradeoff evaluations. Despite this clear relevance, Snap refuses to provide *a single* engineering custodian. Snap's claim that engineers possess only highly technical documents is flawed, as evidenced by the other Defendants' productions where engineers have provided some of the most relevant documents. Equally critical

---

[5] Snap argues that it is a fraction of the size of TikTok, which agreed to produce 56 custodians. First, TikTok's agreement is three times as many custodians as Snap has proposed. Second, Tik Tok has only 8,000 employees in the US and nearly all of the agreed-to custodians are US employees. Further, TikTok has produced over 50,000 documents, allowing Plaintiffs to reach their own conclusions about who should properly serve as a custodian in the case. TikTok has also agreed to permit Plaintiffs to identify six additional custodians after further document review, something Snap has not agreed to do.

[6] According to Snap's 2023 10-K, over 50% of its workforce are engineers.

2

to this case are Snap's marketing and advertising strategies, which deliberately target children and induce compulsive use to boost its revenue. As set forth above, Snap has provided no marketing or advertising custodian.

**Product Management and Design:** Snap's claim that Plaintiffs' product custodians, who worked on the Named Features, are duplicative of D.B. is refuted by Snap's own admissions; Snap proposes product managers working on certain Named Features (A.T., Family Center; C.C., age verification), but claims others are redundant of D.B. (D.L., age inference; M.A., lenses; I.A., Snap Score and Streak). Snap's "cumulative" objection to adding proposed custodians rests only on vague assertions of overlap, without substantive evidence. The mere fact that individuals are in the same department does not disqualify them as relevant custodians. *See Shenwick v. Twitter, Inc.*, 2018 WL 833085, at *1 (N.D. Cal. Feb. 7, 2018).

**User Experience, Modeling, and Personalization Research**: Snap's offer of a single "product researcher" (M.H.) is inadequate. This excludes the Data Science Team, which Snap's 30(b)(6) witness identified as critical for utilizing user data to inform business decisions, and the separate Research department that focuses on user modeling for personalized end-user experiences. Snap inconsistently argues that custodians from the Research Department and Data Science Team are duplicative despite organizational charts showing their distinct roles.

**Snap's Position**

Snap, at 5,000 employees, is less than a tenth the size of the next largest defendant, Meta (at 67,000 employees). TikTok and Google/YouTube have about 150,000 and 190,000 employees, respectively. Plaintiffs seek 54 custodians from Snap. That is almost the number of custodians (56) Plaintiffs have agreed to for TikTok (which is 30 times Snap's size) and close to the 69 custodians that Plaintiffs are seeking from YouTube/Google (almost 40 times Snap's size). It is also nearly half what Plaintiffs have agreed to for Meta, which has more than ten times the number of employees across two platforms. If the other defendants had proportionately as many custodians as Plaintiffs are demanding of Snap, Google/YouTube would have more than 2,000; TikTok would have 1,680; and Meta would have 750. But Snap is not suggesting, as Plaintiffs contend, that "the size of the company" is an excuse to avoid its discovery obligations. Snap's point is a practical one: the universe of relevant documents is smaller at a company where fewer people work. Snap has smaller teams with fewer people working on the relevant features and issues than its co-defendants, and its list of custodians should reflect that.

To that end, Snap has offered a comprehensive proposal on custodians that includes 21 current and former employees who have worked across the relevant issues in this case. The proposal includes top-level executives and vice presidents, directors, senior managers, and other key decision-makers who have played central roles in user safety, development and management of the accused features, and other issues central to Plaintiffs' claims and Snap's defenses. As the scope of the relevant issues has crystallized over the course of RFP negotiations, Snap agreed to add some now-relevant custodians (e.g., D.L.) and removed others (e.g., G.W., K.Z.) for whom broad custodial searches are not warranted. Snap also agreed to custodians (including its co-founder and CEO) that it maintained, and continues to maintain, are inappropriate, in an effort to avoid this dispute. Instead of accepting these compromises, Plaintiffs now seek 33 additional

3

custodians that are, at best, a hodgepodge of largely duplicative or tangentially relevant individuals. They seem to be targeting an arbitrarily high number of custodians, rather than ensuring substantive coverage of the issues relevant to claims and defenses in this litigation.[7]

**Snap's Comprehensive Proposal Includes Custodians Who Possess Relevant Information Across All of the Relevant Issues.**

Producing parties are "best situated to evaluate the procedures [and] methodologies" for "producing their own electronically stored information."' *Weinstein v. Katapult Grp., Inc.*, 2022 WL 4548798, at *2 (N.D. Cal. Sept. 29, 2022) (quoting *The Sedona Principles*, Third Edition, 19 SEDONA CONF. J. 1, Principle 6, 118 (2018) ["Sedona Principle 6"]). That is so because it is the "responding party" who "must make decisions on what is required to meet its . . . production obligations based on direct input from those inside the organization who create, receive, and store their own information (i.e., individual custodians) . . . Rarely will a court or opposing party have direct access to the specific knowledge required to make those decisions." Sedona Principle 6 cmt. 6.a. Indeed, Plaintiffs acknowledge that they have made their requests based on "extremely limited information."[8] Snap investigated Plaintiffs' claims and has proposed 21 individuals whose Snap tenure is, on average, more than six years and who cut across numerous departments. They provide full custodian coverage for the areas of relevant discovery.

