UNITED STATES DISTRICT COURT                    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Further Case Management/** |
| ADOLESCENT ADDICTION/ | ) | **Motions** |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 130 |
| | ) | |
| _____ | ) | Oakland, California |
| | | Friday, May 17, 2024 |

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

APPEARANCES:

For Plaintiffs:           Lieff, Cabraser, Heimann &
                          Bernstein
                          275 Battery Street, 30th Floor
                          San Francisco, California  94111
                   BY:    LEXI J. HAZAM,
                          MICHAEL LEVIN-GESUNDHEIT,
                          PATRICK I. ANDREWS, ATTORNEYS AT LAW

                          Seeger Weiss LLP
                          55 Challenger Road, Sixth Floor
                          Ridgefield Park, New Jersey  07660
                   BY:    CHRISTOPHER A. SEEGER,
                          AUDREY SIEGEL, ATTORNEYS AT LAW

                   (Appearances continued next page)

Reported By:        Raynee H. Mercado, CSR No. 8258

    Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

## A P P E A R A N C E S (CONT'D.)


For Plaintiffs:          Motley Rice LLC
                         401 9th Street NW Suite 630
                         Washington, DC  20004
                 BY:  PREVIN WARREN, ATTORNEY AT LAW

                         Motley Rice LLC
                         28 Bridgeside Boulevard
                         Mt. Pleasant, South Carolina  29464
                 BY:  JADE A. HAILESELASSIE, ATTORNEY AT LAW

                         Andrus Anderson LLP
                         155 Montgomery Street, Suite 900
                         San Francisco, California  94104
                 BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW

                         Beasley Allen Crow Methvin Portis &
                            Miles, P.C.
                         218 Commerce Street
                         Montgomery, Alabama  36103
                 BY:  CLINT RICHARDSON,
                         DAVIS S. VAUGHN, ATTORNEY AT LAW

                         Social Media Victims Law Center
                         821 Second Avenue, Suite 2100
                         Seattle, Washington  98104
                 BY:  GLENN DRAPER, ATTORNEY AT LAW

                         Gibbs Law Group
                         1111 Broadway, Suite 2100
                         Oakland, California  94607
                 BY:  ANDRE MURA, ATTORNEY AT LAW

                         Kessler Topaz Meltzer Check LLP
                         280 King of Prussia Road
                         Radnor, Pennsylvania  19087
                 BY:  TYLER S. GRADEN,
                         MELISSA L. YEATES, ATTORNEY AT LAW

                         Levin Sedran and Berman LLP
                         510 Walnut Street, Suite 500
                         Philadelphia, Pennsylvania  19106
                 BY:  MICHAEL M. WEINKOWITZ, ATTORNEY AT LAW

**A P P E A R A N C E S (CONT'D.)**

```
For Plaintiffs:          Carella Byrne Cecchi Brody &
                           Agnello, P.C.
                         5 Becker Farm Road
                         Roseland, New Jersey  07068
                     BY: MICHAEL INNES, ATTORNEY AT LAW


For Plaintiff State      California Department of Justice
of California:           1515 Clay Street, 20th Floor
                         Oakland, California  94612-0550
                     BY: JOSHUA E. OLSZEWSKI-JUBELIRER,
                           DEPUTY ATTORNEY GENERAL


For Plaintiff Colorado:  Colorado Department of Law
                         1300 Broadway, 6th Floor
                         Denver, Colorado  80203
                     BY: BIANCA MIYATA,
                           SENIOR ASSISTANT ATTORNEY GENERAL
                         ELIZABETH OREM,
                           ASSISTANT ATTORNEY GENERAL

For Plaintiff            Office of the Kentucky Attorney
Commonwealth of           General
Kentucky:                Consumer & Senior Protection
                         1024 Capital Center Drive, Suite 2000
                         Frankfort, Kentucky  40601
                     BY: CHRISTIAN LEWIS, COMMISIONER
                         DANIEL KEISER, Assistant Attorney
                           General
```

**A P P E A R A N C E S (CONT'D.)**

```
For the Meta          Covington & Burling LLP
Defendants:           One City Center
                      850 Tenth Street, NW
                      Washington, DC  20001-4956
                 BY:  MICHAEL X. IMBROSCIO,
                      CHRISTIAN J. PISTILLI,
                        ATTORNEYS AT LAW


                      Covington & Burling LLP
                      1999 Avenue of the Stars, Suite 3500
                      Los Angeles, California  90067
                 BY:  ASHLEY SIMONSEN, ATTORNEY AT LAW


                      Covington & Burling LLP
                      Sales Force Tower
                      415 Mission Street, Suite 5400
                      San Francisco, California  94111-5356
                 BY:  ISAAC D. CHAPUT, ATTORNEY AT LAW



For Defendant Snap    Munger, Tolles & Olson
Inc.:                 560 Mission Street, 27th Floor
                      San Francisco, California  94105
                 BY:  JONATHAN H. BLAVIN, ATTORNEY AT LAW



For Defendant TikTok  King & Spalding LLP
Inc.; ByteDance, Inc.: 1180 Peachtree Street, N.E.
                      Suite 1600
                      Atlanta, Georgia  30309-3521
                 BY:  GEOFFREY M. DRAKE, ATTORNEY AT LAW


                      King & Spalding LLP
                      1700 Pennsylvania Avenue NW
                      Suite 900
                      Washington, D.C.  20006
                 BY:  DAVID P. MATTERN, ATTORNEY AT LAW



                      Faegre Drinker Biddle & Reath LLP
                      300 North Meridian Street, Suite 2500
                      Indianapolis, Indiana  46204
                 BY:  ANDREA PIERSON, ATTORNEY AT LAW
```

## A P P E A R A N C E S (CONT'D.)


```
For Defendant YouTube    Wilson Sonsini Goodrich & Rosati
Inc.:                    633 West Fifth Street, Suite 1550
                         Los Angeles, California  90071
                    BY:  MATTHEW K. DONOHUE, ATTORNEY AT LAW

                         Morgan Lewis Bockius
                         300 S. Grand Avenue, 22nd Floor
                         Los Angeles, California  90071
                    BY:  YARDENA R. ZWANG-WEISSMAN,
                           ATTORNEY AT LAW

                         Williams & Connolly LLP
                         725 Twelfth Street NW
                         Washington, DC  20005
                    BY:  ASHLEY W. HARDIN, ATTORNEY AT LAW
```


--oOo--

```
 1   Friday, May 17, 2024                            7:59 a.m.
 2                   P R O C E E D I N G S
 3                        --o0o--
 4
 5       THE CLERK:  Good morning, everyone.  These
 6   proceedings are being court-reported by this court.  Any other
 7   recording of this proceeding either by video, audio, including
 8   screenshots or other copying of the hearing is strictly
 9   prohibited.
10       Your Honor, now calling the civil matter 22-MD-3047-YGR,
11   In Re Social Media Adolescent Addiction Personal Injury
12   Products Liability Litigation.
13       Appearances for today's hearing will be added onto the
14   minutes and transcript.
15       Good morning.
16       THE COURT:  All right.  Thank you.  Good morning.
17       Okay.  Let's get our plan together for today.  If I could
18   have one from each side on the mic, and we'll go through.
19   There are a number of just case management issues that we need
20   to deal with in addition to the argument.
21       So with respect to case management, who will be dealing
22   with those topics?
23       MR. WARREN:  Previn Warren for the personal injury
24   school district plaintiffs.
25       MS. SIMONSEN:  Your Honor, a number of us from the
```

1    defense side, but I can begin.

2        Ashley Simonsen, Covington & Burling, for the Meta

3    defendants.

4            **THE COURT:** Okay.  And then with respect to the

5    argument, have you all met and conferred on the outline of

6    topics?  Or if not we can just go -- I can go through and

7    identify them.  Or is there just going to be one arguing?

8            **MR. WEINKOWITZ:** Good morning, Your Honor.

9                (Discussion off the record.)

10            **MR. WEINKOWITZ:** Yes, I'm sorry.

11        Mike Weinkowitz on behalf of the school district

12    plaintiffs.

13        We made a proposal to the defendants, but the defendants

14    thought we would just defer to how you would want to proceed,

15    which is fine with us.

16        My proposal would be -- the plaintiffs' proposal we do

17    nuisance first, negligence second.  We can do derivative

18    injury and proximate cause after that.

19        And then if you need to hear on First Amendment and 230,

20    which we --

21            **THE COURT:** Well, we decided we were not --

22            **MR. WEINKOWITZ:** Right.

23            **THE COURT:** -- doing that --

24            **MR. WEINKOWITZ:** Correct.

25            **THE COURT:** -- so we're not doing that.

```
 1              MR. WEINKOWITZ:  Great.

 2              MS. HARDIN:  Ashley Hardin for the defendants, Your

 3   Honor.

 4         That order is acceptable to the defense.

 5         And I'm happy to tell you who's going to cover what if

 6   you'd like to hear that, or we can save that for when the time

 7   comes.

 8              THE COURT:  Okay.  Well, I'm going to flip them.  So

 9   I'd like to discuss the threshold issues first, so derivative

10   injury rule and then proximate cause.

11         Who will be doing those?

12              MR. WEINKOWITZ:  Those will be handled for the

13   plaintiff by Andre Mura, M-U-R-A.

14              THE COURT:  And for the defense?

15              MS. HARDIN:  That will be Christian Pistilli from

16   Covington & Burling, who represents the Meta defendants.

17              THE COURT:  Okay.  And they'll be doing both?

18              MS. HARDIN:  Both.

19              THE COURT:  Okay.  And then moving to public

20   nuisance?

21              MR. WEINKOWITZ:  For the plaintiffs, I'll be covering

22   that.

23              MS. HARDIN:  I'll be covering that, Your Honor,

24   Ashley Hardin from Williams & Connolly on behalf of the

25   YouTube defendants.
```

```
 1                THE COURT:  Okay.  And then negligence.
 2                MR. WEINKOWITZ:  Melissa Yeates will be handling
 3       negligence for the plaintiffs, Y-E-A-T-E-S.
 4                MS. HARDIN:  That's David Mattern from King &
 5       Spalding, who represents the TikTok defendants.
 6                THE COURT:  All right.  Anything I missed?
 7                MR. WEINKOWITZ:  No, that's it.  Thanks.  That's it,
 8       Your Honor.
 9                MS. HARDIN:  That's it, Your Honor.
10                THE COURT:  Okay.  All right.  Let's go ahead and
11       deal with the case management issues first.
12           Let's start with the plaintiffs' administrative motion
13       with respect to the bellwether user data and account
14       information.  This is at Docket 843.
15                MR. CHAPUT:  Good morning, Your Honor.  Isaac Chaput,
16       Covington & Burling, for the Meta defendants.
17                MR. WARREN:  And Previn Warren for the personal
18       injury school district plaintiffs.
19                THE COURT:  Okay.  So there are problems with
20       plaintiffs meeting my deadlines and there -- it appears to be
21       concerns about getting data sooner from the defense.  Right?
22                MR. WARREN:  Yes, Your Honor.  I think both of those
23       are fair.
24                THE COURT:  Okay.
25           So first let me ask you, why should I be granting
```

1   plaintiffs' relief when you're not meeting my deadlines?

2   Especially, and I should say, because you asked for those

3   deadlines.

4           **MR. WARREN:**  Yes, Your Honor.

5       Well, we are certainly not hitting a perfect score on the

6   plaintiff fact sheet.  There's no dispute about that.  I will

7   say that, you know, subsequent to Your Honor's order, we have

8   had 23 of the missing 45 fact sheets filed by the deadline.

9   Two were filed late.  And one will be filed today.

10      So that leaves 21 out of the 233 plaintiffs' fact sheets

11  that are -- are missing.  Of those, five of those cases are

12  set to be dismissed so they will exit the pool entirely.  I

13  think those are pending agreement from defendants to dismiss

14  those cases.  Some of the dismissals, I think, have been

15  filed.  Others not yet but will be.

16          **THE COURT:**  Hold on.  Hold on.

17              (Off-the-record discussion.)

18          **THE COURT:**  Thank you.  Go ahead.

19          **MR. WARREN:**  So that -- that takes us from 21 down

20  to, I believe, that's 16 missing plaintiffs' fact sheets.  And

21  in those situations, you know, we do have the attorneys --

22              (Off-the-record discussion.)

23          **THE COURT:**  All right.  So of the 16 --

24          **MR. WARREN:**  Of the 16, there are three cases where

25  the attorneys have moved to withdraw for just inability to

1    contact the clients.  So really efforts -- all efforts have

2    been made to, you know, handle those cases, and the attorneys

3    just, you know, in the absence of being able to do anything

4    else, they're moving to withdraw.

5            **THE COURT:**  Right.

6            **MR. WARREN:**  So that leaves 13.  The -- the lawyers

7    for those 13 cases are able to address those.  They're here

8    today.  It's two -- two firms.

9         And my understanding is that eight of those, the clients

10   are also nonresponsive.  The attorneys have not yet moved to

11   withdraw.  I think that may be -- may be something that comes,

12   but they have not determined to reach that point.

13        And then there's five left.  Those are Mr. Draper.  Glenn

14   Draper of the Social Media Victims Law Center is here if you

15   would like to speak with him about those five cases.  And I

16   think he has approached defendants about extenuating

17   circumstances and asked for an extension of time given the

18   very specific factual situations of those clients.

19        So I guess what I would like to convey is we -- you know,

20   I know Your Honor has had concerns about gamesmanship at

21   various points in this process.  We really, really are not

22   trying to play games here.  The attorneys -- well, leadership

23   has conveyed the, you know, importance of these deadlines to

24   the attorneys.  The attorneys have conveyed that to the

25   clients.  Either the clients have been unreachable, or every

1    effort has been made to get the PFS in, you know, either on

2    time or, in a couple cases, a little late.

3         So that's the work we've been doing.  We've been really

4    trying our hardest, and our success rate at this point hovers

5    above 90 percent.  So an A minus is certainly not a perfect

6    score, but we're trying what we can do.

7         On the other side of it, you know, for the defendants'

8    fact sheets, it's not that we're asking for an accelerated

9    deadline of that discovery.  We're just asking for the

10   discovery to be produced in line with the JCCP.  So what the

11   defendants are already doing and already able to do, we would

12   just ask that that basic information be produced to us.

13        We see that as the flip of the plaintiffs' fact sheets,

14   right?  So right now, defendants have 90 percent of the

15   plaintiff fact sheets.  We have zero percent of the

16   defendants' fact sheets.  And we'd like to bring that up

17   closer to parity.

18        And of course there are also going to be discovery

19   requests, and those will be handled through Magistrate Judge

20   Kang in the due course.  But for this limited set of kind of

21   threshold information, which is the snapshots and the

22   defendants' fact sheets, we would just ask that those be

23   produced on a kind of commensurate schedule to the state court

24   proceeding.

25             THE COURT:  Okay.  Remind me of your name again?

1      **MR. CHAPUT:**  Isaac Chaput, Covington & Burling, Your

2  Honor.

3      **THE COURT:**  Okay.  Mr. Chaput, why is it that in the

4  state you can produce this information in two days, and here

5  you all convinced me that you needed 45?

6      **MR. CHAPUT:**  So there are a number of nuances in --

7  in that area, Your Honor.

8      First, defendants' opposition will be filed on -- on

9  Monday as -- as it is due under the rule --

10     **THE COURT:**  So that may be, but we're here today.

11  And so I don't know why you would want to do that in any event

12  if I'm asking you the question.

13     I have a not insignificant amount of cases on my docket at

14  the moment.  I'll spend all morning with you, and then I'll

15  roll right into the continuing evidentiary hearing in Epic

16  Games vs. Apple.  So you want me to read some more on Monday,

17  when I have about 30 lawyers in the audience and I can deal

18  with things right now?  It's not like you can appeal the

19  order.

20     **MR. CHAPUT:**  I'm happy to address the substance now,

21  Your Honor.

22     The -- the 45 days that we have under the process to

23  obtain confirmation -- confirmation and consent forms from the

24  plaintiffs and then produce the account captures is necessary

25  because of the volume of account captures that we're dealing

1    with in that --

2              THE COURT:  What do you mean by volume?  If I order

3    this with respect to the bellwethers, what's the issue?

4              MR. CHAPUT:  So, Your Honor, I was trying to address

5    Your Honor's question about the difference between the two

6    days and the 45 days, and that's the reason that the 45 days

7    is necessary in that particular circumstance.

8         With respect to the two-day timeline that Judge Kuhl

9    ordered in the JCCP, we have expressed to Judge Kuhl that we

10   are concerned that we likely will not be able to meet that

11   deadline.  And she's told us that we should nonetheless try

12   and meet and confer with plaintiffs if we need to.

13        Currently, the -- the major issue that is -- means we need

14   a little bit more time to get the account captures produced to

15   plaintiffs is simply the volume of other account captures each

16   of the defendants is already working through in order to

17   comply with that 45-day timeline to provide account captures

18   where individual plaintiffs are unable to access their

19   accounts.

20        There's a significant volume of accounts that are subject

21   to that procedure, both in this proceeding and in the JCCP.

22   And we're under all existing deadlines to -- to roll those

23   captures out in a -- in a quick basis.

24        And so, you know, in -- if we were to kind of set that

25   process to the side and -- in order to meet this new deadline

1    that plaintiffs are asking for here, that -- that would

2    require us to potentially not be able to make those other

3    deadlines.

4       Additionally, I understand that certain of the defendants

5    have additional timing concerns that other counsel can

6    address.  But really, Your Honor, I think the -- the core of

7    this is the plaintiffs -- the bellwether plaintiffs were

8    selected back on April 19th.  And plaintiffs waited weeks

9    before even asking for us to produce these captures.  And that

10   significant delay on plaintiffs' side suggests that the --

11      **THE COURT:**  When were they -- when did they ask you?

12      **MR. CHAPUT:**  They first requested the account

13   captures on May 2nd.  But they didn't serve a request for

14   production seeking those account captures until a week ago.

15   And even today, one of the bellwether plaintiffs hasn't yet

16   served any requests for production for those account captures.

17      **THE COURT:**  When you said that they asked on May 2nd,

18   what does that mean?

19      **MR. CHAPUT:**  They sent us an email asking us to

20   produce the account captures, but they didn't serve requests

21   for production seeking those account captures.

22      **THE COURT:**  So you do nothing between the informal

23   request and the formal request?

24      **MR. CHAPUT:**  That's not accurate, Your Honor.  We --

25   we met and conferred with them, and we expressed that in

1    defendants' view in order to produce this discovery, we need a

2    formal request for production.  We need to follow the federal

3    rules so that everything is buttoned up, we have the actual

4    request, and we are being responsive to a request for

5    production under Rule 34.

6              **MR. WARREN:**  Your Honor, may I briefly respond?

7              **THE COURT:**  You may.

8              **MR. WARREN:**  We would not be asking for perfection

9    out of the defendants in this process given that we ourselves

10   have not been able to meet that standard.  What we are asking

11   for is for the defendants to work in good faith to produce the

12   DFS and the snapshots in as timely a manner as they can, as

13   consistent with the JCCP as possible.

14       That request was rebuffed.  And we were told to route

15   everything through Rule 34 requests, which is -- would be

16   treating the DFS data and the user snapshots different in kind

17   than the PFS.

