# Exhibit A

E-Served: Jun 7 2024  9:57AM PDT  Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

06/07/2024

David W. Slayton, Executive Officer / Clerk of Court

By: _____ L. M'Greené _____ Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| Coordinated Proceeding<br>Special Title (Rule 3.400)<br><br>**SOCIAL MEDIA CASES** | CASE NO.  JCCP 5255<br>Lead Case: 22STCV21355<br><br>This Ruling Relates to:<br>24STCV01468; 23STCV14900;<br>23SSTCV14780; 23STCV26875<br><br>**Opinion and Order re (1) Defendants'<br>Demurrer to Certain School District<br>Complaints, (2) Defendants' Motion<br>to Strike Certain School District<br>Complaints**<br><br>Hon. Carolyn B. Kuhl<br>Department 12<br>Spring Street Courthouse |

## Introduction

The school districts that are plaintiffs in the cases at issue on these motions, like the individual personal injury plaintiffs whose cases also are part of this coordinated proceeding, allege that the social media defendants have maximized their own benefit and advertising revenue at the expense of the health of minor users of the social media companies' applications or websites.  Notwithstanding a federal statute that provides internet publishers with immunity that is unavailable to traditional publishers (see 47 U.S.C. § 230), this court has held that the individual personal injury plaintiffs have viable common law personal injury claims against the social media defendants, although not for recovery based on Defendants' publication of third-party content.  (Court's Ruling on Defendants' Demurrer to Master Complaint and Three Short Form Complaints, Oct. 13, 2023 (October 2023 Ruling).)

Now before the court is a Demurrer and a Motion to Strike concerning complaints filed by public school districts who allege that the injuries to minors caused by their use of Defendants' social media sites have had a ripple effect on public schools. The School District plaintiffs in these cases seek recovery on the ground that student mental illness and emotional trauma inflicted on them by defendants' social media sites have in turn caused the school districts to make expenditures to support the students and to compensate for disruption to their educational mission.

As discussed below, common law doctrines that have stood the test of time allow compensation for the direct victim of a defendant's negligent actions, but in most circumstances do not extend liability to others who may be affected by the injury to the direct victim, especially when the injuries to third parties do not involve physical injury to person or property. These limiting principles serve the purpose of avoiding, as then-Judge Benjamin Cardozo wrote, "liability in an indeterminate amount for an indeterminate time to an indeterminate class." (*Ultramares Corp. v. Touche* (1931) 255 N.Y. 170, 179, quoted with approval in *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 414.)

The common law allows for incremental advancement based on human experience. But here Defendants' alleged conduct has been enabled by a federal statute that withdraws the availability of common law remedies for a favored class of publishers of content. This federal statutory policy cannot be an excuse for twisting general common law principles as an end-run to try to fix, so to speak, what Congress has decided to accept. To expand the common law in order to provide a remedy for those who are indirectly affected by the negative consequences of social media for youth would create a broad web of indeterminate liability that the common law has heretofore refused to impose.

For the reasons set forth below, the Demurrer to the four complaints challenged by Defendants is sustained in its entirety. Defendants' accompanying Motion to Strike is therefore moot.

## I.    **Background/Procedural History**

Plaintiffs in these coordinated proceedings are individuals and public school districts that allege they have suffered various types of harm as a result of minors using Defendants' social media platforms. Plaintiffs bring their claims against multiple Defendants that designed and operated the following social media platforms: Facebook, Instagram, Snapchat, TikTok, and YouTube. Facebook and Instagram are owned, designed, and operated

by a group of Defendants who are referred to collectively in these proceedings as Meta.  Snapchat is owned, designed, and operated by Defendant Snap Inc. (Snap).  TikTok is owned, designed, and operated by multiple Defendants who are referred to collectively in these proceedings as ByteDance.  YouTube is owned, designed, and operated by multiple Defendants referred to collectively in these proceedings as Google.

The current issue presented in this coordinated proceeding concerns the following four public school districts who have brought claims against Defendants: West Warwick Public Schools located in Rhode Island (West Warwick); School Board of Brevard County located in Florida (Brevard); San Diego Unified School District located in California (San Diego); and Vancouver Public Schools located in Washington (Vancouver).  The court refers to West Warwick, Brevard, San Diego, and Vancouver collectively as the "School Districts."

On January 19, 2024, the School Districts filed the following complaints:

> 1. Complaint For Damages And Demand For Jury Trial, The School Board of Brevard County, Fla. v. Meta Platforms, Inc., et al., Case No. 24STCV01468 (L.A. Super. Ct. Complaint filed Jan. 19, 2024) (FL Complaint);
> 2. Amended Complaint For Damages And Demand For Jury Trial, San Diego Unified School District v. Meta Platforms, Inc., et al., Case No. 23STCV14900 (L.A. Super. Ct. Amended Complaint filed Jan. 19, 2024) (CA Complaint);
> 3. Amended Complaint For Damages And Demand For Jury Trial, Vancouver School District No. 37 v. Meta Platforms, Inc., et al., Case No. 23STCV14780 (L.A. Super. Ct. Amended Complaint filed Jan. 19, 2024) (WA Complaint); and
> 4. Amended Complaint For Damages And Demand For Jury Trial, West Warwick Public Schools v. Meta Platforms, Inc., et al., Case No. 23STCV26875 (L.A. Super. Ct. Amended Complaint filed Jan. 19, 2024) (RI Complaint).

For purposes of this ruling, the court refers to these four complaints collectively as the "Complaints."  All the Complaints allege causes of action for public nuisance.  The FL Complaint, the CA Complaint, and the RI Complaint also allege causes of action for negligence and gross negligence. The WA Complaint is limited to a single cause of action for public nuisance.

Each School District alleges causes of action under the common law of its respective state.  However, the factual allegations are substantially similar in all four of the Complaints.  The School Districts allege that Defendants have created and promoted their addictive social media platforms to the School Districts' students, "resulting in substantial interference with school district operations and imposing a large burden on school districts, who are often the number one provider of mental health services to youth."  (FL Compl., ¶ 1.)

In its action for public nuisance, Brevard alleges that "Defendants have created a crisis of social media addiction in Plaintiff's schools, injuring the public health and safety in Plaintiff's community, disrupting the educational mission of Plaintiff, and interfering with the operations, use, and enjoyment of the property of Plaintiff."  (FL Compl., ¶ 850.)  "Defendants, by designing, developing, marketing, supplying, promoting, advertising, operating, and distributing their respective social media platforms for use by students in Plaintiff's schools in the manner described above, have engaged in conduct that substantially and unreasonably interferes with the health and safety of Plaintiff's students, substantially and unreasonably interferes with the functions and operations of Plaintiff's schools, including the public educational mission of Plaintiff, and harms the health, safety, and welfare of the Plaintiff's community, and adversely impacts Plaintiff's use and enjoyment of its property."  (FL Compl., ¶ 851.)

With respect to Defendants' duties to the School Districts under a theory of negligence, the CA Complaint states that Defendants owed a duty not to expose the School Districts to an unreasonable risk of harm because addiction of minors to Defendants' platforms was reasonably likely to disrupt "the learning process" and require "additional expenditures at public schools."  (CA Compl., ¶¶ 888-889.)  The CA Complaint states that "Defendants not only were aware of the risk that their products would addict school children, they were actively seeking that result … . Defendants wanted children using their products during the school day."  (CA Compl., ¶ 890.)

The School Districts list the following "costs and resource expenditures" incurred by the School Districts "to address students' problematic social media use": (1) costs associated with addressing or preventing students' use of Defendants' platforms in schools; (2) costs associated with having to provide "disciplinary services," parent notification, "revised teaching plans," mental health services to address students' "behavioral issues" and harmful addiction to Defendants' platforms; (3) property damage caused by students resulting from students' use of Defendants' platforms; (4) costs associated with

investigating and responding to threats made against schools and students on Defendants' platforms; and (5) costs associated with updating school policies and handbooks.  (FL Compl., ¶ 808.)

Defendants now demur to the Complaints in their entirety, asking the court to dismiss the School Districts' claims.  In a separate Motion, Defendants move to strike numerous portions of the Complaints on the grounds that they are improper under section 230 of the Communications Decency Act, 47 U.S.C. § 230 (Section 230), the First Amendment, and the tort law of California, Florida, Rhode Island, and Washington.

In opposing the Demurrer, the School Districts do not attempt to explain how they might amend the Complaints in order to state a viable claim if Defendants' arguments were to be accepted by the court.

## II.   **The Demurrer Must Be Sustained as to all Negligence-Based Causes of Action Because the School Districts are Unable to Allege that Defendants Owe Them a Cognizable Duty Under the Common Law**

The WA Complaint does not allege a cause of action for negligence. Therefore, this court's analysis of the viability of the School District's negligence causes of action only addresses the negligence claims pleaded under California, Rhode Island and Florida law.

Plaintiffs allege that the Defendants' infliction of harm on minors who use their platforms has caused harm to the School Districts primarily because they have had to make significant economic expenditures to deal with students' mental health, to overcome attention deficits that retard the educational mission, to provide additional supervision of students and to purchase sleeves to bar transmissions to student cell phones.  These alleged harms to the School District are economic losses – they do not arise from personal injury or from damage to property.

Plaintiffs also allege summarily that they have been required to address "property damaged as a result of students acting out because of mental, social, and emotional problems Defendants' conduct is causing."  (FL Compl., ¶ 906(g); CA Compl., ¶ 904(g); RI Compl., ¶ 915(g); see also RI Compl., ¶ 845 [alleging that unspecified property damage has been caused by "more students … acting out as a result of the decline Defendants caused in students' mental, emotional, and social health"].)   The FL Complaint alleges one instance of physical damage to property more specifically. Brevard alleges that student conduct resulted in a bathroom sink being

ripped from the wall, and that footprints indicated that a student had jumped up and down on the sink to cause the damage.  The FL Complaint seeks compensation for expenditures to repair or replace the damaged property.  (FL. Compl., ¶ 831.)

As discussed below, California, Rhode Island and Florida apply the economic loss doctrine either to preclude recovery in negligence for purely economic losses (damages not caused by personal injury or injury to property) or to significantly limit the duty to compensate for a purely economic loss even when harm may be foreseeable.

As to the damages sought based on physical injury to property, the causal connection between the Defendants' actions and the alleged property damage is either too attenuated to satisfy the requirements of proximate cause or is barred by Section 230.

