# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NETCHOICE, LLC** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:24-cv-170-HSO-BWR** |
| | § | |
| | § | |
| **LYNN FITCH,** | § | |
| *in her official capacity as* | § | |
| *Attorney General of Mississippi* | § | **DEFENDANT** |

## MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF NETCHOICE, LLC'S MOTION [3] FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER, AND PRELIMINARILY ENJOINING ENFORCEMENT OF MISSISSIPPI HOUSE BILL 1126

BEFORE THE COURT is Plaintiff NetChoice, LLC's Motion [3] for Preliminary Injunction and Temporary Restraining Order, seeking to enjoin Mississippi House Bill 1126 ("H.B. 1126" or the "Act") which was signed into law on April 30, 2024, and is set to take effect on July 1, 2024. Plaintiff asks this Court for an order preliminarily enjoining Defendant Lynn Fitch, in her official capacity as Mississippi Attorney General—and her agents, employees, and all persons acting under her direction or control—from taking any action to enforce H.B. 1126 or the challenged portions of H.B. 1126 before its July 1, 2024, effective date. *See* Mot. [3]. *Amicus Curiae* Electronic Frontier Foundation has filed a Brief in support of Plaintiff's Motion, *see* Br. [25], and Attorney General Fitch has filed a Response in opposition, *see* Resp. [26]. After consideration of the record in this case, relevant legal authority, and the record of the hearing held on June 26, 2024, the Court finds

that a preliminary injunction should issue.   Plaintiff's request for a temporary

restraining order will be denied as moot.

## I.   BACKGROUND

A.   Mississippi H.B. 1126

Plaintiff challenges Sections 1-8 of H.B. 1126, which provide in relevant part

as follows:

SECTION 3. (1) This act applies only to a digital service provider who provides a digital service that:

(a)    Connects users in a manner that allows users to socially interact with other users on the digital service;

(b)    Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and

(c)    Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:

(i)    A message board;

(ii)    A chat room; or

(iii)    A landing page, video channel or main feed that presents to a user content created and posted by other users.

(2)    This act does not apply to:

(a)    A digital service provider who processes or maintains user data in connection with the employment, promotion, reassignment or retention of the user as an employee or independent contractor, to the extent that the user's data is processed or maintained for that purpose;

(b)    A digital service provider's provision of a digital service that facilitates e-mail or direct messaging services, if the digital service facilitates only those services;

(c)    A digital service provider's provision of a digital service that:

(i)    Primarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and

(ii)    Allows chat, comment or other interactive functionality that is incidental to the digital service; or

(d)    A digital service provider's provision of a digital service that primarily functions to provide a user with access to career development opportunities, including:

(i)    Professional networking;

(ii)    Job skills;

(iii)    Learning certifications;
(iv)    Job posting; and
(v)    Application services.

\*    \*    \*

SECTION 4. (1) A digital service provider may not enter into an agreement with a person to create an account with a digital service unless the person has registered the person's age with the digital service provider.    A digital service provider shall make commercially reasonable efforts to verify the age of the person creating an account . . . .

(2)    A digital service provider shall not permit an account holder who is a known minor to be an account holder unless the known minor has the express consent from a parent or guardian . . . .

\*    \*    \*

SECTION 6. (1) In relation to a known minor's use of a digital service, a digital service provider shall make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates the following harms to minors:

(a)    Consistent with evidence-informed medical information, the following: self-harm, eating disorders, substance use disorders, and suicidal behaviors;

(b)    Patterns of use that indicate or encourage substance abuse or use of illegal drugs;

(c)    Stalking, physical violence, online bullying, or harassment;

(d)    Grooming, trafficking, child pornography, or other sexual exploitation or abuse;

(e)    Incitement of violence; or

(f)    Any other illegal activity.

(2) Nothing in subsection (1) shall be construed to require a digital service provider to prevent or preclude:

(a)    Any minor from deliberately and independently searching for, or specifically requesting, content . . . .

Ex. [1-1] at 3-9 (Miss. H.B. 1126, §§ 3-4, 6).

In summary, Section 4(1) of H.B. 1126 requires all users, adults and minors alike, to verify their age before they may open an account with non-excluded digital service providers (the "age-verification requirement"), while Section 4(2) requires parental consent before a known minor may create an account (the "parental-

consent requirement").   *Id.*   Section 5 contains a limitation for collection of data by non-excluded digital service providers that enter into an agreement with a known minor for access to a digital service (the "data-collection limitation"),[1]  and Section 6 requires those digital service providers to make commercially reasonable efforts to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates certain harms to minors (the "prevention-or-mitigation requirement").[2]  *See id.*   But Section 6(2) does not require digital service providers to prevent or preclude minors with accounts from "deliberately and independently searching for, or specifically requesting, content."   *Id.*   Sections 7 and 8 of the Act provide civil remedies and criminal penalties for its violation.   *See id.* at 9-12.

B.    NetChoice

Plaintiff NetChoice, LLC ("NetChoice" or "Plaintiff") is a nonprofit trade association for internet companies.   Compl. [1] at 4.   Its Complaint [1] asserts that H.B. 1126 regulates some services offered by the following of NetChoice's members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap,

---

[1]  Plaintiff does not appear to challenge the data-collection limitation specifically.   *Amicus curiae* Electronic Frontier Foundation notes that, "while the data privacy provisions of this law are not severable from the unconstitutional age-verification regime Mississippi House Bill 1126 imposes, that does not render those provisions independently unconstitutional. Should the law's data privacy provisions appear in a well-crafted comprehensive privacy law that did not require age verification, they would be subject to a different standard and could likely satisfy First Amendment scrutiny."   Br. [25] at 8-9.

[2]  Plaintiff refers to this as a monitoring-and-censorship requirement, *see* Compl. [1] at 27-28, while Defendant refers to it as the strategy provision, *see* Resp. [26] at 9-10.

