Pages 1 - 78

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

```
IN RE:  SOCIAL MEDIA          )
ADOLESCENT ADDICTION/PERSONAL )
INJURY PRODUCTS LIABILITY     )
LITIGATION,                   )
                              )  NO. C 22-md-03047-YGR (PHK)
                              )
_____)
```

San Francisco, California
Thursday, July 11, 2024

APPEARANCES:

For Plaintiffs:

              LIEFF, CABRASER, HEIMANN
                 & BERNSTEIN LLP
              275 Battery Street - 29th Floor
              San Francisco, California 94111
      BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**

              MOTLEY RICE LLC
              401 9th Street NW - Suite 630
              Washington, D.C. 20004
      BY:  **PREVIN WARREN, ATTORNEY AT LAW**
            **ABIGAIL BURMAN, ATTORNEY AT LAW**

              ANDRUS ANDERSON LLP
              155 Montgomery Street, Suite 900
              San Francisco, CA  94104
      BY:  **JENNIE LEE ANDERSON, ATTORNEY AT LAW**

              MOTLEY RICE LLC
              28 Bridgeside Boulevard
              Mount Pleasant, South Carolina 29464
      BY:  **JESSICA L. CARROLL, ATTORNEY AT LAW**

        **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No. 12219

1  **APPEARANCES:   (CONTINUED)**

2  For Plaintiff State of California:
                        CALIFORNIA DEPARTMENT OF JUSTICE
3                       455 Golden Gate Avenue - 11th Floor
                        San Francisco, California 94102
4              BY:  **MEGAN O'NEILL, DEPUTY ATTORNEY**
                    **GENERAL**
5
   For People of the State of California:
6                       QUINN, EMANUEL, URQUHART
                          & SULLIVAN LLP
7                       50 California Street - 22nd Floor
                        San Francisco, California  94111
8              BY:  **EMILY C. KALANITHI, ATTORNEY AT LAW**

9  For State of New Jersey:
                        NEW JERSEY DIVISION OF LAW
10                      DATA PRIVACY & CYBERSECURITY
                        124 Halsey Street
11                      5th Floor
               BY:  **VERNA J. PRADAXAY,**
12                  **DEPUTY ATTORNEY GENERAL**

13 For Plaintiff State of Colorado:
                        COLORADO DEPARTMENT OF LAW
14                      1300 Broadway - 6th floor
                        Denver, Colorado 80203
15             BY:  **ELIZABETH ANNE OREM, SENIOR ASSISTANT**
                    **ATTORNEY GENERAL**
16
   For Plaintiff Commonwealth of Kentucky:
17                      KENTUCKY OFFICE OF THE
                        ATTORNEY GENERAL
18                      Office of Consumer Protection
                        1024 Capital Center Drive - Suite 200
19                      Frankfort, Kentucky 40601
               BY:  **DANIEL KEISER, COMMISSIONER**
20
   For Federal/State Liaison:
21                      BEASLEY ALLEN CROW METHVIN
                          PORTIS & MILES, PC
22                      234 Commerce Street
                        Montgomery, Alabama 36103
23             BY:  **JOSEPH G. VAN ZANDT, ATTORNEY AT LAW**

24          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

25

```
 1   APPEARANCES:   (CONTINUED)

 2   For Defendant Meta:
                           COVINGTON & BURLING LLP
 3                         1999 Avenue of the Stars - Suite 3500
                           Los Angeles, California 90025
 4                  BY:   ASHLEY M. SIMONSEN, ATTORNEY AT LAW

 5                         COVINGTON & BURLING LLP
                           One City Center
 6                         850 Tenth Street, NW
                           Washington, D.C.  20001
 7                  BY:   PAUL W. SCHMIDT, ATTORNEY AT LAW

 8                         COVINGTON & BURLING LLP
                           Sales Force Tower
 9                         415 Mission Street - Suite 5400
                    BY:   ISAAC D. CHAPUT, ATTORNEY AT LAW
10
     For Defendant Snap:
11                         MUNGER, TOLLES & OLSON LLP
                           355 South Grand Avenue - 35th Floor
12                         Los Angeles, California 90071
                    BY:   ROWLEY J. RICE, ATTORNEY AT LAW
13
     For Defendant TikTok:
14
                           FAEGRE DRINKER BIDDLE & REATH LLP
15                         90 S. 7th Street - Suite 2200
                           Minneapolis, Minnesota 55402
16                  BY:   AMY R. FITERMAN, ATTORNEY AT LAW

17                         FAEGRE DRINKER BIDDLE & REATH LLP
                           300 North Meridian Street - Suite 2500
18                         Indianapolis, Indiana 46204
                    BY:   ANDREA PIERSON, ATTORNEY AT LAW
19
                           KING & SPALDING LLP
20                         50 California Street - Suite 3300
                           San Francisco, California 94111
21                  BY:   BAILEY J. LANGNER, ATTORNEY AT LAW

22                         KING & SPALDING LLP
                           1180 Peachtree Street
23                         Atlanta, Georgia 30309
                    BY:   GEOFFREY DRAKE, ATTORNEY AT LAW
24

25            (APPEARANCES CONTINUED ON FOLLOWING PAGE)
```

1    **APPEARANCES**:    (CONTINUED)

2    For Defendant YouTube:

3                              WILSON, SONSINI, GOODRICH & ROSATI
                              650 Page Mill Road
                              Palo Alto, California 94304
4                    BY:    **ANDREW KRAMER, ATTORNEY AT LAW**

5                              MORGAN, LEWIS AND BOCKIUS, LLP
                              600 Brickell Avenue - Suite 1600
6                              Miami, Florida 33131
                        BY:   **BRIAN M. ERCOLE, ATTORNEY AT LAW**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    <u>**Thursday - July 11, 2024**</u>                              <u>**1:08 p.m.**</u>

2                        P R O C E E D I N G S

3                             ---o0o---

4         **THE CLERK:**  Please remain seated and come to order.

5    Court is now in session.  The Honorable Peter H. Kang

6    presiding.

7         Now calling 22-3047, In Re:  Social Media Adolescent

8    Addiction and Personal Injury Products Liability Litigation.

9         Counsel, when speaking, please make sure you state your

10   appearance for the record and the court reporter, and approach

11   the podiums.

12        Thank you.

13        **THE COURT:**  All right.  Good afternoon.

14        **ALL:**  Good afternoon.

15        **THE COURT:**  All right.  So we're here for this month's

16   DMC.  Unless there's something in the sections on just

17   reporting on status, should we go straight to the ripe

18   discovery issues or is there something prior to that section

19   anybody wants to talk about?

20        **MS. SIMONSEN:**  Good afternoon.  Ashley Simonsen,

21   Covington & Burling, counsel for the Meta defendants.

22        **MR. WARREN:**  Good afternoon.  Previn Warren, counsel

23   for the personal injury and school district plaintiffs.

24        **THE CLERK:**  Good afternoon to both of you.

25        **MR. WARREN:**  Good afternoon.

1          **MS. SIMONSEN:**  We have a positive development to

2    report on an issue, which is that we've resolved our dispute

3    regarding the timing of the remaining custodial file

4    productions for the Meta anticipated deponents.

5      I wanted to ask if Your Honor would so order the agreement

6    simply in light of the other orders that govern custodial file

7    productions to ensure that we do have a court ordered

8    stipulation.

9          **THE COURT:**  Is that --

10          **MR. WARREN:**  We have no objection to that.  And the

11    parties can work together to submit something for Your Honor.

12          **THE COURT:**  So ordered, and if you need something in

13    writing, you should submit a stipulation and proposed order.

14          **MR. WARREN:**  Very well.

15          **MS. SIMONSEN:**  Thank you, Your Honor.

16          **MR. WARREN:**  Thank you.

17          **THE COURT:**  Thank you.  And thank you for working that

18    out.

19          **MS. SIMONSEN:**  Our pleasure.

20          **THE COURT:**  All right.  So who wants to talk about --

21    on ripe discovery disputes, the first one is forensic

22    inspection protocol.

23          **MS. PIERSON:**  Good afternoon, Your Honor.  Andrea

24    Pierson for the TikTok defendants.

25          **THE COURT:**  Good afternoon.

1    **MS. CARROLL:** Good afternoon, Your Honor. Jessica

2  Carroll from Motley Rice for the personal injury plaintiffs.

3    **THE COURT:** Okay. Gotcha. Good afternoon.

4    Okay. So it appears to be the -- I guess it's really

5  defendants pushing the issue, so why don't you go first.

6    **MS. PIERSON:** It is. Thank you, your Honor.

7    Your Honor, defendants seek the Court's assistance today

8  in exercising their right pursuant to Rule 34 to inspect

9  forensic images of the devices that the bellwether plaintiffs

10 say they routinely use to access the defendants' platforms.

11   Our specific request to you is that you order the parties

12 to negotiate a protocol for full forensic imaging and

13 defendants' inspection of that imaging.

14   Plaintiffs' claims put the devices squarely at issue.

15 There is a compelling need for inspection of the devices and no

16 alternative means to understand key issues in this case

17 presented by the devices.

18   Defendants and their experts need to inspect forensic

19 imaging of the devices to adequately evaluate the validity of

20 the plaintiffs' claims. First, that they were addicted only to

21 defendants' platforms and not to the devices themselves, the

22 devices' features, or to other apps or platforms added to the

23 devices.

24   And second, that the defendants' platforms were the sole

25 cause of their addiction, and that their alleged injuries had

1    no alternative causes from the devices themselves, their

2    features, or their applications.

3        Defendants understand that the plaintiffs have concerns

4    related to privacy of the information on their devices that

5    must be balanced.  That's why defendants drafted a protocol

6    that includes creation of the images and oversight by neutral

7    third -- by a neutral third party, and inspection and

8    production subject to protections of the Court's protective

9    order and privilege log protocol.

10       We're open to discussing the parameters of the protocol

11   with the plaintiffs, but they declined.  And that's because

12   there's a threshold dispute of whether defendants' experts and

13   counsel may inspect the forensic images with those protections

14   in place.

15       The parties also disagree about which devices should be

16   subject to the protocol.

17       By way of background, Your Honor, Section 13 of the

18   plaintiffs' fact sheet asks plaintiffs to identify the devices

19   used to access the platforms on a routine basis.  Each of the

20   12 bellwether plaintiffs identified multiple devices routinely

21   used:  Tablets, phones, and computers.  In fact, from the list

22   of -- from the list of devices that have been provided by

23   plaintiffs to date, we know that there are at least 18, if not

24   more, different makes, models -- makes and models of devices

25   that the bellwether plaintiffs possess.

1      So in March we wrote to the plaintiffs and asked them to

2   forensically image all their devices.  And in April and May, we

3   served a request for inspection and production of any devices

4   identified in the PFS's and any imaging within the plaintiffs'

5   custody and control.

6      We also sent a proposed protocol which we attached to the

7   letter briefs filed yesterday, Your Honor, that was modeled

8   after the protocol entered by Judge Gonzalez Rogers in the

9   *eHealth Insurance* case.

10      Defendants' proposed protocol essentially said

11   four things:  First, that a neutral third party would make and

12   store forensic imaging of the routine devices.

13      Second, that the imaging would be subject to the Court's

14   protective order and its protections.

15      Third, that the plaintiffs would be able to review the

16   image and log information that they deemed to be privileged,

17   CSAM, or clearly non-responsive.  And we've offered to work

18   with the plaintiffs to define what would be "clearly

19   non-responsive," but a couple of examples that we provided are

20   things like contacts or credit card and payment information.

21      Defendants' counsel and their experts would have access to

22   the portions of the forensic image that are not subject to the

23   log so that they can inspect, review, and test imaging in a

24   holistic way and within the confines of the work product

25   protection.

1      As I said, the plaintiffs rejected the proposed protocol.

2  They did agree, however, that forensic imaging for preservation

3  of some devices is appropriate, and they informed us that they

4  were in the process of obtaining that for some of the devices,

5  although we don't yet have the details related to that.

6      The parties have had multiple meet and confers, in fact,

7  two more since we submitted the DMC statement, and we've agreed

8  that, first, full forensic imaging should be conducted; and

9  second, to the extent that plaintiffs' vendor has already

10  created full forensic images and will provide to us the chain

11  of custody and details necessary to assure its accuracy, we

12  don't need to repeat that work.

13      However, as I said, we are still in disagreement about

14  whether defendants' experts should be permitted to inspect full

15  forensic images of the devices and which devices should be

16  imaged and subject to that inspection.

17      It's defendants' position that it should be all the

18  devices on which the plaintiffs routinely used their platforms,

19  obviously, subject to the requirement that they have to be

20  within the plaintiffs' possession, custody, or control.

21      It's plaintiffs' position that they ought only to have to

22  provide information from forensic imaging of the plaintiffs'

23  primary device; and they've suggested how that might be

24  defined, but it is one device for any period of time.

25      We believe, based on the information we have thus far from

PROCEEDINGS

1    the complaints and from the information provided by plaintiffs,

2    that the plaintiffs are using multiple devices at any given

3    point in time to access our platforms.

4        To orient the Court, I know that you wrote the decision in

5    *Jones*; we're obviously familiar with that, Your Honor, so I

6    won't belabor what a forensic image might contain.

7            **THE COURT:**  I've read the briefs, so you don't need to

8    repeat what's in the briefing.

9            **MS. PIERSON:**  Thank you.

10       But I will say it's important to note, Your Honor, that

11   the forensic images of these devices are all unique.  In fact,

12   there is no one forensic image or one list or table of contents

13   that apply to the forensic images for all of the devices that

14   we're talking about.

15       The content of the forensic image and the device is unique

16   and depends on the type of device.  Is it a phone, a tablet, or

17   a computer?

18       It depends on the model.  Is it an Apple an Android, or

19   other model?

20       It depends on the features that are on the device at any

21   given period of time.  And we know that the features for

22   different makes and models change over time.

23       We know that there are device settings that can be applied

24   and changed over time by the user.  There are apps -- in fact,

25   there are thousands and thousands of apps that a user can load,

**PROCEEDINGS**

1    can use, and can delete.  There are messaging services and

2    different Internet browsers.

3         And in the case of Apple devices, the version of iOS

4    that's downloaded at any given time will impact not just what

5    the digital footprint looks like in the forensic image, but it

6    also will impact what databases are contained within the

7    forensic image.

8         The storage capacity, the use of Cloud storage, and so

9    much more that's within the control of the individual user and

10   depends on the individual device, all of those things impact

11   the content of the forensic image.

12        And maybe more importantly, Your Honor, is that while all

13   of these devices will have databases and log files and

14   applications -- some of them, thousands -- the device forensic

15   images within the image, each of those things are

16   interconnected, so that looking at one database or one file

17   within the forensic image inevitably leads to numerous others.

18        These are essentially threads that make up a much larger

19   tapestry.  And it's not possible, Your Honor, to look at the

20   individual threads and get a complete picture of the tapestry

21   that is, in fact, the use of the device.

22        Let me give you a concrete example, Your Honor, of this.

23   On Android devices, app developers can control which data from

24   an app is included in the device backups, which might impact

25   how much data is available in the forensic image.

1      App developers on iOS devices, in contrast, must include

2   all app data and backups by default.  Necessarily, then, the

3   types of databases within those two types of devices will be

4   different.  But it's even more complicated than that, Your

5   Honor.

6      Depending on the version of software that's downloaded on

7   the device at any given time, the make, the model, and the

8   settings of the device, all of those things will impact the

9   content of the forensic image.

10      There is -- there is no table of contents that crosses all

11   of these devices or all of the types of devices.  And remember,

12   in the case of the bellwether plaintiffs, Your Honor, we're

13   talking about 18 or more different types of devices.  There's

14   not one list that fits these.

15      Under Rule 34, a party has a right directly to inspect

16   copy, test, or sample electronically-stored information.  And

17   the advisory committee notes acknowledge direct access to

18   devices for inspection may be justified based on the claims in

19   the cases.

20      That notes consistent with the case law which we've cited

21   in the letter brief.  And the case law on this point makes

22   clear that a court may order forensic imaging and inspection

23   where there is a compelling interest in the device or image,

24   and there is no alternative way to obtain the information.

25      That's the relevant standard.

**PROCEEDINGS**

1    In determining whether a compelling interest exists,

2   courts consider whether the plaintiffs actively put their

3   devices at issue when they chose to sue.  And here we know that

4   the plaintiffs actively put their devices at issue.  They say

5   in the master complaint that they are addicted to defendants'

6   platforms and only to defendants' platforms, and that those

7   platforms alone caused them to suffer various personal

8   injuries.

9    The master complaint discusses how the plaintiffs'

10   smartphones supposedly caused the same alleged harms plaintiffs

11   attribute to defendants' platforms.  They cite to articles that

12   call those devices "slot machines in their pocket."  And the

13   article specifically points to features that encourage extreme

14   usage that are device-specific features, not

15   defendant-platform-specific features, device features.

16    The master complaint says that those features and other

17   applications, not the defendants' platforms, include things

18   such as texting, e-mailing, browsing the internet, gaming,

19   accessing cyber pornography and video chatting, and it says

20   that those things are potentially addictive, distracting, and

21   harmful.

22    The master complaint points to other features that are

23   device-specific or common to platforms unrelated to the

24   defendants which plaintiffs also say are harmful, such as

25   nighttime notifications, insufficient screen time limits,

1    filters, infinite use, and others.

2        The defendants' experts need access to inspect the full

3    forensic images of the devices upon which plaintiffs'

4    addictions allegedly played out to test whether evidence of

5    addiction actually exists and to explore the cause and any

6    potential alternative causes for plaintiffs' alleged

7    addictions.

8        There is no alternative means to get information about how

9    plaintiffs used their devices other than from the devices

10   themselves.  Defendants cannot simply get usage data from

11   thousands of different app makers and device manufacturers for

12   20 or more different models and different types of devices.

13       There are a couple of cases that we've cited in our letter

14   brief, Your Honor, that we think are -- are important and

15   factually analogous that you should consider.

16       The first is the Apple case that was decided in 2019 --

17       **THE COURT:**  I've read the cases.  You don't -- you

18   don't need to summarize the case law for me.

19       **MS. PIERSON:**  Okay.  I would just say this,

20   Your Honor, not only does the Apple case set out the standard

21   that we believe is applicable to analyzing this question, but

22   also that it takes on directly the *Henson* case that's relied

23   upon by the plaintiffs.  And the Court there found that the key

24   distinction was that in *Henson*, there were no protections

25   afforded for the plaintiffs' privacy.  There was no presence of

**PROCEEDINGS**

1  a third-party neutral in the process.  There was no inclusion

2  of the protections of the protective order.

3     Similarly, we find the *Abilify* case to be on point.  It

4  involves a personal injury.  And there as well, the Court

5  ordered forensic imaging with protections like those that are

6  offered in the protocol that the defendants have proposed.

7     As it relates to the two cases that the plaintiffs rely on

8  primarily, Your Honor, *Henson* and *Jones*, we find that those

9  cases are not analogous.  Unlike this case, neither *Henson* nor

10 *Jones* implicated the broad performance and usage questions

11 plaintiffs raise here when they point to the alleged failures

12 and addictive properties of features and settings common to the

13 devices themselves and myriad other platforms on the devices.

14    And neither of those cases involve an allegation of

15 addiction on or to a device that includes compulsive use over a

16 long period of time and specific patterns of behavior.

17        **THE COURT:**  Again, in the interest of time, I think

18 the *Jones* case is the opinion I wrote, so I'm familiar with

19 that one intimately.

20        **MS. PIERSON:**  It is.

21        **THE COURT:**  And the other -- I've read the case law,

22 so you don't -- I understand your argument.  You also briefed

23 the issue, so...

24        **MS. PIERSON:**  Understood.  I thought it might be

25 helpful, Your Honor, to talk really specifically about some

**PROCEEDINGS**

1  things that we think are critical to the forensic -- to

2  reviewing full forensic imaging of the devices and maybe more

3  specifically why we think the plaintiffs' proposal to use

4  search terms for portions of the information in the image and

5  production of isolated databases and others, why we think that

6  just doesn't work.

7      First and foremost, as I mentioned earlier, Your Honor,

8  all of the information in the image is interrelated.  There are

9  hundreds, if not thousands, of databases and logs, and those

10  logs work together and populate one another.  It's not possible

11  for defendants' experts to take each of the individual threads

12  in isolation and try to weave those into what was the original

13  tapestry.

14      **THE COURT:**  Stop you there.

15      Are you saying there are hundreds and thousands of

16  databases and logs on each individual device?

17      **MS. PIERSON:**  No.  To be clear, Your Honor, there can

18  be hundreds of databases within an individual device, depending

19  on the device -- the device type.  The log files will be

20  separate and apart from that.

21      **THE COURT:**  Okay.

22      **MS. PIERSON:**  Okay.

23      I want to give you a couple of concrete examples of where

24  the need to look at this holistically becomes really important,

25  Your Honor.

1      In the case of notifications, that's a prime example, we

2  know that the master complaint points to defendants' platforms

3  and allege that notifications from defendants' platforms alone,

4  especially at night, cause their addictions and injuries.

5      Full forensic imaging, inspection of that, will show us

6  what notifications the plaintiffs received and when and from

7  whom, whether it's the device, the defendants' apps, or other

8  apps.  It will show us how plaintiffs interacted with the

9  notifications.  It will tell us whether the notifications were

10 received alone or in combination.  Were they sent individually?

11 Were they stacked?  Were they timed?

12     It will tell us whether the notifications were used

13 simultaneously with plaintiffs' use of other platforms and

14 device features.  Notifications are not all kept in a single

15 database.  They can be kept in the database that pertains to

16 usage of a particular app; they can cross databases within the

17 app; and they are essentially filed within the forensic image

18 differently depending on the device, the operating systems, and

19 the applications.

20     In a given case, if a plaintiff alleges "I received a

21 series of notifications from one of the defendants and that's

22 what woke me up at night," it will be critical that our experts

23 are able to look across the databases and to compare those at

24 the same time to know:  Did the plaintiff receive the

25 notifications?  Did they act on the notifications?  Was the

**PROCEEDINGS**

1  notification sent alone or was it sent in combination with

2  other notifications?

3      **THE COURT:**  Stop you there.

4    So if it's a notification from one of the defendants to a

5  bellwether plaintiff's phone, does the defendants' system keep

6  a record of having sent the notification?

7      **MS. PIERSON:**  Yes.  But what the defendants' system

8  won't have is a couple of things, Your Honor.

9    What are all of the other notifications that the

10  plaintiffs was receiving at the same time, not just from the

11  defendants' platforms, but from other platforms that are not

12  defendants?  And also, what notifications are they receiving

13  from the device itself?

14    There are settings on the device too that will impact this

15  as well.  We all have settings or our devices that can silence

16  notifications or time the notifications or stack the

17  notifications.  If we were to look only at the information

18  that's within any individual defendant platform, that would not

19  give us the complete picture as to what information the

20  plaintiff is receiving by notification and, more importantly,

21  what are they doing in response to that information.

22    That requires us to look across multiple databases

23  simultaneously.  And because there is no table of contents,

24  it's not as though we can say, "Give us the databases for these

25  10 apps and that's the end of the question."

**PROCEEDINGS**

1    The question is impacted by the features on the device,

2   the settings, what settings were activated and, you know,

3   numerous other factors that I won't repeat here.

4    But that's just one example, Your Honor.

5    Another example, it will be critical, given the

6   allegations in the master complaint, that the defendants are

7   able to look at things like switching behaviors and the focus

8   of the user at the time that they're using their device.

9    In isolation, a database that pertains to a particular

10   platform, defendants' or another platform, won't tell us what

11   behaviors the plaintiff was engaged in in switching between

12   apps and features and -- and devices.

13    So again, to go back to the bellwether plaintiffs for a

14   second.  If a bellwether plaintiff alleges that they were

15   awakened in the middle of the night by a notification from my

16   client or one of the other of the defendants, and that as a

17   result of that, they were scrolling through my client's

18   platform, it will be important for us to know:  Were they

19   exclusively focused on my client's platform?  Were they going

20   back and forth between numerous other platforms?  And we know

21   there can be many on any individual device.  Were they moving

22   between devices?  And were they focused on any particular

23   platform or the content of that platform?

24    We can't tell that by looking at individual databases or

25   log files.  We have to look holistically at full forensic

1    images in order to be able to understand the complete picture.

2         And that's compound by the fact, Your Honor, that the

3    claim here is addiction, and addiction over a -- a duration of

4    time.  There's no plaintiff in this case who claims that they

5    were addicted for a day or a week or a month.

6         So now we're talking about:  What's the pattern of

7    behavior in the use of the device across a long duration of

8    time?

9         That requires an opportunity to inspect the full forensic

10   image to be able to see holistically, is there evidence of

11   compulsive use?  Is it compulsive use of a defendants' platform

12   alone or a variety of things?  Is the cause of that the

13   interruption that the plaintiffs claim from a defendants'

14   platform or is it something about the device that causes that?

15        Now, we know that the master complaint includes

16   allegations that there are features on the devices -- that are

17   common features on the device itself that cause the user to

18   repeatedly engage.  So a key question in this case will be:

19   What is it that's causing the repeated behavior of the

20   plaintiff if, in fact, evidence of that exists?  Is it

21   something on defendants' platforms, on other platforms, or is

22   it a result of a device or feature itself?

23        You know, similarly, we know that the plaintiffs have put

24   at issue features that are common to the devices, like parental

25   controls, screen time notifications, the ability to shut down

**PROCEEDINGS**

1    devices based on screen time.

2          That crosses not just the defendants' platforms but all of

3    the other platforms on the device, and the features and

4    settings of the device itself.  All of those things are working

5    in tandem any time a user is engaged with their device.

6          There are other things about the forensic image that we're

7    interested in looking at, Your Honor.  Things like system logs

8    and the app-specific history files for defendant and

9    non-defendant platforms.  Things like browsing history and

10   device-specific features and controls, and deleted information.

11         But at the end of the day, with hundreds of potential

12   device features and thousands of potential applications that

13   can be on any one of the 18 or more device types that we know

14   the bellwether plaintiffs have, it's not reasonable to think

15   that we could come up with a list of databases to be produced

16   or a list of search terms that would allow us to search across

17   text-searchable fields for all of those devices.

18         We require the entire forensic image for our experts to

19   inspect to really understand completely the very device usage

20   that these plaintiffs have put at issue in their master

21   complaint.

22         And there is no alternative means to get this, Your Honor.

23   We cannot go to the manufacturers of every app that was ever

24   available to all of these plaintiffs over the relevant time

25   period and ask them for all of the information that they have

1    and weave together this tapestry.

2        I mean, even if we could, that would not include the

3    features of the devices on each of the different devices that

4    the plaintiffs use to access our platforms, which vary within

5    the device as well.

6        Only inspection of full imaging with appropriate

7    safeguards can help us to understand, evaluate, and test the

8    plaintiffs' claims.

9        They claim that their addictions started on the devices;

10    that it was perpetuated by use of the devices; that their

11    injuries occurred on or while using the devices; and in many

12    cases, they say that evidence of the injury itself is on the

13    devices.

14        Plaintiffs claim that neither the devices themselves, nor

15    anything other than the defendants' platforms, caused their

16    addiction or injuries.  We have the right to explore and test

17    those claims.  And we can do that within appropriate

18    safeguards, just as the Court ordered in the *Apple* case and in

19    the *Abilify* case, and as Judge Gonzalez Rogers ordered in the

20    *eHealth Insurance* case as well.

21        The devices that the plaintiffs routinely used are at the

22    very heart of their claims.  Plaintiffs elected to put those at

23    issue in the master complaint, and they cannot now shield them

24    from inspection.

25        Thank you, Your Honor.

1          **THE COURT:**  Okay.

2      Plaintiffs.

3          **MS. CARROLL:**  Thank you, Your Honor.  Again, Jessica

4   Carroll for the personal injury plaintiffs.

5      Just to start by addressing a few of Ms. Pierson's points

6   related to the scope of the devices, the routine devices in the

7   PFS are not an accurate representation of the devices that

8   plaintiffs used to access social media primarily.

9      To give one concrete example of this -- because I think

10  there was an overstatement as to all bellwether plaintiffs

11  having multiple devices -- I know of one of Motley Rice's

12  bellwether plaintiffs specifically who, I think, only selected

13  one, a personal cell phone.

14     But under our definition of primary device, she would have

15  two primary devices because she has an old cell phone that she

16  didn't trade in in her possession, custody, and control that

17  she used during the relevant time period as her main device,

18  and then she has her current cell phone.  And so in that case,

19  there's two.

20     There are often situations where a child has an iPad

21  first, and they access social media on that as their primary

22  device, and then a few years later they get a cell phone, and

23  then that becomes their primary device.  Most individuals who

24  are accessing these social media apps are doing so on one

25  device at a time.

1    But that doesn't mean that it is only one device.  And

2    I've made that -- tried to make that abundantly clear to

3    defendants over the course of our meet and confers, and it's

4    still being misrepresented here today.

5    So I just wanted to explain that first before we get to

6    what I don't consider to be a dispute over forensic imaging

7    because plaintiffs have agreed to do a full file system

8    forensic image of these primary devices where -- which are

9    going to contain the most relevant information.

10    We agree that these devices will have certain types of

11    data and information that the defendants are entitled to have.

12    But they're not entitled to a full forensic image.  You know,

13    they -- their request is reaching far beyond the tailored and

14    proportional discovery requests, and are asking for an entire

15    mirror image of a device that is essentially a digital record

16    of nearly every aspect of an individual's life that I have not

17    found one case where that has been allowed to happen.

18    And so this would be -- this is -- it's a novel request,

19    and I feel like plaintiffs have been more than cooperative in

20    our meet and confers.  We've been more than willing to give

21    them exactly what they want.  They have offered no basis for

22    their assertion that this is the only way that they can obtain

23    this information.

24    I've got a list from our expert, and this is an expert who

25    is a forensics expert, who is routinely hired by Ms. Pierson's

1    firm, who said it is absolutely possible to produce this data

2    in a targeted way while not producing irrelevant data and

3    private data that the defendants are not entitled to.

4        You know, listing some of the data categories that we

5    would be able to produce from in a relevant proportional way is

6    the app usage data, browser history, search data, location

7    data, communication logs, media files, metadata, application

8    settings and preferences, deleted data and artifacts, device

9    usage metrics, health and fitness data --

10        **THE COURT:**  The court reporter is going to ask you to

11   slow down.

12        **MS. CARROLL:**  Oh, sorry.

13       Health and fitness data and third-party app data.

14       Related to the apps, not every app on a device is going to

15   be relevant.  There are many that are going to be.  Defendant

16   app -- like Ms. Pierson said, defendant app features,

17   notifications, those databases, some of those are going to be

18   produced wholesale because they should.  And those

19   conversations we've introduced as being willing to meet with

20   their ESI vendor and talk through what format would get them

21   what they want.

22       I think the -- to get to the heart of the issue here and

23   to cut through all of the hyperbole, there's only two

24   situations where courts have ordered a full forensic image of

25   any kind, and that's where there's evidence of some sort of

1    malfeasance or misfeasance in the discovery process, which is

2    not what is the case here.  We haven't even been allowed to

3    produce this data.  That's the *Abilify* litigation case that

4    they cite.  And the other one is where the device performance

5    itself is at issue, and that's the *Apple* case that they cite.

6        And I don't know if Your Honor has had the ability to --

7    or opportunity to read the protocol that was in that --

8            **THE COURT:**  The Court has.

9            **MS. CARROLL:**  Okay.

10       But I would just point to the fact that even where

11   the courts have allowed a full forensic image, what is

12   accessible by the party requesting that is very limited under

13   the appropriate boundaries within the discovery rules and the

14   case law as it's -- as it normally is.

15       And -- let me see what else.

16       The other -- the other thing related to this -- this

17   support -- I think I mentioned this already, but we've agreed

18   and, as of last evening, defendants have also agreed to confer

19   with the ESI vendors, but have relayed that that is not

20   something that would set aside this dispute, which, again, I

21   don't think is a dispute at all.

22       And we've been trying to do as your standing order

23   requires and meet and confer in good faith and provide the

24   relevant information that we ought to.  But I don't think

25   there's any case law out there that supports a full file

1    forensic image to the defendants.

2        If there is any deficiency that they can identify, they

3    have the ability to bring that to Your Honor, and we can work

4    with our ESI vendor and our forensic experts to provide the

5    information that's missing.

6            **THE COURT:**  Okay.

7            **MS. PIERSON:**  May I respond briefly, Your Honor?

8            **THE COURT:**  Briefly.

9            **MS. PIERSON:**  I will be brief.

10       Just a couple of things.  First of all, the *Abilify* case

11   sets out the two circumstances in which full forensic imaging

12   and inspection can be appropriate.  And the very first one is

13   the one that we're talking about, which is it's -- where the

14   use of the computer or computer files is the focus of the

15   claims in the case.  They have put at issue the use of the

16   devices at the heart of this case.

17       We're not claiming that there's been some malfeasance at

18   all.  This isn't a remedy under Rule 37.  This is a request to

19   inspect under Rule 34.

20       And the example that Ms. Carroll gave of two devices

21   potentially, but only one of those being at issue.  Of course,

22   old devices in the plaintiffs' possession are relevant and

23   contain relevant information.  And the same is true with the

24   device that the plaintiff is currently using.

25           **THE COURT:**  I don't think she's disputing that.

1           **MS. PIERSON:**  Okay.  Thank you.  That was --

2           **THE COURT:**  You're shaking your head here.

3           **MS. CARROLL:**  Yeah.  No, I am.  I'm not disputing

4    that.

5           **THE COURT:**  Okay.  Just for the record.

6           **MS. PIERSON:**  We have consulted with multiple experts

7    in the field, Your Honor.  The information that I provide today

8    isn't mine alone.  It's based on their analysis and the

9    information that they've provided.  They tell us that they need

10   to inspect a full forensic image because the use of the device

11   holistically is at the heart of this case.

12       And the things that Ms. Carroll suggests that we can look

13   at in individual databases doesn't satisfy the compelling need

14   that the defendants have to look at those things holistically

15   and as they are interwoven together.

16       Ms. Carroll gives the example of "not all apps are

17   relevant."  And I actually beg to differ.  The example that

18   we've talked about previously that she suggested is a SkyMiles

19   app, for example.

20       It's true, on its face, you might say that a SkyMiles app

21   is not relevant, but if their claim in this case is compulsive

22   use of our platforms on the device, and it turns out they

23   compulsively use a different app -- whether that's SkyMiles or

24   Roblox or any other app -- that's at the heart of this case,

25   and it goes to the question of causation and alternative

1    causation.

2        We did tell -- the plaintiffs did suggest to us yesterday

3    that our ESI vendors could talk directly, and we're open to

4    considering that, Your Honor, to form the parameters of the

5    protocol.

6        And that is our request today, Your Honor, that you give

7    us direction to meet and confer and negotiate the parameters of

8    a protocol that would provide for full forensic inspection of

9    all of the routine devices identified in the PFS 13A, and that,

10    in addition to that, we work out the parameters of a protocol

11    that would allow for the inclusion of a third-party neutral and

12    inspection by our experts of full forensic images, subject to

13    the log protections and protective order as well.

14        **THE COURT:** Ms. Carroll, anything further?

15        **MS. CARROLL:** Yeah. I'll respond briefly because I

16    think it's fair to point out that their request is akin to us

17    asking any one of their custodians to hand over a device and

18    let us run through it, or any of their databases, let us rifle

19    through those. It's not something that's within the discovery

20    rules that we can do.

21        And to go back to the case that Ms. Pierson is discussing,

22    the *In Re: Abilify* litigation that they cite, the plaintiffs

23    here are not putting the device at issue. I understand that

24    defendants have a right to pursue alternative causes, and we

25    are more than willing to provide them the data and information

1   from these devices to be able to do that.

2       And until this Court has any evidence of any kind or

3   support that there is no alternative way that this can be done,

4   where plaintiffs are saying the alternative way is we'll

5   provide it to you, under the ESI protocol that exists, there's

6   no need to go through further expense and delay when we have

7   industry-leading ESI and forensic vendors that we're working

8   with already.  We've been doing this for two years.  Let us

9   produce this data to you, and if there's an issue, bring it to

10  Your Honor.

11      **THE COURT:**  So it would, of course, be quicker and

12  probably less expensive for the plaintiffs if you just gave

13  them the images, but I'm not going to hear an argument from you

14  in the future that it's burdensome and costly and, you know,

15  that there's been delay because of the burden and cost here.

16      Am I getting that commitment from you?

17      **MS. CARROLL:**  That's actually a point I had written

18  down, Your Honor, is that it would be a lot less burdensome for

19  us to produce this --

20      **THE COURT:**  That's right.

21      **MS. CARROLL:**  -- in a comprehensive way.  But we have

22  an ethical obligation to our clients and --

23      **THE COURT:**  So you're willing to accept the burden?

24      **MS. CARROLL:**  We're willing to accept the burden.

25      **THE COURT:**  Okay.  All right.

1        Okay.  Thank you.  And thank you for the briefing.

2        So I start with -- it's interesting, usually in discovery

3   disputes, you don't get a lot of guidance from the Supreme

4   Court.  I start with *Riley v. California*, 573 U.S. 373, where

5   the Supreme Court said (as read):

6            "Modern cell phones as a category implicate

7       privacy concerns far beyond those implicated by the

8       search of a cigarette pack, a wallet, or a purse.

9       Cell phones differ in both the quantitative and a

10      qualitative sense from other objects that might be

11      kept on an arrestee's person."

12       This is a criminal case, of course.  (as read):

13            "The storage capacity of cell phones has several

14      interrelated consequences for privacy," and they go

15      through those, and go on to say, "It is no

16      exaggeration to say that many of the more than

17      90 percent of American adults who own a cell phone

18      keep on their person a digital record of nearly every

19      aspect of their lives from the mundane to the

20      intimate."

21       And I can go on.

22       And then, again, typically, don't get tons of guidance

23   from appellate courts on discrete discovery issues like this,

24   but the 9th Circuit did say in *Jones v. Riot Hospitality*,

25   95 F.4th 730 (as read):

1              "To be sure, there is a strong privacy interest

2          in the contents of mobile phones.  For discovery

3          purposes, those privacy considerations are generally

4          considered either in Rule 26(b) proportionality

5          analyses or as part of Rule 26(c) protective orders."

6       I also thankfully have guidance from Judge Orrick of this

7    Court who affirmed Magistrate Judge Ryu's order denying of

8    forensic imaging of cell phones.  This is from *Wisk Aero v.*

9    *Archer Aviation*, 2022, Westlaw 6250989.

10      And he wrote that (as read):

11             "Courts have often expressed special concern

12         about permitting inspections of personal computing

13         devices.  The advisory committee notes to FRCP34,

14         which governs production of electronically-stored

15         information explain that the rule, quote, is not

16         meant to create a routine right of direct access to a

17         party's electronic information system.  Although such

18         access might be justified in some circumstances,

19         courts should guard against undue intrusiveness

20         resulting from inspecting or testing such systems."

21      And later on he quotes the *Apple* Case at 219 Westlaw

22   3973752, which says personal devices are afforded special

23   privacy protections, which is in line to the quote I read from

24   *Riley v. California*.

25      All right.  And then obviously there's -- both parties

1   have cited their cases where forensic inspection was ordered

2   and cases where it was not.  For example, in the *Henson v. Turn*

3   case, it was not ordered.  It was denied.  In the *In Re:*

4   *Anthem Data Breach Litigation*, 216 Westlaw 11505231.  This --

5   Magistrate Judge Cousins denied access to the computer

6   systems -- the full computer systems, which included a request

7   for phones.  He found that disproportional under the rules.

8        So given that the defendants here take the position that

9   the standard is compelling interest, I find they have not met

10  the compelling interest standard.

11       I note in the *Wisk Aero* case, I think it is, Judge Orrick

12  noted that the standard for the relevance part of this is good

13  cause.  And I haven't seen good cause either given what the

14  plaintiffs here have agreed to do.

15       So as I understand -- and I just want to make sure I got

16  this right, Ms. Carroll -- for the devices at issue, in

17  addition to working out search terms, your clients -- you are

18  agreeing on behalf of your clients to provide app usage data,

19  browser history data, location data, communication logs, media

20  files, metadata, application settings, and that whole list of

21  other types of data that you had read off which is buried in

22  the record.

23       Is that correct?

24            **MS. CARROLL:**  That is correct.

25       Let me make one clarifying point with that, if I may,

1    Your Honor, which is related to the search terms -- because I

2    think that it wasn't clear in the briefing, at least on

3    defendants' part.

4        We mentioned using search terms for certain things like

5    large e-mail databases on a device.  That is not how we intend

6    to, you know, parse and search for relevance of every data

7    category here.  Like I mentioned earlier, there are some

8    categories of data, certain app databases that would be likely

9    produced in wholesale in its native format or whatever format,

10   that our ESI vendor --

11       **THE COURT:**  And you're agreeing to that because we all

12   recognize search terms won't pick up --

13       **MS. CARROLL:**  Absolutely.

14       **THE COURT:**  Okay.  All right.

15       So to the defendants' point, Ms. Pierson's point, that

16   there are potentially thousands and many, many apps that could

17   have been used, as part of the meet -- I'm going to order you

18   to meet and confer to work out the details of this.  I'm

19   ordering plaintiffs -- because it's a limited number of devices

20   we're talking about -- right? -- it's just for the bellwethers

21   here.  You know what apps are on those devices currently.  So I

22   want you to give a full list and a chart to the defendants of

23   what all those apps are.  Okay?

24       **MS. CARROLL:**  We've agreed to do that, Your Honor.

25       **THE COURT:**  Okay.  And so nothing stops the defendants

1  from sending subpoenas to those limited number of app

2  companies.  It may be a large number, but it's not thousands.

3  All right?  I doubt it's thousands.  And if you tell me it's

4  thousands, I may change my mind here.

5          MS. PIERSON:  I don't know, Your Honor.  I mean, we're

6  talking about 20 different devices.  We don't have the benefit

7  of having seen the forensic images.  They've seen the forensic

8  images.

9      But, you know, plaintiffs have represented to us that we

10  can have app-specific history files for defendant and

11  non-defendant platforms.  We need all of those.  The ones that

12  are presently on the phone and ones that are deleted as well.

13          THE COURT:  I'm saying they have to give you a list of

14  every single app on every single device, all right, and then

15  you can proceed from there.  All right?

16          MS. PIERSON:  We also need the app history usage on

17  the phone itself, the forensic image itself.

18          THE COURT:  Okay.  So part of my order here on the

19  meet and confer is, you both have experts, you both have some

20  sense of what kinds of, call it log system database, non kind

21  of search term searchable data is on the devices that would

22  help the defendants figure out -- create what you call this

23  tapestry.  All right?

24      Work and have your experts as part of the meet and

25  confers, if appropriate, work to identify, not by name but

1    descriptively, because often document requests are requests

2    made descriptively as opposed to go-get-'em requests, but if

3    you know, for example, from your experts that Apple has these

4    names for these types of databases for the system settings, for

5    example -- just for an example -- you can give those as

6    examples of what you're looking for -- right? -- and what you

7    expect them to produce.

8         And I'm going to expect the plaintiffs to be forthcoming

9    in producing and identifying what the various settings are and

10   what the databases are on the devices to avoid a full forensic

11   turnover.

12        Do you understand what I'm saying, Ms. Carroll?

13             **MS. CARROLL:**  I do.  Thank you.

14             **THE COURT:**  Okay.  And so the goal here is I'm not

15   going to be able to figure out exactly, because, you know, I

16   don't have the phones and I don't have the system files, and I

17   haven't used my engineering skills in a long time to figure

18   that stuff out.  So what I want you to do is work with the

19   people who know the technology.  All right?

20        As I've said previously in other contexts, communicate

21   transparently in the meet and confer process to figure out what

22   types of, as you call, the databases, system log files, the

23   metadata files, the other kinds of things that would help

24   create this tapestry.

25        And I'm going expect the plaintiffs to transparently

1  identify whether the devices have those and then, if so,

2  produce them.

3      All right?

4      All right?

5      Is that understood?

6          **MS. CARROLL:**  It is, Your Honor.

7      May I ask one clarifying question related to the scope of

8  the devices?

9          **THE COURT:**  I'm not there yet.

10          **MS. CARROLL:**  Okay.

11          **THE COURT:**  Okay.  And so the other part of it is

12  because there will be some, call it data, on the phones that

13  can be found through search terms, work out -- I'm going to

14  expect you to meet and confer and work out a set of search

15  terms.  All right?

16      I understand this may be an iterative process, and

17  nothing's stopping the defendants from saying, "Oh, now that

18  we've looked at these files, it's calling -- it's calling to

19  data in another file and we want that."  All right?

20      And I'm going to expect plaintiffs to produce that and not

21  require a brand-new set of document requests, right, that this

22  is going to be an iterative, cooperative, and collaborative

23  process to get this because I'm doing the plaintiffs a favor

24  here by not requiring a full forensic image handover.

25      Do you understand that?

1          MS. CARROLL:  Yes, your Honor.

2          THE COURT:  Okay.

3          MS. PIERSON:  Your Honor, there are two sort of

4    practical problems that we have here.  I mean, just like you

5    don't know what you don't know about the bellwether plaintiffs'

6    devices.  Neither do we.  And --

7          THE COURT:  But you will.  My point is you will.

8          MS. PIERSON:  I understand.

9       A simple list of the apps is not going to tell us that.

10   We will need from the plaintiffs a complete listing of the

11   things that are on their phone.  And if they group them in

12   categories the way you described, maybe that's a good place to

13   start.  But without knowing the --

14         THE COURT:  Other than a list of all the apps, what

15   else do you need that's on the phone?

16         MS. PIERSON:  Apps, features that are -- the unique

17   features to the device as well, the features that are used or

18   not used on the device at any given time.  It's more than just

19   apps that are -- that are loaded on your phone.

20         THE COURT:  Okay.  So when I was talking about data,

21   right, I meant things that you were talking about, like

22   settings, feature settings -- right?  I mean, once you know --

23   do you know -- you know what the models are.

24         MS. PIERSON:  Some, not all.  We don't have a complete

25   listing of all of the routine devices.

PROCEEDINGS

1              **THE COURT:**  I want the plaintiffs to provide every

2      model number of every bellwether device we're talking about to

3      the defendants so we have a complete universe of what the

4      devices are.  All right?

5          And if you know what kind of features you are looking for,

6      you've listed a bunch, like parental control features, that

7      are, like, specific to the phone itself as opposed to some app,

8      list those out and tell them that we want the log -- however

9      they're logged, whether they're logged or there's a database of

10     those features, work with the experts to describe what it is

11     you're looking for for each of the features.

12         Do you understand?

13             **MS. PIERSON:**  We can try to do that.

14         I would just note the efficiency of -- if plaintiffs

15     possess the forensic images from the devices already, this is

16     information that is easily accessible to them, as opposed to us

17     researching 20 different models of devices and coming up with

18     that list.

19             **THE COURT:**  You're going to do have to do that anyway

20     once you get the -- if I gave you the full forensic images,

21     you're going to have to do that anyway with your experts

22     anyway.  So this -- all I'm doing is having you do it without

23     getting the full image.  Because I'm concerned about -- have

24     concerns about the overbreadth and the privacy issues of a full

25     image.

**PROCEEDINGS**

1    If it turns out -- if it turns out that I hear that the

2    plaintiffs are not being forthcoming and, you know, responding

3    and giving information, you know, this is without prejudice you

4    coming back saying that the process isn't working out.

5    So it behooves everyone here to work cooperatively on

6    this.

7    **MS. PIERSON:**  Getting that kind of a listing by a

8    particular deadline, Your Honor, I think could be helpful to

9    start the process.

10    We are concerned about the fact that, without some idea of

11    what the plaintiffs' device is, what they look like, it becomes

12    difficult to depose the plaintiffs, and that delays us on our

13    schedule.

14    So, you know, if this is going to be an iterative process,

15    it will be time-consuming.  And really the sooner we can get

16    it, the better.

17    **THE COURT:**  You'll get them a list within a week?

18    **MS. CARROLL:**  I cannot answer that question right now,

19    Your Honor, because there's -- there are 12 bellwether

20    plaintiffs.  And I've got to reach out to their counsel to

21    figure out -- I know some have been forensically imaged -- the

22    full file system imaged, some have not.  Some are in the --

23    they're in the process of doing that.  But I would need to get

24    with counsel for those bellwether plaintiffs to get a date.

25    But we could provide a date to the defendants and the Court

**PROCEEDINGS**

1    probably by Monday.

2        **THE COURT:**  Okay.  Tell you what:  For those devices

3    where you have the information or can readily get the

4    information, don't wait, start producing it on a rolling basis

5    and disclosing it now if you have it.  Okay?

6        **MS. CARROLL:**  Yes, Your Honor.

7        **THE COURT:**  And work expeditiously to get -- again,

8    it's just a list of apps and a list of -- it behooves -- the

9    defense, give them a description of the features for -- that

10   you're looking for that are besides the apps.  Okay?

11       **MS. PIERSON:**  We could use specific identification of

12   the makes and models of each of the devices in their

13   possession, too, Your Honor.

14       **THE COURT:**  So if it's 12 bellwethers -- and let's

15   even assume they've got even -- let's assume, worst case,

16   they've got four former phones and devices and -- it's less

17   than 50 devices.  You should be able to get them a complete

18   list of all models within a couple days.

19     Can you do it by Monday?

20       **MS. CARROLL:**  I don't think that that's feasible, Your

21   Honor.

22       **THE COURT:**  By Wednesday next week.

23       **MS. CARROLL:**  My understanding from other bellwether

24   counsel regarding devices listed in the PFS, some of those are

25   not in the plaintiffs' custody -- possession, custody, or

1    control.  They might be a school laptop that they used

2    eight years ago.  It might be a family home computer.

3        **THE COURT:**  Okay.  So if it's not currently in their

4    custody, possession, or control, then it's not in -- then I'm

5    not asking you to do something that's physically impossible to

6    do.

7        **MS. PIERSON:**  But something like a family home

8    computer is clearly within the plaintiffs' possession, custody,

9    or control.

10       **THE COURT:**  Right.  So what I'm saying is, of those

11   devices that are within the bellwether plaintiffs' custody,

12   possession, and control, how long -- will it take more than a

13   week to give them a list of the devices and their model

14   numbers?

15       **MS. CARROLL:**  I want to clarify that point, Your

16   Honor, because we disagree with Ms. Pierson's -- there are

17   non-parties that live in the household with the plaintiff.  And

18   many -- these are -- these are young people.  Many of these

19   plaintiffs still live at home or at least the computer that

20   they used during the relevant time period that they may have

21   put on the plaintiff fact sheet because there is no definition

22   for "routine," they may have misunderstood.

23       I've spoken with at least one client specifically who

24   didn't understand the question, didn't read it properly, put, I

25   think, six different devices.

**PROCEEDINGS**

1    And when asked the question, "Which of these did you --

2    was your main device that you accessed social media on," it was

3    two out of six.

4        And so I think there's a real dispute, and I don't want

5    to -- I don't want to overlook that and promise information

6    from devices that we're not agreeing to.

7        We want to get them the data and information from those

8    devices that are going to have it.  The other ones are not

9    going to -- they're going to be more irrelevant than relevant.

10        **THE COURT:**  So let me -- I didn't address this -- the

11    second issue you've raised which is:  What is the scope of

12    devices at issue here?

13        So clearly it includes everything that the plaintiffs have

14    defined as a main device.  I think that's the wording you used;

15    right?  Whether it's current or a previous one -- right?  So

16    it's not a single device.  It's whatever, within the relevant

17    time period that they ever used as whatever you've called the

18    main device.

19        I think it also does include any devices within their

20    possession, custody, or control that they have habitually and

21    routinely used to access to the defendants' platforms.

22        And it's up to you to go back to your clients and make

23    that inquiry and figure out, subject to, you know, all your

24    obligations as counsel, which of those -- and if you're saying

25    that some of the ones on the PFS's don't actually meet that now

1   that we go back and double-check, then you've got to make that

2   representation.  And if it turns out you're right, then you're

3   right.  And if it turns out you're wrong, I'm sure the

4   defendants are going to raise it with the Court in one way or

5   the other.  Okay?

6        **MS. CARROLL:**  Yes, your Honor.

7        And the example that I gave earlier is actually in

8   defendants' favor, where there was only one listed on the

9   routine device section of the PFS, but we know because it's our

10   client, they have an old cell phone that would be part of this

11   primary device; and we would include data from that.

12        **THE COURT:**  That's great.  That's great.  And I

13   applaud that.

14        But, again, you need to go back, and if it's your position

15   that some of the things on the PFS's are either incomplete one

16   way or the other or overinclusive in one way or another, and

17   you've got a list of devices that the bellwethers -- again,

18   ordinary English meaning of the words -- routinely, habitually,

19   regularly use or used during the relevant time period to access

20   the defendants' platforms, those are within the scope of this.

21        Do you understand?

22        **MS. CARROLL:**  Yes, Your Honor.

23        **THE COURT:**  Okay.  And -- but they need the list of

24   them so -- what I -- why don't you do this:  As part of your

25   meet and confer, file a status report by next Friday as to

**PROCEEDINGS**

1    whether or not that list has been completely -- whether you met

2    and conferred on it, whether the list has been provided or not.

3    Right?

4         And I also want to get a status on coming to agreement on

5    search terms.  All right?  And whether the list of apps has

6    been -- started to have been -- in other words, status report

7    on everything I'm requiring you to do here today.  Okay?

8    Because I -- I -- a lot of this is stuff that you should be

9    able to do fairly expeditiously because it's not requiring

10   production of anything at this point, it's just sharing

11   information once somebody looks at the device, whether it's a

12   tablet or a phone or whatever.  Okay?

13             **MS. CARROLL:**  Yes, Your Honor.

14             **MS. PIERSON:**  Your Honor, two additional just

15   practical considerations.

16        One, to the extent that the plaintiffs have identified a

17   routine device in their -- in a PFS but they're saying today,

18   okay, that doesn't meet the routinely used definition that

19   we've described today, it would be helpful for us to know

20   what -- also what is the list of devices that they accessed our

21   platforms on but they're now saying that isn't routine.

22        The PFS says what it -- what it says, so if there's

23   some -- again, to the point of we don't know what we don't

24   know, unless we know what's being excluded, we don't know if

25   we're really being given the full gamut of the information that

1    you're describing.  So it would be helpful to know both.

2         **THE COURT:**  If you -- let me make it clear.

3         The list that you give them of devices should be

4    correlated by individual plaintiffs.  So if you've got that,

5    you'll be able to tell whether there's something on the list

6    that doesn't match up with the bellwether's PFS; right?

7         **MS. PIERSON:**  I think that's right, Your Honor.  We

8    can at least start there and report back to you in our report

9    on Friday if that doesn't work.

10        The other practical problem -- and, you know, we're very

11   concerned about the delay that this process has caused.  We

12   started this conversation with the plaintiffs in March.  Here

13   we are in July with a process that's going to go on into August

14   and September, we fear.

15        **THE COURT:**  I don't think it's going to go into August

16   and September.  They've already started imaging a bunch of the

17   devices.  They're going to continue to image all the rest of

18   them; right?

19        And then you're going to give them the list of the

20   databases, features, settings, all those things that you want

21   from them.  And if I've been clear -- I think I was clear --

22   I'm going to expect the plaintiffs to start a rolling

23   production of all that electronic data and electronic ESI,

24   essentially, to you-all as soon as possible.

25        **MS. PIERSON:**  Understood.

1    Back to the apps and platforms other than the defendants'

2    apps and platforms.  We also have the practical problem that

3    the defendants can't get information from the app manufacturers

4    because the Stored Communications Act only allows users to

5    request that information.  So that information is within the

6    plaintiffs' ability to start gathering now as it relates to

7    other apps that they used that are on the devices.

8        And we'd like to -- for the plaintiffs to get that process

9    started of collecting that information because we're not able

10   to do that.

11       MS. CARROLL:  May I ask a clarifying point?

12       Is this from the device -- this is new to me.  Is this

13   from the device itself or are you asking plaintiffs to go out

14   to -- I have -- I counted last night because I was curious,

15   probably 85 apps on my own cell phone.

16       Are you asking plaintiffs to go to 85 app --

17       MS. PIERSON:  Yes.

18       MS. CARROLL:  -- manufacturers and ask for their data

19   or --

20       MS. PIERSON:  Yes.

21       MS. CARROLL:  This is about device forensics.  That's

22   what this --

23       THE COURT:  I'm not -- I'm going to deny that request

24   without prejudice because that was never teed up as part of

25   this.  That was not briefed, and it's a new -- it's beyond the

1    scope of what we're talking about today.

2        If you're asking for, essentially, voluntary discovery

3    from the plaintiffs from third-party app developers, you've got

4    to go through your normal meet-and-confer procedure.

5        **MS. PIERSON:**  I'm sorry, Your Honor.

6        I was following up on the comment that you made earlier

7    that once they provide this list of apps to us that we might

8    have to going to those app manufacturers to request the usage

9    information from them.  We need both the usage information

10   that's contained within the forensic image.

11       But if you are expectation, Your Honor, is that we take

12   the information that the plaintiffs give us and that somehow we

13   go out and get that information from various platforms, the

14   practical issue is that that's not possible for us.

15       So that information, just as the plaintiffs download their

16   data from our apps, that information is also within their

17   possession, custody, and control.  They can get that

18   information.  We cannot.

19       **MS. CARROLL:**  We can sign a release that would allow

20   them to do that.

21       **THE COURT:**  Okay.  So make this part of your

22   meet-and-confer.  Okay?

23       **MS. PIERSON:**  Thank you, Your Honor.

24       **THE COURT:**  All right.  Okay.

25       I think that resolves -- oh, you filed an amended -- or

1    corrected brief on -- or joint letter on the forensic imaging

2    issue, so can I -- for purposes of record-keeping and

3    housekeeping, can we deem the previous version, which is

4    Docket 998, to be either withdrawn or vacated as moot?

5         **MS. PIERSON:**  You can, Your Honor.  The first one we

6    filed just had the exhibits mixed up a little bit, so we wanted

7    to correct that for Your Honor.

8         **THE COURT:**  We'll reflect that in the DMC order just

9    so we can get rid of that one from the docket.

10        Okay.  Any other questions -- or practical questions on

11   how to go forward based on my instructions on this particular

12   dispute?

13        **MS. PIERSON:**  Not today.

14        **MS. CARROLL:**  No, your Honor.  Thank you.

15        **THE COURT:**  All right.  Who -- next dispute is

16   Docket 995, the AGs' preservation obligations.

17        Madam Reporter, do you need a break?

18                    (Pause in proceedings.)

19        **THE COURT:**  Why don't we just -- for the reporter, why

20   don't we take a 10-minute break.

21        **MR. SCHMIDT:**  Understood.

22                    (Recess taken at 2:11 p.m.)

23                    (Proceedings resumed at 2:24 p.m.)

24        **THE CLERK:**  Remain seated.  Come to order.  Court is

25   back in session.  The Honorable Peter H. Kang presiding.

1        **THE COURT:**  Okay.  Before we move to that issue, I've

2   been meaning to do this.  I've been doing it at a regular basis

3   at my normal motions calendars and even CMC calendars, and I

4   keep forgetting to do it with you-all.

5        But since I'm got so many lawyers and law firms in the

6   room, I want to remind you all, the Court has a robust pro bono

7   program that's always in search of lawyers to represent

8   pro bono clients who have been prescreened by the pro bono

9   staff attorneys in cases.

10       And so the e-mail address to contact them is fedpro,

11  F-E-D-P-R-O, @sfbar.org.  It's run through the San Francisco

12  Bar Association.

13       My list is a little bit out of date, but I know there are

14  prisoner civil rights cases that need both full-scope

15  representation, some need representation just for settlement

16  conference purposes.  There are non-incarcerated plaintiff

17  cases, such as -- there's a product liability case; there's a

18  computer fraud and abuse act case; employment discrimination

19  case; and a 1983 civil rights case, at least on the list I had.

20  Again, it's a little bit out of date.

21       But they're in front of judges like Judge Chen,

22  Judge Gonzalez Rogers, Judge White, Judge Gilliam, Judge Lin,

23  and even other judges, like Judge Ryu, Judge DeMarchi, and

24  Judge Beeler, at least, again, as of this date.

25       And so it's a wonderful opportunity for lawyers to get --

**PROCEEDINGS**

 1  give -- provide service to the community, and the Court.  I

 2  know when I was a younger lawyer, it was a wonderful

 3  opportunity to get -- opportunities for younger lawyers to get

 4  in-court and deposition experience, in settlement conference

 5  experience, and they're always looking for good lawyers.  And

 6  so please send the word out to your various firms and your

 7  friends and your colleagues and everybody you know in the

 8  network to contact fedpro@sfbar.org, if there's any interest,

 9  which I highly encourage.

10      Okay.  So having said that, State Attorney Generals.

11          MR. SCHMIDT:  Good afternoon, your Honor.  Paul

12  Schmidt for Meta.

13          THE COURT:  Good afternoon.

14          MS. O'NEILL:  Good afternoon.  Megan O'Neill from the

15  California AG's office on behalf of the state AGs.

16          THE COURT:  Good afternoon.

17      So I guess it's really -- Meta's pushing this issue, so

18  why don't you go first.

19          MR. SCHMIDT:  Sure.  Sure.  And I will just say we do

20  appreciate the flag on the pro bono point, our firm, and I'm

21  sure the other firms here take that very seriously, and we

22  will -- we will act on that.

23      As I signaled before the break, we think this issue is

24  tremendously important.  We also think it's pretty

25  straightforward, so I'll be pretty targeted in what I say

1    guided by what Your Honor said, obviously, about being familiar

2    with the papers.

3        As a framing point, there is no dispute that the AGs have

4    hold obligations, that they have preservation obligations; and

5    they've not disputed that those go back until 2021.  So that is

6    the baseline.  And the question is how they meet those

7    preservation obligations.  And there's two disputes that the

8    parties presently have on that issue.

9        One relates to the 20 states that have no hold at all in

10   any form whatsoever, and they're just relying on what we've

11   been given as two examples of policies governing AG's offices.

12       As to those 20 states, I would highlight three of the

13   cases we cited, again, mindful that the Court's familiar with

14   the cases.

15       I would cite the *Apple* case where the *Apple* case made a

16   point of saying the fact that Apple is in compliance with a

17   different set of hold policies doesn't answer the question

18   before the Court in terms of different parties, different

19   claims, different products, and different witnesses.  We think

20   that principle applies here.

21       I would cite the *City of Colton* case where this argument

22   was rejected in the context of the EPA making it, the record

23   statutes are sufficient.

24       And I would cite the *HVI Cat Canyon* case which says very

25   clearly for a large organization -- and federal and state

1  government departments certainly are large organizations -- it

2  is customary to impose a litigation hold on documents.  Once it

3  is reasonably anticipated that litigation may ensue, the case

4  law has developed the expectation that a party will implement

5  such a litigation hold to preserve documents that may turn out

6  to be relevant once litigation is filed.

7       Those cases all speak to that -- this -- this threshold

8  issue that there should be some form of a hold for these 20

9  states that have none, and there's been no citation of case law

10  to the contrary that is anything close to the situation.

11       What we've had instead is reference to two policies, and

12  only two policies -- I think it's Kentucky and California --

13  that only apply to investigatory files.  We already know from

14  the requests that we have served to the AGs requested that they

15  have agreed to answer, at least in part, that that does not

16  cover discovery that will be provided.

17       So that's a pretty straightforward question.  And

18  throughout our meet-and-confers, throughout the briefing,

19  there's never been an ability by the State AGs to make any kind

20  of representation that for the states that have no holds at

21  all, that what the -- what the holds that are being undertaken

22  are, what the policies they're relying on are, or even that

23  they've done the analysis to say:  Here's why the majority of

24  states have done it -- or here's why the 15 have done it,

25  here's why the 20 haven't.

1    None of that is before the Court.  I don't think they

2    could put that before the Court because I don't think they've

3    looked at whether Indiana doesn't need a hold but other states

4    have entered a hold.  Louisiana doesn't have a hold, et cetera.

5    So that's the first issue and we think that could not be a

6    simpler issue, the states that have no hold.

7    The second issue is the agency issue that's pending with

8    the Court.  And obviously we are eager for the Court's

9    guidance.  I hate saying that with an issue that's thorny, I

10   know, and that the Court is looking at across many states, but

11   that will help the parties.

12   Our view is that, even in the absence of that guidance,

13   before we have that guidance, they should be doing something

14   with respect to those agencies.  They're on notice for us --

15   from us as to specific agencies that we believe are relevant.

16   The Court flagged this issue at the May hearing, stating

17   its surprise that state agencies had not received notice of the

18   discovery dispute; the *Ramos* case that we cite supports our

19   position in terms of issuing some kind of notice.

20   And I would say that the course of conduct also supports

21   that in the time -- in the last several weeks since we have

22   raised this issue, seven states have now given some form of

23   notice to their agencies.  We don't yet know the scope of that

24   notice, whether it covers the agencies -- we've identified who

25   it covers -- but they've given some form of notice.  And I

1    would flag a couple of points on that.

2        One is that there's no discerning principal as to which

3    states have done it and which haven't, which fits with this

4    broader point that there's no evidence before the Court that

5    any kind of a reasoned analysis has been done to determine

6    whether holds are appropriate in the states that have done them

7    but somehow not in the states that haven't.

8        Two, about half of the seven states that have given agency

9    holds have not imposed a hold within their own AG's office,

10    which, again, seems pretty nonsensical in terms of why they're

11    issuing notices or holds to agencies but not within their own

12    AG's offices.

13        But then three of those seven states, not one has come

14    forward before the Court with any kind of burden or other type

15    of argument, saying this was really, really tough to do.  And,

16    in fact, some of them have said that they've issued holds; some

17    of them suggested they've just sent out courtesy notices, which

18    there's no reason that every state AG could not do pretty --

19    pretty readily.

20        So those are the two issues before the Court.  We think

21    there's already a baked-in issue on this point in terms of the

22    lack of these holds until now that we'll have to sort out down

23    the road.  That's not before the Court right now.  But we do

24    have the chance as to -- going forward to mitigate this issue

25    with the Court's guidance, which is why we've presented this

**PROCEEDINGS**

```
1   issue to the Court, either to direct that holds be issued, or

2   at least to give guidance as to the Court's views as to the

3   AGs' obligations under the Federal Rules in this area.

4            THE COURT:  Okay.  Ms. O'Neill.

5            MS. O'NEILL:  Thank you.

6        Your Honor, as law enforcement agencies, the AGs take

7   evidence preservation obligations very seriously.  And I can

8   confirm that each state AG has -- at issue in this matter, has

9   independently determined that its current practices meet its

10  preservation obligations in this case.

11       And the reality is evidence preservation is what we do as

12  law enforcement agencies.  We're in the business of gathering

13  and preserving evidence that we obtain in investigations.  This

14  lawsuit is the result of such an investigation.  It's a civil

15  law enforcement action about Meta's conduct and Meta's

16  violations of the law.

17       The AGs are acting in their sovereign law enforcement

18  capacity as government law offices.  We are not percipient

19  witnesses.  The information that the AGs have about Meta's

20  misconduct comes from our investigation and our litigation

21  efforts.  And the AGs have procedures in place to preserve that

22  evidence that has been obtained in investigations and

23  litigation.

24       We have pointed in our brief to statutes, regulations,

25  policies, and procedures that mandate the retention of those
```

1  investigation and litigation files.  And these are the

2  documents that are relevant and core to this case.

3      Now, Meta is seeking an order from this Court, but it's

4  doing so in the abstract.  It's not in conjunction with any

5  particular discovery requests based on speculative and

6  hypothetical concerns.  It's pointed to no discovery requests

7  that the AGs have thus far been deficient in responding to.

8  It's essentially circumventing the normal process of responses

9  and objections to discovery requests and conferrals about any

10  disputes.

11      Now, litigation holds surely are a mechanism for parties

12  to meet their preservation obligations.  They're common, and

13  for many litigants in many cases, they're standard practice.

14  The cases that Meta has cited stand for that unsurprising

15  proposition.

16      But none of Meta's cases require a government law office

17  acting in a sovereign civil law enforcement capacity to issue a

18  litigation hold to its lawyers.  And, in fact, none of their

19  cases -- and, I guess, you know, I think my friend on the other

20  side mentioned that they couldn't find a case on point, and I

21  think that's actually an informative fact.  It's such an

22  unusual situation that there is no case law on this particular

23  issue.

24      Meta cites the *Colton* case, but there the EPA was a

25  regulatory agency with subject matter expertise in

1  environmental issues.  The evidence at issue was an analysis of

2  environmental harms by EPA contractors, and the court found

3  fault in not issuing a litigation hold to the people who had

4  percipient knowledge of that model in that environmental

5  analyses.  The AGs, by contrast, do not have percipient

6  knowledge of Meta's misconduct and, again, are acting as a

7  government law office.

8       Other cases, including the *Apple* case, dealt with private

9  parties, and there was also some indication that evidence had

10 been lost.

11      And again, Meta has not cited to any cases in which a

12 court actually ordered a party to issue a litigation hold.

13      Now, when an AG's office actions give rise to litigation,

14 when they're the subject matter of litigation, a litigation

15 hold may be appropriate.  For example, in California when the

16 Department of Justice sues to enforce a contract or is sued for

17 employment discrimination, then it issues a litigation hold to

18 persons with knowledge of the dispute; but it doesn't need to

19 do so when the AG is prosecuting violations of the law on

20 behalf of the People of the State of California.

21      The lawyers working on that case don't have percipient

22 knowledge of the dispute, but they do preserve the evidence

23 that is relevant to the violations as a matter of course.

24      Now, with respect to state agencies, Meta's request is

25 simply an attempt to relitigate the pending state agency

1   discovery issue.

2           **THE COURT:** We're not going to do that.

3           **MS. O'NEILL:** And I know there's been a lot of

4   briefing on that and I will not get into the details.

5           **THE COURT:** Okay.

6           **MS. O'NEILL:** I don't think anyone wants that at this

7   point.

8       But as we have explained before, very briefly, the AGs

9   have brought this action on their own behalf.  They don't

10  represent state agencies in this matter.  They're not seeking

11  damages or restitution on their behalf.  And they haven't

12  included state agencies or their personnel in their

13  investigation or litigation teams.

14      So because the AGs don't have legal and practical

15  possession, custody, or control over state agency documents, we

16  also don't have preservation obligations or abilities with

17  respect to those documents.

18      Now, Meta could have issued subpoenas or preservation

19  notices to the agencies at any time, but it has chosen not to.

20  It says that it's concerned about agencies possibly destroying

21  documents, but it's failed to take this step that's within its

22  power to address that concern.

23      Unlike in this case, Meta's cases analyze a state agency's

24  duty to preserve evidence when that agency is a party, and none

25  of those cases ordered an AG's office to issue a litigation

1    hold to a state agency -- or, again, to issue a litigation hold

2    at all.

3         In *HVI Cat Canyon*, the case was formally brought on behalf

4    of two California state agencies; they were the parties in

5    interest.  And in *Ramos*, the California Department of

6    Corrections and Rehabilitation was a defendant in the case.

7         Now, Meta has noted that some states have taken action to

8    address Meta's concerns about -- State AGs have taken actions

9    to address Meta's concerns about state agencies.  Meta advised

10   that it would not consider the issuance of a litigation hold or

11   other actions vis-a-vis state agencies to be a waiver of the

12   AGs' position regarding their possession, custody, or control

13   of agency documents.

14        So a handful of states who are authorized to issue

15   litigation holds to state agencies have decided to do so out of

16   courtesy to resolve the dispute as to them.  Other states have

17   notified agencies of the litigation and of the dispute

18   regarding their documents.

19        Some have not taken action, and for some this is in

20   recognition of the confusion and tension in state government

21   that could result from the AG sending a request to preserve

22   documents when the AG cannot actually order agencies to do so.

23        But, again, at bottom, Meta's request to the Court with

24   respect to state agencies should be rejected because the AGs

25   simply do not have possession, custody, or control over those

1  documents.

2       **MR. SCHMIDT:**  May I make two points briefly in reply?

3       The first -- thank you, Your Honor.

4       The first is that the states' view of what are important

5  documents for their investigation doesn't control.  As

6  litigants in federal court, they're bound by the rules that

7  what both parties can demonstrate to be relevant controls; and

8  their preservation is not focused on that, it's focused on what

9  they think is important.

10      And we already know from the extremely limited information

11 we've been given that there are gaps.  We know there's no rhyme

12 or reason to why some states have held and some states haven't.

13 There's no showing that it relates to different preservation

14 obligations within the states.  And there's no showing that the

15 states that are just wholesale refusing to hold in any manner

16 at all have done any analysis or have any authority to rely on

17 to say:  Here's how we're meeting our preservation obligations.

18      We've been given exactly two examples of those states

19 as -- of states' bases for saying "We don't need a hold because

20 of these requirements."  Those two examples we already know

21 from looking at our discovery requests to the states.  And

22 their responses as to what they're objecting but agreeing to

23 produce are not sufficient to cover relevant material that will

24 be produced in this case.

25      We know the same thing is true on the agency side and

1   we're not relitigating that issue; that issue is pending before

2   Your Honor.

3       While it's pending, they should be preserving.  And,

4   again, the fact that some states have done that and others

5   haven't, we don't hold that against them in terms of waiving

6   their objection to doing agency discovery.  I want to be very

7   clear on that.

8       We do think it illustrates the haphazard and

9   un-thought-out nature of what is happening here, and the fact

10  that there should be a floor that they comply with.  The fact

11  that they've done that with no burden assertion at all is

12  meaningful.  That's the first point.

13      The second point is quite simply that the states are not

14  excused from the Federal Rules because they say that they're

15  performing an investigatory or regulatory lawsuit.  The Federal

16  Rules apply fully in that setting.  They chose to file in

17  federal court.  There's not a special AG rule on discovery or

18  discovery obligations.  The *Colton* case speaks to that.  That

19  was a CERCLA case brought by the FDA -- brought by the EPA, I'm

20  sorry, where the Court was very clear that hold obligations

21  apply fully in that context.

22      And it's worth noting they've not disputed they're subject

23  to discovery.  They've not disputed they have preservation

24  obligations.  And they've not actually cited a single case that

25  says -- notwithstanding discovery obligations that they've now

1    conceded in terms of agreeing to produce documents,

2    preservation obligations they've conceded -- they're somehow

3    not subject to any kind of hold obligation.

4         And the positions they've taken in terms of the

5    conflicting positions they've taken speak to the lack of merit

6    in that position, as does the lack of any case supporting their

7    view when we have put cases before the Court that are contrary

8    to their view.

9         Thank you.

10        **MS. O'NEILL:**  Your Honor, may I briefly respond?

11        **THE COURT:**  Sure.

12        **MS. O'NEILL:**  Thank you.

13        Just taking the second point first, Your Honor, the state

14   AGs do not object to the Federal Rules applying to them or

15   take -- have any dispute with that.

16        Litigation holds are not always required to meet

17   preservation obligations, and the state AGs, as I mentioned

18   before, have determined that the procedures that they have in

19   place are sufficient to meet their preservation obligations.

20        Regarding the fact that state AGs may have taken different

21   positions or taken different actions, some state AGs, of

22   course, have issued litigation holds, some have not.

23        Each state AG is different, has different approaches, has

24   different structures, and has different policies and

25   procedures.  We are each separate parties that have distinct

1    aspects.

2       Some AGs have decided to issue litigation holds as part of

3    a belt-and-suspenders approach and some have not.

4       I'd also just note that Meta has not raised this dispute

5    as to particular RFPs or as to any alleged deficiencies in the

6    AGs' responses to any RFPs.  It could have done so, and if it

7    had, the Court would have the full picture in front of it,

8    including the AGs' objections to those RFPs.

9       The AGs have lodged objections to some RFPs and agreed to

10   produce in response to others.  If there are materials that we

11   haven't agreed to produce, and Meta believes that they should

12   be, or there are places that they believe, repositories that

13   they believe we should search and we have not agreed to, then

14   we can engage in conferrals and we can go through that process.

15      But that's not the dispute that Meta has raised here.

16   Instead, Meta has asked for relief that we think is unnecessary

17   and not appropriate.

18      **MR. SCHMIDT:**  May I just make one small factual point

19   on where the discovery stands?

20      I believe we've gotten a handful of documents -- 900 --

21   from the AGs.  They're at the very early stages of their

22   production, so we have no way right now to know the impact of

23   this.  I suspect we may be back before the Court once we do

24   know the impact of that.

25      But that's a different question than:  How do we prevent

1  this from compounding, as a problem, going forward where we do

2  know this will be a problem going forward?

3          **THE COURT:**  Okay.

4          **MS. O'NEILL:**  Your Honor, I just have to very briefly

5  dispute that.  Meta is able to bring disputes regarding

6  particular RFPs if they have a problem about the way that we

7  are searching for and the types of documents that we are

8  looking at.  And we are in the process of conferrals.  We have

9  had meet-and-confers.  We have exchanged correspondence.  But

10 we're waiting for correspondence and have been waiting for over

11 a month from Meta related to our position on how we're

12 conducting searches and the documents that we believe are

13 relevant and proportional to the needs of the case.

14         **MR. SCHMIDT:**  Without agreeing with the one-month

15 point, that is correct; we are conferring on discovery, and we

16 will bringing that to the Court.  That's separate than what

17 that issue is.

18         **THE COURT:**  I hope you're conferring so that you don't

19 need to bring it to the Court.

20         **MR. SCHMIDT:**  Yes, that is our goal, obviously.

21         **THE COURT:**  That's my goal.

22         **MR. SCHMIDT:**  Yes.

23         **THE COURT:**  That should be your goal as well.

24         **MR. SCHMIDT:**  It is our goal.

25         **THE COURT:**  Okay.

1          **MR. SCHMIDT:**  And we've been guided -- if I can just

2     say something on that, Your Honor.

3          We have been guided by Your Honor's direction on that and

4     have resolved a lot of issues on that basis -- and that's true

5     on the other side as well -- from conferring with plaintiffs

6     that they've been guided by that as well.

7          **THE COURT:**  I'm gratified by that.

8          Okay.  So there's no dispute here that the state AGs, as

9     litigants and parties, are fully bound by the Federal Rules of

10    Civil Procedure just like any other litigant.

11         So as in Judge Grewal's opinion in his *Apple/Samsung* case

12    on preservations, 881 F.Supp.2d 1132.  He said, you know (as

13    read):

14             "The common law imposes the obligation to

15         preserve evidence from the moment that litigation is

16         reasonably anticipated.  The duty to preserve

17         evidence also includes an obligation to identify,

18         locate, and maintain information that is relevant to

19         specific predictable and identifiable litigation.

20             "At the same time, it is generally recognized

21         that when a company or organization has a document

22         retention policy, it is obligated to suspend that

23         policy and implement a litigation hold to ensure the

24         preservation of relevant documents after the

25         preservation duty has been triggered."

1     So as I understand, as to the 20 states that have not --

2  it is 20, right? -- that have not issued any kind of litigation

3  hold?

4     **MS. O'NEILL:**  I actually have one update that I have

5  not updated Meta on, but it is 19; one additional state has

6  issued a litigation hold.

7     **THE COURT:**  Okay.  All right.

8     As to the 19 states that have not issued litigation holds

9  within the AG's office itself -- I'm not talking about the

10  agency issue right now -- I understand the state AGs to

11  represent to the Court that those 19 states have determined

12  internally that their existing obligations under either policy,

13  regulation, or statutory -- local statutes, in their views,

14  would satisfy their preservation obligations under the Federal

15  Rules.

16     That may or may not be true.  I don't need extra briefing

17  on that.

18     **MS. O'NEILL:**  Understood.

19     **THE COURT:**  I've heard no argument, and I don't think

20  there could be a credible argument, that issuing a litigation

21  hold is burdensome.  It's not -- it's just issuing a litigation

22  hold.  I mean, I don't want to sound like a broken record, I've

23  done it myself, it's not that hard; right?

24     And so if the state AGs are correct, that their current

25  obligations under local law, statute, regulation fully complies

1   with what a litigation hold would require, then issuing a

2   litigation hold is, at best, duplicative and not burdensome.

3   Okay?

4        If Meta and the defendants are correct that there's some

5   universe of documents that would somehow not be captured by

6   local statute, regulation, or policy -- and they cite as

7   examples their, I think it's really suspicion, that it could be

8   things like communications with school boards, lobbyists, and

9   advocacy organizations; documents related to proposed

10  litigation; they reference other document requests -- I don't

11  know whether those are covered by everybody's local statute,

12  regulation, or policies, but to the extent there are -- there

13  is some sub-universe of documents that would not be covered by

14  the local statute, regulation, or policies, then the issuance

15  of a litigation hold is not duplicative because it would pick

16  up those categories that are outside of whatever scope the

17  local law or statute requires; right?

18       And so in that case -- that case, issuing a litigation

19  hold is certainly advisable at this point, if there is -- if

20  there does exist some lack of overlap between the two.

21       So just on the issue of should a litigation hold be

22  issued, the answer is, yes.  I'm going to order the 19 states

23  that haven't issued one to issue litigation holds because,

24  again, if it's duplicative, then there's very little burden to

25  issuing them.  And if it's not duplicative, then it's picking

1  up documents that aren't subject to existing policy, statute,

2  or regulation.

3      **MS. O'NEILL:**  Your Honor, could I just be heard on the

4  burden point very briefly?

5      **THE COURT:**  You didn't make the argument in the brief,

6  so -- and like I said, even if you were to try to make a burden

7  argument at this point, I -- I mean, I guess -- I said it, I'll

8  say it again:  It's not that hard.  Okay?  Issuing a litigation

9  hold to the set of people identified -- who you identified is

10  just not that hard.

11      Okay.  So I'm not, at this point -- and nobody's arguing

12  this.  I'm not deciding when any particular State AG's office

13  preservation obligation attached, what the date of that was,

14  because we're talking about for these states that it hasn't

15  been done yet, so it doesn't really matter at this point when

16  that obligation attached.

17      And I'm certainly not deciding that there's even the hint

18  of any kind of spoliation or risk of spoliation here.  It may

19  be that the state AGs' obligations have fully preserved

20  everything, and Meta's suspicion that there's this, quote,

21  could be a problem or will be a problem going forward, is --

22  that's speculation at this point.  So I'm not -- I don't want

23  anybody to take the position that I -- by issuing this order,

24  I'm implying that I think or agree that there's a potential

25  spoliation problem.

PROCEEDINGS

 1          I will point out, in *United States v. Federal Resources*
 2     *Corporation*, 2012 Westlaw 1623408, the chief judge of that
 3     district ordered the Government to issue litigation holds --
 4     here at the Department of Justice -- litigation holds.  And he
 5     ordered them to issue them to the Department of Energy, the
 6     Department of the Interior, and the Department of Agriculture.
 7          And this was over the Government's objection, so there's
 8     that.
 9          I also note that in *FTC v. Lights of America*, 2012 Westlaw
10     695008, the Central District of California ordered that the
11     FTC -- and this was raised in the context of a spoliation
12     argument -- that the FTC did, at some point, have an obligation
13     to issue litigation holds to itself even though it was an
14     investigative agency, but held that simply starting an
15     investigation, in this particular case, did not trigger the
16     date for when the litigation hold should have been issued
17     because it did a much more detailed analysis of when was
18     litigation actually anticipated and reasonably anticipated, and
19     went through that.
20          So the fact that an investigation started in this case in
21     the *FTC/Lights of America* case, that was not enough to justify
22     or require that a litigation hold be issued.
23          Also, I think, ultimately, if I remember correctly, I
24     don't think that court found any spoliation.  All right?
25          So I'll tell you right this -- I'm not prejudging

1    anything.  I'm not a big fan of parties spending a lot of time

2    on spoliation arguments over things that are not material to

3    the case.  If it turned out somebody deleted some e-mails

4    having to do with, you know, setting up a lunch or something --

5    I don't want those kind of disputes.  I don't want you spending

6    your time and energy on disputes that are not germane to the

7    merits of the case.

8        Having said that, I mean, if -- I'm hoping that, you know,

9    Meta's suspicion that something went wrong here turns out not

10   to be well-founded, and once you take your discovery, you're

11   going to figure out that there's nothing here.

12       But I draw these cases to your attention to address the

13   parties' points that, A, there is precedent for courts ordering

14   investigative agencies to issue litigation holds to themselves

15   when they're parties themselves.  All right?

16       And also ordering, in this case, the Department of

17   Justice, the Civil Litigation Enforcement Agency to issue

18   litigation holds to other agencies of the U.S. Government.

19   Okay?

20       So I don't know how I found those and you didn't, given

21   the number -- amount of resources you all have compared to me.

22   But anyway, the Court found those.

23       So take those into account as you go forward in these

24   disputes.  You may want to do more legal research on your own.

25       But I think that -- that resolves the first big issue is:

**PROCEEDINGS**

1    Do the AGs have to issue litigation holds to themselves?

2         The answer, I think, is yes, as I said -- not I think, is

3    yes.

4         The agency issue, my expectation is the Court will be

5    issuing the order on state agency discovery -- I'm not going to

6    give an exact date, but in due course and hopefully shortly.

7    And the Court will issue a supplemental order after that

8    because I think everybody recognizes that that decision will

9    impact this decision.

10        I will -- I'm not going to order the State AGs to do this

11   because, again, the state agencies are currently not parties to

12   the case.  All right?  But as a courtesy, some of the state AGs

13   have given notice to the agencies of the pendency of the suit,

14   the discovery disputes here.  I certainly think that, as a

15   matter of caution, that's not a terrible thing to have done.

16        And, again, I don't -- I'm not requiring anybody to do

17   that, but for those state AGs that haven't at least just given

18   a courtesy notice to the agencies, since you know who they are,

19   I would think hard about whether or not it's advisable, just as

20   a matter of courtesy.

21        **MS. O'NEILL:**  Thank you, Your Honor.  Understood.

22   I have two just small points.

23        **THE COURT:**  Sure.

24        **MS. O'NEILL:**  I did just want to make, for the record,

25   related to a comment that my opposing counsel made early on

1   that it was undisputed that the State AGs had a preservation

2   obligation that began in 2021, I just -- kind of following on

3   Your Honor's comments that you're not issuing an order related

4   to when that preservation duty attached, that is not

5   undisputed, just for the record.

6       And then I also wanted to just clarify the scope of your

7   order and -- related to what the scope of the litigation holds

8   being ordered are.  My understanding would be that the State

9   AGs will determine who is likely to have relevant information

10  based on the law about preservation, but I just wanted to

11  clarify that that -- that is Your Honor's understanding as

12  well.

13      **THE COURT:**  Correct.  I fully expect the State AGs to

14  follow, I think, ample guidance in the law as to, you know, the

15  breadth of people who should be recipients of litigation holds.

16  And I assume you've got plenty of examples in, you know -- both

17  in the case law and within your own practices on how to do

18  that.

19      Yeah.  I'm not ordering anything unusual in that regard.

20  I expect the State AGs to do a reasonable, you know, competent

21  inquiry as to who should get the litigation holds and issue

22  them appropriately.

23      **MR. SCHMIDT:**  And, Your Honor, we're not -- we're not

24  asking for anything more than that.

25      The only thing we would ask for is to get the same

**PROCEEDINGS**

1  information regarding the new states that we got for the old

2  ones, which is just date and person.

3          THE COURT:  Any objection to --

4          MS. O'NEILL:  No objection.

5          THE COURT:  Okay.

6          MR. SCHMIDT:  Thank you, Your Honor.

7          THE COURT:  Good.  I think that resolves Docket 995.

8          MR. SCHMIDT:  I think it does, Your Honor.

9          THE COURT:  Okay.

10          MR. SCHMIDT:  Thank you.

11          THE COURT:  Okay.  On other ripe disputes, I don't --

12  well, I know that -- for the record, the one related to the

13  TikTok defendants and plaintiffs, the Court received an e-mail

14  dated July 8th, 2024, from counsel for TikTok and the SD/PI

15  plaintiffs reporting that the parties have reached agreement on

16  plaintiffs' request for production related to influencers,

17  RFPs 249 to 252.  So that resolves that one.

18      I just want to state that for the record because there was

19  an e-mail, which is not on file in the docket.

20      So thank you for that report, and thank you for working

21  out that issue.

22      I don't think there are any other ripe issues to discuss,

23  are there?

24          MR. RICE:  Your Honor, Rowley Rice from Munger,

25  Tolles & Olson for Snap.

1          There was one other ripe issue listed in the DMC for Snap,

2     but the parties have been meeting and conferring, and

3     anticipate that we're going to -- we're generally aligned on

4     the scope of the RFPs and took the H2 off calendar and are

5     continuing to meet and confer on search terms.

6          **THE COURT:**  Great.  I appreciate the work on that, and

7     certainly encourage you to keep working those things out.

8          **MR. WARREN:**  And, Your Honor, Previn Warren for the

9     personal injury/school district plaintiffs.

10         I also did just want to mention that the parties, I

11    believe, have or shortly will submit to chambers the updated

12    deposition chart that I believe is due.

13         **THE COURT:**  Great.  And I take it from the earlier

14    portion of the status report that scheduling depositions is

15    proceeding apace and there's no disputes to be raised with me

16    to consider at this point.

17         **MR. WARREN:**  Nothing at this point, Your Honor.

18         **THE COURT:**  Good.  I appreciate the cooperation on

19    getting those calendared.

20         Okay.  Any other issues, questions, people want to raise

21    with the Court at this time?

22         **MS. LANGNER:**  Good afternoon, Your Honor.  Bailey

23    Langner from King & Spalding for the TikTok defendants.

24         Your Honor, I just wanted to briefly update you on one

25    item from the unripe section related to school districts.  And

**PROCEEDINGS**

1    that's Section 3, related to the school district plaintiffs'

2    Rule 26 disclosures regarding computation of damages.

3           **THE COURT:**  What page of the --

4           **MS. LANGNER:**  That is page 13, Your Honor.

5           **THE COURT:**  13.  Okay.  Yup.  Okay.  I'm there.

6           **MS. LANGNER:**  The parties met and conferred.  They

7    conducted an H2 conference on July 8th related to this issue

8    with lead counsel.  And the plaintiffs continue to take the

9    position that their computation of damages are not required

10   until the expert discovery phase of litigation.  The parties

11   have reached an impasse on that issue and will be submitting

12   letter brief this coming Monday, July 15th.

13          **THE COURT:**  I was hoping you'd work that one out.

14   Okay.  We'll take that up in due course once I see the letter

15   brief.

16          **MS. LANGNER:**  Thank you, Your Honor.

17          **THE COURT:**  Any other reports or issues, Ms. O'Neill?

18          **MS. O'NEILL:**  Megan O'Neill for the AGs again.  Just

19   have a small matter related to the third set of RFPs for the

20   AGs.

21       The AGs and Meta have agreed to a seven-day extension of

22   the deadline for the AGs to serve their third set of RFPs,

23   subject to the Court's approval.  The Court had previously

24   ordered that to be due on July 15th, and we've agreed to move

25   that deadline to July 22nd.

1          THE COURT:  Is that correct?

2          MS. SIMONSEN:  That is correct with the --

3          THE COURT:  For the record, identify yourself.

4          MS. SIMONSEN:  Apologies.  Ashley Simonsen for the

5    Meta defendants.

6        That is correct.  The state AGs requested that extension.

7    We granted it subject to their agreement that we could have an

8    extra seven days for our responses and objections, which they

9    have granted.

10          MS. O'NEILL:  That's correct.

11          THE COURT:  Okay.  So ordered.

12          MS. O'NEILL:  Thank you.

13          MS. SIMONSEN:  Thank you.

14          THE COURT:  Any other issues to discuss at this point?

15          MS. SIMONSEN:  Nothing from defendants.  Thank you,

16    Your Honor.

17          THE COURT:  Okay.  We're adjourned until the next

18    hearing in this case.

19          THE CLERK:  We're off the record in this matter.

20    Court is in recess.

21              (Proceedings adjourned at 3:02 p.m.)

22                      ---o0o---

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


DATE:    Sunday, July 14, 2024




_____
     Ruth Levine Ekhaus, RMR, RDR, FCRR, CSR No. 12219
          Official Reporter, U.S. District Court