UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Actions | Case No. 22-md-03047-YGR   (PHK)<br><br>**DISCOVERY MANAGEMENT ORDER NO. 8 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF JULY 11, 2024**<br><br>Upcoming DMC Dates:<br>August 8, 2024, at 1:00 pm<br>September 12, 2024, at 2:00 pm<br>October 24, 2024, at 1:00 pm |

On July 11, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. Dkt. 988 (Discovery Management Conference Statement); Dkt. 1011 (Minute Order). At the DMC, the Court heard oral arguments on discovery issues identified as ripe for decision by the Parties. Dkts. 988, 995, 998, and 999. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the DMC (all of which are incorporated herein by reference).

## LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) delineates the scope of discovery in federal civil actions and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Information need not be admissible to be discoverable. *Id.* Relevancy for purposes of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In*

*re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial.") (alteration omitted).

While the scope of relevance is broad, discovery is not unlimited. *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries."). Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1). The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. In evaluating the proportionality of a discovery request, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the burden of establishing that its request satisfies the relevancy requirements under Rule 26(b)(1). *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012). The resisting party, in turn, has the burden to show that the discovery should not be allowed. *Id.* The resisting party must specifically explain the reasons why the request at issue is objectionable and may not rely on boilerplate, conclusory, or speculative arguments. *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied.").

//

//

# DISCUSSION

## I. FORENSIC IMAGING PROTOCOL

In the July 2, 2024, Discovery Management Conference Statement, Defendants Snap, TikTok, and YouTube aver that they served Requests for Productions ("RFPs") on the Bellwether Personal Injury ("PI") Plaintiffs seeking to "inspect the electronic devices used by a Bellwether PI Plaintiff during the Relevant Time Period to access any social media platform, or, alternatively, to obtain forensic images or clones of the devices, as well as all documents related to the plaintiffs' usage data." [Dkt. 988 at 9]. Defendants also aver that they served RFPs seeking "documents sufficient to show the unique identifying number for the devices a Bellwether PI Plaintiff used on a 'routine basis' to access Defendants Platforms[.]" *Id.* Defendants "provided a proposed protocol to govern the inspection of the Bellwether PI Plaintiffs' devices and usage data by a neutral third party." *Id.* The PI Plaintiffs object to a full turnover of the devices' forensic images and object to the protocol. *Id.*

The Discovery Management Conference Statement, and subsequent Joint Discovery Letter Brief, indicate that there are two issues related to these RFPs and the forensic imaging of the PI Plaintiffs' devices. Dkts. 988 and 999 (Joint Discovery Letter Brief on the forensic imaging issue). First, Defendants request the Court compel the PI Plaintiffs to produce a complete forensic image of the Bellwether PI Plaintiffs' devices and request the Court institute a forensic imagining protocol. *Id.* Second, the Parties seek clarity on which devices are at issue. *Id.*

As an initial administrative matter, the Parties filed an earlier, incomplete version of their Joint Discovery Letter Brief, dkt. 998, which they stipulated to withdraw during the DMC. Transcript of July 11, 2024, Oral Argument at 50, *In Re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, No. 4:22-MD-03047-YGR (N.D. Cal. July 11, 2024) (No. 1011) ("Hearing Transcript"). That earlier version of the Discovery Letter Brief was intended to be replaced by the final version filed at dkt. 999. *Id.* At the DMC, the Parties confirmed that the earlier version of the Discovery Letter Brief was incomplete and should be considered withdrawn and replaced by the final version, dkt. 999. *Id.* Accordingly, the Court **ORDERS** the earlier, incomplete version of the Joint Discovery Letter Brief **RESOLVED** as **MOOT**. [Dkt. 998].

The Court addresses each issue raised in the Joint Discovery Letter Brief, dkt. 999, and as further argued in the DMC Status Report and at the DMC, in turn.

### A. Whether the PI Plaintiffs must produce for inspection a complete forensic image of the Bellwether PI Plaintiffs' devices

The Court holds that PI Plaintiffs need not produce a complete forensic image of the Bellwether PI Plaintiffs' devices.

Defendants argue in their letter briefing that they have a right to "test Plaintiffs' claim that their alleged addiction to Defendants' platforms—which Plaintiffs admittedly accessed with their Devices—are a cause, or the sole cause, of their claimed injuries." *Id.* at 10–11. Defendants further that "[a] forensic image is the only way to obtain a comprehensive view of how Plaintiffs used their Devices, including the features and services on them, because data and data sources vary, depending on the device and operating system." *Id.* at 11. Defendants aver that their forensic imagining protocol and the Court's protective order would mitigate any potential privacy concerns. *Id.* at 12.

At oral argument, Defendants primarily reiterate their Joint Discovery Letter Brief arguments. Hearing Transcript at 7–23. The Defendants' primary argument, which expands upon the brief, relates to the interconnectedness of the databases and log files of the devices. *Id.* Specifically, Defendants argue that "looking at one database or one file within the forensic image inevitably leads to numerous others. These are essentially threads that make up a much larger tapestry. And it's not possible . . . to look at the individual threads and get a complete picture of the tapestry that is, in fact, the use of the device." *Id.* at 12.

In the Discovery Management Conference Statement, the PI Plaintiffs object to the production of the devices' full forensic image and the forensic image protocol because the PI Plaintiffs are "already performing forensic imaging on Plaintiffs' primary devices used to access social media and other of Plaintiffs' devices containing relevant information, and have relayed their willingness to provide certain, but not all, requested information and data on those devices." [Dkt. 988 at 10]. In the Joint Discovery Letter Brief, the PI Plaintiffs argue that the wholesale production of the PI Plaintiffs' devices is overbroad and not proportional to the needs of the case. [Dkt. 999 at 12]. At oral argument, the PI Plaintiffs reiterate the arguments set forth in their briefing. Hearing

4

Transcript at 24–28.

Here, the Court finds that production of the total forensic image of the PI Plaintiffs' devices is overbroad and not proportional to the needs of this case. The Court is particularly cautious about the strong privacy interests implicated by accessing individuals' cellphones. Hearing Transcript at 32–34 (citing *Riley v. California*, 573 U.S. 373 (2014); *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730 (9th Cir. 2024); *In re Apple Inc. Device Performance Litig.*, No. 5:18-MD-02827-EJD, 2019 WL 3973752 (N.D. Cal. Aug. 22, 2019); *In re Anthem, Inc. Data Breach Litig.*, No. 15-MD-02617 LHK (NC), 2016 WL 11505231 (N.D. Cal. Apr. 8, 2016); *Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2022 WL 6250989 (N.D. Cal. Aug. 19, 2022)). Modern cellphones contain vast amounts of personal information, including private communications, photos, location data, and other sensitive data. *Id.* Requiring the production of a complete forensic image could expose all this information, much of which is likely irrelevant to the issues in this litigation. *Jones v. Sunbelt Rentals, Inc.*, No. 22CV05954AMOPHK, 2023 WL 10691302, at *9 (N.D. Cal. Nov. 16, 2023). The blanket production of the devices' full forensic image does not meet the proportionality requirement. *Id.* Handover of the complete forensic images of the devices for free inspection by Defendants' counsel and experts imposes a significant privacy intrusion without a clear demonstration that such extensive discovery is necessary for resolving the central issues of the case; particularly, where the PI Plaintiffs are agreeing to provide data and files culled from the forensic images. Dkt. 999 at 13–14; Hearing Transcript at 25–27.

The Court appreciates Defendants' concern that Defendants are "looking at one database or one file within the forensic image [which] inevitably leads to numerous others." Hearing Transcript at 12. As such, the Court **ORDERS** the following:

As an initial matter, the PI Plaintiffs are **ORDERED** to produce a list of every model number of every relevant Bellwether PI Plaintiffs' device. Because each manufacturer and operating system can differ in terms of the types and naming conventions for system logs, data bases, and relevant app data, providing that list is proportional, relevant, and necessary for the Parties to meaningfully discuss the files and data sought from each device. Said list of devices must be correlated by individual Bellwether PI Plaintiff. Further, the PI Plaintiffs are **ORDERED** to provide a full list

5

and chart to the Defendants of all the applications which are currently on the relevant Bellwether PI Plaintiffs' devices. Because each app developer (and the operating system it interacts with) can differ in terms of the types and naming conventions for user logs, data bases, and relevant app data, providing that list is proportional, relevant, and necessary for the Parties to meaningfully discuss the files and data sought from each device.

With this information in hand, the Parties are **ORDERED** to meet and confer to determine which data sets are to be produced from the PI Plaintiffs devices which includes: application usage data, browser history data, location data, communication logs, media files, metadata, application settings, and other data files reasonably and in good faith identified by Defendants as relevant to how the device user used that device during the relevant time period. At the DMC and in their briefing, the PI Plaintiffs committed to producing these types of data files from the devices, in lieu of providing a complete forensic image. Dkt. 999 at 13–14; Hearing Transcript at 25–27. Indeed, at the DMC, the PI Plaintiffs conceded that it would likely be less costly and less burdensome to produce the total forensic images from the devices at issue, but confirmed that they accept the burdens of meeting and conferring in order to produce files and data culled from the devices (instead of handing over complete forensic images) in the manner consistent with this Order, including iterative productions as more information is exchanged. Hearing Transcript at 31–32.

To the extent appropriate during the meet and confers, the Parties are encouraged to have their respective technical consultants or experts participate to facilitate discussion as to the technical relevance of particular data files, logs, or other files, as well as technical feasibility issues relating to the logistics of production of such electronic information. The PI Plaintiffs are **ORDERED** to be forthcoming in producing and identifying the various relevant settings for each device and what databases are on the devices in order to allow for meaningful meet and confers and in order to avoid a full forensic turnover. Defendant are admonished not to overreach unreasonably in their request for data and files from the devices.

The Parties are also **ORDERED** to engage in the production of this forensic data in an iterative process. The Court **ORDERS** the Parties to work collaboratively on producing the electronic data, and the PI Plaintiffs are expected to produce said electronic files and data without

6

requiring brand-new sets of document requests in such a manner that is consistent with an iterative, cooperative, and collaborative process.

In addition to these data files, syslogs, and app settings (which are not readily searchable using keywords or search terms, and thus are more reasonably identified for production through a series of meet and confers), the Court recognizes that there may be other types of files on the devices which may be located using search terms. The PI Plaintiffs have offered to use an agreed set of search terms to search for and, if found, produce non-privileged, relevant electronically stored documents from the devices. Accordingly, the Parties are further **ORDERED** to discuss a reasonably targeted set of search terms for a search of ESI on the devices as part of the meet and confers. As with usual ESI productions, the search term discussions may require exchange of hit counts and proposed/counter-proposed modified search terms by both sides. After the search terms are finalized, the PI Plaintiffs are **ORDERED** to run the agreed upon search terms on the collected data files from the Bellwether PI Plaintiffs' devices and produce relevant, non-privileged ESI accordingly.

The Court **ORDERS** the PI Plaintiffs to produce the electronic information consistent with this Order from the relevant devices on a rolling basis.

The Court **ORDERS** the Parties to file a joint status report by July 19, 2024, in which the Parties shall report on the outcome of the meet and confers and the status of production of electronic files and data from the devices.

The Court finds that this approach strikes a fair balance between the need to protect the PI Plaintiffs' privacy (and concerns over lack of proportionality and burden) and the Defendants' legitimate interest in conducting relevant, proportional discovery which they contend is related to their defenses.

### B.   The devices which are subject to discovery

The second forensic imaging dispute relates to the scope of the at-issue devices. The PI Plaintiffs argue that Defendants' request for all "routine" devices is overbroad and unreasonable. [Dkt. 999 at 14]. In response to the Plaintiff Fact Sheet ("PFS"), the PI Plaintiffs checked pre-filled boxes to indicate what device they "used on a routine basis to access Defendants' platforms." *Id.*

However, the PI Plaintiffs argue that the PFS did not define the phrase "routine basis," and the available options to check included devices that are not in the PI Plaintiffs' possession, custody, or control (e.g., parents or guardian's phone, friend or sibling's phone). *Id.*

As a compromise, the PI Plaintiffs agreed to forensically image PI Plaintiffs' "primary device," which they defined as a device that: (1) is the Plaintiff's personal device; (2) is not anyone else's personal device or a family device; (3) has been the main device on which the Plaintiff accessed any social media platform during the relevant time period; and (4) is in the Plaintiff's possession, custody, or control. *Id.*

Defendants argue that this definition of "primary device" is too limiting. [Dkt. 999 at 10–12]. At the DMC, Plaintiffs argued that the alternative (all devices checked on their PFS) is overbroad because, for example, a Plaintiff may have used a school-furnished laptop or tablet to access the Defendants' platforms, but such a device is not within that Plaintiff's custody, possession, or control. Hearing Transcript at 43. Further, Plaintiffs clarified at the DMC that "primary device" is not limited to a single, current device, but would include any devices still in a Plaintiff's custody, possession, or control which that Plaintiff used in the past (during the relevant time frame for discovery) as a "primary device" at that time. Hearing Transcript at 24.

The Court finds that neither Parties' definition of the scope of relevant devices is appropriate. The PI Plaintiffs' definition is too limiting and appears to contemplate that a PI Plaintiff would have only a single "primary device" at any given time. While it is possible that a particular PI Plaintiff only used a single device to access Defendants' platforms during the relevant period, the Court recognizes that adolescents can and sometimes do use multiple devices on a regular basis. The Defendants' definition is overbroad because it apparently would include devices which are not within the Plaintiffs' custody, possession, or control.

Accordingly, the Court holds that the devices subject to this Order and from whose forensic images the data and files are to be produced, per above, comprise all devices (cellphones, tablets, laptops, computers, and the like) which are in each Bellwether PI Plaintiff's possession, custody, or control and that they have habitually, routinely, or regularly used during the relevant time period to access the Defendants' platforms. Plaintiffs' counsel are **ORDERED** to determine which devices

1   meet these criteria with their Bellwether Plaintiff clients. The Court has previously ruled on what
2   constitutes the relevant default time period for discovery. To the extent devices checked off on a
3   particular PFS do not meet these criteria, those devices are not included in the scope of this Order
4   (such as devices which are not currently within a Plaintiff's possession, custody, or control such as
5   a school-supplied laptop used years ago and returned to the school), and Plaintiffs are **ORDERED**
6   to make clear to Defendants whether or not they are omitting devices from a PFS from the list of
7   relevant devices pursuant to this Order. The Parties are expected and **ORDERED** to meet and
8   confer in good faith over any disputes concerning the list of relevant devices provided by Plaintiffs
9   to Defendants.

## II. STATE ATTORNEY GENERALS' PRESERVATION OBLIGATIONS

Meta seeks from the Court an order compelling the State Attorney Generals ("State AGs") to issue: (1) a litigation hold on the State AGs' Offices and (2) a litigation hold on the States' respective state agencies. [Dkt. 995 at 2]. For the following reasons, the Court **RESOLVES** the first issue in this order. The second issue shall be resolved in a later court order.

In the Joint Discovery Letter Brief, Meta argues the State AGs have neglected their duty to preserve relevant documents for litigation. *Id.* at 6. Meta argues that since the investigation began in November 2021, most State AGs have not issued litigation holds, with only a few doing so after this dispute arose. *Id.* Meta argues that despite its compliance with court orders to disclose their litigation hold recipients, the State AGs revealed that twenty-one of thirty-five states have not issued holds, and even among those that did, the holds were minimal and did not include state agency employees. *Id.*

The State AGs respond by arguing that Meta's request for court-mandated litigation holds is unnecessary and unfounded, as it fails to demonstrate any inadequacy in the standard preservation practices of each of the State AGs or identify any inaccessible relevant documents. *Id.* at 8.

The State AGs aver that existing preservation policies, mandated by local law, regulation, or policy, are sufficient to satisfy their preservation obligations in this matter. *Id.* at 8–9. For example, California requires electronic case files to be preserved for twenty-five years after closure, and Kentucky requires case files to be retained for eight years after closure. *Id.* at 9 (citing Cal.

9

Gov. Code § 12274; Ky. Rev. Stat. § 171.450). The State AGs argue these measures ensure compliance with the Federal Rules of Civil Procedure. *Id.* at 9.

Further, the State AGs emphasize that as civil law enforcement agencies, they have established procedures to preserve evidence consistently, including within their investigative files. *Id.* at 8. The State AGs argue that they are acting in a sovereign civil law enforcement capacity, not as traditional witnesses with direct involvement in the litigation as percipient witnesses. *Id.* at 9.

Finally, the State AGs argue that Meta's concerns are speculative and request the Court to reject Meta's demand to require litigation holds, which are allegedly an overreach into governmental preservation practices. *Id.* at 8.

At oral argument, the Parties both reiterated arguments within the Joint Discovery Letter Brief. Hearing Transcript at 52–64. Furthermore, the State AGs clarified that, without waiving their arguments that litigation holds are unnecessary, as of the date of the DMC, nineteen State AGs (out of the thirty-five involved in this case) have not issued litigation holds, or conversely that sixteen State AGs have done so. *Id.* at 68.

After considering the briefing and the oral argument, the Court holds that each State AG is **ORDERED** to issue a litigation hold to its own office with regard to documents and materials of that office within the scope of discovery in this case. The Court finds that issuing a litigation hold is not unduly burdensome. A litigation hold placed by a State AG to its own office would, at worst, be duplicative of the relied-upon by local laws, regulations, and/or policies, and, at best, prevent inadvertent destruction of documents not covered by local law, regulations, and/or policy cited by the State AGs. For example, Meta argues that their discovery requests to the State AGs seek documents such as communications with school districts, potential or proposed legislation, and other documents which fall outside a traditional "investigative" file and thus would fall outside the requirements of local law or policy regarding preservation of investigative files. [Dkt. 995 at 7–8]. The burden on a State AG of issuing a litigation hold to their own office outweighs the potential harm which could result from the potential loss or destruction of relevant documents that exist outside the scope of local laws, regulations, and/or policies that the State AGs follow regarding the preservation of documents. To the extent the litigation hold is entirely duplicative (in scope), then

the administrative burden of issuing a litigation hold is minor. To the extent the litigation hold is not duplicative, then such a hold is necessary and useful to preserve documents that might otherwise be at risk of being lost in future.

To the extent the State AGs argued that no courts have ordered civil enforcement government agencies, such as the State AGs here, to issue litigation holds to their own office, that argument is not well-taken. For example, in *FTC v. Lights of America*, the court found that the Federal Trade Commission (which was both a party and the civil enforcement agency prosecuting the case) was required to issue a litigation hold to its own office. *FTC v. Lights of Am. Inc.*, No. SACV 10-1333 JVS, 2012 WL 695008 (C.D. Cal. Jan. 20, 2012).

Accordingly, the Court **ORDERS** any State AG which has not issued a litigation hold to its office to do so for this case promptly. The State AGs are **ORDERED** to perform a reasonable and competent analysis as to who within their offices should receive the litigation hold. Further, at the DMC, the State AGs did not object to providing, and are **ORDERED** to provide, the date(s) of the litigation hold(s) and the persons who are the recipients of the hold(s) to the Defendants. Hearing Transcript at 74–75. By issuing this Order, the Court makes no implied finding that spoliation has or may have occurred.

In that regard, Meta's suspicion that spoliation may have occurred and the argument that the litigation holds "should" have been issued as soon as the commencement of the investigations by each State AG does not appear to be supported by law – the start of an investigation is not necessarily the date on which litigation is reasonably foreseeable, because it is common that investigations can result in no litigation being filed. *See Lights of America*, 2012 WL 695008 at *3–4. As stated at the DMC, the Court admonishes the Parties not to waste time and resources arguing over potential or merely suspected spoliation of immaterial documents.

The Court will issue a separate Order resolving the dispute as to whether the State AGs are required to issue litigation holds to other state agencies within their respective states. In that regard, the Court notes that the State AGs argument that no court has ordered a civil law enforcement agency to issue litigation holds to other agencies of the government is not well-founded. *See United States v. Fed. Res. Corp.*, No. 2:11-CV-00127-BLW, 2012 WL 1623408 (D. Idaho May 9, 2012) (ordering

11

1  U.S. Dept. of Justice to issue litigation holds to the U.S. Dept. of Agriculture, Dept. of the Interior, and Dept. of Energy).

### III. MISCELLANEOUS ISSUES

#### A. Stipulation on disputes associated with RFPs regarding influencers who use Defendant TikTok's platform

In the July 2, 2024, Discovery Management Conference Statement, the Parties identified that there was previously a dispute concerning RFPs relating to Influencers who used Defendant TikTok's platform. Dkt. 988; Hearing Transcript at 75. The Parties informed the Court through a joint email that the issue was resolved through the meet and confer process, and they confirmed at the DMC that they have withdrawn the dispute. *Id*. As such, the Court **RESOLVES** this issue as **MOOT** in light of the Parties' agreement with the Court's appreciation for their efforts.

#### B. Oral stipulation on extension of deadline for State AGs to serve third set of requests for production and corresponding extension for Meta's responses

At the DMC, Meta and the State Attorneys General indicated that they have mutually agreed to extend the deadline for the State Attorneys General to serve their Third Set of Requests for Production by seven days, moving the due date from July 15, 2024, to July 22, 2024, subject to the Court's approval. *Id.* at 77–78. The Parties have also agreed that Meta will have an additional seven days to respond to and object to these RFPs. *Id.*

Pursuant to the Parties' oral stipulation, as reflected at the DMC, **IT IS SO ORDERED**.

#### C. Oral stipulation on timing for remaining custodial file production

At the DMC, Meta reported that the Parties have successfully resolved their dispute regarding the timing of the remaining custodial file productions for Meta's anticipated deponents. *Id.* at 6. The Parties requested that the Court formalize their agreement in light of existing orders governing custodial file productions. *Id.* Plaintiffs did not object to this request at the DMC. *Id.*

Pursuant to the Parties' agreement, as reflected at the DMC, **IT IS SO ORDERED**. The Parties may submit a stipulation and proposed order if needed.

**Dated**: July 18, 2024

_____
PETER H. KANG
United States Magistrate Judge