UNITED STATES DISTRICT COURT    *ORIGINAL*

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable YVONNE GONZALEZ ROGERS, Judge

| | | |
|---|---|---|
| IN RE: SOCIAL MEDIA | ) | **Further Case Management/** |
| ADOLESCENT ADDICTION/ | ) | **Motions Hearing** |
| PERSONAL INJURY PRODUCTS | ) | |
| LIABILITY LITIGATION | ) | NO. C 22-03047 YGR |
| | ) | |
| | ) | |
| ALL ACTIONS | ) | Pages 1 - 68 |
| | ) | |
| _____ | ) | Oakland, California |
| | | Friday, July 12, 2024 |

### REPORTER'S TRANSCRIPT OF PROCEEDINGS

APPEARANCES:

For Plaintiffs:         Lieff, Cabraser, Heimann &
                        Bernstein
                        275 Battery Street, 30th Floor
                        San Francisco, California  94111
                  BY:   LEXI J. HAZAM, ATTORNEYS AT LAW

                        Lieff Cabraser Heimann & Bernstein LLP
                        780 Third Avenue, 48th Floor
                        New York, New York  10017-2024
                  BY:   KELLY K. MCNABB,
                        GABRIEL A. PANEK, ATTORNEYS AT LAW


            (Appearances continued next page)



Remotely Reported By:    Raynee H. Mercado, CSR No. 8258


     Proceedings reported by electronic/mechanical stenography;
transcript produced by computer-aided transcription.

## A P P E A R A N C E S (CONT'D.)

```
For Plaintiffs:        Motley Rice LLC
                       Motley Rice LLC
                       401 9th Street NW Suite 630
                       Washington, DC  20004
                 BY:   ABIGAIL BURMAN,
                       PREVIN WARREN, ATTORNEYS AT LAW

                       Motley Rice LLC
                       28 Bridgeside Boulevard
                       Mt. Pleasant, South Carolina  29464
                 BY:   JESSICA L. CARROLL, ATTORNEY AT LAW

                       Motley Rice LLC
                       One Corporate Center
                       20 Church St., 17th Floor
                       Hartford, CT 06103
                 BY:   MATHEW JASKINSKI, ATTORNEY AT LAW


                       Andrus Anderson LLP
                       155 Montgomery Street, Suite 900
                       San Francisco, California  94104
                 BY:   JENNIE LEE ANDERSON, ATTORNEY AT LAW

                       Beasley Allen Crow Methvin Portis &
                          Miles, P.C.
                       234 Commerce Street
                       Montgomery, Alabama  36103
                 BY:   JOSEPH G. VANZANDT, ATTORNEY AT LAW

                       Gibbs Law Group
                       1111 Broadway, Suite 2100
                       Oakland, California  94607
                 BY:   ANDREW MURA, ATTORNEY AT LAW

                       Kessler Topaz Meltzer Check LLP
                       280 King of Prussia Road
                       Radnor, Pennsylvania  19087
                 BY:   TYLER S. GRADEN, ATTORNEY AT LAW
```

### A P P E A R A N C E S (CONT'D.)

```
For Plaintiff of        Colorado Department of Law
Colorado:               1300 Broadway, 6th Floor
                        Denver, Colorado  80203
                 BY:    BETH OREM,
                        ASSISTANT ATTORNEY GENERAL


For Plaintiff           Office of the Kentucky Attorney
Commonwealth of          General
Kentucky:               Office of Consumer Protection
                        1024 Capital Drive, Suite 200
                        Frankfor, Kentucky  40601
                 BY:    DANIEL KEISER,
                        ASSISTANT ATTORNEY GENERAL

For Plaintiff People of California Department of Justice
the State of            455 Golden Gate Avenue, 11th Floor
California:             San Francisco, California 94102
                 BY:    MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL


For Plaintiff State of  New Jersey Division of Law
New Jersey:             Data Privacy & Cybersecurity Section
                        124 Halsey Street, 5th Floor
                        Neward, New Jersey  07101
                 BY:    VERNA PRADAXAY,
                        DEPUTY ATTORNEY GENERAL



For the Meta            Covington & Burling LLP
Defendants:             One City Center
                        850 Tenth Street, NW
                        Washington, DC  20001-4956
                 BY:    TIMOTHY C. HESTER,
                        PAUL SCHMIDT, ATTORNEYS AT LAW
```

# A P P E A R A N C E S (CONT'D.)

For the Meta            Covington & Burling LLP
Defendants:             1999 Avenue of the Stars, Suite 3500
                        Los Angeles, California  90067
                        ASHLEY SIMONSEN, ATTORNEY AT LAW


For Defendant Snap      Munger, Tolles & Olson
Inc.:                   560 Mission Street, 27th Floor
                        San Francisco, California  94105
                   BY:  JONATHAN H. BLAVIN, ATTORNEY AT LAW


For Defendant TikTok    King & Spalding LLP
Inc.; ByteDance, Inc.:  1180 Peachtree Street, N.E.
                        Suite 1600
                        Atlanta, Georgia  30309-3521
                   BY:  GEOFFREY M. DRAKE, ATTORNEY AT LAW

                        King & Spalding LLP
                        50 California Street, Suite 3300
                        San Francisco, California  94111
                   BY:  BAILEY J. LANGNER, ATTORNEY AT LAW

                        Faegre Drinker Biddle & Reath LLP
                        300 North Meridian Street, Suite 2500
                        Indianapolis, Indiana  46204
                   BY:  ANDREA R. PIERSON, ATTORNEY AT LAW


For Defendant Alphabet  Wilson, Sonsini, Goodrich & Rosati
Inc.; Google, LLC;      One Market Plaza
YouTube, Inc.:          Spear Tower, Suite 3300
                        San Francisco, California  94105
                   BY:  LAUREN GALLO WHITE, ATTORNEY AT LAW

                        Morgan, Lewis & Bockius LLP
                        600 Brickell Avenue, Suite 1600
                        Miami, Florida  33131-3075
                   BY:  BRIAN M. ERCOLE, ATTORNEY AT LAW


--O0O--

```
1    Friday, July 12, 2024                              8:29 a.m.

2                         P R O C E E D I N G S

3                         (Zoom Webinar)

4                              --o0o--

5

6         THE CLERK:  Good morning, everyone.

7         These proceedings are being court-reported by this court.

8    Any other recording of this proceeding, either by video,

9    audio, including screenshots or other recording of the

10   hearing, is strictly prohibited.

11        Your Honor, now calling the civil matter

12   22-MD-3014-47-YGR, In Re Social Media Adolescent Addiction

13   Personal Injury Products Liability Litigation.

14        Parties' appearances will be included in today's sign-in

15   sheets.

16        Thank you.

17        THE COURT:  Okay.  Good morning.

18        So as is our custom, we will have your appearances on the

19   docket.  Just make sure that you identify yourself when you

20   come to the microphone.

21        What I have on our agenda, and you can let me know if

22   there is more to add, the motion to dismiss the Zuckerberg

23   complaint, the motions with respect to the plaintiff fact

24   sheets and changes, I believe there's six.  There were some

25   updates in your case management statement.
```

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*

```
1        I don't have any update for you on the inter-circuit
2    assignment, but we are making some progress.  So hopefully by
3    the next time, I'll have -- I'll have more of an update or
4    more of a complete update for you.
5        And then the protocol that you referenced.
6        Are there other things that we need to discuss?
7            MR. WARREN:  Good morning, Your Honor.  Previn Warren
8    for the personal injury and school district plaintiffs.
9        Just a point of clarification.  When you mentioned the
10   plaintiffs' fact sheet, I believe what you meant -- but I
11   would appreciate your clarification -- was the motion to amend
12   to add YouTube and certain Beasley Allen cases.
13           THE COURT:  Right.
14           MR. WARREN:  Okay.  Yes.  We do have that on the
15   agenda as well.
16       There's nothing else on our list except a brief update
17   that we can provide the Court on count 18 which was addressed
18   at the last hearing.  And we can deal with that at the end.
19           THE COURT:  Okay.
20           MR. HESTER:  Your Honor, Timothy Hester on behalf of
21   Meta.
22       There is a small housekeeping question on the scheduling
23   for the motion to dismiss on the Florida complaint that we
24   wanted to discuss with the Court at some point.  We can do
25   that at the end, too.
```

```
 1              THE COURT:  Okay.
 2         All right.  Let's go ahead and do some of the case
 3    management stuff first before we move to the Zuckerberg
 4    complaint.
 5         Let's start with these plaintiff fact sheets and whether
 6    they should be amended.
 7              MR. VAN ZANDT:  Good morning, Your Honor.  Joseph
 8    Van Zandt for the plaintiffs.
 9              MR. ERCOLE:  Good morning, Your Honor.  Brian Ercole
10    for the YouTube and Google defendants.
11              THE COURT:  Okay.  Hold on.
12         So that's E-R-C-O-L-E?
13              MR. ERCOLE:  That's correct, Your Honor.
14              THE COURT:  So I put these, at least for purposes of
15    analysis, in two different buckets.  One is the bucket of
16    those three that are part of the bellwether trials.  And the
17    second are the others, I believe there are three, that are
18    not.  I think the arguments are slightly different for each.
19         So I'd like a response from the plaintiff to the
20    defendants' argument that by doing this, not only late, but by
21    doing this, what you have done is impact the balance that we
22    were trying to achieve with these bellwether cases.  It seems
23    entirely inappropriate.
24              MR. VAN ZANDT:  Well, Your Honor, there's certainly
25    no intent to try to impact the balance of the bellwether
```

```
 1        selection.
 2                THE COURT:  But you do understand that it is
 3        impacting it?
 4                MR. VAN ZANDT:  Certainly it -- it may change -- it
 5        would change the --
 6                THE COURT:  Right.
 7                MR. VAN ZANDT:  -- the parties that are in certain
 8        bellwether cases.  But the process that has led to --
 9                THE COURT:  No.  It not only changes the parties that
10        were involved, but it changes the balance of the cases that
11        are getting tried to give information about the relative
12        culpability of the defendants, if any.
13                MR. VAN ZANDT:  Yes, Your Honor.  It certainly would
14        change that to an extent.
15            But it's our position that these three plaintiffs that are
16        bellwether plaintiffs are not -- their usage of YouTube cannot
17        be a surprise to YouTube.  They were plaintiffs who submitted
18        these forms.  YouTube, as a defendant, as a company, they know
19        who uses their platform and how much they use these platforms.
20            This is a very complicated process working with young
21        adult and minor plaintiffs who are suffering from -- from
22        severe mental health issues, working through their history of
23        usage over time.
24            And the more we meet with these clients, the more we
25        learn.  And we've honestly been surprised to learn how much
```

1    YouTube usage is at play that we -- that we otherwise did not

2    previously discover with our clients.  It is a process sitting

3    down and investigating this thoroughly with our clients.  And

4    so we're adding -- we're adding this in under good faith as we

5    learn additional information.

6        **THE COURT:**  I'm not suggesting that it's not good

7    faith.  What I am suggesting is that it throws off the balance

8    that we were trying to achieve for bellwethers.

9        Again, you say that this is a complicated process.  I had

10    Ms. Hazam up at the podium saying, "Hey, Judge, we can do all

11    of this under expedited conditions."  And now what you're

12    saying is that, no, actually you don't have everything you

13    need and you needed more time.

14        **MR. VAN ZANDT:**  I'm certainly not undermining

15    anything Ms. Hazam has said regarding the schedule and what

16    can -- what can be done here.  As soon as additional

17    information was discovered, we sought to amend the complaints.

18        As -- and so that's -- that's simply all we're trying to

19    do here, is not -- not hurt the balance of the bellwether

20    program, but simply representing our clients and at --

21    amending their complaint once we've discovered new information

22    that they have provided, that defendants have presumably known

23    all along in terms of which plaintiffs used their platforms

24    and how long they've used their platforms.

25        **THE COURT:**  Response.  Mr. --

```
1          MR. ERCOLE:  Your Honor, you hit the nail on the head
2     with --
3          THE COURT:  I did for three, not for three others,
4     and yet you're still objecting on three of them for which
5     there is no impact on the bellwethers.
6          MR. ERCOLE:  Your Honor, so if I may, I -- just to
7     correct the record, I think there are four additional cases
8     where we asserted objections.  So I'm happy to focuses on
9     the --
10         THE COURT:  You should focus on those because those
11    are the ones with which you have issues.
12         MR. ERCOLE:  Sure.  So, Your Honor, with respect to
13    two of those additional cases, they -- and that would be the
14    Coppleton case and the Murden case, Your Honor -- in those
15    particular cases, the plaintiff there submitted a YouTube
16    appendix saying no harm from any of the features at issue.
17       So with respect to those particular cases, we've asserted
18    a futility -- those two cases we've asserted a futility
19    argument in that --
20         THE COURT:  It doesn't persuade.  These are young
21    people that the lawyers are meeting with them.  You can
22    cross-examine them on it.
23       So denied.
24         MR. ERCOLE:  Okay.
25       So just for the record, Your Honor, the -- the plaintiffs
```

```
 1      themselves didn't even, on the futility argument, didn't even
 2      respond to that argument in our briefing.
 3          And -- and just -- just to make the point, like injury and
 4      harm is a requirement for each particular claim in this case
 5      and we have an under-oath statement from the plaintiff
 6      submitted after discussion with their counsel saying I haven't
 7      been harmed by these features --
 8              THE COURT:  That was in the first statement, right?
 9          MR. ERCOLE:  It was in -- no.  It was in the most
10      recent one.  There's an appendix that they submitted.  And
11      that remains the only appendix they've submitted as to
12      YouTube.
13              THE COURT:  Okay.  A response on those two.
14          MR. VAN ZANDT:  Your Honor, certainly if there's an
15      under-oath statement, I'm sure defendants can and will
16      cross-examine plaintiffs on --
17              THE COURT:  That's not what he's saying.  He's saying
18      that your clients, in the most recent one, in the most recent
19      fact statements have said they are not harmed.  So how can you
20      assert a claim if they're not harmed?
21          MR. VAN ZANDT:  Well, Your Honor, our clients are --
22              THE COURT:  How can you assert --
23          MR. VAN ZANDT:  -- providing factual information
24      about the usage of the platform.  They are -- they are not
25      experts who can claim -- tie causation as to any particular
```

1    platform, any particular features.  That is something that --

2    that clients may not be able to do.

3        But plaintiffs are alleging YouTube usage -- significant

4    YouTube usage in the amendments that we're seeking to have.

5    And, again, there's probably no one that knows that better

6    than YouTube itself as to which plaintiffs use their platforms

7    and how much they use their platforms.

8            THE COURT:  They're not under an obligation to go and

9    do your research.  They're not.

10           MR. VAN ZANDT:  Right.  And as soon as we have found

11   out this additional information from our clients, we have

12   sought accordingly to amend the fact sheet and to amend the

13   complaint.

14           THE COURT:  It says -- I'm looking at one of these

15   for Coppleton.  "Do you contend that the feature contributed

16   to your injuries?"  And they say, "No."

17       So how are you going to put someone on the stand claiming

18   injury when they're saying that there is no injury?

19           MR. VAN ZANDT:  Your Honor, the plaintiff is not

20   saying there is no injury.  The plaintiff --

21           THE COURT:  "Do you contend that this feature

22   contributed to your injuries?"  The answer is "No."

23           MR. VAN ZANDT:  Right.  And what I'm saying is that

24   plaintiffs are not always in the best position to make a

25   causation statement as to which particular design features

 1    contributed to their injuries.  These are answers by lay

 2    witnesses.  They're alleging injury.  They're alleging YouTube

 3    usage.  But whether or not each particular --

 4        **THE COURT:**  -- cannot opine without a foundation.

 5    You can't just put an expert on the stand to make generic

 6    statements.

 7        Every single one of these boxes, you have "No."  The

 8    person has identified -- has said "No."

 9        **MR. VAN ZANDT:**  Your Honor, respectfully we don't

10    have "No."  Our client has "No."  An expert can take the

11    harms, the injuries that the plaintiffs have in medical

12    records, analyze the amount of YouTube usage that they've

13    had -- there's going to be hard data about the extent and the

14    severity of their usage of YouTube -- and draw conclusions as

15    to the harm that that could have caused the plaintiff.

16        Again, the plaintiff is not in the best position always to

17    identify which features may or may not have caused harm to

18    them.

19        And it's a pretty rigid response.  It's "yes" or "no."

20    And, again, we leave it up for the plaintiffs to answer these

21    questions the best that they can.

22        And that is -- if that is a concern for YouTube, that's

23    something that can be ferreted out through discovery, but it

24    is -- it would not be -- should not be a basis to deny

25    amendment at this stage of a case, especially for a case

```
 1      that's not in the bellwether pool.
 2              THE COURT:  So with respect to Coppleton, it also
 3      says "Average minutes of watching YouTube, zero."
 4              MR. VAN ZANDT:  Again, Your Honor, I am not sure if
 5      that is the most updated version of fact sheet.
 6          So again --
 7              THE COURT:  Well, that's the one you provided --
 8              MR. VAN ZANDT:  Sure.
 9              THE COURT:  -- to me.  So I don't understand how it
10      is -- why it is that Coppleton wants to amend if -- if they
11      haven't -- and assuming that you can pass the -- the first
12      issue on injury, they're not even attempting to allege any use
13      of YouTube or watching videos.
14              MR. VAN ZANDT:  Right.
15              THE COURT:  So why are you suing them?
16              MR. VAN ZANDT:  It is -- it's our understanding that
17      there -- that there is YouTube usage there, and that would be
18      the reason that we would be amending -- I can't answer on the
19      spot exactly why the fact sheet says that and something will
20      have to --
21              THE COURT:  Maybe you should go back to the desk,
22      figure it out, and we'll talk about it later.
23              MR. ERCOLE:  Your -- Your Honor --
24              THE COURT:  In general --
25              MR. ERCOLE:  I apologize, Your Honor.  I didn't mean
```

```
 1       to cut you off.
 2            THE COURT:  -- I'm not letting you change the
 3       bellwethers.  That is, you can -- if you have a basis for
 4       suing them, then I'm going to allow you to have a separate
 5       complaint against them and you join the general pool like
 6       everybody else.
 7            But that will not be part of the bellwether trial.  I will
 8       not allow you to upset the balance that we have tried to
 9       achieve through this process.  So that's one.  So the
10       bellwether landscape does not change.
11            With respect to, you know, amendments to the complaints,
12       in general, I'm going to let them amend.  I have -- within the
13       last 30 days, I've had another 30 lawsuits, approximately,
14       filed.
15            So the fact that they're filing them now or changing --
16       it -- there is no harm, there is no prejudice, they keep
17       rolling in.
18            Those claims will be in the same position as all of the
19       others, and there is no prejudice to the defendants.
20            Understand?
21            MR. ERCOLE:  Yes, Your Honor.  And with respect to
22       these, just for clarification, Your Honor, we did -- there
23       were 15 or so requests to amend for many, I think there were
24       maybe eight or -- or nine we didn't oppose.  These were the
25       ones that we focused on because we thought there was
```

```
 1    particular prejudice or there was a futility argument.
 2         So we did try to be selective, but we certainly understand
 3    Your Honor's guidance on this issue.
 4              THE COURT:  Rule 15 is very liberal.  And I
 5    understand that plaintiffs, especially young people, are very
 6    flighty.  And the more -- do you have children?
 7              MR. ERCOLE:  I -- I do not.  I live in Miami, Your
 8    Honor.  I have a dog so that does not count but --
 9              THE COURT:  Doesn't count.  Do you have any nephews,
10    nieces?  Do you know any young people?
11              MR. ERCOLE:  I do, Your Honor, yes.
12              THE COURT:  Okay.  Then you know that they're not
13    always reliable and it takes time and effort to get to the
14    bottom of things.  So at least that's my perspective about
15    young people, having dealt with many.
16         So I'm going to allow -- I have a very liberal view on
17    Rule 15, and I'm going to allow it.
18         But you have a Rule 11 obligation, and I don't understand
19    how you, under Rule 11, how you can be asking to amend things
20    where there is apparently no data to support the claim against
21    the defendants.
22              MR. VAN ZANDT:  I understand that concern, Your
23    Honor, and appreciate your patience.  And I will -- I will go
24    back and get that figured out right now.  And if you would
25    like to -- if you're able to circle back to that, I'll be able
```

1    to provide an answer to you.

2              **THE COURT:** Well, if the two of you need to leave the

3    courtroom and figure it out, then that's fine with me.

4         All right.  Let's move to the next issue.

5         Since we're talking about plaintiffs, why don't we go

6    ahead and look at the protocol that you all want to put in

7    place for plaintiffs who are not responding to their lawyers.

8              **MS. McNABB:** Good morning, Your Honor.  Kelly McNabb,

9    Lieff Cabraser, for the personal injury plaintiffs.

10             **MR. DRAKE:** Good morning.  Geoffrey Drake, King &

11   Spalding, for the TikTok defendants.

12             **THE COURT:** Okay.  So Drake and McNabb?

13             **MS. McNABB:** Correct, Your Honor.

14             **MR. DRAKE:** Yes.

15             **THE COURT:** And that's two B's, Raynee.

16             **MS. McNABB:** Correct.  M-C- capital N-A-B-B.

17             **THE COURT:** Okay.  So the protocol that you've

18   proposed, and this is at Docket 987, pages 6, 7, and 8, in

19   general I -- I think it's fine.

20        I'm assuming that you're not only going to mail the

21   notice, but you'll email the notice as well.

22             **MS. McNABB:** Correct, Your Honor.

23             **THE COURT:** Let me just say to the defendants, I

24   frequently use this rule for pro se plaintiffs who don't

25   prosecute, who file lawsuits, then don't get them served, who

```
 1    don't respond.  So got a template order, I give them time to
 2    respond, and then I dismiss without prejudice.
 3        The likelihood that I would dismiss with prejudice for a
 4    failure to prosecute is low to zero.
 5              MR. DRAKE:  Understood, Your Honor.
 6              THE COURT:  So I actually do not want motions.
 7              MR. DRAKE:  Understood.
 8              THE COURT:  Okay?  Anything else?
 9              MS. McNABB:  The only outstanding issue, Your Honor,
10    is in the Levin matter.  It's case number 22-CV-06263.
11    Counsel filed their motion to withdraw on May 16th.  And at
12    the last status conference, we -- you held that in abeyance
13    until we worked out this protocol.
14              THE COURT:  Right.
15              MS. McNABB:  So I think at this point, it's at the
16    number two part of the protocol which is the order to show
17    cause.
18              THE COURT:  Okay.  And -- and did -- I don't think
19    you provided me a form.
20              MS. McNABB:  We did not.  So what I would propose is
21    we put this proposed protocol into a stipulated proposed
22    order.  And with that, we can include a proposed order to show
23    cause that Your Honor can use in these proceedings.
24              THE COURT:  That'd be great.  Thank you.
25        Okay?
```

```
 1            MR. DRAKE:  That sounds good.

 2            THE COURT:  Thank you.

 3            MS. McNABB:  Thank you, Your Honor.

 4            THE COURT:  All right.

 5       So, Mr. Hester, you wanted to talk about a Florida issue?

 6            MR. HESTER:  Yes, Your Honor.  And I know the Court

 7  is very busy so I regret troubling you with this scheduling

 8  question.  It may be resolved by the Court's decision on the

 9  next -- on the September CMC.  I wasn't sure what the Court's

10  plan was for that.

11            THE COURT:  My plan was to give you some more dates.

12  But we're not there yet.

13            MR. HESTER:  All right.  So -- so, Your Honor, we'd

14  be happy to -- to aim for that September CMC if that works for

15  the Court.  Or I could also give the Court these other dates

16  that were available, but I know you have a lot going on so....

17            THE COURT:  Yeah.  So what I had planned on as we

18  move into the fall is -- and I'm just bringing up my calendar,

19  hold on a minute -- probably another CMC September 13th.

20            MR. HESTER:  That would resolve the issue entirely,

21  Your Honor.  If we could argue it then, that would work very

22  well for us.

23            THE COURT:  Why don't you all -- does September 13th

24  work for everybody?  It's about a month after our August.

25            MS. OREM:  Your Honor, Beth Orem for the state AG's.
```

```
 1    September 13th works for the Florida AG's.

 2              THE COURT:  Okay.

 3         And that is O-R-E-M?

 4              MS. OREM:  Yes.

 5              THE COURT:  Okay.  So we'll hear argument on that

 6    September 13th.

 7              MR. HESTER:  Thank you, Your Honor.  I appreciate

 8    that very much.

 9              THE COURT:  Sure.

10              MS. OREM:  Thank you.

11              THE COURT:  Okay.  Apparently I have a pretrial

12    conference in a criminal matter that day, but I can move that

13    pretrial -- we can move that to the afternoon, Mr. Cuenco.

14              THE CLERK:  Yes, Your Honor.

15              THE COURT:  And we'll take this one in the morning.

16    The lawyers in the criminal matter are local.  That way you

17    can catch your planes.

18         Okay.  And then count 18?

19              MR. PANEK:  Good morning.  Gabriel Panek of Lief

20    Cabraser for the personal injury plaintiffs.

21              MS. LANGNER:  Good morning, Your Honor.  Bailey

22    Langner from King & Spalding for the TikTok defendants.

23              THE COURT:  Okay.  Hold on.  Langner, L-A-N-G-N-E-R?

24              MS. LANGNER:  Yes.

25         And apologies, Your Honor.  I was not originally scheduled
```

1  to appear today.  We learned from plaintiffs this morning that

2  they would be addressing this issue, and luckily I live very

3  close by and was able to make it here.

4       **THE COURT:**  That's fine.  Okay.

5    And your name again.

6       **MR. PANEK:**  Gabriel Panek, P-A-N-E-K.

7       **THE COURT:**  Got it.  Thank you.

8       **MR. PANEK:**  Thank you, Your Honor.

9       **THE COURT:**  Okay.  So what's the issue?

10       **MR. PANEK:**  Your Honor, at the last case management

11  conference, plaintiffs agreed to review certain states'

12  defendants identified in their motion to dismiss where, under

13  count 18, loss of consortium damages might not be available

14  for filial consortium.

15    We went back and we did that and we have identified

16  24 states plus the District of Columbia that defendants raised

17  where a standalone claim seeking damages for loss of

18  consortium is not viable.

19    Where that leaves us is that plaintiffs would propose to

20  stipulate on the record.  We have sent a stipulation to this

21  effect to defendants, who have opposed it thus far, to

22  stipulate on the record that plaintiffs in these

23  25 jurisdictions cannot pursue filial loss of consortium

24  damages.

25    The disconnect, I think, comes from the fact that count 18

1    often is not limited to loss of consortium damages.  It also

2    includes requests for medical expenses and loss of services.

3        And we want to ensure that plaintiffs in those states are

4    still able to pursue claims for those damages which defendants

5    have not contended are not viable, while ensuring that the

6    issue at the last status conference is resolved.

7        So we would propose we can stipulate on the record, we

8    could submit a written stipulation, or any other way that

9    Your Honor thinks would be best to resolve that.

10            **THE COURT:**  All right.  A response.

11            **MS. LANGNER:**  Yes.  Thank you, Your Honor.

12        With respect to Mr. Panek, they are -- they are proposing

13    a stipulation that doesn't make any sense in light of the

14    legal viability of these claims.

15        So at the June 21st hearing on defendants' nonpriority

16    motion to dismiss, defendants argued that any loss of

17    consortium claims brought in the 25 states and the District of

18    Columbia must be dismissed because those jurisdictions do not

19    recognize standalone loss of consortium claims brought by

20    parents or other more attenuated persons.

21        Plaintiffs pleaded their loss of consortium claim as a

22    separate count in their master complaint.  They, at the

23    hearing and in their briefing, did not seriously dispute these

24    points, and as Mr. Panek said, agreed to take a second look at

25    agreeing to dismiss the claims briefed by defendants.

1    We -- we were surprised, Your Honor, when we received

2    their stipulation in which they concede that standalone loss

3    of consortium claims are not permitted in the states briefed

4    by defendants with the exception of Connecticut, and they

5    state that they will not seek loss of consortium damages, but

6    they still seek to maintain their loss of consortium claims to

7    seek other forms of damages.

8    That position does not make any sense.  Loss of consortium

9    claims are not permitted in these states regardless of the

10   types of damages sought.  A claim which does not exist cannot

11   be the basis for any type of damages.

12   So if the plaintiffs will not dismiss these claims

13   voluntarily, we request that the Court grant defendants'

14   motion to dismiss as to count 18.

15   **THE COURT:**  Yeah, I don't understand how you can just

16   think that you can have floating damages unconnected to an

17   actual cause of action.  If these states have said you cannot

18   state this cause of action, then you cannot state that cause

19   of action, period.

20   If you want to attach those damages to some other claim

21   that is viable that states have said you can acquire those

22   kinds of damages if successful, then you can do that.  You

23   can't have damages that are floating out there unattached to

24   an unviable claim.

25   **MR. PANEK:**  What I would say, Your Honor, is that in

1    certain states, and this is sort of just a reality of the

2    pleading, is that count 18 is an attempt to join many states

3    which have different approaches to how a plaintiff -- which

4    may have different approaches to how a plaintiff can recover

5    loss of consortium, medical expenses, and loss of services

6    damages.

7         In some states, plaintiffs do, are able to, or must bring

8    a standalone claim for medical expenses, a parent seeking

9    medical expenses on behalf of their child.  The approach

10   varies by state, but in some states that is brought as a

11   standalone claim, it's not a derivative claim, it's a primary

12   claim by the parent to recover the medical expenses they paid

13   on behalf of the child.

14        **THE COURT:**  Well, then that's what you have to bring.

15   You can't bring it -- if you have to bring a claim for medical

16   expenses, then that's what you have to do.

17        **MR. PANEK:**  What I would -- and this is to respond to

18   one of the points that Ms. Langner raised, which is that

19   our -- again one of the disconnects here is that we believe

20   that defendants are focused excessively on the label of the

21   claim.

22        Now there's a lot of case law that says it's not what the

23   claim is called.  And here it is called count 18, loss of

24   consortium and society.  But it's not the label that controls.

25   It's what the relief sought is.

1    And the medical expenses, it's a standalone paragraph,

2    paragraph 1090, that doesn't say this is a loss of consortium

3    claim and we are seeking medical expenses to redress that.

4    Indeed we pointed that out on page 19 of our opposition

5    brief.  So defendants are wrong that we haven't contested

6    that.

7    But regardless, we want to make sure that our clients are

8    not prejudiced from bringing forms of relief that nobody has

9    said they aren't entitled to.

10    If Your Honor thinks it would be better to amend the

11    master complaint to make that clear, we would be happy to.  I

12    don't know if there would be logistical issues that would

13    arise out of that with respect to the PFS.  But we're, of

14    course, willing to work those through if that's the path Your

15    Honor would prefer.

16    **THE COURT:**  The path I would prefer is the path that

17    is consistent with the law.  And the path you're trying to

18    take is not consistent with the law in 24 states plus D.C.

19    **MR. PANEK:**  I -- one example I would give, though, is

20    that there's a case out of the New York -- we've cited it to

21    the defendants.  It's called the *George* case, it's from the

22    Second Department of the Appellate Division, where there was a

23    standalone loss of consortium claim that sought different

24    types of damages similar to what we are seeking here.

25    And the Appellate Division affirmed the dismissal, quote,

```
1    of so much of the cause of action as sought damages for the

2    plaintiffs' loss of the children's society.  It did not affirm

3    the dismissal with respect to other forms of damages sought.

4         And there are other cases that do that as well where you

5    have one cause of action that is sort of a parental damages --

6    standalone parental damages cause of action.  That does not

7    necessarily get thrown out entirely if parts of the relief

8    where, here, medical expenses, loss of services, are viable

9    even if the loss of consortium might not be viable.

10         So that is what we thought was our stipulation was doing

11   exactly what Your Honor has requested.  We -- we have

12   attempted to do that in good faith to ensure on the record

13   making clear that we agree plaintiffs in those states cannot

14   pursue loss of consortium damages, but they still may be

15   entitled to bring standalone claims for these other forms of

16   relief that defendants have never contested they cannot seek.

17              THE COURT:  A response.

18              MS. LANGNER:  Yes, Your Honor.

19         As you stated, plaintiffs here only bring a loss of

20   consortium claim.  They did not bring a standalone claim for

21   medical expenses or I think it was loss of services.

22              THE COURT:  You're on notice and you have been on

23   notice that they were attempting to seek these kinds of

24   damages.

25         So it -- this -- so now it's a question of form.  You
```

```
 1    can't claim prejudice.  You've been on notice since the
 2    beginning that they were attempting to seek these kinds of
 3    damages.
 4        So respond to the issue of form.
 5            MS. LANGNER:  Yes, Your Honor.
 6        What we're asking here or -- is for the dismissal of the
 7    loss of consortium claim.  In their briefs, plaintiffs state
 8    that they can seek these sorts of damages tied to, for
 9    example, wrongful death claims.
10        Whether or not that is true, I'm not here to dispute that
11    today, but we are seeking to dismiss the loss of consortium
12    claims, which, as discussed, are not legally viable in the --
13    the 25 states plus the District of Columbia.
14            THE COURT:  Well, I don't know.  Is -- wrongful death
15    assumes a death, right?
16            MS. LANGNER:  Correct.
17            THE COURT:  So I didn't understand these expenses to
18    just be related to death.  Or maybe are they only related to
19    death?
20            MR. PANEK:  They are not, Your Honor.
21            THE COURT:  So what -- I mean, you've got 17 other
22    causes of action.
23            MR. PANEK:  That's right.
24            THE COURT:  And none of these damages are allowed
25    under these 17 causes of action?
```

```
 1            MR. PANEK:  I -- my impression is that it may be the
 2    case in some states and it may not be the case in other
 3    states.  If that is what it's coming down to for Your Honor,
 4    we would request supplemental briefing to go through that on a
 5    state-by-state basis to make sure that nobody is unfairly
 6    prejudiced here.
 7            THE COURT:  Well --
 8            MR. PANEK:  One -- if -- oh, sorry, Your Honor.
 9            MS. LANGNER:  Your Honor, these issues have been
10    briefed extensively.  And the plaintiffs, in their briefing,
11    submit tables -- pull those up -- where they -- where they
12    claim that these types of damages are permitted.
13        And I'm looking at their table.  And most -- this is
14    Appendix B at page 31 of the plaintiffs' opposition.
15        And these are -- they list approximately eight or nine
16    states, and they specifically tie these to wrongful death
17    acts.  So I -- I don't understand how they say that they can
18    still bring these related to the loss of consortium claim.
19            THE COURT:  Okay.  I don't understand your statement.
20    That's not what he said.
21            MR. PANEK:  If I may, Your Honor.  Indeed this is
22    not -- I think that again we're -- we're getting hung up on
23    the difference between loss of consortium and the remaining
24    damages with -- which we think are viable.  And one analogy I
25    would just draw again is to, for instance, a UCL claim which
```

1    may have this act is unfair, this act was unlawful, and it may

2    be that a court, on a motion to dismiss, agrees that the

3    unlawful act was unlawful but the unfair act was not unfair.

4        But that doesn't mean you throw the whole claim out.

5    You -- you dismiss the parts of the claim seeking relief that

6    are not -- on theories that are not viable but you leave --

7        **THE COURT:**  You just conceded --

8        **MR. PANEK:**  Um-hmm.

9        **THE COURT:**  -- you conceded that 24 states and D.C.

10    do not recognize this cause of action.

11        **MR. PANEK:**  Yes, Your Honor.

12        **THE COURT:**  So the question is do you and can you tie

13    these expenses that you've alleged to some other claim?

14        **MR. PANEK:**  And what I would say to that is I -- I'm

15    not certain as I stand here for every single state --

16        **THE COURT:**  And if you're not certain -- well, then

17    you don't get them in those states.  That's my point.  You

18    don't get them just because you want them.  You actually have

19    to tie them to the law in the specific states at issue.  And

20    if you cannot get -- if they -- if they don't authorize them,

21    you're not entitled to them.

22        **MR. PANEK:**  Right.

23        **THE COURT:**  Or your client is not entitled to them.

24        **MR. PANEK:**  Sorry.  I may have misunderstood Your

25    Honor's question.  Loss of consortium damages, no, we agree

 1    those are not going to be authorized in those

 2    25 jurisdictions.

 3        Medical expenses and loss of services in those

 4    25 jurisdictions, parental plaintiffs in all of those states

 5    are entitled to those.

 6        Whether that's as a standalone cause of action, whether

 7    it's a form of relief for another -- for the primary tort

 8    claim, I cannot say on a state-by-state basis what that is.

 9        But I will say that in all -- in all of those states,

10    there is a path for parents to recover medical expenses that

11    they spent to redress tort harms by their minor child,

12    deceased or not deceased.

13        And if, again, we think that this is just a matter of

14    defendants are focused too much on the fact that it says loss

15    of consortium and society underneath count 18.  We think that

16    if you struck the portions of paragraph 1091 that allege

17    damages for loss of consortium, with respect to those

18    25 states, the rest of the count would still be viable in all

19    of those states.

20        **THE COURT:**  Again, I don't know that that is true.

21    Remember, counts have elements.

22        **MR. PANEK:**  Yes.

23        **THE COURT:**  And I said to you at the outset I had

24    issues about that claim because I looked at the elements in

25    California for that claim and they didn't seem to have any

1    bearing on this situation whatsoever.

2              MR. PANEK:  Yes, Your Honor.

3              THE COURT:  So do you have the elements for each of

4    those states?

5              MR. PANEK:  For loss of consortium, no.  But for

6    medical expenses and loss of services, yes.

7              THE COURT:  Okay.  But that's not what you've

8    alleged.

9              MR. PANEK:  And that's why we are trying to -- we

10   have said that we will stipulate out damages under a loss of

11   consortium theory in those 25 jurisdictions.

12             THE COURT:  All right.  This is what you need to do.

13             MR. PANEK:  Yes, Your Honor.

14             THE COURT:  You need to go back and -- I am willing

15   to look at your stipulation, but it must be state by state and

16   it must identify the claim upon which you believe you're

17   entitled to those.  And if it is something -- you know, let's

18   say the state calls it loss of consortium and injury to

19   family.  Then let me know what the claim is actually labeled

20   in that state.

21             MR. PANEK:  Um-hmm.

22             THE COURT:  And I want to have the elements.  And I

23   don't want you to pull them out of the hat.  I want to know

24   what your authority is for them.

25             MR. PANEK:  Yes.  And I will say with respect to

```
 1    those 25 states, and -- and we will certainly file a
 2    stipulation with -- with that level of detail for Your Honor,
 3    we would not be claiming the elements of loss of consortium
 4    for any of those states.  It would only be making sure that
 5    plaintiffs in those states can still pursue medical expenses
 6    and loss of services.
 7              THE COURT:  They cannot pursue it without a claim.
 8    Do you understand what I'm saying?
 9              MR. PANEK:  Yes, Your Honor.  We will set out what
10    the basis is for the standalone claim for medical expenses and
11    loss of services in those states.
12              THE COURT:  And what it sounds like is you're asking
13    to substitute a claim or you're seeking to have that dismissed
14    in -- and replaced with something similar.
15              MR. PANEK:  Well, we think count 18 by itself does
16    stand on its own, but we are willing to amend to make it clear
17    to break those out to make it crystal clear this is a claim
18    for medical expenses, this is a claim for loss of consortium.
19              THE COURT:  Again, it's not clear to me that you can
20    do what you're saying that you can do.  But I will wait and
21    see until I have stuff that's something more specific.
22         It seems inconsistent to me that you can stand there and
23    say that you have -- that you stipulate that these 24 states
24    and D.C. do not allow for this kind of claim, but, yes, they
25    do allow for the kind of claim that you want to -- it makes no
```

```
 1    sense.  You need to be more specific.
 2              MR. PANEK:  Yes, Your Honor.
 3              THE COURT:  What you're saying is inconsistent.
 4              MR. PANEK:  Yes.  What we are focusing on the damages
 5    that are being sought rather than the primary cause of action
 6    and so --
 7              THE COURT:  You cannot get damages without a cause of
 8    action.
 9              MR. PANEK:  Yes, of course.
10       And we can make it clear in the stipulation the basis for
11    the cause of action in those 25 jurisdictions with respect to
12    medical expenses and loss of services.
13              THE COURT:  Give me the docket number again of the
14    appendix.
15              MS. LANGNER:  It is Docket 597, Appendix B is the one
16    I was referencing.
17                         (Pause in the proceedings.)
18              THE COURT:  Okay.  So we'll take -- looking at that
19    appendix, in Maryland, you've already indicated that you have
20    authority for the proposition that damages -- and this
21    appendix says:  These are the states in which a parent cannot
22    sustain independent claims for loss of consortium although
23    they can recover damages for loss of companionship and
24    society.
25       With respect to Maryland, the cause of action at issue
```

```
 1    that provides that is the wrongful death statute.  Correct?
 2              MR. PANEK:  In -- in the appendix, yes.
 3              THE COURT:  Okay.  The appendix cites the law.
 4              MR. PANEK:  Yes, that's right.
 5              THE COURT:  And so the claim is wrongful death.
 6              MR. PANEK:  Right.
 7              THE COURT:  And you have that claim.
 8              MR. PANEK:  Yes.
 9              THE COURT:  So with respect to -- you've already
10    asserted that claim.
11              MR. PANEK:  Yes.
12              THE COURT:  That's -- that's 16.
13              MR. PANEK:  Right.
14              THE COURT:  So there's no need for claim 18.
15              MR. PANEK:  There is a need for claim 18 to the
16    extent in paragraph 1090 it seeks medical expenses and in one
17    part of paragraph 1091 it's --
18              THE COURT:  So why would, at 1090, why wouldn't the
19    stipulation be that paragraph 1090 relates also to cause of
20    action 16?
21              MR. PANEK:  In some states there must be a standalone
22    claim for medical expenses.  In some states --
23              THE COURT:  Is it in Maryland or not?
24              MR. PANEK:  As I stand here, I cannot say for sure.
25    However, I would say if you turn the page to the next page of
```

1    the appendix, to the bottom of 32 and to the top of 33, that

2    is a decision from the Maryland Court of Appeals stating that

3    plaintiffs in personal injury claims do have valid claims for

4    loss of services and necessary expenses.

5            **THE COURT:**  Personal injury claims.

6        So, first of all, that's not what the appendix says.  But

7    second of all, your personal injury claims are not necessarily

8    loss of consortium.  You've got 17 other claims.

9            **MR. PANEK:**  That's right, but we want to preserve the

10    right to bring a standalone claim seeking medical expenses and

11    loss of services.

12        In many states, the common law doctrine says a plaintiff,

13    when there is a personal injury, two causes of action arise,

14    one for the child seeking damages to the child, and another

15    from the parents seeking medical expenses and loss of

16    services.  We are trying to preserve the second half of that.

17        I understand that count 18 is captioned loss of consortium

18    and society, and that may have been inapt drafting to try to

19    bring everything in under one capacious heading.

20        But in those states, and which is many, many states, that

21    is a viable standalone claim that should not be affected by

22    whether or not there is a loss of consortium claim, which is a

23    different theory of recovery and a different theory of

24    liability.

25            **MS. LANGNER:**  Your Honor, there's --

```
 1            THE COURT:  But that is the theory that you alleged.

 2            MR. PANEK:  That is --

 3            THE COURT:  That is the theory that you alleged.  I

 4    only have the complaint for purposes of jury instructions and

 5    elements of claims.  And if you're thinking something else,

 6    you didn't properly allege it.

 7            MR. PANEK:  And we are willing to amend to more

 8    proper -- to more clearly allege it.  Because -- and again --

 9            THE COURT:  You're going to have to do it on a

10    state-by-state basis because I can tell you that if Maryland

11    says that you can get this under -- under a wrongful death

12    claim and you already have a wrongful death claim, the motion

13    is granted as to Maryland.

14            MR. PANEK:  I --

15            THE COURT:  And I will do this on a state-by-state

16    basis.

17            MR. PANEK:  I think that our preferred and our

18    proposed approach would be that with respect to Maryland, as

19    an example, the paragraph of -- in count 18 seeking damages

20    for loss of consortium, we agree that should not be viable as

21    to Maryland.

22       If any plaintiff has that under another cause of action,

23    wrongful death, for instance, that would be part of the

24    wrongful death cause of action.  No need to pursue it in

25    count 18.
```

```
 1          But count 18 does include other claims for relief.  It
 2    includes medical expenses and loss of services, and we don't
 3    want those, which are completely disconnected from loss of
 4    consortium, to fall out just because they are under the same
 5    heading when it is not the name of the heading that controls.
 6          THE COURT:  Well, I need to know what controls for
 7    25 states and D.C.
 8          MR. PANEK:  Yes, Your Honor.
 9          THE COURT:  Two weeks.
10          MR. PANEK:  Yes, Your Honor.
11          THE COURT:  Talk about it next month.
12          MS. LANGNER:  Thank you, Your Honor.
13          THE COURT:  Thank you.
14          MR. PANEK:  Thank you.
15          THE COURT:  Okay.  Now, is it -- is all that's left
16    the complaint against Zuckerberg?
17          MR. WARREN:  Your Honor, substantively I believe
18    that's right.
19          We did want to raise one issue in terms of scheduling in
20    terms of putting other case management conferences on the
21    schedule for the balance of the year, if Your Honor desires to
22    do that.
23          I believe Judge Kang has scheduled some of the discovery
24    management conferences, and I can provide those dates if that
25    would be helpful.
```

```
 1            THE COURT:  Well, you may change them if they don't
 2    fit with my schedule because my schedule controls.
 3            MR. WARREN:  Absolutely.
 4            THE COURT:  All right.  What did he give you?
 5            MR. WARREN:  He gave us -- well, holding aside
 6    September since Your Honor just scheduled the CMC for that.
 7            THE COURT:  Well, what did he give you?
 8            MR. WARREN:  He gave us September 26th for the DMC,
 9    October 17th, November 21st, and December 19th.
10            THE COURT:  Yeah, none of those work.
11            MR. WARREN:  Okay.  Very well.
12            THE COURT:  I mean, look.  I can do the end of
13    September, but that's going to be significantly longer in
14    between our August and September.  So it doesn't matter to me.
15    If you want to wait that long, I can wait that long and do
16    September 27th.
17            MR. WARREN:  I would defer to, I think, the AGs who
18    would have a --
19            THE COURT:  Let me tell you, though -- let me give
20    you the rest of my calendar.
21            MR. WARREN:  Yeah, thank you.
22            THE COURT:  October is always the most difficult
23    month.  So I can do -- yes, the week of the 17th is not -- so
24    I can do either -- I can do the 25th if you want to do the end
25    of September.  Then I could do October 25th.
```

```
 1            MS. SIMONSEN:  Your Honor, I'm sorry to interrupt.
 2    Ashley Simonsen for the Meta defendants.
 3        The end of September does not work for us with respect to
 4    in particular the argument that Mr. Hester mentioned earlier.
 5            THE COURT:  So the 27th does not work for Mr. Hester?
 6    Okay.
 7            MS. SIMONSEN:  That's correct.
 8            THE COURT:  So if we stick with September 13th and --
 9    part of the problem is I'm in back-to-back-to-back trials.  So
10    I could do -- I know October 9th is possible and I know
11    October 25th.
12            MR. WARREN:  And I don't think plaintiffs would have
13    a preference, Your Honor.  Whatever works best for the Court.
14            MS. SIMONSEN:  Same for the defendants, Your Honor.
15            THE COURT:  And then let's look at November.  So he's
16    given you November 21st?
17            MR. WARREN:  Yes, Your Honor.
18            THE COURT:  So I can do November 22nd.
19            MR. WARREN:  Terrific.  Thank you, your Honor.
20            THE COURT:  And then in terms of December, let's -- I
21    can either do -- well, 9, 10, or 11.  Which would you prefer?
22    Monday, Tuesday, or Wednesday?
23            MR. WARREN:  Again, I don't think plaintiffs have a
24    strong preference.  Tuesday or Wednesday would probably be
25    preferable to Monday but --
```

```
 1              MS. SIMONSEN:  Similar for the defendants, Your
 2    Honor.  Tuesday or Wednesday would likely be preferable.
 3              THE COURT:  Okay.  So let's do December 10.
 4              MR. WARREN:  Thank you, Your Honor.  And --
 5              THE COURT:  And so back to October.  The -- the 9th
 6    would be about a month.  The 25th would be six weeks.  So....
 7         On the other hand, November 22nd is a month after.
 8              MS. SIMONSEN:  Yeah.
 9              THE COURT:  So it doesn't matter to me.  I think it's
10    a question of how much time you all need, how much of my time
11    you need in terms of what's going on during that period.
12              MR. WARREN:  I think the 25th would work great for
13    the plaintiffs.  That would be fine.
14         Point of clarification.  Would the 13th be -- of September
15    be the Florida argument and a CMC?
16              THE COURT:  Yes.
17              MR. WARREN:  Okay.  Thank you.
18              MS. SIMONSEN:  The 25th is fine for your -- for the
19    defendants, Your Honor.
20              THE COURT:  Okay.  So those will all be 9:00 a.m.
21    unless I'm in trial in which case it will change to the
22    afternoon.
23              MR. WARREN:  Very well, Your Honor.  Thank you.
24              THE COURT:  Okay.
25              THE CLERK:  Sorry, Your Honor.  To clarify, the
```

```
 1    November date is November 22nd?
 2              THE COURT:  Correct.
 3              THE CLERK:  Thank you.
 4              MR. WARREN:  And, Your Honor, we also would just want
 5    to add, you know, given that many motions are fully joined and
 6    submitted, and I don't know how many more there will be,
 7    hopefully not many, it may be possible to pull down some of
 8    these if there aren't really any pending issues of great
 9    relevance or importance.  And we can work with the defendants
10    on that and let the Court know.
11              THE COURT:  Okay.  That's fine.
12              MR. WARREN:  Great.
13              THE COURT:  Sometimes just having it on the calendar
14    allows things that bubble up to get resolved, and it also
15    makes sure that you're doing things because you know you're
16    coming in.
17              MR. WARREN:  Right.
18              THE COURT:  So, but happy to see you all.
19              MR. WARREN:  Thank you.  We're always happy to see
20    you, too.
21              THE COURT:  I'm not so sure about that.
22              MR. WARREN:  Maybe depends on the motion.
23      I will --
24              THE COURT:  And we are --
25              MR. WARREN:  I'm sorry.
```

```
1            THE COURT:  We are working through all of these --
2    all of these motions that have been briefed.  So you'll get a
3    large omnibus order.  I'm doing them in sections.  But because
4    I'm in trial all week, I'm primarily working on them on the
5    weekends.  So --
6            MS. SIMONSEN:  Thank you.
7            THE COURT:  Okay.
8            MR. WARREN:  Thank you, Your Honor.
9        And I'm informed that Mr. Van Zandt has -- can return to
10   address the issues about the Beasley Allen clients if you
11   would like.
12           THE COURT:  Okay.  That's fine.
13           MR. WARREN:  Thank you.
14           THE COURT:  And then we'll move into the argument
15   about the Zuckerberg motion.
16           MR. WARREN:  Thank you, Your Honor.
17           MR. VAN ZANDT:  Thank you, your Honor.
18       Again, Joseph Van Zandt for the Beasley Allen plaintiffs.
19       I apologize for the confusion earlier, and I appreciate
20   the Court's patience.
21       So both of the plaintiffs at issue, the plaintiff fact
22   sheet itself does allege YouTube usage.  I believe what Your
23   Honor might have been looking at was the YouTube appendix.
24   And the question there about the YouTube usage on the appendix
25   is:  How much did you use YouTube when you were not logged in
```

1    to YouTube?  And the answer was zero.

2        And so in the fact sheet itself for both of the plaintiffs

3    at issue, which was Murden and Coppleton, the plaintiffs do

4    allege what we would indicate as significant YouTube usage

5    from a -- from an early age in their fact sheets.

6        So the issue then that the defendants are arguing related

7    to futility is the question on the fact sheet that goes

8    through each individual design feature and asks if the

9    plaintiff used that feature and then asks if the plaintiff is

10   alleging harm from that specific feature.

11       But both of these plaintiffs are alleging YouTube usage

12   and they are alleging injury from their usage of social media,

13   all of their usage of social media from all defendants

14   including YouTube.  So they are alleging usage and injury from

15   YouTube.

16       **MR. ERCOLE:**  Your Honor, the only document that

17   exists with respect to this issue of injury is one they stated

18   under oath where for each specific feature regarding YouTube

19   at issue, they said we have not been injured.

20       As a result of that representation under oath, they cannot

21   bring claims against YouTube.  It would be futile to bring

22   those particular claims.

23       Putting aside the other arguments with respect to undue

24   delay and the fact that this is like two years after filing,

25   I'm just focusing on the futility piece, that is what our

```
 1    argument is on futility where you have someone stating under
 2    oath I haven't been injured by the features at issue.  And we
 3    submitted those appendices.  They're the only ones that have
 4    been submitted specific to YouTube.  They were negotiated.
 5    The point was to understand the nature of the injury, if any.
 6    And the answer is:  No, we haven't been injured.
 7        You shouldn't be allowed to amend years into a case where
 8    you've stated under oath that you haven't been harmed by the
 9    very features that are at issue in this case, Your Honor.
10            THE COURT:  I'm going to let you respond.  But I'm
11    also going to say that it is a bit of a stretch to keep
12    referring to years when, as you well know, even though this
13    has been pending for not quite two years, nothing happened,
14    initially because everybody was wondering whether the entirety
15    of the case was going to get thrown out, myself included.
16        So be careful with your words.  It makes you less
17    credible.
18            MR. ERCOLE:  Understood, Your Honor.
19            MR. VAN ZANDT:  Your Honor, the YouTube appendix is
20    not the -- does not contain the entire universe of design
21    features of YouTube's and our allegations against YouTube.  It
22    is an appendix attached to a plaintiff fact sheet which is
23    used for vetting in case analysis purposes.
24        It does not contain all of the allegations.  There's
25    nothing on the appendix related to age verification, parental
```

```
 1    controls.  There are broader claims against YouTube that this
 2    plaintiff has and that master complaint has that are not
 3    listed on that appendix.  At the end of the day, the plaintiff
 4    alleges significant YouTube usage and alleges injury from that
 5    usage.
 6        I would note again this is not a plaintiff in the
 7    bellwether category, and so we would respectfully ask that
 8    Your Honor place this plaintiff -- these two, Coppleton and
 9    Murden, in the category of non-bellwethers and grant the leave
10    to amend.
11            THE COURT:  Anything else?
12            MR. VAN ZANDT:  Not from the plaintiffs, Your Honor.
13            MR. ERCOLE:  From our perspective, no, Your Honor.
14    We've sort of articulated our reasons with respect to undue
15    delay, futility, and prejudice and, you know, understand
16    Your Honor's position.
17        But we do think with respect to these two particular
18    plaintiffs, again we tried to be targeted in the oppositions
19    to motions to amend that we brought, but with respect to these
20    two particular plaintiffs, given these under-oath
21    representations about lack of injury from the YouTube
22    features, we thought this was an argument that is meritorious,
23    Your Honor.
24            THE COURT:  Well, it just may mean that they have a
25    very weak case with respect to your client, at least as it
```

1    relates to the allegations at issue here.

2        That is, in fact, the point of the fact sheets, is to

3    identify the specific products.  There were numerous

4    allegations that have been thrown out.  And if that's what

5    you're relying on, then, you know, I don't know -- I don't

6    know how much value that case has.  But that's -- that's

7    something that's not decided on a motion to dismiss.

8        Okay.  Let's go to the Zuckerberg issues.

9                (Pause in the proceedings.)

10            **THE COURT:**  All right.  Appearances, please.

11            **MR. HESTER:**  Good morning again, Your Honor.  Timothy

12    Hester on behalf of Mark Zuckerberg and the Meta defendants

13    more broadly.

14            **MR. JASINSKI:**  Good morning, Mathew Jasinski with

15    Motley Rice on behalf of the individual plaintiffs.

16            **THE COURT:**  J-A-S-I-N-S-K-I?

17            **MR. JASINSKI:**  Yes, your Honor.

18            **THE COURT:**  Okay.  All right.

19        Why don't we start with you, Mr. Jasinski, in terms of

20    replying to the defendants' reply brief.

21            **MR. JASINSKI:**  Yes, Your Honor.

22        I think the principal issue that the -- that

23    Mr. Zuckerberg relies upon is this notion on misfeasance

24    versus nonfeasance.  And he teases that out of the

25    Pennsylvania case law, the Pennsylvania Supreme Court decision

1    in *Wicks*.   I don't believe that he cites a case from any other

2    state.

3         But even with respect to Pennsylvania case law, there is a

4    later decision from the intermediate appellate court much more

5    recently, I think in 2018, in *B&R Resources* where the court

6    explains *Wicks* and says that the Supreme Court did not hold

7    that inaction can never be sufficient to support participation

8    theory of liability, rather mere nonfeasance is not

9    sufficient.

10        And the court gave as an example of mere nonfeasance a

11   claim based on the fact that the corporate officer should have

12   known of the wrongful act.   So a should-have-known claim is

13   not going to cut it.   We don't make a should-have-known claim

14   here.

15        I think that the common thread through the corporate

16   officer participation cases is the knowledge that the officer

17   has.   In *Ecodiesel*, for example, that's clear.   Again, that

18   was the case involving Mr. Marchionne and the Chrysler defeat

19   device coverup.

20        But the allegations in *Ecodiesel*, which Mr. Zuckerberg

21   points to as being an example of a case in which the corporate

22   participation doctrine was sufficiently alleged, we've looked

23   at that complaint very closely, and they are very general and

24   frankly scant allegations against Mr. Marchionne that rely

25   principally upon his public statements about how Chrysler Fiat

1    intended to try to use diesel in -- to compete in the

2    marketplace; allegations about numerous public statements

3    concerning EcoDiesel engines and their emissions and

4    performance characteristics; and optimistic statements that

5    diesel vehicles would give Fiat an edge on the competition.

6         And then some what I would say frankly are conclusory

7    allegations that Fiat and FCA conspired to install and conceal

8    emission control software with Mr. Marchionne at the helm, and

9    that it did so and that it --

10                    (Off-the-record discussion.)

11         **THE COURT:**  Yes.  In particular, I'm not the only one

12    who's tired, but Ms. Mercado is my reporter in the trial and

13    we go very long days.

14         **MR. JASINSKI:**  I understand.  I apologize for getting

15    animated about this.

16         In the -- in the -- another allegation that the company

17    made misrepresentations under the direction and control of

18    Fiat and Marchionne, that these are general and pretty

19    conclusory statements.

20         That's not what we have in this case.  We've made very

21    particularized allegations about Mr. Zuckerberg, most

22    especially with respect to his knowledge.

23         And in fact when you read counts eight and nine of the

24    underlying complaint, he is a -- he features prominently in

25    that, both with respect to the various misleading statements

 1    that he makes, which we think evidence the effort by his

 2    company to conceal the defects and the harms posed by his

 3    platforms, but also with respect to, for example,

 4    Mr. Zuckerberg learning from a very leading scholar in the

 5    field about the harms that were posed by his platforms.  And

 6    that was a conversation he had directly.

 7            **THE COURT:**  Has the -- has the Chrysler -- what

 8    happened in Chrysler?  It's a 2018 case.  Did that decision by

 9    Judge Chen make it up to the Ninth Circuit?  Has it been

10    affirmed?  What is the procedural posture of that litigation?

11            **MR. JASINSKI:**  You know that I should know the answer

12    to that question, Your Honor.  My understanding is it settled,

13    and I don't -- I don't -- I certainly don't believe that that

14    decision was reversed.  I can't tell the Court whether it was

15    affirmed.

16            **THE COURT:**  Mr. Hester, do you know?

17            **MR. HESTER:**  I believe it did not go up on appeal,

18    Your Honor.

19            **THE COURT:**  Okay.

20            **MR. JASINSKI:**  We'd also point to the *Juul* decision

21    as well.  I think that the *Juul* allegations with respect to

22    the individual corporate officers, they are more robust than

23    they were in the *Ecodiesel* case, but I think that they are

24    still allegations that support the sufficiency of the claims

25    that we've alleged against Mr. Zuckerberg.

1          In *Juul* you had two founders who designed an addictive

2     youth-oriented product.  Here we have the same thing.  And we

3     have Mr. Zuckerberg having his -- his -- having both

4     contributed to the design directly of Facebook in the first

5     instance, and then allegations that indicate he played a very

6     prominent, very prominent role in design choices moving

7     forward.

8          There's also an allegation in the *Juul* case that the two

9     founders had expressed an intent to disrupt the tobacco

10    industry while courting its expertise and investment.  And

11    here we have Mr. Zuckerberg playing the tobacco playbook by

12    dodging questions from Congress about the addictiveness of its

13    products.

14         We've got allegations in *Juul* concerning testing that we

15    think demonstrate the importance of the knowledge with respect

16    to whether the statements and omissions in that case were

17    misleading.

18         And here again, I think it's very clear that

19    Mr. Zuckerberg had a great deal of knowledge about his

20    products, that he had exercised an outsized level of control

21    over his products, and -- and contributed to the

22    misinformation campaign that we think was undertaken by Meta.

23         And this is not an example of a case in which they were

24    simply relying on the fact that this CEO is in charge.  I

25    think that that's clear from our pleadings.  This is -- this

```
 1    is not simply, well, he was at the top and so therefore he
 2    must be liable.  We understand that's not how this works.
 3              THE COURT:  Well, not all CEOs are alike.  Isn't
 4    that -- we all can agree with that, right?
 5              MR. HESTER:  Yes, Your Honor.
 6              MR. JASINSKI:  Yes, Your Honor.
 7              THE COURT:  I mean we sit in Silicon Valley, don't
 8    we?  Mr. Musk is different from many other CEOs, and even he
 9    would agree with that.
10         So the mere -- I would say the mere title of CEO is not
11    enough.
12              MR. HESTER:  Agreed.
13              MR. JASINSKI:  And we agree.
14              THE COURT:  Go ahead.
15              MR. JASINSKI:  Okay.  I want to focus on the reply,
16    Your Honor.  Bear with me a moment.
17              THE COURT:  Well, why don't you respond, Mr. Hester.
18              MR. HESTER:  Yes, Your Honor.
19         Maybe just to set the table, I think especially because
20    counsel has put weight on Mr. Zuckerberg's knowledge, I think
21    it's important to go back to emphasize that the Court has
22    already rejected the plaintiffs' claim that Mr. Zuckerberg can
23    be held personally liable for his own alleged admissions and
24    misrepresentations.
25         And the Court specifically rejected liability theories
```

1  that included, quoting from the Court's order 4/15 of 2024,

2  Docket 753 at 10 to 11, the Court rejected the theory that his

3  exclusive and superior knowledge was a sufficient basis for

4  personal liability.

5     So now we face the question whether he can be held

6  personally liable as a corporate officer participant.

7        **THE COURT:**  Let me tell you that when I wrote that,

8  even though it had not been adequately briefed, I knew that

9  this was an issue.  Just so that you're aware.

10       **MR. HESTER:**  Right.  Thank you, Your Honor.

11    And so but let's go back to the -- to the principle in the

12  cases involving corporate officer liability, which is often

13  called a participant liability theory.  And it requires some

14  affirmative deliberate conduct to participate in or

15  specifically direct a tort.

16    And there's variations in language of the cases.  You

17  know, there's common law standard.  But they all capture the

18  same basic point.  They use the phrases "directly involved,"

19  "affirmative acts," "direct personal participation,"

20  "actively participated."

21    Misfeasance, not mere nonfeasance is just one formulation

22  of the --

23       **THE COURT:**  But you also agree that evidence in any

24  case and in any trial, especially of misconduct, is not always

25  direct evidence, it can be circumstantial evidence.  And

 1   circumstantial evidence has the same persuasive power as

 2   direct evidence.  A jury gets to decide that ultimately.

 3          **MR. HESTER:**  Yes, Your Honor.  But there's many cases

 4   that have dismissed these participant theories at the pleading

 5   stage where there's not sufficient allegations of affirmative

 6   conduct or specific direction.  And I think that's exactly

 7   what we have here.

 8      These formulations under the case law which often are

 9   decided on motions to dismiss are all reflecting the same

10   basic point that there has to be allegations of some

11   affirmative deliberate conduct, some --

12          **THE COURT:**  So what were the affirmative deliberate

13   conduct in *Juul* that made it sufficient?

14          **MR. HESTER:**  I think *Juul* is a really good example

15   that illustrates the line I'm trying to draw.

16      The court said there, and this is from 497 F.Supp.3d, and

17   I'm quoting from 670 to -71.  The court said the complaint,

18   quote, must specifically allege personal participation rather

19   than mere awareness.

20          **THE COURT:**  I'm not asking for statements of law.

21   I'm asking for what facts that were alleged --

22          **MR. HESTER:**  Yes.

23          **THE COURT:**  -- that made it sufficient.  I have the

24   law.

25          **MR. HESTER:**  And the court drew a distinction.  There

1   were two officers where it said the allegations were

2   sufficient, three others where it said the allegations were

3   not.  As to the two where it said the allegations were

4   sufficient, the court quoted the following:  They developed

5   the deceptive youth-focused marketing campaign.  That's at

6   Page 671.

7        They, quote, personally reviewed images from the deceptive

8   campaign and, quote, provided specific direction and the

9   content of the website that was deceptive.  And, quote, they

10  engineered test results consistent with the deceptive

11  messaging.

12       So based on those allegations, the court concluded that

13  there were sufficient bases to conclude at the pleading stage

14  they were, quote, knowing participants in the scheme to

15  defraud.

16       Conversely, there were allegations against three other

17  directors that were dismissed on this participation theory

18  that were not sufficient to plead participation.

19       And there, the court said, and I'm quoting from page 608,

20  allegations that the three other directors, quote, had final

21  say over the deceptive marketing materials were not enough.

22       And the court said the plaintiffs, quote, are simply

23  trying to hold them liable for acts taken in their capacity as

24  corporate directors.  And then the court said, quote, New York

25  courts require more than mere awareness or control.

1       So there we have a clear line that the court drew between

2  very specific allegations of active affirmative participation

3  in the misleading deceptive campaign, including developing the

4  very messaging that was deceptive, personally reviewing the

5  images that were deceptive, and then engineering test results.

6       **THE COURT:**  Let me get a response on *Juul*.  It seems

7  to me that the allegations that are in the complaint here are

8  more consistent with what *Juul* said was insufficient than what

9  *Juul* said was sufficient.

10      **MR. JASINSKI:**  I disagree, Your Honor.  I mean I

11  think if you look at the directors that the court concluded in

12  *Juul* that did not have sufficient allegations against them

13  under the corporate participation doctrine, they were entirely

14  conclusory allegations that merely stated that they had,

15  quote, control and final say.  And we have not merely alleged

16  that Mr. Zuckerberg had control and final say.

17      I think that the -- as I mentioned before, I do think the

18  *Juul* allegations are -- are quite robust, but I don't think

19  that they are the bare minimum.  In other words, I think there

20  are examples of other cases that have allegations --

21      **THE COURT:**  So you concede, then, that your

22  allegations are not as robust as *Juul*.

23      **MR. JASINSKI:**  No, I don't concede that, Your Honor,

24  but they are -- that they are different.

25      So, for example, I've mentioned before the allegation

1    that -- with respect to design.  We have allegations with

2    respect to design.  So I think we checked that box.

3        The -- the allegation with respect -- with respect to the

4    reengineering of testing, I would agree there's no sort of

5    specific corollary in our case.

6        But I do think that more generally speaking, that

7    reflected a level of involvement in -- in knowing about the

8    fact that the -- the statements and omissions were misleading.

9    And we have very generous allegations with respect to

10   Mr. Zuckerberg's knowledge here.

11       Another allegation in *Juul* pertained specifically to

12   statements made to *New York Times* that selling Juul to youth

13   was antithetical to the company's mission.

14       We have similar types of statements by Mr. Zuckerberg in

15   various settings with respect to protections for

16   under-13-year-olds, the safety of the platform, and these are

17   directly contrary to internal statements about his drive for

18   growth, focusing on teens, and the like.

19       So I -- I do think that we meet the standard with respect

20   to *Juul*.  But I also would submit as a matter of law that --

21   that *Juul* is particularly robust in the minefield of cases.

22           **THE COURT:**  So then let's move to *Ecodiesel*.

23       Mr. Hester.

24           **MR. HESTER:**  Yes, Your Honor.

25       In *Ecodiesel*, again, we have very specific allegations of

```
 1      a knowing participation in a scheme to defraud.  And I'm
 2      quoting here from page 983 of the decision.  It's
 3      295 F.Supp.3d at 983.
 4          Led by Mr. Marchionne, who was the CEO, the court said,
 5      quote, plaintiffs allege that the defendants, including
 6      Marchionne, quote, conspired to install and conceal emissions
 7      control software in the EcoDiesel engines to illegally
 8      circumvent stringent U.S. emissions standard.
 9          That's a very specific allegation of direct conspiracy.
10              THE COURT:  So someone could say that's also
11      conclusory unless you have specific facts as to what -- how it
12      is that they conspired and how it is that they installed.
13              MR. HESTER:  Well, the specific -- the specific
14      allegations were that this CEO was the one who directed the
15      installation of these deceptive devices.  So you have specific
16      direction to install a deceptive device that was meant to
17      trick and circumvent U.S. emissions controls.
18              THE COURT:  Do you agree that the -- that the
19      allegations were that specific, that the CEO directed the
20      installation?  Mr. Jasinski.
21              MR. JASINSKI:  Well, as a conclusory matter, they
22      were.  But I also think -- I think Mr. Hester is focusing on
23      the wrong part of that decision because the -- there was an
24      omission claim, what the court deemed a concealment omission
25      claim that was specific to failing to disclose to consumers
```

1   the fact that their cars did not actually in real world

2   conditions obtain the types of -- well, a fuel efficiency and

3   limited environmental impact that they thought that they did.

4        Now the reason is because there's this defeat device.  But

5   I focus on this because it was not -- the involvement

6   necessarily in -- that the defeat device itself that mattered

7   for purposes of that claim.  What mattered was a role in -- in

8   concealing and keeping that defeat device quiet.

9        But I think, Your Honor, generally speaking, when you look

10  through -- and I've read that complaint -- they are very

11  limited specific allegations in terms of Mr. Marchionne.

12       It was, I think, the inference, which we agree would be

13  appropriate to draw from his optimistic statements about

14  diesel and public statements about the performance

15  characteristics of the EcoDiesel engine that, quote, given the

16  role Mr. Marchionne played vis-a-vis diesel engines is a

17  reasonable inference that he was directly involved with and

18  therefore knowledgeable about what was happening with the

19  EcoDiesel engines.

20       And the company's concealment of the defeat devices,

21  concealment of the defeat devices.  The court wasn't relying

22  on the defeat devices themselves.

23           **THE COURT:**  Okay.  So I think we all agree that there

24  is a claim that exists.  We all agree as to what the general

25  elements are of such an allegation to hold someone liable

 1    under this theory.

 2        So it's all just factual analysis, right?  Factual

 3    analysis in terms of actual allegations and what inferences

 4    can be drawn from those allegations.

 5        So anything else you want to argue on the specific factual

 6    allegations or lack thereof?

 7        **MR. HESTER:**  Well, Your Honor, yes.  I would -- I

 8    would say that the allegations in the addendum focus on things

 9    like Mr. Zuckerberg's, quote, unique level of control or the

10    opportunity to disclose more information.

11        I would submit that becomes essentially analogous to what

12    could be said about virtually any CEO who's engaged and active

13    in a corporation.  They would have the ability to control, to

14    direct employees, to have final say, to have the opportunity

15    to disclose more to the public.

16        That's inherent in a CEO's role.  And if that were

17    sufficient, it's going to apply broadly across virtually any

18    CEO of a major company that's actively involved in the

19    business.

20        And that's the reason that the allegations that we see in

21    cases that permit this participation theory to proceed are

22    much more specific than just saying the CEO had control or

23    could have disclosed more if he -- if he -- if he decided to

24    or had the authority to direct his employees to do more.

25        They involve much more specific, clear allegations of some

 1    specific direction or active participation.  And the addendum

 2    doesn't allege that.  It really is -- and quoting from

 3    paragraph 23 of the addendum:  He could have but did not share

 4    information.  He, quote, had the opportunity to tell

 5    plaintiffs about the risk of harm.

 6        That's -- that's really inherent in any CEO's role.  And I

 7    think it cuts way too broadly the way the plaintiffs are

 8    suggesting the participation theory should apply.

 9        It's much more limited to something specific involving

10    some allegations of affirmative acts or some very specific

11    direction that they haven't come up with here, Your Honor.

12        So I would submit what they're really --

13        **THE COURT:**  And what can I infer from Zuckerberg's

14    own statements to Congress and to the public?  That is, he

15    specifically stated that the company was focused on making

16    sure Facebook isn't just fun to use, but also good for

17    people's well-being.

18        Can't I infer that he actually had a basis for that

19    statement or that he -- that he investigated that issue and

20    had knowledge of that issue before making that statement?

21    Can't I infer that?

22        **MR. HESTER:**  Well, Your Honor, I think -- I think the

23    answer is in a -- in relation to this participation theory,

24    there has to be some allegation that he specifically directed

25    a broader tort, a broader alleged tort by the corporation.

1   This is participation in a tort by the corporation.  The

2   Court's already held that he is not personally liable.

3        **THE COURT:**  I understand that.  You don't have to

4   remind me what I've already done.  I know what I've done.

5        The question is in terms of his corporate role.  What

6   you're saying is that this guy is totally hands-off.  Like --

7   like any other big CEO, he's -- he's hands-off, and so he

8   can't be held liable under this theory because he's a

9   hands-off CEO.

10       And there are many -- I grant you there are many CEOs who

11   are hands-off.  It is not clear to me that Zuckerberg is one

12   of them.

13       **MR. HESTER:**  No, Your Honor.  I would flip it around

14   the other way, Your Honor.  I would said that where you have

15   an active engaged CEO, that certainly the CEO's conduct can be

16   attributed to the corporation in relation to a corporation's

17   tortious conduct.  That's certainly true.

18       The question here is, is there personal liability that

19   attaches to the CEO for his activity.  And the case law that

20   we see involves something much more concrete and specific

21   where it's not simply he had the ability to disclose or he

22   could have known more or could be inferred.  It requires some

23   more specific allegation than that.

24       And if we -- if we permit this sort of inference, it

25   collapses the distinction between participant liability and

1    individual liability -- individual personal liability because

2    what in effect the participant liability theory would be

3    entirely overlapping with personal liability, and that's not

4    where the law is.

5        The reason they call it participant liability is there has

6    to be some allegation of active participation in the

7    corporation's broader tort.  And there's no --

8            THE COURT:  Knowing about an issue and refusing to

9    fund engineers isn't sufficient?  That is, refusing to fund

10   engineers or programs to address the issue that he's telling

11   the public "no problem."  His engineers are telling him

12   actually there is a problem and we need more engineers to fix

13   it, and him saying no, you can't have those resources, that's

14   not enough active participation?

15           MR. HESTER:  I would say it's not enough in two

16   senses, Your Honor.

17       First of all, every day CEO's make judgments on resource

18   requests.  So to draw an inference simply from the denial of a

19   resource request would really cut very broadly in terms of

20   this concept of participation.

21           THE COURT:  So you're saying that he has to be the

22   engineer sitting there or the -- you know, doing the work?

23           MR. HESTER:  No.  I'm saying there has to be some

24   specific direction of the tort.

25       But the second point I would make, Your Honor, is the

1    allegation here is not around Zuckerberg's decisions on

2    design.  The allegations are whether he -- he engaged --

3    participated in an alleged fraud or misrepresentation by Meta.

4        So this is not -- this -- since we're dealing only with

5    counts eight and nine of the complaint, these allegations

6    around resource requests or decisions he made about how the

7    products would be designed, these are not implicated by

8    counts eight and nine.  Those are misrepresentation or fraud

9    theories.

10        And as to those theories, there would need to be some

11    allegation of some specific direction to misrepresent or omit

12    information or some allegation that he actively participated

13    in some alleged scheme by Meta to misrepresent.  And there's

14    no such allegation here.

15            THE COURT:  All right.  Where's the allegation if it

16    exists?

17            MR. JASINSKI:  Well, Your Honor, I think that the

18    allegation pertaining to resource requests is a key part of

19    the fraudulent omission claim because that is information that

20    was not being disclosed at the same time that Mr. Zuckerberg

21    and others were making statements touting the focus that the

22    company had on safety.

23        And one thing that I find curious is the argument that

24    Mr. Zuckerberg -- and this is from -- I think Mr. Hester just

25    said it and also from Mr. Zuckerberg's brief -- that there's

 1   no allegation he directed anybody to make an omission.

 2       He directed himself to make an omission.  We have alleged

 3   that he had this knowledge and that he was speaking and he was

 4   omitting this information.  So I don't -- I can't understand

 5   the notion that if he had told a spokesperson to do the same

 6   thing, he could be held liable, but because he did it himself

 7   he can't.  I don't -- that doesn't make sense to me.

 8       So I think that all of the -- the allegations that we have

 9   with respect to Mr. Zuckerberg's role, the culture of

10   concealment he created, the growth-at-all-costs philosophy,

11   the design influence he had, his vetoing internal pleas for

12   help or ignoring internal pleas for help, coupled with the

13   fact that he is speaking and making misleading public

14   statements as part of Meta's effort to conceal, and the fact

15   that he knew the truth -- and knowledge, I think, is again a

16   through line in these cases.

17       The cases that have dismissed these claims often do so

18   because the officer didn't even know what was going on.  The

19   *Mozingo* case is a great example of this where there was a

20   cherrypicker, a crane essentially, that was defective, or

21   allegedly so.

22       And the -- the officer or I think former president had

23   authorized one prototype, and that was the full extent of the

24   allegations.  There was literally nothing else.  And the court

25   said that's not enough.  I agree that's not enough.

1      That's not what we have here.  We have somebody who is

2  deeply involved in the day-to-day of the very issue underlying

3  counts eight and nine.  He has his hands all over it.

4           **THE COURT:**  Okay.

5      When I scheduled this hearing, I told you that I had a

6  criminal case back in at 10:00.  It's six minutes to 10:00 so

7  you each get three minutes --

8           **MR. HESTER:**  All right.

9           **THE COURT:**  -- on your own --

10          **MR. HESTER:**  Thank you, Your Honor.

11          **THE COURT:**  -- without interruption.

12          **MR. HESTER:**  Thank you, Your Honor.

13          **THE COURT:**  If I can help myself.

14          **MR. HESTER:**  Should I go first, Your Honor?

15          **THE COURT:**  You should.  It's your motion.

16          **MR. HESTER:**  Yes.

17      I would say, first of all, to infer participation in a

18  tort by a corporation from denials of resource requests would

19  sweep very broadly against CEOs much beyond Mr. Zuckerberg.

20      Same thing for objectives of growth or success of a

21  corporation.  That's not enough to infer participation in a

22  tort.

23      And again, I would point back to the *Juul* case where the

24  court rejected and dismissed under New York law allegations

25  against three directors who had the final say over this

 1    alleged deceptive marketing campaign.  And the court said that

 2    wasn't enough to establish active knowing participation in the

 3    deceptive scheme.

 4        So simply to say he was -- Mr. Zuckerberg was broadly

 5    aware of what was going on in the company, again, that doesn't

 6    suffice to establish the participation liability theory.

 7        And to take counsel's position and to say Zuckerberg was

 8    making the statements himself, therefore he was participating,

 9    that totally collapses the distinction between personal

10    liability of corporate officers and this participation

11    liability theory.

12        And that's why the participation liability theory is

13    different.  It requires something more because we're talking

14    about the officer participating in a broader tort by the

15    corporation.

16        And so it can't be said that if Mr. Zuckerberg made a

17    statement and he's not personally liable, nonetheless for that

18    same statement he's liable on a participant liability theory,

19    then collapses the doctrines, and there's no case law that

20    supports that.  The case law is always talking about

21    participation in an alleged broader tort by the corporation.

22        I hope I've gotten in my three minutes, Your Honor.

23            **THE COURT:**  Go ahead.

24        **MR. JASINSKI:**  Thank you, Your Honor.

25    The participation in a fraudulent omission case

 1     necessarily includes the omission.  It can't be that we simply
 2     come to the court and say Mr. Zuckerberg didn't say anything,
 3     we're done, he should be held liable.
 4          But we don't do that.  We say that he didn't say anything.
 5     We also said that he said some things and they were
 6     misleading.  And we couple that with very particularized
 7     allegations about his knowledge of the harms, direct knowledge
 8     of the harms, and his role in contributing to them in part by
 9     vetoing these resource requests and the like.
10          This is, I think, the notion that any CEO knows something
11     about his company and therefore can't be held liable for
12     anything about his company doesn't make sense to me.
13          Mr. Zuckerberg knew specific -- specific important
14     material facts that Meta had a duty to tell the public.
15     Mr. Zuckerberg knew that, knew these facts, had the
16     opportunity to disclose them, and participated in the
17     fraudulent and negligent omission by failing to do so.
18          I think that Mr. Hester is reducing the Court's previous
19     order simply to the point that the Court found he had no duty
20     to speak, but the Court's reasoning -- obviously I don't want
21     to describe it for Your Honor because you're well aware of
22     it -- but was focused on whether the duty attached to him
23     personally.  We understand it did not, but it did attach to
24     Meta and he participated in Meta's breach of that duty.
25               THE COURT:  Okay.  Anything else?

1          **MR. JASINSKI:**  Not for the plaintiffs, Your Honor.

2          **THE COURT:**  Submitted.

3          **MR. JASINSKI:**  Thank you.

4          **MR. HESTER:**  Thank you, Your Honor.

5          **THE COURT:**  All right.  Then I will see you all in

6    August.  Stay cool.  It's hot out there.

7       We're adjourned.  Thank you.

8          **THE CLERK:**  Court is adjourned.  Thank you.

9          (Proceedings were concluded at 9:58 A.M.)

10                      --o0o--

11

12

13                 **CERTIFICATE OF REPORTER**

14

15          I certify that the foregoing is a correct transcript

16   from the record of proceedings in the above-entitled matter.

17   I further certify that I am neither counsel for, related to,

18   nor employed by any of the parties to the action in which this

19   hearing was taken, and further that I am not financially nor

20   otherwise interested in the outcome of the action.

21

22   _____

23   Raynee H. Mercado, CSR, RMR, CRR, FCRR, CCRR

24              Wednesday, July 17, 2024

25

*RAYNEE H. MERCADO, CSR, RMR, CRR, FCRR, CCRR (510) 565-7228*