# EXHIBIT B

JOINT STATUS REPORT ON DISCOVERY FOR AUGUST 8, 2024
DISCOVERY MANAGEMENT CONFERENCE

COVINGTON & BURLING LLP
ASHLEY M. SIMONSEN, SBN 275203
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Liaison Counsel for Defendants*

*[Additional Counsel on Signature Page]*

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

### FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| **COORDINATION PROCEEDING SPECIAL TITLE [RULE 3.400]**<br><br>**SOCIAL MEDIA CASES**<br><br>**THIS DOCUMENT RELATES TO:**<br><br>*All Cases*<br><br>*(Christina Arlington Smith, et al., v. TikTok Inc., et al., Case No. 22STCV21355)* | **JUDICIAL COUNCIL COORDINATION PROCEEDING NO. 5255**<br><br>For Filing Purposes: 22STCV21355<br><br>**JOINT STATUS CONFERENCE STATEMENT FOR JULY 19, 2024 CONFERENCE**<br><br>Judge: Hon. Carolyn B. Kuhl<br>SSC-12<br><br>Date:  July 19, 2024<br>Time:  11:00 AM |

JCCP bellwethers despite being presence at the DMC. Defendants likewise raised this argument during the meet and confer on this issue, and as Ms. Jeffcott expressly stated that no objection was made because both the MDL and JCCP understood those limits to apply only to general discovery *and not bellwether discovery*. This, along with contorting Mr. VanZandt's involvement in the MDL bellwether cases appear to be part of Defendants' current "gotcha" tactics.

  **C. Meta Relevant Time Period**

  <u>Plaintiffs' Position:</u>

  Magistrate Judge Kang held an MDL Discovery Management Conference on June 20, 2024 and, among other things, addressed the temporal scope of Meta's document production.  Magistrate Judge Kang ordered a general relevant time period for discovery commencing January 1, 2012, through April 1, 2024, while allowing additional discovery limited to specific features of Meta's platforms launched before January 1, 2012 to commence on January 1 of the year a particular feature was introduced.  By way of example and according to Meta, no age verification was implemented on Facebook until 2013 or on Instagram until December 2019.  Parental control features were not introduced on Facebook until 2023 or on Instagram until 2022.[10]  Therefore, if Meta had ***discussed, considered, proposed, or rejected*** age verification or parental controls before January 1, 2012, then Plaintiffs would have no discovery of that critical fact.

  At the June 20 DMC, JCCP Plaintiffs appeared and objected to Judge Kang's ruling on the temporal scope of discovery as to Meta.  While disagreeing with Judge Kang's ruling, the MDL plaintiffs have elected not to appeal the ruling to Judge Gonzalez Rogers.  This ruling, however, seriously prejudices the JCCP plaintiffs because it is unnecessarily restrictive in view of both the claims and scope of the case in the JCCP and the time periods of usage of Meta's platforms by certain JCCP bellwether plaintiffs.  Those issues are addressed in turn below.

  *Claims and Scope of Case*

  Broadly speaking, the MDL court took a largely product-focused view and analyzed the Plaintiffs' claims principally on a feature-by-feature basis.  *In re Soc. Media Adolescent Addiction/Pers.*

---

[10] *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.* (N.D. Cal. No. 4:22-MD-03047-YGR), June 2024 Discovery Management Conference Transcript at 68-69.

*Inj. Prod. Liab. Litig.* (N.D. Cal. Nov. 14, 2023, No. 4:22-MD-03047-YGR) 2023 WL 7524912, at *20, *motion to certify appeal denied* (N.D. Cal. Feb. 2, 2024, No. 4:22-MD-03047-YGR) 2024 WL 1205486 ("[I]t is the *functionalities* of the alleged products that must be analyzed . . . . Thus, the Court begins by setting out a framework, then applies it to plaintiffs' alleged defects.") (emphasis in original).

This Court's approach, however, was not to view the Defendants' platforms as products, but rather, that Defendants' liability should be assessed based on negligence principles, a point that the Court's October 13, 2023 Order addressing Defendants' Demurrer on personal injury claims (Demurrer Order) repeatedly makes clear:

- o "Whether or not defendants are liable should be determined by focusing on the defendants' conduct." (Demurrer Order at 39);

- o "Defendants are alleged to have facilitated use of their platforms by youth under the age of 13 by adopting protocols that do not verify the age of users, and 'facilitat[ed] unsupervised and/or hidden use of their respective platforms by youth.'" (Demurrer Order at 40);

- o "The Master Complaint is replete with allegations that Defendants were well aware of the harms that could result to Plaintiffs by their use of Defendants' platforms." (Demurrer Order at 46);

- o "And Plaintiffs allege that Defendants were on notice through their own research as well as through independent medical studies that this intended frequency and intensity of use of Defendants' *platforms* risked adverse health effects for the minor users." (Demurrer Order at 47, emphasis added).

- o "Plaintiffs allegations are more appropriately conceptualized as contending that Defendants *engaged in a course of conduct* intended to shape the user experience for these Plaintiffs, and that this course of conduct foreseeably caused personal injury to Plaintiffs." (Demurrer Order at 39, emphasis added).

Magistrate Judge Kang's ruling as to the temporal scope of Meta's document production is perhaps understandable given the product/feature-specific analytical framework adopted by the MDL court. But his ruling, as applied to the JCCP Plaintiffs, omits from discovery entirely documents before 2012 (e.g., the first eight years of the company's existence) that directly bear upon critical issues of

liability under this Court's ruling including Meta's "course of conduct" as to its "platform" generally, and related issues of Meta's knowledge and notice of both the need for additional youth safeguards (age verification and parental controls as two examples) and harms and potential harms associated with youth use of its platforms.

To put this problem into context, in 2005 Facebook became available to high school students and in 2006 it permitted anyone 13 years of age and older to join the platform.  JCCP Plaintiffs allege that before the platform was made available to such young and vulnerable users Meta (then Facebook) should have implemented robust age-verification and parental controls, and that it should have done the same when it acquired Instagram.  Yet, *eight (8) years* would go by until the company in 2013 implemented even rudimentary age-verification on Facebook, and Instagram had no mandatory age verification until the end of 2019 (all of which Plaintiffs allege was entirely insufficient and ineffective). The situation was even worse as it relates to parental controls, as Facebook  failed to launch them until 2023 (some 18 years after it permitted teens onto the platform) and Instagram failed to launch them until 2022 (10 years after Meta acquired Instagram).   If during this remarkably long span of years Meta employees discussed the potential need for age verification and parental controls or received information, knowledge or notice of the potential need for them and yet failed to implement any, such information would go directly to Meta's "course of conduct" – and the reasonableness or unreasonableness of it – which this Court has held is a fundamental aspect of Plaintiffs' claims. (Demurrer Order at 39).  However, under Magistrate Judge Kang's ruling, Meta is not required to even look for, much less produce, any such documents before January 1 of 2012.  And, in the case of documents relating to the risks of harm to youth posed by Meta's *platforms generally* – that is, not tied to a specifically-named feature—Meta is required to produce *nothing* for the first eight (8) years of the company's existence.

Plaintiffs' concerns here are not simply theoretical.  Information in the public domain strongly suggests that such materials likely exist.  For example, Sean Parker, who served as Facebook's first

President, joined the company when it was only five months old and brought on its first investors[11] has

publicly stated:

> God only knows what it's doing to our children's brains. . . . The thought process that went into building these applications, Facebook being the first of them, . . . was all about: How do we consume as much of your time and conscious attention as possible? . . . And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post . . . . And that's going to get you to contribute more content, and that's going to get you . . . more likes and comments. . . . It's a social-validation feedback loop . . . exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. . . . The inventors, creators it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people understood this consciously. And we did it anyway.

Parker's comments clearly reference decisions made in the early days of the company, and they

fit quite closely with how this Court has characterized Plaintiffs' claims, "as contending that [Meta]

engaged in a course of conduct intended to shape the user experience for these Plaintiffs and that this

course of conduct foreseeably caused personal injury to Plaintiffs." (Demurrer Order at 39). Similarly,

both Plaintiffs' negligence claims and their punitive damages claims necessarily require discovery into

Meta's knowledge, notice, state of mind, and actions or inactions in relation to various aspects of its

*platforms* overall, and not necessarily confined to any particular feature. Examples include:

- o What did Meta do to maximize time spent on its platform by youth users, and when did it do it, including the earliest dates of such actions and internal communications about the issue.

- o What did Meta know and when did it know it in terms of potential adverse impacts and harms to youth on its platforms, including the earliest dates of Meta's knowledge on these topics and internal discussions about them.

- o What did Meta know and when did it know it, or what should it have known, about the need to have adequate age verification on its platforms, including the earliest date of what Meta knew or should have known, or discussed internally about this topic.

---

[11] According to Mark Zuckerberg, Parker "was pivotal in helping transform Facebook from a college project into a real company." Forbes, September 21, 2011.

      ○ What did Meta know and when did it know it, or what should it have known, about the need to have adequate parental controls on its platforms, including the earliest date of what Meta knew or should have known, or discussed internally about this topic.

These examples illustrate why Meta's knowledge, course of conduct, and actions or inactions are at the heart of the case in the JCCP. And these issues go back to the earliest days of the company.

*Time Period of Usage of Meta's Platforms by Certain JCCP Bellwether Plaintiffs*

Another significant problem with prohibiting any discovery that is not feature-specific prior to 2012 is that certain bellwether plaintiffs in the JCCP began using Meta's platforms well before that date. For example, Plaintiff Jamie Loach began using Facebook in 2006. However, as things presently stand, this Plaintiff would be permitted no discovery at all (unless explicitly tied to a specific feature) into the above issues for the first *six years* of the plaintiff's use. Such a situation is clearly prejudicial to her claims. Likewise, Plaintiff Whitney Lambert began using the platform in 2008 and Plaintiff James McCune began using it in 2009, all of them, like Plaintiff Loach, years before 2012.[12] Precluding discovery into these foundational issues over a considerable period of years during which these plaintiffs were using Meta's platforms is unwarranted and prejudicial to their claims.

*Relief Requested*

At the June 27, 2024 Case Management Conference, the Court directed Plaintiffs to "make a specific argument of need to move to broader discovery in a particular area" and gave, as an example, "a narrow request about what the – what the state of mind was at certain periods of time." (June 27, 2024 CMC Tr. at 39; 46). The Court also instructed the parties to confer and for Plaintiffs to "thoroughly discuss the parameters of what you are seeking in the next report." (*Id.* At 46). Plaintiffs have now done as the Court directed.

---

[12] Meta mistakenly suggests that these plaintiffs will get all discovery that they need during the early periods of use through the DFS process, but nothing about the DFS requires Meta to produce internal documents that go to the issues described above including, by way of example, Meta's own knowledge and notice of the need for youth safeguards such as age verification and parental controls. As the Court is aware, the DFS provides limited user data as to each plaintiff. This was limited in the DFS informal discovery conference process due to data that could be provided within the bellwether selection timeframe with the Court indicating Plaintiffs would "get everything" related to bellwether plaintiff user data during bellwether discovery.

Specifically, Plaintiffs have identified a very small subset of only 15 document requests that already were served on Meta (less than 5% of the total requests served on Meta), which, for the reasons explained above, Plaintiffs request Meta be ordered to search for and produce from the inception of the company.  Plaintiffs can file a motion to compel and would like to do so to create a record for the trial bellwethers' claims – which are expected to go to final judgment.  Those 15 document requests are set forth in full in the chart below, and collectively fall into the following five (5) key subject areas that all directly relate to the issues explained above:

- Parental Controls (Request No's. 85, 86, 87)
- Youth Access and Age Verification (Request No.'s 138, 139, 140, 145)
- Safety of youth, adverse impacts to youth, problematic or compulsive use, youth addiction (Request No's. 108, 112, 113, 117, 118)
- Youth targeting (Request No. 84)
- Warnings and potential warnings to youth users and parents (Request No.'s 106, 107)

| REQUEST NO. 84. | Documents that constitute, describe, or discuss the targeting of, or marketing and advertising to, Children, Teens, and Youth on Your Platform, including Documents or data provided to advertisers. |
|---|---|
| REQUEST NO. 106. | All Documents concerning warnings discussed or provided to users, potential users, parents, or guardians of any risks to the Safety of Children, Teens, and Youth in using Your Platform or any of the Named Features. |
| REQUEST NO. 107. | All Documents concerning the effectiveness of any warnings provided to users, potential users, parents, or guardians of any risks to the Safety of Children, Teens, and Youth in using Your Platform or any of the Named Features. |
| REQUEST NO. 108. | All literature reviews or syntheses You performed concerning the topics of addiction, compulsive use, problematic use, Safety, or Youth Users on social media platforms, including on Your Platform, and all of Your Communications concerning the same. |
| REQUEST NO. 112. | All Documents concerning any actual or proposed analyses by You concerning the topics of addiction, compulsive use, problematic use, or Safety of Youth users on Your Platform or any other social media platform, and all Documents referenced in or Communications concerning the same. |
| REQUEST NO. 113. | Any meeting agendas, presentation materials, handouts, background materials, or other Documents concerning any actual or potential adverse impact of Your Platform or any other social media platform on the Safety of Children, Teens, and Youth users that were discussed, tested, proposed, or implemented by any of Your Unit(s) responsible in whole or part for the Safety of Your users. |
| REQUEST NO. 117. | All actual or proposed analysis of the use of Your Platform or any other social media platform by Children, Teens, and Youth, including any focus group or survey research and all Documents referenced in or Communications concerning the same. |

| REQUEST NO. 118. | All analyses, or Documents reflecting proposed analyses, of the actual or potential impact of use of Your Platform or any other social media platform on the Safety of Children, Teens, and Youth, and any Documents referenced in or Communications concerning the same. |
|---|---|
| REQUEST NO. 145. | All Documents that constitute, identify, describe, or discuss Your Policies regarding access to Your Platform by Children ("Child Access Policies"), including comments, edits, or suggested changes to such Policies. |
| REQUEST NO. 85. | Documents that constitute, identify, or describe any Policies, tools, mechanisms, or other means for parents or guardians to monitor, limit, or control use of Your Platform by their Children or Teens ("Parental Controls") that You make available to parents during the Relevant Time Period. |
| REQUEST NO. 86. | All Documents concerning the ability of users to circumvent Parental Controls or the prevalence of Children or Teens using Your Platform in a manner that evades Parental Controls. |
| REQUEST NO. 87. | All Documents that constitute, identify, describe, or discuss any analysis of the efficacy of any Parental Controls, including awareness of Parental Controls, accessibility and ease of use of Parental Controls, deterrence to use of Parental Controls, impact of Parental Controls on the Safety of Children or Teens, and impact of Parental Controls on the frequency, duration, and intensity of usage of Your Platform ("Engagement") by Children or Teens. |
| REQUEST NO. 138. | Documents that constitute, identify, or describe any Policies, models, tools, mechanisms, or other means used by You to verify the age of users ("Age-Verification Tools") on Your Platform during the Relevant Time Period. |
| REQUEST NO. 139. | All Documents that constitute, identify, describe, or discuss any analysis of the efficacy or accuracy of any of Your Age-Verification Tools. |
| REQUEST NO. 140. | All Documents that constitute, identify, describe, or discuss any analysis of actual or proposed new, modified, or alternatively designed Age-Verification Tools, including their potential to increase the efficacy or accuracy of age verification on Your Platform. |

Plaintiffs' requests are narrowly tailored to issues of critical importance to their claims in the

JCCP. As set forth above, the issues raised by these requests go directly to essential elements of

Plaintiffs' negligence and punitive damages claims. In making this request, Plaintiffs are not asking this

Court to contradict Judge Kang. The default start date for Meta's document production will still be 2012

for over 95% of Plaintiffs' document requests, his ruling regarding feature-specific discovery will still

apply and only if documents exist that meet the descriptions in this vary narrow subset of requests will

Meta be required to produce materials from earlier time periods.[13]

---

[13] Although Plaintiffs' request is straightforward and limited to these 15 production requests, Meta obscures the issue by arguing at length about search terms, and repeatedly claims that Plaintiffs **may** get relevant documents **if** feature-specific search terms just happen to turn up documents unrelated to the

1   The burden on Meta presented by this request is minimal, and JCCP Plaintiffs will be

2   significantly prejudiced if they are not permitted this discovery, particularly since certain bellwether

3   plaintiffs began using Meta's platforms as early as 2006.  The scope of the case is different, and

4   arguably broader, in the JCCP than in the MDL, in terms of the claims, issues and time period of

5   plaintiffs' usage, and discovery should appropriately take those differences into account.  Prior to

6   making this request, Plaintiffs shared the above list with Meta's counsel and conferred with them about

7   it, but the parties were unable to reach any agreements with respect to these issues.

8   **Meta's Position:**

9   This Court should deny Plaintiffs' request to expand the Relevant Time period applicable to

10  general and "feature-specific" discovery of Meta in the JCCP, beyond what Judge Kang ordered in the

11  MDL – with no objection from the MDL Plaintiffs.  The Relevant Time Period ordered by Judge Kang

12  already requires Meta to collect and review documents for 122 agreed-to custodians over a ***twelve-year***

13  ***period*** (from 2012-2024), and to additionally collect documents hitting on "feature-specific" search

14  terms from December 31, 2011 back as far as 2006 (depending on the launch date of the feature).  Meta

15  has previously estimated that these collections will return ***over ten million documents*** for review.

16  Plaintiffs utterly fail to explain how a discovery period spanning ***nearly 20 years*** and returning ***millions***

17  ***of documents*** is not sufficient to prosecute their cases.  Nor could they, when they previously assured

18  this Court – in pressing for a highly accelerated case schedule and early trial date – that "[p]articularly

19  for the Meta Defendants[,] . . . there is lots of information out there, ***and we're going to use that to***

20  ***make sure our discovery is tailored and targeted.***"  11/7/23 JCCP CMC Tr. 41:25-42:6 (emphasis

21  added); *see also id.* 41:25-42:6 (Court admonishing Plaintiffs that they "have to know that getting to [an

22  early trial] means ***you are going to have to think about how much discovery you need***." (emphasis

23

24

25  specific features at issue, offering a handful of examples in support. But it is difficult to conceive of

26  how, other than by sheer happenstance, searching for documents about specific features with terms such
    as "accounts to follow." "similar network," or complicated strings requiring more than one term or

27  phrase to appear in the document (none of which are focused on age verification or parental controls)
    would reveal documents addressing issues of age verification and parental controls. These examples

28  underscore Plaintiffs' need for the items called for in this very small subset of production requests.

added)).  For these reasons and the additional reasons set forth below, this Court should order the same Relevant Time Period in the JCCP that Judge Kang ordered in the MDL.

For the Court's reference, Defendants attach hereto as **Exhibits F, G, and H** the parties' letter-briefing on Relevant Time Period in the MDL; the transcript of hearing on that dispute; and Judge Kang's subsequent order memorializing his rulings.

*Plaintiffs Misunderstand Magistrate Judge Kang's Ruling*

As a threshold matter, Plaintiffs misunderstand Magistrate Judge Kang's ruling on the time period(s) applicable to discovery as to Meta.  Judge Kang did *not* limit *all* "feature-specific" discovery to January 1 of the year each feature was launched, as Plaintiffs have suggested.  For any features launched in 2012 or later – including parental controls and age verification – plaintiffs will get discovery going back to January 1, 2012.

Plaintiffs are also incorrect that "if Meta had ***discussed, considered, proposed, or rejected*** age verification or parental controls before 2012, then Plaintiffs would have no discovery of that critical fact."  Meta is implementing Judge Kang's order authorizing feature-specific discovery before 2012 by running 107 broad search terms – negotiated and agreed-to by plaintiffs – relating to the features launched before 2012.  Meta will run these 107 broad search terms across the documents of all agreed-to custodians employed at the company before 2012, back to January 1 of the year of launch of each pre-2012 feature, which for some features is 2006.  Meta then intends to produce responsive, non-privileged documents returned by those search terms – ***regardless of whether they relate to the features for which feature-specific discovery was authorized before 2012***.

Contrary to Plaintiffs' assertion, it is not "difficult to conceive" how documents addressing issues of age verification and parental controls – or any other features launched after 2011 – might be returned by the "feature-specific" terms Meta has agreed to run over pre-2012 documents.  For example, documents from before 2012 discussing how parental controls or age verification might address purported defects in Meta's platforms or alleged harms to users – such as excessive notifications, recommendations to teens of other accounts to follow, the ability of teens to privately message with other users, ephemeral content, endless scroll, social comparison, and problematic use – should be

captured by the below feature-specific search terms, and will be produced if responsive and non-privileged:

- (teen* OR tween* OR adolescent* OR kid* OR youth* OR child* OR underage* OR juvenile* OR pre-teen* OR preteen* OR "gen* z" OR "genz" OR "gen-z" OR (gen w/2 "z") OR (generation w/2 "Z") OR (gen w/2 alpha) OR (generation w/2 alpha) OR "gen* alpha" OR "gena" OR "gen-a" OR private)) **w/15** (messag* OR chat* OR conversation* OR "DM")

- notif* **w/10** (tim* OR number OR "too many" OR excessiv* OR repeat* OR bombard* OR incessant* OR nonstop OR non stop OR non-stop OR never-ending OR never ending OR night OR evening OR midnight OR sleep* OR bed* or "turn off" OR push OR adjust*)

- (("problematic use*" or "social compar*" or "rabbit hole" or "rabbithole" or "habit loop")) **AND** (algo* w/5 recommend*)

- ((increas* w/5 engage*) OR (increas* w/5 use)) **AND** ((algo* w/5 rank*) OR (algo* w/5 content*) OR (algo* w/5 recommend*))

- (infinit* or endless* or begin*or endless* or end* or paus* or never-ending or "never ending" or passive) **w/5** (scroll* OR feed* OR newsfeed* OR news feed*)

- "ephemeral content"

- "similar profile*" OR "similar network*" OR "similar activit*" OR "similar interest*" OR "complementary profile*" OR "complementary activ*" OR "complementary interest*"

- "Accounts To Follow" OR "People You May Know"

- (recommend* OR suggest* OR "you should") **w/15** (pedo* OR predator* OR groom*)

Contrary to Plaintiffs' assertion, Meta is not "obscur[ing] the issue" by pointing to search terms. As Plaintiffs' counsel know (from participating in search term negotiations in the MDL and coordinating with MDL plaintiffs' counsel), all Defendants are using search terms to locate potentially responsive custodial documents – making them directly relevant to the question of whether Plaintiffs will be getting sufficient discovery over the time period(s) allowed.[14]

       In addition to allowing discovery into all of the features challenged by plaintiffs going back to 2006, Judge Kang's ruling will also allow discovery into Meta's "course of conduct" and "the reasonableness or unreasonableness of it" going back to 2006. Plaintiffs are thus flatly incorrect that

---

[14] Meta will supply the Court with a list of the parties agreed-to feature-specific and more general search terms upon request.

"Meta is required to produce nothing for the first eight (8) years of the company's existence" "relating to the risks of harm to youth posed by Meta's *platforms generally* – that is, not tied to a specifically-named feature" (emphasis in Plaintiffs' Position). While Meta will be running the "feature-specific" terms only from the beginning of the year when each feature was launched (if launched prior to 2012), those terms are so broad – e.g., ("underage* **AND** (abuse* OR exploit*); "teen* w/15 conversation*"; "youth w/15 message*"; "end* w/5 newsfeed*" – that they will likely encompass the broader information sought by Plaintiffs during this period. For example, documents from before 2012 discussing the purported defects in Meta's platforms or alleged harms to users, as reflected in the above exemplary search terms, should be captured by those terms and, if responsive and non-privileged, will be produced. *See* 6/20/24 MDL DMC Tr. 81:20-23 (Judge Kang pressing JCCP Plaintiffs' co-lead counsel on why they would not get responsive documents "when [Meta] run[s] the custodial searches . . . for documents going . . . back to" 2006).

*Plaintiffs Misconstrue the Courts' Motion-to-Dismiss/Demurrer Rulings*

Plaintiffs' argument that a fundamentally different approach to discovery is required in the JCCP because the MDL court supposedly "took a product-focused view" while this Court supposedly took a "negligence" approach misapprehends both Courts' motion-to-dismiss and demurrer rulings. This Court, no less than the MDL court, adopted a *feature-specific* framework for analyzing Plaintiffs' negligence claim – because the JCCP negligence claim was equally predicated on challenging specific *features* of Defendants' platforms. *See, e.g.*, JCCP Master Complaint ¶¶ 2, 95, 439 (alleging that "an array of design features [embedded in Defendants']" services "work in combination" to "induce addiction, compulsive use, and other severe mental and physical harm"); *id.* ¶¶ 929-30 (specifying challenged features for negligence claim).

As this Court explained in its demurrer ruling on the negligence claim: "Plaintiffs are clear that they seek to prove . . . injury to minors from the *features* that Defendants used on their platforms"; and Plaintiffs' allegations that their "harms were caused *by the design features* of Defendants' platforms is critical to this court's decision." Demurrer Order, at 10, 39 (emphases added); *see also id.* at 56 (holding that "because the Master Complaint can be read to state that Defendants' *design features*

*themselves . . .* caused Plaintiffs' harms, the Demurrer cannot be sustained" (emphasis added)); *id.* at p.1 (("[Plaintiffs'] addictions, they contend, resulted from allegedly manipulative *features*" (emphasis added)); *id.* at 55 ("Plaintiffs allege that *the design features* of each of the platforms at issue here cause these types of harms" (emphasis added)).

The fact that the MDL Court went further in clarifying which features are protected by Section 230 or the First Amendment, while this Court believed California procedural rules did not warrant doing so, *see id.* at 66 (declining "to sustain a demurrer to a portion of a cause of action"), does not change the basic fact that a feature-specific approach to discovery on a feature-specific negligence claim remains appropriate.  Presumably for these reasons, Judge Kang already rejected this same argument when the JCCP and MDL plaintiffs both made it to him.  *See* **Exhibit G**, 6/20/24 MDL DMC Tr. 79:9-12 (co-lead counsel for JCCP Plaintiffs), *id.* 51:21-4, 76:6-11 (counsel for MDL plaintiffs).  Specifically, Judge Kang responded that "I'm not going to have kind of a broad early, early, early default discovery date because at some point in time it starts getting -- it starts getting unproportional I believe."  *Id.* 64:18-65:7.

Regardless, as explained above, the discovery Plaintiffs will be getting through the MDL is significantly broader than "feature-specific" discovery.  Meta has agreed to run incredibly broad search terms – including dozens of standalone Youth Terms like young*, minor*, and teen* – across the documents of all 122 agreed-to custodians going back to January 1, 2012, and as noted above will be producing responsive, non-privileged documents returned by those terms; Meta will also be producing responsive, non-privileged documents returned by the additional broad "feature-specific" terms it has agreed to run from December 31, 2011 back as far as 2006.  Accordingly, Plaintiffs' concern that they will be getting only narrow "feature-specific" discovery going back to 2006 is unfounded.

*Plaintiffs' "Periods of Usage" Argument Undermines Their Argument*

Meta disagrees that the JCCP bellwether Plaintiffs' time periods of usage have any bearing on the appropriate time period applicable to general and "feature-specific" discovery as to Meta.  There is an entirely separate process for Plaintiffs to get discovery relating to their usage history – namely, the DFS – and Meta has already agreed through the DFS to produce available information relating to all JCCP Plaintiffs' usage.  And as explained above, the expansive time periods for general and "feature-specific"

discovery of Meta allowed under Judge Kang's ruling provide more than sufficient coverage for "internal documents" relating to Meta's "knowledge and notice."

Even crediting Plaintiffs' argument that they need discovery of Meta going back to the earliest period of use of any bellwether Plaintiff, however, ***they will get that***:  the earliest date of use of any of the bellwether plaintiffs is 2006, and (as explained above) Plaintiffs will get discovery from Meta going back to 2006 – including non-privileged documents responsive to the hundreds of plaintiffs' RFPs Meta has not objected to that are returned by the broad "feature-specific" search terms.  Thus, Plaintiffs' argument that bellwether Plaintiff Jamie Loach "would be permitted no discovery at all (unless explicitly tied to a specific feature) . . . for the first *six years* of the plaintiff's use" is incorrect.  If anything, the JCCP Plaintiffs' focus on periods of usage by the bellwether Plaintiffs only underscores why their request for discovery going *further* back in time (to the date of inception of the company) should be *denied* (because no bellwether Plaintiffs used the platforms before 2006).

*The Court Should Reject the "Relief Requested" by Plaintiffs*

Plaintiffs ask this Court to order Meta to produce discovery going back to 2004 for what they describe as a "very small subset of only 15 document requests that already were served on Meta."  In fact, these RFPs are incredibly broad; and Meta has already negotiated with plaintiffs the search terms aimed at locating documents responsive to these RFPs (to the extent not objected to), which took into account the period of time over which they would be run (2012-2024).

Regardless, as explained above, Plaintiffs will get back to 2006 any non-privileged documents responsive to these RFPs (to the extent not objected to) if they are returned by the broad "feature-specific" search terms Meta has agreed to run.[15]  If the MDL and/or JCCP plaintiffs have good cause following production of those documents to seek additional targeted discovery before 2006, they may seek it from Judge Kang.  Indeed, Judge Kang has already ordered that plaintiffs may upon a showing of need serve "specific" RFPs for "materials that fall outside the Relevant Time Period" – leaving entirely unclear why the JCCP Plaintiffs are seeking prematurely to appeal Kang's ruling to this Court now.  DMO 7 (MDL ECF 969) at 2-3; 5/23 MDL Hr'g Tr. at 91; *see also* 6/20 MDL DMC Tr. 64:20-65:3.  Notably, Judge

---

[15] As indicated above, the date range for the feature-specific terms being run prior to 2012 will vary depending on when the feature at issue was released.

Kang's approach is consistent with the approach this Court has repeatedly emphasized it prefers to take, wherein "core" discovery is produced first, with Plaintiffs then having the ability to seek additional discovery only upon a showing of need. *See supra* Section III(B). Since Judge Kang has already said he will allow plaintiffs to do that – after allowing far more than just "core" discovery at the first instance – Plaintiffs' effort to appeal his ruling to this Court now, before documents going back to 2006 have even been produced, is premature at best.

For all of these reasons, Plaintiffs' request to expand the Relevant Time Period as to Meta should be denied, at a minimum without prejudice to renewal after they have received the already-broad discovery Judge Kang has allowed.

## IV.    Bellwether Trial Schedule

### Plaintiffs' Position:

In line with Plaintiffs' request and the Court's prior guidance, Plaintiffs believe early bellwether trials beginning in the summer of 2025 is appropriate and justified.  Indeed, the bellwether selection process, which has occurred during the summer months, has confirmed to Plaintiffs that conducting trials during summertime will minimize disruption to the school schedule of most bellwethers and allow for greater participation by minor plaintiffs and minor witnesses.

Based on the Court's prior statements, it is Plaintiffs' understanding that the Court would like multiple bellwethers to be prepared for each trial date.  Plaintiffs believe that, beginning with a trial in June 2025, trials could be scheduled thereafter every six weeks with the goal of having three trials during the summer. Plaintiffs respectfully request the Court's guidance on scheduling and order the Parties to meet and confer and present proposed pre-trial schedule(s) at the next CMC.

### Defendants' Position:

It is premature to set trial dates in the PI bellwether cases.  This Court has made clear that the availability of trial dates will not be a challenge such that the Parties need not reserve a trial date prematurely.  Rather, the Court has said it intends to discuss bellwether trial dates with the Parties this fall after, among other things, the MDL Court determines how it intends to set cases for trial, including when to try the first State Attorney General (AG) case.  That discussion, in particular, is ongoing in the MDL, with the Court and parties evaluating whether Meta has a right to a jury trial on the AGs' claims.

# EXHIBIT F

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047<br><br>Case Nos.:  4:22-md-03047-YGR-PHK<br><br>**JOINT LETTER BRIEF ON PROTECTIVE ORDER REGARDING RELEVANT TIME PERIOD APPLICABLE TO META DOCUMENT SEARCH AND PRODUCTION**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |
| This Filing Relates to:<br><br>*All Actions* | |

Dear Judge Kang:

      Pursuant to the Court's Standing Order for Discovery in Civil Cases, the PI/SD Plaintiffs and Defendants Meta Platforms, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; and Siculus, Inc. (collectively, "Meta") respectfully submit this letter brief regarding the Relevant Time Period applicable to Plaintiffs' discovery requests and Meta's search, collection, and review of responsive documents.  **Exhibit A** is a copy of excerpts from the PI/SD Plaintiffs' First Set of Requests for Production (RFPs) served on Meta.  **Exhibit B** is a copy of excerpts from Meta's Objections and Responses to Plaintiffs' First Set of RFPs served on Plaintiffs.

      Pursuant to that Discovery Standing Order and Civil Local Rule 37-1, the Parties attest that they repeatedly met and conferred by video conference, email, and correspondence before filing this brief.  The final conferral was attended by lead trial counsel for the parties involved in the dispute on May 16, 2024.  Because all lead counsel were not located in the geographic region of the Northern District of California or otherwise located within 100 miles of each other, they met via videoconference.  Lead trial counsel have concluded that no agreement or negotiated resolution can be reached.

Dated:  May 23, 2024                Respectfully submitted,

                                 *Lexi J. Hazam*
                                 LEXI J. HAZAM
                                 **LIEFF CABRASER HEIMANN &**

BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 Challenger Road, 6th floor
Ridgefield Park, NJ 07660
Telephone: 973-639-9100
Facsimile: 973-679-8656
cseeger@seegerweiss.com

Counsel to Co-Lead Counsel and Settlement
Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 Montgomery Street, Suite 900
San Francisco, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

Liaison Counsel

JOSEPH G. VANZANDT
**BEASLEY ALLEN CROW METHVIN
PORTIS & MILES, P.C.**
234 Commerce Street
Montgomery, AL 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
220 W. Garden Street, 9th Floor
Pensacola, FL 32502
Telephone: 850-316-9100
ejeffcott@forthepeople.com

Federal/State Liaison Counsel

MATTHEW BERGMAN
**SOCIAL MEDIA VICTIMS LAW CENTER**

2

821 Second Avenue, Suite 2100
Seattle, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 Broadway
New York, NY 10003
Telephone: 212-558-5500
Facsimile: 212-344-5461
jbilsborrow@weitzlux.com

PAIGE BOLDT
**WATTS GUERRA LLP**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
Telephone: 210-448-0500
PBoldt@WattsGuerra.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701 1100
tcartmell@wcllp.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 Madison Ave, 7th Floor
New York, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY,
PSC**
2380 Grandview Drive
Ft. Mitchell, KY 41017
Telephone: 888-606-5297
semery@justicestartshere.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
Telephone: (646) 666-8908
carrie@cagoldberglaw.com

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY,
PSC**
600 West Main Street, Suite 100

3

Louisville, KY 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

SIN-TINY MARY LIU
**AYLSTOCK WITKIN KREIS &
OVERHOLTZ, PLLC**
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 Hudson Yards, 11th floor
New York, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 Broadway, Suite 2100
Oakland, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212.213.8311
hnappi@hrsclaw.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 South Baylen Street, Suite 600
Pensacola, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, P.C.**
1500 Rosecrans Ave., Ste. 500
Manhattan Beach, CA 90266
Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: (818) 839-2333

4

Facsimile: (818) 986-9698
rtellis@baronbudd.com
dfernandes@baronbudd.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

MELISSA YEATES
JOSEPH H. MELTZER
**KESSLER TOPAZ MELTZER & CHECK,
LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com
jmeltzer@ktmc.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205.855.5700
fu@dicellolevitt.com

*Attorneys for Plaintiffs*

**COVINGTON & BURLING LLP**

Ashley M. Simonsen
Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email:  asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*

5

Michael X. Imbroscio, *pro hac vice*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email:  pajones@cov.com
Email:  pschmidt@cov.com

Emily Johnson Henn (State Bar. No. 269482)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800
Email:  ehenn@cov.com

Isaac D. Chaput (State Bar No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: +1 (415) 591-6000
Facsimile: +1 (415) 591-6091
Email:  kpatchen@cov.com
Email:  ichaput@cov.com

Gregory L. Halperin, *pro hac vice*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
Email:  ghalperin@cov.com

*Attorney for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC;
Instagram, LLC; Siculus, Inc.; and Mark Elliot
Zuckerberg*

6

**Plaintiffs' Position**: This dispute concerns the Relevant Time Period applicable to Plaintiffs' discovery requests and Meta's search, collection, and review of responsive documents. Plaintiffs agreed to limit collection of custodians' files to their first date of employment through the date of collection[1] as the default Relevant Time Period. There is substantial justification for that default period. In contrast, the period Meta proposes – January 1, 2015 through February 14, 2023 – would shield *known* relevant information from discovery for no justifiable reason.

The discovery period turns on the facts alleged; more lengthy discovery periods are appropriate where necessary to ascertain the defendant's knowledge or notice of harmful conduct. *E.g.*, *Facebook Consumer Privacy Litig.*, 2021 WL 10282215, at *5 (N.D. Cal. 2021) (ordering 14-year time period for discovery). Courts generally recognize that a defendant's experience with its own product, predecessor products, or related products is relevant to issues such as notice, knowledge of risk, and alternative designs. *E.g.*, *Welding Fume Prods. Liab. Litig.*, 2010 WL 7699456, at *19 n.104 (N.D. Ohio 2010) (historical documents discovered from defendants dating back several decades relevant to show defendants' awareness of dangers); *Hatamian v. AMD*, 2015 WL 7180662, at *2 (N.D. Cal. 2015) (discovery [is allowed] to extend to events before and after the period of actual liability so as to provide context."); *accord Petconnect Rescue, Inc. v. Salinas*, 2022 WL 448416, at *7 (S.D. Cal. 2022). Here, liability for Plaintiffs' design defect, failure to warn, and negligence claims extends back to the development of its features and applications as well as the development of Meta's critical platform design choices, many of which were made between 2004 and 2015. *See Fassett v. Sears Holdings Corp.*, 319 F.R.D. 143, 157 (M.D. Pa. 2017) (temporal scope encompassing the design, is reasonable in a products case); *accord Theobald v. Piper Aircract, Inc.*, 2017 WL 9248504, at *3 (S.D. Fla. 2017) (discovery period eight years before product was built). Foreclosing discovery that pre-dates 2015 will deprive Plaintiffs of highly relevant information critical to their case.

**Meta Began Designing the Relevant Technology in 2004.** Meta began designing the core technology that drives Facebook in 2004 by launching thefacebook.com. Master Compl. ("PI Compl.") ¶¶ 279-281. Facebook continued to add features including photos, newsfeed, chat, messenger, Facebook live, and other features between 2004 and 2015, as well as implement numerous modifications to these features. *Id*. at ¶¶282-291. These changes included introducing newsfeed in 2006, adding a video service in 2007, launching Facebook chat in 2008, an algorithm to make personalized suggestions for "friending" in 2008, the "like" button in 2009, changing newsfeed from chronologic to algorithmic raking in 2009, launching the messenger app in 2012, and acquiring Instagram in 2012, which was designed and launched in 2010. *Id*. at ¶¶279-290, 296-298. Plaintiffs need, are entitled to, and would be prejudiced without discovery going back to the beginning of the development and testing of the relevant technology to understand how Meta developed and designed its addictive features and products, what alternative designs were available and/or considered and rejected, and why Meta chose the design it did when marketing its product. Plaintiffs have compromised at the date of first employment for each custodial file.

**Meta has no good cause to limit discovery to 2015-2023.** Plaintiffs' RFPs to Meta define the Relevant Time Period as "the date [Meta] first researched, designed, or developed the Facebook Platform or any of its predecessors to the present." Contrary to Meta's assertions that Plaintiffs did not assert this issue until months after Meta began collecting custodial files, Plaintiffs have repeatedly addressed the fact that the Relevant Time Period runs from the initial design and development of the platforms and features at issue and does not end upon the filing of the Master Complaint in correspondence and meet and confers regarding the RFPs going back to February of this year. Any delay in bringing this dispute to the Court is due to Meta's reluctance to "ripen" the dispute. During early conferrals, During early conferrals, Meta declined to say whether it would stand on its time

---

[1] This offer was made without prejudice to Plaintiffs' ability to request updated and refreshed productions consistent with the Parties' obligations under the Federal Rules.

period objections and instead asked to defer conferral on time period to custodian/search terms discussions. The dispute did not ripen until Meta provided its search proposal with a proposed time period limitation on April 5, to which Plaintiffs timely objected.

Meta offers 3 "justifications" for arbitrarily excluding relevant documents: (1) prior productions to the AsG were limited to 2015,[2] (2) discovery should cut-off at the date of the PI Compl.,[3] and (3) there is simply not enough time to meet the Court's deadlines using the Relevant Time Period. These reasons do not accurately describe the AsG's investigation or fit the facts of this case, nor are they consistent with the law. It is axiomatic that Meta possesses relevant information responsive to Plaintiffs' RFPs during the entirety of Plaintiffs' Relevant Time Period.[4] Yet, Meta seeks to unilaterally limit its collection of relevant information to **conceal** critical documents it **knows** are relevant and responsive to Plaintiffs' RFPs, suggesting it is just too burdensome for one of the world's largest companies to comply with its most basic discovery obligations. To the degree Meta is raising an undue burden argument in opposition to the Relevant Time Period, or an argument that it is disproportional to the needs of the case, that argument is unavailing. "The party who resists discovery has the burden to show discovery should not be allowed, and has the burden of clarifying, explaining, and supporting its objections." *Keith H. v. Long Beach Unified Sch. Dist.*, 228 F.R.D. 652, 655-56 (C.D. Cal. 2005). Meta cannot meet that burden here. As an initial matter, the parties have already agreed upon a limited number of custodians, and that search terms will be applied to make an initial determination of potential relevance. Further, many of the agreed upon custodians were not even employed prior to 2015 or after 2023, and thus would not be subject to collection outside that timeframe. In addition, Meta has disclosed that they intend to use TAR **after** the application of search terms to **further** cull irrelevant documents. Any issues in meeting the Court's deadlines can be addressed by the application of TAR to the review process, as well as increased staffing where necessary.

Proportionality does not mean that Meta can "refuse discovery simply by making a boilerplate objection that it is not proportional." *Milliner v. Mut. Securities, Inc.,* 2017 WL 6419275, at *3 (N.D. Cal. 2017). Rule 26(b) outlines six factors for determining proportionality. *Valentine v. Crocs, Inc.,* 2024 WL 2193321, at *1 (N.D. Cal. 2024). Each weighs against Meta and in Plaintiffs' favor.[5] Meta has acknowledged during conferrals that relevant information exists earlier than the restricted time period it proposes to search, but it has not actually performed any custodial searches using Plaintiffs' Relevant Time Period and thus does not actually know how many additional documents Plaintiffs' proposed time frame would identify. This alone is reason to reject Meta's position. Plaintiffs requested information on how, as a practical matter, Meta would exclude documents which fall outside the arbitrary cut-off dates for collection which it

---

[2] Meta mischaracterizes the AsG's investigation. As Meta acknowledges, after the AsG's first CID, subsequent requests sought productions dated to 2012. The AsG's Complaint contains several allegations dating as far back as 2004, Multistate Cmpl. ¶24, and allegations about harm dating back to the 2010s, *id.* ¶¶71, 227. The scope of the AsG's case should be judged from the product of their investigation—the AsG's Complaint—not initial requests issued three years ago. To clarify, the AsG are conferring separately with Meta regarding its R&O's to their RFPs, but agree with the PI/SD Plaintiffs' position on relevant time period.

[3] Meta's position that discovery to Meta should be cut-off as of the date of the PI Compl. is particularly troubling given the fact that in Meta's discovery propounded to the SD Plaintiffs, Meta has taken the position that discovery should run through 2024, or present day.

[4] The beginning date for the Relevant Time Period proposed by YouTube and Snap is also January 1, 2015, illustrating that this date has little to do with the actual facts relevant to this case.

[5] Meta has made no showing at all, and the Court should not speculate on Meta's burden. *E.g., Dairy v. Harry Shelton Livestock, LLC*, 2021 WL 4476778, at *1 (N.D. Cal. 2021).

proposes. Meta has refused to answer or provide further details on the grounds that this information is "privileged". Critically, however, Meta is only using search terms to identify the outer boundary of relevant information. Meta is **not** using search terms to exclude non-responsive information. Meta's TAR tool, Relativity Active Learning, is designed to rank the documents within a collection by relevance and exclude non-responsive documents from the review process. This allows Meta to meet tight production timelines, leverage a limited staff of human reviewers, and minimize the bottleneck caused by the algorithm training process.[6] For example, in *3M Earplug Litig.*, MDL No. 2885 (N.D. Florida), **no** search terms, time period, or other filters/limitations were used prior to application of TAR. The total document collection consisted of just under 9 million documents. Of these, only 715 thousand were reviewed by the defendants. This left just under 8.3 million documents in the unreviewed set. TAR should be used as it is designed – to rank documents based on relevancy and exclude non-responsive documents from the review process once properly trained.

As to the discovery "cut-off" date, the law is clear that discovery does not "cut off" on the date a complaint is served. *See Rosales v. FitFlop USA, LLC*, 2013 WL 12416060, at *2-3 (S.D. Cal. 2013). Where claims involve allegations of ongoing conduct and injunctive relief, discovery through the present is appropriate. *FTC v. Precision Patient Outcomes, Inc.*, 2023 WL 4475604, at *2 (N.D. Cal. 2023); *Wilson v. Gaver*, 2016 WL 11811706, at *6 (C.D. Cal. 2016). Here, the bellwether PI/SD Plaintiffs allege ongoing harm, and Meta continues to develop the relevant technology and engage in marketing of its products. Nonetheless, Plaintiffs have compromised at the date of production of each custodial file, with allowance for reasonable supplementation.

**Meta's Position.**  The Court should reject Plaintiffs' request for an ***unlimited*** expansion of the Relevant Time Period Meta has been using since discovery opened.  Plaintiffs propose an unbounded 20-year timeframe, spanning the date of inception of the company to the present. Meta, by contrast, has proposed a sufficiently broad timeframe that begins on **Jan. 1, 2015**— the start date specified by the AGs for most of their pre-suit CID requests—and ends on **Feb. 14, 2023**—the date the MDL PI Master Complaint was filed.  It will permit Meta to meet the accelerated discovery timeline Plaintiffs demanded, and covers the key youth safety allegations, alleged misstatements, challenged features, and statutes of limitation.

*First*, Plaintiffs' proposed unbounded timeframe plainly is not "tailored and proportionate to the needs of the case."  *Rusoff v. Happy Group, Inc.*, 2023 WL 114224, at *3 (N.D. Cal. Jan. 5, 2023). Expanding Meta's Relevant Time Period now would require the collection, processing, and review of up to ***233 additional cumulative years*** of custodial data, jeopardizing Meta's ability to meet the September 20 substantial completion deadline.  The burden is particularly magnified here, where Meta has agreed to more than ***double*** its original number of proposed custodians (from 48 to 127), and already is running extremely broad search terms.  Indeed, Meta estimates that it ***already*** will need to collect, process, and review ***millions of documents***—and ***millions more*** if Plaintiffs' search terms are added—and substantially complete all of that work in the next four months.  Notably, Plaintiffs have refused to make ***any*** movement on this issue.  They describe as a "compromise" their willingness to accept each custodian's first employment date as the start date, but that is an empty offer in that it seeks all of a custodian's documents, without date limitation.  And Plaintiffs have not budged from their position that Meta must go back to the inception of the company for non-custodial collections. Plaintiffs also claim to have "compromised at the date of *production* of each custodial file," but that offer ***back-tracks*** from their prior end-date offer (date of *collection*).  Moreover, after insisting on a truncated discovery period—and despite knowing Meta's position on Relevant

---

[6] *See* Declaration of Maura R. Grossman in *Diisocyanates Antitrust Litigation*, MDL No. 2862 (W.D.PA 2018), ECF No. 459; Declaration of Douglas Forrest in *Uber Technologies, Inc. Litigation*, MDL No. 3084 (N.D.CA 2023), ECF No. 261-7 (filed on 2/12/24).

Time Period since 2023—Plaintiffs did not press this issue until **months after** Meta had already begun processing large custodial collections (and reviewing the files using that Relevant Time Period). *Cf.* Tr. of 1/25/24 DMC 108:13-18 (cautioning Plaintiffs against "dilly-dallying on getting your document requests and other written discovery out").[7]

Plaintiffs suggest that because Meta is using TAR **and** search terms, it can collect an unlimited volume of documents, without regard to relevance or timeframe. But the use of TAR is far from the only factor to consider in assessing the appropriate timeframe for a litigation. Plaintiffs' argument also ignores their own refrain that TAR "follows the notion of garbage in, garbage out," Tr. of 1/25/24 DMC 14:14-15, 15:10-11, and overlooks that Meta needs to use TAR to meet the September 20 substantial completion deadline **based on the documents already collected**. It also ignores critical parts of the process where "increased staffing" does not solve issues, like the machine time it takes to collect and process documents and increased costs associated with processing and review of the additional documents pulled in. Plaintiffs fault Meta for not using search terms to **exclude** non-responsive information, but conveniently omit that Meta asked Plaintiffs to propose such terms and **they never did**, following up only to **add** 122 search terms to the 318 they had already proposed (while agreeing to drop only 2).

*Second*, Meta's Relevant Time Period encompasses the key youth-safety allegations. Indeed, of the 100+ documents obtained by Plaintiffs from a former employee whose allegations against Meta form the basis for these suits, none pre-date 2015; most are from 2018-2020. *See* Tr. of 11/7/23 JCCP CMC 41:25-42:6 (Plaintiffs' counsel representing that as to Meta, "there is lots of information out there, **and we're going to use that to make sure our discovery is tailored and targeted**."); Tr. of 1/25/24 DMC 103:12-15, 105:3-5, 106:22-25 (Court confirming that if Plaintiffs' "efficient" schedule were ordered, they'd "take the efforts to make sure you meet the deadlines"). And *none* of the statements challenged by the AGs predates 2018.[8]

*Third*, Meta's Relevant Time Period will afford Plaintiffs ample documents regarding the design of the specific features they are challenging. Plaintiffs have repeatedly said these cases concern "[b]ad code, plain and simple"—a reference to Defendants' content delivery algorithms. Tr. of 11/9/22 CMC 77:2-4. Those algorithms launched for Instagram in 2016, and Plaintiffs' specific allegations about Facebook's algorithms predominantly focus on 2018 onward, when Facebook shifted to "meaningful social interactions." ECF 494 ¶¶ 266, 273; 845(j). And the challenged image filters were launched in 2017, third-party augmented reality filters in 2019, and ephemeral content features in 2015-2017 and 2020. *Id.* ¶¶ 845(k), 864(d)& (l). Plaintiffs emphasize the "like" button, but that is not one of the alleged defects the Court

---

[7] Plaintiffs raised the Relevant Time Period in a letter dated February 22 and on a call the next day, but did not otherwise raise it until April 18, despite pressing other disputes. Plaintiffs' claim that Meta "declined to say whether it would stand on its time period objections" is false. On February 9, Meta objected to Plaintiffs' definition of "Relevant Time Period," supplied Meta's definition, and stated that "[a]ny response to the Requests by Meta indicating that documents will be searched for and/or produced" was an indication that Meta "intends, subject to its objections, to conduct a reasonable and proportionate search for responsive information … **for the Relevant Time Period**." Ex. B at 3, 4. Where Meta agreed in response to specific RFPs to search for and produce documents (RFPs 1, 4-8, 10, 11, 13, 14, 20, 24-28, 30 of Set 1), it specified that it would do so "for the Relevant Time Period." Plaintiffs' assertion that Meta "asked to defer conferral on time period to custodian/search terms discussions" also is false. Meta asked to combine *letter-briefing* on those topics, which Plaintiffs inexplicably refused, declaring impasse and demanding a final conferral on May 16.

[8] The PI Plaintiffs have abandoned their misrepresentation claims, asserting only omission claims based on information they concede was disclosed by 2021. *See* ECF 600 at 11, 19.

allowed to proceed to discovery. *See* ECF 430 at 4, 18 (addressing only the timing and clustering of notifications, including notifications of likes); *see also* ECF 494 ¶¶ 845(l), 864. Plaintiffs also focus on "chat" features and "personalized suggestions for 'friending,'" but to the extent the Court permitted Plaintiffs' challenges to those "features" to proceed, they are limited to a theory that Meta failed to warn of *allegedly inadequate screening* of adult-minor interactions. *See* MTD Order (ECF 430) at 6; ECF 494 ¶¶ 845(u), 864(l); *see also* ECF 494 ¶ 405 (challenging Meta's CSAM-scanning practices within the past 4 years). Accordingly, Plaintiffs' bald assertion that Meta is seeking to "**conceal** critical documents it **knows** are relevant and responsive to Plaintiffs' RFPs" is unfounded, and also overlooks that the standard for reasonable and proportional discovery is not whether a single relevant document might exist at any point in the past. *See Rusoff*, 2023 WL 114224, at *3. Finally, Plaintiffs' cited cases involved discovery periods for *a particular discovery request* that are *the same as or shorter than* the discovery period Meta is offering for *all collections*; none support Plaintiffs' position.[9]

*Third*, far from "arbitrary," the start date of Meta's Relevant Time Period (January 1, 2015) mirrors the start date specified by the AGs in their first pre-suit CID. The AGs have observed that they subsequently issued a CID related to COPPA, and targeted requests for structured data, that specified a start date of 2012. At most, this suggests the start date should be 2012 for certain targeted requests; but when Meta offered to go back to 2010 for up to 5 custodians of Plaintiffs' choice, they rejected that offer. Given the AGs deemed 2015 sufficient for most issues in their investigation, which was "directly related and relevant to the MDL" according to the PI/SD Plaintiffs, Tr. of Dec. 14, 2022 CMC 46:14-16; *see also id.* 47:4-5 ("It will all be relevant"), that date should be treated as presumptively reasonable for these follow-on suits.

*Fourth*, Meta's start date sufficiently encompasses most of the relevant statutes of limitations, which in most states are between 2 to 4 years for product liability and negligence claims. *See Oppenheimer Fund, Inc. v. Sanders,* 437 U.S. 340, 352 (1978) ("It is proper to deny discovery . . . to events that occurred before an applicable limitations period, unless the information sought is otherwise relevant to the issues in the case."). And courts routinely adopt complaint filing dates as appropriate end dates for discovery purposes. *See, e.g., Waidhofer v. Cloudflare, Inc.*, 2021 WL 8532942, at *2 (C.D. Cal. Mar. 10, 2021); *Martinelli v. Johnson & Johnson*, 2016 WL 1458109, at *1 (E.D. Cal. Apr. 13, 2016). If the Court is inclined to order a later end date, Meta submits (and proposed to Plaintiffs) that October 2023 would be an appropriate middle ground.[10]

---

[9] *See In re Facebook, Inc. Consumer Privacy User Profile Litig.*, 2021 WL 10282215, at *5 (N.D. Cal. Sept. 29, 2021) (14-year period for single request); *Petconnect Rescue, Inc. v. Salinas*, 2022 WL 448416, at *3-7 (S.D. Cal. Feb. 14, 2022) (up-to 5-year period for particular requests); *Theobald v. Piper Aircraft, Inc.*, 2017 WL 9248504, at *3 (S.D. Fla. Nov. 15, 2017) (8-year period limited to requests regarding design history); *Fassett v. Sears Holdings Corp.*, 319 F.R.D. 143, 157 (M.D. Pa. 2017) (5-year period limited to requests regarding manufacture, design, or sale of allegedly defective product or its parts); *In re Welding Fume Prods. Liab. Litig.*, No. 1:03-CV-17000 (N.D. Ohio Apr. 10, 2016), ECF No. 1729 at 2) (8-year limit on *part* of single discovery request); *see also Hatamian v. Adv. Micro Devices, Inc.*, 2015 WL 7180662, at *2 (N.D. Cal. Nov. 16, 2015) (2.5-year overall discovery period).

[10] Plaintiffs observe that the date specified in Meta's initial bellwether RFPs is later (April 1, 2024), but that date mirrors the **agreed** document production end date for the PFS. Meta has separately agreed to produce user data for every bellwether PI plaintiff through May 2024. Those agreements in an entirely different context have no bearing on the relevant end date for Meta's productions. In any event, with the exception of two plaintiffs who started using Facebook in 2011, all of the bellwether plaintiffs began using Meta's platforms in 2012 or later, supporting (if anything) an outer-bound start date of 2012. Indeed, the AGs confirmed during the Parties' final conferral (on May 16) that "2012 would be the relevant [start] date for us."

**ATTESTATION**

I, Jennie Lee Anderson, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: May 23, 2024

By: /s/ *Jennie Lee Anderson*

Jennie Lee Anderson

# EXHIBIT G

Pages 1 - 99

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA              )
ADOLESCENT ADDICTION/PERSONAL     )
INJURY PRODUCTS LIABILITY         )
LITIGATION                        )
                                  )   NO. C 22-md-03047-YGR (PHK)
                                  )
_____    )

                        San Francisco, California
                        Thursday, June 20, 2024

APPEARANCES:

For Plaintiffs:
                    LIEFF, CABRASER, HEIMANN
                        & BERNSTEIN LLP
                    275 Battery Street - 29th Floor
                    San Francisco, California 94111
               BY:  LEXI J. HAZAM, ATTORNEY AT LAW
                    MICHAEL LEVIN-GESUNDHEIT,
                               ATTORNEY AT LAW


                    ANDRUS ANDERSON LLP
                    155 Montgomery Street, Suite 900
                    San Francisco, CA  94104
               BY:  JENNIE LEE ANDERSON, ATTORNEY AT LAW


                    MOTLEY RICE LLC
                    28 Bridgeside Boulevard
                    Mount Pleasant, South Carolina 29464
               BY:  JESSICA L. CARROLL, ATTORNEY AT LAW


                    SEEGER WEISS LLP
                    1515 Market Street - Suite 1380
                    Philadelphia, Pennsylvania  19102
               BY:  AUDREY SIEGEL, ATTORNEY AT LAW


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR
              Official Reporter, CSR No's. 12219

**APPEARANCES**:   (CONTINUED)

For PSC Members:
                              WAGSTAFF & CARTMELL LLP
                              4740 Grand Avenue - Suite 300
                              Kansas City, Missouri 64112
                   BY:  **THOMAS P. CARTMELL, ATTORNEY AT LAW**

For Federal/State Liaison:
                              BEASLEY ALLEN CROW METHVIN
                                PORTIS & MILES, PC
                              234 Commerce Street
                              Montgomery, Alabama 36103
                   BY:  **JOSEPH G. VAN ZANDT, ATTORNEY AT LAW**

For Government Entity Subcommittee:
                              LEVIN SEDRAN AND BERMAN LLP
                              510 Walnut Street - Suite 500
                              Philadelphia, Pennsylvania 19106
                   BY:  **MICHAEL WEINKOWITZ, ATTORNEY AT LAW**

For Plaintiff State of Colorado:
                              COLORADO DEPARTMENT OF LAW
                              1300 Broadway - 6th floor
                              Denver, Colorado 80203
                   BY:  **BIANCA MIYATA, SENIOR ASSISTANT**
                        **ATTORNEY GENERAL**

For Plaintiff State of California:
                              CALIFORNIA DEPARTMENT OF JUSTICE
                              455 Golden Gate Avenue - 11th Floor
                              San Francisco, California 94102
                   BY:  **JOSEPH OLSZEWSKI-JUBILIRER**
                        **DEPUTY ATTORNEY GENERAL**
                        **MEGAN O'NEILL, DEPUTY ATTORNEY GENERAL**

For Plaintiff Commonwealth of Kentucky:
                              KENTUCKY OFFICE OF THE
                              ATTORNEY GENERAL
                              Office of Consumer Protection
                              1024 Capital Center Drive - Suite 200
                              Frankfort, Kentucky 40601
                   BY:  **CHRISTIAN LEWIS, COMMISSIONER**

                   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For State of New Jersey:
                        NEW JERSEY DIVISION OF LAW
                        DATA PRIVACY & CYBERSECURITY
                        124 Halsey Street
                        5th Floor
                  BY:  **VERNA J. PRAXADAY,**
                        **DEPUTY ATTORNEY GENERAL**

For Defendant Meta:
                        COVINGTON & BURLING LLP
                        1999 Avenue of the Stars - Suite 3500
                        Los Angeles, California 90025
                  BY:  **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        Sales Force Tower
                        415 Mission Street - Suite 5400
                  BY:  **ISAAC D. CHAPUT, ATTORNEY AT LAW**

                        COVINGTON & BURLING LLP
                        One City Center
                        850 Tenth Street, NW
                        Washington, D.C.  20001
                  BY:  **PAUL W. SCHMIDT, ATTORNEY AT LAW**

For Defendant Snap:
                        MUNGER, TOLLES & OLSON LLP
                        355 South Grand Avenue - 35th Floor
                        Los Angeles, California 90071
                  BY:  **FAYE PAUL TELLER, ATTORNEY AT LAW**

For Defendant TikTok:

                        KING & SPALDING LLP
                        1180 Peachtree Street
                        Atlanta, Georgia 30309
                  BY:  **GEOFFREY DRAKE, ATTORNEY AT LAW**

                        KING & SPALDING LLP
                        1700 Pennsylvania Ave NW
                        Washington, D.C. 20006
                  BY:  **DAVID P. MATTERN, ATTORNEY AT LAW**


          (APPEARANCES CONTINUED ON FOLLOWING PAGE)

1   **APPEARANCES**:   (CONTINUED)

2

3   For Defendant TikTok (Cont'd.)
                          FAEGRE DRINKER BIDDLE & REATH LLP
4                         90 S. 7th Street - Suite 2200
                          Minneapolis, Minnesota 55402
5               BY:  **AMY R. FITERMAN, ATTORNEY AT LAW**

6

    For Defendant YouTube:
7                         WILSON, SONSINI, GOODRICH & ROSATI
                          650 Page Mill Road
8                         Palo Alto, California 94304
            BY:  **ANDREW KRAMER, ATTORNEY AT LAW**
9
                          WILSON, SONSINI, GOODRICH & ROSATI
10                        One Market Street
                          Spear Tower - Suite 3300
11                        San Francisco, California 94105
                BY:  **LAUREN GALLO WHITE, ATTORNEY AT LAW**
12
                          WILLIAMS & CONNOLLY LLP
13                        680 Maine Avenue, SW
                          Washington, D.C. 20005
14              BY:  **JOSEPH PETROSINELLI, ATTORNEY AT LAW**

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **Thursday - June 20, 2024**                              **1:05 p.m.** |
| 2 |                            **P R O C E E D I N G S** |
| 3 |                                   ---o0o--- |
| 4 |     **THE CLERK:**  Please remain seated.  Come to order. |
| 5 |     Court is now in session.  The Honorable Peter H. Kang |
| 6 | presiding. |
| 7 |     Now calling 22-MD-3047, In Re: Social Media Adolescent |
| 8 | Addiction and Personal Injury Products Liability Litigation. |
| 9 |     Counsel, when speaking, please approach the podium and |
| 10 | state your appearances for the record. |
| 11 |     **THE COURT:**  Good afternoon. |
| 12 |     **ALL:**  Good afternoon. |
| 13 |     **THE COURT:**  So shall we walk through the status |
| 14 | report? |
| 15 |     The first issue that I see that requires my attention is |
| 16 | the request for the issue about extensions for Meta's |
| 17 | production of documents from custodians and the request for |
| 18 | some limited extensions.  Have you reached agreement on those |
| 19 | or -- |
| 20 |     **MS. WALSH:**  Good afternoon, Your Honor.  Alexandra |
| 21 | Walsh for the plaintiffs. |
| 22 |     We are very close to agreement.  We were just continuing |
| 23 | our discussions in the hall just now, and I am hopeful that we |
| 24 | will be there very soon. |
| 25 |     **THE COURT:**  Okay. |

PROCEEDINGS

1    the ability to serve their set of requests.

2            **MR. VAN ZANDT:**  Thank you, Your Honor.

3            **THE COURT:**  Next week?

4            **MR. VAN ZANDT:**  Soon after they are selected.  They

5    won't be finalized until the 27th, after the hearing with

6    Judge Kuhl; and once the pool is finalized, those will be

7    issued soon after they're selected.

8            **THE COURT:**  But within a week after they're selected?

9            **MR. VAN ZANDT:**  We will endeavor and do our best on

10   that.

11           **THE COURT:**  Okay.  So --

12           **MR. VAN ZANDT:**  Our goal is to issue them as soon as

13   possible.

14           **THE COURT:**  Okay.  A week.  And if you need to ask for

15   a courtesy extension of that week, I'm sure Ms. Simonsen will

16   give it to you.

17           **MR. VAN ZANDT:**  Thank you.

18           **THE COURT:**  Okay.  So let's take a short break while

19   they try to work out the IT issues.

20           **THE CLERK:**  We're off the record.  Court is in recess.

21                   (Recess taken at 1:56 p.m.)

22                 (Proceedings resumed at 2:05 p.m.)

23           **THE CLERK:**  Please remain seated and come to order.

24       Court is now in session.  The Honorable Peter H. Kang

25   presiding.

**PROCEEDINGS**

1          Recalling Multidistrict Litigation 22-3047, In Re: Social

2    Media Adolescent Addiction and Personal Injury Products

3    Liability Litigation.

4          **THE COURT:**  Okay.  Can you-all hear me okay without an

5    echo out there?

6          People are nodding.  Okay.

7          All right.  Let's do Meta relevant time period,

8    ECF Docket 888.

9                        (Pause in proceedings.)

10         **MS. SIMONSEN:**  Ashley Simonsen -- good afternoon

11   again, Your Honor.  Ashley Simonsen, Covington & Burling,

12   counsel for the Meta defendants.

13         **MR. CARTMELL:**  Good afternoon, Your Honor.  Tom

14   Cartmell on behalf of the plaintiffs.  Nice to meet you.  I

15   don't think I've been before you before.

16         **THE COURT:**  Thank you.

17         Okay.  So, again, I've read the briefing and I've read the

18   further briefing in the status report.

19         Well, before I -- why -- okay.  Before I say anything, let

20   me hear what Meta's -- if there's anything -- you don't have to

21   repeat what you've argued.  So anything to add?  Or maybe

22   you've already worked it out and have reached agreement.

23         **MS. SIMONSEN:**  Unfortunately, we have not, Your Honor.

24         We did ask plaintiffs at one point if part of the

25   agreement on search terms could be agreement to our expanded

1  relevant time period; and part of the reason is -- as

2  Your Honor can appreciate, I'm sure -- if the relevant time

3  period is expanded further, that multiplies the collection of

4  documents beyond the -- I mentioned the figure already --

5  13.7 million is what we estimate would be pulled back by the

6  search terms we've agreed to so far over that extended relevant

7  time period.

8       The one additional point I would just kind of throw out,

9  Your Honor, is having learned today that the AGs will be

10 presenting additional search terms, perhaps -- you know, maybe

11 over 10 or more, you know, our original position on relevant

12 time frame was 2015 as the start date.  That is the date that

13 the Attorneys General specified in their presuit civil

14 investigative demand.  Now, they did go back for a couple of

15 other kind of targeted issues a little bit further.

16      I would submit, Your Honor, that 2015 is an eminently

17 reasonable start date.  It aligns with the general start dates

18 that Your Honor has ordered for the other defendants, which I

19 think are around 2015 or 2016.

20      Meta would still agree to go back to 2008 with

21 feature-specific terms for any custodians employed prior to

22 2015.  So they would get that feature-specific discovery going

23 back to the launch date of any features launched before that

24 time, but I think it would help a lot with the search term

25 negotiations to have a little more room there in terms of

1  adding search terms if we could start at 2015, again, going all

2  the way out to April 1st, 2024, consistent with Your Honor's

3  prior rulings.

4        **THE COURT:**  Any objection to that?

5        **MR. CARTMELL:**  Yes, Your Honor.

6      With all due respect, we'd like to, with your permission,

7  argue today, honestly, why we believe that our position that we

8  offered in our negotiations is more appropriate and, honestly,

9  why a relative time period that's based on features with a

10  system that's set up that would have a new set of search terms

11  based on -- specific search terms based on features is really

12  not appropriate for this case.

13      And we've now -- we recognize your order, Your Honor.  I

14  haven't read it yet, but I know it just came, and I heard -- we

15  heard what you said at the last -- at the last status

16  conference.

17      I will say this:  I think Meta is distinguishable, I

18  think, from some of the other defendants for several reasons.

19  I think that a feature-based relevant time period with a search

20  term -- specific search terms that are feature based is going

21  to be very severely, frankly, devastatingly limiting to our

22  discovery that's important to us in this case in the early

23  years.  And what it does is for the first -- according to their

24  interpretation of your order, for the first eight years, we

25  literally -- after Facebook was brought to market, we literally

1  would get very little to none discovery during that period of

2  time.

3      For the first four years, according to Meta, we would

4  absolutely get no documents -- get a look at or discover any

5  documents for the first four years.

6      For the next four years, from 2008 to 2012, they want to

7  do a specific search term by feature.  And we believe that the

8  search terms that we have not received yet -- so we're talking

9  about receiving, probably, nine sets of new search terms over

10 time, and it's -- we think that's very unworkable for a whole

11 host of reasons as well.

12     But specific feature search terms, we've had the chance to

13 look at documents -- I think we're unique a little bit from the

14 other defendants on that point.  And the way that the company

15 is chatting within the company is not talking in terms of those

16 features.  And I think, according to Meta, they're saying that

17 very relevant key documents that we believe exist -- and, in

18 fact, we have some evidence that do exist -- would not be

19 produced to us in that situation.  I want to give you a few

20 examples.

21     But you asked other plaintiffs' attorneys at the last

22 hearing why do we need to go back so far, and so very briefly

23 what I would say is that, Your Honor, we have a negligence

24 claim in the JCCP; a negligence claims in the MDL that has not

25 been ruled on; and a failure to warn claim here.  We also have

**PROCEEDINGS**

1    a punitive damage claim that I think -- I wanted to emphasize

2    and emphasize the negligence claim in the JCCP because I don't

3    think it was necessarily by Meta -- I know in the brief or last

4    time.

5        But our claim is that they designed -- not only designed

6    but implemented, administered, their platforms in a way that

7    cause kids and young adults to become addicted, problematic

8    use, addicted use, and then that resulted in all the harms.

9        Our claim is that they knew or they should have known --

10   our negligence claim -- that the way they designed and

11   implemented and administered and monitored and supervised --

12   not just designed -- their platform, that they should have

13   known would have resulted in that, and in fact, they did.  And

14   their motive and intent -- from the very beginning at Facebook,

15   their notice and knowledge about problems with kids -- about

16   kids from the very beginning at Facebook, are extremely

17   relevant in this case.

18       And I would argue were distinguishable, the Meta case,

19   from the other defendants in some regards because they've been

20   around so long -- right? -- and it turns out that there is a

21   lot of information in the public domain.

22       We brought up for you, Your Honor, Sean Parker, the first

23   president of Meta, who made a statement in 2017 about the

24   development of Facebook, and he said at that time, and I think

25   it's very important (as read):

1          "The thought process that went into building the

2     application, Facebook being the first of them, was

3     all about:  How do we consume as much of your time

4     and conscious attention as possible?"

5          And then he goes on to talk about how "We had" -- "We

6     talked about how we had to give kids a little dopamine hit."

7     And he talks about that it was himself -- and he names Mark

8     Zuckerberg specifically -- who knew what they were doing when

9     they did that.

10         And so in this case, unlike some of the others, just

11    because they haven't been around as much or for as long, we

12    have, in the public domain, evidence we believe that it's

13    extremely likely that at that time period starting at

14    Facebook -- he's talking about the 2004 and 2005 time period

15    when Mr. Parker was involved in the invention -- they were

16    talking about these things.

17         And according to Meta's proposal, those types of

18    conversations that were happening, we would be unable to

19    discover; we would be unable to, you know, get that probative,

20    obviously, evidence that's, you know, extremely important to

21    our case.  Their -- the way it's set up right now, for

22    seven years we wouldn't be able to get any of those documents.

23         And a few other points that I want to make.  We have

24    plaintiffs in the bellwether cases in JCCP that are from --

25    using Facebook from 2006, mid-2000s, currently.  And so I think

1    that's a distinguishing factor, a factor from the others as

2    well.

3        So I think the other thing is that our claims are not all

4    feature based.  You know, our claims are in some respects --

5    for example, with age verification -- and there are some --

6    some dispute between some whether age verification, for

7    example, is a feature or not.  But our claim is, in our

8    pleadings, from the inception of Facebook, their age

9    verification was inadequate.

10        Our experts are looking for documents during the relevant

11    time period when Facebook came out, when they decided in 2005

12    that they were going to open up Facebook, not just to college

13    kids but to high school kids, and then in 2006, when they

14    decided that they were going to open it up to everybody other

15    than those under the age of 2013, [sic] if there were

16    conversations and documents at that time talking about whether

17    they were looking at alternative types of -- or feasible types

18    of age verification or parental controls at that time, we think

19    that period of time is extremely relevant for us.

20        And the other thing is, it's not a secret that when we try

21    this case or when -- you know, when -- it's not a secret what

22    our claim is; that we are claiming that Meta lit the match that

23    started the fire that ended up in the mental health problems

24    with kids.  So we're claiming that they lit the match when in

25    2005 and 2006, they decided to allow everybody 13 and up on

1    this -- on this platform.

2        The other reason that I want to, real quickly, say that I

3    think that in this specific instance, because of the status of

4    the case and because of the Court-imposed deadlines that we

5    have that were talked about previously and keeping in line with

6    those, I think a feature-based relevant time period with new

7    search terms -- because what we're talking about is now going

8    and negotiating -- I think it's nine if we look at all the

9    features that -- and we don't agree at this point what features

10   are at issue, but I think it would be nine.

11       So, for example, if Mark Zuckerberg was involved in all of

12   the feature development, inventions, things like that, then

13   they would run, according to Meta's interpretation, for each of

14   the nine features they would have a different set of

15   feature-specific terms that they would run; and then they would

16   run, according to them, from 2012 on, against all of our terms

17   that we've agreed on.

18       So -- so you're talking about us negotiating I think nine

19   more times on search terms that we haven't received yet, and --

20   and also for our claims which are not feature based and for

21   documents that -- that will not be picked up, relevant

22   documents that won't be picked up if the term of the feature is

23   not in there.

24       For example, if -- if there's a document that says, "Hey,

25   we're seeing a lot of kids on our platform at this point," and

1  that's to Mark Zuckerberg and the response is, "Well, you know,

2  we need to storm forward and, you know, we're not going to do

3  anything about that or change it," that's not going to get

4  picked up.

5       According to Meta, the only way the documents that are

6  relevant for eight years following the time that Facebook

7  was -- was designed and developed and over time continued to be

8  developed and the time period that they were implementing it,

9  we won't get any documents if they don't name the exact

10 feature.

11      For example, Sean Parker's -- if you look at his

12 statements, if we ran Sean Parker's statements, it would be

13 picked up, it would be relevant from the 2012 search terms

14 because he says in the statement "We don't know what we're

15 doing to children's brains," and we've negotiated "children's"

16 as a search term so it would be picked up.

17      But in 2004 until 2012, according to Meta's belief what

18 should happen here, those kinds of statements would not be

19 picked up because they don't name a specific platform.

20      So, you know, we feel strongly that our offer and what

21 should happen here -- and we think we took into consideration,

22 Your Honor, proportionality, the needs of the case, as well as

23 the need for us to get relevant discovery for those first

24 seven years by offering -- we have 127 currents custodians, and

25 from 2010 on, we'll run our search terms that include "youth"

1  and "kids" and "children" and "bullying," and harms that are at

2  issue in the case that also talk about, you know, the relevant

3  claims that we have related to age verification and other

4  things.

5      And for six, only six, custodians would we ask that we get

6  their custodial files and we run the full search terms that

7  we've agreed on.  That would include Mark Zuckerberg, who

8  nobody can argue is not extremely relevant in this case; and

9  other individuals who were there at the time talking with Mark

10 Zuckerberg about the development of these -- of the platform

11 for Facebook:  The chief engineer at that time, the VP of

12 product -- of the product development at that time.

13     Just six.  I don't think that the burden with that is much

14 different than what they're offering, and it allows us to do it

15 more efficiently.  We don't have to continue to negotiate for

16 weeks to a month nine new sets of search terms.  We can get the

17 depositions going, and it protects our ability to get the

18 discovery during the key period of time from that first seven

19 to eight years when we think that's one of the most important

20 times for our case, Your Honor.

21     **MS. SIMONSEN:**  Thank you, Your Honor.  Ashley Simonsen

22 for the Meta defendants.

23     At the prior discovery hearing Your Honor ruled that --

24 you said (as read):

25         "I'm not going to grant anyone blanket discovery

1    across all features for all time for just one giant

2    time frame.  I'm going to basically trigger that

3    discovery based the date that each individual feature

4    was launched."

5        And the approach that we've proposed is consistent with

6    that.

7        This case is -- predominantly it's a product liability

8    case.  It's based on plaintiffs' challenges to 20 or so

9    specific features that were specifically enumerated in their

10   complaint and that Judge Gonzalez Rogers analyzed on a

11   feature-by-feature basis in her motion to dismiss.

12       And so for that reason it makes sense.  Plaintiffs are

13   going to get -- if we go back to 2015, they're going to get

14   nine years of general discovery.  They've not said they won't

15   get documents over that nine-year period touching on the

16   motivations of the company to increase users or the amount of

17   time that users spend on the platforms.  They've not

18   articulated a reason why they need to go all the way back to

19   2004 before they, you know, concede even any of the

20   bellwether -- any of the plaintiffs at all were on the

21   platforms for that kind of general discovery.

22       And I would note, too, that I heard my colleague say that

23   based on this Sean Parker statement, that we wouldn't get a

24   document talking about children's brains.  Well, one of the

25   features that we've agreed to go back in time for is

1    algorithmic recommendations, recognizing that it was in 2009

2    that there was a shift from the chronological feed to the

3    algorithmically driven feed that is the type of algorithm that

4    the plaintiffs are challenging in this case.  If there's a

5    document talking about the impact of that challenged feature on

6    children's brains, it will be returned.

7         On just a few other additional wrap-up points, Your Honor,

8    we can share with plaintiffs the list of feature-specific terms

9    that we propose to run.  They actually already have them

10   because at the outset of our search term negotiations, we

11   proposed a set of feature-specific terms.  There's only, I

12   think, one feature, which is the -- the Facebook friend

13   recommendation feature where there's -- there was kind of one

14   narrow, earlier iteration of that where we would -- we would

15   propose running just a narrower term.  But we can share those

16   with plaintiffs, and we can kind of work them out between now

17   and Wednesday, as apparently, we're going to be doing with

18   respect to the State AGs' new terms.

19        I also wanted to point out, since my colleague mentioned,

20   you know, when the plaintiffs have been using these platforms,

21   that the bellwether plaintiffs did not begin using these

22   platforms, as I understand it, until 2011 and '12.  And so to

23   the extent that that is relevant to what the relevant time

24   period should be for company discovery, I'm not sure it is, but

25   since my colleague brought it up, I think it's relevant -- I

1  think it's worth mentioning that to Your Honor.  There may be

2  some plaintiffs in the pool who used the platforms earlier than

3  that, but the bellwether plaintiffs, it was much -- it was much

4  earlier.

5      Let me make sure there's nothing else I want to point out.

6              (Pause in proceedings.)

7      **MS. SIMONSEN:**  I think that's it, Your Honor.

8      I get just on the point about nine features, only -- they

9  think there are nine features, I guess, for which we would have

10 to go back in time.  We're very forthcoming with plaintiffs.

11 We shared with them, based on our investigation, the launch

12 date for all of the features for both Instagram and Facebook.

13 We ultimately identified for them five features for which we

14 would go further back in time because they were launched prior

15 to 2011.

16     So, now, if we -- if we start the general time period at

17 2015, we, of course, would look at adding feature-specific

18 terms for any features launched between 2012 and 2015.

19     **MR. CARTMELL:**  Can I just say one thing?  I apologize,

20 Your Honor.

21     **THE COURT:**  Yeah.

22     **MR. CARTMELL:**  Real quick, because I meant to say it

23 and my colleague reminded me.

24     Our failure to warn claims, you know, are not feature

25 specific.  They're failure to warn of the harms, potentially,

 1    that could exist, as the surgeon general said.

 2         And I'll just leave it at that for now.

 3         **THE COURT:**  Okay.

 4         **MS. SIMONSEN:**  If I could just very briefly respond on

 5    that to say that Judge Gonzalez Rogers analyzed that claim on a

 6    feature-by-feature basis.  So I think the way that the Court is

 7    looking at that claim is on a feature-by-feature basis.

 8         **THE COURT:**  Okay.  So the way -- I mean, consistent

 9    with the ruling at the previous hearing, my discussion at the

10    previous hearing, I -- in my mind, there are kind of two

11    categories or universes of document discovery we're talking

12    about here, which is kind of the technical implementation,

13    planning documents for specific features, and then there's kind

14    of the general discovery that we're talking about.

15         So I do continue to believe that discovery with respect to

16    specific features should be triggered by the date those

17    features were developed and released.

18         So on the five that are in the status report, feature

19    discovery on Facebook friend recommendations can start as of

20    January 1, 2008; Facebook algorithmic recommendations starts as

21    of January 1, 2009; Facebook endless scroll starts January 1

22    2009; Facebook geolocation starts January 1, 2010; the Facebook

23    notifications starts January 1, 2011.

24         There is a dispute between the parties about Facebook

25    newsfeed, and this goes to something that I think I alluded to

1    in the order that was issued today.  To the extent the parties

2    are disputing whether a particular feature is actually at issue

3    in the case or not, I mean, to some extent it's the plaintiffs'

4    theories to put them in the case; and so if -- I take it your

5    position is the newsfeed is in the case?

6         MR. CARTMELL:  Yes, Your Honor.  Paragraph 195 of our

7    complaint specifically states that.

8         THE COURT:  Okay.  So discovery on Facebook newsfeed

9    starts as of January 1, 2006.

10        MS. SIMONSEN:  Your Honor, may I respond on that

11   point?  Because it is important, it actually goes to the

12   algorithmic recommendations point.

13        The plaintiffs have defined named features the same way in

14   all 13 sets of their requests for production, and they map onto

15   the allegations of the complaint.

16        The newsfeed, to the extent that's a challenged feature,

17   what plaintiffs are challenging is the algorithmic

18   recommendations appear -- the way the algorithm recommends

19   content to users.

20        In plaintiffs' complaint, they focus specifically on what

21   they refer to as engagement-based ranking algorithms.  So they

22   allege in their complaint that 2009 marked the change from

23   chronological to algorithmic ordering for the Facebook

24   newsfeed; and that in 2009, Meta did away with Facebook's

25   chronological feed in favor of engagement-based ranging.  In

1    2016, it did the same on Instagram.

2        So January 1st, 2009, based on this features approach is

3    the earliest date for which discovery into that feature, which

4    is not newsfeed but algorithmic recommendations, that's the

5    earliest it should go back to.  Because prior to that time, it

6    was a chronological feed the same type of way you might see

7    content on any website, and that's not what plaintiffs are

8    challenging.  They're challenging the specific design of the

9    algorithms used to rank content in a way they claim is

10   addictive.  So we're just going on what they've alleged.

11       MR. CARTMELL:  Your Honor, what we alleged was that

12   there were multiple features -- actually, what we alleged was

13   the platform as a whole was designed improperly, and then we

14   have a whole lot of different -- and I want to bring up

15   other -- other features that are in there.

16       With new -- with the newsfeed it -- paragraph 195, we

17   specifically said this was the first feature that was designed

18   to keep people on the actual platform for the maximum amount of

19   time.  I mean, it's central to our case, and that's when it

20   started.

21       THE COURT:  Okay.  So I think they've articulated at

22   least a reason why it's relevant to discovery -- for discovery

23   purposes going back to January 1, 2006, and I can -- at the

24   last hearing on this similar issue with other defendants,

25   I believe there was an argument plaintiffs made that it goes to

**PROCEEDINGS**

1   alternate designs as well, and alternatives available.  So it's

2   going to go back -- for newsfeed, it's going to go back to

3   January 1st, 2006.

4        You had -- there was discussion about age verification --

5        **MR. CARTMELL:**  Yes.

6        **THE COURT:**  -- which is not one of the features listed

7   here, unless it's subsumed by one of these.  I want to make

8   sure.  If it isn't, I want to address that since you raised it.

9        When do the plaintiffs allege that age verification

10  becomes relevant for your case?

11       **MR. CARTMELL:**  In 2006.  That is when they made the

12  decision that they were going to allow 13-year-olds and up

13  actually on the platform.  Our experts have an opinion that at

14  that time, based on those circumstances, that would be

15  relevant.

16       **THE COURT:**  So as to age verification, same thing.

17  Discovery starts on that feature as of January 1, 2006.

18       With regard to the general time frame for all other

19  nonfeature-specific discovery, you know, I preface it by

20  saying:  If plaintiffs can find targeted document requests

21  based on other evidence that something preceding this --

22  because it is a default cutoff -- that something preceded

23  should be sought in discovery -- I note the Sean Parker quote

24  is from 2017, so -- I mean, but if you've got evidence that

25  there is a document that precedes the default cutoff that I'm

1  going to impose, you can certainly -- you know, the default can

2  be overcome if you've got an evidentiary basis or a basis to

3  find something specific.  All right?

4      But I'm not going to -- as I said before, I'm not going to

5  have kind of a broad early, early, early default discovery date

6  because at some point in time it starts getting -- it starts

7  getting unproportional I believe.

8      So I note that in the status report it was reported to me

9  that the AGs confirmed on May 16th that for many of the State

10  AGs' request served to date, 2012 is the relevant time frame.

11  So the default cutoff date is going to be January 1, 2012,

12  based on that.

13          MR. CARTMELL:  Your --

14          THE COURT:  Go ahead.

15          MR. CARTMELL:  Your Honor, we have other -- multiple

16  other features that are in our pleadings that we -- for

17  example, the "like" button.  There's been an argument by Meta

18  that the "like" button is not included, but it's clear from a

19  page and a half of our pleadings that we're claiming the "like"

20  button is one of those things that gives a dopamine hit that

21  keeps kids on the platform.

22          THE COURT:  Do you have a date for the "like" button?

23          MR. CARTMELL:  2009.

24          MS. SIMONSEN:  Your Honor, again, the "like" button is

25  not a named feature.  It is not a feature that

1    Judge Gonzalez Rogers analyzed in her decision.  What she

2    addressed was the timing and clustering of notifications,

3    including notifications of "likes."  And notifications -- the

4    time frame for notifications on Instagram, for instance, is

5    2012 is when that feature launched.

6        And there will be certainly discovery going back to 2012

7    about the "like" button.  To the extent it's relevant to this

8    case, it relates to notifications and those began in 2012.

9        **MR. CARTMELL:**  Your Honor, again, the JCCP the "like"

10   button is at issue, and the proceedings and rulings here affect

11   the discovery in the JCCP.  The "like" button is obviously in

12   that case.

13       And, also, the judge has said -- and I think you have also

14   confirmed -- that all of the features in -- and it actually

15   says in the pleadings, it may say "complaint," are at issue in

16   the case.

17       So that's one thing that I think the reason is there's

18   some disagreement here, is they are using a definition in our

19   RFPs that defined seven or eight things.  We have multiple

20   others, like features -- excuse me -- like the "like" button in

21   our pleadings, and I think the pleadings have -- and the judge

22   has ruled the pleadings would actually control in that

23   situation.

24       And so there's several others that -- that, you know, have

25   not been mentioned; but we've always taken the position:  Well,

1    wait.  If they're in our pleadings, you're put on notice and

2    we're telling you that they contribute to the addiction or

3    problematic use or compulsive use of kids.

4           **THE COURT:**  I mean, the question is:  Why didn't you

5    include them in the definition of named features, though?

6           **MR. CARTMELL:**  Well, our -- I think some of them would

7    be subsumed within those definitions, okay, individually.

8           **THE COURT:**  The "like" button January 1, 2009.  You

9    got that.

10          **MR. CARTMELL:**  Okay.

11          **THE COURT:**  Are there others?

12          **MR. CARTMELL:**  Yes, there are others, Your Honor.

13          **THE COURT:**  What else do you -- what else do you need?

14          **MR. CARTMELL:**  We have Facebook Chat in April 2008.

15   We have --

16          **MS. SIMONSEN:**  Your Honor --

17          **MR. CARTMELL:**  Can -- I'll just read the list --

18          **THE COURT:**  Yeah.

19          **MR. CARTMELL:**  -- and then Ms. Simonsen can respond.

20       We have hashtags in January 2011.

21       We have facial recognition tagging in December 2010.

22       We have parental controls.  And, Your Honor, that is

23   another -- from the inception of -- of Facebook, our experts

24   will opine that when they decided in 2004 to allow 13-year-olds

25   to 18-year-olds onto their platform, was there discussions

1   about any parental controls, getting permission from parents,

2   things like that?  That's a central part of our case in this.

3   So parental controls in our -- in our belief is, that that

4   would be 2006, when that happened.

5       Then before 2010, we have CSAM reporting protocols.

6       Geolocation -- actually, CSAM was in 2010.

7       Geolocation was in 2010.

8       And I don't remember if Ms. Simonsen said friend

9   recommendations in May of 2008.

10         **THE COURT:**  Friend recommendation is already there.

11         **MR. CARTMELL:**  Okay.

12         **THE COURT:**  All right.  Do you want to respond?

13         **MS. SIMONSEN:**  Yes, Your Honor.

14       On the point about parental controls, and this goes back

15   to the age verification as well, what plaintiffs, I think, are

16   trying to do is say that -- that they're challenging like the

17   absence of features, when what they are challenging are

18   specific features; namely, the types of parental controls and

19   age verification that Meta was utilizing on its platform.

20       And we confirmed for them that the parental control

21   feature did not launch until much later.  Certainly going

22   back -- the notion that we would go back to 2006 for that does

23   not make sense.  Parental controls were launched on Facebook in

24   2023, and on Instagram in 2022.

25       And I can, you know, provide kind of similar dates when it

1    comes to age verification.  I mean, on Instagram it was in

2    December 2019 that it became mandatory for new account holders

3    to provide their age.  That would be the relevant, I think,

4    start date for that particular feature.

5        I think 2013 is probably the earliest that it would be for

6    Facebook.  That would be when reporting and review and

7    checkpointing started based on our investigation.

8        So, you know, I think -- with respect to parental controls

9    and age verification, I think were covered by the 2012 and

10   forward.

11       To address the remaining points, my colleague mentioned

12   hashtags.  That, again, is not a feature listed in their list

13   of named features.  To Your Honor's point, if that was

14   something they were wanting discovery into as a feature, I

15   don't know why they wouldn't have included it in a definition

16   they included in 13 sets of RFPs that we negotiated

17   extensively.

18       It's also not a feature that has once been mentioned by

19   plaintiffs in any of the conferrals that we have had with them

20   on these issues or in the letter briefing.

21       With respect to facial recognition, again, I don't know

22   that face recognition *per se* -- that is not a named feature.

23   What -- what -- it's just simply not a named feature.  It's not

24   something that they've pursued discovery into to date.  Image

25   filters is the closest thing I can think of that is -- maybe

1    maps onto that.  Those were launched on Facebook in 2017, and

2    on Instagram in 2018.

3         Geolocation, I do agree with my colleague on that one, it

4    was 2010.  We confirmed that with them in the course of our

5    discussions, and so that is one that we've already agreed that

6    we would go back for.

7         And with respect to CSAM, I think plaintiffs have taken

8    the position that anything relating to the reporting of CSAM,

9    including how Meta reported it to the National Center for

10   Exploited and Missing Children [sic] is relevant.  Their

11   complaint focuses only on the ability for users to report CSAM,

12   and that is the feature that Judge Gonzalez Rogers analyzed in

13   her motion to dismiss decision.

14        The earliest date that we've been able to determine that

15   Instagram users had the ability to report suspected CSAM or

16   adult predator accounts specifically was 2012.  So that should

17   be the relevant start date for CSAM we would submit.

18        **THE COURT:**  Is there a date for Facebook?

19        **MS. SIMONSEN:**  I don't have a date -- I do not have a

20   date for Facebook; but my understanding, based on the

21   information we've been able to gather, is that it would likely

22   be around the same date.  It's something we can look into

23   further and try to pin down.  We have been working hard to try

24   to pin that down.

25        **MR. CARTMELL:**  Your Honor, we have 2010 for CSAM

1    filters -- or CSAM reporting protocols.  And that is in our

2    complaint and does apply.

3         **MS. SIMONSEN:**  And I'm not sure -- is -- I would need

4    to check.  I don't know what that's referring to because,

5    again, their complaint in places references reporting of CSAM

6    to NCMEC by Meta.  "NCMEC" is the abbreviation for the

7    organization I mentioned.

8         But, again, the feature at issue is the ability for users

9    to report CSAM and suspected predator accounts to Meta.  And

10   based on our investigation, we understand that it was 2012 that

11   users were able to specifically report suspected CSAM or adult

12   predator accounts.

13        **MR. CARTMELL:**  May I respond?

14        Your Honor, with respect to CSAM reporting and age

15   verification, parental controls, we allege in our -- in our

16   pleadings that they knew about those potential requirements and

17   features that could be implemented, considered them, and

18   didn't -- didn't do them.

19        Our claim with age verification, with CSAM, is that they

20   should have done it sooner and they didn't.  It becomes

21   relevant when it was something that they considered, and we

22   believe that it was something they considered, and the

23   negligence was that they didn't do it.  And so those -- those

24   are obviously relevant.

25        **MS. SIMONSEN:**  And, Your Honor, discovery -- just to

 1  respond on that point, discovery back to, say, 2012 on CSAM,

 2  back to January 1st of 2012 for CSAM, is going to pull in

 3  documents demonstrating that that particular ability to

 4  specifically report CSAM wasn't available prior to that time.

 5      And so it should be sufficient to go back to the 1st of

 6  January.  That gives them some lead time before the feature was

 7  actually launched -- right? -- to get documents discussing the

 8  development of that particular design feature.  And, again,

 9  they're going to get discovery about that issue all the way

10  through to April 1st, 2024.  That should be sufficient.

11      Again, to Your Honor's point, if there's something

12  specific from an earlier period of time they have reason to

13  think they need, they can certainly come back to us.

14      I do think it's worth mentioning again, that expanding the

15  time periods further back on these specific features is just

16  going to jam us on the timeline we already have given,

17  you know, we've already agreed to search terms returning

18  13.7 million documents.

19      I know we haven't had a chance to really talk to

20  Your Honor about it because the parties reached agreement, but

21  we increased the number of custodians we agreed to use from 48

22  to 127, which is a very large number of custodians by any

23  measure for any litigation.

24      And so, you know, I think at some point, particularly

25  given the advanced accelerated schedule these plaintiffs

1    requested, there has to be some reasonable limit on how far

2    back in time some of this discovery can go.

3        **THE COURT:** Okay. So do you agree with Ms. Simonsen

4    that what you're -- what you referred to as facial recognition

5    tagging is what she referred to as image filters, or are you

6    talking about different things?

7        **MR. CARTMELL:** Yeah, no. So image filters we have as

8    2010 on Instagram, and 2012 on Facebook, and that's both in

9    our -- in our RFP definitions and in our complaint.

10       **MS. SIMONSEN:** Your Honor, we confirmed in the course

11   of meet and confers that image filters launched on Facebook

12   in 2017, and on Instagram in 2018. I didn't hear anything back

13   from plaintiffs on that. This is the first I'm hearing that

14   they had a different date that they thought that those were

15   launched, but those dates have been confirmed through our

16   investigation. I think it may actually be public that that's

17   when those features launched.

18       **MR. CARTMELL:** If we have proof of that -- I mean, not

19   that I won't take your word for it, but I'm just saying we have

20   evidence that -- and we put it, I think, in our complaint --

21   that it was in 2010 and 2012. So we'd just like to confirm

22   that. If we confirm that that's when it started and there was

23   nothing beforehand, then, you know, obviously it is what it is

24   and we'll be fine with that.

25       But, I mean, we had --

1    **THE COURT:** So I thought I was going to be able to go

2    through all of them with you, but it sounds like you're going

3    to need to meet and confer, so...

4    **MS. SIMONSEN:** It sounds to me like, just on the image

5    filters -- although, I will say, again, Your Honor, we've been

6    trying to reach resolution on these issues for some time.  We

7    shared this information with them.  They didn't challenge it,

8    so --

9    **THE COURT:** Okay.  I hear what you're saying.

10    Okay.  So -- and I don't remember if I said this.  So for

11    Facebook Chats it starts January 1, 2008.

12    Hashtags, January 1, 2011.

13    Image filters, it's going to start -- well, it will be

14    subsumed in the general default because if -- it's going to

15    start 2017.

16    If you have evidence that it started before then, I'm

17    going to order you both to meet and confer and see if that date

18    needs to be altered by agreement.  And that's image

19    filters/facial recognition tagging.

20    Age verification is going to start January 1, 2013.

21    Again, this is based on the same representation by Ms. Simonsen

22    that that's when it launched.

23    And, again, if you've got evidence that you think they

24    considered it -- that it was something that was under

25    consideration, but not implemented prior to that, and you want

1    to get discovery of that, I'm going to order you to meet and

2    confer and see if you can, by agreement, alter that date.

3    Okay?

4         The "likes" go back to January 1, 2009.

5         Parent controls, again, based on it's going to be subsumed

6    by the default.  It looks like you said 2023?  Really?

7         **MS. SIMONSEN:**  2023 and 2022.  Yes, Facebook 2023, and

8    Instagram 2022.

9         **THE COURT:**  So it's going to be the subsumed in the

10   default.  But, again, if you've got evidence that it really

11   does go back to an earlier date, before 2012, because that's --

12   then you're free -- I'm going to order you to meet and confer

13   and try to see if you can work that out.

14        Same thing, CSAM reporting.  Again, because, Ms. Simonsen,

15   I'm going to hold -- because you couldn't give me a date for

16   Meta -- or for Facebook on that one, I'm going to give you

17   January 1, 2010; right?

18        And then on geolocation, it looks like everybody agrees

19   January 1, 2010.  Okay?

20        **MR. CARTMELL:**  Your Honor, on the age verification and

21   the parent controls, just -- just so -- you know, to be clear,

22   our claim is that they -- they were negligent all along and

23   they didn't have them when they should have had.  So when they

24   started, we're saying, is way too late.  And when they should

25   have had them, it seems like that should be the date --

1  right? -- starting in 2006, when they had the opportunity to do

2  it and didn't.  That's what our -- that's what our experts are

3  going to say.  So --

4      **THE COURT:**  The fact that they didn't have it in 2006,

5  I mean, it's a negative.  That's already in the record; right?

6      **MR. CARTMELL:**  But that is -- that's why the

7  feature-based program here is tough; right?  Because we're

8  claiming negligence, that they didn't do things they should

9  have done.  That's part of negligence, and it's relevant during

10  the time period when they should have done it.  And so our

11  claim is --

12      **THE COURT:**  I'm not foreclosing it.  If you've got

13  evidence that you think there are documents -- there's a

14  universe of documents that predate 2013, for example, on age

15  verification, or this specific subset of custodians who you

16  think are critical to that that have documents preceding that,

17  then I'm going to expect you to meet and confer and talk with

18  Ms. Simonsen about, you know, trying to expand that date

19  backwards in time, and I'm sure she'll be reasonable in

20  discussing that with you.  Okay?

21      Remember, I said these are default cutoffs -- right? --

22  and default means default; right?

23      If you can come up with a good reason or a reasonable

24  reason, I expect the parties to work together collaboratively

25  in trying to figure out if there's a reason to go back for

 1  specific issues.  Okay?

 2          MR. CARTMELL:  Can I ask about notifications?  Was

 3  that included?

 4      I apologize.  I haven't taken great --

 5          THE COURT:  Notifications, January 1, 2011.

 6          MR. CARTMELL:  Okay.  We have 2007.

 7          MS. SIMONSEN:  Notifications is another one we shared

 8  with them in advance.  It was 2011 for Facebook, for Instagram

 9  2012.

10          THE COURT:  So, again, if you've got some evidence

11  that you think it started or -- started before 2011, meet and

12  confer.

13          MR. CARTMELL:  Share it with them and meet and confer?

14          THE COURT:  Yeah.

15          MR. CARTMELL:  Okay, we'll do that, Your Honor.

16      I want to just, real quick, look and make sure we didn't

17  miss anything.

18      User options -- oh, I think that's going to be the same --

19  the same thing, that it wasn't implemented until 2021, but our

20  claim is that it should have been implemented earlier than

21  that.  Those are safety sort of safeguards that we're claiming.

22      All right.  I think that covers what I have written down

23  on my list, Your Honor.

24          THE COURT:  Okay.  So we've all got the transcript.  I

25  don't want to have to repeat all that.  So if you need

1    clarification, please refer to the transcript on that.  I

2    assume you-all took good notes of the dates on each of these

3    features.

4        Okay.  In my mind, that resolves this dispute.  Is there

5    anything still open on this particular dispute?

6            MR. CARTMELL:  I would --

7            MS. SIMONSEN:  Nothing --

8            MR. CARTMELL:  Go ahead.  Sorry.

9            MS. SIMONSEN:  Nothing from Meta's perspective.

10       I had a clarifying question with respect to the search

11   term negotiations coming out of this, but nothing with respect

12   to Your Honor's rulings.

13           MR. CARTMELL:  One thing I would ask, Your Honor.

14       Ms. Simonsen mentioned that they have their search terms

15   for this feature-based program.  We would ask that they provide

16   those to us today or --

17           THE COURT:  Me too.  Because you're going to work out

18   search terms and be done with it by next Wednesday; right?

19           MR. CARTMELL:  Right.

20           THE COURT:  Yes.

21           MR. CARTMELL:  So just as soon as possible today or

22   tomorrow, if we could get that.

23       And the only other thing I have, Your Honor, is that --

24           THE COURT:  Any objection to that?

25           MS. SIMONSEN:  No, not at all.

1          **THE COURT:**  All right.

2          **MR. CARTMELL:**  The only other thing I have is that

3   Mr. Van Zandt from the JCCP would like to say something about

4   this topic.

5          **MR. VAN ZANDT:**  Thank you, Your Honor.  Joseph Van

6   Zandt.

7          And I'm sure you're ready to move on, so I'll be very

8   quick with this.

9          So in terms of the JCCP, I did just want to make a record

10  on this.  So Ms. Simonsen indicated that these are product

11  liability claims in this case, which is not true for the JCCP.

12  The JCCP is based on negligence claims.

13         And the JCCP is where an overwhelming majority of the

14  plaintiffs -- personal injury plaintiffs at least -- are

15  pending.  900 -- over 950 cases compared to, I think,

16  200-something here in the MDL.

17         So this -- a product-by-product or feature-by-feature

18  ruling in terms of the relevance of discovery and going back

19  would really hamstring the claims of the overwhelming majority

20  of the plaintiffs in this litigation.

21         And Your Honor indicated that if we have specific evidence

22  that relevant evidence exists for the time periods, it's hard

23  to get more specific than the former president of the company

24  in 2005, who left the company in 2005, indicating that they

25  knew what they were doing to addict people to the platform and

1    they did it anyway.

2        He left the company in 2005, continued consulting with

3    Mark Zuckerberg for the years after that.  While he might have

4    said the comments in 2017, his only knowledge as to what was

5    happening would have been during that time frame that we're

6    trying to get.

7        The plaintiffs aren't asking to go back that far for

8    everyone.  We're asking for a handful of custodians that would

9    go back to the date they started employment with the company.

10        **THE COURT:**  Mr. Parker is not there so there's no

11    custodian.  I mean, you could subpoena him personally, as an

12    individual.  You're free to do that.  Because we're only

13    talking party discovery here.  If there are individuals who are

14    out there who have left the company, and there are a lot of

15    them, you're free to subpoena them.

16        This is just document discovery.  You're certainly free to

17    depose whoever you want to depose and get testimony.  I'm not

18    putting any limits on time frame -- for the subject matter time

19    frame that you can ask questions on.

20        That's -- you know, if people -- I mean, obviously, you've

21    got some public statements by people.  You've got testimony by

22    people from other cases or from Congress.  There are plenty of

23    ways to depose people on these issues without having to delve

24    into the history, especially for people who aren't at the

25    company anymore.  I mean, I don't know how to get Mr. Parker's

1    documents at this point.

2            MR. VAN ZANDT:  Right.  And I'm sure we'll see to

3    that.  But the point is to the custodians who are still

4    employed with Meta who were there at the same time Mr. Parker

5    was, and would have been having these conversations with him --

6    including Mark Zuckerberg -- the evidence going back to the

7    date that they joined the company is extremely critical to the

8    core of the claims in both litigations, but especially the

9    JCCP.

10           So we're asking for a narrow, narrow window of plaintiffs

11   that would go back to the date -- to the date of initial

12   employment.  I mean, on the -- the entire custodian list, there

13   was -- there's only 15 people on the entire custodian list that

14   were employed there before 2010; and we're not asking for even

15   all of those.  We're asking for a limited universe of

16   plaintiffs that would go back to the date that they started at

17   the company, which we believe will generate incredibly

18   important evidence on motive, intent, and knowledge, which are

19   relevant to the claims in both those litigations.

20           THE COURT:  And you don't think you're going to find

21   when they run the custodial searches on those 15 people for

22   documents going -- in some cases going back to 2008 or even

23   2000 -- yes, at least 2008, you're not going to find anything

24   that's going to either help you point to something earlier?

25           MR. VAN ZANDT:  That's certainly possible, but we --

1   there's no way we can know that.  So it's -- we can't know how

2   long before they launched a certain feature that they started

3   discussing that feature.  We know, at least from comments from

4   Mr. Parker, again, the president in 2005, they're talking about

5   creating a platform that keeps people coming back and gives

6   people dopamine hits.

7        So when they -- when they planned out and mapped out when

8   they were going to release certain features, they could have

9   started discussing those two or three years prior.  So the

10  feature release date really doesn't give us the true background

11  or the motive or intent or knowledge of what these features

12  could do.

13       **THE COURT:**  I've already balanced proportionality

14  versus relevance there and decided that the January 1st of the

15  year the feature comes out.  I hear your argument.  I've

16  already considered it.  Whatever year -- January 1st of the

17  year the feature came out is the appropriate cutoff, I think,

18  for this.

19       But, again, if you find something in the production or you

20  find something in a deposition that leads you to earlier

21  documents, you're free to ask a go-get-'em type or whatever

22  follow up you need to get that.  Again, as I said, these are

23  default cutoffs and you can certainly do your work to try to

24  get at earlier stuff if you really think it's that critical.

25       **MR. VAN ZANDT:**  Thank you, Your Honor.  We do think

1  it's critical and we've requested it, and understand your --

2  your instructions about that.

3          **THE COURT:**  I'm not foreclosing you from trying to get

4  at it; but, you know, let's take this -- try to -- I'm trying

5  to get the first set of document requests done with so you can

6  get going -- right? -- on this stuff.  Right?  And so that's

7  where we are.

8          **MR. VAN ZANDT:**  Okay.  Thank you.

9          **THE COURT:**  Okay.

10         **MS. SIMONSEN:**  Thank you, Your Honor.

11     May I ask just one clarifying question with respect to

12  search term negotiations?

13         **THE COURT:**  Sure.

14         **MS. SIMONSEN:**  I think we've talked through kind of

15  the launch dates of these various features.  Obviously, we're

16  going to be going back further in time than we had planned for

17  certain features.  I think it would help in search term

18  negotiations to have an understanding that Your Honor would

19  endorse an approach where we go back to the date of launch for

20  features launched after 2012.  That would save us from, for

21  instance, in the case of something that launched in 2017,

22  you know, five years worth of running search terms over

23  documents where the feature hasn't even launched yet.

24     I'd just like to know if Your Honor is sort of open to

25  that approach.  It's something that I certainly think we would

# EXHIBIT H

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-03047-YGR   (PHK) |
| | **DISCOVERY MANAGEMENT ORDER NO. 7 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF JUNE 20, 2024** |
| This Document Relates to: All Actions | Upcoming DMC Dates: July 11, 2024 at 1:00 pm August 15, 2024 at 1:00 pm September 26, 2024 at 1:00 pm |

On June 20, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. *See* Dkts. 967-68. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the June 20th DMC regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

## I. Meta's Production of Custodial Documents and Additional Search Terms

The PI/SD Plaintiffs and Meta continue to meet and confer regarding three additional search terms to be applied to Meta's collections. *See* Dkt. 941. The Court **ORDERS** the Parties to complete their meet and confers on any search terms remaining in dispute by no later than **June 26, 2024**. If any disputes remain with regard to search terms between Meta and the PI/SD Plaintiffs (or any sub-group of PI/SD Plaintiffs), they shall diligently and in good faith comply with the Court's discovery dispute resolution procedures (including meet and confer by the relevant lead counsel) in bringing any such disputes to the Court's attention for resolution.

The Parties seek clarification from the Court as to the deadline for Meta to produce "any custodial files returned by any additional search terms or expanded Relevant Time Period agreed-to or ordered by the Court (beyond Meta's original (April 5) proposed search terms and Relevant Time Period)." [Dkt. 940 at 8 n.1]. The Parties raise concerns regarding early-noticed depositions with potentially incomplete custodial files. As discussed at the June 20th DMC, the Parties are **ORDERED** to work collaboratively to complete search term negotiations so that Meta can begin producing documents using the search terms with dispatch and so that the Parties can work collaboratively to schedule (or rearrange the schedule of) depositions to take advantage of any custodial files which are able to be produced more quickly than others. The Court directs the Parties to continue their coordination with the Tennessee Attorney General's office on scheduling (and, if needed, adjusting the schedule) of cross-noticed depositions.

The Court **ORDERS** the AG Plaintiffs to immediately provide Meta with a final list of proposed additional search terms directed at the AG Plaintiffs' document requests served to date, as well as search terms directed to their anticipated next (and hopefully final) set of document requests. These Parties are likewise **ORDERED** to complete their meet and confer on Meta search terms by no later than **June 26, 2024**. If any disputes remain with regard to search terms between Meta and the AG Plaintiffs (or any sub-group of AG Plaintiffs), they shall diligently and in good faith comply with the Court's discovery dispute resolution procedures (including meet and confer by the relevant lead counsel) in bringing any such disputes to the Court's attention for resolution.

## II.    Meta Request to Limit Further Written RFPs

Meta asks for a Court order limiting Plaintiffs to no more than five additional targeted RFPs beyond the RFPs served as of May 31, 2024. [Dkt. 937 at 10]. Meta asks, in the alternative, that the Court order Plaintiffs to commit to "limiting future RFPs to those necessary to obtain materials concerning new developments, facts, or issues that may come to light in discovery or otherwise." *Id.* at 12.

The PI/SD Plaintiffs commit that they would limit their right to serve additional RFPs with two qualitative exceptions: (1) they reserve the right to serve additional RFPs on Meta for

1    materials that fall outside the Relevant Time Period; and (2) they reserve the right to serve follow-

2    up RFPs on Meta to obtain materials concerning new developments, facts, or issues that may come

3    to light in discovery or otherwise.  *Id.* at 14.  Meta agrees to this approach, in lieu of a numerical

4    limit on RFPs.  [Dkt. 967 at 19].  Accordingly, the Court accepts the PI/SD Plaintiffs' qualitative

5    limitations on further RFPs (subject to the SD Bellwether Plaintiffs' requests, discussed below).

6            The PI/SD Plaintiffs seek leave to serve one set of RFPs directed at discovery sought

7    specifically by the SD Bellwether Plaintiffs (recently finalized).  *Id.* at 30-31.  The PI/SD

8    Plaintiffs are **GRANTED** leave to propound one set of bellwether plaintiff-specific RFPs on Meta

9    directed at discrete discovery issues for those bellwether cases by no later than **June 26,**

10   **2024**.  The Court expects the Parties to continue to meet and confer on these issues and work

11   expeditiously to complete RFPs in a timely manner.

12           The JCCP Bellwether Plaintiffs have not yet been (but will soon be) selected in the JCCP.

13   Accordingly, the JCCP Plaintiffs are **GRANTED** leave to propound one set of bellwether

14   plaintiff-specific RFPs on Meta directed at discrete discovery issues for those bellwether cases in

15   the JCCP proceeding.  The due date for this set of RFPs is **one week after the JCCP Bellwether**

16   **Plaintiffs are selected**.  The Court admonishes the Parties to work together reasonably if there is a

17   need to extend that deadline.

18           At the June 20th DMC, the AG Plaintiffs argued that they cannot be limited to using the

19   exact same qualitative approach as the PI/SD Plaintiffs.  The AG Plaintiffs argue that they are

20   "differently positioned" from the PI/SD Plaintiffs and "a little bit behind" with respect to

21   discovery and thus require more leeway to serve additional RFPs on Meta.  *Id.* at 20.  In particular,

22   the AG Plaintiffs argue that there are issues (such as financial issues and issues for which they

23   would confer with their expert witnesses) which are not addressed by the RFPs served to date by

24   any Plaintiff.  Meta argues, in response, that it should not have to respond to the AG Plaintiffs'

25   second set of RFPs (served on June 7, 2024) because they are duplicative of RFPs served by the

26   PI/SD Plaintiffs.  Meta argues that the AG Plaintiffs should withdraw the second set of RFPs and

27   serve "targeted, narrow, follow-up requests" that are specific to the unique features of the AG

28   Plaintiffs' case.  *Id.* at 26.  The AG Plaintiffs argue that their second set of requests are not

3

1   duplicative, that Meta should serve Responses & Objections to that set, and that the Parties should

2   handle disputes over those RFPs on the merits.

3           The Court **ORDERS** Meta to respond to Plaintiffs' already-served RFPs (including the

4   AG Plaintiffs' second set of RFPs). To the extent Meta believes the RFPs are duplicative, they

5   can raise that objection and the Parties are expected to work reasonably to resolve any

6   disputes. The AG Plaintiffs are admonished not to pursue duplicative RFPs since the AG

7   Plaintiffs now have access to all documents produced by Meta to the PI/SD Plaintiffs, including

8   the documents produced with regard to the pre-suit investigations.

9           The AG Plaintiffs are **GRANTED** leave to file one additional set of RFPs, by no later than

10  **July 15, 2024**, to allow them to seek discovery on non-duplicative issues (particularly after

11  conferring with their experts). Other than this one additional set of RFPs, the Court **ORDERS**

12  that the AG Plaintiffs (like the PI/SD Plaintiffs) may not serve any further RFPs on Meta, subject

13  to the same two qualitative exceptions: (1) they reserve the right to serve additional RFPs on Meta

14  for materials that fall outside the Relevant Time Period; and (2) they reserve the right to serve

15  follow-up RFPs on Meta to obtain materials concerning new developments, facts, or issues that

16  may come to light in discovery or otherwise.

17          This **RESOLVES** Dkt. 937.

18  **III.     Meta Relevant Time Period**

19          The Parties dispute the Relevant Time Period governing Plaintiffs' discovery requests

20  directed at Meta and Meta's search, collection, and review of responsive documents. [Dkt. 888].

21  The Parties confirm that they have reached agreement as to the default end date: "April 1, 2024,

22  with the exception of non-Email/Workchat files, for which the end date is the date of collection

23  (which generally falls between January and April 2024 for the 122 of 127 total agreed-to

24  custodians identified to date by Plaintiffs)." [Dkt. 940 at 11]. Accordingly, the Court **ORDERS**

25  the default end date to be as so indicated and agreed-upon by the Parties.

26          The Parties continue to dispute the appropriate start date for discovery. Meta proposes a

27  start date for Named Feature-specific discovery requests dating back to January 1st of the year of

28  the feature's launch and a default start date of January 1, 2015 for all other issues. [Dkt. 967 at

United States District Court
Northern District of California

49].

Plaintiffs propose a general default start date of January 1, 2010 and a "date-of-hire" start date for six custodians of Plaintiffs' choice (who all worked at Facebook prior to 2010). [Dkt. 940 at 12]. Unlike the Named Feature approach for determining start dates of document discovery issues for Snap, TikTok, and YouTube which the Court ordered previously, Plaintiffs argue that the start date for discovery requests directed at Meta should not be tethered to specific features, because Meta is "distinguishable" from those entities. [Dkt. 967 at 50]. Plaintiffs argue that a feature-based start date for discovery requests made to Meta would, in effect, preclude Plaintiffs from obtaining documents relating to the first four years of Facebook's founding. *Id.* at 50-51. In addition, Plaintiffs argue that because Plaintiffs bring general negligence claims and punitive damages claims against Meta, documents relating to the early days of Facebook are relevant to those issues. *Id.* at 51-52. Plaintiffs argue that because Facebook has been in existence much long than the other social media platforms at issue in this MDL, and because some of the JCCP Plaintiffs began using Facebook in 2006, discovery of Meta's documents prior to their proposed default of 2010 should be allowed. *Id.* at 52-53.

As stated at the June 20th DMC, the Court **ORDERS** the default start date for Plaintiffs' discovery requests directed to Meta to be as follows: **January 1, 2006** for discovery requests relating to Facebook Newsfeed; **January 1, 2008** for discovery requests relating to Facebook Chat and Facebook Friend Recommendations; **January 1, 2009** for discovery requests relating to Facebook Algorithmic Recommendations, Facebook Endless Scroll, and the Facebook "like" button; **January 1, 2010** for CSAM reporting and Facebook Geolocation; **January 1, 2011** for hashtags; and **January 1, 2012** for all other issues.

The Court **ORDERS** the Parties to meet and confer on whether earlier start dates can be agreed upon for features where Plaintiffs have evidence that such other features were launched earlier, such as Facebook Notifications, Parental Controls, Facial Recognition Tagging, and Image Filters.

This **RESOLVES** Dkt. 888.

United States District Court
Northern District of California

1    **IV.    YouTube Custodians**

2        Plaintiffs and YouTube dispute whether YouTube must add certain current and former

3    employees as document custodians.  [Dkt. 848].  Prior to the June 20th DMC, the Parties

4    confirmed with the Court that they had reached agreement on all but two potential custodians: (1)

5    former YouTube CEO, Susan Wojcicki; and (2) current YouTube CEO, Neal Mohan.

6        YouTube argues that it should only have to provide Mohan as a document custodian and

7    not Wojcicki because (1) the two CEOs would produce duplicative information as their

8    employment with YouTube significantly overlapped; (2) while admitting that the "apex doctrine"

9    does not apply to document discovery, YouTube argues that Plaintiffs have not shown that

10   Wojcicki has "uniquely relevant" information; and (3) requiring both CEOs to be custodians

11   would be unduly burdensome.  [Dkt. 967 at 88-90].

12       Plaintiffs argue that both CEOs are necessary because: (1) Mohan did not start at YouTube

13   until 2015 (and Wojcicki was CEO beginning in 2014); (2) the standard for naming a CEO as a

14   document custodian is not different than for any other employee (because the apex doctrine does

15   not apply to document discovery); (3) YouTube's document retention period is short and thus any

16   burden is expected to be minimal; (4) Wojcicki created an "ad hoc committee" called "Roomba"

17   during her tenure (and thus does uniquely have such documents); and (5) Wojcicki was CEO

18   during several important events, including the FTC's fining of YouTube in 2019 for COPPA

19   violations, Wojcicki's testimony before Congress in 2021, and the launch of various product and

20   feature changes in 2015, 2018, and 2019.  *Id.* at 90-94.

21       As stated at the June 20th DMC, the Court **ORDERS** that both Wojcicki and Mohan shall

22   be added as document custodians.  To address YouTube's concerns regarding duplicative

23   discovery and proportionality, the default start date for Mohan's custodial searches shall be

24   **January 1, 2023** (the year Mohan became YouTube's CEO).  The Court **DENIES** YouTube's

25   request to shift the cost of these additional custodial searches to Plaintiffs.

26       This **RESOLVES** Dkt. 848.

27   **V.    Remaining Issues**

28       The next DMC Statement (in advance of the July 11, 2024 DMC) shall be due by no later

1   than close of business on **July 2, 2024**.

2          The Parties are ordered to promptly file an omnibus sealing motion directed at Dkt. 891, in

3   accordance with the sealing procedures for this MDL.  *See* Dkt. 341.

4

5          **IT IS SO ORDERED.**

6   Dated: June 24, 2024

7                                                          _____

8                                                          PETER H. KANG
                                                           United States Magistrate Judge