MAYOR AND CITY COUNCIL         \*       IN THE
OF BALTIMORE,

                                 \*       CIRCUIT COURT

        Plaintiff,
v.                              \*       FOR

BP P.L.C., et al.,                 \*       BALTIMORE CITY

        Defendants.             \*       Case No.: 24-C-18-004219

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## <u>MEMORANDUM OPINION AND ORDER</u>

There is no question that global warming and climate change are wreaking havoc on our environment.  It is quite possible that this world, this country and, perhaps, this City have reached the point of no return in addressing the effects of global gas emissions and climate change.  According to the United Nations Intergovernmental Panel on Climate Change, massive incidents of floods, drought, heat waves, etc. will continue if there are not significant and drastic measures taken to decrease the use of fossil fuels. Daniel Brigham, *The Making of the Clean Air Act*, 71 Hastings L. J. 901 (2020).  Global warming is the long-term warming of the planet's overall temperature due to human activities, "namely the impact of urbanization and [primarily] the burning of fossil fuels." Alexa Austin, *Cleaning Up the Confusion: Climate Change Litigation and Preemption*, 10 Joule: Duquesne Energy & Env't L. J. 6 (2022).  It is debatable whether the damage that has already been done by the world's overuse and misuse of fossil fuels can be reversed.  Scientists have concluded that the earth's global average temperature has increased by 1.8 degrees Fahrenheit. *Id.*  Global warming, which is experienced worldwide, has been evidenced by unstable temperatures, rising sea levels, extreme storms and heatwaves resulting in infrastructure damages and public health problems.

Baltimore, like many jurisdictions across the country, is concerned about the present effect and future threat of climate change.  To that end, in July 2018, the Mayor and City Council of Baltimore ("Baltimore") filed suit against twenty-five (25) major national and international fossil fuel companies[1] ("Defendants") alleging that these Defendants are individually and collectively responsible for a substantial portion of the total greenhouse gases emitted in the world. *See generally* Baltimore's Complaint ("Compl.").  Every person, household and business, including government agencies, use gas and electricity – whether traveling in private or public vehicles, buses or subway trains, or heating their homes and/or offices.  Baltimore alleges that the Defendants must be held accountable for deceiving consumers by disseminating misleading information that undermined the scientific community's consensus about climate change which led to the overuse of fossil fuels around the world. *Id.*  According to Baltimore, the Defendants have known for nearly a half century that unrestricted production and use of their fossil fuels have created greenhouse gas pollutions that have warmed the planet and changed the climate not only throughout the world but particularly in Baltimore. Compl. ¶¶ 1, 5.  Instead of sharing their knowledge, Defendants deployed a sophisticated campaign of deception to misrepresent and conceal their products' risks. *Id.*  Baltimore places at the feet of the Defendants the responsibility for injuries suffered in the past and for injuries predicted in the future because of increased use of Defendants' fossil fuels.  Each Defendant's conduct has contributed substantially to the buildup of $CO^2$ in the environment that drives global warming and its physical, environmental and socioeconomic consequences. *Id.* at ¶ 6.  Namely, Baltimore alleges that it has suffered climate

---

[1]  BP P.L.C., BP America Inc., BP Products North America Inc., Chevron Corp., Chevron USA Inc., CITGO Petroleum Corporation, CNX Resources Corp., CONSOL Energy Inc., CONSOL Marine Terminals LLC, ConocoPhillips, ConocoPhillips Co., Louisiana Land & Exploration Co. LLC, Crown Central LLC, Crown Central New Holdings LLC, Exxon Mobil Corp., Exxon Mobil Oil Corp., Hess Corp., Marathon Petroleum Corp., Speedway LLC, Marathon Oil Corp., Marathon Oil Co., Phillips 66, Phillips 66 Co., Shell PLC., Shell USA, Inc.

change related injuries such as sea level rise, increased frequency and severity of extreme

precipitation events, increased frequency and severity of drought, increased frequency and

severity of heat wave and extreme temperatures, and consequently social and economic injuries

associated with those physical and environmental changes. *See generally* Compl. and *Mayor &*

*City Council of Baltimore v. BP P.L.C.*, 31 F.4th 178, 195 (4th Cir. 2022) ("*Baltimore IV*")

(quoting J.A. 92, 140-41).  Baltimore complains that because of Defendants' actions (or

inactions) these climate related injuries have caused infrastructure damages and public health

issues throughout Baltimore.  Baltimore's Complaint asserts eight causes of action: (Counts 1-2)

public and private nuisance; (Counts 3-4) strict liability failure to warn and strict liability for

design defect; (Counts 5-6) negligent design defect and negligent failure to warn; (Count 7)

trespass; and (Count 8) violations of the Maryland Consumer Protection Act ("MCPA").

## PROCEDURAL CONTEXT

In July of 2018, Baltimore filed its original complaint in the Circuit Court for Baltimore

City.  In August of 2018, Defendants filed a notice of removal to the U.S. District Court of

Maryland.  Baltimore subsequently moved to remand the matter to state court.  On June 10,

2019, the U.S. District Court of Maryland[2] granted Baltimore's motion and remanded the case to

the Circuit Court for Baltimore City.  Defendants appealed.  Pending appeal, Defendants filed

their initial Motion to Dismiss for Failure to State a Claim Upon Which Relief Can be Granted

(#66) on February 7, 2020.[3]  The U.S. Court of Appeals for the Fourth Circuit affirmed[4] the U.S.

District Court's decision to remand the matter to state court on March 6, 2020.  Defendants filed

a petition for certiorari which was granted.  On August 6, 2020, this court stayed the instant

---

[2] 388 F. Supp.3d 538.
[3] Additional motions were filed at this time but not addressed in this memorandum.
[4] 952 F.3d 452.

matter pending the decision on the petition for certiorari.  The United States Supreme Court

vacated and remanded the case for consideration of Defendants' (remaining) theories of

removal.[5]  On remand, the Fourth Circuit affirmed the U.S. District Court of Maryland and

remanded the matter to the Circuit Court for Baltimore City. *Baltimore IV*, 31 F.4th 178 (2022).

Again, Defendants filed a petition for certiorari which was denied. *Baltimore IV*, 31 F.4th 178

(2022), *cert. denied*, 143 S. Ct. 1795, 215 L. Ed.2d 678 (2023).  On May 12, 2023, this court

lifted the August 6, 2020 stay.  A remote status conference was held on August 4, 2023.  At the

conference, Defendants orally motioned for permission to re-brief its motions to dismiss [6]and to

allow the filing of individual defense motions.[7]  The motions were granted. (#183).

On October 16, 2023, Defendants filed Defendants' Motion to Dismiss Plaintiff's

Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (#199)[8] which

included an accompanying Memorandum (Defs.' Mot.).  On January 23, 2024, Baltimore filed

Plaintiff Mayor and City Council of Baltimore's Memorandum of Law in Opposition to

Defendants' Motion to Dismiss for Failure to State a Claim (#199/7) (Pl.'s Opp'n).  On January

29, 2024, Defendants filed their Reply Memorandum in Support of Defendants' Motion to

Dismiss for Failure to State a Claim Upon Which Relief Can Be Granted. (#199/8) (Defs.'

Reply).  On February 12, 2024, Baltimore filed Plaintiff Mayor and City Council of Baltimore's

Motion for Leave to File Sur-reply in Opposition to Defendants' Motions to Dismiss (#232),

which was denied on January 8, 2024.  A remote electronic hearing was conducted on the

---

[5] 539 I.S. 230; 141 S.Ct. 1532 (2021).
[6] Defendants requested allowance to re-brief both the motion to dismiss for failure to state a claim and motion to dismiss for lack of personal jurisdiction.
[7] Baltimore agreed to allow Defendants to re-brief its joint motion but opposed the request to file individual motions to dismiss.
[8] Other preliminary motions were filed (jointly and individually), however, they are not addressed in this memorandum.

Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which
Relief Can Be Granted (#199) on March 12, 2024 before the Honorable Videtta A. Brown.

### STANDARD OF REVIEW

Defendants move to dismiss the complaint filed by Baltimore pursuant to Maryland Rule
2-322 (b)(2).  In considering a motion to dismiss for failure to state a claim upon which relief can
be granted, this court must assume the truth of all well-pleaded relevant and material facts in the
complaint as well as all inferences that reasonably can be drawn therefrom. *Stone v. Chicago
Title Ins. Co.*, 330 Md. 329, 333 (1993); *Tadjer v. Montgomery Cty.*, 300 Md. 539, 542 (1984).
The facts comprising the cause of action must be pleaded with sufficient specificity.  Bald
assertions and conclusory statements by the pleader will not suffice. *Continental Masonry Co. v.
Verdel Constr. Co.*, 279 Md. 476 (1977).  However, dismissal is proper only if the alleged facts
and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the
plaintiff. *Morris v. Osmose Wood Preserving*, 340 Md. 519, 531 (1995).

### DISCUSSION

On motion, Defendants raise several challenges to Baltimore's complaint which they pray
demands dismissal: (1) Baltimore's claims are preempted by federal common law; (2)
Baltimore's state law claims are preempted by the Clean Air Act; (3) Baltimore's claims raise
nonjusticiable political questions; (4) Maryland laws require dismissal of Baltimore's claims in
that (a) Baltimore fails to allege a claim for public and private nuisance; (b) Baltimore's failure
to warn claims fail because Defendants had no duty to warn; (c) Baltimore's design defect claims
fail because Baltimore fails to allege any design defect; (d) Baltimore's trespass claim is not
adequately plead; and (e) Baltimore fails to adequately allege a Maryland Consumer Protection
Act ("MCPA ") claim.  *See generally* Defs.' Mot.

Several states and municipalities have filed lawsuits against fossil fuel companies seeking abatement and/or compensation under the (novel) theory that these companies' extraction, production, promotion, marketing, and sale of fossil fuels has contributed to the increase in fossil fuel use and contributed to global climate change resulting in injury to plaintiffs' infrastructures. In each case, the question has been whether these cases can and should be tried and resolved in state court or whether the federal court and/or Congress should resolve the matters. Commentators and scholars have noted that these cases have come to State court because of the difficult policy challenges and the federal government's reluctance to address climate change.

"[A] combination of…elements would make climate change difficult for any institution to address, but the particular circumstances and structure of the federal government make it especially ill-suited to do so.  For one thing, the United States is one of the most powerful nations in the world.  It is also the largest historical emitter of GHGs [greenhouse gases]. Together, these facts make it unlikely that the United States will voluntarily commit itself to significantly scaling back its emissions or that another group of nations will succeed at compelling it to do so.  This problem is worsened by the fact that Congress and executive agencies face a high risk of legislative and regulatory capture, a risk that is particularly acute in the realm of climate and energy policy, where huge international companies wield more power than do many nations."

*Climate Litigation-Federal Preemption of State Law-Ninth Circuit Finds That State Public Nuisance Claims Against Fossil Fuel Producers Are Not Completely Preempted By Federal Law*, 134 Harv. L. Rev. 1897, 1901-02 (2021).

To further complicate this court's consideration of the issues presented here, federal and state courts have differed greatly in their opinions on the same or similar issues.  The divergent opinions rested on how each court characterized the complaint.  Some recent decisions on these issues have been articulated in *City of New York v. Chevron Corporation*, 993 F.3d 81 (2021) ("*NYC*"); *City & Cnty. of Honolulu v. Sunoco, LP.*, 153 Haw. 326 (2023) ("*Honolulu*"), *State ex rel. Jennings v. BP Inc.*, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ("*Delaware*"), and *City of Oakland v. BP PLC,* 969 F.3d 895 (9th Cir. 2020) *("Oakland"*).  Summarily, the *NYC* and

*Delaware* courts granted motions to dismiss finding that the city's claims were preempted by federal common and federal statutory law while the *Honolulu* court denied a motion to dismiss finding that state claims were not preempted by federal common or statutory law.

In this matter, Baltimore agrees with and relies on the *Honolulu*[9] decision and the Defendants agree with and rely on the *NYC* and *Delaware* decisions.  In reading each case opinion it is clear that the characterization of the plaintiff's complaint guided the court's analysis.  *Honolulu* (relying on language used in *Baltimore IV*) and Baltimore say its complaint(s) only concern the production, promotion and sale of fossil fuels and not the regulation of emissions.  They opine that the complaint(s) focus only on the tortious marketing conduct of Defendants. *Baltimore IV*, 31 F.4th at 217 and *Honolulu*, 153 Haw. at 354.  *NYC* interpreted the complaint under its consideration as a suit over global greenhouse emissions and held that the allegations of deceptive promotion and marketing of Defendants' products is simply artful pleading.  "Artful pleading cannot transform the City's complaint into anything other than a suit over global greenhouse emissions." *NYC*, 993 F.3d at 91.

This court aligns itself with the reasoning and decision articulated in *NYC* and **GRANTS** the Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (#199) for the following reasons:

## QUESTIONS PRESENTED

1. *Are Baltimore's claims preempted by federal common law and/or the Clean Air Act (CAA)?* [10]

---

[9] Baltimore also relies on the 4th Circuit's opinion in *Mayor and City Counsel of Baltimore v. BP P.L.C*, 31 F. 4th 178 (2022) (*Baltimore IV*). However, that Court addressed removal jurisdiction.

[10] The discussion of questions 1 and 2 will be addressed simultaneously. Question 3 will not be addressed in light of the court's decision on questions 1 and 2.

Although Baltimore characterizes its Complaint as only addressing the alleged promotion and sale of fossil fuel products and the concealment and misrepresentation of the products' known dangers, Defendants argue that fundamentally Baltimore alleges that its injuries are caused by anthropogenic greenhouse gas emissions. Defs.' Mot. 7.  Defendants argue that regardless of how the complaint is framed, the suit plainly seeks damages for alleged harms caused by gas emissions from all over the world and interstate pollution is governed by federal common and statutory law.  Only federal law can govern claims based on foreign emissions, and foreign policy concerns foreclose any state law remedy. *Id*. at 13.  Defendants argue that because Baltimore seeks damages for alleged harms caused by interstate and international emissions, (1) its claims cannot be governed by state law and (2) federal law governs and preempts state law claims seeking damages for interstate emissions.  Under the Constitution's structure, matters that involve interstate controversies cannot be handled in state court under state law. *Id*. at 9-10. Defendants further assert that Baltimore's claims involve uniquely federal interests that are committed by the Constitution to federal control preempting any state law. *Id*. at 9 (citing *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988)).  "These exclusively federal areas include "interstate and international disputes implicating the conflicting rights of States." *See Id*. (citing *Texas Indus. v. Radcliff Materials*, 451 U.S. 630, 640-641(1981)).  Defendants recognize that Congress has displaced federal common law with the Clean Air Act (CAA), however, they argue that that displacement does not allow state law to govern matters (foreign emissions) that it was never competent to handle. Defs.' Mot. 12.  Because the CAA does not regulate foreign emissions, federal law is still required – and still exists – to settle such disputes, thereby preempting state law claims sounding in global emissions.  Defendants plainly posit that federal common law has not been displaced with respect to foreign emissions. Defs.' Reply 6.

8

Furthermore, Defendants argue that the CAA preempts the state law claims seeking damages for global pollution. Although Baltimore says its complaint is seeking damages and not the regulation of gas emissions, Defendants argue that Baltimore intends to hold Defendants liable for the effects of emissions made around the world – not just in Baltimore or the U.S. - and the request for damages is a form of regulation. Defs.' Mot. 14.

To the contrary, Baltimore argues that Defendants' reliance on federal law is misplaced. Baltimore claims that Defendants' argument that the Constitution prohibits applying state law for injuries allegedly caused by out of state pollution fails for four (4) reasons: (1) Baltimore's claims look nothing like any federal common law cause of action; (2) even if the claims were to have once come within federal common law, that body of law has been displaced by the CAA; (3) federal common law of foreign emissions does not exist and Defendants have failed to show that the foreign affairs doctrine applies; and (4) there is no basis to craft a new federal common law. Pl.'s Opp'n 7-8.

Additionally, Baltimore argues that the foreign affairs doctrine as relied on by Defendants is not a preemption defense. *Id*. at 17. No court has recognized a federal common law of foreign emissions and there is no basis to do so. *Id*. at 19. Further, Baltimore says Defendants fail to carry their burden to show that Baltimore's Complaint would support the recognition of a new federal common law because this case does not fit the narrow and restricted areas available to all judge-made federal law absent express congressional authorization. *Id*. More particularly, this court cannot create new federal common law. *Id*. at 20. Even if this court could create new federal law, Defendants fail to satisfy the strict requisites. *Id*.

Finally, Baltimore argues that the CAA does not preempt its state-based claims because it is not attempting to regulate or abate emissions. Baltimore maintains that even if federal

common law was applicable, it has been displaced by the CAA. Pl.'s Opp'n 21.  Once displaced the federal common law ceases to exist and, therefore, cannot preempt state law. *Id*. at 13-14. Once a statute like the CAA displaces federal common law, the statute may preempt state law, but the displaced common law cannot. *Id*. at 16.

As previously stated, courts across the country have differed on the issue as to whether federal law preempts state claims based on global emissions.  These courts also differed in their characterization of the claims.  In this case, Baltimore declares that it does not seek to regulate gas emissions, but instead its claims are designed to hold the Defendants accountable for misrepresenting the truth about the use and consequences of fossil fuels and for misleading consumers.  This misrepresentation and deceptive campaign of misinformation, according to Baltimore, is what has driven the increased use of Defendants' fossil fuels and thereby, the increase in global emissions. *See generally* Compl.  Essentially, Baltimore asks this court to follow *Baltimore IV's* and *Honolulu's* opinions because they are consistent with Baltimore's position and characterization of its own complaint.  "Baltimore … 'does not seek to impose liability on Defendants for their direct emissions of greenhouse gases and does not seek to restrain Defendants from engaging in their business operations.'" *Baltimore IV*, 31 F.4th at 195 (quoting J.A. 47).  Rather, "Baltimore seeks compensatory and punitive damages, disgorgement of profits, civil penalties under the MCPA, and equitable relief…" *Id*. at 196.

This court's characterization of Baltimore's complaint differs from *Baltimore IV's* and *Honolulu's* characterization of similar complaints.  This court aligns itself with the opinions of the Second Circuit and the Superior Court of Delaware.[11]  This court agrees with *NYC* that a complaint such as presented by Baltimore is artful but not sustainable.  Baltimore's arguments

---

[11] *City of New York v. Chevron Corporation*, 993 F. 3d 81 (2021). *State ex rel. Jennings v. BP Inc*., 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024),

that it does not seek to directly penalize emitters; that it seeks damages rather than abatement; and that its claims will not result in the regulation of global emissions are not accepted by this court as the goal of its complaint.  To the extent that characterization of the complaint guides the analysis, this court finds that Baltimore's complaint is entirely about addressing the injuries of global climate change and seeking damages for such alleged injuries.  The explanation by Baltimore that it only seeks to address and hold Defendants accountable for a deceptive misinformation campaign is simply a way to get in the back door what they cannot get in the front door.  As Defendants state, that explanation "…cannot be squared with Plaintiff's own characterization of its Complaint: Plaintiff alleges that '[t]he increased emissions attributable to Defendants' tortious conduct have engendered significant climate impacts.' Plaintiff 'does not allege that Defendants' campaign of deception and disinformation or failures to warn are in and of themselves a public nuisance.' Plaintiff thus cannot deny that it seeks redress for harms allegedly caused by climate change - a global phenomenon caused by emissions from sources in literally every State and Nation in the world - or that it seeks to hold Defendants liable under Maryland law for those out-of-state emissions." Defs.' Reply 15 (quoting Pl.'s Opp'n 28 n.9).

Although the characterization of the complaint mattered in *NYC, Honolulu* and *Baltimore IV*, the Defendants are correct in asserting that the characterization of the complaint does not matter here.  The characterization "does not change the preemption [and displacement] analysis because [Baltimore] admits that its alleged injuries all stem from interstate and international emissions." Defs.' Mot. 17.  Whether the complaint is characterized one way or another, the analysis and the answer are the same - the Constitution's federal structure does not allow the application of state law to claims like those presented by Baltimore.  The characterization of the complaint is particularly important when deciding the preemptive effect of the CAA.

Baltimore's claims cannot survive because they are preempted by federal common law (and the CAA). This court follows the sound reasoning of *NYC*.

After *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938), federal common law practically ceases to exist[12], however, there remains limited areas of law where federal common law continues to exist because of uniquely federal interests. *City of Milwaukee v. Illinois & Michigan (Milwaukee II)*, 451 U. S. 304 (1981). "Erie also sparked 'the emergence of a federal decisional law in areas of national concern.' The 'new' federal common law addresses 'subjects within national legislative power where Congress has so directed' or where the basic scheme of the Constitution so demands. Environmental protection is undoubtedly an area 'within national legislative power,' one in which federal courts may fill in 'statutory interstices' and, if necessary, even 'fashion federal law.'" *Delaware*, 2024 WL 98888 at *8.[13]  Having recognized that federal common law is "subject to the paramount authority of Congress," it is only resorted to in the absence of an applicable Act of Congress. *Milwaukee II*, 451 U.S. at 314.  This line of rational thinking follows *Illinois v. City of Milwaukee (Milwaukee I)*, 406 U.S. 91 (1972), where the Court reasoned that the remedy sought by Illinois was not within the scope of remedies prescribed by Congress and held that when dealing "with air and water in their ambient or interstate aspects, there is a federal common law." *Milwaukee I*, 406 U.S. at 103.

Global pollution-based complaints were never intended by Congress to be handled by individual states.  Federal law governs disputes involving air and water in their ambient state. *See Am. Elec. Power Co. (AEP) v. Connecticut*, 564 U.S. 410, 421 (2011) ("One State cannot apply its own law to claims that deal with air and water in their ambient or interstate aspects.").

---

[12] A federal court could not generally apply a federal rule of decision, despite the existence of jurisdiction, in the absence of an applicable Act of Congress. *Milwaukee v. Illinois*, 451 U.S. 304, 313 (1981).
[13] Dismissing state-based claims because of the preemptive effect of the CAA.

The Supreme Court of the United States has held that state law cannot be used to resolve claims seeking redress for injuries caused by out of state pollution (sources). *See generally Int'l Paper Co. v. Ouellette*, 479 U.S. 481 (1987). The Second Circuit held that federal law governs cases such as this because it "'implicate[s] two federal interests that are incompatible with the application of state law,' namely, the 'overriding need for a uniform rule of decision' on matters influencing national energy and environmental policy and the 'basic interests of federalism.'" *See* Defs.' Mot. 10 (quoting *NYC* 993 F.3d at 91-92).

Baltimore's argument relies heavily on *Baltimore IV* and *Honolulu's* holding that its case is not about regulating emissions but about misrepresentation and deception as well as the holding that federal law has been displaced and ceases to exist. However, *Baltimore IV* is distinguishable from this case. This court's decision is not in conflict with *Baltimore IV*. The Fourth Circuit analyzed federal common law preemption under the lens of removal jurisdiction where the sole consideration and focus was the doctrine of complete preemption and not the federal defense of ordinary preemption as it applied to the merits of the case. In other words**,** the question before the Fourth Circuit was whether Defendants' preemption defenses could create federal question jurisdiction in light of the well pleaded complaint rule. *See Baltimore IV*, 31 F.4th at 178. Their answer was no**.** In fact, *Baltimore IV* distinguished itself from *NYC* by indicating that in a removal matter it was "bound by the well-pleaded complaint rule or 'heightened standard' that did not apply" in *NYC. Id*. at 203. This court respects *Baltimore IV*'s decision but is not bound by it. As stated in *NYC*, this court is "free to consider the [Defendants'] preemption defense on its own terms, not under the heightened standard unique to the removability inquiry." *NYC*, 993 F.3d at 93-94. Baltimore agreed that the Fourth Circuit

decision would not preclude this court from holding that Baltimore's claims would/could be preempted by federal law. Defs.' Mot. 19.[14]

The instant case goes beyond the limits of Maryland state law. Again, the bottom line is that Baltimore, like *NYC* (and if the truth be told *Honolulu*), "intends to hold the [Defendants] liable under [Maryland] law, for the effects of emissions made around the globe over the past several hundred years. In other words, [Baltimore] requests damages for the cumulative impact of conduct occurring simultaneously across just about every jurisdiction on the planet." *NYC*, 993 F.3d at 93. In *AEP*, Justice Ginsburg explained that cases, such as this one, are inappropriate under state law in that there are questions of national or international policy. Furthermore, Congress and the "expert agency [are]… better equipped to do the job than individual district [or state] judges issuing ad hoc, case-by-case injunctions" or decisions. *AEP*, 564 U.S. at 427-428. Judges lack the scientific, economic, and technological resources that the [EPA] possesses. *Id*.

Congress may displace federal common law over foreign emissions as it did with domestic emissions when it enacted the CAA. The CAA displaced federal common law as it relates to domestic emissions, not foreign emissions. Federal common law is still required to apply to extraterritorial aspects of claims challenging undifferentiated global emissions. *NYC*, 993 F.3d at 95 n.7, 101. State law cannot provide a remedy to claims involving foreign emissions. However, if Congress fails to act or does not provide a cause of action, state law is not presumptively competent to address this issue. *See NYC*, 993 F.3d at 98.

---

[14] "Indeed, Plaintiff told the U.S. Supreme Court that the Fourth Circuit's decision in this case 'would not preclude a district court in the Fourth Circuit from holding that a claim identical to New York City's. filed in federal court, would be preempted by federal law.'" Defs.' Mot. 19 (quoting Br.in Opp., *BP P.L.C.*, No. 22-361, 2022 WL 17852486, at 12-13).

*Does the CAA preempt Baltimore's state claims?*

As stated by the Second Circuit, once the court concludes that these claims must be brought under federal common law, those claims run headlong into a problem of their own – the CAA. *Id.* at 95.  The CAA displaced federal common law claims concerning domestic greenhouse gas emissions. Defs.' Mot. 20.  Defendants argue that even if the Constitution did not preclude Baltimore's state law claims, the claims would still be barred by the preemptive effect the CAA would have on regulating out of state greenhouse gas emissions. *Id.*  Baltimore alleges that the preemptive effect of the CAA is the only consideration for this court and that the CAA does not preempt its claims. Pl.'s Opp'n 21.  Baltimore argues that both conflict and field preemption fail in this case.  "There is not field preemption because the CAA's savings clauses make clear Congress did not intend to bar all state regulation of air pollution." *Id.*  Baltimore further argues that conflict preemption fails because the claims do not prevent Defendants' compliance with the CAA. *Id.*

To determine whether the CAA preempts (express or implied) Baltimore's state law claims, this court must initially focus on the purpose of the CAA. In 1963, President Lyndon B. Johnson signed into law the Clean Air Act 42 U.S.C. §7401 (amended in 1970 and 1990) which to date was the most significant response to the growing concern and evidence of climate change. *Evolution of the Clean Air Act*, ENV'T PROT. AGENCY, https://www.epa.gov/clean-air-act-overview/evolution-clean-air-act (Nov. 21, 2023).  The purpose of the CAA was (and is) to provide protection of public health by improving the quality of the nation's air.  Congress purposed that air pollution prevention at its source is the primary responsibility of States and local governments.  In 1970, the CAA shifted its focus and authorized the development of federal and state regulations to limit emissions from both stationary and mobile sources. *Id.*  The

Act established and empowered the Federal Environmental Protection Agency (EPA) to establish national ambient air quality standards for various pollutants and to promulgate rules and regulations for attaining those standards. *Id*. In 1977 Congress again made changes to the CAA that established major permit review requirements for the National Ambient Air Quality Standards. In 1990 "the CAA substantially increased the authority and responsibility of the federal government." *Id*. The most significant changes regarded urban pollution, permits, motor vehicles, air toxics, acid rain, and ozone depletion. Alexa Austin, *Cleaning Up the Confusion: Climate Change Litigation and Preemption*, 10 Joule: Duquesne Energy & Envtl. L.J. 6, 12 (2022). "The Act authorized the EPA to divide the country into 'air quality control region[s]'… It required each state to submit for EPA approval a 'state implementation plan' (SIP), setting forth the state's program for achieving the requisite air quality standards in each of its control regions …" *Department of Transp. v. Armacost*, 311 Md. 64, 66 (1987). Additionally, under the Act, each state is authorized to enforce the limitations approved by the EPA and adopt and regulate any area covered under their SIP. The CAA contains a savings clause pertaining to state common law claims. *See* 42 U.S.C. §7604(e)(1)-(2) (preserving state regulation over in-state pollution sources only); *see also* Defs.' Mot. 22-24.

When federal laws invalidate or supersede a state law, that state law is considered preempted. Preemption can be either express or implied. Generally, "preemption will not be found unless the Court concludes preemption was 'the clear and manifest purpose of Congress' (express) or that 'a scheme of federal regulation… [is] so pervasive as to make reasonable the inference that Congress left no room for the states to supplement it.'" (implied). Jonathan H. Adler, *Displacement and Preemption of Climate Nuisance Claims*, 17 J.L. Econ. & Pol'y, 217, 240 (2022). If implied preemption is applied, the question is whether it is either "field

preemption" or "conflict preemption".  Baltimore argues that implied preemption (in either form) fails: "[t]here is no field preemption because the CAA's savings clauses make clear Congress did not intend to bar all state regulation of air pollution. Pl.'s Opp'n 21 (citing *42 U.S.C. §7401 (a)(3)*).  There is no conflict preemption because "no aspect of its claims would make Defendants' compliance with the CAA impossible or stand in the way of the CAA's purposes and objectives." *Id*. at 21.

The CAA has carved out certain areas for the states to act in regulating emissions.  First, Congress says the CAA will not interfere if the state is regulating an in-state source. *See* 42 U.S.C §7401(a)(3); *see also Ouellette*, 479 U.S. at 481.  The purpose of the CAA is to occupy the field with the exception of those areas set aside for the state.  The CAA includes two savings clauses, a citizen-suit savings clause and a states' rights savings clause. *See* 42 U.S.C. §§7604 and 7416, respectively.  The Supreme Court held that the Clean Water Act (CWA) preempts state law claims when dealing with an out of state point source. *Ouellette*, 479 U.S. at 500.  The CAA (which is analogous to the CWA) does not preempt state law when pollution from within the state (a state source) is at issue.  When claims are based on out of state sources/emissions, the CAA preempts to the extent that the claims seek to regulate emissions. Defs.' Mot. 23.

Defendants argue that "[b]ecause [Baltimore's] claims seek remedies for harms allegedly caused by cumulative worldwide greenhouse gas emissions over more than a century, imposition of those remedies would necessarily regulate interstate emissions, thereby upsetting the careful balance Congress struck though the comprehensive Clean Air Act regime overseen by EPA." *Id*. Baltimore asks this court to follow the preemption analysis in *Baltimore IV*.  However, as previously stated, *Baltimore IV* decided that preemption does not give rise to a federal question for the purpose of removal.  This court, like the Second Circuit, considers the Defendants'

preemption defense argument on its own terms and not under the heightened standard unique to the removability inquiry. *NYC*, 993 F.3d at 94 (following *City of Oakland*, *Massachusetts*, *Rhode Island*, etc.[15]). The Supreme Court stated that "[l]egislative displacement of federal common law does not require the 'same sort of evidence of a clear and manifest [congressional] purpose' demanded for preemption of state law. "Rather, the test is simply whether the statute 'speak[s] directly to [the] question' at issue." *AEP*, 564 U.S. at 424 (quoting *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618 (2010)). For the CAA to displace federal common law it is required that there is evidence that Congress has provided a sufficient legislative solution to the particular issue. *NYC*, 993 F.3d at 95.

The CAA speaks directly to the domestic emissions issues in this case. The Second Circuit held that the City's state law claims are displaced by federal common law, and the Clean Air Act displaces the City's federal common law damages claims where domestic emissions are involved. The Second Circuit again provides guidance in its analysis of two prior decisions, *AEP*, 564 U.S. 410 and *Native Village of Kivalina v. ExxonMobil Corp.*, 696 F.3d 849 (2012). In *AEP* the question before the Supreme Court was whether the plaintiffs could maintain federal common law public nuisance claims against major electric power companies where the plaintiffs sought an injunction to set carbon dioxide emissions caps. The Supreme Court held that the CAA, which entrusted the complex balancing of emissions to the EPA and provides a means to seek limits on emissions from domestic power plants, displaced any federal common law right to seek abatement. *AEP* 564 U.S. at 428, 429. In this matter, Baltimore maintains that it is not seeking an injunction or in any way seeks regulation of Defendants' gas emissions. However, Baltimore does seek damages rather than abatement and Defendants argue that seeking damages,

---

[15] *See City of Oakland v. BP P.L.C.*, 960 F.3d 570, 575 (9th Cir.); *see also Massachusetts v. ExxonMobil Corp.*, 462 F. Supp. 3d 31, 34 (D. Mass. 2020); *Rhode Island v. Chevron Corp.*, 393 F. Supp. 3d 142, 146, (D.R.I. 2019).

in this instance, is tantamount to regulation. Defs.' Mot. 24-25.  Although *AEP* addressed abatement and not damages, in its ruling the Second Circuit found further support in the decision of *Kivalina* where the city requested damages for past emissions and did not seek abatement. The Ninth Circuit held that the Clean Air Act displaces the City's common law damages claims. Although *Kivalina* did not seek abatement but sought damages, the analysis is the same. The Ninth Circuit opined that "the Supreme Court has instructed that the type of remedy asserted is not relevant to the applicability of the doctrine of displacement." *Kivalina*, 696 F.3d at 857.  The Ninth Circuit held that according to the Supreme Court, the CAA displaces federal common law and "[t]hat determination displaces federal common law public nuisance actions seeking damages, as well as those actions seeking injunctive relief." *Id*. at 858.  So, it is true here, that regardless of whether Baltimore seeks injunctive relief or damages, Baltimore's claims are barred by the CAA.  This court aligns with the sound reasoning of the Second Circuit and its agreement with the Ninth Circuit – "…that the Clean Air Act displaces the City's common law damages claims…" which "…if successful would operate as a *de facto* regulation on greenhouse gas emissions." *NYC*, 993 F.3d at 96.  Therefore, if the CAA preempts federal common law, it preempts state law claims as well. *Id*. at 100.

However, as Baltimore feared, it may not have an open and direct avenue to a cause of action even under federal common law in that foreign policy concerns [may] foreclose a federal common law cause of action targeting emissions emanating from beyond our national borders. *Id*. at 101. That question may be resolved by the United States Supreme Court if the Honolulu defendants' petition for certiorari[16] is granted.

---

[16] *See Sunoco LP v. City and Cnty. of Honolulu*, No. 23-947 (U.S.); *Shell PLC v. City & Cnty of Honolulu*, No. 23-952 (U.S.).

2.   *Does Baltimore Plead Actionable Claims Under Maryland Law:*

Having granted the Defendants' Motion to Dismiss, the court need not consider the individual state law claims.  However, to make the record complete, the court will briefly address the state law claims.

A.  *Public and Private Nuisance*

In the first and second cause(s) of action, Baltimore alleges that Defendants created a public and private nuisance by affirmatively and knowingly promoting the sale and use of fossil fuel.  Compl. ¶¶ 218-235.  Defendants allege that Baltimore fails to state a claim for both public and private nuisance.  Defendants argue that Baltimore improperly attempts to expand the scope of state nuisance law. Defs.' Mot. 33.  Defendants contend that Baltimore's  nuisance claims fail for several reasons: (1) Maryland only recognizes nuisance claims that are based on use of land; (2) Maryland does not recognize nuisance claims based on production, promotion and sale of a consumer product and (3) (Even if Maryland did recognize a nuisance claim based on the alleged facts of this case), the alleged facts do not show that Defendants exercised sufficient control over the instrumentality that caused the nuisance. *Id*. at 32-33.  Per Defendants, to extend public nuisance theory to cases such as this one would eviscerate the boundary between nuisance and product liability. Defs.' Reply 20.

Baltimore alleges that the "Defendants created, assisted in creating, or were a substantial factor in contributing to a nuisance by, … '[c]ontrolling every step of the fossil fuel product supply chain' including … 'promoting the sale and use of fossil fuel products which Defendants knew to be hazardous and knew would cause or exacerbate global warming and related consequences'…" Pl.'s Opp'n 28.  Baltimore declares that the nuisance claims are supported by

well-recognized Maryland law and "Maryland does not limit nuisance claims to the use of land or categorically exclude liability for nuisances created by wrongful promotion of hazardous products." *Id*. at 30. Baltimore argues that the Maryland federal district court recognized that nuisance liability under Maryland law can extend to a defendant who misleadingly markets products for uses the defendant knows will likely cause environmental or health hazards. *Id*. at 31. Baltimore finds its support in the Fourth Circuit's opinions in *State v. Exxon Mobil Corp*, 406 F. Supp. 3d 420 (2019) and *Mayor and City Council of Baltimore v. Monsanto Co.*, 2020 WL 1529014. Additionally, Baltimore argues that Maryland law does not impose a control requirement. "'[C]ontrol is not a required element to plead public nuisance …'" in that Maryland imposes liability on all who actively participate in creating a nuisance. Pl.'s Opp'n 35 (citing *Monsanto*, 2020 WL 1529014). Baltimore argues that even if the law did require control, their complaint satisfies that requirement in that Defendants controlled every step of the fossil fuel product supply chain. *Id*. at 37.

"A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land. A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts §§821B, 821D. "A public right is one common to all members of the general public…not like the individual right that everyone has not to be assaulted or defamed or defrauded." §821B, Comment g. Defendants are correct that Maryland state courts have yet to extend public nuisance law to cases concerning production, promotion and sale of consumer products. Under Maryland law such claims are more suited as product liability claims. However, Baltimore is also correct that Maryland's Fourth Circuit extended the theory of public nuisance liability to the deceptive promotion of dangerous products while recognizing that Maryland state courts have not done so. The Fourth Circuit upheld the

public nuisance claim that was based on Exxon's manufacturing and marketing of MTBE gasoline (*See Exxon*, 406 F. Supp. 3d at 467) and on *Monsanto's* marketing and promotion of PCBs (*See Monsanto*, 2020 WL 1529014 at *9-10).

This court finds that *Exxon* and *Monsanto* are clearly distinguishable from the present case. First, in *Exxon*, the State brought action against manufacturers, marketers and distributors of gasoline asserting public nuisance in that the State's waters were contaminated with MTBE, a fuel additive. 406 F. Supp. 3d 420. The MTBE was already deemed a dangerous toxic product as were the PCBs in *Monsanto*.  In *Monsanto*, the State sufficiently pled that "the defendants substantially participated in creating a public nuisance by marketing and promoting PCBs while withholding their 'extensive knowledge about PCB's harmful effects.'" Pl.'s Opp'n 31 (quoting *Monsanto*, 2020 WL 1529014 at *9-10).  In both cases the dangerous products were directly deposited into and directly entered the land and water of the plaintiff.  The *Exxon* Court specifically held that "[b]ecause no case law forecloses this theory of public nuisance liability under Maryland law, I reject defendants' argument that the State's public nuisance claim must be dismissed to the extent it is premised on their manufacture, marketing, and supply of MTBE gasoline." *Exxon*, 406 F. Supp. 3d at 469.  As Defendants characterized these federal cases, "both cases allege facts that established a tight nexus between the sale of a product and the contamination of local lands and waters." Defs.' Reply 22.  Such tight nexus does not exist in the instant case.  The Defendants' products have not been deemed dangerous in and of themselves. Fossil fuels are a lawful consumer product guided and regulated by the EPA. In the instant case, Baltimore does not allege that the Defendants directly released a hazardous chemical into the waters or lands of Baltimore at the point of sale.  Rather, Baltimore alleges that Defendants' misrepresentations and deceptive conduct resulted in increased global use of fossil fuels which,

Baltimore says, has caused damage to the infrastructure of Baltimore. Pl.'s Opp'n 29-30.  The

damages alleged by Baltimore are the result of fossil fuel usage and gas emissions by third

parties located all over the world.  *Exxon* and *Monsanto* are in keeping with the Defendants'

argument that public nuisance claims in Maryland must relate to a defendant's use of land.

This court recognizes that the Appellate Courts of Maryland have yet to extend public

nuisance to deceptive marketing complaints[17].  The Fourth Circuit had a lower hurdle to jump

considering the "tight nexus" between the defendants' actions and the nuisance.  The causation

in this case is much more attenuated.  Thus far in Maryland, public nuisance theory has only

been applied to cases involving a defendant's use of land. *See Tradjer v. Montgomery Cty*., 300

Md. 539 (1984); *see also Whitaker v. Prince George's Cty*., 307 Md. 368 (1986).  It is the

opinion of this court, in keeping with Oklahoma (*State ex rel. Hunter v. Johnson & Johnson*, 499

P.3d 719 (2021)) and Rhode Island (*State v. Lead Indus. Ass'n*, 951 A.2d 428 (2008)), that the

lines between public nuisance law and product liability must be maintained.  Therefore, until the

Maryland Appellate Courts extend nuisance law to product liability cases, this court will not take

that leap and dismisses the nuisance claims.

Defendants also argue that even if the public nuisance theory was sustainable, Baltimore

fails to show that the Defendants exercised control over the instrumentality that caused the

nuisance. Defs.' Reply 23.  Defendants argue that emissions from their products occurred long

after they relinquished control of their products to third parties, *Id*. at 24, and the "instrumentality

allegedly causing Plaintiff's claimed harms is the worldwide combustion of fossil fuels that

releases greenhouse gas emissions. Defs.' Mot. 39.  Baltimore claims that Defendant's control

argument rests upon a false premise that the instrumentality of the nuisance is the emission

---

[17] Baltimore states that the instrumentality of the nuisance is the ongoing marketing and selling fossil fuels while misrepresenting their dangers.  Pl.'s Opp'n 37.

resulting from the fossil fuels.  "[H]ere, the nuisance causing instrumentality is … 'their ongoing conduct of marketing, distributing, and selling [fossil fuels]' while misrepresenting their hazards." Pl.'s Opp'n 37 (citing *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E. 2d 1136, 1143 (Ohio 2002)).  Considering this court's decision to dismiss the nuisance claims, it need not reach the decision as to whether Baltimore has shown exclusive control.

   *B. Duty to Warn*

   In count 3 (strict liability) and count 6 (negligence),  Baltimore alleges that Defendants owed a duty to Baltimore and its residents to warn Baltimore and residents of the dangers of using Defendants' fossil fuels.  Defendants argue that Baltimore's failure to warn claim for strict liability and negligence should be dismissed because Defendants had no duty to warn the world of the climate effects that inevitably flow from the intended use of their products. Defs.' Mot. 42.  Defendants emphasize that under Maryland law, duty "'requires a close or direct effect of the tortfeasor's conduct on the injured party.'" *Id*. (citing *Gourdine*, 405 Md. 722, 746 (2008)).  Imposing a duty on Defendants would be establishing a duty to warn the world, which is inapposite of Maryland law.  Additionally, Defendants claim that no duty is owed where the dangers were clear and obvious and generally known. *Id*. at 43.  Defendants argue that the link between fossil fuel use and global climate change has been well understood and widely known for at least a half a century. *Id*.

   Conversely, Baltimore argues that under the theories of strict liability and negligence, the Defendants have a duty to warn because they knew or should have known of the dangerousness of fossil fuel use.  Baltimore claims that "'the determination of whether a duty exists represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." Pl.'s Opp'n 45-46 (citing *Gourdine*, 405 Md. at 745).  Baltimore's theory is that

under Maryland law the question of duty is answered by the analysis of several factors: foreseeability of harm; degree of certainty of injury; closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to defendant's conduct; policy of preventing future harm; and the extent of the burden to the defendant and consequences to the community. *Id*. at 46.  According to Baltimore, foreseeability is not only a required factor when assessing duty, but the most important factor. *Id*. (relying on *Kiriakos v. Phillips*, 448 Md. 440, 486 (2016)).  Further, Baltimore indicates that Defendants owe a duty to warn as Baltimore is a foreseeable bystander. *Id*. at 47.  Finally, Baltimore declares that the question of whether the dangers associated with the Defendants' products were open and obvious is a factual question preserved for the trier of fact. *Id*.

Maryland courts have recognized that duty to warn is an element of both strict liability and negligence claims. *Owings-Illinois, Inc. v. Zenobia*, 325 Md. 420, 435. n.7 (1992); *Gourdine*, 405 Md. at 722.  The existence of a legal duty in this case is a question of law to be determined by this court. *Gourdine*, 405 Md. at 732.  With respect to determining whether a duty exists, the *Gourdine* court discusses the nature of duty and foreseeability, citing *Patton v. United States of America Rugby Football*, 381 Md. 627, 637 (2004), "[w]here the failure to exercise due care creates risks of personal injury, 'the principal determinant of duty becomes foreseeability.' The foreseeability test 'is simply intended to reflect current societal standards with respect to an acceptable nexus between the negligent act and the ensuing harm.'" *Id*. at 745.  There is not a bright line rule that duty be defined without regard to the size of the group to which the duty would be owed. *Id*. at 752.  However, *Gourdine* does warn against requiring a duty that would be owed to the world.  "One cannot be expected to owe a duty to the world at large to protect it against the actions of third parties …" *Id*. at 750 (quoting *Valentine v. On Target, Inc.*, 353 Md.

25

544, 553 (1999)).  The assessment of foreseeability must include a regard for the size of the group to which the duty would be owed. *Id.*

In the present matter, Baltimore alleges that consumers all over the world used the Defendants' products which resulted in global gas emissions that caused climate change and ultimately injured Baltimore and its residents.  Based on this premise Baltimore claims that Defendants owed Baltimore and other consumers a duty to warn of their products' known climatic hazards. Pl.'s Opp'n 45.  Defendants aptly point out that "[Baltimore's] theory would extend the purported duty to everyone contributing to climate change because Plaintiff alleges that its injury results not from its own use of or direct exposure to Defendants' products, but from worldwide consumers' decisions to use fossil fuels over the course of decades, resulting in the global atmospheric accumulation of greenhouse gases …, which then results in climatic changes, sea level rise, and finally increased mitigation costs to [Baltimore]." Defs.' Reply 26.

In this case, the duty to warn would be extended to every single human being on the planet whose use of fossil fuel products may have contributed to global climate change, ultimately affecting Baltimore and its residents.  This exact level of duty – to the world – is what Maryland law warns against.  As Defendants explained, "[e]ven a foreseeable risk of injury does not create a duty to warn an "indeterminate class of people."" *Id.* at 25.  Baltimore does not allege that its injury comes from its own use of or direct exposure to Defendant's fossil fuels but from consumers' decisions to use fossil fuels across the globe for many years.  For the reasons stated above, this court finds that the Defendants did not have a duty to warn.  Therefore, counts 3 and 6 are dismissed.

*C. Design Defect*

Baltimore seeks relief under a products liability theory for strict liability for design defect (count 4) and negligent design defect (count 5). Defendants request that this court dismiss Baltimore's design defect claims because Baltimore has failed to allege any defect inherent in the design of Defendants' products. Defendants' products function as they were intended to in light of the fact that there may have been negative results of using the products (i.e., emissions of greenhouse gasses). Defs.' Mot. 45. Even if the products' normal function was dangerous, liability still would not attach. Defendants argue that its products are not unreasonably dangerous as is required to sustain a design defect claim. Supposing Baltimore could allege a defective condition, Baltimore could not satisfy the consumer expectation test, which considers whether a product is dangerous to an extent beyond what is contemplated by the ordinary consumer with ordinary and common knowledge of the product's characteristics. Defendants argue that Baltimore cannot support that level of dangerousness in its claims because Baltimore itself alleges widespread, longstanding knowledge of the products' characteristics. *Id.* at 46-47. Defendants argue that the allegations stated in the complaint "belie Plaintiff's claims that fossil fuel products 'have not performed as safely as an ordinary consumer would expect them to' with respect to emissions of greenhouse gases." *Id.* at 47 (quoting Compl. ¶ 253).

Baltimore argues that application of the consumer expectation test supports its claim that Defendants' products are defective and that Baltimore has adequately plead negligence and strict liability design defect claims. Baltimore argues that Defendants "'took affirmative steps to misrepresent the nature of [climate] risks'" and that "conduct 'prevented reasonable consumers from forming an expectation that fossil fuel products would cause grave climate changes.'" Pl.'s Opp'n 51 (quoting Compl. ¶ 254). Baltimore says that Defendants' arguments fail because "[the

products] do not perform as safely as a reasonable consumer would expect, as a consequence of Defendants' deliberate efforts to prevent consumers from appreciating that the products' normal use would cause [climate change]." *Id*. at 52.  Ultimately, Baltimore says that the determination of when and what a Maryland consumer appreciated and understood is for the jury to decide.

In rebuttal, Defendants argue that Baltimore failed to confront the flaw in their claim that "all of its injuries resulted from normal and intended use of Defendants' products and that a design defect claim cannot be premised on a characteristic that is inherent in the product." Defs.' Reply 28.  Further, the Defendants argue that Baltimore's contention that its claim turns on Defendants' promotional efforts is fundamentally problematic in that the Maryland Supreme Court has stated "the 'relevant inquiry in a strict liability action' for design defect focuses not on the conduct of the manufacturer but rather on the product itself.'" *Id*. (quoting *Phipps v. General Motors*, 278 Md. 337, 344 (1976)).

Baltimore seeks relief under a products liability theory for negligent product design (count 5) and strict liability (count 4).  Maryland law follows the theory of strict liability (for design defect) as is set forth in the Restatement (Second) of Torts §402A (1965).  Elements necessary to sustain a strict liability claim are: (1) the product was in defective condition at the time that it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause of the injuries, and (4) that the product was expected to and did reach the consumer without substantial change in its condition. *Phipps v. General Motors Corp.*, 278 Md. 337, 344 (1976).  "For a seller to be liable under §402A, the product must be both in a 'defective condition' and 'unreasonably dangerous' at the time that it is placed on the market by the seller."  *Id*. The elements are applicable to a negligence action as well as strict liability action, meaning that the presence of a defect in the Defendants' product(s)

is necessary for Baltimore to recover under either theory.  However, in an action founded on strict liability in tort, as opposed to a traditional negligence action, the plaintiff need not prove any specific act of negligence on the part of the seller.  The burden of proof that the product is defective is in the hands of Baltimore, the alleged injured party.  The defect may be evidenced by showing a defect in the design, a defect in the manufacturing process or that the product is inherently defective due to an extremely high level of dangerousness. *Cofield v. Lead Indus. Ass'n,* 2000 WL 32492681 at *2 (D. Md., 2000).  Before this court can consider the "unreasonably dangerous" element, the defective condition of the product element must be satisfied.

In this matter Baltimore has not alleged that the Defendants' products were defective at the time the products left the possession of any Defendant.  That is a fatal flaw.  It is simply not alleged.  The product(s) must be both in a defective condition and unreasonably dangerous at the time the products were placed in the market.  Additionally, Baltimore's theory that: "Defendants' fossil fuel products did not perform as safely as a reasonable consumer would expect because Defendants' affirmatively prevented reasonable consumers from understanding their products' true dangers," Pl.'s Opp'n 53, is mistakenly focused on the behavior of the manufacturer and not the product itself.  "The relevant inquiry in a strict liability action focuses not on the conduct of the manufacturer but rather on the product itself." *Phipps*, 278 Md. at 344.  This court will not address the "unreasonably dangerous" element because Baltimore has not carried its burden in showing that the Defendants' products were defective.  Baltimore failed to allege or show a defect in the design of Defendants' products, therefore counts 4 and 5 are dismissed.

### D. Trespass

Baltimore's seventh cause of action is trespass. Compl. ¶¶ 282-290.  Defendants request dismissal of the trespass claim for the following reasons: (1) Baltimore fails to allege that Defendants interfered with property over which Baltimore has exclusive control. Defs.' Mot. 48.  Defendants argue that Baltimore is required to identify specific properties that Defendants have allegedly trespassed and that naming the location is a pleading requirement pursuant to Maryland Rule 2-304. Defs.' Reply 31.; (2) Baltimore fails to allege that Defendants or their products intruded on to any property owned by Baltimore.  Baltimore cannot sustain a claim for trespass because of the use of Defendants' products by third parties resulted in weather changes that affect another's property. Defs.' Mot. 49.  Maryland courts have held that for a defendant to be liable for trespass there must be some connection with or some control over the object. *Id.* (citing *Rockland Bleach and Dye Works Co. v. H.J. Williams Corp.*, 242 Md. 375, 387 (1966)).  Defendants state that the link between its products and the harms alleged by Baltimore is far too attenuated. *Id.* at 49.; and (3) Baltimore's claim fails because it not ripe.  The harms Baltimore allege are anticipated future invasions of property.  Future property invasions that have not occurred are not actionable. *Id.*

Baltimore states that it does in fact specify property over which it has control and on which Defendants have trespassed.  Baltimore points out that it "owns, leases, occupies, and/or controls real property throughout the City." Compl. ¶ 283.  However, Baltimore notes, it is not required at the pleading stage to specify each precise parcel that has been invaded. Pl.'s Opp'n 40.  Baltimore also argues that it is not obligated to specify each precise parcel of property or land that has been invaded by Defendants (relying on *Exxon*, 406 F. Supp. 3d at 471).  "Here the Complaint provides sufficient specificity to state a claim for trespass based on allegation that

flooding, sea level rise and other climate-related invasions threaten, 'the City's stormwater drainage system, especially in the vicinity of Jones Falls, Gwynns Falls, and Herring Run,' Compl. ¶ 79, among other City-owned, leased, or controlled property and infrastructure. Compl. ¶¶ 197,199, 201-208, 213-15, 283-285; Pl.'s Opp'n 41.  Baltimore argues that Defendants are liable for trespass when it interferes with Baltimore's possessory interest in its property by entering or causing something to enter the land (relying on *Exxon v. Albright*, 433 Md. 303, 408 (2013)).  Baltimore's argument relies on the alleged fact that Defendants caused foreign matter to invade its property and that "Defendants substantially contributed to invasions of City property by misleadingly and deceptively marketing their fossil fuel products, knowing that emission from those products would cause the very climate-related invasions alleged …" Pl.'s Opp'n 42.  Furthermore, Baltimore argues that Defendants are incorrect that there is no precedent to support its claim.

In Maryland, a trespass occurs "[w]hen a defendant interferes with a plaintiff's interest in the exclusive possession of the land by entering or causing something to enter the land [of the property owner]." *Rosenblatt v. Exxon Co.*, U.S.A., 335 Md., 58, 78 (1994).  Although Defendants argue that Baltimore failed to specify the properties over which it has exclusive ownership and therefore this court should dismiss the complaint, this court notes that Baltimore's complaint alleges several properties over which it has ownership or control, i.e., Inner Harbor, Jones Falls, etc.  However, this court struggles with the novel theory of trespass in this case. That theory being that: "Defendants substantially contributed to invasions of City property by misleadingly and deceptively marketing their fossil fuel products, knowing that emissions from those products would cause the very climate-related invasions alleged …"  Pl.'s Opp'n 42. Baltimore's theory of trespass is one that has not been recognized by Maryland state courts.

Maryland does, however, recognize that trespass can be caused by foreign matter entering the land attributed to a defendant's behavior.  "[W]hen an adjacent property is invaded by an inanimate or intangible object it is obvious that the defendant must have some connection with or some control over that object in order for an action in trespass to be successful…" *Rockland*, 242 Md. at 387.  Baltimore relies on *State ex rel. Jennings v. Monsanto Co.*, 299 A.3d 372 (Del. 2023), which held that the defendant substantially contributed to the entry of PCBs onto the State's land by supplying PCBs to Delaware manufacturers and consumers, knowing that their use would eventually trespass onto other lands. Pl.'s Opp'n 42 n.23.  In *Jennings* and in *City of Bristol v. Tilcon Materials, Inc.*, 931 A.2d 237, 259 (2007), the actual foreign matter is the product produced and manufactured by the defendant.  Baltimore also argues that its theory is supported by *Rockland*, where the defendant trespassed by placing fill material that was carried onto the plaintiff's land by "foreseeable seasonal rains." *Rockland*, 242 Md. at 387.  However, the instant case is factually distinguishable and therefore the theory is misapplied.  The foreign matter in *Rockland* is the defendant's fill material and it was the seasonal rains that carried the fill material onto the property of the plaintiff. In *Jennings*, the foreign matter was the PCBs.  In each case the defendants had a connection and control over the foreign matter.  That is not the theory in this case.  In each of these cases the defendant had control of the foreign matter or made a substantial contribution to the invasion.  Baltimore asks this court to determine that the Defendants' "substantial contribution" includes its marketing of its products, consumers' reliance on the marketing, increase in the sale and use of Defendants' products, the use of the products in every part of the world and the emission from that use causing the rainfalls and floods (foreign matter) in Baltimore. As Defendants have pointed out, "[t]he link between this activity and the harms of which Plaintiff complains is far to attenuated to constitute the control

necessary to establish liability for trespass." Defs.' Mot. 49.  This court will not make that leap and extend trespass liability beyond where the Maryland Supreme Court has previously allowed.

### E. Maryland Consumer Protection Act Claim

Baltimore alleges in count 8 of its complaint that Defendants violated the Maryland Consumer Protection Act (MCPA) "by engaging in the deceptive marketing and promotion of their products both by (1) making false and misleading statements regarding the known severe risks posed by their fossil fuel products that had the capacity, tendency or effect of misleading consumers and by (2) making false representations and misleading omissions of material fact regarding the known severe risks posed by their fossil fuel products with the intent that consumers would rely on those representations." Compl. ¶ 295.  Defendants argue that Baltimore's claim should be dismissed for the following reasons: (1) Baltimore's claim fails to allege that it relied on any statement made by Defendants; (2) it is baseless because it is not premised on any deceptive statement about Defendants' products; and (3) it is time barred. Defs.' Mot. 51-55.

This court finds it necessary to address only the third argument – that Baltimore's claim is time barred.  Defendants allege that Baltimore's claim is barred by the 3-year statute of limitations.  Defendants argue that Baltimore "knew or reasonably should have known by reasonable diligence the facts giving rise to its MCPA claim far more than 3 years before it commenced this action in 2018." Defs.' Reply 37.  Baltimore argues that its claim is timely because Defendants' fraudulent concealment tolled the statutes of limitation. Pl.'s Opp'n 56.

"A civil action at law shall be filed within three years from the date it accrues…" CJP §5-101. An action accrues when a plaintiff knew or reasonably should have known. *Cain v. Midland Funding, LLC*, 475 Md. 4, 35 (2021).  The question of when an action accrues is a question of

law to be determined by the judge. *Id.* Baltimore filed its claim in July of 2018. The statements and allegations made in the complaint make it clear that Baltimore was well aware of Defendants' alleged conduct before 2015 when it could have reasonably discovered a "wrong" committed by Defendants. Information as to Defendants' alleged misleading statements and false representations, true or not, was admittedly known by Baltimore years before 2015. Therefore, count 8 is dismissed.

## CONCLUSION

For the foregoing reasons the Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (#199) is **GRANTED**.

_____
Judge Videtta A. Brown
Circuit Court for Baltimore City

July 10, 2024

_____
Date

07/10/2024 2:37:36 PM

34

| | | |
|---|---|---|
| MAYOR AND CITY COUNCIL OF BALTIMORE, | * | IN THE |
| | * | CIRCUIT COURT |
| Plaintiff, | | |
| v. | * | FOR |
| BP P.L.C., et al., | * | BALTIMORE CITY |
| Defendants. | * | Case No.: 24-C-18-004219 |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## **ORDER**

Upon consideration of the Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (#199), counsels' memoranda and oral arguments, it is **ORDERED**, by the Circuit Court for Baltimore City, Part 33, hereby:

**ORDERED** that, for the reasons stated in the Memorandum Opinion and Order, Defendants' Motion to Dismiss Plaintiff's Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (#199) is hereby **GRANTED.**

_____
Judge Videtta A. Brown

July 10, 2024
_____
Ordered

07/10/2024 2:37:54 PM

35