UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Actions | Case No. 22-md-03047-YGR   (PHK)<br><br>**DISCOVERY MANAGEMENT ORDER NO. 9 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF AUGUST 8, 2024**<br><br><u>Upcoming DMC Dates:</u><br>September 12, 2024 at 1:00 pm<br>October 24, 2024 at 2:00 pm<br>November 21, 2024 at 1:00 pm |

On August 8, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. *See* Dkts. 1062, 1067. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the August 8th DMC regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

**I.     Forensic Imaging and Device Data Production**

The Parties raise several disputes in connection with Plaintiffs' previously-ordered production of forensically imaged data for the primary devices used by the MDL PI Bellwether Plaintiffs to access Defendants' platforms. *See* Dkt. 1025 at 4-9.

<u>Issue 1: Full Forensic Imaging</u>

First, Defendants complain about the slow pace of Plaintiffs' production, arguing that "very little progress" has been made since the last DMC. [Dkt. 1067 at 11:23-12:1]. The Parties report that thirty-eight of the ninety-three devices used by the MDL PI Bellwether Plaintiffs to access Defendants' platforms remain in Plaintiffs' possession, and of those thirty-eight devices,

thirty-one were used in the relevant time frame. *Id.* at 11:3-6, 14:17-21. Defendants complain that only ten of the thirty-one devices have undergone "full" forensic imaging. *Id.* at 11:3-10. Plaintiffs argue that they need more time to do full imaging of the remaining devices at issue because it is a very complex process, there are only a few ESI vendors that can do this type of imaging, they only recently hired an ESI vendor capable of performing the work, and they have to get replacement phones for the individuals whose phones are being imaged in the meantime. *Id.* at 13:18-14:7. Plaintiffs also raise concerns regarding CSAM on the devices. *Id.* at 17:10-15. Plaintiffs state that they can realistically have all forensic imaging on the thirty-one devices completed (on a rolling production basis) by the end of August. *Id.* at 14:22-15:5.

As an initial matter, the Court is disappointed at the relatively small number of devices imaged to date. The Court notes that Plaintiffs' qualitative representations at last month's DMC regarding the extent of imaging completed thus far appear to be inconsistent with the actual numbers reported at this month's DMC. Plaintiffs' counsel did not alert the Court as to the difference in completion rates for full forensic imaging versus merely logical imaging. Nor was the Court alerted at that time as to the length of time needed to complete full forensic imaging. The Court's denial of Defendants' request to inspect the devices directly was based, at least in part, on Plaintiffs' characterization of how many devices had already undergone full forensic imaging and the speed with which Plaintiffs would work on producing electronic files from the devices.

As stated at the August 8th DMC, the Court **ORDERS** the Parties to work out an agreement regarding an appropriate procedure for dealing with CSAM on the devices. Plaintiffs are **ORDERED** to produce full forensic imaging for the remaining thirty-one devices at issue by no later than **August 30, 2024**. Such production shall be on a rolling basis with full imaging of a minimum of five devices due by **August 16, 2024**, a minimum of five additional devices due by **August 23, 2024**, and all remaining devices due by **August 30, 2024**. Any devices which are not fully imaged by August 30, 2024 may, in the Court's discretion, be subject to a motion for reconsideration regarding inspection of the devices by Defendants and their experts.

Issue 2: Search Terms

Defendants also complain about the speed of negotiations regarding search terms for the electronic files on Plaintiffs' forensically imaged devices. They ask the Court to set a hard deadline for the Parties to finalize search terms so that depositions can commence without delay. [Dkt. 1049 at 27].

As stated at the August 8th DMC, the Court **ORDERS** the Parties to finalize their agreed upon search terms by no later than **August 16, 2024**. The Court repeats its previous admonitions that the task of working out search terms is something that the lawyers in a case should be able to do without judicial intervention. As soon as search terms are finalized, Plaintiffs shall promptly commence rolling production of electronic files that hit on the search terms from all devices that are fully imaged. The Parties are **ORDERED** to promptly meet and confer (including with their respective ESI vendors) to produce a chart of devices that is organized in a sufficient manner such that each device can be readily identified with the corresponding data or files that are produced.

Issue 3: Device Identifying Information

Defendants complain that they are still lacking significant amounts of device identifying information set forth in Appendix A of the August DMC Statement. [Dkt. 1067 at 24:15-19]. They ask that Plaintiffs immediately provide this missing information. *Id.* at 27:10-15.

Plaintiffs, who characterize Appendix A as a "148-page wish list," argue that the Parties have not fully met and conferred on this issue. *Id.* at 27:18-22.

As stated at the August 8th DMC, the Court **ORDERS** the Parties to meet and confer by no later than **August 16, 2024** regarding what should be included in the chart of missing device identifying information, after which Plaintiffs should begin supplementing the chart of agreed upon information. Based on Defendants' representations, the identifying information should consist of each device's make, model, current operating system, and currently loaded apps. The Parties are free to negotiate further information—with the understanding that if Defendants insist on more information (such as information that can only be gleaned after full forensic imaging, *e.g.,* prior operating systems) they must accept longer delay before receiving the information. Conversely, if the only identifying information agreed upon is the basic information listed above,

3

Plaintiffs must promptly provide such information since it can be gleaned simply from turning on and looking at the devices themselves.

The Parties shall provide the Court with a status report regarding their progress in resolving these issues by no later than **August 19, 2024**. In determining what information to include in the status report, the Court advises the Parties to utilize the same philosophical approach as used for the monthly DMC Statements. If there is a dispute on which the Parties have fully met and conferred, they may include that dispute within the status report as a "ripe" dispute. The Parties may, in their discretion, also include summary information regarding brewing/unripe disputes which the Parties reasonably expect may require Court intervention.

**II.    Discovery Limits Applicable to MDL and JCCP PI/SD Bellwether Plaintiffs**

The Parties dispute the extent of the MDL and JCCP Bellwether Plaintiffs' written discovery limits. [Dkt. 1049 at 14-19]. Plaintiffs proposed the following "Bellwether case-specific" discovery limits for each Bellwether Plaintiff's ability to serve discovery against Defendants:

- Each SD Plaintiff may serve up to 15 case-specific interrogatories and 17 RFAs per each Defendant group in each SD Bellwether case; and
- Each PI Plaintiff may serve up to 10 interrogatories and 15 RFAs per each named Defendant group in each PI Bellwether case.

*Id.* at 14.

Plaintiffs argue that this case-specific discovery is necessary to ensure a "fair and efficient" process because Defendants were previously allotted case-specific discovery against the individual Bellwether Plaintiffs. *Id.* at 15. The JCCP Plaintiffs also raise concerns about certain special interrogatories under California state law which require more individualized treatment. [Dkt. 1067 at 45:22-46:7].

Defendants argue that Plaintiffs' request for case-specific discovery contravenes the Court's previous Order regarding discovery limits and that Plaintiffs are not entitled to additional discovery beyond those limits. [Dkt. 1049 at 16]. Defendants argue that Plaintiffs can simply allocate some part of their current interrogatories and RFAs to the individual Bellwether

4

Plaintiffs. [Dkt. 1067 at 34:13-19]. Defendants also complain that allowing each individual Bellwether Plaintiff to serve case-specific interrogatories and RFAs could subject each Defendant to excessive numbers of requests, many of which are likely to be duplicative (perhaps with only minor variations). *Id.* at 38:12-23. They argue that the Bellwether Plaintiffs should be required to combine common requests into one document (and that they should be allocated a lower number of additional requests as a consequence).

The Court rejects Defendants' argument that the previous Discovery Limits Order is unalterable. While discovery limits are typically presumptive, the Court recognizes that sometimes the case develops such that good cause exists for additional or modified discovery. The Court expects the Parties to work out reasonable accommodations in such cases. At the DMC, the Defendants represented that, with that guidance from the Court, they would be amenable to trying to work out a compromise with the Plaintiffs on this issue.

Accordingly, the Parties (including the JCCP Plaintiffs) are **ORDERED** to further meet and confer on this dispute to determine mutually agreeable numerical limits as to each Bellwether Plaintiff's case-specific written discovery. As part of their conferral, the Parties shall work to determine whether they can agree on any process or arrangement of limits for dealing with discovery requests which are common to all (or a subset of) Bellwether Plaintiffs so as to avoid unnecessarily repetitive discovery requests being served by each and every Bellwether Plaintiff (if possible).

### III. MDL Bellwether Plaintiffs' Responses to Defendants' RFPs 32-34 and 66

The Parties dispute the adequacy of the MDL Bellwether Plaintiffs' responses to Defendants' discovery requests seeking information regarding "familial and other stressors with the potential to affect user Plaintiffs' mental health," including information as to these Plaintiffs' household members' criminal and divorce proceedings, foreclosures, and child protective services encounters (RFPs 32-34), as well as information regarding the user Plaintiffs' romantic "break ups" (RFP 66). [Dkt. 1051].

Defendants argue that they need this information because Plaintiffs allege their injuries were caused by addiction to Defendants' platforms and Defendants seek to investigate other

potential causes for those injuries arising from home dynamics, negative events involving other family members, broken relationships, and the like. *Id.* at 12. Defendants confirm that: (1) the scope of the requests has been limited in the negotiations and correspondence to the Relevant Time Period; (2) the requests only seek documents within the possession, custody, or control of the Plaintiffs themselves; and (3) the requests only seek information already in the stored repositories or documents that the Plaintiffs collected (meaning that the dispute would not require a new document collection). [Dkt. 1067 at 49:15-17, 53:7-9, 54:17-24]. In terms of relief, Defendants are only seeking an Order requiring Plaintiffs to run a new set of search terms which are directed to these specific requests across the Bellwether Plaintiffs' already collected documents. Plaintiffs argue that the requests are not proportionate because they encompass third-party information that is sensitive and potentially unrelated to this case. *Id.* at 51:24-53:5.

The Court finds the requests seeking information regarding third parties (RFPs 32-34) relevant and proportionate to the needs of the case, as narrowed by Defendants. Accordingly, the Court **ORDERS** Plaintiffs to run new search terms (discussed further below) directed to those RFPs and to collect, process, and produce non-privileged documents resulting from those new search terms.

The Court **ORDERS** the Parties to meet and confer regarding search terms directed at RFP 66 (concerning Plaintiffs' romantic "break ups") on a case-by-case basis to determine whether such information would be relevant in that particular Bellwether Plaintiff's case. Plaintiffs are **ORDERED** to confer with their clients in advance to find out how many, if any, "break ups" of any potential relevance each Bellwether Plaintiff experienced during the Relevant Time Period. Plaintiffs shall share that information with Defendants in the meet and confer process. To the extent that "break ups" are potentially relevant to a particular case, the Bellwether Plaintiff shall provide Defendants with basic information as to the romantic event(s) at issue (*e.g.,* the length and scope of the relationship). Upon Plaintiffs' submission of this information to Defendants, the Parties are directed to develop search terms for each Bellwether Plaintiff which would capture documents responsive to the request (if any exist).

The Court expects the Parties to have achieved significant progress on this dispute by the

1  next DMC.  Because the Parties have altered the scope of these requests through detailed
2  discussions and correspondence, the Parties shall promptly file a joint stipulation and proposed
3  order regarding resolution of this dispute (including agreements as to search terms or a process for
4  finalizing such search terms promptly for all of these requests) to accurately reflect the scope of
5  the requests as narrowed, the relief sought, and the anticipated schedule for meeting and
6  conferring to complete the resolution.

    This **RESOLVES** Dkt. 1051.

## IV.   Updates on JCCP Bellwether Discovery in DMC Statements

The Parties dispute whether, and to what extent, they should include information regarding the status of discovery in the JCCP (especially the JCCP Bellwether cases) within the monthly DMC Statement submitted to this Court prior to each DMC in this MDL.  [Dkt. 1049 at 20-21].  Defendants argue that it would be "helpful" to include information about the amount of discovery being served by and on the JCCP Bellwethers, as well as information regarding brewing and ripe discovery disputes.  *Id.* at 20.  They complain that Plaintiffs refused to allow them to include a status update regarding JCCP discovery in the August DMC Statement.  *Id.*

Plaintiffs argue that Defendants are effectively trying to "dramatically increase the already lengthy DMC statement" by forcing the inclusion of numerous pages of overly detailed (and likely useless) charts, statistics, and other such information about the JCCP.  *Id.*  Plaintiffs argue that such information would not be helpful, and in fact, would be burdensome to both the Court and the Parties.  Plaintiffs suggest including a short paragraph or two regarding the JCCP proceedings in the DMC Statement, similar to what they have been doing with the CMC Statements, and they suggest attaching a copy of the latest JCCP Status Conference Statement as well.  *Id.* at 21.

As stated at the August 8th DMC, the Court **ORDERS** the Parties to attach the most recent JCCP Status Conference Statement to each DMC Statement going forward.  The Parties may, where appropriate, omit pages of that JCCP Status Conference Statement which are wholly unrelated to discovery issues.  In determining what information to include within the DMC Statement itself regarding JCCP discovery, the Parties should use the same philosophical approach as used for determining what information to include regarding MDL discovery.  The Parties may

include within the DMC Statement itself a short summary of the proceedings in the JCCP which are relevant to discovery. The summary shall not exceed a reasonable length of approximately two paragraphs. The Parties may also, where appropriate, include information within the DMC Statement itself regarding JCCP discovery disputes that are brewing or ripe (particularly where the Parties agree or reasonably anticipate that such disputes will be heard by this Court). The Parties shall avoid exhaustive recitations of numerical data and they shall not include unnecessary charts or tables.

### V. Domestic and Foreign Governmental Investigations of Meta

The Parties dispute Plaintiffs' request for documents concerning domestic and foreign governmental investigations into Meta relating to whether Meta's platforms and/or business practices "present risks to the health and safety of Children or Teens." [Dkt. 1056]. At the August 8th DMC, the Parties confirmed that they are close to reaching agreement to resolve all issues pertaining to this dispute. [Dkt. 1067 at 76:9-17]. They anticipate reaching a full and final compromise within the next week or so. *Id.* at 77:3-4.

Accordingly, the Court **ORDERS** that Dkt. 1056 is **HELD IN ABEYANCE** until further notice.

### VI. Relevant Time Period Governing JCCP Plaintiffs' Requests to Meta

The JCCP Plaintiffs object to this Court's previous ruling regarding the Relevant Time Period governing Meta-related discovery. [Dkt. 1049 at 22-23]. They argue that they are entitled to discovery going further back in time than the MDL Plaintiffs, and that such discovery should not be tethered to the Named Features because the claims at issue in the JCCP are different from the product liability claims in the MDL. *Id.* The JCCP Plaintiffs complain that the feature-based search terms governing pre-2012 discovery are inadequate for capturing what they assert would otherwise be relevant discovery in the JCCP. *Id.*

Meta argues that the prior discussion and Order regarding time limits for relevant discovery should remain in place. *Id.* at 23. They argue that the JCCP Plaintiffs' theory of liability depends in large part on the Named Features (or lack thereof) prior to 2012. Meta also argues that, because it has already agreed to use the agreed upon search terms directed to Named

8

Features prior to 2012 in such a way that any documents that hit on the search terms are being produced regardless of date, the JCCP Plaintiffs will be obtaining discovery going as far back as 2006. Meta argues that its document production is not yet complete, and thus, any contentions by the JCCP Plaintiffs regarding the allegedly low number of documents produced from the files of early employees or certain identified custodians of Meta are premature.

The JCCP Plaintiffs argue that their negligence theory of liability goes to the platform "as a whole" and that the feature-specific search terms will not result in production of documents going to Meta's early awareness of the asserted risks of addiction to teenagers or the alleged goal of attracting adolescents to use the platform more. [Dkt. 1067 at 83:19-84:6]. They argue that search terms directed to Named Features alone do not capture documents addressing the alleged harms (or risks of harms) during a time period prior to the Named Features' implementation.

The Court finds that this dispute is not yet ripe. Until Meta substantially completes document production from the custodians who are early Meta employees, it is speculative to argue that the pre-2012 search terms are inadequate for purposes of discovery relating to the JCCP Plaintiffs' theories of liability, and it is speculative to assume that these search terms will fail in capturing for production documents that would relate to the allegedly known risk of harms in that time period. Further, as discussed at the DMC, it is evident that the JCCP Plaintiffs' negligence theories relate, at least in part, to missing or inadequate Named Features. The Court has not been presented with evidence sufficient to require opening up large swaths of documents for new search terms (which entails delays and costs for both sides). However, the Court recognizes that this dispute will likely remain unresolved until a further hearing after more documents have been produced. The JCCP Plaintiffs' proposal to have Meta run a long list of post-2012 search terms against over twenty custodians' files at this time is overbroad, oppressive, and disproportionate to the needs of the case, particularly where some terms are as broad as, for example, the word "teen."

Accordingly, the Court **ORDERS** Meta to continue to process its search for documents in the manner discussed at the DMC, and in particular, to abide by its agreement to produce non-privileged documents that hit on the feature-specific search terms for the pre-2012 period without withholding based on date.

In order for the Court to understand the scope of this dispute (in anticipation that the dispute will require further Court intervention), the Court **ORDERS** the Parties to meet and confer for purposes of determining: (1) two or three sample search terms for the pre-2012 period that the Parties agree will adequately address the JCCP Plaintiffs' concern about capturing documents which discuss or evidence the alleged harms and/or risks of harm balanced within the general framework of features (to avoid overbreadth and disproportionality); and (2) two custodians for running searches of the sample terms.  As noted above, the Court expects counsel to be able to develop search terms without judicial intervention.  Upon reaching agreement on the sample terms and custodians, Meta shall run a sample hit report using those new terms across the files of the identified custodians and provide that information to Plaintiffs.  Meta shall deduplicate the documents in that sample hit report from the documents already produced so as to identify how many unique or new documents are implicated by the new search terms.  The Parties shall then meet and confer to see if a negotiated resolution can be worked out in light of the actual data.  The Court declines to set hard deadlines for this process but expects the Parties to have made significant progress on this dispute by next month's DMC (including reporting on the sample hit reports).

As a final note, the Court reiterates its understanding of the general approach to allocating discovery disputes between the MDL and JCCP proceedings.  The JCCP Plaintiffs complain that Defendants essentially characterize every discovery dispute as one that implicates the MDL.  Defendants, for their part, argue that the JCCP Plaintiffs are attempting to obtain overly broad discovery.  The Court cautions the Parties against any attempts to "play off" the MDL versus the JCCP.  While the Parties are free to ask for clarification as to whether a specific discovery dispute should be heard by one court or the other, Judge Kuhl's Order and directives in the JCCP are clear—the Parties should avoid gamesmanship and the Court expects the Parties to reasonably interpret Judge Kuhl's Orders and directives regarding the allocation of discovery disputes between the MDL and the JCCP (as well this Court's own rulings and guidance on these issues).

### VII. Meta's Production of Hyperlinked Documents

Plaintiffs complain that Meta has failed to timely produce hyperlinked documents requested by Plaintiffs pursuant to the ESI Protocol. [Dkt. 1049 at 21-22]. Plaintiffs report that over thirty percent of the documents produced by Meta thus far in this litigation contain hyperlinks to documents that are not attached as family members or otherwise knowable to Plaintiffs. [Dkt. 1067 at 107:1-6]. Plaintiffs complain that Meta has been "incredibly dilatory" in response to their requests for specific hyperlinked documents. *Id.* at 110:20-22. Plaintiffs argue that Meta has the capability to obtain hyperlinked documents using technological tools not previously available. [Dkt. 1049 at 21].

At the DMC, Plaintiffs made clear that they are not presently seeking relief from the Court in connection with this dispute. [Dkt. 1067 at 109:9-10]. Meta argued that the Parties have not adequately met and conferred regarding the dispute. *Id.* at 108:15-109:3.

As no relief is presently sought, the Court **ORDERS** the Parties to complete any ongoing meet and confers on this issue. The Court admonishes Meta to confer with its ESI vendor to develop optimal processes (or find better resources) for searching for hyperlinked documents, even if the search is manual. Five months is too long to process seventeen documents (even if they had hundreds of hyperlinks). The Court expects the Parties to report on the progress of their negotiations at the next DMC.

### VIII. Remaining Issues

At the August 8th DMC, the Parties informed the Court that they have very recently begun conferring regarding a potential joint stipulation to extend the "overall" deadlines governing this case (including "aspects of discovery"). *Id.* at 7:23-8:15. Preliminary discussions remain ongoing, and the Parties stated that they are unable to provide the Court with any further details at this time. *Id.* Accordingly, the Parties are **ORDERED** to keep this Court informed as to the status of this issue.

At the DMC, the Court identified two seemingly duplicative filings of an Administrative Motion. *See* Dkts. 1030-31. Plaintiffs confirmed that the duplicate filing was an inadvertent error. Accordingly, the Court **ORDERS** that the State Attorneys General's Administrative Motion for

Leave to File Supplemental Information [Dkt. 1030], which Plaintiffs confirmed is identical to Plaintiffs' subsequently filed State Attorneys General's Administrative Motion for Leave to File Supplemental Information [Dkt. 1031], is **DENIED AS MOOT**.

The Court reminds the Parties to let the Court's staff know if an inadvertent duplicate filing occurs in future, so that the Court can terminate the filing as moot instead of wasting time and resources trying to figure out if there is some intended difference between facially identical filings.

**IT IS SO ORDERED.**

Dated: August 15, 2024

_____
PETER H. KANG
United States Magistrate Judge