1

2

3

4 **UNITED STATES DISTRICT COURT**

5 **NORTHERN DISTRICT OF CALIFORNIA**

6 **SAN FRANCISCO DIVISION**

7

8 IN RE: SOCIAL MEDIA ADOLESCENT
   ADDICTION/PERSONAL INJURY
9 PRODUCTS LIABILITY LITIGATION

Case No. 22-md-03047-YGR  (PHK)

**ORDER GRANTING-IN-PART AND
DENYING-IN-PART META'S
REQUEST FOR PARTY DISCOVERY
ON THIRD-PARTY STATE AGENCIES
PURSUANT TO FED. R. CIV. P. 34
AND GRANTING META'S FIRST,
SECOND, AND THIRD
ADMINISTRATIVE MOTIONS FOR
LEAVE TO FILE SUPPLEMENTAL
INFORMATION**

Re: Dkts. 685, 738, 1031, 1074, 1110

10

11 This Document Relates to:

12 All Actions

13

14

15

16 **INTRODUCTION**

17 This case is a multidistrict litigation between various private and public plaintiffs and social

18 media defendants.  Now before the Court is a dispute between Defendant Meta Platforms, Inc.

19 ("Meta") and those thirty-five State Plaintiffs who appear by, and in several cases are themselves,

20 the Attorneys General of various states.  Each State Plaintiff is represented by attorneys from the

21 office of their respective State Attorney General.  After Meta served requests for production of

22 documents under Federal Rule of Civil Procedure 34 on the State Attorneys General, the Parties

23 disputed whether or not certain identified state agencies should be subject to party discovery, and

24 thus, whether the States Attorneys General should not only collect and produce documents from the

25 Attorney General's office but also from relevant custodians within the identified state agencies.

26 [Dkt. 685].  The State Attorneys General all object to the document requests for a variety of reasons

27 and, germane to the instant Order, they object to treating their respective state agencies as being

28 subject to party discovery and insist that all of these agencies are third parties from whom Meta

should seek documents by subpoenas under Federal Rule of Civil Procedure 45. *Id.* at 8–10. Meta disagrees and contends that the Requests for Production served on the State Attorneys General are the proper vehicle for seeking documents from the identified agencies, and that forcing Meta to serve over 200 subpoenas duces tecum under Rule 45 is not justified and is overly burdensome.

Accordingly, the primary issue in dispute is whether the named State Plaintiffs have "control" for purposes of discovery over their respective state agencies' documents. *See id.* at 6–7, 9–10; *see also* Dkt. 738. After careful review of multiple rounds of briefing, the relevant legal standards, and oral argument at multiple hearings, the Court herein sets forth its conclusions of a state-by-state analysis to resolve whether and which named State Plaintiffs have control over their respective state agencies' documents – and thus whether such documents are to be sought in discovery by requests for production under Rule 34 (party discovery) or by subpoenas under Rule 45 (third party discovery). For the following reasons, Meta's request to compel the State Plaintiffs to include their identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART**. [Dkts. 685, 738]

## BACKGROUND

On February 23, 2024, Meta sent the State Attorneys General a list of state agencies "that may possess information relevant to the claims or defenses." Dkt. 685 at 6. Meta served requests for production of documents under Rule 34 on the State Attorneys General on February 27, 2024. [Dkt. 686 at 1]. The Parties subsequently met and conferred, as required by this Court's Standing Order for Discovery, regarding whether the Parties could reach negotiated resolution of the instant dispute. [Dkt. 685]. The Parties included discussion of this dispute in their Joint Status Report on Discovery filed on February 16, 2024. [Dkt. 617 at 17].

The Court heard oral argument on this issue at the Discovery Management Conference ("DMC") held on February 22, 2024. *See* Dkt. 648. At that hearing, the Court ordered the Parties to submit a chart specifying the state agencies from whom Meta sought discovery, including an indication from the corresponding state Attorney General whether or not that state Attorney General would be representing the identified agencies for purposes of discovery in this case. *Id.* The Parties thereafter submitted the chart to this Court via email.

United States District Court
Northern District of California

On March 15, 2024, the State Attorneys General and Meta filed a Joint Letter Brief setting forth their respective positions on this dispute over whether the state agencies should be subject to party discovery.  [Dkt. 685].  The Parties identified this dispute as a "ripe" dispute in their Joint Status Report on Discovery filed on March 15, 2024.  [Dkt. 686 at 8].  The Court heard oral argument on this dispute at the DMC held on March 18, 2024.  *See* Dkts. 691, 699.  On April 1, 2024, the State Attorneys General and Meta filed their Joint Supplemental Letter Brief on the issue of state agency discovery which included supplemental briefing on a state-by-state basis addressing arguments from each of the thirty-five State Attorneys General and Meta's rebuttal to each.  [Dkt. 738,].  As part of that Supplemental Letter Brief was the chart (previously lodged with the Court) identifying the specific state agencies at issue and the indication from each of the State Attorneys General whether or not their office would represent each such agency in discovery in this case.  [Dkt. 738-1].

In the April 12, 2024, Joint Status Report on Discovery, the Parties requested guidance on whether they should be prepared for further oral argument on this dispute.  [Dkt. 750 at 8].  By Order dated April 17, 2024, the Court directed the Parties to be prepared to discuss the extent to which additional oral argument regarding this dispute was needed or desired.  [Dkt. 759].  At the April 22, 2024 DMC, the Court sought the Parties' views on whether further oral argument was warranted in light of the record presented.  *See* Dkts. 777, 782.  While Meta did not seek further oral argument, certain State Attorneys General requested further oral argument.  On April 24, 2024, pursuant to the Court's instructions, the State Attorneys General filed a Notice indicating that the states of Arizona, California, New Jersey, and Pennsylvania requested the opportunity to present further oral argument.  [Dkt. 787].  The Notice indicated that the "remainder of the State AGs will have their interests represented by a singular argument presented by a member of the State AGs MDL Co-Lead Counsel [unidentified in the Notice]."  *Id.* at 2.  On May 2, 2024, the State Attorneys General filed an amendment to the Notice, indicating that the "State AGs have reconsidered their position and respectfully amend their request" and indicated that only the states of Arizona, California, New Jersey, and Pennsylvania sought additional oral argument (and thus dropped the request for an additional, as yet unidentified, state Attorney General to also present argument on behalf of the

3

1  remainder of the states).  [Dkt. 803 at 2].  The remaining State Attorneys General did not seek

2  additional oral argument.  *Id.*  The Court heard additional oral argument from the Parties at a hearing

3  on May 6, 2024.  [Dkt. 818].

4        On July 24, 2024, the State Attorneys General filed an Administrative Motion for Leave to

5  File Supplemental Information.  [Dkt. 1031].  The Administrative Motion sought leave to file

6  information that Meta had served a Notice of its intent to serve twenty-six subpoenas on some of

7  the agencies at issue.  *Id.*  The Notice indicated that Meta was taking these steps without waiving its

8  rights with regard to this pending dispute.  On July 29, 2024, Meta filed its Response to the

9  Administrative Motion, indicating that Meta did not object to the submission of these subpoenas as

10  supplemental information.  [Dkt. 1035].  Meta informed the Court that Meta served another twenty-

11  six subpoenas on various state agencies on July 29, 2024.  *Id.* at 2 n.1.  Meta repeated its stated

12  position that service of these subpoenas without waiving Meta's position that the state agencies

13  should be subject to party discovery.  *Id.* at 2. On August 19, 2024, the State Attorneys General filed

14  a Second Administrative Motion for Leave to File Supplemental Information.  [Dkt. 1074].  This

15  Second Administrative Motion sought leave to file information that Meta had served an additional

16  Notice of its intent to serve an additional fifty-seven subpoenas on additional agencies at issue.  *Id.*

17  at 2.  The Notice indicated that Meta takes no position with regard to this Second Administrative

18  Motion.  *Id.* at 6.

19                                    **LEGAL STANDARDS**

20        The following legal standards apply to the Court's analysis of the control issue for each of

21  the states, discussed further below.

22  **I.      CONTROL UNDER FED. R. CIV. P. 34**

23        Rule 34 requires a party served with document requests to produce responsive, non-

24  privileged documents which are in that party's possession, custody, or control.  Because Rule 34 is

25  written in the disjunctive, control is a separate and sufficient basis for production; issues such as

26  actual possession, legal ownership, and custody are distinct from the issue of control.  *Soto v. City*

27  *of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995) (finding the City of Concord has control of

28  documents of non-employee psychiatrists who evaluated individual officer-defendants); *Bess v.*

United States District Court
Northern District of California

4

*Cate*, No. 2:07-cv-1989 JAM JFM, 2008 WL 5100203, at *1 (E.D. Cal. Nov. 26, 2008) (for control issue "legal ownership of the document is not determinative."). The Ninth Circuit has held that "[c]ontrol is defined as the legal right to obtain documents on demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) [hereinafter *Citric Acid*] (quoting *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)) (concluding that legal control test is proper standard under Fed. R. Civ. P. 45). As the party seeking production of documents under Rule 34, Meta has the burden of proving that a State's Attorney General has legal control over (*i.e.*, the legal right to obtain on demand) the identified State's agencies' documents. *Hitachi, Ltd. v. AmTRAN Tech. Co.*, No. C-05-2301-CRB (JL), 2006 WL 2038248 at *1 (N.D. Cal. 2006) (citing *Norman v. Young*, 422 F.2d 470, 472–73 (10th Cir. 1970)).

In *Citric Acid*, the Ninth Circuit provided guidance on what is required to show a "legal right to obtain documents upon demand." *Citric Acid*, 191 F.3d at 1107. In the factual situation in that case, the Ninth Circuit focused on whether or not there existed a contract "expressly giv[ing] . . . the right to obtain the records . . . upon demand." *Id.* "[T]he cases are fairly uniform that a contractual obligation to provide documents is dispositive of the issue of control." *Masimo Corp. v. Shenzhen Mindray Bio–Med. Elecs. Co.*, No. SA CV 12-02206-CJC (DFMx), 2015 WL 12912331, at * 2 (C.D. Cal. Apr. 17, 2015). The Ninth Circuit also explained that, in *Citric Acid*, there was an absence of "legal control" because the subpoenaed party "lacks the *legal ability* to obtain documents from" the third party. 191 F.3d at 1107 (emphasis added). Accordingly, based on *Citric Acid* then, either a contractual right or a legal ability to obtain documents are factors sufficient to show "legal control" over documents for purposes of Rule 34.

In *Citric Acid*, the Ninth Circuit further explained that an indicator of a lack of legal control occurs when the allegedly controlled third party can refuse to provide documents without legal or other repercussions:

> C&L–US [(the subpoenaed party)] asked C&L–Switzerland [(the third-party allegedly under control)] to produce those documents, but C&L–Switzerland refused. There is no mechanism for C&L–US to compel C&L–Switzerland to produce those documents, and it is not clear how Varni wants C&L–US to go about getting the ECAMA documents, since C&L–Switzerland could legally —and without breaching any contract—continue to refuse to turn over such

United States District Court
Northern District of California

documents.

*Citric Acid*, 191 F.3d at 1108.

Thus, under *Citric Acid*, a "mechanism" to compel the third party to produce the documents, such as an ability to enforce a legal duty under a contract, would demonstrate legal control (and in the facts of *Citrc Acid*, no such contractual mechanism existed).

Subsequent to *Citric Acid*, the Ninth Circuit has not delineated with precision what other factors are sufficient to show a "legal right to obtain documents upon demand." *See, e.g.*, *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167, 169 (N.D. Cal. 2001) (observing that while *Citric Acid*'s legal control test "has been accepted within this circuit in discussions of both Rule 34(a) and 45(a)[,] . . . there has been little discussion as to precisely what is meant by 'legal right' and 'upon demand'").

Courts agree that the *Citric Acid* legal control test is a fact specific inquiry. *See Perez v. State Farm Mut. Auto. Ins. Co.*, No. C-06-01962 JW (PSG), 2011 WL 1362086, at *2 (N.D. Cal. Apr. 11, 2011) ("The determination of control is often fact-specific."); *Miniace v. Pac. Maritime Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *1 (N.D. Cal. Feb. 13, 2006) ("'Legal right' is evaluated in the context of the facts of each case."). Because the inquiry is fact specific, no court has attempted to limit or compile all factors relevant to an analysis under the *Citric Acid* legal control test.

As a general matter, "[f]ederal courts have interpreted 'control' broadly." *Hitachi*, 2006 WL 2038248, at *1 (finding legal control and granting motion to compel Hitachi to search and produce documents from third party, Hitachi's licensing agent Inpro); *Miniace*, 2006 WL 335389, at *1 ("'Control' need not be actual control; courts construe it broadly as 'the legal right to obtain documents upon demand.'"). "The definition of control under Rule 34 includes situations well beyond those which would permit a finding of *in personam* jurisdiction or liability based on an alter ego situation." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp. Inc.*, No. CV 14-03053 MWF (AFMx), 2018 WL 1157752, at *21 (C.D. Cal. Mar. 2, 2018) (citation omitted).

Because determination of the issue of control is fact specific depending on the totality of circumstances, there are no fully exhaustive lists of factors which have been found relevant to

United States District Court
Northern District of California

6

determining control.  However, helpfully, at least one federal district court approaching this issue has surveyed the case law:

> [T]here are a number of factors which may be distilled from case law which help to determine when documents in the possession of one corporation may be deemed under control of another corporation. These factors focus on the other corporation's actual control or inferred control, including any "complicity" in storing or withholding documents. They include (a) commonality of ownership, (b) exchange or intermingling of directors, officers or employees of the two corporations, (c) exchange of documents between the corporations in the ordinary course of business, (d) any benefit or involvement by the non-party corporation in the transaction, and (e) involvement of the non-party corporation in the litigation . . . . [B]ecause of the ownership situation, there often exists some intermingling of directors, officers, or employees, or business relations. Consequently, the subsidiary may be required to respond to a Rule 34 request which includes the parent company's documents. Sister corporations are subject to the same analysis.

*Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 306–07 (M.D.N.C. 1998) (internal citations omitted).

Further, as noted, the *Citric Acid* approach to control includes evaluation of whether there is a legal right to access the documents.  *Citric Acid*, 191 F.3d at 1107.  Accordingly, under a straightforward application of the "legal right" standard, where a statute (or similar legal mandate) provides a right to obtain documents, that statute or legal mandate has been held to be sufficient to demonstrate control over third party's documents for purposes of discovery.  *See In re ATM Fee Antitrust Litig.*, 233 F.R.D. 542, 544–45 (N.D. Cal. 2005) ("by federal statute, a bank holding company necessarily controls its subsidiary banks. . . . Therefore, if [third party] BANA or any other wholly-owned subsidiary bank of [defendant] BAC has possession and custody of documents responsive to Plaintiffs' requests, then [defendant] BAC has legal control of the documents through its control of the [third-party] subsidiary bank and must produce any which are responsive to Plaintiffs' Rule 34 requests.").  For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by *statute*, affiliation or employment."  *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for

and obtain transcript of testimony from SEC).  Therefore, in the analysis of individual states below, the Court will consider whether there exists a statute or other legal mandate which satisfies the control test.

Despite their request for state-by-state briefing and separate opportunities for oral argument from each state, throughout the briefing and oral argument, the Attorneys General of the individual states raise several arguments that implicate the same or similar legal issues.  The Court turns to these common legal issues and the legal standards applicable to all of the states' objections to party discovery for their agencies and, to avoid prolixity, addresses them here instead of repeating them in the discussion of each state's arguments.

## II.    STATE LAW AND CONTROL UNDER FED. R. CIV. P. 34

The instant dispute involves document requests served upon governmental entities. However, the Court notes that precedent regarding the application of the control factors in the context of document requests made upon private corporations or entities may be illustrative.  In a case involving the New York Attorney General, the Supreme Court held that "[i]f a State chooses to pursue enforcement of its laws in court, then it is not exercising its power of visitation and will be treated like a litigant.  *An attorney general acting as a civil litigant must* file a lawsuit, survive a motion to dismiss, *endure the rules of procedure and discovery*, and risk sanctions if his claim is frivolous or his discovery tactics abusive."  *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009) (emphasis added).  The Ninth Circuit has held that "[w]hen the government is named as a party to an action, it is placed in the same position as a private litigant, and the rules of discovery in the Federal Rules of Civil Procedure apply."  *Exxon Shipping Co. v. U.S. Dep't of Int.*, 34 F.3d 774, 776 n.4 (9th Cir. 1994).  Not surprisingly then, the fact that this case involves governmental entities rather than private entities does not materially change the legal or analytical approach to the control issue.

Nevertheless, the Court is cognizant that governmental agencies differ from private entities in certain ways, as stressed by the state Attorneys General.  These differences are accounted for in the analyses below.  However, because the Court is not relying on the law of private corporations or corporate governance to analyze the control issue here, the differences are not in and of

8

United States District Court
Northern District of California

themselves outcome determinative of the inquiry. For example, the fact that private corporations are legal entities formed under state law, whereas the state Attorney General is (typically) an office created by a state constitution, has little bearing on distinguishing precedent on the issue of control. Other than pointing out these kinds of public/private differences, the Attorneys General do not demonstrate how or why the legal precedent cited are distinguishable based on the legal (or constitutional) source of creation of the entities for deciding the control issue. From the Court's review, the precedent relevant to the issues here do not apply a different legal control test based on whether an entity is a for-profit business as opposed to a governmental agency or officer.

Because the inquiry for control is fact-specific, courts have examined the state's constitutional or statutory scheme as part of the totality of circumstances when deciding whether one governmental entity has control over the documents of another governmental entity. *See, e.g.*, *United States v. Am. Express Co.*, No. 10-CV-04496-NGG (RER), 2011 WL 13073683 (E.D.N.Y. July 29, 2011) [hereinafter *Amex*]; *Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, No. 2:11-CV-02101-SHM, 2012 WL 6003540 (W.D. Tenn. Nov. 30, 2012), *supplemented*, No. 2:11-CV-02101-SHM, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012); *Washington v. GEO Grp., Inc.*, No. 3:17-CV-05806-RJB, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 571 F. Supp. 3d 406 (E.D. Pa. 2021) [hereinafter *Generic Pharmaceuticals (I)*]; *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 4083934 (N.D. Ill. June 20, 2023) [hereinafter *Monsanto*]; *In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352 (E.D. Pa. 2023) [hereinafter *Generic Pharmaceuticals (II)*].

Ultimately, the control issue under Rule 34 is governed by federal law. A federal district court has the authority under federal law to order disclosure of documents in discovery in civil actions, notwithstanding state law which put limits on such disclosure. *Gonzales v. Spencer*, 336 F.3d 832, 834–35 (9th Cir. 2003) (Although state law limited prosecutor's access to juvenile records, "the court could have ordered disclosure notwithstanding state law[.]"). District court opinions have recognized that a state law restriction on producing documents is not a barrier to a finding of control, and thus, have ordered production of a third-party agency's documents as part of party discovery. *See, e.g.*, *Doe v. Cnty. of Santa Clara*, No. 15-cv-01725-EJD (HRL), 2015 WL 14073467, at *1

1    (N.D. Cal. Nov. 30, 2015) ("Federal courts may grant lawyers permission to view juvenile case files

2    in spite of California's contrary confidentiality laws, however, because federal privilege law

3    controls who may access evidence"); *Evans v. City of Tulsa*, No. 08-CV-547-JHP-TLW, 2009 WL

4    3254907, at *2 (N.D. Okla. Oct. 7, 2009) (ordering the defendant municipality in case involving

5    both federal and state law claims  to produce documents from three agencies (county clerk, district

6    attorney, and Family and Children Services) and stating that "[i]n federal questions cases, federal

7    courts are not bound by state statutes which impose limits on the discovery process").

8         Similarly, federal regulations, even when interpreted with the force of law, cannot be

9    enforced if they purport to override the Federal Rules of Civil Procedure.  *In re Bankers Tr. Co.*, 61

10   F.3d 465, 470–71 (6th Cir. 1995) [hereinafter *Bankers Trust*].  In *Bankers Trust*, the Federal Reserve

11   Board refused to produce documents because a federal regulation barred their production absent

12   following procedures to request such documents via separate action in district court in Washington,

13   D.C.  *Id.* at 469.  The *Bankers Trust* opinion analyzed the conflict between the federal regulation

14   and Rule 34, and concluded that the Federal Rules of Civil Procedure govern whether the documents

15   should be produced:

16           We likewise conclude that Congress did not empower the Federal
             Reserve to prescribe regulations that direct a party to deliberately
17           disobey a court order, subpoena, or other judicial mechanism
             requiring the production of information.  We therefore hold that the
18           language in 12 C.F.R. § 261.14 that requires a party that is served with
             a subpoena, order, or other judicial process to continually decline to
19           disclose information or testimony exceeds the congressional
             delegation of authority and cannot be recognized by this court.  Such
20           a regulation is plainly inconsistent with Rule 34 and cannot be
             enforced. To allow a federal regulation issued by an agency to
21           effectively override the application of the Federal Rules of Civil
             Procedure and, in essence, divest a court of jurisdiction over
22           discovery, the enabling statute must be more specific than a general
             grant of authority as found here.
23
             Moreover, we find no compelling reason to discard the relatively
24           straightforward discovery methods outlined in the Federal Rules of
             Civil Procedure simply because the Federal Reserve has attempted to
25           mandate a different procedure.

26   *Id*. at 470–71.

27         Analogously, the Supreme Court has recognized that discovery in a federal civil action is

28   controlled by federal law, and that a finding of control over documents cannot be disregarded even

United States District Court
Northern District of California

in situations where foreign law would potentially impose criminal sanctions for producing the documents. *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 205–06 (1958). Thus, discovery laws and corporate laws rooted in a different sovereign are insufficient to override the application of the "legal control" test. control. *Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626, 627 (N.D. Ind. May 28, 1993) (finding subsidiary has control over parent corporation documents and rejecting and argument that "international interpretation of its corporate structure and the Japanese discovery law result in the conclusion that its does not have the requisite control over documents in possession of its parent companies"). Furthermore, the *Uniden* Court explained that "[t]he expanded definition of control under Rule 34 was signaled by the Supreme Court's decision in *Societe Internationale*." *Uniden*, 181 F.R.D. at 306. As the *Uniden* Court explained further:

> This [Supreme Court] language indicates a direction to lower courts to closely examine the actual relationship between two corporations and guard against not just fraud and deceit, but also sharp practices, inequitable conduct, or other false and misleading actions whereby corporations try to hide documents or make discovery of them difficult. Certainly, this broad construction of Rule 34 is consonant with American civil process which puts a premium on disclosure of facts to ascertain the truth as the means of resolving disputes.

*Id.*

In the same regard, the Ninth Circuit has held that a federal statute (and federal regulations promulgated thereunder) cannot serve as a basis for a government agency to refuse to provide discovery. *Exxon Shipping*, 34 F.3d at 776–78 (rejecting government agencies' refusals of subpoenaed depositions based on both federal statute and regulations). The Ninth Circuit held long ago that agency regulations (and the statutes under which the regulations were promulgated) are not proper barriers to production of documents where control has been found. *Harvey Aluminum (Inc.) v. N.L.R.B.*, 335 F.2d 749, 753 (9th Cir. 1964) ("Whether the compulsion of the rule [for an agency to produce documents] is constitutional or statutory, the Board may not avoid it by adopting regulations inconsistent with its requirements.").

The import of these precedents is that, if a court finds control over documents, then neither federal statute nor federal regulation (nor foreign law) are a legal bar to application of Rule 34 and

United States District Court
Northern District of California

requiring production based on that finding of control. To the extent the state Attorneys General argue that a state statute would excuse or bar production of the agencies' documents even where the Court finds control, then for similar reasons that argument is legally unsound. Here, the Multistate Complaint asserts claims under the Federal Children's Online Privacy Protection Act ("COPPA") on behalf of all the Filing States. *See California v. Meta Platforms, Inc.*, No. 23-cv-05448, at Dkt. 1, ¶¶ 851-59 (N.D. Cal. Oct. 24, 2023) [hereinafter Multistate Complaint]. "[I]n cases presenting federal questions, such as here, ***discoverability***, privileges and confidentiality ***are governed by federal law***, not state law." *Garner v. City of New York*, No. 17-CV-843 (JGK)(KNF), 2018 WL 5818109, at *3 (S.D.N.Y. Oct. 17, 2018) (civil rights case asserting both federal and state law causes of action) (emphasis added).

While courts have considered the impact of state constitutions and state laws in analyzing the issue of control where governmental entities are involved, comity-based arguments do not require a finding of a lack of control as a matter of law. Precedent makes clear that notions of comity or arguments about the supremacy of state law (including even a co-pending state court proceedings) are not sufficient to bar a party seeking discovery in a federal court under federal law. *In re PersonalWeb Techs., LLC Pat. Litig.*, No. 18-md-02834-BLF, 2022 WL 19833889, at *1 (N.D. Cal. Apr. 12, 2022) (rejecting comity arguments as bases to bar motion to compel enforcement of third party subpoenas in federal court where state law receivership action was co-pending and noting that "[i]t is settled law that state courts have no authority to bar – by injunction or otherwise – the prosecution of *in personam* actions in federal courts").

## III.    SEPARATION AND INDEPENDENCE OF A STATE ATTORNEY GENERAL FROM THE EXECUTIVE BRANCH OF THE STATE

The state Attorneys General all argue, using almost identical verbiage, that the office of their state Attorney General is either a separate constitutional officer, separately elected, and/or with separate spheres of authority which make that office independent from the local office of the Governor, which includes all the identified state agencies within the executive branch of that State. *See* Dkt. 685 at 9–10. This argument relies on either the state constitution or state laws defining the roles of the different state officers, and as such, the above discussion regarding how state law does

1    not override federal law applies with equal force.  Further, based on this separation of powers

2    argument, the state Attorneys General argue that they are not the state officers ultimately overseeing

3    the state agencies (the Governor being that officer). They argue, for that reason, that the state

4    Attorneys General have no control over those agencies.  *Id.* at 10.  Indeed, some courts deciding a

5    control issue in the context of governmental entities have put weight on the separation of powers

6    issue under the facts of established there.  *In re Gold King Mine Release in San Juan Cnty.*, No.

7    1:18-MD-02824-WJ, 2020 WL 13563527 at *3–4 (D.N.M. Dec. 23, 2020).

8         However, with further examination, these arguments focusing on a dual executive under a

9    state constitution (from which stems the separation of powers between a state Attorney General and

10   a state Governor) are not entirely persuasive.  Corollary arguments that the state Attorneys General

11   have no executive authority over the state agencies (such as "[t]hey do not set agency priorities,

12   cannot discipline agency employees") are equally unpersuasive.  *See* Dkt. 685 at 9–10.  These

13   arguments ignore the reality that the "legal control" issue for discovery arises when there are two

14   legally distinct or separate entities.  If the mere fact that two separately constituted or formed entities

15   were enough to defeat control, then there would almost never be a finding of control.  Indeed, in the

16   analogous situation where two "sister corporations" are involved, courts have found control of one

17   entity over the documents of another.  *See Uniden*, 181 F.R.D. at 307–08 (finding control as between

18   two "sister corporations" where neither was under the corporate authority of the other).  This

19   illustrates the point: if one of two "sister corporations" can be found to have control over documents

20   of the other, then for the same reasons, one of two parts of a split or dual executive can be found to

21   have control of documents of the other.

22        The state Attorneys General emphasize the separateness of the agencies from the Attorney

23   General without explanation as to how specifically that separation affects control as to the

24   documents at issue.  If only one entity were involved, then by definition that single entity would

25   "possess" the documents under Rule 34 and the disjunctive issue of control would not arise.

26   *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-WHO (TSH), 2020 WL

27   820327, at *8–9 (N.D. Cal. Feb.19, 2020).  Whether or not there is a "dual executive" or separation

28   of powers is not by itself dispositive of the control issue.  Analogously, in the context of corporate

United States District Court
Northern District of California

13

1  entities, lack of ownership interests by one corporation of another is not sufficient to defeat a finding

2  of control.  *See QC Labs v. Green Leaf Lab* LLC, No. 8:18-cv-01451-JVS (JDEx), 2019 WL

3  6797250, at *8–9 (C.D. Cal. July 19, 2019) (finding control even though two entities "are not in a

4  parent-wholly owned subsidiary relationship, nor do the two entities have identical ownership

5  structure").  To the extent some precedent cited by the state Attorneys General have relied on policy-

6  based reasons rooted in comity for finding a lack of control by an Attorney General over a state

7  agency, those decisions are distinguishable because they do not apply the Ninth Circuit's *Citric Acid*

8  test (for example, state Attorneys General cite a state intermediate appellate court opinion, *People*

9  *ex rel. Lockyer v. Superior Ct.*, 19 Cal. Rptr. 3d 324 (Cal. Ct. App. 2004), which did not apply Rule

10  34); they involve a factual record different from the record here; and they appear not to involve or

11  consider factors such as commonality of counsel, commonality of interests, or the discussion of the

12  supremacy of federal law in this inquiry (informed at least in part by the Supreme Court's directive

13  in *Societe Internationale* and the cases cited above).  [Dkt. 685 at 9–10].

14       The existence of a separation of powers between a state Attorney General and a Governor

15  may be a factor in the control analysis, but that factor does not necessarily preclude the Attorney

16  General's legal right to access to state agency documents.  The logical fallacy of the "separation of

17  powers" argument is that this concept concerns distinct spheres of governmental authority to act

18  within their roles as arms of the government and does not necessarily impact whether or not there is

19  control of documents for purposes of discovery.  To be clear, control under Rule 34 is a discovery

20  concept and is not subject of the exact same conceptual bounds of "corporate control" (as a parent-

21  subsidiary) or "operational control" (such as setting agency policy or disciplining agency

22  employees, as the state Attorney Generals argue).  Where one entity is under the day-to-day

23  operational control of another, that factual situation has been found to be a factor in finding control,

24  because such unfettered power to control all the operations of another entity would indicate a legal

25  right to obtain the documents (again, such as in a parent-subsidiary situation).  *See In re ATM Fee*

26  *Antitrust Litig.*, 233 F.R.D. at 545; *see also LG Display Co., Ltd. v. Chi Mei Optroelectronics Corp.*,

27  No. 08CV2408-L (POR), 2009 WL 223585, at *3 (S.D. Cal. Jan. 28, 2009) ("Numerous courts have

28  concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-

owned subsidiary that it must be deemed to have control over documents located with that subsidiary.").

But, the converse is not necessarily true: lack of operational, day-to-day control of an entity does not end the inquiry, as the state Attorneys General argue – otherwise, control would never be found in situations except those involving a parent-subsidiary or similar direct-control type of relationship. For example, in *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, the Court found that a subsidiary corporation had control of the documents of its parent corporation for purposes of discovery, despite the fact that the subsidiary by definition lacked corporate or operational control over the parent corporation. *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, 224 F.R.D. 471, 472–73 (N.D. Cal. 2004) (finding subsidiary has control of documents of parent corporation); *see also Uniden*, 181 F.R.D. at 307–08 (finding control as between two "sister corporations" where neither was under the corporate authority of the other). "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630, 638 (D. Or. 2015). Here, the attorney-client relationship between the state Attorneys General and their respective state agencies (a relationship mandated by state law) necessitates close coordination. Thus, although operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "managerial power" in terms of day-to-day operations or policy making is not determinative for evaluating "control" for purposes of discovery.

Similarly, to the extent the State Attorneys General argue that they lack "unfettered access" or some otherwise unbounded right to access state agencies' documents, such argument is legally incorrect. A determination of "control" of documents, for purposes of Rule 34, does not require showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*, 2023 WL 4083934, at *5 ("Despite the State's characterization of the issue, we need not decide whether the Illinois Attorney General has "unfettered access to all state agencies' records under all circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less."). Further, the state Attorneys General implicitly assume an overly restrictive view of the control test for documents under Rule 34. To the contrary, courts have recognized that control for purposes of

document discovery is liberally construed.  *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans v. Tilton*, No. 1:07CV01814 DLB PC, 2010 WL 1136216, at *1–2 (E.D. Cal. Mar. 19, 2010); *Inland Concrete Enterprises, Inc. v. Kraft Americas LP*, No. CV 10-1776-VBF (OPX), 2011 WL 13209239, at *3–4 (C.D. Cal. Feb. 3, 2011).

Indeed, control of documents in the split-governmental context is amply demonstrated by a Western District of Tennessee decision.  *Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at *3.  In that case, the Court found that the Tennessee Attorney General had control of the documents of the "Tennessee General Assembly, its legislators, representatives, or agents" – despite the fact that the state's legislature is not under executive control or authority of the state's Attorney General. *Id.*  Clearly, under the Tennessee state constitution, the Attorney General does not exert supervisory control over the Tennessee legislature.  But that factor was not determinative of the control issue for documents under Rule 34.  "Control" for purposes of discovery is not coterminous with the concept of "functional control" or "political control".

Ultimately, the argument that state agencies are outside a state Attorney General's executive authority is merely another way to restate that there are two distinct entities involved.  Seen for what it is, that argument amounts to nothing more than restating the issue to be decided, without helping to decide the issue.  Similarly, arguing that the state agencies are independent because there is a "divided executive" under a state constitution again improperly conflates the "legal control" issue for discovery of documents with "operational control" or "functional independence."  Under the legal standards discussed, the Court finds these arguments and these alleged factors to be ultimately unhelpful in determining whether or not there is control for purposes of discovery, because these arguments beg the issue and as such are not outcome determinative of the control issue.

## IV.     COMMONALITIES BETWEEN THE STATES, THE STATE ATTORNEYS GENERAL, AND THE STATE AGENCIES

There are thirteen cases in this Multi-District Litigation in which the States themselves are the named plaintiffs and in which the Attorney General of that State is not named as co-plaintiff (but is rather counsel representing the plaintiff).  *See* Multistate Complaint (naming California, Connecticut, Idaho through its Attorney General, Illinois, Indiana, Kentucky, Louisiana, Maine,

Minnesota by its Attorney General, New York by its Attorney General, Pennsylvania by its Attorney General, Rhode Island, and Wisconsin as plaintiffs).  Further, there are nineteen cases in this Multi-District Litigation in which both the State itself and the Attorney General (as relator) are the named co-plaintiffs, and thus both entities are represented by the Attorney General of that State.  *Id.* (naming "*ex rel.*" the Attorney Generals of Arizona, Colorado, Delaware, Georgia, Hawai'i, Kansas, Michigan, Missouri, Nebraska, North Carolina, North Dakota, Ohio, Oregon, South Carolina, South Dakota, Virginia, Washington, and West Virginia); *see also Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1 (N.D. Cal. Dec. 1, 2023) (Montana Complaint naming "State of Montana, *ex rel*. Austin Knudsen, Attorney General" as "Plaintiffs"); *see also U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 823 n.6 (S.D. Tex. 2007) ("the Fifth Circuit has expressly held that relator is a party to the suit."); *accord Power Authority ex rel. Solar Liberty Energy Sys. v. Advanced Energy Indus.*, No. 19-CV-1542-LJV-JJM, 2024 WL 957788, at *2 (W.D.N.Y Mar. 6, 2024).

In all thirty-two cases, the State itself is a party to the suit.  Courts have found that discovery obligations extend to other government agencies even if they are non-parties based on the recognition that the State (or the government as a whole) is essentially the real party in interest and thus the discovery obligation extends to the entire government.  In an analogous case involving an order for the production of documents from a non-party agency proceeding, the Ninth Circuit held that:

> [t]he rationale of the rule [requiring production of the documents, witness statements] . . . applies with equal vigor whether the statements are in the possession of the agency conducting the hearing ***or of another agency of the government*** . . . .  The [National Labor Relations] Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States. The proceedings which the Board initiated against petitioners were public proceedings, undertaken on behalf of that government to enforce a public Act. In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements otherwise within the rule ***simply because the documents rested in the hands of another federal agency***, and we perceive no valid distinction, for this purpose, between that case and this one.

*Harvey Aluminum*, 335 F.2d at 754 (citations omitted) (emphasis added); *cf. also Bank Line v. United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948) (ordering production of documents from

17

1    non-party, the Department of the Navy, noting that "[t]he several departments are all agencies of

2    one government, possessed, theoretically, at least, of a single will" where "suit is prosecuted by the

3    Department of Justice for the benefit of the Treasury Department, and that the Navy Department [is]

4    not exercising any discretion as to institution of litigation.").

5          This rationale has been applied to the governments of other nation states, such as in a case

6    involving Ghana: "When an agency of government institutes suit, any obligation to disclose relevant

7    information extends to the government Qua government requiring disclosure of all documents in its

8    possession, custody or control, not just those materials in the immediate possession of the particular

9    agency-plaintiff." *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass.

10   1979).

11         Under different factual situations, state agencies have been found to be agents of their

12   respective States. *See, e.g.*, *San Francisco NAACP v. San Francisco Unified School Dist.*, 484 F.

13   Supp. 657, 667 (N.D. Cal. 1979) (collecting cases which "have found liability [of a State] under an

14   agency theory" involving school boards); *In re Airport Car Rental Antitrust Litig.*, 521 F. Supp.

15   568, 586–87 (N.D. Cal. 1981), *aff'd*, 693 F.2d 84 (9th Cir. 1982) ("Air travelers require ground

16   transportation and it would follow that the [airport operating agency Air] Board, as the agent of the

17   state in performing this function, would have a duty to provide adequate and reliable services.")

18   (quoting *Padgett v. Louisville & Jefferson Cnty. Air Bd.*, 492 F.2d 1258, 1260 (6th Cir. 1974)); *San*

19   *Francisco Unified Sch. Dist. v. Johnson*, 479 P.2d 669, 677 (Cal. 1971) ("the state [of California]

20   has created local school districts, whose governing boards function as agents of the state.");

21   *Crumpler v. Bd. of Admin.*, 108 Cal. Rptr. 293, 305 (Cal. Ct. App. 1973) (finding Board of

22   Administration of Public Employees' Retirement System and city of Mendocino "were agents of

23   the state [of California]" in administering that retirement system).  A principal-agent relationship

24   has been held to be a factor that supports a finding of control for purposes of discovery.  *Lofton v.*

25   *Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (JSC), 2014 WL 10965261, at *2 (N.D. Cal.

26   Nov. 25, 2014); *Hitachi*, 2006 WL 2038248 at *1; *Rosie v. Romney*, 256 F. Supp. 2d 115, 118 (D.

27   Mass. 2003).  Meta argues that the agencies at issue are under the control of their respective State,

28   and therefore subject to party discovery.  *See* Dkt. 685 at 6–7 (citing cases).

United States District Court
Northern District of California

However, the state Attorneys General argue that other courts have recognized that Rule 34 should not be interpreted to allow party discovery of every agency of a state government, merely because suit was filed in the name of the State absent a showing of some other factors demonstrating control. *Id.* at 9 (citing cases). As with other factors impacting the control issue, the case law makes clear that this factor is one among the totality of circumstances to be considered in deciding whether or not there is control. *See Colorado v. Warner Chilcott Holdings*, No. 05-02182, 2007 WL 9813287, at *4 (D.D.C. May 8, 2007) (The Court "will not aggregate separate state governmental agencies without a strong showing to the contrary by Defendants[.]"). The *Amex* opinion followed *Warner Chilcott Holdings* in finding that the state Attorneys General lacked control over their respective agencies' documents because that court granted "great deference" to the dual executive, separate agency factors. *Amex*, 2011 WL 13073683, at *2. As recognized by *Warner Chilcott Holdings*, court can take this factor into account under the totality of the circumstances for evaluating control for each state. *Warner Chilcott Holdings*, 2007 WL 9813287, at *4

A more specific concept of "independence" involves the state Attorney General's independent discretion to file a lawsuit. The state Attorneys General argue that, by pursuing these civil enforcement actions, the state Attorneys General are acting within their exclusive independent authority under their state constitutions and that this independent prosecutorial authority does not require involvement of any state agencies (with exceptions for certain states where specific agencies are, in fact, required to approve and proceed with the litigation). The *Generic Pharmaceuticals (II)* Court rejected the argument that, because the Attorney General was suing as an independent agency, it necessarily lacked control over other agencies' documents. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358. As that Court noted, the District of Columbia's "Attorney General has 'broad power to exercise all such authority as the public interest requires' and has 'wide discretion in determining what litigation to pursue to uphold the public interest, absent specific constitutional or statutory guidance to the contrary.'" *Id.* The *Generic Pharmaceuticals (II)* Court reasoned that "[t]his broad authority, in the context of litigation where the AGO is representing the District of Columbia, does not support the position that the AGO cannot exercise its authority to obtain documents from other agencies." *Id.*

Conversely, in *Amex*, that Court relied on the factor that "the decision to pursue an enforcement action against Amex was one of policy, made independently of the State Governors and state agencies" as a basis to find a lack of control.  *Amex*, 2011 WL 13073683, at *2.  However, the *Amex* Court failed to address or apparently consider the point considered by the *Generic Pharmaceuticals (II)* opinion: such broad authority on the part of the state Attorneys General (in filing the litigation) would in fact be consistent with having a right to exercise authority to obtain documents from other agencies (and at least would be inconsistent with a lack of such authority).  *Compare Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358, *with Amex*, 2011 WL 13073683, at *2.

Indeed, courts have found when a state Attorney General initiates litigation on behalf of the state, and thus exercises authority to file a lawsuit *parens patriae*, that Attorney General has legal control over agency documents.  *See, e.g.*, *GEO Grp., Inc.*, 2018 WL 9457998, at *3 ("In this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies.  Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies."); *Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984) (where an "agency of government institutes suit, any obligation to disclose relevant information extends to the government qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff"); *see also United States v. AT&T*, 461 F. Supp. 1314, 1333–34 (D.D.C. 1978) ("The Attorney General . . . [is] responsible for instituting and conducting the criminal and civil litigation of the United States[]" "it hardly seems reasonable to insulate the entire government, other than the Attorney General's Office, from the direct discovery process.").

Similarly, many of the state Attorneys General argue that the non-party agencies are not parties to this case, and thus they are by definition not subject to party discovery.  The short response to this circular argument is that Rule 34 reaches non-parties where there is control, so a third party's status as a third party to the case is no basis on which to find a lack of control.  This argument ignores the many cases in which a non-party was found properly subject to party discovery under

United States District Court
Northern District of California

Rule 34 because the named party had control over the non-party's documents.  *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-00299, 2022 WL 1540589 at *1–2 (W.D. Tex. May 16, 2022) ("In many examples the United States points to, Texas has demonstrated its control over documents held by non-party agencies or officials . . . .  The Court finds that Texas has control over documents and ESI that are held by [the Office of the Governor], [the Office of the Attorney General], and any other executive agency known to the State to be in the possession, custody, or control of relevant documents.  Because Texas has control over these items, it must produce the items responsive to the United States' Rule 34 production request.").

## V.    "VIRTUAL VETO"

Throughout their briefs and at oral argument, the state Attorneys General stressed the "dual/divided executive" of their constitutional structures of their local governments.  The Court is mindful of the nature of state governance and has taken it into account as appropriate.  Indeed, courts have discussed the unique positions in which state Attorneys General sit within a state government.  *Amex*, 2011 WL 13073683, at *3.  Focusing on the independent authority of a state Attorney General as compared to the separate authority of the remainder of the executive branch, the *Amex* Court found that state Attorneys General lacked control over their respective state agencies' documents based on the risk of the agencies having a potential "virtual veto" on their state Attorney General:

> It is not for this court to interfere with the State Attorneys General's ability to exercise their state constitutional power to bring an enforcement lawsuit absent gubernatorial approval.  To find that the State Attorneys General have control over the documents in possession of state agencies that operate wholly independently of the State Attorneys General would be giving the Governors' Offices and state agencies a 'virtual veto' over the policy decision to bring an enforcement action that rightfully lies with the State Attorneys General."

*Id.*  The state Attorneys General rely on this "virtual veto" argument in this Multi-District Litigation.

Upon further examination, the "virtual veto" argument is speculative as to why and how an agency's actions in responding to discovery would rise to the level of the hypothetical "virtual veto" over litigation.  The *Amex* opinion does not adequately explain how treating a non-party agency as subject to party discovery would, by itself, result in a state Governor's preventing or obstructing future lawsuits by its attorney general.  *See id.*  Indeed, regardless of the non-party agency's actions,

21

the state Attorney General would still have its own independent authority to initiate and prosecute its own lawsuits – there is no "veto" over that power.  *Monsanto*, 2023 WL 4083934, at *3.  The *Amex* Court does not discuss why the Governor or agencies would refuse to comply with party discovery, when faced with a court order requiring them to do so.  Nor does the *Amex* opinion explain why there would be a "veto" in light of the procedural remedies available to secure production of documents from the hypothetically refusing state agencies; nor does the opinion discuss alternative procedures available to obtain discovery from recalcitrant third parties.

More fundamentally, the *Amex* Court's alleged harm from a "virtual veto" is illusory.  Even if state agencies operate independently from their state attorneys general, the *Amex* opinion ignores the role that state attorneys general have as counsel for the state agencies.  As discussed below, typically a State's constitutional or statutory scheme mandates that all state agencies utilize their state Attorney General as legal counsel in litigation (albeit sometimes with allowable exceptions under certain conditions, none of which have been shown to exist or been triggered in this Multi-District Litigation).  Under such required representation schemes, the state Attorneys General must still advise, confer, and coordinate with their clients (the respective state agencies) regardless of whether a discovery request is served pursuant to Rule 34 or Rule 45.  The "virtual veto" argument assumes without explanation that these agencies would refuse to comply with party discovery under Rule 34, but would at the same time comply with third-party discovery under Rule 45.  In other words, the "virtual veto" argument assumes the agencies would reject party discovery with such vehemence that they would risk sanctions, but inexplicably would comply normally in response to subpoenas.  While the burdens and procedures between Rule 34 document requests and third-party subpoenas differ in some respects, as a practical matter, when it comes down to the fundamental issue of whether documents will be produced, the same general types of discussions between counsel as to relevance, scope, proportionality, and privilege apply to both.  It is not explained why an agency would absolutely refuse to produce documents at all under Rule 34 without good and proper reasons, and yet why the same good and proper reasons would disappear in the face of a subpoena.  Further, it is not explained why a Governor or state agency lacks the exact same "virtual veto" if and when it were to obstinately refuse to produce any documents at all in response to a subpoena –

the same unfounded fear that an agency would act so extremely uncooperatively is unbounded and (under the plaintiffs' hypothetical) would be just as likely to occur in response to a subpoena.

Further, these unsubstantiated fears that agencies would refuse to produce documents, even when coordinating with their own lawyers from their own state Attorney General's office, ignores the close relationship lawyers have with their clients.  Indeed, this argument ignores the likely much closer relationship that a state agency would have with lawyers from their state's Attorney General's office, who repeatedly represent their state's agencies in multiple matters throughout the years.  This argument also ignores that this refusal to produce documents sought under Rule 34 would persist even after these state Attorneys General perform able legal services and reasonably advise their clients about the obligations to comply with reasonable, proportional discovery under the Federal Rules (and the enforcement mechanisms available when parties refuse to comply at all).  Combined with the fact that there is no explanation how a refusal to produce documents would necessarily put the litigation to an end (*i.e.*, veto the litigation), the alleged harm here is based on a hyperbolic, worst-case scenario argument.  Therefore, the notion that Governors or state agencies could effectively veto an enforcement action by withholding documents sought under Rule 34 is an unfounded hypothetical and not a strong basis on which to find a lack of control where other factors support such a finding.

As discussed, if the state agencies simply refused to provide documents, the *Amex* opinion ignores that they *would* be subject to legal consequences.  *Lofton, v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015) ("The court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses.").  A Court has the inherent authority to enforce its own Orders to control the conduct of the proceedings, protect the "orderly administration of justice," and maintain "the authority and dignity of the court."  *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764–67 (1980).  Should a state agency violate an Order compelling production, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agencies committing any such hypothetical refusal to abide by Court Order.  The Ninth Circuit has long recognized that,

1    if non-party agencies refuse to produce documents, ultimately the courts may compel them to do so.

2    *Harvey Aluminum*, 335 F.2d at 754 ("[T]he Departments of Justice and Labor are not sovereign, and

3    though the [National Labor Relations] Board may not be able to compel them to produce documents

4    in their possession, the President *or, if need be, the courts, may do so*.") (emphasis added).

5         The "virtual veto" argument suffers from a further legal weakness: the argument appears to

6    be based on incorrect views of the legal duties and the role of counsel in the discovery process.  As

7    counsel for a party subject to discovery, a state Attorney General has the legal authority and duty to

8    take action to make inquiry and collect the documents from the uncooperative state agencies directly

9    and cannot simply sit on their hands in the face of an uncooperative client.  *See, e.g.*, *Rhea v.*

10   *Washington Dep't. of Corr.*, 2010 WL 5395009, at *6 (W.D. Wash. Dec. 27, 2010) (State Attorney

11   General representing agency: "counsel" "has an obligation to not just request documents of his

12   client, but to search for sources of information.  Counsel must communicate with the client, identify

13   all sources of relevant information, and 'become fully familiar with [the] client's document retention

14   policies, as well as [the] client's data retention architecture.'") (internal citation omitted).  "The

15   relevant rules and case law establish that an attorney has a duty and obligation to have knowledge

16   of, supervise, or counsel the client's discovery search, collection, and production. It is clear to the

17   Court that an attorney cannot abandon his professional and ethical duties imposed by the applicable

18   rules and case law and permit an interested party or person to 'self-collect' discovery without any

19   attorney advice, supervision, or knowledge of the process utilized."  *Equal Emp. Opportunity*

20   *Comm'n v. M1 5100 Corp.*, No. 19-CV-81320, 2020 WL 3581372, at *2–3 (S.D. Fla. July 2, 2020)

21   ("Attorneys have a duty to oversee their clients' collection of information and documents, especially

22   when ESI is involved, during the discovery process. Although clients can certainly be tasked with

23   searching for, collecting, and producing discovery, it must be accomplished under the advice and

24   supervision of counsel, or at least with counsel possessing sufficient knowledge of the process

25   utilized by the client.  Parties and clients, who are often lay persons, do not normally have the

26   knowledge and expertise to understand their discovery obligations, to conduct appropriate searches,

27   to collect responsive discovery, and then to fully produce it, especially when dealing with ESI,

28   without counsel's guiding hand.").

This would not be the first time an attorney was faced with a client who posed difficulties in collecting documents for discovery.  *See, e.g.*, *Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B (BLM), 2010 WL 1336937, at *2–5 (S.D. Cal. April 2, 2010).  Counsel in a litigation have legal duties to take proactive steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails (or worse, refuses) to produce or provide documents. *Id.* (detailing "Discovery Errors" by counsel); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2016 WL 5791210, at *3–4 (N.D. Cal. Oct. 4, 2016) (awarding discovery sanctions where, among other things, there was "no indication that Safeway's counsel guided or monitored [client employee] Mr. Guthrie's search of the legacy drive in any significant way").

Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents.  *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 16-cv-06370-EJD (VKD), 2020 WL 2838806, at *5–7 (N.D. Cal. June 1, 2020) (awarding discovery sanctions: "It is not enough for counsel to provide advice and guidance to a client about how to search for responsive documents, and then not inquire further about whether that advice and guidance were followed . . . .  The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) . . . . [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."); *see also Etopus Tech., Inc. v. Liu*, No. 23-cv-06594-HSG (PHK), 2024 WL 3311053, at *6 (N.D. Cal. July 5, 2024) (ordering production of documents and ordering counsel to provide supplemental response "attesting to the fact that Defendant's counsel performed the search for documents directly (and did not rely solely on their client), and attesting to whether Defendant's counsel themselves performed a reasonable, good faith search").

The Court finds as legally erroneous the argument that the state Attorneys General would lack control over state agency materials simply because litigation counsel is either helpless in the face of an uncooperative client or can satisfy their obligations as officers of the Court by merely acquiescing to a client's refusal to collect documents (and presumably allowing a client to face sanctions). *See Kaur v. Alameida*, No. CV F 05 276 OWW DLB, 2007 WL 1449723, at *2 (E.D. Cal. May 15, 2007) (finding defendants have control over agency documents and ordering further search: "defendants *and counsel are reminded of their duty under Rule 34* to conduct a diligent search and reasonable inquiry in effort to obtain responsive documents") (emphasis added). The "virtual veto" arguments are based on a fundamentally flawed misunderstanding of counsel's role and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice – counsel have a proactive duty to conduct discovery under the rules without requiring constant judicial intervention. "In complex litigation such as this, cases are shaped, if not won or lost, in the discovery phase. The rules of discovery must necessarily be largely self-enforcing. The integrity of the discovery process rests on the faithfulness of ***parties and counsel*** to the rules—both the spirit and the letter. '[T]he discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention and . . . those Rules rely on the honesty and good faith of counsel in dealing with adversaries.' The rules of procedure (and attorneys' duty to adhere to them) apply with equal force to decisions made in private discussions behind closed doors in a client's office on how much effort to expend to answer the opposing party's discovery, as to attorney conduct in the bright light of open court." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 507 (D. Md. 2000) (citation omitted) (emphasis added); *see also King v. Habib Bank Ltd.*, No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 (S.D.N.Y. July 1, 2024) ("embroil[ing this judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules").

In addition to supervising the collection of documents and making inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to improve the administration of civil justice, both as officers of the court and under their ethical

United States District Court
Northern District of California

obligations as members of the bar.  *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment; *see also* Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that *obliges each attorney* to stop and think about the legitimacy of a discovery request, a response thereto, or an objection. The term 'response' includes answers to interrogatories and to requests to admit as well as responses to production requests.  ***If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse.***") (emphasis added)

These duties imposed on counsel are important for the discovery system under the Federal Rules to operate rationally and effectively.  As the Ninth Circuit has recognized, "legal duties" are logical antecedent to "legal rights" and thus the state Attorneys' General legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents.  *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The logical relationship between rights and duties has been the subject of considerable academic examination.  Wesley Hohfeld famously described rights and duties as 'jural correlatives'— different aspects of the same legal relation.  Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted).  Here, the recognition that a state Attorney General, presumptively counsel for its state agencies, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery leads logically to the conclusion that the state Attorneys General have the legal right to access those documents.  That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

Finally, as discussed herein, the issue of control is analyzed on a state-by-state basis.  Assuming there is a factual record showing an actual, cognizable, and not an unfounded hypothetical

risk of a "virtual veto" materializing in a particular State, the Court would consider that factor among the totality of circumstances to evaluate the control issue.

## VI.   ATTORNEY-CLIENT RELATIONSHIP AND LEGAL RIGHT TO ACCESS

As noted, many (if not all) of the state Attorneys General have confirmed that they will (or likely will) represent their respective state agencies.  When a state agency is mandated to use the state attorney general as its exclusive legal counsel, this mandate carries with it an indication that the attorney general has legal control over the agency's documents.  The close coordination underlying an attorney-client relationship is a factor in the legal control analysis.  "In general, an attorney is presumed to have control over documents in its client's possession." *Perez v. Perry*, No. SA-11-CV-360-OLG-JES, 2014 WL 1796661, at *2 (W.D. Tex. May 6, 2014).

In *Love v. New Jersey Dept. of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864, at *5–6 (D.N.J. Aug. 11, 2017), the Court held that the defendants have control over the documents of a third-party state agency "albeit through their attorney" where those defendants were defended by the New Jersey Attorney General, who also represented the third-party agency.  *Accord Williams v. Hawn*, No. 1:21-cv-446, 2022 WL 22859198, at *2 (W.D. Mich. Aug. 26, 2022) (finding defendants have control over third-party agency documents: "Courts have considered the existence of a principal-agent relationship sufficient to satisfy the 'possession, custody, or control' requirement . . . .  Here, Defendants are represented by the Michigan Attorney General, which has demonstrated access to [third-party agency] MDOC documents and materials in many cases before this Court.").

In *Synopsys, Inc. v. Ricoh Co.*, No. C-03-2289 MJJ (EMC), 2006 WL 1867529 (N.D. Cal. July 5, 2006), the defendants sought an order compelling Ricoh to search for and produce documents from a third party, KBSC.  The Court ordered that search for documents where it was "especially telling" that common counsel was involved:

> In making this order, the Court finds that Ricoh has sufficient control over KBSC for purposes of Rule 34 for the Court to order counsel for Ricoh to search the storage facility . . . .  Although the Court acknowledges that voluntary cooperation between a party and a third party does not automatically establish control, the facts here suggest that there is more than just voluntary cooperation.  It is especially telling that KBSC agreed to be represented by Ricoh's counsel for

> purposes of discovery and, more important, that Ricoh was able to secure a search of the storage facility by Mr. Bershader and a declaration from the same within only three days of the parties' meet and confer."

*Id.* at *2. Under *Synopsys*, then, the fact that the party and third party are represented by the same counsel is "especially telling" and thus a relevant factor in finding legal control. The Court is cognizant that *Synopsys* cites out-of-circuit case law which refers to the "practical ability" factor rejected by the Ninth Circuit in *Citric Acid*. *Id.* (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997)). However, in *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-cv-01967 CW (NC), 2012 WL 161240, at *4 (N.D. Cal. Jan. 17, 2012), the Court undertook a "close look at the facts of those two cases" and explained that at least in part their holdings did not fundamentally rely on the "practical ability" test. The Court held that, even if the Court were to apply the rejected "practical ability" test, under the facts of the case the moving party failed to support a finding of "practical ability." *Id.*

In the state governance context, a legal relationship between the state Attorney General and the agency establishes a direct legal link between the agency and the plaintiff (either directly where the Attorney General is a named plaintiff, or through counsel), thus supporting a finding of control. *See Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at *3 ("Based upon these statutory duties to handle 'all legal services,' 'direct and supervise' all litigation, and 'represent' the State of Tennessee, one such responsibility must be to respond appropriately to discovery requests on behalf of the entities of the state government that he represents as required by the Federal Rules of Civil Procedure."). As the designated legal representative for a state agency, the Attorney General has professional and ethical obligations to access to all relevant documents to provide effective legal counsel and representation. This access is *legally mandated* (and goes beyond a mere practicality), ensuring that the Attorney General can fulfill their duties under the Federal Rules.

If a state agency's use of the state Attorney General as legal counsel is not mandatory but relies on consent of the state agency, the analysis of legal control over the agency's documents may rely on other factors such as whether, in a given case, the state agency has already committed in fact to be so represented, or if there are no conditions for the state agency to avoid relying on the free legal services of the state attorney general. While a state agency may be granted by statute some

potential or theoretical ability to choose legal representation, often that ability is subject to the discretion of the state Attorney General or subject to some other restriction (such as a conflict of interest).  Further, at hearings in this Multi-District Litigation which involves some states where the state agency may have some ability to be represented by counsel other than the state Attorney General, this Court has inquired of and suggested to the State Attorneys General that they discuss this litigation and confirm whether or not the agencies at issue will rely on their local state Attorney General.  *See* Dkt. 818.  The Court notes that, to date, no separate counsel has entered appearances for any of the state agencies at issue, and the state Attorneys General previously indicated that they have either chosen not to or (at minimum) simply failed to confer with their state agencies, even as a courtesy.  However, a number of State Attorneys General have voluntarily sent litigation hold notices to their respective identified agencies, and pursuant to this Court's Order, the State Attorneys General who did not voluntarily do so have sent litigation hold notices to their respective agencies. [Dkt. 1025].  Despite having notice of this litigation and the fact that they may be the subject of discovery, none of the state agencies at issue have moved to intervene to advance their own alleged interests in not being subject to party discovery.  And no state agencies (where they would have the ability to do so under state law) have indicated that they retained private or separate counsel (such as agency counsel) to represent their interests without the benefit of otherwise free legal representation from their State Attorney General.  Thus, the current record submitted to this Court for decision indicates that no state agencies have confirmed they will retain separate counsel (as none has entered appearance), and the Court analyzes the issues for the states below with the factual record as the State Attorneys General have chosen to submit.

## VII.   A PARTY TO THE SUIT IS BOTH A LEGAL SERVICES PROVIDER WHILE ALSO COUNSEL TO BOTH ITSELF AS A PARTY AND COUNSEL TO THE THIRD PARTY

As discussed, in nineteen of the state lawsuits here, the state Attorney General is a named party to the suit as relator.  Further, in another three lawsuits, the state Attorney General is the sole named plaintiff.  *See* Multistate Complaint (naming Attorneys General of Maryland and New Jersey); *see also Office of the Attorney General, State of Florida, Department of Legal Affairs v. Meta Platforms, Inc.*, No. 23-cv-05885, at Dkt. 1 (N.D. Cal. Oct. 24, 2023) (Florida complaint

United States District Court
Northern District of California

naming "Office of the Attorney General, State of Florida" as Plaintiff).  Thus, in twenty-two of the cases in this Multi-District Litigation the Party nominally subject to party discovery as plaintiff is the state Attorney General itself.  In the remaining thirteen state Plaintiff cases in this Multi-District Litigation, the plaintiff state is represented by the state Attorney General as counsel.

As discussed in the state-by-state analysis below, for many (if not most) of the states the Attorney General is obligated by local law to represent the state agencies at issue in this matter.  Indeed, several of the state Attorneys General have indicated to the Court that they will in fact represent their state agencies at issue for purposes of discovery in this case.  *See* Dkt. 738-1.  For the remainder, the state Attorney General may have some element of statutory discretion not to necessarily represent the state agencies under certain conditions (such as a conflict of interest) – but no such conditions have been presented to the Court by any of the state Attorneys General.  Accordingly, the upshot is that, on the current record before the Court, it appears that all (or virtually all) of the state Attorneys General will represent both the named plaintiff and the state agencies at issue for purposes of discovery in this case.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both a party to the case while also acting or able to act as counsel for a third party.  However, law firms and legal services providers are themselves parties to litigation sometimes.  And this case would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel v. Salas*, No. MC 17-17965, 2018 WL 691649, at *4 (E.D. La. Feb. 2, 2018) ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").

Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  Thus, to the extent a state Attorney General represents a state agency for discovery, that state Attorney General would be presumed to have control over the documents in its client's possession.

United States District Court
Northern District of California

1    Precedent explains why courts have found a legal services provider, particularly a state

2   Attorney General, representing both a party and a third party (particularly a state agency) to be

3   properly found to have control of the third party's documents for discovery.  First, again as discussed

4   above, control in this context does not mean "operational" or "managerial" control – these

5   precedents are not deciding that a law firm directs the day-to-day operations of their client, and

6   arguments by several of the state Attorneys General that they do not control the state agencies in

7   this "operational" or "executive" sense are not on point.  Second, in a reflection that control should

8   be grounded in reality, courts find control in situations involving government attorneys representing

9   both a party and a third-party agency based on their real-world experiences and the facts as a whole.

10   *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453 ("[c]ontrol must be firmly placed in

11   reality.").

12    Multiple courts have found that a party (such as a government employee or official) has

13   control over documents of a state agency based in part on the fact that the governmental party was

14   represented by and/or employed by the state Attorney General:

15         If Defendants seek to avoid production by contending that they are
           not in possession, custody or control of the requested documents, their
16         objection is denied.  The specific facts of this action render such an
           objection unfounded.  By virtue of their employment with non-party
17         CDCR [California Department of Corrections and Rehabilitation],
           individual defendants are represented by the Attorney General's
18         Office.  It is this Court's experience that either individual defendants
           who are employed by CDCR and/ or the Attorney General can
19         generally obtain documents, such as the ones at issue here, from
           CDCR by requesting them.  They have constructive control over the
20         requested documents, and the documents must be produced.

21   *Pulliam v. Lozano*, No. 1:07-CV-964-LJO-MJS, 2011 WL 335866, at *1 (E.D. Cal. Jan. 31, 2011);

22   *see also Quiroga v. Green*, No. 1:11CV00989 AWI DLB, 2013 WL 6086668, at *2 (E.D. Cal. Nov.

23   19, 2013) (affirming Magistrate Judge order finding defendant has control over third-party agency

24   documents: "it is this Court's experience that either individual defendants who are employed by

25   CDCR, and/or the Attorney General who represents them, can generally obtain documents from

26   CDCR by requesting them.  If this is the case, then, based on their relationship with CDCR, they

27   have constructive control over the requested documents and the documents must be produced.");

28   *accord Mitchell v. Adams*, No. CIVS062321GEBGGHP, 2009 WL 674348, at *9, 11–13, 17 (E.D.

Cal. Mar. 6, 2009) (rejecting multiple objections regarding alleged lack of control of agency documents where common counsel represented a party and the agency). To the extent these precedent involve a government official as the party found to have control over agency documents, these precedents are even more germane to the twenty-four cases here where the state Attorney General themselves are the specifically named plaintiff or co-plaintiff.

Similarly, in *Zackery*, the Court overruled the objection that the named individual defendants lacked control over the documents of a third-party agency. *Zackery v. Stockton Police Dep't.*, No. CIVS-05-2315MCEDADP, 2007 WL 1655634, at *4 (E.D. Cal. June 7, 2007). The *Zackery* Court ordered that discovery be provided to the plaintiff directly by the government counsel involved (who both represented the named defendants and the agency): "the court will direct **counsel for defendants** [Office of the City Attorney] to make the necessary inquiries and arrangements for the requested citizen complaint records to be produced to plaintiff." *Id.* (emphasis added).

These cases are illustrative of factual situations involving the same prosecuting attorneys (such as a state Attorney General) representing both a named party and the third party agency, and demonstrate that courts conclude there is control such that the agency documents were subject to party discovery. This factor of "common counsel" and its impact on a finding of control extends beyond the governmental entity context, thus demonstrating that this factor is recognized and applied by courts in a broader context. *See, e.g.*, *Almont Ambulatory Surgery Center, LLC*, 2018 WL 1157752, at *19 (finding control where, among "[o]ther factors that courts consider to 'determine when documents in the possession of one corporation may be deemed under control of another corporation,' . . . Additional factors include: employing the same attorneys") (citations omitted); *see also M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 139 (S.D.N.Y. 1986) (finding control where "[i]n fact, it appears that Mr. Hainline [(counsel for the third parties)] and defendants' present counsel have a working relationship.").

To be clear, the Court is not relying on these precedents to demonstrate the practical ability of the state Attorney General to obtain documents from the state agencies. Rather these precedents demonstrate that, under the totality of circumstances, control can be found where the decision is firmly placed in reality. These precedents also demonstrate that the hypothetical fear of agency

United States District Court
Northern District of California

refusals to cooperate with party discovery has not materialized.

Finally, the Court is not holding broadly that the law requires finding a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party. However, this factor is one of the totality of factors which impact the control inquiry and here, because the state Attorneys General are either parties themselves or at least are counsel for a party, and because the state Attorneys General will represent the state agencies for discovery, this factor takes on particular significance.

## VIII.   STATUTORY RESTRICTIONS ON A STATE ATTORNEY GENERAL FROM ACCESSING DOCUMENTS FROM THE STATE'S AGENCIES

Several state Attorneys General have argued that local statutes place limitations on their ability to access documents from a state agency. These are discussed in detail in the state-by-state analysis below. As a preliminary matter, not all of these statutes actually place limits on the state Attorneys General as argued. Some are limited to only a specific subset of agencies (some of which are not even relevant to this matter). And detailed analysis shows that some actually provide a mechanism and a right to access agency documents, not prohibit access.

As a variation of this argument, some of the state Attorneys General argue that public channels or public information requests are required for the state Attorney General to obtain documents from state agencies. This argument is based on an interpretation of the various "open records" statutes which the Court finds legally erroneous. None of the cited "public records" statutes state that they are the exclusive method by which a state Attorney General can access documents from state agencies. Further, the state Attorneys General argue perhaps too much in this regard – if their arguments are taken literally, then these "open records" statutes would constitute a legal right to access the agencies' documents on the part of the corresponding state Attorney General. By definition, an "open records" statute provides a mechanism by which a state Attorney General can literally obtain requested documents upon demand from an agency. If the state Attorneys General were correct that, every time a lawyer of the state Attorney General seeks documents from state agencies, a public records law requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and

records of the agency subject to the Act.  At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34.  *See Flagg v. City of Detroit*, 252 F.R.D. 346, 355–57 (E.D. Mich. 2008) ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure.").  However, the Court finds that the arguments based on these "open records" statutes to be incorrect, in any event.

The "open records" arguments are particularly weak in the situation where a state Attorney General is required to act as counsel for the state agencies by local mandate.  If this interpretation of the "open records" statutes were correct, then the state Attorneys General would have to submit an "open record" request or "public information" request even when representing a state agency, to get documents from its own client.  In fact, under the argument presented, any lawyer representing any state agency (whether the state Attorney General or private counsel) would be forced to use an "open records" request to obtain documents from their own client.  Such an interpretation is nonsensical and impractical, as well as contrary to the principles of effective legal representation.  As counsel, a state Attorney General will have the normal type of direct access to the necessary documents from its own clients, ensuring efficient and comprehensive legal support for the agencies involved.  The Attorneys General's role as legal counsel for state agencies (with concomitant ethical and professional obligations) directly contradicts the argument that they would be entirely restricted from accessing their clients' documents.  In their capacity as counsel, Attorneys General are often responsible for representing the interests of state agencies, which would include responding to subpoenas and managing legal matters on their behalf.  This representative role inherently requires a level of access to agency documents necessary to fulfill their duties effectively.  The state Attorneys General cite no precedent requiring any attorneys representing a state agency to use either an "open records" request or a subpoena to obtain documents from their own clients.  The cited "public records" or "open information" statutes are not shown to be actual impediments to normal attorney-client access to documents, because those statutes apply to records which are to be

United States District Court
Northern District of California

produced for public inspection (and not for purposes of litigation such as this Multi-District Litigation), particularly where there is a Protective Order limiting public availability of confidential documents.

While other statutes discussed below may be factors in the legal control analysis, such statutes are only one among the totality of factors for deciding control and the discussion above regarding the impact (or lack thereof) of state statutes on this issue is of equal force.

## IX.   THIRD PARTY INVOLVEMENT IN THE LITIGATION AND WHETHER THE THIRD PARTY STANDS TO BENEFIT FROM THE LITIGATION

In the context of corporate disputes, courts have found legal control when a party and non-party have similar financial interests.  In *Hitachi*, Defendant AmTRAN argued that Plaintiff and patent owner Hitachi had legal control over documents from Hitachi's patent licensing agent Inpro II Licensing Sarl (Inpro), and accordingly that Hitachi should obtain and produce documents from Inpro in response to AmTRAN's Rule 34 document requests.  *Hitachi*, 2006 WL 1038248, at *1. The *Hitachi* opinion noted that "a subsidiary will be required to produce documents wholly owned by the parent company.  The third party's financial interest in the litigation might further require its cooperation in the discovery process." *Id.* (citations omitted).

In the context of state governance, this principle applies where state Attorneys General and the state agencies would benefit from a damage award resulting from the litigation brought by the state Attorney General.  Just as courts have found legal control in corporate settings when a party and non-party have similar financial interests, a similar rationale applies to state entities. *Id.*  If a state agency stands to gain financially from the litigation outcome, its interests align closely with those of the Attorney General. *Cf. Japan Halon*, 155 F.R.D. at 628–29 ("This court does not agree that because neither parent corporation owns a majority of the shares, neither will benefit. The court is also not convinced that because any award would go to Japan Halon, its parent corporations would not benefit directly enough to warrant any production of documents on their behalf.").  When litigation proceeds directly support or fund a state agency, it is reasonable to expect full cooperation in the discovery process.  This cooperation ensures the availability of relevant documents, enhancing the attorney general's enforcement actions and promoting justice.  Here, all the States have expressly

1  stated that "[t]his action is in the public interest of the Filing States" and thus have made clear they

2  have a substantial stake in the outcome of this action going even beyond financial interests.  *See*

3  Multistate Complaint at ¶ 12.

4  **X.    OTHER RELEVANT FACTORS**

5        As discussed above, the Ninth Circuit rejected the "practical ability" as the test for legal

6  control in *Citric Acid*.  *See Genentech, Inc. v. Trustees of Univ. of Pennsylvania*, No. C 10-2037

7  PSG, 2011 WL 5373759, at *2 (N.D. Cal. Nov. 7, 2011) (distinguishing *Hitachi*'s citation to

8  "practical ability" case law); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, 2012

9  WL 161240, at *4.  The Court notes that one district court in this Circuit has carefully analyzed

10  *Citric Acid* and found that the Ninth Circuit cited favorably therein to a Third Circuit opinion which

11  holds that "practical ability" is a factor for the "legal control" test.  *AFL Telecomms. LLC v.*

12  *SurplusEQ.com Inc.*, No. CV11-1086 PHX DGC, 2012 WL 2590557, at *2 (D. Az. July 5, 2012)

13  (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140–41 (3rd Cir. 1988)).  Precedents in this

14  district have, however, distinguished *AFL Telecommunications*.  *See Seifi v. Mercedes-Benz U.S.A.,*

15  *LLC*, No. 12-CV-05493TEH (JSC), 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014); *cf. also*

16  *Dugan v. Lloyds TSB Bank, PLC*, No. 12CV02549WHANJV, 2013 WL 4758055, at *2 (N.D. Cal.

17  Sept. 4, 2013).

18        As noted, the issue in *Citric Acid* arose in the context of a motion to enforce a subpoena

19  directed to a third party, in which the moving party was seeking discovery from a fourth party via

20  that third party.  *Citric Acid*, 191 F.3d at 1106–07.  That is, in *Citric Acid* the subpoenaed third party

21  was alleged to control a further uninvolved fourth party.  *Id.*

22        District court opinions have noted that *Citric Acid* dealt with a subpoena, and those opinions

23  have assumed that the standard and scope of "legal control" for purposes of a subpoena is the same

24  as the standard for evaluating the scope of "legal control" for purposes of a document request to a

25  party under Fed. R. Civ. P. 34.  *See, e.g.*, *Soto*, 162 F.R.D. 603; *Hitachi*, 2006 WL 2038248; *In re*

26  *Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167; *Perez*, 2011 WL 1362086; *Miniace*, 2006 WL 335389.

27  However, it appears that no Ninth Circuit case has specifically addressed whether the scope and

28  standard for evaluating "legal control" under Rule 34 is the same with regard to a subpoena under

United States District Court
Northern District of California

Rule 45 (which was at issue in *Citric Acid*).  As noted, other Circuits have expressly held that "practical ability" is a factor for the legal control test in the context of document requests under Rule 34.  *Gerling Int'l Ins. Co.*, 839 F.2d at 140–41.

As the Ninth Circuit has stated, "[w]e begin with the principle that the district court is charged with effectuating the speedy and orderly administration of justice.  There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly."  *United States v. W.R. Grace*, 526 F.2d 499, 508–09 (9th Cir. 2008).  Further, district courts have wide discretion in controlling and managing the discovery process.  *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988).  Indeed, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery."  *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998).  As examples, "upon motion[,] the court may limit the time, place, and manner of discovery, or even bar discovery altogether on certain subjects, as required 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'"  *Id.*  (quoting Fed. R. Civ. P. 26(c)).  "And[,] the court may also set the timing and sequence of discovery."  *Crawford-El*, 523 U.S. at 598.

Here, the complexity of the multidistrict litigation creates a compounding impact on streamlining discovery.  Courts should also consider the goals of efficiency, preservation of judicial resources, preservation of party resources, and simplification of an already complex discovery landscape.  Courts should consider the manner and process for pretrial discovery in order to reduce the expense, number of disparate disputes, and procedural complexity.  Document requests directed to one party are, in this Court's experience, typically more efficient and streamlined than multiple separate subpoenas each directed to non-parties.

In the context of a state in which the statutory scheme mandates the Attorney General to represent a state agency in litigation, a state Attorney General *will* represent those state agencies in responding to the discovery here, regardless of whether the documents are sought by Rule 34

requests for production or by Rule 45 subpoenas.  It would be wasteful to require a party in a complex litigation to serve individual subpoenas on a multitude of state agencies, particularly where all parties and this Court know that the Attorneys General *will be* representing those state agencies in responding to the subpoenas.  It is not firmly grounded in reality, and thus elevates form over substance, to ignore that, at the end of the day, many if not all of the parties will be litigating and negotiating for the documents sought with the very same legal services providers.

Several state Attorneys General have argued that, for analytical purposes, the Court should subdivide their offices between the team or division of attorneys litigating this Multi-District Litigation versus other sections or divisions of that particular state Attorney General, in order to argue that there should not be any consequences flowing from the state Attorneys General representing both the plaintiff and the state agencies.  Such argument is not supported by citation to law and is contrary to the weight of law.  The scope of an attorney-client relationship (and the duties flowing therefrom) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office:

> When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the "rule of imputed disqualification," . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender.

*People ex rel. Peters v. Dist. Ct. In & For Cnty. of Arapahoe*, 951 P.2d 926, 930 (Colo. 1998); *accord City of Cnty. of Denver v. Cnty. Ct. of City & Cnty. of Denver*, 37 P.3d 453, 457 (Colo. App. 2001); *see also Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 637–38, 642 (Cal. Ct. App. 2010), *as modified* (May 6, 2010) (recognizing rebuttable presumption of imputed knowledge in the context of government attorneys).  Some jurisdictions treat public legal service organizations like private law firms in the context of the scope of the attorney-client relationship.  Even in jurisdictions which do not automatically impute shared confidences from an attorney-client relationship to an entire public law office, those courts recognize that ethical screening or other procedures are required.  At a general level, the law does not support the blanket argument that different individual

United States District Court
Northern District of California

lawyers in the Attorney General's office have separate, discrete attorney-client relationships with their clients.

In this multidistrict litigation, this Court has convened monthly Discovery Management Conferences in order to provide regular and detailed guidance on the complex discovery process and discovery disputes. As fact discovery has progressed, the Court has been presented with numerous discovery motions necessitating separate, hours-long hearings on such disputes. Managing and controlling state agency discovery as set forth herein is, in one way, intended to help facilitate management of the overall discovery process in this multidistrict litigation. Resolution of this "control" issue is directly related to proper and rational management of discovery.

This is not merely a hypothetical concern about managing discovery. If the state Attorneys General were correct as to the absolute lack of control of any of the agencies at issue, then Meta would be required to issue over 250 individual subpoenas, and then negotiate the scope of each subpoena after receiving written responses and objections to each. The state agencies and their counsel would be required to correspondingly respond and object to all of these subpoenas and negotiate them with Meta. As a result, there would be the potential for these parties to present over 200 allegedly separate disputes over these subpoenas to this Court, with the potential for raising inconsistent or contradictory arguments. This is not merely a hypothetical concern. The Fourth Circuit was confronted with precisely this situation. *In re S.C. Dep't of Parks, Recreation & Tourism*, 103 F.4th 287, 289 (4th Cir. 2024). In that case, a group of multiple States sued Google for alleged antitrust violations, among them South Carolina. *Id.* Google then served party discovery, including document requests on the State Attorneys General who objected to the discovery requests to the extent they sought state agency documents, and the Attorneys General argued (as here) that Google should serve subpoenas on the state agencies. *Id.* Indeed, the State Attorneys General (including South Carolina) wrote that "Google issued Federal Rule 45 subpoenas to numerous state agencies, and State Plaintiffs believe that these subpoenas are the proper channels for Google to seek documents that are in the possession, custody, or control of those agencies." *Id.* Instead of litigating the "control" issue in that case, Google opted instead to voluntarily serve subpoenas on the state agencies. *Id.* Despite the statements by the South Carolina Attorney General

about the propriety of the subpoena process, the South Carolina Department of Parks, Recreation and Tourism ("SCPRT") disagreed with the statements of the South Carolina Attorney General and moved to quash Google's subpoena entirely based on Eleventh Amendment immunity arguments. *Id.* at 289–90.  In arguments highly reminiscent of the arguments about "control" asserted in this action, "[a]ccording to SCPRT, because the attorney general 'does not represent SCPRT or have custody, possession, or control over its records,' and because he 'did not bring his claims against Google in a sovereign capacity,' his joining the State to the litigation against Google could not have waived the Eleventh Amendment immunity of SCPRT, which is a 'statutorily and constitutionally separate' state agency." *Id.* at 291.  The district court denied SCPRT's motion to quash.  On appeal, the Fourth Circuit affirmed and rejected South Carolina's arguments which emphasized the "separateness" of the agency from the State and emphasized the argument that the Attorney General "does not represent" the agency and does not "have custody or control of its records." *Id*. at 293. While *In re South Carolina Department of Parks, Recreation & Tourism* ultimately dealt with waiver of Eleventh Amendment immunity by a state Attorney General extending to all agencies of the state, the teachings for the analogous situation here is self-evident: requiring a party (like Google in that case, or Meta here) to serve subpoenas on different state agencies who could then assert different (even contradictory) arguments against the subpoenas, where there is a demonstrable and legal basis for finding control, is not conducive to the just and efficient administration of justice.

To the extent the Court find "control" under Rule 34 standards and finds some state agencies are subject to party discovery, their documents would be sought by document requests directed just to one party in each state.  While there are real-world implications for management of discovery that flow from the Court's resolution of this control issue, to be clear the Court has analyzed the issues under appropriate legal standards discussed herein, but also cognizant of the broad discretion the Court exercises in ordering the sequence and management of discovery consistent with the Federal Rules.

Accordingly, the Court exercises its authority in finding the conclusions as to control for each state below pursuant to appropriate legal standards and under the totality of circumstances, firmly grounding its decision in reality and underpinned by the Court's full discretion.

**DISCUSSION**

As an initial matter, the Court notes that this discovery dispute solely concerns whether the State Attorneys General's offices have legally sufficient control such that, in responding to Meta's discovery requests, the state agencies' documents should be obtained and produced by the State Attorneys General in response to Fed. R. Civ. P. 34 document requests. For the purposes of this dispute, the Parties do not dispute that the State Attorneys General lack possession or custody of the documents from the state agencies – the only issue presented is the issue of control. Indeed, the law would be clear that the State Attorneys General would have the obligation to respond to the discovery requests if they did have possession or custody of the documents. To the extent the Parties frame their arguments or this dispute as to whether the agencies should be treated as "parties" for this multidistrict litigation such arguments are, at best, imprecise. Whether a party needs to or is requested to be joined as a named party to this case under Fed. R. Civ. P. 19 or 20 are issues, of course, beyond the scope of the discovery referral order in this action.

Thus, the issue at hand is the specific question: whether the State Attorneys General have legal control, for the purposes of discovery, over their respective state agencies under relevant legal standards. It is self-evident from the length of this opinion that state Attorneys General and Meta raised complex questions in the context of the factors used to determine control under the "legal control" test. In light of (and incorporating by reference) this discussion of the legal standards, the Court next analyzes the control issue on a state-by-state basis. The Court approaches that state-by-state analysis following the directive that, fundamentally, "[c]ontrol must be firmly placed in reality." *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453.

**I.    ARIZONA**

In opposition to the control issue, the Arizona Attorney General argues primarily the following factors: (1) Arizona agencies may respond without the Arizona Attorney General's assistance; (2) the Arizona Attorney General's powers arise from statute and are thus not plenary; and (3) the Arizona Attorney General is a separate entity and independent from the Arizona agencies. [Dkt. 738-2 at 2]

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) the Arizona Attorney General is the chief legal advisor for the State; and (2) certain Arizona agencies are proscriptively barred from obtaining counsel other than the Arizona Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following Arizona Agencies: Board of Regents, Commerce Authority, Department of Child Safety; Department of Education; Department of Health Services; Governor's Office; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education. *Id.* All but three of these state agencies are prohibited from employing legal counsel (or making expenditures for legal services) outside the Arizona Attorney General's office. Ariz. Rev. Stat. §§ 41-192(A), -192(D).

After considering the Parties' briefs, oral argument and other material submitted, and applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor of a finding that the Arizona Attorney General does have legal control, for purposes of discovery, over most of the Arizona agencies at issue. While the Arizona Attorney General asserts that Arizona agencies might respond without its assistance and that the Arizona Attorney General's powers arise from (and thus are somehow limited by) statute, these arguments do not negate the fact that the Attorney General is the chief legal advisor for the state government. Ariz. Rev. Stat. § 41-192(A). The statutory scheme in Arizona requires that "[t]he attorney general ***shall***: 1. Be the legal advisor of the departments of this state and render such legal services as the departments require . . . . [A]nd coordinate the legal services required by other departments of this state or other state agencies." Ariz. Rev. Stat. § 41-192(A)(1)–(3) (emphasis added).

Importantly, the Arizona Attorney General's arguments do not negate the fact that all but three of the Arizona agencies at issue here are barred by Arizona law from obtaining counsel other than the Attorney General. Ariz. Rev. Stat. § 41-192(D). Indeed, the Arizona Attorney General previously confirmed that its office would definitely represent at least four of the Arizona agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 3–4]. And in their more recent brief, the Arizona Attorney General conceded that they will represent five state agencies at issue. Dkt. 738-2 at 2 (referring "to the five [agencies] that the [Arizona Attorney General] currently will, at the request of the agency, represent"). The Arizona statute is clear on its

United States District Court
Northern District of California

face that six of the agencies at issue are prohibited completely from retaining separate counsel. *See* Ariz. Rev. Stat. § 41-192(D). While the Arizona Attorney General indicated to the Court that the Attorney General would not represent the Arizona Department of Education and the Arizona Governor's Office of Strategic Planning and Budgeting, that is an error of law because neither of these agencies are exempt from the express statutory prohibition on retaining different counsel. *See* Ariz. Rev. Stat. § 41-192(D). And to be clear, despite its name, the Arizona Governor's Office of Strategic Planning and Budgeting is an agency outside the Arizona Governor's office, has duties to advise both the Governor and Legislature, and is statutorily situated within the Act defining the Arizona Department of Administration. *See* Ariz. Rev. Stat. at §§ 41-701, -722 to -723. Further, as noted above, the Arizona Attorney General has apparently not conferred with these agencies and no other counsel has entered appearance to date for these agencies. Because the Arizona statute is clear on its face that six agencies are barred from retaining separate counsel, *see* Ariz. Rev. Stat. § 41-192(D), the Court finds, based on the current record, that the Arizona Attorney General will serve as counsel in this matter for six agencies (Department of Child Safety; Department of Education; Department of Health Services; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education).

As to the three other state agencies (the Commerce Authority, Board of Regents, and Governor's office), the Arizona statutory scheme allows those other agencies to retain separate counsel apart from the state Attorney General. *see* Ariz. Rev. Stat. §§ 41-192(D)(4), (7), and (10). The Arizona Attorney General has represented to the Court that these three agencies will not be represented by the Attorney General for purposes of discovery in this matter, should subpoenas be served on these three agencies. [Dkt. 738-1 at 3–4].

Accordingly, it appears that under the statutory scheme six agencies will be represented by the Arizona Attorney General in this matter for discovery. *See* Ariz. Rev. Stat. §§ 41-192(A), -192(D). Thus, because the Arizona Attorney General will be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery, the Court in its discretion determines that a finding of control as to these six agencies is further supported by the simple and pragmatic realities involved in these circumstances.

United States District Court
Northern District of California

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Arizona Department of Child Safety, the Arizona Department of Education, and the Arizona Department of Health Services.  [Dkt. 1031-5 at 734–859].  None of these state agencies are allowed to employ legal counsel other than the Arizona Attorney General and thus by statute each must be represented by the Arizona Attorney General in this matter for discovery.  *See* Ariz. Rev. Stat. §§ 41-192(D) ("no state agency other than the attorney general shall employ legal counsel or make an expenditure or incur an indebtedness for legal services, but the following are exempt from this section[,]" listing state agencies other than the three at issue).  This arrangement indicates strongly that the Attorney General, in fulfilling its role as Chief Legal Advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.  Therefore, these subpoenas, and the statutory scheme in Arizona regarding how the Attorney General will respond to them, further support the Court's conclusion that the Arizona Attorney General has legal control, for the purposes of discovery, over at least these the three agencies recently listed in the intent to issue subpoenas.

Relatedly, the Arizona Attorney General has taken the position that communications between the Arizona Attorney General and these state agencies would be covered by the attorney-client privilege if such communications are encompassed within the scope of discovery sought by Meta.  [Dkt. 738-2 at 2].  To the extent the Arizona Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" of the state Attorney General, that argument is incorrect.  The Arizona Attorney General proffers this argument to limit the attorney-client privilege (and hence the attorney-client relationship) only as to some parts of the state Attorney General's office but not other sub-teams, without citation to any legal support for that proposition.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office as discussed above.  *See, e.g.*, *People ex rel.*

*Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings v. State*, 441 S.E.2d 262, 266 (Ga. 1994) (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun v. Area Agency on Aging of Se. Arkansas*, 618 S.W.3d 137, 137 (Ark. 2021) (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").

Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required to avoid either imputed or actual sharing of confidences to avoid a finding of dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support the Arizona Attorney General's argument that different individual lawyers in the Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Arizona Attorney General's attempt to simultaneously disclaim the existence of an attorney-client relationship as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Arizona Attorney General's Office and these agencies.  "[T]o the extent that [the State] asserts an attorney-client privilege with these

legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at \*2. The fact that the Arizona Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Arizona Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).

Further, there is no statutory, legal, or administrative rule cited which prohibits the Arizona Attorney General from accessing the documents of the state agencies at issue. To the extent the Arizona Attorney General relies on the statutory origins of that office, such state statutes are unavailing to prohibit a finding of control here. Analogously, in *Osborn*, the Arizona federal Magistrate Judge overruled objections and ordered individual defendants (officials of the Arizona Department of Corrections) to produce personnel documents from the files of the state agency, despite arguments that state statutory restrictions forbade the production of the documents. *Osborn v. Bartos*, 2010 WL 3809847 at \*15 (D. Ariz. Sept. 20, 2010). The *Osborn* court rejected the arguments of the Arizona Attorney General (representing the defendants in that case) that an under an Arizona statute "they are without authority to produce the records" and that Arizona regulations "make personnel files confidential." *Id.* The Court ordered the defendants in *Osborn* "to produce, from **whatever personnel or similar file** specifically related to the designated officer, **where such records are normally maintained**, the performance appraisals and disciplinary records in Request 4 as to the named Defendants[.]" *Id.* at \*16 (emphasis added).

Further, the Arizona Attorney General does not cite any statutory or legal prohibition on the Arizona Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.

1     *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

2     recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

3     lawsuit . . . .   Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

4     to respond as to responsive materials over which Salas and his law firm had possession, custody or

5     control.").   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

6     over documents in its client's possession."   *Perez*, 2014 WL 1796661, at *2.   The Court is not

7     holding broadly that there must be a finding of a legal right of access to and thus control over third

8     party client documents in every case involving a legal services provider as a party; rather, under the

9     particular facts here, and under the totality of circumstances viewed in light of applicable legal

10    standards, the Court finds that control exists as to the six agencies represented by the Arizona

11    Attorney General.

12          Indeed, at least one other federal court has previously found that the Arizona Attorney

13    General has legal control over Arizona state agency materials.   *Generic Pharmaceuticals (II)*, 699

14    F. Supp. 3d at 357–58.   While this Court reaches its own independent conclusions consistent with

15    the applicable legal standards discussed above and in light of the facts and circumstances presented

16    here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly

17    consistent with, and to that extent further persuasively supports, the conclusion here with regard to

18    the Arizona Attorney General's having control with regard to documents of the state agencies at

19    issue.   Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the

20    objecting states including Arizona and given the Arizona Attorney General's office's experience in

21    litigating and losing an analogous issue as to authorization to produce documents from agency files

22    in *Osborn*, this Court is disappointed that the Arizona Attorney General and Meta were unable  to

23    reach a negotiated resolution of this dispute, which other states were able to do in *Generic*

24    *Pharmaceuticals (II)*.   As the Court has repeatedly encouraged the Parties at multiple Discovery

25    Management Conferences, they should make every effort to work out discovery disputes through

26    reasonable, good faith negotiations between able and experienced counsel, particularly where, as

27    here, there is guidance in precedent on the discovery issue at hand.

28          Accordingly, in view of the legal standards and the record viewed in the totality of

United States District Court
Northern District of California

circumstances, the Court finds that the Arizona Attorney General has control, for the purposes of discovery, over the documents of six of the Arizona agencies at issue, listed above.  The Court notes that the Court credits the Arizona Attorney General's offices representation to this Court that the Board of Regents, Commerce Authority, and Governor's office will not be represented by any attorney within the Arizona Attorney General's office for purposes of this case.  Should that representation turn out to be in error or shown to be false, the Court will reconsider its findings as to control with regard to those three agencies upon proper motion.

## II.   CALIFORNIA

In opposition to the control issue, the California Attorney General argues primarily the following factors: (1) the California Attorney General is a separate entity and independent from the California agencies; (2) California agencies are statutorily responsible for maintaining their own records; and (3) if found to be subject to control for purposes of discovery, the California agencies would thereby be granted a "virtual veto" over the California Attorney General's independent responsibilities to bring enforcement actions.  [Dkt. 738-3 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) California law sets forth a preference for the California Attorney General to be employed as the attorney of all legal matters in which California has an interest; (2) the California Attorney General is presumptively the legal representative of all California agencies in any judicial proceedings unless specifically exempted; and (3) California agencies, with limited exception, are proscriptively barred from obtaining counsel other than the California Attorney General, without consent from the California Attorney General. *Id.* at 3.  Here, Meta seeks discovery from the following California Agencies: Business, Consumer Services, and Housing Agency; Department of Child Support Services; Department of Consumer Affairs; Department of Education, Department of Finance; Department of Health Care Services; Department of Public Health; Office of the Governor; Governor's Office of Business and Economic Development; Health and Human Services Agency; Mental Health Services Oversight and Accountability Commission; Office of Data and Innovation; and School Finance Authority. *Id.*

After considering the Parties' briefs, oral argument and other material submitted, and

1   applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor

2   of a finding that the California Attorney General does have legal control, for purposes of discovery,

3   over the California agencies in dispute.  While the California Attorney General is a separate entity

4   and while the California agencies maintain their own records, this does not outweigh the requirement

5   that the California Attorney General is statutorily required to act as the California agencies' counsel,

6   with limited exceptions which are not shown to be applicable here.  *See* Cal. Govt. Code § 11040(a).

7          The California Legislature made clear that the California statutory scheme prefers the

8   California Attorney General represent state agencies: "It is the intent of the [California] Legislature

9   that overall efficiency and economy in state government be enhanced by employment of the

10  Attorney General as counsel for the representation of state agencies and employees in judicial and

11  administrative adjudicative proceedings."  Cal. Govt. Code § 11040(a).  The statutory scheme in

12  California presumes that the California Attorney General will represent state agencies in judicial

13  actions (even to the exclusion of that agency's own counsel) absent written consent: "Except with

14  respect to employment by the state . . . agencies specified by . . . name in Section 11041 or when

15  specifically waived by statute other than Section 11041, a state agency ***shall obtain the written***

16  ***consent of the Attorney General*** before doing either of the following: (1) Employing in-house

17  counsel to represent a state agency or employee in any judicial or administrative adjudicative

18  proceeding.  (2) Contracting with outside counsel."  *Id.* at § 11040(c) (emphasis added).

19         Further, the California Legislature has made clear "that it is in the best interests of the people

20  of the State of California that ***the Attorney General be provided with the resources*** needed to

21  develop and maintain the Attorney General's capability to provide competent legal representation

22  of state agencies and employees ***in any judicial*** or administrative adjudicative ***proceeding***."  *Id.* at

23  § 11040(a) (emphasis added).  Access to documents from state agencies are "resources needed" for

24  the California Attorney General "to provide competent legal representation of state agencies" in this

25  action.

26         Indeed, the California Attorney General confirmed that its office could represent all of the

27  California agencies at issue, if Meta were to serve those agencies with a subpoena in this matter.

28  [Dkt. 738-1 at 4–5].  The Court notes that the State Attorneys General have filed an Administrative

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

2    to various state agencies, including the California Department of Child Support Services, the

3    California Department of Education, and the California Mental Health Services Oversight and

4    Accountability Commission.  [Dkt. 1031-3 at 27–153].  None of these state agencies are allowed to

5    employ legal counsel other than the California Attorney General absent written consent, and no such

6    consent has been presented thus far.  Accordingly, and based on the record before the Court, it

7    appears that under the statutory scheme each will be represented by the California Attorney General

8    in this matter for discovery, whether because of the intended subpoenas or because the Court finds

9    control for purposes of discovery.  *See* Cal. Govt. Code § 11040(a). Thus, as a matter of the efficient

10   and rational administration of justice in this case, because the California Attorney General will be

11   involved in representing these state agencies in any event in this case (whether to respond to

12   subpoenas or to respond to party discovery), the Court in its discretion determines that a finding of

13   control is further supported by the simple and pragmatic realities involved in these circumstances.

14   At oral argument, counsel for the California Attorney General argued that, even if the Court

15   found that the California Attorney General had legal access and control over the California state

16   agencies' materials, those state agencies could disagree and simply refuse to provide requested

17   documents to the California Attorney General and could hypothetically put the California Attorney

18   General in a position of being at risk of sanctions through no fault of its own.  This is a variation on

19   the "virtual veto" argument, discussed above, which the Court finds unpersuasive to rebut the

20   finding of control.  The California Attorney General's argument asserts that their office lacks any

21   legal mechanism to force or require compliance from the state agencies, which in their view

22   demonstrates lack of control.  *Id.*  This argument is without merit.  First, this argument rests entirely

23   on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order

24   finding control, the state agencies would simply refuse to provide documents based on nothing more

25   than an obstinate and unreasoned disagreement.  The California Attorney General presented no facts,

26   no affidavits, no prior examples of state agency refusals, and no testimony to support this feared

27   response by California state agencies.

28   Indeed, in many analogous cases in which a California prison official was sued individually,

51

the courts found that the individual official had control over documents of a state agency (the California Department of Corrections and Rehabilitation (CDCR)) and thus the state agency was subject to party discovery – and those findings are based in part on the fact that the individual party defendants were represented by and/or employed by the California Attorney General:

> If Defendants seek to avoid production by contending that they are not in possession, custody or control of the requested documents, their objection is denied. The specific facts of this action render such an objection unfounded. By virtue of their employment with non-party CDCR, individual defendants are represented by the Attorney General's Office. It is this Court's experience that either individual defendants who are employed by CDCR and/ or the Attorney General can generally obtain documents, such as the ones at issue here, from CDCR by requesting them. They have constructive control over the requested documents, and the documents must be produced.

*Pulliam*, 2011 WL 335866, at *1; *see also Quiroga*, 2013 WL 6086668, at *2 (affirming Magistrate Judge order finding defendant has control over third-party agency documents: "it is this Court's experience that either individual defendants who are employed by CDCR, and/or the Attorney General who represents them, can generally obtain documents from CDCR by requesting them. If this is the case, then, based on their relationship with CDCR, they have constructive control over the requested documents and the documents must be produced."); *accord Mitchell*, 2009 WL 674348, at *9, 11–13, 17 (rejecting multiple objections regarding alleged lack of control of agency documents).

Similarly, in *Zackery*, the Court overruled the objection that the named defendants lacked control over the documents of a third-party agency. *Zackery*, 2007 WL 1655634, at *4. The *Zackery* Court granted relief to the Plaintiff seeking discovery as follows: "the court will direct **counsel for defendants** [Office of the City Attorney] to make the necessary inquiries and arrangements for the requested citizen complaint records to be produced to plaintiff." *Id*. These California precedents make clear that courts in California have in fact found control in numerous factual situations in which the involvement of the same prosecuting attorneys (often the California Attorney General) representing both a named party and the third-party agency supported the conclusion of control such that the California agency documents were subject to party discovery.

To be clear, the Court is not relying on these precedents to demonstrate the practical ability

United States District Court
Northern District of California

of the state Attorney General to obtain documents from the state agencies, rather these precedents rebut and demonstrate exactly the opposite of the hypothetical fear of agency refusal posited by the state Attorneys General as a reason why they should be found not to have control for purposes of discovery.  Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure.  "We think that surely one must assume that litigants will obey court orders.  Once we assume otherwise, then our system of jurisprudence is in serious trouble."  *E. I. du Pont de Nemours & Co. v. Finklea*, 442 F. Supp. 821, 825 (S.D. W. Va. 1977); *see also Casas v. City of Baldwin Park*, No. B270313, 2017 WL 1153336, at *6 (Cal. Ct. App. 2017) (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Second, this argument ignores the fact that Meta has the ability to file a motion to compel production of documents by any such hypothetically disagreeing state agencies, and thus there is indeed a procedural and legal avenue to enforce compliance from any such hypothetically intransigent agencies.  The state Attorneys General's argument that they lack legal mechanism to force compliance from their state agencies is myopic.  Should Meta be required to file a motion to compel, the Court is perspicacious enough to understand that the fault would lie with the hypothetical state agency and not the California Attorney General, and in the event some enforcement mechanism were needed (such as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand how and where to focus any such enforcement Order.

Finally, the Court is not persuaded by the argument that the California Attorney General lacks control over state agency documents, because an attorney in a court proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to collect or provide documents for production in discovery.  As counsel for a party subject to discovery, the California Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply sit on their hands in the face of an uncooperative client – this is would not be the first time an attorney was faced with a client who

was difficult to deal with in collecting documents for discovery. *See, e.g.*, *Qualcomm Inc.*, 2010 WL 1336937, at *2–5. Counsel in a litigation has legal duties to take pro-active steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails to (or worse, refuses to) produce or provide documents. *Id.* at *2–5 (detailing "Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at *3–4 (awarding discovery sanctions where, in part, "there is no indication that Safeway's counsel guided or monitored [client employee] Mr. Guthrie's search of the legacy drive in any significant way."). Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *Optronic Techs., Inc.*, 2020 WL 2838806, at *5–7 (awarding discovery sanctions; "It is not enough for counsel to provide advice and guidance to a client about how to search for responsive documents, and then not inquire further about whether that advice and guidance were followed . . . . The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) . . . . [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."). The Court rejects as legally erroneous the California Attorney General's arguments, because they are based on a misunderstanding of counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice. *See King*, Case No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing the judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

In addition to their duties to supervise the collection of documents and make inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to

54

improve the administration of civil justice, both as officers of the Court and under their ethical obligations as members of the bar of this Court. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment. "Rule 26(g) imposes ***an affirmative duty to engage in pretrial discovery in a responsible manner*** that is consistent with the spirit and purposes of Rules 26 through 37 . . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that ***obliges each attorney*** to stop and think about the legitimacy of a discovery request, ***a response thereto, or an objection*** . . . . If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See* Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically antecedent to "legal rights" – and thus the California Attorney General's legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'— different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, presumptively counsel for state agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery lends further support to the conclusion that the state Attorney General has the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

The California Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the California Attorney General would necessarily have access to and thus control over the

relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at

\*5–6 (finding state Attorney General has control over agency documents "based on his broad

statutory and common law powers to control and manage legal affairs on behalf of state agencies,

has a legal right to obtain responsive documents from the state agencies referenced in the

Complaint").  To the extent the California Attorney General argues that these agencies are "separate

entities under law" from the state Attorney General and are not supervised by the state Attorney

General, *see* dkt. 738-3 at 2, that argument misapprehends the "legal control" test for documents –

the issue is not simply whether one entity is under the day-to-day operational control of the other

(such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities

are legally separate (such as two different and separately incorporated entities), but rather whether

there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for

Rule 34 purposes does not require the party to have actual managerial power over the foreign

corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*,

305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and

the state agencies (a relationship mandated by state law) necessitates close coordination.  While

operational control may be a factual situation which demonstrates a legal right to obtain the

documents, the absence of such "executive or functional control" is not determinative for evaluating

"control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises

when there are two legally distinct or separate entities – otherwise, if only one entity were involved,

there would be no dispute that party discovery covered that one entity.  As discussed above, courts

have found "control" for purposes of discovery where a party is clearly not in managerial control

over the third-party, such as a subsidiary having control over the documents of a parent corporation,

or an individual government officer having control over the documents of an entire agency.  Thus,

arguing that the agencies "operate outside the California Attorney General's authority" or are

"established as a separate entity, under various laws or constitutional provisions" is simply re-stating

the issue, *id.*, and not determinative of the issue.  Arguing that the agencies are "controlled" by the

Governor or another "independently elected official" in a "divided executive" under the California

Constitution, *id.*, confuses and conflates the "legal control" issue for discovery with "operational

control" or "independence" and thus constitutes a legally erroneous argument.

Further, there is no statutory, legal, or administrative rule cited which prohibits the California Attorney General from accessing the documents of the state agencies at issue.  Nor is there citation to any statutory or legal prohibition on the California Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather under the particular facts here and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Consistent with the analysis of this issue as raised by other state Attorneys General, the Court finds the California Attorney General's "virtual veto" argument unpersuasive.  [Dkt. 738-3 at 2].  As explained above (and incorporated herein by reference), the "virtual veto" argument is entirely speculative.  This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state attorney general's independent law enforcement responsibilities.  The argument also directly contradicts the well-established legal principle and statutory scheme that a state Attorney General, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

Finally, the Court has recognized that the issue of control of state agency documents when a State is a party has been litigated and decided against numerous States in a previous Multi-District

57

United States District Court
Northern District of California

1  Litigation involving most of the same States and state Attorneys General as are involved in this case.

2  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)*

3  opinion not only ruled against the objecting States, but also helpfully identified numerous States

4  which withdrew their objections to party discovery and negotiated a resolution of this issue with the

5  opposing party there.  *Id.* at 356 n.5.  In that case, California is identified as one of the States which

6  reached agreement on the state agency control issue without requiring that court to expend resources

7  resolving the dispute there.  *Id.*  As discussed above, the California Attorney General has, from this

8  Court's review of precedent, repeatedly litigated and lost on the analogous issue of control of state

9  agency documents in cases involving a state official sued individually, typically involving control

10  over documents of the California Department of Corrections and Rehabilitation.  Other states have

11  apparently repeatedly litigated and lost the same issue, resulting in one court within the Ninth Circuit

12  warning a state Attorney General to avoid unnecessarily multiplying the proceedings and risk

13  sanctions.  *Emanuel v. Collins*, No. 3:20-CV-0566-RCJ-CLB, 2022 WL 22236619, at *3 n.2 (D.

14  Nev. July 20, 2022) (Finding control: "This Court has expressly rejected similar arguments made

15  by NDOC [(Nevada Department of Corrections)] and its counsel in the past.  Therefore, Defendants

16  and their counsel are cautioned and reminded that improper discovery conduct in this, or other cases,

17  may result in discovery sanctions in the future.") (citation omitted).  Given that the *Generic*

18  *Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states in

19  that case, given that California was able to reach a negotiated resolution of the dispute in that Multi-

20  District Litigation, and further given the California Attorney General's repeatedly litigating and

21  losing a similar control issue in the face of multiple reasoned decisions adverse to the California

22  Attorney General, this Court is disappointed that the California Attorney General and Meta were

23  unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the

24  Parties at multiple Discovery Management Conferences, they should make every effort to work out

25  discovery disputes through reasonable, good faith negotiations between able and experienced

26  counsel, particularly where (as here) there is guidance in precedent on the discovery issue at hand.

27  **III.    COLORADO**

28  In opposition to the control issue, the Colorado Attorney General argues primarily the

58

1   following factors: (1) the Colorado Attorney General brought the lawsuit under its own independent

2   law enforcement capacity; (2) the Colorado legislature has recognized that the Colorado Attorney

3   General cannot access Colorado agencies' documents when it is acting in its enforcement capacity;

4   and (3) the Colorado Attorney General is a separate entity and independent from the Colorado

5   agencies.  [Dkt. 738-4 at 2].

6        In support of a finding of control with regard to these state agencies' documents, Meta argues

7   based primarily on the following factors: (1) Colorado agencies are proscriptively barred from

8   retaining litigation counsel other than the Colorado Attorney General; (2) the Colorado Attorney

9   General has already confirmed that it would represent the identified agencies in responding to a

10  Meta subpoena; and (3) the Colorado Attorney General admits that it intends to assert privilege

11  claims.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Behavioral Health

12  Administration; Department of Education; Department of Higher Education; Department of Human

13  Services; Department of Regulatory Agencies; Office of the Governor; Office of Economic

14  Development & International Trade; and Office of State Planning and Budgeting.  *Id.*

15       After considering the factors argued in the briefs, the Court finds that the factors weigh in

16  favor of a finding that the Colorado Attorney General does have legal control, for purposes of

17  discovery, over the Colorado agencies in dispute.  While the Colorado Attorney General is a separate

18  entity and while the Colorado Attorney General did bring the instant action pursuant to its own

19  independent authority, this does not outweigh the requirement that the Colorado Attorney General

20  must statutorily act as the Colorado agencies' counsel.  Colo. Rev. Stat. § 24-31-101(1)(a).  Under

21  Colorado's statutory scheme, "[t]he attorney general: ***Shall act*** as the chief legal representative of

22  the state ***and be the legal counsel*** and advisor ***of each*** department, division, office, board,

23  commission, bureau, and ***agency of state government[.]***").  *Id.* (emphasis added); *see also* Colo.

24  Rev. Stat. § 24-31-111(1) ("The attorney general ***shall*** provide legal services for each state agency

25  as provided in section 24-31-101.") (emphasis added).  Under Colorado law, "[n]o state agency shall

26  appoint, solicit, or employ any person to perform legal services except in accordance with this part

27  1."  Colo. Rev. Stat. § 24-31-111(2).  None of the statutory exceptions in section -111, which

28  requires a finding by the Colorado Governor of a failure or refusal to provide legal representation

by the Colorado Attorney General, are argued or present in this case.  Colo. Rev. Stat. § 24-31-111(5).

Indeed, the Colorado Attorney General confirmed that its office will represent all of the Colorado agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 6].  The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Colorado Behavioral Health Administration and the Colorado Department of Education.  [Dkt. 1031-3 at 154–237].  Neither of these state agencies are allowed to employ legal counsel other than the Colorado Attorney General absent a finding by the Colorado Governor that the Colorado Attorney General has been unable, failed to, or refuses to provide legal services to the agencies, and no exceptions to an agency's prohibition on employing separate counsel has been presented thus far.  *See* Colo. Rev. Stat. § 24-31-111(5).  Accordingly, it appears that under the statutory scheme each agency will be represented by the Colorado Attorney General in this matter for discovery.  *See* Colo. Rev. Stat. § 24-31-101(1)(a).  Thus, because the Colorado Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Colorado Attorney General has taken the position that communications between the Colorado Attorney General and these state agencies would be covered by the attorney-client privilege when the Colorado Attorney General is legal counsel for a state agency.  [Dkt. 738-4 at 2].  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  To the extent the Colorado Attorney General is asserting that the attorney-client privilege applies to communications between the Colorado Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office, that further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

United States District Court
Northern District of California

Further, there is no statutory, legal, or administrative rule cited which prohibits the Colorado Attorney General from accessing the documents of the state agencies at issue.  While the Colorado Attorney General cites a statute which requires their office to enter into information sharing agreements with state licensing agencies in enforcement actions, none of the agencies at issue here are licensing agencies.  Colo. Rev. Stat. § 6-1-116(4).  Indeed, it is clear that the Colorado Legislature's view is that "it best serves the consumer protection interests of the state to allow a licensing authority to share with a district attorney or the attorney general information regarding a regulated person, which information may be relevant to a consumer protection investigation of the regulated person" and that "District attorneys and the attorney general are tasked with, and have the expertise needed for, enforcing consumer protection laws in the state."  Colo. Rev. Stat. § 6-1-116(1)(b)–(d).  Viewed in context, the Colorado Legislature expressed its intention that these state licensing authorities would share information with the Colorado Attorney General specifically to "*facilitate* the investigation and *enforcement of complaints* alleging violations of consumer protection or unfair trade laws."  Colo. Rev. Stat. § 6-1-116(4) (emphasis added). Thus, the cited statute does not serve as a prohibition on the Colorado Attorney General's access to these licensing agencies' documents, but to the contrary serves as an encouraged means for sharing information in order to "facilitate" enforcement actions.  The statute provides for a procedural, legal mechanism, approved by the Colorado Legislature, for these licensing agencies to share information with the Colorado Attorney General.  If anything, the statute cited by the Colorado Attorney General further supports a finding of legal right of access and thus control over these licensing agency documents, and the Court finds the Colorado Attorney General's characterization of this statute as barring access or evidence of lack of right to access as erroneous.

Further, to the extent the Colorado Attorney General argues that there must be an information sharing agreement from licensing agencies in order to disclose the agencies' records, this argument is in essence the same "virtual veto" argument advanced by several other states' Attorneys General and discussed above.  As explained previously, the Court finds the "virtual veto" argument to be speculative and unpersuasive.  This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement

responsibilities.  The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.  Finally, as noted, none of the Colorado agencies at issue in this case are licensing authorities and thus the statute regarding an information sharing agreement is not applicable to the agencies under consideration here.

There is no citation to any statutory or legal prohibition on the Colorado Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharms.* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 365 n.5.  In that case, Colorado is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources

62

United States District Court
Northern District of California

1   resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the

2   control issue against all the remaining objecting states and given that Colorado was able to reach a

3   negotiated resolution of the dispute in that Multi-District Litigation, the Court is disappointed that

4   the Colorado Attorney General and Meta unable to reach a negotiated resolution here as well.  As

5   the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences,

6   they should make every effort to work out discovery disputes through reasonable, good faith

7   negotiations between able and experienced counsel, particularly where, as here, there is guidance in

8   precedent on the discovery issue at hand.

9   **IV.    CONNECTICUT**

10       In opposition to the control issue, the Connecticut Attorney General argues primarily the

11  following factors: (1) the Connecticut Attorney General brought the lawsuit under its own

12  independent law enforcement capacity; (2) the Connecticut Attorney General is a separate entity

13  and independent from the Connecticut agencies; and (3) the Connecticut agencies would create a

14  "virtual veto" over the Connecticut Attorney General's independent responsibilities to bring

15  enforcement actions.  [Dkt. 738-5 at 2].

16       In support of a finding of control with regard to these state agencies' documents, Meta argues

17  primarily that the Connecticut Attorney General must act as counsel for the Colorado agencies.  *Id.*

18  at 3. Here, Meta seeks discovery from the following agencies: Commission for Educational

19  Technology; Department of Consumer Protection (the agency responsible for "authoriz[ing] the

20  [Connecticut Attorney General]" to bring this suit); Department of Economic and Community

21  Development; Department of Education; Department of Mental Health and Addiction Services;

22  Department of Public Health; Department of Children and Families; Office of Health Strategy;

23  office of Higher Education; Office of Policy and Management; Office of the Child Advocate; Office

24  of the Governor; and Office of the State Comptroller.  *Id.*

25       After considering the factors argued in the briefs, the Court finds that the factors weigh in

26  favor of a finding that the Connecticut Attorney General does have legal control, for purposes of

27  discovery, over the Connecticut agencies in dispute.  While the Connecticut Attorney General is a

28  separate entity and while the Connecticut Attorney General did bring the instant action in its own

1   independent authority, this does not outweigh the requirement that the Connecticut Attorney

2   General must statutorily act as the Connecticut agencies' counsel.  Conn. Gen. Stat. § 3-125.

3          Under Connecticut's statutory scheme, "[t]he Attorney General shall have general

4   supervision over all legal matters in which the state is an interested party, except those legal matters

5   over which prosecuting officers have direction."  *Id.*  Further, the Connexticut Attorney General

6   "shall appear for . . . all heads of departments and state boards, commissioners, agents, inspectors,

7   committees, auditors, chemists, directors, harbor masters, and institutions . . . in all suits and other

8   civil proceedings . . . in which the state is a party or is interested . . . in any court or other tribunal,

9   as the duties of his office require[.]"  *Id.*  Such representation is for "all such suits shall be conducted

10  by [the Connecticut Attorney General] or under [their] direction."  *Id.*

11         Indeed, the Connecticut Attorney General confirmed that its office will represent all of the

12  Connecticut agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

13  [Dkt. 738-1 at 7–8].  Accordingly, it appears undisputed that under the Connecticut statutory scheme

14  each will be represented by the Connecticut Attorney General in this matter for discovery.  *See*

15  Conn. Gen. Stat. § 3-125.  Thus, because the Connecticut Attorney General appears likely to be

16  involved in representing these state agencies in any event in this case, whether to respond to

17  subpoenas or to respond to party discovery.

18         Further, the Connecticut Department of Consumer Protection is, under Connecticut law,

19  tasked with authorizing the Connecticut Attorney General to bring Connecticut Unfair Trade

20  Practices Act enforcement actions such as the current action.  *See* Conn. Gen. Stat. § 42-110m.  The

21  Connecticut Attorney General has taken the position that communications between its office and

22  the Connecticut Department of Consumer Protection regarding authorizing this action (with no

23  limitation as to time frame) is subject to the attorney-client privilege.  [Dkt. 738-5 at 2].  By

24  definition, an attorney-client relationship is a prerequisite to assertion of the attorney-client

25  privilege.  *See Graf*, 610 F.3d at 1156.  Thus, the Connecticut Attorney General's admission that it

26  has an existing (indeed pre-existing) attorney-client relationship with this specific state agency

27  regarding this matter lends further support for a finding of a legal right of access and thus control

28  over the documents of the Connecticut Department of Consumer Protection.  Regardless of whether

United States District Court
Northern District of California

or not there is control with regard to the other Connecticut state agencies, the position of the Connecticut Department of Consumer Protection is markedly different and, at a minimum, the Court finds that the Connecticut Attorney General's office has legal right to access and thus control over the documents of the Connecticut Department of Consumer Protection for purposes of discovery in this matter.

Relatedly, the Connecticut Attorney General has taken the position that communications between the Connecticut Attorney General and the other state agencies at issue would be covered by the attorney-client privilege when the Connecticut Attorney General is legal counsel for those state agency. [Dkt. 738-4 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Connecticut Attorney General is asserting the attorney-client privilege applies to communications between the Connecticut Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office further supports the conclusion of control here.

In addition, there is no statutory, legal, or administrative rule cited which prohibits the Connecticut Attorney General from accessing the relevant documents of any of the state agencies at issue. There is no citation to any statutory or legal prohibition on the Connecticut Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court

has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Connecticut Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Connecticut Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Connecticut Attorney General argues that the Connecticut Constitution establishes the Governor and the Attorney General as "independently elected officials filling separate constitutionally created offices," *see* dkt. 738-5 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed

66

above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Connecticut Attorney General is separate from the executive branch agencies under the control of the Governor is merely a restatement of the issue and not determinative of the issue. *Id.* Arguing that the agencies are "controlled" by the Governor (who is an "independently elected official" in a "dual executive" under the Connecticut Constitution) confuses and conflates the "legal control" issue for discovery with "operational control" or "independence" and thus constitutes a legally erroneous argument.

Finally, to the extent the Connecticut Attorney General asserts essentially the same "virtual veto" argument advanced by several other States' Attorneys General, as discussed above the Court finds the "virtual veto" argument to be speculative and unpersuasive. This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities. The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

Indeed, at least one other federal court has previously found that the Connecticut Attorney General has legal control over Connecticut state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Connecticut Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Connecticut, this Court is disappointed that the Connecticut Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)* As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out

discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Connecticut Attorney General has legal control, for the purposes of discovery, over the documents held by the Connecticut agencies listed by Meta.

## V.    DELAWARE

In opposition to the control issue, the Delaware Attorney General argues primarily the following factors: (1) Delaware law explicitly indicates that the Delaware Department of Justice does not have a right to access Delaware state agency documents in lieu of discovery under a state statute; and (2) Delaware case law has previously held that control over documents turns on whether a party has the power, unaided by courts, to force document production.  [Dkt. 738-6 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Delaware agencies are proscriptively barred from obtaining counsel other than the Delaware Attorney General, without consent from the Delaware Attorney General and the Governor of Delaware.  *Id.* at 3 (citations omitted).  Here, Meta seeks discovery from the following agencies: Department of Education; Department of Health and Human Services; Department of Services for Children, Youth and Families; Office of Management and Budget; and Office of the Governor.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Delaware Attorney General has legal control, for purposes of discovery, over the Delaware agencies in dispute.  The Court finds that mandatory representation by the Delaware Attorney General, subject to consent of the Delaware Attorney General and Governor of Delaware, weighs heavily towards a finding of legal control.

The Delaware Attorney General heavily relies on a statutory argument based on Title 29, § 250(b) of the Delaware Code, which states:

> The Attorney General shall have the right of access at all times to the books, papers, records and other documents of any officer, department, board, agency, instrumentality or commission of the state government. The Attorney General shall not have this right of access for purposes of discovery in any civil actions brought by or on the relation of the Attorney General other than for the books, papers, records, and documents of the Department of Justice.

The Delaware Attorney General argues that the second sentence should be interpreted to

prohibit the Delaware Attorney General any possible right to access the documents of any state agencies "for purposes of discovery" in any action filed by the Attorney General. [Dkt. 738-6 at 2]. The Delaware Attorney General's interpretation of the statute is contrary to the express language of the statute cited. The first sentence of Section 2508(b) gives the Attorney General a broad right to access the documents of state agencies on demand. The second sentence of Section 2508(b) says that "[t]he Attorney General shall not have this right of access" to the documents. The intent of the statute is thus clear – in investigations, in defense of civil action, and in criminal actions, the Delaware Attorney General has a broad right to access state agency documents. In civil actions initiated by the Delaware Attorney General, the statute simply provides that the Delaware Attorney General cannot rely on this statute as a substitute for discovery in that action. However, contrary to the Delaware Attorney General's argument, this statute does not take away every or any other right the Attorney General may have to access the documents of state agencies. At best, the second sentence of Section 2508(b) puts the Delaware Attorney General in the same position as most (if not all) of the other state Attorneys General with regard to control – there being no express statutory right to access documents, the Court examines whether other sources of law provide that right. The second sentence of Section 2508(b) indicates a legislative intent to require the Attorney General to use other available avenues to obtain documents from state agencies in connection with civil litigation, and an intent to disallow the Attorney General to use this statute as an end-around normal discovery procedures. This statute does not prohibit or forbid the Delaware Attorney General from seeking agency documents using any such other available or normal processes.

The Delaware Attorney General further argues that this statute "is thus consistent with the general rule in Delaware that 'attorneys do not exercise control over their clients' property.'" Dkt. 738-6 at 2 (citing *Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, No. CIV.A. 3874-VCS, 2009 WL 2501542, at *4 (Del. Ch. Aug. 5, 2009)). First, the decision by the Delaware Attorney General to cite *Sokol* is unusual because that case involved a motion to transfer jurisdiction from the Chancery court to Colorado Superior Court. In so holding, the Delaware court stated that "[t]his case has no relevant connection to Delaware, and Delaware law has no bearing on it." *Sokol*, 2009 WL 2501542, at *5. Accordingly, the Delaware Attorney General's argument that *Sokol* demonstrates a "general

1   rule in Delaware" is undercut by the very case they cite, and the Court does not credit the argument

2   for that reason alone.

3          Second, the excerpt from *Sokol* quoted by the Delaware Attorney General has no bearing on

4   control for purposes of discovery. *Sokol* involved a dispute between a law firm and a former client

5   over alleged overbilling of fees and alleged breach of fiduciary duty, and the parties there disputed

6   whether subject matter jurisdiction was proper in Chancery Court or in a Superior Court which can

7   hear professional negligence (i.e., legal) claims. The statement quoted from *Sokol* by the Delaware

8   Attorney General in this Court is a passage distinguishing the scope of the attorney-client

9   relationship from the scope of a fiduciary duty of a trustee when they control property of another as

10  a fiduciary. *Id.* at *4. The *Sokol* opinion's statement, viewed in proper context, indicates that

11  attorneys do not control under the rules governing fiduciary duties the property of a client. And

12  *Sokol* recognized that there can, in fact, be "circumstances in which an attorney exercises control

13  over the property of a client." *Id.*

14         Further, the Court notes that *Sokol*'s analysis is consistent with this Court's analysis of the

15  close relationship between attorneys and clients regarding control for purposes of discovery

16  discussed above. The *Sokol* opinion states that "attorneys simply hold positions of heightened trust

17  . . . which requires the attorney to meet certain professional standards." *Id.*

18         Facially, this statute makes no mention of attorney controlling client property and thus does

19  not support the Delaware Attorney General's argument. More importantly, this argument

20  erroneously confuses property ownership concepts with control for purposes of discovery. In *In*

21  *Synopsys*, Judge Chen found control where "the word control does not require that the party have

22  legal ownership or actual physical possession of the documents at issue." *Synopsys*, 2006 WL

23  1867529, at *2 (citation and internal quotations omitted). Indeed, "while courts have cautioned that

24  "[l]egal ownership is not determinative of whether a party has . . . control of a document for the

25  purposes of Rule 34 the court takes this to mean: if the third-party has 'legal ownership' of the

26  document, the inquiry as to control does not end there. Conversely, if a party does have legal

27  ownership, as here, the court finds a strong indication that defendants possess the very definition of

28  'control' over these documents." *Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D.

United States District Court
Northern District of California

Kan. 2007) (internal quotations omitted); *see also* 7 Moore's Federal Practice – Civil § 34.14 ("Legal restrictions that may limit a party's ability to obtain certain documents or to disclose them to others will not necessarily preclude a finding that the party has possession, custody, or control over those documents.").

The Delaware Attorney General relies on not only *Sokol* and other Delaware state caselaw to argue lack of control. [Dkt. 738-6 at 2]. The Delaware Attorney General cites *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, No. CIV.A. 379-N, 2005 WL 1713067, at *11 (Del. Ch. July 13, 2005), for the proposition that the "key inquiry" for control "is whether they have "the power, unaided by the courts, to force production of the documents." First, *Deephaven* is an unpublished Chancery Court opinion applying Delaware's statutory scheme under Section 220 of Title 8 of the Delaware Code, for a shareholder to inspect the records kept by a Delaware corporation as a fiduciary for its shareholders, which is a far cry from Rule 34. *Id.* As discussed above, control of property by someone acting under a fiduciary duty is not the same legal standard for control of documents under Rule 34, and to the extent the Delaware Attorney General asserts otherwise, that argument is legally erroneous. Second, the Delaware Attorney General also argues here that its argument based on *Deephaven* is supported by another state law case, *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 510 (Del. 2005). [Dkt. 738-6 at 2]. That case is not helpful or germane to the issues here. *Weinstein*, like *Deephaven*, concerned inspection of documents controlled by a subsidiary corporation, and the *Weinstein* opinion makes clear that the analysis under Delaware's Section 220 requires two different types of specific control, the first being the "fiduciary" control discussed above, and the second being "actual control" to control operations of a subsidiary organization to force that entity to provide its financial documents for inspection. *Weinstein*, 870 A.2d at 511–12. The discussion in *Weinstein* regarding whether court enforcement of a duty to open documents up for corporate inspection is specifically based on the text of Section 200, and jurisprudence under that state law. *Id.* The cited passage from *Weinstein* nowhere uses the phrase "key inquiry" and nowhere equates Section 220 with Rule 34. Fundamentally, the Court finds the Delaware Attorney General's arguments based on Section 220 and Delaware Chancery Court precedent to be legally irrelevant. Indeed, the Court has serious concerns about the manner in which

1   the control issue was presented and briefed by several of the state Attorneys General, including the

2   Delaware Attorney General,  given how attenuated these state law arguments are from the law under

3   Rule 34.

4       To be clear, the Court rejects the argument that a "key inquiry" under Rule 34 is whether the

5   party involved has "the power, unaided by the courts, to force production of the documents."  Indeed,

6   the issue of control under Rule 34 only requires determining if there is a "legal right" to access or

7   obtain the documents upon demand.  Often, a party with a "legal right" must, in fact, use the court

8   system to enforce and validate that right.  Nothing in the text of Rule 34 or the Federal Rules of

9   Civil Procedure state, much less imply, that control is to be construed as a discretionary, extra-

10  judicial exercise of "power" (unlike the Delaware statute and case law relied upon heavily by the

11  Delaware Attorney General here).  To the contrary, the Federal Rules contemplate and provide

12  measures for parties to seek judicial relief when confronted with a party refusing to produce

13  documents in discovery. *See, e.g.*, Fed. R. Civ. P. 37.  Further, the scheme for discovery under the

14  Federal Rules contemplate that, in appropriate circumstances, not only can judicial relief for

15  discovery be sought, but also the courts have the authority to sanction parties (and third parties) for

16  failure to obey a discovery order, among other conduct.  Fed. R. Civ. P. 37(b)-(f).  A simple review

17  of the Federal Rules demonstrates the inapplicability of Delaware's statutory scheme as analogous

18  for purposes of this dispute.

19      Further, as discussed in the Legal Standards section above, the inquiry regarding control for

20  purposes of Rule 34 discovery is a federal question, governed by the Federal Rules of Civil

21  Procedure.  As discussed above, even if the Delaware Attorney General's interpretation of Section

22  2508 were correct, that state statute can not preempt federal law, and Delaware's Section 220, and

23  related case law, are not persuasive in evaluating the control issue under Rule 34, because that

24  statutory scheme is so different from Rule 34.  Even though detailed consideration of the specific

25  factors under a comity analysis are not applicable in this case given the Supremacy Clause of the

26  U.S. Constitution, the Court has analyzed the cited state law statutes and cases for completeness.

27  *Cf., e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571RJHHBP, 2006 WL 3378115, at

28  *2–4 (S.D.N.Y. Nov. 16, 2006) (holding that international comity did not support allowing French

United States District Court
Northern District of California

"blocking statute" to prohibit discovery proceeding under Federal Rules of Civil Procedure 34 and 45).  The Court's extensive review of the cited Delaware statute and case law, summarized herein, demonstrates that the Delaware Attorney General's arguments here are, at best, incorrect as a matter of law, and, at worst, risk raising questions as to counsel's judgment and credibility.

Because Section 2508 does not operate to foreclose a finding of control under Rule 34, as discussed above, the Court next turns to analyzing the issue of control with regard to other factors. Importantly, the Delaware Attorney General's arguments do not negate the fact that all but of the Delaware agencies at issue here are barred by Delaware law from obtaining counsel other than the Attorney General, absent consent from the Attorney General.  Del. Code. § 2507.  Indeed, the Delaware Attorney General confirmed that its office could represent all of the Delaware agencies at issue, if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 8].  As noted above, the Delaware Attorney General has had months to confer with the agencies about whether they would seek consent to obtain different counsel.  To date, no such other counsel has entered appearance for the Delaware state agencies, and the Delaware Attorney General has not indicated that it has provided any consents to any of the agencies.  Under Delaware's statutory scheme,

> the Attorney General shall have the following powers, duties and authority: . . .  to provide legal advice, counsel and services for administrative offices, agencies, departments, boards, commissions and officers of the state government concerning any matter arising in connection with the exercising of their official powers or duties . . . , to represent as counsel in all proceedings or actions which may be brought on behalf of or against them in their official capacity in any court, except in actions in which the State has a conflicting interest, all officers, agencies, departments, boards, commissions and instrumentalities of state government.

Del. Code. § 2504(3) (emphasis added).

Accordingly, based on the record presented to the Court, under the Delaware statutory scheme each agency at issue here will be represented by the Delaware Attorney General in this matter for discovery.  *See* Del. Code §§ 2503, 2507.  Thus, as a matter of the efficient and rational administration of justice in this case, because the Delaware Attorney General will be involved in representing these state agencies in any event in this case (whether to respond to subpoenas or to

respond to party discovery), the Court in its discretion determines that a finding of control is further supported by the simple and pragmatic realities involved in these circumstances.

Relatedly, the Delaware Attorney General has taken the position that communications between the Delaware Attorney General's office and these state agencies would be covered by the attorney-client privilege.  [Dkt. 738-6 at 2].  To the extent the Delaware Attorney General has attempted to subdivide its own office between Delaware Attorney General's attorneys in the Fraud and Consumer Division (litigating this case to date) and other attorneys in the Delaware Attorney General's Civil Division (who alleged "are responsible for providing legal advice and representation to the Delaware State Agencies"), *see id.*, in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not other "divisions" of that same organization, that argument is not supported by citation to any law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g., People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening; *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious

74

United States District Court
Northern District of California

1    disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer

2    disqualified when joining prosecutors' office but "the entire office in which that attorney works is

3    not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of

4    the entire prosecuting office is not necessary absent special facts, such as a showing of actual

5    prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public

6    legal service organizations like private law firms and impute shared confidences among lawyers of

7    the entire public law entity.   Even in jurisdictions which do not automatically impute

8    disqualification, and shared confidences, to an entire public law office, those courts recognize that

9    ethical screening or other procedures are required out of recognition that actual (as opposed to

10   imputed) sharing of confidences may occur and such procedures are required to avoid dissemination

11   of attorney-client privileged communications within an entire public law organization.  This review

12   of case law demonstrates that no courts support the Delaware Attorney General's argument that

13   different individual lawyers in the Delaware Attorney General's office have *ex ante* separable,

14   discrete attorney-client relationships.

15        The Court rejects the Delaware Attorney General's attempt to simultaneously disclaim the

16   existence of an attorney-client privilege as between the "team" of attorneys currently working on

17   this case, while apparently attempting to preserve the ability to assert that the privilege applies to

18   communications between other lawyers in the Georgia Attorney General's Office and these

19   agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

20   legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

21   that on one hand the [State] Attorney General represents these individuals, but that for discovery

22   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

23   2014 WL 1796661, at *2*.  To the extent the Georgia Attorney General is asserting that the attorney-

24   client privilege applies to communications between the Georgia Attorney General's office and the

25   agencies at issue, that further supports the conclusion of control here.  Assertion of the attorney-

26   client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*,

27   610 F.3d at 1156.

28        In addition, there is no citation to any statutory or legal prohibition on the Delaware Attorney

General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## VI.    FLORIDA

In opposition to the control issue, the Florida Attorney General argues primarily the following factors: (1) Florida law prevents the Florida Attorney General from accessing documents held by Florida agencies; (2) the Florida Attorney General is a separate entity and independent from the Florida agencies; (3) the Florida Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) Florida agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records. [Dkt. 738-7 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Florida agencies are proscriptively barred from obtaining counsel other than the Florida Attorney General, with certain legal exceptions; and (2) the Florida laws, which purportedly prevents the Florida Attorney General from accessing documents held by Florida agencies, are "wholly unrelated to the discovery at issue[.]" *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commerce; Department of Agriculture and Consumer

1  Services; Department of Children and Families; Department of Education; Department of Health;

2  and Office of the Governor.  *Id.*

3        After considering the factors argued in the briefs, the Court finds that the factors weigh in

4  favor of a finding that the Florida Attorney General does have legal control, for purposes of

5  discovery, over the certain listed Florida agencies.  While the Florida Attorney General is a separate

6  entity and while the Florida Attorney General does bring the instant action in its own independent

7  authority, this does not outweigh the requirement that the Florida Attorney General must statutorily

8  act as the Florida agencies' counsel.

9        Under Florida's statutory scheme, the Florida Attorney general "[s]hall appear in and attend

10  to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state

11  may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of this

12  state."  Fla. Stat. § 16.01(4).  Additionally, the Florida Attorney General "[s]hall appear in and attend

13  to such suits or prosecutions in any other of the courts of this state or in any courts of any other state

14  or of the United States."  Fla. Stat. § 16.01(5).  Moreover, "[t]he Department of Legal Affairs shall

15  be responsible for providing all legal services required by any department, unless otherwise

16  provided by law.  However, the Attorney General may authorize other counsel where emergency

17  circumstances exist and shall authorize other counsel when professional conflict of interest is

18  present."  Fla. Stat. § 16.015.

19        Curiously, the Florida Attorney General takes the position that it would not represent the

20  listed agencies.  [Dkt. 738-1 at 9].  However, on the record before the Court, this is an error of law

21  because neither of these agencies are exempt from the express prohibition on retaining different

22  counsel.  Accordingly, it appears undisputed that under the Florida statutory scheme each state

23  agency at issue here will be represented by the Florida Attorney General in this matter for discovery.

24  *See* Fla. Stat. § 16.01(4).  Thus, because the Florida Attorney General appears likely to be involved

25  in representing these state agencies in any event in this case, whether to respond to subpoenas or to

26  respond to party discovery.

27        Relatedly, the Florida Attorney General has not disclaimed whether it will assert that

28  communications between the Florida Attorney General and these state agencies are covered by the

United States District Court
Northern District of California

United States District Court
Northern District of California

attorney-client privilege.  [Dkt. 738-7 at 2].  The Florida Attorney General's argument that "in Florida, the privilege is not waived by communicating work product or attorney-client privileged material to another state agency" is circular.  *Id.*  If there is an attorney client relationship between the Florida Attorney General and these state agencies, then by definition any such communications would not operate as a waiver of privilege because they are inherently privileged to begin with. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  To the extent the Florida Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Florida Attorney General's office and the agencies at issue, that further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Florida Attorney General from accessing the relevant documents of any of the state agencies at issue.  The Florida Attorney General's argument that two Florida state agencies are required to maintain their own records is unavailing.  [Dkt. 738-7 at 2].  Simply having a statute that makes these Florida agencies statutorily responsible for maintaining, preserving, retaining, and providing their own records does not demonstrate that the Florida Attorney General lacks access to those documents. First, the statutes cited by the Florida Attorney General relate to records and materials which are outside the scope of and thus not a restriction on the discovery sought in this case.  Fla. Stat. § 893.055 (the Florida Attorney General's ability to request records held by the Florida Department of Health); Fla. Stat. § 409.9072 (the Florida Agency for Health Care Administration's provision of Medicaid-related documents to the Florida Attorney General).  Second, the Florida statutes here do not specifically restrict or prohibit the Florida Attorney General's access to agency records for discovery purposes – rather, as noted they provide mechanisms for the Florida Attorney General to request and gain access to specific documents from those two state agencies in certain

circumstances.  The general statutory responsibility of Florida agencies to manage their own records does not negate the Florida Attorney General's role as counsel for those agencies, which inherently involves obtaining necessary documents for effective representation in litigation.  Therefore, because these statutes do not prohibit the Florida Attorney General's access to the state agencies' materials relevant in this matter for discovery, the Court finds that the Florida Attorney General has a legal right to access and thus control of the relevant records of the agencies listed by Meta.

In addition, there is no citation to any statutory or legal prohibition on the Florida Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Florida Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Florida Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

United States District Court
Northern District of California

right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Florida Attorney General argues that the state agencies are "independent" of the Florida Attorney General, are "not under the supervision nor control" of the Florida Attorney General, and that under the Florida Constitution the Attorney General is an "independent, elected official," *see* dkt. 738-7 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that "[n]one of them [the state agencies] are related to" the Florida Attorney General and that they "operate outside of the Florida [Attorney General Office's] authority," is merely a restatement of the issue and not determinative of the issue. [Dkt. 738-7 at 2].  Arguing that the "decision to pursue this enforcement action was at the discretion of the Florida [Attorney General Office] and made independently of the state agencies," confuses and conflates the "legal control" issue for discovery with "operational control" or "daily functional independence" and thus constitutes a legally erroneous argument.  *Id.*

Indeed, at least one other federal court has previously found that the Florida Attorney General has control over Florida state agency materials under Fed. R. Civ. P. 34 and "they are

80

therefore subject to party discovery." *Freyre v. Hillsborough Cnty. Sheriff's Off.*, No. 813CV02873T27TBM, 2016 WL 1029512, at *2 (M.D. Fla. Mar. 9, 2016), *vacated*, No. 813CV02873T27TBM, 2016 WL 4502463 (M.D. Fla. July 6, 2016) (citations omitted) (The Court later vacated the order as a part of the parties' settlement. *Freyre*, 2016 WL 4502463, at *1).

The Florida Attorney General argues that the *Freyre* was vacated and thus should be disregarded. [Dkt. 738-7 at 2]. The *Freyre* opinion is not binding precedent, and the fact that *Freyre* was vacated in connection with a settlement impacts the rights of the parties to that case. But nothing in the vacatur of that opinion requires this Court to blind itself to whatever persuasive effect flows from that Florida Federal Court's analysis. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above, the analysis by the Florida Federal Court is certainly consistent with (and to that extent further supports) the analysis here with regard to the Florida Attorney General having control with regard to documents of the state agencies at issue.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Florida is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Florida was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Florida Attorney General and Meta here were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is

guidance in precedent on the discovery issue at hand.

## VII.    GEORGIA

In opposition to the control issue, the Georgia Attorney General argues primarily the following factors: (1) the Georgia Attorney General must utilize public channels to compel an agency to produce document; (2) the Georgia Attorney General is a separate entity and independent from the Georgia agencies; and (3) the Georgia Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-8 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Georgia agencies are proscriptively barred from obtaining counsel other than the Georgia Attorney General, with limited exceptions; and (2) the Georgia Attorney General's purported required use of public channels to compel an agency to produce documents is limited for circumstance which require the records be produced for public inspection.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of Regents; Department of Behavioral Health and Developmental Disabilities; Department of Economic Development; Department of Education; Department of Family and Children Services; Department of Human Services; Department of Public Health; Governor's Office; and Office of the Child Advocate.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Georgia Attorney General does have legal control, for purposes of discovery, over the listed Georgia agencies.  While the Georgia Attorney General is a separate entity and while the Georgia Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Georgia Attorney General must statutorily act as the Georgia agencies' counsel.

Under Georgia's statutory scheme, the Georgia Attorney General has the duty to "represent the state in all civil actions tried in any court[.]"  Ga. Code § 45-15-3(6).  Additionally, the Georgia Attorney General's department "is vested with complete and exclusive authority and jurisdiction in all matters of law relating to the executive branch of the government and every department, office, institution, commission, committee, board, and other agency thereof.  Every department, office,

United States District Court
Northern District of California

institution, commission, committee, board, and other agency of the state government is prohibited from employing counsel in any manner whatsoever unless otherwise specifically authorized by law." Ga. Code § 45-15-34.

Indeed, the Georgia Attorney General confirmed that its office could represent all of the Georgia agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 9–10].  The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Georgia Department of Behavioral Health and Developmental Disabilities and the Georgia Department of Education.  [Dkt. 1031-4 at 17-101]. Neither of these state agencies are allowed to employ legal counsel other than the Georgia Attorney General absent circumstances not at issue here.  Ga. Code §§ 45-15-3, -14, -34.  Accordingly, it appears that under the statutory scheme each will be represented by the Georgia Attorney General in this matter for discovery.  Thus, because the Georgia Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Further, the Georgia Attorney General has taken the position that communications between the Georgia Attorney General and these state agencies would be covered by the attorney-client privilege, and that communications between the specific prosecution team in this case and the state agencies would be covered by the work product doctrine (but apparently not the attorney-client privilege).  [Dkt. 738-8 at 2].  To the extent the Georgia Attorney General has attempted to subdivide its own office between the prosecution team in this case and other divisions of the state Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not other sub-teams (such as the Consumer Protection Division which is the prosecuting team for this action), that argument is not supported by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g., People ex rel.*

83

1   *Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to

2   the client extends beyond the individual attorney and applies with equal force to the other attorneys

3   practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires

4   disqualification of all members of a law firm when any one of them practicing alone would be

5   disqualified because of a conflict of interest . . . .   The rule of imputed disqualification applies to

6   both private firms and public law firms such as a district attorney's office or the office of the state

7   public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d

8   at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we

9   should presume knowledge is imputed to all members of a tainted attorney's law firm.  However,

10   we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"   The court

11   recognizing presumption of imputed knowledge in the context of government attorneys, which

12   presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266

13   (because individual government lawyer at issue "should be screened from any direct or indirect

14   participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492

15   S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office

16   in which that attorney works is not disqualified as long as the disqualified attorney is appropriately

17   screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such

18   as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some

19   jurisdictions treat public legal service organizations like private law firms and impute shared

20   confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not

21   automatically impute disqualification, and shared confidences, to an entire public law office, those

22   courts recognize that ethical screening or other procedures are required out of recognition that actual

23   (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid

24   dissemination of attorney-client privileged communications within an entire public law

25   organization.  This review of case law demonstrates that no courts support the Georgia Attorney

26   General's argument that different individual lawyers in the Georgia Attorney General's office have

27   *ex ante* separable, discrete attorney-client relationships.

28        The Court rejects the Georgia Attorney General's attempt to simultaneously disclaim the

United States District Court
Northern District of California

84

existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Georgia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Georgia Attorney General is asserting that the attorney-client privilege applies to communications between the Georgia Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Georgia Attorney General from accessing the relevant documents of any of the state agencies at issue. The Georgia Attorney General's argument that the Georgia Attorney General must use public channels to obtain documents from state agencies is not a credible interpretation of the statute relied upon – there is no citation that a public records request is the only way for the Georgia Attorney General to get documents from state agencies. [Dkt. 738-8 at 2]. If the Georgia Attorney General were correct, then the Georgia Attorney General would have to submit an Open Records Act request even when representing a state agency, to get documents from its own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel, the Georgia Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Georgia Open Records Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). *Bowers v. Bd. of Regents of the Univ. Sys. of Georgia*, 378 S.E.2d 460, 460 (Ga. 1989). Further, there is no citation to any statutory or legal prohibition on the Georgia

85

United States District Court
Northern District of California

Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Georgia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Georgia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Georgia Attorney General argues that "various constitutionally created state officials whom Georgia residents separately elect and endow with distinct responsibilities" and that the Georgia Attorney General and the head of the Department of Education "are constitutional officers and separately elected in statewide elections," *see* dkt. 738-8 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether one entity (or the head of an entity) is under the day-to-day operational control of the other (such as a parent-wholly-owned-

subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established corporations), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that these "elected officials – including the [Georgia] Governor and the [Georgia Attorney General] – can have different interests and litigate against each other," is merely a restatement of the issue that there are two entities involved here and not determinative of that issue. *Id.* Arguing that "the [Georgia Attorney General] alone brought this action . . . outside the scope of any agency representation or direction from the [Georgia] Governor," confuses and conflates the "legal control" issue for discovery with "operational control" or "daily functional independence" and thus constitutes a legally erroneous argument. *Id.*

## VIII.   HAWAI'I

In opposition to the control issue, the Hawai'i Attorney General argues primarily the following factors: (1) the Hawai'i Attorney General is a separate entity and independent from the Hawai'i agencies; and (2) the Hawai'i Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-9 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

87

based primarily on the following factors: (1) the Hawai'i Attorney General must act as counsel for the Hawai'i agencies; and (2) Hawai'i has already confirmed that it will represent each of the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Budget and Finance; Department of Business, Economic Development and Tourism; Department of Commerce and Consumer Affairs; Department of Education; Department of Health; Department of Human Services; Governor; and State Council on Mental Health. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Hawai'i Attorney General does have legal control, for purposes of discovery, over the Hawai'i agencies in dispute. While the Hawai'i Attorney General is a separate entity and while the Hawai'i Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Hawai'i Attorney General must statutorily act as the Hawai'i agencies' counsel.

Under Hawai'i's statutory scheme, the Hawai'i Attorney General "shall administer and render state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct; represent the State in all civil actions in which the State is a party[.]" Haw. Rev. Stat. § 26-7. Additionally, the Hawai'i Attorney General shall "at all times when called upon, give advice and counsel to the heads of departments, district judges, and other public officers, in all matters connected with their public duties, and otherwise aid and assist them in every way requisite to enable them to perform their duties faithfully." Haw. Rev. Stat. § 28-4.

Indeed, the Hawai'i Attorney General confirmed that its office could represent all of the Hawai'i agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 9–10]. Indeed, the Hawai'i Attorney General will act as counsel for the Hawai'i agencies if the agencies receive a subpoena from Meta. [Dkt. 738-1 at 10–11]. Accordingly, it appears that under the statutory scheme each will be represented by the Hawai'i Attorney General in this matter for discovery, whether because of any future subpoenas or because the Court finds control for purposes of discovery. *See id.* Thus, because the Hawai'i Attorney General appears likely to be

involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Hawai'i Attorney General has taken the position that all communications between any division of the Hawai'i Attorney General and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-9 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Hawai'i Attorney General is asserting the attorney-client privilege applies to communications between the Hawai'i Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Hawai'i Attorney General from accessing the relevant documents of any of the state agencies at issue. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal

1    standards, the Court finds that control exists here.

2          The Hawai'i Attorney General's role as counsel for the agencies at issue inherently involves

3    obtaining necessary documents for effective representation in litigation.  In acting as counsel, the

4    Hawai'i Attorney General would necessarily have access to and thus control over the relevant

5    documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6

6    (finding state Attorney General has control over agency documents "based on his broad statutory

7    and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

8    right to obtain responsive documents from the state agencies referenced in the Complaint").  To the

9    extent the Hawai'i Attorney General argues that these agencies are "independent" from the state

10   Attorney General and are not supervised by the state Attorney General, *see* dkt. 738-9 at 2, that

11   argument misapprehends the "legal control" test for documents – the issue is not simply whether

12   one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

13   subsidiary relationship), and not simply whether the two entities are legally separate (such as two

14   different and separately incorporated entities), but rather whether there is a legal right to obtain the

15   documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require

16   the party to have actual managerial power over the foreign corporation, but rather that there be close

17   coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

18   client relationship between the state Attorney General and the state agencies (a relationship

19   mandated by state law) necessitates close coordination.  While operational control may be a factual

20   situation which demonstrates a legal right to obtain the documents, the absence of such "executive

21   or functional control" is not determinative for evaluating "control" for purposes of discovery.  By

22   definition, the "legal control" issue for discovery arises when there are two legally distinct or

23   separate entities – otherwise, if only one entity were involved, there would be no dispute that party

24   discovery covered that one entity.  As discussed above, courts have found "control" for purposes of

25   discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

26   having control over the documents of a parent corporation, or an individual government officer

27   having control over the documents of an entire agency. Thus, arguing that "the agencies identified

28   by Meta are distinct entities under Hawai'i law.  [The Hawai'i Attorney General] is one of a

United States District Court
Northern District of California

maximum of twenty principal departments within the Executive Branch" is simply re-stating the issue, and not determinative of the issue.  [Dkt. 738-9 at 2].  The Hawai'i Attorney General's argument that: "Each department is headed by a separate executive, and subject to the supervision of the governor" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of the head of each entity.  *Id.*

Further, the Hawai'i Attorney General's citation to and reliance on *Lobisch v. United States*, No. CV 20-00370 HG-KJM, 2021 WL 6497240 (D. Hawaii Aug. 19, 2021), is unavailing.  In *Lobisch*, the Plaintiff sued the United States Government and sought party discovery from every agency of the United States Government, including any branch of the military and any federal employee.  *Id.* at *1.  There, the Party seeking discovery made no showing of control and simply argued based on the plain language of Fed. R. Civ. P. 34.  *Id.* at 1–2.  The *Lobisch* Court rejected that Plaintiff's arguments as contrary to the mandates of Fed. R. Civ. P. 1 as well as contrary to the Federal Torts Claim Act (the substantive law underlying the lawsuit).  *Id.* at 2.  Because there was no attempt to show control in *Lobisch*, that opinion never discusses the issue and never analyzes the issue under *Citric Acid*.  Accordingly, the *Lobisch* decision is not determinative or even germane to the issue here.  Unlike in *Lobisch*, here there has been extensive argument over and (as detailed in this Order) extensive analysis of the control issue under the facts presented.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, Hawai'i is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Hawai'i was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

United States District Court
Northern District of California

the Hawai'i Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## IX.   IDAHO

In opposition to the control issue, the Idaho Attorney General argues primarily the following factors: (1) the Idaho Attorney General is a separate entity and independent from the Idaho agencies; (2) the Idaho Attorney General may demand records from other agencies; however, it may only do so pursuant to statute; and (3) the Idaho Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-10 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Idaho agencies are proscriptively barred from obtaining counsel other than the Idaho Attorney General, with limited exceptions.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Commerce Department; Education Board; Education Department; Governor's Office; and Health and Welfare Department.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Idaho Attorney General does not have legal control, for purposes of discovery, over the Idaho agencies in dispute.  While the Idaho Attorney General must act as the legal counsel for the Idaho agencies, this requirement does not override the statutory limitation that the Attorney General may only demand documents from these agencies if explicitly permitted by statute.  Since the present lawsuit was initiated under the Idaho Attorney General's independent law enforcement capacity and no relevant statute grants the Idaho Attorney General authority to demand documents from the Idaho agencies in question, the Court concludes that the Idaho Attorney General does not have legal control, for the purposes of discovery, over the Idaho agencies in dispute.

Under Idaho's statutory scheme, the Idaho Attorney General shall "perform all legal services for the state and to represent the state and all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all courts and before all administrative tribunals

United States District Court
Northern District of California

or bodies of any nature." Idaho Code § 67-1401(1). Additionally, the Idaho Attorney General is required to "advise all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all matters involving questions of law." Idaho Code § 67-1401(2). Furthermore, "no department, agency, office, officers, board, commission, institution or other state entity shall be represented by or obtain its legal advice from an attorney at law other than the attorney general," with certain exceptions. Idaho Code § 67-1406. One such exception potentially relevant includes "colleges and universities" which "may employ private counsel to advise them and represent them before courts of the *state of Idaho*." Idaho Code § 67-1406(2). However, the instant matter is not before the State of Idaho.

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies. *See* Dkt. 1031-5. None of these state agencies are allowed to employ legal counsel other than the Idaho Attorney General and thus by statute each must be represented by the Idaho Attorney General in this matter for discovery. This arrangement indicates strongly that the state Attorney General, in fulfilling its role as chief legal advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Idaho Attorney General has legal control, for the purposes of discovery, over the documents held by the Idaho agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *See Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Idaho is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that Idaho was able to reach a negotiated

United States District Court
Northern District of California

United States District Court
Northern District of California

1  resolution of the control dispute in that Multi-District Litigation, this Court is disappointed that Meta

2  and Idaho were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly

3  encouraged the Parties at multiple Discovery Management Conferences, they should make every

4  effort to work out discovery disputes through reasonable, good faith negotiations between able and

5  experienced counsel, particularly where, as here, there is guidance in precedent on the discovery

6  issue at hand.

7  **X.      ILLINOIS**

8         In  opposition  to  the  control  issue,  the  Illinois  Attorney  General  argues  primarily  the

9  following factors: (1) the Illinois Attorney General is a separate entity and independent from the

10  Illinois  agencies;  and  (2)  the  Illinois  Attorney  General  brought  the  lawsuit  under  its  own

11  independent law enforcement capacity.  [Dkt. 738-11 at 2].

12         In support of a finding of control with regard to these state agencies' documents, Meta argues

13  primarily that the Illinois Attorney General is required to represent Illinois agencies, pursuant to the

14  Illinois Constitution.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of

15  Education; Board of Higher Education; Department of Children and Family Services; Department

16  of Commerce and Economic Opportunity; Department of Human Services; Department of Public

17  Health; and Office of the Governor.  *Id.*

18  After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of

19  a finding that the Illinois Attorney General does have legal control, for purposes of discovery, over

20  the Illinois agencies in dispute.  While the Illinois Attorney General is a separate entity and while

21  the Illinois Attorney General does bring the instant action in its own independent authority, this does

22  not outweigh the requirement that the Illinois Attorney General is "the legal officer of the State."

23  Ill. Const. Art. V, § 15.  The Illinois Constitution has been interpreted to require that the Illinois

24  Attorney General represent state agencies.  *People ex rel. Sklodowski v. State*, 642 N.E.2d 1180,

25  1184 (Ill. 1994), *as modified on denial of reh'g* (Nov. 15, 1994).  Indeed, the Illinois Attorney

26  General admits that "the [Illinois Attorney General] has broad statutory and common law powers to

27  conduct litigation on behalf of State agencies[.]"  [Dkt. 738-11 at 2].

28         Indeed, the Illinois Attorney General confirmed that its office could represent all of the

Illinois agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 11–12].  Accordingly, it appears that under the Illinois Constitutional scheme each will likely be represented by the Illinois Attorney General in this matter for discovery, whether because of any future subpoenas or because the Court finds control for purposes of discovery.  *See Env't Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. 1977).  Thus, because the Illinois Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Illinois Attorney General has taken the position that any past or future communications between any the Illinois Attorney General and these state agencies, if they are responsive to Meta's discovery requests, would be covered by the attorney-client privilege.  [Dkt. 738-11 at 2].  Indeed, the Illinois Attorney General admis that "attorney-client relationship exists between a State agency and the Attorney General." *Id.* (quoting *Env't Prot. Agency*, 372 N.E.2d at 52).  "[T]o the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  The fact that the Illinois Attorney General is asserting the attorney-client privilege applies to communications between the Illinois Attorney General's office and the agencies at issue (and admitting that an attorney-client relationship exists, even as to past communications relevant to discovery in this case) further supports the conclusion of control here.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Illinois Attorney General from accessing the relevant documents of any of the state agencies at issue.  The Illinois Attorney General cites two statutes which allegedly restrict state agencies from providing "certain types of information to anyone, even other agencies." Dkt. 738-11 at 2 (citing 20 Ill. Comp. Stat. 2305/2.1(c); 410 Ill. Comp. Stat. 305/9(2)).  Those two statutes are not applicable to scope of discovery in this action: Section 2.1(c) relates to "[s]haring of information on reportable illnesses, health conditions, unusual disease or symptom clusters, or suspicious events between and among public health and law enforcement authorities[,]" and Section 9(2) relates to the confidentiality of

95

"[a]ll information and records held by a State agency, local health authority, or health oversight agency pertaining to HIV-related information[.]"  The Illinois Legislature knew how to specify restricting sharing of information between agencies and the Illinois Attorney General in these two specific instances, but failed to do so more generally for discovery (unlike, for example, the Delaware Legislature as discussed above), and this lack of a general prohibition supports a finding of control.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Illinois Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Illinois Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Illinois Attorney General argues that the Illinois Attorney General and the Illinois

96

Governor "are independently elected by the State's voters; they serve in different roles, enjoy unique rights and responsibilities, and have control over separate governmental functions," *see* dkt. 738-11 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "there is no law that gives the [Illinois Attorney General] control over their [the agencies'] executive functions" is simply re-stating the issue to be decided, and not determinative of the issue. *Id.* The Illinois Attorney General's argument that these are "independent state agencies" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of each entity.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

*(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Illinois is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Illinois was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Illinois Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XI.   INDIANA

In opposition to the control issue, the Indiana Attorney General argues primarily the following factors: (1) the Indiana Attorney General is a separate entity and independent from the Indiana agencies; (2) certain offices are entitled to employ counsel for litigation purposes without approval from the Indiana Attorney General; (3) the Indiana Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) the Indiana Attorney General is not seeking damages on behalf of the listed agencies. [Dkt. 738-12 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Indiana agencies are proscriptively barred from obtaining counsel other than the Indiana Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commission on Improving the Status of Children in Indiana; Department of Child Services; Department of Education; Department of Health; Family and Social Services Administration; Governor; Office of Management and Budget; and State Board of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Indiana Attorney General does have legal control, for purposes of discovery, over the listed Indiana agencies which are not subject to an exception of mandatory

representation. While the Indiana Attorney General is a separate entity and while the Indiana Attorney General does bring the instant action in its own independent authority and does not seek damages on behalf of the listed agencies, this does not outweigh the requirement that the Indiana Attorney General will act as the agencies' counsel. The statutory scheme in Indiana requires that "[t]he attorney general shall have charge of and direct the prosecution of all civil actions that are brought in the name of the state of Indiana or any state agency." Ind. Code § 4-6-3-2(a). "The [Indiana] Attorney General's authority to represent the State, *its agencies* and officers is nearly exclusive, and agencies may not employ any attorney without the written consent of the Attorney General." *Indiana State Highway Comm'n v. Morris*, 528 N.E.2d 468, 474 (Ind. 1988) (emphasis added).

Importantly, the Indiana Attorney General's arguments do not negate the fact that all of the Indiana agencies at issue here are barred by Indiana law from obtaining counsel other than the Indiana Attorney General: "No agency . . . shall have any right to name, appoint, employ, or hire any attorney or special or general counsel to represent it or perform any legal service in behalf of the agency and the state without the written consent of the attorney general." Ind. Code § 4-6-5-3(a). Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Commission on Improving the Status of Children in Indiana, the Indiana Department of Education, and the Indiana Department of Health. [Dkt. 1031-5 at 227–352]. None of these state agencies are allowed to employ legal counsel other than the Indiana Attorney General absent consent (and there is no indication of any such consent in the record) and thus by statute each must be represented by the Indiana Attorney General in this matter for discovery. *See* Ind. Code §§ 4-6-5-1, -2 (the Indiana Attorney General "shall have the sole right and power" to assign an attorney "to any agency of the state of Indiana to perform in behalf of such agency"). This arrangement indicates strongly that the Indiana Attorney General, in fulfilling its statutory role to as "nearly exclusive" legal representative of state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Indiana Attorney General has legal control, for

the purposes of discovery, over the documents held by the Indiana agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Relatedly, the Indiana Attorney General has taken the position that communications between the Indiana Attorney General and these state agencies would be covered by the attorney-client privilege if such communications are encompassed within the scope of discovery sought by Meta. [Dkt. 738-12 at 2]. Indeed, the Indiana Attorney General admis that "Indiana law has long cemented the idea that '[t]he relationship of attorney and client clearly applies to the [Indiana] Attorney General and the state agencies he represents, and the attorney-client privilege should protect communications exchanged in that relationship.'" *Id.* "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Indiana Attorney General is asserting the attorney-client privilege applies to communications between the Indiana Attorney General's office and the agencies at issue even as to past communications within the scope of relevant discovery in this case further supports the conclusion of control here.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Indiana Attorney General from accessing the documents of the state agencies at issue. The Indiana Attorney General argues control is somehow lacking because Indiana law contemplates that the Indiana Attorney General can issue civil investigative demands to state agencies. Dkt. 738-12 at 2 (citing Ind. Code §§ 4-6-3-1, -3 (regarding issuance of civil investigative demands to state agencies)). As Meta argues, however, the fact that there exists a statutory right for the Indiana Attorney General demonstrates that the Indiana Legislature expressly intended there to be a formal mechanism for sharing of documents between state agencies and the Indiana Attorney General. [Dkt. 738 at 3]. There is nothing in this statutory scheme which indicates that the procedure for issuing civil investigative demands to agencies is the exclusive manner by which the Indiana Attorney General can obtain documents from state agencies, and rather than implying that the statute prohibits or denigrates from a legal right to obtain documents from state agencies, the statutory scheme here

United States District Court
Northern District of California

indicates support for (and a legal mechanism for) information sharing between Indiana agencies and the Indiana Attorney General.

The Indiana Attorney General does not cite to any general statutory or legal prohibition on the Indiana Attorney General's representing the state agencies in this matter for purposes of discovery. The Indiana Attorney General cites to one entity, the Indiana Economic Development Corporation, which is defined under state law as an "independent instrumentality" and not a state agency, and which has an express statutory right to retain its own legal counsel. Dkt. 738-12 at 2 (citing Ind. Code §§ 5-28-3-2, -5-3). Meta expressly disclaims seeking "party discovery" from the Indiana Economic Development Corporation and expressly commits to "treat the Economic Development Corporation as a non-party for purposes of discovery." [Dkt. 738-12 at at 3 n.1].

The Indiana Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Indiana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Indiana Attorney General argues that the Indiana Attorney General "is a separately elected and statutorily created office" from the Indiana Governor, *see* dkt. 738-12 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual

United States District Court
Northern District of California

United States District Court
Northern District of California

situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Indiana Attorney General "does not exert generalized control over the agencies or their documents," dkt. 738-12 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Indiana Attorney General's argument that these are "agencies are not subject to management by [the Indiana Attorney General], are not directed by [the Indiana Attorney General]," erroneously conflates the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery. *Id.*

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Indiana is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Indiana was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Indiana Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XII.   KANSAS

In opposition to the control issue, the Kansas Attorney General argues primarily the following factors: (1) the Kansas Attorney General is a separate entity and independent from the Kansas agencies; (2) Kansas agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (3) the Kansas Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-13 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Kansas Attorney General must appear for the state and control the state's prosecution or defense. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Regents; Department for Aging and Disability Services; Department for Children and Families; Department of Administration; Department of Commerce; Department of Education; Department of Health and Environment; and Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Kansas Attorney General has legal control, for purposes of discovery, over the listed Kansas agencies. First, the statutory scheme in Kansas requires that "[t]he attorney general *shall* appear for the state, and prosecute and defend any and all actions and proceedings, civil or criminal, . . . in all federal courts, in which the state shall be *interested* or a party, and *shall*, when so appearing, control the state's prosecution or defense." Kan. Stat. § 75-702(a) (emphasis added). It cannot be seriously disputed that the State of Kansas is interested when one or more of its state agencies are the target of discovery in a federal action. Second, the Kansas Attorney General is the chief legal officer for the state of Kansas. *DeBerry v. Kansas State Bd. of Acct.*, 196 P.3d 958, 958 (Kan. Ct. App. 2008) ("Acting as counsel for the Board, which is the administrative agency in charge of regulating the practice of certified public accountancy in the state of Kansas, is entirely consistent with the attorney general's role as chief legal officer for the State. Although the legislature has identified various situations in which the attorney general is *required* to provide representation, we find no Kansas law that precludes the attorney general from representing the Board under the particular circumstances presented in this case.") (emphasis in original). Further, Kansas's statutory scheme requires that "[t]he attorney general *shall* . . . prosecute or *defend* for the state *all actions*, civil or criminal, relating to any matter *connected with their departments*." Kan. Stat. § 75-703 (emphasis added).

Importantly, the Kansas Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Kansas agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, the Kansas Attorney General confirmed that its office would definitely represent all of the Kansas agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Kansas Attorney General in this matter for discovery. *See* Kan. Stat. §§ 75-702, -703. Curiously, the Kansas Attorney General takes the position that it would not represent the listed agencies. [Dkt. 738-1 at 13]. However, on the record before the Court, this is an error of law because neither of these agencies are exempt from the express prohibition on retaining different

United States District Court
Northern District of California

1    counsel.  Thus, because the Kansas Attorney General will be involved in representing these state

2    agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

3         Relatedly, the Kansas Attorney General has taken the position that communications between

4    the Kansas Attorney General and these state agencies would be covered by the attorney-client

5    privilege if such communications are encompassed within the scope of discovery sought by Meta.

6    [Dkt. 738-13 at 2].  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7    legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

8    that on one hand the [State] Attorney General represents these individuals, but that for discovery

9    purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

10   2014 WL 1796661, at *2.  Just as the Court in *Perez* rejected the inconsistent approach to privilege

11   there, here the Kansas Attorney General argues that "the Attorney General does not ***currently***

12   represent any of the identified agencies" while at the same time arguing that "***if*** another state agency

13   requests legal representation or legal advice from the [Kansas] Attorney General's Office, or

14   receives a discovery request in this litigation, information related to those communications with that

15   agency ***are privileged***, under privilege doctrines including attorney-client privilege."  Dkt 738-13 at

16   2 (emphasis added).  The Kansas Attorney General's attempt to preserve the ability to assert the

17   attorney-client privilege between the Kansas Attorney General's office and the agencies at issue

18   further supports the conclusion of control here.  Here, it is illusory to argue "if" the Kansas Attorney

19   General would represent the state agencies – the Kansas Attorney General has already confirmed

20   that their office will do so for discovery in this matter.  [Dkt. 738-1 at 13].  Assertion of the attorney-

21   client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*,

22   610 F.3d at 1156.

23         Further, there is no statutory, legal, or administrative rule cited which prohibits the Kansas

24   Attorney General from accessing the documents of the state agencies at issue for purposes of

25   discovery.  The Kansas Attorney General's argument that the Kansas Attorney General must use

26   either the Kansas Open Records Act, Kan. Stat. § 45-215 *et seq.*, or a subpoena to obtain documents

27   from state agencies who are their client is not a credible interpretation of the Kansas Open Records

28   Act – there is no citation that a public records request is the only way for the Kansas Attorney

United States District Court
Northern District of California

1  General to get documents from state agencies they are representing in litigation.  [Dkt. 738-8 at 2].

2  If the Kansas Attorney General were correct, then the Kansas Attorney General would have to

3  submit an Open Records Act request even when representing a state agency, to get documents from

4  its own client – which is not merely impractical and not believable but also contrary to the principles

5  of effective legal representation.  If the Kansas Attorney General's supposition that, every time the

6  Kansas Attorney General seeks documents from state agencies, Open Records Act requests would

7  be routine and necessary, then the logical conclusion is that Open Records Act would be a routinely

8  used legal right to access those documents and records of the agency subject to the Act.  At least

9  one court has found that a state "public records" Freedom of Information Act constitutes a legal

10  right to access documents from an agency for purposes of "control" under Rule 34.  *See Flagg*, 252

11  F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel

12  are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the

13  least, to conclude that the [named defendant] City lacks a legal right to obtain these records as

14  necessary to discharge its statutory duty of disclosure.").  As counsel, the Kansas Attorney General

15  will have the normal type of direct access to the necessary documents from its own clients, without

16  resorting to public channels, ensuring efficient and comprehensive legal support for the agencies

17  involved.  The Kansas Open Records Act is not an impediment to that access, because that Act only

18  applies to records which are to be produced for public inspection (and not for purposes of litigation

19  such as this case in which there is a Protective Order limiting public availability of confidential

20  documents). Kan. Stat. § 45-220(a).  Further, the Kansas Open Records Act nowhere states that this

21  statute is the only means by which the Kansas Attorney General can obtain records from other state

22  agencies – the statute merely sets up a permissive system for public inspection, not a restriction or

23  limitation on access.  Indeed, the Kansas Attorney General has cited no precedent requiring the

24  Kansas Attorney General to use either an Open Records Act request or a subpoena to obtain

25  documents from state agencies represented in litigation by the Kansas Attorney General.  The Court

26  finds this argument to be wholly unpersuasive.  Finally, the argument that there is no statute or law

27  specifically authorizing the Kansas Attorney General "unfettered access to or the right to compel

28  document production of other agencies' documents" is legally incorrect.  Control, for purposes of

Rule 34, does not require showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*, 2023 WL 4083934, at \*5 ("Despite the State's characterization of the issue, we need not decide whether the Illinois Attorney General has "unfettered access to all state agencies' records under all circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less."). Further, the state Attorney General's argument implicitly assumes an overly restrictive view of the control test for documents under Rule 34. To the contrary, courts have recognized that control for purposes of document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at \*1; *Evans*, 2010 WL 1136216, at \*1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at \*3–4.

Additionally, the Kansas Attorney General does not cite any statutory or legal prohibition on the Kansas Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kansas Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Kansas Attorney General would necessarily have access to and thus control over the relevant

documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Kansas Attorney General argues that the Kansas Attorney General "separate and distinct elected entity with separate duties and responsibilities as delineated in the Kansas Constitution and Kansas law," *see* dkt. 738-13 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the Kansas Attorney General "is not suing on behalf of or representing any state agency in this litigation; rather, he brings this action under independent statutory authority," dkt. 738-13 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Kansas Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is

108

insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kansas Attorney General cites and relies upon *Amex*, 2011 WL 13073683, and *Warner Chilcott Holdings*, 2007 WL 9813287, at *4–5. [Dkt. 78-13 at 2]. As discussed above (and incorporated herein), the Court finds neither of these cases to be persuasive (and neither is binding). Both cases focus on the issue of executive control and the structure of the executive branch of the local state government, and as discussed above, the Ninth Circuit's standard for control is not limited to or determined by whether there is "operational control" of one entity by another in day-to-day functions. *Citric Acid*, 191 F.3d at 1107–08 (explaining that control over local unions was not found in *International Union* even though the national union could theoretically dissolve and take over the operations and hence the documents of the local unions).

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Kansas is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kansas was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kansas Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XIII. KENTUCKY

In opposition to the control issue, the Kentucky Attorney General argues primarily the

United States District Court
Northern District of California

following factors: (1) the Kentucky Attorney General is a separate entity and independent from the Kentucky agencies; (2) only two agencies, which are not on Meta's listed agencies, allow the Kentucky Attorney General to have access to material evidence and information; (3) Kentucky agencies have their own staffing and capacity to independently initiate and participate in litigation and retain counsel as they see fit; and (4) the Kentucky Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-14 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily the Kentucky Attorney General must act as chief legal officer tasked with attending to the legal business of Kentucky state agencies.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of Education, Cabinet for Health and Family Services, Department for Behavioral Health, Developmental and Intellectual Disabilities, Department for Business Development, Department for Public Health, Department of Education, Finance and Administration Cabinet, Governor, and Office of State Budget Director.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Kentucky Attorney General has legal control, for purposes of discovery, over the listed Kentucky agencies. First, the Kentucky "Attorney General is the chief law officer of the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political subdivisions, and the legal adviser of all state officers, departments, commissions, and agencies[.]" Ky. Rev. Stat. § 15.020(1).  Second, the statutory scheme in Kentucky requires that "the Attorney General **shall** . . . **enter an appearance in all cases**, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state, **and attend to all litigation** and legal business in or out of the state required of the office by law, or in which the Commonwealth has an interest, **and any litigation** or legal business that **any** state officer, department, commission, or **agency may have** in connection with, or growing out of, his, her, or **its official duties**[.]"  Ky. Rev. Stat. § 15.020(3) (emphasis added).

The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies.  *See* Dkt. 1031-5.  Indeed, the Kentucky Attorney General confirmed that its office could

United States District Court
Northern District of California

United States District Court
Northern District of California

represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 13–14].  Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Kentucky Attorney General in this matter for discovery.  *See* Ky. Rev. Stat. § 15.020(1).  Thus, because the Kentucky Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

The Kentucky Attorney General relies on statutory authority for Kentucky agencies to hire their own counsel to demonstrate that the Kentucky Attorney General may have no role in representing the agencies here and thus would not have control.  Dkt. 738-14 at 2 (citing Ky. Rev. Stat. § 12.210).  However, the Kentucky Legislature made clear that this statute does not denigrate from Section 15.020 quoted above which requires that the Kentucky Attorney General "shall" appear in any litigation that any agency may have in connection with its official duties.  *See* Ky. Rev. Stat. § 12.230 ("KRS 15.020 shall remain in full force and effect, except to the extent the same is in conflict with KRS 12.200 to 12.220[.]").  Further, the Kentucky statutory scheme continues to recognize that "[t]he [Kentucky] Governor or any department ***may require the advice or services*** of the Attorney General and the assistant attorneys general in matters relating to the duties or functions of ***any such office or department***."  *Id.* (emphasis added).

Further, there is no statutory, legal, or administrative rule cited which prohibits the Kentucky Attorney General from accessing the documents of the state agencies at issue for purposes of discovery.  To the contrary, the Kentucky Attorney General admits that state law requires that "***[a]ll departments, agencies***, officers, and employees ***of the Commonwealth shall fully cooperate with the [Kentucky] Attorney General*** in carrying out the functions of [Kentucky consumer protection laws]."  Ky. Rev. Stat. § 367.160(1) (emphasis added).  This statutory requirement affords the Kentucky Attorney General the legal right to obtain documents from state agencies when enforcing state consumer protection laws, thus satisfying the *Citric Acid* test for control here.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services

United States District Court
Northern District of California

provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kentucky Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Kentucky Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Kentucky Attorney General argues that the "Kentucky agencies at issue . . . are distinct and separate entities," *see* dkt. 738-14 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law)

United States District Court
Northern District of California

necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. *See, e.g.*, *Sublett v. Henson*, No. 5:16-CV-00184-TBR, 2018 WL 3939333, at *3–6 (W.D. Ky. Aug. 16, 2018) (rejecting objections of named defendants, officers and officials of state prison, to document requests, and finding warden has control over documents of the Kentucky Department of Corrections). Thus, arguing that "[t]he Kentucky Attorney General and [Kentucky] Governor are separately elected constitutional officers of the Commonwealth . . . [and] the other agencies named by Meta are headed by individuals appointed by the Governor," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Kentucky Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kentucky Attorney General cites several cases in which the Kentucky Attorney General has been "in direct legal conflict with these agencies." [Dkt. 738-14 at 2 n.1]. This argument is merely another way of restating the "operational independence" argument rejected argument above. The fact that, in other cases involving different issues, the Kentucky Attorney General has been adverse to state agencies is not determinative of whether there is control for purposes of the documents sought in discovery in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 356–57. Just as a joint defense group in a multi-defendant litigation may include companies which, in other venues, are adverse litigants, the law understands that entities may be adverse in one forum and still yet may have aligned legal interests in another.

Finally, the Court has recognized that the issue of control of state agency documents, when

113

a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Id.* at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Kentucky is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kentucky was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kentucky Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XIV.  LOUISIANA

In opposition to the control issue, the Louisiana Attorney General argues primarily the following factors: (1) the Louisiana Attorney General is a separate entity and independent from the Louisiana agencies; and (2) most Louisiana agencies have their own general counsel or contract with outside counsel to handle their other legal needs. [Dkt. 738-15 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Louisiana Attorney General acts as the chief legal officer of the state and is required by statute to represent state agencies in all litigation involving tort claims. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Children and Family Services, Department of Education, Department of Health, Department of Economic Development, Office of Planning and Budget, and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Louisiana Attorney General does have legal control, for purposes of

United States District Court
Northern District of California

1   discovery, over the listed Louisiana agencies which are not subject to an exception of mandatory

2   representation.  While the Louisiana Attorney General is a separate entity and while the Louisiana

3   Attorney General does bring the instant action in its own independent authority, this does not

4   outweigh the requirement that the Louisiana Attorney General will act as the agencies' counsel.  The

5   statutory scheme in Louisiana requires that "[t]he attorney general **shall** represent the state and **all**

6   **departments and agencies** of state government in **all litigation** arising out of or involving **tort**[.]"

7   La. Stat. § 49:257(A) (emphasis added).  "[C]onsumer protection claims sound in tort[.]"  *Zodiac*

8   *21, Inc. v. Oyo Hotels, Inc.*, No. CV 20-63-SDD-RLB, 2020 WL 6479160, at *6 n.56 (M.D. La.

9   Nov. 3, 2020) (analyzing claim under Louisiana Unfair Trade Practice and Consumer Law); *accord*

10  *Kreger v. Gen. Steel Corp.*, No. CIV.A. 07-575, 2010 WL 2902773, at *12 (E.D. La. July 19, 2010)

11  ("class members' consumer protection claims . . . sound in tort).  Indeed, the Louisiana Attorney

12  General admits here that "the Louisiana Attorney General does represent state agencies in specific

13  circumstances, such as litigation arising out of or involving tort[.]"  [Dkt. 738-15 at 2].

14      Further, the Court notes that the State Attorneys General have filed an Administrative

15  Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

16  to various state agencies, including the Louisiana Department of Education and the Louisiana

17  Department of Health.  [Dkt. 1031-5 at 1070–1153].  The Louisiana Attorney General is required

18  by statute to represent each of these agencies in this matter for discovery.  *See* La. Stat. § 49:257(A).

19  This arrangement indicates strongly that the Louisiana Attorney General, in fulfilling its state

20  constitutional role as "chief legal officer of the state," La. Const. art. IV, § 8, would necessarily and

21  inherently have access to and control over the necessary documents for effective legal representation

22  of these state agencies.  Therefore, the Court concludes that the Louisiana Attorney General has

23  legal control, for the purposes of discovery, over the documents held by the Louisiana agencies

24  listed by Meta, including in particular the agencies recently listed in the intent to issue subpoenas.

25      The Louisiana Attorney General has taken the position that, because that office "does not

26  represent agencies in this action," communications between the Louisiana Attorney General and

27  these state agencies "are **generally** not protected under the attorney-client privilege."  Dkt. 738-15

28  at 2 (emphasis added).  The Louisiana Attorney General's use of the word "generally" reveals the

1    intention: the Louisiana Attorney General is attempting to preserve the ability to assert the attorney-

2    client privilege later when faced with formal discovery (or this Order).  It is illusory to argue the

3    Louisiana Attorney General does not presently represent the state agencies – the Louisiana Attorney

4    General has already confirmed that their office could do so for discovery in this matter.  [Dkt. 738-

5    1 at 14–15].  And as discussed above, the Louisiana Legislature requires the Louisiana Attorney

6    General to represent agencies in cases such as this which sound in tort.  "[T]o to the extent that [the

7    State] asserts an attorney-client privilege with these legislators, it does so solely in their official

8    capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

9    General represents these individuals, but that for discovery purposes the [Plaintiff] United States

10   must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  Just as the

11   court in *Perez* rejected the inconsistent approach to privilege there, here the Court rejects the

12   Louisiana Attorney General's apparent intention to argue now (in opposition to this motion) that

13   "generally" the privilege does not apply, while plainly relying on the word "generally" to preserve

14   the ability to assert the privilege later.  The Louisiana Attorney General's attempt to preserve the

15   ability to assert the attorney-client privilege between the Louisiana Attorney General's office and

16   the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-client

17   privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610

18   F.3d at 1156.

19          Further, there is no statutory, legal, or administrative rule cited which prohibits the Louisiana

20   Attorney General from accessing the documents of the state agencies at issue.  [Dkt. 738-15 at 2].

21   Because the Louisiana Attorney General is required to serve as counsel for the Louisiana agencies

22   in litigation arising out of or involving tort, the Court is not persuaded by the argument that "most

23   state agencies have their own general counsel or contract with outside counsel to handle their ***other***

24   legal needs."  *Id.* (emphasis added).  The instant case falls outside the scope of "their other legal

25   needs" and therefore such authority by the agencies in "other" areas of law is legally irrelevant here.

26   Similarly, the Louisiana Attorney General does not cite to any general statutory or legal prohibition

27   on the Louisiana Attorney General's representing the state agencies in this matter for purposes of

28   discovery.

1   The Louisiana Attorney General's role as counsel for the agencies at issue inherently

2   involves obtaining necessary documents for effective representation in litigation.   In acting as

3   counsel, the Louisiana Attorney General would necessarily have access to and thus control over the

4   relevant documents needed to respond to discovery requests.   *See Monsanto*, 2023 WL 4083934, at

5   *5–6 (finding state Attorney General has control over agency documents "based on his broad

6   statutory and common law powers to control and manage legal affairs on behalf of state agencies,

7   has a legal right to obtain responsive documents from the state agencies referenced in the

8   Complaint").   To the extent the Louisiana Attorney General argues that the Louisiana Attorney

9   General "is an independently elected constitutional officer" from the Louisiana Governor, *see* dkt.

10  738-15 at 2, that argument misapprehends the "legal control" test for documents – the issue is not

11  simply whether one entity is under the day-to-day operational control of the other (such as a parent-

12  wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

13  (such as two different and separately incorporated entities), but rather whether there is a legal right

14  to obtain the documents as explained by *Citric Acid*.   "'The control analysis for Rule 34 purposes

15  does not require the party to have actual managerial power over the foreign corporation, but rather

16  that there be close coordination between them.'"   *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

17  Here, the attorney-client relationship between the state Attorney General and the state agencies (a

18  relationship mandated by state law) necessitates close coordination.   While operational control may

19  be a factual situation which demonstrates a legal right to obtain the documents, the absence of such

20  "executive or functional control" is not determinative for evaluating "control" for purposes of

21  discovery.   By definition, the "legal control" issue for discovery arises when there are two legally

22  distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute

23  that party discovery covered that one entity.   As discussed above, courts have found "control" for

24  purposes of discovery where a party is clearly not in managerial control over the third-party, such

25  as a subsidiary having control over the documents of a parent corporation, or an individual

26  government officer having control over the documents of an entire agency.   Thus, arguing that the

27  Louisiana Attorney General "is a separate department under the executive branch," dkt. 738-15 at

28  2, is simply re-stating the issue to be decided, and not determinative of the issue.   The Louisiana

United States District Court
Northern District of California

Attorney General's argument that these agencies "are legally distinct entities," erroneously conflates the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery. *Id.*

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

**XV.   MAINE**

In opposition to the control issue, the Maine Attorney General argues primarily the following factors: (1) the Maine Attorney General is a separate entity and independent from the Maine agencies; (2) the Maine Attorney General brought the lawsuit under its own independent law enforcement capacity; and (3) that the statutes which require the Maine Attorney General to represent Maine agencies does not afford the Maine Attorney General control or access to the Maine agencies' documents. [Dkt. 738-16 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Maine Attorney General is the chief law officer of the state and that the Maine Attorney General must appear for all Maine agencies in all civil actions

in which the state is a party; (2) Maine agencies are proscriptively barred from obtaining counsel other than the Maine Attorney General without consent from the Maine Attorney General; and (3) the Maine Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Department of Economic & Community Development, Department of Education, Department of Health & Human Services, Division of Administration, and Governor's Office.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Maine Attorney General does have legal control, for purposes of discovery, over the Maine agencies in dispute.  The Maine Attorney General admits that the Maine Attorney General is "the chief law officer of the State."  Dkt. 738-16 at 2 (quoting *Lund v. Pratt*, 308 A.2d 554, 558 (Me. 1973). The statutory scheme in Maine requires that "[t]he Attorney General or a deputy, assistant or staff attorney *shall appear* for the State . . . and agencies of the State in *all civil actions* and proceedings in which the State is a party or interested . . . in all the courts of the State and in those actions and proceedings before any other tribunal when requested by the Governor or by the Legislature or either House of the Legislature. All such actions and proceedings *must* be prosecuted or defended by the Attorney General or under the Attorney General's direction."  Me. Rev. Stat. tit. 5, § 191(3) (emphasis added).

Importantly, the Maine Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Maine agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent.  [Dkt. 738-13 at 2].  Under Maine's statutory scheme, "*[a]ll legal services* required by those officers, boards and commissions in matters relating to their official duties *must be rendered by the Attorney General* or under the Attorney General's direction. The officers or *agencies of the State may not act at the expense of the State as counsel, nor employ private counsel* except upon prior written approval of the Attorney General."  Me. Rev. Stat. tit. 5, § 191(3)(B) (emphasis added).  Here, no such consent has been proffered or even predicted.

The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state

119

agencies, including the Maine the Maine Department of Education and the Maine Department of Health & Human Services. [Dkt. 1031-4 at 550–633]. Significantly, the Maine Attorney General has confirmed that its office will definitely represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 15]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Maine Attorney General in this matter for discovery. *See* Me. Rev. Stat. tit. 5, § 191(3). Thus, because the Maine Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Maine Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The absence of a general statute that authorizes the Maine Attorney General to access all Maine agencies' documents does not, by itself, mandate a conclusion that the Maine Attorney General lacks control, for the purposes of discovery, of the documents of the listed Maine agencies. The Maine Attorney General's argument that the absence of a statute denying "control of agency documents cannot equate to a conclusion that he [the Maine Attorney General] does have such control" misconstrues the legal control test – the absence or existence of a statute is not by itself "equating to a conclusion" or outcome determinative. To the extent a statute exists or is lacking is, however, a factor for the Court to consider, along with the other factors discussed herein.

With regard to statutory authorization to access documents, the situation in Maine is not as simplistic as the Maine Attorney General posits. First, the Maine Attorney General admits that agencies are sometimes expressly required by local law to provide records to the Attorney General. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 9-B, § 226(2)). Indeed, the cited statute requires the Maine Superintendent of Financial Institutions to disclose information upon written request by the Maine Attorney General. *See* Me. Rev. Stat. tit. 9-B, § 226(2). The Maine Attorney General's argument that "[c]ertain documents maintained by these agencies are confidential by statute" incorrectly equates "confidentiality" with a restriction on the Attorney General's right to access these documents as counsel for the agencies at issue. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 22, § 4008)). First, this cited statute relates to the Maine Department of Health and Human Services,

and thus is inapplicable to any of the other state agencies at issue.  *See* Me. Rev. Stat. tit. 22, § 1-A. Second, the cited statute creates confidentiality restrictions preventing public disclosure of documents containing a child's personally identifying information in connection child protective activities and when a child is in the custody or care of that department.  Me. Rev. Stat. Title 22, § 4008(1).  Finally, and contrary to the Maine Attorney General's argument, the cited statute specifically states that these records "are available" to "legal counsel for the department" and thus the cited statute actually provides the Maine Attorney General an explicit legal right to obtain and access these documents of the Maine Department of Health and Human Services (one of the agencies at issue here) when acting as counsel for that agency.  The Court thus finds that Title 22, § 4008(1) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of that state agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Maine Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Maine Attorney General would necessarily have access to and thus control over the

121

relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

To the extent the Maine Attorney General argues that the Maine Attorney General "has a unique role in Maine government, distinct from the executive branch," *see* dkt. 738-16  at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  While the Maine Attorney General is a separate entity and brought the instant action in the exercise of "independent authority," dkt. 738-16 at 2, that fact alone does not outweigh the implications flowing from the fact that the Maine Attorney General will act as the agencies' counsel.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that "the agencies that Meta has identified are administered by the Governor or officials she appoints.  The autonomy of the

United States District Court
Northern District of California

[Maine] Attorney General from these officials and agencies is well-settled," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Maine Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Maine Attorney General's argument that "[w]hen acting as counsel to an agency, he [the Maine Attorney General] has no more legal control of client documents than Meta's lawyers have of Meta's documents," is a variation on the argument rejected above (such as in the discussion of this issue with regard to California) that lawyers are somehow helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery.  *Id.*  Contrary to the Maine Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients.  The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients.  As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents.  Here, where the law requires the state Attorney General to represent the agencies at issue (and where the state Attorney General has confirmed that representation in this matter), there is no basis to avoid those obligations and their attendant legal rights.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the

opposing party there.  *Id.* at 356 n.5.  In that case, Maine is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Maine was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Maine Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XVI.  MARYLAND

In opposition to the control issue, the Maryland Attorney General argues primarily the following factors: (1) the Maryland Attorney General is a separate entity and independent from the Maryland agencies; (2) the Maryland Attorney General brought the lawsuit under its own independent law enforcement capacity; and (3) the Maryland Attorney General would have to utilize public channels in order to obtain documents from the Maryland agencies, which does not amount to control over the Maryland agencies' documents.  [Dkt. 738-17 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Maryland agencies are proscriptively barred from obtaining counsel other than the Maryland Attorney General without Maryland Attorney General approval – with few exceptions not relevant to the listed Maryland agencies.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Center for School Safety, Department of Budget and Management, Department of Commerce, Department of Health, Department of Human Services, Governor's Office, Higher Education Commission, and State Department of Education.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Maryland Attorney General has legal control, for purposes of discovery, over the Maryland agencies in dispute.  While the Maryland Attorney General is a separate entity and while the Maryland Attorney General does bring the instant action exercising its own

independent authority, this does not outweigh the fact that the Maryland Attorney General will act as the agencies' counsel.  First, the Maryland "Attorney General has general charge of the legal business of the State." Md. Code, State Gov't § 6-106(a).  Second, the statutory scheme in Maryland requires that "[t]he Attorney General is the legal adviser of and ***shall*** represent and otherwise perform ***all of the legal work*** for each officer and ***unit of the State government***."  Md. Code, State Gov't § 6-106(b) (emphasis added).  Specific Maryland statutory schemes for agencies echo and reinforce that the Maryland Attorney General is the legal representative for each of those agencies, including agencies at issue here.  *See e.g.*, Md. Code, Health-Gen. § 2-107 ("The Attorney General is legal adviser to the Department [of Health].");  Md. Code, Econ. Dev. § 2-116 (Department of Commerce);  Md. Code, Human Serv. § 2-208 (Department of Human Services).  The Maryland Constitution makes clear that the Governor is also to be represented by the Maryland Attorney General.  Md. Const. art. 5, § 3(d) ("The Governor may not employ additional counsel [other than the Maryland Attorney General], in any case whatever, unless authorized by the General Assembly.").

Importantly, the Maryland Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Maryland agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2].  Agencies in Maryland may not employ other counsel without the Maryland Attorney General's approval, and there is no such approval in the record.  Md. Code, State Gov't § 6-106(c).  The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Maryland Center for School Safety and the Maryland Department of Human Services.  [Dkt. 1031-4 at 634–717].  Neither of these state agencies are allowed to employ legal counsel other than the Maryland Attorney General absent consent and thus by statute each will likely be represented by the Maryland Attorney General in this matter for discovery.  *See* Md. Code, State Gov't. § 6-106(c).  This arrangement indicates strongly that the state Attorney General, in fulfilling its role as the legal adviser of each unit of the State government, would necessarily and inherently have access to and control over the necessary documents for effective legal representation

of these state agencies.  Therefore, the Court concludes that the Maryland Attorney General has legal control, for the purposes of discovery, over the documents held by the Maryland agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Indeed, the Maryland Attorney General confirmed that its office could represent all of the Maryland agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 15–16].  Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Maryland Attorney General in this matter for discovery.  *See* Md. Code, State Gov't. § 6-106.  Thus, because the Maryland Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Maryland Attorney General has taken the position that communications between the Maryland Attorney General and these state agencies would be covered by the attorney-client privilege if such agencies are represented by the Maryland Attorney General.  [Dkt. 738-17 at 2].  To the extent that the Maryland Attorney General has attempted to subdivide its own office between the enforcement team in this case and other attorneys within the Office of the State Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only to some parts of the State Attorney General's office but not to other teams, that argument is not supported by citation to law and is contrary to the weight of legal authority.  *Id.* at 2 n.2.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office

126

or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support the Maryland Attorney General's argument that different individual lawyers in the Maryland Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Maryland Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Maryland Attorney General's Office and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

United States District Court
Northern District of California

1   that on one hand the [State] Attorney General represents these individuals, but that for discovery

2   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

3   2014 WL 1796661, at *2.   To the extent the Maryland Attorney General is asserting that the

4   attorney-client privilege would apply to communications between the Maryland Attorney General's

5   office and the agencies at issue, that further supports the conclusion of control here.   Assertion of

6   the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client

7   relationship. *See Graf*, 610 F.3d at 1156.   Just as the *Perez* Court rejected the inconsistent approach

8   to privilege there, here the Maryland Attorney General argues that "[t]he [Maryland Attorney

9   General] attorneys that are counsel to independent state agencies are distinct from the [Maryland

10  Attorney General] attorneys who are working on the instant matter.   The [Maryland Attorney

11  General] attorneys comprising the enforcement team do not have an attorney-client relationship with

12  any independent state agencies." [Dkt 738-18 at 2 n.2].   The Maryland Attorney General's attempt

13  to preserve the ability to assert the attorney-client privilege between the Maryland Attorney

14  General's office and the agencies at issue further supports the conclusion of control.   It is illusory

15  to argue that individual attorneys within the Maryland Attorney General's office have their own

16  separate attorney-client relationships with the state agencies.   The Maryland Attorney General has

17  already confirmed that their office could do so for discovery in this matter.   [Dkt. 738-1 at 13].

18  Assertion of the attorney client privilege requires, as a prerequisite, the existence of an attorney-

19  client relationship and here the individual attorneys within the Maryland Attorney General's office

20  are not treated like solo practitioners.

21          Further, there is no statutory, legal, or administrative rule cited which prohibits the Maryland

22  Attorney General from accessing the documents of the state agencies at issue for purposes of

23  discovery.   The Maryland Attorney General's argument that the Maryland Attorney General must

24  use either the Maryland Public Information Act, Md. Code, Gen. Prov. §§ 4-101 through 4-601, or

25  a subpoena to obtain documents from state agencies who are their client is not a credible

26  interpretation of the Maryland Public Information Act – there is no citation that a public records

27  request is the only way for the Maryland Attorney General to get documents from state agencies

28  they are representing in litigation. [Dkt. 738-8 at 2]. If the Maryland Attorney General were correct,

then the Maryland Attorney General would have to submit a Public Information Act request every time they represent a state agency, to get documents from its own client - which is not merely impractical and not believable but also contrary to the principles of effective legal representation. As counsel, the Maryland Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved.  The Maryland Public Information Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents).  Md. Code, Gen. Prov. § 4-103.  Further, the Maryland Public Information Act nowhere states that this statute is the only means by which the Maryland Attorney General can obtain records from other state agencies – the statute merely sets up a permissive system for public inspection, not a restriction or limitation on access.  Indeed, the Maryland Attorney General has cited no precedent requiring the Maryland Attorney General to use either a Public Information Act request or a subpoena to obtain documents from state agencies represented in litigation by the Maryland Attorney General.  The Court finds this argument to be wholly unpersuasive.  Finally, the argument that there is no statute specifically authorizing the Maryland Attorney General to obtain documents from state agencies assumes an overly restrictive view of the control test for documents.  [Dkt. 738-17 at 2].  To the contrary, courts have recognized that control for purposes of document discovery is liberally construed.  *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans*, 2010 WL 1136216, at *1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at *3–4.

The Maryland Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Maryland Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

United States District Court
Northern District of California

Complaint").  To the extent the Maryland Attorney General argues that "the [Maryland] Attorney General has no control over the state agencies previously identified by Meta, as typically, Maryland state agencies are part of the Executive Department and they report to the Governor," *see* dkt. 738-17 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  *See, e.g.*, *Diven v. Souders*, No. 1:21-CV-01276-BAH, 2024 WL 184345, at *3 (D. Md. Jan. 17, 2024) (finding named defendants (correctional officers) have control over documents of Maryland Department of Public Safety & Correctional Services).  Thus, arguing that the Maryland "Attorney General and the Governor are separate constitutional officers," dkt. 738-17 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Maryland Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

130

Finally, the Maryland Attorney General does not cite any statutory or legal prohibition on the Maryland Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## XVII. MICHIGAN

In opposition to the control issue, the Michigan Attorney General argues primarily the following factors: (1) the Michigan Attorney General is a separate entity and independent from the Michigan agencies; and (2) the Michigan Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-18 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Michigan Attorney General must act as counsel for the Michigan agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Education, Department of Health and Human Services, Department of Labor and Economic Opportunity, Department of Lifelong Education, Advancement, and Potential, Executive Office of the Governor, and State Budget Office. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in

United States District Court
Northern District of California

United States District Court
Northern District of California

favor of a finding that the Michigan Attorney General does have legal control, for purposes of discovery, over the listed Michigan agencies.  While the Michigan Attorney General is a separate entity and while the Michigan Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Michigan Attorney General will act as the agencies' counsel.  First, the Michigan Attorney General admits that "[t]he Attorney General serves as counsel to the Governor and state agencies."  Dkt. 738-17 at 2 (citing Mich. Comp. Laws § 14.28 ("The attorney general shall prosecute and defend all actions in the supreme court, in which the state shall be interested, or a party[.]").  Under Michigan's statutory scheme, "the attorney general shall also, when requested by the governor, or either branch of the legislature, and may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested."  Mich. Comp. Laws § 14.28.  As the Michigan Court of Appeals noted, "[u]nder our scheme of laws, the ***attorney general has the duty*** as a constitutional officer possessed with common law as well as statutory powers and duties ***to represent*** or furnish legal counsel to many interests-the State, ***its agencies***, the public interest and others designated by statute."  *Att'y Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d 16, 29 (Mich. Ct. App. 2000) (quoting *State ex rel. Allain v. Mississippi Pub. Serv. Comm'n*, 418 So. 2d 779, 783 (Miss. 1982)) (emphasis added).

Importantly, the Michigan Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Michigan agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2].  The Michigan Attorney General has the mandatory duty to defend agencies in Michigan in all suits relating to matters connected with their departments upon request of the Governor.  Mich. Comp. Laws, § 14.29.  Indeed, the Michigan Attorney General confirmed that its office could represent all of the Michigan agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 16–17].  Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Michigan Attorney General in this matter for discovery.  *See* Mich. Comp. Laws, § 14.29.  Thus, because the Michigan Attorney

1   General will likely be involved in representing these state agencies in any event in this case, whether

2   to respond to subpoenas or to respond to party discovery.

3       Relatedly, the Michigan Attorney General has taken the position that communications

4   between the Michigan Attorney General and these state agencies are subject to the attorney-client

5   privilege (with no limitations as to time frame). [Dkt. 738-18 at 2]. By definition, an attorney-client

6   relationship is a prerequisite to assertion of the attorney-client privilege. *See Graf*, 610 F.3d at 1156.

7   Thus, the Michigan Attorney General's admission that it has an existing (indeed pre-existing)

8   attorney-client relationship with the agencies at issue lends further support for a finding of a legal

9   right of access and thus control over the documents of these state agencies.

10      The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

11  organization, the attorney general, is both a party to the case while also acting or able to act as

12  counsel for a third party. However, this would not be the first time that a legal services provider, as

13  a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*,

14  *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients

15  and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . .

16  . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond

17  as to responsive materials over which Salas and his law firm had possession, custody or control.").

18  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

19  documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Michigan Attorney

20  General admits that "to the extent the Attorney General has any 'control' over a listed state agency,

21  it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly

22  that there must be a finding of a legal right of access to and thus control over third party client

23  documents in every case involving a legal services provider as a party; rather, under the particular

24  facts here, and under the totality of circumstances viewed in light of applicable legal standards, the

25  Court finds that control exists here.

26      The Michigan Attorney General's likely role as counsel for the agencies at issue would

27  inherently involve obtaining necessary documents for effective representation in litigation. In acting

28  as counsel, the Michigan Attorney General would necessarily have access to and thus control over

United States District Court
Northern District of California

the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").  To the extent the Michigan Attorney General argues that the "the [Michigan] Attorney General has no relevant authority to direct state agencies' conduct, all of which conduct falls under the Governor's constitutionally distinct purview," *see* dkt. 738-18 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  *See Williams*, 2022 WL 22859198, at *2 (finding named defendants, corrections officers, have control over third-party agency Michigan Department of Correction (MDOC) documents, noting that: "Here, Defendants are represented by the Michigan Attorney General, which has demonstrated access to [third-party agency] MDOC documents and materials in many cases before this Court.").  Thus, arguing that "the [Michigan] Governor—and

the agencies she oversees—are not under the [Michigan] Attorney General's authority," dkt. 738-18 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Michigan Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Indeed, at least one other federal court has previously found that the Michigan Attorney General has legal control over Michigan state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Michigan Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Michigan, this Court is disappointed that the Michigan Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XVIII. MINNESOTA

In opposition to the control issue, the Minnesota Attorney General argues primarily the following factors: (1) the Minnesota Attorney General is a separate entity and independent from the Minnesota agencies; (2) the Minnesota Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Minnesota agencies would create a "virtual veto" over the Minnesota Attorney General's independent responsibilities to bring enforcement actions; (4) the Minnesota agencies are not required to use the Minnesota Attorney General as legal counsel; (5) Minnesota agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; (6) the Minnesota Attorney General may not able to obtain non-

135

United States District Court
Northern District of California

1   public data from Minnesota agencies unless specifically authorized by statute or federal law; and

2   (7) the Minnesota Attorney General would have to utilize public channels in order to obtain

3   documents from the Minnesota agencies.  [Dkt. 738-19 at 2].

4          In support of a finding of control with regard to these state agencies' documents, Meta argues

5   primarily that Minnesota agencies are proscriptively barred from obtaining counsel other than the

6   Minnesota Attorney General without consent from the Minnesota Governor or if the Minnesota

7   Attorney General is an adverse party.  *Id.* at 3.  Here, Meta seeks discovery from the following

8   agencies: Department of Commerce, Department of Health, Department of Human Services,

9   Education Department, Employment and Economic Development Department, Governor's Office,

10  Office of Higher Education, and Department of Management and Budget.  *Id.*

11         The Court finds that the Minnesota Attorney General has control, for the purposes of

12  discovery, of the listed Minnesota agencies.  While the Minnesota Attorney General is a separate

13  entity and while the Minnesota Attorney General does bring the instant action exercising its own

14  independent authority, this does not outweigh the fact that the Minnesota Attorney General will act

15  as the agencies' counsel.  Under Minnesota's statutory scheme, "[t]he attorney general ***shall*** act as

16  the attorney for all state officers and ***all boards or commissions*** created by law in all matters

17  pertaining to their official duties."  Minn. Stat. § 8.06 (emphasis added).  Minnesota law requires

18  that "[t]he attorney general ***shall appear*** for the state in all causes in the supreme and ***federal courts***

19  wherein the state is directly interested."  Minn. Stat. § 8.01 (emphasis added).  Absent exceptions

20  which are not present or shown to exist here, "no additional counsel shall be employed and the legal

21  business of the state shall be performed exclusively by the attorney general and the attorney

22  general's assistants."  *Id.*

23         Importantly, the Minnesota Attorney General's arguments do not negate the fact that (unlike

24  other states) there is no cited law or statute which empowers any of the Minnesota agencies at issue

25  here to employ or obtain counsel in this matter other than the Attorney General absent consent.

26  [Dkt. 738-13 at 2].  Even in exceptional circumstances where different counsel may be employed,

27  "the ***attorney general*** shall thereupon be authorized to employ such counsel" and not the agencies.

28  Minn. Stat. § 8.06 (emphasis added).  Indeed, the Minnesota Attorney General confirmed that its

1   office could represent all of the Minnesota agencies at issue if Meta were to serve those agencies

2   with a subpoena in this matter.  [Dkt. 738-1 at 17–18].  Accordingly, it appears that under the

3   statutory scheme each agency will likely be represented by the Minnesota Attorney General in this

4   matter for discovery.  *See* Minn. Stat. §§ 8.01, 8.06.  Thus, because the Minnesota Attorney General

5   will likely be involved in representing these state agencies in any event in this case, whether to

6   respond to subpoenas or to respond to party discovery.

7           Relatedly, the Minnesota Attorney General has taken the position that, "to the extent a

8   separate division" of the Attorney General's office "may be engaged by an agency,"

9   communications between the Minnesota Attorney General and these state agencies are subject to

10  the attorney-client privilege.  [Dkt. 738-19 at 2].  To the extent the Minnesota Attorney General has

11  attempted to subdivide its own office between the "CP Section" of attorneys currently prosecuting

12  this case and other attorneys within the state Attorney General in order to somehow argue that the

13  scope of attorney-client privilege is limited only as to some parts of the state Attorney General's

14  office but not other teams, that argument is not supported by citation to law and is contrary to the

15  weight of law.  *Id.*  The scope of attorney-client relationship (and the duties flowing therefrom,

16  including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal

17  services organization due to well-known rules of imputation of confidences to a legal services

18  organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When

19  an attorney associates with a law firm, the principle of loyalty to the client extends beyond the

20  individual attorney and applies with equal force to the other attorneys practicing in the firm. This

21  principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all

22  members of a law firm when any one of them practicing alone would be disqualified because of a

23  conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public

24  law firms such as a district attorney's office or the office of the state public defender."); *accord City*

25  *of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not

26  doubt that vicarious disqualification is the general rule, and that we should presume knowledge is

27  imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper

28  circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of

United States District Court
Northern District of California

imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Minnesota Attorney General's argument that different individual lawyers in the Minnesota Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Minnesota Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Minnesota Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Minnesota Attorney General is asserting that the attorney-client privilege would apply to communications between the Minnesota Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of

United States District Court
Northern District of California

the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. Just as the Court in *Perez* rejected the inconsistent approach to privilege there, here the Minnesota Attorney General argues that "[t]o the extent a separate [Minnesota Attorney General] division (walled-off from the CP Section) may be engaged by an agency to provide legal services, communications between the agency and that separate [Minnesota Attorney General] division would likely be privileged." [Dkt 738-19 at 2]. The Minnesota Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Minnesota Attorney General's office and the agencies at issue further supports the conclusion of control here. Here, it is illusory to argue that sub-teams attorneys within the Minnesota Attorney General's office have their own separate attorney-client relationships with the state agencies. The Minnesota Attorney General has already confirmed that their office could represent these agencies for discovery in this matter. [Dkt. 738-1 at 13]. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Minnesota Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the

1    particular facts here, and under the totality of circumstances viewed in light of applicable legal

2    standards, the Court finds that control exists here.

3          The Minnesota Attorney General's likely role as counsel for the agencies at issue would

4    inherently involve obtaining necessary documents for effective representation in litigation.  In acting

5    as counsel, the Minnesota Attorney General would necessarily have access to and thus control over

6    the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934,

7    at *5–6 (finding state Attorney General has control over agency documents "based on his broad

8    statutory and common law powers to control and manage legal affairs on behalf of state agencies,

9    has a legal right to obtain responsive documents from the state agencies referenced in the

10   Complaint").  To the extent the Minnesota Attorney General argues that the "Minnesota's Governor

11   and [Minnesota Attorney General] operate as independent elected officials under the state

12   constitution," *see* dkt. 738-19 at 2, that argument misapprehends the "legal control" test for

13   documents – the issue is not simply whether one entity is under the day-to-day operational control

14   of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the

15   two entities are legally separate (such as two different and separately incorporated entities), but

16   rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The

17   control analysis for Rule 34 purposes does not require the party to have actual managerial power

18   over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude*

19   *Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state

20   Attorney General and the state agencies (a relationship mandated by state law) necessitates close

21   coordination.  While operational control may be a factual situation which demonstrates a legal right

22   to obtain the documents, the absence of such "executive or functional control" is not determinative

23   for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for

24   discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity

25   were involved, there would be no dispute that party discovery covered that one entity.  As discussed

26   above, courts have found "control" for purposes of discovery where a party is clearly not in

27   managerial control over the third-party, such as a subsidiary having control over the documents of

28   a parent corporation, or an individual government officer having control over the documents of an

United States District Court
Northern District of California

1  entire agency.  Thus, arguing that "[o]nly the Governor can compel agencies to act—including

2  searching for and producing documents in their possession, custody, or control—because the

3  [Minnesota] Governor, *not the [Minnesota Attorney General]*, has the authority to appoint agency

4  commissioners who serve at the Governor's pleasure," dkt. 738-19 at 2 (emphasis in original), is

5  simply re-stating the issue to be decided, and not determinative of the issue.  The Minnesota

6  Attorney General's arguments erroneously conflate the legal control issue with "operational

7  control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of

8  legal control of the documents for purposes of discovery.

9          Further, there is no statutory, legal, or administrative rule cited which prohibits the

10  Minnesota Attorney General from accessing the documents of the state agencies at issue for

11  purposes of discovery.  The Minnesota Attorney General's argument that "each agency has control

12  over its own data" and that therefore the Minnesota Attorney General must issue a public data

13  request or a subpoena to obtain data from state agencies who are their client is not a credible

14  interpretation of Minnesota law.  Dkt. 738-19 at 2 (citing Minn. Stat. § 13.05(9)).  There is no

15  citation to law holding that a public records request is the only way for the Minnesota Attorney

16  General to get documents from state agencies they are representing in litigation.  [Dkt. 738-19 at 2].

17  If the Minnesota Attorney General were correct, then the Minnesota Attorney General would have

18  to submit a Public Information Act request every time they represent a state agency, to get

19  documents from its own client – which is not merely impractical and not believable but also contrary

20  to the principles of effective legal representation.  As counsel, the Minnesota Attorney General will

21  have the normal type of direct access to the necessary documents from its own clients, without

22  resorting to public channels, ensuring efficient and comprehensive legal support for the agencies

23  involved.  The cited Minnesota statute on Data Practices is not an impediment to that access, because

24  that statute only applies to data which are to be produced for public inspection (and not for purposes

25  of litigation such as this case in which there is a Protective Order limiting public availability of

26  confidential documents).  Minn. Stat. § 13.01.  Further, the Minnesota statute nowhere states that

27  this statute is the only means by which the Minnesota Attorney General can obtain records from

28  other state agencies – the statute merely sets up a permissive system for public inspection, not a

United States District Court
Northern District of California

1    restriction or limitation on access.  Indeed, the Minnesota Attorney General has cited no precedent

2    requiring the Minnesota Attorney General to use either a public request or a subpoena to obtain

3    documents from state agencies represented in litigation by the Minnesota Attorney General.  The

4    Court finds this argument to be wholly unpersuasive.

5        Significantly, the Minnesota Attorney General ignores that this public data statute

6    specifically exempts attorneys collecting data when those attorneys are acting as counsel for a

7    government entity, and the statute specifically mandates that such attorneys' uses and collections of

8    data from agencies are governed by statutes, rules, and professional responsibility standards for

9    discovery instead.  Minn. Stat. § 13.393 ("Notwithstanding the provisions of this chapter and section

10   15.17, the use, collection, storage, and dissemination of data by an attorney acting in a professional

11   capacity for a government entity shall be governed by statutes, rules, and professional standards

12   concerning discovery, production of documents, introduction of evidence, and professional

13   responsibility[.]").  The Minnesota statutory scheme thus directly provides the Minnesota Attorney

14   General an explicit legal right to obtain and access documents from the agencies at issue pursuant

15   to the normal rules and statutes for discovery, when acting as counsel for those agencies.  The Court

16   thus finds that Minn. Stat. § 13.393 directly satisfies *Citric Acid*'s requirement of a showing of a

17   legal right to access the documents of the state agencies at issue.

18       The Court rejects the Minnesota Attorney General's argument that there is no law "that

19   grants the [Minnesota Attorney General] blanket authority to obtain agency documents upon

20   demand" in light of this statute and in light of the fact that the control test under *Citric Acid* does

21   not require "blanket authority."  [Dkt. 738-19 at 2].

22       Next, the Minnesota Attorney General argues that "[r]equiring the [Minnesota Attorney

23   General] to produce agency documents would upend the constitutional division of powers because

24   the [Minnesota] Governor would be able to impermissibly control the [Minnesota Attorney

25   General's] litigation by, for example, instructing agencies to refuse to produce documents."  [Dkt.

26   738-19 at 2].  This is the same "virtual veto" argument advanced by several other states' Attorneys

27   General and discussed above.  As explained previously, the Court finds the "virtual veto" argument

28   to be speculative and unpersuasive.  This argument is based on an unfounded assumption that the

United States District Court
Northern District of California

Governor and state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities.  This argument rests entirely on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order finding control, the Governor and state agencies would simply refuse to provide documents based on nothing more than an obstinate and unreasoned disagreement.  The Minnesota Attorney General presented no facts, no affidavits, no prior examples of state agency refusals, and no testimony to support this feared response by the Governor or state agencies.  Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure.  The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

## XIX.  MISSOURI

In opposition to the control issue, the Missouri Attorney General argues primarily the following factors: (1) the Missouri Attorney General is a separate entity and independent from the Missouri agencies; (2) the Missouri Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Missouri Attorney General does not seeking relief on behalf of the Missouri agencies; (4) Missouri agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (5) under Missouri case law, Missouri agencies are not required to produce records of another agencies and it is prohibited from disseminating records of any agency other than its own records.  [Dkt. 738-20 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Missouri Attorney General is tasked with appearing in and defending any proceeding or tribunal in which the state's interests are involved.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Department of Economic Development, Department of Elementary and Secondary Education, Department of Health and Senior Services, Department of Higher Education & Workforce Development, Department of Mental Health, Department of Social Services, Office of Administration, Office of the Child Advocate, and Governor's Office.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Missouri Attorney General has legal control, for purposes of discovery, over the documents of the listed Missouri agencies. While the Missouri Attorney General is a separate entity and while the Missouri Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Missouri Attorney General will act as the agencies' counsel. First, the Missouri Attorney General "may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Mo. Stat. § 27.060. It is self-evident that, when a Missouri agency is the subject or target of discovery, the state's interests are involved.

Importantly, the Missouri Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Missouri agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, under Missouri precedent, "[t]he Attorney General is authorized to represent the interests of the State generally." *Fogle v. State*, 295 S.W.3d 504, 510 (Mo. Ct. App. 2009). Indeed, the Missouri Attorney General confirmed that its office could represent all of the Missouri agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 18]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Missouri Attorney General in this matter for discovery. *See* Mo. Stat. § 27.060. Thus, because the Missouri Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Missouri Attorney General has taken the position that, "to the extent a separate division" of the Attorney General's office "may be engaged by an agency," communications between the Missouri Attorney General and these state agencies are subject to the attorney-client privilege. [Dkt. 738-20 at 2]. To the extent the Missouri Attorney General has attempted to subdivide its own office between the attorneys currently prosecuting this case and other attorneys within the state Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not "section counsel," that argument is not supported by citation to law and is contrary to the weight of law. *Id.*

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .   The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.   Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review

1  of case law demonstrates that no courts support the Missouri Attorney General's argument that

2  different individual lawyers in the Missouri Attorney General's office have *ex ante* separable,

3  discrete attorney-client relationships.

4         The Court rejects the Missouri Attorney General's attempt to simultaneously disclaim the

5  existence of an attorney-client privilege as between the attorneys currently working on this case,

6  while apparently attempting to preserve the ability to assert that the privilege applies to

7  communications between other lawyers in the Missouri Attorney General's Office and these

8  agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

9  legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

10 that on one hand the [State] Attorney General represents these individuals, but that for discovery

11 purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

12 2014 WL 1796661, at *2.  To the extent the Missouri Attorney General is asserting that the attorney-

13 client privilege would apply to communications between the Missouri Attorney General's office

14 and the agencies at issue, that further supports the conclusion of control here.  Assertion of the

15 attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.

16 *See Graf*, 610 F.3d at 1156.  Just as the Court in *Perez* rejected the inconsistent approach to privilege

17 there, here the Missouri Attorney General argues that Meta's discovery is "so broad" as to

18 encompass communications between "sections of the [Missouri Attorney General] not participating

19 in this action" (at least, as of the date of this brief) and the agencies, and "there is the possibility that

20 those agencies, in conjunction with their Agency section counsel" could assert privilege.  [Dkt. 738-

21 20 at 2].  The Missouri Attorney General's attempt to preserve the ability to assert the attorney-

22 client privilege between the Missouri Attorney General's office and the agencies at issue further

23 supports the conclusion of control here.  Here, it is not convincing to argue that sub-teams attorneys

24 within the Missouri Attorney General's office have their own separate attorney-client relationships

25 with the state agencies.  The Missouri Attorney General has already confirmed that their office could

26 represent these agencies for discovery in this matter.  [Dkt. 738-20 at 18].  Assertion of the attorney-

27 client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*,

28 610 F.3d at 1156.

146

United States District Court
Northern District of California

Further, there is no citation to any statutory or legal prohibition on the Missouri Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Missouri Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Missouri Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Missouri Attorney General argues that the "[Missouri Attorney General] is an elected official independent of the [Missouri] Governor," *see* dkt. 738-20 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two

different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "[t]he Governor, not the [Missouri Attorney General], has executive control over other state agencies," dkt. 738-20 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Missouri Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Missouri Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Missouri Attorney General's argument that "an agency is not in possession of another's records, and cannot produce that which it does not possess, it is error to compel one agency to produce another's records" is fundamentally a legally erroneous proposition, because the argument focuses solely on "possession" and presumes incorrectly that Federal Rule of Civil Procedure 34 lacks the word control as a disjunctive basis for requiring party discovery. [Dkt. 738-20 at 2]. The Missouri Attorney General's citation to and reliance on *Bedell* is inapposite. *Id.* (citing *Bedell v. Dir. of Revenue, State of Mo.*, 935 S.W.2d 94, 96 (Mo. Ct. App. 1996)). In *Bedell*, the

148

1    state court did not apply any version of the control test applicable under federal law such as *Citric*

2    *Acid* – instead, the *Bedell* court focused exclusively on state law precedent limited to whether one

3    agency "possessed" the documents of another agency.  *Bedell*, 935 S.W.2d at 96.  *Bedell* is legally

4    irrelevant to the issue in dispute here, as well as presenting a factually distinguishable scenario.

5            Indeed, at least one other federal court has previously found that the Missouri Attorney

6    General has legal control over Missouri state agency materials.  *Generic Pharmaceuticals (II)*, 699

7    F. Supp. 3d at 357–58.  While this Court reaches its own independent conclusions consistent with

8    the applicable legal standards discussed above and in light of the facts and circumstances presented

9    here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly

10   consistent with, and to that extent further persuasively supports, the conclusion here with regard to

11   the Missouri Attorney General's having control with regard to documents of the state agencies at

12   issue.  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the

13   objecting states including Missouri, this Court is disappointed that the Missouri Attorney General

14   and Meta were unable to reach a negotiated resolution of this dispute, which other states were able

15   to do in *Generic Pharmaceuticals (II)*.  As the Court has repeatedly encouraged the Parties at

16   multiple Discovery Management Conferences, they should make every effort to work out discovery

17   disputes through reasonable, good faith negotiations between able and experienced counsel,

18   particularly where, as here, there is guidance in precedent on the discovery issue at hand.

19   **XX.    MONTANA**

20           In opposition to the control issue, the Montana Attorney General argues primarily the

21   following factors: (1) the Montana Attorney General is a separate entity and independent from the

22   Montana agencies; and (2) the Montana Governor could choose to employ counsel different from

23   the Montana Attorney General.  [Dkt. 738-21 at 2].

24           In support of a finding of control with regard to these state agencies' documents, Meta argues

25   primarily that the Montana Attorney General is tasked with appearing in and defending any

26   proceeding or tribunal in which the state's interests are involved.  *Id.* at 3.  Here, Meta seeks

27   discovery from the following agencies: Board of Public Education, Department of Commerce,

28   Department of Public Health and Human Services, Governor's Office, Office of the Commissioner

United States District Court
Northern District of California

of Higher Education, and Office of Public Instruction.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Montana Attorney General has legal control, for purposes of discovery, over the documents of the listed Montana agencies.  While the Montana Attorney General is a separate entity and while the Montana Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Montana Attorney General has broad authority to act as the agencies' counsel.

First, under the Montana Constitution the Montana Attorney General is the "legal officer of the state and shall have the duties and powers provided by law."  Mont. Const. § 4(4).  The Montana Supreme Court has held that Montana Court precedent supports the notion that the Montana Attorney has "***broad powers* . . . *as the first legal officer of the state*.***"  *Montana Power Co. v. Montana Dep't of Pub. Serv. Regul.*, 709 P.2d 995, 1002 (Mont. 1985) (citing *State ex rel. Olsen v. Public Service Commission*, 283 P.2d 594 (Mont. 1955) [hereinafter *Olsen*]) (emphasis added).  The Montana Supreme Court furthered that "the [Montana] Attorney General not only had the constitutional and statutory powers specifically enumerated for him, but ***broad common law duties***, when not restricted or limited by statute."  *Id.*  In *Olsen*, the Montana Supreme Court explained in fulsome detail the breadth of the powers of the state Attorney General:

> [T]his court has repeatedly held that the attorney general has common-law powers and duties.  The Attorney General is the principal law officer of the state. His duties are general. His authority is co-extensive with public legal affairs of the whole community . . . . The office of Attorney General is of ancient origin. The powers and duties appertaining to it were recognized by the common law, and the common law has been a part of our system of jurisprudence from the organization of Montana territory to the present day . . . .  It is the general consensus of opinion that in practically every state of this Union whose basis of jurisprudence is the common law, the office of Attorney General, as it existed in England, was adopted as a part of the governmental machinery, and that in the absence of express restrictions, the common-law duties attach themselves to the office so far as they are applicable and in harmony with our system of government . . . .
>
> The authorities substantially agree that, in addition to those conferred on it by statute, the office is clothed with all of the powers and duties pertaining thereto at common law; and, as the chief law officer of the State, the Attorney General, in the absence of express legislative restriction to the contrary, may exercise all such power and authority

United States District Court
Northern District of California

as the public interests may from time to time require.  In short, the Attorney General's powers are as broad as the common law unless restricted or modified by statute . . . .

Moreover, it is generally held that the attorney general, in addition to the powers and duties conferred and imposed upon him by statute, is clothed and charged with all the common-law powers and duties pertaining to his office as well, except in so far as they have been expressly restricted. The duties of the office are so numerous and varied that it has not been the policy of the state legislatures to attempt specifically to enumerate them; and it cannot be presumed, therefore, in the absence of an express inhibition, that the attorney general has not such authority as pertained to his office at common law. Accordingly, as the chief law officer of the state, he may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may, from time to time, require, and may institute, conduct, and maintain all such suits and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights . . . .

The common-law duties of the attorney general, as chief law officer of the state, when not restricted or limited by statute, are very numerous and varied. In England, the Attorney General was the chief legal adviser of the Crown and was intrusted [sic] with the management of all legal affairs and the prosecution of all suits, civil and criminal, in which the Crown was interested. . . . Such being the nature of the rights and duties that attached to the position at its inception, it is generally held that in the exercise of his common-law powers, an attorney general may not only control and manage all litigation in behalf of the state, but he may also intervene in all suits or proceedings which are of concern to the general public . . . .

Obviously there can be no dispute as to the right of an attorney general to represent the state in all litigation of a public character. The attorney general represents the public and may bring all proper suits to protect its rights.

*Olsen*, 283 P.2d at 598–99 (internal quotations and citations omitted; emphasis added).

It is self-evident that, when a Montana agency is the subject or target of discovery, in a case such as this, such a proceeding is litigation of a public character, involves the public interests, and involves the public legal affairs of the state. *See id.*  Indeed, in the complaint here discusses, in several sections, alleged harms to Montana consumers and young Montanans which implicate issues of public character and the public interest. *See, e.g.*, *Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1.  Further, the multistate complaint expressly states that this action is in the public interest of the Filing States.  *See* Multistate Complaint at ¶ 12.

Importantly, the Montana Attorney General's arguments do not negate the fact that (unlike

United States District Court
Northern District of California

1    other states) there is no cited law or statute which empowers any of the Montana agencies at issue

2    here to employ or obtain counsel in this matter other than the Montana Attorney General.  [Dkt.

3    738-21 at 2].  Indeed, the Montana Attorney General confirmed that its office could represent all of

4    the Montana agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

5    [Dkt. 738-1 at 19].  Accordingly, it appears that, under the broad common law and constitutional

6    duties of the Montana Attorney General, each agency will likely be represented by the Montana

7    Attorney General in this matter for discovery.  *See* Mont. Const. § 4(4).  Thus, because the Montana

8    Attorney General will likely be involved in representing these state agencies in any event in this

9    case, whether to respond to subpoenas or to respond to party discovery.

10         Relatedly, the Montana Attorney General argues that, "[b]ecause the Montana Attorney

11    General's Office does not represent any of the six state entities at issue, its position is that pre-suit

12    communications related to this matter between the [Montana Attorney General's] Office and those

13    entities are not protected by the attorney-client privilege."  [Dkt. 738-21 at 2].  That statement,

14    however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the

15    Montana Attorney General will assert privilege with respect to post-suit communications.  The

16    Court rejects the Montana Attorney General's attempt to simultaneously disclaim the existence of

17    an attorney-client privilege for pre-suit communications, while apparently attempting to preserve

18    the ability to assert the privilege applies to post-suit communications.  "[T]o to the extent that [the

19    State] asserts an attorney-client privilege with these legislators, it does so solely in their official

20    capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

21    General represents these individuals, but that for discovery purposes the [Plaintiff] United States

22    must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  To the extent

23    the Montana Attorney General implies its intention to assert that the attorney-client privilege would

24    apply to communications between the Montana Attorney General's office and the agencies at issue,

25    that would further supports the conclusion of control here.  Assertion of the attorney-client privilege

26    requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at

27    1156.

28         Further, the Montana Attorney General does not cite any statutory or legal prohibition on

the Montana Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, the Montana Attorney General admits that "the Attorney General's Office has statutory and common-law responsibility and authority to represent these agencies in certain circumstances." [Dkt. 738-21 at 2]. Under *Olsen¸* the broad common law power to represent the state's agencies would only be limited by statute – and none is argued here. *Olsen*, 283 P.2d at 599. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Montana Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Montana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Montana Attorney General argues that state Constitution establishes "constitutionally independent executive offices, which are each separately elected and operate with

United States District Court
Northern District of California

their own independent constitutional authority—including the Attorney General," *see* dkt. 738-21 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that "Montana law provides that state records 'are and remain the property of the public agency possessing the records,'" dkt. 738-21 at 2 (citing Mont. Code § 2-6-1013(1)), focuses on the irrelevant issue of "possession" and ignores the control issue to be decided.  The Montana Attorney General's arguments also erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Montana Attorney General from accessing the documents of the state agencies at issue for purposes of discovery.  The Montana Attorney General's argument that "even where the Attorney General *does* represent a state agency, the Office functions like an ordinary attorney serving its client, and thus

154

must obey the agency's litigation decisions" is essentially the same argument rejected above that counsel is helpless in the face of an intransigent client and somehow has no duties to the Court to work on discovery, including supervising the collection of documents.  Dkt. 738-20 at 2 (emphasis in original).  Lawyers are not entirely helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery.  Contrary to the Montana Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients.  The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients.  As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents.  Here, the Montana Attorney General cites no law which permits them to avoid those obligations and their attendant legal rights.

For those reasons, the Court finds that the factors weigh in favor of a finding that the Montana Attorney General has legal control, for purposes of discovery, over the documents of the listed Montana agencies.

## XXI.   NEBRASKA

In opposition to the control issue, the Nebraska Attorney General argues primarily the following factors: (1) the Nebraska Attorney General is a separate entity and independent from the Nebraska agencies; (2) the Nebraska Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Nebraska Attorney General does not seek relief on behalf of the Nebraska agencies; and (4) Nebraska avers that "State agencies routinely refuse to provide information to [the Nebraska Department of Justice] Consumer Protection Bureau absent a third-party civil investigative demand, third-party subpoena, or a public records request[.]"  [Dkt. 738-22 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) under Nebraska law, the Nebraska Attorney General has general control and supervision of all legal business of all Nebraska departments and bureaus, and (2) Nebraska agencies are proscriptively barred from obtaining counsel other than the Nebraska Attorney General without consent from the Nebraska Attorney General or Nebraska Governor. *Id.* at 3.   Here, Meta seeks discovery from the following agencies: the Children's Commission, Department of Administrative Services, Department of Economic Development, Department of Education, Department of Health and Human Services, and Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Nebraska Attorney General does have legal control, for purposes of discovery, over the listed Nebraska agencies.   While the Nebraska Attorney General is a separate entity and while the Nebraska Attorney General does bring the instant action in its own independent authority, this does not outweigh the legal right to access agencies' documents which result from the requirement that the Nebraska Attorney General must statutorily act as the Nebraska agencies' counsel.

Under Nebraska's statutory scheme, the Nebraska Attorney General has "the general control and supervision of all actions and legal proceedings in which the State of Nebraska may be a party or may be interested, and ***shall have charge and control of all the legal business of all departments*** and bureaus of the state, or of any office thereof, which requires the services of attorney or counsel in order to protect the interests of the state."   Neb. Rev. Stat. § 84-202 (emphasis added). Additionally, "[t]he [Nebraska] Attorney General is authorized to appear for the state and prosecute and defend, in any court or before any officer, board or tribunal, any cause or matter, civil or criminal, in which the state may be a party or interested."  Neb. Rev. Stat. § 84-203.

Further, there is no citation to any statutory or legal prohibition on the Nebraska Attorney General's representing the state agencies in this matter for purposes of discovery.   Indeed, under Nebraska law, the Nebraska Attorney General shall "prosecute or defend for the state ***all civil*** or criminal actions and proceedings relating to any matter connected with any of such officers' departments if, after investigation, he or she is convinced there is sufficient legal merit to justify the proceeding" upon "the request of the Governor, head of any executive department, Secretary of

United States District Court
Northern District of California

State, State Treasurer, Auditor of Public Accounts, Board of Educational Lands and Funds, State Department of Education, or Public Service Commission."  Neb. Rev. Stat. § 84-205(5) (emphasis added).  In any such actions, the state agencies "***shall not pay or contract to pay*** from the funds of the state ***any money for special attorneys*** or counselors-at-law unless the employment of such special counsel is made upon the written authorization of the Governor or the Attorney General." *Id.* (emphasis added).  The Nebraska statutory scheme makes clear the Nebraska legislature's strong preference that the Nebraska Attorney General represent state agencies in civil matters.

Indeed, the Nebraska Attorney General confirmed that its office could represent all but one of the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 19–20].  With respect to the one exception (the Nebraska Governor), the briefs and submissions from the Nebraska Attorney General do not explain how (in light of the Nebraska statutory scheme) the Nebraska Governor would not be represented by the Attorney General.  The Nebraska cites no statutory or legal provision which bars the Nebraska Attorney General from representing the Nebraska Governor.  The Nebraska Attorney General concedes that "[w]hen a Nebraska state agency receives a subpoena, it ***may choose*** to seek assistance from the [Nebraska Department of Justice] Legal Services and Civil Litigation Bureaus, who can serve as outside counsel for certain agencies." Dkt. 738-22 at 2 (emphasis added).  As discussed, no separate counsel has appeared for any Nebraska state agencies, despite the fact that litigation holds have been issued and the agencies have had notice of the pendency of discovery in this matter for some time.  Accordingly, based on the statutory scheme and the record before the Court, the Nebraska Attorney General will likely represent these state agencies for purposes of discovery.

As part of the argument stressing the separation of the Attorney General's office from the state agencies, the Nebraska Attorney General relies on a "governmental structure" argument to subdivide the office of the Nebraska Attorney General for purposes of this dispute.  Dkt. 738-22 at 2.  The Nebraska Attorney General argues that "there is a critical distinction between the [Nebraska Department of Justice] when it acts affirmatively in its capacity as enforcer of state consumer protection law (as it does in this lawsuit) and the [Nebraska Department of Justice] when it acts defensively in its role as outside counsel for state agencies." *Id.* (uncited).  The Nebraska Attorney

General argues that the "organizational structure" of the Nebraska Department of Justice "distinguishes between the [Nebraska Department of Justice's] Consumer Protection Burau, which represents the state and state consumers as enforcers of Nebraska's consumer protection laws, and the [Nebraska Department of Justice's] Legal Services and Civil Litigation Bureaus, which advise certain state agencies and occasionally represent them in court." *Id.* The Nebraska Attorney General asserts that these distinctions are germane to this "control" dispute without explaining how or why. Further, the Nebraska Attorney General cites no law which finds these administrative, operational groupings of lawyers within that office as relevant, much less critical, to the determination of "control" under Rule 34.

Consistent with the "structural" argument, the Nebraska Attorney General argues that communications between different sections of the Nebraska Attorney General are ethically walled off where there are conflicts of interest and, on that basis, argues for a finding of no control. [Dkt. 738-22 at 2]. The Nebraska Attorney General cites no law, regulation, or statute which requires the alleged ethical walls between different bureaus within the Attorney General's office to be established in cases such as this Multi-District Litigation, where there is no basis for a conflict of interest to exist between the Attorney General's office and any of the state agencies at issue. The mere citation to the general rule of professional conduct regarding avoiding conflicts of interest is, alone, not persuasive. [Dkt. 738-22 at 2 (citing Neb. R. of Prof. Cond. § 3-501.7)]. The fact that ethical walls were set up in prior (unexplained and uncited) cases, where no affidavit or evidence attests to any ethical wall being set up in this Multi-District Litigation. As discussed, litigation holds have been issued to the state agencies and there has been ample time for ethical walls to be established and for separate counsel to appear, if any were to appear. On the current record before the Court, these "structural" arguments regarding sub-teams within the Nebraska Attorney General's office do not suffice to overcome the finding of "control" for purposes of discovery, much like similar arguments regarding subdividing public law offices do not establish that there are separate, discrete attorney-client relationships within the Nebraska Attorney General's office and the agencies at issue for purposes of this Multi-District Litigation.

To the extent the Nebraska Attorney General has attempted to subdivide its own office

158

between the prosecution team in this case and other divisions of the state Attorney General in order to somehow argue that there is no "legal control," that argument is not supported by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.

The Nebraska Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Nebraska Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies,

has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). The fact that there might be different sub-teams or different individual attorneys working on responding to the state agency discovery requests, as compared to the attorneys working on prosecuting this action, does not obviate the fact that these are all attorneys within the same public law office. If, as here, the Attorney General's office is counsel for the agencies, then the Attorney General's office will have a legal right to access the state agencies' documents, and there is no law which alters that conclusion simply because different individual lawyers within the same legal services organization have the direct communications and relationships with the state agencies. Simply put, there is no cited law which determines whether specific individuals within an organization themselves have individualized "control" under Rule 34 where they are seeking access to the documents on behalf of the organization as a whole.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Nebraska Attorney General argues (without citation to caselaw) that "State agencies routinely refuse to provide information to NE DOJ Consumer Protection Bureau absent a third-party civil investigative demand, third-party subpoena, or a public records request, all of which would be

160

handled by the agency according to its protocols." [Dkt. 738-22 at 2]. As an initial matter, it is not surprising that, in cases where the Nebraska Attorney General is investigating an agency itself for potential violations of law, that agency would refuse to provide information absent formal process. But the fact that state agencies would sometimes require formal investigative demands or subpoenas in other cases says nothing about whether or not there is "control" for the documents at issue here. As noted, there is no basis to assume that the Nebraska Attorney General and the state agencies have any adversity or conflicts of interest with regard to this Multi-District Litigation. Indeed, the contrary is true given that the Nebraska Attorney General has declared that this action is in the public interest of the State of Nebraska. *See* Multistate Complaint at ¶ 12.

Further, this argument ignores that agencies' "routinely" requesting investigative demands or subpoenas or records requests in other cases (apparently where the Attorney General is adverse to the agencies) does not obviate the fact that, here where the Attorney General is counsel representing the agencies, such formal processes are not needed. The Nebraska Attorney General cites no law supporting the view that an investigative demand, subpoena, or public records request are the only ways for the Nebraska Attorney General to obtain documents from state agencies when they are clients. [Dkt. 738-25 at 2]. Indeed, the Nebraska Attorney General implicitly concedes that there are other avenues for that office to obtain documents from state agencies when this argument is limited by the word "routinely." *Id.* If the Nebraska Attorney General intends to imply that formal mechanisms for obtaining agency documents are the only mechanisms, then the Nebraska Attorney General would have to subpoena, or serve an investigative demand, or submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel for the agencies (and not prosecuting or investigating the agencies), the Nebraska Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct. To the extent the Nebraska Attorney General implies that the state agencies may have a "virtual veto" here, that argument is both unsupported by evidence

or facts germane to this case and is legally unpersuasive as discussed above.  Indeed, as discussed herein, the Nebraska Attorney General argues too much by relying on these other formal procedures: if the Nebraska Attorney General is implying that its lawyers "routinely" obtain agency documents using legal procedures such as subpoenas, civil investigative demands, and public records requests, then that admission of a "routine" process may be viewed as constituting a legal right of access to the agencies' documents upon demand.  In any event, the Court need not reach that issue to find "control" on the record presented here.  Ultimately, the Nebraska Attorney General's argument about what may "routinely" happen in other (apparently adversarial) cases does not negate or inform what is actually happening in this case, on the record before the Court here.

The Nebraska Attorney General argues that, because Google sought documents from Nebraska state agencies by subpoena in connection with a case in the Eastern District of Virginia, that somehow suggests that state agencies should not be subject to party discovery here.  [Dkt. 738-22 at 2 (citing *United States v. Google LLC*, 698 F. Supp. 3d 876 (E.D. Va. 2023)].  Apparently, the University of Nebraska at Omaha represented itself in responding to the subpoena in the *Google* case, while the Nebraska Department of Transportation was represented by the Nebraska Attorney General.  The subpoenas issued in April 2023.  [Dkts. 738-41 to -43].  A review of the docket from the *Google* Court shows that no motions to compel were filed and certainly none were decided prior to April 2023.  *See United States v. Google LLC*, No. 23-cv-108, at Dkts. 1-167.  The only discovery matters on that docket prior to April 2023 reflect stipulated and preliminary motions practice regarding the protective order, ESI protocol, and the discovery plan.  *Id.*  It is apparent that, in the circumstances of that case, Google chose not to pursue party discovery voluntarily, and instead tactically chose to seek documents from the state agencies by subpoena.  There is no Order on the control issue decided by the *Google* Court.  This Court declines the Nebraska Attorney General's suggestion to follow that "same process" here, where (unlike *Google*) Meta has chosen to litigate this issue and (again unlike in *Google*) the Nebraska Attorney General has also chosen to litigate its opposition to the control issue.  While the parties here could have attempted to negotiate this dispute to follow the non-litigated process in *Google*, there is nothing legally instructive or persuasive in the voluntary process followed by the parties in *Google* which informs the "control" issue here

1    (other than the fact that the parties in *Google* conserved both their and that Court's resources by

2    opting not to litigate the issue, unlike here).

3         Accordingly, it appears that under the statutory scheme each will be represented by the

4    Nebraska Attorney General in this matter for discovery.  Thus, because the Nebraska Attorney

5    General appears likely to be involved in representing these state agencies in any event in this case,

6    whether to respond to subpoenas or to respond to party discovery.

7    **XXII.  NEW JERSEY**

8         In opposition to the control issue, the New Jersey Attorney General argues primarily that the

9    New Jersey Attorney General is a separate entity and independent from the New Jersey agencies.

10   [Dkt. 738-23 at 2].

11        In support of a finding of control with regard to these state agencies' documents, Meta argues

12   based primarily on the following factors: (1) New Jersey agencies are proscriptively barred from

13   obtaining counsel other than the New Jersey Attorney General without consent from the New Jersey

14   Governor; and (2) the New Jersey Attorney General has acknowledged that it will definitely

15   represent all but two of the identified agencies (and that it could represent the remaining two

16   agencies).  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Department of

17   Children & Families, Department of Education, Department of Health, Department of Human

18   Services, Department of the Treasury, Economic Development Authority, Governor's Counsel on

19   Mental Health Stigma, Office of the Governor, and Office of the Secretary of Higher Education.  *Id.*

20        After considering the factors argued in the briefs, the Court finds that the factors weigh in

21   favor of a finding that the New Jersey Attorney General does have legal control, for purposes of

22   discovery, over the identified New Jersey agencies.  While the New Jersey Attorney General asserts

23   its independence as a separate entity, this does not negate the legal and practical realities highlighted

24   by Meta. Specifically, New Jersey agencies are barred from obtaining counsel other than the New

25   Jersey Attorney General without the Governor's consent, which firmly establishes the Attorney

26   General as their primary legal representative.

27        Under New Jersey's statutory scheme, the New Jersey Attorney General shall "[e]xamine

28   and decide all legal matters submitted to him by the Governor or the Legislature and act for them in

any matter in which they may be interested, and shall exclusively attend to and control all litigation and controversies to which the State is a party or in which its rights and interests are involved[.]" N.J. Stat. § 52:17A-4(c).  Additionally, the New Jersey Attorney General shall "[a]ct as the sole legal adviser, attorney or counsel[] . . . for all officers, departments, boards, bodies, commissions and instrumentalities of the State Government in all matters other than those requiring the performance of administrative functions entailing the enforcement, prosecution and hearing of issues as imposed by law upon them; and represent them in all proceedings or actions of any kind which may be brought for or against them in any court of this State[.]" N.J. Stat. § 52:17A-4(e).

Importantly, the New Jersey Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the New Jersey agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-23 at 2].  Under New Jersey law, "[n]o special counsel shall be employed for the State or for or by any officer, department, board, body, commission or instrumentality of the State Government except by authority of the Attorney-General, and then only with the approval of the Governor, and provided that appropriations have been made therefor, unless the matter be of such an emergency and shall be so declared by the Governor." N.J. Stat. § 52:17A-13.  Indeed, the New Jersey Attorney General confirmed that its office will definitely represent all but two agencies at issue (and that it could represent the remaining two agencies) if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 36–37].  Accordingly, it appears that under the statutory scheme almost every agency at issue will definitely be represented by the New Jersey Attorney General in this matter for discovery.  With regard to the  the New Jersey Economic Development Authority and the New Jersey Office of the Governor, the New Jersey Attorney General's indication that it could represent them is not explained in the context of the statutory scheme.  Here, there has been no evidence that the New Jersey Attorney General has authorized separate counsel, no indication that the Governor's approval has been sought or granted, and no evidence of any appropriations having been made for separate counsel.  *See* N.J. Stat. § 52:17A-4(e).  As discussed, no separate counsel has appeared for any New Jersey state agencies, despite the fact that litigation holds have been issued and the agencies have had notice of the pendency of

discovery in this matter for some time.  Accordingly, based on the record before the Court, the New Jersey Attorney General will likely represent these two other state agencies for purposes of discovery.

Relatedly, the New Jersey Attorney General has taken the position that the New Jersey agencies do not share confidential information and do not "engage in the same functions, or have the same management teams." [Dkt. 738-23 at 2].  That argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.

By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  The New Jersey Attorney General's reliance on the separation between these agencies and the Department of Law and Public Safety, and the alleged lack of "administrative control and oversight" is thus unpersuasive.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in administrative or managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  The New Jersey Attorney General's arguments erroneously conflate the legal control issue with "administrative control" or "generalized control" over each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

United States District Court
Northern District of California

165

1    Further, there is no statutory, legal, or administrative rule cited which prohibits the New

2    Jersey Attorney General from accessing the documents of the state agencies at issue for purposes of

3    discovery.  The New Jersey Attorney General's argument that there is a lack of "unfettered access

4    to records of every agency" and reference in general to agencies' records laws is unpersuasive on

5    the issue of "control" for purposes of discovery.  [Dkt. 738-23 at 2].  First, the "control" test for

6    Rule 34 does not require unbounded, fully discretionary access to records of every agency at all

7    times under every conceivable set of circumstances – the question rather is whether there is a legal

8    right to access upon demand the documents at issue in this case.  Whether or not Meta has failed to

9    show "unfettered access" of every agency's records does not answer the "control" question for the

10   specific agencies' documents at issue here for Rule 34.

11   Second, the argument based on agencies' records laws is irrelevant for the same reasons

12   discussed herein with regard to similar arguments based on confidentiality laws of other states.  The

13   only statute actually cited by the New Jersey Attorney General relates to confidentiality of records

14   of child abuse reports within the New Jersey Department of Children and Families.  [Dkt. 738-23 at

15   2 (citing N.J. Stat. Ann. § 9:6-8.10a)].  As an initial matter, that statute is irrelevant to any of the

16   other agencies at issue and poses no barriers to the New Jersey Attorney General's access to those

17   other agencies' documents.  Further, that statute is limited to reports, investigations, and findings of

18   child abuse made pursuant to three specific New Jersey statutes, and thus poses no restriction on an

19   attorney accessing other documents of the New Jersey Department of Children and Families.

20   Because the issues being litigated in this Multi-District Litigation do not focus on specific reports

21   or investigations of instances of child abuse in New Jersey, the cited statute appears to be irrelevant

22   to the scope of discovery in this case.  More importantly, the cited statute does not bar access to

23   documents by an attorney representing the Department of Children and Families.  Contrary to the

24   New Jersey Attorney General's arguments, that statute expressly states that these child abuse records

25   "may be disclosed" in numerous listed circumstances, including disclosure to a "federal, State, or

26   local government entity, to the extent necessary for such entity to carry out its responsibilities under

27   law to protect children from abuse and neglect."  N.J. Stat. Ann. § 9:6-8.10a(1)(b)(20).  Here, the

28   Multistate Complaint (of which the New Jersey Attorney General is a party) asserts in multiple

United States District Court
Northern District of California

United States District Court
Northern District of California

sections that Meta has harmed youth.  *See, e.g.*, Multistate Complaint at ¶¶ 1-2 (Meta "has ignored the sweeping damage these Platforms have caused to the mental and physical health of our nation's youth . . . .  Meta designed and deployed harmful and psychologically manipulative product features to induce young users' compulsive and extended Platform use[.]").  Facially, the cited New Jersey records statute would appear to grant an express legal right for the New Jersey Attorney General to access these records from the Department of Children and Families, to the extent those records were necessary to carry out its responsibilities to protect children from abuse and neglect.  On this basis alone, the Court finds that the cited statute, N.J. Stat. Ann. § 9:6-8.10a, satisfies *Citric Acid*'s requirement of a legal right to access those documents of that agency by the New Jersey Attorney General.  For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by **statute**, affiliation or employment."  *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)).

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the Attorney General, is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  Here, the New Jersey Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state

agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies. *See* Dkt. 1031-5. None of these state agencies are allowed to employ legal counsel other than the New Jersey Attorney General and thus by statute each must be represented by the New Jersey Attorney General in this matter for discovery. *See* N.J. Stat. § 52:17A-4(c). This arrangement indicates strongly that the state Attorney General, in fulfilling its role as chief legal advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the New Jersey Attorney General has legal control, for the purposes of discovery, over the documents held by the New Jersey agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Instructive on the "control" issue is the New Jersey district court opinion in *Love v. NJ Dep't of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864 (D.N.J. Aug. 11, 2017), *opinion clarified sub nom. Love v. New Jersey Dep't of Corr., No. 15CV4404 (SDW)(SCM)*, 2017 WL 4842379 (D.N.J. Oct. 26, 2017). In *Love*, the plaintiff sued several individual officers of a New Jersey state prison and served document requests on each of them. The named defendants, all employees of the New Jersey Department of Corrections and all represented by the New Jersey Attorney General, objected and argued that they lacked control over the documents of the Department of Corrections. The *Love* Court took notice "that the Attorney General is obligated to defend State employees against civil claims; and anytime a defense is provided, such as here, 'the State shall provide indemnification for the State Employee.' Therefore, the Court finds that State has a significant stake in the outcome of this suit and that Mr. Love has met his burden to prove that the Northern State Officers have 'control', albeit through their attorney, over the records and

United States District Court
Northern District of California

United States District Court
Northern District of California

information at-issue." *Id.* at *6.  As in *Love*, here the New Jersey Attorney General both represents itself and is obligated to represent the state agencies at issue, and the State of New Jersey has a significant stake in the outcome of this Multi-District Litigation given that the Multistate Complaint expressly states that "[t]his action is in the public interest of the Filing States."  *See* Multistate Complaint at ¶ 12.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, New Jersey is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that New Jersey was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the New Jersey Attorney General and Meta were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XXIII. NEW YORK

In opposition to the control issue, the New York Attorney General argues primarily the following factors: (1) the New York Attorney General is a separate entity and independent from the New York agencies; and (2) the New York Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-24 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) with exceptions not particularly relevant here, the New

169

1   York Attorney General must act as counsel for the New York agencies, and (2) nothing in New

2   York law prohibits the New York Attorney General from accessing agency documents.  *Id.* at 3.

3   Here, Meta seeks discovery from the following agencies: Council on Children and Families,

4   Department of Education, Department of Health, Department of State, Higher Education Services

5   Corporation, Office of Children and Family Services, Office of Mental Health, Office of the

6   Governor, and State Division of the Budget.  *Id.*  Meta states that it has agreed not to seek party

7   discovery from the Empire State Development Corporation, and therefore, the Court **DENIES**

8   Meta's motion with regard to that agency.  *Id.* at 3 n.2.

9        After considering the factors argued in the briefs, the Court finds that the factors weigh in

10  favor of a finding that the New York Attorney General does have legal control, for purposes of

11  discovery, over the listed New York agencies (excluding the Empire State Development

12  Corporation, as discussed above).  While the New York Attorney General is a separate entity and

13  while the New York Attorney General does bring the instant action in its own independent authority,

14  this does not outweigh the requirement that the New York General will act as the remaining

15  agencies' counsel.

16       The statutory scheme in New York requires that the New York Attorney General

17  "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge

18  and control of all the legal business of the departments and bureaus of the state, or of any office

19  thereof which requires the services of attorney or counsel, in order to protect the interest of the

20  state[.]"  N.Y. Exec. Law § 63(1).

21       The New York Attorney General does not cite to any statutory or legal prohibition on the

22  New York Attorney General's representing the state agencies in this matter for purposes of

23  discovery.  Indeed, the New York Attorney General confirmed that its office could represent the

24  agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1

25  at 21].  Accordingly, it appears that under the statutory scheme each agency will be represented by

26  the New York Attorney General in this matter for discovery.

27       Importantly, the New York Attorney General's arguments do not negate the fact that all of

28  the New York agencies at issue here must notify the New York Attorney General if any property or

United States District Court
Northern District of California

1    interest of the state must be defended: "[n]o action or proceeding affecting the property or interests

2    of the state shall be instituted, defended or conducted by any department, bureau, board, council,

3    officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him

4    of the said action or proceeding, the nature and purpose thereof, so that he may participate or join

5    therein if in his opinion the interests of the state so warrant."  N.Y. Exec. Law § 63(1).  This

6    arrangement indicates strongly that the New York Attorney General, in fulfilling its statutory role

7    for the state agencies, would necessarily and inherently have access to and control over the necessary

8    documents for effective legal representation of these state agencies.

9          The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

10   organization, the attorney general, is a party to the case while also acting as counsel for a third party.

11   However, this would not be the first time that a legal services provider, as counsel for a party, is

12   found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018

13   WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and

14   defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .

15   Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as

16   to responsive materials over which Salas and his law firm had possession, custody or control.").

17   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

18   documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding

19   broadly that there must be a finding of a legal right of access to and thus control over third party

20   client documents in every case involving a legal services provider as a party; rather, under the

21   particular facts here, and under the totality of circumstances viewed in light of applicable legal

22   standards, the Court finds that control exists here.

23         The New York Attorney General's role as counsel for the agencies at issue inherently

24   involves obtaining necessary documents for effective representation in litigation.  In acting as

25   counsel, the New York Attorney General would necessarily have access to and thus control over the

26   relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at

27   *5–6 (finding state Attorney General has control over agency documents "based on his broad

28   statutory and common law powers to control and manage legal affairs on behalf of state agencies,

United States District Court
Northern District of California

1   has a legal right to obtain responsive documents from the state agencies referenced in the

2   Complaint").

3     Further, the New York Attorney General argues that the New York Attorney General is a

4   separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-24 at 2 ("The

5   [New York Attorney General] NYAG is an independently-elected official, and unlike almost all

6   other executive branch officers, including the heads of the state entities Meta identified, does not

7   necessarily act pursuant to the directives of the [New York] Governor.").  However, this argument

8   misapprehends the "legal control" test for documents – the issue is not simply whether one entity is

9   under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary

10  relationship), and not simply whether the two entities are legally separate (such as two different and

11  separately incorporated entities), but rather whether there is a legal right to obtain the documents as

12  explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to

13  have actual managerial power over the foreign corporation, but rather that there be close

14  coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

15  client relationship between the state Attorney General and the state agencies (a relationship

16  mandated by state law) necessitates close coordination.  While operational control may be a factual

17  situation which demonstrates a legal right to obtain the documents, the absence of such "executive

18  or functional control" is not determinative for evaluating "control" for purposes of discovery.  By

19  definition, the "legal control" issue for discovery arises when there are two legally distinct or

20  separate entities – otherwise, if only one entity were involved, there would be no dispute that party

21  discovery covered that one entity.  As discussed above, courts have found "control" for purposes of

22  discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

23  having control over the documents of a parent corporation, or an individual government officer

24  having control over the documents of an entire agency.

25    Relatedly, the New York Attorney General argues that "[s]ome pre-suit [New York Attorney

26  General] communications with such entities, therefore, may be privileged. The [New York Attorney

27  General] does not, however, represent any of the state entities Meta has identified in this litigation,

28  so no pre-suit communications arising out of this litigation are attorney-client privileged."  [Dkt.

United States District Court
Northern District of California

United States District Court
Northern District of California

738-24 at 2].  That statement, however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the New York Attorney General will assert privilege with respect to post-suit communications.    The Court rejects the New York Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege for pre-suit communications, while apparently attempting to preserve the ability to assert the privilege applies to post-suit communications.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at \*2.  To the extent the New York Attorney General implies its intention to assert that the attorney-client privilege would apply to communications between the New York Attorney General's office and the agencies at issue, that further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

The New York Attorney General's reliance on *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 263 (N.D.N.Y. 2006) [hereinafter *Boardman*], does not dictate a different result.  [Dkt. 738-24 at 2].  The *Boardman* Court recognized that "control in the context of discovery is to be broadly construed."  *Id.* at 267–68.  The *Boardman* Court properly recognized that "[t]he burden of establishing control over the documents being sought rests with the demanding party."  *Id.*  Critically, the finding of lack of control by one New York agency over the documents of another agency resulted from an express failure by the moving party (Amtrak) to meet its burden: "Amtrak's contention that [state agency] DOT has possession, custody, and control of [second state agency] OSC's records **is supported by nothing more than hypotheses**."  *Id.* (emphasis added). Here, by contrast, the record submitted to the Court is not mere hypotheses, as evident from the extended discussion in this Order.  To the extent the New York Attorney General attempts to extrapolate from *Boardman* a general rule that no state agency can ever have control over the documents of another state agency, that argument is belied by *Boardman* itself: "The determination of control is often fact specific and thus generalizations, as [*Compagnie Francaise d'Assurance*

*Pour le Com. Exterieur*]'s pronouncement seems to have done, are difficult to apply across the board." *Id.* at 267 (citing *Compagnie Francaise d'Assurance Pour le Com. Exterieur*, 105 F.R.D. 16).

The fact that several other New York courts have found a state agency has control over the documents over another agency for purposes of discovery confirms that the issue of "control" is often case and fact specific. *See, e.g.*, *Compagnie Francaise d'Assurance Pour le Com. Exterieur*, 105 F.R.D. at 35; *see also In re Opioid Litigation*, No. 400000/2017, 2019 WL 4120096, at *1 (N.Y. Sup. Ct. Aug. 14, 2019) (finding control and distinguishing *Boardman* "easily"); *see also Gross v. Lunduski*, 304 F.R.D. 136, 141–44 (W.D.N.Y. 2014) (distinguishing *Boardman* and finding named defendant, individual corrections officer, has "control" over documents of N.Y. Department of Correctional and Community Services in part because New York State Attorney General was representing both defendant and agency); *see also Guillory v. Skelly*, No. 12-CV-00847S F, 2014 WL 4542468, at *8–9 (W.D.N.Y. Sept. 11, 2014) (distinguishing *Boardman* and finding named defendants, individual corrections officers, have "control" over documents of N.Y. Department of Correctional and Community Services); *see also Siano Enders v. Boone*, No. 1:19-CV-948 (BKS/CFH), 2021 WL 3471558, at *3-4 (N.D.N.Y. Aug. 6, 2021) (finding named defendants, individual retired employees of N.Y. agency, have control over documents of their former employer-agency); *cf. also United States v. UBS Sec. LLC*, No. 118CV6369RPKPK, 2020 WL 7062789, at *4–7 (E.D.N.Y. Nov. 30, 2020) (finding that named party, the United States, has control over documents of agencies (HUD and Treasury)); *cf. also Loc. 3621, EMS Officers Union, DC-37, AFSCME, AFL-CIO v. City of New York*, No. 18CV4476LJLJW, 2023 WL 8804257, at *11 (S.D.N.Y. Dec. 30, 2023) (finding that named party, City of New York, has control over documents of city agencies (NYCAPS, DCAS, Fire Department of New York, "or any other City department or agency")).

Therefore, the Court concludes that the New York Attorney General has legal control, for the purposes of discovery, over the documents held by the New York agencies listed by Meta.

## XXIV. NORTH CAROLINA

In opposition to the control issue, the North Carolina Attorney General argues primarily the

following factors: (1) the North Carolina Attorney General is a separate entity and independent from the North Carolina agencies; (2) the heads of North Carolina agencies are statutorily responsible for the "legal custody of all books, papers, documents and other records of the department;" and (3) the North Carolina Attorney General is not authorized to make decisions in areas which have been specifically delegated to a designated department.  [Dkt. 738-25 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) in general the North Carolina Attorney General is required to represent all state agencies, and (2) North Carolina agencies are proscriptively barred from obtaining counsel other than the North Carolina Attorney General, without consent from the North Carolina Attorney General. *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Department of Commerce, Department of Health and Human Services, Department of Public Instruction, Office of Governor, and Office of State Budget and Management. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the North Carolina Attorney General has legal control, for purposes of discovery, over the listed North Carolina agencies.  While the North Carolina Attorney General is a separate entity from the state agencies, this does not outweigh the requirement that the North Carolina Attorney General will act as the agencies' counsel and will thus have access to the documents.

The statutory scheme in North Carolina requires the North Carolina Attorney General "[t]o represent all State departments, agencies, institutions, commissions, bureaus or other organized activities of the State which receive support in whole or in part from the State."  N.C. Gen. Stat. § 114-2.  More importantly, North Carolina law prohibits state agencies from employing separate counsel (subject to an exception not evident here): "No department, officer, agency, institution, commission, bureau or other organized activity of the State which receives support in whole or in part from the State shall employ private counsel, except with the approval of the Governor. The Governor shall give his approval only if the Attorney General has advised him . . . that it is impracticable for the Attorney General to render the legal services."  N.C. Gen. Stat. § 147-17. There is nothing in the North Carolina Attorney General's submissions to this Court indicating that

United States District Court
Northern District of California

the North Carolina Attorney General has advised the Governor that representing the agencies is impracticable here, and there is nothing in the record to indicate that the Governor has approved separate counsel being retained by the state agencies.  And given the circumstances of this case there is no basis to even suspect that the North Carolina Attorney General has a conflict of interest with any of the listed state agencies in relation to this Multi-District Litigation.  Further, as noted, no separate counsel has appeared for any state agencies in this case.

Indeed, the North Carolina Attorney General confirmed that its office could represent all but one of the listed agencies if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 22].  And as to that one agency (the North Carolina Department of Commerce), there is nothing in the record to indicate how or why that agency would be permitted to retain separate counsel for this case under § 147-17, and the North Carolina Attorney General's briefing does not adequately explain why they represent confusingly to the Court that they would not represent that agency.  When evaluating this issue, the Court determines that the plain language of the statute should control, as opposed to the unexplained statement of counsel.  The statutory scheme in North Carolina makes clear the North Carolina legislature's strong preference that state agencies be represented by the North Carolina Attorney General.  This arrangement indicates strongly that the North Carolina Attorney General, in fulfilling its statutory role to carry out its duties to represent all agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the North Carolina Attorney General from accessing the documents of the state agencies at issue.  The North Carolina Attorney General argues that "agency documents, not all of which are public records, are under the legal control of separately elected constitutional officers and each agency has their own separate processes for responding to public records requests[.]"  [Dkt. 738-25 at 2].  This argument is based on an incorrect assumption that "public records" laws and processes are the only way in which the North Carolina Attorney General can obtain documents from the state agencies when they are clients of the lawyers of that office.  A public records law does not amount to a statutory or legal prohibition on the North Carolina Attorney General from accessing the documents in the scope of

United States District Court
Northern District of California

its representation of the agencies as clients.  If the North Carolina Attorney General's supposition that, every time the North Carolina Attorney General seeks documents from state agencies, a public records Act requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and records of the agency subject to the Act.  At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34.  *See Flagg*, 252 F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure.").  However, the North Carolina Attorney General cites no law supporting the view that a public records request is the only way for the North Carolina Attorney General to get documents from state agencies when they are clients.  [Dkt. 738-25 at 2].  If the North Carolina Attorney General were correct, then the North Carolina Attorney General would have to submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation.  As counsel, the North Carolina Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct.  The North Carolina open records law is not an impediment to that access, because public records requests apply to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents).

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

United States District Court
Northern District of California

1   recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

2   lawsuit . . . .   Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

3   to respond as to responsive materials over which Salas and his law firm had possession, custody or

4   control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

5   over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

6   holding broadly that there must be a finding of a legal right of access to and thus control over third

7   party client documents in every case involving a legal services provider as a party; rather, under the

8   particular facts here, and under the totality of circumstances viewed in light of applicable legal

9   standards, the Court finds that control exists here.

10         The North Carolina Attorney General's role as counsel for the agencies at issue inherently

11   involves obtaining necessary documents for effective representation in litigation.   In acting as

12   counsel, the North Carolina Attorney General would necessarily have access to and thus control

13   over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL

14   4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his

15   broad statutory and common law powers to control and manage legal affairs on behalf of state

16   agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

17   Complaint").

18         To the extent the North Carolina Attorney General argues that the North Carolina Attorney

19   General is a "separate principal departments headed by the independently elected Governor," dkt.

20   738-25 at 2, that argument misapprehends the "legal control" test for documents – the issue is not

21   simply whether one entity is under the day-to-day operational control of the other (such as a parent-

22   wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

23   (such as two different and separately incorporated entities), but rather whether there is a legal right

24   to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

25   does not require the party to have actual managerial power over the foreign corporation, but rather

26   that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

27   Here, the attorney-client relationship between the state Attorney General and the state agencies (a

28   relationship mandated by state law) necessitates close coordination.  While operational control may

be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the North Carolina Attorney General "does not represent any state agencies in this action and brings this action in the public interest under North Carolina's consumer protection laws[,]" dkt. 738-25 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The North Carolina Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Court is not persuaded by the North Carolina Attorney General's argument that North Carolina law does not authorize the Attorney General "to make decisions in areas which have been specifically delegated toa designated department," dkt. 738-25 at 2 (citing *Tice v. Dep'. of Transp.*, 312 S.E2d 241, 245 (N.C. Ct. App. 1984)). That argument does not mandate a different result over "control" for purposes of discovery. Nothing in North Carolina law "specifically delegates" to the listed state agencies the handling of discovery issues surrounding the production of documents in a civil matter. The fact that agencies may have their own internal procedures for handling public records requests is irrelevant, as noted above, because such public records procedures are not the only method by which the North Carolina Attorney General can obtain documents from state agencies in the course of representing them in litigation. Indeed, under North Carolina law, because the North Carolina Attorney General is specifically mandated to represent the state agencies in litigation, if anything the cited *Tice* case supports the view that handling this discovery issue is properly within the legislatively-mandated scope of duties of the North Carolina Attorney General. To the extent the *Tice* opinion reflects the concept that, for policy and operational duties, each

179

1  agency is structurally independent, again that is simply another irrelevant reiteration and confusion

2  of "managerial power" with "control" for purposes of discovery.

3  Furthermore, at least one other federal court has previously found that the North Carolina

4  Attorney General has legal control over North Carolina state agency materials.  *Generic*

5  *Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  While this Court reaches its own independent

6  conclusions consistent with the applicable legal standards discussed above and in light of the facts

7  and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District

8  Litigation is certainly consistent with, and to that extent further persuasively supports, the

9  conclusion here with regard to the North Carolina Attorney General's having control with regard to

10  documents of the state agencies at issue.  Given that the *Generic Pharmaceuticals (II)* opinion

11  resolved the control issue against all the objecting states including North Carolina, this Court is

12  disappointed that the North Carolina Attorney General and Meta here were unable to reach a

13  negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals*

14  *(II)*  As the Court has repeatedly encouraged the Parties at multiple Discovery Management

15  Conferences, they should make every effort to work out discovery disputes through reasonable,

16  good faith negotiations between able and experienced counsel, particularly where, as here, there is

17  guidance in precedent on the discovery issue at hand.

18  Therefore, the Court concludes that the North Carolina Attorney General has legal control,

19  for the purposes of discovery, over the documents held by the North Carolina agencies listed by

20  Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

21  **XXV.  NORTH DAKOTA**

22  In opposition to the control issue, the North Dakota Attorney General argues primarily the

23  following factors: (1) the North Dakota Attorney General is a separate entity and independent from

24  the North Dakota agencies;   (2) the North Dakota Attorney Generals powers are specifically

25  determined by the legislature and prescribed by law; (3) the North Dakota agencies' ability to share

26  information with other agencies or access records of other agencies is control by state law; (4) the

27  North Dakota Attorney General does not seek relief on behalf of North Dakota agencies; and (5) the

28  North Dakota Attorney General is not automatically required to represent North Dakota agencies.

United States District Court
Northern District of California

1    [Dkt. 738-26 at 2].

2          In support of a finding of control with regard to these state agencies' documents, Meta argues

3    based primarily on the following factors: (1) North Dakota agencies are proscriptively barred from

4    obtaining counsel other than the North Dakota Attorney General, without consent from the North

5    Dakota Attorney General; and (2) the North Dakota Attorney General is "expressly allowed to

6    'access and examine any record under the control of the state board of higher education' in the

7    course of representing that board." *Id.* at 3.  Here, Meta seeks discovery from the following

8    agencies: the Department of Commerce, Department of Health and Human Services, Department of

9    Public Instruction, Department of Education Standards and Practices Board, Office of Management

10   and Budget, and Office of the Governor.  *Id.*

11         After considering the factors argued in the briefs, the Court finds that the factors weigh in

12   favor of a finding that the North Dakota Attorney General has legal control, for purposes of

13   discovery, over the listed North Dakota agencies.  While no specific statute exists that explicitly

14   grants the North Dakota Attorney General access to the documents from the North Dakota agencies,

15   the North Dakota Attorney General will act as counsel to these state agencies, subject to such request

16   which appears certain based on the record, and will thus have control over the documents.  The

17   Court repeatedly asked the state Attorneys General whether they have spoken with the agencies at

18   issue, and they chose not to.  No separate counsel has entered appearance for these state agencies.

19   Accordingly, the record before the Court is that all of the agencies at issue will be represented by

20   the North Dakota Attorney General.

21         The statutory scheme in North Dakota requires that the North Dakota Attorney General shall

22   "[a]ppear and defend all actions and proceedings against any state officer in the attorney general's

23   official capacity in any of the courts of this state or of the United States."  N.D. Cent. Code § 54-

24   12-01.  Indeed, the North Dakota Attorney General confirmed that its office could represent all of

25   the listed agencies if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-

26   1 at 22].  Importantly, the North Dakota Attorney General's arguments do not negate the fact that

27   all of the North Dakota agencies at issue here are barred by North Dakota law from obtaining counsel

28   other than the North Dakota Attorney General: "[a] state . . . agency may not employ legal counsel,

United States District Court
Northern District of California

and no person may act as legal counsel in any matter, action, or proceeding in which the state . . . agency is interested or is a party, except upon written appointment by the attorney general." N.D. Cent. Code § 54-12-08. This statutory scheme makes plain the North Dakota Legislature's strong preference that the North Dakota Attorney General will represent state agencies in cases such as this Multi-District Litigation. As a result, this arrangement indicates strongly that the North Dakota Attorney General, in fulfilling its statutory role to appear and defend all action for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the North Dakota Attorney General has legal control, for the purposes of discovery, over the documents held by the North Dakota agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Further, there is no statutory, legal, or administrative rule cited which prohibits the North Dakota Attorney General from accessing the documents of the state agencies at issue. Meta argues that North Dakota law specifically grants the North Dakota Attorney General the statutory right to "access and examine any record under the control of the state board of higher education" when appointed to represent that agency or an institution under the control of the state board of higher education. [Dkt. 738-26 at 3 (citing N.D. Cent. Code § 54-12-08(4)]. However, the North Dakota State Board of Higher Education is in charge of the university system in North Dakota and does not appear to be one of the agencies at issue in this case for discovery. Accordingly, Meta's reliance on the cited statute is irrelevant and fails to show a legal right of access for the documents of the agencies at issue here.

The North Dakota Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation, as explained above. In acting as counsel, the North Dakota Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state

agencies referenced in the Complaint").

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The North Dakota Attorney General argues that its powers are conferred by the North Dakota Constitution, and because the North Dakota Constitution has not explicitly conferred access to agency documents, the North Dakota Attorney General does not have legal control over the documents.  [Dkt. 738-26 at 2].  However, the North Dakota Attorney General does not cite to any statutory or legal prohibition on the North Dakota Attorney General's representing the state agencies for purposes of discovery (and accessing their clients' documents in the course of such representation).  To the extent the North Dakota Attorney General argues that the North Dakota Attorney General separate and distinct elected entity with separate duties and responsibilities, *see* dkt. 738-26 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  .  "'The control analysis for Rule

United States District Court
Northern District of California

34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the North Dakota Attorney General "brought this action in a law enforcement capacity, pursuant to statutory authority, to enjoin unlawful practices.  The [North Dakota Attorney General] alone decides whether to bring such an action[,]" dkt. 738-26 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The North Dakota Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Relatedly, the North Dakota Attorney General has taken the position that communications between the North Dakota Attorney General and these state agencies would be covered by the attorney-client privilege.  Dkt. 738-26 at 2 ("Communications between other [North Dakota Attorney General's] divisions and client state agencies may be privileged if it is an active litigation record, attorney work product, or attorney consultation.").  To the extent the North Dakota Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state North Dakota General's office but not other sub-teams, that argument is not supported by citation to law and is contrary to the weight of law.  The scope of

United States District Court
Northern District of California

attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support North Dakota's argument that different individual lawyers in the North Dakota Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the North Dakota Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "division" of attorneys currently working

on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in other "divisions" of the North Dakota Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the North Dakota Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the North Dakota Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Instructive on the control issue is the District of North Dakota's opinion in *North Dakota v. United States*, No. 1:19-CV-150, 2021 WL 6278456 (D.N.D. Mar. 24, 2021). In that case, the State of North Dakota, represented by the North Dakota Attorney General, served document requests on the United States, and expressly argued that several federal agencies should be the subject of party discovery. *Id.* at *2. The United States objected, taking positions strikingly similar to the North Dakota Attorney General in this Multi-District Litigation, and argued that North Dakota should seek documents from such listed agencies by subpoena under Rule 45 instead. *Id.* After reviewing multiple cases involving whether federal agencies should be subject to party discovery when the United States is the named party, the North Dakota district court held that while those precedents "all involved circumstances quite different from those of this case, each involved the United States as a party, and each followed the principle that the United States' obligation to respond to discovery requests is not limited to an agency named in the action. This order need not, and therefore does not, consider whether North Dakota can recover for any acts of employees of agencies other than the USACE. Even if North Dakota's recovery is limited to negligent acts of USACE employees, that would not foreclose North Dakota from seeking discovery from other federal agencies who possess relevant information." *Id.* at *4. It is noteworthy that, in *North Dakota v. United States*, the North Dakota Attorney General argued that government agencies should be subject to party

United States District Court
Northern District of California

1    discovery when the sovereign is a named party and succeeded in that argument when seeking

2    discovery from another sovereign.  *See id.* at *2–4. The fact that the North Dakota Attorney General

3    is now arguing the exact opposite position, when its sovereign is a party and its agencies are the

4    target of discovery, undercuts the persuasive force of the arguments presented.  The analogous result

5    in *North Dakota v. United States* supports the finding of "control" for purposes of discovery here.

6            Given the North Dakota federal court's decision in the analogous *North Dakota v. United*

7    *States* case (which the North Dakota Attorney General was involved in as counsel), this Court is

8    disappointed that the North Dakota Attorney General and Meta were unable to reach a negotiated

9    resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*.  As

10   the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences,

11   they should make every effort to work out discovery disputes through reasonable, good faith

12   negotiations between able and experienced counsel, particularly where, as here, there is guidance in

13   precedent on the discovery issue at hand.

14           Therefore, the Court concludes that the North Dakota Attorney General has legal control,

15   for the purposes of discovery, over the documents held by the North Dakota agencies listed by Meta.

16   **XXVI.  OHIO**

17           In opposition to the control issue, the Ohio Attorney General's primary substantive argument

18   is that the Ohio Attorney General is a separate entity and independent from the Ohio agencies.  [Dkt.

19   738-27 at 2].

20           In support of a finding of control with regard to these state agencies' documents, Meta argues

21   based primarily on the following factors: (1) Ohio agencies are proscriptively barred from obtaining

22   counsel other than the Ohio Attorney General; and (2) Ohio state law mandates that Ohio agencies

23   furnish documents to the Ohio Attorney General.  *Id.* at 3.  Here, Meta seeks discovery from the

24   following agencies: the Department of Children and Youth, Department of Development,

25   Department of Education & Workforce, Department of Health, Department of Higher Education,

26   Department of Job and Family Services, Department of Mental Health & Addiction Services,

27   Department of Youth Services, Office of Budget and Management, and Office of Governor.  *Id.*

28           After considering the factors argued in the briefs, the Court finds that the factors weigh in

favor of a finding that the Ohio Attorney General does have legal control, for purposes of discovery, over the listed Ohio agencies. While the Ohio Attorney General is a separate entity, this does not outweigh the requirement that the Ohio Attorney General will act as the agencies' counsel and that Ohio state law explicitly mandates that Ohio agencies furnish documents to the Ohio Attorney General.

There is no statutory, legal, or administrative rule cited which prohibits the Ohio Attorney General from accessing the documents of the state agencies at issue. To the contrary, "[p]ublic officers and their deputies, assistants, clerks, subordinates, and employees shall render and furnish to the attorney general, or to the attorney general's designated representatives when so requested, all information and assistance in their possession or within their power." Ohio Rev. Code § 1331.16(N). Unlike other states, the Ohio legislature explicitly created a legal right for the Ohio Attorney General to access state agencies' documents. For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by *statute*, affiliation or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)). Thus, the cited statute expressly grants the Ohio Attorney General an explicit legal right to obtain and access these documents of the agencies at issue here. The Court thus finds that Ohio Rev. Code § 1331.16(N) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of the state agencies here.

Further, and as a separate reason for finding "control" here, the Court notes that the statutory framework in Ohio (like other States) requires that the Ohio Attorney General serve as counsel for the state agencies at issue. As discussed above, the nature of the attorney-client relationship in this action and under the facts here support a finding of "control" with respect to discovery of the state agencies' documents.

188

First, the statutory scheme in Ohio requires that the Ohio Attorney General "is the chief law officer for the state and all its departments[.]"  Ohio Rev. Code § 109.02.  "[T]he attorney general is legal counsel for all state agencies."  *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 925 N.E.2d 641, 658 (Ohio Ct. App. 2009), *aff'd*, 941 N.E.2d 745 (Ohio 2010); *see also Northeast Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) ("Under Ohio Rev. Code Ann. § 109.02, the Attorney General is 'the chief law officer for the state and all its departments' and shall appear for the State in any tribunal in a case in which the state is a party when required by the governor or the general assembly. The Attorney General, then, is both the State's chief legal officer and a representative of the people and the public interest[.]").  Indeed, the Ohio Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 23–24].  Accordingly, it appears that under the statutory scheme each agency will be represented by the Ohio Attorney General in this matter for discovery because of the intended subpoenas.

There is no citation to any statutory or legal prohibition on the Ohio Attorney General's representing the state agencies in this matter for purposes of discovery.  Importantly, while the Ohio Attorney General certified that it "could" represent these agencies for purposes of discovery in this Multi-District Litigation, that statement must be viewed in light of the statutory scheme in Ohio which forbids all of the Ohio agencies at issue from obtaining other counsel: "no state officer or board, or head of a department or institution of the state shall employ, or be represented by, other counsel or attorneys at law."  Ohio Rev. Code § 109.02.  This statutory scheme makes plain the Ohio Legislature's mandate (and not mere preference) that the Ohio Attorney General will represent state agencies in cases such as this Multi-District Litigation.  As a result, this arrangement indicates strongly that the Ohio Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies, since the Ohio Attorney General's office must have had a long and deep history of working with and representing these agencies in light of the legislative mandate in favor of representation.

The Ohio Attorney General's role as counsel for the agencies at issue inherently involves

189

United States District Court
Northern District of California

obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Ohio Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, it is unavailing for the Ohio Attorney General to argue that the Ohio Attorney General is a separate and distinct elected entity with separate duties and responsibilities from these agencies.  Dkt. 738-27 at 2.  This argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  .  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party.  However, this would not be the first time that a legal services provider, as a party, is found to have

190

control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the Ohio Attorney General argues that "[t]here is a distinction between the attorneys from the Ohio Attorney General's office who have filed this lawsuit – all of whom are assigned to the Consumer Protection Section within the office - and the attorneys from the same office who may be engaged in responding to subpoenas related to this lawsuit on behalf of their respective clients."  [Dkt. 738-27 at 2].  To the extent the Ohio Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the Ohio Attorney General's office but not other sub-teams (and more surprisingly, argues that the privilege would be asserted as against attorneys in the Consumer Protection Section), that argument is not supported by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we

191

should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"   The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  Here, there is no indication or evidence of any such ethical screening, and it is simply not realistic or credible to presume that lawyers in the Ohio Attorney General's office representing these agencies for discovery in this Multi-District Litigation would fail to coordinate with the attorneys already involved in this Multi-District Litigation.  It lacks even more credibility for the Ohio Attorney General to argue that the attorney-client privilege would be asserted to prevent such communications between lawyers in that same office where there is no basis to assume any adversity as between any of the state agencies and the State (a party to this case) or the Ohio Attorney General (also a party, as relator, in this case).  This review of case law demonstrates that no courts support Ohio's argument that different individual lawyers in the Ohio Attorney General's office have *ex ante* separable, discrete attorney-client relationships which allow the privilege to be selectively asserted, even as against other lawyers in the Ohio Attorney General's office.

The Ohio Attorney General's citation to and reliance on *Monsanto* as support of the

United States District Court
Northern District of California

1    "separate entities" and "constitutional structure" arguments is not persuasive.  [Dkt. 738-27 at 2

2    (citing *State of Ohio v. Monsanto Co.*, Hamilton C.P. No. A1801237 (Ohio Ct. Common Pleas Dec

3    2, 2020)].  The *Monsanto* opinion is a state court opinion which does not discuss *Citric Acid*, does

4    not apply the relevant federal precedent, and relies as legal support on another Ohio state court

5    opinion on the lack of interchangeability of different Ohio agencies under Ohio state law.  *Id.*

6            By contrast, instructive here is the Southern District of Ohio's opinion in *Bivens v. Lisath*,

7    No. 2:05-CV-0445, 2007 WL 2891416 (S.D. Ohio Sept. 28, 2007).  In that civil rights case, an

8    inmate sued various correctional officers and officers of an Ohio state prison, all of whom (as well

9    as the non-party Ohio Department of Rehabilitation and Corrections) were represented by the Ohio

10   Attorney General - which also apparently intervened in that case as a party as well.  *Id.*  The Court

11   denied the request because "the documents which he [plaintiff] describes in his request (# 22) are

12   documents which would appear to be under the possession or control of the defendants in this case.

13   As a result, he need not subpoena those documents, but may simply request them through the normal

14   discovery processes that are available to parties to litigation and identified in Federal Rules of Civil

15   Procedure 26 through 37."  *Bivens*, 2007 WL 2891416, at *6.  In *Bivens*, despite the fact that the

16   named individual defendant officers do not exercise executive or managerial oversight of the agency

17   at issue, the Court found "control" for purposes of discovery.  Just as in this Multi-District Litigation,

18   in *Bivens* the Ohio Attorney General was both counsel to the named defendants, as well as the third-

19   party agency, and was itself a party (as intervenor much like its status as relator party here).  The

20   analogous result in *Bivens* further supports the Court's finding of "control" here.

21           Indeed, at least one other federal court has previously found that the Ohio Attorney General

22   has legal control over Ohio state agency materials.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d

23   at 357–58.  While this Court reaches its own independent conclusions consistent with the applicable

24   legal standards discussed above and in light of the facts and circumstances presented here, the

25   analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with,

26   and to that extent further persuasively supports, the conclusion here with regard to the Ohio Attorney

27   General's having control with regard to documents of the state agencies at issue. Given that the

28   *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states

United States District Court
Northern District of California

including Ohio (which the Ohio Attorney General was involved in), and given the Ohio federal court's decision finding control in the analogous *Bivens* case (which the Ohio Attorney General was involved in both as counsel and a party), this Court is disappointed that the Ohio Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent (such as *Generic Pharmaceuticals (II)* and *Bivens*) on the discovery issue at hand.

Therefore, the Court concludes that the Ohio Attorney General has legal control, for the purposes of discovery, over the documents held by the Ohio agencies listed by Meta.

## XXVII. OREGON

In opposition to the control issue, the Oregon Attorney General argues primarily the following factors: (1) the Oregon Attorney General is a separate entity and independent from the Oregon agencies; (2) the Oregon Attorney General's powers extends as far as set forth by statute or Oregon common law and limited by statute or conferred upon some other official; and (3) the Oregon Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-28 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) that Oregon agencies are proscriptively barred from obtaining counsel other than the Oregon Attorney General, without consent from the Oregon Attorney General due to a conflict, and (2) that Oregon law affords the Oregon Attorney General "[f]ull charge and control of all the legal business" of state agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Business Oregon, the Office of the Governor, Department of Administrative Services, Department of Consumer and Business Services, and Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Oregon Attorney General does have legal control, for purposes of

discovery, over the listed Oregon agencies.  While the Oregon Attorney General is a separate entity and while the Oregon Attorney General is acting pursuant to her statutory authority in bringing this action, this does not outweigh the requirement that the Oregon Attorney General will act as the agencies' counsel.  The Oregon Attorney General's powers provide "full control" for rendering legal services for Oregon agencies.  The Oregon Attorney General does not indicate any sort of limitation to such legal power conferred upon the office.  Moreover, the fact that Oregon agencies are proscriptively barred from obtaining counsel other than the Oregon Attorney General (other than in situations involving a conflict) further reinforces the finding of control over the documents necessary for effective legal representation.  Therefore, the Court concludes that the Oregon Attorney General has legal control, for the purposes of discovery, over the documents held by the Oregon agencies listed by Meta.

The statutory scheme in Oregon requires that the Oregon Attorney General have "[g]eneral control and supervision of all civil actions and legal proceedings in which the State of Oregon may be a party or may be interested[,]" and have "*[f]ull charge and control of all the legal business* of all departments, commissions and bureaus of the state, or of any office thereof, which requires the services of an attorney or counsel in order to protect the interests of the state."  Or. Rev. Stat. § 180.220 (emphasis added).  Indeed, the Oregon Attorney General confirmed that its office will definitely represent all of the Oregon agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 24].  Importantly, the Oregon Attorney General's arguments do not negate the fact that all of the Oregon agencies at issue here are barred by Oregon law from obtaining counsel other than the Oregon Attorney General: "No state officer, board, commission, or the head of a department or institution of the state shall employ or be represented *by any other counsel* or attorney at law."  Or. Rev. Stat. § 180.220 (emphasis added).  This statutory arrangement indicates strongly that the Oregon Legislature expressed its preference that the Oregon Attorney General, in fulfilling its statutory role for the state agencies, would exercise such "full control" over legal representation of agencies, which necessarily and inherently includes having access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Oregon

Attorney General from accessing the documents of the state agencies at issue.  The Oregon Attorney General argues that "[t]here is no statute or case law that grants the Attorney General authority to compel another state agency to provide documents in a proceeding for which that agency is not a party."  [Dkt. 738-28 at 2].  However, the absence of an express statute granting access, by itself, does not amount to a legal prohibition for the Oregon Attorney General to access documents as part of its representation of the state agencies in this matter for purposes of discovery.  Indeed, the plenary statutory phrasing that this Attorney General will have both "general control and supervision" over civil actions and "full charge and control" over "all the legal business" of the agencies can reasonably be interpreted to include access to the documents of these agencies when they are clients being represented or defended in a civil action.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

There is no citation to any statutory or legal prohibition on the Oregon Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party.  However, this would not be

the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the Oregon Attorney General has taken the position that communications between the Oregon Attorney General and these state agencies "may include confidential communications protected by the attorney-client or common interest privileges."  Dkt. 738-28 at 2 ("The Attorney General would assert privilege for confidential communications between the Attorney General and any of the identified agencies if the responsive document contained privileged communications.").  To the extent the Oregon Attorney General has attempted to preserve the ability to assert that the privilege applies to communications between the Oregon Attorney General's Office and these agencies (by using conditional phrasing such as "may", such attempts support a finding of an attorney-client relationship and thus the kind of access that supports a finding of control for purposes of discovery. *Perez*, 2014 WL 1796661, at *2  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Oregon Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Oregon Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the Oregon Attorney General argues that the Oregon Attorney General is a separate and distinct elected entity with separate duties and responsibilities.  [Dkt. 738-28 at 2].  However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  Thus, arguing that the Oregon "Attorney General made the decision to pursue this action as a matter of policy, independently of the Governor and other agencies," dkt. 738-28 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Oregon Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

"'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the Oregon Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  Therefore, the Court concludes that the Oregon Attorney General has legal control, for the purposes of discovery, over the documents held by the Oregon agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Indeed, at least one other federal court has previously found that the Oregon Attorney General has legal control over Oregon state agency materials.  *Generic Pharmaceuticals (II)*, 699

United States District Court
Northern District of California

1    F. Supp. 3d at 357–58.  While this Court reaches its own independent conclusions consistent with

2    the applicable legal standards discussed above and in light of the facts and circumstances presented

3    here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly

4    consistent with, and to that extent further persuasively supports, the conclusion here with regard to

5    the Oregon Attorney General's having control with regard to documents of the state agencies at

6    issue.  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the

7    objecting states including Oregon, this Court is disappointed that the Oregon Attorney General and

8    Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do

9    in *Generic Pharmaceuticals (II)*.  As the Court has repeatedly encouraged the Parties at multiple

10   Discovery Management Conferences, they should make every effort to work out discovery disputes

11   through reasonable, good faith negotiations between able and experienced counsel, particularly

12   where, as here, there is guidance in precedent on the discovery issue at hand.

13   **XXVIII. PENNSYLVANIA**

14        In opposition to the control issue, the Pennsylvania Attorney General argues primarily the

15   following factors: (1) the Pennsylvania Attorney General is a separate entity and independent from

16   the Pennsylvania agencies; (2) the Pennsylvania Attorney General can only access Pennsylvania

17   agency documents when the Pennsylvania Attorney General is utilizing its investigatory powers;

18   (3) the Pennsylvania Attorney General's instant law suit is premised on harm done to Pennsylvania

19   consumers and not the state; (4) the Pennsylvania Attorney General does not seek relief on behalf

20   of the Pennsylvania agencies.  [Dkt. 738-29 at 2].

21        In support of a finding of control with regard to these state agencies' documents, Meta argues

22   based primarily on the following factors: (1) the Pennsylvania Attorney General must act as counsel

23   for the Pennsylvania agencies; and (2) Pennsylvania law allows the Pennsylvania Attorney General

24   to access Pennsylvania agency documents whenever necessary to carry out its functions.  *Id.* at 3.

25   Here, Meta seeks discovery from the following agencies: Business Oregon, the Office of the

26   Governor, Department of Administrative Services, Department of Consumer and Business Services,

27   and Department of Education.  *Id.*

28        After considering the factors argued in the briefs, the Court finds that the factors weigh in

1    favor of a finding that the Pennsylvania Attorney General does have legal control, for purposes of

2    discovery, over the listed Pennsylvania agencies.  While the Pennsylvania Attorney General asserts

3    that Pennsylvania agencies are independent, these arguments do not negate the fact that the Attorney

4    General is the chief legal advisor for the state government.  Further, as discussed below, the

5    argument that the Pennsylvania Attorney General can only access agency documents for

6    investigations is not persuasive.

7    Here, unlike in several other states, the Court finds that there is an express right for the

8    Pennsylvania Attorney General to access state agencies' documents.  For purposes of establishing

9    "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of

10    a legal right to access documents created by *statute*, affiliation or employment."  *In re Legato Sys.,*

11    *Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to

12    obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. §

13    203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM*

14    *Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its

15    subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding

16    Company Act, 12 U.S.C. § 1841(a)(1)).

17    Here, there is an express statute granting the Pennsylvania Attorney General a legal right to

18    access the documents and materials of the six state agencies. Under Pennsylvania law, the

19    Pennsylvania Attorney General has the unfettered right to obtain documents from Pennsylvania state

20    agencies.  Specifically, Pennsylvania law provides that "[t]he office of Attorney General *shall have*

21    *the right to access at all times to the books and papers of any Commonwealth agency* necessary

22    to carry out its duties under this act."  71 Pa. Stat. § 732-208 (emphasis added).

23    In opposing the arguments in favor of control, the Pennsylvania Attorney General argues

24    that they have no legal right or ability to obtain documents from the state agencies, and that the state

25    agencies could simply refuse to hand over documents to the Attorney General in response to the

26    document requests.  Despite the plain wording of the statute, the Pennsylvania Attorney General

27    argues that this statute is limited only to situations in which the Pennsylvania Attorney General is

28    investigating a particular state agency.  [Dkt. 738-29 at 2].  That assertion is wrong as a matter of

United States District Court
Northern District of California

200

United States District Court
Northern District of California

1  law.  First, there is no such express limitation in the text of the statute.  The plain text of a statute

2  controls its interpretation.  *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1068 (N.D. Cal. 2023)

3  (citing *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1105 (9th Cir. 2014); *K Mart Corp. v. Cartier, Inc.*,

4  486 U.S. 281, 291 (1988)).   Second, the Pennsylvania Attorney General cites nothing in the

5  surrounding text of the statutory scheme of the Act to indicate that the Pennsylvania legislature

6  implicitly intended to limit the scope of the Pennsylvania Attorney General's right to access agency

7  papers only to direct investigations of those agencies by the state Attorneys General.  *Smith v.*

8  *Spizzirri*, 601 U.S. 472, 472 (2024) (rejecting party's argument to interpret Section 3 of the Federal

9  Arbitration Act because "respondents' attempt to read 'stay' to include 'dismiss' cannot be squared

10  with the surrounding statutory text"); *K Mart Corp.*, 486 U.S. at 291 (implicit limitations should not

11  be read into a statute absent clear guidance from the rest of the Act or other compelling guidance

12  from the legislature).

13  　　　　Further, the Pennsylvania Attorney General made exactly this same argument in another

14  Multi-District Litigation involving a similar discovery dispute, and that court rejected this very same

15  argument:

16  　　　　Pennsylvania also argues that the [Special Discovery Master's Report
      and Recommendation] R&R incorrectly determined that the OAG
17  　　　　[Office of Attorney General] had control over the state agency
      documents sought by Defendants because the OAG only has such
18  　　　　power when it is either investigating potentially unlawful behavior by
      Commonwealth agencies or litigating claims on behalf of
19  　　　　Commonwealth agencies.  Neither is being done here. Pennsylvania
      argues that the Amended Fourth R&R effectively seeks to usurp the
20  　　　　OAG's investigative authority, and would have the result of making
      each Commonwealth agency a party subject to Rule 26 discovery in
21  　　　　every litigation brought by or against the OAG.  If Defendants want
      the documents, Pennsylvania argues, they must serve them on the
22  　　　　agencies as part of third-party discovery, and Pennsylvania represents
      that the OAG has offered to facilitate that discovery process . . . .
23  　　　　Pennsylvania statutes address the relationship between the Office of
      the Attorney General and Commonwealth agencies with regard to the
24  　　　　right to obtain documents. The key Pennsylvania statute, Section 208
      of the Commonwealth Attorneys Act, provides in full that "[t]he
25  　　　　Office of Attorney General shall have the right to access at all times
      to the books and papers of any Commonwealth agency necessary to
26  　　　　carry out his duties under this act."  The Pennsylvania Supreme Court
      has held that Section 208:
27
28  　　　　"lists only one condition on the mandate of production: the material
      sought must be 'necessary' for execution of the OAG's duties. We

201

> recognize that the OAG has a broad array of duties involving Commonwealth agencies beyond criminal investigations, and that the [statute] is of correspondingly broad scope. Nevertheless the authorization remains qualified only by what is 'necessary.'"
>
> Although the Pennsylvania Supreme Court was ruling in the context of a grand jury investigation of a Commonwealth agency, the Court expressly affirmed that the statute is a broad one that extends beyond criminal investigations, qualified only by what is "necessary." Because Pennsylvania has put into this suit the relevance of documents from the agencies that paid for generic drugs, it is necessary to its duties in complying with the Federal Rules of Civil Procedure in the litigation of the MDL, and the OAG therefore has access to the documents under Pennsylvania law.

*Generic Pharmaceuticals (I)*, 571 F. Supp. 3d at 410–11 (quoting *In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 216 (Pa. 2014)).

Here, the Pennsylvania Attorney General filed suit against Meta and the prosecution of this matter is, by definition, one of the Attorney General's duties. Responding to discovery is a necessary part of litigating this case, which the Pennsylvania Attorney General chose to initiate. Obtaining documents in order to respond to discovery requests is necessary to accomplish the Attorney General's duties in this case. Meta asserts that the documents sought from these agencies are relevant to (or at the very least, within the scope of discovery for) the issues disputed in this Multi-District Litigation, and the state Attorney General's make no argument that the documents are irrelevant to the case.

The fact that the Pennsylvania Attorney General is not seeking civil penalties, but is instead asserting harm to Pennsylvania consumers, is not dispositive of whether the documents are necessary for the Pennsylvania Attorney General to carry out its duties. [Dkt. 738-29 at 2]. To the extent the Pennsylvania agencies have relevant, responsive documents concerning the alleged harms to Pennsylvania consumers, the Pennsylvania Attorney General has by definition put those issues and documents relevant to such issues into this suit. And here, as in the *Generic Pharmaceuticals (I)* Multi-District Litigation, these agency documents are necessary for the Pennsylvania Attorney General's duties in complying with the Federal Rules of Civil Procedure in this Multi-District Litigation. 71 Pa. Stat. § 732-208 ("[t]he office of Attorney General shall have the right to access at all times to the books and papers of ***any Commonwealth agency necessary to carry out its duties under this act***.") (emphasis added).

Further, Pennsylvania law mandates that the Pennsylvania "Attorney General **shall represent** the Commonwealth and **all Commonwealth agencies**." 71 Pa. Stat. § 732-204 (emphasis added). Under Pennsylvania law, the Pennsylvania Attorney General's office will necessarily represent these state agencies in responding to Meta's discovery in this matter (regardless of whether the discovery is pursued procedurally under Rule 34 or under Rule 45), and thus the Pennsylvania Attorney General has an express statutory right under Pennsylvania law to obtain documents from these state agencies upon demand. The Court finds that searching for and producing relevant, non-privileged documents from the state agencies is necessary for the Pennsylvania Attorney General to carry out its duties in this Multi-District Litigation. *See id.* Even absent the express statutory right to obtain documents, the mandatory attorney-client relationship is sufficient to establish that the Pennsylvania Attorney General has legal control over the state agencies' documents here.

Relatedly, the Pennsylvania Attorney General has taken the position that, "should" the Pennsylvania Attorney General be retained by the state agencies with regard to responding to any subpoenas, communications between the Pennsylvania Attorney General and these state agencies would be covered by the attorney-client privilege. [Dkt. 738-9 at 2]. In order to minimize this assertion of privilege, the Pennsylvania Attorney General has attempted to subdivide its own office between the team litigating this case and "different attorneys than those involved in this enforcement action" in order to argue conclusively that the assertion of attorney-client privilege "would not change the possession, custody, or control analysis" without citation to any legal support. *Id.* The Court finds this argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of

203

imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support Pennsylvania's argument that different individual lawyers in the Pennsylvania Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects Pennsylvania's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the attorneys "involved in this enforcement action" while apparently attempting to preserve the ability to assert the privilege applies to communications between other lawyers in the Attorney General's office and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official

1    capacities . . . .   [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

2    General represents these individuals, but that for discovery purposes the [Plaintiff] United States

3    must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  The fact that

4    the Pennsylvania Attorney General is attempting to preserve the ability to assert the attorney-client

5    privilege between the Pennsylvania Attorney General's office and the agencies at issue further

6    supports the conclusion of control here.  Assertion of the attorney client privilege requires, as a

7    prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

8         Indeed, the Pennsylvania Attorney General confirmed that its office could represent all of

9    the Pennsylvania agencies at issue, if Meta were to serve those agencies with a subpoena in this

10   matter.  [Dkt. 738-1 at 25].  Accordingly, it appears that under the statutory scheme each agency

11   will be represented by the Pennsylvania Attorney General in this matter for discovery.  71 Pa. Stat.

12   § 732-204.  Thus, as a matter of the efficient and rational administration of justice in this case,

13   because the Pennsylvania Attorney General will be involved in representing these state agencies in

14   any event in this case (whether to respond to subpoenas or to respond to party discovery), the Court

15   in its discretion determines that a finding of control is further supported by the simple and pragmatic

16   realities involved in these circumstances.

17        At oral argument, the Pennsylvania Attorney General (along with other states) raised the

18   same "virtual veto" argument raised by other states.  As discussed, this argument is based on an

19   unsupported hypothetical possibility that the state agencies could simply refuse to cooperate with

20   their statutorily-mandated lawyers (the Pennsylvania Attorney General's office) and refuse to

21   provide documents in response to the document requests.  From that, the Pennsylvania Attorney

22   General (consistent with other states) argues that the Attorney General's office would have no

23   mechanism or recourse if the agencies simply refused, and that this would put the Attorney

24   General's office in the untenable position of potentially being sanctioned for failure to obtain

25   documents from the state agencies.  *Id.*  This is a variation on the "virtual veto" argument, discussed

26   above, which the Court finds unpersuasive to rebut the finding of control.

27        First, the Pennsylvania Attorney General presented no evidence to support this hypothetical

28   risk that the Pennsylvania state agencies would simply refuse to provide documents, and presented

no evidence that these agencies have ever refused to cooperate in discovery in the past. Indeed, this hypothetical refusal by state agencies is a particularly weak argument in light of Pennsylvania's statutory scheme which gives the Pennsylvania Attorney General the express right to obtain agency documents. Second, this hypothetical raised by the Pennsylvania Attorney General (and other states) is not merely an unfounded "fear", this argument assumes that the state agencies would act unreasonably in defiance of a discovery Order such as the instant Order. It is not reasonable to base a legal conclusion on an unreasonable, unsupported hypothetical that imagines the worst possible behavior; rather, the law presumes that parties will act reasonably and rationally in response to court Orders. "We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble." *E. I. du Pont de Nemours & Co.*, 442 F. Supp. at 825; *see also Casas*, 2017 WL 1153336, at *6 (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Third and perhaps most importantly, if the state agencies simply refused to comply, they would be subject to legal consequences. A Court has the inherent authority to enforce its own Orders in order to control the conduct of the proceedings, protect the "orderly administration of justice," and to maintain "the authority and dignity of the court." *Roadway Express, Inc.*, 447 U.S. at 764–67 (citations omitted). Because (as discussed herein) the Court finds that the Pennsylvania Attorney General's office has legal control of documents from the Pennsylvania state agencies (and thus discovery from the state agencies under Rule 34 is appropriate), then the state agencies would be in direct violation of this very Order if they should hypothetically choose to completely defy this very Order and refuse to provide documents to the Pennsylvania Attorney General. Meta could, in that situation, file a motion to compel and, should the state agencies continue to simply refuse to provide documents, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agencies for any such hypothetical refusal to abide by an Order of this Court. The Pennsylvania Attorney General's argument that the Court would choose to sanction their office in this situation presumes this Court would act in ignorance of the source of the non-compliance – if, as hypothetically theorized, it were the state agencies who were non-compliant

206

United States District Court
Northern District of California

1  despite the best efforts of the state Attorney General to secure compliance, the Court is perspicacious

2  enough to understand that the fault would lie with the hypothetical state agency and not the

3  Pennsylvania Attorney General, and in the event some enforcement mechanism were needed (such

4  as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand

5  how and where to focus any such enforcement Order. *Qualcomm*, 2010 WL 1336937, at *2–5;

6  *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7.

7  Therefore, unlike the factors in *Citric Acid*, the state agencies here would not be in a position

8  to obstinately refuse to provide documents in response to the document requests without incurring

9  risk of legal consequences. Unlike in *Citric Acid*, the party here which is alleged to (and found to)

10  have control (the state Attorney General) does in fact have legal recourse to secure the compliance

11  of the controlled entities (the state agencies) should they simply refuse to turn over the documents.

12  This bolsters the Court's finding that the state Attorney General here does possess the "legal ability"

13  to obtain the documents from the state agencies, over and in addition to the statutory basis discussed

14  above. *Cf. Citric Acid*, 191 F.3d at 1107 (lack of "legal ability" to obtain documents is a factor in

15  finding no "legal control"). The fact that legal recourse is available in this event is therefore a factor

16  which, according to *Citric Acid*, demonstrates that legal control exists in the factual circumstances

17  here.

18  As discussed above, the Court is not persuaded by the argument that the Pennsylvania

19  Attorney General lacks control over state agency documents, because an attorney in a court

20  proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to

21  collect or provide documents for production in discovery. As counsel for a party subject to

22  discovery, the Pennsylvania Attorney General has the legal authority and duty to take action to make

23  inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply

24  sit on their hands in the face of an uncooperative client – this is would not be the first time an

25  attorney was faced with a client who was difficult to deal with in collecting documents for discovery.

26  *See, e.g.*, *Qualcomm*, 2010 WL 1336937, at *2–5. Counsel in a litigation has legal duties to take

27  pro-active steps in supervising and searching for documents in discovery that go far beyond simply

28  acceding to a client who fails to (or worse, refuses to) produce or provide documents. *Id.* (detailing

United States District Court
Northern District of California

"Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at *3–4.  Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7 ("The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents.  However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort . . . .  [T]he Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests.").  The Court rejects as legally erroneous the Pennsylvania Attorney General's arguments, because they are based on a misunderstanding of counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice.  *See King*, Case No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing the judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

In addition to their duties to supervise the collection of documents and make inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to improve the administration of civil justice, both as officers of the Court and under their ethical obligations as members of the bar of this Court.  *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment.  "Rule 26(g) imposes ***an affirmative duty to engage in pretrial discovery in a responsible manner*** that is consistent with the spirit and purposes of Rules 26 through 37 . . . .  The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that ***obliges each attorney*** to stop and think about the legitimacy of a discovery request, ***a response thereto, or an objection*** . . . .  If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See* Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically

United States District Court
Northern District of California

antecedent to "legal rights" – and thus the Pennsylvania Attorney General's legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman*, 287 F.3d at 790 n.5 ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'—different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, acting as counsel for the state agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery lends further support to the conclusion that the state Attorney General has the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

The Pennsylvania Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Pennsylvania Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Pennsylvania Attorney General argues that these agencies are "separate entities under law" from the state Attorney General and are not supervised by the state Attorney General, *see* Dkt. 738-29 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The

control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the Pennsylvania Attorney General "neither governs nor is governed by another Commonwealth agency" is simply re-stating the issue, *id.* (citation omitted), and not determinative of the issue.  Arguing that the Pennsylvania Attorney General is "an independent agency", *id.*, confuses and conflates the "legal control" issue for discovery with "operational control" or "functional independence" and thus constitutes a legally erroneous argument.

Meta has argued that state agencies are part of the government of the Commonwealth of Pennsylvania (the Plaintiff) and thus should be treated as parties for purposes of discovery based on that status.  [Dkt. 685 at 6 n.4].  Semantically this position may have some facial appeal at a broad level.  *See In re Redf Mktg., LLC*, No. 12-32462, 2015 WL 1137661, at *3 (Bankr. W.D.N.C. Mar. 10, 2015) ("state agencies are, as the term suggests, agents of the state.").  If the Pennsylvania state agencies are agents of the state, then under *Hitachi*, that factor would militate in favor of finding "legal control." *Hitachi*, 2006 WL 2038248, at *1.  However, determining whether a particular state agency is an agent of its sovereign state appears to involve a multi-factor analysis.  *See Savage v. Glendale Union High School Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1040–41 (9th Cir. 2003) ("To determine whether a governmental entity is an arm of the state for Eleventh Amendment

210

purposes, we examine the following factors: (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity.").  Here, Meta has not cited law to establish whether "agency" for purposes of discovery is evaluated under the same legal standard as "agency" for purposes of sovereign immunity, and further Meta has provided only cursory argument to support a finding that each of the six Pennsylvania state agencies should be held to be agents of the Commonwealth of Pennsylvania for purposes of discovery under applicable legal standards.  Accordingly, while the Court notes this factor, it is non-dispositive on the record presented to the Court.

The Pennsylvania Attorney General has cited no statutory, legal, or administrative rule cited which prohibits the Pennsylvania Attorney General from accessing the documents of the state agencies at issue, and as discussed above, there is an express statute granting that access.  Nor is there citation to any statutory or legal prohibition on the Pennsylvania Attorney General's representing the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party or counsel to a party; rather under the particular facts here and under the totality of circumstances viewed in light of

applicable legal standards, the Court finds that control exists here.

Indeed, at least one other federal court has previously found that the Pennsylvania Attorney General has legal control over Pennsylvania state agency materials. *Generic Pharmaceuticals (I)*, 571 F. Supp. 3d at 408; *see also* 2023 WL 6985587, at *3 (E.D. Pa. Oct. 20, 2023). While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed herein in light of the facts and circumstances presented here, the analysis in both opinions from the Pennsylvania federal district court in the *Generic Pharmaceuticals (I)* and *Generic Pharmaceuticals (II)* Multi-District Litigations are certainly consistent with (and to that extent further persuasively supports) the conclusion here with regard to the Pennsylvania Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (I)* Court resolved the control issue against all the objecting states including Pennsylvania, this Court is disappointed that the Pennsylvania Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where (as here) there is guidance in precedent on the discovery issue at hand.

## XXIX. RHODE ISLAND

In opposition to the control issue, the Rhode Island Attorney General argues primarily the following factors: (1) the Rhode Island Attorney General is a separate entity and independent from the Rhode Island agencies; and (2) the Rhode Island Attorney General only represents Rhode Island agencies if requested by said agency and if the Rhode Island Attorney General consents to act as legal counsel. [Dkt. 738-30 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) that the Rhode Island Attorney General is the legal representative of all state agencies, and (2) that no statute deprives the Rhode Island Attorney General from accessing Rhode Island agency documents. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Board of Governors for Higher Education; Department of Administration; Department of Behavioral Healthcare, Developmental Disabilities and Hospitals;

United States District Court
Northern District of California

Department of Children, Youth, and Families; Department of Education; Department of Health; Department of Human Services; Executive Office of Health and Human Services; Office of the Governor; and Office of the Child Advocate. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Rhode Island Attorney General does have legal control, for purposes of discovery, over the listed Rhode Island agencies.

The statutory scheme in Rhode Island requires that "the attorney general, whenever requested, ***shall act*** as the legal adviser of . . . all state boards, divisions, departments, and commissions . . . and shall institute and prosecute, whenever necessary, all suits and proceedings which they may be authorized to commence, and ***shall appear for*** and defend the . . . boards, divisions, departments, commissions, commissioners, and officers, ***in all suits*** and proceedings which may be brought against them in their official capacity." 42 R.I. Gen. Laws § 42-9-6 (emphasis added).

Indeed, the Rhode Island Attorney General confirmed that its office could represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 25–26]. As discussed above, no separate counsel has entered appearance on behalf of the Rhode Island state agencies. Accordingly, it appears that under the statutory scheme each agency will be represented by the Rhode Island Attorney General in this matter for discovery. *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020) (the Rhode Island "attorney general . . . by law is obligated to act as legal advisor ***for all state agencies*** and officers acting in their official capacity and to defend them against suit, R.I. Gen. Laws § 42-9-6[.]") (emphasis added). Certainly, in the face of this statutory scheme, it is not surprising that the Rhode Island Attorney General cites no law which prohibits that office from representing the state agencies in this matter.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Rhode Island Attorney General from accessing the documents of the state agencies at issue. The Rhode Island Attorney General argues that the "Rhode Island laws that permit or require sharing of information do so in the context of affirmative investigations, actions, or projects." Dkt. 738-30 at 2 (citations omitted). However, several of these statutes relate to sharing information with agencies

United States District Court
Northern District of California

or commissions other than the Attorney General and are thus irrelevant to the control issue here. *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-119-8 (disclosure to the R.I. Commission on Women and Girls; § 42-26-11 (disclosure to "commission of the Public Safety Grant Administration Office")).  Other cited statutes relate to disclosures from agencies not involved in this action or for statutory purposes unrelated to this Multi-District Litigation, and thus are not instructive on the control issue here.  *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-45.1-12 (relating to Antiquities Act of R.I.); § 42-66-10 (relating to Office of Healthy Aging, not at issue in this Multi-District Litigation); § 42-66.7-9(b) (relating to long term care ombudsman, not at issue in this Multi-District Litigation)).  Further, while these statutes provide for disclosure of information in the context of certain investigations or for identified purposes, none of these statutes state that they are the ***only*** method by which the Rhode Island Attorney General may obtain documents from state agencies.  Indeed, the only cited statute which relates to an agency at issue in this case, *see* dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-72-8(b)), grants the Rhode Island Attorney General the unrestricted legal rights to access documents and information from the Rhode Island Department of Children, Youth, and Families, in circumstances involving either an investigation of (or prosecution of) criminal conduct by another person relating to a child or other children within the same family unit, or an investigation of (or prosecution of) false reporting of child abuse or neglect.  *See* R.I. Gen. Laws §§ 42-72-8(b)(7), -8(b)(9).  If the Rhode Island Attorney General were currently investigating any potential criminal charges against Meta relating to children (which is known only to the Rhode Island Attorney General at this time), then the Rhode Island Attorney General would have a legal right to access (and thus control) over the documents of the Rhode Island Department of Children, Youth, and Families.  In any event, close reading of these statutes, ultimately, demonstrates that none of them explicitly or implicitly forbid the Rhode Island Attorney General from accessing documents for the purposes of discovery during its scope of legal representation of the state agencies.

The Rhode Island Attorney General argues that agencies "routinely require the [Rhode Island Attorney General's] Office to issue subpoenas in enforcement cases before producing documents to the Office." [Dkt. 738-30 at 2].  From this, the Rhode Island Attorney General appears

to be arguing that the only way to obtain documents from state agencies would be by subpoena here, even if the Rhode Island Attorney General were representing those very same state agencies as clients (and not as the subjects of investigations).  An argument that a lawyer representing a Rhode Island state agency (whether the state Attorney General or private counsel) would be forced to issue a subpoena to obtain documents from their own client is nonsensical and impractical, as well as contrary to the principles of effective legal representation.  As counsel for a state agency, the Rhode Island Attorney General will have the normal type of direct access to the necessary documents from its own clients, ensuring efficient and comprehensive legal support for the agencies involved.  Under the statutory scheme, the Rhode Island Attorney General is regularly called upon to represent the interests of state agencies, which inherently requires a level of access to agency documents necessary to render legal representation effectively.  The Rhode Island Attorney General cites no precedent requiring any attorneys representing a Rhode Island state agency to use a subpoena to obtain documents from their own clients.  The Rhode Island Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Rhode Island Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Relatedly, the Rhode Island Attorney General has stated that the attorney client privileged is not asserted for communications between the Rhode Island Attorney General and these state agencies "unless the Office has explicitly agreed to represent a state agency."  [Dkt. 738-30 at 2].  The fact that the agencies had not formally retained the Attorney General as of the date of the submission of their brief does not alter the reality that, under the statutory scheme, they will be retained by the Attorney General once discovery formally is initiated against them by Meta (whether by Rule 45 subpoena or by party discovery pursuant to this Order).  The fact that the Rhode Island Attorney General implicitly acknowledges that it could be retained by these agencies (and thus the

United States District Court
Northern District of California

United States District Court
Northern District of California

attorney-client privilege would apply to communications with the agencies) further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

Further the Rhode Island Attorney General explicitly argues that communications between the state agencies and the Attorney General may be protected by the work product doctrine.  [Dkt/ 738-30 at 2].  The fact that the Rhode Island Attorney General asserts that pre-suit communications with the state agencies may be protected by the work product doctrine is an implicit admission that these agencies may have been involved in pre-suit investigations, may have interests in the outcome of this case, and (at a minimum) worked with the Attorney General on this case in a pre-suit attorney-client relationship.  As discussed above, case law recognizes that factors that support a finding of control include situations where the third party has an interest in the outcome of the matter and where the third party participated in the preparation of or prosecution of the matter behind the scenes as an unnamed party.  *See, e.g.*, *Hitachi*, 2006 WL 1038248, at *1.  Asserting the work product doctrine over communications with state agencies thus further supports a finding of control here.

The Court rejects the Rhode Island Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege over communications with the agencies at issue, while apparently attempting to preserve the ability to assert work product protection applies to communications between the Rhode Island Attorney General's Office and these agencies.  "[I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit

216

United States District Court
Northern District of California

1    required Salas to respond as to responsive materials over which Salas and his law firm had

2    possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is

3    presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at

4    *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and

5    thus control over third party client documents in every case involving a legal services provider as a

6    party; rather, under the particular facts here, and under the totality of circumstances viewed in light

7    of applicable legal standards, the Court finds that control exists here.

8        Further, the Rhode Island Attorney General argues that the Rhode Island Attorney General

9    is a separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-30 at 2

10   ("Rhode Island state agencies are represented by separate and distinct legal counsel, and Rhode

11   Island laws only delegate such a right or duty in limited circumstances.").  However, this argument

12   misapprehends the "legal control" test for documents – the issue is not simply whether one entity is

13   under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary

14   relationship), and not simply whether the two entities are legally separate (such as two different and

15   separately incorporated entities), but rather whether there is a legal right to obtain the documents as

16   explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to

17   have actual managerial power over the foreign corporation, but rather that there be close

18   coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-

19   client relationship between the state Attorney General and the state agencies (a relationship

20   mandated by state law) necessitates close coordination.  While operational control may be a factual

21   situation which demonstrates a legal right to obtain the documents, the absence of such "executive

22   or functional control" is not determinative for evaluating "control" for purposes of discovery.  By

23   definition, the "legal control" issue for discovery arises when there are two legally distinct or

24   separate entities – otherwise, if only one entity were involved, there would be no dispute that party

25   discovery covered that one entity.  As discussed above, courts have found "control" for purposes of

26   discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary

27   having control over the documents of a parent corporation, or an individual government officer

28   having control over the documents of an entire agency.  The Rhode Island Attorney General's

arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the Rhode Island Attorney General has legal control, for the purposes of discovery, over the documents held by the Rhode Island agencies listed by Meta.

## XXX. SOUTH CAROLINA

In opposition to the control issue, the South Carolina Attorney General argues primarily the following factors: (1) the South Carolina Attorney General is a separate entity and independent from the South Carolina agencies; and (2) the South Carolina Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-31 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) that South Carolina agencies are proscriptively barred from obtaining counsel other than the South Carolina Attorney General, without consent from the South Carolina Attorney General, and (2) that the South Carolina Constitution and local law provides the South Carolina Attorney General the ability to require all state agencies to provide information in writing upon any subject.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: the Commission on Higher Education, Department of Administration Executive Budget Office, Department of Children's Advocacy, Department of Commerce, Department of Consumer Affairs, Department of Education, Department of Health and Human Services, Department of Mental Health, Department of Social Services, Education Oversight Committee, and Office of the Governor.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the South Carolina Attorney General does have legal control, for purposes of discovery, over the listed South Carolina agencies.  While the South Carolina Attorney General is a separate entity and while the South Carolina Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the South Carolina Attorney General will act as the agencies' counsel.

The statutory scheme in South Carolina requires that "the Attorney General ***shall*** conduct

1  all litigation which may be necessary for **any department of the state government** or any of the

2  boards connected therewith, and all these boards or departments are **forbidden to employ any**

3  **counsel** for any purpose except through the Attorney General and upon his advice[.]"  S.C. Code

4  § 1-7-80 (emphasis added).

5       Indeed, the South Carolina Attorney General confirmed that its office could represent the

6  agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1

7  at 27–28].  Accordingly, under the statutory scheme each agency will be represented by the South

8  Carolina Attorney General in this matter for discovery.

9       Importantly, the South Carolina Attorney General's arguments do not negate the fact that all

10  of the South Carolina agencies at issue here are barred by South Carolina law from obtaining counsel

11  other than the South Carolina Attorney General.  S.C. Code § 1-7-80; *see also* S.C. Code § 1-7-160

12  ("[a] department or agency of state government may not hire a classified or temporary attorney as

13  an employee except upon the written approval of the Attorney General and at compensation

14  approved by him.").  This arrangement indicates strongly that the South Carolina Attorney General,

15  in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to

16  and control over the necessary documents for effective legal representation of these state agencies.

17       Further, there is no statutory, legal, or administrative rule cited which prohibits the South

18  Carolina Attorney General from accessing the documents of the state agencies at issue.  Indeed, the

19  contrary is true.  South Carolina law permits the South Carolina Attorney General to access

20  agencies' documents at the direction of the Governor.  *See The State of South Carolina v. Purdue*

21  *Pharma L.P.*, No. 2017CP4004872, 2019 WL 3753945 (S.C.Com.Pl. July 05, 2019).  In *Purdue*

22  *Pharma*, the South Carolina court found "unconvincing" the State of South Carolina's refusal to

23  produce documents from certain agencies "on the ground that information in the possession,

24  custody, or control of executive agencies other than the Attorney General, as well as the Public

25  Employee Benefit Authority and Department of Health and Human Services (both of whom were

26  expressly named in the Amended Complaint), is outside of the State's possession, custody, or

27  control."  *Id.*  at *1.  Based on the South Carolina Constitution, the *Purdue Pharma* court held that

28  "[a]s the legal representative of the executive branch, the Attorney General, at the direction of the

*United States District Court*
*Northern District of California*

1   Governor, has the ability to require '[a]ll State officers, agencies, and institutions within the

2   Executive Branch' to 'give him information in writing upon any subject relating to the duties and

3   functions of their respective offices, agencies, and institutions.'" *Id.* (quoting S.C. Const. Art. IV,

4   § 17).  Citing South Carolina Rule of Civil Procedure 34 (which is analogous to Fed. R. Civ. P. 34,

5   and includes the same "possession, custody, or control" language), the *Purdue Pharma* court held

6   that "the contested information nonetheless appears to be within the possession, custody or control

7   of the Attorney General."  *Id.*

8       Under *Citric Acid*, if there were a "legal mechanism" to obtain the documents (such as filing

9   a breach of contract action, which by definition would require seeking assistance in enforcement

10  from a judicial officer in a legal action), then there would have been a finding of "control" for

11  purposes of discovery.  191 F.3d at 1107-08.  Here, under the South Carolina Constitution and

12  *Purdue Pharma*, there is a legal mechanism for the South Carolina Attorney General to obtain the

13  agencies' documents.  Under *Citric Acid*, the fact that enforcement was contingent on a court or

14  judicial officer exercising authority to grant relief in a breach of contract case did not detract from

15  the legal right to access; here analogously, the fact that direction from the Governor under the

16  Constitution did not (in *Purdue Pharma*) detract from the Attorney General's legal right to access

17  the agencies' documents.  Based on the South Carolina Constitution and *Purdue Pharma*, the Court

18  finds that there is a legal right for the South Carolina Attorney General to access the state agencies'

19  documents upon demand, and thus "control" exists under Rule 34 for at least these reasons.

20      There is no citation to any statutory or legal prohibition on the South Carolina Attorney

21  General's representing the state agencies in this matter for purposes of discovery.  The Court

22  recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the

23  attorney general, is a party to the case while also acting as counsel for a third party.  However, this

24  would not be the first time that a legal services provider, as counsel for a party, is found to have

25  control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649,

26  at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this

27  court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34

28  request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

United States District Court
Northern District of California

220

United States District Court
Northern District of California

1   materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court

2   has noted that "[i]n general, an attorney is presumed to have control over documents in its client's

3   possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be

4   a finding of a legal right of access to and thus control over third party client documents in every

5   case involving a legal services provider as a party; rather, under the particular facts here, and under

6   the totality of circumstances viewed in light of applicable legal standards, the Court finds that

7   control exists here.

8       The South Carolina Attorney General's role as counsel for the agencies at issue inherently

9   involves obtaining necessary documents for effective representation in litigation.  In acting as

10  counsel, the South Carolina Attorney General would necessarily have access to and thus control

11  over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL

12  4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his

13  broad statutory and common law powers to control and manage legal affairs on behalf of state

14  agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

15  Complaint").

16      Relatedly, the South Carolina Attorney General has taken the position that communications

17  between the South Carolina Attorney General and these state agencies "would be protected under

18  the attorney-client privilege" if that office were retained by such agencies.  [Dkt. 738-31 at 2].  The

19  fact that the agencies had not formally retained the Attorney General as of the date of the submission

20  of their brief does not alter the reality that, under the statutory scheme, they will be retained by the

21  Attorney General once discovery formally is initiated against them by Meta (whether by Rule 45

22  subpoena or by party discovery pursuant to this Order).  The fact that the South Carolina Attorney

23  General admits could be retained by these agencies and thus the attorney-client privilege would

24  apply to communications with the agencies further supports the conclusion of control here.

25  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-

26  client relationship.  *See Graf*, 610 F.3d at 1156.

27      Further the South Carolina Attorney General, like other states, argues that responding to a

28  subpoena "would be handled by different attorneys than those involved in this enforcement action"

and that therefore this "would not change the possession, custody, or control analysis." *Id.* This argument is not supported by citation to any law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening; *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that there is insufficient legal support for South Carolina's argument that having different individual lawyers in the South Carolina Attorney General's office represent the agencies for discovery somehow inexplicably "would not change" the "control" analysis. [Dkt.

738-31 at 2].

The Court rejects the South Carolina Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the attorneys currently "involved in this enforcement action," while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the South Carolina Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.

To the extent the South Carolina Attorney General argues that the South Carolina Attorney General is a separate and distinct elected entity with separate duties and responsibilities from the state agencies, that argument is not persuasive. Dkt. 738-31 at 2 ("The [South Carolina Attorney General] does not share a common executive with any of these agencies, which stand independently from the Attorney General's Office."). This argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed

United States District Court
Northern District of California

1  above, courts have found "control" for purposes of discovery where a party is clearly not in

2  managerial control over the third-party, such as a subsidiary having control over the documents of

3  a parent corporation, or an individual government officer having control over the documents of an

4  entire agency.  Thus, arguing that the South Carolina Attorney General "brings an action on behalf

5  of the State of South Carolina . . . and not as the legal representative or attorney of any department

6  or agency of state government," dkt. 738-31 at 2, is simply re-stating the issue to be decided, and

7  not determinative of the issue.  The South Carolina Attorney General's arguments erroneously

8  conflate the legal control issue with "operational control" or "functional independence" of each

9  entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of

10  discovery.

11       Finally, the Court has recognized that the issue of control of state agency documents, when

12  a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

13  District Litigation involving most of the same States and State Attorneys General as are involved in

14  this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals*

15  *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

16  which withdrew their objections to party discovery and negotiated a resolution of this issue with the

17  opposing party there.  *Id.* at 356 n.5.  In that case, South Carolina is identified as one of the States

18  which reached agreement on the state agency control issue without requiring that court to expend

19  resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion

20  resolved the control issue against all the remaining objecting states and given that South Carolina

21  was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court

22  is disappointed that the South Carolina Attorney General and Meta were unable to reach a negotiated

23  resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

24  Management Conferences, they should make every effort to work out discovery disputes through

25  reasonable, good faith negotiations between able and experienced counsel, particularly where, as

26  here, there is guidance in precedent on the discovery issue at hand.

27       Therefore, the Court concludes that the South Carolina Attorney General has legal control,

28  for the purposes of discovery, over the documents held by the South Carolina agencies listed by

Meta.

**XXXI. SOUTH DAKOTA**

In opposition to the control issue, the South Dakota Attorney General argues primarily the following factors: (1) the South Dakota Attorney General is a separate entity and independent from the South Dakota agencies; (2) the South Dakota Attorney General is not automatically required to represent South Dakota agencies, and once such representation occurs, South Dakota law grants the South Dakota Attorney General access to the South Dakota agencies' documents.  [Dkt. 738-32 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the South Dakota Attorney General is South Dakota's "representative in judicial proceedings;" and (2) no statute deprives the South Dakota Attorney General from access to South Dakota agency documents.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: the Board of Regents, Bureau of Finance and Management, Department of Education, Department of Health, Department of Social Services, Governor's Office, and Governor's Office of Economic Development.  *Id.*

The statutory scheme in South Dakota requires that "[i]t is the duty of the attorney general: (1) To appear for the state and prosecute and defend all actions and proceedings, civil or criminal, in the Supreme Court, in which the state shall be interested as a party; [and] (2) When requested by the Governor or either branch of the Legislature, or whenever, in the judgment of the attorney general, the welfare of the state demands, to appear for the state and prosecute or defend, in any court or before any officer, ***any cause or matter, civil*** or criminal, in which the state may be a party or interested[.]"  S.D. Codified Laws § 1-11-1 (emphasis added).

Indeed, the South Dakota Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 28–29].  As discussed above, no separate counsel has appeared for any of the state agencies at issue.  Accordingly, it appears that under the statutory scheme each agency will be represented by the South Dakota Attorney General in this matter for discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the South

United States District Court
Northern District of California

1   Dakota Attorney General from accessing the documents of the state agencies at issue.  Indeed, the
2   contrary is true.  South Dakota law permits the South Dakota Attorney General to access agencies'
3   documents with consent of the Governor.  S.D. Codified Laws § 1-11-10 ("Under such resolution
4   or order of the Governor, or the attorney general's own relation with consent of the Governor, the
5   attorney general . . . shall have access to any and all books, blanks, . . . and materials and equipment
6   of the office, department, bureau, board, commission, or any other component part of the state
7   government or any branch, arm, or agency of the government[.]").  The South Dakota Attorney
8   General admits that there are other specific statutes giving the Attorney General the right to access
9   certain agencies' documents under certain conditions.  [Dkt. 738-32 at 2].  In *Citric Acid*, the lack
10  of control was based on a lack of "legal mechanism" to obtain the documents (such as filing a breach
11  of contract action, which by definition would require seeking assistance in enforcement from a
12  judicial officer in a legal action).  191 F.3d at 1107-08.  Here, under these statutes, there appear to
13  be legal mechanisms for the South Dakota Attorney General to obtain the documents – for example,
14  under Section 1-11-10, the Attorney General has the legal authority under its "own relation" to have
15  access to the records of any agency, with the assistance and consent of the Governor.  Under *Citric
16  Acid*, the fact that enforcement was contingent on a court or judicial officer exercising authority to
17  grant relief in a breach of contract case did not detract from the legal right to access; here
18  analogously, the fact that consent is required from the Governor under the statute should not detract
19  from the Attorney General's legal right to access the agencies' documents.

20      The South Dakota Attorney General does not provide any citation to any statutory or legal
21  prohibition on the South Dakota Attorney General's representing the state agencies in this matter
22  for purposes of discovery.  *See* Dkt. 738-32 at 2.  The Court recognizes that this is a somewhat
23  unusual situation, in which a law enforcement organization (the attorney general) is both a party to
24  the case while also acting or able to act as counsel for a third party.  However, this would not be the
25  first time that a legal services provider, as counsel for a party, is found to have control over third
26  party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas
27  individually and his law firm, the subpoena recipients and defendants in this court, are counsel of
28  record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production

United States District Court
Northern District of California

United States District Court
Northern District of California

1    to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas

2    and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general,

3    an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL

4    1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of

5    access to and thus control over third party client documents in every case involving a legal services

6    provider as a party; rather, under the particular facts here, and under the totality of circumstances

7    viewed in light of applicable legal standards, the Court finds that control exists here.

8        Relatedly, the South Dakota Attorney General has taken the position that communications

9    between the South Dakota Attorney General and these state agencies would be covered by the

10   attorney-client privilege.  [Dkt. 738-32 at 2].  The fact that the South Dakota Attorney General

11   admits it "may appear on behalf of the state agencies" and thus "would assert" that communications

12   with the agencies are privileged further supports the conclusion of control here.  Assertion of the

13   attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.

14   *See Graf*, 610 F.3d at 1156.

15       Finally, the Court has recognized that the issue of control of state agency documents, when

16   a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

17   District Litigation involving most of the same States and State Attorneys General as are involved in

18   this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals*

19   *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

20   which withdrew their objections to party discovery and negotiated a resolution of this issue with the

21   opposing party there.  *Id.* at 356 n.5.  In that case, South Dakota is identified as one of the States

22   which reached agreement on the state agency control issue without requiring that court to expend

23   resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion

24   resolved the control issue against all the remaining objecting states and given that South Dakota was

25   able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is

26   disappointed that the South Dakota Attorney General and Meta were unable to reach a negotiated

27   resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

28   Management Conferences, they should make every effort to work out discovery disputes through

1 reasonable, good faith negotiations between able and experienced counsel, particularly where, as
2 here, there is guidance in precedent on the discovery issue at hand.

3 Therefore, the Court concludes that the South Dakota Attorney General has legal control,
4 for the purposes of discovery, over the documents held by the South Dakota agencies listed by
5 Meta.

6 **XXXII. VIRGINIA**

7 In opposition to the control issue, the Virginia Attorney General argues primarily the
8 following factors: (1) the Virginia Attorney General is a separate entity and independent from the
9 Virginia agencies; and (2) the Virginia Attorney General brought the lawsuit under its own
10 independent law enforcement capacity.  [Dkt. 738-33 at 2].

11 In support of a finding of control with regard to these state agencies' documents, Meta argues
12 based primarily on the following factors: (1) the Virginia Attorney General is required to conduct
13 all legal services for Virginia agencies, and (2) Virginia law prohibits the Governor and agencies
14 from employing regular counsel.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies:
15 the Department of Behavioral Health and Developmental Services, Department of Education,
16 Department of Health, Department of Planning and Budget, Department of Social Services,
17 Economic Development Partnership, Foundation for Healthy Youth, Office of Children's Services,
18 and Office of the Governor.  *Id.*

19 After considering the factors argued in the briefs, the Court finds that the factors weigh in
20 favor of a finding that the Virginia Attorney General does have legal control, for purposes of
21 discovery, over the listed Virginia agencies. While the Virginia Attorney General is a separate entity
22 and while the Virginia Attorney General brought the instant action pursuant to its own authority,
23 this does not outweigh the requirement that the Virginia Attorney General will act as the agencies'
24 counsel.

25 The statutory scheme in Virginia requires that "[a]ll legal service in civil matters for the
26 Commonwealth, the ***Governor, and every*** state department, institution, division, commission,
27 board, bureau, ***agency***, entity, official, court, or judge, including the conduct of ***all civil litigation*** in
28 which any of them are interested, ***shall*** be rendered and performed by the Attorney General."  Va.

228

United States District Court
Northern District of California

Code § 2.2-507 (emphasis added).  Additionally, Virginia law requires that "[n]o regular counsel shall be employed for or by the Governor or any state department, institution, division, commission, board, bureau, agency, entity, or official." *Id.*

Indeed, the Virginia Attorney General confirmed that its office will definitely represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 29–30].  Accordingly, under the statutory scheme each agency will be represented by the Virginia Attorney General in this matter for discovery (whether for party discovery under Rule 34 or for subpoenas under Rule 45).

Importantly, the Virginia Attorney General's arguments do not negate the fact that all of the Virginia agencies at issue here are barred by Virginia law from obtaining counsel other than the Virginia Attorney General, absent certain special conditions not present here.  Va. Code § 2.2-510 (requiring Governor approval, where it is impracticable or uneconomical for the Virginia Attorney General to render such services, or where the Virginia Attorney General must certify to the Governor that it is unable to render certain legal services).  Here, no separate counsel has entered appearance for any of the state agencies, and indeed based on the Virginia Attorney General's confirmation of representation, none is expected to.  This arrangement indicates strongly that the Virginia Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Relatedly, the Virginia Attorney General has taken the position that communications between the Virginia Attorney General and these state agencies "could" be covered by the attorney-client privilege.  [Dkt. 738-33 at 2].  To the extent the Virginia Attorney General has attempted to subdivide its own office between the Attorney General's Consumer Protection Section litigating this case as opposed to "attorneys in other sections of the Department of Law" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Virginia Attorney General's office but not other "sections," that argument is not supported by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety

of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that there is insufficient legal support for Virginia's argument that different individual lawyers in the Virginia Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Virginia Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "section" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to

communications between other lawyers in the Virginia Attorney General's Office and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  The fact that the Virginia Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Virginia Attorney General's office and the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

The Virginia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation.  In acting as counsel, the Virginia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the Virginia Attorney General argues that the Virginia Attorney General and the Virginia Governor are "separately elected constitutional officers with distinct duties and independent authority."  Dkt. 738-33 at 2 (citations omitted).  However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship

*(left margin, rotated text)* United States District Court  Northern District of California

mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Virginia Attorney General brought this action "pursuant to the Attorney General's own authority to enforce the Virginia Consumer Protection Act[,]" dkt 738-33 (citing Va. Code § 59.1-203), is simply re-stating the issue to be decided, and not determinative of the issue. The Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the Virginia agencies listed by Meta.

## XXXIII. WASHINGTON

In opposition to the control issue, the Washington Attorney General argues primarily the following factors: (1) the Washington Attorney General is a separate entity and independent from the Washington agencies; and (2) the Washington Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-34 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Washington Attorney General must act as counsel for the Washington agencies; and (2) the Washington Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Children, Youth, and Families; Department of Health; Health Care Authority; Office of Financial Management Washington Office

1    of the Governor; Board of Education; Board of Health; Department of Commerce; Department of

2    Health; and Department of Social and Health Services.  *Id.*

3           After considering the factors argued in the briefs, the Court finds that the factors weigh in

4    favor of a finding that the Washington Attorney General does have legal control, for purposes of

5    discovery, over the listed Washington agencies.  While the Washington Attorney General is a

6    separate entity and while the Washington Attorney General does bring the instant action in its own

7    independent authority, this does not outweigh the requirement that the Washington Attorney

8    General will act as the agencies' counsel.

9           The statutory scheme in Washington requires that "[t]he attorney general ***shall*** also represent

10   the state and all officials, departments, boards, commissions and ***agencies*** of the state in the courts,

11   and before all administrative tribunals or bodies of any nature, ***in all legal or quasi legal matters***,

12   hearings, or proceedings, and advise all officials, departments, boards, commissions, or agencies of

13   the state in all matters involving legal or quasi legal questions, except those declared by law to be

14   the duty of the prosecuting attorney of any county."  Wash. Rev. Code § 43.10.040 (emphasis

15   added).

16          Indeed, the Washington Attorney General confirmed that its office would definitely

17   represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

18   [Dkt. 738-1 at 30].  Accordingly, under the statutory scheme each agency will be represented by the

19   Washington Attorney General in this matter for discovery (whether or not sought under Rule 34 or

20   under Rule 45).

21          Relatedly, the Washington Attorney General has taken the position that communications

22   between the Washington Attorney General and these state agencies would be covered by the

23   attorney-client privilege.  [Dkt. 738-34 at 2].  To the extent the Washington Attorney General has

24   attempted to subdivide its own office between the "CP Division" litigating this case and other "AGO

25   attorneys" in order to somehow argue that the scope of attorney-client privilege is limited only as to

26   some parts of the state Washington General's office but not other sub-teams, that argument is not

27   supported by citation to law and is contrary to the weight of law.  The scope of an attorney-client

28   relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client

United States District Court
Northern District of California

233

privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .   The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support Washington's argument that different individual lawyers in the Washington Attorney General's office have *ex ante*

234

1   separable, discrete attorney-client relationships.

2       The Court rejects the Washington Attorney General's attempt to simultaneously disclaim

3   the existence of an attorney-client privilege as between the "CP Division" of attorneys currently

4   working on this case, while apparently attempting to preserve the ability to assert that the privilege

5   applies to communications between other lawyers in the Washington Attorney General's Office and

6   these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7   legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

8   that on one hand the [State] Attorney General represents these individuals, but that for discovery

9   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

10  2014 WL 1796661, at *2.  The fact that the Washington Attorney General is attempting to preserve

11  the ability to assert the attorney-client privilege between the Washington Attorney General's office

12  and the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-

13  client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*,

14  610 F.3d at 1156.

15      The Washington Attorney General's role as counsel for the agencies at issue inherently

16  involves obtaining necessary documents for effective representation in litigation.  In *Rhea*, the

17  Washington Attorney General was representing a state agency and was sanctioned by the

18  Washington District Court for failure to properly search for sources of information to provide

19  documents in discovery.  *Rhea*, 2010 WL 5395009 at *6-7 (counsel 'has an obligation to not just

20  request documents of his client, but to search for sources of information.'").  In acting as counsel,

21  the Washington Attorney General has both discovery duties under the Federal Rules but also ethical

22  and professional duties which would necessarily provide access to and thus control over the relevant

23  documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6

24  (finding state Attorney General has control over agency documents "based on his broad statutory

25  and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

26  right to obtain responsive documents from the state agencies referenced in the Complaint").

27      Further, the Washington Attorney General argues that the Washington Attorney General is

28  a separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-34 at 2

United States District Court
Northern District of California

235

United States District Court
Northern District of California

(citations omitted).  However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  Thus, arguing that the Washington Attorney General is not suing on behalf of or representing any state agency in this litigation and arguing that this action is brought under independent statutory authority, dkt. 738-34 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Washington Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Furthermore, the Western District of Washington's *Wilson v. Washington*, No. C16-5366 BHS, 2017 WL 518615 (W.D. Wash. Feb. 8, 2017), opinion on "control" involving Washington State agencies is instructive.  In *Wilson*, the plaintiffs sued the State of Washington, one specific agency, and an individual official of the state.  The defendants, represented by the Washington Attorney General, objected to document requests on that grounds "that they lack control or custody

of information sought by Plaintiff. Specifically, they argue that the requested information is held by state agencies **not listed as defendants**." *Id.* at *3. The Washington district judge ruled that "[t]his argument is unavailing." *Id.* (citing *Soto*, 162 F.R.D. at 619). Here, as in *Wilson*, the State of Washington is a named plaintiff (along with the Attorney General as relator). Here, as in *Wilson*, the Washington Attorney General argued that unnamed state agencies' documents are outside the control of the named parties. Here, as in *Wilson*, the Washington Attorney General is essentially repeating the same asserted arguments which the Washington federal district court rejected.

This is not the only instance in which a Washington district court rejected similar state agency arguments by the Washington Attorney General. In *Geo*, the State of Washington (represented, as here, by the Washington Attorney General) objected to document requests on the grounds that the Attorney General's Office lacked control over state agencies. *GEO Grp., Inc.*, 2018 WL 9457998, at *2. Geo sought documents from four agencies (including the Department of Social and Health Services and the Washington Governor's Office, both at issue in this case as well), and the Washington Attorney General argued lack of control because those agencies were not parties to the suit and the lawsuit was initiated as *parens patriae*. *Id.* In seeking to compel party discovery as against these state agencies, "GEO contends that the AGO has actual control over information held by state agencies because of the AGO's requisite relationship with them and statutory power to represent them." *Id.* The *Geo* Court found that "[i]n this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies. Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies." *Id.* at *3.

The *Geo* opinion distinguished precedent partially on the grounds that the litigation in *Geo* was initiated *parens patriae* whereas the litigation in the precedent was "effectively, an enforcement action on behalf of another agency" where the State was a nominal party. *Id.* (distinguishing *Boardman*, 233 F.R.D. at 265). However, the *Geo* opinion also distinguished *Boardman* on the grounds that the precedent "relied heavily analyzing the Constitution for the State of New York, a different state." *Id.* Further, the *Geo* opinion cited approvingly the *Wilson* opinion discussed above, and in *Wilson* the finding of control was not based on distinguishing litigation *parens patriae* versus

an agency enforcement action.  *Wilson*, 2017 WL 518615, at *3.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, Washington is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Washington was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Washington Attorney General and Meta were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Washington Attorney General has legal control, for the purposes of discovery, over the documents held by the Washington agencies listed by Meta.

## XXXIV. WEST VIRGINIA

In opposition to the control issue, the West Virginia Attorney General argues primarily the following factors: (1) the West Virginia Attorney General brought the lawsuit under its own independent law enforcement capacity; and (2) the West Virginia Attorney General is a separate entity and independent from the West Virginia agencies.  [Dkt. 738-35 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: the West Virginia Attorney General must act as counsel for the West Virginia agencies absent the existence of statutory exemptions (not present here).  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: the Bureau for Children and Families,

United States District Court
Northern District of California

1    Department of Education, Department of Health and Human Resources, Development Office,

2    Governor's Office, State Budget Office, Department of Education. *Id.*

3        After considering the factors argued in the briefs, the Court finds that the factors weigh in

4    favor of a finding that the West Virginia Attorney General does have legal control, for purposes of

5    discovery, over the listed West Virginia agencies.  While the West Virginia Attorney General is a

6    separate entity and while the West Virginia Attorney General does bring the instant action in its own

7    independent authority, this does not outweigh the requirement that the West Virginia Attorney

8    General will act as the agencies' counsel.

9        The statutory scheme in West Virginia requires that "[t]he attorney general shall give written

10    opinions and advice upon questions of law, and ***shall*** prosecute and defend suits, actions, and other

11    legal proceedings, and generally render and perform all other legal services, whenever required to

12    do so, in writing, by the governor . . . or any other state officer, board or commission, or the head of

13    any state educational, correctional, penal or eleemosynary institution[.]"  W. Va. Code § 5-3-1

14    (emphasis added).  Furthermore, "[t]he attorney general ***shall*** appear as counsel for the state ***in all***

15    ***causes*** pending in . . . ***any federal court***, in which the state is interested; . . . and when such

16    appearance is entered he shall take charge of and have control of such cause[.]"  W. Va. Code § 5-

17    3-2 (emphasis added).  As discussed above, no separate counsel has appeared for any of the agencies

18    here, and on the record presented, it appears that under the statutory scheme the West Virginia

19    Attorney General will represent these agencies.

20        Indeed, the West Virginia Attorney General confirmed that its office could represent the

21    agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1

22    at 31].  Accordingly, it appears that under the statutory scheme each agency will be represented by

23    the West Virginia Attorney General in this matter for discovery.

24        Further, there is no statutory, legal, or administrative rule cited which prohibits the West

25    Virginia Attorney General from accessing the documents of the state agencies at issue.  Nor is there

26    citation to any statutory or legal prohibition on the West Virginia Attorney General's representing

27    the state agencies in this matter for purposes of discovery.  The Court recognizes that this is a

28    somewhat unusual situation, in which a law enforcement organization (the attorney general) is both

a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the West Virginia Attorney General has taken the position that communications between the West Virginia Attorney General and these state agencies would be covered by the attorney-client privilege.  [Dkt. 738-35 at 2].  To the extent the West Virginia Attorney General argues that his office "does not represent any other state agency" ***currently*** in this action, but also argues that "***when*** the AG is serving as legal counsel for a state agency" then the privilege applies, the West Virginia Attorney General plainly is attempting to preserve the ability to assert the attorney-client privilege between the West Virginia Attorney General's office and the agencies at issue - and that position further supports the conclusion of control here.  Parsing whether the agencies ***at the moment of the writing of their brief*** may not have been represented by the West Virginia Attorney General, but keeping open the obvious likelihood that they ***will*** be represented for discovery under the statutory scheme in West Virginia, is a myopic argument which is not firmly grounded in reality and not persuasive. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  The fact that the West Virginia Attorney General

1    is attempting to preserve the ability to assert the attorney-client privilege between the West Virginia

2    Attorney General's office and the agencies at issue further supports the conclusion of control here.

3    Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-

4    client relationship.  *See Graf*, 610 F.3d at 1156.  And, as discussed above, "[i]n general, an attorney

5    is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661,

6    at *2.  There is no showing here to rebut that presumption.

7            The West Virginia Attorney General's role as counsel for the agencies at issue inherently

8    involves obtaining necessary documents for effective representation in litigation.  In acting as

9    counsel, the West Virginia Attorney General would necessarily have access to and thus control over

10   the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934,

11   at *5–6 (finding state Attorney General has control over agency documents "based on his broad

12   statutory and common law powers to control and manage legal affairs on behalf of state agencies,

13   has a legal right to obtain responsive documents from the state agencies referenced in the

14   Complaint").  Further, the West Virginia Attorney General argues that the West Virginia Attorney

15   General is a separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-

16   35 at 2 (citations omitted).  However, this argument misapprehends the "legal control" test for

17   documents – the issue is not simply whether one entity is under the day-to-day operational control

18   of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the

19   two entities are legally separate (such as two different and separately incorporated entities), but

20   rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The

21   control analysis for Rule 34 purposes does not require the party to have actual managerial power

22   over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude*

23   *Medical S.C., Inc.*, 305 F.R.D. at 638.  Further illuminating of the issue, the West Virginia federal

24   court in *Baxley* found that a state agency (the West Virginia Division of Corrections and

25   Rehabilitation) had control over documents of a third-party vendor (a medical contractor) such that

26   the state agency was required to search for and produce documents from that third-party, overruling

27   the state agency's objections that the third-party "is not a parent or subsidiary corporation of

28   Defendants or in any way related thereto, and Defendants do not have custody of the responsive

United States District Court
Northern District of California

documentation." *Baxley v. Jividen*, No. 3:18-CV-01526, 2020 WL 4282033, at *3–5 (S.D.W. Va. July 27, 2020). Separateness of the entities involved is not determinative of the "control" issue.

Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. Thus, arguing that the West Virginia Attorney General is not suing on behalf of or representing any state agency in this litigation, and arguing that the "COPPA claim is not reliant on or related to any state agencies' claim(s)[,]" dkt. 738-35 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the lack of operational control is not alone determinative for evaluating "control." The West Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the West Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the West Virginia agencies listed by Meta.

## XXXV. WISCONSIN

In opposition to the control issue, the Wisconsin Attorney General's primary argument is that: the Wisconsin Attorney General only has powers prescribed by law and no such law proscribes the Wisconsin Attorney General to be able to access the documents of Wisconsin agencies. [Dkt. 738-36 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

242

United States District Court
Northern District of California

based primarily on the following factors: the Wisconsin Attorney General has already confirmed that it is acting as counsel to the Wisconsin Governor in this litigation and that all but one of the listed agencies are controlled by the Wisconsin Governor. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Administration, Department of Children and Families, Department of Health, Department of Public Instruction, Department of Children's Mental Health, and Office of the Governor. *Id.*

After considering the briefing, the Court finds that the factors weigh in favor of a finding that the Wisconsin Attorney General does have legal control, for the purposes of discovery, over the listed Wisconsin agencies. Specifically, it has legal control, for the purposes of discovery, over the listed Wisconsin agencies that are controlled by the Wisconsin Governor because the Wisconsin Attorney General is acting as counsel in this litigation for the Wisconsin Governor. As discussed above, no separate counsel has appeared for any Wisconsin agencies. Accordingly, on the record presented to the Court, it appears that the Wisconsin Attorney General (a) has admitted it has been and will represent the Wisconsin Governor in this action, and (b) will represent the Wisconsin agencies controlled by the Governor.

The statutory scheme in Wisconsin requires that the Wisconsin Attorney General through the Wisconsin Department of Justice "*shall* . . . appear for the state and prosecute or defend all actions and proceedings, civil or criminal, in the court of appeals and the supreme court, in which the state is interested or a party, and attend to and prosecute or defend all civil cases sent or remanded to any circuit court in which the state is a party." Wis. Stat. § 165.25(1) (emphasis added). Additionally, the Wisconsin Attorney General "*shall* . . . [i]f requested by the governor or either house of the legislature, *appear for and represent* the state, *any state department, agency*, official, employee or agent, whether required to appear as a party or witness *in any civil* or criminal *matter*, and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." Wis. Stat. § 165.25(1m) (emphasis added).

Indeed, the Wisconsin Attorney General confirmed that its office could represent the Wisconsin agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

United States District Court
Northern District of California

1   [Dkt. 738-1 at 31–32].  Additionally, the Wisconsin Attorney General has (through artful language)

2   confirmed that it has acted as counsel to the Governor in this litigation.  Dkt. 738-36 at 2 ("Here,

3   with respect to this litigation **and with the exception of the governor**, **the [Wisconsin Attorney**

4   **General] has not acted as counsel** to any of the agencies identified by Meta in the Joint Chart.")

5   (emphasis added).  The Wisconsin Attorney General further concedes that all the agencies in the

6   chart are run by a secretary (or in one instance, a director), who each are appointed by the Governor.

7   *Id.*   Under Wisconsin law, all secretaries "serve at the pleasure of the governor."  Wis.

8   Stat  § 15.05(1)(a).  Similarly, the director of the Office of Children's Mental Health is run by a

9   director who shall likewise "serve at the pleasure of the governor."  Wis. Stat. § 15.194(1).  Because

10  each of these agencies are run by appointees of the Governor and serve at the Governor's pleasure,

11  their choices of counsel will clearly be determined by the Governor.  And because the Wisconsin

12  Attorney General has been and will represent the Governor in this case already and no other counsel

13  has entered appearance for the state agencies, it is not surprising that the Wisconsin Attorney

14  General would also thus represent these state agencies.

15          Accordingly, it appears that under the statutory scheme each agency will be represented by

16  the Wisconsin Attorney General in this matter for discovery.  While the Wisconsin Attorney General

17  argues that there is no statute that expressly grants that office the right to access agencies'

18  documents, the Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney

19  General from accessing any agency documents.  This arrangement indicates strongly that the

20  Wisconsin Attorney General, in fulfilling its statutory role as counsel for the Governor and the state

21  agencies, would necessarily and inherently have access to and control over the necessary documents

22  for effective legal representation of these state agencies.

23          Relatedly, the Wisconsin Attorney General has taken the position that communications

24  between the Wisconsin Attorney General and these state agencies would be covered by the attorney-

25  client privilege "where the AG is serving as legal counsel for a state agency."  [Dkt. 738-36 at 2].

26  To the extent the Wisconsin Attorney General indicates that "a review will be undertaken to

27  determine whether a legal privilege will apply," that indicates that the Wisconsin Attorney General

28  is attempting to preserve the ability to assert the attorney-client privilege between the Wisconsin

1   Attorney General's office and the agencies at issue, and that position further supports the conclusion

2   of control here.  Assertion of the attorney-client privilege requires, as a prerequisite, the existence

3   of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.  And, as discussed above, "[i]n

4   general, an attorney is presumed to have control over documents in its client's possession." *Perez*,

5   2014 WL 1796661, at *2.  There is no showing here to rebut that presumption.

6        The Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney

7   General from serving as counsel for the state agencies at issue.  Indeed, the Wisconsin Attorney

8   General's role as counsel for the agencies at issue inherently involves obtaining necessary

9   documents for effective representation in litigation.  In acting as counsel, the Wisconsin Attorney

10  General would necessarily have access to and thus control over the relevant documents needed to

11  respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney

12  General has control over agency documents "based on his broad statutory and common law powers

13  to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive

14  documents from the state agencies referenced in the Complaint").

15       Further, the Wisconsin Attorney General argues that the Wisconsin Attorney General is a

16  separate and distinct elected entity with "executive control over only one agency of state

17  government: the Wisconsin Department of Justice."  *See* Dkt. 738-36 at 2 (citations omitted).

18  However, this argument misapprehends the "legal control" test for documents – the issue is not

19  simply whether one entity is under the day-to-day "executive control" of the other (such as a parent-

20  wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

21  (such as two different and separately incorporated entities), but rather whether there is a legal right

22  to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

23  does not require the party to have actual managerial power over the foreign corporation, but rather

24  that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

25  Here, the attorney-client relationship between the state Attorney General and the state agencies (a

26  relationship mandated by state law) necessitates close coordination.  While operational control may

27  be a factual situation which demonstrates a legal right to obtain the documents, the absence of such

28  "executive or functional control" is not determinative for evaluating "control" for purposes of

United States District Court
Northern District of California

discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

The Western District of Wisconsin's opinion in *Perez v. Frank*, No. 06-C-248-C, 2006 WL 6040464, at *1 (W.D. Wis. Nov. 27, 2006), is instructive.  In *Perez*, the plaintiff was suing several individual defendants who were officials within the Wisconsin Department of Corrections.  *Id.*  In that case, the plaintiff requested issuance of a subpoena for documents directed to the Department of Corrections.  *Id.*  The Wisconsin Court denied the request, tellingly, because "[b]efore I issue the requested subpoena to plaintiff, it will be necessary for him to advise the court why he believes the documents he wants *are not in the control of the defendants in light of the fact that they appear to be documents belonging to the Department of Corrections*. If the documents plaintiff seeks to inspect are in the control of the defendants, then he should request the production of documents pursuant to Fed. R. Civ. P. 34."  *Id.*  In *Perez*, the defendants were represented by the Wisconsin Attorney General.  *Id.*  Thus, the holding in *Perez*, known to the Wisconsin Attorney General's office, is that a Wisconsin federal judge has recognized that individuals, employed by a state agency, but none of whom are alleged to be in "executive control" of that agency, have sufficient apparent control of agency documents such that a subpoena is unnecessary and that party discovery is the appropriate procedural vehicle for document discovery.  The *Perez* ruling thus by analogy persuasively supports this Court's conclusions on control regarding documents in this case for the Wisconsin agencies.  *Cf. also Trane Co. v. Klutznick*, 87 F.R.D. 473, 476–78 (W.D. Wis. 1980) (finding named defendant, President of the United States, has control over information in the hands of non-party agencies such that supplemental interrogatory responses are ordered).

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in

United States District Court
Northern District of California

this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there.  *Id.* at 356 n.5.  In that case, Wisconsin is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Wisconsin was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Wisconsin Attorney General and Meta were unable to reach a negotiated resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Wisconsin Attorney General has legal control, for the purposes of discovery, over the documents held by the Wisconsin agencies listed by Meta.

### ADMINISTRATIVE MOTIONS

As discussed above, the State Attorneys General filed an Administrative Motion for Leave to File Supplemental Information, a Second Administrative Motion for Leave to File Supplemental Information, and a Third Administrative Motion for Leave to File Supplemental Information.  [Dkts. 1031, 1074, 1110].  All three seek leave to file information that Meta has served notices of its intent to serve subpoenas on some of the agencies at issue.  *Id.*  Meta's Response to the first Administrative Motion indicates that Meta does not object to the submission of these subpoenas as supplemental information and made clear its position that service of these subpoenas was being conducting without waiving Meta's position that the state agencies should be subject to party discovery.  [Dkt. 1035 at 2].  As of the date of this Order, Meta takes no position with regard to the Second Administrative Motion, and the Court presumes that Meta's position would be the same as with respect to the First and Third Administrative Motion in any event.  [Dkt. 1074 at 6; Dkt. 1110].  No opposition on the merits being filed, the Court **GRANTS** all three Administrative Motions.

**CONCLUSION**

The Court is disappointed that the Parties were incapable of reaching a negotiated resolution of this "control" issue, but rather required the Court to expend its valuable resources analyzing over thirty-five briefs on this "control" issue (where the State Attorneys General requested that the issues here required separate briefing for each State), conduct multiple hearings on this issue (where ultimately only a handful of the States presented oral argument), and prepare this admittedly length Order (where, as discussed above, a large number of the arguments overlapped and repeated, with only slight variations, from state to state). Indeed, rather than reaching negotiated resolution of this issue as in *Generic Pharmaceuticals (II)*, the Attorneys General of multiple states here preemptively declared at oral argument their intent to appeal any adverse ruling on "control" before they even saw this Order or this Court's reasoning (and where the Court did not rule from the bench). The detailed discussion in this Order is intended, hopefully, to facilitate any later review. The Court again reminds counsel for all Parties of their duties under Fed. R. Civ. P. 1 and 26 to work collaboratively for the efficient progress of this case, and to avoid unduly multiplying the proceedings.

For all reasons discussed herein, Meta's motion to compel the State Attorneys General to include the identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART** consistent with this Order.

The Parties (including counsel for the State Agencies) are **ORDERED** to promptly meet and confer regarding a mutually agreeable and reasonable date for the State Agencies to substantially complete their respective productions of documents in response to either the Rule 34 requests or, to the extent applicable, Rule 45 subpoenas. The Parties shall include a summary report on the status of State Agency discovery in the Discovery Management Conference reports going forward.

**IT IS SO ORDERED.**

Dated: September 6, 2024

_____

PETER H. KANG
United States Magistrate Judge

248