*[Parties and Counsel Listed on Signature Pages]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR (PHK)<br><br>**JOINT STATUS REPORT ON DISCOVERY FOR SEPTEMBER 12, 2024 DISCOVERY MANAGEMENT CONFERENCE**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

Pursuant to Discovery Management Order ("DMO") No. 2 (ECF 606), the Personal Injury ("PI") and School District and Local Government Entity ("SD") Plaintiffs, State Attorneys General ("State AGs"), and Defendants submit this agenda and joint statement in advance of the September 12, 2024, Discovery Management Conference ("DMC").

## I.    Status of Discovery and Parties' Progress in Meeting Discovery Deadlines

### A.    Parties Agreement to Certain Conditions Associated with Administrative Motion re Case Schedule

The MDL Personal Injury ("PI") and School District and Local Government Entity ("SD") Plaintiffs, State Attorneys General ("State AGs"), JCCP Bellwether PI Plaintiffs, and Defendants wish to inform the Court that, in connection with the Parties' Administrative Motion re Case Schedule (ECF 1079), filed August 22, 2024, they have also agreed to the following terms:

1.    Absent good cause, the Parties (in both the MDL and JCCP proceedings) agree to finalize, and, if necessary, brief, all disputes about the scope of Defendants' written responses and objections to Plaintiffs' existing discovery requests by the Parties' new proposed substantial completion deadline of November 5, 2024.  For avoidance of doubt, disputes regarding assertions of privilege, redactions, confidentiality designations, and the sufficiency of Defendants' productions are not encompassed by this term.

2.    Any additional requests for production of documents ("RFPs") served by Plaintiffs will be targeted consistent with prior discussions of counsel and Court guidance (*see* MDL DMO No. 7 (ECF 969), at 2-4; 5/23 MDL Discovery Hr'g Tr. at 91; 6/20 MDL DMC Tr. at 64:20-65:3; 8/8 MDL Discovery Hr'g Tr. at 105:3-8).

3.    MDL Plaintiffs agree: (1) to finalize negotiations on search terms for SD Bellwether Plaintiffs by September 6; and (2) to submit any remaining disputes by September 11.

4.    JCCP Bellwether PI Plaintiffs agree, absent good cause, to the same generic search terms as those negotiated for the Bellwether PI Plaintiffs in the MDL.

5.    The Parties (in both the MDL and JCCP proceedings) agree to serve all remaining ROGs and RFAs no later than February 14, 2025, with the understanding that any party may petition the

appropriate Court to show good cause why it is necessary to serve such additional discovery after February 14, 2025.

6.     In addition to the substantial completion deadline otherwise contemplated in the parties' Joint Administrative Motion, Meta, TikTok, Snap, and YouTube agree to the following custodial file production deadlines:

- Meta:
    - Meta substantially completed production of custodial files for A.D., C.S., and K.A..
    - Production of custodial files for P.R., R.S., K.H., P.A.D., M.G.S., K.J., J.C., M.R., D.C., and J.G. will be substantially complete by September 20.
    - Production of privilege logs and any documents downgraded through the privilege log process, for A.D., C.S., K.A., will be completed by September 20.
    - Production of privilege logs and any documents downgraded through the privilege log process, for P.R., R.S., K.H., P.A.D., M.G.S., K.J., J.C., and J.G., will be completed by November 5.
    - Production of custodial files, for all other custodians whose depositions have been noticed by Plaintiffs as of August 20, will be substantially complete by October 10.
    - Production of privilege logs and any documents downgraded through the privilege log process, for all other custodians whose depositions have been noticed by Plaintiffs as of August 20, will be completed by November 20.
    - Production of privilege logs and any documents downgraded through the privilege log process, for all other Meta custodians, will be completed by December 20.
- TikTok:
    - Production of non-Mandarin custodial files for A.C., J.Y., and R.L. will be substantially complete by August 30.
    - Production of Mandarin custodial files for A.C., J.Y., and R.L. will be substantially complete by September 9
    - Production of non-Mandarin custodial files for C.C., Y.F., S.L., and J.F. will be

substantially complete by September 13

- o Production of Mandarin custodial files for C.C., Y.F., S.L., and J.F. will be substantially complete by September 20

- o Production of non-Mandarin custodial files for C.B., E.E., J.R., J.E., L.Y., and R.M. to be substantially complete by September 20

- o Production of Mandarin custodial files for C.B., E.E., J.R., J.E., L.Y., and R.M. to be substantially complete by October 20

- o Production of non-Mandarian custodial files for W.Z., M.T., M.W., V.P., E.H., J.D., V.M., T.E., S.G., A.Z., and F.Z. will be substantially complete by October 20

- o Production of Mandarian custodial files for W.Z., M.T., M.W., V.P., E.H., J.D., V.M., T.E., S.G., A.Z., and F.Z. will be substantially complete by November 5

- o Defendants reserve their rights on the timing of the production of the custodial files for K.Z. and Y.Z. in the event there are issues processing these custodians' data.

- o The TikTok Defendants will provide the MDL PI/SD and JCCP Plaintiffs with updates with each production deadline and make productions in advance of the above deadlines when feasible (i.e., a custodian's files are ready for production).

- o Production of custodial files is on a rolling basis.  TikTok agrees not to hold documents ready to produce until the "completed by" date.

- Snap:

  - o Snap agrees to produce responsive documents identified as a result of the parties' agreed-on search related to N.J. in E.S.'s files by the end of August.

  - o Production of custodial files for J.B., J.S., and J.B. will be substantially complete by August 26.

  - o Production of custodial files for M.J., J.S., K.W., N.Y., and D.L. will be substantially complete by October 15.

  - o Snap agrees to make additional document productions on September 20, October 15, and November 5.

- o Of the 8 remaining custodians that Plaintiffs have not yet identified, Plaintiffs agree to identify 2 custodians by the end of August, 2 custodians by September 5, 2 custodians by September 13, and 2 custodians by the end of September.

- o Plaintiffs have reserved their rights to seek files from additional custodians, if there is good cause to do so, and Snap has reserved its rights to object to the same.

- YouTube:

  - o Production of M.H.'s custodial files based on the original search terms, as well as the supplemental search terms, will be substantially complete by August 16.

  - o Production of F.G.'s custodial files based on the supplemental June 17 search terms for the original time period will be substantially complete by August 16.

  - o Production of J.B.'s custodial files will be substantially complete by August 20.

  - o Production of C.G.'s custodial files will be substantially complete by August 30.

  - o Production of the custodial files of K.E., E.T., K.O., and J.R. will be substantially complete by September 9.

  - o Production of the custodial files of A.W.P. and T.K. will be substantially complete by September 20.

  - o An additional year of files from A.W.P. and F.G. may be produced after September 20, consistent with the parties' discussions.

7. To facilitate cooperation in depositions among the MDL PI/SD Plaintiffs, State AG MDL Plaintiffs ("MDL AGs"), JCCP Plaintiffs, Tennessee AG, Massachusetts AG, and any other governmental entity that subsequently cross-notices into any deposition noticed or cross-noticed by the PI/SD Plaintiffs or MDL AGs (collectively, "Related Plaintiffs"):

- Meta will produce documents to all Related Plaintiffs within seven business days.

- Meta will provide to all Related Plaintiffs crosswalks that identify all relevant Bates numbers for each produced document. Meta has provided crosswalks for documents produced on or before August 21, 2024 by August 28, 2024, and it will provide crosswalks for documents produced after August 21, 2024 simultaneously with the re-production of those documents.

- Meta will provide to each AG that is a Related Plaintiff a list of AG investigative documents that

have not been cross-produced to PI/SD Plaintiffs.

● Meta produced to each Related Plaintiff that is bound by a protective order in its respective action the Attorney General investigative documents that it agreed to produce to PI/SD Plaintiffs on June 14, 2024, along with a crosswalk that identifies all relevant Bates numbers, including Bates numbers from the Attorney General investigation.

## B.   Plaintiffs' Written Discovery Served on Defendants

The Parties provide below an update on the RFPs served by Plaintiffs on Defendants; Defendants' document productions in response to Plaintiffs' RFPs; Interrogatories ("Rogs") served by Plaintiffs on Defendants; and Requests for Admission ("RFAs") served by Plaintiffs on Defendants.

### 1.   RFPs Served; Defendants' Responses & Objections

The PI/SD Plaintiffs, State AGs, Bellwether PI Plaintiffs and Bellwether SD Plaintiffs have served on **Meta** a total of 1,067 Requests for Production of Documents ("RFPs").  (PI/SD Plaintiffs have served 368 common RFPs; State AGs have served 183 RFPs; nine of the twelve Bellwether PI Plaintiffs have each served 40 identical RFPs on Meta, for a total of 360 RFPs; the Bellwether SD Plaintiffs have served 13 identical RFPs each on Meta, for a total of 156 RFPs.)  Meta has served responses and objections to 1,066 of those requests.

The PI/SD Plaintiffs have served 279 common RFPs on the TikTok Defendants.  Certain Bellwether PI Plaintiffs have each served 40 RFPs on the TikTok Defendants, for a total of 920 RFPs.  The Bellwether SD Plaintiffs have served 13 RFPs on the TikTok Defendants.  Collectively, 1,212 RFPs have been served on the TikTok Defendants.

The **TikTok** Defendants have served R&Os to all of the PI/SD Plaintiffs' RFPs with the exception of RFP Set Nos. 16 and 17 that are due September 19 and 20, respectively.

The PI/SD Plaintiffs have served 175 common RFPs on **Snap**.  Certain Bellwether PI Plaintiffs have served 280 RFPs on **Snap**.  The Bellwether SD Plaintiffs have also served 13 RFPs on **Snap**, for a total of 156 RFPs.  **Snap** has served R&Os to all but two of the PI Plaintiffs' RFPs, which are due September 30, 2024.

The PI/SD Plaintiffs have served 148 common RFPs.  The Bellwether PI Plaintiff Smith has served 40 RFPs on **YouTube**.  The Bellwether SD Plaintiffs have served 14 RFPs on YouTube.  **YouTube** has served R&Os to all of these RFPs.

### 2. Defendants' Document Productions

All Defendants have been producing documents in response to Plaintiffs' RFPs and will continue to make rolling productions.

**Meta** has produced approximately 540,000 documents as of September 5, 2024.  Meta has also produced certain structured data for each of the bellwether PI plaintiffs, as well as account captures for each of the Facebook and Instagram accounts the bellwether PI plaintiffs has confirmed as being theirs.

The **TikTok** Defendants have produced 83,816 documents as of September 5, 2024, in response to the PI/SD Plaintiffs' RFPs.

**Snap** has produced 157,730 documents as of September 5, 2024, in response to the PI/SD Plaintiffs' RFPs and Rule 30(b)(6) deposition notice, as well as 77,622 records of user account data.

**YouTube** has produced more than 264,960 documents, as of September 5, 2024, in response to the PI/SD Plaintiffs' RFPs and/or certain topics in the PI/SD Plaintiffs' 30(b)(6) deposition notice.

### 3. Interrogatories Served; Defendants' Responses & Objections

The MDL and JCCP Plaintiffs are collectively allowed to serve 45 common Rogs on each group of Defendants under the Discovery Limitations Order.  *See* ECF 702 ¶¶ 1-2.

Plaintiffs have served 2 of the 45 Rogs they are permitted to serve on **Meta**, and Meta has served R&Os to those Rogs.

Plaintiffs have served 1 Rog, with 6 subparts, on **Snap**, and Snap has served R&Os to that Rog.

Plaintiffs have served 4 Interrogatories on **TikTok**, and TikTok has served R&Os to those Rogs.

Plaintiffs have served 1 Interrogatory, with at least 5 subparts, on YouTube, and YouTube has served R&Os to that Interrogatory.

### 4. Requests for Admissions Served; Defendants' Responses & Objections

Plaintiffs have served 10 RFAs on **TikTok** and TikTok has served R&Os to those RFAs.

### C.      Defendants' Written Discovery Served on MDL Bellwether PI Plaintiffs

The Parties provide below an update on the written discovery served by Defendants on the MDL Bellwether PI Plaintiffs; the MDL Bellwether PI Plaintiffs' document productions in response to Defendants' RFPs; the status of the Parties' conferrals; the imaging of Plaintiffs' routinely-used devices; and Defendants' RFPs 32-34 and 66 re romantic relationships.

### 1.      Written Discovery Served

*RFPs.*  Defendants have jointly served 81 unique RFPs in each of the 12 Bellwether PI cases in the MDL (972 RFPs total in the Bellwether PI cases).

*Rogs.*  Defendants are collectively allowed to serve 10 interrogatories for each minor (under age eighteen) bellwether PI Plaintiff and 7 interrogatories for all other bellwether PI Plaintiffs under the Discovery Limitations Order.  See ECF 702 ¶ 5.  Defendants have jointly served 5 to 7 unique Rogs in each of the 12 Bellwether PI cases in the MDL, including to each of the four Plaintiff parents in the D'Orazio, Hawthorne, Mullen, and Smith cases.

### 2.      MDL Bellwether PI Plaintiffs' Document Productions

The chart below sets forth the MDL Bellwether PI Plaintiffs' document productions to date made in response to RFP Set One, which are being made on a rolling basis.  Defendants have requested that each MDL PI Bellwether Plaintiff state when their rolling productions will be completed. Plaintiffs have responded that productions by Plaintiffs Craig and S.K will be substantially completed by September 30, that productions  by B.M. and B.H. will be substantially completed by October 15, and that the other eight MDL Bellwether PI Plaintiffs' productions will be substantially completed on November 5, 2024.

The MDL Bellwether PI Plaintiffs also provided authorizations to Defendants that allowed Defendants to request medical, employment, educational, workers' compensation, disability, Medicaid/Medicare, and insurance records when applicable.  The number of documents Defendants have collected with those authorizations are not included in the below chart.

| Plaintiff Group | Number of Documents Produced in Response to RFPs | Number of Documents Produced with PFS |
|---|---|---|
| MDL PI Bellwether Plaintiff Laurel Clevenger [1] | 39,403 | 4 |
| MDL PI Bellwether Plaintiff Klinten Craig [2] | 48,141 | 2 |
| MDL PI Bellwether Plaintiff B.S. on behalf of J.D. [3] | 21,991 | 2 |
| MDL PI Bellwether Plaintiff Jessica D'Orazio and Christine D'Orazio [4] | 23,592 | 1 |
| MDL PI Bellwether Plaintiff Maria Elena Rodriguez individually and on behalf of M.G. [5] | 2 | 3 |
| MDL PI Bellwether Plaintiff Lorine Hawthorne individually and on behalf of B.H. [6] | 14,546 | 4 |
| MDL PI Bellwether Plaintiff N.K. on behalf of S.K. [7] | 8,907 | 11 |
| MDL PI Bellwether Plaintiff Dymand McNeal [8] | 46,511 | 4 |
| MDL PI Bellwether Plaintiff David Melton [9] | 1,142 | 2 |
| MDL PI Bellwether Plaintiff Nuala Mullen and Elizabeth Mullen [10] | 43,036 | 29 |
| MDL PI Bellwether Plaintiff M.M. on behalf of B.M. [11] | 8,511 | 8 |
| MDL PI Bellwether Plaintiff Leslie Smith and Jessica Smith [12] | 25,685 | 2 [Defs' Count]; 3 [Pls' Count] |

### 3.    Status of Conferrals

The Parties have conducted and continue to conduct meet-and-confers regarding the MDL Bellwether PI Plaintiffs' R&Os to Defendants' RFPs, ESI repositories, and search terms to be applied by the MDL Bellwether PI Plaintiffs.

Following the August 8 DMC, the Court ordered the parties to finalize agreed-upon search terms by August 16, 2024.  DMO 9 (ECF No. 1070) at 3.  On August 16, the Court granted a joint request by the Parties to extend the deadline to finalize agreed-upon search terms to be run across Bellwether PI Plaintiffs' ESI until August 23.  ECF No. 1072.  On August 23, the Parties finalized general search terms to be run across Bellwether PI Plaintiffs' ESI, and the Court granted a joint request by the Parties to extend the deadline to finalize case-specific search term negotiations until August 30, 2024.  ECF No. 1083.  The Parties agreed to case-specific search terms to be run across Bellwether PI Plaintiffs' ESI on August 30;

however, further discussions may occur regarding the data sources across which a few terms will be run for two Bellwether PI Plaintiffs. The Parties continue to discuss the search terms to apply to data sources Plaintiffs have identified for loss of consortium plaintiffs/parents/guardians.  As noted above, the JCCP Bellwether PI Plaintiffs have agreed, absent good cause, to the same general search terms as those negotiated for the Bellwether PI Plaintiffs in the MDL.

### 4.      Update on Responses to Defendants' RFPs 32-34, and 66

The Court heard argument regarding the Bellwether PI Plaintiffs' R&Os to these RFPs at the August 8, 2024 DMC.  Following the Court's ruling in DMO 9, the Parties filed a joint stipulation reflecting the narrowed scope of these requests, and agreeing that Bellwether PI Plaintiffs would provide Defendants information regarding romantic breakups by August 14, 2024, to guide the Parties' discussion regarding searching for documents responsive to the narrowed RFP 66.  ECF No. 1069.  The Parties concluded negotiations on general search terms, which included terms pertaining to RFPs 32-34, on August 23, 2024.

On August 14, Plaintiffs proposed case-specific search terms regarding romantic relationships of six months or more, or that were discussed by Plaintiffs with medical or mental health providers. Defendants proposed case-specific search terms related to additional romantic relationships on August 14 and 15. The Parties have agreed to case-specific search terms for the romantic relationships identified to date.

### D.      Defendants' Written Discovery Served on MDL Bellwether SD Plaintiffs

The Parties provide below an update on the written discovery served by Defendants on the Bellwether SD Plaintiffs; the Bellwether SD Plaintiffs' document productions in response to Defendants' RFPs; and the status of conferrals.

### 1.      Written Discovery Served

*RFPs.*  Defendants have jointly served 83 unique RFPs in each of the 12 Bellwether SD cases in the MDL, an additional 67 RFPs on DeKalb School District, an additional 39 RFPs on Saint Charles Parish Public Schools, an additional 11 RFPs on the Jordan School District, and an additional 28 RFPs on Tucson Unified School District (1,141 RFPs total in the Bellwether SD cases).

*Rogs.*  Defendants are collectively allowed to serve 15 Rogs for each Bellwether SD Plaintiff under the Discovery Limitations Order.  *See* ECF 702 ¶ 5.  Defendants have jointly served approximately 3 unique Rogs in each of the 12 Bellwether SD cases in the MDL.

### 2.    MDL Bellwether SD Plaintiffs' Document Productions

The chart below sets forth the number of documents produced by each SD Bellwether Plaintiff to date.

| SD Bellwether Plaintiff | Number of Documents Produced for Priority Deponents or in Response to RFPs | Number of Documents Produced with PFS |
| --- | --- | --- |
| The Baltimore City Board of School Commissioners | 939 | 185 |
| Breathitt County School District | 16,064 | 7 |
| Charleston County School District | 15,275 | 70 |
| School District of the Chathams | 3,474 | 17 |
| DeKalb County School District | 0 | 40 |
| Board of Education of Harford County | 3,677 | 151 |
| The School Board of Hillsborough County | 887 | 36 |
| Irvington Public Schools | 8,741 | 8 |
| Board of Education of Jordan School District | 15,717 | 7 |
| Spartanburg 6 School District | 1,668 | 5 |
| Saint Charles Parish School Board | 617 | 5 [Defs' Count]; 16 [Pls' Count] |
| Tucson Unified School District | 9,646 | 52 |

### 3.    Status of Conferrals

*Litigation Holds.*  Following Judge Kang's order that the State AGs issue litigation holds, Plaintiffs confirmed that all Bellwether (and non-Bellwether) SD Plaintiffs would be instructed to issue litigation holds to the extent they had not done so already regardless of the districts' preservation policies in place or mandated by regulation.  The Parties continue to engage in district-specific discussions for the Bellwether SD Plaintiffs regarding whether particular individual custodians should be issued litigation holds.

*Written Discovery.* The Parties have conducted and continue to conduct meet-and-confer conferences regarding the Bellwether SD Plaintiffs' Plaintiff Fact Sheets ("PFSs") and R&Os to Defendants' First Set of RFPs and First Set of Rogs. The Parties engaged in numerous district-specific meet-and-confers in June, July, and August related to PFSs, Supplemental PFSs, and Defendants' First Set of RFPs. The Parties also conducted an all-Bellwether meet-and-confer on July 17 related to Defendants' First Set of Rogs. On July 24, the Bellwether SD Plaintiffs sent Defendants an all-Bellwether, omnibus letter setting out their joint positions on a number of outstanding issues related to their responses to Defendants' First Set of RFPs and First Set of Rogs. On August 9, the Defendants responded to the omnibus response from the Bellwether SD Plaintiffs; the Bellwether SD Plaintiffs responded on August 19. On August 29, Defendants sent another response.

**E.   Meta's Written Discovery Served on MDL State AGs and Agencies**

The Parties provide below an update on the written discovery served by Meta on the MDL State AGs; the State AGs' R&Os; the State AGs' document productions; the status of conferrals; the litigation hold issue; and Meta's Rule 45 subpoenas to State agencies.

**1.   Written Discovery Served**

*RFPs.* Meta served its first set of 45 RFPs on each of the 35 State AGs on February 27, 2024. Meta served its second set of RFPs on the 35 State AGs on May 3, 2024. This Court ruled on the pending dispute over Meta's ability to take party discovery of State agencies in its order of September 6, 2024. *See* ECF 1117.

*Rogs.* Meta is allotted a combined total of up to 32 identical Rogs for each State AG, and up to 6 additional State-specific Rogs for each State AG. Meta served its first set of 7 identical Rogs on each of the 35 State AGs on May 3, 2024.

**2.   State AGs' Responses and Objections**

The State AGs served their collective R&Os to Meta's first 45 RFPs on March 28, 2024. The State AGs served their collective R&Os to Meta's second set of RFPs and first set of Rogs on June 3, 2024.

### 3. State AGs' Document Productions

The State AGs collectively produced 28 documents on April 29, 2024, 885 documents on May 31, 2024, and 13,763 documents on August 30, 2024.

### 4. Status of Conferrals

The Parties met and conferred on April 16, 2024, regarding the State AGs' R&Os to Meta's first 45 RFPs, as well as Meta's request that the State AGs identify custodians and search terms.  At Meta's suggestion, the Parties discussed a subset of RFPs and agreed to exchange letters regarding the other RFPs. Meta self-identified its own Meta custodians on March 27 and Meta first requested that the State AGs identify custodians and search terms as early as April 5.   In subsequent letter correspondence, the State AGs proposed targeted searches instead of custodial searches as an efficient and effective manner of collecting responsive documents, and Meta accepted the targeted search proposals that the State AGs provided, without waiving any rights.  The State AGs await further correspondence from Meta regarding remaining RFPs.

### 5. Update on Litigation Hold Issue

On July 26, 2024, the State AGs provided an updated list of custodians who received litigation holds and the dates on which they received holds, confirming that all 35 States have implemented litigation holds within their AGs' offices following this Court's Order at the July 11 DMC.  The State AGs provided a further updated list to Meta on August 16, 2024.

### 6. Update on Rule 45 Subpoenas

Without waiving Meta's position that the State AGs have control over State agencies' documents, as of the date of filing of this statement, Meta has provided the State AGs with notice of Meta's intent to serve 141 Rule 45 subpoenas on state entities, including subpoenas to entities in all 35 states with State AG enforcement actions in the MDL, and is in the process of serving the subpoena.

After Meta served the first 26 of its Rule 45 subpoenas, the State AGs filed an Administrative Motion for Leave to File Supplemental Information to alert the Court of the development (ECF 1031).  In its Response, Meta indicated that it did not object to the Administrative Motion, but reiterated its position (also asserted when notifying the State AGs of its intent to issue the subpoenas) that these subpoenas did

not moot the pending dispute as to whether the State AGs have control over State agencies' documents (ECF 1035). After Meta served 57 additional Rule 45 subpoenas, the State AGs filed a Second Administrative Motion for Leave to File Supplemental Information to alert the Court of the further developments (ECF 1074). Meta took no position on the filing of the Motion.  On August 28 and 30, 2024, Meta sent notice of its intent to serve subpoenas on 39 and 18 additional State entities, respectively. Accordingly, the State AGs filed a Third Administrative Motion for Leave to File Supplemental Information to alert the Court of the further developments (ECF 1110).  On September 6, 2024, Meta sent notice of its intent to serve a subpoena on 1 additional State entity, bringing the total to 141 entities.  Meta calculates that, so far, over 40 percent of the state entities that have been in contact with Meta's counsel regarding a subpoena are being represented by the relevant State AG's office, which the State AGs contend is consistent with the AGs' representations in the State Attorney General Plaintiffs' and Meta Defendants' Joint Submission Regarding State Agencies Pursuant To Discovery Management Order No. 3 (ECF 738-1).

**F.      Third-Party Written Discovery**

The chart below summarizes the status of third-party subpoenas served by the PI/SD Plaintiffs and one third-party subpoena served by the State AGs (denoted below) to date.

| Third-Party Subpoena Recipient | Date Served |
|---|---|
| Multiplier (Mobius) | May 15, 2024 |
| Technology Coalition, Inc. | June 13, 2024 |
| Family Online Safety Institute (FOSI) | July 2, 2024 |
| NetChoice | July 11, 2024 |
| National Center for Missing and Exploited Children (NCMEC) | July 24, 2024 |
| United Talent Agency (UTA) | August 13, 2024 |

| Third-Party Subpoena Recipient | Date Served |
|---|---|
| Starcom Mediavest Group, Inc. D/B/A Spark Foundry | August 19, 2024 |
| AVOQ LLC (fra Team Subject Matter, LLC) | September 6, 2024 |
| BGR Government Affairs | September 6, 2024 |
| Blue Mountain Strategies, LLC | August 30, 2024 |
| Crossroads Strategies, LLC | September 6, 2024 |
| Hilltop Advocacy | Service in process |
| Jeffries Strategies, LLC | September 6, 2024 |
| K&L Gates, LLP | September 6, 2024 |
| Mehlman Consulting, Inc. | September 6, 2024 |
| Monument Advocacy | September 6, 2024 |
| Off Hill Strategies, LLC | Service in process |
| Oversight Board, LLC | September 4, 2024 (served by the State AGs) |

## G.    Depositions

The Parties will submit by email to the Court following this filing an updated Joint Deposition Status Chart.  The Parties set forth below the status of Plaintiffs' notices of anticipated fact depositions to Defendants; Plaintiffs' 30(b)(6) deposition notices to Defendants; Defendants' notices of anticipated fact depositions to the MDL PI Bellwether Plaintiffs; an update on the treating provider protocol; and Defendant's notices of anticipated fact depositions to the SD Bellwether Plaintiffs.

### 1.    Plaintiffs' Notices of Anticipated Defendant Fact Depositions

To date, Plaintiffs have identified 39 Meta witnesses, 20 TikTok witnesses, 11 Snap witnesses, and 15 YouTube witnesses as anticipated deponents.

### a)  Meta

As of August 29, Plaintiffs have identified 39 current and former Meta employees whom they seek to depose.  In terms of scheduling, Plaintiffs have requested and Meta has confirmed dates for 14 witnesses, including four witnesses in October, seven witnesses in November, and three witnesses in December.  Plaintiffs have not yet requested dates for the remaining witnesses.

### b)  TikTok

As of August 31, Plaintiffs have identified 20 current and former witnesses as early deponents with respect to the TikTok Defendants.  In terms of scheduling, Plaintiffs have served deposition notices for three witnesses.  Deposition dates have been set for two of those witnesses – both for two days in October.  For the third witness, the parties initially agreed to dates in early October for the deposition, but Plaintiffs later withdrew that notice and indicated that, in light of the likely schedule extension, they would be proceeding with that deposition sometime in the future.  To facilitate deposition scheduling, the TikTok Defendants are planning to provide Plaintiffs with location information and translator needs for all twenty of the early deponents.  The TikTok Defendants intend to have a meet and confer soon with Plaintiffs to get certainty from Plaintiffs as to which depositions they intend to proceed with and when so the parties can work collaboratively on scheduling.

On July 5, 2024, counsel for the TikTok Defendants provided notice to Plaintiffs, consistent with the Deposition Protocol, of 11 depositions of employees of the TikTok Defendants noticed in a Related Action – *Arkansas v. TikTok Inc., et al.,* No. 12CV-23-65 (Arkansas Circuit Court, Cleburne County).  Plaintiffs have cross-noticed seven of these depositions.  Plaintiffs have also reached out to the Arkansas AG to coordinate these depositions.  After one initial meeting, Plaintiffs' repeated further attempts to coordinate with the Arkansas AG have gone unanswered.  The depositions have not yet occurred.  According to TikTok, these depositions are not occurring on the dates for which they were noticed.  TikTok will keep Plaintiffs updated on the scheduling of these depositions and will coordinate with Plaintiffs on the timing of relevant custodial files vis-a-vis the depositions.

### c)      Snap

In April and May, Plaintiffs identified 11 potential early deponents as to Snap.  Plaintiffs have since indicated that they intend to proceed with only two depositions before the November 5 proposed substantial completion deadline, as well as a third deposition shortly after the November 5 deadline.

### d)      YouTube

In July, Plaintiffs requested deposition dates for 12 deponents.  The parties are working cooperatively to identify mutually agreeable deposition dates, and to coordinate associated productions for those deponents.

### 2.      PI/SD Plaintiffs' 30(b)(6) Deposition Notices to Defendants

Plaintiffs deposed the Meta Defendants' two 30(b)(6) witnesses on Plaintiffs' ESI topics on July 24 and July 31, 2024.  Plaintiffs separately served a Rule 30(b)(6) Deposition by Written Question ("DWQ") on Meta, consisting of 285 numbered questions (eventually reduced to 214; the Parties dispute the total number of questions including subparts).  On July 25, 2024, Meta served its R&Os to Plaintiffs' 30(b)(6) DWQ.

Plaintiffs deposed the TikTok Defendants' two 30(b)(6) witnesses on Plaintiffs' ESI and preservation topics on May 7 and May 9, 2024.

Plaintiffs deposed Snap's 30(b)(6) witness on Plaintiffs' corporate structure topics on May 1, 2024. Plaintiffs deposed Snap's 30(b)(6) witness on Plaintiffs' ESI and preservation topics on June 13, 2024.

Plaintiffs deposed three YouTube 30(b)(6) witnesses on a range of corporate structure and ESI topics on May 9, May 24, and June 26, 2024.

### 3.      Defendants' Notices of Anticipated MDL Bellwether PI Plaintiff Fact Depositions

In connection with the MDL PI Bellwether cases, Defendants have identified 60 priority witnesses (plaintiffs, family members, and treating clinicians) as anticipated deponents.  In connection with the Parties' submission to Judge Gonzalez Rogers regarding their Administrative Motion re Case Schedule, Defendants identified approximate dates by which they intend to depose each of these witnesses.  As additional medical records and documents are produced, Defendants expect to identify additional potential deponents.

### 4. Update on Treating Provider Protocol

The Parties are near agreement on the parameters of a protocol for depositions of treating healthcare providers in Bellwether PI cases and the Parties plan to submit their proposed protocol to the Court for consideration. Defendants believe the Parties should be coordinating with the JCCP Plaintiffs to agree on a uniform protocol. The MDL PI Bellwether Plaintiffs do not oppose this coordination but defer to the JCCP PI Bellwether Plaintiffs. Defendants and the JCCP Bellwether PI Plaintiffs raised their remaining disputes to Judge Kuhl at the August 29, 2024 JCCP CMC, and the Parties continue to negotiate to timely resolve negotiations on a Joint Treating Provider Protocol.

### 5. Defendants' Notices of Anticipated SD Plaintiff Fact Depositions

In connection with the SD Bellwether cases, Defendants have identified 156 witnesses, including school administrators, mental health counselors, school board members and other school district personnel as anticipated deponents. The Joint Deposition Status Chart submitted by email on the date of this filing shows the status of the Bellwether SD Plaintiffs' productions of custodial files for identified priority deponents.

The Bellwether SD Plaintiffs have provided Defendants with lists of individuals the Bellwether SD Plaintiffs have identified as key witnesses for each of the Plaintiff School Districts to help narrow the focus for purposes of identifying initial deponents. In connection with the Parties' submission to Judge Gonzalez Rogers regarding their Administrative Motion re Case Schedule, Defendants identified approximate dates by which they intend to depose each of these witnesses. The Parties continue to confer on the timing of depositions and the expected dates of custodial file productions.

## H. MDL Plaintiff Fact Sheets and Initial Disclosures

### 1. Personal Injury Plaintiff Fact Sheets

As of August 29, there are 289 individual MDL PI Plaintiffs that have filed a Short Form Complaint in this MDL. 190 PI Plaintiffs served PFSs by the April 1 deadline set forth in the PFS Implementation Order (ECF 596) and Case Management Order 10 (ECF 604). Pursuant to the Court's April 10 Order (ECF 748), an additional 45 PI Plaintiffs were to provide PFSs by May 8. Of those 45 Plaintiffs, 22 Plaintiffs failed to serve a PFS by the deadline (2 Plaintiffs subsequently dismissed their cases), 5 Plaintiffs served a PFS after the deadline, and 15 Plaintiffs have yet to serve a PFS.

Defendants have submitted a number of PFS deficiency letters and the PI Plaintiffs have responded, including by raising the validity of such alleged deficiencies, and/or amending their PFSs accordingly. There are, however, certain deficiency letters that have not been responded to within the 60-day period set forth in the PFS Implementation Order (ECF 596). Should the Parties reach an impasse on any of the individual deficiency letters, they will raise them with this Court. In addition, certain counsel for Plaintiffs with outstanding PFSs have informed Defendants that their clients have not been reachable, in which case the Parties will follow the procedures set forth in the Stipulated Order Regarding Withdrawal of Counsel. See ECF 1033.

### 2.      School District Plaintiff Fact Sheet (PFS)

By the SD Defendants' count, as of August 29, 2024, there are 224 individual SD Plaintiffs in this MDL. 110 SD Plaintiffs served PFSs by the April 1, 2024 deadline set forth in the Implementation Order (ECF 731). Since April 1, 2024, 59 SD Plaintiffs have served PFSs.  55 SD Plaintiffs have not yet served a PFS, and PFSs for those 55 SD Plaintiffs are not yet due under the Court's orders.

The SD Defendants have submitted a number of PFS deficiency letters, and the SD Plaintiffs have responded, including by meeting and conferring on such alleged deficiencies, raising the validity of the alleged deficiencies, and/or amending their PFSs accordingly.  There are, however, certain agreed-upon matters that certain SD Plaintiffs have agreed to amend in their PFSs based on meet and conferrals, and those SD Plaintiffs are in the process of preparing amended PFS based on these negotiations.  Should the Parties reach an impasse on any of the individual deficiency letters, they will raise them with this Court.

### I.      JCCP Discovery Update

On August 29, 2024, Judge Kuhl held a CMC in the JCCP.  The Court addressed trial scheduling and, assuming a May 2, 2025 deadline for the close of fact discovery in the MDL,[1] ordered that bellwether trial picks should be selected before May 2025 (the Court suggested selection in February or March 2025).

---

[1] Subsequent to JCCP hearing, MDL Plaintiffs and Defendants submitted an alternative schedule to Judge Gonzalez Rogers, which sets the fact discovery cutoff at April 4, 2025. On September 6, Judge Gonzalez Rogers informed liaison counsel for the parties that she will approve this new cutoff.

In order to accomplish that goal for selection, the Court ordered the parties to meet and confer and recommend (in a joint report due September 12) early deadlines for the following events: (1) plaintiffs' production of documents (including device data) and written discovery as to the 21 bellwether discovery pool plaintiffs; (2) defendants' production of user documents for the 21 bellwether discovery pool plaintiffs; (3) substantial completion of defendants' medical record collection for the 21 bellwether discovery pool plaintiffs; (4) scheduling of depositions of each bellwether discovery pool plaintiff and 2 (or 3) key witnesses for such plaintiff and one treating medical professional for such plaintiff; and (5) completion of the depositions referenced in #4.  The Court also ordered the parties to recommend to the Court whether trial bellwether selection could take place based on such discovery, at which point discovery would be completed as to the bellwether trial pool plaintiffs.

The Court also ordered the parties to meet and confer and state in their joint report their respective positions with respect to: (a) an early determination of jury instructions on the subject of negligence and causation (including Section 230) and whether such determination would also require a ruling on choice-of-law for each bellwether trial plaintiff; (b) whether non-case-specific experts and/or causation experts could be designated prior to the presumed May 2, 2025 fact discovery cut-off and, if so, whether Sargon motions could proceed following such designation (and appropriate discovery regarding such experts). The Court ordered the parties to return for a further status conference on these issues on September 16, 2024.

On August 30, 2024, Judge Kuhl entered Case Management Order No. 10 Governing Handling of CSAM Related to Bellwether Plaintiffs, attached hereto as Exhibit A.  This Order sets forth requirements that the JCCP Bellwether plaintiffs and plaintiffs' vendors must follow related to collection and inspection of relevant physical devices as it relates to CSAM.  Finally, the Court ordered the parties to continue to meet and confer on each side's responses to written discovery, and bring disputes to her on a future date.

## II.   Ripe Discovery Disputes

### A.   Disputes Between PI/SD Bellwether Plaintiffs and Defendants

#### 1.   Discovery Limitations Applicable to MDL and JCCP PI/SD Bellwether Plaintiffs

The Parties appear to be nearing the end of their negotiations over discovery limitations applicable to the MDL and JCCP PI/SD Bellwether Plaintiffs and expect to submit letter-briefing on any outstanding disputes in time for the issue to be heard at the next DMC.

#### 2.   Timing of Rolling Productions (Plaintiffs and Consortium Plaintiffs)

The Parties have reached an impasse regarding timing for the bellwether personal injury Plaintiffs to substantially complete productions of ESI from their forensically-imaged devices and expect to submit letter-briefing in time for the issue to be heard at the next DMC.

#### 3.   Forensic Imaging of/Data from J.D.'s Routine Device

**<u>Defendants' Position:</u>**

Plaintiff J.D.'s responses to Defendants' Interrogatory Number 7 disclosed that Plaintiff presently has in her possession a Hewlett-Packard 255 GH Notebook ("Notebook") that was used to "watch videos on YouTube occasionally."  J.D. reported in her initial and First Amended Plaintiff Fact Sheet that she used a "Personal computer" and a "School tablet or computer" on a "routine basis to access Defendant's Platforms" and has never amended or modified those statements. Nonetheless, J.D. did not disclose the Notebook on her "Main Device" spreadsheet and, on request, has refused to forensically image or otherwise produce any relevant data or documents from the device.  J.D. used this device for years, and Defendants are entitled to relevant data and information from this device, including J.D.'s usage of other platforms and applications, in order to test Plaintiffs' allegations and show that Defendants' platforms did not cause her alleged injuries.

Plaintiff disputes this is a relevant device because, according to Plaintiff, it was only occasionally used to access YouTube.  But this device was used by J.D. for years, and the Court has rejected Plaintiffs' definition as "too limiting" since it "appears to contemplate that a PI Plaintiff would have only a single 'primary device' at any given time"; indeed, "adolescents can and sometimes do use multiple devices on a regular basis. CMO 8 at 8.  Moreover, Defendants are allowed to test J.D.'s assertion that she only

"occasionally" used the device to access YouTube, and, at a minimum, are entitled to discover what platforms, videos, and other applications Plaintiff accessed through this device over the last three years.

In addition, Plaintiff objects that because the device is school-issued, it is not "owned" by Plaintiff. But this is not "a school-supplied laptop used years ago and returned to the school." CMO 8 at 9..  Here, Plaintiff has custody of the laptop and does not have to return the device until she graduates from Alabama Virtual Academy—an entirely online school—in May 2025. It is indisputable that the laptop is in Plaintiff's possession and it has relevant information.

Plaintiffs argue that imaging J.D.'s Notebook might require her to miss two days of school, but this does not justify Plaintiffs' refusal to image or produce data from the device.  The parties can arrange imaging to avoid such a conflict, such as by imaging the device over a weekend or providing an interim replacement device.  Moreover, as discussed during the H2 on September 4, 2024, Defendants have offered to pay for imaging in the interim and take up the issue of costs later.  In short, Plaintiffs brought this lawsuit putting data from their electronic devices at issue, and J.D. should have to produce relevant data from her school-issued device that she admittedly used to access YouTube.

**Plaintiffs' Position:**

Plaintiff J.D. has fully complied with DMO 8 by imaging every device in her "possession, custody, or control" that she "habitually, routinely, or regularly used during the relevant time period to access the Defendants' platforms." DMO 8 at 8. Consistent with the Court's directive, her counsel "determined which devices meet [that] criteria" and disclosed each relevant device to Defendants. DMO 8 at 8–9. She also disclosed devices that do not meet that criteria, namely her Hewlett-Packard 255 GH Notebook, which she specified in a sworn interrogatory response was only used occasionally to access YouTube. No more is required.

Defendants' sole ground for imaging the Notebook is that J.D. "used the device for years." But that is irrelevant. As DMO states clearly, devices that were not habitually, routinely, or regularly used to access the Defendants' platforms "are not included in the scope" of the Order. DMO at 9. Beyond lacking any support or justification, Defendants' request to "test" J.D.'s sworn statement that she used the Notebook only occasionally to access YouTube would cause substantial cost and burden. J.D. cannot attend school without the Notebook and imaging it would require her to miss at least two days of school.

She would also need permission from her school, Alabama Virtual Academy, to do so, since the Notebook does not belong to her. Moreover, the cost associated with forensically imaging a devices is substantial. Defendants provide no justification for imposing such cost and burden. Their request to expand the scope of DMO 8 to include irrelevant devices should be denied.

### 4.      SD Bellwether Plaintiffs: Search Term Negotiations

**SD Plaintiffs' Position:**

The parties have been in ongoing negotiations regarding search terms and have each exchanged multiple rounds of proposed search terms. The Parties agreed to conclude their meet and confer by September 6, and to the extent they were unable to reach agreement, submit their respective positions in a joint letter brief on September 11 so that this matter could be heard at the DMC. In light of the Parties' prior joint letter briefing agreement, Plaintiffs were surprised to receive Defendants' position statement below and asked that it be removed. Plaintiffs offered to Defendants either briefing disputes in this DMC statement or via separate letter briefing, but not both, which would be in contravention of the Court's guidance and the Parties' consistent practice, including, for example Defendants asking Plaintiffs to remove from this statement argument regarding an issue after the two sides agreed to instead do separate letter briefing before the DMC. Defendants refused to remove their insert from the DMCS. Plaintiffs therefore will not agree to a separate joint letter brief, oppose Defendants' submitting additional briefing unilaterally in contravention of the Court's Standing Order.[2]

It is Defendants' conduct that delayed negotiations, not Plaintiffs. Plaintiffs initially sent their proposed search terms to Defendants in mid-June. A month later, on July 19, Defendants responded with

---

[2] Such a brief would also exceed the limits on discovery briefing imposed by Section H(2) of the Standing Order, which the Parties have already nearly expended on the issue here. There was never agreement to do two sets of briefing on search terms, and if Defendants required more time to address the issue, they could simply have accepted Plaintiffs' offer of letter briefing next week in place of in this Statement.

obviously overbroad and irrelevant terms (e.g., proposing terms like GPA, ADD, camp*, Covid*, volunteer* for *school districts* to run). On August 1, Plaintiffs asked Defendants for a meet and confer to collectively discuss Defendants' proposed terms and on August 6 asked Defendants to provide a basis for their terms given the disconnect between the proposed terms and the propounded RFPs and Plaintiffs' responses and objections.[3] During the Parties' August 15 meet and confer, Plaintiffs again asked Defendants to revise their terms such that they would be narrowly tailored to capture relevant and responsive documents. Defendants' refused. On August 23, Plaintiffs provided a counter-proposal to do just that. It should come to no surprise that Plaintiffs' rejected a large number of Defendants' proposed terms given many of the terms were not relevant to the School Districts' claims or the RFPs. As articulated then, this counter proposal was based on relevance, not burden. The ESI protocol only requires hit reports if the Producing Party is claiming burden. In attempts to move the ball forward, on August 27 Plaintiffs provided hit reports for a sample of districts (Jordan, Tucson, Harford, and Spartanburg) and indicated that they would be making further revisions based on burden. Plaintiffs' updated counter-proposal was provided August 29 with an accompanying hit report for Tucson, followed by hit reports for other Districts as received from Plaintiffs' e-vendor.

Following the August 30 hearing with Judge Gonzalez Rogers, where she made clear the Parties must meet the case schedule deadlines, on September 2 Defendants' provided a second revised counter-proposal. Ten of the twelve SD Bellwether Plaintiffs again provided hit reports for these terms (and all prior iterations). The hit report show that *Defendants' proposed terms increase the volume of documents for review by 4 to 8 times*.[4]

---

[3] Although Defendants' provided a laundry list of any of the possible 83 RFPs a term could possibly relate to (e.g., "ADD" as a standalone term to cull documents related to Defendants' RFPs related to board meetings or COVID, as well as 13 other RFPs), Defendants have never explained why their proposed terms were relevant such that they should be run against all custodians.

[4] Although Defendants do not need hit reports from every single bellwether to see this pattern, the vendors for the remaining two Districts are working on running hit reports and Plaintiffs will send once received.

Clearly aware of the unreasonable breadth of their proposed terms, and at Plaintiffs' request to discuss a briefing schedule so the Parties could meet their agreed-to September 11 briefing deadline, Defendants sent Plaintiffs a third proposal the day this DMC statement is due, and the deadline the Parties set to complete their negotiations. Although Plaintiffs have not had an opportunity to review Defendants' eleventh hour proposal, they previously advised Defendants that any increase in document volume will jeopardize the schedule, thus if Defendants intended to add additional terms to Plaintiffs' August 29 proposal, other terms would need to be modified or dropped elsewhere. Plaintiffs will review Defendants' latest proposal.

Despite Defendants' failure to meaningfully engage in search term negotiations that would result in a reasonable set of terms for the School Districts to run, the Districts have been diligently reviewing and producing documents using the terms they originally proposed over two months ago.

**Defendants' Position:**

Plaintiffs have significantly delayed search term negotiations and prejudiced Defendants given the parties' September 6 deadline to complete search term negotiations by (1) failing to provide any hit reports for two bellwether school districts, in violation of the ESI Order; (2) delaying in providing complete hit reports for the other ten bellwether school districts, including providing hit reports for certain school districts for the first time a day before the parties' deadline to conclude search term negotiations; (3) rejecting over 90% of the additional terms Defendants proposed in their July 19 counter proposal without articulating a valid basis for doing so; and (4) rejecting (in its entirety) Defendants' effort to further narrow their proposed additional terms via Defendants' September 2 revised counter proposal.  Plaintiffs claim there is an "impasse" but that is only because they have refused to engage at all.  They have rejected Defendants' multiple counter proposals as "nonstarters," refusing to suggest any modifications and instead insisting on their original proposal.  It is not a negotiation when one side does not make any move at all, let alone meaningful moves.

Given the express requirement of the ESI Order, the parties' prior practices negotiating search terms for Defendants' files, the clear relevance of Defendants' proposed search terms, and the operative deadline for substantially completing document productions, Defendants requested weeks ago that Plaintiffs provide hit reports for the search terms in Defendants' counterproposal to which Plaintiffs object

on a claim of burden.  *See* ESI Order ("In the event that a Producing Party claims burden with respect to modified and/or additional search terms proposed by a Requesting Party, the Producing Party shall provide a hit report for the terms at issue using industry-standards processing tools, such as NUIX or other similar tools.").  Defendants, at Plaintiffs' request, provided additional basis for each of their proposed search terms, including identifying the RFPs to which each additional search term relates.  For weeks, Plaintiffs refused to provide hit reports and refused to otherwise explain their rejection of over 90% of Defendants' proposed terms.  On August 28, Plaintiffs (for the first time) provided the requested hit reports for two bellwethers (Tucson Unified School District and Board of Education of Jordan School District) and materially incomplete hit reports that did not include hit counts against Defendants' requested search terms for two other bellwethers (Harford County Board of Education ("Harford") and Spartanburg 6 School District ("Spartanburg")).  In response to continued urging by Defendants, Plaintiffs eventually provided corrected hit reports for Harford and Spartanburg, as well as hit reports for four other bellwether school districts (School District of Chathams, School Board of Hillsborough County, Irvington Public Schools, and St. Charles Parish Public Schools).  Defendants also received hit reports for Charleston County School District and Breathitt County School District on September 4 and September 5, respectively (i.e., less than two days before the parties' deadline to complete search term negotiations).  However, Plaintiffs still have not provided any hit report for Dekalb County School District.[5]  It appears that this school district may not be able to generate hit reports because they have not finished collecting custodial files.

Defendants also requested Plaintiffs provide transparency about the hit reports that were provided, including (a) the total number of documents that the search terms were run across; (b) the source(s) of the collected documents (i.e., the custodians and non-custodial sources are included; whether it includes emails, chats, items from shared drives; etc.); (c) whether the search terms were run against all agreed-upon custodians and non-custodial sources; (d) whether the hit reports include any de-duping efforts (e.g., de-duping via email threading or other analytics); and (e) an "inclusiveness" metric that Harford and

---

[5] At 5:45pm PT the day this DMC Statement was due, Plaintiffs transmitted the Baltimore City Board of School Commissioners hit report.

Spartanburg provided in their reports.  Plaintiffs have not provided this transparency for each school district that provided hit reports.

Despite this delay, Defendants provided another counterproposal to Plaintiffs on Monday, September 2, including dropping more than 50 terms and narrowing numerous others. Notwithstanding Defendants' effort to make meaningful progress on search term negotiations by providing a revised counterproposal on a federal holiday, Plaintiffs refused to adopt any of the narrowed search terms in Defendants' proposal nor did Plaintiffs offer any alternative proposal.  Instead, on September 4, Plaintiffs insisted on a meet and confer to discuss a schedule for briefing.

Plaintiffs' unjustified delay in providing hit reports for the majority of bellwether school districts, ongoing failure to provide hit reports for two school districts, refusal to compromise on search terms in response to Defendants' counter proposals, and resistance to providing the requested transparency have stymied meaningful negotiation of search terms.  All 12 bellwether school districts should be ordered to provide the requested transparency.  In addition, the bellwether school districts should be precluded from making burden arguments that were not supported by the production of timely hit reports.

Finally, Defendants properly included this argument in this DMC Statement.  This argument relates to the process around negotiating search terms—not the merits question of the specific search terms Plaintiffs should be required to run, which Defendants will brief separately in their letter-brief due September 11, 2024.  Plaintiffs have stated that they will not participate in that letter-briefing and, accordingly, Defendants plan to submit their 2.5-page position statement on the issue in a standalone, non-joint submission by the Court-ordered deadline.

### 5.  Non-Bellwethers' Computation of FRCP 26(a) Damages

**Defendants' Position:**

Contrary to Plaintiffs' claim, Defendants are not asking for "premature discovery" from the non-bellwether school district plaintiffs. The non-bellwether plaintiffs were required to provide damages computations as part of their FRCP 26(a) initial disclosures in February 2024, they have failed to do so despite earlier promises that the information would be forthcoming in their PFSs, and they are now taking the position that they are exempt from providing such damages computations at all. It is critical that Defendants receive damages computations for all non-bellwether SD Plaintiffs in the near term, as

required by the Federal Rules of Civil Procedure, so they can understand the potential exposure they face in this litigation.  The parties are submitting letter briefs on this issue, to be filed on September 6, 2024 concurrently with the DMCS. Defendants respectfully request that the Court hear argument during the September 12, 2024 DMC and order the non-bellwether school districts to provide damages computations within thirty (30) days.

**SD Plaintiffs' Position:**

Defendants' request for premature discovery from the non-bellwether SDs is contrary to the bellwether and PFS process jointly agreed to by the parties and implemented by the Court. Defendants are receiving substantial information about damages from both Bellwether SDs – which have already provided PFS, SPFS and the requested damages computations – as well as from Non-Bellwether SDs, which have provided PFSs and will soon provide SPFS. As more fully set forth in the letter brief on this issue, requiring non-bellwether SDs to provide damages computations at this time is entirely contrary to the efficiencies and conservation of resources gained from bellwether and PFS process and is not required by FRCP 26.

**B.    Disputes Between PI/SD Plaintiffs and Meta**

**1.    Meta's Production of Hyperlinked Documents**

**Plaintiffs' Position:**

Based on Plaintiffs' review of documents to date, it has become apparent that Meta employees use hyperlinks almost exclusively to convey the type of information that is normally conveyed in an email attachment. However, at Meta's insistence during negotiations on the ESI Protocol, Meta is not currently required to produce hyperlinked documents in the first instance. Instead, the solution proposed by Meta during negotiations on the ESI Protocol and adopted by the Court, requires Plaintiffs to make requests of Meta for specific documents hyperlinked in documents produced by Meta. This process is not working and causing extreme prejudice to Plaintiffs. Indeed, Meta took just over four months to produce the documents requested by Plaintiffs in their first hyperlink request. And there are thousands more highly-relevant hyperlinked documents that Plaintiffs require to fully comprehend the documents Meta has produced and to fairly prosecute Plaintiffs' claims.  Furthermore, since the ESI Protocol was entered, Meta has acquired the technical capabilities to collect hyperlinked documents in the first instance and produce

them at the same time as their source document. However, Meta argues that employing those capabilities now would interrupt Meta's workflow. That interruption pales in comparison to the prejudice to Plaintiffs under the current process.  After conferring in-person with Meta, Plaintiffs proposed a solution on August 8th in an attempt to resolve their dispute. While the parties have continued to confer on the issue, they have reached an impasse. Primarily, defendants are attempting to extremely limit the number of relevant hyperlinked documents they will produce and will not agree to produce custodian's documents in advance of their depositions. Plaintiffs' proposal is below. Plaintiffs require a prompt resolution to this issue.

Plaintiff's proposal:

- Meta will produce responsive, non-produced, and non-privileged hyperlinked internal Meta documents within 30 days from requests from Plaintiffs.
- Plaintiffs' requests will list the specific hyperlinks they are asking for production of, in addition to identifying the document production numbers in which each hyperlink appears. See ESI Stip., App'x 1, ¶ 13 ("If there are particular hyperlinks identified by the Requesting Party in produced documents, the Requesting Party may submit a list of hyperlinks . . . .").
- This applies to documents that are actually hyperlinked in a produced document and does not extend to documents that are merely referenced by name or description in a produced document.
- Before making a request, Plaintiffs will search Meta's existing productions to confirm they are not able to locate the document themselves.
- If Meta identifies a hyperlinked document in its existing production, it will notify Plaintiffs within 3 weeks from receiving the request.
- Plaintiffs will not make more than one hyperlink production request per week, with each request limited to hyperlinks from 50 documents. For the avoidance of doubt, Plaintiffs do not agree with Meta's characterization that a weekly request would not be "reasonable or proportional." Plaintiffs' expectation is that they will need to send a weekly request given the extremely high prevalence of hyperlinks within the produced documents. Plaintiffs further do not agree to Meta's attempted limitation on a given request to 50 hyperlinks

rather than 50 documents containing hyperlinks.

- Plaintiffs may request that Magistrate Judge Kang authorize more than 50 requests per week for good cause. While Plaintiffs agree to meet and confer with Meta regarding the rationale for such requests, due to the timing and ongoing nature of production of hyperlinked documents, any good cause requests may be raised with Magistrate Judge Kang in the next scheduled DMC and will be treated as an "ongoing issue" on the DMCS, rather than one subject to the standard topic exchange deadlines and timeframes for H2 conferrals. The parties will agree to waive any such objections that would prevent a request from being promptly raised to Magistrate Judge Kang.

- With each production in response to a request, Meta will provide the metadata necessary to make the family relationship between the source documents and hyperlinked documents. This should be provided in the format, and utilizing the template sent to Meta on August 8, 2024.

- For hyperlink requests that include source documents in the file of a custodian scheduled to be deposed within 30 days of the request, the hyperlinked documents from documents within that witness's custodial file, which Plaintiffs will identify, shall be produced within 14 days of the request.

**Meta's Position:**

Meta is working diligently to respond to Plaintiffs' requests that it produce documents hyperlinked in documents Meta has produced, and to increase the pace of its hyperlinked document productions.  As Meta has repeatedly explained to Plaintiffs, they are simply incorrect that Meta "has acquired the technical capabilities to collect hyperlinked documents in the first instance and produce them at the same time as their source document."  Because Meta uses Microsoft Outlook for email and Meta personnel primarily create documents in non-Microsoft applications, there is no automated method Meta can use to collect and produce documents that are hyperlinked in emails.  Instead, Meta and its counsel must undertake a burdensome and manual process to identify and collect each hyperlinked document individually.  Further, Plaintiffs' insistence that they need thousands of hyperlinks produced is contradicted by the fact that,

excluding requests made in RFPs, Plaintiffs only began sending hyperlink production requests in August and have asked Meta to produce 55 hyperlinks.  Meta has now produced (or confirmed it previously produced) 12 of those documents.  Six of the hyperlinks cannot be collected.  Meta anticipates producing 8 of the 37 remaining documents the week of September 9 and expects to produce (or confirm it previously produced) the final 29 documents by September 20.[6]

        Meta has attempted to negotiate a further protocol with Plaintiffs for the production of hyperlinked documents, but the parties have been unable to reach agreement.  The key dispute is over a limitation on the volume of hyperlinks that Plaintiffs can request production of at any one time.  Meta has offered that Plaintiffs may request production of up to 50 hyperlinked documents per week, subject to the limitation in the ESI Stipulation that requests "shall not be excessive and shall be reasonable, proportional to the needs of the case, and not unduly burdensome."  Limiting the volume of requests by the number of hyperlinks is necessary because each individual hyperlink collection imposes the heavy burden of a manual process.[7]  A volume limit is also necessary because Meta is facing voluminous requests for hyperlink productions in related litigations (which will ultimately be reproduced to plaintiffs in this proceeding).  Plaintiffs instead want the limit to be tied to the number of documents containing hyperlinks

---

[6] Plaintiffs continue to complain about the pace of Meta's production of hyperlinked documents in response to certain requests for production, but those productions, comprising a total of 302 hyperlinked documents and documents simply referenced in produced documents, are now complete.  As Meta explains above, it has worked to accelerate the pace of its hyperlinked document productions significantly, and will continue to do so.  The protocol Meta and Plaintiffs have been discussing would obligate Meta to produce hyperlinked documents within 30 days of a request.

[7] For each hyperlink request, Meta must take a series of manual steps.  First, one must natively extract the hyperlink from the document, meaning extracting it in the application in which it was created so that it can be properly read .  After the hyperlink is read, a reviewer searches for document id information present in the hyperlink (if it is included), extracts the document id information, and then searches for the document id in Meta's document review platform to determine if the hyperlinked document has already been produced. Each search must be conducted separately.  If Meta determines that the document was previously produced, the search stops.  If the document was not previously produced, then Meta must follow the hyperlink accessing Meta's secure user environment.  Often, the hyperlink result is met with further restricted access, which must be resolved.  Once the access is resolved, then the document must be forensically collected, reviewed for responsiveness and privilege, and produced.  This process must take place in combination with the significant collection, review, and production processes for this matter that are already placing stress on Meta's resources.

and have demanded that they be able to request that Meta produce all hyperlinks in up to 50 documents per week, regardless of the number of hyperlinks in the document.  Since each document can contain numerous hyperlinks, Plaintiffs' proposal imposes effectively no limit.  A per-hyperlink limitation will encourage Plaintiffs to target their requests to those documents that they actually need, bearing in mind Meta's already-voluminous productions.

Meta's proposal:

- Meta will produce responsive, non-produced, and non-privileged hyperlinked internal Meta documents within 30 days of requests from Plaintiffs.

- Plaintiffs' requests will list the specific hyperlinks they are asking for production of, in addition to identifying the document production numbers in which each hyperlink appears. See ESI Stip., App'x 1, ¶ 13 ("If there are particular hyperlinks identified by the Requesting Party in produced documents, the Requesting Party may submit a list of hyperlinks . . . .").

- This agreement applies only to specific, individual documents that are actually hyperlinked in a produced document, and does not extend to documents that are merely referenced by name or description in a produced document.

- Before making a request, plaintiffs will search Meta's existing productions to confirm they are not able to locate the document themselves.

- Plaintiffs will not make more than one hyperlink production request per week, with each request limited to 50 hyperlinks.  Plaintiffs' requests, in total, "shall not be excessive and shall be reasonable, proportional to the needs of the case, and not unduly burdensome." Meta does not agree that it would be reasonable or proportional for Plaintiffs to, in practice, consistently send one request each week.  Meta expects that Plaintiffs will be judicious in their requests and comply with the ESI Order.  See ESI Stip., App'x 1, ¶ 13 (requests "shall not be excessive and shall be reasonable, proportional to the needs of the case, and not unduly burdensome."

- For hyperlink requests that include source documents in the file of a custodian scheduled to be deposed within 30 days of the request, Meta will work to prioritize its analysis,

collection, and production of the hyperlinked documents. Plaintiffs will submit requests for production of hyperlinked documents for upcoming deponents promptly upon receipt of productions of those deponents' custodial files.

### 1. RFPs 68-70 and 290

In RFPs 68-70 and 290, the PI/SD Plaintiffs requested that Meta produce organizational charts or employee directories sufficient to identify employees (1) responsible for developing, testing, implementing, and altering Named Features on Meta's platforms or (2) principally responsible for user safety on Meta's platforms. The parties have met and conferred extensively on these RFPs but have been unable to resolve their disputes. The parties intend to submit letter-briefing on their dispute by September 10, 2024, in advance of the September 12, 2024 DMC.

## B. Disputes Between PI/SD Plaintiffs and TikTok

### 1. Personnel File Productions for Deponents

**PI/SD Plaintiffs' Position:**

The parties have met and conferred regarding this issue and are at an impasse. They plan to submit joint letter briefing on September 10, 2024, so that this matter can be heard at the upcoming September Discovery Management Conference.

## II. Discovery Issues that Do Not Currently Require Court Action

### A. Unripe Issues Between PI Plaintiffs and All Defendants

#### 1. Surgeon General Call for Warning Labels

**PI/SD Plaintiffs' Position**

On July 17, 2024, the United States Surgeon's General called for warning labels on Defendants' social media platforms as set forth in the Opinion piece published in the *New York Times*.[8] The PI/SD Plaintiffs followed up with Defendants to confirm that Defendants would be producing non-privileged documents regarding this highly relevant development, including: (1) communications regarding the Surgeon General's call for warnings; (2) analysis and assessment of Defendants' platform's warnings (or

---

[8] https://www.nytimes.com/2024/06/17/health/surgeon-general-social-media-warning-label.html.

lack of warnings) in light of the Surgeon's General's call for warnings; (3) proposed or suggested changes to Defendants' platform's warnings in response to the Surgeon General's call for warnings; and, (4) implemented changes to Defendants' platform's warnings in response to the Surgeon General's call for warnings, all of which would be responsive to preexisting RFPs Defendants have a duty to supplement (YouTube/Google RFP 52 and 53; Meta RFP 106 and 107; TikTok/ByteDance RFP 169 and 170; Snap RFP 39 and 40). Defendants refused, insisted that the PI/SD Plaintiffs propound duplicative RFPs that would only result in delay, and then—once PI/SD Plaintiffs propounded said RFPs—indicated that they intend to refuse to respond to the extent these documents fall outside the Relevant Time Period (ending April 1, 2024), ignoring this Court's clear guidance that targeted RFPs outside the Relevant Time Period are appropriate.

**Defendants' Position**

After originally (improperly) asking Defendants to "supplement" their existing productions with documents responsive to four brand-new categories of documents identified in letter correspondence, and after refusing Defendants' request that they serve an RFP formally requesting those documents, Plaintiffs have now reversed course and actually served such an RFP (and with an expanded scope). Defendants' responses and objections are due in late September. Accordingly, it is premature for Plaintiffs to be raising this RFP even as an "unripe" dispute; indeed, as a compromise, Defendants indicated that they would be willing to produce at least some documents responsive to Plaintiffs' initial request and had not completed negotiations over the appropriate time period applicable to the requests before Plaintiffs unilaterally abandoned the negotiations and served the broader RFP instead.

### 2.      PI Plaintiffs' Missing Devices

**Defendants' Position:**

Over the course of the past several weeks, Defendants learned that a number of the bellwether plaintiffs lost, destroyed, or got rid of their electronic devices after filing their lawsuits. Defendants have growing concerns about the inadequacy of Plaintiffs' preservation efforts and the spoliation of evidence. While the parties agreed to additional discovery in the D. Melton and K. Craig cases, they are continuing to meet and confer regarding the devices belonging to J.D., B.H., S.K., N. Mullen, and L. Clevenger.

**PI Plaintiffs' Position:**

The terms "lost" or "destroyed" do not accurately reflect the status of the Bellwether Plaintiff devices referenced above and are inconsistent with the very detailed information Plaintiffs have provided to Defendants on the status of these devices. For most of the Plaintiffs' devices referenced above, these were not Main Devices used to access Defendants' platforms, and Plaintiffs have provided substantial information to Defendants to demonstrate that the lack of these physical devices does not equate to critical ESI being lost. Plaintiffs will continue to meet and confer in good faith with Defendants regarding any additional concerns they may have.

### 3.    User Account Data Production Issues

**PI Plaintiffs' Position:**

All Personal Injury Bellwether Plaintiffs, in both the MDL and JCCP, have identified various technical and/or production deficiencies in all Defendants' production of DFS Data and Account Snapshots of Personal Injury Plaintiffs' social media accounts.  Plaintiffs alerted Defendants as of the date of the initial topic exchange for this statement that this dispute was forthcoming, and formally sent an email stating that the MDL Plaintiffs have substantially similar issues as those raised by JCCP Plaintiffs on 8/30 and have since sent letters to each Defendant outlining these deficiencies that have- in some cases- made the productions nearly unusable, and request that the Parties meet and confer to remedy the deficiencies in those productions. Defendants' contention Plaintiffs have waited too long to raise this issue is not well taken – Plaintiffs have been working diligently to understand the parameters of the data, consult with eDiscovery professionals to understand what deficiencies exist for each Defendant, and attempt to review the data and documents themselves and only bring this deficiency to Defendants now after coming to fully understand the problem in order to reach a workable solution.

**Defendants' Position:**

Defendants began producing DFS Data and Account Snapshots to plaintiffs five months ago, yet the JCCP plaintiffs elected to wait until late August to raise any purported issues with those productions, and the MDL plaintiffs did not even send correspondence to Defendants about any purported deficiencies until the day before this filing.  Defendants will confer with Plaintiffs about any questions they may have about these productions, but note that the amount of time Plaintiffs have waited to raise these issues

seriously prejudices Defendants' ability to modify their productions in any material respect given the complexities involved in identifying and producing user account data – complexities Plaintiffs are well aware of from the parties' prior negotiations.  Defendants disagree with Plaintiffs' claim that any purported deficiencies make the Snapshots "unusable."

### 4.  Imaging of Bellwether PI Plaintiffs' Main Routine Devices

On August 15, 2024, the Court issued DMO No. 9 requiring Plaintiffs to complete full forensic imaging of all Main Devices by August 30, 2024, as well as provide Defendants with specific identifying information for the devices.[9]  *See* ECF No. 1070.  As of August 30, 2024, Plaintiffs reported that their Forensics vendor had completed full file system ("FFS") images of all Plaintiffs' Main Devices, other than one device with an incompatible Operating System that the Vendor is continuing to work on resolving. The Bellwether PI Plaintiffs and Defendants provided their latest status report on August 26, 2024, see ECF 1086, and will submit an updated status report by separate filing on September 6, 2024.

### 5.  Third-Party Subpoenas

Plaintiffs' counsel have asserted objections refusing to produce any documents in response to Rule 45 subpoenas directed to Plaintiffs' parents, guardians, and other witnesses specifically identified by Plaintiffs in their Fact Sheets and initial document productions. The Parties are meeting and conferring on a reasonable scope of documents to be produced in response to the subpoenas.

## B.  Unripe Issues Between SD Plaintiffs and All Defendants

### 1.  Defendants' Subpoenas to Local Government Entities

**<u>SD Plaintiffs' Position:</u>**

Over the past weeks, Defendants have served numerous subpoenas on state and local government entities ranging from statewide health departments to local sheriffs to volunteer fire departments.  While the subpoenas purport to seek information with respect to the Bellwether School District cases, they are

---

[9] The Parties use the term "Main Devices" to refer to the Court's definition in DMO 8 of devices from which information will be initially produced:  "[A]ll devices (cellphones, tablets, laptops, computers, and the like) which are in each Bellwether PI Plaintiff's possession, custody, or control and that they have habitually, routinely, or regularly used during the relevant time period to access the Defendants' platforms." Order at 8:24–9:25; Hrg. Tr. at 45:19–21.

patently overbroad and call for the production of vast swathes of irrelevant and highly sensitive information about student, faculty, and staff physical and mental health, as well as interactions with law enforcement, including matters with no nexus whatsoever to the schools—e.g., off campus incidents and matters arising outside of school hours or the academic year.  The Plaintiff School Districts have objected to and requested to meet and confer on this improper campaign that appears designed to punish and harass cities and towns whose schools are seeking abatement of the nuisance created by Defendants.

**Defendants' Position:**

Defendants have served subpoenas on state and local government agencies that fund, supervise and/or evaluate the administration of mental health, education, and public safety resources that are used or available in the bellwether school districts.  Plaintiffs' counsel have complained about the breadth of the subpoenas but (i) the subpoenas are addressed to third parties who are not represented by Plaintiffs' counsel; (ii) the subpoenas seek information that is relevant to disproving Plaintiffs' claims and demonstrating that other factors have caused the injuries that Plaintiffs seek to blame on Defendants; (iii) Plaintiffs do not have standing to complain because the subpoenas do not seek their documents; (iv) the third parties are represented by their own counsel who can raise issues as they deem appropriate; and (v) Defendants will continue to meet and confer with counsel for the third parties that are subject to the subpoenas to address any concerns about burden.

## 2.    Custodians and Non-Custodial Sources

**Defendants' Position:**

Plaintiffs still have not confirmed identification of all proper non-custodial sources in the majority of bellwether cases. For example, in Hillsborough, Jordan, and Tucson, Plaintiffs only identify a single non-custodial source—a student information system or SIS—and will not answer questions about whether these districts have the types of non-custodial sources identified by other districts as containing potentially relevant documents, data, or information (e.g., enterprise resource planning or ERP software with financial documentation, bullying/harassment tip line, etc.), nor have these Plaintiffs confirmed that the types of aggregate reports they have agreed to produce can be obtained by the SIS system or agreed-upon custodial sources. Further, most Plaintiffs districts have not provided meaningful information regarding their

agreed-upon non-custodial sources, including the types of information they expect to search and any exports and reports required by Appendix 1(12) of the ESI Protocol.

**SD Plaintiffs' Position:**

The parties have been in the process of meeting and conferring on the identification of non-custodial sources and, as acknowledged by Defendants, all of the bellwether SD plaintiffs have identified such sources. Defendants have raised certain questions regarding the non-custodial sources of some bellwether SDs, several of which have been resolved, and the bellwether SD Plaintiffs have also informed Defendants that they are continuing to investigate and will disclose more sources if more are identified. The bellwether SD plaintiffs continue to work in good faith to investigate non-custodial sources and will disclose additional sources if they are identified.

> **3. Bellwether SD Plaintiffs' Responses and Objections to Defendants' RFPs, Including Definition of "Online Media & Communication Services" and RFP Nos. 28, 31, 74, 77, 79-81**

**Defendants' Position:**

Following nearly four months of negotiations and discussions, on August 23, Defendants requested an "H.2" conference of lead trial counsel to discuss remaining issues regarding the R&Os to their Requests for Production of Documents (Set 1) for all MDL SD Bellwether Plaintiffs, which Plaintiffs scheduled for nearly two weeks later, on September 6. The Parties are at an impasse on and plan to letter-brief disputes regarding the definition of "Online Media & Communications Services," and RFP Nos. 28, 31, 74, 77, 79-81. Despite requesting an expedited briefing schedule to get these issues before the Court in time for the September 12th DMC, Plaintiffs refused, and the Parties agreed to submit a joint letter-brief on these disputes to the Court on September 17, 2024.

**SD Plaintiffs' Position:**

Plaintiffs disagree with Defendants regarding issues they have raised regarding RFP Nos. 28, 31, 74, 77, 79-81 , as well as the definition of Online Media & Communications Services and have articulated their basis for this disagreement in multiple letters and during numerous meet and confers. The parties will submit a joint letter brief on this issue on September 17, 2024.

### 4.      Defendants' Interrogatories 2-3

**Defendants' Position:**

On July 24, 2024, following numerous meet and confers regarding Defendants' Interrogatory (Set One), Plaintiffs agreed to supplement their responses to Interrogatory Nos. 2-3, which seek information related to Plaintiffs' alleged damages, including property damage, and request for abatement.  Despite this agreement, Plaintiffs have failed to supplement their responses in any of the bellwether cases and a number of districts will not provide a deadline or timeline for supplementing their responses, despite the fact that these requests ask about past instances of property damage that should be within Plaintiffs' knowledge.

**SD Plaintiffs' Position:**

As a compromise, Bellwether SD Plaintiffs agreed that, while maintaining objections regarding the burden and proportionality of Defendants' supplementation requests, they would amend their responses to Interrogatory No. 2 to identify the time period for which they are seeking damages and would continue to investigate and supplement their responses to Interrogatory No. 3 with additional information obtained about incidents of vandalism that the Bellwether SD Plaintiffs have attributed to social media, as necessary.  Since the time this agreement was made, Bellwether SD Plaintiffs also provided Defendants with estimated past compensatory damages computations to be further refined through expert reports pursuant to the Court's schedule.

### 5.      Bellwethers' Computation of FRCP 26(a) Damages

**Defendants' Position:**

After months of meet and confer, Plaintiffs finally provided FRCP 26(a) damages computations for alleged past compensatory damages for the bellwether school districts on August 22, 2024; however, the damages computations are insufficient because they provide only a lump sum amount rather than a computation of each category of damages allegedly incurred by the districts, as required by FRCP 26(a). In addition, the bellwether school districts have not provided documents supporting their damages computations, which is also required. See FRCP 26(a)(1)(A)(iii).  On August 30, 2024, Defendants requested that the bellwether school districts supplement their damages computations—the necessary

information and documentation is all within Plaintiffs' knowledge and possession, so there is no excuse for Plaintiffs' failure to provide it— and are awaiting a response from Plaintiffs.

**SD Plaintiffs' Position:**

Despite Plaintiffs maintaining their position that damages computations, which will require expert testimony, are premature and not required under FRCP 26(a), as a compromise, the Bellwether SDs Plaintiffs agreed to provide estimated computations of past compensatory damages, which were provided to Defendants on August 22, 2024. Plaintiffs contend that the damages computations provided on August 22 are sufficient and nothing more is required. Plaintiffs are, however, only recently in receipt of Defendants' letter regarding the damages computations, which they will review and consider.

### 6.      Defendants' Responses and Objections to Bellwether SD Plaintiffs' RFPs

**SD Plaintiffs' Position:**

The Bellwether SD Plaintiffs served a corrected set of omnibus RFPs on each Defendant on July 2, 2024 and each Defendant thereafter served responses and objections, but Defendants have failed to produce a single document in response. Plaintiffs sent each Defendant a deficiency letter regarding these RFPs on August 30, 2024 and requested meet and confers with Defendants. Defendants have not responded to these deficiency letters nor have the majority of Defendants provided dates for meet and confers.

**Defendants' Position**:

Defendants each served timely responses and objections to the SD Plaintiffs' supposedly Bellwether-specific RFPs, including to note that many of the requests were not in fact Bellwether-specific, but rather were another attempt to serve general discovery regarding Defendants' services.  Plaintiffs did not send deficiency letters and request to meet and confer until August 30, 2024 (the Friday before Labor Day weekend).  Defendants intend to meet and confer with Plaintiffs on these RFPs shortly.

### C.      Unripe Issues Between PI/SD Plaintiffs and Meta Defendants

### 1.      RFP 124

**PI/SD Plaintiffs' Position:**

Meta has agreed in principle to produce data from Single Review Tool ("SRT"), which it represents catalogs all user and third-party (*e.g.*, parental) complaints submitted to Meta through formal channels, as

well as Meta's responses thereto. The PI/SD Plaintiffs and Meta have made progress toward agreement on the varieties of complaints that will be included in a data export, and the Attorneys General, who are also seeking SRT data, are now involved in those discussions as well. The PI/SD Plaintiffs are concerned that, after months of conferrals, Meta still has not provided a schema or equivalent information identifying exactly what fields and subfields exist in the database or written descriptions of the meanings of these fields and subfields—none of which depends on agreement as to the exact varieties of complaints Meta will produce.

**Meta's Position:**

Meta does not maintain in the ordinary course of business a data dictionary of the type Plaintiffs have sought in connection with RFP 124 but nevertheless, in an effort to reach a compromise on this RFP and avoid a dispute, and despite having no obligation to do so, Meta voluntarily provided Plaintiffs with a sample from its data warehouse of eight user and non-user reports submitted to Meta through formal channels (including reports that are reviewed through the Single Review Tool), including the full universe of data associated with the reports ("fields" and "subfields"); offered to investigate the definitions of each relevant field (as Meta does not maintain such definitions in a central repository); and provided Plaintiffs with written descriptions of several violation types associated with user reports.  Following a further request from Plaintiffs for additional descriptions of the fields associated with the sample data Meta provided, Meta also offered (during an August 23, 2024 conferral) to provide descriptions of the data related to user and non-user reports and to develop written descriptions for Plaintiffs following that conferral.  Plaintiffs' vague suggestions of delay are not well taken given the great lengths to which Meta has gone to voluntarily investigate and provide detailed information about these complex data to Plaintiffs, and given that the PI/SD plaintiffs failed to include the AG plaintiffs in their negotiations with Meta on this issue, resulting in the AGs recently requesting additional time to consider and arrive at their position on this dispute.

2.      **RFP 224**

**PI/SD Plaintiffs' Position:**

Meta has refused to produce documents in response to Plaintiffs' RFP 224, which seeks depositions transcripts and recordings in related litigation to which Meta is a party. Deposition testimony by Meta witnesses, including potential witnesses in this matter, in actions with related legal theories or underlying facts are highly-relevant and can be produced with little or no burden. Meta has refused to produce any such transcripts and provided no substantive response to Plaintiffs' attempt at reaching a resolution.

**Meta's Position:**

Plaintiffs' position has several deficiencies:  (1) some of the transcripts Plaintiffs seek are not in fact from related litigation, but rather are from proceedings with no relevance to these cases, which is underscored by the fact that they are not identified as Related Actions in the Deposition Protocol, (2) the transcripts in those irrelevant actions are covered by protective orders entered in those proceedings, (3) as to transcripts from Related Actions there is no ripe dispute because Meta already has produced the only transcript that would be responsive from a deposition taken to date, and (4) subsequent or future transcripts in Related Actions are governed by the Deposition Protocol, and are not appropriately handled by way of an RFP.

1.      **Meta's Response to Plaintiffs' Interrogatory Set No. 1**

On June 28, 2024, Plaintiffs received Meta's responses and objections to Plaintiffs' Interrogatories, which included, in part, information related to the content moderation systems on Meta's platforms. In response, Plaintiffs sent Meta a letter on July 23 outlining Plaintiffs' perceived deficiencies in Meta's responses. Meta responded to Plaintiffs' letter on August 9. The Parties then met and conferred on August 23 and August 27 to discuss their respective positions. On August 23, 2024, Plaintiffs sent Meta correspondence summarizing the Parties' discussion with respect to Interrogatory No. 2, and on September 3, Plaintiffs sent Meta a letter summarizing the Parties' discussion with respect to Interrogatory No. 1. While Meta does not agree that the letters are complete or accurate in all respects, it has informed Plaintiffs of its intention to supplement its response to Interrogatories Nos. 1 and 2. The Parties will continue to meet and confer on this issue as needed following Plaintiffs' receipt of Meta's supplemental responses.

### 2.     Meta's Responses and Objections to Plaintiffs' Rule 30(b)(1) Written Questions

**PI/SD Plaintiffs' Position:**

Meta served its R&Os to the PI/SD Plaintiffs' Rule 30(b)(1) written questions on Plaintiffs' 30(b)(6) Topics 3-6 on July 25, 2024. Meta's responses are largely deficient, including improperly asserting broad substantive objections and limitation, and Plaintiffs sent a meet and confer letter on August 25, 2024 raising their concerns by the lack of responsiveness and transparency throughout Meta's submission. Plaintiffs identified significant deficiencies with Meta's responses, many of which are unclear, unreliable and incapable of satisfying Meta's obligation to respond to Plaintiffs' 30(b)(6) written deposition on corporate structure topics, as ordered by Magistrate Kang.

**Meta's Position:**

This dispute arises from Plaintiffs' service of hundreds of written deposition questions (some with a dozen or more subparts) that sought a vast quantity of information stretching back 20 years to which no live witness or witnesses could ever reasonably respond.  Meta nonetheless conducted an expansive and highly burdensome investigation and developed substantive answers to Plaintiffs' questions.  Although Meta strongly believes the purported deficiencies in Plaintiffs' letter lack merit, the parties held one productive meet-and-confer on this issue on August 29 and Meta remains optimistic that the parties may be able to resolve any disputes without Court intervention.

### 3.     Meta's 30(b)(6) ESI Depositions

**PI/SD Plaintiffs' Position:**

During both Rule 30(b)(6) ESI depositions, Meta's counsel engaged in conduct that was both inappropriate and obstructive, including numerous instances of speaking objections, attempts to coach the witness, improper attorney-client privilege instructions – actions that unnecessarily consumed the limited time afforded to Plaintiffs.  Additionally, Meta failed to designate witnesses on all topics outlined in the Amended Deposition Notice and did not adequately prepare the witnesses on topics for which they were designated.

**Meta's Position:**

Plaintiffs concluded Meta's Rule 30(b)(6) ESI depositions with hours of time left on the record and did not send a deficiency letter until over a month after the depositions concluded.  Each of Meta's

witnesses spent dozens of hours preparing for their deposition, reviewed relevant documents, compiled respective charts with relevant information, talked with multiple Meta employees to prepare for their testimony, and testified consistent with the information reasonably available to Meta in response to Plaintiffs' noticed topics.  The purported deficiencies Plaintiffs have identified, and about which Meta will confer, were the result of Plaintiffs' approach to questioning, which exceeded the bounds of the negotiated deposition scope and appeared focused in large part on manufacturing disputes rather than obtaining substantive testimony.

### 4.     Meta's Disclosure of Information From Non-Custodial Sources

**PI/SD Plaintiffs' Position:**

The parties continue to meet and confer regarding the identification, collection, and production of relevant and responsive information from non-custodial sources, including structured and unstructured data sources.  With respect to structured data sources, despite Plaintiffs RFPs and Meta's Rule 30(b)(6) testimony that it had schemas (*i.e.*, the organizational framework or blueprint that defines how data is organized, stored, and accessed with the database, including definitions of tables, columns, data types, relationships, indexes, and other data elements) readily available, Meta has refused and failed to produce such discovery.  Meta's production of schemas would greatly assist the parties in identifying relevant information for collection and production.

**Meta's Position:**

Plaintiffs have never requested to meet and confer with Meta regarding "schemas" for its structured data sources.  Had the parties conferred, Meta would have explained that Plaintiffs are misconstruing Meta's 30(b)(6) testimony.

### 5.     Meta Relevant Time Period Issue

**Plaintiffs' Position:**

JCCP Plaintiffs have sent a request to Meta's counsel to run four search strings over the custodial files of two Meta employees in accordance with Discovery Management Order 9, which are narrowly tailored to provide JCCP Plaintiffs us with documents that capture discussion or contemplation of features before implementation, and the possible harms stemming from failure to implement features like age verification and parental controls—all essential to the JCCP negligence case. Meta has responded that it

does not believe these search terms comply with the Courts instructions on sample search terms, taking a narrow definition of the Court's instructions. JCCP Plaintiffs believe the global proposal properly balances the concerns of the Court against the need to seek early discovery, have sought to create a globally balanced proposal, and disagree with Meta's assertion that every search string must contain both a harm and feature specific term, but will continue to meet and confer on this issue.

**Meta's Position:**

Following argument on the JCCP Plaintiffs' effort (represented by Joseph VanZandt) to expand the Relevant Time Period as to Meta, the Court ordered the Parties to "meet and confer for purposes of determining … two or three sample search terms for the pre-2012 period [which dates back to 2006 at the earliest] … capturing documents which discuss or evidence the alleged harms and/or risks of harm balanced within the general framework of features (to avoid overbreadth and disproportionality)."  DMO 9 (emphasis added).  Over three weeks later, a different lawyer representing plaintiffs in both the MDL and the JCCP who has not previously participated in these conferrals proposed four search strings, none of which comply with this framework: the first two contain only feature-specific terms (with no connection to alleged harms/risks of harm), while the third and fourth combine broad youth terms with broad terms relating either to (a) safety/harm/injuries generally (as opposed to specific harms/risk of harm) or (b) growth/engagement, with no tie whatsoever to specific features.  Meta therefore asked Plaintiffs' counsel –who, in her capacity as counsel for MDL PI/SD Plaintiffs had not taken issue with the Court's Relevant Time Period ruling as to Meta, but is apparently now leading this negotiation, along with Chris Ayers – to return a revised list of only 2-3 terms that comply with DMO 9, which she agreed to consider following a conferral on September 6, 2024.

### 6.     Scheduling of Meta Depositions

Plaintiffs have requested that each witness reserve two full days for their depositions (see ECF 742 at 5 (permitting two days); ECF 702 at 2 (permitting up to 12 hours for each deposition).  Defendants have asked Plaintiffs to "meet and confer in advance of each deposition regarding estimated time lengths," as required by the Discovery Limitations Order (ECF 706, para. 6) and Deposition Protocol (ECF 743, para II.A.1), but that conferral has not yet occurred.  Plaintiffs have told Meta that once Plaintiffs have received and had an opportunity to assess the full custodial file for each deponent, they will be in a better position

to advise which depositions will not require a second day. Plaintiffs will relay the information to Meta as soon as they are able. Meta has requested that this information be provided immediately for witnesses M.R., D.C., A.D., C.S., and K.A., as to whom Plaintiffs now have substantially complete custodial files; at a minimum, this information should be provided no later than ten days prior to the deposition, including because many witnesses are no longer Meta employees, so their circumstances will vary, with their employers having no relationship to this case. The Parties continue to confer and will report to the Court if impasse is reached.

### D.   Unripe Issues Between PI/SD Plaintiffs and TikTok

#### 1.   Implementation of the Extraterritorial Order

**PI/SD Plaintiffs' Position:**

Over two months ago, Judge Kang ordered TikTok to produce "technical and implementation documents" concerning Named Features on Toutiao and Douyin, age assurance on the French TikTok platform, and marketing documents concerning Musical.ly. Plaintiffs asked TikTok to identify additional custodians who may possess such documents, but to date TikTok has not suggested any new custodians in China; the three custodians that the parties added recently were discussed before this Court's ex-US order and were necessary for other reasons, but regardless their addition does not obviate TikTok's obligation to "open this up to discovery from more custodians in China." *See* Hr'g Transcript, ECF 903 at 25:18-26:2 ("That's my ruling."). Plaintiffs remain concerned that TikTok's ongoing investigation of current employees to manually identify responsive documents is deficient if not broadened to include former employees, and that TikTok is not providing sufficient details about or imposing a deadline on its investigation.

**TikTok' Position:**

The TikTok Defendants have on numerous occasions identified the custodians previously agreed to whom may have responsive "technical and implementation documents" related to the design of Named Features on Toutiao and Douyin and age verification for the TikTok platform in France, and have also agreed to add three document custodians based outside the United States that the parties had held in abeyance pending a ruling on plaintiffs' motion to compel discovery into services other than the TikTok Platform in the United States. Moreover, the TikTok Defendants have asked the entities that operate

Douyin and Toutiao to help identify relevant "technical and implementation documents" for the design of Named Features on those platforms—including documents by current and former personnel of those entities "in China" (and elsewhere)—and have been working diligently with those entities to collect those documents for review for production in these cases. The TikTok Defendants do not currently anticipate issues meeting deadlines for this discovery; however, as Plaintiffs have acknowledged, obtaining this discovery will require considerable time and effort, and the TikTok Defendants will continue to regularly update Plaintiffs regarding the status of these efforts.

### 2.      Production of Data from Non-Custodial Sources

**PI/SD Plaintiffs' Position:**

Plaintiffs have repeatedly requested TikTok confirm whether it is searching non-custodial sources for various RFPs. TikTok often responded that information is not likely to reside in non-custodial sources. The TikTok Defendants have repeatedly agreed to provide Plaintiffs an updated list of non-custodial sources that they are searching and the type of information that will exist in each, but despite requests from Plaintiffs, the TikTok Defendants have yet to produce a list indicating the type of information that will exist in each non-custodial source.

**TikTok's Position:**

The TikTok Defendants have been transparent as to non-custodial sources that may contain responsive information to Plaintiffs' RFPs, including providing an updated list of the same on April 22, 2024 and two deponents on these topics on May 7 and 9, 2024 (during which the TikTok Defendants did produce a list of potentially relevant non-custodial sources and the type of information contained in each source).   As the TikTok Defendants produce responsive documents, they are clearly identifying the sources from which they have been produced.

### 3.      Plaintiffs' Requests for Admission

**PI/SD Plaintiffs' Position:**

Plaintiffs have served a set of requests for admission relating to the TikTok Platform, which concerns age verification and parental controls. TikTok has served Objections and Responses to Set One of Plaintiffs' RFAs, in response to which, on August 29, 2024, Plaintiffs sent TikTok a deficiency letter

pointing out TikTok's inappropriate objections and failure to admit or deny several of the requests and requesting to meet and confer. TikTok has not responded.

**TikTok's Position:**

The parties have yet to meet and confer on the TikTok Defendants' Responses and Objections to RFA Set 1, which were just served on August 22, 2024, but will cooperate in doing so.

### 4.     AG Productions for Deponents

**PI/SD Plaintiffs' Position:**

Before discovery opened in this litigation, the MDL Court ordered Defendants to produce a limited number of documents they previously produced to State Attorneys General. After discovery opened, the PI/SD Plaintiffs served RFPs calling for production of the rest of these documents. In the spirit of compromise and consistent with an agreement reached with Meta, the PI/SD Plaintiffs have requested TikTok produce any additional documents it previously produced to the State Attorneys General relating to the same areas Meta agree to produce, specifically: Company Information, Ad Fraud, Ad Metrics, Youth Mental Health, COPPA, Impersonation Accounts, and Document Retention and the Parties are meeting and conferring.

**TikTok's Position:**

The TikTok Defendants have consistently agreed to re-produce productions made to State Attorneys General consistent with Judge Gonzalez Rogers' Order on the same (Dkt. 125) and have agreed to refresh those productions to the extent necessary.  To the extent the information Plaintiffs have just recently requested as noted above is consistent with that Order, the TikTok Defendants will produce the same.  Of note, "Ad Fraud" and "Ad Metrics" are not the subject of the more than 350 RFPs served by the Plaintiffs in this litigation, To the extent the TikTok Defendants understand what is meant by the same.

### 5.     Production of Hyperlinks

**PI/SD Plaintiffs' Position:**

On June 7, 2024, Plaintiffs served a second set of hyperlink requests, but TikTok did not respond until July 12, 2024, refusing to produce documents based on a claim of burden. After discussion, on August 19, TikTok supplemented its response to Plaintiffs' second set of hyperlink requests by identifying which requests it considers burdensome, and Plaintiffs are working to review those requests and narrow

as appropriate. For the previous set of hyperlink requests, Plaintiffs have asked TikTok to individually enumerate each hyperlink and the Bates number of each corresponding document in the production, as required by the ESI Protocol, ECF 690 at 8, and are awaiting a response from TikTok.

**TikTok's Position:**

The TikTok Defendants have timely responded to hyperlink requests and produced more than 400 documents associated with requested hyperlinks and is actively collecting more than 250 additional documents associated with Plaintiffs' second set.  Notably, Plaintiffs' second set of requests implicated more than 3,100 documents, which the TikTok Defendants assert is not reasonable and not consistent with this Court's order on the same.  The TikTok Defendants will continue to meet and confer with Plaintiffs to resolve any potential disputes.

### 6.      Lark Spoliation and Investigation

**PI/SD Plaintiffs' Position:**

After learning that the TikTok Defendants have failed to preserve certain types of Lark Chats (through the ability of employees to "recall" certain instant messages and set other instant messages to self-destruct through "secure chat") and gathering additional information during 30(b)(6) depositions, Plaintiffs served a set of RFPs and an interrogatory on June 7, 2024 to understand the scope of relevant information that may have been deleted and the reason for that deletion. TikTok has agreed to provide certain information in response to these RFPs and interrogatory, but has not yet produced such information and has been investigating the issue for several months. While the Parties are continuing to meet and confer, Plaintiffs are concerned regarding the length of TikTok's investigation into this problem and the failure to provide updates regarding when this investigation will be completed.

**TikTok's Position:**

The TikTok Defendants disagree with Plaintiffs' characterization of two features that were a part of its Lark collaboration system or the suggestion of spoliation.  Regardless, the TikTok Defendants have been transparent in how these features were used by relevant custodians (if at all) and will continue to work towards providing information on the same as is relevant and necessary to Plaintiffs' prosecution of their claims in this matter.

### 7. RFPs 178-179 (Crisis Communications)

**PI/SD Plaintiffs' Position:**

The Parties are continuing to meet and confer regarding RFPs 178-179 regarding crisis communications. The Parties have agreed that TikTok may search a limited number of custodians most likely to have these documents, but TikTok has not yet provided Plaintiffs will the custodians who it proposes to search or information about the units likely to handle these communications. Plaintiffs have also requested that, given TikTok's preference to search for these documents via search terms rather than collecting them after speaking with these limited number of custodians, TikTok add one additional search term for this search and TikTok is considering whether it could agree to narrowed version of the same.

**TikTok's Position:**

The parties continue to meet and confer, and the TikTok Defendants are preparing a proposed limited number of custodians to search in relation to these requests, which they anticipate will be provided by the date of this filing.  As noted, the TikTok Defendants are also considering Plaintiffs' proposed limited additional search terms.

### 8. RFPs 217-218 (Policies Regarding Data Storage)

**PI/SD Plaintiffs' Position:**

These requests seek documents relating to TikTok's data storage and retention policies, which are narrowly defined, clearly relevant documents. TikTok has thus far refused to produce any documents in responses to these RFPs, a stark contrast to the approach taken by TikTok's fellow Defendants, who produced documents in response to equivalent requests. Plaintiffs have written TikTok two letters regarding these requests (on August 16 and September 3) and requested to meet and confer, but have not received a substantive response or a date for a meet and confer.

**TikTok's Position:**

Plaintiffs' position is new and the parties have never met and conferred on these RFPs to the TikTok Defendants' recollection.  That said, the TikTok Defendants' provided two ESI witnesses on the subject of data storage and retention and testified regarding the existence (or lack thereof) of any such policies on the same.  Retention policies were produced in connection with those depositions to the extent they exist.  The TikTok Defendants have not withheld any responsive documents.

### 9. RFPs 220-222, 224-228

**PI/SD Plaintiffs' Position:**

These requests seek documents relating to TikTok's budgets and business plans, which are narrowly defined, clearly relevant documents. TikTok has thus far refused to produce any documents in responses to these RFPs, a stark contrast to the approach taken by TikTok's fellow Defendants, who produced documents in response to equivalent requests. Plaintiffs have written TikTok three letters regarding these requests (on August 16, August 28, and September 3) and requested to meet and confer, but have not received a substantive response or a date for a meet and confer.

**TikTok's Position:**

Plaintiffs only recently raised these RFPs with the TikTok Defendants (other than sending a deficiency letter in April of 2024 challenging an objection) and have not made any proposals to narrow their requests on the same other than seeking to meet and confer, which the TikTok Defendants agreed to do and have provided availability for the same.

### 10. RFPs 230, 233 (Students and Safety)

**PI/SD Plaintiffs' Position:**

These requests seek documents related to TikTok's efforts to increase or promote usage of its platform by children or teens in schools, and documents concerning any analyses that TikTok performed regarding the impact on schools or school districts from social media.  The parties conferred regarding these requests, and on August 16, 2024, Plaintiffs requested confirmation that TikTok is searching for and producing documents responsive to this request.  TikTok has not yet responded to Plaintiffs' request.

**TikTok's Position:**

The TikTok Defendants are not certain a dispute exists at all related to these RFPs and is willing to meet and confer with Plaintiffs on the same if necessary.  The TikTok Defendants are providing Plaintiffs with their understanding of the parties' agreement on the same.

### 11.     RFPs 261, 265 (Tap Again to Exit)

**PI/SD Plaintiffs' Position:**

These targeted requests seek documents related to the "Tap again to exit" feature on TikTok. TikTok has refused to search for and produce documents responsive to these requests, but referred Plaintiffs to a handful of already produced documents that are not responsive to these requests.  On August 16, 2024, Plaintiffs again requested that TikTok search for and produce responsive documents; TikTok has not yet responded to Plaintiffs' request.

**TikTok's Position:**

The TikTok Defendants have not refused to produce documents responsive to these requests. Rather, Plaintiffs' RFPs seek documents "sufficient to show" and the TikTok Defendants assert that they have already produced such documents by way of responding to other RFPs.  The TikTok Defendants are willing to meet and confer with Plaintiffs to resolve.

### 12.     Deposition scheduling

**PI/SD Plaintiffs' Position:**

The Deposition Protocol unambiguously requires that if the "noticed date is unworkable for the witness or their Counsel, Counsel for the witness shall, within ten (10) days of receipt of the notice, provide alternative dates within thirty (30) days of the notice date, in accordance with Section D of the Court's Standing Order for Discovery in Civil Cases." (ECF No. 742 at 7) (emphasis added); see also id. ("To facilitate scheduling the witness or their Counsel shall provide three (3) alternative dates within 10 days of receipt of the notice.")  The TikTok Defendants, however, refuse to follow this 10-day rule for purposes of scheduling depositions of former employees. Plaintiffs are willing to grant (and have granted) reasonable extensions, but the TikTok Defendants' refusal to be bound by the Deposition Protocol, coupled with their considerable delays in providing alternative dates, will create myriad problems in the coming months if not corrected.

**TikTok's Position:**

To date, Plaintiffs have served deposition notices for three former employees and the TikTok Defendants have provided Plaintiffs with alternative, workable dates for each of those depositions.  The

parties have agreed to dates for depositions of two former witnesses and a third such deposition was scheduled, but then taken down by Plaintiffs in light of the potential extension in the fact discovery period. The TikTok Defendants will continue to work with Plaintiffs collaboratively to schedule depositions of all witnesses, including former employees, and invite Plaintiffs to proactively identify former witnesses whom they seek to depose so the TikTok Defendants have ample time to make contact and arrange deposition on mutually agreeable dates.

### 13.     RFPs 301-318 (Algorithms)

**PI/SD Plaintiffs' Position:**

These requests relate to TikTok's algorithmic recommendation system, a Named Feature in this case.  Defendants have so far refused to search for and produce responsive documents.  Plaintiffs served a deficiency letter regarding Defendants' objections and responses to these requests on August 8, 2024, and have requested a meet and confer regarding the same, but have not yet heard back regarding that request.

**TikTok's Position:**

The TikTok Defendants will be sending a letter shortly in response to Plaintiffs' deficiency letter. The TikTok Defendants are willing to meet and confer with Plaintiffs in the hope of making progress on these issues.

### E.     Unripe Issues Between PI/SD Plaintiffs and Snap

### 1.     Snap's Data Preservation

**PI/SD Plaintiffs' Position:**

Following a Rule 30(b)(6) deposition of Snap in June, Plaintiffs have endeavored to meet and confer with Snap to clarify gaps in Snap's preservation of potentially relevant data. On August 5, 2024, Plaintiffs sent Snap a formal letter requesting information on a reasonable number of issues arising from these conferrals. To date, Snap has not responded to Plaintiffs' request and has not been forthcoming about its data preservation practices, suggesting that these issues will unfortunately need to formally be brought to the Court's attention.

**Snap's Position:**

Beginning with a letter in late June, without any evidence of spoliation, Plaintiffs initiated an extraordinary series of requests of Snap that have no connection to the substantive issues in dispute and would obliterate the reasonable limits on discovery the Court has put in place. Among other things, Plaintiffs have demanded that Snap collect and search against all Slack messages currently retained by the company (more than 8 TB of data) and that Snap undertake a manual process to provide detailed information about other litigation holds and the amount of retained data for all individuals on Snap's litigation hold list. Snap responded to Plaintiffs' most recent letter on August 31 and will continue to meet and confer with Plaintiffs in an effort to avoid burdening the Court with a dispute, if possible.

### 2.    Production of Information from Non-Custodial Sources

**PI/SD Plaintiffs' Position:**

In mid August, Plaintiffs sent Snap correspondence seeking information about the non-custodial sources Snap was preserving and searching as part of this litigation. To date, Snap has refused to substantively respond. Plaintiffs are concerned that Snap is not appropriate preserving and/or searching for responsive documents in non-custodial sources.

**Snap's Position:**

Snap received a letter from Plaintiffs on August 15, 2024 asking more than 15 distinct questions about Snap's custodial and non-custodial data sources, some of which were answered in prior M&C's. While this appears to be yet another attempt by Plaintiffs to needlessly probe the minutiae of how Snap is conducting its own document collection, review, and production—again untethered from any substantive issues in the case—Snap is investigating Plaintiffs' questions and will respond soon.

### F.    Unripe Issues Between PI/SD Plaintiffs and YouTube

### 1.    RFP Sets 1-9 and RFP Set A

The Parties continue to meet and confer on YouTube's responses to PI/SD Plaintiffs' RFPs. The Parties are meeting and conferring over YouTube's substantive responses, search methodology for production of documents, which includes the application of search terms versus targeted collection for

certain RFPs, YouTube's search methodology and production of documents from non-custodial sources, and any other review that YouTube intends to conduct.

### 2. Production from Non-Custodial Sources

**PI/SD Plaintiffs' Position:**

Plaintiffs seek assurances that YouTube is adequately searching non-custodial sources in response to Plaintiffs' RFPs.  YouTube's RFP responses notably agree to search only <u>custodial</u> sources and YouTube has refused, despite multiple meet and confer sessions, to explain in even the most basic terms what is doing to search non-custodial sources—e.g., whether it is searching the sources identified by Plaintiffs and, if so, whether it is using search terms, automated tools, or some other means.  YouTube's lack of candor on this issue raises serious concerns that can and should easily be put to rest so that any deficiencies in YouTube's searches can be resolved before the parties commence depositions.

**YouTube's Position:**

Plaintiffs' accusation that YouTube is not being candid with respect to searching non-custodial sources is baseless.  YouTube has repeatedly assured Plaintiffs, in its amended responses to Plaintiffs' RFPs and in meet and confer and related correspondence, that it has produced and will continue to produce documents from appropriate non-custodial sources identified through a reasonable and diligent search.  YouTube has also described its search methodology in meet and confer, explaining that with limited exceptions identified to Plaintiffs for which YouTube has or will run search terms, YouTube's search and review of non-custodial sources consists of targeted, manual collections followed by a comprehensive complete review of those collections.  YouTube has engaged and will continue to engage in further meet and confer with Plaintiffs regarding particular non-custodial sources.

1

Respectfully submitted,

2

DATED: September 6, 2024

3

By: */s/ Lexi J. Hazam*
LEXI J. HAZAM
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

4

5

6

7

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

8

9

10

11

Co-Lead Counsel

12

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
cseeger@seegerweiss.com

13

14

15

16

Counsel to Co-Lead Counsel

17

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

18

19

20

21

Liaison Counsel

22

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
633 WEST FIFTH STREET, SUITE 2652
LOS ANGELES, CA 90071
Telephone: 213-787-8590
ejeffcott@forthepeople.com

23

24

25

26

JOSEPH VANZANDT
**BEASLEY ALLEN**
234 COMMERCE STREET

27

28

MONTGOMERY, LA 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

Federal/State Liaisons

MATTHEW BERGMAN
GLENN DRAPER
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org
glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106

Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

Plaintiffs' Steering Committee Leadership

RON AUSTIN
**RON AUSTIN LAW**
400 MANHATTAN BLVD.
HARVEY, LA 70058
Telephone: 504-227–8100
raustin@ronaustinlaw.com

PAIGE BOLDT
**WALSH LAW**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
Telephone: 210-448-0500
PBoldt@alexwalshlaw.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701-1100
tcartmell@wcllp.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202
Telephone: 859-600-6725
semery@justicestartshere.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
Telephone: 646-666-8908
carrie@cagoldberglaw.com

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

SIN-TING MARY LIU

**AYLSTOCK WITKIN KREIS & OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

JOSEPH E. MELTER
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
jmeltzer@ktmc.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212-213-8311
hnappi@hrsclaw.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, PC**
1500 ROSECRANS AVE., STE. 500
MANHATTAN BEACH, CA 90266
Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818-839-2333

59

rtellis@baronbudd.com
dfernandes@baronbudd.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205-855-5700
fu@dicellolevitt.com

Plaintiffs' Steering Committee Membership

*Attorneys for Individual Plaintiffs*

**PHILIP J. WEISER**
Attorney General
State of Colorado

_/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773, *pro hac vice*
First Assistant Attorney General
Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

_/s/ Megan O'Neill_
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer (CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Megan.Oneill@doj.ca.gov

1

2          *Attorneys for Plaintiff the People of the State of
           California*

3

4          **RUSSELL COLEMAN**
           Attorney General

5          Commonwealth of Kentucky

6          */s/ J. Christian Lewis*

7          J. Christian Lewis (KY Bar No. 87109),
           *Pro hac vice*

8          Philip Heleringer (KY Bar No. 96748),
           *Pro hac vice*

9          Zachary Richards (KY Bar No. 99209),
           *Pro hac vice*

10         Daniel I. Keiser (KY Bar No. 100264),
           *Pro hac vice*

11         Matthew Cocanougher (KY Bar No. 94292),

12         *Pro hac vice*
           Assistant Attorneys General

13         1024 Capital Center Drive, Suite 200
           Frankfort, KY 40601

14         CHRISTIAN.LEWIS@KY.GOV

15         PHILIP.HELERINGER@KY.GOV
           ZACH.RICHARDS@KY.GOV

16         DANIEL.KEISER@KY.GOV
           MATTHEW.COCANOUGHER@KY.GOV

17         Phone: (502) 696-5300
           Fax: (502) 564-2698

18

19         *Attorneys for Plaintiff the Commonwealth of Kentucky*

20         **MATTHEW J. PLATKIN**
           Attorney General

21         State of New Jersey

22         */s/ Kashif T. Chand*

23         Kashif T. Chand (NJ Bar No. 016752008),
           *Pro hac vice*

24         Section Chief, Deputy Attorney General
           Thomas Huynh (NJ Bar No. 200942017),

25         *Pro hac vice*
           Assistant Section Chief, Deputy Attorney General

26         Verna J. Pradaxay (NJ Bar No. 335822021),

27         *Pro hac vice*
           Mandy K. Wang (NJ Bar No. 373452021),

28         *Pro hac vice*

                                    62

Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiff New Jersey*
*Division of Consumer Affairs*

1

COVINGTON & BURLING LLP

2

By: */s/ Ashley M. Simonsen*

3

Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP

4

1999 Avenue of the Stars
Los Angeles, CA 90067

5

Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749

6

Email: asimonsen@cov.com

7

Phyllis A. Jones, *pro hac vice*

8

Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP

9

One City Center

10

850 Tenth Street, NW
Washington, DC 20001-4956

11

Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291

12

Email: pajones@cov.com

13

*Attorney for Defendants Meta Platforms, Inc.*

14

*f/k/a Facebook, Inc.; Facebook Holdings,*
*LLC; Facebook Operations, LLC; Facebook*

15

*Payments, Inc.; Facebook Technologies, LLC;*
*Instagram, LLC; Siculus, Inc.; and Mark Elliot*

16

*Zuckerberg*

17

FAEGRE DRINKER LLP

18

By: */s/ Andrea Roberts Pierson*
Andrea Roberts Pierson, *pro hac vice*

19

FAEGRE DRINKER LLP
300 N. Meridian Street, Suite 2500

20

Indianapolis, IN 46204

21

Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000

22

Email: andrea.pierson@faegredrinker.com
Email: amy.fiterman @faegredrinker.com

23

Amy R. Fiterman, *pro hac vice*

24

FAEGRE DRINKER LLP
2200 Wells Fargo Center

25

90 South Seventh Street

26

Minneapolis, MN 55402
Telephone: +1 (612) 766-7768

27

Facsimile: +1 (612) 766-1600
Email: amy.fiterman@faegredrinker.com

28

Geoffrey Drake, *pro hac vice*
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel.: 404-572-4600
Email: gdrake@kslaw.com
Email: dmattern@kslaw.com

David Mattern, *pro ha vice*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, D.C. 20006
Telephone: +1 (202) 626-2946
Email: dmattern@kslaw.com

*Attorneys for Defendants TikTok Inc. and ByteDance Inc.*

MUNGER, TOLLES & OLSON LLP
By: */s/ Jonathan H. Blavin*
Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
Email: jonathan.blavin@mto.com

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Laura M. Lopez, (SBN 313450)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: rose.ehler@mto.com
Email: victoria.degtyareva@mto.com
Email: Ariel.Teshuva@mto.com

Lauren A. Bell (*pro hac vice forthcoming*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

Email: lauren.bell@mto.com

*Attorneys for Defendant Snap Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
By: */s/ Brian M. Willen*
Brian M. Willen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email: bwillen@wsgr.com

Lauren Gallo White (SBN 309075)
Samantha A. Machock (SBN 298852)
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
Email: smachock@wsgr.com

Christopher Chiou (SBN 233587)
Matthew K. Donohue (SBN 302144)
WILSON SONSINI GOODRICH & ROSATI
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: cchiou@wsgr.com
Email: mdonohue@wsgr.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

WILLIAMS & CONNOLLY LLP
By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (*pro hac vice*)
jpetrosinelli@wc.com
Ashley W. Hardin (*pro hac vice*)
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone.: 202-434-5000
Fax: 202-434-5029

66

*Attorneys for Defendants YouTube, LLC and Google LLC*

MORGAN, LEWIS & BOCKIUS LLP
By: */s/ Yardena R. Zwang-Weissman*
Yardena R. Zwang-Weissman (SBN 247111)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Tel.: 213.612.7238
Email: yardena.zwang-weissman@morganlewis.com

Brian Ercole (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131-3075
Tel.: 305.415.3416
Email: brian.ercole@morganlewis.com

Stephanie Schuster (*pro hac vice*)
1111 Pennsylvania Avenue NW
NW Washington, DC 20004-2541
Tel.: 202.373.6595
Email: stephanie.schuster@morganlewis.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

1

## **ATTESTATION**

2

3        I, Lexi J. Hazam, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the

4    filing of this document has been obtained from each signatory hereto.

5

6    Dated: September 6, 2024

7                                                      By: /s/ *Lexi J. Hazam*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28