# EXHIBIT A

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| **DISTRICT OF COLUMBIA,** | ) | |
| **Plaintiff** | ) | |
| | ) | **Case No. 2023-CAB-6550** |
| **v.** | ) | |
| | ) | **Judge Neal E. Kravitz** |
| | ) | |
| **META PLATFORMS, INC.,** *et al.***,** | ) | |
| **Defendants** | ) | |

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANTS' MOTION TO DISMISS

### I.    INTRODUCTION

The District of Columbia filed this action on October 24, 2023 against Meta Platforms, Inc. and Instagram, LLC (collectively "Meta") alleging past and ongoing violations of the District of Columbia Consumer Protection Procedures Act, D.C. Code §§ 28-3901 to 28-3913 ("CPPA"). The District alleges that Meta intentionally manipulates children into compulsive and excessive use of Facebook and Instagram, Meta's flagship social media platforms, through the use of design features specifically intended to exploit children's heightened vulnerabilities to addictive technologies. The District claims that Meta actively seeks to ensnare children in the overuse of its platforms for the purpose of maximizing its profits from advertising revenue, and that it does so despite its knowledge, based on extensive internal and external studies, that compulsive and excessive use of social media is directly linked to profoundly negative outcomes for youth, including depression, anxiety, insomnia, diminished academic performance, and even suicide.

The complaint alleges two counts of CPPA violations. In the first, the District alleges that Meta engages in unfair trade practices, in violation of D.C. Code § 28-3904, by designing its social media platforms to include features it knows are psychologically and physically harmful to

children.  In the second, the District alleges that Meta engages in deceptive trade practices, in

violation of D.C. Code §§ 28-3904(e), (f), and (f-1), by making false misrepresentations and

material omissions that have a tendency to mislead in its statements regarding the safety of

Facebook and Instagram.  The District seeks a permanent injunction prohibiting Meta from

engaging in unfair and deceptive trade practices that harm District consumers, including

children, and from making false and otherwise misleading statements about the safety of its

social media platforms.  The District also seeks restitution or damages, civil penalties, and

reasonable attorney's fees and costs.

### <u>Count I</u>: <u>Unfair Trade Practices</u>

As indicated, the District alleges in Count I that Meta commits unfair trade practices in

violation of the CPPA by seeking to maximize its advertising revenue at the expense of the

health and well-being of its youngest subscribers through the use of addictive and manipulative

design features intended to hook children into spending as much time as possible on its social

media platforms—platforms that are readily available to children and other users through

applications ("apps") on their smartphones, tablets, and other devices.  The complaint identifies

the following as the most addictive and manipulative design features employed by Meta:

- "Personalization algorithms" allow Meta to provide each child user with personalized content tailored to the particular child's previous use of the platform.  The District alleges that Meta provides the personalized content using a sequencing method referred to by psychologists as a "variable reinforcement schedule" or "variable reward schedule."  Compl. ¶ 59.  The schedule refers to a periodic pattern that delivers specific types of content known to be of interest to the particular user and is targeted to trigger a release of dopamine at unpredictable intervals.  Compl. ¶ 60.  The District alleges that Meta predicts what content will generate a dopamine response in a particular user and then tailors the user's feed so that content likely to elicit a dopamine response is provided on a variable schedule. Compl. ¶ 62. The District analogizes Meta's approach to that of a slot machine—alternately providing and withholding rewards to

induce addictive behavior. Compl. ¶ 61. The District alleges that personalization algorithms result in longer usage for children and that they push young users to more extreme content. Compl. ¶¶ 64, 66. The longer periods of usage, and the resulting greater amounts of data collected, the District alleges, increase Meta's advertising revenue at the expense of children's health.

- "Alerts" are notifications Meta provides to its users on their smartphones. Compl. ¶ 68. The District alleges that the alerts, including vibrations and visual and sound notifications, enable Meta to interrupt its users at any time of the day or night for the purpose of luring them back to its platforms. Compl. ¶¶ 69-70. According to the District, alerts are disruptive for users of all ages but are especially harmful to children, who, because of their greater vulnerability to distraction and psychological manipulation, suffer inattentiveness, hyperactivity, and reduced productivity and well-being as a result of the alerts. Compl. ¶ 72. The District alleges that Meta sends alerts to children during the school day, interrupting their ability to concentrate on their schoolwork, and at night, preventing them from sleeping enough to be able to function at their best. Compl. ¶¶ 74, 107. The District cites a recent study showing that teenagers received a median of 237 notifications on their smart phones each day, 23% of which arrived during school hours, and 5% of which arrived during sleeping hours on school nights. Compl. ¶¶ 74, 107. The alerts employed by Meta, the District alleges, have an impact on the brains of children similar to that of stimulating drugs. Compl. ¶ 72.

- "Infinite scroll" involves the partial display of additional content at the bottom of a user's screen. Compl. ¶ 76. The feature prevents the user from viewing a single post without also seeing the top portion of the next post in the user's feed. *Id*. The teasing of future content continues indefinitely, inducing the user to continue scrolling without pause and, the District alleges, making it difficult for children to disengage from the platform because the feed lacks a natural end point. Compl. ¶¶ 76, 78. Similar to the infinite scroll feature, the District alleges, Meta also employs an "autoplay" feature intended to keep children glued to Facebook and Instagram by automatically moving to the next "story" once one story is complete. Compl. ¶ 80.

- "Ephemeral content" is material Meta makes available on its platforms only temporarily. Compl. ¶ 83. Examples include "stories," which are available for viewing for a short time, and "Instagram live" videos, which are streamed in real time and not thereafter available. Compl. ¶¶ 84-86. Meta notifies users of the

availability of ephemeral content through push notifications and tells them the content will soon disappear forever. Compl. ¶ 83. The District alleges that the feature is intended to induce a fear of missing out ("FOMO") in children and to create a sense of urgency that encourages children to check their social media accounts on a frequent basis to avoid missing posts of interest. Compl. ¶¶ 83, 89.

- "Reels" uses Meta's algorithms to present short-form videos that are individually tailored to users' known interests. Compl. ¶ 90. Individual videos in a reel last fifteen to ninety seconds and are presented as an infinite stream; like the infinite scroll, they play automatically and perpetually as the user swipes up. Compl. ¶ 91. The District alleges that the addition of reels in 2020 and 2021 increased the addictive design of Facebook and Instagram and was created for the express purpose of attracting and increasing youth engagement. Compl. ¶¶ 90, 92. According to the District, the manner in which Reels are presented ensures that a child using Facebook or Instgram will not navigate away from the platform due to boredom. Compl. ¶ 91.

The District alleges that these design features foster compulsive and excessive use of Meta's platforms. The complaint cites internal data from Meta in 2019 showing that 55% of Meta's users in the United States suffered from problematic use, defined by Meta as "serious, negative impacts on sleep, relationships, work, or lives, combined with lack of control over [Facebook] use," while 3.1% of its users suffered from "severe" problematic use. Compl. ¶ 97. The District alleges that these harms are particularly acute in children, Compl. ¶ 98, and that the increased use of Meta's platforms is connected with significant psychological harms, including higher rates of major depressive episodes, anxiety, sleep disturbances, and suicide, Compl. ¶96, and with distinct changes in brain development that can adversely affect emotional regulation and impulse control, Compl. ¶ 103. According to the District, the frequency of suicidal thoughts in children has increased dramatically in recent years in parallel with the increase in children's use of social media. Compl. ¶¶ 111, 114.

The District also alleges that Meta is well aware of extensive psychological and survey data showing that its social media products harm children. For example, the District cites a 2021 study conducted in-house by Meta indicating that 6% of teen girls in the United States and 13% of those in the United Kingdom traced their desire to commit suicide or otherwise harm themselves to their use of Instagram. Compl. ¶ 128. Other internal Meta documents cited by the District describe the unique vulnerability of teenagers to features designed to cause addiction. As examples, the District quotes Meta researchers who have stated in internal reports that "[t]een brains are much more sensitive to dopamine," Compl. ¶ 119, that teenagers therefore "have a much harder time stopping [excessive use of Meta's platforms] even though they want to," *id.*, and that teenagers talk about their use of Meta's products like "addicts" and "wish they could spend less time caring about it, but they can't help themselves," Compl. ¶ 124.

Finally, the District alleges that Meta steadfastly refuses to take any action to mitigate its platforms' known harms to children. Specifically, the District alleges that Meta's leaders have repeatedly rejected steps recommended by the company's own internal researchers aimed at limiting the extent of the harm, such as by removing the most addictive design features described above, and that Meta's leaders have done so because they prioritize the company's profit over the safety and well-being of the children who use the company's platforms. Compl. ¶ 134.

<u>**Count II**</u>: <u>**Deceptive Trade Practices**</u>

The District alleges in Count II that Meta commits deceptive trade practices in violation of the CPPA by affirmatively misrepresenting to its consumers that its social media platforms are safe for children and by omitting from its statements and otherwise concealing from the public the known adverse effects on children of its addictive design features. The misrepresentations and omissions alleged in the complaint fall into the following categories:

- Meta falsely claims that its social media platforms are safe and age-appropriate for young people and that the platforms are not designed to take advantage of children's addictive tendencies, despite Meta's possession of information establishing precisely the opposite. Specifically, the District alleges that Meta officials and publications have falsely stated, among other things, that Meta does not set goals for increasing the amount of time users spend on its platforms, Compl. ¶¶ 43, 44, 88, 143, 148; that it does not quantify a lifetime monetary value for a child's use of its products, Compl. ¶ 46; and that it did not study dopamine feedback loops for the purpose of keeping users trapped on its platforms, Compl. ¶¶ 5, 119, 141.

- Meta knowingly misrepresents the appropriateness of its social media platforms for children and conceals the known risk that its platforms will expose children to harmful content. The District alleges, for example, that Meta claims it "age-gates" (limits children's access to) content understood to be inappropriate for young people, Compl. ¶ 149, even though Meta's own internal documents reveal, to the contrary, that Meta amplifies on its platforms psychologically and emotionally gripping content relating to eating disorders, violence, negative self-perception and body image, bullying, and other subjects harmful to children. Compl. ¶ 153. For example, the complaint cites internal Meta research showing that when a user follows anorexia-related content, the personalization algorithms provide the user additional anorexia-related content. Compl. ¶ 155. The complaint also alleges that Meta publicly characterizes Instagram as a source of support for teenagers struggling with thoughts of suicide and self-harm, Compl. ¶ 158, even though Meta's officials are fully aware, and have acknowledged internally, that the more time a user spends on Instagram, the more likely the user is to be exposed to admissions of suicide and self-harm. Compl. ¶ 154. The complaint states further that Meta claims its platforms are a source of support for teens struggling with mental health issues, Compl. ¶ 158, even though it knows that 13.5% of teen girls who use Instagram say the platform makes thoughts of suicide and self-harm worse, 17% say the platform makes eating issues worse, and one in three say Meta makes their body image issues worse, Compl. ¶ 156.

- Meta knowingly omits from its statements and conceals the existence and prevalence of adult predators who contact children via its social media platforms. In particular, the District alleges that Meta has failed to tell children or their parents that predatory adults pretending to be teens interact with minors on the platforms and prepare minors for "sextortion or CEI [child exploitive imagery] trading." Compl. ¶¶ 161, 166. The District alleges further that Meta

fails to warn children and their parents of the risks of adult predators notwithstanding a 2020 internal Meta report expressly finding that Instagram has "minimal child safety protections" and that the "interoperability" design feature of Meta's platforms increases the ability of predators to discover minors across apps.  Compl. ¶ 162.

- Meta knowingly misleads consumers, including parents, about design features that promote body dysmorphia (a mental health condition that causes obsessive thoughts about perceived flaws in one's appearance) and eating disorders in children.  As one example, the District alleges that Meta has told parents it has taken steps to combat body dissatisfaction and eating disorders, Compl. ¶ 168, when in fact Meta knows its platforms' visual selfie camera filters, which simulate facial plastic surgery, actively encourage body dysmorphia in young girls.  Compl. ¶ 170.  As another example, the District alleges that Meta's own employees recommended that a temporary ban on the visual selfie camera filters (put in place based on internal data showing the filters' negative psychological effects on teenage girls) be made permanent, Compl. ¶ 171, but that Meta's founder vetoed a permanent ban, falsely stating that he had seen "no data" suggesting the filters are harmful, Compl. ¶ 175.  The complaint quotes a senior Meta staffer who noted her disagreement with this decision in a message to Meta's founder: "I don't think it's the right call given the risks . . . I just hope that years from now we will look back and feel good about the decision we made here." Compl. ¶ 176.

- Meta knowingly misleads consumers about the harms children face from features on its social media platforms that encourage social comparisons.  As one example, the District alleges that Meta's "likes" feature, which allows users to tap a heart or a thumbs-up icon, causes unhealthy social comparisons among teenagers, Compl. ¶ 181, 182, and that showing users "like counts" exacerbates the problem, Compl. ¶ 183.  Yet despite Meta's knowledge of the mental health effects of "likes" and "like counts," the District alleges, Meta's senior leadership has chosen to maintain this harmful feature while deceptively representing to the public that Meta favors the well-being of its users whenever it is faced with a choice between features that promote addictive user engagement and those that promote user well-being.  Compl. ¶ 185.  The District alleges further that Meta chose not to implement a proposal known as Project Daisy to remove "like counts" from Instagram posts, and that it falsely claimed its decision was based on user preferences rather than on concerns about a likely adverse impact on its revenue. Compl. ¶¶ 187, 193, 196.

- Meta knowingly misleads consumers concerning the safety of its social media platforms for children by making statements that omit, obscure, and misrepresent contrary internal research findings. The complaint describes several unpublished internal studies the District alleges Meta has hidden from the public, including a 2019 study finding that Instagram is addictive and creates low-level mental anxiety that can become more serious over time, Compl. ¶ 204; a 2019 study finding that one in two Instagram users experienced at least one mental-health-related issue in the preceding thirty days, Compl. ¶ 205; a 2020 internal literature review finding that Instagram worsened body dissatisfaction to a greater extent than the end of a relationship or the loss of a job, Compl. ¶ 206; a 2021 internal report finding that 68% of teenage girls experience negative social comparison on Instagram, Compl. ¶ 208; internal 2021 research showing that the personalization algorithm increases exposure to "negative appearance comparison-provoking" content, Compl. ¶ 209; and internal survey data showing that 6.7% of surveyed Instagram users in 2021 had seen self-harm content within the preceding seven days, Compl. ¶ 220, while 16.9% of users between thirteen and fifteen years old had seen content relating to self-harm on Instagram in the same period, *id.* The District alleges that Meta makes misleading statements contrary to the findings of these unpublished internal reports, such as a third quarter 2021 CSER Report in which Meta claimed that on Instagram "less than 0.05% of views were of content that violated our standards against suicide & self-injury," Compl. ¶¶ 218-219, thereby creating the misleading impression that Instagram users only very rarely experience content relating to suicide and self-injury, Compl. ¶ 221.

## **Meta's Motion to Dismiss**

The case is now before the court on Meta's motion to dismiss the complaint for failure to state a claim on which relief can be granted. *See* Super. Ct. Civ. R. 12(b)(6). Meta makes three main arguments: first, that Section 230 of the Communications Decency Act, 47 U.S.C. § 230, bars all of the unfair trade practice claims in Count I and the omissions-based deceptive trade practice claims in Count II because the challenged claims seek to treat Meta as the publisher of third-party content; second, that the First Amendment precludes the unfair trade practice claims in Count I because the District is seeking to hold Meta liable for organizing, disseminating, and otherwise exercising editorial judgment over protected third-party speech; and third, that the

complaint fails to state actionable claims under the CPPA because the statute does not apply to services provided free of charge, because the District has not alleged a substantial injury to the users of Meta's platforms, and because the misrepresentations alleged in the complaint are non-actionable puffery and/or constitutionally protected speech.  Finally, Meta argues that there is no basis under the CPPA for the District to seek disgorgement as a remedy.

The District has filed an opposition to Meta's motion, and Meta has filed a reply.  The parties presented oral arguments on June 6, 2024, and both parties have filed supplemental briefs and notices of additional authority.

The court has carefully considered the arguments of the parties and the many precedents the parties have brought to the court's attention.  For the following reasons, the court concludes that Meta's motion to dismiss must be denied.

## II.    GOVERNING LEGAL STANDARD

A complaint is subject to dismissal under Rule 12(b)(6) of the Superior Court Rules of Civil Procedure for failure to state a claim on which relief can be granted if it does not satisfy the requirement, set forth in Rule 8(a)(2), that it contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  *See Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 543-44 (D.C. 2011).  The notice pleading rules do "not require detailed factual allegations," *id*. at 544 (internal quotation marks omitted) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)), and all factual allegations in a complaint challenged under Rule 12(b)(6) must be presumed true and liberally construed in the plaintiff's favor, *Grayson v. AT&T Corp.*, 15 A.3d 219, 228-29 (D.C. 2011) (en banc).  Nevertheless, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," and the plaintiff must plead "factual content that allows the court to draw the reasonable inference that

the defendant is liable for the misconduct alleged." *Potomac Dev. Corp.*, 28 A.3d at 544

(internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678). Although a plaintiff can

survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," *Grayson*, 15 A.3d

at 229 (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 947 (D.C. 2009), the "factual allegations must

be enough to raise a right to relief above the speculative level," *OneWest Bank, FSB v. Marshall*,

18 A.3d 715, 721 (D.C. 2011) (internal quotation marks and brackets omitted). Conclusory

allegations "are not entitled to the assumption of truth," and "[w]hile legal conclusions can

provide the framework of a complaint, they must be supported by factual allegations." *Potomac

Dev. Corp.*, 28 A.3d at 544 (quoting *Iqbal*, 556 U.S. at 664).

### III.    <u>SECTION 230</u>

Congress enacted the Communications Decency Act of 1996 ("CDA") to modernize

protections against obscenity and harassment in the digital age. S. Rep. No. 104-23, at 59

(1995); *see* Congressional Research Service, "Section 230: An Overview," January 4, 2024, at 1-

2. The CDA contained provisions that increased the penalties for obscene, indecent, harassing,

and other wrongful uses of telecommunications facilities by persons who knowingly and

intentionally create and send prohibited messages or otherwise use telecommunications devices

to harm others. S. Rep. No. 104-23, at 59. The statute also contained an immunity provision that

was specifically intended to "exclude from liability telecommunications and information service

providers and systems operators who are not themselves knowing participants in the making of

or otherwise responsible for the content of the prohibited communications." *Id*.

The CDA's immunity provision is codified at 47 U.S.C. § 230, giving rise to the term

"Section 230 immunity." Section 230 states, in subsection (c)(1), that "[n]o provider or user of

an interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider."  Section 230 states further, in subsection (e)(3), that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. §§ 230(c)(1), (e)(3).  Together, subsections (c)(1) and (e)(3) provide immunity for telecommunications and information service providers and systems operators from claims that seek to treat them as publishers of information provided by other content providers.  *See, e.g.*, *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 n.3 (11th Cir. 2006).

The question before this court is whether Section 230 immunizes Meta as a matter of law from any of the District's claims.  Meta argues that Section 230 bars the District's unfair trade practice claims alleged in Count I because those claims are based on design features by which Meta makes publishing decisions regarding the organization, display, and dissemination of third-party content.  Meta argues that Section 230 bars the omissions-based deceptive trade practice claims alleged in Count II because those claims are premised on the publication of third-party content.  The District argues in opposition that Section 230 immunity is inapplicable because neither category of claims seeks to treat Meta as the publisher or speaker of any particular third-party content.

The parties agree that the Ninth Circuit's decision in *Barnes v. Yahoo!, Inc.,* 570 F.3d 1096 (9th Cir. 2009), sets forth the proper analytical framework for determining whether the immunity provisions of Section 230 apply in any given set of circumstances.  *Barnes* created a three-part test, holding that Section 230 immunizes from liability "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  570 F.3d at 1100-01.  The parties agree further that Meta satisfies the first prong of the *Barnes*

test, as Meta is unquestionably an interactive computer service provider.  The parties dispute whether Meta satisfies the second and third prongs.

Meta contends that the District is seeking to treat it as a publisher—thereby satisfying the second prong of the *Barnes* test—because its use of the challenged design features constitutes publishing activity and because it would have to change the manner, extent, and timing of its publication of third-party content if it were held liable in this case.  Meta contends that the District seeks to treat it as a publisher of third-party content—thereby satisfying the third prong of the *Barnes* test—because it could not be held liable on the District's claims were it not for its publication of third-party content.  Specifically, Meta argues that the addiction of children alleged in the complaint would not occur but for the third-party content published on its platforms.  Meta thus contends that Section 230 bars all of the unfair trade practice claims alleged in Count I and the omissions-based deceptive trade practice claims alleged in Count II, the latter of which Meta argues are inextricably linked to its failure to edit or remove third-party content.  Both sets of claims, Meta contends, seek to treat it as a publisher of third-party content and therefore fall within the reach of Section 230 immunity.[1]

The District argues, to the contrary, that the second and third prongs of the *Barnes* test are not satisfied because its complaint seeks neither to treat Meta as a publisher nor to hold Meta liable for any particular third-party content.  In particular, the District argues that Meta's use of the challenged design features is not traditional publishing activity; that the remedies sought in the complaint would require Meta to change only the way it publishes content, not the content itself; that its claims cannot be brought against the content creators; and most important, that its

---

[1] Meta does not argue that Section 230 bars the deceptive trade practice claims in Count II based on alleged affirmative misrepresentations.  Those claims, Meta argues, must be dismissed under the First Amendment and for failure to state a claim under the CPPA.  The court will address those arguments below, in Sections IV and V, respectively.

claims alleged in Count I arise not from any particular third-party content but from the harmful effects of the addictive design features employed by Meta. As for the omissions-based claims alleged in Count II, the District argues that Section 230 poses no bar to Meta's liability because the claims do not seek to treat Meta as a publisher of third-party content and because Meta could avoid liability in the future without changing the third-party content it publishes—that is, Meta could simply stop making statements that have a tendency to mislead due to their omission of inconsistent or contrary information.

The case presents a potentially close question on the second prong of the *Barnes* test. The parties make interesting arguments on whether Meta's creation and use of the challenged design features constitutes publishing activity, and the case law, all of it non-binding, yields no definitive answer. *Compare, e.g.*, *In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 831, 833-34 (N.D. Cal. Nov. 14, 2023), *with Zeran v. Am. Online, Inc.*, 129 F.3d 327, 333 (4th Cir. 1997), and *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091-93 (9th Cir. 2021); *see also Utah Div. of Consumer Prot. v. Meta, No. 230908060*, slip op. at 11-12 (Utah 3d Dist. Ct. July 25, 2024). In the end, the court need not decide whether Meta has satisfied the second prong of the *Barnes* test, because the court concludes that Meta has not satisfied the third prong, at least not as a matter of law at the pleading stage.

Again, the third prong of the *Barnes* test requires a social media company claiming immunity under Section 230 to establish that the plaintiff, through its state law claims, seeks to treat the company as the publisher of "information provided by another information content provider"—*i.e.*, of third-party content. Neither the Supreme Court nor the District of Columbia Court of Appeals has had occasion to decide the merits of a dispute over the third prong of the *Barnes* test or otherwise to interpret the reach of Section 230 immunity. This court thus looks to

persuasive case law from other jurisdictions. That case law leads to the conclusion that a social media company satisfies the third prong of the *Barnes* test and thereby qualifies for immunity under Section 230 only for harms arising from particular third-party content displayed on the company's platforms.

The Ninth Circuit's decision in *Lemmon* is particularly instructive. The court held in *Lemmon* that Section 230 did not bar the plaintiffs' claim against an interactive computer service provider in part because the claim did not seek to hold the provider liable for third-party content. 995 F.3d at 1093. Two sets of parents sued Snap, the provider of the social media site Snapchat, over the deaths of their teenage sons, who died in a car crash minutes after uploading a snap on the platform with a filter showing the car's speed (more than 100 miles per hour). *Id*. at 1087-88. The plaintiffs alleged that Snap negligently designed its speed filter in a way that incentivized users to drive at dangerous speeds. *Id*. at 1097. Snap claimed immunity under Section 230. *Id*. The court rejected the Section 230 defense, holding that "[b]y its plain terms, and as the last part of the *Barnes* test recognizes, § 230(c)(1) cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties." *Id*. at 1093. The court explained that the plaintiffs' "claim [did] not turn on information provided by another information content provider" in that it "[did] not depend on what messages, if any, a Snapchat user employing the Speed Filter actually sen[t]" or, more specifically, on "the content of [the late teenager's] particular snap." *Id*. at 1093-94 (internal quotation marks omitted). The court noted that "[t]hose who use the internet . . . continue to face the prospect of liability, even for their 'neutral tools,' so long as plaintiffs' claims do not blame them for the content that third parties generate with those tools." *Id*. at 1094. The court emphasized that it was not the third-party content that caused the plaintiffs' injuries: "[t]he danger is not the Snap [message using the

Speed Filter] itself.  Obviously, no one is harmed by the post.  Rather, the danger is the

speeding." *Id*. at 1093 (quoting the plaintiffs' amended complaint).[2]

Most courts that have considered the scope of the immunity provided by Section 230

have used language consistent with that used in *Lemmon*.  Indeed, the 11th Circuit observed in

*Almeida* that "[t]he majority of federal circuits have interpreted the CDA to establish broad

'federal immunity to any cause of action that would make service providers liable *for*

*information* originating with a third-party user of the service.'"  456 F.3d at 1321 (emphasis

added) (quoting *Zeran*, 129 F.3d at 330); *see Johnson v. Arden*, 614 F.3d 785, 791 (8th Cir.

2010) (same); *Herrick v. Grindr LLC*, 765 Fed. App'x 586, 590 (2d Cir. 2019) (focusing on

whether the claims in the case are "based on information provided by another content provider"

and seek to "treat [the provider] as the publisher or speaker of the offensive content"); *see also*

*Doe v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016); *Henderson v. Source For Pub.*

*Data, L.P.*, 53 F.4th 110, 123 (4th Cir. 2022); *Doe v. MySpace Inc.*, 528 F.3d 413, 419-20 (5th

Cir. 2008); *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852 (9th Cir. 2016); *Ben Ezra, Weinstein,*

*& Co. v. Am. Online, Inc.*, 206 F.3d 980, 986 (10th Cir. 2000); *Marshall's Locksmith Serv. Inc.*

*v. Google, LLC*, 925 F.3d 1263, 1268 (D.C. Cir. 2019); *cf. Competitive Enter. Inst. v. Mann*, 150

A.3d 1213, 1251 (D.C. 2016) (noting, in dictum, that the D.C. Circuit has stated that Section 230

immunity applies if, among other things, the "statement *on which liability is based* is 'provided

by another content provider'" (emphasis added) (quoting *Klayman v. Zuckerberg*, 753 F.3d 1354,

1357 (D.C. Cir. 2014)).

---

[2] The court also held that the second prong of the *Barnes* test was not satisfied, because the plaintiffs' claim treated Snap as a product designer rather than a publisher.  *Lemmon*, 995 F.3d at 1092.  The court made clear, however, that "even if Snap [were] acting as a publisher in releasing Snapchat and its various features to the public," the plaintiffs' claim still would not be barred by Section 230 because it "is not predicated on information provided by another information content provider."  *Id*. at 1094 (internal quotation marks omitted).

The immunity created by Section 230 is thus properly understood as protection for social media companies and other providers from "intermediary" liability—liability based on their role as mere intermediaries between harmful content and persons harmed by it. *See Herrick*, 765 Fed. Appx. at 590 (holding that the defendant provider was entitled to Section 230 immunity as an intermediary because a third-party's content was "precisely the basis of [the plaintiff's] claims that [the provider's platform] is defective and dangerous"); *Internet Brands, Inc.*, 824 F.3d at 852 (holding that the defendant provider could not be held liable as an intermediary for third-party content because the defendant did not transmit any harmful messages). As the Fourth Circuit has explained, "Congress made a policy choice . . . not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." *Zeran*, 129 F.3d at 330-31.

Citing a long list of cases, Meta nonetheless asserts that courts have overwhelmingly found social media companies and other internet content providers categorically immune under Section 230 for their use of algorithms, notifications, and other design features like those at issue in this case. Meta reads far too much into these other cases. Other than a recent ruling by the judge presiding over related multi-district litigation—to be addressed below—all of the decisions on which Meta relies were issued in cases in which plaintiffs sought to hold providers liable for specific (and harmful) third-party content. Other than the multi-district litigation, none of the cases cited by Meta held that Section 230 bars liability where, as here, the third-party content is irrelevant to the claim.[3]

---

[3] *See Backpage.com*, 817 F.3d at 16-17 (sex trafficking ads); *Herrick*, 765 Fed. App'x at 588 (profile impersonating someone); *Nemet Chevrolet, Ltd. v. Consumeraffairs.Com, Inc.*, 591 F.3d 250, 252 (4th Cir. 2009) (negative customer reviews of plaintiff's business); *Zeran*, 129 F.3d at 328 (defamatory messages); *Dyroff v. Ultimate Software Grp.*, Inc., 934 F.3d 1093, 1095 (9th Cir. 2019) (posts coordinating a drug deal); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265  (9th Cir. 2016) (negative reviews of plaintiff's business); *Barnes*, 570 F.3d at 1098 (revenge porn); *Perfect 10, Inc. v. CCBill, LLC*, 488 F.3d

The cases relied on by Meta are thus fully consistent with this court's conclusion that

Section 230 protects against liability only "for information originating with a third-party user."

*Johnson*, 614 F.3d at 791; *see Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th

Cir. 2019) (same).  As the court stated in *Lemmon*, 995 F.3d at 1094, "while providing content-

neutral tools does not render an internet company a 'creator or developer' of the downstream

content that its users produce with those tools, our case law has never suggested that internet

companies enjoy absolute immunity from all claims related to their content-neutral tools."

_____

1102, 1108 (9th Cir. 2007) (copyrighted images); *Almeida*, 456 F.3d at 1318 (misappropriated
photograph); *Marshall's Locksmith*, 925 F.3d at 1265 (scam posts); *Klayman*, 753 F.3d at 1355
(Facebook page that incited violence; *Doe v. Grindr Inc.*, No. 2:23-CV-2093-ODW, 2023 U.S. Dist.
LEXIS 230505, at *8-10 (C.D. Cal. Dec. 28, 2023) (profile content, including user age); *M.P. v. Meta
Platforms, Inc.*, 692 F. Supp. 3d 534, 537 (D.S.C. 2023) (white supremacist content), *remanded on other
grounds*, *M.P. v. Meta Platforms Inc.*, No. 23-1880, 2023 U.S. App. LEXIS 24059, at *1-2 (4th Cir. Sep.
7, 2023); *McCarthy v. Amazon.com, Inc.*, 679 F. Supp. 3d 1058, 1064-65 (W.D. Wash. 2023) (post selling
sodium nitrite); *L.W. v. Snap, Inc.*, 675 F. Supp. 3d 1087, 1093 (S.D. Cal. June 5, 2023) (child sex abuse
material); *Bride v. Snap, Inc.*, No. 2:21-CV-6680-FWS-MRW, 2023 U.S. Dist. LEXIS 5481, *2 (C.D.
Cal. Jan. 10, 2023) (harassing messages), *aff'd in part, rev'd in part sub nom.*, *Est. of Bride v. YOLO
Techs., Inc.*, No. 23-55134, 2024 U.S. App. LEXIS 21229, at *1 (9th Cir. Aug. 22, 2024); *Anderson v.
TikTok, Inc.*, 637 F. Supp. 3d 276, 278 (E.D. Pa. 2022) (self-asphyxiation videos), *rev'd in part, Anderson
v. TikTok, Inc.*, No. 22-3061, 2024 U.S. App. LEXIS 21771, at *5 (3d Cir. Aug. 27, 2024) (holding that
Section 230 did not bar the plaintiff's claims); *Doe v. Snap, Inc.*, 2022 U.S. Dist. LEXIS 119560, *1-2
(S.D. Tex. July 7, 2022) (sexually explicit messages and photos), *aff'd, Doe v. Snap, Inc.*, No. 22-20543,
2023 U.S. App. LEXIS 16095, at *3 (5th Cir. June 26, 2023); *FTC v. Match Grp.*, Inc., No. 3:19-CV-
2281-K, 2022 U.S. Dist. LEXIS 52960, at *4, 23-26 (N.D. Tex. Mar. 24, 2022) (third-party
communications perpetuating scams);  *Rodriguez v. OfferUp, Inc.*, No. 8:19-CV-1290-T-30SPF, 2019
U.S. Dist. LEXIS 247480, at *5-6 (M.D. Fla. Aug. 29, 2019) (misleading advertisement that led to violent
robbery and shooting); *Force v. Facebook, Inc.*, 934 F.3d 53, 59 (2d Cir. 2019) (posts allegedly inciting
terrorist attacks); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1120 (N.D. Cal. 2016) (radicalizing
propaganda allegedly linked to terrorist attacks), *aff'd on other grounds*, 881 F.3d 739, 750 (9th Cir.
2018) (declining to decide whether Section 230 barred the plaintiffs' claims); *Blumenthal v. Drudge*, 992
F. Supp. 44, 47 (D.D.C. 1998) (defamatory statement); *In re Facebook*, 625 S.W.3d 80, 84-85 (Tex.
2021) (grooming messages allegedly aimed at luring victims into sex trafficking), *cert. denied sub. nom.*,
*Doe v. Facebook, Inc.*, 142 S. Ct. 1087, 1087 (2022); *Cross v. Facebook, Inc.*, 222 Cal. Rptr. 3d 250, 255
(Cal. Ct. App. 2017) (posts that allegedly incited violence).

The only other case relied on by Meta, *Prager Univ. v. Google LLC*, 301 Cal. Rptr. 3d 836 (Cal. Ct. App.
2022), is inapposite.  Prager University sued Google for deplatforming its YouTube posts because of its
conservative views, and Google claimed immunity under Section 230.  *Id.* at 843-44.  The case thus
involved a provider's claim of immunity for its actions *restricting* access to (rather than publishing) third-
party content.  Indeed, although the judge in the case found Google immune under § 230(c)(1), *id.* at 847,
the immunity question was properly governed by § 230(c)(2).

The case law also refutes Meta's argument that the third prong of the *Barnes* test is satisfied as long as the District's claims would not exist but for Meta's publication of third-party content. Meta asserts, in this regard, that the District's claims based on addictive design features seek to hold it liable for third-party content, giving rise to Section 230 immunity, because there would be nothing for children to become addicted to if not for the third-party content Meta publishes. But-for causation, however, is not sufficient to implicate Section 230 immunity. As the court explained in *Internet Brands, Inc.*:

> [H]osting [the plaintiff's] user profile on [its] website . . . could be described as a "but-for" cause of [the plaintiff's] injuries. Without it, Flanders and Callum would not have identified her and been able to lure her to their trap. But that does not mean the failure to warn claim seeks to hold Internet Brands liable as the "publisher or speaker" of user content.
>
> Publishing activity is a but-for cause of just about everything [the defendant] is involved in. It is an internet publishing business. Without publishing user content, it would not exist. As noted above, however, we held in *Barnes* that the CDA does not provide a general immunity against all claims derived from third-party content.

824 F.3d at 853; *see also Henderson*, 53 F.4th at 123 (stating that the finding that the defendant's publication of information and "the content of the information published" were but-for causes of the plaintiff's claims was not alone sufficient to trigger Section 230 immunity, "as we do not apply a but-for test.").

As indicated above, the related multi-district litigation is the one case cited by Meta in which a court has found Section 230 immunity applicable even though the claims in the case are not based on any particular third-party content. In *In re Soc. Media Adolescent Addiction*, the court considered whether Section 230 barred claims, similar to those alleged here, based on the addictive effects of design features employed by Meta and other social media providers. 702 F. Supp. 3d 809. The court granted the defendants' motion to dismiss most of the claims, holding

that the claims were barred by Section 230 because they stemmed from the defendants'
publishing activities.  *Id*. at 831, 833-34.  The court did not squarely address the contrasting
view, advanced by the District and adopted by this court, that Section 230 provides immunity
only for claims based on the publication of particular third-party content.  *See id*.  This court
respectfully declines to follow the decision of the judge in the multi-district litigation, as that
decision is inconsistent with this court's reading of the case law and the purpose of the Section
230 immunity provisions.

Indeed, other courts that have recently considered assertions of Section 230 immunity in
cases involving the same types of claims have ruled consistently with this court's interpretation
of the reach of the statute.  In *Netchoice, LLC v. Reyes*, No. 2:23-cv-00911-RJS-CMR, LEXIS
129686, at *2-5 (D. Utah July 22, 2024), a trade association representing internet companies
including Meta sued the State of Utah over a statute that banned social media companies from
using autoplay, infinite scroll, and push notifications and empowered the state to bring civil
actions to enforce the ban.  The court rejected Netchoice's argument that actions brought under
the Utah statute were invalid under Section 230, holding that the Utah statute lacked "a critical
component"—specifically, "an effort to hold a website liable for content produced by third-party
users"—present in cases in which Section 230 immunity was found to apply.  *Id.* at *14.
Because the Utah statute did not make social media companies liable *for* third-party content, the
court held, the statute did not run afoul of Section 230.  *Id*. at *14.  *See also State v. Meta
Platforms, Inc.*, No. 23-CV-4453, LEXIS 146, *15-16 (Vt. Super. Ct. July 28, 2024) (holding
that Section 230 does not bar the plaintiff's claims against Meta based on its allegedly defective
features because "[w]hether [users] are watching porn or puppies, the claim is that they are
harmed by the time spent, not by what they are seeing"—*i.e.*, the plaintiff is "not seeking to hold

19

Meta liable for any content provided by another entity"); Pl.'s Not. of Supp. Auth. Ex. A, *State of Tenn. v. Meta et al.*, slip op. at 19 (Tenn. Chancery Ct. 20th Dist. March 13, 2024) (holding that Section 230 does not bar the plaintiff's claims against Meta because "the features themselves allegedly operate to addict and harm Young Users, regardless of the particular third-party content viewed by the Young Users"); *In re Coordinated Proceeding Special Title Rule 3.550 Soc. Media Cases*, 2023 Cal. Super. LEXIS 76992, *99 (Super. Ct. Cal. Oct. 13, 2023) (holding that Section 230 does not bar the plaintiffs' claims against Meta and other social media companies "based on the allegedly addictive qualities of the interactive features of [their] social media sites" because the companies "are allegedly liable for their own actions, not for the content of third-party postings").

The court therefore concludes that Section 230 provides Meta and other social media companies immunity from liability under state law only for harms arising from particular third-party content published on their platforms.

This interpretation of the statute leads to the further conclusion that Section 230 does not immunize Meta from liability for the unfair trade practice claims alleged in Count I.  The District alleges that it is the addictive design features employed by Meta—and not any particular third-party content—that cause the harm to children complained of in the complaint.  Compl. ¶ 242. As in *Lemmon*, therefore, the District does not seek to "blame [the provider] for the content that third parties generate" on its platforms, only for the "tools" the provider uses to present whatever content third parties provide.  995 F.3d at 1094.  Given that Section 230 immunity is limited to liability for harms arising from particular third-party content, the statute provides no protection to Meta here, at least not at the pleading stage, at which the court is required to accept as true the well-pled facts alleged in the complaint.

The court reaches the same conclusion regarding the omissions-based deceptive trade practice claims alleged in Count II.  Through those claims, the District seeks to hold Meta liable for concealing information in its possession about harmful third-party content on its platforms that would have contradicted Meta's public statements about its platforms' safety, and for omitting information in its possession about the prevalence of sexual predators on its platforms and the dangers to children of certain design features, including its plastic surgery filter.  Again applying the *Barnes* three-part analytical framework, the court concludes that Section 230 provides no refuge to Meta because none of the omissions-based deceptive trade practice claims seeks to treat Meta as a publisher of any particular third-party content.

The court notes that both parties refer to these allegations as "failure to warn" claims and discuss cases from other jurisdictions that address the availability of Section 230 immunity from tort claims based on a defendant's common law duty to warn certain types of plaintiffs of certain types of harms.  Such "failure to warn" claims may give rise to Section 230 immunity if they are the functional equivalent of claims that would be barred by the statute—*i.e.*, if they seek to hold internet service providers liable for failing to provide warnings about offensive or otherwise tortious third-party content on their platforms.  Arguably, such claims might be understood as efforts to treat the providers as publishers of the harmful third-party content, potentially giving rise to Section 230 immunity.

But that is not what the District seeks to accomplish through its omissions-based deceptive trade practice claims.  A deceptive omission claim under the CPPA "does not require a plaintiff to plead and to prove a duty to disclose information."  *Saucier v. Countrywide Home Loans*, 64 A.3d 428, 444 (D.C. 2013).  Rather, under the CPPA a plaintiff need prove only that the defendant omitted material information and that the omission had a tendency to mislead

consumers. *Id.* ("Under [D.C. Code] § 28-3904(f), [the plaintiff] must show that the omitted

information is material and has a tendency to mislead."). The CPPA thereby effectively imposes

a duty on all merchants to disclose information if the information is material and if a failure to

disclose the information has a tendency to mislead. Case law cited by the parties regarding

common law failure to warn claims is thus inapplicable to the statutory claims at issue in this

case.

A closer look at the claims themselves establishes that the claims are not based on Meta's

publication of particular third-party content. The District alleges that Meta's omissions about the

prevalence of harmful third-party content on its platforms are actionable under the CPPA

because the omitted information contradicted Meta's affirmative representations about the safety

of its platforms and rendered those representations misleading. *See, e.g.*, Compl. ¶ 149 (alleging

that Meta claims it 'age-gates' inappropriate content for children while failing to disclose that it

serves children age-inappropriate content). The deceptiveness of these omissions is tied to

Meta's own allegedly false, incomplete, and otherwise misleading representations, not to Meta's

publication of any particular third-party content. The third prong of the *Barnes* test therefore is

not satisfied. Indeed, contrary to an assertion in its brief, Meta would not have to change the

content it publishes or engage in any content moderation to avoid liability for future omissions

claims. Rather, Meta can simply stop making affirmative misrepresentations about the nature of

the third-party content it publishes, or it can disclose the material facts within its possession to

ensure that its representations are not misleading or deceptive within the meaning of the CPPA.

*See Est. of Bride*, No. 23-55134, 2024 U.S. App. LEXIS 21229, at *18 (9th Cir. Aug. 22, 2024)

(holding that Section 230 did not bar the plaintiffs' misrepresentation claims—based on an

allegation that the defendant failed to ban users who bullied or harassed others after stating it

would do so—even though "online content [was] involved in these facts, and content moderation [was] one possible solution").

The District's claim that Meta has unlawfully omitted information it obtained from internal and external reports about the prevalence of sexual predators on its platforms similarly falls outside the scope of Section 230 immunity.  The claim seeks to impose liability on Meta based on its failure to disclose information about the dangers posed by predatory users of its platforms and the ability of those predatory users to connect with children on the platforms.  *See* Compl. ¶ 165 (alleging that Meta is aware that a "top privacy problem (based on prevalence and severity) on Instagram is receiving messages from unwanted people"); Compl. ¶ 160 ("Because it fails to disclose these known risks to children and their parents, Meta allows them a false sense of security.").  The focus of this claim is on Meta's failure to disclose its knowledge of the sexual predators who are able to contact minors over its platforms, not on the content of any messages those sexual predators send.  The claim therefore does not seek to hold Meta liable for any particular third-party content.

Meta, moreover, could avoid liability for such claims in the future without engaging in content moderation.  It could disclose the information it has about the prevalence of sexual predators operating on its platforms, and it could take steps to block adult strangers from contacting minors over its apps.  Indeed, the District alleges that Meta planned to work on "block[ing] unconnected adults on [Facebook] and [Instagram] from initiating messages with minors on [Facebook]" but that "it does not appear Meta ever implemented the 'block.'"  Compl. ¶ 163.

Finally, the District alleges that Meta omitted information about known harms of its design features, including its plastic surgery filter.[4]  Compl. ¶ 170-78.  The District's claim is fairly understood as alleging that Meta's omissions are unlawful given its statements suggesting that its platforms do not foster eating disorders, *see* Compl. ¶ 167-69, or as alleging that Meta had a duty to disclose the harms of its features and failed to do so, *see* Compl. ¶ 178.  Either way, the claim is not barred by Section 230.  If the claim seeks to hold Meta liable for omissions that make its statements about eating disorders misleading, then, as with the omissions regarding the prevalence of harmful third-party content on Meta's platforms, the claim seeks to hold Meta liable for its own false, incomplete, and otherwise misleading representations, not for its publication of any particular third-party content.  If the claim seeks to hold Meta liable for breaching a duty to disclose the harms of its platforms' features, including the plastic surgery filter, then the claim is based on Meta's own conduct, not on any third-party content published on its platforms.

For all of these reasons, the court concludes that Section 230 does not bar any of the District's claims as a matter of law at the pleading stage.

## IV.    <u>FIRST AMENDMENT</u>

Meta contends that the unfair trade practice claims alleged in Count I of the complaint are barred by the First Amendment because the District seeks to hold the company liable for organizing, disseminating, and otherwise exercising editorial judgment over protected third-party

---

[4] Meta's motion to dismiss specifically cites the District's claim about its plastic surgery filter, *see* Compl. ¶ 178, but Meta's broad language and the way it quotes the complaint suggests it may be referring to all alleged omissions relating to harmful design features.  *See* MTD at 15 (citing Compl. ¶ 178 as saying "'Meta ha[d] . . . an obligation to disclose the[] risks and harms' of 'harmful features'").  To the extent Meta seeks the dismissal of claims based on omissions relating to other design features, the court's analysis would lead to the same conclusion the court reaches with regard to the claim based on omissions relating to the plastic surgery filter.

speech.  Meta contends further that the deceptive trade practice claims alleged in Count II also run afoul of the First Amendment to the extent the District seeks to hold the company liable for its officials' statements of opinion and privileged testimony to Congress.

The court will address Meta's First Amendment challenge to the unfair trade practice claims in this section.  It will address Meta's First Amendment challenge to the deceptive trade practice claims in the course of its discussion of the CPPA in Section V.

As an initial matter, the court is not persuaded that the District's unfair trade practice claims implicate the First Amendment.  The District seeks to hold Meta liable for the company's use of addictive design features aimed at maximizing the amount of time children spend on its social media platforms.  The District does not seek to hold Meta liable for any of the content hosted on those platforms or for any message expressed or intended through the use of the design features at issue.  Asked at oral argument to identify such a message, Meta's counsel pointed out (correctly) that Meta's content moderation activities express a message.  Meta's content moderation activities are not at issue in this case, however, and Meta's counsel was unable to articulate any message expressed or intended through Meta's implementation and use of the challenged design features.

In a variety of contexts, the Supreme Court has afforded First Amendment protection to the "editorial function itself." *Denver Area Educ. Telcoms. Consortium v. FCC*, 518 U.S. 727, 737 (1996).  The Court's decisions prohibit the government from requiring newspapers to afford a right of reply to political candidates, *Miami Herald Pub. Co., Div. of Knight Newspapers, Inc. v. Tornillo*, 418 U.S. 241, 258 (1974); from forcing a company to offer a forum for alternate viewpoints in its newsletter; *Pac. Gas & Elec. Co. v. Pub. Utils. Comm'n*, 475 U.S. 1, 4, 20-21 (1986); and from compelling parade organizers to include a group that advocates a message with

which the organizers disagree, *Hurley v. Irish-American Gay*, 515 U.S. 557, 559, 581 (1995). These cases are not controlling here, however, because all of them involved state action that interfered with messaging or other expressive conduct—a critical element that is not present in the case before this court.

Nor are the many other cases cited by Meta helpful to its cause, as every one of them in which the court found challenged conduct to be protected by the First Amendment involved an identifiable message. *See, e.g.*, *303 Creative LLC v. Elenis*, 600 U.S. 570, 593, 596-97 (2023) (marriage website design expresses views on marriage and same-sex marriage); *Coral Ridge Ministries Media, Inc. v. Amazon.com, Inc.*, 6 F.4th 1247, 1254 (11th Cir. 2021) (donating money to specific charities expresses a view); *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 752-53 (8th Cir. 2019) (wedding videography expresses views on marriage and same-sex marriage); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1187-88 (N.D. Cal. 2022), *aff'd sub nom.*, *O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (Twitter's actions in removing, suspending, or adding disclaimers about posts were inherently expressive because "[t]hese decisions operated 'together with numerous decisions regarding other tweets and users to more broadly shape and develop the nature, tone, and substance of the ongoing dialogue that Twitter seeks to foster and present on its platform.'") (quoting Twitter's reply brief).

And although the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383 (2024), is informative, it is similarly unhelpful to Meta.  In *Moody*, the Court remanded decisions of the Fifth and Eleventh Circuits for reconsideration of facial challenges to state laws that would restrict the ability of social media companies to engage in content moderation.  *Id.* at 2399.  In an effort to ensure proper First Amendment analyses on remand, the Court noted that "[d]eciding on the third-party speech that will be included in or excluded from a compilation—

and then organizing and presenting the included items—is expressive activity of its own." *Id*. at 2402. Relying on *Hurley*, moreover, the Court stated that "a narrow, succinctly articulable message is not a condition of constitutional protection." *Id.* at 2402.

     *Moody*, however, involved First Amendment concerns that are not present in the case before this court. In particular, *Moody* involved state regulations of online platforms' decisions to remove or deprioritize posts based on the posts' content or viewpoint. *Id.* at 2395-96. Deprioritizing content relates to "the organizing and presenting" of content, *id.* at 2402, as do the design features at issue here. But the reason deprioritizing specific content or content providers can be expressive is not that it affects the way content is displayed; it can be expressive because it indicates the provider's relative approval or disapproval of certain messages. The Court stated:

> [A social media feed] is the product of a wealth of choices about whether—and, if so, how—to convey posts having a certain content or viewpoint. Those choices rest on a set of beliefs about which messages are appropriate and which are not (or which are more appropriate and which less so). And in the aggregate they give the feed a particular expressive quality.

*Id*. at 2405; *see also id.* at 2408 ("Texas does not like the way those platforms are selecting and moderating content, and wants them to create a different expressive product, *communicating different values and priorities*. But under the First Amendment, that is a preference Texas may not impose.") (emphasis added).

     The Supreme Court, moreover, expressly limited the reach of its holding in *Moody* to algorithms and other features that broadly prioritize or deprioritize content based on the *provider's* preferences, and it emphasized that it was not deciding whether the First Amendment applies to algorithms that display content based on the *user's* preferences. "We therefore do not deal here with feeds whose algorithms respond solely to how users act online—giving them the

content they appear to want, without any regard to independent content standards." *Id*. at 2404 n.5 (citing *post*, at 2 (Barrett, J., concurring)).

Meta nonetheless asks this court to focus on the Supreme Court's statements in *Moody* that content moderation activity is "expressive activity of its own" and that "a narrow, succinctly articulable message is not a condition of constitutional protection." These statements are of course significant, given the court that made them, but they do not aid Meta's case. As discussed, the District's unfair trade practice claims challenge Meta's use of addictive design features without regard to the content Meta provides, and Meta has failed to articulate even a broad or vague message it seeks to convey through the implementation of its design features. So although regulations of community norms and standards sometimes implicate expressive choices, the design features at issue here do not.

Moreover, even if the District's prosecution of its unfair trade practice claims implicated the First Amendment, the court could not find, at least not at the pleading stage, that the District's pursuit of the claims violates the First Amendment as a matter of law. Intermediate scrutiny must be applied when a statute implicates expression but is content-neutral. *See Turner Broad. Sys. v. FCC*, 512 U.S. 622, 642 (1994) (Turner I); *see also 303 Creative LLC*, 600 U.S. at 626, 630 (citing *United States v. O'Brien*, 391 U.S. 367, 376-377 (1968)). To satisfy that constitutional standard, the "law must further a substantial governmental interest that is unrelated to the suppression of expression," *Moody,* 144 S. Ct. at 2407 (internal quotation marks omitted), and that "'would be achieved less effectively absent the regulation,'" *303 Creative LLC*, 600 U.S. at 626 (quoting *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 67 (2006)).

28

The District easily satisfies this standard at the pleading stage.  The CPPA is a content-neutral statute focused on the protection of consumers.  The District's stated interest in prosecuting its claims is the protection of children from the significant adverse effects of the addictive design features on Meta's social media platforms.  The District's interest has nothing to do with the subject matter or viewpoint of the content displayed on Meta's platforms; indeed, the complaint alleges that the harms arise without regard to the content served to any individual user. Compl. ¶ 242.  Meta, moreover, has not suggested any reason to believe that the "manifest purpose" of the District's claims is "to regulate speech because of the message it conveys." *Turner I*, 512 U.S. at 645.

The court therefore has little difficulty concluding that the allegations in Count I of the complaint would be sufficient at the pleading stage to survive intermediate scrutiny even if the court were to find that the District's prosecution of its unfair trade practice claims somehow burdens Meta's expressive activity.  The District has a substantial interest in protecting the city's children from the dire mental health effects of Meta's addictive design features, *see Moody,* 144 S. Ct. at 2403 (recognizing that an emerging danger of social media is its effects on adolescents' mental health), and its interest is unrelated to the suppression of expression.  The District alleges, moreover, that Meta has steadfastly refused to modify its use of the addictive design features in response to the many internal and external studies that have exposed the dangers of those features to children.  It therefore appears that the District's interest in protecting the city's children would be achieved less effectively without this litigation.

For all of these reasons, Meta's request for the dismissal of the unfair trade practices claims on First Amendment grounds must be rejected.

### V.    CONSUMER PROTECTION PROCEDURES ACT

The CPPA protects consumers against false, deceptive, and unfair business practices. *Earth Island Institute v. The Coca-Cola Co.*, No. 22-CV-0895, 2024 D.C. App. LEXIS 330, at *17 (D.C. August 29, 2024). It is "a broad consumer protection statute, meant to 'assure that a just mechanism exists to remedy all improper trade practices.'" *Id*. (quoting D.C. Code § 28-3901(b)(1)). It "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia," and it is to be "construed and applied liberally to promote its purpose." D.C. Code § 28-3901(c).

Meta nonetheless contends that the complaint fails to state plausible claims for relief under the CPPA. Specifically, Meta argues that (1) the CPPA does not apply to its conduct because users have free access to its social media platforms and its provision of services thus does not constitute a "sale, lease or transfer" of consumer goods or services; (2) the District has not alleged the type of economic or monetary harm necessary to establish the "substantial injury" required for unfair trade practice claims; (3) the District's deceptive trade practice claims are based on non-actionable "puffery" and on other speech protected by the First Amendment; and (4) disgorgement is not a remedy available to the District under the statute.

The court will address each of these arguments in turn.

### Applicability of CPPA to Meta's Free Services

Despite the statute's intended breadth, the reach of the CPPA is not unlimited. By its express terms, and as relevant here, the CPPA applies to trade practices only to the extent they relate to the "sale, lease or transfer" of consumer goods or services. *See* D.C. Code § 28-3901(a)(6) (defining "trade practice" as "any act which does or would create, alter, repair,

furnish, make available, provide information about, or, directly or indirectly, solicit or offer for or effectuate, a sale, lease or transfer, of consumer goods or services").

Meta argues that its services are not sold, leased, or transferred within the meaning of § 28-3901(a)(6) because they are provided free of charge to the users of its social media platforms. In particular, Meta contends that the free access it provides to its users clearly is not a "sale" or a "lease" of its platforms and services and that it also cannot plausibly be considered a "transfer" because no ownership interest in its platforms or services is transferred to its users. Meta argues, in this regard, that under the *ejusdem generis* principle of statutory construction the terms "sale," "lease," and "transfer" should be interpreted consistently to require payment and the conveyance of an ownership or other property interest. *See Bolz v. Dist. of Columbia*, 149 A.3d 1130, 1139 (D.C. 2016) ("The canon of *ejusdem generis* counsels that the meaning of a catchall term [in a statute] is informed by the list of words preceding it.").

The court is not persuaded by Meta's reliance on the canon of *ejusdem generis*. "Transfer" is not a "catchall term" found at the end of a list of more specific terms in § 28-3901(a)(6). It is one of three specific terms listed in the statute. The canon of *ejusdem generis* therefore provides no guidance here.

As to the merits of Meta's argument, the court agrees that the use of Meta's social media platforms does not involve a "sale" or a "lease." But the terms "sale" and "lease" must refer to different types of transactions than the term "transfer," else "transfer" would be superfluous and would add nothing to the scope of the statute's reach. *See D.C. Bd. of Elections v. District of Columbia*, 866 A.2d 788, 795 (D.C. 2005) ("A basic principle [of statutory construction] is that each provision of the statute should be construed so as to give effect to all of the statute's provisions, not rendering any provision superfluous.") (quoting *United States Parole Comm'n v.*

*Noble*, 693 A.2d 1084, 1107-08 (D.C. 1997)).  Indeed, it would be illogical to require the conveyance of an ownership or other property interest where the provision of services, as opposed to goods, is at issue.  The providers of services ordinarily do not, and cannot, transfer property interests in their services to their customers.  The Court of Appeals appears to agree, at least implicitly, having repeatedly applied the CPPA in cases involving the provision of services through which no transfer of property interests appears to have occurred.  *See, e.g.*, *Frankeny v. Dist. Hosp. Partners, LP,* 225 A.3d 999, 1002, 1008 (D.C. 2020) (medical services); *Dist. Cablevision Ltd. P'shp v. Bassin*, 828 A.2d 714, 717, 733 (D.C. 2003) (cable television services).

The CPPA, moreover, defines the term "consumer" as "a person who, other than for purposes of resale, does or would purchase, lease (as lessee), or receive consumer goods or services."  D.C. Code § 28-3901(a)(2)(A).  The inclusion of the term "receive" in addition to the terms "purchase" and "lease" in the definition of "consumer" strongly suggests the legislature's intention that the statute cover circumstances in which a person receives goods or services free of charge or in return for something of value other than a direct monetary payment.  Here, of course, the District alleges that Meta receives something of very significant value in return for the use of its platforms: the right to monetize its users' time and data.

The court thus concludes that the complaint plausibly alleges a "transfer" of consumer goods and services within the meaning of D.C. Code § 28-3901(a)(6) even though Meta does not charge a fee for the use of its social media platforms.  At least at the pleading stage, therefore, Meta's argument that the CPPA is inapplicable to the conduct alleged in the complaint must be rejected.

## Substantial Injury

Meta contends next that the unfair trade practice claims alleged in Count I fail as a matter of law because the District has not alleged economic or monetary harm, a necessary component of the "substantial injury" required to prove claims of unfair trade practices. The court concludes otherwise.

The CPPA does not expressly require a showing of "substantial injury." It provides that in construing the term "unfair or deceptive trade practice" due consideration must be given to the interpretations by the Federal Trade Commission ("FTC") and the federal courts of the term "unfair or deceptive act or practice" in the Federal Trade Commission Act ("FTC Act"). D.C. Code § 28- 3901(d). The FTC Act in turn provides that the FTC may not "declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n). The FTC has determined that "'ordinarily' 'emotional impact and other more subjective types of harm' would not make a practice unfair," *Am. Fin. Servs. Ass'n v. FTC*, 767 F.2d 957, 972 (D.C. Cir. 1985) (quoting Letter from FTC to Senators Ford and Danforth, 39 (Dec. 17, 1980)), and federal case law suggests that monetary harm is usually required for a showing of substantial injury, *see, e.g., FTC v. Direct Mktg. Concepts, Inc*., 569 F. Supp. 2d 285, 299 (D. Mass. 2008) ("In most cases 'substantial injury' involves monetary harm.").

Monetary harm, however, is not always a necessary component of "substantial injury." The FTC determined in *In re Int'l Harvester Co*., 104 F.T.C. 949, 1064 (F.T.C. Dec. 21, 1984), that farm equipment caused substantial injury where a design flaw led to severe burns "resulting

in mobility limitations, lasting psychological harm, and severe disfigurement."  The FTC held

that health risks caused by the equipment, rather than any monetary injury, supported a finding

of substantial injury, explaining that "unwarranted health and safety risks may also support a

finding of unfairness."  *Id*. at 1061.  The FTC expressly noted that "i[n] an extreme case . . .

where tangible injury could be clearly demonstrated, [even] emotional effects might possibly be

considered as the basis for a finding of unfairness."  *Id*. at 1073 n.36.  Federal courts have

reached the same conclusion, holding that non-monetary, and even non-tangible, harms can be

sufficient for a finding of substantial injury.  *See, e.g.*, *FTC v. Roca Labs, Inc.*, 345 F. Supp. 3d

1375, 1395 (M.D. Fla. 2018) ("[N]either the legislative history nor the current law requires proof

of tangible harm to the exclusion of intangible harm."); *see also FTC v. Wyndham Worldwide

Corp.*, 799 F.3d 236, 246 (3d Cir. 2015) ("[T]he FTC Act expressly contemplates the possibility

that conduct can be unfair before actual injury occurs.").

      Taken as true at the pleading stage, as they must be, the allegations in the complaint are

sufficient to place this case in the category of unusual cases in which "substantial injury" can be

established without proof of economic harm.  The District alleges that Meta's addictive design

features significantly increase rates among children of major depressive episodes, anxiety, sleep

disturbances, and other mental health disorders, including suicide.  Compl. ¶ 96.  The District

alleges further that Meta knows of the devastating effects its design features have on the mental

health of children and nonetheless persists in its efforts to maximize the amount of time children

spend on its platforms for the purpose of harvesting as much data and selling as many targeted

ads as possible.  Comp. ¶¶ 1, 96, 106, 179, 241.  The court concludes that the District has

presented a plausible claim of "substantial injury" based on allegations of non-economic harm.

34

The FTC and at least one federal court have determined, moreover, that an injury can be "substantial" within the meaning of the FTC Act "if it does a small harm to a large number of people, or if it raises a significant risk of concrete harm." *Roca Labs*, 345 F. Supp. 3d at 1397 (quoting "FTC's Policy Statement on Unfairness," Sen. Comm. on Commerce, Science and Transportation (Dec. 17, 1980), p. 5). The District alleges that Meta's practices pose dangers to the "55,580 daily active teenage users and 94,656 monthly active teenage users" of Meta's platforms in the District. Compl. ¶ 30. Therefore, even if the alleged injuries were too small to constitute "substantial injury" when considered on an individual basis, the District has alleged a plausible claim that the injuries are large enough to do so when viewed collectively.

The District's failure to allege economic or financial harm thus does not require the dismissal of its unfair trade practice claims at the pleading stage.

### Commercial Puffery and Protected Speech

Meta argues that the District's deceptive trade practice claims in Count II fail as a matter of law to the extent they are based on affirmative misrepresentations because the false statements alleged in the complaint are either non-actionable statements of commercial puffery, protected by the First Amendment right to petition the government, or pled without the level of specificity required for claims alleging fraud. The court disagrees.

### 1. Puffery

"Puffery is a legal doctrine that posits some statements are of a type that no reasonable consumer would rely upon them, because there is a certain amount of bluster or 'sales talk' that is to be expected when pushing one's wares." *Earth Island Institute*, No. 22-CV-0895, 2024 D.C. App. LEXIS at *24. Puffery "includes 'the exaggerations reasonably to be expected of a

seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined.'" *Id*. at 25-26 (quoting *Pearson v. Chung*, 961 A.2d 1067, 1076 (D.C. 2008)).

The doctrine's reach, however, is more limited than Meta suggests. While commercial puffery may be non-actionable under the CPPA on the theory that a "general assertion, incapable of measurement, is unlikely to lead reasonable consumers astray," *Meta Platforms, Inc. v. District of Columbia*, 301 A.3d 740, 759 (D.C. 2023), the puffery doctrine is not automatically applicable any time the truth or falsity of a statement cannot be precisely determined. "That is too rigid a view." *Earth Island Institute*, 2024 D.C. App. LEXIS at *28. Rather, "businesses cannot insulate themselves from suit simply by avoiding concrete claims." *Id.* "Vague and ambiguous statements, incapable of being strictly true or false, may yet be actionable as misrepresentations," since "a statement literally true is actionable [under the CPPA] if made to create a false impression." *Id*. at *28-29 (citing *Remeikis v. Boss & Phelps, Inc.*, 419 A.2d 986, 990 (D.C. 1980)). The text of the CPPA makes clear, after all, that the statute "prohibits not just false statements, but those that have any 'tendency to mislead,' including by 'fail[ing] to state a material fact,' or 'us[ing] innuendo and ambiguity as to a material fact.'" *Id*. at *29 (quoting D.C. Code §§ 28-3904(a)-(h)).

The puffery rule, moreover, "'has not been a favored one,' and except in rare cases, the question of whether a statement is an 'actionable misrepresentation' or mere puffery must be 'left to the jury.'" *Id*. at *24 (quoting Prosser & Keeton on Torts § 109 at 757 (5th ed. 1984)). Unless the statement at issue is "so patently hyperbolic that it is implausible for a reasonable consumer to be misled," the statement must "be subject to a 'fact-intensive inquiry' on how a reasonable buyer would be affected" by it, making dismissal of a CPPA claim at the pleading

stage improper. *Id*. at *25 (quoting *MacNaughton v. Young Living Essential Oils, LC*, 67 F.4th 89, 98 (2d Cir. 2023)).

Some of Meta's statements cited in the complaint may be too vague and unverifiable to form the bases of deceptive trade practice claims. Others, including what appear to be internal "talking points," may not have been published to third parties and thus may turn out to be non-actionable even if demonstrably false. But many of the statements attributed to Meta and its top officials in the complaint are not so patently hyperbolic that it would be implausible for a reasonable consumer to be misled by them. Others are sufficiently detailed, quantifiable, and capable of verification that, if proven false, they could support a deceptive trade practice claim. And contrary to Meta's argument, the category of actionable statements under the CPPA includes false and misleading statements of goals or aspirations, as "[a]n aspirational statement can be reasonably 'interpreted to be a representation about the defendant's present intent . . . to act as stated.'" *Id.* at *31-32 (quoting 3 Dobbs *et. al*, The Law of Torts § 678 at 690 (2d ed. 2011)).

The following are just a few examples of the statements alleged in the complaint that are legally sufficient to state plausible deceptive trade practice claims:

- Meta founder Mark Zuckerberg's public statement in 2019 that Meta does not allow "teams [to] set goals around increasing time spent on [Meta's] services." Compl. ¶ 143. The complaint alleges that Meta does in fact set such goals. Compl. ¶¶ 43, 44, 88, 148.

- Mr. Zuckerberg's public statement in 2018 denying that Meta had studied dopamine feedback loops as a means of keeping users trapped on their platforms. Compl. ¶ 141. The complaint alleges that Meta did in fact perform such studies and that Meta utilizes dopamine feedback loops to keep users trapped. Compl. ¶¶ 5, 119.

- Testimony before Congress of Antigone Davis, Meta's Global Head of Safety, in 2021 suggesting that Meta does not identify the lifetime monetary value of children who use its products by stating that is

"just not the way we think about it."  Compl. ¶ 46.  The complaint alleges that an internal Meta email from 2018 identifies the "lifetime value" of a thirteen-year-old teen using Meta's products as roughly $270.00.  Compl. ¶ 45.

- Meta's statement in its 2023 Responsible Business Report that "[w]e want people to connect with others in a safe, positive and supportive environment and leave our apps feeling good about the time they spend on them."  Compl. ¶ 140.  The complaint alleges that Meta employees have acknowledged that Instagram's ranking algorithm takes youth "into negative spirals & feedback loops that are hard to exit from."  Compl. ¶ 66.  The complaint alleges further that Meta's features exploit teenagers who are uniquely vulnerable to addictive technologies.  Compl. ¶¶ 2, 119.

- Meta's statements touting its platforms' "time-management tools" as ways for users to control their use of its products.  Compl. ¶ 133. The complaint alleges that Meta knows its time-management tools are ineffective.  *Id*.

- Ms. Davis's 2021 testimony before Congress that "we do not direct people towards content that promotes eating disorders."  Compl. ¶ 169.  The complaint alleges that Meta's personalization algorithm serves anorexia-related content to users who have previously viewed such content.  Compl. ¶ 155.

The District's deceptive trade practice claims therefore must be allowed to proceed to the fact-intensive inquiries contemplated by the case law on the way a reasonable buyer would be affected by Meta's allegedly false and misleading statements.

### 2.  First Amendment/Noerr-Pennington Doctrine

The *Noerr-Pennington* doctrine provides First Amendment protection for statements made in furtherance of "attempt[s] to persuade the legislature or the executive to take particular action with respect to a law."  *E.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961); *see also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 670 (1965). Statements to the public in support of publicity campaigns advocating for government actions

can be similarly protected.  *See Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 499-500 (1988).

The First Amendment, however, "does not 'cover activity that was not genuinely intended to influence government action,'" *United States v. Philip Morris USA, Inc*., 566 F.3d 1095, 1123 (D.C. Cir. 2009) (quoting *Allied Tube*, 486 U.S. at 508 n.10), and it does not protect "deliberately false or misleading statements," *Philip Morris USA Inc.*, 566 F.3d at 1123-24; *see also Whelan v. Abell*, 48 F.3d 1247, 1255 (D.C. Cir. 1995) ("However broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods.").  In *Philip Morris USA Inc.*, for example, the D.C. Circuit held that false statements regarding the dangers of cigarettes were not protected by the First Amendment, even though the statements were made in furtherance of a public campaign.  566 F.3d at 1124.

As set forth in detail above, the District has plausibly alleged in the complaint that at least some of Meta's statements to Congress and the public were deliberately false or misleading. This is sufficient at the pleading stage to avoid dismissal based on First Amendment protections.

### 3.  Heightened Pleading Standard for Fraud Claims

Rule 9(b) of the Superior Court Rules of Civil Procedure provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Meta cites a single decision of the United States District Court for the District of Columbia for the proposition that CPPA claims premised on misrepresentations and omissions are subject to the heightened pleading standard of Rule 9(b) because they "sound in fraud."  *See Witherspoon v. Philip Morris Inc*., 964 F. Supp. 455, 464 (D.D.C. 1997).  Meta argues that the District's deceptive trade practice claims are not pled with sufficient particularity.

Meta's argument is foreclosed by more recent case law from the District of Columbia Court of Appeals. The Court of Appeals expressly stated in *Frankeny v. Dist. Hosp. Partners, LP*, 225 A.3d 999 (D.C. 2020), that the CPPA "overcomes the 'pleadings problem associated with common law fraud claims' by abridging the elements needed to prove a CPPA violation." *Id*. at 1004 (quoting *Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp.*, 944 A.2d 1055, 1073 n.20 (D.C. 2008)); *see also Saucier*, 64 A.3d at 442. Based on this binding appellate case law, Superior Court judges have repeatedly declined to apply Rule 9(b)'s heightened pleading standard to CPPA claims premised on alleged misrepresentations. *See District of Columbia v. Hofgard*, No. 2015-CA-3354-B, 2015 D.C. Super. LEXIS 15, *13 (D.C. Super. Ct. Aug. 8, 2015) ("[A]s multiple Superior Court judges have held, Rule 9(b) does not apply to a complaint alleging violations of the CPPA.") (collecting cases). Indeed, at least one more recent federal court decision has reached the same conclusion—that "imposing the particularized pleading requirements of Rule 9(b) on such claims would undermine the [CPPA's] purpose." *McMullen v. Synchrony Bank*, 164 F. Supp. 3d 77, 91 (D.D.C. 2016).

The court therefore declines to apply Rule 9(b)'s heightened pleading standard to the District's deceptive trade practice claims.

### **Disgorgement**

In its prayer for relief, the District asks the court to order Meta "to pay restitution or damages in accordance with D.C. Code § 28-3909." Compl. at page 58. Meta acknowledges that § 28-3909(a) authorizes the District, through the Office of the Attorney General, to seek "the restitution of money or property," but it argues that restitution is unavailable here because none of the consumers alleged to have been harmed by its products has paid or otherwise lost any

money or property using them.  Meta contends that what the District really is requesting is disgorgement, a remedy Meta argues the District is not authorized to seek under the CPPA.

Meta's argument regarding the availability of restitution or disgorgement as a remedy is best understood as a motion to strike pursuant to Rule 12(f) of the Superior Court Rules of Civil Procedure.  Rule 12(f) provides, in relevant part, that the court "may strike from a pleading . . . any redundant, immaterial, or scandalous matter."

The court is not persuaded that the District's request for restitution should be stricken. "[R]estitution today is a general term for diverse kinds of recoveries aimed at preventing unjust enrichment of the defendant and measured by the defendant's gains."  *Divver v. D.C. Dep't of Ins., Sec. & Banking*, 306 A.3d 595, 608 (D.C. 2023) (quoting Dan B. Dobbs, *Law of Remedies, Damages, Equity, Restitution* § 1.1 (2d ed. 2001)).  "[R]estitution's central purpose," therefore, "is not simply to make a victim whole, but also to disgorge the wrongdoer of ill-gotten funds." *Id.*  Thus, even if Meta is correct that what the District really seeks here is disgorgement, the court cannot say that the District's request so clearly falls outside the Attorney General's authority under the CPPA that the request should be stricken as redundant, immaterial, or scandalous.

## VI.    CONCLUSION

For the foregoing reasons, it is this 9th day of September 2024

**ORDERED** that Meta's motion to dismiss is **denied**.  It is further

**ORDERED** that Meta has until September 23, 2024 to file an answer to the complaint. *See* Super. Ct. Civ. R. 12(a)(4)(A).  It is further

**ORDERED** that the case remains set for an initial scheduling conference on October 4, 2024 at 9:30 a.m.  As the court and parties have discussed previously, the parties are encouraged to try to reach agreement on a proposed scheduling order to be jointly submitted to the court.


Neal E. Kravitz, Associate Judge
(Signed in Chambers)


Copies to:
Adam R. Teitelbaum, Esq.
Jimmy R. Rock, Esq.
Kevin J. Vermillion, Esq.

John J. DeBoy, Esq.
Timothy C. Hester, Esq.
Christian J. Pistilli, Esq.