UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Actions | Case No. 22-md-03047-YGR   (PHK)<br><br>**DISCOVERY MANAGEMENT ORDER NO. 10 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF SEPTEMBER 12, 2024**<br><br><u>Upcoming DMC Dates:</u><br>October 24, 2024 *advanced* to 1:00 pm<br>November 21, 2024 at 1:00 pm<br>December 11, 2024 at 1:00 pm |

On September 12, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery.  *See* Dkts. 1141, 1155.  This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the September 12th DMC, regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

**I.    Forensic Imaging of MDL Bellwether Plaintiff JD's Device**

Defendants recently learned (via discovery responses) that an MDL Bellwether Plaintiff referred to as "JD" (for anonymity due to age) uses a school-issued Hewlett-Packard 255 GH Notebook to "watch videos on YouTube occasionally." [Dkt. 1120 at 21].  JD attends Alabama Virtual Academy, an entirely online school, and uses the device predominately for school purposes. *Id.* at 22.  JD has had the device for several years but did not disclose it in the "Main Devices" spreadsheet required for this litigation. *Id.* at 21.

Defendants argue that they are entitled to forensically image all of the data from the device, including JD's usage of other platforms, to evaluate whether Defendants' platforms did or

did not cause the alleged injuries, as well as to confirm that JD's use of the device was actually only occasional. *Id.* They argue that the device is essentially a personal device since JD attends virtual school from home. [Dkt. 1155 at 17:1-14]. They argue that it would not be burdensome to produce the device because it is in JD's current possession and JD does not have to return it to the school until 2025 graduation. [Dkt. 1120 at 22].

Plaintiffs oppose producing the device for forensic imaging. *Id.* They argue that they are only required to produce devices that were "habitually, routinely, or regularly used" to access the platforms at issue in this case and this device was only used occasionally. *Id.* They argue that it would be extremely burdensome to produce the device for imaging because JD would be forced to miss several days of school (resulting in a disruption of their schoolwork) and JD would also need to get the school's permission first. *Id.* at 22-23.

At the hearing, Plaintiff's counsel was unable to specify how much usage constitutes "occasional" usage. *See* Dkt. 1155 at 12:13-14:3. Plaintiffs confirmed that they have not yet asked the school about whether they can get JD a temporary replacement laptop to avoid disruption of JD's schoolwork and virtual attendance. *Id.* at 18:12-22.

As stated at the September 12th DMC, the Court **ORDERS** Plaintiffs to contact the Alabama Virtual Academy within the next two weeks to see if they would be able to give JD a temporary replacement laptop. If the school agrees to do so, Plaintiffs shall promptly work with their vendor for forensic imaging of the device. The Parties shall confer with their ESI vendors in advance to see if the forensic imaging of the device can be completed within one weekend, and if not, to seek any recommendations and do their own research for a vendor who can complete imaging quickly. The fact that the device would be imaged does not expand the scope of discoverable files or data from the device—the Court expects the Parties to work collaboratively on keyword and other ESI searches of the device's files which are within the appropriate scope of relevance. The Parties shall file a Joint Status Report regarding this issue by no later than **September 27, 2024**.

II.  **MDL Non-Bellwether SD Plaintiff Damages Computations**

Defendants seek an order compelling the MDL non-Bellwether School District ("SD")

2

1    Plaintiffs to produce damages computations and supporting documentation, as part of the initial
2    disclosures, pursuant to Fed. R. Civ. P. 26(a)(1)(A)(iii), within thirty days.  [Dkt. 1118].  They
3    argue that Rule 26 "plainly requires" that non-Bellwether SD Plaintiffs produce this information
4    "without awaiting a discovery request" and that this information was due as part of their required
5    initial disclosures back in February 2024.  *Id.* at 10.  They argue that the information sought is
6    presently known to Plaintiffs and "should not require expert calculation."  *Id.* at 11.  Defendants
7    argue that they cannot assess the extent of their alleged liability or exposure without this
8    information because the damages initial disclosures provided thus far by the Bellwether SD
9    Plaintiffs show that the claimed past compensatory damages "are substantial and vary widely."  *Id.*
10   at 12.  They also argue that they are unable to correlate the Bellwether SD Plaintiffs' damages
11   disclosures with the non-Bellwether SD Plaintiffs because the school districts vary greatly as well.

12       Plaintiffs argue that the request for damages computations should be denied because: (1) it
13   is not required under the Court's bellwether process in this MDL; (2) it would undermine the
14   efficiency of the proceedings by diverting resources from the Bellwether cases; (3) the
15   Bellwethers have provided a sufficient "representative sampling" of damages information from
16   which Defendants can extrapolate to assess the scope of their liability for comparable school
17   districts; and (4) nothing in Rule 26 or the case law requires that damages computations for non-
18   Bellwether SD Plaintiffs be produced now.  *Id.* at 12-14.

19       At the hearing, Defendants' counsel limited their requested relief to damages computations
20   for past damages as to two specific categories of alleged harm: (1) a computation of damages
21   resulting from alleged property damage increases; and (2) a computation of damages incurred due
22   to alleged increases in hiring numbers.  [Dkt. 1155 at 25:1-18].  The Parties agreed that initial
23   disclosure of non-Bellwether SD Plaintiffs' damages computation are required.  *Id.* at 21:18-20.
24   They confirmed that the dispute is largely about timing.  Plaintiffs' counsel argued different
25   ranges of dates for starting the process of providing these disclosures, from 120 days up to 200
26   days from the date of the DMC.  *Id.* at 30:19-24, 37:22-38:10.

27       As stated at the September 12th DMC, the Court **ORDERS** the non-Bellwether SD
28   Plaintiffs to begin rolling supplemental disclosures of the two categories of claimed past

3

compensatory damages (alleged property damage increases and alleged hiring numbers) by no later than **February 10, 2025**.  The Parties shall provide the Court with regular status updates regarding this issue in their monthly DMC Statements.

This **RESOLVES** Dkt. 1118.

### III.     Meta Organizational Charts

The Parties report a dispute regarding Meta's responses to Plaintiffs' Requests for Production ("RFPs") 68-70 and 290.  [Dkt. 1125].  The RFPs seek information relating to Meta's organizational charts and/or corporate directories that reflect relevant persons, teams, or other organizational structures within Meta responsible for the development, design, and implementation of the features named in Plaintiffs' Master Complaint, as well as those responsible for protecting the safety of users on Meta's platforms.  *See* Dkt. 1125-1.

The present dispute relates to Meta's use of a software tool called Workday, which provides applications for (among other things) human resources management within a company. Plaintiffs request that the Court order Meta to produce: "(1) pictographic representations for the 140 teams Plaintiffs identified in its response to DWQ Exhibit 11, 335 teams identified in Meta's response to DWQ [Deposition on Written Question] 68, and the 24 allocation areas Plaintiffs identified on August 7; (2) a native export from Workday that reflects *all* of Workday's native fields for those same organizational units; and (3) reproductions of the custodial reporting lines and directories produced to date that have been updated to reflect *all* of Workday's native fields in response to Requests No. 68-70 and 290."  Dkt. 1125 at 11.

Plaintiffs argue that: (1) the information sought "is essential to answering basic questions about how Meta's business is organized," particularly given that Meta has undergone a significant amount of employee turnover and reorganization over the last few years; (2) Meta can "easily" export this data from Workday; (3) the request is narrowly tailored to only a subset of Meta's allocation areas ("US Policy, Central Applied Science, and Instagram Safety Foundations Leadership"); and (4) the request is not unduly burdensome.  *Id.* at 9-11.

Meta argues that the request should be denied because: (1) the information Meta has already provided—"reporting structure, team, and employment details for 4,840 individuals over a

4

10-year period"— is more than enough to prepare for the already noticed Rule 30(b)(6) depositions; (2) any marginal benefit to Plaintiffs from additional productions would be outweighed by the burdens to Meta; and (3) Plaintiffs' request for "pictographic representations" from Workday would be particularly burdensome because Meta would have to manually arrange the data and create the pictographs using a Workday tool and working manually to arrange files, a task that Plaintiffs can do themselves, and something Meta is not required to do under the discovery rules. *Id.* at 11-13.

At the hearing, Meta's counsel further argued that Meta was unaware as to how Plaintiffs derived the "allocation areas." [Dkt. 1155 at 54:1-3]. Plaintiffs conceded that they do not need pictographs as to all of the requested teams, and instead stressed that they have not been provided information on many of the teams identified (whether in spreadsheets or other data). *Id.* at 43:11-44:7.

As stated at the September 12th DMC, the Court **DENIES** Plaintiffs' request for pictographic representations as unduly burdensome and disproportionate to the needs of the case. The Parties are free to further meet and confer, and in particular share information, about the technical (and manual work) burden involved in creating pictographs from the Workday platform to see if there is a less burdensome way to create a focused or narrowed subset of pictographs. If the Parties do further meet and confer on this issue, they shall include for each side personnel, consultants, or other persons knowledgeable about the technical features, functionality, and operation of the Workday software.

The Court further **ORDERS** the Parties to continue to meet and confer regarding Plaintiffs' request for spreadsheets containing Workday native fields data for the organizational units sought. To facilitate the narrowing of this dispute, Meta shall provide Plaintiffs with additional information regarding the nature of the 335 teams identified in Meta's responses to DWQ 68, and in particular, Meta shall provide a qualitative description as to how much each of those 335 teams are involved in issues pertaining to safety, privacy, integrity, and the issues in this case. The Parties shall also meet and confer promptly to discuss transparently what are the "allocation areas" identified by Plaintiffs (and from what documents Plaintiffs derived them), and

whether the already identified teams cover the teams within these allocation areas. Similar to the meet and confer to narrow the 335 teams, the Parties shall also undertake collaborative discussions to identify only relevant teams within these allocation areas. The Court strongly advises the Parties to communicate with each other and try to resolve these disputes without judicial intervention. The Parties shall provide a status update regarding this issue in the next DMC Statement.

This **RESOLVES** Dkt. 1125.

### IV. TikTok Deponents' Personnel Files

Plaintiffs seek documents from TikTok deponents' personnel files relating to performance reviews, disciplinary records, and compensation. [Dkt. 1126]. They argue that this information is relevant to show how TikTok sought to maximize revenues and prioritize user growth/engagement at the expense of youth users' safety. *Id.* at 10. They argue that this information cannot be gleaned merely from TikTok's compensation and disciplinary policies alone—they need to be able to see what the company did with these individual employees operationally on an individualized basis to incentive performance. *Id.* at 12. They argue that the request is narrowly tailored to only documents from the personnel files which mention or discuss the deponents' work in eight areas relevant to Plaintiffs' claims (Named Features, User Engagement, Platform Design, Health/Wellness/Safety, Age Verification & Parental Controls, Warnings/Terms of Service/Terms of Use, Marketing/Advertising that included U.S., and CSAM). *Id.* at 10 & n.5. They argue that any concerns regarding privacy are alleviated by the existence of a protective order governing this case. *Id.* at 12. At the hearing, Plaintiffs confirmed that they intend to seek personnel file information from the other Defendants as well. [Dkt. 1155 at 77:18-21].

TikTok argues that Plaintiffs' request for personnel files should be denied because it violates the deponents' privacy rights and Plaintiffs have failed to make a witness-by-witness showing of clear relevance and compelling need. [Dkt. 1126 at 12]. TikTok argues that whether a protective order is in place is irrelevant because Plaintiffs have failed to make a threshold showing that they are even entitled to these materials under the prevailing legal standard. *Id.* at 12-13. They also argue that the request is overly broad because it would be applied to TikTok deponents

6

who have not even been identified yet. *Id.* at 13 & n.10.

The Court finds Plaintiffs' request for the entirety of each and every TikTok deponents' personnel file information relating to "self-evaluations, performance reviews, 360 reviews, or similar documents and discipline records" to be disproportionate to the needs of the case. However, the Court finds that Plaintiffs have made an adequate showing under the legal standards that they are entitled to production of performance review and self-evaluation documents which explicitly mention, discuss, or are directed at any of the eight areas identified by Plaintiffs in the letter briefing from at least some of the twenty TikTok employees that have been noticed as early deponents. The Court finds that Plaintiffs have not made an adequate showing under the legal standards that they are entitled to even these limited set of documents from the files of *all* TikTok deponents, because based on the record presented, at least some of the deponents appear to be of relatively lower level in the company, and because requiring these documents from all deponents appears unnecessarily duplicative and/or disproportionate to the needs of the case.

Accordingly, the Court **ORDERS** the Parties to meet and confer to identify where each of the twenty TikTok deponents sits within the organizational hierarchy so that Plaintiffs can identify a reasonable subset of those deponents from which to request the limited personnel file information discussed above. Any such request shall be limited to only self-evaluations and performance reviews which discuss, mention, or are directed at those individuals' work in the eight areas specified by Plaintiffs in their letter briefing. In producing documents responsive to Plaintiffs' discovery requests for personnel file materials as thus narrowed, TikTok shall be permitted to redact, for privacy and relevancy purposes, any information that TikTok reasonably in good faith believes is truly confidential and/or sensitive personal information irrelevant to this case, as long as such redacted information is not responsive to the eight areas. TikTok shall provide a privilege log which includes all such redactions, including those for relevance.

This **RESOLVES** Dkt. 1126.

### V.  Meta Hyperlinks

The Parties report an ongoing dispute regarding Meta's production of hyperlinked

1  documents. [Dkt. 1120 at 28-33]. Plaintiffs state that, based on their review of documents
2  produced to date, it is apparent that Meta employees use hyperlinks almost exclusively in emails
3  rather than attachments. *Id.* at 28. The ESI protocol requires Meta to produce hyperlinks only
4  upon specific request by Plaintiffs. *See* Dkt. 690. Plaintiffs argue this process "is not working and
5  causing extreme prejudice." [Dkt. 1120 at 28].

6  The Parties provide competing proposals for hyperlinked document production but confirm
7  that the key dispute concerns the limitation on the volume of hyperlink requests that can be made
8  at any one time. *Id.* at 29-33. Plaintiffs propose that they be allowed one request per week for
9  hyperlinks from up to fifty documents (regardless of how many hyperlinks are in the fifty
10 documents). *Id.* at 29. Meta, by contrast, proposes that Plaintiffs be allotted one request per week
11 for up to fifty hyperlinks. *Id.* at 32. In essence, Plaintiffs propose a process under which an
12 unlimited number of hyperlinked documents would need to be searched for.

13 At the hearing, Meta confirmed that this search is a manual process, which cannot be
14 automated. [Dkt. 1155 at 93:22-25]. Plaintiffs argued that Meta's proposal is unreasonable
15 because the total number of hyperlinked documents at issue is likely to be high, simply because
16 Meta's employees use hyperlinks so extensively. *Id.* at 87:17-22. Plaintiffs also raised concerns
17 about the short time frame for hyperlink productions with respect to two upcoming depositions
18 scheduled for late October, given that the custodial files will only be produced on September 20,
19 2024. *Id.* at 90:11-21.

20 The Court **ORDERS** that Plaintiffs shall be allotted one request per week for *either* up to
21 fifty documents containing hyperlinks *or* 200 separate hyperlinks, whichever results in a lower
22 number of hyperlinked documents. The Parties shall provide the Court with a status update
23 regarding this issue in next month's DMC Statement.

24 For the two depositions scheduled for late October, upon completed production of those
25 deponents' custodial files, Plaintiffs shall begin making weekly hyperlink requests directed at
26 those deponents. Meta shall commence rolling production of the requested hyperlinks and shall
27 substantially complete production of the requested hyperlinked documents for these two
28 depositions by no later than **October 14, 2024**. Plaintiffs committed at the DMC to use

8

appropriate judgment and avoid unduly burdensome requests for numbers of hyperlinked documents, and thus the Court orders Plaintiffs to abide by this commitment. Meta shall communicate transparently with Plaintiffs regarding any specific hyperlinked documents that Meta reasonably believes will be difficult to produce by the substantial completion deadline. Meta shall complete all production of the requested hyperlinked documents for these deponents by no later than the Thursday prior to each deponent's scheduled deposition. In a similar manner, the Court expects the Parties to work collaboratively to identify and prioritize production of reasonable numbers of hyperlinked documents prior to the later-scheduled depositions.

The Parties shall promptly file a joint proposed order regarding resolution of this dispute by no later than **September 26, 2024**.

### VI.   MDL Bellwether SD Plaintiffs' Search Terms

The Parties report a dispute concerning Defendants' proposed search terms directed at the documents of the twelve Bellwether SD Plaintiffs. [Dkt. 1120 at 23-27; Dkt. 1132].

As a procedural matter, the Parties disagree whether it is appropriate to brief this issue in both the DMC Statement and separate letter briefing. [Dkt. 1120 at 23, 27]. Defendants argue that the DMC statement briefing appropriately addresses a dispute concerning "the process around negotiating search terms," while the separate briefing was appropriate to address the substantive merits of the specific search terms. *Id.* at 27. Plaintiffs argue that Defendants' bifurcated briefing of this dispute was improper. *Id.* at 23.

Defendants argue that Plaintiffs have significantly delayed the process of finalizing SD Bellwether search terms. *Id.* at 25. They argue that Plaintiffs have prejudiced the defense by failing to provide hit reports for two Bellwether Plaintiffs, delayed providing complete hit reports for the remaining ten Bellwether Plaintiffs, rejected ninety percent of additional search terms, and rejected attempts to narrow the dispute. *Id.* Defendants also argue that Plaintiffs unilaterally imposed a "budget" cap of 2.5 million documents which Plaintiffs could reasonably review, redact (for FERPA purposes), and process for production during the discovery period. [Dkt. 1132 at 12]. Defendants seek to compel the Bellwether SD Plaintiffs to search for and produce documents using additional search terms identified in Appendix A of the letter briefing. *Id.* at 12.

Plaintiffs argue that that practical constraints limit the total number of documents they can review, redact, and process for production given the deadlines in the case. *Id.* at 16. Plaintiffs insist that they are not trying to "cap" the number of documents. [Dkt. 1155 at 114:1-2]. They argue, more generally, that the additional search terms would require them to review millions more documents than could reasonably be reviewed and processed within the fact discovery deadline. *Id.* at 114:2-8. They argue that these budgetary and FERPA constraints make the addition of more search terms unduly burdensome and/or disproportionate. Plaintiffs argue that they already agreed on a subset of search terms and that it would not be feasible to review and process the volume of documents responsive to the proposed additional search terms within the existing case deadlines. Defendants confirm that they are willing to negotiate and drop or modify their additional search terms in order to address the burden and numerosity issues. *Id.* at 111:17-21. They state that they filed the discovery letter brief because they understood Plaintiffs to be refusing any additional search terms.

As an initial matter, the Court is disappointed that the Parties were unable to reach agreement on the procedural issue as to whether to brief this dispute in the DMC Statement or separate letter briefing. The Court reiterates its guidance to the Parties on this issue: To the extent that the Parties agree that a dispute is relatively small-scale and discrete and should be heard at the next DMC, the Parties should brief the dispute in their DMC Statement. To the extent that the dispute requires more fulsome discussion and/or analysis, the Parties should file separate letter briefing in accordance with the Court's Standing Order for Discovery. Whether briefed in the DMC Statement or in a separate filing, the Parties are always required to comply with the meet and confer requirements in Section H of the Court's Standing Order for Discovery. If a dispute is the subject of separate letter briefing, the DMC Statement should provide only a summary of the dispute—the DMC Statement should not be used as a vehicle for additional or new briefing on the dispute.

Regarding the issue relating to the SD Plaintiffs' time constraints caused by processing redactions pursuant to FERPA, the Court notes that, under 34 C.F.R. § 99.31(a)(9), the redactions required by the statute are waived if the disclosure is made "to comply with a judicial order or

10

lawfully issued subpoena" (so long as the educational entity "makes a reasonable effort to notify the parent or eligible student of the order or subpoena in advance of compliance"). *See Pitino v. Univ. of Louisville Athletic Assoc., Inc.*, No. 3:17-CV-722-DJH, 2018 WL 10798040, at *1 (W.D. Ky. June 28, 2018) (finding litigant may satisfy FERPA redaction requirements by serving the opposing party with a "lawfully issued subpoena" requesting the documents at issue). While somewhat unusual, a party may serve another party with a subpoena under appropriate circumstances (particularly where the party serving the subpoena is not attempting to circumvent the requirements of Rule 34 or the Federal Rules generally). *See* Wright & Miller, 8A Federal Practice and Procedure § 2108; *see also* 7 Moore's Federal Practice § 34.02[5][c]; *Mortgage Info. Servs., Inc. v. Kitchens*, 210 F.R.D. 562, 564 (W.D.N.C. 2002). If Defendants serve subpoenas on the Bellwether SD Plaintiffs which are identical to the document requests at issue, no redactions are required and thus the processing of those documents for production will be expedited (and thus the concern over a "cap" on the number of documents that could be reviewed and processed for production will be alleviated if not mooted). 34 C.F.R. § 99.31(a)(9)(i); *Pitino*, 2018 WL 10798040, at *1.

Accordingly, unless the Parties agree otherwise, and in the absence of another procedure mutually agreed upon by the Parties, the Court **ORDERS** Defendants to serve their written discovery requests directed at the existing search terms to the SD Plaintiffs as subpoenas. In light of the fact that the processing time for documents will be thereby mitigated, the Court further **ORDERS** the Parties to continue to meet and confer to narrow the scope of search terms. The Parties are directed to promptly and transparently share their respective hit count reports to facilitate the resolution of this dispute. Defendants shall be mindful not to demand additional search terms which are unduly burdensome, disproportionate, or redundant. Plaintiffs shall be mindful to be prompt and transparent in obtaining and sharing hit count reports. Such meet and confer shall recommence promptly.

The Parties are **ORDERED** to file a Joint Status Report regarding search term negotiations by no later than **September 19, 2024**.

This **RESOLVES** Dkt. 1132.

### VII. MDL/JCCP Bellwether PI Plaintiff Discovery Limits

The Parties report a dispute concerning the interrogatory and request for admission (RFA) limits applicable to the PI Bellwether Plaintiffs in both the JCCP and the MDL. [Dkt. 1134]. The Parties agree that each MDL Bellwether PI Plaintiff should be allowed to serve at least seven additional interrogatories (with two such interrogatories identically worded to Special Interrogatories Nos. 1 and 2 served by the JCCP Bellwether Plaintiffs in the JCCP) and seven additional RFAs. *Id.* at 12. However, the Parties continue to disagree as to three remaining issues.

First, Defendants request that four of the additional RFAs and one of the additional interrogatories served by the MDL Plaintiffs be identically worded (*i.e.,* "common") to those served by the JCCP Plaintiffs. *Id.* at 16. Plaintiffs argue that they need discretion to be able to serve case-specific discovery in the MDL and Defendants' proposal would defeat the purpose of additional discovery limits for Bellwether Plaintiffs (which is to address case-specific issues that differ from plaintiff to plaintiff). *Id.* at 12. Plaintiffs argue that the additional discovery allotted to the MDL Plaintiffs should be "common" only amongst the MDL Plaintiffs. *Id.* Fundamentally, Defendants define "common" interrogatories to be "common" across both the MDL and the JCCP, while Plaintiffs define "common" to be "common" for these purposes only across the MDL.

Second, the Parties dispute whether the MDL Plaintiffs should (like the JCCP Plaintiffs) be allotted additional written discovery related to affirmative defenses that does not count against the case-specific written discovery limits set by this Court. *Id.* at 13, 15. Defendants argue that only the JCCP Bellwether Plaintiffs are allowed to serve those form requests because they are unique to state court procedure and Judge Kuhl specifically allowed such requests (and ordered that the requests do not count against the overall discovery limits). *Id.* at 15.

Plaintiffs argue that Defendants are essentially trying to have it both ways—they are asking for the JCCP and MDL Bellwethers to be treated identically in some respects and differently in other respects, depending how the issue benefits Defendants. *Id.* at 12. Plaintiffs argue that Defendants are trying to "forum shop" and play the JCCP Court against the MDL Court. *Id.* at 13. Plaintiffs argue that the MDL Plaintiffs should be given "parity" with the JCCP

Plaintiffs and allowed to serve an additional five RFAs and a "form-like" interrogatory (basically the same as state court Form Interrogatory 17.1) related to affirmative defenses that are case-specific and that do not count against the case-specific discovery limits otherwise set by this Court. *Id.* Plaintiffs argue that Defendants have not even filed answers in the MDL, so it is impossible to know the scope of affirmative defenses at issue. *Id.* Defendants argue that the Parties negotiated the discovery limits in good faith, and that Plaintiffs never raised this issue of "affirmative defense" requests in the negotiations as a separate set of discovery over and above the agreed upon limits. *Id.* at 14-15.

Third, the JCCP Plaintiffs make clear they have not foreclosed the possibility of serving additional RFAs and form interrogatories beyond those served to date, particularly if new or different affirmative defenses are raised. [Dkt. 1155 at 131:23-132:3]. Plaintiffs argue that this issue should be addressed exclusively with Judge Kuhl because it concerns only the JCCP and does not implicate the MDL. [Dkt. 1134 at 13-14]. At the DMC, the Parties confirmed that there is no actual dispute regarding this issue for the Court to resolve. [Dkt. 1155 at 147:20-25].

Plaintiffs ask the Court to: (1) endorse the Parties' agreement on SD Bellwether discovery limits (set forth in footnote 2 of the Parties' letter briefing); (2) order that the MDL PI Bellwethers may serve seven case-specific interrogatories, with two of those interrogatories to conform to JCCP Special Interrogatories 1 and 2, four of those interrogatories to be individualized to each MDL PI Bellwether, and one of those interrogatories to be "common" across all MDL PI Bellwethers (but not "common" with the JCCP); (3) order that MDL PI Bellwethers may serve seven case-specific RFAs, with four of those RFAs common across the MDL PI Bellwethers; and (4) apply to the MDL PI Bellwethers Judge Kuhl's order permitting service of five additional RFAs and one form interrogatory as to affirmative defenses, with the understanding that MDL PI Bellwethers will not serve this discovery until after Defendants serve Answers or otherwise clarify the affirmative defenses they plan to assert. [Dkt. 1134 at 14].

Defendants complain that the Parties reached a carefully negotiated agreement as to additional discovery limits on September 4, 2024 (identified on page 4 of the letter briefing) but then Plaintiffs made "an eleventh-hour request" that amounted to a last-minute "grab" for even

13

more discovery. *Id.* at 14-15. Defendants argue that if the MDL PI Bellwethers really needed additional case-specific discovery allotments they would have asked for it sooner. Defendants argue that: (1) the MDL PI Bellwethers have not shown entitlement to the additional discovery sought; (2) any additional written discovery relating to affirmative defenses should count against the case-specific limits; (3) any "common" interrogatories and RFAs should be identical across both the JCCP and MDL; and (4) none of the Bellwether Plaintiffs (in either the MDL or JCCP) should be permitted to serve additional California form interrogatories (while acknowledging that the JCCP Bellwethers were previously allowed to serve affirmative defense related discovery requests per Judge Kuhl's ruling) without those counting against discovery limits otherwise. *Id.* at 15-16.

To the extent that the Parties dispute the MDL Bellwether PI Plaintiffs' entitlement to additional discovery limits relating to affirmative defenses, the Court finds that the issue is not yet ripe because, as Plaintiffs admit, the affirmative defenses are not yet known. Thus, the extent of additional discovery on affirmative defenses is not yet known. Accordingly, the Parties are **ORDERED** to meet and confer on this issue after Defendants' Answers are served.

Plaintiffs' request that the one additional interrogatory served by the MDL PI Bellwethers be common across only the MDL (but not the JCCP) is **GRANTED** with the understanding that Plaintiffs in the MDL will ensure (because they have already committed) that two of their "common" interrogatories are or will be identical to the Special Interrogatories already served by the JCCP Plaintiffs. Of the four additional RFAs allotted to the MDL Plaintiffs, the Court **ORDERS** that two of those RFAs shall be common across the JCCP and MDL and two shall be common across only the MDL.

To the extent Defendants ask the Court to prohibit the MDL PI Bellwethers from incorporating language from the California form interrogatories into interrogatories served in this MDL, the request is **DENIED**. The Court advises the Parties to be reasonable in the drafting of their written discovery requests.

Further, the Parties (including the JCCP Plaintiffs) are **DIRECTED** to meet and confer to discuss whether they can reach agreement that would allow discovery produced in the JCCP to be

14

usable in the MDL as if it were discovery in the MDL, and vice versa. The Court is concerned about allegations concerning attempts by any Party to play the MDL and JCCP proceedings off of each other. The Parties are free to meet and confer on any similar proposals which would avoid allegations of gamesmanship as between the two proceedings going forward.

The Parties shall file a proposed order regarding the resolution of all of these disputes on discovery limits by no later than **September 26, 2024**.

This **RESOLVES** Dkt. 1134.

### VIII.   Bellwether SD Plaintiff Discovery Limits

The Parties confirm that they reached agreement on the discovery limits governing the Bellwether SD Plaintiffs. [Dkt. 1134 at 12 & n.2]. The Parties shall file a proposed order regarding resolution of this issue by no later than **September 26, 2024**.

### IX.   Bellwether PI Plaintiff Forensic Image Search Term Productions

The Parties confirm that they are making progress on this issue and there are no ripe disputes for the Court to resolve. [Dkt. 1155 at 148:4-17]. The Parties report that they resolved a pending dispute regarding interim deadlines for the MDL Bellwether PI Plaintiffs to substantially complete search term productions of ESI from their forensically-imaged devices. *Id.*; *see* Dkt. 1121 at 5. The Parties shall provide a further status report on this forensic imaging and search terms issue by no later than **September 20, 2024**.

### X.   Meta Investigations

At the September 12th DMC, the Parties confirmed they have resolved their dispute relating to discovery pertaining to governmental investigations of Meta's practices (RFPs 286 and 287). [Dkt. 1155 at 150:5-14].

This **RESOLVES** Dkt. 1056.

**IT IS SO ORDERED.**

Dated:  September 17, 2024

_____
PETER H. KANG
United States Magistrate Judge