Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pschmidt@cov.com

Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.;
Instagram, LLC; Meta Payments, Inc.; and
Meta Platforms Technologies, LLC*

*Additional counsel listed on signature page*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| THIS DOCUMENT RELATES TO: | Case Nos. 4:22-md-03047-YGR-PHK |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | 4:23-cv-05448-YGR |
| | 4:23-cv-05885-YGR |
| *State of Florida, et al. v. Meta Platforms, Inc.* | 4:24-cv-00805-YGR |
| *State of Montana, ex. rel. Austin Knudsen  v. Meta Platforms, Inc.* | **META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** |
| | Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

**<u>TABLE OF CONTENTS</u>**

I.  INTRODUCTION .................................................................................................................. 1

II. BACKGROUND .................................................................................................................. 2

   A.  The States' Discovery Delays........................................................................................ 2

   B.  Judge Kang's Decision.................................................................................................. 5

      1.  Judge Kang Applied the Appropriate Test for Determining Legal Control. .......... 5

      2.  Judge Kang's Order Correctly Rejected the States' Separation-of-Powers
          Arguments.............................................................................................................. 6

      3.  The Order Correctly Dismissed Hypothetical Concerns of a "Virtual Veto."........ 6

      4.  Judge Kang's Order Properly Recognized that the Discovery Obligations Extend
          to State Agencies When the States *Qua* States Are the Real Parties in Interest. ..... 7

      5.  Judge Kang's Order Accurately Explained Why the Attorney-Client Relationship
          Between the States and State Agencies Supports a Finding of Control. ................. 7

      6.  Judge Kang's Order Properly Considered the Importance of Judicial Efficiency.. 8

      7.  Judge Kang's Order Analyzed Each State's Specific Legal Framework. ............... 8

III. LEGAL STANDARD .......................................................................................................... 9

IV. ARGUMENT ...................................................................................................................... 9

   A.  The States' Common Arguments Are Incorrect. .......................................................... 10

      1.  Judge Kang's Decision Is Not Contrary to Law. ................................................ 10

      2.  Judge Kang's Control Analysis Did Not Err, Let Alone Clearly........................ 11

      3.  The States' Remaining Objections Are Incorrect. .............................................. 13

   B.  The States' Individual Arguments Are Incorrect......................................................... 17

      1.  Arizona ............................................................................................................... 18

      2.  California ............................................................................................................ 19

      3.  Colorado............................................................................................................. 20

      4.  Connecticut ........................................................................................................ 21

      5.  Delaware ............................................................................................................ 21

6.      Florida ................................................................................................. 22

7.      Georgia ............................................................................................... 23

8.      Hawai'i ............................................................................................... 24

9.      Idaho ................................................................................................... 25

10.     Illinois ................................................................................................ 26

11.     Indiana ................................................................................................ 27

12.     Kansas ................................................................................................ 28

13.     Kentucky ............................................................................................ 29

14.     Louisiana ............................................................................................ 30

15.     Maine .................................................................................................. 30

16.     Maryland ............................................................................................ 32

17.     Michigan ............................................................................................ 33

18.     Minnesota ........................................................................................... 34

19.     Missouri ............................................................................................. 35

20.     Montana .............................................................................................. 36

21.     Nebraska ............................................................................................. 36

22.     New Jersey ......................................................................................... 37

23.     New York ........................................................................................... 38

24.     North Carolina ................................................................................... 38

25.     North Dakota ...................................................................................... 39

26.     Ohio .................................................................................................... 40

27.     Oregon ................................................................................................ 41

28.     Pennsylvania ...................................................................................... 42

29.     Rhode Island ...................................................................................... 42

30.     South Carolina ................................................................................... 43

31.     South Dakota ...................................................................................... 44

META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER
OF MAGISTRATE JUDGE

32.  Virginia ................................................................................................ 45

33.  Washington .......................................................................................... 45

34.  West Virginia ....................................................................................... 46

35.  Wisconsin ............................................................................................. 47

C.  If the Court Is Inclined to Reverse, It Should Resolve Meta's Argument that the States (and Their Component Agencies) Are Parties to This Litigation and Subject to Discovery. ................................................................................................................ 48

V.  CONCLUSION .................................................................................................... 49

META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Advisory Op. to Governor,*
  114 So. 850 (Fla. 1927) ........................................................................... 12

*In re Apple Inc. Sec. Litig.,*
  678 F. Supp. 3d 1147 (N.D. Cal. 2023)..................................................... 19

*Att'y Gen. v. Mich. Pub. Serv. Comm'n,*
  625 N.W.2d 16 (Mich. Ct. App. 2000)...................................................... 33

*Bank Line v United States,*
  76 F. Supp. 801 (S.D.N.Y. 1948) .............................................................. 14

*Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.,*
  2012 WL 6003540 (W.D. Tenn. Nov. 30, 2012) ............................... *passim*

*Bivens v. Lisath,*
  2007 WL 2891416 (S.D. Ohio Sept. 28, 2007) ......................................... 40

*Black v. Dep't of Lab. & Indus. of the State of Wash.,*
  131 Wash. 2d 547 (1997) .......................................................................... 45

*New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.,*
  233 F.R.D. 259 (N.D.N.Y. 2006).........................................................13, 38

*Bugg v. Md. Transp. Auth.,*
  358 A.2d 562 (Md. Ct. Spec. App. 1976).................................................. 12

*Bysiewicz v. Dinardo,*
  6 A.3d 726 (Conn. 2010) ........................................................................... 21

*State ex rel. Caryl v. MacQueen,*
  385 S.E.2d 646 (W. Va. 1989)................................................................... 46

*In re Citric Acid Litig.,*
  191 F.3d 1090 (9th Cir. 1999) ............................................................ *passim*

*Colorado v. Warner Chilcott Holdings,*
  2007 WL 9813287 (D.D.C. 2007) ............................................................ 13

*Common Cause R.I. v. Gorbea,*
  970 F.3d 11 (1st Cir. 2020)........................................................................ 42

*Compagnie Francaise d'Assurance v. Phillips Petrol. Co.,*
  105 F.R.D. 16 (S.D.N.Y. 1984) ...........................................................12, 14

*Cooper v. Aaron*,
   358 U.S. 1 (1958) ............................................................................................. 15

*Energy Pol'y Advocs. v. Ellison*,
   980 N.W.2d 146 (Minn. 2022)......................................................................... 35

*Freyre v. Hillsborough Cnty. Sheriff's Off.*,
   2016 WL 1029512 (M.D. Fla. Mar. 9, 2016) ................................................. 22

*Frohnmayer v. State Acc. Ins. Fund Corp.*,
   294 Or. 570 (1983) ........................................................................................... 41

*In re Generic Pharms. Pricing Antitrust Litig.*,
   571 F. Supp. 3d 406 (E.D. Pa. 2021)..............................................11, 12, 25, 42

*In re Generic Pharms. Pricing Antitrust Litig.*,
   699 F. Supp. 3d 352 (E.D. Pa. 2023)...................................................... *passim*

*In re Gold King Mine Release in San Juan Cnty., Colo., on Aug. 5, 2015*,
   2021 WL 847971 (D.N.M. Mar. 5, 2021) ...................................................... 13

*Goldmark v. McKenna*,
   172 Wash. 2d 568 (2011) ................................................................................. 45

*Grimes v. City & Cnty. of San Francisco*,
   951 F.2d 236 (9th Cir. 1991) ............................................................................. 9

*Harvey Aluminum (Inc.) v. N.L.R.B.*,
   335 F.2d 749 (9th Cir. 1964) ........................................................................... 14

*Humphrey on Behalf of State v. McLaren*,
   402 N.W.2d 535 (Minn. 1987) ........................................................................ 34

*Johnson v. Microsoft Corp.*,
   834 N.E.2d 791 (Ohio 2005) ........................................................................... 40

*Kennedy v. State*,
   411 S.W.3d 873 (Mo. Ct. App. 2013) ............................................................. 35

*League of United Latin Am. Citizens v. Abbott*,
   2022 WL 1540589 (W.D. Tex. May 16, 2022) ........................................ *passim*

*Linden v. Solomacha*,
   556 A.2d 346 (N.J. Super. App. Div. 1989) .................................................... 12

*Lobisch v. United States*,
   2021 WL 6497240 (D. Haw. Aug. 19, 2021) .................................................. 25

*People ex rel. Lockyer v. Superior Ct.*,
   122 Cal. App. 4th 1060 (2004) ...........................................................13, 19, 20

*Love v. N.J. Dep't. of Corr.*,
  2017 WL 3477864 (D.N.J. Aug. 11, 2017) ............................................................. 37

*Ly v. Nystrom*,
  615 N.W.2d 302 (Minn. 2000) ............................................................................... 34

*Marshall v. Chater*,
  75 F.3d 1421 (10th Cir. 1996) ................................................................. 15, 23, 30

*State ex rel. McGraw v. Burton*,
  569 S.E.2d 99 (W. Va. 2002) .................................................................................. 46

*Michalowski v. Head*,
  2010 WL 2757359 (D. Me. July 12, 2010) ........................................................... 31

*Miniace v. Pac. Maritime Ass'n*,
  2006 WL 335389 (N.D. Cal. Feb. 13, 2006) ......................................................... 11

*Minneapolis Police Officers Fed'n v. City of Minneapolis*,
  488 N.W.2d 817 (Minn. Ct. App. 1992) ............................................................... 34

*Morgan v. N.Y. State Dep't of Env't Conservation*,
  779 N.Y.S.2d 643 (2004) ........................................................................................ 38

*Neel v. Strong*,
  114 S.W.3d 272 (Mo. Ct. App. 2003) .................................................................... 35

*State ex rel. Olsen v. Pub. Serv. Comm'n*,
  283 P.2d 594 (Mont. 1955) ..................................................................................... 36

*In re Opioid Litig.*,
  2019 WL 4120096 (N.Y. Sup. Ct. Aug. 14, 2019) .......................................... 12, 38

*Perez v. Perry*,
  2014 WL 1796661 (W.D. Tex. May 6, 2014) ........................................................ 16

*In re PFA Ins. Mktg. Litig.*,
  2021 WL 5991681 (N.D. Cal. Nov. 4, 2021) ................................................. 2, 9, 11

*Illinois ex rel. Raoul v. Monsanto Co.*,
  2023 WL 4083934 (N.D. Ill. June 20, 2023) ................................................... 12, 26

*Rhode Island v. BTTR LLC*,
  No. PC-2022-04492 (Oct. 28, 2022) ...................................................................... 42

*Rimes v. Noteware Dev. LLC*,
  2010 WL 1644693 (N.D. Cal. Apr. 21, 2010) ....................................................... 41

*Seifi v. Mercedes-Benz U.S.A., LLC*,
  2014 WL 7187111 (N.D. Cal. Dec. 16, 2014) ....................................................... 11

*In re Sergeeva*,
  2015 WL 12866970 (N.D. Ga. Feb. 6, 2015) ............................................................... 10

*People ex rel. Sklodowski v. State*,
  642 N.E.2d 1180 (Ill. 1994) ...................................................................................... 26

*South Carolina v. Purdue Pharma L.P.*,
  2019 WL 3753945 (S.C. Ct. Com. Pleas, July 5, 2019) ....................................... 12, 43

*State v. Klattenhoff*,
  71 Haw. 598 (1990) .................................................................................................... 24

*State v. Purdue Pharma, L.P.*,
  2020 WL 13566522 (N.M. Dist. July 22, 2020) ........................................................ 12

*In re Thompson's Est.*,
  414 A.2d 881 (Me. 1980) ........................................................................................... 30

*Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*,
  925 N.E.2d 641 (Ohio Ct. App. 2009) ....................................................................... 40

*United States v. Am. Express Co.*,
  2011 WL 13073683 (E.D.N.Y. July 29, 2011) ........................................................... 12

*United States v. AT&T*,
  461 F. Supp. 1314 (D.D.C. 1978) ........................................................................ 12, 48

*United States v. Bennett*,
  2006 WL 2793170 (D. Haw. Sept. 27, 2006) ............................................................ 48

*United States v. Google*,
  698 F. Supp. 3d 876 (E.D. Va. 2023) ......................................................................... 37

*United States v. Nat'l Broad. Co.*,
  65 F.R.D. 415 (C.D. Cal. 1974) .................................................................................. 12

*United States v. Novartis Pharms. Corp.*,
  2014 WL 6655703 (S.D.N.Y. Nov. 24, 2014) ............................................................ 13

*Washington v. GEO Grp., Inc.*,
  2018 WL 9457998 (W.D. Wash. Oct. 2, 2018) ................................................... *passim*

*In re Water Use Permit Applications*,
  9 P.3d 409 (Haw. 2000) .............................................................................................. 24

**Statutes**

71 Pa. Stat. Ann. § 732-204 ............................................................................................ 41

15 U.S.C. § 6504 ............................................................................................................. 14

META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER
OF MAGISTRATE JUDGE

Ariz. Rev. Stat. § 41-192(A) .................................................................................. 18

Cal. Gov't Code §§ 12511, 11040, 11042, 11000 ................................................. 19

Colo. Rev. Stat. Ann. §§ 6-1-116, 24-31-101, 24-31-111, 24-31-111 ................... 20

Conn. Gen. Stat. Ann. § 3-125 .............................................................................. 21

Del. Code Ann., tit. 29, § 2507, 2508 ................................................................... 21

Fla. Stat. §§ 16.01, 16.015 ...............................................................................22, 23

Ga. Code Ann. §§ 45-15-3, 45-15-13, 45-15-14 ................................................... 23

Haw. Rev. Stat. §§ 26-7, 28-4 ............................................................................... 24

Idaho Code § 67-1401 ........................................................................................... 25

Ind. Code Ann. §§ 4-6-3-1, 4-6-5-2 ...................................................................... 27

Kan. Stat. Ann. §§ 75-702, 75-703 ...................................................................28, 29

Ky. Rev. Stat. §§ 12.210, 12.220, 12.230, 15.020, 367.160.............................29, 30

La. Stat. Ann. § 49:257 ......................................................................................... 30

Md. Code Ann., State Gov't § 6-106 ..................................................................... 32

Me. Rev. Stat. tit. 5, § 191; tit. 22, § 4008 ...................................................... 3031

Minn. Stat. § 13.393 .............................................................................................. 35

Mo. Ann. Stat. § 27.060 ........................................................................................ 35

Mont. Code Ann. §§ 2-6-1013, 2-15-201 .............................................................. 36

N.C. Gen. Stat. §§ 114-2, 147-17 .......................................................................... 38

N.D. Cent. Code § 54-12-01 .................................................................................. 39

N.J. Stat. Ann. § 52:17A-4 .................................................................................... 37

N.Y. Exec. Law § 63 ............................................................................................. 38

Ohio Rev. Code § 109.02 ...................................................................................... 40

Or. Rev. Stat. Ann. § 180.220................................................................................ 41

R.I. Gen. Laws § 42-9-6 ........................................................................................ 42

S.C. Code Ann. § 1-7-80 ....................................................................................... 43

S.D. Codified Laws §§ 1-11-1, 37-1-23 ........................................................... 44

Va. Code Ann. §§ 2.2-507, -510, -513 ............................................................ 44

W. Va. Code Ann. §§ 5-3-1, 5-3-2 .................................................................. 46

Wash. Rev. Code Ann. § 43.10.040 ................................................................ 45

Wis. Stat. Ann. § 165.25 ................................................................................. 47

**Other Authorities**

Federal Rule of Civil Procedure 26 .................................................................. 5

Federal Rule of Civil Procedure 34 ........................................................... *passim*

Federal Rule of Civil Procedure 45 ..................................................... 6, 14, 15

Federal Rule of Civil Procedure 72 .................................................................. 9

"About the Office of the Attorney General," Cal. Dep't of Just., Off. of the Att'y Gen. .......................... 4

"2024-25 Budget Proposal," Cal. Legis. Analyst's Off. ................................... 4

Ga. Const. art. V, § 3, ¶ IV ............................................................................. 23

Ill. Const. art. V, § 15 ..................................................................................... 26

La. Const. art. IV, § 8 ...................................................................................... 30

## I.     INTRODUCTION

The States have chosen to sue in federal court, invoking a novel construction of a federal statute (COPPA) that would be unavailable to them in state court. They did so with the promise to the Court—since broken—that they would progress this case swiftly. That decision to sue here comes with benefits for the States and their AGs, like the ability to seek and utilize discovery beyond the far-reaching investigation they undertook before bringing suit. But it also comes with duties, including being subject to the same reasonable discovery that any civil litigant would face.

The current appeal by the States is part of a half-year pattern of delaying their responses to Meta's reasonable discovery requests. They ask the Court to treat as third parties the state agencies on whose behalf they are suing, whose work involves analyzing the kinds of harms alleged here, and who in most cases they represent. This shell game has massively burdened the Court and Meta. It forced Judge Kang to spend four months writing a 248-page opinion rejecting repetitive and unsupported arguments from the States. And, because of the States' refusal to produce agency documents within their control, Meta was forced to issue over 130 subpoenas, and separately negotiate objections premised (incorrectly) on the agencies' third-party status, all to receive miniscule productions to date.

This Court should affirm Judge Kang's decision. He employed the correct legal standard (as the States concede), and the States fail to identify any meaningful errors (let alone clear errors warranting reversal) in his application of that standard. Under Ninth Circuit law, a party has discovery obligations with respect to documents it has the "legal right to obtain." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999). Judge Kang correctly held that the AGs suing on behalf of their states have such control over the documents of their state agencies.[1] And he correctly recognized that this view was reinforced by the Court's practical interest in progressing this litigation, citing "the potential for these parties to present over 200 allegedly separate disputes over these subpoenas to this Court, with the potential for raising inconsistent or contradictory arguments." Order Granting-in-Part and Denying-in-Part Meta's Request for Party Discovery on Third-Party State Agencies ("MJ Order") (Dkt. 1117) at 40. Other courts confronted the same burden from some of these same States in unrelated suits, *id.*, and it has already

---

[1] The only state court overseeing an individual state AG social media lawsuit to have addressed this issue reached essentially the same holding. *See* Dkt. 882-1.

1   manifested here, with Meta forced to undertake burdensome third-party subpoena efforts in light of the

2   States' delay.

3       The States' objections fail to show that Judge Kang's meticulously reasoned 248-page decision

4   was "clearly erroneous or contrary to law."  *See, e.g.*, *In re PFA Ins. Mktg. Litig.*, 2021 WL 5991681, at

5   *1 (N.D. Cal. Nov. 4, 2021) (Gonzalez Rogers, J.).  "This standard is not easily satisfied because it affords

6   the magistrate judge significant deference," and "the reviewing court may not simply substitute its

7   judgment for that of the deciding court."  *Id*. (cleaned up); *see also* MJ Order at 248 (noting that the States

8   "preemptively declared at oral argument their intent to appeal any adverse ruling on 'control' before they

9   even saw this Order or this Court's reasoning").  The States fail to meet this standard.  Through their

10  appeal, the States continue to "elevate[] form over substance," by seeking to force Meta to pursue

11  necessary discovery through hundreds of subpoenas on entities the AGs themselves "*will be* representing."

12  MJ Order at 39.  Having failed to identify reversible legal or factual error in Judge Kang's ruling, the

13  Court should deny their appeal and affirm Judge Kang's Order.[2]

14  **II.   BACKGROUND**

15      **A.   The States' Discovery Delays**

16      The States have profoundly delayed in providing reasonable discovery.  Meta told the AGs it would

17  seek discovery from their state agencies at the start of the year and then served that discovery in February.

18  When the States took an absolutist position—refusing to produce any agency discovery themselves, even

19  as most of the AGs would represent their agencies if subpoenaed in this action—Meta promptly presented

20  this issue to Judge Kang in February (Dkt. 617) and March (Dkt. 685).  Meta argued that the States

21  themselves were parties to this proceeding, as courts have repeatedly held, and alternatively that the

22  agencies' documents were under the "control" of the States for discovery purposes, as courts have likewise

23  repeatedly held.  Dkt. 685 at 6–8.

24

25  ---

26  [2] If the Court is inclined to reverse any of Judge Kang's findings on control, it should nonetheless affirm his order on an alternative ground that, as Meta understands his order, he did not reach: because the States themselves are parties to this proceeding, the entire state (including its agencies) is subject to party discovery on that basis alone, regardless of any findings of control.  As Meta explains below, that issue was fully briefed and many courts have held that party discovery into agencies is appropriate on that basis. *E.g.*, *Washington v. GEO Grp., Inc.*, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018).

27

28

Judge Kang's 248-page opinion rejected the States' hardline position.  The opinion also made clear that the States' manner of litigating this issue had delayed its resolution until this month, by burdening the Court with:

- "expend[ing] its valuable resources analyzing over thirty-five briefs on this 'control' issue (where the State Attorneys General requested that the issues here required separate briefing for each State)," MJ Order at 248;

- "conduct[ing] multiple hearings on this issue (where ultimately only a handful of the States presented oral argument)," *id.*; and

- "prepar[ing] this admittedly lengthy Order (where, as discussed above, a large number of the arguments overlapped and repeated, with only slight variations, from state to state)," *id.*

As noted, this six-month delay prejudiced Meta and forced Meta to undertake costly efforts to obtain third-party discovery from the state agencies.  Yet the agencies have produced a paltry 5,000 documents to date.[3]

The States' appellate strategy seeks to continue this delay.  They moved Judge Kang to stay their discovery obligations under the Order, even as some of their agencies have informed Meta they will not respond to pending subpoenas in light of Judge Kang's Order.  Judge Kang has not yet ruled on the stay request, but he did issue a minute order cautioning the States not to "delay or impede the progress of discovery, negotiations over discovery, and the timely production of discovery."  Dkt. 1174.

The States' delay here is not the only way they have impeded progression of these cases by insisting that a different standard be applied to them than to other federal litigants.  After asking the Court in January to give them special treatment and "prioritize[]" their cases, representing that they "would like to see this process moved along" and that "[w]e believe we can be ready for trial in spring of next year," 1/26/24 CMC Tr. at 54:20–25, 64:18–19, the States have delayed the cases' progress in several ways:

- ***State document holds***:  In July, a half-year after they sued and years after they began their investigation, a large number of the AGs revealed that they had not issued document hold notices.  Meta was forced to seek relief from Judge Kang to ensure they imposed document holds even in just their offices (let alone State agencies, for which Meta has been told that only seven of 35 States

---

[3] Remarkably, the States now blame Meta for not attempting to work around their hardline position earlier, even though Judge Kang decisively rejected that position.

have issued, or were in the process of issuing, some form of notice to unspecified agency recipients. Judge Kang understandably directed them to impose holds for the AGs' offices.

- **Meta's document productions**: In June, when the other plaintiff groups had largely completed serving document requests on Meta and proposing search terms, the States were still unable to commit to concluding their document requests (even though by that point they had already served 147 RFPs and the substantial completion cutoff was nearing) or search term demands (because they had largely not participated in the other plaintiffs' negotiations with Meta). When Judge Kang directed them to promptly conclude these efforts, they attempted to delay because of expert "summer vacations" and lawyer "sabbatical[s]," 6/20/24 DMC Tr. at 32:7–11, and got permission to serve a Third Set of RFPs (which were supposed to be targeted but were in fact sweeping). This delay has made it meaningfully more challenging for Meta to meet its document production obligations.

- **Meta's depositions**: The States have been slow in taking the massive volume of Meta depositions that they seek. Just weeks ago, State counsel (along with the MDL and JCCP co-counsel) postponed a Meta deposition that they had already rescheduled several times. The justification: Meta produced too many documents, and they were unwilling to dedicate resources to review them, even though they would have obtained them a month prior to the scheduled deposition.[4] As a result of this delay, not one deposition of a Meta fact witness has yet been taken.

- **Initial disclosures:** The States tried to claim that they were exempt from having to provide initial disclosures and that "the large proportion of the evidence and the witnesses are going to be with Meta, not with us." 1/25/24 DMC Tr. at 118:9–12. Judge Kang rejected that request for

---

[4] The States' repeated suggestions that they lack resources to prosecute their claims are belied by the facts. The California AG's webpage boasts that their resources include "more than 5,600 lawyers, investigators, sworn peace officers, and other employees." "About the Office of the Attorney General," Cal. Dep't of Just., Off. of the Att'y Gen., https://oag.ca.gov/office. The California DOJ's estimated budget for 2023–24 is more than $1.3 billion. "2024-25 Budget Proposal," Cal. Legis. Analyst's Off., https://lao.ca.gov/Publications/Report/4831. Thirty-four other AGs are part of this case, and they continue to coordinate with other AGs who are proceeding in their own courts.

special treatment:  "I don't think there's any exception in Rule 26 for a party not to give initial disclosures just because they're a government agency."  *Id.* at 118:13–15.

**B.    Judge Kang's Decision**

Judge Kang's comprehensive decision anticipates and refutes the States' repeatedly rehashed arguments.  *See, e.g.*, Dkts. 617 at 19–20, 648 at 2, 667 at 3–4, 685, 716 at 1–3, 738, 818; *see also* MJ Order at 248 (noting that the Court expended "valuable resources" considering "over thirty-five briefs," conducting "multiple hearings," and issuing an "admittedly lengthy Order").

1.    Judge Kang Applied the Appropriate Test for Determining Legal Control.

Judge Kang exhaustively detailed the bases for his finding that the States have control over state agency documents for purposes of discovery.  Judge Kang correctly articulated the appropriate standard for determining if the States have legal control over the agencies' documents: whether the States have "the legal right to obtain documents on demand."  MJ Order at 5 (quoting *Citric Acid*, 191 F.3d at 1107).  Applying the controlling *Citric Acid* test, Judge Kang undertook a "fact specific inquiry" and considered the totality of the circumstances, *id.* at 6, recognizing that past courts "have interpreted 'control' broadly," *id.* (quoting *Hitachi, Ltd. v. AmTRAN Tech Co.*, 2006 WL 2038248 (N.D. Cal. July 18, 2006)).  Judge Kang's Order rightly recognized that an AG "acting as a civil litigant" must "endure the rules of procedure and discovery" and is "placed in the same position as a private litigant."  *Id.* at 8 (cleaned up) (quoting *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009); *Exxon Shipping Co. v. U.S. Dep't of Interior*, 34 F.3d 774, 776 n.4 (9th Cir. 1994)).  Though, for instance, each State's "constitutional or statutory scheme" may be considered, *id.* at 9, a State cannot nullify the application of the Federal Rules of Civil Procedure.  If the Court finds that a State exercises control over state agency documents (which it generally has here), the State must comply with its discovery obligations under Rule 34, notwithstanding any state law purportedly to the contrary.  *Id.* at 10–12.[5]

---

[5] Several States argue that state open-records laws bar them from obtaining the documents possessed by state agencies.  The Order correctly rejects these arguments, including because they would require an AG representing an agency to utilize the open-records provisions to obtain documents from their own client. MJ Order at 35.  Indeed, if taken to their logical extension, the States' assertions indicate that each AG "can literally obtain requested documents upon demand," a "routinely used legal right to access those documents" constituting legal control under the *Citric Acid* test.  *See id.*

5

2.    <u>Judge Kang's Order Correctly Rejected the States' Separation-of-Powers Arguments.</u>

Each State argued that, because governors and attorneys general are "independently elected and control separate governmental functions," an AG cannot exercise legal control over an executive agency's documents. *See* Dkt. 685 at 9–10.  Judge Kang correctly recognized the fundamental "logical fallacy" of this position: whether an AG occupies a "distinct sphere of government" vis-à-vis a governor "does not necessarily impact whether or not there is control of documents for purposes of discovery."  MJ Order at 14.  The States' argument—that because AGs are legally distinct from the identified agencies, the AGs can never exercise control over their documents—is circular and "unpersuasive."  *Id.* at 13.  That the AGs do not exercise "operational, day-to-day control" over agencies and lack "unfettered access" to agency documents is not determinative.  *Id.* at 15.  The appropriate inquiry focuses on whether the AGs exercise legal control over state agency documents for purposes of discovery.

The States' arguments concerning their discretion to file suit on behalf of the states is similarly unavailing.  While the States may have broad discretion to exercise their prosecutorial authority, this discretion does not imply a lack of control over agency documents.  *Id.* at 19.  Indeed, the contrary is true: the AGs' exclusive power to litigate on behalf of the states is entirely "consistent with having a right to exercise authority to obtain documents from other agencies."  *Id.* at 20 (citations omitted).

3.    <u>The Order Correctly Dismissed Hypothetical Concerns of a "Virtual Veto."</u>

The States argued that treating the state agencies as parties for purposes of discovery would grant the agencies a "virtual veto" over the States' decision to bring and litigate cases.  Judge Kang correctly found this argument to be both "unfounded" and incorrect, as nothing would prevent the AGs from "initiat[ing] and prosecut[ing their] own lawsuits."  *Id.* at 22.  Accordingly, the "virtual veto" argument is "based on a hyperbolic, worst-case scenario."  *Id.* at 23.

Indeed, the States never explained why state agencies—often *required* by law to rely on the AGs for all legal services—would refuse to comply with any Rule 34 discovery ordered by the Court in this litigation (and face the prospect of sanctions), but would comply with third-party discovery under Rule

45.[6]  *Id.* at 22–23.  Nor did the States explain why a state agency would not have the "exact same 'virtual veto'" under the AGs' theory of control by "obstinately refus[ing] to produce any documents at all in response to a subpoena."  *Id.*  The AGs, as counsel for the agencies, are subject to "professional and ethical duties" to "conduct or directly supervise [the agencies'] collection, review, and production of responsive documents" as necessary.  *Id.* at 24–25.  "[C]ounsel's legal duty to ensure the collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery."  *Id.* at 27.

        4.    <u>Judge Kang's Order Properly Recognized that the Discovery Obligations Extend to State Agencies When the States *Qua* States Are the Real Parties in Interest.</u>

As Judge Kang explained, thirty-two of the states are directly parties to the suit.  *Id.* at 17.  Under similar circumstances, courts have held that "discovery obligations extend to other government agencies even if they are non parties" where the state "is essentially the real party in interest."  *Id.* (citing *Harvey Aluminum (Inc.) v. N.L.R.B.*, 335 F.2d 749, 754 (9th Cir. 1964); *Bank Line v United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948); *Ghana Supply Comm'n v. N. Eng. Power Co.*, 83 F.R.D. 586, 595 (D. Mass 1979)).  Moreover, the Order examined analogous cases in which state agencies were found to be state agents, and noted that "a principal-agent relationship has been held to be a factor that supports a finding of control for purposes of discovery."  *Id.* at 18 (collecting cases).  The same reasoning applies here— under the totality of the circumstances, the AGs, representing the states as sovereign wholes, must respond to discovery requests aimed at the state's agencies.  *See also id.* at 20 (discussing cases holding that "when a state Attorney General initiates litigation on behalf of the state, and thus exercises authority to file a lawsuit *parens patriae*, that Attorney General has legal control over agency documents").

        5.    <u>Judge Kang's Order Accurately Explained Why the Attorney-Client Relationship Between the States and State Agencies Supports a Finding of Control.</u>

---

[6] Moreover, the MJ Order accurately captures the reality of this litigation: "[w]hen litigation proceeds directly support or fund a state agency, it is reasonable to expect full cooperation in the discovery process."  *Id.* at 36.  Close alignment of interests, financial or otherwise, lends support to a finding of a party's control over non-party documents.  *Id.*  The States have indicated that their filing this suit is in the public interest, "and thus have made clear they have a substantial stake in the outcome of this action."  *Id.* at 37.  It is therefore particularly unlikely that state agencies will refuse to comply with the States' requests.  More fundamentally, as the MJ Order notes, both the AGs and the Court have tools at their disposal to compel compliance with discovery obligations—including court-ordered sanctions.

As the Order correctly recognized, "[t]he close coordination underlying an attorney-client relationship is a factor in the legal control analysis," with courts generally recognizing that counsel is presumed to exercise control over documents possessed by their clients. *Id.* at 28. The AGs submitted briefs confirming that most, if not all, of the States will (or will likely) represent the identified agencies. *Id.* at 28. This relationship "establishes a direct legal link between the agency and the plaintiff . . . , thus supporting a finding of control." *Id.* at 29 (citation omitted). In cases in which the agency is required by statute to utilize an AG's legal services, the AG has "*legally mandated*" access to the agency's documents to ensure that they "can fulfill their duties under the Federal Rules" and their "professional and ethical obligations." *Id.* Moreover, the Order notes that the States cannot avoid their discovery obligations simply because they might represent both the named plaintiff (the individual states or attorney general offices) *and* the identified agencies. *Id.* at 31. Precedent makes clear that governmental parties represented (or employed) by an attorney general may have constructive control over the documents possessed by non-party agencies. *Id.* at 32. "[T]hese precedents are even more germane to the twenty-four cases here where the state Attorney General themselves are the specifically named plaintiff or co-plaintiff." *Id.* at 33.

### 6. Judge Kang's Order Properly Considered the Importance of Judicial Efficiency.

The Order appropriately factored in the need for trial courts "to consider the goals of efficiency, preservation of judicial resources, preservation of party resources, and simplification of an already complex discovery landscape." *Id.* at 38. Especially in the context of this MDL, requiring Meta to serve hundreds of subpoenas on the agencies risks grinding the entire litigation to a halt. *See id.* at 40–41. The Court would be required to consider and rule on dozens, if not hundreds, of disputes related to the subpoenas, raising the risk of conflicting or inconsistent arguments. *Id.* at 40. Such an outcome is particularly unacceptable "where all parties and this Court know that the [AGs] *will* be representing those state agencies in responding to [Meta's] subpoenas." *Id.* at 39.

### 7. Judge Kang's Order Analyzed Each State's Specific Legal Framework.

After setting out the fundamental principles of governing law and addressing cross-cutting arguments, the Order turned to each State's statutory framework and the individualized arguments the Parties presented. Generally, Meta pointed to statutes and caselaw providing that the AG is the state's sole legal officer and counsel for state agencies, which indicated that the AG has the right to access the

agency's documents for litigation purposes.  *See, e.g.*, MJ Order at 50 (California).  In many cases, state agencies are statutorily barred from hiring legal counsel other than the AG (or doing so without the AG's consent).  *See, e.g.*, *id.* at 59 (Colorado).  In certain cases, statutes or caselaw make clear that the AG has exclusive control over legal matters for the state, or explicitly grant access to agency documents to the AG for litigation purposes.  *See, e.g.*, *id.*at 200 (Pennsylvania).

In most cases, Judge Kang noted that the States failed to point to any statute barring access by the AG to agency documents for litigation purposes.  *E.g.*, MJ Order at 49.  Further, most States argued or reserved the ability to argue that the attorney-client privilege would apply to communications between AG offices and agencies, and they conceded that most AGs *would* represent most agencies in responding to third-party subpoenas served by Meta.  *E.g.*, id. at 58.  In addition, Judge Kang analyzed the agencies from which Meta sought discovery and found that most of them should be subject to party discovery based on the applicable legal frameworks.  Finally, Judge Kang noted that courts have held that, in many of the states at issue, AGs had control over agency documents for purposes of discovery—and that agency documents have been produced in those prior cases.  Judge Kang held that the net result was that the AGs had control over the documents of most agencies at issue.

## III.    LEGAL STANDARD

Magistrate judges' determinations of nondispositive matters are "entitled to great deference by the district court."  *PFA Ins.*, 2021 WL 5991681, at *1 (quoting *United States v. Abonce-Barrera*, 257 F.3d 959, 969 (9th Cir. 2001)).  District courts may only reverse magistrate judges' decisions if they are "clearly erroneous" or "contrary to law."  FRCP 72(a).  "The reviewing court may not simply substitute its judgment for that of the deciding court."  *Grimes v. City & Cnty. of San Francisco*, 951 F.2d 236, 241 (9th Cir. 1991).  "This standard is not easily satisfied."  *PFA Ins.*, 2021 WL 5991681, at *1.  Determinations subject to clear-error review may only be set aside if the district court "is left with a definite and firm conviction that a mistake has been committed."  *Id.* (quoting *Perry v. Schwarzenegger*, 268 F.R.D. 344, 348 (N.D. Cal. 2010) (cleaned up)).

## IV.    ARGUMENT

The Court should overrule the States' objections.  Meta first addresses the States' common objections before addressing each State's specific arguments.

### A. The States' Common Arguments Are Incorrect.

#### 1. Judge Kang's Decision Is Not Contrary to Law.

The States attempt to manufacture legal errors or spin various disagreements with Judge Kang's Order into errors of law. But the purported "errors" are either not issues of law in the first place, or not errors at all. Tellingly, the States barely acknowledge the clear-error standard.

*First*, Judge Kang applied the correct legal standard. The States do not dispute that the Ninth Circuit has held that the proper test for determining control is whether a party has the legal right to obtain documents. *See Citric Acid*, 191 F.3d at 1107; Mot. 2. That is precisely the standard that Judge Kang applied. *See, e.g.*, MJ Order at 5–6. Most of the States' remaining purported "legal errors" are just alleged flaws in how Judge Kang applied the legal test—and therefore subject only to clear-error review. *See, e.g.*, *In re Sergeeva*, 2015 WL 12866970, at *3 (N.D. Ga. Feb. 6, 2015) (applying clear-error standard to magistrate judge's findings regarding control). For example, the States appear to argue that because AGs and agencies are formed separately, Judge Kang's control analysis is somehow contrary to law. Mot. 5–6. But that argument—that the AGs and agencies are separate—is in reality just a disagreement with Judge Kang's fact-specific application of the legal standard. The Court should reject this attempt to refashion these issues into purported errors of law (to be reviewed de novo). For the reasons explained in Judge Kang's Order and in the balance of this brief, most of the States' objections should be analyzed under the clear-error standard (despite the States' attempts to cast them as errors of law) and were correct.[7]

*Second*, the States argue that Judge Kang improperly shifted the burden to them to demonstrate they lacked control. Mot. 8. But Judge Kang explicitly stated that "Meta has the burden" of demonstrating control. MJ Order at 5. And throughout his Order, Judge Kang placed the burden on Meta to demonstrate control under States' statutory frameworks. For example, for each State, Judge Kang examined the authorities Meta put forward demonstrating each AG's control and determined whether the standard was met. *See, e.g.*, MJ Order at 44–47 (Arizona). Of course, Judge Kang also examined the argument put forward by the States about why they lacked control, but that is just ordinary analysis of the Parties' arguments, and not evidence that Judge Kang shifted the burden to the AGs. More fundamentally,

---

[7] If the Court concludes that any of the challenged determinations are not subject to clear-error review, those determinations are also legally sound for the reasons in the Order and explained in this brief.

examining whether there was a prohibition on an AG obtaining agency documents (which is what the States' argument boils down to challenging) is proper.  As other courts have held, that is one factor in the control analysis.  *See, e.g.*, *Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, 2012 WL 6003540, at *3 (W.D. Tenn. Nov. 30, 2012), *supplemented*, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012).  But Judge Kang never held, stated, or implied that the lack of a prohibition *alone* sufficed—as his substantive analysis shows.  *See, e.g.*, MJ Order at 36 ("While other statutes discussed below may be factors in the legal control analysis, such statutes are only one among the totality of factors for deciding control and the discussion above regarding the impact (or lack thereof) of state statutes on this issue is of equal force.").  If Judge Kang had *not* examined whether there were such prohibitions, the States would no doubt claim error, but that is not the case here.

### 2.    Judge Kang's Control Analysis Did Not Err, Let Alone Clearly.

Judge Kang's Order carefully applied the legal standard that all agree governs, in a manner that accords with other courts' decisions on the issue.  The States fail to demonstrate any errors in it, let alone overcome the "significant deference," *PFA Ins.*, 2021 WL 5991681, at *1, it is owed.

Under *Citric Acid*, the question is whether a party has the "legal right to obtain" documents.  191 F.3d at 1107–08.  And because that is a factual question that depends on the circumstances, "[t]he determination of control is often fact specific."  *Miniace v. Pac. Maritime Ass'n*, 2006 WL 335389, at *2 (N.D. Cal. Feb. 13, 2006).  That inquiry can be affected by the "interplay" of entities with legal frameworks that govern them—those frameworks might compel, grant, or deny access to documents.  *See, e.g.*, *Seifi v. Mercedes-Benz U.S.A., LLC*, 2014 WL 7187111, at *3 (N.D. Cal. Dec. 16, 2014) (examining impact of federal regulations on control).  So, in the case of AGs and state agencies, courts applying the right-to-obtain standard have time and again looked to the specific statutory frameworks that govern the relationship between AGs and agencies.  *See, e.g.*, *In re Generic Pharms. Pricing Antitrust Litig.* (*Generic I*), 571 F. Supp. 3d 406, 409 (E.D. Pa. 2021).  That is precisely what Judge Kang did: he examined the particular framework governing each AG and each state agency to determine whether the AG had a right to obtain the agency's documents.  *See generally* MJ Order at 42–247.

In taking this approach, Judge Kang joined every other federal court applying the right-to-obtain test in holding that (depending on the facts) AGs possess control over agencies' documents for litigation

purposes.  *See Illinois ex rel. Raoul v. Monsanto Co.*, 2023 WL 4083934, at *5 (N.D. Ill. June 20, 2023); *League of United Latin Am. Citizens v. Abbott* (*LULAC*), 2022 WL 1540589, at *2 (W.D. Tex. May 16, 2022); *In re Generic Pharms. Pricing Antitrust Litig.* (*Generic II*), 699 F. Supp. 3d 352, 357 (E.D. Pa. 2023); *Generic I*, 571 F. Supp. 3d at 409; *Shelby Cnty.*, 2012 WL 6003540; *see also State v. Purdue Pharma, L.P.*, 2020 WL 13566522, at *2 (N.M. Dist. July 22, 2020).  Those decisions are in addition to the cases holding that when the AG sues, the state is the party, so the state (and agencies) is subject to party discovery.  *See LULAC*, 2022 WL 1540589, at *2; *GEO Grp.*, 2018 WL 9457998, at *3; *Compagnie Francaise d'Assurance v. Phillips Petrol. Co.*, 105 F.R.D. 16, 35 (S.D.N.Y. 1984); *United States v. AT&T*, 461 F. Supp. 1314, 1333–34 (D.D.C. 1978); *United States v. Nat'l Broad. Co.*, 65 F.R.D. 415, 419 (C.D. Cal. 1974); *see also In re Opioid Litig.*, 2019 WL 4120096 (N.Y. Sup. Ct. Aug. 14, 2019); *South Carolina v. Purdue Pharma L.P.* (*Purdue*), 2019 WL 3753945, at *2 (S.C. Ct. Com. Pleas, July 5, 2019); *Linden v. Solomacha*, 556 A.2d 346, 347 (N.J. Super. App. Div. 1989); *Bugg v. Md. Transp. Auth.*, 358 A.2d 562, 569 (Md. Ct. Spec. App. 1976); *In re Advisory Op. to Governor*, 114 So. 850, 855 (Fla. 1927).

Instead of addressing these cases, the States raise the specter of "every agency [being] subject to burdensome party discovery every time an AG initiated a consumer protection suit in federal court."  Mot. 8.  But this is precisely the sort of "unfounded hypothetical" the Order considered and rejected.  MJ Order at 23.  Even in the alternate reality presented by the States, in which a "payday lender sued by an AG" seeks discovery from a state governor not party to the litigation, the States are incorrect that they would be automatically "required to obtain the documents" sought by the lender-defendant.  Mot. 8.  In that case, the State and its agencies would still be protected by federal discovery limits, including relevance, proportionality, and undue burden–and could seek relief from the court for unreasonable or abusive discovery demands.  Those limitations entirely address the States' hypothetical parade of horribles.  The States' proposal of a blanket rule that no agency is ever subject to party discovery is not necessary to protect the agencies' legitimate interests.

By contrast, almost every federal case cited by the States did *not* apply the right-to-obtain test or did *not* analyze the statutory frameworks to determine whether there was a right to obtain.  Most began and ended their analysis by asking whether the AG and the agency were subject to common "executive control" or formed separately.  *See United States v. Am. Express Co.*, 2011 WL 13073683 (E.D.N.Y. July

29, 2011); *Colorado v. Warner Chilcott Holdings*, 2007 WL 9813287 (D.D.C. 2007); *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 268 (N.D.N.Y. 2006).  Some of those cases also are distinguishable, for instance, because the AG did not bring the case as *parens patriae* (as all AGs here have).  *See GEO Grp.*, 2018 WL 9457998, at *3 (distinguishing *Boardman* on this basis).   Another based its analysis on its examination of the statutory framework of New Mexico—which is not a state in this MDL.  *See In re Gold King Mine Release in San Juan Cnty., Colo., on Aug. 5, 2015*, 2021 WL 847971, at *3 (D.N.M. Mar. 5, 2021).  Yet another noted that the AGs had offered to produce agency documents to the movant regardless of legal control.  *See United States v. Novartis Pharms. Corp.*, 2014 WL 6655703, at *10 (S.D.N.Y. Nov. 24, 2014).  And the AGs cite state-court cases that often applied state-law tests that differ from the Ninth Circuit's, *see, e.g.*, *People ex rel. Lockyer v. Superior Ct.*, 122 Cal. App. 4th 1060, 1078 (2004), and thus have nothing to say about control of agency documents in federal litigation.

The States also argue that they lack control over documents of agencies whom they represent. Mot. 12–14.  But as explained below, *infra* II.A.3(b), Judge Kang (like many courts) properly relied on the attorney-client relationship between AGs and agencies as a consideration in the control analysis.

### 3.   The States' Remaining Objections Are Incorrect.

The States assail the lengthy and well-reasoned MJ Order as "legally flawed" and "contrary to law."  Mot. 5.  But it is the States' Motion—not the Order—that "fundamentally misapprehends," "disregards," and "misapplies" the governing standards.  *See id.*  Having chosen to "avail[] themselves of the right to bring . . . claims in federal court," *id.* at 8, and to be thus bound by federal rules and standards, the States may not shirk their discovery obligations and introduce still further delay.

### a)   The Order Correctly Rejects Arguments Based on State Sovereignty and Separation of Powers.

The States charge the Order with "fundamentally misapprend[ing]" their dual roles as (i) enforcement agencies and (ii) outside counsel for state agencies.  *Id.* at 5–6.  But Judge Kang carefully considered—and rejected—these arguments.  *See, e.g.*, MJ Order at 12–16, 21–28.  Either formally or in

substance, "the State itself is a party to the suit."[8]  *Id.* at 17; *see also Harvey Aluminum*, 335 F.2d at 754 (explaining that a party-agency can be required to produce documents "in the possession of the [party] or of another agency of the government," as all are "parts of the government of the United States"); *Bank Line*, 76 F. Supp. at 803–04 (ordering document production from a non-party agency, as "the several departments are all agencies of one government, possessed, theoretically, at least, of a single will").[9]

Far from "erroneously" treating the AGs as "monolith[s]," Mot. 5, or eliding the alleged distinctions between the AG as advisor versus litigator, the Order recognizes the legal and practical reality that the AGs represent the States as States, and, by extension, most state agencies, *see, e.g.*, *Bank Line*, 76 F. Supp. at 803–04; *see LULAC*, 2022 WL 1540589, at *3.  Indeed, even setting aside whether the agencies should be treated as parties for purposes of discovery, *cf.* MJ Order at 42, many agencies **will** or ***must*** utilize their respective AG in responding to Meta's discovery requests, irrespective of whether the requests are propounded under Rule 34 or Rule 45,[10] *id.* at 22.  For the reasons outlined in more detail above and below, *supra* II.A.2., *infra* II.B., this is sufficient to establish legal control under *Citric Acid*.

Concerningly, the States appear to embrace (or at least tacitly accept) troubling—and long-since rejected—arguments that non-party branches of state government may willfully flout orders issued by

---

[8] For Florida, Maryland, and New Jersey, the plaintiff is nominally a subdivision of state government.  But it would "elevate[] form over substance," MJ Order at 39, to ignore the reality that States are singular entities: a suit brought by an agency on behalf of the State *qua* State is, in substance, a suit by the State itself, *see Compagnie Francaise d'Assurance*, 105 F.R.D. at 35; *Shelby Cnty.*, 2012 WL 6003540, at *3.  Indeed, these three States assert claims under COPPA, which may only be brought by "the State." 15 U.S.C. § 6504.  In short, the AGs are suing ***as the State***.

[9] The States urge this Court to disregard *Harvey Aluminum* and *Bank Line* because they consider federal agencies that can be ordered by the President to produce documents.  *See* Mot. 12.  But "lack of operational, day-to-day control of an entity does not end the [control] inquiry, as the state Attorneys General argue—otherwise, control would never be found in situations except those involving a parent-subsidiary or similar direct-control type of relationship."  MJ Order at 15.  For the reasons explained in this brief, and in the Order, the States do possess legal control over agency documents, irrespective of "the absence of . . . 'managerial power.'"  *Id.*  And, in any event, courts have reached this same conclusion for state governments.  *E.g.*, *LULAC*, 2022 WL 1540589, at *2; *GEO Grp.*, 2018 WL 9457998, at *3.

[10] The States point to Meta's statement in the September 6 DMC Statement that "over 40 percent of the state entities that have been in contact with Meta's counsel regarding a [Rule 45] subpoena are being represented by the relevant State AG's office" in support of their argument.  Dkt. 1168 at 8.  But as the States concede, "nearly half of the agencies [have] yet to receive subpoenas," Mot. 8, and approximately 25 percent of agencies served with a subpoena have yet to respond.

14

federal courts.[11]  Mot. 7 (classifying as "legal error" the Order's conclusion that a court may exercise its "inherent authority" to require non-parties to comply with its orders).  The States' position is incompatible with bedrock principles of federalism and constitutional law.  *See* MJ Order at 23–24 (noting the Court's "inherent authority" to enforce its discovery orders, including against non-parties); *id.* at 8–12 (explaining that state laws purporting to override federal law, including the Federal Rules, are invalid).  Moreover, the States do not explain why it is that recalcitrant state agencies and officers would comply with a Rule 45 subpoena when they would resist discovery propounded under Rule 34.  *See* MJ Order at 22.

No state agency or officer can lawfully refuse to comply with the Court's discovery order, even when not formally parties to this litigation (though the States here *are* parties).  *See Cooper v. Aaron*, 358 U.S. 1, 18–19 (1958) (rejecting claims by the Governor of Arkansas to "assert a power to nullify a federal court order" to which he was not formally a party); *see also id.* at 22 (Frankfurter, J., concurring) ("[W]hile Arkansas is not a formal party in these proceedings and a decree cannot go against the State, it is legally and morally before the Court.").  That one may seek to do so here does not change this foundational legal principle.  *See* Mot. 16 (noting that California's Governor Newsom "has declined to provide the [California] Attorney General with access to sister agency documents for purposes of responding to discovery in this action"); 9/13/24 CMC Tr. at 72:5–9 ("[Counsel for the State of California:] The Governor's Office and the agencies under its control will not comply with the order regarding State agencies . . . .  It is not a party to this litigation and the Court lacks jurisdiction over it.").  "Should a state agency violate an Order compelling production, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agenc[y]."  MJ Order at 23; *see also id.* at 53 ("[I]n the event some enforcement mechanism were needed (such as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand how and where to focus any such enforcement Order.").  The States' concerns—hypothetical or real—that its non-party agencies and state officers will seek to disobey a federal-court order are not valid reasons to overturn the MJ Order.

---

[11] Even were these arguments not inconsistent with the foundational principles of the Supremacy Clause, they are waived by the States' failure to raise them to Judge Kang before the Order's issuance.  *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

**b)** **The Order Properly Concludes that the AGs, as Presumptive Counsel for Most State Agencies, Exercise Legal Control Over Agency Documents.**

The Order correctly concluded that an AG who serves as counsel for a state agency generally exercises legal control over that agency's documents: "[a]s the designated legal representative for a state agency, the Attorney General has professional and ethical obligations to access all relevant documents," and thus has legal control of the documents under *Citric Acid*. MJ Order at 29; *see also id.* at 27 ("'[L]egal duties' are logical antecedent[s] to 'legal rights' and thus the state Attorneys' General legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents." (citing *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002)). An in-house legal office like an AG "is presumed to have control over documents in its client's possession." *Id.* at 28 (quoting *Perez v. Perry*, 2014 WL 1796661, at *2 (W.D. Tex. May 6, 2014)).

The States first attempt to discount this holding by arguing that Judge Kang relied only on *Perez* and that *Perez* used a "practical ability" to obtain test, rather than a "legal right" to obtain test, but that is incorrect: Judge Kang relied on many authorities, many of which the States ignore here. *See* MJ Order at 28–30 (citing *Williams v. Hawn*, 2022 WL 22859198, at *2 (W.D. Mich. Aug. 26, 2022); *Love v. N.J. Dep't. of Corr.*, 2017 WL 3477864, at *5–6 (D.N.J. Aug. 11, 2017); *In re NCAA Student-Athlete Name & Likeness Litig.*, 2012 WL 161240, at *4 (N.D. Cal. Jan. 17, 2012); *Synopsys, Inc. v. Ricoh Co.*, 2006 WL 1867529, at *2 (N.D. Cal. July 5, 2006)). Indeed, he explicitly recognized that some employed a "practical ability" test but found (in accord with a prior case in this District) that these "holdings did not fundamentally rely on the 'practical ability' test." *Id.* at 29 (quoting *NCAA Student-Athlete Name & Likeness*, 2012 WL 161240, at *4). The Court instead cited these authorities as "illustrative" for the instant inquiry. *See id.* at 33. More to the point, other courts applying the right-to-obtain test *to the attorney-client relationship between AGs and agencies* have found that it can help show control. *E.g.*, *Shelby Cnty.*, 2012 WL 6003540, at *3. The AGs likewise ignore those holdings in their briefing.

The States also object that this outcome is akin to a lawyer "forcibly taking their client's documents and providing them to another party." Mot. 13; *see also id*. at 2 (alleging that agencies will be required to "acquiesce to . . . unprecedented demands and seizures"). The States' claims amount to yet more "hyperbolic, worst-case scenario argument[s]" that this Court should reject. *See* MJ Order at 23. The

16

AGs should not be permitted to have their cake and eat it too: to the extent the AGs (whose attorneys are themselves state employees) are representing or will represent the identified state agencies for purposes of discovery in this action, or otherwise claim the attorney-client privilege, the Court should affirm the Order's conclusion that the AGs exercise legal control over the agencies' documents. *See id.* at 29.

Contrary to the States' intimations, the Order does not force the AGs to navigate between the Scylla of court-ordered sanctions and the Charybdis of ethical or professional breaches. *See* Mot. 13. The Order recognizes that "[t]he close coordination underlying an attorney-client relationship is a factor in the legal control analysis." MJ Order at 28. In cases dealing with private counsel, this factor may not tip the balance in favor of finding that the private legal services provider has control over a non-party client's documents. *Cf. id.* at 32; Mot. 9. But the Order rightly notes that "courts find control in situations involving government attorneys representing both a party and a third-party agency based on their real-world experiences and the facts as a whole."[12] MJ Order at 32 (citation omitted). Here, an attorney-client relationship between an AG and an agency supports finding that the AG has legal control over the agency's documents, especially in cases where the AG is statutorily required to represent the agency and thus has "*legally mandated*" access to its documents. *Id.* at 29. As the Court made clear, "this factor is one of the totality of factors which impact the control inquiry and here, because the state Attorneys General are either parties themselves or at least are counsel for a party, and because the state Attorneys General will represent the state agencies for discovery, this factor takes on particular significance." *Id.* at 34.

## B.    The States' Individual Arguments Are Incorrect.

Most of the States' "state-specific" arguments are, in reality, recycled common contentions. For instance, nearly every State repeats the argument addressed above that AGs perform both enforcement

---

[12] Relatedly, the States take issue with the Order's conclusion that "[t]he scope of an attorney-client relationship (and the duties flowing therefrom) encompasses the entirety of a legal services organization, including a public law office." MJ Order at 39. Contrary to the States' assertion, this does not constitute a holding that "if one lawyer in an AG's Office represents an agency, the entire office represents that agency." Mot. 6. It does not "disregard[] how state legislatures have chosen to organize AGs' offices" or ignore the reality that an AG may represent "state agencies that are adverse to one another." *Id.* at 7. The internal procedures implemented to avoid conflicting representations "do[] not support the blanket argument that different individual lawyers in the Attorney General's office have separate, discrete attorney-client relationship with their clients." MJ Order at 39–40.

and representative functions—an artificial division of their authority that, as the Order recognizes, does not foreclose a finding of control. *See supra* II.A.3(c). To that extent, Meta's responses above—and the reasoning in Judge Kang's Order—demonstrate why they are incorrect. The remainder of the States' arguments are a hodgepodge of alleged minor assertions of error. The States cannot escape the basic fact that their states' frameworks establish the AG as the legal officer for state agencies, necessarily giving them the ability to obtain agency documents for litigation purposes. As court after court has held, *see supra* II.A.2, that means the AGs have control of agency documents.

1. <u>Arizona</u>

Arizona includes *no state-specific* argument about almost any but two agencies, waiving challenges to the Order's conclusions about all other agencies. *See* Mot. 14. Arizona law provides that the AG shall "[b]e the legal advisor of the departments of this state and render such legal services as the departments require," and "have charge of and direct the department of law and shall serve as chief legal officer of the state." Ariz. Rev. Stat. § 41-192(A). No statute bars the AG from accessing any Arizona state agency documents. A federal court has already held based on this statutory framework that the AG has control over agency materials, and thus has discovery obligations with respect to those materials. *Generic II*, 699 F. Supp. 3d at 357–58. Additionally, Arizona has indicated that it may assert attorney-client privilege over communications between it and the relevant agencies. *See* Dkt. 738-2 at 1. Arizona cannot reserve the ability to assert privilege in one breath while disclaiming any attorney-client relationship in the next.

Arizona argues that Judge Kang erred with respect to the Department of Education ("ADE") and Governor's Office of Strategic Planning and Budgeting ("OSPB"), primarily because the AG has stated it has chosen not to represent those agencies. Mot. 14. But Judge Kang already rejected that as a basis to overcome other considerations regarding control, MJ Order at 32, and the AG's choices do not overcome the framework establishing its control over agency documents. Arizona law *requires* that agencies not exempted by § 41-192(D) employ the AG as legal counsel, and neither of these agencies is so exempted.

Arizona also argues that the ADE has at times employed outside counsel, despite being barred "in theory." Mot. 14. But that ADE chooses to violate Arizona's own law does not impact the control analysis and does not mean that the AG lacks control over ADE's documents. In addition, the document cited by

Arizona is simply an agency organizational chart stating that there is a "legal services" office in ADE, which is insufficient to overturn Judge Kang's findings.[13]   And Judge Kang properly found that OSPB is subject to discovery obligations.   MJ Order at 33.   Arizona now argues that agency is part of the Governor's Office, but it fails to address Judge Kang's finding that "despite its name," OSBP is "outside" the "Governor's office, has duties to advise both the Governor and Legislature, and is statutorily situated within the Act defining the Arizona Department of Administration."   *Id.* at 14 (citing Ariz. Rev. Stat. §§ 41-701, -722 to -723).   In the face of that statute and finding, Arizona cites only a webpage and an outdated executive order from before the office was codified by statute, neither of which shows clear error.

2.   California

California law provides that the AG "has charge, as attorney, of all legal matters in which the State is interested," and should be employed as "counsel for the representation of state agencies"; no agency (except for the Department of Education) may obtain counsel other than the AG without the "written consent of the Attorney General."   Cal. Gov't Code §§ 12511, 11040(a), (c), 11042(a), 11000.   No statute bars the AG from accessing any agency documents.   Federal courts have found that the "legal right" standard is met in materially similar situations.   *See supra* II.A.2.   And the AG has confirmed that it may represent the agencies at issue if Meta served them with a subpoena.   Dkt. 738-1 at 3–4.

California fails to show that Judge Kang erred.   It largely reiterates the arguments made by all States, which Meta addresses above.   *Compare* Mot. 15–16 *with supra* II.A.1–3.   Aside from that, it argues that because of the state's dual-executive structure and the state-court *Lockyer* decision, the AG does not have control over agency materials.   But Judge Kang correctly found that the AG "is statutorily required to act as the California agencies' counsel, with limited exceptions which are not shown to be applicable here" and the "California Legislature made clear that the California statutory scheme prefers the California Attorney General represent state agencies" including "in any judicial . . . proceeding."   MJ Order at 50

---

[13] Arizona also never put this "evidence" before Judge Kang, waiving the opportunity to do so now.   And the evidence is not properly authenticated or subject to judicial notice; it is simply an organization chart of unspecified origin pulled from a state website.   *In re Apple Inc. Sec. Litig.*, 678 F. Supp. 3d 1147, 1152 (N.D. Cal. 2023) (courts only permitted to take judicial notice of facts "not subject to reasonable dispute," "generally known," or that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." (cleaned up)).   The Court should decline to consider it.

(cleaned up).  Further, *Lockyer* does not apply the Ninth Circuit test and, so, does not govern; *Lockyer* began and ended its analysis by asking whether the AG and executive agencies were formed separately, not whether there was a legal right to obtain documents under federal law.  122 Cal. App. 4th at 1078.

Strikingly, California now threatens to violate Judge Kang's Order merely because it disagrees with it.  *See* Mot. 16.  But as Meta explained above, that contention is both waived (because California never made it before Judge Kang when given the chance) and unconstitutional.  *See supra* II.A.3(a).

> 3.   Colorado

Colorado law provides that the AG "[s]hall act as the chief legal representative of the state and be the legal counsel . . . of each . . . agency" and "provide legal services for each state agency."  Colo. Rev. Stat. Ann. §§ 24-31-101(1)(a); 24-31-111(1).  Agencies cannot employ other counsel.  *Id.* § 24-31-111(2). No statute bars the AG from accessing agency documents.  Federal courts considering similar frameworks have concluded that AGs have control over agency materials.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

The State tries to muddy the waters now by arguing that "the AG attorneys enforcing the CCPA do not and would not represent agencies 'in this matter,'" Mot. 16, but these claims contradict both the clear statutory language discussed above and the AG's prior representations, *see* Dkt. 738-1 at 5; *see also* MJ Order at 59–60.  Indeed, the AG has confirmed that it would assert privilege claims related to its representation of these agencies, *see* Dkt. 738-4 at 1, notwithstanding its belated attempts to walk these representations back, *see* Mot. 17.  Colorado cannot commit to representing each agency in responding to Meta's discovery requests while also disclaiming any ability to exercise legal control over the agency documents pursuant to the attorney-client relationship.  *See, e.g.*, MJ Order at 31.

Colorado argues that it does not exercise control over agency documents—even when lawyers from the AG's office have and will represent the agencies—by relying on an artificial distinction between the AG-as-independent-enforcer and AG-as-legal-counsel.  Mot. 16.  But it does not address the Order's reasoned rejection of this false dichotomy, much less show how Judge Kang erred.  *See, e.g.*, MJ Order at 39.  Similarly infirm are Colorado's objections to the Order's common-sense reading of statutory language intending for agencies to share information with the AG to "facilitate the investigation and enforcement" of consumer protection laws.  *See* MJ Order at 61 (quoting Colo. Rev. Stat. § 6-1-116(4)).  In any event,

even if Judge Kang's interpretation of this statute were incorrect (it is not), it would not invalidate the remainder of his reasoning and is insufficient to overturn his findings.

### 4.   Connecticut

Connecticut law provides that the AG shall appear for the state departments, boards, and institutions "in all suits and other civil proceedings . . . in which the state is a party or is interested." Conn. Gen. Stat. Ann. § 3-125.  Further, Connecticut courts have found that the authority to perform legal services on behalf of agencies of the state "is conferred exclusively on the attorney general." *Bysiewicz v. Dinardo*, 6 A.3d 726, 748 (Conn. 2010).  No statute bars the Connecticut AG from accessing the documents of the agencies at issue.  A federal court applying the right-to-obtain test has already held that the AG has a "broad grant of authority [that] undercuts the argument that in the prosecution of an action on behalf of the State of Connecticut, the [AG] cannot obtain documents from state agencies." *Generic II*, 699 F. Supp. 3d at 358.  Additionally, the Connecticut AG has confirmed that it may represent the identified agencies if Meta were to serve them with a subpoena in this matter, and that the attorney-client privilege would apply to communications with them.  Dkt. 738-1 at 6–7; Dkt. 738-5 at 1.

Connecticut fails to show any error in Judge Kang's analysis.  Indeed, its briefing fails to engage almost entirely with his detailed analysis of the statutory framework, including explaining why the statutes cited above are insufficient.  *See* MJ Order at 63–68.  Connecticut primarily argues that the AG possesses only statutorily granted powers, Mot. 17, but even if that consideration were relevant, Judge Kang found that statute after statute empowered the AG to obtain documents (by granting the AG the authority to represent agencies).  MJ Order at 63–65.  Its argument is especially misplaced for the Department of Consumer Protection which, as it concedes, *authorized the AG to bring this suit.  Id.*  Nothing in Connecticut's brief about this agency (with almost no authority) overcomes Judge Kang's findings.

### 5.   Delaware

Delaware law requires that the identified agencies utilize the AG as their sole legal counsel absent the AG's consent.  Del. Code Ann., tit. 29, § 2507.  Delaware does not contest this and concedes that it will assert the attorney-client privilege over certain communications with the agencies.  Dkt. 738-6 at 1. Federal courts considering similar statutory frameworks have concluded that an AG has control over the agency materials.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.  The Delaware AG fails to show how Judge

Kang's holding "that mandatory representation [of the identified agencies] by the Delaware Attorney General . . . weighs heavily towards a finding of legal control" is erroneous.  MJ Order at 68.

Rather than addressing these conclusions head-on, Delaware attempts to take refuge in an incorrect interpretation of Title 29, Section 2508(b) of the Delaware Code, which the State reads to bar the AG from accessing agency documents for purposes of discovery.  As the Order makes clear, though, the AG's cramped reading of Section 2508(b) ignores the Delaware Legislature's intention to grant the AG "a broad right to access the documents of state agencies on demand"; the statute simply restricts the AG from using its provisions "as an end-around normal discovery procedures."  MJ Order at 69.

Even if Delaware could demonstrate that Judge Kang erred (and he did not), the AG cannot overcome the fact that its (incorrect) interpretation of Section 2508(b) would conflict with Rule 34: the Supremacy Clause does not allow state law to preempt or void federal law, including the Federal Rules. *See supra* II.A.3(a).  Judge Kang did not ignore Delaware law in concluding that the AG exercises control over agency documents, *see* Mot. 19, and instead carefully reviewed and correctly analyzed applicable state law, MJ Order at 73 ("The Court's extensive review of the cited Delaware statute and case law, summarized herein, demonstrates that the Delaware Attorney General's arguments here are, at best, incorrect as a matter of law, and, at worst, risk raising questions as to counsel's judgment and credibility.").

### 6.   Florida

Florida law is clear: the AG is responsible "for providing all legal services required by any department, unless otherwise provided by law" (or "emergency circumstances").  Fla. Stat. §16.015; *see also id.* § 16.01(4)–(5).  No statute bars the AG from accessing documents of the identified agencies.  It is Florida—not Judge Kang—that commits an "error of law" in insisting that it has no statutory responsibility for providing legal services to Florida agencies.  MJ Order at 77.  One federal court has already found that the Florida AG exercises legal control over agency documents under Rule 34.  *See Freyre v. Hillsborough Cnty. Sheriff's Off.*, 2016 WL 1029512, at *2 (M.D. Fla. Mar. 9, 2016), *vacated*, 2016 WL 4502463 (M.D. Fla. July 6, 2016).[14]  The Florida AG also refused to disclaim assertion of the

---

[14] Florida takes issue with the Court having cited an order that was vacated as part of a settlement, but Judge Kang fulsomely explains that "nothing in the vacatur of that opinion requires this Court to blind itself to whatever persuasive effect flows from that Florida Federal Court's analysis."  MJ Order at 81.

attorney-client privilege over communications between it and the agencies, which "supports the conclusion of control," as the assertion of the privilege requires "the existence of an attorney-client relationship." MJ Order at 78 (citation omitted).

The State attempts to salvage its position by belatedly citing to Section 287.059(2)(a), which permits the "Executive Office of the Governor" and "any department under the exclusive jurisdiction of a single Cabinet Officer" to contract "for private attorney services without the prior written approval of the Attorney General." Reliance on that statute is waived: despite citing many other statutes, Florida failed to present this one in the multiple rounds of litigation preceding the issuance of the Order, depriving Meta of a chance to respond and Judge Kang of a chance to analyze it. *See Marshall v. Chater*, 75 F.3d 1421, 1426 (10th Cir. 1996) ("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived."). Waiver aside, Section 287.059(2)(a) does not alter the AG's role in "appear[ing] in and attend[ing]to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, or in anywise interested." Fla. Stat. § 16.01(4)–(5). Nor did Judge Kang err in resting his decision on the record the AGs presented—none of the identified agencies, which the AG represents as "all hav[ing] in-house legal counsel" and are presumably on notice of this litigation, appeared. MJ Order at 30. And that an agency has the *option* of retaining private counsel in some circumstances does not brush aside the rest of the statutory framework establishing the AG's control over state agency legal matters that Judge Kang and a prior federal district court relied on. *Id.* at 77.

       7.   Georgia

Georgia law provides that the AG "shall act as the legal advisor of the executive department," and "represent the state in all civil actions" relating to "the executive branch and . . . every agency thereof." Ga. Const. art. V, § 3, ¶ IV; Ga. Code Ann. §§ 45-15-3; 45-15-34. It prohibits state agencies from "employing counsel in any manner whatsoever." Ga. Code Ann. §§ 45-15-13 to -14. No statute bars the AG from accessing documents of the agencies at issue. The AG has indicated that it may represent all the agencies if Meta were to serve them with subpoenas in this matter. Dkt. 738-1 at 9. The AG has argued that the communications with the agencies would be privileged. Dkt. 738-8 at 1. As Judge Kang found, the Georgia AG is "vested with complete and exclusive authority" to represent agencies and has control

over agency documents.  MJ Order at 82 (quoting Ga. Code Ann. § 45-15-34).  Federal courts have held the same for states with materially similar statutory frameworks.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 358.

Georgia's response largely parrots the States' overall arguments, and fails to grapple with Judge Kang's analysis of Georgia's framework.  *Compare* Mot. 21 *with* MJ Order at 82–87.  The AG argues that its role as an enforcer is separate from its role representing agencies, but there is nothing in the text of the authorities above or in the Order that restricts the AG's access to agency documents in either role.  The AG also argues that because its office has chosen to organize itself into divisions, that deprives it of control under *Citric Acid*.  Judge Kang rejected this argument, and for good reason: an agency's internal organization has no bearing here, and the statutory framework does not depend at all on that organization.  MJ Order 39–41.  Tellingly, Georgia points to no errors in Judge Kang's analysis of the issue.

### 8. Hawai'i

Hawai'i law provides that the AG "shall administer and render state legal services" to "such departments and officers as the governor may direct" and "shall represent the State in all civil actions in which the State is a party."  Haw. Rev. Stat. §§ 26-7; 28-4.  The Hawai'i Supreme Court has held that the AG "has a statutory duty . . . to provide legal counsel to state agencies."  *In re Water Use Permit Applications*, 9 P.3d 409, 437 (Haw. 2000).  The AG has conceded that "departments must be advised by" the AG.  Dkt. 738-9 at 1.  It has said that it would represent the agencies at issue if Meta served them with subpoenas in this matter.  Dkt. 738-1 at 9–10.  No statute bars the AG from accessing agency documents.  Hawai'i has argued that communications between the AG's office and the state agencies would be covered by attorney-client privilege.  Dkt. 738-9 at 1.  Based on these authorities and others, Judge Kang found that the AG controlled agency documents for litigation purposes.  MJ Order at 87–92.  Federal courts have held the same for states with materially similar statutory frameworks.  *Generic II*, 699 F. Supp. 3d at 358.

Hawai'i largely echoes the States' general arguments, and fails to address *any* of the statutes that Judge Kang analyzed.  *Compare* Mot. 21–22 *with* MJ Order at 87–92.  The AG argues that its role as an enforcer is separate from its role representing agencies, but there is nothing in the text of the authorities above or in the Order that restricts the AG's access to agency documents in either role.  The state supreme court case that Hawai'i cites does not move the ball either: it merely blessed internal firewalls between conflicting civil and criminal proceedings.  *State v. Klattenhoff*, 71 Haw. 598, 604 (1990).  It certainly did

not set aside the statutory framework above.  Hawai'i also relies on *Lobisch v. United States*, 2021 WL 6497240 (D. Haw. Aug. 19, 2021), which Judge Kang rejected.  *See* MJ Order at 91.  *Lobisch* held only that the "entire federal government" was not subject to party discovery in an FTCA action.  *Id.* at *3.  It did not examine a particular statutory framework for control under *Citric Acid*—let alone Hawai'i's.[15]

Finally, Hawai'i argues that, in *Generic* (where it agreed to produce agency discovery), it sought damages on behalf of the injured agency.  But *Generic*'s reasoning—like the reasoning of other courts on this issue—did not turn on that factor; rather, *Generic*'s reasoning turned on whether the AGs exercised control under their statutory frameworks.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 358.

### 9.   Idaho

Idaho law provides that "it is the duty of the attorney general . . . [t]o perform all legal services for the state and to represent the state and all departments, agencies . . . and other state entities in all courts." Idaho Code § 67-1401(1).  By statute (with limited exceptions not relevant here except as to the Governor, who "may" be represented by the AG or other counsel), "no department, agency . . . or other state entity shall be represented by or obtain its legal advice for an attorney at law other than the attorney general . . . ." *Id.* § 67-1406.  No statute deprives the AG of access to agency documents.  Idaho has conceded that the AG may represent all identified agencies in responding to Meta's subpoenas.  Dkt. 738-1 at 10.  And the AG has argued that the attorney-client privilege may apply to communications with agencies.  Dkt. 738-10 at 1.  Federal courts analyzing similar statutory frameworks have held that AGs have control over agency materials under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

Here, Idaho barely addresses Judge Kang's reasoning or the authorities cited.  Instead, it offers only the argument that the "Office of the Attorney General" brought this case and, despite making a non-state-specific argument, accuses Judge Kang of employing a "one-size-fits-all approach."  Mot. 22–23. That is wrong.  Judge Kang analyzed Idaho's statutory framework (something Idaho does not do) and each agency at issue (none of which Idaho mentions).  *Id.*  The fact that Idaho brings a COPPA claim is

---

[15] Further, it appeared unaware of the authorities holding that, when a government is a named party, the government *qua* government is subject to party discovery.  *Supra* II.A.2.  It also based its finding almost entirely on the idea that it would be inefficient to conduct discovery into the entire government, but did not consider that ordinary principles of reasonableness, proportionality, and burden would limit that discovery—and are a better vehicle for doing so than a blanket holding that *no* party discovery can be had.

relevant in confirming that the State is bringing suit, and thus discovery should extend to the State's agencies. *See supra* n.8. Idaho's explanation for why it compels a different result contains virtually no reasoning: as Judge Kang explained, the AG has control of agencies' documents due to its authorities and obligations, not based on anything dependent on the type of claim it chose to bring.

### 10. Illinois

The Illinois Constitution provides that the AG "shall be the legal officer of the state," Ill. Const. art. V, § 15, which "requires the Attorney General to represent . . . State agencies," *People ex rel. Sklodowski v. State*, 642 N.E.2d 1180, 1184 (Ill. 1994). No statute bars the AG from agency documents for discovery purposes. Illinois has confirmed it could represent all the agencies at issue in responding to third-party subpoenas. Dkt. 738-1 at 10–11. The AG has argued that communications with agencies are covered by attorney-client privilege. Dkt. 738-11 at 1. An Illinois federal court has held that the AG has control over agency records for discovery purposes. *Monsanto*, 2023 WL 4083934, at *2–6.[16]

Illinois retreads the States' arguments and fails to grapple *at all* with the statutory framework Judge Kang relied on. *Compare* Mot. 23–24 *with* MJ Order 94–98. First, Illinois repeats the States' "dual role" argument, contending that the AG brought this case in its enforcement capacity but that it represents agencies in a different capacity. Mot. 23. But the statutes Judge Kang relied on are not limited by this invented distinction (for which the State cites no cases). The AG is *required* to represent these agencies regardless of the source of the litigation or whether the agencies have asked. MJ Order 94–98.

Second, Illinois mischaracterizes the Order, arguing that it "states, without support, that the AG will likely provide legal representation *in this litigation* to all state agencies." Mot. 23 (citing MJ Order at 94–95). The Order largely depended on the constitutional and statutory framework governing the Illinois AG generally, not specific to this case only. And the Order correctly noted that the AG is *required* to represent agencies, as Illinois previously conceded. Dkt. 739-11 at 1. Illinois law and Illinois' own statements are ample support for Judge Kang's statement about agency legal representation. Illinois also

---

[16] Illinois attempts to discount *Monsanto* because the suit there was a "joint effort" brought for agencies' benefit. Mot. 23. That mischaracterizes the decision, which primarily relied on the AG's statutory authority as the State's chief legal officer. While that court referenced that the agencies had collaborated with the AG, its control analysis did not turn on that fact. *Monsanto*, 2023 WL 4083934, at *2–6.

argues that the Order wrongly held that "any past or future communications" with agencies were privileged when it previously stated in the state-specific briefing that "few, if any," were.  Mot. 23–24 (quoting MJ Order at 95, Dkt. 738-11).  But Illinois, not Judge Kang, misconstrues Illinois's own representations: two sentences into its brief, it wrote that "*any* past or future communications responsive to Meta's requests that fall within the representational attorney-client paradigm would be privileged."  Dkt. 738-11 at 1 (emphasis added).

> 11.   <u>Indiana</u>

Indiana law provides that the AG "shall have charge of and direct the prosecution of all civil actions that are brought in the name of the State of Indiana or any state agency" and that "[n]o agency . . . shall have the right to name . . . any . . . to represent it . . . without the written consent of the attorney general."  Ind. Code Ann. §§ 4-6-3-2(a); 4-6-5-1 to -2.  No statute bars the AG from accessing agency documents for discovery purposes.  Indiana has conceded that it may represent the agencies in responding to third-party subpoenas in this case, Dkt. 738-1 at 11, and those agencies would be barred from using outside counsel (without the AG's consent).  And the AG has reserved the right to assert the attorney-client privilege over communications between it and agencies while refusing to take a clear position.  Dkt. 738-12 at 1.  Federal courts examining materially similar circumstances have concluded that AGs have a right to obtain agency documents.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 358.

Indiana fails to address most of the authority that Judge Kang relied on.  Instead, it focuses on an argument that Indiana law "provides an exception [to the rule of mandatory representation by the AG] for each Indiana agency named by Meta."  Mot. 24.  But what Indiana really means is that the agencies are "permitted" to use outside attorneys "with consent of the Indiana Attorney General," not that the agencies are actually exempt.  *Id.*  That authority in no way deprives the AG of control over agencies' documents.  For one thing, the AG can choose to withhold its consent (including as a result of a court order), thereby maintaining its control.  *See* Ind. Code Ann. § 4-6-3-2(a).  And in any event, that the AG can permit outside counsel to be employed does not brush aside the statutory framework making it state agencies'

legal officer.  Indiana cannot point to a single federal court ever endorsing its view that a finding of control can be set aside on this shaky ground.[17]

Indiana also argues that Judge Kang erred in relying on Section 4-6-3-3, which permits the AG to access agency documents during investigations, because it applies only to pre-suit demands.  Mot. 24.  But Judge Kang did not rely on the statute to prove control: he noted that *Indiana* relied on it to argue that was the *only* circumstance in which the AG could obtain documents.  MJ Order at 100–01.  As he correctly found, there was no indication in the statute that this power was the *exclusive* way that the AG could do so.  *Id.*  Indiana's response is that the statute would be unnecessary if Judge Kang were correct, but that is wrong: the statute provides the AG with investigative authorities and defines the "persons" subject to it to include agencies—far from an indication that the AG's broader authority was surreptitiously cabined.

12.   <u>Kansas</u>

Kansas states that the Court "misread" certain filings in concluding that the AG would "definitely" represent the identified Kansas agencies.  Mot. 25 (citing MJ Order at 104).  But Judge Kang correctly observed that the Kansas AG had "take[n] the position it would not represent the listed agencies," before concluding that this non-representation is "an error of law."  MJ Order at 104 (citing Dkt. 738-1 at 12).  A minor factual misstatement in Judge Kang's lengthy Order—not least one that was immediately followed by the correct factual statement—does not constitute reversible error, particularly since the overall reasoning and conclusion are amply supported by law.  Indeed, Kansas law provides that the AG is obliged to appear in all actions and proceedings "in which the state shall be interested," Kan. Stat. Ann. § 75-702(a), which includes when "its state agencies are the target of discovery," MJ Order 104.  Kansas also conceded that no statute bars the AG from accessing agency documents, and it has indicated that it may assert attorney-client privilege over communications between it and the agencies.  *See* Dkt. 738-13 at 1.  Yet the Kansas AG somehow argues that it would not represent the listed agencies should Meta serve them with a subpoena.  This is a legal impossibility under Kansas's statutes (which *require* such

---

[17] Indiana cites several cases that it claims Judge Kang ignored, Mot. 24, but one just reiterates the point that the AG can consent to employment of other counsel.  The other merely held that the Governor may also employ their own counsel—which likewise does not alter the clear statutory framework discussed in the Order, a framework that Indiana does not dispute applies to the Governor generally.

representation), and Kansas cannot reserve the ability to assert privilege on the one hand while disclaiming any attorney-client relationship with the other.  A federal court has already held based on this statutory framework that the Kansas AG has control over agency materials.  *Generic II*, 699 F. Supp. 3d at 357–58.

Kansas accuses the Court of "misquot[ing]" the relevant statute.  Mot. 25.  Kansas is wrong.  Kan. Stat. Ann. § 75-703 contains two components.  The State is correct that certain state officers must request that the AG *prosecute* certain bond or contract disputes "upon a breach thereof."  *Id.*  But Judge Kang cites to the second component of that statute, which provides that the AG shall "prosecute or **defend** for the state **all actions**, civil or criminal, relating to any matter connected with their departments."  *Id.* (emphasis added).  And even if Judge Kang's interpretation of Section 75-703 was flawed (and it was not), the State takes no issue with his proper interpretation of Kan. Stat. Ann. § 75-702(a), which separately and independently imposes on the Kansas AG the obligation to represent the identified agencies.  *See* MJ Order at 104.  Kansas does not carry its substantial burden of demonstrating that Judge Kang committed any clear error.

### 13.    Kentucky

Kentucky law provides that the AG is the Commonwealth's "chief law officer" and "shall appear in all cases 'in which the Commonwealth has an interest.'"  Ky. Rev. Stat. § 15.020; Mot. 26 (citing MJ Order at 110).  Kentucky concedes that no statute bars the AG from accessing agency documents.  MJ Order at 105.  Instead, the AG adopts a tortured construction of Ky. Rev. Stat. §§ 12.210 and 12.220 that ignore the intent of the Kentucky Legislature for the AG to manage the Commonwealth's legal affairs.  MJ Order at 111.  Section 15.020 states that the AG must handle "all litigation and legal business that any state . . . agency may have in connection with, or growing out of . . . , its official duties."  Section 15.020 is thus consistent with Sections 12.210 and 12.220, which merely provide that state agencies "may employ" attorneys "with the approval of the Governor."  Judge Kang did not err in recognizing that Section 15.020 was not abrogated by Sections 12.210 and 12.220.  MJ Order at 111; *see also* Ky. Rev. Stat. § 12.230 ("KRS 15.020 shall remain in full force and effect, except to the extent the same is in conflict with KRS 12.200 to 12.220 . . . . The Governor or any department may require the advice or services of the Attorney General . . . in matters relating to the duties or functions of any such office or department.").

Kentucky errs in paying short shrift to the command that "all departments, agencies, officers, and employees of the Commonwealth shall fully cooperate with the Attorney General" in enforcing the Kentucky consumer protection laws.   Ky. Rev. Stat. § 367.160(1).   As Judge Kang explains, this requirement "satisf[ies] the *Citric Acid* test for control here."  MJ Order at 111.  Finally, Judge Kang did not err in resolving this dispute based on "the current record submitted" at the time of decision.  MJ Order at 30.  At the time Judge Kang issued his Order, there was "zero supportive factual evidence" before the Court as to whether any Kentucky agencies "solicited representation or counsel from the" AG.  Mot. 27.  There is no reversible error flowing from the AG's failure to present any contrary evidence to the Court.  *See Marshall*, 75 F.3d at 1426 (evidence not presented to magistrate judge waived).

14.   Louisiana

The Louisiana Constitution establishes the AG as the "chief legal officer of the state," La. Const. art. IV, § 8, which must represent agencies "in all litigation arising out of or involving tort," La. Stat. Ann. § 49:257.   No statute bars the AG from accessing documents of the agencies at issue for discovery purposes.  The AG has already conceded that it may represent the agencies at issue in responding to third-party subpoenas in this case.  Dkt. 738-1 at 13–14.  Federal courts have held based on similar statutory frameworks that AGs have control over agencies' documents.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

Louisiana quibbles with Judge Kang's finding that Section 49:257 is one factor establishing the AG's control over agency documents, arguing that it applies only to tort claims.  Mot. 27.  But as Judge Kang found, courts have repeatedly held that Louisiana consumer protection claims "sound in tort."  MJ Order at 115 (collecting authorities).  Louisiana fails to cite a single authority to the contrary.  It passingly argues that there are no torts "directly involving" the agencies, Mot. 27, but the language of the statute is clear that the AG represents agencies in "***all*** litigation ***arising out of or involving*** tort"—not just those in which an agency is accused of a tort or brings a claim in its own name asserting a tort (as Louisiana seems to assert, without any authority, is required), La. Stat. Ann. § 49:257; MJ Order at 115.

15.   Maine

The Maine AG is "the chief law officer of the State."  *In re Thompson's Est.*, 414 A.2d 881, 890 (Me. 1980).  Maine law requires the AG to "appear for . . . agencies of the State in all civil actions and proceedings in which the State is a party or interested" in state court and in any tribunal when requested

30

by the governor.  Me. Rev. Stat. tit. 5, § 191(3).  "All legal services required by [state agencies] in matters relating to their official duties must be rendered" by the AG (or under their direction); agencies may not "act at the expense of the State as counsel, nor employ private counsel" without the AG's approval.  *Id.* § 191(3)(B).  Maine law requires the AG "to provide legal representation to state agencies."  *Michalowski v. Head*, 2010 WL 2757359, at *6 (D. Me. July 12, 2010).  No statute bars the AG from accessing agency documents.  The AG has said it *will* represent each agency if Meta served them a subpoena.  Dkt. 738-1 at 14.  Maine has reserved the right to assert the attorney-client privilege over communications with agencies.  Dkt. 738-16 at 1.  Federal courts analyzing similar frameworks have held that AGs have control over agency materials under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

Maine makes little effort to address any of Judge Kang's pages of analysis.  Instead, it primarily argues that one statutory provision requiring the AG to represent agencies, Section 191(3), applies outside of state court only when the Governor requests the AG to represent an agency.  That runs into the factual problem that the AG has already confirmed it *will* represent the agencies in this dispute, so the request-of-the-governor proviso is academic at best.[18]  Even setting that aside, Maine does not reference the other authorities above and in the Order that confirm the AG's role as legal officer for agencies generally.

Maine also quibbles with Judge Kang's discussion of a statute protecting the confidentiality of personal identifying information ("PII").  Mot. 28.  There are any number of reasons its argument does not change the outcome.  It applies only to PII related to child protective activities, and only to one agency (the Department of Health and Human Services).  It also only imposes a confidentiality obligation on disclosure of the records, and provides that records are available to the department's "legal counsel"[19]— which includes the AG.  *See* Me. Rev. Stat. Title 22, § 4008(1).  Most fundamentally, as Judge Kang noted, Maine incorrectly equates "confidentiality" under the statute with whether the AG can obtain the documents for discovery purposes.  In all events, if there is confidential information that Maine wishes to

---

[18] Similarly academic—and irrelevant—is the AG's claim that it can decline to represent agencies.  Mot. 28.  Regardless of whether that is an accurate reading of the law, the AG has conceded it will represent the agencies at issue here.  In any event, that the AG can exercise that choice does not change whether it has the right to obtain documents, because it can simply choose to continue representing the agency.

[19] Maine's only response to this last point is that "with respect to this case," the AG is not acting as "legal counsel to the department," Mot. 28, but that is circular and Judge Kang squarely rejected it for reasons Maine has largely not challenged in its briefing, MJ Order 119–21.

31

withhold, that is the sort of dispute to be resolved in the ordinary course; it provides no ground to preemptively insulate Maine's health department from all discovery.

16.    Maryland

Under Maryland law, the AG " has general charge of the legal business of the State" and must "represent and otherwise perform all of the legal work for each officer and unit of the State government." Md. Code Ann., State Gov't § 6-106(a)–(b).  With exceptions not relevant here, no such "officer or unit" may retain other counsel without the AG's approval.  *Id.* § 6-106(c).  No statute bars the AG from accessing agency documents for discovery purposes.  The AG has confirmed that it may represent each of the relevant agencies in responding to subpoenas in this case.  Dkt. 738-1 at 14–15.  And it has argued that it could assert the attorney-client privilege over communications between the AG and the agencies.  Dkt. 738-17 at 1.  Federal courts analyzing materially similar statutory frameworks have held that AGs have control over agencies under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357–58.

In this briefing, the AG barely addresses Judge Kang's reasoning or cited authorities.  Instead, it offers only the argument that the AG brought this case and accuses Judge Kang of employing a "one-size-fits-all approach."  Mot. 28.  That is wrong.  Judge Kang analyzed Maryland's statutory framework in particular (something Maryland does not do) and each agency at issue specifically (none of which Maryland mentions).  The fact that Maryland brings a COPPA claim is relevant in confirming that the State is bringing suit, and thus discovery should extend to the State's agencies.  *See supra* n.8.  Maryland's explanation for why it compels a different result contains virtually no reasoning: as Judge Kang explained, the AG has control of agencies' documents because of its authorities and obligations, not based on anything dependent on the type of claim it chose to bring.

Maryland also places great weight on the contention that attorneys from different divisions represent agencies (in its words, those "specifically hired" to do so).  Mot. 29.  But it has no authority for the view that internal subdivision has any bearing on whether the AG has control of agency documents; all of the authority cited above is to the contrary.  Courts have rejected this argument before.  MJ Order 39 (collecting cases). Maryland argues that in the cases cited by Judge Kang, "the party from whom discovery was sought was an employee of a non-party agency" while here "neither the eight Maryland agencies nor their employees are parties."  Mot. 29.  But those are just two ways of describing the same

1   thing: discovery is sought from non-party agencies.  That does not distinguish the cases cited in this brief

2   and the Order that are, in all material ways, on all fours with the case here.  *Supra* II.A.2.

3             17.   <u>Michigan</u>

4             As the Michigan AG concedes, it is statutorily required to "serve[] as counsel to the Governor and

5   state agencies."  Dkt. 738-18 at 1 (citing Mich. Comp. Laws § 14.28); *see also Att'y Gen. v. Mich. Pub.*

6   *Serv. Comm'n*, 625 N.W.2d 16, 29 (Mich. Ct. App. 2000).  The State does not contest that this duty is

7   "mandatory," MJ Order at 132, nor does it suggest that there are any statutes depriving the AG of access

8   to agency documents.[20]     And the AG intends to assert the attorney-client privilege over all

9   communications between its office and the agencies.  Dkt. 738-18 at 1.  This admission "lends further

10  support for a finding of a legal right of access and thus control over the documents of these state agencies."

11  MJ Order at 133.  Indeed, at least one federal court has already concluded that the Michigan AG has

12  control over agency documents.  *See Generic II*, 699 F. Supp. 3d at 357–58.  Michigan does not and cannot

13  show how Judge Kang's Order erred in following the same well-trodden path.

14            The AG accuses Judge Kang of having erred in "mechanically apply[ing] general attorney-client

15  principles" to its "unique" office.  Mot. 29.  But it is the AG that errs in selectively quoting from *Public*

16  *Service Commission* in support of this assertion.  There, the Court of Appeals recognized the Michigan

17  AG's "unique status" as "a constitutional officer" with the " statutory authority to represent the state ***as***

18  ***its chief legal counsel***."  *Mich. Pub. Serv. Comm'n*, 625 N.W. at 27; *see also id.* at 23 (noting the "unique

19  mandate" of the AG to "perform ***all*** legal services" for state agencies (emphasis added) (citation omitted)).

20  The "unique status" of the AG as the sole legal services provider for agencies "requires accommodation,

21  not exemption, under the rules of professional conduct" with respect to the "sometimes conflicting

22  interests of ***numerous government agencies***."  *Id.* at 28 (emphasis added).  By recognizing the AG's role

23

24  ─────────────────────

25  [20] Michigan appears to argue that the Order requires it to breach the Michigan Rules of Professional
    Conduct by forcing it to turn over client documents without consulting with the agency-client.  Mot. 30.
26  This is not grounded in reality—the Order does not even imply that AG lawyers would forcibly seize and
    produce agency documents having "never consulted" with the agency that owns those documents.  Mot.
27  30; *see also id.* at 2 (complaining that the Order would empower AGs to "demand to search [agency]
    records, and seize whatever documents may be responsive"); *cf.* MJ Order at 22 ("[T]he state Attorneys
28  General must still advise, confer, and coordinate with their clients (the respective state agencies)").

as legal counsel to the State, even when there may be conflicting agency interests, *Public Service Commission* supports Judge Kang's decision on control.

The AG—without explanation—now indicates that "an independent staff attorney" would represent any agencies here, presumably because the agencies' views "are at odds" with the AG's.  Mot. 30.  This belated (and therefore waived) argument carries no water: the AG cannot be adverse to the agencies when it has previously accepted that it could permissibly represent the agencies in responding to Meta's discovery requests.  *See* Dkt. 738-1 at 15–16.

18.   Minnesota

Minnesota does not contest Judge Kang's Order's appropriate conclusion that the AG "will act as the agencies' counsel,"  MJ Order at 136, instead arguing that the AG's only client is "the people of Minnesota," Mot. 30.[21]  In addition to conceding that Judge Kang's Order did not err in this interpretation, this argument misses the point.  That the AG represents the state as a whole does not change that it also represents state agencies that ***are mandated*** to utilize the AG for legal services.  MJ Order at 136–37; *see also* Dkt. 738-19 at 1 (AG preserving assertion of attorney-client privilege).

Minnesota also asserts that Judge Kang's Order rests on a "legal assumption" that the "AG[']s Office is a 'firm' or 'legal services organization.'"  Mot. 30 (citation omitted).  But, by law, the AG is akin to the State's in-house counsel.  The State's authorities are not to the contrary.  *See Humphrey on Behalf of State v. McLaren*, 402 N.W.2d 535, 543 (Minn. 1987) (noting that "a government legal department is not a 'firm' under Rule 1.10" but that the AG's office ***is*** presumptively a firm under Rule of Professional Conduct 3.6); *Minneapolis Police Officers Fed'n v. City of Minneapolis*, 488 N.W.2d 817, 821 (Minn. Ct. App. 1992) ("The public is the government attorney's client, which assumes its immediate identity through various governmental agencies.").

Finally, Minnesota does not demonstrate any error in Judge Kang's interpretation of the Minnesota Data Practices Act (DPA).  Judge Kang correctly explained that the DPA does not require the AG, while

---

[21] Minnesota's citation to *Ly v. Nystrom*, 615 N.W.2d 302 (Minn. 2000) is puzzling.  The portion on which the State relies concerns a "private attorney general statute."  *See id.* at 313.  If anything, *Ly* holds that the AG has a special duty "to protect *public* rights in the interests of the state," *id.*, a duty that would be ***advanced*** by representation of the agencies here.

representing client-agencies, to rely on burdensome Public Information Act requests to review client documents—which would be "impractical and not believable." MJ Order at 141. The State errs in arguing that complying with a discovery order would constitute "unauthorized access" to documents. Mot. 31. And Minnesota reads too much into a single line of dicta in *Energy Policy Advocates* to effectively eviscerate the sweeping authorization of Minn. Stat. § 13.393. *Compare* Minn. Stat. § 13.393 ("[T]he use, collection, storage, and dissemination of data by an attorney acting in a professional capacity for a government entity shall be governed by statutes, rules, and professional standards concerning discovery, production of documents, introduction of evidence, and professional responsibility[.]")*, with Energy Pol'y Advocs. v. Ellison*, 980 N.W.2d 146, 155 (Minn. 2022) ("The [DPA] does not erode the protection of the attorney-client privilege as applied to government law offices.").

19. Missouri

Missouri law charges the AG with "appear[ing] and interplead[ing], answer[ing] or defend[ing], in any proceeding or tribunal in which the state's interests are involved." Mo. Ann. Stat. § 27.060; *see also id.* § 27.020 ("The [AG] may, at the request of [state agencies], assign assistant attorneys general to perform the duties prescribed by law before or upon behalf of such [agencies]."); *Neel v. Strong*, 114 S.W.3d 272, 275 (Mo. Ct. App. 2003) ("In legal actions on behalf of the state, only the [AG] may represent the state with sovereign power."); *Kennedy v. State*, 411 S.W.3d 873, 876 (Mo. Ct. App. 2013) (AG " is authorized to represent the interests of the State generally."). No statute deprives the AG of access to agency documents. Missouri has said that it may represent the agencies at issue in responding to subpoenas from Meta. Dkt. 738-1 at 17. It has argued that it could assert attorney-client privilege over communications between the AG and agencies. Dkt. 738-20 at 1. A federal court applying the right-to-obtain test has already held that the AG has control over agency documents. *Generic II*, 699 F. Supp. 3d at 359. Missouri's response fails to address most of Judge Kang's reasoning and ignores *Generic II*'s similar findings. Missouri primarily argues that the statute cited above is permissive rather than mandatory, but that is of no moment: if the AG has the *authority* to supervise agencies in litigation, it can choose to exercise that authority (including as a result of a court order). Missouri points to no authority for the view that this aspect of the statute overcomes a finding of control.

20. <u>Montana</u>

The AG is the "first legal officer of the state," with "broad common law duties" to represent the state. *See* MJ Order at 150 (quoting *Mont. Power Co. v. Mont. Dep't of Pub. Serv. Regul.*, 709 P.2d 995, 1002 (Mont. 1985)). The State identifies no statute barring the AG's access to agency documents. Federal courts have recognized that the legal right to obtain exists based on the AG's "statutory duties to handle all legal services, direct and supervise all litigation, and represent the [state]," and the absence of a bar on the AG obtaining documents. *Shelby Cnty.*, 2012 WL 6003540, at *3.

Montana errs by relying on the fact that Montana agencies are not under the direct managerial supervision of the AG: that is not relevant to control under *Citric Acid*. *See* MJ Order at 154. The AG is also incorrect to rely on Mont. Code Ann. § 2-6-1013(1), which provides that agency records are the "property" of the agency—as the Order explains, this reliance "focuses on the irrelevant issue of 'possession' and ignores the control issue." MJ Order at 154. The State's gloss of Mont. Code Ann. § 2-15-201(4) is misleading—the statute does not indicate that "agencies are free to use in-house counsel or hire additional counsel other than the Montana AG." *Compare* Mot. 152 *with* Mont. Code Ann. § 2-15-201(4) ("Whenever any suit or legal proceeding is pending against this state that may affect the title of this state to any property or that may result in any claim against the state, the governor may direct the attorney general to appear on behalf of the state and may employ additional counsel that the governor may judge expedient."). Montana also fails to illustrate how Judge Kang's detailed analysis of *Montana Power* and *State ex rel. Olsen v. Pub. Serv. Comm'n*, 283 P.2d 594 (Mont. 1955) erred; as he showed, those cases support the conclusion that the AG has control over agency documents.

21. <u>Nebraska</u>

Contrary to Nebraska's assertion, the AG's "statutory responsibility" to represent state agencies is far from "irrelevant." Mot. 33. The State does not contest Judge Kang's finding that it could—and likely would—represent the identified agencies. MJ Order at 157. Nebraska has not identified any statute that deprives it of access to agency documents. And the AG does not attempt to refute Judge Kang's conclusion that it "would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests." *Id.* at 159 (citing *Monsanto*, 2023 WL 4083934, at *5–6). The State fails to show that Judge Kang erred.

1   Instead, the State accuses Judge Kang of threatening "to rewrite the constitutional structure of

2   Nebraska's government." Mot. 34.  This Court should reject such hyperbolic and groundless arguments.

3   *See* MJ Order at 23.  As the Order explains, "[t]he logical fallacy of the 'separation of powers' argument

4   is that this concept concerns distinct spheres of governmental authority to act within their roles as arms of

5   the government and does not necessarily impact whether or not there is control of documents for purposes

6   of discovery."  *See id.* at 12–14, 21–28; *see also supra* II.A.3(a).

7   Finally, Nebraska suggests that Judge Kang erred in declining to mechanically follow the

8   discovery "process" in an unrelated litigation, *United States v. Google*, 698 F. Supp. 3d 876 (E.D. Va.

9   2023). Mot. 34.  There is no error, much less reversible error, in Judge Kang's correct decision to exercise

10  his independent judgment.  As Judge Kang explained, *Google* is inapposite: unlike Meta, the *Google*

11  defendant did not seek to use Rule 34 to obtain documents from Nebraska agencies.  MJ Order at 162.

12  "[T]here is nothing legally instructive or persuasive in the voluntary process followed by the parties in

13  Google which informs the 'control' issue here."  *Id.*

14        22.   New Jersey

15  New Jersey law provides that the AG "shall exclusively attend to and control all litigation and

16  controversies."  N.J. Stat. Ann. § 52:17A-4(c).  The AG is "the sole legal adviser, attorney or

17  counsel . . . for all officers [and agencies]," and must represent them "in all proceedings or actions."  *Id.*

18  § 52:17A-4(e).  The AG has said it *will* represent all but two of the identified agencies, *see* Dkt. 738-1 at

19  19–20, both of which it has represented before, *see* Dkt 738-23 at 2.  No statute deprives the AG of access

20  to agency documents.  Federal courts analyzing similar statutory frameworks have held that AGs have

21  control over state agencies under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357–58.

22  New Jersey's argument mirrors the flawed and unpersuasive general arguments addressed above.

23  *Compare* Mot. 34–35 *with supra* II.A.  New Jersey relies on the AG's "dual role" to argue that it is bringing

24  an enforcement action, but the statutes above apply only to representing agencies.  Mot. 34.  There is

25  nothing in the statutes (or other authority) that artificially limits them to one AG-invented "role."  The

26  State also argues that Judge Kang "improperly relied on the absence of outside counsel to justify his

27  conclusion that the AG must have control of all agencies' documents at all times."  *Id.*  But that ignores

28  the authorities discussed above and in the Order, and does not displace the AG's authority to "exclusively"

control state litigation.  It also ignores that the AG will represent all but two of the agencies in this litigation (and has previously represented the other two).  Finally, the State argues that Judge Kang's reliance on *Love v. New Jersey Department of Corrections*, 2017 WL 3477864, was misplaced, but New Jersey simply argues that the AG there acted as general counsel while here it is acting as an enforcer.  For the reasons already explained, that dual role finds no support in the relevant statutes or caselaw.

23.  New York

The AG must "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge and control of all the legal business of the departments and bureaus of the state, or of any office thereof which requires the services of attorney or counsel."  N.Y. Exec. Law § 63(1).  The AG "is obligated to prosecute, defend and control all legal business of state agencies."  *Morgan v. N.Y. State Dep't of Env't Conservation*, 779 N.Y.S.2d 643, 645 (2004).  No statute deprives the AG of access to agency documents for discovery purposes.  New York has confirmed that it may represent the agencies at issue in responding to third-party subpoenas in this case.  Dkt. 738-1 at 20.  One New York court has held that because the AG is "obligated to . . . control all legal business of state agencies," the AG is required to "search and produce documents from agencies."  *Opioid Litig.*, 2019 WL 4120096, at *1–2.  Federal courts analyzing similar frameworks have held that AGs have control over agency materials under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357–58.  While New York attempts to rewrite the statute above with an unwritten exception when "an agency responds to a third-party discovery demand," Mot. 35, that broad statute contains no such limitation.  And New York cites a single example of an agency representing itself, but that does not change the explicit statutory framework that Judge Kang relied on. MJ Order at 169–74.[22]

24.  North Carolina

North Carolina ignores that N.C. Gen. Stat. § 114-2 requires the AG "[t]o represent all State . . . agencies."  Though Section 147-17 permits agencies to employ "private counsel" with the AG's finding that it cannot do so and Governor's consent, this exception does not invalidate the Order's

---

[22] New York expends significant ink on whether agencies must notify the AG of discovery demands. Mot. 35–36.  It never explains why this is relevant: the statutes are clear that the AG has charge of **all** legal business of agencies.

1    conclusion that "[t]he statutory scheme" "makes clear the [] legislature's strong preference that state

2    agencies be represented by the [AG]."  MJ Order at 176; *see also* N.C. Gen. Stat. § 147-17(b) (The AG

3    "shall be counsel for all departments, officers, agencies . . . of the State which receive support . . . from

4    the State.").  The State argues that the Governor is "exempt" from the restrictions on hiring private counsel

5    imposed by Section 147-17, Mot. 37, but it has no evidence that the Governor will rely on non-AG counsel

6    in responding to Meta's discovery requests, *see* MJ Order at 176.  And the State's attempt to distinguish

7    between "private counsel" and "in-house counsel," Mot. 37*,* is similarly inapposite.

8         The State cites no authority barring it from accessing agency documents.  It concedes that it could

9    represent the agencies in responding to Meta's discovery requests (except the Department of Commerce).

10   *See* MJ Order at 176; *see also id.* (AG "does not adequately explain why they represent confusingly to the

11   Court that they would not represent [the Department of Commerce]").  And a federal court has concluded

12   that the AG has legal control over state agency materials.  *Generic II*, 699 F. Supp. 3d at 359–60.

13                          25.   North Dakota

14        Under North Dakota law, the AG carries out "all actions and proceedings in favor or for the use of

15   the state which may be necessary in the execution of the duties of any state officer."  N.D. Cent. Code

16   § 54-12-01(3).  The agencies at issue are prohibited from "employ[ing] legal counsel" other than the AG

17   without the AG's approval.  *Id.* § 54-12-08(1).  No statute deprives the AG of access to agency documents

18   (and one statute permits the AG to "access and examine any record under the control of the state board of

19   higher education," *id.* § 54-12-08(4)).  North Dakota has already conceded it may represent the agencies

20   at issue in responding to subpoenas.  Dkt. 738-1 at 21–22.  And it has argued that communications between

21   the AG's office and agencies would be subject to the attorney-client privilege.  Dkt. 738-26 at 1.  Federal

22   courts analyzing materially similar statutory frameworks have held that AGs have control over state

23   agencies under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357–58.  And as Judge Kang

24   pointed out, North Dakota has previously argued to a federal court that, when a sovereign entity was a

25   party, its agencies were subject to party discovery—but it now takes the polar opposite position.  *See* MJ

26   Order at 186–87 (*citing North Dakota v. United States*, 2021 WL 6278456 (D.N.D. Mar. 24, 2021)).

27        North Dakota ignores virtually all of Judge Kang's analysis and fails to adequately address the

28   statutory framework.  Instead, it leads with an argument that *North Dakota* is "distinguishable" on its

facts. Mot. 37. But that case's core holding was that agencies were subject to party discovery, regardless of North Dakota's current quibbles about those agencies' relevance. And other cases have agreed with that holding, including some with materially identical relevant facts to those here. *Supra* II.A.2. And more broadly, Judge Kang's reasoning was not dependent on that one case. He noted it to highlight the inconsistencies between North Dakota's positions in the two litigations. Even if North Dakota were entirely correct about the case's relevance (and it is not), it would not affect the statutory framework described above. North Dakota also repeats the States' argument that the AG is a separate office and separately elected officer from the agency heads. For the reasons explained in the Order and above, that argument does not foreclose a finding of control. *Supra* II.A.3(a).

26.   Ohio

As Ohio concedes, the AG " is legal counsel for all state agencies." *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 925 N.E.2d 641, 658 (Ohio Ct. App. 2009), *aff'd*, 941 N.E.2d 745 (Ohio 2010); *see also* Ohio Rev. Code § 109.02. "[N]o state officer or board, or head of a department or institution of the state shall employ, or be represented by, other counsel or attorneys at law" besides the AG (with exceptions not applicable here). Ohio Rev. Code § 109.02. "This statutory scheme makes plain the Ohio Legislature's mandate (and not mere preference) that the Ohio Attorney General will represent state agencies." MJ Order at 189. Indeed, a federal court has already held that the Ohio AG has legal control over agency materials for purposes of discovery. *Generic II*, 699 F. Supp. 3d at 360.

Ohio takes issue not with any of the above—a concession which would alone support overruling its objections—but with a purported misinterpretation of Section 1331.16(N). Mot. 38. Judge Kang read Section 1331.16(N), which provides that officials must provide "all information and assistance in their possession or within their power" to the AG, to reinforce his conclusion that the AG has control over agency documents under *Citric Acid*. MJ Order at 188. The State insists that Section 1331.16 applies only in the antitrust context. Mot. 2. Its authorities do not definitively make this point. *See, e.g.*, *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 801 (Ohio 2005) (holding that the antitrust laws, not Ohio's consumer protection acts, provide the exclusive remedy for certain monopolistic pricing practices). But even if the State were correct, Judge Kang did not err by pointing to the AG's explicit statutory right to obtain agency documents, as his analysis of jurisdictions lacking such a statute makes clear. *Compare* MJ Order at 188

40

1    *with id.* at 196.  Finally, this Court should not credit the AG's attempt to rewrite *Bivens v. Lisath*, 2007

2    WL 2891416 (S.D. Ohio Sept. 28, 2007).  The *Bivens* court's finding that the AG exercised control over

3    the documents of a third-party agency is an "analogous result" that supports the Order's "finding of

4    'control' here."  MJ Order at 193.

5                27.    <u>Oregon</u>

6        The Department of Justice has "[g]eneral control and supervision of all civil actions and legal

7    proceedings in which the State of Oregon may be a party or may be interested" and "[f]ull charge and

8    control of all the legal business of all departments, commissions and bureaus of the state, or of any office

9    thereof, which requires the services of an attorney or counsel in order to protect the interests of the state."

10   Or. Rev. Stat. Ann. § 180.220.  Agencies cannot employ other counsel unless the AG determines there is

11   a conflict and approves.  *Frohnmayer v. State Acc. Ins. Fund Corp.*, 294 Or. 570, 587 (1983).  The AG

12   has confirmed that it would represent the agencies in responding to a Meta subpoena.  Dkt. 738-1 at 23.

13   And it has confirmed it would assert the attorney-client privilege over communications with all of the

14   agencies at issue.  Dkt. 738-28 at 1.  Federal courts analyzing similar frameworks have held that AGs have

15   control over state agencies under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

16       Oregon fails to engage with Judge Kang's analysis beyond citing the States' general argument.

17   The entirety of its assertion of error is that "[w]hile the order properly quotes Oregon state law, the

18   conclusions it reaches based on those laws involve unsupportable leaps of logic, as explained in the

19   common arguments above."  Mot. 39.  That argument is insufficiently developed for Meta to respond to

20   (beyond incorporating its arguments above, which it does) or for the Court to analyze; the Court should

21   deem Oregon's state-specific challenges waived.  *See Rimes v. Noteware Dev. LLC*, 2010 WL 1644693,

22   at *2 (N.D. Cal. Apr. 21, 2010) (conclusory arguments are waived).

23       Oregon also notes (without explaining further) that the Order inadvertently omits three agencies

24   from its list (an understandable minor error given the volume of agencies at issue and the length of the

25   Order).  *Compare* MJ Order at 196 *with, e.g.*, Dkt. 738-1 (listing agencies from which discovery is sought).

26   The Order's reasoning applies equally to the agencies omitted, the briefing made clear that Meta sought

27   discovery from them, and Oregon's briefing has not identified any meaningful distinction.

28

28.   <u>Pennsylvania</u>

The AG is statutorily required to represent Pennsylvania and "all Commonwealth agencies."  71 Pa. Stat. Ann. § 732-204.  Pennsylvania law explicitly grants its AG "the right to access at all times to the books and papers of any Commonwealth agency necessary to carry out his duties under this act."  *Id*. § 732-208.  "[C]arry[ing] out [the AG's] duties" includes complying with Rule 34 discovery obligations, and to do so it is necessary for the AG to access the "books and papers" of Pennsylvania agencies.  The AG has conceded that it may represent the agencies in responding to third-party subpoenas.  Dkt. 738-1 at 24.  Pennsylvania has also refused to disclaim applying the attorney-client privilege to communications between the AG and agencies.  Dkt. 738-29 at 1.  A federal court has examined Pennsylvania's statutory framework and found that the AG has control of agency documents under the right-to-obtain test.  *See Generic I*, 571 F. Supp. 3d at 411.

In this briefing, Pennsylvania argues that, despite the clear statutory authority allowing the AG to examine agencies' documents, allowing it to do so would actually create "absurd results"; they urge that the Court read an unwritten exception into the statute solely on that basis.  Mot. 39–40.  But two carefully reasoned federal opinions have embraced these so-called "absurd" results.  *See* MJ Order at 199–211; *Generic I*, 571 F. Supp. 3d at 411.  Pennsylvania points to no authority for this extra-textual limitation.

29.   <u>Rhode Island</u>

Rhode Island law provides that "the attorney general, whenever requested, shall act as the legal adviser . . . of all state boards, divisions, departments, and commissions and the officers thereof," and "of all the general officers of the state," and will carry out "all suits and proceedings which they may be authorized to commence."  R.I. Gen. Laws § 42-9-6; *see also Common Cause R.I. v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020) (the Rhode Island AG "by law is obligated to act as legal advisor for all state agencies and officers acting in their official capacity and to defend them against suit").  Rhode Island cannot fault Judge Kang for resolving this dispute based on the "current record submitted" at the time of the Order's issuance, which "indicate[d] that no state agencies have confirmed they will retain separate counsel": there was thus no reversible error.  Mot. 30; *see Marshall*, 75 F.3d at 1426 (evidence not presented to magistrate judge waived).  That a single unreported state court opinion "denied [the AG]

access to Division of Motor Vehicle documents" is not "indicative of a lack of control."[23]  *Id.* at 40–41. Furthermore, no statute deprives the AG of access to agency documents, and the State concedes as much. Indeed, several statutes expressly "provide for disclosure of information" from state agencies to the AG. MJ Order at 214.  As Judge Kang explains, "none of these statutes state that they are the ***only*** method by which the [AG] may obtain documents from state agencies."  *Id.*  These statutes are further indicia that the Legislature intended for the AG to exercise control over agency documents "during its scope of legal representation of the state agencies."  *Id.*; *see also Shelby Cnty.*, 2012 WL 6003540, at *3.

30.     South Carolina

The AG "shall conduct all litigation which may be necessary for any department of the state government . . . and all these boards or departments are forbidden to employ any counsel for any purpose except through the Attorney General and upon his advice."  S.C. Code Ann. § 1-7-80.  A South Carolina court has held that the AG can require agencies to "give him information in writing upon any subject relating to the duties and functions of their respective offices, agencies, and institutions."  *Purdue*, 2019 WL 3753945, at *1–2.  The AG has said that it may represent the agencies at issue in responding to subpoenas by Meta.  Dkt. 738-1 at 26–27.  The AG would "necessarily and inherently have access to and control over the necessary documents for . . . representation of these state agencies."  MJ Order at 219.

South Carolina ignores these authorities and relies *entirely* on a single state-level appropriations act that sought to define agencies' documents as outside the control of the AG when the AG brings suit. Mot. 41–42.  Although the State faults Judge Kang for not citing the statute, Judge Kang analyzed a similar provision for Delaware and found that, in the context of the statutory framework as a whole, it did not foreclose a finding of control.  MJ Order 68–69.  Further, Judge Kang held that "the control issue under Rule 34 is governed by federal law" and courts "have recognized that a state law restriction on producing documents is not a barrier to a finding of control."  *Id.* at 9.  That South Carolina has attempted to

---

[23] The AG cites *Rhode Island v. BTTR LLC*, No. PC-2022-04492 (Oct. 28, 2022).  There is no written copy of the decision available.  The States failed to include the court's oral decision, and were unable to provide a copy of that decision before Meta filed this brief, depriving Meta of an opportunity to address it.  In any event, based on the briefing that the State instead provided to Meta, the decision appears irrelevant because it involved a ***plaintiff*** moving to quash an ***AG*** subpoena ***to*** a state agency on relevance and confidentiality grounds.

unilaterally limit the reach of discovery does not foreclose a finding of control in federal court under federal law—an issue for the court alone.  Were it otherwise, state litigants could always deprive opposing parties of discovery simply by passing a statute declaring that the AG did not control the documents—a result with inequitable consequences far beyond this case.  *See, e.g.*, *LULAC*, 2022 WL 1540589, at *2–3 (Voting Rights Act case noting inequitable consequences of permitting this).

31.    South Dakota

The State asserts that the Order "defiles South Dakota's . . . statutory and constitutional scheme." Mot. 42.  This hyperbolic statement is detached from reality—Judge Kang considered South Dakota's statutory regime and correctly concluded that the AG has control over agency documents.  MJ Order 225–28.  The State does not engage with Judge Kang's reasoning, instead adopting tortured constructions of statutory provisions in an (unsuccessful) attempt to demonstrate error.  The AG argues that the use of "may" in S.D. Codified Laws § 1-11-1, which provides that the AG "may bring a civil action," negates any obligation it has to represent the agencies.  Mot. 42.  But here, the AG has ***already*** opted to commence a civil action.  It beggars belief that the AG would now argue that "the welfare of the state" ***does not*** now "demand" that the AG represent the agencies in responding to Meta's discovery requests, especially when these same agencies stand to gain should the AG prevail.  *See* S.D. Codified Laws § 37-1-23.  The State does not  overcome the fact that under South Dakota law, the AG is generally the State's representative in judicial proceedings, *see id.* § 1-11-1(1)–(4), and any legal services not performed by the AG must be performed under a contract filed with the AG, *see id*. § 1-11-15.

The State also takes issue with the Court's interpretation of Section 1-11-10, granting the AG access to "any and all" agency documents based on "the attorney general's own relation with consent of the Governor."  The AG suggests that it has only "theoretical control" subject to the Governor's consent. Mot. 43.  But this does not refute Judge Kang's correct reasoning that "the fact that consent is required from the Governor under the statute should not detract from the Attorney General's legal right to access the agencies' documents" under *Citric Acid*.  MJ Order at 226.  The existence of a "legal mechanism" allowing the AG to obtain agency documents—even a mechanism "contingent" on the actions of another—establishes control over the documents.  *See id.*

1

32.   <u>Virginia</u>

2

"All legal service in civil matters for the Commonwealth, the Governor, and every state department

3

. . . agency, entity, official, court, or judge, including the conduct of all civil litigation in which any of

4

them are interested, shall be rendered and performed by the Attorney General."  Va. Code Ann. §§ 2.2-

5

507; -510 (requiring Governor's "exemption" or AG's "written recommendation").  "No regular counsel

6

shall be employed for or by the Governor or any state department . . . , bureau, agency, entity, or official."

7

*Id.*; *see id.* § 2.2-513 (extends to "federal matters").  No statute deprives the AG of access to agency

8

documents.  The AG has confirmed that it *will* represent the agencies in responding to a subpoena here.

9

Dkt. 738-1 at 28.  It has said it will assert the attorney-client privilege over communications with agencies.

10

Dkt. 738-33 at 1.  Federal courts analyzing similar frameworks have held that AGs have control over

11

agency materials under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

12

Virginia's response largely parrots the States' common arguments.  *See* Mot. 43–44.  Its arguments

13

about the statutes at issue miss the point: as a whole, they grant the AG the authority to represent agencies,

14

and that authority must necessarily include obtaining documents for litigation purposes.  It never grapples

15

with its concession that it *will* represent the agencies here *in this proceeding* responding to subpoenas.

16

And its arguments about the AG's independent structure are a reprise of the States' common arguments

17

that Judge Kang rightly rejected.  *Supra* II.A.3(a).

18

33.   <u>Washington</u>

19

The AG shall "represent the state and all officials, departments, boards, commissions and

20

agencies."  Wash. Rev. Code Ann. § 43.10.040.  The Washington Supreme Court has held that the AG

21

has the "statutory duty" to represent various agencies.  *See Black v. Dep't of Lab. & Indus. of the State of

22

Wash.*, 131 Wash. 2d 547, 555 n.8 (1997); *Goldmark v. McKenna*, 172 Wash. 2d 568, 573 (2011).  There

23

is no statutory authority denying the AG access to the agency documents.  Washington has confirmed that

24

it *will* represent each agency in responding to subpoenas by Meta, Dkt. 738-1 at 29, and has argued it

25

would assert attorney-client privilege over communications between it and the agencies, Dkt. 738-34 at 1.

26

A Washington federal court has already held that party discovery against state agencies is appropriate in

27

similar circumstances.  *GEO Grp.*, 2018 WL 9457998, at *3.

28

45

Washington attempts to discount *GEO Group*, the only decision by a federal court examining this issue under Washington law.  But its only purported distinctions are that "state agencies' own actions in *GEO* were the bases of defendants' affirmative defenses of laches and unclean hands" and "*GEO* involved the Minimum Wage Act," which was "typically enforced by an agency."  Mot. 44.  But the Court's *reasoning* about the key issue—whether agencies were subject to party discovery—did not depend at all on either of those facts, but rather on the plaintiff being the State.  *GEO Grp.*, 2018 WL 9457998, at *3. To the extent the AG's distinctions matter, they do so only to issues like relevance of the discovery, not to the threshold legal question here.  The AG also cited "potential adversarial interests among agencies," Mot. 45, but it fails to put forward any evidence at all of such a conflict here.[24]  As Judge Kang and other courts have held, a hypothetical conflict is no reason to deny otherwise valid discovery.[25]

### 34.   West Virginia

Under West Virginia law, the AG "shall appear as counsel for the state" and "prosecute and defend suits, actions, and other legal proceedings." W. Va. Code Ann. §§ 5-3-1, 5-3-2.  It is "unlawful" for the State to "expend any public funds . . . for the purpose of paying any person, firm, or corporation for the performance of any legal services." *Id.* § 5-3-1. Thus, the AG "remains the legal representative of the State and its agencies unless specifically exempted by statute." *State ex rel. Caryl v. MacQueen*, 385 S.E.2d 646, 650 (W. Va. 1989).[26]

The State's reliance on *State ex rel. McGraw v. Burton*, 569 S.E.2d 99 (W. Va. 2002), to make the contrary point omits key context.  While the West Virginia Supreme Court of Appeals did observe that state agencies "may in some circumstances" utilize non-AG lawyers, the court emphasized the "central role" the AG plays "in the provision of day-to-day professional legal services to State officials and entities

---

[24] Washington says the conflict is not hypothetical because in a prior case, two state universities litigated against each other. Mot. 45.  That one-off case says nothing about the agencies and AG here.

[25] In a footnote, Washington argues that it has *not* claimed that the attorney-client privilege applies to "communications between AGO enforcement attorneys and state agencies or their attorneys."  Mot. 45 n.20.  That misses the point: Washington has conceded that communications between the AG's Office and an agency "are attorney-client privileged."  Dkt. 738-34 at 1.  That it chooses to set up internal divisions in the AG's Office does not change that this asserted privileged relationship supports a finding of control.

[26] It is true that a client may refuse to take their attorney's advice. *See* Mot. 46.  But, as the Order explains, counsel may not "simply aced[e] to a client who fails (or worse, refuses) to produce or provide documents."  MJ Order at 25.

in and associated with the executive branch of government" and in asserting legal positions before tribunals "only after meaningful consideration of the potential effects of such legal policy and positions on the full range of State entities and interests." *Id.* at 115–16.  Judge Kang did not err in holding that the West Virginia statutory framework indicates that the AG has control over agency documents.  His order neither runs roughshod over separation of powers nor grants the AG any authority that it does not already possess.  *Contra* Mot. 46.  Finally, Judge Kang did not err in understanding that the AG "plainly is attempting to preserve the ability to assert the attorney-client privilege between" its office and the agencies.  MJ Order at 240.  When briefing this dispute, the AG stated that "[w]hen the AG is serving as legal counsel for a state agency, his communications with the agency are confidential and privileged." Dkt. 738-35 at 1.  Judge Kang correctly interpreted the AG's statement to present a "myopic argument which is not firmly grounded in reality": the AG desires to be treated in one way because it may not be representing the agencies at the time of briefing, while leaving open the possibility of undertaking such representation later.  MJ Order at 240.  This is not reversible error.

35.  <u>Wisconsin</u>

The AG must represent "any state department, agency, official, employee or agent" in any proceeding for which the Governor requests.  *See* Wis. Stat. Ann. § 165.25(1)–(1m).  The AG "[a]t the request of the head of any department of state government . . . may appear for and defend any state department . . . in any civil action or other matter brought before a court."  Wis. Stat. Ann. § 165.25(6)(a)(1).  The AG has conceded that it has acted as counsel for the Governor *in this proceeding*, and all but one agency at issue is controlled by the Governor.  *See* Dkt 738-36 at 1 ("Here, with respect to this litigation **and with the exception of the governor**, the AG has not acted as counsel to any of the agencies identified by Meta in the Joint Chart." (emphasis added)).  No statute deprives the AG of access to agency documents.  The AG has also said that it may represent the agencies at issue in responding to subpoenas by Meta in this case.  Dkt. 738-1 at 30–31.  And it has argued that its communications with agencies can be subject to the attorney-client privilege.  Dkt. 738-36 at 1.  Federal courts analyzing similar frameworks have held that AGs have control over state agencies under the right-to-obtain test.  *E.g.*, *Generic II*, 699 F. Supp. 3d at 357.

Wisconsin's briefing fails to engage with these authorities.  Instead, it argues that the AG's actions must be authorized by statute but no statute authorizes the AG to obtain records.  Mot. 46.  But the statutes cited above give the AG the authority to conduct legal affairs for agencies, and that authority inherently includes obtaining documents for litigation.  Next, Wisconsin says that the "order incorrectly concluded the WI AG represents the governor in this case."  Mot. 47.  But that conclusion came straight from Wisconsin itself: "Here, with respect to this litigation ***and with the exception of the governor***, the AG has not acted as counsel to any of the agencies identified by Meta in the Joint Chart."  Dkt 738-36 at 1 (emphasis added).  The AG attempts to recharacterize the statement, but can only contend that it was saying that pre-suit communications "with the governor regarding this litigation may be privileged."  Mot. 47 n.22.  But if those communications were privileged, *it would necessarily mean there was an attorney-client relationship with the Governor regarding this suit*.  Either way, Judge Kang was entitled to rely on the AG's representation.  Finally, the AG argues that the statutes above establish that it may only represent agencies upon request.  But that assertion is addressed by the Order and by the reality that it is the Governor who makes those requests and the AG has represented the Governor in this proceeding.

## C.   If the Court Is Inclined to Reverse, It Should Resolve Meta's Argument that the States (and Their Component Agencies) Are Parties to This Litigation and Subject to Discovery.

District courts may "affirm the Magistrate Judge on any ground apparent from the record."  *United States v. Bennett*, 2006 WL 2793170, at *4 (D. Haw. Sept. 27, 2006).  If the Court is inclined to sustain the States' objections, it should resolve the argument that Meta made before Judge Kang but that, as Meta understands his opinion, he declined to address as "beyond the scope of the discovery referral order in this action," MJ Order at 42: that the States are parties in sum and substance and they (and therefore their component agencies) are subject to discovery on that basis, *compare id. with, e.g.*, *id.* at 17 ("In all thirty-two cases, the State itself is a party to the suit.").  This alternative ground for affirmance was included in the Parties' March 15 letter brief to Judge Kang, *see* Dkt. 685, and is necessary to resolve the dispute if the Court disagrees with Judge Kang on the control issue.

In this case, almost all of the named plaintiffs are the States themselves, not AGs.  *See* Compl. ¶¶ 11, 21.  For three (Florida, Maryland, and New Jersey), the AG is the sole named plaintiff.  MJ Order

META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE

at 30–31.  As noted above, many courts have held that, when a state sues in its name or when an AG sues in the name of the state or its own name, the state itself is the party to the action.  *See authorities cited supra* II.A.2.  And because the State itself is a party to the action, the entire state is subject to discovery— including its agencies.  As one court has explained, "it hardly seems reasonable to insulate the entire government, other than the Attorney General's Office, from the direct discovery process."  *AT&T*, 461 F. Supp. at 1333–34.  Or as another said, "'the State of Texas' is made up of state executive agencies or officials who have information that is relevant to the factual basis for the claim."  *LULAC*, 2022 WL 1540589, at *3.

Holding otherwise would also have inequitable consequences: it would permit states to wall off portions of themselves from party discovery or insulate documents from discovery merely by housing them with agencies other than AG offices.  That would reverberate in cases far beyond this one and would "effectively mean that [litigants] could obtain only a minuscule portion of the universe of relevant documents by party discovery."  *Id.* (so holding in Voting Rights Act suit against Texas).

## V.    CONCLUSION

For the reasons set forth above, Meta respectfully requests that the Court affirm.

Dated:  September 27, 2024                          Respectfully submitted,

**COVINGTON & BURLING LLP**

   */s/ Ashley M. Simonsen*
Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email:  asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000

49

Facsimile: + 1 (202) 662-6291
Email:  pajones@cov.com
Email:  pschmidt@cov.com

Emily Johnson Henn (State Bar. No. 269482)
COVINGTON & BURLING LLP
3000 El Camino Real
5 Palo Alto Square, 10th Floor
Palo Alto, CA 94306
Telephone: + 1 (650) 632-4700
Facsimile: +1 (650) 632-4800
Email:  ehenn@cov.com

Isaac D. Chaput (State Bar No. 326923)
COVINGTON & BURLING LLP
Salesforce Tower
415 Mission Street, Suite 5400
San Francisco, CA 94105
Telephone: +1 (415) 591-6000
Facsimile: +1 (415) 591-6091
Email:  ichaput@cov.com

Gregory L. Halperin, *pro hac vice*
COVINGTON & BURLING LLP
620 Eighth Avenue
New York, NY 10018-1405
Telephone: +1 (212) 841-1000
Facsimile: +1 (212) 841-1010
Email:  ghalperin@cov.com

*Attorneys for Defendants Meta Platforms, Inc.;*
*Instagram, LLC; Meta Payments, Inc.; and*
*Meta Platforms Technologies, LLC*

META DEFENDANTS' OPPOSITION TO STATES' MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER
OF MAGISTRATE JUDGE