# EXHIBIT A



FILED

Sep 30 2024, 9:02 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court



I N T H E

# Court of Appeals of Indiana

State of Indiana,

*Appellant-Plaintiff*

v.

TikTok Inc., ByteDance Ltd., ByteDance Inc., and TikTok Pte.
Ltd.,

*Appellees-Defendants*

---

September 30, 2024

Court of Appeals Case Nos.
23A-PL-3110
23A-PL-3111

Appeal from the Allen Superior Court

The Honorable Jennifer L. DeGroote, Judge

Trial Court Cause Nos.
02D02-2212-PL-400
02D03-2212-PL-401

---

**Opinion by Judge Mathias**

Chief Judge Altice and Judge Bailey concur.


**Mathias, Judge.**

[1]     The State filed two complaints against TikTok, Inc., a California corporation,[1] in which the State alleged that TikTok had engaged in deceptive acts under Indiana's Deceptive Consumer Sales Act (DCSA), Ind. Code §§ 24-5-0.5-0.1 to 12 (2024). The trial court dismissed both complaints on the grounds that the court did not have specific personal jurisdiction over TikTok and, alternatively, that the State's complaints failed to state a claim under the DCSA. Although we have not formally consolidated the State's appeals from the trial court's orders, we nonetheless decide them together in this singular opinion as the factual and legal issues between them substantially overlap.

[2]     We hold as follows:

> 1. TikTok has purposefully invoked substantial contacts within
> Indiana, and the controversies at hand are related to those

---

[1] The State's complaints also named ByteDance, Ltd., ByteDance, Inc., and TikTok Pte., Ltd., all of which are foreign entities, as defendants. The trial court dismissed the State's complaints against those additional defendants for lack of personal jurisdiction. And, on appeal, the State's only contacts-specific arguments that the trial court's judgments on personal jurisdiction were in error relate specifically to California-based TikTok, Inc. We conclude that the State's arguments on appeal therefore fail to sufficiently challenge the dismissals of the three related businesses, we affirm the trial court's dismissal of them, and we limit our review on appeal to the trial court's judgments vis-à-vis TikTok, Inc. *See* Ind. Appellate Rule 46(A)(8)(a); *see also LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 968 (Ind. 2006) (noting "the presumption that a parent and a subsidiary are independent entities and a subsidiary's contacts with the forum are not attributed to the parent corporation for jurisdictional purposes").

contacts. Thus, Indiana's judiciary has specific personal jurisdiction over TikTok.

2. TikTok's business model of exchanging access to its content library for end-user personal data is a "consumer transaction" under the DCSA.

3. The test used to dismiss the State's complaint for failing to state a claim in Cause No. 02D02-2212-PL-400 (Cause PL-400), has been superseded by statutory amendment. Under the current statutory language, the State has stated a claim under the DCSA.

4. The State's complaint in Cause No. 02D03-2212-PL-401 (Cause PL-401) also states a claim under the DCSA.

[3]    We emphasize that the DCSA issues in these appeals test neither evidence nor facts supported by evidence. Rather, the issues here turn only on the legal sufficiency of the State's complaints.

[4]    We affirm in part, reverse in part, and remand for further proceedings in both causes.

## Facts and Procedural History

[5]    In December 2022, the State filed its complaints in Cause PL-400 and Cause PL-401, which complaints the State later amended. According to the State's amended complaints, TikTok is a for-profit California corporation that operates a digital application (TikTok's "app"). TikTok's app is downloaded by end-users onto their smartphones or tablets through Apple's App Store, the Google Play Store, or the Microsoft Store.

[6]     TikTok's app "was the most downloaded app globally in 2022." Appellant's
        App. in 23A-PL-3110, Vol. 2, p. 129; Appellant's App. in 23A-PL-3111, Vol. 2,
        p. 102. The State's amended complaints suggest that millions of end-users in
        Indiana use TikTok's app. And, for tax year 2021, TikTok filed an Indiana
        income tax return that attributed more than $46 million in income to activities
        within Indiana. Appellant's App. in 23A-PL-3110, Vol. 2, p. 127; Appellant's
        App. in 23A-PL-3111, Vol. 2, pp. 100-01.

[7]     TikTok's app "allows users to create, upload, and share short videos and view
        and interact with short videos posted by other users." Appellant's App. in 23A-
        PL-3110, Vol. 2, p. 119; *see also* Appellant's App. in 23A-PL-3111, Vol. 2, p.
        102. In exchange for access to TikTok's vast content library, the end-user must
        agree to allow TikTok to access and collect the end-user's personal data. *See* Tr.
        Vol. 2, pp. 19, 36.[2] Those data include location and device-usage data. They
        also include data regarding the end-user's interactions with the app itself. And,
        in initially registering to use the app, the end-user also must self-report his or
        her age to TikTok.

[8]     TikTok uses the collected personal data to generate a "For You" home page
        that "is a never-ending, algorithmically-personalized stream of videos"
        presented to the end-user upon logging into the app. Appellant's App. in 23A-
        PL-3110, Vol. 2, p. 129; *see also* Appellant's App. in 23A-PL-3111, Vol. 2, pp.

---

[2] The trial court held a consolidated hearing on TikTok's motions to dismiss the two complaints. Thus, the
transcript on appeal of that hearing is identical in both of our case numbers.

102-04. TikTok also sells the collected personal data to advertisers, which make use of the end-user's data—especially his or her location data—to target solicitations within the app to those end-users. *See* Tr. Vol. 2, pp. 19, 36. And, according to the State's amended complaint in Cause PL-401, TikTok's related businesses—most notably, ByteDance, Ltd., a parent company of TikTok headquartered in Beijing, in the People's Republic of China—also have access to TikTok's collected personal data.

[9]     In its amended complaint in Cause PL-400, the State alleged that, "[i]n order to lure . . . children onto its platform or convince parents that it is appropriate for their children to download" and engage with TikTok's app, "TikTok makes a variety of misleading representations and omissions," which in turn enable TikTok "to claim a 12+ rating on the Apple App Store and a 'T' for 'Teen' rating in the Google Play Store and the Microsoft Store." Appellant's App. in 23A-PL-3110, Vol. 2, pp. 118-19. In particular, the State alleged that:

- TikTok "has communicated to Indiana consumers that 'Alcohol, Tobacco, and Drug References,' 'Sexual Content or Nudity,' 'Mature/Suggestive Themes,' and 'Profanity or Crude Humor' are 'Infrequent/Mild' on the platform, when in fact[] these types of content are frequent and intense on the platform." The State further alleged that, in reality, that content is both readily available to end-users by way of an in-app search tool and also can be "promote[d]" to some end-users by way of TikTok's algorithm "regardless of a user's age."
- TikTok has promulgated "Community Guidelines," which are intended to "apply to everyone and everything on TikTok" and "give[] consumers the clear impression that content that violates the Community Guidelines is simply not available on the platform." But, according to the State, that is false. For example, TikTok's Community Guidelines state that TikTok

"do[es] not allow showing or promoting recreational drug use, or the trade of alcohol, tobacco products, and drugs." However, "the TikTok platform contains abundant content about drug use, including content that depicts and promotes drug use and consumption . . . ." The State further alleged that TikTok in fact "mak[es] *no attempt* to enforce certain of its Community Guidelines as written."

- TikTok promotes the availability of an in-app "Restricted Mode," which TikTok identifies as "an option at the account settings level that limits the appearance of content that may not be appropriate for all audiences." According to the State, however, "[i]n reality[] Restricted Mode does virtually nothing to limit mature content." For example, a search within the app for sexually explicit material returns the same, explicit search results whether Restricted Mode is enabled or disabled. As the State summarized: "Scrolling a 13-year-old user's For You page with Restricted Mode turned *on* is not meaningfully different in terms of vulgar and profane content than scrolling the same 13-year-old user's For You page with Restricted Mode turned *off*."

*Id.* at 119, 121-22, 161-65.

[10]    While the State's allegations in Cause PL-400 focused on TikTok's allegedly deceptive acts under the DCSA to induce minors and parents of minors in Indiana to download and access TikTok's app, in its amended complaint in Cause PL-401 the State focused on TikTok's relationship with its Chinese parent company, ByteDance. In particular, in its amended complaint in Cause PL-401, the State alleged that TikTok had omitted informing end-users in Indiana of the risk of Chinese government access to TikTok's collected personal data and, further, that TikTok had made numerous public statements that falsely represented that risk of access.

[11]    According to that complaint:

- "Chinese law requires Chinese citizens, and individuals and organizations or entities in China[,] to cooperate with 'national intelligence work' and grants Chinese Government and Communist Party officials broad, invasive authority to . . . access private networks, communications systems, and facilities to conduct inspections and reviews. . . . [T]here is no meaningful mechanism in China to resist these demands." The State added that "TikTok and ByteDance leadership and employees who are Chinese citizens or who are located in China are no exception" to the access requirements of Chinese law. In other words, according to the State, if a Chinese citizen or entity has access to TikTok's collected personal data, the Chinese government has that same access. And the State affirmatively alleged that ByteDance and other Chinese companies involved in TikTok's regular business operations have access to TikTok's collected personal data.[3]

- TikTok, through representatives, including its CEO in statements to a committee of Congress, and other public statements, has repeatedly refuted the risk of foreign government access to TikTok's collected personal data. The State alleged that those statements were either false or misleading and made with the intent to induce end-users in Indiana to download, use, or continue to use the app.

- TikTok's privacy policy informs consumers that TikTok "may share all of the information we collect with a parent, subsidiary, or other affiliate of our corporate group." However, the privacy policy makes no mention of the possibility that the government of China in particular will have access to TikTok's collected personal data through ByteDance's access.

- The State also alleged that clicking on an internet link within TikTok's app opens an in-app internet browser, which does not apply the user's default-browser's privacy settings. The State alleged that TikTok omits informing possible end-users of the in-app browser's circumvention of an end-user's usual privacy settings.

---

[3] The State's complaint further asserted that ByteDance employees previously have accessed TikTok's collected personal data, in particular, journalists' location data. Appellant's App. in 23A-PL-3111, Vol. 2, p. 114.

Appellant's App. in 23A-PL-3111, Vol. 2, pp. 105-06, 110, 112-13, 123.

[12]    TikTok moved to dismiss the State's amended complaints on the grounds that Indiana lacked specific personal jurisdiction over TikTok and, alternatively, that the State had failed to state a claim under the DCSA in either complaint. The trial court held a consolidated oral-argument hearing on TikTok's motions to dismiss. Following that hearing, the trial court agreed with TikTok on both grounds, and the court then entered its orders dismissing the State's amended complaints.

[13]    These appeals ensued.

## Standard of Review

[14]    The trial court dismissed the State's amended complaints under Indiana Trial Rules 12(B)(2) (for lack of personal jurisdiction) and 12(B)(6) (for failing to state a claim). The trial court's judgments were based only on the allegations pleaded by the State in its complaints; the trial court did not hold an evidentiary hearing or determine facts in deciding TikTok's motions under Rule 12. In such circumstances, our review is de novo. *See, e.g.*, *Bellwether Props., LLC v. Duke Energy Ind., Inc.*, 87 N.E.3d 462, 466 (Ind. 2017).

# 1. TikTok has purposefully invoked substantial contacts within Indiana, and the controversies at hand are related to those contacts. Thus, Indiana's judiciary has specific personal jurisdiction over TikTok.

[15]     We first address the trial court's conclusion that Indiana's judiciary lacks specific personal jurisdiction over TikTok. We analyze whether personal jurisdiction exists in Indiana under the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Boyer v. Smith*, 42 N.E.3d 505, 509 (Ind. 2015) (quotation marks omitted). As our Supreme Court has explained:

> before an Indiana court can properly assert personal jurisdiction over a defendant, the Due Process Clause of the Fourteenth Amendment mandates that the defendant have "certain minimum contacts with the state such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." [*LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006)] (citing *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S. Ct. 154, 90 L. Ed. 95 (1945)). Minimum contacts include acts defendants themselves initiate within or without the forum state that create a substantial connection with the forum state itself. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *see also Anthem Ins. Cos., Inc. v. Tenet Healthcare Corp.*, 730 N.E.2d 1227, 1235 (Ind. 2000), *superseded on other grounds* by *LinkAmerica*.

> The "minimum contacts" test of *International Shoe* and its progeny ensures that a defendant's contacts with Indiana make an Indiana court's exercise of personal jurisdiction fair and just. *LinkAmerica*, 857 N.E.2d at 967 (citing *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. 154). To state this another way, due process

requires that potential out-of-state defendants be able to predict what conduct might make them liable in our courts. *Burger King*, 471 U.S. at 472, 105 S. Ct. 2174 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)). *See also Int'l Shoe Co.*, 326 U.S. at 319, 66 S. Ct. 154; *Anthem Ins. Cos.*, 730 N.E.2d at 1235-36. "The Due Process Clause . . . gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *WorldWide Volkswagen*, 444 U.S. at 297, 100 S. Ct. 559 (citation omitted). Consistent with this longstanding precedent, Indiana courts will employ caution and exert potentially coercive legal authority only over a defendant who has the requisite minimum contacts to Indiana. *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. 154 (citing *Pennoyer v. Neff*, 95 U.S. 714, 24 L. Ed. 565 (1877)).

*Id.* (omission original to *Boyer*).

[16]     The issue in these appeals is one of specific personal jurisdiction. As the Supreme Court of the United States has made clear:

In order for a state court to exercise specific jurisdiction, "the *suit*" must "aris[e] out of or relat[e] to the defendant's contacts with the forum." [*Daimler AG v. Bauman*, 571 U.S. 117,] 127, 134 S. Ct.[ 746,] 754 [(2014)] (internal quotation marks omitted; emphasis added); *see Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-473, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985); *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984). In other words, there must be "an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear [Dunlop Tires Operations, S.A. v. Brown]*, 564 U.S.[ 915,] 919, 131 S. Ct. 2846 [(2011)] (internal quotation marks and

brackets omitted). For this reason, "specific jurisdiction is
confined to adjudication of issues deriving from, or connected
with, the very controversy that establishes jurisdiction." *Ibid.*
(internal quotation marks omitted).

*Bristol-Myers Squibb Co. v. Sup. Ct. of Cal., S.F. Cnty.*, 582 U.S. 255, 262 (2017)

(some alterations in original). "Specific jurisdiction also requires purposeful

availment—meaning a defendant invoked [its] contacts or connections with

Indiana[] and therefore should have reasonably anticipated being called into

court to answer for [its] actions." *Boyer*, 42 N.E.3d at 510.

[17] The question of our judiciary's possible specific personal jurisdiction over

TikTok also involves the fact that TikTok operates over the internet. When

considering the jurisdictional implications of internet-based activity, several

federal courts have followed the approach first set out in *Zippo Manufacturing Co.*

*v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997). *See, e.g.*,

*Fidrych v. Marriott Int'l, Inc.*, 952 F.3d 124, 141 (4th Cir. 2020). As the *Zippo*

court concluded:

> the likelihood that personal jurisdiction can be constitutionally
> exercised is directly proportionate to the nature and quality of
> commercial activity that an entity conducts over the Internet.
> This sliding scale is consistent with well developed personal
> jurisdiction principles. *At one end of the spectrum are situations where
> a defendant clearly does business over the Internet. If the defendant enters
> into contracts with residents of a foreign jurisdiction that involve the
> knowing and repeated transmission of computer files over the Internet,
> personal jurisdiction is proper.* At the opposite end are situations
> where a defendant has simply posted information on an Internet
> Web site which is accessible to users in foreign jurisdictions. A

passive Web site that does little more than make information available to those who are interested in it is not grounds for the exercise [of] personal jurisdiction. The middle ground is occupied by interactive Web sites where a user can exchange information with the host computer. In these cases, the exercise of jurisdiction is determined by examining the level of interactivity and commercial nature of the exchange of information that occurs on the Web site.

*Zippo Mfg. Co.*, 952 F. Supp at 1124 (citations omitted; emphasis added).

[18]    We read *Zippo* as an example of existing specific-personal-jurisdiction precedent in the context of internet-based contacts. For example, where a South Carolina resident used an online website operated by an out-of-state business to book a hotel stay in Italy, the South Carolina resident could not seek to have South Carolina courts exercise specific personal jurisdiction over the website operator for a tort claim arising out of the stay at the hotel. *Fidrych*, 952 F.3d at 141-44; *see also Wolf's Marine, Inc. v. Brar*, 3 N.E.3d 12, 18-19 (Ind. Ct. App. 2014) (holding that Indiana's judiciary had no specific personal jurisdiction over a Michigan company for the storage of a Hoosier's boat in Michigan when the boat had never been in Indiana, the contract was for a limited duration and scope, and no goods or services were delivered to or from or performed in Indiana, although the Hoosier had learned about the company over the internet and had received the contract by email). Conversely, where the defendant "clearly does business over the Internet," such as by agreeing "with residents of a foreign jurisdiction" to engage in "the knowing and repeated transmission of computer files over the Internet," and those contacts with the forum are

connected to the claims at issue, "personal jurisdiction is proper." *Zippo Mfg. Co.*, 952 F. Supp. at 1124.

[19]    We have little trouble concluding that Indiana's judiciary has specific personal jurisdiction over TikTok. TikTok's contacts within Indiana are well beyond the "minimum" needed to satisfy due process. TikTok has millions of end-users of its app within Indiana. Its engagement with those end-users is neither passive nor fleeting—TikTok uses the internet, to which its app is connected, to knowingly and repeatedly transmit data to and from each of those millions of Indiana end-users each and every hour of each and every day.

[20]    Further, TikTok has purposefully availed itself of those Indiana contacts. It has invoked those contacts as part of its business model—the exchange of access to TikTok's content library for end-user personal data, which TikTok collects and monetizes. Indeed, as set forth above, TikTok reported $46 million in Indiana-based income in tax year 2021.

[21]    And the contacts upon which the State's claims are based here are part-and-parcel with the usage of TikTok's app by Indiana residents. In its amended complaints, the State has alleged that, in order to induce end-users in Indiana to download or access its app, TikTok misrepresented or falsely represented various information on which end-users within Indiana were likely to rely when deciding whether to download or access the app. Any reasonable business could and should have anticipated being called into an Indiana court based on those alleged actions and TikTok's substantial Indiana contacts. There is simply no

serious question that the State has established specific personal jurisdiction over TikTok.

[22]    Nonetheless, TikTok asserts that specific personal jurisdiction cannot exist here because TikTok neither engaged in its allegedly deceptive acts "in Indiana" specifically nor "directed" those alleged acts "at Indiana in particular." Appellees' Br. in 23A-PL-3110, at 19; Appellees' Br. in 23A-PL-3111, at 21. In support of those assertions, TikTok relies on a number of authorities that recognize that the passive operation of a website alone, or operating a business via the internet that only occasionally has contacts within the forum state, is insufficient to establish specific personal jurisdiction. Appellees' Br. in 23A-PL-3110, at 20-21 (citing cases); Appellees' Br. in 23A-PL-3111, at 22-23 (same). But TikTok is neither passively operating a website (or its app) nor only occasionally doing business in Indiana via the internet. TikTok's contacts within Indiana are substantial and continuous.

[23]    TikTok also complains that, if we hold that we have specific personal jurisdiction over it, we are effectively holding that there is "roving personal jurisdiction" in scenarios where end-users of an app may carry their smartphones or tablets between jurisdictions. Appellees' Br. in 23A-PL-3110, at 22; Appellees' Br. in 23A-PL-3111, at 24. Specific personal jurisdiction is a case-by-case analysis that looks both to the defendant's minimum contacts with the forum as well as to its claim-related contacts. We concern ourselves only with TikTok's alleged contacts with Indiana and its residents. We need not

concern ourselves with TikTok's hypothetical or speculate on the outcome of
any such hypothetical here.

[24]    Finally, where, as here, a defendant has contacts with the forum state sufficient
for specific personal jurisdiction, we must still determine whether "the assertion
of personal jurisdiction over the defendant is reasonable." *LinkAmerica*, 857
N.E.2d at 967. Determining the reasonableness of exercising personal
jurisdiction requires balancing five factors:

> (1) the burden on the defendant; (2) the forum State's interest in
> adjudicating the dispute; (3) the plaintiff's interest in obtaining
> convenience and effective relief; (4) the interstate judicial
> system's interest in obtaining the most efficient resolution of
> controversies; and (5) the shared interest of the several States in
> furthering fundamental substantive social policies.

*Id.* at 968 (quoting *Burger King*, 471 U.S. at 476-77). "[T]he 'primary concern' is
'the burden on the defendant.' Assessing this burden . . . encompasses
the . . . abstract matter of submitting to the coercive power of a State that may
have little legitimate interest in the claims in question." *Bristol-Myers Squibb*, 582
U.S. at 264 (citation omitted). But "[t]he assertion of personal jurisdiction will
rarely be found unreasonable if 'minimum contacts' are found." *LinkAmerica*,
857 N.E.2d at 967.

[25]    Here, the State is seeking to prevent allegedly deceptive acts against its in-state
residents, whom it has a significant interest in protecting. Further, the State's
interest in litigating in an Indiana court what is a matter of Indiana law is also
significant. Indiana is also the most efficient forum in which to resolve the

State's claims, and we believe the shared interest of the several States in furthering their own substantive social policies against allegedly deceptive acts likewise supports our exercise of jurisdiction.

[26]    TikTok argues that exercising personal jurisdiction over it is unreasonable because the burden on TikTok will be substantial. According to TikTok, the State's complaints here "implicate" consumer protection laws "nationwide (indeed, worldwide)," and no "one state has a more 'significant interest' than any other in addressing the issues." Appellees' Br. in 23A-PL-3111, at 30 (brackets omitted). In other words, TikTok asserts that it ought to have suits against it brought in California rather than in any other forum, even if it might have constitutionally sufficient contacts in another forum.

[27]    We agree with the State that TikTok's argument is a "perverse" understanding of personal jurisdiction and amounts to a demand that the States divest themselves of personal jurisdiction over the largest companies with the greatest reach. Appellant's Br. in 23A-PL-3110, at 30; Appellant's Br. in 23A-PL-3111, at 30. We reject TikTok's position accordingly. Further, as explained above, TikTok's contacts within Indiana are not a close call under the Due Process Clause; thus, the State's interest in adjudicating its claims against TikTok is not marginal. And we discern no unusual burden on TikTok in any event. We

conclude that exercising personal jurisdiction over TikTok here is eminently reasonable.[4]

[28]    We hold that Indiana's judiciary has specific personal jurisdiction over TikTok. We therefore reverse the trial court's judgments to the contrary, and we proceed to the court's alternative dispositions for TikTok under Trial Rule 12(B)(6).

## 2. TikTok's business model of exchanging access to its content library for end-user personal data is a "consumer transaction" under the DCSA.

[29]    In both cause numbers, the trial court alternatively dismissed the State's amended complaints on the theory that the State had not identified a requisite consumer transaction under the DCSA. This issue presents us with a matter of first impression.

[30]    Indiana Code section 24-5-0.5-1 states that the DCSA "shall be liberally construed and applied to promote its purposes and policies." That statute then identifies the DCSA's purposes and policies as being to:

_____

[4] Without question, the Federal Government could enact legislation that expressly preempts state law and empowers the Federal Trade Commission to regulate the activities currently regulated by the DCSA, or it could enact a regulatory scheme that "occupies [the] field" with respect to online digital applications such as TikTok's app. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 212-13 (1983) (discussing field preemption); *see also Altria Grp. Inc. v. Good*, 555 U.S. 70, 76-77 (2008) (discussing express preemption). But there is also no question that the Federal Government has not taken those actions. Indeed, "[f]or decades, the [Federal Trade Commission] has collaborated closely with State Attorneys General to protect consumers from fraud, deception, and other unlawful business practices," and "[t]his remains a vital and important partnership." Fed. Trade Comm'n, Working Together to Protect Consumers: A Study and Recommendations on FTC Collaboration with the State Attorneys General, at 1 (Apr. 10, 2024), *available at* https://www.ftc.gov/system/files/ftc_gov/pdf/p238400_ftc_collaboration_act_report.pdf.

> (1) simplify, clarify, and modernize the law governing deceptive and unconscionable consumer sales practices;
>
> (2) protect consumers from suppliers who commit deceptive and unconscionable sales acts; and
>
> (3) encourage the development of fair consumer sales practices.

I.C. § 24-5-0.5-1(b); *see also Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 332 (Ind. 2013) (noting that the DCSA is "remedial"), *superseded on other grounds by* Pub. L. 65-2014 § 7 (eff. July 1, 2014).

[31]    Indiana Code section 24-5-0.5-3(a) ("section 3(a)") states the relevant operative language of the DCSA:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

The DCSA's definition of a "supplier" includes a corporation that "regularly engages in or solicits consumer transactions." I.C. § 24-5-0.5-2(a)(2), (3)(A). And the DCSA defines a "consumer transaction" in relevant part as follows:

> "Consumer transaction" means a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible, except securities and policies or contracts of insurance . . . , with or without an extension of credit, to a person for purposes that are primarily

personal, familial, charitable, agricultural, or household, or a
solicitation to supply any of these things. . . .

I.C. § 24-5-0.5-2(a)(1).

[32]    TikTok contends, and the trial court agreed, that the DCSA's definition of a
consumer transaction requires an "exchange[] for money." Appellees' Br. in
23A-PL-3110, at 29 (quotation marks omitted); *see also* Appellees' Br. in 23A-
PL-3111, at 32. TikTok observes that its app is available for free in that it costs
no money for an end-user to either download the app or to access the app once
it is downloaded.

[33]    We agree with the State that DCSA's statutory definition of a consumer
transaction does not include the words "exchange for money." There is no
question that any of the described dispositions in the statutory definition *can* be,
and we presume most often are, effectuated by way of an exchange for money,
but the statutory language does not *require* such an exchange.

[34]    Indeed, both the ordinary and the legal definitions of "sale" recognize it as "the
transfer of . . . property from one person to another for a price," with "price"
being further defined as "the quantity of one thing that is exchanged or
demanded . . . for another." *Sale*, Merriam-Webster.com (last accessed
September 20, 2024); *Price*, Merriam-Webster.com (last accessed September 20,
2024); *see also Sale*, Black's Law Dictionary (12th ed. 2024) ("The transfer of
property . . . for a price"); *Price*, Black's Law Dictionary (12th ed. 2024) ("The
cost of something; the amount of money *or other consideration* at which

something is or is expected to be bought or sold") (emphasis added). Thus, the plain and ordinary definition of the word "sale," which is not otherwise defined in the DCSA, includes *any* consideration to effectuate the transfer of property, not only an exchange for money.

[35]    It is undisputed that TikTok exchanges access to its app's content library for end-user personal data. That is the bargain between TikTok and its end-users. And, under the plain and ordinary use of the word, that is a "sale" of access to TikTok's content library for the end-user's personal data. TikTok's business model is therefore a consumer transaction under the DCSA.

[36]    Further, TikTok's argument that we limit consumer transactions to exchanges for money not only disregards the plain and ordinary meaning of the word "sale" but also *narrows* the scope of the DCSA beyond its plain terms, which is expressly contrary to the DCSA's requirement that we "liberally" interpret its provisions. I.C. § 24-5-0.5-1. We reject TikTok's arguments accordingly, and we conclude that the trial court erred in both cause numbers when it dismissed the State's amended complaints on the theory that the State had failed to identify a requisite consumer transaction under the DCSA.

### 3. Under the current language of the DCSA, the State has stated a claim in its amended complaint in Cause PL-400.

[37]    In Cause PL-400, the trial court identified one additional rationale for dismissing the State's amended complaint under Trial Rule 12(B)(6). Again, in that complaint, the State alleged that TikTok had misrepresented various

information to induce parents and young audiences to download TikTok's app and to access it. The State's complaint specifically alleged that TikTok had misrepresented the availability of mature content on its platform and TikTok's enforcement of its stated content standards.

[38]    According to TikTok and the trial court, the State's amended complaint here sought to hold TikTok liable under the DCSA for nonactionable "statements of opinion" rather than "objectively verifiable 'representations of fact.'" Appellant's App. in 23A-PL-3110, Vol. 2, p. 201. In support of that position, TikTok and the trial court rely on our Supreme Court's 2013 opinion in *Kesling*. Notably, at the time of our Supreme Court's opinion in *Kesling*, section 3(a) of the DCSA did not exist as it currently does. *See* I.C. § 24-5-0.5-3(a) (2013). Instead of section 3(a)'s current language, the statute identified only a list of specific "acts" and "representations" as deceptive acts. *Id.*

[39]    In *Kesling*, a car dealer advertised a used car for sale and described the car as a "Sporty Car at a Great Value Price." 997 N.E.2d at 330. A buyer saw the ad, visited the dealer, and purchased the car. She made it forty-four miles before the car became undriveable.

[40]    The buyer sued the dealer and alleged in relevant part that the dealer's description of the car as a "Sporty Car at a Great Value Price" was an actionable misrepresentation under the DCSA. Specifically, she alleged that that language "constituted an implied representation of fact" that the car was road worthy. *Id.* at 332.

[41]     Our Supreme Court did not address the buyer's argument that implied representations were within the scope of the DCSA. Instead, and considering the language of the DCSA at the time, the Court addressed the buyer's argument as follows:

> [W]e find it dispositive that [the dealer's] statements were merely "puffing"—statements of unverifiable *opinion*—and not representations of fact at all.
>
> Indeed, by requiring a representation of *fact*, the DCSA looks to the same criterion that distinguishes an actionable warranty from non-actionable "puffing," which makes breach of warranty cases instructive. For example, calling a diesel truck "road ready" is "an express affirmation of fact," exposing the seller to liability when the engine block cracks two weeks later and renders the truck inoperable. *Wiseman v. Wolfe's Terre Haute Auto Auction, Inc.*, 459 N.E.2d 736, 737-38 (Ind. Ct. App. 1984). By contrast, "statements of the seller's *opinion*, not made as a representation of fact"—such as claiming a product "is the best"—are "simply puffing which does not create an express warranty." *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1082 (Ind. 1993) (emphasis added), *abrogated on other grounds by Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 958-59 (Ind. 2005). Put another way, puffery consists of "empty superlatives on which no reasonable person would rely," or "meaningless sales patter," *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 868 (7th Cir. 1999)—what Learned Hand called the "kind[ ] of talk which no sensible man takes seriously, and if he does he suffers from his credulity." *Vulcan Metals Co. v. Simmons Mfg. Co.*, 248 F. 853, 856 (2d Cir. 1918).

* * *

> While deceptive advertising is certainly detrimental to the public, treating these "puffing" statements as actionable representations would have undesirable consequences as well. Construing either "Sporty Car" or "Great Value Price" as a representation of fact is at best a double inference—first, taking the ad to "impl[y] that the Eclipse was a good car for the price" (as opposed to simply being inexpensive), and second, inferring from the *first* inference that the car was "thus, at a minimum, safe to operate."

> Allowing a deception claim to be based upon such a double inference is problematic . . . . [W]e recognize that the DCSA must be liberally construed, but only so far as its purpose of "protect[ing] consumers from *suppliers* who commit deceptive and unconscionable sales acts," I.C. § 24-5-0.5-1(b) (emphasis added). It does not extend to protecting consumers from *themselves*. Yet that is essentially what [the buyer] seeks—not merely for suppliers to anticipate what consumers might infer from an advertisement *itself* (which, again, is the implied-representation question we reserve for another day), but to further anticipate what consumers might then secondarily infer *from their own inferences*. Such a requirement would exceed the stated purpose of the statute, and demand an unrealistic degree of intuition about consumers' subjective perceptions.

*Id.* at 332-34 (some citations omitted; emphases and some alterations in original).

[42]    Our General Assembly immediately responded to our Supreme Court's opinion in *Kesling* by amending the DCSA. In particular, our General Assembly added the current version of section 3(a), which, again, now reads as follows:

> A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction. Such an act, omission, or practice by a supplier is a violation of

this chapter whether it occurs before, during, or after the transaction. An act, omission, or practice prohibited by this section includes both implicit and explicit misrepresentations.

Pub. L. 65-2014 § 7 (eff. July 1, 2014); *see* I.C. § 24-5-0.5-3(a) (2014).[5] Our General Assembly further moved the prior list of deceptive acts into a new section 3(b) with the proviso that that list in no way "limit[s] the scope of subsection (a)." Pub. L. 65-2014 § 7 (eff. July 1, 2014); *see* I.C. § 24-5-0.5-3(b) (2014).

[43]    Our General Assembly's 2014 amendments to the DCSA had two obvious consequences. First, insofar as *Kesling* had reserved the question of whether implied misrepresentations were actionable under the DCSA, the amended statutory language made clear that they are. *See* I.C. § 24-5-0.5-3(a) (2024). Second, the amended language at least appears to expand the scope of the DCSA such that, instead of prohibiting only a specified list of acts and representations, it now prohibits *any* "unfair, abusive, *or* deceptive act, omission, *or* practice in connection with a consumer transaction." *Id.* (emphases added); *see also* James R. Strickland, *David's Sling: The Undetected Power of Indiana's Deceptive Consumer Sales Act*, 51 Ind. L. Rev. 211, 211-13 (2018).

[44]    We think the fact that our General Assembly expanded the scope of the DCSA in immediate response to *Kesling* makes clear that the current language of

---

[5] Indiana Code section 24-5-0.5-3 has been subsequently amended as well, but those subsequent amendments are not material to our analysis in these appeals.

section 3(a) was intended to supersede our Supreme Court's analysis. *Cf.*

*Woodruff v. Ind. Fam. & Soc. Servs. Admin.*, 964 N.E.2d 784, 795 (Ind. 2012)

("Under most circumstances, an amendment changing a prior statute indicates

a legislative intention that the meaning of the statute has changed.") (quotation

marks omitted). Our General Assembly's changes are especially noteworthy

with respect to the explicit inclusion of implied misrepresentations. As the

Restatement (Second) of Torts makes clear, implied representations in the

consumer-protection context may take the form of "[a] statement of opinion as

to facts not disclosed and not otherwise known to the recipient." Restatement

(Second) of Torts § 539 (Am. L. Inst. 1977). We therefore conclude that

*Kesling*'s distinction between actionable representations of fact and

nonactionable assertions of opinion is no longer good law under the DCSA,

and the trial court erred when it relied on that distinction.

[45]     Although neither our Court nor our Supreme Court has yet considered the

possible scope of the current language of section 3(a) or the depth of its

undefined terms,[6] we need not look past the statutory language itself to decide

this Rule 12(B)(6) appeal. The current language of section 3(a) prohibits certain

"act[s]" or "omission[s]," and a prohibited act or omission may include an

express or an implicit misrepresentation. I.C. § 24-5-0.5-3(a). However, it is

clear that *Kesling*'s assessment that statements "on which no reasonable person

---

[6] Academic authority does so, however. *See generally* Strickland, *supra*.

would rely" are nonactionable remains good law. 997 N.E.2d at 333 (quotation marks omitted); *see also* Restatement (Second) of Torts § 539.

[46]     Here, the State's amended complaint in Cause PL-400 alleges that TikTok acted in ways that caused the nature of the content available on its app to be expressly or implicitly misrepresented in various app stores; that TikTok either expressly or implicitly misrepresented its enforcement of its Community Guidelines; and that TikTok either expressly or implicitly misrepresented the effectiveness of its Restricted Mode. The State further alleged that all of those acts were done in order to induce parents and younger audiences to download and access TikTok's app. And, TikTok's arguments on appeal notwithstanding, we conclude that reasonable persons within Indiana could have relied on any of those alleged express or implied misrepresentations in deciding whether to download and access TikTok's app.

[47]     The State's amended complaint in Cause PL-400 therefore states a claim under the DCSA. The trial court's dismissal of the State's complaint is reversed, and we remand for further proceedings consistent with this opinion.

## 4. The State's amended complaint in Cause PL-401 also states a claim under the DCSA.

[48]     Finally, the trial court also concluded that, notwithstanding its assessments of personal jurisdiction and a "consumer transaction" under the DCSA, the State's amended complaint in Cause PL-401 also failed to identify an actionable claim under the DCSA. We again disagree.

[49]    The State's amended complaint in Cause PL-401 alleges that, in its privacy policy, TikTok has omitted information on which a reasonable person would likely rely in deciding whether to download and access the app—namely, that the government of China would have access to TikTok's collected personal data. The State also alleges that TikTok affirmatively made false public statements that the government of China does not have that access, and that TikTok's allegedly false public statements were made to induce reasonable persons in Indiana to download and access its app. And the State alleges that TikTok has omitted informing possible end-users that its in-app internet browser will enable TikTok to circumvent the end-user's privacy settings in his or her default internet browser, which information the State contends reasonable persons in Indiana would likely rely on in deciding whether to download and access the app.[7] We agree with the State that reasonable persons might have relied on those representations and omissions, and we conclude that those allegations state a claim under the DCSA.

[50]    Accordingly, we reverse the trial court's dismissal of the State's amended complaint in Cause PL-401, and we remand for further proceedings consistent with this opinion.

_____

[7] As we hold in part 2 of this opinion that TikTok's business model is a consumer transaction under the DCSA, we also conclude that TikTok's alleged acts or omissions to induce Indiana residents to download and access its app are acts or omissions "in connection with" a consumer transaction. I.C. § 24-5-0.5-3(a). And insofar as the trial court's judgment in part 4 of this opinion looked to Trial Rule 9, we agree with the State that that Rule did not require dismissing the State's amended complaint in Cause PL-401.

# Conclusion

[51]    For all of these reasons, we affirm the trial court's dismissal of ByteDance, Ltd.,

ByteDance, Inc., and TikTok Pte., Ltd.; we reverse the trial court's judgment

for California-based TikTok, Inc. in both causes; and we remand for further

proceedings in both causes consistent with this opinion.

[52]    Affirmed in part, reversed in part, and remanded for further proceedings.


Altice, C.J., and Bailey, J., concur.


ATTORNEYS FOR APPELLANT

Theodore E. Rokita
Attorney General of Indiana

Scott L. Barnhart
Cory C. Voight
Office of Indiana Attorney General
Indianapolis, Indiana

David H. Thompson
John D. Ohlendorf
Brian W. Barnes
Cooper & Kirk, PLLC
Washington, District of Columbia


ATTORNEYS FOR APPELLEES

Andrea Roberts Pierson
Brian J. Paul
Daniel E. Pulliam
Faegre Drinker Biddle & Reath LLP

Alexander A. Berengaut
Emily Ullman
Megan A. Crowley
Covington & Burling LLP
Washington, District of Columbia