[*Parties and Counsel Listed on Signature Pages*]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case No. 4:22-md-03047-YGR (PHK) |
| This Document Relates To: | **JOINT STATUS REPORT ON DISCOVERY FOR OCTOBER 24, 2024 DISCOVERY MANAGEMENT CONFERENCE** |
| ALL ACTIONS | |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

Pursuant to Discovery Management Order ("DMO") No. 2 (ECF 606), the Personal Injury ("PI") and School District and Local Government Entity ("SD") Plaintiffs, State Attorneys General ("State AGs"), and Defendants submit this agenda and joint statement in advance of the October 24, 2024, Discovery Management Conference ("DMC").

## I. Status of Discovery and Parties' Progress in Meeting Discovery Deadlines

### A. Plaintiffs' Written Discovery Served on Defendants

The Parties provide below an update on the RFPs served by Plaintiffs on Defendants; Defendants' document productions in response to Plaintiffs' RFPs;  Defendants' production of hyperlinked documents in response to Plaintiffs' requests; Interrogatories ("Rogs") served by Plaintiffs on Defendants; and Requests for Admission ("RFAs") served by Plaintiffs on Defendants.

#### 1. RFPs Served; Defendants' Responses & Objections

The PI/SD Plaintiffs, State AGs, Bellwether PI Plaintiffs and Bellwether SD Plaintiffs have served on **Meta** a total of 1,192 Requests for Production of Documents ("RFPs").  (PI/SD Plaintiffs have served 373 common RFPs; State AGs have served 183 RFPs; twelve Bellwether PI Plaintiffs have each served 40 identical RFPs on Meta, for a total of 480 RFPs; the Bellwether SD Plaintiffs have served 13 identical RFPs each on Meta, for a total of 156 RFPs.)  Meta has served responses and objections to 1,147 of those requests.

The PI/SD Plaintiffs have served 294 common RFPs on the TikTok Defendants.   Certain Bellwether PI Plaintiffs have each served 40 RFPs on the TikTok Defendants, for a total of 920 RFPs. The Bellwether SD Plaintiffs have served 13 RFPs on the TikTok Defendants.  Collectively, 1,227 RFPs have been served on the TikTok Defendants.

The **TikTok** Defendants have served R&Os to all of the PI/SD Plaintiffs' RFPs with the exception of RFP Set No. 19 that are due November 14.

The PI/SD Plaintiffs have served 175 common RFPs on **Snap**.  Certain Bellwether PI Plaintiffs have served 320 RFPs on **Snap**.  The Bellwether SD Plaintiffs have also served 13 RFPs on **Snap**, for a total of 156 RFPs.  **Snap** has served R&Os to all but one of the PI Plaintiffs' RFPs, which are due October 28, 2024.

The PI/SD Plaintiffs have served 149 common RFPs on **YouTube**.  The Bellwether PI Plaintiff Smith has served 40 RFPs on YouTube.  The Bellwether SD Plaintiffs have served 14 RFPs on YouTube. YouTube has served R&Os to all of these RFPs but RFP 149, the response to which is due on October 18, 2024.

### 2.    Defendants' Document Productions

All Defendants have been producing documents in response to Plaintiffs' RFPs and will continue to make rolling productions.

**Meta** has produced approximately 1.4 million documents as of October 18, 2024.  Meta has also produced certain structured data for each of the bellwether PI plaintiffs, as well as account captures for each of the Facebook and Instagram accounts the bellwether PI plaintiffs has confirmed as being theirs.

The **TikTok** Defendants have produced 167,436 documents as of October 18, 2024, in response to the PI/SD Plaintiffs' RFPs.  The TikTok Defendants have also produced 34,088 records of user account data.

**Snap** has produced approximately 308,980 documents as of October 15, 2024, in response to the PI/SD Plaintiffs' RFPs and Rule 30(b)(6) deposition notice, as well as 81,673 records of user account data.

**YouTube** has produced approximately 532,259 documents, as of October 11, 2024, in response to the PI/SD Plaintiffs' RFPs and/or certain topics in the PI/SD Plaintiffs' 30(b)(6) deposition notice.

### 3.    Hyperlinks Update

**YouTube:** Plaintiffs have served three sets of hyperlink requests on YouTube, dated May 21, 2024, September 30, 2024, and October 8, 2024. On July 4, 2024, YouTube produced responsive, non-privileged internal Google/YouTube hyperlinks identified in Plaintiffs' May 21 request. On September 30, 2024, PI/SD Plaintiffs sent YouTube a request (labeled Set 1) for 198 hyperlinks.  YouTube confirmed on October 3, 2024 email that it anticipates responding to that request by October 30, including by producing responsive, non-produced, non-privileged internal Google/YouTube hyperlinks by October 30.  On October 8, 2024, PI/SD Plaintiffs sent YouTube a request (labeled Set 2) for 200 hyperlinks. YouTube anticipates responding to that request by November 7. To the extent YouTube requires additional information from Plaintiffs, will need more time to finish its collection and review of certain

3

hyperlinks, or believes that Plaintiffs' ongoing requests become unduly burdensome, the Parties will meet and confer.

**Meta:** Consistent with the Court's guidance from the last discovery conference, the MDL Plaintiffs have served the following weekly requests for hyperlinks since the last DMC (held on September 12, 2024): On September 20, Plaintiffs requested 197 hyperlinks from 24 documents; on September 26, Plaintiffs requested 200 hyperlinks from 49 documents; on October 4, Plaintiffs requested 162 hyperlinks from 50 documents; and on October 11, Plaintiffs requested 170 hyperlinks from 50 documents.  Of the 729 hyperlink requests made by Plaintiffs, Meta has produced 45 new hyperlinked documents and has identified the Bates numbers for 276 previously produced hyperlinked documents.As of October 18, Meta has responded to all but approximately 170 of these 729 hyperlink requests: taking into account that sometimes multiple custodians are attributable to the same document listed (as well as instances where the same link has been requested more than once, albeit in a separate context), Meta has produced 45 new hyperlinked documents; it has identified 276 hyperlinked documents in previously produced documents; and on October 15, Meta reported to Plaintiffs on 141 hyperlinks and the reasons why there were no hyperlinked documents to produce for deponents, K.J., M.S, C.S, and D.C--for example the document was not readily collectible or  the  document was deemed non-responsive. Additionally, after the DMC on September 12, 2024, Meta also produced 13 new hyperlinked documents and identified 336 previously produced hyperlinked documents in connection with the requests that predated the last DMC.

**Snap:**  Plaintiffs served a request for 104 hyperlinks on August 23, 2024.  Snap has substantially completed its productions in response to this first request by (i) providing Plaintiffs a cross-walk that identified already produced documents on September 11, and (ii) producing responsive, non-privileged documents on September 20 and October 15.  Snap has also identified the subset of requested hyperlinks that do not point to accessible documents and instead point to internal landing pages, inactive links, and or document folders, and has offered to meet and confer with Plaintiffs to discuss how to deal with such requests.  On October 4, 2024, Plaintiffs served a request for 90 hyperlinks.   In response to this second request, Snap anticipates providing Plaintiffs with a cross-walk that identifies the subset of hyperlinks for which Snap has already produced documents, in the coming week.  For the remaining hyperlinks, Snap is

in the process of collecting and reviewing reasonably accessible documents for eventual production and will make every effort to produce such documents within 30 days of Plaintiffs' request.

**Tik Tok:** Plaintiffs have served three sets of hyperlinks requests on the TikTok Defendants. More than 400 documents requests responsive to Set 1 were produced last spring. On 8/21/2024, at TikTok's request, Plaintiffs shared a more specific list of the URLs, requested as required by the ESI Protocol. The TikTok Defendants are now preparing a link-by-link breakdown of Bates in the chart they provided.

As to hyperlink request set 2, the TikTok Defendants responded to the same in July, noting that the Plaintiffs' requests implicated more than 3000 hyperlinked documents and asked the Plaintiffs to revisit the same and withdraw some requests. On September 25, Plaintiffs communicated the final 1,400 URL links they are still requesting and the TikTok Defendants are working to collect.

As to hyperlink request set 3, they were just received on September 27. Approximately half of these requested URL links are either inaccurate or inactive links, which has been communicated to the Plaintiffs.

### 4.   Interrogatories Served; Defendants' Responses & Objections

The MDL and JCCP Plaintiffs are collectively allowed to serve 45 common Rogs on each group of Defendants under the Discovery Limitations Order. *See* ECF 702 ¶¶ 1-2. The AGs are allowed to serve eight additional Rogs on Meta. The PI Bellwether Plaintiffs are allowed to serve 3 common Rogs and 4 common RFAs, and 4 individual Rogs and 4 individual RFAs, on each Defendant. The SD Bellwether Plaintiffs are allowed to serve 4 common Rogs and 5 common RFAs, and 5 individual Rogs and 4 individual RFAs, on each Defendant.

Plaintiffs have served 15 of the 45 Rogs they are collectively permitted to serve on **Meta** (Sets 1, 2, and 3), and Meta has served R&Os to 2 of those Rogs. The PI Bellwether Plaintiffs have served 2 of the 3 common Rogs they are permitted to serve on Meta. The Parties continue to meet and confer regarding Meta's response to certain Rogs, discussed further in Section II below. Meta requested a 30-day extension of its deadlines to respond to (a) Plaintiffs' Rogs Set 2 (Nos. 3-13) to November 27, and (b) Plaintiffs' Rogs Set 3 (Nos. 14-15) to December 9. Subject to certain conditions/understandings, Plaintiffs

granted Meta's request as to Set 2, and have agreed to extend the deadline for Set 3 to November 27 while the Parties continue to discuss Meta's original request for an extension until December 9.

Plaintiffs have served 11 Rogs on **Snap** and Snap has served R&Os to one of those Rogs.

Plaintiffs have served 4 sets of interrogatories (15 interrogatories) on **TikTok**, as well as 2 common Interrogatories, and TikTok has served R&Os to Sets 1-3, TikTok's R&O's to Set 4 are due October 27.

Plaintiffs have served 5 Rogs (Sets 1 and 2) on **YouTube**. YouTube has served R&Os to Set 1, and its R&Os to Set 2 will be due on November 14, 2024.

### 5.  Requests for Admissions Served; Defendants' Responses & Objections

Plaintiffs have served 10 RFAs on **TikTok** and TikTok has served R&Os to those RFAs.

### B.  MDL Bellwether PI Plaintiffs' Initial Disclosures

Plaintiffs' initial disclosures incorporate by reference their Plaintiff Fact Sheets ("PFSs").  The PI Bellwether Plaintiffs have agreed to supplement their initial disclosures by Friday, October 18, with the identities of all individuals that they may use "to support [their] claims" who are not listed in Section XIV of their Fact Sheets ("Fact Witnesses").  The PI Bellwether Plaintiffs reserve the right to amend their initial disclosures in the future.

### C.  Defendants' Written Discovery Served in MDL Bellwether PI Cases

The Parties provide below an update on the written discovery served by Defendants in connection with the MDL Bellwether PI cases; the MDL Bellwether PI Plaintiffs' document productions in response to Defendants' RFPs; the status of the Parties' conferrals; Rule 45 subpoenas served by Defendants on third parties; and the imaging of Plaintiffs' routinely-used devices.

### 1.  Written Discovery Served

*RFPs.*  Defendants have jointly served between 81 and 125 RFPs in each of the 12 Bellwether PI cases in the MDL (1,108 RFPs total in the Bellwether PI cases).

*Rogs.*  Defendants are collectively allowed to serve 10 Rogs for each minor (under age eighteen) Bellwether PI Plaintiff and 7 Rogs for all other Bellwether PI Plaintiffs under the Discovery Limitations Order.  *See* ECF 702 ¶ 5.  Defendants have jointly served 6 to 7 unique Rogs to each of the 12 Bellwether

6

PI Plaintiffs and 4 to 7 Rogs to each of the four Plaintiff parents in the D'Orazio, Hawthorne, Mullen, and Smith cases.

### 2.    MDL Bellwether PI Plaintiffs' Document Productions

The chart below sets forth the MDL Bellwether PI Plaintiffs' document productions to date made in response to RFP Set One, which are being made on a rolling basis.  Defendants have requested that each MDL PI Bellwether Plaintiff state when their rolling productions will be completed.  Plaintiffs have responded that productions of text searchable ESI by Plaintiffs Craig, S.K, and B.M. were substantially completed by September 30, that productions of text-searchable ESI by Clevenger, B.H., and Smith were substantially completed by October 10, that productions of text-searchable ESI by Mullen were substantially completed by October 14, that productions of text-searchable ESI by J.D., D'Orazio, and Melton will be substantially completed by October 18, and that productions of text-searchable ESI for McNeal will be substantially completed by November 1, 2024,[1] and productions of text-searchable ESI by  M.G. will be substantially completed by November 4, 2024.

The MDL Bellwether PI Plaintiffs also provided authorizations to Defendants that allowed Defendants to request medical, employment, educational, workers' compensation, disability, Medicaid/Medicare, and insurance records when applicable.  The number of documents Defendants have collected with those authorizations, by Plaintiffs' count,[2] are not included in the below chart.

| Plaintiff Group | Number of Documents Produced in Response to RFPs | Number of Documents Produced with PFS |
|---|---|---|
| MDL PI Bellwether Plaintiff Laurel Clevenger [1] | 40,562 | 4 |
| MDL PI Bellwether Plaintiff Klinten Craig [2] | 51,225 | 2 |
| MDL PI Bellwether Plaintiff B.S. on behalf of J.D. [3] | 34,001 | 2 |
| MDL PI Bellwether Plaintiff Jessica D'Orazio and Christine D'Orazio [4] | 23,606 | 1 |

---

[1] Plaintiff McNeal requested a two-week extension of the Friday, October 18 deadline for substantial completion of text-searchable ESI.  Plaintiff has offered to make twice weekly rolling productions during those two weeks.

[2] Defendants are unable to confirm all of these numbers because of ongoing productions received from Plaintiffs through the time of filing of this Statement.

| Plaintiff Group | Number of Documents Produced in Response to RFPs | Number of Documents Produced with PFS |
| --- | --- | --- |
| MDL PI Bellwether Plaintiff Maria Elena Rodriguez individually and on behalf of M.G. [5] | 2 | 3 |
| MDL PI Bellwether Plaintiff Lorine Hawthorne individually and on behalf of B.H. [6] | 134,270 | 4 |
| MDL PI Bellwether Plaintiff N.K. on behalf of S.K. [7] | 10,218 | 11 |
| MDL PI Bellwether Plaintiff Dymand McNeal [8] | 46,741 | 4 |
| MDL PI Bellwether Plaintiff David Melton [9] | 4,527 | 2 |
| MDL PI Bellwether Plaintiff Nuala Mullen and Elizabeth Mullen [10] | 50,963 | 29 |
| MDL PI Bellwether Plaintiff M.M. on behalf of B.M. [11] | 12,924 | 8 |
| MDL PI Bellwether Plaintiff Leslie Smith and Jessica Smith [12] | 54,708 | 3 |

### 3.    Status of Conferrals

The Parties have conducted and continue to conduct meet-and-confers regarding the MDL Bellwether PI Plaintiffs' R&Os to Defendants' RFPs and ESI repositories.

Following the August 8 DMC, the Court ordered the Parties to finalize agreed-upon search terms by August 16, 2024.  DMO 9 (ECF 1070) at 3.  On August 16, the Court granted a joint request by the Parties to extend the deadline to finalize agreed-upon search terms to be run across Bellwether PI Plaintiffs' ESI until August 23.  ECF 1072.  On August 23, the Parties finalized general search terms to be run across Bellwether PI Plaintiffs' ESI, and the Court granted a joint request by the Parties to extend the deadline to finalize case-specific search term negotiations until August 30.  ECF 1083.  The Parties agreed to case-specific search terms to be run across Bellwether PI Plaintiffs' ESI on August 30; however, further discussions may occur regarding the data sources across which a few terms will be run for two Bellwether PI Plaintiffs.  The JCCP Bellwether PI Plaintiffs have agreed, absent good cause, to the same general search terms as those negotiated for the Bellwether PI Plaintiffs in the MDL.

### 4.    Rule 45 Subpoenas Served by Defendants in PI Bellwether Cases

Defendants served subpoenas with requests for the production of documents to non-party parents, guardians, family, and other fact witnesses identified by the PI Bellwether Plaintiffs in their responses to Plaintiff Fact Sheets and in their initial document productions ("Non-Parties"). Plaintiffs' counsel have indicated through correspondence that they represent 26 of the 30 subpoenaed Non-Parties. Pursuant to agreements reached during extensive meet-and-confer efforts, Non-Parties represented by Plaintiffs' counsel have agreed to produce documents responsive to fifty (50) requests. To date, Non-Parties have produced over 470 responsive documents.

### 5.     Device Imaging Update

The Parties are actively exploring a proposal made by the MDL and JCCP plaintiffs to satisfy the substantial completion deadline for usage data by producing "Redacted Forensic Images," the full filesystem extraction of a main Device with all media files excised, subject to a protocol to ensure that substantive user content produced as part of this process is not disclosed to Defendants without Plaintiffs' consent or review. For a further update, the Parties refer the Court to the October 17, 2024 Joint Status Report on Device Imaging (ECF 1226).

### D.     Defendants' Written Discovery Served in MDL Bellwether SD Cases

The Parties provide below an update on the written discovery served by Defendants in connection with the Bellwether SD cases; the Bellwether SD Plaintiffs' document productions in response to Defendants' RFPs; Rule 45 subpoenas served by Defendants on third parties; and the status of conferrals.

### 1.     Written Discovery Served

Defendants have jointly served 83 unique RFPs in each of the 12 Bellwether SD cases in the MDL, an additional 67 RFPs on DeKalb School District, an additional 39 RFPs on Saint Charles Parish Public Schools, an additional 11 RFPs on the Jordan School District, an additional 33 RFPs on the School Board of Hillsborough County, an additional 19 RFPs on the Spartanburg 6 School District, an additional 22 RFPs on the Board of Education of Harford County, an additional 21 RFPs on the Charleston County School District, an additional 16 RFPs on the Breathitt County School District, an additional 9 RFPs on the Baltimore City Board of School Commissioners, an additional 8 RFPs on the School District of the

Chathams, and an additional 116 RFPs on Tucson Unified School District, for a total of 1,313 RFPs served in the Bellwether SD cases.

*Rogs.* Defendants are collectively allowed to serve 15 Rogs for each Bellwether SD Plaintiff under the Discovery Limitations Order. *See* ECF 702 ¶ 5. Defendants have jointly served approximately 3 unique Rogs in each of the 12 Bellwether SD cases in the MDL.

### 2. MDL Bellwether SD Plaintiffs' Document Productions

The chart below sets forth the number of documents produced by each SD Bellwether Plaintiff to date by Plaintiffs' count.[3]

| SD Bellwether Plaintiff | Number of Documents Produced for Priority Deponents or in Response to RFPs | Number of Documents Produced with PFS |
|---|---|---|
| The Baltimore City Board of School Commissioners | 24,980 | 185 |
| Breathitt County School District | 35,255 | 7 |
| Charleston County School District | 33,820 | 70 |
| School District of the Chathams | 70,968 | 17 |
| DeKalb County School District | 34,772 | 40 |
| Board of Education of Harford County | 32,244 | 151 |
| The School Board of Hillsborough County | 43,493 | 36 |
| Irvington Public Schools | 60,847 | 8 |
| Board of Education of Jordan School District | 21,712 | 7 |
| Spartanburg 6 School District | 23,410 | 5 |
| Saint Charles Parish School Board | 25,126 | 16 |
| Tucson Unified School District | 20,226 | 52 |

### 3. Rule 45 Subpoenas Served by Defendants in SD Bellwether Cases

A chart summarizing the status of the 102 third-party subpoenas served by Defendants in connection with the SD Bellwether cases to date is included in the Appendix.

### 4. Status of Conferrals

---

[3] Defendants are unable to confirm all of these numbers because of ongoing productions received from Plaintiffs through the time of filing of this Statement.

*Written Discovery.* The Parties have conducted and continue to conduct meet-and-confer conferences regarding the Bellwether SD Plaintiffs' PFSs, Supplemental PFSs, and R&Os to Defendants' First Set of RFPs and First Set of Rogs, including numerous district-specific meet-and-confers in September and October. The Parties filed a Joint Letter Brief relating to Defendants' First Set of RFPs on September 25, but they have now successfully resolved the issues in that Letter Brief and withdrew it on October 8. On September 27, Defendants requested a meet-and-confer relating to the Bellwether SD Plaintiffs' collective responses to Rog No. 3; on October 8, the Bellwether SD Plaintiffs responded, taking the position that Defendants' request is premature. The Parties are continuing to work to resolve the outstanding issues as to Defendants' First Set of Rogs, PFSs, and Supplemental PFSs. In almost all of the individual Bellwether SD cases, Defendants have now served a Second Set of RFPs and, in some cases, a Third Set of RFPs. The Parties are engaged in discussions relating to that discovery.

*Search Terms.* Since the September 12 DMC, the Parties have engaged in numerous meet-and-confer conferences regarding the search terms that the Bellwether SD Plaintiffs will use to collect potentially responsive documents. On October 10, the Parties submitted a Joint Letter Brief to this Court regarding this dispute, *see* ECF 1203, which the parties reached an agreement in principle to resolve on October 16.

### E.  Meta's Written Discovery Served on MDL State AGs and Agencies

The Parties provide below an update on the written discovery served by Meta on the MDL State AGs; the State AGs' R&Os; the State AGs' document productions; the status of conferrals; the litigation hold issue; Meta's Rule 45 subpoenas to State agencies; and the State AGs' motion to stay this Court's Order regarding State Agency discovery (ECF 1167).

#### 1.  Written Discovery Served

*RFPs.* Meta served its first set of 45 RFPs on each of the 35 State AGs on February 27, 2024. Meta served its second set of RFPs on the 35 State AGs on May 3, 2024.

*Rogs.* Meta is allotted a combined total of up to 32 identical Rogs for each State AG, and up to 6 additional State-specific Rogs for each State AG. Meta served its first set of 7 identical Rogs on each of the 35 State AGs on May 3, 2024.

### 2.     State AGs' Responses and Objections

The State AGs served their collective R&Os to Meta's first 45 RFPs on March 28, 2024.  The State AGs served their collective R&Os to Meta's second set of RFPs and first set of Rogs on June 3, 2024.

### 3.     State AGs' Document Productions

The State AGs collectively produced 28 documents on April 29, 2024,(AG-MDL-3047-000001 to AG-MDL-3047-002308), 885 documents on May 17, 2024 (AG-MDL3047-002309 to AG-MDL3047-019159), and 13,763 documents on August 30, 2024 (AG-MDL3047-019160 through AG-MDL3047-125783).

### 4.     Status of Conferrals

The current status of the Parties' conferrals regarding disputes related to the States' production of agency documents in response to Meta's document requests directed at the State AGs is reflected in their Joint Letter Brief on States' Production of Documents, filed October 15, 2024 (ECF 1217).

### 5.     Update on Litigation Hold Issue

The current status of the State AGs' production of state agency personnel litigation hold recipient lists (and dates of receipt) is reflected in the Parties' Joint Letter Brief on States' Production of Documents, filed October 15, 2024 (ECF 1217).

### 6.     Update on Rule 45 Subpoenas

The current status of Meta's Rule 45 subpoenas to State agencies is reflected in the Parties' Joint Letter Brief on States' Production of Documents, filed October 15, 2024 (ECF 1217).

### F.     Third-Party Written Discovery Served by Plaintiffs

A chart summarizing the status of third-party subpoenas served by Plaintiffs to date is included in the Appendix.

### G.     Depositions

The Parties will submit by email to the Court following this filing an updated Joint Deposition Status Chart.  The Parties set forth below the status of Plaintiffs' notices of anticipated fact depositions to Defendants; Plaintiffs' 30(b)(6) deposition notices to Defendants; Defendants' notices of anticipated fact

depositions to the MDL PI Bellwether Plaintiffs; an update on the treating provider protocol; and Defendant's notices of anticipated fact depositions to the SD Bellwether Plaintiffs.

### 1. Plaintiffs' Notices of Anticipated Defendant Fact Depositions

To date, Plaintiffs have identified 39 Meta witnesses, 20 TikTok witnesses, 11 Snap witnesses, and 15 YouTube witnesses as anticipated deponents.

#### a) Meta

As of October 18, Plaintiffs have identified 39 current and former Meta employees whom they seek to depose.  In terms of scheduling, Plaintiffs have requested and the parties have confirmed dates for 17 current or former Meta employees, including four witnesses in October, five witnesses in November, three witnesses in December, one witness in January, one witness in February, and one witness in March. Plaintiffs have also requested deposition dates next year for four apex-level Meta executives and one former executive.  The parties are in the process of negotiating those depositions.  Plaintiffs have not yet requested dates for the remaining witnesses.  Meta has requested that Plaintiffs identify deponents that they anticipate could be completed in a single day, but Plaintiffs have not yet provided this information for depositions beyond the week of the October DMC.  Meta has also requested that the apex-level deponents be limited to 7 hours, but Plaintiffs have not agreed, as discussed further in Section II. B.12 below.

#### b) TikTok

As of October 11, Plaintiffs have served deposition notices for 19 current and former witnesses with respect to the TikTok Defendants.  The parties had scheduled 10 depositions between October and February, with two depositions currently set in December, two in January, and four in February, but the parties have agreed to postpone several depositions to allow for the completion of additional document productions which Plaintiffs need to prepare for depositions. The TikTok Defendants have provided Plaintiffs with alternative dates for all requested witnesses and the parties are working cooperatively together on finalizing outstanding dates and any necessary further adjustments. The Plaintiffs have requested that each witness set aside two days per deposition, but also have indicated that they will give TikTok notice closer to each deposition whether the deposition can be conducted in one day and the

13

witness can release the hold on their additional time.  Finally, Plaintiffs have indicated that they plan to serve more deposition notices but have not yet identified the additional witnesses they intend to depose.

### c)  Snap

In April and May, Plaintiffs identified 11 potential early deponents as to Snap.  Plaintiffs have since served deposition notices for 13 witnesses.  Three depositions are scheduled for November and three depositions are scheduled for December.  The parties are still conferring on the date for the remaining witnesses.

### d)  YouTube

As of September 10, 2024, Plaintiffs have served deposition notices for 6 current and former witnesses with respect to the YouTube Defendants. The parties have scheduled these depositions for between November and January, with two depositions currently set for November, three in December, and one in January.  The parties are working cooperatively to identify mutually agreeable deposition dates for additional deponents, and to coordinate associated productions for all deponents.

### 2.  PI/SD Plaintiffs' 30(b)(6) Deposition Notices to Defendants

Plaintiffs deposed the Meta Defendants' two 30(b)(6) witnesses on Plaintiffs' ESI topics on July 24 and July 31, 2024.  Plaintiffs separately served a Rule 30(b)(6) Deposition by Written Question ("DWQ") on Meta, consisting of 285 numbered questions (eventually reduced to 214; the Parties dispute the total number of questions including subparts).  On July 25, 2024, Meta served its R&Os to Plaintiffs' 30(b)(6) DWQ.

Plaintiffs deposed the TikTok Defendants' two 30(b)(6) witnesses on Plaintiffs' ESI and preservation topics on May 7 and May 9, 2024.

Plaintiffs deposed Snap's 30(b)(6) witness on Plaintiffs' corporate structure topics on May 1, 2024. Plaintiffs deposed Snap's 30(b)(6) witness on Plaintiffs' ESI and preservation topics on June 13, 2024. Plaintiffs also served draft 30(b)(6) notices on age verification and A/B testing on September 27, 2024. The parties are conferring about the specific topics and dates for the depositions.

Plaintiffs deposed three YouTube 30(b)(6) witnesses on a range of corporate structure and ESI topics on May 9, May 24, and June 26, 2024.

**3.       Defendants' Notices of Anticipated Depositions in MDL Bellwether PI Cases**

In connection with the MDL PI Bellwether cases, Defendants have identified 60 priority witnesses (plaintiffs, family members, and treating clinicians) as anticipated deponents.  The Joint Deposition Status Chart submitted by email on the date of this filing shows the status of the Bellwether PI Plaintiffs' productions of custodial files for identified priority deponents.  As additional medical records and documents are produced, Defendants expect to identify additional potential deponents.

**4.       Update on Treating Provider Protocol**

The Parties have reached agreement on the parameters of a protocol for depositions of treating providers in Bellwether PI cases in the MDL and JCCP and submitted their proposed protocol to the Court for consideration on October 9, 2024.  *See* ECF No. 1201.  The Order granting the Stipulation was entered by this Court on October 11, 2024.  *See* ECF No. 1206.

**5.       Defendants' Notices of Anticipated SD Plaintiff Fact Depositions**

In connection with the SD Bellwether cases, Defendants have identified 139 witnesses, including school administrators, mental health counselors, school board members and other school district personnel as anticipated deponents.  The Joint Deposition Status Chart submitted by email on the date of this filing shows the status of the Bellwether SD Plaintiffs' productions of custodial files for identified priority deponents.

The Bellwether SD Plaintiffs have provided Defendants with lists of individuals the Bellwether SD Plaintiffs have identified as key witnesses for each of the Plaintiff School Districts to help narrow the focus for purposes of identifying initial deponents.  The Parties continue to confer on the timing of depositions, which will be significantly impacted by the timing for completion of custodial file productions by the SD Plaintiffs based on the final set of search terms the SD Plaintiffs are required to run.

**H.       MDL PI and SD Plaintiff Fact Sheets**

As of October 10, there are 318 individual MDL PI Plaintiffs that have filed a Short Form Complaint in this MDL. 190 PI Plaintiffs served PFSs by the April 1 deadline set forth in the PFS

15

Implementation Order (ECF 596) and Case Management Order 10 (ECF 604).  Pursuant to the Court's April 10 Order (ECF 748), an additional 45 PI Plaintiffs were to provide PFSs by May 8.  Of those 45 Plaintiffs, 22 Plaintiffs failed to serve a PFS by the deadline (2 Plaintiffs subsequently dismissed their cases), 5 Plaintiffs served a PFS after the deadline, and 15 Plaintiffs have yet to serve a PFS.  As of the time of this filing, 251 PFSs have been submitted by PI Plaintiffs in the MDL.

By the SD Defendants' count, as of October 16, 2024, there are 235 individual SD Plaintiffs in this MDL. 110 SD Plaintiffs served PFSs by the April 1, 2024 deadline set forth in the Implementation Order (ECF 731). Since April 1, 2024, 73 SD Plaintiffs have served PFSs.  52 SD Plaintiffs have not yet served a PFS.  PFSs for 42 of the 52 non-submitting SD Plaintiffs are not yet due under the Court's orders.  PFSs for 10 of the 52 non-submitting SD Plaintiffs are past due under the Court's orders.  Deficiency notices have been issued to those 10 SD Plaintiffs.

The SD Defendants have submitted a number of PFS deficiency letters, and the SD Plaintiffs have responded, including by meeting and conferring on such alleged deficiencies, raising the validity of the alleged deficiencies, and/or amending their PFSs accordingly.  There are, however, agreed-upon deficiencies that certain SD Plaintiffs have agreed to correct in their PFSs based on meet and conferrals, but those corrections have not yet been made. Those SD Plaintiffs are in the process of preparing amended PFSs to correct the agreed-upon deficiencies.  Should the Parties reach an impasse on any of the individual deficiency letters, they will raise them with this Court.

## I.       Supplemental School District Plaintiff Fact Sheet (SUP PFS)

By Defendants' count, as of October 16, 2024, 171 of the 235 SD Plaintiffs have served SUP-PFSs.  132 SD Plaintiffs served SUP-PFSs by or just after the applicable deadlines set forth in the Implementation Order (ECF 731).  38 SD Plaintiffs did not serve SUP-PFSs by their applicable deadlines, and deficiency notices were issued to those 38 SD Plaintiffs on October 10, 2024. Since receiving deficiency notices on October 10, 2024, 22 of the deficient SD Plaintiffs submitted SUP-PFSs.  SUP-PFSs for 16 SD Plaintiffs are past due and remain outstanding.  SUP-PFSs for 48 of the 64 non-submitting SD Plaintiffs are not yet due under the Court's orders.

**J.      JCCP Discovery Update**

*Depositions.*  Judge Kuhl has set deadlines for Defendants to complete a discrete set of case-specific depositions in each of the JCCP PI Bellwether discovery cases.  Since the last DMC Statement, Defendants have identified 77 priority fact witness deponents across the JCCP PI Bellwether cases and begun to discuss dates for those depositions with PI Bellwether Plaintiffs' counsel.  Defendants will identify their remaining 3 treating professional witness deponents by November 4.  Defendants continue to collect records related to JCCP PI Bellwether Plaintiffs from healthcare providers, educational institutions, employers, and certain government entities.

*Document Productions and Rog Responses.*  The JCCP PI Bellwether Plaintiffs have agreed to use the same case-specific search terms negotiated with the MDL PI Bellwether Plaintiffs and to be bound by the same forensic imaging protocol to which the MDL Parties ultimately agree.  The JCCP PI Bellwether Plaintiffs have provided a list of data sources from which they will search for responsive documents and certain PI Bellwether Plaintiffs have begun to produce documents in response to Defendants' RFPs, though Defendants have raised concerns with Judge Kuhl regarding the pace of productions.  Certain PI Bellwether Plaintiffs recently amended their R&Os to Defendants' First Set of Rogs (although Judge Kuhl has ordered further amendment, which has not yet occurred), and Defendants have begun serving deficiency notices related to these R&Os. Plaintiffs have likewise expressed concerns about Defendants' bellwether discovery responses, as multiple Defendants are still investigating responses to numerous RFPs. Numerous Defendants have indicated that they may not meet the Court's October 28 substantial completion deadline.

**II.      Ripe Discovery Disputes**

**A.      Disputes Between PI Plaintiffs and All Defendants**

**1.      Preservation of Non-Bellwether PI Plaintiffs' Main Devices**

In connection with a series of meet and confers concerning electronic devices no longer in the possession of bellwether Plaintiffs, Defendants have asked Plaintiffs to perform full filesystem ("FFS") forensic images on every device in each bellwether and non-bellwether Plaintiff's possession, custody, or

control that Plaintiffs habitually, routinely, or regularly used during the relevant time period to access Defendants' services.

**Defendants' Position:** The parties held an H.2 conference on the preservation of non-bellwether devices on October 11, 2024 and agreed that they are at an impasse with respect to this issue. The parties will submit a letter brief on October 21, 2024.

**Plaintiffs' Position:** As Plaintiffs' position in the letter brief also relays, Plaintiffs disagree that this is a ripe issue. Plaintiffs further incorporate their position in Section III.A.2. below.

### B. Disputes Between SD Plaintiffs and All Defendants

#### 1. Bellwether Damages Computation

**Defendants' Position:**

Defendants respectfully request that the Court order Plaintiffs to produce and identify (e.g., by Bates number) the documents that support their FRCP 26(a)(1)(iii) damages computations.   The parties have been meeting and conferring about this dispute since August, held an H2 conference on September 30, and have reached an impasse such that this dispute is now ripe for decision by the Court.[4]

After six months of delay, Plaintiffs finally provided Defendants with their FRCP 26(a) damages computations on August 22.   However, Plaintiffs provided only a sum total of each district's past compensatory damages, even though the districts identified a dozen or more categories of past damages in their respective Plaintiff Fact Sheets. See Plaintiff Fact Sheet, Question 23.  Following an additional meet and confer, Plaintiffs agreed to supplement their Rule 26 disclosures no later than November 15 to provide separate computations for the categories of damages identified in their Plaintiff Fact Sheets.

---

[4] Plaintiffs mischaracterize the parties' meet and confer efforts. On August 30, Defendants sent a conferral letter expressly requesting that Plaintiffs: (1) "provide[ ] Defendants with a computation of each category of damages claimed" and (2) "differentiate which documents pertain to each category of documents." Following extensive meet and confer about this issue during which Defendants consistently reiterated this position, Plaintiffs agreed to do the former, but not the latter. While Plaintiffs' counsel did not expressly state that Plaintiffs were objecting to identifying by Bates number the documents supporting their damages computations until October 16, Plaintiffs should not be permitted to delay resolution of this issue by belatedly asserting a new objection and then unilaterally declaring that, based on that objection, the dispute is not ripe.

However, one dispute remains—namely, Plaintiffs' refusal to identify the documents on which their computations are based. Plaintiffs neglected to produce or identify these documents with their August 22 disclosures. Now, Plaintiffs are taking the position that it is sufficient for them to produce these documents among the tens or perhaps hundreds of thousands of documents they will produce, without identifying which documents support which computation. That position does not satisfy the requirements of Rule 26(a).

Pursuant to Rule 26(a)(1)(iii), Plaintiffs must "without awaiting a discovery request" provide "a computation of each category of damages claimed" as well as all nonprivileged "**documents or other evidentiary material . . . on which each computation is based**, including materials bearing on the nature and extent of injuries suffered[.]" Courts have interpreted this language as requiring that the disclosing party identify with specificity the documents on which a party's damages computations are based so that Defendants may review them. *See Delta Saloon, Inc. v. AmeriGas Propane, Inc.*, 2023 WL 2373537, at *5 (D. Nev. Mar. 3, 2023) (ordering plaintiff's counsel to identify documents supporting its damages calculation by Bates label); *R and R Sails, Inc. v. Ins. Co. of Pennsylvania*, 673 F.3d 1240, 1246 (9th Cir. 2012) (finding it insufficient under Rule 26(a) where a plaintiff provided the amount of fees it sought without describing the documents on which it based its request); *see also Westfall v. Ass'n of Universities for Rsch. in Astronomy*, 2023 WL 1782120, at *7 (D. Ariz. Feb. 6, 2023) (ordering plaintiff to identify documents supporting damages claim); *Jarzyna v. Home Properties, L.P.*, 2012 WL 12865417, at *4 (E.D. Pa. Nov. 21, 2012), *report and recommendation adopted*, No. CV 10-4191, 2013 WL 12155356 (E.D. Pa. Apr. 4, 2013) (requiring "Plaintiff to identify, by bates number, all previously produced documents that support its claims for economic and non-economic damages").[5]

Plaintiffs' objection to identifying which documents support their damages computations is based on inapposite case law which interprets Rule 34, not the damages computation provision of Rule 26. The cases Defendants cite are specific to damages computations and stand for the proposition that Defendants

---

[5] While it is true that *R&R Sails, Inc. v. Insurance Co. of Pennsylvania* arose in a different posture, the Ninth Circuit made clear that a Rule 26 disclosure that "simply provided the approximate amount of [the plaintiff's alleged damages] without describing the documents on which it based the request" was insufficient. 673 F.3d at 1246-47. Yet, this is precisely what Plaintiffs have proposed to provide here.

19

are not required to guess what documents Plaintiffs will rely on at trial to support their claimed damages. Yet that is precisely what Defendants will need do if Plaintiffs provide nothing more than a number and an undifferentiated reference to each district's entire document production.  As the Ninth Circuit has put it, "Rule 26(a)(1)(A)(iii) contemplates damage computation analysis and explanation," *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x 238, 244 (9th Cir. 2021), not merely an "undifferentiated" document production, *Frontline Med. Assocs. v. Coventry Health Care*, 263 F.R.D. 567, 569 (C.D. Cal. 2009) (citing *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006)); *Kaminski-Albright v. Sunbeam Prods., Inc,*, 2018 WL 5274565, at *1 (C.D. Cal. Aug. 2, 2018).

Defendants' position is further supported by the fact that Plaintiffs were required to disclose their damages computations and produce the supporting documents at the time Plaintiffs' initial disclosures were due, more than eight months ago.  Had Plaintiffs done so, there likely would have been no need for Plaintiffs to identify which documents supported those computations, because it presumably would have been readily apparent (*i.e.* those documents would have been part of a limited production that Plaintiffs were required to make along with their initial disclosures).  But Plaintiffs did not disclose their damages computations and the documents supporting them when they were required to do so.  Allowing Plaintiffs to wait until their productions are substantially completed and then to simply refer to their entire document productions without any more specificity would be tantamount to allowing Plaintiffs to circumvent Rule 26 and would compound the prejudice Defendants have already faced as a result of Plaintiffs' belated disclosure.  Indeed, this is precisely why the cases Plaintiffs attempt to distinguish on the basis that they involved damages computations and documents that were "belatedly produced" are precisely on point and support Defendants' position.

The lump sum damages computations Plaintiffs previously provided were calculated to the nearest dollar and/or cent. They were presumably based on supporting documentation and were not merely ballpark estimates. Defendants are entitled to know what those documents are. Accordingly, Defendants

respectfully request that the Court order Plaintiffs to identify with specificity (*e.g.* by Bates number) the documents supporting of their damages computations.[6]

**Plaintiffs' Position:**

This issue is not ripe and has been included here only because of Defendants' refusal to comply with the Court's procedures. Defendants have not raised the issue of School District Plaintiffs ("SDs") identifying damages documents by Bates numbers in ***a single*** meet and confer. To the contrary, during the Parties' September 30, 2024 H2 conference, SDs told Defendants that the they were producing damages documents as part of their ongoing document productions. Defendants acted as if there was agreement and did not raise the issue of identifying documents by Bates numbers. To the SDs' surprise in an email sent 4 days after the meet and confer, Defendants raised this new issue for the first time. When SDs responded that the parties had never met and conferred on the issue, Defendants insisted on unnecessarily presenting this issue to the Court despite the fact that it is not ripe.

Because Defendants have never met and conferred with SDs on the issue, SDs are left with multiple questions with no answers, including, *inter alia*: (1) Why do Defendants need Bates number identification of damages documents at this stage of the litigation – 7  months before expert reports are due and over a year before trial – when damages documents will be further identified through expert reports pursuant to this Court's schedule?; (2) Why do Defendants think that their authority, which focuses on situations where damages documents are belatedly produced, including 5 days before rebuttal expert reports and at the pretrial conference, supports Bates number identification of timely-produced damages

---

[6] To the extent Plaintiffs claim that they should be relieved of their obligation to identify the documents supporting their damages computations because Defendants did not identify by Bates number certain documents listed in Defendants' initial disclosures, Plaintiffs have not met and conferred with Defendants about that issue. And Plaintiffs' position is unfounded. Rule 26(a)(1)(A)(ii)—the provision that requires disclosure of the types of documents Plaintiffs have listed—expressly permits a party to disclose "a description by category and location" of the responsive documents in lieu of producing them. Rule 26(a)(1)(A)(iii)—the provision that requires a disclosure of damages computations—contains no such language. To the contrary, it requires that the party "make available for inspection and copying … the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Plaintiffs were required to do this at the time they served their initial disclosures (i.e. on February 22, 2024), but to date have not done so.

documents here?; (3) Why do Defendants think that the Ninth Circuit's opinion in *R & R Sails, Inc.*, which does not order Bates number identification and instead reverses preclusion of belatedly-produced damages documents, supports their position?; (4) Why do Defendants think that Bates number identification is required for Initial Disclosures but not for Requests for Production when their cited caselaw confirms that document production under Rule 26 is akin to Requests for Production under Rule 34?; and (5) Will Defendants agree to provide Bates number identification for the documents referenced in their Initial Disclosures, including documents related to policies, procedures, terms of use, disclosures, benefits to minors of platform use, and platform features, and documents evidencing the costs and attorneys' fees requested by Defendants as damages?

Even if the issue was ripe, Rule 26 does not require identification of damages documents by Bates number and none of the case law cited by Defendants holds otherwise. First, while entirely ignored by Defendants, the text of Rule 26 states that parties must "make available for inspection and copying **as under Rule 34** the documents" supporting a damages computation. Ninth Circuit authority cited by Defendants reiterates this point: "The advisory committee note to Rule 26 describes this last requirement as '**the functional equivalent of a standing Request for Production under Rule 34**.'" *R & R Sails, Inc. v. Insurance Company of Pennsylvania*, 673 F.3d 1240 (9th Cir. 2012). Case law is clear that a party need not identify responsive documents under Rule 34 by Bates number. *See Yates v. W. Contra Costa Unified Sch. Dist.*, 2017 WL 2106130, at *2 (N.D. Cal. May 15, 2017) ("Rule 34 does not require Plaintiff to identify responsive documents in his response; it requires Plaintiff either to object to the request with specificity (i.e., state the basis for his objection) and indicate whether he is withholding any documents based on his objection, or to state he will allow inspection or produce responsive documents."); *Rutherford v. PaloVerde Health Care Dist.*, 2014 WL 12633523, at *3 (C.D. Cal. Apr. 25, 2014) ("The plain language of Rule 34 does not require the responding party to identify each responsive document in its written response to each document request."). Defendants' demand for SDs to identify documents by Bates number is inconsistent with Rule 26's requirement that documents related to damages computations be provided "as under Rule 34."

Having completely failed to find any authority that supports their position, Defendants misleadingly cherry-pick language from wholly inapposite cases. *Grouse River Outfitters, Ltd. v. Oracle Corp.*, 848 F. App'x 238, 244 (9th Cir. 2021) does not require Bates number identification or even address what documents must be produced under Rule 26; rather, it concerns Plaintiffs' ability to use "damages calculations" that were "not adequately disclose[d]." *Frontline Med. Assocs., Inc. v. Coventry Health Care*, 263 F.R.D. 567, 569 (C.D. Cal. 2009) also does not require Bates number identification and instead, orders a plaintiff to provide a damages computation (which is being provided here), rather than just producing "undifferentiated financial statements." *See also Kaminski-Albright v. Sunbeam Prod., Inc.*, 2018 WL 5274565, at *1 (C.D. Cal. Aug. 2, 2018) (requiring plaintiff to provide "supporting documents" but not requiring identification by Bates number).

Indeed, Defendants' suggestion that courts have interpreted Rule 26 as requiring Bates number identification is demonstrably false under the case law it cites. In *Delta Saloon, Inc. v. AmeriGas Propane, Inc.*, 2023 WL 2373537, at *5 (D. Nev. Mar. 3, 2023), plaintiffs **agreed** to identify documents by Bates number because they were being belatedly produced **five** days before rebuttal expert reports. In *R & R Sails, Inc.*, 673 F.3d at 1246, there is no discussion of Bates number identification and instead, the Ninth Circuit reversed the district court's preclusion of damages based on invoices that plaintiffs had still not made available for inspection at the time of the pretrial conference. *Westfall v. Ass'n of Universities for Rsch. in Astronomy*, 2023 WL 1782120, at *7 (D. Ariz. Feb. 6, 2023) also contains no discussion of Bates number identification and simply requires plaintiff to provide supporting documents for his damages claims, which SDs are already doing here. *See also Jarzyna v. Home Properties, L.P.*, 2012 WL 12865417, at *4 (E.D. Pa. Nov. 21, 2012) (noting there was no dispute and plaintiff had already identified "all previously produced documents that supports its claim for [damages]").

To the extent Bates number identification is ordered, Defendants should likewise be ordered to provide Bates number identification for the documents referenced in their Initial Disclosures, including documents related to: insurance policies; platform policies and/or procedures; platform features; platform usage; public statements governing platform use; terms of use or service; community guidelines or standards; policies regarding user safety, integrity and well-being; disclosures and resources made

23

available to parents; benefits to minors of platform use; operation of platforms; research, publications and scientific literature; COPPA compliance; and damages based on costs and attorneys' fees. *See* Meta Defendants' Rule 26(a)(1) Initial Disclosures; Defendants YouTube, LLC and Google LLC's Initial Disclosures; Defendant Snap Inc.'s Rule 26(a)(1) Initial Disclosures; Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok LLC Initial Disclosures.[7]

### 2. Search Terms

Shortly before the hearing on their Joint Letter Brief scheduled for October 16, 2024, the Parties resolved their disputes over search terms applicable to the SD Bellwether Plaintiffs, and will file a stipulation reflecting that agreement.

### C. Disputes Between Plaintiffs and Meta

#### 1. Discovery of State Agencies Following State Agency Discovery Order and Litigation Hold Recipient Lists

Meta and the State AGs met and conferred, including by videoconference on September 17 and 24, 2024, regarding the State AGs' production of state agency documents pursuant to the Court's September 6, 2024 order deeming various state agency documents within the AGs' control. Various States have participated in further meet-and-confers with Meta. As to 15 of the 35 State AGs,[8] the Parties dispute whether the State AGs should be required to propose custodians and search terms for locating potentially responsive documents in the custody of state agencies; as to 8 of the 35 State AGs,[9] the Parties dispute whether the State AGs should provide litigation hold information for state agency personnel; as to all State AGs, the Parties dispute whether they should be directed to meet and confer to identify what documents

---

[7] Defendants' statement that Plaintiffs have not met and conferred with them on this issue is absurd. No meet and confer has occurred because of Defendants' refusal to meet and confer after they raised their Bates number identification request.

[8] Arizona, California, Colorado, Delaware, Illinois, Kentucky, Maryland, Michigan, Minnesota, Missouri, New York, North Dakota, Oregon, Pennsylvania, and Rhode Island.

[9] Arizona, California, Colorado, Missouri, New York, Oregon, Pennsylvania, and Rhode Island.

Meta seeks beyond the documents obtained through the 141 Rule 45 subpoenas issued to state agencies. The Parties submitted a Joint Letter Brief on the issue on October 15, 2024 (ECF 1217).

2. **JCCP Plaintiffs' Relevant Time Period Dispute as to Meta**

**Plaintiffs' Position:**

The dispute between the parties over the proper Relevant Time Period for discovery has been well briefed, and heard by this Court, therefore we will not repeat our arguments at length. In summation, Plaintiffs believe that custodial file collection should encompass documents from the date of hire to April 2024, for a subset of custodians. Discovery of this time period is necessary in order to capture information central to a negligence case, including Meta's design choices, notice of harmful conduct, and knowledge of harms.

At the June 20, 2024, Discovery Management Conference the Court set the default start date of discovery as January 1, 2012, and created a feature specific framework that would allow Plaintiffs to reach further back in time to seek "technical implementation and planning documents for specific features." *See* Hearing Transcript (6/20/2024) at 61. At the August 8, 2024, Discovery Management Conference the JCCP Plaintiff's objected to this scheme arguing that their negligence-based claims were uniquely prejudiced by the Relevant Time Period as currently constituted. The Court heard arguments and ordered the parties to meet and confer and come to agreement on two custodians for whose files Meta would run three sample search terms across in order to produce hit reports that would further guide the Court on the balance of burden and need for pre-2012 discovery. (Doc 1070 at 10).

The Plaintiffs did just that, and after careful consideration proposed 4 search terms for custodians, Chris Cox and Mark Zuckerberg on August 31, 2024. The parties then engaged in a lengthy meet and confer process, the Plaintiff's dropped a search term and changed their remaining terms at the defendant's request. On September 25, 2024, While the parties continued to confer, and before any agreement was reached, Meta's counsel underlinely picked two custodians, P.R. and L.B., and ran hit reports in a rather obvious attempt to foreclose the issue. This was a highly improper maneuver meant to impede Plaintiffs' ability to obtain actual agreement on this matter, and such a unilateral search conflicts with the Court's instructions to confer. *See Doe v. Heritage Acad., Inc.*, No. CV-16-03001-PHX-SPL,

25

2017 WL 6001481, at *13 (D. Ariz. June 9, 2017). Even after receiving word of this improper unilateral selection of custodians, Plaintiffs still tried to negotiate in good faith. Plaintiffs asked  Meta to run the agreed upon search terms over the custodial files of their selected custodians (L.B. and P.R.) from the date of hire to January 1, 2012, and run the terms across the custodial file of one custodian selected by the Plaintiffs, Mark Zuckerberg. Defendants have refused, foreclosing any further conferrals.

Meta should run the agreed upon search terms over the custodial file of Mark Zuckerberg from date of hire to 2012. Mark Zuckerberg is the creator, designer and CEO of Meta (formerly Facebook) and has remained in that position since 2004. His knowledge of potential harms associated with his design, and the choices he made in light of that knowledge or ignorance are central to the Plaintiffs' negligence claims. Further, Mark Zuckerberg is simply Facebook's oldest employee, and this Court suggested that we prioritize running the hit reports across the custodial files of the oldest Meta employee. *See* Hearing Transcript (08/08/2024) at 90. ("You could run sample search terms of what the plaintiffs think are the most important five, or whatever, three search terms across only one or two exemplary -- so, for example, the oldest employee of Meta, like, his files -- and see what comes up; right?"). Again, these are mere hit reports meant to help the Court assess the relative burden and need of further discovery prior to January 1, 2012, and Mark Zuckerberg is best situated to give the Court the information it needs to make such a decision.

Further, Meta is now arguing that these hit reports should only include custodial documents from January 1, 2006, to January 1, 2012, and not the full pre-2012 time period. This, simply put, is nonsensical. The entire point of this exercise is to help the Court ascertain the burden of further discovery from 2004-2012. This is an exercise designed to shine light on what may exist prior to the default time period set by the Court, continuing to obscure and obfuscate will not help anyone make an accurate determination of next steps. Another significant problem with prohibiting any discovery that is not feature-specific prior to 2012 is that certain bellwether plaintiffs in the JCCP began using Meta's platforms well before that date. For example, Plaintiff Jamie Loach began using Facebook in 2006. However, as things presently stand, this Plaintiff would be permitted no discovery at all (unless explicitly tied to a specific feature) into the above issues for the first six years of the plaintiff's use. Such

a situation is clearly prejudicial to her claims. Likewise, Plaintiff Whitney Lambert began using the platform in 2008 and Plaintiff James McCune began using it in 2009, all of them, like Plaintiff Loach, years before 2012.12 Precluding discovery into these foundational issues over a considerable period of years during which these plaintiffs were using Meta's platforms is unwarranted and prejudicial to their claims.

Plaintiffs respectfully ask this Court to order Meta to run the agreed upon search terms across the custodial files of Mark Zuckerberg, Lars Backstrom, and Pratiti RayChoudhury from date of hire to January 1, 2012, and produce the associated hit reports.

**Meta's Position:**

In DMO 9 (ECF 1070 at 10), this Court ordered the Parties to "meet and confer for purposes of determining: (1) two or three sample search terms for the pre-2012 period that the Parties agree will adequately address the JCCP Plaintiffs' concern about capturing documents which discuss or evidence the alleged harms and/or risks of harm balanced within the general framework of features (to avoid overbreadth and disproportionality); and (2) two custodians for running searches of the sample terms."

In accordance with this Order, Meta ran three sample search terms provided by the JCCP Plaintiffs for the pre-2012 period (i.e., 2006-2011) over the Email and Workplace Chat files of two representative custodians, and provided hit reports to Plaintiffs (on September 25).  The JCCP plaintiffs, however, are insisting that Meta run their sample search terms over those two custodians' files going back *before* 2006, and additionally over the custodial files of Mark Zuckerberg.  Both positions of Plaintiffs should be rejected – and the Court should overrule the JCCP plaintiffs' request for reconsideration of the Court's prior Relevant Time Period rulings once and for all.

A.   **Plaintiffs' Request for Pre-2006 Hit Reports on Their Terms and a Third, Apex-Level Custodian Should Be Rejected**

First, "the pre-2012 time period" over which the Court ordered the 2-3 sample search terms to be run extends back to January 1, 2006 – and no earlier.  *See* DMO 7 (ECF 969) at 4-5.  As recounted in DMO 7, Meta originally proposed "a start date for Named Feature-specific discovery requests dating back to January 1st of the year of the feature's launch." *Id.* at 4.  Plaintiffs, by contrast, proposed "a general

27

default start date of January 1, 2010 and a 'date-of-hire' start date for six custodians of Plaintiffs' choice." *Id.* at 5. The Court ordered a general default start date of January 1, 2012, and rejected Plaintiffs' "date-of-hire" approach for pre-2012 discovery, instead ordering Meta to run Named Feature-specific terms back to January 1 of the date of launch for Named Features that launched before January 1, 2012 – the earliest of which was Facebook Newsfeed, which launched in 2006. *Id.*[10] Thus, the "pre-2012 time period" dates back, at the earliest, to 2006. It does *not* extend back to the "date of hire" for each custodian, as Plaintiffs had requested. Accordingly, in running the JCCP plaintiffs' sample search terms over two selected custodians' files, Meta appropriately limited the time period at issue to 2006-2011 – the "pre-2012 time period." *See also* 8/8/24 DMC Tr. at 93:16-17 (explaining that sample hit reports "is going to be useful for me to help figure out whether or not any further discovery *going back to that historical time period* is even warranted" (emphasis added)).[11]

Second, the Court ordered the search terms to be run over the files of only two custodians. Although the Court ordered the parties to meet and confer for purposes of determining those custodians, it was not practicable for Meta to negotiate those custodians with the JCCP plaintiffs. That is because the

---

[10] As counsel discussed with the Court at the August DMC, *see* 8/8/24 DMC Tr. at 77:10-78:22, Meta is implementing this Court's order authorizing feature-specific discovery before 2012 by running 107 broad search terms – negotiated and agreed-to by plaintiffs – relating to the features launched before 2012. Meta will run these 107 broad search terms across the documents of all agreed-to custodians employed at the company before 2012, back to January 1 of the year of launch of each pre-2012 feature, which for some features is 2006. Meta then intends to produce responsive, non-privileged documents returned by those search terms – regardless of whether they relate to the features for which feature-specific discovery was authorized before 2012." Accordingly, Plaintiffs' suggestion that they have been "prohibit[ed]" from having "any discovery that is not feature-specific prior to 2012" is wrong. Plaintiffs' observation that certain JCCP Bellwether Plaintiffs used Meta's platforms in 2006, 2008, and 2009, far from supporting their argument for an expansion of the relevant time period back to 2004, only reinforces why the current relevant time period ordered by the Court (which extends back to 2006) adequately covers their claims.

[11] Plaintiffs assert that "[t]he entire point of this exercise is to help the Court ascertain the burden of further discovery from 2004-2012," but that is incorrect. When the Parties argued this issue at the August DMC, Plaintiffs' argument was that Meta should have to run its more general post-2012 search terms over the pre-2012 time period, *see id.* at 84:7-19, emphasizing the purported "importance of this evidence as it relates to negligence and punitive damage claims in the JCCP," *id.* at 81:4-10; *see also id.* at 83:11-14 (JCCP plaintiffs' counsel arguing the "problem" is that "Your Honor's prior ruling is related to feature specific, and it's tailored more to a product liability type case, which is what the MDL is").

JCCP plaintiffs waited until *over three weeks after* the August 8, 2024 DMC to initiate a conferral with Meta. Even then, they asked Meta to run 4 lengthy search strings, none of which complied with the Court's detailed guidance about combining feature and harm concepts in each string, and demanded that the terms be run over the files of the two most senior, apex-level pre-2012 custodians: Mark Zuckerberg and Chris Cox. *See id.* at 9.

Meta objected to Plaintiffs' search terms and proposed custodians, and explained in detail why their search terms did not comply with the Court's guidance. Although the JCCP plaintiffs eventually narrowed their terms to three search strings, they did not do so until September 9, 2024 – three days before the September 12, 2024 DMC, totaling 729 hyperlink requests. However, the Court had instructed the parties in DMO 9 to make "significant progress on this dispute by the [September] DMC (***including reporting on the sample hit reports***)." *Id.* at 10 (emphasis added). Accordingly, to ensure it would be in a position to report progress to the Court at the September DMC, Meta selected two representative custodians – a VP, Product Group Lead (P.R.) and a VP, Engineering (L.B.) – to begin running plaintiffs' terms on and provided the hit reports to plaintiffs once they had run. This information would allow plaintiffs and the Court to "understand the scope of this dispute" – the purpose for which the Court ordered the parties' conferrals.

Running plaintiffs' search terms over the files of a third custodian would not advance that purpose, when plaintiffs already have hit reports on their search terms for two custodians, which is all the Court ordered. Nevertheless, in an effort to resolve this dispute without involving the Court, Meta offered for plaintiffs to identify a different, non-apex-level custodian of their choice, and to consider running plaintiffs' proposed terms over that third custodian's files. Plaintiffs refused that offer, however, doubling down on their persistent quest to take intrusive discovery from perhaps the most apex-level witness in these cases, Mark Zuckerberg.

With the hit reports Meta has provided, the Court has what it needs to assess the burden that would be imposed on Meta from running the types of broad, non-feature-specific search terms the JCCP plaintiffs are demanding over the pre-2012 time period – the purpose for which the Court ordered the Parties' conferral in DMO 9. *See id.* Accordingly, the Court should reject plaintiffs' request that Meta run their

sample search terms over P.R.'s and L.B.'s custodial files going back *before* 2006, and additionally over the custodial files of Mark Zuckerberg.

**B.      The Court Should Affirm Its Relevant Time Period Rulings**

At the August 8 DMC, this Court posited that if plaintiffs' expanded terms returned only a small number of documents, it could moot the parties' dispute about expanding those terms as plaintiffs are seeking.  *See* 8/8/24 DMC Tr. at 90:11-13 ("Because, again, maybe very little comes up, and you're arguing about something that's a tempest in a teapot.").  The hit reports for plaintiffs' pre-2012 sample search terms demonstrate the opposite.  Those reports show that the total documents returned by *just three sample* search terms over *just two pre-2012 custodians'* files was ***9,803 documents*** (post-deduplication, including family members, and excluding already-produced documents).  Extrapolated out over all pre-2012 custodians' files, and taking into account that plaintiffs' three terms were merely *sample* terms from a broader list they are seeking to run, it is clear that expanding pre-2012 discovery as plaintiffs have requested would add tens of thousands if not hundreds of thousands of additional documents to the review population.

Plaintiffs have shown no basis whatsoever for such a vast expansion of discovery – particularly where Meta has already agreed to run expansive search terms in response to 1,000+ expansive RFPs over an expansive, nearly 20-year time period.  Indeed, this Court already previously reasoned that if the substantial completion deadline "get[s] pushed and the discovery period … extended," it would make sense to "wait and see whether there really is a problem" before ordering additional search terms, reasoning that as of August Plaintiffs had "incomplete information on what's actually going to end up being produced especially from some of these older employees."  8/8/24 DMC Tr. at 85:18-23.  Since that time, the substantial completion deadline has in fact been pushed – by nearly two months, to November 5 – and Meta has substantially completed its production of custodial files for a number of pre-2012 custodians.  Accordingly, before any expansion of the search terms is ordered, plaintiffs should be required

to make a showing that the discovery Meta has already produced – which at this point total over 1.4 million documents – is not sufficient.

### D.     Disputes Between Plaintiffs and Snap

#### 1.     Dispute Over Snap's Failure to Answer Plaintiffs' First Interrogatory

This dispute is straightforward. On July 2, 2024, Plaintiffs served a single interrogatory on Snap seeking information on its preservation of employee chats using a program called Hip Chat. Hip Chat was an instant messaging service utilized by Snap employees for internal communications up until late 2018. Snap first disclosed the existence of Hip Chat during the parties' preservation discussions in 2023 but has steadfastly refused to provide transparent information about when Hip Chat was used, whether Snap preserved Hip Chat data, and what, if any, Hip Chat data it has produced in other litigations. In June 2024, Snap produced a Rule 30(b)(6) witness to testify about ESI preservation, but the witness could not answer basic questions about Hip Chat and when pressed, Snap's counsel instructed the witness not to answer further questions based on privilege. To rectify this impasse, Plaintiffs served an interrogatory identifying when Snap used Hip Chat to communicate, whether Hip Chat data was preserved after it discontinued use, and identifying litigations in which the company produced Hip Chat data.

Snap purported to answer the interrogatory on August 15, 2024, but failed to address, among other things, whether it produced Hip Chat data in other litigations. Plaintiffs thereafter confronted Snap with a court order in *In Re Snap Inc. Securities Litigation*, No. 2:17-cv-03679-SVW-AGR, ECF No. 137 (C.D. Cal. Oct. 17, 2018), which ordered Snap to produce Hip Chat data for specific custodians. Snap failed to disclose this production of Hip Chat data, despite Plaintiffs first inquiring about it in September 2023 when Plaintiffs discovered it through their own independent investigation. Plaintiffs do not know whether Snap has produced Hip Chat in yet other litigations. On October 2, 2024, Snap still did not confirm that it produced Hip Chat data *in In Re Snap Inc. Securities Litigation* (or any other litigation), but stated simply that it was "looking into" the matter. The parties met and conferred on October 7, 2024, and Snap still provided no further information except that it was "looking into" the matter. Plaintiffs asked when Snap would provide a substantive response and Snap would not say.

Accordingly, Snap's response to Plaintiffs' interrogatory is now over sixty days overdue. That interrogatory asked a simple, straightforward question: "if any Hipchat data was produced in litigation, [disclose] the case caption, status of litigation, and status of the Hipchat data." Snap simply refuses to provide a substantive answer. Snap surely knows what it produced in *In Re Snap Inc. Securities Litigation*, as well as any other litigation in which Hip Chat data was produced. And this information is of significant importance because Snap now claims that all Hip Chat data—representing internal messaging exchanged by its employees until late 2018—is inaccessible because Snap is now unable to decrypt the data. Although Plaintiffs are investigating the veracity of this representation, if true it means that Snap has spoliated this critical tranche of evidence. This is obviously highly prejudicial to Plaintiffs. Hip Chat data produced in other litigations may be all the Hip Chat data that Plaintiffs are able to obtain. Plaintiffs therefore need to know what was produced in other litigations.

The Court should compel Snap to fully answer Plaintiffs' interrogatory. Further, if any Hip Chat data was previously produced that belongs to custodians in this matter, Plaintiffs respectfully request that the Court order it produced; Snap has already reviewed such data for privilege and therefore it should not be permitted to further delay disclosing information Plaintiffs sought months ago.

**Snap's Position:**

This issue is not ripe.  No H2 conferral has been held—or even requested—on this issue.

On August 15, 2024, in response to Plaintiffs' Interrogatory, Snap disclosed the information it was aware of at the time regarding prior productions of HipChat data.  After Plaintiffs sought additional information, more than a month later, about the extent to which HipChat data was produced in an unrelated litigation that terminated prior to the filing of any case involved in this MDL, Snap agreed (1) to investigate whether Snap or any of its agents still retain possession of the production, (2) to supplement its Responses and Objections if appropriate upon completion of its investigation, and (3) if there is HipChat data for any of the agreed-upon custodians in this MDL, to produce any such data that hits on the agreed-upon search terms and is responsive.  Because any such production, if one was made, occurred six years ago in an unrelated litigation that terminated prior to the filing of any case in this MDL, information regarding whether Snap or any of its agents still retain possession of it is not readily or quickly

32

ascertainable.  Snap's investigation into this possible prior production is still ongoing.  Because Snap has already agreed to review any in-scope documents that do exist, however, there is no dispute.

Finally, Plaintiffs' assertion that Snap spoliated any HipChat data is unsupported by the facts. Despite Snap's attempt to preserve the HipChat data that was available at the time it was deprecated in 2018, the data became inaccessible due to a technical failure (before the filing of the Master Complaint), which does not equate to spoliation.

### E.      Disputes Between Plaintiffs and YouTube

#### 1.      YouTube's Responses on PI/SD Plaintiffs' RFP Nos. 16 and 18

The Parties submitted a Joint Letter Brief on this issue on October 7, 2024 (ECF No. 1197).

#### 2.      YouTube's Amended Responses or Confirmation in Writing of Agreements Reached by Parties

**<u>Plaintiffs' Position:</u>**

Plaintiffs' request here simple: we seek transparency and clarity with respect to YouTube's obligation to conduct a reasonable search and production from non-custodial sources. In mid-July 2024, YouTube amended its response to the majority of Plaintiffs' request for productions by taking the unorthodox position that it would agree to search and produce from ***only*** custodial sources.[12] *See, e.g.,* Amended Response to RFP No. 12 (agreeing to produce responsive documents but limiting search to only "documents of agreed upon and Court-ordered custodians using the negotiated search terms..."). This response (1) fails to comply with the ESI Order, requiring that a Producing Party collect for review documents or ESI identified in a custodial or non-custodial file that are known through reasonable investigation to be responsive to a discovery request "without regard to whether the responsive content was located via any [agreed upon] search methodology" (Dkt. 690, § 7); and (2) contradicts YouTube's historic representations – during early discussion regarding non-custodial sources – that it had collected

---

[12] In its original responses to Plaintiffs RFPs, YouTube properly responded that it would "conduct a reasonable search for documents" (*see, e.g.* Orig. Response to RFP No. 12), which was inclusive of both custodial and non-custodial sources.

and reviewed from non-custodial sources, including reviewing "in full" non-custodial sources, Google Sites and Shared Drives identified as containing relevant information. YouTube's June 13, 2024, Letter.

Following receipt of YouTube's amended responses, Plaintiffs requested clarification as to YouTube's omission of non-custodial sources from its responses. YouTube initially affirmed that this omission was unintentional: YouTube was ***not*** limiting the scope of its production, and was, in fact, searching and producing from non-custodial sources as well. YouTube refused, however, to confirm this position either via formal amendment or in writing. Instead, while verbally stating during meet and confers that it would conduct a reasonable search of non-custodial sources, in writing YouTube continued to maintain that it is holding firm to its "amended responses," *e.g.*, the continued limitation to only custodial sources. YouTube further maintained that its search of non-custodial sources will be limited to those it deems "reasonably accessible" and "proportional to the needs of this case," but would not identify for which RFPs and non-custodial sources these limitations would apply. During the Parties' H(2) on October 11, 2024, YouTube represented – for the first time – that it would not commit to searching non-custodial sources on all RFPs as it was making this determination on a unilateral, ad hoc basis.

Thus, YouTube will not disclose whether and to what extent it is omitting non-custodial sources from particular requests, nor provide any insight into the purported burdens so that the Parties can discuss potential compromises. Such position is blatantly improper and inherently prejudicial. Rule 34 requires YouTube to either produce all responsive documents in its possession, custody, or control, or state whether any responsive materials are being withheld on the basis of a stated objection. *See* Fed. R. Civ. P. Rule 34(a)(1), (b)(2)(c). Any materials not subject to an objection must be produced or allowed to be inspected. *See* Rule 34(b)(2)(B), (C). An objection that states the limits that have controlled the search for responsive and relevant materials qualifies as a statement that the materials have been "withheld." Rule 34, Advisory Committee Notes (2015 Amendment).

Even in this DMC statement, YouTube provides a confusing and contradictory response. It claims that it has "memorialized in writing, on multiple occasions that its *investigation to locate documents and*

*information includes appropriate non-custodial sources…*[,]"[13] it then turns around and says "YouTube has *not agreed to search* non-custodial sources for all RFPs[.]" YouTube then falsely asserts that "[w]here it has agreed to search non-custodial sources, it has confirmed in writing …." Not so. As reflected in this current response, YouTube has refused to confirm what it is doing and where, because from YouTube's perspective by asking for transparency and clarity in the search process Plaintiffs have "inappropriat[ly] and unnecessary[ily]" "insert[ed] themselves into YouTube's investigation[.]"

YouTube cannot usurp the Court's role in guiding the scope of discovery by self-determining burden and proportionality and failing to disclose when it is withholding relevant documents. Plaintiffs merely ask for written confirmation that YouTube will conduct a reasonable search of non-custodial sources for all Requests for Production—which it previously stated it was doing—***notwithstanding*** the limitations set forth in its amended responses. Or that, to the extent YouTube intends to stand by its stated modification to the search methodology for any specific request, it states so specifically so that the Parties can have an informed discussion of any objection based on undue burden. Ultimately, YouTube's lack of candor and refusal to provide a clear, substantiated, and transparent position on this issue raises serious concerns that can and should easily be put to rest so that any deficiencies in YouTube's searches can be resolved before the parties commence depositions.

**YouTube's Position:**

Plaintiffs' breathless objection to YouTube's decision to avoid the unnecessary burden of formal amendment is perplexing, if not wholly misleading. Plaintiffs accuse YouTube of "refus[ing] … to confirm" in writing that it was not limiting the scope of its productions to custodial sources. This is false. YouTube has agreed to confirm in writing its agreements as to the scope of each of its RFP responses. And YouTube has consistently done so, memorializing in writing its agreements as to each RFP for which YouTube has agreed to modify the scope of its response on a rolling basis. Plaintiffs also accuse YouTube of refusing to identify "which RFPs and non-custodial sources" would be limited to reasonably accessible and proportional searches. This is also false. YouTube has memorialized in writing, on multiple occasions,

---

[13] YouTube provides no explanation on what it has deemed to be "appropriate," thus hiding the full breadth of what it is withholding.

that its investigation to locate documents and information includes appropriate non-custodial sources following a diligent search for reasonably accessible files from accessible sources where responsive documents reasonably are expected to be found.

Finally, Plaintiffs claim to distill their dispute as "merely ask[ing] for written confirmation that YouTube will conduct a reasonable search of non-custodial sources for all Requests for Production, notwithstanding the limitations set forth in its amended responses. Or that, to the extent YouTube intends to stand by its stated modification to the search methodology for any specific request, it states so specifically so that the Parties can have an informed discussion of any objection based on undue burden." Plaintiffs' request to insert themselves into YouTube's investigation is inappropriate and unnecessary.  As to each RFP, YouTube has investigated whether responsive documents are reasonably likely to be found in non-custodial sources, and has conducted searches of those non-custodial sources where searchability is feasible, not unduly burdensome, and where responsive docs are likely to be found Where YouTube has agreed to search non-custodial sources, it has confirmed in writing that, with limited exceptions identified to Plaintiffs in writing, it is searching those searches by manual collecting potentially responsive files and conducting a complete review of all collected files. YouTube has also explained that this methodology is necessitated by the nature of these non-custodial sources, many of which are not text-searchable.

YouTube's written confirmations are more than adequate to clarify and confirm YouTube's position.  There is no reasonable basis to demand formal amendments to each RFP response, particularly at this late stage as the parties work quickly to resolve remaining disputes before the substantial completion deadline.

### 3. YouTube's Search of Noncustodial Sources Identified by PI/SD Plaintiffs

The Parties have reached an impasse on this issue and will submit letter briefing on October 22, 2024. The Parties will be prepared to argue the issue at the Discovery Conference on Thursday, October 24, 2024.

**III.     Discovery Issues that Do Not Currently Require Court Action**

    **A.     Unripe Issues Between All Plaintiffs and Defendants**

        **1.     Plaintiffs' Requests for Certain Personnel, Compensation, and Other Deponent-Specific Discovery**

<u>**Plaintiffs' Position**</u>

Following Your Honor's ruling concerning the PI/SD Plaintiffs' requests for certain personnel file information for TikTok deponents, Plaintiffs proposed a narrowed list of TikTok deponents for whom they seek such information and proposed a set of RFPs directed to compensation and bonus information without resort to personnel files.  Using Your Honor's ruling as guidance, Plaintiffs also engaged with each of the Defendants on these issues, as well as requests for other, targeted discovery with respect to deponents who are current or former employees of Defendants (such as ongoing compensation or cooperation agreements that may exist between a Defendant and a former employee deponent).  Plaintiffs have been meeting and conferring with Defendants in good faith on these issues (including agreeing to further refine the list of deponents at issue, explain their bases for leaving others on the list, limiting requests for compensation/bonus info to certain deponents, and limiting the benefits for which they seek information to truly extraordinary benefits like housing, private club memberships, etc. that are material to the true value of an individual's compensation).

<u>**Defendants' Position**</u>

On September 17, this Court entered an Order, following argument during the September 12, 2024 DMC, that found that Plaintiffs were not entitled to personnel file information as to all deponents for the TikTok Defendants, but instead based on privacy interests and proportionality concerns, were limited to self-reviews and supervisor reviews from a "reasonable subset" of deponents, with Defendants having the ability to redact irrelevant of privacy-protected information.  Rather than following this Court's clear guidance and identifying a "reasonable subset" of deponents, Plaintiffs seek personnel file material from an overly broad set of deponents from each Defendant (who work in a wide range of positions of varying

degrees of seniority) and have also served new discovery seeking compensation information (annual pay, bonus information, benefits information, stock options).  The parties continue to meet and confer.

### 2.     Plaintiffs' October 15 Letter to Defendants Regarding Preservation

**Plaintiffs' Position**

For over a year, Plaintiffs have repeatedly raised concerns with each of the Defendants, both collectively and via Defendant-specific communications, about their custodians' use of personal email accounts and personal devices to engage in relevant and responsive business-related communications, and Defendants' apparent failure to preserve, collect, or produce such materials—among other attempts by Plaintiffs to address, these were specific Topics noticed by Plaintiffs and discussed during Defendants' Rule 30(b)(6) ESI depositions that occurred between May and August 2023. While Defendants' baseless insistence on imaging all non-bellwether devices is without question the impetus for bringing these issues to the Court's attention now, Plaintiffs have slogged away in countless meet and confers over as many months attempting to peel back the layers of Defendants' discovery misconduct, and the more Plaintiffs learn the more troubling Defendants' conduct appears to be—indeed, Meta replaced key custodians' company-issued devices *just last month* apparently without any effort to preserve their contents. Given Defendants' discovery misconduct (including the failure and refusal to identify and disclose use of personal email and personal devices by custodians) and without waiver of the right to seek additional relief and sanctions from the Court, Plaintiffs have demanded that, among other things, each Defendant identify all personal email accounts and devices that any of its custodians used to conduct business during the relevant period, commit that Defendants will complete a full-file collection of those sources within 30 days, and if not collecting provide an attestation under oath that such custodian has not used a personal email or device for any business, including messaging apps or email services (e.g., WhatsApp, Gmail, Signal, Snapchat).

**Defendants' Position**

Plaintiffs first raised these purported issues in the middle of the Parties' H(2) conference on multiple PI Bellwether Plaintiffs' loss or destruction of their devices—perhaps the most critical source of ESI in these cases, which center on how Plaintiffs used those very devices—when PI/SD Plaintiffs' co-

38

lead counsel warned Defendants to think carefully before requesting a forensic image of each PI Plaintiff's device or else "the retribution will be swift and punishing."  Specifically, co-lead counsel threatened that if Defendants pushed for such imaging, Plaintiffs would demand that every single one of Defendants' custodians forensically image their own personal mobile devices—even though full-file imaging of Defendants' custodians' personal devices is wholly unwarranted (nor had ever been requested prior to his threat by co-lead counsel), because their usage data related to various applications is not relevant to this litigation.  The following business day, Plaintiffs sent Defendants a letter raising various purported concerns about Defendants' preservation of custodial data and communications and demanded an H(2) conference three business days later—even though all three categories of purported issues raised in the letter were being raised *for the first time* for most Defendants, despite being based on information (e.g., Defendants' litigation hold lists and the dates each custodian was added) that has been in Plaintiffs' possession for close to six months, *see* DMO 5 (ECF 789) at 6; Plaintiffs' allegation regarding Meta's purported  failure to preserve custodians' company-issued devices (made for the first time the evening this Statement was due) is baseless, so Meta asked Plaintiffs to remove it and confer on the purported issue, but they refused.

### B.    Unripe Issues Between PI Plaintiffs and All Defendants

#### 1.    Defendants' Responses to PI Plaintiffs' RFPs

Together with JCCP Bellwether Plaintiffs, PI Bellwether Plaintiffs have conferred extensively with Defendants to resolve outstanding disputes regarding the identical RFPs served on Defendants by all Bellwether PI Plaintiffs across both the JCCP and MDL, resulting in nearly all disputes reaching resolution as of October 14, 2024.  With the exception of certain requests that the JCCP PI Bellwether Plaintiffs and Defendants have agreed to hold in abeyance until the second phase of the JCCP's bifurcated bellwether discovery period, any RFPs potentially specifically affecting MDL claims, and the remaining few unresolved requests, the MDL PI Bellwether Plaintiffs are in alignment with the JCCP PI Bellwethers and Defendants on all agreements reached and orders issued by Judge Kuhl regarding their requests.  The Parties' conferrals are ongoing.

#### 2.    Defendants' DFS and Account Snapshot Deficiencies

39

**Plaintiffs' Position:**

There are certain issues with DFS and account snapshot productions that the parties are discussing jointly with the JCCP and through individual bellwether counsel – some group-wide issues such as the need for produced data tables in machine-readable format (since the data size makes human review impracticable and inefficient) as well as substantive issues that vary plaintiff to plaintiff such as missing account data or gaps in account data that are inconsistent with the plaintiff's actual usage history (as confirmed by the plaintiff's DYI data).  Deficiency letters were sent to all defendants on October 5, 2024, MDL and JCCP plaintiffs jointly held meet and confers with TikTok and YouTube on October 8, 2024 and await response from Meta and Snap regarding their respective deficiencies; progress was made with YouTube and TikTok but discussions are ongoing at this time and later issues are likely to arise since plaintiffs' review of these massive data sets is ongoing (e.g., the parties have since discussed additional issues such as the need for unique identifiers (Bates stamps) on the produced data for use in rapidly approaching depositions, and plaintiffs also anticipate individual bellwether counsel engaging defendants regarding individual usage data deficiencies they are uncovering through their own review).  There are no ripe discovery issues regarding produced usage data at this time, but plaintiffs bring this to the court's attention because significant deficiencies have been identified to date and complete, accurate and usable usage data for the bellwether plaintiffs is absolutely critical both to the upcoming fact depositions and the bellwether trials – this evidence is central to the plaintiffs' case.

**Defendants' Position:**

Meta will provide a response to Plaintiffs' letter shortly and expects that this response will resolve all issues raised in Plaintiffs' October 5 letter; Meta agrees that there are no ripe discovery issues regarding produced usage data.   Snap also expects to provide a formal response shortly, but has assured Plaintiffs that it is committed to producing complete DFS data for all Plaintiffs and will address any deficiencies. YouTube is not aware of any open disputes concerning its DFS data or account snapshot productions.

TikTok is meeting and conferring with Plaintiffs regarding any purported deficiencies and will continue to do so as necessary.

### C.   Unripe Issues Between SD Plaintiffs and All Defendants

#### 1.   School District Responses to Defendants' Interrogatory No. 3

**<u>Defendants' Position:</u>**

On July 24, 2024, following numerous meet and confers regarding Defendants' Interrogatories (Set One), Plaintiffs agreed to supplement their responses to Interrogatory No. 3, which asks Plaintiffs to "separately identify and describe" vandalism, property damage, or criminal action that the School Districts attribute to Online Media and Communications Services.  Although some of the Plaintiffs amended their interrogatory responses in early September, none of the responses addressed this deficiency; nor has any School District committed to correcting the identified deficiencies (distinct from a vague promise to supplement) by a date certain.  Defendants asked for a lead counsel conference on Plaintiffs' failure to completely and separately identify the responsive information that Plaintiffs already have in their possession, custody, and control. Given SD Lead Counsel's October 8, 2024 email taking the position that Defendants should address each district's answer separately, Defendants are also seeking lead-counsel conferences with individual School Districts where this issue is ripe and are otherwise continuing to meet and confer with individual School Districts concerning their respective answers.

**<u>Plaintiffs' Position:</u>**

Defendants have not raised this issue pursuant to Section H.1 with the vast majority of Bellwether School Districts, and accordingly have not identified (1) which SD BW responses to Defendants' Interrogatory No. 3 they believe are deficient; or (2) what—if anything—they believe is deficient about the responses. Instead, Defendants skipped the H. 1 process and requested a premature H. 2 conference. As Defendants note, on October 8, 2024, SD Lead Counsel sent an email asking them to provide in writing the specific concerns regarding each district's answer, so that it could be considered and the parties could "hold a focused and productive omnibus meet-and-confer to resolve the matter without unnecessarily involving the court" and in response Defendants have reached out to individual School Districts to identify

any issues; the School Districts will meet and confer with Defendants regarding any issues raised with respect to each School Districts' response.

**2.      District-Specific RFPs for Dekalb, Jordan, Tucson, and St. Charles**

**Defendants' Position:**

On September 30, School District Plaintiffs DeKalb County School District, Board of Education of Jordan School District, Tucson Unified School District (TUSD), and St. Charles Parish Public Schools responded to Defendants' district-specific RFPs and included numerous instances where they refused to produce certain categories of documents.  TUSD, for example, objected to producing documents regarding TUSD's desegregation plan's effect on student discipline (RFP 85), discrimination against Native American students (RFP 103), discrimination against African American students (RFP 105), gun violence against students (RFP 105), and complaints about the TUSD School Board's lack of transparency (RFP 110), all of which are relevant to potential alternative causes of the alleged harm.  Defendants and TUSD conducted an initial conference, and TUSD so far has refused to amend its responses; Defendants sent a letter to St. Charles detailing the deficiencies in its response on October 14; and Defendants are in the process of preparing letters to send to DeKalb and Jordan detailing the deficiencies in their responses, and will continue to confer with the School Districts on these issues.

**Plaintiffs' Position:**

To date, Defendants have not provided any written correspondence regarding the responses served on September 30 by DeKalb or Jordan, (and only recently sent a letter to St. Charles that counsel is reviewing); and for TUSD the parties are still considering positions and conferring. Defendants' Second and Third (for Tucson and St. Charles) Sets of RFPs contained numerous cumulative RFPs to their initial "Omnibus" Set of 83 RFPs served on every bellwether School District, despite the parties having reaching agreement on numerous types of requests from the first set regarding student mental health, discipline, discrimination, violence, COVID-19, employee records, and more. Plaintiffs will continue to be available to confer with Defendants regarding their overbroad, irrelevant, and cumulative Second and Third Sets of RFPs, but do not agree to redo the parties' negotiations of the Omnibus Set of RFPs that many of Defendants' new requests seek to do.

### D.      Unripe Issues Between Plaintiffs and Meta Defendants

#### 1.      Source Code Protective Order

**Meta's Position:**

While PI/SD Plaintiffs have long maintained that they do not need to obtain source code from Meta, during a September 6 teleconference Meta informed Plaintiffs that Meta expects to rely on its source code to support its defenses, prompting Plaintiffs (on September 14) to request that Meta provide a draft Source Code Protective Order, which Meta did on September 17.  On October 1, Plaintiffs informed Meta that Plaintiffs were "wrapping up" their review of the draft and asked for a meet-and-confer, but during an October 7 teleconference 7, Plaintiffs refused to negotiate the terms of a Source Code Protective Order because they had espoused a narrow definition of source code limited to "only the computer commands that are written in a programming language and compiled into object code that is run by a computer"— material that Plaintiffs said they did not need in discovery (ignoring the fact that Meta had signaled its intention to rely on source code); at no point did Plaintiffs provide edits or dispute any other terms in Meta's draft Source Code Protective Order, and therefore because the parties were at an impasse, Meta requested an H.2 conference on the subject, which the parties conducted on the day this Statement was filed (October 18).  During that call, Plaintiffs reversed course and said, for the first time, that they wished to negotiate the terms of a Source Code Protective Order to which Meta agreed (hoping to avoid a dispute) on the condition that any delay in the production of source code occasioned by the continuing discussions would not be used as a basis to claim that Meta had not met its November 5 deadline for the substantial completion of document discovery or to re-open any depositions of fact witnesses in the case, to which Plaintiffs agreed in principle, but the parties could not agree on language to capture that agreement for purposes of this submission.

**Plaintiffs' Position:** Meta recently clarified to Plaintiffs that it expects to rely on its source code for purposes of advancing its defenses in this matter and, for the first time today, informed Plaintiffs that it would not be able to provide a fulsome response to one of Plaintiffs' interrogatories absent Plaintiffs' review of Meta's source code.  Given these developments – one of which, again, happened only today – Plaintiffs anticipate working productively with Defendants to negotiate a Source Code Protective Order.

43

Among the items to be considered and negotiated are the definition of "source code" covered by such an order, and what protocols if any should be established through such an order above and beyond the protections that already apply to Highly Confidential (Competitor) material in the existing Protective Order. Plaintiffs dispute Meta's largely-inaccurate, nearly-inscrutable recitation of the parties' negotiation history but maintain that it is irrelevant given the parties' shared desire to work constructively to resolve this issue.

> ### 2.      Plaintiffs' Request for Interrogatory Responses from TN AG Related Action

In order to facilitate Plaintiffs' ability to coordinate with each other and with  AGs litigating in their state courts with respect to depositions, PI/SD Plaintiffs seek access to Meta's interrogatory responses in the Tennessee AG Related Action, which Meta has marked as confidential. The MDL AGs have access to these responses through the Protective Order in the Tennessee AG Action, which contains a law enforcement sharing provision, but they are not able to share those responses with the PI/SD Plaintiffs, leading to inefficiencies and disparities in information among the parties cooperating to conduct depositions.

Following conferral on the issue, the PI/SD Plaintiffs proposed that Meta authorize the Tennessee AG to share Meta's Rog responses to the TN AG with the MDL Plaintiffs (properly designated under the Protective Order) on the condition that, if the MDL Plaintiffs wish to use any particular Rog response in the MDL, they would first have to notify Meta and have it count against their MDL Rog limits.  Meta has informed the MDL Plaintiffs that it is agreeable to this outcome, subject to certain conditions.  Plaintiffs have offered to accept Meta's proposal with respect to one interrogatory response—Tennessee Interrogatory 2 (in Set 2)—to ensure that this response can be used in upcoming depositions.  The Parties will continue to confer as to Meta's proposal more broadly, as well as the AGs' position that they may use Meta's Confidential documents received through law enforcement sharing provisions in MDL depositions

> ### 3.      RFPs 68-70 and 290 – Meta Organizational Charts

In RFPs 68-70 and 290, the PI/SD Plaintiffs requested that Meta produce organizational charts or employee directories sufficient to identify employees (1) responsible for developing, testing, implementing, and altering Named Features on Meta's platforms or (2) principally responsible for user safety on Meta's platforms. The parties have met and conferred extensively on these RFPs and received guidance from the Court at the September 12, 2024 DMC. The parties are continuing to meet and confer in light of the Court's guidance.  The parties have not yet reached an agreement.

### 4.    RFP 124 – User Reports/3d Party Complaints

**Plaintiffs' Position:**

The Parties have been meeting and conferring on production of data reflecting Meta's responses to user complaints, and the Parties are close to agreement as to categories of complaints (referred to as "violation types") that will be produced. However, the Parties are at odds as to: (1) Meta's refusal to produce all non-privileged data fields or even explain (as it had previously agreed) the meaning of all fields so that Plaintiffs can effectively meet and confer and (2) Meta's surprising claim, which appears to be contradicted by data produced in the AG investigation, that it cannot locate any data prior to mid 2022 regarding user reports not escalated to human review. The parties have agreed that any disputes will be briefed by November 5.

**Meta's Position:**

Meta believes that the Parties are close to resolution on this RFP, which they have been negotiating for months and for which Meta has provided Plaintiffs significant information about the  user-reporting data available.  On the first issue Plaintiffs raise, Meta has agreed to produce the fields from large data tables that it determines are relevant and not produce those that are irrelevant--just as any responding party would do in ordinary discovery; Plaintiffs are incorrect that Meta previously agreed to explain the meanings of irrelevant data fields to Plaintiffs and, in fact, Meta *has* provided Plaintiffs with sample data for all data fields (regardless of relevance), while also undertaking burdensome efforts to develop explanations (and provide them to Plaintiffs) for the many complex data fields it has agreed to provide them.  On the second issue, Meta continues to investigate whether any earlier data might be available and

found, but Plaintiffs only raised this issue for the first time within the last two weeks, which comes months after Meta first informed Plaintiffs of the time range of the data it had located to date.

### 5.     Meta's Answers to Plaintiffs' Interrogatories Set 1 (Nos. 1-2)

On June 28, 2024, Plaintiffs received Meta's responses and objections to Plaintiffs' Interrogatories, which included, in part, information related to the content moderation systems on Meta's platforms.   In response, Plaintiffs sent Meta a letter on July 23 outlining Plaintiffs' perceived deficiencies in Meta's responses.  Meta responded to Plaintiffs' letter on August 9.  The Parties then met and conferred on August 23 and August 27 to discuss their respective positions.   On August 23, 2024, Plaintiffs sent Meta correspondence summarizing the Parties' discussion with respect to Interrogatory No. 2, and on September 3, Plaintiffs sent Meta a letter summarizing the Parties' discussion with respect to Interrogatory No. 1. While Meta does not agree that the letters are complete or accurate in all respects, it served a supplemental response to Interrogatory No. 2 on September 20, 2024, and has informed Plaintiffs of its intention to supplement its response to Interrogatory No. 2 and further supplement its response to Interrogatory No. 1. The Parties have met and conferred further on Meta's responses and will continue to do so following Plaintiffs' receipt of Meta's further supplemental responses as needed.

### 6.     Meta's R&Os to Rule 30(b)(6) Written Questions

**<u>Plaintiffs' Position:</u>**

Meta's responses to the PI/SD Plaintiffs' written questions on Plaintiffs' 30(b)(6) Topics 3-6 are largely deficient, non-responsive and avoidant, and assert broad, improper objections and limitations. By August 25, 2024 letter, Plaintiffs raised their concerns of Meta's lack of responsiveness and transparency throughout Meta's submission, identifying significant deficiencies with Meta's responses--many of which are unclear, unreliable, and incapable of satisfying Meta's obligation to respond to Plaintiffs' 30(b)(6) written deposition on corporate structure topics, as ordered by Magistrate Kang. The parties continue to meet and confer.

**<u>Meta's Position:</u>**

This issue arises from Plaintiffs' service of hundreds of written deposition questions (some with a dozen or more subparts) that sought a vast quantity of information stretching back 20 years to which no

46

live witness or witnesses could ever reasonably respond; Meta nonetheless conducted an expansive and highly burdensome investigation and served substantive answers to Plaintiffs' questions on July 25, 2024. Plaintiffs served a letter one month later (on August 25) identifying purported deficiencies in those responses, with which Meta strongly disagrees, but the parties held one productive meet-and-confer on this issue on August 29, and Meta provided a written response on September 17 that addressed the purported deficiencies, offered several compromise positions, and requested that Plaintiffs provide more concrete proposals for resolving their concerns.  Plaintiffs have not responded to the letter.

### 7.    Meta's Preparation of 30(b)(6) ESI designees

**Plaintiffs' Position:**

During both Rule 30(b)(6) ESI depositions, Meta's counsel engaged in conduct that was both inappropriate and obstructive, including numerous instances of speaking objections, attempts to coach the witness, improper attorney-client privilege instructions--actions that unnecessarily consumed the limited time afforded to Plaintiffs. Additionally, Meta failed to designate witnesses on all topics outlined in the Amended Deposition Notice and did not adequately prepare the witnesses on topics for which they were designated. On August 30, 2024, Plaintiffs wrote Meta seeking a number of corrective measures including, among other things, designating Rule 30(b)(6) witnesses for the topics the witnesses were not designated, providing additional testimony for topics for which the witnesses were unprepared, providing assurances that counsel will cease their misconduct during future depositions; and the parties held conferred on September 11--Meta, however, has yet to respond.

**Meta's Position:**

Plaintiffs' purported concerns with Meta's Rule 30(b)(6) ESI depositions, raised for the first time more than a month after the depositions concluded, are not well-taken.  For example, despite Plaintiffs now claiming that ordinary objections to form or to questions that exceeded the scope of the deposition notice "unnecessarily consumed" Plaintiffs' time, they concluded the depositions with nearly three hours remaining from the twelve hours allotted to the deposition.  Meta expects to respond to Plaintiffs' letter in short order.

### 8.    Non-Custodial Sources

**Plaintiffs' Position:**

Plaintiffs continue to meet and confer and seeking Meta's collection and production of highly relevant and responsive information from non-custodial sources, including structured and unstructured data sources. Meta has yet to respond to Plaintiffs' September 17, 2024 letter regarding same—however, despite Meta's knowledge that numerous sources contain relevant and responsive information, Meta has refused to collect and produce such information to Plaintiffs, including, among other things, schemas (i.e., the organizational framework or blueprint that defines how data is organized, stored, and accessed with the database, including definitions of tables, columns, data types, relationships, indexes, and other data elements), which its own 30(b)(6) witness testified were readily available.  Plaintiffs' September 17, 2024 letter also asserted Meta's Rule 30(b)(6) witness's testimony concerning custodians' use of company-issued personal device and Meta's policies regarding same, which Meta withheld until just before Meta's Rule 30(b)(6) ESI deposition was set to begin in July 2024.

**Meta's Position**:

By letter dated April 19, 2024, Meta provided Plaintiffs with an explanation of its approach and search methodology for non-custodial sources; nearly three months later, Plaintiffs sent Meta an email posing various questions about Meta's non-custodial sources; Meta promptly responded by letter dated July 23, 2024 with additional information; and nearly two months letter, on September 17, 2024, Plaintiffs sent Meta yet another letter, largely repeating many of the same questions already addressed in Meta's prior responses of April 19 and July 23.  Plaintiffs' assertion that schemas are "readily available" for Meta's data sources is a mischaracterization of Meta's 30(b)(6) witness testimony, as Meta already explained to Plaintiffs during the parties' September 11, 2024 meet-and-confer, yet Plaintiffs continue to make this specious claim.  Finally, Meta previously provided Plaintiffs with a list of relevant non-custodial sources and as it continues to investigate, Meta will supplement this list and provide such information to Plaintiffs.

### 9.   Meta's R&O's to PI/SD RFPs Set 13

**Plaintiffs' Position:**

In responding to PI/SD RFPs Set 13, Meta generally stated that it will, using prior agreements on custodians and search terms, produce relevant, non-privileged documents, without stating whether Meta believes the documents requested in Set 13 are relevant. Subsequent meet and confers and correspondence have not helped, with Meta repeating the notion that it will produce documents responsive to Set 13 if they discuss some issue Meta deemed relevant in responsive to prior sets of RFPs. Because Set 13 seeks information that, in material part, is arguably not covered by prior RFPs, Plaintiffs intend to seek relief from the Court following a meeting of lead trial counsel.

**Meta's Position:**

Plaintiffs' summary of Meta's responses and objections to the 57 RFPs in Set 13 is inaccurate. Regarding RFPs 313–319, 322–333, 335–341, 343–347, 349–361, and 363–367 in Set 13, the Parties previously agreed that if the agreed-upon search terms return documents discussing Youth in relation to social media or safety or health, and/or discuss the creation, design, implementation, operation, evaluation, testing, or changes to one or more of the Named Features, and/or discuss addictive/compulsive use or potential harms from social media to mental health, Meta will produce them if non-privileged.  Given the overbreadth and undue burden associated with these RFPs, Meta did not agree to targeted searches for the myriad and disparate documents requested by these RFPs, but explained to Plaintiffs that if in the course of its investigation, non-privileged, responsive documents are uncovered, those will also be produced. With respect to the other RFPs in Set 13 that Plaintiffs have raised, Meta has responded in detail to Plaintiffs' purported concerns, with the last exchange occurring a week and a half ago via a detailed 6-page single-spaced letter from Meta to Plaintiffs, with no substantive response from Plaintiffs or request for a conferral as of the date of this filing:

### 10.    Hyperlink Production

**Plaintiffs' Position:**

Although a request for an expedited timeline for producing hyperlinks had been teed up for this Court at the last discovery management conference, this item was left unaddressed, and without the Court's instruction, Plaintiffs are not receiving necessary hyperlinked documents in time for depositions. For example, after the Plaintiffs requested 141 hyperlinked documents for the first deposition of C.S. and

49

Meta agreed to produce these documents by October 14, Meta responded to these requests on October 15, rejecting half of the requests as "non-responsive" or "not readily collectible" and sending only five new documents.  Alarmed that this will become a recurring issue, Plaintiffs have asked Meta for a meet and confer on an expedited timeline in emails dated October 10, October 11, and October 17, but Meta has ignored all of these requests.

**Meta's Position:**

Meta has been working in good faith to investigate, identify, and collect the 729 hyperlinks from Plaintiffs' September 20, September 26, October 4 and October 11 requests, including those requests associated with the first four scheduled Meta deponents—approximately 510  hyperlinks for Meta deponents K.J., M.S., C.S., and D.C.—and as of October 18, has completed its investigation, identification, and production of all but approximately 25, which were only requested 7-14 days ago, despite being associated with documents that Plaintiffs have had for many months.  Among other communications with Plaintiffs on hyperlinks issues, Meta has made hyperlink productions on October 9, 11, 14, 15, and 17; Meta has identified previously-produced hyperlinks to Plaintiffs on October 2, October 4, 7/8, and 15; Meta has communicated with Plaintiffs about incorrect Bates numbers being requested on October 2 and 3; Meta has provided a status update on its progress on hyperlinks to Plaintiffs in emails on October 5 and 15; and Meta is continuing to work with Plaintiffs, including in response to their most recent email of October 17, to identify and/or produce hyperlinked documents in specific deponents' custodial files in advance of the  30-day timeline—when there is a *reasonable* and *appropriate* reason to do so (i.e., when the hyperlinks at issue are located new documents produced to Plaintiffs within the prior 30-day window).  However, Meta has been hampered by Plaintiffs' persistent, voluminous requests for hyperlinks from documents they have had for many months or close to one year, less than 2-3 weeks out from a deposition, including hyperlinks to documents they could and should have found themselves in Meta's prior productions.

### 11.     Meta's R&O's to Bellwether SD RFPs Set A

**SD Plaintiffs' Position:**

On August 1, 2024, Meta responded to the Bellwether SD Plaintiffs first set of Requests for Production—Set A—by refusing to do anything more than what it had previously agreed to do in response to the PI/SD's sets of RFPs (as Meta more or less did in response to PI/SD Plaintiffs' RFPs Set 13, discussed above). Meta refused to engage on custodians or search terms—even the 12 highly-targeted search string (one for each district) the Bellwether SDs proposed—necessary to identify information specific to these RFPs and generally stated that what it was already producing in response to prior RFPs was good enough to satisfy its obligations for the Bellwether SD RFPs. Meta also objects to several RFPs, even using the existing custodians and search terms, as overbroad and irrelevant, e.g., user data for the Bellwether SD's geographic area and marketing distributed in the Bellwether SD's geographic area.

**Meta's Position:**

On July 2, 2024, the SD Bellwether Plaintiffs served 7 general (i.e., non-case-specific) RFPs on Meta and, in connection with those RFPs, demanded new custodians and search terms--notwithstanding that:

- Nearly two weeks earlier, on June 20, 2024, the PI/SD Plaintiffs had committed (and the Court subsequently ordered them) not to serve any additional general (i.e., non-case-specific) RFPs, *see* DMO 7 (ECF 969) at 2-3;[14]

- Over eight weeks earlier, on May 3, 2024, the PI/SD Plaintiffs and Meta had reached a global deal on custodians, limiting the PI/SD Plaintiffs to 127 custodians largely of their choice, pursuant to Court orders requiring them to "finalize" custodian negotiations by a date certain, *see* DMO 5 (ECF 789) at 5-6; f

- Less than a week earlier, on June 27, 2024, the PI/SD Plaintiffs and Meta had reached a global deal on search terms, consisting of 317 general and 107 feature-specific search terms, including dozens of school-related search terms, pursuant to Court orders requiring "Meta and the PI/SD Plaintiffs (or any sub-group of PI/SD Plaintiffs)" to "finalize" search term negotiations by June 26,

---

[14] The PI/SD Plaintiffs' commitment in this regard was subject to two qualitative exceptions that do not apply here: the PI/SD Plaintiffs reserved the right to serve additional RFPs on Meta for materials (1) that fall outside the Relevant Time Period and (2) concerning new developments, facts, or issues that may come to light in discovery or otherwise.  *Id.* at 3.

2024, *see, e.g.*, DMO 6 (ECF 875) at 1; DMO 7 (ECF 969) at 1; *see also* 6/20/24 DMC Tr. at 45:18-22 ("So I'm not limiting [search term negotiations] to just what [RFPs have] been served; right? I want to make the search term negotiation as complete as possible so **when it's done next week, hopefully you'll never have to come back to me on that issue. Okay?**" (emphasis added)).

The School District Plaintiffs were represented in all of the negotiations leading to these agreements by co-lead counsel for the PI/SD Plaintiffs, and indeed their interests were represented: by way of example only, the global search terms deal they reached with Meta included numerous school district-specific search terms. Notwithstanding that the SD Bellwether Plaintiffs' "Set A" RFPs completely contravene and ignore these prior agreements, Meta has attempted to work with them to produce documents responsive to many of their requests, and will continue conferrals in good faith.

### 12.    Meta's Request to Limit Apex-Level Deponents to 7 Hours

**<u>Meta's Position:</u>**

Meta requests that Plaintiffs limit their depositions of apex deponents to 7 hours--the default limit established for all depositions by the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 30(d)(1). Courts routinely place much sharper limits on apex depositions than the full 7 hours allowed under the Federal Rules in light of the well-recognized potential for abuse of those depositions. *See, e.g.*, *Google Inc. v. Am. Blind & Wallpaper Factory, Inc.*, 2006 WL 2578277, at *3 (N.D. Cal. Sept. 6, 2006), *objections overruled*, 2006 WL 3050866 (N.D. Cal. Oct. 23, 2006) ("The deposition . . . shall be limited in scope to [the apex witness's] knowledge of and involvement in the policy change and shall be limited to three hours."). Doing so is particularly warranted here in light of Plaintiffs' noticing an unusually high number of senior-employee depositions and because the other discovery Meta has provided has been so expansive. *See, e.g.*, *In re Google Litig.*, 2011 WL 4985279, at *2 (N.D. Cal. Oct. 19, 2011) (barring deposition of one apex deponent and limiting another to three hours).

**Plaintiffs' Position:**

This MDL involves allegations that have largely survived motion practice brought by individuals, school districts, and state Attorneys General in jurisdictions across the country involving the serious harms Meta has caused to children, an issue that the Court and policymakers have recognized is of urgent public

concern. The individuals managing and directing Meta are directly implicated both because they were personally involved in the conduct and decision-making at issue (as demonstrated by the fact that they are on key documents) and because, as leaders of the company, they share ultimate responsibility for the relevant companywide policies and practices. Considering the different plaintiff groups involved—including cross-noticing State AGs—and the witnesses' extensive and non-duplicative personal knowledge on relevant issues, it is neither appropriate nor feasible to limit these depositions to seven hours.

### E.    Unripe Issues Between State AGs and Meta Defendants

#### 1.    Meta's R&O's to AGs' RFP Sets 2 and 3

The Parties met and conferred regarding Meta's Responses & Objections to the State AGs RFP Set 2 on August 22, August 27, August 30, October 1, and October 17 2024 and met and conferred regarding Meta's Responses and Objections to the State AGs RFP Set 3 on October 11, 2024.

While the parties are making progress and reaching agreement on some fronts, from the State AGs' perspective, open questions remain over the types of information and structured data that Meta maintains and stores in the general course of business and/or in known repositories; the relevance and responsiveness of non-youth data, policies, and information, and the definition of source code, among other issues. From Meta's perspective, the State AGs' RFPs are vastly overbroad, would involve very heavy burdens to comply with, and, in connection with conferrals, the State AGs have made sweeping demands for investigation into broad-ranging topics that require significant time to address.  Given the November 5 deadline for briefing all remaining disputes related to RFPs propounded by the State AGs, and to allow sufficient time for Meta to investigate the State AGs' inquiries and identify potential resolutions of the parties' disputes, the State AGs and Meta have agreed to submit briefing on any remaining disputes by

November 12, one week after the Parties' previously-agreed deadline of November 5 to complete briefing on RFPs served by Plaintiffs to date.

**F.      Unripe Issues Between PI/SD Plaintiffs and TikTok**

              1.      **Plaintiffs and TikTok Defendants' Joint Statement Regarding Agreement to Resolve TikTok Defendants' Failure to Meet Substantial Completion Deadlines for Certain Custodial Productions**

Plaintiffs and the TikTok Defendants have signed a written agreement to resolve issues arising from delays in the TikTok Defendants' custodial productions. This includes their production of custodial documents after substantial completion deadlines, as indicated in this chart:



| Custodian | Non-Mandarin Custodial Files vs. Mandarin Custodial Files | Date of Substantial Completion | Number of Docs Before Substantial Completion | Number of Documents After Substantial | Percentage of Documents After | Total number of Documents |
|---|---|---|---|---|---|---|
| R.L. | Non-Mandarin Custodial Files | 8/30/2024 | 3777 | 11608 | 75% | 15385 |
| C.C. | Non-Mandarin Custodial Files | 9/13/2024 | 2046 | 8810 | 81% | 10856 |
| Y.F. | Non-Mandarin Custodial Files | 9/13/2024 | 379 | 3157 | 89% | 3536 |
| S.L. | Non-Mandarin Custodial Files | 9/13/2024 | 178 | 2067 | 92% | 2245 |
| S.L. | Mandarin Custodial Files | 9/20/2024 | 239 | 626 | 72% | 865 |
| J.F. | Non-Mandarin Custodial Files | 9/13/2024 | 1294 | 4812 | 79% | 6106 |
| J.E. | Non-Mandarin Custodial Files | 9/20/2024 | 1537 | 1579 | 51% | 3116 |
| L.Y. | Non-Mandarin Custodial Files | 9/20/2024 | 804 | 2492 | 76% | 3296 |
| R.M. | Non-Mandarin Custodial Files | 9/20/2024 | 482 | 9398 | 95% | 9880 |

As the TikTok Defendants have explained to Plaintiffs, the TikTok Defendants have experienced significant technical challenges collecting, reviewing, and producing documents hyperlinked within other documents, and that those issues have been the primary driver of documents being produced after the agreed-to interim "substantial completion" deadlines for certain custodians.  In summary, and among other things, the parties have agreed that Plaintiffs will provide the TikTok Defendants a 30-day extension of their substantial completion deadline and the TikTok Defendants will:

- Allow a limited number of fact and 30(b)(6) witness depositions in April 2024, after the fact discovery deadline; the extension will not be used to alter the case schedule, trial date, or authorize supplemental depositions of experts;

- Exchange additional information about the timing and volume of future document productions;

- Refrain from cross-noticing (or requiring cross noticing) of any depositions occurring in non-MDL/JCCP cases absent good cause;

- Allow an additional 200 hyperlinks each week, which includes up to 100 hyperlinks per deponent 14 or more days before a deposition, which will be produced 7 days before a depositions; up to 50 hyperlinks per deponent 7-13 days before a deposition, which will be produced 48 hours before a deposition; and agree to work cooperatively if additional hyperlinks are needed before a deposition;

- Conclude negotiations on several outstanding discovery matters;

- Meet weekly at an appointed time to confer on outstanding discovery and document related matters; and

- Work cooperatively to resolve technical issues with productions.

Having worked cooperatively to reach an agreement on these issues, the parties do not believe they need further assistance of the Court on these issues at this time.

## 2.      RFP 225 (CSAM budgets & expenditures)

**PI/SD Plaintiffs' Position:**

Request for Production 225 asks TikTok to produce "[d]ocuments that constitute, identify, or reflect Your annual budget and actual expenditures for CSAM detection and reporting for Your Platform." Despite agreeing to produce budget-related documents for other aspects of its business (marketing/promotion of TikTok, Trust & Safety, research and development, age verification, child and teen wellbeing), and agreeing to produce other documents related to CSAM detection and reporting (e.g., RFP 190: policies related to CSAM reporting), TikTok refuses to search for and produce responsive documents on the ground that "CSAM is not at issue in the case against the TikTok Defendants. . . ." The operative Master Complaint describes in detail how "ByteDance has designed various TikTok features that promote and dramatically exacerbate sexual exploitation, the spread of CSAM, sextortion, and other socially maladaptive behavior that harms children," SAC ¶ 654; *see id.* ¶¶ 655-74, and these defects are included in Plaintiffs' failure-to-warn claim regarding *all* defective TikTok features, *see* 11/14/23 MTD Order (ECF 430) at 20, 22, 41 n.60; *see also id.* at 15-16 (holding that section 230 does not bar product defect claims based on "the ways in which [Defendants] allow users and visitors to their platforms to report CSAM").

**TikTok's Position:**

As the PI/SD Plaintiffs have acknowledged during meet and confers, the only remaining claim against defendants related to CSAM is for allegedly "[n]ot implementing reporting protocols to allow users or visitors of defendants' platforms to report CSAM and adult predator accounts specifically without the need to create or log in to the products prior to reporting. (Nov. 14, 2023 Order on MTD, at 14-15 (citing MAC ¶ 845(p)). However, the Second Amended Master Complaint does not make this specific

56

assertion against the TikTok Defendants—to the contrary, it asserts that TikTok followed exactly the opposite practice (the "better practice") of allowing reporting of CSAM "when not logged in." (SAMC, ¶ 667, n.751) (incorporating by reference Canadian Centre for Child Protection, Reviewing Child Sexual Abuse Material Reporting Functions on Popular Platforms, at p. 14). Accordingly, discovery about CSAM, and certainly budgets relating to the same, is not relevant to TikTok.

### 3.      RFPs 261-265 ("Tap Again to Exit" feature)

**PI/SD Plaintiffs' Position:**

Requests for Production 261-265 relate to TikTok's "Tap Again to Exit" feature, for which TikTok has agreed to produce responsive documents from agreed upon custodial files.  Request 261, however, asks TikTok to produce "Documents sufficient to identify any executive(s), project leader(s), or employee(s) responsible for developing, deciding to implement, implementing, or deciding not to remove TikTok's "Tap again to exit" user prompt."—information that is essential for Plaintiffs to assess whether the agreed upon custodians are the appropriate custodians who would likely possess responsive documents.  TikTok has repeatedly asserted that it has produced documents "sufficient" to identify the team that was responsible for this feature, and has agreed to provide citations to those documents for Plaintiffs' review, but has so far failed to provide those citations.

**TikTok's Position:**

The TikTok Defendants have previously produced documents responsive to this request and through this meet and confer, Plaintiff now seeks the names of individuals who were working on "Tap Again to Exit" rather than seeking additional documents related to this request, which is not a proper use of a request for production of documents.  However, in an effort to compromise on this issue, the TikTok Defendants agreed to provide the bates range of documents regarding this feature for Plaintiffs.  The TikTok Defendants are also further investigating to provide documents that show what Plaintiffs request if more information can be identified.

### 4.      Non-custodial Sources

**PI/SD Plaintiffs' Position:**

Plaintiffs have repeatedly requested TikTok confirm whether it is searching non-custodial sources for various RFPs. The TikTok Defendants have repeatedly agreed to provide Plaintiffs an updated list of non-custodial sources that they are searching and the type of information that will exist in each, but despite requests from Plaintiffs, the TikTok Defendants have yet to produce a list indicating the type of information that will exist in each non-custodial source. Most recently, on October 3, Plaintiffs asked TikTok to provide "[t]he identification of non-custodial sources searched and produced so far, as well as those planned for future production," but TikTok has not responded.

**TikTok's Position:**

The TikTok Defendants, where appropriate have indicated through meet and confers on various requests for production when the request seeks information from non-custodial sources and likewise have noted where the documents being produced are from custodial sources. The TikTok Defendants have also provided Plaintiffs detailed information regarding its electronically stored information, including presenting two 30(b)(6) witnesses on ESI-related topics.

### 5.      Ex-U.S. Discovery

**PI/SD Plaintiffs' Position:**

For months, Plaintiffs have asked and TikTok has refused to include warnings the company issued abroad but not domestically within its production of documents concerning foreign platforms, insisting that the Court rejected such discovery, despite Plaintiffs pointing out that the Court said no such thing in its order, ECF No. 593, and that the Court said explicitly at the hearing that its ruling on "technical and implementation documents" was not meant to apply to failure to warn. *See* Hr'g Transcript, ECF 903 at 18:13-17. Plaintiffs recently narrowed their request significantly to only include warnings TikTok issued in China or the EU, a compromise proposed weeks ago with no response from TikTok. Plaintiffs also requested, for good cause, discovery into particular age assurance features in Australia and the EU, a specific, targeted, and narrow request for which TikTok has not articulated any burden or other justification for denying.

**TikTok's Position:**

On September 17, Plaintiffs sent a letter (styled "OUS Discovery In addition To The Order") purporting that "the Court never said that its order encompassed all allowable OUS discovery" and requesting that the TikTok Defendants (1) search for documents related to "warnings" and the "efficacy of warnings" for Douyin (a short-form video platform available only in China) and the TikTok platform anywhere in the world, and (2) design-related documents for Douyin and the TikTok platform in the EU, Australia, and Japan. Plaintiffs' informal request—sent four months after the Court's May 23 ruling on the parties' joint letter brief regarding discovery into non-U.S. services and just weeks before the deadline to substantially complete document productions, is entirely too late, has already been denied, at least in-part, by this Court, and is clearly outside the specific and targeted "follow-up" discovery that Plaintiffs agreed to limit further discovery to.  (9/6/2024 Joint Status Report on Discovery [1120], at 2).  Since that time, the parties have continued to engage in good faith meet and confers to attempt to resolve this issue informally.

### 6.  Failure to Warn RFAs Deficiencies

**PI/SD Plaintiffs' Position:**

Plaintiffs have served two sets of requests for admission on TikTok, one concerning age verification and parental controls, the other concerning the lack of warnings on the TikTok Platform. Plaintiffs sent deficiency letters with respect to TikTok's responses and objections, the Parties have met and conferred, and TikTok provided additional information in written correspondence and responded to Interrogatories Plaintiffs served asking for the basis of TikTok's denials and partial denials of the RFAs. Despite the various deficiency letters and rounds of meet-and-confer correspondence, TikTok continues to maintain improper objections to the RFAs, including baseless claims of vagueness and ambiguity where none exists; the parties are continuing to meet and confer about these and other remaining deficiencies in TikTok's responses.

**TikTok's Position:**

Plaintiffs' own insert makes clear that this is not an appropriate "unripe dispute" as it is wholly unclear what alleged issue Plaintiffs are seeking to raise here. The TikTok Defendants have responded to

Plaintiffs' sets of RFAs and remain willing to further meet and confer as needed to the extent any dispute remains.

### 7.     AG Production Refresh

**PI/SD Plaintiffs' Position:**

Before discovery opened in this litigation, the MDL Court ordered Defendants to produce a limited number of documents they previously produced to State Attorneys General (Dkt. 125) and after discovery opened, the PI/SD Plaintiffs served RFPs calling for production of the rest of these documents. During a meeting with Defense counsel on September 17, 2024, the TikTok Defendants agreed to supplement their AG production, but failed to provide an anticipated date for the supplement. Now, nearly a month later, the TikTok Defendants have still not provided any update for when Plaintiffs can expect this supplement.

**TikTok's Position:**

The TikTok Defendants agreed to refresh the production of documents from Attorney General investigations.  Those documents will be produced before the end of October, and likely before this DMC hearing on October 24.

### 8.     Lark Spoilation and Investigation into Same

**PI/SD Plaintiffs' Position:**

TikTok provided new information a few weeks ago illuminating the extent of potential spoliation related to (a) secure (i.e., ephemeral/disappearing) Lark messages and (b) recalled Lark messages. TikTok provided specific permission to 14 document custodians in this case to initiate chats using secure, disappearing messages *after* these cases were filed, and enabled *all* custodians still employed by TikTok to participate in secure, disappearing chats commenced by others until dates ranging from March 2023 to December 2023 (approximately one to one-and-a-half years after these cases were brought). In addition, though TikTok started preserving recalled Lark messages—i.e., chat messages where a sender thinks twice about what they have written and recalls the message, indicated in the chat string by a Mandarin phrase noting that a message has been recalled—in June 2023, more than a year after these cases were brought, specifically due to its preservation obligations, it has refused to produce the contents of any message recalled from a produced Lark chat string  and has refused to review the corpus of preserved messages for

60

any recalled messages responsive to Plaintiffs' requests. According to TikTok, Lark recalled chats from before June 2023 are gone forever, as are all Lark secure chats.

**TikTok's Position:**

Plaintiffs' representations regarding the use of secure chat and recall message features within the Lark communication platform are inaccurate.  That said, the TikTok Defendants are continuing to meet and confer and work cooperatively with Plaintiffs regarding information that has been requested.

### 9.    Failure to Produce Hyperlinks

**PI/SD Plaintiffs' Position:**

In July, citing the hyperlink protocol, TikTok requested that Plaintiffs list all hyperlinks individually rather than identifying a particular document for which Plaintiffs wanted all the hyperlinks—which Plaintiffs did, at considerable effort, retroactively for their first and second set of hyperlink requests and for all such requests moving forward. In turn, Plaintiffs asked that TikTok comply with the same provision of the hyperlink protocol by providing the Bates number of the produced document corresponding to each requested hyperlink, which TikTok committed to doing for set one by October 11, a deadline that TikTok missed without explanation. TikTok has also failed to comply with the hyperlink protocol's requirement that it engage in "reasonable efforts to locate the hyperlinked document," insisting instead that when a hyperlink that Plaintiffs transcribed does not work when clicked, that Plaintiffs—not TikTok—attempt to re-transcribe the hyperlink, even though it is impossible for Plaintiffs to distinguish certain characters in the hyperlinks, such as whether "I" represents an uppercase "i" or lowercase "L."

**TikTok's Position:**

The TikTok Defendants have responded to all of Plaintiffs' requests for hyperlinks which has resulted in 434 documents produced and are currently attempting to provide all relevant hyperlinks to date, where possible.  Of note, Plaintiffs failed to provide the list of the required urls they seek with their requests (as opposed to just generally asking for all links in a document) until very recently, which has unnecessarily slowed the process and caused the TikTok Defendants to do more investigation than is anticipated by the ESI Protocol.  Despite this, the TikTok Defendants are continuing to produce requested hyperlink documents that are located.

### 10.    Production Pace/Metadata

**<u>PI/SD Plaintiffs' Position:</u>**

Plaintiffs have repeatedly raised concerns regarding the slow pace of the TikTok Defendants' productions which has contributed to the production of approximately 167K documents – an amount significantly less than the other Defendants' productions, *i.e.*, Snap at 243K documents, Google at 382K documents, and Meta at 1.4M documents. Likewise, Plaintiffs have identified issues with the metadata provided with the TikTok Defendants' productions, including, but not limited to, the failure to (1) identify affiliated Lark documents within a Lark chat's family, (2) provide the identity of custodians and/or authors, and (3) provide accurate creation and/or modification dates. The TikTok Defendants' slow production pace, lack of transparency, and inadequate metadata is causing prejudice to Plaintiffs and impacting our ability to prepare for depositions.

**<u>TikTok's Position:</u>**

TikTok likewise had concerns regarding the pace of its document productions and had begun to both (1) investigate and resolve identified root causes, and (2) increase resources to speed the pace of productions before Plaintiffs raised their concerns.  As a result of their investigation, the TikTok Defendants proactively reached out to Plaintiffs to discuss the issues identified by both parties, and have now met with Plaintiffs multiple times concerning these issues, sent Plaintiffs' counsel several detailed letters regarding various technical aspects of the document productions, and agreed to weekly meetings to better identify concerns and work cooperatively towards solutions or expedited resolution.  Counsel for Plaintiffs have acknowledged the level of proactivity and transparency that the TikTok Defendants have shown, and the TikTok Defendants are hopeful that the parties can work out an informal accommodation to avoid or minimize any impact on the deposition schedule, which the parties are still meeting and conferring about.

### 11.    Production of Lark Conversations

**<u>PI/SD Plaintiffs' Position:</u>**

Based on Plaintiffs' review of recent productions, it appears that the TikTok Defendants have not produced Lark conversations from all relevant custodial files. This is particularly problematic because

Plaintiffs have identified two versions of the same Lark conversation that reveals missing messages between the versions without any indication that a chat message was removed. This raises serious concerns about whether other Lark conversations thus far produced are missing messages – a problem that Plaintiffs cannot decipher if the TikTok Defendants have not produced Lark conversations from all relevant custodial files.

**TikTok's Position:**

The TikTok Defendants sent Plaintiffs a detailed letter on October 15 that addressed certain of the technical issues associated with the production and review of Lark conversations that Plaintiffs have raised. They then met with Plaintiffs the same day to discuss these issues, answer Plaintiffs' counsel's questions and further explore the concerns raised, and a further meet and confer is scheduled for Friday. As was reported to Plaintiffs, the TikTok Defendants are continuing to investigate some of the Lark issues raised and will continue to meet with Plaintiffs to address any remaining concerns.

### 12.    School District Bellwethers' RFA Set A – Custodians/Search Terms

**SD Plaintiffs' Position:**

On July 1, over a month after Plaintiffs and TikTok concluded negotiations regarding custodians and search terms, School District bellwethers served 13 bellwether-specific requests on TikTok, asking for documents such as correspondence between TikTok and the bellwether School Districts (RFP 1), documents concerning or correspondence between TikTok and parent-teacher associations in the bellwether School Districts (RFP 2), and correspondence between TikTok and any student, parent, or guardian in the bellwether School Districts (RFP 4).  In a subsequent correspondence, SD bellwether Plaintiffs requested that TikTok adopt additional, bellwether-specific search terms (which terms largely encompass the names of the school districts chosen as bellwethers) and identify the custodians most likely to possess documents responsive to their requests.  Tik Tok has refused.

**TikTok's Position:**

In a September 26 letter, the TikTok Defendants explained that they had engaged in extensive negotiations with Plaintiffs regarding custodians (including the ability to add additional custodians by October 5) and search terms that encompassed both the custodian most likely to have communicated with

school districts and numerous search terms relating to schools and school districts. On October 2, the TikTok Defendants agreed to confirm if there were any other custodians who should be considered for the bellwether School District requests. On October 14, the TikTok Defendants confirmed that the previously identified custodian is the appropriate School District custodian, and that the time to add additional custodians (beyond the open slots Plaintiffs negotiated) and negotiate additional search terms has passed.

### 13.     Privilege Log Deficiencies

**PI/SD Plaintiffs' Position:**

Plaintiffs identified at least 200 deficient entries on the privilege log Tik Tok produced in connection with its responses to subpoenas served by state attorneys general ("AG Logs") and also take issue with TikTok's privilege logs relating to communications transmitted using its Lark communications platform, which TikTok has only now advised does not include the sender and recipient metadata required by the protocol governing privilege logs in this case.  While TikTok initially took the position that the AG logs are not governed by the protocol entered in this case and, therefore, any document withheld in connection with that production should be forever immune from challenge, on October 14, 2024, TikTok's counsel agreed to take the issue of amending the AG Logs back to their clients. As far as Lark communications are concerned, TikTok now proposes replacing the to/from/cc/bcc fields with an "All Participants" field, but this proposal does not provide sufficient information for Plaintiffs to assess the validity of the attorney-client privilege asserted.

**TikTok's Position:**

The MDL ESI Protocol specifies that re-productions "may be re-produced in the same manner and form as originally produced in the other matter." ECF 690 at 10. The TikTok Defendants have no obligation to go back and recreate the AG Logs, which the TikTok Defendants reminded Plaintiffs when this inquiry first came up (and was subsequently dropped) in July 2024;  despite this, the TikTok Defendants are willing to review the AG log entries Plaintiffs have called out and will review and amend the same to the extent determined necessary.  As for privilege logging associated with Lark chats produced in this MDL, it is not a question of certain metadata existing or not, but rather the nature of the chats

---

64

themselves which the TikTok Defendants have indicated they are willing to continue working with Plaintiffs to resolve any open questions or concerns.

### 14.   Deposition Translation Protocol

**PI/SD Plaintiffs' Position:**

Because certain deponents have requested an interpreter, with the first such deposition of a Mandarin-speaking witness scheduled for January, on October 8, Plaintiffs proposed a deposition translation protocol modeled after the protocol in *In Re Lithium Ion Batteries*, MDL No. 2420 (Gonzalez Rogers, J.). The TikTok Defendants provided a response to this proposal on October 17, which Plaintiffs are reviewing.

**TikTok's Position:**

To date, Plaintiffs have served 19 deposition notices and, despite not being required under the Deposition Protocol, the TikTok Defendants have proactively provided Plaintiffs with information about which of those deponents may need a translator.  To date, the TikTok Defendants have indicated that for 2 of the 19 witnesses – for whom no deposition dates have been set as the TikTok Defendants are waiting for Plaintiffs to respond to the alternative dates provided – a translator may be needed.  Nevertheless, the TikTok Defendants are in the process of reviewing the translation protocol provided by Plaintiffs and look forward to meeting and conferring with Plaintiffs to efficiently resolve this issue.

### 15.   Plaintiff Maria Elena Rodriguez's deceased daughter M.G.'s TikTok Account was accessed and compromised.

**Plaintiffs' Position:**

On or about August 22, 2024, one of M.G.'s TikTok accounts was accessed by someone, and a post was made to the account—M.G. has been deceased since December 2022. Based upon information and belief, no one has accessed or had access to that account since the date of M.G's death. On August 27, 2024, Plaintiff notified Defendant TikTok of this issue and requested that TikTok undertake an investigation of the issue to determine the location of the IP address for whomever accessed and posted to the account, however, to date, there has been no resolution to this issue.

**TikTok's Position:**

The TikTok Defendants have undertaken an investigation based on Plaintiffs' letter.  The TikTok Defendants will follow up directly with counsel for Plaintiffs to relay the information sought.

### G.    Unripe Issues Between PI/SD Plaintiffs and Snap

#### 1.    Resolution of Snap RFP Set 11

**PI/SD Plaintiffs' Position:**

Plaintiffs' Request for Production Set 11 seeks documents and communications related to the US Surgeon General's call for warnings to accompany minors' use of social media platforms. Snap has responded that it will conduct targeted searches through "selected existing custodians' files," and has Proposed three custodians to search, as well as search terms.  Plaintiffs have requested that Snap conduct its search through three additional custodians and is awaiting Snap's response.

**Snap's Position:**

The parties conducted a meet and confer on October 16 during which Snap provided additional information on its proposed custodians and search terms for RFP Set 11 and Plaintiffs proposed additional custodians.  The parties are continuing to meet and confer on proposed search terms and custodians.

#### 2.    Resolution of Snap Responses to Bellwether School District RFP Set A

**PI/SD Plaintiffs' Position:**

The Bellwether School District Plaintiffs served 13 RFPs on Snap on July 3, 2024. Although Snap responded to the RFPs on August 2, 2024, it refuses to search for and produce documents in response to seven of the 13 RFPs, and refuses to engage in negotiations regarding scope that would address Snap's overbreadth objections.  Snap's claim that the Bellwether School Districts are not permitted to serve RFPs related to their claims is meritless and Plaintiffs have requested a final H2 conferral so this issue can be brought to the Court for resolution.

**Snap's Position:**

Snap has agreed to search for and produce non-privileged responsive documents from RFPs 1-6 because those RFPs concern bellwether specific information, but RFPs 7-13 are improper in light of this Court's prior rulings because these RFPs seek information that is not specific to a Bellwether School District.  RFPs 7-13 are general liability discovery requests and such requests have been subject to a

separate negotiation process during which Plaintiffs represented that any additional RFPs served by the bellwether plaintiffs would be limited to requests related to the bellwether plaintiffs themselves.   Snap will continue to discuss RFPs 7-13 with Plaintiffs to understand Plaintiffs' delay in serving these general liability RFPs.

> **3.** **Plaintiffs' Rule 30(b)(6) Notices Re: Age Verification and A/B Testing**

**PI/SD Plaintiffs' Position:**

Pursuant to the Court's Standing Order and the deposition protocol entered in this case, Plaintiffs informally provided Snap with draft Rule 30(b)(6) notices focused on age verification and A/B testing on September 27, 2024. Although Plaintiffs asked to meet and confer regarding the notices, the parties have yet to meet and confer.

**Snap's Position:**

Snap has begun the process of identifying appropriate designees and discussing with them the appropriate scope of both topics. Because these topics—particularly the notice related to age verification—relate to core substantive issues in the case, Snap has requested a list of the other 30(b)(6) topics that Plaintiffs plan to notice, so that Snap can avoid having the same witness sit for multiple 30(b)(6) topics on separate days. The parties are in the process of meeting and conferring about the scope of the topic and those scheduling issues.

> **H.** **Unripe Issues Between PI/SD Plaintiffs and YouTube**

> **1.** **YouTube's Responses to PI/SD Plaintiffs' RFPs Sets A, 3, 4, 5, 6 8, and 9**

**PI/SD Plaintiffs' Position:**

The Parties continue to meet and confer on YouTube's objections and responses to PI/SD Plaintiffs' request for productions in Sets A, 3, 4, 5, 6,  8, and 9, and plan to proceed to H(2)s as needed in the coming weeks. Plaintiffs are disappointed, however, by YouTube's lack of timely responses, which have consisted of primarily repeated, but unfilled promises, of forthcoming substantive compromise, leading to protracted month-long delays. Given the approaching substantial completion deadline of November 5, Plaintiffs

intend to push for H(2)s, as YouTube's refusal to provide timely responses has effectively placed the Parties at impasse.

**YouTube's Position:**

YouTube disagrees with Plaintiffs' mischaracterization of the meet and confer process. YouTube has and will continue to meet and confer in good faith and in a timely manner in an effort to narrow or resolve any remaining disputes.

**APPENDIX**

**Rule 45 Subpoenas Served by Defendants in SD Bellwether Cases**

| Third-Party Subpoena Recipient | Date Served | Date Response Due |
|---|---|---|
| Arizona Department of Education | August 12, 2024 | September 11, 2024 |
| Arizona Department of Health Services | August 12, 2024 | September 11, 2024 |
| Arizona Department of Public Safety | August 12, 2024 | September 11, 2024 |
| Arizona State Board of Education | August 12, 2024 | September 11, 2024 |
| Atlanta Police Department | September 9, 2024 | October 10, 2024 |
| Avondale Estates Police Department | September 9, 2024 | October 10, 2024 |
| Baltimore City Office of Fire Marshal | Service in Progress | To Be Determined |
| Baltimore Fire Department | August 22, 2024 | September 21, 2024 |
| Baltimore Police Department | August 22, 2024 | September 21, 2024 |
| Baltimore City Health Department | August 19, 2024 | September 18, 2024 |
| Bluffdale Police Department | August 15, 2024 | September 14, 2024 |
| Borough of Chatham New Jersey Health Department | August 12, 2024 | September 11, 2024 |
| Breathitt County Health Department | August 21, 2024 | September 20, 2024 |
| Brookhaven Police Department | September 9, 2024 | October 10, 2024 |
| Charleston County Sherriff's Office | August 22, 2024 | September 23, 2024 |
| Charleston Dorchester Mental Health Center | July 31, 2024 | August 29, 2024 |
| Chatham Borough Fire Department | August 12, 2024 | September 11, 2024 |
| Chatham Borough Police Department | August 12, 2024 | September 11, 2024 |
| Chatham Township Police Department | August 12, 2024 | September 11, 2024 |

69

| Chatham Township Volunteer Fire Department | August 12, 2024 | September 11, 2024 |
|---|---|---|
| City of Decatur Police Department | September 9, 2024 | October 10, 2024 |
| Clarkston Police Department | September 9, 2024 | October 10, 2024 |
| Clayton County Police Department | September 9, 2024 | October 10, 2024 |
| Council of Great City Schools | August 21, 2024 | September 6, 2024 |
| DeKalb County Police Department | July 31, 2024 | August 30, 2024 |
| DeKalb County Public Health | July 23, 2024 | August 22, 2024 |
| Essex County Sheriff's Office | August 9, 2024 | September 7, 2024 |
| Florida Department of Children and Families | August 9, 2024 | September 7, 2024 |
| Florida Department of Education | August 9, 2024 | September 7, 2024 |
| Florida Department of Health | August 9, 2024 | September 7, 2024 |
| Florida Department of Health in Hillsborough | August 9, 2024 | September 7, 2024 |
| Florida Department of Law Enforcement | August 9, 2024 | September 7, 2024 |
| Georgia Bureau of Investigation | August 15, 2024 | September 14, 2024 |
| Georgia Center for School Safety | August 14, 2024 | September 13, 2024 |
| Georgia Department of Behavioral Health & Developmental Disabilities | July 12, 2024 | August 11, 2024 |
| Georgia Department of Community Health | August 1, 2024 | August 31, 2024 |
| Georgia Department of Education | July 23, 2024 | August 12, 2024 |
| Georgia Department of Human Services | August 20, 2024 | September 19, 2024 |
| Georgia Department of Public Health | July 22, 2024 | August 12, 2024 |
| Georgia Department of Public Safety | July 26, 2024 | August 25, 2024 |
| Georgia Governor's Office of Student Achievement | To Be Determined | To Be Determined |

70

| | | |
|---|---|---|
| Harford County Health Department | August 2, 2024 | September 2, 2024 |
| Harford County Sheriff's Office | August 23, 2024 | September 23, 2024 |
| Herriman Police Department | August 1, 2024 | August 30, 2024 |
| Hillsborough Fire Rescue | August 9, 2024 | September 7, 2024 |
| Hillsborough Sheriff's Office | August 9, 2024 | September 7, 2024 |
| Irvington Police Department | August 13, 2024 | September 7, 2024 |
| Jackson Fire Department | August 16, 2024 | September 15, 2024 |
| Jackson Police Department | August 16, 2024 | September 15, 2024 |
| Kentucky Auditor of Public Accounts | August 6, 2024 | September 5, 2024 |
| Kentucky Board of Education | August 6, 2024 | September 5, 2024 |
| Kentucky Center for School Safety | August 6, 2024 | September 5, 2024 |
| Kentucky Department for Public Health | August 6, 2024 | September 5, 2024 |
| Kentucky Department of Behavioral Health, Developmental and Intellectual Disabilities | August 6, 2024 | September 5, 2024 |
| Kentucky Department of Education | August 6, 2024 | September 5, 2024 |
| Lithonia Police Department | September 9, 2024 | October 10, 2024 |
| Louisiana Center for Safe Schools | August 20, 2024 | September 19, 2024 |
| Louisiana Department of Children and Family Services | August 14, 2024 | September 13, 2024 |
| Louisiana Department of Education | July 16, 2024 | August 15, 2024 |
| Louisiana Department of Health | July 16, 2024 | August 15, 2024 |
| Louisiana State Board of Elementary and Secondary Education | July 16, 2024 | August 15, 2024 |
| Louisiana State Police | July 26, 2024 | August 25, 2024 |
| Maryland Center for School Safety | August 19, 2024 | September 2, 2024 |
| Maryland Department of Education | August 19, 2024 | September 2, 2024 |
| Maryland Department of Health | August 19, 2024 | September 2, 2024 |

| | | |
|---|---|---|
| Maryland Department of State Police | August 23, 2024 | September 23, 2024 |
| Maryland Governor's Office for Children | August 19, 2024 | September 2, 2024 |
| Maryland State Board of Education | August 19, 2024 | September 2, 2024 |
| New Jersey Department of Children and Families | August 5, 2024 | September 4, 2024 |
| New Jersey Department of Education | August 9, 2024 | September 7, 2024 |
| New Jersey Department of Health | August 12, 2024 | October 7, 2024 |
| New Jersey Department of Human Services | August 9, 2024 | October 7, 2024 |
| New Jersey Governor's Council on Mental Health Stigma | August 9, 2024 | September 8, 2024 |
| Pima County Health Department | August 14, 2024 | September 13, 2024 |
| Pima County Sheriff's Department | August 12, 2024 | September 11, 2024 |
| Plant City Fire Rescue | August 12, 2024 | September 7, 2024 |
| Plant City Police Department | August 12, 2024 | September 7, 2024 |
| Riverton Police Department | August 12, 2024 | September 11, 2024 |
| Salt Lake County Human Services | July 29, 2024 | August 28, 2024 |
| Salt Lake County Sheriff's Office | July 30, 2024 | August 29, 2024 |
| South Carolina Department of Education | July 31, 2024 | August 29, 2024 |
| South Carolina Department of Health and Human Services | July 31, 2024 | August 29, 2024 |
| South Carolina Department of Mental Health | July 31, 2024 | August 29, 2024 |
| South Carolina Department of Public Health | July 31, 2024 | August 29, 2024 |
| South Carolina Department of Public Safety | August 22, 2024 | September 23, 2024 |
| South Carolina Education and Oversight Committee | July 31, 2024 | August 29, 2024 |
| South Carolina Law Enforcement Division | August 22, 2024 | September 23, 2024 |

| South Jordan Police Department | July 30, 2024 | August 29, 2024 |
| Spartanburg Area Mental Health Center | July 30, 2024 | August 29, 2024 |
| Spartanburg County Sheriff's Office | August 24, 2024 | September 23, 2024 |
| St. Charles Parish Sheriff's Department | July 25, 2024 | August 25, 2024 |
| Stone Mountain Police Department | September 9, 2024 | October 10, 2024 |
| Plant City Fire Rescue | August 12, 2024 | September 7, 2024 |
| Plant City Police Department | August 12, 2024 | September 7, 2024 |
| Township of Chatham New Jersey Health Department | August 12, 2024 | September 11, 2024 |
| Township of Irvington Department of Health and Senior Services | August 9, 2024 | September 7, 2024 |
| Township of Irvington Fire Division | August 9, 2024 | September 7, 2024 |
| Tucson Police Department | August 12, 2024 | September 11, 2024 |
| Utah Department of Health and Human Services | August 14, 2024 | September 13, 2024 |
| Utah Department of Public Safety | July 30, 2024 | August 29, 2024 |
| Utah State Board of Education | July 25, 2024 | September 24, 2024 |
| West Jordan City Police Department | July 30, 2024 | August 29, 2024 |

**Third-Party Written Discovery Served by Plaintiffs**

| Third-Party Subpoena Recipient | Date Served | Date of Initial Production |
| --- | --- | --- |
| Multiplier (Mobius) | May 15, 2024 | |
| Family Online Safety Institute (FOSI) | June 11, 2024 | |
| Technology Coalition, Inc. | June 13, 2024 | September 13, 2024 |
| NetChoice | July 11, 2024 | August 16, 2024 |
| National Center for Missing and Exploited Children (NCMEC) | July 24, 2024 | October 17, 2024 |
| United Talent Agency (UTA) | August 13, 2024 | |
| Starcom Mediavest Group, Inc. D/B/A Spark Foundry | August 26, 2024 | |

73

| | | |
|---|---|---|
| Blue Mountain Strategies, LLC | August 30, 2024 | |
| BGR Government Affairs | September 5, 2024 | |
| AVOQ LLC (fra Team Subject Matter, LLC) | September 6, 2024 | |
| Crossroads Strategies, LLC | September 6, 2024 | |
| Hilltop Advocacy | September 6, 2024 | |
| Jeffries Strategies, LLC | September 6, 2024 | |
| K&L Gates, LLP | September 6, 2024 | |
| Mehlman Consulting, Inc. | September 6, 2024 | |
| Monument Advocacy | September 6, 2024 | |
| Tiber Creek Group, Inc | September 6, 2024 | |
| Off Hill Strategies, LLC | September 9, 2024 | |
| The Oversight Board LLC | September 9, 2024 | |
| AppsFlyer, Inc. | September 11, 2024 | |
| Boston Children's Hospital | September 20, 2024 | |
| Digital Trust & Safety Leadership Council Foundation (Digital Trust) | September 23, 2024 | |
| Privacy Vault Online Inc. d/b/a PRIVO | September 27, 2024 | |
| Neuro-Insight US Inc. | October 1, 2024 | |
| Narrative Strategies | October 10, 2024 | |
| The Net Safety Collaborative | October 10, 2024 | |
| GALE | October 10, 2024 | |
| PMG | October 10, 2024 | |
| WPromote | October 10, 2024 | |
| Kepler | October 14, 2024 | |
| Stanford University | October 15, 2024 | |
| William Morris Endeavor Entertainment, LLC | October 18, 2024 | |
| IPSOS | October 18, 2024 | |
| ConnectSafely | October 15, 2024 | |

Respectfully submitted,

DATED: October 18, 2024

By: */s/ Lexi J. Hazam*
LEXI J. HAZAM
**LIEFF CABRASER HEIMANN &**
**BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

Co-Lead Counsel

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
cseeger@seegerweiss.com

Counsel to Co-Lead Counsel

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

Liaison Counsel

EMILY C. JEFFCOTT
**MORGAN & MORGAN**
633 WEST FIFTH STREET, SUITE 2652
LOS ANGELES, CA 90071
Telephone: 213-787-8590
ejeffcott@forthepeople.com

JOSEPH VANZANDT

75

**BEASLEY ALLEN**
234 COMMERCE STREET
MONTGOMERY, LA 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

Federal/State Liaisons

MATTHEW BERGMAN
GLENN DRAPER
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org
glenn@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

JAYNE CONROY
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 917-882-5522
jconroy@simmonsfirm.com

ANDRE MURA
**GIBBS LAW GROUP, LLP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

ALEXANDRA WALSH
**WALSH LAW**
1050 Connecticut Ave, NW, Suite 500
Washington D.C. 20036
Telephone: 202-780-3014
awalsh@alexwalshlaw.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

Plaintiffs' Steering Committee Leadership

RON AUSTIN
**RON AUSTIN LAW**
400 MANHATTAN BLVD.
HARVEY, LA 70058
Telephone: 504-227–8100
raustin@ronaustinlaw.com

PAIGE BOLDT
**WALSH LAW**
4 Dominion Drive, Bldg. 3, Suite 100
San Antonio, TX 78257
Telephone: 210-448-0500
PBoldt@alexwalshlaw.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701-1100
tcartmell@wcllp.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202
Telephone: 859-600-6725
semery@justicestartshere.com

CARRIE GOLDBERG
**C.A. GOLDBERG, PLLC**
16 Court St.
Brooklyn, NY 11241
Telephone: 646-666-8908
carrie@cagoldberglaw.com

RONALD E. JOHNSON, JR.

77

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KT 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS &**
**OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

JOSEPH E. MELTER
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
jmeltzer@ktmc.com

HILLARY NAPPI
**HACH & ROSE LLP**
112 Madison Avenue, 10th Floor
New York, New York 10016
Telephone: 212-213-8311
hnappi@hrsclaw.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, PC**
1500 ROSECRANS AVE., STE. 500
MANHATTAN BEACH, CA 90266

78

Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818-839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205-855-5700
fu@dicellolevitt.com

Plaintiffs' Steering Committee Membership

*Attorneys for Individual Plaintiffs*

**PHILIP J. WEISER**
Attorney General
State of Colorado

 _/s/ Bianca E. Miyata_
Bianca E. Miyata, CO Reg. No. 42012,
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey, CO Reg. No. 45773, *pro hac vice*
First Assistant Attorney General
Megan Paris Rundlet, CO Reg. No. 27474
Senior Assistant Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

 _/s/ Megan O'Neill_
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer (CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400

80

Fax: (415) 703-5480
Megan.Oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*


**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*Pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
ZACH.RICHARDS@KY.GOV
DANIEL.KEISER@KY.GOV
MATTHEW.COCANOUGHER@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General

81

Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs New Jersey Attorney General
and the New Jersey Division of Consumer Affairs
Matthew J. Platkin, Attorney General for the State of
New Jersey, and Cari Fais, Acting Director of the New
Jersey Division of Consumer Affairs*

COVINGTON & BURLING LLP

By: */s/ Ashley M. Simonsen*
Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Paul W. Schmidt, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings,
LLC; Facebook Operations, LLC; Facebook
Payments, Inc.; Facebook Technologies, LLC;
Instagram, LLC; Siculus, Inc.; and Mark Elliot
Zuckerberg*

KING & SPALDING LLP

By: */s/ Geoffrey M. Drake*
Geoffrey M. Drake, *pro hac vice*
TaCara D. Harris, *pro hac vice*
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: gdrake@kslaw.com
         tharris@kslaw.com

Kristen R. Fournier, *pro hac vice*
KING & SPALDING LLP
1185 Avenue of the Americas, 34th Floor
New York, NY 10036-2601
Telephone: (212) 556-2100
Facsimile: (212) 556-2222

83

Email: kfournier@kslaw.com
David P. Mattern, *pro hac vice*
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
Email: dmattern@kslaw.com

Bailey J. Langner (SBN 307753)
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email: blangner@kslaw.com

Andrea Roberts Pierson, *pro hac vice*
FAEGRE DRINKER LLP
300 N. Meridian Street, Suite 2500
Indianapolis, IN 46204
Telephone: + 1 (317) 237-0300
Facsimile: + 1 (317) 237-1000
Email: andrea.pierson@faegredrinker.com

Amy R. Fiterman, *pro hac vice*
FAEGRE DRINKER LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: +1 (612) 766-7768
Facsimile: +1 (612) 766-1600
Email: amy.fiterman@faegredrinker.com

*Attorneys for Defendants TikTok Inc., ByteDance Inc., TikTok Ltd., ByteDance Ltd., and TikTok LLC*

MUNGER, TOLLES & OLSON LLP
By: */s/ Jonathan H. Blavin*
Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Email: jonathan.blavin@mto.com

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Laura M. Lopez, (SBN 313450)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: rose.ehler@mto.com
Email: victoria.degtyareva@mto.com
Email: Ariel.Teshuva@mto.com

Lauren A. Bell (*pro hac vice forthcoming*)
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave., NW St.,
Suite 500 E
Washington, D.C. 20001-5369
Telephone: (202) 220-1100
Facsimile: (202) 220-2300
Email: lauren.bell@mto.com

*Attorneys for Defendant Snap Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
By: */s/ Brian M. Willen*
Brian M. Willen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899
Email: bwillen@wsgr.com

Lauren Gallo White (SBN 309075)
Samantha A. Machock (SBN 298852)
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
Email: smachock@wsgr.com

85

Christopher Chiou (SBN 233587)
Matthew K. Donohue (SBN 302144)
WILSON SONSINI GOODRICH & ROSATI
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: cchiou@wsgr.com
Email: mdonohue@wsgr.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

WILLIAMS & CONNOLLY LLP
By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (*pro hac vice*)
jpetrosinelli@wc.com
Ashley W. Hardin (*pro hac vice*)
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone.: 202-434-5000
Fax: 202-434-5029

*Attorneys for Defendants YouTube, LLC and Google LLC*

MORGAN, LEWIS & BOCKIUS LLP
By: */s/ Yardena R. Zwang-Weissman*
Yardena R. Zwang-Weissman (SBN 247111)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Tel.: 213.612.7238
Email: yardena.zwang-weissman@morganlewis.com

Brian Ercole (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131-3075
Tel.: 305.415.3416
Email: brian.ercole@morganlewis.com

Stephanie Schuster (*pro hac vice*)
1111 Pennsylvania Avenue NW
NW Washington, DC 20004-2541
Tel.: 202.373.6595

86

Email: stephanie.schuster@morganlewis.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

## **ATTESTATION**

I, Lexi J. Hazam, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: October 18, 2024

By: /s/ *Lexi J. Hazam*