# Exhibit A

43



## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

**SUPERIOR COURT**
**Civil No. 23-2397-BLS1**

### COMMONWEALTH
**Plaintiff**

vs.

### META PLATFORMS, INC., & another[1]
**Defendants**

### MEMORANDUM AND ORDER
### ON MOTION TO DISMISS

The Commonwealth contends that Meta Platforms, Inc. and Instagram, LLC (together,

"Meta") violated G.L. c. 93A, § 2, and created a public nuisance, by designing and using

addictive design features on Instagram to exploit children's psychological vulnerabilities, and

falsely represented to the public that its features were not addictive and that Meta prioritized

youth health and safety. Meta has now moves to dismiss for failure to state a claim. For the

reasons set out below, that motion is denied.

### BACKGROUND

#### A.    The Commonwealth's Factual Allegations[2]

Meta owns, develops, designs, markets, and operates Instagram, a social media platform

that enables users to post and share images and videos, and allows them to interact with other

users. Instagram is accessible through web browsers or through a smart phone application

("app"). Most Instagram users access the platform through the app. More than 33 million young

---

[1]     Instagram, LLC.

[2]     This is a brief summary of the Complaint's factual allegations, which span 88
pages.

people in the United States use Instagram, including over 300,000 daily active users in Massachusetts between ages 13 and 17. Almost all of Meta's revenue comes from advertising targeted based on data collected from its users.

### 1.    Use of Addictive Platform Tools

To generate advertising revenue, Meta knowingly designs and employs the following four features or tools (the "Platform Tools") to interfere with or override young user's ability to regulate their time on Instagram, resulting in mental and physical harms from addictive use:

Incessant Notifications. When the Instagram app is installed on a smart phone, Instagram enables approximately 40 types of audio and visual push notifications by default. These notifications alert users to a variety of events and activities on Instagram. Many of these notifications appear on a user's phone screen even when the user is not on the app or using the phone.

Meta has purposefully designed these notifications, including the way they are "pushed" and displayed, to take advantage of well-understood neurological and psychological phenomena and to increase young users' time spent on Instagram. Among other things, Meta uses sounds and vibrations to trigger dopamine releases and prey on users' "fear of missing out" ("FOMO").

Meta's research has shown that because teens crave acceptance, notifications are highly effective in bringing them back to the app to receive positive validation. Meta's research also shows that the high volume of notifications causes young users to feel overloaded, overwhelmed, and compelled to revisit the app repeatedly during the day and night, causes inattention and hyperactivity, and reduces productivity and well-being.

Intermittent Variable Rewards. To prolong young users' time on Instagram or induce them to return to the platform, Meta uses intermittent variable rewards ("IVRs") associated with

2

"likes" of a user's post. IVRs provide positive stimuli that induces a psychologically pleasing dopamine release at random, unpredictable intervals. The unpredictability of the rewarding stimuli creates a feedback loop in which the user keeps checking for more rewarding stimuli. Knowing that teen brains are particularly susceptible to the feel-good effects of dopamine, Meta has designed its notification delivery system to randomly supply young users with positive, dopamine-inducing notifications (i.e., that someone "liked" a user's post), interspersed with dopamine gaps, to build anticipation and craving. This strengthens the desire to return to the platform with each dopamine release. Meta also sometimes withholds notifications of "likes" on a user's post to deliver larger bursts of dopamine. Similarly, to create suspense, Meta employs a short delay after a user swipes to refresh their feed before new information is displayed.

Infinite Scroll and Autoplay. Meta uses features such as "infinite scroll" and "autoplay" to encourage young users to use Instagram for extended amounts of time. The infinite scroll feature loads new posts and advertisements for the user to view as the user scrolls down their page feed, removing the need to hit a next page button to view more posts. Because there is no natural end point for the user, the infinite scroll format makes it difficult for young users to leave the platform. The autoplay function in Instagram's "Stories" and "Reels" automatically starts playing the next "Story" or "Reel" as the prior one ends without the user needing to take any further action. Both features exploit young users' minds, which seek novelty. Meta is aware that these features harm young users by encouraging passive consumption.

Ephemeral Features. To capitalize on teens' sensitivity to FOMO, Meta has added ephemeral aspects to its "Stories" and "Live" features. Stories are only available to view for 24 hours before disappearing from a user's feed. A user can only interact with the Live feature

when the user broadcasts their livestream video to followers or the public. Meta knows these features cause problematic, habitual use and contribute to mental health harms to young users.

### 2.    Ineffective Age Assurance Measures

Meta has publicly stated that children under 13 years of age should not use Instagram and that it is focused on keeping these users off the platform. Nonetheless, Meta uses an ineffective age verification process. Although Meta is aware that individuals under 13 lack the skill to safely use social media, it has recklessly and/or deliberately disregarded the existence of hundreds of thousands of such users on its platforms because removing them would impact Instagram's growth. Had young users and their families known about Meta's conduct, they would have taken their own measures to police inappropriate underage use.

### 3.    Deceptive Public Statements About Platform Safety

On multiple occasions, Meta has represented that its platform features are safe, not addictive, and prioritize the safety and well-being of its young users over profits. Such statements were made during, among other events, media interviews in 2018 and 2019, a 2018 technology event, Congressional testimony in 2020 and 2021, an October 2021 Facebook post responding to Congressional testimony from a whistleblower, and an October 2021 public statement in response to a 60-Minutes segment on the harms caused by Meta's products.

Meta's statements are belied by its internal data showing that Instagram addicts and harms children. Meta has repeatedly deprioritized youth well-being to increase revenue. Contrary to its public assertions from 2018 to 2022, Meta repeatedly failed to invest meaningfully in well-being initiatives to address known harms to young users. Meta's top executives repeatedly rejected design changes that Meta's internal research indicated would improve well-being. For example, because it would impact revenue, Meta refused to hide "Like"

4

counts, which induces corrosive social comparisons, even after a pilot program indicated hiding

"Like" counts would improve well-being. Meta also refused to remove cosmetic surgery filters

used primarily by teen girls, which experts agreed were harmful. Had consumers known the truth

about Meta's failure to prioritize youth well-being, they would have altered their own conduct.

**B.    The Present Lawsuit**

The Commonwealth filed this case in November 2023. It asserts three counts under G.L.

c. 93A, § 2: that Meta engaged in unfair and deceptive acts and practices by deploying the

Platform Tools with features to induce young users' addictive use of Instagram (Count One); by

misrepresenting that Instagram was safe, not addictive, and prioritized young users' well-being

over profits (Count Two); and by publicly claiming that it excludes users under age 13 from

Instagram and inhibits such users, and failing to employ meaningful age enforcement efforts for

profit-motivated reasons (Count Three). The Commonwealth also asserts a public nuisance

claim, alleging that by purposefully employing features and tools to addict youth and induce

their problematic use of Instagram, Meta has knowingly created, substantially contributed to,

and/or substantially participated in maintaining a youth mental health crisis, the costs of which

have been borne by the Commonwealth's schools and public health system (Count Four).

## DISCUSSION

Meta moves to dismiss on several grounds. It argues that the Commonwealth's claims are

barred by Section 230 of the Communications Decency Act ("the CDA"), 47 U.S.C. § 230

("Section 230"), and/or the First Amendment. It also argues the factual allegations are

5

insufficient to support the claims. I review these arguments under the Mass. R. Civ. P. 12(b)(6) standard.[3]

## I.    **The Communications Decency Act**

Meta contends that the Commonwealth's claims – whether grounded on Instagram's design features or Meta's public representations – are barred by Section 230. As explained below, I disagree.

### A.    **Overview of Section 230 Immunity**

Congress enacted Section 230 "when the internet was young and few of us understood how it would transform American society." Lemmon v. Snap, Inc., 995 F.3d 1085, 1090 (9th Cir. 2021). Among other things, it sought "to promote the continued development of the Internet and other interactive computer services and other interactive media," 47 U.S.C. § 230(b)(1), and "to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation." 47 U.S.C. § 230(b)(2). See Massachusetts Port Auth. v. Turo Inc. ("Turo"), 487 Mass. 235, 239-240 (2021).[4]

---

[3]    Under Rule 12(b)(6), a court must accept as true the complaint's factual allegations and draw "all reasonable inferences" from those allegations in plaintiff's favor. Dunn v. Genzyme Corp., 486 Mass. 713, 717 (2021). The factual allegations must set forth the basis for plaintiff's entitlement to relief with "more than labels and conclusions," Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007); "'rais[ing] a right to relief above the speculative level[,] . . . plausibly suggesting (not merely consistent with)' an entitlement to relief." Iannacchino, 451 Mass. at 636, quoting Bell Atl. Corp., 550 U.S. at 555.

[4]    "Child safety and well-being" are also "explicit goals of the CDA." In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., 2023 WL 7524912 at * 7 (N.D. Cal. Nov. 14, 2023). See 47 U.S.C. § 230(b)(3) ("encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services"), § 230(b)4) ("remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material").

To achieve these aims, Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). See Turo, 487 Mass. at 240. Section 230 "shields website operators from being 'treated as the publisher or speaker' of material posted by users of the site, . . . which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions – such as deciding whether to publish, withdraw, postpone or alter content – are barred.'"[5] Jane Doe No. 1 v. Backpage.com, LLC ("Backpage"), 817 F.3d 12, 18 (1st Cir. 2016) (internal quotations and citations omitted), cert. denied, 580 U.S. 1083 (2017).

"[C]ourts have construed § 230 'to establish broad federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service." Turo, 487 Mass. at 240, quoting Perfect 10, Inc. v. CCBill LLC, 488 F.3d 1102, 1118 (9th Cir.), cert. denied, 552 U.S. 1062 (2007). See Backpage, 817 F.3d at 18 ("near-universal agreement that section 230 should not be construed grudgingly") (and cases cited). Immunity "does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." Id. at 19. See Federal Trade Comm'n v. Accusearch Inc., 570 F.3d 187, 1195 (10th Cir. 2009) ("The prototypical service qualifying for this [Section 230] immunity is an online messaging board . . . on which Internet subscribers post comments and respond to comments posted by others.").

---

[5]     Section 230 alters "the common-law rule that allocates liability to publishers or distributors of tortious material written or prepared by others." Jones v. Dirty World Ent. Recordings LLC, 755 F.3d 398, 407 (6th Cir. 2014).

"Section 230(c)(1) is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications." Cohen v. Facebook, Inc., 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017), aff'd in part and dismissed in part sub nom, Force v. Facebook, Inc., 934 F.3d 53 (2d Cir. 2019), cert. denied, 140 S. Ct. 2761 (2020). Accord Lemmon, 995 F.3d at 1094 (immunity applies to "claims [that], at bottom, depend[ ] on a third party's content, without which no liability could have existed").[6]

"[E]ven with the broad protections provided by the CDA," the immunity available under Section 230(c)(1) is not absolute;[7] "'an interactive computer service provider remains liable for its own speech' and for its own unlawful conduct." Turo, 487 Mass. at 240, quoting Universal Communication Sys., Inc. v. Lycos, Inc. ("Lycos"), 478 F.3d 413, 419 (1st Cir. 2007). See Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC ("Roommates"), 521 F.3d 1157, 1164 (9th Cir. 2008) (CDA "not meant to create a lawless no-man's-land on the Internet"); Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016) ("Congress has not provided an all purpose get-out-of-jail-free card for businesses that publish user content on the internet,

---

[6]    See Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (rejecting attempt to "plead around Section 230 immunity"), cert. denied, 140 S. Ct. 2761 (2020); Kimzey v. Yelp! Inc., 836 F.3d 1263, 1266 (9th Cir. 2016) (rejecting attempt "to plead around the CDA to advance the same basic argument that the statute plainly bars"); Backpage, 817 F.3d at 22 ("third-party content . . . appears as an essential component of each . . . of the appellants' . . . claims."); Doe v. MySpace, Inc., 528 F.3d 413, 420 (5th Cir. 2008) (rejecting plaintiff's attempt to plead around Section 230; plaintiff's "allegations are merely another way of claiming that MySpace was liable for publishing the communications and they speak to MySpace's role as a publisher of online third-party-generated content").

[7]    See 47 U.S.C. § 230(e)(3) ("Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section.").

though any claims might have a marginal chilling effect on internet publishing businesses. . . .

'[W]e must be careful not to exceed the scope of the immunity provided by Congress.'"),

quoting Roommates, 521 F.3d at 1164 n. 15.

Section 230(c)(1) immunity "applies when 'the defendant (1) is a provider or user of an

interactive computer service; (2) the claim is based on information provided by another

information content provider; and (3) the claim would treat the defendant as the publisher or

speaker of that information.'" Turo, 487 Mass. at 240, quoting Backpage, 817 F.3d at 19.[8]

"Practically speaking, the second and third factor tend to overlap in significant ways. The

question of whether a plaintiff seeks to treat an interactive computer service as a publisher or

speaker of third-party information . . . interacts in obvious ways with the question of whether the

information provided is the information of a third-party." In re Apple Inc. App Store Simulated

Casino-Style Games Litig., 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022). See Turo, 487 Mass. at

241-242, quoting Backpage, 817 F.3d at 19 ("The 'ultimate question' in determining whether an

interactive computer service provider . . . is entitled to § 230 immunity is whether 'the cause of

action necessarily requires that the defendant be treated as the publisher or speaker of content

provided by another.'"). "Where a defendant establishes these requirements based on the face of

a complaint, a motion to dismiss may be granted." Cohen, 252 F. Supp. 3d at 156. See Nemet

Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 254-255 (4th Cir. 2009) (because

Section 230 provides "immunity from suit rather than a mere defense to liability," courts

---

[8]     The Ninth Circuit and other courts have articulated this test slightly differently
and in a different order. Under their version of the test, the statute provides immunity to "(1) a
provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a
state law cause of action, as a publisher or speaker (3) of information provided by another
information content provider." Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1100-1101 (9th Cir. 2009)
(footnote omitted). To avoid ambiguity, when referring to the prongs of the test, I refer to them
in the order they are described in Turo, even when describing cases from the Ninth Circuit.

9

"resolve the question of § 230 immunity at the earliest possible stage") (internal quotations, emphasis omitted); Backpage, 817 F.3d at 15 (affirming dismissal under Section 230).

## B.    Deceptive Statements

Section 230 does not apply to claims based on a defendant's own speech. Thus, claims based on a publisher's representations about its publishing conduct are not immunized under Section 230. See, e.g., Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346-347 (D. Mass. 2017) (Young, J.), aff'd, 887 F.3d 542 (1st Cir. 2018); Moving & Storage, Inc. v. Panayotov, 2014 WL 949830 at * 2 (D. Mass. Mar. 12, 2014) (O'Toole, J.).

The Commonwealth alleges that Meta misrepresented the safety of its platform, its efforts to protect the well-being of young users, and its age-verification efforts. To the extent the Commonwealth's claims are based on these purportedly false statements, they are not subject to Section 230 immunity. See, e.g., State v. Meta Platforms, Inc., 2024 WL 3253106 at * 11 (Tenn. Ch. Ct. Mar. 13, 2024) (Section 230 does not bar deception claim against Meta).

## C.    Platform Tools and Age Verification

The Commonwealth's claims are also based on the negative impacts of Instagram's Platform Tools – i.e., incessant notifications, IVR, ephemeral posts, infinite scroll, and auto play – and its ineffective age verification efforts. Whether these claims are subject to immunity requires a careful application of Section 230's three-part test. It is undisputed that Meta meets the first prong of the test. The parties, however, hotly contest whether Meta has satisfied the test's second and third prongs. As explained below, I read the Complaint as principally seeking to hold Meta liable for its own business conduct. In other words, the claims are based, not on

10

Instagram's third-party content, but its features regardless of content. Consequently, I conclude that Meta is not entitled to dismissal under Section 230.[9]

##### 1.    **Prong 2**

The second prong of the test to determine if Section 230 immunity applies looks at whether the claim is based on information provided by another information content provider. An "information content provider" is "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). See Lycos, 478 F.3d at 419 ("broad definition" covers "even those who are responsible for the development of content only 'in part'"). "[I]nternet companies remain on the hook when they create or develop their own internet content" and "to the extent they are responsible . . . in part, for the creation or the development of the offending content on the internet." Lemmon, 995 F.3d at 1093 (internal quotations omitted).

"[A] website helps to develop unlawful content . . . if it contributes materially to the alleged illegality of the conduct." Roommates, 521 F.3d at 1168. "A material contribution to the alleged illegality of the content does not mean merely taking action that is necessary to the display of allegedly illegal content. Rather, it means being responsible for what makes the displayed content allegedly unlawful." Jones, 755 F.3d at 410. See Force v. Facebook, Inc., 934 F.3d 53, 68-69 (2d Cir. 2019) (defendant considered to have developed third-party content if "defendant directly and materially contributed to what made the content itself unlawful" and "may, in some circumstances, be a developer of its users' content if it encourages or advises users to provide the specific actionable content that forms the basis for the claim") (internal

---

[9]    In its briefing, Meta did not separately analyze Prongs 2 and 3, but conflated the analysis after noting that the two prongs tend to overlap. This overlap does not mean that the distinction between the prongs should necessarily be ignored. I analyze each prong separately.

quotations omitted); Social Media Cases, 2023 WL 6847378 at * 32 (Super. Ct. Cal. Oct. 13, 2023) ("Where a provider manipulates third party content in a manner that injures a user, Section 230 does not provide immunity."). "Given the complexity with which online platforms function, it is not always clear . . . if the platform's involvement or intervention in the posting or presentation of [another's] content crosses the line into . . . 'development.'" In re Social Media Adolsecent Addiction/Personal Injury Products Liability Litigation ("In re Soc. Media"), 702 F. Supp. 3d 809, 827-828 (N.D. Cal. 2023). See Elliott v. Donegan, 469 F. Supp. 3d 40, 56-57 (E.D.N.Y. 2020) ("It is relatively easy to define what constitutes the creation of information. . . . Determining what constitutes the development of information is a stickier task.").

Generally, "providing content-neutral tools does not render an internet company a 'creator or developer' of the downstream content that its users produce with those tools." Lemmon, 995 F.3d at 1094. See Daniel v. Armslist, LLC, 386 Wis.2d 449, 472 (2019) ("A neutral tool in the CDA context is a feature provided by an interactive computer service provider that can be utilized for proper or improper purposes. . . . A defendant who provides a neutral tool that is subsequently used by a third party to create unlawful content will generally not be considered to have contributed to the content's unlawfulness.") (internal quotations and citation omitted).[10] However, internet companies do not enjoy "absolute immunity from all claims related to their content-neutral tools;" liability may arise from such tools provided "plaintiffs' claims do not blame them for the content that third parties generate with those tools." Lemmon, 995 F.3d at 1094. See Social Media Cases, 2023 WL 6847378 at ** 30, 33 ("Section 230 does not bar a

---

[10]      "Examples of . . . neutral tools include a blank text box for users to describe what they are looking for in a roommate . . . , a rating system that allows consumers to award businesses between one and five stars and write reviews, ... and a social media website that allows groups to create profile pages and invite members." Daniel, 386 Wis.2d at 473 (internal citations omitted).

claim based on features of a social media site that have an adverse effect on users apart from the content of material published on the site" and "does not shield [d]efendants from liability for the way in which their platforms actually operate").

The Commonwealth alleges physical and mental harm to young users from Instagram's design features *themselves,* which purportedly cause addictive use, and not from the viewing of any specific third-party content or from design choices that contributed to the development or creation of that content. In other words, the alleged harm occurs regardless of the content that users see. As such, Prong 2 is not satisfied because the Commonwealth is seeking to hold Meta liable for its own injurious conduct (creating and employing tools to addict young users and engaging in ineffective age verification), not that of any other party.[11]

In support of its position, Meta cites several decisions from around the country. However, in each, Prong 2 was conceded, undisputed, or satisfied because the action alleged harm caused by third party content.[12] Meta also relies on a recent decision by a federal district court in

---

[11]     See, e.g., Lemmon, 995 F.3d at 1093-1094 (Prong 2 not satisfied where Snapchat designed reward system and Speed Filter; plaintiffs' negligent design claim based on allegation these features worked together to encourage users to drive at dangerous speeds; claim "rest[ed] on nothing more than Snap's 'own acts'"); Moving & Storage, Inc., 2014 WL 949830 at * 2 (Prong 2 not satisfied where "plaintiffs' claims do not arise from the content of [third-party customer] reviews . . . but instead, the defendants' alleged ill-intentioned deletion of . . . reviews . . . , coupled with various representations;" "[t]he manner in which the information is presented, or withheld, is the conduct at issue, as well as the allegedly misleading ratings which result from such alleged manipulations").

[12]     See, e.g., Backpage, 817 F.3d at 19 (Prong 2 conceded); Lycos, 478 F.3d at 420 (Prong 2 satisfied where plaintiff's allegations merely established defendant's conduct made it easier for *others* to develop and disseminate misinformation); Dyroff, 934 F.3d at 1096, 1099 (Prong 2 satisfied where website's notification and recommendation functions did not materially contribute to content that harmed plaintiff's son); Barnes, 570 F.3d at 1101 (website allegedly failed to remove explicit profiles of plaintiff posted by ex-boyfriend, no dispute "'information content' . . . at issue . . . provided by another 'information content provider'"); Force, 934 F.3d at 68-71 (Facebook's algorithms did not develop terrorist organization's content by directing such content to users most interested in the organization and terrorist activities). See also Social

California, which concluded that claims against Instagram and other platforms were barred

insofar as they were based on notifications, infinite scroll, autoplay, and ephemeral postings. See

In re Soc. Media, 2023 WL 7524912 at ** 13-16. However, that decision does not explicitly

conduct a Prong 2 analysis,[13] and I do not find it otherwise persuasive as it pertains to those

features, particularly considering the cogent analysis provided by a California Superior Court

decision that reaches the opposite conclusion. See Social Media Cases, 2023 WL 6847378 at **

30-35.

### 2.    Prong 3

Prong 3 "asks whether a cause of action seeks to treat a defendant as a 'publisher or

speaker' of third-party content." Lemmon, 995 F.3d at 1091. Stated differently, it "focus[es] on

whether the duty the plaintiff alleges stems from the defendant's status or conduct as a publisher

or speaker." Id. (internal quotations omitted). See Dyroff, 934 F.3d at 1098 ("what matters is

whether the claims 'inherently require[ ] the court to treat the defendant as the "publisher or

speaker" of content provided by another,'" quoting Barnes, 570 F.3d at 1102); Henderson v.

Soiurce for Public Data, L.P., 53 F.4th 110, 120-121 (4th Cir. 2022) ("A claim treats the

defendant 'as the publisher or speaker of any information' when it (1) makes the defendant liable

for publishing certain information to third parties, and (2) seeks to impose liability based on that

information's improper content."). "In this particular context, publication generally involve[s]

reviewing, editing, and deciding whether to publish or to withdraw from publication third-party

---

Media Cases, 2023 WL 6847378 at * 34 (distinguishing Dyroff and explaining that "in Dyroff, liability was premised on the website's publication and recommendation of third-party content and injury flowing from that content, not from the provider's own actions").

[13]    See In re Soc. Media, 2023 WL 7524912 at * 8 ("[P]laintiffs allege that defendants fail to meet the [third] prong. The Court thus directs the bulk of its analysis there.")

content." Lemmon, 995 F.3d at 1091 (internal quotations omitted). See Lycos, 478 F.3d at 422

("If the cause of action is one that would treat the service provider as the publisher of a particular

posting, immunity applies not only for the service provider's decisions with respect to that

posting, but also for its inherent decisions about how to treat postings generally."); Turo, 487

Mass. at 242 ("[f]eatures . . . [that] reflect choices about what content can appear on the website

and in what form are editorial choices that fall within the purview of traditional publisher

functions. . . but more concentrated involvement in the transaction may fall outside that

purview") (internal quotations and citations omitted).[14]

"Section 230 does not create immunity simply because publication of third-party content

is relevant to or a but-for cause of the plaintiff's harm. The issue is whether the defendant's

alleged duty to the plaintiff could 'have been satisfied without changes to the content posted by

the website's users and without conducting a detailed investigation.'" In re Soc. Media, 2023

WL 7524912 at * 9, quoting Doe v. Internet Brands, Inc., 824 F.3d 846, 851 (9th Cir. 2016). See

HomeAway.com, Inc. v. City of Santa Monica, 918 F.3d 676, 682 (9th Cir. 2019) (rejecting "test

that would provide immunity under the CDA solely because a cause of action would not

otherwise have accrued but for the third-party content"; courts must "look instead to what the

duty at issue actually requires: specifically, whether the duty would necessarily require an

internet company to monitor third-party content"); Social Media Cases, 2023 WL 6847378 at *

12 ("Even if third-party content is a 'but-for' cause of the harm suffered by a plaintiff, the action

is not barred by Section 230 if the cause of action does not seek to hold the provider liable as a

publisher."); Henderson, 53 F.4th at 122-123 ("for [immunity] to apply, we require that liability

---

[14]     "A clear illustration of a cause of action that treats a website proprietor as a
publisher is a defamation action founded on the hosting of defamatory third-party content."
Internet Brands, Inc., 824 F.3d at 851.

15

attach to the defendant on account of some improper content within their publication;" "we do not apply a but-for test") (internal quotation marks omitted, emphasis removed).

Meta fails to satisfy Prong 3 for essentially the same reasons it cannot satisfy Prong 2. The Complaint does not seek to hold Meta liable for its conduct as a publisher or speaker, i.e., for its publication decisions. Rather, the Commonwealth seeks to hold Meta liable in "its distinct capacity as a product designer." Lemmon, 995 F.3d at 1092. The Commonwealth alleges that Instagram's features in and of themselves, regardless of their associated content, cause its young users to become addicted to the platform or to participate on the platform at an inappropriate age. If the Commonwealth were successful, Meta would not have to alter or monitor Instagram's third-party content; the gravamen of the allegations have nothing to do with the type of content editing, monitoring, or removal that could trigger immunity under Section 230.[15]

In support of its position, Meta points to statements in Backpage, Lycos, Force, and other cases which perhaps could be broadly read to suggest that any efforts engaged in by a social media company related to the content of its platforms or the platform's design and operation constitute an exercise of protected publishing functions. See, e.g., Backpage, 817 F.3d at 21

---

[15]    See Lemmon, 995 F.3d at 1092-1093 (Prong 3 not satisfied where claim derived from alleged dangerous Snapchat filter that showed the user's speed, not content created using the feature; "though publishing content is 'a but-for cause of just about everything' Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a 'publisher or speaker'"); Social Media Cases, 2023 WL 6847378 at * 31 (claims against Meta and other platform owners based on interactive operational features, including IVR algorithms, continuous scrolling, auto play, not subject to Section 230 because they "do not seek to require that Defendants publish or de-publish third-party content that is posted on those platforms. The features themselves allegedly operate to addict and harm minor users of the platforms regardless of the particular third-party content viewed by the minor user"); State v. Meta Platforms, Inc., 2024 WL 3253106 at * 10 (no immunity where complaint alleged that Instagram's features operated to addict and harm young users, regardless of the third-party content). Cf. MySpace., 528 F.3d at 420, 422 (immunity applied to claims regarding age-verification where plaintiff attempted to hold defendant liable for harm caused by objectionable content posted by third-party user).

16

(Prong 3 satisfied where plaintiffs' claims, which "address[ed] . . . decisions about how to treat postings," challenged "features that are part and parcel of the overall design and operation of the [defendant's] website (such as the lack of phone number verification, the rules about whether a person may post after attempting to enter a forbidden term, and the procedure for uploading photographs)" that "reflect[ed] choices about what content can appear on the website and in what form"). As noted above, however, these decisions concerned cases that at their core focused on the defendants' display of third-party content and the analysis therein must be read in that light. In Force, for example, victims of terrorist attacks alleged that Facebook provided material support to terrorist organization through its display of terrorist content. See 934 F.3d at 57, 65, 68. Similarly, in Backpage, sex trafficking victims brought claims against the operator of online classified advertisements for the harm they suffered from its postings. See 817 F.3d at 16, 19–20. Because in those cases the plaintiffs' claims were closely tied to third-party content, their assertions regarding the platform's features were properly viewed as seeking "to treat [the] defendant as a 'publisher or speaker' of third-party content." Lemmon, 995 F.3d at 1091.

The same is not true here. As discussed with regard to Prong 2, the Commonwealth is seeking to hold Meta liable for its own conduct, not that of a third-party. As pled, third-party content is not an essential component of the Commonwealth's claims. See Lemmon, 995 F.3d at 1093, 1094 (Section 230 "cuts off liability only when a plaintiff's claim faults the defendant for information provided by third parties" and as such immunity only applies to "claims [that], at bottom, depend[ ] on a third party's content, without which no liability could . . . exist[ ]"); Social Media Cases, 2023 WL 6847378 at * 32 ("Where a provider manipulates third party content in a manner that injures a user, Section 230 does not provide immunity."); Airbnb, Inc. v. Boston, 386 F. Supp. 3d 113, 120 n.5, 121 n.7 (D. Mass. 2019) (Sorokin, J.) (rejecting assertion

17

that First Circuit interpreted Section 230 to "expansively protect[ ] all decisions a company makes that in any way implicate the overall design and operation of its online platform"; both Backpage and Lycos "focused on the basis for the plaintiffs' assertions of liability, asking whether 'third-party content is . . . an essential component of' the plaintiffs' claims") (internal quotations omitted).

I recognize the distinction the Commonwealth makes is somewhat subtle given that features like ephemeral content, notifications, and autoplay are tied to the display of the platform's third-party content. However, the distinction is consistent with the purposes and language of the CDA. See Social Media Cases, 2023 WL 6847378 at * 32 ("So long as providers are not punished for publishing third-party content, it is consistent with the purposes of Section 230 to recognize a common law duty that providers refrain from actions that injure minor users by inducing frequency and length of use of a social media platform to the point where a minor is addicted and can no longer control the information they receive from that platform."). Discovery may reveal that the line the Commonwealth seeks to draw cannot be maintained in fact, but the Complaint's allegations are sufficient to avoid a finding of Section 230 immunity at this stage.

## II.    **First Amendment**

Meta argues the Commonwealth's claims are barred by the First Amendment because they seek to hold Meta liable for its content policies and other editorial functions associated with curating third-party content.[16] Viewing the Complaint in the light most favorable to the Commonwealth, I find this argument is unavailing.

---

[16]      Meta also argues that the claims violate Article 16 of the Massachusetts Declaration of Rights. The parties agree that Article 16 is "generally coextensive with the federal constitution when it comes to the freedom of expression," Flaherty v. Knapik, 999 F. Supp. 2d 323, 332 (D. Mass. 2014) (Ponsor, J.), and therefore focus their arguments on authority analyzing the First Amendment. See Defendants' Memorandum in Support of Defendants'

Insofar as the Commonwealth's claims are based on the Platform Tools that allegedly induce addiction in young users and Meta's allegedly ineffective age verification efforts, I read such claims to be principally based on conduct and product design, not on expressive content. See Id. at * 37 ("Because the allegations . . . can be read to state that Defendants' liability grows from the way their platforms functioned, the Demurrer cannot be sustained pursuant to the protections of the First Amendment. . . . [T]he allegations can be read to state that Plaintiffs' harms were caused by their addiction to Defendants' platforms themselves, not simply to exposure to any particular content visible on those platforms.").[17] As such, Meta has failed to establish that the claims are entirely based on protected speech or expression and that therefore dismissal is appropriate.

To the extent the Commonwealth's claims are based on Meta's alleged false statements to the public about its efforts to ensure the well-being of its young users and age verification efforts, such misrepresentations are not protected by the First Amendment. See Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 771 (1976) ("Untruthful speech, commercial or otherwise, has never been protected for its own sake."); Fanning v. Federal Trade Comm'n, 821 F.3d 164, 174 (1st Cir. 2016) ("The First Amendment . . . does not protect misleading commercial speech."), cert. denied, 580 U.S. 1049 (2017); Meta Platforms, Inc. v. District of Columbia, 301 A.3d 740, 758 (D.C. 2023) ("the only speech that is

---

Motion to Dismiss (Docket # 23) at 10 n.4; Commonwealth's Opposition to Defendants' Motion to Dismiss (Docket # 24) at 23 n.23. I do the same.

[17]     Even if these features carry some expressive element, the claim may very well be permitted under the intermediate scrutiny test set forth in Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of New York, 447 U.S. 557, 566 (1980), because the Complaint plausibly alleges that such elements are commercial in nature and that the Commonwealth has a substantial interest in protecting young users from their harmful impacts. This determination, however, is better left to a later stage of the litigation.

being targeted by the District's investigation are Meta's public statements regarding the

company's content moderation practices;" "even if content moderation is itself protected speech,

fraudulent misrepresentations regarding a company's moderation practices is not").[18]

## III.    Sufficiency of Allegations

### A.    G.L. c. 93A

The Consumer Protection Act prohibits "unfair or deceptive acts or practices in the

conduct of any trade or commerce." G.L. c. 93A, § 2(a). Generally, to state a claim under G.L. c.

93A, "a plaintiff must allege facts sufficient to establish four elements: first, that the defendant

has committed an unfair or deceptive act or practice; second, that the unfair or deceptive act or

practice occurred in the conduct of any trade or commerce; third, that the plaintiff suffered an

injury; and fourth, that the defendant's unfair or deceptive conduct was a cause of the injury."

Rafferty v. Merck & Co., 479 Mass. 141, 161 (2018) (internal quotations omitted). When the

Commonwealth brings an enforcement action under the statute, however, it is not required to

establish that any individual was harmed by the allegedly unfair or deceptive act or practice

insofar as it seeks injunctive relief and civil penalties. See G.L. c. 93A, § 4;[19] Commonwealth v.

---

[18]    Meta also suggests the deception claims concern alleged misrepresentations made
to influence the legislative process and are therefore protected by the First Amendment under the
Noerr-Pennington doctrine. See United Mine Workers of Am. v. Pennington, 381 U.S. 657
(1965); Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127 (1961);
Evans v. Lorillard Tobacco Co., 465 Mass. 411, 456-457 (2013) (explaining doctrine). However,
"[t]he protection [provided by the doctrine] does not cover activity that was not genuinely
intended to influence government action . . . [and] does not protect deliberately false or
misleading statements." United States v. Philip Morris USA Inc., 566 F.3d 1095, 1123 (D.C. Cir.
2009) (citation omitted). I note that it appears from the Complaint that several statements relied
upon by the Commonwealth were made in the press. The extent to which the doctrine applies is
best resolved at a later stage of the litigation.

[19]    And compare G.L. c. 93A, §§ 9, 11.

20

Fall River Motor Sales, Inc., 409 Mass. 302, 312 (1991); Commonwealth v. Chatham Development Co., Inc., 49 Mass. App. Ct. 525, 528-529 (2000).

"[W]hether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact. . . . But whether conduct found to be unfair or deceptive rises to the level of a chapter 93A violation is a question of law[.]" H1 Lincoln, Inc. v. South Washington St., LLC, 489 Mass. 1, 13-14 (2022) (internal quotations and citation omitted).

Meta argues the Commonwealth fails to plausibly allege that its conduct was unfair and/or deceptive or that such conduct occurred in trade or commerce. These arguments are unpersuasive.[20]

### 1.    Unfair Conduct (Counts One and Three)

"To determine whether conduct rises to the level of an unfair act or practice, courts look to the following factors: '(1) whether the conduct is within at least the penumbra of some common-law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers or other businesses.'" Columbia Plaza Assocs. v. Northeastern Univ., 493 Mass. 570, 587 (2024), quoting H1 Lincoln, 489 Mass. at 14. Meta argues that as to Counts One and Three, the Complaint fails to plausibly suggest that its conduct rises to the level of an unfair act or practice.

---

[20]    Among other things, the Commonwealth prays for relief requiring defendants to "pay full and complete restitution to every person who has suffered any ascertainable loss by reason of Defendant's unlawful conduct." Complaint at 100. Meta argues that the request for restitution must be dismissed because the harms allegedly experienced by Instagram users relate to mental and physical health, Instagram is a free service, and the Commonwealth pleads no financial injury. The extent to which restitution or some other relief is appropriate is a factual issue that cannot be addressed at this stage. See Commonwealth v. DeCotis, 366 Mass. 234, 245 (1974) ("G.L. c. 93A granted full authority to the courts to use their traditional equity power to fashion decrees to remedy the wrong complained of and to make the decree effective").

Meta first argues that the Commonwealth fails to allege conduct that falls within an established concept of unfairness. I disagree. Count One alleges that Meta designs and employs various Instagram features that it knows encourage addictive use by teenagers. Count Three alleges that Meta fails to meaningfully exclude children under 13, although it is aware of how harmful Instagram is for children. Such allegations are sufficient to avoid dismissal.

Meta also argues that Counts One and Three fail adequately to allege substantial injury. First, it asserts that the Complaint only alleges an attenuated causal chain between the alleged unfair conduct (the design features) and the alleged harm (mental and physical health issues). But the Complaint does adequately allege such a causal connection. To the extent Meta contends that the injuries to users alleged by the Commonwealth all stem from the content of third-party postings, this argument is unpersuasive for the reasons discussed above. See, supra, at 10-18.

Second, Meta argues that the Commonwealth fails to allege monetary harm or non-subjective harm. This argument fails because the type of mental and physical harm alleged by the Commonwealth is the proper subject of an unfair acts or practices claim. See In the Matter of Int'l Harvester Co., 104 F.T.C. 949, 1061 (1984) (with regard to substantial harm requirement, "[w]hile in most cases the harm involved is monetary, . . . 'unwarranted health and safety risks may also support a finding of unfairness,'" quoting Letter from Federal Trade Commission to Senators Ford and Danforth (Dec. 17, 1980)). See also Commonwealth v. Keches Law Group, 2021 WL 2226449 at * 4 (Mass. Super. May 17, 2021) (Salinger, J.) (Attorney General "may enforce c. 93A without having to allege, prove, or quantify any economic injury").

Lastly, pointing to the three-part test used to analyze unfairness under the Federal Trade Commission Act, Meta argues that the Complaint fails to allege that the purported harms to young users are not outweighed by Instagram's countervailing benefit or that those harms are not

22

reasonably avoidable by Instagram's users. See Federal Trade Comm'n v. Direct Mktg.

Concepts, Inc., 569 F. Supp. 2d 285, 299 (D. Mass. 2008) (O'Toole, J.), aff'd, 624 F.3d 1 (1st

Cir. 2010) ("To justify a finding of unfairness[,] the injury . . . must be substantial; it must not be

outweighed by any countervailing benefits to consumers or competition that the practice

produces; and it must be an injury that consumers themselves could not reasonably have

avoided," quoting American Fin. Serv. Ass'n v. Federal Trade Comm'n, 767 F.2d 957, 971

(D.C. Cir. 1985)). In support of the latter contention, Meta points to the Complaint's allegations

regarding Meta's "Take a Break," "Daily Limit," and age-verification tools.

Meta's arguments miss the mark. The Commonwealth is not required to meet these two

factors to prove unfairness and, in any event, the Complaint adequately alleges facts that satisfy

them. The Commonwealth alleges that because Instagram's features are designed to overcome

users' choice and autonomy to regulate their time on the platform, the elective tools referenced

by Meta are an unreasonable option. See Complaint ¶¶ 82-83, 124, 134-136, 255-265, 383. The

Complaint also alleges that Meta's internal research and an expert advisor confirmed that the

risks of the platform outweigh its benefits. Complaint ¶¶ 181, 349, 384. These allegations are

sufficient to plausibly suggest that the harm alleged could be reasonably avoided and that such

harm was not outweighed by Instagram's countervailing benefits.

### 2. Deceptiveness (Counts Two and Three)

An act or practice is deceptive "if it could reasonably be found to have caused a person to

act differently from the way he [or she] otherwise would have acted," that is, "if it possesses a

tendency to deceive." Aspinall v. Philip Morris Companies, Inc., 442 Mass. 381, 394 (2004)

(internal quotations omitted). Liability for deceptive acts or practices "does not require proof that

a plaintiff relied on the representation, . . . that the defendant intended to deceive the plaintiff, . . .

23

or even knowledge on the part of the defendant that the representation was false." Id. (internal citations omitted). "In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which it might reasonably be expected to have upon the general public." Leardi v. Brown, 394 Mass. 151, 156 (1985) (internal quotations omitted). See Aspinall, 442 Mass. at 394. A statement "need not be totally false in order to be deemed deceptive in the context of G.L. c. 93A." Id. A statement that is half-true or even "true as a literal matter" may be actionable if it "create[s] an over-all misleading impression through failure to disclose material information." Id. at 394-395.

Meta alleges Counts Two and Three fail to allege that it engaged in deceptive practices for three reasons. None have merit. First, Meta contends alleged statements about prioritizing safety and well-being are non-actionable, non-specific statements of opinion. But the Complaint alleges that Meta's statements about Instagram's safety and its concern for the well-being of its young users were inconsistent with its actions, which included deprioritizing youth well-being and ignoring its own internal evidence about the harm the platform caused. Given this context, the Complaint plausibly suggests that the statements are at the very least misleading half-truths. Even if the relevant statements are considered opinions, the allegations plausibly suggest that the statements created an over-all misleading impression through failure to disclose material information. See Aspinall, 442 Mass. at 394-395; McEneaney v. Chestnut Hill Realty Corp., 38 Mass. App. Ct. 573, 575 (1995) ("opinion may constitute a statement of fact if it may reasonably be understood by the recipient as implying that there are facts to justify the opinion or at least that there are no facts that are incompatible with it. . . . This is particularly true where the maker is understood to have special knowledge of facts unknown to the recipient.") (internal citations omitted). The extent to which these statements are actionable are best addressed at a later stage.

24

Second, Meta argues the Commonwealth fails to allege that many of its purported statements are false. It specifically points to the allegations supporting Count Three. See Complaint ¶¶ 324, 327, 335-336, 402. However, even if these statements are literally true, the Complaint plausibly suggests that the statements created an over-all misleading impression through the failure to disclose material information.

Lastly, Meta contends the Complaint fails plausibly to allege that users would have acted differently if they were aware of the purported deception. Whether consumers would have acted differently is "ill-suited for resolution on a motion to dismiss." Commonwealth v. Exxon Mobil Corp., 2021 WL 3493456 at * 12 (Mass. Super. June 22, 2021) (Green, J.). In any event, the Commonwealth alleges that had users and families been aware of the harmful nature of Instagram's design features they may have decided not to use the platform or restricted its use. Complaint ¶¶ 55, 298, 299, 344. [21]

### 3.    **Trade or Commerce**

As noted above, a plaintiff must allege that the unfair or deceptive act or practice occurred "in the conduct of any trade or commerce," which the statute defines to include:

> the advertising, the offering for sale, rent or lease, the sale, rent, lease or distribution of any services and any property, tangible or intangible, real, personal or mixed, any security . . . and any contract of sale of a commodity for future delivery, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this commonwealth.

G.L. c. 93A, § 1(b) (emphasis added). "The use of the words 'distribution of any services' in conjunction with words such as 'sale' and 'lease' indicates an intent that the services be

---

[21]    Meta also argues that the Commonwealth's allegations fail to show a causal connection between the deceptive act and the alleged injury. I disagree.

distributed in exchange for some consideration or that there must be other strong indications that the services are distributed in a business context." Planned Parenthood Fed'n of Am., Inc. v. Problem Pregnancy of Worcester, Inc., 398 Mass. 480, 493 (1986) (emphasis added). See Sullivan v. Five Acres Realty Tr., 487 Mass. 64, 69 (2021) (c. 93A "intended to apply to individuals acting in a business context"). To determine whether a defendant acted in a business context, the court examines "the nature of the transaction, the character of the parties, the activities engaged in by the parties, whether the transaction was motivated by business or personal reasons, whether similar transactions have been undertaken in the past, and whether the participant played an active role in the transaction." Sullivan, 487 Mass. at 69. Whether a defendant was acting in the business context "is determined by the facts of each case" and as such, "[t]his determination is typically for the trier of fact and is preferably decided on a fuller record rather than on a motion to dismiss." Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 849-850 (2017) (internal quotations omitted).

Meta argues that using Instagram does not involve trade or commerce because Instagram is a free service. While the Commonwealth concedes Instagram is free to users, the Complaint alleges that Meta offers and distributes its social media services to millions of Massachusetts users, including over 300,000 teens, in exchange for the collection of personal data, which it then uses to sell targeted advertising opportunities to third parties, Complaint ¶¶ 39, 50, 51, 54; and that Meta derives revenue from selling this advertising. Id. at ¶¶ 36, 52, 143. These allegations plausibly suggest that, although free to users, the provision of Instagram accounts serves a commercial end and that therefore, Meta undertook its purportedly unfair and deceptive actions while engaged in trade or commerce. Cf. Planned Parenthood Fed'n of Am., Inc., 398 Mass. at 493-494 (defendant was not engaged in trade or commerce where it did not charge for its

services and "[t]here [was] little question that [its] employees ... [were] motivated in their work to advocate the pro-life position," rather than profit).

**B.    Public Nuisance**

Citing the Restatement (Third) of Torts and cases from outside Massachusetts, Meta argues that the Commonwealth's public nuisance claim should be dismissed because it seeks an unwarranted expansion of the public nuisance doctrine beyond its traditional bounds to include a product and its impact. It also contends that the claim fails because Meta's alleged conduct does not involve a public right. I disagree.

A public nuisance is one that "interferes with the exercise of a public right by directly encroaching on public property or by causing a common injury." Sullivan v. Chief Justice for Admin. & Mgmt. of Trial Court, 448 Mass. 15, 34 (2006), quoting Connerty v. Metropolitan Dist. Comm'n, 398 Mass. 140, 148 (1986). "In determining whether there has been an unreasonable interference with a public right, a court may consider, inter alia, '[w]hether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience[.]'" Id., quoting Restatement (Second) of Torts § 821B. "Massachusetts courts have allowed public nuisance claims concerning dangerous products." Commonwealth v. Purdue Pharma, L.P., 2019 WL 5495866 at * 5 (Mass. Super. Sept. 17, 2019) (Sanders, J) (and cases cited). Here, the Commonwealth alleges that Meta has contributed to a youth mental health crisis by promoting the addictive use of its platform. This is sufficient to support a public nuisance claim.

Meta also argues that the public nuisance claim fails because the Complaint does not plausibly suggest that Meta proximately caused the alleged harms. See Alholm v. Town of Wareham, 371 Mass. 621, 626 (1976) ("plaintiffs ha[ve] the burden of proving that the alleged

27

nuisance . . . was the proximate cause of their injuries"). Meta asserts that those harms are associated with third parties who provide the alleged content and who act independently from Meta. Again, I disagree. As noted above, the Complaint is primarily based on Meta's own conduct, not third-party content. Moreover, because Meta was purportedly aware of the harms occurring to young users from overuse of Instagram, the alleged mental and physical harms suffered by Massachusetts youth and the associated burdens to the Massachusetts school and health care systems were foreseeable.

## ORDER

Defendants' Motion to Dismiss (Docket # 22) is **DENIED**.

Dated: October 17, 2024

Peter B. Krupp
Justice of the Superior Court

28