# EXHIBIT A

The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

1       **IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

2       Opinion Number:

3       Filing Date: October 21, 2024

4       **NO. S-1-SC-39284**

5       **JOHNSON & JOHNSON and**
6       **JOHNSON & JOHNSON CONSUMER**
7       **COMPANIES, INC.,**

8              Petitioners,

9       v.

10      **THE HONORABLE**
11      **MATTHEW JUSTIN WILSON,**

12             Respondent,

13      and

14      **STATE OF NEW MEXICO ex rel.**
15      **HECTOR BALDERAS, Attorney General;**
16      **BAUSCH HEALTH COMPANIES, INC.,**
17      **f/k/a VALEANT PHARMACEUTICALS**
18      **INTERNATIONAL, INC.; BAUSCH HEALTH**
19      **AMERICAS, INC., f/k/a VALEANT**
20      **PHARMACEUTICALS INTERNATIONAL;**
21      **and BAUSCH HEALTH US LLC, f/k/a**
22      **VALEANT PHARMACEUTICALS NORTH AMERICA LLC,**

23             Real Parties in Interest.

24      **ORIGINAL PROCEEDING ON PETITION FOR**
25      **WRIT OF SUPERINTENDING CONTROL**

1   Bardacke Allison, LLP
2   Benjamin Allison
3   Justin W. Miller
4   Cole P. Wilson
5   Santa Fe, NM

6   Skadden, Arps, Slate, Meagher & Flom, LLP
7   Richard T. Bernardo
8   New York, NY

9   for Petitioners

10  Raúl Torres, Attorney General
11  Mark W. Allen, Assistant Attorney General

12  for Respondent

13  Hector H. Balderas, Attorney General
14  Brian L. Moore, Assistant Attorney General
15  Brian McMath, Assistant Attorney General
16  Santa Fe, NM

17  Robles, Real & Anaya, P.C.
18  Marcus J. Rael, Jr.
19  Albuquerque, NM

20  Fears Nachawati Law Firm
21  Majed Nachawati
22  S. Ann Saucer
23  Dallas, TX

24  for Real Party in Interest State of New Mexico
25  ex rel. Hector H. Balderas, Attorney General

26  Office of the Governor
27  Holly Agajanian, Chief General Counsel
28  Kyle P. Duffy, Deputy General Counsel
29  Santa Fe, NM

30  for Amicus Curiae

1               **OPINION**

2       **THOMSON, Chief Justice.**

3       {1}      This case affords us the opportunity to decide a narrow—but important—

4       issue of first impression: whether the New Mexico Office of the Attorney General

5       (Attorney General or OAG), in representing the State in civil litigation brought by

6       the attorney general, has the discovery authority to obtain and produce documents

7       and information from a state executive agency that is not a named party to the

8       litigation. Exercising our original jurisdiction to issue a writ of superintending

9       control under Article VI, Section 3 of the New Mexico Constitution, we answer that

10      question in the affirmative and hold that under New Mexico's governing statutory

11      framework, *see* NMSA 1978, § 8-5-2 (1975), the Attorney General's authority to

12      access executive agency materials for discovery purposes is fairly and necessarily

13      implied and incurs no resulting constitutional violation.

14      **I.      PROCEDURAL BACKGROUND**

15      {2}      The original action in district court was brought by the Attorney General on

16      behalf of the State, and seeks equitable and injunctive relief, civil penalties, and

17      money damages including restitution against Defendants-Petitioners Johnson &

18      Johnson and Johnson & Johnson Consumer Companies, Inc. (collectively,

19      Petitioners), as well as several affiliate companies. The amended complaint

1    expressly invokes the State's "sovereign and *parens patriae* authority"[1] in alleging

2    that Petitioners marketed, advertised, and sold talcum powder products in New

3    Mexico despite knowledge that those products contained carcinogens, including

4    asbestos. The State seeks recovery under both common-law and statutory causes of

5    action. These encompass, on the one hand, claims sounding in fraud and negligent

6    misrepresentation; negligence; and unjust enrichment; and also include claims

7    arising under the New Mexico Unfair Practices Act, NMSA 1978, §§ 57-12-1 to -26

8    (1967, as amended through 2019); the New Mexico Medicaid Fraud Act, NMSA

9    1978, §§ 30-44-1 to -8 (1989, as amended through 2004); the New Mexico Fraud

10   Against Taxpayers Act, NMSA 1978, §§ 44-9-1 to -14 (2007, as amended through

11   2015); and the New Mexico False Advertising Act, NMSA 1978, Section 57-15-1

12   to -10 (1965, as amended through 1967).

13   {3}    The State's amended complaint references six state executive agencies not

14   named as parties to the litigation. The State alleges these agencies incurred

15   unspecified expenditures due to Petitioners' alleged wrongdoing. The agencies

---

[1]A state's *parens patriae* (literally parent of the country) powers allow it to bring an action on behalf of its citizenry against a defendant whose conduct impacts "'the health and well-being—both physical and economic—of its residents in general.'" *LG Display Co., Ltd. v. Madigan*, 665 F.3d 768, 771 (7th Cir. 2011) (citation omitted).

1    identified are the New Mexico Human Services Department (HSD)—the agency

2    charged with the administration of the state's Medicaid program—as well as the

3    New Mexico Department of Health, the New Mexico Department of Corrections,

4    the Risk Management Division of the General Services Department, the Retiree

5    Health Care Authority, and the Public Schools Insurance Authority.

6    {4}    In addition to litigation delays attributed to Petitioners' prior bankruptcy stay,

7    the case remains mired in the discovery stage. The parties' exchange of document

8    requests and interrogatories resulted in one main sticking point: a disagreement over

9    the Attorney General's authority to obtain and produce discovery documents and

10    information belonging to the state executive agencies listed in the amended

11    complaint. The Attorney General's response to the discovery request caused a

12    substantial disparity in the parties' respective quantities of documents produced.

13    Petitioners turned over a half million documents—while the State produced only the

14    handful of documents (four to be precise) located in the OAG's files, as well as a

15    single spreadsheet prepared by that office.

16    {5}    This disparity, in turn, led Petitioners to move to compel the production of the

17    materials from agencies not parties to the litigation but named in the complaint. The

18    motion to compel argues that the State—through its Attorney General—having

19    brought "a wide-ranging complaint alleging damages" that include executive agency

1   expenditures, "must produce documents and information within the possession,

2   custody, or control of those agencies." Opposing the motion, the State asserted that

3   the Attorney General "'has neither possession, custody or control of documents

4   within other branches, agencies, departments, or other entities of State of New

5   Mexico government, nor, unless otherwise advised by the State, the practical ability

6   to get documents from those agencies.'" On that basis, the State sought to relegate

7   Petitioners' agency discovery requests to third-party discovery only. As an apparent

8   fallback position and by way of footnote, the State attempted to distance itself from

9   the inclusion in its amended complaint of any references to executive agencies other

10  than HSD. The State asserted that by that point in time, it "believe[d] that . . . HSD

11  is the only state agency that would have relevant information on damages sustained

12  by the State."

13  {6}    The district court denied outright Petitioners' motion to compel, concluding

14  that "[t]he state agencies mentioned in the [State's] Amended Complaint, such as

15  the [HSD], are not subject to common executive control nor are they interrelated

16  with the [OAG] and should not be lumped together for discovery purposes" (citing

17  *United States v. Am. Express* Co., 1:10-cv-04496 at 5-7, 2011 WL 13073683

18  (E.D.N.Y. July 29, 2011), ECF No. 151).

{7}     Petitioners now seek to invoke this Court's original jurisdiction by way of writ of superintending control, requesting that we review—and reverse—the district court's unfavorable discovery ruling. The parties' present submissions reiterate their discovery positions in the district court with minor variations. Specifically, Petitioners argue that the State's discovery obligations extend to its constituent agencies and that, even if that were not so, the State would still be required to produce agency documents and information under New Mexico's liberal discovery standards. The State counters that the discovery relief sought by Petitioners would infringe on separation of powers principles involving the Attorney General and the Governor because "the State, acting through the [OAG], does not have possession, custody, or control of documents or information held by gubernatorially controlled State agencies," in particular any "not a party to the underlying case." In addition, the State echoes its misgivings over its own pleading assertions concerning expenditures made by multiple executive agencies, this time representing that it now seeks compensation for expenditures made solely by HSD.

{8}     For reasons set out herein, we grant the petition for writ of superintending control to review the statutory and separation of powers issues here presented, vacate the district court's discovery order, and remand the matter to the district court with instructions to compel the production of all relevant, responsive, and non-privileged

documents and information held by the executive agencies referenced in the State's amended complaint. Our remand is without prejudice to the State's right to file a motion to amend its amended complaint consistent with the multi-agency concerns expressed in its court filings in this case. We do not purport to address the merits of any such motion or, for that matter, of any specific discovery requests.

## II.    DISCUSSION

### A.    This Court's Power of Superintending Control

{9}    "The power of superintending control is the power to control the course of ordinary litigation"—and hence "the authority to regulate pleading, practice, and procedure"—in lower courts. *Dist. Ct. of the Second Jud. Dist. v. McKenna*, 1994-NMSC-102, ¶ 3, 118 N.M. 402, 881 P.2d 1387 (internal quotation marks and citation omitted). This broad and extraordinary power allows the Court both to "offer guidance to lower courts on how to properly apply the law," *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 30, 410 P.3d 201, and "to correct any *specie* of error," *Kerr v. Parsons*, 2016-NMSC-028, ¶ 16, 378 P.3d 1, including any error in the discovery process, *see State ex rel. Brandenburg v. Blackmer*, 2005-NMSC-008, ¶ 7, 137 N.M. 258, 110 P.3d 66 (recognizing that a discovery order, in proper circumstances where "important legal issues" are involved, may be "reviewable as an exercise of superintending control").

{10}    The exercise of our superintending control authority, traditionally sparing in use, *see State ex rel. Anaya v. Scarborough*, 1966-NMSC-009, ¶ 8, 75 N.M. 702, 410 P.2d 732, is typically reserved for situations where it is "necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense," or to address "an issue of first impression" of constitutional proportion. *State v. Wilson*, 2021-NMSC-022, ¶ 14, 489 P.3d 925 (internal quotation marks and citation omitted). Both criteria are present in this case, which involves important questions surrounding intra-Executive Branch separation of powers—a constitutional "issue of first impression . . . without clear answers under New Mexico law," *Chappell v. Cosgrove*, 1996-NMSC-020, ¶ 6, 121 N.M. 636, 916 P.2d 836—as well as the potential imposition of undue delay, burden, and expense on one party but not the other by way of unilateral third-party discovery.

{11}    Given the OAG's stated commitment to pursuing more environmental, consumer protection, and other state-interest civil lawsuits,[2] the statutory and

---

[2]The Attorney General announced a "rebrand[ing]" of the agency's name and logo to the New Mexico Department of Justice (https://www.santafenewmexican.com/news/local_news/attorney-general-rebrands-office-to-new-mexico-department-of-justice/article_ecd45cf6-af0f-11ee-beaf-ab01093741ba.html (last visited 10/16/2024)), the name given to the agency by statute. *See* NMSA 1978, § 8-5-1 (1933). We refer in this opinion to the agency by the statutory name of its "head thereof": Office of the Attorney General or OAG. *Id.*

1  constitutional issues raised herein are not "passing one[s], and it is reasonable to

2  predict additional future cases may arise. Accordingly, it is in the public interest to

3  settle the question[s] now." *Wilson*, 2021-NMSC-022, ¶ 15 (internal quotation

4  marks, and citation omitted).

5  **B.    Standard of Review and Relevant Discovery Principles**

6  {12}    We generally review discovery orders for an abuse of discretion. *Est. of*

7  *Romero ex rel. Romero v. City of Santa Fe*, 2006-NMSC-028, ¶ 6, 139 N.M. 671,

8  137 P.3d 611. But we review de novo related questions of law, including issues of

9  statutory and constitutional interpretation. *Id.*

10  {13}    Effective discovery is essential to the fairness of litigation, as the aim of the

11  discovery process is "to make a trial less a game of blindman's buff and more a fair

12  contest with the basic issues and facts disclosed to the fullest practicable extent."

13  *United Nuclear Corp. v. Gen. Atomic Co.*, 1980-NMSC-094, ¶ 54, 96 N.M. 155, 629

14  P.2d 231 (internal quotation marks and citation omitted); *see Pincheira v. Allstate*

15  *Ins. Co.*, 2008-NMSC-049, ¶ 21, 144 N.M. 601, 190 P.3d 322 (stating that "the

16  purpose of our discovery rules is to allow liberal pretrial discovery" (emphasis

17  omitted)). Consistent with this liberal discovery policy is the expansive construction

18  the *United Nuclear* Court gave what are now numbered Rules 1-033 and 1-034

19  NMRA—which govern the use of party discovery in the form, respectively, of

8

1    interrogatories and document production requests. *United Nuclear*, 1980-NMSC-

2    094, ¶¶ 55-56. This interpretative approach, intended "to insure that a litigant's right

3    to discovery is broad and flexible," *id*. ¶ 54 (internal quotation marks and citation

4    omitted), is guided by two limiting principles: first, a party "cannot be required to

5    produce materials which he is incapable of procuring," and second, a party "should

6    not be required to obtain, collect or turn over materials which the . . . party [seeking

7    discovery] is equally capable of obtaining on its own," *id.* ¶ 57.

8    {14}    Although each of these principles is ultimately likely to come into play in this

9    case, only the first principle—the ability of the producing party, here the Attorney

10   General acting on behalf of the State to procure agency materials—is directly

11   implicated in our discovery discussion. Under the *United Nuclear* standard, both the

12   requirement of Rule 1-033(A) that the answering party "furnish such information as

13   is available to the party" and the requirement of Rule 1-034(A)(1) that the answering

14   party produce documents or other "tangible things" in its "possession, custody or

15   control" have been distilled down to a single "pragmatic" question: "whether the

16   party from whom the materials are sought has the practical ability to obtain those

17   materials." *United Nuclear*, 1980-NMSC-094, ¶ 58; *see also* 8B Charles Alan

18   Wright, Arthur A. Miller, *Federal Practice and Procedure* § 2210 (3d ed. 2010)

1    (indicating that "control" of materials sought under federal discovery procedures

2    means the legal right or practical ability to obtain them).

3    {15}     Relying largely on federal case law, the *United Nuclear* Court went on to

4    emphasize the following points that, as will be seen, tend to support Petitioners'

5    discovery stance in this case:

6        [I]t is immaterial under Rules 33 and 34 [of the New Mexico Rules of
7        Civil Procedure for the District Courts] that the party subject to the
8        discovery orders does not own the documents, or that it did not prepare
9        or direct the production of the documents, or that it does not have actual
10       physical possession of them. It is also clear that the mere fact that the
11       documents are in the possession of an individual or entity which is
12       different or separate from that of the named party is not determinative
13       of the questions of availability or control.

14   *United Nuclear*, 1980-NMSC-094, ¶ 58 (footnotes omitted).

15   {16}     We highlight an additional factor that helps foster full and meaningful

16   discovery consistent with our liberal discovery rules: the faithful adherence to the

17   principle of mutuality of discovery—the goal that discovery be reciprocal between

18   the parties rather than "a one-way proposition." *See Knight v. Presbyterian Hosp.*

19   *Ctr.*, 1982-NMCA-125, ¶ 16, 98 N.M. 523, 650 P.2d 45.

20   **C.     The Attorney General's Discovery Authority to Obtain and Produce**
21   **Non-Party Executive Agency Materials in State-Interest Civil Litigation**
22   **Brought by the Attorney General**

23   {17}     As the party resisting Petitioners' discovery arguments, it is the State's

24   "burden to clarify and explain its objections and to provide support therefor." *United*

1    *Nuclear*, 1980-NMSC-094, ¶ 267 (internal quotation marks and citation omitted);

2    *see Blankenship v. Hearst Corp*., 519 F.2d 418, 429 (9th Cir. 1975) (describing this

3    burden applied to denying discovery sought by the defendants as a "heavy" one).

4    The State's principal discovery objection, that the OAG lacks authority to obtain and

5    produce responsive documents or information in the possession of gubernatorially

6    controlled executive agencies, is ultimately unconvincing given the OAG's role in

7    our constitutional government. *See* § 8-5-2(B) (authorizing the Attorney General to

8    "prosecute and defend . . . all actions and proceedings, civil or criminal, in which the

9    state may be a party or interested when, in his judgment, the interest of the state

10   requires such action or when requested to do so by the governor"). Placing the State's

11   discovery objection in proper context requires an understanding of the "divided

12   executive" structure so prevalent today in state governments across the country and

13   of the differing roles played by the State, the OAG, and other executive agencies in

14   state-interest civil litigation. We begin our analysis addressing these two topics in

15   turn.

16   **1.     The divided executive branch**

17   {18}     The hallmark of a divided executive branch is the apportionment of "executive

18   power among different executive officers not subject to gubernatorial control," a

19   dispersal of power that typically features—as is the case in New Mexico—an

1    independently elected attorney general who "does not serve at the will of the

2    Governor." William P. Marshall, *Break Up the Presidency? Governors, State*

3    *Attorneys General, and Lessons from the Divided Executive*, 115 Yale L.J. 2446,

4    2448 (2006); *see* N.M. Const. art. V, § 1 (listing five executive officers, including

5    the attorney general, who are elected independently from the governor and lieutenant

6    governor). This fragmented executive framework—long a mainstay of governance

7    in the vast majority of states nationwide—is intended "to weaken the power of a

8    central chief executive and further an intrabranch system of checks and balances."

9    Marshall, *supra*, at 2451; *see also Goldmark v. McKenna*, 259 P.3d 1095, 1101

10   (Wash. 2011) (en banc) (noting that the founders of the State of Washington intended

11   for its structurally divided executive branch "to have each office act as a check upon

12   the others").

13   {19}    The benefits of an independently elected attorney general who serves as a

14   state's chief legal officer in a divided executive branch were well stated more than

15   half a century ago.

16            [A]n elected Attorney General has a measure of independence
17       and a sense of personal and direct responsibility to the public. The
18       elected official has a natural and impelling desire to be creative and to
19       exercise broader initiative in the service of the public. He is free of the
20       fear of dismissal by any superior official if he should exercise contrary
21       independent judgment. He is in the best position to render maximum
22       service to the People and impartial advice to the Governor, the
23       Legislature and State departments and agencies. He can appear in Court

1  without fear or favor—an attorney in the fullest and finest sense of the
2  word.

3  Patrick C. McGinley, *Separation of Powers, State Constitutions & the Attorney*
4  *General: Who Represents the State?* 99 W. Va. L. Rev. 721, 756 (1997) (quoting
5  Louis K. Lefkowitz, *Position Paper of Louis K. Lefkowitz, Attorney General, to*
6  *Constitutional Convention, Committee on the Executive Branch* (June 1, 1967,
7  Albany, N.Y.)).

8  {20}    Along with the autonomy created by the independent election of most state
9  attorneys general has come a considerable expansion of their duties and
10 responsibilities, which now typically include the "authority to pursue litigation that
11 advances or vindicates public interests." *Pennsylvania v. Mid-Atl. Toyota Distrib.,*
12 *Inc.*, 704 F.2d 125, 131 (4th Cir. 1983) ("In general, a state Attorney General may
13 institute such suits as he deems necessary for . . . the protection of public rights."
14 (omission in original) (internal quotation marks and citation omitted)); *see also State*
15 *Attorneys General Powers and Responsibilities*, National Association of Attorneys
16 General (NAAG) 247 (Emily Myers, ed., 4th ed. 2018) (observing that state
17 attorneys general regularly "deal with [consumer protection] issues that range from
18 health care to automobiles to privacy, often working together across the states and
19 territories to protect citizens from unfair, misleading, unconscionable, and deceptive
20 acts and practices").

13

{21}    It is the Attorney General's exercise of this authority that gives rise to the discovery dispute at hand. The conceptual puzzle at the heart of the dispute "is that no matter how extensive the Attorney General's powers have become, they still must be reconciled with those of the Governor, who, in virtually every state [including New Mexico], enjoys the even more expansive charge of assuring that the laws are faithfully executed." Marshall, *supra*, at 2452-53; *see* N.M. Const. art. V, § 4 ("The supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed.").

{22}    Our Legislature has set forth the near-all-encompassing duties assigned to the Attorney General in pursuing state-interest civil litigation, which largely alleviates the above quoted, intra-Executive Branch separation of powers concerns identified by Marshall, *supra*, at 2452-53, and raised by the State herein.

**2.    State-interest civil litigation and the respective roles of the Attorney General and state agencies**

{23}    As one commentator has noted, the role and function of state attorneys general has "changed considerably" over the years, so much so that they now "occupy an unusual position in state government, with most of them armed with virtually full control over litigation in the name of their state and considerable independence from other institutions in state government." Paul Nolette, *Federalism on Trial: State Attorneys General and National Policymaking in Contemporary America* 18, 20

14

1    (2015) (tracing this evolution back to the 1980's when the "most consequential

2    efforts" of state attorneys general had gone from "serv[ing] as advocates for the state

3    and its agencies primarily through defensive litigation" to pursuing "offensive

4    litigation in which they represent their states as plaintiffs in increasingly large-scale

5    coordinated litigation campaigns"). Despite this shift in focus and the singular brand

6    of authority and independence that accompanied it, state attorneys general are not

7    typically characterized as party litigants in the lawsuits they bring. *See State ex rel.*

8    *Norvell v. Credit Bureau of Albuquerque, Inc.*, 1973-NMSC-087, ¶¶ 4-6, 85 N.M.

9    521, 514 P.2d 40 (concluding that the state is the proper party litigant while the

10   attorney general acts as the state's legal representative in the case), *cited with*

11   *approval* in *Mid-Atl. Toyota Distrib.*, 704 F.2d at 130-31 (indicating that the several

12   state statutes there at issue in the underlying *parens patriae* damage actions

13   "allocate[] to the attorney[s] general power and authority to *represent* the

14   jurisdiction[s] and [their] interests in [enforcement] litigation" (emphasis added)).

15   {24}    Labels aside, however, in the context of state-interest civil litigation, a state

16   attorney general is commonly thought of as "assum[ing] the role of a litigant [in]

17   represent[ing] what he perceives to be the interest of the state and the public at

18   large." *Manchin v. Browning*, 296 S.E.2d 909, 918-19 (W. Va. 1982), *overruled on*

19   *other grounds by State ex rel. Discover Fin. Servs., Inc. v. Nibert*, 744 S.E.2d 625,

1    645 (2013)). Even if the litigation status of a state attorney general in a civil lawsuit

2    is limited to a representative capacity only, it is reasonable to say that the relationship

3    thus created between the attorney general and the state lacks the constraints of the

4    traditional attorney-client relationship given the attorney general's "virtually full

5    control over litigation in the name of the[] state and considerable independence from

6    other institutions in state government." Nolette, *supra*, at 10. This broad authority is

7    clearly provided for in our statute. *See* § 8-5-2(B). In sum, no matter how the OAG's

8    litigation role is styled, it is that office—to the exclusion of all other executive

9    departments and agencies—that controls the substance and conduct of such state-

10    interest civil lawsuits.

11    {25}    As Petitioners correctly argue, however, the discovery questions presented in

12    this case are not ultimately dependent on the party status of the State's executive

13    agencies. We view the non-party status of the various state agencies as being more

14    clear cut and broadly referenced but not denominated as party plaintiffs in the State's

15    amended complaint. The agencies identified in the State's pleading have no direct

16    stake in the underlying lawsuit and can claim at most a tangential financial or fiscal

17    interest in the outcome. We see no sound basis in law or policy to treat such ancillary

18    executive agencies as party plaintiffs for discovery or any other purposes. These

19    agencies, as part of a larger entity of our state government, find themselves

16

1    implicated in litigation not of their own making and in a forum in which their

2    strategic choices are controlled by the Attorney General. *See State Attorneys General*

3    *Powers and Responsibilities*, *supra*, at 48 (observing that a state attorney general's

4    authority to represent the state in state-interest civil litigation is designed to

5    "protect[] the interests of the state as a whole as a unitary client, rather than any one

6    of the many potential agency manifestations of the state").

7    {26}    Instead, the issues ultimately hinge on whether the OAG, acting as counsel

8    for the State, had "the practical ability to obtain" the non-party agency documents

9    and information sought by Petitioners. *See United Nuclear*, 1980-NMSC-094, ¶ 58.

10   Guided by the discovery standards this Court reiterated in *United Nuclear* and in

11   light of our ensuing analyses rejecting the core statutory and constitutional issues

12   raised in the petition, we conclude that the OAG had the practical ability to obtain

13   the requested agency documents and information.

14   **3.    Statutory analysis**

15   {27}    In defining the duties of the OAG, our Legislature has plainly set out a broad

16   range of action that is available to that office in both civil and criminal litigation. *See*

17   § 8-5-2. Central to our analysis here is Section 8-5-2(B), which authorizes the

18   Attorney General to "prosecute and defend . . . all actions and proceedings, civil or

19   criminal, in which the state may be a party or interested when, *in his judgment*, the

17

1    interest of the state requires such action or when requested to do so by the governor"

2    (emphasis added).[3]

3    {28}    This Court has given proper effect to the broad and expansive terms of the

4    above-quoted provision, affording the Attorney General wide "discretion in

5    determining when the public interest requires him to bring a civil action on behalf

6    of the state," *State ex rel. Bingaman v. Valley Sav. & Loan Ass'n*, 1981-NMSC-108,

7    ¶ 6, 97 N.M. 8, 636 P.2d 279, and, more important for present purposes, recognizing

8    the virtually unfettered control given the Attorney General—as the "chief law officer

9    of the state"—over the conduct of all litigation matters the Attorney General chooses

10   to bring. *See Lyle v. Luna*, 1959-NMSC-042, ¶¶ 23-25, 65 N.M. 429, 338 P.2d 1060

---

[3]It bears mentioning that the defined powers of state attorneys general vary widely across the country in both substance and level of specificity. *See State Attorneys General Powers and Responsibilities* (the 2018 NAAG edition), *supra*, 92-93 & n.4; *see also NAAG, Powers, Duties and Operations of State Attorneys General*, 197-98 (1977) (predecessor of the 2018 NAAG edition) (recognizing New Mexico's prior compilations of Section 8-5-2(B) and NMSA 1978, Section 8-5-3 (1933) as specific among counterpart statutes nationwide). *See State Attorneys General Powers and Responsibilities* 84 (Lynn M. Ross ed., 1990) (printing the full text of Section 8-5-2(A)-(C), (I), (J) and highlighting its specificity). By contrast, for example, the Ohio counterpart statute to Section 8-5-2 does "not clearly define[] . . . [t]he exact extent of the Attorney General's litigation authority," a circumstance which has caused the Sixth Circuit Court of Appeals to "decline to wade into the debate regarding the parameters of [that] authority." *N.E. Ohio Coalition for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006).

1    (internal quotation marks and citation omitted). Indeed, this Court's opinion in *Luna*

2    signaled that, "[i]n the absence of explicit legislative expression to the contrary, the

3    attorney general possesses *entire dominion* over every suit instituted by him in his

4    official capacity whether there is a relator or not." *Id.* ¶ 23 (emphasis added) (internal

5    quotation marks and citation omitted); *accord Florida ex rel. Shevin v. Exxon Corp.*,

6    526 F.2d 266, 268 (5th Cir. 1976) ("There is and has been no doubt that the

7    legislature may deprive the attorney general of specific powers; but in the absence

8    of such legislative action, he typically may exercise all such authority as the public

9    interest requires.").

10   {29}    The State's briefing to this Court—advanced by its Attorney General—

11   readily acknowledges the Attorney General's complete and "exclusive control" over

12   the litigation process in cases commenced by the Attorney General on behalf of the

13   State. In asserting that the Attorney General has the authority to bring actions on

14   behalf of the state but none of the responsibility to produce the discovery materials

15   that support any given set of claims, the State insists that the breadth of the Attorney

16   General's litigation authority does not "extend[] to the power to compel *party*

17   discovery from non-party executive agencies." In so arguing, the State makes much

18   of the absence from the statutory scheme of an express delegation to the Attorney

19   General of that precise authority. In the process, the State through its Attorney

1  General advances a position that in the end erodes the Attorney General's statutory

2  grant of authority, a bewildering litigation stance considering the aligned interests

3  of the two entities in the context of this lawsuit.

4  {30}    On the merits, and as discussed below, the State's argument is too restrictive

5  and violates the "ancient" and "well-acknowledged" predicate-act canon of statutory

6  construction, which provides that "whenever a power is given by a statute,

7  everything necessary to making it effectual or requisite to attaining the end is

8  implied." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of*

9  *Legal Texts* § 30, at 192-93 (2012) (quoting James Kent, *Commentaries on American*

10  *Law* *464 (Charles M. Barnes ed., 13th ed. 1884)); *see also* 2B Norman J. Singer &

11  J.D. Shambie Singer, *Statutes & Statutory Construction*, § 55:4, at 457-58 (7th ed.

12  2012) (stating, under the rubric of the "implied powers" rule, that "[a] statute which

13  confers powers or duties in general terms includes by implication all powers and

14  duties incidental and necessary to make the legislation effective").

15  {31}    As a practical matter, it stands to reason that the broad and exclusive statutory

16  powers conferred upon our Attorney General to initiate and take charge of state-

17  interest civil litigation would necessarily encompass the authority, if not the

18  obligation, to produce responsive documents and information created or possessed

19  by non-party executive agencies. This pragmatic assumption finds support in the

1    reasoning provided by the Connecticut Supreme Court in distinct but related

2    circumstances:

3        The Attorney General's responsibility is not [directed] to serving or
4        representing the particular interests of State agencies . . . , but embraces
5        serving or representing the broader interests of the State. . . . It seems
6        to us that if the Attorney General is to have the unqualified role of chief
7        legal officer of the State, he or she must be able to direct the legal affairs
8        of the State *and its agencies.* Only in this way will the Attorney General
9        properly serve the State and the public interest.

10    *Conn. Comm'n of Special Revenue v. Conn. Freedom of Info. Comm'n*, 387 A.2d

11    533, 537-38 (Conn. 1978) (emphasis added).

12    {32}    Significantly, the import of the passage quoted above goes beyond mere

13    pragmatism and has itself recently been identified as an independent basis to compel

14    a state attorney general to obtain and produce documents from non-party, sibling

15    agencies. *See In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352,

16    358 (E.D. Pa. Oct. 20, 2023) (order) (relying on portions of *Conn. Comm'n of*

17    *Special Revenue*, 387 A.2d at 537-38, also quoted herein, to conclude that under

18    Connecticut law, the "broad grant" of statutory powers to the state attorney general,

19    including the "general supervision over all legal matters in which the state is an

20    interested party," defeats "the argument that in the prosecution of an action on behalf

21    of the State of Connecticut, the [Attorney General] cannot obtain documents from

22    state agencies" (internal quotation marks omitted)).

1   {33}    This same conclusion obtains when we approach the issue from a different

2   perspective. We refer to the aforementioned predicate-act canon of construction, one

3   long recognized in substance, if not in name, in New Mexico. *See State ex rel. Otto*

4   *v. Field*, 1925-NMSC-019, ¶ 64, 31 N.M. 120, 241 P. 1027 ("In the construction of

5   Constitutions, as well as of statutes, it has often been held that the powers necessary

6   to the exercise of a power clearly granted will be implied." (internal quotation marks

7   and citation omitted)); *see also* Order Granting Petition for Writ of Mandamus, *State*

8   *ex rel. Madrid v. Turner*, No. 26,035 at 2 (N.M. Dec. 14, 1999) (nonprecedential)

9   ("As a constitutional office within broad statutory powers, including *all powers*

10  *reasonably and necessarily implied therefrom*, the Attorney General has the

11  responsibility and the power to represent the interests of the State and its officials in

12  all litigation before state and federal courts, and to manage and control said litigation,

13  unless otherwise provided by law." (emphasis added)).

14  {34}    Our reliance on this interpretative canon as a basis to authorize the Attorney

15  General to obtain and produce discovery materials from other executive agencies

16  constitutes a reasonably necessary measure in the circumstances of this case. After

17  all, such an approach dovetails with the OAG's mandatory pre-litigation duty to

18  assess or confirm that a sufficient factual basis exists for believing that there is "good

19  ground to support" a particular cause of action. *See* Rule 1-011(A) NMRA;

22

1   *Kropelnicki v. Siegel*, 290 F.3d 118, 131 (2d Cir. 2002) (recognizing that a pleading

2   violates Rule 11 of the Federal Rules of Civil Procedure where, among other criteria,

3   "*after reasonable inquiry*, a competent attorney could not form a reasonable belief

4   that the pleading is well grounded in fact" (emphasis added)). As the Supreme Court

5   of Kentucky said in similar circumstances,

> 6     The power to institute actions must include the ability to inspect and
> 7     review documents and information relative to a determination of
> 8     whether a good faith belief exists in order to bring legal action. The
> 9     power granted by [Kentucky's information-sharing] statute is not
> 10    limited to that which is expressly conferred but also includes that which
> 11    is necessary to accomplish the things which are expressly authorized.

12  *Strong v. Chandler*, 70 S.W.3d 405, 409 (Ky. 2002) (citation omitted).

13  {35}   And assuming the OAG has the practical ability to obtain and review agency

14  materials to fairly evaluate the merits of a case *in its early* stages, as it most assuredly

15  does, then logic and fair play likewise dictate that the OAG would have at its disposal

16  that same capability when it comes to providing meaningful discovery to an

17  adversary in a *pending* case.

18  {36}   Given the laudable degree of specificity built into the provisions of our

19  Section 8-5-2 and the exclusive management and control accorded the Attorney

20  General in the conduct of state-interest civil litigation, there can be little question

21  that the implication to be drawn here—that the Attorney General has the authority

22  to access, review, and produce state agency documents and information—is "a

1  necessary, not a conjectural or argumentative one." Scalia and Garner, *supra* at 193

2  (footnote, internal quotation marks, and citation omitted).

3  {37}    At bottom, nothing in the plain terms of Section 8-5-2 or our caselaw's reading

4  of those provisions provides support for the State's discovery objection. Nor, as we

5  show next, does the State fare better on the constitutional side of its argument.

6  **4.    Constitutional analysis**

7  {38}    The State's argument that giving the Attorney General discovery control over

8  state agencies would allow the Governor to interfere with the Attorney General's

9  authority under Section 8-5-2(B) lacks merit because it is based on conflicting

10  premises. While some have supported the notion that allowing the Attorney General

11  to control documents held by independent state agencies could give the Governor or

12  those agencies undue influence over enforcement actions, *see, e.g.*, *Am. Express Co.*,

13  1:10-cv-04496 at 6, this argument falls apart under closer examination. The State's

14  "virtual veto" theory claims that involving the OAG in discovery targeting non-party

15  executive agencies would jeopardize state-interest civil litigation brought by the

16  Attorney General by encouraging interference from the Governor or the agencies

17  themselves. Yet, at the same time, the State concedes that the OAG has exclusive

18  authority over initiating state-interest civil litigation, which directly contradicts the

1   State's claim that such authority could be undermined by gubernatorial or agency

2   actions.

3   {39}    Instructive on this score is *Illinois ex rel. Raoul v. Monsanto Co.*, an

4   unreported but well-reasoned memorandum opinion and order that addressed intra-

5   executive branch separation of powers considerations arising under the Illinois

6   Constitution, which requires "the Illinois Attorney General's Office [to] operate[]

7   independently of the rest of the executive branch, including state agencies (who are

8   controlled by the Illinois Governor)." 1:22-cv-05339 at 4 (N.D. Ill. June 20, 2023),

9   ECF No. 76. The federal district court presiding in *Raoul*, *id.* at 6, rejected as

10  "speculative and generally unpersuasive" a nearly identical "'virtual veto'"

11  argument advanced therein by the state. The court reasoned that it was not clear how

12  granting the defendant's motion to compel

> would (or could) result in the Illinois Governor preventing or
> obstructing future lawsuits by the Illinois Attorney General. To the
> extent the Governor does not want the Attorney General to bring a
> particular action, nothing we decide today affects his ability (or rather,
> his *inability*) to block such action. . . . Without more explanation, the
> Court is unpersuaded that granting [the defendant's discovery] motion
> will stir up constitutional problems between the two state leaders, either
> now or in the future.

21  *Id.* at 6-7 (noting the absence of any "Illinois caselaw stating that non-party state

22  agencies cannot be subject to party discovery in cases brought by the Illinois

23  Attorney General under its *parens patriae* authority").

{40}    As was true in *Raoul*, the State's broad assertions here of a potential intra-Executive Branch conflict fail to carry the day. *See In re Generic Pharms.*, 699 F. Supp. 3d at 357 & n.11 (holding in multi-district litigation that "[g]eneral arguments regarding a possible conflict between the [Attorney General] and the governor of a [s]tate with authority over state agencies are not sufficient" to raise a constitutional question adequate to derail agency document discovery (citing *Raoul*, 1:22-cv-05339 at 7 (addressing separation of power arguments))).

{41}    One remaining aspect of the State's virtual veto argument deserves mention: its reflection of a jaundiced judicial view of Executive Branch integrity, a view that ignores the separation of powers-based presumption that at any given time "the executive is acting rationally and in good faith." *State ex rel. Beeler, Schad & Diamond, P.C. v. Burlington Coat Factory Warehouse Corp.*, 860 N.E.2d 423, 429 (Ill. App. Ct. 2006); *see Delahanty v. Commonwealth*, 558 S.W.3d 489, 505 (Ky. Ct. App. 2018) (recognizing "the presumption that public officials, when following statutorily established procedures, are proceeding in good faith and in a proper exercise of the power and discretion reposed in them," and indicating that "specific allegations of overreaching or otherwise impermissible conduct or motives should be addressed as part of particular cases, not through a wholesale attack on the entire

1   statutory scheme" (text only)[4] (citation omitted)). We have every confidence that

2   our colleagues in the Executive Branch will help facilitate our shared interest in full

3   and fair discovery in cases of all stripes.

4   {42}   We need to emphasize that none of this—neither our statutory nor

5   constitutional analyses—leaves the Governor or an affected executive agency

6   without recourse to a potential legal remedy with the aid of the OAG or its appointed

7   designee if a particular request for agency discovery is deemed to be unreasonable

8   or burdensome, or in the case of the Governor alone, to implicate a valid claim of

9   privilege. *See, e.g.*, *Republican Party of N.M. v. N.M. Tax'n & Revenue Dep't*, 2012-

10  NMSC-026, ¶¶ 43-49, 283 P.3d 853 (announcing that "our jurisprudence supports a

11  limited form of executive privilege derived from the constitution," one "not available

12  to the entire executive branch . . . but instead reserved to the . . . Governor"). All we

13  address here is the State's notion that a *blanket* statutory or constitutional ban on the

14  use of party discovery with respect to non-party executive agencies is somehow

15  required in state-interest civil litigation brought by the Attorney General. And all we

16  hold is that no such ban is warranted or appropriate under New Mexico law.

---

[4] "(Text only)" indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

1   {43}   We also stress that our holding today should not be construed as granting any

2   defendant the broad license to disrupt the vital work of already busy state agencies

3   with what otherwise would be viewed as oppressive or harassing discovery tactics.

4   A defendant's entitlement to party discovery in appropriate circumstances should

5   not be used as an instrument to delay and frustrate the progress of litigation with,

6   say for example, a flood of discovery requests for documents that vary in content

7   and form from the manner and means by which the documents were collected and

8   stored by a given agency. *See* Rule 1-034(B)(1) (providing in part that, "[u]nless the

9   parties otherwise agree, or the court otherwise orders, . . . a party who produces

10  documents for [discovery] inspection shall produce them as they are kept in the usual

11  course of business"); *see* and *compare* NMSA 1978, § 14-2-8(B) (2009) (absolving

12  public bodies of the responsibility to "create a public record" in response to a records

13  request made under New Mexico's Inspection of Public Records Act). Though not

14  necessary to resolve this appeal, we note that it is within the district court's wide

15  discretion in managing pre-trial discovery to prevent in the first instance any such

16  abuses from tainting the discovery process.

17  **III.   CONCLUSION**

18  {44}   For the foregoing reasons, we grant the petition for writ of superintending

19  control and order the district court to comply with the holding and rationale of this

28

1  opinion in resolving the parties' discovery dispute. We hereby vacate our previously

2  issued stay, allowing the underlying litigation to proceed, consistent with this

3  opinion, in the district court.

4  {45}    **IT IS SO ORDERED.**

5

6  _____
                          **DAVID K. THOMSON, Chief Justice**

7  **WE CONCUR:**

8  _____

9  **MICHAEL E. VIGIL, Justice**

10 _____

11 **C. SHANNON BACON, Justice**

12 _____

13 **JULIE J. VARGAS, Justice**

14 _____

15 **BRIANA H. ZAMORA, Justice**