1

2

3                    UNITED STATES DISTRICT COURT

4                 NORTHERN DISTRICT OF CALIFORNIA

5

| | |
|---|---|
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION** | MDL No. 3047 |
| | Case No. 4:22-md-3047-YGR |
| This Document Relates to: | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS THE SCHOOL DISTRICT AND LOCAL GOVERNMENT ENTITIES' MASTER COMPLAINT** |
| School District and Local Government Entities' Master Complaint | |
| | Re: Dkt. No. 601 |

13          This order is the third in a series addressing the consolidated claims of hundreds of actions

14    brought on behalf of children and adolescents, school districts and local government entities, and

15    state attorneys general alleging that several social media companies designed their platforms to

16    foster compulsive use by minors, resulting in a variety of harms.

17          Before the Court is defendants' motion to dismiss plaintiffs' First Amended Master

18    Complaint (Local Government and School District) (Dkt. No. 729, "SD-FAC"), which currently

19    incorporates claims of negligence and public nuisance under the laws of nineteen states against the

20    social media defendants, namely Meta's Facebook and Instagram, Google's YouTube,

21    ByteDance's TikTok, and Snapchat.  For the reasons set forth in this Order, based on a careful

22    review of the pleadings and the briefing submitted by the parties as well as oral argument heard on

23    May 17, 2024, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motion to dismiss the

24    school district complaint.[1]  Here, the Court addresses only threshold questions applicable to

25    plaintiffs' negligence and public nuisance claims, and only the negligence claim on the substantive

26    _____

27          [1] For the reader's ease, and given the length of the order, a table of contents is included as
      Attachment A.  Further, as a shorthand, the Court uses the reference to "school district plaintiffs"
28    to refer collectively to both school districts and the local government entities.

United States District Court
Northern District of California

elements.[2]

Defendants principally contend the school district and local government entities' alleged injuries are too remote or attenuated for the law to redress, whether under theories of proximate cause, the "derivative injury" rule, or a negligence-based duty of care.

In most ways, the Court disagrees. Negligence, as a common-law cause of action, provides a flexible mechanism to redress evolving means for causing harm. School district plaintiffs' allegations sufficiently fall within the ambit—by and large—of the relevant states' negligence laws. That said, two dimensions of plaintiffs' theories of injury are not cognizable. *First*, as often the case with claims against social media companies, Section 230 and the First Amendment impose a fairly significant limitation on plaintiffs' theories of recovery. Thus, the Court herein limits plaintiffs' claims consistent with the its prior orders. *Second*, the Court finds that certain sets of plaintiffs' allegations involve the non-foreseeable intervening conduct of third parties that breaks the chain of legally attributable causation between the plaintiffs and defendants. Again, given the nature of the action, this order allows claims to proceed but limits the scope. The motion to dismiss is generally denied.

# I.     BACKGROUND

## A.     Procedural Background

On December 19, 2023, school districts filed a consolidated master complaint against Meta, Snap, TikTok, and YouTube, asserting negligence and public nuisance causes of action. On March 27, 2024, the school districts filed the latest version of their amended complaint.

As of today, school districts bring negligence and public nuisance claims under the laws of nineteen states: Alaska, Arizona, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, New Jersey, Nevada, North Carolina, Pennsylvania, Rhode Island, South Carolina, Utah, and Virginia.[3] The social media defendants move to dismiss all

---

[2] An order addressing plaintiffs' public nuisance clam on the merits will follow separately.

[3] At the time defendants filed their motion to dismiss, there were no school districts or local government entities in this multidistrict litigation ("MDL") from Arizona or Utah. However, the parties stipulated that further briefing is not necessary on Utah and Arizona law: "Both

United States District Court
Northern District of California

claims.  (Dkt. No. 601.)  The Court held argument on the motion on May 17, 2024.[4]

**B.     Relevant Facts Alleged**

As an overview, the school district complaint consists of an extensive 316-page set of general allegations, combined with others specific to each defendant.  The Court outlines the allegations most relevant to the instant motion.  To that end, plaintiffs' theory is three-fold:  First, defendants deliberately designed their social media platforms to foster compulsive use and addiction in minors, whose mental and physical health deteriorated.  Second, as a result, plaintiffs, who "are on the front lines of redressing the damage caused" by defendants' design choices, expended substantial financial resources to mitigate the mental health and consequent behavioral issues their students suffer as a result of social media addiction.  (SD-FAC ¶ 1.)  Third, social media companies target schools.

The SD-FAC provides as follows:

**1.     Platform Designs That Harm Youth Public Health**

With respect to the first theory, plaintiffs describe the impact of defendants' intentional design choices on youth mental health.  Scientific research, including defendants' own studies, directly connects defendants' platform design choices with compulsive use and its attendant behavioral problems—such as a minor's lessening of control, inability to cut down on platform usage, experiencing intense cravings, increased tolerance and corresponding increased need for

---

Arizona and Utah look to Section 821B and 821C of the Restatement (Second) of Torts." Accordingly, the briefing largely addresses the issues.  (Dkt. No. 847.)  Thus, those claims rise or fall with those of the other states for the purposes of this motion only.

[4] The parties have also filed various supplemental authority after briefing completed.  *See Alaska v. Express Scripts, Inc.*, No. 23-cv-00233, 2024 WL 2321210, at *1 (D. Alaska May 22, 2024); *Mayor and City Council of Baltimore v. BP P.L.C.*, No. 24-C-18-004219 (Md. Cir. Ct. July 10, 2024) (MDL Dkt. No. 1065-1); *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 744 (9th Cir. 2024) (no Section 230 prohibition on contract claims, but barring unjust enrichment, negligence, and UCL claims which would require content moderation); *Doe v. Uber Techs., Inc.*, No. 22-16562, 2024 WL 3717483, at *4 (9th Cir. Aug. 8, 2024) ("Plaintiff's arguments are based entirely on Uber's own affirmative conduct in creating or contributing to the risk of sexual assault at the hands of a third party in how it conducts its business."); *NetChoice, LLC v. Reyes*, No. 2:23-CV-00911-RJS-CMR, 2024 WL 4135626, at *8 (D. Utah Sept. 10, 2024) (First Amendment restrictions on speech).

3

United States District Court
Northern District of California

more platform time, development of withdrawal symptoms, neglecting responsibilities at home, work, or school due to intensity of usage, and foregoing important social or recreational activities. (SD-FAC ¶¶ 11, 137.)  Numerous studies, most of which are specific to certain of defendants' platforms, describe in detail the reported and assessed impacts of youth addiction to defendants' platforms as designed.  (*Id.* ¶¶ 139–82; *see also, e.g.*, *id.* ¶ 158 ("This study measured fMRI responses in 12-year-old adolescents who used Facebook, Instagram, and Snapchat over a three-year period and found that . . . those who engaged in high social media checking behavior 'showed lower neural sensitivity to social anticipation' than those who engaged in low to moderate checking behavior.").

Like the personal injury plaintiffs and state attorneys general ("State AGs"), the school district plaintiffs focus on specific design choices as to a number of platform features, in particular a set of "core" features which include, among others:

- failure to implement robust age verification processes to determine users' ages;
- failure to implement effective parental controls;
- failure to implement effective parental notifications;
- failure to implement opt-in restrictions to the length and frequency of use sessions;
- failure to enable default protective limits to the length and frequency of use sessions;
- creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;
- failure to label content that has been edited, such as by applying a filter;
- making filters available to users so they can, among other things, manipulate their appearance;
- failure to create adequate processes for users to report suspected CSAM to defendants' platforms;
- failing to put default protective limits to the length and frequency of sessions;
- failing to institute blocks to use during certain times of day (such as during school hours or late at night);
- not providing a beginning and end to a user's "Feed";
- publishing geolocating information for minors;
- recommending minor accounts to adult strangers;
- limiting content to short-form and ephemeral content, and allowing private content;
- timing and clustering of notifications of content in a way that promotes addiction; and
- use of algorithms to promote addictive engagement.

4

United States District Court
Northern District of California

(SD-FAC ¶¶ 103–09.)  In this way, the SD-FAC draws from and mirrors the personal injury plaintiffs' allegations.  These are similarly outlined in the Court's prior order regarding that complaint.  *See Social Media I*, 702 F. Supp. 3d at 818–24; *see also* Dkt. No. 1214, AG Order at 24–31.

### 2.   The School Districts' Response to a Youth Mental Health Crisis

With respect to the second prong of their theory, the school districts diverted resources to manage the impact of their students' compulsive use and accompanying mental health issues. (*See, e.g.*, SD-FAC ¶¶ 193–231.)  The students' overuse "results in significant disruption to schools' operations" and "greatly frustrates their ability to achieve their mandate of educating students in a safe and healthy environment."  (*Id.* ¶ 195.)  Some experts agree that school districts must take steps to intervene and reduce the harmful effects to schools of compulsive social media use.  (*See id.* ¶ 160.)  The various costs incurred and resources expended include:

(a)   Expending, diverting, and increasing resources and increasing staff time to confiscate cell phones and other devices;

(b)   Hiring additional counselors, staff, and personnel in response to increased mental health and behavioral issues caused by students' social media use;

(c)   Expending, diverting, and increasing resources to repair property damaged as a result of students' addiction to social media and compulsive participation in social media challenges that direct destruction or theft of school property;

(d)   Expending, diverting, and increasing resources to repair property damaged as a result of students acting out because of mental, social, and emotional problems Defendants' conduct caused;

(e)   Expending, diverting, and increasing time and resources, and increasing staff, to communicate and engage with parents and guardians of students regarding youth mental health, behavioral issues, and attendance problems;

(f)   Expending, diverting, and increasing resources to investigate and respond to threats made against schools and students over social media that are pushed by Defendants' platforms to drive user engagement;

(g)   Expending, diverting and increasing resources to add additional information technology resources in an attempt limit students' access to social media platforms and mitigate risks posed by students' social media use;

(h)   Investing in physical barriers (such as magnetic pouches) to keep students from accessing social media platforms on school property;

(i)      Developing new and revised teaching plans to address students' altered learning habits, e.g., reduced attention span, inability to communicate effectively;

(j)      Providing additional learning support to address students' declining achievement, e.g., after school support, as a result of the negative impact of problematic social media use on students' ability and capacity to learn;

(k)      Hiring additional mental health personnel (41% of public schools added staff to focus on student mental health);

(l)      Expending and diverting resources and increasing staff to address student discipline issues caused by Defendants' attracting and addicting students to their social media platforms;

(m)      Expending, diverting and increasing resources for modifications to mental health curricula;

(n)      Expending, diverting, and increasing resources to create education materials for youth, parents, and staff addressing social media addiction and harm;

(o)      Expending and diverting time and resources, and increasing staff, to route students and youth to counselors and mental health service providers;

(p)      Expending, diverting, and increasing resources to develop additional mental health resources (46% of public schools created or expanded mental health programs for students, 27% added student classes on social, emotional, and mental health and 25% offered guest speakers for students on mental health);

(q)      Training teachers to help students with their mental health and expending, and diverting time and resources to increase staff and train staff to identify students and youth exhibiting symptoms of mental health issues (56% of public schools offered professional development to teachers on helping students with mental health);

(r)      Expending, diverting, and increasing resources to update student handbooks and similar materials to address use of Defendants' platforms; and,

(s)      Expending, diverting, and increasing resources to update school policies to address use of Defendants' platforms.

(*Id.* ¶ 212; *see also id.* ¶ 247 (substantially similar set of injury alleged as to local government entity plaintiffs).)

Additionally, the overuse results in "[d]eclines in academic performance [which] can affect school district funding, governmental review metrics, and teacher reviews, in addition to taxing students' mental health." (*Id.* ¶ 210.) Several studies have described how excessive social media use is related to poorer academic performance. (*Id.* ¶ 160.) "Such poor academic performance is often linked to (1) distraction from multitasking on social media, thereby adversely affecting

learning, and (2) high enough usage to amount to addiction, which increases academic procrastination and reduces sleep time and quality, increasing academic stress." (*Id.* ("[E]ight out of ten Gen Z students say social media distracts from schoolwork, with 72% of students saying they frequently viewed their social media platform notifications while completing schoolwork or studying.").)

Moreover, defendants' social media presence in schools can threaten the safety of students, teachers, and school property. For instance, some addiction and compulsive participation in "social media challenges" "direct destruction or theft of school property," which require both investigation and a response. (*Id.* ¶ 212(c), (f); *see also id.* ¶ 248(g), (h) (presenting similar allegations as to local government plaintiffs); *see also* ¶¶ 6, 32, 109, 187, 212, 248, 787–88, 973, 990, 1000, 1023 (generalized allegations of property damage and vandalism); *see id.* ¶¶ 6, 107, 212, 248, 788, 973, 990, 998, 999, 1023 (allegations of expenditures related to crimes or threats stemming from social media use are similarly generalized)).)

Certain dangerous social media "challenges" can cause significant harm to students and school property. (*Id.* ¶ 183.) For example, the "devious licks" TikTok challenge involved youth "post[ing] videos of them vandalizing school bathrooms." (*Id.* ¶ 184.) The "Blackout Challenge" "encourages youth to make themselves faint by holding their breath and constricting their chest muscles." (*Id.* ¶ 185.) The "I Killed Myself" challenge involves participants faking their own deaths and recording family members' reactions. (*Id.*) "Russian Roulette" at one point became a viral challenge. (*Id.*)

Finally, some platform features specifically facilitate the creation and propagation of viral challenges. For one, defendants' algorithms amplify dangerous challenges. (*Id.* ¶ 190.) As an example, Meta employees identified that high amplification of posts using the word "challenge" was "super high risk" and prompted "#killchallenge" to go viral. (*Id.*) Additionally, TikTok and Snap have created filters or overlays that facilitate challenges. (*Id.* ¶¶ 191–92.) Finally, Snap "promotes viral challenges" through its "Spotlight" feature. (*Id.* ¶ 192.) Snap "gives cash prizes to challenge participants whose challenges receive the most views on Snap Spotlight." (*Id.*) Altogether, these dangerous challenges result in injury, death, and property destruction; are the

result of defendants' conduct and addictive platform designs; and altogether cause financial harm to the school districts.  (*Id.* ¶ 187.)[5]

### 3. Social Media Companies Target Schools

Finally, defendants have deliberately targeted school-aged children with knowledge of the impact their conduct could have on schools.  (*Id.* ¶ 214.)

**Facebook.**  Meta has acknowledged, in a presentation allegedly reviewed by Mark Zuckerberg, that "[h]igh school is the key driver of U.S. teen social activity and occupied 6+ hours per day."  (*Id.* ¶ 214 (alteration in original).)  For Facebook, Meta's "[r]esearch indicates that we have 'FB' and 'non-FB' high schools; tipping schools may be high impact" and "[i]n the United States, per-high school adoption is a crucial driver of teen Facebook engagement."  (*Id.* (alterations in original).)  "Meta conducted a school analysis and concluded that "'FB High Schools" (>75% adoption) have . . . 22% more TS [Time Spent] per MAP [Monthly Active Person] . . . compared to high schools with 5-30% FB adoption.'  As a result of this research, Meta set out to make a 'big 2017 bet' on 'high school communities' to attract 'teens.'"  (*Id.* (alterations in original).)

**Instagram.**  As to Instagram, Meta has noted that "[w]inning schools is the way to win with teens because an individual teen's engagement is highly correlated with school MAP [Monthly Active Person] penetration."  (*Id.* ¶ 215 (alterations in original).)  Instagram's "teen's team" discussed how to study teen penetration and engagement and "noted their capability to tell when teens 'open the app AT school' and geolocate 'which high school they go to.'"  (*Id.*)  Instagram has also partnered with the National PTA and Scholastic to "'integrate [their] parent's guide and IG programming into the 500 back to school nights' across the country," thus having the "ripple effect" of reaching out "to '20,000 classrooms across the U.S.' and to '250K+' teachers."

---

[5] Plaintiffs also cite, in a footnote, TikTok's policy regarding online challenges.  *Id.* ¶ 183 n.194 (citing *Online Challenges*, TikTok, https://www.tiktok.com/safety/en-us/online-challenges (last visited October 24, 2024).  There, TikTok writes that the majority of challenges "are fun and safe, but some promote harmful behaviors including the risk of serious injury.  Our Community Guidelines prohibit dangerous challenges."  *Id.*  The page offers a step-by-step approach for users to review the risks of a challenge and guidance on when and how to report challenges.  *Id.*

1    (*Id.* ¶ 216 (alteration in original) (footnote omitted).)  Internal documentation further indicates

2    that:

> [T]he goal of the parents plan was to get "parents to think, my kids
> are on social media, and my FAVORITE app for them to be on is
> Instagram, bar none. . . ." Instagram also tested new features by high
> school, noting that "getting critical mass in a high school very quickly
> (e.g. <u>in the same afternoon</u>) is extremely important," and one way to
> do this was "a (hacky) way to use push notifications from their IG
> [Instagram] account . . . .'" They explained "[w]e want to learn as
> much as we can from these High School tests about what levers we
> have for driving teen engagement."

8    (*Id.* (alterations and emphasis in original).)  In Meta's words, "Winning Teens = Winning High

9    Schools."  (*Id.* ¶ 217.)

10        **TikTok.**  As to TikTok, when the platform decides to age-verify youth users, it has used a

11   "school ID" tool which identifies the age, grade in school, and birth year of a user.  (*Id.* ¶ 218.)

12   TikTok has acknowledged (apparently in internal documentation) that its platform "is particularly

13   popular with younger users, who are seen as more vulnerable to online harms and the negative

14   impacts of compulsive use."  (*Id.* ¶ 219.)  Internal research noted that "users try to 'mitigate

15   TikTok's interference with their obligations and productivity,' including 'school.'"  (*Id.*)  The

16   same research also noted that "aspects of TikTok that contributed to participants' challenges with

17   managing their time includ[e] the continuous scroll, few or no breaks between content, short

18   videos, and not knowing what the next video will be.'"  (*Id.*)  Further:

> TikTok acknowledged that users believe its "platform is addictive,"
> and that "compulsive usage interferes with essential personal
> responsibilities" such as "sufficient sleep," "school responsibilities,"
> and "connecting with loved ones." TikTok admitted that it is
> interfering with the school day and student sleep, stating "we send
> notifications to users during the school day and in some cases, up until
> midnight which could interfere with sleep." Therefore, it stated "[w]e
> should therefore be prepared to implement product changes to address
> concerns in [the wellbeing] area if needed, including . . . [a]voiding
> sending users push notifications around bedtime and (for younger
> users) during the school day."
>
> TikTok also sought to directly enter schools, noting that "we have
> about 80 high schools across the country" that it would be sending its
> TikTok toolkit for "back to school nights," and that it was
> "coordinating with the Department of Education and they plan to send
> a PDF of the toolkit in their August newsletter, which is going out on

United States District Court
Northern District of California

Friday to nearly 30K subscribers." As with Meta, TikTok recognized the importance of controlling the narrative, noting in a different document that recent years had been "fraught with PR and GR [Government Relations] issues for ByteDance and TikTok," which "reduced advertiser trust, user loyalty, investor confidence, and [TikTok's] ability to consistently hire top talent." Combating these issues would "ensure the long term success of the ByteDance ecosystem and help further [the TikTok] brand."

(*Id.* ¶¶ 220–21 (alterations in original).)

**Snapchat.** According to a Forbes forum, Snapchat "'started catching on with high schoolers in LA as they could send digital notes back and forth during classes.' Snapchat 'grew very quickly in tight-knit communities at high schools and colleges, where students interact at a very high frequency and can (and did) tell each other to download Snapchat in between classes.' Once Snapchat knew it had appeal among school-aged children, Snapchat 'ran with it and never looked back.'" (*Id.* ¶ 222.)[6] Another news article provided an anecdote of the classroom impact of a new Snapchat feature release. (*Id.* ¶ 223.) As the article explained, one teacher noted that "'[i]n 16 years of teaching I can't think of anything that has ever disrupted my classroom more than today's Snapchat update.' The teacher explained that during class kids were so focused on updating their Snapchat, 'you would have thought it was crack. They seriously could not keep away from it. I even had one girl crawl under the table with her phone.'" (*Id.* (alteration in original).)[7] Snapchat also touted an "unparalleled student and parent audience," noting that 90% of students aged 13–24 in the United States and the United Kingdom are on Snapchat and promoted its "Back to School on Snapchat" and "Snap to School" advertisements. (*Id.* ¶ 224.)

**YouTube** has advertised itself for use in schools, creating YouTube.com/Teachers, which provides tips for how teachers can bring YouTube into the classroom. (*Id.* ¶ 226.) Some public reporting has indicated that students are "glued to the[ir] devices during class — posting on social

---

[6] Quoting Billy Gallagher, *How Snapchat Gained Success by Going Viral at High Schools Across Los Angeles*, FORBES (Feb. 16, 2018), https://www.forbes.com/sites/quora/2018/02/16/how-snapchat-gained-success-by-going-viral-at-high-schools-across-los-angeles.

[7] Quoting Caroline Moss, *High-School Teacher: In My 16 Years of Teaching, Nothing Has Disrupted My Classroom More Than Snapchat's New Update*, BUSINESS INSIDER (May 2, 2014), https://www.businessinsider.com/high-school-teacher-on-snapchat-update-2014-5.

United States District Court
Northern District of California

United States District Court
Northern District of California

media [and] searching YouTube," among other distractions.  (*Id.* ¶ 228 (alteration in original).)[8]  While not specific to school usage, when YouTube pitches to certain prospective partners, it claims it "is today's leader in reaching children age 6–11 against top TV channels," "was unanimously voted as the favorite website for kids 2-12," is "the #1 website regularly visited by kids," and that "93% of tweens visit YouTube to watch videos."  (*Id.* ¶ 227.)

\*     \*     \*

Finally, school districts have at times contacted a defendant to request assistance.  For example, "Meta reported internally that a middle school in Oakland asked Facebook to implement a 'hotline in which real people could help school officials (deans of discipline, administrators, teachers leaders' solve problems being caused by social media, but that it would '[p]robably not [be] cheap.'  Another Meta employee noted they had been 'having a lot of conversations lately with Principals at schools and school districts.'"  (*Id.* ¶ 211 (alterations in original).)  In some cases, "school districts across the country have been imposing bans on the cellphones used to access Defendants' platforms to attempt to 'to curb student obsession, learning disruption, disciplinary incidents and mental health worries.'"  (*Id.* ¶ 228.)[9]

## II.    LEGAL FRAMEWORK

In an MDL, the transferee court applies the law of its circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL.  *In re Anthem, Inc. Data Breach Litig.*, 2015 WL 5286992, at *2 (N.D. Cal. Sept. 9, 2015) (collecting Ninth Circuit cases).

The standard here is well-known and not in dispute.  To survive a motion to dismiss "after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134–35 (9th

---

[8] Quoting Donna St. George, *Students Can't Get Off Their Phones. Schools Have Had Enough.*, WASH. POST (May 9, 2023), https://www.washingtonpost.com/education/2023/05/09/school-cellphone-ban-yondr.

[9] Quoting St. George, *supra* n.8.

11

1   Cir. 2014) (cleaned up).  The district court must assume that the plaintiffs' allegations are true and

2   draw all reasonable inferences in their favor.  The court need not, however, construe as true

3   conclusory statements or unreasonable inferences.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049,

4   1055 (9th Cir. 2008).  These well-established standards apply with equal force in MDL

5   proceedings.  *Social Media I*, 702 F. Supp. 3d at 823–24.

6        Defendants' motion seeks to dismiss plaintiffs' claims of both negligence and public

7   nuisance.  In the interest of providing instructive orders for the parties expediently, the Court here

8   addresses the threshold issues applicable to both claims and the negligence claim on all issues.

9   The Court will address the balance of plaintiffs' public nuisance claim in a separate order.

10  **III.   THRESHOLD ISSUES FOR BOTH NEGLIGENCE AND PUBLIC NUISANCE**

11       Defendants move to dismiss the SD-FAC on four threshold grounds.  *First*, the claims are

12  barred by Section 230, and *second*, under the First Amendment.  Here, the arguments mirror those

13  previously made.  *Third*, the claims are barred by the so-called derivative injury rule as they are

14  entirely derivative of others' harms, indirect, and remote, and thus not cognizable.  *Fourth*, the

15  SD-FAC lacks facts supporting proximate causation.  The Court considers each argument in turn.

16       **A.     Section 230 and the First Amendment**

17       As noted, here the parties effectively repeat the Section 230 and First Amendment

18  arguments presented in the personal injury plaintiff context.  In summary, the causal predicate for

19  the alleged injuries here parallel those of the personal injury plaintiffs, namely the intentional

20  design, development, and deployment of platform features to foster compulsive use and cause

21  social media addiction and failures to warn thereof.

22       In its prior order, the Court determined that a conduct-specific, feature-by-feature

23  assessment of defendants' platforms was warranted under Ninth Circuit law for Section 230 and

24  First Amendment purposes.  *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab.*

25  *Litig.* ("*Social Media I*"), 702 F. Supp. 3d 809, 829 (N.D. Cal. 2023); *see also* Dkt. No. 1214, AG

26  Order at 25.  The school districts argue that their negligence and public nuisance claims warrant

27  distinct treatment and thus this Court should permit allegations with respect to *all* features to

28  survive.  The Court disagrees.  While negligence and public nuisance present different legal

United States District Court
Northern District of California

12

frameworks from the products liability (and, in the state attorney-general context, consumer-protection) claims previously considered, the school districts' foundational theory of causation targets the same conduct by defendants as discussed in prior orders.

Thus, the Court applies its conduct-specific assessment from its order on the personal injury plaintiffs' priority claims to the school districts' claims.  Because the arguments and allegations are the same in this respect, the Court does not repeat its analysis but incorporates it herein.[10]  With respect to allegations pertaining to the defendants' design, development, and deployment of certain features, the Court reapplies its past findings here as follows:

- **Allegations with Respect to Features *Not* Barred by Section 230 or the First Amendment:**

    - failure to implement robust age verification processes to determine users' ages;

    - failure to implement effective parental controls;

    - failure to implement effective parental notifications;

    - failure to implement opt-in restrictions to the length and frequency of use sessions;

    - failure to enable default protective limits to the length and frequency of use sessions;

    - creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;

---

[10] Specifically, defendants here move to dismiss as barred by Section 230 allegations related to:  recommendation algorithms and content delivery; allegedly deficient age verification, parental controls, and reporting processes; allowing users to share geolocation data; short-form and ephemeral content; private content; comments, likes, and reactions; recommendation of users' accounts to other users; lack of default time restrictions; endless content feeds and autoplay; and failures-to-warn. Dkt. No. 601 at 7–16.  Defendants further move to dismiss as barred by the First Amendment allegations related to: allegedly deficient age verification and parental controls; and rewards and notifications generated by defendants.  While some of the phrasing and framing may differ slightly from the Court's language in its prior order, reproduced here, the Court's prior order encompasses defendants' motion nonetheless.  Further, while defendants do not move to dismiss certain features (*e.g.*, making appearance-altering filters available to users), the Court reproduces the full scope of features previously discussed for clarity.

Finally, defendants also move to dismiss as barred by Section 230 allegations related to the intentional and harmful acts of third parties.  Whether and to what extent those allegations survive are discussed *infra* in the context of proximate cause.

United States District Court
Northern District of California

- • failure to label content that has been edited, such as by applying a filter;

- • making filters available to users so they can, among other things, manipulate their appearance; and

- • failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

- • **Allegations with Respect to Features *Barred* By Section 230:**

  - • Failing to put default protective limits to the length and frequency of sessions;

  - • Failing to institute blocks to use during certain times of day (such as during school hours or late at night);

  - • Not providing a beginning and end to a user's "Feed";

  - • Publishing geolocating information for minors;

  - • Recommending minor accounts to adult strangers;

  - • Limiting content to short-form and ephemeral content, and allowing private content;

  - • Timing and clustering of notifications of *third-party* content in a way that promotes addiction; and

  - • Use of algorithms to promote addictive engagement.

- • **Allegations with Respect to Features *Not* Barred by Section 230 but *Barred* by the First Amendment:**

  - • The timing and clustering of notifications of *defendants'* content to increase addictive use.

*Social Media I*, 702 F. Supp. 3d at 829, 836–37, 839.

Next, and consistent with the Court's order on the State AGs' claims, the Court declines at this stage to dismiss any theories of a failure-to-warn of known risks of addiction attendant to any platform features or as to platform construction in general. (*See* Dkt. No. 1214, AG Order at 36–37.)

Defendants also argue that Section 230 bars allegations relating to the intentional and harmful acts of third parties, in particular that third parties have used defendants' platforms to transmit threats and engage in sexual exploitation, including the dissemination of CSAM. The Court addresses in more detail below this and other forms of third-party conduct in the context of proximate cause and a duty to protect against third-party harms.

14

### B.      The Derivative Injury Rule

Defendants argue the school districts' claims are barred by the "derivative injury rule." Said differently, under the rule, claims derivative of third-party harms are not cognizable.  If applicable here, the school districts could not recover for indirect damages based upon the students' or residents' injuries.

#### 1.      Legal Framework

Defendants urge that courts impose a threshold "direct injury" requirement on claims, which would limit recovery to plaintiffs whose chain of causation leading to damages is not interrupted by the intervening acts of third parties from whom the plaintiffs' injuries derive. Defendants rely on cases involving proximate cause in either the federal RICO or antitrust context, and to a lesser degree, cases discussing Article III standing.

The Court addresses the arguments, but ultimately, these are fact-intensive questions which do not counsel dismissal at this early stage.

**General Principles.**  In *Holmes v. Sec. Inv. Prot. Corp.*, the Court established a three-factor policy assessment to determine whether a plaintiff had sufficiently alleged proximate cause for standing purposes under federal RICO and antitrust claims.  503 U.S. 258, 268–69 (1992). The test asks whether (1) "there are more direct victims of the alleged wrongful conduct who can be counted on to vindicate the law as private attorneys general;" (2) "it will be difficult to ascertain the amount of the plaintiff's damages attributable to defendant's wrongful conduct;" and (3) "the courts will have to adopt complicated rules apportioning damages to obviate the risk of multiple recoveries."  *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001) (quoting *Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999)).  This inquiry is sometimes referred to as a "remoteness" test.  *See, e.g.*, *Oregon Laborers-Emps. Health & Welfare Tr. Fund v. Philip Morris Inc.*, 185 F.3d 957, 963 (9th Cir. 1999).

Some courts have noted this more stringent proximate causation test under *Holmes* does not apply to state-law claims.  *See JUUL*, 497 F. Supp. 3d at 665 (distinguishing "the government entities' state law claims" from "the more stringent RICO proximate causation standard"); *City of*

United States District Court
Northern District of California

*Everett v. Purdue Pharma L.P.*, 2017 WL 4236062, at *6 (W.D. Wash. Sept. 25, 2017) (noting citations to cases like *Wash. Pub. Hosp. Dists.*, discussed *infra*, were "inapposite" as to state-law proximate cause analysis because "those cases applied a proximate cause standard from RICO law"); *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 538 (1st Cir. 2024) ("*Assuming* these considerations [the *Holmes* factors] apply outside of the RICO context, they would not require the dismissal of the complaint in this case." (emphasis supplied)).

Other courts have used this line of cases as instructive when assessing state-law claims. *See United Food & Com. Workers Unions, Emps. Health & Welfare Fund v. Philip Morris, Inc.*, 223 F.3d 1271, 1274 n.7 (11th Cir. 2000) (noting the similarity of the claims to those applying *Holmes* and that "the principles of proximate cause in federal RICO and antitrust cases are borrowed largely from the general common law of proximate cause"); *Laborers Loc. 17*, 191 F.3d at 243 ("[A]nalogous principles to those that doomed plaintiffs' RICO causes of action also bar plaintiffs' common law fraud and special duty actions."). The Third Circuit has simply applied the *Holmes* factors to state-law public nuisance and negligence claims. *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 425 (3d Cir. 2002) (applying *Holmes*'s "doctrine of remoteness"). Not surprisingly, each party focuses on the cases with their desired result.

Defendants focus on two sets of cases. In the first, health-care funds or providers were barred from recovery for expenses of medical treatment of third parties, specifically (i) *Laborers Loc. 17* and (ii) *Wash. Pub. Hosp. Districts*. In the former, plaintiff labor union health and welfare funds sued defendant tobacco companies for engaging in an advertising campaign designed to mislead the public about the health risks and addictive danger of smoking, under a RICO theory. *Laborers Loc. 17 Health & Benefit Fund v. Philip Morris, Inc.*, 191 F.3d 229, 232–33 (2d Cir. 1999). That campaign, plaintiffs contended, caused plaintiffs to spend "tens of millions of dollars" on medical services for plan participants suffering from smoking-related diseases. *Id.* at 233. The Second Circuit held that plaintiffs' damages were too attenuated under the *Holmes* policy factors. Among other reasons, the court found that because it could not determine which losses would be attributable to the plaintiff funds' own mismanagement versus smoking-related

problems, it would be an exercise in "sheer" "speculation." *Id.* at 240.[11]

In *Ass'n of Washington Pub. Hosp. Districts v. Philip Morris Inc.*, an association of public hospital districts (and its members) alleged federal antitrust, RICO, and state-law claims against tobacco companies and organizations.  There, the hospital districts alleged the tobacco companies misrepresented and concealed the addictive nature of nicotine and associated health risks and conspired to suppress competition to develop less harmful nicotine products.  241 F.3d 696, 700 (9th Cir. 2001).  The hospital districts sought "to recover their unreimbursed costs for treating patients suffering from tobacco-related illness."[12]  *Id.*

The Ninth Circuit held that these costs were derivative under *Holmes* and noted that "[a]ll other Courts of Appeals that have addressed the issue have agreed that union trust funds lack standing to bring antitrust and RICO claims against the tobacco industry to recover their increased expenditures for treating tobacco-related illnesses."  *Id.* at 702 (citing, among others, *Laborers Loc. 17*).  Applying the *Holmes* factors, the court explained that (i) "[s]mokers are the 'more direct victims' who can vindicate the public interest," (ii) the damage calculation would require "speculation" regarding how individual use would change without the alleged offending conduct, and (iii) duplicative recovery was possible because individual smokers could bring state-law claims to recover for personal injuries.  *Id.*

By contrast, in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, where government entities sued a nicotine product manufacturer for "injuries as a result of a public health crisis in their school districts and communities," the court distinguished *Wash. Pub. Hosp. Districts*.  497 F. Supp. 3d 552, 664 (N.D. Cal. 2020); *see also id.* at 650 n.78.  There, the court held that "[t]he government entities allege . . . injuries in the form of operational costs that were directly borne by them, not passed on by any intermediate party."  *Id.* at 665.

---

[11] The court noted, however, that there was no risk of multiple recovery because New York law prohibits the insured for recovering medical expenses paid for by the insurer.  *Id.* at 240–41.

[12] As political subdivisions of the state of Washington, the hospital districts "are required by state and federal law to provide health care services to the general public regardless of their patients' ability to pay."  *Wash. Pub. Hosp. Districts*, 241 F.3d at 700.

The second set of cases arise where municipalities seek recovery for increased expenses (police administration, hospital services, etc.) relating to third-party illegal firearms use: *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 425 (3d Cir. 2002), and *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 537 (1st Cir. 2024), which reached opposite conclusions as to the derivativeness of the alleged harm.  States also, on the surface, seem to have taken different approaches on this issue.  *Compare Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 121 (Conn. 2001), *with City of Boston v. Smith & Wesson Corp.*, 2000 WL 1473568, at *5–6 (Mass. Super. Ct. 2000).  While these cases reached different results, a nuanced read reveals key factual variations guiding each court's disposition.

In *City of Philadelphia*, the city and five civic organizations sued fourteen gun manufacturers under state-law claims of public nuisance, negligence, and negligent entrustment. 277 F.3d at 419.  Plaintiffs' injuries included "the costs associated with preventing and responding to incidents of handgun violence and crime," including criminal justice administration, police and emergency medical services, and educational programs.  *Id.*  Assessing proximate cause,[13] the Third Circuit explained that "plaintiffs seek reimbursement for expenses that arise only because of the use of firearms to injure or threaten City residents." *Id.* at 425.  Plaintiffs injuries were too remote reasoning, (i) that plaintiffs assert damages different from those suffered by gun violence victims "makes them no less derivative"; (ii) those "directly injured by gun violence—such as gunshot wound victims—are more appropriate plaintiffs than the City or the organizational plaintiffs whose injuries are more indirect"; and (iii) the gun manufacturers had no legal duty to protect citizens from the deliberate and unlawful use of their products.  *Id.*[14]

---

[13] As noted earlier, the Third Circuit applied what it called the "doctrine of remoteness," citing *Holmes* and *Laborers Loc. 17*, both of which involved proximate cause under RICO.  *See City of Philadelphia*, 277 F.3d at 423.  The court did not specifically distinguish *Holmes*'s typical RICO and antitrust context from its at-issue state-law claims.

[14] *See also Ganim v. Smith & Wesson Corp.*, 780 A.2d 98, 121 (Conn. 2001) (plaintiff municipal entity and mayor lacked standing where alleging harms of, *inter alia*, "increased expenses for police services, including courts, prisons and related services, emergency services, pension benefits, health care and social services," because injuries resulting from "handguns [that] . . . end up in the hands of unauthorized and unintended users who then misuse them in

By contrast, in *Estados Unidos Mexicanos*, the government of Mexico sued seven U.S. gun manufacturers and one gun distributor on the theory that "defendants know that their guns are trafficked into Mexico and make deliberate design, marketing, and distribution choices to retain and grow that illegal market and the substantial profits that it produces," causing significant harm within Mexico. 91 F.4th 511, 515–16 (1st Cir. 2024), *cert. granted*, No. 23-1141 (Oct. 4, 2024). Assessing proximate cause under the Protection of Lawful Commerce in Arms Act's predicate exception, the First Circuit explicitly drew a line between cases like *City of Philadelphia*, and cases like *City of Boston* (as well as citing *JUUL* in support), which applied *Holmes*'s derivative-injury rule to opposite results, finding "the reasoning of the latter cases persuasive." *Id.* at 536. The court explained these latter cases "have recognized that selling guns into an *illegal market* may cause direct harm to a governmental entity that is not derivative of harm to its residents." *Id.* (emphasis supplied). While the court held that claims of lower economic efficiency of Mexico's citizens were derivative, "if Mexico can prove that it had to proactively spend more funds to bolster its healthcare facilities, social services, and judicial system in response to the cartels' accumulation of defendants' guns, these expenses might also not be merely derivative of the injuries suffered by individual victims." *Id.* at 537.[15]

### 2.    Analysis

The school districts allege injuries that include, but are not limited to, diverting and

_____

Bridgeport" were too remote from defendant gun manufacturers' conduct).

[15] Defendants also point to some Article III standing cases, which are less persuasive.  In *Arias v. Dyncorp*, the court held that provincial plaintiffs' environmental claims (*e.g.*, harms relating to decreased agricultural production), were derivative of the claims of the individual plaintiffs' because the provincial plaintiffs did not hold possessory interest over the harmed land. 738 F. Supp. 2d 46, 52 (D.D.C. 2010), *aff'd*, 752 F.3d 1011 (D.C. Cir. 2014).  This case differs; there, plaintiffs appeared to assert claims for injury to land that was not their own.  In *Coyne v. Am. Tobacco Co.*, the court found no distinct injury in fact where two locally elected Ohio public officials asserted injury by way of an increased "tax burden" resulting from "injury to . . . individual smokers and the State of Ohio." 183 F.3d 488, 491, 495 (6th Cir. 1999).  Cases like these (including, also, *Smoke-Spirits* and *Blue Cross* which were discussed in *JUUL*), highlight the sometimes ambiguous and pliable nature of the term "derivative."  Plaintiffs' injuries were "derivative" in that they were duplicative—*i.e.*, they sought recovery for harm done solely to a third party but reshaped with creative pleading.

United States District Court
Northern District of California

increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage.  (SD-FAC ¶ 212.)  These injuries borne by the school districts are related to, but unique from, the alleged injuries of their minor students.  For example, the school districts allege they have had to hire mental health personnel and develop further mental health resources to mitigate the negative in-school consequences of their students' addiction to and compulsive use of defendants' platforms.  In this Court's view, the school districts' alleged injuries are "distinct" from harms allegedly suffered by students in their respective school districts (including any personal injury plaintiff residing in a suing district).  The Court notes several distinctions between the authorities described above and the instant injuries presented by the school districts' claims.

As to the suits against gun manufacturers, these cases are distinguishable under *Holmes*.  Cases like *City of Philadelphia* rely on policy principles to limit, if not prohibit, a manufacturer's liability for certain criminal use of its products, even if foreseeable—a circumstance largely not present in the allegations against the school districts.  *See City of Philadelphia*, 277 F.3d at 425 (gun manufacturers had no legal duty to protect citizens from unlawful use of their weapons); *Ganim*, 780 A.2d 98, 120 (determining whether harms are too remote is "part of the judicial task, based on policy considerations, of setting some reasonable limits on the legal consequences of wrongful conduct").  A careful read of the First Circuit's opinion in *Estados Unidos Mexicanos* highlights this nuance.  Where *City of Philadelphia* sought to limit a manufacturer's liability for the *illegal* use of its *legally* distributed product, *Estados Unidos Mexicanos* recognizes this policy consideration is absent where the manufacturer is alleged to deliberately exacerbate the harmful (there, criminal) use and distribution of its products.  In so recognizing, the First Circuit found the alleged injuries were not derivative of the harms visited upon individual victims to the extent the municipalities suffered distinct injury—*e.g.*, increased expenditures for healthcare resources and social services.

The character and cause of the alleged injuries in *Estados Unidos Mexicanos* parallel the

case here.  The social media defendants are alleged to have deliberately fostered compulsive use in minor users, which would foreseeably cause the kind of damage mitigation expenditure incurred by the school districts.  Such foreseeability is discussed in more detail in the next section of this order, as it forms a cornerstone of the traditional proximate-causation analysis.

As to the suits involving derivative medical treatment, both *Wash. Pub. Hosp. Districts* and *Laborers Loc. 17* differ from the suits against gun manufacturers at least insofar as they do not involve the illegal conduct of third parties.  Yet, as evidenced by *JUUL*, these medical treatment cases are distinguishable.  Importantly, none of the school district's claims are "pass-through" costs, a sensible distinction raised in *JUUL*, and one which preoccupied both the *Wash. Pub. Hosp. Districts* and *Laborers Loc. 17* courts.  The alleged injuries here are distinct and borne exclusively by the school districts.  Defendants notably do not argue that minor students bear the cost of increased expenditures for healthcare resources at their schools.  That the school districts suffer a corollary impact does not render their injuries "derivative."

The *Holmes* factors have not been uniformly applied by the courts and, in some cases, have been found inapplicable to state-law claims.  Here, even if applied, they would not dispose of the school districts' claims.  *First*, while personal injury plaintiffs are in some respects "more direct victims" to vindicate the law, their claims cannot vindicate the school districts alleged, and unique, injuries.  *Second*, because they are unique, the Court can envision a measure of damages that do not overlap with prospective or current individual plaintiffs.  Further, that myriad other factors might also play a role is hardly uncommon in litigation.  Consideration of such factors at this stage is premature.  *Third*, as noted, currently, the risk of multiple recovery is minor, or not readily apparent, given the school districts appear to seek recovery of unique damages.  On balance at this preliminary stage, the *Holmes* factors do not urge dismissal of the school districts' claims, even if applicable.

## C.     Proximate Causation

### 1.     Legal Framework

In general, the factfinder resolves issues of proximate cause.  *See, e.g.*, *JUUL*, 497 F. Supp. 3d at 665.  However, where the existence of proximate cause turns not on a question of fact but on

1    whether the facts alleged are capable of establishing proximate cause, the issue is a matter of law

2    resolvable on a motion to dismiss.  *See, e.g.*, *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d

3    1099, 1127–28 (Ill. 2004); *Fraser v. Mint Mobile, LLC*, 2022 WL 1240864, at *2 (N.D. Cal. Apr.

4    27, 2022).

5            Fundamentally, proximate causation serves as "a policy consideration" to limit "a

6    defendant's liability to foreseeable consequences that have a reasonably close connection with

7    both the defendant's conduct and the harm which that conduct created."  *Goodrich & Pennington*

8    *Mortg. Fund, Inc. v. J.R. Woolard, Inc.*, 120 Nev. 777, 784 (Nev. 2004).  As this Court has

9    previously written, typically, "whether proximate cause exists hinges on whether the harm alleged

10   is a foreseeable result of the at-issue conduct."  *Social Media I*, 702 F. Supp. 3d at 861 (citing

11   Restatement of Torts (Third) § 29).

12           Many home-state jurisdictions agree, finding foreseeability as the touchstone for proximate

13   cause.  *See, e.g.*, *Boulders at Escalante LLC v. Otten Johnson Robinson Neff & Ragonetti PC*, 412

14   P.3d 751, 762 (Col. Ct. App. 2015) ("Foreseeability is the touchstone . . . . ").  Other states

15   characterize the inquiry as one of the "remoteness" of the defendants' conduct.  *See, e.g.*, *Howarth*

16   *v. State, Pub. Def. Agency*, 925 P.2d 1330, 1333 (Alaska 1996) (defendant's conduct "in no sense

17   became exhausted or remote"); *Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 958

18   (Cal. 2003) (claim prevented where harm is "remotely connected to a defendant's wrongful

19   conduct"); *Matthews v. Williford*, 318 So. 2d 480, 481 (Fla. Dist. Ct. App. 1975) ("[A] remote

20   condition or conduct which furnishes only the occasion for someone else's supervening

21   negligence is not a proximate cause . . . .").  Often, both characterizations, "foreseeability" and

22   "remoteness," result in the same inquiry into proximate cause.  *See, e.g.*, *Goodrich & Pennington*,

23   120 Nev. at 784 (proximate cause limits liability to "*foreseeable* consequences that have a

24   reasonably *close connection*" with defendants' conduct (emphases supplied)).

25           Similarly, the impact of intervening third-party conduct is folded into the "foreseeability"

26   or "remoteness" inquiry.  *See, e.g. Johnson v. Avis Rent A Car Sys., LLC*, 858 S.E.2d 23, 30 (Ga.

27   2021) (quoting *Goldstein, Garber & Salama, LLC v. J.B.*, 797 S.E.2d 87, 89 (Ga. 2017)) (even

28   where an "intervening and independent wrongful act of a third person producing the injury" will

United States District Court
Northern District of California

22

be treated as the proximate cause of a plaintiff's injury, if that injury "could reasonably have been anticipated, apprehended, or foreseen by the original wrong-doer, the causal connection is not broken, and the original wrong-doer is responsible for all of the consequences resulting from the intervening act."); *see also Meadows v. Diverse Power, Inc.*, 675 S.E.2d 571, 573 (Ga. Ct. App. 2009) ("An intervening act will break the causal connection between an initial act of negligence and an injury if the defendant, in ordinary prudence, could not have foreseen that some injury would result from its negligence.").

Thus, "regardless of the correct label for the analysis, the dispute here primarily focuses on whether the government entities' injuries are too attenuated or remote from the alleged conduct to plausibly plead proximate cause for their negligence and public nuisance claims." *JUUL*, 497 F. Supp. 3d at 664.[16]

### 2.    Analysis

Defendants' argument that the complaint does not allege proximate cause focuses on two cases.  First, defendants discuss *City of Chicago v. Beretta U.S.A. Corp.*, 821 N.E.2d 1099 (Ill. 2004).  There, the City of Chicago sued defendants, arguing they sought to exploit the illegal firearms market within the city.  *Id.* at 1135.  Defendant gun dealers argued that their sale of firearms "merely furnishes a condition by which the criminal acts of others are made possible" and so is "too remote to constitute legal cause of a nuisance."  *Id.* at 1132.  The Illinois Supreme Court agreed, concluding that defendants' lawful commercial activity, followed by the harmful criminal activity of intervening third parties, may not be considered a proximate cause of the City's harm. *Id.* at 1136.

---

[16] Defendants make much ado about whether foreseeability alone suffices to establish proximate cause.  They point to federal authority holding that "[i]n the context of the [Fair Housing Act], foreseeability alone does not ensure the close connection that proximate cause requires."  *Bank of Am. Corp. v. City of Miami, Fla.*, 581 U.S. 189, 202 (2017).  Rather, plaintiffs must show their alleged harms are not "too remote" from defendants' conduct.  *Id.* at 202.  Given the Court's assessment below as well as its reasoning under the "derivative injury" rule, which focuses on conduct too remote or attenuated from the plaintiff's injury, the Court need not determine on a state-by-state basis whether remoteness is independently dispositive of the school districts' claims.

United States District Court
Northern District of California

1    Second, defendants turn to *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023), a suit brought

2   under the Antiterrorism Act ("ATA").  Plaintiffs alleged that social media defendants aided ISIS

3   because (i) ISIS had a presence on defendants' platforms and (ii) "defendants' recommendation

4   algorithms matched ISIS-related content to users most likely to be interested in that content."  *Id.*

5   at 498.  The facts of *Taamneh* are extreme.  The Supreme Court wrote that the "mere creation of

6   those platforms" does not create liabililty, even though bad actors might be able to use the

7   platforms for illegal and terrible ends.  *Id.* at 499.  The Supreme Court analogized to "internet or

8   cell service providers" and found that defendants' recommendation algorithms did not go "beyond

9   passive aid" under the ATA.  *Id.*

10    By contrast, the plaintiff school districts' claims are multifaceted and the theories differ

11   than those previously litigated.  They do not all rest on the mere knowledge or notice that bad

12   actors are causing harm.  First, with respect to the expenditure of resources to manage youth

13   mental health and addiction issues, the school districts' alleged injuries are both a sufficiently

14   direct (see discussion *supra* as to the "derivative injury" rule) and a foreseeable consequence of

15   the defendants' deliberate design of their platforms to foster compulsive use in minors.  In this

16   way, a "reasonably close connection," *Goodrich*, 120 Nev. at 784, exists between the school

17   districts' injuries and defendants' conduct because the defendants developed an addictive product

18   "with features that appeal to youth and then directly target[ed] youth with its marketing," "causing

19   a public health crisis in their school districts and communities," with the consequence that the

20   "government entities suffered direct harm in combatting the crisis through multiple forms of costs

21   and damages," *JUUL*, 497 F. Supp. 3d at 664.  The Court has described the detailed allegations

22   above. That this conduct would foreseeably injure the school districts is plausibly alleged.

23    This foreseeability is bolstered by allegations of defendants' own knowledge.  (*See, e.g.*,

24   SD-FAC ¶ 214 (quoting internal Meta presentation that "[h]igh school is the key driver of U.S.

25   teen social activity and occupied 6+ hours per day"); *id.* ¶ 1020(a) (Meta characterizes high

26   schools as either "Facebook" or "non-Facebook" and analyzes Instagram penetration based on

27   which school a user attends); *id.* ¶ 1020(b) (alleging that TikTok internal documents reflect

28   knowledge of daytime school disruption).)  To dive further into proximate causation under the

United States District Court
Northern District of California

24

plaintiffs' theory of injury would require the Court to second-guess the facts alleged. These alleged harms can proceed.

Second, and by contrast, alleged injury stemming from non-foreseeable third-party conduct cannot be attributable to defendants. Consistent with the above recitation of proximate causation principles, defendants' general knowledge that bad actors may propagate harmful challenges, transmit threats, or engage in crime on their platforms does not, on its own, suffice to establish proximate cause.[17] However, where the actor is a defendant, not a third party, this ruling would not extend. The Court notes two illustrative examples. *One*, plaintiffs allege that TikTok and Snap create filters or overlays that facilitate challenges. (SD-FAC ¶¶ 191–92.)[18] On the one hand, many of TikTok's and Snap's filters may facilitate entirely innocuous challenges and thus may not be the proximate cause of any harm; on the other, some filters may foreseeably facilitate dangerous challenges. This is a question of fact, which depends largely on the foreseeable uses of filters developed by TikTok or Snap. Plaintiffs' allegations, while perhaps deliberately generalized, are plausible and so survive defendants' motion to dismiss to the extent that any filters created by defendants generated specific dangerous challenges.

*Two*, plaintiffs allege that, as described earlier, Snap "promotes viral challenges" through its "Spotlight" feature. (SD-FAC ¶ 192.) To the extent "promotion" of a challenge refers to the mere publication of a third-party content on Snap, any such allegations would be barred by Section 230. Yet, to the extent "promotion" refers to conduct like providing cash prizes to challenge participants, such promotion could constitute encouragement that steps outside the bounds of Section 230. Whether and to what extent Snap or any other defendant promoted some specific dangerous challenges is a question of fact not resolved here.

---

[17] To be clear, this holding does not impact allegations relating to inadequate protocols around reporting CSAM and adult predator accounts, consistent with the Court's prior order. *See Social Media I*, 702 F. Supp. 3d at 830, 836, 853. Rather, this finding parallels the Court's prior order that personal injury plaintiffs' allegations failed to show misfeasance relating to similar allegations. *See id.* at 858.

[18] As noted, such filters are *not* barred by Section 230. *See Social Media I*, 702 F. Supp. 3d at 830.

25

1                                    *        *        *

2          To summarize, the plaintiff school districts' allegations are limited by Section 230 and the

3   First Amendment to the same extent as described in the Court's prior order on the personal injury

4   plaintiffs' claims.  As to the "derivative injury" rule, the school districts' alleged injuries (*i.e.*,

5   resource expenditures) are borne exclusively by them, and as such are not derivative of any

6   student's or personal injury plaintiff's injuries (*e.g.*, medical expenses).

7          Further, plaintiffs' *core* theory of injury suffices to establish proximate cause at the

8   pleading stage: as alleged, defendants' conduct deliberately fostered compulsive use of their

9   platforms which foreseeably caused the plaintiff school districts to respond by expending

10  resources to mitigate the impact of such use in their schools.  This core theory of injury focuses on

11  the impact of compulsive use *itself*, irrespective of third-party content, defendants' protected

12  publishing activity and defendants' protected first-party speech.  As to any alleged injuries to the

13  school districts stemming from dangerous challenges, threats, and crimes disseminated or

14  perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations

15  fail proximate causation for a lack of particularized allegations.  However, such allegations are not

16  barred to the extent defendants promoted, developed, or participated in a foreseeably dangerous

17  challenge, *beyond* the algorithmic publication, curation, or amplification of that third-party

18  challenge.

19  **IV.    NEGLIGENCE**

20         To state a claim of negligence, plaintiffs must adequately allege (i) duty, (ii) breach of

21  duty, (iii) causation, and (iv) damages.  *See, e.g.*, *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo.

22  1992).  The Court has already assessed proximate causation with respect to both the public

23  nuisance and negligence claims.  Here, defendants move for failure to allege a cognizable legal

24  duty and urge the claims are barred by the economic loss doctrine in the majority of relevant

25  states.[19]

26

27         ───────────────
           [19] Much of defendants' brief focuses on injuries caused by third-party conduct as with

28  dangerous social media challenges, crimes, or threats on defendants' platforms.  *See Social Media
    I*, 702 F. Supp. 3d at 855 (discussing scope of duty to prevent third-party harm).  Because those

United States District Court
Northern District of California

## A.     Duty and Compulsive Use

The at-issue states evaluate duty in various but similar ways.[20]  Some states assess a set of factors that include, with a measure of variation: (1) the foreseeability of harm to the plaintiff, (2) the degree of certainty that the plaintiff suffered injury, (3) the closeness of the connection between the defendant's conduct and the injury suffered, (4) the policy of preventing future harm, and (5) the extent of the burden to the defendant and the consequences to the community of imposing a legal duty to exercise care.  *See Gushlaw v. Milner*, 42 A.3d 1245, 1256–57 (R.I. 2012); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (also considering "the moral blame attached to the defendant's conduct" and "the availability, cost, and prevalence of insurance for the risk involved"); *see also Goodwin v. Yeakle's Sports Bar & Grill, Inc.*, 62 N.E.3d 384, 387 (Ind. 2016) (determining the existence of a duty requires courts to "employ a three-part balancing test: (1) the relationship between the parties; (2) the foreseeability of harm; and (3) public policy concerns").[21]  "[N]o single factor controls."  *Casebolt*, 829 P.2d at 356.

Other jurisdictions frame the duty analysis in terms of the foreseeable consequences and reasonableness of defendants' alleged risk-creating conduct.  *See Est. of Mullis by Dixon v. Monroe Oil Co.*, 505 S.E.2d 131, 137 (N.C. 1998) ("Risk-creation behavior thus triggers duty where the risk is both unreasonable and foreseeable."); *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 810 (Va. 2018) (The "risk reasonably to be perceived defines the duty to be

---

allegations have been excluded as a matter of proximate cause as discussed, the Court does not reevaluate those allegations as a matter of duty under negligence.  Instead, the Court's evaluation of legal duty focuses exclusively on the allegations that focus on defendants' own conduct—fostering compulsive use—and the corresponding foreseeability of injury to school districts.

[20] As noted earlier, those seventeen states are Alaska, California, Colorado, Florida, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Nevada, New Jersey, North Carolina, Pennsylvania, Rhode Island, South Carolina, and Virginia.  Further, the parties have further stipulated that claims under Utah and Arizona law rise and fall with the laws of these states.

[21] *See also Com. Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d 133, 137 (Pa. 2006) (discussing a substantially similar set of factors); *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992) (same); *Happel v. Wal-Mart Stores, Inc.*, 766 N.E.2d 1118, 1124 (Ill. 2002) (same); *Kennedy Krieger Inst., Inc. v. Partlow*, 191 A.3d 425, 440 (Md. 2018) (same); *Coleman v. Martinez*, 254 A.3d 632, 645 (N.J. 2021) (same).

United States District Court
Northern District of California

obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." (quoting *Palsgraf v. Long Island R. Co.*, 162 N.E. 99, 100 (N.Y. 1928))).[22]  For instance, in Florida, "[t]he duty element of negligence focuses on whether the defendant's conduct *foreseeably created a broader 'zone of risk'* that poses a general threat of harm to others."  *Grieco v. Daiho Sangyo, Inc.*, 344 So. 3d 11, 23 (Fla. Dist. Ct. App. 2022) (citation omitted) (emphasis supplied).  The court must evaluate "whether it was *objectively reasonable to expect* the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility."  *Id.* (emphasis supplied).[23]

While each state articulates its own framework, three fundamental considerations emerge: (1) the relationship between the parties, in particular, the relationship between the defendant's conduct and the plaintiff's injury; (2) the foreseeability of the plaintiff's injury; and (3) public policy concerns.[24]  In this framework, the Court considers each.

   ***Relationship between the Parties***.  No formal relationship is required between the parties.

---

[22] In Kentucky, determining duty is a "policy decision," *Shelton v. Kentucky Easter Seals Soc., Inc.*, 413 S.W.3d 901, 908 (Ky. 2013), for which the most important factor is foreseeability, *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003), and which involves consideration of the reasonableness and utility of the risk created, *see id.* at 91 (citing Restatement (Second) of Torts §§ 291, 292).

In *Hill v. Lundin & Assocs., Inc.*, 256 So. 2d 620 (La. 1972), Louisiana adopted a "duty-risk" analysis akin to the approach in *Palsgraf v. Long Island R. Co.*, 162 N.E. 99 (N.Y. 1928) for ordinary negligence cases.  12 La. Civ. L. Treatise, Tort Law § 4:2 (2d ed.).

[23] While the parties provide occasional citations to the laws of Alaska, Georgia, Nevada, and South Carolina, neither party presents the complete framework for a duty analysis under those states.  *See, e.g.*, *Purvis v. Aveanna Healthcare, LLC*, 563 F. Supp. 3d 1360, 1366 (N.D. Ga. 2021) (under Georgia law, plaintiff must establish that the defendant owes a "duty of care").  Plaintiffs focus on foreseeability as the touchstone, and defendants emphasize foreseeability is not dispositive and focus on public policy factors.  The Court engages with all considerations provided in the parties' citations and thus considers its discussion comprehensive of the parties' positions as to the applicable standards for evaluating duty in all at-issue states.

[24] Some states consider the relationship between the parties one aspect of the foreseeability factor, rather than an independent consideration.  *See, e.g.*, *Social Media Cases*, No. 22STCV21355, 2023 WL 6847378, at *24 (Cal. Super. Ct. Oct. 13, 2023) ("The trilogy of foreseeability factors are foreseeability, certainty, and the connection between the plaintiff and the defendant.").

United States District Court
Northern District of California

"The only 'relationship' which must exist [for a duty to arise] is a sufficient juxtaposition of the parties in time and space *to place the plaintiff in danger from the defendant's acts*." *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 811 (Va. 2018) (alteration and emphasis in original) (quoting *RGR, LLC v. Settle*, 764 S.E.2d 8, 19 (Va. 2014)).  The Court has already determined that the school districts' injuries are sufficiently "direct" in the context of the "derivative injury" rule, and that analysis applies here.

*Foreseeability*.  A defendants' conduct must foreseeably produce "the *specific danger* causing the plaintiff's injury."  *Grieco*, 344 So. 3d at 23 (emphasis added); *see also, e.g.*, *Hurn v. Greenway*, 293 P.3d 480, 487 (Alaska 2013) ("It is not enough that Greenway could foresee Jeffrey's anger; the question is whether Greenway could foresee his indiscriminate armed attack.").  As noted above, some states look to "whether it was *objectively reasonable to expect* the specific danger causing the plaintiff's injury, not simply whether it was within the realm of any conceivable possibility."  *Grieco*, 344 So. 3d at 23.

The parties primarily discuss two cases in which courts found that a product manufacturer's conduct foreseeably caused injury to school districts and local government entities.  First, plaintiffs rely on *JUUL*, which involved a manufacturer's ("JLI's") design, marketing, and targeting of the JUUL e-cigarette device to youth:

> The school districts allege that JLI created a product that had features to intentionally appeal to young users (*e.g.*, flavors and easily disguisable), marketed it directly to youth using social media, young attractive models, websites and networks frequented by teens, and even marketed it directly in school through deceptive "education programs" that taught students how to use JUUL and told them it was safe.  This alleged conduct hooked millions of teenagers onto vaping with an addictive product that is easily concealed in schools, and foreseeably caused a multitude of problems for the school districts, including, but not limited to, the need to devote substantial staff time to addressing the crisis, financial costs from new equipment to detect e-cigarette use, and handling hazardous waste on school grounds.

497 F. Supp. 3d at 655 (citations omitted).

Similarly, *In re Nat'l Prescription Opiate Litig. – West Boca Medical Center* involved allegations that the defendant opioid manufacturers' activities manufacturing, distributing, and dispensing of prescription opioid products foreseeably injured plaintiff West Boca Medical

Center, Inc. ("West Boca").  452 F. Supp. 3d 745, 786 (N.D. Ohio 2020).  West Boca alleged:

> its injuries were within the "foreseeable zone of risk" created by Defendants' manufacturing, distributing, and dispensing activities, because: (a) if not conducted with a requisite level of care, these activities could (and, in fact, did) foreseeably allow opioids to be diverted in large quantities into West Boca's service area; (b) this diversion could (and, in fact, did) foreseeably lead to widespread injury to people's health, creating a public health crisis; and (c) hospitals are necessarily and foreseeably on the "front lines" of any and all health crises. . . . [N]ot only could the Defendants have reasonably foreseen that hospitals would bear the responsibility for treating individuals with opioid addiction, but the Defendants may have even counted on it . . . "defendants knew that but for West Boca's providing at least some aspect of a safety net, the number of overdose deaths and other related health consequences arising from opioid addictions would have even been far greater than actually occurred."

*Id.*  The court held that because defendants' "activities regarding these potentially dangerous and highly addictive opioid drugs create a 'general threat of harm to others,' . . . it is therefore appropriate, under Florida law, to recognize a legal duty" to ensure the threatening conduct is carried out reasonably.  *Id.* (quoting *Sewell v. Racetrac Petroleum, Inc.*, 245 So. 3d 822, 825 (Fla. Dist. Ct. App. 2017)).

Here, defendants challenge whether the school district plaintiffs have sufficiently alleged that their injuries were a foreseeable result of the youth mental health crisis caused by defendants' intentional design choices.  The Court finds plaintiffs have.[25]  *First*, plaintiffs describe the foreseeable *and known* impact of defendants' intentional design choices on youth mental health.  *Second*, plaintiffs then allege this youth mental health crisis foreseeably caused harm to school districts, supported by particularized allegations of defendants' awareness of the consequences to school districts of their students' compulsive media use.  (*See, e.g.*, SD-FAC ¶ 216 ("Instagram

---

[25] Defendants' characterization of plaintiffs' theory of foreseeable injury as a five-part "Rube Goldberg" sequence (Dkt. No. 601 at 53) does not persuade for reasons repeatedly discussed.  Plaintiff school districts' injuries are one step removed from defendants' alleged conduct, not four: as alleged, the social media platforms' intentional design choices *caused* a youth mental health crisis, which *caused* schools to expend resources to mitigate its harmful effects.  It is fairly simple to describe any causal chain as composed of innumerable intermediate steps; it is more challenging to identify the legally significant moments of impact along that chain, as is required of courts in assessing questions of proximate cause or duty.

United States District Court
Northern District of California

also tested new features by high school, noting that 'getting critical mass in a high school very quickly (e.g. <u>in the same afternoon</u>) is extremely important . . . .'" (emphasis in original)); *id.* ¶ 220 ("TikTok admitted that it is interfering with the school day and student sleep, stating 'we send notifications to users during the school day and in some cases, up until midnight which could interfere with sleep.'").)  These allegations are described in more detail above.  (*See supra* Section I.B.3.)

While perhaps not as foreseeable at their inception, as these platforms became sophisticated in their targeting and capture of minor users as to instill compulsive use of the platforms, plaintiffs plausibly allege that it was "objectively reasonable to expect" the alleged corollary injuries.  *Grieco*, 344 So. 3d at 23.  Plausibility is bolstered, again, by defendants' alleged actual knowledge (SD-FAC ¶¶ 214–31) and is consistent with the analogous situations in *JUUL* and *West Boca*.  Defendants provide no closely comparable caselaw on foreseeability to persuade otherwise.

While "[f]oreseeability is the most important" factor, "foreseeability alone is insufficient to establish a duty if the burden of taking care or the effect on society is too harsh."  *Hurn v. Greenway*, 293 P.3d 480, 487 (Alaska 2013); *see also, e.g.*, *O'Neil v. Crane Co.*, 266 P.3d 987, 1006 (Cal. 2012) ("[F]oreseeability is not synonymous with duty; nor is it a substitute." (citation omitted)); *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324, 325 (S.C. 1986) ("Foreseeability itself does not give rise to a duty."); *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1249 (Pa. 2012) ("[F]oreseeability . . . is not alone determinative of the duty question."); *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1083 (Md. 1986) ("The fact that a result may be foreseeable does not itself impose a duty in negligence terms.").  Rather, public policy considerations must support imposing a duty. The Court turns there next.

**Public Policy Factors**.  "In each of the relevant jurisdictions, public policy factors govern whether a defendant owes a duty of care."[26]  *JUUL*, 497 F. Supp. 3d at 655.  Defendants contend

---

[26] In some jurisdictions, foreseeability comprises part of the public policy factors.  *See, e.g.*, *JUUL*, 497 F. Supp. 3d at 655; *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968).

United States District Court
Northern District of California

that two public policy considerations counsel against the imposition of a duty in this case: a duty here would (i) lead to a dramatic expansion of liability and "throw open the courthouse doors" to a limitless pool of potential plaintiffs, and (ii) curtail defendants' and their users' freedom of speech.

*First*, a "duty of care will not be [imposed] . . . where the social utility of the activity concerned is so great, and avoidance of the injuries so burdensome to society, as to outweigh the compensatory and cost-internalization values of negligence liability." *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 946 (Cal. 2023) (alteration in original) (quoting *Merrill v. Navegar, Inc.*, 28 P.3d 116, 140 (Cal. 2001) (Werdegar, J., dissenting)). Courts have rejected proposed duties to foreseeable plaintiffs that would "deluge" courts with lawsuits which are both "hard to prove and difficult to cull early in the proceedings" thus leading to a "dramatic expansion of liability." *Id.* at 950; *see also Est. of Madden v. Sw. Airlines, Co.*, No. 21-cv-00672, 2021 WL 2580119, at *6 (D. Md. June 23, 2021) ("Maryland courts have historically been exceedingly concerned about 'opening the floodgates' to expansive new classes of third-party plaintiffs.").

Defendants urge that the duty would potentially expose them to tenuous claims from unbounded categories of plaintiffs. The doomsday view is a dramatic overstatement. The claims are no more expansive than defendants' own intentional and targeted actions to specific schools, especially given the narrowing of the claims which have excluded those claims based on third-party conduct.

Defendants' cited cases do not counsel otherwise, perhaps because at the time the motion was filed the third-party injuries were still at issue. Indeed, the proposed duties in those cases could capture theoretically limitless classes of plaintiffs.[27] Here, defendants' concrete and

---

[27] *See Kuciemba*, 531 P.3d at 948 (declining to impose "a duty to the household members of employees" to protect against COVID-19 infections); *John Rocchio Corp. v. Pare Eng'g Corp.*, 201 A.3d 316, 323 (R.I. 2019) (considering it "absurd" to impose a duty as to a "third party [who] is unidentifiable and unforeseeable at the time of the alleged negligence"); *In re Certified Question from Fourteenth Dist. Ct. of Appeals of Texas*, 740 N.W.2d 206, 220 (Mich. 2007) ("Just as recognizing a cause of action based solely on [asbestos] exposure would create a potentially limitless pool of plaintiffs, so too would imposing a duty on a landowner to anybody who comes into contact with somebody who has been on the landowner's property."); *Est. of Madden v. Sw. Airlines, Co.*, 2021 WL 2580119, at *7 (D. Md. June 23, 2021) ("[T]he class of foreseeable third-party plaintiffs suggested by Plaintiffs," encompassing airline employees' family members

United States District Court
Northern District of California

United States District Court
Northern District of California

particularized awareness of potential and actual harms to these plaintiffs appropriately tailors the scope of duty.

*Second*, defendants argue that their platforms provide a medium for protected First Amendment expression which would be chilled by the imposition of the school districts' proposed duty.  In support, defendants rely primarily on *Zamora* and *Olivia N.*  The Court disagrees with defendants' expansive reading of those cases.

In *Zamora v. Columbia Broad. Sys.*, the minor plaintiff, along with his parents, alleged that three broadcasting companies caused him to become "involuntarily addicted to and 'completely subliminally intoxicated' by the extensive viewing of television violence . . . ."  480 F. Supp. 199, 200 (S.D. Fla. 1979).  As a result, the minor plaintiff "developed a sociopathic personality, became desensitized to violent behavior[,] became a danger to himself and others," and in fact shot and killed his 83-year-old neighbor as a result.  *Id.*  Plaintiffs argued that the defendant broadcasting companies breached their duty "generally to avoid making 'violent' shows available for voluntary consumption . . . ."  *Id.* at 201; *see also id.* at 206 ("suggest[ing] that the liability sought . . . would place broadcasters in jeopardy for televising Hamlet, Julius Caesar, Grimm's Fairy Tales").  The court considered the theory "impractical and unrealistic," noting the possible "staggering adverse effect on the commercial world and our economic system," and potential for "liability in an indeterminate amount for an indeterminate time to an indeterminate class."  *Id.* at 202 (quoting *Yuhas v. Mudge*, 322 A.2d 824, 825 (N.J. Super. Ct. App. Div. 1974)).

Similarly, in *Olivia N. v. Nat'l Broad. Co.*, the plaintiff sued NBC for negligence after a group of minors, allegedly influenced by and seeking to copy a violent scene from a film

---

exposed to COVID-19, "offers few clear limiting principles."); *Ruiz v. ConAgra Foods Packaged Foods LLC*, 606 F. Supp. 3d 881, 889 (E.D. Wis. 2022) (potential plaintiffs "could also have been a neighbor, a houseguest, or someone . . . who caught the virus from someone who caught it from" plaintiffs' spouse).  Defendants also cite *Abad v. G4S Secure Sols. (USA), Inc.*, 293 So. 3d 26 (Fla. Dist. Ct. App. 2020) (declining to impose a duty on security services provider for an employee's commission of mass murder due to "severe public policy implications" despite knowledge of the employee's expressions of desire to commit mass murder), which entails markedly different policy considerations involving criminal activities of third parties, rather than how to place reasonable limits on liability for the ripple effects of a defendant's conduct.

broadcast on the network, attacked the plaintiff. 178 Cal. Rptr. 888, 890–91 (Cal. Ct. App. 1981). The court dismissed the action, finding the broadcast constitutionally protected under the First Amendment and noting that "television networks would become significantly more inhibited in the selection of controversial materials if liability were to be imposed on a simple negligence theory." *Id.* at 494–95; *see also id.* at 494–95 ("[T]he effect of the imposition of liability could reduce the U. S. adult population to viewing only what is fit for children.").[28]

Defendants urge that imposing liability under plaintiffs' theory of negligence would chill both defendants' and the public's ability to use social media platforms to exercise their own First Amendment rights. Not so. The Court has already limited plaintiffs' claims to the extent the complaint seeks to impose liability for platform features and defendants' conduct protected by the First Amendment, discussed *supra*. The remainder of defendants' conduct is not so tied. Defendants fail to explain how a remedy for plaintiffs' "core" theory of injury—that defendants' caused minors to compulsively use their platforms, to the foreseeable detriment of both those minors and the school districts—would chill protected First Amendment expression. Plaintiffs' negligence core theory of injury seeks to impose liability only on defendants' non-expressive and intentional design choices to foster compulsive use in their minor users and a failure to warn thereof, not on what is said on defendants' social media platforms. *Zamora* and *Olivia N.* are not to the contrary.

---

[28] Defendants additionally cite a series of cases for the same general proposition where the alleged liability arose from publishing protected speech. There, the First Amendment bars relief. *See DeFilippo v. Nat'l Broad. Co.*, No. 79-3678, 1980 WL 336092, at *3 (R.I. Super. June 8, 1980) ("To rule otherwise would create a chilling effect on the first amendment rights of others, in that broadcasters might, out of fear of litigation, undertake sweeping self-censorship."); *Bill v. Superior Court*, 187 Cal. Rptr. 625, 631 (Cal. Ct. App. 1982) (the "activity in producing a motion picture and arranging for its distribution, is socially unobjectionable—and, in light of First Amendment considerations, must be deemed so even if it had the tendency to attract violence-prone individuals to the vicinity of theaters at which it was exhibited."); *Delfino v. Agilent Technologies, Inc.*, 52 Cal. Rptr.3d 376, 398 (2006) ("[A] finding of duty here might have a significant chilling effect upon Internet free speech and might encourage extreme employer oversight of employee activities.").

United States District Court
Northern District of California

United States District Court
Northern District of California

**B.      Economic Loss Doctrine as a Bar**

The parties' briefing on this topic is relatively brief, essentially providing little more than case citations.  In short, states that subscribe to the economic loss doctrine (or rule) bar damages in tort for purely economic loss.  Exceptions exist and the parties dispute whether those exceptions apply.[29]  The Court considers the laws of thirteen states, namely Alaska, California, Georgia, Illinois, Indiana, Kentucky, Louisiana, Maryland, Nevada, New Jersey, Pennsylvania, Rhode Island, and Virginia.

For the most part, plaintiffs' allegations fall within at least one exception to the economic loss doctrine, with the exception of Illinois and Maryland.  For those states, more analysis was required to determine whether the economic loss doctrine should apply in the first place, as the school district plaintiffs' alleged injuries do not appear to fall within the scope of "economic loss" as contemplated by the doctrine.  Nor do the alleged injuries implicate the considerations the doctrine aims to resolve—notably, requiring contracting parties to resort exclusively to their contractual remedies for a product purchaser's disappointed economic expectations.  *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 3, cmt. a (2020) (describing the "majority" conception of the economic loss rule as "limited to parties who have contracts").

The Court holds as follows:

**Alaska** applies the economic loss doctrine even without privity of contract.  *Anchorage v. Integrated Concepts & Rsch. Corp.*, 2015 WL 926219, at *4 (D. Alaska Mar. 4, 2015).  An exception exists where "the defendant knew or had reason to know [plaintiff] was likely to be economically damaged by its conduct."  *Id.*  Because the Court has determined plaintiffs are foreseeably harmed by defendants' conduct, the Court will not apply the economic loss doctrine to the Alaska plaintiffs' negligence claims.

**California's** Supreme Court has identified two "recurring set[s] of circumstances" in which the economic loss rule applies: (i) where liability would be in "an indeterminate amount for

---

[29]  Other than Colorado, Florida, North Carolina, and South Carolina where the parties agree the rule does not apply.  See Dkt. No. 601 at 57–58 n.54.

35

an indeterminate time to an indeterminate class" and (ii) "in deference to a contract between litigating parties." *Sheen v. Wells Fargo Bank, N.A.*, 505 P.3d 625, 632 (Cal. 2022) (quoting *S. California Gas Leak Cases*, 441 P.3d 881, 896 (Cal. 2019)).  As to the latter, tort damages are not barred when "the duty that gives rise to tort liability is either completely independent of the contract or arises from conduct which is both intentional and intended to harm." *Id.* (quoting *Erlich v. Menezes*, 981 P.2d 978, 983 (Cal. 1999)).  Here, neither circumstance is argued or appears to apply.  The doctrine will not be applied to California plaintiffs' negligence claims.

**Georgia** applies the rule "regardless of contractual privity" except for (i) "actions where the defendant breaches a duty imposed by law or arising from a special relationship," (ii) damages claims for harm to "person or property," (iii) a "misrepresentation exception," and (iv) an "accident exception."  *Murray v. ILG Techs., LLC*, 378 F. Supp. 3d 1227, 1243–44 (S.D. Ga. 2019), *aff'd*, 798 F. App'x 486 (11th Cir. 2020); *see also Johnson v. 3M*, 563 F. Supp. 3d 1253, 1304 (N.D. Ga. 2021) (re "duty imposed by law or arising from a special relationship" (citing Ga. Code Ann. § 51-1-11)), *aff'd*, 55 F.4th 1304 (11th Cir. 2022); *Holloman v. D.R. Horton, Inc.*, 524 S.E.2d 790, 796 (Ga. Ct. App. 1999) (misrepresentation exception); *Home Depot U.S.A., Inc. v. Wabash Nat. Corp.*, 724 S.E.2d 53, 59–60 (2012) (accident exception).  As to the first exception, the court in *Johnson* refused to apply the doctrine where the "independent duties of care" for the negligence claims arose under state and federal environmental laws.  *Johnson*, 563 F. Supp. 3d at 1310–11.  For purposes of Georgia's economic loss doctrine, these independent duties of care need not arise from statute and may arise under common-law tort theories.  *See Unger v. Bryant Equip. Sales & Servs., Inc.*, 335 S.E.2d 109, 111 (Ga. 1985) (economic loss doctrine was no bar to negligence claims); Ga. Code Ann. § 51-1-11 ("Except as otherwise provided in this Code section, no privity is necessary to support a tort action; but, if the tort results from the violation of a duty which is itself the consequence of a contract, the right of action is confined to the parties and those in privity to that contract, except in cases where the party would have a right of action for the injury done independently of the contract . . . .").  Here, because the school districts allege an independent duty of care under Georgia law, the exception applies and the doctrine does not bar the claims.

United States District Court
Northern District of California

1    **Illinois's** Supreme Court found "there can be no recovery in tort solely for economic

2    losses." *Moorman Mfg. Co. v. Nat'l Tank Co.*, 435 N.E.2d 443 (Ill. 1982); *Anderson Elec. v.*

3    *Ledbetter Erection Corp.*, 503 N.E.2d 246, 247 (Ill. 1986).  "[C]ontract law, which protects

4    expectation interests, provides the proper standard when a qualitative defect is involved, i.e., when

5    a product is unfit for its intended use." *Moorman*, 435 N.E.2d at 448.  Further, a plaintiff with

6    such a claim "cannot recover in tort, regardless of the plaintiff's inability to recover under an

7    action in contract." *Anderson Elec. v. Ledbetter Erection Corp.*, 503 N.E.2d 246, 249 (Ill. 1986)

8    ("disappointed commercial expectations" do not warrant an exception).

9    The Supreme Court of Illinois has articulated three exceptions, namely where plaintiff's

10   damages are caused (i) from a tortious event, *i.e.*, a sudden or dangerous occurrence, resulting in

11   personal injury or property damage; (ii) by defendant's intentional, false representation, *i.e.*, fraud;

12   or (iii) a negligent misrepresentation by a defendant in the business of supplying information for

13   the guidance of others in their business transactions.  *Fireman's Fund Ins. Co. v. SEC Donohue,*

14   *Inc.*, 679 N.E.2d 1197, 1199 (Ill. 1997) (citations omitted) (citing *Moorman Mfg. Co. v. Nat'l*

15   *Tank Co.*, 435 N.E.2d 443 (Ill. 1982)).

16   Plaintiffs contend the personal injury or property damage exception should apply.

17   However, the Court has dismissed plaintiffs' claims of property damage.

18   Nonetheless, while not raised by the parties, the Court is not convinced that plaintiff school

19   districts allege "economic losses" as contemplated in Illinois.  Illinois courts define economic loss

20   as "'damages for inadequate value, costs of repair and replacement of the defective product, or

21   consequent loss of profits-without any claim of personal injury or damage to other property . . .' as

22   well as 'the diminution in the value of the product" due to inferior quality.  *Moorman Mfg. Co. v.*

23   *Nat'l Tank Co.*, 435 N.E.2d 443, 449 (Ill. 1982) (citations omitted).[30]  Here, the alleged damages,

24   _____

25   [30] The Third Restatement, defines "economic loss" in broad terms as "pecuniary damage
     not arising from injury to the plaintiffs' person or from physical harm to the plaintiff's property."

26   Restatement (Third) of Torts: Liab. for Econ. Harm § 2 (2020).  However, the next section of the
     Third Restatement advances what it calls the "majority" economic loss rule which is limited to

27   "negligence in the performance or negotiation of a contract between the parties."  *Id.* § 3.  The
     definition of economic loss in Illinois (and Maryland, discussed *infra*) appears at least consistent

28   with that majority rule, although not explicit.  *See Redarowicz v. Ohlendorf*, 441 N.E.2d 324, 327

37

*i.e.*, resource expenditures to mitigate the consequences of mental health harms, do not stem from a "loss of profits" or "an unexpectedly defective product." *see Moorman*, 435 N.E.2d at 449.

Defendants' reliance on *In re Boeing 737 MAX Pilots Litig.*, 638 F. Supp. 3d at 860 does not persuade otherwise. There, the issue centered on the "defeated expectations of a commercial bargain." *See Anderson*, 503 N.E.2d at 249. Plaintiff pilots alleged that, had they known of the defective design of Boeing's 737 MAX planes, they "never would have made the [financial] investment to become MAX certified." 638 F. Supp. 3d 838, 849 (N.D. Ill. 2022). When the aircraft was grounded, many were terminated, and had "to spend significant personal time, effort, and finances, to receive a rating on different aircraft." *Id.* The court found that "the pilots suffered purely economic losses" barred under the doctrine. *Id.* at 860. Here, a direct contractual and business relationship between the parties is not alleged. Without more, the Court declines to apply the economic loss doctrine to Illinois plaintiffs' claims at this stage.

**Indiana**'s doctrine is rooted in the understanding that because parties typically allocate the risk of economic loss through a direct, contractual relationship, "the economic loss rule prevents a party from recovering in tort for commercial losses that it could have protected itself against through the contractual relationship." *Residences at Ivy Quad Unit Owners Ass'n, Inc. v. Ivy Quad Dev., LLC*, 179 N.E.3d 977, 983 (Ind. 2022) (quoting *Indianapolis-Marion Cnty. Pub. Libr. v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 729 (Ind. 2010)). As such, Indiana's economic loss doctrine does not apply in the absence of privity. *See id.*; *see also U.S. Bank, N.A. v. Integrity Land Title Corp.*, 929 N.E.2d 742, 745 (Ind. 2010) (claims based on negligent misrepresentation not barred). Here, privity is not alleged. The dispute is not contractual in nature. The doctrine does not bar the Indiana plaintiffs' negligence claims.

---

(Ill. 1982) ("To recover in negligence there must be a showing of harm above and beyond *disappointed expectations*." (emphasis supplied)); *In re Chicago Flood Litig.*, 680 N.E.2d 265, 274 (Ill. 1997) ("This court described economic loss as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits—without any claim of personal injury or damage to other property . . . .'" (emphasis omitted)); *see also All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 866 (7th Cir. 1999) (applying Wisconsin law) ("The function of the economic-loss doctrine" is to "confin[e] contract parties to their contractual remedies . . . .").

United States District Court
Northern District of California

**Kentucky's** Supreme Court maintains the rule based (1) upon "the historical distinction between tort and contract law;" (2) to protect the "parties' freedom to allocate economic risk by contract;" and (3) to encourage "the party best situated to assess the risk of economic loss, usually the purchaser, to assume, allocate, or insure against that risk." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 739 (Ky. 2011) (quoting *Mt. Lebanon Pers. Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002). The rule does not impact "traditional product liability theories" (*id.* at 738) but focuses on cases where parties were connected by contract. *See Superior Steel, Inc. v. Ascent at Roebling's Bridge, L.L.C.*, 540 S.W.3d 770, 792 (Ky. 2017) (applying the economic loss rule when developer brought claims of both negligent performance of contract and breach of contract that were "difficult to differentiate" and "the claim terminology itself suggests that the negligence is in the performance of contractual duties"); *Nami Res. Co., L.L.C. v. Asher Land & Min., Ltd.*, 554 S.W.3d 323, 335–36 (Ky. 2018) (applying the economic loss rule where fraud claim for underpayment of royalties was "indistinguishable" from breach of contract claim).[31] Here, because the plaintiffs do not allege they were in privity with the defendants, the economic loss doctrine does not bar the Kentucky plaintiffs' negligence claims.

**Louisiana.** While federal district courts have reached differing conclusions as to whether and in what way Louisiana might recognize the economic loss rule outside of the maritime context where the landscape is firmly established and obviously inapplicable,[32] the Fifth Circuit's decision

---

[31] Defendants' reliance on *Giddings* is misplaced. There, the parties had been in a contractual relationship. *Giddings*, 348 S.W.3d at 734. The court viewed the negligent misrepresentation claim as "essentially an attempt to make an end-run around the negotiated warranty in the parties' contract," therefore warranting application of the economic loss rule. *Id.* at 744. Application of the economic loss rule does not turn on the name of the claim, but the facts of the relationship between the parties.

[32] "Both the Louisiana Supreme Court and the federal Fifth Circuit have adopted the *Robins Dry Dock* rule in the context of an unintentional *maritime* tort." *TS & C Invs., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370, 374–75 (W.D. La. 2009). District courts have differed as to its application outside the maritime context. *Compare In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 680 F. Supp. 2d 780, 796 (E.D. La. 2010) ("Louisiana does not recognize the [economic loss rule ("ELR")], nor does it recognize a doctrine sufficiently similar to enable the Court to conduct an ELR analysis for Plaintiffs' tort claims under Louisiana law."), *with TS & C Invs., L.L.C. v. Beusa Energy, Inc.*, 637 F. Supp. 2d 370 (W.D. La. 2009) (conducting an *Erie* analysis, describing the Louisiana Supreme Court's endorsement of the economic loss rule in the

in *Wiltz v. Bayer CropScience, Ltd. Partnership*, suggests that Louisiana's economic loss rule can be applied outside of the maritime context. 645 F.3d 690 (5th Cir. 2011) (holding economic loss rule applied to claims under the Louisiana Products Liability Act for economic losses due to crawfish crop decline resulting from pesticide).

However, "Louisiana does not recognize the [economic loss rule] as adopted in other states." *In re Chinese Manufactured Drywall Prod. Liab. Litig.*, 680 F. Supp. 2d at 796. Instead, Louisiana follows the rule of *Robins Dry Dock*, "which, broadly stated, operates to deny a plaintiff recovery for economic loss resulting from physical damage to property in which he has no proprietary interest." *Louisiana Crawfish Producers Ass'n-W. v. Amerada Hess Corp.*, 935 So. 2d 380, 382 (La. Ct. App. 2006) (citing *Robins Dry Dock & Repair Co. v. Flint*, 275 U.S. 303 (1927)); *see also TS & C Invs., L.L.C.*, 637 F. Supp. 2d at 380 (holding the economic loss rule barred claim for economic damages stemming from interstate closure because "plaintiffs do not have a proprietary interest in the property that was affected by the interstate's shutdown"); *Wiltz*, 645 F.3d at 700 ("Even assuming the plaintiffs had some inchoate 'proprietary interest' in the farmers' crawfish (as the plaintiffs contend), the plaintiffs still did not have an actual, enforceable right to buy those crawfish.").

As noted above, briefing was cursory. Defendants have not sustained their burden to show how Louisiana's economic loss rule could apply to plaintiffs' allegations. Plaintiffs do not seek recovery for "economic loss" resulting from physical property damage in which they lack a proprietary interest.[33] As limited, plaintiffs' claims seek pecuniary recuperation for their own resource expenditures. The Court will not apply the doctrine at this juncture to the Louisiana plaintiffs' claims.

**Maryland** applies the doctrine "when the parties are not in privity with one another or the

---

maritime context under *Robins Dry Dock*, and concluding the rule could apply in non-maritime context).

[33] Nor is it apparent plaintiffs ever sought such recovery. To illustrate, plaintiffs' alleged injuries to physical property—now dismissed—sought recovery for physical damage to their own property, not economic loss resulting from that damaged property's declined usability.

1    alleged negligent conduct did not result in physical injury or risk of severe physical injury or

2    death." *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 155 A.3d 445, 452

3    (Md. 2017).  In general, "[e]conomic losses include such things as the loss of value or use of the

4    product itself, the cost to repair or replace the product, or the lost profits resulting from the loss of

5    use of the product." *Pulte Home Corp. v. Parex, Inc.*, 923 A.2d 971, 1002 (Md. Ct. Spec. App.

6    2007), *aff'd*, 942 A.2d 722 (Md. 2008) (alteration in original) (quoting *A.J. Decoster Co.*, 634

7    A.2d at 1332); *Nat'l Lab. Coll., Inc. v. Hillier Grp. Architecture New Jersey, Inc.*, 739 F. Supp. 2d

8    821, 832 (D. Md. 2010) (same quoting William L. Prosser, The Law of Torts §§ 101, at 665 (4th

9    ed. 1971))); *see also* 18 M.L.E. Products Liability § 31 (discussing economic loss under Maryland

10   law).  Maryland courts do not apply the economic loss rule in cases involving allegations of

11   property damages as opposed to purely "economic loss."  *See A.J. Decoster Co. v. Westinghouse*

12   *Elec. Corp.*, 634 A.2d 1330, 1333–34 (Md. 1994) (plaintiff sought recovery for the loss of its

13   chickens, which the court viewed as being for the replacement of property, and therefore not

14   purely economic in nature).

15          Again, briefing was limited but it appears that absent privity or its equivalent, Maryland

16   requires an "intimate nexus" between the parties for cases where there were "no safety concerns

17   and the risk was purely economic." *Id*. at 453.[34]  However, "where the risk created is one of

18   personal injury, no such direct relationship need be shown, and the principal determinant of duty

19   becomes foreseeability." *Jacques v. First Nat. Bank of Maryland*, 515 A.2d 756, 759–60 (Md.

20   1986).

21   _____

22          [34] The "intimate nexus" test "requires the relationship between the parties to be sufficiently
     close—or intimate—to support finding a tort duty" such that "the defendant could be held liable to

23   the plaintiff for pecuniary losses." *Balfour*, 155 A.3d at 452.  Here, the "linking conduct" is
     present when the facts alleged "show the defendant knew or should have known of the plaintiff's

24   reliance." *Id.* at 457; *see also Chicago Title Ins. Co. v. Allfirst Bank*, 905 A.2d 366, 383 (Md.
     2006) (finding a privity-equivalent intimate nexus between a title company, the drawer of a check,

25   and a depositary bank when the depositary bank "knew, or should have known" that the check was
     not supposed to be applied to a customer's personal account).  The rationale limits the

26   "defendant's risk exposure to an actually foreseeable extent,' allowing a defendant to control the
     risk to which he or she is exposed." *Chicago Title Ins. Co.*, 905 A.2d at 380 (quoting *Walpert,*

27   *Smullian & Blumenthal, P.A. v. Katz*, 762 A.2d 582, 596 (Md. 2000)).

28

United States District Court
Northern District of California

1    Plaintiffs do not argue there is an "intimate nexus" between the parties but point instead to

2    their allegations of that "property damage," which would render Maryland's economic loss rule

3    inapplicable.  Because the Court has dismissed those allegations, that exception to the economic

4    loss rule no longer applies.

5    As with the discussion of Illinois law, while not raised by the parties, the Court is not

6    convinced that plaintiff school districts allege "economic losses" as contemplated in Maryland.

7    Plaintiff school districts' alleged injuries do not constitute the loss of value or loss of use of

8    defendants' platforms, the cost to repair or replace use of the platforms, or any lost profits

9    resulting from loss of use of the platforms.  *See A.J. Decoster Co.*, 634 A.2d at 1332; *Pulte Home*

10   *Corp.*, 923 A.2d at 1002; *Nat'l Lab. Coll., Inc.*, 739 F. Supp. 2d at 832.  Not all financial or

11   pecuniary injury appears to constitute "economic loss."  As such, the Court declines to apply the

12   economic loss doctrine to Maryland plaintiffs' claims at this stage.

13   **Nevada.**  In Nevada, the economic loss doctrine provides that "'absent privity of contract

14   or personal injury or property damage,' a plaintiff may not recover in negligence or strict tort

15   liability for purely economic losses."  *Calloway v. City of Reno*, 993 P.2d 1259, 1273 (Nev. 2000)

16   (quoting *Loc. Joint Exec. Bd. of Las Vegas, Culinary Workers Union, Loc. No. 226 v. Stern*, 651

17   P.2d 637, 638 (Nev. 1982)).  "The primary purpose of the rule is to shield a defendant from

18   unlimited liability for all of the economic consequences of a negligent act, particularly in a

19   commercial or professional setting, and thus to keep the risk of liability reasonably calculable."

20   *Loc. Joint Exec. Bd. of Las Vegas*, 651 P.2d at 638.  However, it "does not bar recovery in tort

21   where the defendant had a duty imposed by law rather than by contract and where the defendant's

22   intentional breach of that duty caused purely monetary harm to the plaintiff."  *Mitman v. LA 1,*

23   *LLC*, 539 P.3d 1177 (Nev. 2023) (quoting *Giles v. Gen. Motors Acceptance Corp.*, 494 F.3d 865,

24   879 (9th Cir. 2007)).  As elaborated earlier, because the defendants' duty is imposed by law rather

25   than contract, the economic loss doctrine does not bar the Nevada plaintiffs' claims.

26   **New Jersey's** doctrine "'prohibits plaintiffs from recovering in tort economic losses to

27   which their entitlement only flows *from a contract*.'"  *Bracco Diagnostics Inc. v. Bergen*

28   *Brunswig Drug Co.*, 226 F. Supp. 2d 557, 562 (D.N.J. 2002) (emphasis supplied) (quoting

United States District Court
Northern District of California

42

*Duquesne Light Co. v. Westinghouse Elec. Corp.*, 66 F.3d 604, 618 (3d Cir. 1995)); *see also*

*Saltiel v. GSI Consultants, Inc.*, 788 A.2d 268, 280 (N.J. 2002) (no tort remedy from a contractual

relationship "unless the breaching party owes an independent duty imposed by law."). Duty

includes taking "reasonable measures to avoid the risk of causing economic damages, aside from

physical injury, to [those] . . . whom defendant knows or has reason to know are likely to suffer

such damages from its conduct," including economic damages. *People Exp. Airlines, Inc. v.*

*Consol. Rail Corp.*, 495 A.2d 107, 116 (N.J. 1985). Thus, tort damages are independent from

contract damages. *See id.*; *Saltiel*, 788 A.2d at 280. Here, plaintiffs' claims are not based on

contract and sufficient allegations of foreseeability exist. The doctrine does not apply to the New

Jersey plaintiffs' negligence claims.

**Pennsylvania** allows recovery for "purely pecuniary damages" under a negligence theory

where the alleged breach of a legal duty arises under common law that is independent of any

contract. *Dittman v. UPMC*, 196 A.3d 1036, 1038 (Pa. 2018); *see also Bilt-Rite Contractors, Inc.*

*v. The Architectural Studio*, 866 A.2d 270, 285, 288 (Pa. 2005) (economic loss rule did not bar

negligent misrepresentation claim under Section 552 of the Restatement (Second) of Torts where

the cause of action did not require privity and a contractual relationship was not alleged); *In re*

*JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F.Supp.3d 552, 660 (N.D. Cal.

2020) ("*Dittman* indicates that Pennsylvania courts would not bar the school districts' negligence

claim" because "the school districts plausibly plead a common-law duty that arises independently

from any contractual obligations, and finding a duty comports with foreseeability and public

policy factors.").

Because plaintiffs have alleged a common-law duty arising independently from any

contractual obligations that comports with public policy factors as discussed above, the economic

loss doctrine does not bar the Pennsylvania plaintiffs' negligence claims.

**Rhode Island.** The "rationale for abiding by the economic loss doctrine" in Rhode Island

"centers on the notion that commercial transactions are more appropriately suited to resolution

through the law of contract, than through the law of tort." *Franklin Grove Corp. v. Drexel*, 936

A.2d 1272, 1275 (R.I. 2007). As such, the Supreme Court of Rhode Iland has "explicitly

United States District Court
Northern District of California

limit[ed]" the economic loss doctrine "to commercial transactions." *Id.* (quoting *Rousseau v. K.N. Const., Inc.*, 727 A.2d 190, 193 (R.I. 1999)); *see also Rousseau*, 727 A.2d at 193 ("When a cause of action arises under a contract and a consumer lacks privity of contract with the offending party, an action in tort remains available, even if the damages are purely economic."). The economic loss doctrine does not apply and so does not bar the Rhode Island school district plaintiffs' negligence claims.

**Virginia** courts first determine "whether a cause of action sounds in contract or tort" to decide if the doctrine applies. *Gerald M. Moore & Son, Inc. v. Drewry*, 467 S.E.2d 811, 813 (Va. 1996); *see also Ward v. Ernst & Youn*g, 435 S.E.2d 628, 632 (Va. 1993); *Blake Const. Co. v. Alley*, 353 S.E.2d 724, 726 (Va. 1987); *Abi-Najm v. Concord Condo., LLC*, 699 S.E.2d 483, 489 (Va. 2010). Where the source of the duty is contract, the economic loss doctrine bars an action in tort. *See id.* at 489 (quoting *Dunn Const. Co. v. Cloney*, 682 S.E.2d 943, 946 (Va. 2009)). However, an independent duty does not. *Id.* (doctrine did not bar an alleged breach of a statutory duty arising under the Virginia Consumer Protection Act); *see also id.* at 363–64 (doctrine does not bar a fraudulent inducement claim). Because the alleged duty in this case exists independent of contract, the Virginia plaintiffs' claims of negligence are not barred by the economic loss doctrine.

\*     \*     \*

In sum, defendants' conduct is plausibly alleged to have contributed to negative mental health outcomes for students, causing foreseeable resource expenditures by the school districts to combat that alleged public health crisis. Further, defendants have not sustained their burden that the economic loss doctrine bars any of the school district plaintiffs' claims of negligence. Defendants' motion to dismiss plaintiffs' claim of negligence is **DENIED**.

## V. CONCLUSION

Defendants' motion to dismiss plaintiffs' claims of negligence is **GRANTED IN PART** and **DENIED IN PART**.

*First*, Plaintiffs' claims are limited by Section 230 and the First Amendment to the same extent discussed in the Court's prior orders: allegations related to certain platform features are

United States District Court
Northern District of California

insulated by Section 230 and the First Amendment, other platform features are not so insulated, and at this stage the Court declines to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general.

*Second*, the "derivative injury" rule is no bar to plaintiffs' claims.

*Third*, plaintiffs sufficiently allege that defendants proximately caused resource expenditures related to defendants' conduct fostering compulsive use in minors, but plaintiffs fail to allege that defendants proximately caused third-party harms flowing from physical property damage, crimes, or threats transmitted on defendants' social media platforms.

*Fourth*, plaintiffs adequately allege defendants' breach of a duty of care.

*Fifth* and final, the Court declines to dismiss plaintiffs' claims in any of the at-issue states under the economic loss doctrine.

A separate order will follow as to the portion of defendants' motion seeking dismissal of the school districts claims of public nuisance.

**IT IS SO ORDERED.**

Dated: October 24, 2024

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

**ATTACHMENT A**

**TABLE OF CONTENTS**

I.      **Background** ................................................................................................. **2**

    A.      Procedural Background ................................................................ 2

    B.      Relevant Facts Alleged ............................................................... 3

        1.      Platform Designs That Harm Youth Public Health ....................... 3

        2.      The School Districts' Response to a Youth Mental Health Crisis ............... 5

        3.      Social Media Companies Target Schools ....................... 8

II.     **Legal Framework** .................................................................................... **11**

III.    **Threshold Issues for Both Negligence and Public Nuisance** ......................... **12**

    A.      Section 230 and the First Amendment ....................... 12

    B.      The Derivative Injury Rule ....................... 15

        1.      Legal Framework ....................... 15

        2.      Analysis ....................... 19

    C.      Proximate Causation ....................... 21

        1.      Legal Framework ....................... 21

        2.      Analysis ....................... 23

IV.     **Negligence** ............................................................................................ **26**

    A.      Duty and Compulsive Use ....................... 27

    B.      Economic Loss Doctrine as a Bar ....................... 35

V.      **Conclusion** ............................................................................................ **44**