Pages 1 - 149

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA          )
ADOLESCENT ADDICTION/PERSONAL  )
INJURY PRODUCTS LIABILITY      )
LITIGATION                     )
                               )  **NO. 22-MD-03047 YGR (PHK)**
                               )
_____)

San Francisco, California
Thursday, October 24, 2024

**APPEARANCES:**

For Plaintiffs:

   SEEGER WEISS LLP
   55 Challenger Road, Floor 6
   Ridgefield Park, New Jersey 07660
  BY: **AUDREY C. SIEGEL, ATTORNEY AT LAW**

   LIEFF, CABRASER, HEIMANN
     & BERNSTEIN LLP
   275 Battery Street, 29th Floor
   San Francisco, California 94111
  BY: **LEXI J. HAZAM**
   **MICHAEL LEVIN-GESUNDHEIT**
   **ATTORNEYS AT LAW**

   MOTLEY RICE LLC
   401 9th Street NW, Suite 630
   Washington, D.C. 20004
  BY: **PREVIN WARREN, ATTORNEY AT LAW**
   **ABIGAIL BURMAN, ATTORNEY AT LAW**

   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RMR, RDR, CRR, CCRR, CRG, CCG
    CSR No. 7445, Official United States Reporter

1    **APPEARANCES:** (CONTINUED)

2    For Plaintiffs:

3                          MOTLEY RICE LLC
                          28 Bridgeside Boulevard
                          Mount Pleasant, South Carolina 29464
4                    BY:  **JESSICA L. CARROLL, ATTORNEY AT LAW**

5                          GIBBS LAW GROUP LLP
                          1111 Broadway, Suite 2100
6                          Oakland, California 94607
                     BY:  **ANDRE MICHEL MURA, ATTORNEY AT LAW**

7

8    For Attorneys General:

9                          NATIONAL ASSOCIATION
                              OF ATTORNEYS GENERAL
                          1850 M Street NW, 12th Floor
10                         Washington, D.C. 20036
                     BY:  **ANN HAIGHT, DEPUTY ATTORNEY GENERAL**

11

     For Plaintiff State of Arizona:
12                         OFFICE OF THE ATTORNEY GENERAL
                          2005 North Central Avenue
13                         Phoenix, Arizona 85004-1592
                     BY:  **NATHAN E. WHELIHAN**
14                         **ASSISTANT ATTORNEY GENERAL**

15   For Plaintiff State of California:
                          CALIFORNIA DEPARTMENT OF JUSTICE
16                         455 Golden Gate Avenue - 11th Floor
                          San Francisco, California 94102
17                   BY:  **MEGAN O'NEILL**
                          **DEPUTY ATTORNEY GENERAL**
18                         **EMILY C. KALANITHI**
                          **SUPERVISING DEPUTY ATTORNEY GENERAL**

19

20   For Plaintiff State of Colorado:
                          COLORADO DEPARTMENT OF LAW
21                         1300 Broadway - 6th floor
                          Denver, Colorado 80203
22                   BY:  **BIANCA MIYATA**
                          **SENIOR ASSISTANT ATTORNEY GENERAL**

23

24            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

25

1    **APPEARANCES**:   (CONTINUED)

2    For Plaintiff State of Connecticut:
                       CONNECTICUT OFFICE OF THE ATTORNEY
3                        GENERAL
                       165 Capitol Avenue
4                      Hartford, Connecticut 06106
               **BY:  KRISLYN M. LAUNER**
5                    **ASSISTANT ATTORNEY GENERAL**

6    For Plaintiff Commonwealth of Kentucky:
                       KENTUCKY OFFICE OF THE ATTORNEY GENERAL
7                      Office of Consumer Protection
                       1024 Capital Center Drive - Suite 200
8                      Frankfort, Kentucky 40601
               **BY:  MATTHEW COCANOUGHER**
9                    **ASSISTANT ATTORNEY GENERAL**

10   For Plaintiff State of New Jersey:
                       NEW JERSEY OFFICE OF THE
11                       ATTORNEY GENERAL
                       Division of Law
12                     124 Halsey Street
                       Box 45029
13             **BY:  THOMAS HUYNH**
                     **VERNA PRADAXAY**
14                   **DEPUTY ATTORNEYS GENERAL**

15   For Plaintiff State of New York:
                       DEWEY & LEBOEUF LLP
16                     1301 Avenue of the Americas
                       New York, New York 10019-6092
17             **BY:  KEVIN C. WALLACE, ATTORNEY AT LAW**

18   For Plaintiff State of Minnesota:
                       MINNESOTA OFFICE OF THE ATTORNEY GENERAL
19                     445 Minnesota Street, Suite 1400
                       St Paul, Minnesota 55101
20             **BY:  CAITLIN M. MICKO**
                     **ASSISTANT ATTORNEY GENERAL**
21
     For Plaintiff State of Pennsylvania:
22                     PENNSYLVANIA OFFICE OF THE
                         ATTORNEY GENERAL
23                     Strawberry Square, 16th Floor
                       Harrisburg, Pennsylvania 17120
24             **BY:  JONATHAN BURNS, DEPUTY ATTORNEY GENERAL**

25          **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES:**  (CONTINUED)

For Government Entity Subcommittee:
                    KESSLER TOPAZ MELTZER CHECK LLP
                    280 King of Prussia Road
                    Radnor, Pennsylvania 19087
            BY:  **TYLER S. GRADEN, ATTORNEY AT LAW**

                    LEVIN SEDRAN & BERMAN LLP
                    510 Walnut Street, Suite 500
                    Philadelphia, Pennsylvania 19106-3697
            BY:  **MICHAEL WEINKOWITZ, ATTORNEY AT LAW**


For Federal/State Liaison:
                    BEASLEY ALLEN LAW FIRM
                    218 Commerce Street
                    Montgomery, Alabama 36104
            BY:  **CLINTON RICHARDSON, ATTORNEY AT LAW**
                 **JOSEPH VANZANDT, ATTORNEY AT LAW**


For Defendant Meta:
                    COVINGTON & BURLING LLP
                    1999 Avenue of the Stars - Suite 3500
                    Los Angeles, California 90025
            BY:  **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                    COVINGTON & BURLING LLP
                    620 Eighth Ave
                    New York, New York 10018
            BY:  **CHRISTOPHER Y.L. YEUNG, ATTORNEY AT LAW**
                 **GREGORY L. HALPERIN, ATTORNEY AT LAW**

                    MUNGER, TOLLES & OLSON LLP
                    355 South Grand Avenue, 35th Floor
                    Los Angeles, California 90071
            BY:  **ROWLEY J. RICE, ATTORNEY AT LAW**
                 **ARIEL T. TESHUVA, ATTORNEY AT LAW**

                    SKADDEN, ARPS, SLATE, MEAGHER
                      & FLOM LLP
                    500 Boylston Street
                    Boston, Massachusetts 02116
            BY:  **CATHERINE I. MULLALEY, ATTORNEY AT LAW**

        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

1   **APPEARANCES**:   (CONTINUED)

2   For Defendant TikTok:

                                   KING & SPALDING LLP

3                                     50 California Street, Suite 3300

                                  San Francisco, California 94111

4                      BY:   **BAILEY J. LANGNER, ATTORNEY AT LAW**

5                                     KING & SPALDING LLP

                                  1180 Peachtree Street

6                                     Atlanta, Georgia 30309

                   BY:   **GEOFFREY DRAKE, ATTORNEY AT LAW**

7

                                  KING & SPALDING LLP

8                                     1700 Pennsylvania Avenue, N.W.

                                  Washington, D.C. 20006

9                      BY:   **DAVID P. MATTERN, ATTORNEY AT LAW**

10

11  For Defendant YouTube:

                                  WILSON, SONSINI, GOODRICH & ROSATI

12                                    650 Page Mill Road

                                  Palo Alto, California 94304

13                     BY:   **ANDREW KRAMER, ATTORNEY AT LAW**

14

                                  WILSON, SONSINI, GOODRICH & ROSATI

15                                    One Market Street

                                  Spear Tower, Suite 3300

16                                    San Francisco, California 94105

                   BY:   **LAUREN GALLO WHITE, ATTORNEY AT LAW**

17

18

19

20

21

22

23

24

25

1    **Thursday - October 24, 2024**                                      **1:10 p.m.**

2                          **P R O C E E D I N G S**

3                                ---o0o---

4        **THE CLERK:**  You can remain as you are.  Court will

5    come to order.

6        All right.  The United States District Court for the

7    Northern District of California is now in session.

8    The Honorable Magistrate Judge Peter Kang presiding.

9        We are calling matter 4:22-md-3047-YGR, In Re Social Media

10   Adolescent Addiction/Personal Injury Products Liability

11   Litigation.

12           **THE COURT:**  Good afternoon.

13           **ALL:**  Good afternoon.

14           **THE COURT:**  All right.  So my plan, unless you want to

15   do some preliminary stuff, is to just start to march through

16   the DMC statement.

17       He's nodding?

18       Okay.  So, but the things that were separately letter

19   briefed, I'm going to hold those till the end.

20           **MS. MIYATA:**  Your Honor, I do have a preliminary

21   matter --

22           **THE COURT:**  Sure.

23           **MS. MIYATA:**  -- that is not on the statement as a ripe

24   matter --

25           **THE COURT:**  Okay.

PROCEEDINGS

1          **MS. MIYATA:**  -- but is time sensitive, if the Court

2    allows.

3          **THE COURT:**  Okay.

4          **MS. MIYATA:**  Thank you.

5        Bianca Miyata from the State of Colorado for the

6    State AGs.

7        Your Honor, I'd like to raise an issue regarding hyperlink

8    production and Meta.  This was noted in the discovery

9    management statement, but because of the time sensitivity and

10   the relationship to depositions, we'd like to raise this now

11   with the Court's indulgence.

12       The plaintiffs remain very concerned as our requests to

13   Meta for hyperlinks related to pending depositions -- and by

14   that, I mean depositions taking place within 30 days -- have

15   not been fulfilled prior to deposition.

16       As recently as yesterday, we had an issue with this.  Over

17   the course of the past month, we've asked Meta at least three

18   times to meet and confer with us on prioritizing these

19   deposition-related hyperlink requests to make sure that we can

20   get the documents in advance of deposition and, also, don't

21   create the conundrum of potentially having to seek permission

22   from the Court to recall a deponent to discuss these hyperlink

23   documents.

24       We have made suggestions for how to do so while attempting

25   to mitigate burden on the particular requests.

**PROCEEDINGS**

1          Just recently, I believe, the private plaintiffs, the

2     personal injury plaintiffs, and the school districts have

3     reached an agreement with TikTok about kind of a graduated

4     schedule where, if requests for up to a set number of

5     hyperlinks are made as many as 14 days before the deposition,

6     they will produce those within 7.

7          We can make a smaller number of requests 7 to 13 days

8     before the deposition, and those will be produced within

9     48 hours of the deposition.  And anything requested after that

10    would go into the normal queue.

11         But our request to meet and confer, as well as our

12    suggestion that perhaps that proposal could also be amenable to

13    Meta, have simply gone unanswered, so we have not been able to

14    discuss that with them.

15         And we have depositions scheduled for every business day,

16    almost, through the end of the year and also into 2025.  So

17    this is an urgent and time-sensitive matter for us that we

18    would like to seek guidance and clarification from the Court

19    from.

20         We did have a deposition yesterday -- and just to kind of

21    illustrate how this problem could come up -- where a document

22    was introduced at deposition, Meta's counsel objected, saying

23    that that document was not complete without the embedded

24    hyperlinks, and those hyperlink docs were not able to be put

25    before the deponent.  And we anticipate similar situations

1  coming up throughout our coming depositions should we not be

2  able to have some guidance and some resolution of this issue.

3         **MS. SIMONSEN:**  Your Honor, Ashley Simonsen from

4  Covington & Burling for the Meta defendants.

5         I will be candid with Your Honor that this is not a

6  dispute we expected to come up today.  It was an unripe

7  dispute.  We received no notice from the State

8  Attorneys General that they intended to raise it with you

9  today, which is typically the type of courtesy the parties will

10 give each other if they are going to raise an issue that's not

11 ripe.

12        I can tell you that there have been a large volume of

13 requests for hyperlinks from the plaintiffs since the last DMC.

14 They've requested 729 hyperlinks via their weekly requests.

15 That includes 510 hyperlinks associated with the first four

16 scheduled Meta deponents.

17        As of October 18th, when our DMC statement was filed last

18 week, we had completed our investigation and had identified in

19 prior productions or produced all but approximately 25 of those

20 hyperlinks.  And those 25 were requested only 7 to 14 days

21 prior to last Friday, despite being actually associated with

22 documents plaintiffs have had for many months and, in some

23 cases, almost two years.

24        So, you know, part of the issue here is we're getting

25 requests for hyperlinks that reach, you know, up to the ceiling

1  that Your Honor previously set.  I know my colleague Isaac

2  Chaput discussed with you, last time we were here, that it was

3  really stretching the bounds of what we thought we were going

4  to be able to do to meet those requests.

5      I can tell you we are pouring tremendous resources,

6  tremendous resources into getting this done as quickly as we

7  can, and I think we've made great progress, but it is -- it

8  does not help that we're getting requests from plaintiffs for

9  hyperlinks in documents they've had for two years when we've

10  got a deposition coming up in less than a couple of weeks and

11  they're demanding immediate turnaround.

12      It also doesn't help that they're demanding hyperlinks for

13  documents that are actually already located in documents that

14  we've produced and that, if they spent some time searching

15  through the productions, they too could find.

16      So, you know, I could walk through, Your Honor, all of the

17  communications that we've had with plaintiffs.  I think the

18  suggestion that we haven't been communicating is unfair.

19      We made productions on October 9th, 11th, 14th, 17th, and

20  21st.

21      We identified hyperlinks plaintiffs were requesting in

22  previously produced documents on October 2nd, 4th, 7th, 8th,

23  15th, and 21st.

24      We communicated with plaintiffs about incorrect Bates

25  numbers that they were requesting on October 2nd, 3rd, 5th, and

**PROCEEDINGS**

1  16th.

2      We provided a status update on the progress of our

3  hyperlink collections for the first four deponents in emails

4  that we sent on October 5th and 15th.

5      We provided plaintiffs a status update on our progress for

6  all hyperlinks requested on September 20th -- that was the

7  sixth request -- on October 21st.

8      And we continue to work with them to identify and produce

9  hyperlinks in specific deponents' custodial files when there's

10 a reasonable and appropriate basis to do so; namely, when the

11 hyperlinks are in documents that were produced to plaintiffs in

12 the past 30 days, documents they haven't had for more than

13 two years but waited until the last minute to request.

14     So, you know, Your Honor, we're happy to continue to try

15 to confer with the plaintiffs.  I know they've made a

16 suggestion that we reach a compromise agreement similar to the

17 agreement that I understand they've reached with TikTok.  We

18 are considering that proposal, but we don't have an answer for

19 them.  There are aspects of it that I don't think are going to

20 be workable on our end.

21     But we will confer with them.  And in accordance with

22 Your Honor's standing order, we will tee this up as a ripe

23 dispute once the proper process has been followed and would

24 submit to Your Honor that it simply hasn't been followed here

25 by my colleague raising it with you today without any notice to

1  us.

2      **MS. MIYATA:**  Your Honor, if I may respond just on a

3  few points there.

4      We certainly -- I certainly want to agree with my

5  colleague Ms. Simonsen in the fact that there has been

6  significant communication about the general hyperlink request

7  process, and we very much appreciate that.

8      But in contrast, there's been a notable absence of

9  response to our requests on prioritization of hyperlinks that

10  are related to pending depositions within the next 30 days,

11  which brings me to my next point, which is, we certainly did,

12  in our most recent requests, let counsel know, for Meta, that

13  should we not have the opportunity to discuss this matter with

14  them, we would have no choice other than to bring this to

15  Your Honor because we have ongoing depositions.  We've had a

16  handful of depositions in the past month.  We have depositions

17  running nearly every day of November, and this is a problem

18  that is apt to only compound itself.

19      I --

20      **THE COURT:**  Let me stop you there.

21      **MS. MIYATA:**  Yes.

22      **THE COURT:**  Is there any objection to prioritizing

23  hyperlinks for upcoming depos?

24      **MS. SIMONSEN:**  Those are the ones we are trying to

25  prioritize, but the volume has been immense and has -- but,

1    yes.  No, there is no problem with prioritizing those.

2        **THE COURT:**  You have your answer.

3        **MS. MIYATA:**  The volume that we have requested is well

4    within the allotment that the Court set in its past order; but

5    despite making those requests, we have not received those

6    hyperlinks in advance of the deposition.  And if we don't

7    receive the hyperlink documents in advance of the deposition --

8        **THE COURT:**  She reported to me that they produced all

9    but 25 of the hyperlink documents that have been requested.  Is

10   that incorrect?

11       **MS. MIYATA:**  Per our information, that is incorrect,

12   Your Honor.  We have 141 requests that we made that went

13   unanswered.

14       We also learned from the private plaintiffs about an

15   additional several hundred documents.  They believe those to

16   either be not relevant to the case or not obtainable.  It is

17   difficult for us to push back on the relevance of a hyperlink

18   document embedded in a document that was produced to us in the

19   course of discovery.

20       **MS. SIMONSEN:**  Your Honor, I think the issue may be

21   that they're -- they're requesting hyperlinks and, in some

22   instances, we're referring them to documents that we already

23   produced that are the documents hyperlinked to.  So those

24   aren't unanswered requests; right?  We've actually identified

25   the document already in the production.

```
 1        Again, we did not come here today prepared to argue these

 2   numbers, and so I don't want to -- I can't make any further

 3   representations to you other than I know those carefully vetted

 4   numbers I just shared that were accurate as of last Friday.

 5        THE COURT:  Okay.  It's not a ripe dispute, so -- but

 6   here's my guidance.  Okay?  You have commitment -- you have

 7   consensus that Meta's going to prioritize links that are for

 8   upcoming depositions within the next 30 days.

 9        Right?

10        She's nodding her head "yes."

11        MS. SIMONSEN:  Yes.

12        THE COURT:  All right.  So it's incumbent on you to

13   continue to meet and confer.  It sounds like they're providing

14   fairly regular status reports on their production of those.

15        Also, I seem to recall getting a commitment from not you,

16   but your colleagues, that if it's -- if it's a hyperlink

17   document that you can find yourselves from looking through the

18   production, that you're going to do that.  And so --

19        MS. MIYATA:  And we have done so.

20        THE COURT:  Let me finish.

21        So I haven't heard much from your side on how much effort

22   you're putting into that, but I'm just going to encourage you

23   to keep doing that because if I'm hearing from Meta that a lot

24   of these -- or some of these documents are ones that have

25   already been produced, that are already in the production, and
```

**PROCEEDINGS**

1    it may be feasible from the embedding document to find it --

2    right? -- with enough keywords, redouble those efforts to find

3    them yourselves to reduce the number of hyperlinks you need to

4    request.

5             MS. MIYATA:  And we are doing that.

6             THE COURT:  Okay.

7             MS. MIYATA:  If I could clarify, the number of

8    hyperlinks that are being requested related to deponents fall

9    well under the cap that Your Honor has set for the overall

10   requests.

11            THE COURT:  I'm not hearing -- I'm not hearing any

12   objection from them on that issue; right?  I'm hearing that

13   it's a large volume, but we knew it was a large volume going

14   into this.  So it is what it is.

15            MS. MIYATA:  And to clarify, if Meta is to prioritize

16   the requests for those hyperlinks for depositions taking place

17   within the next 30 days, am I to understand that's a commitment

18   to produce them in advance of the deposition?  Because I think

19   that -- that is really where the rubber has met the road about

20   the -- I think the gap between the previous order and where we

21   were experiencing, I think, a disconnect and where we have not

22   been able to get Meta to meet and confer to discuss this issue.

23            THE COURT:  It seems to me if Meta identifies the

24   document in the hyperlink, they have it.  So if they either

25   know that it's already been produced and can give you the Bates

 1    number or if they have it because they've identified it, they

 2    can produce it.  I don't see any reason for Meta to hold onto

 3    it.

 4           **MS. MIYATA:**  They have not been doing so, Your Honor.

 5           **THE COURT:**  I don't see any reason for Meta to be

 6    holding onto documents they've identified that correspond to

 7    the hyperlink.

 8           **MS. MIYATA:**  And I think that that is where we have

 9    run into difficulties here, Your Honor.  We have not received

10    responses as to -- we have not received those responsive

11    documents or the Bates numbers identifying those documents so

12    have, at times, been going into depositions without what we

13    have requested per deponent.

14           **MS. SIMONSEN:**  That's just simply not consistent with

15    my understanding of what we've been doing, Your Honor.  So

16    I think there seems to be a miscommunication.  I'm happy to

17    confer with Ms. Miyata after this DMC to get on the same page.

18        But we are already doing what Ms. Miyata has asked

19    Your Honor to order us to do, which is prioritize for

20    production hyperlinks associated with deponents coming up in

21    the next 30 days.

22        We will continue to do that, and we will continue to

23    produce hyperlink documents and to identify hyperlink documents

24    in already-produced documents where that is -- where they are

25    located.

1          **THE COURT:**  And just so I'm clear, you're not

2     holding -- you're going to produce or identify by Bates number

3     as soon as you've got it; right?

4          **MS. SIMONSEN:**  Absolutely, Your Honor.

5          **THE COURT:**  All right.  So it seems to me you do need

6     to keep meeting and conferring.

7          I will say, I mean, if the request for the hyperlink

8     document has been made and there's been zero response on it,

9     just hypothetically -- right? -- there's been no information,

10    and then the underlying document's used at a deposition, it's a

11    little unusual for the defending attorney to say, "You can't

12    depose the witness about it because the exhibit is incomplete."

13    Right?

14         So, I mean, I'm not going to get into that; but just,

15    you know, there is a weirdness there that I'm not entirely

16    comfortable with.

17         **MS. SIMONSEN:**  And I appreciate that, Your Honor.

18         My understanding is that what happened was a document was

19    put in front of a witness.  The witness said he did not know

20    what was at the other end of the hyperlink.  It was not

21    apparent whether we had produced that document already, the one

22    that was at the hyperlink, or if plaintiffs had asked for it;

23    and there was no suggestion by plaintiffs on the record that

24    there was an issue here.

25         So this, again, is the first time I'm hearing of this, and

1   I'm not sure that it's been accurately represented to

2   Your Honor.

3       **THE COURT:**  Okay.  I expect everybody to be, you know,

4   playing aboveboard at the depositions, both in terms of,

5   you know, how exhibits are characterized and how they -- how

6   objections are made -- all right? -- on both sides.

7       **MS. SIMONSEN:**  Certainly, Your Honor.  And I think if

8   there is an issue like this that comes up in a future

9   deposition, I think plaintiffs can raise it to us, and we can

10  work with them to figure out if we have already told them what

11  the hyperlinked document is.  We're happy to do that.

12      **THE COURT:**  Okay.  Mr. Previn wants to say something.

13      **MR. WARREN:**  Good morning, Your Honor.  Previn Warren

14  for the personal injury --

15      **THE COURT:**  I keep doing that.

16      **MR. WARREN:**  -- school district plaintiffs.

17      **THE COURT:**  I'm so sorry.

18      **MR. WARREN:**  Don't be sorry.

19      **THE COURT:**  I know I'm not the only one, but I'm so

20  sorry.

21      **MR. WARREN:**  No, no.  Ms. Simonsen does it too.  It's

22  fine.

23                      (Laughter.)

24      **MR. WARREN:**  I was at the deposition, so I just wanted

25  to come up to clarify what happened there.  And this happened

**PROCEEDINGS**

1  during questioning from the Tennessee Attorney General's

2  Office, not actually from any plaintiff represented in

3  this court.

4      But, yes, it's true that the questioning attorney put a

5  document before the witness and there wound up being a

6  challenge, effectively, an objection from Meta's counsel

7  regarding that document because the hyperlinks were not

8  appended to it.  That sort of puts us in a bind.

9      I think, you know, we absolutely hear Your Honor that we

10  need to take the time to chase down the hyperlinks and

11  associate them, which we're doing; but without the link

12  established by Meta itself, there's going to be that gap where

13  counsel or the witness can say, "You may think that's where

14  that hyperlink goes, but who's to say?"

15      And that puts us in a real -- in a real bind when it comes

16  to foundation, authenticity, and personal knowledge that we

17  really want to close.  And that's why we have requests out to

18  Meta.  We're -- you know, we're identifying the documents; but

19  even if we think the document might be in the database, we

20  still need them to confirm that through their own forensic

21  records so that we don't have any issue going into these

22  depositions.

23          **THE COURT:**  I assume, in that case, you send an email

24  to Meta saying, "We think this hyperlink corresponds to this

25  document.  Please say 'yes' or 'no.'"

PROCEEDINGS

1          **MR. WARREN:**  I think we actually, Your Honor, haven't

2    been doing that to date.  We've just been not putting in those

3    requests because we have caps; right?  So if we -- if we can

4    associate them, we're not even actually trying to go there.

5          So to some extent, what I'm offering to you is a little

6    bit academic, but it's still a concern in general.  And the

7    only reason we're not is because we have a limit; right?  If we

8    could, we certainly would ask them for that confirmation just

9    to, you know, put to rest any authenticity issue that might

10   arise.  But we have to prioritize, you know, per Your Honor's

11   direction.  We're doing that.

12         So, in any event, I just wanted to say that that's what

13   happened at the deposition so that Your Honor has a record

14   there.

15         **THE COURT:**  Well, okay.  So I'm going to clarify my

16   prior directive on this.  If you're confident that you've

17   identified, based on your own investigation, a document that

18   corresponds to a hyperlink and all you're asking for them is to

19   confirm it, why should that count against the cap, I guess?  I

20   mean, it reduces everybody's work if they've done the work;

21   right?

22         **MS. SIMONSEN:**  I think it can -- why don't I take that

23   back, Your Honor.  I think it can still take some time to do

24   the identification, but I understand the point Your Honor is

25   making.

1    **THE COURT:**  They found the document for you, assuming

2    they've done the work and it's -- you know, they're not --

3    they're doing diligent work and they've reasonably found what

4    should be the document.

5    **MS. SIMONSEN:**  The issue is that all of those requests

6    are now going to be replaced with requests for hyperlinks they

7    can't find and, I think, on top of what is already, you know,

8    sort of stretching the limits of what we can handle in the

9    short time frame we're being asked to handle it.

10    **THE COURT:**  I'm not going to direct it, but why don't

11    you -- I'm going to make it part of -- at least I'm going to

12    encourage the parties to work out a deal where informal

13    requests to confirm whether documents plaintiffs have found

14    correspond to a hyperlink shouldn't count against the cap and

15    that you'll cooperate reasonably in making those confirmations

16    without counting them against the cap.  Okay?

17    **MS. SIMONSEN:**  Yes.  We're glad to confer about that.

18    **MR. WARREN:**  Thank you, Your Honor.  That would help.

19    The last thing I'd say is just this objection that's

20    coming up on authenticity and admissibility around hyperlink

21    documents.  We would just ask for Your Honor's direction that

22    that not be a permissible objection at depositions, given that,

23    you know, we are -- we have a process in place to deal with the

24    hyperlink issues and, you know -- unless, of course, that

25    we're, you know, getting it wrong and attaching a document to

1   the document that isn't there.

2       THE COURT:  How is an objection to the authenticity of

3   a document a proper deposition objection?  That's an objection

4   to the evidence.  The document is not an objection to the form

5   of the question.

6       MS. SIMONSEN:  Your Honor, I'm communicating with my

7   colleague that defended this deposition, and they have no

8   recollection of having objected on the grounds that plaintiffs'

9   counsel is suggesting they did.

10      Now, if there was -- I think we're just going to have to

11  go back and look into this further because it sounds like there

12  was a misunderstanding.  And, again --

13      THE COURT:  You agree that's not an objection to the

14  form of a question; right?

15      MS. SIMONSEN:  Correct, I do.

16      THE COURT:  Right.  So, I mean, there's your answer.

17  And there certainly should not be instructions not to answer

18  based on those kinds of concerns; right?  I mean, that's -- I

19  mean, there's only a limited number of bases to instruct not to

20  answer, and that -- I don't see how objecting to the

21  authenticity of a document is one of those.

22      MR. WARREN:  And I'm certainly not suggesting there

23  was an instruction, Your Honor.

24      THE COURT:  Okay.  But I just -- maybe I'm worrying

25  too much about what could be happening -- what could happen in

1    the future.  So I just want to plant that flag -- all right? --

2    so you-all understand.

3        **MS. SIMONSEN:**  Of course, Your Honor.  We completely

4    agree.

5        I think -- I mean, I'm guessing.  Part of the issue here

6    may be that plaintiffs chose to use a document where either

7    they hadn't requested the hyperlink from us or they had

8    requested it and maybe we'd identified it but they didn't have

9    that link made by the time they went to the deposition.

10       So if they're choosing to use a document that has a

11   hyperlink in it but not have the hyperlink document that we've

12   told them is connected to it --

13       **THE COURT:**  Well, then that's on them.

14       **MS. SIMONSEN:**  That's exact- --

15       **THE COURT:**  I don't think they're going to do that.

16       **MR. WARREN:**  Of course.  Of course.  If we've asked

17   for the hyperlink and they've provided it and we don't append

18   that to the document or otherwise make it available, that is on

19   us.

20       But I think we're talking about a scenario where we didn't

21   have the opportunity to get that hyperlink, either because we

22   made a request that wasn't fulfilled or because we just

23   couldn't make the request because of the cap.

24       I mean, it's not -- I've heard Ms. Simonsen complain that

25   we're asking for hyperlinks for documents we've had for

PROCEEDINGS

1   two years, and that's true.  But that's a good thing.  That's

2   because we're taking the time to actually assess which

3   documents we need at these depositions and whittle it down.

4        I mean, if we had done it two years ago, we wouldn't have

5   possibly known that, and the volume would have been

6   insurmountable for everybody involved.  We're trying to figure

7   out, as we prep for these depositions, what's going to matter

8   and make the requests in real time.  I think that's ultimately

9   to Meta's benefit.

10       So I don't see that as really a cause for concern here.

11  It kind of suggests we're doing our job, if anything.

12       **MS. SIMONSEN:**  Your Honor, I don't have any concern

13  with what Mr. Warren is saying.  My issue is, it doesn't sound

14  like we've even confirmed that there was a request for this

15  particular hyperlink made.

16       And, sure, there is a cap, and that poses some limits.

17  But we can't be responsible for the fact that they don't have a

18  hyperlinked document they didn't request.  So when they're

19  making their request, they need to be prioritizing the

20  documents with hyperlinks they want to --

21       **THE COURT:**  I'm sure they are.

22       I'm sure you are.

23       **MR. WARREN:**  We certainly are.  And, again, I can't

24  speak to this specific situation and I don't really want to.

25  This isn't about what happened.

1      I mean, again, this was a document used by a plaintiff

2  that isn't even a party to this proceeding; right?  So I don't

3  know if that plaintiff made the request or not.  I don't --

4  it's water under the bridge as far as I'm concerned.  We're

5  really talking about how this ought to work going forward.

6      I do have a concern that if we haven't made the request,

7  then the authenticity objection is somehow viable.  Again, we

8  have a cap on how many requests we can make, and it's not going

9  to be possible for us to make all the requests that we

10  ultimately will need between the depositions and summary

11  judgment.

12      This is a massive, sprawling case.  There will necessarily

13  be occasions where we have to use a document and we couldn't

14  request the hyperlink because of the cap.  I mean, if the cap

15  is lifted, then I would absolutely agree with Ms. Simonsen that

16  that authenticity objection would be viable.

17          **THE COURT:**  Meta doesn't want the cap lifted; right?

18          **MS. SIMONSEN:**  We cannot have -- I mean, there's just

19  a limit on what we can do, especially when we are moving toward

20  the substantial completion deadline.  I mean, we've already

21  produced, I think, over 6 million pages of documents.  I mean,

22  we are so --

23          **THE COURT:**  On authenticity; right?  I think I've said

24  this multiple times.  I'm assuming smart trial lawyers are

25  going to reach agreement on, you know, admitting that documents

**PROCEEDINGS**

1  produced in the -- that were kept in the ordinary course are

2  authentic.  That's not going to be an issue.

3      I mean, you're not going to go to trial spending trial

4  time arguing over authenticity of documents that were actually

5  produced out of Meta's own files or some company's own files or

6  some plaintiff's own files.  I mean, why would you do that?

7      **MS. SIMONSEN:**  Correct, Your Honor.  And I don't think

8  there's going to be a dispute if, down the road, we have to

9  link two documents to each other as, you know, the hyperlinked

10 document.

11     **THE COURT:**  But just to address Mr. Warren's concern,

12 at deposition, I mean, maybe someone could, in a particular

13 weird case, convince me otherwise in a specific circumstance,

14 but I don't think authenticity is a proper objection at a

15 deposition.

16     **MS. SIMONSEN:**  I agree with you, and I don't think

17 that we lodged such an objection.

18     **THE COURT:**  Okay.  So --

19     **MS. SIMONSEN:**  So we'll confirm and confer.

20     **THE COURT:**  Maybe it's not going to be an issue going

21 forward, but I think I've addressed your concern.

22     **MR. WARREN:**  Yes, Your Honor.  And as long as it's not

23 an issue going forward, I think that's -- that situation --

24     **THE COURT:**  I certainly do encourage more -- as much

25 conversation and, you know, talking through the issues as you

1    can.

2          **MR. WARREN:**  Of course, Your Honor.  Thank you.

3          **MS. SIMONSEN:**  Your Honor, if I may, just, I have a

4    clarification from my colleague that defended this deposition.

5          They've now recalled what happened, and it was that the

6    lawyer for the plaintiff put in front of the witness a public

7    document, a web page with the Instagram community standards.

8    And it wasn't a document that Meta produced.  It was a public

9    document.

10          **THE COURT:**  Okay.

11          **MS. SIMONSEN:**  And my colleague simply objected that

12    the document contained hyperlinks, just made that objection on

13    the record.

14          But, again, it was something that the plaintiff pulled

15    from Meta's website.  It wasn't a document where they had

16    requested that we produce hyperlinks that somehow weren't

17    produced.  So I just want the record to be clear.

18          I mean, I appreciate the issues that counsel is facing,

19    and I just want Your Honor to know we are really working

20    diligently with them.  And I do -- I think it's a little

21    unfortunate that this issue was raised with Your Honor today by

22    citing this issue that came up in a deposition that really has

23    nothing to do with the hyperlinks dispute in order to make it

24    seem, apparently, that there is some prejudice plaintiffs are

25    suffering when that isn't the case.

**PROCEEDINGS**

1       So we will continue to work with plaintiffs.  We will

2   confer with them on how to streamline this process further.  It

3   sounds like there are some things they might be able to do to

4   help, and go forward from there.

5       **THE COURT:**  Okay.  But for the benefit of your

6   colleague, who must be listening in by Zoom, it is not a proper

7   objection -- it's not an objection to state on the record that

8   a document has hyperlinks in it.  Right?  Nobody defending a

9   deposition should be commenting on what an exhibit shows unless

10  there's an objection that they're trying to lay a foundation

11  that it's privileged or, otherwise, that there's something

12  else.  But just simply stating, whether it's in the form of

13  objection or not, that the document contains hyperlinks, that's

14  not an objection to the form of the question either.

15      **MS. SIMONSEN:**  Understood.  I imagine there was

16  broader context.  And I won't take up any more of Your Honor's

17  time with this today, but just to know that it didn't have

18  anything to do with a document containing --

19      **THE COURT:**  Everyone defending all depositions in this

20  case, you're going to get my views.  I mean, there are a

21  certain number of proper objections at depositions, and

22  everything else is out of bounds.  You shouldn't really be

23  talking -- I mean, I really don't like speaking objections

24  either.

25      **MR. WARREN:**  Your Honor, can I seek guidance from

1    the Court on that?  And this is legitimately not something I've

2    ever raised with Ms. Simonsen or anyone.  It actually occurred

3    about an hour ago at a deposition that's pending right now.

4        There have been objections to form issues that are stated

5    concisely and non-argumentatively, but that are not stated as

6    objections to form.  So, for example, today there have been

7    numerous objections to characterization.  And we don't really

8    believe that that's proper.  By the same token, I don't know if

9    it violates the plain terms of the deposition protocol.  It

10   would be helpful to get Your Honor's guidance on whether

11   something like an objection to characterization is a proper

12   objection as Your Honor sees it.

13       **THE COURT:**  So the stated words of the objection is

14   "Object to characterization"?

15       **MR. WARREN:**  Correct.  The idea being that the way in

16   which the questioner was characterizing a document perhaps was

17   objectionable.

18       **MS. SIMONSEN:**  Your Honor, I don't know the context

19   and what -- could we please have an opportunity to confer with

20   Mr. Warren?  We may have agreement on this issue.

21       **THE COURT:**  Right.

22       **MR. WARREN:**  Okay.  Very well.  That's fine.  There

23   was a meet and conferral about this at the deposition already,

24   but I'm happy to do that.

25       **THE COURT:**  But I do encourage everyone -- we all know

1  what the form of the question objections are.  So you should,

2  you know, try to conform.  If people are trying to use

3  different formulations or different language to mean it's an

4  objection to the form of the question, such as -- I don't

5  know -- "lacks foundation" but they're using different words,

6  then they should just use the unobjectionable words to phrase

7  the objection.

8      **MR. WARREN:**  Well, I think that that's the question;

9  right?  Is it permissible for a defending attorney to say, for

10  example, "Objection to foundation," or is Your Honor's

11  preference that all form objections be stated as objections to

12  form?  I think there's different approaches that different --

13      **THE COURT:**  You mean, like, the lawyer would literally

14  say, "Object to form"?

15      **MR. WARREN:**  Correct.

16      **THE COURT:**  And then state what form?

17      **MR. WARREN:**  No.  Just say "Object to form" to avoid

18  any concern about coaching or suggesting anything to the

19  witness.

20      **THE COURT:**  No.  I mean, because, again, if it's an

21  objection to the form of the question, the questioning attorney

22  needs to know how they can fix it.  That's the whole point.

23      **MR. WARREN:**  Right, of course.  But -- and this is

24  just in my practice in the past --

25      **THE COURT:**  I know there are courts where all

**PROCEEDINGS**

1  objections to form are preserved so nobody's supposed to say

2  anything; right?

3        **MR. WARREN:**  Right.

4        **THE COURT:**  And there are other courts that say all

5  you say is "Objection to form."

6        **MR. WARREN:**  Right.

7        **THE COURT:**  I don't necessarily subscribe to that

8  unless I think that it's unnecessarily, like, delaying

9  depositions.  Right?

10        **MR. WARREN:**  Okay.  That was the clarification, object

11  to form.

12        **THE COURT:**  Because, again, there is some opportunity

13  for the questioning attorney to fix it if they know exactly

14  what the --

15        **MR. WARREN:**  Sure.

16        **THE COURT:**  -- what the problem is.

17        **MR. WARREN:**  That's helpful guidance.  Thank you,

18  Your Honor.  Appreciate it.

19        **MS. SIMONSEN:**  And, Your Honor, I'm sorry to belabor

20  this.  I do want to make clear, I have now confirmed the issue

21  was that the question asked had to do with a document that

22  plaintiffs' counsel represented was the complete document.  And

23  so the only point my colleague was making was that it did

24  contain hyperlinks, to be clear that it was not the complete

25  document.

PROCEEDINGS

 1        So, again, it was not kind of an objection to the

 2   question; only to the representation being made so that the

 3   record was clear.

 4        **THE COURT:**  I mean, I don't want to be a law

 5   professor, but I think the proper objection in that case is

 6   it -- either -- it either lacks foundation or assumes facts or

 7   represents facts not in evidence or something like that.  I

 8   mean, not to just say -- I mean, they can get into a colloquy,

 9   if they want to, on the record as to what the problem is with

10   the question, but then you can explain because there are

11   hyperlinks and it's not complete.  But, anyway --

12        **MS. SIMONSEN:**  Understood, Your Honor.

13        **THE COURT:**  -- work it amongst yourselves.

14        **MR. WARREN:**  Yeah.  I appreciate that, Your Honor.

15        **THE COURT:**  I expect people to act reasonably at the

16   depositions.

17        **MR. WARREN:**  For what it's worth, I do think, in

18   general, depositions have been going smoothly and counsel have

19   been participating effectively.

20        **THE COURT:**  Good.

21        And I received messages that we really need to move on,

22   given the number of issues.

23        **MR. WARREN:**  Thank you, Your Honor.

24        **MS. SIMONSEN:**  Thank you, Your Honor.

25        **THE COURT:**  All right.  So who's going to argue school

1  district bellwether damages computation and the documents

2  underlying those?

3      **MS. LANGNER:**  Good afternoon, Your Honor.  Bailey

4  Langner from King & Spalding for the TikTok defendants.

5      **MR. GRADEN:**  Good afternoon, Your Honor.  Tyler Graden

6  for the school district plaintiffs.

7      **THE COURT:**  Okay.  So, I need clarification.  Have the

8  school districts actually produced the documents that would

9  underlie or that they rely on for their computations of

10  damages?

11      **MR. GRADEN:**  So they have produced and they're

12  continuing to produce.

13      **THE COURT:**  Okay.  So if they have produced, have they

14  been produced in a way -- were they produced contemporaneously

15  with the initial disclosure --

16      **MR. GRADEN:**  They were produced --

17      **THE COURT:**  -- of the computations?

18      **MR. GRADEN:**  They were produced as part of the Rule 34

19  requests in the normal course that they were -- they were kept.

20      **THE COURT:**  Okay.  So -- and I haven't seen the

21  computation.  I don't really need to see the computation.  But

22  assuming the computations are more than just a lump sum, which

23  they're supposed to be, has Meta been just unable -- have the

24  defendants been unable to figure out what documents correlate

25  to the computations?  Is that the problem?

1      **MS. LANGNER:** Your Honor, if I could provide a little

2   context.

3      So on August 22nd, the plaintiffs did provide a lump-sum

4   figure for their damages computation.  We have since met and

5   conferred with them, and they are going to provide further

6   breakdowns by compu- -- by category of damages.

7      **THE COURT:** Okay.

8      **MS. LANGNER:** They're going to do that by

9   November 15th.

10     We have asked the plaintiffs to either separately produce

11  or identify, for example, by Bates number the documents that

12  support their damages computations.  And what we understand

13  from them is that those documents are somewhere in their

14  document productions or will be produced but, essentially,

15  that, you know, we are left to guess which ones support their

16  computations.

17     **THE COURT:** What's the harm in giving them the Bates

18  numbers of the ones that have been produced?

19     **MR. GRADEN:** So, a few things.

20     First, it's not required by the rule.  The rule says that

21  we have to identify -- make the documents available for

22  inspection and copying as under Rule 34.  I don't think there's

23  any dispute that Rule 34 does not require Bates-by-Bates

24  identification of the documents.

25     The second issue is that these are very early preliminary

1   estimates.  We have experts whose reports will be due in May

2   who will be providing a fine point on the damages and also

3   listing the documents relied upon to support those damages

4   estimates.

5       So really, at this stage, when these are just very early

6   estimates provided by the school districts to help defendants

7   understand the scope of liability, help with mediation, the

8   whole list of things that the initial disclosures are there

9   for, there's really no need to identify documents that are

10  identified at this preliminary, initial stage when those may or

11  may not be, and likely will not be, the corpus of documents

12  that are ultimately relied on at trial.

13      **THE COURT:**  Well, that's not the point of the initial

14  disclosures.  Everybody knows they're called initial

15  disclosures for a reason; right?  And you're supposed to

16  supplement the disclosures, you know, according to the rule,

17  when your contentions are changed.  So everyone knows they're

18  preliminary.

19      **MS. LANGNER:**  Your Honor, if I may respond.

20      I mean, if plaintiffs had produced these documents, as

21  they were supposed to, back in February of this year, we

22  wouldn't be in the situation where we were having to guess

23  which documents support their damages computations.  They would

24  have been produced in advance -- you know, if they had produced

25  them in February or March or April or May or June or July,

**PROCEEDINGS**

1    before their damages -- before their document productions had

2    started in earnest, we wouldn't be in this situation.  So

3    that's one point.

4         Plaintiffs' point about the experts, this really is not an

5    expert issue.  These are past compensatory damages, costs

6    incurred by the school districts.  So there should be receipts.

7    There should be construction bids.  There should be salaries

8    for personnel that they're hiring.  This is material that is in

9    the school districts' possession, custody, or control.  And,

10   again, we are entitled to know what their damages computations

11   are and what those computations are based on.

12             **MR. GRADEN:**  If I --

13             **THE COURT:**  Sure.

14             **MR. GRADEN:**  It sounds to me like the defendants

15   already know the types of documents that we will be relying on.

16   If there are receipts, if there are salaries, if there are

17   budgets, those are the types of things that are being produced

18   and are continuing to be produced.

19        It's the Bates by -- Bates-by-Bates identification of the

20   documents that make up these calculations with these categories

21   that we're objecting to.

22             **THE COURT:**  But why?

23             **MR. GRADEN:**  It's not required, and there's no real --

24             **THE COURT:**  It's also not prohibited.

25             **MR. GRADEN:**  But it's also not appropriate.  It serves

1  no real purpose because, as I said, these are very early

2  preliminary estimates.  So there really is no prejudice to

3  defendants to know how we are calculating our damages when they

4  will get that full explanation with Bates identification as

5  part of the expert reports that are coming due.

6          **MS. LANGNER:**  And, Your Honor, I mean, counsel keeps

7  saying these are preliminary estimates.  We've received, at

8  this stage, the lump-sum numbers that plaintiffs have provided

9  to date, and those were calculated to the dollar and, in some

10  cases, the cents.  These seem like they are based on, you know,

11  actual numbers and these are not ballpark estimates.  That's

12  not how they've been represented to us.  And so, you know,

13  again, it seems like these figures have been calculated based

14  on documents.  And, you know, based on the requirements of

15  Rule 26(a)(1)(A)(3), we are entitled to know these.

16      In addition, the case law that we -- that we cited to in

17  our brief supports the idea that it is plaintiffs' burden, as

18  the party seeking damages, to explain how they got to their

19  damages figures.

20          **MR. GRADEN:**  To be clear, none of the cases cited by

21  defendants require Bates identification as part of the Rule 26

22  disclosures.

23          **THE COURT:**  Right.  So on that point, *Graham vs. State*

24  *Farm Mutual*, out of the District of Colorado, required Bates

25  numbering of documents produced as part -- to support the

1  calculation under Rule 26.

2      *Mortgage* -- sorry.  *Kline vs. Mortgage Electronic*

3  *Security*, out of the Southern District of Ohio, also required

4  the Bates numbering of documents that were being relied on for

5  computation of damages.

6      And I forgot where -- I was looking it up.  It's either in

7  the Advisory Committee notes or it's in case law, but I think

8  everyone agrees the purpose of the damages disclosure is so

9  that defendants can understand what their potential exposure

10  is.

11      And, again, plaintiffs are under a duty to seasonably,

12  you know, supplement and -- supplement their disclosures when

13  those change.  Everyone knows these are initials.  So the fact

14  that they're initial, it may be that the documents that go to

15  later calculations change and some are removed and some are

16  added.  That doesn't mean you don't identify the documents now.

17      And I don't see any -- I don't see any prohibition.  I

18  found case law that says, you know -- I don't see how the

19  defendants are supposed to really understand how the

20  calculations are achieved without knowing which documents go to

21  the calculations.

22      So I am going to order the plaintiffs to identify by

23  Bates number the documents that underlie the -- that they rely

24  on for their calculations.  But I'm not -- I mean, it's not a

25  trial evidentiary ruling.  Nobody's precluding you from

**PROCEEDINGS**

1    changing that; right?  You can always supplement your

2    disclosures and change the documents.  That's part of -- that's

3    contemplated in the rule too.  Okay?

4        **MR. GRADEN:**  Understood, Your Honor.

5        **THE COURT:**  All right.  How much time do you need to

6    do that?

7        **MR. GRADEN:**  Well, I think we have until November 15th

8    to come up with the calculations.

9        **THE COURT:**  So why don't you do it as part of the

10   November 15th supplemental disclosure.

11       **MR. GRADEN:**  All right.  And just to be clear,

12   Your Honor, this ruling goes both ways.  So defendants, in

13   their disclosures, will also have to identify by Bates number?

14       **MS. LANGNER:**  Defendants aren't seeking damages,

15   Your Honor.  This --

16       **THE COURT:**  Which documents do you --

17       **MR. GRADEN:**  They do list damages.  They do list

18   attorneys' fees, expenses.  There's also the (a)(2) disclosures

19   that we're happy to meet and confer with them about to --

20       **THE COURT:**  That's not ripe.  So if you want to raise

21   that with them at some point, that's not -- I'm not going to

22   rule on anything like that today.  And unless they've got

23   counterclaims, they're not making a claim for damages; so they

24   don't -- they're not under the rule for damages here.

25       **MR. GRADEN:**  Understood.

1          **THE COURT:**  All right.

2          **MS. LANGNER:**  Thank you, Your Honor.

3          **THE COURT:**  But I do encourage -- I mean, it sounds

4    like you are trying to work things through, so I do keep

5    encouraging you to do that and try to work things out.  Okay?

6          **MR. GRADEN:**  Thank you, Your Honor.

7          **MS. LANGNER:**  Thank you.

8          **THE COURT:**  All right.  Okay.

9          **MR. WARREN:**  Your Honor, may I briefly be heard on an

10   issue?  It'll be brief.

11         **THE COURT:**  Okay.

12         **MR. WARREN:**  Okay.  So I'm hearing reports from the

13   field that Your Honor's guidance on objections is being

14   interpreted and applied in real time and I think very much

15   misinterpreted and misapplied in real time.

16        There are now apparently objections being lodged that the

17   question calls for expert testimony.  That is not a form

18   objection.

19         **THE COURT:**  That is not a form objection.

20         **MR. WARREN:**  So that should stop.

21         **THE COURT:**  So whoever's doing that in real time

22   should stop doing it.

23         **MR. WARREN:**  It's Mr. Schmidt.  And I appreciate that.

24   We'll make sure that that gets passed along.

25         **THE COURT:**  Okay.

PROCEEDINGS

1      **MR. WARREN:**  Thank you.

2      **THE COURT:**  All right.  That's the letter brief.

3      Let's see.  Snap, I guess, is the next non-letter brief

4   dispute.

5      **MR. LEVIN-GESUNDHEIT:**  Mike Levin-Gesundheit for

6   plaintiffs.

7      **MS. TESHUVA:**  Hi.  Ariel Teshuva, Munger, Tolles &

8   Olson, for Snap.

9      **THE COURT:**  Good afternoon to you both.

10      Okay.  So I guess -- it looks like Snap has been

11   investigating for quite a while whether or not those documents,

12   especially the ones about HipChat, have been produced in prior

13   litigations.

14      You must know by now whether or not they've been produced.

15      **MS. TESHUVA:**  Unfortunately, Your Honor, the prior

16   production at issue is in a case that terminated over

17   three years ago; and if there was a production, it would have

18   been over six years ago, which is why it's taking us so long to

19   definitively confirm whether there's any documents that remain.

20      As of today, neither Snap and Snap's outside counsel in

21   that matter have not been able to locate any documents.  But

22   given how long ago it was and the fact that it's terminated,

23   some of the attorneys involved are no longer at their original

24   firms and we're checking archival sources, that is why it's

25   taking a few weeks.

1    But we are working on it and are -- do not actually have a

2    dispute with plaintiffs in regards to the substance.  If there

3    is something, we'll review it.  If there isn't, then we'll tell

4    plaintiffs that.  It's just a matter of confirming whether or

5    not there is anything.

6        THE COURT:  Okay.  But, I mean, it's been -- it's been

7    requested since July.

8        MS. TESHUVA:  Just to clarify, the interrogatory was

9    served in July, and we responded in August and identified a

10   prior production that we were aware of in a DOJ matter.  That

11   production, we have located.  We're reviewing it.  Responsive

12   documents from that production will be produced.

13       On September 20th, plaintiffs identified an order from a

14   case six years ago that ordered production of documents.  Snap

15   was not aware that documents were produced six years ago from

16   HipChat.  We're investigating and consulting with Snap's

17   outside counsel in that matter to confirm whether or not there

18   were, in fact, documents.

19       THE COURT:  Okay.  Is the issue that -- did I read

20   this correctly, the HipChat data is no longer available because

21   it's been deprecated?  So you're trying to find out if there's

22   an archived copy of it somewhere?  Is that what this is all

23   about?

24       MR. LEVIN-GESUNDHEIT:  May I respond?

25       THE COURT:  Yeah.

PROCEEDINGS

1          **MR. LEVIN-GESUNDHEIT:**  The issue is that Snap

2     represents that the HipChat data was on a USB drive, an

3     encrypted USB drive.  And it still has the drive, but it cannot

4     access it.  We haven't gotten a lot of clarity about exactly

5     why, and we're working with Snap to do an inspection and

6     understand because, of course, it'd be best to just get into

7     that drive.

8          I do think that there -- there are some things that

9     I think would help move this along, if I might.

10          What I would suggest is that Snap provide reports every

11     14 days until it's completed its investigation, just apprising

12     us of what it's done to try to get to the bottom of this.  We

13     don't know whether it's really gone through its litigation

14     files and asked the right personnel to figure out whether there

15     are other cases where HipChats have been produced.

16          And I would also --

17          **THE COURT:**  Again, is it because you're just trying to

18     find a different copy of the HipChat data somewhere in

19     somebody's files?  Is that why you're asking for all this?

20          **MR. LEVIN-GESUNDHEIT:**  We're trying to find out

21     whether the HipChats can be located somewhere else; that's

22     right.  And, you know, ideally, what we would hope is that if

23     this USB drive cannot be accessed -- and that's Snap's

24     representation -- that in some other litigations, there was a

25     collection, a full collection, of certain custodians' HipChats.

1          So, for example, in the private securities case where we

2     understand we found, ourselves, that Snap had been ordered to

3     produce HipChats from Evan Spiegel, you know, the CEO, I would

4     expect that the way this occurred was that all of Evan

5     Spiegel's HipChats were extracted, stored somewhere, maybe

6     multiple places, perhaps on a hard drive or a server somewhere,

7     at outside counsel or a discovery vendor or at Snap, and then,

8     from there, search terms were applied.

9          So I would hope that perhaps the original collection file

10    is still available somewhere; and, therefore, from that

11    original collection file, this case's search terms could be

12    applied from the full collection of chats.

13         **THE COURT:**  Okay.  So the dispute isn't whether or not

14    they're answering whether or not they were -- whether or not

15    they were produced in the previous litigation.  The real --

16    what you're really going after here is finding out from them if

17    a separate electronic collection of HipChats exists somewhere.

18         **MR. LEVIN-GESUNDHEIT:**  Correct.  And understanding

19    whether there are other cases besides the one we identified and

20    the DOJ matter that counsel referenced exist could shed light

21    on whether there are other sources available.

22         **THE COURT:**  So, I mean, have you gone to the -- you

23    must know who the discovery vendor was back in that prior case.

24    Have you gone to them and just asked if they still have an

25    archived version of what was collected and put on Relativity

**PROCEEDINGS**

1  for that case, assuming Relativity was used?

2          **MS. TESHUVA:**  Your Honor, we are working with Snap's

3  outside counsel in that matter, and my understanding is that

4  they are conducting that investigation.  They're checking their

5  own firm's archival sources and have confirmed -- let me just

6  double-check.

7      I believe they have confirmed with the e-discovery vendor

8  in that case that there is no archival copy that remains, but I

9  would like to double-check that before I --

10         **THE COURT:**  So there is no archival?

11         **MS. TESHUVA:**  No archival copy remaining with the

12 e-discovery vendor.

13         **MR. LEVIN-GESUNDHEIT:**  If I might, in my experience,

14 as much as law firms may not necessarily admit this, there

15 often are ZIP files and TAR files and RAR files that are saved

16 on firm -- secure firm servers and hard drives before something

17 is sent to a discovery vendor.

18     So it's certainly poss- -- I would hope that Snap's

19 outside counsel is searching through its own sources to see

20 whether it still has the HipChat extractions.

21         **MS. TESHUVA:**  And, again, my understanding is that

22 they are searching those archival sources, have not located

23 anything to date.  They are now searching through other

24 archives to -- just to definitively confirm that they don't

25 have anything and that their e-discovery vendor does not have

1    anything.

2        My understanding is that part of the issue is that this

3    firm has moved locations in the past year, so they want to

4    confirm that all documents are where they are supposed to be.

5        And we have not found anything.

6        **THE COURT:**  We're only talking about one law firm?

7        **MS. TESHUVA:**  With this particular matter.  And these

8    are -- I should say, as far as I am aware, HipChat data has

9    only been produced in a DOJ investigation, and we are checking

10   now to see whether it was also produced in this private

11   securities matter.

12       We can confirm with our client definitively that it was

13   not produced in any other matter, and we're happy to do that

14   and confirm that for plaintiffs.  I don't believe that is the

15   case.  But that is my current understanding.

16       **THE COURT:**  Okay.  I'm going to order you to meet and

17   confer and provide either -- at least verbal, if not written,

18   confirmation by email weekly on where things stand in this

19   investigation.  The rog's been outstanding since July.  I mean,

20   time is running out.  I mean --

21       **MS. TESHUVA:**  I do want to clarify, Your Honor.  Of

22   course, we're happy to provide that, but we have been providing

23   regular updates.  We've met and conferred with counsel,

24   you know, at least three times on this matter.  We're happy to

25   continue conferring.  Our goal -- if there is data, we don't

1   disagree, it has to be reviewed.  We're looking for it.  We

2   just have not -- are not finding it.

3          THE COURT:  Okay.

4          MR. LEVIN-GESUNDHEIT:  Might I add something, if I

5   may?

6          THE COURT:  Sure.

7          MR. LEVIN-GESUNDHEIT:  I think that if the HipChat

8   productions from the private securities matter are produced --

9   and my understanding, I believe, is that there were -- the

10  productions were ordered to be produced -- given the delay and

11  given that those productions were already reviewed for

12  privilege, if they're located and that's all that's there,

13  there's no underlying file where search terms can be applied to

14  all of Evan Spiegel's chats, if that's the case, then I think

15  that it would be appropriate for Snap to just reproduce all the

16  documents that were produced in the other case without

17  conducting another review, as it is suggesting.

18         THE COURT:  That's a hypothetical -- let's get --

19  we're not there yet.  I mean, if it comes up that they find it

20  and they know it's the -- it is the production that's already

21  been reviewed, I'm expecting you to meet and confer and,

22  you know, work reasonably on that and not unduly delay the

23  reproduction in this case.

24       But we don't know whether that's the case, but I'm not

25  going to rule on a hypothetical yet.

**PROCEEDINGS**

1        **MR. LEVIN-GESUNDHEIT:**  Understood, Your Honor.

2        **THE COURT:**  But I do want you to be communicating

3    weekly on this because time is -- you know, people have

4    reminded me repeatedly, time is short in this case.

5        **MR. LEVIN-GESUNDHEIT:**  Okay.  And the one other thing

6    I might add.  And if I'm overstepping, please let me know.  I

7    think it will be helpful to get a list from Snap of all

8    class actions that it's been subject to in the last however

9    many years so that we can confirm that the right cases have

10    been examined.

11        **THE COURT:**  I mean, don't you subscribe to Courthouse

12    News?

13        **MR. LEVIN-GESUNDHEIT:**  Well, we've obviously done our

14    own research, but we could have missed something.  I hear what

15    you're saying, Your Honor.

16        It sounds like you don't agree.

17        **THE COURT:**  It sounds like that's something you can do

18    just as easily as they can, so -- based on public sources.  So

19    you can search on Pacer.  You can search on Courthouse News.

20    I'm sure you'll find --

21        **MR. LEVIN-GESUNDHEIT:**  I thought I would ask.

22        **THE COURT:**  Yeah.  No, I don't think that's warranted

23    at this point.

24        Okay.  So -- and I'm hoping to see a resolution of this by

25    the time of the next DMC, one way or the other.  And maybe the

 1  resolution is Snap says, "We've checked and we've checked and

 2  we've checked, and we can't find."

 3         **MS. TESHUVA:**  I hope so too, and we certainly will

 4  continue to confer with plaintiffs about our investigation.

 5         **THE COURT:**  Okay.

 6         **MR. LEVIN-GESUNDHEIT:**  Thank you, Your Honor.

 7         **MS. TESHUVA:**  Thank you, Your Honor.

 8         **THE COURT:**  That's everything that's not the subject

 9  of a letter brief in the DMC statement; is that -- unless I'm

10  missing something.

11      Oh, that's right.  I am missing one.

12         **MR. VANZANDT:**  Good afternoon, Your Honor.

13         **THE COURT:**  Good afternoon.

14         **MR. VANZANDT:**  Joseph VanZandt for the JCCP

15  plaintiffs.

16      So that issue on page 25 of the DMC statement --

17         **THE COURT:**  I skipped it.  You're right.

18      Okay.  She's already there.

19      Okay.  So I was hoping this process was going to work more

20  smoothly than it would.

21      So what is wrong with the two custodians Meta chose?

22         **MR. VANZANDT:**  They unilaterally chose them without a

23  meet-and-confer process.  Your Court --

24         **THE COURT:**  They've chosen them; right?  So that's

25  water under the bridge.

1        I guess my question to you is:  Given that they've chosen

2   them, are they non-representative of what you want?  I mean,

3   what's wrong with those two? is my real question.

4        **MR. VANZANDT:**  Right.  They're not -- they're not

5   plaintiffs' choice.  Defendants don't just get to choose how

6   they do ESL on themselves.

7        So plaintiffs have specifically asked, from the very

8   beginning, for this to be related to Mark Zuckerberg.  And even

9   the two custodians they did choose, they didn't even run the

10  terms back to the first date of employment.  They only ran them

11  back to January 1st of 2006.  So they've completely undermined

12  this whole process.  And we can't fully be able to analyze this

13  issue, as the Court seeks to do, until this has been done.

14       We've already bent over backwards to come up with search

15  terms that defendants could live with, at your Court's -- at

16  the Court's instruction that it should be handled by the

17  parties, not coming back here for it.  And then Meta

18  unilaterally selected these without any meet and confer on the

19  process, knowing that we had different requests.  We had

20  already requested the two that we wanted.

21       **THE COURT:**  Okay.  With the two that they've done

22  already, do you still need two more, including Mark Zuckerberg

23  in one of the two more, or would one more do it?

24       **MR. VANZANDT:**  Right.  In order to try to avoid having

25  to come back here and talk about this, we offered to drop one

**PROCEEDINGS**

1   of the other two.  We offered just for Mark Zuckerberg, to run

2   these same search terms against his; and defendants refused to

3   confer on that and, instead, declared an impasse.

4          **THE COURT:**  Okay.  Why not agree to just do

5   Mr. Zuckerberg's collection?

6          **MS. SIMONSEN:**  Your Honor, Mr. Zuckerberg is probably

7   the least representative of the custodians that were employed

8   prior to 2012.

9          I do want to make clear that the reason that we selected

10  the two custodians we did was because we were approaching the

11  last DMC.  Your Honor had asked the parties, in the DMO that

12  was issued after the August DMC, to make progress on this issue

13  and ideally even have hit reports by the time we came back to

14  you.

15         The issue is, Mr. VanZandt says plaintiffs have been

16  bending over backward.  In fact, they waited, I think, over

17  three weeks after the August DMC to send us not two to three,

18  but four lengthy search strings that didn't comply with your

19  guidance.

20         So we promptly conferred with them.  We explained why they

21  didn't comply.  It then took time to get more search terms

22  back.  As the September DMC was approaching, we felt that to

23  comply with Your Honor's order, at least its spirit, we needed

24  to go ahead and run those search terms.

25         And we did -- in conferring with Ms. Malone, who I've been

**PROCEEDINGS**

speaking with primarily on this issue for plaintiffs, we did

talk about giving them the ability to identify a different

custodian besides Mark Zuckerberg because he is not a

representative custodian, and they declined that offer and

instead sort of doubled down on their efforts to get

information about his documents.

But I think the key here is the question Your Honor opened

with, which is:  Why do they need that information?  Why --

they have it for two custodians, two representative custodians.

The purpose of this exercise was to be able to assess

whether Meta even had anything from before 2012 for any of

these pre-2012 custodians.  We've now confirmed that we do;

and, in fact, it's close to 10,000 documents for just these two

custodians for just three sample search terms, which themselves

are quite lengthy.  But, again -- so that number would be

expected to multiply dramatically by the time we add the rest

of the pre-2012 custodians in.

And I think the real key here --

**THE COURT:**  How many pre-2012 custodians are there

total?  There can't be that many.

**MS. SIMONSEN:**  I think it's only about maybe 15 or so.

But, again, I think they're seeking to add a significant number

of search terms.  I think the last time we were before

Your Honor, they were suggesting that we should have to run all

of the post-2012 search terms over the files of the pre-2012

1    custodians.

2         Your Honor then, for that reason, said, "Give Meta a

3    couple sample search terms and let's see what comes back."

4         So, you know, presumably the list is much longer.

5         And, I mean, the reality is, Your Honor, we're at a point

6    where we're starting depositions.  As Your Honor knows from the

7    colloquy we had at the outset, we have -- we've substantially

8    completed custodial files for the deponents that have gone

9    forward in the past week and that are about to go forward.

10        There might have been time for an expansion of the

11   relevant time period.  We still would have objected that it was

12   improper but -- you know, if this had been timely pursued by

13   plaintiffs, but they haven't timely pursued it.

14        They haven't come to Your Honor with any articulation of a

15   need, which was the -- which was a prerequisite Your Honor

16   articulated at the last DMC.

17        In the interim, Your Honor suggested we run these sample

18   search terms on a couple of custodians to see if there was even

19   a problem, to see if the issue was moot.  Well, we know the

20   issue isn't moot because it returned almost 10,000 documents

21   for two custodians for just three search terms.

22        So then the question becomes:  Now they've had documents

23   produced by Meta for pre-2012 custodian documents going back to

24   the start of the pre-2012 time period, which is 2006 at the

25   earliest.

PROCEEDINGS

1          What Your Honor suggested was:  If the substantial

2   completion deadline is pushed, which it was, plaintiffs come

3   back to me and point me to a reason you think you're not

4   getting what you need after you've seen pre-2012 documents.

5          And even in this briefing that we submitted to Your Honor,

6   plaintiffs are fighting about whether we should have run the

7   terms over a third custodian's documents instead of

8   articulating any need to expand the search terms that were run.

9          And I think at this point, Your Honor, we need to respect

10  the ruling that was issued months ago about the relevant time

11  period.  It's a relevant time period that spans 2006 to 2024.

12  Your Honor knows that Meta is producing, if identified and not

13  privileged, documents hit on by the pre-2012 feature-specific

14  terms, whether they relate to features or any other issue that

15  we've agreed to produce documents responsive to RFPs on.  So

16  there's no reason to think they're not getting the types of

17  material they're looking for.

18         So for those reasons, Your Honor, I think this issue

19  should be put to rest once and for all, and let's proceed with

20  depositions with the wealth of documents these plaintiffs have

21  and go from there.

22         MR. VANZANDT:  Your Honor, I want to, I guess, first

23  recognize what's happening here.

24         So Your Honor gave the plaintiffs a path forward on this,

25  that the parties should meet and confer, both about search

 1  terms and custodians.  Meta completely failed to comply with

 2  the Court's directives and are now asking Your Honor to decide

 3  this issue substantively when we've not even had that

 4  opportunity to do that.

 5      And if we want to talk about substantively, we can.

 6  Your Honor's previous statement was:  Maybe -- well, let me

 7  start over.  There's a lot of points, and I'll slow down a

 8  little bit.

 9      First off, why Mark Zuckerberg?  That goes back to a

10  comment Your Honor made back in August -- quote, "For example,

11  the oldest employee of Meta" -- when Your Honor was talking

12  about who these search terms should be run up against.

13      Mark Zuckerberg is the oldest employee of Meta, to our

14  knowledge.  He started the company.  And that's why it's

15  critical to run the search terms.

16      Your Honor also indicated that when we do these sample

17  search terms, it might result in only a small number of

18  documents, making this issue moot.

19      Meta is now arguing that this is a large number of

20  documents, which is partly true.  It's certainly not a small

21  number of documents.  It is close to -- actually, just over a

22  11,000 documents, which only represents .6 percent of the

23  overall production.

24          **THE COURT:**  Just so I'm clear, it's 11,000 documents

25  after de-duping and --

1          **MR. VANZANDT:**  That's right.

2          **THE COURT:**  Okay.

3          **MR. VANZANDT:**  So that's 11,000 for these two

4    individuals that -- let me take that back.

5          That's 11,000 documents for two individuals.  They only

6    ran them back to January two thousand- -- January 1, 2016, and

7    then they only ran them on emails and internal messaging

8    platforms.  That's it.

9          **MS. SIMONSEN:**  Your Honor, I just want to --

10         **MR. VANZANDT:**  I didn't interrupt.

11         **THE COURT:**  You can respond.

12         **MR. VANZANDT:**  Thank you.

13         **MS. SIMONSEN:**  I was going to correct the number.

14   That's all.

15         **MR. VANZANDT:**  I appreciate that.

16         So it is my understanding that there's 11,817 documents.

17         And this -- you know, I hate to keep coming back and

18   bringing this up.  This is critical to the JCCP, not just

19   because the way we interpret Judge Kuhl's ruling.  Literally,

20   on September 16th, Judge Kuhl stated this, which goes directly

21   to this issue, in a conversation about experts.  Judge Kuhl

22   stated (as read):

23              "There is sort of a peripheral mention of the

24         potential that experts may think about evaluation of

25         general causation design feature by design feature.

1         And that might be required in the MDL, given the

2     product liability ruling."

3         But we have here a negligence theory that has more to do

4     with the relationship of the parties.  It has to do with the

5     relationship of the parties, the conduct, the intent, the

6     motive.

7         And if there are -- if there are, just with this very

8     precursory search, over 11,000 documents that are referencing

9     words like "teen," "preteen," "minor," "kids," "children" back

10    all the way to 2006, that's a problem.  That goes to the core

11    of our allegations, and we should be allowed to do discovery on

12    that.

13        I'm not asking Your Honor to decide the issue

14    substantively today.  Just let us get the hit report so we can

15    analyze this issue, as the Court originally set out, and move

16    forward from there.  That's all we're asking.

17        **THE COURT:**  Just so I'm clear, for the relevant time

18    period, were -- well, who's the second custodian you wanted

19    besides Mr. Zuckerberg?

20        **MR. VANZANDT:**  I don't know if I can say his name.

21    His initials are C.C.

22        **THE COURT:**  Okay.  Were either Mr. Zuckerberg's or

23    C.C.'s documents part of that production, the production --

24    were they part of what's been collected and produced for the

25    relevant time period?

**PROCEEDINGS**

1        **MS. SIMONSEN:**  Yes, Your Honor.  I'm not sure if we've

2   substantially completed productions for those two yet.

3        **THE COURT:**  But they've been collected?

4        **MS. SIMONSEN:**  Yes.  They are part of the relevant

5   time period production, including, you know, pre-2012

6   documents.

7        **THE COURT:**  Okay.  So, again, as to those -- well, as

8   to any of the pre-2012 custodians, again, just so I'm a hundred

9   percent clear -- I know we've gone through this at multiple

10  DMCs -- if a document predates the relative time period but it

11  hits on the search terms, you've been producing it; right?

12       **MS. SIMONSEN:**  So maybe it makes sense just to back up

13  one moment.

14       The sort of capital R, capital T, capital P, relevant time

15  period, the general relevant time period starts January 1st,

16  2012 --

17       **THE COURT:**  Right.

18       **MS. SIMONSEN:**  -- and extends to April 1st, 2024.

19       **THE COURT:**  Right.

20       **MS. SIMONSEN:**  We've run very general search terms

21  over that time frame.

22       **THE COURT:**  Right.

23       **MS. SIMONSEN:**  Then there's the pre-2012 time period,

24  which runs from, at the earliest, January 1st, 2006, through

25  the end of 2011.

1          We're running feature-specific terms, still quite broad,

2     over that time frame; and we're producing responsive material,

3     whether they relate to the implementation of features or any

4     other issue that's responsive in the case.

5          **THE COURT:**  Okay.  And of the, call it, 2006 to 2012

6     time frame documents -- I guess for any of them, if a later

7     document happened to attach an older document, like a 2005

8     document or two thousand- -- have you been withholding the --

9          **MS. SIMONSEN:**  Not to my knowledge.  We wouldn't be.

10          **THE COURT:**  And if the hit -- so are the searches done

11     in a way that if it's a document that's dated before 2006, it

12     just never would have come up?

13          **MS. SIMONSEN:**  I don't believe so.  I know that when

14     we pulled the documents out of Meta's systems to then be,

15     you know, exported into our databases for review, those were

16     limited in the sense that they went back to January 1st, 2006.

17     But I don't believe that we're limiting what we would then

18     produce based on the timing of, like, an attachment or

19     something to that effect.

20          **THE COURT:**  All right.  So while I appreciate the

21     arguments, run the hit reports on Mr. Zuckerberg's documents.

22     Okay?  And let's get the hit reports to the other side.  And

23     maybe -- I keep hoping that, given the passage of time, it's

24     still going to be a small number of documents and it's not

25     going to be that big a dispute.  One can hope.  But we don't

1  know; right?  And so run the hit reports, and we'll go from

2  there.

3      And I encourage you to meet and confer and figure out if

4  you can, for example, limit the number of pre-2012 custodians

5  to a very small number of key people who you think would be the

6  ones that would have the documents, and limit the number of

7  extra search terms -- right? -- to a very small number because

8  you are getting a lot of stuff anyway, even going back to 2006.

9      I know you don't think it picks up everything as to

10  general negligence and causation issues, but the search -- I

11  bet those search terms are broad enough that you are probably

12  getting some stuff.  And you-all know discovery -- I think both

13  of you have cited to me discovery is not supposed to be a

14  hundred percent perfect; right?

15      So -- but if you are getting stuff that goes to your cause

16  of action in the JCCP separate from product liability from

17  pre-2012, then the system is working to some extent.  I know

18  it's not perfect from your point of view.

19      But I'm still holding -- I want to know how many documents

20  are really at issue here because if it's a small number, I'm

21  hoping you can work it out really.  Okay?

22      **MS. SIMONSEN:**  Appreciate that, Your Honor.

23      I did just want to clarify that, as Your Honor previously

24  stated, notwithstanding that it's a negligence claim, which is

25  a claim that the plaintiffs in this case also have, it is based

1  on specific features, and Judge Kuhl's ruling recognized that.

2  And I just also want to point out that Mr. VanZandt

3  mentioned something Judge Kuhl had said at a September 16th

4  conference, which was in the context of discussing general

5  causation experts.  And there was a subsequent confirmation by

6  I believe it was MDL plaintiffs' counsel that the JCCP and MDL

7  plaintiffs do not believe there is a different sort of general

8  causation standard for purposes of the product liability versus

9  negligence claims.

10  So the context in which that statement was made, I think,

11  you know, subsequent events clarify that it's of no import to

12  the instant question, which is whether they're going to get

13  questioned -- going to get documents relevant to their

14  negligence claim and their product liability claim for the MDL

15  plaintiffs through the documents that we are producing.

16  **THE COURT:**  I'm already hearing disagreement from --

17  **MR. VANZANDT:**  Yeah.  I'm not quite sure even what

18  Ms. Simonsen is referring to there; but lest there be some

19  allegation that I misstated what Judge Kuhl said, I have a copy

20  of the transcript here if Your Honor would like to see it.

21  Okay.

22  **MS. SIMONSEN:**  I'm not disputing what Judge Kuhl said.

23  Just a recognition by the -- both sets of plaintiffs that the

24  general causation standard wouldn't sort of be different for

25  product liability versus negligence claims but --

PROCEEDINGS

1          **THE COURT:**  I wasn't in the hearing.  I don't know

2     what she said.  I do know -- you know, I'm not fore- -- I'm

3     certainly not foreclosing the discovery here because we're kind

4     of working our way through it to see if some reasonable

5     proportional amount of discovery is appropriate here, given the

6     difference between the JCCP and the MDL.  That's really what

7     I'm getting at.  I think you've all intuited that if not -- if

8     I haven't said it previously; right?

9          So it shouldn't take that long, hopefully, to get them the

10    hit reports.  Do it, you know, with all reasonable due prompt

11    speed, and meet and confer promptly.

12         I don't -- I mean, I've heard both -- I've read and I've

13    heard, you know, "We've tried to contact them.  They haven't

14    gotten back to us."  All right?  So try to be as prompt as

15    possible in communicating so that I don't have to hear

16    arguments about "They're not responding to me," because you

17    really -- I think I've said it enough times -- you should all

18    be communicating regularly and promptly.

19         **MR. VANZANDT:**  Right.

20         **MS. SIMONSEN:**  And I think --

21         **MR. VANZANDT:**  Your Honor, I would like to confirm,

22    though, that those hit reports are going to be run back to the

23    date of first employment, not the date the defendants have

24    selected.  On their own, unilaterally, they ran these search

25    terms back to January 1, 2016; and that is -- that really

1  defeats the purpose of what we've been requesting.

2      THE COURT:  Well, I thought you ran them --

3      MS. SIMONSEN:  No.

4      THE COURT:  -- back to 2006.

5      MR. VANZANDT:  I'm sorry.  2006.

6      MS. SIMONSEN:  That's correct, Your Honor.  And that's

7  consistent with Your Honor's prior ruling.

8      And the last time we talked about this, in August, the

9  entire focus of Mr. VanZandt's argument was on the general

10  search terms we were running post-2012 and why those weren't

11  sufficient to pick up general issues of liability pre-2012.

12      I understand that they want documents going back to 2004,

13  but Your Honor already conducted a proportionality analysis and

14  determined that before 2012 is not proportional for generalized

15  search terms and before the 1st of January of the date of

16  launch of any pre-2012 feature is not proportional.

17      THE COURT:  So let me ask you this:  In the documents

18  of Mr. Zuckerberg's that are collected and in your database

19  now, does that include anything from pre-2006?

20      MS. SIMONSEN:  It does not because we collected those

21  documents consistent with Your Honor's relevant time period

22  rulings.

23      THE COURT:  Just for purposes of the hit report, let's

24  get what you have now, because I don't want to delay things by

25  having you argue about going back two more years' worth of

PROCEEDINGS

1   documents.

2           **MS. SIMONSEN:**  Thank you.

3           **THE COURT:**  Because, again, maybe going back to 2006

4   tells us there's only a couple hundred documents or a few

5   dozens of documents, and then I'm assuming you can work things

6   out at that point.  Okay?

7           **MS. SIMONSEN:**  Thank you, Your Honor.

8           **MR. VANZANDT:**  Understood.  Thank you, Your Honor.

9           **THE COURT:**  All right.  Let's take a short break.

10  Maybe come back at 2:30.

11          **THE CLERK:**  Court stands in recess.

12                  (Recess taken at 2:21 p.m.)

13                  (Proceedings resumed at 2:35 p.m.)

14          **THE CLERK:**  Court will come to order.

15      We are back on the record in Case Number 22-md-3047,

16  In Re Social Media Adolescent Addiction/Personal Injury

17  Products Liability.

18          **THE COURT:**  Okay.  Let's do joint letter brief on

19  plaintiffs' RFPs Number 16 and 18, which the complete version

20  is Docket 1198-1, which was sealed.  It's got no redactions,

21  so...

22          **MR. KRAMER:**  Good afternoon, Your Honor.  Andrew

23  Kramer for the YouTube defendants.

24          **THE COURT:**  Who's arguing this one for the plaintiffs?

25          **MS. SIEGEL:**  Good afternoon, Your Honor.  Audrey

PROCEEDINGS

1    Siegel on behalf of the school district personal injury

2    plaintiffs.

3         THE COURT:  Okay.  So just a clarification question

4    for me.  What are growth teams?

5         MR. KRAMER:  I think that's a good question.  It's a

6    very broad term.

7         MS. SIEGEL:  Sure.  Growth teams are teams that are

8    intended to grow the user base or user engagement.

9         THE COURT:  Is that like a term of art used within

10   YouTube, or is it --

11        MS. SIEGEL:  I'm not sure, but we have been using the

12   words "growth" for other purposes as well.  For example,

13   I think that we used "growth" or a similar term in terms of

14   defining materiality of changes if it has an impact on growth.

15        THE COURT:  Okay.  So is -- on RFP 16, is YouTube --

16   well, is there really an objection that, conceptually, the

17   discovery sought is not relevant --

18        MR. KRAMER:  I think the issue --

19        THE COURT:  -- or is the argument really that it's not

20   proportional?

21        MR. KRAMER:  I think the issue is that parts of it are

22   not relevant, large parts, because not every form of user

23   categorization regarding growth or research or advertising is

24   relevant in this case.

25        This case is about minors.  And the only theory of

1  relevance that plaintiffs have identified for user

2  categorization is that these documents might support their

3  allegations regarding the targeting of minor users on the

4  service.  So production of documents regarding all manner in

5  which YouTube's engagement or research or advertising teams

6  might categorize users would not be productive or proportional

7  here.

8      And I think the documents that plaintiffs cite from

9  YouTube's productions illustrate this point well.  For example,

10 one of those documents discusses research that YouTube

11 conducted into its user base, and that research groups users by

12 theoretical profiles, such as intellectuals or information

13 seekers.  That sort of categorization, in the context of user

14 research, is not relevant to the claims here.

15     And to the extent there's some portion of this request

16 that might seek documents that are relevant, such as documents

17 concerning YouTube's categorization of minors in the context of

18 analyzing engagement, those documents are already being

19 produced in connection with YouTube's responses to plaintiffs'

20 other requests that are specifically about areas such as

21 research, advertising, or engagement.

22     In fact, YouTube has already produced thousands of

23 documents that discussed user categorization in the context of

24 recommendations, engagement, advertising, research, and those

25 discussed demographics and user segmentation.

**PROCEEDINGS**

1          So YouTube's response to RFP 16, together with its

2     response to the RFPs that are actually about research,

3     engagement, and the issues in this case and discuss

4     categorization in those contexts, give plaintiffs what they

5     reasonably need.

6          But it would not be proportional for YouTube to

7     separately, in response to this request, seek out and identify

8     every conceivable way that its research, engagement, or

9     advertising teams might categorize users, regardless of how

10    those categorizations are relevant to any issue in this case.

11         **THE COURT:**  Okay.  On relevance, why is -- why would

12    documents that go to whether or not YouTube categorizes users

13    as intellectuals versus -- is there a contrary category?

14         **MR. KRAMER:**  I don't think it was a this versus that.

15    It was just different profiles.  So you could be an

16    intellectual.  You could be an information seeker.  It was

17    just --

18         **THE COURT:**  So why are those categorizations relevant

19    for purposes of discovery?

20         **MS. SIEGEL:**  Sure.

21         Our claim that YouTube uses user data to target minors

22    isn't limited to:  The user data specifically is only used for

23    the purpose of targeting a specific minor.  Right?  Instead,

24    it's that the collection of data is used to make sure that each

25    user is maximally engaged by giving recommendations that are

PROCEEDINGS

1    based on those categories.

2         So, for example, they collect the information that a user

3    is intellectually engaged for the purpose of providing

4    recommendations that will keep the minor user's eyes glued to

5    the page.

6              THE COURT:  Okay.  What's your response to that?

7              MR. KRAMER:  Again, it's that to the extent these

8    documents discuss the categorization of minor users in

9    situations such as engagement, that document is already being

10   picked up in response to the engagement RFPs.  So to the extent

11   those are responsive, they're already being picked up.

12        But this request is separate from those requests that are

13   actually about discrete issues.  This is broadly just seeking

14   identification of every way that we categorize, and that's

15   simply too broad.

16             THE COURT:  That goes to proportionality too.

17             MR. KRAMER:  I think it's a mix of both

18   proportionality and just overbreadth here, to the point where a

19   lot of the things that they're asking about isn't relevant.

20        And to the extent that there is a document that discusses

21   minor users and engagement of minor users and might discuss a

22   profile that has to do with intellectuals in that context, that

23   is responsive to the engagement or the research RFPs.

24             THE COURT:  Circling back to my first question, when

25   you reference -- you said you proposed limiting documents to

1  three discrete areas:  user research, advertising, growth

2  teams.  Are there specific custodians you've identified that go

3  to each of those categories?

4       **MS. SIEGEL:**  There are particular custodians who go to

5  those categories, and their custodial documents, I believe, are

6  being searched for not a list of all the ways that it

7  categorizes users, but for other requests.  And those requests

8  may include documents that happen to demonstrate some of the

9  ways that they are categorizing users.

10      But I want to say that I believe that counsel is

11 conflating the issues of relevance and proportionality.  For

12 example, the fact that they have produced documents that may

13 have some overlap with this request and may have some tendency

14 to show what the categories are is not the same as producing a

15 document that describes what the categories are.  And the fact

16 that a document may be relevant to more than one RFP doesn't

17 provide a basis to refuse to produce documents responsive to a

18 particular RFP unless there's a showing of unreasonable,

19 cumulative discovery or duplicative discovery.

20      And I feel like he's conflating those issues; right?  One

21 goes to burden and one goes to relevance.

22      The categories of document -- the categories that they're

23 using are relevant because they go to how YouTube is collecting

24 this information to use it for the purpose of increasing

25 engagement and user growth.

**PROCEEDINGS**

1    **THE COURT:**  So if there's a random email from one

2    YouTube employee to another, saying, "Some of our users are

3    over 18 and some of them are under 18," and they go on to talk

4    about something else, is that the kind of document you're going

5    to --

6           **MS. SIEGEL:**  No.  It's specifically --

7           **THE COURT:**  -- such as that randomly --

8                    (Simultaneous speaking.)

9       (Stenographer interrupts for clarification of the record.)

10          **THE COURT:**  Is that the kind of document you're trying

11   to pick up because somebody in YouTube said, "We have two

12   groups of user bases"?

13          **MS. SIEGEL:**  It specifically is not.  We did not ask

14   for all documents demonstrating any category of users.  What

15   we've asked for is, narrowly, documents sufficient to show what

16   categories are being used.  So we're looking for, you know,

17   schemas, prototypes, or explanatory documents that describe how

18   these categories are made.

19       And I would note that YouTube's production, including

20   productions that postdate the letter brief, demonstrate that

21   YouTube does have documents, for example, explaining what

22   inferred demogra- -- how reliable inferred demographics are and

23   how those inferred demographics are obtained.  So it's

24   reasonable to expect that that type of document would also

25   include information concerning the categories for inferred

PROCEEDINGS

1    demographics.

2         This was not included in the letter brief because it was

3    produced after the letter brief.  But so, no, we're not looking

4    for the one-off email that says, "Hey, we have some users under

5    18."  What we're looking for are documents sufficient to show

6    what these categories are.

7              **MR. KRAMER:**  Your Honor, if I --

8              **THE COURT:**  Yeah.  Go ahead.

9              **MR. KRAMER:**  I think plaintiffs were envisioning there

10   might be some grand list that lists:  Here are the ways that

11   users are categorized when we're thinking about engagement or

12   advertising.  It's just simply not that easy.

13        And as I think Your Honor might have recognized, these

14   categories are very broad.  Growth, advertising, engagement,

15   research, those could touch virtually every aspect of YouTube's

16   business.  And investigating every way that YouTube might

17   categorize users in those contexts would involve dozens, if not

18   hundreds, of different teams to see how they categorize users

19   going back years in all kinds of contexts that aren't relevant

20   in this case.

21             **THE COURT:**  Okay.  Go ahead.

22             **MS. SIEGEL:**  I think it's reasonable to say that the

23   three teams listed may, in fact, include, you know, five teams;

24   but I think to go on and say dozens and dozens of teams or, as

25   YouTube argues in its brief, that it implicates the entire

PROCEEDINGS

1   database when we're asking specifically for a subset of teams

2   related to user research, growth, growth which encompasses

3   engagement, and advertising is not correct.

4        And I would also note that we're asking for sufficient to

5   show.  So they're now coming back and basically arguing that

6   the -- that an inability to perfectly give every single

7   category that they may have ever used in some subset of teams

8   not listed is not a basis to not provide us with documents that

9   do relate to the specific ways that these teams categorize

10  users.

11       **THE COURT:**  So that goes back to my first question.

12  So is user research the name of a specific team, identifiable

13  group of people within YouTube?  Is advertising -- I assume

14  there's an advertising department.  It may have a different

15  name but --

16       **MR. KRAMER:**  I think there's an advertising umbrella

17  that could implicate many different teams who discuss

18  advertising in different contexts, who play different roles

19  within that.  So, I mean, there's a whole -- there's a whole

20  silo, a whole sector of the business that deals with

21  advertising, but it's not as easy as there's an advertising

22  team.

23       **THE COURT:**  This goes back to one of my other

24  questions.  Are there specific custodians that you think would

25  be the prime people to have these kinds of documents that

**PROCEEDINGS**

1  you've identified?

2      MS. SIEGEL:  There are custodians within the teams,

3  but we don't necessarily know that the custodian file itself

4  would have the documents that we're asking for that are

5  sufficient to show.  But we could work to identify the list of

6  teams that this is intended to encompass in terms of the

7  custodians that are on those teams as they're -- they've been

8  named by defendants.

9      THE COURT:  Have you proposed search terms to get at

10 what you're really looking for?

11     MS. SIEGEL:  We have proposed global search terms that

12 are getting to RFPs.  I don't think that this is really a

13 search term issue necessarily, but we are willing to propose

14 search terms that we think would get to this specific RFP.

15     THE COURT:  Without search terms, other than a manual

16 search, how do you want them to find the documents?

17     MS. SIEGEL:  There -- well, in the first place, there

18 are search terms that we believe would provide sort of

19 responsive documents to this.  So doc- -- you know, that's the

20 first basis.  But just because they're using those search terms

21 doesn't mean that they're going to produce the documents that

22 are responsive to those search terms.

23     So, for example, it may be that YouTube has already

24 located a document that specifically addresses this request

25 pursuant to the search terms; but because YouTube has not

1  agreed to produce -- those documents don't fall within the

2  scope of an agreement that YouTube has made to produce

3  documents, they would still withhold it.

4      So we can --

5          THE COURT:  Stop right there.

6      If a document hits on a search term that the parties have

7  negotiated and agreed upon, are you withholding them if they --

8  unless they're privileged?

9          MR. KRAMER:  We may if it doesn't fall within the

10  agreement to produce.  The search -- we have over a thousand

11  search terms, and they're very broad.  One could be Gen Z.

12  Just because something hits on that doesn't necessarily mean

13  it's responsive to one of plaintiffs' requests.

14          THE COURT:  Is there a secondary level of review going

15  on to see whether it falls within either -- some agreed-upon

16  scope of relevance?  Is that what's going on?

17          MR. KRAMER:  That's right, Your Honor.  But as I

18  discussed, we've produced thousands of documents that already

19  discussed user categorization because, to the extent plaintiffs

20  are interested in how YouTube categorizes users, if that is

21  relevant to their case and it's discussed in a document that is

22  discussing minor users and any of those issues regarding

23  categorization are part of that discussion, that document is

24  being produced in response to other RFPs regarding research,

25  advertising, and engagement.

 1            THE COURT:  Okay.

 2            MS. SIEGEL:  If I could add --

 3            THE COURT:  Yeah.

 4            MS. SIEGEL:  -- one point about search terms, which is

 5     that, yes, search terms can be used, and I do think that there

 6     would be documents that we are looking for produced by the

 7     already existing search terms or additional search terms.

 8         But, in addition, YouTube has, basically, collections of

 9     schema and databases and documents that relate to that; and so

10     YouTube could likely -- or at least they haven't represented to

11     us that they couldn't -- go to a catalog of, you know, schema

12     related to particular tables, select the ones that are

13     relevant, and produce them.

14         It isn't necessarily true that what we need is a search

15     term in order to get these explanatory documents or schemas.

16            THE COURT:  You say schema related to particular

17     tables?  What does that mean?

18            MS. SIEGEL:  Sure.  So there's documents where --

19     where they're saying -- where they say things like, "Oh, okay.

20     Well, we -- the inferred demographics are in a particular

21     island or table within Bigtables."  And so YouTube could go to

22     that Bigtable where they know that it is and could download

23     them -- right? -- or download the list of schema.  It's not

24     necessarily search-term dependent.  That's only one way to find

25     the documents.

**PROCEEDINGS**

1      **THE COURT:**  Are you saying "Bigtable"?

2      **MS. SIEGEL:**  Yeah.  Bigtables is a database.  That is

3  the name of a database that YouTube uses.

4      **THE COURT:**  But it's not -- okay.  You're not saying

5  it's a big table.  That's a term used within YouTube, I guess,

6  or is it --

7      **MS. SIEGEL:**  Andrew could perhaps better explain that,

8  but I understand Bigtable to be a type of data repository or

9  table.

10      **MR. KRAMER:**  Your Honor, this is news to me.  But like

11  I said, to my knowledge, there is not some proto or some table

12  that lists all the ways that YouTube categorizes its users.

13  It's not as simple as pulling something -- pulling some

14  database that will give plaintiffs a list of:  Here are all the

15  ways they do it, and here's all the contexts in which users are

16  categorized.

17      **MS. SIEGEL:**  Have they -- have you asked your client

18  if that is the case?

19      **MR. KRAMER:**  We have investigated that, Your Honor.

20      **THE COURT:**  I don't -- if it doesn't exist, it doesn't

21  exist.  I mean, so -- okay.  So if you're saying there is no

22  such schema after reasonable inquiry and investigation --

23      **MR. KRAMER:**  Your Honor, we would be happy to confirm

24  that for plaintiffs.

25      **THE COURT:**  Then confirm that and do provide --

PROCEEDINGS

 1    certainly, you need to provide a supplemental response to the

 2    RFP, then, so it's formally part of the discovery record here

 3    that no such documents exist.

 4        Okay.  So assuming schemas regarding the Bigtable don't

 5    exist, what other types of documents do you think might exist

 6    that would go to what you're looking for?

 7            MS. SIEGEL:  Sure.  So as I mentioned before, search

 8    terms that hit on particular ages or demographics may include

 9    or have already hit upon documents related to -- to --

10    documents that do show all of the ways that users are

11    categorized, but they may still be being withheld from

12    production based on the scope of defendants' agreement.

13        I would note that in that regard, as to the search terms

14    already in place, there's no additional burden as they're

15    already searching through these documents.

16        And to your point, you know, we could look at a discrete

17    category of search terms like schema -- schema within a certain

18    number of some of these demographics or other methods by which

19    they categorize plaintiffs -- or categorize users.

20            THE COURT:  Okay.

21            MR. KRAMER:  Your Honor, if I may.

22        I have concerns with -- it seems like plaintiffs want to

23    engage in new search term discussions for this specific

24    request.  We're weeks away from substantial completion, and

25    they already have thousands of documents that discuss this

1  issue.  If there are specific questions that they have, we're

2  happy to discuss those; but I don't believe it's appropriate to

3  discuss new search terms and --

4      **THE COURT:**  Well, so if the concern is that they've

5  run search terms and found documents that you think would

6  respond to RFP 16 but they've withheld them in some way, can

7  you confirm whether you've done that or not?  I mean, or can

8  you -- I mean, you're saying you've already produced thousands.

9  Are there any others that you've found, but not produced?

10      **MR. KRAMER:**  Your Honor, I think part of the issue is

11  the breadth of RFP 16, which seeks documents -- which seeks

12  identification every way that any of these groups -- in any of

13  these contexts of research, engagement, or I believe it was

14  advertising may have categorized users.

15      I don't know if there are documents that discuss that in a

16  context that isn't also discussing something relevant here,

17  like looking at minor users and their engagement.  So I

18  can't --

19      **THE COURT:**  So you have been starting reviewing the

20  documents they've produced to date.  Are there -- is there a

21  specific -- I don't want to give it a name.  Are there a

22  specific advertising group, like weekly report or, you know,

23  user growth team quarterly strategy document that has a --

24  seems to be a regular document that you've identified within

25  the company that has these kinds of -- or we believe would have

1    these kinds of categorizations?

2         MS. SIEGEL:  I'm not sure that I entirely understand

3    that question.

4         THE COURT:  Well, you've started to review YouTube's

5    documents; right?

6         MS. SIEGEL:  We've reviewed documents.  We have found

7    documents that indicate that there are ongoing discussions in

8    which one person will ask "How do we find how the user

9    demographics are being calculated?"  And they say, "Go to this

10   document which will explain how the user demographics inferred

11   are being discussed."

12      But that document has not been produced, for example.

13        THE COURT:  Ask them to produce it.

14        MS. SIEGEL:  The document describing that was produced

15   last week.

16        THE COURT:  Okay.

17        MS. SIEGEL:  So not as of yet.

18        THE COURT:  Okay.  I assume YouTube's going to be

19   reasonable, that if they come to you -- if the plaintiffs come

20   to you with -- show you that a document that's been produced

21   references another document that hasn't been produced and falls

22   within the scope of a document request, that it should -- that

23   you'll go get it.

24        MR. KRAMER:  We're happy to have discussions with

25   plaintiffs in that regard, and we're happy to work with them

1    cooperatively.

2          **THE COURT:**  Okay.

3          **MS. SIEGEL:**  I would just reiterate that YouTube still

4    hasn't definitively stated whether documents that are -- that

5    would describe the schema and whether it exists, that they

6    could just go pull this schema or pull this -- pull documents

7    related to these categories.  They still haven't even

8    established that.  And so I would ask that they be required to

9    answer that one way or another and produce them if they do

10   exist.

11         **THE COURT:**  I thought that's what we talked about;

12   that you were going to go back -- you told me that they don't

13   exist.  Are we talking about the documents that you said don't

14   exist?

15         **MR. KRAMER:**  If we're discussing a proto or a grand

16   schema that lists all the ways we categorize, my understanding

17   is that does not exist; but I'm happy to go back and discuss

18   with my client and confirm with the plaintiffs.

19         **MS. SIEGEL:**  Even if a grand schema that relates to

20   all three -- to every department in the entire YouTube or

21   Google does not exist, that doesn't mean that it doesn't exist

22   within -- that there aren't schema within these particular

23   teams, even if the teams need to be named more -- with more

24   particularity.

25         **THE COURT:**  I think we've established these aren't the

PROCEEDINGS

1   names of teams; right?

2        **MS. SIEGEL:**  Okay.

3        **THE COURT:**  These are -- these are descriptions of

4   functional units within the company that could be, what I'm

5   hearing, is multiple teams; right?

6        **MR. KRAMER:**  Certainly, Your Honor.

7        **THE COURT:**  All right.  So this is why I keep going

8   back to whether you've identified custodians who you think

9   might be the kinds of people who would have these kinds of

10  documents.

11       **MS. SIEGEL:**  We have.

12       **THE COURT:**  All right.  Then I'm going to order you to

13  meet and confer.  You identify -- plaintiffs identify the

14  people -- the custodians who you think would have these kinds

15  of documents that you're looking for.  All right?

16       And, YouTube, go ask those people:  Do you have protos?

17  Do you have schemas?  Do you have engineering, you know,

18  software architecture documents, whatever they are -- right? --

19  that describe the category -- what is it?  You want the

20  categorization of the user base.  Is that what you're getting

21  at, or the demographics?

22       **MS. SIEGEL:**  The categories that are -- yes, the way

23  that users are categorized.

24       **THE COURT:**  Okay.  So it feels like you haven't met

25  and conferred enough on this, so you need to really figure that

**PROCEEDINGS**

1    out.

2         The other thing I was thinking is, other than protos and

3    schemas, the only other documents -- type -- specific types of

4    documents that is referenced in the briefing here are, like,

5    customer surveys and questionnaires.  By definition, don't

6    customer surveys and questionnaires have categories of users in

7    them?  Not the responses, but the actual -- I mean, right?

8    Because you're getting demographic data from the users.

9         **MR. KRAMER:**  I think the responses might clarify

10   certain demographic information, but I don't know if in sending

11   out the surveys, they are sending them to certain groups based

12   on it but --

13        **THE COURT:**  What they want to know is how you

14   categorize people.  So, for example, if the survey says, "Are

15   you under 18?  Are you over 18," you've categorized in the

16   survey -- it doesn't matter what the people respond.  You've

17   created categories in the survey when you're sending questions

18   to users.

19        Do you understand what I'm saying?

20        **MR. KRAMER:**  I take the Court's point, yes.

21        **THE COURT:**  All right.  So, again, if any of these

22   custodians have demographic surveys, user questionnaires, user

23   surveys, you know, you don't need all the responses.  All you

24   need is the survey itself.  That will show you the way at least

25   the person who created those surveys categorized users when

1  they asked questions about them; right?  I mean, by definition;
2  right?

3      MR. KRAMER:  I believe it would, Your Honor, but the
4  way that user -- the way that YouTube might ask users who are
5  responding to surveys to report certain demographic
6  information, that doesn't mean that that is being used in any
7  way that's relevant in this case.

8      THE COURT:  Well, that's for follow-up discovery by
9  them when they ask witnesses about how they're used; right?  I
10 mean, unless the document, on its face, says, "This is going to
11 be used for" -- right?

12    I mean, but if the survey exists, it seems to me that's an
13 easy, identifiable, not burdensome way to find at least a small
14 subset of documents that are clearly responsive to the RFP.

15     MR. KRAMER:  I think we would have some concerns,
16 Your Honor, if we have surveys that are directed toward purely
17 adult users, for example, where this case is about minor users.
18 And if it's not a way that adult users are being asked to
19 report or identify, I don't see how that would be relevant if
20 there's no tie to minor users in this case.

21     THE COURT:  Well, I mean, I think there -- as I
22 understand the plaintiffs' argument, that the way that YouTube
23 operates, it tries to maximize engagement across a number of
24 different factors.  And so they -- it may relate, ultimately,
25 to engagement by minors; but how those -- how -- tell me if I'm

1    summarizing incorrectly -- but how the user base is understood

2    and split up feeds into that, ultimately.

3        And while the end result is whether or not minors are

4    engaged, I just -- for purposes of discovery -- again, it's

5    going to be a limited -- you don't have a -- there can't be

6    that many customer surveys and questionnaires out there.  So I

7    just don't see the -- balancing proportionality and relevance,

8    I think they still should get them.  Okay?

9        All right.  Again, from the custodians who they identify.

10   Okay?  Because I'm not asking you to go back to the company

11   and, like, survey everybody.  Okay?  Because, presumably,

12   plaintiffs have done their homework and have tried to figure

13   out who's who within the company.

14       Okay.  But, again, a lot of this, I think you're going to

15   need to meet and confer further on it.  Okay?

16       **MS. SIEGEL:**  I would also ask that to the extent that

17   documents sufficient, that are actually showing this

18   information, have already been collected and found to be

19   responsive to search terms, I don't think that they should be

20   withheld based on -- based on the scope of other --

21       **THE COURT:**  I asked him the question.  He doesn't

22   know, standing here, whether or not they've been withheld.

23       **MS. SIEGEL:**  Right.  So I'm just asking that that be a

24   part of the meeting and conferring, is determining whether

25   those have been withheld already.

1          **THE COURT:**  I'm expecting a fulsome and transparent

2     and cooperative conversation in your meet and confers, as I

3     always expect.  Okay?

4          **MR. KRAMER:**  Certainly, Your Honor.

5          **THE COURT:**  Okay.  This is granular enough, I'm going

6     to ask you two to prepare a proposed order on this because you

7     know what you're going for in more detail than I do.  It's one

8     of those situations where you know the case better than I do.

9          RFP 18, well, would that be subsumed in all this?  I mean,

10    if the only dispute is whether they should -- you should be

11    getting documents sufficient to show analysis based on race and

12    ethnicity, since they've already agreed on age and gender,

13    isn't that part of what you're going to be getting?

14         **MS. SIEGEL:**  I think the RFPs are distinct.  So

15    Number 16 is asking just sufficient to show what the categories

16    are; whereas, 18 is asking for actual analysis concerning the

17    demographic categories of -- as limited, age, gender, and race,

18    ethnicity.  So the first request doesn't ask for the analysis.

19    It just asks for the categories.

20         **THE COURT:**  So how do you respond to YouTube's

21    argument that race and ethnicity isn't part of the group that

22    is alleged to be harmed here?

23         **MS. SIEGEL:**  Sure.  What I would say is that

24    plaintiffs' allegations in the complaint aren't necessarily --

25    they don't necessarily attempt to identify every basis on which

PROCEEDINGS

1  defendants collect data and utilize data.  Instead, they allege

2  more broadly and more holistically that they collect data and

3  that they use that data for the purposes of increasing

4  engagement, growing its user base, and advertising.

5       And so data -- if you take data, certainly the term "data"

6  and personal information would include basic demographic

7  information such as race and ethnicity.

8            THE COURT:  Yeah.  But if it doesn't go to your cause

9  of action, why is it within the scope of relevance for

10  discovery?

11           MS. SIEGEL:  Well, it does go to our scope.  So it

12  goes to how -- how race and ethnicity, as one part of the data

13  that are being collected, is being used to further engage and

14  addict people of particular races and ethnicities to the

15  platform.

16       So, for example, they may be determining a user's race and

17  ethnicity and then determining that because they have this race

18  and ethnicity, they want to see information from creators that

19  share that ethnicity; or they want -- I don't know -- anything

20  based on a stereotypical statement of a race or ethnicity.

21       And so it relates to how they may be utilizing that

22  information to continue to addict and increase engagement of

23  users who happen to be of a particular race and ethnicity.

24           THE COURT:  Response?

25           MR. KRAMER:  Yes.  I think this sort of circles back

**PROCEEDINGS**

1  to a similar point where not every analysis regarding race,

2  ethnicity has anything to do with plaintiffs' claims.  This

3  case isn't about race.  There are no race-based allegations

4  against YouTube in this case.

5      To the extent there are discussions or analyses

6  regarding -- I heard my colleague mention engagement.  To the

7  extent there are analyses regarding engagement and minor users

8  and looking at potentially a disparate impact or differences

9  between race, that's being picked up and produced because it's

10  responsive to that separate issue.  But a request asking for

11  every analysis concerning race just sweeps too broadly,

12  Your Honor.

13      **THE COURT:**  Okay.  How do you -- asking for -- I mean,

14  asking for every -- here, you are asking for every single

15  analysis based on race and ethnicity.  You're not asking for

16  documents sufficient.  So how do you respond to that objection?

17      **MS. SIEGEL:**  I would note that, again, the request is,

18  either way, limited to the search of the custodians that we've

19  already agreed upon, and those custodians are -- are expected

20  to sort of be on some of the youth teams or, rather, be

21  directed toward youth and engagement.

22      But I did want to just -- my colleague has asked to say

23  something on behalf of the school district plaintiffs, so I

24  wanted to let him jump in for a second.

25      **MR. WEINKOWITZ:**  Mike Weinkowitz on behalf of the

1   school district plaintiffs.

2        On the issue of race and ethnicity, there is an allegation

3   in this case that certain youth of certain races and

4   ethnicities have been impacted -- have been impacted at

5   schools; and as a result, the school districts have suffered

6   damage.

7        So I just wanted to make sure that we weren't just talking

8   about the personal injury plaintiffs; that there is an

9   allegation here, particularly with one school district, the

10  Baltimore School District, that their youth have been impacted.

11  And it's not just a matter of youth, but it's a matter of race

12  and ethnicity, and they have suffered damages.  So there is --

13  there is relevance here beyond just the PI school districts,

14  the PIs.

15       **THE COURT:**  Do you dispute that?

16       **MR. KRAMER:**  I don't dispute that there may be an

17  allegation, Your Honor.  But I think this also circles back to

18  there's an RFP about research regarding the possible impact

19  that use of YouTube may have on its users.  And to the extent

20  there was a document discussing children's school or minors and

21  the possible impact that use may have and it discusses

22  disparate impacts based on race, that's being picked up in

23  respect to the research requests.

24       **THE COURT:**  Have you identified the custodians who you

25  think would have the documents responsive to RFP 18?

1       **MS. SIEGEL:**  I don't believe that's been a part of the

2  parties' efforts to meet and confer on this particular RFP.

3       **THE COURT:**  So I order you to meet and confer on this

4  RFP.  Plaintiffs are to identify the custodians who they

5  believe would have documents responsive to this RFP.

6       As with the other one, if YouTube has found such documents

7  but not produced them because of some prior agreement about

8  whether or not things should be produced or not, you should

9  produce them.  Because you've already found them, you should

10 produce them.

11      And I think it's incumbent on the plaintiffs to

12 identify -- I mean, again, every analysis, any kind of

13 analysis?  You've got to put a little more -- in the meet and

14 confers, put more detail.  Again, you've seen their internal

15 documents.  Maybe they've got a quarterly titled report that

16 goes into this or a set of documents from a marketing group or

17 whatever it is -- right? -- that you can point to as the type

18 of document you're looking for, in which case, then, if those

19 types of documents from those custodians exist that talk about

20 race and ethnicity, if they haven't been produced and searched

21 for, they ought to be.

22      **MR. KRAMER:**  Understood, Your Honor.

23      **THE COURT:**  Okay.  So, again, include RFP 18 in the

24 joint proposed order too.

25      Anything further on this one?  I think I've covered

1    everything.

2             **MS. SIEGEL:**  I think --

3             **MR. KRAMER:**  I don't believe so, Your Honor.

4             **THE COURT:**  Okay.  Hopefully, I'll see a report in the

5    next DMC report that you've resolved all this.

6             **MS. SIEGEL:**  Thank you.

7             **MR. KRAMER:**  Thank you, Your Honor.

8             **THE COURT:**  All right.  Who's going to do lost devices

9    of non-bellwether plaintiffs?

10            **MR. HALPERIN:**  Greg Halperin, Your Honor, for Meta on

11   behalf of the defendants.

12            **MS. CARROLL:**  Jessica Carroll on behalf of the

13   personal injury plaintiffs.

14            **THE COURT:**  All right.  I suppose this is really the

15   defendants' motion to compel, so why don't you go first.

16            **MR. HALPERIN:**  Yes, Your Honor.

17       There are really two facts here that I think are

18   undisputed that drive this issue.  The first, plaintiffs'

19   devices have discoverable information on them.  There can be no

20   doubt that they have information about the time that plaintiffs

21   were spending on other platforms, that they have information

22   about notifications; and for that reason, Your Honor recognized

23   the relevance of full-file forensic imaging of the bellwether

24   plaintiffs' devices previously; and Judge Kuhl, as recently as

25   last month, indicated that this sort of data is critical.

**PROCEEDINGS**

1    The second relevant fact is that absent taking steps to
2    preserve this information, just by the passage of time, that
3    information will be lost by plaintiffs' ordinary operation of
4    their phones, which, as we understand it, overwrite older usage
5    data, older notifications data to make room for the newer data.

6    As plaintiffs told Judge Kuhl, they understand some of
7    this data exists only for 30 to 60 days.  And as plaintiffs'
8    expert, in one of the MDL cases where the plaintiff lost the
9    device and submitted a declaration from an expert, told us,
10   quote (as read):

11        "In my experience, these logs are generally made
12        available for 30 days, depending on device usage."

13   Those two facts, relevance and ephemerality, trigger an
14   obligation of all plaintiffs, not just the bellwether
15   plaintiffs, to take steps to preserve this data.  The
16   information exists on plaintiffs' devices.  It's not in our
17   possession.

18   We know of only one way to preserve this data.  We know of
19   the way that we've proposed, full-file forensic imaging.  We've
20   asked plaintiffs repeatedly:  If you have some other way that
21   you are taking -- some other step that you know of to preserve
22   this data, tell us and we can confer about whether we think
23   that's a sufficient way to preserve this data.

24   But rather than come to us and say, "Yes, we actually have
25   some other way and we're doing it," they've simply told us,

"We're not doing full-file forensic imaging, and we're not going to tell you what we're doing to preserve this data."

In fact, we've asked them:  Have you even sent hold notices to all of your plaintiffs?  Will you tell us when you sent a preservation letter to your plaintiffs?  Did you send a letter and when?

They've told us they won't tell us that either, even though they secured an order from this Court that defendants have to provide, for every person we put on a hold list, who it was and when we did it.

In September and October of 2022, now more than two years ago, Meta sent letters to virtually every plaintiff counsel in the case, reminding them of their preservation obligation as it relates to the devices they've used.

They never responded to tell us that they weren't preserving this data.  We learned about it in the course of negotiations and conferrals about the bellwether plaintiffs' devices and what they were or were not doing to preserve that data.

By not preserving this data back when the cases were originally filed several years ago, we believe we've already lost some data closest in time to when the cases were filed.

What we're seeking here is not a sanction or any sort of backward-looking remedy for what's happened already.  We're simply seeking to prevent further loss of data that will

1  continue to happen by the passage of time in these cases.

2      And so what we've asked, Your Honor, is two things.  One,

3  for plaintiffs' counsel to confirm that all their clients

4  received litigation holds.  And since some of these clients --

5  many of these clients are minors, some as young as 10 years

6  old, that they didn't just send some legalese to their clients

7  to preserve data; they've actually taken steps to ensure their

8  clients understand their obligation here.

9      And, two, that they perform full-file forensic imaging of

10 the main devices used in the relevant time period.  Not to

11 produce them to us, we're not asking for production at this

12 time, but simply to preserve those images so that if these

13 cases are ultimately moved into discovery, we have the data

14 that would otherwise be lost.

15     Now, as to the hold issue, the first issue, there's reason

16 for concern that a number of plaintiffs either didn't receive a

17 hold or didn't understand their hold obligations.  A

18 significant number of bellwether plaintiffs have lost main

19 devices, either in the MDL or the JCCP, that heighten concerns

20 for the rest of the pool as to whether they received or

21 understood their obligations.

22     That includes a plaintiff in the MDL who performed a

23 factory reset of her iPhone prior to imaging that would have

24 required her to confirm at least four times that she wanted to

25 erase her device's data; it includes multiple plaintiffs who

1    sold their phones, gave them to other family members, traded in

2    their phones to get new ones, or otherwise no longer have their

3    phones; and it includes plaintiffs who sold or discarded their

4    laptops.

5        Based on that information, we simply want to understand:

6    Did every plaintiff receive -- were they informed by their

7    counsel to preserve this data, and do they understand that

8    obligation to prevent further loss?

9        As to the imaging to ensure that the relevant data is

10   preserved, as I understand it, plaintiffs raise two objections.

11   The first is that imaging is invasive.  But at this time, we're

12   not asking for any intrusion into plaintiffs' lives.  We're not

13   asking to receive the data.

14       We're sensitive that these cases involve the intimate

15   details of plaintiffs' personal lives, as do virtually all

16   personal injury cases.  That's the nature of the claims

17   plaintiffs brought.  And the Court gave consideration to those

18   issues when it ordered production of partial data from the

19   imaging -- from the devices of the bellwether plaintiffs.

20       But there's no intrusion as to the non-bellwethers at all

21   right now because we're simply asking that this information be

22   preserved, not that it be turned over to anyone for review or

23   inspection.  We just want to make sure the data still exists in

24   these cases down the road.

25       The second thing they say, Your Honor, is that imaging is

1    expensive.  As Your Honor is intimately familiar from all our

2    DMC statements, the volume of discovery in these cases on the

3    defense side has been immense.

4         Mr. Warren said earlier in this hearing that, quote, "This

5    is a massive, sprawling case."  The volume of discovery from

6    Meta, as you've heard, we've produced over 1.4 million

7    documents, and the cost, on our side, to ready productions like

8    that is quite high.

9         But here, as we understand it from plaintiffs, the cost to

10   image a single device is $1200.  That's less than three times

11   the filing fee in federal court; and it's also, as we expect,

12   not going to be borne by the plaintiffs themselves.  It'll be

13   borne by the plaintiffs' counsel, some of the most

14   well-resourced plaintiff firms in the country, that told

15   this Court, when seeking appointment to leadership positions,

16   that they were willing to commit the resources necessary to

17   prosecute these cases.

18        Any additional costs beyond the $1200 to review the images

19   immediately or buy permanent replacement phones for plaintiffs

20   so that they don't have to be away from their phone for a short

21   period of time during imaging, we think those are optional

22   costs that the plaintiffs have decided to bear that aren't

23   necessary at this time.

24        The images don't need to be reviewed right now simply to

25   preserve the data.  Permanent replacement phones don't need to

1  be provided when presumably they could provide a loaner phone

2  for the day or two for the existing device to be imaged at much

3  lower cost.

4      And so from our perspective, what we're asking for is for

5  plaintiffs to meet their basic preservation obligations and

6  ensure that this critical information is preserved.

7          **THE COURT:**  Response?

8          **MS. CARROLL:**  Your Honor, let me first say

9  unequivocally, for the record, that plaintiffs and plaintiffs'

10  counsel are well aware of our duty to preserve relevant

11  information and have communicated this directly to our clients,

12  and they are specifically aware of their obligation to preserve

13  devices.

14      We have -- contrary to what defendants are conveying to

15  the Court here, we've provided ample support -- excuse me --

16  throughout the discovery process for our efforts in

17  preservation.

18      Just to give a few examples of those that are not

19  mentioned by Mr. Halperin, are in our joint letter brief to

20  this Court in July, we explained that at that point, we had

21  already spent over $2 million on preservation for bellwether

22  and non-bellwether plaintiffs.

23      It's exponentially increased since then, and that didn't

24  include the file-system-level imaging that we've done as

25  ordered by this Court.

1    Beyond that, we volunteered information in this file

2   system imaging process to the defendants about prior imaging

3   that was done on these devices.  It was a different form of

4   imaging, a logical image, which is the industry standard for

5   individual personal injury plaintiffs in preserving ESI from

6   devices.

7    As part of the meet-and-confer process with -- related to

8   specific bellwether devices, we agreed to provide the

9   preservation notice or litigation hold notice dates for all

10   bellwethers.

11    And for those specific plaintiffs and devices that were

12   identified by defendants that are no longer in plaintiffs'

13   possession, we agreed to additional discovery, including

14   additional deposition time, even where plaintiffs don't think

15   that it's warranted because we took reasonable efforts to

16   preserve this data.

17    I think it's important to understand the difference of

18   what we're talking about here, as Mr. Halperin said.  The --

19   I think the crux of where we disagree is the critical nature of

20   this extra level of device data that they are seeking from

21   these plaintiffs' devices; that layer of data that involves the

22   system files and logs, the usage data.

23    When defendants approached plaintiffs with the proposition

24   of wanting to collect a mirror image, a full file-system

25   forensic image, of our plaintiffs' -- bellwether plaintiffs'

1    devices, that was in May of this year, May 28th of this year.

2    That's the first instance that we had been put on notice of

3    this data being critical to them.

4        To date, they've still not provided any support of why it

5    is critical; and, in fact, the facts actually point to it not

6    being necessary or critical data because of its ephemeral

7    nature.  And the data -- the system-level data that does exist

8    for more than 30 or 60 days from third-party application

9    databases can be -- it can be obtained from a better source,

10   the original source.

11       And often, most of these bellwether plaintiffs, at least,

12   have provided multiple devices.  The defendants have yet to

13   even receive the device data.  We have finally agreed on a

14   protocol.  Plaintiffs intend to have that production complete

15   by the substantial completion deadline.

16       But it's difficult to understand how defendants can claim

17   the data is critical and that it's lost and that this somehow

18   puts a burden on non-bellwether plaintiffs, where discovery is

19   stayed, to preserve this data because of its critical nature

20   when they haven't even evaluated the data and have not provided

21   any support whatsoever for the idea that they can't obtain it

22   anywhere else.

23       One more thing that I wanted to point out here was in

24   the -- in the *Martin v. Johnson* case that defendants cite as

25   the federal court's authority to order preservation, they did

1  not include that court's factors that they've included which

2  they use to analyze whether a preservation order would be

3  appropriate; and that was whether the party seeking the

4  preservation order can demonstrate that the opposing party will

5  destroy necessary, critical evidence without the preservation

6  order, whether the requesting party would suffer irreparable

7  harm if a preservation order is not entered, and the burden

8  imposed upon granting a preservation order.

9      I think it was minimized, but the burden is substantial,

10  and it would significantly delay this litigation if plaintiffs

11  in the MDL and JCCP, even more so the JCCP, where they have

12  substantially more personal injury plaintiffs and an expedited

13  schedule, would now have to forensically image devices which

14  have not been shown to have any data that's necessary to defend

15  their cases.

16      **MR. HALPERIN:**  Your Honor, I don't think we've heard

17  there what's really troubling to defendants, which is, we still

18  don't know what steps plaintiffs are taking, if any, to

19  preserve this data.

20      **THE COURT:**  Well --

21      **MR. HALPERIN:**  If there's --

22      **THE COURT:**  -- she said -- she represented, as an

23  officer of the court, I assume -- right?  You understand your

24  duties there?

25      She represented, I think, unequivocally, that plaintiffs

PROCEEDINGS

1  have been told and they're well aware and plaintiffs' counsel

2  are well aware of the duty to preserve, which I assume you

3  meant to cover the discovery in this case, including whatever

4  is on their phones and not to do factory resets and all that.

5      So, I mean, you have a represent- -- an oral

6  representation.  You can print out the transcript.  You'll have

7  it; right?  What more do you need, I guess, at that point?

8      **MR. HALPERIN:**  The problem, Your Honor, is it's not

9  simply "Don't trade in your device.  Don't sell your device."

10 If I keep the same phone I have for a period of years, my phone

11 is going to overwrite older usage data.

12     **THE COURT:**  So this is -- she made the point that some

13 of the logs are ephemeral.  Those are the ones you're worried

14 about.  Some of the system-level files are not ephemeral --

15 right? -- and you get the data either in the phone itself or

16 through some third-party app.

17     What is it about the ephemeral files that are only kept

18 for 30 days that's so critical?

19     **MR. HALPERIN:**  Well, as we understand it, Your Honor,

20 the ephemeral files, or at least among them, are both usage and

21 notification data.  Those two things are critical to

22 defendants' defense of these cases.

23     Plaintiffs claim, number one, that they are addicted to

24 our platforms.  They are using our platforms excessively.  In

25 order to defend against that allegation, we need to see what

**PROCEEDINGS**

1  else are plaintiffs doing on their devices and how much time

2  are they spending on it.

3      **THE COURT:**  So what is it in the system files that

4  doesn't give them usage and notification data that's in the

5  ephemeral files?  Or do the system files that you're talking

6  about that are non-ephemeral have all the same usage and

7  notification data?

8      **MS. CARROLL:**  Okay.  I see the distinction.

9      So the device system files -- so an iPhone, for example,

10  is going to have usage data that may not be able to be obtained

11  from another source related to screen time.  Screen time data

12  is a great example.  It only goes back 30 days and then it

13  rewrites itself.

14     The data from third-party application databases also

15  contains usage data.  I don't think anyone in this room knows

16  exactly the confines or scope of that data for each

17  application.

18     But we're not talking about a single main device.  And

19  there are dozens of data sources for each of these plaintiffs,

20  including multiple devices for some of these plaintiffs.

21     I think we've performed a full file-system image of

22  Plaintiff Melton's seven -- seven of Melton's devices.  And,

23  you know, so, yes, he doesn't -- he's not in possession of

24  three that are being brought to the Court's attention, but we

25  have seven others.

PROCEEDINGS

1      And my point is, is the defendants, at this point it's

2  premature to say that they're missing any critical data where

3  they haven't even evaluated all of the data that's available to

4  them that we're producing through this discovery process.

5          **THE COURT:**  So have you been analyzing the usage and

6  notification data that's been produced so far?

7          **MR. HALPERIN:**  It hasn't been produced yet,

8  Your Honor.  It's going to be produced by November 4th.

9          **THE COURT:**  All right.

10         **MR. HALPERIN:**  What we have done is spoken to our

11 forensic experts, and we have a declaration from theirs, as to

12 when this type of data is typically stored, and it's a short

13 period of time.

14     In terms of the number of devices, plaintiffs reference

15 seven devices.  I don't think that plaintiff is using all seven

16 devices today.  What we're concerned about is ongoing usage

17 leading to older devices being -- or older data on those

18 devices being imaged.

19     So I think we could certainly narrow the request to the

20 main devices that are still in use.  If there are older devices

21 that were used five years ago and are sitting in a drawer,

22 turned off, nothing's happening to those devices at this point.

23 And that's certainly a way to narrow the scope and narrow the

24 cost here.

25         **THE COURT:**  Okay.  Well, at least that's one way to

PROCEEDINGS

 1    narrow things.

 2         Mr. VanZandt's been waiting.

 3              **MS. CARROLL:**  Yeah, go ahead.

 4         **MR. VANZANDT:**  Thank you, Your Honor.  Joseph VanZandt

 5    on behalf of the JCCP plaintiffs.

 6         I do want to note, I guess, early last week Mr. Halperin

 7    read, I guess, a longer version of that same argument to

 8    Judge Kuhl, and Judge Kuhl indicated that she would address

 9    this at the next JCCP CMC.  It does have a disproportionate

10    impact on the JCCP, given there are over 1700 personal injury

11    cases there.

12         And the cost, Mr. Halperin is drastically underestimating.

13    It costs $1200 per device.  The average bellwether plaintiff

14    has five or seven devices.  And the only way to do this imaging

15    would be to actually fly a technician to the plaintiff to do

16    the imaging there or for the plaintiff to send their phone in.

17         And that is -- there's a lot of issues with that.  Number

18    one, the addiction to the platforms and the phone being the

19    primary way that they access that.  Also, just safety and

20    concern issues of plaintiffs being without their phones.

21         And so for the bellwether plaintiffs, the way we've

22    addressed this is actually replacing their devices.  Have them

23    ship that in.  Our vendors keep it; they do the data; they pull

24    all that information.

25         At a minimum, Your Honor, if defendants are going to seek

1    such extreme relief, they need to have some specific case, some

2    specific information to rely on.  And when they brought this up

3    to Judge Kuhl, Judge Kuhl specifically said she does not feel

4    defendants have the facts they need to bring a motion.

5        (As read):

6            "It's just out there in the ether to me.  You

7        don't have a specific situation."

8        And so we're talking about hypothetical problems right

9    now.  We do need a -- would need a specific information --

10   situation to assess; and even then, if there is some allegation

11   that data has been lost, it should be addressed in the specific

12   case.

13       It would be like -- I mean, there's allegations of

14   spoliation against a number of defendants.  Just, for example,

15   if Meta lost and spoliated something, us going after the same

16   types of remedies against all the other defendants because Meta

17   did something.

18       So the remedy they're seeking just here is overly broad;

19   it's extraordinary.  We intend to address this with Judge Kuhl

20   in the JCCP.  But certainly, I just wanted to state that point

21   to Your Honor.

22       **THE COURT:**  I'm going to -- you-all are -- I think

23   I've said this before.  You-all are much more experienced at

24   this stuff than I am, so help me out.

25       Kind of generally in these kinds of cases, your experience

 1   is we have a set of bellwether plaintiffs; right?  Their

 2   devices, we've already kind of taken care of.

 3        So here we're talking about non-bellwether plaintiffs.

 4   Their devices and their specific -- discovery of their specific

 5   situations -- I guess my real question is:  After all the

 6   bellwethers have, like, either settled or gone to trial --

 7   right? -- whatever happens to the non-bellwether plaintiffs?

 8   Do they all settle?  I mean, does another subset of them become

 9   new bellwethers?  What ends up happening?

10        **MR. VANZANDT:**  It depends on the litigation.

11   Oftentimes there is an initial bellwether pool, which is where

12   both MDL and JCCP are.  And once that pool is worked out -- I

13   mean, we have, I think, 12 cases here, 20 there.  So there's a

14   long list of trials to take place.  If those cases go forward

15   and there's no resolution, no settlement, then there would

16   generally be a second round of bellwether cases that would be

17   put into a pool.  It could be different types of cases,

18   different types of injuries.  It's really specific to the case.

19        Sometimes you go through one bellwether phase or half of a

20   bellwether phase and there's global resolution; and if so, the

21   non-bellwethers would then be part of that global resolution.

22   So there's certainly different scenarios that could happen.

23        But the fact is, the whole point of the bellwether process

24   is to focus in on this small group of cases.  Discovery is

25   stayed as to these other cases, and that helps the parties.  So

 1   you're talking about the same counsel who's doing extensive

 2   work with discovery, the same vendors.  We would have to all

 3   drastically divert resources, which would take away and slow

 4   down the entire bellwether process, which we suspect is part of

 5   what's driving this in the first place.

 6        **MR. HALPERIN:**  That's absolutely not what's driving

 7   this, Your Honor.

 8        I do agree with Mr. VanZandt as to that's typically how

 9   the process works.  If there's no general -- if there's no

10   overall resolution, another set of cases are picked.

11        We're not doing this to slow down the process.

12        **THE COURT:**  Let me -- so before we get there, so,

13   quote, "another set of cases are picked."  Do we restart

14   discovery of those new bellwethers and we -- you-all come back

15   to me or somebody like me and start it all over again?  Is that

16   what happens?

17        **MR. HALPERIN:**  Yes, Your Honor.  Discovery is opened

18   on another wave of cases.  And it's not, you know, defensive

19   discovery, discovery of the company.  It's discovery of the

20   case-specific facts in those particular cases.

21        **THE COURT:**  Attorneys Full Employment Act, okay.

22                          (Laughter.)

23        **THE COURT:**  Okay.

24        **MS. CARROLL:**  I think -- I think that's our point,

25   Your Honor, is, like, the -- to the extent there are any issues

1   with an individual plaintiff, those have -- the defendants have

2   recourse through the courts, through the process of any

3   potential loss of relevant evidence from these devices.

4        We have never stated that we would not provide

5   confirmation that we have provided litigation hold notices,

6   specific even to devices, for plaintiffs that are not

7   bellwethers.  It's just that their ask was intertwined with

8   "And if you haven't performed a full file-system image, you

9   will."

10       So it was a "We're not going to do that."  But I think

11  we've provided, as I identified at least a few examples, that

12  we have been doing this from the beginning.  We just weren't

13  made aware of the intention for a specific level of system data

14  that isn't normally collected in personal injury lawsuits.

15       And one thing -- one thing -- one more thing, Your Honor,

16  that I think is really important to point out here because

17  defendants keep -- the only case that they cite to is the

18  *In Re Apple Litigation*.  And I think, very strategically,

19  defendants cut off the second half of the quote that they

20  included in their joint letter brief, which, read in its

21  entirety, says that (as read):

22            "Plaintiffs actively put their devices at issue

23       when they chose to sue Apple over Apple's alleged

24       intrusion and trespass to the devices through its

25       software updates."

PROCEEDINGS

1     And then the next sentence says (as read):

2          "It is well established that a plaintiff cannot

3     bring a suit and then limit defendants' discovery

4     that is the target at the subject matter of the

5     plaintiffs' claims."

6     And despite defendants' efforts to make it so, plaintiffs'

7  devices are not the subject matter of plaintiffs' claims; their

8  platforms are.  And so I think that needs to be focused here.

9     And to Mr. VanZandt's point, we don't have the factual

10 basis, we don't have a legal basis, and we don't have a factual

11 record that supports that this data is critical.

12    We were willing and agreeable to exploring this data and

13 allowing defendants to have access to this data for the

14 bellwether pool.  It was a limit -- to see if it did have

15 critical data that they need.

16    But I think not knowing what exists on there and to the

17 extent that it exists, it's an unreasonable and

18 disproportionate burden to put on plaintiffs, especially

19 non-bellwether plaintiffs.

20         **MR. HALPERIN:**  May I respond, Your Honor?

21         **THE COURT:**  Briefly.  We've got to move on.

22         **MR. HALPERIN:**  Understood, Your Honor.

23    Three quick points.  The plaintiffs want to focus on

24 what -- whether the data is relevant to their claims.  Rule 26

25 entitles us to discovery on issues relevant to claims or our

**PROCEEDINGS**

1  defenses.  Plaintiffs' devices are critical to our defenses,

2  even if they're not to their claims.

3      Second, on logical versus full-file imaging, logical

4  imaging gets us text-based information:  text messages,

5  emails, those sorts of things on the devices.  Logical imaging

6  isn't going to get us this usage data that, from our

7  perspective, really is critical.

8      And three is, we've been told by some plaintiff firms in

9  the course of the conferral process, Morgan & Morgan being one

10 of them, that they're not even doing logical imaging of their

11 devices.  Some firms are, but many firms are not.

12     And so we're not asking for logical imaging.  We're asking

13 for full imaging because we want the data as close in time as

14 possible to when these cases -- when the injuries arose.

15         **MR. VANZANDT:**  Your Honor, if I may add one more

16 thing.  Joseph VanZandt again.

17     I think we're kind of missing the context of these

18 injuries.  This is not a single-event accident that happened

19 three years ago.  These are ongoing, everyday injuries, not

20 just -- the injuries aren't just ongoing, the tort is ongoing

21 every single day.

22     And so for defendants to say, "Let's go back" -- "They

23 should have gone back three years ago and pulled this data

24 every 30 days," as soon as those cases get put into a

25 bellwether pool, they're going to demand that the devices be

 1   imaged again.  Under defendants' theory, we would have to image

 2   our plaintiffs' devices every 30 days.

 3        And I know they're now saying, "Well, we want it as far

 4   back as closest to the injury."  Today is just as close to the

 5   injury as it was three years ago.  The conduct that defendants

 6   are doing is ongoing today.  This is a continuing tort

 7   situation, and so it is an ever-evolving situation.

 8        THE COURT:  Okay.  You're starting to repeat

 9   yourselves a little bit, so that's a sign to me that we're

10   nearing the end.

11        So on litigation hold, remind me.  I ordered -- I know I

12   ordered Meta or the defendants to disclose -- was it a chart or

13   a list of the people and the dates of the litigation holds?

14   Was that how I did it?  You didn't produce the litigation hold

15   notices themselves.

16        MS. CARROLL:  Yes, Your Honor.

17        MR. HALPERIN:  Yes, you did.  It was DMO 5,

18   Your Honor.

19        THE COURT:  Okay.  So I'm going to order plaintiffs to

20   produce a similar chart, just identifying the date on which you

21   sent your litigation hold notices to the non-bellwether

22   plaintiffs.  You don't have to produce the holds themselves.

23        On the devices, I just -- again, balancing relevance and

24   proportionality, I take your point that there's -- defense's

25   point that there is user -- usage and notification data in the

1     devices; but if there -- if it's constantly overwritten every

2     30 days, it's constantly getting lost, as the plaintiffs said.

3     It's constantly been getting lost up to now.

4          And so the fact that there is other system-level and

5     application-level data that's available from other sources to

6     get at usage and notification -- because I assume there has to

7     be other sources of that, other than these ephemeral files --

8     leads me to believe, other than the representation that these

9     files could be useful or could show usage notification, I don't

10    think they're the only source of that information.  I think

11    everybody would agree with that.

12         So they may -- the last 30 days' worth of usage of a

13    device has maybe some relevance or probative value, but it's

14    certainly not as probative as the usage over time going back to

15    when somebody first started using a particular app, which

16    I think is going to be resident at your client -- the defendant

17    clients' servers if it's going to be anywhere.  So while it's

18    relevant, it's of, I think, limited relevance.

19         And then I go to proportionality.  And these are

20    non-bellwether plaintiffs.  We're not supposed to be spending a

21    lot of discovery time and effort on non-bellwether plaintiffs,

22    especially at this point.

23         And the plaintiffs point out, it's a large number of

24    devices with a large number of people who may never have their

25    cases go to trial and who may never be the subject of

PROCEEDINGS

1    individualized discovery.

2        And, again, given the -- the cost issue plays a factor

3    into it, although I don't think it overwhelms us because even

4    defendants are willing to narrow it to just the current ongoing

5    device.  So we're not talking about five or seven devices per

6    people.

7        So I'm going to deny the request to force non-bellwether

8    plaintiffs to forensically image all their -- certainly, all

9    their devices, but even as narrowed to their ongoing devices.

10       However, I am also going to order the plaintiffs, it is --

11   I mean, I know we're not here on spoliation issues; but since

12   you are in contact with your clients, if -- your clients need

13   to be reminded, you know, that they can't be selling, disposing

14   of, transferring, you know, factory resetting their devices;

15   right?  And so, you know, it's going to be on them if they do

16   it and it comes up and it becomes relevant later.  But I do

17   think it's incumbent on you to, especially since these are

18   individuals, some of them are minors, they're probably not that

19   sophisticated, to really hammer that home.  I mean, they really

20   can't be doing that because if they become relevant at some

21   point in terms of -- you know, those individuals become

22   relevant at some point, there are going to be issues raised,

23   and I'm trying to forestall that if we can.

24       So forewarned is better than not.  Okay?

25           MS. CARROLL:  Yes, Your Honor.

1       **THE COURT:**  Okay.

2       **MS. CARROLL:**  May I ask a question --

3       **THE COURT:**  Sure.

4       **MS. CARROLL:**  -- related to the chart --

5       **THE COURT:**  Yes.

6       **MS. CARROLL:**  -- that plaintiffs are to provide with

7    the preservation or litigation hold notice dates?

8       You know, in the context of the ask to Meta, it was to

9    identify the custodians at issue, to narrow the pool and get to

10   depositions more quickly, and it was in lieu of a 30(b)(6)

11   deposition.

12      My ask here is:  What purpose does it serve to provide

13   this information to -- they haven't -- that's the only reason

14   we haven't given it to them, is because it's a lot of work.

15   It's not -- it's not batched litigation holds to hundreds of

16   custodians at one time.  Each individual plaintiff is going to

17   have a unique date, and there are hundreds of firms that we

18   have to contact that have to go and pull these individual

19   dates.

20      **THE COURT:**  I'm not saying you need to do it tomorrow.

21      **MS. CARROLL:**  And that was going to be my next

22   question, was:  You know, if there is a purpose for doing this

23   work, which is going to take away from -- resources from

24   substantive work in advancing the bellwether pool, is what's

25   going to be the time frame that's required for us to provide

1    this to defendants?

2        THE COURT:  Well, since we're talking about

3    non-bellwether plaintiffs, part of my order, you two are going

4    to meet and confer and work out a rational, I would say

5    non-prompt schedule that doesn't interfere with current

6    discovery for you to provide that.  Because, again, it doesn't

7    have to happen tomorrow.  I don't think it has to happen next

8    week.  It shouldn't be interfering tremendously with other

9    discovery.  But you don't need until, like, February to do it

10   either.  So, I mean, you should be able to do it on a

11   reasonable time frame that doesn't jam you on current

12   discovery.  Okay?

13       MS. CARROLL:  Thank you, Your Honor.

14       THE COURT:  And if you can work out a date kind of

15   using the rule of reason, that's what I encourage you to do.

16   Otherwise, I've said this before, if you want me to start

17   drawing lines and, you know, picking numbers, I will; and if

18   you can't pick one that you can both agree to, that's what I'll

19   do.  Okay?

20       MR. HALPERIN:  I'm sure we can reach agreement on this

21   one, Your Honor.

22       THE COURT:  I'm confident you will and you can.

23       MS. CARROLL:  Thank you.

24       THE COURT:  Okay.  Can you prepare a joint proposed

25   order on this one too, just so it's all memorialized in a way

PROCEEDINGS

1   that you-all understand mutually with each other what's going

2   to happen here?

3          **MS. CARROLL:**  Yes, Your Honor.

4          **MR. HALPERIN:**  Yes, Your Honor.

5          **THE COURT:**  Okay.  Let's take a break.  Come back at

6   4:00.

7                  (Recess taken at 3:48 p.m.)

8                  (Proceedings resumed at 4:02 p.m.)

9          **THE CLERK:**  Court will come to order.

10      We're back on the record in the 22-md-3047, In Re Social

11   Media Adolescent Addiction/Personal Injury Products matter.

12          **THE COURT:**  Okay.  So Docket 1217, Joint Letter Brief

13   on States' Production of Documents.  Who's arguing this one?

14          **MR. YEUNG:**  Hi, Your Honor.  Chris Yeung, Covington &

15   Burling.

16          **THE COURT:**  Good afternoon.

17          **MR. COCANOUGHER:**  Good afternoon, Your Honor.  Matthew

18   Cocanougher from the Kentucky Attorney General's Office.

19          **THE COURT:**  Good afternoon.

20      Okay.  So...  Well, of the 20 states that are continuing

21   to meet and confer, is there -- are they still continuing to do

22   that?  Is there still no dispute as to them?

23          **MR. YEUNG:**  Yes.  We're continuing to meet and confer

24   about process, yes, and we've start- -- we've begun to receive

25   search terms and custodians from some of them.

PROCEEDINGS

```
 1          THE COURT:  Okay.  So they're what you've called --
 2    referred to as 15 states -- I don't know if you used the word
 3    "holdouts," but there are 15 states that are at issue.
 4          Of those 15, is it 8 states that won't provide -- or
 5    identify litigation holds?  Is that --
 6          MR. YEUNG:  That's right.
 7          THE COURT:  So it's not 15 and a separate 8?  It's --
 8          MR. YEUNG:  Correct.
 9          THE COURT:  The 8 is part of the 15?
10          MR. YEUNG:  Let me just double-check my chart really
11    quickly.
12          Yes, I believe that all -- actually, yeah, all 8 are
13    within the -- it's actually now 14.  North Dakota has dismissed
14    its claims from the case, so they're out.  So it's 14 --
15          THE COURT:  14, that's right.
16          MR. YEUNG:  -- holdouts.
17          THE COURT:  Okay.  And was North Dakota one of the 8
18    on the litigation hold issue?
19          MR. YEUNG:  North Dakota was not one of the 8.
20    North Dakota was one of the 15.
21          THE COURT:  So the litigation hold issue, I think, is
22    more discrete and, I hope, simpler.  The states say it's not
23    ripe, but you're still meeting and conferring.  So shouldn't I
24    tell to you meet and confer further and resolve it?
25          MR. COCANOUGHER:  Your Honor, Kentucky is not one of
```

PROCEEDINGS

1    the states in the litigation hold, so I'm going to let my

2    colleague from the California Attorney General's Office address

3    that.

4         **MS. O'NEILL:**  Thank you.

5         Good afternoon, Your Honor.  Megan O'Neill for the People

6    of the State of California.

7         Yes, Your Honor, we don't really think there's a dispute

8    here.  We'd be happy to meet and confer further.

9         Meta asked the states for information regarding litigation

10   holds that have been issued to state agency personnel, and we

11   agreed to gather that information.  And we have done what we

12   agreed to do, but we'd be happy to further discuss with Meta

13   that issue.

14        **MR. YEUNG:**  That's not entirely correct.  We've heard

15   nothing from Arizona.  Arizona has not said yes.

16        We heard nothing from Missouri.  Missouri has not said

17   yes.

18        New York has not said yes.

19        Rhode Island has not said yes.

20        Oregon told us, "We're not going to give you the

21   information unless you provide us with an actual explanation as

22   to why it's relevant."

23        So there are clear disputes that are already ripe here,

24   and this is the same litigation hold information that I think

25   you just ordered -- that you ordered Meta to provide, that you

1   just ordered, you know, the bellwether plaintiffs to provide.

2   This is -- I don't think there's a dispute that this is stuff

3   that we should get.

4           MS. O'NEILL:  Your Honor, can I respond quickly?

5           THE COURT:  Yeah.

6           MS. O'NEILL:  The state AGs that have litigation hold

7   information about state agencies have provided that information

8   to Meta.  And where Meta does not have information about

9   particular agencies, that is because the relevant state AG does

10  not have information to report.

11      We will continue to provide to Meta, on a rolling basis,

12  the litigation hold information that Meta has requested as we

13  receive that information.

14          THE COURT:  So you're speaking on behalf of just

15  California or on behalf of all 8 or some subset?

16          MS. O'NEILL:  I am speaking on behalf of all 8 states

17  that are at issue.  I do have further information regarding

18  particular states that my opposing counsel mentioned.

19      For New York, my understanding is that state agency

20  counsel are directly interfacing with Meta regarding litigation

21  hold issues and state agency discovery issues more broadly.

22      I also understand that the Oregon Attorney General has

23  provided Meta all of the litigation hold information that it

24  has at this time, which includes the names of Oregon agencies

25  that have received litigation holds.

**PROCEEDINGS**

1      And I understand that the Arizona Attorney General has

2 begun discussions with relevant Arizona agencies regarding

3 litigation holds.

4      **THE COURT:**  Okay.  What about -- there's two missing.

5 I've got Arizona, Missouri, New York, Rhode Island, Oregon.

6 Who are the other two?

7      **MS. O'NEILL:**  I believe I did not mention Missouri and

8 Rhode Island, and my understanding is that their position is

9 the same that I articulated; that they provided information

10 that they have and if they have not provided information, they

11 have not received the litigation hold information that Meta has

12 requested from the relevant state agencies.

13      **THE COURT:**  But will provide it on a rolling basis?

14      **MS. O'NEILL:**  If -- once they -- if and when they

15 receive that information.

16      **THE COURT:**  Okay.  I'm still counting one, two, three,

17 four, five, six states.  Are there two others that haven't been

18 mentioned at all by either side?

19      **MS. O'NEILL:**  I think California was one of them, and

20 the same thing that I just said would apply to California.

21      And I'm looking at my list.

22      **MR. YEUNG:**  Pennsylvania.

23      **MS. O'NEILL:**  Pennsylvania.  And the same would apply

24 to Pennsylvania as well.

25      **THE COURT:**  Okay.  So Pennsylvania, Missouri,

PROCEEDINGS

 1 | Rhode Island, and California are all acting in accordance with

 2 | what you said California's doing, basically?

 3 |         **MS. O'NEILL:**  That's correct.

 4 |         **THE COURT:**  Okay.  There's still one state missing.  I

 5 | only count seven states.

 6 |         **MR. YEUNG:**  Did you say Colorado?

 7 |         **THE COURT:**  Ah.

 8 |         **MS. O'NEILL:**  Colorado, yes.  And we can put Colorado

 9 | in that group as well.

10 |         **THE COURT:**  Okay.  So just to help narrow it, so it

11 | sounds like Missouri, Rhode Island, California, Pennsylvania,

12 | Colorado are not objecting to and will provide the information

13 | from state agencies on a rolling basis as they receive it; is

14 | that right?

15 |         **MS. O'NEILL:**  That's correct.  As we -- we have asked

16 | and conferred with state agencies, and we will provide that

17 | information as we receive it.

18 |         **THE COURT:**  Okay.  So I don't think there's a dispute

19 | there --

20 |         **MR. YEUNG:**  Well, so can I put this --

21 |         **THE COURT:**  -- as to those.

22 |         **MR. YEUNG:**  Yeah.  I'd like to put this a little bit

23 | in context.

24 |     Eight months ago, we served RFPs that called for the

25 | production of state agency documents.  From these eight states,

1    we have not received any litigation hold information about

2    individual recipients, when they were issued, and what agencies

3    they're affiliated with.

4         You know, so I appreciate their, you know, representation

5    that we'll receive this on a rolling basis now.  That was not

6    what was disclosed to us before the letter briefing uniformly.

7    We need -- we need some clarity on when that's actually going

8    to happen.

9         **THE COURT:**  Do you have any insight into how quickly

10   you can start that rolling process?

11        **MS. O'NEILL:**  Well, Your Honor, just to be clear, we

12   have -- the state AGs that we've been discussing have asked the

13   state agencies -- have told the state agencies of Meta's

14   request, have conveyed that to them and asked for information,

15   and some state agencies have provided information and some have

16   not.

17        And that is what we have pledged to Meta to do, and that

18   is what we will continue to do.  If we receive information, we

19   will provide that to Meta.  We don't have a problem with that.

20        **THE COURT:**  Okay.  Well, I'm going to order you to

21   give Meta a weekly update on those efforts, and you should

22   continue to go back to the agencies and bug them if they

23   haven't given the information.  Do you understand?

24        **MS. O'NEILL:**  Understood.  But could I just ask for

25   clarification on what you expect to see in those reports?

1          **THE COURT:**  Well, it's either, "Yes, we've gone back

2     to the agencies and asked" -- "and reminded them and asked them

3     again and they've told us, you know, it'll come in a week or it

4     will come in two weeks or it'll come next" -- "over the

5     weekend," or whatever it is.  I mean, you need to -- it's a

6     status report.  This is part of the collaborative process of

7     discovery that you should be communicating openly with each

8     other about; right?

9          And if it turns out that a particular state agency

10    somewhere says, "We're never going to tell you and we don't

11    want to be involved in this, and we're never going to give that

12    information and go away," then you need to tell Meta that so

13    they can, you know, get appropriate relief from the Court.

14    Okay?

15         **MS. O'NEILL:**  Understood.  We can -- we can provide

16    that information.

17         **THE COURT:**  Okay.  So as to -- sounds like New York is

18    already interfacing with you directly through their agency

19    counsel.  Is there a dispute there?

20         **MR. YEUNG:**  They haven't given us litigation hold

21    information.  So, you know, even -- whether it's through the AG

22    or through their -- through their -- through a law firm that is

23    representing the Governor's Office who has been interfacing

24    with us, we don't have any litigation hold information.  They

25    haven't committed to us that they would give us litigation hold

1   information.  So it's the same -- it's the same thing.  We are,

2   again, having discussions, but they just haven't given us that

3   information.

4          **THE COURT:**  I take it nobody from New York is here.

5          **MS. O'NEILL:**  I believe we actually do have counsel

6   for New York.

7          **THE COURT:**  Okay.

8          **MR. WALLACE:**  Thank you, Your Honor.  Kevin Wallace

9   for the office of the New York State Attorney General.

10      Although I am not the party that is communicating with

11  counsel for Meta on these issues, the Governor's Office has

12  counsel that is representing most of the agencies.

13      For one agency that is not under the sort of umbrella of

14  discussions that are happening with the Governor's Office,

15  we've reached out.  We're due to speak, I think, on Tuesday.  I

16  will prioritize for that discussion the litigation hold issues.

17      But that's sort of the status.  And I believe they're

18  trying to work through a bunch of issues at once, and so this

19  hasn't, I think, peeled off.  That's just my knowledge of sort

20  of what's going on with the Governor's counsel, that there's a

21  funnel of issues that they're trying to deal with in order to

22  get that discovery going.

23         **THE COURT:**  Okay.  Well, it seems to me you need -- if

24  you need to, you need to tee up a specific meet and confer with

25  the other New York counsel; and if they won't give you the

 1    information, file a motion specifically as to them and have

 2    that counsel come and explain to me why they can't do it.

 3    All right?

 4            **MR. YEUNG:**  Okay.

 5            **THE COURT:**  Okay.

 6            **MR. YEUNG:**  Thank you, Your Honor.

 7            **THE COURT:**  But, certainly, you should relay to your

 8    colleagues that, you know, giving over litigation hold

 9    information isn't that burdensome, and they should really be

10    working on it.

11            **MR. WALLACE:**  Understood, Your Honor.

12            **THE COURT:**  And there's really not a good reason not

13    to do it.

14        Okay.  Who's here for -- is anybody here for Arizona?

15            **MS. O'NEILL:**  Yes, Your Honor.

16            **MR. WHELIHAN:**  Nathan Whelihan on behalf of the

17    Arizona Attorney General's Office.

18            **THE COURT:**  Good afternoon.

19        So the representation was Arizona has started to -- I just

20    wrote "started," so I don't know where Arizona stands.

21            **MR. WHELIHAN:**  Right.  We have had one meet and confer

22    directly with Meta.  I have been in personal contact with the

23    six different sets of agency counsel and counsel for the

24    Governor's Office and counsel for the Department of Education

25    in order to -- you know, I've collected where they stand on

1  this and whether or not they even have litigation holds, which

2  some of them who just found out about this recently do not, or

3  did not when I spoke to them a week or two ago.

4      We -- I mean, we have not yet -- I think my colleague from

5  Meta is correct.  We have not yet agreed to produce that

6  information, but it's because we don't know -- you know, we

7  haven't finished collecting it.  We don't -- we're still

8  coordinating with the state agencies on --

9          **THE COURT:**  I'm not hearing an objection to giving the

10  information.  It's just a matter of getting it.

11          **MR. WHELIHAN:**  Well, I guess there's one state agency

12  who still is getting back to me.  So, like, I can't promise

13  that I can give information for all six agencies because they

14  haven't all agreed to give it, so...

15          **THE COURT:**  All right.  To the extent that there are

16  actual refusals to give the information, you have to let Meta

17  know so that they can properly tee up a meet and confer.

18          **MR. WHELIHAN:**  Right.  There's been no refusal yet.

19          **THE COURT:**  In which case, then, you need to work

20  diligently with your clients and the agencies to get that

21  information and start producing it on a rolling basis, I think.

22  I mean, you know, I don't mean it -- I'm going to leave it up

23  to you to do the collaborative and cooperative meet and confers

24  to try to get the information to each other.  Okay?

25          **MR. WHELIHAN:**  Understood, Your Honor.

1     **THE COURT:**  Okay.  Who's here -- oh, no.  Yeah.  Who's

2  here from Oregon?  Anyone?

3     **MS. O'NEILL:**  Your Honor, I don't believe we have

4  anyone here from Oregon.

5     **THE COURT:**  Okay.  So what I heard from Meta's counsel

6  is they said they weren't going to give any, but you said that

7  they are giving information.  So I don't know what the facts

8  are.

9     **MS. O'NEILL:**  My understanding is that Oregon AG

10  counsel informed Meta that litigation holds had been issued to

11  certain agencies, and that was all the information that they

12  had at that time.

13     **THE COURT:**  Okay.

14     **MR. YEUNG:**  Well, that's, again, not entirely correct.

15  They mentioned that they had issued -- asked certain

16  agencies to issue litigation holds; but as -- when we said,

17  "Are you going to" -- "Can you give us the specific names,

18  titles, individuals, who they went to, recipient information,"

19  they said, "Why do you need it?  We need an actual explanation

20  of your legal basis for that."

21     So I have to presume that they have the information.

22  They're not turning it over to me.  They didn't tell me they

23  don't have the information.

24     **THE COURT:**  Did you tell them -- I mean, we just heard

25  it before.  The reason the plaintiffs asked for Meta's

1  litigation hold list was to identify custodians and identify

2  potential witnesses.  Did you tell --

3         **MR. YEUNG:**  Yes.

4         **THE COURT:**  All right.  And what did they say?

5         **MR. YEUNG:**  That was -- the response was that:  What

6  is the actual -- I'll quote -- actual explanation of Meta's

7  legal position pertaining to the request for this information?

8  That is the response we got back.

9      But that was in response to us saying, "This is why we

10  want the information," they want -- they said this.

11     So I think --

12        **THE COURT:**  All right.  Well, you can continue to meet

13  and confer with them.  You can tell them that I've ordered --

14  I think -- I don't think I've denied anybody's request to

15  provide just a list of litigation holds with dates and names.

16  So if they want a reason why, it's because that's what I've

17  ordered consistently throughout this case when it's been

18  presented to me.  So if they want to come in and say that

19  they're exempt from it for some reason, they're welcome to try

20  to convince me.

21        **MR. YEUNG:**  Okay.

22        **THE COURT:**  Okay.  I think that handles the litigation

23  holds; right?

24     Okay.  So let's go to the larger issue.

25     So search -- it's really whether now 14 states --

1   right? -- will engage in meeting and conferring on search

2   terms.  That's really the crux of the dispute; right?

3           **MR. YEUNG:**  And custodians, correct, search terms and

4   custodians.

5           **THE COURT:**  And custodians, right.

6       All right.  So has there been any progress on the issue?

7   Where do things stand?

8           **MR. YEUNG:**  We have 14 states who are refusing -- who

9   have not committed to giving us search terms and custodians.

10  There are 20 who have, and we are continuing to meet and confer

11  with them about a variety of issues.  We have received three

12  proposals from three of the states as to search terms and

13  custodians.  Those are not among the 14 that we're moving

14  against.

15          **THE COURT:**  Okay.  What's the position of the 14,

16  then?

17          **MR. COCANOUGHER:**  Sure, Your Honor.  Again, this is

18  Matthew Cocanougher with the Kentucky Attorney General's

19  Office.

20      Many of the 14 are still meeting and conferring with Meta

21  on this issue.

22          **THE COURT:**  All right.

23          **MR. COCANOUGHER:**  This is not an issue where these 14

24  states -- basically, Meta came -- after Your Honor's

25  September 6th order, Meta instituted the meet-and-confer

process.  State AGs showed up, and Meta basically said, "We're going to give you a date certain, October 4th; and if you do not opt in to our process of universal search terms and custodians, we're going to add you to the letter briefing."

So, many of the states that are in this 14 have reached out to Meta asking for them to -- and we are in contact with our state agency counsel, who are asking us:  Can Meta please provide us with more particularity as to what they actually want?  Because we received these Rule 45 subpoenas, we negotiated with Meta; and then after we're getting ready to produce, at least in a couple of agencies in Kentucky, after we're getting ready to produce, we receive a letter from Meta that says, "Hold all that in abeyance.  We're not doing that anymore."

So these agencies are trying to figure out if there's a more efficient way.  So they did not opt in to a universal search term and custodian process by October 4th and are included in this process.

Now, especially I can speak for Kentucky.  We have not been told by the agencies that they are refusing to use search terms and custodian process.  They just would like to narrow the search so they know specifically what they're searching for because they've already done a lot of work.  At least five of the agencies have already done work with the Rule 45 subpoena.

THE COURT:  So you say many are meeting and conferring

1  with Meta.  Of the 14, how many of the 14 are?

2        **MR. COCANOUGHER:**  Your Honor, there are -- there are

3  four states in which the state agencies are not agreeing to

4  provide documents to the state Attorneys General.  Kentucky is

5  not one of those states.

6        But, so it would be my understanding -- and counsel can

7  certainly correct me if I'm wrong, but it would be my

8  understanding that out of -- so out of that 14, I would think

9  10 are continuing to at least communicate with Meta about this.

10        **THE COURT:**  Okay.  All right.  So what's wrong with

11  continuing to meet and confer with those 10 that want to and

12  are agreeable to meeting and conferring?

13        **MR. YEUNG:**  There are not 10 that are willing to meet

14  and confer.  I've got no responses from Delaware, Missouri, and

15  Rhode Island on this issue.

16        **THE COURT:**  Slow down.

17        **MR. YEUNG:**  Sure.

18        **THE COURT:**  So I think I know who the four are.  The

19  four who are just refusing are California -- is it Michigan,

20  Colorado, Pennsylvania?  Do I have that right?

21        **MR. COCANOUGHER:**  That's my understanding, Your Honor.

22        **THE COURT:**  So of the 10, then, who do you -- who are

23  the ones that you think are not responding at all?

24        **MR. YEUNG:**  Delaware, Missouri, Rhode Island.

25        **THE COURT:**  Slow down.

1          Delaware, Missouri, Rhode Island.

2                  MR. YEUNG:  We haven't heard from them at all.

3                  THE COURT:  Okay.

4                  MR. YEUNG:  Arizona hasn't given us a position.  We

5      had one meet and confer.  They didn't tell us -- that was

6      before the letter briefing.  They didn't say yes.  They still

7      haven't said yes.

8          You know, I've had -- we've had discussions with Illinois,

9      Kentucky, Minnesota, and Oregon.  They haven't told us yes on

10     search terms.  They haven't necessarily said no.  They haven't

11     said yes either.  And we came to them, all of the AGs, two

12     business days after Your Honor's September 6 order and said,

13     "Here's a schedule for negotiating search terms and custodians

14     that will get you to substantial completion by November 5th."

15         They rejected it.  They wanted to meet and confer more,

16     and so we did.  We met and conferred with all of the AGs.  We

17     met and conferred with individual AGs.

18         And, finally, we said, "November 5th's upcoming.  Tell us

19     by early October" -- I believe the date was October 4th -- "are

20     you going to give us search terms and custodians and by when?

21     And if you want to couple that with a proposal about, you know,

22     what agencies might not be, you know, relevant to this dispute,

23     if you want to couple that with what requests for production --

24     that was, again, served seven months ago at that point in

25     time -- need to be narrowed, let us know that."

1        But all we're asking for -- all we asked for by

2   October 4th was not an actual search term and custodian

3   proposal, but a commitment to give it to us by a date certain

4   of their choosing.  The 14 that are here today couldn't do that

5   for whatever reason; either refused to, wanted to meet and

6   confer more, just didn't respond.  That's why we're here.

7        And I appreciate Kentucky bringing up some of the agencies

8   that have done work to respond to the Rule 45 subpoenas.

9        I want to point out two things.  Of the 14 states, within

10  those 14 states, there are only 12 agencies that produced

11  anything to Meta in connection with any -- in connection with

12  the agency subpoenas.  Those totaled less than 650 documents.

13  So we're talking less than one agency per state and less than

14  46 documents per state.  We just don't have a meaningful volume

15  to have that be the gating issue for any discussion.

16       We talked a lot about search terms.  We talked a lot about

17  custodians all day today.  I've waited for my moment to talk

18  more about search terms.  That's what I want.  I want them to

19  give me a search term and custodian proposal.  You know, we're

20  two -- less than two weeks away from substantial completion,

21  and that hasn't happened yet.

22       And it's not that I don't have the terms or the custodians

23  in hand.  I don't even have a date by which they're going to

24  give me those things.

25            THE COURT:  Okay.  There's still two -- there's two

1    states missing because I've got -- of the 10 we're talking

2    about.  Delaware, Missouri, Rhode Island, Arizona on one side;

3    Illinois, Kentucky --

4         **MR. YEUNG:**  Maryland has told us they want to give

5    each agency an opportunity to raise individual objections to

6    our RFPs that were served, again, eight months ago, and then we

7    would have to meet and confer with each of those agencies

8    individually about the productions.

9         **THE COURT:**  Okay.  There's still one more state

10   missing.  So Illinois, Kentucky, Minnesota, Oregon, Maryland.

11   I'm missing a state.

12        **MR. YEUNG:**  Maryland, California, Colorado.  Is it

13   Colorado?

14        **THE COURT:**  Colorado is one of the four.

15        **MR. YEUNG:**  Four, right.

16    Okay.  Delaware, Missouri, Rhode Island, New York,

17   Pennsylvania.

18        **THE COURT:**  New York.

19        **MR. YEUNG:**  New York.

20        **THE COURT:**  Where does New York stand?

21        **MR. YEUNG:**  New York wants to have a discussion about

22   us withdrawing our motion to compel.

23        **THE COURT:**  This motion?

24        **MR. YEUNG:**  Correct, and the underlying motion that

25   led to your order.

1          **THE COURT:**  You mean the state agency order?

2          **MR. YEUNG:**  Correct.

3          **THE COURT:**  Okay.  I'm not --

4          **MR. YEUNG:**  And not New York.

5          **THE COURT:**  Not New York.

6          **MR. YEUNG:**  Yeah.  New York Governor, just to be

7    clear.  The Governor's Office.

8          **THE COURT:**  Okay.

9          **MR. WALLACE:**  Kevin Wallace for the New York Attorney

10   General's Office.

11         That is not what we have proposed, but my understanding is

12   the nature of those was, we will give you essentially the same

13   production.  Because we object to the legal framework, though,

14   we would do it under different auspices and that those

15   discussions are ongoing.

16         **THE COURT:**  Has New York given you custodians and

17   search terms or a deadline to do that?

18         **MR. YEUNG:**  No.

19         **THE COURT:**  Okay.

20         **MR. WALLACE:**  Your Honor, may --

21         **THE COURT:**  I'm certainly not going to withdraw my

22   state agency order if that's -- if there's some implicit

23   request there floating in the ether.  I mean, I know it's up on

24   appeal, and you're welcome to do with it what you think you

25   can.

1        But the -- all right.  For the states that are also -- you

2    can tell Maryland, individual objections to the RFPs, that's

3    not how the rules work.

4            **MR. YEUNG:**  That's what we told them.

5            **THE COURT:**  Okay.  Well, you can tell them I've ruled

6    that's not how the rules work.

7        And so Illinois -- and so just help me out here.  The

8    states have yet to propose a set of search terms that they

9    would agree to and have yet to propose a set of custodians that

10   they would propose to be the people searched?

11           **MR. COCANOUGHER:**  That is correct.

12           **THE COURT:**  Okay.

13           **MR. COCANOUGHER:**  But --

14           **THE COURT:**  Ah.

15           **MR. COCANOUGHER:**  Yes, I will wait, Your Honor.

16           **THE COURT:**  Because that's the relief requested, as I

17   understand it.

18           **MR. YEUNG:**  Correct.

19           **THE COURT:**  Okay.  All right.

20           **MR. YEUNG:**  And then we can have the negotiation,

21   correct.

22           **THE COURT:**  So as to at least the states that are

23   talking with you, any of them, even of these 10 -- right? --

24   how long have the negotiations been going -- the discussions

25   been going on?

1    **MR. YEUNG:**  We tried -- again, we tried to -- we

2    proposed search terms and negotiations two business days after

3    your order.  So that was the first Tuesday.  You know, that's

4    where we -- we called for a meet and confer on the Sunday.  We

5    said, "Let's start meeting and conferring."

6        And then on the Tuesday, we provided a schedule that

7    proposed:  Here's when we get initial terms and custodians from

8    the states.  Here's the period where we negotiate.  If we have

9    any disagreements, this is the time to do it.  There's a

10   deadline to raise them with Your Honor.  And then, you know,

11   substantial completion November 5th.

12       So we -- from our perspective, we started this discussion

13   two business days --

14   **THE COURT:**  That's all.  I just wanted -- okay.  So

15   that's all water under the bridge.  I mean, it is what it is.

16       So you can relay this to your colleagues to the extent

17   they're not here.  The states, at least the 10 states that

18   have -- that are part of this group, especially the ones that

19   have been meeting and conferring -- that's one, two, three,

20   four, five -- six, as I count -- at a minimum, need to provide

21   at least a proposal on search terms and custodians no later

22   than next Friday.  I mean, that's plenty of time to come up

23   with a set of proposed search terms and the people who would be

24   the custodians within the agencies and the -- to the extent the

25   AG's office has documents.

1    And then I'm going to order the parties to meet and confer

2    during the week of the 4th to try to finalize those.  And it's

3    going to require -- it may require, you know, active -- lots of

4    emails flying back and forth and active negotiations daily that

5    week.  If it does, then it does.

6    And to the extent -- you know, I'm hoping -- I've said

7    this before.  You really don't want me in there drafting search

8    terms for you-all.  So if there is -- if there is a dispute,

9    it's going to be -- that gives you time to tee it up in the

10   next DMC statement, and we'll talk about it at the next DMC.

11   But you really do need to get the proposals out and just get

12   the ball rolling.  Okay?

13        **MR. COCANOUGHER:**  Sure, Your Honor.  May I just add

14   something, just for the record?

15        **THE COURT:**  Sure.

16        **MR. COCANOUGHER:**  So our records -- and this is just

17   for the record.  I know Your Honor has already ruled.  But our

18   records actually indicate that these 14 states have produced

19   4,002 records.  And I know -- so I just wanted to point that

20   out.

21        **THE COURT:**  Okay.  That's great.

22        **MR. COCANOUGHER:**  And --

23        **THE COURT:**  And I will say, to the extent agencies of

24   any states have already collected documents they thought they

25   were going to produce in response to the subpoenas, if they

1    would otherwise be responsive to the document requests, I don't

2    see any reason to hold onto them.  I would just go ahead and

3    produce them; right?

4        And you can use that as a basis to argue why search terms

5    should be narrowed or dropped because you've already searched

6    and found documents and produced them.  You're free to confer

7    with them on that.  But I don't see any reason to hold off on

8    producing documents that have -- as you said, were about to be

9    produced and were already collected.

10        **MR. COCANOUGHER:**  So, Your Honor, just so I'm clear,

11   by next Friday -- so next week we're going to meet and confer.

12   And by "we," I actually mean each of the state agency

13   counsels --

14        **THE COURT:**  Yes.

15        **MR. COCANOUGHER:**  -- for Kentucky and those 10 states.

16        And then by Friday of next week, we are to send our

17   proposal for search terms and custodians to Meta.

18        **THE COURT:**  Yes.  And meet and confer, finalizing all

19   that the following week.

20        **MR. YEUNG:**  Can I just clarify one thing?

21        He mentioned that we should be meeting and conferring with

22   the agency counsel.  I believe it should be the

23   Attorney General.  Your order required us to go meet and confer

24   with the 30 -- then 35 Attorney Generals.  That's what we've

25   been doing.  They've been the conduits.  They're the ones who

1  have been deemed in control of these agency records.  We should

2  be meeting and conferring with them.  They should be going to

3  the agencies and talking to the agencies and figuring this

4  stuff out.

5       **THE COURT:**  Well, when you said "agency counsel," I

6  thought you meant a different lawyer within the AG's Office who

7  happens to be representing them.

8       **MR. COCANOUGHER:**  No.  So for Kentucky, Your Honor,

9  for Kentucky, these are totally separate agencies.  So we will

10 have to set up meet and confers with the independent general

11 counsels for these agencies because they will be the ones

12 providing the actual substantive information to us.

13      **THE COURT:**  So the AG's Office in your state is not

14 involved in helping or working with those agencies in discovery

15 at all?

16      **MR. COCANOUGHER:**  After Your Honor's order, we reached

17 out to those agencies.  We gave them the order.  We gave them

18 the discovery request.  And so we have been in communications

19 with them about your order and about providing us with

20 information to then provide to Meta.  So that's where we are.

21      But it will -- it will require their substantive decisions

22 from the independent general counsels of those agencies, if

23 that makes sense.

24      **THE COURT:**  That does make sense.

25      But then it's incumbent on you to, like, be very

1   cooperative and impress upon them how cooperative they be in

2   scheduling all this.  I don't want to find out in November that

3   the meet and confers were impossible or were delayed because

4   people in different agencies said they weren't available.

5        I've set hard deadlines here because of the schedule in

6   this case, and so I'm expecting any other -- it'd be -- it's a

7   situation, for example, where if a party in a case were suing

8   both, like, a parent corporation and subsidiary, they may both

9   have separate counsel, but they have to work together to meet

10  and confer with the other side.  Right?

11       And so if you're telling me that they've got

12  decision-makers who need to sit at the table for the meet and

13  confers to be productive -- is that what you're saying?

14           **MR. COCANOUGHER:**  That's exactly what I'm saying.

15           **THE COURT:**  All right.  Then they need to make

16  themselves available on the schedule the Court has set.  Okay?

17       And I'm not going to be sympathetic to arguments that the

18  meet and confers can't happen, that we can't resolve these

19  issues in a timely manner because somebody just doesn't want to

20  appear by Zoom or by phone, or whatever, for a meet and confer.

21  Do you understand that?

22           **MR. COCANOUGHER:**  I understand that.

23           **THE COURT:**  So please relay that message to all your

24  colleagues.

25           **MR. COCANOUGHER:**  Will do.

 1        Two more.  Very brief.  Very brief.

 2            **THE COURT:**  Yeah.

 3            **MR. COCANOUGHER:**  In response to Rhode Island and

 4   Delaware, it is my understanding that they did reach out to

 5   Meta and let them know that they were waiting to hear back from

 6   their agencies, but they had not heard back.

 7            **THE COURT:**  This is why I made my order covering all

 8   10 in case -- right?  And so, Meta, it is incumbent on you to

 9   relay all this to all the states who are willing to negotiate

10   with you, even the ones that haven't really, as you say,

11   provided much contact and get that ball rolling.  Okay?

12            **MR. YEUNG:**  Okay.

13            **THE COURT:**  All right.

14            **MR. YEUNG:**  What about the four?

15            **THE COURT:**  I'm not there yet.

16        So you're standing up patiently wanting to talk about --

17   from New York or --

18            **MR. WALLACE:**  I was going to address -- I'm sorry.

19   Kevin Wallace from New York again.

20        I was just going to address that, Your Honor, there are a

21   lot of -- it's -- we're working with Meta.  But it is -- each

22   agency has its own data system, has its own system, and, as in

23   Kentucky, has its own counsel's office.  So we're working with

24   them.

25        I would like you to make sure, though, that Meta is also

PROCEEDINGS

```
 1   making itself available because sometimes it can take a week
 2   for us to get a meet and confer together.  So if we're going to
 3   have our feet held to the fire, Meta's feet need to be held to
 4   the fire as well.
 5          THE COURT:  It applies equally to everyone.  Do you
 6   understand?
 7          MR. YEUNG:  Understood.  And we have been -- we've
 8   been scheduling meet and confers with those who have been
 9   reaching out.
10          MR. WALLACE:  But I just want you to understand that
11   we are working with states that are having trouble with the
12   framework of the decision, but then also just legitimately,
13   like, different systems, different kinds of employees.
14       And I think in some instances it may be the case that
15   there can be data dumps that come before search terms, and so
16   we're trying to stage that, and we are working diligently.  So
17   I just wanted confirm that.
18          THE COURT:  This is why you have meet and confers and
19   you work all those technical details out and work out a
20   schedule; that's right.
21          MR. WALLACE:  Love to meet and confer, Your Honor.
22          MR. YEUNG:  Just to facilitate that, I think if you do
23   have a situation like Kentucky, who insists on bringing all the
24   decision-makers, that we coordinate that in a single meeting as
25   opposed to having us do six of them.  Because, as you can tell,
```

 1    if we do 6 times 14, that's a lot of meet and confers for Meta

 2    to have to attend.

 3             THE COURT:  I mean, that's not an unreasonable ask, is

 4    to try to get everybody at the table at the same time.

 5             MR. COCANOUGHER:  Yeah.  I will do the best I possibly

 6    can.

 7             THE COURT:  I would encourage that.  And there

 8    should -- you should be -- Meta needs to be able to be flexible

 9    in terms of scheduling, whether it's, you know, even at odd

10    hours or on a weekend.  I mean, you're the one pressing on the

11    time, so you need to make yourselves available when all of

12    their side is available.

13             MR. YEUNG:  Understood.

14             THE COURT:  Okay.

15        All right.  The four, so California -- is it Michigan? --

16    Colorado and Pennsylvania.  Briefing says that the state

17    agencies in those four states are simply refusing to provide

18    documents and engage in this process because they believe --

19    well, they disagree with my order, I guess.  Is that

20    fundamentally where we are?

21             MS. MIYATA:  Your Honor, Bianca Miyata from the State

22    of Colorado.

23        Yes.  For those four states, we have requested access to

24    the documents per the court's order, and counsel for those

25    state agencies have either told myself and my counterparts "no"

PROCEEDINGS

1  or have communicated directly with Mr. Yeung and his counsel --

2  his -- I'm sorry -- his colleagues that, respectfully, they

3  would not be providing those documents.

4       **THE COURT:**  Okay.  Well, I mean, when there is a party

5  that's refusing to provide discovery, you are smart enough to

6  know what resources and options you have available to you to

7  get enforcement of that order.

8       **MR. YEUNG:**  Right.  So we thought that bringing the

9  letter briefing here before Your Honor would do that,

10  especially -- I mean, for Colorado, the ones who've been

11  reaching out to me are her colleagues in the Attorney General's

12  Office.  Those are other AAGs.

13       In California, the ones who were representing the various

14  agencies in connection with the subpoenas were Assistant

15  Attorney -- were other attorneys in the Attorney General's

16  Office.

17       So I think if Your Honor issues an order requiring those

18  four states to provide us with search and custodians, that is

19  the relief that we're seeking.

20       **THE COURT:**  Yeah.

21       **MS. MIYATA:**  Your Honor, if I may clarify just

22  briefly.

23       **THE COURT:**  Yeah.

24       **MS. MIYATA:**  My understanding of the effect of

25  the Court's -- the Court's order, the lengthy order requiring

1    state agencies to provide documents, is that it ruled state

2    agencies were subject to party discovery, not that state

3    agencies were actually parties to this action.  I think

4    the Court specifically declined to go that far in its ruling.

5        And I just want to make very clear that that's -- I want

6    to put that on the record.

7             THE COURT:  I thought I said that multiple times

8    but --

9             MS. MIYATA:  I just -- I just want to clarify, for

10    these purposes, for this proceeding as well.

11             THE COURT:  Okay.  So if the -- tell me if you can't

12    speak on behalf of all four.  But, so is the only basis on

13    which the agencies are refusing to provide documents is that

14    they simply disagree with my order on state agency?

15             MS. MIYATA:  So what I can -- my understanding, and I

16    can say just, you know, speaking for Colorado at this point as

17    an example, that correspondence went directly to Meta; and

18    I believe that those agencies explained that, respectfully,

19    they did not believe themselves to be subject to that order or

20    subject to the jurisdiction of the Northern District of

21    California.

22             THE COURT:  Okay.  Is that -- I don't know.  Can you

23    confirm that that is the same position for California and

24    Michigan and Pennsylvania?

25             MS. MIYATA:  I believe that is the same for that group

1    of four states, yes.

2         **THE COURT:**  I know we've got counsel for California

3    here.

4        Can you confirm that just for the record.

5         **MS. O'NEILL:**  Megan O'Neill for the State of

6    California.

7        I can confirm that.

8         **THE COURT:**  Okay.  And then is there somebody from

9    Michigan or Pennsylvania here?

10                         (No response.)

11        **THE COURT:**  I take it not.

12    So I'll take your --

13        **MS. MIYATA:**  I do not believe so, no.

14        **THE COURT:**  I'll take your representation that --

15        **MS. MIYATA:**  Thank you.

16        **THE COURT:**  -- they are taking the same position.

17    Okay.  So I find that that is not a sufficient basis to

18    refuse to provide proposals for search terms and custodians.

19    So I'm going to order that California, Michigan, Colorado, and

20    Pennsylvania also engage in the meet-and-confer process and the

21    deadlines I set for submitting proposals and finalizing the

22    search terms and custodians issue.

23        **MS. MIYATA:**  Your Honor, if I may just make a record

24    on this issue.

25        I certainly don't want to turn back to ground that we've

1   already tread numerous times, but I will say, you know, for us

2   standing here as consumer protection counsel, of course

3   the Court, you know, may enter that order, but I do have to

4   represent, as we stand here today, we do not believe that we

5   have the ability to comply with that order.

6       I do not have the information or the knowledge of what

7   would even give rise to reasonable search terms or what

8   custodians within the agency may be appropriate.  And while I

9   can certainly go to our -- go to the agency -- go to counsel

10  for the agencies and ask for that information, if they say,

11  "No, I will not provide that to you," I do not have a legal

12  mechanism to compel them to give that to me or a legal

13  mechanism to enforce that request.

14      **THE COURT:**  I think I made clear in my order there are

15  other legal mechanisms, including this Court, that can -- if

16  Meta chooses, they can try to follow.

17      **MR. YEUNG:**  Just to be clear, when she says "agency

18  counsel from Colorado," the ones that reached out to me are all

19  Assistant Attorney Generals --

20      **THE COURT:**  Okay.

21      **MR. YEUNG:**  -- or Deputy Assistant Attorney Generals.

22      **THE COURT:**  Right now we're not at the point of

23  enforcing of the order.  I just issued the order.

24      **MR. YEUNG:**  Thank you.

25      **THE COURT:**  So let's get to see whether or not any of

1  the agencies change their minds in light of this, and we can

2  proceed there.

3      I think Meta knows well enough what steps, hopefully,

4  don't need to be taken but could be taken if there's a failure

5  to comply with a court order.  Okay?

6          **MR. YEUNG:**  Thank you.

7          **THE COURT:**  All right.  Does that resolve everything

8  in this letter brief?

9          **MR. YEUNG:**  For this particular letter brief?

10         **THE COURT:**  Yeah.

11         **MR. YEUNG:**  I think so.

12         **THE COURT:**  All right.  So can you provide a joint

13  proposed order, just make sure everybody's okay with the

14  language, and then submit it?

15         **MR. YEUNG:**  Yeah.  Okay.

16         **THE COURT:**  Okay.

17         **MS. MIYATA:**  And, Your Honor, by when would you like

18  to see that proposed order?

19         **THE COURT:**  Today's Thursday.  I mean, Monday.

20         **MR. YEUNG:**  Okay.

21         **THE COURT:**  In fact, for all the proposed orders, if I

22  didn't set deadlines, you know, Monday, I think, is a good

23  date.

24      Okay.  So I think that's everything.  Is there anything we

25  didn't cover that somebody wants to raise with me?

PROCEEDINGS

```
 1            MS. SIMONSEN:  Nothing from the defendants,

 2    Your Honor.

 3            THE COURT:  Anything from the plaintiffs?

 4            MS. MIYATA:  Nothing from the State AGs.

 5            THE COURT:  All right.  So we are adjourned until the

 6    next hearing.  Thank you.

 7            THE CLERK:  Court stands in recess.

 8            (Proceedings adjourned at 4:42 p.m.)

 9                        ---o0o---

10

11                 CERTIFICATE OF REPORTER

12        I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14

15    DATE:  Monday, October 28, 2024

16

17

18

19    _____

20         Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

21       CSR No. 7445, Official United States Reporter

22

23

24

25
```