UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>All Actions | MDL No. 3047<br><br>Case No. 4:22-md-3047-YGR<br><br>**ORDER GRANTING DEFENDANT MARK ZUCKERBERG'S SECOND MOTION TO DISMISS**<br><br>Re: Dkt. No. 833 |

Defendant Mark Zuckerberg moves to dismiss claims of fraudulent and negligent concealment and misrepresentation asserted against him personally in over two dozen cases in this multi-district litigation ("MDL"). Having carefully considered the parties' briefing and argument on July 12, 2024, the Court **GRANTS** defendant Zuckerberg's motion to dismiss.

I.  **BACKGROUND**

At least two dozen plaintiffs seek to impose liability on defendant Mark Zuckerberg as a corporate-officer participant in Meta's alleged fraudulent concealment and misrepresentation (Count 8) and negligent concealment and misrepresentation (Count 9)[1] as it relates to alleged material information relating to the negative health effects of platform usage on young users. While the Court previously granted Zuckerberg's first motion to dismiss as to his direct liability under these claims, the Court also permitted plaintiffs leave to amend to file one consolidated addendum on this point specifically. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, 2024 WL 1786290, at *9 (N.D. Cal. Apr. 15, 2024), Dkt. No. 753. Plaintiffs filed their consolidated addendum on April 26, 2024. (Dkt. Nos. 794 (redacted), 795-1 (sealed).)

---

[1] As set forth in personal injury plaintiffs' Second Amended Master Complaint ("SAMC"). Dkt. No. 494.

The most relevant allegations in plaintiffs' addendum focus on (i) Zuckerberg's control over platform development, (ii) Zuckerberg's awareness of safety risks, (iii) instances in which Zuckerberg rejected proposed resource allocations to child safety and well-being, and (iv) Zuckerberg's public representations relating to platform safety.

**Control over Platform Development.** Several allegations discuss the tight grip that Zuckerberg has maintained over "key design decisions." (Addendum ¶ 16.) Zuckerberg has maintained a controlling stake over Facebook (now Meta) since its inception. (*Id.* ¶ 5.) Plaintiffs allege that as a result of Zuckerberg's unique level of control, he can unilaterally reject design decisions and shareholder proposals, and has done so with respect to child safety. (*See id.* ¶¶ 5–7.)

**Awareness of Safety Risks.** The allegations identify a variety of instances in which Zuckerberg was made aware of the risks that "engagement" presented to youth platform users. (*See id.* ¶¶ 20, 23, 25, 27, 30, 36, 37.) For example, an internal Meta study from 2017 indicated that in a given week, about 5.9 million people leave Facebook because "they spent too much time" or were taking a break and "planned to return," and found that, compared to users generally, this subset had more sessions, received more notifications, and had a faster response time to notifications. (*Id.* ¶ 25 (citing SAMC ¶ 298).) In January 2018, Zuckerberg received two reports: (i) "One estimated that there were some four million children under thirteen years old on Instagram" (*Id.* ¶ 23 (citing AG Compl. ¶ 657), (ii) "The other found that increased use of Facebook among 10- to 12-year-old girls 'was linked with body image concerns, the idealization of thinness, and increased dieting'" (*Id.* ¶ 23 (citing SAMC ¶ 102)).

**Denials of Resource Requests.** Certain allegations pair Zuckerberg's awareness of a potential safety issue with a specific denial of a resource request. (*See id.* ¶¶ 19, 21, 29, 32.) For example, "[i]n late 2017, high-ranking executives at Meta emailed one another in active disagreement about whether to increase the quantity of notifications sent to users to boost engagement, even if it worsened user experience. The conversation ended with confirmation that daily active users '[was] a bigger concern for Mark . . . than user experience.'" (*Id.* ¶ 21 (citing AG Compl. ¶ 318–22) (alterations in original).) In April 2020, "Mr. Zuckerberg intervened in a Vice President of Product Design's proposed implementation of a ban on camera filters simulating

2

plastic surgery. Despite near-unanimous support from consultation with 21 independent experts, and academic research on the subject, Mr. Zuckerberg ultimately vetoed the proposal (opting to lift the ban)." (*Id.* ¶ 32.)

**Public Representations on Platform Safety.** The allegations reassert numerous public representations made by Zuckerberg regarding platform safety. (*See id.* ¶¶ 22, 24, 26, 28, 33, 34, 38.) The Court described these in its prior order. *In re Social Media*, 2024 WL 1786290, at *2.

## II.  LEGAL FRAMEWORK

The basic framework is well-known, not in dispute, and was previously provided. *See In re Anthem, Inc. Data Breach Litig.*, 2015 WL 5286992, at *2 (N.D. Cal. Sept. 9, 2015); *In re Social Media*, 2024 WL 1786290, at *3. With respect to allegations of fraud, a complaint "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also, Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1124 (9th Cir. 2009); *Daniel v. Ford Motor Co.*, 806 F.3d 1217, 1225 (9th Cir. 2015) (reliance "can be presumed, or at least inferred, when the omission is material").[2]

## III.  DISCUSSION

Plaintiffs' claims against defendant Zuckerberg arise under the laws of thirteen states, namely Arizona, Colorado, Connecticut, Georgia, Maryland, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Texas, Virginia, and Wisconsin. *See also In re Social Media*, 2024 WL 1786290, at *3. Each state recognizes corporate-officer participation in the corporation's tort as a basis for the officer's personal liability. With minor variation in articulation, these states all share a substantially similar standard for evaluating a corporate officer's participation in a tort. (*See* Dkt. No. 833, Mot. at 8–10 (providing a state-by-state survey).)

In general, "a corporate officer will not be held personally liable for the acts of the

---

[2] The parties dispute whether Rule 9(b) applies to a theory of corporate-officer liability. The Court disagrees that Rule 9(b) serves to heighten the corporate-officer liability showing, but need not decide because, at any rate, the distinction appears largely immaterial. The state-specific standards of corporate-officer liability as applied would focus on whether the corporate officer directed, authorized, or sanctioned those predicate misrepresentations or omissions. That is the inquiry.

corporation by mere virtue of his status as a corporate officer." *State ex rel. Fisher v. Am. Cts., Inc.*, 644 N.E.2d 1112, 1114 (Ohio App. Ct. 1994). However, "corporate officers may be held personally liable for actions of the company if the officers *take part in the commission* of the act or if they *specifically directed* the particular act to be done, or *participated* or *cooperated* therein." *Id.* (emphases supplied); *Galas v. Lending Co.*, 2013 WL 308745, at *3 (D. Ariz. Jan. 25, 2013) ("A corporate officer or director is, in general personally liable for all torts which he [or she] authorizes or directs or in which he participates, and notwithstanding that he [or she] acted as an agent of the corporation." (quoting *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1021 (9th Cir. 1985))).[3] Thus, the question is whether the corporate officer commissioned, performed, specifically directed, participated in, authorized, ratified, or otherwise assented to the alleged tort.[4]

---

[3] *See also, e.g.*, *Hildebrand v. New Vista Homes II, LLC*, 252 P.3d 1159, 1166 (Colo. App. 2010) ("Corporate agents are liable for torts of the corporation if they approved of, sanctioned, directed, actively participated in, or cooperated in such conduct." (citation omitted)); *CoStar Realty Info., Inc. v. Meissner*, 604 F. Supp. 2d 757, 769 (D. Md. 2009) (corporate officer "is not personally liable unless he [or she] specifically directed the particular acts to be done or participated or co-operated therein" (citation omitted)); *N.S. Sportswear, Inc. v. State*, 819 S.W.2d 230, 232 (Tex. App. 1991) ("At common law, a corporate officer may be held individually liable for torts of the corporation if he participated in, or had knowledge of and assented to, the wrongful conduct."); *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) (corporate officer not liable for corporation's torts "unless he [or she] specifically directed the particular act to be done or participated, or cooperated therein" (citation omitted)); *Parker v. Carilion Clinic*, 819 S.E.2d 809, 823 (Va. 2018) (corporate officer may be liable where he or she "directed, ratified, or performed the tortious conduct").

[4] Defendant tries to import a misfeasance/nonfeasance distinction into this standard by pointing to Pennsylvania authority holding that "corporate officers may be held liable for misfeasance" but "may not be liable for mere nonfeasance." *Wicks v. Milzoco Builders, Inc.*, 470 A.2d 86, 90 (Pa. 1983) (holding insufficient "the mere averment that a corporate officer should have known the consequences of the liability-creating corporate act"); *accord Loeffler v. McShane*, 539 A.2d 876, 878 (Pa. Super. Ct. 1988). As has been more recently recognized, "[w]hile the Pennsylvania courts continue to adhere to the 'old distinction between an agent's acts of nonfeasance and acts of misfeasance or malfeasance . . . the modern rule is that,' as long as the agent participated in the tort, 'personal liability can attach regardless of whether the breach was a result of misfeasance or nonfeasance.'" *Ramos v. Wal-Mart Stores, Inc.*, 202 F. Supp. 3d 457, 464 n.4 (E.D. Pa. 2016). "In practice, applying such labels may be more descriptive" than functional. *See id.* (quoting *Haupt v. Miller*, 514 N.W.2d 905, 909 (Iowa 1994)). While potentially appropriate in Pennsylvania, the Court declines to rely on the misfeasance/nonfeasance distinction

4

Here, in order to determine whether active participation existed, plaintiffs must begin with the wrong at issue. Counts 8 and 9 of the personal injury plaintiffs' second amended master complaint allege that *Meta* fraudulently and negligently misrepresented and concealed the addictive design of its platforms and known risks of platform use. Therefore, to establish corporate-officer liability, plaintiffs here must allege that *Zuckerberg* directed, sanctioned, or participated in *Meta's* concealment of this information.[5] Plaintiffs attempt to do so with the following:

> Through [Counts 8 and 9], Plaintiffs allege that Meta: (1) knew that Instagram and Facebook pose serious health risks to users, most especially youth, SAMC ¶ 979, 990; (2) was under a duty to disclose the defective condition of its platforms and breached that duty both by failing to disclose these risks and concealing them via misleading statements, SAMC ¶¶ 979-80, 991-93; and (3) prevented Plaintiffs from learning about the defective nature of the product by way of its material omissions and concealment, causing Plaintiffs' injuries, SAMC ¶¶ 985-86, 994-97.
>
> In addition, through their short-form complaints and this addendum, Plaintiffs allege that Mr. Zuckerberg himself directed, participated in, knew of, and in fact served as the guiding spirit behind Meta's tortious concealment and omissions.

---

for all states at issue here. "Participation" and its analogues are the operative terms to apply.

Additionally, the parties dispute whether and to what extent "participation" and its analogues require affirmative conduct on part of the corporate officer. Some cases are more explicit as to the intentionality required. *See, e.g.*, *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *9 (N.D. Tex. May 27, 2011) (requiring "factual allegations of some sort of *conscious wrongdoing*" (emphasis supplied)). On the other hand, one court has explained that a corporate officer may have "direct, personal participation in the wrongdoing" where he or she was "the guiding spirit behind the wrongful conduct." *Spurgeon v. Empire Petroleum Partners, LLC*, 2019 WL 2521722, at *3 (Tex. App. June 19, 2019). For purposes of this case, these are distinctions without a difference. The Court here focuses on whether the alleged conduct in this case amounts to the kind of participation envisioned in these states.

[5] At argument on Zuckerberg's first motion to dismiss, "plaintiffs confirmed their theories of misrepresentation as to Zuckerberg are based exclusively on misrepresentation by omission." Dkt. No. 753 at 6 (citing Dkt. No. 669, Tr. of Feb. 23, 2024 Case Management Conference at 11:13–17). Plaintiffs' opposition here reflects this approach, arguing Zuckerberg's conduct "constitute[s] direct participation in Meta's tortious *omissions and concealment*." Dkt. No. 889 at 7.

(Addendum ¶¶ 3–4.) Generalized allegations, even if compelling, are insufficient. Plaintiffs fail to allege any instance where Zuckerberg directed the suppression of material information.[6]

For this reason, plaintiffs' four arguments for why Zuckerberg's conduct constitutes "direct participation," without more, are insufficient to impute Meta's allegedly tortious omissions and concealment to him personally. All the allegations focus on the overall performance and impact of the platforms generally; not the portions which this Court has found to be actionable. Nonetheless, the Court addresses each: (i) Zuckerberg's misleading public statements, (ii) his control over disclosures about Meta's products, (iii) his failure to prevent or abate Meta's tortious conduct despite having the knowledge and authority to do so, and (iv) his general involvement in developing social media products to teens.

*First*, plaintiffs posit that Zuckerberg's misleading *affirmative* statements constitute direct participation in Meta's omissions and concealment. In terms of context, plaintiffs are not proceeding on a theory that Zuckerberg made *affirmative* misrepresentations, but argue that because his affirmative statements are misleading, or at least not forthcoming, these statements support the inference that he participated in Meta's alleged fraudulent concealment. On their own, they do not plausibly support the inference that Zuckerberg participated in a scheme or directed any employee to conceal information. There is no allegation that Zuckerberg directed an employee to suppress an internal report that otherwise was going to be disclosed.

*Second*, plaintiffs argue that Zuckerberg is an active participant in the company conduct under his supervision, which includes control over disclosures about Meta's products. Control alone, the caselaw is clear, is insufficient to establish a corporate officer's participation. *See, e.g., In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 671 (N.D.

---

[6] The Court has narrowed the scope of the plaintiffs' fraudulent and negligent misrepresentation claims against Meta pursuant to Section 230. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, No. 2024 WL 4532937, at *57 (N.D. Cal. Oct. 15, 2024). The Court has not held that the existence of the platforms is at issue, yet plaintiffs' generalized theory, taken at face value, proceeds on that basis, *i.e.*, that Zuckerberg should have disclosed that the platforms on the whole present dangers to users. At a minimum, the law requires that plaintiffs' allegations be more narrowly tailored.

Cal. 2020) (holding sufficient allegations *beyond* "mere knowledge or control" which offered "multiple examples" of "direct participation"). To hold a corporate officer's control alone is sufficient would dissolve the distinction between a chief executive and the corporation given the executive's ultimate authority over the company's decisions, including the public disclosure of internal information. Zuckerberg, under plaintiffs' theory, could be liable for failing to disclose any negative internal reports that might come across his desk. Such a holding would, at a minimum, be in tension with the fact that the Court has already held that Zuckerberg does not personally have a duty to disclose to Meta's users absent a "special relationship." *See In re Social Media*, 2024 WL 1786290, at *7.[7]

*Third*, plaintiffs argue that Zuckerberg failed to prevent or abate Meta's tortious conduct despite his knowledge of harm and authority to take action. This theory fails for the same reason.[8] Here, plaintiffs focus on Zuckerberg's specific denials of resource requests or product initiatives related to teen well-being, as with increasing notification quantity (Addendum ¶ 21), vetoing a proposed ban on filters simulating plastic surgery (*id.* ¶ 32), and rejecting other funding for well-

---

[7] Plaintiffs also characterize Zuckerberg as the "guiding spirit" and "central figure in the challenged corporate activity," with reference to alleged instances where Zuckerberg has "defied" talking points provided by Meta's staff on the negative effects of social media and has fostered a corporate culture of fear. Addendum ¶¶ 33(c), 44. The Court acknowledges there is some merit to these allegations, however they lack sufficient specificity. For instance, Zuckerberg's choice of response to a question from a congressperson does not itself plausibly suggest he directed Meta's scheme of concealment. *See* Addendum ¶ 33(c) ("Mr. Zuckerberg told Congress in March 2021 that the 'research we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits.'").

[8] Plaintiffs' caselaw in support largely restates the above-discussed rules and involve circumstances far more specific and particularized than plaintiffs' sweeping allegations which ostensibly seek to hold Zuckerberg liable for all information Meta allegedly concealed related to child safety and well-being. *See Capen Wholesale, Inc. v. Probst*, 509 N.W.2d 120, 126 (Wis. Ct. App. 1993) (distinguishing a corporate officer that "do[es] nothing" "under circumstances that suggest lack of knowledge, involvement, or authority" with another corporate officer who "might *choose* to 'do nothing' despite having knowledge . . . and authority" in case involving commingling of funds); *Scribner v. O'Brien, Inc.*, 363 A.2d 160, 168 (Conn. 1975) (affirming individual officer's liability for negligent construction given his daily presence on the property and undertaking as supervisor—regardless of whether he "was acting in his individual capacity or as an officer" given his "failure to act with reasonable care").

being initiatives (*id.* ¶¶ 19, 29, 31, 35). These examples of Zuckerberg's exercise of authority, plaintiffs argue, make him the "person who would have made the decision to place warnings on" products or otherwise disclose product risks. *See Wellborn v. Mountain Accessories Corp.*, 23 F. Supp. 2d 1321, 1328 (D. Wyo. 1998), *aff'd*, 198 F.3d 260 (10th Cir. 1999). The Court disagrees these allegations are enough to plausibly suggest that Zuckerberg directed or authorized the suppression of information. While Zuckerberg's vetoes are *consistent* with a theory that Zuckerberg chose to disbelieve or suppress any recognition of Meta's platforms' negative impact on mental health, none of these instances of rejecting resource funding requests or product proposals constitute the "authorization," "participation," or "sanctioning" of the concealment of information relating to user well-being. Again, plaintiffs fail to tie specific allegations of Zuckerberg's conduct to the misrepresentation theories at issue.

*Fourth*, plaintiffs argue that Zuckerberg's involvement in developing and promoting Meta's social media products to teens supports the reasonable inference that he was directly involved with and knowledgeable of the products' negative impact and Meta's concealment of that information. Plaintiffs last and final theory highlights the issue present throughout plaintiffs' approach: plaintiffs rely Zuckerberg's general control of his company, product development, and messaging to impute liability for Meta's failure to disclose information relating to platform use and young users' mental health. Such generalized control is insufficient to show that Zuckerberg specifically directed, authorized, or sanctioned Meta's alleged tortious concealment.

The parties' cases do not compel otherwise. In *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prod. Liab. Litig.*, the corporate officer (Marchionne) argued that plaintiffs only identified two statements by him, both of which "express[ed] intentions to expand FCA operations" and so could not support his participation in plaintiffs' fraud-on-consumer claims. 295 F. Supp. 3d 927, 988–89 (N.D. Cal. 2018). While the court found Marchionne's position "is not without some merit," there were sufficient allegations in the complaint to survive a motion to dismiss. *Id.* In particular, plaintiffs alleged that Marchionne expressly "'signed off' on the FCA companies' statements about EcoDiesel" and, in other words, "approved of, or ratified, the use of the 'EcoDiesel' logo on the Class Vehicles, and with knowledge of the emissions problem." *Id.*

8

As to the specificity of the allegations, the court held that it was a "reasonable inference" Marchionne approved or ratified the use of the logo because "he heavily promoted diesel within the FCA entities" and "plausibly would have maintained oversight as to what was happening with the diesel engines," including with respect to the "EcoDiesel" brand. *Id.* Thus, plaintiffs linked Marchionne's conduct to the harmful corporate conduct alleged in the complaint.

In *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prod. Liab. Litig.*, the court held that plaintiffs sufficiently alleged certain corporate officers' "individual participation in the alleged misconduct." 497 F. Supp. 3d 552, 671 (N.D. Cal. 2020). There, plaintiffs "allege[d] more than mere knowledge or control by offering multiple examples about [two officers'] personal and direct participation in the deceptive scheme," for example: personally (i) reviewing and providing specific direction on an allegedly teen-focused marketing campaign, (ii) designing an addictive product that appealed to young users, (iii) engineering test results consistent with deceptive messaging, and (iv) having control *and* input over specific advertising. *Id.* Again, the plaintiffs were able to identify *specific* conduct from the corporate officers that constituted "direct participation in the deceptive scheme at issue." *See id.*[9]

## IV. CONCLUSION

Defendant's motion to dismiss is **GRANTED**. Plaintiffs' allegations are not sufficient to plausibly allege that Zuckerberg directed the suppression of material information. Control of corporate activity alone is insufficient. While possible that discovery may reveal a more active participation and direction by Zuckerberg in Meta's alleged fraudulent concealment, the allegations before the Court are insufficient to meet the standard for corporate-officer liability in

---

[9] Similarly, in *Dean v. Beckley*, plaintiffs alleged a corporate officer (Beckley) "actively participated in a fraudulent inducement of the sale of [an] RV to" plaintiffs. 2010 WL 3928650, at *3 (D. Md. Oct. 1, 2010). The court found that plaintiffs "pled with sufficient particularity a claim for common law fraud" based on what "Beckley misrepresented": that "the company would take back the RV and refund their money." *Id.*

the thirteen at-issue jurisdictions.

**IT IS SO ORDERED.**

Dated: November 7, 2024

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE