1

2

3                        UNITED STATES DISTRICT COURT

4                      NORTHERN DISTRICT OF CALIFORNIA

5

6   **IN RE: SOCIAL MEDIA ADOLESCENT**          MDL No. 3047
    **ADDICTION/PERSONAL INJURY**
7   **PRODUCTS LIABILITY LITIGATION**           Case No. 4:22-md-3047-YGR
8
                                                **ORDER GRANTING IN PART AND DENYING**
9   This Document Relates to:                   **IN PART DEFENDANTS' MOTION TO**
                                                **DISMISS THE SCHOOL DISTRICT AND**
10  School District and Local Government        **LOCAL GOVERNMENT ENTITIES' CLAIMS**
    Entities' Master Complaint                  **OF PUBLIC NUISANCE**
11
12                                              Re: Dkt. No. 601

13          This order is the fourth in a continuing series of orders addressing claims against several

14   social media companies.  This order addresses the remaining portion of defendants' motion to

15   dismiss plaintiffs' First Amended Master Complaint (Local Government and School District)

16   (Dkt. No. 729, "SD-FAC")[1] as it relates to the *public nuisance claims* under the laws of nineteen

17   states against the social media defendants, namely Meta's Facebook and Instagram, Google's

18   YouTube, ByteDance's TikTok, and Snapchat.

19          Defendants principally contend the school district and local government entities' claims of

20   public nuisance overstep the tort's boundaries in all of the nineteen at-issue states.  The Court

21   disagrees.  Public nuisance, like negligence, provides a flexible mechanism to redress evolving

22   means for causing harm.  While some other jurisdictions have imposed land- or product-related

23   limitations on public nuisance claims, others have expressly permitted actions outside of that

24   context, and none of the at-issue states have formally adopted such limitations.  While public

25

26          _____

27          [1] The Court previously **GRANTED IN PART** and **DENIED IN PART** the motion, covering
     threshold issues applicable to both claims of negligence and public nuisance and the negligence
     claim on the substantive elements.  *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab.*
28   *Litig.*, 2024 WL 4673710 (N.D. Cal. Oct. 24, 2024).

United States District Court
Northern District of California

United States District Court
Northern District of California

1  nuisance law remains in flux, the Court declines to import these limitations and hold that the

2  supreme courts of the at-issue states would *per se* prohibit the kind of action brought by the school

3  districts under the alleged facts of this case.  However, because a handful of at-issue state supreme

4  courts have expressed reluctance to expand public nuisance, the Court declines to permit the

5  public nuisance actions to proceed with respect to those at-issue states.

6          Thus, and for the reasons more explicitly set forth in this Order, based on a careful review

7  of the pleadings and the briefing submitted by the parties as well as oral argument heard on May

8  17, 2024, the Court largely **DENIES** defendants' motion to dismiss the school district complaint as

9  to public nuisance's substantive elements, granting only as to Illinois, New Jersey, Rhode Island,

10 and South Carolina.[2]

11 **I.      BACKGROUND AND LEGAL FRAMEWORK**

12         The Court set forth the background and legal framework to the States' public nuisance

13 claim in its prior order on this motion to dismiss.  *See In re Soc. Media Adolescent Addiction/Pers.*

14 *Inj. Prod. Liab. Litig.*, 2024 WL 4673710, at *2–8 (N.D. Cal. Oct. 24, 2024), Dkt. No. 1267

15 ("Prior Order").  That background is incorporated herein.

16 **II.     PUBLIC NUISANCE**

17         The school districts assert claims of public nuisance under the laws of nineteen states, not

18 all fifty.  *See In re Social Media*, 2024 WL 4673710, at *2 & n.3.  The Court focuses on that

19 subset of states.  A public nuisance is defined in the Restatement (Second) of Torts as follows:

20             (1) A public nuisance is an unreasonable interference with a right
               common to the general public.

21             (2) Circumstances that may sustain a holding that an interference with
22             a public right is unreasonable include the following:

23                 (a) Whether the conduct involves a significant interference
                   with the public health, the public safety, the public peace, the
24                 public comfort or the public convenience, or

25                 (b) whether the conduct is proscribed by a statute, ordinance

26

27         [2] As a shorthand, the Court uses "school district plaintiffs" to refer collectively to both
   school districts and the local government entities.
28

2

or administrative regulation, or

(c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

Restatement (Second) of Torts § 821B (1979).

Defendants move to dismiss the school districts' public nuisance claims on three primary grounds: *First*, state precedent and public policy forecloses public nuisance actions that lack a nexus between the defendants' conduct and use of land, or actions that overlap with products liability law. *Second*, plaintiffs have failed to allege that defendants' conduct interferes with a public right. *Third*, the school districts' alleged injuries do not constitute "special injury" for the purposes of public nuisance. The Court addresses each.

### A.    Land- and Product-Related Limitations on Public Nuisance

As noted, defendants argue, *first*, that public nuisance only supports claims involving the use of land, and *second*, that public nuisance cannot support a claim based on allegedly defective products.

#### 1.    Public Nuisance and Land Use

The Court agrees that public nuisance claims have "historically been linked to the use of land by the one creating the nuisance," and in some states "[c]ourts have limited public nuisance claims to these traditional bounds." *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 724 (Okla. 2021). Other courts, however, have declined to limit public nuisance claims to harms arising from a defendant's use of land. *See, e.g.*, *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 815 (N.D. Ohio 2022) ("[A]lthough we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving public health or safety, we have never held that public nuisance law is strictly limited to these types of actions." (quoting *Cincinnati v. Beretta U.S.A. Corp.*, 768 N.E.2d 1136, 1142 (Ohio 2002))).

As often in this MDL, the answer cannot be provided in one stroke, but requires a state-by-state review. Some states have explicitly spoken to this issue, while others have not. As discussed in detail below, defendants concede that California and Indiana do not require a connection to a

3

defendant's use of land,[3] and that nine more states have not directly addressed this potential limitation, namely Alaska, Colorado, Georgia, Kentucky, Louisiana, Maryland, North Carolina, Nevada, and Virginia. (Dkt. No. 601 at 33 n.20.)[4] Defendants urge that six states have limited public nuisance to land or property use, namely Florida, Illinois, New Jersey, Pennsylvania, Rhode Island, and South Carolina. The Court briefly reviews the available authority in a subset of those states, where provided by the parties:

**Alaska.** In *Alaska v. Express Scripts, Inc.*, the District of Alaska explained that while "the Alaska Supreme Court has not expressly addressed whether the tort of public nuisance was limited to claims involving property," recent decisions from the Alaska Supreme Court indicate it would not endorse such a restriction due to its broad framing of public nuisance. *See* No. 23-cv-00233, 2024 WL 2321210, at *3 (D. Alaska May 22, 2024) (discussing *Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542, 544 (Alaska 2012)).

**Florida.** The parties offer competing authority.

Defendants assert Florida *prohibits* non-property-related nuisance claims, offering a 1927 Supreme Court of Florida opinion defining a public nuisance as "an unlawful *use of one's own property* in such way as to cause material annoyance, discomfort, or hurt to the public." *Pompano Horse Club v. State*, 111 So. 801, 816 (Fla. 1927) (emphasis supplied). Plaintiffs point to *In re National Prescription Opiate Litigation*, in which the court "conclude[d] that Florida nuisance law does not require an interference with the use and enjoyment of property," a proposition slightly different from the one at issue. 452 F. Supp. 3d 745, 775 (N.D. Ohio 2020). However, that court

---

[3] *See City of Gary ex rel. King v. Smith & Wesson Corp.*, 801 N.E.2d 1222, 1233 (Ind. 2003) ("The fact that public nuisance has never been applied to situations other than those involving real property or an unlawful activity does not mean it cannot arise in other contexts."); *Ileto v. Glock Inc.*, 349 F.3d 1191, 1213 (9th Cir. 2003) (holding that California law does not limit public nuisance to property claims).

[4] As to Utah and Arizona, the parties stipulated that both states look to Sections 821B and 821C of the Restatement (Second) of Torts and did not provide other authority. *See In re Social Media*, 2024 WL 4673710, at *2 n.3.

4

United States District Court
Northern District of California

based its determination on a Supreme Court of Florida decision which held that practicing

medicine with neither a license nor skill is a nuisance *per se*, and which "suggests that Florida

allows for at least some non-property-related nuisance claims." *Id.* (discussing *Estep v. State ex*

*rel. Caro*, 23 So. 2d 482, 483 (Fla. 1945)).

      **Illinois's** Supreme Court wrote in *City of Chicago v. Beretta U.S.A. Corp.* that "[w]hile no

case law in this jurisdiction expressly limits application of the doctrine of public nuisance to these

two circumstances"—*i.e.*, conduct involving the defendant's use of land or violation of a statute or

ordinance—"no case law expressly authorizes its application in the absence of either condition.

To do so would be to expand the law of nuisance to encompass a third circumstance . . . . We are

reluctant to allow such an expansion." 821 N.E.2d 1099, 1117 (Ill. 2004). The court ruled on the

narrower grounds, though, that the courts should "defer to the legislature in the matter of

regulating the manufacture, distribution, and sale of firearms" given "strong public policy"

considerations. *Id.* at 1121.

      **New Jersey's** Supreme Court wrote in *In re Lead Paint Litigation* that "public nuisance

has historically been tied to conduct on one's own land or property as it affects the rights of the

general public" and so "a public nuisance, by definition, is related to conduct, *performed in a*

*location within the actor's control*, which has an adverse effect on a common right." 924 A.2d

484, 495, 499 (N.J. 2007) (emphasis supplied). Defendants' characterization of this statement as

the court's "definition" of public nuisance extends too far. The court made clear that this was just

an observation on the "evolution" of public nuisance doctrine. *See id.* In fact, where the court

could have ruled on this simpler ground, it went much further and assessed the case's specific

circumstances in a manner that indicates it may prefer a more nuanced analysis of a public

nuisance claim implicating products liability. Moreover, the conduct at issue here is within the

actor's control. That said, the Court notes the New Jersey Supreme Court's expressed reluctance

at expanding public nuisance doctrine.

      **Pennsylvania.** The parties offer competing authority.

      Defendants argue that Pennsylvania *prohibits* public nuisance claims that lack a nexus

between defendants' use of land and conduct, offering *City of Philadelphia v. Beretta U.S.A.*,

*Corp.*, 126 F. Supp. 2d 882, 907–08 (E.D. Pa. 2000), *aff'd*, 277 F.3d 415 (3d Cir. 2002).  While *City of Philadelphia* discussed relevant limitations related to the overlap of public nuisance with products liability claims, discussed *infra*, that court touched on the instant nexus issue only insofar as it observed that the plaintiff's cases were "of little use because they involve either traditional land-based nuisances or violations of ordinances."  *Id.* at 909.  That remark provides no support for a land-based limitation on public nuisance claims under Pennsylvania law, and so defendants fail to persuade.

Plaintiffs rely on *Commonwealth v. Monsanto Co.*, in which the Commonwealth Court of Pennsylvania permitted a nuisance claim against manufacturers of polychlorinated biphenyls ("PCBs") even though the alleged harm from the PCBs happened after the defendants' legal sale of the PCBs because the defendants "knew that the uses for which they marketed, sold, and distributed PCB mixtures would result in leaching, leaking, and escaping their intended applications and contaminating (i.e., polluting)" the Commonwealth's waters.  269 A.3d 623, 652 (Pa. Commw. Ct. 2021) ("If Plaintiffs can prove their claims, Defendants should not be permitted to escape liability merely because they did not pour PCBs into the Commonwealth's environment first-hand.").  That is, the public nuisance claims survived even though the harm alleged did not result from *defendants'* use of land, although the alleged public nuisance did cause harm *to* land and water via pollution.[5]

**Rhode Island.**  In *State v. Lead Industries, Ass'n, Inc.*, the state sued former lead pigment manufacturers and the Lead Industries Association under a public nuisance theory for the harmful health effects of lead paint.  951 A.2d 428, 434 (R.I. 2008).  The Rhode Island Supreme Court ultimately held that the plaintiffs failed to allege "an interference with a right common to the general public" and failed to allege that "defendants were in control of the lead pigment" at the time it harmed plaintiffs.  *Id.* at 455.  Nonetheless, it devoted a section of its opinion to "another attribute of public nuisance": the fact that "public nuisance typically arises on a defendant's land

---

[5] *See also Atl. Richfield Co. v. Cnty. of Montgomery*, 294 A.3d 1274, 1287 n.11 (Pa. Commw. Ct.) (discussing *Monsanto*), *appeal denied*, 307 A.3d 1205 (Pa. 2023).

United States District Court
Northern District of California

and interferes with a public right." *Id.* at 452. While the court did not impose a land-based limitation, this Court notes the Rhode Island Supreme Court's expressed reluctance at expanding outside those parameters.

**South Carolina's** Supreme Court has taken a different approach and held that "the special or particular injury requirement necessary for an individual to maintain a cause of action for public nuisance is satisfied only by injury to the individual's real or personal property." *Overcash v. S.C. Elec. & Gas Co.*, 614 S.E.2d 619, 622 (S.C. 2005). While *Overcash* focused on "redress[ing] wrongs resulting in *personal injuries* sustained by an *individual*," the court's explanation that "[t]he addition of personal injury to public nuisance actions in South Carolina would perpetuate the erosion of any semblance of doctrinal consistency in the common law of nuisance" counsels against further expansion of public nuisance under South Carolina law. *See id.* (emphasis added).

As to the remaining states, defendants acknowledge that Colorado, Georgia, Kentucky, Louisiana, Maryland, North Carolina, Nevada, and Virginia have not directly addressed whether their states' public nuisance claims require a nexus between a defendant's use of land and conduct. (Dkt. No. 601 at 33 n.20.) Defendants provide no authority and simply assert these states would not depart from what defendants call "the longstanding majority rule." However, the different approaches among the states, and even among members of their highest courts of appeals,[6] provides reason to expect variation among the states on this issue.

Plaintiffs point to cases from these states that have in some form adopted the definition of public nuisance outlined in section 821B of the Restatement (Second) of Torts. *See, e.g.*, *Friends of Willow Lake, Inc.*, 280 P.3d at 548 & n.27 (relying on section 821B's definition of public nuisance). Plaintiffs rely both on (i) section 821B's broad language defining the kind of "unreasonable interference with a right common to the general public" that plaintiffs must allege,

---

[6] *See, e.g.*, *In re Lead Paint Litig.*, 924 A.2d at 506 (Zazzali, J., dissenting) (arguing that the Supreme Court of New Jersey "has a duty to reconcile outdated formulations of the common law with the complexities of contemporary society," that defendants should not "avoid liability simply because past applications of the public nuisance doctrine do not mirror the circumstances of this appeal," and that "the public nuisance doctrine is an appropriate and efficient means for vindicating the public's right to be free from" defendants' conduct).

United States District Court
Northern District of California

*see* Restatement (Second) of Torts § 821B(1) & cmt. b; and (ii) comment h to section 821B, which states that "[u]nlike a private nuisance, a public nuisance does not necessarily involve interference with use and enjoyment of land," *id.* § 821B cmt. h.  As to the first, courts may endorse or rely on section 821B but still impose separate limitations on the Restatement's approach.  As to the second, plaintiffs are not aided by comment h to section 821B because that comment concerns the distinction between a private nuisance, which involves defendant's conduct that interferes with a *plaintiff's* use and enjoyment of land, and a public nuisance, which has historically concerned harm flowing from the *defendant's* use of land.[7]  Thus, even if these opinions were all understood to adopt section 821B's definition of public nuisance in full, they do not aid plaintiffs on this issue.

In the absence of express case law, courts have taken either expansive or restrictive approaches based on the facts of the cases before them.  For instance, one court found that "[t]he fact that public nuisance has never been applied to situations other than those involving real property or an unlawful activity does not mean it cannot arise in other contexts."  *City of Gary*, 801 N.E.2d at 1233.  Some courts have explicitly permitted certain public nuisance claims in the absence of state case law to the contrary.  *See In re JUUL Labs, Inc., Mktg., Sales Practices, and Prod. Liab. Litig.*, 497 F. Supp. 3d 552, 647 (N.D. Cal. 2020) (Defendant "points out that no Arizona court has recognized a nuisance cause of action against a manufacturer of a consumer product based on sale, marketing, or distribution of that product.  That is not reason enough to conclude that Arizona courts would not recognize the kind of public nuisance claims alleged here.").  Nonetheless, defendants urge that a federal court sitting in diversity should in general take a restrictive approach on unclear issues of state law.  *See Davidson v. Apple, Inc.*, 2017 WL 3149305, at *18 (N.D. Cal. July 25, 2017) ("[T]o the extent that . . . state law remains unclear . . . , a federal court sitting in diversity 'should opt for the interpretation that restricts liability, rather

---

[7] In this vein, plaintiffs argue their claims still survive because plaintiffs have alleged some harm to real property.  This again misses the point—defendants argue that public nuisance claims require a nexus between *defendants'* use of land and conduct, not plaintiffs' land.

United States District Court
Northern District of California

than expands it, until the [state's highest court] decides differently.'" (quoting *Werwinski v. Ford Motor Co.*, 286 F.3d 661, 680 (3d Cir. 2002), *abrogated by Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021)).[8]  The Court generally aligns with the logic and approach in the *JUUL* court.

Accordingly, the Court makes a split decision and finds that for Illinois, Rhode Island, and South Carolina, the motion on this ground is **GRANTED**.  As noted, the supreme courts of Illinois and Rhode Island expressed reluctance at expanding public nuisance doctrine, and South Carolina has taken a different approach not embracing the circumstances here.  For the balance of the states, the motion is **DENIED**.  Either courts have rejected the limitation or they have not addressed the issue.  *See JUUL*, 497 F. Supp. 3d at 647 (the absence of caselaw "is not reason enough to conclude that [these] courts would not recognize the kind of public nuisance claims alleged here.").[9]

### 2.     Product-Based Limitations on Public Nuisance Actions

Notably, both sides flip-flop on the applicability of products liability law to this MDL.  Said differently, defendants submit that public nuisance law should not be used where products liability law is more appropriate, yet they have hotly contested use of products liability law in this MDL.  Plaintiffs disagree, and argue, alternatively, that the claims *do not* concern products liability although counsel for the personal injury plaintiffs vociferously argued for its application

---

[8] *See also Engert v. Stanislaus Cnty.*, 2015 WL 3609315, at *32 (E.D. Cal. June 8, 2015) ("A federal court sitting in diversity cannot be expected to create new doctrines expanding state law." (quoting *Hochendoner v. Genzyme Corp.*, 95 F. Supp. 3d 15, 31 (D. Mass. 2015), *aff'd in part, vacated in part, remanded*, 823 F.3d 724 (1st Cir. 2016))); *Taylor v. Louisiana Pac. Corp.*, 165 F.3d 36 (9th Cir. 1998) ("We have previously noted that, '[a]s a federal court ruling on state law, we feel no duty to be in the vanguard in changing the state law.'" (quoting *Brown v. Link Belt Corp.*, 565 F.2d 1107, 1111 (9th Cir. 1977))).

[9] *Compare City of Gary*, 801 N.E.2d at 1232 ("We are not persuaded that a public nuisance necessarily involves either an unlawful activity or the use of land.  Defendants cite no Indiana case that establishes this requirement, but point out that all Indiana cases to date have fallen into one of these two categories.  We think that is due to the happenstance of how the particular public nuisance actions arose and not to any principle of law."), *with* Donald G. Gifford, *Public Nuisance as a Mass Products Liability Tort*, 71 U. CINN. L. REV. 741, 831 (2003) (describing how "when one reads hundreds of nuisance cases from medieval times to the present, one is struck by the reality that public nuisance almost always involves land" and usually "defendant's, not plaintiff's, use of land").

United States District Court
Northern District of California

1  in this MDL.

2      a)      **On Point Authority for At-Issue States**

3         The parties provide state supreme court authority for three states at issue (Illinois, New

4  Jersey, and Rhode Island) which have addressed whether public nuisance claims can encompass

5  an unreasonable interference with a public right caused by allegedly dangerous or defective

6  products.  The Court finds that these states express reluctance to expand public nuisance and thus

7  counsel grant of the motion on this ground for those three states:

8         **Illinois's** main case was discussed in the Prior Order, namely *City of Chicago v. Beretta*

9  *U.S.A. Corp.* 821 N.E.2d 1099, 1109 (Ill. 2004).  *See In re Social Media*, 2024 WL 4673710, at

10  \*15.  The Court need not repeat the standard set forth above for Illinois.  However, as to products-

11  liability-specific claims, the Illinois Supreme Court was "reluctant to interfere in the lawmaking

12  process in the manner suggested by plaintiffs, especially when the product at issue is already so

13  heavily regulated by both the state and federal governments."  *City of Chicago*, 821 N.E.2d at

14  1109.[10]

15         **New Jersey's** Supreme Court in *In re Lead Paint Litig.*, *supra*, also held that the public

16  nuisance claims there sounded in products liability.  924 A.2d at 503.  Thus, it declined to impose

17  liability in public nuisance "on manufacturers of ordinary consumer products which, although

18  legal when sold . . . , have become dangerous through deterioration and poor maintenance by the

19  purchasers."  *Id.*[11]

---

[10] As to this issue, the Supreme Court of Illinois "conclude[d] that it is possible to create a public nuisance by conducting a lawful enterprise in an unreasonable manner."  *City of Chicago*, 821 N.E.2d at 1124.  In that circumstance, and if "the enterprise is highly regulated by state or federal law," then "the *Gilmore* rule provides the proper framework for addressing the unreasonable interference element of a public nuisance claim."  *Id.*  The parties have not briefed the applicability of *Gilmore* in this action.

[11] Defendants also rely on a Third Circuit opinion that pre-dates *In re Lead Paint*, in which the circuit wrote that "no New Jersey court has ever allowed a public nuisance claim to proceed against manufacturers for lawful products that are lawfully placed in the stream of commerce."  *Camden Cnty. Bd. of Chosen Freeholders v. Beretta, U.S.A. Corp.*, 273 F.3d 536, 540 (3d Cir. 2001).  That court explained that "[i]f defective products are not a public nuisance as a matter of law, then the non-defective, lawful products at issue in this case cannot be a nuisance without

United States District Court
Northern District of California

1    **Rhode Island's** Supreme Court, as noted above, dismissed the public nuisance claim in

2    *Lead Indus., Ass'n, Inc.* for two reasons: one, because the "right of an individual child not to be

3    poisoned by lead paint" constituted a "nonpublic" right.  951 A.2d at 454.  Two, defendants were

4    no longer in a position to "abate the alleged nuisance, the standard remedy in a public nuisance

5    action." *Id.* at 435.  In apparent dicta, the court elaborated further that products liability law was

6    the proper course.  *Id.* at 456.  The court explained:

> Public nuisance focuses on the abatement of annoying or bothersome
> activities.  Products liability law, on the other hand, has its own well-
> defined structure, which is designed specifically to hold
> manufacturers liable for harmful products that the manufacturers have
> caused to enter the stream of commerce.
>
> Undoubtedly, public nuisance and products liability are two distinct
> causes of action, each with rational boundaries that are not intended
> to overlap. . . .
>
> . . .
>
> A product-based public nuisance cause of action bears a close
> resemblance to a products liability action, yet it is not limited by the
> strict requirements that surround a products liability action.  Courts
> presented with product-based public nuisance claims have expressed
> their concern over the ease with which a plaintiff could bring what
> properly would be characterized as a products liability suit under the
> guise of product-based public nuisance. . . .

*Id.*  Thus, according to the court, "[i]t is essential that these two causes of action remain just that

—two separate and distinct causes of action."  *Id.* at 457.  This is sufficient authority to grant

defendants' motion.

Based on the foregoing, the authority from Illinois, New Jersey, and Rhode Island warrant

grant of the motion to dismiss on those grounds.

### b)    Non-Binding Authority

With respect to the remaining states, the Court considers the parties' other authority.

***First***, the parties cite cases from the supreme courts of three states not at issue here:

**Oklahoma**, **Ohio**, and **Connecticut**.  In *State ex rel. Hunter v. Johnson & Johnson*, the Supreme

straining the law to absurdity."  *Id.*

11

1    Court of Oklahoma found that an opioid manufacturer could not be held liable under a public

2    nuisance theory.  499 P.3d 719, 721 (Okla. 2021).  In the 100 years since that statute was codified,

3    the court had "limited Oklahoma public nuisance liability to defendants (1) committing crimes

4    constituting a nuisance, or (2) causing physical injury to property or participating in an offensive

5    activity that rendered the property uninhabitable." *Id.* at 724.  Again, the state's allegations

6    sounded in product liability given that that "[p]ublic nuisance is fundamentally ill-suited to resolve

7    claims against product manufacturers": "(1) the manufacture and distribution of products rarely

8    cause a violation of a public right, (2) a manufacturer does not generally have control of its

9    product once it is sold, and (3) a manufacturer could be held perpetually liable for its products

10   under a nuisance theory." *Id.*

11        By contrast, the **Ohio** Supreme Court reversed lower courts and allowed the City of

12   Cincinnati to sue handgun manufacturers, trade associations, and one handgun distributor under

13   nuisance, negligence, and products liability theories for harms resulting from "the widespread

14   accessibility of the firearms to prohibited users, including children and criminals." *Cincinnati v.*

15   *Beretta USA Corp.*, 768 N.E.2d 1136, 1141, 1140 (Ohio 2002).  Relevant here, that supreme court

16   explained first that while public nuisance law was historically limited "to actions connected to real

17   property or to statutory or regulatory violations involving public health or safety, [it had] never

18   held that public nuisance law [was] strictly limited to these types of actions." *Id.* at 1142.  Also,

19   "under the Restatement's broad definition, a public-nuisance action can be maintained for injuries

20   caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the

21   product unreasonably interferes with a right common to the general public" for *ongoing* conduct.

22   *Id.*

23        Finally, the **Connecticut** Supreme Court, in *Ganim v. Smith & Wesson Corp.*, addressed

24   nuisance when similarly faced with claims against defendants, who were "various firearms

25   manufacturers, trade associations and retail sellers."  780 A.2d 98, 101 (Conn. 2001).  While

26   "acknowledge[ing] that the definition of a common-law public nuisance is, without more,

27   capacious enough to include the allegations of the plaintiffs' complaint," the court held that the

28   remoteness doctrine barred plaintiffs' public nuisance claim, *id.* at 132, under *Holmes* and

*Laborers Loc. 17*, *id.* at 122, 132, which this Court distinguished in the Prior Order.

According to defendants, five of these six state supreme courts discussed above have determined that public nuisance cannot encompass harms flowing from dangerous products. While on the surface, defendants' assessment may appear accurate, none of the courts shut the door as a matter of law. One dissent in fact raised the need for tort law to be accessible to the modern economy. *See supra* note 6. Moreover, and as discussed more below, while defendants here conveniently argue that the claims should be resolved under the purview of products liability, they also dispute the "product" classification in other motions.

**Second**, moving to other courts, the parties offer persuasive lower-court authority for five states at issue: **Alaska, California, Florida, Maryland,** and **Pennsylvania.** Otherwise, defendants provide no authority on this issue for the courts of Arizona, Colorado, Georgia, Indiana, Kentucky, Louisiana, Nevada, North Carolina, South Carolina, Utah, and Virginia. As to the courts of those states, plaintiffs have only provided affirmative citations from these courts to section 821B of the Second Restatement.

The Court briefly surveys the available authority provided by the parties.

**Alaska.** As noted earlier, in *Alaska v. Express Scripts, Inc.*, the District of Alaska concluded that "[g]iven the Alaska Supreme Court's decision in *Friends of Willow Lake* and the trend of Alaska Superior Court decisions, this Court concludes that Alaska law allows for a claim of public nuisance that is not property-based and based on the use of a lawful product." 2024 WL 2321210, at *4 (D. Alaska May 22, 2024) (discussing, among others, *Friends of Willow Lake, Inc. v. State, Dep't of Transp. & Pub. Facilities, Div. of Aviation & Airports*, 280 P.3d 542 (Alaska 2012)).

**California.** In *Ileto v. Glock Inc.*, plaintiffs alleged that gun manufacturers "market, distribute, promote, and sell their products with reckless disregard" for human life and created an "oversaturated" firearms market that unreasonably interfered with public safety and health. 349 F.3d 1191, 1210 (9th Cir. 2003). The Ninth Circuit wrote:

> [T]he fact that the manufacture and sale of guns is legal does not prevent the plaintiffs from pursuing their nuisance claim. Here, the alleged nuisance is not premised on the legal manufacture and design

13

of the guns or the sale of guns to individuals who are legally entitled to purchase them. On the contrary, the nuisance claim rests on the defendants' actions in creating an illegal secondary market for guns by purposefully over-saturating the legal gun market in order to take advantage of re-sales to distributors that they know or should know will in turn sell to illegal buyers. We agree with the Ohio Supreme Court's conclusion "that under the Restatement's broad definition, a public nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public." *City of Cincinnati*, 768 N.E.2d at 1142.

*Ileto*, 349 F.3d at 1214.

By contrast, three California Court of Appeal cases found differently where the cases involved ordinary products. In *In re Firearm Cases*, the court held only that public nuisance requires the plaintiff to establish proximate cause, which plaintiff failed to do with respect to the "conduct of the defendants and any incident of illegal acquisition of firearms or criminal acts or accidental injury by a firearm." 126 Cal. App. 4th 959, 988–89 (Cal. Ct. App. 2005). In *City of Modesto Redevelopment Agency v. Superior Ct.*, the court wrote that "the law of nuisance is not intended to serve as a surrogate for *ordinary* products liability" involving the discharge of two cleaning solvents, perchloroethylene and trichloroethylene, into public sewer systems. 13 Cal. Rptr. 3d 865, 867–68, 873 (Cal. Ct. App. 2004) (emphasis supplied); *see also City of San Diego v. U.S. Gypsum Co.*, 35 Cal. Rptr. 2d 876, 883 (Cal. Ct. App. 1994) (concern with approach "devouring" tort). Thus, a split in authority exists in California.[12]

**Florida.** No appellate or federal decisions are cited. In *Penelas v. Arms Tech., Inc.*, a Florida trial court held that "[p]ublic nuisance does not apply to the design, manufacture, and

---

[12] In the parallel Judicial Council Coordination Proceedings ("JCCP") involving claims of public nuisance by school districts caused by social media addiction, the JCCP court granted defendants' demurrer and motion to strike certain school district claims of public nuisance, including those arising under California law. *See Social Media Cases*, JCCP No. 5255, at 29–33 (Cal. Sup. Ct. June 7, 2024). Notably, the JCCP court is bound by the above-discussed California appellate authority, whereas this Court provides more deference to the Ninth Circuit's approach in *Ileto*. Defendants filed a copy of this opinion on the MDL docket (No. 22-md-3047) at Dkt. No. 934-1.

United States District Court
Northern District of California

distribution of a lawful product.  A separate body of law (strict product liability and negligence) has been developed to apply to the manufacture and design of products."  1999 WL 1204353, at *4 (Fla. Cir. Ct. Dec. 13, 1999), *aff'd*, 778 So. 2d 1042 (Fla. Dist. Ct. App. 2001).  Affirming the decision, the appellate court characterized the plaintiffs' theory of public nuisance as a "round-about attempt" "to regulate firearms and ammunition through the medium of the judiciary" even though state statute regulating the industry "expressly preempts . . . the entire field of firearm and ammunition regulation."  778 So. 2d at 1045.

**Maryland.**  In *Mayor and City Council of Baltimore v. BP P.L.C.*, a trial court dismissed the mayor and city council's claims of public nuisance against fossil fuel companies for their contribution to greenhouse gas emissions.  No. 24-C-18-004219, at 1–2 (Md. Cir. Ct. July 10, 2024).[13]  "Maryland state courts . . . have yet to extend public nuisance law to cases concerning production, promotion and sale of consumer products."  *Id.* at 21.  The court acknowledged two cases discussed below which "extended the theory of public nuisance liability to the deceptive promotion of dangerous products while recognizing the Maryland state courts have not done so."  *Id.* at 21–22 (citing *State v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 467 (D. Md. 2019), and *Mayor & City Council of Baltimore v. Monsanto Co.*, No. CV RDB-19-0483, 2020 WL 1529014, at *8 (D. Md. Mar. 31, 2020)).

First, in *Exxon*, the federal district court found that "defendants who manufactured and distributed [methyl tertiary butyl ether ("MTBE")] gasoline substantially contributed to the creation of a public nuisance" because they had "extensive knowledge" of the environmental hazards of MTBE, intentionally and deceptively promoted MBTE, manufactured and distributed MTBE gasoline in Maryland with knowledge it would be placed into leaking storage and delivery systems, and failed to warn the downstream handlers, consumers, and public of these dangers.

---

[13] Defendants filed a copy of this opinion on the MDL docket (No. 22-md-3047) at Dkt. No. 1065-1.  The case was previously removed to federal court, then eventually remanded back to the Circuit Court for Baltimore City.  *See Mayor & City Council of Baltimore v. BP P.L.C.*, 388 F. Supp. 3d 538 (D. Md. 2019) (finding removal improper), *aff'd*, 952 F.3d 452 (4th Cir. 2020), *vacated and remanded*, 593 U.S 230 (2021), *and aff'd*, 31 F.4th 178 (4th Cir. 2022).

United States District Court
Northern District of California

*Exxon*, 406 F. Supp. 3d at 469.  Second, in *Monsanto*, the federal district court held that the defendants "manufactured, distributed, marketed, and promoted [polychlorinated biphenyls ("PCBs")], resulting in the creation of a public nuisance that is harmful to health and obstructs the free use of the City's stormwater and other water systems and waters," with "extensive knowledge" about these PCB's harmful effects, which they withheld and misrepresented to the public and government officials.  *Monsanto*, 2020 WL 1529014, at *10.  The *BP* state court considered both cases "clearly distinguishable" due to the "tight nexus" with land and water contamination.  No. 24-C-18-004219, at 22–23.

**Pennsylvania.**  In *City of Philadelphia v. Beretta U.S.A., Corp.* (previously discussed), the Eastern District of Pennsylvania held that "[n]uisance is inapplicable to suits based on the design and distribution of products."  *City of Phila. v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 909 (E.D. Pa. 2000), *aff'd* 277 F.3d 415 (2002).  That court relied on exclusively out-of-state opinions, and on an opinion from the "only appellate court to consider such a claim by a municipality against the gun industry" at that time, *i.e.*, the intermediate appellate court in *City of Cincinnati*, which the Supreme Court of Ohio would later reverse as discussed above.  *See id.* at 910.[14]

### c)    Reasonableness of the Interference

As outlined above, while a few high courts have considered alleged public nuisances caused by harmful products such as firearms, lead, and opioids, none has formally adopted a *per se* exclusion of a public nuisance claim involving products.  Rather, courts have carefully considered whether the unique circumstances alleged establish an unreasonable interference with a

---

[14] While not an at-issue jurisdiction, plaintiffs alerted the Court of a recent order from the Superior Court of Massachusetts denying Meta's motion to dismiss, among others, the Commonwealth's claim of public nuisance.  *Commonwealth v. Meta Platforms, Inc.*, No. 23-2397 (Mass. Sup. Ct. Oct. 17, 2024).  That court rejected the same argument before this Court on substantially similar allegations—"that the Commonwealth's public nuisance claim should be dismissed because it seeks an unwarranted expansion of the public nuisance doctrine beyond its traditional bounds to include a product and its impact."  *Id.* at 27.  The court held that the Commonwealth's allegations "that Meta has contributed to a youth mental health crisis by promoting the addictive use of its platform" was "sufficient to support a public nuisance claim."  *Id.*  A copy of the opinion was filed on this MDL's docket at Dkt. No. 1239-1.

public right.

"When a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) (quoting *Kona Enterprises, Inc. v. Est. of Bishop*, 229 F.3d 877, 885 n.7 (9th Cir. 2000)).[15] Thus, it is this Court's obligation to "make a reasonable determination" of whether these states would find that the circumstances alleged establish an *unreasonable* interference with a public right.

Several considerations have guided other courts' assessments: (i) whether products liability law provides a more appropriate vehicle for addressing the alleged nuisance-creating conduct, (ii) the manufacturer's control over the product and ability to abate the nuisance, (iii) whether the product is lawfully distributed and, if so, whether the harm results from the product's unlawful use, (iv) the existence of governmental regulation addressing the manufacturer's conduct, and

---

[15] Faced with unclear caselaw, defendants urge that this Court must opt for the interpretation that restricts liability, rather than expands it, until the various states' high courts decide differently. *See Davidson v. Apple, Inc.*, 2017 WL 3149305, at *18 (N.D. Cal. July 25, 2017). Under this approach, defendants will sustain their burden by pointing to an absence of caselaw in plaintiffs' favor. Other courts have taken this approach when faced with new questions of public nuisance. *See, e.g.*, *City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 421 (3d Cir. 2002) ("Pennsylvania precedent does not support the public nuisance claim plaintiffs advance here, and we cannot predict that the Pennsylvania Supreme Court will choose to expand state public nuisance law in the manner plaintiffs urge."); *Tioga Pub. Sch. Dist. No. 15 of Williams Cnty., State of N.D. v. U.S. Gypsum Co.*, 984 F.2d 915, 920 (8th Cir. 1993) ("Tioga has not presented us with any North Dakota cases extending the application of the nuisance statute to situations where one party has sold to the other a product that later is alleged to constitute a nuisance, nor has our research disclosed any such cases.").

Other courts, however, disagree that the *absence* of cases from a jurisdiction involving a particular theory of liability requires a federal court to dismiss that theory. *See, e.g.*, *JUUL*, 497 F. Supp. 3d at 647; *Ileto*, 349 F.3d at 1213–15; *Exxon*, 406 F. Supp. 3d at 469 ("Because no case law forecloses this theory of public nuisance liability under Maryland law, I reject defendants' argument that the State's public nuisance claim must be dismissed to the extent it is premised on their manufacture, marketing, and supply of MTBE gasoline."); *Cincinnati*, 768 N.E.2d at 1142 ("[A]lthough we have often applied public nuisance law to actions connected to real property or to statutory or regulatory violations involving public health or safety, we have never held that public nuisance law is strictly limited to these types of actions." (footnote omitted)).

United States District Court
Northern District of California

1    (v) the prospect of limitless liability.  The Court considers the impact of each in this action.

2          **1.     *Products Liability or Public Nuisance as Appropriate Framework*.**  Despite the

3    varied approaches, the Third Restatement has decidedly taken a stance on this issue:

> Tort suits seeking to recover for public nuisance have occasionally
> been brought against the makers of products that have caused harm,
> such as tobacco, firearms, and lead paint.  These cases vary in the
> theory of damages on which they seek recovery, but often involve
> claims for economic losses the plaintiffs have suffered on account of
> the defendant's activities; they may include the costs of removing lead
> paint, for example, or of providing health care to those injured by
> smoking cigarettes.  Liability on such theories has been rejected by
> most courts, and is excluded by this Section, because the common law
> of public nuisance is an inapt vehicle for addressing the conduct at
> issue.  Mass harms caused by dangerous products are better addressed
> through the law of products liability, which has been developed and
> refined with sensitivity to the various policies at stake.  Claims for
> reimbursement of expenses made necessary by a defendant's products
> might also be addressed by the law of warranty or restitution.  If those
> bodies of law do not supply adequate remedies or deterrence, the best
> response is to address the problems at issue through legislation that
> can account for all the affected interests.

*Public Nuisance Resulting in Economic Loss*, Restatement (Third) of Torts: Liab. for Econ. Harm
§ 8 cmt. g (2020); *see also id.* § 8 cmt. b (criticizing cases which permit "unsound claims of public
nuisance to be brought on facts outside the traditional ambit of the tort").

          Here, the question of whether a "product" even exists and upon which a products liability

claim could survive remains hotly contested.[16]  Defendants in the related personal injury cases

---

[16] Consider the following distinction raised in *JUUL*:

> The allegations here do not concern the JUUL product itself, but
> rather the alleged consequence of JLI's conduct.  Put differently, the
> *public nuisance claims are premised on JLI's aggressive promotion*
> of JUUL to teens and efforts to create and maintain an e-cigarette
> market based on youth sales, not on any alleged defect in JUUL
> products.  This is not, as JLI contends, an attempt to stretch nuisance
> law to allow claims against manufacturers of allegedly dangerous
> products or based on failures to warn in the marketing of those
> products.  The public nuisance claims alleged here are not as novel as
> JLI characterizes them to be; similar claims have been alleged in
> numerous opioid and gun manufacturer cases.

*JUUL*, 497 F. Supp. 3d at 646 (emphasis supplied).  Here, however, the school district plaintiffs'

United States District Court
Northern District of California

United States District Court
Northern District of California

1  argue no product exists.  In fact, social media platforms have been described as the "virtual public

2  square."  Plaintiffs here also argue their claims "do not concern product liability law as they do not

3  seek to recover for injuries suffered from a defective product."  (Dkt. No. 668 at 30.)  In any event,

4  and despite myriad rulings, the high courts have not *per se* prohibited the theory advanced.

5  Consistent with these divergent approaches, the Court declines to find that all state supreme courts

6  at issue would necessarily find that the issues raised here concern an "ordinary" products liability

7  action resolved solely by a products liability remedy.

8        **2.**      ***Manufacturer's Control and Ability to Abate.***[17]  Next, many courts expressed

9  concern over the manufacturer's control of the product once placed into the stream of commerce.

10  In cases of deteriorating lead paint, for instance, the harmful effects of deterioration occurred

11  many years after any of the lead pigment manufacturers made the paint, at a point where those

12  manufacturers had no ability to remove, alter, or modify the paint to create safe conditions.  *See In*

13  *re Lead Paint Litig.*, 924 A.2d at 501; *Lead Indus., Ass'n, Inc.*, 951 A.2d at 435–36.

14        Again, this case is different.  Here, defendants maintain constant and perpetual control over

15  the distribution and design of their digital platforms and, as alleged, have the apparent capability

16  to abate the nuisance-causing conduct at any time.

17        **3.**      ***Unlawful Use of a Lawfully Distributed Product.***  This third factor is a variation of

18  the second.  Defendants' conduct in creating and selling the products was permitted by law as

19  regulated.  However, particularly in the case of firearm distribution, third parties could take that

20

21  allegations that defendants' platform design in fostering compulsive use is an integral part of
defendants' marketing and distribution of the product.  The Court is not convinced that plaintiffs

22  can rely on the same distinction raised in *JUUL*.  Notably, this Court has held that portions of
defendants' platforms are products for the purposes of products liability law; therefore, these

23  product-related considerations are relevant in this action.  Should, at some point, a higher court

24  determine that defendants' platforms are *not* products, then plaintiffs' argument would serve to
recognize an alternate path for establishing potential liability in public nuisance.

25

26      [17] Control may also be considered a factor in the proximate causation inquiry, rather than a
separate element to prove in a nuisance action.  *See City of Chicago*, 821 N.E.2d at 1132 ("Control

27  is not a separate element of causation in nuisance cases that must be pleaded and proven in
addition to cause in fact and legal cause.  It is, rather, a relevant factor in both the proximate cause

28  inquiry and in the ability of the court to fashion appropriate injunctive relief.").

1    product placed lawfully into the stream of commerce and use it in unlawful, criminal ways, even if

2    that unlawful use was foreseeable.  *See, e.g.*, *Ganim*, 780 A.2d at 132; *City of Chicago*, 821

3    N.E.2d at 1116; *Cincinnati*, 768 N.E.2d at 1142; *cf. Hunter*, 499 P.3d at 725.

4              In this case, the Court discussed this concern in the context of the "derivative injury" rule.

5    *See In re Social Media*, 2024 WL 4673710, at *12–13.  Here, the Court has limited plaintiffs'

6    allegations to exclude injury more appropriately attributable to the intervening conduct of third

7    parties.  What remains, by contrast, is solely defendants' conduct in fostering compulsive use

8    through their platform design, distribution, and marketing decisions—conduct attributable directly

9    to the defendants.  The alleged public nuisance does not stem from the unlawful manipulation of

10   defendants' lawful products, but the alleged tortious conduct of the defendants themselves.

11             **4.      Existence of Legislation Regulating the Conduct.**  Similarly, "when the product at

12   issue is already so heavily regulated by both the state and federal governments," courts have

13   avoided permitting claims of public nuisance that would impose liability beyond that created by

14   government regulation.  *See, e.g.*, *City of Chicago*, 821 N.E.2d at 1121.  In other words, courts

15   should be careful to consider whether the proposed theory of public nuisance would interfere with

16   government regulation.  Here, the Court is unaware, nor have defendants pointed to, government

17   regulation as to this conduct specifically.  Again, the Court has already limited exposure where

18   legislation provided immunity under Section 230.  Thus, the instant public nuisance action does

19   not serve to enlarge the potential liability imposed on social media platform contrary to any

20   apparent legislative determination.

21             **5.      Boundless Liability.**  Boundless liability is a question typically posed under

22   proximate cause.  As discussed, the Court is not persuaded by defendants' concerns that

23   permitting these claims of negligence and public nuisance will open the floodgates of liability.

24   The school districts' claims are grounded in their plausible allegations: defendants targeted minors

25   *at the school level*, readily could foresee the strain their addictive platform design would impose

26   *on schools*, and in some cases knew of those direct impacts *to schools*.  *See In re Social Media*,

27   2024 WL 4673710, at *15.  Proximate causation serves to limit the scope of liability only to the

28   reach of defendants' own actions.

United States District Court
Northern District of California

*      *      *

The considerations counselling against imposing liability in public nuisance where firearm, lead paint, and opioid products are implicated are not present in this case—and not all state high courts surveyed even agreed as to the impact of those considerations.  Moreover, the Court notes that the Ninth Circuit, interpreting California law in *Ileto*, unambiguously "agree[d] with the Ohio Supreme Court's conclusion 'that under [Section 821B of] the Restatement's broad definition, a public nuisance action can be maintained for injuries caused by a product if the facts establish that the design, manufacturing, marketing, or sale of the product unreasonably interferes with a right common to the general public.'"  *Ileto*, 349 F.3d at 1214 (quoting *Cincinnati*, 768 N.E.2d at 1142).  Because the state high courts at issue which have not spoken on this issue but have endorsed the Restatement's definition of public nuisance, and because none of the concerns discussed by other states weigh against the plaintiffs' theory, the Court declines to find that the high courts of the at issue states would consider the alleged interference "unreasonable," much less impose a *per se* prohibition on public nuisance actions implicating the conduct at issue, except with respect to Illinois, New Jersey, and Rhode Island.

The Court next turns to the merits of plaintiffs' public nuisance claims.

**B.      Interference with a Public Right**

Plaintiffs allege that defendants' conduct interferes with both the public right to health and safety and the public right to education.  Defendants do not dispute the existence of those rights, generally speaking, only whether (i) defendants' conduct interferes with either right and, (ii) even if so, the interference affects the entire community.

Public rights are distinct from private rights.  As the Restatement explains:

> A public right is one common to all members of the general public. It is collective in nature and not like the individual right that everyone has not to be assaulted or defamed or defrauded or negligently injured. Thus the pollution of a stream that merely deprives fifty or a hundred lower riparian owners of the use of the water for purposes connected with their land does not for that reason alone become a public nuisance.  If, however, the pollution prevents the use of a public bathing beach or kills the fish in a navigable stream and so deprives all members of the community of the right to fish, it becomes a public

nuisance.

Restatement (Second) of Torts § 821B cmt. g; *see also Lead Indus. Ass'n, Inc.*, 951 A.2d at 448 ("[A] public right is more than an aggregate of private rights by a large number of injured people."). Courts generally conform to this historical conception, that a public nuisance arises from interference with *shared* public resources—like air, water, or rights of way. *See, e.g.*, *Lead Indus. Ass'n, Inc.*, 951 A.2d at 455 ("no reason to depart from the long-standing principle that a public right is a right of the public to shared resources such as air, water, or public rights of way."); *Hunter*, 499 P.3d at 726 (same).

Public nuisance claims fail where the defendants' conduct separately imposes risks of harm to individuals, rather than a risk of harm to public health generally. *See, e.g.*, *City of Chicago*, 821 N.E.2d at 1116 ("[W]e are reluctant to state that there is a public right to be free from the threat that some individuals may use an otherwise legal product (be it a gun, liquor, a car, a cell phone, or some other instrumentality) in a manner that may create a risk of harm to another."). However, courts are careful to distinguish when defendants' conduct imposes individual risks as opposed to risk to a public right generally. In *JUUL*, defendant argued that the public right "flow[ed] through the individual right to be free from alleged defective products or alleged deceptive marketing." *JUUL*, 497 F. Supp. 3d at 648. The court disagreed, framing the issue as in an opioids case:

> [I]t suffices to note the defendants' failure to establish why public health is not a right common to the general public, nor why such continuing, deceptive conduct as alleged would not amount to interference; it can scarcely be disputed, moreover, that the conduct at the heart of this litigation, alleged to have created or contributed to a crisis of epidemic proportions, has affected a considerable number of persons.

*Id.* (quoting *In re Opioid Litigation*, 2018 WL 3115102, at *22 (N.Y. Sup. Ct. June 18, 2018)).

Here, plaintiffs' allegations are akin to those presented in *JUUL* and *In re Opiod Litigation*. Any interference with a public right can be reframed as a series of individual harms— after all, interference with a public right will harm *individuals*, not some amorphous collective. Here, defendants make their platforms available to the entire public. The alleged nuisance-causing conduct does not solely target individual children and schools, but is directed to the public, writ

large.[18]  Further, defendants fail to rebut (i) that the public health is a right common to the public, (ii) and that their conduct as alleged interferes with that common right.  While the students' injuries are individualized byproducts of that interference, and while the school districts' resource diversion and expenditure are individualized corollary impacts of those individual students' harms, those harms and costs all flow from defendants' alleged interference with the public health.[19]

Further, because the Court has found that plaintiffs have successfully established unreasonable interference with the public's right to health and safety, the Court declines to rule on the issue of whether defendants' have unreasonably interfered with a public right to education.[20]

_____

[18] Also, that certain aspects of defendants' platforms (*e.g.*, recommendation algorithms) may adapt and tailor themselves to the individual user does not make defendants' interference any less general, but simply reflects the sophistication and precision of defendants' conduct.  Gun manufacturers were not, so to speak, physically at the scene of a crime; social media platforms, though, are present in classrooms when they engage with students during the school day.

[19] Defendants further argue that, when public rights are at issue, the alleged interference must affect the entire community, even if damage is unequal among those affected.  This is a variation of defendants' claim that plaintiffs' allegations amount only to interference with the rights of students alone.  Defendants construe plaintiffs' allegations too narrowly.  Moreover, they offer only one case to support the line of argument.  In *Russo*, the plaintiff-student "sustained injury when he fell from gymnastic rings while participating in the school's physical education class."  *Russo v. Town of Greeenwich*, 1998 WL 552383, at *3 (Conn. Super. Ct. Aug. 20, 1998).  The court held that a public right could not be inferred: "To recover under a nuisance claim . . . , the plaintiff must show that the harmful condition had a tendency to create danger upon members of the general public, not just members of the public school system."  *Id.*  Here, defendants' conduct as alleged has a tendency to affect all youth and the general public, even if the school districts seek remedy solely for consequences that occur to schools, on school grounds, and during school hours.

[20] As laid out in the complaint, *see* SDFAC ¶ 207, defendants' conduct has interfered with students' rights to "a safe and high-quality public education," which plaintiffs note has been expressly recognized in many jurisdictions, *see, e.g.*, Cal. Const. art. IX, § 5 ("The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established.").  Defendants' conduct is causing "dramatic disruption in the teaching and learning ecosystems of all our nation's schools" and has "detract[ed] from the primary mission of our schools, which is to educate our children."  SDFAC ¶ 199.

C.    **Special Injury**

"In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference."  Restatement (Second) of Torts § 821C(1).  Courts refer to this as the "special injury" requirement for public nuisance claims brought by private plaintiffs.  *See, e.g.*, *JUUL*, 497 F. Supp. 3d at 649.

To adequately plead special injury, plaintiffs must "provide sufficient detail" that the harm is "unique to schools and different in kind from that suffered by the general public in their community."  *JUUL*, 497 F. Supp. 3d at 649; *see also In re Nat'l Prescription Opiate Litig.*, 452 F. Supp. 3d at 774 ("[A]t least with respect to increased operational costs and direct purchase of excess opioid pills," "West Boca has alleged concrete economic costs, unique to hospital entities, that are different than the alleged interference with human health outcomes suffered by the general public as a result of the opioid crisis."); *In re StarLink Corn Prod. Liab. Litig.*, 212 F. Supp. 2d 828, 848 (N.D. Ill. 2002) (holding that "[c]ommercial corn farmers, as a group, are affected differently than the general public" because "[w]hile the general public has a right to safe food, plaintiffs depend on the integrity of the corn supply for their livelihood").[21]

For instance, in *Johnson v. 3M*, the court explained that in that case "the general public harm involves the contamination of [three] [r]ivers and the interference with the use and

_____

[21] *See also, e.g.*, *State v. Purdue Pharma L.P.*, 2018 WL 4468439, at *4 (Alaska Super. July 12, 2018) (permitting public nuisance claim where "[t]he State alleges opioid use, overuse, and addiction has injured the State by causing deaths, overwhelming medical resources and emergency rooms, increasing illegal activity and law enforcement activities, increasing costs for medical care of infants born with neonatal abstinence syndrome and requiring foster treatment, and incurring significant expenses in addiction treatment" (footnotes omitted)); *James v. Arms Tech., Inc.*, 820 A.2d 27, 35, 50–53 (N.J. App. Div. 2003) (permitting public nuisance claim which caused city "to expend significant government funds on 'police protection, overtime, emergency services, coroner and morgue services, pension benefits, health care, social services and other necessary facilities and services'" due to alleged nuisance-causing distribution, promotion, and sale of guns); *Monsanto*, *supra*, 2020 WL 1529014, at *9 (holding special injury adequately alleged where city had already incurred "costly damage to its stormwater system and waters which it constructs and/or maintains for the public welfare" and costs of "implementing impervious surface restoration efforts").

United States District Court
Northern District of California

United States District Court
Northern District of California

enjoyment of those waters, including the provision of safe drinking water." 563 F. Supp. 3d 1253, 1340 (N.D. Ga. 2021), *aff'd*, 55 F.4th 1304 (11th Cir. 2022). By contrast, the plaintiffs "experienced special harm in the particular harm of having to 'pay the added costs of attempting to remove the PFAS contamination by way of increased rates and surcharges they incur as ratepayers.'" *Id.* at 1341 (citation omitted). Thus, plaintiffs adequately alleged "harm distinguishable from the harm to the general public." *Id.*

By contrast, consider *In re McKinsey & Co., Inc. Nat'l Prescription Opiate Consultant Litig.*, in which the court held that a group of neonatal-abstinence syndrome ("NAS") plaintiffs failed to adequately plead special injury for their public nuisance claim. 2023 WL 4670291, at *8 (N.D. Cal. July 20, 2023). "That the injuries are similar among the NAS minors and others exposed to opioids means that they are not different in kind to confer the Plaintiffs with special standing to bring a public nuisance claim." *Id.*

That a plaintiff suffers injuries different in *degree* does not establish the difference in *kind* required to establish special injury. *See, e.g.*, *Lanser*, 2013 WL 10408619, at *6 (finding no special injury because plaintiff's "exposure to the odors [arising from the alleged nuisance] while he is working is not sufficiently different in kind from the injury suffered by [his] neighbors"); *Arriaga v. New England Gas Co.*, 483 F. Supp. 2d 177, 187 (D.R.I. 2007) ("[I]t does not appear that the plaintiffs have suffered 'special damages' that are separate and distinct from those suffered by others . . . [a]s already noted, the possibility that the *degree* of harm suffered by the plaintiffs might be greater than the degree of harm suffered by other members of the public would not establish that the plaintiffs' harm is separate and distinct."); *Page v. Niagara Chem. Div. of Food Mach. & Chem. Corp.*, 68 So. 2d 382, 384 (Fla. 1953) ("The same fumes, dust and gases which the plaintiffs allege are objectionable to them, would also affect the members of the general public in that area . . . . The fact that plaintiffs might be affected to a greater degree would not, under the above decisions, entitle them to injunctive relief.").[22]

---

[22] Defendants also cite to *Allegheny Gen. Hosp. v. Philip Morris, Inc.*, 228 F.3d 429, 446 (3d Cir. 2000) ("[T]he Hospitals' injuries are derivative of the nonpaying patients' injuries, and the Hospitals are one of numerous parties in the public harmed . . . .") (applying Pennsylvania

25

Some courts have differed as to the appropriate point of comparison to establish whether a plaintiff's injury is different in kind. On the one hand, some courts have compared plaintiffs' injuries to similarly situated plaintiffs. *See, e.g.*, *E. Me. Med. Ctr. v. Teva Pharma. USA, Inc.*, No. BCD-CIV-2022-00025, at *10 (Me. Super. Ct. Feb. 13, 2023) (plaintiff hospitals' injuries were not "distinguishable from those theoretically endured by other institutions in Maine that serve the public welfare, such as first responders, or individuals who do business with or care for opioid-affected persons"); *Fayetteville Ark. Hosp. Co., LLC v. Amneal Pharma., LLC*, No. 72CV-20-156 at *4 (Ark. Cir. Ct. Dec. 16, 2022) (plaintiff hospitals' "alleged injury was no different than circumstances experienced by, among others, the court system, law enforcement, ambulance services, and other hospitals"). On the other hand, and consistent with the Restatement, some courts have compared plaintiffs' injuries with the members of entire public. *See Baptiste v. Bethehem Landfill Co.*, 965 F.3d 214, 222 (3d Cir. 2020) (reversing district court where for special injury analysis "the District Court should have compared the injuries suffered by putative class members . . . with the harm shared by *all community members*" rather than just "similarly situated class members" (emphasis supplied)); *JUUL*, 497 F. Supp. 3d at 650 (school districts adequately pled "unique harm to schools that is different in kind than *the community at large*" (emphasis supplied)).

The proper inquiry before the Court is to compare the risks defendants' conduct imposes on the school districts with the risks imposed on the public at large. The public at large incurs harm in the form of medical malady; school districts, by contrast, seek recovery of resource diversion. *In re McKinsey* is consistent with this distinction. The school district plaintiffs' injuries seek recovery of costs uniquely imposed on them and not similarly borne by any other members of the community. *See JUUL*, 497 F. Supp. 3d at 650. That school districts may incur injury similar in kind to one another does not indicate they incur injury similar in kind to the entire community. *See Baptiste*, 965 F.3d at 222.

Further, defendants argue that their conduct as alleged does not interfere with the plaintiff

---

law), which concerns the "derivative injury" rule and so is inapposite to the instant issue.

school districts' *own* exercise of any public rights.  That is, defendants' conduct at most interferes with the public rights to health, safety, and education of the school districts' *students*.  The Court disagrees.  Defendants' conception of injury is too narrow and goes against the weight of caselaw.[23]  If defendants were correct, the only individuals able to assert interference with public health or education would be personal injury plaintiffs.[24]  For instance, schools, hospital systems, or municipalities (not otherwise authorized by statute to sue on behalf of their constituents) would all be prohibited from bringing public-health public nuisance claims because *their* rights did not suffer interference.  Every court that has held that school districts can bring public nuisance claims goes against defendants' proposition.  It is enough that the defendants' conduct interferes with a public right and that the plaintiffs' injuries flows as a direct consequence of that interference.

Finally, because the Court holds that plaintiffs have adequately alleged special injury, plaintiffs have authority to seek abatement of the nuisance.  *See* Restatement (Second) of Torts § 821C(2)(a) (a plaintiff may "maintain a proceeding to enjoin to abate a public nuisance" if the plaintiff has "the right to recover damages," *i.e.*, has adequately alleged special injury).  The Court need not address whether plaintiffs have authority to abate under the Restatement's other provisions.  *See id.* § 821C(2)(b)–(c); *see also* 58 Am. Jur. 2d Nuisances §§ 183, 184 (discussing public nuisance authority to sue for public bodies, individuals, and other parties).

## III.    CONCLUSION

To summarize, defendants' motion to dismiss the school districts' claims of public nuisance is **GRANTED IN PART** as to public nuisance claims arising under the laws of Illinois, New

---

[23] In support, defendants solely cite *Rincon Band of Luiseno Mission Indians etc. v. Flynt*, 286 Cal. Rptr. 3d 29 (Cal. Ct. App. 2021).  This case is inapposite.  *Rincon* held that the plaintiff Indian tribes, tribe entities, and tribe members were prohibited by the "clear jurisdictional limits" by statute from seeking "redress of an alleged public harm that is *not* within their own jurisdiction." *Id.* at 60.

[24] In fact, this theory would effectively prevent any private plaintiffs from bringing public nuisance suits on these facts, because the personal injury plaintiffs' claims of medical harm are likely not different in kind from the risks of harm imposed on the public at large.  Thus, personal injury plaintiffs would be unable to bring suit for failure to allege "special injury," and any other plaintiffs would be unable to bring suit for failure to allege interference with their own rights.

1   Jersey, Rhode Island, and South Carolina.

2   As to the others, the Court declines to impose a land- or product-related limitation on a

3   public nuisance cause of action under the laws of the remaining fifteen states, namely Alaska,

4   Arizona, California, Colorado, Florida, Georgia, Indiana, Kentucky, Louisiana, Maryland,

5   Nevada, North Carolina, Pennsylvania, Utah, and Virginia. The motion is **DENIED** as to those

6   states. The available high court authority carefully considers the implications of potential product-

7   related public nuisance actions, but no high court has formally adopted such a restriction, instead

8   favoring a nuanced assessment of what a given claim attempts to accomplish under public

9   nuisance law. States have employed starkly divergent approaches to this issue, and so the Court

10  has endeavored to conduct a nuanced assessment unique to the allegations presented. The school

11  districts' claims of public nuisance survive.

12  This terminates Dkt. No. 601 in Case No. 22-md-03047.

13  **IT IS SO ORDERED.**

14

15  Dated: November 15, 2024

16

17  **YVONNE GONZALEZ ROGERS**
    **UNITED STATES DISTRICT COURT JUDGE**

18

19

20

21

22

23

24

25

26

27

28

*United States District Court*
*Northern District of California*