UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-03047-YGR   (PHK) |
| | **DISCOVERY MANAGEMENT ORDER NO. 13 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF DECEMBER 11, 2024** |
| This Document Relates to: All Actions | Upcoming DMC Dates: January 16, 2025 at 2:00 pm February 20, 2025 at 1:00 pm March 20, 2025 at 1:00 pm RESET to April 22, 2025 at 1:00 pm |

On December 11, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the December 11th DMC, regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

## I.    Plaintiffs' Interrogatory ("ROG") Limits as to Snap and TikTok

The Parties report a dispute as to how to count certain interrogatories that Plaintiffs served on Snap and TikTok. [Dkt. 1420; Dkt. 1428]. Plaintiffs as a group (including the JCCP Plaintiffs) are allotted a combined total of up to forty-five interrogatories per each of the four main Defendant groups (Meta, Snap, TikTok, and YouTube) in this litigation. *See* Dkt. 672. Snap and TikTok both argue that Plaintiffs have been attempting to circumvent these numerical limits by serving ROGs with multiple, discrete subparts which should be counted as separate interrogatories.

United States District Court
Northern District of California

1    Federal Rule of Civil Procedure 33(a) provides the default numerical limits for

2  interrogatories as follows: "Unless otherwise stipulated or ordered by the court, a party may serve

3  on any other party no more than 25 written interrogatories, including all discrete subparts.  Leave

4  to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(2)."

5  Fed. R. Civ. P. 33(a)(1).  "Rule 33(a) does not prohibit the use of subparts in an interrogatory; it

6  provides that discrete subparts count against the rule's presumptive 25-interrogatory limit."

7  *Solaria Corp. v. GCL Sys. Integration Tech. Co.*, No. 20-cv-07778-BLF (VKD), 2021 WL

8  2022246, at *2 (N.D. Cal. May 21, 2021).  "Although the rule does not define 'discrete subparts,'

9  the prevailing view is that interrogatory subparts should be counted as one interrogatory 'if they

10  are logically or factually subsumed within and necessarily related to the primary question.'"  *Id.*

11  (quoting *Synopsys, Inc. v. ATopTech, Inc.*, 319 F.R.D. 293, 294 (N.D. Cal. 2016); *see also*

12  *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-03393-YGR (JSC), 2014 WL 7188779, at *6

13  (N.D. Cal. Dec. 16, 2014) ("[I]nterrogatories which contain multiple subparts, i.e., those which

14  'introduce a line of inquiry that is separate and distinct from the inquiry made by the portion of the

15  interrogatory that precedes it' are generally construed as separate interrogatories.") (alteration

16  omitted).

17    Because disputes such as this typically involve a case-specific inquiry, the Court heard oral

18  argument on the interrogatories at issue and ruled at the DMC that some, but not all, of the

19  requests should be counted as multiple interrogatories.  *See Synopsys*, 319 F.R.D. at 295 ("This

20  court agrees that the task of counting interrogatories requires a case-specific assessment.").  As

21  noted at the DMC, Plaintiffs may (if they choose) withdraw any of these interrogatories and serve

22  revised requests if they wish to reduce the overall count of interrogatories used (keeping in mind

23  the Court's rulings and guidance on these issues).  The Court's rulings are incorporated herein by

24  reference and summarized below:

25    <u>"Hipchat" ROG 1 (Snap Set 1)</u>

26    ROG 1, which is directed at Snap, asks the following:

27    Identify and describe (a) the time period during which Hipchat was
     used and/or available for use by any of Your employees; (b) the date
28    Hipchat data was archived; (c) whether the archive encompasses all

> Hipchat data and, if not, the decision regarding what Hipchat data would not be archived and/or preserved; (d) the storage location(s) of the archived Hipchat data and whether it is exportable and searchable; (e) if any Hipchat data was produced in litigation, the case caption, status of litigation, and status of the Hipchat data; and (f) if Snap contends that any Hipchat data is not accessible, an explanation of the circumstances that led to the inaccessibility and all efforts to access and/or retrieve the Hipchat data.

[Dkt. 1428-1 at 9].

Snap argues that ROG 1 asks six separate questions that can each be answered without reference to the others. [Dkt. 1428 at 10]. At the DMC, Snap argued that the interrogatory is improperly compound because it merely starts with the phrase "identify and describe" followed by a list of discrete items to be addressed.

As noted above, where the subpart of an interrogatory "introduce[s] a line of inquiry that is separate and distinct from the inquiry made by the portion of the interrogatory that precedes it," the subpart is generally counted as a separate interrogatory. *AngioScore*, 2014 WL 7188779, at *6. This formulation is apt here, where the interrogatory at issue does not state a "primary question" up front, but instead, asks the responding party to "identify and describe" followed by several itemized subparts. While the lack of a "primary question" is unusual (and the Parties are admonished to avoid drafting peculiarities in future), the grouping of the subparts enables a rational interpretation of the topics at which the interrogatory is directed. As *AngioScore* explains, the analysis proceeds from comparing the portion in dispute to determine whether it is separate and distinct from the sections that precede it or not.

As stated at the December 11th DMC, the Court **ORDERS** that ROG 1 shall count as three separate interrogatories. Specifically, subparts (a)-(d) shall count as one interrogatory directed to the topic of storage of Hipchat data; subpart (e) shall count as one interrogatory directed to the topic of prior litigation involving Hipchat data; subpart (f) shall count as one interrogatory directed to Snap's contentions (if any) regarding whether Hipchat data is not accessible.

"Safety Feature" ROG 8 (Snap Set 2; TikTok Set 4)

ROG 8, which has the same text directed to both Snap and TikTok, asks the following:

> Describe the development and implementation of each Safety Feature from the creation of [the Platform] through the date of service of this interrogatory. For purposes of this interrogatory, 'describe' means to

1

2

3

4

5

6

> identify the following for each Safety Feature: (i) the date on which the feature was first made available on [the Platform]; (ii) the Person(s) with primary responsibility for the feature during each year of the Relevant Time Period; (iii) a general description of the feature's intended purpose; (iv) all names by which the feature has been known internally and/or promoted externally; (v) the population of users or non-users (e.g. parents without [Platform] accounts) to whom You made the feature available; (vi) whether the feature is applied by default or must be opted into by a user; (vii) whether and how You notify users about or encourage users to adopt the feature, either during account creation or at any other time; and (viii) whether the feature is still available to users on the [] Platform.

7   [Dkt. 1420-1 at 9; Dkt. 1428-2 at 10].

8      Snap and TikTok argue that ROG 8 improperly asks eight standalone questions multiplied

9   by at least ten Safety Features for TikTok (and thus should count as eighty interrogatories) and

10  three Safety Features for Snap (and thus should count as twenty-four interrogatories).  [Dkt. 1420

11  at 8; Dkt. 1428 at 10].  Plaintiffs argue that ROG 8 centers around "a single common theme"

12  regarding the Defendants' accused services and thus should be construed as one question.  [Dkt.

13  1420 at 10; Dkt. 1428 at 8].

14     In the patent litigation context, accused functionalities of a single accused product do not

15  count as separate interrogatories as long as the functionalities are similar for all versions of the

16  accused product.  *Synopsys*, 319 F.R.D. at 295.  Pursuant to the legal standards above and

17  analyzing the text of the interrogatory, the Court **ORDERS** that ROG 8 shall count as two

18  separate interrogatories.  Specifically, subparts (i)-(iv) shall count as one interrogatory which goes

19  to "development" of Safety Features; subparts (v)-(vii) shall count as one interrogatory which goes

20  to "implementation" of Safety Features.

21     <u>"Named Feature" ROG 10 (Snap Set 2; TikTok Set 4)</u>

22     ROG 10 asks the following:

23

24

25

> For each Named Feature, identify the following: (i) the date on which the Feature was first implemented on Your Platform; (ii) the Person(s) with primary responsibility for the Feature during each year of the Relevant Time Period; and (iii) major modifications to each Named Feature and when each such modification was implemented on Your Platform.

26

[Dkt. 1420-1 at 10; Dkt. 1428-2 at 10-11].

27

28     TikTok and Snap argue that ROG 10 improperly asks at least three unrelated, standalone

United States District Court
Northern District of California

4

1  questions for each of the Named Features.  [Dkt. 1420 at 8; Dkt. 1428 at 11].  At the DMC, the

2  Parties confirmed that there are roughly fifteen Named Features at issue for Snap and roughly

3  thirteen Named Features at issue for TikTok.  Defendants argue that this interrogatory should

4  therefore count as forty-five interrogatories for Snap and thirty-nine interrogatories for TikTok.

5      Pursuant to the legal standards above, the Court **ORDERS** that ROG 10 shall count as two

6  separate interrogatories which are addressed to discrete subject matter.  Specifically, subparts (i)-

7  (ii) shall count as one interrogatory which goes to "implementation" of the Named Features;

8  subpart (iii) shall count as one interrogatory which goes to "major modifications" of the Named

9  Features.

10      "Percentage Rate of Adoption" ROG 9 (TikTok Set 4; Snap Set 2)

11      ROG 9 to TikTok asks the following:

12          For each year during the Relevant Time Period, identify the
           percentage rate of adoption for each Safety Feature by domestic users
13          of Unknown Age, Non-Age Gate users, Hidden Minors, each
           Reported Age between 0 and 100, and each Inferred Age between 0
14          and 100. To the extent a Safety Feature is made available only to non-
           users (i.e. parents or guardians) identify the percentage rate of
15          adoption as kept by You in the ordinary course of business.

16  [Dkt. 1420-1 at 9-10].  ROG 9 to Snap asks for identical information but for "domestic users of

17  Null or Unknown Age."  [Dkt. 1428-2 at 10].

18      The Court **ORDERS** that ROG 9 shall count as a single interrogatory.

19      "Age Group" ROG 2 and "Average Revenue" ROG 6 (TikTok Set 4; Snap Set 2)

20      ROG 2 to TikTok asks: "For each year in the Relevant Time Period, identify the number of

21  domestic TikTok users of Unknown Age, Non-Age Gate users, Hidden Minors, each Reported

22  Age between 0 and 100, and each Inferred Age between 0 and 100."  [Dkt. 1420-1 at 8].  ROG 2

23  to Snap asks for the same information except by age categorizations for "domestic Snapchat users

24  of Null or Unknown Age," "Reported Age," and "Inferred Age."  [Dkt. 1428-2 at 9].

25      ROG 6 asks for Average Revenue Per User broken down by the same age categorizations

26  as in ROG 2.  [Dkt. 1420-1 at 9; Dkt. 1428-2 at 10].

27      Plaintiffs argue that ROG 2 and ROG 6 both ask a single primary question relating to age

28  and therefore count as one interrogatory each.  [Dkt. 1420 at 10-11; Dkt. 1428 at 7-8].  Defendants

1   argue that these ROGs ask for responses for five different age categories for TikTok and three

2   different age categories for Snap, and thus, should be counted as such. [Dkt. 1420 at 8; Dkt. 1428

3   at 10].

4        The Court **ORDERS** that ROG 2 and ROG 6 shall each count as a single interrogatory.

5   <u>"Age Group Information Broken Down by Decile" ROGs 3-5 (Snap Set 2; TikTok Set 4)</u>

6        These ROGS seek information about users (such as Time Spent Per App Session) for each

7   different defined age categorization discussed above, further broken down "by decile" within each

8   age categorization [Dkt. 1420-1 at 8-9; Dkt. 1428-2 at 9-10]. Each company apparently uses

9   different definitions of "age" and thus different age categorizations for users.

10       Plaintiffs argue that ROGs 3-5 ask a single primary question correlated to a user's age and

11  therefore count as one question each. [Dkt. 1420 at 10-11; Dkt. 1428 at 7-8]. Defendants argue

12  that these ROGs are confusingly worded, and improperly ask for responses for five different age

13  categories for TikTok and three different age categories for Snap, further broken down by

14  different deciles within each age grouping. [Dkt. 1420 at 8; Dkt. 1428 at 10].

15       These ROGs ask for information broken down by decile across multiple definitions of age

16  grouping, three defined age groups for Snap (Unknown Age, Reported Age, and Inferred Age) and

17  five defined age groups for TikTok (Unknown Age, Non-Age Gate, Hidden Minors, Reported

18  Age, and Inferred Age). Unlike ROGs 2 and 6, these interrogatories seek information across at

19  least four dimensions of data and are thus not sufficiently linked across all of the different

20  categorizations of age groupings by decile to count as a single interrogatory.

21       Accordingly, the Court **ORDERS** that ROGs 3-5 shall count as three interrogatories each

22  for Snap (nine total), and five interrogatories each for TikTok (fifteen total).

23  <u>"Model Feature" ROGs 25-26 (TikTok Set 5)</u>

24       ROGs 25-26 ask TikTok to "itemize and describe each type of user interaction and other

25  Model Feature" which is used to retrieve content (ROG 25) or used in models to rank content

26  (ROG 26). [Dkt. 1420-2 at 7]. Each ROG further defines "itemize and describe" as follows:

27            For purposes of this request, "itemize and describe" means to identify

28            [i] the interaction or Model Feature by both its plain language names
          and any alphanumeric code, [ii] the date You created the Model

United States District Court
Northern District of California

> Feature, [iii] the Identity of the Person who created the Model Feature, [iv] the Identity of the Person or Team responsible for maintaining the Model Feature, [v] the purpose for which the Model Feature was created, and [vi] the weight given to the Model Feature at any given time.

*Id.* (roman numerals added for reference).

TikTok argues that ROGs 25-26 improperly ask multiple standalone questions for each of the Model Features. Plaintiffs argue that these interrogatories are directed to a common issue, *viz.,* how Model Features are used in either content retrieval or ranking. The Parties disagree as to the total number of Model Features at issue for TikTok.

Pursuant to the legal standards above, the Court **ORDERS** that ROGs 25-26 shall count as two separate interrogatories each (four total) which are addressed to discrete subject matter. Specifically, subparts [i]-[iv] of each ROG shall count as one interrogatory which goes to identifying facts on the development of each Model Feature; subparts [v]-[vi] of each ROG shall count as one interrogatory which goes to facts on the function of each Model Feature.

At the DMC, the Parties confirmed that there is no longer a dispute as to ROG 7.

The Court makes these rulings without prejudice to Plaintiffs serving replacement interrogatories. The Parties are directed to meet and confer regarding Snap's and TikTok's deadlines for responding to these interrogatories.

This **RESOLVES** Dkts. 1420 and 1428.

## II.    JCCP Scope of Discovery as to Meta

The JCCP Plaintiffs and Meta report a dispute as to the JCCP Plaintiffs' request to expand pre-2012 document discovery of Meta. [Dkt. 1422].

In accordance with this Court's directives and Orders at the August and October DMCs, Meta recently produced hit reports (using three agreed upon search terms) for the custodial file of Mark Zuckerberg dating back to January 1, 2006, and for the custodial files of two additional custodians unilaterally chosen by Meta, identified by their initials as L.B. and P.R., from those individuals' date of hire. *Id.* at 6, 9; *see* Dkt. 1299 at 4-5. The hit reports identified 31,047 documents for Mr. Zuckerberg, and a combined total of 11,817 documents for L.B. and P.R. [Dkt. 1422 at 6, 9].

The JCCP Plaintiffs now request that Meta run a total of five search terms (including the previous three) across five custodians from date of employment—Zuckerberg, L.B., P.R., the Meta CTO, and the Meta CPO (identified as Chris Cox)—and produce nonprivileged, responsive documents.

The JCCP Plaintiffs clarify that the two additional search terms that they request relate to the language Meta uses to track users over time and Meta's early knowledge of potential harms. Plaintiffs argue that they need two additional custodians because Meta unilaterally selected L.B. and P.R. They argue that the discovery sought is necessary because: (1) the initial hit reports confirm that "material amounts of information" relevant to their claims predate 2012; (2) two JCCP Bellwether Plaintiffs began using Meta platforms prior to 2012; (3) the hits from L.B. and P.R. show that they are not suitable custodians (and thus Meta was not justified in selecting them); and (4) the relationship between Meta and the individual JCCP Plaintiffs is highly relevant to their negligence claims.

Meta argues that: (1) the JCCP Plaintiffs are essentially making an improper request for reconsideration of the Relevant Time Period; (2) they have failed to make particularized showings of need for specific pre-2012 documents; and (3) there is "enormous burden" because the sample hit reports suggest an upwards of one hundred thousand additional documents to be reviewed and processed.

As stated at the December 11th DMC, Meta is **ORDERED** to run the three previously agreed upon search terms (subject to any modification agreed to by the Parties after meet and confer) across the custodial files of Mr. Zuckerberg (dating back to January 1, 2006), L.B (from date of hire or January 1, 2006, whichever is later), P.R. (from date of hire or January 1, 2006, whichever is later), and Chris Cox (from date of hire or January 1, 2006, whichever is later), and to promptly produce all nonprivileged responsive documents. To the extent the JCCP Plaintiffs seek documents predating January 1, 2006, the request is **DENIED**. The JCCP Plaintiffs' request for additional search terms is also **DENIED**. The two additional search terms are either duplicative of the other search terms or are not limited to teens and youth, and they are not proportional to the needs of the case, especially considering that the three previously selected

United States District Court
Northern District of California

1    search terms were proposed by Plaintiffs and were presumably their priority requests (and as Meta

2    argued, those three search terms were not the subject of substantial narrowing or negotiation

3    because they were originally proposed as test terms to determine the scope of documents

4    potentially at issue).  In other words, Plaintiffs already were granted leave for three search terms

5    that they chose and have not demonstrated sufficiently that either of the two additional search

6    terms are proportional or necessary.  The Parties are **ORDERED** to meet and confer regarding any

7    modifications to the three previously ordered search terms by no later than **December 21, 2024**.

8           This **RESOLVES** Dkt. 1422.

9    **III.    States' Production of Documents**

10          The Parties report myriad, ongoing disputes regarding Meta's discovery of documents of

11   multiple state agencies in Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Illinois,

12   Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Nebraska, New

13   Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Dakota, Washington,

14   and Wisconsin.  [Dkt. 1430].

15          In resolving these disputes and providing guidance to the Parties, the Court is cognizant of

16   the relevant legal standards.  Federal Rule of Civil Procedure 26(b)(1) delineates the scope of

17   discovery in federal civil actions and provides that "[p]arties may obtain discovery regarding any

18   nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs

19   of the case."  Information need not be admissible to be discoverable.  *Id.*  Relevancy for purposes

20   of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could

21   lead to other matter that could bear on, any issue that is or may be in the case."  *In re Williams-*

22   *Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437

23   U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No.

24   18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally

25   recognize that relevancy for purposes of discovery is broader than relevancy for purposes of

26   trial.") (alteration omitted).

27          While the scope of relevance is broad, discovery is not unlimited.  *ATS Prods., Inc. v.*

28   *Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes

of discovery, is defined broadly, although it is not without ultimate and necessary boundaries."). Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery. Fed. R. Civ. P. 26(b)(1). The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the commonsense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry. The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. In evaluating the proportionality of a discovery request, the Court considers "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to the information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

The party seeking discovery bears the burden of establishing that its request satisfies the relevancy requirements under Rule 26(b)(1). *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*, 285 F.R.D. 481, 485 (N.D. Cal. 2012). The resisting party, in turn, has the burden to show that the discovery should not be allowed. *Id.* The resisting party must specifically explain the reasons why the request at issue is objectionable and may not rely on boilerplate, conclusory, or speculative arguments. *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir. 1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to carry a heavy burden of showing why discovery was denied.").

The Court has broad discretion and authority to manage discovery. *U.S. Fidelity & Guar. Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). As part of its inherent discretion and authority, the Court has broad discretion in determining relevancy for discovery purposes. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005)

United States District Court
Northern District of California

10

1  (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).  The Court's discretion extends to

2  crafting discovery orders that may expand, limit, or differ from the relief requested.  *See*

3  *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to

4  tailor discovery narrowly and to dictate the sequence of discovery").  For example, the Court may

5  limit the scope of any discovery method if it determines that "the discovery sought is unreasonably

6  cumulative or duplicative, or can be obtained from some other source that is more convenient, less

7  burdensome, or less expensive."  Fed. R. Civ. P. 26(b)(2)(C)(i).

8  　　　In the joint letter briefing regarding this dispute, Meta categorized the various state

9  agencies in different categories based generally on their levels of compliance with the Court's

10  prior Orders governing discovery from state agencies, particularly as to timing and sharing of

11  information to negotiate a mutually agreeable scope of discovery of documents.  The Court

12  addresses the state agencies in each category in turn:

13  　　　Category 1: Agencies Refusing to Comply with this Court's Orders

14  　　　Based on reports at the DMC, the following ten agencies continue to refuse to comply with

15  this Court's Orders regarding document production on the grounds that they are not subject to

16  party discovery in this action, that they are not subject to the jurisdiction of this Court, and/or they

17  insist that they must be subpoenaed for documents (and will not produce documents in response to

18  Rule 34 document requests):

19  - Office of the California Governor

20  - California Governor's Office of Business and Economic Development

21  - California Department of Consumer Affairs

22  - California Department of Finance

23  - California Department of Public Health

24  - California Business, Consumer Services, and Housing Agency

25  - California Office of Data and Innovation

26  - Office of the Kansas Governor

27  - Office of the Governor of the State of New York

28  - New York State Division of the Budget

United States District Court
Northern District of California

United States District Court
Northern District of California

1        At the December 11th DMC, there was dispute over whether the following eleven agencies

2  are or are not refusing to obey the Court's Orders—while these agencies do appear to be

3  negotiating with Meta over search parameters and/or custodians and thus are apparently not

4  complete "holdouts," the record is unclear as to whether they will ultimately comply with their

5  discovery obligations (and they appear to have missed interim deadlines previously set by the

6  Court for completing this discovery process):

7      • Kansas Department of Administration

8      • Kansas Department for Aging and Disability Services

9      • Kansas Department for Children and Families

10      • Kansas Department of Commerce

11      • Kansas Department of Health and Environment

12      • New York Council on Children and Families

13      • New York Department of Health

14      • New York Department of State

15      • New York Higher Education Services Corporation

16      • New York Office of Children and Family Services

17      • New York Office of Mental Health

18            Prior to the DMC, counsel for these Category 1 agencies filed procedurally improper

19  letters with the Court, identifying themselves as "nonparties" to this action, rehashing arguments

20  that their respective state's AG does not exercise control over agency documents, insisting that

21  they are not subject to the jurisdiction of this Court, and (in the case of California and New York)

22  requesting that the Court stay enforcement of its September 6, 2024 Order regarding document

23  production. *See* Dkts. 1429, 1440, 1443-44.

24            To the extent attorneys (who may or may not have entered appearances) attempted to make

25  *ex parte* requests on behalf of certain state agencies for reconsideration, or for a stay, or for other

26  alterations of the Court's prior discovery rulings, the requests are **DENIED** as procedurally

27  improper under the Civil Local Rules, as well as this Court's Standing Order for Discovery and

28  the prior Orders and directives issued in this case. *Ex parte* letters and status reports submitted to

the Court making these kinds of requests, unsupported by proper meet and confers, do not comply, for example, with Civil Local Rule 7-11 (governing motions for administrative relief, to the extent the request seeks administrative relief) or Section H of the Court's Standing Order for Discovery (governing discovery disputes, to the extent the requests seek relief with regard to a discovery dispute).

At the DMC, counsel for the seven California agencies clarified that those agencies have in fact been "engaging" with Meta regarding proposed search terms and custodians and are "working to provide hit reports." [Dkt. 1457 at 89:14-90:9]. Counsel stated that the purpose of the letter was to "preserve" the California agencies' "position." *Id.* at 89:12.

The Kansas AG reported that some of the Kansas agencies at issue are "cooperating" with Meta and clarified that the main holdout was the Kansas Governor's Office. *Id.* at 84:17-86:9. The New York AG made representations suggesting that he had not directly communicated with counsel for the eight New York agencies at issue prior to the DMC regarding their position. *Id.* at 83:18-84:1. He reported that at least some of the agencies were producing documents pursuant to Rule 45 subpoenas. *Id.* at 79:22-80:8.

At the DMC, counsel for Meta expressed frustration with these agencies, represented that they have not made progress on finalizing search terms and/or custodians, and indicated that the agencies have not met the interim deadlines previously set by the Court for state agency discovery.

By no later than **December 18, 2024**, Meta and each of the above Category 1 agencies shall file a single-page, evenly divided letter setting forth an agreed-upon schedule to show how they intend to complete discovery, on an expedited basis, to comply with the remaining deadlines in this case. The Court repeats its admonitions to the Parties that they are expected to work collaboratively to get this discovery completed timely.

The Court again admonishes the AGs that they have been and continue to be **ORDERED** to coordinate with all of their state's agencies in this process. The AGs have an obligation to facilitate this discovery from the state agencies, as ordered previously by the undersigned and by the presiding District Judge in this case. To the extent the AGs are merely passing along this Court's Orders to the agencies without anything more, that does not constitute sufficient

United States District Court
Northern District of California

1  coordination and facilitating of this process.  By way of example, the AGs are expected to be

2  actively engaging with the agencies (or their counsel) meaningfully; they are expected to be

3  involved in efforts to communicate, coordinate, and facilitate negotiations with Meta; and they are

4  expected to take proactive steps directly with the agencies to get this discovery completed.

5      The Court notes that some of the state agencies have apparently retained counsel with

6  regard to communicating with Meta about these discovery issues, while others rely on their agency

7  counsel.  However, to date, none of those agencies' counsel have entered appearances in this case.

8  The agencies have known about discovery in this case for months and continue to deliberately

9  choose not to appear before this Court to argue in defense of their positions and actions (and

10  indeed some apparently continue to argue to Meta that they are not subject to the jurisdiction of

11  this Court, without regard for this Court's rulings in this matter).  Experienced counsel understand

12  the potential results of knowingly choosing not to represent their clients' positions or properly

13  present arguments to a court on a dispute and thus cannot be reasonably expected to complain later

14  when they or their clients are dissatisfied with the consequences of their choices.

15      To the extent Meta seeks relief against any of these states or agencies, Meta should address

16  motions or requests for relief which impact or involve case management, case scheduling, or

17  similar issues to the presiding District Judge, *e.g.,* Meta's request that certain states be taken off

18  the current trial calendar due to the delay.  *See* Dkt. 1430 at 13.

19      Category 2: State Agencies That Have Partially Complied with this Court's Orders

20      Certain agencies (identified by Meta in footnote 2 and footnote 3 of the joint letter

21  briefing) have either failed to provide Meta with *any* search terms, custodians, hit reports, or

22  transparency regarding alternate search methods that they may be employing, or have provided

23  only partial information.  *See* Dkt. 1430 at 12 n.2, 13 n.3.

24      The agencies identified by Meta in footnote 4 of the joint letter briefing have apparently

25  been negotiating with Meta but have not yet completed those negotiations or productions of

26  documents.  *See id.* at 14 n.4.

27      At the December 11th DMC, the Court heard exhaustive argument on this dispute from

28  counsel representing the agencies at issue in Arizona, Colorado, Connecticut, Illinois, Indiana,

14

United States District Court
Northern District of California

1    Michigan, Minnesota, Nebraska, New Jersey, Ohio, Pennsylvania, Rhode Island, South Dakota,

2    Washington, and Wisconsin.  While the Court summarizes the discussions on the record regarding

3    the agencies from each of these states, the summary below is merely a summary and the Court

4    incorporates by reference its directives stated on the record at the DMC:

5            Counsel for the Colorado agencies at issue reported that those agencies were "actively

6    working" with Meta, that all agencies but one had already provided Meta with search terms and

7    custodians, and that the remaining agency (Behavioral Health Administration) had agreed to run

8    search terms through its principal agency.  Counsel confirmed that none of the Colorado agencies

9    at issue had yet provided hit reports due to issues with Google Vault artificially limiting search

10   strings but insisted that those agencies were working with Meta to do so promptly.

11           Counsel for the New Jersey agencies at issue reported that two agencies (Department of

12   Health and Department of Treasury) have already provided custodians as well as hit reports for

13   some search terms.  Counsel stated that the New Jersey agencies were working with Meta to try to

14   work around technical limitations involving Microsoft Purview.  Counsel admitted that the

15   agencies only provided the name of one custodian for one agency (New Jersey Department of

16   Health).  Counsel represented that the New Jersey agencies were running additional hit reports

17   using more useful delimiters (because the prior hit report resulted in zero hits).  Counsel reported

18   that the New Jersey agencies were committed to negotiate additional custodians, to negotiate more

19   reasonable search terms, and to be more transparent regarding the process they are using to search

20   for documents.

21           Counsel for the Connecticut agencies at issue reported that those agencies have provided

22   search terms and custodians but not hit reports.  Counsel represented that the agencies would work

23   with Meta to do so promptly.

24           Counsel for the Ohio agencies at issue reported that those agencies were working with

25   Meta to provide all outstanding materials.

26           Counsel for the sole Illinois agency at issue, the Illinois Department of Health, reported

27   that the agency responded to Meta's previously issued Rule 45 subpoena that it had no materials.

28   Meta's counsel expressed doubts regarding the sufficiency of the search conducted by the agency

1  in response to the subpoena, as well as the agency's representation that it had no responsive

2  documents.  Meta's counsel noted that the agency's director is also the co-chair of the Illinois

3  Children's Mental Health Partnership.  The Parties confirmed that they were in the process of

4  negotiating search terms and custodians.  Counsel for the Illinois agency raised concerns regarding

5  overly broad search terms producing large numbers of hits, as well as limitations with respect to

6  manpower and technological feasibility.

7        Counsel for the Minnesota agencies at issue reported that the Department of Human

8  Services had completed production pursuant to a Rule 45 subpoena but would be willing to

9  conduct follow-up go get 'em searches where appropriate.

10        Counsel for the Nebraska agencies at issue reported that those agencies were all working to

11  provide search terms, custodians, and hit reports, but were in different stages of doing so.  Counsel

12  reported that the Nebraska Children's Commission had recently completed a manual search which

13  produced a very small number of documents.

14        Counsel for the Pennsylvania agencies at issue reported that they very recently provided hit

15  reports using Meta's search terms, which yielded 1.3 million documents.  Counsel reported that

16  these agencies were committed to negotiate search terms and custodians with Meta and to work on

17  completing discovery in a timely manner.

18        Counsel for the Rhode Island agencies at issue reported that the Department of Health is

19  responsible for public health, and thus, is most likely to have relevant documents.  Counsel

20  reported that two other agencies at issue which run the state hospital and state Medicaid

21  program—the Executive Office of Health and Human Services, and the Behavioral Health and

22  Developmental Disability Services—raised concerns.  Counsel for Rhode Island argued that

23  search terms should be limited to those search terms which specifically mention or include "social

24  media" or terms specific to social media.  Meta's counsel argued that search terms should not be

25  so limited, because Meta is seeking discovery as to alternate causes for teen mental health issues

26  as part of Meta's theory of defense.

27        At the December 11th DMC, the Court overruled Rhode Island's objections as to relevance

28  of Meta's proposed search terms directed to "alternate stressors."  The Court further **ORDERED**

the Parties to negotiate narrowing any such search terms and targeting the custodians, in order to address concerns as to proportionality and overbreadth. Without making any findings as to the merits of Meta's defense theory, the Court finds that there is a scope of such search terms which would be both relevant for purposes of discovery and proportional. The Court expects counsel to work on negotiating these search terms appropriately.

Counsel for the South Dakota agencies at issue reported that the Governor's Office of Economic Development is a small office with only five employees, and that the agency is able to run hit counts but is resource limited. Counsel likewise reported that the Office of the Governor is unable technologically to run hit counts and was in the process of searching for documents manually. Meta's counsel represented that Meta would be open to deprioritizing additional agencies but complained that South Dakota has not been sufficiently forthcoming with information necessary to make that determination.

At the DMC, the Court reminded the Parties that if they are making technological arguments as to feasibility of searches (such as South Dakota's representation that they are incapable of running Boolean searches using "and" or similar connectors or delimiters), they are expected to have technical personnel involved in the meet and confers so that negotiations can proceed with more direct knowledge as to representations as to IT capabilities. If an agency represents that it simply lacks the technical feasibility or skills or resources to run search reports, then the Parties should openly and transparently discuss alternate methods of searching for documents (whether manually or using some hybrid system). If an agency is lacking in technological resources to be able to run ESI searches, the Parties should consider and discuss having Meta (or its eDiscovery vendor) inspect the computers at issue and use their own resources to copy relevant files from those computers pursuant to Rule 34(a)(1)(A).

Counsel for Washington State reported that there were numerous agencies at issue, that they have discussed deprioritizing some of them with Meta, that the search terms Meta has proposed are too numerous, and that Meta added search terms instead of narrowing or eliminating any. Meta's counsel reported that Washington State has been slow in providing information needed to allow Meta to make the determination as to whether any other agencies should be

deprioritized.  Meta's counsel reported that the number of search terms was changed because as a counterproposal Meta took Washington State's search terms and tried to line up Meta's counter-proposed terms with the state's list.  The Court admonishes the Parties to be transparent in providing information to help deprioritize agencies, if that is possible, and to continue negotiating search terms reasonably.

Counsel for the Arizona agencies at issue reported that Meta has refused to use go get 'em requests for the Department of Child Safety.  He reported that using search terms would be unwieldy because the agency deals with children placed in foster care, and thus, the search terms would hit on numerous irrelevant documents.  Meta's counsel argued that Meta does not want individual case files, that Meta narrowed search terms to avoid irrelevant documents, and that Meta agreed to narrow the search to higher level custodians who would not be expected to be working with lots of individual case files.  Counsel for the Arizona agencies argued that the search terms, even as revised, still result in an unacceptably high number of hits.  At the DMC, the Court directed the Parties to continue to negotiate to narrow the search terms to reasonable hit results, to be forthcoming in providing hit reports, and to be transparent if there are technological barriers to providing hit reports or running searches.  As discussed above, there are other procedures available for discovery of ESI which the Parties should be discussing openly if there are such technological barriers or resource constraints.

Counsel for the Wisconsin agencies at issue reported that those agencies had done manual searches for documents and were providing hit reports for documents based on search terms being negotiated.  Again, the Parties should be exchanging proposals and counterproposals to narrow search terms, running and sharing hit reports, and resolving these disputes in a collaborative manner.

Counsel for the Michigan agencies at issue reported that those agencies had provided hit reports for documents based on search terms being negotiated but the hits were returning results which would yield one million documents.  The Court repeats the admonition that the Parties should be engaging on the search term process, exchanging proposals and counterproposals to narrow search terms in a timely manner, exchanging proposals and counterproposals to narrow

1    custodians in a timely manner, running and sharing hit reports in a timely manner, and resolving

2    these disputes in a collaborative fashion.

3    Finally, counsel for the Indiana agencies at issue reported that those agencies had provided

4    hit reports for documents based on search terms being negotiated, that their counter-proposed

5    search terms for the Department of Child Services yielded a result of forty-three thousand hits (a

6    number which Indiana is comfortable with), and that Meta should not be counter proposing search

7    terms that yield over one million documents.  The Court reiterates that Meta should be narrowing

8    or dropping search terms and custodians, using go get 'em requests, agreeing to reasonable

9    alternative search methodologies, and even deprioritizing agencies, where appropriate.  The

10   Court's admonitions above (*viz.,* that the Parties should be engaging on the search term process,

11   exchanging proposals and counterproposals to narrow search terms in a timely manner,

12   exchanging proposals and counterproposals to narrow custodians in a timely manner, transparently

13   providing information on alternative search methodologies (if any are proposed), explaining

14   transparently why go get 'em requests are adequate to eliminate or narrow at least some search

15   terms, running and sharing hit reports in a timely manner, and resolving these disputes in a

16   collaborative fashion) applies to all states and agencies at issue in this litigation.

17   In summary, Meta argued, among other things, that many of the agencies at issue have

18   failed to adequately communicate with Meta regarding their positions; that certain agencies have

19   attempted to restart the entire document production process after hiring outside counsel; that

20   certain agencies have identified custodians but then refused to run search terms and provide hit

21   reports for those custodians; that certain agencies have run searches using their own terms or

22   methods but then refused to provide hit reports or otherwise explain how the search was

23   conducted; and that certain agencies have refused to perform searches with terms that go to Meta's

24   defense theories.

25   The Court provided detailed guidance to Meta and the agencies as to how to expedite this

26   process and keep the overall case schedule on track.  The Parties are expected to work together to

27   get outstanding production completed as quickly as possible.  The Parties should focus on

28   finalizing search terms and hit reports and getting the documents by running those search terms

United States District Court
Northern District of California

19

across the negotiated custodians' files.  The Parties must be transparent in their meet and confers and hold each other to their statements.  To the extent that Meta's proposed search terms yield large amounts of unresponsive documents, the agencies must counter propose modified search terms reasonably directed at obtaining the types of documents sought.  It is not sufficient for an agency to simply say that the search terms produce too many hits.  The Parties should be working to eliminate, or at least narrow, search terms—Meta should not be adding new search terms in negotiations.  If either side knows of a reasonable way to modify search terms to work around an agency's technological limitations or to otherwise speed up the process, the Parties should discuss using that method.  If an agency opts to use alternative search methods (other than search terms) to comply with their duty to search for and produce documents, the agency must be transparent with Meta regarding that process (*i.e.,* how you got the documents, what criteria were used, and who you got them from).  Meta is further directed to finalize determinations regarding agencies that should be deprioritized.

By no later than __December 18, 2024__, Meta and each state agency at issue shall file a single-page, evenly divided letter regarding their agreed upon schedule to complete remaining discovery obligations.  The Court stated at the DMC that there is to be no argument in these letters.  The Court will hold the Parties to these dates.  Any and all state agencies (in footnotes 2, 3, or 4) who owe Meta hit reports **SHALL** provide them by no later than __December 16, 2024__.

This **RESOLVES** Dkt. 1430.

### IV.     Housekeeping Issues

The Court **SO ORDERS** Meta's commitment regarding service of additional RFPs on the AGs as set forth in the DMC Statement.  [Dkt. 1408 at 2].

The Court **SO ORDERS** Meta and Plaintiffs' agreement as to expedited production of hyperlinked documents pertaining to depositions set within the next thirty days.  *Id.* at 3.

Due to a conflict in the Court's calendar, the April DMC is **RESET** for __April 22, 2025 at 1:00 p.m.__

The Court has taken under consideration the Parties' request to reset the February DMC to another date.  Until the Court orders otherwise, the February DMC shall remain set for February

1    20, 2024.

2

3    **IT IS SO ORDERED.**

4    Dated:  December 20, 2024

5

6    PETER H. KANG
     United States Magistrate Judge