Case No. 25-584

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

*In re* THE PEOPLE OF THE STATE OF CALIFORNIA

*Petitioner.*

THE PEOPLE OF THE STATE OF CALIFORNIA

*Petitioner - Plaintiff,*

– v. –

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA,

*Respondent,*

THE PEOPLE OF THE STATE OF CALIFORNIA, et al.,

*Real-Parties-In-Interest – Plaintiffs,*

– v. –

META PLATFROMS INC., et al.,

*Real-Parties-In-Interest – Defendants.*

## ADDENDUM TO MOTION TO INTERVENE/JOIN

PHILIP J. WEISER
Attorney General

SHANNON STEVENSON
Solicitor General
  *Counsel of Record*

Colorado Department of Law
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720-508-6000
Email: Shannon.Stevenson@coag.gov

KRISTA BATCHELDER
Deputy Solicitor General

DANNY RHEINER
Assistant Solicitor General

LANE TOWERY
Assistant Attorney General Fellow

*Attorneys for State of Colorado*

*(Additional counsel on signature page)*

January 29, 2025

## Table of Contents

### Trial Court Orders

ORDER GRANTING-IN-PART AND DENYING-IN-PART META'S REQUEST FOR PARTY DISCOVERY ON THIRD-PARTY STATE AGENCIES (Sep. 6, 2024) (Dkt. No. 1117)................1

DISCOVERY MANAGEMENT ORDER NO. 12 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF NOVEMBER 21, 2024 (Nov. 26, 2024) (Dkt. No. 1380)..............................249

ORDER RE: SCHEDULE FOR STATE AGENCY DOCUMENT PRODUCTION (Dec. 31, 2024) (Dkt. No. 1495)...........................................................................................................257

### Other Documents

SUPPLEMENTAL LETTER BRIEF RE: STATE AGENCY DISCOVERY (Kentucky) (Apr. 1, 2024) (Dkt. No. 738-14)..........................................................................................................265

NOTICE OF INFORMATION REGARDING STATE-AGENCY DISCOVERY ISSUE (Kansas) (Dec. 11, 2024) (Dkt. No. 1441)..............................................................................................268

NON-PARTY STATUS UPDATE AND STATEMENT RE: STATE AGENCY DISCOVERY (New York) (Dec. 11, 2024) (Dkt. No. 1443).............................................................................284

JOINT STATUS REPORT ON STATE AGENCIES' PRODUCTION OF DOCUMENTS (Jan. 7, 2025) (Dkt. No. 1503)...................................................................................................................290

### Transcripts

DISCOVERY MANAGEMENT CONFERENCE TRANSCRIPT (Nov. 21, 2024) (Dkt. No. 1372)...................................................................................................................324

DISCOVERY MANAGEMENT CONFERENCE TRANSCRIPT (Jan. 16, 2025) (Dkt. No. 1578)...................................................................................................................473

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 22-md-03047-YGR (PHK) |
| | **ORDER GRANTING-IN-PART AND DENYING-IN-PART META'S REQUEST FOR PARTY DISCOVERY ON THIRD-PARTY STATE AGENCIES PURSUANT TO FED. R. CIV. P. 34 AND GRANTING META'S FIRST, SECOND, AND THIRD ADMINISTRATIVE MOTIONS FOR LEAVE TO FILE SUPPLEMENTAL INFORMATION** |
| This Document Relates to: | |
| All Actions | |
| | Re: Dkts. 685, 738, 1031, 1074, 1110 |

## INTRODUCTION

This case is a multidistrict litigation between various private and public plaintiffs and social media defendants. Now before the Court is a dispute between Defendant Meta Platforms, Inc. ("Meta") and those thirty-five State Plaintiffs who appear by, and in several cases are themselves, the Attorneys General of various states. Each State Plaintiff is represented by attorneys from the office of their respective State Attorney General. After Meta served requests for production of documents under Federal Rule of Civil Procedure 34 on the State Attorneys General, the Parties disputed whether or not certain identified state agencies should be subject to party discovery, and thus, whether the States Attorneys General should not only collect and produce documents from the Attorney General's office but also from relevant custodians within the identified state agencies. [Dkt. 685]. The State Attorneys General all object to the document requests for a variety of reasons and, germane to the instant Order, they object to treating their respective state agencies as being subject to party discovery and insist that all of these agencies are third parties from whom Meta

should seek documents by subpoenas under Federal Rule of Civil Procedure 45. *Id.* at 8–10. Meta disagrees and contends that the Requests for Production served on the State Attorneys General are the proper vehicle for seeking documents from the identified agencies, and that forcing Meta to serve over 200 subpoenas duces tecum under Rule 45 is not justified and is overly burdensome.

Accordingly, the primary issue in dispute is whether the named State Plaintiffs have "control" for purposes of discovery over their respective state agencies' documents. *See id.* at 6–7, 9–10; *see also* Dkt. 738. After careful review of multiple rounds of briefing, the relevant legal standards, and oral argument at multiple hearings, the Court herein sets forth its conclusions of a state-by-state analysis to resolve whether and which named State Plaintiffs have control over their respective state agencies' documents – and thus whether such documents are to be sought in discovery by requests for production under Rule 34 (party discovery) or by subpoenas under Rule 45 (third party discovery). For the following reasons, Meta's request to compel the State Plaintiffs to include their identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART**. [Dkts. 685, 738]

## BACKGROUND

On February 23, 2024, Meta sent the State Attorneys General a list of state agencies "that may possess information relevant to the claims or defenses." Dkt. 685 at 6. Meta served requests for production of documents under Rule 34 on the State Attorneys General on February 27, 2024. [Dkt. 686 at 1]. The Parties subsequently met and conferred, as required by this Court's Standing Order for Discovery, regarding whether the Parties could reach negotiated resolution of the instant dispute. [Dkt. 685]. The Parties included discussion of this dispute in their Joint Status Report on Discovery filed on February 16, 2024. [Dkt. 617 at 17].

The Court heard oral argument on this issue at the Discovery Management Conference ("DMC") held on February 22, 2024. *See* Dkt. 648. At that hearing, the Court ordered the Parties to submit a chart specifying the state agencies from whom Meta sought discovery, including an indication from the corresponding state Attorney General whether or not that state Attorney General would be representing the identified agencies for purposes of discovery in this case. *Id.* The Parties thereafter submitted the chart to this Court via email.

United States District Court
Northern District of California

On March 15, 2024, the State Attorneys General and Meta filed a Joint Letter Brief setting forth their respective positions on this dispute over whether the state agencies should be subject to party discovery. [Dkt. 685]. The Parties identified this dispute as a "ripe" dispute in their Joint Status Report on Discovery filed on March 15, 2024. [Dkt. 686 at 8]. The Court heard oral argument on this dispute at the DMC held on March 18, 2024. *See* Dkts. 691, 699. On April 1, 2024, the State Attorneys General and Meta filed their Joint Supplemental Letter Brief on the issue of state agency discovery which included supplemental briefing on a state-by-state basis addressing arguments from each of the thirty-five State Attorneys General and Meta's rebuttal to each. [Dkt. 738,]. As part of that Supplemental Letter Brief was the chart (previously lodged with the Court) identifying the specific state agencies at issue and the indication from each of the State Attorneys General whether or not their office would represent each such agency in discovery in this case. [Dkt. 738-1].

In the April 12, 2024, Joint Status Report on Discovery, the Parties requested guidance on whether they should be prepared for further oral argument on this dispute. [Dkt. 750 at 8]. By Order dated April 17, 2024, the Court directed the Parties to be prepared to discuss the extent to which additional oral argument regarding this dispute was needed or desired. [Dkt. 759]. At the April 22, 2024 DMC, the Court sought the Parties' views on whether further oral argument was warranted in light of the record presented. *See* Dkts. 777, 782. While Meta did not seek further oral argument, certain State Attorneys General requested further oral argument. On April 24, 2024, pursuant to the Court's instructions, the State Attorneys General filed a Notice indicating that the states of Arizona, California, New Jersey, and Pennsylvania requested the opportunity to present further oral argument. [Dkt. 787]. The Notice indicated that the "remainder of the State AGs will have their interests represented by a singular argument presented by a member of the State AGs MDL Co-Lead Counsel [unidentified in the Notice]." *Id.* at 2. On May 2, 2024, the State Attorneys General filed an amendment to the Notice, indicating that the "State AGs have reconsidered their position and respectfully amend their request" and indicated that only the states of Arizona, California, New Jersey, and Pennsylvania sought additional oral argument (and thus dropped the request for an additional, as yet unidentified, state Attorney General to also present argument on behalf of the

remainder of the states). [Dkt. 803 at 2]. The remaining State Attorneys General did not seek additional oral argument. *Id.* The Court heard additional oral argument from the Parties at a hearing on May 6, 2024. [Dkt. 818].

On July 24, 2024, the State Attorneys General filed an Administrative Motion for Leave to File Supplemental Information. [Dkt. 1031]. The Administrative Motion sought leave to file information that Meta had served a Notice of its intent to serve twenty-six subpoenas on some of the agencies at issue. *Id.* The Notice indicated that Meta was taking these steps without waiving its rights with regard to this pending dispute. On July 29, 2024, Meta filed its Response to the Administrative Motion, indicating that Meta did not object to the submission of these subpoenas as supplemental information. [Dkt. 1035]. Meta informed the Court that Meta served another twenty-six subpoenas on various state agencies on July 29, 2024. *Id.* at 2 n.1. Meta repeated its stated position that service of these subpoenas without waiving Meta's position that the state agencies should be subject to party discovery. *Id.* at 2. On August 19, 2024, the State Attorneys General filed a Second Administrative Motion for Leave to File Supplemental Information. [Dkt. 1074]. This Second Administrative Motion sought leave to file information that Meta had served an additional Notice of its intent to serve an additional fifty-seven subpoenas on additional agencies at issue. *Id.* at 2. The Notice indicated that Meta takes no position with regard to this Second Administrative Motion. *Id.* at 6.

**LEGAL STANDARDS**

The following legal standards apply to the Court's analysis of the control issue for each of the states, discussed further below.

## I. CONTROL UNDER FED. R. CIV. P. 34

Rule 34 requires a party served with document requests to produce responsive, non-privileged documents which are in that party's possession, custody, or control. Because Rule 34 is written in the disjunctive, control is a separate and sufficient basis for production; issues such as actual possession, legal ownership, and custody are distinct from the issue of control. *Soto v. City of Concord*, 162 F.R.D. 603, 619 (N.D. Cal. 1995) (finding the City of Concord has control of documents of non-employee psychiatrists who evaluated individual officer-defendants); *Bess v.*

United States District Court
Northern District of California

*Cate*, No. 2:07-cv-1989 JAM JFM, 2008 WL 5100203, at *1 (E.D. Cal. Nov. 26, 2008) (for control issue "legal ownership of the document is not determinative."). The Ninth Circuit has held that "[c]ontrol is defined as the legal right to obtain documents on demand." *In re Citric Acid Litig.*, 191 F.3d 1090, 1107 (9th Cir. 1999) [hereinafter *Citric Acid*] (quoting *United States v. Int'l Union of Petroleum & Indus. Workers*, 870 F.2d 1450, 1452 (9th Cir. 1989)) (concluding that legal control test is proper standard under Fed. R. Civ. P. 45). As the party seeking production of documents under Rule 34, Meta has the burden of proving that a State's Attorney General has legal control over (*i.e.*, the legal right to obtain on demand) the identified State's agencies' documents. *Hitachi, Ltd. v. AmTRAN Tech. Co.*, No. C-05-2301-CRB (JL), 2006 WL 2038248 at *1 (N.D. Cal. 2006) (citing *Norman v. Young*, 422 F.2d 470, 472–73 (10th Cir. 1970)).

In *Citric Acid*, the Ninth Circuit provided guidance on what is required to show a "legal right to obtain documents upon demand." *Citric Acid*, 191 F.3d at 1107. In the factual situation in that case, the Ninth Circuit focused on whether or not there existed a contract "expressly giv[ing] . . . the right to obtain the records . . . upon demand." *Id.* "[T]he cases are fairly uniform that a contractual obligation to provide documents is dispositive of the issue of control." *Masimo Corp. v. Shenzhen Mindray Bio–Med. Elecs. Co.*, No. SA CV 12-02206-CJC (DFMx), 2015 WL 12912331, at * 2 (C.D. Cal. Apr. 17, 2015). The Ninth Circuit also explained that, in *Citric Acid*, there was an absence of "legal control" because the subpoenaed party "lacks the *legal ability* to obtain documents from" the third party. 191 F.3d at 1107 (emphasis added). Accordingly, based on *Citric Acid* then, either a contractual right or a legal ability to obtain documents are factors sufficient to show "legal control" over documents for purposes of Rule 34.

In *Citric Acid*, the Ninth Circuit further explained that an indicator of a lack of legal control occurs when the allegedly controlled third party can refuse to provide documents without legal or other repercussions:

> C&L–US [(the subpoenaed party)] asked C&L–Switzerland [(the third-party allegedly under control)] to produce those documents, but C&L–Switzerland refused. There is no mechanism for C&L–US to compel C&L–Switzerland to produce those documents, and it is not clear how Varni wants C&L–US to go about getting the ECAMA documents, since C&L–Switzerland could legally —and without breaching any contract—continue to refuse to turn over such

documents.

*Citric Acid*, 191 F.3d at 1108.

Thus, under *Citric Acid*, a "mechanism" to compel the third party to produce the documents, such as an ability to enforce a legal duty under a contract, would demonstrate legal control (and in the facts of *Citrc Acid*, no such contractual mechanism existed).

Subsequent to *Citric Acid*, the Ninth Circuit has not delineated with precision what other factors are sufficient to show a "legal right to obtain documents upon demand." *See, e.g.*, *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167, 169 (N.D. Cal. 2001) (observing that while *Citric Acid*'s legal control test "has been accepted within this circuit in discussions of both Rule 34(a) and 45(a)[,] . . . there has been little discussion as to precisely what is meant by 'legal right' and 'upon demand'").

Courts agree that the *Citric Acid* legal control test is a fact specific inquiry. *See Perez v. State Farm Mut. Auto. Ins. Co.*, No. C-06-01962 JW (PSG), 2011 WL 1362086, at *2 (N.D. Cal. Apr. 11, 2011) ("The determination of control is often fact-specific."); *Miniace v. Pac. Maritime Ass'n*, No. C 04-03506 SI, 2006 WL 335389, at *1 (N.D. Cal. Feb. 13, 2006) ("'Legal right' is evaluated in the context of the facts of each case."). Because the inquiry is fact specific, no court has attempted to limit or compile all factors relevant to an analysis under the *Citric Acid* legal control test.

As a general matter, "[f]ederal courts have interpreted 'control' broadly." *Hitachi*, 2006 WL 2038248, at *1 (finding legal control and granting motion to compel Hitachi to search and produce documents from third party, Hitachi's licensing agent Inpro); *Miniace*, 2006 WL 335389, at *1 ("'Control' need not be actual control; courts construe it broadly as 'the legal right to obtain documents upon demand.'"). "The definition of control under Rule 34 includes situations well beyond those which would permit a finding of *in personam* jurisdiction or liability based on an alter ego situation." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp. Inc.*, No. CV 14-03053 MWF (AFMx), 2018 WL 1157752, at *21 (C.D. Cal. Mar. 2, 2018) (citation omitted).

Because determination of the issue of control is fact specific depending on the totality of circumstances, there are no fully exhaustive lists of factors which have been found relevant to

United States District Court
Northern District of California

App. 006

1    determining control.  However, helpfully, at least one federal district court approaching this issue

2    has surveyed the case law:

> 3    [T]here are a number of factors which may be distilled from case law
>      which help to determine when documents in the possession of one
> 4    corporation may be deemed under control of another corporation.
>      These factors focus on the other corporation's actual control or
> 5    inferred control, including any "complicity" in storing or withholding
>      documents. They include (a) commonality of ownership, (b)
> 6    exchange or intermingling of directors, officers or employees of the
>      two corporations, (c) exchange of documents between the
> 7    corporations in the ordinary course of business, (d) any benefit or
>      involvement by the non-party corporation in the transaction, and (e)
> 8    involvement of the non-party corporation in the litigation . . . .
>      [B]ecause of the ownership situation, there often exists some
> 9    intermingling of directors, officers, or employees, or business
>      relations. Consequently, the subsidiary may be required to respond to
> 10   a Rule 34 request which includes the parent company's documents.
>      Sister corporations are subject to the same analysis.

11

12   *Uniden Am. Corp. v. Ericsson Inc.*, 181 F.R.D. 302, 306–07 (M.D.N.C. 1998) (internal citations

13   omitted).

14          Further, as noted, the *Citric Acid* approach to control includes evaluation of whether there is

15   a legal right to access the documents.  *Citric Acid*, 191 F.3d at 1107.  Accordingly, under a

16   straightforward application of the "legal right" standard, where a statute (or similar legal mandate)

17   provides a right to obtain documents, that statute or legal mandate has been held to be sufficient to

18   demonstrate control over third party's documents for purposes of discovery.  *See In re ATM Fee*

19   *Antitrust Litig.*, 233 F.R.D. 542, 544–45 (N.D. Cal. 2005) ("by federal statute, a bank holding

20   company necessarily controls its subsidiary banks. . . . Therefore, if [third party] BANA or any other

21   wholly-owned subsidiary bank of [defendant] BAC has possession and custody of documents

22   responsive to Plaintiffs' requests, then [defendant] BAC has legal control of the documents through

23   its control of the [third-party] subsidiary bank and must produce any which are responsive to

24   Plaintiffs' Rule 34 requests.").  For purposes of establishing "legal control" over documents,

25   "[d]ecisions from within this circuit have noted the importance of a legal right to access documents

26   created by *statute*, affiliation or employment."  *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170

27   (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not

28   within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for

*United States District Court*
*Northern District of California*

and obtain transcript of testimony from SEC). Therefore, in the analysis of individual states below, the Court will consider whether there exists a statute or other legal mandate which satisfies the control test.

Despite their request for state-by-state briefing and separate opportunities for oral argument from each state, throughout the briefing and oral argument, the Attorneys General of the individual states raise several arguments that implicate the same or similar legal issues. The Court turns to these common legal issues and the legal standards applicable to all of the states' objections to party discovery for their agencies and, to avoid prolixity, addresses them here instead of repeating them in the discussion of each state's arguments.

## II. STATE LAW AND CONTROL UNDER FED. R. CIV. P. 34

The instant dispute involves document requests served upon governmental entities. However, the Court notes that precedent regarding the application of the control factors in the context of document requests made upon private corporations or entities may be illustrative. In a case involving the New York Attorney General, the Supreme Court held that "[i]f a State chooses to pursue enforcement of its laws in court, then it is not exercising its power of visitation and will be treated like a litigant. *An attorney general acting as a civil litigant must* file a lawsuit, survive a motion to dismiss, *endure the rules of procedure and discovery*, and risk sanctions if his claim is frivolous or his discovery tactics abusive." *Cuomo v. Clearing House Ass'n, L.L.C.*, 557 U.S. 519, 531 (2009) (emphasis added). The Ninth Circuit has held that "[w]hen the government is named as a party to an action, it is placed in the same position as a private litigant, and the rules of discovery in the Federal Rules of Civil Procedure apply." *Exxon Shipping Co. v. U.S. Dep't of Int.*, 34 F.3d 774, 776 n.4 (9th Cir. 1994). Not surprisingly then, the fact that this case involves governmental entities rather than private entities does not materially change the legal or analytical approach to the control issue.

Nevertheless, the Court is cognizant that governmental agencies differ from private entities in certain ways, as stressed by the state Attorneys General. These differences are accounted for in the analyses below. However, because the Court is not relying on the law of private corporations or corporate governance to analyze the control issue here, the differences are not in and of

themselves outcome determinative of the inquiry. For example, the fact that private corporations are legal entities formed under state law, whereas the state Attorney General is (typically) an office created by a state constitution, has little bearing on distinguishing precedent on the issue of control. Other than pointing out these kinds of public/private differences, the Attorneys General do not demonstrate how or why the legal precedent cited are distinguishable based on the legal (or constitutional) source of creation of the entities for deciding the control issue. From the Court's review, the precedent relevant to the issues here do not apply a different legal control test based on whether an entity is a for-profit business as opposed to a governmental agency or officer.

Because the inquiry for control is fact-specific, courts have examined the state's constitutional or statutory scheme as part of the totality of circumstances when deciding whether one governmental entity has control over the documents of another governmental entity. *See, e.g.*, *United States v. Am. Express Co.*, No. 10-CV-04496-NGG (RER), 2011 WL 13073683 (E.D.N.Y. July 29, 2011) [hereinafter *Amex*]; *Bd. of Educ. of Shelby Cnty., Tenn. v. Memphis City Bd. of Educ.*, No. 2:11-CV-02101-SHM, 2012 WL 6003540 (W.D. Tenn. Nov. 30, 2012), *supplemented*, No. 2:11-CV-02101-SHM, 2012 WL 6607288 (W.D. Tenn. Dec. 18, 2012); *Washington v. GEO Grp., Inc.*, No. 3:17-CV-05806-RJB, 2018 WL 9457998, at *3 (W.D. Wash. Oct. 2, 2018); *In re Generic Pharms. Pricing Antitrust Litig.*, 571 F. Supp. 3d 406 (E.D. Pa. 2021) [hereinafter *Generic Pharmaceuticals (I)*]; *Illinois ex rel. Raoul v. Monsanto Co.*, No. 22 C 5339, 2023 WL 4083934 (N.D. Ill. June 20, 2023) [hereinafter *Monsanto*]; *In re Generic Pharms. Pricing Antitrust Litig.*, 699 F. Supp. 3d 352 (E.D. Pa. 2023) [hereinafter *Generic Pharmaceuticals (II)*].

Ultimately, the control issue under Rule 34 is governed by federal law. A federal district court has the authority under federal law to order disclosure of documents in discovery in civil actions, notwithstanding state law which put limits on such disclosure. *Gonzales v. Spencer*, 336 F.3d 832, 834–35 (9th Cir. 2003) (Although state law limited prosecutor's access to juvenile records, "the court could have ordered disclosure notwithstanding state law[.]"). District court opinions have recognized that a state law restriction on producing documents is not a barrier to a finding of control, and thus, have ordered production of a third-party agency's documents as part of party discovery. *See, e.g.*, *Doe v. Cnty. of Santa Clara*, No. 15-cv-01725-EJD (HRL), 2015 WL 14073467, at *1

United States District Court
Northern District of California

1  (N.D. Cal. Nov. 30, 2015) ("Federal courts may grant lawyers permission to view juvenile case files

2  in spite of California's contrary confidentiality laws, however, because federal privilege law

3  controls who may access evidence"); *Evans v. City of Tulsa*, No. 08-CV-547-JHP-TLW, 2009 WL

4  3254907, at *2 (N.D. Okla. Oct. 7, 2009) (ordering the defendant municipality in case involving

5  both federal and state law claims  to produce documents from three agencies (county clerk, district

6  attorney, and Family and Children Services) and stating that "[i]n federal questions cases, federal

7  courts are not bound by state statutes which impose limits on the discovery process").

8       Similarly, federal regulations, even when interpreted with the force of law, cannot be

9  enforced if they purport to override the Federal Rules of Civil Procedure. *In re Bankers Tr. Co.*, 61

10  F.3d 465, 470–71 (6th Cir. 1995) [hereinafter *Bankers Trust*].  In *Bankers Trust*, the Federal Reserve

11  Board refused to produce documents because a federal regulation barred their production absent

12  following procedures to request such documents via separate action in district court in Washington,

13  D.C.  *Id.* at 469.  The *Bankers Trust* opinion analyzed the conflict between the federal regulation

14  and Rule 34, and concluded that the Federal Rules of Civil Procedure govern whether the documents

15  should be produced:

16       We likewise conclude that Congress did not empower the Federal
      Reserve to prescribe regulations that direct a party to deliberately
17       disobey a court order, subpoena, or other judicial mechanism
      requiring the production of information.  We therefore hold that the
18       language in 12 C.F.R. § 261.14 that requires a party that is served with
      a subpoena, order, or other judicial process to continually decline to
19       disclose information or testimony exceeds the congressional
      delegation of authority and cannot be recognized by this court.  Such
20       a regulation is plainly inconsistent with Rule 34 and cannot be
      enforced. To allow a federal regulation issued by an agency to
21       effectively override the application of the Federal Rules of Civil
      Procedure and, in essence, divest a court of jurisdiction over
22       discovery, the enabling statute must be more specific than a general
      grant of authority as found here.
23
      Moreover, we find no compelling reason to discard the relatively
24       straightforward discovery methods outlined in the Federal Rules of
      Civil Procedure simply because the Federal Reserve has attempted to
25       mandate a different procedure.

26  *Id.* at 470–71.

27       Analogously, the Supreme Court has recognized that discovery in a federal civil action is

28  controlled by federal law, and that a finding of control over documents cannot be disregarded even

in situations where foreign law would potentially impose criminal sanctions for producing the documents. *Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 205–06 (1958). Thus, discovery laws and corporate laws rooted in a different sovereign are insufficient to override the application of the "legal control" test. control. *Japan Halon Co. v. Great Lakes Chemical Corp.*, 155 F.R.D. 626, 627 (N.D. Ind. May 28, 1993) (finding subsidiary has control over parent corporation documents and rejecting and argument that "international interpretation of its corporate structure and the Japanese discovery law result in the conclusion that its does not have the requisite control over documents in possession of its parent companies"). Furthermore, the *Uniden* Court explained that "[t]he expanded definition of control under Rule 34 was signaled by the Supreme Court's decision in *Societe Internationale*." *Uniden*, 181 F.R.D. at 306. As the *Uniden* Court explained further:

> This [Supreme Court] language indicates a direction to lower courts to closely examine the actual relationship between two corporations and guard against not just fraud and deceit, but also sharp practices, inequitable conduct, or other false and misleading actions whereby corporations try to hide documents or make discovery of them difficult. Certainly, this broad construction of Rule 34 is consonant with American civil process which puts a premium on disclosure of facts to ascertain the truth as the means of resolving disputes.

*Id.*

In the same regard, the Ninth Circuit has held that a federal statute (and federal regulations promulgated thereunder) cannot serve as a basis for a government agency to refuse to provide discovery. *Exxon Shipping*, 34 F.3d at 776–78 (rejecting government agencies' refusals of subpoenaed depositions based on both federal statute and regulations). The Ninth Circuit held long ago that agency regulations (and the statutes under which the regulations were promulgated) are not proper barriers to production of documents where control has been found. *Harvey Aluminum (Inc.) v. N.L.R.B.*, 335 F.2d 749, 753 (9th Cir. 1964) ("Whether the compulsion of the rule [for an agency to produce documents] is constitutional or statutory, the Board may not avoid it by adopting regulations inconsistent with its requirements.").

The import of these precedents is that, if a court finds control over documents, then neither federal statute nor federal regulation (nor foreign law) are a legal bar to application of Rule 34 and

United States District Court
Northern District of California

requiring production based on that finding of control. To the extent the state Attorneys General argue that a state statute would excuse or bar production of the agencies' documents even where the Court finds control, then for similar reasons that argument is legally unsound. Here, the Multistate Complaint asserts claims under the Federal Children's Online Privacy Protection Act ("COPPA") on behalf of all the Filing States. *See California v. Meta Platforms, Inc.*, No. 23-cv-05448, at Dkt. 1, ¶¶ 851-59 (N.D. Cal. Oct. 24, 2023) [hereinafter Multistate Complaint]. "[I]n cases presenting federal questions, such as here, *discoverability*, privileges and confidentiality *are governed by federal law*, not state law." *Garner v. City of New York*, No. 17-CV-843 (JGK)(KNF), 2018 WL 5818109, at *3 (S.D.N.Y. Oct. 17, 2018) (civil rights case asserting both federal and state law causes of action) (emphasis added).

While courts have considered the impact of state constitutions and state laws in analyzing the issue of control where governmental entities are involved, comity-based arguments do not require a finding of a lack of control as a matter of law. Precedent makes clear that notions of comity or arguments about the supremacy of state law (including even a co-pending state court proceedings) are not sufficient to bar a party seeking discovery in a federal court under federal law. *In re PersonalWeb Techs., LLC Pat. Litig.*, No. 18-md-02834-BLF, 2022 WL 19833889, at *1 (N.D. Cal. Apr. 12, 2022) (rejecting comity arguments as bases to bar motion to compel enforcement of third party subpoenas in federal court where state law receivership action was co-pending and noting that "[i]t is settled law that state courts have no authority to bar – by injunction or otherwise – the prosecution of *in personam* actions in federal courts").

## III. SEPARATION AND INDEPENDENCE OF A STATE ATTORNEY GENERAL FROM THE EXECUTIVE BRANCH OF THE STATE

The state Attorneys General all argue, using almost identical verbiage, that the office of their state Attorney General is either a separate constitutional officer, separately elected, and/or with separate spheres of authority which make that office independent from the local office of the Governor, which includes all the identified state agencies within the executive branch of that State. *See* Dkt. 685 at 9–10. This argument relies on either the state constitution or state laws defining the roles of the different state officers, and as such, the above discussion regarding how state law does

not override federal law applies with equal force. Further, based on this separation of powers argument, the state Attorneys General argue that they are not the state officers ultimately overseeing the state agencies (the Governor being that officer). They argue, for that reason, that the state Attorneys General have no control over those agencies. *Id.* at 10. Indeed, some courts deciding a control issue in the context of governmental entities have put weight on the separation of powers issue under the facts of established there. *In re Gold King Mine Release in San Juan Cnty.*, No. 1:18-MD-02824-WJ, 2020 WL 13563527 at *3–4 (D.N.M. Dec. 23, 2020).

However, with further examination, these arguments focusing on a dual executive under a state constitution (from which stems the separation of powers between a state Attorney General and a state Governor) are not entirely persuasive. Corollary arguments that the state Attorneys General have no executive authority over the state agencies (such as "[t]hey do not set agency priorities, cannot discipline agency employees") are equally unpersuasive. *See* Dkt. 685 at 9–10. These arguments ignore the reality that the "legal control" issue for discovery arises when there are two legally distinct or separate entities. If the mere fact that two separately constituted or formed entities were enough to defeat control, then there would almost never be a finding of control. Indeed, in the analogous situation where two "sister corporations" are involved, courts have found control of one entity over the documents of another. *See Uniden*, 181 F.R.D. at 307–08 (finding control as between two "sister corporations" where neither was under the corporate authority of the other). This illustrates the point: if one of two "sister corporations" can be found to have control over documents of the other, then for the same reasons, one of two parts of a split or dual executive can be found to have control of documents of the other.

The state Attorneys General emphasize the separateness of the agencies from the Attorney General without explanation as to how specifically that separation affects control as to the documents at issue. If only one entity were involved, then by definition that single entity would "possess" the documents under Rule 34 and the disjunctive issue of control would not arise. *Illumina Cambridge Ltd. v. Complete Genomics, Inc.*, No. 19-mc-80215-WHO (TSH), 2020 WL 820327, at *8–9 (N.D. Cal. Feb.19, 2020). Whether or not there is a "dual executive" or separation of powers is not by itself dispositive of the control issue. Analogously, in the context of corporate

United States District Court
Northern District of California

1    entities, lack of ownership interests by one corporation of another is not sufficient to defeat a finding

2    of control.  *See QC Labs v. Green Leaf Lab* LLC, No. 8:18-cv-01451-JVS (JDEx), 2019 WL

3    6797250, at *8–9 (C.D. Cal. July 19, 2019) (finding control even though two entities "are not in a

4    parent-wholly owned subsidiary relationship, nor do the two entities have identical ownership

5    structure").  To the extent some precedent cited by the state Attorneys General have relied on policy-

6    based reasons rooted in comity for finding a lack of control by an Attorney General over a state

7    agency, those decisions are distinguishable because they do not apply the Ninth Circuit's *Citric Acid*

8    test (for example, state Attorneys General cite a state intermediate appellate court opinion, *People*

9    *ex rel. Lockyer v. Superior Ct.*, 19 Cal. Rptr. 3d 324 (Cal. Ct. App. 2004), which did not apply Rule

10   34); they involve a factual record different from the record here; and they appear not to involve or

11   consider factors such as commonality of counsel, commonality of interests, or the discussion of the

12   supremacy of federal law in this inquiry (informed at least in part by the Supreme Court's directive

13   in *Societe Internationale* and the cases cited above).  [Dkt. 685 at 9–10].

14           The existence of a separation of powers between a state Attorney General and a Governor

15   may be a factor in the control analysis, but that factor does not necessarily preclude the Attorney

16   General's legal right to access to state agency documents.  The logical fallacy of the "separation of

17   powers" argument is that this concept concerns distinct spheres of governmental authority to act

18   within their roles as arms of the government and does not necessarily impact whether or not there is

19   control of documents for purposes of discovery.  To be clear, control under Rule 34 is a discovery

20   concept and is not subject of the exact same conceptual bounds of "corporate control" (as a parent-

21   subsidiary) or "operational control" (such as setting agency policy or disciplining agency

22   employees, as the state Attorney Generals argue).  Where one entity is under the day-to-day

23   operational control of another, that factual situation has been found to be a factor in finding control,

24   because such unfettered power to control all the operations of another entity would indicate a legal

25   right to obtain the documents (again, such as in a parent-subsidiary situation).  *See In re ATM Fee*

26   *Antitrust Litig.*, 233 F.R.D. at 545; *see also LG Display Co., Ltd. v. Chi Mei Optroelectronics Corp.*,

27   No. 08CV2408-L (POR), 2009 WL 223585, at *3 (S.D. Cal. Jan. 28, 2009) ("Numerous courts have

28   concluded that a parent corporation has a sufficient degree of ownership and control over a wholly-

owned subsidiary that it must be deemed to have control over documents located with that subsidiary.").

But, the converse is not necessarily true: lack of operational, day-to-day control of an entity does not end the inquiry, as the state Attorneys General argue – otherwise, control would never be found in situations except those involving a parent-subsidiary or similar direct-control type of relationship. For example, in *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, the Court found that a subsidiary corporation had control of the documents of its parent corporation for purposes of discovery, despite the fact that the subsidiary by definition lacked corporate or operational control over the parent corporation. *Choice-Intersil Microsystems, Inc. v. Agere Sys.*, 224 F.R.D. 471, 472–73 (N.D. Cal. 2004) (finding subsidiary has control of documents of parent corporation); *see also Uniden*, 181 F.R.D. at 307–08 (finding control as between two "sister corporations" where neither was under the corporate authority of the other). "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc. v. Janssen-Counotte*, 305 F.R.D. 630, 638 (D. Or. 2015). Here, the attorney-client relationship between the state Attorneys General and their respective state agencies (a relationship mandated by state law) necessitates close coordination. Thus, although operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "managerial power" in terms of day-to-day operations or policy making is not determinative for evaluating "control" for purposes of discovery.

Similarly, to the extent the State Attorneys General argue that they lack "unfettered access" or some otherwise unbounded right to access state agencies' documents, such argument is legally incorrect. A determination of "control" of documents, for purposes of Rule 34, does not require showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*, 2023 WL 4083934, at *5 ("Despite the State's characterization of the issue, we need not decide whether the Illinois Attorney General has "unfettered access to all state agencies' records under all circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less."). Further, the state Attorneys General implicitly assume an overly restrictive view of the control test for documents under Rule 34. To the contrary, courts have recognized that control for purposes of

document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans v. Tilton*, No. 1:07CV01814 DLB PC, 2010 WL 1136216, at *1–2 (E.D. Cal. Mar. 19, 2010); *Inland Concrete Enterprises, Inc. v. Kraft Americas LP*, No. CV 10-1776-VBF (OPX), 2011 WL 13209239, at *3–4 (C.D. Cal. Feb. 3, 2011).

Indeed, control of documents in the split-governmental context is amply demonstrated by a Western District of Tennessee decision. *Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at *3. In that case, the Court found that the Tennessee Attorney General had control of the documents of the "Tennessee General Assembly, its legislators, representatives, or agents" – despite the fact that the state's legislature is not under executive control or authority of the state's Attorney General. *Id.* Clearly, under the Tennessee state constitution, the Attorney General does not exert supervisory control over the Tennessee legislature. But that factor was not determinative of the control issue for documents under Rule 34. "Control" for purposes of discovery is not coterminous with the concept of "functional control" or "political control".

Ultimately, the argument that state agencies are outside a state Attorney General's executive authority is merely another way to restate that there are two distinct entities involved. Seen for what it is, that argument amounts to nothing more than restating the issue to be decided, without helping to decide the issue. Similarly, arguing that the state agencies are independent because there is a "divided executive" under a state constitution again improperly conflates the "legal control" issue for discovery of documents with "operational control" or "functional independence." Under the legal standards discussed, the Court finds these arguments and these alleged factors to be ultimately unhelpful in determining whether or not there is control for purposes of discovery, because these arguments beg the issue and as such are not outcome determinative of the control issue.

## IV. COMMONALITIES BETWEEN THE STATES, THE STATE ATTORNEYS GENERAL, AND THE STATE AGENCIES

There are thirteen cases in this Multi-District Litigation in which the States themselves are the named plaintiffs and in which the Attorney General of that State is not named as co-plaintiff (but is rather counsel representing the plaintiff). *See* Multistate Complaint (naming California, Connecticut, Idaho through its Attorney General, Illinois, Indiana, Kentucky, Louisiana, Maine,

United States District Court
Northern District of California

Minnesota by its Attorney General, New York by its Attorney General, Pennsylvania by its Attorney General, Rhode Island, and Wisconsin as plaintiffs). Further, there are nineteen cases in this Multi-District Litigation in which both the State itself and the Attorney General (as relator) are the named co-plaintiffs, and thus both entities are represented by the Attorney General of that State. *Id.* (naming "*ex rel.*" the Attorney Generals of Arizona, Colorado, Delaware, Georgia, Hawai'i, Kansas, Michigan, Missouri, Nebraska, North Carolina, North Dakota, Ohio, Oregon, South Carolina, South Dakota, Virginia, Washington, and West Virginia); *see also Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1 (N.D. Cal. Dec. 1, 2023) (Montana Complaint naming "State of Montana, *ex rel.* Austin Knudsen, Attorney General" as "Plaintiffs"); *see also U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 481 F. Supp. 2d 815, 823 n.6 (S.D. Tex. 2007) ("the Fifth Circuit has expressly held that relator is a party to the suit."); *accord Power Authority ex rel. Solar Liberty Energy Sys. v. Advanced Energy Indus.*, No. 19-CV-1542-LJV-JJM, 2024 WL 957788, at *2 (W.D.N.Y Mar. 6, 2024).

In all thirty-two cases, the State itself is a party to the suit. Courts have found that discovery obligations extend to other government agencies even if they are non-parties based on the recognition that the State (or the government as a whole) is essentially the real party in interest and thus the discovery obligation extends to the entire government. In an analogous case involving an order for the production of documents from a non-party agency proceeding, the Ninth Circuit held that:

> [t]he rationale of the rule [requiring production of the documents, witness statements] . . . applies with equal vigor whether the statements are in the possession of the agency conducting the hearing *or of another agency of the government* . . . . The [National Labor Relations] Board, the Department of Justice, and the Department of Labor are all parts of the government of the United States. The proceedings which the Board initiated against petitioners were public proceedings, undertaken on behalf of that government to enforce a public Act. In a criminal prosecution the Department of Justice would scarcely be heard to say that it was not required to produce statements otherwise within the rule *simply because the documents rested in the hands of another federal agency*, and we perceive no valid distinction, for this purpose, between that case and this one.

*Harvey Aluminum*, 335 F.2d at 754 (citations omitted) (emphasis added); *cf. also Bank Line v. United States*, 76 F. Supp. 801, 803–04 (S.D.N.Y. 1948) (ordering production of documents from

non-party, the Department of the Navy, noting that "[t]he several departments are all agencies of one government, possessed, theoretically, at least, of a single will" where "suit is prosecuted by the Department of Justice for the benefit of the Treasury Department, and that the Navy Department [is] not exercising any discretion as to institution of litigation.").

This rationale has been applied to the governments of other nation states, such as in a case involving Ghana: "When an agency of government institutes suit, any obligation to disclose relevant information extends to the government Qua government requiring disclosure of all documents in its possession, custody or control, not just those materials in the immediate possession of the particular agency-plaintiff." *Ghana Supply Comm'n v. New England Power Co.*, 83 F.R.D. 586, 595 (D. Mass. 1979).

Under different factual situations, state agencies have been found to be agents of their respective States. *See, e.g.*, *San Francisco NAACP v. San Francisco Unified School Dist.*, 484 F. Supp. 657, 667 (N.D. Cal. 1979) (collecting cases which "have found liability [of a State] under an agency theory" involving school boards); *In re Airport Car Rental Antitrust Litig.*, 521 F. Supp. 568, 586–87 (N.D. Cal. 1981), *aff'd*, 693 F.2d 84 (9th Cir. 1982) ("Air travelers require ground transportation and it would follow that the [airport operating agency Air] Board, as the agent of the state in performing this function, would have a duty to provide adequate and reliable services.") (quoting *Padgett v. Louisville & Jefferson Cnty. Air Bd.*, 492 F.2d 1258, 1260 (6th Cir. 1974)); *San Francisco Unified Sch. Dist. v. Johnson*, 479 P.2d 669, 677 (Cal. 1971) ("the state [of California] has created local school districts, whose governing boards function as agents of the state."); *Crumpler v. Bd. of Admin.*, 108 Cal. Rptr. 293, 305 (Cal. Ct. App. 1973) (finding Board of Administration of Public Employees' Retirement System and city of Mendocino "were agents of the state [of California]" in administering that retirement system). A principal-agent relationship has been held to be a factor that supports a finding of control for purposes of discovery. *Lofton v. Verizon Wireless (VAW) LLC*, No. 13-cv-05665-YGR (JSC), 2014 WL 10965261, at *2 (N.D. Cal. Nov. 25, 2014); *Hitachi*, 2006 WL 2038248 at *1; *Rosie v. Romney*, 256 F. Supp. 2d 115, 118 (D. Mass. 2003). Meta argues that the agencies at issue are under the control of their respective State, and therefore subject to party discovery. *See* Dkt. 685 at 6–7 (citing cases).

United States District Court
Northern District of California

However, the state Attorneys General argue that other courts have recognized that Rule 34 should not be interpreted to allow party discovery of every agency of a state government, merely because suit was filed in the name of the State absent a showing of some other factors demonstrating control. *Id.* at 9 (citing cases). As with other factors impacting the control issue, the case law makes clear that this factor is one among the totality of circumstances to be considered in deciding whether or not there is control. *See Colorado v. Warner Chilcott Holdings*, No. 05-02182, 2007 WL 9813287, at *4 (D.D.C. May 8, 2007) (The Court "will not aggregate separate state governmental agencies without a strong showing to the contrary by Defendants[.]"). The *Amex* opinion followed *Warner Chilcott Holdings* in finding that the state Attorneys General lacked control over their respective agencies' documents because that court granted "great deference" to the dual executive, separate agency factors. *Amex*, 2011 WL 13073683, at *2. As recognized by *Warner Chilcott Holdings*, court can take this factor into account under the totality of the circumstances for evaluating control for each state. *Warner Chilcott Holdings*, 2007 WL 9813287, at *4

A more specific concept of "independence" involves the state Attorney General's independent discretion to file a lawsuit. The state Attorneys General argue that, by pursuing these civil enforcement actions, the state Attorneys General are acting within their exclusive independent authority under their state constitutions and that this independent prosecutorial authority does not require involvement of any state agencies (with exceptions for certain states where specific agencies are, in fact, required to approve and proceed with the litigation). The *Generic Pharmaceuticals (II)* Court rejected the argument that, because the Attorney General was suing as an independent agency, it necessarily lacked control over other agencies' documents. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358. As that Court noted, the District of Columbia's "Attorney General has 'broad power to exercise all such authority as the public interest requires' and has 'wide discretion in determining what litigation to pursue to uphold the public interest, absent specific constitutional or statutory guidance to the contrary.'" *Id.* The *Generic Pharmaceuticals (II)* Court reasoned that "[t]his broad authority, in the context of litigation where the AGO is representing the District of Columbia, does not support the position that the AGO cannot exercise its authority to obtain documents from other agencies." *Id.*

United States District Court
Northern District of California

1    Conversely, in *Amex*, that Court relied on the factor that "the decision to pursue an

2   enforcement action against Amex was one of policy, made independently of the State Governors

3   and state agencies" as a basis to find a lack of control.  *Amex*, 2011 WL 13073683, at *2.  However,

4   the *Amex* Court failed to address or apparently consider the point considered by the *Generic*

5   *Pharmaceuticals (II)* opinion: such broad authority on the part of the state Attorneys General (in

6   filing the litigation) would in fact be consistent with having a right to exercise authority to obtain

7   documents from other agencies (and at least would be inconsistent with a lack of such authority).

8   *Compare Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 358, *with Amex*, 2011 WL 13073683, at

9   *2.

10    Indeed, courts have found when a state Attorney General initiates litigation on behalf of the

11   state, and thus exercises authority to file a lawsuit *parens patriae*, that Attorney General has legal

12   control over agency documents.  *See, e.g.*, *GEO Grp., Inc.*, 2018 WL 9457998, at *3 ("In this Court's

13   view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington

14   includes its agencies.  Because the AGO is the law firm to the State of Washington, the AGO should

15   respond to and produce discovery on behalf of the State of Washington, including its agencies.");

16   *Compagnie Francaise d'Assurance Pour le Com. Exterieur v. Phillips Petroleum Co.*, 105 F.R.D.

17   16, 35 (S.D.N.Y. 1984) (where an "agency of government institutes suit, any obligation to disclose

18   relevant information extends to the government qua government requiring disclosure of all

19   documents in its possession, custody or control, not just those materials in the immediate possession

20   of the particular agency-plaintiff");  *see also United States v. AT&T*, 461 F. Supp. 1314, 1333–34

21   (D.D.C. 1978) ("The Attorney General . . . [is] responsible for instituting and conducting the

22   criminal and civil litigation of the United States[]" "it hardly seems reasonable to insulate the entire

23   government, other than the Attorney General's Office, from the direct discovery process.").

24    Similarly, many of the state Attorneys General argue that the non-party agencies are not

25   parties to this case, and thus they are by definition not subject to party discovery.  The short response

26   to this circular argument is that Rule 34 reaches non-parties where there is control, so a third party's

27   status as a third party to the case is no basis on which to find a lack of control.  This argument

28   ignores the many cases in which a non-party was found properly subject to party discovery under

Rule 34 because the named party had control over the non-party's documents. *See, e.g.*, *League of United Latin Am. Citizens v. Abbott*, No. 21-CV-00299, 2022 WL 1540589 at \*1–2 (W.D. Tex. May 16, 2022) ("In many examples the United States points to, Texas has demonstrated its control over documents held by non-party agencies or officials . . . . The Court finds that Texas has control over documents and ESI that are held by [the Office of the Governor], [the Office of the Attorney General], and any other executive agency known to the State to be in the possession, custody, or control of relevant documents. Because Texas has control over these items, it must produce the items responsive to the United States' Rule 34 production request.").

## V. "VIRTUAL VETO"

Throughout their briefs and at oral argument, the state Attorneys General stressed the "dual/divided executive" of their constitutional structures of their local governments. The Court is mindful of the nature of state governance and has taken it into account as appropriate. Indeed, courts have discussed the unique positions in which state Attorneys General sit within a state government. *Amex*, 2011 WL 13073683, at \*3. Focusing on the independent authority of a state Attorney General as compared to the separate authority of the remainder of the executive branch, the *Amex* Court found that state Attorneys General lacked control over their respective state agencies' documents based on the risk of the agencies having a potential "virtual veto" on state Attorney General:

> It is not for this court to interfere with the State Attorneys General's ability to exercise their state constitutional power to bring an enforcement lawsuit absent gubernatorial approval. To find that the State Attorneys General have control over the documents in possession of state agencies that operate wholly independently of the State Attorneys General would be giving the Governors' Offices and state agencies a 'virtual veto' over the policy decision to bring an enforcement action that rightfully lies with the State Attorneys General."

*Id.* The state Attorneys General rely on this "virtual veto" argument in this Multi-District Litigation.

Upon further examination, the "virtual veto" argument is speculative as to why and how an agency's actions in responding to discovery would rise to the level of the hypothetical "virtual veto" over litigation. The *Amex* opinion does not adequately explain how treating a non-party agency as subject to party discovery would, by itself, result in a state Governor's preventing or obstructing future lawsuits by its attorney general. *See id.* Indeed, regardless of the non-party agency's actions,

the state Attorney General would still have its own independent authority to initiate and prosecute its own lawsuits – there is no "veto" over that power. *Monsanto*, 2023 WL 4083934, at *3. The *Amex* Court does not discuss why the Governor or agencies would refuse to comply with party discovery, when faced with a court order requiring them to do so. Nor does the *Amex* opinion explain why there would be a "veto" in light of the procedural remedies available to secure production of documents from the hypothetically refusing state agencies; nor does the opinion discuss alternative procedures available to obtain discovery from recalcitrant third parties.

More fundamentally, the *Amex* Court's alleged harm from a "virtual veto" is illusory. Even if state agencies operate independently from their state attorneys general, the *Amex* opinion ignores the role that state attorneys general have as counsel for the state agencies. As discussed below, typically a State's constitutional or statutory scheme mandates that all state agencies utilize their state Attorney General as legal counsel in litigation (albeit sometimes with allowable exceptions under certain conditions, none of which have been shown to exist or been triggered in this Multi-District Litigation). Under such required representation schemes, the state Attorneys General must still advise, confer, and coordinate with their clients (the respective state agencies) regardless of whether a discovery request is served pursuant to Rule 34 or Rule 45. The "virtual veto" argument assumes without explanation that these agencies would refuse to comply with party discovery under Rule 34, but would at the same time comply with third-party discovery under Rule 45. In other words, the "virtual veto" argument assumes the agencies would reject party discovery with such vehemence that they would risk sanctions, but inexplicably would comply normally in response to subpoenas. While the burdens and procedures between Rule 34 document requests and third-party subpoenas differ in some respects, as a practical matter, when it comes down to the fundamental issue of whether documents will be produced, the same general types of discussions between counsel as to relevance, scope, proportionality, and privilege apply to both. It is not explained why an agency would absolutely refuse to produce documents at all under Rule 34 without good and proper reasons, and yet why the same good and proper reasons would disappear in the face of a subpoena. Further, it is not explained why a Governor or state agency lacks the exact same "virtual veto" if and when it were to obstinately refuse to produce any documents at all in response to a subpoena –

United States District Court
Northern District of California

the same unfounded fear that an agency would act so extremely uncooperatively is unbounded and (under the plaintiffs' hypothetical) would be just as likely to occur in response to a subpoena.

Further, these unsubstantiated fears that agencies would refuse to produce documents, even when coordinating with their own lawyers from their own state Attorney General's office, ignores the close relationship lawyers have with their clients. Indeed, this argument ignores the likely much closer relationship that a state agency would have with lawyers from their state's Attorney General's office, who repeatedly represent their state's agencies in multiple matters throughout the years. This argument also ignores that this refusal to produce documents sought under Rule 34 would persist even after these state Attorneys General perform able legal services and reasonably advise their clients about the obligations to comply with reasonable, proportional discovery under the Federal Rules (and the enforcement mechanisms available when parties refuse to comply at all). Combined with the fact that there is no explanation how a refusal to produce documents would necessarily put the litigation to an end (*i.e.*, veto the litigation), the alleged harm here is based on a hyperbolic, worst-case scenario argument. Therefore, the notion that Governors or state agencies could effectively veto an enforcement action by withholding documents sought under Rule 34 is an unfounded hypothetical and not a strong basis on which to find a lack of control where other factors support such a finding.

As discussed, if the state agencies simply refused to provide documents, the *Amex* opinion ignores that they *would* be subject to legal consequences. *Lofton, v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015) ("The court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses."). A Court has the inherent authority to enforce its own Orders to control the conduct of the proceedings, protect the "orderly administration of justice," and maintain "the authority and dignity of the court." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 764–67 (1980). Should a state agency violate an Order compelling production, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agencies committing any such hypothetical refusal to abide by Court Order. The Ninth Circuit has long recognized that,

if non-party agencies refuse to produce documents, ultimately the courts may compel them to do so. *Harvey Aluminum*, 335 F.2d at 754 ("[T]he Departments of Justice and Labor are not sovereign, and though the [National Labor Relations] Board may not be able to compel them to produce documents in their possession, the President *or, if need be, the courts, may do so*.") (emphasis added).

   The "virtual veto" argument suffers from a further legal weakness: the argument appears to be based on incorrect views of the legal duties and the role of counsel in the discovery process. As counsel for a party subject to discovery, a state Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly and cannot simply sit on their hands in the face of an uncooperative client. *See, e.g.*, *Rhea v. Washington Dep't. of Corr.*, 2010 WL 5395009, at *6 (W.D. Wash. Dec. 27, 2010) (State Attorney General representing agency: "counsel" "has an obligation to not just request documents of his client, but to search for sources of information. Counsel must communicate with the client, identify all sources of relevant information, and 'become fully familiar with [the] client's document retention policies, as well as [the] client's data retention architecture.'") (internal citation omitted). "The relevant rules and case law establish that an attorney has a duty and obligation to have knowledge of, supervise, or counsel the client's discovery search, collection, and production. It is clear to the Court that an attorney cannot abandon his professional and ethical duties imposed by the applicable rules and case law and permit an interested party or person to 'self-collect' discovery without any attorney advice, supervision, or knowledge of the process utilized." *Equal Emp. Opportunity Comm'n v. M1 5100 Corp.*, No. 19-CV-81320, 2020 WL 3581372, at *2–3 (S.D. Fla. July 2, 2020) ("Attorneys have a duty to oversee their clients' collection of information and documents, especially when ESI is involved, during the discovery process. Although clients can certainly be tasked with searching for, collecting, and producing discovery, it must be accomplished under the advice and supervision of counsel, or at least with counsel possessing sufficient knowledge of the process utilized by the client. Parties and clients, who are often lay persons, do not normally have the knowledge and expertise to understand their discovery obligations, to conduct appropriate searches, to collect responsive discovery, and then to fully produce it, especially when dealing with ESI, without counsel's guiding hand.").

United States District Court
Northern District of California

This would not be the first time an attorney was faced with a client who posed difficulties in collecting documents for discovery. *See, e.g.*, *Qualcomm Inc. v. Broadcom Corp.*, No. 05cv1958-B (BLM), 2010 WL 1336937, at *2–5 (S.D. Cal. April 2, 2010).  Counsel in a litigation have legal duties to take proactive steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails (or worse, refuses) to produce or provide documents. *Id.* (detailing "Discovery Errors" by counsel); *Rodman v. Safeway Inc.*, No. 11-cv-03003-JST, 2016 WL 5791210, at *3–4 (N.D. Cal. Oct. 4, 2016) (awarding discovery sanctions where, among other things, there was "no indication that Safeway's counsel guided or monitored [client employee] Mr. Guthrie's search of the legacy drive in any significant way").

Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *See Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.*, No. 16-cv-06370-EJD (VKD), 2020 WL 2838806, at *5–7 (N.D. Cal. June 1, 2020) (awarding discovery sanctions: "It is not enough for counsel to provide advice and guidance to a client about how to search for responsive documents, and then not inquire further about whether that advice and guidance were followed . . . .  The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) . . . .  [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."); *see also Etopus Tech., Inc. v. Liu*, No. 23-cv-06594-HSG (PHK), 2024 WL 3311053, at *6 (N.D. Cal. July 5, 2024) (ordering production of documents and ordering counsel to provide supplemental response "attesting to the fact that Defendant's counsel performed the search for documents directly (and did not rely solely on their client), and attesting to whether Defendant's counsel themselves performed a reasonable, good faith search").

The Court finds as legally erroneous the argument that the state Attorneys General would lack control over state agency materials simply because litigation counsel is either helpless in the face of an uncooperative client or can satisfy their obligations as officers of the Court by merely acquiescing to a client's refusal to collect documents (and presumably allowing a client to face sanctions). *See Kaur v. Alameida*, No. CV F 05 276 OWW DLB, 2007 WL 1449723, at *2 (E.D. Cal. May 15, 2007) (finding defendants have control over agency documents and ordering further search: "defendants *and counsel are reminded of their duty under Rule 34* to conduct a diligent search and reasonable inquiry in effort to obtain responsive documents") (emphasis added). The "virtual veto" arguments are based on a fundamentally flawed misunderstanding of counsel's role and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice – counsel have a proactive duty to conduct discovery under the rules without requiring constant judicial intervention. "In complex litigation such as this, cases are shaped, if not won or lost, in the discovery phase. The rules of discovery must necessarily be largely self-enforcing. The integrity of the discovery process rests on the faithfulness of ***parties and counsel*** to the rules—both the spirit and the letter. '[T]he discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention and . . . those Rules rely on the honesty and good faith of counsel in dealing with adversaries.' The rules of procedure (and attorneys' duty to adhere to them) apply with equal force to decisions made in private discussions behind closed doors in a client's office on how much effort to expend to answer the opposing party's discovery, as to attorney conduct in the bright light of open court." *Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 507 (D. Md. 2000) (citation omitted) (emphasis added); *see also King v. Habib Bank Ltd.*, No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 (S.D.N.Y. July 1, 2024) ("embroil[ing this judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules").

In addition to supervising the collection of documents and making inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to improve the administration of civil justice, both as officers of the court and under their ethical

obligations as members of the bar. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment; *see also* Fed. R. Civ. P. 26(g) advisory committee's note to 1983 amendment ("Rule 26(g) imposes an affirmative duty to engage in pretrial discovery in a responsible manner that is consistent with the spirit and purposes of Rules 26 through 37. . . . The subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification requirement that *obliges each attorney* to stop and think about the legitimacy of a discovery request, a response thereto, or an objection. The term 'response' includes answers to interrogatories and to requests to admit as well as responses to production requests. ***If primary responsibility for conducting discovery is to continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse.***") (emphasis added)

These duties imposed on counsel are important for the discovery system under the Federal Rules to operate rationally and effectively. As the Ninth Circuit has recognized, "legal duties" are logical antecedent to "legal rights" and thus the state Attorneys' General legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'— different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, presumptively counsel for its state agencies, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery leads logically to the conclusion that the state Attorneys General have the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

Finally, as discussed herein, the issue of control is analyzed on a state-by-state basis. Assuming there is a factual record showing an actual, cognizable, and not an unfounded hypothetical

United States District Court
Northern District of California

1  risk of a "virtual veto" materializing in a particular State, the Court would consider that factor among

2  the totality of circumstances to evaluate the control issue.

3  ## VI.    ATTORNEY-CLIENT RELATIONSHIP AND LEGAL RIGHT TO ACCESS

4            As noted, many (if not all) of the state Attorneys General have confirmed that they will (or

5  likely will) represent their respective state agencies.  When a state agency is mandated to use the

6  state attorney general as its exclusive legal counsel, this mandate carries with it an indication that

7  the attorney general has legal control over the agency's documents.  The close coordination

8  underlying an attorney-client relationship is a factor in the legal control analysis.  "In general, an

9  attorney is presumed to have control over documents in its client's possession."  *Perez v. Perry*, No.

10  SA-11-CV-360-OLG-JES, 2014 WL 1796661, at \*2 (W.D. Tex. May 6, 2014).

11            In *Love v. New Jersey Dept. of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864,

12  at \*5–6 (D.N.J. Aug. 11, 2017), the Court held that the defendants have control over the documents

13  of a third-party state agency "albeit through their attorney" where those defendants were defended

14  by the New Jersey Attorney General, who also represented the third-party agency.  *Accord Williams*

15  *v. Hawn*, No. 1:21-cv-446, 2022 WL 22859198, at \*2 (W.D. Mich. Aug. 26, 2022) (finding

16  defendants have control over third-party agency documents: "Courts have considered the existence

17  of a principal-agent relationship sufficient to satisfy the 'possession, custody, or control'

18  requirement . . . .  Here, Defendants are represented by the Michigan Attorney General, which has

19  demonstrated access to [third-party agency] MDOC documents and materials in many cases before

20  this Court.").

21            In *Synopsys, Inc. v. Ricoh Co.*, No. C-03-2289 MJJ (EMC), 2006 WL 1867529 (N.D. Cal.

22  July 5, 2006), the defendants sought an order compelling Ricoh to search for and produce documents

23  from a third party, KBSC.  The Court ordered that search for documents where it was "especially

24  telling" that common counsel was involved:

25            > In making this order, the Court finds that Ricoh has sufficient control
              > over KBSC for purposes of Rule 34 for the Court to order counsel for
26            > Ricoh to search the storage facility . . . .  Although the Court
              > acknowledges that voluntary cooperation between a party and a third
27            > party does not automatically establish control, the facts here suggest
              > that there is more than just voluntary cooperation.  It is especially
28            > telling that KBSC agreed to be represented by Ricoh's counsel for

United States District Court
Northern District of California

> purposes of discovery and, more important, that Ricoh was able to secure a search of the storage facility by Mr. Bershader and a declaration from the same within only three days of the parties' meet and confer."

*Id.* at \*2. Under *Synopsys*, then, the fact that the party and third party are represented by the same counsel is "especially telling" and thus a relevant factor in finding legal control. The Court is cognizant that *Synopsys* cites out-of-circuit case law which refers to the "practical ability" factor rejected by the Ninth Circuit in *Citric Acid*. *Id.* (citing *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 146 (S.D.N.Y. 1997)). However, in *In re NCAA Student-Athlete Name & Likeness Litig.*, No. 09-cv-01967 CW (NC), 2012 WL 161240, at \*4 (N.D. Cal. Jan. 17, 2012), the Court undertook a "close look at the facts of those two cases" and explained that at least in part their holdings did not fundamentally rely on the "practical ability" test. The Court held that, even if the Court were to apply the rejected "practical ability" test, under the facts of the case the moving party failed to support a finding of "practical ability." *Id.*

In the state governance context, a legal relationship between the state Attorney General and the agency establishes a direct legal link between the agency and the plaintiff (either directly where the Attorney General is a named plaintiff, or through counsel), thus supporting a finding of control. *See  Bd. of Educ. of Shelby Cnty., Tenn.*, 2012 WL 6003540, at \*3 ("Based upon these statutory duties to handle 'all legal services,' 'direct and supervise' all litigation, and 'represent' the State of Tennessee, one such responsibility must be to respond appropriately to discovery requests on behalf of the entities of the state government that he represents as required by the Federal Rules of Civil Procedure."). As the designated legal representative for a state agency, the Attorney General has professional and ethical obligations to access to all relevant documents to provide effective legal counsel and representation. This access is *legally mandated* (and goes beyond a mere practicality), ensuring that the Attorney General can fulfill their duties under the Federal Rules.

If a state agency's use of the state Attorney General as legal counsel is not mandatory but relies on consent of the state agency, the analysis of legal control over the agency's documents may rely on other factors such as whether, in a given case, the state agency has already committed in fact to be so represented, or if there are no conditions for the state agency to avoid relying on the free legal services of the state attorney general. While a state agency may be granted by statute some

United States District Court
Northern District of California

potential or theoretical ability to choose legal representation, often that ability is subject to the discretion of the state Attorney General or subject to some other restriction (such as a conflict of interest). Further, at hearings in this Multi-District Litigation which involves some states where the state agency may have some ability to be represented by counsel other than the state Attorney General, this Court has inquired of and suggested to the State Attorneys General that they discuss this litigation and confirm whether or not the agencies at issue will rely on their local state Attorney General. *See* Dkt. 818. The Court notes that, to date, no separate counsel has entered appearances for any of the state agencies at issue, and the state Attorneys General previously indicated that they have either chosen not to or (at minimum) simply failed to confer with their state agencies, even as a courtesy. However, a number of State Attorneys General have voluntarily sent litigation hold notices to their respective identified agencies, and pursuant to this Court's Order, the State Attorneys General who did not voluntarily do so have sent litigation hold notices to their respective agencies. [Dkt. 1025]. Despite having notice of this litigation and the fact that they may be the subject of discovery, none of the state agencies at issue have moved to intervene to advance their own alleged interests in not being subject to party discovery. And no state agencies (where they would have the ability to do so under state law) have indicated that they retained private or separate counsel (such as agency counsel) to represent their interests without the benefit of otherwise free legal representation from their State Attorney General. Thus, the current record submitted to this Court for decision indicates that no state agencies have confirmed they will retain separate counsel (as none has entered appearance), and the Court analyzes the issues for the states below with the factual record as the State Attorneys General have chosen to submit.

## VII.   A PARTY TO THE SUIT IS BOTH A LEGAL SERVICES PROVIDER WHILE ALSO COUNSEL TO BOTH ITSELF AS A PARTY AND COUNSEL TO THE THIRD PARTY

As discussed, in nineteen of the state lawsuits here, the state Attorney General is a named party to the suit as relator. Further, in another three lawsuits, the state Attorney General is the sole named plaintiff. *See* Multistate Complaint (naming Attorneys General of Maryland and New Jersey); *see also Office of the Attorney General, State of Florida, Department of Legal Affairs v. Meta Platforms, Inc.*, No. 23-cv-05885, at Dkt. 1 (N.D. Cal. Oct. 24, 2023) (Florida complaint

United States District Court
Northern District of California

naming "Office of the Attorney General, State of Florida" as Plaintiff). Thus, in twenty-two of the cases in this Multi-District Litigation the Party nominally subject to party discovery as plaintiff is the state Attorney General itself. In the remaining thirteen state Plaintiff cases in this Multi-District Litigation, the plaintiff state is represented by the state Attorney General as counsel.

As discussed in the state-by-state analysis below, for many (if not most) of the states the Attorney General is obligated by local law to represent the state agencies at issue in this matter. Indeed, several of the state Attorneys General have indicated to the Court that they will in fact represent their state agencies at issue for purposes of discovery in this case. *See* Dkt. 738-1. For the remainder, the state Attorney General may have some element of statutory discretion not to necessarily represent the state agencies under certain conditions (such as a conflict of interest) – but no such conditions have been presented to the Court by any of the state Attorneys General. Accordingly, the upshot is that, on the current record before the Court, it appears that all (or virtually all) of the state Attorneys General will represent both the named plaintiff and the state agencies at issue for purposes of discovery in this case.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both a party to the case while also acting or able to act as counsel for a third party. However, law firms and legal services providers are themselves parties to litigation sometimes. And this case would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel v. Salas*, No. MC 17-17965, 2018 WL 691649, at *4 (E.D. La. Feb. 2, 2018) ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control.").

Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Thus, to the extent a state Attorney General represents a state agency for discovery, that state Attorney General would be presumed to have control over the documents in its client's possession.

1    Precedent explains why courts have found a legal services provider, particularly a state

2  Attorney General, representing both a party and a third party (particularly a state agency) to be

3  properly found to have control of the third party's documents for discovery.  First, again as discussed

4  above, control in this context does not mean "operational" or "managerial" control – these

5  precedents are not deciding that a law firm directs the day-to-day operations of their client, and

6  arguments by several of the state Attorneys General that they do not control the state agencies in

7  this "operational" or "executive" sense are not on point.  Second, in a reflection that control should

8  be grounded in reality, courts find control in situations involving government attorneys representing

9  both a party and a third-party agency based on their real-world experiences and the facts as a whole.

10  *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453 ("[c]ontrol must be firmly placed in

11  reality.").

12    Multiple courts have found that a party (such as a government employee or official) has

13  control over documents of a state agency based in part on the fact that the governmental party was

14  represented by and/or employed by the state Attorney General:

> If Defendants seek to avoid production by contending that they are
> not in possession, custody or control of the requested documents, their
> objection is denied.  The specific facts of this action render such an
> objection unfounded.  By virtue of their employment with non-party
> CDCR [California Department of Corrections and Rehabilitation],
> individual defendants are represented by the Attorney General's
> Office.  It is this Court's experience that either individual defendants
> who are employed by CDCR and/ or the Attorney General can
> generally obtain documents, such as the ones at issue here, from
> CDCR by requesting them.  They have constructive control over the
> requested documents, and the documents must be produced.

21  *Pulliam v. Lozano*, No. 1:07-CV-964-LJO-MJS, 2011 WL 335866, at *1 (E.D. Cal. Jan. 31, 2011);

22  *see also Quiroga v. Green*, No. 1:11CV00989 AWI DLB, 2013 WL 6086668, at *2 (E.D. Cal. Nov.

23  19, 2013) (affirming Magistrate Judge order finding defendant has control over third-party agency

24  documents: "it is this Court's experience that either individual defendants who are employed by

25  CDCR, and/or the Attorney General who represents them, can generally obtain documents from

26  CDCR by requesting them.  If this is the case, then, based on their relationship with CDCR, they

27  have constructive control over the requested documents and the documents must be produced.");

28  *accord Mitchell v. Adams*, No. CIVS062321GEBGGHP, 2009 WL 674348, at *9, 11–13, 17 (E.D.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Cal. Mar. 6, 2009) (rejecting multiple objections regarding alleged lack of control of agency

2    documents where common counsel represented a party and the agency).  To the extent these

3    precedent involve a government official as the party found to have control over agency documents,

4    these precedents are even more germane to the twenty-four cases here where the state Attorney

5    General themselves are the specifically named plaintiff or co-plaintiff.

6           Similarly, in *Zackery*, the Court overruled the objection that the named individual defendants

7    lacked control over the documents of a third-party agency.  *Zackery v. Stockton Police Dep't.*, No.

8    CIVS-05-2315MCEDADP, 2007 WL 1655634, at *4 (E.D. Cal. June 7, 2007).  The *Zackery* Court

9    ordered that discovery be provided to the plaintiff directly by the government counsel involved (who

10   both represented the named defendants and the agency): "the court will direct **counsel for**

11   **defendants** [Office of the City Attorney] to make the necessary inquiries and arrangements for the

12   requested citizen complaint records to be produced to plaintiff."  *Id.* (emphasis added).

13          These cases are illustrative of factual situations involving the same prosecuting attorneys

14   (such as a state Attorney General) representing both a named party and the third party agency, and

15   demonstrate that courts conclude there is control such that the agency documents were subject to

16   party discovery.  This factor of "common counsel" and its impact on a finding of control extends

17   beyond the governmental entity context, thus demonstrating that this factor is recognized and

18   applied by courts in a broader context.  *See, e.g.*, *Almont Ambulatory Surgery Center, LLC*, 2018

19   WL 1157752, at *19 (finding control where, among "[o]ther factors that courts consider to

20   'determine when documents in the possession of one corporation may be deemed under control of

21   another corporation,' . . . Additional factors include: employing the same attorneys") (citations

22   omitted); *see also M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 139 (S.D.N.Y. 1986)

23   (finding control where "[i]n fact, it appears that Mr. Hainline [(counsel for the third parties)] and

24   defendants' present counsel have a working relationship.").

25          To be clear, the Court is not relying on these precedents to demonstrate the practical ability

26   of the state Attorney General to obtain documents from the state agencies.  Rather these precedents

27   demonstrate that, under the totality of circumstances, control can be found where the decision is

28   firmly placed in reality.  These precedents also demonstrate that the hypothetical fear of agency

refusals to cooperate with party discovery has not materialized.

Finally, the Court is not holding broadly that the law requires finding a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party. However, this factor is one of the totality of factors which impact the control inquiry and here, because the state Attorneys General are either parties themselves or at least are counsel for a party, and because the state Attorneys General will represent the state agencies for discovery, this factor takes on particular significance.

## VIII. STATUTORY RESTRICTIONS ON A STATE ATTORNEY GENERAL FROM ACCESSING DOCUMENTS FROM THE STATE'S AGENCIES

Several state Attorneys General have argued that local statutes place limitations on their ability to access documents from a state agency. These are discussed in detail in the state-by-state analysis below. As a preliminary matter, not all of these statutes actually place limits on the state Attorneys General as argued. Some are limited to only a specific subset of agencies (some of which are not even relevant to this matter). And detailed analysis shows that some actually provide a mechanism and a right to access agency documents, not prohibit access.

As a variation of this argument, some of the state Attorneys General argue that public channels or public information requests are required for the state Attorney General to obtain documents from state agencies. This argument is based on an interpretation of the various "open records" statutes which the Court finds legally erroneous. None of the cited "public records" statutes state that they are the exclusive method by which a state Attorney General can access documents from state agencies. Further, the state Attorneys General argue perhaps too much in this regard – if their arguments are taken literally, then these "open records" statutes would constitute a legal right to access the agencies' documents on the part of the corresponding state Attorney General. By definition, an "open records" statute provides a mechanism by which a state Attorney General can literally obtain requested documents upon demand from an agency. If the state Attorneys General were correct that, every time a lawyer of the state Attorney General seeks documents from state agencies, a public records law requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and

United States District Court
Northern District of California

records of the agency subject to the Act. At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34. *See Flagg v. City of Detroit*, 252 F.R.D. 346, 355–57 (E.D. Mich. 2008) ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure."). However, the Court finds that the arguments based on these "open records" statutes to be incorrect, in any event.

The "open records" arguments are particularly weak in the situation where a state Attorney General is required to act as counsel for the state agencies by local mandate. If this interpretation of the "open records" statutes were correct, then the state Attorneys General would have to submit an "open record" request or "public information" request even when representing a state agency, to get documents from its own client. In fact, under the argument presented, any lawyer representing any state agency (whether the state Attorney General or private counsel) would be forced to use an "open records" request to obtain documents from their own client. Such an interpretation is nonsensical and impractical, as well as contrary to the principles of effective legal representation. As counsel, a state Attorney General will have the normal type of direct access to the necessary documents from its own clients, ensuring efficient and comprehensive legal support for the agencies involved. The Attorneys General's role as legal counsel for state agencies (with concomitant ethical and professional obligations) directly contradicts the argument that they would be entirely restricted from accessing their clients' documents. In their capacity as counsel, Attorneys General are often responsible for representing the interests of state agencies, which would include responding to subpoenas and managing legal matters on their behalf. This representative role inherently requires a level of access to agency documents necessary to fulfill their duties effectively. The state Attorneys General cite no precedent requiring any attorneys representing a state agency to use either an "open records" request or a subpoena to obtain documents from their own clients. The cited "public records" or "open information" statutes are not shown to be actual impediments to normal attorney-client access to documents, because those statutes apply to records which are to be

United States District Court
Northern District of California

1  produced for public inspection (and not for purposes of litigation such as this Multi-District

2  Litigation), particularly where there is a Protective Order limiting public availability of confidential

3  documents.

4  While other statutes discussed below may be factors in the legal control analysis, such

5  statutes are only one among the totality of factors for deciding control and the discussion above

6  regarding the impact (or lack thereof) of state statutes on this issue is of equal force.

7  **IX.    THIRD PARTY INVOLVEMENT IN THE LITIGATION AND WHETHER THE
   THIRD PARTY STANDS TO BENEFIT FROM THE LITIGATION**

8  In the context of corporate disputes, courts have found legal control when a party and non-

9  party have similar financial interests.  In *Hitachi*, Defendant AmTRAN argued that Plaintiff and

10  patent owner Hitachi had legal control over documents from Hitachi's patent licensing agent Inpro

11  II Licensing Sarl (Inpro), and accordingly that Hitachi should obtain and produce documents from

12  Inpro in response to AmTRAN's Rule 34 document requests.  *Hitachi*, 2006 WL 1038248, at *1.

13  The *Hitachi* opinion noted that "a subsidiary will be required to produce documents wholly owned

14  by the parent company.  The third party's financial interest in the litigation might further require its

15  cooperation in the discovery process."  *Id.* (citations omitted).

16  In the context of state governance, this principle applies where state Attorneys General and

17  the state agencies would benefit from a damage award resulting from the litigation brought by the

18  state Attorney General.  Just as courts have found legal control in corporate settings when a party

19  and non-party have similar financial interests, a similar rationale applies to state entities.  *Id.*  If a

20  state agency stands to gain financially from the litigation outcome, its interests align closely with

21  those of the Attorney General.  *Cf. Japan Halon*, 155 F.R.D. at 628–29 ("This court does not agree

22  that because neither parent corporation owns a majority of the shares, neither will benefit. The court

23  is also not convinced that because any award would go to Japan Halon, its parent corporations would

24  not benefit directly enough to warrant any production of documents on their behalf.").  When

25  litigation proceeds directly support or fund a state agency, it is reasonable to expect full cooperation

26  in the discovery process.  This cooperation ensures the availability of relevant documents, enhancing

27  the attorney general's enforcement actions and promoting justice.  Here, all the States have expressly

28

1   stated that "[t]his action is in the public interest of the Filing States" and thus have made clear they

2   have a substantial stake in the outcome of this action going even beyond financial interests.  *See*

3   Multistate Complaint at ¶ 12.

4   **X.  OTHER RELEVANT FACTORS**

5       As discussed above, the Ninth Circuit rejected the "practical ability" as the test for legal

6   control in *Citric Acid*.  *See Genentech, Inc. v. Trustees of Univ. of Pennsylvania*, No. C 10-2037

7   PSG, 2011 WL 5373759, at *2 (N.D. Cal. Nov. 7, 2011) (distinguishing *Hitachi*'s citation to

8   "practical ability" case law); *see also In re NCAA Student-Athlete Name & Likeness Litig.*, 2012

9   WL 161240, at *4.  The Court notes that one district court in this Circuit has carefully analyzed

10  *Citric Acid* and found that the Ninth Circuit cited favorably therein to a Third Circuit opinion which

11  holds that "practical ability" is a factor for the "legal control" test.  *AFL Telecomms. LLC v.*

12  *SurplusEQ.com Inc.*, No. CV11-1086 PHX DGC, 2012 WL 2590557, at *2 (D. Az. July 5, 2012)

13  (citing *Gerling Int'l Ins. Co. v. Comm'r*, 839 F.2d 131, 140–41 (3rd Cir. 1988)).  Precedents in this

14  district have, however, distinguished *AFL Telecommunications*.  *See Seifi v. Mercedes-Benz U.S.A.,*

15  *LLC*, No. 12-CV-05493TEH (JSC), 2014 WL 7187111, at *2 (N.D. Cal. Dec. 16, 2014); *cf. also*

16  *Dugan v. Lloyds TSB Bank, PLC*, No. 12CV02549WHANJV, 2013 WL 4758055, at *2 (N.D. Cal.

17  Sept. 4, 2013).

18      As noted, the issue in *Citric Acid* arose in the context of a motion to enforce a subpoena

19  directed to a third party, in which the moving party was seeking discovery from a fourth party via

20  that third party.  *Citric Acid*, 191 F.3d at 1106–07.  That is, in *Citric Acid* the subpoenaed third party

21  was alleged to control a further uninvolved fourth party.  *Id.*

22      District court opinions have noted that *Citric Acid* dealt with a subpoena, and those opinions

23  have assumed that the standard and scope of "legal control" for purposes of a subpoena is the same

24  as the standard for evaluating the scope of "legal control" for purposes of a document request to a

25  party under Fed. R. Civ. P. 34.  *See, e.g., Soto*, 162 F.R.D. 603; *Hitachi*, 2006 WL 2038248; *In re*

26  *Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. 167; *Perez*, 2011 WL 1362086; *Miniace*, 2006 WL 335389.

27  However, it appears that no Ninth Circuit case has specifically addressed whether the scope and

28  standard for evaluating "legal control" under Rule 34 is the same with regard to a subpoena under

United States District Court
Northern District of California

United States District Court
Northern District of California

Rule 45 (which was at issue in *Citric Acid*). As noted, other Circuits have expressly held that "practical ability" is a factor for the legal control test in the context of document requests under Rule 34. *Gerling Int'l Ins. Co.*, 839 F.2d at 140–41.

As the Ninth Circuit has stated, "[w]e begin with the principle that the district court is charged with effectuating the speedy and orderly administration of justice. There is universal acceptance in the federal courts that, in carrying out this mandate, a district court has the authority to enter pretrial case management and discovery orders designed to ensure that the relevant issues to be tried are identified, that the parties have an opportunity to engage in appropriate discovery and that the parties are adequately and timely prepared so that the trial can proceed efficiently and intelligibly." *United States v. W.R. Grace*, 526 F.3d 499, 508–09 (9th Cir. 2008). Further, district courts have wide discretion in controlling and managing the discovery process. *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). Indeed, "Rule 26 vests the trial judge with broad discretion to tailor discovery narrowly and to dictate the sequence of discovery." *Crawford-El v. Britton*, 523 U.S. 574, 598 (1998). As examples, "upon motion[,] the court may limit the time, place, and manner of discovery, or even bar discovery altogether on certain subjects, as required 'to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.'" *Id.* (quoting Fed. R. Civ. P. 26(c)). "And[,] the court may also set the timing and sequence of discovery." *Crawford-El*, 523 U.S. at 598.

Here, the complexity of the multidistrict litigation creates a compounding impact on streamlining discovery. Courts should also consider the goals of efficiency, preservation of judicial resources, preservation of party resources, and simplification of an already complex discovery landscape. Courts should consider the manner and process for pretrial discovery in order to reduce the expense, number of disparate disputes, and procedural complexity. Document requests directed to one party are, in this Court's experience, typically more efficient and streamlined than multiple separate subpoenas each directed to non-parties.

In the context of a state in which the statutory scheme mandates the Attorney General to represent a state agency in litigation, a state Attorney General *will* represent those state agencies in responding to the discovery here, regardless of whether the documents are sought by Rule 34

1    requests for production or by Rule 45 subpoenas.  It would be wasteful to require a party in a

2    complex litigation to serve individual subpoenas on a multitude of state agencies, particularly where

3    all parties and this Court know that the Attorneys General *will be* representing those state agencies

4    in responding to the subpoenas.  It is not firmly grounded in reality, and thus elevates form over

5    substance, to ignore that, at the end of the day, many if not all of the parties will be litigating and

6    negotiating for the documents sought with the very same legal services providers.

7            Several state Attorneys General have argued that, for analytical purposes, the Court should

8    subdivide their offices between the team or division of attorneys litigating this Multi-District

9    Litigation versus other sections or divisions of that particular state Attorney General, in order to

10   argue that there should not be any consequences flowing from the state Attorneys General

11   representing both the plaintiff and the state agencies.  Such argument is not supported by citation to

12   law and is contrary to the weight of law.  The scope of an attorney-client relationship (and the duties

13   flowing therefrom) encompasses the entirety of a legal services organization due to well-known

14   rules of imputation of confidences to a legal services organization, including a public law office:

15           When an attorney associates with a law firm, the principle of loyalty
             to the client extends beyond the individual attorney and applies with
16           equal force to the other attorneys practicing in the firm. This principle,
             known as the "rule of imputed disqualification," . . . requires
17           disqualification of all members of a law firm when any one of them
             practicing alone would be disqualified because of a conflict of interest
18           . . . . The rule of imputed disqualification applies to both private firms
             and public law firms such as a district attorney's office or the office
19           of the state public defender.

20   *People ex rel. Peters v. Dist. Ct. In & For Cnty. of Arapahoe*, 951 P.2d 926, 930 (Colo. 1998);

21   *accord City of Cnty. of Denver v. Cnty. Ct. of City & Cnty. of Denver*, 37 P.3d 453, 457 (Colo. App.

22   2001); *see also Kirk v. First Am. Title Ins. Co.*, 108 Cal. Rptr. 3d 620, 637–38, 642 (Cal. Ct. App.

23   2010), *as modified* (May 6, 2010) (recognizing rebuttable presumption of imputed knowledge in the

24   context of government attorneys).  Some jurisdictions treat public legal service organizations like

25   private law firms in the context of the scope of the attorney-client relationship.  Even in jurisdictions

26   which do not automatically impute shared confidences from an attorney-client relationship to an

27   entire public law office, those courts recognize that ethical screening or other procedures are

28   required.  At a general level, the law does not support the blanket argument that different individual

lawyers in the Attorney General's office have separate, discrete attorney-client relationships with their clients.

In this multidistrict litigation, this Court has convened monthly Discovery Management Conferences in order to provide regular and detailed guidance on the complex discovery process and discovery disputes. As fact discovery has progressed, the Court has been presented with numerous discovery motions necessitating separate, hours-long hearings on such disputes. Managing and controlling state agency discovery as set forth herein is, in one way, intended to help facilitate management of the overall discovery process in this multidistrict litigation. Resolution of this "control" issue is directly related to proper and rational management of discovery.

This is not merely a hypothetical concern about managing discovery. If the state Attorneys General were correct as to the absolute lack of control of any of the agencies at issue, then Meta would be required to issue over 250 individual subpoenas, and then negotiate the scope of each subpoena after receiving written responses and objections to each. The state agencies and their counsel would be required to correspondingly respond and object to all of these subpoenas and negotiate them with Meta. As a result, there would be the potential for these parties to present over 200 allegedly separate disputes over these subpoenas to this Court, with the potential for raising inconsistent or contradictory arguments. This is not merely a hypothetical concern. The Fourth Circuit was confronted with precisely this situation. *In re S.C. Dep't of Parks, Recreation & Tourism*, 103 F.4th 287, 289 (4th Cir. 2024). In that case, a group of multiple States sued Google for alleged antitrust violations, among them South Carolina. *Id.* Google then served party discovery, including document requests on the State Attorneys General who objected to the discovery requests to the extent they sought state agency documents, and the Attorneys General argued (as here) that Google should serve subpoenas on the state agencies. *Id.* Indeed, the State Attorneys General (including South Carolina) wrote that "Google issued Federal Rule 45 subpoenas to numerous state agencies, and State Plaintiffs believe that these subpoenas are the proper channels for Google to seek documents that are in the possession, custody, or control of those agencies." *Id.* Instead of litigating the "control" issue in that case, Google opted instead to voluntarily serve subpoenas on the state agencies. *Id.* Despite the statements by the South Carolina Attorney General

about the propriety of the subpoena process, the South Carolina Department of Parks, Recreation and Tourism ("SCPRT") disagreed with the statements of the South Carolina Attorney General and moved to quash Google's subpoena entirely based on Eleventh Amendment immunity arguments. *Id.* at 289–90. In arguments highly reminiscent of the arguments about "control" asserted in this action, "[a]ccording to SCPRT, because the attorney general 'does not represent SCPRT or have custody, possession, or control over its records,' and because he 'did not bring his claims against Google in a sovereign capacity,' his joining the State to the litigation against Google could not have waived the Eleventh Amendment immunity of SCPRT, which is a 'statutorily and constitutionally separate' state agency." *Id.* at 291. The district court denied SCPRT's motion to quash. On appeal, the Fourth Circuit affirmed and rejected South Carolina's arguments which emphasized the "separateness" of the agency from the State and emphasized the argument that the Attorney General "does not represent" the agency and does not "have custody or control of its records." *Id.* at 293. While *In re South Carolina Department of Parks, Recreation & Tourism* ultimately dealt with waiver of Eleventh Amendment immunity by a state Attorney General extending to all agencies of the state, the teachings for the analogous situation here is self-evident: requiring a party (like Google in that case, or Meta here) to serve subpoenas on different state agencies who could then assert different (even contradictory) arguments against the subpoenas, where there is a demonstrable and legal basis for finding control, is not conducive to the just and efficient administration of justice.

To the extent the Court find "control" under Rule 34 standards and finds some state agencies are subject to party discovery, their documents would be sought by document requests directed just to one party in each state. While there are real-world implications for management of discovery that flow from the Court's resolution of this control issue, to be clear the Court has analyzed the issues under appropriate legal standards discussed herein, but also cognizant of the broad discretion the Court exercises in ordering the sequence and management of discovery consistent with the Federal Rules.

Accordingly, the Court exercises its authority in finding the conclusions as to control for each state below pursuant to appropriate legal standards and under the totality of circumstances, firmly grounding its decision in reality and underpinned by the Court's full discretion.

**DISCUSSION**

As an initial matter, the Court notes that this discovery dispute solely concerns whether the State Attorneys General's offices have legally sufficient control such that, in responding to Meta's discovery requests, the state agencies' documents should be obtained and produced by the State Attorneys General in response to Fed. R. Civ. P. 34 document requests. For the purposes of this dispute, the Parties do not dispute that the State Attorneys General lack possession or custody of the documents from the state agencies – the only issue presented is the issue of control. Indeed, the law would be clear that the State Attorneys General would have the obligation to respond to the discovery requests if they did have possession or custody of the documents. To the extent the Parties frame their arguments or this dispute as to whether the agencies should be treated as "parties" for this multidistrict litigation such arguments are, at best, imprecise. Whether a party needs to or is requested to be joined as a named party to this case under Fed. R. Civ. P. 19 or 20 are issues, of course, beyond the scope of the discovery referral order in this action.

Thus, the issue at hand is the specific question: whether the State Attorneys General have legal control, for the purposes of discovery, over their respective state agencies under relevant legal standards. It is self-evident from the length of this opinion that state Attorneys General and Meta raised complex questions in the context of the factors used to determine control under the "legal control" test. In light of (and incorporating by reference) this discussion of the legal standards, the Court next analyzes the control issue on a state-by-state basis. The Court approaches that state-by-state analysis following the directive that, fundamentally, "[c]ontrol must be firmly placed in reality." *Int'l Union of Petroleum & Indus. Workers*, 870 F.2d at 1453.

**I.     ARIZONA**

In opposition to the control issue, the Arizona Attorney General argues primarily the following factors: (1) Arizona agencies may respond without the Arizona Attorney General's assistance; (2) the Arizona Attorney General's powers arise from statute and are thus not plenary; and (3) the Arizona Attorney General is a separate entity and independent from the Arizona agencies. [Dkt. 738-2 at 2]

In support of a finding of control with regard to these state agencies' documents, Meta argues

United States District Court
Northern District of California

based primarily on the following factors: (1) the Arizona Attorney General is the chief legal advisor for the State; and (2) certain Arizona agencies are proscriptively barred from obtaining counsel other than the Arizona Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following Arizona Agencies: Board of Regents, Commerce Authority, Department of Child Safety; Department of Education; Department of Health Services; Governor's Office; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education. *Id.* All but three of these state agencies are prohibited from employing legal counsel (or making expenditures for legal services) outside the Arizona Attorney General's office. Ariz. Rev. Stat. §§ 41-192(A), -192(D).

After considering the Parties' briefs, oral argument and other material submitted, and applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor of a finding that the Arizona Attorney General does have legal control, for purposes of discovery, over most of the Arizona agencies at issue. While the Arizona Attorney General asserts that Arizona agencies might respond without its assistance and that the Arizona Attorney General's powers arise from (and thus are somehow limited by) statute, these arguments do not negate the fact that the Attorney General is the chief legal advisor for the state government. Ariz. Rev. Stat. § 41-192(A). The statutory scheme in Arizona requires that "[t]he attorney general ***shall***: 1. Be the legal advisor of the departments of this state and render such legal services as the departments require . . . . [A]nd coordinate the legal services required by other departments of this state or other state agencies." Ariz. Rev. Stat. § 41-192(A)(1)–(3) (emphasis added).

Importantly, the Arizona Attorney General's arguments do not negate the fact that all but three of the Arizona agencies at issue here are barred by Arizona law from obtaining counsel other than the Attorney General. Ariz. Rev. Stat. § 41-192(D). Indeed, the Arizona Attorney General previously confirmed that its office would definitely represent at least four of the Arizona agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 3–4]. And in their more recent brief, the Arizona Attorney General conceded that they will represent five state agencies at issue. Dkt. 738-2 at 2 (referring "to the five [agencies] that the [Arizona Attorney General] currently will, at the request of the agency, represent"). The Arizona statute is clear on its

face that six of the agencies at issue are prohibited completely from retaining separate counsel. *See* Ariz. Rev. Stat. § 41-192(D). While the Arizona Attorney General indicated to the Court that the Attorney General would not represent the Arizona Department of Education and the Arizona Governor's Office of Strategic Planning and Budgeting, that is an error of law because neither of these agencies are exempt from the express statutory prohibition on retaining different counsel. *See* Ariz. Rev. Stat. § 41-192(D). And to be clear, despite its name, the Arizona Governor's Office of Strategic Planning and Budgeting is an agency outside the Arizona Governor's office, has duties to advise both the Governor and Legislature, and is statutorily situated within the Act defining the Arizona Department of Administration. *See* Ariz. Rev. Stat. at §§ 41-701, -722 to -723. Further, as noted above, the Arizona Attorney General has apparently not conferred with these agencies and no other counsel has entered appearance to date for these agencies. Because the Arizona statute is clear on its face that six agencies are barred from retaining separate counsel, *see* Ariz. Rev. Stat. § 41-192(D), the Court finds, based on the current record, that the Arizona Attorney General will serve as counsel in this matter for six agencies (Department of Child Safety; Department of Education; Department of Health Services; Governor's Office of Strategic Planning and Budgeting; Office of Economic Opportunity; and State Board of Education).

As to the three other state agencies (the Commerce Authority, Board of Regents, and Governor's office), the Arizona statutory scheme allows those other agencies to retain separate counsel apart from the state Attorney General. *see* Ariz. Rev. Stat. §§ 41-192(D)(4), (7), and (10). The Arizona Attorney General has represented to the Court that these three agencies will not be represented by the Attorney General for purposes of discovery in this matter, should subpoenas be served on these three agencies. [Dkt. 738-1 at 3–4].

Accordingly, it appears that under the statutory scheme six agencies will be represented by the Arizona Attorney General in this matter for discovery. *See* Ariz. Rev. Stat. §§ 41-192(A), -192(D). Thus, because the Arizona Attorney General will be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery, the Court in its discretion determines that a finding of control as to these six agencies is further supported by the simple and pragmatic realities involved in these circumstances.

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Arizona Department of Child Safety, the Arizona Department of Education, and the Arizona Department of Health Services. [Dkt. 1031-5 at 734–859]. None of these state agencies are allowed to employ legal counsel other than the Arizona Attorney General and thus by statute each must be represented by the Arizona Attorney General in this matter for discovery. *See* Ariz. Rev. Stat. §§ 41-192(D) ("no state agency other than the attorney general shall employ legal counsel or make an expenditure or incur an indebtedness for legal services, but the following are exempt from this section[,]" listing state agencies other than the three at issue). This arrangement indicates strongly that the Attorney General, in fulfilling its role as Chief Legal Advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, these subpoenas, and the statutory scheme in Arizona regarding how the Attorney General will respond to them, further support the Court's conclusion that the Arizona Attorney General has legal control, for the purposes of discovery, over at least these the three agencies recently listed in the intent to issue subpoenas.

Relatedly, the Arizona Attorney General has taken the position that communications between the Arizona Attorney General and these state agencies would be covered by the attorney-client privilege if such communications are encompassed within the scope of discovery sought by Meta. [Dkt. 738-2 at 2]. To the extent the Arizona Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" of the state Attorney General, that argument is incorrect. The Arizona Attorney General proffers this argument to limit the attorney-client privilege (and hence the attorney-client relationship) only as to some parts of the state Attorney General's office but not other sub-teams, without citation to any legal support for that proposition. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office as discussed above. *See, e.g., People ex rel.*

United States District Court
Northern District of California

*Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings v. State*, 441 S.E.2d 262, 266 (Ga. 1994) (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun v. Area Agency on Aging of Se. Arkansas*, 618 S.W.3d 137, 137 (Ark. 2021) (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").

Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required to avoid either imputed or actual sharing of confidences to avoid a finding of dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Arizona Attorney General's argument that different individual lawyers in the Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Arizona Attorney General's attempt to simultaneously disclaim the existence of an attorney-client relationship as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Arizona Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these

United States District Court
Northern District of California

1   legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue

2   that on one hand the [State] Attorney General represents these individuals, but that for discovery

3   purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

4   2014 WL 1796661, at *2. The fact that the Arizona Attorney General is attempting to preserve the

5   ability to assert the attorney-client privilege between the Arizona Attorney General's office and the

6   agencies at issue further supports the conclusion of control here. Assertion of the attorney-client

7   privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See United*

8   *States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010).

9       Further, there is no statutory, legal, or administrative rule cited which prohibits the Arizona

10  Attorney General from accessing the documents of the state agencies at issue. To the extent the

11  Arizona Attorney General relies on the statutory origins of that office, such state statutes are

12  unavailing to prohibit a finding of control here. Analogously, in *Osborn*, the Arizona federal

13  Magistrate Judge overruled objections and ordered individual defendants (officials of the Arizona

14  Department of Corrections) to produce personnel documents from the files of the state agency,

15  despite arguments that state statutory restrictions forbade the production of the documents. *Osborn*

16  *v. Bartos*, 2010 WL 3809847 at *15 (D. Ariz. Sept. 20, 2010). The *Osborn* court rejected the

17  arguments of the Arizona Attorney General (representing the defendants in that case) that an under

18  an Arizona statute "they are without authority to produce the records" and that Arizona regulations

19  "make personnel files confidential." *Id.* The Court ordered the defendants in *Osborn* "to produce,

20  from **whatever personnel or similar file** specifically related to the designated officer, **where such**

21  **records are normally maintained**, the performance appraisals and disciplinary records in Request

22  4 as to the named Defendants[.]" *Id.* at *16 (emphasis added).

23      Further, the Arizona Attorney General does not cite any statutory or legal prohibition on the

24  Arizona Attorney General's representing the state agencies in this matter for purposes of discovery.

25  The Court recognizes that this is a somewhat unusual situation, in which a law enforcement

26  organization, the attorney general, is both a party to the case while also acting or able to act as

27  counsel for a third party. However, this would not be the first time that a legal services provider, as

28  counsel for a party, is found to have control over third party documents for purposes of discovery.

47

1   *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

2   recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

3   lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

4   to respond as to responsive materials over which Salas and his law firm had possession, custody or

5   control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

6   over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

7   holding broadly that there must be a finding of a legal right of access to and thus control over third

8   party client documents in every case involving a legal services provider as a party; rather, under the

9   particular facts here, and under the totality of circumstances viewed in light of applicable legal

10  standards, the Court finds that control exists as to the six agencies represented by the Arizona

11  Attorney General.

12          Indeed, at least one other federal court has previously found that the Arizona Attorney

13  General has legal control over Arizona state agency materials.  *Generic Pharmaceuticals (II)*, 699

14  F. Supp. 3d at 357–58.  While this Court reaches its own independent conclusions consistent with

15  the applicable legal standards discussed above and in light of the facts and circumstances presented

16  here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly

17  consistent with, and to that extent further persuasively supports, the conclusion here with regard to

18  the Arizona Attorney General's having control with regard to documents of the state agencies at

19  issue.  Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the

20  objecting states including Arizona and given the Arizona Attorney General's office's experience in

21  litigating and losing an analogous issue as to authorization to produce documents from agency files

22  in *Osborn*, this Court is disappointed that the Arizona Attorney General and Meta were unable  to

23  reach a negotiated resolution of this dispute, which other states were able to do in *Generic

24  Pharmaceuticals (II)*.  As the Court has repeatedly encouraged the Parties at multiple Discovery

25  Management Conferences, they should make every effort to work out discovery disputes through

26  reasonable, good faith negotiations between able and experienced counsel, particularly where, as

27  here, there is guidance in precedent on the discovery issue at hand.

28          Accordingly, in view of the legal standards and the record viewed in the totality of

United States District Court
Northern District of California

circumstances, the Court finds that the Arizona Attorney General has control, for the purposes of discovery, over the documents of six of the Arizona agencies at issue, listed above. The Court notes that the Court credits the Arizona Attorney General's offices representation to this Court that the Board of Regents, Commerce Authority, and Governor's office will not be represented by any attorney within the Arizona Attorney General's office for purposes of this case. Should that representation turn out to be in error or shown to be false, the Court will reconsider its findings as to control with regard to those three agencies upon proper motion.

## II. CALIFORNIA

In opposition to the control issue, the California Attorney General argues primarily the following factors: (1) the California Attorney General is a separate entity and independent from the California agencies; (2) California agencies are statutorily responsible for maintaining their own records; and (3) if found to be subject to control for purposes of discovery, the California agencies would thereby be granted a "virtual veto" over the California Attorney General's independent responsibilities to bring enforcement actions. [Dkt. 738-3 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) California law sets forth a preference for the California Attorney General to be employed as the attorney of all legal matters in which California has an interest; (2) the California Attorney General is presumptively the legal representative of all California agencies in any judicial proceedings unless specifically exempted; and (3) California agencies, with limited exception, are proscriptively barred from obtaining counsel other than the California Attorney General, without consent from the California Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following California Agencies: Business, Consumer Services, and Housing Agency; Department of Child Support Services; Department of Consumer Affairs; Department of Education, Department of Finance; Department of Health Care Services; Department of Public Health; Office of the Governor; Governor's Office of Business and Economic Development; Health and Human Services Agency; Mental Health Services Oversight and Accountability Commission; Office of Data and Innovation; and School Finance Authority. *Id.*

After considering the Parties' briefs, oral argument and other material submitted, and

App. 049

49

applying appropriate legal standards discussed herein, the Court finds that the factors weigh in favor of a finding that the California Attorney General does have legal control, for purposes of discovery, over the California agencies in dispute. While the California Attorney General is a separate entity and while the California agencies maintain their own records, this does not outweigh the requirement that the California Attorney General is statutorily required to act as the California agencies' counsel, with limited exceptions which are not shown to be applicable here. *See* Cal. Govt. Code § 11040(a).

The California Legislature made clear that the California statutory scheme prefers the California Attorney General represent state agencies: "It is the intent of the [California] Legislature that overall efficiency and economy in state government be enhanced by employment of the Attorney General as counsel for the representation of state agencies and employees in judicial and administrative adjudicative proceedings." Cal. Govt. Code § 11040(a). The statutory scheme in California presumes that the California Attorney General will represent state agencies in judicial actions (even to the exclusion of that agency's own counsel) absent written consent: "Except with respect to employment by the state . . . agencies specified by . . . name in Section 11041 or when specifically waived by statute other than Section 11041, a state agency ***shall obtain the written consent of the Attorney General*** before doing either of the following: (1) Employing in-house counsel to represent a state agency or employee in any judicial or administrative adjudicative proceeding. (2) Contracting with outside counsel." *Id.* at § 11040(c) (emphasis added).

Further, the California Legislature has made clear "that it is in the best interests of the people of the State of California that ***the Attorney General be provided with the resources*** needed to develop and maintain the Attorney General's capability to provide competent legal representation of state agencies and employees ***in any judicial*** or administrative adjudicative ***proceeding***." *Id.* at § 11040(a) (emphasis added). Access to documents from state agencies are "resources needed" for the California Attorney General "to provide competent legal representation of state agencies" in this action.

Indeed, the California Attorney General confirmed that its office could represent all of the California agencies at issue, if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 4–5]. The Court notes that the State Attorneys General have filed an Administrative

1    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

2    to various state agencies, including the California Department of Child Support Services, the

3    California Department of Education, and the California Mental Health Services Oversight and

4    Accountability Commission. [Dkt. 1031-3 at 27–153]. None of these state agencies are allowed to

5    employ legal counsel other than the California Attorney General absent written consent, and no such

6    consent has been presented thus far. Accordingly, and based on the record before the Court, it

7    appears that under the statutory scheme each will be represented by the California Attorney General

8    in this matter for discovery, whether because of the intended subpoenas or because the Court finds

9    control for purposes of discovery. *See* Cal. Govt. Code § 11040(a). Thus, as a matter of the efficient

10   and rational administration of justice in this case, because the California Attorney General will be

11   involved in representing these state agencies in any event in this case (whether to respond to

12   subpoenas or to respond to party discovery), the Court in its discretion determines that a finding of

13   control is further supported by the simple and pragmatic realities involved in these circumstances.

14   At oral argument, counsel for the California Attorney General argued that, even if the Court

15   found that the California Attorney General had legal access and control over the California state

16   agencies' materials, those state agencies could disagree and simply refuse to provide requested

17   documents to the California Attorney General and could hypothetically put the California Attorney

18   General in a position of being at risk of sanctions through no fault of its own. This is a variation on

19   the "virtual veto" argument, discussed above, which the Court finds unpersuasive to rebut the

20   finding of control. The California Attorney General's argument asserts that their office lacks any

21   legal mechanism to force or require compliance from the state agencies, which in their view

22   demonstrates lack of control. *Id.* This argument is without merit. First, this argument rests entirely

23   on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order

24   finding control, the state agencies would simply refuse to provide documents based on nothing more

25   than an obstinate and unreasoned disagreement. The California Attorney General presented no facts,

26   no affidavits, no prior examples of state agency refusals, and no testimony to support this feared

27   response by California state agencies.

28   Indeed, in many analogous cases in which a California prison official was sued individually,

the courts found that the individual official had control over documents of a state agency (the California Department of Corrections and Rehabilitation (CDCR)) and thus the state agency was subject to party discovery – and those findings are based in part on the fact that the individual party defendants were represented by and/or employed by the California Attorney General:

> If Defendants seek to avoid production by contending that they are not in possession, custody or control of the requested documents, their objection is denied. The specific facts of this action render such an objection unfounded. By virtue of their employment with non-party CDCR, individual defendants are represented by the Attorney General's Office. It is this Court's experience that either individual defendants who are employed by CDCR and/ or the Attorney General can generally obtain documents, such as the ones at issue here, from CDCR by requesting them. They have constructive control over the requested documents, and the documents must be produced.

*Pulliam*, 2011 WL 335866, at *1; *see also Quiroga*, 2013 WL 6086668, at *2 (affirming Magistrate Judge order finding defendant has control over third-party agency documents: "it is this Court's experience that either individual defendants who are employed by CDCR, and/or the Attorney General who represents them, can generally obtain documents from CDCR by requesting them. If this is the case, then, based on their relationship with CDCR, they have constructive control over the requested documents and the documents must be produced."); *accord Mitchell*, 2009 WL 674348, at *9, 11–13, 17 (rejecting multiple objections regarding alleged lack of control of agency documents).

Similarly, in *Zackery*, the Court overruled the objection that the named defendants lacked control over the documents of a third-party agency. *Zackery*, 2007 WL 1655634, at *4. The *Zackery* Court granted relief to the Plaintiff seeking discovery as follows: "the court will direct **counsel for defendants** [Office of the City Attorney] to make the necessary inquiries and arrangements for the requested citizen complaint records to be produced to plaintiff." *Id*. These California precedents make clear that courts in California have in fact found control in numerous factual situations in which the involvement of the same prosecuting attorneys (often the California Attorney General) representing both a named party and the third-party agency supported the conclusion of control such that the California agency documents were subject to party discovery.

To be clear, the Court is not relying on these precedents to demonstrate the practical ability

United States District Court
Northern District of California

of the state Attorney General to obtain documents from the state agencies, rather these precedents rebut and demonstrate exactly the opposite of the hypothetical fear of agency refusal posited by the state Attorneys General as a reason why they should be found not to have control for purposes of discovery. Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure. "We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble." *E. I. du Pont de Nemours & Co. v. Finklea*, 442 F. Supp. 821, 825 (S.D. W. Va. 1977); *see also Casas v. City of Baldwin Park*, No. B270313, 2017 WL 1153336, at *6 (Cal. Ct. App. 2017) (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Second, this argument ignores the fact that Meta has the ability to file a motion to compel production of documents by any such hypothetically disagreeing state agencies, and thus there is indeed a procedural and legal avenue to enforce compliance from any such hypothetically intransigent agencies. The state Attorneys General's argument that they lack legal mechanism to force compliance from their state agencies is myopic. Should Meta be required to file a motion to compel, the Court is perspicacious enough to understand that the fault would lie with the hypothetical state agency and not the California Attorney General, and in the event some enforcement mechanism were needed (such as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand how and where to focus any such enforcement Order.

Finally, the Court is not persuaded by the argument that the California Attorney General lacks control over state agency documents, because an attorney in a court proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to collect or provide documents for production in discovery. As counsel for a party subject to discovery, the California Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply sit on their hands in the face of an uncooperative client – this is would not be the first time an attorney was faced with a client who

United States District Court
Northern District of California

was difficult to deal with in collecting documents for discovery. *See, e.g.*, *Qualcomm Inc.*, 2010 WL 1336937, at *2–5. Counsel in a litigation has legal duties to take pro-active steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails to (or worse, refuses to) produce or provide documents. *Id.* at *2–5 (detailing "Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at *3–4 (awarding discovery sanctions where, in part, "there is no indication that Safeway's counsel guided or monitored [client employee] Mr. Guthrie's search of the legacy drive in any significant way."). Counsel cannot simply advise clients about document requests and leave it up to the client to decide whether or not to risk sanctions for failure to produce – in appropriate circumstances, counsel may need to personally conduct or directly supervise a client's collection, review, and production of responsive documents. *Optronic Techs., Inc.*, 2020 WL 2838806, at *5–7 (awarding discovery sanctions; "It is not enough for counsel to provide advice and guidance to a client about how to search for responsive documents, and then not inquire further about whether that advice and guidance were followed . . . . The Court does not conclude that counsel must always personally conduct or directly supervise a client's collection, review, and production of responsive documents. However, in the circumstances presented here, the Court finds that [counsel] Sheppard Mullin did not make a reasonable effort to ensure that [sanctioned party] Ningbo Sunny produced all the documents responsive to Orion's requests and thus violated its obligations under Rule 26(g)(1)(B) . . . . [T]the Court orders Ningbo Sunny's new counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies with Orion's post-judgment document requests."). The Court rejects as legally erroneous the California Attorney General's arguments, because they are based on a misunderstanding of counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the proper conduct of discovery and the rational administration of justice. *See King*, Case No. 20-cv-04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing] the judge] in day-to-day supervision of discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

In addition to their duties to supervise the collection of documents and make inquiry of clients to ensure proper collection of documents is undertaken, attorneys representing clients in court proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to

1   improve the administration of civil justice, both as officers of the Court and under their ethical

2   obligations as members of the bar of this Court. *See* Fed. R. Civ. P. 1 advisory committee's note to

3   2015 amendment. "Rule 26(g) imposes ***an affirmative duty to engage in pretrial discovery in a***

4   ***responsible manner*** that is consistent with the spirit and purposes of Rules 26 through 37 . . . . The

5   subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification

6   requirement that ***obliges each attorney*** to stop and think about the legitimacy of a discovery request,

7   ***a response thereto, or an objection*** . . . . If primary responsibility for conducting discovery is to

8   continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See*

9   Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

10      As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically

11   antecedent to "legal rights" – and thus the California Attorney General's legal duties to undertake

12   proactive efforts to collect documents from clients in discovery are the flip side to the legal right to

13   access those documents. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 790 n.5 (9th Cir. 2002) ("The

14   logical relationship between rights and duties has been the subject of considerable academic

15   examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'—

16   different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual

17   constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The

18   Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations

19   omitted). Here, the recognition that a state Attorney General, presumptively counsel for state

20   agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents

21   from those agencies for discovery lends further support to the conclusion that the state Attorney

22   General has the legal right to access those documents. That is, counsel's legal duty to ensure

23   collection of documents from a client is a different aspect of (and correlates juridically to) a legal

24   right to access those documents, and thus supports the conclusion of control for purposes of

25   discovery.

26      The California Attorney General's role as counsel for the agencies at issue inherently

27   involves obtaining necessary documents for effective representation in litigation. In acting as

28   counsel, the California Attorney General would necessarily have access to and thus control over the

relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at
\*5–6 (finding state Attorney General has control over agency documents "based on his broad
statutory and common law powers to control and manage legal affairs on behalf of state agencies,
has a legal right to obtain responsive documents from the state agencies referenced in the
Complaint"). To the extent the California Attorney General argues that these agencies are "separate
entities under law" from the state Attorney General and are not supervised by the state Attorney
General, *see* dkt. 738-3 at 2, that argument misapprehends the "legal control" test for documents –
the issue is not simply whether one entity is under the day-to-day operational control of the other
(such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities
are legally separate (such as two different and separately incorporated entities), but rather whether
there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for
Rule 34 purposes does not require the party to have actual managerial power over the foreign
corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*,
305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and
the state agencies (a relationship mandated by state law) necessitates close coordination. While
operational control may be a factual situation which demonstrates a legal right to obtain the
documents, the absence of such "executive or functional control" is not determinative for evaluating
"control" for purposes of discovery. By definition, the "legal control" issue for discovery arises
when there are two legally distinct or separate entities – otherwise, if only one entity were involved,
there would be no dispute that party discovery covered that one entity. As discussed above, courts
have found "control" for purposes of discovery where a party is clearly not in managerial control
over the third-party, such as a subsidiary having control over the documents of a parent corporation,
or an individual government officer having control over the documents of an entire agency. Thus,
arguing that the agencies "operate outside the California Attorney General's authority" or are
"established as a separate entity, under various laws or constitutional provisions" is simply re-stating
the issue, *id.*, and not determinative of the issue. Arguing that the agencies are "controlled" by the
Governor or another "independently elected official" in a "divided executive" under the California
Constitution, *id.*, confuses and conflates the "legal control" issue for discovery with "operational

control" or "independence" and thus constitutes a legally erroneous argument.

Further, there is no statutory, legal, or administrative rule cited which prohibits the California Attorney General from accessing the documents of the state agencies at issue. Nor is there citation to any statutory or legal prohibition on the California Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather under the particular facts here and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Consistent with the analysis of this issue as raised by other state Attorneys General, the Court finds the California Attorney General's "virtual veto" argument unpersuasive. [Dkt. 738-3 at 2]. As explained above (and incorporated herein by reference), the "virtual veto" argument is entirely speculative. This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state attorney general's independent law enforcement responsibilities. The argument also directly contradicts the well-established legal principle and statutory scheme that a state Attorney General, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

Finally, the Court has recognized that the issue of control of state agency documents when a State is a party has been litigated and decided against numerous States in a previous Multi-District

Litigation involving most of the same States and state Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, California is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* As discussed above, the California Attorney General has, from this Court's review of precedent, repeatedly litigated and lost on the analogous issue of control of state agency documents in cases involving a state official sued individually, typically involving control over documents of the California Department of Corrections and Rehabilitation. Other states have apparently repeatedly litigated and lost the same issue, resulting in one court within the Ninth Circuit warning a state Attorney General to avoid unnecessarily multiplying the proceedings and risk sanctions. *Emanuel v. Collins*, No. 3:20-CV-0566-RCJ-CLB, 2022 WL 22236619, at *3 n.2 (D. Nev. July 20, 2022) (Finding control: "This Court has expressly rejected similar arguments made by NDOC [(Nevada Department of Corrections)] and its counsel in the past. Therefore, Defendants and their counsel are cautioned and reminded that improper discovery conduct in this, or other cases, may result in discovery sanctions in the future.") (citation omitted). Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states in that case, given that California was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, and further given the California Attorney General's repeatedly litigating and losing a similar control issue in the face of multiple reasoned decisions adverse to the California Attorney General, this Court is disappointed that the California Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where (as here) there is guidance in precedent on the discovery issue at hand.

### III. COLORADO

In opposition to the control issue, the Colorado Attorney General argues primarily the

United States District Court
Northern District of California

following factors: (1) the Colorado Attorney General brought the lawsuit under its own independent law enforcement capacity; (2) the Colorado legislature has recognized that the Colorado Attorney General cannot access Colorado agencies' documents when it is acting in its enforcement capacity; and (3) the Colorado Attorney General is a separate entity and independent from the Colorado agencies. [Dkt. 738-4 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Colorado agencies are proscriptively barred from retaining litigation counsel other than the Colorado Attorney General; (2) the Colorado Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena; and (3) the Colorado Attorney General admits that it intends to assert privilege claims. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Behavioral Health Administration; Department of Education; Department of Higher Education; Department of Human Services; Department of Regulatory Agencies; Office of the Governor; Office of Economic Development & International Trade; and Office of State Planning and Budgeting. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Colorado Attorney General does have legal control, for purposes of discovery, over the Colorado agencies in dispute. While the Colorado Attorney General is a separate entity and while the Colorado Attorney General did bring the instant action pursuant to its own independent authority, this does not outweigh the requirement that the Colorado Attorney General must statutorily act as the Colorado agencies' counsel. Colo. Rev. Stat. § 24-31-101(1)(a). Under Colorado's statutory scheme, "[t]he attorney general: ***Shall act*** as the chief legal representative of the state ***and be the legal counsel*** and advisor ***of each*** department, division, office, board, commission, bureau, and ***agency of state government[.]***"). *Id.* (emphasis added); *see also* Colo. Rev. Stat. § 24-31-111(1) ("The attorney general ***shall*** provide legal services for each state agency as provided in section 24-31-101.") (emphasis added). Under Colorado law, "[n]o state agency shall appoint, solicit, or employ any person to perform legal services except in accordance with this part 1." Colo. Rev. Stat. § 24-31-111(2). None of the statutory exceptions in section -111, which requires a finding by the Colorado Governor of a failure or refusal to provide legal representation

by the Colorado Attorney General, are argued or present in this case. Colo. Rev. Stat. § 24-31-111(5).

Indeed, the Colorado Attorney General confirmed that its office will represent all of the Colorado agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 6]. The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Colorado Behavioral Health Administration and the Colorado Department of Education. [Dkt. 1031-3 at 154–237]. Neither of these state agencies are allowed to employ legal counsel other than the Colorado Attorney General absent a finding by the Colorado Governor that the Colorado Attorney General has been unable, failed to, or refuses to provide legal services to the agencies, and no exceptions to an agency's prohibition on employing separate counsel has been presented thus far. *See* Colo. Rev. Stat. § 24-31-111(5). Accordingly, it appears that under the statutory scheme each agency will be represented by the Colorado Attorney General in this matter for discovery. *See* Colo. Rev. Stat. § 24-31-101(1)(a). Thus, because the Colorado Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Colorado Attorney General has taken the position that communications between the Colorado Attorney General and these state agencies would be covered by the attorney-client privilege when the Colorado Attorney General is legal counsel for a state agency. [Dkt. 738-4 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Colorado Attorney General is asserting that the attorney-client privilege applies to communications between the Colorado Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

United States District Court
Northern District of California

Further, there is no statutory, legal, or administrative rule cited which prohibits the Colorado Attorney General from accessing the documents of the state agencies at issue. While the Colorado Attorney General cites a statute which requires their office to enter into information sharing agreements with state licensing agencies in enforcement actions, none of the agencies at issue here are licensing agencies. Colo. Rev. Stat. § 6-1-116(4). Indeed, it is clear that the Colorado Legislature's view is that "it best serves the consumer protection interests of the state to allow a licensing authority to share with a district attorney or the attorney general information regarding a regulated person, which information may be relevant to a consumer protection investigation of the regulated person" and that "District attorneys and the attorney general are tasked with, and have the expertise needed for, enforcing consumer protection laws in the state." Colo. Rev. Stat. § 6-1-116(1)(b)–(d). Viewed in context, the Colorado Legislature expressed its intention that these state licensing authorities would share information with the Colorado Attorney General specifically to "*facilitate* the investigation and *enforcement of complaints* alleging violations of consumer protection or unfair trade laws." Colo. Rev. Stat. § 6-1-116(4) (emphasis added). Thus, the cited statute does not serve as a prohibition on the Colorado Attorney General's access to these licensing agencies' documents, but to the contrary serves as an encouraged means for sharing information in order to "facilitate" enforcement actions. The statute provides for a procedural, legal mechanism, approved by the Colorado Legislature, for these licensing agencies to share information with the Colorado Attorney General. If anything, the statute cited by the Colorado Attorney General further supports a finding of legal right of access and thus control over these licensing agency documents, and the Court finds the Colorado Attorney General's characterization of this statute as barring access or evidence of lack of right to access as erroneous.

Further, to the extent the Colorado Attorney General argues that there must be an information sharing agreement from licensing agencies in order to disclose the agencies' records, this argument is in essence the same "virtual veto" argument advanced by several other states' Attorneys General and discussed above. As explained previously, the Court finds the "virtual veto" argument to be speculative and unpersuasive. This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement

United States District Court
Northern District of California

responsibilities. The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency. Finally, as noted, none of the Colorado agencies at issue in this case are licensing authorities and thus the statute regarding an information sharing agreement is not applicable to the agencies under consideration here.

There is no citation to any statutory or legal prohibition on the Colorado Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharms*. opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 365 n.5. In that case, Colorado is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources

United States District Court
Northern District of California

resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Colorado was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, the Court is disappointed that the Colorado Attorney General and Meta unable to reach a negotiated resolution here as well. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## IV. CONNECTICUT

In opposition to the control issue, the Connecticut Attorney General argues primarily the following factors: (1) the Connecticut Attorney General brought the lawsuit under its own independent law enforcement capacity; (2) the Connecticut Attorney General is a separate entity and independent from the Connecticut agencies; and (3) the Connecticut agencies would create a "virtual veto" over the Connecticut Attorney General's independent responsibilities to bring enforcement actions. [Dkt. 738-5 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Connecticut Attorney General must act as counsel for the Colorado agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commission for Educational Technology; Department of Consumer Protection (the agency responsible for "authoriz[ing] the [Connecticut Attorney General]" to bring this suit); Department of Economic and Community Development; Department of Education; Department of Mental Health and Addiction Services; Department of Public Health; Department of Children and Families; Office of Health Strategy; office of Higher Education; Office of Policy and Management; Office of the Child Advocate; Office of the Governor; and Office of the State Comptroller. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Connecticut Attorney General does have legal control, for purposes of discovery, over the Connecticut agencies in dispute. While the Connecticut Attorney General is a separate entity and while the Connecticut Attorney General did bring the instant action in its own

United States District Court
Northern District of California

1    independent authority, this does not outweigh the requirement that the Connecticut Attorney

2    General must statutorily act as the Connecticut agencies' counsel. Conn. Gen. Stat. § 3-125.

3    Under Connecticut's statutory scheme, "[t]he Attorney General shall have general

4    supervision over all legal matters in which the state is an interested party, except those legal matters

5    over which prosecuting officers have direction." *Id.* Further, the Connexticut Attorney General

6    "shall appear for . . . all heads of departments and state boards, commissioners, agents, inspectors,

7    committees, auditors, chemists, directors, harbor masters, and institutions . . . in all suits and other

8    civil proceedings . . . in which the state is a party or is interested . . . in any court or other tribunal,

9    as the duties of his office require[.]" *Id.* Such representation is for "all such suits shall be conducted

10   by [the Connecticut Attorney General] or under [their] direction." *Id.*

11   Indeed, the Connecticut Attorney General confirmed that its office will represent all of the

12   Connecticut agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

13   [Dkt. 738-1 at 7–8]. Accordingly, it appears undisputed that under the Connecticut statutory scheme

14   each will be represented by the Connecticut Attorney General in this matter for discovery. *See*

15   Conn. Gen. Stat. § 3-125. Thus, because the Connecticut Attorney General appears likely to be

16   involved in representing these state agencies in any event in this case, whether to respond to

17   subpoenas or to respond to party discovery.

18   Further, the Connecticut Department of Consumer Protection is, under Connecticut law,

19   tasked with authorizing the Connecticut Attorney General to bring Connecticut Unfair Trade

20   Practices Act enforcement actions such as the current action. *See* Conn. Gen. Stat. § 42-110m. The

21   Connecticut Attorney General has taken the position that communications between its office and

22   the Connecticut Department of Consumer Protection regarding authorizing this action (with no

23   limitation as to time frame) is subject to the attorney-client privilege. [Dkt. 738-5 at 2]. By

24   definition, an attorney-client relationship is a prerequisite to assertion of the attorney-client

25   privilege. *See Graf*, 610 F.3d at 1156. Thus, the Connecticut Attorney General's admission that it

26   has an existing (indeed pre-existing) attorney-client relationship with this specific state agency

27   regarding this matter lends further support for a finding of a legal right of access and thus control

28   over the documents of the Connecticut Department of Consumer Protection. Regardless of whether

or not there is control with regard to the other Connecticut state agencies, the position of the Connecticut Department of Consumer Protection is markedly different and, at a minimum, the Court finds that the Connecticut Attorney General's office has legal right to access and thus control over the documents of the Connecticut Department of Consumer Protection for purposes of discovery in this matter.

Relatedly, the Connecticut Attorney General has taken the position that communications between the Connecticut Attorney General and the other state agencies at issue would be covered by the attorney-client privilege when the Connecticut Attorney General is legal counsel for those state agency. [Dkt. 738-4 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Connecticut Attorney General is asserting the attorney-client privilege applies to communications between the Connecticut Attorney General's office and the agencies at issue when they are represented (as they will be here) by that office further supports the conclusion of control here.

In addition, there is no statutory, legal, or administrative rule cited which prohibits the Connecticut Attorney General from accessing the relevant documents of any of the state agencies at issue. There is no citation to any statutory or legal prohibition on the Connecticut Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court

has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Connecticut Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Connecticut Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Connecticut Attorney General argues that the Connecticut Constitution establishes the Governor and the Attorney General as "independently elected officials filling separate constitutionally created offices," *see* dkt. 738-5 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed

United States District Court
Northern District of California

above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Connecticut Attorney General is separate from the executive branch agencies under the control of the Governor is merely a restatement of the issue and not determinative of the issue. *Id.* Arguing that the agencies are "controlled" by the Governor (who is an "independently elected official" in a "dual executive" under the Connecticut Constitution) confuses and conflates the "legal control" issue for discovery with "operational control" or "independence" and thus constitutes a legally erroneous argument.

Finally, to the extent the Connecticut Attorney General asserts essentially the same "virtual veto" argument advanced by several other States' Attorneys General, as discussed above the Court finds the "virtual veto" argument to be speculative and unpersuasive. This argument is based on an unfounded assumption that state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities. The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

Indeed, at least one other federal court has previously found that the Connecticut Attorney General has legal control over Connecticut state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Connecticut Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Connecticut, this Court is disappointed that the Connecticut Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)* As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out

1  discovery disputes through reasonable, good faith negotiations between able and experienced

2  counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

3      Therefore, the Court concludes that the Connecticut Attorney General has legal control, for

4  the purposes of discovery, over the documents held by the Connecticut agencies listed by Meta.

5  **V.    DELAWARE**

6      In opposition to the control issue, the Delaware Attorney General argues primarily the

7  following factors: (1) Delaware law explicitly indicates that the Delaware Department of Justice

8  does not have a right to access Delaware state agency documents in lieu of discovery under a state

9  statute; and (2) Delaware case law has previously held that control over documents turns on whether

10  a party has the power, unaided by courts, to force document production.  [Dkt. 738-6 at 2].

11      In support of a finding of control with regard to these state agencies' documents, Meta argues

12  primarily that Delaware agencies are proscriptively barred from obtaining counsel other than the

13  Delaware Attorney General, without consent from the Delaware Attorney General and the Governor

14  of Delaware.  *Id.* at 3 (citations omitted).  Here, Meta seeks discovery from the following agencies:

15  Department of Education; Department of Health and Human Services; Department of Services for

16  Children, Youth and Families; Office of Management and Budget; and Office of the Governor.  *Id.*

17      After considering the factors argued in the briefs, the Court finds that the factors weigh in

18  favor of a finding that the Delaware Attorney General has legal control, for purposes of discovery,

19  over the Delaware agencies in dispute.  The Court finds that mandatory representation by the

20  Delaware Attorney General, subject to consent of the Delaware Attorney General and Governor of

21  Delaware, weighs heavily towards a finding of legal control.

22      The Delaware Attorney General heavily relies on a statutory argument based on Title 29, §

23  250(b) of the Delaware Code, which states:

24      The Attorney General shall have the right of access at all times to the
        books, papers, records and other documents of any officer,
25      department, board, agency, instrumentality or commission of the state
        government. The Attorney General shall not have this right of access
26      for purposes of discovery in any civil actions brought by or on the
        relation of the Attorney General other than for the books, papers,
27      records, and documents of the Department of Justice.

28  The Delaware Attorney General argues that the second sentence should be interpreted to

United States District Court
Northern District of California

prohibit the Delaware Attorney General any possible right to access the documents of any state agencies "for purposes of discovery" in any action filed by the Attorney General. [Dkt. 738-6 at 2]. The Delaware Attorney General's interpretation of the statute is contrary to the express language of the statute cited. The first sentence of Section 2508(b) gives the Attorney General a broad right to access the documents of state agencies on demand. The second sentence of Section 2508(b) says that "[t]he Attorney General shall not have this right of access" to the documents. The intent of the statute is thus clear – in investigations, in defense of civil action, and in criminal actions, the Delaware Attorney General has a broad right to access state agency documents. In civil actions initiated by the Delaware Attorney General, the statute simply provides that the Delaware Attorney General cannot rely on this statute as a substitute for discovery in that action. However, contrary to the Delaware Attorney General's argument, this statute does not take away every or any other right the Attorney General may have to access the documents of state agencies. At best, the second sentence of Section 2508(b) puts the Delaware Attorney General in the same position as most (if not all) of the other state Attorneys General with regard to control – there being no express statutory right to access documents, the Court examines whether other sources of law provide that right. The second sentence of Section 2508(b) indicates a legislative intent to require the Attorney General to use other available avenues to obtain documents from state agencies in connection with civil litigation, and an intent to disallow the Attorney General to use this statute as an end-around normal discovery procedures. This statute does not prohibit or forbid the Delaware Attorney General from seeking agency documents using any such other available or normal processes.

The Delaware Attorney General further argues that this statute "is thus consistent with the general rule in Delaware that 'attorneys do not exercise control over their clients' property.'" Dkt. 738-6 at 2 (citing *Sokol Holdings, Inc. v. Dorsey & Whitney, LLP*, No. CIV.A. 3874-VCS, 2009 WL 2501542, at *4 (Del. Ch. Aug. 5, 2009)). First, the decision by the Delaware Attorney General to cite *Sokol* is unusual because that case involved a motion to transfer jurisdiction from the Chancery court to Colorado Superior Court. In so holding, the Delaware court stated that "[t]his case has no relevant connection to Delaware, and Delaware law has no bearing on it." *Sokol*, 2009 WL 2501542, at *5. Accordingly, the Delaware Attorney General's argument that *Sokol* demonstrates a "general

1   rule in Delaware" is undercut by the very case they cite, and the Court does not credit the argument

2   for that reason alone.

3          Second, the excerpt from *Sokol* quoted by the Delaware Attorney General has no bearing on

4   control for purposes of discovery. *Sokol* involved a dispute between a law firm and a former client

5   over alleged overbilling of fees and alleged breach of fiduciary duty, and the parties there disputed

6   whether subject matter jurisdiction was proper in Chancery Court or in a Superior Court which can

7   hear professional negligence (i.e., legal) claims. The statement quoted from *Sokol* by the Delaware

8   Attorney General in this Court is a passage distinguishing the scope of the attorney-client

9   relationship from the scope of a fiduciary duty of a trustee when they control property of another as

10  a fiduciary. *Id.* at *4. The *Sokol* opinion's statement, viewed in proper context, indicates that

11  attorneys do not control under the rules governing fiduciary duties the property of a client. And

12  *Sokol* recognized that there can, in fact, be "circumstances in which an attorney exercises control

13  over the property of a client." *Id.*

14         Further, the Court notes that *Sokol*'s analysis is consistent with this Court's analysis of the

15  close relationship between attorneys and clients regarding control for purposes of discovery

16  discussed above. The *Sokol* opinion states that "attorneys simply hold positions of heightened trust

17  . . . which requires the attorney to meet certain professional standards." *Id.*

18          Facially, this statute makes no mention of attorney controlling client property and thus does

19  not support the Delaware Attorney General's argument. More importantly, this argument

20  erroneously confuses property ownership concepts with control for purposes of discovery. In *In*

21  *Synopsys*, Judge Chen found control where "the word control does not require that the party have

22  legal ownership or actual physical possession of the documents at issue." *Synopsys*, 2006 WL

23  1867529, at *2 (citation and internal quotations omitted). Indeed, "while courts have cautioned that

24  "[l]egal ownership is not determinative of whether a party has . . . control of a document for the

25  purposes of Rule 34 the court takes this to mean: if the third-party has 'legal ownership' of the

26  document, the inquiry as to control does not end there. Conversely, if a party does have legal

27  ownership, as here, the court finds a strong indication that defendants possess the very definition of

28  'control' over these documents." *Ice Corp. v. Hamilton Sundstrand Corp.*, 245 F.R.D. 513, 521 (D.

United States District Court
Northern District of California

App. 070

Kan. 2007) (internal quotations omitted); *see also* 7 Moore's Federal Practice – Civil § 34.14 ("Legal restrictions that may limit a party's ability to obtain certain documents or to disclose them to others will not necessarily preclude a finding that the party has possession, custody, or control over those documents.").

The Delaware Attorney General relies on not only *Sokol* and other Delaware state caselaw to argue lack of control. [Dkt. 738-6 at 2]. The Delaware Attorney General cites *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, No. CIV.A. 379-N, 2005 WL 1713067, at *11 (Del. Ch. July 13, 2005), for the proposition that the "key inquiry" for control "is whether they have "the power, unaided by the courts, to force production of the documents." First, *Deephaven* is an unpublished Chancery Court opinion applying Delaware's statutory scheme under Section 220 of Title 8 of the Delaware Code, for a shareholder to inspect the records kept by a Delaware corporation as a fiduciary for its shareholders, which is a far cry from Rule 34. *Id.* As discussed above, control of property by someone acting under a fiduciary duty is not the same legal standard for control of documents under Rule 34, and to the extent the Delaware Attorney General asserts otherwise, that argument is legally erroneous. Second, the Delaware Attorney General also argues here that its argument based on *Deephaven* is supported by another state law case, *Weinstein Enterprises, Inc. v. Orloff*, 870 A.2d 499, 510 (Del. 2005). [Dkt. 738-6 at 2]. That case is not helpful or germane to the issues here. *Weinstein*, like *Deephaven*, concerned inspection of documents controlled by a subsidiary corporation, and the *Weinstein* opinion makes clear that the analysis under Delaware's Section 220 requires two different types of specific control, the first being the "fiduciary" control discussed above, and the second being "actual control" to control operations of a subsidiary organization to force that entity to provide its financial documents for inspection. *Weinstein*, 870 A.2d at 511–12. The discussion in *Weinstein* regarding whether court enforcement of a duty to open documents up for corporate inspection is specifically based on the text of Section 200, and jurisprudence under that state law. *Id.* The cited passage from *Weinstein* nowhere uses the phrase "key inquiry" and nowhere equates Section 220 with Rule 34. Fundamentally, the Court finds the Delaware Attorney General's arguments based on Section 220 and Delaware Chancery Court precedent to be legally irrelevant. Indeed, the Court has serious concerns about the manner in which

United States District Court
Northern District of California

71

the control issue was presented and briefed by several of the state Attorneys General, including the Delaware Attorney General, given how attenuated these state law arguments are from the law under Rule 34.

To be clear, the Court rejects the argument that a "key inquiry" under Rule 34 is whether the party involved has "the power, unaided by the courts, to force production of the documents." Indeed, the issue of control under Rule 34 only requires determining if there is a "legal right" to access or obtain the documents upon demand. Often, a party with a "legal right" must, in fact, use the court system to enforce and validate that right. Nothing in the text of Rule 34 or the Federal Rules of Civil Procedure state, much less imply, that control is to be construed as a discretionary, extra-judicial exercise of "power" (unlike the Delaware statute and case law relied upon heavily by the Delaware Attorney General here). To the contrary, the Federal Rules contemplate and provide measures for parties to seek judicial relief when confronted with a party refusing to produce documents in discovery. *See, e.g.*, Fed. R. Civ. P. 37. Further, the scheme for discovery under the Federal Rules contemplate that, in appropriate circumstances, not only can judicial relief for discovery be sought, but also the courts have the authority to sanction parties (and third parties) for failure to obey a discovery order, among other conduct. Fed. R. Civ. P. 37(b)-(f). A simple review of the Federal Rules demonstrates the inapplicability of Delaware's statutory scheme as analogous for purposes of this dispute.

Further, as discussed in the Legal Standards section above, the inquiry regarding control for purposes of Rule 34 discovery is a federal question, governed by the Federal Rules of Civil Procedure. As discussed above, even if the Delaware Attorney General's interpretation of Section 2508 were correct, that state statute can not preempt federal law, and Delaware's Section 220, and related case law, are not persuasive in evaluating the control issue under Rule 34, because that statutory scheme is so different from Rule 34. Even though detailed consideration of the specific factors under a comity analysis are not applicable in this case given the Supremacy Clause of the U.S. Constitution, the Court has analyzed the cited state law statutes and cases for completeness. *Cf., e.g.*, *In re Vivendi Universal, S.A. Sec. Litig.*, No. 02CIV5571RJHHBP, 2006 WL 3378115, at *2–4 (S.D.N.Y. Nov. 16, 2006) (holding that international comity did not support allowing French

"blocking statute" to prohibit discovery proceeding under Federal Rules of Civil Procedure 34 and 45). The Court's extensive review of the cited Delaware statute and case law, summarized herein, demonstrates that the Delaware Attorney General's arguments here are, at best, incorrect as a matter of law, and, at worst, risk raising questions as to counsel's judgment and credibility.

Because Section 2508 does not operate to foreclose a finding of control under Rule 34, as discussed above, the Court next turns to analyzing the issue of control with regard to other factors. Importantly, the Delaware Attorney General's arguments do not negate the fact that all but of the Delaware agencies at issue here are barred by Delaware law from obtaining counsel other than the Attorney General, absent consent from the Attorney General. Del. Code. § 2507. Indeed, the Delaware Attorney General confirmed that its office could represent all of the Delaware agencies at issue, if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 8]. As noted above, the Delaware Attorney General has had months to confer with the agencies about whether they would seek consent to obtain different counsel. To date, no such other counsel has entered appearance for the Delaware state agencies, and the Delaware Attorney General has not indicated that it has provided any consents to any of the agencies. Under Delaware's statutory scheme,

> the Attorney General shall have the following powers, duties and authority: . . . to provide legal advice, counsel and services for administrative offices, agencies, departments, boards, commissions and officers of the state government concerning any matter arising in connection with the exercising of their official powers or duties . . . , to represent as counsel in all proceedings or actions which may be brought on behalf of or against them in their official capacity in any court, except in actions in which the State has a conflicting interest, all officers, agencies, departments, boards, commissions and instrumentalities of state government.

Del. Code. § 2504(3) (emphasis added).

Accordingly, based on the record presented to the Court, under the Delaware statutory scheme each agency at issue here will be represented by the Delaware Attorney General in this matter for discovery. *See* Del. Code §§ 2503, 2507. Thus, as a matter of the efficient and rational administration of justice in this case, because the Delaware Attorney General will be involved in representing these state agencies in any event in this case (whether to respond to subpoenas or to

United States District Court
Northern District of California

1   respond to party discovery), the Court in its discretion determines that a finding of control is further

2   supported by the simple and pragmatic realities involved in these circumstances.

3       Relatedly, the Delaware Attorney General has taken the position that communications

4   between the Delaware Attorney General's office and these state agencies would be covered by the

5   attorney-client privilege.  [Dkt. 738-6 at 2].  To the extent the Delaware Attorney General has

6   attempted to subdivide its own office between Delaware Attorney General's attorneys in the Fraud

7   and Consumer Division (litigating this case to date) and other attorneys in the Delaware Attorney

8   General's Civil Division (who alleged "are responsible for providing legal advice and representation

9   to the Delaware State Agencies"), *see id.*, in order to somehow argue that the scope of attorney-

10  client privilege is limited only as to some parts of the state Attorney General's office but not other

11  "divisions" of that same organization, that argument is not supported by citation to any law and is

12  contrary to the weight of law.  The scope of attorney-client relationship (and the duties flowing

13  therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety

14  of a legal services organization due to well-known rules of imputation of confidences to a legal

15  services organization, including a public law office.  *See, e.g., People ex rel. Peters*, 951 P.2d at 930

16  ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond

17  the individual attorney and applies with equal force to the other attorneys practicing in the firm. This

18  principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all

19  members of a law firm when any one of them practicing alone would be disqualified because of a

20  conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public

21  law firms such as a district attorney's office or the office of the state public defender."); *accord City

22  of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not

23  doubt that vicarious disqualification is the general rule, and that we should presume knowledge is

24  imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper

25  circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of

26  imputed knowledge in the context of government attorneys, which presumption could be rebutted

27  by proper ethical screening; *cf. also Billings*, 441 S.E.2d at 266 (because individual government

28  lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious

disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Delaware Attorney General's argument that different individual lawyers in the Delaware Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Delaware Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Georgia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Georgia Attorney General is asserting that the attorney-client privilege applies to communications between the Georgia Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

In addition, there is no citation to any statutory or legal prohibition on the Delaware Attorney

United States District Court
Northern District of California

General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## VI. FLORIDA

In opposition to the control issue, the Florida Attorney General argues primarily the following factors: (1) Florida law prevents the Florida Attorney General from accessing documents held by Florida agencies; (2) the Florida Attorney General is a separate entity and independent from the Florida agencies; (3) the Florida Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) Florida agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records. [Dkt. 738-7 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Florida agencies are proscriptively barred from obtaining counsel other than the Florida Attorney General, with certain legal exceptions; and (2) the Florida laws, which purportedly prevents the Florida Attorney General from accessing documents held by Florida agencies, are "wholly unrelated to the discovery at issue[.]" *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commerce; Department of Agriculture and Consumer

Services; Department of Children and Families; Department of Education; Department of Health; and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Florida Attorney General does have legal control, for purposes of discovery, over the certain listed Florida agencies. While the Florida Attorney General is a separate entity and while the Florida Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Florida Attorney General must statutorily act as the Florida agencies' counsel.

Under Florida's statutory scheme, the Florida Attorney general "[s]hall appear in and attend to, in behalf of the state, all suits or prosecutions, civil or criminal or in equity, in which the state may be a party, or in anywise interested, in the Supreme Court and district courts of appeal of this state." Fla. Stat. § 16.01(4). Additionally, the Florida Attorney General "[s]hall appear in and attend to such suits or prosecutions in any other of the courts of this state or in any courts of any other state or of the United States." Fla. Stat. § 16.01(5). Moreover, "[t]he Department of Legal Affairs shall be responsible for providing all legal services required by any department, unless otherwise provided by law. However, the Attorney General may authorize other counsel where emergency circumstances exist and shall authorize other counsel when professional conflict of interest is present." Fla. Stat. § 16.015.

Curiously, the Florida Attorney General takes the position that it would not represent the listed agencies. [Dkt. 738-1 at 9]. However, on the record before the Court, this is an error of law because neither of these agencies are exempt from the express prohibition on retaining different counsel. Accordingly, it appears undisputed that under the Florida statutory scheme each state agency at issue here will be represented by the Florida Attorney General in this matter for discovery. *See* Fla. Stat. § 16.01(4). Thus, because the Florida Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Florida Attorney General has not disclaimed whether it will assert that communications between the Florida Attorney General and these state agencies are covered by the

United States District Court
Northern District of California

United States District Court
Northern District of California

attorney-client privilege. [Dkt. 738-7 at 2]. The Florida Attorney General's argument that "in Florida, the privilege is not waived by communicating work product or attorney-client privileged material to another state agency" is circular. *Id.* If there is an attorney client relationship between the Florida Attorney General and these state agencies, then by definition any such communications would not operate as a waiver of privilege because they are inherently privileged to begin with. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Florida Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Florida Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Florida Attorney General from accessing the relevant documents of any of the state agencies at issue. The Florida Attorney General's argument that two Florida state agencies are required to maintain their own records is unavailing. [Dkt. 738-7 at 2]. Simply having a statute that makes these Florida agencies statutorily responsible for maintaining, preserving, retaining, and providing their own records does not demonstrate that the Florida Attorney General lacks access to those documents. First, the statutes cited by the Florida Attorney General relate to records and materials which are outside the scope of and thus not a restriction on the discovery sought in this case. Fla. Stat. § 893.055 (the Florida Attorney General's ability to request records held by the Florida Department of Health); Fla. Stat. § 409.9072 (the Florida Agency for Health Care Administration's provision of Medicaid-related documents to the Florida Attorney General). Second, the Florida statutes here do not specifically restrict or prohibit the Florida Attorney General's access to agency records for discovery purposes – rather, as noted they provide mechanisms for the Florida Attorney General to request and gain access to specific documents from those two state agencies in certain

circumstances. The general statutory responsibility of Florida agencies to manage their own records does not negate the Florida Attorney General's role as counsel for those agencies, which inherently involves obtaining necessary documents for effective representation in litigation. Therefore, because these statutes do not prohibit the Florida Attorney General's access to the state agencies' materials relevant in this matter for discovery, the Court finds that the Florida Attorney General has a legal right to access and thus control of the relevant records of the agencies listed by Meta.

In addition, there is no citation to any statutory or legal prohibition on the Florida Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Florida Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Florida Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Florida Attorney General argues that the state agencies are "independent" of the Florida Attorney General, are "not under the supervision nor control" of the Florida Attorney General, and that under the Florida Constitution the Attorney General is an "independent, elected official," *see* dkt. 738-7 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether the two entities are legally separate (such as two different and separately incorporated entities or legally established entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "[n]one of them [the state agencies] are related to" the Florida Attorney General and that they "operate outside of the Florida [Attorney General Office's] authority," is merely a restatement of the issue and not determinative of the issue. [Dkt. 738-7 at 2]. Arguing that the "decision to pursue this enforcement action was at the discretion of the Florida [Attorney General Office] and made independently of the state agencies," confuses and conflates the "legal control" issue for discovery with "operational control" or "daily functional independence" and thus constitutes a legally erroneous argument. *Id.*

Indeed, at least one other federal court has previously found that the Florida Attorney General has control over Florida state agency materials under Fed. R. Civ. P. 34 and "they are

United States District Court
Northern District of California

1    therefore subject to party discovery." *Freyre v. Hillsborough Cnty. Sheriff's Off.*, No.

2    813CV02873T27TBM, 2016 WL 1029512, at *2 (M.D. Fla. Mar. 9, 2016), *vacated*, No.

3    813CV02873T27TBM, 2016 WL 4502463 (M.D. Fla. July 6, 2016) (citations omitted) (The Court

4    later vacated the order as a part of the parties' settlement. *Freyre*, 2016 WL 4502463, at *1).

5          The Florida Attorney General argues that the *Freyre* was vacated and thus should be

6    disregarded. [Dkt. 738-7 at 2]. The *Freyre* opinion is not binding precedent, and the fact that *Freyre*

7    was vacated in connection with a settlement impacts the rights of the parties to that case. But nothing

8    in the vacatur of that opinion requires this Court to blind itself to whatever persuasive effect flows

9    from that Florida Federal Court's analysis. While this Court reaches its own independent

10   conclusions consistent with the applicable legal standards discussed above, the analysis by the

11   Florida Federal Court is certainly consistent with (and to that extent further supports) the analysis

12   here with regard to the Florida Attorney General having control with regard to documents of the

13   state agencies at issue.

14         Finally, the Court has recognized that the issue of control of state agency documents, when

15   a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

16   District Litigation involving most of the same States and State Attorneys General as are involved in

17   this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

18   *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

19   which withdrew their objections to party discovery and negotiated a resolution of this issue with the

20   opposing party there. *Id.* at 356 n.5. In that case, Florida is identified as one of the States which

21   reached agreement on the state agency control issue without requiring that court to expend resources

22   resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the

23   control issue against all the remaining objecting states and given that Florida was able to reach a

24   negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

25   the Florida Attorney General and Meta here were unable to reach a negotiated resolution of this

26   dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management

27   Conferences, they should make every effort to work out discovery disputes through reasonable,

28   good faith negotiations between able and experienced counsel, particularly where, as here, there is

United States District Court
Northern District of California

App. 081
81

United States District Court
Northern District of California

1    guidance in precedent on the discovery issue at hand.

2    **VII.    GEORGIA**

3       In opposition to the control issue, the Georgia Attorney General argues primarily the

4    following factors: (1) the Georgia Attorney General must utilize public channels to compel an

5    agency to produce document; (2) the Georgia Attorney General is a separate entity and independent

6    from the Georgia agencies; and (3) the Georgia Attorney General brought the lawsuit under its own

7    independent law enforcement capacity.  [Dkt. 738-8 at 2].

8       In support of a finding of control with regard to these state agencies' documents, Meta argues

9    based primarily on the following factors: (1) Georgia agencies are proscriptively barred from

10   obtaining counsel other than the Georgia Attorney General, with limited exceptions; and (2) the

11   Georgia Attorney General's purported required use of public channels to compel an agency to

12   produce documents is limited for circumstance which require the records be produced for public

13   inspection.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Board of Regents;

14   Department of Behavioral Health and Developmental Disabilities; Department of Economic

15   Development; Department of Education; Department of Family and Children Services; Department

16   of Human Services; Department of Public Health; Governor's Office; and Office of the Child

17   Advocate. *Id.*

18      After considering the factors argued in the briefs, the Court finds that the factors weigh in

19   favor of a finding that the Georgia Attorney General does have legal control, for purposes of

20   discovery, over the listed Georgia agencies.  While the Georgia Attorney General is a separate entity

21   and while the Georgia Attorney General does bring the instant action in its own independent

22   authority, this does not outweigh the requirement that the Georgia Attorney General must statutorily

23   act as the Georgia agencies' counsel.

24      Under Georgia's statutory scheme, the Georgia Attorney General has the duty to "represent

25   the state in all civil actions tried in any court[.]"  Ga. Code § 45-15-3(6).  Additionally, the Georgia

26   Attorney General's department "is vested with complete and exclusive authority and jurisdiction in

27   all matters of law relating to the executive branch of the government and every department, office,

28   institution, commission, committee, board, and other agency thereof.  Every department, office,

United States District Court
Northern District of California

1    institution, commission, committee, board, and other agency of the state government is prohibited

2    from employing counsel in any manner whatsoever unless otherwise specifically authorized by

3    law." Ga. Code § 45-15-34.

4         Indeed, the Georgia Attorney General confirmed that its office could represent all of the

5    Georgia agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt.

6    738-1 at 9–10].  The Court notes that the State Attorneys General have filed an Administrative

7    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

8    to various state agencies, including the Georgia Department of Behavioral Health and

9    Developmental Disabilities and the Georgia Department of Education.  [Dkt. 1031-4 at 17-101].

10   Neither of these state agencies are allowed to employ legal counsel other than the Georgia Attorney

11   General absent circumstances not at issue here.  Ga. Code §§ 45-15-3, -14, -34.  Accordingly, it

12   appears that under the statutory scheme each will be represented by the Georgia Attorney General

13   in this matter for discovery.  Thus, because the Georgia Attorney General appears likely to be

14   involved in representing these state agencies in any event in this case, whether to respond to

15   subpoenas or to respond to party discovery.

16        Further, the Georgia Attorney General has taken the position that communications between

17   the Georgia Attorney General and these state agencies would be covered by the attorney-client

18   privilege, and that communications between the specific prosecution team in this case and the state

19   agencies would be covered by the work product doctrine (but apparently not the attorney-client

20   privilege).  [Dkt. 738-8 at 2].  To the extent the Georgia Attorney General has attempted to subdivide

21   its own office between the prosecution team in this case and other divisions of the state Attorney

22   General in order to somehow argue that the scope of attorney-client privilege is limited only as to

23   some parts of the state Attorney General's office but not other sub-teams (such as the Consumer

24   Protection Division which is the prosecuting team for this action), that argument is not supported

25   by citation to law and is contrary to the weight of law.  The scope of attorney-client relationship

26   (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege)

27   encompasses the entirety of a legal services organization due to well-known rules of imputation of

28   confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel.*

App. 083

1   *Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to

2   the client extends beyond the individual attorney and applies with equal force to the other attorneys

3   practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires

4   disqualification of all members of a law firm when any one of them practicing alone would be

5   disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to

6   both private firms and public law firms such as a district attorney's office or the office of the state

7   public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d

8   at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we

9   should presume knowledge is imputed to all members of a tainted attorney's law firm. However,

10  we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court

11  recognizing presumption of imputed knowledge in the context of government attorneys, which

12  presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266

13  (because individual government lawyer at issue "should be screened from any direct or indirect

14  participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492

15  S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office

16  in which that attorney works is not disqualified as long as the disqualified attorney is appropriately

17  screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such

18  as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some

19  jurisdictions treat public legal service organizations like private law firms and impute shared

20  confidences among lawyers of the entire public law entity. Even in jurisdictions which do not

21  automatically impute disqualification, and shared confidences, to an entire public law office, those

22  courts recognize that ethical screening or other procedures are required out of recognition that actual

23  (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid

24  dissemination of attorney-client privileged communications within an entire public law

25  organization. This review of case law demonstrates that no courts support the Georgia Attorney

26  General's argument that different individual lawyers in the Georgia Attorney General's office have

27  *ex ante* separable, discrete attorney-client relationships.

28      The Court rejects the Georgia Attorney General's attempt to simultaneously disclaim the

*(left margin, rotated)* United States District Court / Northern District of California

existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Georgia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Georgia Attorney General is asserting that the attorney-client privilege applies to communications between the Georgia Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Georgia Attorney General from accessing the relevant documents of any of the state agencies at issue. The Georgia Attorney General's argument that the Georgia Attorney General must use public channels to obtain documents from state agencies is not a credible interpretation of the statute relied upon – there is no citation that a public records request is the only way for the Georgia Attorney General to get documents from state agencies. [Dkt. 738-8 at 2]. If the Georgia Attorney General were correct, then the Georgia Attorney General would have to submit an Open Records Act request even when representing a state agency, to get documents from its own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel, the Georgia Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Georgia Open Records Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). *Bowers v. Bd. of Regents of the Univ. Sys. of Georgia*, 378 S.E.2d 460, 460 (Ga. 1989). Further, there is no citation to any statutory or legal prohibition on the Georgia

United States District Court
Northern District of California

Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Georgia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Georgia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Georgia Attorney General argues that "various constitutionally created state officials whom Georgia residents separately elect and endow with distinct responsibilities" and that the Georgia Attorney General and the head of the Department of Education "are constitutional officers and separately elected in statewide elections," *see* dkt. 738-8 at 2, these arguments misapprehend the "legal control" test for documents – the issue is not simply whether one entity (or the head of an entity) is under the day-to-day operational control of the other (such as a parent-wholly-owned-

App. 086

United States District Court
Northern District of California

1  subsidiary relationship), and not simply whether the two entities are legally separate (such as two

2  different and separately incorporated entities or legally established corporations), but rather whether

3  there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for

4  Rule 34 purposes does not require the party to have actual managerial power over the foreign

5  corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*,

6  305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and

7  the state agencies (a relationship mandated by state law) necessitates close coordination.  While

8  operational control may be a factual situation which demonstrates a legal right to obtain the

9  documents, the absence of such "executive or functional control" is not determinative for evaluating

10  "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises

11  when there are two legally distinct or separate entities – otherwise, if only one entity were involved,

12  there would be no dispute that party discovery covered that one entity.  As discussed above, courts

13  have found "control" for purposes of discovery where a party is clearly not in managerial control

14  over the third-party, such as a subsidiary having control over the documents of a parent corporation,

15  or an individual government officer having control over the documents of an entire agency.  Thus,

16  arguing that these "elected officials – including the [Georgia] Governor and the [Georgia Attorney

17  General] – can have different interests and litigate against each other," is merely a restatement of

18  the issue that there are two entities involved here and not determinative of that issue.  *Id.*  Arguing

19  that "the [Georgia Attorney General] alone brought this action . . . outside the scope of any agency

20  representation or direction from the [Georgia] Governor," confuses and conflates the "legal control"

21  issue for discovery with "operational control" or "daily functional independence" and thus

22  constitutes a legally erroneous argument.  *Id.*

23  **VIII.   HAWAI'I**

24       In opposition to the control issue, the Hawai'i Attorney General argues primarily the

25  following factors: (1) the Hawai'i Attorney General is a separate entity and independent from the

26  Hawai'i agencies; and (2) the Hawai'i Attorney General brought the lawsuit under its own

27  independent law enforcement capacity.  [Dkt. 738-9 at 2].

28       In support of a finding of control with regard to these state agencies' documents, Meta argues

United States District Court
Northern District of California

based primarily on the following factors: (1) the Hawai'i Attorney General must act as counsel for the Hawai'i agencies; and (2) Hawai'i has already confirmed that it will represent each of the identified agencies in responding to a Meta subpoena.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Department of Budget and Finance; Department of Business, Economic Development and Tourism; Department of Commerce and Consumer Affairs; Department of Education; Department of Health; Department of Human Services; Governor; and State Council on Mental Health.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Hawai'i Attorney General does have legal control, for purposes of discovery, over the Hawai'i agencies in dispute.  While the Hawai'i Attorney General is a separate entity and while the Hawai'i Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Hawai'i Attorney General must statutorily act as the Hawai'i agencies' counsel.

Under Hawai'i's statutory scheme, the Hawai'i Attorney General "shall administer and render state legal services, including furnishing of written legal opinions to the governor, legislature, and such state departments and officers as the governor may direct; represent the State in all civil actions in which the State is a party[.]" Haw. Rev. Stat. § 26-7.  Additionally, the Hawai'i Attorney General shall "at all times when called upon, give advice and counsel to the heads of departments, district judges, and other public officers, in all matters connected with their public duties, and otherwise aid and assist them in every way requisite to enable them to perform their duties faithfully." Haw. Rev. Stat. § 28-4.

Indeed, the Hawai'i Attorney General confirmed that its office could represent all of the Hawai'i agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 9–10].  Indeed, the Hawai'i Attorney General will act as counsel for the Hawai'i agencies if the agencies receive a subpoena from Meta.  [Dkt. 738-1 at 10–11].  Accordingly, it appears that under the statutory scheme each will be represented by the Hawai'i Attorney General in this matter for discovery, whether because of any future subpoenas or because the Court finds control for purposes of discovery.  *See id.*  Thus, because the Hawai'i Attorney General appears likely to be

United States District Court
Northern District of California

1    involved in representing these state agencies in any event in this case, whether to respond to

2    subpoenas or to respond to party discovery.

3         Relatedly, the Hawai'i Attorney General has taken the position that all communications

4    between any division of the Hawai'i Attorney General and these state agencies would be covered

5    by the attorney-client privilege. [Dkt. 738-9 at 2]. "[T]o to the extent that [the State] asserts an

6    attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t

7    is inconsistent for the State to argue that on one hand the [State] Attorney General represents these

8    individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule

9    of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Hawai'i Attorney General

10   is asserting the attorney-client privilege applies to communications between the Hawai'i Attorney

11   General's office and the agencies at issue further supports the conclusion of control here. Assertion

12   of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client

13   relationship. *See Graf*, 610 F.3d at 1156.

14         Further, there is no statutory, legal, or administrative rule cited which prohibits the Hawai'i

15   Attorney General from accessing the relevant documents of any of the state agencies at issue. The

16   Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization,

17   the attorney general, is both a party to the case while also acting as counsel for a third party.

18   However, this would not be the first time that a legal services provider, as counsel for a party, is

19   found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018

20   WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and

21   defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . .

22   Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as

23   to responsive materials over which Salas and his law firm had possession, custody or control.").

24   Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over

25   documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding

26   broadly that there must be a finding of a legal right of access to and thus control over third party

27   client documents in every case involving a legal services provider as a party; rather, under the

28   particular facts here, and under the totality of circumstances viewed in light of applicable legal

standards, the Court finds that control exists here.

The Hawai'i Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Hawai'i Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Hawai'i Attorney General argues that these agencies are "independent" from the state Attorney General and are not supervised by the state Attorney General, *see* dkt. 738-9 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "the agencies identified by Meta are distinct entities under Hawai'i law. [The Hawai'i Attorney General] is one of a

United States District Court
Northern District of California

United States District Court
Northern District of California

maximum of twenty principal departments within the Executive Branch" is simply re-stating the issue, and not determinative of the issue. [Dkt. 738-9 at 2]. The Hawai'i Attorney General's argument that: "Each department is headed by a separate executive, and subject to the supervision of the governor" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of the head of each entity. *Id.*

Further, the Hawai'i Attorney General's citation to and reliance on *Lobisch v. United States*, No. CV 20-00370 HG-KJM, 2021 WL 6497240 (D. Hawaii Aug. 19, 2021), is unavailing. In *Lobisch*, the Plaintiff sued the United States Government and sought party discovery from every agency of the United States Government, including any branch of the military and any federal employee. *Id.* at *1. There, the Party seeking discovery made no showing of control and simply argued based on the plain language of Fed. R. Civ. P. 34. *Id.* at 1–2. The *Lobisch* Court rejected that Plaintiff's arguments as contrary to the mandates of Fed. R. Civ. P. 1 as well as contrary to the Federal Torts Claim Act (the substantive law underlying the lawsuit). *Id.* at 2. Because there was no attempt to show control in *Lobisch*, that opinion never discusses the issue and never analyzes the issue under *Citric Acid*. Accordingly, the *Lobisch* decision is not determinative or even germane to the issue here. Unlike in *Lobisch*, here there has been extensive argument over and (as detailed in this Order) extensive analysis of the control issue under the facts presented.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Hawai'i is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Hawai'i was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that

the Hawai'i Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## IX.    IDAHO

In opposition to the control issue, the Idaho Attorney General argues primarily the following factors: (1) the Idaho Attorney General is a separate entity and independent from the Idaho agencies; (2) the Idaho Attorney General may demand records from other agencies; however, it may only do so pursuant to statute; and (3) the Idaho Attorney General brought the lawsuit under its own independent law enforcement capacity.  [Dkt. 738-10 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Idaho agencies are proscriptively barred from obtaining counsel other than the Idaho Attorney General, with limited exceptions.  *Id.* at 3.  Here, Meta seeks discovery from the following agencies: Commerce Department; Education Board; Education Department; Governor's Office; and Health and Welfare Department.  *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Idaho Attorney General does not have legal control, for purposes of discovery, over the Idaho agencies in dispute.  While the Idaho Attorney General must act as the legal counsel for the Idaho agencies, this requirement does not override the statutory limitation that the Attorney General may only demand documents from these agencies if explicitly permitted by statute.  Since the present lawsuit was initiated under the Idaho Attorney General's independent law enforcement capacity and no relevant statute grants the Idaho Attorney General authority to demand documents from the Idaho agencies in question, the Court concludes that the Idaho Attorney General does not have legal control, for the purposes of discovery, over the Idaho agencies in dispute.

Under Idaho's statutory scheme, the Idaho Attorney General shall "perform all legal services for the state and to represent the state and all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all courts and before all administrative tribunals

*United States District Court*
*Northern District of California*

or bodies of any nature." Idaho Code § 67-1401(1). Additionally, the Idaho Attorney General is required to "advise all departments, agencies, offices, officers, boards, commissions, institutions and other state entities in all matters involving questions of law." Idaho Code § 67-1401(2). Furthermore, "no department, agency, office, officers, board, commission, institution or other state entity shall be represented by or obtain its legal advice from an attorney at law other than the attorney general," with certain exceptions. Idaho Code § 67-1406. One such exception potentially relevant includes "colleges and universities" which "may employ private counsel to advise them and represent them before courts of the *state of Idaho*." Idaho Code § 67-1406(2). However, the instant matter is not before the State of Idaho.

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies. *See* Dkt. 1031-5. None of these state agencies are allowed to employ legal counsel other than the Idaho Attorney General and thus by statute each must be represented by the Idaho Attorney General in this matter for discovery. This arrangement indicates strongly that the state Attorney General, in fulfilling its role as chief legal advisor, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Idaho Attorney General has legal control, for the purposes of discovery, over the documents held by the Idaho agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *See Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Idaho is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that Idaho was able to reach a negotiated

United States District Court
Northern District of California

1  resolution of the control dispute in that Multi-District Litigation, this Court is disappointed that Meta

2  and Idaho were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly

3  encouraged the Parties at multiple Discovery Management Conferences, they should make every

4  effort to work out discovery disputes through reasonable, good faith negotiations between able and

5  experienced counsel, particularly where, as here, there is guidance in precedent on the discovery

6  issue at hand.

7  **X.  ILLINOIS**

8  In opposition to the control issue, the Illinois Attorney General argues primarily the

9  following factors: (1) the Illinois Attorney General is a separate entity and independent from the

10  Illinois agencies; and (2) the Illinois Attorney General brought the lawsuit under its own

11  independent law enforcement capacity. [Dkt. 738-11 at 2].

12  In support of a finding of control with regard to these state agencies' documents, Meta argues

13  primarily that the Illinois Attorney General is required to represent Illinois agencies, pursuant to the

14  Illinois Constitution. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of

15  Education; Board of Higher Education; Department of Children and Family Services; Department

16  of Commerce and Economic Opportunity; Department of Human Services; Department of Public

17  Health; and Office of the Governor. *Id.*

18  After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of

19  a finding that the Illinois Attorney General does have legal control, for purposes of discovery, over

20  the Illinois agencies in dispute. While the Illinois Attorney General is a separate entity and while

21  the Illinois Attorney General does bring the instant action in its own independent authority, this does

22  not outweigh the requirement that the Illinois Attorney General is "the legal officer of the State."

23  Ill. Const. Art. V, § 15. The Illinois Constitution has been interpreted to require that the Illinois

24  Attorney General represent state agencies. *People ex rel. Sklodowski v. State*, 642 N.E.2d 1180,

25  1184 (Ill. 1994), *as modified on denial of reh'g* (Nov. 15, 1994). Indeed, the Illinois Attorney

26  General admits that "the [Illinois Attorney General] has broad statutory and common law powers to

27  conduct litigation on behalf of State agencies[.]" [Dkt. 738-11 at 2].

28  Indeed, the Illinois Attorney General confirmed that its office could represent all of the

1    Illinois agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt.

2    738-1 at 11–12]. Accordingly, it appears that under the Illinois Constitutional scheme each will

3    likely be represented by the Illinois Attorney General in this matter for discovery, whether because

4    of any future subpoenas or because the Court finds control for purposes of discovery. *See Env't*

5    *Prot. Agency v. Pollution Control Bd.*, 372 N.E.2d 50, 51 (Ill. 1977). Thus, because the Illinois

6    Attorney General appears likely to be involved in representing these state agencies in any event in

7    this case, whether to respond to subpoenas or to respond to party discovery.

8         Relatedly, the Illinois Attorney General has taken the position that any past or future

9    communications between any the Illinois Attorney General and these state agencies, if they are

10   responsive to Meta's discovery requests, would be covered by the attorney-client privilege. [Dkt.

11   738-11 at 2]. Indeed, the Illinois Attorney General admis that "attorney-client relationship exists

12   between a State agency and the Attorney General." *Id.* (quoting *Env't Prot. Agency*, 372 N.E.2d at

13   52). "[T]o the extent that [the State] asserts an attorney-client privilege with these legislators, it

14   does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one

15   hand the [State] Attorney General represents these individuals, but that for discovery purposes the

16   [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL

17   1796661, at *2. The fact that the Illinois Attorney General is asserting the attorney-client privilege

18   applies to communications between the Illinois Attorney General's office and the agencies at issue

19   (and admitting that an attorney-client relationship exists, even as to past communications relevant

20   to discovery in this case) further supports the conclusion of control here.

21        Further, there is no statutory, legal, or administrative rule cited which prohibits the Illinois

22   Attorney General from accessing the relevant documents of any of the state agencies at issue. The

23   Illinois Attorney General cites two statutes which allegedly restrict state agencies from providing

24   "certain types of information to anyone, even other agencies." Dkt. 738-11 at 2 (citing 20 Ill. Comp.

25   Stat. 2305/2.1(c); 410 Ill. Comp. Stat. 305/9(2)). Those two statutes are not applicable to scope of

26   discovery in this action: Section 2.1(c) relates to "[s]haring of information on reportable illnesses,

27   health conditions, unusual disease or symptom clusters, or suspicious events between and among

28   public health and law enforcement authorities[,]" and Section 9(2) relates to the confidentiality of

"[a]ll information and records held by a State agency, local health authority, or health oversight agency pertaining to HIV-related information[.]" The Illinois Legislature knew how to specify restricting sharing of information between agencies and the Illinois Attorney General in these two specific instances, but failed to do so more generally for discovery (unlike, for example, the Delaware Legislature as discussed above), and this lack of a general prohibition supports a finding of control.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Illinois Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Illinois Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Illinois Attorney General argues that the Illinois Attorney General and the Illinois

United States District Court
Northern District of California

United States District Court
Northern District of California

Governor "are independently elected by the State's voters; they serve in different roles, enjoy unique rights and responsibilities, and have control over separate governmental functions," *see* dkt. 738-11 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "there is no law that gives the [Illinois Attorney General] control over their [the agencies'] executive functions" is simply re-stating the issue to be decided, and not determinative of the issue. *Id.* The Illinois Attorney General's argument that these are "independent state agencies" erroneously conflates the "legal control" issue with "operational control" or "functional independence" of each entity.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

*(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Illinois is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Illinois was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Illinois Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XI. INDIANA

In opposition to the control issue, the Indiana Attorney General argues primarily the following factors: (1) the Indiana Attorney General is a separate entity and independent from the Indiana agencies; (2) certain offices are entitled to employ counsel for litigation purposes without approval from the Indiana Attorney General; (3) the Indiana Attorney General brought the lawsuit under its own independent law enforcement capacity; and (4) the Indiana Attorney General is not seeking damages on behalf of the listed agencies. [Dkt. 738-12 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Indiana agencies are proscriptively barred from obtaining counsel other than the Indiana Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Commission on Improving the Status of Children in Indiana; Department of Child Services; Department of Education; Department of Health; Family and Social Services Administration; Governor; Office of Management and Budget; and State Board of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Indiana Attorney General does have legal control, for purposes of discovery, over the listed Indiana agencies which are not subject to an exception of mandatory

representation. While the Indiana Attorney General is a separate entity and while the Indiana Attorney General does bring the instant action in its own independent authority and does not seek damages on behalf of the listed agencies, this does not outweigh the requirement that the Indiana Attorney General will act as the agencies' counsel. The statutory scheme in Indiana requires that "[t]he attorney general shall have charge of and direct the prosecution of all civil actions that are brought in the name of the state of Indiana or any state agency." Ind. Code § 4-6-3-2(a). "The [Indiana] Attorney General's authority to represent the State, *its agencies* and officers is nearly exclusive, and agencies may not employ any attorney without the written consent of the Attorney General." *Indiana State Highway Comm'n v. Morris*, 528 N.E.2d 468, 474 (Ind. 1988) (emphasis added).

Importantly, the Indiana Attorney General's arguments do not negate the fact that all of the Indiana agencies at issue here are barred by Indiana law from obtaining counsel other than the Indiana Attorney General: "No agency . . . shall have any right to name, appoint, employ, or hire any attorney or special or general counsel to represent it or perform any legal service in behalf of the agency and the state without the written consent of the attorney general." Ind. Code § 4-6-5-3(a). Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Commission on Improving the Status of Children in Indiana, the Indiana Department of Education, and the Indiana Department of Health. [Dkt. 1031-5 at 227–352]. None of these state agencies are allowed to employ legal counsel other than the Indiana Attorney General absent consent (and there is no indication of any such consent in the record) and thus by statute each must be represented by the Indiana Attorney General in this matter for discovery. *See* Ind. Code §§ 4-6-5-1, -2 (the Indiana Attorney General "shall have the sole right and power" to assign an attorney "to any agency of the state of Indiana to perform in behalf of such agency"). This arrangement indicates strongly that the Indiana Attorney General, in fulfilling its statutory role to as "nearly exclusive" legal representative of state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Indiana Attorney General has legal control, for

United States District Court
Northern District of California

1    the purposes of discovery, over the documents held by the Indiana agencies listed by Meta, including

2    in particular the three agencies recently listed in the intent to issue subpoenas.

3            Relatedly, the Indiana Attorney General has taken the position that communications between

4    the Indiana Attorney General and these state agencies would be covered by the attorney-client

5    privilege if such communications are encompassed within the scope of discovery sought by Meta.

6    [Dkt. 738-12 at 2].  Indeed, the Indiana Attorney General admits that "Indiana law has long cemented

7    the idea that '[t]he relationship of attorney and client clearly applies to the [Indiana] Attorney

8    General and the state agencies he represents, and the attorney-client privilege should protect

9    communications exchanged in that relationship.'"  *Id.*  "[T]o to the extent that [the State] asserts an

10   attorney-client privilege with these legislators, it does so solely in their official capacities . . . .  [I]t

11   is inconsistent for the State to argue that on one hand the [State] Attorney General represents these

12   individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule

13   of Civil Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  The fact that the Indiana Attorney General

14   is asserting the attorney-client privilege applies to communications between the Indiana Attorney

15   General's office and the agencies at issue even as to past communications within the scope of

16   relevant discovery in this case further supports the conclusion of control here.

17           Further, there is no statutory, legal, or administrative rule cited which prohibits the Indiana

18   Attorney General from accessing the documents of the state agencies at issue.  The Indiana Attorney

19   General argues control is somehow lacking because Indiana law contemplates that the Indiana

20   Attorney General can issue civil investigative demands to state agencies.  Dkt. 738-12 at 2 (citing

21   Ind. Code §§ 4-6-3-1, -3 (regarding issuance of civil investigative demands to state agencies)).  As

22   Meta argues, however, the fact that there exists a statutory right for the Indiana Attorney General

23   demonstrates that the Indiana Legislature expressly intended there to be a formal mechanism for

24   sharing of documents between state agencies and the Indiana Attorney General.  [Dkt. 738 at 3].

25   There is nothing in this statutory scheme which indicates that the procedure for issuing civil

26   investigative demands to agencies is the exclusive manner by which the Indiana Attorney General

27   can obtain documents from state agencies, and rather than implying that the statute prohibits or

28   denigrates from a legal right to obtain documents from state agencies, the statutory scheme here

indicates support for (and a legal mechanism for) information sharing between Indiana agencies and the Indiana Attorney General.

The Indiana Attorney General does not cite to any general statutory or legal prohibition on the Indiana Attorney General's representing the state agencies in this matter for purposes of discovery. The Indiana Attorney General cites to one entity, the Indiana Economic Development Corporation, which is defined under state law as an "independent instrumentality" and not a state agency, and which has an express statutory right to retain its own legal counsel. Dkt. 738-12 at 2 (citing Ind. Code §§ 5-28-3-2, -5-3). Meta expressly disclaims seeking "party discovery" from the Indiana Economic Development Corporation and expressly commits to "treat the Economic Development Corporation as a non-party for purposes of discovery." [Dkt. 738-12 at at 3 n.1].

The Indiana Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Indiana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Indiana Attorney General argues that the Indiana Attorney General "is a separately elected and statutorily created office" from the Indiana Governor, *see* dkt. 738-12 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual

United States District Court
Northern District of California

situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Indiana Attorney General "does not exert generalized control over the agencies or their documents," dkt. 738-12 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Indiana Attorney General's argument that these are "agencies are not subject to management by [the Indiana Attorney General], are not directed by [the Indiana Attorney General]," erroneously conflates the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery. *Id.*

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Indiana is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Indiana was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Indiana Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XII.  KANSAS

In opposition to the control issue, the Kansas Attorney General argues primarily the following factors: (1) the Kansas Attorney General is a separate entity and independent from the Kansas agencies; (2) Kansas agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (3) the Kansas Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-13 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Kansas Attorney General must appear for the state and control the state's prosecution or defense. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Regents; Department for Aging and Disability Services; Department for Children and Families; Department of Administration; Department of Commerce; Department of Education; Department of Health and Environment; and Governor. *Id.*

United States District Court
Northern District of California

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Kansas Attorney General has legal control, for purposes of discovery, over the listed Kansas agencies. First, the statutory scheme in Kansas requires that "[t]he attorney general *shall* appear for the state, and prosecute and defend any and all actions and proceedings, civil or criminal, . . . in all federal courts, in which the state shall be *interested* or a party, and *shall*, when so appearing, control the state's prosecution or defense." Kan. Stat. § 75-702(a) (emphasis added). It cannot be seriously disputed that the State of Kansas is interested when one or more of its state agencies are the target of discovery in a federal action. Second, the Kansas Attorney General is the chief legal officer for the state of Kansas. *DeBerry v. Kansas State Bd. of Acct.*, 196 P.3d 958, 958 (Kan. Ct. App. 2008) ("Acting as counsel for the Board, which is the administrative agency in charge of regulating the practice of certified public accountancy in the state of Kansas, is entirely consistent with the attorney general's role as chief legal officer for the State. Although the legislature has identified various situations in which the attorney general is *required* to provide representation, we find no Kansas law that precludes the attorney general from representing the Board under the particular circumstances presented in this case.") (emphasis in original). Further, Kansas's statutory scheme requires that "[t]he attorney general *shall* . . . prosecute or *defend* for the state *all actions*, civil or criminal, relating to any matter *connected with their departments*." Kan. Stat. § 75-703 (emphasis added).

Importantly, the Kansas Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Kansas agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, the Kansas Attorney General confirmed that its office would definitely represent all of the Kansas agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Kansas Attorney General in this matter for discovery. *See* Kan. Stat. §§ 75-702, -703. Curiously, the Kansas Attorney General takes the position that it would not represent the listed agencies. [Dkt. 738-1 at 13]. However, on the record before the Court, this is an error of law because neither of these agencies are exempt from the express prohibition on retaining different

United States District Court
Northern District of California

1  counsel. Thus, because the Kansas Attorney General will be involved in representing these state

2  agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

3      Relatedly, the Kansas Attorney General has taken the position that communications between

4  the Kansas Attorney General and these state agencies would be covered by the attorney-client

5  privilege if such communications are encompassed within the scope of discovery sought by Meta.

6  [Dkt. 738-13 at 2]. "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7  legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue

8  that on one hand the [State] Attorney General represents these individuals, but that for discovery

9  purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*,

10 2014 WL 1796661, at *2. Just as the Court in *Perez* rejected the inconsistent approach to privilege

11 there, here the Kansas Attorney General argues that "the Attorney General does not ***currently***

12 represent any of the identified agencies" while at the same time arguing that "***if*** another state agency

13 requests legal representation or legal advice from the [Kansas] Attorney General's Office, or

14 receives a discovery request in this litigation, information related to those communications with that

15 agency ***are privileged***, under privilege doctrines including attorney-client privilege." Dkt 738-13 at

16 2 (emphasis added). The Kansas Attorney General's attempt to preserve the ability to assert the

17 attorney-client privilege between the Kansas Attorney General's office and the agencies at issue

18 further supports the conclusion of control here. Here, it is illusory to argue "if" the Kansas Attorney

19 General would represent the state agencies – the Kansas Attorney General has already confirmed

20 that their office will do so for discovery in this matter. [Dkt. 738-1 at 13]. Assertion of the attorney-

21 client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*,

22 610 F.3d at 1156.

23      Further, there is no statutory, legal, or administrative rule cited which prohibits the Kansas

24 Attorney General from accessing the documents of the state agencies at issue for purposes of

25 discovery. The Kansas Attorney General's argument that the Kansas Attorney General must use

26 either the Kansas Open Records Act, Kan. Stat. § 45-215 *et seq.*, or a subpoena to obtain documents

27 from state agencies who are their client is not a credible interpretation of the Kansas Open Records

28 Act – there is no citation that a public records request is the only way for the Kansas Attorney

General to get documents from state agencies they are representing in litigation. [Dkt. 738-8 at 2].

If the Kansas Attorney General were correct, then the Kansas Attorney General would have to submit an Open Records Act request even when representing a state agency, to get documents from its own client – which is not merely impractical and not believable but also contrary to the principles of effective legal representation. If the Kansas Attorney General's supposition that, every time the Kansas Attorney General seeks documents from state agencies, Open Records Act requests would be routine and necessary, then the logical conclusion is that Open Records Act would be a routinely used legal right to access those documents and records of the agency subject to the Act. At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34. *See Flagg*, 252 F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure."). As counsel, the Kansas Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Kansas Open Records Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). Kan. Stat. § 45-220(a). Further, the Kansas Open Records Act nowhere states that this statute is the only means by which the Kansas Attorney General can obtain records from other state agencies – the statute merely sets up a permissive system for public inspection, not a restriction or limitation on access. Indeed, the Kansas Attorney General has cited no precedent requiring the Kansas Attorney General to use either an Open Records Act request or a subpoena to obtain documents from state agencies represented in litigation by the Kansas Attorney General. The Court finds this argument to be wholly unpersuasive. Finally, the argument that there is no statute or law specifically authorizing the Kansas Attorney General "unfettered access to or the right to compel document production of other agencies' documents" is legally incorrect. Control, for purposes of

United States District Court
Northern District of California

Rule 34, does not require showing "unfettered access" to all state agencies' documents under all circumstances. *Monsanto*, 2023 WL 4083934, at *5 ("Despite the State's characterization of the issue, we need not decide whether the Illinois Attorney General has "unfettered access to all state agencies' records under all circumstances." Rather, the issue is one of "control" under Rule 34 – nothing more, nothing less."). Further, the state Attorney General's argument implicitly assumes an overly restrictive view of the control test for documents under Rule 34. To the contrary, courts have recognized that control for purposes of document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans*, 2010 WL 1136216, at *1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at *3–4.

Additionally, the Kansas Attorney General does not cite any statutory or legal prohibition on the Kansas Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kansas Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Kansas Attorney General would necessarily have access to and thus control over the relevant

documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Kansas Attorney General argues that the Kansas Attorney General "separate and distinct elected entity with separate duties and responsibilities as delineated in the Kansas Constitution and Kansas law," *see* dkt. 738-13 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Kansas Attorney General "is not suing on behalf of or representing any state agency in this litigation; rather, he brings this action under independent statutory authority," dkt. 738-13 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Kansas Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is

United States District Court
Northern District of California

insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kansas Attorney General cites and relies upon *Amex*, 2011 WL 13073683, and *Warner Chilcott Holdings*, 2007 WL 9813287, at *4–5. [Dkt. 78-13 at 2]. As discussed above (and incorporated herein), the Court finds neither of these cases to be persuasive (and neither is binding). Both cases focus on the issue of executive control and the structure of the executive branch of the local state government, and as discussed above, the Ninth Circuit's standard for control is not limited to or determined by whether there is "operational control" of one entity by another in day-to-day functions. *Citric Acid*, 191 F.3d at 1107–08 (explaining that control over local unions was not found in *International Union* even though the national union could theoretically dissolve and take over the operations and hence the documents of the local unions).

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Kansas is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kansas was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kansas Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XIII. KENTUCKY

In opposition to the control issue, the Kentucky Attorney General argues primarily the

United States District Court
Northern District of California

following factors: (1) the Kentucky Attorney General is a separate entity and independent from the Kentucky agencies; (2) only two agencies, which are not on Meta's listed agencies, allow the Kentucky Attorney General to have access to material evidence and information; (3) Kentucky agencies have their own staffing and capacity to independently initiate and participate in litigation and retain counsel as they see fit; and (4) the Kentucky Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-14 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily the Kentucky Attorney General must act as chief legal officer tasked with attending to the legal business of Kentucky state agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Education, Cabinet for Health and Family Services, Department for Behavioral Health, Developmental and Intellectual Disabilities, Department for Business Development, Department for Public Health, Department of Education, Finance and Administration Cabinet, Governor, and Office of State Budget Director. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Kentucky Attorney General has legal control, for purposes of discovery, over the listed Kentucky agencies. First, the Kentucky "Attorney General is the chief law officer of the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political subdivisions, and the legal adviser of all state officers, departments, commissions, and agencies[.]" Ky. Rev. Stat. § 15.020(1). Second, the statutory scheme in Kentucky requires that "the Attorney General **shall** . . . **enter an appearance in all cases**, hearings, and proceedings in and before all other courts, tribunals, or commissions in or out of the state, **and attend to all litigation** and legal business in or out of the state required of the office by law, or in which the Commonwealth has an interest, **and any litigation** or legal business that **any** state officer, department, commission, or **agency may have** in connection with, or growing out of, his, her, or **its official duties**[.]" Ky. Rev. Stat. § 15.020(3) (emphasis added).

The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies. *See* Dkt. 1031-5. Indeed, the Kentucky Attorney General confirmed that its office could

United States District Court
Northern District of California

represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 13–14]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Kentucky Attorney General in this matter for discovery. *See* Ky. Rev. Stat. § 15.020(1). Thus, because the Kentucky Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

The Kentucky Attorney General relies on statutory authority for Kentucky agencies to hire their own counsel to demonstrate that the Kentucky Attorney General may have no role in representing the agencies here and thus would not have control. Dkt. 738-14 at 2 (citing Ky. Rev. Stat. § 12.210). However, the Kentucky Legislature made clear that this statute does not denigrate from Section 15.020 quoted above which requires that the Kentucky Attorney General "shall" appear in any litigation that any agency may have in connection with its official duties. *See* Ky. Rev. Stat. § 12.230 ("KRS 15.020 shall remain in full force and effect, except to the extent the same is in conflict with KRS 12.200 to 12.220[.]"). Further, the Kentucky statutory scheme continues to recognize that "[t]he [Kentucky] Governor or any department **may require the advice or services** of the Attorney General and the assistant attorneys general in matters relating to the duties or functions of **any such office or department**." *Id.* (emphasis added).

Further, there is no statutory, legal, or administrative rule cited which prohibits the Kentucky Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. To the contrary, the Kentucky Attorney General admits that state law requires that "**[a]ll departments, agencies**, officers, and employees **of the Commonwealth shall fully cooperate with the [Kentucky] Attorney General** in carrying out the functions of [Kentucky consumer protection laws]." Ky. Rev. Stat. § 367.160(1) (emphasis added). This statutory requirement affords the Kentucky Attorney General the legal right to obtain documents from state agencies when enforcing state consumer protection laws, thus satisfying the *Citric Acid* test for control here.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services

provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Kentucky Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Kentucky Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Kentucky Attorney General argues that the "Kentucky agencies at issue . . . are distinct and separate entities," *see* dkt. 738-14 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law)

United States District Court
Northern District of California

necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. *See, e.g.*, *Sublett v. Henson*, No. 5:16-CV-00184-TBR, 2018 WL 3939333, at *3–6 (W.D. Ky. Aug. 16, 2018) (rejecting objections of named defendants, officers and officials of state prison, to document requests, and finding warden has control over documents of the Kentucky Department of Corrections). Thus, arguing that "[t]he Kentucky Attorney General and [Kentucky] Governor are separately elected constitutional officers of the Commonwealth . . . [and] the other agencies named by Meta are headed by individuals appointed by the Governor," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Kentucky Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

In opposition, the Kentucky Attorney General cites several cases in which the Kentucky Attorney General has been "in direct legal conflict with these agencies." [Dkt. 738-14 at 2 n.1]. This argument is merely another way of restating the "operational independence" argument rejected argument above. The fact that, in other cases involving different issues, the Kentucky Attorney General has been adverse to state agencies is not determinative of whether there is control for purposes of the documents sought in discovery in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 356–57. Just as a joint defense group in a multi-defendant litigation may include companies which, in other venues, are adverse litigants, the law understands that entities may be adverse in one forum and still yet may have aligned legal interests in another.

Finally, the Court has recognized that the issue of control of state agency documents, when

a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Id.* at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Kentucky is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Kentucky was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Kentucky Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XIV. LOUISIANA

In opposition to the control issue, the Louisiana Attorney General argues primarily the following factors: (1) the Louisiana Attorney General is a separate entity and independent from the Louisiana agencies; and (2) most Louisiana agencies have their own general counsel or contract with outside counsel to handle their other legal needs. [Dkt. 738-15 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Louisiana Attorney General acts as the chief legal officer of the state and is required by statute to represent state agencies in all litigation involving tort claims. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Children and Family Services, Department of Education, Department of Health, Department of Economic Development, Office of Planning and Budget, and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Louisiana Attorney General does have legal control, for purposes of

discovery, over the listed Louisiana agencies which are not subject to an exception of mandatory representation. While the Louisiana Attorney General is a separate entity and while the Louisiana Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the Louisiana Attorney General will act as the agencies' counsel. The statutory scheme in Louisiana requires that "[t]he attorney general **shall** represent the state and **all departments and agencies** of state government in **all litigation** arising out of or involving **tort**[.]" La. Stat. § 49:257(A) (emphasis added). "[C]onsumer protection claims sound in tort[.]" *Zodiac 21, Inc. v. Oyo Hotels, Inc.*, No. CV 20-63-SDD-RLB, 2020 WL 6479160, at *6 n.56 (M.D. La. Nov. 3, 2020) (analyzing claim under Louisiana Unfair Trade Practice and Consumer Law); *accord Kreger v. Gen. Steel Corp.*, No. CIV.A. 07-575, 2010 WL 2902773, at *12 (E.D. La. July 19, 2010) ("class members' consumer protection claims . . . sound in tort). Indeed, the Louisiana Attorney General admits here that "the Louisiana Attorney General does represent state agencies in specific circumstances, such as litigation arising out of or involving tort[.]" [Dkt. 738-15 at 2].

Further, the Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Louisiana Department of Education and the Louisiana Department of Health. [Dkt. 1031-5 at 1070–1153]. The Louisiana Attorney General is required by statute to represent each of these agencies in this matter for discovery. *See* La. Stat. § 49:257(A). This arrangement indicates strongly that the Louisiana Attorney General, in fulfilling its state constitutional role as "chief legal officer of the state," La. Const. art. IV, § 8, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies. Therefore, the Court concludes that the Louisiana Attorney General has legal control, for the purposes of discovery, over the documents held by the Louisiana agencies listed by Meta, including in particular the agencies recently listed in the intent to issue subpoenas.

The Louisiana Attorney General has taken the position that, because that office "does not represent agencies in this action," communications between the Louisiana Attorney General and these state agencies "are **generally** not protected under the attorney-client privilege." Dkt. 738-15 at 2 (emphasis added). The Louisiana Attorney General's use of the word "generally" reveals the

United States District Court
Northern District of California

United States District Court
Northern District of California

1    intention: the Louisiana Attorney General is attempting to preserve the ability to assert the attorney-

2    client privilege later when faced with formal discovery (or this Order). It is illusory to argue the

3    Louisiana Attorney General does not presently represent the state agencies – the Louisiana Attorney

4    General has already confirmed that their office could do so for discovery in this matter. [Dkt. 738-

5    1 at 14–15]. And as discussed above, the Louisiana Legislature requires the Louisiana Attorney

6    General to represent agencies in cases such as this which sound in tort. "[T]o to the extent that [the

7    State] asserts an attorney-client privilege with these legislators, it does so solely in their official

8    capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

9    General represents these individuals, but that for discovery purposes the [Plaintiff] United States

10   must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. Just as the

11   court in *Perez* rejected the inconsistent approach to privilege there, here the Court rejects the

12   Louisiana Attorney General's apparent intention to argue now (in opposition to this motion) that

13   "generally" the privilege does not apply, while plainly relying on the word "generally" to preserve

14   the ability to assert the privilege later. The Louisiana Attorney General's attempt to preserve the

15   ability to assert the attorney-client privilege between the Louisiana Attorney General's office and

16   the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client

17   privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610

18   F.3d at 1156.

19          Further, there is no statutory, legal, or administrative rule cited which prohibits the Louisiana

20   Attorney General from accessing the documents of the state agencies at issue. [Dkt. 738-15 at 2].

21   Because the Louisiana Attorney General is required to serve as counsel for the Louisiana agencies

22   in litigation arising out of or involving tort, the Court is not persuaded by the argument that "most

23   state agencies have their own general counsel or contract with outside counsel to handle their ***other***

24   legal needs." *Id.* (emphasis added). The instant case falls outside the scope of "their other legal

25   needs" and therefore such authority by the agencies in "other" areas of law is legally irrelevant here.

26   Similarly, the Louisiana Attorney General does not cite to any general statutory or legal prohibition

27   on the Louisiana Attorney General's representing the state agencies in this matter for purposes of

28   discovery.

United States District Court
Northern District of California

The Louisiana Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Louisiana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Louisiana Attorney General argues that the Louisiana Attorney General "is an independently elected constitutional officer" from the Louisiana Governor, *see* dkt. 738-15 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Louisiana Attorney General "is a separate department under the executive branch," dkt. 738-15 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Louisiana

Attorney General's argument that these agencies "are legally distinct entities," erroneously conflates the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery. *Id.*

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

## XV. MAINE

In opposition to the control issue, the Maine Attorney General argues primarily the following factors: (1) the Maine Attorney General is a separate entity and independent from the Maine agencies; (2) the Maine Attorney General brought the lawsuit under its own independent law enforcement capacity; and (3) that the statutes which require the Maine Attorney General to represent Maine agencies does not afford the Maine Attorney General control or access to the Maine agencies' documents. [Dkt. 738-16 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Maine Attorney General is the chief law officer of the state and that the Maine Attorney General must appear for all Maine agencies in all civil actions

in which the state is a party; (2) Maine agencies are proscriptively barred from obtaining counsel other than the Maine Attorney General without consent from the Maine Attorney General; and (3) the Maine Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Economic & Community Development, Department of Education, Department of Health & Human Services, Division of Administration, and Governor's Office. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Maine Attorney General does have legal control, for purposes of discovery, over the Maine agencies in dispute. The Maine Attorney General admits that the Maine Attorney General is "the chief law officer of the State." Dkt. 738-16 at 2 (quoting *Lund v. Pratt*, 308 A.2d 554, 558 (Me. 1973). The statutory scheme in Maine requires that "[t]he Attorney General or a deputy, assistant or staff attorney *shall appear* for the State . . . and agencies of the State in *all civil actions* and proceedings in which the State is a party or interested . . . in all the courts of the State and in those actions and proceedings before any other tribunal when requested by the Governor or by the Legislature or either House of the Legislature. All such actions and proceedings *must* be prosecuted or defended by the Attorney General or under the Attorney General's direction." Me. Rev. Stat. tit. 5, § 191(3) (emphasis added).

Importantly, the Maine Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Maine agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2]. Under Maine's statutory scheme, "*[a]ll legal services* required by those officers, boards and commissions in matters relating to their official duties *must be rendered by the Attorney General* or under the Attorney General's direction. The officers or *agencies of the State may not act at the expense of the State as counsel, nor employ private counsel* except upon prior written approval of the Attorney General." Me. Rev. Stat. tit. 5, § 191(3)(B) (emphasis added). Here, no such consent has been proffered or even predicted.

The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state

agencies, including the Maine the Maine Department of Education and the Maine Department of Health & Human Services. [Dkt. 1031-4 at 550–633]. Significantly, the Maine Attorney General has confirmed that its office will definitely represent all of the state agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 15]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Maine Attorney General in this matter for discovery. *See* Me. Rev. Stat. tit. 5, § 191(3). Thus, because the Maine Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Maine Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The absence of a general statute that authorizes the Maine Attorney General to access all Maine agencies' documents does not, by itself, mandate a conclusion that the Maine Attorney General lacks control, for the purposes of discovery, of the documents of the listed Maine agencies. The Maine Attorney General's argument that the absence of a statute denying "control of agency documents cannot equate to a conclusion that he [the Maine Attorney General] does have such control" misconstrues the legal control test – the absence or existence of a statute is not by itself "equating to a conclusion" or outcome determinative. To the extent a statute exists or is lacking is, however, a factor for the Court to consider, along with the other factors discussed herein.

With regard to statutory authorization to access documents, the situation in Maine is not as simplistic as the Maine Attorney General posits. First, the Maine Attorney General admits that agencies are sometimes expressly required by local law to provide records to the Attorney General. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 9-B, § 226(2)). Indeed, the cited statute requires the Maine Superintendent of Financial Institutions to disclose information upon written request by the Maine Attorney General. *See* Me. Rev. Stat. tit. 9-B, § 226(2). The Maine Attorney General's argument that "[c]ertain documents maintained by these agencies are confidential by statute" incorrectly equates "confidentiality" with a restriction on the Attorney General's right to access these documents as counsel for the agencies at issue. Dkt. 738-16 at 2 (citing Me. Rev. Stat. tit. 22, § 4008)). First, this cited statute relates to the Maine Department of Health and Human Services,

United States District Court
Northern District of California

and thus is inapplicable to any of the other state agencies at issue. *See* Me. Rev. Stat. tit. 22, § 1-A. Second, the cited statute creates confidentiality restrictions preventing public disclosure of documents containing a child's personally identifying information in connection child protective activities and when a child is in the custody or care of that department. Me. Rev. Stat. Title 22, § 4008(1). Finally, and contrary to the Maine Attorney General's argument, the cited statute specifically states that these records "are available" to "legal counsel for the department" and thus the cited statute actually provides the Maine Attorney General an explicit legal right to obtain and access these documents of the Maine Department of Health and Human Services (one of the agencies at issue here) when acting as counsel for that agency. The Court thus finds that Title 22, § 4008(1) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of that state agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both counsel for a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at \*4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Maine Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Maine Attorney General would necessarily have access to and thus control over the

United States District Court
Northern District of California

relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

To the extent the Maine Attorney General argues that the Maine Attorney General "has a unique role in Maine government, distinct from the executive branch," *see* dkt. 738-16 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. While the Maine Attorney General is a separate entity and brought the instant action in the exercise of "independent authority," dkt. 738-16 at 2, that fact alone does not outweigh the implications flowing from the fact that the Maine Attorney General will act as the agencies' counsel. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "the agencies that Meta has identified are administered by the Governor or officials she appoints. The autonomy of the

[Maine] Attorney General from these officials and agencies is well-settled," dkt. 738-14 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Maine Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Maine Attorney General's argument that "[w]hen acting as counsel to an agency, he [the Maine Attorney General] has no more legal control of client documents than Meta's lawyers have of Meta's documents," is a variation on the argument rejected above (such as in the discussion of this issue with regard to California) that lawyers are somehow helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery. *Id.* Contrary to the Maine Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients. The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients. As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents. Here, where the law requires the state Attorney General to represent the agencies at issue (and where the state Attorney General has confirmed that representation in this matter), there is no basis to avoid those obligations and their attendant legal rights.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the

opposing party there. *Id.* at 356 n.5. In that case, Maine is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Maine was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Maine Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XVI. MARYLAND

In opposition to the control issue, the Maryland Attorney General argues primarily the following factors: (1) the Maryland Attorney General is a separate entity and independent from the Maryland agencies; (2) the Maryland Attorney General brought the lawsuit under its own independent law enforcement capacity; and (3) the Maryland Attorney General would have to utilize public channels in order to obtain documents from the Maryland agencies, which does not amount to control over the Maryland agencies' documents. [Dkt. 738-17 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Maryland agencies are proscriptively barred from obtaining counsel other than the Maryland Attorney General without Maryland Attorney General approval – with few exceptions not relevant to the listed Maryland agencies. *Id.* 3. Here, Meta seeks discovery from the following agencies: Center for School Safety, Department of Budget and Management, Department of Commerce, Department of Health, Department of Human Services, Governor's Office, Higher Education Commission, and State Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Maryland Attorney General has legal control, for purposes of discovery, over the Maryland agencies in dispute. While the Maryland Attorney General is a separate entity and while the Maryland Attorney General does bring the instant action exercising its own

independent authority, this does not outweigh the fact that the Maryland Attorney General will act as the agencies' counsel. First, the Maryland "Attorney General has general charge of the legal business of the State." Md. Code, State Gov't § 6-106(a). Second, the statutory scheme in Maryland requires that "[t]he Attorney General is the legal adviser of and *shall* represent and otherwise perform *all of the legal work* for each officer and *unit of the State government*." Md. Code, State Gov't § 6-106(b) (emphasis added). Specific Maryland statutory schemes for agencies echo and reinforce that the Maryland Attorney General is the legal representative for each of those agencies, including agencies at issue here. *See e.g.*, Md. Code, Health-Gen. § 2-107 ("The Attorney General is legal adviser to the Department [of Health]."); Md. Code, Econ. Dev. § 2-116 (Department of Commerce); Md. Code, Human Serv. § 2-208 (Department of Human Services). The Maryland Constitution makes clear that the Governor is also to be represented by the Maryland Attorney General. Md. Const. art. 5, § 3(d) ("The Governor may not employ additional counsel [other than the Maryland Attorney General], in any case whatever, unless authorized by the General Assembly.").

Importantly, the Maryland Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Maryland agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2]. Agencies in Maryland may not employ other counsel without the Maryland Attorney General's approval, and there is no such approval in the record. Md. Code, State Gov't § 6-106(c). The Court notes that the State Attorneys General have filed an Administrative Motion to file supplemental information that Meta has recently served an intent to issue subpoenas to various state agencies, including the Maryland Center for School Safety and the Maryland Department of Human Services. [Dkt. 1031-4 at 634–717]. Neither of these state agencies are allowed to employ legal counsel other than the Maryland Attorney General absent consent and thus by statute each will likely be represented by the Maryland Attorney General in this matter for discovery. *See* Md. Code, State Gov't. § 6-106(c). This arrangement indicates strongly that the state Attorney General, in fulfilling its role as the legal adviser of each unit of the State government, would necessarily and inherently have access to and control over the necessary documents for effective legal representation

United States District Court
Northern District of California

of these state agencies.  Therefore, the Court concludes that the Maryland Attorney General has legal control, for the purposes of discovery, over the documents held by the Maryland agencies listed by Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

Indeed, the Maryland Attorney General confirmed that its office could represent all of the Maryland agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 15–16].  Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Maryland Attorney General in this matter for discovery.  *See* Md. Code, State Gov't. § 6-106.  Thus, because the Maryland Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Maryland Attorney General has taken the position that communications between the Maryland Attorney General and these state agencies would be covered by the attorney-client privilege if such agencies are represented by the Maryland Attorney General.  [Dkt. 738-17 at 2].  To the extent that the Maryland Attorney General has attempted to subdivide its own office between the enforcement team in this case and other attorneys within the Office of the State Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only to some parts of the State Attorney General's office but not to other teams, that argument is not supported by citation to law and is contrary to the weight of legal authority.  *Id.* at 2 n.2.  The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office

or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Maryland Attorney General's argument that different individual lawyers in the Maryland Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Maryland Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Maryland Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue

that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Maryland Attorney General is asserting that the attorney-client privilege would apply to communications between the Maryland Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. Just as the *Perez* Court rejected the inconsistent approach to privilege there, here the Maryland Attorney General argues that "[t]he [Maryland Attorney General] attorneys that are counsel to independent state agencies are distinct from the [Maryland Attorney General] attorneys who are working on the instant matter. The [Maryland Attorney General] attorneys comprising the enforcement team do not have an attorney-client relationship with any independent state agencies." [Dkt 738-18 at 2 n.2]. The Maryland Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Maryland Attorney General's office and the agencies at issue further supports the conclusion of control. It is illusory to argue that individual attorneys within the Maryland Attorney General's office have their own separate attorney-client relationships with the state agencies. The Maryland Attorney General has already confirmed that their office could do so for discovery in this matter. [Dkt. 738-1 at 13]. Assertion of the attorney client privilege requires, as a prerequisite, the existence of an attorney-client relationship and here the individual attorneys within the Maryland Attorney General's office are not treated like solo practitioners.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Maryland Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Maryland Attorney General's argument that the Maryland Attorney General must use either the Maryland Public Information Act, Md. Code, Gen. Prov. §§ 4-101 through 4-601, or a subpoena to obtain documents from state agencies who are their client is not a credible interpretation of the Maryland Public Information Act – there is no citation that a public records request is the only way for the Maryland Attorney General to get documents from state agencies they are representing in litigation. [Dkt. 738-8 at 2]. If the Maryland Attorney General were correct,

United States District Court
Northern District of California

then the Maryland Attorney General would have to submit a Public Information Act request every time they represent a state agency, to get documents from its own client - which is not merely impractical and not believable but also contrary to the principles of effective legal representation. As counsel, the Maryland Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved. The Maryland Public Information Act is not an impediment to that access, because that Act only applies to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents). Md. Code, Gen. Prov. § 4-103. Further, the Maryland Public Information Act nowhere states that this statute is the only means by which the Maryland Attorney General can obtain records from other state agencies – the statute merely sets up a permissive system for public inspection, not a restriction or limitation on access. Indeed, the Maryland Attorney General has cited no precedent requiring the Maryland Attorney General to use either a Public Information Act request or a subpoena to obtain documents from state agencies represented in litigation by the Maryland Attorney General. The Court finds this argument to be wholly unpersuasive. Finally, the argument that there is no statute specifically authorizing the Maryland Attorney General to obtain documents from state agencies assumes an overly restrictive view of the control test for documents. [Dkt. 738-17 at 2]. To the contrary, courts have recognized that control for purposes of document discovery is liberally construed. *E.g.*, *Miniace*, 2006 WL 335389, at *1; *Evans*, 2010 WL 1136216, at *1–2; *Inland Concrete Enterprises, Inc.*, 2011 WL 13209239, at *3–4.

The Maryland Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Maryland Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

United States District Court
Northern District of California

Complaint").  To the extent the Maryland Attorney General argues that "the [Maryland] Attorney General has no control over the state agencies previously identified by Meta, as typically, Maryland state agencies are part of the Executive Department and they report to the Governor," *see* dkt. 738-17 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination.  While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity.  As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.  *See, e.g.*, *Diven v. Souders*, No. 1:21-CV-01276-BAH, 2024 WL 184345, at *3 (D. Md. Jan. 17, 2024) (finding named defendants (correctional officers) have control over documents of Maryland Department of Public Safety & Correctional Services).  Thus, arguing that the Maryland "Attorney General and the Governor are separate constitutional officers," dkt. 738-17 at 2, is simply re-stating the issue to be decided, and not determinative of the issue.  The Maryland Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

United States District Court
Northern District of California

1    Finally, the Maryland Attorney General does not cite any statutory or legal prohibition on

2    the Maryland Attorney General's representing the state agencies in this matter for purposes of

3    discovery. The Court recognizes that this is a somewhat unusual situation, in which a law

4    enforcement organization, the attorney general, is both a party to the case while also acting or able

5    to act as counsel for a third party. However, this would not be the first time that a legal services

6    provider, as a party, is found to have control over third party documents for purposes of discovery.

7    *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

8    recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

9    lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

10   to respond as to responsive materials over which Salas and his law firm had possession, custody or

11   control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

12   over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not

13   holding broadly that there must be a finding of a legal right of access to and thus control over third

14   party client documents in every case involving a legal services provider as a party; rather, under the

15   particular facts here, and under the totality of circumstances viewed in light of applicable legal

16   standards, the Court finds that control exists here.

17   **XVII.  MICHIGAN**

18   In opposition to the control issue, the Michigan Attorney General argues primarily the

19   following factors: (1) the Michigan Attorney General is a separate entity and independent from the

20   Michigan agencies; and (2) the Michigan Attorney General brought the lawsuit under its own

21   independent law enforcement capacity. [Dkt. 738-18 at 2].

22   In support of a finding of control with regard to these state agencies' documents, Meta argues

23   primarily that the Michigan Attorney General must act as counsel for the Michigan agencies. *Id.* at

24   3. Here, Meta seeks discovery from the following agencies: Department of Education, Department

25   of Health and Human Services, Department of Labor and Economic Opportunity, Department of

26   Lifelong Education, Advancement, and Potential, Executive Office of the Governor, and State

27   Budget Office. *Id.*

28   After considering the factors argued in the briefs, the Court finds that the factors weigh in

favor of a finding that the Michigan Attorney General does have legal control, for purposes of discovery, over the listed Michigan agencies. While the Michigan Attorney General is a separate entity and while the Michigan Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Michigan Attorney General will act as the agencies' counsel. First, the Michigan Attorney General admits that "[t]he Attorney General serves as counsel to the Governor and state agencies." Dkt. 738-17 at 2 (citing Mich. Comp. Laws § 14.28 ("The attorney general shall prosecute and defend all actions in the supreme court, in which the state shall be interested, or a party[.]"). Under Michigan's statutory scheme, "the attorney general shall also, when requested by the governor, or either branch of the legislature, and may, when in his own judgment the interests of the state require it, intervene in and appear for the people of this state in any other court or tribunal, in any cause or matter, civil or criminal, in which the people of this state may be a party or interested." Mich. Comp. Laws § 14.28. As the Michigan Court of Appeals noted, "[u]nder our scheme of laws, the ***attorney general has the duty*** as a constitutional officer possessed with common law as well as statutory powers and duties ***to represent*** or furnish legal counsel to many interests-the State, ***its agencies***, the public interest and others designated by statute." *Att'y Gen. v. Michigan Pub. Serv. Comm'n*, 625 N.W.2d 16, 29 (Mich. Ct. App. 2000) (quoting *State ex rel. Allain v. Mississippi Pub. Serv. Comm'n*, 418 So. 2d 779, 783 (Miss. 1982)) (emphasis added).

Importantly, the Michigan Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Michigan agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2]. The Michigan Attorney General has the mandatory duty to defend agencies in Michigan in all suits relating to matters connected with their departments upon request of the Governor. Mich. Comp. Laws, § 14.29. Indeed, the Michigan Attorney General confirmed that its office could represent all of the Michigan agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 16–17]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Michigan Attorney General in this matter for discovery. *See* Mich. Comp. Laws, § 14.29. Thus, because the Michigan Attorney

General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Michigan Attorney General has taken the position that communications between the Michigan Attorney General and these state agencies are subject to the attorney-client privilege (with no limitations as to time frame). [Dkt. 738-18 at 2]. By definition, an attorney-client relationship is a prerequisite to assertion of the attorney-client privilege. *See Graf*, 610 F.3d at 1156. Thus, the Michigan Attorney General's admission that it has an existing (indeed pre-existing) attorney-client relationship with the agencies at issue lends further support for a finding of a legal right of access and thus control over the documents of these state agencies.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Michigan Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Michigan Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Michigan Attorney General would necessarily have access to and thus control over

the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Michigan Attorney General argues that the "the [Michigan] Attorney General has no relevant authority to direct state agencies' conduct, all of which conduct falls under the Governor's constitutionally distinct purview," *see* dkt. 738-18 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. *See Williams*, 2022 WL 22859198, at *2 (finding named defendants, corrections officers, have control over third-party agency Michigan Department of Correction (MDOC) documents, noting that: "Here, Defendants are represented by the Michigan Attorney General, which has demonstrated access to [third-party agency] MDOC documents and materials in many cases before this Court."). Thus, arguing that "the [Michigan] Governor—and

the agencies she oversees—are not under the [Michigan] Attorney General's authority," dkt. 738-18 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Michigan Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Indeed, at least one other federal court has previously found that the Michigan Attorney General has legal control over Michigan state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Michigan Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Michigan, this Court is disappointed that the Michigan Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XVIII. MINNESOTA

In opposition to the control issue, the Minnesota Attorney General argues primarily the following factors: (1) the Minnesota Attorney General is a separate entity and independent from the Minnesota agencies; (2) the Minnesota Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Minnesota agencies would create a "virtual veto" over the Minnesota Attorney General's independent responsibilities to bring enforcement actions; (4) the Minnesota agencies are not required to use the Minnesota Attorney General as legal counsel; (5) Minnesota agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; (6) the Minnesota Attorney General may not able to obtain non-

public data from Minnesota agencies unless specifically authorized by statute or federal law; and (7) the Minnesota Attorney General would have to utilize public channels in order to obtain documents from the Minnesota agencies. [Dkt. 738-19 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that Minnesota agencies are proscriptively barred from obtaining counsel other than the Minnesota Attorney General without consent from the Minnesota Governor or if the Minnesota Attorney General is an adverse party. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Commerce, Department of Health, Department of Human Services, Education Department, Employment and Economic Development Department, Governor's Office, Office of Higher Education, and Department of Management and Budget. *Id.*

The Court finds that the Minnesota Attorney General has control, for the purposes of discovery, of the listed Minnesota agencies. While the Minnesota Attorney General is a separate entity and while the Minnesota Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Minnesota Attorney General will act as the agencies' counsel. Under Minnesota's statutory scheme, "[t]he attorney general *shall* act as the attorney for all state officers and *all boards or commissions* created by law in all matters pertaining to their official duties." Minn. Stat. § 8.06 (emphasis added). Minnesota law requires that "[t]he attorney general *shall appear* for the state in all causes in the supreme and *federal courts* wherein the state is directly interested." Minn. Stat. § 8.01 (emphasis added). Absent exceptions which are not present or shown to exist here, "no additional counsel shall be employed and the legal business of the state shall be performed exclusively by the attorney general and the attorney general's assistants." *Id.*

Importantly, the Minnesota Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Minnesota agencies at issue here to employ or obtain counsel in this matter other than the Attorney General absent consent. [Dkt. 738-13 at 2]. Even in exceptional circumstances where different counsel may be employed, "the *attorney general* shall thereupon be authorized to employ such counsel" and not the agencies. Minn. Stat. § 8.06 (emphasis added). Indeed, the Minnesota Attorney General confirmed that its

United States District Court
Northern District of California

United States District Court
Northern District of California

1    office could represent all of the Minnesota agencies at issue if Meta were to serve those agencies

2    with a subpoena in this matter.  [Dkt. 738-1 at 17–18].  Accordingly, it appears that under the

3    statutory scheme each agency will likely be represented by the Minnesota Attorney General in this

4    matter for discovery.  *See* Minn. Stat. §§ 8.01, 8.06.  Thus, because the Minnesota Attorney General

5    will likely be involved in representing these state agencies in any event in this case, whether to

6    respond to subpoenas or to respond to party discovery.

7         Relatedly, the Minnesota Attorney General has taken the position that, "to the extent a

8    separate division" of the Attorney General's office "may be engaged by an agency,"

9    communications between the Minnesota Attorney General and these state agencies are subject to

10   the attorney-client privilege.  [Dkt. 738-19 at 2].  To the extent the Minnesota Attorney General has

11   attempted to subdivide its own office between the "CP Section" of attorneys currently prosecuting

12   this case and other attorneys within the state Attorney General in order to somehow argue that the

13   scope of attorney-client privilege is limited only as to some parts of the state Attorney General's

14   office but not other teams, that argument is not supported by citation to law and is contrary to the

15   weight of law.  *Id.*  The scope of attorney-client relationship (and the duties flowing therefrom,

16   including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal

17   services organization due to well-known rules of imputation of confidences to a legal services

18   organization, including a public law office.  *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When

19   an attorney associates with a law firm, the principle of loyalty to the client extends beyond the

20   individual attorney and applies with equal force to the other attorneys practicing in the firm. This

21   principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all

22   members of a law firm when any one of them practicing alone would be disqualified because of a

23   conflict of interest . . . .  The rule of imputed disqualification applies to both private firms and public

24   law firms such as a district attorney's office or the office of the state public defender."); *accord City*

25   *of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not

26   doubt that vicarious disqualification is the general rule, and that we should presume knowledge is

27   imputed to all members of a tainted attorney's law firm.  However, we conclude that, in proper

28   circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of

137

imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support the Minnesota Attorney General's argument that different individual lawyers in the Minnesota Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Minnesota Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "team" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Minnesota Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Minnesota Attorney General is asserting that the attorney-client privilege would apply to communications between the Minnesota Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of

the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. Just as the Court in *Perez* rejected the inconsistent approach to privilege there, here the Minnesota Attorney General argues that "[t]o the extent a separate [Minnesota Attorney General] division (walled-off from the CP Section) may be engaged by an agency to provide legal services, communications between the agency and that separate [Minnesota Attorney General] division would likely be privileged." [Dkt 738-19 at 2]. The Minnesota Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Minnesota Attorney General's office and the agencies at issue further supports the conclusion of control here. Here, it is illusory to argue that sub-teams attorneys within the Minnesota Attorney General's office have their own separate attorney-client relationships with the state agencies. The Minnesota Attorney General has already confirmed that their office could represent these agencies for discovery in this matter. [Dkt. 738-1 at 13]. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the Minnesota Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the

United States District Court
Northern District of California

United States District Court
Northern District of California

1  particular facts here, and under the totality of circumstances viewed in light of applicable legal

2  standards, the Court finds that control exists here.

3  The Minnesota Attorney General's likely role as counsel for the agencies at issue would

4  inherently involve obtaining necessary documents for effective representation in litigation. In acting

5  as counsel, the Minnesota Attorney General would necessarily have access to and thus control over

6  the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934,

7  at *5–6 (finding state Attorney General has control over agency documents "based on his broad

8  statutory and common law powers to control and manage legal affairs on behalf of state agencies,

9  has a legal right to obtain responsive documents from the state agencies referenced in the

10  Complaint"). To the extent the Minnesota Attorney General argues that the "Minnesota's Governor

11  and [Minnesota Attorney General] operate as independent elected officials under the state

12  constitution," *see* dkt. 738-19 at 2, that argument misapprehends the "legal control" test for

13  documents – the issue is not simply whether one entity is under the day-to-day operational control

14  of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the

15  two entities are legally separate (such as two different and separately incorporated entities), but

16  rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The

17  control analysis for Rule 34 purposes does not require the party to have actual managerial power

18  over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude*

19  *Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state

20  Attorney General and the state agencies (a relationship mandated by state law) necessitates close

21  coordination. While operational control may be a factual situation which demonstrates a legal right

22  to obtain the documents, the absence of such "executive or functional control" is not determinative

23  for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for

24  discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity

25  were involved, there would be no dispute that party discovery covered that one entity. As discussed

26  above, courts have found "control" for purposes of discovery where a party is clearly not in

27  managerial control over the third-party, such as a subsidiary having control over the documents of

28  a parent corporation, or an individual government officer having control over the documents of an

United States District Court
Northern District of California

1   entire agency.  Thus, arguing that "[o]nly the Governor can compel agencies to act—including

2   searching for and producing documents in their possession, custody, or control—because the

3   [Minnesota] Governor, *not the [Minnesota Attorney General]*, has the authority to appoint agency

4   commissioners who serve at the Governor's pleasure," dkt. 738-19 at 2 (emphasis in original), is

5   simply re-stating the issue to be decided, and not determinative of the issue.  The Minnesota

6   Attorney General's arguments erroneously conflate the legal control issue with "operational

7   control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of

8   legal control of the documents for purposes of discovery.

9        Further, there is no statutory, legal, or administrative rule cited which prohibits the

10  Minnesota Attorney General from accessing the documents of the state agencies at issue for

11  purposes of discovery.  The Minnesota Attorney General's argument that "each agency has control

12  over its own data" and that therefore the Minnesota Attorney General must issue a public data

13  request or a subpoena to obtain data from state agencies who are their client is not a credible

14  interpretation of Minnesota law.  Dkt. 738-19 at 2 (citing Minn. Stat. § 13.05(9)).  There is no

15  citation to law holding that a public records request is the only way for the Minnesota Attorney

16  General to get documents from state agencies they are representing in litigation.  [Dkt. 738-19 at 2].

17  If the Minnesota Attorney General were correct, then the Minnesota Attorney General would have

18  to submit a Public Information Act request every time they represent a state agency, to get

19  documents from its own client – which is not merely impractical and not believable but also contrary

20  to the principles of effective legal representation.  As counsel, the Minnesota Attorney General will

21  have the normal type of direct access to the necessary documents from its own clients, without

22  resorting to public channels, ensuring efficient and comprehensive legal support for the agencies

23  involved.  The cited Minnesota statute on Data Practices is not an impediment to that access, because

24  that statute only applies to data which are to be produced for public inspection (and not for purposes

25  of litigation such as this case in which there is a Protective Order limiting public availability of

26  confidential documents).  Minn. Stat. § 13.01.  Further, the Minnesota statute nowhere states that

27  this statute is the only means by which the Minnesota Attorney General can obtain records from

28  other state agencies – the statute merely sets up a permissive system for public inspection, not a

restriction or limitation on access. Indeed, the Minnesota Attorney General has cited no precedent requiring the Minnesota Attorney General to use either a public request or a subpoena to obtain documents from state agencies represented in litigation by the Minnesota Attorney General. The Court finds this argument to be wholly unpersuasive.

Significantly, the Minnesota Attorney General ignores that this public data statute specifically exempts attorneys collecting data when those attorneys are acting as counsel for a government entity, and the statute specifically mandates that such attorneys' uses and collections of data from agencies are governed by statutes, rules, and professional responsibility standards for discovery instead. Minn. Stat. § 13.393 ("Notwithstanding the provisions of this chapter and section 15.17, the use, collection, storage, and dissemination of data by an attorney acting in a professional capacity for a government entity shall be governed by statutes, rules, and professional standards concerning discovery, production of documents, introduction of evidence, and professional responsibility[.]"). The Minnesota statutory scheme thus directly provides the Minnesota Attorney General an explicit legal right to obtain and access documents from the agencies at issue pursuant to the normal rules and statutes for discovery, when acting as counsel for those agencies. The Court thus finds that Minn. Stat. § 13.393 directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of the state agencies at issue.

The Court rejects the Minnesota Attorney General's argument that there is no law "that grants the [Minnesota Attorney General] blanket authority to obtain agency documents upon demand" in light of this statute and in light of the fact that the control test under *Citric Acid* does not require "blanket authority." [Dkt. 738-19 at 2].

Next, the Minnesota Attorney General argues that "[r]equiring the [Minnesota Attorney General] to produce agency documents would upend the constitutional division of powers because the [Minnesota] Governor would be able to impermissibly control the [Minnesota Attorney General's] litigation by, for example, instructing agencies to refuse to produce documents." [Dkt. 738-19 at 2]. This is the same "virtual veto" argument advanced by several other states' Attorneys General and discussed above. As explained previously, the Court finds the "virtual veto" argument to be speculative and unpersuasive. This argument is based on an unfounded assumption that the

United States District Court
Northern District of California

Governor and state agencies would inexplicably obstruct a state's attorney general's independent law enforcement responsibilities. This argument rests entirely on an unreasonable, unfounded, hypothetical assumption that, despite this Court issuing an Order finding control, the Governor and state agencies would simply refuse to provide documents based on nothing more than an obstinate and unreasoned disagreement. The Minnesota Attorney General presented no facts, no affidavits, no prior examples of state agency refusals, and no testimony to support this feared response by the Governor or state agencies. Contrary to the unfounded assumption that state agencies will refuse to provide documents, the Court presumes, instead, that parties (including third parties such as the agencies at issue here) will act reasonably in the face of a court Order and will comply with the Federal Rules of Civil Procedure. The argument also directly contradicts the well-established legal principle and statutory scheme that a state attorney general, acting as counsel, inherently has access to relevant documents to effectively represent a state agency.

## XIX. MISSOURI

In opposition to the control issue, the Missouri Attorney General argues primarily the following factors: (1) the Missouri Attorney General is a separate entity and independent from the Missouri agencies; (2) the Missouri Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Missouri Attorney General does not seeking relief on behalf of the Missouri agencies; (4) Missouri agencies are statutorily responsible for maintaining, preserving, retaining, and providing access to its own records; and (5) under Missouri case law, Missouri agencies are not required to produce records of another agencies and it is prohibited from disseminating records of any agency other than its own records. [Dkt. 738-20 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Missouri Attorney General is tasked with appearing in and defending any proceeding or tribunal in which the state's interests are involved. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Economic Development, Department of Elementary and Secondary Education, Department of Health and Senior Services, Department of Higher Education & Workforce Development, Department of Mental Health, Department of Social Services, Office of Administration, Office of the Child Advocate, and Governor's Office. *Id.*

United States District Court
Northern District of California

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Missouri Attorney General has legal control, for purposes of discovery, over the documents of the listed Missouri agencies. While the Missouri Attorney General is a separate entity and while the Missouri Attorney General does bring the instant action exercising its own independent authority, this does not outweigh the fact that the Missouri Attorney General will act as the agencies' counsel. First, the Missouri Attorney General "may also appear and interplead, answer or defend, in any proceeding or tribunal in which the state's interests are involved." Mo. Stat. § 27.060. It is self-evident that, when a Missouri agency is the subject or target of discovery, the state's interests are involved.

Importantly, the Missouri Attorney General's arguments do not negate the fact that (unlike other states) there is no cited law or statute which empowers any of the Missouri agencies at issue here to employ or obtain counsel in this matter other than the Attorney General. [Dkt. 738-13 at 2]. Indeed, under Missouri precedent, "[t]he Attorney General is authorized to represent the interests of the State generally." *Fogle v. State*, 295 S.W.3d 504, 510 (Mo. Ct. App. 2009). Indeed, the Missouri Attorney General confirmed that its office could represent all of the Missouri agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 18]. Accordingly, it appears that under the statutory scheme each agency will likely be represented by the Missouri Attorney General in this matter for discovery. *See* Mo. Stat. § 27.060. Thus, because the Missouri Attorney General will likely be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

Relatedly, the Missouri Attorney General has taken the position that, "to the extent a separate division" of the Attorney General's office "may be engaged by an agency," communications between the Missouri Attorney General and these state agencies are subject to the attorney-client privilege. [Dkt. 738-20 at 2]. To the extent the Missouri Attorney General has attempted to subdivide its own office between the attorneys currently prosecuting this case and other attorneys within the state Attorney General in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Attorney General's office but not "section counsel," that argument is not supported by citation to law and is contrary to the weight of law. *Id.*

United States District Court
Northern District of California

1    The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of

2    the attendant attorney-client privilege) encompasses the entirety of a legal services organization due

3    to well-known rules of imputation of confidences to a legal services organization, including a public

4    law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a

5    law firm, the principle of loyalty to the client extends beyond the individual attorney and applies

6    with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of

7    imputed disqualification,' . . . requires disqualification of all members of a law firm when any one

8    of them practicing alone would be disqualified because of a conflict of interest . . . .  The rule of

9    imputed disqualification applies to both private firms and public law firms such as a district

10   attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d

11   at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious

12   disqualification is the general rule, and that we should presume knowledge is imputed to all

13   members of a tainted attorney's law firm.  However, we conclude that, in proper circumstances, the

14   presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in

15   the context of government attorneys, which presumption could be rebutted by proper ethical

16   screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue

17   "should be screened from any direct or indirect participation in the matter," vicarious

18   disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer

19   disqualified when joining prosecutors' office but "the entire office in which that attorney works is

20   not disqualified as long as the disqualified attorney is appropriately screened.  Disqualification of

21   the entire prosecuting office is not necessary absent special facts, such as a showing of actual

22   prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public

23   legal service organizations like private law firms and impute shared confidences among lawyers of

24   the entire public law entity.   Even in jurisdictions which do not automatically impute

25   disqualification, and shared confidences, to an entire public law office, those courts recognize that

26   ethical screening or other procedures are required out of recognition that actual (as opposed to

27   imputed) sharing of confidences may occur and such procedures are required to avoid dissemination

28   of attorney-client privileged communications within an entire public law organization.  This review

of case law demonstrates that no courts support the Missouri Attorney General's argument that different individual lawyers in the Missouri Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Missouri Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the Missouri Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the Missouri Attorney General is asserting that the attorney-client privilege would apply to communications between the Missouri Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. Just as the Court in *Perez* rejected the inconsistent approach to privilege there, here the Missouri Attorney General argues that Meta's discovery is "so broad" as to encompass communications between "sections of the [Missouri Attorney General] not participating in this action" (at least, as of the date of this brief) and the agencies, and "there is the possibility that those agencies, in conjunction with their Agency section counsel" could assert privilege. [Dkt. 738-20 at 2]. The Missouri Attorney General's attempt to preserve the ability to assert the attorney-client privilege between the Missouri Attorney General's office and the agencies at issue further supports the conclusion of control here. Here, it is not convincing to argue that sub-teams attorneys within the Missouri Attorney General's office have their own separate attorney-client relationships with the state agencies. The Missouri Attorney General has already confirmed that their office could represent these agencies for discovery in this matter. [Dkt. 738-20 at 18]. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

United States District Court
Northern District of California

1        Further, there is no citation to any statutory or legal prohibition on the Missouri Attorney

2 General's representing the state agencies in this matter for purposes of discovery. The Court

3 recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the

4 attorney general, is both a party to the case while also acting or able to act as counsel for a third

5 party. However, this would not be the first time that a legal services provider, as a party, is found

6 to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL

7 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in

8 this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule

9 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

10 materials over which Salas and his law firm had possession, custody or control."). Indeed, one court

11 has noted that "[i]n general, an attorney is presumed to have control over documents in its client's

12 possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be

13 a finding of a legal right of access to and thus control over third party client documents in every

14 case involving a legal services provider as a party; rather, under the particular facts here, and under

15 the totality of circumstances viewed in light of applicable legal standards, the Court finds that

16 control exists here.

17        The Missouri Attorney General's likely role as counsel for the agencies at issue would

18 inherently involve obtaining necessary documents for effective representation in litigation. In acting

19 as counsel, the Missouri Attorney General would necessarily have access to and thus control over

20 the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934,

21 at *5–6 (finding state Attorney General has control over agency documents "based on his broad

22 statutory and common law powers to control and manage legal affairs on behalf of state agencies,

23 has a legal right to obtain responsive documents from the state agencies referenced in the

24 Complaint"). To the extent the Missouri Attorney General argues that the "[Missouri Attorney

25 General] is an elected official independent of the [Missouri] Governor," *see* dkt. 738-20 at 2, that

26 argument misapprehends the "legal control" test for documents – the issue is not simply whether

27 one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

28 subsidiary relationship), and not simply whether the two entities are legally separate (such as two

United States District Court
Northern District of California

different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "[t]he Governor, not the [Missouri Attorney General], has executive control over other state agencies," dkt. 738-20 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Missouri Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Missouri Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Missouri Attorney General's argument that "an agency is not in possession of another's records, and cannot produce that which it does not possess, it is error to compel one agency to produce another's records" is fundamentally a legally erroneous proposition, because the argument focuses solely on "possession" and presumes incorrectly that Federal Rule of Civil Procedure 34 lacks the word control as a disjunctive basis for requiring party discovery. [Dkt. 738-20 at 2]. The Missouri Attorney General's citation to and reliance on *Bedell* is inapposite. *Id.* (citing *Bedell v. Dir. of Revenue, State of Mo.*, 935 S.W.2d 94, 96 (Mo. Ct. App. 1996)). In *Bedell*, the

state court did not apply any version of the control test applicable under federal law such as *Citric Acid* – instead, the *Bedell* court focused exclusively on state law precedent limited to whether one agency "possessed" the documents of another agency. *Bedell*, 935 S.W.2d at 96. *Bedell* is legally irrelevant to the issue in dispute here, as well as presenting a factually distinguishable scenario.

Indeed, at least one other federal court has previously found that the Missouri Attorney General has legal control over Missouri state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Missouri Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Missouri, this Court is disappointed that the Missouri Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XX. MONTANA

In opposition to the control issue, the Montana Attorney General argues primarily the following factors: (1) the Montana Attorney General is a separate entity and independent from the Montana agencies; and (2) the Montana Governor could choose to employ counsel different from the Montana Attorney General. [Dkt. 738-21 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues primarily that the Montana Attorney General is tasked with appearing in and defending any proceeding or tribunal in which the state's interests are involved. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Board of Public Education, Department of Commerce, Department of Public Health and Human Services, Governor's Office, Office of the Commissioner

1   of Higher Education, and Office of Public Instruction.  *Id.*

2           After considering the factors argued in the briefs, the Court finds that the factors weigh in

3   favor of a finding that the Montana Attorney General has legal control, for purposes of discovery,

4   over the documents of the listed Montana agencies.  While the Montana Attorney General is a

5   separate entity and while the Montana Attorney General does bring the instant action exercising its

6   own independent authority, this does not outweigh the fact that the Montana Attorney General has

7   broad authority to act as the agencies' counsel.

8           First, under the Montana Constitution the Montana Attorney General is the "legal officer of

9   the state and shall have the duties and powers provided by law." Mont. Const. § 4(4).  The Montana

10  Supreme Court has held that Montana Court precedent supports the notion that the Montana

11  Attorney has "**broad powers** . . . **as the first legal officer of the state**."  *Montana Power Co. v.*

12  *Montana Dep't of Pub. Serv. Regul.*, 709 P.2d 995, 1002 (Mont. 1985) (citing *State ex rel. Olsen v.*

13  *Public Service Commission*, 283 P.2d 594 (Mont. 1955) [hereinafter *Olsen*]) (emphasis added).  The

14  Montana Supreme Court furthered that "the [Montana] Attorney General not only had the

15  constitutional and statutory powers specifically enumerated for him, but ***broad common law duties***,

16  when not restricted or limited by statute." *Id.*  In *Olsen*, the Montana Supreme Court explained in

17  fulsome detail the breadth of the powers of the state Attorney General:

18              [T]his court has repeatedly held that the attorney general has
                common-law powers and duties.  The Attorney General is the
19              principal law officer of the state. His duties are general. His authority
                is co-extensive with public legal affairs of the whole community . . .
20              . The office of Attorney General is of ancient origin. The powers and
                duties appertaining to it were recognized by the common law, and the
21              common law has been a part of our system of jurisprudence from the
                organization of Montana territory to the present day . . . .  It is the
22              general consensus of opinion that in practically every state of this
                Union whose basis of jurisprudence is the common law, the office of
23              Attorney General, as it existed in England, was adopted as a part of
                the governmental machinery, and that in the absence of express
24              restrictions, the common-law duties attach themselves to the office so
                far as they are applicable and in harmony with our system of
25              government . . . .

26              The authorities substantially agree that, in addition to those conferred
                on it by statute, the office is clothed with all of the powers and duties
27              pertaining thereto at common law; and, as the chief law officer of the
                State, the Attorney General, in the absence of express legislative
28              restriction to the contrary, may exercise all such power and authority

United States District Court
Northern District of California

as the public interests may from time to time require. In short, the Attorney General's powers are as broad as the common law unless restricted or modified by statute . . . .

Moreover, it is generally held that the attorney general, in addition to the powers and duties conferred and imposed upon him by statute, is clothed and charged with all the common-law powers and duties pertaining to his office as well, except in so far as they have been expressly restricted. The duties of the office are so numerous and varied that it has not been the policy of the state legislatures to attempt specifically to enumerate them; and it cannot be presumed, therefore, in the absence of an express inhibition, that the attorney general has not such authority as pertained to his office at common law. Accordingly, as the chief law officer of the state, he may, in the absence of some express legislative restriction to the contrary, exercise all such power and authority as public interests may, from time to time, require, and may institute, conduct, and maintain all such suits and proceedings as he deems necessary for the enforcement of the laws of the state, the preservation of order, and the protection of public rights . . . .

The common-law duties of the attorney general, as chief law officer of the state, when not restricted or limited by statute, are very numerous and varied. In England, the Attorney General was the chief legal adviser of the Crown and was intrusted [sic] with the management of all legal affairs and the prosecution of all suits, civil and criminal, in which the Crown was interested. . . . Such being the nature of the rights and duties that attached to the position at its inception, it is generally held that in the exercise of his common-law powers, an attorney general may not only control and manage all litigation in behalf of the state, but he may also intervene in all suits or proceedings which are of concern to the general public . . . .

Obviously there can be no dispute as to the right of an attorney general to represent the state in all litigation of a public character. The attorney general represents the public and may bring all proper suits to protect its rights.

*Olsen*, 283 P.2d at 598–99 (internal quotations and citations omitted; emphasis added).

It is self-evident that, when a Montana agency is the subject or target of discovery, in a case such as this, such a proceeding is litigation of a public character, involves the public interests, and involves the public legal affairs of the state. *See id.* Indeed, in the complaint here discusses, in several sections, alleged harms to Montana consumers and young Montanans which implicate issues of public character and the public interest. *See, e.g.*, *Montana v. Meta Platforms, Inc.*, No. 24-cv-00805, at Dkt. 1. Further, the multistate complaint expressly states that this action is in the public interest of the Filing States. *See* Multistate Complaint at ¶ 12.

Importantly, the Montana Attorney General's arguments do not negate the fact that (unlike

1   other states) there is no cited law or statute which empowers any of the Montana agencies at issue

2   here to employ or obtain counsel in this matter other than the Montana Attorney General. [Dkt.

3   738-21 at 2]. Indeed, the Montana Attorney General confirmed that its office could represent all of

4   the Montana agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

5   [Dkt. 738-1 at 19]. Accordingly, it appears that, under the broad common law and constitutional

6   duties of the Montana Attorney General, each agency will likely be represented by the Montana

7   Attorney General in this matter for discovery. *See* Mont. Const. § 4(4). Thus, because the Montana

8   Attorney General will likely be involved in representing these state agencies in any event in this

9   case, whether to respond to subpoenas or to respond to party discovery.

10      Relatedly, the Montana Attorney General argues that, "[b]ecause the Montana Attorney

11  General's Office does not represent any of the six state entities at issue, its position is that pre-suit

12  communications related to this matter between the [Montana Attorney General's] Office and those

13  entities are not protected by the attorney-client privilege." [Dkt. 738-21 at 2]. That statement,

14  however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the

15  Montana Attorney General will assert privilege with respect to post-suit communications. The

16  Court rejects the Montana Attorney General's attempt to simultaneously disclaim the existence of

17  an attorney-client privilege for pre-suit communications, while apparently attempting to preserve

18  the ability to assert the privilege applies to post-suit communications. "[T]o to the extent that [the

19  State] asserts an attorney-client privilege with these legislators, it does so solely in their official

20  capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney

21  General represents these individuals, but that for discovery purposes the [Plaintiff] United States

22  must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent

23  the Montana Attorney General implies its intention to assert that the attorney-client privilege would

24  apply to communications between the Montana Attorney General's office and the agencies at issue,

25  that would further supports the conclusion of control here. Assertion of the attorney-client privilege

26  requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at

27  1156.

28      Further, the Montana Attorney General does not cite any statutory or legal prohibition on

United States District Court
Northern District of California

the Montana Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, the Montana Attorney General admits that "the Attorney General's Office has statutory and common-law responsibility and authority to represent these agencies in certain circumstances." [Dkt. 738-21 at 2]. Under *Olsen¸* the broad common law power to represent the state's agencies would only be limited by statute – and none is argued here. *Olsen*, 283 P.2d at 599. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Montana Attorney General's likely role as counsel for the agencies at issue would inherently involve obtaining necessary documents for effective representation in litigation. In acting as counsel, the Montana Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Montana Attorney General argues that state Constitution establishes "constitutionally independent executive offices, which are each separately elected and operate with

their own independent constitutional authority—including the Attorney General," *see* dkt. 738-21 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that "Montana law provides that state records 'are and remain the property of the public agency possessing the records,'" dkt. 738-21 at 2 (citing Mont. Code § 2-6-1013(1)), focuses on the irrelevant issue of "possession" and ignores the control issue to be decided. The Montana Attorney General's arguments also erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Montana Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The Montana Attorney General's argument that "even where the Attorney General *does* represent a state agency, the Office functions like an ordinary attorney serving its client, and thus

United States District Court
Northern District of California

must obey the agency's litigation decisions" is essentially the same argument rejected above that counsel is helpless in the face of an intransigent client and somehow has no duties to the Court to work on discovery, including supervising the collection of documents. Dkt. 738-20 at 2 (emphasis in original). Lawyers are not entirely helpless or absolved of all duty to supervise and, if necessary, directly obtain documents from clients for discovery. Contrary to the Montana Attorney General's argument "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Federal Rules of Civil Procedure contemplate and require that counsel take proactive steps, without the need for constant court intervention, to comply with and collaborate on discovery, including taking appropriate steps to collect (or supervise the collection) of documents from clients. The system for rational and reasonable discovery and disclosures under the Federal Rules would fall apart if lawyers were simply relieved of any legal duty or obligations to obtain documents for production in discovery from their clients. As discussed above, that legal duty is jurally related to and logically another facet of a legal right to obtain documents. Here, the Montana Attorney General cites no law which permits them to avoid those obligations and their attendant legal rights.

For those reasons, the Court finds that the factors weigh in favor of a finding that the Montana Attorney General has legal control, for purposes of discovery, over the documents of the listed Montana agencies.

## XXI. NEBRASKA

In opposition to the control issue, the Nebraska Attorney General argues primarily the following factors: (1) the Nebraska Attorney General is a separate entity and independent from the Nebraska agencies; (2) the Nebraska Attorney General brought the lawsuit under its own independent law enforcement capacity; (3) the Nebraska Attorney General does not seek relief on behalf of the Nebraska agencies; and (4) Nebraska avers that "State agencies routinely refuse to provide information to [the Nebraska Department of Justice] Consumer Protection Bureau absent a third-party civil investigative demand, third-party subpoena, or a public records request[.]" [Dkt. 738-22 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: (1) under Nebraska law, the Nebraska Attorney General has general control and supervision of all legal business of all Nebraska departments and bureaus, and (2) Nebraska agencies are proscriptively barred from obtaining counsel other than the Nebraska Attorney General without consent from the Nebraska Attorney General or Nebraska Governor. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Children's Commission, Department of Administrative Services, Department of Economic Development, Department of Education, Department of Health and Human Services, and Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Nebraska Attorney General does have legal control, for purposes of discovery, over the listed Nebraska agencies. While the Nebraska Attorney General is a separate entity and while the Nebraska Attorney General does bring the instant action in its own independent authority, this does not outweigh the legal right to access agencies' documents which result from the requirement that the Nebraska Attorney General must statutorily act as the Nebraska agencies' counsel.

Under Nebraska's statutory scheme, the Nebraska Attorney General has "the general control and supervision of all actions and legal proceedings in which the State of Nebraska may be a party or may be interested, and ***shall have charge and control of all the legal business of all departments*** and bureaus of the state, or of any office thereof, which requires the services of attorney or counsel in order to protect the interests of the state." Neb. Rev. Stat. § 84-202 (emphasis added). Additionally, "[t]he [Nebraska] Attorney General is authorized to appear for the state and prosecute and defend, in any court or before any officer, board or tribunal, any cause or matter, civil or criminal, in which the state may be a party or interested." Neb. Rev. Stat. § 84-203.

Further, there is no citation to any statutory or legal prohibition on the Nebraska Attorney General's representing the state agencies in this matter for purposes of discovery. Indeed, under Nebraska law, the Nebraska Attorney General shall "prosecute or defend for the state ***all civil*** or criminal actions and proceedings relating to any matter connected with any of such officers' departments if, after investigation, he or she is convinced there is sufficient legal merit to justify the proceeding" upon "the request of the Governor, head of any executive department, Secretary of

State, State Treasurer, Auditor of Public Accounts, Board of Educational Lands and Funds, State Department of Education, or Public Service Commission." Neb. Rev. Stat. § 84-205(5) (emphasis added). In any such actions, the state agencies "**shall not pay or contract to pay** from the funds of the state **any money for special attorneys** or counselors-at-law unless the employment of such special counsel is made upon the written authorization of the Governor or the Attorney General." *Id.* (emphasis added). The Nebraska statutory scheme makes clear the Nebraska legislature's strong preference that the Nebraska Attorney General represent state agencies in civil matters.

Indeed, the Nebraska Attorney General confirmed that its office could represent all but one of the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 19–20]. With respect to the one exception (the Nebraska Governor), the briefs and submissions from the Nebraska Attorney General do not explain how (in light of the Nebraska statutory scheme) the Nebraska Governor would not be represented by the Attorney General. The Nebraska cites no statutory or legal provision which bars the Nebraska Attorney General from representing the Nebraska Governor. The Nebraska Attorney General concedes that "[w]hen a Nebraska state agency receives a subpoena, it **may choose** to seek assistance from the [Nebraska Department of Justice] Legal Services and Civil Litigation Bureaus, who can serve as outside counsel for certain agencies." Dkt. 738-22 at 2 (emphasis added). As discussed, no separate counsel has appeared for any Nebraska state agencies, despite the fact that litigation holds have been issued and the agencies have had notice of the pendency of discovery in this matter for some time. Accordingly, based on the statutory scheme and the record before the Court, the Nebraska Attorney General will likely represent these state agencies for purposes of discovery.

As part of the argument stressing the separation of the Attorney General's office from the state agencies, the Nebraska Attorney General relies on a "governmental structure" argument to subdivide the office of the Nebraska Attorney General for purposes of this dispute. Dkt. 738-22 at 2. The Nebraska Attorney General argues that "there is a critical distinction between the [Nebraska Department of Justice] when it acts affirmatively in its capacity as enforcer of state consumer protection law (as it does in this lawsuit) and the [Nebraska Department of Justice] when it acts defensively in its role as outside counsel for state agencies." *Id.* (uncited). The Nebraska Attorney

United States District Court
Northern District of California

1    General argues that the "organizational structure" of the Nebraska Department of Justice

2    "distinguishes between the [Nebraska Department of Justice's] Consumer Protection Burau, which

3    represents the state and state consumers as enforcers of Nebraska's consumer protection laws, and

4    the [Nebraska Department of Justice's] Legal Services and Civil Litigation Bureaus, which advise

5    certain state agencies and occasionally represent them in court." *Id.* The Nebraska Attorney General

6    asserts that these distinctions are germane to this "control" dispute without explaining how or why.

7    Further, the Nebraska Attorney General cites no law which finds these administrative, operational

8    groupings of lawyers within that office as relevant, much less critical, to the determination of

9    "control" under Rule 34.

10            Consistent with the "structural" argument, the Nebraska Attorney General argues that

11   communications between different sections of the Nebraska Attorney General are ethically walled

12   off where there are conflicts of interest and, on that basis, argues for a finding of no control. [Dkt.

13   738-22 at 2]. The Nebraska Attorney General cites no law, regulation, or statute which requires the

14   alleged ethical walls between different bureaus within the Attorney General's office to be

15   established in cases such as this Multi-District Litigation, where there is no basis for a conflict of

16   interest to exist between the Attorney General's office and any of the state agencies at issue. The

17   mere citation to the general rule of professional conduct regarding avoiding conflicts of interest is,

18   alone, not persuasive. [Dkt. 738-22 at 2 (citing Neb. R. of Prof. Cond. § 3-501.7)]. The fact that

19   ethical walls were set up in prior (unexplained and uncited) cases, where no affidavit or evidence

20   attests to any ethical wall being set up in this Multi-District Litigation. As discussed, litigation holds

21   have been issued to the state agencies and there has been ample time for ethical walls to be

22   established and for separate counsel to appear, if any were to appear. On the current record before

23   the Court, these "structural" arguments regarding sub-teams within the Nebraska Attorney General's

24   office do not suffice to overcome the finding of "control" for purposes of discovery, much like

25   similar arguments regarding subdividing public law offices do not establish that there are separate,

26   discrete attorney-client relationships within the Nebraska Attorney General's office and the agencies

27   at issue for purposes of this Multi-District Litigation.

28            To the extent the Nebraska Attorney General has attempted to subdivide its own office

United States District Court
Northern District of California

between the prosecution team in this case and other divisions of the state Attorney General in order to somehow argue that there is no "legal control," that argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.

The Nebraska Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Nebraska Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies,

has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). The fact that there might be different sub-teams or different individual attorneys working on responding to the state agency discovery requests, as compared to the attorneys working on prosecuting this action, does not obviate the fact that these are all attorneys within the same public law office. If, as here, the Attorney General's office is counsel for the agencies, then the Attorney General's office will have a legal right to access the state agencies' documents, and there is no law which alters that conclusion simply because different individual lawyers within the same legal services organization have the direct communications and relationships with the state agencies. Simply put, there is no cited law which determines whether specific individuals within an organization themselves have individualized "control" under Rule 34 where they are seeking access to the documents on behalf of the organization as a whole.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The Nebraska Attorney General argues (without citation to caselaw) that "State agencies routinely refuse to provide information to NE DOJ Consumer Protection Bureau absent a third-party civil investigative demand, third-party subpoena, or a public records request, all of which would be

160

handled by the agency according to its protocols." [Dkt. 738-22 at 2]. As an initial matter, it is not surprising that, in cases where the Nebraska Attorney General is investigating an agency itself for potential violations of law, that agency would refuse to provide information absent formal process. But the fact that state agencies would sometimes require formal investigative demands or subpoenas in other cases says nothing about whether or not there is "control" for the documents at issue here. As noted, there is no basis to assume that the Nebraska Attorney General and the state agencies have any adversity or conflicts of interest with regard to this Multi-District Litigation. Indeed, the contrary is true given that the Nebraska Attorney General has declared that this action is in the public interest of the State of Nebraska. *See* Multistate Complaint at ¶ 12.

Further, this argument ignores that agencies' "routinely" requesting investigative demands or subpoenas or records requests in other cases (apparently where the Attorney General is adverse to the agencies) does not obviate the fact that, here where the Attorney General is counsel representing the agencies, such formal processes are not needed. The Nebraska Attorney General cites no law supporting the view that an investigative demand, subpoena, or public records request are the only ways for the Nebraska Attorney General to obtain documents from state agencies when they are clients. [Dkt. 738-25 at 2]. Indeed, the Nebraska Attorney General implicitly concedes that there are other avenues for that office to obtain documents from state agencies when this argument is limited by the word "routinely." *Id.* If the Nebraska Attorney General intends to imply that formal mechanisms for obtaining agency documents are the only mechanisms, then the Nebraska Attorney General would have to subpoena, or serve an investigative demand, or submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation. As counsel for the agencies (and not prosecuting or investigating the agencies), the Nebraska Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct. To the extent the Nebraska Attorney General implies that the state agencies may have a "virtual veto" here, that argument is both unsupported by evidence

United States District Court
Northern District of California

or facts germane to this case and is legally unpersuasive as discussed above. Indeed, as discussed herein, the Nebraska Attorney General argues too much by relying on these other formal procedures: if the Nebraska Attorney General is implying that its lawyers "routinely" obtain agency documents using legal procedures such as subpoenas, civil investigative demands, and public records requests, then that admission of a "routine" process may be viewed as constituting a legal right of access to the agencies' documents upon demand. In any event, the Court need not reach that issue to find "control" on the record presented here. Ultimately, the Nebraska Attorney General's argument about what may "routinely" happen in other (apparently adversarial) cases does not negate or inform what is actually happening in this case, on the record before the Court here.

The Nebraska Attorney General argues that, because Google sought documents from Nebraska state agencies by subpoena in connection with a case in the Eastern District of Virginia, that somehow suggests that state agencies should not be subject to party discovery here. [Dkt. 738-22 at 2 (citing *United States v. Google LLC*, 698 F. Supp. 3d 876 (E.D. Va. 2023)]. Apparently, the University of Nebraska at Omaha represented itself in responding to the subpoena in the *Google* case, while the Nebraska Department of Transportation was represented by the Nebraska Attorney General. The subpoenas issued in April 2023. [Dkts. 738-41 to -43]. A review of the docket from the *Google* Court shows that no motions to compel were filed and certainly none were decided prior to April 2023. *See United States v. Google LLC*, No. 23-cv-108, at Dkts. 1-167. The only discovery matters on that docket prior to April 2023 reflect stipulated and preliminary motions practice regarding the protective order, ESI protocol, and the discovery plan. *Id.* It is apparent that, in the circumstances of that case, Google chose not to pursue party discovery voluntarily, and instead tactically chose to seek documents from the state agencies by subpoena. There is no Order on the control issue decided by the *Google* Court. This Court declines the Nebraska Attorney General's suggestion to follow that "same process" here, where (unlike *Google*) Meta has chosen to litigate this issue and (again unlike in *Google*) the Nebraska Attorney General has also chosen to litigate its opposition to the control issue. While the parties here could have attempted to negotiate this dispute to follow the non-litigated process in *Google*, there is nothing legally instructive or persuasive in the voluntary process followed by the parties in *Google* which informs the "control" issue here

United States District Court
Northern District of California

(other than the fact that the parties in *Google* conserved both their and that Court's resources by opting not to litigate the issue, unlike here).

Accordingly, it appears that under the statutory scheme each will be represented by the Nebraska Attorney General in this matter for discovery. Thus, because the Nebraska Attorney General appears likely to be involved in representing these state agencies in any event in this case, whether to respond to subpoenas or to respond to party discovery.

## XXII. NEW JERSEY

In opposition to the control issue, the New Jersey Attorney General argues primarily that the New Jersey Attorney General is a separate entity and independent from the New Jersey agencies. [Dkt. 738-23 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) New Jersey agencies are proscriptively barred from obtaining counsel other than the New Jersey Attorney General without consent from the New Jersey Governor; and (2) the New Jersey Attorney General has acknowledged that it will definitely represent all but two of the identified agencies (and that it could represent the remaining two agencies). *Id.* at 3. Here, Meta seeks discovery from the following agencies: Department of Children & Families, Department of Education, Department of Health, Department of Human Services, Department of the Treasury, Economic Development Authority, Governor's Counsel on Mental Health Stigma, Office of the Governor, and Office of the Secretary of Higher Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the New Jersey Attorney General does have legal control, for purposes of discovery, over the identified New Jersey agencies. While the New Jersey Attorney General asserts its independence as a separate entity, this does not negate the legal and practical realities highlighted by Meta. Specifically, New Jersey agencies are barred from obtaining counsel other than the New Jersey Attorney General without the Governor's consent, which firmly establishes the Attorney General as their primary legal representative.

Under New Jersey's statutory scheme, the New Jersey Attorney General shall "[e]xamine and decide all legal matters submitted to him by the Governor or the Legislature and act for them in

United States District Court
Northern District of California

1  any matter in which they may be interested, and shall exclusively attend to and control all litigation

2  and controversies to which the State is a party or in which its rights and interests are involved[.]"

3  N.J. Stat. § 52:17A-4(c).  Additionally, the New Jersey Attorney General shall "[a]ct as the sole

4  legal adviser, attorney or counsel[] . . . for all officers, departments, boards, bodies, commissions

5  and instrumentalities of the State Government in all matters other than those requiring the

6  performance of administrative functions entailing the enforcement, prosecution and hearing of

7  issues as imposed by law upon them; and represent them in all proceedings or actions of any kind

8  which may be brought for or against them in any court of this State[.]"  N.J. Stat. § 52:17A-4(e).

9        Importantly, the New Jersey Attorney General's arguments do not negate the fact that (unlike

10  other states) there is no cited law or statute which empowers any of the New Jersey agencies at issue

11  here to employ or obtain counsel in this matter other than the Attorney General absent consent.

12  [Dkt. 738-23 at 2].  Under New Jersey law, "[n]o special counsel shall be employed for the State or

13  for or by any officer, department, board, body, commission or instrumentality of the State

14  Government except by authority of the Attorney-General, and then only with the approval of the

15  Governor, and provided that appropriations have been made therefor, unless the matter be of such

16  an emergency and shall be so declared by the Governor."  N.J. Stat. § 52:17A-13.  Indeed, the New

17  Jersey Attorney General confirmed that its office will definitely represent all but two agencies at

18  issue (and that it could represent the remaining two agencies) if Meta were to serve those agencies

19  with a subpoena in this matter.  [Dkt. 738-1 at 36–37].  Accordingly, it appears that under the

20  statutory scheme almost every agency at issue will definitely be represented by the New Jersey

21  Attorney General in this matter for discovery.  With regard to the  the New Jersey Economic

22  Development Authority and the New Jersey Office of the Governor, the New Jersey Attorney

23  General's indication that it could represent them is not explained in the context of the statutory

24  scheme.  Here, there has been no evidence that the New Jersey Attorney General has authorized

25  separate counsel, no indication that the Governor's approval has been sought or granted, and no

26  evidence of any appropriations having been made for separate counsel.  *See* N.J. Stat. § 52:17A-

27  4(e).  As discussed, no separate counsel has appeared for any New Jersey state agencies, despite the

28  fact that litigation holds have been issued and the agencies have had notice of the pendency of

United States District Court
Northern District of California

1    discovery in this matter for some time.  Accordingly, based on the record before the Court, the New

2    Jersey Attorney General will likely represent these two other state agencies for purposes of

3    discovery.

4         Relatedly, the New Jersey Attorney General has taken the position that the New Jersey

5    agencies do not share confidential information and do not "engage in the same functions, or have

6    the same management teams." [Dkt. 738-23 at 2].  That argument misapprehends the "legal control"

7    test for documents – the issue is not simply whether one entity is under the day-to-day operational

8    control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply

9    whether the two entities are legally separate (such as two different and separately incorporated

10   entities), but rather whether there is a legal right to obtain the documents as explained by *Citric*

11   *Acid*.  "'The control analysis for Rule 34 purposes does not require the party to have actual

12   managerial power over the foreign corporation, but rather that there be close coordination between

13   them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship

14   between the state Attorney General and the state agencies (a relationship mandated by state law)

15   necessitates close coordination.  While operational control may be a factual situation which

16   demonstrates a legal right to obtain the documents, the absence of such "executive or functional

17   control" is not determinative for evaluating "control" for purposes of discovery.

18        By definition, the "legal control" issue for discovery arises when there are two legally

19   distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute

20   that party discovery covered that one entity.  The New Jersey Attorney General's reliance on the

21   separation between these agencies and the Department of Law and Public Safety, and the alleged

22   lack of "administrative control and oversight" is thus unpersuasive.  As discussed above, courts have

23   found "control" for purposes of discovery where a party is clearly not in administrative or

24   managerial control over the third-party, such as a subsidiary having control over the documents of

25   a parent corporation, or an individual government officer having control over the documents of an

26   entire agency.  The New Jersey Attorney General's arguments erroneously conflate the legal control

27   issue with "administrative control" or "generalized control" over each entity, and thus is insufficient

28   to rebut a finding of legal control of the documents for purposes of discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the New Jersey Attorney General from accessing the documents of the state agencies at issue for purposes of discovery. The New Jersey Attorney General's argument that there is a lack of "unfettered access to records of every agency" and reference in general to agencies' records laws is unpersuasive on the issue of "control" for purposes of discovery. [Dkt. 738-23 at 2]. First, the "control" test for Rule 34 does not require unbounded, fully discretionary access to records of every agency at all times under every conceivable set of circumstances – the question rather is whether there is a legal right to access upon demand the documents at issue in this case. Whether or not Meta has failed to show "unfettered access" of every agency's records does not answer the "control" question for the specific agencies' documents at issue here for Rule 34.

Second, the argument based on agencies' records laws is irrelevant for the same reasons discussed herein with regard to similar arguments based on confidentiality laws of other states. The only statute actually cited by the New Jersey Attorney General relates to confidentiality of records of child abuse reports within the New Jersey Department of Children and Families. [Dkt. 738-23 at 2 (citing N.J. Stat. Ann. § 9:6-8.10a)]. As an initial matter, that statute is irrelevant to any of the other agencies at issue and poses no barriers to the New Jersey Attorney General's access to those other agencies' documents. Further, that statute is limited to reports, investigations, and findings of child abuse made pursuant to three specific New Jersey statutes, and thus poses no restriction on an attorney accessing other documents of the New Jersey Department of Children and Families. Because the issues being litigated in this Multi-District Litigation do not focus on specific reports or investigations of instances of child abuse in New Jersey, the cited statute appears to be irrelevant to the scope of discovery in this case. More importantly, the cited statute does not bar access to documents by an attorney representing the Department of Children and Families. Contrary to the New Jersey Attorney General's arguments, that statute expressly states that these child abuse records "may be disclosed" in numerous listed circumstances, including disclosure to a "federal, State, or local government entity, to the extent necessary for such entity to carry out its responsibilities under law to protect children from abuse and neglect." N.J. Stat. Ann. § 9:6-8.10a(1)(b)(20). Here, the Multistate Complaint (of which the New Jersey Attorney General is a party) asserts in multiple

App. 166

sections that Meta has harmed youth. *See, e.g.*, Multistate Complaint at ¶¶ 1-2 (Meta "has ignored the sweeping damage these Platforms have caused to the mental and physical health of our nation's youth . . . . Meta designed and deployed harmful and psychologically manipulative product features to induce young users' compulsive and extended Platform use[.]"). Facially, the cited New Jersey records statute would appear to grant an express legal right for the New Jersey Attorney General to access these records from the Department of Children and Families, to the extent those records were necessary to carry out its responsibilities to protect children from abuse and neglect. On this basis alone, the Court finds that the cited statute, N.J. Stat. Ann. § 9:6-8.10a, satisfies *Citric Acid*'s requirement of a legal right to access those documents of that agency by the New Jersey Attorney General. For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by **statute**, affiliation or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)).

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the Attorney General, is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. Here, the New Jersey Attorney General admits that "to the extent the Attorney General has any 'control' over a listed state

App. 167

United States District Court
Northern District of California

1    agency, it is exclusively in the attorney-client context." [Dkt. 738-18 at 2]. The Court is not holding

2    broadly that there must be a finding of a legal right of access to and thus control over third party

3    client documents in every case involving a legal services provider as a party; rather, under the

4    particular facts here, and under the totality of circumstances viewed in light of applicable legal

5    standards, the Court finds that control exists here.

6          Further, the Court notes that the State Attorneys General have filed an Administrative

7    Motion to file supplemental information that Meta has recently served an intent to issue subpoenas

8    to various state agencies. *See* Dkt. 1031-5. None of these state agencies are allowed to employ

9    legal counsel other than the New Jersey Attorney General and thus by statute each must be

10   represented by the New Jersey Attorney General in this matter for discovery. *See* N.J. Stat. §

11   52:17A-4(c). This arrangement indicates strongly that the state Attorney General, in fulfilling its

12   role as chief legal advisor, would necessarily and inherently have access to and control over the

13   necessary documents for effective legal representation of these state agencies. Therefore, the Court

14   concludes that the New Jersey Attorney General has legal control, for the purposes of discovery,

15   over the documents held by the New Jersey agencies listed by Meta, including in particular the three

16   agencies recently listed in the intent to issue subpoenas.

17         Instructive on the "control" issue is the New Jersey district court opinion in *Love v. NJ Dep't

18   of Corr.*, No. 2:15-CV-4404-SDW-SCM, 2017 WL 3477864 (D.N.J. Aug. 11, 2017), *opinion

19   clarified sub nom. Love v. New Jersey Dep't of Corr., No. 15CV4404 (SDW)(SCM)*, 2017 WL

20   4842379 (D.N.J. Oct. 26, 2017). In *Love*, the plaintiff sued several individual officers of a New

21   Jersey state prison and served document requests on each of them. The named defendants, all

22   employees of the New Jersey Department of Corrections and all represented by the New Jersey

23   Attorney General, objected and argued that they lacked control over the documents of the

24   Department of Corrections. The *Love* Court took notice "that the Attorney General is obligated to

25   defend State employees against civil claims; and anytime a defense is provided, such as here, 'the

26   State shall provide indemnification for the State Employee.' Therefore, the Court finds that State

27   has a significant stake in the outcome of this suit and that Mr. Love has met his burden to prove that

28   the Northern State Officers have 'control', albeit through their attorney, over the records and

information at-issue." *Id.* at *6. As in *Love*, here the New Jersey Attorney General both represents itself and is obligated to represent the state agencies at issue, and the State of New Jersey has a significant stake in the outcome of this Multi-District Litigation given that the Multistate Complaint expressly states that "[t]his action is in the public interest of the Filing States." *See* Multistate Complaint at ¶ 12.

Finally, the Court has recognized that the issue of control of state agency documents, when a State or State Attorney General is a party, has been litigated and decided in a previous Multi-District Litigation involving most of the same States and State Attorneys General as are involved in this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, New Jersey is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that New Jersey was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the New Jersey Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XXIII. NEW YORK

In opposition to the control issue, the New York Attorney General argues primarily the following factors: (1) the New York Attorney General is a separate entity and independent from the New York agencies; and (2) the New York Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-24 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) with exceptions not particularly relevant here, the New

1   York Attorney General must act as counsel for the New York agencies, and (2) nothing in New

2   York law prohibits the New York Attorney General from accessing agency documents. *Id.* at 3.

3   Here, Meta seeks discovery from the following agencies: Council on Children and Families,

4   Department of Education, Department of Health, Department of State, Higher Education Services

5   Corporation, Office of Children and Family Services, Office of Mental Health, Office of the

6   Governor, and State Division of the Budget. *Id.* Meta states that it has agreed not to seek party

7   discovery from the Empire State Development Corporation, and therefore, the Court **DENIES**

8   Meta's motion with regard to that agency. *Id.* at 3 n.2.

9           After considering the factors argued in the briefs, the Court finds that the factors weigh in

10  favor of a finding that the New York Attorney General does have legal control, for purposes of

11  discovery, over the listed New York agencies (excluding the Empire State Development

12  Corporation, as discussed above). While the New York Attorney General is a separate entity and

13  while the New York Attorney General does bring the instant action in its own independent authority,

14  this does not outweigh the requirement that the New York General will act as the remaining

15  agencies' counsel.

16          The statutory scheme in New York requires that the New York Attorney General

17  "[p]rosecute and defend all actions and proceedings in which the state is interested, and have charge

18  and control of all the legal business of the departments and bureaus of the state, or of any office

19  thereof which requires the services of attorney or counsel, in order to protect the interest of the

20  state[.]" N.Y. Exec. Law § 63(1).

21          The New York Attorney General does not cite to any statutory or legal prohibition on the

22  New York Attorney General's representing the state agencies in this matter for purposes of

23  discovery. Indeed, the New York Attorney General confirmed that its office could represent the

24  agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1

25  at 21]. Accordingly, it appears that under the statutory scheme each agency will be represented by

26  the New York Attorney General in this matter for discovery.

27          Importantly, the New York Attorney General's arguments do not negate the fact that all of

28  the New York agencies at issue here must notify the New York Attorney General if any property or

App. 170

interest of the state must be defended: "[n]o action or proceeding affecting the property or interests of the state shall be instituted, defended or conducted by any department, bureau, board, council, officer, agency or instrumentality of the state, without a notice to the attorney-general apprising him of the said action or proceeding, the nature and purpose thereof, so that he may participate or join therein if in his opinion the interests of the state so warrant." N.Y. Exec. Law § 63(1). This arrangement indicates strongly that the New York Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The New York Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the New York Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies,

has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the New York Attorney General argues that the New York Attorney General is a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-24 at 2 ("The [New York Attorney General] NYAG is an independently-elected official, and unlike almost all other executive branch officers, including the heads of the state entities Meta identified, does not necessarily act pursuant to the directives of the [New York] Governor."). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

Relatedly, the New York Attorney General argues that "[s]ome pre-suit [New York Attorney General] communications with such entities, therefore, may be privileged. The [New York Attorney General] does not, however, represent any of the state entities Meta has identified in this litigation, so no pre-suit communications arising out of this litigation are attorney-client privileged." [Dkt.

United States District Court
Northern District of California

738-24 at 2]. That statement, however, is silent as to (and thus appears artfully drafted to leave open the possibility) whether the New York Attorney General will assert privilege with respect to post-suit communications. The Court rejects the New York Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege for pre-suit communications, while apparently attempting to preserve the ability to assert the privilege applies to post-suit communications. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. To the extent the New York Attorney General implies its intention to assert that the attorney-client privilege would apply to communications between the New York Attorney General's office and the agencies at issue, that further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The New York Attorney General's reliance on *New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259, 263 (N.D.N.Y. 2006) [hereinafter *Boardman*], does not dictate a different result. [Dkt. 738-24 at 2]. The *Boardman* Court recognized that "control in the context of discovery is to be broadly construed." *Id.* at 267–68. The *Boardman* Court properly recognized that "[t]he burden of establishing control over the documents being sought rests with the demanding party." *Id.* Critically, the finding of lack of control by one New York agency over the documents of another agency resulted from an express failure by the moving party (Amtrak) to meet its burden: "Amtrak's contention that [state agency] DOT has possession, custody, and control of [second state agency] OSC's records *is supported by nothing more than hypotheses*." *Id.* (emphasis added). Here, by contrast, the record submitted to the Court is not mere hypotheses, as evident from the extended discussion in this Order. To the extent the New York Attorney General attempts to extrapolate from *Boardman* a general rule that no state agency can ever have control over the documents of another state agency, that argument is belied by *Boardman* itself: "The determination of control is often fact specific and thus generalizations, as [*Compagnie Francaise d'Assurance*

1     *Pour le Com. Exterieur*]'s pronouncement seems to have done, are difficult to apply across the

2     board." *Id.* at 267 (citing *Compagnie Francaise d'Assurance Pour le Com. Exterieur*, 105 F.R.D.

3     16).

4        The fact that several other New York courts have found a state agency has control over the

5     documents over another agency for purposes of discovery confirms that the issue of "control" is

6     often case and fact specific. *See, e.g.*, *Compagnie Francaise d'Assurance Pour le Com. Exterieur*,

7     105 F.R.D. at 35; *see also In re Opioid Litigation*, No. 400000/2017, 2019 WL 4120096, at *1 (N.Y.

8     Sup. Ct. Aug. 14, 2019) (finding control and distinguishing *Boardman* "easily"); *see also Gross v.*

9     *Lunduski*, 304 F.R.D. 136, 141–44 (W.D.N.Y. 2014) (distinguishing *Boardman* and finding named

10     defendant, individual corrections officer, has "control" over documents of N.Y. Department of

11     Correctional and Community Services in part because New York State Attorney General was

12     representing both defendant and agency); *see also Guillory v. Skelly*, No. 12-CV-00847S F, 2014

13     WL 4542468, at *8–9 (W.D.N.Y. Sept. 11, 2014) (distinguishing *Boardman* and finding named

14     defendants, individual corrections officers, have "control" over documents of N.Y. Department of

15     Correctional and Community Services); *see also Siano Enders v. Boone*, No. 1:19-CV-948

16     (BKS/CFH), 2021 WL 3471558, at *3-4 (N.D.N.Y. Aug. 6, 2021) (finding named defendants,

17     individual retired employees of N.Y. agency, have control over documents of their former employer-

18     agency); *cf. also United States v. UBS Sec. LLC*, No. 118CV6369RPKPK, 2020 WL 7062789, at

19     *4–7 (E.D.N.Y. Nov. 30, 2020) (finding that named party, the United States, has control over

20     documents of agencies (HUD and Treasury)); *cf. also Loc. 3621, EMS Officers Union, DC-37,*

21     *AFSCME, AFL-CIO v. City of New York*, No. 18CV4476LJLJW, 2023 WL 8804257, at *11

22     (S.D.N.Y. Dec. 30, 2023) (finding that named party, City of New York, has control over documents

23     of city agencies (NYCAPS, DCAS, Fire Department of New York, "or any other City department

24     or agency")).

25        Therefore, the Court concludes that the New York Attorney General has legal control, for

26     the purposes of discovery, over the documents held by the New York agencies listed by Meta.

27     **XXIV. NORTH CAROLINA**

28        In opposition to the control issue, the North Carolina Attorney General argues primarily the

United States District Court
Northern District of California

United States District Court
Northern District of California

1   following factors: (1) the North Carolina Attorney General is a separate entity and independent from

2   the North Carolina agencies; (2) the heads of North Carolina agencies are statutorily responsible for

3   the "legal custody of all books, papers, documents and other records of the department;" and (3) the

4   North Carolina Attorney General is not authorized to make decisions in areas which have been

5   specifically delegated to a designated department. [Dkt. 738-25 at 2].

6           In support of a finding of control with regard to these state agencies' documents, Meta argues

7   based primarily on the following factors: (1) in general the North Carolina Attorney General is

8   required to represent all state agencies, and (2) North Carolina agencies are proscriptively barred

9   from obtaining counsel other than the North Carolina Attorney General, without consent from the

10  North Carolina Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following agencies:

11  Department of Commerce, Department of Health and Human Services, Department of Public

12  Instruction, Office of Governor, and Office of State Budget and Management. *Id.*

13          After considering the factors argued in the briefs, the Court finds that the factors weigh in

14  favor of a finding that the North Carolina Attorney General has legal control, for purposes of

15  discovery, over the listed North Carolina agencies. While the North Carolina Attorney General is a

16  separate entity from the state agencies, this does not outweigh the requirement that the North

17  Carolina Attorney General will act as the agencies' counsel and will thus have access to the

18  documents.

19          The statutory scheme in North Carolina requires the North Carolina Attorney General "[t]o

20  represent all State departments, agencies, institutions, commissions, bureaus or other organized

21  activities of the State which receive support in whole or in part from the State." N.C. Gen. Stat.

22  § 114-2. More importantly, North Carolina law prohibits state agencies from employing separate

23  counsel (subject to an exception not evident here): "No department, officer, agency, institution,

24  commission, bureau or other organized activity of the State which receives support in whole or in

25  part from the State shall employ private counsel, except with the approval of the Governor. The

26  Governor shall give his approval only if the Attorney General has advised him . . . that it is

27  impracticable for the Attorney General to render the legal services." N.C. Gen. Stat. § 147-17.

28  There is nothing in the North Carolina Attorney General's submissions to this Court indicating that

the North Carolina Attorney General has advised the Governor that representing the agencies is impracticable here, and there is nothing in the record to indicate that the Governor has approved separate counsel being retained by the state agencies. And given the circumstances of this case there is no basis to even suspect that the North Carolina Attorney General has a conflict of interest with any of the listed state agencies in relation to this Multi-District Litigation. Further, as noted, no separate counsel has appeared for any state agencies in this case.

Indeed, the North Carolina Attorney General confirmed that its office could represent all but one of the listed agencies if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 22]. And as to that one agency (the North Carolina Department of Commerce), there is nothing in the record to indicate how or why that agency would be permitted to retain separate counsel for this case under § 147-17, and the North Carolina Attorney General's briefing does not adequately explain why they represent confusingly to the Court that they would not represent that agency. When evaluating this issue, the Court determines that the plain language of the statute should control, as opposed to the unexplained statement of counsel. The statutory scheme in North Carolina makes clear the North Carolina legislature's strong preference that state agencies be represented by the North Carolina Attorney General. This arrangement indicates strongly that the North Carolina Attorney General, in fulfilling its statutory role to carry out its duties to represent all agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the North Carolina Attorney General from accessing the documents of the state agencies at issue. The North Carolina Attorney General argues that "agency documents, not all of which are public records, are under the legal control of separately elected constitutional officers and each agency has their own separate processes for responding to public records requests[.]" [Dkt. 738-25 at 2]. This argument is based on an incorrect assumption that "public records" laws and processes are the only way in which the North Carolina Attorney General can obtain documents from the state agencies when they are clients of the lawyers of that office. A public records law does not amount to a statutory or legal prohibition on the North Carolina Attorney General from accessing the documents in the scope of

App. 176

its representation of the agencies as clients.  If the North Carolina Attorney General's supposition that, every time the North Carolina Attorney General seeks documents from state agencies, a public records Act requests would be routine and necessary, then the logical conclusion is that the public records law would be a routinely used legal right to access those documents and records of the agency subject to the Act.  At least one court has found that a state "public records" Freedom of Information Act constitutes a legal right to access documents from an agency for purposes of "control" under Rule 34.  *See Flagg*, 252 F.R.D. at 355–57 ("Because at least some of the text messages maintained by [(third party)] SkyTel are 'public records' within the meaning of Michigan's FOIA, it would be problematic, to say the least, to conclude that the [named defendant] City lacks a legal right to obtain these records as necessary to discharge its statutory duty of disclosure.").  However, the North Carolina Attorney General cites no law supporting the view that a public records request is the only way for the North Carolina Attorney General to get documents from state agencies when they are clients.  [Dkt. 738-25 at 2].  If the North Carolina Attorney General were correct, then the North Carolina Attorney General would have to submit a public records request every time the lawyers of that office were representing a state agency, to get documents from their own client – which is not merely impractical but also contrary to the principles of effective legal representation.  As counsel, the North Carolina Attorney General will have the normal type of direct access to the necessary documents from its own clients, without resorting to public channels, ensuring efficient and comprehensive legal support for the agencies involved consistent with the ethical obligations and applicable rules of professional conduct.  The North Carolina open records law is not an impediment to that access, because public records requests apply to records which are to be produced for public inspection (and not for purposes of litigation such as this case in which there is a Protective Order limiting public availability of confidential documents).

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting or able to act as counsel for a third party.  However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena

United States District Court
Northern District of California

1    recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida

2    lawsuit . . . .  Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas

3    to respond as to responsive materials over which Salas and his law firm had possession, custody or

4    control.").  Indeed, one court has noted that "[i]n general, an attorney is presumed to have control

5    over documents in its client's possession."  *Perez*, 2014 WL 1796661, at *2.  The Court is not

6    holding broadly that there must be a finding of a legal right of access to and thus control over third

7    party client documents in every case involving a legal services provider as a party; rather, under the

8    particular facts here, and under the totality of circumstances viewed in light of applicable legal

9    standards, the Court finds that control exists here.

10          The North Carolina Attorney General's role as counsel for the agencies at issue inherently

11   involves obtaining necessary documents for effective representation in litigation.  In acting as

12   counsel, the North Carolina Attorney General would necessarily have access to and thus control

13   over the relevant documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL

14   4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his

15   broad statutory and common law powers to control and manage legal affairs on behalf of state

16   agencies, has a legal right to obtain responsive documents from the state agencies referenced in the

17   Complaint").

18          To the extent the North Carolina Attorney General argues that the North Carolina Attorney

19   General is a "separate principal departments headed by the independently elected Governor," dkt.

20   738-25 at 2, that argument misapprehends the "legal control" test for documents – the issue is not

21   simply whether one entity is under the day-to-day operational control of the other (such as a parent-

22   wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate

23   (such as two different and separately incorporated entities), but rather whether there is a legal right

24   to obtain the documents as explained by *Citric Acid*.  "'The control analysis for Rule 34 purposes

25   does not require the party to have actual managerial power over the foreign corporation, but rather

26   that there be close coordination between them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.

27   Here, the attorney-client relationship between the state Attorney General and the state agencies (a

28   relationship mandated by state law) necessitates close coordination.  While operational control may

United States District Court
Northern District of California

be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the North Carolina Attorney General "does not represent any state agencies in this action and brings this action in the public interest under North Carolina's consumer protection laws[,]" dkt. 738-25 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The North Carolina Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

The Court is not persuaded by the North Carolina Attorney General's argument that North Carolina law does not authorize the Attorney General "to make decisions in areas which have been specifically delegated toa designated department," dkt. 738-25 at 2 (citing *Tice v. Dep'. of Transp.*, 312 S.E2d 241, 245 (N.C. Ct. App. 1984)). That argument does not mandate a different result over "control" for purposes of discovery. Nothing in North Carolina law "specifically delegates" to the listed state agencies the handling of discovery issues surrounding the production of documents in a civil matter. The fact that agencies may have their own internal procedures for handling public records requests is irrelevant, as noted above, because such public records procedures are not the only method by which the North Carolina Attorney General can obtain documents from state agencies in the course of representing them in litigation. Indeed, under North Carolina law, because the North Carolina Attorney General is specifically mandated to represent the state agencies in litigation, if anything the cited *Tice* case supports the view that handling this discovery issue is properly within the legislatively-mandated scope of duties of the North Carolina Attorney General. To the extent the *Tice* opinion reflects the concept that, for policy and operational duties, each

1  agency is structurally independent, again that is simply another irrelevant reiteration and confusion

2  of "managerial power" with "control" for purposes of discovery.

3      Furthermore, at least one other federal court has previously found that the North Carolina

4  Attorney General has legal control over North Carolina state agency materials. *Generic*

5  *Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent

6  conclusions consistent with the applicable legal standards discussed above and in light of the facts

7  and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District

8  Litigation is certainly consistent with, and to that extent further persuasively supports, the

9  conclusion here with regard to the North Carolina Attorney General's having control with regard to

10  documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion

11  resolved the control issue against all the objecting states including North Carolina, this Court is

12  disappointed that the North Carolina Attorney General and Meta here were unable to reach a

13  negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals*

14  *(II)* As the Court has repeatedly encouraged the Parties at multiple Discovery Management

15  Conferences, they should make every effort to work out discovery disputes through reasonable,

16  good faith negotiations between able and experienced counsel, particularly where, as here, there is

17  guidance in precedent on the discovery issue at hand.

18      Therefore, the Court concludes that the North Carolina Attorney General has legal control,

19  for the purposes of discovery, over the documents held by the North Carolina agencies listed by

20  Meta, including in particular the three agencies recently listed in the intent to issue subpoenas.

21  **XXV. NORTH DAKOTA**

22      In opposition to the control issue, the North Dakota Attorney General argues primarily the

23  following factors: (1) the North Dakota Attorney General is a separate entity and independent from

24  the North Dakota agencies; (2) the North Dakota Attorney Generals powers are specifically

25  determined by the legislature and prescribed by law; (3) the North Dakota agencies' ability to share

26  information with other agencies or access records of other agencies is control by state law; (4) the

27  North Dakota Attorney General does not seek relief on behalf of North Dakota agencies; and (5) the

28  North Dakota Attorney General is not automatically required to represent North Dakota agencies.

[Dkt. 738-26 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) North Dakota agencies are proscriptively barred from obtaining counsel other than the North Dakota Attorney General, without consent from the North Dakota Attorney General; and (2) the North Dakota Attorney General is "expressly allowed to 'access and examine any record under the control of the state board of higher education' in the course of representing that board." *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Commerce, Department of Health and Human Services, Department of Public Instruction, Department of Education Standards and Practices Board, Office of Management and Budget, and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the North Dakota Attorney General has legal control, for purposes of discovery, over the listed North Dakota agencies. While no specific statute exists that explicitly grants the North Dakota Attorney General access to the documents from the North Dakota agencies, the North Dakota Attorney General will act as counsel to these state agencies, subject to such request which appears certain based on the record, and will thus have control over the documents. The Court repeatedly asked the state Attorneys General whether they have spoken with the agencies at issue, and they chose not to. No separate counsel has entered appearance for these state agencies. Accordingly, the record before the Court is that all of the agencies at issue will be represented by the North Dakota Attorney General.

The statutory scheme in North Dakota requires that the North Dakota Attorney General shall "[a]ppear and defend all actions and proceedings against any state officer in the attorney general's official capacity in any of the courts of this state or of the United States." N.D. Cent. Code § 54-12-01. Indeed, the North Dakota Attorney General confirmed that its office could represent all of the listed agencies if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 22]. Importantly, the North Dakota Attorney General's arguments do not negate the fact that all of the North Dakota agencies at issue here are barred by North Dakota law from obtaining counsel other than the North Dakota Attorney General: "[a] state . . . agency may not employ legal counsel,

United States District Court
Northern District of California

1    and no person may act as legal counsel in any matter, action, or proceeding in which the state . . .

2    agency is interested or is a party, except upon written appointment by the attorney general." N.D.

3    Cent. Code § 54-12-08. This statutory scheme makes plain the North Dakota Legislature's strong

4    preference that the North Dakota Attorney General will represent state agencies in cases such as this

5    Multi-District Litigation. As a result, this arrangement indicates strongly that the North Dakota

6    Attorney General, in fulfilling its statutory role to appear and defend all action for the state agencies,

7    would necessarily and inherently have access to and control over the necessary documents for

8    effective legal representation of these state agencies. Therefore, the Court concludes that the North

9    Dakota Attorney General has legal control, for the purposes of discovery, over the documents held

10   by the North Dakota agencies listed by Meta, including in particular the three agencies recently

11   listed in the intent to issue subpoenas.

12          Further, there is no statutory, legal, or administrative rule cited which prohibits the North

13   Dakota Attorney General from accessing the documents of the state agencies at issue. Meta argues

14   that North Dakota law specifically grants the North Dakota Attorney General the statutory right to

15   "access and examine any record under the control of the state board of higher education" when

16   appointed to represent that agency or an institution under the control of the state board of higher

17   education. [Dkt. 738-26 at 3 (citing N.D. Cent. Code § 54-12-08(4)]. However, the North Dakota

18   State Board of Higher Education is in charge of the university system in North Dakota and does not

19   appear to be one of the agencies at issue in this case for discovery. Accordingly, Meta's reliance on

20   the cited statute is irrelevant and fails to show a legal right of access for the documents of the

21   agencies at issue here.

22          The North Dakota Attorney General's role as counsel for the agencies at issue inherently

23   involves obtaining necessary documents for effective representation in litigation, as explained

24   above. In acting as counsel, the North Dakota Attorney General would necessarily have access to

25   and thus control over the relevant documents needed to respond to discovery requests. *See*

26   *Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency

27   documents "based on his broad statutory and common law powers to control and manage legal

28   affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state

agencies referenced in the Complaint").

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The North Dakota Attorney General argues that its powers are conferred by the North Dakota Constitution, and because the North Dakota Constitution has not explicitly conferred access to agency documents, the North Dakota Attorney General does not have legal control over the documents. [Dkt. 738-26 at 2]. However, the North Dakota Attorney General does not cite to any statutory or legal prohibition on the North Dakota Attorney General's representing the state agencies for purposes of discovery (and accessing their clients' documents in the course of such representation). To the extent the North Dakota Attorney General argues that the North Dakota Attorney General separate and distinct elected entity with separate duties and responsibilities, *see* dkt. 738-26 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. . ""The control analysis for Rule

United States District Court
Northern District of California

34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the North Dakota Attorney General "brought this action in a law enforcement capacity, pursuant to statutory authority, to enjoin unlawful practices. The [North Dakota Attorney General] alone decides whether to bring such an action[,]" dkt. 738-26 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The North Dakota Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Relatedly, the North Dakota Attorney General has taken the position that communications between the North Dakota Attorney General and these state agencies would be covered by the attorney-client privilege. Dkt. 738-26 at 2 ("Communications between other [North Dakota Attorney General's] divisions and client state agencies may be privileged if it is an active litigation record, attorney work product, or attorney consultation."). To the extent the North Dakota Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state North Dakota General's office but not other sub-teams, that argument is not supported by citation to law and is contrary to the weight of law. The scope of

United States District Court
Northern District of California

attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support North Dakota's argument that different individual lawyers in the North Dakota Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the North Dakota Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "division" of attorneys currently working

on this case, while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in other "divisions" of the North Dakota Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the North Dakota Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the North Dakota Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Instructive on the control issue is the District of North Dakota's opinion in *North Dakota v. United States*, No. 1:19-CV-150, 2021 WL 6278456 (D.N.D. Mar. 24, 2021). In that case, the State of North Dakota, represented by the North Dakota Attorney General, served document requests on the United States, and expressly argued that several federal agencies should be the subject of party discovery. *Id.* at *2. The United States objected, taking positions strikingly similar to the North Dakota Attorney General in this Multi-District Litigation, and argued that North Dakota should seek documents from such listed agencies by subpoena under Rule 45 instead. *Id.* After reviewing multiple cases involving whether federal agencies should be subject to party discovery when the United States is the named party, the North Dakota district court held that while those precedents "all involved circumstances quite different from those of this case, each involved the United States as a party, and each followed the principle that the United States' obligation to respond to discovery requests is not limited to an agency named in the action. This order need not, and therefore does not, consider whether North Dakota can recover for any acts of employees of agencies other than the USACE. Even if North Dakota's recovery is limited to negligent acts of USACE employees, that would not foreclose North Dakota from seeking discovery from other federal agencies who possess relevant information." *Id.* at *4. It is noteworthy that, in *North Dakota v. United States*, the North Dakota Attorney General argued that government agencies should be subject to party

discovery when the sovereign is a named party and succeeded in that argument when seeking discovery from another sovereign. *See id.* at *2–4. The fact that the North Dakota Attorney General is now arguing the exact opposite position, when its sovereign is a party and its agencies are the target of discovery, undercuts the persuasive force of the arguments presented. The analogous result in *North Dakota v. United States* supports the finding of "control" for purposes of discovery here.

Given the North Dakota federal court's decision in the analogous *North Dakota v. United States* case (which the North Dakota Attorney General was involved in as counsel), this Court is disappointed that the North Dakota Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the North Dakota Attorney General has legal control, for the purposes of discovery, over the documents held by the North Dakota agencies listed by Meta.

## XXVI. OHIO

In opposition to the control issue, the Ohio Attorney General's primary substantive argument is that the Ohio Attorney General is a separate entity and independent from the Ohio agencies. [Dkt. 738-27 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) Ohio agencies are proscriptively barred from obtaining counsel other than the Ohio Attorney General; and (2) Ohio state law mandates that Ohio agencies furnish documents to the Ohio Attorney General. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Children and Youth, Department of Development, Department of Education & Workforce, Department of Health, Department of Higher Education, Department of Job and Family Services, Department of Mental Health & Addiction Services, Department of Youth Services, Office of Budget and Management, and Office of Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in

United States District Court
Northern District of California

United States District Court
Northern District of California

favor of a finding that the Ohio Attorney General does have legal control, for purposes of discovery, over the listed Ohio agencies. While the Ohio Attorney General is a separate entity, this does not outweigh the requirement that the Ohio Attorney General will act as the agencies' counsel and that Ohio state law explicitly mandates that Ohio agencies furnish documents to the Ohio Attorney General.

There is no statutory, legal, or administrative rule cited which prohibits the Ohio Attorney General from accessing the documents of the state agencies at issue. To the contrary, "[p]ublic officers and their deputies, assistants, clerks, subordinates, and employees shall render and furnish to the attorney general, or to the attorney general's designated representatives when so requested, all information and assistance in their possession or within their power." Ohio Rev. Code § 1331.16(N). Unlike other states, the Ohio legislature explicitly created a legal right for the Ohio Attorney General to access state agencies' documents. For purposes of establishing "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of a legal right to access documents created by *statute*, affiliation or employment." *In re Legato Sys., Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. § 203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding Company Act, 12 U.S.C. § 1841(a)(1)). Thus, the cited statute expressly grants the Ohio Attorney General an explicit legal right to obtain and access these documents of the agencies at issue here. The Court thus finds that Ohio Rev. Code § 1331.16(N) directly satisfies *Citric Acid*'s requirement of a showing of a legal right to access the documents of the state agencies here.

Further, and as a separate reason for finding "control" here, the Court notes that the statutory framework in Ohio (like other States) requires that the Ohio Attorney General serve as counsel for the state agencies at issue. As discussed above, the nature of the attorney-client relationship in this action and under the facts here support a finding of "control" with respect to discovery of the state agencies' documents.

First, the statutory scheme in Ohio requires that the Ohio Attorney General "is the chief law officer for the state and all its departments[.]" Ohio Rev. Code § 109.02. "[T]he attorney general is legal counsel for all state agencies." *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 925 N.E.2d 641, 658 (Ohio Ct. App. 2009), *aff'd*, 941 N.E.2d 745 (Ohio 2010); *see also Northeast Ohio Coal. for Homeless & Serv. Emps. Int'l Union, Loc. 1199 v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006) ("Under Ohio Rev. Code Ann. § 109.02, the Attorney General is 'the chief law officer for the state and all its departments' and shall appear for the State in any tribunal in a case in which the state is a party when required by the governor or the general assembly. The Attorney General, then, is both the State's chief legal officer and a representative of the people and the public interest[.]"). Indeed, the Ohio Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 23–24]. Accordingly, it appears that under the statutory scheme each agency will be represented by the Ohio Attorney General in this matter for discovery because of the intended subpoenas.

There is no citation to any statutory or legal prohibition on the Ohio Attorney General's representing the state agencies in this matter for purposes of discovery. Importantly, while the Ohio Attorney General certified that it "could" represent these agencies for purposes of discovery in this Multi-District Litigation, that statement must be viewed in light of the statutory scheme in Ohio which forbids all of the Ohio agencies at issue from obtaining other counsel: "no state officer or board, or head of a department or institution of the state shall employ, or be represented by, other counsel or attorneys at law." Ohio Rev. Code § 109.02. This statutory scheme makes plain the Ohio Legislature's mandate (and not mere preference) that the Ohio Attorney General will represent state agencies in cases such as this Multi-District Litigation. As a result, this arrangement indicates strongly that the Ohio Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies, since the Ohio Attorney General's office must have had a long and deep history of working with and representing these agencies in light of the legislative mandate in favor of representation.

The Ohio Attorney General's role as counsel for the agencies at issue inherently involves

United States District Court
Northern District of California

obtaining necessary documents for effective representation in litigation. In acting as counsel, the Ohio Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, it is unavailing for the Ohio Attorney General to argue that the Ohio Attorney General is a separate and distinct elected entity with separate duties and responsibilities from these agencies. Dkt. 738-27 at 2. This argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. . "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as a party, is found to have

control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the Ohio Attorney General argues that "[t]here is a distinction between the attorneys from the Ohio Attorney General's office who have filed this lawsuit – all of whom are assigned to the Consumer Protection Section within the office - and the attorneys from the same office who may be engaged in responding to subpoenas related to this lawsuit on behalf of their respective clients." [Dkt. 738-27 at 2]. To the extent the Ohio Attorney General has attempted to subdivide its own office between the team litigating this case and other "agency counsel sections" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the Ohio Attorney General's office but not other sub-teams (and more surprisingly, argues that the privilege would be asserted as against attorneys in the Consumer Protection Section), that argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we

United States District Court
Northern District of California

should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. Here, there is no indication or evidence of any such ethical screening, and it is simply not realistic or credible to presume that lawyers in the Ohio Attorney General's office representing these agencies for discovery in this Multi-District Litigation would fail to coordinate with the attorneys already involved in this Multi-District Litigation. It lacks even more credibility for the Ohio Attorney General to argue that the attorney-client privilege would be asserted to prevent such communications between lawyers in that same office where there is no basis to assume any adversity as between any of the state agencies and the State (a party to this case) or the Ohio Attorney General (also a party, as relator, in this case). This review of case law demonstrates that no courts support Ohio's argument that different individual lawyers in the Ohio Attorney General's office have *ex ante* separable, discrete attorney-client relationships which allow the privilege to be selectively asserted, even as against other lawyers in the Ohio Attorney General's office.

The Ohio Attorney General's citation to and reliance on *Monsanto* as support of the

"separate entities" and "constitutional structure" arguments is not persuasive. [Dkt. 738-27 at 2 (citing *State of Ohio v. Monsanto Co.*, Hamilton C.P. No. A1801237 (Ohio Ct. Common Pleas Dec 2, 2020)]. The *Monsanto* opinion is a state court opinion which does not discuss *Citric Acid*, does not apply the relevant federal precedent, and relies as legal support on another Ohio state court opinion on the lack of interchangeability of different Ohio agencies under Ohio state law. *Id.*

By contrast, instructive here is the Southern District of Ohio's opinion in *Bivens v. Lisath*, No. 2:05-CV-0445, 2007 WL 2891416 (S.D. Ohio Sept. 28, 2007). In that civil rights case, an inmate sued various correctional officers and officers of an Ohio state prison, all of whom (as well as the non-party Ohio Department of Rehabilitation and Corrections) were represented by the Ohio Attorney General - which also apparently intervened in that case as a party as well. *Id*. The Court denied the request because "the documents which he [plaintiff] describes in his request (# 22) are documents which would appear to be under the possession or control of the defendants in this case. As a result, he need not subpoena those documents, but may simply request them through the normal discovery processes that are available to parties to litigation and identified in Federal Rules of Civil Procedure 26 through 37." *Bivens*, 2007 WL 2891416, at *6. In *Bivens*, despite the fact that the named individual defendant officers do not exercise executive or managerial oversight of the agency at issue, the Court found "control" for purposes of discovery. Just as in this Multi-District Litigation, in *Bivens* the Ohio Attorney General was both counsel to the named defendants, as well as the third-party agency, and was itself a party (as intervenor much like its status as relator party here). The analogous result in *Bivens* further supports the Court's finding of "control" here.

Indeed, at least one other federal court has previously found that the Ohio Attorney General has legal control over Ohio state agency materials. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Ohio Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states

United States District Court
Northern District of California

including Ohio (which the Ohio Attorney General was involved in), and given the Ohio federal court's decision finding control in the analogous *Bivens* case (which the Ohio Attorney General was involved in both as counsel and a party), this Court is disappointed that the Ohio Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent (such as *Generic Pharmaceuticals (II)* and *Bivens*) on the discovery issue at hand.

Therefore, the Court concludes that the Ohio Attorney General has legal control, for the purposes of discovery, over the documents held by the Ohio agencies listed by Meta.

## XXVII. OREGON

In opposition to the control issue, the Oregon Attorney General argues primarily the following factors: (1) the Oregon Attorney General is a separate entity and independent from the Oregon agencies; (2) the Oregon Attorney General's powers extends as far as set forth by statute or Oregon common law and limited by statute or conferred upon some other official; and (3) the Oregon Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-28 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) that Oregon agencies are proscriptively barred from obtaining counsel other than the Oregon Attorney General, without consent from the Oregon Attorney General due to a conflict, and (2) that Oregon law affords the Oregon Attorney General "[f]ull charge and control of all the legal business" of state agencies. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Business Oregon, the Office of the Governor, Department of Administrative Services, Department of Consumer and Business Services, and Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Oregon Attorney General does have legal control, for purposes of

United States District Court
Northern District of California

discovery, over the listed Oregon agencies. While the Oregon Attorney General is a separate entity and while the Oregon Attorney General is acting pursuant to her statutory authority in bringing this action, this does not outweigh the requirement that the Oregon Attorney General will act as the agencies' counsel. The Oregon Attorney General's powers provide "full control" for rendering legal services for Oregon agencies. The Oregon Attorney General does not indicate any sort of limitation to such legal power conferred upon the office. Moreover, the fact that Oregon agencies are proscriptively barred from obtaining counsel other than the Oregon Attorney General (other than in situations involving a conflict) further reinforces the finding of control over the documents necessary for effective legal representation. Therefore, the Court concludes that the Oregon Attorney General has legal control, for the purposes of discovery, over the documents held by the Oregon agencies listed by Meta.

The statutory scheme in Oregon requires that the Oregon Attorney General have "[g]eneral control and supervision of all civil actions and legal proceedings in which the State of Oregon may be a party or may be interested[,]" and have "*[f]ull charge and control of all the legal business* of all departments, commissions and bureaus of the state, or of any office thereof, which requires the services of an attorney or counsel in order to protect the interests of the state." Or. Rev. Stat. § 180.220 (emphasis added). Indeed, the Oregon Attorney General confirmed that its office will definitely represent all of the Oregon agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 24]. Importantly, the Oregon Attorney General's arguments do not negate the fact that all of the Oregon agencies at issue here are barred by Oregon law from obtaining counsel other than the Oregon Attorney General: "No state officer, board, commission, or the head of a department or institution of the state shall employ or be represented *by any other counsel* or attorney at law." Or. Rev. Stat. § 180.220 (emphasis added). This statutory arrangement indicates strongly that the Oregon Legislature expressed its preference that the Oregon Attorney General, in fulfilling its statutory role for the state agencies, would exercise such "full control" over legal representation of agencies, which necessarily and inherently includes having access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Oregon

United States District Court
Northern District of California

Attorney General from accessing the documents of the state agencies at issue. The Oregon Attorney General argues that "[t]here is no statute or case law that grants the Attorney General authority to compel another state agency to provide documents in a proceeding for which that agency is not a party." [Dkt. 738-28 at 2]. However, the absence of an express statute granting access, by itself, does not amount to a legal prohibition for the Oregon Attorney General to access documents as part of its representation of the state agencies in this matter for purposes of discovery. Indeed, the plenary statutory phrasing that this Attorney General will have both "general control and supervision" over civil actions and "full charge and control" over "all the legal business" of the agencies can reasonably be interpreted to include access to the documents of these agencies when they are clients being represented or defended in a civil action.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

There is no citation to any statutory or legal prohibition on the Oregon Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is both a party to the case while also acting as counsel for a third party. However, this would not be

the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Relatedly, the Oregon Attorney General has taken the position that communications between the Oregon Attorney General and these state agencies "may include confidential communications protected by the attorney-client or common interest privileges." Dkt. 738-28 at 2 ("The Attorney General would assert privilege for confidential communications between the Attorney General and any of the identified agencies if the responsive document contained privileged communications."). To the extent the Oregon Attorney General has attempted to preserve the ability to assert that the privilege applies to communications between the Oregon Attorney General's Office and these agencies (by using conditional phrasing such as "may", such attempts support a finding of an attorney-client relationship and thus the kind of access that supports a finding of control for purposes of discovery. *Perez*, 2014 WL 1796661, at *2 Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Oregon Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Oregon Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

1    right to obtain responsive documents from the state agencies referenced in the Complaint").

2         Further, the Oregon Attorney General argues that the Oregon Attorney General is a separate

3    and distinct elected entity with separate duties and responsibilities.  [Dkt. 738-28 at 2].  However,

4    this argument misapprehends the "legal control" test for documents – the issue is not simply whether

5    one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-

6    subsidiary relationship), and not simply whether the two entities are legally separate (such as two

7    different and separately incorporated entities), but rather whether there is a legal right to obtain the

8    documents as explained by *Citric Acid*.  While operational control may be a factual situation which

9    demonstrates a legal right to obtain the documents, the absence of such "executive or functional

10   control" is not determinative for evaluating "control" for purposes of discovery.  By definition, the

11   "legal control" issue for discovery arises when there are two legally distinct or separate entities –

12   otherwise, if only one entity were involved, there would be no dispute that party discovery covered

13   that one entity.  Thus, arguing that the Oregon "Attorney General made the decision to pursue this

14   action as a matter of policy, independently of the Governor and other agencies," dkt. 738-28 at 2, is

15   simply re-stating the issue to be decided, and not determinative of the issue.  The Oregon Attorney

16   General's arguments erroneously conflate the legal control issue with "operational control" or

17   "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control

18   of the documents for purposes of discovery.

19        "'The control analysis for Rule 34 purposes does not require the party to have actual

20   managerial power over the foreign corporation, but rather that there be close coordination between

21   them.'"  *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638.  Here, the attorney-client relationship

22   between the Oregon Attorney General and the state agencies (a relationship mandated by state law)

23   necessitates close coordination.  Therefore, the Court concludes that the Oregon Attorney General

24   has legal control, for the purposes of discovery, over the documents held by the Oregon agencies

25   listed by Meta, including in particular the three agencies recently listed in the intent to issue

26   subpoenas.

27        Indeed, at least one other federal court has previously found that the Oregon Attorney

28   General has legal control over Oregon state agency materials.  *Generic Pharmaceuticals (II)*, 699

United States District Court
Northern District of California

F. Supp. 3d at 357–58. While this Court reaches its own independent conclusions consistent with the applicable legal standards discussed above and in light of the facts and circumstances presented here, the analysis in the *Generic Pharmaceuticals (II)* Multi-District Litigation is certainly consistent with, and to that extent further persuasively supports, the conclusion here with regard to the Oregon Attorney General's having control with regard to documents of the state agencies at issue. Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the objecting states including Oregon, this Court is disappointed that the Oregon Attorney General and Meta were unable to reach a negotiated resolution of this dispute, which other states were able to do in *Generic Pharmaceuticals (II)*. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

## XXVIII. PENNSYLVANIA

In opposition to the control issue, the Pennsylvania Attorney General argues primarily the following factors: (1) the Pennsylvania Attorney General is a separate entity and independent from the Pennsylvania agencies; (2) the Pennsylvania Attorney General can only access Pennsylvania agency documents when the Pennsylvania Attorney General is utilizing its investigatory powers; (3) the Pennsylvania Attorney General's instant law suit is premised on harm done to Pennsylvania consumers and not the state; (4) the Pennsylvania Attorney General does not seek relief on behalf of the Pennsylvania agencies. [Dkt. 738-29 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Pennsylvania Attorney General must act as counsel for the Pennsylvania agencies; and (2) Pennsylvania law allows the Pennsylvania Attorney General to access Pennsylvania agency documents whenever necessary to carry out its functions. *Id.* at 3. Here, Meta seeks discovery from the following agencies: Business Oregon, the Office of the Governor, Department of Administrative Services, Department of Consumer and Business Services, and Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in

United States District Court
Northern District of California

1   favor of a finding that the Pennsylvania Attorney General does have legal control, for purposes of

2   discovery, over the listed Pennsylvania agencies. While the Pennsylvania Attorney General asserts

3   that Pennsylvania agencies are independent, these arguments do not negate the fact that the Attorney

4   General is the chief legal advisor for the state government. Further, as discussed below, the

5   argument that the Pennsylvania Attorney General can only access agency documents for

6   investigations is not persuasive.

7       Here, unlike in several other states, the Court finds that there is an express right for the

8   Pennsylvania Attorney General to access state agencies' documents. For purposes of establishing

9   "legal control" over documents, "[d]ecisions from within this circuit have noted the importance of

10  a legal right to access documents created by *statute*, affiliation or employment." *In re Legato Sys.,*

11  *Inc. Sec. Litig.*, 204 F.R.D. at 170 (emphasis added) (finding "legal control" and ordering party to

12  obtain and produce transcript not within current possession where federal regulation, 17 C.F.R. §

13  203.6, grants legal right to ask for and obtain transcript of testimony from SEC); *see also In re ATM*

14  *Fee Antitrust Litig.*, 233 F.R.D. at 545 (finding "a bank holding company necessarily controls its

15  subsidiary banks" and thus has "legal control" of documents of bank by virtue of the Bank Holding

16  Company Act, 12 U.S.C. § 1841(a)(1)).

17      Here, there is an express statute granting the Pennsylvania Attorney General a legal right to

18  access the documents and materials of the six state agencies. Under Pennsylvania law, the

19  Pennsylvania Attorney General has the unfettered right to obtain documents from Pennsylvania state

20  agencies. Specifically, Pennsylvania law provides that "[t]he office of Attorney General *shall have*

21  *the right to access at all times to the books and papers of any Commonwealth agency* necessary

22  to carry out its duties under this act." 71 Pa. Stat. § 732-208 (emphasis added).

23      In opposing the arguments in favor of control, the Pennsylvania Attorney General argues

24  that they have no legal right or ability to obtain documents from the state agencies, and that the state

25  agencies could simply refuse to hand over documents to the Attorney General in response to the

26  document requests. Despite the plain wording of the statute, the Pennsylvania Attorney General

27  argues that this statute is limited only to situations in which the Pennsylvania Attorney General is

28  investigating a particular state agency. [Dkt. 738-29 at 2]. That assertion is wrong as a matter of

200

law.  First, there is no such express limitation in the text of the statute.  The plain text of a statute controls its interpretation.  *In re Path Network, Inc.*, 703 F. Supp. 3d 1046, 1068 (N.D. Cal. 2023) (citing *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1105 (9th Cir. 2014); *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 291 (1988)).  Second, the Pennsylvania Attorney General cites nothing in the surrounding text of the statutory scheme of the Act to indicate that the Pennsylvania legislature implicitly intended to limit the scope of the Pennsylvania Attorney General's right to access agency papers only to direct investigations of those agencies by the state Attorneys General.  *Smith v. Spizzirri*, 601 U.S. 472, 472 (2024) (rejecting party's argument to interpret Section 3 of the Federal Arbitration Act because "respondents' attempt to read 'stay' to include 'dismiss' cannot be squared with the surrounding statutory text"); *K Mart Corp.*, 486 U.S. at 291 (implicit limitations should not be read into a statute absent clear guidance from the rest of the Act or other compelling guidance from the legislature).

Further, the Pennsylvania Attorney General made exactly this same argument in another Multi-District Litigation involving a similar discovery dispute, and that court rejected this very same argument:

> Pennsylvania also argues that the [Special Discovery Master's Report and Recommendation] R&R incorrectly determined that the OAG [Office of Attorney General] had control over the state agency documents sought by Defendants because the OAG only has such power when it is either investigating potentially unlawful behavior by Commonwealth agencies or litigating claims on behalf of Commonwealth agencies.  Neither is being done here. Pennsylvania argues that the Amended Fourth R&R effectively seeks to usurp the OAG's investigative authority, and would have the result of making each Commonwealth agency a party subject to Rule 26 discovery in every litigation brought by or against the OAG.  If Defendants want the documents, Pennsylvania argues, they must serve them on the agencies as part of third-party discovery, and Pennsylvania represents that the OAG has offered to facilitate that discovery process . . . . Pennsylvania statutes address the relationship between the Office of the Attorney General and Commonwealth agencies with regard to the right to obtain documents. The key Pennsylvania statute, Section 208 of the Commonwealth Attorneys Act, provides in full that "[t]he Office of Attorney General shall have the right to access at all times to the books and papers of any Commonwealth agency necessary to carry out his duties under this act." The Pennsylvania Supreme Court has held that Section 208:
>
> "lists only one condition on the mandate of production: the material sought must be 'necessary' for execution of the OAG's duties. We

> recognize that the OAG has a broad array of duties involving Commonwealth agencies beyond criminal investigations, and that the [statute] is of correspondingly broad scope. Nevertheless the authorization remains qualified only by what is 'necessary.'"

> Although the Pennsylvania Supreme Court was ruling in the context of a grand jury investigation of a Commonwealth agency, the Court expressly affirmed that the statute is a broad one that extends beyond criminal investigations, qualified only by what is "necessary." Because Pennsylvania has put into this suit the relevance of documents from the agencies that paid for generic drugs, it is necessary to its duties in complying with the Federal Rules of Civil Procedure in the litigation of the MDL, and the OAG therefore has access to the documents under Pennsylvania law.

*Generic Pharmaceuticals (I)*, 571 F. Supp. 3d at 410–11 (quoting *In re Thirty-Third Statewide Investigating Grand Jury*, 86 A.3d 204, 216 (Pa. 2014)).

Here, the Pennsylvania Attorney General filed suit against Meta and the prosecution of this matter is, by definition, one of the Attorney General's duties. Responding to discovery is a necessary part of litigating this case, which the Pennsylvania Attorney General chose to initiate. Obtaining documents in order to respond to discovery requests is necessary to accomplish the Attorney General's duties in this case. Meta asserts that the documents sought from these agencies are relevant to (or at the very least, within the scope of discovery for) the issues disputed in this Multi-District Litigation, and the state Attorney General's make no argument that the documents are irrelevant to the case.

The fact that the Pennsylvania Attorney General is not seeking civil penalties, but is instead asserting harm to Pennsylvania consumers, is not dispositive of whether the documents are necessary for the Pennsylvania Attorney General to carry out its duties. [Dkt. 738-29 at 2]. To the extent the Pennsylvania agencies have relevant, responsive documents concerning the alleged harms to Pennsylvania consumers, the Pennsylvania Attorney General has by definition put those issues and documents relevant to such issues into this suit. And here, as in the *Generic Pharmaceuticals (I)* Multi-District Litigation, these agency documents are necessary for the Pennsylvania Attorney General's duties in complying with the Federal Rules of Civil Procedure in this Multi-District Litigation. 71 Pa. Stat. § 732-208 ("[t]he office of Attorney General shall have the right to access at all times to the books and papers of ***any Commonwealth agency necessary to carry out its duties under this act***.") (emphasis added).

United States District Court
Northern District of California

1    Further, Pennsylvania law mandates that the Pennsylvania "Attorney General **shall**

2    **represent** the Commonwealth and *all Commonwealth agencies*." 71 Pa. Stat. § 732-204 (emphasis

3    added). Under Pennsylvania law, the Pennsylvania Attorney General's office will necessarily

4    represent these state agencies in responding to Meta's discovery in this matter (regardless of whether

5    the discovery is pursued procedurally under Rule 34 or under Rule 45), and thus the Pennsylvania

6    Attorney General has an express statutory right under Pennsylvania law to obtain documents from

7    these state agencies upon demand. The Court finds that searching for and producing relevant, non-

8    privileged documents from the state agencies is necessary for the Pennsylvania Attorney General to

9    carry out its duties in this Multi-District Litigation. *See id.* Even absent the express statutory right

10   to obtain documents, the mandatory attorney-client relationship is sufficient to establish that the

11   Pennsylvania Attorney General has legal control over the state agencies' documents here.

12   Relatedly, the Pennsylvania Attorney General has taken the position that, "should" the

13   Pennsylvania Attorney General be retained by the state agencies with regard to responding to any

14   subpoenas, communications between the Pennsylvania Attorney General and these state agencies

15   would be covered by the attorney-client privilege. [Dkt. 738-9 at 2]. In order to minimize this

16   assertion of privilege, the Pennsylvania Attorney General has attempted to subdivide its own office

17   between the team litigating this case and "different attorneys than those involved in this enforcement

18   action" in order to argue conclusively that the assertion of attorney-client privilege "would not

19   change the possession, custody, or control analysis" without citation to any legal support. *Id.* The

20   Court finds this argument is not supported by citation to law and is contrary to the weight of law.

21   The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of

22   the attendant attorney-client privilege) encompasses the entirety of a legal services organization due

23   to well-known rules of imputation of confidences to a legal services organization, including a public

24   law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a

25   law firm, the principle of loyalty to the client extends beyond the individual attorney and applies

26   with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of

27   imputed disqualification,' . . . requires disqualification of all members of a law firm when any one

28   of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of

App. 203

imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]"  The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective.").  Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity.  Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization.  This review of case law demonstrates that no courts support Pennsylvania's argument that different individual lawyers in the Pennsylvania Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects Pennsylvania's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the attorneys "involved in this enforcement action" while apparently attempting to preserve the ability to assert the privilege applies to communications between other lawyers in the Attorney General's office and these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official

capacities . . . .  [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.  The fact that the Pennsylvania Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Pennsylvania Attorney General's office and the agencies at issue further supports the conclusion of control here.  Assertion of the attorney client privilege requires, as a prerequisite, the existence of an attorney-client relationship.  *See Graf*, 610 F.3d at 1156.

Indeed, the Pennsylvania Attorney General confirmed that its office could represent all of the Pennsylvania agencies at issue, if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 25].  Accordingly, it appears that under the statutory scheme each agency will be represented by the Pennsylvania Attorney General in this matter for discovery.  71 Pa. Stat. § 732-204.  Thus, as a matter of the efficient and rational administration of justice in this case, because the Pennsylvania Attorney General will be involved in representing these state agencies in any event in this case (whether to respond to subpoenas or to respond to party discovery), the Court in its discretion determines that a finding of control is further supported by the simple and pragmatic realities involved in these circumstances.

At oral argument, the Pennsylvania Attorney General (along with other states) raised the same "virtual veto" argument raised by other states.  As discussed, this argument is based on an unsupported hypothetical possibility that the state agencies could simply refuse to cooperate with their statutorily-mandated lawyers (the Pennsylvania Attorney General's office) and refuse to provide documents in response to the document requests.  From that, the Pennsylvania Attorney General (consistent with other states) argues that the Attorney General's office would have no mechanism or recourse if the agencies simply refused, and that this would put the Attorney General's office in the untenable position of potentially being sanctioned for failure to obtain documents from the state agencies.  *Id.*  This is a variation on the "virtual veto" argument, discussed above, which the Court finds unpersuasive to rebut the finding of control.

First, the Pennsylvania Attorney General presented no evidence to support this hypothetical risk that the Pennsylvania state agencies would simply refuse to provide documents, and presented

no evidence that these agencies have ever refused to cooperate in discovery in the past. Indeed, this hypothetical refusal by state agencies is a particularly weak argument in light of Pennsylvania's statutory scheme which gives the Pennsylvania Attorney General the express right to obtain agency documents. Second, this hypothetical raised by the Pennsylvania Attorney General (and other states) is not merely an unfounded "fear", this argument assumes that the state agencies would act unreasonably in defiance of a discovery Order such as the instant Order. It is not reasonable to base a legal conclusion on an unreasonable, unsupported hypothetical that imagines the worst possible behavior; rather, the law presumes that parties will act reasonably and rationally in response to court Orders. "We think that surely one must assume that litigants will obey court orders. Once we assume otherwise, then our system of jurisprudence is in serious trouble." *E. I. du Pont de Nemours & Co.*, 442 F. Supp. at 825; *see also Casas*, 2017 WL 1153336, at *6 (The Court recognized the existence of "the legal presumption that defendants had regularly discharged their duties and complied with the court's order.").

Third and perhaps most importantly, if the state agencies simply refused to comply, they would be subject to legal consequences. A Court has the inherent authority to enforce its own Orders in order to control the conduct of the proceedings, protect the "orderly administration of justice," and to maintain "the authority and dignity of the court." *Roadway Express, Inc.*, 447 U.S. at 764–67 (citations omitted). Because (as discussed herein) the Court finds that the Pennsylvania Attorney General's office has legal control of documents from the Pennsylvania state agencies (and thus discovery from the state agencies under Rule 34 is appropriate), then the state agencies would be in direct violation of this very Order if they should hypothetically choose to completely defy this very Order and refuse to provide documents to the Pennsylvania Attorney General. Meta could, in that situation, file a motion to compel and, should the state agencies continue to simply refuse to provide documents, this Court would have the inherent authority to issue sanctions (including monetary sanctions) against the state agencies for any such hypothetical refusal to abide by an Order of this Court. The Pennsylvania Attorney General's argument that the Court would choose to sanction their office in this situation presumes this Court would act in ignorance of the source of the non-compliance – if, as hypothetically theorized, it were the state agencies who were non-compliant

despite the best efforts of the state Attorney General to secure compliance, the Court is perspicacious enough to understand that the fault would lie with the hypothetical state agency and not the Pennsylvania Attorney General, and in the event some enforcement mechanism were needed (such as the hypothetically feared sanctions), the Court would presumably have the wisdom to understand how and where to focus any such enforcement Order. *Qualcomm*, 2010 WL 1336937, at *2–5; *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7.

Therefore, unlike the factors in *Citric Acid*, the state agencies here would not be in a position to obstinately refuse to provide documents in response to the document requests without incurring risk of legal consequences. Unlike in *Citric Acid*, the party here which is alleged to (and found to) have control (the state Attorney General) does in fact have legal recourse to secure the compliance of the controlled entities (the state agencies) should they simply refuse to turn over the documents. This bolsters the Court's finding that the state Attorney General here does possess the "legal ability" to obtain the documents from the state agencies, over and in addition to the statutory basis discussed above. *Cf. Citric Acid*, 191 F.3d at 1107 (lack of "legal ability" to obtain documents is a factor in finding no "legal control"). The fact that legal recourse is available in this event is therefore a factor which, according to *Citric Acid*, demonstrates that legal control exists in the factual circumstances here.

As discussed above, the Court is not persuaded by the argument that the Pennsylvania Attorney General lacks control over state agency documents, because an attorney in a court proceeding can simply do nothing when faced with a client who (hypothetically here) refuses to collect or provide documents for production in discovery. As counsel for a party subject to discovery, the Pennsylvania Attorney General has the legal authority and duty to take action to make inquiry and collect the documents from the uncooperative state agencies directly, and cannot simply sit on their hands in the face of an uncooperative client – this is would not be the first time an attorney was faced with a client who was difficult to deal with in collecting documents for discovery. *See, e.g.*, *Qualcomm*, 2010 WL 1336937, at *2–5. Counsel in a litigation has legal duties to take pro-active steps in supervising and searching for documents in discovery that go far beyond simply acceding to a client who fails to (or worse, refuses to) produce or provide documents. *Id.* (detailing

United States District Court
Northern District of California

United States District Court
Northern District of California

1    "Discovery Errors" by counsel); *Rodman*, 2016 WL 5791210, at *3–4. Counsel cannot simply

2    advise clients about document requests and leave it up to the client to decide whether or not to risk

3    sanctions for failure to produce – in appropriate circumstances, counsel may need to personally

4    conduct or directly supervise a client's collection, review, and production of responsive documents.

5    *Optronic Techs., Inc.*, 2020 WL 2838806 at *5–7 ("The Court does not conclude that counsel must

6    always personally conduct or directly supervise a client's collection, review, and production of

7    responsive documents. However, in the circumstances presented here, the Court finds that [counsel]

8    Sheppard Mullin did not make a reasonable effort . . . . [T]he Court orders Ningbo Sunny's new

9    counsel of record to undertake an independent effort to ensure that Ningbo Sunny fully complies

10   with Orion's post-judgment document requests."). The Court rejects as legally erroneous the

11   Pennsylvania Attorney General's arguments, because they are based on a misunderstanding of

12   counsel's role (and duties) in discovery and the available procedures under the Federal Rules for the

13   proper conduct of discovery and the rational administration of justice. *See King*, Case No. 20-cv-

14   04322-LGS-OTW, Dkt. 272, slip op. at 2 ("embroil[ing the judge] in day-to-day supervision of

15   discovery [is] a result directly contrary to the overall scheme of the federal discovery rules.").

16   In addition to their duties to supervise the collection of documents and make inquiry of

17   clients to ensure proper collection of documents is undertaken, attorneys representing clients in court

18   proceedings have legal duties under the Federal Rules of Civil Procedure to work cooperatively to

19   improve the administration of civil justice, both as officers of the Court and under their ethical

20   obligations as members of the bar of this Court. *See* Fed. R. Civ. P. 1 advisory committee's note to

21   2015 amendment. "Rule 26(g) imposes ***an affirmative duty to engage in pretrial discovery in a***

22   ***responsible manner*** that is consistent with the spirit and purposes of Rules 26 through 37 . . . . The

23   subdivision provides a deterrent to both excessive discovery and evasion by imposing a certification

24   requirement that ***obliges each attorney*** to stop and think about the legitimacy of a discovery request,

25   ***a response thereto, or an objection*** . . . . If primary responsibility for conducting discovery is to

26   continue to rest with the litigants, they must be obliged to act responsibly and avoid abuse." *See*

27   Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment.

28   As the Ninth Circuit has recognized, "legal duties" are jural correlatives and logically

United States District Court
Northern District of California

antecedent to "legal rights" – and thus the Pennsylvania Attorney General's legal duties to undertake proactive efforts to collect documents from clients in discovery are the flip side to the legal right to access those documents. *Newman*, 287 F.3d at 790 n.5 ("The logical relationship between rights and duties has been the subject of considerable academic examination. Wesley Hohfeld famously described rights and duties as 'jural correlatives'—different aspects of the same legal relation. Oliver Wendell Holmes described rights as 'intellectual constructs used to describe the consequences of legal obligations. [sic] As he puts it [in The Common Law (1881)], 'legal duties are logically antecedent to legal rights.'") (internal citations omitted). Here, the recognition that a state Attorney General, acting as counsel for the state agencies here, has legal duties to supervise the collection of (and possibly directly obtain) documents from those agencies for discovery lends further support to the conclusion that the state Attorney General has the legal right to access those documents. That is, counsel's legal duty to ensure collection of documents from a client is a different aspect of (and correlates juridically to) a legal right to access those documents, and thus supports the conclusion of control for purposes of discovery.

The Pennsylvania Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Pennsylvania Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). To the extent the Pennsylvania Attorney General argues that these agencies are "separate entities under law" from the state Attorney General and are not supervised by the state Attorney General, *see* Dkt. 738-29 at 2, that argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The

control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Pennsylvania Attorney General "neither governs nor is governed by another Commonwealth agency" is simply re-stating the issue, *id.* (citation omitted), and not determinative of the issue. Arguing that the Pennsylvania Attorney General is "an independent agency", *id.*, confuses and conflates the "legal control" issue for discovery with "operational control" or "functional independence" and thus constitutes a legally erroneous argument.

Meta has argued that state agencies are part of the government of the Commonwealth of Pennsylvania (the Plaintiff) and thus should be treated as parties for purposes of discovery based on that status. [Dkt. 685 at 6 n.4]. Semantically this position may have some facial appeal at a broad level. *See In re Redf Mktg., LLC*, No. 12-32462, 2015 WL 1137661, at *3 (Bankr. W.D.N.C. Mar. 10, 2015) ("state agencies are, as the term suggests, agents of the state."). If the Pennsylvania state agencies are agents of the state, then under *Hitachi*, that factor would militate in favor of finding "legal control." *Hitachi*, 2006 WL 2038248, at *1. However, determining whether a particular state agency is an agent of its sovereign state appears to involve a multi-factor analysis. *See Savage v. Glendale Union High School Dist. No. 205, Maricopa County*, 343 F.3d 1036, 1040–41 (9th Cir. 2003) ("To determine whether a governmental entity is an arm of the state for Eleventh Amendment

United States District Court
Northern District of California

purposes, we examine the following factors: (1) whether a money judgment would be satisfied out of state funds; (2) whether the entity performs central governmental functions; (3) whether the entity may sue or be sued; (4) whether the entity has the power to take property in its own name or only in the name of the state; and (5) the corporate status of the entity."). Here, Meta has not cited law to establish whether "agency" for purposes of discovery is evaluated under the same legal standard as "agency" for purposes of sovereign immunity, and further Meta has provided only cursory argument to support a finding that each of the six Pennsylvania state agencies should be held to be agents of the Commonwealth of Pennsylvania for purposes of discovery under applicable legal standards. Accordingly, while the Court notes this factor, it is non-dispositive on the record presented to the Court.

The Pennsylvania Attorney General has cited no statutory, legal, or administrative rule cited which prohibits the Pennsylvania Attorney General from accessing the documents of the state agencies at issue, and as discussed above, there is an express statute granting that access. Nor is there citation to any statutory or legal prohibition on the Pennsylvania Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party or counsel to a party; rather under the particular facts here and under the totality of circumstances viewed in light of

1   applicable legal standards, the Court finds that control exists here.

2          Indeed, at least one other federal court has previously found that the Pennsylvania Attorney

3   General has legal control over Pennsylvania state agency materials.  *Generic Pharmaceuticals (I)*,

4   571 F. Supp. 3d at 408; *see also* 2023 WL 6985587, at *3 (E.D. Pa. Oct. 20, 2023).  While this Court

5   reaches its own independent conclusions consistent with the applicable legal standards discussed

6   herein in light of the facts and circumstances presented here, the analysis in both opinions from the

7   Pennsylvania federal district court in the *Generic Pharmaceuticals (I)* and *Generic Pharmaceuticals*

8   *(II)* Multi-District Litigations are certainly consistent with (and to that extent further persuasively

9   supports) the conclusion here with regard to the Pennsylvania Attorney General's having control

10  with regard to documents of the state agencies at issue.  Given that the *Generic Pharmaceuticals (I)*

11  Court resolved the control issue against all the objecting states including Pennsylvania, this Court

12  is disappointed that the Pennsylvania Attorney General and Meta were unable to reach a negotiated

13  resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

14  Management Conferences, they should make every effort to work out discovery disputes through

15  reasonable, good faith negotiations between able and experienced counsel, particularly where (as

16  here) there is guidance in precedent on the discovery issue at hand.

17  **XXIX. RHODE ISLAND**

18         In opposition to the control issue, the Rhode Island Attorney General argues primarily the

19  following factors: (1) the Rhode Island Attorney General is a separate entity and independent from

20  the Rhode Island agencies; and (2) the Rhode Island Attorney General only represents Rhode Island

21  agencies if requested by said agency and if the Rhode Island Attorney General consents to act as

22  legal counsel.  [Dkt. 738-30 at 2].

23         In support of a finding of control with regard to these state agencies' documents, Meta argues

24  based primarily on the following factors: (1) that the Rhode Island Attorney General is the legal

25  representative of all state agencies, and (2) that no statute deprives the Rhode Island Attorney

26  General from accessing Rhode Island agency documents. *Id.* at 3.  Here, Meta seeks discovery from

27  the following agencies: the Board of Governors for Higher Education; Department of

28  Administration; Department of Behavioral Healthcare, Developmental Disabilities and Hospitals;

Department of Children, Youth, and Families; Department of Education; Department of Health; Department of Human Services; Executive Office of Health and Human Services; Office of the Governor; and Office of the Child Advocate. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Rhode Island Attorney General does have legal control, for purposes of discovery, over the listed Rhode Island agencies.

The statutory scheme in Rhode Island requires that "the attorney general, whenever requested, ***shall act*** as the legal adviser of . . . all state boards, divisions, departments, and commissions . . . and shall institute and prosecute, whenever necessary, all suits and proceedings which they may be authorized to commence, and ***shall appear for*** and defend the . . . boards, divisions, departments, commissions, commissioners, and officers, ***in all suits*** and proceedings which may be brought against them in their official capacity." 42 R.I. Gen. Laws § 42-9-6 (emphasis added).

Indeed, the Rhode Island Attorney General confirmed that its office could represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 25–26]. As discussed above, no separate counsel has entered appearance on behalf of the Rhode Island state agencies. Accordingly, it appears that under the statutory scheme each agency will be represented by the Rhode Island Attorney General in this matter for discovery. *Common Cause Rhode Island v. Gorbea*, 970 F.3d 11, 17 (1st Cir. 2020) (the Rhode Island "attorney general . . . by law is obligated to act as legal advisor ***for all state agencies*** and officers acting in their official capacity and to defend them against suit, R.I. Gen. Laws § 42-9-6[.]") (emphasis added). Certainly, in the face of this statutory scheme, it is not surprising that the Rhode Island Attorney General cites no law which prohibits that office from representing the state agencies in this matter.

Further, there is no statutory, legal, or administrative rule cited which prohibits the Rhode Island Attorney General from accessing the documents of the state agencies at issue. The Rhode Island Attorney General argues that the "Rhode Island laws that permit or require sharing of information do so in the context of affirmative investigations, actions, or projects." Dkt. 738-30 at 2 (citations omitted). However, several of these statutes relate to sharing information with agencies

United States District Court
Northern District of California

or commissions other than the Attorney General and are thus irrelevant to the control issue here. *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-119-8 (disclosure to the R.I. Commission on Women and Girls; § 42-26-11 (disclosure to "commission of the Public Safety Grant Administration Office")). Other cited statutes relate to disclosures from agencies not involved in this action or for statutory purposes unrelated to this Multi-District Litigation, and thus are not instructive on the control issue here. *See, e.g.*, Dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-45.1-12 (relating to Antiquities Act of R.I.); § 42-66-10 (relating to Office of Healthy Aging, not at issue in this Multi-District Litigation); § 42-66.7-9(b) (relating to long term care ombudsman, not at issue in this Multi-District Litigation)). Further, while these statutes provide for disclosure of information in the context of certain investigations or for identified purposes, none of these statutes state that they are the **only** method by which the Rhode Island Attorney General may obtain documents from state agencies. Indeed, the only cited statute which relates to an agency at issue in this case, *see* dkt. 738-30 at 2 (citing R.I. Gen. Laws § 42-72-8(b)), grants the Rhode Island Attorney General the unrestricted legal rights to access documents and information from the Rhode Island Department of Children, Youth, and Families, in circumstances involving either an investigation of (or prosecution of) criminal conduct by another person relating to a child or other children within the same family unit, or an investigation of (or prosecution of) false reporting of child abuse or neglect. *See* R.I. Gen. Laws §§ 42-72-8(b)(7), -8(b)(9). If the Rhode Island Attorney General were currently investigating any potential criminal charges against Meta relating to children (which is known only to the Rhode Island Attorney General at this time), then the Rhode Island Attorney General would have a legal right to access (and thus control) over the documents of the Rhode Island Department of Children, Youth, and Families. In any event, close reading of these statutes, ultimately, demonstrates that none of them explicitly or implicitly forbid the Rhode Island Attorney General from accessing documents for the purposes of discovery during its scope of legal representation of the state agencies.

The Rhode Island Attorney General argues that agencies "routinely require the [Rhode Island Attorney General's] Office to issue subpoenas in enforcement cases before producing documents to the Office." [Dkt. 738-30 at 2]. From this, the Rhode Island Attorney General appears

to be arguing that the only way to obtain documents from state agencies would be by subpoena here, even if the Rhode Island Attorney General were representing those very same state agencies as clients (and not as the subjects of investigations). An argument that a lawyer representing a Rhode Island state agency (whether the state Attorney General or private counsel) would be forced to issue a subpoena to obtain documents from their own client is nonsensical and impractical, as well as contrary to the principles of effective legal representation. As counsel for a state agency, the Rhode Island Attorney General will have the normal type of direct access to the necessary documents from its own clients, ensuring efficient and comprehensive legal support for the agencies involved. Under the statutory scheme, the Rhode Island Attorney General is regularly called upon to represent the interests of state agencies, which inherently requires a level of access to agency documents necessary to render legal representation effectively. The Rhode Island Attorney General cites no precedent requiring any attorneys representing a Rhode Island state agency to use a subpoena to obtain documents from their own clients. The Rhode Island Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Rhode Island Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Relatedly, the Rhode Island Attorney General has stated that the attorney client privileged is not asserted for communications between the Rhode Island Attorney General and these state agencies "unless the Office has explicitly agreed to represent a state agency." [Dkt. 738-30 at 2]. The fact that the agencies had not formally retained the Attorney General as of the date of the submission of their brief does not alter the reality that, under the statutory scheme, they will be retained by the Attorney General once discovery formally is initiated against them by Meta (whether by Rule 45 subpoena or by party discovery pursuant to this Order). The fact that the Rhode Island Attorney General implicitly acknowledges that it could be retained by these agencies (and thus the

United States District Court
Northern District of California

attorney-client privilege would apply to communications with the agencies) further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further the Rhode Island Attorney General explicitly argues that communications between the state agencies and the Attorney General may be protected by the work product doctrine. [Dkt/ 738-30 at 2]. The fact that the Rhode Island Attorney General asserts that pre-suit communications with the state agencies may be protected by the work product doctrine is an implicit admission that these agencies may have been involved in pre-suit investigations, may have interests in the outcome of this case, and (at a minimum) worked with the Attorney General on this case in a pre-suit attorney-client relationship. As discussed above, case law recognizes that factors that support a finding of control include situations where the third party has an interest in the outcome of the matter and where the third party participated in the preparation of or prosecution of the matter behind the scenes as an unnamed party. *See, e.g.*, *Hitachi*, 2006 WL 1038248, at *1. Asserting the work product doctrine over communications with state agencies thus further supports a finding of control here.

The Court rejects the Rhode Island Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege over communications with the agencies at issue, while apparently attempting to preserve the ability to assert work product protection applies to communications between the Rhode Island Attorney General's Office and these agencies. "[I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.

The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the Attorney General) is both counsel to a party to the case while also acting or able to act as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit

required Salas to respond as to responsive materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

Further, the Rhode Island Attorney General argues that the Rhode Island Attorney General is a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-30 at 2 ("Rhode Island state agencies are represented by separate and distinct legal counsel, and Rhode Island laws only delegate such a right or duty in limited circumstances."). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. The Rhode Island Attorney General's

United States District Court
Northern District of California

United States District Court
Northern District of California

1  arguments erroneously conflate the legal control issue with "operational control" or "functional

2  independence" of each entity, and thus is insufficient to rebut a finding of legal control of the

3  documents for purposes of discovery.

4        Therefore, the Court concludes that the Rhode Island Attorney General has legal control, for

5  the purposes of discovery, over the documents held by the Rhode Island agencies listed by Meta.

6  **XXX.  SOUTH CAROLINA**

7        In opposition to the control issue, the South Carolina Attorney General argues primarily the

8  following factors: (1) the South Carolina Attorney General is a separate entity and independent from

9  the South Carolina agencies; and (2) the South Carolina Attorney General brought the lawsuit under

10  its own independent law enforcement capacity.  [Dkt. 738-31 at 2].

11        In support of a finding of control with regard to these state agencies' documents, Meta argues

12  based primarily on the following factors: (1) that South Carolina agencies are proscriptively barred

13  from obtaining counsel other than the South Carolina Attorney General, without consent from the

14  South Carolina Attorney General, and (2) that the South Carolina Constitution and local law

15  provides the South Carolina Attorney General the ability to require all state agencies to provide

16  information in writing upon any subject.  *Id.* at 3.  Here, Meta seeks discovery from the following

17  agencies: the Commission on Higher Education, Department of Administration Executive Budget

18  Office, Department of Children's Advocacy, Department of Commerce, Department of Consumer

19  Affairs, Department of Education, Department of Health and Human Services, Department of

20  Mental Health, Department of Social Services, Education Oversight Committee, and Office of the

21  Governor.  *Id.*

22        After considering the factors argued in the briefs, the Court finds that the factors weigh in

23  favor of a finding that the South Carolina Attorney General does have legal control, for purposes of

24  discovery, over the listed South Carolina agencies.  While the South Carolina Attorney General is a

25  separate entity and while the South Carolina Attorney General does bring the instant action in its

26  own independent authority, this does not outweigh the requirement that the South Carolina Attorney

27  General will act as the agencies' counsel.

28        The statutory scheme in South Carolina requires that "the Attorney General ***shall*** conduct

all litigation which may be necessary for **any department of the state government** or any of the boards connected therewith, and all these boards or departments are **forbidden to employ any counsel** for any purpose except through the Attorney General and upon his advice[.]"  S.C. Code § 1-7-80 (emphasis added).

Indeed, the South Carolina Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1 at 27–28].  Accordingly, under the statutory scheme each agency will be represented by the South Carolina Attorney General in this matter for discovery.

Importantly, the South Carolina Attorney General's arguments do not negate the fact that all of the South Carolina agencies at issue here are barred by South Carolina law from obtaining counsel other than the South Carolina Attorney General.  S.C. Code § 1-7-80; *see also* S.C. Code § 1-7-160 ("[a] department or agency of state government may not hire a classified or temporary attorney as an employee except upon the written approval of the Attorney General and at compensation approved by him.").  This arrangement indicates strongly that the South Carolina Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Further, there is no statutory, legal, or administrative rule cited which prohibits the South Carolina Attorney General from accessing the documents of the state agencies at issue.  Indeed, the contrary is true.  South Carolina law permits the South Carolina Attorney General to access agencies' documents at the direction of the Governor.  *See The State of South Carolina v. Purdue Pharma L.P.*, No. 2017CP4004872, 2019 WL 3753945 (S.C.Com.Pl. July 05, 2019).  In *Purdue Pharma*, the South Carolina court found "unconvincing" the State of South Carolina's refusal to produce documents from certain agencies "on the ground that information in the possession, custody, or control of executive agencies other than the Attorney General, as well as the Public Employee Benefit Authority and Department of Health and Human Services (both of whom were expressly named in the Amended Complaint), is outside of the State's possession, custody, or control."  *Id.*  at *1.  Based on the South Carolina Constitution, the *Purdue Pharma* court held that "[a]s the legal representative of the executive branch, the Attorney General, at the direction of the

App. 219

United States District Court
Northern District of California

Governor, has the ability to require '[a]ll State officers, agencies, and institutions within the Executive Branch' to 'give him information in writing upon any subject relating to the duties and functions of their respective offices, agencies, and institutions.'" *Id.* (quoting S.C. Const. Art. IV, § 17). Citing South Carolina Rule of Civil Procedure 34 (which is analogous to Fed. R. Civ. P. 34, and includes the same "possession, custody, or control" language), the *Purdue Pharma* court held that "the contested information nonetheless appears to be within the possession, custody or control of the Attorney General." *Id.*

Under *Citric Acid*, if there were a "legal mechanism" to obtain the documents (such as filing a breach of contract action, which by definition would require seeking assistance in enforcement from a judicial officer in a legal action), then there would have been a finding of "control" for purposes of discovery. 191 F.3d at 1107-08. Here, under the South Carolina Constitution and *Purdue Pharma*, there is a legal mechanism for the South Carolina Attorney General to obtain the agencies' documents. Under *Citric Acid*, the fact that enforcement was contingent on a court or judicial officer exercising authority to grant relief in a breach of contract case did not detract from the legal right to access; here analogously, the fact that direction from the Governor under the Constitution did not (in *Purdue Pharma*) detract from the Attorney General's legal right to access the agencies' documents. Based on the South Carolina Constitution and *Purdue Pharma*, the Court finds that there is a legal right for the South Carolina Attorney General to access the state agencies' documents upon demand, and thus "control" exists under Rule 34 for at least these reasons.

There is no citation to any statutory or legal prohibition on the South Carolina Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization, the attorney general, is a party to the case while also acting as counsel for a third party. However, this would not be the first time that a legal services provider, as counsel for a party, is found to have control over third party documents for purposes of discovery. *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are counsel of record for the Salas defendants in the Florida lawsuit . . . . Thus, a Rule 34 request for production to Salas in the Florida lawsuit required Salas to respond as to responsive

materials over which Salas and his law firm had possession, custody or control."). Indeed, one court has noted that "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at \*2. The Court is not holding broadly that there must be a finding of a legal right of access to and thus control over third party client documents in every case involving a legal services provider as a party; rather, under the particular facts here, and under the totality of circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

The South Carolina Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the South Carolina Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at \*5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Relatedly, the South Carolina Attorney General has taken the position that communications between the South Carolina Attorney General and these state agencies "would be protected under the attorney-client privilege" if that office were retained by such agencies. [Dkt. 738-31 at 2]. The fact that the agencies had not formally retained the Attorney General as of the date of the submission of their brief does not alter the reality that, under the statutory scheme, they will be retained by the Attorney General once discovery formally is initiated against them by Meta (whether by Rule 45 subpoena or by party discovery pursuant to this Order). The fact that the South Carolina Attorney General admits could be retained by these agencies and thus the attorney-client privilege would apply to communications with the agencies further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

Further the South Carolina Attorney General, like other states, argues that responding to a subpoena "would be handled by different attorneys than those involved in this enforcement action"

and that therefore this "would not change the possession, custody, or control analysis." *Id.* This argument is not supported by citation to any law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening; *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that there is insufficient legal support for South Carolina's argument that having different individual lawyers in the South Carolina Attorney General's office represent the agencies for discovery somehow inexplicably "would not change" the "control" analysis. [Dkt.

738-31 at 2].

The Court rejects the South Carolina Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the attorneys currently "involved in this enforcement action," while apparently attempting to preserve the ability to assert that the privilege applies to communications between other lawyers in the South Carolina Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2.

To the extent the South Carolina Attorney General argues that the South Carolina Attorney General is a separate and distinct elected entity with separate duties and responsibilities from the state agencies, that argument is not persuasive. Dkt. 738-31 at 2 ("The [South Carolina Attorney General] does not share a common executive with any of these agencies, which stand independently from the Attorney General's Office."). This argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed

United States District Court
Northern District of California

App. 223

United States District Court
Northern District of California

1     above, courts have found "control" for purposes of discovery where a party is clearly not in

2     managerial control over the third-party, such as a subsidiary having control over the documents of

3     a parent corporation, or an individual government officer having control over the documents of an

4     entire agency.  Thus, arguing that the South Carolina Attorney General "brings an action on behalf

5     of the State of South Carolina . . . and not as the legal representative or attorney of any department

6     or agency of state government," dkt. 738-31 at 2, is simply re-stating the issue to be decided, and

7     not determinative of the issue.  The South Carolina Attorney General's arguments erroneously

8     conflate the legal control issue with "operational control" or "functional independence" of each

9     entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of

10    discovery.

11         Finally, the Court has recognized that the issue of control of state agency documents, when

12    a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

13    District Litigation involving most of the same States and State Attorneys General as are involved in

14    this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals*

15    *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

16    which withdrew their objections to party discovery and negotiated a resolution of this issue with the

17    opposing party there.  *Id.* at 356 n.5.  In that case, South Carolina is identified as one of the States

18    which reached agreement on the state agency control issue without requiring that court to expend

19    resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion

20    resolved the control issue against all the remaining objecting states and given that South Carolina

21    was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court

22    is disappointed that the South Carolina Attorney General and Meta were unable to reach a negotiated

23    resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

24    Management Conferences, they should make every effort to work out discovery disputes through

25    reasonable, good faith negotiations between able and experienced counsel, particularly where, as

26    here, there is guidance in precedent on the discovery issue at hand.

27         Therefore, the Court concludes that the South Carolina Attorney General has legal control,

28    for the purposes of discovery, over the documents held by the South Carolina agencies listed by

United States District Court
Northern District of California

1    Meta.

2    **XXXI. SOUTH DAKOTA**

3         In opposition to the control issue, the South Dakota Attorney General argues primarily the

4    following factors: (1) the South Dakota Attorney General is a separate entity and independent from

5    the South Dakota agencies; (2) the South Dakota Attorney General is not automatically required to

6    represent South Dakota agencies, and once such representation occurs, South Dakota law grants the

7    South Dakota Attorney General access to the South Dakota agencies' documents.  [Dkt. 738-32 at

8    2].

9         In support of a finding of control with regard to these state agencies' documents, Meta argues

10   based primarily on the following factors: (1) the South Dakota Attorney General is South Dakota's

11   "representative in judicial proceedings;" and (2) no statute deprives the South Dakota Attorney

12   General from access to South Dakota agency documents.  *Id.* at 3.  Here, Meta seeks discovery from

13   the following agencies: the Board of Regents, Bureau of Finance and Management, Department of

14   Education, Department of Health, Department of Social Services, Governor's Office, and

15   Governor's Office of Economic Development.  *Id.*

16        The statutory scheme in South Dakota requires that "[i]t is the duty of the attorney general:

17   (1) To appear for the state and prosecute and defend all actions and proceedings, civil or criminal,

18   in the Supreme Court, in which the state shall be interested as a party; [and] (2) When requested by

19   the Governor or either branch of the Legislature, or whenever, in the judgment of the attorney

20   general, the welfare of the state demands, to appear for the state and prosecute or defend, in any

21   court or before any officer, ***any cause or matter, civil*** or criminal, in which the state may be a party

22   or interested[.]"  S.D. Codified Laws § 1-11-1 (emphasis added).

23        Indeed, the South Dakota Attorney General confirmed that its office could represent the

24   agencies at issue if Meta were to serve those agencies with a subpoena in this matter.  [Dkt. 738-1

25   at 28–29].  As discussed above, no separate counsel has appeared for any of the state agencies at

26   issue.  Accordingly, it appears that under the statutory scheme each agency will be represented by

27   the South Dakota Attorney General in this matter for discovery.

28        Further, there is no statutory, legal, or administrative rule cited which prohibits the South

United States District Court
Northern District of California

1    Dakota Attorney General from accessing the documents of the state agencies at issue.  Indeed, the

2    contrary is true.  South Dakota law permits the South Dakota Attorney General to access agencies'

3    documents with consent of the Governor.  S.D. Codified Laws § 1-11-10 ("Under such resolution

4    or order of the Governor, or the attorney general's own relation with consent of the Governor, the

5    attorney general . . . shall have access to any and all books, blanks, . . . and materials and equipment

6    of the office, department, bureau, board, commission, or any other component part of the state

7    government or any branch, arm, or agency of the government[.]").  The South Dakota Attorney

8    General admits that there are other specific statutes giving the Attorney General the right to access

9    certain agencies' documents under certain conditions.  [Dkt. 738-32 at 2].  In *Citric Acid*, the lack

10   of control was based on a lack of "legal mechanism" to obtain the documents (such as filing a breach

11   of contract action, which by definition would require seeking assistance in enforcement from a

12   judicial officer in a legal action).  191 F.3d at 1107-08.  Here, under these statutes, there appear to

13   be legal mechanisms for the South Dakota Attorney General to obtain the documents – for example,

14   under Section 1-11-10, the Attorney General has the legal authority under its "own relation" to have

15   access to the records of any agency, with the assistance and consent of the Governor.  Under *Citric*

16   *Acid*, the fact that enforcement was contingent on a court or judicial officer exercising authority to

17   grant relief in a breach of contract case did not detract from the legal right to access; here

18   analogously, the fact that consent is required from the Governor under the statute should not detract

19   from the Attorney General's legal right to access the agencies' documents.

20          The South Dakota Attorney General does not provide any citation to any statutory or legal

21   prohibition on the South Dakota Attorney General's representing the state agencies in this matter

22   for purposes of discovery.  *See* Dkt. 738-32 at 2.  The Court recognizes that this is a somewhat

23   unusual situation, in which a law enforcement organization (the attorney general) is both a party to

24   the case while also acting or able to act as counsel for a third party.  However, this would not be the

25   first time that a legal services provider, as counsel for a party, is found to have control over third

26   party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4 ("Both Salas

27   individually and his law firm, the subpoena recipients and defendants in this court, are counsel of

28   record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for production

1    to Salas in the Florida lawsuit required Salas to respond as to responsive materials over which Salas

2    and his law firm had possession, custody or control.").  Indeed, one court has noted that "[i]n general,

3    an attorney is presumed to have control over documents in its client's possession."  *Perez*, 2014 WL

4    1796661, at *2.  The Court is not holding broadly that there must be a finding of a legal right of

5    access to and thus control over third party client documents in every case involving a legal services

6    provider as a party; rather, under the particular facts here, and under the totality of circumstances

7    viewed in light of applicable legal standards, the Court finds that control exists here.

8         Relatedly, the South Dakota Attorney General has taken the position that communications

9    between the South Dakota Attorney General and these state agencies would be covered by the

10   attorney-client privilege.  [Dkt. 738-32 at 2].  The fact that the South Dakota Attorney General

11   admits it "may appear on behalf of the state agencies" and thus "would assert" that communications

12   with the agencies are privileged further supports the conclusion of control here.  Assertion of the

13   attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship.

14   *See Graf*, 610 F.3d at 1156.

15        Finally, the Court has recognized that the issue of control of state agency documents, when

16   a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

17   District Litigation involving most of the same States and State Attorneys General as are involved in

18   this case.  *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58.  The *Generic Pharmaceuticals*

19   *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

20   which withdrew their objections to party discovery and negotiated a resolution of this issue with the

21   opposing party there.  *Id.* at 356 n.5.  In that case, South Dakota is identified as one of the States

22   which reached agreement on the state agency control issue without requiring that court to expend

23   resources resolving the dispute there.  *Id.*  Given that the *Generic Pharmaceuticals (II)* opinion

24   resolved the control issue against all the remaining objecting states and given that South Dakota was

25   able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is

26   disappointed that the South Dakota Attorney General and Meta were unable to reach a negotiated

27   resolution of this dispute.  As the Court has repeatedly encouraged the Parties at multiple Discovery

28   Management Conferences, they should make every effort to work out discovery disputes through

United States District Court
Northern District of California

reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the South Dakota Attorney General has legal control, for the purposes of discovery, over the documents held by the South Dakota agencies listed by Meta.

## XXXII. VIRGINIA

In opposition to the control issue, the Virginia Attorney General argues primarily the following factors: (1) the Virginia Attorney General is a separate entity and independent from the Virginia agencies; and (2) the Virginia Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-33 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Virginia Attorney General is required to conduct all legal services for Virginia agencies, and (2) Virginia law prohibits the Governor and agencies from employing regular counsel. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Behavioral Health and Developmental Services, Department of Education, Department of Health, Department of Planning and Budget, Department of Social Services, Economic Development Partnership, Foundation for Healthy Youth, Office of Children's Services, and Office of the Governor. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the Virginia Attorney General does have legal control, for purposes of discovery, over the listed Virginia agencies. While the Virginia Attorney General is a separate entity and while the Virginia Attorney General brought the instant action pursuant to its own authority, this does not outweigh the requirement that the Virginia Attorney General will act as the agencies' counsel.

The statutory scheme in Virginia requires that "[a]ll legal service in civil matters for the Commonwealth, the **Governor, and every** state department, institution, division, commission, board, bureau, **agency**, entity, official, court, or judge, including the conduct of **all civil litigation** in which any of them are interested, **shall** be rendered and performed by the Attorney General." Va.

United States District Court
Northern District of California

Code § 2.2-507 (emphasis added). Additionally, Virginia law requires that "[n]o regular counsel shall be employed for or by the Governor or any state department, institution, division, commission, board, bureau, agency, entity, or official." *Id.*

Indeed, the Virginia Attorney General confirmed that its office will definitely represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 29–30]. Accordingly, under the statutory scheme each agency will be represented by the Virginia Attorney General in this matter for discovery (whether for party discovery under Rule 34 or for subpoenas under Rule 45).

Importantly, the Virginia Attorney General's arguments do not negate the fact that all of the Virginia agencies at issue here are barred by Virginia law from obtaining counsel other than the Virginia Attorney General, absent certain special conditions not present here. Va. Code § 2.2-510 (requiring Governor approval, where it is impracticable or uneconomical for the Virginia Attorney General to render such services, or where the Virginia Attorney General must certify to the Governor that it is unable to render certain legal services). Here, no separate counsel has entered appearance for any of the state agencies, and indeed based on the Virginia Attorney General's confirmation of representation, none is expected to. This arrangement indicates strongly that the Virginia Attorney General, in fulfilling its statutory role for the state agencies, would necessarily and inherently have access to and control over the necessary documents for effective legal representation of these state agencies.

Relatedly, the Virginia Attorney General has taken the position that communications between the Virginia Attorney General and these state agencies "could" be covered by the attorney-client privilege. [Dkt. 738-33 at 2]. To the extent the Virginia Attorney General has attempted to subdivide its own office between the Attorney General's Consumer Protection Section litigating this case as opposed to "attorneys in other sections of the Department of Law" in order to somehow argue that the scope of attorney-client privilege is limited only as to some parts of the state Virginia Attorney General's office but not other "sections," that argument is not supported by citation to law and is contrary to the weight of law. The scope of attorney-client relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client privilege) encompasses the entirety

of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that there is insufficient legal support for Virginia's argument that different individual lawyers in the Virginia Attorney General's office have *ex ante* separable, discrete attorney-client relationships.

The Court rejects the Virginia Attorney General's attempt to simultaneously disclaim the existence of an attorney-client privilege as between the "section" of attorneys currently working on this case, while apparently attempting to preserve the ability to assert that the privilege applies to

communications between other lawyers in the Virginia Attorney General's Office and these agencies. "[T]o to the extent that [the State] asserts an attorney-client privilege with these legislators, it does so solely in their official capacities . . . . [I]t is inconsistent for the State to argue that on one hand the [State] Attorney General represents these individuals, but that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45." *Perez*, 2014 WL 1796661, at *2. The fact that the Virginia Attorney General is attempting to preserve the ability to assert the attorney-client privilege between the Virginia Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156.

The Virginia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Virginia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the Virginia Attorney General argues that the Virginia Attorney General and the Virginia Governor are "separately elected constitutional officers with distinct duties and independent authority." Dkt. 738-33 at 2 (citations omitted). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship

App. 231

mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Virginia Attorney General brought this action "pursuant to the Attorney General's own authority to enforce the Virginia Consumer Protection Act[,]" dkt 738-33 (citing Va. Code § 59.1-203), is simply re-stating the issue to be decided, and not determinative of the issue. The Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the Virginia agencies listed by Meta.

## XXXIII. WASHINGTON

In opposition to the control issue, the Washington Attorney General argues primarily the following factors: (1) the Washington Attorney General is a separate entity and independent from the Washington agencies; and (2) the Washington Attorney General brought the lawsuit under its own independent law enforcement capacity. [Dkt. 738-34 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues based primarily on the following factors: (1) the Washington Attorney General must act as counsel for the Washington agencies; and (2) the Washington Attorney General has already confirmed that it would represent the identified agencies in responding to a Meta subpoena. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Children, Youth, and Families; Department of Health; Health Care Authority; Office of Financial Management Washington Office

United States District Court
Northern District of California

1 of the Governor; Board of Education; Board of Health; Department of Commerce; Department of

2 Health; and Department of Social and Health Services. *Id.*

3       After considering the factors argued in the briefs, the Court finds that the factors weigh in

4 favor of a finding that the Washington Attorney General does have legal control, for purposes of

5 discovery, over the listed Washington agencies. While the Washington Attorney General is a

6 separate entity and while the Washington Attorney General does bring the instant action in its own

7 independent authority, this does not outweigh the requirement that the Washington Attorney

8 General will act as the agencies' counsel.

9       The statutory scheme in Washington requires that "[t]he attorney general **shall** also represent

10 the state and all officials, departments, boards, commissions and **agencies** of the state in the courts,

11 and before all administrative tribunals or bodies of any nature, **in all legal or quasi legal matters**,

12 hearings, or proceedings, and advise all officials, departments, boards, commissions, or agencies of

13 the state in all matters involving legal or quasi legal questions, except those declared by law to be

14 the duty of the prosecuting attorney of any county." Wash. Rev. Code § 43.10.040 (emphasis

15 added).

16       Indeed, the Washington Attorney General confirmed that its office would definitely

17 represent all the agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

18 [Dkt. 738-1 at 30]. Accordingly, under the statutory scheme each agency will be represented by the

19 Washington Attorney General in this matter for discovery (whether or not sought under Rule 34 or

20 under Rule 45).

21       Relatedly, the Washington Attorney General has taken the position that communications

22 between the Washington Attorney General and these state agencies would be covered by the

23 attorney-client privilege. [Dkt. 738-34 at 2]. To the extent the Washington Attorney General has

24 attempted to subdivide its own office between the "CP Division" litigating this case and other "AGO

25 attorneys" in order to somehow argue that the scope of attorney-client privilege is limited only as to

26 some parts of the state Washington General's office but not other sub-teams, that argument is not

27 supported by citation to law and is contrary to the weight of law. The scope of an attorney-client

28 relationship (and the duties flowing therefrom, including the scope of the attendant attorney-client

United States District Court
Northern District of California

privilege) encompasses the entirety of a legal services organization due to well-known rules of imputation of confidences to a legal services organization, including a public law office. *See, e.g.*, *People ex rel. Peters*, 951 P.2d at 930 ("When an attorney associates with a law firm, the principle of loyalty to the client extends beyond the individual attorney and applies with equal force to the other attorneys practicing in the firm. This principle, known as the 'rule of imputed disqualification,' . . . requires disqualification of all members of a law firm when any one of them practicing alone would be disqualified because of a conflict of interest . . . . The rule of imputed disqualification applies to both private firms and public law firms such as a district attorney's office or the office of the state public defender."); *accord City of Cnty. of Denver*, 37 P.3d at 457; *see also Kirk*, 108 Cal. Rptr. 3d at 637–38, 642 ("We do not doubt that vicarious disqualification is the general rule, and that we should presume knowledge is imputed to all members of a tainted attorney's law firm. However, we conclude that, in proper circumstances, the presumption is a rebuttable one[.]" The court recognizing presumption of imputed knowledge in the context of government attorneys, which presumption could be rebutted by proper ethical screening); *cf. also Billings*, 441 S.E.2d at 266 (because individual government lawyer at issue "should be screened from any direct or indirect participation in the matter," vicarious disqualification of entire office denied); *cf. also Calhoun*, 492 S.W.3d at 137 (individual lawyer disqualified when joining prosecutors' office but "the entire office in which that attorney works is not disqualified as long as the disqualified attorney is appropriately screened. Disqualification of the entire prosecuting office is not necessary absent special facts, such as a showing of actual prejudice; or, perhaps the screening procedures are ineffective."). Some jurisdictions treat public legal service organizations like private law firms and impute shared confidences among lawyers of the entire public law entity. Even in jurisdictions which do not automatically impute disqualification, and shared confidences, to an entire public law office, those courts recognize that ethical screening or other procedures are required out of recognition that actual (as opposed to imputed) sharing of confidences may occur and such procedures are required to avoid dissemination of attorney-client privileged communications within an entire public law organization. This review of case law demonstrates that no courts support Washington's argument that different individual lawyers in the Washington Attorney General's office have *ex ante*

United States District Court
Northern District of California

1    separable, discrete attorney-client relationships.

2    The Court rejects the Washington Attorney General's attempt to simultaneously disclaim

3    the existence of an attorney-client privilege as between the "CP Division" of attorneys currently

4    working on this case, while apparently attempting to preserve the ability to assert that the privilege

5    applies to communications between other lawyers in the Washington Attorney General's Office and

6    these agencies.  "[T]o to the extent that [the State] asserts an attorney-client privilege with these

7    legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent for the State to argue

8    that on one hand the [State] Attorney General represents these individuals, but that for discovery

9    purposes the [Plaintiff] United States must resort to Federal Rule of Civil Procedure 45."  *Perez*,

10   2014 WL 1796661, at *2.  The fact that the Washington Attorney General is attempting to preserve

11   the ability to assert the attorney-client privilege between the Washington Attorney General's office

12   and the agencies at issue further supports the conclusion of control here.  Assertion of the attorney-

13   client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*,

14   610 F.3d at 1156.

15   The Washington Attorney General's role as counsel for the agencies at issue inherently

16   involves obtaining necessary documents for effective representation in litigation.  In *Rhea*, the

17   Washington Attorney General was representing a state agency and was sanctioned by the

18   Washington District Court for failure to properly search for sources of information to provide

19   documents in discovery.  *Rhea*, 2010 WL 5395009 at *6-7 (counsel 'has an obligation to not just

20   request documents of his client, but to search for sources of information.'").  In acting as counsel,

21   the Washington Attorney General has both discovery duties under the Federal Rules but also ethical

22   and professional duties which would necessarily provide access to and thus control over the relevant

23   documents needed to respond to discovery requests.  *See Monsanto*, 2023 WL 4083934, at *5–6

24   (finding state Attorney General has control over agency documents "based on his broad statutory

25   and common law powers to control and manage legal affairs on behalf of state agencies, has a legal

26   right to obtain responsive documents from the state agencies referenced in the Complaint").

27   Further, the Washington Attorney General argues that the Washington Attorney General is

28   a separate and distinct elected entity with separate duties and responsibilities.  Dkt. 738-34 at 2

United States District Court
Northern District of California

App. 235

(citations omitted). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. Thus, arguing that the Washington Attorney General is not suing on behalf of or representing any state agency in this litigation and arguing that this action is brought under independent statutory authority, dkt. 738-34 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. The Washington Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Furthermore, the Western District of Washington's *Wilson v. Washington*, No. C16-5366 BHS, 2017 WL 518615 (W.D. Wash. Feb. 8, 2017), opinion on "control" involving Washington State agencies is instructive. In *Wilson*, the plaintiffs sued the State of Washington, one specific agency, and an individual official of the state. The defendants, represented by the Washington Attorney General, objected to document requests on that grounds "that they lack control or custody

236

of information sought by Plaintiff. Specifically, they argue that the requested information is held by state agencies ***not listed as defendants***." *Id.* at \*3. The Washington district judge ruled that "[t]his argument is unavailing." *Id.* (citing *Soto*, 162 F.R.D. at 619). Here, as in *Wilson*, the State of Washington is a named plaintiff (along with the Attorney General as relator). Here, as in *Wilson*, the Washington Attorney General argued that unnamed state agencies' documents are outside the control of the named parties. Here, as in *Wilson*, the Washington Attorney General is essentially repeating the same asserted arguments which the Washington federal district court rejected.

This is not the only instance in which a Washington district court rejected similar state agency arguments by the Washington Attorney General. In *Geo*, the State of Washington (represented, as here, by the Washington Attorney General) objected to document requests on the grounds that the Attorney General's Office lacked control over state agencies. *GEO Grp., Inc.*, 2018 WL 9457998, at \*2. Geo sought documents from four agencies (including the Department of Social and Health Services and the Washington Governor's Office, both at issue in this case as well), and the Washington Attorney General argued lack of control because those agencies were not parties to the suit and the lawsuit was initiated as *parens patriae*. *Id.* In seeking to compel party discovery as against these state agencies, "GEO contends that the AGO has actual control over information held by state agencies because of the AGO's requisite relationship with them and statutory power to represent them." *Id.* The *Geo* Court found that "[i]n this Court's view, where the plaintiff is the State of Washington, discovery addressed to the State of Washington includes its agencies. Because the AGO is the law firm to the State of Washington, the AGO should respond to and produce discovery on behalf of the State of Washington, including its agencies." *Id.* at \*3.

The *Geo* opinion distinguished precedent partially on the grounds that the litigation in *Geo* was initiated *parens patriae* whereas the litigation in the precedent was "effectively, an enforcement action on behalf of another agency" where the State was a nominal party. *Id.* (distinguishing *Boardman*, 233 F.R.D. at 265). However, the *Geo* opinion also distinguished *Boardman* on the grounds that the precedent "relied heavily analyzing the Constitution for the State of New York, a different state." *Id.* Further, the *Geo* opinion cited approvingly the *Wilson* opinion discussed above, and in *Wilson* the finding of control was not based on distinguishing litigation *parens patriae* versus

1 an agency enforcement action. *Wilson*, 2017 WL 518615, at *3.

2 Finally, the Court has recognized that the issue of control of state agency documents, when

3 a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

4 District Litigation involving most of the same States and State Attorneys General as are involved in

5 this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals*

6 *(II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States

7 which withdrew their objections to party discovery and negotiated a resolution of this issue with the

8 opposing party there. *Id.* at 356 n.5. In that case, Washington is identified as one of the States

9 which reached agreement on the state agency control issue without requiring that court to expend

10 resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion

11 resolved the control issue against all the remaining objecting states and given that Washington was

12 able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is

13 disappointed that the Washington Attorney General and Meta were unable to reach a negotiated

14 resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery

15 Management Conferences, they should make every effort to work out discovery disputes through

16 reasonable, good faith negotiations between able and experienced counsel, particularly where, as

17 here, there is guidance in precedent on the discovery issue at hand.

18 Therefore, the Court concludes that the Washington Attorney General has legal control, for

19 the purposes of discovery, over the documents held by the Washington agencies listed by Meta.

20 **XXXIV. WEST VIRGINIA**

21 In opposition to the control issue, the West Virginia Attorney General argues primarily the

22 following factors: (1) the West Virginia Attorney General brought the lawsuit under its own

23 independent law enforcement capacity; and (2) the West Virginia Attorney General is a separate

24 entity and independent from the West Virginia agencies. [Dkt. 738-35 at 2].

25 In support of a finding of control with regard to these state agencies' documents, Meta argues

26 based primarily on the following factors: the West Virginia Attorney General must act as counsel

27 for the West Virginia agencies absent the existence of statutory exemptions (not present here). *Id.*

28 at 3. Here, Meta seeks discovery from the following agencies: the Bureau for Children and Families,

Department of Education, Department of Health and Human Resources, Development Office, Governor's Office, State Budget Office, Department of Education. *Id.*

After considering the factors argued in the briefs, the Court finds that the factors weigh in favor of a finding that the West Virginia Attorney General does have legal control, for purposes of discovery, over the listed West Virginia agencies. While the West Virginia Attorney General is a separate entity and while the West Virginia Attorney General does bring the instant action in its own independent authority, this does not outweigh the requirement that the West Virginia Attorney General will act as the agencies' counsel.

The statutory scheme in West Virginia requires that "[t]he attorney general shall give written opinions and advice upon questions of law, and ***shall*** prosecute and defend suits, actions, and other legal proceedings, and generally render and perform all other legal services, whenever required to do so, in writing, by the governor . . . or any other state officer, board or commission, or the head of any state educational, correctional, penal or eleemosynary institution[.]"  W. Va. Code § 5-3-1 (emphasis added). Furthermore, "[t]he attorney general ***shall*** appear as counsel for the state ***in all causes*** pending in . . . ***any federal court***, in which the state is interested; . . . and when such appearance is entered he shall take charge of and have control of such cause[.]"  W. Va. Code § 5-3-2 (emphasis added). As discussed above, no separate counsel has appeared for any of the agencies here, and on the record presented, it appears that under the statutory scheme the West Virginia Attorney General will represent these agencies.

Indeed, the West Virginia Attorney General confirmed that its office could represent the agencies at issue if Meta were to serve those agencies with a subpoena in this matter. [Dkt. 738-1 at 31]. Accordingly, it appears that under the statutory scheme each agency will be represented by the West Virginia Attorney General in this matter for discovery.

Further, there is no statutory, legal, or administrative rule cited which prohibits the West Virginia Attorney General from accessing the documents of the state agencies at issue. Nor is there citation to any statutory or legal prohibition on the West Virginia Attorney General's representing the state agencies in this matter for purposes of discovery. The Court recognizes that this is a somewhat unusual situation, in which a law enforcement organization (the attorney general) is both

United States District Court
Northern District of California

1    a party to the case while also acting or able to act as counsel for a third party.  However, this would

2    not be the first time that a legal services provider, as counsel for a party, is found to have control

3    over third party documents for purposes of discovery.  *See, e.g.*, *Becnel*, 2018 WL 691649, at *4

4    ("Both Salas individually and his law firm, the subpoena recipients and defendants in this court, are

5    counsel of record for the Salas defendants in the Florida lawsuit . . . .  Thus, a Rule 34 request for

6    production to Salas in the Florida lawsuit required Salas to respond as to responsive materials over

7    which Salas and his law firm had possession, custody or control.").  Indeed, one court has noted that

8    "[i]n general, an attorney is presumed to have control over documents in its client's possession."

9    *Perez*, 2014 WL 1796661, at *2.  The Court is not holding broadly that there must be a finding of a

10   legal right of access to and thus control over third party client documents in every case involving a

11   legal services provider as a party; rather, under the particular facts here, and under the totality of

12   circumstances viewed in light of applicable legal standards, the Court finds that control exists here.

13   Relatedly, the West Virginia Attorney General has taken the position that communications

14   between the West Virginia Attorney General and these state agencies would be covered by the

15   attorney-client privilege.  [Dkt. 738-35 at 2].  To the extent the West Virginia Attorney General

16   argues that his office "does not represent any other state agency" ***currently*** in this action, but also

17   argues that "***when*** the AG is serving as legal counsel for a state agency" then the privilege applies,

18   the West Virginia Attorney General plainly is attempting to preserve the ability to assert the

19   attorney-client privilege between the West Virginia Attorney General's office and the agencies at

20   issue - and that position further supports the conclusion of control here.  Parsing whether the

21   agencies ***at the moment of the writing of their brief*** may not have been represented by the West

22   Virginia Attorney General, but keeping open the obvious likelihood that they ***will*** be represented for

23   discovery under the statutory scheme in West Virginia, is a myopic argument which is not firmly

24   grounded in reality and not persuasive.  "[T]o the extent that [the State] asserts an attorney-client

25   privilege with these legislators, it does so solely in their official capacities . . . .  [I]t is inconsistent

26   for the State to argue that on one hand the [State] Attorney General represents these individuals, but

27   that for discovery purposes the [Plaintiff] United States must resort to Federal Rule of Civil

28   Procedure 45."  *Perez*, 2014 WL 1796661, at *2.  The fact that the West Virginia Attorney General

is attempting to preserve the ability to assert the attorney-client privilege between the West Virginia Attorney General's office and the agencies at issue further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. And, as discussed above, "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. There is no showing here to rebut that presumption.

The West Virginia Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the West Virginia Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint"). Further, the West Virginia Attorney General argues that the West Virginia Attorney General is a separate and distinct elected entity with separate duties and responsibilities. Dkt. 738-35 at 2 (citations omitted). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day operational control of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Further illuminating of the issue, the West Virginia federal court in *Baxley* found that a state agency (the West Virginia Division of Corrections and Rehabilitation) had control over documents of a third-party vendor (a medical contractor) such that the state agency was required to search for and produce documents from that third-party, overruling the state agency's objections that the third-party "is not a parent or subsidiary corporation of Defendants or in any way related thereto, and Defendants do not have custody of the responsive

documentation." *Baxley v. Jividen*, No. 3:18-CV-01526, 2020 WL 4282033, at *3–5 (S.D.W. Va. July 27, 2020). Separateness of the entities involved is not determinative of the "control" issue.

Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of discovery. As discussed above, courts have found "control" for purposes of discovery where a party is clearly not in managerial control over the third-party, such as a subsidiary having control over the documents of a parent corporation, or an individual government officer having control over the documents of an entire agency. By definition, the "legal control" issue for discovery arises when there are two legally distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute that party discovery covered that one entity. Thus, arguing that the West Virginia Attorney General is not suing on behalf of or representing any state agency in this litigation, and arguing that the "COPPA claim is not reliant on or related to any state agencies' claim(s)[,]" dkt. 738-35 at 2, is simply re-stating the issue to be decided, and not determinative of the issue. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the lack of operational control is not alone determinative for evaluating "control." The West Virginia Attorney General's arguments erroneously conflate the legal control issue with "operational control" or "functional independence" of each entity, and thus is insufficient to rebut a finding of legal control of the documents for purposes of discovery.

Therefore, the Court concludes that the West Virginia Attorney General has legal control, for the purposes of discovery, over the documents held by the West Virginia agencies listed by Meta.

## XXXV. WISCONSIN

In opposition to the control issue, the Wisconsin Attorney General's primary argument is that: the Wisconsin Attorney General only has powers prescribed by law and no such law proscribes the Wisconsin Attorney General to be able to access the documents of Wisconsin agencies. [Dkt. 738-36 at 2].

In support of a finding of control with regard to these state agencies' documents, Meta argues

based primarily on the following factors: the Wisconsin Attorney General has already confirmed that it is acting as counsel to the Wisconsin Governor in this litigation and that all but one of the listed agencies are controlled by the Wisconsin Governor. *Id.* at 3. Here, Meta seeks discovery from the following agencies: the Department of Administration, Department of Children and Families, Department of Health, Department of Public Instruction, Department of Children's Mental Health, and Office of the Governor. *Id.*

After considering the briefing, the Court finds that the factors weigh in favor of a finding that the Wisconsin Attorney General does have legal control, for the purposes of discovery, over the listed Wisconsin agencies. Specifically, it has legal control, for the purposes of discovery, over the listed Wisconsin agencies that are controlled by the Wisconsin Governor because the Wisconsin Attorney General is acting as counsel in this litigation for the Wisconsin Governor. As discussed above, no separate counsel has appeared for any Wisconsin agencies. Accordingly, on the record presented to the Court, it appears that the Wisconsin Attorney General (a) has admitted it has been and will represent the Wisconsin Governor in this action, and (b) will represent the Wisconsin agencies controlled by the Governor.

The statutory scheme in Wisconsin requires that the Wisconsin Attorney General through the Wisconsin Department of Justice "***shall*** . . . appear for the state and prosecute or defend all actions and proceedings, civil or criminal, in the court of appeals and the supreme court, in which the state is interested or a party, and attend to and prosecute or defend all civil cases sent or remanded to any circuit court in which the state is a party." Wis. Stat. § 165.25(1) (emphasis added). Additionally, the Wisconsin Attorney General "***shall*** . . . [i]f requested by the governor or either house of the legislature, ***appear for and represent*** the state, ***any state department, agency***, official, employee or agent, whether required to appear as a party or witness ***in any civil*** or criminal ***matter***, and prosecute or defend in any court or before any officer, any cause or matter, civil or criminal, in which the state or the people of this state may be interested." Wis. Stat. § 165.25(1m) (emphasis added).

Indeed, the Wisconsin Attorney General confirmed that its office could represent the Wisconsin agencies at issue if Meta were to serve those agencies with a subpoena in this matter.

1    [Dkt. 738-1 at 31–32].  Additionally, the Wisconsin Attorney General has (through artful language)

2    confirmed that it has acted as counsel to the Governor in this litigation.  Dkt. 738-36 at 2 ("Here,

3    with respect to this litigation *and with the exception of the governor*, *the [Wisconsin Attorney*

4    *General] has not acted as counsel* to any of the agencies identified by Meta in the Joint Chart.")

5    (emphasis added).  The Wisconsin Attorney General further concedes that all the agencies in the

6    chart are run by a secretary (or in one instance, a director), who each are appointed by the Governor.

7    *Id.*    Under Wisconsin law, all secretaries "serve at the pleasure of the governor."   Wis.

8    Stat § 15.05(1)(a).  Similarly, the director of the Office of Children's Mental Health is run by a

9    director who shall likewise "serve at the pleasure of the governor." Wis. Stat. § 15.194(1).  Because

10   each of these agencies are run by appointees of the Governor and serve at the Governor's pleasure,

11   their choices of counsel will clearly be determined by the Governor.  And because the Wisconsin

12   Attorney General has been and will represent the Governor in this case already and no other counsel

13   has entered appearance for the state agencies, it is not surprising that the Wisconsin Attorney

14   General would also thus represent these state agencies.

15          Accordingly, it appears that under the statutory scheme each agency will be represented by

16   the Wisconsin Attorney General in this matter for discovery.  While the Wisconsin Attorney General

17   argues that there is no statute that expressly grants that office the right to access agencies'

18   documents, the Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney

19   General from accessing any agency documents.  This arrangement indicates strongly that the

20   Wisconsin Attorney General, in fulfilling its statutory role as counsel for the Governor and the state

21   agencies, would necessarily and inherently have access to and control over the necessary documents

22   for effective legal representation of these state agencies.

23          Relatedly, the Wisconsin Attorney General has taken the position that communications

24   between the Wisconsin Attorney General and these state agencies would be covered by the attorney-

25   client privilege "where the AG is serving as legal counsel for a state agency."  [Dkt. 738-36 at 2].

26   To the extent the Wisconsin Attorney General indicates that "a review will be undertaken to

27   determine whether a legal privilege will apply," that indicates that the Wisconsin Attorney General

28   is attempting to preserve the ability to assert the attorney-client privilege between the Wisconsin

United States District Court
Northern District of California

Attorney General's office and the agencies at issue, and that position further supports the conclusion of control here. Assertion of the attorney-client privilege requires, as a prerequisite, the existence of an attorney-client relationship. *See Graf*, 610 F.3d at 1156. And, as discussed above, "[i]n general, an attorney is presumed to have control over documents in its client's possession." *Perez*, 2014 WL 1796661, at *2. There is no showing here to rebut that presumption.

The Wisconsin Attorney General cites no law which prohibits the Wisconsin Attorney General from serving as counsel for the state agencies at issue. Indeed, the Wisconsin Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation. In acting as counsel, the Wisconsin Attorney General would necessarily have access to and thus control over the relevant documents needed to respond to discovery requests. *See Monsanto*, 2023 WL 4083934, at *5–6 (finding state Attorney General has control over agency documents "based on his broad statutory and common law powers to control and manage legal affairs on behalf of state agencies, has a legal right to obtain responsive documents from the state agencies referenced in the Complaint").

Further, the Wisconsin Attorney General argues that the Wisconsin Attorney General is a separate and distinct elected entity with "executive control over only one agency of state government: the Wisconsin Department of Justice." *See* Dkt. 738-36 at 2 (citations omitted). However, this argument misapprehends the "legal control" test for documents – the issue is not simply whether one entity is under the day-to-day "executive control" of the other (such as a parent-wholly-owned-subsidiary relationship), and not simply whether the two entities are legally separate (such as two different and separately incorporated entities), but rather whether there is a legal right to obtain the documents as explained by *Citric Acid*. "'The control analysis for Rule 34 purposes does not require the party to have actual managerial power over the foreign corporation, but rather that there be close coordination between them.'" *St. Jude Medical S.C., Inc.*, 305 F.R.D. at 638. Here, the attorney-client relationship between the state Attorney General and the state agencies (a relationship mandated by state law) necessitates close coordination. While operational control may be a factual situation which demonstrates a legal right to obtain the documents, the absence of such "executive or functional control" is not determinative for evaluating "control" for purposes of

Case 4:22-cv-03507-YGR Document 244-1 Filed 09/06/25 Page 248 of 481

1    discovery. By definition, the "legal control" issue for discovery arises when there are two legally

2    distinct or separate entities – otherwise, if only one entity were involved, there would be no dispute

3    that party discovery covered that one entity. As discussed above, courts have found "control" for

4    purposes of discovery where a party is clearly not in managerial control over the third-party, such

5    as a subsidiary having control over the documents of a parent corporation, or an individual

6    government officer having control over the documents of an entire agency.

7        The Western District of Wisconsin's opinion in *Perez v. Frank*, No. 06-C-248-C, 2006 WL

8    6040464, at *1 (W.D. Wis. Nov. 27, 2006), is instructive. In *Perez*, the plaintiff was suing several

9    individual defendants who were officials within the Wisconsin Department of Corrections. *Id.* In

10   that case, the plaintiff requested issuance of a subpoena for documents directed to the Department

11   of Corrections. *Id.* The Wisconsin Court denied the request, tellingly, because "[b]efore I issue the

12   requested subpoena to plaintiff, it will be necessary for him to advise the court why he believes the

13   documents he wants ***are not in the control of the defendants in light of the fact that they appear***

14   ***to be documents belonging to the Department of Corrections***. If the documents plaintiff seeks to

15   inspect are in the control of the defendants, then he should request the production of documents

16   pursuant to Fed. R. Civ. P. 34." *Id.* In *Perez*, the defendants were represented by the Wisconsin

17   Attorney General. *Id.* Thus, the holding in *Perez*, known to the Wisconsin Attorney General's

18   office, is that a Wisconsin federal judge has recognized that individuals, employed by a state agency,

19   but none of whom are alleged to be in "executive control" of that agency, have sufficient apparent

20   control of agency documents such that a subpoena is unnecessary and that party discovery is the

21   appropriate procedural vehicle for document discovery. The *Perez* ruling thus by analogy

22   persuasively supports this Court's conclusions on control regarding documents in this case for the

23   Wisconsin agencies. *Cf. also Trane Co. v. Klutznick*, 87 F.R.D. 473, 476–78 (W.D. Wis. 1980)

24   (finding named defendant, President of the United States, has control over information in the hands

25   of non-party agencies such that supplemental interrogatory responses are ordered).

26       Finally, the Court has recognized that the issue of control of state agency documents, when

27   a State or State Attorney General is a party, has been litigated and decided in a previous Multi-

28   District Litigation involving most of the same States and State Attorneys General as are involved in

United States District Court
Northern District of California

this case. *Generic Pharmaceuticals (II)*, 699 F. Supp. 3d at 357–58. The *Generic Pharmaceuticals (II)* opinion not only ruled against the objecting States, but also helpfully identified numerous States which withdrew their objections to party discovery and negotiated a resolution of this issue with the opposing party there. *Id.* at 356 n.5. In that case, Wisconsin is identified as one of the States which reached agreement on the state agency control issue without requiring that court to expend resources resolving the dispute there. *Id.* Given that the *Generic Pharmaceuticals (II)* opinion resolved the control issue against all the remaining objecting states and given that Wisconsin was able to reach a negotiated resolution of the dispute in that Multi-District Litigation, this Court is disappointed that the Wisconsin Attorney General and Meta were unable to reach a negotiated resolution of this dispute. As the Court has repeatedly encouraged the Parties at multiple Discovery Management Conferences, they should make every effort to work out discovery disputes through reasonable, good faith negotiations between able and experienced counsel, particularly where, as here, there is guidance in precedent on the discovery issue at hand.

Therefore, the Court concludes that the Wisconsin Attorney General has legal control, for the purposes of discovery, over the documents held by the Wisconsin agencies listed by Meta.

## ADMINISTRATIVE MOTIONS

As discussed above, the State Attorneys General filed an Administrative Motion for Leave to File Supplemental Information, a Second Administrative Motion for Leave to File Supplemental Information, and a Third Administrative Motion for Leave to File Supplemental Information. [Dkts. 1031, 1074, 1110]. All three seek leave to file information that Meta has served notices of its intent to serve subpoenas on some of the agencies at issue. *Id.* Meta's Response to the first Administrative Motion indicates that Meta does not object to the submission of these subpoenas as supplemental information and made clear its position that service of these subpoenas was being conducting without waiving Meta's position that the state agencies should be subject to party discovery. [Dkt. 1035 at 2]. As of the date of this Order, Meta takes no position with regard to the Second Administrative Motion, and the Court presumes that Meta's position would be the same as with respect to the First and Third Administrative Motion in any event. [Dkt. 1074 at 6; Dkt. 1110]. No opposition on the merits being filed, the Court **GRANTS** all three Administrative Motions.

United States District Court
Northern District of California

247

**CONCLUSION**

The Court is disappointed that the Parties were incapable of reaching a negotiated resolution of this "control" issue, but rather required the Court to expend its valuable resources analyzing over thirty-five briefs on this "control" issue (where the State Attorneys General requested that the issues here required separate briefing for each State), conduct multiple hearings on this issue (where ultimately only a handful of the States presented oral argument), and prepare this admittedly length Order (where, as discussed above, a large number of the arguments overlapped and repeated, with only slight variations, from state to state). Indeed, rather than reaching negotiated resolution of this issue as in *Generic Pharmaceuticals (II)*, the Attorneys General of multiple states here preemptively declared at oral argument their intent to appeal any adverse ruling on "control" before they even saw this Order or this Court's reasoning (and where the Court did not rule from the bench). The detailed discussion in this Order is intended, hopefully, to facilitate any later review. The Court again reminds counsel for all Parties of their duties under Fed. R. Civ. P. 1 and 26 to work collaboratively for the efficient progress of this case, and to avoid unduly multiplying the proceedings.

For all reasons discussed herein, Meta's motion to compel the State Attorneys General to include the identified state agencies within the scope of party discovery is **GRANTED-IN-PART** and **DENIED-IN-PART** consistent with this Order.

The Parties (including counsel for the State Agencies) are **ORDERED** to promptly meet and confer regarding a mutually agreeable and reasonable date for the State Agencies to substantially complete their respective productions of documents in response to either the Rule 34 requests or, to the extent applicable, Rule 45 subpoenas. The Parties shall include a summary report on the status of State Agency discovery in the Discovery Management Conference reports going forward.

**IT IS SO ORDERED.**

Dated: September 6, 2024

_____
PETER H. KANG
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>———————————————————<br><br>This Document Relates to:<br>All Actions | Case No. 22-md-03047-YGR  (PHK)<br><br>**DISCOVERY MANAGEMENT ORDER NO. 12 FOLLOWING DISCOVERY MANAGEMENT CONFERENCE OF NOVEMBER 21, 2024**<br><br><u>Upcoming DMC Dates:</u><br>December 11, 2024 at 1:00 pm<br>January 16, 2025 at 1:00 pm<br>February 20, 2025 at 1:00 pm |

On November 21, 2024, this Court held a Discovery Management Conference ("DMC") in the above-captioned matter regarding the status of discovery. *See* Dkts. 1370, 1372. This Order memorializes and provides further guidance to the Parties, consistent with the Court's directions on the record at the November 21st DMC, regarding the deadlines and directives issued by the Court during that hearing (all of which are incorporated herein by reference).

**I.    Interim Discovery Deadlines for State AG Cases**

The Court has carefully considered the Parties' arguments and competing proposals regarding the schedule for their discovery plan and for the corresponding interim discovery deadlines governing the State AG cases against Meta. *See* Dkt. 1336 at 4-13. As stated at the November 21st DMC, the Court **ORDERS** the discovery deadlines in those cases modified as follows:

| EVENT OR DEADLINE | DATE |
|---|---|
| Start date for rolling productions of state agency documents requested pursuant to subpoenas | November 22, 2024 |

App. 249

United States District Court
Northern District of California

| | |
|---|---|
| Deadline for completion of conferrals re: Rule 34 state agency discovery | December 2, 2024 |
| Last date to file discovery letter briefs re: disputes concerning production of state agency documents (Rule 34 requests or subpoenas) | December 9, 2024 |
| Start date for rolling productions of state agency documents requested pursuant to Rule 34 | December 6, 2024 |
| Deadline for Rule 30(b)(6) subpoenas or notices to the State AGs and/or state agencies | December 13, 2024 |
| Substantial completion of production for State AG and state agency documents requested pursuant to Rule 45 subpoenas | December 23, 2024 |
| Last date for Parties to meet and confer re: scheduling of State AG and state agency Rule 30(b)(6) depositions (*and* to meet and confer re: any such disputes) | January 6, 2025 |
| Substantial completion of production for State AG and state agency documents requested pursuant to Rule 34 | January 10, 2025 |
| Last date for file discovery letter briefs re: disputes concerning scheduling or taking of any State AG and state agency Rule 30(b)(6) depositions | January 13, 2025 |
| Deadline for Parties to meet and confer to identify and commence scheduling State AG and state agency individual fact witness depositions (*and* to meet and confer re: any such disputes) | February 14, 2025 |
| Deadline for Meta to serve deposition notices for State AG and state agency individual fact witness depositions | February 21, 2025 |
| Last date to file discovery letter briefs re: any disputes concerning scheduling or taking of State AG and state agency fact witness depositions | February 21, 2025 |
| Dates for Rule 30(b)(6) depositions of State AGs and state agencies to be taken (unless otherwise agreed upon by the Parties) | February 3, 2025 through March 7, 2025 |
| Deadline for Meta to complete depositions of State AG and state agency fact witnesses | April 4, 2025 |

At the DMC, several of the State AGs (most notably, Arizona and Minnesota) raised concerns regarding their agencies' ability to meet the above deadlines due to insufficient funding, staffing, and technological capabilities. Meta, for its part, complained that multiple state agencies were refusing to provide hit reports. The Court admonishes the Parties to engage in prompt and

transparent negotiations for purposes of identifying reasonable search terms and custodians and exchanging hit reports. The Court has repeatedly advised the Parties to include their respective ESI vendors in such negotiations to address concerns and help resolve disputes regarding technological feasibility.

To the extent that state agencies have collected documents but refuse to provide Meta with search terms or hit reports, it is incumbent upon those agencies to tell Meta how the documents were collected. State agencies are expected to run and share hit reports on their own proposed search terms, at a minimum, assuming they used search terms. If state agencies collected documents for production using some other process, they are likewise expected to disclose transparently the processes used to locate the responsive documents. The Court strongly encourages Meta to work out informal deals with state agencies to facilitate document production, such as agreements to use "go get 'em" requests in lieu of search terms. The Court also strongly encourages the Parties to actively communicate and negotiate disputes regarding objections to document requests (whether by subpoena or Rule 34 requests) to avoid unnecessary delay.

## II.      State Agency "Holdouts"

As confirmed by the Parties, the following state agencies continue to refuse to meet and confer with Meta at all regarding search terms and custodians—in clear and direct contravention of this Court's Orders and Judge Gonzalez Rogers' Orders—because they apparently do not believe they are subject to party discovery in this case or the jurisdiction of this Court:

- California Office of the Governor
- California Governor's Office of Business and Economic Development
- California Department of Finance
- California Department of Public Health
- California Department of Consumer Affairs
- California Business, Consumer Services, and Housing Agency
- California Office of Data and Innovation
- South Carolina Office of the Governor

No counsel for these eight state agencies attended the November 21st DMC (either in

person or remotely). As such, the Court **ORDERED** the State AGs to provide this Court with the names, bar numbers, and pertinent contact information for all counsel responsible for and representing these eight state agencies who have taken the position that they are entitled to refuse to comply with the Orders issued in this case and that they are not subject to this Court's jurisdiction in this action for purposes of discovery. The California AG and the South Carolina AG each subsequently sent emails to the Court responding to the Court's Order in this regard, but they have not filed their responses on the docket. On or before **December 2, 2024**, both the California AG and the South Carolina AG **SHALL** file their responses on the docket.

### III.     YouTube RFPs

The Parties report a dispute as to the adequacy of YouTube's amended responses to Request Nos. 62, 69, 71, 72, 76, and 79 in Plaintiffs' Request for Production ("RFP") Set 4. [Dkt. 1305].

RFP No. 62

RFP No. 62 seeks documents concerning YouTube's "crisis management or crisis communication structure, organization" and/or policies for responding to "investigations, lawsuits, media inquiries, or government inquiries" related to the safety of minor users. [Dkt. 1306-2 at 11]. Plaintiffs argue that information sought by this request—regarding how YouTube handles crises, investigations, lawsuits, and media and government inquiries, including who is involved, and the methods of communication—is highly relevant and crucial for Plaintiffs to establish "knowledge of relevant risks at YouTube's highest levels" and to select appropriate deponents. [Dkt. 1305 at 8].

YouTube, in its portion of the joint letter brief, argues that it "has already provided 30(b)(6) testimony, produced documents, and served an interrogatory response that together provide Plaintiffs with the information sought by this request in the most reliable and comprehensive form in which it is available." *Id.* at 11. Specifically, YouTube argues that: (1) Plaintiffs "elicited over four hours of testimony regarding YouTube's corporate structure" at a recent deposition, including testimony regarding the structure of the six teams directly responsible for YouTube's crisis management and the individuals within those teams; (2) YouTube produced

United States District Court
Northern District of California

documents showing the structure of those six teams; and (3) YouTube provided "a detailed summary of the reporting lines for each of YouTube's custodians" in response to Plaintiffs' Interrogatory No. 1.  *Id.*  YouTube argues that Plaintiffs can readily ascertain the individuals involved in crisis management and communications from the documents already produced.  *Id.*

At the November 21st DMC, Plaintiffs argued that YouTube still has not provided the nonprivileged policies relating to crisis management or responding to investigations, lawsuits, media inquiries, or government inquiries pertaining to the safety of minors.  YouTube, in response, argued that no such policies exist.

Accordingly, the Court **ORDERS** YouTube to promptly produce all nonprivileged policies (including any nonprivileged documents discussing such policies) responsive to Plaintiffs' request at issue.  To the extent that YouTube does not possess any nonprivileged policies responsive to the request, YouTube shall file a supplemental response to the request confirming that no such policies exist.  YouTube shall log any otherwise responsive documents withheld on the grounds of privilege on a timely privilege log.  The Court further **ORDERS** the Parties to meet and confer regarding Plaintiffs' request for information regarding the methods of communication for these crisis management teams, as it is clear that the Parties' dispute on this portion of the request is not yet ripe.

RFP No. 69

RFP No. 69 seeks documents that "constitute, identify, or reflect" YouTube's "[p]olicies, process, and criteria" used to "evaluate or determine compensation" for employees working in or with units with responsibility for issues related to youth safety.  [Dkt. 1306-2 at 13].

Plaintiffs argue that "information regarding compensation, performance bonuses, and other incentives that rewarded (or failed to reward) accomplishments by individuals responsible for youth safety are relevant to the issue of whether YouTube prioritized user growth and engagement over safety."  [Dkt. 1305 at 9].  Plaintiffs argue that YouTube's production thus far—"consisting of five documents concerning generic Google-wide compensation policies"—is inadequate because YouTube improperly limited its production to documents "sufficient to show" YouTube's compensation policies and the documents produced do not show YouTube's compensation

policies specifically directed at youth safety. *Id.* YouTube argues that Plaintiffs have failed to explain how compensation policies are relevant to this case. *Id.* at 12. In addition, YouTube argues that it has not produced compensation documents specific to youth safety because no such policies exist. *Id.*

The Parties agree that this request does not seek compensation information for lower-level employees. At the DMC, counsel for YouTube stated that no documents exist which discuss the process or criteria by which the companywide policies are applied to those employees working on youth safety. Counsel for YouTube indicated they were in the process of confirming this. Assuming this to be the case, the Court **ORDERS** counsel for YouTube to promptly serve a supplemental response to RFP No. 69 which states that no such documents exist.

<u>Remaining RFPs</u>

RFP Nos. 71, 72, 76, and 79 seeks documents concerning YouTube's policies for facilitating, documenting, processing, reporting, and retaining complaints related to the safety of youth users of the YouTube platform. [Dkt. 1306-2 at 15-17, 20, 22].

The Parties confirm that their dispute on these requests is limited to: (1) whether YouTube should be required to produce final historical versions of internal policies for RFP Nos. 71, 72, 76, and 79; and (2) whether YouTube should be required to produce final historical versions of its public policies for RFP Nos. 72, 76, and 79.

As stated at the November 21st DMC, the Court **ORDERS** the Parties to meet and confer regarding this dispute and the specific policies at issue. The Parties reported at the DMC that they are in the process of evaluating a proposed stipulation which would resolve this dispute and therefore they are directed to file a joint stipulation and proposed order regarding this dispute.

This **RESOLVES** Dkt. 1305.

### IV.    Meta Compensation Documents

The PI/SD Plaintiffs ("Plaintiffs") move to compel Meta to produce documentation sufficient to show the compensation, bonus, and stock awards/options for eleven Meta witnesses. [Dkt. 1318]. Meta has already agreed to produce performance reviews and self-evaluations for these same eleven deponents. Plaintiffs argue that they also need documents showing specific

United States District Court
Northern District of California

compensation amounts for each deponent to be able to get a "complete picture" regarding the extent to which Meta prioritized user engagement and business growth at the expense of youth safety. Meta argues that Plaintiffs' request for specific dollar figures should be denied because: (1) the specific compensation any particular Meta employee received is irrelevant to Plaintiffs' claims and theories as they have articulated them; (2) the "generally applicable compensation policies" and individual performance reviews already produced by Meta, when taken together, give Plaintiffs the same information that they seek from the compensation documents; and (3) the request for compensation documents violates the deponents' California constitutional right to financial privacy.

At the November 21st DMC, Meta confirmed that it has produced performance reviews for at least two of the eleven deponents at issue and that Meta will be producing the remaining reviews on a rolling basis. Plaintiffs reported that they have not yet had an opportunity to review these materials, and thus, could not speak to Meta's argument that the documents provide a commensurate level of detail as the actual dollar figure for compensation. The Parties are **ORDERED** to continue to meet and confer on this issue as directed by this Court. The Parties shall file a joint stipulation and proposed order regarding this dispute.

This **RESOLVES** Dkt. 1318.

### V. Miki Rothschild Deposition

At the November 21st DMC, the Parties raised a time-sensitive dispute regarding the clawback of three documents asserted to contain privileged communications, where that clawback has impacted and resulted in the last-minute cancellation of the noticed deposition of a senior-level Meta employee, Miki Rothschild. The Parties were directed to promptly file joint letter briefing on this dispute, which they have done. *See* Dkt. 1375.

The Parties **SHALL** promptly file on the docket a joint notice regarding the re-noticed date for Mr. Rothschild's deposition.

### VI. California v. TikTok

In light of the recent Order relating the California AG's civil enforcement action against TikTok to this MDL, the Parties are **ORDERED** to provide a brief status update and contingent

discovery plan in the January Joint DMC Statement regarding how they plan to complete

discovery for TikTok in the event the case is not remanded.

## VII. Housekeeping Issues

The Parties are directed to reformat their monthly Joint DMC Statements going forward to

more clearly delineate issues that are ripe for discussion at the next DMC and issues that are

unripe. As such, the Joint DMC Statement should be divided into four sections: (1) administrative

issues that the Parties would like to bring to the Court's attention which are not disputed and

which do not require Court action; (2) administrative issues that are disputed and/or require Court

action; (3) truly ripe discovery disputes for which joint letter briefing has already been filed or will

be filed imminently; and (4) unripe discovery disputes. The Court reminds the Parties that any

disputes for which the joint letter briefing is filed less than one week prior to the DMC will be

addressed at that DMC in this Court's discretion.


**IT IS SO ORDERED.**

Dated: November 26, 2024

_____

PETER H. KANG
United States Magistrate Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

Case No. 22-md-03047-YGR (PHK)

**ORDER RE: SCHEDULE FOR STATE AGENCY DOCUMENT PRODUCTION**

Re: Dkts. 1466 and 1472

This MDL has been referred to the undersigned for discovery purposes. *See* Dkt. 426. Now pending before the Court are joint letters submitted by Meta and the States regarding their proposed schedules for completing discovery from the state agencies in this action. [Dkt. 1466; Dkt. 1471]. The Court ordered these Parties to submit these schedules at the December 11, 2024 Discovery Management Conference ("DMC") in response to the ongoing delays in finalizing search terms, custodians, and other search procedures for many of the state agencies' documents.

The Court reiterates the relevant legal standards for discovery. Federal Rule of Civil Procedure 26(b)(1) delineates the scope of discovery in federal civil actions and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Information need not be admissible to be discoverable. *Id.* Relevancy for purposes of discovery encompasses "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal.

United States District Court
Northern District of California

1  Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader

2  than relevancy for purposes of trial.") (alteration omitted).

3      While the scope of relevance is broad, discovery is not unlimited.  *ATS Prods., Inc. v.*

4  *Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes

5  of discovery, is defined broadly, although it is not without ultimate and necessary boundaries.").

6  Information, even if relevant, must be "proportional to the needs of the case" to fall within the

7  scope of permissible discovery. Fed. R. Civ. P. 26(b)(1).  The 2015 amendments to Rule 26(b)(1)

8  emphasize the need to impose reasonable limits on discovery through increased reliance on the

9  commonsense concept of proportionality: "The objective is to guard against redundant or

10  disproportionate discovery by giving the court authority to reduce the amount of discovery that

11  may be directed to matters that are otherwise proper subjects of inquiry.  The [proportionality

12  requirement] is intended to encourage judges to be more aggressive in identifying and

13  discouraging discovery overuse." Fed. R. Civ. P. 26 advisory committee's note to 2015

14  amendment.  In evaluating the proportionality of a discovery request, the Court considers "the

15  importance of the issues at stake in the action, the amount in controversy, the parties' relative

16  access to the information, the parties' resources, the importance of the discovery in resolving the

17  issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

18  Fed. R. Civ. P. 26(b)(1).

19      The party seeking discovery bears the burden of establishing that its request satisfies the

20  relevancy requirements under Rule 26(b)(1).  *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*,

21  285 F.R.D. 481, 485 (N.D. Cal. 2012).  The resisting party, in turn, has the burden to show that the

22  discovery should not be allowed.  *Id.*  The resisting party must specifically explain the reasons

23  why the request at issue is objectionable and may not rely on boilerplate, conclusory, or

24  speculative arguments.  *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.

25  1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to

26  carry a heavy burden of showing why discovery was denied.").

27      The Court has broad discretion and authority to manage discovery.  *U.S. Fidelity & Guar.*

28  *Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude

United States District Court
Northern District of California

App. 258

in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). As part of its inherent discretion and authority, the Court has broad discretion in determining relevancy for discovery purposes. *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 635 (9th Cir. 2005) (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)). The Court's discretion extends to crafting discovery orders that may expand, limit, or differ from the relief requested. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery"). For example, the Court may limit the scope of any discovery method if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Throughout this litigation, the Court has encouraged (and continues to insist that) the Parties approach discovery in a collaborative and rational manner. *See* Fed. R. Civ. P. 1 advisory committee's note to 2015 amendment ("Rule 1 is amended to emphasize that just as the court should construe and administer these rules to secure the just, speedy, and inexpensive determination of every action, *so the parties share the responsibility to employ the rules in the same way. Most lawyers and parties cooperate to achieve these ends.* But discussions of ways to improve the administration of civil justice regularly include pleas to discourage over-use, misuse, and abuse of procedural tools that increase cost and result in delay. *Effective advocacy is consistent with—and indeed depends upon—cooperative and proportional use of procedure.*") (emphasis added). This Court has admonished all Parties in this case that counsel have a proactive duty to conduct discovery under the rules without requiring constant judicial intervention. *See Poole ex rel. Elliott v. Textron, Inc.*, 192 F.R.D. 494, 507 (D. Md. 2000) ("The rules of discovery must necessarily be largely self-enforcing. The integrity of the discovery process rests on the faithfulness of *parties and counsel* to the rules—both the spirit and the letter.") (emphasis added); *Hopei Garments (Hong Kong), Ltd. v. Oslo Trading Co.*, No. 87 CIV. 0932 (MBM), 1988 WL 25139, at *3 (S.D.N.Y. Mar. 8, 1988) ("[T]he discovery provisions of the Federal Rules are meant to function without the need for constant judicial intervention, and [] those Rules rely on the

honesty and good faith of counsel in dealing with adversaries."); *see also Chism v. Nat'l Heritage Life Ins. Co.*, 637 F.2d 1328, 1331 (9th Cir. 1981) ("[E]mbroil[ing] the trial judge 'in day-to-day supervision of discovery . . . [is] a result directly contrary to the overall scheme of the federal discovery rules"); *cf. In re Google Litig.*, No. C 08-03172 RMW (PSG), 2011 WL 6951972, at *6 (N.D. Cal. July 8, 2011) (Parties should not be "free to flout their [discovery] obligations until a trial court utterly loses patience with them, and thereby embroil trial judges in day-to-day supervision of discovery.").

At the DMC held on December 11, 2024, and pursuant to Discovery Management Order No. 13 issued thereafter, the Court ordered Meta and the state agencies at issue to jointly submit final proposed schedules for getting state agency-related discovery finished within the currently set case schedule. *See* Dkt. 1479. The Parties promptly did so. *See* Dkts. 1466, 1472. The Court has carefully reviewed these submissions.

The Court attaches as an Appendix to this Order a marked-up version of the proposed schedules which indicates those proposed deadlines adopted by the Court, those proposed deadlines rejected by the Court, and modified deadlines as set by the Court in light of the tasks remaining in discovery, the time available, the current case schedule, and as an exercise of the Court's discretion to manage discovery.

Given the history of these Parties' inability to work out their differences in discovery, the Court was not shocked but nonetheless was disappointed at their failure to submit even *one* jointly proposed, fully agreed upon schedule as between Meta and the numerous state agencies at issue. All of the proposed schedules submitted were, at least to some extent, disputed. Further, despite this Court's explicit directives at the DMC for these proposed schedules to be submitted, two States failed to submit *any* proposed schedule for their agencies. Moreover, several States failed to counter propose a handful of specific dates for individual line-item deadlines or events, where Meta proposed dates for those specific events. The Court finds that failures by certain States to counter propose any schedule at all, or to counter propose a date in response to a specific date proposed by Meta, constitute a knowing waiver of rights.

The Court is likewise disappointed at the often times extreme positions set forth in the

United States District Court
Northern District of California

App. 260

4

Parties' competing proposed schedules. For example, one State proposed a highly truncated window of only one week in which depositions of the State's agencies could be taken. Meta, for its part, proposed for all States that the first date Meta could serve deposition notices would be December 30, 2024, with an additional proposal that all States object within three business days (*i.e.*, over the New Year's holiday) or that the States counter propose deposition dates within seven business days. Despite the Court's guidance at several DMCs to work things out rationally, these types of competing proposed schedules strain credulity. Given the relatively early first date for Meta to be able to serve deposition notices, there is no need to deviate from Section D of this Court's Standing Order for Discovery, which sets forth the requirements for the state agencies to object and counter propose alternate dates for depositions, if there are any objections. The Court expects counsel for all Parties to fully comply with the letter and spirit of Section D with regard to deposition scheduling.

The Court is further disappointed that the Parties' competing proposals included a number of cases in which the competing proposed deadlines differed only by about one or two weeks—experienced counsel on both sides of this dispute know better. The Court is discontented that seasoned attorneys for Meta and the States were incapable of reaching agreement on dates where the difference between the Parties was just a matter of days. At the last two DMCs, the Court heard repeatedly from lawyers for both sides that they were working hard to compromise, that they were trying their best, and that the failure to reach final agreements was the fault of the other side. At this point, such self-serving statements stand in stark contrast to what the Court has seen in the competing proposed schedules. Counsel on both sides should focus on actually compromising to resolve their disputes over search terms, custodians, and search procedures—results and actions will speak louder than generic arguments which strain credulity.

With regard to finalizing agreements on search terms and custodians, the Court is deeply concerned that several States included caveats in their proposed schedules (and a handful included argument about the alleged overbreadth of Meta's search terms). As noted in the attached Appendix, the Court **ORDERS** all of these Parties to finalize their agreements on search terms without any further undue delay. In the attached Appendix, the Court has set dates for the

United States District Court
Northern District of California

commencement of rolling productions by the state agencies, as well as dates for substantial

completion of such productions. As a matter of common sense and fair administration of

discovery, Meta and the States need to work backward from those dates to figure out for

themselves the deadlines by which they need to finalize search terms, custodians, and any other

disputed issues. Smart, experienced lawyers understand that they need to finish the search terms

negotiations sufficiently prior to the starting date for rolling productions so that rolling

productions can actually start by the deadlines set.

As noted in the Appendix, the Court has set deadlines for the start of rolling productions.

Meta's proposals included multiple such deadlines, which the Court **DENIES** as unnecessary

because the concept of rolling productions (plural) is for documents to be continuously produced

(in daily or at least weekly batches, as they are processed). The Court notes that several States

proposed starting rolling productions much later in the process, which the Court **DENIES** as set

forth in the Appendix. The requirement for the state agencies to start rolling productions means

that the States are to roll the productions continuously as they are processed, so that productions

meet the substantial completion date.

The Court has not set a specific date to finalize these negotiations because the Court

assumes the Parties understand the practicalities here and will work to finalize by dates that work

for the specific situation for each state agency. The Court expects counsel to resolve search terms

and custodians without the need for the Court to parse individual search strings for the Parties—as

the Court has stated at prior DMCs, counsel are far better suited to negotiate the search terms

because of familiarity with the details of the case. Thus, as a practical matter, the Court expects

agreements on all search terms and custodians to be finalized within a matter of days from the date

of this Order, absent agreement by the Parties or other highly unusual circumstances.

Accordingly, Meta and the States **SHALL** file (for each State) a joint one-page status

report, by no later than **January 6, 2025**, stating simply whether negotiations regarding search

terms and custodians are finalized such that rolling productions can start by the deadline set by the

Court for that State's agencies. Further, the status report for each State **SHALL** indicate whether

any or all of the disputes involving that State in the joint discovery letter brief filed on December

United States District Court
Northern District of California

20, 2024 [Dkt. 1482] have been resolved.  If any disputes remain unresolved as between Meta and a particular State, the status report for that State shall identify (without further argument) which disputes in the joint letter brief [Dkt. 1482] remain unresolved.  These status reports **SHALL NOT** include argument blaming the other side as to why search terms and custodians remain disputed—as far as this Court is concerned, any failure to finalize agreement is a failure by all counsel involved.

If a status report for a particular State indicates that search terms and custodians are still disputed (between Meta and one or more agencies of that State) as of January 6, 2025, the Court **ORDERS** that counsel for Meta, counsel for the state agency (or agencies) at issue, and counsel for the State Attorney General's office at issue working on this case **SHALL** meet and confer **in person** at a location mutually agreed upon, where that meet and confer shall take on or before **January 14, 2025**.  The status report **SHALL** indicate for the Court the date, time, and location of the meet and confer, as well as the names and titles of all lawyers who will be participating in the meet and confer.

If the Parties are unable to agree on a schedule or location for this in-person meet and confer, then they **SHALL** jointly report **in person** to Courtroom F on the 15th Floor of the San Francisco courthouse (located at 450 Golden Gate Ave.) at 10:30 a.m. on a mutually agreed upon date chosen from January 7, 2025 through January 14, 2025 where they will receive instructions from the Court on completing their meet and confer at the courthouse.  The status report **SHALL** indicate for the Court the names and titles of the lawyers who will appear and **SHALL** inform the Court of the date of their appearance in Courtroom F.  If the Parties are unable even to agree upon a date to appear in this Court, then they **SHALL** so state in the status report and they **SHALL** jointly report **in person** to Courtroom F at 10:30 a.m. on January 7, 2025, unless otherwise ordered by the Court.

The Court again admonishes the Parties that they must work collaboratively and transparently to get all remaining discovery completed in a timely manner.  The Court is disappointed that these Parties have proven incapable of working out their disagreements on this discovery resulting in failures to meet the deadlines previously set.  The Court has made clear to

App. 263

7

these Parties repeatedly that finishing this discovery on the current case schedule is imperative.

The Parties should not expect the Court to grant further extensions for completing this discovery, and the Court will view with a jaundiced eye failures to meet the deadlines set by this Order given the long pendency of this discovery, the extensive guidance previously provided by the Court, and the motions practice this discovery has inordinately spawned. The Court will take fully into account such failures to meet deadlines in evaluating further discovery disputes or other motions practice.

This **RESOLVES** Dkts. 1466 and 1472.

**IT IS SO ORDERED.**

Dated: December 31, 2024

PETER H. KANG
United States Magistrate Judge

**Exhibit 14**

**Kentucky Attorney General's Position:** In only two instances does Kentucky law grant the Office of the Kentucky Attorney General (KYOAG) full, unmediated access to another agency's files. However, neither of those agencies are listed in the March 11, 2024 Joint Chart. While no specific Kentucky statute or constitutional provision explicitly prohibits or prevents the KYOAG from accessing documents of the state agencies identified by Meta, there is no authority granting such access. However, as a practical matter, the existing distribution of authority among Kentucky's separately elected executive branch officers prevents the KYOAG from exercising control or direct access to other agencies' records absent express statutory authority.

*The KYOAG lacks a legal right to obtain documents from the entities identified by Meta.* The Kentucky Attorney General and Governor are separately elected constitutional officers of the Commonwealth. KY. Const. § 91; KY. Const. § 70; Ky. Rev. Stat. § 12.020. Each of the other agencies named by Meta are headed by individuals appointed by the Governor. Ky. Rev Stat. § 12.040. These department heads "have direction and control of their respective departments." Ky. Rev. Stat. § 12.040(1). Given this structure of Kentucky government, Meta is unable to demonstrate that the KYOAG has a legal right to obtain documents from other agencies upon demand. While Ky. Rev. Stat. § 367.160(1) dictates that departments and agencies "of the Commonwealth shall fully cooperate with the Attorney General in carrying out the functions of" the Kentucky Consumer Protection Act (KYCPA), this required cooperation does not indicate that the KYOAG has the legal right to obtain another agency's documents upon demand nor that the documents are within the possession, custody, or control of the KYOAG. Notably, Ky. Rev. Stat. § 367.160 delineates only two specific agencies for which designees of the KYOAG "have the same access to material evidence and information" as those agencies. They are the Public Service Commission (Ky. Rev. Stat. § 367.160(2)) and the Department of Insurance (Ky. Rev. Stat. § 367.160(3)), neither of which were identified by Meta in the Joint Chart.

*Whether the KYOAG's communications with the entities are privileged.* The KYOAG does not represent any of the Kentucky agencies at issue. They are distinct and separate entities with their own legal staffing and capacity to independently initiate and participate in litigation and retain counsel as they see fit. Ky. Rev. Stat. §12.210. Although Ky. Rev. Stat. § 15.020 provides that the KYOAG is the chief law officer and legal adviser of all departments, commissions, and agencies of the Commonwealth, the KYOAG is not specifically required to represent agencies and those agencies are free to use their own counsel or employ outside counsel. *See Hogan v. Glasscock*, 324 S.W.2d 815, 817 (Ky. Ct. App. 1959). In fact, the KYOAG on occasion finds itself in direct legal conflict with these agencies.[1] The KYOAG did not bring this suit on behalf of and has not been retained by any other agency. Therefore, any pre-suit communications between the KYOAG and any Kentucky agency are not privileged.

---

[1] *See, e.g., Commonwealth ex rel. Beshear v. Bevin*, 575 S.W.3d 673 (Ky. 2019) (KYOAG adverse to Governor, Secretary of Education, and Workforce Development Cabinet); *Cameron v. Beshear*, 628 S.W.3d 61 (Ky. 2021) (KYOAG adverse to Governor and Cabinet for Health and Family Services); *Coleman v. Beshear*, 2024 WL 875611 (Ky. Ct. App. 2024) (Governor adverse to Attorney General and all other state constitutional officers) (not final). *See also Cameron v. EMW Women's Surgical Center, P.S.C.*, 142 S.Ct. 1002 (U.S. 2022) (Kentucky attorney general entitled to intervene after the cabinet secretary for Health and Family Services declined to appeal injunction).

1

**Meta's Position:** The Kentucky agencies that Meta has identified—Board of Education, Cabinet for Health and Family Services, Department for Behavioral Health, Developmental and Intellectual Disabilities, Department for Business Development, Department for Public Health, Department of Education, Finance and Administration Cabinet, Governor, and Office of State Budget Director—are subject to discovery as a matter of state and Ninth Circuit law. Kentucky law provides that the "Attorney General is the chief law officer of the Commonwealth of Kentucky and all of its departments, commissions, agencies, and political subdivisions." Ky. Rev. Stat. Ann. § 15.020(1). By statute (with limited exceptions not relevant here), the Attorney General "shall . . . attend to . . . any litigation or legal business that any . . . department, commission, or agency may have in connection with, or growing out of, . . . its official duties." *Id.* § 15.020(3); *compare Hogan v. Glasscock*, 324 S.W.2d 815 (Ky. Ct. App. 1959) (allowing *local* school boards to employ counsel). As the AG admits, no statute or constitutional provision deprives the AG of access to agency documents. To the contrary, "[a]ll departments, agencies, officers, and employees of the Commonwealth shall fully cooperate with the Attorney General" in carrying out its consumer protection enforcement duties. *Id.* § 367.160.[2]

Because the Kentucky AG, as "chief legal officer," is tasked with attending to the "legal business" of the state agencies at issue here and can require agency "cooperat[ion]" in this consumer protection lawsuit, they have "control" over agency materials—and therefore have discovery obligations with respect to them—under *In re Citric Acid*'s "legal right" standard.[3] *See, e.g.*, *Bd. of Educ. of Shelby Cnty. v. Memphis City Bd. of Educ.*, 2012 WL 6003540, at *3 (W.D. Tenn. Nov. 30, 2012) (legal right based on AG's "statutory duties to handle 'all legal services,' 'direct and supervise' all litigation, and 'represent' the State of Tennessee," and the absence of any authority denying the AG the ability to "obtain responsive documents on demand"); *In re Generic Pharms. Pricing Antitrust Litig.*, 571 F. Supp. 3d 406, 411 (E.D. Pa. 2021) (legal right based on obligation to "represent[] Commonwealth agencies" and statute providing that the AG "shall have the right to access at all times to the books and papers of any Commonwealth agency necessary to carry out his duties" (cleaned up)). Claims that the AG "on occasion" may come into conflict with other state departments do not warrant a different result. *See In re Generic Pharms. Pricing Antitrust Litig*, 2023 WL 6985587, at *2 (E.D. Pa. Oct. 20, 2023) ("[g]eneral arguments regarding a possible conflict" do not bar finding that AG exercises control over agency documents, as "state agencies 'undoubtedly hold many relevant documents and stand to benefit from the Attorney General's success in the case'").

---

[2] The AG's observation that Kentucky law affords "the same access to material evidence and information" in the files of only two agencies is irrelevant. *In re Citric Acid* does not require "the same access" before control may attach.

[3] Outside this briefing, Kentucky has not taken a position in this litigation regarding whether communications between the Attorney General's office and the relevant agencies are privileged.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

People of the State of California, *et al.*

    v.                                                    MDL No. 3047

Meta Platforms, Inc., Instagram, LLC, Meta            Case No.: 4:22-md-03047-YGR

Payments, Inc., Meta Platforms Technologies, LLC      **NOTICE OF INFORMATION
                                                      REGARDING STATE-AGENCY
                                                      DISCOVERY ISSUE**

IN RE: SOCIAL MEDIA ADOLESCENT               Judge: Hon. Yvonne Gonzalez Rogers

ADDICTION/PERSONAL INJURY                    Magistrate Judge: Hon. Peter H. Kang
PRODUCTS LIABILITY LITIGATION
THIS DOCUMENT RELATES TO:

 4:23-cv-05448.

**TO THE COURT, ALL PARTIES, AND THEIR COUNSEL:**

    The Office of the Kansas Attorney General respectfully writes to inform the Court of a

matter impacting the progess of discovery in this case. The Office of the Kansas Governor,

which oversees five of the seven other Kansas state agencies identified in the Court's order

(Department for Aging and Disability Services; Department for Children and Families;

Department of Administration, Department of Commerce, and Department of Health and

Environment), has, of yet, not complied with the Court's September 6, 2024 discovery orders,

ECF 1117. The Office of the Attorney General has been in regular communication with both

Defendants and the Governor's office and has taken all steps reasonably within its power to

secure compliance with the Attorney General's discovery obligations according to the Court's

order.

App. 268

Following the Court's order, the Attorney General provided both the Governor's office and the general counsels of all the relevant agencies with copies of this Court's order and initiated discussions regarding custodians and search terms. Understanding the Governor's ongoing objection to being subject to party discovery, the Attorney General also issued subpoenas under the Kansas Consumer Protection Act (KCPA) seeking the same information sought by Defendants' discovery requests. A copy can be provided to the court upon request.

On October 15, 2024, the Governor's counsel wrote a letter to the Attorney General stating they would respond only to a subpoena or open records request, and restated the Governor's objections to being subject to the Court's orders. A copy of this letter is attached to this filing as Exhibit A. Despite issuance of the aforementioned KCPA subpoenas on October 31, 2024, the Governor's agencies have not complied, arguing that the Attorney General's subpoena authority ends once a case is filed. A copy of this letter is attached as Exhibit B. Following its refusal to comply with the KCPA subpoena, the Attorney General engaged in repeated discussions with the Governor's Office in an attempt to obtain agency compliance with the Court's orders. On November 20, 2024, the Governor's counsel contacted the Attorney General and stated the agencies would only produce documents under a Fed. R. Civ. P. 45 subpoena.

In sum, despite multiple and ongoing attempts to secure the Governor's cooperation, the Attorney General has been unable to move the Governor to comply with this Court's orders. To date, the Governor's agencies have provided custodians and hit reports for search terms prepared by the Attorney General, but, thus far, no agency under the Governor's authority has provided the Attorney General with any responsive documents.[1]

---

[1] One agency not under the Governor's jurisdiction has provided documents, which the Attorney General will bates stamp before providing to Defendants.

*          *          *

The Governor's counsel, Justin Whitten, KS Bar No. 28344, has requested certain correspondence be provided to the Court.  Mr. Whitten's letter is attached to this filing as Exhibit C.

The Office of the Attorney General maintains its position, previously presented, that agencies not under the administrative control of the Attorney General or not otherwise intimately connected with the State's case should not be subject to party discovery under the Rules of Civil Procedure. Nonetheless, it understands the Court's previous orders on the matter and understands that, as officers of the court, the Office's attorneys are bound to comply with that order unless or until overturned or amended by higher authority. Consequently, the Office of the Attorney General has made all reasonable efforts to gain compliance with that order from the affected State agencies.[2]

Dated: December 11, 2024

Respectfully submitted,

**KRIS W. KOBACH**
Attorney General
State of Kansas

/s/ *Sarah Dietz*
_____
Sarah Dietz (KS Bar No. 27457)
Kaley Schrader (KS Bar No. 27700)
Assistant Attorneys General
120 SW 10th Avenue
Topeka, Kansas 66612
Tel: 785-296-3751
Kaley.schrader@ag.ks.gov
Sarah.dietz@ag.ks.gov

---

[2] Among the agencies' many complaints are that, even if they were to comply, the burden of reviewing the documents would overwhelm their small legal staffs. The Office of the Attorney General has offered to bear the costs of this review and is presently talking to several firms who potentially could perform the necessary work.

3

App. 270



Capitol Building
Room 241 South
Topeka, KS 66612

# Kansas
### Office of the Governor

Phone: (785) 296-3232
governor.kansas.gov

Laura Kelly, Governor

October 15, 2024

Sarah Dietz
Assistant Attorney General
Officer of Kansas Attorney General Kris Kobach

RE: Discovery in Meta Litigation, *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR

Dear Ms. Sarah Dietz,

The Kansas Attorney General does not have custody or control, legal or physical, of documents in the possession, custody, or control of the Office of the Governor. I understand there is a decision from a federal magistrate judge in California that may hold otherwise. *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR, Order Sept. 6, 2024, pg. 104 ("the Court finds that the factors weigh in favor of finding that the Kansas Attorney General has legal control, for the purposes of discovery, over the listed Kansas agencies.").

Nothing in this response is intended nor may be interpreted as acquiescence by the Office of the Kansas Governor or any other Kansas agency, apart from the Kansas Attorney General, to the jurisdiction of the court in that case. The Governor did not: initiate that suit, request your office investigate or initiate that suit, enter an appearance in that suit, participate in that suit, nor request your office's representation in that suit. Simply put, the Governor is not a party to that suit.

Moreover, I do not read the magistrate's order as making the Governor a party – nor could it in the absence of appropriate service or motion practice under FRCP 19. The magistrate's order may impose a legal fiction on the Attorney General as to its document control capabilities, but it does not, with respect, impose a legal obligation for production on a non-party such as the Kansas Governor.

As you know the Governor and the Attorney General are legally distinct, separate, elected constitutional officers of our executive branch of government. Kansas Const. art 1, sec. 3. And as a separate legal entity, the Governor will not consent to party discovery in the above-referenced suit. We will comply with a reasonable third-party subpoena or a reasonable request for records under the Kansas Open Records Act.

Our goal is not to be obstinate, but as I believe you can understand, we cannot countenance a position that fundamentally erodes the independence of the Office of the Kansas Governor, especially in a case in which the Governor was not consulted, is not represented, and is not a party. This is not meant as an attack, but you must

1

App. 271



EXHIBIT

A

understand how we balk at the audacity of a claim that our Attorney General somehow controls our records and we must turn them over in a case we have nothing to do with. The aims of your suit appear laudable, and as you know, the Kansas Attorney General has been empowered explicitly by our legislature to bring the suit in accordance with your enforcement prerogative of the Kansas Consumer Protection Act, K.S.A. 50-628,50-632. The Kansas Governor does not enforce the Kansas Consumer Protection Act, nor did the Kansas Governor file a related complaint under the Kansas Consumer Protection Act.

If the parties believed the Kansas Governor to be party, they should have followed the necessary rules of federal civil procedure for joinder of a required party. That the Attorney General of Kansas has joined the suit does not *ipso facto* join all state agencies and executive officers to the suit. Such a position is wholly untenable and inconsistent with the structure of our executive branch and the statute at issue in this case, which vest the Attorney General, not the Governor's Office, with enforcement powers under the Kansas Consumer Protection Act.

Moreover, at no time prior to this discussion of discovery have the parties attempted to treat the Governor as a party – we have not been served with any documents, invited to any scheduling conferences, invited to supply any briefing, or otherwise treated as party. You are aware that when agencies or executive officers like the Governor or the legislature are sued, we may seek representation from your office in accordance with K.S.A. 75-702(b). No such request has been made here by the Office of the Kansas Governor. The court wrote "the Kansas Attorney General's role as counsel for the agencies at issue inherently involves obtaining necessary documents for effective representation in litigation." Order at 107. The reality is that currently, you are not "counsel for the agencies at issue," including the Governor's Office. You will become counsel if requested by the Governor's Office, which we will only do if we become a party or if we are served with a subpoena. But at this time, no request for representation has been made and thus no counsel relationship exists as would serve as a basis for you to obtain documents consistent with the court's order.

Again, the Governor is not a party to this suit, nor has she been treated as a party. Accordingly, we decline to engage in party discovery. As stated, we will comply with a reasonable third-party subpoena or a reasonable request for records under the Kansas Open Records Act.

Lastly, we do not want to see you sanctioned for failing to comply with an order you cannot comply with while respecting the structure of our government. Using your office as a clearinghouse for discovery of nearly all executive branch entities may seem administratively efficient but sweeps so broadly in impact, that it is, in my opinion, an unconscionable discovery position and represents a gross misunderstanding of the structure of our state government. We understand that the court's position is not your position, and I mention it to communicate solidarity that: 1) such a sweeping grant of custodial powers would need to be expressly provided for in state statute - note, our state statutes already expressly indicate no such broad grant of authority as evidenced by our state's open records act, which imposes record production obligations on "each public agency," K.S.A. 45-220, as opposed to merely funneling all records request through the Attorney General; 2) as our interactions now show, there actually is no efficiency gained by what should have been discovery through existing third-party discovery avenues likes subpoenas; and 3) efficiency in discovery, if it exists at all here, will never be of such magnitude as to warrant dissolution of the legal boundaries inherent in our executive branch offices that have existed for over a century.

2

App. 272

Respectfully,

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly



**Kansas**
Office of the Governor

Capitol Building
Room 241 South
Topeka, KS 66612

Phone: (785) 296-3232
governor.kansas.gov

Laura Kelly, Governor

November 14, 2024

Sarah Dietz
Assistant Attorney General
Office of Kansas Attorney General Kris Kobach

RE: Subpoena issued under K.S.A. 50-631 as proxy for Discovery in Meta Litigation, *In re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, 22-md-03047-YGR

Dear Ms. Sarah Dietz,

We are providing you with our objections to the subpoena we received from your office on November 1, 2024, pursuant to K.S.A. 50-631.

We ask that you withdraw your subpoena as we believe it is an *ultra vires* exercise of subpoena power under the Kansas Consumer Protection Act, K.S.A. 50-631, once a complaint has been filed, as is the case here when the complaint was filed on October 24, 2023. Without waiving any right for us to seek to quash the subpoena, in the alternative, we ask that you modify your subpoena as follows: 1) limiting the timeframe of the request from when Governor Kelly took office on January 14, 2019 to when the complaint in the above-reference litigation was filed on October 24, 2023; 2) limiting the requests to only those germane to alleged violations of the Kansas Consumer Protection Act, which we believe would be withdrawing all but request no. 8.

Further, we discussed the idea of using Boolean search terms as a proxy for complying with the subpoena, we ask that you limit the Boolean search terms as identified herein. Your proposed 57 Boolean searches resulted in 9,572 Outlook items, not including attachments, which far exceeds our ability to review and would create an undue burden on our office. Our proposed modification would entail using 22 of your 57 Boolean searches resulting in a less burdensome 424 responsive items, not including attachments.

Please note we are not intending to be obstructionist in that we believe the Attorney General's Office and Governor's Office are aligned in the legal concerns regarding party discovery in the above-referenced litigation. And we intend to assist where appropriate and reasonable. Nevertheless, to preserve all defenses and rights of our client and to ensure your request does not unduly burden the resources of our office at the expense of service to our client, we wish to make you aware of the following objections:

1. Where, as here, the Attorney General has joined a complaint alleging violations of the Kansas Consumer Protection Act, the investigatory subpoena power under that act is not available for use as a proxy for responding to discovery for what should have been a Rule 45 subpoena from the federal court.

At the outset, we note that unlike a discovery subpoena which would impose a burden on the Governor's Office to object in accordance with K.S.A. 60-245(c), an administrative subpoena such as the one you issued under K.S.A. 50-631 puts the burden on you to substantiate the subpoena furthers your investigation. *See, e.g., People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977)("The attorney general's subpoena, under the Colorado Consumer Protection Act, affords greater protection because the burden of

1

App. 274

EXHIBIT
B

seeking court review is upon the attorney general. He must carry the burden of satisfying the court that reasonable grounds exist to believe the subpoena is necessary to terminate or prevent a deceptive trade practice. The court, therefore, is the protective barrier between the naked demand of the subpoena to produce and an enforceable court order.").

We did not locate any Kansas appellate case discussing the scope of the Attorney General's subpoena power under K.S.A. 50-631, but in looking at similar statutes in other jurisdictions, I have found support for the proposition that this administrative/investigatory subpoena ends once a lawsuit is initiated.

In *Cavalry SPV I, LLC v. Morrisey*, 232 W. Va. 325, 337, 752 S.E.2d 356, 368 (2013), the West Virginia Attorney General received complaints of violations of the West Virginia Consumer Credit and Protection Act and issued investigative subpoenas. The Attorney General's statutory subpoena power was as follows:

> If the attorney general has probable cause to believe that a person has engaged in an act which is subject to action by the attorney general, he may, and shall upon request of the commissioner, make an investigation to determine if the act has been committed and, to the extent necessary for this purpose, may administer oaths or affirmations, and, upon his own motion or upon request of any party, may subpoena witnesses, compel their attendance, adduce evidence, and require the production of any matter which is relevant to the investigation, including the existence, description, nature, custody, condition and location of any books, records, documents or other tangible things and the identity and location of persons having knowledge of relevant facts, or any other matter reasonably calculated to lead to the discovery of admissible evidence. *Id.* at 332.

The court elaborated on the distinction between investigatory subpoena power and adjudicatory subpoena power, noting that once a complaint has been filed, investigatory subpoena power for violations alleged in the complaint cease.

> Once a complaint has been filed formally charging a party with statutory misconduct, however, the Attorney General no longer may rely upon his powers of investigation to elicit information to establish those specific consumer protection violations that form the basis of the complaint. Rather, upon the commencement of enforcement proceedings through the filing of a civil action by the Attorney General, the Attorney General's investigatory powers end as to those matters addressed in the complaint and are supplanted by the rules of discovery applicable to civil proceedings generally. *Id.* at 337.

*See also People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977) (noting that an attorney general vested with administrative subpoena power under a consumer protection statute "reflects a compromise that attempts to balance the public's interest in effective investigation at the *preliminary stage* against the individual's interest in being free from governmental intermeddling.") (emphasis added).

As you know, K.S.A. 50-631(a) provides "If, by the attorney general's own inquiries or as a result of complaints, the attorney general has reason to believe that a supplier has engaged in, is engaging in or is about to engage in an act or practice that violates this act, the attorney general, or any deputy attorney general or assistant attorney general, may administer oaths and affirmations, subpoena witnesses or matter and collect evidence." There is no time limitation in this provision, which may support some argument that the power survives past the filing of complaint. However, I don't think that argument carries the day. Clearly the plain language "has reason to believe that a supplier has engaged in, is engaging in or is about to engage in an act or practice that violates this act" indicates investigative intent in that it seeks to detect past or probable violations.

2

It does not speak to enforcement of violations post-complaint. Coupled with the civil remedy procedures under K.S.A. 50-632 such as an injunction, and the civil discovery mechanisms under K.S.A. Chapter 60, I think the mechanism for discovery post-complaint is party discovery or subpoenas from the court. The appropriate action would be either you or Meta issuing a Rule 45 subpoena.

Moreover, if the subpoena power was intended to persist past the investigatory process, we think the Legislature could have so provided. But it did not, likely leaving such post-investigation discovery to the long-established discovery processes of civil procedure.

We think that the power to subpoena records under K.S.A. 50-631 ceased upon your filing or joining of the complaint, at which time the proper discovery vehicle for further information was party discovery and Rule 45 subpoenas. The subpoena you issued to our office on November 1, 2024, was not in furtherance of an investigation. In fact, a comparison of the subpoena the Governor's Office received from the Attorney General shows the subpoena is near identical to the Rule 45 subpoena served by Meta on the Department for Children and Families. What the Governor's Office received is essentially Meta's Rule 45 discovery subpoena reproduced by the Attorney General as an investigatory subpoena under the Kansas Consumer Protection Act.

The Attorney General Office's presumably completed its investigation which led to the two counts of the violation of the Kansas Consumer Protection Act that it alleged in the complaint filed in the above-referenced litigation. Now, having been confronted with a legally dubious discovery order in federal court in the Northern District of California, the Attorney General attempts compliance with the order through use of its investigatory subpoena power. But the train on the investigation already left the station; the Attorney General is not investigating a violation. Rather, it is responding to discovery about an investigation completed as the precursor to it joining the above-referenced lawsuit.

Administrative subpoenas survive constitutional challenge for unreasonable search and seizure only if they meet the touchstone of reasonableness. *Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 208, 66 S. Ct. 494, 505, 90 L. Ed. 614 (1946) ("The gist of the protection is in the requirement, expressed in terms, that the disclosure sought shall not be unreasonable."); *see also People ex rel. MacFarlane v. Am. Banco Corp.*, 194 Colo. 32, 38, 570 P.2d 825, 829 (1977) ("In our view, the protections afforded persons served with an attorney general's subpoena are as full and as meaningful as those afforded persons served with a grand jury subpoena. Under both, the person from whom information is sought may refuse to submit to the demands of the subpoena if it is unreasonable.").

Here, it is unreasonable for the Attorney General to attempt to command production of documents sought in discovery from Meta (not even the Attorney General) of an already filed case under the guise of an investigatory subpoena from the Attorney General.

2. Even if the Kansas Consumer Protection Act permits the Attorney General to issue a subpoena post-investigation pursuant to K.S.A. 50-631, the subpoena issued is overly broad and unduly burdensome for the following reasons outlined below.

As applicable to all reasons, the resources of the Governor's Office are limited, consisting of a Chief Counsel and Deputy Chief Counsel and no legal support. So, while serving the legal needs of the Kansas Governor, we simply do not have a lot of additional bandwidth to conduct an extensive review of records. Further, we are technologically limited in that we do not have a centralized way of searching text messages, and I am not sure of our ability to search network drives. We can, as we have explained, perform simple Boolean searches of e-mails, and we are willing to conduct reasonable Boolean searches of e-mails. Moreover, any records that are retrieved will require legal review for any privilege before being produced to your office. As noted, there are

3

App. 276

two attorneys for the Governor's Office, and we simply do not have the capacity for large scale document review.

    a.   The subpoena seeks records from January 1, 2012, but Governor Kelly is not the custodian of records prior to her becoming Governor on January 14, 2019.

K.S.A. 75-104(e), generally, provides that the Governor's records at the end of the administration are transferred to the custody of the state historical society. It further provides "During the lifetime of the former governor, no person shall have access to any such records, correspondence or other papers which are not required to be disclosed under K.S.A. 45-221 and amendments thereto, except upon consent of the former governor, and the former governor shall be considered the official custodian of such records, correspondence and other papers which are not required to be disclosed."

Meta's instructions in its first set of requests for production said "unless otherwise specified, the time period for these request is January 1, 2015, to the date of production of documents." The subpoena from the Attorney General contained the exact same instruction at paragraph 9 of the instructions. Asking for nearly a decade's worth of records is too much, especially in light of the resource limitations identified above and the fact that Governor Kelly's administration is not the custodian of records of the prior administrations. We ask that you modify your subpoena so that it ranges from January 14, 2019, the date Governor Kelly assumed office, and the earlier of either the date the Kansas Attorney General completed its investigation and determined Meta had violated the Kansas Consumer Protection Act or the date the complaint initiating the action at issue was filed. Asking for records beyond the date of the AG's determination or complaint creates additional unwarranted burden on our resources and has no relevance to the AG's findings regarding violations or enforcement of the Kansas Consumer Protection Act.

For records prior to Governor Kelly's administration – January 1, 2015, to January 13, 2019 – we ask that you please direct your request to the Kansas historical society.

    b.   The subpoena is overly broad and creates an undue burden on the Governor's Office

The subpoena contains 22 categories of requests *in addition to* 20 subcategories in request no 3., 3 subcategories in request no. 5, 8 sub-subcategories in request no. 5.c, 6 subcategories in request no. 12, and 2 subcategories in request no 22. As noted above, the Governor's Office resources are limited, and we are not in a position to comply by the requested time frame of November 21 (20 days from date of receipt).

You originally provided a list of 57! different Boolean searches to be run across the mailboxes of the 15 custodians we identified. We ran this search for the time period from when Governor Kelly took office, January 14, 2019, to the date the complaint against Meta was filed, October 24, 2023. Later, on November 8, 2024, you provided 195!! different Boolean searches.

Our Office of Information Technology Services reports the following responsive items to the 57-search list you provided:

| Search Criteria | No. Items |
|---|---|
| ("mental health") NEAR(7) ("youth") | 3576 |
| ("mental health") NEAR(7) ("child") | 3392 |
| ("mental health") NEAR(7) ("adolescent") | 513 |
| ("Facebook") NEAR(7) ("youth") | 224 |

4

App. 277

| | |
|---|---:|
| ("social media") NEAR(7) ("child") | 216 |
| ("mental health") NEAR(7) ("teen") | 197 |
| ("mental health") NEAR(7) ("social media") | 183 |
| ("wellbeing") NEAR(7) ("youth") | 162 |
| ("social media") NEAR(7) ("budget") | 155 |
| ("social media") NEAR(7) ("youth") | 148 |
| ("Facebook") NEAR(7) ("mental health") | 99 |
| ("complaint") NEAR(7) ("budget") | 75 |
| ("suicide") NEAR(7) ("social media") | 72 |
| ("social media") NEAR(7) ("behavior") | 69 |
| ("Facebook") NEAR(7) ("suicide") | 67 |
| ("complaint") NEAR(7) ("social media") | 59 |
| ("social media") NEAR(7) ("harm") | 58 |
| ("social media") NEAR(7) ("kid") | 53 |
| ("social media") NEAR(7) ("benefit") | 47 |
| ("anxiety") NEAR(7) ("social media") | 44 |
| ("mental health") NEAR(7) ("kid") | 37 |
| ("depression") NEAR(7) ("social media") | 26 |
| ("self-harm") NEAR(7) ("youth") | 24 |
| ("social media") NEAR(7) ("teen") | 17 |
| ("Facebook") NEAR(7) ("addiction") | 14 |
| ("Instagram") NEAR(7) ("youth") | 8 |
| ("social media") NEAR(7) ("filter") | 7 |
| ("addiction") NEAR(7) ("social media") | 6 |
| ("Instagram") NEAR(7) ("suicide") | 6 |
| ("Instagram") NEAR(7) ("mental health") | 5 |
| ("complaint") NEAR(7) ("cellphone") | 3 |
| ("Facebook") NEAR(7) ("anxiety") | 3 |
| ("social media") NEAR(7) ("adolescent") | 2 |
| ("wellbeing") NEAR(7) ("teen") | 2 |
| ("digital advertisement") NEAR(7) ("social media") | 1 |
| ("Instagram") NEAR(7) ("anxiety") | 1 |
| ("Instagram") NEAR(7) ("depression") | 1 |
| ("compulsive use") NEAR(7) ("social media") | 0 |
| ("digital advertisement") NEAR(7) ("facebook") | 0 |
| ("digital advertisement") NEAR(7) ("instagram") | 0 |
| ("Facebook") NEAR(7) ("compulsive use") | 0 |
| ("Facebook") NEAR(7) ("depression") | 0 |
| ("Facebook") NEAR(7) ("self-harm") | 0 |
| ("Facebook") NEAR(7) ("sleep disturb") | 0 |
| ("Instagram") NEAR(7) ("addiction") | 0 |
| ("Instagram") NEAR(7) ("compulsive use") | 0 |
| ("Instagram") NEAR(7) ("self-harm") | 0 |
| ("Instagram") NEAR(7) ("sleep disturb") | 0 |
| ("mental health") NEAR(7) ("young user") | 0 |

5

App. 278

| | |
|---|---|
| ("self-harm") NEAR(7) ("social media") | 0 |
| ("sleep disturb") NEAR(7) ("social media") | 0 |
| ("sleep disturb") NEAR(7) ("youth") | 0 |
| ("social media") NEAR(7) ("compulsive") | 0 |
| ("social media") NEAR(7) ("physical health") | 0 |
| ("social media") NEAR(7) ("psychological health") | 0 |
| ("social media") NEAR(7) ("social health") | 0 |
| ("social media") NEAR(7) ("young user") | 0 |

Note: the NEAR(7) means 5 words separate the two end words, which we believe was comparable to "w/5" [within 5 words] search between the two end words. These items are outlook data files, most likely e-mails, and the count of responsive hits does not account for e-mail attachments, which would add attorney review time. This is a total of 9,572 items, not including attachments, and there is no way the Governor's Office legal team can review this number of items without it substantially interfering with our ability to provide counsel to our client Governor Kelly and the Governor's Office.

K.S.A. 60-245(c)(1) imposes a duty on the issuer of the subpoena to "take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena." In determining whether to enforce a subpoena, district courts are empowered to weigh equitable criteria as reasonableness and oppressiveness – it is a balancing of hardships and benefits. *Cessna Aircraft Co.  Kansas Comm'n on C.R.*, 229 Kan. 15, 31, 622 P.2d 124, 137 (1981). In *Cessna Aircraft Co.*, the Kansas Supreme Court noted the Kansas Commission on Civil Rights did not have "unlimited subpoena powers and can subject an entire facility to demands and whims without some showing of relevancy to the *investigation*." *Id.* at 28 (emphasis added). Here, the investigation is done, and the complaint filed. There can be no credible argument that the Attorney General filed first and sought support after the fact, as that would raise ethical concerns as to whether the filing of the complaint was supported by facts at the time it was filed – the law does not countenance a file first, investigate later approach.

In reviewing the list above, we believe these would be more applicable search terms and reasonable number of items for review:

| | |
|---|---|
| ("complaint") NEAR(7) ("social media") | 59 |
| ("social media") NEAR(7) ("harm") | 58 |
| ("social media") NEAR(7) ("kid") | 53 |
| ("social media") NEAR(7) ("benefit") | 47 |
| ("anxiety") NEAR(7) ("social media") | 44 |
| ("mental health") NEAR(7) ("kid") | 37 |
| ("depression") NEAR(7) ("social media") | 26 |
| ("self-harm") NEAR(7) ("youth") | 24 |
| ("social media") NEAR(7) ("teen") | 17 |
| ("Facebook") NEAR(7) ("addiction") | 14 |
| ("Instagram") NEAR(7) ("youth") | 8 |
| ("social media") NEAR(7) ("filter") | 7 |
| ("addiction") NEAR(7) ("social media") | 6 |
| ("Instagram") NEAR(7) ("suicide") | 6 |
| ("Instagram") NEAR(7) ("mental health") | 5 |

6

App. 279

| | |
|---|---|
| ("complaint") NEAR(7) ("cellphone") | 3 |
| ("Facebook") NEAR(7) ("anxiety") | 3 |
| ("social media") NEAR(7) ("adolescent") | 2 |
| ("wellbeing") NEAR(7) ("teen") | 2 |
| ("digital advertisement") NEAR(7) ("social media") | 1 |
| ("Instagram") NEAR(7) ("anxiety") | 1 |
| ("Instagram") NEAR(7) ("depression") | 1 |

This represents a far more reasonable 424 items, consistent with your obligation to ensure no undue burden on our office.

> c. The subpoena's requests are not reasonably relevant to an investigation of a Kansas Consumer Protection Act violation.

"To be valid, administrative subpoenas must satisfy three requirements: (1) The inquiry is one that the agency or board is authorized to make, (2) the demand must not be too indefinite, and (3) the information sought must be reasonably relevant to the purpose of the inquiry." *Hansa Ctr. for Optimum Health, LLC v. State,* 52 Kan. App. 2d 503, Syl. 4, 369 P.3d 977, 978 (2016).

Here, the Attorney General has issued this administrative subpoena under K.S.A. 50-631, which is limited to investigations of violations of the Kansas Consumer Protection Act. Yet, the subpoena requests the following documents:

Request No. 7: Policies proposed, recommended, or enacted by the Kansas Governor's Office regarding screen time and acceptable use of cell phones, computers, tablets, or other electronic devices by Young Users.

Unless the Attorney General is investigating these current or proposed policies, such policies are not relevant to alleged violations of the Kansas Consumer Protection Act.

Request No. 9: Complaints to the Kansas Governor's Office by teachers or school districts regarding budget crises from inflation, underfunding, unfunded mandates, and other causes.

Such complaints about "budget crises" have no bearing on an alleged violation of the Kansas Consumer Protection Act.

Request No. 10: Documents related to state assessments in Kansas, including reports and analyses regarding the history of K-12 state assessment or standardized testing scores, performance by schools and/or districts, and any other measures of school performance.

Measures of school performance are not relevant to an alleged violation of the Kansas Consumer Protection Act.

Request No. 11: Legislation or policies proposed by, proposed on behalf of, or testified on by the Kansas Governor's Office, regardless of such legislation or policies were enacted, regarding Young User's use of Social Media Platforms.

App. 280

Proposed legislation or policies are not going to violate the Kansas Consumer Protection Act, which is itself a creature of statute. Legislation can override or supplement existing legislation. This request has no bearing on an alleged violation of the Kansas Consumer Protection Act.

Request No. 12: Mental, social, emotional, or behavioral health services provided by the Kansas Governor's Office to Young Users during the Relevant Period, including:

a. Counseling or therapy;
b. Psychiatric services;
c. Crisis intervention;
d. Inpatient short-term and long-term programs;
e. Resource centers; and
f. Services for Young Users dealing with substance abuse or addiction issues.

The provision of mental health services has no bearing on an alleged violation of the Kansas Consumer Protection Act.

The above are a few examples. And rather than relist the numerous requests in your subpoena, we will suffice with identifying which request we do think germane to an alleged violation of the Kansas Consumer Protection Act:  Request No. 8, seeking "complaints to the Kansas Governor's Office by teachers or school districts regarding social media or cell phone use by Young Users and/or the need for acceptable use or other policies to address Young Users' use of social media or cell phones."

Respectfully,

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly

App. 281



Capitol Building
Room 241 South
Topeka, KS 66612

# Kansas
### Office of the Governor

Phone: (785) 296-3232
governor.kansas.gov

Laura Kelly, Governor

December 6, 2024

Hon. Judge Yvonne Gonzalez Rogers
United States District Court, Northern District of California
Oakland Courthouse
1301 Clay Street
Oakland CA 94612

Hon. Magistrate Judge Peter H. Kang
United States District Court, Northern District of California
San Francisco Courthouse
450 Golden Gate Ave,
San Francisco, CA 94102

Dear Honorable Judge Rogers and Honorable Judge Kang:

The Office of Kansas Governor Laura Kelly respectfully asks for time to expeditiously
obtain local counsel to enter a limited appearance to file objections to any order of this
Court holding that either: 1) the Kansas Governor is represented by the Kansas Attorney
General in this matter; or 2) that the Kansas Attorney General has control over the Kansas
Governor's documents. This request is made respectfully and without waiving any right to
subsequently object to jurisdiction. Governor Kelly also respectfully requests that any
questions regarding interpretation of Kansas law as to document control and/or the
existence of an attorney-client relationship be submitted as certified questions from this
Court to the Kansas Supreme Court in accordance with the Uniform Certification of
Questions of Law Act, as adopted in Kansas Statutes Annotated K.S.A. 60-3201, et seq.

A holding that the Kansas Attorney General controls the documents of a separately elected
state-constitutional officer would be a seismic shift in the structure and function of Kansas
state government, which recognizes the Kansas Governor and the Kansas Attorney General
as legally distinct entities. *See, e.g.,* Kansas Constitution Article 1, Section 1 (providing in
part "[t]he constitutional officers of the executive department shall be the governor,
lieutenant governor, secretary of state, and attorney general, who shall have such
qualifications as are provided by law. Such officers shall be chosen by the electors of this
state …"); *see also First Baptist Church v. Kelly*, 455 F. Supp. 3d 1078, 1083 (D. Kan. 2020)
(illustrating legally distinct offices of the Governor and the Attorney General in case where
the Kansas Governor was sued in her official capacity; Kansas Attorney General was not
sued); *see also State ex rel. Schmidt v. Kelly*, 309 Kan. 887, 888, 441 P.3d 67, 70 (2019) (
illustrating in an action where Kansas Attorney General on relation of the state sued the
Kansas Governor, that the Kansas Attorney General, Kansas Governor, and the State are
not a single entity.)

1

## App. 282



EXHIBIT
C

Moreover, I am not aware of any state law vesting the Kansas Attorney General with custodianship of the Kansas Governor's records; in fact, there is authority suggesting the opposite. *See, e.g.,* Kan. Stat. Annot. 45-220 (providing in the context of production of records in response to open records request that the obligation runs to "each public agency," as opposed to a central repository like the Kansas Attorney General); *see also* Kan. Stat. Annot. 75-104 (providing for the retention and disposition of records of the Governor without any mention of the Kansas Attorney General and specifically noting in subsection (e) and (f) custodianship of certain records either by the former Governor or the Kansas Historical Society).

Further, at no point has an attorney-client relationship existed between the Kansas Governor and the Kansas Attorney General in this matter. Counsels for both entities have been clear with each other on that point. Kansas Statute Annotated 75-702 vests the attorney general with the power to control the state's prosecution in the federal courts. But that provision does not force-place an attorney-client relationship in a situation such as here where the prosecution is by the Kansas Attorney General under the specific Kansas Consumer Protection Act, which vests prosecution authority solely with the Attorney General, not the "state" to wit: the Governor's Office or other state agencies. *See, e.g.,* Kan. Stat. Annot. 50-628 (specifically identifying Kansas Attorney General as entity responsible for enforcement of the Kansas Consumer Protection Act; *see also* Kan. Stat. Annot. 50-632 (identifying Kansas Attorney General and county or district attorney as only entities empowered to bring action for certain forms of relief such as damages or injunction under the Kansas Consumer Protection Act). Simply put, the Governor has no role in the Attorney General's prosecution of the Kansas Consumer Protection Act; in the absence of any involvement, there is no need for an attorney-client relationship on the matter.

In this case, the Kansas Governor has not been represented nor had an opportunity to be heard on these issues of extreme impact to the autonomy and rights of the Kansas Governor. Such issues cannot be fairly decided without input from the Kansas Governor. Moreover, respect for the dual sovereign structure of our state and federal government favors that such questions be decided by the Kansas Supreme Court. Accordingly, we respectfully request an opportunity to retain local counsel and to be heard on these issues and that certified questions regarding document control and the existence of an attorney-client relationship as between the Kansas Governor and the Kansas Attorney General be submitted to the Kansas Supreme Court. We also respectfully ask that any order affecting the Kansas Governor's Office be stayed until after the Kansas Governor has had a chance to be heard on the matter.

Respectfully,

/s/ Justin Whitten

Justin Whitten
Chief Counsel for Kansas Governor Laura Kelly
300 SW 10th Avenue, Room 541-E | Topeka, KS 66612
Justin.h.whitten@ks.gov
Cell (785) 581-3419
Kansas Bar 28344, Missouri Bar 65275

2

SELENDY GAY PLLC
Faith E. Gay
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com

*Attorney for the Office of the Governor of the*
*State of New York*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION

*People of the State of California, et al.,*

     v.

*Meta Platforms, Inc., Instagram, LLC, Meta*
*Payments, Inc., Meta Platforms Technologies,*
*LLC*

MDL No. 3047

Case Nos.: 4:22-md-03047-YGR (PHK)
         4:23-cv-05448-YGR (PHK)

**NON-PARTY STATUS UPDATE AND**
**STATEMENT RE: STATE AGENCY**
**DISCOVERY**

Judge: Hon. Yvonne Gonzalez Rogers

Magistrate Judge: Hon. Peter H. Kang

Dear Judge Kang,

     We represent the Office of the Governor of the State of New York (the "Executive Chamber") in connection with discovery that defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC (together, "Meta") seek from the Executive Chamber and other executive agencies within the New York Governor's administration including New York Office of Children and Family Services ("OCFS"), New York Council on Children and Families ("CCF"), New York Department of Health ("DOH"), New York Office of Mental Health ("OMH"), New York State Division of the Budget ("DOB"), New York Department of State ("DOS"), and New York Higher Education Services Corporation ("HESC") (together, the "Executive Agencies").

     We write in reference to Docket Number 1434 in Case Number 4:22-md-03047-YGR-PHK and in response to the Court's statement during the November 21, 2024, discovery management conference that it would hear from non-party agency counsel regarding the status of discovery. We appreciate the opportunity, as a non-party outside the Court's jurisdiction, to be heard.

Consistent with the guidance provided by this Court, we respectfully request permission to file the attached discovery status report and position statement, to assist the Court without waiving our jurisdictional objections as non-parties. As detailed in the attached, the Executive Agencies have proactively and repeatedly contacted Meta in an attempt to reach a mutually beneficial resolution that would provide prompt, voluntary discovery from the Executive Agencies and would avoid Court intervention. Meta has refused to engage in good faith or to pursue discovery with appropriate diligence and reasonableness. The attached status report also sets out support for the well-settled position under New York law that the New York Attorney General has no control over the Executive Agencies.

As the Court noted in Docket Number 1434, our presence outside this jurisdiction constrains our ability to appear. As a final note of clarification, we do not seek to file the attached status report under seal or *ex parte*.

Dated: December 11, 2024

Respectfully submitted,

**SELENDY GAY PLLC**

/s/ *Faith E. Gay*

Faith E. Gay
1290 Avenue of the Americas
New York, NY 10104
Tel: 212-390-9000
fgay@selendygay.com

*Attorney for Non-Party Office of the Governor of New York*

---

Selendy Gay PLLC
1290 Avenue of the Americas
New York, NY 10104
212.390.9000

**Selendy|Gay**

Faith E. Gay
Partner
212.390.9001
fgay@selendygay.com

December 11, 2024

<u>Via ECF</u>

The Honorable Peter H. Kang
United States Magistrate Judge
United States District Court, Northern District
450 Golden Gate Avenue, 15th Floor, Courtroom F
San Francisco, CA 94102

Re:    ***People of the State of California, et al. v. Meta Platforms, Inc. et al.*, 4:23-cv-05448-TGR-PHK (N.D.Cal.); *In re Social Media Adolescent Addiction/Personal Inj. Products Liab. Litig.*, 4:22-md-03047-YGR-PHK**

Dear Judge Kang,

We represent the Office of the Governor of the State of New York (the "Executive Chamber") in connection with discovery that defendants Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., and Meta Platforms Technologies, LLC (together, "Meta") seek from the Executive Chamber and other executive agencies in the New York Governor's administration including Office of Children and Family Services ("OCFS"), Council on Children and Families ("CCF"), Department of Health ("DOH"), Office of Mental Health ("OMH"), Division of the Budget ("DOB"), Department of State ("DOS"), and Higher Education Services Corporation ("HESC") (together, the "Executive Agencies").

The New York State Attorney General ("NYAG") does not represent the Executive Agencies in connection with this matter. The NYAG has conveyed to the undersigned this Court's guidance at the November 21, 2024 discovery management conference that the Court would hear from non-party agency counsel regarding the status of discovery. We are grateful for this opportunity to be heard, and thus briefly summarize our client's position and the record below.

As this Court's Order issued on September 6, 2024 (the "September 6 Order") recognizes, the Executive Agencies are not parties to the above-captioned litigation, *see, e.g.*, Dkt. 1117 at 1, 20, and the NYAG "is a separate entity" and is prosecuting this lawsuit "in its own independent authority." *Id.* at 170. As separate, non-party entities located within New York State who were not involved with the filing or prosecution of this

lawsuit, the Executive Agencies are not subject to jurisdiction in, and thus are not bound by orders of, the Northern District of California. *See, e.g.*, *Stanford Health Care v. CareFirst of Maryland, Inc.*, 716 F. Supp. 3d 811, 816 (N.D. Cal. 2024) (finding that even a *party* to a litigation cannot be 'haled into a jurisdiction solely as a result of ... the unilateral activity of another party or a third person'" (alteration in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)); *see also Burger King Corp.*, 471 U.S. at 471-72 (recognizing that the Due Process Clause prohibits foreign sovereigns from binding even *parties* to a litigation without jurisdiction over them).

Separately, the September 6 Order's finding that the NYAG has control over the Executive Agencies' documents is inconsistent with the New York State Constitution and the New York Executive Law, which do not require the Executive Agencies to provide documents to Meta or the NYAG without issuance of a non-party subpoena. By design under New York law, the NYAG and the Governor are separately elected officials who operate independently of one another, with separate powers, duties, and obligations. *See, e.g.*, N.Y. Const. Art. IV § 1, Art. V § 1. The Governor is head of the Executive Department, N.Y. Exec. L. § 30, and the NYAG is head of the Department of Law, N.Y. Const. Art. V § 4; N.Y. Exec. L. § 60, which is not a division of the Executive Department overseen by the Governor, N.Y. Exec. L. § 31. Indeed, courts in New York have recognized that state agencies are separate and distinct entities that cannot be viewed collectively and thus do not control other state agency documents. *See New York ex rel. Boardman v. Nat'l R.R. Passenger Corp.*, 233 F.R.D. 259 (N.D.N.Y. 2006)[1]; *Wandering Dago Inc. v. New York State Off. of Gen. Servs.*, 2015 WL 3453321, at *8 (N.D.N.Y. May 29, 2015); *U.S. v. Novartis Pharmaceuticals Corp.*, 2014 WL 6655703, at *9 (S.D.N.Y. Nov. 24, 2014). This reasoning applies with even greater force when applied to the contention that the NYAG—a constitutionally separate entity—controls documents at the Executive Agencies.

More specifically, under New York law, in actions such as the above-captioned litigation that the NYAG brings pursuant to her authority under Executive Law § 63(12), *see* Compl. ¶¶ 21 & n.4; Prayer for Relief ¶ B(19), the NYAG must seek documents according to New York's Civil Practice Law and Rules, which, in turn, imposes specific notice and motion requirements for subpoenas served on departments or bureaus of the state or any officer thereof. *See* CPLR §§ 2307, 3120(4) ("Nothing contained in this section [permitting a party to serve discovery requests after an action is commenced] shall

_____

[1] The Court suggested that *Boardman* was premised on a failure by the party seeking discovery to meet its burden of proving control, *see* Dkt. 1117 at 173-74, but the *Boardman* court found that such a burden could never be met under New York law considering the separate nature of state agencies. *See* 233 F.R.D. at 268 ("Thus, [party] has not *and cannot* meet its burden of proving control.") (emphasis added)). Indeed, the *Boardman* court *expressly* stated that having previously served as General Counsel to a state agency, it had "personal knowledge to the fact" that the NYAG does not have access to agency documents without agency permission or a subpoena. *See id.* at 268 n.11.

App. 287

The Honorable Peter H. Kang
December 11, 2024

be construed to change the requirement of section 2307 that a subpoena duces tecum to be served upon a … department or bureau … of the state ….").

Nor is there a "requirement that the [NYAG] will act as [the Executive Agencies'] counsel" "in this matter for discovery." *Contra* Dkt. 1117 at 170. This is evidenced by the Executive Chamber's retention of private counsel in this matter. Executive Law § 63(1), cited by Meta and the Court, does not provide otherwise, as that provision contains no language permitting the NYAG to obtain documents or information and instead obligates the NYAG to provide legal representation where the NYAG must protect the interests of New York State. Document requests propounded on the Executive Agencies as non-parties to a litigation do not automatically qualify as such actions or proceedings.

In sum, the general premise of the September 6 Order purports to upend well-settled separation of powers under New York law as to the non-party Executive Agencies and thus has potential implications far beyond this matter.

Significantly, even though the September 6 Order misapprehends New York law as set forth above, and the Executive Agencies have had no opportunity to object given their non-party status, the Executive Agencies nevertheless voluntarily and proactively reached out to Meta beginning in September 2024 to offer reasonable, workable, and efficient resolutions that would avoid Court intervention. The Executive Agencies have no interest in slowing down or withholding discovery in this important matter.

First, the Executive Agencies proposed to Meta that the undersigned act as a single point of contact for the Executive Agencies for purposes of proceeding with discovery under Federal Rule of Civil Procedure 45 ("Rule 45"), if Meta would agree to withdraw its claim that it could obtain documents from the Executive Agencies through the NYAG. Meta took over a month to consider and then rejected that offer, while failing to pursue any discovery from the Executive Agencies.

Despite Meta's inaction and rejection of its good-faith resolution, the undersigned thereafter voluntarily provided reasonable search parameters for Rule 45 discovery for the four Executive Agencies Meta previously subpoenaed (OMH, DOH, OCFS, and CCF). Meta refused these search parameters and insisted that OMH, DOH, OCFS, and CCF run facially overbroad terms determined unilaterally by Meta that yielded thousands or millions of documents according to the hit counts produced by the agencies. These massive hit counts, which were immediately provided to Meta, are unsurprising given that many of the terms do not refer to Meta, or even social media in general; some search terms reference social media platforms other than Meta; and the terms are standalone and disjunctive. Inexplicably, Meta also continues to hold the Rule 45 subpoenas to OMH, DOH, OCFS, and CCF in abeyance, thereby impeding rolling production from the Executive Agencies.

The undersigned also promptly offered to meet-and-confer with Meta on behalf of the four remaining Executive Agencies Meta has never subpoenaed (Chamber, DOB, DOS, HESC) if Meta would serve Rule 45 subpoenas on them. Meta rejected this offer as well and has not otherwise pursued discovery from these Executive Agencies.

App. 288

The Honorable Peter H. Kang
December 11, 2024

It has always been our goal to find a workable solution for all involved. That is why we have been voluntarily and repeatedly reaching out to Meta since September to negotiate a path to production. It seems apparent, however, that Meta would rather pursue misplaced complaints about the NYAG, which does not control the Executive Agencies or their documents, than negotiate reasonable production parameters directly with these non-parties, who have repeatedly offered to make non-party productions.

For the reasons set forth above, the Executive Agencies respectfully request that the Court stay its September 6, 2024 discovery order with respect to the State of New York and allow third-party discovery to proceed pursuant to the Executive Agencies' ongoing meet and confer process with Meta.

Reserving all rights, including the Executive Agencies' non-party status and all jurisdictional objections, we remain available to promptly continue our meet-and-confer with Meta, to promptly produce documents under Rule 45 subpoenas, and to further assist the Court.

Respectfully submitted,

/s/ *Faith E. Gay*

Faith E. Gay
Partner

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos.:  4:22-md-03047-YGR (PHK)<br>4:23-cv-05448-YGR<br><br>**JOINT STATUS REPORT ON STATE AGENCIES' PRODUCTION OF DOCUMENTS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

Dear Judge Kang:

Pursuant to ECF No. 1495, Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively, "Meta") and the State Attorneys General ("State AGs") respectfully submit the attached joint one-page status reports regarding discovery of documents of certain state agencies in 25 States:  Arizona, California, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Dakota, Washington, and Wisconsin.[1]

---

[1] Meta reports that the Parties resolved their disputes regarding discovery of state agency documents in nine of these States in advance of the December 20, 2024 joint letter briefing: Connecticut, Kentucky, Louisiana, Maine, New Jersey, North Carolina, Oregon, Rhode Island, South Carolina, Virginia, Washington, and Wisconsin.  Subsequent to the December 20, 2024 joint letter briefing, the Parties fully resolved their disputes regarding discovery of state agency documents in three States: Indiana, Kansas, and South Dakota.  Two States are discussing dismissal of their cases:  Michigan and Missouri.  As set forth more fully herein, some disputes remain outstanding in eleven States: Arizona, California, Colorado, Delaware, Hawai'i, Illinois, Minnesota, Nebraska, New York, Ohio, and Pennsylvania.

Ten states were not ordered to submit scheduling proposals and therefore were not addressed in the Court's December 31 Order and are not included here.  Four States dismissed their cases: Florida, Georgia, Montana, and North Dakota.  Three States reached agreement with Meta on search parameters in advance of the December 11 Discovery Management Conference that precipitated the scheduling submissions: Oregon, South Carolina, and Virginia.  Three States are asserting only COPPA claims, and therefore are not subject to the discovery disputes at issue: Idaho, Maryland, and West Virginia.

Dated: January 6, 2025

Respectfully submitted,

**COVINGTON & BURLING LLP**

*/s/Ashley Simonsen*
Ashley Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones, *pro hac vice*
Michael X. Imbroscio, *pro hac vice*
Stephen Petkis, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com
Email: mimbroscio@cov.com
Email: spetkis@cov.com

Paul W. Schmidt, *pro hac vice*
Christopher Y.L. Yeung, *pro hac vice*
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
Telephone: + 1 (212) 841-1262
Facsimile: + 1 (202) 662-6291
Email: pschmidt@cov.com
Email: cyeung@cov.com

*Attorneys for Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC*

**KRIS MAYES**
Attorney General
State of Arizona

/s/ Laura Dilweg
Laura Dilweg (AZ No. 036066, CA No. 260663)
Chief Counsel - Consumer Protection and Advocacy
Section
Nathan Whelihan (AZ No. 037560, CA No.
293684), *pro hac vice*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:    (602) 542-4377
Laura.Dilweg@azag.gov
Nathan.Whelihan@azag.gov

*Attorneys for Plaintiff State of Arizona*


**PHILIP J. WEISER**
Attorney General
State of Colorado

/s/ Krista F. Batchelder
Krista Batchelder, CO Reg. No. 45066, *pro hac vice*
Deputy Solicitor General
Shannon Stevenson, CO Reg. No. 35542, *pro hac vice*
Solicitor General
Elizabeth Orem, CO Reg. No. 58309
Danny Rheiner, CO Reg. No. 48821
Assistant Attorney Generals
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6384
krista.batchelder@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.
Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

/s/ Anna Ferrari
R. Matthew Wise (CA SBN 238485)
Lara Haddad (CA SBN 319630)
Supervising Deputy Attorneys General
Anna Ferrari (CA SBN 261579)
Deputy Attorney General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Anna.Ferrari@doj.ca.gov

*Attorneys for the California Health and Human
Services Agency, the Department of Health Care
Services, and the Mental Health Services
Oversight and Accountability Commission*


**MARGARET R. PRINZING** (CA SBN
209482)
Olson Remcho, LLP
1901 Harrison Street, Suite 1550
Oakland, CA 94612
Phone: (510) 346-6200
Fax: (510) 574-7061
Email: mprinzing@olsonremcho.com

*Attorneys for Non-Parties
Office of the Governor
California Office of Data & Innovation
California Governor's Office of Business and
Economic Development
California Department of Finance
California Department of Public Health
California Department of Consumer Affairs
and
California Business, Consumer Services and
Housing Agency*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
 Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorney General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Marion Quirk*
Marion Quirk (DE Bar 4136), *pro hac vice*
Director of Consumer Protection
Ryan Costa (DE Bar 5325), pro hac vice
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8810
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**ANNE E. LOPEZ**
Attorney General
State of Hawaiʻi

*/s/ Christopher T. Han*
Bryan C. Yee (HI JD No. 4050),
*pro hac vice*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Mark Snodgrass*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*

4

Supervising Deputy Attorney General
Christopher T. Han (HI JD No. 11311),
*pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawai'i 96813
Phone: (808) 586-1180
Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

*Attorneys for Plaintiff State of Hawai'i*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Kevin Whelan*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud
Bureau (IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Adam Sokol, Consumer Counsel, Consumer Fraud
Bureau (IL Bar No. 6216883)
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro
hac vice*
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Kevin Whelan, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6321715), *pro
hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-2218
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Adam.Sokol@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Kevin.Whelan@ilag.gov

Asyl Nachabe (LA Bar No. 38846),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov
StyronC@ag.louisiana.gov

*Attorneys for State of Louisiana*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8829
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388)
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180
caitlin.micko@ag.state.mn.us

App. 294

*Attorneys for Plaintiff the People of the State of Illinois*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ Philip Heleringer*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*Pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
ZACH.RICHARDS@KY.GOV
DANIEL.KEISER@KY.GOV
MATTHEW.COCANOUGHER@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Colin P. Snider*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-3840
Email: michaela.hohwieler@nebraska.gov
Email: colin.snider@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State of New York*

*Attorney for Plaintiff State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General

New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs New Jersey Attorney General and the New Jersey Division of Consumer Affairs Matthew J. Platkin, Attorney General for the State of New Jersey, and Cari Fais, Director of the New Jersey Division of Consumer Affairs*

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns

**DAVE YOST**
Attorney General
State of Ohio

*/s/ Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney General Dave Yost*

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

*/s/ Charles G. White*
Charles G. White (N.C. State Bar No. 57735)
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
cwhite@ncdoj.gov

*Attorney for Plaintiff, State North Carolina*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

7

App. 296

Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Alexandra Kory*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Alexandra.Kory@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov
*Attorney for Plaintiff State of Rhode Island*

*/s/ Jessica M. LaMie*
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Colin R. Stroud*
Colin R. Stroud
Assistant Attorney General
WI State Bar #1119457, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 261-9224
stroudcr@doj.state.wi.us

*Attorney for Plaintiff State of Wisconsin*

8

**SECTION I: STATES WITH NO OUTSTANDING AGENCY DISCOVERY DISPUTES**

### Connecticut

Negotiations regarding search terms and custodians for the relevant Connecticut agencies were finalized on December 20, 2024. The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Connecticut.

## Indiana

Negotiations regarding search terms and custodians for the following Indiana agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Child Services
2. Department of Health
3. Department of Education
4. Indiana Family and Social Services Administration

App. 299

**Kansas**

Negotiations regarding search terms and custodians for the following Kansas agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Board of Regents
2. Department of Aging and Disability Services
3. Department of Children and Family Services
4. Department of Education
5. Department of Health & Environment
6. Governor's Office

## Kentucky

Negotiations regarding search terms and custodians for the relevant Kentucky agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Kentucky.

App. 301

**Louisiana**

Negotiations regarding search terms and custodians for the relevant Louisiana agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Louisiana.

## Maine

Negotiations regarding search terms and custodians for the relevant Maine agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Maine.

**New Jersey**

      Negotiations regarding search terms and custodians for the relevant New Jersey agencies were finalized on December 19, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving New Jersey.

App. 304

**North Carolina**

Negotiations regarding search terms and custodians for the relevant North Carolina agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving North Carolina.

App. 305

**Rhode Island**

Negotiations regarding search terms and custodians for the relevant Rhode Island agencies were finalized on December 20, 2024. The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Rhode Island.

App. 306

**South Dakota**

Negotiations regarding search terms and custodians for the following South Dakota agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Education
2. Department of Health
3. Department of Social Services
4. Board of Regents
5. Office of the Governor
6. Bureau of Finance and Management

App. 307

**Washington**

Negotiations regarding search terms and custodians for the relevant Washington agencies were finalized on December 20, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Washington.

**Wisconsin**

Negotiations regarding search terms and custodians for the relevant Wisconsin agencies were finalized on December 19, 2024.  The joint discovery letter brief filed on December 20, 2024 did not include any disputes involving Wisconsin.

App. 309

## SECTION II: STATES THAT INTEND TO DISMISS THEIR CASES

### Michigan

Michigan has agreed in principle to dismiss its case, subject to the parties memorializing their agreement in writing. The parties are discussing the terms of such dismissal.

13

App. 310

## Missouri

Missouri has agreed in principle to dismiss its case, subject to the parties memorializing their agreement in writing. The parties are discussing the terms of such dismissal.

App. 311

## SECTION III: STATES WITH OUTSTANDING AGENCY DISCOVERY DISPUTES

### Arizona

Negotiations regarding search terms and custodians for the following Arizona agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Arizona Department of Education

Disputes involving the following Arizona agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Arizona Board of Education: Disputes remain regarding search terms and reasonable number of documents for review.
2. Arizona Department of Child Safety: Disputes remain regarding search terms and reasonable number of documents for review.
3. Arizona Department of Health Services: Disputes remain regarding search terms and reasonable number of documents for review.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

<u>Date</u>:  January 13, 2025

<u>Time</u>:  11:00 AM MT

<u>Location</u>:  2005 N. Central Avenue Phoenix, AZ 85004

<u>Attendees</u>:  For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Arizona – Nathan Whelihan, Assistant Attorney General, Consumer Protection and Advocacy Section

Laura Dilweg, Section Chief Counsel, Consumer Protection and Advocacy Section

Kirsten Wright, CFP Division Chief, Department of Child Safety

Heather Pellegrino, Section Chief Counsel, Civil & Criminal Litigation & Advice Section, Department of Child Safety

Anna Dahlquist, Unit Chief Counsel, CFP/CLA, Department of Child Safety

Patricia LaMagna, Health Unit Chief Counsel, Department of Health Services

Victoria Bergin, Assistant Attorney General, SGD/EHS, Board of Education

## California

Negotiations regarding search terms and custodians for the following California agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Office of Data and Innovation
2. Business, Consumer Services, and Housing Agency

California agencies have begun to produce documents.  Nevertheless, disputes involving the following California agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. California Department of Health Care Services: Disputes remain about custodians and search terms.
2. Mental Health Services Oversight and Accountability Commission: Disputes remain about custodians and search terms.
3. Health and Human Services Agency: Disputes remain about custodians and search terms.
4. Department of Consumer Affairs:  Disputes remain about custodians and search terms.
5. Department of Finance:  Disputes remain about custodians and search terms.
6. Department of Public Health:  Disputes remain about custodians and search terms.
7. Office of the Governor:  Disputes remain about custodians and search terms.
8. Governor's Office of Business and Economic Development: Disputes remain about custodians and search terms, or in the alternative, targeted searches.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 14, 2025

Time:  10:00 AM PT

Location:  Covington & Burling LLP, Salesforce Tower, 415 Mission St Suite 5400, San Francisco, CA 94105

Attendees:  For Meta – Christopher Yeung, Partner, Covington & Burling LLP

For California – For California's Executive Agencies – Margaret R. Prinzing, Partner

For other California agencies – Anna Ferrari, Deputy Attorney General

For the California Attorney General's office – David Beglin, Deputy Attorney General

App. 313

## Colorado

Disputes involving the following Colorado agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Behavioral Health Administration: Disputes remain about custodians, search terms, and the applicable time period.
2. Department of Education: Disputes remain about custodians, search terms, and the applicable time period.
3. Department of Higher Education: Disputes remain about custodians, search terms, and the applicable time period.
4. Department of Human Services: Disputes remain about custodians, search terms, and the applicable time period.
5. Governor's Office: Disputes remain about custodians, search terms, and the applicable time period.
6. State Planning and Budgeting: Disputes remain about custodians, search terms, and the applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

<u>Date</u>:  January 13, 2025

<u>Time</u>:  1:00 PM

<u>Location</u>:  Denver, Colorado

<u>Attendees</u>:  For Meta – Christopher Y. L. Yeung, Partner, Covington & Burling LLP

      For Colorado – Jen Sullivan, Deputy Attorney General

      Krista Batchelder, Deputy Solicitor General – Appearing on behalf of the

      Consumer Protection Section of the Colorado AG office

      Counsel for BHA: Aaron Pratt, Second Assistant Attorney General*

      Counsel for CDE: Joe Peters, Senior Assistant Attorney General*

      Counsel for CDHE: Lauren Peach, First Assistant Attorney General*

      Counsel for CDHS: Ann Pogue, First Assistant Attorney General*

      Counsel for the Colorado Governor's Office and OSPB: LeeAnn Morrill, First Assistant Attorney General*

      *Or counsel appearing with knowledge and necessary delegated authority

### Delaware

Disputes involving the following Delaware agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1.  Delaware Department of Education: Disputes remain regarding search terms and hit report timeliness.

2.  Delaware Department of Services for Children, Youth & Their Families: Disputes remain regarding search terms and hit report timeliness.

3.  Delaware Office of the Governor: Disputes remain regarding custodians, search terms, and applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date: Friday, January 10, 2025

Time: 12:00 PM ET

Location: Covington & Burling, New York Times Building, 620 Eighth Avenue, New York, NY

Attendees: For Meta – José E. Arvelo, Of Counsel, Covington & Burling LLP

For Delaware – Marion Quirk (Director of Consumer Protection, DE DOJ); Shaun Kelly (Counsel to OGOV); Ryan Costa (Deputy Director of Consumer Protection, DE DOJ) (attending virtually); Ralph Durstein III (Counsel to DE DOE & DE DSCYF) (attending virtually).

## Hawaii

Negotiations regarding search terms and custodians for the following Hawai'i agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Department of Education

Disputes involving the following Hawai'i agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1.  Department of Human Services: Disputes remain regarding search terms, reasonable number of documents for review, and time period.

2.  Department of Health: Disputes remain regarding search terms, reasonable number of documents for review, and time period.

3.  State Council on Mental Health: Disputes remain regarding applicable time period.

4.  Department of Budget and Finance: Disputes remain regarding applicable time period

5.  Office of the Governor: Disputes remain regarding applicable time period.

6. Department of Commerce and Consumer Affairs: Disputes remain regarding applicable time period.

7. Department of Business, Economic Development, and Tourism: Disputes remain regarding applicable time period.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 14, 2025

Time:  11:00 AM PT

Location:  San Francisco, California

Attendees:  For Meta – Christopher Y.L. Yeung, Partner, Covington & Burling LLP

For Hawai'i – Christopher Han, Deputy Attorney General

## Illinois

Negotiations regarding search terms and custodians for the following Illinois agencies have been finalized, and any disputes involving those agencies contained in the joint discovery letter brief filed on December 20, 2024 have been resolved:

1. Department of Human Services
2. Department of Public Health
3. Office of the Governor
4. State Board of Education

Disputes involving the following Illinois agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Department of Children and Family Services: Search terms, custodians, applicable time period, hit report completeness, hit report timeliness.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 10, 2025

Time:  2:00 PM CST

Location:  Office of the Illinois Attorney General, 115 S. LaSalle St., 26th Floor, Chicago, IL 60603.

Attendees:  For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Illinois – Matthew C. Davies, Assistant Attorney General, Consumer Fraud Bureau, Office of the Illinois Attorney General; Michelle Camp, Special Assistant to the General Counsel, Illinois Department of Children and Family Services

App. 317

## Minnesota

Negotiations regarding search terms and custodians for the following Minnesota agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1.  Minnesota Department of Education

Disputes involving the following Minnesota agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1.  Minnesota Department of Human Services: Search terms and custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

<u>Date</u>:  January 13, 2025

<u>Time</u>:  1:00 PM CT

<u>Location</u>:  Chicago, Illinois

<u>Attendees</u>:  For Meta – Stephen Petkis, Partner, Covington & Burling LLP

For Minnesota AGO – Caitlin Micko, Assistant Attorney General, Office of the Minnesota Attorney General

For DHS – Aaron Winter, Assistant Attorney General, Office of the Minnesota Attorney General

## Nebraska

Negotiations regarding search terms and custodians for the following Nebraska agencies have been finalized, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Nebraska Children's Commission
2. Nebraska Department of Education

Disputes involving the following Nebraska agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Nebraska Governor's Office: Search terms and applicable time period.
2. Nebraska Department of Health and Human Services: Search terms and custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  January 13, 2025

Time:  2:00 PM CST

Location:  Chicago, Illinois

Attendees:  For Meta – Stephen Petkis, Partner, Covington & Burling LLP

For Nebraska – Anna Anderson, Assistant Attorney General, Office of Attorney General

For Nebraska Governor's Office – Maureen Larsen, Legal Counsel

For Nebraska Department of Health and Human Services – Ryan Patrick, Counsel

App. 319

**New York**

Disputes involving the following New York agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Council on Children and Families: Search terms, custodians, applicable time period, reasonable number of documents for review.
2. Department of Education: Search terms, custodians, applicable time period, reasonable number of documents for review.
3. Department of Health: Search terms, custodians, applicable time period, reasonable number of documents for review.
4. Office of Children and Family Services: Search terms, custodians, applicable time period, reasonable number of documents for review.
5. Office of Mental Health: Search terms, custodians, applicable time period, reasonable number of documents for review.
6. Office of the Governor: Search terms, custodians, applicable time period, reasonable number of documents for review.
7. State Division of Budget: Search terms, custodians, applicable time period, reasonable number of documents for review, or in the alternative, targeted searches.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

<u>Date</u>:  January 10, 2025

<u>Time</u>:  10:00 AM ET

<u>Location</u>:  Covington and Burling LLP, 620 Eighth Avenue, New York, NY 10018

<u>Attendees</u>:  For Meta – Christopher Y. L. Yeung, Partner, Covington & Burling LLP

For New York – Kevin Wallace, Senior Enforcement Counsel, Economic Justice Division, New York Office of the Attorney General.

For the Office of the Governor, Council on Children and Families, Department of Health, Office of Children and Family Services, Office of Mental Health, and State Division of Budget – Faith Gay, Partner, Selendy Gay; Claire O'Brien, Associate, Selendy Gay

**Ohio**

Negotiations regarding search terms and custodians for the following Ohio agencies have been finalized as of January 6, 2025, and any disputes involving those agencies contained in the joint letter brief filed on December 20, 2024 have been resolved:

1. Department of Children and Youth
2. Department of Education and Workforce
3. Department of Higher Education
4. Department of Job and Family Services
5. Department of Mental Health & Addiction Services
6. Department of Youth Services

Disputes involving the following Ohio agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Department of Health: Search terms and custodians.
2. Office of the Governor: Custodians.

In an attempt to resolve these outstanding disputes, Meta and the Department of Health will conduct an in-person meet and confer as set forth below:

Date: January 14, 2025

Time: 10:00 AM ET

Location: Covington and Burling, One City Center, 850 Tenth Street, NW, Washington, DC, 20014.

Attendees: For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Ohio Department of Health – Kevin R. Walsh, Senior Assistant Attorney General; Tyler J. Herrmann, General Counsel, Ohio Department of Health

In an attempt to resolve these outstanding disputes, Meta has proposed that it and the Office of the Governor will conduct an in-person meet and confer as set forth below:

Date: January 10, 2025

Time: 12:00 PM CST

Location: Chicago O'Hare International Airport, exact location TBD.

Attendees: For Meta – Michael N. Kennedy, Partner, Covington & Burling LLP

For Office of the Governor – Shawn J. Organ, Organ Law LLP

## Pennsylvania

Disputes involving the following Pennsylvania agencies from the joint discovery letter brief filed on December 20, 2024 remain unresolved:

1. Pennsylvania Department of Communities and Economic Development: Disputes remain regarding custodians.
2. Pennsylvania Department of Education: Disputes remain regarding custodians.
3. Pennsylvania Department of Health: Disputes remain regarding custodians.
4. Pennsylvania Department of Human Services: Disputes remain regarding custodians.
5. Pennsylvania Governor's Office: Disputes remain regarding custodians.
6. Pennsylvania Office of the Budget: Disputes remain regarding custodians.

In an attempt to resolve these outstanding disputes, the Parties will conduct an in-person meet and confer as set forth below:

Date:  Tuesday, January 14, 2025

Time:  2:00-3:00 PM ET

Location:  1650 Arch Street, 25th Floor, Philadelphia, PA 19103

Attendees:  For Meta – José E. Arvelo (Of Counsel).

> For Pennsylvania's Office of General Counsel – Jonathan D. Koltash (Deputy General Counsel)
>
> For Pennsylvania's Office of Attorney General – Jonathan R. Burns (Deputy Attorney General)

## **ATTESTATION**

I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: January 6, 2025

By: */s/ Ashley M. Simonsen*
Ashley M. Simonsen

App. 323

Pages 1 - 148

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE SOCIAL MEDIA ADOLESCENT    )
ADDICTION/PERSONAL INJURY        )
PRODUCTS LIABILITY LITIGATION.   )
                                 )    **NO. 4:22-md-03047-YGR (PHK)**
                                 )
_____   )

San Francisco, California
Thursday, November 21, 2024

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

          WAGSTAFF & CARTMELL LLP
          4740 Grand Avenue, Suite 300
          Kansas City, Missouri  64112
   BY:  **THOMAS P. CARTMELL**
       **ATTORNEY AT LAW**

          LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
          275 Battery Street - 29th Floor
          San Francisco, California  94111
   BY:  **LEXI J. HAZAM**
       **MICHAEL LEVIN-GESUNDHEIT**
       **ATTORNEYS AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

STENOGRAPHICALLY REPORTED BY:
Kelly L. Shainline
CSR No. 13476, RPR, CRR
Official Reporter

```
 1   APPEARANCES:  (CONTINUED)

 2   For Plaintiffs:
                         LIEFF, CABRASER, HEIMANN & BERNSTEIN LLP
 3                       250 Hudson Street - 8th Floor
                         New York, New York 10013
 4               BY:  PATRICK ANDREWS
                     ATTORNEY AT LAW
 5
                         MOTLEY RICE LLC
 6                       One Corporate Center
                         20 Church Street - 17th Floor
 7                       Hartford, Connecticut  06103
                 BY:  JESSICA C. COLOMBO
 8                   ATTORNEY AT LAW

 9                       MOTLEY RICE LLC
                         401 9th Street N.W., Suite 630
10                       Washington, DC  20004
                 BY:  PREVIN WARREN
11                   ATTORNEY AT LAW

12                       SEEGER WEISS LLP
                         55 Challenger Road, 6th Floor
13                       Ridgefield Park, New Jersey  07660
                 BY:  JENNIFER R. SCULLION
14                   AUDREY C. SIEGEL
                     ATTORNEYS AT LAW
15

16   For Plaintiff Commonwealth of Kentucky:

17                       OFFICE OF THE KENTUCKY ATTORNEY GENERAL
                         Office of Consumer Protection
18                       1024 Capital Drive, Suite 200
                         Frankfort, Kentucky  40601
19               BY:  MATTHEW C. COCANOUGHER
                     ATTORNEY AT LAW
20
21           (APPEARANCES CONTINUED ON FOLLOWING PAGE)
22
23
24
25
```

App. 325

```
 1   APPEARANCES:   (CONTINUED)

 2
     For Plaintiff People of the State of California:
 3

 4                        CALIFORNIA DEPARTMENT OF JUSTICE
                          Attorney General's Office
 5                        455 Golden Gate Avenue, 11th Floor
                          San Francisco, California  94102
 6             BY:  MEGAN O'NEILL
                    DEPUTY ATTORNEY GENERAL
 7
                          QUINN, EMANUEL, URQUHART & SULLIVAN LLP
 8                        50 California Street - 22nd Floor
                          San Francisco, California  94111
 9             BY:  EMILY C. KALANITHI
                    ATTORNEY AT LAW
10

11   For Plaintiff State of Arizona:

12                        ARIZONA ATTORNEY GENERAL'S OFFICE
                          Consumer Protection and Advocacy
13                        2005 N. Central Avenue
                          Phoenix, Arizona  85004
14             BY:  NATHAN E. WHELIHAN
                    ATTORNEY AT LAW
15
     For Plaintiff State of New Jersey:
16

17                        NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
                          Division of Law
18                        124 Halsey Street
                          P.O. Box 45029
19                        Newark, New Jersey  07102
               BY:  THOMAS HUYNH
20                  ATTORNEY AT LAW

21        (APPEARANCES CONTINUED ON FOLLOWING PAGE)

22

23

24

25
```

```
 1   APPEARANCES:   (CONTINUED)

 2   For Plaintiff State of Minnesota:

 3                       MINNESOTA ATTORNEY GENERAL'S OFFICE
                         445 Minnesota Street, Suite 1200
 4                       St. Paul, Minnesota  55101
                BY:  CAITLIN MICKO
 5                    ATTORNEY AT LAW

 6   For Meta Defendants:
                         COVINGTON & BURLING LLP
 7                       1999 Avenue of the Stars - Suite 3500
                         Los Angeles, California  90067
 8              BY:  ASHLEY SIMONSEN
                     ATTORNEY AT LAW
 9
                         COVINGTON & BURLING LLP
10                       One City Center
                         850 Tenth Street, NW
11                       Washington, D.C.  20001
                BY:  PAUL SCHMIDT
12                   MICHAEL IMBROSCIO
                     ATTORNEYS AT LAW
13
                         COVINGTON & BURLING LLP
14                       The New York Times Building
                         620 Eighth Avenue
15                       New York, New York  10018
                BY:  CHRISTOPHER YEUNG
16                   ATTORNEY AT LAW

17                       COVINGTON & BURLING LLP
                         Salesforce Tower
18                       415 Mission Street - Suite 5400
                         San Francisco, California  94105
19              BY:  SERENA R. SAFFARINI
                     ATTORNEY AT LAW
20
21              (APPEARANCES CONTINUED ON FOLLOWING PAGE)

22

23

24

25
```

App. 327

 1   **APPEARANCES**:   (CONTINUED)

 2

     For Defendant Snap, Inc.:
 3
                         MUNGER, TOLLES & OLSON LLP
 4                       560 Mission Street - 27th Floor
                         San Francisco, California  94105
 5              BY:  **JONATHAN H. BLAVIN**
                     **ATTORNEY AT LAW**
 6
                         MUNGER, TOLLES & OLSON LLP
 7                       350 South Grand Avenue - 50th Floor
                         Los Angeles, California  90071
 8              BY:  **FAYE PAUL TELLER**
                     **ATTORNEY AT LAW**
 9

10
     For Defendant TikTok, Inc., and ByteDance, Inc.:
11
                         KING & SPALDING LLP
12                       1180 Peachtree Street
                         Atlanta, Georgia  30309
13              BY:  **GEOFFREY DRAKE**
                     **ATTORNEY AT LAW**
14
                         KING & SPALDING LLP
15                       50 California Street - Suite 3300
                         San Francisco, California  94111
16              BY:  **BAILEY J. LANGNER**
                     **ATTORNEY AT LAW**
17
     For Defendant YouTube, LLC:
18
                         WILSON, SONSINI, GOODRICH & ROSATI, P.C.
19                       953 East Third Street, Suite 100
                         Los Angeles, California  90013
20              BY:  **MATTHEW K. DONOHUE**
                     **ATTORNEY AT LAW**
21

22

23

24

25

```
 1    Thursday - November 21, 2024                        1:02 p.m.

 2                        P R O C E E D I N G S

 3                            ---oOo---

 4        THE CLERK:  Now calling 22-md-3047, In Re Social Media

 5   Adolescent Addiction and Personal Injury Products Liability

 6   Litigation.

 7        Counsel, when speaking, please approach and state your

 8   appearance for the court reporter very clearly before you start

 9   your argument.  Thank you.

10        THE COURT:  Okay.  Good afternoon, all.

11        ALL:  Good afternoon.

12        THE COURT:  So let's do this first:  Let's go through

13   the -- do the parties have a difference of opinion on what the

14   interim deadlines should be for completing the State agency

15   discovery?

16        Let me take down these dates, and then -- well, why don't

17   you take them down first, and then we'll go from there.

18        So completion of conferrals regarding Rule 34 State agency

19   discovery, November 22, 2024.  Start date, start date for

20   rolling productions of State agency documents requested

21   pursuant to subpoenas -- okay, this is not in your chart --

22   start date November 22.

23        Last day to file discovery letter briefs regarding

24   disputes over State agency documents, whether sought by request

25   for production or subpoenas, December 2nd.
```

1    Start date for rolling productions of State agency

2  documents sought by Rule 34 document requests, December 6th.

3  I'm really fixing that because the DMO had it on a Saturday,

4  which I didn't intend as a deadline.

5    Deadline for 30(b)(6) -- yeah -- 30(b)(6) depo notices to

6  State AGs or State agencies, December 13th, 2024.  I'm not sure

7  why Meta proposed a Sunday deadline for that.  So Friday,

8  December 13th.

9    Substantial completion of State AG and State agency

10  documents sought pursuant to subpoenas, December 23rd, 2024.

11    Last day for the parties to meet and confer regarding

12  scheduling, hopefully finalizing the schedule for 30(b)(6)

13  depos of State AGs and State agencies and last day to meet and

14  confer about any disputes regarding scheduling or taking any of

15  those depositions, January 6, 2025.

16    Raise your hand if I'm going too fast.

17    Okay.  Substantial completion of State AG and State agency

18  documents produced pursuant to Rule 34 discovery, January 10th.

19  I modified the DMO on that because I wanted to accommodate the

20  holidays, basically.

21    Last day to file discovery letter briefs regarding any

22  unresolved disputes on scheduling or taking of any 30(b)(6)

23  depositions, January 13th, 2025.

24    Deadline for the parties to meet and confer -- deadline,

25  so not the first day, hopefully, but the last day to meet and

```
 1   confer to identify and start scheduling State AG and State
 2   agency fact individual witness depositions and meet and confer
 3   regarding any disputes regarding the same, February 14th, 2025.
 4       Deadline for Meta to serve depo notices for State AG and
 5   state agency fact witness depositions and last day to file
 6   discovery letter briefs regarding any unresolved disputes
 7   regarding the scheduling or taking of any such depositions,
 8   February 21st, 2025.
 9       30(b)(6) depositions of State agencies and AGs to be taken
10   between February 3rd and March 7th, 2025.  The parties may
11   agree otherwise, but not past the fact discovery deadline.  So,
12   in other words, if you want to, you can try to take them
13   earlier.
14       Deadline for Meta to complete fact depositions of the
15   State AG and State agency fact witnesses, April 4th, 2025.
16       So in the interest of time, I'll give the parties brief
17   opportunity to tell me why some of those dates or any of those
18   dates don't work.
19       MR. COCANOUGHER:  Good afternoon, Your Honor.  Matt
20   Cocanougher from the State --
21       THE COURT:  Good afternoon.
22       MR. COCANOUGHER:  Good afternoon, Your Honor.  Matt
23   Cocanougher from the Kentucky Attorney General's Office.
24       THE COURT:  Good afternoon.
25       MR. COCANOUGHER:  I just want to make some brief
```

```
 1    points.

 2         So we have spoken with the other State Attorney Generals'

 3    Offices who have spoken with their agency counsel, and they are

 4    working as hard as they can, but they have indicated this first

 5    deadline, the completion of conferrals by November 22nd, is

 6    going to be very difficult to meet because we are still -- many

 7    of them are still in the process of conferring with Meta.

 8    Either the State agencies have provided search terms, Meta has

 9    countered, states are preparing to counter.

10         And just so Your Honor knows, they have let us know -- a

11    majority of states have let us know that that's going to be a

12    very difficult deadline for them to meet.

13         THE COURT:  Okay.  So that doesn't help me in terms of

14    a request to -- you're asking till Monday?  What are you asking

15    for?

16         MR. COCANOUGHER:  Any additional time would be

17    appreciated, Your Honor.

18         THE COURT:  Any objection from Meta to extend that a

19    little bit?

20         MR. YEUNG:  No objection to a brief extension to the

21    following Monday.

22         I'll note that I'm similarly concerned about the states'

23    ability to meet the Friday deadline.  I think a lot of that is

24    on what's going on.  I mean, we spent -- last time we were here

25    in the DMO -- DMC, I mean, you ordered 14 states to give us
```

```
 1    search terms and custodians by November 1.
 2            THE COURT:  That's a different topic.
 3            MR. YEUNG:  Okay.
 4            THE COURT:  We'll get to whether people are complying
 5    with that order or not secondly, but I just -- so I want to set
 6    the dates first.
 7            MR. YEUNG:  Sure.
 8            THE COURT:  Well, given Thanksgiving, can you-all get
 9    it done by Monday, December 2nd?  It gives you another week
10    minus a holiday.
11            MR. COCANOUGHER:  I think that would be --
12            MR. YEUNG:  I mean, I have my concerns if that's even
13    going to work, but we -- I mean, I wouldn't give them more
14    time.  This is sort of an issue that, in our view, is the
15    states' own doing.
16            THE COURT:  I mean, I'm going to preview a little bit.
17    To the extent there are states or agencies that are simply
18    refusing to negotiate with you, that's a different topic.
19    Okay?
20            MR. YEUNG:  Yeah.
21            THE COURT:  For those who are negotiating and who need
22    the time and are trying to get this done, is December 2nd
23    adequate?
24            MR. YEUNG:  It would be.  I think what we will need in
25    the interim is a deadline for states to actually give us hit
```

1    reports on the terms that we provided.  We have --

2            THE COURT:  I've said this at multiple DMCs.  When

3    you're doing negotiations over search terms, you should be

4    voluntarily providing hit reports to each other.  All right?

5    And so I'm going to repeat that admonition.

6        I think I've -- I don't want to keep repeating myself, but

7    part of the whole negotiation over search terms is what I call,

8    you know, a transparent collaborative discussion.  And so I was

9    disappointed that there was at least some indication that hit

10   reports haven't provided and that you haven't -- you know, it

11   appears that you haven't narrowed the disputes over search

12   terms or the numbers of search terms.  Right?

13       So you've got to work harder on this.  Once we set these

14   dates, I'm not going to be in the mood to move them because the

15   very clear indication from Judge Gonzalez Rogers is to get this

16   discovery done.  Okay?

17           MR. COCANOUGHER:  Understood, Your Honor.

18           THE COURT:  Okay.

19           MR. COCANOUGHER:  May I make one more brief point?

20           THE COURT:  Okay.

21           MR. COCANOUGHER:  So it's a two-way street.  So we

22   just ask that Meta -- when we provide search terms, we have

23   been -- we've gotten back from Meta -- basically most states

24   have gotten back one large set of search terms, which many

25   believe are overly broad.

1        And we just want to make sure it's a two-way street.  So

2    we're -- these are tight deadlines, and so we want to make sure

3    Meta is also coming to the table to limit the discovery to what

4    is appropriate.

5        **THE COURT:**  For the record, I was actually looking

6    straight at Meta's counsel when I said, "I expect you to be

7    narrowing the number of search terms and the number of disputes

8    here and working hard to finish it."  So I actually wasn't even

9    speaking to the State Attorney Generals' counsel when I said

10   that comment.

11       So I will reiterate.  As the party who is proposing and

12   counterproposing search terms, Meta should be working -- I

13   mean, discovery is not -- it's never perfect.  We know that.

14   Okay?  So you're not going to get every search term you want.

15       Part of the back and forth in the negotiation is to narrow

16   things down to a point where both sides are either equally

17   happy or equally unhappy.  I don't really care either way as

18   long as you reach agreement.  Do you understand?

19       **MR. YEUNG:**  Completely understand.  We've -- in our

20   discussions with the states, we have been very clear if there

21   are terms that are problematic, let us know what they are and

22   then we will -- we will take that into consideration and

23   potentially drop them.  We have dropped certain terms with

24   certain states.

25       The other -- but we don't have hit reports.  They claim

 1  burden with respect to our terms.  We don't have them.  I can't

 2  have that discussion without the hit reports.

 3      **THE COURT:**  You heard me say -- right? -- the hit

 4  reports are needed as a rational part of this discussion.

 5  Okay?

 6      **MR. COCANOUGHER:**  Yes, Your Honor.  You were clear.

 7      **THE COURT:**  Okay.  So completion of referrals

 8  regarding Rule 34 State agency discovery, December 2nd, 2024.

 9      Any other problems with any of the other interim deadlines

10  that are set?

11      **MR. YEUNG:**  There's another deadline on the 2nd.

12  That's the last day to discuss Rule 34.

13      **THE COURT:**  All right.  Let's push that to

14  December 9th.  Last day to file discovery letter briefs on

15  unresolved disputes regarding State agency documents sought

16  either by subpoena or RFPs, December 9th.

17      **MR. YEUNG:**  Okay.

18      **THE COURT:**  Any other problems with the deadlines?

19      **MR. COCANOUGHER:**  I don't have any additional ones,

20  Your Honor.

21      **THE COURT:**  Okay.  So no objections further from the

22  State AGs.

23      Any objections from Meta?

24      **MR. YEUNG:**  No objections.

25      **THE COURT:**  Okay.  So those will be set in the DMO

```
 1   that will issue after this DMC.

 2        Okay.  So let's turn to the issue --

 3             MR. WHELIHAN:  Your Honor, if I may, for the State of

 4   Arizona.

 5             THE COURT:  Sure.

 6             MR. WHELIHAN:  Just for the record, these negotiations

 7   have been going on.  Arizona is absolutely going to have issues

 8   with a lot of these deadlines.

 9        Counsel for Meta insists that there be hit reports

10   provided.  I think we need to understand what these -- at least

11   the agencies in Arizona, how they're situated, I've had

12   multiple agencies that I've been working with who have been

13   running the terms that Meta's got, but it's not -- they don't

14   have, like, a relativity platform that they can put millions of

15   documents into and then run search terms and hit reports.  So

16   they're running the terms and they're getting results against,

17   like, their Outlook 360 environment and they're getting

18   millions of documents.

19        And then I don't -- you know, I want to -- I want to sort

20   of get on the record that, like, if we tell Meta that your

21   search materials produced 138 million documents from this

22   agency over the last 12 years, are they going to accept that as

23   a hit report?

24        You know, I think there's -- a lot of this the agencies

25   are situated they're underfunded, they're understaffed.
```

```
 1  They're doing the best they can to try to comply with these

 2  deadlines to try to run Meta search terms, to try to come up

 3  with search terms of their own that make sense.

 4       But we're very nervous that, you know, even if it's

 5  November 22nd or December 2nd, for example, if we come back and

 6  tell Meta, "These produced millions of documents.  Here's what

 7  we think is reasonable," and Meta says, "No," I don't -- you

 8  know, I don't know where we're going to be able to meet in the

 9  middle on that unless Meta significantly narrows its --

10       THE COURT:  Putting aside search terms, part of my

11  previous order was also to try to identify custodians.  So you

12  shouldn't be needing to run searches against the entirety of

13  the entire Outlook e-mail database for an agency.

14       MR. WHELIHAN:  That's correct, Your Honor.  But

15  there's other problems with that because these agencies, they

16  change parties, they change people every four years out of

17  elections.  They're trying to figure out who worked there

18  8 years ago, 12 years ago.  They don't know who those people

19  are, so it's difficult for them to propose custodians that make

20  sense.

21       When they do propose custodians, you know, Meta -- we've

22  had the meet and confer, Meta says, "Well, you know, when does

23  that cover?"  Well, it only covers the last two years because

24  that's when we were elected.  That's when the people who we

25  know who worked here started working here.
```

App. 338

```
 1        So I just want to get on the record that, you know, we're
 2   doing everything we can to try to negotiate, to try to be
 3   reasonable; but, you know, the idea that we can just -- that
 4   these agencies are something akin to a company like Meta or,
 5   you know, a well-funded organization that, you know, they have,
 6   like, an IT person and, you know, of counsel that represents
 7   them, and they're not familiar with how to do this.
 8        I'm trying to explain things to them.  I'm trying to get
 9   them to do things.  And, you know, it's happening.  We're
10   giving Meta productions.  We're trying to propose things as the
11   agencies can propose them.
12        And I'm happy to try to organize more meet and confers
13   before the 2nd to complete conferrals; but if completing
14   conferrals means coming to an agreement on search terms and
15   custodians, it may take that long for, you know, the Department
16   of -- the Arizona Department of Education to figure out who
17   worked there eight years ago, you know.  And so if Meta is
18   going to be insistent on that timeline, we won't -- they might
19   not have -- I'm going to hope that they do, but I don't know
20   they're going to have custodians that go that far back.
21             THE COURT:  Okay.  Well, this is part of the back and
22   forth.  If it is -- if it's impossible or overly burdensome,
23   truly burdensome, to try to figure out who the custodian was
24   too long ago, that's part of your negotiation with Meta over
25   can we do custodians -- okay, maybe two years isn't enough,
```

```
 1   maybe only four years back -- right? -- and try to find -- I
 2   mean, I shouldn't -- you know how to negotiate these things;
 3   right?  I shouldn't have to tell you how to do this; right?
 4       So I understand that if one side is asking for custodians
 5   that go too far back in time, the obvious response is to say,
 6   "Can we pull that back" -- right? -- "so we hit the deadlines
 7   that the Court has set?"
 8       And I'm going to expect Meta to be reasonable in what it's
 9   seeking here because, again, to their point, if the custodians
10   from 4, 6, 8, 10 years ago are no longer there and the way they
11   keep their files it's impossible to figure out who they are,
12   then you've got to make -- you know, you've got to make that
13   record, then I'm expecting you to work that out; right?
14       So that, again, Meta wants the documents.  You're not
15   going to get every -- you're not going go get 110 percent of
16   what you want, so you're going to have, you know, give --
17   right? -- so that you get closure on a reasonable number of
18   custodians over a reasonable time frame, you know, with
19   reasonable search terms so you can get this done in the
20   schedule we have.  Okay?
21          MR. YEUNG:  Understood.  And I think we have been
22   reasonable with Arizona.  They -- just for the record, they
23   were one of the 14 holdout states.  We didn't get search terms
24   and custodians on November 1.  We had to push and push and
25   push, threaten to conferral.
```

```
 1        Now we got some -- now we got some proposals for most of
 2   the agencies.  It should have happened on November 1.  It
 3   didn't happen.  We actually gave them our proposed search terms
 4   on November 8.  I have no hit report.  We have deprioritized
 5   certain agencies at their request as well.
 6        This is all part of a broader -- broader picture here
 7   where we actually -- we did propose a schedule for a
 8   search-term negotiations two days out -- two business days
 9   after your September 6 order they fought, and we're here where
10   we are now.
11        And so, you know, we are -- the thing I don't want to have
12   happen, the thing that Meta doesn't want to have happen is that
13   these deadlines give the states an excuse to sidestep some of
14   the orders and provide us with the discovery, which I'm already
15   hearing.  I already have a state that's telling me, "I don't
16   want to give you hit reports.  I want you to" -- they've had
17   our search terms for two weeks now.  Have never seen a hit
18   report.
19        What they're telling me is, "In light of the Friday
20   deadline, which was in the DMO for conferrals, what I want you
21   to do, Meta, is pick your must-have search terms in a vacuum,
22   and I'm going to decide whether or not I'm going to run them."
23   That's what's happening with some of these states, and I want
24   to make sure -- that's not Arizona, it's a different state, but
25   I want to make sure we're still getting -- another holdout
```

```
 1   state -- but I want to make sure we're still getting the

 2   reasonable discovery we're entitled to.

 3           THE COURT:  You could have found any number of places

 4   in transcripts from prior DMCs where I've said, "People need to

 5   exchange hit reports."

 6           MR. YEUNG:  Right.

 7           THE COURT:  And so if there's somebody saying that

 8   they don't have to give you a hit report, that's contrary to

 9   kind of the directives I've given to all the parties in this

10   case since day one.  So are they here?  Do you want me to talk

11   to them?  Which counsel is that who's taking that position?

12           MR. YEUNG:  Matt, are you here?  He's not.

13           MR. COCANOUGHER:  It's Illinois.

14           MR. YEUNG:  Yeah.

15           MR. WHELIHAN:  I mean, I can say for Arizona the

16   problem is these agencies run these terms, like I said, against

17   environments larger -- they try to go back 12 years and they

18   see millions of documents, and then they're afraid to even

19   provide anything because they're, like, "We can't -- we can't

20   possibly review 100 million documents."

21       And Meta is refusing to, you know, narrow the scope of the

22   subpoenas, narrow the scope of the requests they're making to

23   these agencies so the agencies don't know who the relevant

24   custodians would be, who they are.  You know, meta hasn't

25   engaged with these agencies on an individual level, and so it's
```

```
 1    just, you know, agencies running a massive amount of terms that
 2    include things -- you know, we'll get this later, I'm sure --
 3    things like "phone" and "computer" and "e-mail" and "device"
 4    and "iPhone" and, you know, it pulls back everything they have.
 5         And, you know, I --
 6         MR. YEUNG:  And we agreed to drop some of the -- like,
 7    "phone" has been dropped by Meta.
 8         MR. WHELIHAN:  Well, you didn't tell us "phone" was
 9    dropped, and I have people running them right now.  I have
10    people running those queries and it takes them nine hours to
11    run the queries, and then they get a result and they tell me
12    that they're afraid to provide it to you.  So I --
13         MR. YEUNG:  It's not a standalone term; but, you
14    know --
15         THE COURT:  Address your comments to the Court.  We're
16    not doing a meet and confer here.
17         MR. WHELIHAN:  Sure.
18         THE COURT:  Okay?  If you want to meet and confer, I'm
19    going to send you in the hallway to finish your meet and
20    confer.  Do you understand?
21         MR. WHELIHAN:  Apologies, Your Honor.
22         THE COURT:  You do need to talk promptly with each
23    other and transparently with each other, and it sounds like --
24    you've got a deadline here.  All right?  And the reason I set
25    all those dates is I want you to work, and both sides are going
```

```
 1    to have to give -- all right? -- to hit those deadlines.

 2        You know, I understand there's frustration.  I hear

 3    frustration on both sides.  The obvious thing to do is to

 4    negotiate and horse trade and make a deal here.  Okay?

 5        For example, if the environment is such that the search

 6    term is that you're demanding and the time frame you're

 7    demanding are pulling up a billion documents, that's not useful

 8    to anybody.  Okay?

 9        All right.  But your people need to provide the hit

10    reports -- right? -- and, you know, let them know.  And so it

11    goes both ways; right?  There has to be discussion and

12    negotiation here.

13            MR. WHELIHAN:  As long as there's flexibility on what

14    a hit report means because it's not going to be, like, you

15    know, I worked on the discovery report, the hit report, from

16    relativity and getting an agency to run terms against their

17    systems.

18            THE COURT:  That's part of the conversation.

19            MR. WHELIHAN:  I just hope we don't -- you know, we --

20            THE COURT:  I don't want to hear that you're disputing

21    what defines a hit report.  Okay?  I mean --

22            MR. YEUNG:  And I've offered the suggestion to various

23    AGs.  Some are using E-Discovery vendor, some are using their

24    AG services -- servers in order to pull the documents and

25    search for them.  I feel like those are -- these are
```

```
 1    technological issues that can be surmounted -- that are
 2    surmountable.  You can generate -- you should be able to
 3    generate a hit report like we all are used to seeing so that we
 4    know how many documents are brought up by hits, so we can have
 5    an informed discussion about what terms to keep, what terms not
 6    to keep.  And that's what we want, and what we haven't received
 7    are any hit reports.
 8         THE COURT:  Okay.  I think I've already addressed the
 9    hit report issue.
10         MR. YEUNG:  Sure.
11         THE COURT:  Again, I think I've said this at other
12    previous DMCs, if it's necessary and appropriate, you can
13    always have technical people on the line -- all right? -- who
14    are the techies on both sides who can speak to actual
15    technological feasibility or infeasibility of things --
16    right? -- and so it isn't just filtered through the lawyers,
17    which can lead to, you know, misunderstandings down the line.
18         It's been my experience when you have two IT folks talking
19    to each other, they speak the same language.  They know what --
20    when something is technologically reasonable versus not; right?
21    And so I'm not going to order that, but I'm going to strongly
22    suggest that if these -- some of your disputes go to whether
23    something is technologically feasible or infeasible or
24    unreasonable.  It's useful to have techie people on the line to
25    figure out a way to break that impasse and find a compromise.
```

1    Okay?

2         **MR. YEUNG:**  And Meta has agreed to -- has welcomed

3    that discussion.  We have had some of those discussions with

4    the tech people about feasibility.

5         **THE COURT:**  Good.  Good.  As a former engineer myself,

6    I like having tech people involved.  So that's good.

7         **MS. MICKO:**  Good afternoon, Your Honor.  Caitlin Micko

8    on behalf of the State of Minnesota.

9         I just wanted to also put on the record that Minnesota is

10   in a very similar position as Arizona.  There's some

11   technological limitations to what the agencies can do in terms

12   of hit reports.  And so what they are currently doing for the

13   identified custodians is exporting those files, which requires

14   the involvement of an entirely different agency.

15        And so we're going through that process, but I just wanted

16   to be very clear that I know and we plan to, you know, look

17   through those custodial files.  That might be challenging to

18   make the deadline, but we are trying to be creative with Meta

19   about other ways to assess their proposed search terms, and

20   we're continuing to meet and confer on that.

21        **THE COURT:**  Okay.  I mean, I think, again, it's in the

22   protective order.  There's a clawback provision on privilege,

23   so you can certainly reach a more explicit agreement about

24   clawback of inadvertently privileged documents that could

25   reduce the time to have to review them for privilege.  You

1  could do clawbacks for other things too if it will help reduce

2  the time and burden of pre-reviewing while processing before

3  production.

4        **MS. MICKO:**  Right.  I think I'm just trying to speak

5  to assessing and negotiating the search terms from the start.

6        **THE COURT:**  Okay.  Well, same admonition I made to the

7  Kentucky Attorney General goes to Minnesota as well.  All

8  right?

9        **MS. MICKO:**  We'll do our best.

10        **THE COURT:**  And with Meta too.

11        **MS. MICKO:**  Thank you, Your Honor.

12        **THE COURT:**  Thank you.

13        **MR. COCANOUGHER:**  Your Honor, Matt Cocanougher again.

14      Just one clarification.  Meta last week served us new

15  discovery requests, and I'm assuming, but wanted to clarify,

16  that these deadlines would not apply to the discovery that was

17  served last week.

18        **THE COURT:**  What are these new discovery requests?

19        **MR. YEUNG:**  There are only three document requests.

20  There's a series of interrogatories that are related to COPPA

21  claims.  There's also a request for documents that are

22  referenced or consulted in connection with interrogatory

23  responses.

24      There are two other -- you know, separate RFPs, one of

25  which is -- I don't have the exact language in front of me, but

```
 1    in short, calls for communications between the Attorney
 2    Generals' Offices and various other Attorneys Generals and
 3    agencies.  The second is Attorney General communications with
 4    former Meta employees.  Those are two -- those are the three
 5    RFPs, if I'm remembering correctly.
 6         MS. KALANITHI:  Yes.  Your Honor, Emily Kalanithi from
 7    the California Attorney General's Office.  Thank you.
 8         Yeah, we were surprised to receive those requests.  This
 9    was after the parties had submitted their joint proposed plans.
10    We believed the AGs Offices in particular had party discovery
11    complete with, you know, the exception of this outstanding
12    State agency issue.
13         We completed our productions in August, and these are
14    requests that could have been -- are largely duplicative of
15    requests that were made earlier; and to the extent they're not,
16    could have been made months earlier.  So we were unpleasantly
17    surprised to receive party discovery at this point in time.
18    We, you know, will respond in due course.
19         We understand Meta's counsel is considering whether to
20    agree that this is the end-of-party discovery requests or
21    document requests in this action; but, you know, to the extent
22    there are these deadlines that are out there, we want to
23    confirm that we'll be responding under the normal federal rules
24    to the RFPs.
25         THE COURT:  Yes, you have the normal time to respond.
```

1   If Meta's serving -- late serving, just last week, document

2   requests that are duplicative of previously served document

3   requests, I don't understand that approach at all given your

4   arguments about scheduling this discovery.  So that --

5           **MR. YEUNG:**  I don't --

6           **THE COURT:**  It's problematic if that's what's

7   happening.

8           **MR. YEUNG:**  I don't think that they're duplicative.

9   Again, one set is targeted at COPPA claims, which was not

10  something that was the focus of the initial set; and, frankly,

11  most of the requests relating to COPPA are in the form of

12  interrogatories and not in the form of RFPs.

13      With the other two categories, they were served for a

14  couple of reasons.  Some of it is information that we gleaned

15  recently about outreach that Attorneys General have had with

16  Meta -- Meta -- former Meta employees.  This is not something

17  that we knew about back in February.  That is certainly

18  something that is -- you know, we would like to -- like

19  discovery on.  I feel like that's a very discrete, narrow

20  category.

21      It's -- just to be clear, it's communications with former

22  Meta employees about this action.  It's not broad.  It's about

23  this case.

24      And, similarly, with the Attorney Generals and the agency

25  discovery, it is, again, about this action.  That is, in part,

1   in response to various claims.  It's unclear what privilege

2   folks are invoking, what communications they're claiming.

3        We're happy to have those discovery requests proceed along

4   the normal track; but from a -- from a document production

5   standpoint, I'm not even -- they will know better than I, but

6   I'm not sure -- this is not why -- this is -- these are very

7   different in terms of what they're seeking.

8        **MS. KALANITHI:**  There is at least one of the RFPs --

9   and we are only talking about the RFPs.  I don't think this

10  relates to the interrogatories that were served.  But one of

11  the RFPs was for all communications with any agency, federal,

12  state, otherwise, regarding this action, and that is largely

13  duplicative of a previously served RFP.

14       And so I think what we're looking for at this point is

15  just confirmation from Meta that we are done with party

16  discovery or at least RFPs that are directed to the State AGs

17  at this point in time.  And, you know, we will be serving

18  objections and responses to those RFPs in the due course.

19       **THE COURT:**  Are you done?

20       **MR. YEUNG:**  I'll have to -- I haven't talked about

21  that with the team.  I'll have to get back to talk to them and

22  then get back to them, but I understood all that you've said

23  about the deadlines and how they interplay with various items.

24       **THE COURT:**  Okay.  I don't want late-served discovery

25  to start interfering with the rest of discovery, especially if

```
 1    you think it's narrowed and focused.  And if it is narrowed and
 2    focused and you can narrow it and focus it even more to make it
 3    even more precise for the other side, then do so.  Okay?
 4    Because that's off schedule from this other stuff because you
 5    just served it last week.  They've got the time to respond and
 6    you just have to work it through.
 7              MR. YEUNG:  Understood.
 8         And I'll just add one more note.  There are three states
 9    that in the last DMC stood up -- or maybe it was the CMC -- and
10    indicated that they're only asserting COPPA claims, and we've
11    already told those three states that they don't need to -- they
12    can focus on the COPPA requests that were just recently served.
13              THE COURT:  I saw that in the statement.
14              MR. YEUNG:  Yeah.  Yeah.
15              THE COURT:  Okay.  All right.  Hopefully you'll report
16    to me at the next DMC that this is all resolved and you're all
17    going forward and it's all -- it's all squared away.
18         Okay.  Anything else on the scheduling issue?
19                        (No response.)
20              THE COURT:  Okay.  So let's talk about the issue that
21    you were hinting at, which is -- so it's unclear to me from the
22    DMC statement.  Are there states or are there not states or
23    State agencies that are simply refusing to negotiate with you
24    over custodians and search terms because they haven't been
25    served with a subpoena and they don't feel like, in their view,
```

1    they're supposed to comply with either my order on party

2    discovery or Judge Gonzalez Rogers' order saying my order is

3    not stayed and you're supposed to proceed?  So are there any

4    real true holdouts I guess is the real question.

5           **MR. YEUNG:**  I think the short answer is, yes, there

6    are some states that, you know, have provided custodians and

7    search terms for maybe a single agency and are not -- resisting

8    doing the same for the rest of the agencies.  That has

9    happened.

10        In recent -- in this past week we've gotten custodians for

11   California, for example, but we still don't have search terms

12   or a commitment that those -- that we'll receive custodians for

13   more than the, I think it was, three agencies that provided

14   them.

15        Missouri told me yesterday they're going to get me stuff

16   on Monday, so I don't have it yet.  I have a commitment to say,

17   you know -- but they were directed to give us the search term

18   custodians on November 1 and they're -- you know, after a lot

19   of conferrals, Monday is when they're going to give it to me.

20   I'll see what I get.

21        But there are various states like that where I look -- you

22   know, they're not -- they're not in compliance with the order

23   directing disclosure of this information by the 1st.  Some

24   states have moved closer towards compliance in the interim, but

25   there are still some states where I would not say they're

 1    substantially in compliance with those -- with your November 1

 2    deadline.

 3         **THE COURT:**  Are there any states or agencies that are

 4    simply not going to provide you custodians or search terms and

 5    have said, "We're just not gonna"?

 6         **MR. YEUNG:**  Where is California?

 7         I mean, California would be one.  I think -- it's --

 8    they -- have I received a flat no, completely no?  I don't know

 9    it's been phrased that way, but it's been set -- what's been --

10    there's been no commitment on dates and there's no commitment

11    that they will provide custodians and search terms for

12    particular agencies.

13         And when we press for H.2. conferral so we can bring this

14    issue before Your Honor, I get the, "Well, we need to wait 10

15    business days and then we have 5 business days to letter brief

16    it."  So there are a number of states where I couldn't bring

17    these issues to Your Honor's attention as a ripe issue.

18         **THE COURT:**  So I'm looking at page 12 of the DMC

19    statement.  This is Meta's section.  You identify the

20    following:  Arizona, California, Delaware, Minnesota,

21    Pennsylvania, and Rhode Island as states which did not propose

22    search terms or custodians for agencies by November 1, have not

23    committed to any date by which such terms or custodians will be

24    provided, and have not agreed to a meet and confer.

25         So is that -- does that subparagraph (b) of your paragraph

```
 1    one there, does that remain true?
 2         MR. YEUNG:  Let me just pull that up.
 3       So I can say that Arizona has provided, I believe, search
 4    terms and custodians for all but two agencies putting aside
 5    ones that we deprioritized.
 6       California has given --
 7         THE COURT:  Slow down.
 8         MR. YEUNG:  Oh, sorry.
 9         THE COURT:  So Arizona has provided custodians and
10    search terms for all but two agencies.  And what's the excuse
11    for the two agencies they haven't provided?
12         MR. YEUNG:  One we've, I believe -- I think -- let me
13    just check my notes.  I don't want to misstate.
14         THE COURT:  Let me be clear.  Of those two agencies
15    that haven't done it, is it because they're refusing or it's
16    just been -- they're taking, again, the position that they
17    don't have to, they're not gonna, they haven't been subpoenaed,
18    they're not --
19         MR. YEUNG:  I think one of them, if I'm remembering
20    correctly, is taking the position that they need us to narrow
21    our request further before they can do that.  Is that -- that's
22    one of them.
23       Is that -- that's right?
24         MR. WHELIHAN:  If you'd like me to speak to that now,
25    Nathan Whelihan for Arizona Attorney General's Office.
```

```
 1        One of them is the Department of Child Safety.  The
 2   Department of Child Safety received a subpoena from Meta in
 3   July.  They responded to that subpoena in August asking Meta to
 4   narrow the scope of what they were seeking from the Department
 5   of Child Safety.
 6        I now understand that Meta has either lost or they don't
 7   know why but they don't have a record of having ever received
 8   that.  During our meet and confer earlier this month, the
 9   Department of Child Safety tried to engage them on that and
10   tell them what they were asking for in the subpoena and, you
11   know, likewise what would be in Rule 34 discovery would be so
12   broad as to encompass essentially every record the agency
13   possesses, including many, you know, records either in or
14   related to individual child case files of children who are in
15   abusive homes or neglect, or that kind of thing, or taken out
16   of their home or trying to be reunified with their family.
17        And they told Meta they agree to the idea of custodians
18   and search terms, but they would need Meta -- something in
19   writing to take to their client narrowing the scope of what
20   they were asking for and explain what they were asking for in
21   order for them to propose meaningful search terms and
22   custodians.
23        THE COURT:  I'm still trying to identify any states or
24   agencies that are simply refusing to engage.  It sounds like
25   that agency is engaging or tried to engage.  So that's one
```

App. 355

```
 1   agency.

 2        There's a second Arizona agency that hasn't yet?  What's

 3   their position?

 4        MR. WHELIHAN:  I received search terms and the

 5   custodian proposals from the Arizona Department of Education

 6   this morning as I was boarding my delayed flight here today.  I

 7   will provide that once I get to a laptop later today.

 8        And there is one more agency that I had anticipated they

 9   would have given to me yesterday, but they -- I haven't -- they

10   haven't yet.

11        THE COURT:  Okay.

12        MR. YEUNG:  So I think that -- and then we've got the

13   bulk -- the rest of it.  I'll double-check, but I believe that

14   we have at least something from everybody else in Arizona.

15        THE COURT:  Okay.  All right.  So there's no agency

16   and there's no part of Arizona that's simply refusing to engage

17   is what I'm hearing.

18        MR. WHELIHAN:  With the exception of the Department of

19   Child Safety is asking that Meta engage with them in order for

20   them to be able to propose --

21        THE COURT:  Meta will engage with them, yes?

22        MR. YEUNG:  And we have.  On the phone call that's

23   referenced, we said three or four times we're not looking for

24   individual case files; and the response I got was, "Put it to

25   me in writing because it's not" -- they want it in writing.
```

App. 356

 1    So it was a call with, I think, three or four different

 2  agencies.  It was set for a particular time period.  We tried

 3  to engage, we tried to tell them, like, "Look, this is not what

 4  we're looking for."  And they kept on bringing it up, kept on

 5  bringing it up.  So we are where we are.

 6    We're not going to do that -- we don't need to -- right,

 7  we don't need to -- we're taking a look at the requests and

 8  trying to engage in the way that they want us to engage, but we

 9  definitely did try and engage with them on the conferral.

10    **THE COURT:**  Look, if they're asking for them in

11  writing, it doesn't take that long to send them an e-mail,

12  so...

13    **MR. YEUNG:**  What they wanted in writing was

14  everything.  Yes.  It was not just that one issue.  I think at

15  the end of the call, they were comfortable with my oral

16  representation that that's not what we were looking for, but

17  they wanted -- they were looking for more.  They wanted us to

18  go back and put in writing some type of narrowing of our

19  request, which is a little bit more involved exercise than that

20  one single component.

21    **MR. WHELIHAN:**  My understanding is that their counsel

22  is confused about what Meta is looking for.  Counsel for Meta

23  told them that they wanted aggregate information.  We're not

24  really sure what "aggregate information" means.

25    They told them they wanted studies and reports.  The

1  department doesn't prepare studies and reports.

2      They told them that they wanted -- so they're looking for

3  a clarification, and they need something in writing to say

4  that, "Yeah, we don't want anything related to child case

5  files," because that's the vast majority of what the agency is

6  and what it has.  So they just want that to take to their

7  client so their client can understand that.

8      And we've sent three e-mails to Meta that have gone

9  unreplied to asking for them to engage on the Department of

10 Child Safety after we sent them the objections that were sent

11 over the summer that Meta somehow misplaced.

12      **THE COURT:**  Okay.  You know, if you're complaining

13 about delay and you've been delaying, I mean -- again, I do

14 want prompt discussions back and forth.  Get it done.  That's

15 all I'm saying.  Okay?

16      I don't want to hear -- what's happened in the past has

17 happened.  All right?  It's very clear to me you need to --

18 both sides need to kind of alter their behavior to some extent.

19 I mean, when -- I don't want to tell people how to practice

20 law.

21      If an attorney needs something in writing confirming what

22 the other side has said, there's nothing stopping your side

23 from sending a letter to Meta saying, "You agreed to this" --

24 right? -- and then taking it to the client.

25      **MR. WHELIHAN:**  Understood, Your Honor.

App. 358

1    **THE COURT:**  I mean, that happens in discovery all the

2    time.  Okay?  You send a letter -- you have a meet and confer.

3    You send a letter that says, "You agreed to this" -- right? --

4    "and if you disagree with the way we summarized it, let us know

5    immediately."

6    **MR. WHELIHAN:**  The problem is we need clarification of

7    what "aggregate data" means.  We don't --

8    **THE COURT:**  But there are different issues here;

9    right?  Like, for example, if a big issue is, like, if they

10   don't want -- you don't want to give and they don't want

11   individual child case files, that's a short letter or e-mail.

12   All right?  You don't have to do it all in one if it's going to

13   be a holdup.  That's all I'm saying.

14       I don't care how you get it done, but you've got to get it

15   done.  Okay?

16   **MR. YEUNG:**  This is not an issue that is unique to

17   this type of agency in Arizona.  The other agencies we've had

18   discussions with on this point have been fine taking our oral

19   representation.

20       I believe it's actually now in the DM -- one of the

21   statements, either the CMC or DMC statement, that we are not

22   looking for individual case files.  So we've been trying to

23   work with them.  We've had 50 conferrals -- I looked it up --

24   50 conferrals -- over 50 conferrals with states in November.

25   That's --

1    **THE COURT:**  I expected a lot because there are a lot

2    of agencies you're going through.

3    **MR. YEUNG:**  Of course.  And there's -- and they are

4    doing that and that's why it's taking some time.  And, you

5    know, we're doing -- we're hopeful -- we're hoping that we can

6    do this orally via representations, which is what many folks

7    have been able to do; but if they want a letter, they want

8    something in writing, we are preparing that as we speak.

9    **THE COURT:**  With all deliberate speed.  Okay?

10   **MR. YEUNG:**  Yes.

11   **THE COURT:**  All right.  So are there -- go back to

12   my -- we got off track again.

13      Are there states or agencies that are simply refusing to

14   provide custodians or search terms?

15   **MR. YEUNG:**  So we can go to California next.

16   California has given me custodians for three agencies, no

17   search terms so far, no commitment to provide custodians for

18   any other agency.

19   **MS. O'NEILL:**  Your Honor, Megan O'Neill for the

20   California Department of Justice.

21      Just to briefly recap, yes, Meta issued Rule 45 subpoenas

22   to five California agencies.  Three of those agencies have

23   agreed to provide search terms and custodians.  Meta agreed to

24   deprioritize one of those agencies.

25      One has not yet provided as much terms and custodians, but

1  the AG's Office is working to facilitate conferrals on this

2  issue, and we hope that a conferral will take place soon.

3      The remainder of the California agencies have taken the

4  position that they will not provide documents to the AG's

5  Office for party discovery in this case.

6      We have still -- the AG's Office has still --

7          **THE COURT:**  Stop there.  How many agencies and which

8  are they?

9          **MS. O'NEILL:**  There are eight agencies.  I need a

10  minute to provide the exact list.  If I can have the Court's

11  indulgence to gather that.

12          **THE COURT:**  Do you know which agencies they are?

13          **MR. YEUNG:**  I'll have to look at the -- look at my

14  computer.

15          **MS. O'NEILL:**  I have the list now.

16          **THE COURT:**  Okay.

17          **MS. O'NEILL:**  The California School of Finance

18  Authority, the California Office of the Governor --

19          **THE COURT:**  Slow down.

20          **MS. O'NEILL:**  Apologies.

21          **THE COURT:**  Okay.

22          **MS. O'NEILL:**  The California Governor's Office of

23  Business and Economic Development.

24          **THE COURT:**  Okay.

25          **MS. O'NEILL:**  The California Department of Finance.

```
 1              THE COURT:  Okay.

 2              MS. O'NEILL:  The California Department of Public

 3    Health, the California Department of Consumer Affairs, the

 4    California Business Consumer Services and Housing Agency.

 5              THE COURT:  Consumer Services and Housing Agency?

 6              MS. O'NEILL:  Yes, that's right.

 7         And then California Office of Data and Innovation.

 8         And I will just say, Your Honor, that the AG's Office has

 9    been attempting to facilitate conferrals with these agencies

10    and Meta, and we have suggested to Meta that they issue 45

11    subpoenas to those agencies.

12              THE COURT:  So I appreciate your offer to, quote,

13    "help facilitate discussions," but at this point, in light of

14    my order, subpoenas are not needed.  And so what is the stated

15    position of these eight agencies?  Are they simply disagreeing

16    with my order?

17              MS. O'NEILL:  My understanding is that the position of

18    these agencies is that they are not parties to this litigation

19    and, therefore, are not subject to the jurisdiction of this

20    Court and its orders and, therefore, they are not providing

21    documents to the AG's --

22              THE COURT:  Is there counsel for any of those agencies

23    here?

24              MS. O'NEILL:  I don't believe so.

25              THE COURT:  What does it mean in our system of
```

1    government for an agency in the face of an order from a federal

2    judge to say, "We simply are not going to comply with it"?  How

3    does that -- how does that -- what happened to the rule of law?

4         **MS. O'NEILL:**  Your Honor, I don't represent the

5    agencies and I'm not really able to comment more fulsomely on

6    their position.

7         **THE COURT:**  By tomorrow you are ordered to submit to

8    me a list of every counsel for each of these agencies who is

9    responsible for taking this position.  I want their name.  I

10   want their State Bar number.  I want their addresses, their

11   contact information.

12        **MS. O'NEILL:**  Understood, Your Honor.

13        **THE COURT:**  I have conferred with

14   Judge Gonzalez Rogers on this.  The reason I'm going through

15   this list to find out what agencies and states are not

16   complying with the orders -- it's not just my order, it's her

17   order as well -- is she will be considering sanctions.  Okay?

18        So it's up to you-all in conferral with your colleagues to

19   figure out if that's the path you want to go down.  All right?

20   And it's her who's going to be considering sanctions.  It's not

21   just me considering discovery sanctions.  All right?  Do you

22   understand?

23        **MS. O'NEILL:**  I understand, Your Honor.

24        **THE COURT:**  Do you agree with those agencies that they

25   can just defy my order?

1       **MS. O'NEILL:**  Your Honor, it's not my position --

2       **THE COURT:**  Have you told their counsel that they are

3  in defiance of my order and in defiance of

4  Judge Gonzalez Rogers' order?

5       **MS. O'NEILL:**  Your Honor, we have informed them of the

6  order.  We have provided all of the information that's

7  necessary for them to make their decisions.

8       **THE COURT:**  That's not my question.  Have you told

9  them that they are in defiance of both my order and her order?

10       **MS. O'NEILL:**  I have not told them that, no.

11       **THE COURT:**  Has anyone in your office told them that?

12       **MS. O'NEILL:**  Not that I'm aware of, but I am not

13  aware of all the conversations that have happened.

14       **THE COURT:**  This is very troubling to me.

15    Okay.  Are there any other State agencies or AGs that are

16  not complying with providing custodians or search terms at all?

17       **MR. YEUNG:**  Yeah.  I'll run through the list that I

18  have.

19    Delaware is going to give us --

20       **THE COURT:**  That's not my question.  If people are in

21  negotiations with you or said they're going to give you stuff,

22  that's not my question.

23       **MR. YEUNG:**  Okay.

24       **THE COURT:**  I want to know are there agencies or

25  states as a whole that are simply refusing to provide

```
 1    custodians or search terms at all.

 2             MR. YEUNG:  So Minnesota has taken the position that

 3    the agencies for whom Meta has subpoenaed, that they're not

 4    subject to the search term/custodian process.

 5             THE COURT:  That you have subpoenaed?

 6             MR. YEUNG:  We subpoenaed -- the agencies we

 7    subpoenaed back before Your Honor issued the September 6th

 8    order to move discovery along, those agencies are -- the

 9    Minnesota -- my understanding is that Minnesota is taking the

10    position that search terms and custodians do not need to be

11    provided for those subpoenaed agencies.

12             THE COURT:  I don't understand that.  Okay.

13             MR. YEUNG:  Well, that's --

14             MS. MICKO:  Caitlin Micko on behalf of the State of

15    Minnesota.

16        It's a little bit more complicated than that, Your Honor.

17    The Department of Human Services is one of the agencies that

18    was issued a Rule 45 subpoena.  They negotiated the scope of

19    the Rule 45 subpoena back in August; and in doing so, explained

20    to Meta that it was too burdensome to run search terms and

21    custodians.  They memorialized that negotiation in an e-mail

22    that went unanswered by Meta, and they started to prepare their

23    production pursuant to the Rule 45 subpoena when Meta put it in

24    abeyance.

25        As soon as Judge Gonzalez Rogers ordered that they
```

1    restart, that's what they did, and they are set to complete

2    their production this week pursuant to their original

3    negotiations.

4          **THE COURT:**  Okay.

5          **MS. MICKO:**  The Minnesota Department of Health has

6    also completed their production, produced over 13,000

7    documents, 90,000 pages.  And so they consider their

8    obligations complete.

9          And the Department of Education has served objections, has

10   asked Meta to engage in meet and conferrals, and their

11   production is forthcoming.

12         And I will also note that at our most recent meet and

13   confer, Meta asked these agencies to explain the process they

14   went through to conduct the search, and the agencies have

15   agreed to do that.  So we're -- we are continuing to confer

16   about that process.

17         **THE COURT:**  Okay.

18         **MS. MICKO:**  So I would submit to the Court Minnesota

19   agencies are fully engaged in the process.  We are not a

20   holdout state.

21         **THE COURT:**  Okay.  Let's move on.

22         **MR. YEUNG:**  So then there's New York.  New York has

23   given me search terms and custodians for one agency.  I've had

24   discussions with both the New York AG and counsel for the

25   New York Governor's Office's Executive Chamber, which I think I

 1   mentioned last time we were here.

 2       Since then, the other agencies -- the rest of the agencies

 3   that are -- all the agencies that are represented by the

 4   Executive Chamber's counsel, which totals eight agencies, they

 5   have provided me with four search terms that they propose

 6   running on an unidentified set of custodians for three agencies

 7   without any commitment to do anything else with respect to the

 8   remainder of their -- with the balance.

 9       THE COURT:  Okay.  So, again, that doesn't really

10   answer my question.  Are there any New York agencies that are

11   refusing to even engage in discussions about custodians or

12   search terms?

13       MR. YEUNG:  Well, I would at least put the ones that

14   haven't even put search terms in writing in that bucket even

15   though I haven't been given a flat no.  For the ones that

16   were -- have given me search terms, I don't know who they're

17   running them against and they haven't really engaged.

18       THE COURT:  If they've given -- if they've given you

19   search terms and that's part of the negotiation, you've got

20   until December whatever to try to work that out.  So that's not

21   what I'm asking about.

22       What are the agencies that have not given you anything?

23       MR. YEUNG:  Let me consult.  It might be more

24   efficient if I give it to you after this in writing, if

25   that's --

1          THE COURT:  No.  I need the list now because you're

2    meeting with Judge Gonzalez Rogers tomorrow.

3          MR. YEUNG:  Okay.

4          THE COURT:  If you can't have -- if you don't have a

5    list of anybody else who's not complying, that's fine.

6          MR. YEUNG:  Well, I know -- but these are the agencies

7    that are not complying.  I just don't have their names at my

8    fingertips at this point in time.  I apologize.

9          THE COURT:  If you need time to look in your computer,

10   then you can come back, and we'll move on to another issue.

11         MR. YEUNG:  Okay.  But there are other states as well.

12         THE COURT:  You understand --

13         MR. YEUNG:  I understand.

14         THE COURT:  -- if it's people who have -- you've made

15   points about people who you believe are not substantively or

16   substantially complying.  That's not what I'm asking.  Okay?

17   You've got time to finish meet and conferring with them.  All

18   right?

19        I'm asking people, such as those eight California

20   agencies, that are simply refusing to do anything.  Do you

21   understand the difference of what I'm asking for?

22         MR. YEUNG:  Yes, I understand.  I understand the

23   difference.

24         THE COURT:  Okay.

25         MR. YEUNG:  Just as a clarification, I mean, with

```
 1    Pennsylvania, they want us to reach out to each of the
 2    individual agency counsel themselves and have this discussion
 3    with them.  We tried to have a call where the AG brought in the
 4    agencies and have this discussion.  They didn't want to do
 5    that.
 6          THE COURT:  That's in defiance of my order.  My order
 7    says, and I think Judge Gonzalez Rogers also put in an order,
 8    the AGs are supposed to help coordinate all this.
 9          MR. YEUNG:  We agree with that, and so that's why we
10    haven't -- I haven't gotten a flat no from some of the
11    Pennsylvania agencies, is because the AGs are not -- but, you
12    know -- so it's a slightly different issue, but I agree with
13    that that's not in -- that that's not in compliance with the
14    Court orders.
15          THE COURT:  Okay.  Why don't you figure out who's left
16    to list, and then we'll move on to another issue.
17          MR. YEUNG:  Okay.
18          THE COURT:  Okay.  Should we take a break?
19       Do you need a break?  Can we keep going?
20       Okay, we'll keep going.
21       Who's doing Letter Brief 1305?  That's the YouTube.
22          MS. SIEGEL:  Good afternoon.  Audrey Siegel on behalf
23    of the PI/SD plaintiffs.
24          THE COURT:  Good afternoon.
25          MR. DONOHUE:  Good afternoon.  Matthew Donohue on
```

1    behalf of the YouTube defendants.

2        **THE COURT:**  Good afternoon.

3        All right.  So I've read the letter brief.  On RFP 62,

4    tell me if I'm misunderstanding, but you wanted documents

5    sufficient to show crisis management organization and policies

6    for responding to investigation of the lawsuits regarding

7    minors, including methods of communication thereto.

8        So YouTube, at least in the brief, said that they produced

9    documents sufficient to show the teams and the reporting lines

10   and gave a 30(b)(6) and a rog on this about the teams who do

11   this.  So what's missing?  I don't understand what they didn't

12   provide yet.

13       **MS. SIEGEL:**  Sure.  So, first of all, 30(b)(6)

14   testimony is not a substitute for documents.  Right?  So we

15   still need documents to be able to use, for example, against

16   other deponents.

17       But going beyond that, the 30(b)(6) deposition testimony

18   related only to the organizational structures of some of the

19   departments.  It did not include any testimony regarding the

20   policies related to the communications.

21       **THE COURT:**  Let me stop you there.

22       Have you produced the policies?

23       **MR. DONOHUE:**  It is my understanding, and I just want

24   to be clear because "policies" is kind of a vague term, so this

25   question as written kind of straddles into a lot of

```
 1   specifically, I think, legal advice to the extent it's talking
 2   about responding to government investigations and lawsuits.
 3           THE COURT:  Okay.
 4           MR. DONOHUE:  If we bracket off in-house legal
 5   policies, my understanding is there are no such policies.
 6           THE COURT:  There's your answer.
 7           MS. SIEGEL:  That's the first time that we've heard
 8   anything like that, and I would also note that that seems to
 9   not be entirely accurate.
10       You know, YouTube, there was an article just yesterday
11   from the New York Times titled "How Google spent 15 years
12   creating a culture of concealment," where they talk about all
13   of the policies that do exist extremely limiting communications
14   and designed to invoke attorney-client privilege where it's not
15   there by cc'ing attorneys who will, and YouTube are well aware
16   of this.
17       And so in the first instance, if there is, in fact, no
18   policies related to how to respond to crises or crises or media
19   inquiries or investigations, they can state as much in an
20   amended response.  We've never heard anything like that before.
21           THE COURT:  Let me stop you there.  If you're saying
22   that there are no nonprivileged policies for crisis management
23   or responding to investigations, lawsuits regarding safety of
24   minors, then you are ordered to serve a supplemental response
25   to the document request saying such.
```

App. 371

1      **MR. DONOHUE:**  I think we can meet and confer.  Again,

2  I just want to be clear, that, like, we would want to interpret

3  this in a way that is not referring to in-house legal's

4  policies for handling -- like, the request as written calls for

5  policies to respond to investigations, lawsuits, which a lot of

6  that seems to refer directly to what would just be the function

7  of an in-house legal department.

8      **THE COURT:**  Sure.  Like I said --

9      **MR. DONOHUE:**  We're happy to -- we're happy to meet

10  and confer on an amended response.

11      **THE COURT:**  You can provide a response.  No, I'm

12  ordering you to provide a supplemental response to the document

13  request that says, if this is a fact -- right? -- that says

14  there are no nonprivileged policies responsive to this request.

15      **MS. SIEGEL:**  Can I raise -- sorry.  I didn't mean to

16  interrupt.

17      **THE COURT:**  I mean, if that's not true, then you need

18  to produce the nonprivileged policies.

19      **MR. DONOHUE:**  Understood.

20      **THE COURT:**  Okay.

21      **MR. DONOHUE:**  And, again, just to be clear, the

22  request calls for documents concerning, but you're -- the

23  concerning goes much farther.  I'm talking about the policies

24  themselves.  That's my understanding.

25      **THE COURT:**  Let's get the policies themselves first,

```
 1   and then see if there's anything beyond that that they want to
 2   take further discovery on.
 3            MR. DONOHUE:  Absolutely.
 4            THE COURT:  All right.
 5       All right.  The other thing, again, the document request
 6   asks for methods of communications -- identifying methods of
 7   communications between the people or, I guess, the teams that
 8   do this stuff.  The briefing didn't talk about that.
 9       So have any documents been produced on methods of
10   communication between the people who work on these things?
11            MR. DONOHUE:  I mean, honestly, Your Honor, I'm not
12   entirely sure what that means.  There has been, again, 30(b)(6)
13   depositions on how Google employees communicate with each
14   other; you know, the use of e-mail, chat, things like that.  So
15   that is certainly something that plaintiffs have had an
16   opportunity to investigate into.
17            THE COURT:  Was there anything more that you wanted?
18            MS. SIEGEL:  Yeah.  Well, first of all, going back to
19   the order about policies, I would like to note two things.
20   First of all, if they're going to say that there are no
21   documents that exist, that's one thing.  If they're going to
22   say that there are no nonprivilege documents that exist, then I
23   believe those documents that are being withheld should be
24   logged on a privilege log.  I think that's particularly
25   critical here given the article I just cited and the habit of
```

App. 373

```
 1   false claims of privilege.

 2          THE COURT:  I didn't say it because I thought that

 3   goes without saying.

 4      If you're saying that there are only privileged policies

 5   or not even -- if there are privileged policies that are

 6   otherwise responsive to the RFP -- again, I assume you've got a

 7   schedule or discussions on when to exchange privilege logs.  If

 8   you're withholding anything based on privilege with regard to

 9   this RFP, you need to put it on a log.

10          MR. DONOHUE:  Well, I think it's -- Your Honor, it's

11   not just a matter of privilege.  Part of it is the matter of

12   the request as written, it becomes very difficult to define

13   what one would call within a legal department a policy for

14   responding to lawsuits related to the safety of children,

15   teens, and youth who use your platform.

16          THE COURT:  Well, this is where the burden of proof

17   falls on you.  Right?  If you are the party asserting

18   privilege, the burden of proof is on you to assert the

19   privilege; and failure to assert it timely, which means putting

20   it on the log, waives the privilege so --

21          MR. DONOHUE:  Your Honor, I apologize.

22          THE COURT:  -- or potentially waives the privilege.

23   So if you've got -- if you're in doubt as to what to log or

24   whether to log, I think you've got to make that judgment

25   yourself; right?
```

 1           MR. DONOHUE:  Understood.

 2           THE COURT:  All right.  And, again, I don't know if

 3    you have an agreement not to bother logging things that have to

 4    do directly with this lawsuit.  For example, often people say

 5    you don't have to log, you know, documents concerning the

 6    present lawsuit, so that may relieve any burden.  I don't know

 7    if such an agreement exists.

 8           MS. SIEGEL:  No, it does not.  I just thought it was

 9    an important point to clarify just in terms of how it's

10    phrased.

11           THE COURT:  I think I've clarified it.

12           MS. SIEGEL:  Thank you.

13           THE COURT:  What about -- so do you need anything more

14    on methods of communications?  If they communicate by e-mail

15    and internal text or whatever they're using --

16           MS. SIEGEL:  I'd like to go back, actually, also to

17    the issue about not having any nonprivileged documents because

18    counsel has focused on the portion of the request that relates

19    to lawsuits or government inquiries, but there is also the part

20    of the request that relates to crisis management and media

21    inquiries.

22        And so plaintiffs complain -- there's no question that

23    YouTube has been the subject of media regarding the safety of

24    children and its addictive features since at least, I think,

25    2012, and what -- so how they relate to inquiries that would be

```
 1    related to those media -- to those news articles would be

 2    relevant, but as would YouTube's tracking and management of

 3    crises as they are evolving or coming into effect.  So, for

 4    example, even if not asked a media inquiry, if they are

 5    tracking other crises and news articles as they emerge and

 6    their response to them as well.

 7         So there's not just the question -- even with regard to

 8    the -- and even with regard to the investigations and lawsuits,

 9    there may be one part of the policy that relates to how the

10    legal team is going to respond and there may be another part of

11    a crisis management policy that concerns how Google is going to

12    investigate the claims and issues or safety issues that are

13    brought up in order to remedy them or in order to change its

14    policies regarding in response to these types of issues.

15         And then if you need a moment, that's fine, but otherwise

16    I'm happy to address the issue of communications.

17         THE COURT:  Okay.  So are there -- there must be

18    nonprivileged documents responsive to this request regarding

19    media inquiries.

20         MR. DONOHUE:  Your Honor, my understanding, and we

21    will serve an amended response according to Your Honor's

22    instructions, is that there is not a crisis management or

23    crisis communication policy related to media inquiries related

24    to the safety of children, teen, and youth who use our

25    platform.
```

App. 376

1          **THE COURT:**  Okay.  If that's what they're saying,

2     that's what they're saying.

3          **MS. SIEGEL:**  But what they're doing is they're sort of

4     segmenting one thing at a time.

5          So the first is media inquiries.  It is doubtful that a

6     company like YouTube has no policy for how to respond to media

7     inquiries just to begin with.  If, in fact, they don't have any

8     nonprivilege documents, they can go ahead and say that.

9          But they're separating out, again, here, you know,

10    investigations or crisis management, so their policies for

11    responding to that.  And we already know from their 30(b)(6)

12    deposition that they have a group called Roomba, which is an

13    *ad hoc* group that responds to emerging crises.

14         **THE COURT:**  Let me stop you there.  The document

15    requests, at least as relayed to me, says documents concerning

16    any crisis management or crisis communication structure,

17    organization, or policy developed by you, YouTube, to respond

18    to investigations, lawsuits, media inquiries, or government

19    inquiries.

20         So I don't -- I mean, the document request on its face

21    links the two, it links crisis management to media inquiries,

22    unless you've got a separate request that asks for, you know,

23    media inquiries in general and how you handle them, that's --

24    because that's -- your argument seems to be focused on trying

25    to find those documents, and that's not this request.

App. 377

 1          **MS. SIEGEL:**  So I do think that -- I mean, I still

 2     think that it's unlikely -- it also includes investigations,

 3     and I think investigations would be broad enough to cover

 4     crises as they're emerging.

 5          **THE COURT:**  Sure.  No, but my point is, it looks like

 6     this request as phrased is -- it does link crisis management

 7     and crisis communication to investigations, lawsuits, media

 8     inquiries, and all that.

 9          So, again, if they -- if they can truthfully say under

10     Rule 11, you know, in an amended supplemental response that

11     there are no such documents other than privilege documents

12     which we will log, then that's your answer.

13          But if there are other ways that you think you can get at

14     media inquiries, I mean, you can always serve another document

15     request, I suppose, or ask for a 30(b)(6) on this group that

16     you've talked about.

17          All right.  I mean, you've got other tools to get at

18     that -- other than this RFP because it sounds like what you're

19     really going after is not exactly what this RFP is going after.

20          **MS. SIEGEL:**  I think we are really going after what

21     this RFP is after.  It may be accurate that we are also

22     interested in other information, but I do think that what is

23     here is needed, responsive, and should be produced.

24          **THE COURT:**  Okay.  So, again, if there exist

25     nonprivileged documents responsive to this RFP, they need to be

```
 1    produced; or if they've already been produced, you need to tell
 2    them they have them been and, you know, point them in the right
 3    direction.
 4         But if there are no nonprivileged docs -- too many
 5    negatives.  If only privilege documents exist that would be
 6    otherwise responsive to this request, then you need to say that
 7    clearly in a supplemental response.  And then you can take
 8    further discovery to get around that or try to figure out --
 9    you know, look at the log once they see it and see whether
10    they're actually justified in taking the privilege --
11              MS. SIEGEL:  Sure.  But I --
12              THE COURT:  -- position.
13              MS. SIEGEL:  Sorry.
14         If I could just make one last point.
15              THE COURT:  Yeah.
16              MS. SIEGEL:  It may be that YouTube's tracking of
17    media documents where they're not asked for comment, so it's
18    not a media inquiry but it's another media statement, I see
19    where you're coming from to say that that's outside the scope;
20    but to the extent that, you know, Roomba is designed to, in
21    part, deal with crises that are -- that come about as a result
22    of media inquiries, that would still be relevant and
23    responsive.
24              THE COURT:  What's the name of the group?
25              MS. SIEGEL:  Roomba, the vacuum cleaner.
```

1          **THE COURT:**  That's what I thought you were saying.  I

2     just wanted to make sure.

3          Okay.  So --

4          **MR. DONOHUE:**  Your Honor, if I can clarify.

5          My understanding is that is not -- that is not a group.

6     That is just an informal term that is used for, as she said

7     earlier, an *ad hoc* group that might exist for a particular

8     purpose.

9          **MS. SIEGEL:**  Right.  And so they must have a policy

10    related to that *ad hoc* group even if it's not a standing group.

11         **THE COURT:**  Do they?  Is there a written policy with

12    regard to this *ad hoc* group?

13         **MR. DONOHUE:**  My understanding is, no, because it is

14    not -- this is not referred to a standing organization.  It is

15    a -- it is a -- as the nature of the term might suggest, it is

16    sort of a generic, relatively informal term for a type of *ad* --

17    a type of *ad hoc* group.

18         **THE COURT:**  Okay.  So, again, if you -- if we agree

19    that this Roomba -- documents concerning this Roomba group

20    would be responsive to this RFP but would be privileged, then

21    that's your answer; right?  I mean, I understand you don't --

22         **MS. SIEGEL:**  This is the first time we're hearing that

23    these policies don't exist.  I don't even think that that was

24    in the --

25         **THE COURT:**  I don't like to do meet and confers in

```
 1  front of me but that's fine, we can do that.

 2       Okay.  So, again, I think I've resolved it; right?  So if

 3  there exists nonprivilege documents responsive to this, you do

 4  need to produce them; but it sounds like there are none, in

 5  which case you do need to log them and give a supplemental

 6  response.

 7            MR. DONOHUE:  Your Honor, if I can just clarify two

 8  things.

 9       Number one, when you say "responsive" -- so I think we've

10  been talking about the policies, specific structural documents,

11  things like that.  Then there's a whole other bag of worms that

12  gets pulled in when you say "concerning."  And, again, I'm

13  thinking here specifically about to the extent we're dragging

14  in legal and there's legal communications that have to be

15  logged.

16       Is your -- are you talking just about the actual policies

17  and the documents or --

18            THE COURT:  Or documents that discuss the policies.

19            MR. DONOHUE:  Okay.

20            THE COURT:  Not just vaguely relate to them in some

21  extended existential way --

22            MR. DONOHUE:  Understood.

23            THE COURT:  -- but actually refer to them, discuss

24  them explicitly, or are the policies themselves.

25            MR. DONOHUE:  And then just to clarify, on the
```

App. 381

1   privilege log, we would do that in the same way we've been

2   logging -- we've been doing our privilege logs generally?

3          **THE COURT:**  I assume, yes, you should follow --

4          **MR. DONOHUE:**  Okay.

5          **THE COURT:**  -- the same agreement you have on that.

6   Okay.  RFP 69 you wanted --

7          **MS. SIEGEL:**  Wait.  Sorry.

8   You did ask about the communications issue --

9          **THE COURT:**  Yeah.  Yeah.

10         **MS. SIEGEL:**  -- and why communications policies are

11  necessary or what we're getting at there.

12         And the response to that is that YouTube does have a

13  history of specifically instructing employees on how to

14  communicate to avoid discovery.  This was also a part of the

15  *New York Times* article I referenced yesterday.

16         But while YouTube states that, well, there are, in fact --

17  there has already been 30(b)(6) testimony regarding how

18  employees are intended to communicate, that was how

19  employees -- what systems employees are instructed to use for

20  communications, that does not necessarily relate to not using

21  particular language in regard to crises as they are emerging.

22  It does not relate to YouTube's use of particular other forms

23  of communications in terms of a crisis.

24         For example, the article lists a situation in which one

25  YouTube C suite member asked Susan Wojcicki if she had a fax

```
1    machine because he didn't want to send the communication via
2    e-mail.
3         And so I think that, you know, when we're thinking about
4    what the communications are generally, it's probably true that,
5    you know, general information about communications and what
6    systems and tools are available might be sufficient, but that
7    does not appear to be the case here and that was not testified
8    to at the 30(b)(6) deposition.
9              THE COURT:  So, like I said, the briefing didn't
10   really touch on this piece of it on either side, so -- and
11   you're referencing an article that just came out.  So I'm going
12   to order you to meet and confer on this subpiece of it on the
13   methods of communication issue and see if you can reach
14   agreement on it because it sounds like it's actually not ripe.
15             MR. DONOHUE:  Understood.
16             THE COURT:  Okay.
17        All right.  Request for Production 69 is going after
18   documents for compensation for working on safety for youth,
19   which apparently the parties agree would not include
20   lower-level employees.
21        YouTube's position is you've produced the company's
22   generic or general compensation policy, which are the policies
23   responsive to this request, and that no specific policies
24   regarding youth safety exist.
25        So, again, is this a situation where you need that in a
```

```
 1   supplemental response or is the briefing enough?

 2        MS. SIEGEL:  So two things.  The first is that that is

 3   the -- the briefing was, in fact, the first time that we heard

 4   about it.  We did, perhaps belatedly but prior to -- just

 5   before we came in, we did try to discuss this with opposing

 6   counsel.

 7        But the other issue to note is that the general -- like,

 8   how -- documents concerning how the general policies are

 9   actually applied to youth safety I think would be relevant and

10   responsive and that there's no basis for withholding them, and

11   that information is absent from YouTube's joint letter brief.

12        So, for example, if there are documents reflecting or

13   relating to the compensation policy where they're talking

14   about, "Oh, we can't get any good hires for our safety teams

15   because of YouTube's compensation policy" -- right? --

16   something like that would be responsive to the extent that --

17   and here, to the -- you know, again because YouTube is not

18   producing all documents that hit on search terms that are

19   reviewed and only responding with those that are within its

20   scope of agreed production, the mere fact that there aren't any

21   policies wouldn't necessarily mean that there are no documents

22   relating to how those policies are actually applied in the

23   sense.

24        But that said, if YouTube does state that there are no

25   policies specific to child safety and that there are no
```

App. 384

1   policies -- no documents reflecting how they're applied to

2   safety in an amended response, of course that would be

3   sufficient for us.

4        **MR. DONOHUE:**  Yeah.  So I agree there was a

5   conversation before about what exists and what doesn't, and

6   we're trying to confirm exactly some of the details of that.

7        But my understanding is there are -- there are no such

8   policies beyond the generic policies we've produced.  The only

9   thing that we're aware of that would be, arguably, something

10  reflecting how those policies are applied would be individual

11  compensation information.

12       **THE COURT:**  Okay.

13       **MR. DONOHUE:**  And we obviously have a separate whole

14  agreement and discussion around that.

15       **THE COURT:**  Okay.  So let me just -- other than

16  whatever's in people's personnel and compensation files, are

17  there -- are there documents that discuss the process or

18  criteria by which the policies are applied to those people

19  working on youth safety or just they don't exist?

20       **MR. DONOHUE:**  My understanding is they do not exist.

21       **THE COURT:**  Okay.  So you need to put that -- what I'm

22  hearing is you need to put that in a supplemental response, and

23  that may solve this current dispute.

24       **MR. DONOHUE:**  I think it may, yeah.

25       **MS. SIEGEL:**  Yep.

App. 385

1      **THE COURT:**  Okay.  And then RFP 71, 72, 76, and 79.

2      So this goes to documents -- or, actually, policies on

3   user complaints in different forms.

4      And I understand from YouTube is they've produced the

5   current policies, and it sounds like most of these are up on

6   the website somewhere or the terms of service, or something

7   like that.

8      **MR. DONOHUE:**  There's a number of different things

9   referred to as policies, and there's both internal and external

10  policies; but in either case, what we are referring to is a

11  website.  It's either an internal website or an external

12  website.

13     **THE COURT:**  All right.  And then what I understand is

14  that when we start talking about if there were prior versions

15  found, you've also produced those?

16     **MS. SIEGEL:**  No.  Sorry.

17     **THE COURT:**  If there were complete prior versions

18  found, you've produced them?

19     **MR. DONOHUE:**  If there were complete prior versions

20  that we encountered as part of our custodial production, those

21  were produced.

22     **THE COURT:**  Okay.  And what I'm hearing is the current

23  dispute is whether you need to go back and look in noncustodial

24  sources for the prior versions?  Is that what you're looking

25  for?

1      **MS. SIEGEL:**  That -- I think I would say that's

2  accurate.

3      **MR. DONOHUE:**  I think the issue is a little different

4  than that, which is that a prior version in the concept of

5  like, you know, here's a -- here is a complete document that is

6  the policy as it existed on such date does not exist.

7      Because these are -- these are websites, they're not

8  maintained in the same way as you might have a document where,

9  you know, you send out the new memo when there's a new version.

10 People go and they edit it, and there's not a saved version of

11 the former policy, quote/unquote, that existed on such and such

12 date.

13      **THE COURT:**  Okay.

14      **MR. DONOHUE:**  So what we have done is, we have

15 produced all the policies we have that exist.  And then my

16 understanding is there's a system where somebody can at a very

17 manual sort of edit-by-edit, policy-by-policy basis go through

18 and pull out, like, a little snippet for a particular date and

19 collect those.  It has to be done -- because the way the system

20 works, it has to be done on an individual per policy, like, an

21 individual -- a human pulling each one individually for each

22 change and then produce that.  And we have done that for a

23 number of the key policies that are at issue.

24      We have also offered that if there are particular other

25 policies that plaintiffs would like us to do that for, that we

```
 1   would be willing to discuss that.  Plaintiffs have not engaged
 2   in that.  Instead, want us to produce every -- basically do
 3   that process for every version change that we can find for all
 4   of the policies we have produced, which I think is -- it's in
 5   excess of 100 internal policies, maybe approaching 200.
 6          MS. SIEGEL:  If I could respond to that.
 7       I think there's a little bit -- first, a piece of
 8   clarification on what counsel has said, which is that they
 9   produced the key policies in this way of going back and getting
10   them.
11       But I don't think, or at least I don't understand, that
12   the key policies that he's referring to are these
13   complaint-oriented policies.  I think there are other types of
14   policies.
15       And the second thing I would say is, far from insisting
16   that they produce all versions in every policy, we have sought
17   to meet and confer with them regarding these requests and
18   historical versions of these requests for months.
19       In regard to the specific -- when they came back and said
20   that this was this process after months of asking them to
21   identify what the process was, we asked for additional
22   information so that we could understand what the burden was and
23   if there was a viable way to sort of limit the policies.
24       But it's not as though YouTube is saying, "Well, we know
25   that the policies were changed on XYZ date or that there were
```

App. 388

```
 1   significant changes in these policies on these particular
 2   dates."  They're essentially asking us to just shoot in the
 3   dark on which particular versions of the policies that we might
 4   need.
 5        And to the extent that they're claiming burden, it's not
 6   enough to just say, "No, actually, that would be really hard."
 7   It sounds like they know how to do this.  They're capable of
 8   doing this.  They've done it for other policies and procedures,
 9   and so they should have also an estimate of time, an estimate
10   of man hours, an estimate of cost of what it is to produce
11   these policies.
12        They haven't provided that.  They haven't provided
13   information about where even -- what even repository these
14   documents are stored in.  And so it's not that plaintiffs have
15   taken the position that no matter what burden you say, you have
16   to produce literally everything; it's that we've asked them for
17   information about the burden so to meaningfully meet and
18   confer.
19           THE COURT:  So tell me if I'm wrong.  I think YouTube
20   in the briefing identified what they think are the key
21   policies, which is child safety policy, harassment and bullying
22   policy, harmful or dangerous self-harm and eating disorder
23   policy, age-restricted content policy for the relevant time
24   period.  Is that -- oh, policy for reporting inappropriate
25   videos, channels, other content.
```

```
 1        Did I miss one?  One, two, three, four...  There's six as
 2   I count them.  Six; right?  Let me go through it again.
 3        Child safety policy; harassment and bullying policies;
 4   harmful or dangerous content policy; policy for reporting
 5   inappropriate videos, channels, or other content; suicide,
 6   self-harm, and eating disorders policy; and age-restricted
 7   content policy.
 8        Are those what you're referring to as the key policies?
 9           MR. DONOHUE:  Yes, Your Honor.
10           THE COURT:  But, as I heard you say, you're really
11   only interested in user complaint policies -- right? -- which
12   would be the policy of reporting inappropriate videos,
13   channels, and other content?
14           MS. SIEGEL:  We have certainly asked about policies
15   that relate to their policies on that type of content.
16   However, what they're not saying is that these are their
17   policies for investigating, responding to, and analyzing the
18   complaints, which is what is at issue in these questions.
19   Right?
20        Yes, the complaint reporting process is a part of it, but
21   it's not really the only part of it.  We're seeking policies
22   related to facilitating, documenting, reviewing, analyzing,
23   discussing, and responding to and addressing user complaints.
24           MR. DONOHUE:  Your Honor, if I may.
25        The -- if the issue is the identity of the policies that
```

```
1    are most important, we have produced the current versions.

2    Plaintiffs have those in their possession.  They can look at

3    those and say what they think they would like to come back to

4    us and say, "Can we go back on that?"  That's sort of what we

5    offered to do.

6        So I don't understand the issue about the dispute about

7    which policies are in dispute.

8             THE COURT:  What is it about that?

9             MS. SIEGEL:  They have not a single time phrased it

10   anything like that.

11       And I would also note that they have a very large document

12   production.  And to say, "You should be able to go find all of

13   the policies to determine which policies are the best ones to

14   come back to us and let us know," is different than them just

15   saying, "These are the policies."  Right?

16       And then number two is that they're not saying that if we

17   requested the specific policies, they would produce all of

18   those historical versions of that.  They're saying that we

19   should also from the current policies be able to pick a subset

20   of those policies -- a subset of those changes or versions, and

21   it's just not --

22            THE COURT:  So let's just go one step at the time.  I

23   mean, how hard is it to -- I mean, I assume the word

24   "policies" -- how hard is it to find these policies in the

25   document production?
```

App. 391

1      **MS. SIEGEL:**  I think that a search for the term

2  "policies" would be quite large.  I mean, we have tried.

3      **THE COURT:**  Does YouTube know where by Bates number

4  each of these policies are in production?

5      **MR. DONOHUE:**  I don't know offhand how it's been

6  logged.

7      **THE COURT:**  Okay.  So if what YouTube is saying, "We

8  produced all the current policies and you need to go back and

9  find the ones that you think are key" --

10      **MR. DONOHUE:**  And, Your Honor, respectfully, if we

11  produce more, that's not going to make it any easier for

12  plaintiffs to sift through and find what they want.  Plaintiffs

13  ultimately will have to do that.

14      **THE COURT:**  I mean, the phrasing that you've used,

15  because it's not capitalized, are these the titles of each

16  policy or are these just a generic -- or not generic -- but are

17  these just a description of the policy?

18      **MR. DONOHUE:**  It think that's a description of the

19  policy.

20      **THE COURT:**  Well, you know, Plaintiffs, if you're the

21  one who want to find out more information about these, I mean,

22  you're going to have to use keyword searches to try to find the

23  policies.  Right?

24      But I do expect, again, in the spirit of being transparent

25  and collaborative in the meet-and-confer process, if YouTube

 1  knows where the policies are, because you know you produced

 2  them with this production set on this date -- right? -- then

 3  you should tell the other side.  Okay?

 4          MR. DONOHUE:  Of course.  We'll look into that.

 5          THE COURT:  And to counsel's point, the categories of

 6  policies here don't go to policies, if any exist, on

 7  investigating or responding to user complaints.  Is it because

 8  they don't exist or you've produced them?

 9          MR. DONOHUE:  I'm not actually entirely sure the

10  answer to that question.  I think the way we are defining

11  things may encompass responding to user complaints.

12          THE COURT:  Okay.

13          MR. DONOHUE:  A content policy is related to what

14  happens when that content is reported, and that is a user

15  complaint in a sense.

16          THE COURT:  Okay.  And I'm sure the way each side is

17  using adjectives to describe a policy, that you're not going to

18  use the exact same terms.  So you need to -- I think this is

19  one on investigating reporting complaints, you still need to

20  meet and confer because, yeah, I don't think you're done on

21  that one.

22      But in terms of the historical policies, I do think both

23  sides need to do some work to try to find the policies and try

24  to figure out which of those you really do need the historical

25  versions; right?  And if it's a subset, if it's only one or

```
 1   two, I don't mean -- I don't think you've got much of a burden
 2   argument because it's only one or two.
 3        MR. DONOHUE:  Yeah, of course.  We have been happy to
 4   meet and confer on that basis.
 5        THE COURT:  Okay.
 6      All right.  I think -- does that cover all of those
 7   requests?
 8        MS. SIEGEL:  It does, Your Honor.  Thank you.
 9        THE COURT:  Okay.  So just to save the Court a little
10   bit of time, I'm going to ask you to jointly submit a proposed
11   order on resolving this one just so I make sure the
12   phraseology -- that we're all on the same wavelength on the
13   phraseology for that, Your Honor.
14        MR. DONOHUE:  Of course, Your Honor.  Thank you.
15        MS. SIEGEL:  Thank you.
16        THE COURT:  Five-minute break.
17                 (Recess taken at 2:28 p.m.)
18              (Proceedings resumed at 2:36 p.m.)
19        THE CLERK:  Now recalling 22-3047.
20      Counsel, as a reminder, please approach and state your
21   appearance every time you speak.
22        THE COURT:  Okay.  Who's doing Docket 1318, Meta
23   compensation docs?
24        MS. SCULLION:  Good afternoon, Your Honor.  Jennifer
25   Scullion for the PI/SD plaintiffs.
```

1          THE COURT:  Good afternoon.

2          MS. SAFFARINI:  Good afternoon, Your Honor.  Serena

3   Saffarini for the Meta defendants.

4          THE COURT:  Good afternoon.

5      Okay.  What is the compelling need for the exact dollar

6   figure of these 11 people's compensation, bonus, and stock

7   options reports?

8          MS. SCULLION:  Sure.  And thank you, Your Honor.

9          The compelling need is that, as Your Honor gave us

10  guidance when we looked at this issue with respect to TikTok,

11  we've targeted these deponents for whom we're seeking this

12  personnel information.  We engaged and came to agreement with

13  Meta on 11 out of 39.  We did pretty good on the targeting

14  there.  So we're getting the evaluations and the reviews and we

15  have the policies.

16      So we're missing sort of that third leg of:  Okay, here's

17  the policies of how bonuses and compensation are determined.

18  Here's part of the data that goes into that for that

19  individual, their evaluations -- you know, their reviews.  We

20  can see what was being discussed, what was the outcome.

21      So for those individuals, we're trying to get that

22  complete picture of -- again, what we're looking for really is

23  an understanding of Meta's conduct.  What did Meta do to

24  incentivize or disincentivize certain performance from these

25  individuals?  So it's really just to try and get that complete

```
 1    picture for the select group of individuals.
 2         THE COURT:  Okay.  How would the dollar figures alone
 3    give you the linkage between what you're calling incentivizing
 4    them versus the result of that incentive?
 5         MS. SCULLION:  Well, the dollar figures, because we
 6    can tie it to the policy, will tell us whether Meta was valuing
 7    them as someone who exceeded expectations or there's sort of
 8    those categories that Meta has and a lot of employers have.
 9         And we can look and see how does that compare to, well,
10    what was the review where they determined from that review to
11    be someone who had, in fact, exceeded expectations.  And if
12    that review, for example, from our perspective, is really
13    highlighting that that individual contributed greatly to one of
14    Meta's key goals, which was to expand user engagement -- and we
15    know -- expanding user engagement we know is something Meta did
16    look at in terms of its bonus policies generally.  So it's not
17    that we are guessing at this.
18         So if we can see from the review that person had comments
19    that that year they contributed to expanding user engagement,
20    you know, in a meaningful way and then we can see, well, what
21    was the outcome, you know, in terms of their bonus, were they
22    deemed someone who had exceeded expectations or I think there's
23    even like a way beyond that category, which I have here.
24         THE COURT:  You have the reviews that say exceeded --
25    you don't have the dollar figure, but you've got the review
```

```
 1   itself that says they exceeded or didn't explanations.
 2        MS. SCULLION:  I don't know that we actually have
 3   the -- that the reviews themselves say that they exceeded
 4   expectations.  We don't have --
 5        THE COURT:  Okay.
 6        MS. SCULLION:  -- you know, all of those yet for these
 7   individuals.  But, you know, so we do want to see what the
 8   compensation, you know, looked like, what the outcome was.
 9        We also -- the other part of it is we want to, frankly,
10   test to make sure that what Meta is saying the policy is is, in
11   fact, how it played out with individuals.  So there's sort of
12   that checking, you know, as well.  So there's those two.
13        THE COURT:  Okay.  Do you concede or you agree that
14   the information sought here is governed by the California
15   Constitution right to privacy or do you dispute that?
16        MS. SCULLION:  So, Your Honor, we -- we agree that
17   concept of compensation is -- I think Your Honor correctly drew
18   a distinction last time between stuff that's coming from their
19   personnel file as opposed to from the accounting files.
20        We took that to heart, and that's why we went back with
21   Meta and the other defendants and said, "Well, we want the
22   information coming out of your accounting files."  And YouTube,
23   for example, we were able to reach an agreement on a number of
24   the deponents.  We're still discussing others.
25        So in that respect, it's not clear to me that it really
```

1  does fall within California's policy; but even so and if it

2  did, I think Your Honor last time correctly drew -- said there

3  was a balance to be struck here, and that that balance could be

4  struck by targeting, you know, a subset of individuals, which

5  we did.  We've stayed away, at Your Honor's direction, from the

6  lowest level of folks.  We've also stayed away from the very

7  highest level of folks as well because at a certain point, that

8  also becomes a little bit meaningless.

9      So we have focused in on folks in the middle; and even

10  within that, we have horse traded, we've made a deal, and

11  we've, you know, gotten to these 11.

12      **THE COURT:**  Okay.  What's Meta's position on this?

13      **MS. SAFFARINI:**  Your Honor, I can start by saying,

14  yes, the reviews do include those exceeded expectations --

15  Meta's expectations ratings.  And so to the extent that

16  plaintiffs are conceding that that's really what they are

17  looking for, that already has started to be produced and we're

18  doing rolling productions for the 11 that we've agreed to.

19      **THE COURT:**  So the real dispute is over the dollar

20  figures then?

21      **MS. SAFFARINI:**  It sounds to us like the only thing

22  that they're asking for is the dollar figure.

23      I would also add that the combination of the policy and

24  those ratings actually does get plaintiffs what they want, and

25  it's not really clear to us that the dollar figure is additive

1    in any way, that it is a third leg.

2        And so these policies are highly confidential, so I'm not

3    able to discuss in detail on the record, but plaintiffs do have

4    these policies; and if they look at them side by side with the

5    performance reviews, they do have what they need.

6        THE COURT:  Do you have -- what's your response to

7    that?

8        MS. SCULLION:  Again, so we haven't actually seen the

9    evaluations and reviews to know if they do consistently have

10   those -- those indications.  So if we could get those and

11   continue to confirm that.

12       THE COURT:  It sounds like you are getting them or you

13   have gotten them.

14       MS. SAFFARINI:  We have produced for two of the -- I

15   think there's a kind of rolling as we get them out of our

16   system and we're kind of targeting as the depositions are

17   scheduled to make sure we get them ahead of those.

18       THE COURT:  Have you seen those two that have been

19   produced?

20       MS. SCULLION:  I have not, Your Honor.  I -- the first

21   deposition I know of that's coming up for this is actually

22   still coming up, so I didn't understand they had been produced

23   yet.

24       THE COURT:  Okay.  So -- well, let me ask you this:

25   We do have a protective order, and there's certainly case law

```
 1   that says, you know, balance the privacy right, you know, if
 2   there's a compelling need.  And there's some support in the
 3   case law for the fact that since you can put it under a
 4   protective order, that helps protect the right to privacy and
 5   mitigate the issue.
 6        So why isn't putting the dollar figures under protective
 7   order, even at the highest level, why isn't that sufficient?
 8        MS. SAFFARINI:  Well, Your Honor, plaintiffs haven't
 9   articulated any relevance to the dollar figure at all, and so
10   even just to begin the balancing, it's a very weak need.
11        On the other hand, there is --
12        THE COURT:  But I -- so I don't want to put words in
13   counsel's mouth, but what I heard -- and I'm sure she'll tell
14   me if I'm wrong -- is that the relevance is that knowing the
15   dollar figures is the final piece of the puzzle in terms of the
16   factual record as to how the policy was implemented in terms of
17   rewarding people based on the results of the review.
18        MS. SCULLION:  Yes.  And I guess I would add,
19   Your Honor, the actual dollar figure, it's just -- I think it's
20   just ordinary human nature that the amount of the money can be
21   more motivating or disincentivizing depending on the actual
22   amount.  I mean, it's not as if the actual amount doesn't
23   matter to any of us in terms of our incentives.
24        THE COURT:  Yeah.  I mean, hypothetically, since
25   nobody here -- we're not talking about dollar figures.  I mean,
```

1    if somebody got a zero bonus even though worked hard on

2    increasing user engagement, that actually hurts the plaintiffs'

3    case; right?  So it's a fact -- the dollar figure has, at some

4    level, some evidentiary value -- right? -- in the hypothetical

5    I posed, for example.

6          **MS. SAFFARINI:**  Right.  And, Your Honor, the policies

7    would reflect that -- the policies with the performance reviews

8    would already reflect that without needing -- if it was a zero

9    dollar, if they received no bonus.

10      I, mean, again, I can't go into the details of the policy,

11   and it sounds like maybe plaintiff needs some time to review

12   those now that they have been produced or have started to be

13   produced.

14      But to the extent plaintiffs claim that they just need to

15   see the trend year over year in correlation with the

16   qualitative reviews of what we are producing, that is something

17   that they can get from the policies we have already produced.

18         **THE COURT:**  So the two that have been -- two persons'

19   materials have been produced, is that everything historical as

20   well or just their current?

21         **MS. SAFFARINI:**  It is -- it's for, I believe, the

22   relevant time period.  We have several years of reviews.

23         **MS. SCULLION:**  If I may?

24         **THE COURT:**  Yeah.

25         **MS. SCULLION:**  Your Honor, I guess I would add, again,

```
 1    just the actual numbers that do matter to see -- just, again, I
 2    think it's human nature to understand what the actual amount
 3    is.  Your Honor pointed out if for some reason the numbers are
 4    counter to our story, then, you know, the chips will fall where
 5    they are.
 6        My colleague reminds me that the Pradaxa court, which we
 7    did cite, did point out that the percentage of increase is not
 8    enough.  You need to know the actual amount of compensation
 9    because a 10 percent, you know, bonus on a much lower amount of
10    compensation is very different from a higher amount of
11    compensation.  So the actual amount is relevant as observed by
12    the Pradaxa court.
13        MS. SAFFARINI:  And, Your Honor, this is the first
14    time that plaintiffs have claimed that they need the actual
15    number.  I mean, this whole briefing reflects that they're
16    talking about the trend.  All of our discussions have been
17    about how they want to show how Meta's conduct in relation to
18    the plaintiffs -- or in relation to the employee's performance
19    and how Meta incentivizes the employees, and that is reflected
20    in the policies.
21        To now kind of try to claim that they -- for the first
22    time, that they need the dollar amount is at odds with all of
23    our prior discussions.
24        And also, I mean, as we cited in our briefing, the dollar
25    amount is not necessarily relevant particularly where you
```

```
1    already know that these are Meta employees.  Right?  So to the
2    extent you're trying to show bias, the HP court said that:  We
3    already know this person is a full-time employee of HP.  You
4    don't need the dollar value of his compensation to show his
5    bias.
6        By contrast, some of the cases that plaintiffs cited were
7    about third parties who are, you know, under kind of a
8    short-term contingency where perhaps the dollar amount would be
9    relevant to bias.
10       MS. SCULLION:  Your Honor, with all due respect, the
11   entire dispute is about trying to get the specific dollar
12   amounts.  We've always said that that is what is relevant here.
13       And, again, you look at cases like Pradaxa that recognize
14   that, in fact, it's not -- we're not trying to get it to show
15   bias.  We're trying to get it to show the incentives and the
16   disincentives, and the actual amount that was provided to
17   someone naturally is understood to be relevant to how much they
18   were trying to be incentivized or how much Meta was trying to
19   disincentivize them.
20       THE COURT:  Okay.  But you did make the bias argument
21   in an offhanded way in your briefing, so -- but I hear what
22   you're saying, you're not focusing on that.
23       So --
24       MS. SAFFARINI:  If I may add one other thing the -- at
25   least on the -- on this part.
```

App. 403

```
1      Plaintiffs have not shown any kind of justification for
2   this theory that there is a trend that's incentivized in
3   particular, that these policies even take into account the
4   kinds of incentives and metrics that they're claiming we are
5   trying to -- we're trying to encourage.  So to the extent that
6   they haven't even kind of made that initial showing, there
7   really is no reason to believe that this kind of is anything
8   more than a fishing expedition.
9          THE COURT:  Well, without the historical documents,
10  they can't show the trend.  I mean, it's kind of a
11  chicken-and-egg problem, isn't it?
12         MS. SAFFARINI:  Well, and as I said, they do have the
13  historical documents and they do have the trend.
14         THE COURT:  Yeah.
15         MS. SCULLION:  I'm sorry.  I didn't want to interrupt.
16         THE COURT:  Last word.
17         MS. SCULLION:  No, it's just -- I mean, just the
18  policy, again, just vaguely talks about basically
19  performance -- your performance.  So to actually be able to
20  see, again, all the pieces together is going to be important as
21  you're getting into a deposition to understand:  Who is this
22  person in front of you?  How are they incentivized?
23      When I'm looking at the documents and looking at why they
24  made certain choices, what they did, putting it all together,
25  that story together, to see what the actual compensation was,
```

1   what the actual result was of this compensation and bonus

2   policy is critical to being able to weave that story together.

3          MS. SAFFARINI:  And, Your Honor, I can represent that

4   that is not an accurate statement about the vague nature of the

5   policy.  The policy is quite clear and specific, and I think

6   counsel does have that policy.

7          THE COURT:  Maybe.  I took her statement as vague

8   because she was trying to avoid saying anything in open court.

9          MS. SCULLION:  I was.  I'm happy to hand up to

10  Your Honor a piece of paper.

11         THE COURT:  No, I don't need to see that.

12     So are you both here through the CMC tomorrow?

13         MS. SCULLION:  I am scheduled to return this evening.

14  If Your Honor would like me to stay and meet and confer, I'd do

15  that.

16         THE COURT:  Because it sounds like at least two -- the

17  files for two people have been produced, and you haven't had a

18  chance to look at them.  What I'm hearing from Meta is that if

19  you had those, that might -- that might be enough to satisfy

20  you -- right? -- without -- because we don't know what's in

21  them.  There may be enough detail in there that it actually

22  allows you to craft the evidentiary record that you want to

23  craft without knowing the actual dollar figures.  I don't know

24  that.  You don't know that either -- right? -- because you

25  haven't looked at them, admittedly.

```
 1        So I'm going to order you to meet and confer after we
 2   break for today here, and you can stay in the courtroom and
 3   there's an attorney lounge upstairs.  It shouldn't take that
 4   long.  Hopefully you can pull those files up on your laptop.
 5   Yes?
 6             MS. SAFFARINI:  Yes, Your Honor.
 7             THE COURT:  Okay.  And then try to meet and confer and
 8   try to see if either, A, it moots the motion because if
 9   that's -- if it's of such detail and of such a character that
10   you don't think you need the actual dollar figures, that's
11   great; or it may reduce the number of people from 11 to some
12   lower number because, again, I don't know what's in there.
13   Right?
14             MS. SCULLION:  It's that -- and I'm happy to do that,
15   Your Honor.  Obviously we will.  It's that last part that I
16   don't know that looking at two is going to tell us about the
17   balance of them, but we will be happy to look and see what we
18   can figure out.
19             THE COURT:  It may or may not.
20             MS. SCULLION:  Yeah.
21             THE COURT:  The issue is I don't know because I
22   haven't looked at them either; right?  And so I just want to
23   hold them open as a possibility, that once you see the detail
24   that's actually in the -- and I'm -- we're talking about the
25   entire historical files for these people; right?  It may be
```

App. 406

1    enough of a trend and enough data and details in there you may

2    be, like, "Okay.  We actually only need it for these people."

3    Or it may not.  Right?

4            MS. SCULLION:  And, Your Honor, after we've met and

5    conferred to --

6            THE COURT:  Then submit a joint -- put something on

7    the record in the docket saying that, you know, you met and

8    conferred and were still unable to resolve the motion, and I'll

9    issue an order then.  Okay?

10           MS. SAFFARINI:  Your Honor, and to just at least put

11   on the record as well that in addition to the tenuous relevance

12   of this information, plaintiffs' request should be denied

13   because it goes back on several agreements that they've made in

14   discovery that we have already closed out compensation-related

15   requests based on RFP 123.

16           THE COURT:  I saw that and saw a dispute as to whether

17   they waived their rights to that, and I don't -- I mean, I take

18   the point, but I don't think that's -- if it was a situation

19   where they didn't respond on the issue and were saying -- but,

20   you know, there's a real dispute there.  So try to work it out,

21   if you can.  If you can't, then I'll issue an order on it.  But

22   I understand the argument.  I'm just -- I'm not quite that

23   persuaded by it, so I'm probably not going to reach the merits

24   of it unless I have to.  Okay?

25           MS. SAFFARINI:  Right.  And perhaps just the one point

```
 1    that might help on that is that for the -- Meta actually went
 2    through the -- all of the custodians and identified the one
 3    individual who is not subject to those policies and then
 4    provided additional information about his compensation, which,
 5    again, shows that Meta was intending to wrap up this entire
 6    dispute, and that was the conversation that was had at the
 7    time.
 8         MS. SCULLION:  Your Honor, I think we explained in the
 9    papers the RFP asked for policies.  When there was a dispute,
10    you know, one of the things that was discussed in the meet and
11    confer was:  Well, then just provide us the actual compensation
12    numbers.
13         But the resolution of that was not that we said, "Okay.
14    Now we're never getting, you know, compensation numbers because
15    you've now agreed to give us the policies."
16         I mean, it's -- it feels like they're taking a potential
17    resolution that was offered in a meet and confer in order to
18    address what ultimately was not an objection that they stood
19    behind and now trying to say that was a waiver of something,
20    and I've -- that makes no sense to me.  That's not how a meet
21    and confer works.  That's not what that particular RFP was
22    about, and it's certainly nothing we actually did waive in
23    those discussions.
24         THE COURT:  I've heard both sides on that point.
25    Anything further on this motion?
```

1           **MS. SCULLION:**  No, Your Honor.

2           **MS. SAFFARINI:**  No, Your Honor.

3           **THE COURT:**  So submit something, if you can, today

4    after the meet and confer.  Just let me know if I need to issue

5    an order on it.  Okay?

6           **MS. SCULLION:**  Thank you, Your Honor.

7           **THE COURT:**  All right.

8           **MS. SAFFARINI:**  Thank you, Your Honor.

9           **THE COURT:**  Okay.  All right.  Mr. Yeung, should we go

10   back to where we left off with you?

11          **MR. YEUNG:**  Sure.

12      So let me start by clarifying one thing that I said about

13   Pennsylvania.  My understanding is that they've now agreed to

14   provide search terms and custodians, but it won't be until

15   early December.  I imagine they may need to revisit that plan

16   given the deadlines now.

17          **THE COURT:**  Okay.  Good.

18          **MR. YEUNG:**  So in terms of the other states, other

19   agencies, we already talked about California.

20      Georgia had been refusing, but they're also agreed --

21   they've also agreed to stipulate to dismiss their case with

22   prejudice, so I think we can skip them.

23      New York, the Division of Budget and the Governor's -- and

24   the governor have refused to provide search terms and

25   custodians.

1        **THE COURT:**  Hold on.

2     Okay.  So New York.  Give me the names again.

3        **MR. YEUNG:**  Division of Budget and the Governor's

4  Office.

5        **THE COURT:**  Have they stated to you why they're

6  refusing to provide custodians or search terms?

7        **MR. YEUNG:**  Same position of California essentially,

8  that they're not subject to this Court's orders.

9        **THE COURT:**  Okay.  Is there counsel for New York in

10  the room today?

11        **MR. COCANOUGHER:**  No, sir, Your Honor.

12        **THE COURT:**  Okay.

13        **MR. COCANOUGHER:**  But I believe -- I believe counsel

14  for New York was going to come because they were going to do

15  letter briefing, and then they ended up not doing letter

16  briefing.  I think they believed that the issue was resolved,

17  so I don't believe they're here today, but we can certainly try

18  to contact their counsel.

19        **MR. YEUNG:**  We told them to hold off on the letter

20  briefing because the counsel for the governor and the Executive

21  Office was going to provide a proposal to us yesterday, which

22  they did.

23     My -- what I'm reacting to now is what has happened since

24  that proposal.  There's still nothing on the Governor's Office.

25  There's still nothing on the Division of Budget.

```
 1        What they did give us yesterday were -- sorry -- were
 2   search terms for the Department of Mental Health, the
 3   Department of Health, and the Office of Children and Family
 4   Services, and the Council for Children and Families.  So those
 5   agencies are not in compliance with the custodian aspect of
 6   Your Honor's orders.
 7        So it was not brought to letter briefing because the world
 8   changed a little bit since we last spoke on the issue.
 9             THE COURT:  So wait.  You got a proposal yesterday
10   from?
11             MR. YEUNG:  The counsel to the New York Governor's
12   Office, the Executive Chamber, who represents, as I understand
13   it, all six of the agencies that I just mentioned for New York.
14             THE COURT:  But you just told me the Governor's Office
15   is refusing to provide.
16             MR. YEUNG:  They provided for their office.  They have
17   not -- they've refused to provide, but their position is --
18             THE COURT:  For their office.
19             MR. YEUNG:  Their position is that they also represent
20   some other executive agencies.
21             THE COURT:  Okay.
22             MS. O'NEILL:  May I speak, Your Honor?  Megan O'Neill
23   on behalf of the State AGs.
24        I've just been in communication with counsel for the
25   New York AG and just have a brief update.
```

App. 411

1      The New York AG has been facilitating conferrals with all
2  of the relevant State agencies.  The agencies are not refusing
3  to comply with the orders.  The negotiations are ongoing, and
4  the AG thinks that productive conferrals can still continue.
5          **THE COURT:**  Including for the Division of Budget and
6  the Governor's Office itself?
7          **MS. O'NEILL:**  That is my understanding.
8          **THE COURT:**  Okay.  Well, I'd suggest you reach out to
9  them immediately and see if you can jump start those
10  discussions.
11          **MR. YEUNG:**  Yep.
12          **THE COURT:**  Okay.  Is there anybody else I need to
13  know about who's refusing to provide custodians and search
14  terms?
15          **MR. YEUNG:**  So for Rhode Island, my understanding is
16  that on -- they're going to provide us with a reason why
17  certain agencies do not need search terms or custodians, but
18  they're not -- they haven't given that to us yet and they
19  haven't agreed to do search terms and custodians.
20          **THE COURT:**  Is there anybody from Rhode Island here?
21          **MR. COCANOUGHER:**  No, Your Honor, but I can check with
22  their counsel.
23      It's my understanding from previous discussions with him
24  that they are working to get search terms and custodians for
25  each of their agencies.  It was not -- it was not represented

App. 412

```
 1  to me that any of the Rhode Island agencies are completely

 2  refusing to provide search terms and custodians.

 3          THE COURT:  Okay.  Again, as with the previous

 4  discussions about those two New York departments and divisions,

 5  you ought to follow up with Rhode Island.

 6          MR. YEUNG:  We'll follow up with them.

 7          THE COURT:  Okay.

 8          MR. YEUNG:  The South Carolina's Governor's Office.

 9                      (Pause in proceedings.)

10          MR. YEUNG:  The South Carolina Governor's Office.

11          THE COURT:  They are refusing to provide custodians

12  and search terms?

13          MR. YEUNG:  Correct.

14          THE COURT:  Okay.  Anybody from South Carolina here?

15          MS. O'NEILL:  Megan O'Neill for the State AGs.

16      No, but that is my understanding of the position of the

17  South Carolina Governor's Office.

18          THE COURT:  That they -- as with those eight

19  California agencies, they are not going to provide custodians

20  or search terms?

21          MS. O'NEILL:  Excuse me, I would appreciate a moment

22  to confirm that, if that's possible.

23          THE COURT:  Sure.

24          MS. O'NEILL:  Thank you.

25          THE COURT:  Okay.  Let's move on.  Anybody else?
```

1          MR. YEUNG:  For South Dakota, the Office of the

2   Governor and the Bureau of Finance and Management.

3          THE COURT:  Anybody from South Dakota here today?

4          MR. COCANOUGHER:  No, Your Honor.

5          THE COURT:  Okay.  All these states have stuck you

6   with it, so can you confirm that they are not providing

7   custodians and search terms because they don't -- they just

8   don't feel like they're required to because they don't believe

9   in the order or...

10          MR. COCANOUGHER:  I will -- I will reach out to them

11   right now.

12          THE COURT:  Okay.

13          MR. COCANOUGHER:  And that was -- sorry.  Could you

14   tell me --

15          THE COURT:  Office of the Governor and Bureau of

16   Finance and Management.

17          MR. YEUNG:  Bureau -- correct.

18          THE COURT:  Okay.  Anyone else?

19          MR. YEUNG:  So we did cover Minnesota already

20   previously.  Our understanding of their position is that the

21   three agencies in discussion, that the Department of Commerce,

22   the Governor's Office, and the Office of Higher Education, that

23   they're not going to provide search terms and custodians I

24   believe based on -- is it relevance grounds or some other

25   grounds?  But we're not getting them.

App. 414

1      **MS. MICKO:**  Good afternoon.  Caitlin Micko on behalf

2  of the State of Minnesota.

3      These three agencies -- Commerce, the Office of Higher

4  Education, and the Governor's Office -- have asked to be

5  deprioritized after conducting a reasonable search and

6  concluding that they had no responsive documents, and Meta has

7  refused to deprioritize them or engage or provide clarity on

8  what they are looking for from these agencies despite our

9  requests.

10      They are continuing to negotiate, however, and on Monday

11  they agreed to provide information about the process that they

12  undertook to reach that decision.  So meet and confers are

13  ongoing.

14      **THE COURT:**  Okay.  It sounds like you need to wrap it

15  up with them and figure out if you want to deprioritize them or

16  not.

17      **MR. YEUNG:**  Understood.

18      There are a number of other agencies that -- from

19  individual states where -- who are not agreeing to supply

20  search terms and custodians for a variety of reasons, but we

21  are still talking with them.

22      **THE COURT:**  Okay.

23      **MR. YEUNG:**  I can run down that list as well.  We're,

24  you know, continuing to talk with them.

25      **THE COURT:**  Is it -- well, let me make the question a

App. 415

```
 1   little more pointed.  Are they not providing custodians and
 2   search terms because of ongoing negotiation about overbreadth
 3   and burden; or are they not providing custodians and search
 4   terms because, as stated on behalf of those eight California
 5   agencies, they don't believe they're subject to the Court's
 6   jurisdiction and they don't believe they are subject to party
 7   discovery?
 8        MR. YEUNG:  I think it's -- I don't have them broken
 9   out in that level of detail.  I know some of them certainly
10   fall into the bucket of "We have done our work.  We don't think
11   we have relevant documents."  We've gone back and we said, "But
12   what about this or that?"  And there's discussion going on.
13        There are some Governor Offices included in that bucket.
14   I'm just not -- I haven't been engaged in those discussions
15   personally, so I don't know if it's of the nature of, you know,
16   "We're refusing for the moment because we're outside the
17   jurisdiction but we're willing to talk."  Right?  These are all
18   states who have said, "We're willing to talk."
19        THE COURT:  Okay.  So if they're willing to talk, for
20   now I won't put them in the bucket of -- the bucket of type of
21   refusal that I'm searching for.
22        Okay.  Is there anyone else that falls into that bucket,
23   essentially of taking the position similar to those California
24   agencies and the Governor's Office for South Carolina, which
25   are the nine that I'm aware of right now?
```

1          MR. YEUNG:  I don't believe so.

2          THE COURT:  Okay.  It sounds like we've got updates.

3          MS. O'NEILL:  Yes.  Again, Megan O'Neill for the State

4    AGs.

5      I have confirmed with the South Carolina AG's Office that

6    the South Carolina Office of the Governor has not thus far

7    provided them access to the documents.  They would like to note

8    that they thought that they were in productive conferrals with

9    Meta regarding whether a Rule 45 subpoena could be issued

10   instead, but that is the status as far as I'm aware.

11         THE COURT:  Okay.  As I stated earlier, in light of my

12   order, subpoenas are no longer -- if I've ruled that that

13   agency is subject to party discovery, because I didn't do it

14   for every agency, but, yeah, okay, not applicable in this

15   particular case I don't think.  All right.

16         MS. O'NEILL:  Thank you.

17         MR. SCHMIDT:  Your Honor, may I just say one thing on

18   this?  Paul Schmidt for Meta.

19      I think what you're hearing is this has been a really

20   involved process.  We've heard loud and clear from the Court

21   that the Court wants us to be conferring, and that we shouldn't

22   dig in on formalities where we can work things out with them.

23      What we have seen -- so we have been doing that and that's

24   taken a lot of people from our team.

25      What we have seen is two things that have made that very

 1   challenging.  One is, with a number of the agencies we have not

 2   gotten progress until we're on the verge of going to the Court

 3   and suddenly we get progress.  That's frustrating in terms of

 4   moving things ahead, but we've been working that out and we

 5   have made progress in that way.

 6        The second thing, and I just want to flag this for the

 7   Court because I think it's going to be potentially a big bucket

 8   of agencies we come back to the Court with, is there are a

 9   large number of agencies, and we heard it hear from Minnesota,

10   where they're saying, "We want you to figure out how to not

11   burden us with your discovery," when we've served them with

12   discovery, we're willing to give them search terms, and we're

13   not getting either search terms or hit reports back.

14        And those ones I think we're going to be back to the Court

15   on some of those.  And we're fine continuing to negotiate, we

16   will.  We'll narrow, as we've been doing, where that's

17   appropriate; but I think there's going to be a number of those

18   we come back to the Court on because their view is, even though

19   the Court said search terms, even though the Court said

20   custodians, even though the Court said today hit reports, we're

21   not getting those.

22        And if we can look at them and say, "All right, we can

23   live without that," we will, but we're not going to be able to

24   do that for all of them where they're essentially trying to put

25   the burden on us to figure out for them what they think is

1    relevant when we tried to do that through search terms and

2    through the document requests at the outset.

3            THE COURT:  Let me put a pin in that.  If it's -- some

4    of it sounded -- tell me if I'm wrong.  I've forgot her name,

5    the counsel from Minnesota.

6        Three of the agencies from Minnesota have been -- despite

7    not getting agreement on search terms, they've been producing

8    and collecting documents and getting them to you.  Is that --

9    are my notes correct on that or on the process of doing that?

10           MS. MICKO:  There's -- Your Honor, Caitlin Micko for

11   the State of Minnesota.

12       There's two agencies.  One agency has completed its

13   production.  Another one will complete this week.

14           THE COURT:  Okay.  And I thought Department of Human

15   Services was also working on producing and collecting

16   documents.

17           MS. MICKO:  That's right.

18           THE COURT:  And then Department of Education also.

19           MS. MICKO:  Is working on production.

20           THE COURT:  Right.  So --

21           MS. MICKO:  That's forthcoming.

22           THE COURT:  Right.  So there are three agencies -- so

23   if it's a situation like that where you've got agencies where,

24   okay, they technically haven't complied with my order and you

25   don't have search terms or custodians but they've actually

1   collected and they're producing documents, then I think it's

2   incumbent on the agencies to explain to Meta how you found the

3   documents.

4           MR. SCHMIDT:  Yes.

5           THE COURT:  If you didn't use their search terms or an

6   agreed set of search terms, you need to be transparent with

7   them on how you did that.  It can be done verbally.  It doesn't

8   need to be done in a supplemental response to the document

9   request unless there's going to be a real dispute over that;

10  right?  But even then, hopefully it can just be done by letter

11  brief.  Okay?

12          MS. MICKO:  Your Honor --

13          MR. SCHMIDT:  That's all I'm asking for, Your Honor.

14  It seems fundamentally unfair to us to say, "We've got a

15  certain amount mass, 5,000, 10,000, whatever it is, you're

16  done," and we don't know how they got that mass, we don't know

17  what might have been missed.  That's what we're pushing on, you

18  know, and that's where I think Your Honor has already ruled.

19  For every agency you addressed that question with search terms

20  and custodians and hit reports.

21          THE COURT:  And, again, if an agency chooses not to go

22  down that road but they are transparent with you about how they

23  got the documents and that resolves the issue, as you said,

24  Meta should live with it -- right? -- because it may not be

25  perfect but it may be good enough.

1          **MR. SCHMIDT:**  Yeah.  I think the question is if that

2     resolves the issue.  If it truly does, then we're being

3     reasonable.  If it doesn't and we have questions, then we've

4     got a court order from Your Honor saying search terms and

5     custodians, and that's the default mechanism.  That's certainly

6     what we followed in meeting their discovery requests.  That's

7     what they should do.

8          But we will look at what they give us.  If we have these

9     exceptions where they started before that order and they're

10    saying, "This is good enough," if we can understand and get

11    that comfort, then we'll work with them on that.

12         **THE COURT:**  I expect you to be, you know, as hopefully

13    you do in your negotiations, be flexible and, you know,

14    cooperative with each other.  Because, again, if it's a

15    situation were they produced some thousands of documents

16    already and they tell you how they found them, maybe wrap it up

17    by giving some -- you know, a follow-up go-get-them request.

18    In other words, you don't need to start from scratch on search

19    terms and all that if you just think there's some stuff

20    missing.  Right?  And then you can negotiate whether there's

21    some, you know, cleanup to do it.

22         I rather you try to work it out that way informally as

23    opposed to try to start from scratch with trying to then craft

24    search terms and all that because that's going to mess up the

25    schedule.

1          **MR. SCHMIDT:**  Yeah, and we're not saying anything

2    different.  Our only view is having fought and lost this issue

3    for the better part of a year, they shouldn't now be able to

4    say, "We're going to win this issue on the backside just by not

5    complying."

6          If they have another way of complying and it's a

7    reasonable way, we'll work with them on that.

8               **THE COURT:**  All right.

9               **MR. NGUYEN:**  Your Honor, Thomas Nguyen for the State

10   of New Jersey.

11         I just do want to make a quick note for the record.  So

12   New Jersey provided Meta with search terms; and during our meet

13   and confer, Meta stated that they would redline them and

14   provide them back to us, especially with regards to the

15   location limiters or spacing limiters between different terms.

16         Instead, Meta did exactly what Your Honor warned them not

17   to do, which is to start completely over and provide new search

18   terms as a wholesale, and they did this after waiting 19 days

19   beforehand.

20         So with regards to New Jersey, we would just ask

21   Your Honor to remind everyone that to the extent that there are

22   search terms being proposed, that we don't start over.  And

23   Your Honor did so previously, but we would just encourage

24   further encouragement there, Your Honor.

25              **MR. YEUNG:**  New Jersey is maybe the one state who has

 1   provided more than a handful of search terms.

 2        And what we had asked them to do was, "Let's -- you know,

 3   we've got two search term proposals.  Give us the hit reports

 4   and then we can have a discussion."  We haven't gotten the hit

 5   reports for -- at least for our terms, as I understand it, but

 6   we're willing to work with them.

 7        But I also don't want the New Jersey experience to be

 8   informative for the rest of the AGs because it's very

 9   different.  The -- I mean, terms that we've been getting from

10   the other AGs are 8 to 15 -- anywhere between 8 to 15.  I told

11   you about the four I got from New York, which, you know, is

12   low.  It's very different from what's going on with New Jersey.

13        But we're -- our request with New Jersey was:  Give us the

14   hit reports and let's have a discussion about which terms are

15   ripe.  And we haven't received those yet.

16        **MR. NGUYEN:**  Your Honor, may I clarify?

17        So with regard to the hit reports, we presented Meta with

18   our search terms, but Meta didn't indicate one way or the other

19   whether or not they would accept them for the purpose of

20   running hit reports.  Instead, providing wholesale a new set of

21   terms, which were much more expansive and also don't have any

22   location limiters but regards to the terms are rather just mere

23   and/or statements.

24        So with regards to the hit reports, we, of course, take to

25   heart that hit reports are an effective way to provide a metric

1    through which Your Honor and, of course, Meta can assess the

2    viability of certain terms, but we would need guidance about

3    whether or not the hit reports should be run on Meta's terms

4    that they proposed wholesale or our original terms.

5         Because we were under the impression originally that we

6    were operating under the terms that we proposed, but then Meta

7    then proposed new terms which were being introduced to other

8    states but really didn't make sense given that New Jersey

9    provided very tailored terms to the responses -- or requests, I

10   should say, Your Honor.

11        **THE COURT:**  Well, I mean, why not both?  I mean, you

12   could run the search terms on both.  I mean, is there anything

13   stopping you from doing that?

14        **MR. NGUYEN:**  There is a resource concern, Your Honor,

15   given that a lot of these agencies are using Microsoft Purview,

16   if I recall correctly, which we're running across, like, the

17   custodians documents.  So it's not as if they're exporting it

18   and running it on a different site.  So there are technical

19   limitations, as well as bandwidth limitations, as well as

20   manpower limitations associated with running these hit reports.

21        **THE COURT:**  So at a minimum, I mean, you proposed the

22   search terms, you ought to run the hit reports on your own

23   search terms.  And if you can show the hit reports show that

24   you're returning, you know, a sufficiently large number of

25   documents, then that could inform how Meta approaches the

```
 1   further negotiations.  Right?
 2        And, Meta, if there are competing more than a handful of
 3   search terms on both sides, you know, at some point the
 4   ordering of whether you get the search terms before you
 5   modify -- get the hit reports before modifying the search terms
 6   and all that, in this situation, I think you should be flexible
 7   and you should be talking --
 8            MR. YEUNG:  Understood.
 9            THE COURT:  -- more iteratively about this.  Okay?
10            MR. YEUNG:  Understood.
11            MR. NGUYEN:  Makes sense to us, Your Honor, and we'll
12   provide guidance to the State agencies to begin running those
13   hit reports and also to work with Meta in an iterative fashion.
14            THE COURT:  Okay.  Yep.  All right.
15            MR. NGUYEN:  Thank you.
16            THE COURT:  Okay.  Just so I'm clear -- so -- oh, wait
17   a minute.  Is there going to be somebody try to confirm with
18   South Dakota or not?
19            MR. COCANOUGHER:  I'll do that right now.
20            THE COURT:  Yeah.
21            MR. COCANOUGHER:  I apologize, Your Honor.  I was
22   going to see if any other states were called that I need to
23   come up there.
24            THE COURT:  Okay.
25        All right.  So just so I'm clear -- and just somebody
```

App. 425

```
 1    stand up and tell me if I'm wrong -- those agencies that are
 2    not complying with the orders from myself and
 3    Judge Gonzalez Rogers are the eight California agencies listed
 4    previously; and so far the Governor's Office for South Carolina
 5    and possibly, subject to confirmation, the Office of Governor
 6    and the Bureau of Finance and Management for South Dakota?  Am
 7    I missing anybody or have I overincluded anybody?
 8         MR. YEUNG:  I think there are the Rhode Island
 9    agencies; the New York agencies, which -- I understand that
10    we're going to reach out to them.  But those two.
11         And then there's -- again, there is this bucket of
12    agencies who have taken -- specific agencies who have taken
13    various positions on whether or not search terms and custodians
14    are appropriate, but we're still meeting and conferring with
15    them so I haven't identified them.
16         THE COURT:  No, we're only talking about --
17         MR. YEUNG:  Yeah.
18         THE COURT:  So New York and Rhode Island sound like
19    they want to talk to you, so --
20         MR. YEUNG:  Yes, and we're going to reach out.  I
21    mean, yeah.  Yeah.
22         THE COURT:  So I'm not going to put them in this
23    refusal bucket or true holdout bucket.
24         MR. YEUNG:  Sure.
25         THE COURT:  Okay.  While we're waiting for
```

1  confirmation about South Dakota, let's do this:  So in the CMC

2  Joint Statement, Docket 1337, for Judge Gonzalez Rogers, the

3  parties raised a question about clarifying whether

4  Judge Gonzalez Rogers' order should be clarified in light of my

5  order or orders, and whether production, according to Meta's

6  Rule 45 subpoenas, is intended to take place in lieu of

7  producing in response to Meta's request for production under

8  Rule 34 for the agencies in receipt of such a Rule 45 subpoena.

9      Who's going to speak to that issue?  Because I will let

10  you know, I've conferred with Judge Gonzalez Rogers on this

11  issue and since this is essentially a request to clarify her

12  order but also in light of my order or my orders in light of

13  her order, it's my order too, so I'm going to -- so I'm here to

14  clarify.  So --

15      **MR. SCHMIDT:**  We think we have the Court's guidance.

16  We don't think there's anything to clarify with

17  Judge Gonzalez Rogers.

18      **MS. O'NEILL:**  Megan O'Neill for the State AGs.

19      We disagree.

20      **MR. SCHMIDT:**  Sorry.  Can I say just one more thing?

21      To the extent there is something to clarify, it's really

22  just asking Judge Gonzalez Rogers in a procedural and

23  appropriate way to reverse what Your Honor did.

24      We had a ruling from Judge Gonzalez Rogers that said,

25  "Coordinate, continue complying with Judge Kang."  We had a

```
 1   ruling the next day from Your Honor saying, "Here's what you
 2   need to do to comply."
 3        There's really no question, in our view, that needs
 4   clarification.  If they want to appeal Your Honor's ruling,
 5   that would be misplaced we think, but that's not what they're
 6   purporting to do.
 7             THE COURT:  Appeal to the Ninth Circuit you mean?
 8   They've already appealed.
 9             MR. SCHMIDT:  Well, I think they're trying to appeal
10   again the latter ruling, the day-after ruling.
11             THE COURT:  Okay.
12        All right.  Go ahead.
13             MS. O'NEILL:  Thank you, Your Honor.
14        We do think that there is a lack of clarity as to how the
15   different orders interact, and we are not seeking to relitigate
16   issues that this Court has already decided, but we do think
17   that there is some ambiguity as to how the Court's October 30th
18   order -- excuse me -- YGR's October 30th order and your
19   later -- Your Honor's --
20             THE COURT:  Did you say "YGR's"?
21             MS. O'NEILL:  Excuse me, Judge Gonzalez Rogers.
22   Sorry.  Judge Gonzalez Rogers'.  You can have preview into my
23   notes -- my note taking here.
24        -- and Your Honor's later discovery management order.
25        The October 30th order reinstated the Rule 45 subpoenas
```

1    that Meta served on several State agencies of course.  It

2    directed the parties to immediately resume and continue

3    document productions based on those subpoenas.

4        The Court also stated that the parties should comply with

5    Your Honor's orders, of course, regarding timing and procedures

6    to complete discovery but, quote, "to the extent that Rule 45

7    subpoenas were not issued."

8        Our position is that that order is clear that

9    Judge Gonzalez Rogers was directing the parties to focus on the

10   Rule 45 subpoenas to the extent that they were issued.  And so

11   those agencies who were issued Rule 45 subpoenas should, at

12   least in the interim, focus on completing the productions under

13   those subpoenas and not being forced to start from scratch with

14   search terms and custodians and party discovery where they were

15   already far along the road of complying with the Rule 45

16   subpoenas and producing under those subpoenas.

17       We think that's a more efficient result that's going to be

18   the result -- or that's the procedure through which we can get

19   documents -- the agencies can get documents produced most

20   quickly and most efficiently for this case.

21       THE COURT:  So just so there's complete clarity, I'm

22   not going to speak for Judge Gonzalez Rogers, but the Court

23   does not believe those orders in conjunction are unclear in any

24   way.

25       Okay.  So, yes, to the extent agencies have been

App. 429

```
 1   subpoenaed, they are to complete the collection and production
 2   of documents pursuant to those subpoenas and work with Meta to
 3   negotiate that.  But to the extent Meta has served Rule 34
 4   requests for production that reached those agencies, now to the
 5   extent that Meta has done so, presumably Meta is being
 6   judicious and not seeking to start from scratch completely with
 7   duplicative requests for production that duplicate what's in
 8   the subpoenas or, you know, essentially trying to do a do over
 9   from what's in the subpoenas.  Right?  And so I'm assuming
10   everybody is acting reasonably here.
11       I view the way you should be going forward is that you
12   should be, A, yes, focusing on getting the documents in
13   response to the subpoenas out, of course; but to the extent
14   there are requests for production that are outside the scope of
15   the subpoenas and what's sought there -- right? -- and, again,
16   I think the assumption has been that what you asked -- what
17   Meta asked for in the subpoenas is kind of both from the
18   priority -- prioritized agencies and the prioritized sets of
19   documents from those agencies, presumably hopefully there won't
20   be a lot of requests for production directed to those agencies
21   that need follow up on, but presumably there will be some.
22   Right?
23       And that -- I don't see anything in either order that says
24   that should be held in abeyance, and so there needs to be equal
25   effort made to getting those documents, you know, searched for
```

```
 1    and produced and, as I said at the top of this hearing, get

 2    this done.  Okay?

 3              MS. O'NEILL:  Thank you, Your Honor.

 4              MR. SCHMIDT:  Thank you, Your Honor.

 5              MS. O'NEILL:  I appreciate that.

 6         And can I ask for just one clarification?

 7              THE COURT:  Sure.

 8              MS. O'NEILL:  I think it would be very helpful for the

 9    State agencies for Meta to identify specifically what they are

10    looking for above and beyond what was called for in the

11    subpoenas and what negotiations had resulted in over those

12    Rule 45 subpoenas, so that the State agencies can really

13    understand and not duplicate efforts between the Rule 45

14    subpoenas and the Rule 34 discovery.  I think that would be

15    helpful and efficient for both parties.

16              THE COURT:  I was hoping that you would have done that

17    between yourselves anyway.  I would have hoped that some

18    paralegal somewhere would have taken the requests and the

19    subpoenas and compared them to the document requests and

20    cross-checked which ones line up and which ones don't.  No?

21              MR. SCHMIDT:  I -- we have -- we've been doing that on

22    our end.

23         I don't think there's a ripe dispute on this issue before

24    the Court.  They've certainly not identified in their

25    submission to Judge Gonzalez Rogers anything that is ripe on
```

```
 1    this dispute other than that they don't want to do search terms
 2    and custodians.
 3         And nothing about Judge Gonzalez Rogers' ruling exempted
 4    them from that.  It just says, "Work on the subpoenas where
 5    there's subpoenas."  That doesn't preclude search terms.  And
 6    the next day Your Honor confirmed that by saying, "Do search
 7    terms."
 8         We have two groups of states.  One that already agreed and
 9    maybe wants to get out, and one that was ordered to both before
10    and after by Your Honor and they're trying to get out.
11         That's not proper, and it's especially not proper when we
12    think of how this arises.  The only reason we have these
13    subpoenas is because the way the states briefed this issue, it
14    took time for the Court to resolve this issue.  And Your Honor
15    said to us in that time, "Try to be efficient.  Go out and do
16    subpoenas."
17         We did that, and now they're saying:  Oh, we lost this
18    issue, but you started the subpoenas so excuse us from what
19    some of them agreed to and some of them were twice ordered to
20    before and after Judge Gonzalez Rogers' ruling, and we don't
21    think that's a proper request for relief.
22         MS. O'NEILL:  Your Honor, I think you already --
23    excuse me.
24         THE COURT:  So you made your point, but I think you've
25    already won so you don't need to make that point again.
```

 1          **MR. SCHMIDT:**  Okay.  Thank you, Your Honor.

 2          **MS. O'NEILL:**  And I would just like to say, I meant no

 3  disrespect to Judge Gonzalez Rogers.  It's been quite a day.  I

 4  appreciate your indulgence with that.

 5          **THE COURT:**  Yes, I will agree.  I don't take it that

 6  you meant her any disrespect.

 7          **MR. SCHMIDT:**  Your Honor, I know Your Honor doesn't

 8  speak for Judge Gonzalez Rogers, but does this resolve this for

 9  tomorrow or shall we --

10          **THE COURT:**  She will have her own things to say on

11  this issue to you.

12          **MR. SCHMIDT:**  Okay.  Thank you, Your Honor.

13          **MS. MICKO:**  Your Honor, on the same point, though, I

14  just want to be clear for the record that you indicated that

15  you expect Meta to not restart the process, but that has been

16  Minnesota's experience so far, is that Rule 45 agencies who

17  have either completed or substantially completed and negotiated

18  their subpoenas are being asked to restart the process all

19  over.  And so that's, you know, part of where we're seeing

20  these orders differently.

21          **THE COURT:**  So this goes to the second part of what I

22  said, which is, presumably -- we're only -- to the extent we're

23  talking only about party discovery now to those agencies who

24  were subpoenaed, it's only party discovery that's

25  nonduplicative of what's in the subpoenas.

 1        And, again, I said hopefully it's not that many requests

 2   because, presumably, what was asked from the agencies in the

 3   subpoenas is the core of what you wanted anyway.  Right?  And

 4   understanding that Minnesota is in a slightly different

 5   position because you voluntarily produced the documents without

 6   reaching agreement on the search terms.

 7        Again, if you share how you found the documents, again,

 8   that may resolve everything as well.  Right?  And it may

 9   resolve whatever document requests they think weren't covered

10   by the subpoenas that they need to get more discovery on is

11   what I'm saying.  Right?

12             MR. SCHMIDT:  Yes.

13             THE COURT:  I don't know what you did; right?

14             MR. SCHMIDT:  Just to illustrate that concretely, for

15   one of the Minnesota agencies, my understanding, I think it's

16   consistent with counsel -- counsel's representation earlier, is

17   they've produced 13,500 documents.  If they tell us how they

18   found them and they included looking across their surfaces and

19   their sources, that might answer it.  It might be that they

20   just pulled down some public stuff, then that wouldn't answer

21   it.

22        Another agency produced eight documents.  That -- it's not

23   saying we're starting over to say, "We don't think that's fair.

24   We don't think you clearly used search terms.  And if you did,

25   tell us what you used and what it hit on."  That is a different

1    discussion.

2        **THE COURT:**  I assume that's the agency that's in the

3    process of still producing stuff.

4        **MS. MICKO:**  Yeah.  That's not a fair representation.

5    They've communicated this week about exactly what they did for

6    their production, to answer your question, and they have a much

7    more voluminous production forthcoming.

8        **THE COURT:**  Okay.  So --

9        **MR. SCHMIDT:**  I'm not representing they're done.  I'm

10   just telling the Court where it is now.  That's all.

11       **THE COURT:**  I take your point.  It's not really ripe

12   as to -- because I don't -- hopefully you're able to work

13   out -- if there's party discovery document requests to agencies

14   that have been subpoenaed, hopefully you're able to work out

15   what that is.  And, again, I'm going to caution Meta not to

16   overreach there and be judicious in terms of what you seek over

17   and above what was in the subpoenas.

18       **MR. SCHMIDT:**  Yeah, we've -- if I could say two things

19   on that, Your Honor.

20       We have had the view that they have been successful in

21   getting much more from us than we can get from them, and that

22   doesn't seem fair on our side.

23       We have also heard loud and clear what Your Honor said

24   about being judicious and being targeted, and we're acting on

25   that.

```
 1              THE COURT:  Okay.  One of the unfortunate truths of
 2    life is that is often unfair.
 3              MR. SCHMIDT:  That's why we have courts, Your Honor.
 4              THE COURT:  I was once told by a judge on the
 5    East Coast.
 6         All right.  So anything further?
 7              MS. MICKO:  No.  Thank you, your Honor.
 8              MR. SCHMIDT:  Thank you, Your Honor.
 9              THE COURT:  Yeah.
10              MR. WHELIHAN:  Nathan Whelihan for the Arizona
11    Attorney General's Office.
12         I just wanted to put on the record that for Arizona, Meta
13    has made the same representations to us that the Rule 45
14    subpoenas, they've called them a subset of the 34, but when we
15    asked them to clarify how they're a subset or what -- the
16    subset what they would need additional, they say they're two
17    different things.
18         And so I just want to put that on the record, that Meta
19    has not approached this with Arizona from the perspective of,
20    "Oh, well, if you tell us how you did that, we might be
21    satisfied with that."  You know, they've treated them as:  You
22    have to do that and you have to do it again.  So --
23              MR. SCHMIDT:  I don't know that that's a fair
24    representation, but we'll talk with them.
25              THE COURT:  Work it out, and then presumably you're
```

```
 1   going to be cooperative and transparent about which you think
 2   are duplicative and not requested production that need be
 3   followed up on and which are still at least open to discussion
 4   as to whether there needs to be anything further done.
 5           MR. SCHMIDT:  We hear loud and clear Your Honor's
 6   direction in that regard.
 7           THE COURT:  Okay.
 8           MR. SCHMIDT:  Your Honor, if we've had our list of
 9   states come up, my colleague --
10           THE COURT:  No, no.  South Dakota is still --
11           MR. COCANOUGHER:  Your Honor --
12           THE COURT:  Yes.
13           MR. COCANOUGHER:  -- I've e-mailed and called all the
14   numbers I have and have not been able to --
15           THE COURT:  So you can tell your colleague from
16   South Dakota that they're on the list as a true holdout for
17   now, but they can always raise that with Judge Gonzalez Rogers
18   at a different point in time and with me.  Okay?
19           MR. COCANOUGHER:  Thank you, Your Honor.
20           MR. SCHMIDT:  We had an emergent issue that we've been
21   discussing with the plaintiffs that and my colleague,
22   Mr. Imbroscio, wanted to address.
23           THE COURT:  Okay.
24           MR. IMBROSCIO:  Good afternoon, Your Honor.  Mike
25   Imbroscio.
```

App. 437

1      We're here on an issue relating to a deposition that was

2 supposed to happen today and tomorrow.  It's a deposition of

3 Miki Rothschild, who's a fairly senior Meta employee.  He

4 oversees the entire central youth product organization at the

5 company.

6           **THE COURT:**  Okay.

7           **MR. IMBROSCIO:**  It's actually the third time we've had

8 the deposition set.  It was set originally in August.  That was

9 taken down, and they asked for dates in October.  We gave them

10 dates in October that they accepted.  And they came to us and

11 said, "Well, you've actually produced too many documents.  We

12 need more time."  First time I've heard that in a case.  And so

13 we set on November 21, '22.

14      That date has been noticed since September 13th.

15 Mr. Rothschild obviously has arranged his schedule both for

16 prep and for the deposition and cleared two full days in what

17 is otherwise a pretty busy time.

18      I, alongside several of my colleagues, came out for the

19 deposition and the day before the deposition at about 12:50, we

20 got a note from Mr. Cartmell who said that they're going to

21 pull down the deposition.  The stated basis was there was a

22 document that was recently clawed back that was inadvertently

23 produced, clawed back, and they said, "Until we get that

24 document, we don't want to proceed on the deposition."

25      Within about 28 minutes of me getting that letter, I

1   e-mailed back to Mr. Cartmell and said, "That's the only

2   reason?  Let's get on the phone, let's talk about it.  Surely

3   we can't -- I don't want to waste these two days.  If you want

4   to fight the challenge, that's fine, I'll get into the document

5   in a minute, but that's not a reason to stop the deposition."

6       Mr. Cartmell declined to call me back, declined to engage

7   otherwise despite what can fairly be called imploring to do so.

8       I wanted to get on the phone with Your Honor yesterday,

9   which I thought was a reasonable thing to do.  They declined to

10  even have an H.2. or something, whatever the equivalent would

11  be.

12      I said, "Well, the judge's standing procedures does have

13  emergent deposition protocol."  That only applies if we're in a

14  deposition I was told.  In fact, I was accused of -- let me get

15  this right -- violating the Court's standing order by even

16  suggesting getting you on the phone.  I've been doing this for

17  a lot of years, Your Honor, never had that happen before.

18      So, basically, what's happened is we've now lost the

19  chance to take this deposition.  The document -- you know,

20  there is a dispute over whether this document is privileged.

21  It came into existence because we got a -- we got a request I

22  think on November 5 to follow up on one of these hyperlinks and

23  whether the document hyperlinked was this, in fact, document.

24  The document they provided was labeled "Attorney-Client

25  Privilege" on the front cover.  It led us to think, "Hold on

 1   here.  Maybe something went awry."  We produced, I think,

 2   about -- what? -- 8 million pages, I think a huge number of

 3   documents.

 4        And I said, "Okay.  Well we can -- we can sort that out

 5   but that's not a reason to hold the deposition.  And if it

 6   ultimately turns out after review by the Court that it's not

 7   privileged or fully privileged as we've said, we can -- you

 8   know, we'll bring the witness back.  You know, we can do it."

 9   They refused and said, "No, this is" -- essentially, as I

10   understand their argument, it's the linchpin of the deposition.

11        We've produced over 74,000 documents for this gentleman.

12   He is at the center of this case as it relates to youth, and

13   they didn't proceed.

14        It's just very frustrating that this happened this way.

15   Setting aside the imposition of the witness, which is

16   substantial, you know, we had four lawyers out here.  The

17   client flew in from out of town to do all this.  We had a tech

18   person who was here in town for this.

19        And so I'm sort of at a loss on what we're supposed to do

20   here.  We -- the deposition, like, as you know, was coordinated

21   with Tennessee.  It was actually originally noticed by the

22   Tennessee lawyers and then cross-noticed on the 13th by the MDL

23   plaintiff lawyers.  I would note that it was the MDL plaintiff

24   lawyers that we'd been discussing the dates with, including the

25   "You produced too many documents" discussion.

 1          We -- when they didn't agree to get on the phone with

 2    Your Honor yesterday, we asked to see -- to talk to the

 3    Tennessee judge this morning, which we did.  The Tennessee

 4    judge basically said, "You know, what am I supposed to do?"

 5          The lawyer for Tennessee, even though he very candidly

 6    said, "I'm not involved in the deposition.  I didn't even see

 7    the document, but I'm told by the team that it's the linchpin

 8    and we can't go forward."

 9          I think the judge reasonably said, "You know, I'm here in

10    Tennessee.  I really can't force you to go forward."  And he

11    did say Tennessee was probably rolling the dice on this one;

12    but, you know, we couldn't get the deposition to proceed today.

13          So we think that's improper.  We think there ought to be

14    consequences for it.  We want to get this deposition set as

15    quickly as we can, get a date for the witness.  But we think

16    there ought to be -- the consequences, and I'll be very

17    straight about it, and I've communicated this relief to the

18    plaintiffs, one is we think they ought to be docked some amount

19    of time for the day that they wasted, five hours, seven hours.

20          Two is, we ought to pick a date that's convenient to the

21    witness in the very near future that's his date that he can do

22    and arrange it.  We're at the end of the year, lots of business

23    meetings.  In fact, he's arranged his schedule to do the

24    deposition these two days before things got busy at year-end.

25          And, three, I think there needs to be some sort of

App. 441

1    recognition through fees and costs of going through this

2    process.

3        I'm happy to answer any questions, including about the

4    substance of the document, which I think is not the issue

5    that's relevant here, although we'll certainly be prepared to

6    deal with that in the course of the hearing.

7            **THE COURT:**  Response.

8            **MR. CARTMELL:**  Good afternoon, Your Honor.  Tom

9    Cartmell for the MDL plaintiffs.

10       We strongly disagree with, I guess, the characterization

11   about what happened and, most importantly, that the deposition

12   was postponed or the suggestion that it was postponed for not a

13   good reason.  I guess what I'd like to do, Your Honor, is

14   respond and tell you what happened and why it mattered.

15       The documents that we're talking about were produced to us

16   by Meta in August.  Presumably at that time lawyers from Meta

17   reviewed the documents -- right? -- and found that they were

18   not privileged.

19       Since August at least, we have been reviewing with what

20   I'll call the Miki Rothschild deposition team thousands and

21   thousands of documents.  They've produced I think, that's

22   right, 70,000-plus documents.  The deposition team includes

23   lawyers from PSE firms like my firm, AG MDL lawyers, Tennessee

24   AG lawyers, Kentucky AG lawyers, Massachusetts AG lawyers,

25   Arkansas AG lawyers.  That's the Miki Rothschild team.  And

1    we've been pouring through documents for months and months and

2    months whittling them down to prepare for this deposition so

3    that we could have, you know, a targeted, you know, efficient

4    examination, and we've done that over time.  We were totally

5    prepared for this deposition.

6         This witness -- let me say first, the documents that were

7    clawed back that we're talking about in this case are hugely

8    critical to this witness.  They go to the heart of this

9    witness' testimony, and let me give you a little bit of context

10   about that.

11        Mr. Rothschild was the senior product director for youth

12   safety and well-being, definitely high up, reports to Mr. Cox

13   who reports to Mr. Zuckerberg.  Very important deposition.

14        And he is credited throughout the organization by Mr. Cox,

15   by Mr. Clegg, the highest levels, as developing the strategy,

16   the business plan for the entire company -- it started with

17   Instagram, but it was adopted throughout the company -- on

18   preventing harms to kids to safety and well-being.  That's what

19   the plan was.

20        And he credits himself for that.  He does a performance

21   evaluation and he says, "What I did in 2022 was I developed and

22   implemented the youth strategy and business plan for how we are

23   going to handle youth safety and well-being across the family

24   of apps."

25        So these documents that we're talking about here that were

 1   clawed back are the plan.  They're the business plan.  They're

 2   the strategy.

 3       We had set up our work and our outline for this deposition

 4   to talk about the most important factor with this witness in

 5   his deposition; and three days, business days, before the

 6   deposition occurred at 8:40 my time, that's Midwest time,

 7   6:40 here, we got a notice, a letter, saying, "The plans, the

 8   strategy" -- I think it was three documents -- "are being

 9   clawed back."

10       Now, we didn't know it at that time.  That was Friday at

11   8:40.  We couldn't figure it out until Monday because it didn't

12   go through in our DISCO system and all that.  All we had was

13   the Bates numbers, and we had to figure out whether or not

14   these were documents we were going to use.

15       So Monday I figured out -- afternoon Monday, I think, my

16   paralegal came in and she told me, "They clawed back two of the

17   documents on your outline for the deposition."  I went to the

18   outline and figured out what they were.  They were the plan,

19   the strategy plan, the business plan, the heart of the

20   deposition for him, the most important documents at that point.

21       So at that point we put together -- we gathered up

22   everybody on the team -- the Tennessee AGs, the Massachusetts

23   AGs, the MDL AGs -- and we got on a Zoom and we said, "What

24   should we do?  Here's what happened.  It's just happened right

25   now."  And we said -- you know, talked about what we should do.

1    And at that point unanimously everybody decided it doesn't

2  make sense to go forward with this deposition.  We're taking

3  the deposition of the guy who developed the plan, the business

4  plan, on safety and well-being for kids and three business days

5  before they claw it back.

6    Now, we had told them November 5th, we had sent them a

7  letter or an e-mail saying -- November 5th we're trying to

8  figure out if this is the same hyperlink where it says "this

9  plan" because we wanted to make sure about that before the

10  deposition.

11    They waited 10 days.  We didn't hear a thing from them

12  until 10 days, and at 8:40 on the 15th they clawed it back.

13  Okay.  And then we started what happened on Monday.

14    Monday evening we sent an e-mail or letter over to them

15  saying specifically that they needed to remove the redactions

16  and we want to have a meet and confer immediately; and that if

17  they didn't remove them, the redactions, we were considering

18  postponing the deposition.

19    We asked them to do it by 9:00 a.m.  At 8:59 a.m., the

20  next day -- now we're on Tuesday of this week -- 8:59 a.m. we

21  find out from them that they're not willing to remove the

22  redactions.  They sent us the redactions and -- because they

23  had told us that they were going to do that after that.

24    Once we figured that out and we had offered

25  meet-and-confer times at 10:00 a.m. Midwest time for the meet

App. 445

```
 1    and confer, they said, "We're not available till 4:00 p.m."
 2         At 4:00 p.m. my colleagues attended a meet and confer with
 3    I believe it was one lawyer from Meta who really didn't have
 4    any knowledge about the document or didn't seem like, I'm told,
 5    was prepared to be involved in the deposition.  We were asking
 6    specifically:  What's the basis for the privilege?  She was not
 7    able to tell us any basis for the privilege.
 8         We said at that time:  We are willing to, you know, do
 9    some emergency briefing and get this before the Court and
10    immediately reschedule the deposition of Mr. Rothschild, and
11    they refused to do so at that point.  They wouldn't do it.
12         So then -- so I get on a plane.  I come out here,
13    Your Honor, on a plane with my team.  The Kentucky AGs get on a
14    plane, they come here.  Tennessee AGs are here.  Massachusetts,
15    I'm not sure.  Arkansas AG is here.  And everybody heads to
16    California, you know, because we don't know specifically
17    whether or not they're going to remove all the redactions or
18    say, "Let's just go ahead and do it."
19         And so we get here, and I've been here since Tuesday.  We
20    all have been here.  On Wednesday around mid-morning,
21    11:00 a.m., we get the e-mail, I do, from Meta's counsel saying
22    we want to have an emergency meet and confer and our plan is to
23    have an emergency some sort of hearing or procedure or
24    submission to you, Your Honor.
25         And the reply back immediately after we all got on the
```

App. 446

```
 1   phone, all the AGs, the entire time and the MDL AGs from the
 2   other states, and said, "Is this a procedure?  Is this
 3   something?  Is it in Your Honor's order to do this?"  We looked
 4   at the orders, and what the order says is:  During a deposition
 5   if you have a conflict and there is a problem, you can notify
 6   me and there may be an emergency procedure.
 7       We responded that there's no procedure for this, and we
 8   don't believe that you have an appropriate basis to do this.
 9   We're willing to bring this up at the hearing tomorrow.  We're
10   willing to bring the document and show the document in camera
11   to Your Honor; and if Your Honor decides that we should go
12   forward with the deposition immediately, we're willing to do
13   that.
14       We responded to them twice or three times yesterday.  We
15   didn't think that there was an appropriate procedure.  We
16   weren't trying to blow them off.  We weren't trying to ignore
17   them or prevent them to do something improper -- or proper, but
18   there was no mechanism to do it at that point.
19       So, Your Honor, I guess what I would say is this document
20   is -- we've decided as a team, and as all of us in these cases,
21   that going forward with this deposition without these documents
22   that are really at the heart of his testimony, that the
23   structure of our examination is built -- you know, is built
24   on -- there's other documents, for sure, and documents that go
25   to the -- you know, his work up to that policy and things like
```

App. 447

```
 1   that, but you take his examination about:  Here's the work you
 2   did, the work you did, it goes to the crescendo and there's no
 3   plan?  That didn't make sense to us.
 4        So we decided that it was most efficient for you to
 5   actually get a chance to hear this and then rule on this and
 6   then at that point, based on your ruling, reschedule the
 7   deposition.  We took down the notice.  We renoticed it for
 8   December 12th and December 13th.
 9        I will say this, Your Honor:  There is absolutely no
10   incentive -- and I'm not sure what Meta's counsel is saying our
11   motive would have been or our incentive would have been to pull
12   this deposition out.  We're ready for this deposition.  We're
13   here.  We'd spent months preparing.  I can tell you, personally
14   this is horrible for me to reschedule this deposition.
15        In the MDL we have all kinds of work we have to get done.
16   I have other depositions that I have to get done that I'm
17   assigned to, and this jams a lot of stuff for us.  There was no
18   reason for us to pull this down.
19        And the other thing I would say is, two weeks ago, a
20   little over two weeks ago, we got a letter from defense counsel
21   saying, "Heads-up, we're not going to have produced all of
22   Miki Rothschild's documents by the time of his deposition, and
23   so you better understand that and I recommend that we
24   reschedule that to January 30th and 31st."  This was their
25   recommendation because they were telling us, "If you take the
```

1    deposition and you know that we're not going to have given you

2    all the -- you're taking it at your own risk and we're not

3    going to let you take the deposition again."

4         Now, we didn't agree with that obviously, but we decided

5    at that time, we turned him down.  We said, "No.  We're ready

6    to go.  We're going to take the deposition."  So I think that

7    shows there was no reason for us to just bail on this

8    deposition.

9         As far as his comment that this has been taken down twice

10   before, I totally disagree with that.  That was -- one of those

11   was, as you'll recall, we were working through a new discovery

12   order and timing of the custodial file productions, and it just

13   so happened that his fell so early that there was no way we

14   were going to have the documents.  So that wasn't just us.

15   That was an agreement between the parties that we would push it

16   back.

17        Now, you know, this document, we believe strongly, is not

18   privileged.  We are prepared as soon as possible, Your Honor,

19   as you want us to, and we'll file briefs, we'll go through the

20   process, and we'll set the deposition as soon as possible.  We

21   don't want any more delay than that.

22             **THE COURT:**  Can you get me a letter brief tomorrow?

23             **MR. IMBROSCIO:**  We have -- we worked over the last

24   24 hours to get you the relevant affidavit or declarations.  We

25   have the documents we can hand to you right now.

1    Here's the problem:  That's what we were prepared to do.

2    They got signed this morning.  But that's what I wanted to

3    happen yesterday.  We could have begun the deposition today,

4    had this hearing in the afternoon; and if Your Honor found the

5    document, you know, needed to be redacted less or produced in

6    its entirety, we could have done that for the day two, but

7    we've now lost that opportunity and that's what's incredibly

8    frustrating, why we wouldn't even just get on the phone and we

9    could just call Your Honor.  That's the way professionals are

10   supposed to act, and that's not what happened.

11       And it's very, very frustrating because, as Mr. Cartmell

12   said, this jams up all our schedules, including the witness'

13   schedule but also all of our schedules.  We are jam packed.

14   There's not a free day on most of our schedules between the

15   depositions and the preparations and the travel to do all this

16   work in the next four months.

17       **THE COURT:**  Do you-all remember, I think it was the

18   first or second DMC, I asked you:  Did you have a schedule for

19   when you were going to start talking about depositions?  And

20   you-all looked at me like I was crazy; right?

21       **MR. IMBROSCIO:**  That's why in these cases depositions

22   are scheduled two months out.  That's why this has been noticed

23   since September 13th.

24       I'm actually surprised a lot of orders in cases we have

25   have a no cancellation within three days' period provision.

```
 1   This doesn't for whatever reason.

 2        But let me just respond to two things that -- first, this

 3   suggestion that we just willy-nilly said we weren't going to

 4   produce all the documents by his deposition left out a pretty

 5   crucial fact.  This was a brand-new document request that came

 6   in earlier that month on teen accounts.  Of course, we said

 7   it's not going to be available.  We said, "Hey, as you probably

 8   imagine, these documents aren't going to be ready.  We can move

 9   it."  This was a month ago.  "We'll move it, but let's do it

10   now so we don't waste time."  They said, "We're going to move

11   forward."  That's fine.  You know, you can take your chances

12   there.  So the suggestion that we somehow don't care about this

13   date is just wrong.

14        We're talking about basically one document.  It's

15   different versions of the same document.  The notion -- I think

16   in our clawback letter we pointed out the fact that there were,

17   in fact, lawyers involved and we identified the lawyers because

18   it did not appear on the face of the document, even though the

19   face of the document cover pages you'll see has

20   "Attorney-Client Privilege" on it.

21        And like a lot of things, there's a complicated story with

22   the document, which was laid out in the affidavits.  But, like,

23   that's almost beside the point, Your Honor.  Like, there are

24   always going to -- discovery is not perfect.  There are always

25   going to be issues.
```

App. 451

```
 1        You know, yeah, we did produce these documents in August,
 2   but it was their inquiry that led us to realize, "Hey, a couple
 3   versions of this document were produced."  A number of them are
 4   already on the privilege log.  It's not like there was some
 5   affirmative decision.  This was a mistake.  Someone didn't look
 6   at this document the right way.  That happens.  Discovery is
 7   not perfect.
 8        But we can't live in a world where if we don't have an
 9   absolute perfect deposition, you know, set of documents, you
10   know, we can't proceed.
11        As a general matter, these folks have been using between
12   40 and 50 exhibits even for the last couple depos this week,
13   and there have been -- there were two earlier depos this week;
14   one that I defended and one that I attended partially.  I think
15   they used 35 or 40 exhibits in each one.  So the notion that
16   one document, even as crucial as Mr. Cartmell suggests it was
17   to their entire theory of this case or this deposition, that's
18   not a reason to do this.
19        At a minimum, we should have been on the phone with
20   Your Honor to get it done, and that's -- I'm expressing
21   frustration as you can tell, but that's -- I don't think it was
22   appropriate what happened here.
23            MR. CARTMELL:  Your Honor, briefly, if I may respond
24   to that.
25            THE COURT:  Very briefly.
```

```
 1              MR. CARTMELL:  Yes.  First of all, we offered to

 2    brief.  They refused.

 3         The other thing is these documents are not the same

 4    document.  They're not the same document.  He said that they

 5    were two of the same, just a little bit different.  They're

 6    totally different documents.  They're totally different

 7    documents.

 8              THE COURT:  Wait.  Just so I'm clear, is it one

 9    document that was clawed back or --

10              MR. CARTMELL:  Three documents.

11              THE COURT:  Three documents.

12              MR. CARTMELL:  Two of them apply to Mr. Rothschild.

13              THE COURT:  Okay.

14              MR. IMBROSCIO:  It's three versions of a PowerPoint

15    presentation.  One is 50 pages --

16              MR. CARTMELL:  That's not true.  One is 50 pages.  One

17    is 47 pages.  One is Phase 1 of the business plan.  One is

18    Phase 2 of the business plan.

19         I've lived with this document for, you know, months.  I

20    know this document in and out, and we can't talk about it, I

21    get it, but that's what these documents are.

22         The other thing, Your Honor, is part of our -- because he

23    brought this up, part of the reasoning, you know, that we felt

24    unanimously among all of us lawyers on this team was because we

25    were concerned about gamesmanship as well.  If three-day --
```

App. 453

```
 1   business days before a deposition when they know the documents
 2   that we are going to use -- this whole hyperlink thing is
 3   really strange to me because I've never gone through it; right?
 4   They're a tech company, they use hyperlinks.  We have to ask
 5   them for hyperlinks to prepare for a deposition so they know
 6   what documents we're going to use; right?
 7        So we sent them a hyperlink.  We said, "We're going to use
 8   this document."  They knew it.  Ten days later right before the
 9   deposition we get a claw back.
10        Part of it is gamesmanship, and we don't want that
11   continue happening.  And, frankly, this is a bigger subject on
12   the whole issue of overuse of redactions that is being
13   exhibited in this case.
14        So this idea that nobody can cancel a deposition three --
15   three days in advance, you know, we're concerned about the
16   gamesmanship that nobody can claw back a document that just --
17   they know we're going to use it, and it gets clawed back right
18   before a deposition when it's the most -- you know, some of the
19   most important documents in the case.
20             THE COURT:  So the primary gating item is to figure
21   out whether that document is privileged or not, right --
22             MR. CARTMELL:  Yes, Your Honor.
23             THE COURT:  -- as I understand?
24        So can you get me a letter brief on it tomorrow?  Is that
25   too soon or can you do it Monday?
```

App. 454

1          **MR. CARTMELL:**  I was asked to ask for Monday.

2          **THE COURT:**  Okay.  Monday.  Letter brief on Monday on

3   the privilege issue.  I will prioritize getting to it.

4      In the meantime, on the assumption that I work as quickly

5   as I can to decide that issue, and it may not be the world's --

6   it won't be a 258-page order, can you nail down another date

7   for Mr. Rothschild's deposition?

8          **MR. IMBROSCIO:**  We are working very closely with him

9   because of the upheaval this has caused.  The dates that they

10  suggested can't work.  We don't want to let it slip into the

11  new year because he's already prepared.  You know, we're

12  looking at dates the first two full weeks of the month.

13         **THE COURT:**  January?

14         **MR. IMBROSCIO:**  No, of December.  We want this to

15  happen in a week.  You know, hopefully a week -- either a week

16  from this Monday or two weeks from this Monday or Tuesday, but

17  I should say, the witness is still trying to arrange his

18  schedule.  But our view is the date that the witness says it

19  should happen, it should happen.

20      And, frankly, like, that is, as you say, the primary

21  gating mechanism as to what's -- but in many ways that's not

22  the real issue here.  The real issue is they shouldn't be

23  allowed to do this.  Like, this is -- okay.  I'm sorry.

24         **THE COURT:**  So let's take everything one step at a

25  time.

1    So, first, get me the letter brief on Monday.  I will try

2    to decide that as quickly as possible.

3    Why don't you also just put a notice, a joint notice, on

4    the docket just so I know when his deposition is going to be

5    actually going forward --

6           **MR. IMBROSCIO:**  Okay.

7           **MR. CARTMELL:**  Okay.

8           **THE COURT:**  -- on the renotice date.

9    Once all that dust is cleared on that issue, if both sides

10   want to file motions under Rule 37 or otherwise or a motion for

11   protective order or want to raise it as a procedural issue in

12   the DMC, you're free -- I mean, you're free to do whatever you

13   think is appropriate.

14   On -- but I will give you this guidance; right?  In the

15   local rules, there is local rule, I'm forgetting the number, on

16   ex parte motions; right?  And so that -- there is a procedure.

17   It's not in my standing orders, although I think my standing

18   orders refer to the local rules.  There is a mechanism to get

19   to a Court or a judge quickly, not by phone but, you know,

20   outside of kind of the ordinary schedule of briefing things.

21   So there is a mechanism to do that built into the local rules,

22   and so I would just remind you-all that that exists.

23          **MR. IMBROSCIO:**  We're certainly aware of that but, I

24   mean, we were talking about we had two hours to try to get this

25   resolved, and that would have been very -- I mean, our view is

 1    that would have been very challenging.

 2         THE COURT:  Usually my experience is it's like two

 3    pages long -- right? -- and they usually get sent to the

 4    chambers quickly once they're filed.  I'm just saying there's a

 5    mechanism to try to get to a judge on short order and so -- go

 6    ahead.

 7         MR. CARTMELL:  Can I say one thing so I don't get

 8    balled out by "I meant to say this"?

 9         There was a mention of A-C privilege being on the

10    document.  I just want to say, they've produced 9,300

11    A-C privilege documents that aren't clawed back or aren't

12    privileged.  Obviously the law is that that doesn't determine

13    whether a document in the Ninth Circuit is privileged or not.

14         MR. IMBROSCIO:  Of course.

15         THE COURT:  Right.  So whoever gave you that note, you

16    may want to talk to them after this too because that didn't

17    advance the ball, I don't think.

18         MR. CARTMELL:  I will, Your Honor.  Thank you.

19         THE COURT:  Okay.  So let's get the document squared

20    away, the depo taken, and we'll deal with whether people

21    really -- after things have simmered down a little bit, whether

22    people really want to go for fees and costs under Rule 37, and

23    otherwise we can talk about that.  Okay?

24         MR. CARTMELL:  Thank you, Your Honor.

25         MR. IMBROSCIO:  The fees and costs, like one of the

```
 1    relief -- pieces of relief we thought was just they -- they
 2    should reduce the amount of time.
 3          THE COURT:  If you want to pursue that, you're
 4    certainly -- I can't stop you.  Certainly that's, you know,
 5    your prerogative.
 6       Okay.  Anything further on that particular issue?
 7          MR. CARTMELL:  No, Your Honor.  Thank you.
 8          THE COURT:  So don't except -- I'm not going to call
 9    you here on Thanksgiving for a hearing on that motion.
10          MR. CARTMELL:  Okay.
11          THE COURT:  So I'll decide it on the papers.  I assume
12    the parties are okay with that.
13          MR. CARTMELL:  Yes.
14          MR. IMBROSCIO:  Yes, Your Honor.
15          THE COURT:  Okay.  All right.  So we've done that.
16    We've done that.  We've done that.
17       Ah, so you submitted a stipulation to me saying, "Judge,
18    your DMC statements are too cumbersome and burdensome and all
19    that so here's the format we want to use," but you didn't
20    really follow the format that you proposed.  You mixed up ripe
21    and unripe disputes all over the place.
22       And anybody here understand the term "UX" or "UI"?  From a
23    UX perspective, this was not a good user experience for me to
24    use because, unlike the previous format, which very clearly
25    delineated things that need Court action at the DMC versus
```

1    things that are on the horizon, you kind of jumbled things up.

2    Right?

3        So verbally -- I don't think I need to do this --

4    right? -- what I expected was for you to keep kind of the

5    overall structure of:  Here's the ripe stuff and here's the

6    unripe stuff.

7        And I understand, most of the ripe stuff you want to be in

8    the letter briefs and you just say, "See letter brief."  Right?

9    But there is stuff in here ripe, I guess, like the whole

10   dispute over scheduling -- right? -- which was essentially a

11   ripe dispute.  And so it would have helped me if -- or at least

12   a dispute that one side or the other wanted me to take action

13   on at this DMC.  Okay?

14       Whereas, a bunch of these you kind of -- you listed

15   disputes and you said, "There's an ECF here, but there's a

16   joint letter brief forthcoming and there's a joint letter brief

17   forthcoming," and I -- that's not helpful.

18       So separate out stuff that I need to focus on as ripe and

19   stuff that's on the horizon as unripe.  Okay?

20           **MR. WARREN:**  Very well, Your Honor.  Previn Warren for

21   the School District plaintiffs.

22       I'm happy to fall on the sword for that.  That was kind of

23   a collective fever dream of myself and Ms. Simonsen to

24   reimagine the DMC statements.  We thought we had nailed it, and

25   we clearly did not.

```
 1        I will say, you know, part of the effort was try to
 2   identify things we thought we would have to speak with you
 3   about and subsequently got resolved, and so that's why they
 4   show up on the statement as JLB forthcoming, but nothing was
 5   forthcoming because we were able to sort it out following Your
 6   Honor's, you know, guidance that the parties sought.
 7        THE COURT:  Let me ask you something.  If you file
 8   a -- like, this gets filed like a week before the DMC; and if
 9   you file a letter brief, like, two days before the DMC, do you
10   really expect me to have the time to be able to get to it?  I
11   might.
12        I think I've told you this multiple times in the past.
13   I'm going to use my discretion to decide whether or not I'm
14   going to hear something at the DMC or not; but as a
15   practical -- if you file it on noon -- like, at 11:00 a.m. the
16   day of a DMC, you know what I mean?  So --
17        MR. WARREN:  Fair enough, Your Honor.  We hear you.
18   We will -- we'll continue to work to iterate this and improve
19   the UX.  I think the hope is that --
20        THE COURT:  If it's joint letter brief forthcoming,
21   I'd put that in the unripe section --
22        MR. WARREN:  Sure.
23        THE COURT:  -- because you've defined ripe as things
24   where the joint letter brief has been filed, as of the date --
25        MR. WARREN:  Sure.
```

1          **THE COURT:**  -- of the statement, and you could always

2     update me.  And I'll see it on the docket if you filed

3     something.

4          **MR. WARREN:**  Sure.  Very well.

5          Your Honor, truth be told, I think both parties were

6     aligned in not even listing unripe issues because of the

7     potential confusion that could cause, and we would be

8     comfortable returning to that.  I think we were trying to be

9     responsive to Your Honor's edit to the proposed order.

10         **THE COURT:**  No.  I mean, even though the bullet points

11    are quite pithy and actually give very -- the point on the

12    unripe issue is if I do spot something that I think I can give

13    you guidance on, I'm hoping to, you know, head something off at

14    the path before it turns into a letter brief or something

15    later.  That's all.  Nothing jumped out on this one.

16         **MR. WARREN:**  Makes sense, Your Honor.  I will just

17    note every additional word or section we add to this is another

18    opportunity for the parties to fight and not advance the ball.

19    So if it isn't informative to Your Honor, I think all things

20    being equal, we'd prefer to just drop it; but, of course, if it

21    is informative, then we'll keep it.

22         **THE COURT:**  I guess it's an in-case thing on the

23    unripe -- listing the unripe stuff by bullet point and it can

24    be -- it should be neutrally phrased -- right? -- so you're not

25    arguing the unripe issues to me.  So I just want to know what

1    the issue is.

2            **MR. WARREN:**  Yeah.

3            **THE COURT:**  Okay.

4            **MR. WARREN:**  Very well, Your Honor.

5            **MS. SIMONSEN:**  Understood.  Thank you, Your Honor.

6            **THE COURT:**  Think of it, you know, as an appellate

7    brief, like, you know, question presented; right?  This is the

8    question.

9            And then you've got this other category of -- I forget

10   what the stipulation said -- like administrative issues you

11   want to talk about with the Court; right?  And some of that is

12   like, you know, giving me status reports on, like, forensic

13   imaging and things like that.

14           But the schedule -- like, the schedule thing -- right? --

15   that's more of an administrative issue.  It wasn't a joint

16   letter brief or whatever.

17           So what I would, again, ask you, if you're going to have a

18   section on administrative reporting on stuff, separate --

19   sub-separate that out on things that are disputed that I need

20   to act on versus stuff you're actually just reporting on.

21           **MS. SIMONSEN:**  Understood, Your Honor.

22           **MR. WARREN:**  Understood.  So if we had a section that

23   things just reporting on ripe disputes, bullet points of other

24   miscellany, does that work?

25           **THE COURT:**  Well, so administrative issues; right?

```
 1   Things you're reporting on, that's all you're doing.  Right?
 2           MR. WARREN:  Right.
 3           THE COURT:  Disputed issues that are administrative in
 4   some way, they're not really a discrete truly discovery
 5   management writ large; right?  And then maybe something --
 6   that's on the administrative section.
 7       And then truly ripe discovery disputes -- right? -- just
 8   list those out for me in whatever way you want if they've been
 9   letter briefed -- right? -- and then the unripe disputes.
10           MR. WARREN:  Okay.  So four sections.  I think I got
11   it.
12           THE COURT:  I think that's right.
13           MR. WARREN:  All right.  Very well.  Thank you,
14   Your Honor.
15           THE COURT:  Did I miss anything?  Okay.
16       All right.  So that's that.
17       Questions on the -- all right.  You know, like
18   Silicon Valley engineers, we're going to iterate this.
19           MR. WARREN:  V3.0.
20           THE COURT:  That's right.
21       Okay.  Ah, so I saw that the TikTok case has been folded
22   into the MDL by Judge Gonzalez Rogers' order yesterday?  Today?
23   It's been related at least; right?
24           MR. WARREN:  It's been related, and I'll let the State
25   of California address that.
```

App. 463

1         **THE COURT:**  Yeah.  The only question I have is:  How

2    does that affect what we do here, if at all?

3         **MR. WARREN:**  I will let the representative of the

4    People take that one.  Thank you.

5         **MR. DRAKE:**  Geoffrey Drake, King & Spalding, for the

6    TikTok defendants.

7         My colleagues from O'Melveny & Myers -- excuse me -- are

8    handling the AG cases and will be here tomorrow to discuss that

9    with Judge Gonzalez Rogers, I imagine, from the correspondence

10   that's occurred so far and the opposition to the administrative

11   motion that the State begins to commence by filing a motion to

12   remand, which we'll be opposing, and that will be the first

13   step.  And I don't know how Judge Gonzalez Rogers intends to

14   handle that.

15        I believe TikTok then, if the case is not remanded, would

16   intend to file some motion to dismiss; but I believe the

17   parties would, in that instance, then also confer on exactly

18   what Your Honor asked about, which is:  How will this case fold

19   into the ongoing discovery?

20        **MS. O'NEILL:**  Megan O'Neill for the People of the

21   State of California.

22        I don't think I have anything to add beyond that.  That's

23   an accurate statement of the status, and we'll be prepared to

24   discuss with Judge Gonzalez Rogers tomorrow.

25        **THE COURT:**  Okay.  So I -- probably for the next DMC

```
 1   statement then, I'm going to expect to see some call it an

 2   administrative report on TikTok and California's plan on how to

 3   fold TikTok -- what the discovery plan is for folding TikTok,

 4   that case, into this case; right?  Whether it's by stipulating

 5   to all the discovery, you know, that's already taken care of

 6   and there's no additional discovery that needs to be taken.

 7        I don't know what you're going to work out, but some

 8   inkling to me as to how -- what I'm going to be faced with over

 9   the next six months with regard to this complication.  Okay?

10   And I just want a plan from both of you on that.

11            MR. DRAKE:  Absolutely, Your Honor.  Understood.

12            THE COURT:  All right.

13            MS. O'NEILL:  And, Your Honor, just one note on that.

14        We -- as counsel mentioned, we do have a pending motion

15   for remand.  We don't think that the Court has jurisdiction

16   over this case, and so we will be pursuing that and that

17   position will be reflected in any report that we provide to the

18   Court as ordered.

19            THE COURT:  Sure.  That's Judge Gonzalez Rogers'

20   business, not mine.  So all I care about is whether -- how I'm

21   going to handle any discovery if you stay in the case.  That's

22   the main issue.

23            MR. DRAKE:  Thank you, Your Honor.

24            MS. O'NEILL:  Thank you.

25            THE COURT:  All right.  And just to be clear, just
```

 1   because you submit a discovery plan for me doesn't prejudice

 2   your rights to -- on the remand.  I don't think anybody is

 3   going to take that position.

 4          **MS. O'NEILL:**  Understood.  Thank you.

 5          **THE COURT:**  Okay.  There's that.

 6      Oh, so in the briefing on the discovery schedule and plan

 7   for the State AGs, there was reference made to the fact that I

 8   had approved the stipulation between plaintiffs and the

 9   bellwether school districts that gave a little bit of extension

10   of time, at least in terms of deadlines for depositions, in

11   those cases.

12      I mean, if people are going to -- I'm not here to change

13   Judge Gonzalez Rogers' deadlines.  Right?  And so I did that

14   because it was a stipulation and all that; but if people are

15   going to rely on that to try to blow past her deadlines

16   generally in the case, that is not my -- that was not my

17   intention and you should not do that.  Okay?  Otherwise I will

18   seriously consider reconsidering that order and changing it

19   from May 15th back to April 4th for the depo deadline.  Okay?

20   Understood?

21      All right.  You haven't heard from South Dakota yet, have

22   you?

23          **MR. COCANOUGHER:**  I just checked, Your Honor.  Now my

24   cell phone service is not great here, but I will continue to

25   check.

```
 1            THE COURT:  Okay.  All right.

 2       Oh, yeah, so proceeding along.  So the next -- so I think

 3   the next several DMCs are set, but we didn't set one in

 4   April 2025 yet.  So it will be April 24th, which will be the

 5   day after the CMC that month, again at 1:00 o'clock here.

 6       Did you want to report on the results of the meet and

 7   confer?  Did you complete it yet?

 8            MS. SCULLION:  Yes, Your Honor.  Thank you.  We did --

 9   Jennifer Scullion for the PI/SD plaintiffs.

10       We did meet and confer, and we have a proposal on the

11   table that's being considered in terms of a stipulation to, we

12   think, potentially resolve the issue.

13            THE COURT:  Perfect.

14            MS. SCULLION:  So we hope to report back with good

15   news.

16            THE COURT:  Okay.  Great.

17            MS. SAFFARINI:  Thank you, Your Honor.

18            THE COURT:  Thank you for that.

19       All right.  Oh, and I forget -- the other -- going back to

20   that stipulation on the bellwether school districts, consistent

21   with my encouraging parties to try to work things out, when I'm

22   presented with stipulations, I try not to tinker with them.

23   Because if you've worked them out, that's what I've been urging

24   you to do, so I don't think it's my job at that point to meddle

25   in the stipulations.  So that's the reason why I don't think
```

 1   anybody should take that as me trying to overrule or change

 2   Judge Gonzalez Rogers' fact discovery cutoff date.

 3       Okay.  Anything from the plaintiffs?

 4           **MS. HAZAM:**  No, Your Honor.

 5           **THE COURT:**  Anything from the defense?

 6           **MR. LEVIN-GESUNGHEIT:**  For the PI/SD plaintiffs,

 7   Michael Levin-Gesungheit from Lieff Cabraser.

 8       I do have one thing to bring up as a follow up from last

 9   time about Snapchat.  Is there counsel for Snapchat here?

10       Okay.  Well, I don't think it's fair to bring up without

11   their counsel, but we are -- I guess I would just note for the

12   record, following Your Honor's ruling both orally and in

13   writing, Snapchat has confirmed that it has not retained copies

14   of HipChat documents from multiple litigations; but at the last

15   hearing it noted that it had a production to the DOJ and that

16   it was reviewing it for relevance.

17       And we have not been able to obtain an update about when

18   exactly we will get those documents, and so we are hoping that

19   Snap will provide them.  It's been quite some time.  I

20   recognize Snap cannot respond right now, so I guess I'll just

21   state that for the record.

22           **THE COURT:**  Well, when -- they're going to be --

23   somebody for Snapchat is going to be here tomorrow, right, for

24   the CMC presumably?  Right?  And are you going to be here

25   tomorrow?

1     **MR. LEVIN-GESUNGHEIT:** I'll -- we can continue to

2  confer with Snap.  We were hoping to get a little prodding from

3  Your Honor, but we're in the situation we're in, so that's all

4  I got.

5     **THE COURT:** Okay.

6     **MR. LEVIN-GESUNGHEIT:** Your Honor, I see that I

7  believe Ms. Teller might have her hand up on Zoom.  She's one

8  of Snap's counsel.

9     **THE CLERK:** Would you like me to promote her?

10    **THE COURT:** Yeah, could you please?

11    If there's Snap's counsel on the line, that's even better.

12    So is somebody on Zoom who wanted to chime in?

13    **MS. TELLER:** Yeah.  This is Faye Paul Teller from

14  Munger, Tolles & Olson.  I'm sorry, I don't have video on.

15    I just got a notification because I had not able to join,

16  but I understood an issue was raised.  If it is possible -- I

17  understand this may be related to HipChat.  If it is possible

18  to meet and confer tomorrow, we will have folks at the CMC.

19    So I'm happy to answer any questions that I can right now.

20    **THE COURT:** It looks like you ought to meet with them

21  at the CMC tomorrow.

22    **MR. LEVIN-GESUNGHEIT:** We're happy to continue meeting

23  and conferring.  I mean, all we're looking for is just a date

24  certain by which this will be completed.  We think perhaps a

25  court order will get that done.  It's been a really long time.

```
 1   That's all this is really about.
 2            MS. TELLER:  I apologize.  It's a little hard for me
 3   to hear.
 4        I think I hear a question being posed about finishing the
 5   negotiation on the HipChat issue; is that right?
 6            THE COURT:  I think the question is that there was a
 7   production of HipChat data or messages found in a production to
 8   the DOJ that was being reviewed for relevance and privilege, I
 9   assume, and I guess the question is:  When will that be
10   completed so that those HipChat -- that HipChat data can be
11   produced?
12            MS. TELLER:  I understand from my colleagues that
13   we're reviewing it and it's in process.  I don't have a firm
14   date that they plan to produce it.  Although I'm sure,
15   Your Honor, if you order something, we'll make sure to comply
16   with that.
17        But I apologize, I'm not terribly informed on this issue.
18   I obviously did not realize it was going to be raised at this
19   DMC.
20            THE COURT:  Okay.  Why don't you -- why don't you --
21   whoever for Snap is at the CMC tomorrow, confer with
22   plaintiffs' counsel whoever is there tomorrow to just try to
23   between now and then come up with a firm date that you can
24   propose that you'll definitely be done by.  Okay?
25            MS. TELLER:  Of course, Your Honor.
```

```
 1            THE COURT:  Okay.

 2            MR. LEVIN-GESUNGHEIT:  Thank you, Your Honor.

 3            THE COURT:  All right.  Any other miscellaneous open

 4    items?

 5                          (No response.)

 6            THE COURT:  All right.  I will see you in three weeks,

 7    I think; right?

 8            THE CLERK:  We're off the record in this matter.

 9    Court is in recess.

10                 (Proceedings adjourned at 4:16 p.m.)

11                          ---oOo---
```

1

2

3                    **CERTIFICATE OF REPORTER**

4          I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled matter.

6

7   DATE:    Saturday, November 23, 2024

8

9

10

11   _____

12        Kelly Shainline, CSR No. 13476, RPR, CRR
                 U.S. Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

 1    current budget stuff or current things.  So I want you to meet

 2    and confer, and you may have to either redo the notice or at

 3    least say, by agreement, which topics go back to 2012 and which

 4    don't just so that the states can adequately prepare their

 5    witnesses, knowing which ones this is really an issue in.

 6        On the general objection by the states that the relevant

 7    time period shouldn't go back to 2012, I'm going to overrule

 8    that just generally because, as a blanket objection, I don't

 9    think it's appropriate.  I think it's -- the real --

10    procedurally, the practical thing is, for some of these, if

11    Meta insists on asking questions that go back to 2012 or '13

12    and the state no longer has that information, then the normal

13    30(b)(6) answer is "We've investigated and we don't have that

14    information.  So as a party, we don't know because it's too

15    old."  Right?

16            MR. RICHARDS:  Understood, Your Honor.

17            THE COURT:  All right.  So I'm not going to bar the

18    deposition on that ground.  A lot of it is going to be topic

19    and question dependent and based on what preparation each state

20    is able to do for their witnesses, and I'm assuming they're

21    going to do the required preparation for each of their

22    witnesses.

23        And then on the issue of whether this implicates the state

24    agency control issue that was part of -- a large part of the

25    discussion in discovery disputes last year, I think that's a

**PROCEEDINGS**

1    red herring and it's irrelevant.

2        The 30(b)(6) notice is addressed to each state as a state,

3    as a party; it's not addressed to the agencies.  And so as the

4    responding party to the deposition notice, it is up to each

5    state, as a party, to decide whom they want to pony up and

6    present as the representative witness for each topic.  And so

7    it may be an agency person; it may not be an agency person.  It

8    may require talking to an agency person; it may not require

9    talking to an agency person.

10       But this is not -- they're not trying to get at discovery

11   from an agency by these notices.  They're asking the state to

12   provide a witness.  And it's up to the state to decide who they

13   want to provide.  It's totally within your control.  Okay?

14       **MR. RICHARDS:**  Okay.  I would just ask, Your Honor,

15   there's an underlying question here about the bindingness of

16   the testimony from a state agency.  I think it also relates to

17   the overbreadth issue that we've raised just on the plethora of

18   topics in the notice.

19       And so insofar as the state AGs would be putting up

20   witnesses from other agencies who might have agency-specific

21   information, it would be helpful to understand the bindingness

22   of that testimony on the litigants.

23       **THE COURT:**  Again, that's not how Rule 30(b)(6)

24   works.  You present a witness on behalf of the state --

25   right? -- the party, to testify on behalf of the state.  It may

 1  or may not be an agency person; it may be -- it may be

 2  somebody -- it could be -- I mean, I've seen cases where people

 3  put up expert witnesses.  It could be whoever you choose.

 4       That person has to then be prepared to answer questions on

 5  that particular topic.  Now, of course, it is often the case

 6  that sometimes the topics are so broad that it requires an

 7  encyclopedic knowledge of an individual and it's -- they may

 8  not know everything that comes up at the deposition; but they

 9  do need -- they're under an obligation to be prepared to answer

10  questions on that topic.

11       And so it is -- to the extent they're able to answer after

12  adequate preparation, then that is binding in the sense that

13  they're representing the state and they were prepared by the

14  state to talk on that topic.  I don't care whether they're an

15  agency person or not.  It's up to you whether they're an agency

16  person or not.  It's not up to Meta.  It's not up to me.

17       And if the answer is "Well, that's such a detailed

18  question, there's no way to prepare to answer that but we'll

19  try to get" -- the usual thing -- "we'll try to get you that

20  answer later," that's usually what happens.  And sometimes the

21  answer is "We looked into that and we just don't know.  As a

22  party, we take no position on that."  Right?  Because it's

23  just -- it's a weird detail that nobody has ever looked into or

24  is incapable of knowing.  I mean, it really depends on the

25  question.  All right?

 1    But in terms of bindingness, the way 30(b)(6) works is you

 2   pick the witness who's going to bind -- quote, "bind,"

 3   represent the party on a particular topic; and it could be --

 4   it looks like it could be multiple people, each one with a

 5   different set of topics.  Right?  And it's up to you to prepare

 6   them adequately.

 7        **MR. RICHARDS:**  I would just also -- I think we -- the

 8   state AGs have, you know, compared the -- you know, reviewed

 9   Your Honor's order from September 6th and looked at the

10   language of Rule 30 and Rule 34; and I think this, you know,

11   concerns the language in Rule 30 about reasonably available and

12   the difference in scope under those two rules.

13        And so I think our position would be that soliciting the

14   information which might be within the agency's knowledge would

15   go -- would not be reasonably available to the AGs just based

16   on the way those topics are written.

17        **THE COURT:**  Again, you're misunderstanding.  This is

18   where I said I think it's a red herring; it's a misnomer.

19        Under Rule 30(b)(6), the party here -- it's not the

20   state AG -- I mean, there's a couple of states where the AG is

21   the party, but for the most part, the state is the party;

22   right?  And the state has a responsibility as a party to

23   identify a person to testify on behalf of that party with

24   regard to that issue.  Right?

25        And it is often the case in very large corporations, very

App. 476

**PROCEEDINGS**

1   large entities, whoever that person is, they may need to talk

2   to multiple people and review multiple documents to be prepared

3   to testify on that topic.  Right?  But that's not some untoward

4   way of getting discovery from those people who they talk to to

5   prepare for.  That's the normal process.  Right?

6          **MR. RICHARDS:**  I understand that, Your Honor.  And I

7   would just -- you know, and not to reargue the briefing, but

8   I think -- we're not aware of any situation where a state has

9   been designated in this way, where multiple agencies have been

10  wrapped up.

11         The definition, you know, of the responding parties in the

12  notice does apply to those agencies in your September 6 order.

13  And our review of the case law, including cases Meta cited,

14  we're not aware of any situation where multiple agencies are

15  wrapped up into one 30(b)(6) notice, even if the party is a

16  state.

17         In those instances in the cases we've reviewed, they're

18  distinguishable because the agencies have either received a

19  notice themselves or, in the corporate context, the facts have

20  been so different and the notices, again, in those cases have

21  been to one entity.  So we're not aware of any case law or --

22  you know, that says that multiple entities could be wrapped up

23  in that one 30(b)(6) notice.

24         **THE COURT:**  That happens all the time.  You send a

25  depo notice, a 30(b)(6) depo notice to a conglomerate, General

1    Electric, and they've got to pony up a witness to speak on

2    behalf of the conglomerate.

3        I mean, it may require talking to other people to prepare.

4    That's the whole purposes of Rule 30(b)(6).  As a party, you're

5    supposed to find someone who can be prepared.  We're not

6    dealing with California state law where it's got to be the

7    person most knowledgeable.  Right?  You've got an obligation to

8    prepare the person -- reasonably, of course -- right? -- to

9    answer questions on the topic.  Right?

10       And so, again, it's not -- there's no wrapping up of

11   people -- of agencies as a party here.  That's why I think the

12   argument and that line of discussion is really orthogonal to

13   this because under Rule 30(b)(6), the witness is just supposed

14   to talk to whoever they need to.  Again, it may not be an

15   agency.  They may just be able to prepare to answer the

16   question based on review of some documents.  I don't know.

17   Right?  And it's going to depend topic by topic.

18       But I think trying to posit that this is an attempt to get

19   at depositions of agencies is -- starts with the wrong

20   supposition -- right? -- because, again, it's up to you to

21   decide how to prepare the witnesses best -- right? -- and it

22   may or may not include agencies.

23           MR. RICHARDS:  I understand that, Your Honor.

24       And I would just also say that, you know, perhaps using

25   your General Electric example, the states don't view themselves

**PROCEEDINGS**

 1   as such a monolithic entity.

 2        And just to use Kentucky as an example, you know, as

 3   opposed to, like, the federal government or something like

 4   that, these are dual executives.  Kentucky is a state that has

 5   one party of a Governor and one party of an Attorney General.

 6   And so we think sort of forcing them to come together and make

 7   a statement on behalf of the state or take a position on behalf

 8   of the state, as an entity, would not account for that

 9   dual executive function and the fact that there might not be a

10   coherent statement to provide on behalf of the state *qua* state.

11        **THE COURT:**  Well, I think partially that argument has

12   been rejected in the previous motion.  I know it's under

13   Rule 34, but that concept was previously rejected.

14        And, again, here, the state is the entity that's the

15   party.  Right?  And, again, as a party -- because I took out

16   the contention topics, most of what's left is just factual.

17   And as a party, you have to be able to answer factual questions

18   if you know -- right? -- if the party knows.  Right?

19        And sometimes a party as an entity, a corporation, a large

20   entity, a government entity, takes a position that it doesn't

21   know -- right? -- or it takes no position, or it's done a

22   reasonable investigation and can't find that information.

23   Right?  Again, it's going to be very question specific and it's

24   going to be very topic specific.

25        And, again, I'm going to leave it up to you to, you know,