1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6                             SAN FRANCISCO DIVISION

7

8    IN RE: SOCIAL MEDIA ADOLESCENT          Case No. 22-md-03047-YGR   (PHK)
     ADDICTION/PERSONAL INJURY
9    PRODUCTS LIABILITY LITIGATION           **DISCOVERY MANAGEMENT ORDER
                                             NO. 14 FOLLOWING DISCOVERY
10                                           MANAGEMENT CONFERENCE OF
                                             JANUARY 16, 2025**
11   This Document Relates to:
     All Actions                             Upcoming DMC Dates:
12                                           February 13, 2025 at 1:00 pm
                                             March 20, 2025 at 1:00 pm
13                                           April 22, 2025 at 1:00 pm

14

15          On January 16, 2025, this Court held a Discovery Management Conference ("DMC") in

16   the above-captioned matter regarding the status of discovery.  This Order memorializes and

17   provides further guidance to the Parties, consistent with the Court's directions on the record at the

18   January 16th DMC, regarding the deadlines and directives issued by the Court during that hearing

19   (all of which are incorporated herein by reference).

20   **I.      Parental Attendance at MDL Bellwether PI Plaintiff Depositions**

21          MDL Bellwether Plaintiff S.K., who recently turned eighteen but was a minor when she

22   filed her case, requests permission for her mother to attend her upcoming deposition.  [Dkt. 1532].

23   Defendants oppose Plaintiff S.K.'s request (or any similar requests made by other adult plaintiffs

24   of full capacity) on the grounds that the Deposition Protocol governing this MDL does not allow

25   parents or guardians to attend adult Plaintiffs' depositions.  *Id.* at 13; *see* Dkt. 742 at 2

26   ("[D]epositions may be attended by members of the Court-appointed Plaintiffs' Leadership, the

27   State Attorneys General, and employees of their firms/offices or their designees, Counsel of record

28   in any proceeding in which the deposition is cross-noticed, members and employees of their firms,

United States District Court
Northern District of California

United States District Court
Northern District of California

attorneys specially engaged by a Defendant or Plaintiffs for purposes of the deposition, the Parties or the representative of each respective Party (including in-house Counsel), any person who is assisting a Party and whose presence is reasonably required by the aforementioned Counsel of record (such as a consulting expert), court reporters, videographers, document technicians, court interpreters, the deponent, and Counsel for the deponent."). Defendants argue that Plaintiff S.K.'s deposition will involve "deeply personal topics," including topics addressing her relationship with her mother and the extent to which the relationship may have caused and/or exacerbated Plaintiff S.K.'s alleged injuries. [Dkt. 1532 at 13]. Defendants argue that it "may be uncomfortable" for Plaintiff S.K. to discuss these topics in front of her mother. *Id.* They argue that the mother's presence will potentially "inhibit" Plaintiff S.K.'s "candor and honesty." *Id.*

Plaintiffs complain that Defendants are unreasonably "refusing the requests of just one individual bellwether Plaintiff that she be permitted to have a parent attend her deposition to provide support—and have shut down overtures to even negotiate over this issue[,] . . . notwithstanding that this Plaintiff's claims were filed when she was a minor, and [she] only recently (in December) reached the age of majority." *Id.* at 14. Plaintiffs argue that they only agreed to schedule Plaintiff S.K.'s deposition after she turned eighteen, at Defendants' behest, with the understanding that Plaintiff S.K.'s mother would still be allowed to attend her deposition (as would have been the case had she still been a minor). *Id.* at 14-15. They argue that Plaintiff S.K., a high school student who still lives at home with her parents, "could have and should have been deposed" before she turned eighteen (so that her mother could attend the deposition without issue), and it is only because of Defendants' "gamesmanship" that she was not deposed prior to turning eighteen. *Id.* at 15.

To the extent that Defendants seek a blanket ruling regarding parental attendance at all adult Plaintiffs' depositions, the request is **DENIED**. As to Plaintiff S.K., the Court noted at the DMC that the Parties' briefing did not provide a sufficient factual record to allow the Court to resolve the dispute. At the DMC, the Court **ORDERED** Plaintiffs to submit declarations from Plaintiff S.K. and her mother explaining why the mother's presence at the deposition is necessary. Plaintiffs promptly did so. *See* Dkt. 1582.

United States District Court
Northern District of California

1    The Court has broad discretion and authority to manage discovery. *U.S. Fidelity & Guar.*

2  *Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude

3  in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of

4  discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). The Court's

5  discretion extends to crafting discovery orders that may expand, limit, or differ from the relief

6  requested. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad

7  discretion to tailor discovery narrowly and to dictate the sequence of discovery"). In managing

8  discovery, the Court may issue "an order to protect a party or person from annoyance,

9  embarrassment, oppression, or undue burden or expense." Fed. R. Civ. P. 26(c)(1). "District

10  courts have the discretion to limit the scope of discovery to ensure a deponent is not subjected to

11  an undue burden or annoyance. This [discretion] . . . also includes the ability to specify the

12  location of a deposition and the persons who may be present." *Pen Am. Ctr. Inc. v. Escambia*

13  *Cnty. Sch. Bd.*, No. 3:23cv10385/TKW/ZCB, 2024 WL 3831305, at *3 (N.D. Fla. July 22, 2024)

14  (limiting deposition of minor witness and ordering that one parent be permitted to attend the

15  deposition). Courts managing discovery in MDL products liability litigation have expressly

16  allowed parents to attend the deposition of a child witness under age twenty-one. *See, e.g.*, *In re*

17  *Zofran (Ondansetron) Prods. Liab. Litig.*, No. 1:15-md-2657-FDS, 2018 WL 2761849, at *2 (D.

18  Mass. May 17, 2018) ("Absent further court order, if a child under the age of 21 is deposed, the

19  parents may attend the deposition[.]").

20    Having reviewed the declarations of Plaintiff S.K. and her mother, the Court finds that

21  S.K.'s desire to have her mother present at her deposition is sincere. The Court further finds that,

22  had S.K. known that her mother might not be able to attend the deposition after S.K. turned

23  eighteen recently (apparently in December 2024), S.K. would have made herself available for

24  deposition prior to her birthday so that her mother would be able to attend the deposition as of

25  right under the Deposition Protocol. The fact that S.K. only recently turned eighteen, is still in

26  high school, and resides with her parents are also factors which impact whether or not her mother

27  should be permitted to attend her deposition.

28    In the exercise of its discretion, the Court **ORDERS** that Plaintiff S.K.'s mother may

United States District Court
Northern District of California

1   attend S.K.'s deposition, subject to the following.  To be clear, while she may attend the

2   deposition, S.K.'s mother is **ORDERED** not to speak or use body language, facial expression,

3   note passing, or any other means to expressively coach or indicate to S.K. how to testify.

4       Second, as discussed at the DMC, the Parties are **ORDERED** to meet and confer for

5   purposes of identifying the module of questions to be asked at Plaintiff S.K.'s deposition that are

6   most likely to implicate S.K.'s relationship with her mother, the length of time of such module,

7   and a process for having S.K's mother step outside of the deposition room for those questions

8   only.  During this module of questioning, if the deposition is taken place in person, the persons in

9   the deposition room with S.K. **SHALL BE LIMITED** to the sole lawyer asking the questions and

10  the lawyer defending S.K.'s deposition, as well as the court reporter and any videographer.  If

11  S.K.'s deposition is taken virtually or remotely, the persons visible onscreen **SHALL BE**

12  **LIMITED** to S.K, the sole lawyer asking the questions, and the lawyer defending S.K.'s

13  deposition.  *See In re Zofran*, 2018 WL 2761849, at *2 (limiting number of attorneys at

14  deposition).  For guidance, the Court expects (based on the discussion with counsel during the

15  DMC) that this module during which S.K.'s mother will step out will be limited to about one hour

16  or so at maximum.  The Court expects the Parties will readily agree to any other reasonable

17  accommodations one side or the other needs.  The Court will consider sanctions against any Party

18  demanding unreasonable accommodations, or denying reasonable requests.

19      The Parties also raise a related dispute regarding attendance at bellwether Plaintiffs'

20  depositions by parents who have their own loss of consortium claims.  [Dkt. 1532 at 14-15].  The

21  Deposition Protocol allows for other Parties to attend the deposition of a Party, and thus, parents

22  who are also Plaintiffs with their own loss of consortium claims are allowed to attend party

23  depositions under the Protocol.  Accordingly, Defendants do not object to such attendance,

24  "provided that Plaintiffs disclose in advance of the deposition whether consortium Plaintiffs plan

25  to attend so that Defendants can sequence the consortium Plaintiff's deposition to occur prior to

26  the other depositions in the case." *Id.* at 14.  At the DMC, Plaintiffs stated that they do not oppose

27  providing such notice with respect to Plaintiff Mullens, specifically.  [Dkt. 1578 at 15:23-16:2].

28  However, Plaintiffs raised concerns regarding the propriety of a bright-line rule for scheduling

4

depositions in all consortium cases, insisting that depositions should be scheduled in a manner that is equally convenient to both sides and serves to move the case forward. *Id.* at 16:3-12. Because scheduling of multiple depositions involves taking into consideration numerous factors and the availabilities of different persons, the Court finds it impractical to require a blanket approach to scheduling at this time. As discussed at the DMC, the Court **ORDERS** the Parties to continue to meet and confer on this issue and to work together to resolve their differences.

This **RESOLVES** Dkt. 1532.

## II.     MDL Bellwether PI Plaintiff Fact Witnesses

The Parties report a dispute concerning Plaintiffs' use of non-"key" treater witness declarations or affidavits in connection with Rule 702 and summary judgment briefing, as well as a related dispute concerning the overall number of bellwether-specific fact witnesses Defendants seek to depose. [Dkt. 1527; Dkt. 1528].

Use of Non-"Key" Treater Declarations or Affidavits

As to the first dispute, Defendants report that the MDL Bellwether PI Plaintiffs have each disclosed "up to 10 treater witnesses (with an average of 6.3 per case)." [Dkt. 1528 at 13]. Defendants argue that they "cannot feasibly depose that volume of treaters," given that there is a thirty-hour limit for fact depositions overall in each bellwether case. *Id.* The Parties apparently managed to narrow the scope of this dispute through extensive negotiations: Plaintiffs agreed to disclose one or two "key" treaters for each bellwether case whose testimony they intend to use to support the claims for each corresponding bellwether Plaintiff, and further agreed to allow Defendants an opportunity to depose any non-"key" treaters listed as trial witnesses (regardless of the thirty-hour cap). *Id.* However, the Parties remain at an impasse as to whether Plaintiffs may rely on potential future declarations or affidavits from non-"key" treaters (who will have never been deposed) in connection with Rule 702 or summary judgment briefing. *Id.*

Defendants argue that Plaintiffs' proposed reservations as to non-"key" treater testimony "would effectively require Defendants to prophylactically depose all 69 treaters" listed on the bellwether Plaintiffs' Rule 26 Initial Disclosures. *Id.* Defendants argue that there is neither time in the schedule nor room in Defendants' thirty-hour limit to do so. *Id.* Defendants ask that the

1   Court enter an order precluding Plaintiffs from relying on declarations or affidavits from non-

2   "key" treaters in connection with Rule 702 and summary judgment briefing.  *Id.* at 14.

3           Plaintiffs, insisting that they "have no present intention of relying on affidavits or

4   declarations from treatment providers who have not been deposed," argue that this dispute is

5   "hypothetical and not ripe for judicial intervention."  *Id.*  Plaintiffs argue that, even assuming they

6   did ultimately submit a non-"key" treater declaration or affidavit in connection with future Rule

7   702 or summary judgment briefing, there would be no prejudice, because Plaintiffs have

8   committed to allowing Defendants to depose any non-deposed treatment provider whose affidavit

9   or declaration is submitted.  *Id.*  Plaintiffs argue that they should not be preemptively restricted

10  from using otherwise admissible evidence to respond to Defendants' summary judgment

11  arguments, given that Defendants themselves have no such restrictions.  *Id.* at 15.

12          To the extent that Defendants ask the Court to preemptively bar Plaintiffs from relying on

13  declarations or affidavits of non-deposed treatment providers categorically for purposes of future,

14  as-yet unfiled Rule 702 and summary judgment motions, the request is **DENIED**.  This request is

15  based on hypothetical events which may or may not come to pass, with regard to motions which

16  may or not be filed.  As such, the request is both impractical and premature.

17          Nevertheless, to address Defendants' concerns regarding unfair surprise through Plaintiffs'

18  introduction of affidavits from non-deposed treaters, in the event Plaintiffs *do* use a non-"key"

19  treater's declaration or affidavit to support their briefing in Rule 702 or summary judgment

20  motions practice, Plaintiffs **SHALL** make that individual available for deposition by no later than

21  **<u>seven (7) calendar days</u>** before the response brief is due to allow Defendants sufficient time to

22  take the deposition and then use the transcript in any responsive briefing.  While Plaintiffs have

23  stated unequivocally that they do not intend presently to submit declarations from non-"key"

24  treaters, if they choose to do so, they are further **ORDERED** to pre-clear and reserve deposition

25  dates for such non-"key" treaters consistent with this Order.  Because the selection of witnesses

26  from whom to submit declarations and affidavits is within each Party's control, counsel will not be

27  credibly heard later to express inability to make such witnesses available for deposition within the

28  time frame required.  The Court thus takes Plaintiffs' stated agreement on these issues and

United States District Court
Northern District of California

1   converts such agreement to an Order of this Court.

2       Further, as stated at the DMC, this ruling on non-deposed witnesses whose declarations

3   and affidavits are used in later Rule 702 or summary judgment motions applies equally to

4   Defendants should Plaintiffs file their own such motions.  That is, should Defendants rely on

5   declarations or affidavits from non-deposed defense witnesses to respond to Plaintiff's Rule 702 or

6   summary judgment motions, Defendants are **ORDERED** to make such declarants or affiants

7   available for deposition by no later than **<u>seven (7) calendar days</u>** before Plaintiffs' responsive

8   briefing is due.

9       <u>Non-Treater Fact Witness Depositions</u>

10      As to the second related dispute, Plaintiffs raise concerns regarding the "impossible

11  number" of bellwether-specific, non-treater fact witnesses that Defendants seek to depose: a total

12  of seventy-four non-treater deponents over the eleven bellwether cases.  [Dkt. 1527 at 12].  While

13  acknowledging that there is no cap on the number of depositions that Defendants may take,

14  Plaintiffs argue that it would be all but impossible for Defendants to depose all seventy-four non-

15  treater witnesses (plus at least one treater witness per bellwether case) within the thirty-hour

16  overall time limit.  *Id.*  In addition, Plaintiffs argue that "many" of the fact witness depositions

17  "appear intended to harass, intimidate, and place undue harm on the Plaintiff," citing "as just one

18  example," Defendants' intended deposition of minor Plaintiff J.D.'s estranged father, "who has

19  not had contact with J.D. or her family in more than a decade, meaning J.D. would have been

20  around only six years old the last time she had contact with this person." *Id.* at 13.  Plaintiffs ask

21  that the Court "immediately intervene to require Defendants to comply with the Court's

22  instruction, remove duplicative, cumulative, and inconvenient witnesses from their deposition

23  lists, refrain from additional deposition notices and subpoenas, and revoke any outstanding

24  subpoenas to such witnesses." *Id.* at 14.

25      Defendants, in response, argue that they are hamstrung, because Plaintiffs have identified

26  more material witnesses in their initial disclosures than Defendants can practically depose within

27  the remaining time limits.  *Id.* at 14.

28      As with the dispute concerning non-"key" treater witnesses, the Court declines to

United States District Court
Northern District of California

United States District Court
Northern District of California

preemptively circumscribe who, or how many, fact witnesses Defendants may depose.  It is Plaintiffs' obligation to identify within their initial disclosures all individuals who fall within the scope of Rule 26; it is Defendants' prerogative to depose as many of those individuals as they see fit, within the time frame allotted.  As noted at the DMC, based on document discovery and the testimony obtained during the first rounds of depositions, it should become apparent to both sides which other persons listed in the initial disclosures are the more likely candidates for deposing and which are not.  There are other discovery tools available to identify persons who are more likely candidates for deposition and those who are not, and the Court expects Defendants to rationally prioritize (and deprioritize) depositions to be taken based on their discovery efforts as the record develops.  Indeed, the time limits for depositions are intended, at least in part, to give rational consideration as the case proceeds to how many depositions to take, how many hours of deposition to take with each particular witness, and how to obtain discovery reasonably needed to prepare the case without boiling the ocean and deposing every single possible individual.  There is also nothing in the Federal Rules of Civil Procedure preventing Plaintiffs from identifying those witnesses on their initial disclosures they consider to be more "key" than others (similar to how they have done for the treater witnesses).  Not every single person listed in a party's initial disclosures needs to be deposed in every case, particularly in a complex case.  Accordingly, this dispute is both hypothetical and prematurely assumes that counsel will fail to reasonably prioritize and manage taking of depositions.  To the extent Plaintiffs ask the Court to force Defendants to withdraw deposition notices at this time and forbid Defendants from taking a set number of depositions, the request is **DENIED**.  To the extent Defendants have used this dispute as a vehicle to request more hours to be added to their time limits for depositions, that request is also **DENIED**.  The Court expects the Parties to work together to avoid duplicative, harassing, and/or unnecessarily cumulative testimony and **ORDERS** the Parties to continue their meet and confers about witnesses and deposition scheduling to transparently and rationally discuss disputes over why particular witnesses' depositions would or would not be unnecessary.

This **RESOLVES** Dkts. 1527 and 1528.

United States District Court
Northern District of California

### III.     Snap Current and Former Employees' Snapchats

The PI/SD Plaintiffs and Snap report a dispute regarding Snap's production of messages from current and former employees' Snapchat accounts.  [Dkt. 1544].  Snapchat messaging can take either of two forms: (1) "snaps," which are photos or videos that may contain text; and (2) "chats," which are text-based messages that may contain photos or videos.  *Id.* at 7.  According to Plaintiffs, "Snap employees, including the custodians identified in this case, regularly communicated with one another for work purposes using Snapchat snaps and chats."  *Id.*  Snap has agreed to collect and produce all responsive, work-related chats sent or received by current employee custodians.  *Id.* at 7, 9.  Plaintiffs demand that Snap also produce: (1) all responsive, work-related chats sent or received by former employee custodians; and (2) all responsive, work-related snaps sent or received by either former or current employee custodians.  *Id.* at 7.

Plaintiffs argue that the discovery sought is highly relevant to this litigation, stressing that "multiple Snap witnesses deposed thus far have testified that they regularly communicated via Snapchat about their work responsibilities, including with upper management and their project teams."  *Id.*  Plaintiffs argue that production would not be burdensome, because Snapchat messages are "ephemeral" by default, meaning that most employee snaps and chats "were not preserved unless specifically saved by a user."  *Id.* at 7 n.1.

Snap refuses to produce current employees' responsive snaps, arguing that doing so would be "an egregious invasion of their privacy."  *Id.* at 9.  Snap stresses that its employees do not maintain separate "business" Snapchat accounts; rather, Snap employees communicate at work using their "personal" Snapchat accounts.  *Id.*  Snap argues that it should not be forced to comb through employees' snaps from their personal Snapchat accounts, positing that the snaps would largely consist of "photos of their children, family members, and non-employee friends."  *Id.*

Snap refuses to produce *any* snaps or chats from any former employees (unless granted express permission to do so by such former employees) on the grounds that doing so would violate the Stored Communications Act ("SCA"), 18 U.S.C. §§ 2701 *et seq.*.  *Id.* at 9-10.

The party seeking discovery bears the burden of establishing that its request satisfies the relevancy requirements under Rule 26(b)(1).  *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*,

United States District Court
Northern District of California

1    285 F.R.D. 481, 485 (N.D. Cal. 2012).  The resisting party, in turn, has the burden to show that the

2    discovery should not be allowed.  *Id.*  The resisting party must specifically explain the reasons

3    why the request at issue is objectionable and may not rely on boilerplate, conclusory, or

4    speculative arguments.  *Id.*; *see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.

5    1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to

6    carry a heavy burden of showing why discovery was denied.").

7    	The Court is unpersuaded by Snap's arguments.  First, as to the production of snaps, to the

8    extent Snap raises generalized concerns about employees' privacy, the Court notes that there is a

9    Protective Order governing discovery in this litigation which includes highest levels of

10   confidentiality designations where appropriate.  *See* Dkt. 1209.  To the extent that Snap raises

11   more specific concerns about the collection and production of employees' family photos and other

12   personally sensitive materials, there is nothing in the record to suggest that these materials would

13   be significantly intertwined with employees' work-related communications and no reason has

14   been posited why Snap would even produce truly personal materials such as family photos in

15   discovery here.  Indeed, as discussed at the DMC, the way Snapchat works is that, in each user's

16   account, there would typically be threads of snaps or chats which constitute separate, parallel

17   conversations with different groups of people—it is highly likely that work-related snaps and chats

18   would not be in the same threads as personal or family related threads.  Snap has identified no

19   discovery requests which call for employees' personal family photos or other personal materials

20   unrelated to this case.  Snap's objections are **OVERRULED**.  Accordingly, the Court **ORDERS**

21   Snap to promptly produce all responsive, non-privileged work-related snaps sent and received by

22   its current employee custodians.

23   	To the extent that Snap objects to producing any current or former employees' Snapchat

24   messages (either chats or snaps) on the grounds that doing so would violate the SCA, Snap's

25   objections are **OVERRULED**.  The SCA prohibits "whoever (1) intentionally accesses without

26   authorization a facility through which an electronic communication service is provided . . . and

27   thereby obtains, alters, or prevents authorized access to a wire or electronic communication while

28   it is in electronic storage in such system[.]"  18 U.S.C. § 2701(a)(1).  However, the SCA

1    specifically exempts from this prohibition certain categories of conduct: "Subsection (a) of this

2    section does not apply with respect to conduct authorized . . . (1) by the person or entity providing

3    a wire or electronic communication[.]"  18 U.S.C. § 2701(c).  That is, "[t]he SCA grants immunity

4    to 18 U.S.C. § 2701(a) claims to electronic communication service providers ('ECS providers')

5    for accessing content on their own servers."  *In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1026-27

6    (N.D. Cal. 2014) (citing 18 U.S.C. § 2701(c)(1)).

7    Here, it is undisputed that Snap's employee handbook explicitly states that "all electronic

8    communications, including email, made by team members using Snap's devices, systems, or

9    networks are considered company property."  [Dkt. 1544 at 8].  Thus, all snaps and chats created

10   by Snap's current and former employees are the property of Snap, not the employees.

11   Accordingly, when Snap (the owner of the electronic communication service) accesses its own

12   electronic storage systems, by definition Snap does so with its own authorization.  That is, Snap

13   (as the owner of the electronic storage, the electronic communication service, and the snaps and

14   chats at issue) is always "authorized" to access its own storage systems to retrieve its own

15   property.

16   Snap's access of its own storage servers to access the snaps and chats it owns (even if

17   created originally by its current or former employees) is an intentional access *with* authorization,

18   and thus, not a violation of § 2701(a) which prohibits access *without* authorization.  *See In re*

19   *Google Asst. Privacy Litig.*, 457 F. Supp. 3d 797, 822 (N.D. Cal. 2020) ("[O]f course, Defendants

20   have authorization to access their own servers.").  For similar reasons, Snap's access of these

21   stored messages is conduct authorized by itself, because Snap owns the snaps and chats, as well as

22   its own electronic storage and electronic communication system and service, and thus, this

23   conduct is exempt from the prohibitions in the SCA under § 2701(c).  *See Yahoo Mail Litig.*, 7 F.

24   Supp. 3d at 1026-27.

25   Snap's argument assumes that Snap violates the SCA when it uses its own electronic

26   systems to access stored messages which it owns.  Taking this argument to its logical end would

27   mean that, under Snap's view, whenever a corporate entity accesses its own email storage system

28   to access stored emails, that corporate entity violates the SCA.  This Court is highly skeptical that,

United States District Court
Northern District of California

in any employment or trade secrets disputes, Snap's own Human Resources or employment litigators would agree that Snap was legally barred by the SCA from accessing the snaps and chats of Snap's employees stored on Snap's servers. Snap's objections based on the SCA are **OVERRULED**. Accordingly, Snap is **ORDERED** to promptly produce all responsive, non-privileged work-related snaps and chats sent or received by current and former employee custodians.

This **RESOLVES** Dkt. 1544.

### IV.     YouTube RFPs and Noncustodial Databases

The PI/SD Plaintiffs and YouTube report a dispute as to the adequacy of YouTube's amended responses to Request Nos. 37 and 50 in Plaintiffs' Request for Production ("RFP") Set 3, as well as a dispute concerning certain noncustodial YouTube databases. [Dkt. 1538; Dkt. 1541]. At the DMC, the Parties confirmed that they had resolved their entire dispute regarding RFPs 37 and 50, as well as portions of their dispute over noncustodial databases. [Dkt. 1578 at 42:4-43:15]. The Court provided the Parties with guidance as to the remaining issues in dispute and directed them to continue to meet and confer in the courthouse during the DMC. The Parties thereafter confirmed the full resolution of all disputes. *Id.* at 86:13-87:6. The Court **ORDERED** the Parties to submit a joint stipulation regarding resolution of the disputes, which they have since done. *See* Dkt. 1590.

This **RESOLVES** Dkts. 1538 and 1541.

### V.     States' Production of Documents

The Parties confirm that they have resolved all previously raised disputes relating to Meta's discovery of documents of state agencies in Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Indiana, Kansas, Kentucky, Louisiana, Maine, Michigan, Minnesota, Missouri, Nebraska, New Jersey, New York, North Carolina, Ohio, Pennsylvania, Rhode Island, South Dakota, Washington, and Wisconsin. *See* Dkt. 1482 at 1 n.1; Dkt. 1503 at 1 n.1; Dkt. 1514; Dkt. 1516; Dkt. 1518; Dkt. 1530; Dkt. 1533; Dkt. 1536; Dkt. 1553; Dkt. 1560; Dkt. 1578 at 26:9-27:3, 91:9-13. The Court appreciates these Parties efforts to negotiate agreements on document productions and thanks them for their efforts.

1    At the January 16th DMC, the Court heard argument from Meta and the sole remaining

2    state agency at issue, the Illinois Department of Children and Family Services ("DCFS"),

3    regarding their ongoing dispute over search terms and document production limits.  *See* Dkt. 1537.

4    These Parties confirmed that they remained at an impasse regarding, among other things, DCFS's

5    request for a protective order specifically referencing certain Illinois statutes regarding production

6    of minor children's personal health information.  The Court has carefully considered these Parties'

7    arguments, and the Parties submitted the matter after oral argument at the DMC.

8    First, as to whether a further protective order is needed specific to Illinois state law, at the

9    DMC, counsel for DCFS conceded that if the Court directly orders DCFS to produce documents

10    on the record and in writing then no further amendment to the Protective Order would be needed.

11    Dkt. 1578 at 84:11-12.  Accordingly, the Court **ORDERS** DCFS to produce responsive, non-

12    privileged documents in this MDL consistent with this Court's rulings on scope of discovery,

13    including this DMO.  If this Order is somehow insufficient to allow DCFS's document production

14    to proceed, these Parties are **ORDERED** to submit a proposed amendment to the Protective Order

15    specific to DCFS, by no later than **<u>February 10, 2025</u>**, to overcome any further procedural hurdles

16    to DCFS's production of documents.

17    With regard to the objection to producing a high volume of documents which contain

18    personal health information (PHI) about children, at the DMC, the Parties reported having

19    exchanged filtering terms and appeared agreeable to using terms to extract or exclude from

20    production those documents containing PHI about children.  [Dkt. 1578 at 81:3-21].  Accordingly,

21    the Court **ORDERS** these Parties to finalize their meet and confers and develop an agreed final

22    list of up to fifteen terms (such as "ACR," "administrative case review," "QSR," or "critical

23    event") which will be used to exclude or filter out of any production of DCFS's documents

24    containing PHI or other confidential information of children.  The Parties are free to agree upon a

25    different number of such filter terms.

26    In the briefing on this issue, Meta indicated that it agreed that DCFS can exclude from

27    production any documents that hit on a search term solely because an email signature block

28    contains a search term.  [Dkt. 1537 at 6].  Accordingly, the Court **ORDERS** that DCFS can

1    exclude from production any such documents which hit on a search term solely because an email

2    signature block contains a search term.

3        With regard to the dispute over search terms, the Parties filed with the Court a chart

4    identifying agreed-upon search terms. *Id.* at 1-2. DCFS is **ORDERED** to use at least those

5    agreed upon search terms to search for, collect, review, process, and then produce responsive, non-

6    privileged documents.

7        The Court notes that in the same filing, as ordered previously by the Court, the Parties

8    listed the disputed search terms as proposed by Meta and any modifications to those proposals

9    from DCFS. In the chart of disputed search terms, DCFS counter-proposed no modified or edited

10    versions of Meta's search terms and took the position that no such search terms should be used at

11    all. *Id.* at 4-6. In the briefing on this dispute, it was reported by Meta that DCFS took the position

12    that, if DCFS was to run searches using search terms, "the search terms must all have some

13    connection to social media." *Id.* at 3. DCFS did not argue for this limitation on search terms at

14    the DMC (or in the chart of disputed search terms), and accordingly, DCFS's request to limit all

15    search terms to those which "must all have some connection to social media" is **DENIED**.

16        With regard to the dispute over other search terms, at the DMC counsel for DCFS made

17    clear that the primary concern is the volume of documents resulting from the search terms, and not

18    the specific search terms themselves proposed by Meta. DCFS requested that, regardless of what

19    search terms are used for its search for documents to produce, there be a cap of fifteen thousand

20    documents to be reviewed for production. Dkt. 1578 at 81:8-14. At the DMC, Meta reported that

21    it offered a compromise cap of forty-five thousand documents to be reviewed based on search

22    terms. *Id.* at 82:2-10. In the briefing on this issue, these Parties were further apart on the cap

23    dispute but were unable to negotiate a resolution on their own. The Court is disappointed that

24    experienced lawyers were incapable of negotiating a number that would compromise and resolve

25    this dispute. As the Court has repeatedly stated to counsel in this MDL, line-drawing or numerical

26    limit negotiations are the kinds of disputes that the Court expects able counsel to be able to work

27    out without Court intervention, particularly because the Parties know the details of their cases

28    better. *See, e.g.*, *In re Social Media Adolescent Addiction/Personal Injury Prods. Liab. Litig.*, No.

1    22-md-03047-YGR (PHK), 2025 WL 211974, at *3 (N.D. Cal. Jan. 16, 2025).

2         In any event, the Parties here have submitted the dispute as to the numerical cap on

3    documents to review for production (which is intertwined with the disputed search terms) to the

4    Court.  [Dkt. 1578 at 86:2-5].  The Court has broad discretion and authority to manage discovery.

5    *U.S. Fidelity*, 641 F.3d at 1136 n.10; *Laub*, 342 F.3d at 1093.  The Court's discretion extends to

6    crafting discovery orders that may expand, limit, or differ from the relief requested.  *Crawford-El*,

7    523 U.S. at 598.  Taking into account the list of disputed search terms and DCFS's stated position

8    that Meta can use any search terms as long as there is a "cap" in place, and further taking into

9    account the extraction of documents from production based on filtering terms and solely hitting on

10   signature blocks discussed above, the Court **ORDERS** that Meta **SHALL** identify to DCFS, by no

11   later than **February 10, 2025**, those disputed search terms which Meta wants DCFS to use to

12   search for documents to review for production.  The Court further **ORDERS** that the cap on the

13   number of unique documents DCFS must review for production after running these identified

14   search terms (and also including the agreed-upon search terms discussed above), after filtering out

15   documents using the filter terms discussed above and removing the documents which hit solely on

16   signature blocks as discussed above, is set at thirty-five thousand documents.  The Parties are free

17   to agree upon a different cap.

18        DCFS **SHALL** promptly run search and filter terms consistent with this Order and

19   **SHALL** commence rolling production of responsive, non-privileged documents **February 20,**

20   **2025**, and **SHALL** substantially complete production by no later than **March 7, 2025**.  The Parties

21   are free to agree upon a different start date for rolling production and a different date for

22   substantial completion.

23        This **RESOLVES** Dkts. 1482, 1516, 1518, 1522, 1523, 1530, 1533, 1536, 1537, 1548,

24   1549, 1553, 1559, 1560, and 1561.

25   **VI.    30(b)(6) Deposition Notices Served by Meta on Plaintiffs**

26        The Parties report multiple disputes over Meta's Rule 30(b)(6) deposition notices directed

27   to the Plaintiffs represented by the State Attorneys General (herein for ease of reference, "States"

28   or "State Plaintiffs").  [Dkt. 1525].  As summary background: Meta timely served 30(b)(6)

deposition notices on each of the remaining thirty-one State Plaintiffs, seeking testimony on forty-two topics.  The States, in their responses, objected to thirty-four of Meta's forty-two noticed topics and sought to limit several other topics.

Disputes Regarding the 30(b)(6) Notices as Served

First, Meta and the States disagree as to whether Meta must serve separate deposition subpoenas for each individual agency that is producing documents in this litigation or whether a single Rule 30(b)(6) notice directed to each State Plaintiff suffices.  *Id.* at 12-14, 18-20.

Federal Rule of Civil Procedure 26(b)(1) provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case."  Information need not be admissible to be discoverable.  *Id.* Relevancy for purposes of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal. Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader than relevancy for purposes of trial.") (alteration omitted).

While the scope of relevance is broad, discovery is not unlimited.  *ATS Prods., Inc. v. Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes of discovery, is defined broadly, although it is not without ultimate and necessary boundaries."). Information, even if relevant, must be "proportional to the needs of the case" to fall within the scope of permissible discovery.  Fed. R. Civ. P. 26(b)(1).  The 2015 amendments to Rule 26(b)(1) emphasize the need to impose reasonable limits on discovery through increased reliance on the common-sense concept of proportionality: "The objective is to guard against redundant or disproportionate discovery by giving the court authority to reduce the amount of discovery that may be directed to matters that are otherwise proper subjects of inquiry.  The [proportionality requirement] is intended to encourage judges to be more aggressive in identifying and discouraging discovery overuse."  Fed. R. Civ. P. 26 advisory committee's note to 2015

16

1    amendment.  In evaluating the proportionality of a discovery request, a court should consider "the

2    importance of the issues at stake in the action, the amount in controversy, the parties' relative

3    access to the information, the parties' resources, the importance of the discovery in resolving the

4    issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

5    Fed. R. Civ. P. 26(b)(1).

6            The Court has broad discretion and authority to manage discovery.  *U.S. Fidelity*, 641 F.3d

7    at 1136 n.10; *Laub*, 342 F.3d at 1093.  The Court's discretion extends to crafting discovery orders

8    that may expand, limit, or differ from the relief requested.  *Crawford-El*, 523 U.S. at 598.

9            Meta argues that, because the States have sued under their *parens patriae* authority, "each

10    State as a whole—including its component agencies—is properly subject to providing Rule

11    30(b)(6) testimony."  [Dkt. 1525 at 12].

12            The States, stressing that the text of Rule 30(b)(6) allows a party to name as the deponent

13    "a governmental agency, or other entity," argue that Meta's deposition notices "fail to adhere to

14    the plain letter of Rule 30(b)(6) by sweeping up 264 state agencies in 31 Notices."  *Id.* at 19.  They

15    argue that the rule "does not require one governmental agency to testify as to the knowledge of

16    another agency."  *Id.*  They argue that Meta's deposition notices directed to each State would

17    impose "immense burden" because "attorneys representing the State AGs would be responsible for

18    preparing witnesses on the intricacies of 233 separate state agencies."  *Id.*  Continuing to assert

19    that state agencies are not Parties to this litigation, the States also argue that Meta's deposition

20    notices "would prejudice the State AGs in prosecuting their case by having agencies make

21    statements against the State AGs' interest[.]"  *Id.* at 20.

22            The Parties devote large portions of their briefing on this particular dispute on the issue of

23    whether the States' Rule 30(b)(6) obligations implicate the same question of an entity's "control"

24    for purposes of document production under Rule 34.  As the Court made explicitly clear at the

25    DMC, this line of argument is irrelevant because the instant dispute does not implicate the state

26    agency control issue in any way.  *See* Dkt. 1578 at 58:23-59:1, 63:10-14.  Meta's 30(b)(6) notices

27    to the States are addressed to each State Plaintiff as a Party, and thus, the notices are not addressed

28    to the State AGs or to the individual agencies.  The States' arguments that the deposition notices

United States District Court
Northern District of California

17

United States District Court
Northern District of California

1    served by Meta are an improper attempt to take discovery from state agencies is based on a

2    misunderstanding on how Rule 30(b)(6) works.

3          "A 30(b)(6) deposition—a reference to Federal Rule of Civil Procedure 30(b)(6)—gives a

4    litigant the opportunity to question an organization's representative about a specified topic.  The

5    organization has 'a duty to make a conscientious, good-faith effort to designate knowledgeable

6    persons for Rule 30(b)(6) depositions and to prepare them to fully and unevasively answer

7    questions about the designated subject matter.'"  *In re Facebook, Inc. Consumer Privacy User*

8    *Profile Litig.*, 655 F. Supp. 3d 899, 916 (N.D. Cal. 2023) (citation omitted).

9          When selecting persons to testify on behalf of an entity or organization, "[a]n

10   organizational party subject to a Rule 30(b)(6) notice may designate whomever it chooses—or

11   several different people—to testify."  *Heath v. Google LLC*, No. 15-cv-01824-BLF (VKD), 2018

12   WL 4491368, at *2 (N.D. Cal. Sept. 19, 2018) (quoting 8A RICHARD A. MARCUS, FEDERAL

13   PRACTICE AND PROCEDURE § 2104 (3d ed. 2018)).  However, in response to a Rule 30(b)(6)

14   deposition notice, "[t]he named organization must designate one or more officers, directors, or

15   managing agents, or designate other persons who *consent* to testify on its behalf[.]"  Fed. R. Civ.

16   P. 30(b)(6) (emphasis added).  The advisory committee's notes make clear that "[t]he organization

17   may designate persons other than officers, directors, and managing agents, *but only with their*

18   *consent*.  Thus, an employee or agent who has an independent or conflicting interest in the

19   litigation—for example, in a personal injury case—can refuse to testify on behalf of the

20   organization."  Fed. R. Civ. P. 30 advisory committee's note to 1970 amendment (emphasis

21   added).  Further, while a party may request a 30(b)(6) deposition of an organization, the party

22   seeking such deposition "may not demand that a specific person appear as the [organization]'s

23   designated witness."  *Ilani v. Abraham*, No. 2:17-cv-00692-APG-PAL, 2018 WL 10467640, at *2

24   (D. Nev. Aug. 21, 2018); *see also Wachovia Sec., LLC v. Nola LLC*, No. 05 C 7213, 2008 WL

25   4866333, at *2, 5 (N.D. Ill. Jun. 5, 2008) (adopting report and recommendation to sanction party

26   which designated as 30(b)(6) designee a person who refused to serve as corporate representative).

27         With these legal standards in mind, it becomes evident why the State Plaintiffs' professed

28   concerns about "sweeping up" agencies and their attempts to conflate the current dispute with the

United States District Court
Northern District of California

1  state agency control issue are legally erroneous.  In response to the 30(b)(6) notices, each AG-

2  represented Plaintiff here will select one or more designated individuals to testify on the allowed

3  topics (as discussed further below, objections to the "contention" topics are sustained).  Because

4  the individuals designated by these Plaintiffs must consent and then be prepared to testify on the

5  designated topics, the whole issue of control over state agencies is not germane.  Meta here cannot

6  force these Plaintiffs to select any specific person to serve as a 30(b)(6) designee, and certainly

7  cannot force a specific agency employee to sit as a 30(b)(6) designee.  The choice of

8  representative(s) is a decision to be made by each Plaintiff, who also have the duty to prepare the

9  representative(s) to testify.  *See Bd. of Trs. of Leland Stanford Jr. Univ. v. Tyco Int'l Ltd.*, 253

10  F.R.D. 524, 526 (C.D. Cal. 2008) ("[B]ecause Rule 30(b)(6) explicitly requires a company to have

11  persons testify on its behalf as to all matters reasonably available to it, . . . the Rule 'implicitly

12  requires persons to review all matters known or reasonably available to [the corporation] in

13  preparation for the [Rule] 30(b)(6) deposition.'  In other words, personal knowledge of the

14  designated subject matter by the selected deponent is of no consequence.").  In light of the legal

15  standards under Rule 30(b)(6), the State Plaintiffs' arguments that Meta is somehow seeking to

16  take discovery from state agencies (without serving separate notices on each agency) are thus

17  misplaced.  For similar reasons, the States Plaintiffs' arguments that they are prejudiced because it

18  is improper to have one agency testify for another agency and because Meta is allegedly trying to

19  obtain agency testimony adverse to the State Plaintiffs are all misplaced.  By serving 30(b)(6)

20  notices on these Plaintiffs, Meta is by definition seeking discovery from each Plaintiff as a Party.

21  Whether a particular State Plaintiff chooses to designate as a representative a person who is

22  nominally employed by a state agency (who also consents to serve as a 30(b)(6) witness) is up to

23  each State Plaintiff, not Meta—but in that instance, the discovery is still being taken from the

24  designating Party (and not the entity which nominally employs that representative).

25      The requirement under Rule 30(b)(6) of consent underscores why the States' attempts to

26  relitigate or raise the state agency control issue is a red herring—the rule here requires consent,

27  which is not the same thing as legal control under Rule 34.  Under Rule 30(b)(6), a Plaintiff can

28  elect to designate someone not employed by a state agency and Meta cannot complain about that

1    choice *ex ante* or attempt to dictate who the designee should be.  There is thus no way for Meta to

2    try to take discovery from state agencies by using a 30(b)(6) deposition notice directed to a

3    Plaintiff.  To be clear, the Court repeatedly stated at the DMC that the September 6, 2024 Order on

4    state agency control is irrelevant or orthogonal to the instant dispute—the Court only discussed

5    that prior Order at the DMC because the State Plaintiffs kept bringing it up.  Lest there be any

6    confusion, this Court is not extending the September 6, 2024 Order and need not rely on that prior

7    Order to resolve the dispute here over the Rule 30(b)(6) notices.

8        Similarly, the States raise concerns regarding the "bindingness" of Rule 30(b)(6)

9    witnesses' testimony, particularly their concern that somehow a state agency would "bind" a State

10   Plaintiff.  Again, as discussed above, the designated representative (who will testify by consent to

11   serve as a designee for a Plaintiff) is the witness testifying on behalf of that Plaintiff and thus a

12   state agency (which is an entity and not a natural person) is not qualified to serve as a designated

13   witness which can bind the Plaintiff.  Designated "persons" testify for a Party in response to a

14   Rule 30(b)(6) notice, not designated entities.  Again, Plaintiffs here are improperly conflating the

15   state agency control issue with designated witnesses under Rule 30(b)(6).  The States' concerns

16   are again based on a misunderstanding as to how Rule 30(b)(6) works.  With regard to the extent

17   to which a designated 30(b)(6) witness binds a Party, the district courts in the Ninth Circuit have

18   mostly taken "a middle ground and hold that a party cannot rebut the testimony of its Rule

19   30(b)(6) witness when, as here, the opposing party has relied on the Rule 30(b)(6) testimony, and

20   there is no adequate explanation for the rebuttal."  *United States v. HVI Cat Canyon, Inc.*, No. CV

21   11-5097 FMO (SSx), 2016 WL 11683593, at *5 n.7 (collecting cases).

22       Further, at the DMC, some State AGs raised arguments that their cases are not brought on

23   behalf of the state government and that somehow Meta's 30(b)(6) deposition notices attempt to

24   define the State Plaintiffs in a way that again sweeps in state agencies.  The State Plaintiffs appear

25   to agree with Meta that they filed these suits "in their *parens patriae* authority," but suggest that

26   this somehow supports their position on this issue.  *See* Dkt. 1578 at 69:1-7.  One State argued that

27   its case was filed "on behalf of the People" of that State, as if somehow that picayune technicality

28   in pleading caption differentiated that State from the other State Plaintiffs or somehow exempted

United States District Court
Northern District of California

United States District Court
Northern District of California

1   that State Plaintiff from having to designate witnesses under Rule 30(b)(6).  *Id.* at 68:4-9.  The

2   Court finds this argument to be without merit.  *See California v. Purdue Pharma L.P.*, No. SACV

3   14-1080-JLS (DFMx), 2014 WL 6065907, at *3 (C.D. Cal. Nov. 12, 2014) ("[A]s the substantive

4   state law [of California] makes clear, the 'People of the State' and 'the State' are descriptive of the

5   same sovereignty.") (collecting cases) (internal quotation marks and alterations omitted).

6   　　　　At the DMC, Meta made very clear that their 30(b)(6) deposition notices are seeking

7   testimony from each Plaintiff as a Party, not from agencies as entities.  *See* Dkt. 1578 at 65:20-21

8   ("[I]t's not that we're taking a deposition of the agency because if we had wanted that, we would

9   have done that via 30(b)(6)[.]").  Accordingly, Plaintiffs' concerns that the deposition notices are a

10  surreptitious attempt to take discovery from all of the state agencies are simply unfounded.

11  　　　　Further, as discussed above, an organizational entity which files suit as a party is under

12  obligation under Rule 30(b)(6) to designate and prepare representative, consenting witnesses to

13  testify for that party.  There is no exemption under Rule 30(b)(6) to exempt a plaintiff captioned as

14  "The State of" or "the Commonwealth of" or even "The People of" from this obligation.  The

15  Plaintiffs at issue here are entities, not natural persons; as such, they are subject to Rule 30(b)(6)

16  regardless of how they are denominated.  *See* Fed. R. Civ. P. 30(b)(6) ("Notice or Subpoena

17  Directed to an Organization" and stating that the rule applies to any "other entity").  Taken in

18  proper context, this Court's rulings on discovery are not rulings as to liability; a ruling as to

19  whether an entity is a "party" for purposes of responding to a Rule 30(b)(6) deposition notice is

20  not a ruling as to the status of that entity for purposes of liability.  Throughout this litigation

21  (including at the most recent DMC), both the Court and counsel for the State Attorneys General

22  have used the words "State" or "States" as shorthand to refer to those party Plaintiffs represented

23  by their respective State Attorney General for purposes of discovery.  This Court knows what it

24  said and what it meant, as did counsel attending the DMC, and to be clear, this Court has made no

25  express findings from the bench as to liability issues.

26  　　　　<u>Objections to Specific 30(b)(6) Deposition Topics</u>

27  　　　　The Parties' next dispute concerns the noticed deposition topics themselves.  The States

28  object to providing testimony on certain noticed topics on the grounds that the testimony is

improperly sought from opposing counsel regarding their "mental impressions, legal theories, and strategies in this case" or is otherwise privileged.  [Dkt. 1525 at 20-24].  The States also argue that "much" of the testimony sought is "irrelevant" and/or "obtainable by other means."  *Id.* at 22.

The gist of this particular objection is that Meta's deposition notices include multiple topics which seek testimony as to the State Plaintiffs' contentions on different issues.  So-called "contention" depositions are objectionable.  As stated at the January 16th DMC, the Court **SUSTAINS** the States' objections to providing a witness on contention deposition topics (namely, Topics 22-29 and 36-38 in the 30(b)(6) deposition notice).  As discussed long ago by Judge Brazil, it is more appropriate for a party such as Meta to take discovery on an opponent's contentions using appropriately framed contention interrogatories, and not contention deposition topics under Rule 30(b)(6).  *See McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 134 F.R.D. 275, 286-87 (N.D. Cal. 1991) (discussing considerations weighing against proposed deposition of fact witness regarding patent infringement contentions and holding, as a matter of discovery management in a complex case, that contention interrogatories are a more appropriate vehicle for obtaining such information), *overruled on other grounds*, 765 F. Supp. 611 (N.D. Cal. 1991); *see also Yahoo!, Inc. v. MyMail, Ltd.*, No. 16-cv-07044-EJD (SVK), 2017 WL 2177519, at *3 (N.D. Cal. May 18, 2017) ("MyMail seeks a deposition to explore the basis for the allegations in Yahoo's complaint in the California action, which derive at least in part from MyMail's own allegations in the Texas action. In the unique circumstances of this case, these topics are better explored, at least in the first instance, through contention interrogatories than through deposition of Yahoo corporate representatives."); *3M Co. v. Kanbar*, No. C06-01225 JW (HRL), 2007 WL 1794936, at *2 (N.D. Cal. June 19, 2007) (granting protective order regarding contention deposition topics more appropriately addressed through contention interrogatories).

The States have also asserted non-specific objections that the 30(b)(6) deposition topics are overbroad or seek information not within the knowledge of the State Plaintiffs.  It was evident at the DMC that the Parties have not adequately met and conferred on these issues, and it appears that many of the disputes here are dependent on the specific questions to be asked under specific topics in the deposition notice.  As stated at the DMC, the Court **ORDERS** the Parties to meet and

confer to attempt to resolve any such disputes.  Rule 30(b)(6) mandates that "[b]efore or promptly after the notice or subpoena is served, the serving party and the organization must confer in good faith about the matters for examination."  As guidance, the Court notes that Rule 30(b)(6) requires the party seeking the deposition to "describe with reasonable particularity the matters for examination."  *See Sprint Commc'ns Co. v. Theglobe.com, Inc.*, 236 F.R.D. 524, 528 (D. Kan. 2006) ("[T]o allow the Rule to effectively function, the requesting party must take care to designate, with painstaking specificity, the particular subject areas that are intended to be questioned, and that are relevant to the issues in dispute[.]").  As discussed at the DMC, that "particularity" may beneficially require Meta to specify (either in an amended deposition notice or via the meet and confer process) which specific documents it expects representative witnesses to be able to testify about.  *See* Dkt. 1578 at 66-67.  Meta should not expect to be heard to be reasonably complaining that a 30(b)(6) designee was insufficiently prepared to testify about the details of a specific document when that document is not identified in the 30(b)(6) notice or in the meet and confer to clarify scope.

In responding to the 30(b)(6) notice, the Rule requires the party being deposed to have persons testify on its behalf as to all matters "reasonably available" to it.  The "purpose behind Rule 30(b)(6) undoubtedly is frustrated in the situation in which a corporate party produces a witness who is unable and/or unwilling to provide the necessary factual information on the entity's behalf."  *Movement Mortg., LLC v. MLD Mortg., Inc.*, No. CV 20-08387-MWF (AFMx), 2022 WL 1731759, at *3 (C.D. Cal. Jan. 11, 2022) (quoting *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 304 (3d Cir. 2000)).  As explained by one court,

> [T]he Rule makes clear that a party is not permitted to undermine the beneficial purposes of the Rule by responding that no witness is available who personally has direct knowledge concerning the areas of inquiry.  If need be, the responding party must prepare deponents by having them review prior fact witness deposition testimony as well as documents and deposition exhibits.  Any other interpretation of the Rule would allow the responding corporation to 'sandbag' the deposition process.  Although the Court readily acknowledges that the requirements listed above may be onerous, the burden upon such a responding entity is justified since a corporation can only act through its employees.  These requirements negate any possibility that an inquiring party will be directed back and forth from one corporate representative to another, vainly searching for a deponent who is able

to provide a response which would be binding upon that corporation.

*Sprint Commc'ns*, 236 F.R.D. at 528 (citations and quotation marks omitted).

With these standards in mind, the Court encourages (and expects) the Parties to work collaboratively to resolve (or at least narrow) disputes about the 30(b)(6) deposition topics' breadth and specificity.

Relevant Time Period

Finally, the States object to providing Rule 30(b)(6) testimony as to facts which occurred prior to September 2021 because "the State AGs' investigation relating to this litigation did not begin until September 2021." [Dkt. 1525 at 24]. The States argue that "most" of their anticipated Rule 30(b)(6) testimony "would be limited to that timeframe, save for certain exceptions such as consumer complaints or document retention policies which might predate that period." *Id.*

To the extent that the State Plaintiffs here seek a protective order limiting all testimony on facts predating September 2021, the request is **DENIED**. As stated at the DMC, the Court **ORDERS** the Parties to meet and confer for purposes of identifying the specific deposition topics seeking historical information of facts prior to September 2021. To the extent a State Plaintiff's representative witness is asked for historical information that no longer exists or which the State Plaintiff no longer possesses (or is not reasonably available after a reasonable investigation), then it is entirely possible that the witness may testify that such information is not known or not reasonably available to the Plaintiff. By identifying the specific deposition topics which seek information prior to September 2021 (and specifying how far in the past Meta seeks such information), the Parties here are expected to reasonably meet and confer to resolve disputes over temporal scope of the deposition topics and resolve disputes over facts which are not known or reasonably available and thus obviate unnecessary time wasted at the depositions.

To the extent Meta intends to serve amended Rule 30(b)(6) deposition notices to remove the contention topics and address the other objections discussed (and hopefully resolved through meet and confers), such amended notices **SHALL** be promptly served, and the Plaintiffs here **SHALL** promptly serve their responses to the amended Rule 30(b)(6) deposition notices.

This **RESOLVES** Dkt. 1525.

**VII.    Snap Privileged Documents Dispute**

The PI/SD Plaintiffs and Snap report a dispute as to Snap's assertion of privilege in connection with fourteen redacted documents.  [Dkt. 1547].  The Court finds the dispute suitable for resolution without oral argument.  *See* Civil L.R. 7-1(b).  The Parties have submitted the documents at issue for *in camera* review.  A written order resolving the dispute will be issued in due course.

**IT IS SO ORDERED.**

Dated:  February 5, 2025

_____
PETER H. KANG
United States Magistrate Judge

United States District Court
Northern District of California