# EXHIBIT A

MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 10
Docket:       BCD-23-73
Argued:       March 7, 2024
Decided:      February 6, 2025

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.


EASTERN MAINE MEDICAL CENTER et al.

v.

WALGREEN CO. et al.


HORTON, J.

[¶1]  Eastern Maine Medical Center and eight other Maine hospitals[1] (the Hospitals) appeal from a judgment entered in the Business and Consumer Docket (*Duddy, J.*) dismissing their 509-page complaint against businesses and individuals ("the Opioid Sellers") involved in marketing and distributing prescription opioids.[2]  The essence of the Hospitals' cause of action is that the

---

[1]  The other hospitals are Aroostook Medical Center, Blue Hill Memorial Hospital, Charles A. Dean Memorial Hospital, Inland Hospital, Maine Coast Regional Health Facilities, Mercy Hospital, MRH Corp., and Sebasticook Valley Health.

[2]  The complaint sorts the defendants into two primary categories: "marketing defendants" and "distributor defendants."  The marketing defendants include pharmaceutical manufacturing and sales companies, and the distributor defendants include national retail pharmacies and distributors.

The named marketing defendants are Teva Pharmaceuticals USA, Inc.; Cephalon, Inc.; Watson Laboratories, Inc.; Actavis LLC; Actavis Pharma, Inc.; Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Endo Pharmaceuticals, Inc.; Endo Health Solutions, Inc.; Par Pharmaceutical, Inc.; Par Pharmaceuticals Companies, Inc.; Allergan Finance, LLC; Allergan Sales, LLC; Allergan USA, Inc.; and AbbVie, Inc.  The case is stayed as to the following marketing defendants due to the defendants' pending bankruptcy proceedings: Endo Pharmaceuticals, Inc.; Endo Health Solutions, Inc.; Par Pharmaceutical, Inc.; and Par Pharmaceuticals Companies, Inc.  In a series of unopposed motions

2

Opioid Sellers "worked together to create illegitimate demand for dangerous opioids and to unlawfully increase the supply to meet that demand," causing an epidemic of opioid misuse and opioid disorders that required the Hospitals to incur the high cost of care for patients diagnosed with opioid misuse, addiction, and dependency, with only partial reimbursement provided by private and government insurance. The Hospitals contend that the court erred in dismissing their complaint and that if the complaint was defective, the court should have granted them leave to amend. We affirm the dismissal.

---

filed after oral argument, the Hospitals requested a limited stay of the appeal as to all other marketing defendants based on pending settlements. We granted the stay.

The named distributor defendants are AmerisourceBergen Drug Corporation; Xcenda L.L.C.; Anda, Inc.; Cardinal Health, Inc.; H.D. Smith, LLC; McKesson Corporation; Walgreen Co.; Walgreen Eastern Co., Inc.; CVS Health Corporation; CVS Pharmacy, Inc.; CVS Orlando FL Distribution, L.L.C.; CVS TN Distribution, L.L.C.; Rite Aid of Maine, Inc.; Rite Aid of Maryland, Inc.; P.J.C. Distribution Inc.; Eckerd Corporation; Walmart Inc.; and Walmart Stores East, LP. The case is stayed as to the following distributor defendants due to the defendants' pending bankruptcy proceedings: Rite Aid of Maine, Inc.; Rite Aid of Maryland, Inc.; P.J.C. Distribution, Inc.; and Eckerd Corporation. In unopposed motions filed after oral argument, the Hospitals requested a limited stay of the appeal as to the following distributor defendants based on pending settlements: AmerisourceBergen Drug Corporation; Xcenda L.L.C.; Anda, Inc.; Cardinal Health, Inc.; H.D. Smith, LLC; and McKesson Corporation. We granted the stay.

The complaint also named as defendants four individual sales representatives associated with one or more businesses named as marketing defendants: Marc Blattstein, Jason Nagel, Frank Neel, and Jeff Saucier. The complaint was dismissed with prejudice as to Nagel and Neel on December 13, 2022, and without prejudice as to Blattstein on January 25, 2023. The Hospitals did not appeal those dismissals, and those individuals have not participated in this appeal. The case is stayed as to Jeff Saucier due to a pending bankruptcy.

# I. BACKGROUND

[¶2]  The following facts are drawn from the procedural record and the Hospitals' complaint, viewed in the light most favorable to them.  *See Meridian Med. Sys., LLC v. Epix Therapeutics, Inc.*, 2021 ME 24, ¶ 2, 250 A.3d 122.  The nine Hospitals are non-profit corporations that operate hospitals in Maine.  On September 10, 2021, the Hospitals filed a complaint in the Superior Court (Cumberland County) against the Opioid Sellers, all of whom they alleged participated in the sale, marketing, and distribution of opioids in Maine.

[¶3]  The complaint alleges six theories of liability for the Hospitals' causes of action: negligence, public nuisance,[3] unjust enrichment, fraud and negligent misrepresentation, fraudulent concealment, and civil conspiracy.  The complaint's 509 pages contain 1,847 numbered paragraphs of allegations that in summary assert the following:

- The Opioid Sellers have engaged in a concerted effort to increase the use of opioids to treat a wide array of medical conditions.  Despite knowing that opioids were addictive and that there was no evidence that they were safe or effective for treating many medical conditions, the Opioid Sellers fraudulently influenced regulatory bodies, doctors, and other organizations to endorse and proselytize the efficacy of opioids and concealed information regarding their risks, with the goal of increasing their use through prescribing practices.  Through these independent actors, the Opioid Sellers successfully induced prescribers and hospitals

---

[3]  Although the complaint captions the Hospitals' second claim broadly as a claim for "nuisance," it alleges that the Opioid Sellers engaged in interference with public rights only, thereby limiting the claim to one for public nuisance.  *See infra* ¶¶ 22-28.

4

to utilize opioids more extensively.  It was foreseeable that many patients who were prescribed opioids would misuse them.  Nonetheless, the Opioid Sellers continued to advocate for broader use of opioids and failed to report data that clearly showed that demand for opioids exceeded legitimate medical needs.

- As a foreseeable consequence, an epidemic of opioid misuse, addiction, and dependency ensued nationwide, including in Maine.  The Hospitals have a legal obligation to provide treatment in many instances regardless of whether they will be compensated, and they foreseeably incurred various costs in coping with the epidemic of opioid misuse created by the Opioid Sellers' conduct.  The Hospitals realized lower rates of return for treating opioid-dependent patients, whose treatment is more complex and costly than other patients.  Additionally, the Hospitals incurred costs identifying opioid-dependent patients, purchasing medically unnecessary quantities of opioids, training personnel to treat opioid overdoses, and hiring personnel to address safety concerns caused by opioid-dependent patients.

[¶4]  The matter was transferred to the Business and Consumer Docket in May 2022.  Later in May 2022, the Opioid Sellers filed multiple motions to dismiss the complaint.  The Hospitals opposed the motions to dismiss in August 2022 and requested leave to amend their complaint pursuant to M.R. Civ. P. 15(a) if the court determined that the defendants' motions should be granted in whole or part.

[¶5]  After hearing oral argument on the motions, the court entered an order in February 2023 dismissing the complaint in its entirety as to all of the Opioid Sellers.  The court concluded that the complaint did not comply with M.R. Civ. P. 8(a) (requiring any pleading setting forth a claim to contain "a short

and plain statement of the claim") but elected not to dismiss the complaint on that ground. The court instead examined the viability of the legal theories underlying the allegations of the complaint to determine whether the Hospitals could be "entitled to relief under any set of facts that [they] might prove in support of [their] claim[s]," *Bonney v. Stephens Mem'l Hosp.*, 2011 ME 46, ¶ 16, 17 A.3d 123 (quotation marks omitted). Viewing the factual allegations of the complaint as though they were admitted, the court concluded that the Hospitals could not recover under any of the legal theories pleaded in the complaint. With respect to causation, the court concluded that as a matter of law the alleged harm incurred by the Hospitals was too attenuated from the Opioid Sellers' alleged conduct to support recovery. The court also concluded that the alleged damages were too speculative to be cognizable and were in any case precluded by the federal Medicaid statute and regulations. *See* 42 U.S.C.A. § 1395cc(a)(1)(A)(i) (Westlaw through Pub. L. No. 118-157); 42 C.F.R. § 447.15 (2023). The court then addressed each of the theories of liability pleaded in the complaint and concluded as a matter of law that

(1)    the Hospitals' negligence and negligent misrepresentation claims could not succeed because the Opioid Sellers owed no duty to protect the Hospitals from the harm alleged;

6

(2)     the Hospitals' public nuisance claim failed because the Opioid Sellers did not interfere with a public right and the Hospitals did not suffer a special injury;

(3)     the Hospitals' unjust enrichment claim failed because the Hospitals did not allege that they had conferred any benefit upon the Opioid Sellers for which restitution should be required;

(4)     the fraud and fraudulent concealment claims failed because they were not pleaded with particularity and instead stated sweeping and general allegations; and

(5)     the Hospitals' civil conspiracy claim failed because it is not an independent tort.

[¶6]  The court's order of dismissal did not grant the Hospitals leave to amend their complaint.  The Hospitals timely appealed.  *See* 14 M.R.S. § 1851 (2024); M.R. App. P. 2B(c).[4]

## II.  DISCUSSION

[¶7]  We begin by addressing the complaint's compliance with the Maine Rules of Civil Procedure.  Then, after setting forth the applicable standard of review, we address the sufficiency of the allegations to support each claim set forth in the complaint.

---

[4]  By consent of the parties, two amicus briefs have been submitted: one from the National Association of Manufacturers, Product Liability Advisory Counsel, and Chamber of Commerce of the United States of America; and the other from the Maine Hospital Association.

**A.    The Court's Conclusion that the Hospitals' Complaint Did Not Comply with M.R. Civ. P. 8(a)**

[¶8]  The Hospitals argue that the complaint, although "assuredly long and detailed, . . . was both sufficient to pass muster under M.R. Civ. P. 12(b)(6) and appropriate for the claims pleaded."  They contend that the complaint needed to be lengthy because of the factual and legal complexity of the case as well as the number of parties.

[¶9]  "Maine is a notice pleading state," meaning that the complaint must "give fair notice of the cause of action."  *Howe v. MMG Ins. Co.*, 2014 ME 78, ¶ 9, 95 A.3d 79 (quotation marks omitted).  To do so, the complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief."  M.R. Civ. P. 8(a).  "Each averment . . . shall be simple, concise, and direct."  M.R. Civ. P. 8(e)(1).  Although "[w]hat constitutes a 'short and plain statement' varies with the type of case[, a] verbose statement of the evidence relied upon is not, of course, short and plain."  2 Harvey, *Maine Civil Practice* § 8:2 at 353 (3d, 2024-2025 ed. 2024).

[¶10]  The Hospitals' complaint is decidedly not short or plain.  The complaint is over five hundred pages long and contains nearly two thousand paragraphs of allegations—well beyond what we have previously deemed outside the bounds of Rule 8.  *See Meridian Med. Sys., LLC*, 2021 ME 24, ¶¶ 1, 4,

8

250 A.3d 122 (concluding that a thirty-two-page, 126-paragraph complaint asserting multiple tort claims in a business dispute was not a "short and plain statement"). The complaint provides a narrative of the history of the opioid epidemic, citing books, articles, studies, and findings of federal investigations to support its allegations. The complaint describes in eye-watering detail the evidence the Hospitals presumably intend to rely upon to prove their claims, but fails to link the cited evidence in a clear fashion to the elements of the claims pleaded in the complaint.

[¶11]  Moreover, the complaint is repetitious. The first two hundred pages outline the factual basis for the Hospitals' claims, and the last three hundred repeat much of the same information separately as to each defendant. Although complex cases may require more extensive pleading, the Hospitals' complaint provides far more information at far greater length than is necessary to set forth the basis for the claims. Even considering that the Hospitals were required to plead their fraud claims "with particularity," M.R. Civ. P. 9(b), the Hospitals' complaint greatly exceeds the bounds of permissible length for pleading. The sheer length of the complaint would have justified its dismissal, but the court's dismissal was based instead on the legal insufficiency of the Hospitals' claims. Endorsing the court's exercise of discretion in refraining

9

from dismissing the complaint because of its failure to comply with Rule 8(a) and instead reaching the sufficiency of the complaint's allegations as to each element of each claim, we now review the court's conclusions regarding the sufficiency of the complaint, turning first to the standard of review.

## B.    Our Standard of Review for the Court's Dismissal of the Complaint for Failure to State a Claim Without Granting Leave to Amend

[¶12]    Rule 15 of the Maine Rules of Civil Procedure governs the amendment of complaints and other pleadings and establishes the general rule that "leave [to amend] shall be freely given when justice so requires." M.R. Civ. P. 15(a).  "After judgment on dismissal of a complaint for failure to state a claim, the right to amend depends upon leave of court, but the admonition to allow amendment 'freely' still applies.  Amendment is ordinarily permitted as a routine matter, at least the first time, if it appears that the defect can be corrected."  2 Harvey, *Maine Civil Practice* § 15:3 at 473 (3d, 2024-2025 ed. 2024); *see Glynn v. City of South Portland*, 640 A.2d 1065, 1067 (Me. 1994) (holding that the court did not abuse its discretion in declining to allow amendment when the amendment would not cure the complaint's failure to state cognizable claims); *Kraul v. Me. Bonding & Cas. Co.*, 559 A.2d 338 (Me. 1989) (same).

10

[¶13]  Upon analyzing the Hospitals' allegations, the court concluded as a matter of law that the Hospitals could not prevail on their theories of liability. Presumably, the court did not grant leave to amend because the insufficiency of the complaint could not be remedied.  We therefore consider whether the Hospitals' complaint was legally deficient in pleading the Hospitals' cause of action and whether the defects could be corrected.  "We review the legal sufficiency of a complaint de novo, examining the complaint in the light most favorable to the plaintiff to determine whether it sets forth elements of a cause of action or alleges facts that would entitle the plaintiff to relief pursuant to some legal theory."  *Meridian Med. Sys., LLC*, 2021 ME 24, ¶ 2, 250 A.3d 122 (quotation marks omitted).

## C.    The Legal Sufficiency of the Hospitals' Theories of Liability

[¶14]  The devastation to people and society that has resulted from what is often called "the opioid epidemic" is hard to overstate.  The wave of opioid use disorders that has resulted from the opioids that have flooded America has cost lives, orphaned children, decimated families, disrupted employers, depleted social service agencies, and increased crime, and its effects continue to reverberate throughout the nation.  *See* U.S. Dep't of Health & Human Servs., *Facing Addiction in America: The Surgeon General's Spotlight on Opioids* 4 (Sept.

2018) (summarizing the consequences of the opioid epidemic).  Legal and illegal marketers, distributors, and sellers of opioids have been held liable in civil and criminal actions across the nation.  *See* Nora Freeman Engstrom & Robert L. Rabin, *Pursuing Public Health Through Litigation: Lessons from Tobacco and Opioids*, 73 Stan. L. Rev. 285, 307-21 (2021).  But their liability is not unlimited, nor does it run in favor of every plaintiff.

[¶15]   As we explain below, the fundamental shortcoming in the Hospitals' cause of action is that the Hospitals have not directly suffered the harm that they allege has been caused by the wrongful conduct of the Opioid Sellers—opioid use disorders, including misuse, addiction, and dependency. The Hospitals stand in the same position as the employers, family members, crime victims, social service agencies, and others that have sustained economic and non-economic losses in many forms as a result of the opioid epidemic without having had opioid use disorders themselves.  As real as the indirect economic losses caused by opioid use disorders are, they are not necessarily compensable as a matter of law.  That the losses for which the Hospitals seek compensatory damages are purely economic limits the Opioid Sellers' liability to the Hospitals.  In contrast to the general duty of care to avoid causing physical injury, the Restatement establishes as a general principle that "[a]n actor has

12

no general duty to avoid the unintentional infliction of economic loss on another." Restatement (Third) of Torts: Liab. for Econ. Harm § 1(1) & cmt. a (2020). Although the Hospitals allege intentional tortious conduct, the Hospitals do not and cannot in good faith allege that the Opioid Sellers' tortious intent was to inflict economic loss on the Hospitals.

### 1. Negligence

[¶16] In any negligence case, the plaintiff must prove that the defendant breached a duty owed to the plaintiff and that the breach was the proximate cause of the harm or loss for which the plaintiff seeks relief. *See Bell ex rel. Bell v. Dawson*, 2013 ME 108, ¶¶ 17, 24, 82 A.3d 827. "Whether a defendant owes a duty of care to a plaintiff is a matter of law for the court. In determining whether a duty exists, we must ascertain whether the alleged wrongdoer is under any obligation for the benefit of the particular plaintiff." *Bryan R. v. Watchtower Bible & Tract Soc'y of N.Y., Inc.*, 1999 ME 144, ¶ 11, 738 A.2d 839 (1999) (citations and quotation marks omitted).

[¶17] The Opioid Sellers likely owed a common law duty of care to the consumers of prescription opioids and arguably, under theories of contribution or indemnification, to the health care providers who prescribed opioids and thereby incurred potential liability to consumers. *See* Restatement (Second) of

Torts § 388 (1965); *Emery v. Hussey Seating Co.*, 1997 ME 162, ¶ 9, 697 A.2d 1284; *see also Merriam v. Wanger*, 2000 ME 159, ¶ 8, 757 A.2d 778 ("Proximate cause is that cause which, in natural and continuous sequence, unbroken by an efficient intervening cause, produces the injury, and without which the result would not have occurred." (quotation marks omitted)).  We have never held, however, that a hospital that treats a victim injured by a negligent act can assert its own negligence claim for the cost of treatment directly against the person who caused the injury.  Instead, a hospital's claim derives from and depends on the negligent party's liability to the hospital's injured patient—through subrogation, *see Me. Mun. Emps. Health Tr. v. Malone*y, 2004 ME 51, ¶ 7, 846 A.2d 336, or under the Maine hospital lien statute, *see* 10 M.R.S. §§ 3411-3415 (2024), neither of which has been pleaded here.  The Hospitals do not have a cognizable direct claim of negligence against the Opioid Sellers.

### 2. Fraud, Fraudulent Concealment, and Negligent Misrepresentation

[¶18]  Just as their negligence claim relies on the Opioid Sellers' alleged breach of a duty of care owed to others, the Hospitals' allegations of fraud, fraudulent concealment, and negligent misrepresentation depend on the Opioid Sellers' fraudulent or negligent misrepresentations and omissions to

14

others, such as accrediting bodies, governmental agencies, prescribers, and consumers.

[¶19]  The torts of fraud and negligent misrepresentation both require proof that the harm resulted from the plaintiff's reliance on the defendant's misrepresentation that is the basis of the claim.  *See Barr v. Dyke*, 2012 ME 108, ¶ 16, 49 A.3d 1280; *Binette v. Dyer Libr. Ass'n*, 688 A.2d 898, 903 (Me. 1996).[5] Likewise, the elements of a claim of fraudulent concealment include the plaintiff's detrimental reliance on the defendant's failure to disclose a material fact in violation of a legal or equitable duty to disclose.  *Picher v. Roman Cath. Bishop of Portland*, 2009 ME 67, ¶ 30, 974 A.2d 286.  The irremediable difficulty with the Hospitals' fraud, fraudulent concealment, and negligent misrepresentation claims is that the Hospitals do not and cannot in good faith allege that in rendering treatment to patients with opioid use disorders they were acting in reliance upon any fraudulent or negligent misrepresentation or failure to disclose by any Opioid Seller.  Their treatment of those patients was pursuant to their mission and not based on reliance on the Opioid Sellers.  Their

---

[5]  *See* Restatement (Third) of Torts: Liab. for Econ. Harm § 11 (2020) ("The person to whom a fraudulent misrepresentation is made can recover against its maker for economic loss only if: (a) that person relies on the misrepresentation in acting or refraining from action; (b) the reliance is justifiable; and (c) the misrepresentation causes the loss."); *id.* § 5 (1) (providing that a person engaged in trade or business who "supplies false information for the guidance of others is subject to liability for pecuniary loss caused to them by their reliance upon the information, if the actor fails to use reasonable care in obtaining or communicating it").

claims fail as a matter of law due to the absence of the reliance element common to the torts of fraud, fraudulent concealment, and negligent misrepresentation.

### 3. Unjust Enrichment

[¶20]  A claimant for unjust enrichment must prove that "(1) it conferred a benefit on the other party; (2) the other party had appreciation or knowledge of the benefit; and (3) the acceptance or retention of the benefit was under such circumstances as to make it inequitable for it to retain the benefit without payment of its value." *Tucci v. City of Biddeford*, 2005 ME 7, ¶ 14, 864 A.2d 185. The Hospitals contend that they conferred a recoverable benefit on the Opioid Sellers by funding the cost of treating opioid misuse caused by the Opioid Sellers and that it would be inequitable for the Opioid Sellers to retain the benefit without compensating the Hospitals.

[¶21]  At first glance, it might seem that the Hospitals' unjust enrichment claim fails at the outset because they did not confer any benefit on the Opioid Sellers.  However, the claim could be viewed as a claim for equitable subrogation, a theory of liability rooted in restitution and unjust enrichment. *See N. E. Ins. Co. v. Concord Gen. Mut. Ins. Co.*, 433 A.2d 715, 719 (Me. 1981).  The operative principle of equitable subrogation is that "[o]ne who pays a debt that in equity and good conscience should have been paid by another *succeeds to the*

16

*rights of the payee against the other*." *Id.* (emphasis added). Under the theory of equitable subrogation, the Hospitals can be deemed to have conferred a benefit upon the Opioid Sellers if the Opioid Sellers—rather than the Hospitals—should have funded the costs of treating the Hospitals' patients who suffer from opioid use disorders. But that proposition assumes that the Opioid Sellers would be found liable under some theory to pay the medical bills of each of the patients whose treatment figures into the Hospital's claimed compensatory damages regardless of the individual circumstances of the patients. Because such liability would need to be alleged and proved on an individual basis based on the facts supporting each patient's claim or claims against the Opioid Sellers, we cannot make the categorical assumption of law that the claim requires. For that reason, the Hospitals' unjust enrichment claim fails as a matter of law.

### 4. Public Nuisance

[¶22] The Hospitals' claim for public nuisance asserts that the Opioid Sellers' acts and omissions interfered with public health, that public health is a cognizable public right, and that the Hospitals' unreimbursed costs resulting from the opioid epidemic are a special injury distinct from the injury that the nuisance inflicted upon the public.

[¶23]   The tort of nuisance comprises two broad categories: public nuisance, also known as common nuisance, *see Foley v. H. F. Farnham Co.*, 135 Me. 29, 31, 188 A. 708, 710 (1936), and private nuisance, *see Johnston v. Me. Energy Recovery Co.*, 2010 ME 52, ¶ 15, 997 A.2d 741.  The distinction between the two is essentially that a public nuisance involves a harm that "violates public rights, and produces a common injury," *Foley*, 135 Me. at 31, 188 A. at 710, whereas a private nuisance involves a harm to the rights, interests, or property of particular persons, *see Johnston*, 2010 ME 52, ¶ 15, 997 A.2d 741. At common law, a public nuisance "may be said to be anything wrongfully done, or permitted, which violates public rights, and produces a common injury; when it injures that portion of the public that necessarily comes in contact with it." *Foley*, 135 Me. at 31, 188 A. at 710; Restatement (Second) of Torts § 821B cmt. g (1979) (indicating that a condition may create a public nuisance when it "deprives all members of the community" of a public right that is "common to all members of the general public").  A private nuisance "consists in a use of one's own property in such a manner as to cause injury to the property, or other right, or interest of another." *Johnston*, 2010 ME 52, ¶ 15, 997 A.2d 741 (quotation marks omitted).

18

[¶24]  Nuisance is a common law tort, but the Maine Legislature has enacted statutes declaring a wide variety of activities to be actionable nuisances.  *See* 17 M.R.S. §§ 2791-2808 (2024).  The Hospitals' complaint recites that their nuisance claim is brought under the common law and 17 M.R.S. § 2701 (2024), which applies to public nuisances and private nuisances and "provides a cause of action for damages for a common law nuisance." *Johnston,* 2010 ME 52, ¶ 16 n.1, 997 A.2d 741.  Section 2701 states: "Any person injured in his comfort, property or the enjoyment of his estate by a common and public or a private nuisance may maintain against the offender a civil action for his damages, unless otherwise specially provided."

[¶25]  The Restatement (Second) of Torts § 821B(2)(a) recognizes that a condition creating a significant interference with "the public health [or] the public safety" may support a public nuisance claim.  A government official or agency with jurisdiction to bring claims for harm caused to public property or resources has standing under the common law to bring a public nuisance action on behalf of the public.  *See Larson v. New England Tel. & Tel. Co.*, 141 Me. 326, 338, 44 A.2d 1, 7 (1945) ("[A] public nuisance is abatable by the proper officials."); *Smedberg v. Moxie Dam Co.*, 148 Me. 302, 311, 92 A.2d 606, 610 (1952) ("The State, and the State alone, on the facts set forth in this complaint

has the right to complain against acts of the defendant which may constitute a public nuisance."); 17 M.R.S. § 2741(2) (2024) (authorizing the Attorney General, a district attorney, or seven "legal voters of that county" to seek abatement of certain common nuisances).

[¶26]  However, at common law and under 17 M.R.S. § 2701, the ability of a private plaintiff to bring a public nuisance claim is limited.  At common law, "[i]t is not enough that [the] plaintiff has been damaged"; the plaintiff "must show an infringement of private rights," *Smedberg*, 148 Me. at 311, 92 A.2d at 611, resulting in "special legal injury different in kind as well as degree from that suffered by others."  *Whitmore v. Brown*, 102 Me. 47, 58, 65 A. 516, 520 (1906); *see Kennebunk, Kennebunkport & Wells Water Dist. v. Maine Tpk. Auth.*, 145 Me. 35, 54-55, 71 A.2d 520, 531 (1950) (holding that a water utility that had no right to obtain water from a brook except as a member of the public could not recover for public nuisance against a polluter of the water supply); *Smedberg,* 148 Me. at 310-11, 92 A.2d at 610 (holding that a sporting camp owner, whose right to fish in and use a lake was no different than the public's, could not recover for loss of access to lake amenities); *see also* Restatement (Third) of Torts: Liab. for Econ. Harm § 8 (2020) ("An actor whose wrongful conduct harms or obstructs a public resource or public property is subject to

20

liability for resulting economic loss if the court concludes that the claimant's losses are distinct in kind from those suffered by members of the affected community in general.").[6]

[¶27]  In "provid[ing] a cause of action for damages for a common law nuisance," *Johnston,* 2010 ME 52, ¶ 16 n.1, 997 A.2d 741, section 2701 echoes our common law precedent by requiring that a plaintiff in any private or public nuisance action be "injured in his comfort, property, or the enjoyment of his estate."  *See Johnston,* 2010 ME 52, ¶ 14, 997 A.2d 741 (quotation marks omitted).  In other words, as our common law precedent requires, the nuisance must infringe on a right particular to the plaintiff and cause injury different in kind from the injury to the public generally.

---

[6]  A comment to section 8 indicates that public nuisance claims based on dangerous consumer products are better presented as product liability claims:

Tort suits seeking to recover for public nuisance have occasionally been brought against the makers of products that have caused harm, such as tobacco, firearms, and lead paint.  These cases vary in the theory of damages on which they seek recovery, but often involve claims for economic losses the plaintiffs have suffered on account of the defendant's activities; they may include the costs of removing lead paint, for example, or of providing health care to those injured by smoking cigarettes.  Liability on such theories has been rejected by most courts, and is excluded by this Section, because the common law of public nuisance is an inapt vehicle for addressing the conduct at issue.  Mass harms caused by dangerous products are better addressed through the law of products liability, which has been developed and refined with sensitivity to the various policies at stake. . . .

. . . [P]roblems caused by dangerous products might once have seemed to be matters for the law of public nuisance because the term "public nuisance" has sometimes been defined in broad language that can be read to encompass anything injurious to public health and safety.  The traditional office of the tort, however, has been narrower than those formulations suggest, and contemporary case law has made clear that its reach remains more modest.

Restatement (Third) of Torts: Liab. for Econ. Harm § 8 cmt. g (2020).

[¶28]  Assessed against this standard, the Hospitals' public nuisance claim cannot stand.  On its face, the Hospitals' complaint fails to state a claim; although it may allege a nuisance interfering with public rights, it does not allege that the defendants caused a nuisance that interfered with a separate right of the Hospitals.  *See* 17 M.R.S. § 2701.  The nuisance that the Hospitals allege the Opioid Sellers proximately caused is an increase in the incidence of opioid misuse.  *See Town of Stonington v. Galilean Gospel Temple*, 1999 ME 2, ¶¶ 19-21, 722 A.2d 1269 (discussing whether a complaint adequately alleged that each defendant's conduct proximately caused a nuisance).  Although the Hospitals claim that the nuisance caused them "special injury" in the form of unreimbursed costs attributable to opioid misuse,[7] the Hospitals' injury is but a subset of the injuries to the public occasioned by the increase in opioid misuse; it is no different *in kind* from the injury to the public.  The nature of the Hospitals' health care mission means that their economic loss caused by the opioid epidemic took the form of the unreimbursed cost of treating patients

---

[7]  The Hospitals' complaint alleges special injury as follows:

As a result of Defendants' actions, Plaintiffs have suffered a special injury, different from that suffered by the public at large, by individual users, and by governmental entities.  Plaintiffs have suffered a broad range of adverse operational impacts, including, but not necessarily limited to (1) the lower rate of realization from the provision of health care to patients with opioid-related conditions, (2) elevated operational expenses incurred to respond to the conditions created by the opioid epidemic, and (3) the cost of purchasing opioids Plaintiffs would not have otherwise purchased but for Defendants' conduct.

22

with opioid use disorders, whereas the economic losses the Opioid Sellers may have caused to the public—including private and governmental entities, employers, family members, others who served and supported those suffering from opioid use disorders, and taxpayers who funded the cost of the governmental response to the opioid epidemic—have taken a wide variety of different forms.  But there is ultimately no difference in kind between the injury to the Hospitals and the injury to the public—we all have suffered the devastating human, social, and economic effects that result from an increase in opioid misuse.  The alleged injuries to the Hospitals are not sufficiently particular to the Hospitals to support a public nuisance claim; they are instead part of the broad public injury resulting from increased opioid misuse and therefore may not be addressed in a private cause of action.  *See Smedberg*, 148 Me. at 310-11, 92 A.2d at 610-11.[8]

---

[8] A comparison to the special injury claimed by the plaintiff in *Smedberg* illustrates the point.  The plaintiff in *Smedberg* was a sporting camp owner who claimed special injury in the form of lost boat rentals and customer revenues as a result of losing access to Lake Moxie for boating and fishing—economic loss of a different type than the loss sustained by other users of the lake.  *Smedberg v. Moxie Dam Co.*, 148 Me. 302, 310-11, 92 A.2d 606, 610-11 (1952).  Still, we decided that the plaintiff's right to lake access and his injury resulting from the alleged public nuisance—loss of lake access—were no different than the rights held and injury incurred by the public.  *Id.*  Similarly, the opioid epidemic did not infringe on any right of the Hospitals greater than or different from the rights of the public to be shielded from the ill effects of opioid misuse and opioid use disorders and did not proximately cause the Hospitals injury in the form of economic loss different in kind from the injury in the form of economic loss that it caused to the public.

### 5.    Civil Conspiracy

[¶29]  The Hospitals' claim of civil conspiracy "fails as the basis for the imposition of civil liability absent the actual commission of some independently recognized tort." *Cohen v. Bowdoin*, 288 A.2d 106, 110 (Me. 1972) (emphasis omitted).  Because their complaint fails to state a cognizable claim of a separate tort, the court correctly dismissed the civil conspiracy claim.  *See Potter, Prescott, Jamieson & Nelson, P.A. v. Campbell,* 1998 ME 70, ¶ 8, 708 A.2d 283.

## III.  CONCLUSION

[¶30]  The Hospitals' complaint does not state facts sufficient to support any of the causes of action that they have alleged.  Moreover, the complaint's deficiencies involve an irremediable inability to meet at least one element of each of the theories of liability alleged, such as duty, reliance, and particularized injury.  It therefore would have been futile for the court to have granted the Hospitals leave to amend their complaint.  We affirm the judgment of the Superior Court dismissing the Hospitals' complaint for failure to state a claim upon which relief can be provided.  *See* M.R. Civ. P. 12(b)(6).

The entry is:

Judgment affirmed.

24

---

Kelly W. McDonald, Esq., Murray, Plumb & Murray, Portland, and Daniel H. Charest, Esq. (orally), Burns Charest LLP, Dallas, Texas, for appellants Eastern Maine Medical Center, Aroostook Medical Center, Blue Hill Memorial Hospital, Charles A. Dean Memorial Hospital, Inland Hospital, Maine Coast Regional Health Facilities, Mercy Hospital, MRH Corp., and Sebasticook Valley Health

Geraldine G. Sanchez, Esq., Roach Ruprecht Sanchez & Bischoff, P.C., Portland; Conor B. O'Croinin, Esq., and William J. Murphy, Esq. (orally), Zuckerman Spaeder LLP, Baltimore, Maryland; and Devon Galloway, Esq., Zuckerman Spaeder LLP, New York, New York for appellees CVS Pharmacy, Inc.; CVS Orlando FL Distribution L.L.C.; and CVS TN Distribution, L.L.C.

Johanna L. Gauvreau, Esq., McCoy Leavitt Laskey, Falmouth; Kate Wallace, Esq., Jones Day, Boston, Massachusetts; and Anthony J. Dick, Esq., Jones Day, Washington, District of Columbia, for appellees Walmart Inc. and Wal-Mart Stores East, LP

David P. Ginzer, Esq., Richardson Whitman Large & Badger, Portland; and Alex J. Harris, Esq., Bartlit Beck LLP, Denver, Colorado, for appellees Walgreen Co. and Walgreen Eastern Co., Inc.

Richard P. Olson, Esq., and Emily P. Crowley, Esq., Curtis Thaxter LLC, Portland; and George A. Borden, Esq., Steven M. Pyser, Esq., and Richard S. Cleary, Jr., Esq., Williams & Connolly LLP, Washington, District of Columbia, for appellee Cardinal Health, Inc.

Jeffrey D. Russell, Esq., Verrill Dana, Portland; and Brian T. Himmel, Esq., Reed Smith LLP, Pittsburgh, Pennsylvania, for appellee H.D. Smith, LLC

Jeffrey D. Russell, Esq., Verrill Dana, Portland; Kim M. Watterson, Esq., Reed Smith LLP, Pittsburgh, Pennsylvania; and Louis W. Schack, Esq., Reed Smith LLP, Philadelphia, Pennsylvania for appellees AmerisourceBergen Drug Corporation and Xcenda, LLC

Theodore Small, Esq., and Braden M. Clement, Esq., Skelton, Taintor & Abbott, Lewiston; and Randall Mark Levine, Esq., Morgan, Lewis & Bockius LLP, Washington, District of Columbia for appellees Cephalon, Inc.; Teva Pharmaceuticals USA, Inc.; Watson Laboratories, Inc.; Actavis Pharma, Inc. f/k/a Watson Pharma, Inc.; and Actavis LLC

Sigmund D. Schutz, Esq, PretiFlaherty, Portland, for appellees Allergan Finance, LLC, f/k/a Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc.; and Abbvie Inc.

William D. Pandolph, Esq., Sulloway & Hollis, PLLC, Concord, New Hampshire, and Christian Pistilli, Esq., Covington & Burling, LLP, Washington, District of Columbia, for appellee McKesson Corporation

James M. Campbell, Esq., and Michelle I. Schaffer, Esq., Campbell Conroy & O'Neil, P.C., Boston, Massachusetts; Stephen Brody, Esq., O'Melveny & Myers LLP, Washington, District of Columbia; and Charles Lifland, Esq., and Amy Laurendeau, Esq., O'Melveny & Myers LLP, Los Angeles, California, for appellees Johnson & Johnson; Janssen Pharmaceuticals, Inc.; Ortho-McNeil-Janssen Pharmaceuticals, Inc.; and Janssen Pharmaceutica, Inc.

Jesse E. Weisshaar, Esq., and Philip Goldberg, Esq., Shook, Hardy & Bacon L.L.P., Washington, District of Columbia, for amici curiae National Association of Manufacturers, Product Liability Advisory Council, and Chamber of Commerce of the United States of America

Timothy H. Norton, Esq., Kelly, Remmel & Zimmerman, Portland, for amicus curiae Maine Hospital Association

Business and Consumer Docket docket number CIV-2022-25
For Clerk Reference Only