# EXHIBIT A

# The State of New Hampshire

**MERRIMACK COUNTY**                                    **SUPERIOR COURT**

THE STATE OF NEW HAMPSHIRE

v.

META PLATFORMS, INC. and INSTAGRAM, LLC

Docket No.: 217-2023-CV-00594

## <u>ORDER</u>

The plaintiff, the State of New Hampshire, brings this suit against the defendants, Meta Platforms, Inc. and Instagram, LLC for violations of the Consumer Protection Act ("CPA"), products liability, and negligence. The State's claims arise out of Meta's use of certain design features and the impact of those features on children in New Hampshire. Meta moves to dismiss. The State objects. The Court held a hearing on this matter on June 13, 2024. The parties submitted notices of supplemental authority following the hearing. For the following reasons, Meta's motion is DENIED.

## I.    Standard

In reviewing a motion to dismiss, the Court "assume[s] the truth of the facts as alleged in the plaintiff's pleadings and construe[s] all reasonable inferences in the light most favorable to the plaintiff." <u>Barufaldi v. City of Dover</u>, 175 N.H. 424, 427 (2022). The Court "need not assume the truth of statements in the plaintiff's pleadings, however, that are merely conclusions of law." <u>Sanguedolce v. Wolfe</u>, 164 N.H. 644, 645 (2013). "The standard of review in considering a motion to dismiss is whether the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery."

1

Barufaldi, 175 N.H. at 427.  "This threshold inquiry involves testing the facts alleged in the pleadings against the applicable law."  Id.  "The trial court may also consider documents attached to the plaintiff's pleadings, or documents, the authenticity of which are not disputed by the parties, official public records, or documents sufficiently referred to in the complaint."  Id.  The Court will grant the motion "if the facts pled do not constitute a basis for legal relief."  Id.

## II.    Background

Meta is a Delaware corporation.  (Compl. ¶ 19.)  Meta owns and operates the social media platform, Facebook, and owns and operates the social media platform, Instagram, through its wholly-owned subsidiary, Instagram, LLC.  (Id. ¶ 20.)  Instagram, LLC is also a Delaware corporation.  (Id. ¶ 21.)  The Court refers to the defendants collectively as "Meta" and to Facebook and Instagram as the "Social Media Platforms" or the "Platforms."

### A.  Usage of the Social Media Platforms

In 2023, Facebook had over 226 million active monthly users in the United States, representing 68% of the population, including over ten million of those users under eighteen.  (Id. ¶ 49.)   Nearly one million of those users lived in New Hampshire, representing 68% of residents, including 34,063 users under eighteen, representing 13.49% of the under-eighteen population.  (Id. ¶¶ 27, 49.)  That same year, Instagram had over 192 million active monthly users in the United States, over 58% of the population, with 32,389,032 under eighteen.  (Id. ¶ 50.)  733,019 of those users lived in New Hampshire, representing over 52% of residents, including 89,339 users under eighteen, representing 35% of the under-eighteen population.  (Id. ¶¶ 27, 50.)  In April

2023, Meta's internal data showed that 55,885 New Hampshire teenagers were active daily Instagram users.  (Id. ¶ 52.)  In 2022, 62% of teenagers reported using Instagram. (Id. ¶ 51.)  The rate is higher for teenage girls.  (Id.)  Almost half of those teenagers reported checking Instagram at least once a day, 27% reported checking it several times a day, and 10% reported checking it almost constantly.  (Id.)

    B.  Meta's Advertising

    To fully access the Social Media Platforms, users must agree to Meta's Terms of Use.  (Id. ¶ 35.)  By doing so, users consent to Meta collecting and using their data for monetization and creation of personalized algorithms.  (Id.)  Meta then sells advertising space to marketers and, utilizing user data, allows them to target users by location, demographics, interests, and behaviors.  (Id. ¶ 29.)  Meta also allows advertisers to target "designated market areas," which include Manchester, New Hampshire.  (Id. ¶ 30.)  In 2023, Meta derived $542,835,568 from advertisement revenue from users with ties to New Hampshire.  (Id.)  In addition to paying for advertisements, advertisers directly contract with "content creators," including children, to promote their products on Instagram.  (Id. ¶ 47.)

    Meta's monetization centers on maximizing the amount of time users spend on the app and the amount of data collected from each user.  (Id. ¶ 33.)  Meta intentionally designs its Social Media Platforms to maximize user engagement, and, thus, maximize profits.  (Id.)  Meta monetizes user data by (1) selling targeted advertising and (2) feeding users personalized algorithms to maximize their time spent on the app.  (Id. ¶ 34.)

Meta is financially motivated to attract and maintain children on its Social Media Platforms because teenagers are "one of the most valuable advertising demographics." (Id. ¶ 42.)  Since at least 2015, Meta has focused on increasing the time teens spend on its Social Media Platforms.  (Id.)  In 2019, one of Instagram's quarterly goals was to hit two million hours of teen watch time on IGTV (Instagram's former long-form video feature).  (Id. ¶ 44.)  Further, an internal email circulated in September 2018 revealed that Meta discusses its youngest users in terms of their "lifetime value" to the company. (Id. ¶ 45.)  However, Meta has publicly denied placing monetary value on children.  (Id. ¶ 46.)  In 2021, Senator Amy Klobuchar asked Antigone Davis, Meta's Global Head of Safety, what Meta believed the lifetime monetary value of children users was, to which Ms. Davis responded, "that's just not the way we think about it" and "[t]hat's just not how we think about building products . . . for young people."  (Id.)  Instagram has become Meta's most successful social media platform in attracting and retaining child users.  (Id. ¶ 48.)  Because of that, the State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens."  (Id. ¶ 53.)

C.  Alleged Addictive Features

The State alleges that "Meta intentionally includes manipulative design features in its Social Media Platforms that it knows are particularly effective in increasing compulsive and excessive use in teens."  (Id. ¶ 53.)  Thus, the State asserts that Meta employs these design features to trick children into spending as much attention and time as possible on its Social Media Platforms and maximize Meta's profits.  (Id. ¶ 56.) The United States Surgeon General has identified certain harmful design features that

overlap with those included in the State's complaint, including personalization algorithms, alerts, infinite scroll, and Reels.  (Id.)

      i.  <u>Personalization Algorithms</u>

Meta uses personalization algorithms across its Social Media Platforms, including on Instagram's Main Feed (the scrolling presentation of content immediately visible upon opening the app) and Explore Feed (another scrolling presentation of algorithmically curated content that can be optionally guided by a user's input of text in a search box).  (Id. ¶ 57.)  In 2016, Meta changed Instagram's user feeds to incorporate personalization algorithms.  (Id. ¶ 58.)  Previously, users' feeds were in reverse chronological order.  (Id.)

The personalization algorithms serve users categories of content based on a sequencing method psychologists refer to as "variable reinforcement schedules" or "variable reward schedules."  (Id.)  Variable reward schedules work by periodically delivering types of content in an unpredictable pattern that trigger a release of dopamine in the user.  (Id. ¶ 60.)  Dopamine is a neurotransmitter released in anticipation of a potential reward and is associated with pleasure.  (Id.)  However, dopamine neurons only fire for a relatively short period of time and, afterwards, an individual may become "disheartened and disengaged."  (Id.)  Meta's personalization algorithms manipulate the dopamine responses in its child users, inducing them to engage repeatedly with Meta's products.  (Id. ¶ 61.)

The State alleges that personalization algorithms are particularly effective on, and dangerous to, children because they have incomplete brain maturation, lack of impulse control, and reduced executive functions.  (Id. ¶ 63.)  The personalization

algorithm's ability to learn more about the user as they scroll allows it to display more of what will keep the user hooked, known as "presence amplification," pushing them into a "rabbit hole" of increasingly more extreme content. (Id. ¶¶ 65, 67.) When a user experiences preference amplification the absence of other, more moderate information makes it difficult for the user to get out of a rabbit hole. (Id. ¶ 68.) In 2021, Meta internally acknowledged how Instagram's personalization algorithms take children "into negative spirals & feedback loops that are hard to exit from." (Id.)

   ii. <u>Alerts</u>

When a user installs the Instagram app on their phone, Instagram employs a range of alerts in response to certain in-app activities. (Id. ¶ 70.) Alerts are delivered to a user's phone via vibrations, visuals, sounds, in-app notifications, and emails. (Id. ¶ 71.) These alerts are designed to increase children's engagement by taking advantage of neurological and psychological phenomena to trigger sudden dopamine releases. (Id.) The alerts allow Meta to disrupt its users at any time to encourage them to return to the Social Media Platforms. (Id. ¶ 72.) The notifications trigger users' fear of missing out ("FOMO") and leads to them consistently checking the Social Media Platforms. (Id. ¶ 77.)

Alerts are harmful for children and Meta knows that "smartphone notifications cause inattention and hyperactivity among teens, and they reduce productivity and well-being." (Id. ¶ 74 (brackets omitted).) Research has shown teenagers check their phone on average 51 times per day, with some teens checking their phone over 400 times per day. (Id. ¶ 76.) During that period, the teenagers received a median of 237 notifications on their phones per day, with some users receiving as many as 4,500 in a day. (Id.)

While users are able to disable notifications, they are enabled by default and the addictive elements of the Social Media Platforms are a barrier for children to take the step to disable them.  (Id. ¶¶ 71, 77.)

### iii.  Infinite Scroll and Autoplay

In 2016, Instagram debuted "infinite scroll."  (Id. ¶ 78.)  Infinite scroll is a method of content delivery that partially displays additional content at the bottom of the user's screen, such that the user is typically unable to look at a single post in isolation, and automatically loads new content as the user scrolls.  (Id.)  This format makes it difficult for children to disengage with the Social Media Platform because there is no natural end point.  (Id. ¶ 79.)  Meta does not allow users to turn off infinite scroll.  (Id. ¶ 80.)  Similarly, Meta uses an "autoplay" feature on Instagram "Stories," which keeps the user watching unless the user takes affirmative action to disengage.  (Id. ¶ 81.)  Facebook users are able to turn off autoplay but disabling the feature on Instagram is difficult for users.  (Id. ¶ 82.)

### iv.  Ephemeral Content

In 2016, Meta started implementing ephemeral content features in its Social Media Platforms.  (Id. ¶ 84.)  Ephemeral content is only temporarily available to users with notifications and visual design cues indicating that the content will soon disappear forever.  (Id. ¶ 85.)  This type of content encourages users to frequently check the Social Media Platforms and induces a sense of FOMO in children.  (Id. ¶¶ 84–85.)  Two examples of ephemeral content are Instagram's "Stories," which contains content that is only available for a short time, and "Instagram Live," which contains content only available while the creator is live-streaming.  (Id. ¶¶ 87–88.)  Meta informs users of

Instagram Live content by sending a push notification to users that reads, "[@user]
started a live video.  Watch before it ends!"  (Id. ¶ 89.)  An executive summary circulated
internally in 2016 indicated that the goals of live content were to increase the time users
spent watching these videos, specifically teenagers.  (Id. ¶ 90.)

        v.  <u>Reels</u>

In 2020 and 2021, Meta introduced "Reels" which present short-form videos
based on data collected from each user.  (Id. ¶ 92.)  Similar to infinite scrolling, Reels
automatically plays as the user swipes the screen to the next video.  (Id. ¶ 93.)  As of
April 2023, Reels were limited to 15 to 90 second video clips.  (Id.)  The short nature of
the videos and the frameless way it fills a user's screen ensure the user will not get
bored and close the app.  (Id.)  Meta's investment in Reels was specifically designed to
attract and increase youth engagement.  (Id. ¶ 94.)

        D.  <u>Use of the Social Media Platforms and Corresponding Harm to Children</u>

The State alleges that the harms the Social Media Platforms cause all users are
particularly acute in children.  (Id. ¶ 101.)  During adolescence, children's risk-taking
behavior is at its peak and their self-esteem is vulnerable.  (Id. ¶ 102.)  Children's brain
regions associated with a desire for risk-taking, attention, peer feedback, and
reinforcement are sensitive and regions associated with maturity and impulse control
are not fully developed.  (Id.)  For these reasons, teenagers are more susceptible to
misinformation, peer pressure, and false images on social media.  (Id.)  The United
States Surgeon General has recognized that "the current body of evidence indicates
that while social media may have benefits for some children and adolescents, there are
ample indicators that social media can also have a profound risk of harm to the mental

health and well-being of children and adolescents." (Id. ¶ 104.) Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement. (Id. ¶ 105.)

Children who use social media for at least five hours per day are many times more likely to have clinically relevant symptoms of depression than non-users. (Id. ¶ 106.) During the same period in which social media use increased, the rate of teenagers suffering from severe mental health problems and suicide, both nationally and in New Hampshire, also increased by significant margins. (Id. ¶¶ 116–17, Figures 2 and 3.) Frequent social media use has been associated with distinct changes in the developing brain in the amygdala, which is vital for impulse control and emotional regulation and could increase adolescent sensitivity to reward and punishment. (Id.) These brain changes track the changes experienced by people who become addicted to gambling or drugs. (Id. ¶ 107.) Frequent social media use is also linked to disruptions in children's sleep, which can cause or worsen depression and anxiety. (Id. ¶ 109–10.) Meta has been aware since 2019 that excessive social media use is correlated with sleep problems. (Id. ¶ 111.) In 2021, more than 75% of New Hampshire teenagers reported getting fewer than eight hours of sleep on an average school night, with more than 20% reporting getting five or fewer hours of sleep. (Id. ¶ 113.)

E.  Meta's Knowledge of the Harms Caused by its Social Media Platforms

The State alleges that Meta is aware that a majority of its users suffer from problematic use of Social Media Platforms and that such use has a serious effect on users' sleep, relationships, mental health, and general well-being. (Id. ¶¶ 100, 111.) The State alleges that Meta is aware that teenagers are more susceptible to its

addictive design features and are more likely to excessively use its Platforms.  (Id. ¶¶ 122–25.)

Meta's internal data supports these allegations.  In 2020, internal Meta statistics showed that teenagers are 40% more likely to spend five or more hours per day, and at least 28 hours per week, on Instagram than non-teenagers.  (Id. ¶ 123.)  Meta's internal research concluded,

> Teen brains are much more sensitive to dopamine, one of the reasons that the risk of drug addiction is higher for adolescents and it's the same thing that keeps them scrolling and scrolling.  Due to the immature brain, they have a much harder time stopping even though they want to—our own product foundation research has shown teens are unhappy with the amount of time they spend on our app.

(Id. ¶ 125.)  In 2020, Meta started a project to better understand teenagers, including their brain development.  (Id. ¶ 126.)  Meta's research resulted in similar conclusions to those outlined supra Section D.  (See generally id. ¶¶ 126–38.)

While the Social Media Platforms have "time-management tools," including notifications and reminders to stop scrolling, most users dismiss them.  (Id. ¶ 140.) Meta knows those tools are ineffective at counteracting compulsive and excessive use. (Id.)  Meta has considered but rejected design changes after finding that those changes would decrease the danger of harm to children, but also decrease engagement.  (Id. ¶¶ 105, 141.)

F.  Meta's Alleged Misrepresentations

Meta, through its own publications, public statements, and testimony of corporate officers, has stated that well-being of its users is a top priority.  (Id. ¶¶ 144 ,150.) However, the State alleges these public statements are at odds with Meta's internal surveys, research, and reports, and, in some cases, with its own officers' testimony.  (Id.

¶¶ 144-229.)  Specifically, the State alleges Meta has made misrepresentations regarding the safety of the Social Media Platforms, (id. ¶¶ 144–46, 165,) Meta's intention to prioritize well-being over user engagement, (id. ¶¶ 205–29,) and the prevalence of user exposure to harmful and predatory content served by Meta's algorithms, (id. ¶¶ 146–64.)

## III.    Analysis

The State brings claims against Meta for violations of the CPA (RSA 358-A:2) for unfair acts or practices for its manipulative and addictive design features (Count I), violations of the CPA (RSA 358-A:2) for deceptive practices (Count II), strict products liability for defective design (Count III), strict products liability for failure to warn (Count IV), and negligence (Count V).  Meta moves to dismiss all claims, arguing that this Court lacks personal jurisdiction over it, Section 230 of the federal Communications Decency Act and the First Amendment of the United States Constitution bar the State's claims, the two CPA counts fail to state a claim, and the State lacks standing to pursue its common law claims for strict products liability and negligence and does not state a viable claim under those theories.  The Court addresses each argument in turn.

### A.  Personal Jurisdiction

The standard of review on a motion to dismiss for lack of personal jurisdiction varies according to the case's procedural posture.  Seward v. Richards, 174 N.H. 401, 406 (2021).  "While the general rule applicable to motions to dismiss is that all facts properly pleaded by the plaintiff are deemed true . . . when those facts relate to personal jurisdiction, the plaintiff must offer affirmative proof."  Staffing Network, Inc. v. Pietropaolo, 145 N.H. 456, 457 (2000).  In the absence of an evidentiary hearing, the

Court applies a prima facie standard to determine whether personal jurisdiction is met. Id.

"Determining whether a court may exercise personal jurisdiction over a defendant contemplates a two-part analysis." Seward, 174 N.H. at 407. "First, the State's long-arm statute must authorize such jurisdiction. Second, the requirements of the federal Due Process Clause must be satisfied." Id. New Hampshire's long-arm statute, RSA 510:4, authorizes the exercise of personal jurisdiction to the extent permissible under the Due Process Clause. Id. Accordingly, the Court's analysis depends upon due process. Id.; RSA 510:4, I.

"Under the Federal Due Process Clause, a court may exercise personal jurisdiction over a non-resident defendant if the defendant has minimum contacts with the forum, such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Seward, 174 N.H. at 407. "Minimum contacts is not necessarily a numbers game; in order to be subject to the jurisdiction of the forum state, a nonresident need only have one contact with the forum, so long as the contact is meaningful." Id. "Jurisdiction can be 'general,' where the defendant's contacts with the forum State are continuous and systematic, or 'specific,' where the cause of action arises out of or relates to the defendant's forum-based contacts." Id. Here, the parties solely address whether the Court can exercise specific personal jurisdiction over Meta. Accordingly, the Court focuses its analysis on that inquiry.

"To determine whether exercising specific personal jurisdiction over the defendant[] comports with due process, [the Court] examine[s] whether: (1) the contacts relate to the cause of action; (2) the defendant[] ha[s] purposefully availed [itself] of the

protection of New Hampshire's laws; and (3) it would be fair and reasonable to require the defendant[] to defend the suit in New Hampshire."  Seward, 174 N.H. at 407–08. "Each factor must be evaluated on a case-by-case basis, and all three factors must be satisfied for the exercise of jurisdiction to be constitutional."  Id. at 408.  "Questions of specific jurisdiction are always tied to the particular claims asserted."  Id.

The Court begins with the relatedness factor.  "To satisfy the relatedness factor, there must be more than just an attenuated connection between the contacts and the claim; the defendant's in-state conduct must form an important, or at least material, element of proof in the plaintiff's case."  Id. at 409.  "The relatedness test is a flexible, relaxed standard, and the court's assessment of relatedness is informed by the concept of foreseeability."  Id.  For tort claims, the relatedness inquiry "focuses on whether the defendant's in-forum conduct caused the injury or gave rise to the cause of action." United States v. Swiss Am. Bank, Ltd., 274 F.3d 610, 622 (1st Cir. 2001).  Further, to satisfy specific personal jurisdiction, "a plaintiff must link the defendant's suit-related conduct to the forum.  Mere market exploitation will not suffice."  Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 324 (5th Cir. 2021).

Meta argues that the State's claims do not relate to Meta's contacts with New Hampshire.  The State's claims arise out of Meta's alleged addictive design features and its misrepresentations and omissions.  Meta contends that this conduct did not occur in New Hampshire and, therefore, it cannot serve as a basis for personal jurisdiction.  Meta rejects any attempt by the State to rely on its advertising and marketing to support personal jurisdiction because its advertising and marketing does not serve as a basis for the State's claims.  (Id.)  The State responds that its claims

arise directly out of Meta's contacts with New Hampshire, namely; its relationships with hundreds of thousands of New Hampshire residents, including children; the design features it implements on Social Media Platforms used by New Hampshire residents; and its deceptive conduct which has played a role in inducing New Hampshire residents' use of the Platforms.

In Walden v. Fiore, 571 U.S. 277, 279 (2014), the Supreme Court held that a Nevada court could not "exercise personal jurisdiction over a defendant on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada" where "the defendant had no other contacts with Nevada."  The Walden Court noted that its holding was consistent with Calder v. Jones, 465 U.S. 783 (1984).  Walden, 571 U.S. at 289–90.  In Calder, the Court held that a California court could exercise personal jurisdiction over Florida defendants whose "intentional, and allegedly tortious, actions were expressly aimed at California."  465 U.S. at 785–86.  Under Walden and Calder, the proper inquiry is not merely whether New Hampshire residents suffered an injury but whether Meta's conduct connects it to New Hampshire in a "meaningful way."  Walden, 571 U.S. at 290.

The Supreme Court has referred to the following as a "paradigm example": the defendant "extensively promoted, sold, and serviced" vehicles in the forum states and the plaintiffs resided in the forum states, used the allegedly defective vehicles in the forum states, and suffered injuries in the forum states.  Ford Motor Co. v. Mont Eighth Jud. Dist. Ct., 592 U.S. 351, 366 (2021).  These facts created an "affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that t[ook] place."  Id. at 370.

14

Meta's contacts with New Hampshire relate to the State's claims alleging harm caused by Meta's implementation of features on its Social Media Platforms used by New Hampshire residents and Meta's misrepresentations which have induced New Hampshire residents to use its Social Media Platforms.  In coming to this conclusion, the Court relies on the following facts pleaded by the State.  Meta offers an interactive Social Media Platform accessible to New Hampshire citizens.  While users need not pay to use the Platforms, Meta harvests users' personal data.  (Compl. ¶ 34.)  Meta then sells targeted advertising, based on that collected data, and employs addictive features on the Platforms to increase the amount of user time spent, increasing the amount of data Meta can collect and sell advertising for.  (Id.)  It is this core business model which is alleged to have harmed New Hampshire children.  Meta's contacts with New Hampshire—its service agreements with users, collection of personal data, and sale of advertising based on that data—are inherently connected with the use of addictive design features at issue in this matter which further its business model.  In a similar manner to Ford Motor Co., Meta extensively promotes its Platforms in the forum state, enters service agreements and collects data of residents of the forum state, and those residents use Meta's Platforms in the forum state and suffered injuries in the forum state.  Cf. 592 U.S. at 366.

The Court disagrees with Meta that its geographically targeted advertising and marketing are unrelated to the State's claims.  Meta permits advertisers to target designated market areas, including Manchester, New Hampshire, and otherwise target users based on their location, demographics, interests, and behaviors.  (Compl. ¶¶ 29–30, 38–39.)  Meta is able to offer targeting advertising by harvesting users' data.  (Id.)

This incentivizes Meta to keep users on its Platforms for the maximum amount of time to increase the amount of data harvested. To keep users on its Platforms, Meta employs the addictive design features that form the basis of the State's claims. This distinguishes the State's claims from matters in which a plaintiff's claims in no way relate to a defendant's use of geographically targeted advertising. See Johnson v. TheHuffingtonPost.com, Inc., 21 F.4th 314, 321 (5th Cir. 2021) (holding that the defendant's use of geographically targeted advertising did not relate to the plaintiff's libel claim).

Put simply, Meta derives its profits from users viewing and interacting with advertisements on its Social Media Platforms. To drive engagement, Meta designs and employs the addictive design features that form the basis of the State's claims. For this reason, Meta's targeted advertising efforts are not only related but integral to the State's claims.

For the foregoing reasons, assuming the facts alleged in the State's complaint as true and construing all inferences in the State's favor, the State has demonstrated the relatedness factor of the specific personal jurisdiction test.

The Court next turns to the purposeful availment prong of the specific personal jurisdiction test. "The second prong of the due process analysis considers whether the defendants have purposefully availed themselves of the protection of New Hampshire's laws." Seward, 174 N.H. at 411–12. "To satisfy the second requirement, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protection of that state's laws and making the defendant's involuntary presence before the state's

16

courts foreseeable." Id. ¶ 412. "Purposeful availment requires both foreseeability and voluntariness." Id. "Voluntariness requires that a defendant's contacts with the forum state proximately results from actions by the defendant." Id. "The contacts must be deliberate and not based on the unilateral actions of another party, and cannot be merely fortuitous, but rather, the defendants must have purposefully directed actions at New Hampshire." Id. "Foreseeability requires that the contacts must be of a nature such that a defendant could reasonably anticipate being haled into court here." Id.

Meta argues that its alleged conduct does not demonstrate that it purposefully availed itself of the protection of New Hampshire's laws because the conduct was not specifically directed at New Hampshire. The State responds that Meta purposefully directed commercial activities to New Hampshire by, (1) advertising, marketing, and distributing its Social Media Platforms to New Hampshire consumers and making substantial profits from selling user data, (2) entering into contracts with each of its New Hampshire users, and (3) encouraging children in New Hampshire to use its products.

In Keeton v. Hustler Magazine, Inc., 465 U.S. 770, 773–74 (1984), the Court found that there was specific jurisdiction over the defendant publisher where it had no employees or offices in the forum, did not expressly aim its publication or conduct at the forum, and magazine sales in the forum made up only a small fraction of the defendant's total sales, but the defendant circulated 10,000 to 15,000 copies of its magazine to subscribers in the forum each month. The Court reasoned that the defendant "continuously and deliberately exploited" the forum's market. Keeton, 465 U.S. at 781. Because the defendant produced "a national publication aimed at a nationwide audience," there was "no unfairness in calling it to answer for the contents of

that publication wherever a substantial number of copies are regularly sold and distributed." Id.

The Keeton Court's reasoning applies here, despite Meta's arguments distinguishing operating the Social Media Platforms from physically distributing magazines. Meta's Platforms are accessible to New Hampshire users. More than that, in exchange for the use of the Platforms, Meta harvests users' personal information and sells it to advertisers, which advertise on the Platforms. See uBID, Inc. v. GoDaddy, Inc., 623 F.3d 421, 427–28 (7th Cir. 2010) (determining that website operator defendant had minimum contacts with the forum because it exploited the forum's market and engaged in extensive national advertising, despite the fact that it did not specifically target forum residents through advertising). Like the publisher in Keeton, Meta has specific connections with New Hampshire and furthers those connections each time it contracts with users to offer its Platforms in exchange for their data. This is voluntary contact with the forum state and its citizens. See Seward, 174 N.H. at 412. While Meta argues that its contacts with New Hampshire are based on the unilateral activity of New Hampshire users, its harvesting and sale of New Hampshire users' data causes the Court to disagree. For these reasons, it is foreseeable that Meta's contacts with New Hampshire are such that it should reasonably anticipate being haled into court here. See id.

The parties dispute the applicability of the sliding scale framework outlined by Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). The Court need not rely on Zippo's sliding scale framework because, as discussed, Meta has done more than operate a website accessible in the forum. This is not a case where the

defendant operates a website simply visible in the forum, see McBee v. Delica Co., Ltd., 417 F.3d 107, 124 (1st Cir. 2005), or an interactive website, see Gullen v. Facebook.com, Inc., No. 15 C 7681, 2016 WL 245910, at *3 (N.D. Ill. Jan. 21, 2016).[1] Rather, the State alleges that Meta designed an addictive application, collects personal data from New Hampshire users, sells that personal data to advertisers, and profits from advertisers' ability to target their advertisements to New Hampshire users based on their location and preferences learned from the data collected by Meta.  (Compl. ¶¶ 36–38.)  This is conduct directly targeted to New Hampshire.  Meta's engagement in similar conduct elsewhere does is irrelevant to this Court's analysis.  Therefore, the Court concludes that Meta has purposefully availed itself of jurisdiction in New Hampshire courts.

Lastly, the Court addresses the fairness and reasonableness of exercising jurisdiction over Meta.  The third and final prong of the specific personal jurisdiction test asks, "whether it would be fair and reasonable to require the defendants to defend the suit in New Hampshire."  Seward, 174 N.H. at 413.  "For this determination, [the Court] examine[s] the five so-called 'gestalt factors,' which are: the burden on the defendant; the forum state's interest in adjudicating the dispute; the plaintiff's interest in obtaining convenient and effective relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering fundamental substantive social policies."  Id.

---

[1] While Facebook.com was the defendant in Gullen, there were no similar facts, as are present in the State's complaint, about the defendant's profits derived from the forum, its collection of data for the purposes of advertising, or its sale of that data to advertisers.

Meta argues that forcing it to litigate in New Hampshire is unfair because its place of business in California is an appreciable distance from New Hampshire and attorneys general from 33 other states are pursuing similar litigation in a consolidated action in California (the "MDL Litigation").  See In re Social Media Adolescent Addiction/Personal Injury Prod. Liability Litig., No. 4:23-cv-05448-YDR, 4:23-cv-05885-YGR (N.D. Cal. Oct. 15, 2024).  Meta asserts that efficiency calls for litigating the State's claim with the others in California.  The State contends that the burdens of modern travel are minimal and that it is not unfair to require Meta to defend itself in the forum wherein the State seeks to protect hundreds of thousands of forum consumers.

The Court begins with the first gestalt factor: the burden on the defendant.  While Meta is headquartered in California, it is a large corporation capable of defending itself anywhere.  Meta's Social Media Platforms, Facebook and Instagram, had over 418 million combined users in the United States in 2023.  "Because suit in a foreign jurisdiction always burdens a foreign company, the defendant must establish that the Court's exercise of jurisdiction would be onerous in a special, unusual, or other constitutionally significant way."  State v. N. Atlantic Refining Ltd., 160 N.H. 275, 286 (2010).  The Court cannot say, with Meta's vast reach including into New Hampshire as outlined supra, that exercising jurisdiction would be special, unusual, or constitutionally significant.  With respect to the second factor, New Hampshire has a strong interest in obtaining relief in its courts for harms allegedly committed against its citizens.  See Benitez-Allende v. Alcan Aluminio do Brasil, S.A., 857 F.2d 26, 31 (1st Cir. 1988).  Further, "New Hampshire also has a strong interest in protecting the legitimacy of its court judgments."  Seward, 174 N.H. at 413.  The third factor also weighs in favor of

exercising jurisdiction because the State's interest in obtaining convenient and effective relief is furthered by providing it a means to pursue redress in its home courts. The fourth factor weighs against exercising jurisdiction because the most efficient resolution is the consolidated litigation of other similar suits in the multi-district litigation venued in California district court. Finally, exercising jurisdiction supports the "shared interest of the several states in furthering fundamental substantive social policies." The states have an interest in protecting their citizens from harm and obtaining relief in their own courts.

Accordingly, having considered the gestalt factors, the Court determines it is fair and reasonable to exercise jurisdiction over Meta.

Altogether, the Court determines it can exercise specific personal jurisdiction over Meta because it has purposefully availed itself of the Court's jurisdiction, its contacts with New Hampshire are related to the conduct underlying the State's claims, and it is fair and reasonable to exercise jurisdiction here. Seward, 174 N.H. at 407. Having found that the Court may exercise personal jurisdiction over Meta, the Court turns to Meta's arguments on the merits.

B. Section 230 of the Communications Decency Act

Meta argues that Section 230 of the Communications Decency Act ("Section 230") bars the State's claims because they treat Meta as a publisher of third-party content. Because Section 230 is an affirmative defense, dismissal is only proper if Meta's immunity is evident from the face of the complaint. Teatotaller, LLC v. Facebook, Inc., 173 N.H. 442, 449 (2020) (quoting Force v. Facebook, Inc., 934 F.3d 53, 63 n. 15 (2d Cir. 2019)).

In 1996, Congress enacted Section 230 "to promote the continued development of the Internet" and "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material," among other policies.  47 U.S.C. § 230(b)(1), (4).  To achieve these goals, Section 230 immunizes interactive computer service providers, like Meta, from legal claims that treat them as a publisher or speaker of third-party content.  See 47 U.S.C. § 230(c)(1), (e)(3).  While courts have interpreted Section 230 to "broadly immunize internet companies from liability . . . this immunity is not limitless."  Calise v. Meta Platforms, Inc., 103 F.4th 732, 736 (9th Cir. 2024).

To determine whether Section 230 immunity applies to a given case, courts employ a three-prong test.  Under this test, Section 230 only protects "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider."  Teatotaller LLC, 173 N.H. at 450 (quoting Universal Commc'n v. Lycos, Inc., 478 F.3d 413, 418 (1st Cir. 2007)); see also Calise, 103 F.4th at 740; Lemmon v. Snap, Inc., 995 F.3d 1085, 1091 (9th Cir. 2021); Barnes v. YAHOO!, Inc., 570 F.3d 1096, 1100–01 (9th Cir. 2009).

It is undisputed that Meta is a provider of an interactive computer service and therefore satisfies the first prong.  To analyze the second and third prongs, the Court must determine whether it is evident from the face of the complaint that each of the State's claims treat Meta as a publisher or speaker of third-party content.  This determination rests upon the State's theory of liability in each count.  See Teatotaller,

LLC, 173 N.H. at 451; Calise, 103 F.4th at 740 (stating that courts must "examine each claim to determine whether a plaintiff's theory of liability would treat a defendant as a publisher or speaker of third-party content") (emphasis in the original).  Thus, the Court must examine Meta's duty under the State's theories of liability.  As explained by the Ninth Circuit in Calise,

> We must therefore examine two things in looking at duty.  First, what is the "right" from which the duty springs?  If it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then [Section 230] does not apply.  Second, we ask what is this duty requiring the defendant to do?  If it obliges the defendant to "monitor third-party content"—or else face liability—then that too is barred by [Section 230].

Id. (cleaned up).

In Lemmon, the Ninth Circuit examined the duty of social media companies to design reasonably safe products.  There, the parents of two boys who died in a high-speed car accident sued Snap, Inc. ("Snap"), alleging that Snap negligently designed its social media platform, Snapchat.  Lemmon, 995 F.3d at 1087.  Like Instagram and Facebook, Snapchat is a social media platform that allows users to share photos and videos with other Snapchat users.  See id. at 1088.  To promote user engagement, Snapchat provides users with rewards such as "trophies, streaks, and social recognitions," but does not tell users how to earn these rewards.  Id.  At the time, Snapchat had developed a "speed filter," which allowed users to superimpose their real-life speed atop user-created content.  Id.  The plaintiffs alleged Snapchat knew or should have known that its users believed that Snapchat would reward them for posting a "snap" at 100 miles per hour or over.  Id. at 1089.  While Snapchat warned users not to use the filter while driving, the warnings proved ineffective.  Id. at 1090.  The trial

court dismissed the plaintiffs' amended complaint, ruling that Section 230 barred their claim. Id.

On appeal, the Ninth Circuit reversed the trial court's decision and concluded that the plaintiffs' claim did not treat Snap as a publisher or speaker of third-party content because the cause of action focused on Snap's duty, as a manufacturer, to design a reasonably safe product. Id. at 1091–92. The court explained,

> [The plaintiffs'] negligent design lawsuit treats Snap as a products manufacturer, accusing it of negligently designing a product (Snapchat) with a defect (the interplay between Snapchat's reward system and the Speed Filter). Thus, the duty that Snap allegedly violated "springs from" its distinct capacity as a product designer. This is further evidenced by the fact that Snap could have satisfied its "alleged obligation"—to take reasonable measures to design a product more useful than it was foreseeably dangerous—without altering the content that Snapchat's users generate. Snap's alleged duty in this case thus "has nothing to do with" its editing, monitoring, or removing of the content that its users generate through Snapchat.

Id. at 1092 (cleaned up). In its analysis, the court conceded that Snap, in some capacity, acted as a publisher or speaker of third-party content, but concluded that was not enough to confer immunity under Section 230. Id. The court explained,

> That Snap allows its users to transmit user-generated content to one another does not detract from the fact that the [plaintiffs] seek to hold Snap liable for its role in violating its distinct duty to design a reasonably safe product. As in Internet Brands, Snap "acted as the 'publisher or speaker' of user content by" transmitting [the boys'] snap, "and that action could be described as a 'but-for' cause of [the boys'] injuries." This is unsurprising: Snap "is an internet publishing business. Without publishing user content, it would not exist. But though publishing content is "a but-for cause of just about everything" Snap is involved in, that does not mean that the [plaintiffs'] claim, specifically, seeks to hold Snap responsible in its capacity as a "publisher or speaker." The duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content."

Id. at 1092–93 (citing Doe v. Internet Brands, Inc., 824 F.3d 846, 853 (9th Cir. 2016)).

The Court finds this reasoning persuasive and applicable here. While the State's complaint alleges that New Hampshire children are exposed to harmful content while using the Social Media Platforms, the thrust of the State's allegations in Counts I, III, and V are based on Meta's duty as a manufacturer to design reasonably safe products and allege that Meta's own conduct regarding the design of those products is defective.[2] This duty is independent of Meta's role as a publisher of third-party content. While the Northern District of California decided differently in the MDL Litigation, wherein Meta is a defendant, see In re: Social Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig., 702 F.Supp.3d 809, 830–33 (N.D. Cal. 2023), the Court finds its decision today to be consistent with persuasive authority, as well as the language and purpose of Section 230, see 47 U.S.C. § 230(b)(3), (4); Calise, 103 F.4th at 736 (reasoning that immunity under Section 230 is not limitless); Lemmon, 995 F.3d at 1092–93 (holding that Section 230 did not bar negligent design claim); Internet Brands, 824 F.3d at 853 (holding that Section 230 did not bar failure to warn claim).

To be clear, Section 230 protects Meta against any claims where the alleged harm arises from the substance of third-party content posted on the Social Media Platforms. See Force, 934 F.3d at 66 (finding Facebook was protected under Section 230 for harm resulting from Hamas content); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1098 (9th Cir. 2019) (finding the defendant was protected under Section 230 when a user died from fentanyl toxicity after purchasing fentanyl from another user on the defendant's online service). However, the State alleges that Meta's product design features, in and of themselves, are harmful to New Hampshire children regardless of the

---

[2] The Court separately analyzes whether the Social Media Platforms are "products" in Section V, infra, regarding products liability.

substance of the third-party content displayed.  (Compl. ¶¶ 238, 241-44, 249, 281-84, 301, 315.)  Thus, the Court determines that Section 230 does not bar the State's claims within Counts I, III, and V.

To the extent that Meta argues that Section 230 immunizes them against aspects of Counts II, IV, and V involving Meta's alleged misrepresentations and failures to warn, the Court disagrees.  These counts are not based on Meta's role as a publisher of third-party content.  Rather, the duty alleged to be breached arises out of Meta's knowledge that its products harm New Hampshire children.  Thus, Section 230 does not bar these claims.  See Doe v. Internet Brands, Inc., 824 F.3d 846, 852–53 (finding that Section 230 does not bar failure to warn claims); In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d 809, 834 (N.D. Cal. 2023) (same); Hiam v. HomeAway.com, Inc., 267 F. Supp. 3d 338, 346–47 (D. Mass 2017); aff'd, 887 F.3d 542 (1st Cir. 2018) (reasoning that claims based on publisher's own speech are not barred by Section 230).

IV.   First Amendment

Meta contends that the First Amendment and Part I, Article 22 of the New Hampshire Constitution protect its editorial discretion to disseminate third-party speech and, thus, bar the State's claims.  The State contends that its claims are not barred because the conduct challenged is not protected speech but, rather, Meta's implementation of addictive design features.  However, Meta argues that because its "content publication algorithms and other design choices are simply the means by which Meta presents and arranges speech, they 'fall squarely within the core of the First

Amendment security.'"  (Def.'s Memo. ISO Mot. to Dismiss at 16) (citing Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, 515 U.S. 557, 570 (1995)).

Like Section 230, the First Amendment protects publishers' discretion to disseminate third-party speech and categorically protects publishers from liability for injuries arising out of that speech.  See Miami Hearld Pub'g Co. v. Tornillo, 418 U.S. 241, 258 (1974); Moody v. NetChoice, LLC, 144 S.Ct. 2383, 2393 (U.S. 2024) (comparing social media company's content moderation to traditional publishers' editorial choices, which "also select and shape other parties' expression into their own curated speech products").  Many courts, including the MDL court, have held that certain publishing decisions made by social media companies trigger First Amendment scrutiny.  See In re Social Media Adolescent Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 836 (applying First Amendment protection to the timing and clustering of notifications of Meta's own content); NetChoice, LLC v. Florida, 34 F.4th 1196, 1203–04, 1210 (11th Cir. 2022) (finding that social media companies engaged in protected speech when they expressed their political views through content moderation practices).

Thus, the First Amendment, like Section 230, immunizes Meta against any claims alleging harm arising from the substance of third-party content, as that conduct falls within a traditional publishing role.  See Tornillo, 418 U.S. at 258; Reno v. ACLU, 521 U.S. 844, 870 (1997).  However, because the Court has concluded that the thrust of the State's claims seeks to hold Meta accountable for the harm caused by the alleged addictive design features themselves, regardless of the substance of the third-party content disseminated, the Court similarly finds that the First Amendment does not bar

the State's claims.  See In re Social Media Adolescent Addiction/Personal Injury Pro.

Liability Litigation, 702 F. Supp. 3d at 836 (stating that Meta's briefing ignored that

"much of the conduct alleged by plaintiff does not constitute speech or expression" and

"d[id] not explain how holding them liable in that context would be akin to making them

liable for speech").

V.    Consumer Protection Act

The State asserts two claims alleging that Meta violated New Hampshire's

Consumer Protection Act ("CPA"), RSA 358-A:2.  In the first, Count I, the State alleges

that Meta violated the CPA by intentionally incorporating addictive design features and

algorithms into its Social Media Platforms despite its knowledge of the harm children

suffer from those features.  (Compl. ¶ 238.)  The State also alleges, in Count II, that

Meta violated the CPA by engaging in deceptive acts or practices, in particular: (1)

deceptively representing that the Social Media Platforms are safe and failing to disclose

and/or concealing information indicating the Platforms are not safe; (2) misrepresenting

that the Social Media Platforms are not designed to hook children; and (3)

misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶¶ 260–62.)

Meta moves to dismiss both CPA claims on the following grounds: (1) the State

failed to identify unlawful conduct that took place in New Hampshire; (2) Meta is exempt

from CPA liability because it falls under the CPA's publisher exception; (3) the alleged

unfair or deceptive practices are not alleged to have occurred in the conduct of trade or

commerce; (4) both counts fail to state a claim; and (5) the State is not entitled to

restitution.  The Court addresses each argument in turn.

a.  <u>Conduct in or Directed at New Hampshire</u>

Meta contends that the State's CPA claims must fail because the State has not alleged that the underlying conduct occurred in New Hampshire.  Meta cites the fact that its principal place of business is in California and the State does not allege that Meta maintains offices, employees, or assets in New Hampshire.  The State responds that the "offending conduct" occurred within New Hampshire because Meta's alleged misrepresentations were received by New Hampshire consumers and Meta's design features affected New Hampshire users.

RSA 358-A:2 makes unlawful the use of "any unfair or deceptive act or practice in the conduct of any trade or commerce within this state."  "Trade" and "commerce" include "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."  RSA 358-A:1, II; <u>LaChance v. U.S. Smokeless Tobacco Co.</u>, 156 N.H. 88, 96 (2007) (emphasizing the broad sweep of the CPA indicated by the language, "any trade or commerce directly <u>or indirectly</u> affecting the people of this state").  "The limitation in RSA 358-A:2 to 'conduct of any trade or commerce within this state' has been interpreted to mean that the statute only applies to offending conduct that took place in New Hampshire."  <u>Environamics Corp. v. Ferguson Enter., Inc.</u>, No. Civ. 00-579-JD, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001).

The following decisions demonstrate a spectrum of whether a defendant's conduct satisfies the "within this state" element of the CPA.  In <u>LaChance</u>, the New

Hampshire Supreme Court held that the plaintiffs, who were purchasers of smokeless tobacco products from retail stores across New Hampshire, could bring a CPA claim against the defendants, who manufactured smokeless tobacco products and marketed them through in-store displays.  156 N.H. at 89 (addressing whether the plaintiff's claims satisfied the "trade or commerce" requirement, not specifically addressing the territorial requirement).  In Environamics, the court determined that the "within this state" requirement was satisfied where the defendant shipped a contaminated product to New Hampshire.  2001 WL 1134727, at *4.  Alternatively, the Precourt Court ruled that the defendant's conduct was not within the State of New Hampshire where it shipped its beef to a New York company which then incorporated the defendant's beef into another product which it distributed to New Hampshire.  Precourt v. Fairbank Reconstruction Corp., 856 F. Supp. 2d 327, 344 (D.N.H. 2012).

The Court determines that the State's allegations support that the conduct underlying the claims against Meta has a sufficient New Hampshire nexus.  The Court begins with the State's claims arising out of Meta's design features.  In 2023, Facebook and Instagram had 34,063 and 89,339 New Hampshire users under eighteen, respectively.  (Compl. ¶¶ 49–50.)  Meta also derived $542,835,568 from ad revenue sourced from New Hampshire users in 2023.  (Id. ¶ 40.)  Further, as explained above, supra Section A, Meta's algorithms are influenced by the data collected from New Hampshire users.  To say that Meta's alleged unfair or deceptive act or practice of incorporating addictive design features and algorithms into its Social Media Platforms used by tens of thousands of New Hampshire children is not conduct within this state is not credible.  Turning to the State's claims arising out of Meta's alleged

misrepresentations, the Court determines that the conduct likewise occurred "within this state" because New Hampshire children are alleged to have suffered from the impacts of Meta's misrepresentations and omissions.  (See id. ¶¶ 32, 261.)  Certain alleged misrepresentations are included on Meta's website, accessed by the tens of thousands of New Hampshire child users and New Hampshire adult users on a regular basis.  (See id. ¶ 145.)  For these reasons, the Court views the State's allegations as similar to those in LaChance and Environamics, satisfying the CPA's territorial requirement at the pleading stage.

The Court's decision is in accord with other jurisdictions that determined the CPA's territorial requirement was satisfied on a claim alleging a nationwide scheme under which New Hampshire citizens have suffered despite the conduct not directly occurring in New Hampshire.  See In re Niaspan Antitrust Litig., 42 F. Supp. 3d 735, 761 (E.D. Penn. 2014); In re Chocolate Confectionary Antitrust Litig., 749 F. Supp. 2d 244, 234–35 (M.D. Penn. 2010); In re DDAVP Indirect Purchaser Antitrust Litig., 903 F. Supp. 2d 198, 231 (S.D.N.Y. 2012).

### b.  Publisher Exemption Under RSA 358-A:3, IV

Meta contends that it is exempt from liability under RSA 358-A because it is a publisher under RSA 358-A:3, IV.  The State argues that the exemption is inapplicable because the State seeks to hold Meta liable for its use of addictive design features and for its misrepresentations, not as a publisher of third-party content.

RSA 358-A:3 exempts certain persons or conduct from liability under RSA 358-A. One of those exceptions, RSA 358-A:3, IV, exempts from liability, "[p]ublishers, broadcasters, printers, or other persons engaged in the dissemination of information or

reproduction of printed or pictorial matter who publish, broadcast, or reproduce material without knowledge of its deceptive character." Cf. Karpinski v. Union Leader Corp., No. 18-cv-1214-PB, 2019 WL 3203144, at *8 (D.N.H. July 16, 2019) (analyzing RSA 358-A:3, IV where the suit arose out of the substance of an article published by the defendant newspaper).

The Court agrees with the State. For similar reasons outlined, supra Section B, addressing Meta's Section 230 arguments, the State seeks to hold Meta liable not for its publishing of certain content, but rather for the addictive features it implements into its Social Media Platforms and for the alleged misrepresentations it has made to the public. The State's CPA claims do not arise out of Meta's publishing of deceptive material. For that reason, RSA 358-A;3, IV does not apply.

      c.  Conduct of Trade or Commerce

Meta argues that its alleged conduct does not constitute "conduct in any trade or commerce" because the State does not, and cannot, allege that users pay to use the Social Media Platforms. The State responds that Meta has engaged in "trade or commerce" in New Hampshire by exchanging the use of its Social Media Platforms for users' personal data.

"To determine whether the [CPA] applies to a particular transaction, [the Court] analyze[s] the activity involved, the nature of the transaction, and the parties to determine whether a transaction is a personal or business transaction." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (declining to extend to the CPA to isolated sales of property by owners). The CPA defines "trade" and "commerce" as, "the advertising,

offering for sale, sale, or distribution of any services or any property . . . ."  RSA 358-A:1.  The Court must engage in statutory interpretation of the term "sale" in the CPA.

When engaging in statutory interpretation, the Court "first look[s] to the language of the statute itself, and, if possible, construe[s] that language according to it plain and ordinary meaning."  State v. Doyle, 176 N.H. 594, 597 (2024).  The Court "give[s] effect to every word of a statute whenever possible and will not consider what the legislature might have said or add language that the legislature did not see fit to include."  Id.  The Court "construe[s] all parts of a statute together to effectuate its overall purpose" and attempts to construe all parts "in harmony with the overall statutory scheme."  Id.

"Sale" is defined as "[t]he action or an act of selling or making over to another for a price; the exchange of a commodity for money or other valuable consideration."  Oxford English Dictionary, "Sale," July 2023; Matter of Carter, 2024 N.H. 30, ¶ 9 ("When a term is not defined in a statute, [the Court] look[s] to its common usage, using the dictionary for guidance.").  It is also defined as, "[t]he transfer of property or title for a price."  Black's Law Dictionary, "Sale," (12th ed. 2024).  Upon review of the plain meaning of "sale," the Court cannot say that it requires an exchange of money.  The Court declines to read words into the statute the legislature did not see fit to include.  See Doyle, 176 N.H. at 597.  Rather, a sale could be an exchange wherein consumers are able to access Meta's Social Media Platforms in exchange for a price—Meta's collection of their personal data.  While Meta does not charge for its product, it receives valuable consideration in the form of person information.  The State has alleged such an exchange, satisfying the "trade or commerce" element of the CPA at the pleading stage.  (See Compl. ¶ 34.)  The Court's conclusion is in accordance with the purpose of the

CPA: "to ensure an equitable relationship between consumers and persons engaged in business." Hughes, 143 N.H. at 578.

The Court notes that Meta originally relied upon a trial court decision from an Indiana court interpreting a similar state statute. See Indiana v. Tiktok, Inc., No. 02D02-2212-PL-400, 2023 WL 8481303, at *6 (Ind. Ct. Super. Nov. 29, 2023). That court determined that Tiktok's operation of an app, free to users, was not a "consumer transaction" under Indiana's comparable consumer protection act because users did not exchange money for use of the app. Id.; see also Ind. Code § 24-5-0.5-2(1) (defining a "consumer transaction" as "a sale, lease, assignment, award by chance, or other disposition of an item of personal property, real property, a service, or an intangible"). The Court of Appeals of Indiana reversed the trial court's decision, determining that Tiktok's business model of exchanging access to its content library for end-user personal data was a "consumer transaction." State v. Tiktok, Nos. 23A-PL-3110, 23A-PL-3111, 2024 WL 4340387, at *8–9 (Ind. Ct. App. Sept. 30, 2024). The court concluded that, "the plain and ordinary definition of the word 'sale,' which is not otherwise defined in the DCSA, includes any consideration to effectuate the transfer of property, not only an exchange of money." Id. at *9 (noting that an interpretation limiting the definition of the word "sale" to exchanges for money narrows the scope of the act beyond its plain terms, contrary to its requirement of liberal interpretation). The Court adopts a reasoning similar to that of the Indiana Court of Appeals, here.

    d.  Failure to State a Claim

Meta argues that the State fails to state a claim under either of its CPA counts. It contends that the State has failed to allege facts demonstrating the "rascality" of Meta's

conduct or that New Hampshire citizens suffered substantial injury from Meta's acts. The State responds that its allegations of Meta's conduct meet New Hampshire's rascality test and that the alleged harms to New Hampshire children's mental health suffices as substantial injury.

The CPA proscribes unfair and deceptive trade practices in general, RSA 358-A:2, and sets forth a list of specific types of conduct that qualify as unfair or deceptive trade practices, RSA 358-A:2, I–XVIII.  Fat Bullies Farm, LLC v. Devenport, 170 N.H. 17, 24 (2017).  Although the general provision is broadly worded, the New Hampshire Supreme Court has recognized that not all conduct in the course of trade or commerce falls within the scope of the CPA.  Id.

"In determining which commercial actions not specifically delineated are covered by the act," the Court employs the "rascality" test.  Id.  "Under the rascality test, the objectionable conduct must attain a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Id.  In addition to the rascality test, New Hampshire courts look to the federal courts' interpretation of the Federal Trade Commission Act for guidance.  Id.  The Federal Trade Commission considers: "(1) Whether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common-law, statutory or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers . . . ."  Id.  The New Hampshire Supreme Court has found the rascality test unmet when a defendant was alleged to have engaged in conduct

common in the particular industry in which the parties engaged.  See Hair Excitement, Inc. v. L'Oreal U.S.A., Inc., 158 N.H. 363, 371 (2009).

      i.   Count I

In Count I, the State alleges that Meta committed unfair acts in violation of the CPA by intentionally incorporating addictive design features and algorithms into its Social Media Platforms despite knowledge of the harms suffered by child users of those features.  (Compl. ¶ 238.)  Meta contends that the State fails to state a claim on Count I because Meta's alleged manipulative and addictive design features are not unique to its Social Media Platforms and the State has not alleged a "substantial injury."  The State disagrees that Meta's design features need to be unique to be actionable under the CPA.  The State further asserts that non-monetary harm can suffice as a substantial injury, establishing an unfair act or practice.

Meta's contention that its design features do not satisfy the rascality test because they are well known to the public and other social media services use similar features is unpersuasive to the Court.  Of note, the fact that other social media services use similar features is not a fact pleaded in the complaint.  For that reason, the Court cannot consider it.  See Barufaldi, 175 N.H. at 427; Hair Excitement, Inc., 158 N.H. at 371 (reviewing the trial court's decision of the plaintiff's CPA claim on the merits, not at the motion to dismiss stage).  Further, while Meta's design features may be well known, the State alleges that Meta misrepresented and omitted information about the design features' addictive nature.  Accordingly, in viewing the facts in the light most favorable to the State, the Court cannot rule that the addictive nature of Meta's design features is known and understood by the public.

Therefore, the Court is left with the State's allegations that Meta intentionally incorporated addictive design features and algorithms into its Social Media Platforms. The State alleges Meta did so with an understanding of the harms suffered by children using the Platforms.  Finally, the State alleges that Meta's acts and omissions have exploited children's psychological vulnerabilities for Meta's financial gain.  The knowing exploitation of children's health for financial gain rises to "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce."  Hair Excitement, Inc., 158 N.H. at 369.

The Court next addresses Meta's argument that the State has not alleged a substantial injury.  Relying on the Federal Trade Commission's test to determine whether conduct is unfair or deceptive, the New Hampshire Supreme Court requires a showing that the conduct causes substantial injury to consumers.  Fat Bullies Farm, Inc., 170 N.H. at 24.  The Court is unaware of precedent from the New Hampshire Supreme Court substantively analyzing the meaning or scope of "substantial injury." Accordingly, the Court turns to other jurisdictions' interpretations of the Federal Trade Commission Act.

In 1985, the Court of Appeals for the District of Columbia relied on a policy statement from the Federal Trade Commission which stated, "in most cases substantial injury would involve monetary harm and that 'ordinarily' emotional impact and other more subjective types of harm would not make a practice unfair."  Am. Fin. Serv. Ass'n v. F.T.C., 767 F.2d 957, 972 (D.C. Cir. 1985).  Further, the Commission's policy statement clarified that it is "not concerned with trivial or merely speculative harms."  Id. The Commission also noted in correspondence with United States senators that it does

not "cover subjective examples of harm such as emotional distress or offenses to taste or social belief." Id. at n.18. However, an act or practice can cause 'substantial injury' by doing "a small harm to a large number of people, or if it raises a significant risk of concrete harm." Id.; F.T.C. v. Neovi, Inc., 604 F.3d 1150, 1157 (9th Cir. 2010).

The State has alleged harm sufficing to establish substantial injury under the CPA. The State alleges that use of Meta's Social Media Platforms "results in psychological and health harms among children, including increased rates of major depressive episodes, anxiety, sleep disturbances, suicide, and other mental health concerns." (Compl. ¶ 99.) The State also alleges that frequent social media use has been associated with distinct changes in the amygdala region of a developing brain. (Id. ¶ 106.) Even accepting a classification of the harms alleged by the State as "emotional distress," such allegations establish a substantial injury. The harm suffered by New Hampshire child users of the Social Media Platforms is not subjective or trivial. Rather, the State alleges that use of the Platforms causes serious injury to teenagers' health. This alleged harm is sufficiently concrete, see Neovi, Inc., 604 F.3d at 1157 (requiring that an injury be "concrete" to satisfy the substantial injury test), and serious to constitute substantial injury. See District of Columbia v. Meta Platforms, Inc., No. 2023-CAB-6550, at *34 (D.C. Super Ct. Sept. 9, 2024) (holding that the District alleged a substantial injury by alleging that Meta's addictive design features significantly increase rates of major depressive episodes anxiety, sleep disturbances, and other mental health disorders, including suicide, among children); F.T.C. v. Accusearch, Inc., No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wy. Sept. 28, 2007) (ruling that, "while the substantial injury requirement may not *ordinarily* be met from emotional impact that

is 'trivial or merely speculative,' the evidence presented to the Court demonstrates a host of emotional harms that are substantial and real and cannot be fairly classified as either trivial or speculative").  Further, were the Court to accept the proposition that the harm alleged by the State is "small," which the Court is disinclined to do, a large number of people suffer from the harm, and, thus, the State has alleged a substantial injury. See id.

Accordingly, the State has stated a claim upon which this Court may grant relief on Count I of its complaint.

ii.    Count II

In Count II, the State alleges that Meta made misrepresentations to consumers, specifically: (1) deceptively representing that the Social Media Platforms are safe and failing to disclose and/or actively concealing information that they are not; (2) misrepresenting that the Social Media Platforms are not designed to hook children; and (3) misrepresenting that Meta prioritizes user well-being over profits.  (Compl. ¶ 262.) Meta argues that its subjective, generalized statements about the safety of the Social Media Platforms are statements of opinions or goals and cannot form the basis for a deceptive practices claim.  Meta also contends that Count II fails because the State did not allege with specificity that its misrepresentations were false or misleading, the State's allegations about Meta's prioritization of time spent are not material, and Meta's statements to Congress are not actionable.  The State disagrees, arguing that it alleged Meta's misrepresentations and omissions with sufficient specificity based on actionable deceptions.

First, the Court addresses Meta's argument that the State's deceptive practices claim must be pleaded with specificity.  Meta relies on a New Hampshire superior court decision from 1999, a decision from the District Court for the District of New Hampshire, and a New Hampshire Supreme Court decision.  First, the superior court order only briefly addresses the plaintiff's CPA claim and does not set out a standard of review separate from the plaintiff's claim for fraud.  See Nichols v. Gen. Motors Corp., No. 99-C-566, 1999 WL 33292839, at *4–5 (N.H. Super. Ct. Dec. 13, 1999).  Second, the federal court's decision applied a heightened pleading standard to the plaintiff's CPA claim after determining that a federal procedural rule required such standard for claims sounding in fraud.  Micronics Filtration Holdings, Inc. v. Miller, No. 18-cv-303-JL, 2018 WL 4845749, at *6 (D.N.H. 2018).  This Court need not consider rulings from other courts applying federal procedural rules rather than the rules this Court is bound by.  Finally, Meta's reliance on Jay Edwards, Inc. v. Baker, 130 N.H. 41, 46–47 (1987), is misplaced because that decision specifically addresses the standard of review for claims of fraud, and does not discuss broader applicability of the standard to claims such as CPA claims.

Consequently, the Court applies the traditional standard of review on a motion to dismiss to Meta's motion to dismiss Count II of the State's complaint.  See LaChance v. U.S. Smokeless Tobacco Co., 156 N.H. 88, 93–100 (2007) (employing the typical motion to dismiss framework to resolve an appeal of a trial court's grant of the defendant's motion for judgment on the pleadings—which are treated like motions to dismiss in New Hampshire—of the plaintiff's CPA claim); Snierson v. Scruton, 145 N.H. 73, 80–81 (2000) (applying a specificity test to the plaintiff's fraud and negligent

misrepresentation claims and then ruling that the plaintiff's CPA allegations "support[ed] a claim of unfair or deceptive trade practices" and not mentioning a specificity requirement).

The Court turns to Meta's argument that the State's claims arising out of alleged misrepresentations regarding the Social Media Platforms' safety are non-actionable statements of opinion, not misstatements of fact. The Court disagrees. Accepting the State's allegations as true, Meta's statements about the Social Media Platforms' safety went beyond mere puffery. See Hughes v. Panasonic Consumer Elecs. Co., Civ. Act. No. 10-846, 2011 WL 2976839, at *12 (D.N.J. July 21, 2011) (finding that alleged statements regarding "industry leading" characteristics were mere puffery insufficient to satisfy federal pleading standards). Rather, Meta is alleged to have known of the specific harms the Platforms caused child users and yet Meta reiterated the safety of the Platforms. Similarly, Meta prioritized users' time spent on the Platforms, knowing of the harm extended use of the Platforms caused, while making statements of its prioritization of safety and well-being. This goes beyond statements of corporate optimism. The Court finds these statements actionable because Meta is alleged to have known of specific harms, omitted the information from its public statements, and represented the opposite. Such conduct is subject to liability under the CPA.

The cases Meta cites are inapposite. See Morris v. Princess Cruises, Inc., 236 F.3d 1061, 1067–68 (9th Cir. 2001) (ruling that the plaintiff's claim for negligent misrepresentation was non-actionable where the plaintiff denied discussing the quality or nature of medical care on the cruise ship; the central issue of the claim). In particular, the Court finds decisions related to car manufacturers or ride-sharing

application companies' statements about the safety of their products distinct.[3]  A reasonable consumer understands the inherent danger in operating a car and receiving a car ride from a stranger.  However, the same is not true for use of social media applications.  The State alleges that Meta knew about dangers posed by the Social Media Platforms and misrepresented or omitted key facts about the Platforms' safety.  For that reason, a reasonable consumer does not have the same understanding of the dangers of social media as they might of the dangers of cars.  To put it plainly, the dangers posed to users by Meta's addictive design features are far less visible or obvious than those posed by riding in cars with strangers.  The Court also notes that several of the cases cited by Meta involve securities actions in which the analysis focused on the understanding of a reasonable investor.  Here, the Court must determine whether a reasonable consumer may have been misled by Meta's statements.  Viewing the State's allegations in the light most favorable to it, the Court concludes a reasonable consumer may have been so misled.  Accordingly, the Court is not persuaded by Meta's arguments and finds the State's allegations actionable.

Meta breaks down the rest of its argument into categories of statements related to: (1) prevalence of harmful content; (2) Project Daisy; (3) filters; (4) Meta's prioritization of time spent; and (5) other allegations generally alleging that Meta "deceived" and "misled" the public, consumers, and external researchers and regulators.  The State responds that particular statements or practices can deceive

---

[3] See In re Lyft Inc. Sec. Litig., 484 F. Supp. 3d 758, 770 (N.D. Cal. 2020); Azoulai v. BMW of N. Am. LLC, No. 16-cv-00589-BLF, 2017 WL 1354781, at *8 (N.D. Cal. 2017); In re Ford Motor Co. Sec. Litig., Class Action, 381 F.3d 563, 571 (6th Cir. 2004); Greater Houston Trans. Co. v. Uber Tech., Inc., 155 F. Supp. 3d 670, 683 (S.D. Tex. 2015); XYZ Two Way Radio Serv., Inc. v. Uber Tech., Inc., 214 F. Supp. 3d 179, 183–84 (E.D.N.Y. 2016).

while being vague or technically true.  The State asserts that it has alleged a concerted, global effort to deceive through Meta's various statements about certain aspects of the Social Media Platforms.  The State refers to similar allegations made against tobacco companies related to statements about the health hazards posed by consumption of their products.  See King v. Philip Morris, Inc., No. 990C0856, 2000 WL 34016358, at *10 (N.H. Super. Ct. Nov. 2, 2000).

The Court is inclined to agree with the State that the proper approach is to view Meta's statements as a whole to determine whether the State has stated a claim that the statements are misrepresentations violative of the CPA.  The Court concludes that the State has done so.  The State has alleged that Meta's statements about the Social Media Platforms were designed to minimize the harmful effects Meta was aware the Platforms had on child users.  (Compl. ¶ 4.)  The Court's analysis is whether Meta's conduct attained "a level of rascality that would raise an eyebrow of someone inured to the rough and tumble of the world of commerce." Fat Bullies Farm, LLC, 170 N.H. at 24.  Meta's statements, whether they concerned the prevalence of harmful content, Project Daisy, filters, its prioritization of time spent on the Platforms, or more general deceiving or misleading statements, aimed to conceal the negative impacts of social media use on children, portray the Platforms as safe for children and indicate that Meta prioritized child safety.  These statements are misleading such that they reach the required level of rascality at the pleading stage.

The Court lastly addresses Meta's arguments regarding statements it is alleged to have made in testimony to Congress.  Meta contends that it cannot be liable for such statements because the First Amendment bars claims based on efforts to petition the

government, including congressional testimony, and any statements made to Congress were not made "in the conduct of any trade or commerce" as required by RSA 358:A-2.

Meta's first argument relies on the Noerr-Pennington doctrine which is "rooted in the Petition Clause of the First Amendment" and protects "an attempt to persuade the legislature or the executive to take particular action with respect to a law." United States v. Philip Morris USA Inc., 566 F.3d 1095, 1123 (D.C. Cir. 2009). The doctrine only covers activity "genuinely intended to influence government action." Id. Additionally, neither the doctrine nor the First Amendment protect petitions predicated on fraud or deliberate misrepresentation. Id. (collecting cases). Because the State has stated a claim that Meta's statements were misrepresentations, in violation of the CPA, they are not entitled to protection under Noerr-Pennington. The Court assumes the truth of the State's allegations: that Meta made statements to Congress which it knew were false or misleading. Accordingly, neither the Noerr-Pennington doctrine nor the First Amendment protect Meta's statements because they constitute deliberate misrepresentation.[4] See id.

The Court is likewise not persuaded by Meta's argument that the statements it made to Congress were not within "trade or commerce," and, consequently, are not actionable under the CPA. The CPA applies to "persons engaged in trade or commerce." Hughes v. DiSalvo, 143 N.H. 576, 578 (1999) (quoting Chase v. Dorais, 122 N.H. 600, 601 (1982)). "Remedies under the [CPA] are not available where the transaction is strictly private in nature, and is in no way undertaken in the ordinary

---

[4] The Court assumes, without deciding, that the Noerr-Pennington doctrine applies in this context as a defense to the State's CPA claim. However, the Court recognizes that some courts, see, e.g., Andrx Pharm., Inc. v. Elan Corp., PLC, 421 F.3d 1227, 1233 (11th Cir. 2005), have limited the applicability of the doctrine to antitrust actions (where the doctrine originated).

course of a trade or business." Id. (cleaned up).  Assuming all of the facts in the State's complaint as true, and construing all inferences in the State's favor, Meta's statements to Congress were a part of its overall scheme to conceal known harm stemming from children's use of the Social Media Platforms.  (Compl. ¶ 143–44, 188, 205–06.)  As discussed, this is a key aspect of Meta's business model.  Therefore, the State has pleaded sufficient facts to state a claim under the CPA arising from Meta's statements about the Platforms' safety.

      e.  Restitution

Finally, Meta alleges that the State is not entitled to restitution on its CPA claims because no user is alleged to have paid to use Meta's services.  The State disagrees, arguing that restitution need not be compensatory but may also be used to disgorge wrongdoers of funds unlawfully obtained.

RSA 358-A:4, III(a) permits the attorney general to bring suit against any person the attorney general has reason to believe has committed a violation of RSA 358-A.  In that suit, the attorney general "may petition the court for an order of restitution of money or property to any person or class of persons injured thereby."  RSA 358-A:4, III(a).

The New Hampshire Supreme Court has not addressed the scope of restitution under RSA 358-A:4, III(a).  In certain actions, New Hampshire has recognized the broader reach of restitution, including the disgorgement of the benefit derived by a defendant.  See In re Haller, 150 N.H. 427, 430 (2003) ("Restitution is an equitable remedy typically applied to contracts implied in law to disgorge the benefit of unjust enrichment.").  In the criminal context, the legislature has specifically defined restitution as "money or service provided by the offender to compensate a victim for economic loss

. . . ." RSA 651:62, V. Black's Law Dictionary defines "restitution" as "an ambiguous term, sometimes referring to the disgorging of something which has been taken and at times referring to compensation for injury done." RESTITUTION, Black's Law Dictionary (12th ed. 2024).

In the Court's view, this determination requires an understanding of whether Meta has wrongfully received revenue from third-party advertisers from the increased time youth users spent on the Social Media Platforms as a result of Meta's alleged violations of the CPA. The State's allegations indicate this inquiry would be answered in the affirmative, but the Court cannot definitively rule from the face of the complaint. Accordingly, it declines to resolve this dispute at this juncture.

VI.    <u>Products Liability and Negligence</u>

The State alleges that Meta is liable for the defective design of its Social Media Platforms (Count III), its failure to warn about the risks associated with use of the Social Media Platforms (Count IV), and its negligence in its design, manufacturing, marketing, distributing, and labeling of its Social Media Platforms (Count V). Meta moves to dismiss all three state common law claims, arguing that the State lacks standing to pursue such claims and each count fails to state a claim as a matter of law. The State contends it has <u>parens</u> <u>patriae</u> standing to pursue its claims and it stated a claim under each theory. Meta also argues that the State's strict products liability claims fail as a matter of law because the Social Media Platforms are not "products," that the State's negligence claim fails because the State has not alleged that Meta violated a duty of care, and that all of the State's common law claims fail because it did not sufficiently allege proximate causation. The Court addresses each issue in turn.

a. <u>Standing</u>

"<u>Parens</u> <u>patriae</u> literally means 'parent of the country,' and refers traditionally to the role of the state as sovereign and guardian of persons under legal disability." <u>State v. City of Dover</u>, 153 N.H. 181, 185 (2006). The theory is "a concept of standing utilized to allow the state to protect 'quasi-sovereign' interests such as health, comfort and welfare of its citizens, interstate water rights, and the general economy of the state." <u>Id</u>. at 185–86. To satisfy <u>parens</u> <u>patriae</u> standing, "[f]irst, the state must assert an injury to a 'quasi sovereign' interest, an interest apart from the interests of particular private parties. Second, the state must allege injury to a 'substantial segment' of its population." <u>Id</u>. at 186. The Court addresses each inquiry in turn.

"Quasi-sovereign" interests are those "that the State has in the well-being of its populace," which must be "sufficiently concrete to create an actual controversy between the State and the defendant." <u>Id</u>. (citing <u>Alfred L. Snapp & Son, Inc. v. Puerto Rico</u>, 458 U.S. 592, 602 (1982)). For example, states have a quasi-sovereign interest "in the abatement of public nuisances, instances in which the injury to the public health and comfort is graphic and direct." <u>Id</u>. Courts have "generally interpreted the health and well-being category of quasi-sovereign interests broadly." <u>Id</u>. "A state also has a quasi-sovereign interest in preventing any injury or potential injury to the general health and well-being of its residents." <u>Id</u>.

In <u>Dover</u>, the New Hampshire Supreme Court ruled that "the State has a quasi-sovereign interest in protecting the health and well-being, both physical and economic, of its residents with respect to the statewide water supply." <u>Id</u>. The Court reasoned that "[t]he control and elimination of water pollution is a subject clearly within the scope of

the State's constitutional police power." Id.  The Court also relied on the State's interest, as articulated by RSA 481:1, in providing "careful stewardship over all the waters lying within its boundaries." Id.  Thus, the Court concluded that the State had a quasi-sovereign interest in protecting its waters from methyl tertiary butyl ether contamination. Id.

The State contends it has a quasi-sovereign interest in protecting children from Meta's operation of the Social Media Platforms which the State has alleged causes significant harm to New Hampshire children.  The State has a quasi-sovereign interest in the health of its citizens. Id.  The State has alleged that Meta's Social Media Platforms harm children. (Compl. ¶¶ 104–117.)  In New Hampshire, 13.49% of the under-eighteen population are active monthly Facebook users and 35% are active monthly Instagram users. (Id. ¶¶ 49–50.)  Teenagers in New Hampshire have also suffered from declining mental health since 2011. (Id. ¶¶ 118–19.)  The State has an interest in protecting the mental health of its youngest population.  The Court sees no reason to distinguish between physical and mental health in this context. See Dover, 153 N.H. at 186 (stating that the state has a quasi-sovereign interest in the physical health of its citizens); Snapp, 458 U.S. at 607 (same).  Therefore, the Court determines that the State has pleaded sufficient facts to satisfy the quasi-sovereign interest prong of the parens patriae standing test.

The second inquiry is "whether a sufficiently substantial segment of the population is affected by the challenged conduct." Dover, 153 N.H. at 187.  In Dover, 13.2% of the statewide water supplies were contaminated, corresponding to hundreds of public water systems and approximately 40,000 private water supplies. Id.  The

Court determined that the foregoing data demonstrated that the contamination directly affected a substantial portion of the population of New Hampshire.  Id.  The Court noted that the State "clearly" met the substantial segment test.  Id.

Over a third of minors in New Hampshire are active Instagram users and 13% actively use Facebook.  While there is no particular number which satisfies the substantial segment prong, see People v. Peter & John's Pump House, Inc., 914 F. Supp. 809, 812 (N.D.N.Y. 1996) ("There is no numerical talisman to establish parens patriae standing . . . ."), the proportion of New Hampshire citizens impacted by Meta's Social Media Platforms exceeds the proportion impacted in Dover.  If the State "clearly" met the prong in Dover, then the State has met the same prong under the facts alleged here.  Further, while the State alleges teenage usage of the Social Media Platforms in 2023, future users will also be impacted by the same alleged products liability and negligence, increasing the segment of the population affected.  See New York, by James v. Niagara-Wheatfield Central Sch. Dist., __ F.4th __, __, No. 22-2178-cv, 2024 WL 4487669, at *7 (2d Cir. Oct. 15, 2024) (permitting consideration of future individuals who may be injured by the defendant's actions in the analysis of the substantial segment prong of the parens patriae test); Com. of Massachusetts v. Bull HN Info. Sys., Inc., 16 F. Supp. 2d 90, 97 (D. Mass. 1998) (recognizing the state's quasi-sovereign interest in preventing potential injury to the general health and well-being of its residents).  Accordingly, the Court determines that the State has pleaded sufficient facts to satisfy the substantial segment of the parens patriae standing test.

Some jurisdictions consider a third prong to the parens patriae test, requiring the State show that individuals could not obtain complete relief through private suits.  See

<u>Dover</u>, 153 N.H. at 187.  The reasoning underlying the third prong is to ensure that the state's interest is "sufficiently severe and generalized, it must stand apart from the interests of particular parties–in other words, the controversy must in substance implicate the state's interest in economic supervision, and not merely affect the fortunes of a limited class of her citizens."  <u>New York v. Facebook, Inc.</u>, 549 F. Supp. 3d 6, 22 (D.D.C. 2021) (citing <u>Snapp</u>, 458 U.S. at 607).  However, the New Hampshire Supreme Court has not applied this prong in its consideration of whether the State has standing. <u>See</u> <u>Dover</u>, 153 N.H. at 187 (declining to place the burden on the State to show whether the cities could obtain complete relief through the State's suit).  The Court has only employed the test when determining what types of damages the State may recover in a <u>parens</u> <u>patriae</u> suit.  <u>See</u> <u>State v. Hess Corp.</u>, 161 N.H. 426, 436–37 (2011) (ruling on an interlocutory transfer of a partial motion for summary judgment).

The Court declines to apply the third prong to the preliminary determination of the State's <u>parens</u> <u>patriae</u> standing at the motion to dismiss stage.  Therefore, because the State has met the two prongs of the <u>parens</u> <u>patriae</u> standing test, the State may pursue its common law claims against Meta on behalf of its citizens.

b.  <u>Whether the Social Media Platforms are "Products"</u>

Meta argues that the State's strict products liability claims fail because the Social Media Platforms are not products and the harm the State alleges stems from intangible information and ideas, not products.  The State contends that categorizing the Social Media Platforms as products is a better reasoned approach, the Platforms are more appropriately considered products in the products/services dichotomy, and the harm the State alleges arises from design elements of the Platforms, not third-party content.

The New Hampshire Supreme Court has not defined what a product is under strict products liability.  However, it has adopted the Restatement (Second) of Torts to analyze other questions under strict products liability.  See Kelleher v. Marvin Lumber & Cedar Co., 152 N.H. 813, 831 (2005).  The parties both rely on the Restatement (Third) of Torts which specifically addresses what constitutes a product.  The Court likewise relies on the Restatement (Third) of Torts because of the New Hampshire Supreme Court's previous reliance on the Restatement's approach, the Restatement (Second) of Torts' silence on the issue of defining a product, and the parties' joint reliance on the Restatement (Third) of Torts.

The Restatement (Third) of Torts defines a product as, "tangible personal property distributed commercially for use or consumption."  Restatement (Third) of Torts: Prod. Liab. § 19 (1998).  Further, "[s]ervices, even when provided commercially, are not products."  Id.  However, items such as electricity are products "when the context of their distribution and use is sufficiently analogous to the distribution and use of tangible personal property that it is appropriate to apply the rules state in the Restatement."  Id.

Given the nature of the State's claims, the Social Media Platforms are products. The State alleges that the Platforms' design features harm users.  Meta's business model is operating social networking applications which allow users to share and view content and communicate with other users.  (Compl. ¶ 20.)  However, the Social Media Platforms are the vehicle through which Meta effectuates that business model.  Meta designs, develops, programs, markets, distributes, and profits from the Social Media Platforms.  (Id. ¶ 299.)  For this reason, the Platforms are akin to the distribution and

use of tangible property.  See Restatement (Third) of Torts: Prod. Liab. § 19 (1998).

Further, the Platforms are not services.  While users may experience a customized

display when engaging with the Platforms, the design features are uniform.

Consequently, Meta is not performing a unique service for every user of its Platforms.

Other jurisdictions are in accord with the Court's analysis.  In Brookes v. Lyft Inc.,

the court ruled that the Lyft application was a product because, while Lyft's business

model was a transportation network company in which it connects riders with drivers,

Lyft designed and distributed the Lyft application to carry out that business model.  No.

50-2019-CA-004782-MB, 2022 WL 19799628, at *3 (Fla. Cir. Ct. Sept. 30, 2022).  The

court also noted that the plaintiff's claim was based on the design of the application

which Lyft designed, distributed, and placed into the stream of commerce.  Id. at *4; see

also In re Uber Technologies, Inc., Passenger Sexual Assault Litig., __ F. Supp. 3d __,

__, No. 3084 CRB, 2024 WL 4211217, at *23 (N.D. Cal. Aug. 15, 2024) (finding the

Uber application a product because the alleged defects in the application have similar

plausible analogues in tangible products); T.V. v. Grinder, LLC, No. 3:22-cv-864-MMH-

PDB, 2024 WL 4128796, at *26 (M.D. Fla. Aug. 13, 2024) (recommending a finding that

the defendant social networking application is a product because it designed its app for

its business, made design choices for the app, placed the app in the stream of

commerce, distributed the app in the global marketplace, marketed the app, and

generated revenue and profits from the app); cf. In re Social Media Adolescent

Addiction/Personal Injury Pro. Liability Litigation, 702 F. Supp. 3d at 849 (adopting a

defect-specific approach to determine whether the challenged functionalities of the

defendants' social media were products).  But see Social Media Cases, No. JCCP 525,

22STCV21355, 2023 WL 6847378, at *16 (Cal. Super. Oct. 13, 2023) (determining that social media was not a product because applying the doctrine of products liability to social media does not align with the goals of the doctrine and interactions between social media companies and their users are different from traditional product sales).

The Court does not address at length Meta's argument that the State only alleges harm from intangible information delivered by the Social Media Platforms.  As discussed supra, Section B, the State's claims are based on the Social Media Platforms' alleged defective and dangerous features, not the information contained therein. Accordingly, the State's products liability claim is based on harm caused by the product: the Social Media Platforms themselves.

c.    Duty of Care

Meta argues that the State's negligence claim fails because it does not allege a duty of care that Meta violated.  The State responds that Meta owes a duty to everyone, and in particular its users, to exercise reasonable care not to subject others to an unreasonable risk of harm.  Specifically, the State points to the duty to design reasonably safe products and the duty to warn of foreseeable risks in the chosen design.

"To recover for negligence, the plaintiff must demonstrate that the defendant owes a duty to him, that the defendant breached that duty, and that the breach proximately caused injury to him."  Robinson v. 1 Bouchard Street Realty, ___ N.H. ___, ___, 2024 N.H. 59, ¶ 7.  "Absent a duty, there is no negligence."  Id.  "Whether a duty exists in a particular case is a question of law."  Id.  "When charged with determining whether a duty exists in a particular case, [the Court] necessarily encounter[s] the

broader, more fundamental question of whether the plaintiff's interests are entitled to legal protection against the defendant's conduct." Grady v. Jones Lang LaSalle Constr. Co., 171 N.H. 203, 207 (2018). "In making this determination, [the Court] consider[s] whether the societal importance of protecting the plaintiff's interest outweighs the importance of immunizing the defendant from extended liability." Id.

"A person injured by a product may proceed against the seller or manufacturer of the product under a theory of negligence." 8 McNamara, New Hampshire Practice: Personal Injury — Tort and Insurance Practice § 8.09 (2024) (citing State v. Exxon Mobil Corp., 168 N.H. 211, 233–36 (2015)). "A manufacturer has a duty to act in a reasonable way in designing and manufacturing a product." Id. Thus, because Meta has designed a product, placed that product in the stream of commerce, marketed it, and profited from it, Meta has a duty to reasonably design the Social Media Platforms.

Meta argues that interactive communication services like the Platforms do not owe a duty of care for content publication or consumption. Meta also contends that it does not owe a duty to prevent harm caused by third parties. The Court's review of the State's claim for negligence, (see Compl. ¶¶ 314–20), indicates that the State bases its negligence claim on Meta's alleged design, manufacture, marking, distribution, and labeling of the Social Media Platforms and the resulting compulsive and excessive use of the Platforms. The claim does not mention harm caused by Meta's publication or users' consumption of content or harm caused by third parties. Accordingly, the Court finds Meta's arguments irrelevant. However, to the extent the State seeks to hold Meta liable for content it publishes on its Social Media Platforms, such liability is barred by Section 230, see supra Section III(B). On the other hand, for the reasons articulated

throughout this order, Meta can be held liable for its implementation of certain design features.

      d.  <u>Proximate Causation</u>

Meta argues that all of the State's common law claims fail because it does not sufficiently allege proximate causation. The State contends that its allegations—that (1) Meta's use of addictive design features causes users, particularly teenagers, to engage with the Social Media Platforms compulsively and excessively; and (2) compulsive and excessive use of the Platforms causes harm to children's mental health—suffice to establish proximate causation. The State acknowledges that its theory is broad but argues that it has provided detailed factual support.

"Proximate causation requires a court to determine whether the defendant should be legally liable for what he has caused." <u>Fish v. Homestead Woolen Mills, Inc.</u>, 134 N.H. 361, 364 (1991). "Liability for negligence is imposed only for injuries resulting from the particular hazard against which the duty of due care required protection to be given." <u>Id</u>. Generally, proximate causation is a question of fact. <u>Cecere v. Loon Mountain Recreation Corp.</u>, 155 N.H. 289, 295 (2007).

The Court determines that, in viewing the facts alleged in the light most favorable to the State and taking all reasonable inferences in its favor, the State has alleged proximate causation. In its complaint, the State has laid out how social media impacts young users' mental health, (Compl. ¶¶ 104–117), that New Hampshire teenagers use the Social Media Platforms, (<u>id</u>. ¶¶ 49–50), and that New Hampshire teenagers' mental health has declined since 2011, corresponding with Meta's acquisition of Instagram, (<u>id</u>. ¶¶ 98, 118–19). The State has alleged that Meta is aware of the addictive nature and

harmful impacts of the design of its Platforms. (Id. ¶¶ 69, 78, 111, 122, 125, and 136.)

Viewing these allegations together, the State has sufficiently pleaded that Meta's

alleged design and implementation of addictive and dangerous features and

misrepresentations and omissions about the safety of the Platforms proximately caused

the worsening of teenage mental health in New Hampshire.

**VII.    Conclusion**

     For the foregoing reasons, Meta's motion to dismiss is DENIED.

**SO ORDERED.**

December 10, 2024
_____
**Date**

_____
**John C. Kissinger, Jr.**
**Presiding Justice**

Clerk's Notice of Decision
Document Sent to Parties
on 12/11/2024