Accused Features: Snap has proposed five key product managers (PMs) who are responsible for feature development from conception to deployment. They serve as the hubs that centralize discussions among the design, policy, safety, legal, engineering, and growth teams. Snap has included N.F.Y., a leader on Snap's product design team who brings a safety perspective to all aspects of feature development, and D.O., who reviews new lenses for safety issues. Snap's list also includes a product executive, D.B., who supervises nearly a dozen PMs covering most features, as well as PMs like C.C., M.W., and D.M.S. That is more than sufficient. *See Lauris v. Novartis AG*, 2016 WL 7178602, at *4 (E.D. Cal. Dec. 8, 2016) (a party need not "examine every document in its voluminous files to comply with discovery obligations," need only develop a reasonably comprehensive strategy such as identifying "key" employees); *Handloser v. HCL Am., Inc.*, 2020 WL 7405686, at *2 (N.D. Cal. Dec. 17, 2020) (denying request to add custodians where producing party agreed to include relevant department heads).

Safety: In addition to N.F.Y. and D.O., Snap has proposed more than half a dozen custodians who work on safety issues as senior executives and directors across multiple relevant departments, including Trust & Safety, which handles user reports; Product Management; Communications; and Policy. Snap's list includes *ten* members of the cross-functional safety

---

[7] Indeed, the 54 total custodians Plaintiffs now seek is more than Plaintiffs sought at any point during the parties' negotiations. Before the parties' last meeting, Plaintiffs proposed 45 custodians, and seemed willing to withdraw some. Snap can only assume this number is designed to maximize the number of disputed custodians in hopes that this Court will 'split the baby.'

[8] Plaintiffs complain about the current status of Snap's document productions but Snap has made 11 productions to date (comprising 923 documents and almost 5,000 pages) and faithfully complied with the Court's schedule. Plaintiffs also ignore that Snap is one of only two defendants to have produced a witness on its organizational structure.

team ("Safety XFN"), whose work spans nearly every department and touches safety issues across Snapchat, ensuring Plaintiffs receive a broad swath of relevant discussions on safety. Growth: Snap has included its Senior Director of Growth (D.L.), a member of the Core Growth Team (C.C.), and the manager of the Product Growth Team (D.B.). Internal Research and Analyses: Snap has proposed its long-time Senior Manager of Product Research, M.H., as well as the leader of its consumer insights research team, L.S. Snap will also run search terms against the Product Research team's shared GDrive. Marketing: Snap is willing to confer with Plaintiffs about targeted searches but does not believe custodial searches—particularly with the broad searches Plaintiffs have suggested—are appropriate for this category of information.

**Plaintiffs' Custodians Are Not Efficiently Tailored to Provide Relevant Discovery.**

With its 55-custodian list—it bears repeating, almost the same number Plaintiffs have agreed to with respect TikTok at nearly 30 times Snap's size—Plaintiffs fail to recognize that even relevant discovery must yield to considerations of proportionality and burden, as the authority they rely on (but fail to faithfully quote) recognizes. *See In re 3M Combat Arms*, 2019 WL 5388523, at *1 (noting that "the inclusion of these additional custodians is *proportional to the needs of the case*" (emphasis added)). Given Snap's proportionately much smaller size and the important and central roles of the custodians Snap has proposed, Plaintiffs' additional custodians work on largely either irrelevant or only tangentially relevant issues, such that search terms—which the parties are still negotiating but which Plaintiffs currently insist include extremely broad standalone terms like "student" and "preteen"—are going to hit on large volumes of documents that are not relevant to the issues in this case.

As the Court well knows, discovery is not a fishing expedition and Plaintiffs are not entitled to discovery from Snap's core function areas that have nothing to do with Plaintiffs' claims. It is Plaintiffs' burden to show "good cause to compel designation of additional document custodians," which requires a demonstration that each of Plaintiffs' proposed additional 33 custodians possess "uniquely relevant information that is not available from the sources" Snap has already designated and that the inclusion of each custodian is proportional to the needs of the case.  *In re Facebook, Inc. Consumer Priv. User Profile Litig.*, 2021 WL 10282213, at *14 (N.D. Cal. Nov. 14, 2021). As detailed in the attached chart, some of Plaintiffs' custodians work on irrelevant issues, like the technical feasibility of conceptual designs. For others, like data scientists, any relevant information can be more efficiently obtained via targeted collections. Still others, like Plaintiffs' lengthy list of engineers, are likely to pull in large volumes of technical discussions that Plaintiffs have acknowledged they do not want. For that reason, Snap's proposed Growth custodians (C.C. and D.L) are going to have more relevant and useful documents than the engineers on the "Core Growth" team. And contrary to Plaintiffs' assertion that Snap excluded all engineers, Snap agreed to include its Director of Security Engineering (J.B.), who manages Snap's safety infrastructure and serves on the Safety XFN.

5

## **ATTESTATION**

I, James J. Bilsborrow, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: May 23, 2024

By: <u>/s/ James J. Bilsborrow</u>