18       And we think that lack of parity is -- is not -- is not

19   equitable.  And we think that we need -- all parties would

20   benefit from some early, you know, immediate productions of

21   this basic information just as they're doing in the JCCP.

22       But, again, we're -- we're not out to play gotcha with the

23   defendants and say, oh, you produced it on day three, not day

24   two, you know, we're going to go to the court.  We would work

25   with them, but we do just want to ensure that they are going

1    to respect the DFS process that was negotiated in the JCCP

2    with an understanding that it would be important to the MDL as

3    the PFS process was.

4         MR. CHAPUT:  Your Honor, if I may address the DFS

5    process because that's a bit distinct from the account capture

6    issue I was addressing previously.

7         With respect to the DFS-type data, defendants do expect

8    that we're going to produce that data at a reasonable time

9    after bellwether selection is complete.

10        THE COURT:  What does that mean?

11        MR. CHAPUT:  That means that it's going to vary for

12   each defendant, Your Honor.  And the reason for that is there

13   are some significant burdens associated in getting that data

14   production out.  And plaintiffs are aware of those burdens

15   from their participation in the JCCP DFS discussions.

16        So for the May 31st production of DFS data that's going to

17   be made in the JCCP, defendants had to finalize their lists of

18   the accounts that would be produced on that date at the

19   beginning of May.

20        The plaintiffs here didn't reach out to us asking to

21   have --

22        THE COURT:  How many were on that list?

23        MR. CHAPUT:  For Meta, there are a few -- a few

24   hundred accounts, if I recall.

25        And the burden, Your Honor, isn't the volume of accounts.

1    It's the amount of time that's required to get the data out of

2    the systems and to quality check the production.

3        The request from plaintiffs to produce the DFS-type data

4    in this proceeding for Meta came after we had already

5    finalized that list.  And so it was simply too late for us to

6    include those particular accounts in the production that we're

7    already running and that's going to be made on May 31st.

8        That month-long production process for Meta followed an

9    even longer process of restoring historical data so that data

10   would actually be accessible to be queried for the production.

11       And so as a result of the process that the parties

12   negotiated and agreed to in the JCCP, Meta is only able to

13   produce complete DFS data in the JCCP for accounts that we had

14   identified as of February 27th of this year.  And that

15   limitation is reflected in the DFS that's attached to

16   plaintiffs' motion at ECF 843-2.  That limitation is missing,

17   however, from the plaintiffs' proposed order at ECF 843-4.

18       And the limitation really matters because one of the

19   bellwether personal injury plaintiffs filed her case on

20   April 1st.  And so her accounts therefore could not have been

21   identified as of February 27th.  And Meta hasn't yet had time

22   to restore all of the historical data for each of her accounts

23   and -- and query it.

24       Additionally, because we haven't yet finished bellwether

25   selection in either this proceeding or the JCCP, we don't know

```
1    the full universe of accounts that we're going to need to

2    produce the DFS data for.  Because of the amount of time that

3    it takes both for this data restore process and the month-long

4    production process itself, we would submit that we should make

5    this production of DFS data a single time for all of the

6    bellwether plaintiffs because otherwise we're going to be

7    incurring unnecessary burden of pulling -- running these

8    productions multiple times.

9        And as I said, the burden doesn't come from the number of

10   accounts that you're pulling, but just the time that it takes

11   to move the volume of data we're talking about from one place

12   to another.

13           THE COURT:  I don't understand that.  I don't

14   understand how it is that there isn't a burden -- we have how

15   many plaintiffs, 233?

16           MR. WARREN:  Yes, Your Honor.

17           THE COURT:  I don't understand how -- how there is

18   less burden to pull data for ten people versus 233.  That's

19   the argument you're making?

20           MR. CHAPUT:  No.  That's not the argument I'm making,

21   Your Honor.  The argument I'm making --

22           THE COURT:  You just said that the volume doesn't

23   matter.

24           MR. CHAPUT:  Correct, because we are -- we are

25   querying the same set of data and the -- the number of account
```

1    identifiers that you are asking to call out of that data set

2    doesn't have a meaningful impact on how long it takes to run

3    the production.  Because -- just because of the --

4        **THE COURT:**  And it doesn't -- so you said you're

5    doing quality control.  There is no difference between doing

6    quality control between 10 or 15 and 233?

7        **MR. CHAPUT:**  The -- the checks are essentially the

8    same in terms of making sure that the process is operated

9    correctly and that there weren't errors in the process.

10       And that -- that process of making sure that there were no

11   errors takes substantially the same amount of time.

12       As Your Honor can -- can appreciate based on the -- the

13   colloquy we're having, this is a very complex dispute.  We

14   spent hours negotiating both with plaintiffs with Judge Kuhl

15   in the context of the JCCP DFS.

16       **THE COURT:**  Yeah, but at the JCCP, she's telling you

17   to do it in two days.

18       **MR. CHAPUT:**  So, Your Honor, if I may.  The DFS data

19   is not being produced in two days.  The two-day deadline is

20   only for the account captures which is a completely separate

21   process from pulling the DFS data.

22       **THE COURT:**  And for the account captures, when are

23   you producing them here?

24       **MR. CHAPUT:**  So it -- it varies between defendants.

25   Certain defendants anticipate that we could provide them

```
 1    within the next couple of weeks.  Other defendants will need a
 2    bit longer due to the --
 3           THE COURT:  That's too ambiguous for me.  So how long
 4    is it going to take Meta?
 5           MR. CHAPUT:  June 10th at the latest.
 6           THE COURT:  Snap.
 7           MR. BLAVIN:  Your Honor, Jonathan Blavin from Munger
 8    Tolles.
 9       I think we can get the data produced, the account
10    preservation snapshots, in approximately a month.
11           THE COURT:  Give me a date.
12           MR. BLAVIN:  Four weeks from today.
13       And, Your Honor, I would just note that Snap is a
14    significantly smaller company than some of the other
15    codefendants.  And its resources are already extremely
16    strained at this moment in trying to meet the existing
17    workflow deadlines, but we've told plaintiffs' counsel that we
18    could get them the data in four weeks for the preservation
19    snapshots.
20           THE COURT:  So June 14th.
21       TikTok?
22           MS. PIERSON:  Your Honor, we can be prepared by
23    June 14th.
24           CERTIFIED STENOGRAPHIC REPORTER:  Please state your
25    appearance for the record.
```

```
 1              MS. PIERSON:  Apologies.
 2        Andrea Pierson, Faegre Drinker, for the TikTok defendants.
 3        Your Honor, the TikTok defendants can also be prepared to
 4   produce those things by June the 14th.  We could probably do
 5   it by June the 10th which is the date on which our responses
 6   to request for production are currently due if -- if that's
 7   helpful to plaintiffs in some way.
 8              THE COURT:  YouTube.
 9              MS. ZWANG-WEISSMAN:  Yardena Zwang-Weissman for the
10   YouTube defendants.
11        And Your Honor, for YouTube we can also produce snapshots
12   for the bellwethers that have sued YouTube by June 14th.
13              MR. WARREN:  Your Honor, may I briefly make three
14   points?
15        Very briefly, first Mr. Chaput is mistaken in indicating
16   that the plaintiffs did not ask for the DFS data until
17   May 2nd.  We asked for in it March, and we have the receipts
18   to prove that.
19        Second, Mr. Chaput is right --
20              THE COURT:  So I take it you have emails, but you
21   don't have formal requests.
22              MR. WARREN:  Yes, Your Honor.
23        Second, Mr. Chaput is right that DFS data is not due two
24   days after bellwether identification.  It is due four days
25   after bellwether identification.
```

```
 1          Third --

 2              THE COURT:  And with respect to the account captures,

 3     is he right, four days, not two days?

 4              MR. CHAPUT:  So --

 5              THE COURT:  Yes or no?

 6              MR. CHAPUT:  For the account captures, it's two days.

 7     For the DFS data, we're making that production on May 31st.

 8     But again, for Meta, that's a process that we began in

 9     February.

10              THE COURT:  When I talk, you stop.

11              MR. CHAPUT:  I apologize, Your Honor.

12              THE COURT:  Account captures is four days under the

13     JCCP?

14              MR. CHAPUT:  We are doing it in two days in the JCCP,

15     just the account captures.

16              THE COURT:  For how many accounts?

17              MR. CHAPUT:  We don't know yet.  It's 24 plaintiffs.

18     Each plaintiff may have multiple accounts.

19              THE COURT:  And just the individual plaintiffs or the

20     school districts as well?

21                      (Simultaneous colloquy.)

22              MR. CHAPUT:  Just the personal -- I apologize, Your

23     Honor.

24          Just the personal injury plaintiffs.  Judge Kuhl hasn't

25     yet set a schedule for selection of school district
```

1    bellwethers.

2              **THE COURT:**  And how is it that you're producing on

3    May 31st when the requirement is two days?

4              **MR. CHAPUT:**  So these are two separate items.  The

5    May 31st production is the production of DFS data.  The DFS --

6              **THE COURT:**  When are you producing or have you

7    already produced the account captures in the JCCP?

8              **MR. CHAPUT:**  We have not yet produced the account

9    captures in the JCCP.  Bellwethers will be randomly selected

10   on June 17th, 24 personal injury bellwethers.  And then two

11   days later, the defendants will produce account captures for

12   those 24 personal injury bellwether plaintiffs who are

13   randomly selected on June 17th.

14       As I mentioned previously, we have expressed to Judge Kuhl

15   that we are concerned we won't be able to meet that deadline,

16   but we are going to do what we can to do so.

17             **THE COURT:**  So I'm not understanding why it would be

18   any different here.

19             **MR. CHAPUT:**  The --

20             **THE COURT:**  Because here -- she's -- she's given you

21   two days.  You say okay, I can't meet that.  But you're

22   telling me you need four weeks.

23             **MR. CHAPUT:**  And frankly, Your Honor, four weeks from

24   our perspective is actually the amount of time we think it's

25   going to take to -- to get this right and -- and do it well.

1    And we are concerned about having to rush to do it in -- in

2    the JCCP.

3         THE COURT:  So have you told her that you're going to

4    miss her deadline by four weeks less two days?

5         MR. CHAPUT:  We have -- we have not, Your Honor.  We

6    have told her that we're concerned about --

7         THE COURT:  What have you told her you're going to do

8    then?

9         MR. CHAPUT:  We have --

10        THE COURT:  She's ordering to do it in two days.

11        MR. CHAPUT:  We have told her that we're going to

12   meet and confer with plaintiffs to the extent that we are

13   unable to make that production.

14     We're also taking steps in advance of the June 17th

15   deadline so that we can produce those accounts more quickly by

16   preparing ourselves so that we -- we're -- we're in a position

17   to roll out those productions quickly.

18        THE COURT:  And why can't you do that here now?

19        MR. CHAPUT:  Because we've already started those

20   preparations for the JCCP, and so we have a month before that

21   deadline hits.  And so that's the same timeline that -- that

22   we're describing for -- for Your Honor.

23        THE COURT:  But they haven't been selected yet.

24        MR. CHAPUT:  But we know which plaintiffs are

25   bellwether-eligible.

1          **THE COURT:**  All right.  What else do you all want to
2   say on the account captures?

3          **MR. WARREN:**  The only thing I would add is that the
4   bellwether-eligible plaintiffs in the JCCP number in the
5   hundreds.  Here we're talking about 12.

6      I would also say that, you know, I've heard for the first
7   time a lot of arguments about burdens from the defendants.
8   You know, we, as personal injury plaintiffs, have faced
9   significant burdens with kids in the hospital, parents that
10  are traumatized.  We have --

11         **THE COURT:**  So -- so you can't argue burden because
12  you asked for this schedule.

13         **MR. WARREN:**  I understand.

14         **THE COURT:**  So -- so it's different.  They didn't
15  want this schedule.

16         **MR. WARREN:**  I understand, Your Honor.  My -- my
17  simple point is just that if we can do it, they can do it.

18         **THE COURT:**  Well, they're two different -- they're
19  two different issues.  I don't know what it is that they need
20  to do.

21     Okay.  So we've talked about account captures.  Now we'll
22  talk about the other.  I needed to separate them.

23     So you have four days to do defendant fact sheets in the
24  state.

25         **MR. CHAPUT:**  That is not correct, Your Honor.  The

1    defendant fact sheets are due on May 31st.  For Meta, we began

2    the process of pulling the data that we're going to produce on

3    May 31st on February 27th.

4            **THE COURT:**  Why didn't you do that here?

5            **MR. CHAPUT:**  So we did include in the data that we

6    were pulling out of -- the historical data that we were

7    pulling out of cold storage, we did include accounts that we

8    had identified for the MDL plaintiffs.

9        However, there is an MDL personal injury bellwether

10   plaintiff whose case wasn't filed until April 1st.

11           **THE COURT:**  Well, we can separate that.  The rest?

12           **MR. CHAPUT:**  For those cases that had been on file

13   before February 27th and we had completed the account

14   identification process by February 27th, we did include those

15   in the data that we restored from cold storage.

16       However, as I mentioned previously, the production process

17   for that DFS data takes approximately four weeks.  And the

18   team that is responsible for that process is currently

19   focusing on meeting our May 31st JCCP DFS data deadline.

20       Additionally, because we haven't yet finalized the list of

21   bellwether plaintiffs -- bellwether personal injury plaintiffs

22   for the MDL, we don't yet know the full set of accounts that

23   we're going to need to produce DFS-type data for in the MDL.

24       And because that production process is going to take us a

25   month for that DFS data either way, we would submit that we

1   should just wait a couple weeks until we have our final list,

2   and then we can start that production process.

3       Additionally that will be after the DFS production is

4   complete in the JCCP proceeding, and so we won't need to

5   divert resources from focusing on getting that production out

6   the door at that time.

7           **MR. WARREN:**  May I respond?

8           **THE COURT:**  You may.

9           **MR. WARREN:**  On June 17th, bellwethers are going to

10  be randomly selected in the JCCP.  On June 21st, the parties

11  are ordered to provide the PFS and DFS to the court.  So

12  that's the four days that I was mentioning previously.

13      The defendants had access to the plaintiffs' preservation

14  forms for all the bellwethers.  So they already know, you

15  know, a large majority, if not all, of the accounts for which

16  these would have to -- this information would have to be

17  pulled.

18      Again, to the extent that there are other accounts that

19  haven't identified, of course we're not going to tag

20  defendants with, you know, an obligation there, but we will

21  work with them to get that done expeditiously.

22      The point here isn't to, you know, tax them with something

23  that's impossible.  It's to, you know, put them on even

24  footing with what we're doing for the plaintiffs' fact sheets.

25          **THE COURT:**  What about the fact that they relied on

1    the schedule that I ordered?

2            MR. WARREN:  With respect to...?

3            THE COURT:  With respect to the deadlines and when

4    things were due.

5            MR. WARREN:  Your Honor, I -- if that's with respect

6    to the plaintiffs' fact sheets, I've addressed it, and I --

7    and I think that all I can do is say that we've attempted to

8    do our very best to meet the deadlines.  There is, you know,

9    dozens if not hundreds of lawyers involved here.  Our

10    compliance rate isn't perfect, and I completely acknowledge

11    that.

12        That said, we do have a stable set of, you know, certain

13    number of bellwethers as to which we can and are moving

14    forward.  They've served discovery requests on those

15    bellwethers that are quite voluminous.  You know, so there's

16    no sense in which that process is being halted or stalled.

17    We're moving forward.

18            THE COURT:  What I'm saying is under the order, they

19    were given 45 days from the date that you -- that the fact

20    sheets were provided, right?

21            MR. WARREN:  Correct, Your Honor.

22            THE COURT:  And they relied on that in their

23    workflow, right?

24            MR. WARREN:  Correct, Your Honor.

25            THE COURT:  Until you filed your -- there was no --

1   there was no sense that this was going to be an issue until

2   you filed your motion asking for expedited relief.

3          **MR. WARREN:**  Well, Your Honor --

4          **THE COURT:**  So my question is:  In the orderly

5   process, why is it that they shouldn't have been able to rely

6   in terms of their workflow with my order?

7          **MR. WARREN:**  Your Honor, I think that they should be

8   able to rely on your order, of course.  They should also be

9   able to rely on what's happening in the JCCP.  You know,

10  there's an extent to which the ask here is relatively minor in

11  terms of volume.  It's 12 accounts or 12 -- sorry -- 12

12  plaintiffs.

13      You know, we are expediting the production of a

14  substantial amount of fact discovery to the defendants through

15  the plaintiffs' fact sheets process, and we are just asking

16  for that -- that courtesy to be returned to us from the

17  defendants.

18      And this is an issue that has been raised for months.  I

19  mean, it not the first time.  And not only in March, but also

20  during the informal conversations about preservation, there

21  are extensive discussions about the need for these snapshots

22  from defendants.  They were on notice about that and have had

23  a lot of time to prepare.

24          **THE COURT:**  And what is it that you need?  Why do you

25  need the information before June 10th?

```
 1              MR. WARREN:  Well, Your Honor, I think --

 2              THE COURT:  What's going to happen between now and

 3    June 10th that is critical about that information?

 4              MR. WARREN:  I think to some extent, that is

 5    bellwether-specific.  I know that document requests have come

 6    to the bellwethers.  I know that certain depositions are

 7    already being noticed or will be noticed.  At least they've

 8    identified potential individuals that they intend to depose.

 9              THE COURT:  Okay.  So when are those depositions

10    starting?

11              MR. WARREN:  I don't think they've served formal

12    notices.  What they've done is they've identified pursuant to

13    Judge Kang's process a list of anticipated deponents that they

14    want an early production.

15              THE COURT:  Beginning when?

16              MR. WARREN:  I don't think they've --

17              THE COURT:  When?

18              MR. WARREN:  -- set dates for that.

19              MR. CHAPUT:  We haven't yet set dates, Your Honor,

20    because we haven't yet received any productions from

21    plaintiffs, and we need documents from them beyond just what's

22    included in the PFS before we can start taking their

23    depositions.

24         We have identified certain individuals we intend to depose

25    but haven't yet noticed any depositions.
```

```
 1              THE COURT:  For those individuals who you've
 2   identified, have you looked at their information already as
 3   part of your process?
 4              MR. CHAPUT:  For --
 5              THE COURT:  Have you gathered their information
 6   already and reviewed it?
 7              MR. CHAPUT:  For bellwethers who were selected by the
 8   defendants, we have looked at certain information.
 9              THE COURT:  Well, I tell you what.  With respect to
10   all the information you've already looked at, you produce that
11   in the next two business days.  You've already looked at it,
12   you already have it so produce it.  Understood?
13              MR. CHAPUT:  Understood, Your Honor.
14              THE COURT:  All right.  With respect to the balance,
15   what is it that you're going to do with that information in
16   terms of needing it so quickly to upend the process that was
17   previously ordered?
18              MR. WARREN:  Your Honor, we don't want to upend
19   anything, and I think that's not the -- not the goal here.
20              THE COURT:  It is.  You're asking me to change my
21   order.
22              MR. WARREN:  Your Honor, what we would do with that
23   information is we would help prepare the witnesses, we'd help
24   prepare the client, we'd help understand and evaluate the case
25   and its merits, I mean do all the things we would ordinarily
```

```
 1    do in working up a case.
 2            THE COURT:  I understand that, but you don't even
 3    have depositions set.
 4            MR. WARREN:  No.  That's true.
 5            THE COURT:  Anything else on this topic?
 6            MR. WARREN:  Not from the plaintiffs, Your Honor.  I
 7    think if the -- yeah, not from the plaintiffs.
 8            MR. CHAPUT:  The only thing I'd note, Your Honor, is
 9    we hear Your Honor on the account captures issue.  With
10    respect to the DFS-type data, I would just ask that we have
11    the opportunity to meet and confer further with plaintiffs.
12      I hear Mr. Warren saying he's hearing new information
13    about burden.  That's information that -- we had shared
14    previously in the context of the JCCP DFS negotiations, but if
15    Mr. Warren hasn't heard it, I'd like the opportunity to confer
16    with him about those burdens so that we can reach a schedule
17    that meets plaintiffs' needs but also addresses the burdens on
18    the defense side of the --
19      (Clarification by the Certified Stenographic Reporter.)
20            MR. CHAPUT:  That address the burdens on the defense
21    side.  I just think that a little bit more conferral on the
22    DFS-type data specifically would benefit both sides.
23            THE COURT:  Okay.  You have the weekend.  I want
24    something on file with respect to your meet and confer by noon
25    on Monday.
```

1          MR. WARREN:  Very well, Your Honor.

2          THE COURT:  And if you can't agree, I'll issue my

3    order.

4          MR. WARREN:  Thank you, Your Honor.

5          THE COURT:  Next issue, with respect to the

6    supplemental briefing on the motion to dismiss with the school

7    district plaintiffs from Utah and Arizona, your stipulation

8    that's filed at 847 is agreeable to me.

9        So I understand that to be that you agree that Arizona and

10   Utah look to the restatement, but if I ultimately deny on a

11   particular narrow issue with respect to Utah law, I'll give

12   you an opportunity to brief the unlawful conduct part of the

13   prong.

14       That's what I understand it to be.

15         MR. WEINKOWITZ:  That's my understanding, Your Honor.

16         MS. HARDIN:  Your Honor, our position is that the

17   issues that we're going to discuss today that are generally

18   applicable under the restatement, we'll be asking Your Honor

19   to dismiss the cases on those grounds.

20       Only if Your Honor were to deny the defendants' motion on

21   all bases, we believe we have an additional basis under Utah

22   law which is that the conduct must be unlawful, and we would

23   like the opportunity to brief that.  We certainly hope it

24   won't be necessary, Your Honor.

25         THE COURT:  Okay.  I understand the agreement.  So

```
 1    the stipulation at 847 is approved.

 2              MR. WEINKOWITZ:  Thank you, Your Honor.

 3              MS. HARDIN:  Thank you.

 4              THE COURT:  Okay.  There is a Meta motion to submit

 5    supplemental authority at 844.  That too is granted.

 6         Do the states want -- I don't know if the states agree or

 7    don't agree and whether they need an opportunity to weigh in.

 8              MS. OREM:  Good morning, Your Honor, Beth --

 9              THE COURT:  Good morning.

10              MS. OREM:  Beth Orem for the state AGs.

11         We are planning to file a motion -- or I'm sorry, not a

12    motion.  We're planning to file a response on Monday because

13    there are some inaccuracies --

14              THE COURT:  From your perspective?

15              MS. OREM:  Yes.  In the chart.  And had Meta

16    conferred with us, we perhaps could have resolved those

17    earlier.

18              THE COURT:  Okay.

19              MS. OREM:  But we don't oppose.

20              THE COURT:  Okay.

21         Your request to file a response is granted.

22              MS. OREM:  Thank you, Your Honor.

23              THE COURT:  Thank you.

24         All right.  They've got issues with -- well, they're

25    outstanding.  I had -- Mr. Warren, you made mention of more.
```

1    I only had three motions to dismiss at this point.

2        So I have a case filed by BS.  This is Docket 22-2495.

3    Defendants didn't consent, but they did not oppose.

4            MR. WARREN:  I'm sorry what -- could I trouble Your

5    Honor to repeat that docket number?

6            THE COURT:  22-CV-2495.

7            MR. WARREN:  Um-hmm.

8            THE COURT:  So what I show is plaintiffs have filed a

9    motion for voluntary dismissal.  Defendants did not consent

10   but did not oppose even though it was one of their picks.  So

11   I was going to grant that request given the lack of

12   opposition.

13           MR. WARREN:  Thank you, Your Honor.

14           THE COURT:  The next one I have, 22-6423, *Casteel*,

15   defendants did consent to that one.  That is granted.  But

16   whoever the plaintiffs' lawyer is on that one, if you would

17   please make sure to file that stipulation in the member case

18   docket, not just the MDL docket.

19           MR. WARREN:  Thank you, Your Honor.

20           THE COURT:  And then the last -- I guess I need

21   something on this one.  This is *Araluce*, A-R-A-L-U-C-E,

22   23-5073.  This is not a joint stipulation.  I don't have any

23   statement from the defendants.

24       What is the defendants' position on this one?

25           MS. SIMONSEN:  If you give me a moment, Your Honor,

1    I'll try to ascertain.  We've had a number of requests for

2    dismissal.

3         **THE COURT:**  Okay.  Ms. Simonsen.

4         Those are the three that I have.

5         While she's checking, Mr. Warren, are there others we can

6    deal with today?

7         **MR. WARREN:**  Your Honor, I don't know if there are

8    others that -- well, it's possible.  I am aware of at least

9    one case where there -- I'm not sure if the dismissal was

10   granted or not.  That's 22-CV-6692.

11        I'm hesitant to say the name only because I don't know in

12   my notes whether I have a minor name or not.

13        **THE COURT:**  Okay.

14        **MR. WARREN:**  I believe the defendants have agreed to

15   that -- that dismissal on May 15th.  That's what my notes say.

16   But of course Ms. Simonsen can correct me if I'm wrong.

17        **THE COURT:**  We can check as well.

18        **MR. WARREN:**  And then I believe the others that I had

19   referenced were -- there was a notification of intent to

20   dismiss, but I do not believe there's a pending motion to

21   dismiss for those.

22        **THE COURT:**  Okay.  While she's checking, there --

23   I've got some questions about plaintiffs' motion to seal at

24   Docket 811.  This is the sealing of the bellwether briefs, and

25   it's just -- there seem to be some inconsistencies with

```
 1    respect to redactions.  Some health information is redacted.

 2    Others is not redacted.  There is no -- I don't know if this

 3    is just because people were rushing or if it is actually

 4    that -- I need someone to go back and check from the

 5    plaintiffs' side whether or not the request needs to be

 6    amended because we're seeing lots of inaccuracies -- I mean

 7    inconsistencies.

 8            MR. WARREN:  Inconsistencies.

 9        Well, I will say, Your Honor, I certainly will go back and

10    check and have the lawyer responsible for that on our team

11    check.  There was a fairly, I think, significant effort to

12    work with the defendants to make sure there was agreement on

13    what should and shouldn't be redacted so that inconsistencies

14    may just be a function of the parties trying to negotiate

15    through that.

16            THE COURT:  Okay.  And -- and that's fine, but if

17    someone could just take a -- take a look at it again and you

18    can just even send me an email --

19            MR. WARREN:  Sure.

20            THE COURT:  -- or chambers an email that says we've

21    met and conferred and this is the way we've agreed to do it, I

22    would appreciate it because --

23            MR. WARREN:  Of course, Your Honor.  And that email

24    will be coming from Mr. James Marsh who's our sealing czar for

25    the plaintiffs' leadership.
```

1          **THE COURT:**  Okay.  It is a thankless job.

2          **MR. WARREN:**  Indeed which is why I called out his

3     name in gratitude.

4          **THE COURT:**  Is he here so I can thank him too?

5          **MR. WARREN:**  I don't know if he is.  I don't believe

6     so.  But he may be listening.

7          **MS. SIMONSEN:**  Your Honor, I do have the answer on

8     the *Araluce* matter, 23-5073.  The defendants informed the

9     plaintiffs that we would consent to the dismissal of that case

10    with prejudice.  And that is because plaintiffs informed us

11    that the plaintiff no longer wishes to pursue her case.

12         **THE COURT:**  Okay.  So that request is granted and

13    it's dismissed with prejudice.

14         **MS. SIMONSEN:**  Thank you, Your Honor.

15         **THE COURT:**  Again, will you make sure that the -- I

16    don't have a note that it hasn't been filed on the member case

17    docket, but we need it in.

18         **MR. WARREN:**  May I just briefly confer with

19    Ms. Simonsen on that issue?

20         **THE COURT:**  Yes.

21              (Off-the-record discussion.)

22         **MR. WARREN:**  Your Honor, thank you for the brief

23    intersession.

24       I am not aware of whether that motion was filed with -- by

25    those attorneys to dismiss without prejudice or with prejudice

1  so it may be a contested issue.  That's one thing I would just

2  appreciate the chance to check the docket on.

3         **THE COURT:**  Okay.

4         **MS. SIMONSEN:**  Your Honor, I have confirmed that

5  the -- with respect to *Araluce*, it was filed on the member

6  case docket and the notice did say plaintiff was dismissing

7  with prejudice.  They simply did not note defendants' position

8  on the issue in their motion.

9         **THE COURT:**  Okay.

10        **MR. WARREN:**  Very well.  So there's no issue there.

11        **THE COURT:**  Great.  Thank you.

12    Okay.  Is anyone here from the Di Cello Levitt firm?  They

13 filed a motion to withdraw as counsel in 22-63 -- 6263.

14        **MR. WARREN:**  Your Honor, I'm doing a visual scan.  I

15 don't see any lawyers from that firm present.

16    I am aware of that -- of that motion, however.

17        **THE COURT:**  Okay.  We will deal with that in writing,

18 then.

19    Just a footnote back on your issues with defense

20 production.  I'm going to see Judge Kuhl over the next few

21 days at the American Law Institute's annual meeting.  So to

22 the extent that you think that there is information that we

23 both should know, you should put that in the filings so she

24 and I can talk about the issues.  Okay?

25    Bellwether issues.  Here the defendants are asking for

1      relief as opposed to the plaintiffs.

2            **MS. SIMONSEN:**  My colleague Andrea Pierson will

3      address that, Your Honor.

4            **MS. PIERSON:**  Thank you, Your Honor.

5        Andrea Pierson, Faegre Drinker, for the TikTok defendants.

6            As we outlined in the CMC statement, Your Honor, you may

7      recall that we discussed the dismissal or refusal to waive

8      *Lexecon* in half of the defendants' bellwether picks at the

9      last hearing.

10           Following that hearing, you issued your order on

11     April 23rd and finalized the nine picks and ordered the

12     defendants to choose three more as replacement picks.

13           On May the 3rd, we learned that yet another bellwether

14     pick by the defendants would be dismissed.  In our view, Your

15     Honor, this creates an unlevel playing field that cannot

16     simply be cured through another replacement pick.

17           So as we noted in the CMC statement, Your Honor, we asked

18     for three forms of relief.  The first of those is an

19     additional strike for the defendants -- excuse me -- as

20     opposed to a replacement pick.

21           Our view is that the effect of plaintiffs' dismissals of

22     the defendants' bellwether choices and the refusal to waive

23     *Lexecon* creates unfair prejudice that cannot be cured.  It

24     acts essentially as strikes on the defendants' picks, and

25     that's not something that we can simply fix through

```
 1      replacements.
 2              THE COURT:  Can I ask you a question?  On -- I
 3      haven't -- it just occurred to me as I'm sitting here
 4      listening to you.
 5         With respect to Lexecon, do those cases go back to a
 6      federal court in those jurisdictions or back to a state court?
 7              MS. PIERSON:  Back to the federal transferor court,
 8      Your Honor.  They would stay -- in this proceeding, they'd be
 9      transferred ultimately for trial back to the -- to the
10      transfer court.
11              THE COURT:  What if I tried them in that
12      jurisdiction?
13              MS. PIERSON:  You can do that, Your Honor.
14              THE COURT:  Would that help?
15              MS. PIERSON:  I -- potentially, yes.  I mean I'd want
16      the opportunity to confer with my codefendant counsel, of
17      course, but it is within Your Honor's discretion to try those
18      cases in a different jurisdiction, the transferor
19      jurisdiction.
20              THE COURT:  Because it's just a different jury pool.
21              MS. PIERSON:  That's right.
22              THE COURT:  Well, I would consider that.
23              MS. PIERSON:  You may recall, Your Honor, that your
24      deadline for the -- the plaintiffs to object or waive Lexecon
25      is today.
```

```
 1              THE COURT:  Right.

 2              MS. PIERSON:  I think we'll have a fulsome report for

 3   you on how that affects the pool after today's deadline.  We

 4   frequently get these things on the last day so I don't have a

 5   complete report for you today except to say that the number is

 6   somewhere between 25 and 30 plaintiffs who have notified us

 7   that they will not waive Lexecon.  But I do think that's an

 8   issue that is worth evaluating once we get beyond today's

 9   deadline as --

10              THE COURT:  I think -- I think it would be helpful to

11   have those two pieces of data before making a decision.  So

12   one is you should check with your clients and see if I tried

13   the case in those other jurisdictions whether that makes a

14   difference.  That would be one.

15         Second, we need to know what the full pool looks like.  So

16   I think what I could do is when I have that information, I can

17   meet with you all online to get kind of, you know, final

18   thoughts before making a decision.

19         So why don't we wait on this.  It's always interesting to

20   me to try cases in different places.  I tried one up in

21   Eureka, a 1983 case, and it was terrific.  Got to know a

22   different population up there.  So that might be a fun thing

23   to do.

24         Okay.  So why don't we -- why don't we wait on that.  It

25   takes my computer a while to get the calendar up.  And before
```

```
 1     we leave today, I'll give you a time next week so we can
 2     discuss it with more information.
 3               MS. PIERSON:  Thank you, Your Honor.
 4               THE COURT:  Okay.  Thank you.
 5               MR. WARREN:  Thank you.
 6               THE COURT:  All right.
 7          I believe that's it, right?
 8          Oh, no.  I guess YouTube wanted to discuss a protocol.
 9          And then again before we leave, let me make sure I get an
10     update from you on the discovery issues, but I do want to get
11     to the oral argument here.  It's almost 9:00 o'clock.
12          All right.  So YouTube.
13               MS. ZWANG-WEISSMAN:  Thank you, Your Honor.  Yardena
14     Zwang-Weissman for the YouTube defendants.
15          Your Honor, we're asking the Court simply for an orderly
16     fair process through a protocol to address the amendments of
17     short form complaints in this case.
18          And of particular concern to our client in particular here
19     are plaintiffs' recent attempts to amend the complaints to add
20     YouTube as a defendant in a number of cases.
21          And this concern, Your Honor, is not just hypothetical.
22     Since we were before Your Honor last a few weeks ago, there
23     have been at least 14 attempts by the plaintiffs to add
24     YouTube as a defendant to various cases.
25          And importantly from our perspective, one of those cases,
```

*Clevenger*, has already been selected by the defense as a

bellwether pick.  So changing the composition unilaterally at

this point in time by the plaintiffs after bellwether

selection is particularly concerning to our client.

So at this point in time, Your Honor, we're not asking you

to weigh in on that issue in particular.  We're just asking

for a fair process which we think can be implemented through a

protocol so that all defendants, even those that plaintiffs

attempt to be named in future cases, A, have notice that

plaintiffs intend to amend cases to add those defendants or

make other substantive amendments to the cases, and, B, have

an opportunity by way of filing an objection to discuss those

issues with Your Honor, object, and then we'll have that

discussion with the Court in due course.

**THE COURT:**  I think that's fair.  Why shouldn't it --

why shouldn't that discussion -- especially when you're adding

in parties, why would you object to that notion?

**MR. ANDREWS:**  Good morning, Your Honor.  Patrick

Andrews, Lieff Cabraser, for the personal injury plaintiffs.

The reason why that proposal should not happen is because

it's contrary to the federal rules.  And it's --

**THE COURT:**  It's contrary to the federal rules?  Do

you know that they could bring a motion to dismiss under the

federal rules if they're added after and we've already gone

through a significant amount of work to pull this thing

1    together in an organized manner, and you think it's a problem?

2         **MR. ANDREWS:**  It's contrary to the federal rules --

3    I'll -- Your Honor proposed the exact process through which

4    YouTube can assert its rights, which is a motion to dismiss.

5         **THE COURT:**  So you want me to go through yet another

6    round of motions to dismiss so that you can randomly and late

7    belatedly add people -- add defendants to your cases.

8         **MR. ANDREWS:**  It's -- it's not that we want another

9    round of a motion to dismiss.  It would be similar to what

10   Your Honor ordered with respect to Snap's plaintiff-specific

11   motions to dismiss which relate only to short-form complaints.

12     Your Honor could order some other --

13        **THE COURT:**  Why are you doing this?

14        **MR. ANDREWS:**  The reason we are doing this, Your

15   Honor, is because under the rules plaintiffs are entitled to

16   amend their complaints by the consent of the existing

17   defendants.

18     There is no requirement that plaintiffs inform the

19   not-yet-named defendants and seek their consent before --

20        **THE COURT:**  So all the defendants have consented?

21        **MR. ANDREWS:**  In many cases, or in at least some

22   cases, the other defendants have consented to plaintiffs'

23   request for an amendment, and then the plaintiffs have simply

24   filed their amended complaints.  That's the process that

25   Rule 15(a)(2) envisions.  If the exist --

 1              THE COURT:  With respect -- I don't care about minor

 2     changes.  I am asking whether the defendants consented to

 3     adding a defendant.

 4              MR. ANDREWS:  Correct.

 5              THE COURT:  And you didn't discuss that with the

 6     other defendants?

 7              MS. ZWANG-WEISSMAN:  So, Your Honor, absolutely we

 8     have when we knew about it.  So this is not a one-off case

 9     where plaintiffs don't know who represents YouTube in these

10     proceedings, you know, a to-be-named defendant where they have

11     no idea who counsel is.

12              THE COURT:  But why -- so I don't understand why --

13     why it's an issue if I've got other defendants who are totally

14     fine with you being added as a defendant.

15              MS. ZWANG-WEISSMAN:  Your Honor, in each instance

16     where YouTube -- where plaintiffs have proposed to add YouTube

17     as a defendant in the federal proceeding, there have been --

18     all of the defendants have not yet consented in those

19     instances.

20          So those 14 cases that I mentioned at the beginning of

21     this discussion, Your Honor, have not received -- there have

22     been not been full consent by all the defendants to date.

23          That is why we are coming here today, Your Honor, to

24     propose an orderly process so that we don't have to intervene

25     with a Rule 24, you know, intervening procedure.  We don't

1    expect a flurry of motion practice or paperwork for us and the

2    parties and the Court to have to deal with.

3        There's a very simple process here where plaintiffs can

4    just provide notice in those same emails that they send to

5    other defendants, to counsel for YouTube so that there's not a

6    race on plaintiffs' part to, A, file an amendment to a

7    short-form complaint, or B, from YouTube's perspective to

8    somehow hope that the others defendants catch that the email

9    wasn't also addressed to YouTube so that we can hurry in and

10   file a motion to intervene.

11       That seems superfluous and inefficient in an MDL like

12   this, and there's a much simpler process to go about getting

13   us to the right result.

14           **THE COURT:**  I would agree.

15       You will, you will -- I am not going to focus on this

16   right now.  You will come up with a protocol that gives them

17   the proper ability to object to the extent that they believe

18   that they should for your belated attempt to add a defendant

19   at this juncture.  You will do that.

20       And in fact, you will do that right now.  You'll go out to

21   the conference room and figure it out while I take argument on

22   the rest of these motions.  Do you understand me?

23           **MR. ANDREWS:**  Understood, Your Honor.

24           **THE COURT:**  All right.

25           **MS. ZWANG-WEISSMAN:**  Thank you, Your Honor.

```
 1            THE COURT:  Okay.  Let's get to the argument.
 2            MS. SIMONSEN:  Your Honor, I'm sorry to interrupt.
 3   Ashley Simonsen.
 4        There was one additional case management issue that we
 5   were hoping to address, which is the school district
 6   bellwether selection.
 7            THE COURT:  Well, are we going to deal with that?
 8   Are we going to deal with that after we know the Lexecon
 9   objections?
10            MS. SIMONSEN:  I'll defer to my colleague, Geoffrey
11   Drake for the TikTok defendants.
12            MR. WEINKOWITZ:  We know, Your Honor.  Yesterday we
13   found out that Warshaw will -- will not waive Lexecon.  So
14   what we do now have is a full complement of school -- of
15   school district bellwether plaintiffs.
16            THE COURT:  Okay.  But you've not talked to your
17   client about my offer to try these cases.
18            MR. DRAKE:  Geoffrey Drake from King & Spalding for
19   the TikTok defendants.
20        That's correct, Your Honor.  We'd like the opportunity to
21   do that, including the original two that led to this process,
22   Baltimore and Dekalb.  And being from Atlanta, I'd welcome
23   Your Honor perhaps to the Northern District of Georgia for our
24   trial.  So we'll talk to our clients about that, and perhaps
25   we could lump that in with the schedule that you're
```

```
 1    contemplating on -- on the personal injury side.
 2            THE COURT:  I think you should.
 3            MR. DRAKE:  Okay.
 4            THE COURT:  I'll just fly all over the country and
 5    try these cases.
 6            MR. DRAKE:  Thank you, Your Honor.
 7            MR. WEINKOWITZ:  Thank you, Your Honor.
 8            THE COURT:  Thank you.
 9        All right.  Let's get to the argument then.
10        So first we'll deal with the derivative injury rule.
11        Okay.  Good morning.  Why don't you state your appearances
12    again, and then we'll get started.
13            MR. MURA:  Good morning, Your Honor.  Andre Mura for
14    the plaintiffs.
15            THE COURT:  Good morning.
16            MR. PISTILLI:  Good morning, Your Honor.  Christian
17    Pistilli, Covington & Burling, for Meta.
18            THE COURT:  And that's P-I-S-T-I-L-L-I?
19            MR. PISTILLI:  Yes, Your Honor.
20            THE COURT:  All right.  Your motion.  You may
21    proceed.
22            MR. PISTILLI:  Thank you, Your Honor.
23        I'm going to be addressing the two related issues of
24    proximate causation, derivative injury, and then the
25    remoteness argument.
```

 1          Start with the derivative injury argument.  And here the
 2     core of the school district's claim is that defendants'
 3     services are allegedly addictive, that their students suffered
 4     mental health harms as a result of treating and otherwise
 5     responding to their students' mental health harms, and then
 6     the school districts incurred costs in responding to those
 7     harms.
 8          As the plaintiffs themselves emphasized in their briefs,
 9     they're bringing claims as first responders to what they call
10     a health crisis.  And we'd submit, Your Honor, that under a
11     long line of cases, proximate causation is lacking in such
12     cases because the injuries are derivative of harms to third
13     parties, in this case the students.
14          And the Ninth Circuit's decision in *Association of*
15     *Washington Public Hospitals* we think is particularly
16     illustrative here.  The plaintiffs in that case were public
17     hospital districts, so quite analogous to the public school
18     district plaintiffs here.  And like the plaintiffs here, they
19     brought state common law claims including public nuisance
20     claims.
21          Now the defendants in those cases were tobacco companies.
22     The plaintiffs in *Washington Hospitals* alleged that the
23     defendants concealed the addictive nature of their products.
24          Likewise here, the plaintiffs allege that defendants
25     misled and failed to warn the public about the allegedly

 1    addictive nature of their services.

 2        Then the plaintiffs in *Washington Hospitals* alleged that

 3    as a result of their patients' use of defendants' products,

 4    they incurred increased costs in treating their patients'

 5    tobacco-related illnesses.

 6        Similarly here, the school districts allege that they

 7    incurred increased costs to treat their students' mental

 8    health issues allegedly caused by defendants' services.

 9        And in *Washington Hospitals*, the Ninth Circuit dismissed

10    the plaintiffs' claims as impermissibly derivative, noting

11    that, quote, without injury to smokers, plaintiffs would not

12    have incurred the additional expenses in paying for medical

13    the expenses --

14        **THE COURT:**  I understand your reliance on *Washington*.

15    Address, though, defendant -- I mean plaintiffs' case of the

16    *Labor Local 17 vs. Phillip Morris*.

17        **MR. PISTILLI:**  I'm sorry.  Could you repeat that,

18    Your Honor?

19        **THE COURT:**  Oh, no.  You did that one as well.  All

20    right.  Keep going, that's fine.

21        **MR. PISTILLI:**  Well, yeah, Your Honor, we'd submit

22    that case is really on all fours with *Washington Hospitals*.

23    Without any alleged injury to students, the school districts

24    would not have incurred additional expenses in paying for

25    their students' mental health costs.

 1              THE COURT:  Okay.  A response, Mr. Mura, on that

 2    case.

 3              MR. MURA:  On which case?  I'm sorry, Your Honor.

 4              THE COURT:  The *Washington*.

 5              MR. MURA:  Yes, Your Honor.  That was a case that

 6    both Judge Orrick, in *Juul*, and the Federal District Court, in

 7    *City of Everett*, the District Court from Washington, both

 8    distinguished that case as being about damages for

 9    unreimbursed medical expenses.

10        So when you're talking about unreimbursed medical

11    expenses, you're talking about a derivative injury because the

12    financial loss is the same.

13        Here we have -- the school districts have not alleged a

14    derivative injury.  They have alleged harm caused by

15    defendants' actions.  And that harm goes in multiple

16    directions.

17              THE COURT:  So it's a pass-through.

18              MR. MURA:  It's not a pass-through, Your Honor.  It's

19    a harm that goes in multiple directions.  It goes directly to

20    school-aged children.  And it goes directly to the schools and

21    local governments.

22        The difference here is, for example, there are two

23    categories of harms that -- that the school districts have

24    alleged, prevention costs and mitigation costs.  Prevention

25    costs are not purely derivative because they occur prior to

```
 1    students' personal injuries, and they're incurred even if a

 2    student is not personally injured.

 3            THE COURT:  So let me ask the defendant, then, if I

 4    don't find -- if I find that they're not reimbursement, that

 5    they're not pass-throughs, but that they are prevention, how

 6    does that case apply?

 7            MR. PISTILLI:  Well, they allege a couple categories

 8    of injuries here, Your Honor.  But the main category of injury

 9    they allege, and this is clear in their complaint and in their

10    briefing, is treating mental health harms to students.  They

11    say that --

12            THE COURT:  So that --

13            MR. PISTILLI:  -- they're the treaters.

14            THE COURT:  That could be one component.  That wasn't

15    my question.  My question is to the extent that I find they've

16    alleged damages that are not pass-throughs, and not

17    reimbursement costs, how does the case apply?

18            MR. PISTILLI:  So we would submit that the case

19    applies equally.  And we think that the *City of Philadelphia*

20    *v.* --

21            THE COURT:  Preventative costs?  For preventative

22    costs?

23            MR. PISTILLI:  Yeah, so that's addressed, Your Honor,

24    in, we think, *City of Philadelphia v. Beretta*, which is a

25    Third Circuit case, and applying the same derivative injury
```

1    argument.  And plaintiffs made, you know, essentially the

2    argument that plaintiffs' counsel are making here.

3         **THE COURT:**  So then the answer to my question is

4    *Washington Public Hospitals* doesn't apply if that's what I

5    find.  You need to rely on a Third Circuit case for the

6    hypothetical that I am submitting.

7         **MR. PISTILLI:**  We think *Washington Public Hospitals*

8    is most directly applicable to the mental health injuries they

9    allege.  We think the same principle of derivative injury,

10   though, that the Ninth Circuit applies in *Washington Hospitals*

11   equally applies to other costs that plaintiffs would not have

12   incurred but for injury to their students.

13      I was just pointing Your Honor to the *City of Philadelphia*

14   case because it squarely applies this reasoning, the reasoning

15   from *Washington Hospitals*, to plaintiffs' argument where they

16   attempted to say no, no, no, some of our -- some of our

17   injuries are different.  In *City of Philadelphia* they said we

18   have to police gun violence.  Policing gun violence doesn't

19   directly flow through injuries to shooting victims.  And the

20   Third Circuit said no.

21                  (Simultaneous colloquy.)

22        **THE COURT:**  -- *City of Philadelphia*.

23      A response.

24        **MR. MURA:**  Your Honor, *City of Philadelphia* was a

25   case in which there was no proximate because as the First

 1   Circuit explained in *Estados Unidos Mexicanos*, in that case,

 2   the -- the City of Philadelphia had alleged that mere

 3   awareness that the defendants' gun manufacturers knew that

 4   their guns were being used in improper ways.  But here --

 5           **THE COURT:**  Well, isn't there a circuit split between

 6   the First and the Third on this topic?

 7           **MR. MURA:**  On the question of whether --

 8           **THE COURT:**  On derivative injury from firearms.

 9           **MR. MURA:**  I -- I think that's fair, Your Honor.

10           **THE COURT:**  Okay.

11           **MR. MURA:**  I think that's fair.

12           **THE COURT:**  So *City of Philadelphia* helps defendants.

13   *Estados Unidos* helps you.

14           **MR. MURA:**  That's correct.

15           **THE COURT:**  And is there a Ninth Circuit case that

16   either of you found -- because I'm not seeing one in my notes

17   here -- that addresses where the Ninth falls on the topic?

18           **MR. MURA:**  We have Ninth Circuit District Court

19   cases, Your Honor, but not a Ninth Circuit case.

20       We do think that reading *Washington Public Hospitals*, its

21   understanding of when -- when something is purely derivative

22   is supportive of plaintiffs.  One, *Washington Hospitals* was a

23   RICO cause of -- a RICO case.

24       And so there are cases such as *City of Everett*, a federal

25   case from Washington, which has distinguished *Washington*

1   *Public Hospitals* on that basis.

2       But the court in *Juul* also talked about both preventative

3   costs and these types of mental health-related costs.

4       Those are not costs that are where the school districts

5   are seeking reimbursement or to pay directly for the mental

6   health care costs of any students.  So that is entirely

7   distinguishable even under existing Ninth Circuit precedent.

8           **THE COURT:**  Mr. Pistilli, the derivative injury rule

9   appears to be rooted in federal antitrust and RICO proximate

10  cause doctrine rather than state law proximate cause.

11      Why should I -- well, first of all, do you agree with that

12  premise?

13          **MR. PISTILLI:**  Respectfully, Your Honor, I don't, and

14  I think the best I can do there is to quote from the

15  *Washington Hospitals* decision where the Ninth Circuit said

16  quote, the hospital district's common law claims fail for the

17  same reasons their RICO -- their federal antitrust and RICO

18  claims failed.

19          **THE COURT:**  Yeah, but it extended it.  It didn't say

20  that it wasn't rooted in the federal antitrust and RICO

21  standard.

22          **MR. PISTILLI:**  Yeah, it's rooted in it, but it went

23  on to say the proximate cause test is -- the proximate cause

24  test in RICO is the common law proximate cause test.  So the

25  Ninth Circuit has said the common law test is the same as the

1    RICO antitrust test.

2          **THE COURT:**  Do you agree with that?

3          **MR. MURA:**  No, we do not agree.  And the District

4    Courts and the Ninth Circuit do not agree with that.

5          **MR. PISTILLI:**  Respectfully, Your Honor, the Ninth

6    Circuit said it's the same test.

7          **THE COURT:**  So your best case for the Ninth Circuit

8    saying it's not the same test?

9          **MR. MURA:**  Well, Judge Orrick in *Juul*.

10         **THE COURT:**  Ninth Circuit.  I am a huge fan of my

11   colleague across the Bay, but he's not on the Ninth Circuit.

12         **MR. MURA:**  Yes, Your Honor.  Well, I would

13   respectfully submit that that's a misreading of that case

14   because there is no right to -- there is no tort action for

15   reimbursement of damages under the common law so the statement

16   that that would not be recognized under the common law is not

17   a statement that we disagree with.  But that does not mean or

18   redefine derivative injury in the way that defendants are

19   trying to redefine it here to require this extension where the

20   costs borne by the -- by the schools are entirely distinct and

21   unique and are not the reimbursement of specific costs for

22   schools.

23       And I think the cases that we've cited make that point

24   explicitly.  And it's -- for example, on page 20 of our brief,

25   we discuss the City of Boston against Smith & Wesson.  This is

1   a Massachusetts Superior Court decision that's been cited by

2   numerous courts as persuasive.

3       The court explained there that wholly apart from any harm

4   caused by the defendants which comprise the public entity's

5   community and regardless of when -- whether any individual is

6   harmed, the community itself, the public entities suffer their

7   own distinct harms.

8       And those are the distinct harms that the plaintiff school

9   entity and local governments here have alleged, not any sort

10  of harms or costs that the school -- school children have

11  suffered.

12      And, in fact, it's quite obvious that there isn't overlap

13  because the reason for the derivative injury rule is you want

14  the proper plaintiff to be vindicating the rights.  But the

15  school children could not be seeking to vindicate the

16  financial losses that the school districts have alleged here.

17  These are separate harms, separate injuries that need to be

18  separately vindicated in separate lawsuits.

19          **MR. PISTILLI:**  Your --

20          **THE COURT:**  Go ahead.

21          **MR. PISTILLI:**  So, first, briefly on the *Smith &*

22  *Wesson* case, it's telling that that's what they went to.  It's

23  an unpublished trial court opinion.  It's from Massachusetts

24  which is a jurisdiction that's not at issue in our motion.

25  It's a case that relied on a Massachusetts pleading rule that

```
 1    motions to dismiss are not appropriate vehicles for, quote,
 2    resolving undecided points of substantive law.  That's
 3    obviously not the way it works in federal court.
 4        And it's also inconsistent with a number of the other gun
 5    cases from appellate courts in jurisdictions at issue.
 6    There's the Gamin case from Connecticut.  There's the City of
 7    Philadelphia case we've discussed from the Third Circuit.
 8    There's the Penelas decision which was affirmed by an
 9    appellate court in Florida.  There's People v. Sturm, Ruger
10    in -- in New York.  So that -- that's Smith & Wesson.
11        And then on the Juul decision, Your Honor, we would submit
12    that Juul actually distinguishes this case in the decision in
13    its discussion of Washington Hospitals.  It was very
14    significant to Judge Orrick in Juul that the plaintiffs there
15    were not seeking treatment expenses on behalf of students.
16    The court essentially said, well, if you're seeking medical
17    treatment expenses, that's Washington Hospitals.
18        Here, plaintiffs clearly are seeking that.  We would
19    submit that it is their principal injury alleged in the
20    complaint.  And so even under Juul's reasoning, we think the
21    fact that what they are seeking is medical treatment --
22            THE COURT:  But -- but your argument in that respect
23    only goes to a portion of the alleged damages.
24            MR. PISTILLI:  That -- that's -- that's right, Your
25    Honor.  We at least agree --
```

```
 1            THE COURT:  So that wouldn't be a basis for granting
 2    the motion --
 3            MR. PISTILLI:  Well --
 4            THE COURT:  -- given that other damages have been
 5    alleged.
 6            MR. PISTILLI:  Well, we think it would certainly be
 7    appropriate, you know, especially in the context of an MDL,
 8    Your Honor, to provide guidance on this given that, you know,
 9    in Juul it was very significant to the court that there
10    were -- no treatment expenses were sought.
11        And -- and as I said earlier, you know, while it's not
12    directly addressed in Washington Hospitals, the great weight
13    of appellate authority on these derivative injury cases
14    recognize that it extends more broadly than just the -- the
15    direct treatment expenses.  Really the test is would the
16    schools be incurring these expenses but for the injury to
17    their students.
18        And if there weren't, in the school's views, issues
19    relating to use of -- of social media, they wouldn't have to
20    be taking, you know, the -- the sort of preventative or
21    education steps that -- that they claim.  And -- and there
22    again, you know, we just think the City of Philadelphia case
23    is very instructive in that, you know, police and gun violence
24    was assumed within the role.
25            THE COURT:  I want to move to a question about the
```

 1    distinction you're making between remoteness and

 2    foreseeability.

 3        Are you making a distinction between those two concepts?

 4            **MR. PISTILLI:**  Yes, Your Honor.  We --

 5            **THE COURT:**  Okay.  Then if you're making a

 6    distinction between those two concepts, identify for me the

 7    objective factors which would create a difference between

 8    remote and foreseeability.  What are the objective factors

 9    that any judge should look at?

10            **MR. PISTILLI:**  The -- I'm sorry, Your Honor.

11            **THE COURT:**  I just want a list.

12            **MR. PISTILLI:**  That number of steps, intervening

13    conduct, whether, you know, time, place, wrongdoing of third

14    parties, those -- those all go to --

15            **THE COURT:**  Number of steps.  So what would be the

16    number of steps to make one foreseeable versus remote?  Give

17    me an example of that.

18            **MR. PISTILLI:**  Sure.  Well, I think there's an

19    example that comes straight from the plaintiffs' complaint,

20    which is --

21            **THE COURT:**  I'm asking for case law, not -- not their

22    complaint.  I'm looking for objective factors based in the

23    case law, number of steps.

24            **MR. PISTILLI:**  Well, I would think that the *City of*

25    *Chicago* case, Your Honor, which was another case involving gun

1    violence where the -- the court essentially said that the --

2    the intervening acts of the --

3            **THE COURT:**  How many steps?

4            **MR. PISTILLI:**  Well, there I think it was just the

5    intervening act of the people who wrongfully --

6            **THE COURT:**  Okay.

7            **MR. PISTILLI:**  -- used the firearm.  So it was just

8    the one intervening step in that case.  Though I don't know

9    that there's a numerical test.

10            **THE COURT:**  You made the statement that the objective

11    factor that the court should consider is the number of steps

12    between remote and foreseeable.

13            **MR. PISTILLI:**  Yes, but in -- in some cases the

14    intervening acts of a third party is sufficient.  So that

15    would be essentially one step between the --

16                    (Simultaneous colloquy.)

17            **THE COURT:**  So it's not -- so it's foreseeable but

18    not remote?  Or it's remote but not foreseeable?

19            **MR. PISTILLI:**  It would be too remote.  Like in the

20    gun violence cases, it's too remote where between the

21    defendants' alleged wrongful conduct and then injury is, one,

22    the wrongful acts of people using the firearms, and then two,

23    the pass-through injury to the, you know, in those cases it

24    was largely cities.

25            **THE COURT:**  What is -- what is -- so which of those

1    standards -- I -- I take it you believe that foreseeability is

2    less remote?

3            **MR. PISTILLI:**  So --

4            **THE COURT:**  Or is remote?  Yeah, tell me.

5            **MR. PISTILLI:**  So first, Your Honor, in the *Bank of*

6    *America* case, the Supreme Court said, you know, discussing the

7    general common law rule that proximate cause encompasses more

8    than foreseeability.  We have footnote 23 of our reply brief.

9    We cite a case from each of the relevant jurisdictions that

10   you know, in some fashion or other embraces the concept that

11   proximate causation may be lacking even where the injury is

12   foreseeable.

13       I think a really great example of this, Your Honor, is the

14   *Modisette v. Apple* case from the California Court of Appeals.

15   That was a case where the plaintiffs sued after they were

16   struck in their vehicle by someone who was using FaceTime

17   while driving.

18       And the reason I think that case is really instructive,

19   Your Honor, is the California Court of Appeals says yes, it

20   was foreseeable that this could happen.  And yet it says that

21   nevertheless, legal causation is lacking because simply

22   Apple's conduct is too remotely connected to the injury for

23   the law to allow a claim to go forward against Apple because

24   that was, Your Honor, a case involving the sustaining of a --

25   of a demurrer.  So that, I think, really illustrates the

```
 1        point.
 2              THE COURT:  Well, it's an illustration, but it
 3        doesn't give me any objective factors.  And it does seem like
 4        you don't really have -- you said number of steps, but you
 5        don't really mean it because you can't really identify
 6        anything objectively to substantiate that first -- that first
 7        statement of yours.
 8              MR. PISTILLI:  Well, no.  It's -- I think the --
 9        the -- the linchpin is that there is some sort of intervening
10        conduct.  I think depending upon the facts of the case, one
11        step is oftentimes sufficient.  But certainly the Court can --
12              THE COURT:  But the quantity, it doesn't seem to
13        matter to you.
14              MR. PISTILLI:  Well, we would submit that in many
15        cases one intervening step can be enough.  Here, though, there
16        are actually --
17              THE COURT:  Okay.  It's not -- so what's your other
18        objective factor?
19           You're not persuasive on the first.  Is there another
20        objective factor that courts should consider in determining
21        the difference between foreseeability and remoteness?
22              MR. PISTILLI:  Well, it's really sort of whether the
23        wrongful conduct of a third party is sort of the -- the --
24              THE COURT:  Do you understand what I'm trying to get
25        at?  Maybe you have a response.
```

```
 1            MR. MURA:  Yes, Your Honor.

 2            THE COURT:  Any objective considerations to determine

 3    the difference between foreseeability and remoteness?

 4            MR. MURA:  Your Honor, I think it's a fact-based

 5    inquiry that is rarely decided at the motion to dismiss stage.

 6    And I think the difference here is that that defeats the

 7    remoteness argument under any sort of objective considerations

 8    is the fact that plaintiffs here have alleged that the

 9    defendants intentionally acted.

10        I mean they engaged in direct affirmative conduct in

11    creating a marketing and addictive product to school children

12    which directly and foreseeably harmed school districts.

13        And so that's a big difference between the cases that my

14    friend on the other side is discussing, like most of that

15    against Apple --

16            THE COURT:  But their marketing here is really quite

17    different, isn't it, than what they were doing in Juul?

18            MR. MURA:  I don't think so.  I don't think so, Your

19    Honor.  I mean we've alleged, for example -- we've alleged

20    that they infiltrated schools to make -- to make their

21    products in schools a top priority.  This included the SNAP to

22    School program, back-to-school nights, Google's Tips & Tricks

23    for beginning YouTube into the classroom.

24        We've also alleged that their own internal studies and

25    public studies have shown the direct links that made it
```

 1     foreseeable that if you market an addictive product to school

 2     children, it's going to affect schools.

 3         And particularly given the allegations of intentional

 4     conduct here, that distinguishes this case from cases like

 5     *Modisette* where someone merely furnished a condition by which

 6     injury could occur.

 7         Here, the defendants marketed a knowingly addictive

 8     product directly to students during school hours.  I mean the

 9     complaint is replete with these allegations.

10         Now defendants may want to present a different story, but

11     that's not appropriate at the motion to dismiss stage where

12     these allegations, because they're plausibly pled, need to be

13     accepted as true.

14         The other case I would point to you --

15             **THE COURT:**  So you haven't provided citations or --

16     or you -- I've got this in the reply brief, his reference to

17     footnote 23, which came in on reply.

18             **MR. MURA:**  Yes, Your Honor.

19             **THE COURT:**  Do you have cases to the contrary with

20     respect to their, you know, claim that it's well-established

21     principle of common law that the plaintiffs are supposed to

22     show that their alleged harms are not remote?

23             **MR. MURA:**  We disagree with the -- with the cases in

24     footnote 3 [sic] insofar as they've been described.  I

25     think --

1    **THE COURT:**  Twenty-three or three?

2    **MR. MURA:**  In footnote 23.  When we looked at those

3    cases, they're basically just talking a foreseeability

4    analysis.  And of course if something is unforeseeable, it may

5    be unforeseeable because it's too remote, it's too attenuated.

6    But the case law is clear that that foreseeability

7    question is a question of fact that shouldn't be decided at

8    the motion to dismiss stage.

9    And in any event, there's nothing too remote about the

10   fact -- about the chain of causation here.  The same argument

11   was made to the First Circuit.  And the First Circuit said,

12   sure, you can always fashion a multiple -- a long chain of

13   causation, but that's not the relevant question.  The question

14   is whether it's foreseeable.  And that is consistent with many

15   of the cases cited in footnote 23 by defendants.

16   **THE COURT:**  Do you have an example of marketing

17   during school hours?

18   **MR. MURA:**  We do in the complaint.  We have an

19   example for SNAP, for example, where they -- where they did an

20   update during the school that was highly disruptive.  We have

21   an -- examples of the programs that I just talked to you about

22   where the -- each of the social media companies were targeting

23   schools themselves and trying to infiltrate the schools with

24   their products to show how they were helpful to education.

25   So I do think that there -- there are marketing

1    allegations here.  And if the question is are they sufficient,

2    surely they are, and they establish the intentionality of

3    defendants' conduct.  And that more than makes it foreseeable

4    for purposes of the motion to dismiss stage.

5        I would also -- in response to some of these intervening

6    cause arguments that defendants have made, I would point the

7    Court to the *Ileto* decision which is a Ninth Circuit decision

8    that the court has already cited in its prior motions to

9    dismiss but deals with causation as well and talks about how

10   the fact that there are links in the causal change involving

11   third-party actions, even criminal actions, does not defeat

12   proximate cause where those actions are foreseeable.

13       So, again, it just comes down to foreseeability.  And

14   *Ileto* is also helpful because it talks about how

15   foreseeability may arise directly from the risk created by the

16   original active negligence.

17       And so here --

18           **THE COURT:**  So can you make a distinction for me --

19   it's easier to see the distinction in *Juul* between product

20   design versus specific marketing to determine choice.

21           **MR. MURA:**  Well, Your Honor, I think the -- the

22   marketing and the targeting in *Juul* are highly similar in that

23   it was an addictive product that the defendants in both

24   cases --

25           **THE COURT:**  Yeah, but they weren't talking as -- I

1   mean, here we've got a platform, and we've -- and I've at

2   least made distinctions between aspects of the platform that

3   could be viewed as products and aspects of the platform that

4   could not.

5       In *Juul*, the focus was less on the product other than --

6   but -- but more on the marketing knowing that the product was

7   a product.

8       So I'm trying to -- to thread whether the allegations here

9   relate to product issues or marketing.

10          **MR. MURA:**  It's both the creation of an addictive

11   product and the marketing.  And I would point the Court to

12   paragraph 65 of the master complaint which discusses how

13   defendants deliberately designed their platform to encourage

14   compulsive use during the school day.  And it cites a recent

15   study by Common Sense Media which confirmed ubiquity and

16   intensity of notifications during the school day.

17          **THE COURT:**  But -- right, but what is different about

18   what they were doing during the school day versus what they

19   were just doing, period?  How is the school day different from

20   after school or evening or before school?

21          **MR. MURA:**  Well, part of it was their profitability

22   increases through the increased use of the phone, and that is

23   a big block of time --

24          **THE COURT:**  Yeah, vacation, though.  I mean the

25   summer months are different from the school year.  Do you have

```
 1   anything that's specific to the school day that -- right.

 2   Specific to the school day.  Not generic, not a generic

 3   reference to just increased use but specific to the school

 4   day.

 5          MR. MURA:  I believe the paragraphs around 211, 213,

 6   and 214 to 228 are allegations that -- that discuss both

 7   knowledge of defendants' intentionality and the impact on the

 8   schools and the schools' reaction.

 9       And there is a profit motive to having their products used

10   all the time, and that includes during the school day.  And it

11   goes to the awareness of the ways in which -- the ways in

12   which the use of the product by school -- I mean it is

13   targeted towards school-age children.

14          THE COURT:  Okay.

15          MR. MURA:  And so that is the link.

16          THE COURT:  Let's move on.  It's been 30 minutes on

17   this topic.  We'll move on to public nuisance.

18          MR. MURA:  Thank you, Your Honor.

19          THE COURT:  And I now know who you are but just go

20   ahead and --

21          MS. HARDIN:  Ashley Hardin.

22          THE COURT:  Okay.  So that's fine.  In general,

23   plaintiffs go first.  Then --

24          MS. HARDIN:  Yes, ma'am.

25          THE COURT:  Then defense.  I don't care.  It's very
```

```
 1    nice of you to wait but you go first.
 2            MR. WEINKOWITZ:  Mike Weinkowitz on behalf of the
 3    school district plaintiffs.
 4            THE COURT:  Okay.
 5            MS. HARDIN:  Ashley Hardin on behalf of the YouTube
 6    defendants.
 7            THE COURT:  All right.  Your motion, Ms. Hardin.  You
 8    go first.
 9            MS. HARDIN:  Yes, Your Honor.
10       The Court ought to dismiss the school direct plaintiffs'
11    public nuisance claims for three reasons.  One, it is beyond
12    the traditional ambit of the tort.  Second, they have not
13    adequately alleged interference with a public right.  And
14    third, they do not have standing to bring these claims because
15    they haven't adequately alleged special injury.
16       I'll take them up one by one, Your Honor, unless Your
17    Honor would like to start in a different location.
18            THE COURT:  No, you can start there.  I doubt I will
19    stay silent for long.  Go ahead.
20            MS. HARDIN:  The plaintiffs -- these school districts
21    plaintiffs, Your Honor, are trying to apply the law of public
22    nuisance to a set of claims to which it was never intended to
23    apply.
24       The law of public nuisance has never been broad enough nor
25    has it ever been intended to be broad enough to address all
```

```
 1    and any manner of social problems.  Rather, the traditional
 2    law of public nuisance is limited in two important respects
 3    that bear on this case.  One is that historically public
 4    nuisance limited to circumstances in which there is some nexus
 5    to land.  That often --
 6              THE COURT:  I think you've got the stronger on this
 7    one.  So Mr. Weinkowitz --
 8              MR. WEINKOWITZ:  Yes, Your Honor.
 9              THE COURT:  -- address the land issue.
10              MR. WEINKOWITZ:  Yes.  Defendants' categorical
11    argument with -- that there is a requirement that there be an
12    interference of land has just been expressly rejected by a
13    number of courts.
14              THE COURT:  But many courts have found that.
15              MR. WEINKOWITZ:  Well, that doesn't -- many courts
16    have found -- the courts that the defendants cite when they --
17                   (Simultaneous colloquy.)
18              MR. WEINKOWITZ:  -- talk about property, they talk
19    about it being --
20              THE COURT:  Rhode Island, Illinois, South Carolina?
21              MR. WEINKOWITZ:  Those -- those courts did not say
22    that it's only related to land.  Those courts, when the --
23    they -- they specifically say that it has been traditionally
24    related to land.
25         And in each one of those states, there are cases where
```

1   their public nuisance claims have been led -- have gone on

2   where there is not property.

3      And if you look at the Restatement Comment H -- 821B,

4   Comment H specifically says, unlike a private nuisance, a

5   public nuisance does not necessarily involve interference with

6   the use of enjoyment of land.  And the cases in those states

7   specifically note that, private nuisance, while it may be

8   related to property, public nuisance does not always relate to

9   property.

10      And there -- there's -- and the reporter note is replete

11   with examples on that.  Practicing medicine without a license,

12   public profanity, vicious dog bites, snake handling at

13   religious ceremonies, indecent exhibitions and -- and public

14   fighting.

15      The adapt -- nuisance is an adaptable and -- and evolving

16   cause of action that changes with scientific and factual

17   circumstances.  This was recognized by Justice Ginsburg in --

18   in the -- writing for the majority in the Supreme Court.

19      Opioid MDL looked at this very same issue the defendants

20   made --

21         THE COURT:  So it seems to me that -- that there are

22   distinctions being made.  Defendants concede, right, that

23   California and Indiana do not require a connection, correct?

24   To land.

25         MS. HARDIN:  Not an express use of the defendants'

```
 1    land, Your Honor.  But many of the cases, as have been -- as
 2    have been recognized by California courts, have indeed --
 3              THE COURT:  Of course.  That --
 4              MS. HARDIN:  -- dealt with land.
 5              THE COURT:  But that doesn't mean that they require
 6    it.
 7              MS. HARDIN:  We have stated in the brief, Your Honor,
 8    that Indiana and California do not require an express use or
 9    interference with land.
10              THE COURT:  So Alaska, Colorado, Georgia, Kentucky,
11    Louisiana, Maryland, North Carolina, Nevada, and Virginia
12    haven't actually addressed the topic.
13              MR. WEINKOWITZ:  That's correct.  Those states have
14    not addressed the topic.
15              THE COURT:  So --
16              MR. WEINKOWITZ:  I'm sorry.
17              THE COURT:  Correct, they've not addressed it.
18              MS. HARDIN:  The Supreme Court in those -- in those
19    states, Your Honor -- I'm not sure I got the full list firmly
20    in my brain from when you just rattled them off -- the
21    Supreme Courts in those states have not necessarily
22    addressed -- directly addressed it.  But if you look at the
23    history of the case law in all of those states, you will find
24    that overwhelmingly all of the cases involve land.
25         And what every single case involves, Your Honor, including
```

1    every single case that Mr. Weinkowitz just cited from the

2    Restatement involves a specific physical location, a place

3    where one can go to encounter the nuisance-causing conduct and

4    the interference.  And every case he just listed involves

5    that.  The bullfighting, the vicious dog, the unlawful

6    practice of medicine, the indecent exposure, they all involve

7    a physical location, and we don't have that here.

8          **THE COURT:**  But have you talked to Tim Sweeney?

9    We're living in the metaverse.  That is the next -- that is

10   the next place where people engage in conduct and people will

11   engage, in many people's view, in -- in the -- you know,

12   that's where things will happen.  You can go to concerts.  You

13   can do all sorts of things on platforms that were never --

14   were never envisioned, but that doesn't mean that things don't

15   happen there.  That doesn't mean that people don't have

16   conversations there.  That doesn't mean that it is not the

17   modern public platform.

18       Think about Twitter.  I mean, that is where people engage.

19   People don't talk to each other anymore physically.  They

20   engage and do things in that kind of platform.

21         **MS. HARDIN:**  That may very well be, Your Honor, but

22   the law of public nuisance is not the doctrine to apply to

23   address issues that may surround that.  There may be causes of

24   action that address those issues, but public nuisance is not

25   one of them.

```
 1              THE COURT:  Like what?

 2              MS. HARDIN:  I'm sorry?  Like what?

 3              THE COURT:  Like what?

 4              MS. HARDIN:  Well, I think it would obviously depend

 5      on the circumstances.  But Your Honor has allowed --

 6              THE COURT:  First of all --

 7              MS. HARDIN:  -- personal injuries cases --

 8              THE COURT:  First of all --

 9              MS. HARDIN:  -- for example.

10              THE COURT:  You need to slow down.

11              MS. HARDIN:  Yes, ma'am.

12              THE COURT:  Because my court reporter is going to be

13      on the record until 4:30 this afternoon.

14              MS. HARDIN:  Apologies.

15              THE COURT:  So slow down.

16         Go ahead.

17              MS. HARDIN:  What types of cause of action Your Honor

18      has already allowed, personal injury causes of action on the

19      basis of these very same issues.  Defendants obviously

20      disagreed with that, but both Your Honor and Judge Kuhl in the

21      JCCP have allowed claims to go forward.

22         There -- if there are communication issues, of course

23      there'd be potentially a host of causes of action.  But in

24      this case, getting back to the plaintiffs' allegations here,

25      public nuisance doesn't apply to it.
```

1          And the second important limitation, if I may, Your Honor,

2     in addition to the land argument is that the Restatement and

3     the majority of state Supreme Court cases to have addressed

4     the issue have held that public nuisance law does not apply to

5     the manufacture and the distribution of a product put into the

6     stream of commerce.  It does not apply even when the conduct

7     of the defendant is alleged to be wrongful.

8          So for example, the cases you cited, Your Honor, or that

9     you mentioned, Rhode Island, Illinois, they -- the Oklahoma

10    Supreme Court case in the *Hunter* case, Your Honor, which

11    involved opioids -- the claims in those cases were all that

12    the defendants had acted wrongfully, that they had

13    overpromoted their product or promoted it in a way that was

14    wrongful because the allegation was that the defendant knew

15    that there were dangers associated with the product and that

16    it was not safe.

17         Public nuisance has been held not to apply even in that

18    circumstance.  It's certainly been held to apply in a

19    circumstance where the product is alleged to be defectively

20    designed, as these plaintiffs allege.

21         And we've quoted you those cases, Your Honor.  Of the

22    seven Supreme Court cases to have considered the issue, five

23    of the state Supreme Court cases have rejected the application

24    of nuisance.  And the third Restatement directly rejects the

25    application of nuisance to these types of claims, Your Honor.

```
1              THE COURT:  All right.  A response.

2              MR. WEINKOWITZ:  The categorical all-or-nothing

3      approach that public nuisance cannot involve a product should

4      be rejected.  One, there's no bright line rule that public

5      nuisance cannot involve a product.  Two, it has to do with the

6      conduct that's alleged, and here we have alleged --

7              THE COURT:  There are a number of states that have

8      seemed to have categorically said that product cases do not --

9      are not permitted.

10             MR. WEINKOWITZ:  Well, in --

11             THE COURT:  And so --

12             MR. WEINKOWITZ:  Sorry, Your Honor.

13             THE COURT:  -- again, citing to me -- there is no one

14     rule for everybody.  There is not.  That's why these cases are

15     tough.  So with respect to those cases and those states that

16     have said it doesn't apply, what's your response?

17             MR. WEINKOWITZ:  With respect to those -- those

18     particular cases and -- and probably --

19             THE COURT:  States.

20             MR. WEINKOWITZ:  -- states, you're probably thinking

21     of the gun cases and the lead -- and the lead paint cases.

22     And the difference between those cases and this case is

23     fundamental.

24         In those cases, the defendants, when the product, the gun

25     or the lead paint, left -- left their control, they had no
```

1    more control of it, they had no more control of the

2    instrumentality.  And that's what made the differences for the

3    courts in those cases.

4        And here, the defendants control the instrumentality,

5    their platforms, as we sit here today.  They could pick up

6    the -- the lawyers could pick up the phone, they could call

7    someone at the company, and they could make a change to the

8    product.  They have control of the products.

9        So the distinction in the gun cases and the lead paint

10   cases is control.

11       And why do you need control in a public nuisance case?

12   Because if you don't have control, you cannot abate.  If you

13   don't have control, you cannot fix the public nuisance.

14           **THE COURT:**  Okay.  A response, on control.

15           **MS. HARDIN:**  Control is not an element that we've

16   moved on, Your Honor.  And I think if you -- the cases speak

17   for --

18           **THE COURT:**  But do you agree that if you have

19   control, that's indicative or that would be an element that

20   would allow public nuisance?

21           **MS. HARDIN:**  No, Your Honor.  That's a separate issue

22   from whether or not public nuisance has been -- has a

23   limitation to either land or to the distribution and

24   manufacture of products.  And the cases treat them as separate

25   and distinct issues.

```
 1              THE COURT:  In the cases that were cited, the lead

 2    and gun cases, was control discussed?

 3              MS. HARDIN:  Some of them do and some of them don't,

 4    Your Honor, because control is actually not an element in

 5    every state.

 6              THE COURT:  For the states where it is an element.

 7              MS. HARDIN:  I could not give you an exhaustive list.

 8    It is definitely an element in the Illinois City of Chicago

 9    case and in the Rhode Island case, Your Honor.

10              THE COURT:  Okay.

11              MS. HARDIN:  But that -- that's again a separate

12    issue that need not trouble the Court here because it is

13    separate from the --

14              THE COURT:  Well, I have to --

15              MS. HARDIN:  -- from the --

16              THE COURT:  It's not an issue of trouble.  It's an

17    issue that the plaintiffs are arguing so I have to consider

18    it, I can't ignore it.

19              MS. HARDIN:  I understand, Your Honor, but we didn't

20    move on that basis and so it's not an answer --

21              THE COURT:  Whether or not you moved is not relevant

22    if the plaintiffs' argument is that the distinction at issue

23    is one of control.  So you can choose to ignore it, and then

24    I'll decide without your argument.  Or you can address it.

25              MS. HARDIN:  We are not ignoring it, Your Honor.  Our
```

1    point is that it is not the distinction.

2            THE COURT:  Okay.

3        MS. HARDIN:  That is not the basis.  If you read the

4    Rhode Island Supreme Court, it tells you we don't apply

5    product -- we don't apply public nuisance to products because

6    rarely, if ever, will the manufacture or the distribution of a

7    product impact a public right.

8        When we read *Illinois* --

9        THE COURT:  Rarely if ever, which meant that there

10   might be a rare instance where it does?

11       MS. HARDIN:  Well, I think the plaintiff has said we

12   have a categorical rule that a public nuisance claim can never

13   involve a product.  That is not the claim.  It's not that a

14   public nuisance may never involve, in some tangential fashion,

15   a product.  The issue is that public nuisance does not apply

16   when the claim is simply one of negligence or -- or defective

17   design because that is the law of products liability and

18   negligence.

19       And the third Restatement says that the -- the application

20   of public nuisance law to those types of claims is inapt and

21   that it has -- it was a misuse of the second Restatement to

22   the extent that cases who have allowed such an extension of

23   public nuisance have done so in reliance on the Restatement.

24       So that -- and we'll get -- public right was my second

25   issue, Your Honor.  I'm happy to move to that, or if you still

1    have questions on this one.

2              THE COURT:  You should because you'll run out of time

3    otherwise.

4              MS. HARDIN:  So public -- the plaintiffs have not

5    adequately alleged a public nuisance claim, Your Honor,

6    because they have not --

7              THE COURT:  You're still speaking very fast.  I'm

8    sure you had a lot of coffee this morning.

9              MS. HARDIN:  I'm afraid I can't even blame it on

10   that, Your Honor.  It's just a fault.

11        Public rights are shared indivisible resources to things

12   like air, water, and rights-of-way.  That's the definition

13   under the Restatement.  Your Honor can also think of it as

14   public rights are really the ability of the public to be in

15   public and to use public spaces and public resources.

16        Plaintiffs have not alleged any of that.  They don't even

17   address that definition, much less try to show that they meet

18   it.  Rather what they have said is that they have alleged a

19   public right because they have identified an alleged public

20   health crisis in the United States.

21        But the cases are clear, Your Honor, that the existence of

22   a public health crisis is not the same thing as interference

23   with a public right.  But the Rhode Island, the Illinois, and

24   the Oklahoma Supreme Courts started with the notion that in

25   those cases, there had been some sort of interfere -- some

1    sort of public health crisis.  In Rhode Island, it's the

2    ingestion of lead paint and poisoning by children.  In *Hunter*,

3    the Oklahoma case, it's the opioid epidemic and addiction in

4    the United States.  And in Illinois, it's gun violence.

5        And they said that doesn't answer the question because we

6    still ask what is the nature of the right that is allegedly

7    being interfered with.

8        And the plaintiffs are quite clear, both throughout their

9    complaint and in their opposition, that the interference --

10   and this is a quote from their brief on opposition page 34,

11   Your Honor -- that the interference is with the mental health

12   of school-age children thereby interfering with a public right

13   to health.

14       And what they have alleged the interference is, Your

15   Honor, is things like -- the injuries that result are things

16   like body dysmorphia, anxiety, depression, self-harm,

17   interruption with relationships, and difficulty in school.

18   And those are quintessentially private rights, Your Honor.  If

19   there's been an interference at all, it's with the private

20   rights of students.

21           **THE COURT:**  So let me get a response from the school

22   districts on that topics, the rights of the school districts

23   being violated as opposed to the violations derivative from

24   their students' rights.

25           **MR. WEINKOWITZ:**  I understand, Your Honor.  My answer

1    to that question is, is that, you know, the school

2    districts -- the defendants' arguments are basically that the

3    school districts are not exercising any rights at all, and as

4    a result of that, there's no public nuisance claim because the

5    entire claim is based on the individual students' rights.

6        But what I'd like to show you, Your Honor, is when I heard

7    that argument and I read the brief, I thought, wow, that's an

8    interesting argument and I'd like to see precisely what it is

9    that the defendants are citing in support of that argument.

10   Because that really focuses the narrow of public nuisance

11   quite -- quite narrowly.

12       Could I get the ELMO?

13           **THE COURT:**  Yes.  We can turn that on.

14               (Demonstrative published.)

15           **MR. WEINKOWITZ:**  Your Honor, so what I did was I went

16   to the part of their brief where they made this argument, and

17   I looked at footnote 39.  And there they say see Restatement

18   section 821B Comment g, and then they have a parenthetical.

19       And it says public nuisance is one that, and here is where

20   the quote starts:  Interference with those who come in contact

21   with it in the exercise of a public right.

22       So I thought, wow, that's -- that's an interesting

23   argument.  And there's a period.  And then I decided, well, I

24   had to go back in and --

25           **THE COURT:**  There's a period after the parenthetical,

1     not in the quote.

2          MR. WEINKOWITZ:  Correct.  So then I went in -- I

3     went into the Restatement to see precisely what the quote was.

4     And what -- what you see here is the paragraph that they

5     quoted from, they picked -- they picked that phrase out, and

6     it says, "It is, however, necessary" -- "It is not, however,

7     necessary for the entire community to be affected by a public

8     nuisance so long as the nuisance will interfere with those who

9     come in contact with it."  And this is the part they put in

10    italics:  "In the exercise of a public right."  But there's an

11    "or" there.  And it says:  "Or it otherwise affects the

12    interests of the community at large."

13        And it is that phrase there where we find our public

14    right.  And maybe the ellipsis was missing, but it's that

15    particular phrase where we find the public right, and the

16    school districts don't actually have to be exercising the

17    public right.  The case simply needs to involve a public

18    right.  And --

19          THE COURT:  Let me -- let me ask.  I don't know if

20    you cited these cases.  There were a series of cases that came

21    out of -- I think it was school district cases in San Antonio,

22    Texas, where the court found that there was no fundamental

23    right to an education.  But did it talk about -- those cases,

24    did those cases talk about the nature of the right to an

25    education?

1          MR. WEINKOWITZ:  I don't remember specifically what

2     those cases talk about with regard to the right to public

3     education.  But what I will say about that is the right to

4     public education is found in every constitution, state

5     constitution.

6          And the right to education, the school districts have a

7     duty to deal with the students that are before them, to deal

8     with their mental health, to deal with -- to educate them.

9          THE COURT:  Well, I mean they have all sorts of

10    duties including with respect to those who are covered by the

11    ADA and --

12         MR. WEINKOWITZ:  That's correct.

13         THE COURT:  -- and others.  I just didn't know

14    whether courts had -- circuit courts had opined on the nature

15    of the right as opposed to --

16         MR. WEINKOWITZ:  I -- I haven't -- and I will confess

17    to you, Your Honor, there are no cases where the public right

18    to education has been identified specifically as the right

19    that was interfered with a nuisance claim.  I can't purport to

20    say that.

21         What I can purport to say is that there are two rights

22    that are involved here, and it's public health and public

23    education.  And you get the public education right out of the

24    constitutions of each state.  I think that the Court can

25    recognize the existence of that right and the right -- and the

 1  Restatement doesn't specifically require their -- it gives a
 2  list of public rights --
 3       THE COURT:  Let me interrupt you.
 4       MR. WEINKOWITZ:  I'm sorry.
 5       THE COURT:  That's all right.  I just want to get
 6  this one closed up here so we can take a break.
 7     Is it true, have you checked whether, Ms. Hardin, all of
 8  the state constitutions at issue include the right to public
 9  health and/or public education?
10       MS. HARDIN:  There is no constitutional right to
11  health of which I am aware, Your Honor, in any of the states.
12       THE COURT:  So he just said that -- that it stems
13  from those state constitutions.  So --
14       MS. HARDIN:  I understood Mr. Weinkowitz to be
15  speaking of the right to public educa- -- his alleged right to
16  public education, not public health.  But perhaps I
17  misunderstood.
18       THE COURT:  Okay.  Well --
19       MS. HARDIN:  There is no right to health.
20       THE COURT:  Let's get clarity.
21     What were you talking about?
22       MR. WEINKOWITZ:  I may have misspoken.  If you look
23  at Appendix E to our brief, as there is the state constitution
24  of the 17 states at issue.  Within that state constitution is
25  the public right to education.  The public right to health is

```
 1       identified in the Restatement --
 2               THE COURT:  I see.
 3               MR. WEINKOWITZ:  -- and the case law.  So we have the
 4       constitutions for the public right to education.
 5               THE COURT:  Okay.  And you agree with that with
 6       respect to the education piece?
 7               MS. HARDIN:  I do not agree with -- I agree that
 8       there are in some states a constitutional duty imposed on
 9       states to provide a system of public education.  That might,
10       under some circumstances, Your Honor, give rise to a
11       corresponding right of the citizenry to access public
12       education.  But that would not be a claim under public
13       nuisance.  Mr. Weinkowitz is quite right about the fact that
14       there has never been a case in any of the 50 states in all of
15       the law of public nuisance that has ever held that there is a
16       right to public education that is redressable through public
17       nuisance law.
18          Not even *Juul*, which is the plaintiffs' answer to most
19       things in this case, held that there was a public right to
20       education.  Judge Orrick decided that case on the alleged
21       interference with public health.
22          So we do not believe that -- that public education saves
23       their public -- their public nuisance claims here, Your Honor,
24       because we are still left with, at bottom, what is the
25       interference with alleged private rights.
```

1      Because even as it relates to what it is they claim has

2   been interfered with vis-a-vis education, it is individual

3   students, it alleged interference with their academic

4   performance, their ability to participate, their ability to

5   pay attention.

6      It is -- you know, I think we cited in the brief, Your

7   Honor, 80 times they mention the youth mental health crisis in

8   their complaint.  That is what these cases are alleged to be

9   about.

10      And when we read the Restatement and the Supreme Court

11   cases to have addressed this issue, this is not the kind of

12   public right -- or not the kind of interference that satisfies

13   the notion of public right because, again, it isn't

14   coextensive.

15          **THE COURT:**  Mr. Weinkowitz, the defendants argue that

16   you lack authority to seek abatement of a public nuisance.

17   What is your standing or statutory authority to seek an

18   abatement?

19          **MR. WEINKOWITZ:**  Your Honor, the causes of action are

20   private rights of action.  They are not public.  They are not

21   being brought by the school districts as public entities.  And

22   as a result of their being a private right of action, there is

23   in fact, as long as we can meet the special injury

24   requirement, which I can argue that we do, then we have the

25   right -- we have the right to seek abatement.

1    And I can address the special injury argument, or I can go

2    back to the private rights argument because I have some

3    responses for that too.

4        **THE COURT:**  You should be -- you can make your

5    arguments.  Just be judicious with your words.

6        **MR. WEINKOWITZ:**  On private rights, the school --

7    first of all, the defendants have cherrypicked the allegations

8    out of the complaint and ignored the allegations that indicate

9    that it's more than just a private right.

10    We have alleged that the defendants' conduct not just

11    harmed an individual student or one individual student but the

12    entire public school system.  It has impacted and infected how

13    schools operate, how teachers teach, how coaches coach, how

14    parent deal with their children.

15    Of course the school districts are going to describe the

16    harms to individuals in the complaint because without

17    describing those harms and the interference of those harms,

18    the school districts would never be able to explain how the

19    harms are impacting the schools.  You can't have a public

20    health crisis without having individuals.  So to say that our

21    entire complaint is about individual rights is just a

22    mischaracterization.

23        **THE COURT:**  Okay.  Two minutes each to provide any

24    further thoughts, and then we'll take our break.

25        **MS. HARDIN:**  Yes, Your Honor.

1    All those injuries that Mr. Weinkowitz just noted are not

2    interferences with any public rights.  The fact that teachers'

3    jobs might be harder or that they have had to expend more

4    resources does not impact any indivisible resource that we

5    have.  We've covered the issues of no right to public

6    education.

7    On special injury, Your Honor, they absolutely have to be

8    injured in the exercise of their public rights.  I'm not sure

9    to what Mr. Weinkowitz is referring when he looks at the

10   Restatement because Restatement Section 821C, which involves

11   this direct issue, makes it quite clear that you can only be

12   specially injured if you are injured exercising the right

13   common to the general public that was the subject of the

14   interference.

15   Certainly the school districts have not been injured in

16   the exercise of their rights to public health or their rights

17   to public education.  Even if there were such rights, wouldn't

18   make any sense to even speak in those terms.  It is clear from

19   the complaint and from the opposition that we are talking

20   about the interference with students' rights.

21   So they don't meet that threshold showing for special

22   injury.  Their injuries are not different in kind and degree,

23   Your Honor, because they are derivative.  For reasons

24   Mr. Pistilli has already explained, they are follow-on

25   injuries.  They are not distinct.

1        And if you look at the examples in the Restatement, Your

2    Honor, of what it means to have special injury, every single

3    one of them involves some interference with a -- with a public

4    highway or a sidewalk that -- that impacts the -- the

5    plaintiffs' ability to access his or her land.

6        And those cases essentially say that those plaintiffs

7    could have also maintained a private nuisance because of the

8    interference with their land.  And I think even the plaintiffs

9    agree that private nuisance has to involve use and

10   interference with land.

11       You will not find in the Restatement, you will not find in

12   a single case cited by the plaintiffs, other than the *Juul*

13   case, that holds that there is special injury when one

14   plaintiff simply has paid more money as a result of injury to

15   a third party.

16       **MR. WEINKOWITZ:**  Comment H to the Restatement.

17   Pecuniary loss qualifies as special injury.  This is page 4 on

18   the Restatement.  Pecuniary loss to the plaintiff resulting

19   from a public nuisance is normally a different kind of harm

20   from that suffered from the general public.

21       Then it goes on to give an example.  A contract who loses

22   the benefit of a particular contract or is put to additional

23   expense in forming it because of the obstruction of a public

24   highway preventing him from transporting materials --

25       **THE COURT:**  Slow down.

1          **MR. WEINKOWITZ:**  -- to the place performance can

2     recover from public nuisance.  The same holds true for lost

3     profit.

4          The injuries to the school districts are not -- they are

5     specific to the school districts.  They are different from the

6     injuries to the individual users' addiction, and they are

7     wholly -- we have alleged that there has been injury to the

8     school property, that the defendants have targeted the

9     school -- not only the students but the individual school

10    districts.

11         The master complaint alleges in detail internal documents

12    in research by the defendants that, in the words of Meta,

13    winning schools is the way to win with teams because an

14    individual teen engagement is highly correlated.

15         TikTok and defendant -- and TikTok and Meta, just like big

16    tobacco, just like big tobacco, joined up with third-party

17    organizations called the National PTA and the Scholastic, and

18    they went to back-to-school sponsor, back-to-school nights, to

19    infiltrate the schools themselves inside the schools to get

20    access to students, to get access to teachers, to get access

21    to administrators.  And as a result of that conduct, they

22    contributed to, and just like big tobacco and just like *Juul*,

23    to be honest with you, they infiltrated the schools and they

24    created the public nuisance.

25         **THE COURT:**  And on that, your two minutes is up,

```
 1    Mr. Weinkowitz.
 2           MR. WEINKOWITZ:  Thank you, Your Honor.
 3           THE COURT:  Thank you both.
 4       We will stand in recess for 20 minutes.
 5           THE CLERK:  Court is in recess.
 6        (Recess taken at 10:01 A.M.; proceedings resumed at
 7    10:21 A.M.)
 8           THE CLERK:  Please remain seated and come to order.
 9    Court is back in session.
10           THE COURT:  Okay.  We're back on the record.
11       The record will reflect that the parties are present.
12       Let's get the argument then on the last topic, negligence.
13       Ms. Yeates.  Melissa Yeates and David Mattern.
14       Mr. Mattern, you may proceed.
15           MR. MATTERN:  Good morning, Your Honor.
16       So I'm going to focus to today on duty and then the
17    economic loss rule.
18       And to start with duty, there are three points that I want
19    to talk about today.
20       The first is the third-party argument and how really all
21    the school districts' allegations are based on harms to or
22    from third parties that are barred by law.
23       The second point I want to discuss is foreseeability and
24    why, as a legal question, the school districts' theory of
25    liability is not foreseeable as a matter of law.
```

 1       And finally I want to talk a little bit about public

 2  policy.

 3       But to start with the issue about third parties, this --

 4  the school districts' claims aren't that they use the

 5  defendants' services.  Instead they claim that -- that they

 6  should be allowed to recover the money they spent providing

 7  harm to -- mental health services and the like to injuries

 8  they say students suffered.

 9       And that's really clear if you take a look at their

10  complaint.  So I'm looking at paragraphs 1017 where they say

11  defendants' actions constituted a failure to act in a way that

12  was necessary for the protection or assistance of another in

13  which the actor is under a duty to do so.

14       And really all the allegations in this negligence section

15  are the same.

16       And why that's important is because in all the 19 states

17  that are at issue, courts as a matter of law only recognize

18  these types of claims if there's a special relationship with

19  the school districts, say, that they don't allege, or if there

20  was an example of misfeasance or the defendant doing something

21  to increase the risk of harm.  And there are no allegations

22  that support that here.

23       I might respond to a couple of points that I expect my

24  friend will make.  And the first is that rather than really

25  deal with the issue about a special relationship, the school

1    districts pivot to argue that because the platforms control

2    their services, they have a supervisory relationship, and

3    that's enough.

4        One, that's not the law.  That's not what the cases say.

5    But also the four cases that they cite on this don't even

6    support the rule they're articulating.  And this is from

7    page 47 in their opposition.

8        So the cases they talk about are *Kesner*, *Cricket*, *J'Aire,*

9    *McCain*.  And these are all cases where there was more of a

10   direct injury caused between the plaintiff and the defendants.

11       So *Kesner* is the asbestos case.  Key to the court's

12   rationale there was that, well, the employer has the ability

13   to control what the employee does during the day.  That's a

14   kind of supervisory control.  That's much different and

15   doesn't exist for what the school districts allege against the

16   platforms.

17       And even if you weren't sure about that, *Modisette*

18   considered this exact argument when considering Apple, and

19   Apple's FaceTime program, and said no, *Kesner* doesn't apply to

20   design claims brought against Apple and platforms like Apple.

21   So that really resolves that question.

22       The three other cases are even worse for the school

23   districts.  *Cricket* is a case where someone, a two-year-old,

24   used a lighter that caught curtains in a house on fire and

25   burned down the house and killed the occupants inside.  The

```
 1    estate sued.  And there, there was a direct injury.  So that's
 2    inapposite.
 3        J.R. dealt -- deals with a special relationship between a
 4    contractor, not applicable here.
 5                    (Off-the-record discussion.)
 6        MR. MATTERN:  And so really that shows why the
 7    supervisory relationship part isn't enough.
 8        The last piece of this is the misfeasance piece.  And we
 9    think this is resolved by Your Honor's order in the personal
10    injury cases which said that there were no allegations that
11    the platforms engaged in the kinds of misfeasance that courts
12    have recognized as an exception to this doctrine.
13        And so I'm happy to answer any questions about the
14    third-party harm point, but we think that's a clear reason why
15    we should win on the duty question.
16        THE COURT:  A response.
17        MS. YEATES:  Yes, Your Honor.  Melissa Yeates of
18    Kessler Topaz on behalf of the school district plaintiffs.
19        The focus of a negligence claim is on defendants' conduct.
20    And the threshold question that defense counsel is speaking
21    about is whether defendants owed plaintiffs a duty to act with
22    due care, whether it's fair and equitable in this circumstance
23    to require defendants to act in a way to avoid undue risk of
24    harm to the school districts.
25        The school districts allege that defendants directly
```

1    targeted students and schools with the goal of never-ending

2    use.  The complaint is filled with allegations related to

3    defendants' specific targeting of the schools and the specific

4    harm that this caused the schools.

5        This is not a third-party no-duty-to-protect case, which

6    is what defendants are attempting to shoehorn this case into.

7    The no-duty-to-protect cases are cases like defendants cite in

8    *Brown vs. Taekwondo*, *Regents of University of California*.

9    Those are cases where plaintiffs merely allege that the

10   defendant failed to protect them from a third party's conduct

11   and primarily criminal conduct.

12       So the Taekwondo organization failed to protect a

13   plaintiff from sexual abuse by her coach.  The University

14   failed to protect a plaintiff from a stabbing that happened in

15   a chemistry classroom.  That is not the type of situation we

16   have here.

17       The no-duty-to-protect rule only applies when the

18   complaint's allegations solely focus on the conduct of a third

19   party.  And that's the same situation for when a special

20   relationship applies.  A special relationship is only

21   considered in cases like that where there are no allegations

22   that the defendants' affirmative conduct created the risk of

23   peril to the plaintiffs.

24       Here, those cases bear no resemblance to this case where

25   the school districts allege that defendants' conduct, the

1    actions they took themselves, have harmed the school

2    districts.

3        In creating the youth mental health crisis, in targeting

4    schools, in targeting school-age children, we have numerous

5    allegations about the fact that they wanted to win schools,

6    that they wanted to make sure children were using their

7    platforms compulsively, they were addicted to their platforms,

8    they couldn't put them down at any time of day including

9    during the school day.

10        Defendants even promoted their platforms as safe and

11    beneficial to use in schools.  They sent back-to-school kits.

12    They updated features so that their platforms could be used on

13    desktop computers during the school day.  And they sent tips

14    and tricks for use in the classroom.

15        All of this conduct, in targeting schools, attempting to

16    addict children to these platforms, and monopolize their

17    attention during the school day when the focus is supposed to

18    be on education which the school districts here are obligated

19    to provide, those are the allegations.  Those are direct

20    allegations of affirmative actions taken by defendants.  And

21    so those cases that defense counsel is talking about are

22    wholly inapposite here.

23            THE COURT:  So, Mr. Mattern, I can't point to the

24    exact allegations, and I'm sure that there are some that, you

25    know, only involve third-party conduct, but there clearly are

1    others that do not.

2    And in a social media order that I previously issued, I

3    made that distinction about the fact that negligence claims

4    where you have defendants' conduct that is -- or I should say

5    it differently -- where there were no allegations about --

6    about the role of the defendants because you had -- you know,

7    they're interactive, so to speak.

8    So the complaint, in order for you to succeed, I would

9    have to ignore all of the allegations of defendants' conduct.

10    How can I do that?

11    And what is the point of the motion given that there are

12    allegations, so even to the extent that you're right that

13    there is some third-party conduct, it's not solely third-party

14    conduct that's at issue.

15    **MR. MATTERN:**  So two responses to that, Your Honor.

16    So, first, you're absolutely right that there are examples

17    such as paragraph 1023 subparagraph R that deal with claims of

18    vandalism and theft that are clearly by third parties.  And I

19    think there maybe is even, you know, agreement in our

20    understanding that those claims would be barred under the law.

21    For the second part of your question, though, I think how

22    we view the case is that all of the school districts'

23    allegations are based on harm that they say students and --

24    students really inflict on the school districts in a way that

25    students cause distractions, that they weren't paying

1  attention in class --

2  **THE COURT:**  But -- just that's not -- that's not

3  accurate on the face of the complaint.  I mean there are

4  allegations about the specific conduct that the defendants are

5  engaging in.  And it may be right, it may be wrong.  But you

6  want me to ignore it and I can't.  And so the question is, is

7  there anything to be done short of ignoring that?  I have to

8  accept those allegations as true for purposes of this motion.

9      I understand in other parts of the motion maybe there's a

10 way to narrow.  I don't understand how to narrow with this

11 part of the motion because on this particular issue, there are

12 allegations that you want to ignore that I cannot.

13 **MR. MATTERN:**  So I'm going to take a translator to

14 convince you on foreseeability and public policy.  But taking

15 the question as it comes, my suggestion would be to, at the

16 very least, dismiss the claims in paragraph 1023r and the

17 allegations that relate to property damage by students.

18     And the gist of these allegations is that students watched

19 the videos of viral pranks on various platforms and then

20 replicated those pranks, which would be things like defacing

21 the bathroom or like stealing bathroom doors, stuff like that.

22 **THE COURT:**  All right.  So response on 1023R.

23 **MS. YEATES:**  Yes, Your Honor.

24     There are allegations related to property damage

25 throughout the complaint, and there are a couple of different

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

1  reasons for that property damage.

2     One of the reasons is that because defendants acted in a

3  way to create and market these platforms to teens in a way to

4  make them use the platforms compulsively and addict them, that

5  conduct has led teens to act out in schools and create

6  property damage.

7     **THE COURT:**  Isn't that a bit too, for lack of a

8  better word given that the prior counsel couldn't give me any

9  objective factors, too remote?

10    **MS. YEATES:**  It is not too remote.  Because this

11  property damage is happening in a situation where a student is

12  using their device in the classroom either to post or to look

13  at videos and they're causing a disruption in the classroom

14  and a teacher has to go in and try to take the device away or

15  stop that conduct.  And that can lead to disruptions,

16  outbreaks.  That can lead to property damage.

17    But the reason the student is acting like that is because

18  they're addicted to the platform, which is exactly what

19  defendants encouraged them to do.  That's exactly why they

20  made these design choices, why they made these marketing

21  choices.

22    And so if you look at cases when third-party conduct is

23  involved, just the fact that a third party is involved does

24  not mean that you cannot have foreseeability of harm and you

25  cannot have a duty.

1          And the *Hacala* case says that very expressly, that when a

2     defendants' conduct puts a plaintiff in the foreseeable zone

3     of risk and another party's conduct is also foreseeable, it's

4     also within that foreseeable zone of risk, you have to look at

5     the conduct as a whole, and that third party's conduct doesn't

6     break the chain.

7          **THE COURT:** Well, we won't reargue it, but it seems

8     as if you're focusing on content which gets you back to the

9     230 problem in addition to being too attenuated.

10         Let's move to the other sections.

11         Foreseeability, economic loss doctrine.

12         **MR. MATTERN:** And just briefly on the 230 question,

13    Your Honor, which I'm not going to reargue, but we agree and

14    we think that's the problem with all of the property

15    allegations in addition to the argument that it's too

16    attenuated as a matter of traditional negligence law.

17         Moving on to foreseeability, though, I think everyone

18    generally agrees on the framework that foreseeability and

19    public policy are what pretty much every state considers in

20    deciding whether there's a duty. I think maybe there's a

21    dispute at the margins about the weight that each state gives

22    them, but I think everyone agrees that --

23         **THE COURT:** Do we agree? Do you agree on the

24    framework?

25         **MS. YEATES:** I'm sorry. Could you repeat that?

```
 1              MR. MATTERN:  Yeah.  So starting off with the

 2    framework, I think everyone agrees that pretty much every

 3    state looks at both foreseeability and public policy factors

 4    in deciding whether there's a duty.

 5              MS. YEATES:  I do not agree with that.

 6              THE COURT:  Okay.  Well, let's start with legal duty.

 7              MR. MATTERN:  All right.  So to start with that, and

 8    I think Modisette is really a great case here, it's

 9    California, it's a case where -- sorry.  Modisette is great

10    for the framework point.  It's a case where a California court

11    applied public policy even despite finding an injury

12    foreseeable.

13         But on the question of foreseeability, so I think there

14    are three problems with the school districts' allegations

15    here.  The first is that many of the ways that they claim the

16    defendants targeted schools or targeted school-age individuals

17    are barred by 230 and the First Amendment.

18         And just to take like a couple of examples.

19              THE COURT:  Well, we aren't going to discuss that.

20    So move on.  I understand those arguments.  We've had so much

21    debate.

22              MR. MATTERN:  Okay.

23              THE COURT:  I don't need your argument on that

24    matter.

25              MR. MATTERN:  Okay.  Understood, Your Honor.
```

1    And just for the record, I'm talking about paragraphs 220

2    to 240.  But that's one point.

3    The second part is that the other piece to this is that

4    really the injuries that the school districts claim are too

5    attenuated and not foreseeable in terms of the doctrine.

6    And I want to draw a comparison to *Juul* because I think

7    the differences in the allegations here and in *Juul* are really

8    a great example of why the school districts' allegations are

9    not foreseeable.

10    So the focus in *Juul* and in the opioid cases and in a lot

11    of -- and the other cases that the school districts have cited

12    have all been on some illegal conduct.

13    So the focus in *Juul* was a concern of avoiding creating a

14    market for youth vaping which is not permitted.  Likewise in

15    the opioid cases, the concern in those cases is with creating

16    a black market for drugs.  That's in stark contrast to the

17    platforms here which are lawfully used by students and many

18    others for legitimate purposes.

19    And so I think if you look at each of those allegations,

20    that's really a key distinction just as a legal matter about

21    that element of illegality is missing, which is why the

22    allegations here are different as a matter of law.

23    The next point to this is that accepting the school

24    districts' allegations requires drawing a long string of

25    inferences, many more than courts accept for foreseeability.

1    And, again, this is, as a legal question, it requires that the

2    defendants design services in a way that is deficient, that's

3    the first part.  The second is that some students use them and

4    that for some of those students it was harmful to their mental

5    health or caused some other negative effect.

6        The fourth part of that is that there must be some injury

7    that the students inflicted on the school districts, whether

8    it's diverting resources, causing a distraction, or what the

9    case may be.

10        And the next part of that is that the school district had

11    to respond to that specific disruption or diversion or

12    whatever, as the case may be.

13        And if you really parse the allegations of the complaint,

14    it doesn't really draw that line through.

15        There's some generalized -- I'm sorry, Your Honor.

16            **THE COURT:**  I'm not sure I agree with you.  But go

17    ahead.

18            **MR. MATTERN:**  I think that there are generalized

19    allegations about ways they -- they say that the platforms

20    targeted school districts.  We disagree with those, but I'm

21    not going to argue it at this -- at the posture.

22        But I think what's missing is a connection that a

23    particular school was targeted or that a particular school

24    responded to what they say were disruptions caused by students

25    using social media.

```
 1         And, Your Honor, I think I'm much closer to the age of
 2    being in school than many of the folks that have appeared
 3    before you.  I think -- I grew up with social media and
 4    schools have a long history of banning many things ranging
 5    from, you know, books to Game Boys to even calculators.  It
 6    seems like this is sort of in line with that.  But it's not
 7    evidence of actual disruption in response.
 8              THE COURT:  Do you have children?
 9         MR. MATTERN:  I do not.
10              THE COURT:  Well, as a parent, I'm probably then
11    closer to you -- closer than you to having school-aged kids in
12    those environments.  And it's -- it's ubiquitous.  I mean
13    they're everywhere.
14         And the challenges that they're facing -- I don't know
15    that they have a claim -- but the challenges that they are
16    facing are real, they are significant, and they all fall back
17    and they are all tied back to these platforms.
18         MR. MATTERN:  But, Your Honor, I think the -- the
19    flip side of that, and this gets to the public policy point,
20    if it's okay to move on to that, is really the important value
21    that these platforms serve really as forums for communication
22    and expression.  And this is everything from --
23              THE COURT:  I think it's really debatable at this
24    point, right, how much is -- how much is valued and how much
25    isn't valued.
```

1          MR. MATTERN:  Well, I can certainly say that for many

2     students like -- for many students it's a way to have a

3     network to a community that they wouldn't have access to

4     otherwise.  Like, for example, I think the experience of a gay

5     teen growing up in rural Ohio is probably a lot different than

6     a teen growing up in Oakland.  And social networks make it

7     possible to have those kinds of communications or to build

8     those networks that wouldn't exist otherwise.

9          THE COURT:  There is a double-edged sword.  It's a

10    double-edged sword.

11         MR. MATTERN:  But this is also this First Amendment,

12    you know, free speech, these benefits, these are issues that

13    courts have considered many times, even recognizing that it's

14    a double-edged sword and the -- the social and societal

15    arguments that go along with it.

16       This is something that's come up in the context of violent

17    movies in the '80s and '90s, and that courts in *Olivia* and --

18    and *Zamora* considered and cited public policy in declining to

19    impose a duty as a matter of law for fear of chilling speech.

20         THE COURT:  All right.  Let's get a response

21    including with respect to *Modisette*, which is, for the court

22    reporter, M-O-D-I-S-E-T-T-E, *vs. Apple*.

23       Go ahead.

24         MS. YEATES:  Yes, Your Honor.

25       The type of foreseeability analysis that defense counsel

1    was describing is not the appropriate foreseeability analysis

2    that applies at the duty stage.  That's more akin to

3    foreseeability at the proximate cause stage which is a factual

4    issue and goes to the jury.

5       The foreseeability analysis when it comes to duty, which

6    is a question for the Court, is a much broader analysis.  It

7    does not require that the precise harm in a given case be

8    predictable.  Instead it's enough that defendants should have

9    foreseen that the general risk of injury would result from

10    their conduct to these plaintiffs.

11       And when considering duty under that general analysis, you

12    look to this class of plaintiffs.  Is it foreseeable that this

13    class of plaintiffs would be harmed by defendants' conduct?

14    And we submit it was clearly foreseeable that when defendants

15    were targeting students who spend six hours of their day in

16    school, Facebook -- it's in our -- the allegations are in our

17    complaint -- Facebook understood that that was six valuable

18    hours.  They wanted to get those back.  They wanted to drive

19    user engagement during that schoolday time.

20       And so when defendants are specifically targeting students

21    in schools, and schools have an obligation, they're on the

22    front lines, they are the providers of educational services

23    during the day, disciplinary services, mental health and other

24    school services, they have been targeted, they are clearly the

25    class of entities that these defendants have a foreseeable

1    duty to.  The defendants' conduct put them in the foreseeable

2    zone of risk just like Judge Orrick found in *Juul*.

3        With regard to public policy, certain states do look to

4    public policy in addition to foreseeability.  Many of those

5    states still say foreseeability is the number one, the

6    principal determinant.  But there are other public policy

7    factors, and each of those weigh in favor of imposing a duty

8    on defendants here.

9        Number one, the moral blame associated with defendants'

10   conduct here is high.  And in considering that, courts often

11   look to whether defendants made money associated with their

12   negligent conduct.  Here, defendants certainly did, and lots

13   of it.  And that was the goal of the conduct, in fact.

14       There's a close connection between defendants' conduct in

15   creating the youth mental health crisis and targeting schools

16   and targeting students including during the school day, and

17   the school districts' harm.

18       There is no social utility in defendants' conduct in

19   targeting and addicting children, and any utility in the

20   platforms themselves is outweighed by the nature of the risk

21   and the foreseeability of the harm here.

22       The magnitude of the harm here is great.  There is no

23   significant burden on defendants in order for them to change

24   their conduct.  They could create less addictive platforms.

25   They could stop targeting kids and schools.  The community and

1    the public will benefit if a duty is imposed and the youth

2    mental health crisis is curbed.

3        And there is strong public policy in favor of preventing

4    future harm and in defendants bearing the risk associated with

5    their negligent conduct as opposed to it being left as a

6    burden on the school districts.

7            **THE COURT:**  You mentioned that they wanted the six

8    hours back.  What are the allegations with respect to their

9    specific conduct with respect to those specific hours?  Or are

10   there?

11           **MS. YEATES:**  I have a list of the allegations about

12   targeting schools, but if you're looking for that specific

13   allegation, I think I did flag it here.

14       So if you look at the allegations at 65 and 214, that's

15   where that type of analysis by defendants is talked about.

16   There are another -- there are a number of other targeting

17   allegations, 7, 16, 58, 65, 67, 211 through 228.

18           **THE COURT:**  Okay.  Thank you.

19           **MS. YEATES:**  You're welcome.

20       Your Honor asked a question on *Modisette* so I'd like to

21   talk about that if that's okay with you.

22           **THE COURT:**  Okay.

23           **MS. YEATES:**  Defendants point to this case as the sky

24   is falling.  You know, if -- if defendants have a duty to

25   school districts here, suddenly the courthouse doors are open

1    and everyone can sue them for anything.  But that's simply not

2    the fact.

3         The *Modisette v. Apple* case is very precise in its

4    analysis.  The issue there was that Apple had designed the

5    FaceTime feature and had not included a lockout technology on

6    it.  And then someone using the FaceTime feature was driving

7    and injured people in a car crash.

8         The court there actually said that was foreseeable.  This

9    was an affirmative act case, and the court applied a

10   foreseeability and a public policy analysis, which is the

11   appropriate analysis here.  And the court said even though it

12   was foreseeable, there are a lot of public policy factors at

13   issue here, and those weigh against imposing a duty.

14        And a couple of the things that the court looked at was

15   that the California legislature had considered and chosen not

16   to ban cell phone use while driving.  Instead they elected to

17   have hands-free options.  They recognized the importance of

18   being able to report traffic conditions, emergencies, and

19   things of that sort.

20        And so the cell phone use was providing benefits to the

21   community.  And so they weighed that against the duty that

22   plaintiffs would -- were requesting in that case, which,

23   different from here, was an extremely broad duty.

24        Because Apple -- there were no allegations in the

25   complaint that Apple had attempted to make FaceTime addictive

1    to drivers, had targeted drivers, had encouraged drivers to

2    use FaceTime while driving, we have all of those allegations

3    here, they didn't exist in the Apple case.

4       And the duty that was requested would run to all

5    individuals who were injured by drivers using phones.  The

6    court said that's not beneficial for society.  That's -- we

7    need to have some line-drawing here.

8       And because of policy concerns, and the fact that

9    importing that type of duty is akin to a general duty to the

10   public, and it may preclude cell phone use which was already

11   expressly permitted by the California courts, that that was

12   against public policy and so they decided not to impose a duty

13   there.

14      Here there are no such policy concerns.  There is no law

15   supporting compulsive social media use by teens or in schools.

16   And the public policy concerns I just talked about, including

17   the moral blame, the lack of social utility of defendants'

18   conduct and the other public policy factors support imposing a

19   duty.

20          **THE COURT:**  Any comments with respect to the public

21   policy considerations?  And then we'll have very short

22   argument on economic loss.

23          **MR. MATTERN:**  Thank you, Your Honor.

24      So I want to start with *Modisette* because I think that's a

25   really helpful frame for the public policy considerations.

1    And that's one, you know, while we think that -- I didn't hear

2    a response about why the illegality nature of *Juul* versus the

3    platforms here is enough to distinguish *Juul* on

4    foreseeability.

5        Even if you don't agree with that, *Modisette* says, okay,

6    we'll accept that the alleged harm is foreseeable, but as a

7    matter of public policy we're going to decline to impose a

8    duty.  And this is a question that the court decided at the

9    demurrer stage so it was a legal question.

10        And as I think my friend really explained, the basic

11    public policy reason for doing so is that it was permissible

12    for someone to use a cell phone.  There wasn't a law banning

13    it.  Which again supports the illegality point I drew.

14        But second, looking at the opinion itself, *Modisette*

15    pointed to decisions in the Supreme Court in, like, *Riley* and

16    *Carpenter* that described how cell phones --

17        **THE COURT:**  So I'll go back and read *Modisette*, but

18    you're going to run out of time.

19        **MR. MATTERN:**  Okay.  My point, though, is that

20    *Modisette* supports if there's a design claim targeted at a

21    platform that someone can lawfully use, there's a strong

22    public policy against imposing a duty there.  And that's

23    exactly what the school districts want to impose here.  So

24    that's one aspect of the public policy.

25        The second part to that is the First Amendment value of

1    these platforms as, you know, forums for expressive

2    communication, for speech, for joining communities, all the

3    reasons that we talked about a little bit ago.

4        And on a motion-to-dismiss stage, these are -- these First

5    Amendment considerations are considerations that courts

6    considered in cases like *Zamora*, in cases -- although it was a

7    slightly more complicated posture as a legal question in

8    *Olivia N.*, considered in *Sanders*, and considered in many of

9    the video game cases.

10       So we think that that is a really strong countervailing

11   consideration and something that also distinguishes the school

12   districts' allegations in this context from those allegations

13   in *Juul* and opioids.

14       And the third point is the -- is the issue of potentially

15   limitless liability.  The theory that the school districts

16   espouse as to targeting is extraordinarily broad.

17       For example, I think I heard Mr. Weinkowitz cite efforts

18   that platforms like TikTok made to go to the PTA to explain

19   parental controls and other features of their platform, if

20   really just having a meeting with the school by anyone is

21   enough to consider targeting, that could really expand the

22   kinds of claims that school districts could bring, including,

23   you know, including anything -- anything that's theoretically

24   used by children, whether it be like sugary cereals or, you

25   know, notebooks or toys that are directed towards children,

 1    and we think that really isn't the law.  And the fact the

 2    plaintiffs do not cite any cases by school districts that had

 3    ever recognized these claims is telling.

 4        So these are really the three points we consider on this

 5    point.

 6            **THE COURT:**  Do you want to say anything about the

 7    economic loss doctrine?  Do you want to say anything?

 8            **MR. MATTERN:**  Yes, Your Honor.

 9        So two parts to this.  So the reason I wanted to flag the

10    economic damages point -- sorry -- the property damages point

11    before is that the only noneconomic damages, the only property

12    damages are what we talked about in 1023 subparagraph R that

13    deal, you know, viral pranks and, you know, destroying of

14    school property.

15        If you put those aside, all the other damages are barred

16    by the economic loss rule in the states that recognize it.

17    I'll acknowledge that there are three states that don't, which

18    are Colorado and the two Carolinas, but we think in the rest

19    of the -- the other 16 states, all of plaintiffs --

20            **THE COURT:**  What about Florida?

21            **MR. MATTERN:**  So I think the Florida cases talk about

22    economic loss as a consideration in the negligence point.  So

23    the analysis is a little different in the sense that it's

24    baked into whether as a matter of Florida law there's a duty,

25    but the outcome is the same which is that there's no recovery

1   in negligence for economic losses in Florida.

2           THE COURT:  Do you agree with respect to Florida?

3           MS. YEATES:  Do I agree that the economic loss rule

4   applies in Florida?  No.  We cite the *Tiara Condominium* case

5   that says the economic loss rule does not apply in Florida.

6       And the *In Re Short Squeeze* case that they put into their

7   reply brief, that doesn't change that in any way.  *In Re Short*

8   *Squeeze* just talks about the difference between duty analysis

9   and the economic loss rule and makes clear that the *Tiara*

10  *Condominium* holding about economic loss, the economic loss

11  rule not applying, does not also apply to a duty analysis.

12  And so part of the duty analysis, when you look at

13  foreseeability and public policy factors, you can look at

14  whether those economic losses are foreseeable.  But the rule

15  does not apply outside of products liability claims.

16          THE COURT:  You do concede that it applies in

17  12 jurisdictions.

18      Let's -- you don't have to necessarily count.  My question

19  really is, although I'd like to make sure that there are the

20  12 jurisdictions, if it applies in those jurisdictions and I

21  find that the property damage claims are -- should be

22  dismissed, property-damage-based claims, is there anything

23  left?

24          MS. YEATES:  We do not agree that it applies in the

25  sense that it applies to this case in those jurisdictions.  I

1    think what we are trying to distinguish in our brief is the

2    states where there is no such doctrine, that's Colorado,

3    North Carolina, South Carolina, then there's another set of

4    states that only apply the doctrine between contracting

5    parties or in products liability actions, which are not

6    applicable here.  That's Arizona, Florida, Georgia, Indiana,

7    Maryland, and Rhode Island.

8        And the remaining states also do not apply the economic

9    loss doctrine to this type of case when there is an

10   independent duty to act with due care.  And so those states

11   look at where, what is the source of the duty of due care, and

12   if it's not coming from a contract or a commercial

13   transaction, then once the independent duty is established,

14   then the economic loss doctrine does not apply to bar claims.

15       **THE COURT:**  So are you saying that -- are you taking

16   the position that there is no contract between -- well,

17   perhaps not with the school districts.

18       Certainly there are lots of consumer plaintiffs' lawyers

19   who believe that there is a contract between consumers

20   themselves and the platforms.

21       **MS. YEATES:**  There is no commercial transaction at

22   issue here between the school districts and the defendants

23   that would allow the economic loss rule to apply.

24       **THE COURT:**  Okay.  Do you want to address that point?

25       **MR. MATTERN:**  Yes.  Your Honor, we disagree that

1    those estimates limit the economic loss rule to the

2    contractual context.  I think for all of the -- all the cases

3    that the school districts cited on this point, they just dealt

4    with special circumstances where it was only discussing a

5    contract.

6        And there are other cases from the states of those courts

7    that apply the economic loss rule to traditional negligence

8    claims that aren't based on a contractual allegations.  And so

9    I'd like to give like a couple of examples just from some of

10   the states that I think I heard my friend say.

11       So, for example, in Georgia, the Supreme Court -- sorry --

12   the Eleventh Circuit explained just a couple of years ago that

13   the economic loss rule has expanded to bar recovery in all

14   negligence-based tort actions.  And that's *Murray*, and the pin

15   cite for that is 798 F. Appendix 486.

16       Likewise, I think I heard my friend say Alaska.  And

17   Alaska they cite to a decision from the Alaska Supreme Court

18   from two years ago that deals with a question about a

19   noneconomic damages cap.  It's not even about the economic

20   loss rule itself.

21       The opinion -- but that opinion, though, does not support

22   the rule that the economic loss rule only applies to

23   contractual claims.  And other cases in Alaska have applied it

24   to traditional tort claims.

25       And I think we briefed some of these other examples, but

1   just a couple of examples about how the contractual limitation

2   we don't think really exists.

3          **THE COURT:**  Okay.  I'll look at the -- I'll have to

4   look at the various state-by-state review.

5      Anything else on this?

6          **MS. YEATES:**  May I respond to two items quickly that

7   defense counsel raised.

8      With regard to illegality, nothing in any of the cases,

9   *Ileto, Juul*, or otherwise, is based on the illegal nature of

10  the product.  Instead they look at defendants' actions.  They

11  looked at defendants' conduct and determined whether that

12  conduct put plaintiffs in the foreseeable zone of risk.  And

13  we have alleged that defendants' conduct here certainly did

14  put school districts in the foreseeable zone of risk.

15     With regard to public policy, I just also wanted to note

16  that the federal government as well as state legislatures

17  across the country are attempting to ban and put limits on

18  these social media companies, and so public policy is

19  certainly not weighing in their favor.

20     And with regard to the property damage issue, our

21  allegations about property damage are content neutral.  We

22  allege that it is defendants' conduct in pushing these

23  challenges to go viral, it's their business model to promote

24  the challenges to increase user engagement.  They don't care

25  what the content is, they don't care what the students say.

1    The goal is to promote them, to make them go viral, to make

2    them be using it all day during the school, and they reward

3    and incentivize the students to use those.

4        And then also with regard to the property damage that

5    stems from the mental health crisis itself and the behavioral

6    issues associated with that, that's certainly content-neutral

7    property damage that is not affected by section 230.

8            **MR. MATTERN:**  May I briefly respond, Your Honor?

9            **THE COURT:**  Yes.

10           **MR. MATTERN:**  So I think I heard my friend make three

11   points which I'll take in order.

12           **THE COURT:**  Well, no, you've already dealt with some

13   of them.

14           **MR. MATTERN:**  Okay.

15           **THE COURT:**  So what do you -- you've got one minute.

16   What do you want to say?

17           **MR. MATTERN:**  Okay.  So I just wanted to direct this

18   Court to page 46 of your order in the personal injury cases

19   which deals with *Ileto* and why this illegality distinction is

20   important.

21       I think that we've already addressed the second point.

22   The argument that we made, of course, was the important First

23   Amendment value that these platforms serve.

24       But the third point that I want to talk a little bit about

25   is that the school districts' allegations can't be, as I think

1    my friend just put it, content neutral.  They're allegations,

2    and this is clear from the complaint, is that someone saw a

3    viral prank or someone, for example, stole a faucet from the

4    bathroom.

5            **THE COURT:**  I've got all those points.

6            **MR. MATTERN:**  Okay.  Thank you, Your Honor.

7        Then we would just ask that you dismiss the negligence

8    claim.

9            **THE COURT:**  Okay.  I've looked at my schedule with

10   respect to the bellwether issues, and I can do a conference

11   with you all on Tuesday, May 21st either first thing in the

12   morning at 8:00 a.m. or preferably at the end of the day like

13   4:00 o'clock.

14           **MS. YEATES:**  Thank you, Your Honor.

15           **THE COURT:**  Thank you.

16           **MS. PIERSON:**  Your Honor, Andrea Pierson, Faegre

17   Drinker for the TikTok defendants.

18       Either or those times will work for the defendants,

19   whatever is most convenient for the Court.

20       I think we would also ask, your -- your prior order, CMO

21   13, requires the defendants to disclose replacement picks on

22   May 22nd which is Wednesday.  We wondered if that deadline

23   might be held in abeyance until after this conference, or if

24   we could move that back a couple days, just so we have a

25   chance to talk with you first and then a little bit of time to

```
 1    reflect.

 2           MR. WARREN:  Your Honor, Previn Warren for the

 3    plaintiffs.

 4        Both of those times would work.  If the morning time is

 5    doable, that would be preferable from our end.  But either

 6    way.

 7        I don't quite understand the need for defendants to have

 8    more time, but if they -- we'd be amenable to kicking it by a

 9    day if that's necessary for whatever reason.

10           THE COURT:  Okay.  So let's go ahead and set it for

11    8:00 a.m.  We can -- we'll have it on the webinar link.  I

12    only need on the platform individuals who are going to speak.

13    So if you'll let Mr. Cuenco know that in advance.

14        I'll split the difference, selections due by noon on the

15    24th.

16           MS. PIERSON:  Thank you, Your Honor.

17           MR. WARREN:  Thank you, Your Honor.

18           THE COURT:  Okay.

19        Do I have my folks who are meeting and conferring?  Do I

20    have a protocol?

21           MR. ANDREWS:  Hello, Your Honor.  Patrick Andrews for

22    Lieff Cabraser for the plaintiffs.

23        We did meet and confer, and plaintiffs are happy to agree

24    to a protocol that would require plaintiffs to provide notice

25    to all defendants when seeking leave to amend -- or I mean,
```

1    sorry, when seeking to amend their short-form complaints.  And

2    that would provide for a meet-and-conferral process in which

3    plaintiffs would hear out all of the defendants on any

4    concerns that they may have about the request to amend.

5        What plaintiffs are not prepared to agree to is a

6    requirement that would provide the unnamed defendant veto

7    power on whether or not the plaintiffs may amend by consent

8    when the other existing defendants consent to the amendment as

9    provided for under Rule 15(a)(2) as that would disrupt the

10   orderly process of filing without leave provided for in

11   Rule 15.

12       And indeed in cases where YouTube is not sought to be

13   add [sic], that's exactly what's happened.  Plaintiff have --

14   plaintiffs have requested the consent of the existing

15   defendants in those cases.  And the -- when the existing

16   defendants have provided consent, they have filed amended

17   complaints, and added defendants, to date, have not raised any

18   objections about that process.  That is -- allows plaintiffs

19   to proceed with amendment without any sort of logjam caused by

20   unnamed defendants and unnecessary motion practice.

21           **THE COURT:**  You should all be aware that I recently

22   changed my standing order and my notes.  While I am in this

23   four-month trial, no one is allowed to -- and including this

24   unless it's in my order -- no one is allowed to file any

25   motion whatsoever without complying with that standing order.

1    All right.  So what is your response with respect to

2    Rule 15 and your demands?

3         **MS. ZWANG-WEISSMAN:**  Your Honor, reading between the

4    lines of what plaintiffs' counsel is saying, the only thing

5    that plaintiffs' counsel agreed during meet-and-confer to do

6    was to provide notice to the to-be-named defendants, but not

7    to agree to any further protocol that has anything whatsoever

8    to do with Rule 15, Rule 24, or otherwise.

9         So notice alone, Your Honor, without the opportunity to

10   object in an organized and orderly way doesn't get us very far

11   at all.  And frankly it makes no sense in a case of this

12   nature like an MDL.

13        There is a very simple, very efficient procedural remedy

14   to this that requires less time, significantly less paperwork,

15   including less motion practice, and would be fair to all

16   parties, plaintiffs included, and that proposed process is

17   laid out in the protocol that we attached as Exhibit B to the

18   CMC statement for today's proceedings.

19        And that -- that proposed protocol has four very simple

20   components.  One, it proposes to give notice --

21        **THE COURT:**  Hold on.

22        **MS. ZWANG-WEISSMAN:**  -- to all.

23        **THE COURT:**  I said hold on.

24        **MS. ZWANG-WEISSMAN:**  Oh, I'm sorry, Your Honor.  I

25   didn't hear.

```
 1                    (Pause in the proceedings.)

 2          THE COURT:  Let me get it.  It's not in my binder.

 3          MS. ZWANG-WEISSMAN:  I could provide Your Honor with

 4   a copy if it would be helpful.

 5          THE COURT:  Sure.  If you have one.

 6                    (Pause in the proceedings.)

 7          THE COURT:  Any objection to paragraph 1?

 8          MR. ANDREWS:  Your Honor, we don't object --

 9          THE COURT:  Any -- just yes or no.

10          MR. ANDREWS:  No.

11          THE COURT:  Okay.  Any objections to paragraph 2?

12   Yes or no?

13          MR. ANDREWS:  No, Your Honor.

14          THE COURT:  So I take it with respect to paragraph 3,

15   you object to 3B.

16          MR. ANDREWS:  Correct, Your Honor.

17          THE COURT:  Do you agree with the first sentence of

18   paragraph 4?

19          MR. ANDREWS:  I -- I don't believe we agree to the

20   right to intervene, but we are amenable to them --

21          THE COURT:  Do they have a right or not, is my

22   question?  Do they have a right or not under Rule 24?

23          MR. ANDREWS:  It depends on the circumstances.  In

24   some cases, they have a right to intervene under Rule 24 --

25          THE COURT:  Do they have a right here where you're
```

```
 1     seeking to name them?
 2             MR. ANDREWS:  They would have -- we would agree to a
 3     right to intervene in those circumstances.
 4             THE COURT:  I'll issue an order on my own without
 5     further input from you all unless you want to give me other
 6     things to consider in terms of a protocol.  There will be a
 7     protocol.  It will be streamlined.  And I will not be
 8     inundated by paper.  Do you understand?
 9             MR. ANDREWS:  Understood, Your Honor.
10             THE COURT:  Do you understand?
11             MS. ZWANG-WEISSMAN:  Understood, Your Honor.
12             THE COURT:  Anything else you want me to consider?
13             MS. ZWANG-WEISSMAN:  No, Your Honor.  Thank you for
14     your time.
15             MR. ANDREWS:  No, Your Honor.  Thank you.
16             THE COURT:  All right.
17         Are there any other issues that you all want to address
18     today before we meet again on, I believe it's June 21st.  That
19     will be at 2:00 p.m.  I will be in trial that day.
20         Anything else?
21             MR. WARREN:  Not from the plaintiffs, Your Honor.
22             THE COURT:  Mr. -- okay.
23         Anything from the defense?
24             MS. SIMONSEN:  Nothing for the defendants, Your
25     Honor.  Thank you.
```

1           **THE COURT:**  All right.  So in that case, my court

2     reporter will be delighted that she gets a break before our

3     1:00 o'clock.

4         Everybody have safe travels.  And we'll be in touch in

5     writing.  Thank you.

 1          **THE CLERK:**  Court is adjourned in this matter.

 2              (Proceedings were concluded at 11:13 A.M.)

 3                          --o0o--

 4

 5

 6

 7                  **CERTIFICATE OF REPORTER**

 8

 9          I certify that the foregoing is a correct transcript

10      from the record of proceedings in the above-entitled matter.

11      I further certify that I am neither counsel for, related to,

12      nor employed by any of the parties to the action in which this

13      hearing was taken, and further that I am not financially nor

14      otherwise interested in the outcome of the action.

15

16      _____

17          Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

18                  Wednesday, May 22, 2024

19

20

21

22

23

24

25