A.  <u>Under California, Rhode Island, and Florida Law, the School Districts'
    Negligence Causes of Action Cannot Be Brought for Purely Economic
    Loss</u>

1. *California Law*

Under California law, "there is no recovery in tort for negligently inflicted 'purely economic losses,' meaning financial harm unaccompanied by physical or property damage." (*Sheen v. Wells Fargo Bank, N.A.* (2022) 12 Cal.5th 905, 922, internal citations omitted.)  The economic loss rule is not a new tort doctrine.  In *Ultramares*, *supra*, 255 N.Y. at p. 179, then-Judge Benjamin Cardozo warned that allowing recovery for purely economic losses flowing from negligent acts would permit "liability in an indeterminate amount for an indeterminate time on an indeterminate class." (See *Southern California Gas Leak Cases* (2019) 7 Cal.5th 391, 414 (*Gas Leak Cases*), quoting *Ultramares.*)  Current jurisprudence continues to limit recovery for purely economic loss based on a cause of action for negligence.

The current Restatement of Torts, while recognizing that there are special duties of care to prevent economic loss in defined circumstances (such as professional negligence, invited reliance and public nuisance) (Rest.3d Torts: Liab. for Econ. Harm, § 1, cmt. (d)), adopts the general principle that "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another" (*id.* § 1(1).)  The Restatement, like Judge Cardozo, explains the limitation based on a concern that liability for economic losses can be "[i]ndeterminate and disproportionate" because "[e]conomic losses proliferate more easily than losses of other kinds." (*Id.,* § 1, cmt. (c)(1).)  For example, "a single negligent utterance can cause

economic loss to thousands of people who rely on it, those losses may produce additional losses to those who were relying on the first round of victims, and so on." (*Id.*)

In a recent decision, the California Supreme Court reaffirmed the economic loss rule as well-settled California law and stated the general rule that there is no "presumptive duty of care to guard against any conceivable harm that a negligent act might cause." (*Gas Leak Cases, supra,* 7 Cal.5th at p. 399.)  The Court surveyed the near unanimity of other states' laws on the applicability of the rule (*id.* at pp. 403-407) and relied on the Restatement Third of Torts (*id.* at p. 407).

The California Supreme Court did recognize that a duty to guard against purely economic losses could exist when there was a "special relationship" between a plaintiff and the defendant.  (*Id.* at pp. 400, 408.) The two cases cited by the Supreme Court in which a "special relationship" permitted departure from the economic loss rule are cases involving commercial transactions in which the defendant could be understood to have undertaken a special duty to protect the plaintiff's interests. (*Id.* at pp. 400-400-402, discussing *Biakanja v. Irving* (1958) 49 Cal.2d 647 (*Biakanja*) and J'Aire Corp. v. Gregory (1979) 24 Cal.3d 799 (*J'Aire*).)  In *Biakanja*, the intended beneficiary of a will was allowed to recover for assets she would have received if the notary had not negligently prepared a document.  In *J'Aire*, a special relationship was recognized between a restaurant owner and the contractor hired by the property owner to renovate the space to be occupied by the restaurant owner.  The School Districts do not argue that they have an analogous special relationship with Defendants.  There is no contention that Defendants engaged in a commercial transaction or undertook a duty to perform on the understanding that the School Districts would be the beneficiaries of the Defendants' performance and would be injured if Defendants performed negligently.

A lack of "spatial bounds within which to cabin claims" (*Gas Leak Cases, supra,* 7 Cal.5th at p. 408) exists here as it did in *Gas Leak Cases*.  To be sure, *Gas Leak Cases* involved an industrial injury.  But there was no question in that case that some businesses in the zone of the uncontrolled gas leak suffered substantial economic harm when the gas leak forced nearby residents to move away.  The problem identified by the California Supreme Court was that the economic harm did not have any clear boundaries as to the locations where business harm should be recognized or the duration of the effects of the industrial injury on the businesses.  The Court was willing to consider the issue on demurrer even though the Court's duty determination required a "higher level of generality than would a jury's

analysis of fact-intensive issues like breach and causation." (*Gas Leak Cases*, *supra*, at p. 408, internal citations and quotation marks omitted.)

Similarly here, the School Districts allege that student conduct attributable to the actions of the Defendants adversely affected the school learning environment and student mental health.  But the School Districts do not offer any persuasive test for determining the boundaries for where and when liability for such alleged harm would rationally end.  As to temporal indeterminacy, the effects of addiction on students could go on for years even if Defendants were to end the practices challenged by the School Districts.  As to the problem of determining who is entitled to relief, there is no reason why private and parochial schools could not make the same claims asserted by the School Districts that have brought suit.  Colleges also could state claims based on the continuing effects of the addiction and mental health problems (such as body dysmorphia, self-harm and depression) alleged to result from minors' exposure to Defendants' platforms.  Employers could allege a claim for the value of work missed by employees suffering from mental health problems caused by their addiction to social media platforms when they were minors.  Minors' health problems caused by social media also could cause increased expenses for public health services.  Thus, the theory of recovery and duties alleged in this case present problems of uncabined liability that fall squarely within the rationale for the economic loss rule.

The School Districts do not contend that the economic loss rule is somehow inapplicable to the negligence claims in the CA Complaint.  But the School Districts argue that the economic loss rule would not apply to the negligence claims pleaded under Rhode Island law in the RI Complaint and under Florida law in the FL Complaint.  The School Districts' argument, challenging the California Supreme Court's conclusion that other states have broadly accepted the economic loss rule, does not correctly interpret the relevant Rhode Island and Florida authorities.

### 2. Rhode Island Law

In Rhode Island, as the School Districts note, the economic loss rule applies, but with one caveat that is not applicable here.  "The economic loss doctrine provides that a plaintiff is precluded from recovering purely economic losses in a negligence cause of action. [Citation.] In other words, under this doctrine, a plaintiff may not recover damages under a negligence claim when the plaintiff has suffered no personal injury or property damage." (*Franklin Grove Corp. v. Drexel* (R.I. 2007) 936 A.2d 1272, 1275 (*Franklin*).)  However, "[u]nder Rhode Island law, the economic loss doctrine

does not apply to consumer transactions." (*Gartner Texas Properties, LLC v. JPS Construction and Design Inc.* (D.R.I. 2021) 516 F.Supp.3d 173, 177.)

This exception was created in order to provide "increased protection and an opportunity for recovery in cases in which consumers deal with commercial entities." (*Rousseau v. K.N. Const., Inc.* (R.I. 1999) 727 A.2d 190, 193 (*Rousseau*).) Thus, for example, the Rhode Island Supreme Court in *Rousseau* refused to apply the economic loss rule to negligence claims brought by individual persons who purchased property and brought negligence claims against an engineer who, before the purchase, had incorrectly determined that the property was suitable for the construction of a septic tank. But the Rhode Island Supreme Court in *Franklin* did apply the economic loss rule in a case where the plaintiff was *a corporation* that purchased property and brought negligence claims against an engineer who had negligently evaluated the condition of the property. Thus, as one federal court applying Rhode Island law put it, Rhode Island provides an "exception to the economic loss rule for ordinary consumers who deal with commercial entities." (*Western Reserve Life Assur. Co. of Ohio v. Conreal LLC* (D.R.I. 2010) 715 F.Supp.2d 270, 290, internal citations, quotation marks, and brackets omitted.) "When a cause of action arises under a contract and a consumer lacks privity of contract with the offending party, an action in tort remains available, even if the damages are purely economic." (*Rousseau*, *supra*, 727 A.2d at p. 193.)

Rhode Island's carveout for individual consumers does not apply to the negligence claims brought by the School Districts. The exception is intended and applied to provide a tort remedy to an individual who deals indirectly with a commercial entity but is not protected by contract and who sustains harm as a result of the negligence of the commercial entity. In the instances in which Rhode Island has applied this exception, the concerns about undefined boundaries of liability that motivate the economic loss doctrine do not exist.

By contrast, the School Districts are not individual consumers of Defendants' platforms who need special protections but are not protected by contract. The School Districts are public entities that do not allege harm arising from their role as ordinary consumers; they do not fit the Rhode Island exception to the economic loss doctrine designed for situations in which "consumers deal with commercial entities." Rather, as discussed above, the School Districts' claims raise problems of potential unlimited liability arising from pure economic harm caused by Defendants' alleged injury inflicted on third parties. Rhode Island law therefore bars West Warwick's negligence claims to the extent they are based on purely economic harms.

### 3. Florida Law

Under Florida law, there is no general duty to avoid causing economic loss and special circumstances are required to create such a duty.  As explained in *Tank Tech, Inc. v. Valley Tank Testing, L.L.C.* (Fla. Dist. Ct. App. 2018) 244 So.3d 383, 393, "in order to proceed on a common law negligence claim based solely on economic loss, there must be some sort of link between the parties or some other extraordinary circumstance that justifies recognition of such a claim."  (See also *Insight Securities, Inc. v. Deutsche Bank Trust Company Americas* (S.D. Fla., Aug. 6, 2021, No. 20-23864-CIV) 2021 WL 3473763, at *4, aff'd (11th Cir., June 28, 2022, No. 21-12817) 2022 WL 2313980 [explaining that under Florida law there must be some relationship between the plaintiff and the defendant in order for the plaintiff to recover purely economic losses].)

As explained by the federal district court in *In re January 2021 Short Squeeze Trading Litigation* (S.D. Fla. 2022) 584 F.Supp.3d 1161, Florida follows the majority of jurisdictions that do not apply a *strict* "economic loss rule" requiring dismissal of all negligence claims that seek recovery only for economic harm, but rather recognize there is a "general lack of a duty to avoid causing economic harm."  (*Id.* at p. 1188.)  In affirming that district court decision, the Eleventh Circuit added that in Florida the term "economic loss rule" refers only to a specific affirmative defense in a product liability case.  (*Juncadella v. Robinhood Fin. LLC* (2023) 76 F.4th 1335, 1352.)  Instead, Florida courts "limit the zone-of-risk doctrine to non-economic injuries" when considering whether an activity foreseeably placed another person in the zone of risk for purposes of recognizing a duty of care.  (*Id.* at pp. 1353-1354.)  Thus, Florida adopts the general principle that "[a]n actor has no general duty to avoid the unintentional infliction of economic loss on another" (Rest.3d Torts: Liab. For Econ. Harm, § 1(1)), and is one of a majority of states that have rejected a view of the economic loss rule that requires dismissal of *all* tort claims that cause only pure economic loss to another.  (*Id.*, § 1, cmt. (b).)[1]

---

[1] Thus, except in one narrow circumstance, Florida has rejected the view that, whenever a plaintiff seeks recovery in tort for economic loss alone, the claim must be rejected without further analysis.  In *Tiara Condominium Ass'n, Inc. v. Marsh & McLennan Companies, Inc.* (Fla. 2013) 110 So.3d 399, the Florida Supreme Court held that the economic loss rule does not bar recovery in tort in every instance in which parties are in privity of contract with each other, and that the absolutist economic loss rule is limited to product liability claims by consumers.  In *Indemnity Ins. Co. of North America v. American Aviation, Inc.* (Fla. 2004) 891 So.2d 532, the Florida Supreme Court held that the economic loss rule does not automatically preclude all consumer tort claims for economic harm from injury by a product but operates to completely preclude claims by consumers for economic harm to the product itself.

The Florida courts have "expanded the tort of negligence by creating duties to protect plaintiffs in situations that do not result in personal injury or property damage … only when specific circumstances have warranted a more liberal judicial rule and an expanded duty of care." (*Lucarelli Pizza & Deli v. Posen Const., Inc.* (Fla. Dist. Ct. App. 2015) 173 So.3d 1092, 1094 (*Lucarelli*).)  *Lucarelli* cites for that proposition *Monroe v. Sarasota County School Bd.* (Fla. Dist. Ct. App. 1999) 746 So.2d 530, 531, which holds that "as a general rule …. bodily injury or property damage is an essential element of a cause of action in negligence.  We will expand the common law tort of negligence, waiving that essential element only under extraordinary circumstances which clearly justify judicial interference to protect a plaintiff's economic expectations."

In *Curd v. Mosaic Fertilizer, LLC* (2010) 39 So.3d 1216 (*Curd*), overruled on other grounds by *Lieupo v. Simon's Trucking, Inc.* (Fla. 2019) 286 So.3d 143, the Florida Supreme Court recognized the continuing applicability of the general principle of common law negligence that there is no recovery "for purely economic losses when the plaintiff has sustained no bodily injury or property damage." (*Id.* at p. 1223.)  The Court then considered whether there should be an exception to that rule when commercial fishermen are affected by negligent acts causing pollution that injures marine wildlife.  The Court held that the fishermen had a "special interest within [the] zone of risk" because they were "licensed to conduct commercial activities," i.e., fishing in the waters that had been negligently polluted.  (*Id.* at p. 1228.)

In *Virgilio v. Ryland Group, Inc.* (11th Cir. 2012) 680 F.3d 1329 (*Virgilio*), the federal appellate court interpreted *Curd* as turning on a "special interest" in property—the marine life—that had been damaged.  (*Id.* at p. 1340, fn. 31.)  In *Lucarelli*, the Florida Court of Appeal also read *Curd* narrowly, citing *Virgilio*.  (*Lucarelli*, *supra*, 173 So.3d at p. 1095.)  While not deciding the issue, the Court of Appeal in *Lucarelli* expressed doubt that restaurant owner plaintiffs who sustained economic harm when their business was interrupted could prove a negligence claim against a construction company whose conduct damaged a natural gas line and affected all commercial gas users.  (*Id.*)

The School Districts are not basing their negligence claims on a special relationship with Defendants.  (See, e.g., Pls' Opp. Defs' Dem., at p. 17, fn. 18.)  To be sure, the allegations in the Complaints can be read to state that the School Districts have a special relationship with their *students*, but those allegations concern the School Districts' educational responsibilities to their students, not responsibilities of Defendants to the School Districts.  The

Complaints at issue here allege that some Defendants offered services "in partnership with the National PTA and Scholastic" or in coordination with "the Department of Education" related to "back to school nights," but there is no allegation that the economic harm pleaded arises out of that offer of services.  (FL Compl., ¶¶ 812, 816.)

Nor do the School Districts have a "special interest within the zone of risk" as was the case in *Curd*.  Many persons and entities have an interest in, and are adversely affected economically by, the alarming rise in youth mental illness alleged by the School Districts.  The persons and entities within the "zone of risk" for economic harm that the School Districts would have this court recognize include youth organizations and their leaders; educational institutions of all kinds (not just public elementary and secondary schools); medical providers and medical facilities that may be required to provide care for mentally ill minors affected by social media without full compensation for the medical services; employers; and siblings or other family members whose social circumstances are negatively affected by a minor relative's social media addiction and resulting mental illness.  The common law of tort does not recognize a claim when the "defendant commits a negligent act that injures a third party's person or property, and indirectly—though perhaps foreseeably—causes various sorts of economic loss to the plaintiff ... ." (Rest.3d Torts: Liab. for Econ. Harm, § 7, cmt. (a).)

The special circumstances recognized as within the "zone of risk" of the defendant's pollution in *Curd* were far different.  In that case, the claim for economic harm was based on destruction of marine wildlife—physical property in which the fishermen were determined to have a cognizable interest based on rights the government had recognized by granting a license to take fish from the affected waters.  The risk of potentially limitless liability that concerned the court in *Lucarelli* was not present because the identity of the persons who could seek recovery was limited by the licensing authority.  (Cf., Rest.3d Torts: Liab. for Econ. Harm, § 7, cmt. (c) ["A claimant with a proprietary interest in property can recover for economic losses that result when the property is damaged"].)

The School Districts cannot articulate a defined class of persons or entities who are uniquely recognized as being within the zone of risk of Defendants' conduct toward the minors who use their social media platforms.  As with California and Rhode Island, there is no basis for recognizing a duty to indemnify the School Districts for economic harm caused to them by minors who allegedly have been injured by Defendants' actions in creating and manipulating the social media platforms used by the minors.

**B. Defendants' Economic Losses Cannot Be Recharacterized as Property Damage Merely Because They "Occurred" on School District Property**

In an attempt to skirt the economic loss rule, the School Districts try to paint *all* of their harms as "property damage" merely because the purely economic harms allegedly suffered by the School Districts could be said to have "occurred on school district property." (See Pls' Opp. Defs' Dem., at pp. 25-26, citing *Koll-Irvine Center Property Owners Assn. v. County of Orange* (1994) 24 Cal.App.4th 1036, 1041 (*Koll-Irvine*) and *In re JUUL Labs, Inc., Marketing, Sales Practices, and Products Liability Litigation* (N.D. Cal. 2020) 497 F.Supp.3d 552, 620-622 (*JUUL*).)   However, these authorities do not support the School Districts' attempted end run around the economic loss rule.

*Koll-Irvine* did not even discuss the economic loss rule; instead, the portion of that case cited by the School Districts concerned what activities constitute "interferences with the use and enjoyment of land actionable under a private nuisance theory." (*Koll-Irvine*, at p. 1041.) The economic loss rule refers to property *damage* as distinct from purely economic loss; it does not refer to "interferences" with property rights. The School Districts' argument improperly confuses *breach* (i.e., interference with property rights) with the resulting *damage* (i.e., physical damage to property). The principle from *Koll-Irvine* that "[a]n interference need not directly damage the land or prevent its use to constitute a nuisance" has no applicability to the negligence analysis. (*Id.*) Moreover, the "interferences" mentioned by the court in *Koll-Irvine* were not examples of a purely economic harm that has its locus on or near the plaintiff's property; rather, the court listed "interferences caused by noise, smoke and vibrations from flights over [property owners'] homes." (*Id.*) With respect to the purely economic harms alleged in the Complaints, no such physical interferences with property are at issue here. As for *JUUL*, the School Districts cite to the portion of that opinion that dealt with proximate cause and standing. And in any event, *JUUL* addressed such issues based, at least in part, on allegations of physical damage to property, such as the disposal of waste on school property. (See, e.g., *JUUL*, at p. 622.)

**C. The School Districts' Negligence Claims for Recovery Based on Property Damage to the Schools Fail Because They Do Not Allege a Cognizable Duty and Because They Are Barred by Section 230**

*1. Relevant Allegations of Physical Injury to School Property*

Given the foregoing, in order for the negligence claims to survive the instant Demurrer, they must adequately allege that Defendants owed a

certain cognizable duty to the School Districts, and that Defendants' breach of that duty caused more than purely economic harm.  In their Opposition, the School Districts claim that the following portions of the Complaints "allege property damage, assaults on district employees, and other harms on school property. *See* All Compl. ¶¶ 658, 808; Calif. Compl. ¶¶ 830, 904; Fla. Compl. ¶¶ 831, 906; R.I. Compl. ¶¶ 845, 915." (Pls' Opp. Defs' Dem., at p. 25.)

The School Districts allege they have had to expend resources "addressing property damaged as a result of students acting out because of mental, social, and emotional problems Defendants' conduct is causing."  (FL Compl., ¶ 906(g); CA Compl., ¶ 904(g); RI Compl., ¶ 915(g); see also RI Compl., ¶ 845 [alleging that unspecified property damage has been caused by "more students ... acting out as a result of the decline Defendants caused in students' mental, emotional, and social health"].)  Similarly, the School Districts allege that "[s]tudents' problematic social media use has also led to property damage and physical assaults on students and staff."  (CA Compl., ¶ 830.)

Some of the paragraphs cited by the School Districts as allegations of physical harm to property actually allege purely economic harm.  For example, the School Districts cite to paragraph 808 of the Complaints, even though that paragraph lists certain "costs and resource expenditures of school districts forced to address students' problematic social media use."  (FL Compl., ¶ 808; see also FL Compl., ¶ 906; RI Compl., ¶ 915.)

The only allegation mentioning a specific example of property damage is found in the Florida Complaint: "In one instance, an elementary school bathroom sink was found ripped almost completely off the wall. Footprints were visible on the sink where the student had presumably jumped up and down on the sink attempting to separ[a]te it from the wall." (FL Compl., ¶ 831.)

All Complaints allege as follows with respect to TikTok's "challenge videos":

> TikTok's algorithms also promote challenges that specifically target school districts. As a result of challenges, school districts have sustained property damage, ranging from stolen urinals to smashed floor tiles. In response, schools have been forced to lock down bathrooms for large portions of the day. Other schools have resorted to diverting staff to monitor bathrooms during the school day. Repairing damages resulting from challenges puts strain on schools

> that already have budget constraints. Even for schools that do not suffer property damage, responding to threats of the challenge and communicating with students and families diverts significant time away from classroom instruction and other administrative activities.

(FL Compl., ¶ 658, internal footnotes omitted.)

The relevant allegations can thus be summarized as two separate theories of liability for property damage.  First, Defendants' platforms caused minor users' mental and emotional harm; and then, because these minor users were so harmed, they "acted out" by defacing or destroying school property.  Second, the content of TikTok's challenge videos encouraged minor users to engage in particular types of destruction of school property.  These two causal theories of property destruction are addressed separately below.

### 2. Defendants Did Not Owe a Duty to the School Districts Not to Cause Mental or Emotional Harm to those Students who Damaged School Property

Foreseeability of harm to the plaintiff flowing from the defendant's conduct is a primary requirement for determining whether the defendant has a duty to prevent harm allegedly caused by the defendant's negligent act.  It is the first, but not the last, consideration in determining whether a plaintiff can pursue a negligence claim for personal or property injury.

To proceed on their negligence causes of action, the School Districts must adequately plead: "(1) a duty or obligation recognized by the law requiring the defendant to protect others from unreasonable risks; (2) a breach of that duty; (3) a reasonably close casual connection between the conduct and the resulting injury; and (4) actual loss or damages." (*Grieco v. Daiho Sangyo, Inc.* (Fla. Dist. Ct. App. 2022) 344 So.3d 11, 22 (*Grieco*).) "[T]he determination of whether a duty is owed presents a question of law to be determined by the court." (*Id.*, internal citations and quotation marks omitted; see also *Ferreira v. Strack* (R.I. 1994) 636 A.2d 682, 685.)

The determination of whether a duty exists "should reflect considerations of public policy, as well as notions of fairness." (*Id.*)  "As to duty, the proper inquiry … is whether the defendant's conduct created a foreseeable zone of risk, not whether the defendant could foresee the specific injury that actually occurred. [Citation.] … Foreseeability, alone, does not define duty—it merely determines the scope of the duty once it is determined to exist. The injured party must show that a defendant owed not

merely a general duty to society but a specific duty to him or her, for without a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm." (*Grieco*, *supra*, 344 So.3d at p. 23, internal citations, quotation marks, and brackets omitted; see also *Sewell v. Racetrac Petroleum, Inc.* (Fla. Dist. Ct. App. 2017) 245 So.3d 822, 825 (*Sewell*) ["a legal duty is sometimes not recognized or is substantially curtailed even if the risk is foreseeable"].)  The Rhode Island Supreme Court has "consistently recognized that foreseeability of injury does not, in and of itself, give rise to a duty. [Citation.] Other courts have noted that the question is not simply whether an event is foreseeable, but whether a *duty* exists to take measures to guard against it. [Citation.] Accordingly, the element of foreseeability must be considered in conjunction with other relevant factors. [Citation.] In no circumstances can foreseeability alone create a duty to act." (*Ferreira*, *supra*, 636 A.2d at p. 688, fn. 4, internal citations, quotation marks, brackets, and ellipses omitted; emphasis in original.)

In California, "[d]uty, under the common law, is essentially an expression of policy that the plaintiff's interests are entitled to legal protection against the defendant's conduct." (*Kuciemba v. Victory Woodworks, Inc.* (2023) 14 Cal.5th 993, 1016 (*Kuciemba*), internal citations and quotation marks omitted.)  California Civil Code section 1714 "establishes the default rule that each person has a duty 'to exercise, in his or her activities, reasonable care for the safety of others.'" (*Brown v. USA Taekwondo* (2021) 11 Cal.5th 204, 214, internal citations and quotation marks omitted.))  California courts make exceptions to Civil Code section 1714's general duty of ordinary care "only when foreseeability and policy considerations justify a categorical no-duty rule." (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 772.)  Those foreseeability and policy considerations are examined through the so-called *Rowland* analysis based on *Rowland v. Christian* (1968) 69 Cal.2d 108 (*Rowland*).. (*Kuciemba*, at p. 1021.)  The *Rowland* factors are:

> … the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.

(*Rowland*, at p. 113.)  The same factors are applied by the courts of Rhode Island.  (See *Banks v. Bowen's Landing Corp.* (R.I. 1987) 522 A.2d 1222, 1225.)  As the California Supreme Court has noted, the *Rowland* factors fall into two categories: "The first group involves foreseeability and the related concepts of certainty and the connection between plaintiff and defendant. The second embraces the public policy concerns of moral blame, preventing future harm, burden, and insurance availability. The policy analysis evaluates whether certain kinds of plaintiffs or injuries should be excluded from relief." (*Kuciemba*, *supra*, 14 Cal.5th at pp. 1021-1022, internal citations and quotation marks omitted.)

The trilogy of foreseeability factors are foreseeability, certainty, and the connection between the plaintiff and the defendant.  Consideration of these factors does not support a finding of duty here.

Taking the general allegations in the Complaints to be true, a trier of fact would be unable to conclude therefrom that the alleged property damage was a foreseeable consequence of Defendants' designing and operating their platforms in such a way as to harm the mental and emotional health of minor users.  The Complaints allege that the harm to minor users of the platforms—in the form of addiction, depression, and other mental and emotional harm—was foreseeable.  But there is nothing in the Complaints suggesting that it would have been foreseeable that these mental and emotional harms would, in turn, cause the harmed students to then "act out" and destroy school property.  Indeed, in the portion of their Opposition addressing the foreseeability of the School Districts' harm, the School Districts fail to explain how it was foreseeable that mental and emotional harms would lead to destruction of school property; instead, the School Districts focus on their argument that purely economic harms were a foreseeable consequence of Defendants' interactions with minor users.  (See Pls' Opp. Defs' Dem., at pp. 17-20.)  The School Districts fail to point to any factual allegations from which this court could conclude that the destruction of, say, an elementary school bathroom sink in Florida was the foreseeable result of the mental and emotional harms negligently inflicted on minor users of Defendants' platforms.

"The third *Rowland* factor, the closeness of the connection between the defendant's conduct and the injury suffered, … is strongly related to the question of foreseeability itself."  (*Kesner v. Superior Court* (2016) 1 Cal.5th 1132, 1148, internal citations and quotation marks omitted.)  This factor is relevant when a court is called upon to determine whether the defendant owes "a duty to prevent injury that is the result of conduct," and in those circumstances "the touchstone of the analysis is the foreseeability of that

intervening conduct." (*Id.*)  Here the alleged chain of causation requires the court to consider not just whether it was foreseeable that the Defendants' conduct would cause injury to the minors themselves, but also whether it was foreseeable that the mental and emotional harm in turn would cause minors to commit acts of vandalism at their school—acts of vandalism that they otherwise would not commit.

Here there is only a tenuous connection between, on the one hand, Defendants' design, operation, and promotion of the platforms and, on the other, a minor user's decision to destroy or deface school property.  Between Defendants' actions and the School Districts' alleged property damage lie the alleged intentional actions taken by third parties to destroy property.  There are no allegations suggesting that every minor who used the platforms was mentally or emotionally harmed in such a way that he or she was preconditioned to destroy or deface school property.  To the contrary, the allegations state that the mental and emotional harm suffered by minor users led to a wide variety of different reactions and behaviors on the part of those minor users, from "body dissatisfaction," to "self-harming behaviors," to the development of "eating disorders." (See, e.g., FL Compl., ¶ 132.) None of the factual allegations can be read to suggest that Defendants' design and operation of the platforms set in motion a chain of events that would lead to minor users destroying school property.  And while Plaintiffs contend that Defendants "target[ed] their actions toward schools and school children" so that use of the platforms would occur by students at school (Pls' Opp. Defs' Dem., at p. 22), there is no allegation (beyond, perhaps, the TikTok challenge video allegations discussed below) suggesting that Defendants targeted the destruction of school property.  By allegedly causing minor users to suffer mental or emotional harms, Defendants may have made those minor users more likely to "act out"; but this court cannot conclude that the way in which the minor students would "act out" was somehow connected to the destruction of school property.

Indeed, the School Districts' own allegations regarding TikTok's challenge videos demonstrates that the connection between the mental and emotional harm caused by Defendants and the property damage caused by certain third-party minors is far from clear: Plaintiffs here allege that the challenge videos themselves—and not merely emotional or mental harms— encouraged the destruction of school property.  There are no similar allegations that, say, Meta could foresee that causing a minor user mental or emotional harm by use of its social media platforms would then cause the minor user to engage in the destruction of school property.

Plaintiffs cite *Hacala v. Bird Rides, Inc.* (2023) 90 Cal.App.5th 292 (*Hacala*) as support for their contention that there is a sufficiently close

connection between the addictive qualities of the social media platforms and the conduct of the minors in vandalizing the schools to satisfy the third *Rowland* factor.  *Hacala* is not analogous.  In that case, the defendant scooter rental company maintained the ability to control the instrumentality that harmed the plaintiff when a user of the scooter left the scooter in a location that was not visible to the plaintiff (a pedestrian) at night.  The Court of Appeal found that third-party injury was foreseeable to the scooter rental company because it controlled each electric scooter through a downloadable app, was able to monitor and locate its scooters and determine if they were properly parked and out of pedestrian rights-of-way, and failed to locate and remove scooters parked in violation of the requirements of a permit under which the scooter rental company operated.  (*Id.* at p. 312.)  Based on these facts, the Court of Appeal found that the complaint adequately alleged a failure by the scooter rental company to exercise ordinary care in the management of its property causing the plaintiff's physical injury.  (*Id.* at p. 313.)  Here, by contrast, Defendants did not "own" the instrumentality of harm, and did not maintain control over or monitor the physical actions of the minors who committed the acts of vandalism.  The Court of Appeal in *Hacala* found that the scooter owner had a duty of care that "broadly encompasses [the scooter owner's] obligation to remove or relocate its property when a … scooter is in a location where it poses a risk of harm to others."  (*Id.* at p. 314.)  For obvious reasons, the School Districts do not allege that Defendants have similar obligations to control the physical location of the minors who use their platforms.  The bases for recognition of a duty to prevent injury caused by third-party conduct in *Hacala* are absent here.

Even if property damage to the School Districts could be considered to be foreseeable under the first three Rowland factors, there must be a limit imposed on Defendants' liability in order "to avoid an intolerable burden on society."  (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552.)  Under the School Districts' theory of liability, any company that causes mental or emotional harm through interactions with a customer would be liable to any individuals or entities that are then harmed by that customer if a trier of fact might conclude that the mental or emotional harm played some role in causing the customer to "act out" and harm those individuals or entities.  Expanding tort law to allow for this and similar suits for harm caused by mentally or emotionally harmed customers "would throw open the courthouse doors to a deluge of lawsuits that would be both hard to prove and difficult to cull early in the proceedings."  (*Kuciemba*, *supra*, 14 Cal.4th at p. 1031.)

The California Court of Appeal in *Modisette v. Apple Inc.* (2018) 30 Cal.App.5th 136 (*Modisette*), like the Rhode Island and Florida courts in the cases cited above, stressed that important policy considerations can weigh

against a finding of duty in order to avoid a limitless extension of tort liability. "Courts invoke the concept of duty to limit generally the otherwise potentially infinite liability which would follow from every negligent act. The conclusion that a defendant did not have a duty constitutes a determination by the court that public policy concerns outweigh, for a particular category of cases, the broad principle enacted by the Legislature that one's failure to exercise ordinary care incurs liability for all the harms that result." (*Id.* at p. 143, internal citations, quotation marks, brackets, and ellipses omitted.)

In *Modisette*, the plaintiffs sued Apple, Inc. (Apple) for injuries caused "when a driver using the FaceTime application on his iPhone crashed into [the plaintiffs'] car … ." (*Id.* at p. 139.) The plaintiffs alleged that Apple had wrongfully failed to implement in the iPhone 6 Plus a safer alternative design that would automatically prevent drivers from using the FaceTime application when driving at highway speed. (*Id.* at p. 140.) The court decided that the plaintiffs were unable to properly plead the existence of a duty. The court concluded "first, that there was not a 'close' connection between Apple's conduct and the [plaintiffs'] injuries and, second, that 'the extent of the burden to Apple and consequences to the community of imposing a duty to exercise care with resulting liability for breach' would be too great if a duty were recognized." (*Id.* at p. 145, internal citations and brackets omitted.) As to this first factor, the court reasoned that "Apple's design of the iPhone … simply made [the third-party driver's] use of the phone while driving possible, as does the creator of any product (such as a map, a radio, a hot cup of coffee, or makeup) that could foreseeably distract a driver using the product while driving." (*Id.* at p. 146.) Regarding concerns about an unlimited extent of liability, the court considered the burden that a finding of liability "would place upon cell-phone manufacturers and the consequences to the community" and concluded that those considerations "strongly militate toward finding that Apple has no duty to the [plaintiffs] even if their injuries were foreseeable." (*Id.* at p. 148.)

It is hard to imagine how any business or institution could function—or reasonably insure itself against potential losses—if its liability extends to all those who could reasonably be expected to interact with the individuals that are caused emotional harm by that business or institution. A restauranteur who negligently sold a diner spoiled food would be liable to the person who was later struck by the diner's car, given that the diner's poor driving may have resulted from suffering under the effects of food poisoning. An employer who wrongfully terminated its employee would be liable to any third party who was later assaulted by the employee when that employee was "acting out" as a result of his emotional distress caused by the wrongful termination. A parent who negligently raised her child so as to cause the child mental or emotional harm, would potentially be liable to any persons

that are likely to come into contact with that child.  Importantly, Plaintiffs' policy arguments in favor of imposing a duty on Defendants do not address the relevant allegations concerning the property damage allegedly suffered by the School Districts.  (See Pls' Opp. Defs' Dem., at p. 22 [faulting Defendants for interfering with students' education].)

The foregoing analysis applies equally to the negligence claims of Brevard, despite the fact that Florida law has not *explicitly* adopted the *Rowland* factors.  The courts of Florida, like those of California, look to both foreseeability and public policy factors when determining whether the defendant owed a duty to the plaintiff.  As the School Districts acknowledge, "[t]he duty element of negligence focuses on whether the defendant's conduct foreseeably created a broader 'zone of risk' that poses a general threat of harm to others."  (*McCain v. Florida Power Corp.* (Fla. 1992) 593 So.2d 500, 502.)

But, similar to the analysis under the *Rowland* factors, Florida courts do not restrict their analysis of the duty question to foreseeability.  "In evaluating the existence of a common law duty, courts assess the interests of each party and society to determine whether a duty should be imposed. Citation.] Duty is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection or not."  (*Shamrock-Shamrock, Inc. v. Remark* (Fla. Dist. Ct. App. 2019) 271 So.3d 1200, 1204-1205, internal citations, quotation marks, and brackets omitted.)  Florida courts, relying on the Restatement (Third) of Torts, recognize that "a legal duty is sometimes not recognized or is substantially curtailed even if the risk is foreseeable."  (*Sewell*, *supra*, 245 So.3d at p. 825.)  When actions of a third party are part of the causal chain of events, Florida finds "no duty to prevent – and no liability for – a third party's misconduct absent the existence of a special relationship."  (*Grieco, supra,* 344 So.3d at p. 25 [no duty for compressed air manufacturer to protect against user getting high and causing auto accident].)  "[A] duty of reasonable care is not owed to the world at large but arises out of a relationship between the parties."  (*Id.*)

Accordingly, the analysis of this court above regarding both (1) foreseeability of the harm, and (2) whether liability for such harm can properly be asserted against Defendants under general public policy principles, is equally applicable under Florida law.

The School Districts cite no cases that would support an expansion of the common law to make a defendant liable, in the absence of any special relationship, for the harmful actions of a third party that result from mental or emotional harm negligently inflicted on that third party by that defendant.

The School Districts rely heavily on *JUUL*.  But when the allegations in this case are limited—as they must be under the economic loss rule—to Defendants' platforms allegedly causing minors to "act out" and destroy or deface school property, it is clear that *JUUL* is not analogous.

*JUUL* and other cases cited by the School Districts dealt with a defendant manufacturer that created a physical product and a "market" for that product that ultimately led to *the product itself* causing harm.  (*JUUL*, *supra*, 497 F.Supp.3d at p. 656 [manufacturer "created the youth vaping market"].)  For example, in *JUUL*, with respect to the alleged property damage, the plaintiffs there alleged that the defendants' vaping products left "hazardous waste on school grounds." (*JUUL*, at p. 654.)  Here, by contrast, there is no allegation that the platforms *themselves* caused the property damage at the School Districts' schools; rather, the operation of the platforms and the destruction of school property are separated by a far more complicated and attenuated chain of events, including the mental and emotional health of third parties and their harmful and willful acts.[2]

### 3. The Negligence Claims Are Barred by Section 230 to the Extent They Are Based on TikTok's Challenge Videos Inducing Students to Damage School Property

Unlike more generalized allegations regarding the mental and emotional harms suffered by minor users of Defendants' platforms, the allegations regarding TikTok's alleged challenge videos suggest that ByteDance engaged in actions more targeted at the School Districts themselves.  But this court need not determine whether ByteDance owes a duty to the School Districts not to feature on its website challenge videos that might foreseeably encourage third-party students to commit property damage on school property.  Such liability is barred by Section 230 under current precedential authorities.

Defendants argue that Section 230 bars allegations of harm resulting from challenge videos viewed on TikTok's social media site because such allegations impermissibly treat Defendants as the publishers of third-party content.  The court must decide that issue here because the other

---

[2] The federal district court in *Juul* also relied heavily on the reasoning of *Ileto v. Glock Inc.* (9th Cir. 2003) 349 F.3d 1191, 1197 (*Ileto*), where the Ninth Circuit, purporting to apply California law, held that a negligence claim would lie based on a theory that the manufacturer and distributor of guns facilitated "the creation of an illegal secondary gun market."  But the reasoning of that case subsequently was criticized by the California Court of Appeal in *In re Firearm Cases* (2005) 126 Cal.App.4th 959, which granted summary judgment in favor of gun manufacturers, distributors and retailers, relying on the reasoning articulated by the dissenting Ninth Circuit judges in *Ileto*.

allegations pleaded in support of a negligence claim do not state a claim upon which relief may be granted (for the reasons discussed above).

The Complaints make clear that the challenge videos are content created by the users of Defendants' platforms. (See, e.g., FL Compl., ¶ 651.) And here, the relevant negligence claims would be based on the allegation that certain minor users watched the challenge videos and were then encouraged by the challenge videos' content to engage in "copycat" actions destroying or defacing school property. (See, e.g., FL Compl., ¶ 658.) The negligence claims alleging harm based on the existence of this third-party content on Defendants' platforms thus seek to hold Defendants liable as publishers of the third-party content. Such claims based on harm suffered as a result of the content of the challenge videos on TikTok are barred by Section 230. (*Barrett v. Rosenthal* (2006) 40 Cal.4th 33, 57 ["Congress intended to create a blanket immunity from tort liability for online republication of third party content"]; see also October 2023 Ruling, at pp. 15-18.)

The School Districts attempt to avoid application of Section 230 by contending that they seek to hold ByteDance liable, not as a publisher of the challenge videos, but rather as an "active promoter" of the third-party content appearing on TikTok. (See Pls' Opp. Defs' MTS, at p. 10.) The School Districts fault ByteDance for "promot[ing] challenges that specifically target school districts." (FL Compl., ¶ 658.) This argument conflicts with binding California authority on the interpretation of Section 230. In *Wozniak v. YouTube, LLC* (2024) 100 Cal.App.5th 893, the California Court of Appeal held that recommendations by social media platforms are "tools meant to facilitate the communication and content of others," and thus the recommendation of third-party content is immune under Section 230. (*Id.* at pp. 916-918 [holding that YouTube's recommendations of certain harmful "scam videos" were subject to Section 230 immunity].)

*Wozniak* is supported by substantial authority. (See, e.g., *Dyroff v. Ultimate Software Group, Inc.* (9th Cir. 2019) 934 F.3d 1093; *Force v. Facebook, Inc.* (2d Cir. 2019) 934 F.3d 53 (*Force*) ; *In re Facebook, Inc.* (Tex. 2021) 625 S.W.3d 80.) However, there have been very thoughtful opinions penned by well-respected judges that criticize the conclusion that an internet service provider is treated as a "publisher" of third-party content when it affirmatively recommends third party content to a social media user. (See separate opinions by Judge Berzon and Judge Gould in *Gonzalez v. Google LLC* (9th Cir. 2021) 2 F.4th 871 (*Gonzalez*), vacated and remanded (2023) 598 U.S. 617, and rev'd sub nom. *Twitter, Inc. v. Taamneh* (2023) 598 U.S. 471; and separate opinion of Chief Judge Katzman in *Force*, supra, 934 F3d at pp. 76-89.) The United States Supreme Court granted certiorari

in Gonzalez to address this question, but ultimately did not reach the issue, essentially resolving the case on other grounds. (*Twitter, Inc. v. Taamneh* (2023) 598 U.S. 471.) Despite the persuasive reasoning of these concurring and dissenting views, this court is bound by *Wozniak.* Thus, Section 230's immunity bars the School District's theory of a duty arising out of TikTok's promotion of challenge videos.[3]

The School Districts' attempt to analogize the challenge video allegations to the facts in *Lemmon v. Snap, Inc.* (9th Cir. 2021) 995 F.3d 1085 (*Lemmon*) is not persuasive.  In *Lemmon,* the plaintiffs were parents of two deceased boys who sued Snap, "alleging that it encouraged their sons to drive at dangerous speeds and thus caused the boys' deaths through its negligent design of its smartphone application Snapchat." (*Id.* at p. 1087.) At issue was Snap's app called the "Speed Filter."  "The app … permits its users to superimpose a filter over the photos or videos that they capture through Snapchat at the moment they take that photo or video. [One of the deceased boys] used one of these filters—the Speed Filter—minutes before the fatal accident on May 28, 2017. The Speed Filter enables Snapchat users to record their real-life speed." (*Id.* at p. 1088, internal quotation marks omitted.)  "Many of Snapchat's users suspect, if not actually believe, that Snapchat will reward them for recording a 100-MPH or faster snap using the Speed Filter. According to plaintiffs, this is a game for Snap and many of its users with the goal being to reach 100 MPH, take a photo or video with the Speed Filter, and then share the 100-MPH-Snap on Snapchat." (*Id.* at p. 1089, internal quotation marks and brackets omitted.)

The Ninth Circuit reversed the district court's dismissal of the plaintiffs' action under Section 230, concluding "that, because the [plaintiffs'] claim neither treats Snap as a publisher or speaker nor relies on information provided by another information content provider, Snap does not enjoy immunity from this suit under § 230(c)(1)." (*Id.* at p. 1087, internal quotation marks omitted.)  The court noted that the plaintiffs in *Lemmon* alleged a cause of action that "rest[ed] on the premise that manufacturers have a duty to exercise due care in supplying products that do not present an unreasonable risk of injury or harm to the public." (*Id.* at p. 1092.)  The court then concluded that the claims were not barred by Section 230:

> The duty underlying such a claim differs markedly from the duties of publishers as defined in [Section 230]. Manufacturers have a specific duty to refrain from designing a product that poses an unreasonable risk of injury or harm

---

[3] Because Section 230 bars the claim, the court does not reach the issue of whether considerations of duty or proximate cause also would preclude liability to the School Districts.

to consumers. [Citation.] Meanwhile, entities acting solely as publishers—*i.e.*, those that "review material submitted for publication, perhaps edit it for style or technical fluency, and then decide whether to publish it," [citation]—generally have no similar duty. [Citation.]

It is thus apparent that the [plaintiffs'] amended complaint does not seek to hold Snap liable for its conduct as a publisher or speaker … . [T]he duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. [Citation.] This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. [Citation.] Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat. [Citation.]

(*Id.*, internal citations and brackets omitted; italics in original.)

Unlike the allegations here, the facts in *Lemmon* were that the Speed Filter *itself* encouraged users to engage in dangerous driving; here, by contrast, it is the specific third-party content presented in the challenge videos and the recommendation of that content that allegedly encouraged minor users to destroy or deface school property.  Thus, unlike the claims in *Lemmon*, here the School Districts seek to hold ByteDance liable as a publisher of that content.  The court in *Wozniak* rejected reliance on *Lemmon* for the same reasons.  (*Wozniak*, *supra*, 100 Cal.App.5th at p. 913.)  As stated above, under current California law interpreting Section 230, liability based on promotion of challenge videos by TikTok is barred.

### III.   The School District's Complaints Do Not State a Claim for Nuisance Under the Law of Any of the Four Relevant States

The School Districts purport to allege a claim of public nuisance.  A claim of public nuisance is premised on interference with a public right.  In the tort jurisprudence of nuisance, a public right refers to "those indivisible resources shared by the public at large, such as air, water, or public rights of way.  The interference must deprive all members of the community of a right to some resource to which they otherwise are entitled." (*State v. Lead Industries, Ass'n, Inc.* (R.I. 2008) 951 A.2d 428, 453 (*Lead Industries*) .) The public right to which the School Districts claim entitlement is "public

health."[4]  The School Districts' reliance on nuisance fails because the right not to be injured by the Defendants' social media platforms is a right personal to the minors who used Defendants' platforms, and individual injuries to health have not been recognized by any of the four States in question as a basis for nuisance liability, even when the individual harms are considered collectively.

### 1. Rhode Island Law

In *Lead Industries*, the Rhode Island Supreme Court considered whether the State of Rhode Island could maintain a claim against the manufacturers of lead pigment used in paint by seeking a remedy of abatement of lead paint as a nuisance.  The Court acknowledged that "[i]t is undisputed that lead poisoning constitutes a public health crisis that has plagued and continues to plague this country, particularly its children," and that childhood lead poisoning is "the most severe environmental health problem in Rhode Island." (*Id.* at p. 436, internal citations and quotation marks omitted.)  Nevertheless, the Court concluded that harms to persons caused by exposure to a harmful product or to harmful conduct by a defendant cannot be aggregated so as to be considered interference with a public right.  "The right of an individual child not to be poisoned by lead paint is strikingly similar to other examples of nonpublic rights cited by courts," referring, as examples, to the right everyone has not to be assaulted, defamed or defrauded, or negligently injured. (*Id.* at p. 454, citing examples from Rest.2d Torts, § 821B, cmt. (g).)

The Court in *Lead Industries* noted that the common law "takes place gradually and incrementally and usually in a direction that can be predicted," and that the Court is "particularly loath to indulge in the abrupt abandonment of settled principles and distinctions that have been carefully developed over the years." (*Id.* at pp. 445-446, internal citations and quotation marks omitted.)  When addressing the requirement that there be interference with a public right, the court in *Lead Industries* quoted approvingly from text found in an academic article:

> Unlike an interference with a public resource, the manufacture and distribution of products rarely, if ever, causes a violation of a public right as that term has been

---

[4] To the extent the Complaints might be read to allege an interference with the right to a public education, that right is personal to students and is not a right personal to the School Districts. (See, e.g., *Collins v. Thurmond* (2019) 41 Cal.App.5th 879, 896 [explaining how the right to adequate public education is held by the students and controls actions of state school boards].)  The School Districts bring suit on their own behalf, not on behalf of their students or on behalf of the People of their respective States.

> understood in the law of public nuisance. Products generally are purchased and used by individual consumers, and any harm they cause—even if the use of the product is widespread and the manufacturer's or distributor's conduct is unreasonable—is not an actionable violation of a public right. The sheer number of violations does not transform the harm from individual injury to communal injury.

(*Id.* at p. 448, quoting Donald G. Gifford, *Public Nuisance As A Mass Products Liability Tort* (2003) 71 U. Cin. L. Rev. 741, 817, internal citations, quotation marks, brackets, and ellipses omitted.)  The Court also stressed that "[a] common feature of public nuisance is the occurrence of a dangerous condition at a specific location." (*Lead Industries*, at p. 452.) The court then noted that "public nuisance typically arises on a defendant's land and interferes with a public right."  (*Id.*)

The Court found that the state had failed to allege that the presence of lead in paint interfered with a "public right." (*Id.* at pp. 453-454.)  "The term public right is reserved more appropriately for those indivisible resources shared by the public at large, such as air, water, or public rights of way." (*Id.* at p. 453.)  The Court concluded that "[t]he right of an individual child not to be poisoned by lead paint is strikingly similar to other examples of nonpublic rights cited by courts … ." (*Id.* at p. 454.)  The Court based this determination, in part, on the fact that the harms were caused by the defendant's product, quoting the following text from a decision by the Supreme Court of Illinois:

> "Similarly, cell phones, DVD players, and other lawful products may be misused by drivers, creating a risk of harm to others. In an increasing number of jurisdictions, state legislatures have acted to ban the use of these otherwise legal products while driving. A public right to be free from the threat that other drivers may defy these laws would permit nuisance liability to be imposed on an endless list of manufacturers, distributors, and retailers of manufactured products that are intended to be, or are likely to be, used by drivers, distracting them and causing injury to others."

(*Id.* at pp. 454-455, quoting *City of Chicago v. Beretta U.S.A. Corp.* (2004) 213 Ill.2d 351, 375 (*Beretta*).  The Court in *Lead Industries* continued: "Like the *Beretta* court, we see no reason to depart from the long-standing principle that a public right is a right of the public to shared resources such as air, water, or public rights of way." (*Lead Industries*, at p. 455.)

The School Districts rely on *State v. Purdue Pharma L.P.*, 2019 WL 3991963 (R.I.Super.), in which a Rhode Island trial court distinguished *Lead Industries* and found that the State could maintain a claim for nuisance against the manufacturers and distributors of prescription opioids. The trial court in that decision concluded that the "public right" at issue was "freedom from an overabundance of prescription opioids." (*Id.* at *9.) In a later decision in the opioid proceedings, the trial court recognized that while *Lead Industries* affirmed that public health was a public right, the Rhode Island Supreme Court "distinguished between a public right and an aggregation of private rights" and concluded that injury to health from lead paint "was more akin to a products liability claim" and should not create liability under a nuisance theory. (*State v. Purdue Pharma L.P.*, 2022 W.L. 577874 (R.I.Super.) at * 28.) The *Purdue Pharma* trial court reasoned that, while the harm from lead paint was "identifiable to specific individuals, namely, the residents of homes that have not had the lead paint abated," the "potential victims of the opioid epidemic are not so easily identified, nor are they confined to one private location (i.e., the home)." (*Id.*) Whether or not the Rhode Island trial court was correct in *Purdue Pharma*, here, the harm from Defendants' social media platforms is identifiable to specific individuals, and the School Districts seek to extend tort remedies to reach, not the harm caused by the social media sites themselves, but the harm caused by the minor users of the social media sites.

The reasoning of the Rhode Island Supreme Court in *Lead Industries* is that tort liability should not be extended from the defined limits of its reach by the expedient of calling the secondary, collective effects of tortious conduct toward particular victims a "nuisance." As discussed below, this approach is consistent with the law in California, Florida and Washington. The reasoning of *Lead Industries* bars the School Districts' nuisance claims under Rhode Island law.

The Restatement (Third) of Torts Liability for Economic Harm cites with approval the Rhode Island Supreme Court's decision in *Lead Industries* and criticizes the decisions of a minority of jurisdictions that allow plaintiffs to bring public nuisance claims based on harms caused by a defendant's products:

> Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint. These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of

removing lead paint, for example, or of providing health care to those injured by smoking cigarettes. Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue. Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake. Claims for reimbursement of expenses made necessary by a defendant's products might also be addressed by the law of warranty or restitution. If those bodies of law do not supply adequate remedies or deterrence, the best response is to address the problems at issue through legislation that can account for all the affected interests.

... [P]roblems caused by dangerous products might once have seemed to be matters for the law of public nuisance because the term "public nuisance" has sometimes been defined in broad language that can be read to encompass anything injurious to public health and safety. The traditional office of the tort, however, has been narrower than those formulations suggest, and contemporary case law has made clear that its reach remains more modest. The rules stated in this Section and Comment reflect that modesty.

(Rest.3d Torts: Liab. for Econ. Harm, § 8, cmt. (g), (2020).)

### 2. California Law

The California courts also have held that a claim for public nuisance cannot be used by a private person or entity to attempt to remedy the collective effects of individual injuries to health that arise from distribution of products or from other actions by a defendant that may give rise to a duty toward the defendant's customers. In *City of San Diego v. U.S. Gypsum Co.* (1994) 30 Cal.App.4th 575 (*City of San Diego*), a city sued defendant manufacturers and distributors under a public nuisance theory for damages stemming from the installation of asbestos in the city's buildings. Noting that nuisance is "generally a land-connected tort," the Court of Appeal held that the nuisance claim was defective because the city had "essentially pleaded a products liability action, not a nuisance action." (*Id.* at pp. 584-585.) The court noted that no prior case law supported the notion that nuisance could be based on harms caused by a product, and stressed the

importance of not expanding the meaning of nuisance to include any conceivable interference with property:

> California law has permitted recovery in nuisance where a defendant has owned or controlled property from which the nuisance arose [citation], where a defendant has created a nuisance on another's property [citation] or where a defendant has employed another to perform work that has resulted in a nuisance to plaintiff's property [citation]. [¶] [The plaintiff city] cites no California decision, however, that allows recovery for a defective product under a nuisance cause of action. Indeed, under [the city's] theory, nuisance "would become a monster that would devour in one gulp the entire law of tort." (*Tioga Public School Dist. No. 15 of Williams County, State of N.D. v. U.S. Gypsum Co.* (8th Cir. 1993) 984 F.2d 915, 921.)

(*Id.* at pp. 585-586, internal citations and ellipses omitted.)

The reasoning of City of San Diego was echoed in *City of Modesto Redevelopment Agency v. Superior Court (*2004) 119 Cal.App.4th 28 (*City of Modesto*). *City of Modesto* agreed that "the law of nuisance is not intended to serve as a surrogate for ordinary products liability." (*Id.* at p. 39.) The court also concluded that a claim for failure to warn "is analogous to the manufacture, distribution, and supplying of asbestos-containing materials" and "does not fall within the context of nuisance, but is better analyzed through the law of negligence or product liability, which have well-developed precedents to determine liability for failure to warn." (*Id.* at p. 42.) Thus, suppliers of dry cleaning solvents could not be held liable for nuisance on a theory that the products were defective or the suppliers failed to warn users. (*Id.*) The court therefore permitted the nuisance claim to proceed only against defendants who "took affirmative steps directed toward the improper discharge of solvent waste" into the city's water supply thereby directly causing property damage. (*Id.* at p. 43.)

Although the School Districts rely on *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 (*County of Santa Clara*), that case accepts and applies the reasoning and holdings of *City of San Diego* and *City of Modesto*. *County of Santa Clara* involved two kinds of public nuisance claims, which the court analyzed separately: (1) a claim bought by the county on behalf of the People of the State of California seeking abatement of lead-containing paint, and (2) a claim on behalf of class plaintiffs seeking damages for injuries to property owned by the class plaintiffs. (*County of Santa Clara*, at pp. 303-304.)  The court allowed the *representative* public

nuisance claim to proceed, noting that this claim, brought by a government entity on behalf of the People, sought the equitable remedy of abatement, not damages. (*Id.* at p. 310-311.)  However, with respect to the class plaintiffs' claims for damages to their own property, the *County of Santa Clara* court expressly followed *City of San Diego* and *City of Modesto*:

> In light of [*City of*] *San Diego* and [*City of*] *Modesto,* we are reluctant to extend liability for damages under a public nuisance theory to an arena that is otherwise fully encompassed by products liability law. The class plaintiffs' public nuisance cause of action, unlike the representative cause of action, is brought on their own behalf (rather than on behalf of the People) and seeks damages for a special injury rather than abatement, so, unlike the representative cause of action, it is difficult to distinguish the class plaintiffs' public nuisance cause of action from the causes of action that were disapproved in [*City of*] *San Diego* and [*City of*] *Modesto.* It is true that the class plaintiffs' public nuisance cause of action, like the representative cause of action, alleges that defendants did something more than merely manufacture and distribute a product and fail to warn. [The class plaintiffs also alleged intentional promotion of the use of lead paint.]  Nevertheless, the class plaintiffs' public nuisance cause of action is much more like a products liability cause of action because it is, at its core, an action for *damages for injuries caused to plaintiffs' property by a product,* while the core of the representative cause of action is an action for remediation of a public health hazard. While the issue is close, we are not convinced that [*City of*] *San Diego* and [*City of*] *Modesto* erred in concluding that liability for damages for product-related injuries should not be extended beyond products liability law to public nuisance law. The superior court did not err in sustaining the demurrer to the class plaintiffs' public nuisance cause of action.

(*Id.* at p. 313, emphasis in original.)[5]

The School Districts are not public entities suing on behalf of the People of their respective states.  Rather, they are proceeding based on

---

[5] The representative claim for public nuisance that was allowed to proceed in *County of Santa Clara* was eventually tried to a jury.  The Court of Appeal decision in *People v. ConAgra Grocery Products Co.* (2017) 17 Cal.App.5th 51, is the appeal from that verdict.

private claims for damages purportedly based on a public nuisance.  The School Districts therefore are bound by the California precedents holding that a plaintiff cannot state a claim for nuisance based on injuries caused by a defendant's sale of a product or based on another tort theory such as negligence or negligent failure to warn.  As in *City of Modesto*, Defendants' conduct here "does not fall within the context of nuisance, but is better analyzed through the law of negligence or product liability, which have well-developed precedents to determine liability … ."  (*City of Modesto*, 119 Cal.App.4th at p. 42.)

The School Districts argue that these precedents are not applicable because this court has held that Defendants' social media platforms are not "products" subject to product liability doctrine.  But the School Districts misconstrue the underlying reasons why the cases discussed above refuse to recognize a claim grounded in nuisance.  *City of San Diego*, *City of Modesto* and *County of Santa Clara* refused to recognize nuisance claims, not because of the applicability of any particular element of product liability law, but because other tort principles developed in the context of consumer relationships with providers of products or services construct doctrinal limits on liability, and nuisance law should not be allowed to sweep aside those limits.  This court's prior decision explained the tort principles that shape the liability analysis for Defendants' conduct in relation to users of the social media platforms:

> The focus in this case is more appropriately on the alleged conduct of Defendants, and on whether common law negligence provides a basis for imposing a duty to avoid the harm for which Plaintiffs seek recovery.  As discussed below, the common law has shaped negligence as a nuanced doctrine, not one of unlimited liability.  Plaintiffs' allegations are more appropriately conceptualized as contending Defendants engaged in a course of conduct intended to shape the user experiencer for these Plaintiffs, and that this course of conduct foreseeably caused personal injury to Plaintiffs.

(October 2023 Ruling, at p. 39.)  This court then analyzed the *Rowland* factors in order "to decide whether the scope of the general rule of section 1714 [California's general statement of the duty of ordinary care] should be limited."  (*Id.* at p. 45.)  After an extensive discussion (*id.* at pp. 45-53), this court concluded that "there is no basis for deviating from general principles of negligence requiring Defendants to exercise due care in the management of their property for the safety of their customers" (*id.* at p. 53).

As discussed above, the *Rowland* factors do not support a finding that Defendants owe a duty toward the School Districts. California case law holds that the limits of liability for negligence should not be evaded by creating a theory of nuisance based on the collective effects of injury to a defendant's customers. This doctrinal limitation precludes the nuisance claims alleged under California law.

### 3. Florida Law

Florida courts also have refused to recognize liability under a public nuisance theory when a plaintiff seeks recovery based on collective injuries to a group of people who have been injured by a defendant's conduct. In *Cunningham v. Anchor Hocking Corp.* (Fla. Dist. Ct. App. 1990) 558 So.2d 93 (*Cunningham*), the court looked to Florida Statutes Section 823.01 in construing the scope of the tort of public nuisance in Florida. (*Id.* at p. 97.) That statute provides misdemeanor penalties for "[a]ll nuisances that tend to annoy the community, injury to health of the citizens in general, or corrupt the public morals ...." (Florida Statutes, § 823.01.) In *Cunningham*, the plaintiffs were employees who worked in a glass manufacturing plant and alleged exposure to toxic substances resulting in various injuries to their health. The court held that these plaintiffs had "failed to allege injury 'to the health of the citizens in general' or corruption of public morals, as is required by Section 823.01, Florida Statutes." (*Cunningham*, at p. 97; see also *Department of Agriculture & Consumer Services v. Bogorff* (Fla. Dist. Ct. App. 2010) 35 So.3d 84, 89 ["To be a public nuisance, property must cause inconvenience or damage to the public generally"], internal quotation marks and footnotes omitted].)

In *Penelas v. Arms Technology, Inc.* (Fla. Cir. Ct., Dec. 13, 1999, No. 99-1941 CA-06) 1999 WL 1204353 (*Penalas*), aff'd on other grounds by (Fla. Dist. Ct. App. 2001) 778 So.2d 1042, the Florida trial court similarly held that public nuisance does not apply to claims based on collective injuries caused by the distribution or design of a lawful product. "A separate body of law (strict product liability and negligence) has been developed to apply to the manufacture and design of products." (*Id.* at *4.) The court cited the same Eighth Circuit opinion referenced by the California Court of Appeal in *City of San Diego*, which reasons that nuisance law should not be expanded to overcome limitations in other tort doctrines lest nuisance law "become a monster that would devour in one gulp the entire law of tort ... ." (*Id.*, citing *Tioga Public School Dist. No. 15 of Williams County, State of N.D. v. U.S. Gypsum Co.* (8th Cir. 1993) 984 F.2d 915, 921) The trial court in *Penalas* therefore rejected the attempt to state a claim for public nuisance based on

increased costs for police, emergency, and other services resulting from injuries due to firearms.[6]

Thus, under Florida law, the School Districts have failed to allege a claim for public nuisance because the public interest they attempt to assert is actually harm to a group of individuals who have been injured by their interaction with Defendants' social media platforms. This collective reference to individualized injury from interaction with Defendants' social media platforms does not qualify as the sort of "injury to the health of citizens in general" that may give rise to a claim for public nuisance under Florida law. "A public nuisance violates public rights, subverts public order, decency or morals, or causes inconvenience or damage to the public generally." (*Orlando Sports Stadium, Inc. v. State ex rel. Powell* (Fla. 1972) 262 So.2d 881, 884.)

Moreover, the School Districts lack standing to sue for public nuisance because they did not suffer particular damage in exercising a right common to the general public. In *Cunningham,* the Court of Appeal held that a party lacks standing to sue for public nuisance when it "has suffered no particular damages in the *exercise of a right common to the general public … .."* (Cunningham, *supra,* 558 So.2d at p. 97, internal citations and quotation marks omitted; emphasis in original.) In so holding, the Florida appellate court relied on *Philadelphia Electric Co. v. Hercules, Inc.* (3d Cir. 1985) 762 F.2d 303, which refused to recognize a claim for public nuisance based on a defendant's alleged pollution of a water source that was not a public source, but rather was a water source limited to the plaintiff's land. (*Hercules*, at p. 316.) A claim for public nuisance must allege that the defendant has interfered with a right common to the public, and that the plaintiff has suffered particular injury by being deprived of that same public right. (See Rest.2d Torts, § 821C.)

In *Cunningham,* the employee plaintiffs were not injured by being deprived of a right to public health because they were individually injured by toxic substances that did not affect the public generally. In *Hercules*, the plaintiff was not injured by being deprived of a public right to clean water because no public waters were affected, and the plaintiff was asserting its individual rights as a landowner. Here, even if (contrary to the argument

---

[6] The Florida District Court of Appeal upheld the Penelas trial court's dismissal of the nuisance claims, although on somewhat different grounds. (See *Penelas v. Arms Technology, Inc.* (Fla. Dist. Ct. App. 2001) 778 So.2d 1042.) The Court of Appeal criticized and rejected the public nuisance claims against gun manufacturers on the ground that they were "an attempt to regulate firearms and ammunition through the medium of the judiciary," and held that "the judiciary is not empowered to 'enact' regulatory measures in the guise of injunctive relief." (*Id.* at p. 1045.)

above) the public health was injured by Defendants' social media platforms, the School Districts are entities, not people, and they cannot assert a "right common to the general public," i.e., an alleged right not to be addicted to or suffer mental health injury caused by social media.  Because the School Districts thus cannot assert that they themselves shared in the injury to public health, they cannot bring a nuisance action under Florida law based on alleged harm to public health.

Finally, the Florida courts have expressed a strong aversion to expanding the common law of nuisance to substitute for the absence of legislative regulation.  In *Penelas v. Arms Technology, Inc.* (Fla. Dist. Ct. App. 2001) 778 So.2d 1042, 1045, the Court of Appeal criticized and rejected the public nuisance claims against gun manufacturers on the ground that they were "an attempt to regulate firearms and ammunition through the medium of the judiciary."  The Florida appellate court made clear that "the judiciary is not empowered to 'enact' regulatory measures in the guise of injunctive relief."  (*Id.*)  Although the School Districts here assert claims for damages, they seek to use nuisance to expand liability beyond the immediate victims of Defendants' social media platforms, and thereby use this tort remedy to make Defendants' conduct too expensive to maintain.  Under Florida law, this expansion of tort liability as a substitute for legislative regulation must be rejected.

### 4. Washington Law

Washington law also limits the scope of nuisance liability to preclude litigants from pursuing a nuisance claim as a way of aggregating and expanding the scope of liability under other tort doctrines.  In particular, where a plaintiff's claim pleads facts based on alleged negligent conduct by the defendant, negligence principles apply, and the Washington courts will not entertain a nuisance cause of action.

In *Atherton Condominium Apartment-Owners Ass'n Bd. of Directors v. Blume Development Co.* (1990) 115 Wash.2d 506 (*Atherton*), the Washington Supreme Court considered a nuisance cause of action pleaded by condominium apartment owners against Blume, the original owner, developer, and construction contractor for the condominium building.  (*Id.* at p. 511.)  The condominium owners alleged that the building as constructed by Blume violated the building code requirements for fire-resistant construction and therefore constituted a fire hazard and nuisance.  (*Id.* at p. 513, 527.)  The Washington Supreme Court held that, "[i]n Washington, a negligence claim presented in the garb of nuisance need not be considered apart from the negligence claim. [Citations.]  In those situations where the alleged nuisance is the result of the defendant's alleged negligent conduct,

rules of negligence are applied." (*Id.* at p. 527, internal citations and quotation marks omitted.)  The court reasoned that the condominium owners' contention that the building was a nuisance was "premised on their argument that Blume was negligent in failing to construct [the condominium building] in compliance with the applicable building code." (*Id.* at p. 528.)  Therefore, the Court held that "even if [the condominium building] does constitute a nuisance, the nuisance would be solely the result of Blume's alleged negligent construction," and the Court refused to "consider the nuisance claim apart from the negligence claim … ." (*Id.*; see also *Hostetler v. Ward* (Wash. Ct. App. 1985) 41 Wash.App. 343, 348, 360 [considering a claim for public nuisance created by a park used "as a haven for  the consumption of alcoholic beverages by minors," and holding that, "where allegedly a nuisance is the result of negligence, rules applicable to negligence should be applied"].)

The rationale for the Washington rule that a claim sounding in negligence may not be pleaded in nuisance is that nuisance should not be used to expand tort liability by side-stepping tort doctrines that provide context, definition, and limitation developed in the context of delineating negligence liability.  In *Atherton*, the Court found that the condominium owners had not stated an actionable claim for negligence because Washington law does not recognize a negligence claim for the cost of repairing construction defects beyond any remedies provided by contract. (*Atherton*, *supra*, 115 Wash.2d at p. 526.)  In *Albin v. National Bank of Commerce of Seattle* (1962) 60 Wash.2d 745, the Washington Supreme Court held that, even if a condition of property could be properly characterized as a nuisance, because the defendant only could be liable for the condition if it omitted "to perform a duty," only a claim for negligence, and not a claim for nuisance, could move forward to trial. (*Id.* at p. 753, internal quotation marks omitted.)  The Court reasoned that "[w]henever a nuisance has its origin in negligence," defenses available in negligence cannot be cut off and a plaintiff cannot pursue a claim for nuisance. (*Id.*)

It does not matter for the application of this principle of Washington common law that Vancouver has not attempted to plead a claim for negligence (in contrast with the other School Districts).  Vancouver alleges it has been injured due to Defendants' breach of duty toward the minor customers of the social media companies who are also Vancouver's students.[7]  The School District cannot elide the principles of foreseeability,

---

[7]  For example, Vancouver alleges that Defendants knew or should have known that their platforms were designed to harm school-age children, and that Defendants thus "knew or should have known that [their] platforms were causing serious harm and impacts on public schools … ." (WA Compl., ¶¶ 187-197.)  "Despite the foreseeable risk to students and to school districts, each Defendant failed to adequately warn youth or their parents, including

duty, zone of risk, and proximate cause that govern the outcome of a common law claim of negligence by substituting an assertion that the outcome of Defendants' conduct has been a nuisance. As discussed above, when "a nuisance has its origin in negligence" a plaintiff must establish the elements of a negligence claim in order to state a claim against a defendant.

Moreover, in a recent decision of the Washington Supreme Court, that Court counseled against expanding liability based on public nuisance beyond the conduct that the Washington legislature has expressly designated as a nuisance and conditions or conduct that prior case law recognizes as creating a nuisance. (*Animal Legal Defense Fund v. Olympic Game Farm, Inc.* (Wash. 2023) 533 P.3d 1170, 932-933 (*ALDF*), citing Wash. Rev. Code Ann. § 7.48.140.) The Court rejected the attempt of the plaintiff in that case to rely on an alleged violation of the Washington animal protection statutes as a basis for a nuisance claim. The Washington Supreme Court stated that Washington "case law has limited nuisances to actions that interfere in the use and enjoyment of property or threaten public health and safety" (*ALDF*, at p. 933), and further restricted expansion of nuisance principles by concluding that its precedents "not only establish when and under what circumstances claims exist but are express in limiting claims to those circumstances" (*Id.* at p. 937). The School Districts in the instant matters do not rely on any conduct that Washington by statute has declared to be a nuisance, nor do they cite any Washington appellate precedents that recognize a public nuisance claim based on any conduct or condition analogous to the circumstances the School Districts allege create a nuisance.[8] The School Districts fail to convince this court that they have stated or can state a claim for nuisance under Washington law.

---

[Vancouver's] students and families, of the known risks and harms of using its platforms." (WA Compl., ¶ 198.) Vancouver further alleges that Defendants were "in a superior position to control the risks of harm, ensure the safety of [their] platforms, insure against and spread the costs of any harm resulting from their dangerous choices." (WA Compl., ¶ 200; see also WA Compl., ¶¶ 899-900, 911.)

[8] Defendants rely on *City of Everett v. Purdue Pharma L.P.* (W.D. Wash., Sept. 25, 2017, No. C17-209RSM) 2017 WL 4236062 to argue that, because Vancouver's public nuisance claim lacks a requisite connection to land, Vancouver's nuisance claim necessarily fails. (Defs' Dem., at p. 24.) The School Districts, for their part, cite *State v. Purdue Pharma L.P.*, 2018 WL 7892618 (Wash.Super.) to support their argument that Washington law allows a plaintiff to assert a nuisance claim whenever the defendant's actions interfere with *either* property *or* public health and safety. (Pls' Opp. Defs' Dem., at pp. 4-5, 7-8.) Having reviewed these two unpublished trial court rulings, this court finds neither to be persuasive, given that neither court engaged in an extended analysis of Washington common law.

## IV.   **Conclusion**

For the reasons stated above, the Demurrer to the four Complaints at issue are sustained without leave to amend.  As noted above, the School Districts have not expressly sought leave to amend, nor have they suggested a factual basis for further amendment.

Because the Demurrer is sustained in its entirety, the Defendants' Motion to Strike is moot.

Dated:  June 7, 2024

Carolyn B. Kuhl / Judge

Hon. Carolyn B. Kuhl
Judge of the Superior Court