Inc., which owns and operates Snapchat; and (7) X.   Compl. [1] at 4.   Some of these "members operate websites that are among the Internet's most popular destinations, disseminating billions of user-generated posts," and, according to NetChoice's Vice President and General Counsel Carl Szabo ("Szabo"), its members' "websites are full of a wide range of valuable expression and communities."   Ex. [3-2] at 4.   "Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech."   *Id.*

Szabo's Declaration states that "[i]n general, members' websites publish, disseminate, create, curate, or distribute protected speech, or all of the above . . . by displaying text, audio, graphics, or video to users."   *Id.* at 5.   NetChoice members' websites "disseminate different expressive content in different ways to serve different user bases"; some of the content is generated by the websites themselves, some of it by advertisements, and much of the content is generated by users, "who sometimes use these websites to share content with a website-specific list of 'friends' (or 'connections') and sometimes use these websites to share with the world at large."   *Id.*

C.    Plaintiff's Complaint [1]

NetChoice filed its Complaint [1] for Declaratory and Injunctive Relief in this Court on June 7, 2024, raising First Amendment facial challenges to the Act's central coverage definition (Count I), age-verification requirement (Count III),

parental-consent requirement (Count IV), and the prevention-or-mitigation requirement[3] (Count V).   Alternatively, the Complaint alleges that the Act is overbroad, *see* Compl. [1] at 18-22, 25-33 (Counts I, III, IV, V); Mem. [4] at 15-30, and that its central coverage definition of "digital service provider" is unconstitutionally vague and violates principles of free speech and due process, Compl. [1] at 23-24, 33-34 (Count II, VI); Mem. [4] at 30-31.   The Complaint [1] further alleges that 47 U.S.C. § 230 preempts the monitoring-and-censorship requirements in Section 6.   Compl. [1] at 35-36 (Count VII).   Plaintiff seeks equitable relief enjoining Defendant from enforcing the Act, *see id.* at 36 (Count VIII), and a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful, *see id.* at 36-37 (Count IX).

D.   <u>Plaintiff's Motion [3] for Preliminary Injunction and Temporary Restraining Order</u>

NetChoice's Motion [3] contends that H.B. 1126 "will unconstitutionally impede both adults and minors' access to vast amounts of constitutionally protected speech on a broad range of websites."   Mot. [3] at 1.   It argues that the First Amendment "does not permit the Act's requirements for covered websites to verify the ages of their users or to secure parental consent before allowing minors to access the websites," and "[s]imilarly, the First Amendment and 47 U.S.C. § 230 do not allow the government to choose what content- and viewpoint-based categories of users' speech websites cannot disseminate."   *Id.*   NetChoice maintains that "[t]he

---

[3]  The Complaint refers to this as the monitoring-and-censorship requirement.   Compl. [1] at 27-28.

entire Act is also unconstitutionally vague, and sections 1-8 . . . likewise violate both the First Amendment and the Due Process Clause of the Fourteenth Amendment." *Id.*

*Amicus Curiae* Electronic Frontier Foundation ("EFF") has filed a Brief [25] in support of Plaintiff's Motion [3] "to emphasize how online age restrictions significantly burden the speech and privacy rights of all internet users, not just minors." Br. [25] at 8. EFF contends that "age verification imposes significant burdens on adults' access to constitutional speech and 'discourage[s] users from accessing' the online services that require that verification." *Id.* at 9 (quoting *Reno v. ACLU*, 521 U.S. 844, 856 (1997)). EFF posits that, because "[i]nternet users are highly sensitive to website access barriers, . . . age verification is likely to notably reduce adult users' willingness to consume or create protected content on a site," *id.*, and is much more privacy-invasive and carries with it security risks, *id.* at 11. Moreover, unlike other in-person ID checks where adults face less difficulty before purchasing products and are only precluded from buying adult content if their age cannot be verified, "the inability to verify an adult's age online will block their access to *all* content on the given platform—a much more significant and damaging First Amendment burden." *Id.* at 10 (emphasis in original).

Even if an adult's age can be reliably and non-intrusively verified, EFF argues that the online age verification requirement chills users from accessing protected speech by impermissibly burdening the right to be anonymous online and by putting users' most sensitive data at risk of inadvertent disclosure or data

breach.  *See id.* at 14-18.   EFF contends that the burden placed on adult user rights is significant, *see id.* at 18-20, and that "[w]hile Mississippi may have an interest in protecting children from harms, its efforts to accomplish that goal cannot be at the expense of the rights of adults to access constitutionally protected speech," *id.* at 20.

The Attorney General responds that "NetChoice fails to establish standing to bring a First Amendment claim against any of the provisions on which it seeks injunctive relief."  Resp. [26] at 8; *see id.* at 8-11.   To the extent NetChoice has standing, the Attorney General contends that H.B. 1126 permissibly regulates conduct, not speech, and is not subject to heightened First Amendment scrutiny; rather, rational-basis review applies.  *See id.* at 11-15.   As for Plaintiff's overbreadth argument concerning what the Court refers to as the Act's prevention-or-mitigation requirement, the Attorney General asserts that "NetChoice cannot show that a statute that reaches and regulates so much harmful, unprotected, and illegal conduct lacks a sufficiently 'lawful sweep.'"  *Id.* at 15.

The Attorney General further contends that Plaintiff's arguments that the three challenged provisions are subject to strict scrutiny because they are content-based, speaker-based, or viewpoint-based fail because they are in fact based on conduct and harm, not speech and expression.  *See id.* at 16-17.   Even if the Act could be said to regulate to some extent based on content such that intermediate scrutiny applies, the Attorney General insists that the Act satisfies it.  *See id.* at 17-19.   To the extent the Court finds that strict scrutiny applies, the Attorney

General also argues that it is satisfied. *See id.* at 19-23. "[T]he State has a compelling interest in protecting minors from the predatory behavior that is commonplace on the interactive social-media platforms that the Act covers," *id.* at 20, and "the Act is narrowly tailored to protect minors from the harms inflicted by online predators," *id.* at 21; *see id.* at 21-22. Next, the Attorney General states that NetChoice is likely to lose on its vagueness claim because "[t]he Act is clear about who and what it covers," *id.* at 23, and it gives fair notice, *see id.* at 23-27. Finally, Plaintiff likely will not succeed on its preemption claim because 47 U.S.C. § 230 does not excuse platforms from complying with state laws that require the platforms "to take steps to help protect children from harmful interactive online conduct." *Id.* at 27; *see id.* at 27-29.

NetChoice replies that it has associational standing and standing to invoke users' rights. *See* Reply [27] at 3-5. It maintains that the challenged provisions violate the First Amendment, as they regulate protected speech—not just conduct—triggering strict scrutiny, *see id.* at 5-8, and that "the Act is not remotely tailored" to the one interest the Attorney General invokes, protecting children from online predatory harm, and "certainly is not the least restrictive means of doing so," *id.* at 8 (quotation omitted). Plaintiff argues that the entire Act is also underinclusive and that its vagueness claims are likely to succeed. *See id.* at 9-10.

## II.  DISCUSSION

This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

A preliminary injunction under Federal Rule of Civil Procedure 65(a) is an

extraordinary remedy, requiring the moving party to establish four factors:

> (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Mock v. Garland*, 75 F.4th 563, 577 (5th Cir. 2023) (quotation omitted).   When the

government is the opposing party, the last two factors merge.   *Nken v. Holder*, 556

U.S. 418, 435 (2009).    Movant bears the burden of persuasion on all requirements.

*Mock*, 75 F.4th at 587.

A.   NetChoice's standing to maintain this suit

This Court must first determine whether NetChoice has standing to bring

these claims.   "In essence the question of standing is whether the litigant is

entitled to have the court decide the merits of the dispute or of particular issues.

This inquiry involves both constitutional limitations on federal-court jurisdiction

and prudential limitations on its exercise."   *Warth v. Seldin*, 422 U.S. 490, 498

(1975).

NetChoice advances claims not only on its members' behalf but also on behalf

of its members' users.   *See* Compl. [1].   "A party ordinarily may assert only 'his

own legal rights and interests, and cannot rest his claim to relief on the legal rights

or interests of third parties.'"   *Vote.Org v. Callanen*, 89 F.4th 459, 472 (5th Cir.

2023) (quoting *Warth*, 422 U.S. at 499).   But this is a prudential rule, not a constitutional one.   *Id.*   "Third-party standing often turns on categorized relationships — e.g., vendor-vendee, doctor-patient, employer-employee."   *Id.* (quotation omitted).   "Vendors are routinely accorded standing to assert the constitutional rights of customers and prospective customers."   *Id.* (quotation omitted).

1.   Constitutional standing

To establish Article III constitutional standing, "a plaintiff must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief."   *Food & Drug Admin. v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1555 (2024).

According to the Complaint [1], Plaintiff NetChoice is a nonprofit trade association for internet companies.   *See* Compl. [1] at 4.   It asserts both associational standing and organizational standing to challenge the Act in its own right.   *See id.* at 4-5.   NetChoice also claims that it may assert a violation of the First Amendment rights of its members' current and prospective users.   *See id.* at 5 (citing *Virginia v. Am. Booksellers Ass'n, Inc.,* 484 U.S. 383, 392-93 (1988)); Mem. [4] at 15.

The Court first considers whether NetChoice has associational standing. Associational standing derives from an association's members, and an association

> has standing to bring claims on behalf of its members when (1) individual members would have standing, (2) the association seeks to

11

vindicate interests germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the individual members' participation.

*Students for Fair Admissions, Inc. v. Univ. of Texas at Austin*, 37 F.4th 1078, 1084 (5th Cir. 2022) (footnote omitted).   Individuals have standing to sue if they "(1) have suffered an injury in fact, (2) that is fairly traceable to the challenged action of the defendant, and (3) that will likely be redressed by a favorable decision."   *Ass'n of Am. Physicians & Surgeons Educ. Found. v. Am. Bd. of Internal Med.,* 103 F.4th 383, 390 (5th Cir. 2024) (quotation omitted).   "[S]tanding rules are relaxed for First Amendment cases so that citizens whose speech might otherwise be chilled by fear of sanction can prospectively seek relief."   *Id.*

The Attorney General argues that NetChoice does not have associational standing because it has not shown that its members would have standing to sue in their own right, as NetChoice "presses the claims not of its members but of its members' *users*."   Resp. [26] at 9 (emphasis in original).   The Attorney General argues that NetChoice members' harms are merely financial, *see id.* at 9-10, but such harm does not preclude a finding of standing.   "An increased regulatory burden typically satisfies the injury in fact requirement."   *Contender Farms, L.L.P. v. U.S. Department of Agriculture*, 779 F.3d 258, 266 (5th Cir. 2015).   The Supreme Court has held that plaintiffs have standing to bring a pre-enforcement facial challenge when "the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance

measures or risk criminal prosecution." *American Booksellers Association, Inc.*, 484 U.S. at 392.

That is the situation here. The record reflects that many of NetChoice's members would incur substantial compliance costs should the Act go into effect. *See, e.g.,* Ex. [3-2] at 24 ("Any website that even attempts to comply with the Act will incur substantial, unrecoverable costs in reconfiguring their service."); Ex. [3-3] at 20 ("Developing and maintaining systems to verify the ages of teenagers to the level of certainty that could be required by the Act is highly complex, human-resource intensive, and time consuming—resulting in unrecoverable compliance costs.").

Those members that believe they would be covered by the Act aver they would need to develop protocols for complying with its requirements; otherwise, they face the risk of civil or criminal penalties. NetChoice argues that the economic risk is particularly acute because the Act is vague, insufficiently apprising its members as to whether they must comply, which may result in members spending even more funds when they err on the side of caution in attempting to comply. *See* Ex. [3-3] at 20; Ex. [3-5] at 23. For at least one member, "the Act will force [it] . . . to spend money far in excess of [its] available budget" and "will jeopardize [its] ability to continue offering the service at all." Ex. [3-5] at 23.

A compliance cost injury alone is sufficient, *see American Booksellers Association, Inc.*, 484 U.S. at 392, but NetChoice also argues that its members' First and Fourteenth Amendment rights will be violated, *see* Mem. [4] at 15-31. "[A]

13

plaintiff satisfies the injury-in-fact requirement where he alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (quotation omitted). Specifically, NetChoice maintains that its members have a well-established First Amendment right to "disseminate" protected speech by and to minors and adults alike, and a Fourteenth Amendment right to have laws be reasonably clear about the entities to which they apply. *See* Mem. [4] at 15-23. This is sufficient to establish the first prong of associational standing.

The second and third prongs of the associational standing test are also satisfied. NetChoice presents evidence that its purpose is "to make the Internet safe for free enterprise and free expression." Ex. [3-2] at 3. This lawsuit, which is centered on protecting these interests, is germane to that purpose. Nor would this case require each member of the association to participate because the nature of the suit is unlikely to require fact-intensive inquiry of each member. *See, e.g., NetChoice, LLC v. Yost*, No. 2:24-CV-00047, 2024 WL 555904, at *5 (S.D. Ohio Feb. 12, 2024) (reaching the same conclusion with respect to a similar lawsuit brought by NetChoice challenging a parental notification law in Ohio). Having concluded that NetChoice has associational standing to bring this lawsuit, the Court need not resolve whether it has organizational standing.

2.   Prudential standing

The Court next considers whether NetChoice is entitled to bring its specific claims, meaning whether it has prudential standing.   The Supreme Court has "adhered to the rule that a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."   *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quotation omitted).   "The alleged injury must be within the 'zone of interests' protected by the constitutional guarantee invoked."   *Moore as next friend to Moore v. Tangipahoa Parish School Board*, 771 F. App'x 540, 543 (5th Cir. 2019) (per curiam) (quoting *Barlow v. Collins*, 397 U.S. 159, 164 (1970)).

"This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation."   *Kowalski*, 543 U.S. at 129.   But the Supreme Court has also acknowledged that there are circumstances where it might be necessary to recognize a third party's standing to assert the rights of another. *See id.* at 129-30.   The Supreme Court has "limited this exception by requiring that a party seeking third-party standing make two additional showings" – (1) "whether the party asserting the right has a close relationship with the person who possesses the right," and (2) "whether there is a hindrance to the possessor's ability to protect his own interests."   *Id.* at 130 (quotations omitted).

The Attorney General does not dispute that NetChoice, a member-based organization, has prudential standing to bring a claim on behalf of its members.

15

*See* Resp. [26] at 10-11.   But she challenges NetChoice's attempt to vindicate the First Amendment rights of users of the members' websites.   *See id.*

Two district courts have recently conducted thorough analyses of NetChoice's prudential standing to challenge similar state laws imposing age-verification requirements on many of its members.   *See NetChoice, LLC v. Yost*, No. 2:24-CV-00047, 2024 WL 555904, at *5 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, No. 5:23-CV-05105, 2023 WL 5660155, at *12 (W.D. Ark. Aug. 31, 2023).   The Court finds this authority persuasive and that NetChoice "is in a unique position to advocate for the rights of [Mississippi] users and may appropriately do so here." *Griffin*, 2023 WL 5660155, at *12.   In sum, based upon the record before the Court, NetChoice has demonstrated its associational standing to bring claims on behalf of both its members and its members' Mississippi users.

## B.   Likelihood of success on the merits

Having concluded that NetChoice has standing to advance its claims, the Court considers the first factor for obtaining a preliminary injunction, whether NetChoice has a substantial likelihood of success on the merits of its claims.

## 1.   Whether H.B. 1126 regulates content

"[T]he First Amendment provides in relevant part that 'Congress shall make no law . . . abridging the freedom of speech,'" and "the Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States." *Manhattan Cmty. Access Corp. v. Halleck*, 587 U.S. 802, 808 (2019).   The First Amendment protects both freedom of speech as well as the "right to receive

16

information and ideas, regardless of their social worth." *Stanley v. Georgia*, 394

U.S. 557, 564 (1969).   "[T]he right to receive ideas follows ineluctably from the

*sender's* First Amendment right to send them" and "is a necessary predicate to the

*recipient's* meaningful exercise of his own rights of speech, press, and political

freedom."   *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S.

853, 867 (1982) (plurality opinion) (emphasis in original).[4]

    In this case, NetChoice raises a traditional facial challenge and,

alternatively, an overbreadth challenge to H.B. 1126.   *See* Compl. [1] at 18-22, 25-

33 (Counts I, III, IV, V); Mem. [4] at 15-30.   NetChoice also contends that the Act's

central coverage definition of a "digital service provider" is unconstitutionally vague

and violates principles of free speech and due process.   Compl. [1] at 23-24, 33-34

(Count II, VI); Mem. [4] at 30-31.   Finally, NetChoice asserts that 47 U.S.C. § 230

preempts the so-called "monitoring-and-censorship requirements" in Section 6.

Compl. [1] at 35-36 (Count VII).

    "Normally, a plaintiff bringing a facial challenge must establish that no set of

circumstances exists under which the law would be valid, or show that the law lacks

a plainly legitimate sweep."   *Americans for Prosperity Found. v. Bonta*, 594 U.S.

---

[4]  H.B. 1126's primary focus is minors.   But "minors are entitled to a significant measure
of First Amendment protection, and only in relatively narrow and well-defined
circumstances may government bar public dissemination of protected materials to them."
*Erznoznik v. City of Jacksonville*, 422 U.S. 205, 212-13 (1975) (citation omitted).   "No doubt
a State possesses legitimate power to protect children from harm, but that does not include
a free-floating power to restrict the ideas to which children may be exposed."   *Brown v.
Ent. Merchants Ass'n*, 564 U.S. 786, 794 (2011) (citations omitted).   "Speech that is neither
obscene as to youths nor subject to some other legitimate proscription cannot be suppressed
solely to protect the young from ideas or images that a legislative body thinks unsuitable
for them."   *Id.* at 795 (quoting *Erznoznik*, 422 U.S. at 213-214).

595, 615 (2021) (quotations omitted).   In the First Amendment context, however,

the Supreme Court has "recognized a second type of facial challenge, whereby a law

may be invalidated as overbroad if a substantial number of its applications are

unconstitutional, judged in relation to the statute's plainly legitimate sweep."   *Id.*

(quotation omitted); *see Moody v. NetChoice, LLC*, No. 22-277, 2024 WL 3237685, at

*8 (U.S. July 1, 2024).

 "[T]he First Amendment, subject only to narrow and well-understood

exceptions, does not countenance governmental control over the content of messages

expressed by private individuals."   *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622,

641 (1994).   "[T]he most exacting scrutiny" is applied "to regulations that suppress,

disadvantage, or impose differential burdens upon speech because of its content."

*Id.* at 642.   A state "has no power to restrict expression because of its message, its

ideas, its subject matter, or its content," and "[c]ontent-based laws—those that

target speech based on its communicative content—are presumptively

unconstitutional and may be justified only if the government proves that they are

narrowly tailored to serve compelling state interests."   *Reed v. Town of Gilbert*, 576

U.S. 155, 163 (2015) (quotation omitted).

> Government regulation of speech is content based if a law applies to
> particular speech because of the topic discussed or the idea or message
> expressed.   This commonsense meaning of the phrase "content based"
> requires a court to consider whether a regulation of speech on its face
> draws distinctions based on the message a speaker conveys.   Some
> facial distinctions based on a message are obvious, defining regulated
> speech by particular subject matter, and others are more subtle,
> defining regulated speech by its function or purpose.   Both are
> distinctions drawn based on the message a speaker conveys, and,
> therefore, are subject to strict scrutiny.

*Id.* at 163-64 (citations and quotations omitted). "A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotation omitted). Moreover, "[b]ecause speech restrictions based on the identity of the speaker are all too often simply a means to control content, [the Supreme Court has] insisted that laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Id.* at 170 (quotations omitted).

In this case, each of the challenged sections of the Act relies upon the definition of a "digital service provider." H.B. 1126 applies to any digital service that:

> (a)  Connects users in a manner that allows users to socially interact with other users on the digital service;
>
> (b)  Allows a user to create a public, semi-public or private profile for purposes of signing into and using the digital service; and
>
> (c)  Allows a user to create or post content that can be viewed by other users of the digital service, including sharing content on:
>
>     (i)  A message board;
>
>     (ii)  A chat room; or
>
>     (iii)  A landing page, video channel or main feed that presents to a user content created and posted by other users.

Sec. 3(1). But the Act does not apply to certain things, including a digital service that "[p]rimarily functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider." Sec. 3(2)(c)(i).

19

In *Turner Broadcasting System*, the Supreme Court considered must-carry provisions of a regulation that extended to all cable programmers, and found that because the provisions were "based only upon the manner in which speakers transmit their messages to viewers, and not upon the messages they carry," they were not content based. 512 U.S. at 645. But H.B. 1126 does not apply to all digital service providers, specifically excluding from its reach certain providers based upon the primary purpose or subject matter of their service. *See* Sec. 2(c); Sec. 3.

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed," *Reed*, 576 U.S. at 163, which is precisely what H.B. 1126 does, *see* Sec. 3(1); Sec. 3(2)(c)(i). The law's content-based distinction is inherent in the definition of "digital service provider," which is at the core of defining the Act's coverage. *See* Sec. 3. Even if this were considered a speaker-based distinction, the Supreme Court has held that "laws favoring some speakers over others demand strict scrutiny when the legislature's speaker preference reflects a content preference." *Reed*, 576 U.S. at 170. In essence, H.B. 1126 treats or classifies digital service providers differently based upon the nature of the material that is disseminated, whether it is "social interaction," *see* Sec. 3(1)(a), as opposed to "news, sports, commerce, [or] online video games," Sec. 3(2)(c)(i).

Section 3(2)(c)(i) can thus be viewed as either drawing a facial distinction based on the message the digital service provider conveys (i.e., news and sports), or

20

based on a more subtle content-based restriction defining regulated speech by its function or purpose (i.e., providing news and sports). *See* Sec. 3(2)(c)(i); *Reed*, 576 U.S. at 163. Either way, "[b]oth are distinctions drawn based on the message a speaker conveys." *Reed*, 576 U.S. at 163-64. It is of no moment that there is no express restriction on a particular viewpoint, as "[t]he First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire topic." *Id.* at 169 (quotation omitted). Nor is the State's motive considered, as "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." *Id.* at 165 (quotation omitted). The facial distinction in H.B. 1126 based on the message the digital service provider conveys, or the more subtle content-based restriction based upon the speech's function or purpose, makes the Act content-based, and therefore subject to strict scrutiny. *See id.*

The Attorney General argues that H.B. 1126 does not regulate speech, but non-expressive conduct, which the State may regulate if it has a rational basis for doing so. *See* Resp. [26] at 11-12 (citing *City of Dallas v. Stanglin*, 490 U.S. 19, 23-25 (1989)). But the Court is not persuaded that H.B. 1126 merely regulates non-expressive conduct, and *Stanglin*, upon which the Attorney General relies, is distinguishable. *See id.* In *Stanglin*, the "city of Dallas adopted an ordinance restricting admission to certain dance halls to persons between the ages of 14 and

21

18," *Stanglin*, 490 U.S. at 20, and limiting their operating hours to 1 p.m. to midnight when school was not in session, *id.* at 22. "[T]he owner of one of these 'teenage' dance halls, sued to contest the constitutional validity of the ordinance." *Id.* at 20. "The Texas Court of Appeals held that the ordinance violated the First Amendment right of persons between the ages of 14 and 18 to associate with persons outside that age group." *Id.* at 20-21.

The United States Supreme Court reversed. *Id.* at 21. It reasoned that the ordinance restricted attendance at teenage dance halls "to minors between the ages of 14 and 18 and certain excepted adults. It thus limits the minors' ability to dance with adults who may not attend, and it limits the opportunity of such adults to dance with minors." *Id.* at 24. The Supreme Court recognized that these opportunities for dance-hall patrons "might be described as 'associational' in common parlance, but they simply [did] not involve the sort of expressive association that the First Amendment has been held to protect." *Id.* at 24. "There [was] no suggestion that these patrons '[took] positions on public questions' or perform[ed] any of the other similar activities described in *Board of Directors of Rotary International v. Rotary Club of Duarte*, 481 U.S. 537, 548, 107 S.Ct. 1940, 1947, 95 L.Ed.2d 474 (1987)," *id.* at 25, which includes the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends," *Duarte*, 481 U.S. at 548.

This case is distinguishable, as there is competent evidence in the record that NetChoice's members' websites consist of users who take positions on and engage

with others in pursuit of the type of "political, social, economic, educational, religious, and cultural" activities described in *Duarte*. *Id.*; *see also, e.g.,* Ex. [3-2] at 2 ("NetChoice members' websites are full of a wide range of valuable expression and communities. Whether it is to practice their religious beliefs, engage in political discourse, seek cross-cultural dialogue, supplement their education, or learn new skills, people across the nation and world (minors and adults alike) use these websites every day to explore protected speech."). The Attorney General's argument that the Act is conduct-based or that *Stanglin* somehow controls is not persuasive. Because H.B. 1126 regulates content, strict scrutiny applies. *See Reed*, 576 U.S. at 163-64.

2. Whether the Act is likely to fail strict scrutiny

Because the Court concludes that NetChoice is likely to succeed on its argument that the Act imposes content-based restrictions on speech, it next considers whether NetChoice has shown that the Act is likely to fail strict scrutiny. Courts "generally review content-based regulations of speech under strict scrutiny unless they come within an exception such as the commercial speech exceptions of *Zauderer* or *Central Hudson*," *R.J. Reynolds Tobacco Co. v. Food & Drug Admin.*, 96 F.4th 863, 876 (5th Cir. 2024),[5] but those exceptions are not relevant here.

Strict scrutiny "requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest."

---

[5] *See also Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio,* 471 U.S. 626 (1985); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980).

*Reed*, 576 U.S. at 171 (quotation omitted).   Thus, it is Defendant's burden to demonstrate that the Act's differentiation among digital service providers and the content they convey, along with the age and parental-consent requirements, further a compelling governmental interest and are narrowly tailored to that end.   *Id.*

To show a compelling interest, "[t]he State must specifically identify an actual problem in need of solving, and the curtailment of free speech must be actually necessary to the solution.   That is a demanding standard."   *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011) (quotations and citations omitted). According to the Supreme Court, "[i]t is rare that a regulation restricting speech because of its content will ever be permissible."   *Id.* (quotation omitted).

The Attorney General contends that "the State has a compelling interest in protecting minors from the predatory behavior that is commonplace on the interactive social-media platforms that the Act covers," and that "[t]he interest in 'safeguarding the physical and psychological wellbeing of a minor' is manifest and well-settled."   Resp. [26] at 20 (quoting *Maryland v. Craig*, 497 U.S. 836, 852-53 (1990) (internal quotation omitted)).   She maintains that "the Act is narrowly tailored to protect minors from the harms inflicted by online predators," as its "age-verification and parental-consent provisions achieve compelling interests in a narrowly tailored way."   *Id.* at 21.

NetChoice replies that, while protecting children from online predatory harm is a "worthy goal" which its own members already do much to advance, "the Act is not remotely tailored to that interest and certainly is not 'the least restrictive

24

means' of doing so." Reply [27] at 8 (quoting *Americans for Prosperity Found.*, 594 U.S. at 607). NetChoice faults the Attorney General for dismissing private alternatives, even if not perfect, and argues that "[r]egardless, the entire Act is vastly overinclusive as to this interest." *Id.* at 8-9.

The Court accepts as true the Attorney General's position that safeguarding the physical and psychological wellbeing of minors online is a compelling interest. *See* Resp. [26] at 20; *see also, e.g., Sable Commc'ns of California, Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989) (recognizing that "there is a compelling interest in protecting the physical and psychological well-being of minors"). "The Government may serve this legitimate interest, but to withstand constitutional scrutiny, it must do so by narrowly drawn regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." *Sable Commc'ns of California, Inc.*, 492 U.S. at 126 (quotation omitted). "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Id.* Here, Plaintiff has carried its burden of showing that the Act is likely not narrowly tailored to achieve the interests identified by the Attorney General.

The Southern District of Ohio recently addressed a similar law and found that NetChoice had shown a likelihood of success on the merits of its claim that foreclosing minors under eighteen years old from accessing all content on websites, like the ones H.B. 1126 purports to cover, absent affirmative parental consent was overbroad and therefore unconstitutional. *Yost*, 2024 WL 555904, at *12. The

district court there determined that such an approach also was "an untargeted one, as parents must only give one-time approval for the creation of an account . . . ." *Id.*

In addressing legislation prohibiting minors from purchasing violent video games, the Supreme Court in *Brown* held that is doubtful that "punishing third parties for conveying protected speech to children just in case their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Brown*, 564 U.S. at 802. In *Brown,* as here, there were already a series of preexisting protections to help parents. *Id.* at 803; *see also, e.g.,* Ex. [3-2] at 6 (averring that "there is much publicly accessible information about the many wireless routers that offer parental control settings that parents can use to block specific online services, allow only the specific online services that a parent specifies, limit the time that their children spend on the Internet, set individualized content filters, and monitor the online services that their children visit"). The Supreme Court concluded that the legislation at issue in *Brown* was "seriously underinclusive," not only because it excluded portrayals of violence other than video games, but also because it permitted a parental veto. *Brown*, 564 U.S. at 805. It further held the legislation was also overinclusive because it enforced a governmental speech restriction, subject to parental veto. *Id.* at 804. "And the overbreadth in achieving one goal [was] not cured by the underbreadth in achieving the other." *Id.* at 805.

Here, the Attorney General has not shown that the alternative suggested by NetChoice, a regime of providing parents additional information or mechanisms needed to engage in active supervision over children's internet access, *see* Mem. [4] at 28, would be insufficient to secure the State's objective of protecting children, *see, e.g., Brown*, 564 U.S. at 804-05; *see also United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 813 (2000) (for content-based regulations subject to strict scrutiny, "[i]f a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative"); Ex. [3-2] at 7 ("Some NetChoice members have developed their own tools that allow parents to set further restrictions on their minor children's use of the websites.   For example, Meta has developed its 'Family Center,' which provides for parental supervision on Instagram.").

NetChoice has carried its burden of showing that there are a number of supervisory technologies available for parents to monitor their children that the State could publicize.   *See* Mem. [4] at 28; Ex. [3-2] at 6.   Yet, the Act requires all users (both adults and minors) to verify their ages before creating an account to access a broad range of protected speech on a broad range of covered websites. This burdens adults' First Amendment rights, and that alone makes it overinclusive.[6]   But NetChoice has also presented evidence that "[u]ncertainty about how broadly the Act extends—and how Defendant will interpret the Act—

---

[6]  Minors also have a "significant measure of First Amendment protection," and the State may bar public dissemination of protected materials to minors "only in relatively narrow and well-defined circumstances."   *Erznoznik*, 422 U.S. at 212-13.   The State does not have a "free-floating power to restrict the ideas to which children may be exposed."   *Brown*, 564 U.S. at 794.

may spur members to engage in over-inclusive moderation that would block valuable content from all users," and that not all covered websites have the ability to "age-gate," meaning that "they are unable to separate the content available on adults' accounts from content available on minors' accounts."   Ex. [3-2] at 23.   This also renders H.B. 1126 overinclusive.

The Act also requires all minors under the age of eighteen, regardless of age and level of maturity, to secure parental consent to engage in protected speech activities on a broad range of covered websites, which represents a one-size-fits-all approach to all children from birth to 17 years and 364-days old.   H.B. 1126 is thus overinclusive to the extent it is intended as an aid to parental authority beyond the resources for monitoring children's internet use that NetChoice has identified, because not all children forbidden by the Act to create accounts on their own have parents who will care whether they create such accounts.   *See Brown*, 564 U.S. at 789, 804 (holding the state act purporting to aid parental authority by prohibiting the sale or rental of "violent video games" to minors "vastly overinclusive" because "[n]ot all of the children who are forbidden to purchase violent video games on their own have parents who *care* whether they purchase violent video games" (emphasis in original)).

Next, H.B. 1126 is underinclusive because it permits a child to create an account with certain websites, but not others.   For example, if the digital service "[p]*rimarily* functions to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service

provider," and it "[a]llows chat, comment or other interactive functionality that is
*incidental* to the digital service," a minor may create an account without age
verification or parental consent (because the Act simply does not apply). Sec.
3(2)(c) (emphasis added). "Underinclusiveness raises serious doubts about whether
the government is in fact pursuing the interest it invokes, rather than disfavoring a
particular speaker or viewpoint." *Brown*, 564 U.S. at 802.

In *Brown,* the Supreme Court found another reason the statute there was
underinclusive, stating that:

> The Act is also seriously underinclusive in another respect . . . leav[ing]
> this dangerous, mind-altering material in the hands of children so long
> as one parent (or even an aunt or uncle) says it's OK. And there are
> not even any requirements as to how this parental or avuncular
> relationship is to be verified; apparently the child's or putative parent's,
> aunt's, or uncle's say-so suffices.

*Id.*

H.B. 1126 similarly requires only one parent or guardian's consent, and it
does not explain how the parent or guardian relationship is to be confirmed.
Section 4(2) states that "[a]cceptable methods of obtaining express consent of a
parent or guardian include any of the following" and references examples in
subsections (a) through (f). *See* Sec. 4(2) ("A digital service provider shall not
permit an account holder who is a known minor to be an account holder unless the
known minor has the express consent from a parent or guardian."). Only options
(d) and (e) mention confirming or verifying the identity of the purported parent or
guardian, but none of the options, not even options (d) and (e), require verifying that
the person who is representing himself as the minor's parent or guardian is in fact

the parent or guardian of the minor.  *See* Sec. 4(2)(d)-(e) (discussing collecting

information and confirming the identity of the parent or guardian, but not how to

verify parental relationship or guardian status).  This makes H.B. 1126

underinclusive.  *See Brown*, 564 U.S. at 802.

The Act is also underinclusive based upon the definition of digital service

providers.  In support of her argument that the Act is narrowly tailored to advance

the State's compelling interest, the Attorney General argues that "interactive social-

media platforms that the Act covers . . . host predators who target minors and

sexually exploit them, extort them, sell drugs to them, and more," citing the

Surgeon General's Advisory on Social Media and Youth Mental Health as well as

CyberTipline 2023 Report.  Resp. [26] at 20.  If the State believes that access to

the platforms identified in those reports should be restricted to achieve its

compelling interest of protecting children from predators online, then it appears

that the Act is underinclusive because at least some of the "electronic service

providers" ("ESPs") identified in the CyberTipline 2023 Report cited by the Attorney

General were companies that are arguably excluded from the definition of a covered

digital service provider under H.B. 1126.  For example, according to the "2023

CyberTipline Reports by Electronic Service Providers," the public and ESPs

reported numerous instances of suspected child sexual exploitation on Amazon and

Roblox, which Plaintiff cited at the hearing as websites that are carved out of H.B.

1126.  *See* CyberTipline 2023 Report, https://www.missingkids.org/cybertiplinedata

(last accessed June 28, 2024) (linking to 2023 CyberTipline Reports by ESPs,

30

https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf); CyberTipline Reports by ESPs, https://www.missingkids.org/content/dam/missingkids/pdfs/2023-reports-by-esp.pdf (last accessed June 28, 2024) (stating that Amazon had 197 reports, Amazon Photos had 25,497 reports, and Roblox had 13,316 reports).   By carving such websites, which have experienced instances of alleged child sexual exploitation, out from the Act, H.B. 1126 is underinclusive in pursuing the stated compelling interest.

Finally, Section 6 of H.B. 1126 requires covered digital service providers "to develop and implement a strategy to prevent or mitigate the known minor's exposure to harmful material and other content that promotes or facilitates" certain harms to minors, Sec. 6(1), but then states that it shall not be construed to require a provider to prevent or preclude "[a]ny minor from deliberately and independently searching for, or specifically requesting, content," Sec. 6(2)(a).   Permitting minors who have presumably obtained parental consent to view otherwise-prohibited content simply because they initiated it by "searching for" or "requesting" it would not serve the State's compelling interest in protecting minors from the predatory behavior online.   H.B. 1126 is underinclusive in this respect as well.

In summary, NetChoice has demonstrated a substantial likelihood of success on its claim that H.B. 1126 is either overinclusive or underinclusive, or both, for achieving the asserted governmental interest – protecting minors from predatory behavior online – and that a substantial number, if not all, of H.B. 1126's applications are unconstitutional judged in relation to its legitimate sweep.   *See*

*Americans for Prosperity Found.*, 594 U.S. at 615; *Moody,* 2024 WL 3237685, at *8.
As such, it likely is not sufficiently narrowly tailored to survive strict scrutiny.

3.   Due Process claim

Alternatively, NetChoice argues that the Act is void for vagueness under the
First and Fourteenth Amendments.   *See* Compl. [1] at 23-24 (Count II); *id.* 33-34
(Count VI).   Specifically, it contends that the central coverage definition of "digital
service provider," *id.* at 23-24, and the so-called monitoring-and-censorship
requirements in Section 6, *see id.* at 33-34, are unconstitutionally vague and violate
principles of free speech and due process, *id.*

"A fundamental principle in our legal system is that laws which regulate
persons or entities must give fair notice of conduct that is forbidden or required."
*F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

> It is a basic principle of due process that an enactment is void for
> vagueness if its prohibitions are not clearly defined.   Vague laws offend
> several important values.   First, because we assume that man is free to
> steer between lawful and unlawful conduct, we insist that laws give the
> person of ordinary intelligence a reasonable opportunity to know what
> is prohibited, so that he may act accordingly.   Vague laws may trap the
> innocent by not providing fair warning.   Second, if arbitrary and
> discriminatory enforcement is to be prevented, laws must provide
> explicit standards for those who apply them.   A vague law
> impermissibly delegates basic policy matters to policemen, judges, and
> juries for resolution on an ad hoc and subjective basis, with the
> attendant dangers of arbitrary and discriminatory application.   Third,
> but related, where a vague statute abuts upon sensitive areas of basic
> First Amendment freedoms, it operates to inhibit the exercise of those
> freedoms.   Uncertain meanings inevitably lead citizens to steer far
> wider of the unlawful zone than if the boundaries of the forbidden areas
> were clearly marked.

*Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (quotations and footnotes omitted).

In sum, "[a] law is unconstitutionally vague if it (1) fails to provide those targeted by the statute a reasonable opportunity to know what conduct is prohibited, or (2) is so indefinite that it allows arbitrary and discriminatory enforcement." *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir.), *cert. denied*, 144 S. Ct. 348 (2023), *reh'g denied*, 144 S. Ct. 629 (2024) (quotation omitted). "A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

The Supreme Court has stated that "[t]hese standards should not, of course, be mechanically applied. The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement— depends in part on the nature of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 498 (1982). For example, the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.* at 498-99; *see also United States v. Rafoi*, 60 F.4th 982, 996 (5th Cir. 2023) (holding that the vagueness doctrine requires that statutes define a criminal offense "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement").

33

> [P]erhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights.  If, for example, the law interferes with the right of free speech or of association, a more stringent vagueness test should apply.

*Vill. of Hoffman Ests.*, 455 U.S. at 499.   Such is the case here.

NetChoice has shown that at least one core part of the Act is vague and deprives it of a constitutionally-protected liberty interest, making it impermissibly vague in all of its applications.  *See McClelland*, 63 F.4th at 1013 (holding that "a facial challenge may only be sustained "if the enactment is impermissibly vague in all of its applications," and that "[s]ince a void-for-vagueness challenge is ultimately a due-process claim, a plaintiff must allege that he was deprived of a constitutionally-protected property or liberty interest" (quotation and footnote omitted)).   Specifically, H.B. 1126 purports to define a "digital service provider" as one that owns or operates a digital service, which is defined as a "website, an application, a program, or software that collects or processes personal identifying information with Internet connectivity," Sec. 2(a), subject to some additional limitations, Sec. 2(b).

But the Act does not apply to certain things, including:

[a] digital service provider's provision of a digital service that:
(i)    *Primarily functions* to provide a user with access to news, sports, commerce, online video games or content primarily generated or selected by the digital service provider; and
(ii)   Allows chat, comment or other interactive functionality that is *incidental* to the digital service . . . .

Sec. 2(c) (emphasis added).

First, it is unclear what test one uses to determine how a digital service "primarily" functions. *See id.* Nor does the Act provide any guidance as to when a website permits chat, comment, or other interactive functionality that is merely "incidental" to its purpose, as opposed to being a primary or integral function. *See id.* NetChoice has carried its preliminary burden at this stage of the case of demonstrating that this definition is overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement. *See id.*; *McClelland*, 63 F.4th at 1013.

In addition, H.B. 1126 only applies to a digital service provider who provides a digital service that "[c]onnects users in a manner that allows users to *socially interact* with other users on the digital service." Sec. 3(1)(a) (emphasis added). But it does not explicate what constitutes "social" interaction on a digital service, as opposed to other interactions between users on websites. *See id.* Websites are thus left to guess as to whether the Act applies at all to them, and NetChoice has shown that the coverage definition is so indefinite that it presents a concern over potential arbitrary and discriminatory enforcement. *See McClelland*, 63 F.4th at 1013. Because the Court finds that H.B. 1126 is vague in its coverage definition, the Court need not reach the other terms Plaintiff claims are vague.

In sum, NetChoice has demonstrated a substantial likelihood of success on the merits of its claim that some of H.B. 1126's terms are unconstitutionally vague.

C.  Irreparability of harm

This Court next turns to whether NetChoice's members or its members' users will suffer irreparable harm absent an injunction. "In general, a harm is

35

irreparable where there is no adequate remedy at law, such as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). But the mere fact that monetary damages may be available does not always mean that a remedy is adequate. *See id.*

"When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Book People, Inc. v. Wong*, 91 F.4th 318, 340-41 (5th Cir. 2024) (quotation omitted). The Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Here, the potential penalty for knowingly violating the Act includes criminal liability, *see* Sec. 8(2)(q) (making violating the Act an unfair and deceptive trade practice under Section 75-24-5); Miss. Code Ann. § 75-24-20(a) ("Any person who, knowingly and willfully, violates any provision of Section 75-24-5, shall be guilty of a misdemeanor, and upon conviction shall be fined up to One Thousand Dollars ($1,000.00)."), and with respect to compliance costs, covered digital service providers are at risk of irreparable harm by outlaying financial resources to comply "with no guarantee of eventual recovery" from the State if the Court ultimately enters judgment in their favor, *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 765 (2021). Indeed, at least one of NetChoice's members has presented evidence that the alleged financial injury may threaten the very existence of its business. *See* Ex. [3-5] at 22 (averring that "the Act threatens [Dreamwidth's] ability to continue operating"). The Fifth

36

Circuit has found an injury to be irreparable when compliance costs were likely unrecoverable against a federal agency because it enjoyed sovereign immunity. *See Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021).    The Court finds this factor weighs in favor of granting a preliminary injunction.

D.    <u>Balance of equities and the public interest</u>

The last two factors merge when the government is the opposing party. *Nken*, 556 U.S. at 435.    "[I]njunctions protecting First Amendment freedoms are always in the public interest."    *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013).    Because the Court has found that NetChoice has shown a substantial likelihood of success on the merits of its claims, the Court finds that an injunction is in the public interest.    *See id.*; *see also, e.g., Book People, Inc.*, 91 F.4th at 341 ("Because Plaintiffs are likely to succeed on the merits of their First Amendment claim, the State and the public won't be injured by an injunction of a statute that likely violates the First Amendment.").    Based upon the record, NetChoice has shown that all four Rule 65 factors favor a preliminary injunction. NetChoice's Motion [3] should be granted to the extent it seeks a preliminary injunction.

E.    <u>Whether the Court should require security</u>

Rule 65(c) states that a court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

restrained."  Fed. R. Civ. P. 65(c).  "[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the district court "may elect to require no security at all."  *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996).

In this case, neither party has raised the issue of security, and Defendant likely will not incur any significant monetary damage as a result of a preliminary injunction, which ensures that Plaintiff's constitutional rights are protected. Therefore, the Court finds that security is not necessary in this case.  *See id.* Other courts have reached the same conclusion under similar circumstances.  *See, e.g., Thomas v. Varnado*, 511 F. Supp. 3d 761, 766 (E.D. La. 2020) (holding that, because neither the school board or superintendent was likely to incur any significant monetary damages as a result of the preliminary injunction and because the plaintiff was a minor student, it would issue an injunction without security); *Gbalazeh v. City of Dallas*, No. 3:18-CV-0076-N, 2019 WL 2616668, at *2 (N.D. Tex. June 25, 2019) ("The Court exercises its discretion under Federal Rule of Civil Procedure 65(c) to waive the bond requirement, as Plaintiffs are engaged in 'public-interest litigation' to protect their constitutional rights." (quoting *City of Atlanta v. Metro. Atlanta Rapid Transit Auth.*, 636 F.2d 1084 (5th Cir. 1981)).[7]

---

[7]  Because Plaintiff has shown a likelihood of success on the merits on at least some of its claims, the Court need not consider Plaintiff's remaining preemption claim.  *See* Compl. [1] at 35-36.

III.   CONCLUSION

It is not lost on the Court the seriousness of the issue the legislature was attempting to address, nor does the Court doubt the good intentions behind the enactment of H.B. 1126.   But as the Supreme Court has held, "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive . . . ."   *Reed*, 576 U.S. at 165.    That is a high bar, which at this preliminary stage of the proceedings, Plaintiff has shown the Act likely does not meet.

In sum, because the Court finds that Plaintiff NetChoice, LLC has carried its burden of showing a substantial likelihood of success on the merits of its claim that the Act is unconstitutional under a First Amendment facial challenge and, alternatively, a Fourteenth Amendment vagueness challenge, it will grant the Motion for a Preliminary Injunction without requiring security.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Plaintiff NetChoice, LLC's Motion [3] for Preliminary Injunction and Temporary Restraining Order is **GRANTED IN PART**, to the extent it seeks an unsecured preliminary injunction, **and DENIED IN PART** as moot, to the extent it seeks a temporary restraining order.

**IT IS, FURTHER, ORDERED AND ADJUDGED** that, Defendant Mississippi Attorney General Lynn Fitch, and her agents, employees, and all persons acting under her direction or control, are **PRELIMINARILY ENJOINED** under Federal Rule of Civil Procedure 65(a) from enforcing Mississippi House Bill

1126 against Plaintiff NetChoice, LLC and its members, pending final disposition of the issues in this case on their merits.

**SO ORDERED AND ADJUDGED**, this the 1st day of July, 2024.

*s/ Halil Suleyman Ozerden*

HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE