UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION** | MDL No. 3047<br><br>Case No. 4:22-md-3047-YGR<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PERSONAL INJURY PLAINTIFFS' NON-PRIORITY CLAIMS (COUNTS 5, 12, 14, 16–18); AND** |
| This Document Relates to:<br><br>Personal Injury Plaintiffs' Second Amended Master Complaint<br><br>*D.H.* (No. 22-cv-04888)<br><br>*K.S.* (No. 23-cv-05146)<br><br>*"Alice" Doe* (No. 4:23-cv-04719)<br><br>*Ann Frank* (No. 23-cv-04686)<br><br>*C.F. on behalf of her minor child A.K.* (No. 23-cv-04682) | **GRANTING SNAP INC.'S MOTION TO DISMISS COUNTS 12 AND 14 ASSERTED IN PLAINTIFFS D.H., K.S., AND ALICE DOE'S AMENDED SHORT-FORM COMPLAINTS**<br><br>Re: Dkt. Nos. 516 and 533 in Case No. 22-md-3047;<br><br>Dkt. No. 29 in Case No. 22-cv-04888;<br><br>Dkt. No. 14 in Case No. 23-cv-04719; and<br><br>Dkt. No. 12 in Case No. 23-cv-05146 |

This order is the fifth and final in a series of orders addressing motions to dismiss claims brought in this MDL against several social media companies. This order addresses defendants' motion to dismiss personal injury plaintiffs' *non-priority* claims of general negligence (Count 5), wrongful death (Count 16), survival (Count 17), and loss of consortium (Count 18) as set forth in personal injury plaintiff's second amended master complaint (Dkt. No. 494, "2AMC"). Meta also moves to dismiss claims that it violated two criminal child sex abuse material ("CSAM") statutes (Counts 12 and 14, asserted against Meta only), and Snap moves to dismiss claims under those

United States District Court<br>Northern District of California

statutes asserted against it in three member-cases.  For the reasons set forth in this Order, based on a careful review of the pleadings and the briefing submitted by the parties as well as oral argument, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' motions to dismiss.

## I.    BACKGROUND AND LEGAL FRAMEWORK

The Court set forth the background and legal framework to the personal injury plaintiffs' product defect and causation allegations in its prior order on the motion to dismiss personal injury plaintiffs' *priority* claims.  *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.* ("*Social Media I*"), 702 F. Supp. 3d 809, 818–24 (N.D. Cal. 2023), Dkt. No. 430.  That background and those legal standards are incorporated herein, and further allegations relevant to the claims at issue here are set forth below.

## II.    DISCUSSION

As noted above, the motions before the Court concern plaintiffs' *non-priority* claims of general negligence (Count 5), violations of CSAM statutes (Counts 12 and 14), wrongful death (Count 16), survival (Count 17), and loss of consortium (Count 18) as set forth in the 2AMC and relevant Short-Form Complaints ("SFCs").  The Court considers each set of claims in turn.

### A.    Negligence – Count 5 of 2AMC

#### 1.    Theories of Breach

Plaintiffs' general negligence claim (Count 5) is pled as an alternative non-product theory. Plaintiffs allege two sets of breaches of duty committed by each defendant—one set by "affirmative malfeasance, actions, business decisions, and policies," and the other by "non-feasance, failure to act, and omissions."  (2AMC ¶¶ 929, 930.)  Each set is reproduced below.

**Affirmative Malfeasance.**  Plaintiffs allege that each defendant has "breached its duties of care owed to Plaintiffs through its affirmative malfeasance, actions, business decisions, and policies in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms," and that those breaches include:

- "features and algorithms in their respective platforms that, as described above, are currently structured and operated in a manner that unreasonably creates or increases the foreseeable risk of":

- "addiction to, compulsive use of, or overuse of the platform by youth, including Plaintiffs"; and

- "harm to the physical and mental health and well-being of youth users, including Plaintiffs, including but not limited to dissociative behavior, withdrawal symptoms, social isolation, depression, anxiety, suicide and suicidal ideation, body dysmorphia, self-harm, sleep deprivation, insomnia, eating disorders, and death";

- "Including features and algorithms in their respective platforms that, as described above, are currently structured and operated in a manner that unreasonably exposes youth users to sexual predators and sexual exploitation, including features that recommend or encourage youth users to connect with adult strangers on or through the platform";

- "Maintaining unreasonably dangerous features and algorithms in their respective platforms after notice that such features and algorithms, as structured and operated, posed a foreseeable risk of harm to the physical and mental health and well-being of youth users";

- "Facilitating use of their respective platforms by youth under the age of 13, including by adopting protocols that do not ask for or verify the age or identity of users or by adopting ineffective age and identity verification protocols"; and

- "Facilitating unsupervised and/or hidden use of their respective platforms by youth, including by adopting protocols that allow youth users to create multiple and private accounts and by offering features that allow youth users to delete, hide, or mask their usage."

(2AMC ¶ 929.)

**Non-Feasance.** Plaintiffs allege that each defendant "has breached its duties of care owed to Plaintiffs through its nonfeasance, failure to act, and omissions in the development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control of its respective platforms," and that those breaches include:

- "Failing to implement":

  - "effective protocols to block users under the age of 13";

  - "effective parental controls";

  - "reasonably available means to monitor for and limit or deter excessive frequency or duration of use of platforms by youth, including patterns, frequency, or duration of use that are indicative of addiction, compulsive use, or overuse";

- "reasonably available means to limit or deter use of platforms by youth during ordinary times for school or sleep";

- "reasonably available means to set up and operate its platforms without algorithms and features, discussed above, that rely on unreasonably dangerous methods (such as endless scroll, autoplay, IVR, social comparison, and others) as a means to engage youth users"; and

- "reasonably available means to monitor for, report, and prevent the use of their platforms by sexual predators to victimize, abuse, and exploit youth users".

- "Failing to set up, monitor, and modify the algorithms used on their platforms to prevent the platforms from actively driving youth users into unsafe, distorted, and unhealthy online experiences, including highly sexualized, violent, and predatory environments and environments promoting eating disorders and suicide."

- "Failing to provide effective mechanisms for youth users and their parents/guardians to report abuse or misuse of the platforms."

(2AMC ¶ 930.) In essence, the allegations target affirmative conduct by defendants in designing their platforms to foster addiction and compulsive use by young users as well as failures to implement reasonable platform measures to abate the risk of addiction and attendant harms.

As a threshold issue, the parties dispute the scope of the allegations:

*First*, plaintiffs argue that defendants' motion ignores four features placed at issue: self-restrictions, account deletion, filters, and lack of labels for filtered images. (Dkt. No. 597 at 3.) Defendants respond that plaintiffs' negligence claim resembles a "shotgun" pleading that does not adequately put defendants on notice that these features are covered by the claim. (Dkt. No. 644 at 2.) The Court disagrees. While plaintiffs' allegations under Count 5 (above) do not list out all of at-issue features discussed in the Court's prior order, plaintiffs' language is broad enough to encompass these features and the Court's prior order made abundantly clear the set of features at issue.

*Second*, the parties again dispute whether plaintiffs have included a failure-to-warn theory as part of their general negligence claim. While plaintiffs' theories of breach under the general negligence claim as excerpted above provide no indication of a failure-to-warn theory, the Court recognizes that this theory has been heavily litigated in this MDL, and plaintiffs could simply be given leave to replead. The Court declines to exclude failure-to-warn theories from plaintiffs'

United States District Court
Northern District of California

general negligence claim.

## 2. Prior Orders

Defendants assert that the theories of negligence are barred by Section 230, the First Amendment, and for failure to allege proximate cause. The Court addressed these issues in prior orders and the parties agree the Court's prior ruling should apply here.

**Section 230 & First Amendment.** In the order on plaintiffs' priority claims, the Court held that allegations relating to *particular features* of defendants' platforms were neither barred by Section 230 nor the First Amendment:

(i)   failure to implement robust age verification processes to determine users' ages;

(ii)  failure to implement effective parental controls;

(iii) failure to implement effective parental notifications;

(iv)  failure to implement opt-in restrictions to the length and frequency of use sessions;

(v)   failure to enable default protective limits to the length and frequency of use sessions;

(vi)  creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;

(vii) failure to label content that has been edited, such as by applying a filter;

(viii) making filters available to users so they can, among other things, manipulate their appearance; and

(ix)  failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

*Social Media I*, 702 F. Supp. 3d at 839.

The parties agree that this holding should apply to the parties' general negligence claim. (Dkt. No. 974, Tr. of June 21, 2024 Case Management Conference at 16:8–24.) Thus, the Court limits personal injury plaintiffs' general negligence claim to the same extent expressed in its prior order under Section 230 and the First Amendment. *See Social Media I*, 702 F. Supp. 3d at 839.

**Proximate Cause.** Next, defendants move to dismiss for a failure to allege proximate cause with respect to allegations involving third-party misconduct. Plaintiffs agree that the prior order should apply. *See Social Media I*, 702 F. Supp. 3d at 855–60. Therein, the Court held:

United States District Court
Northern District of California

the [complaint] does not sufficiently allege misfeasance such that a duty should attach for third party conduct.  However, it may be possible for plaintiffs, especially with the benefit of discovery, to amend their pleadings to more explicitly and specifically explain the basis for the misfeasance by defendants that they claim.  The Court therefore **DISMISSES WITH LEAVE TO AMEND** plaintiffs' product-based negligence claims to the extent such claims are premised on the existence of a duty to protect users from third party actors using their platforms.

*Id.* at 859 (footnote omitted).  Plaintiffs' general negligence claim is limited to the same extent.

### 3.    Legal Duty

In general, every state places a duty on every person to act with reasonable care to avoid causing injury or imposing an unreasonable risk of harm on others.  *See, e.g.*, *Crow v. Brezenski*, No. 22-cv-1043, 2023 WL 8803432, at *3 (D. Kan. Dec. 20, 2023) ("In Kansas, there is a 'universal rule' to the effect that everyone is under a duty to exercise reasonable care to avoid causing harm to others." (citation omitted)); *Weller v. Blake*, 726 S.E.2d 698, 702 (Ga. Ct. App. 2012) ("This legal duty [in a negligence claim] may arise from the general duty one owes to all the world not to subject them to an unreasonable risk of harm." (citation omitted)); Restatement (Third) of Torts: Phys. & Emot. Harm § 7 (2010) ("An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.").[1]

This general duty of care in negligence has evolved since its inception to define the boundary of reasonable conduct in new and unforeseen circumstances as industry and human affairs develop and evolve, encompassing "whatever the needs of life in a developing civilization require[s]" it to be.  *See MacPherson v. Buick Motor Co.*, 111 N.E. 1050, 1053 (N.Y. 1916) (Cardozo, J.); *see also, e.g.*, *Carrillo v. El Mirage Roadhouse, Inc.*, 793 P.2d 121, 124 (Ariz. Ct. App. 1990) ("The common law is a dynamic and growing thing and its rules arise from the application of reason to the changing condition of society. . . .  Because duty and liability are matters of public policy, they are subject to the changing attitudes and needs of society."); *Kreiss*

---

[1] Plaintiffs include a fifty-state survey of each state's duty of reasonable care. Dkt. No. 597 at 25–30.  While the language employed varies, the parties do not dispute that each state imposes in some form a general duty of reasonable care.

United States District Court
Northern District of California

*v. Allatoona Landing, Inc.*, 133 S.E.2d 602, 610 (Ga. Ct. App. 1963) (Hall, J., concurring) ("Negligence law deals with human life and our civilization is rapidly changing. There will always be progress, and, the common law must move forward to keep pace with our advancing civilization."); *Hays v. City & Cnty. of Honolulu*, 917 P.2d 718, 725 (Haw. 1996) ("Duty is a fluid concept, and as our ideas of human relations change, the law as to duties changes with them. Changing social conditions lead constantly to the recognition of new duties." (cleaned up)).[2]

It is no surprise, then, that courts have held social media platforms subject to duties of care as warranted by the circumstances of their conduct. *See, e.g.*, *Bass v. Facebook, Inc.*, 394 F. Supp. 3d 1024, 1039 (N.D. Cal. 2019) (rejecting Facebook's argument that "it does not owe its users a duty of care" and holding plaintiffs' plausibly alleged that Facebook breached a duty of care by "fail[ing] to comply with minimum data-security standards during the period of the data breach"); *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d 767, 799 (N.D. Cal. 2019) (holding plaintiffs plausibly alleged breach of duty of care where "they entrusted Facebook with their sensitive information, and . . . Facebook failed to use reasonable care to safeguard that information").[3]

---

[2] Defendants argue that plaintiffs' general negligence claim constitutes an "expansive and unprecedented duty" constituting a "wholly unwarranted extension" of state law especially for a federal court sitting in diversity. (Dkt. No. 516 at 15–16 (citing *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 941 (9th Cir. 2001)).) Defendants exaggerate. *Ticknor* itself recognized that the "district court correctly determined that the Montana Supreme Court would likely hold that the arbitration provision of the at-issue Franchise Agreement was unenforceable as unconscionable under Montana law."). The Court rejected this argument in its order on the school districts' public nuisance claims. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.*, No. 22-md-3047, at 17 n.15 (N.D. Cal. Nov. 15, 2024). As always, "[w]hen a decision turns on applicable state law and the state's highest court has not adjudicated the issue, a federal court must make a reasonable determination of the result the highest state court would reach if it were deciding the case." *Med. Lab'y Mgmt. Consultants v. Am. Broad. Companies, Inc.*, 306 F.3d 806, 812 (9th Cir. 2002) (quoting *Kona Enterprises, Inc. v. Est. of Bishop*, 229 F.3d 877, 885 n.7 (9th Cir. 2000)). The Court relies on the available authority provided by the parties to make that reasonable determination.

[3] Defendants point out these cases arose in the context of data privacy, distinct from the personal-injury application of negligence in this case. These cases simply serve to underscore that new conditions of industry are restrained by principles of reasonable care as much as any other kind of conduct. Otherwise, social media companies could ignore any foreseeable, harmful consequences of their conduct, just what negligence seeks to prevent. *See Bass*, 394 F. Supp. 3d

Here, the Court must consider whether plaintiffs plausibly allege that defendants created an unreasonable risk of harm or failed to act with reasonable care by designing their platforms to foster addiction and compulsive use by young users as well as failing to implement reasonable platform measures to abate the risk of addiction and attendant harms.[4]

While the personal injury plaintiffs hail from numerous states, the parties agree for the purposes of this motion that the states rely on a set of factors substantially similar to California's *Rowland* factors[5] in order to evaluate whether a defendant's conduct breaches a duty of care to the plaintiff. (Dkt. No. 974, Tr. of June 21, 2024 Case Management Conference at 29:10–32:8.)[6] As

_____

at 1039 ("From a policy standpoint, to hold that Facebook has no duty of care here 'would create perverse incentives for businesses who profit off the use of consumers' personal data to turn a blind eye and ignore known security risks.'" (quoting *In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1325 (N.D. Ga. 2019))). This does not mean that any proposed duty by an aggrieved user will amount to a cognizable failure to exercise reasonable care. As with any claim, the courts are bound by a careful consideration of the limits of "reasonable care."

[4] One other court, in the parallel consolidated Judicial Council Coordination Proceedings ("JCCP") in California state court, has considered such a duty under a general negligence theory and found in favor of plaintiffs. *See Social Media Cases*, JCCP No. 5255, 2023 WL 6847378, at *23–24 (Cal. Sup. Ct. Oct. 13, 2023).

[5] Under *Rowland*, California courts consider "[1] the foreseeability of harm to the plaintiff, [2] the degree of certainty that the plaintiff suffered injury, [3] the closeness of the connection between the defendant's conduct and the injury suffered, [4] the moral blame attached to the defendant's conduct, [5] the policy of preventing future harm, [6] the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and [7] the availability, cost, and prevalence of insurance for the risk involved." *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (quoting *Rowland v. Christian*, 443 P.2d 561, 564 (Cal. 1968)).

[6] Defendants caveated this understanding by explaining that, while these factors are largely consistent across the states, California applies them differently. That is, California imposes a default duty and the *Rowland* factors are applied to consider whether the at-issue conduct falls outside of that statutory duty. Dkt. No. 974, Tr. of June 21, 2024 Case Management Conference at 30:12–31:1. The other states do not impose a default duty but rely on these factors to determine whether to impose a duty. *Id.*; *see, e.g.*, *Rhodes v. Illinois Cent. Gulf R.R.*, 665 N.E.2d 1260, 1267 (Ill. 1996) ("In resolving whether a duty exists, a court must determine whether there is a relationship between the parties requiring that a legal obligation be imposed upon one for the benefit of the other."). Nonetheless, defendants accepted for the purposes of this motion that the *Rowland* factors provide an analytical framework representative of all at-issue states, reserving their rights to present state-specific arguments as applied to specific cases. Dkt. No. 974, Tr. of

the Court previously explained with respect to a smaller set of states, among the various state-specific articulations "three fundamental considerations emerge: (1) the relationship between the parties, in particular, the relationship between the defendant's conduct and the plaintiff's injury; (2) the foreseeability of the plaintiff's injury; and (3) public policy concerns." *In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig.* ("*Social Media III*"), 2024 WL 4673710, at *17 (N.D. Cal. Oct. 24, 2024), Dkt. No. 1267.[7]  The parties focus on these three considerations, and so does the Court.

**Certainty and Closeness of Injury (Relationship Between the Parties).**  As this Court previously explained, "no formal relationship is required between the parties." *Social Media III*, 2024 WL 4673710, at *17.  "The only 'relationship' which must exist [for a duty to arise] is a sufficient juxtaposition of the parties in time and space to place the plaintiff in danger from the defendant's acts." *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 811 (Va. 2018) (alteration and emphasis in original) (quoting *RGR, LLC v. Settle*, 764 S.E.2d 8, 19 (Va. 2014)); *see also Social Media Cases*, 2023 WL 6847378, at *26 ("[T]he closeness of the connection between the defendant's conduct and the injury suffered, . . . is strongly related to the question of foreseeability itself." (second alteration in original) (quoting *Kesner v. Superior Ct.*, 384 P.3d 283, 293 (Cal. 2016))).  Here, plaintiffs are users of defendants' social media platforms which plaintiffs allege caused harm as a direct result of intended platform use.  This sufficiently juxtaposes the parties "to place the plaintiff in danger from the defendant[s'] acts." *See id*.

**Foreseeability.**  A defendant's conduct must foreseeably produce "the *specific danger* causing the plaintiff's injury." *Grieco*, 344 So. 3d at 23 (emphasis supplied); *see also, e.g.*, *Hurn*

---

June 21, 2024 Case Management Conference at 31:5–13.  Thus, the Court applies the *Rowland* factors and, given the analysis herein, and finds defendants' distinction to be without a difference for purposes of this order.

[7] As previously noted, some states consider the relationship between the parties one aspect of the foreseeability factor, rather than an independent consideration. *See, e.g.*, *Social Media Cases*, 2023 WL 6847378, at *24 ("The trilogy of foreseeability factors are foreseeability, certainty, and the connection between the plaintiff and the defendant."); *see also In re Social Media III*, 2024 WL 4673710, at *17 n.24.

1    *v. Greenway*, 293 P.3d 480, 487 (Alaska 2013) ("It is not enough that Greenway could foresee

2    Jeffrey's anger; the question is whether Greenway could foresee his indiscriminate armed

3    attack.").[8]  Some states look to "whether it was *objectively reasonable to expect* the specific

4    danger causing the plaintiff's injury, not simply whether it was within the realm of any

5    conceivable possibility." *Grieco*, 344 So. 3d at 23.

6            In *Social Media Cases*, plaintiffs alleged that defendant social media companies

7    "deliberately tweaked the design and operation of their apps to exploit the psychology and

8    neurophysiology of kids," who are "uniquely susceptible to addictive features in digital products

9    and highly vulnerable to the consequent harms."  2023 WL 6847378, at *25.  "Knowing this,

10   Defendants wrote code designed to manipulate dopamine release in children's developing brains

11   and, in doing so, create compulsive use of their apps." *Id.*  In short, the court concluded that the

12   alleged "effect of Defendants' algorithms and operational features on Plaintiffs' frequency and

13   intensity of use of the social media sites was not only foreseeable, but was in fact intended." *Id.*

14           The instant plaintiffs' allegations proceed on substantially the same theory as the plaintiffs

15   in *Social Media Cases*.  As this Court previously described, plaintiffs allege that defendants try to

16   cultivate children as users and have deliberately designed their social media platforms to foster

17   compulsive and addictive use, aware of young users' susceptibility to addictive components of

18   their platforms and the negative health consequences that result. *See Social Media I*, 702 F. Supp.

19   3d 809, 819 (N.D. Cal. 2023); *see also, e.g.*, 2AMC ¶ 74 ("[E]ach Defendant deliberately

20   designed, engineered, and implemented dangerous features in their apps that present social-reward

21   and other stimuli in a manner that has caused Plaintiffs and many scores of others to compulsively

22   seek out those stimuli, develop negative symptoms when they were withdrawn, and exhibit

23   reduced impulse control and emotional regulation.").  Defendants' deliberate conduct with

24

25           [8] *Cf. Social Media Cases*, 2023 WL 6847378, at *24 ("[T]he court's task in determining
     duty is not to decide whether a *particular* plaintiff's injury was reasonably foreseeable in light of a
26   *particular* defendant's conduct, but rather to evaluate more generally whether the category of
     negligent conduct at issue is sufficiently likely to result in the kind of harm experienced that
27   liability may appropriately be imposed." (quoting *Cabral v. Ralphs Grocery Co.*, P.3d 1170, 1175
     (Cal. 2011))).
28

United States District Court
Northern District of California

knowledge of the alleged actual and probable resulting harm supports a finding of foreseeability and, more to the point, plausibly indicates a failure to exercise reasonable care.[9]

While "[f]oreseeability is the most important" factor, "foreseeability alone is insufficient to establish a duty if the burden of taking care or the effect on society is too harsh." *Hurn v. Greenway*, 293 P.3d 480, 487 (Alaska 2013); *see also, e.g.*, *O'Neil v. Crane Co.*, 266 P.3d 987, 1006 (Cal. 2012) ("[F]oreseeability is not synonymous with duty; nor is it a substitute." (citation omitted)); *S.C. State Ports Auth. v. Booz-Allen & Hamilton, Inc.*, 346 S.E.2d 324, 325 (S.C. 1986) ("Foreseeability itself does not give rise to a duty."); *Seebold v. Prison Health Servs., Inc.*, 57 A.3d 1232, 1249 (Pa. 2012) ("[F]oreseeability . . . is not alone determinative of the duty question."); *Ashburn v. Anne Arundel Cnty.*, 510 A.2d 1078, 1083 (Md. 1986) ("The fact that a result may be foreseeable does not itself impose a duty in negligence terms."). Rather, public policy considerations must support imposing a duty. The Court turns there next.

***Public Policy Factors.*** "In each of the relevant jurisdictions, public policy factors govern whether a defendant owes a duty of care."[10] *JUUL*, 497 F. Supp. 3d at 655. Plaintiffs argue that public policy supports finding a duty of care for social media companies to avoid taking steps to foster compulsive use and addiction in its young users, given the known corollary mental and physical health consequences of youth addiction to social media platforms. Taking the facts of the complaint true as alleged and drawing reasonable inferences in their favor, the Court agrees. Public policy supports safeguarding child welfare, and courts have found intentional conduct interfering with the health of children plausibly breaches the duty of reasonable care. *See In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 656 (N.D. Cal.

---

[9] Defendants' contrary arguments do not persuade. Defendants urge that *Social Media Cases* was decided under California's purportedly more favorable negligence standard, as discussed *supra* note 6, and thus its reasoning does not counsel imposition of a duty in all states. The Court disagrees, because plaintiffs' allegations of deliberate conduct with knowledge of resulting harm are readily sufficient to find foreseeability. Tellingly, defendants do not provide authority from any state that is substantively to the contrary.

[10] In some jurisdictions, foreseeability comprises part of the public policy factors. *See, e.g.*, *JUUL*, 497 F. Supp. 3d at 655; *Rowland v. Christian*, 69 Cal. 2d 108, 113 (1968).

2020) (explaining that "there is strong 'moral blame' attached to [defendant's] conduct in targeting school children with a dangerous product" and "strong policy in favor of preventing future harm" to those children).  That defendants allegedly *knew* the harmful consequences of their conduct, and maintained course, demonstrates blameworthy conduct further deviating from the standard of reasonable care.  *See Social Media Cases*, 2023 WL 6847378, at *27 ("Moral blame attaches to a party's conduct when there are ameliorative steps the party could have taken to avert foreseeable harm and the party failed to take those steps.").  In essence, plaintiffs' alleged duty of care, i.e., to avoid taking deliberate steps to cause harmful addictions, is within the realm of the basic principle that all actors should avoid imposing risks of unreasonable harm on others.

Defendants levy a series of contrary public policy considerations.  With respect to some, the Court has already limited plaintiffs' allegations to exclude those that improperly tread on conduct protected by Section 230 or the First Amendment, as well as allegations that concern the harmful conduct of third-party actors which cannot legally be attributed, as alleged, to defendants.  Thus, the scope of plaintiffs' complaint has been narrowed in a manner that addresses many of defendants' concerns.

With respect to the balance, *first*, defendants argue that plaintiffs' general negligence theory impermissibly treads on defendants' and the public's freedom of expression.  This assertion is merely another flavor of the same First Amendment concerns previously considered.  *See Social Media III*, 2024 WL 4673710, at *19–21.  Defendants rely on cases like *Zamora v. Columbia Broad. Sys.*, 480 F. Supp. 199, 200 (S.D. Fla. 1979) (First Amendment barred claims that plaintiff became "involuntarily addicted to and 'completely subliminally intoxicated' by the extensive viewing of television violence . . . ."), *Est. of B.H. v. Netflix, Inc.*, 2022 WL 551701, at *3 (N.D. Cal. Jan. 12, 2022) ("California courts have declined to find a duty as a matter of law under the *Rowland* factors for claims implicating expression."), *aff'd*, No. 22-15260, 2024 WL 808797 (9th Cir. Feb. 27, 2024), and *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1101 (9th Cir. 2019) ("No website could function if a duty of care was created when a website facilitates

communication, in a content-neutral fashion, of its users' content.").[11]

Defendants' authority is inapposite for the same reasons explained in the Court's prior order on the school districts' claims of general negligence. The First Amendment concerns do not apply:

> The Court has already limited plaintiffs' claims to the extent the complaint seeks to impose liability for platform features and defendants' conduct protected by the First Amendment, discussed *supra*. The remainder of defendants' conduct is not so tied. Defendants fail to explain how a remedy for plaintiffs' "core" theory of injury—that defendants[] caused minors to compulsively use their platforms, to the foreseeable detriment of both those minors and the school districts—would chill protected First Amendment expression. Plaintiffs' negligence core theory of injury seeks to impose liability only on defendants' non-expressive and intentional design choices to foster compulsive use in their minor users and a failure to warn thereof, not on what is said on defendants' social media platforms.

*Social Media III*, 2024 WL 4673710, at *21.

*Second*, defendants argue that "companies have no general duty to prevent 'addiction.'" (Dkt. No. 516 at 8.)  In support, defendants point to *Modisette v. Apple Inc.*, which considered "[w]hether cell-phone manufacturers have a duty to design cell phones in a manner that applications like FaceTime cannot be accessed while users are driving."  241 Cal. Rptr. 3d 209, 221 (Cal. Ct. App. 2018).  In arguing such a duty exists, plaintiffs in *Modisette* relied in part on studies which allegedly demonstrated the compulsive or addictive nature of smartphone use.  *Id.* at 222.  The court was not persuaded by these studies and noted, among other considerations, that plaintiffs' "complaint does not allege that Apple designed the iPhone to be particularly addictive to drivers compared to other smartphones."  *Id.* at 223.  By contrast, plaintiffs in this MDL *do* allege that defendants *intentionally* designed their social media platforms to be addictive.  These plaintiffs do not claim defendants failed to "prevent addiction," but instead intentionally cultivated

---

[11] *See also Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1037 (9th Cir. 1991) (finding social costs under the First Amendment warranted rejecting plaintiffs' proposal that "the publisher had a duty to investigate the accuracy of" the contents of a reference guide about mushrooms); *McCollum v. CBS, Inc.*, 249 Cal. Rptr. 187, 196 (Cal. Ct. App. 1988); (noting the "countervailing policies" arising out of the First Amendment for duty of care relating to publication of music allegedly leading to plaintiff's suicide).

United States District Court
Northern District of California

addiction and compulsive use.  An intentional course of conduct with known and likely risks resulting from that conduct raises the question of whether that course of conduct is carried out with reasonable care.  Tellingly, defendants make no attempt to explain why, as a matter of public policy and accepting plaintiffs' allegations on their face, the alleged intentional design choices to foster compulsive use should be considered reasonable or are otherwise justified.

*Third*, defendants characterize plaintiffs' theory as "fashion[ing] a novel, nationwide duty to affirmatively create age-verification, parental controls, and reporting features."  (Dkt. No. 644 at 9.)  Not so.  Defendants parse plaintiffs' allegations too narrowly and miss the forest for a few trees.  Plaintiffs allege that defendants intentionally designed a suite of features that preyed on young users' susceptibility to compulsive use of the platforms.[12]  Moreover, the fact that defendants' social media platforms present a new environment in which actors must exercise reasonable care (*i.e.*, a new means for causing harm) does not make their conduct less of a breach.  That is, a new platform of conduct does not make defendants' conduct less negligent.

### B.    CSAM (Criminal Child Sex Abuse Material) Claims – Counts 12 and 14

Plaintiffs bring claims against defendants Meta and Snap alleging violations of federal statutes prohibiting the knowing distribution (18 U.S.C. § 2252) or possession (18 U.S.C. § 2252A) of CSAM.  Personal injury plaintiffs allege these claims against Meta under Counts 12 and 14 of the 2AMC, and three plaintiffs allege Counts 12 and 14 against Snap.  Meta and Snap move to dismiss Counts 12 and 14 as barred by Section 230 and for failure to state a claim.

#### 1.    Background

The 2AMC alleges generally that Meta has possessed and distributed CSAM in violation

---

[12] On the other hand, defendants also argue that plaintiffs' allegations are too general and thus conclusory when plaintiffs allege that "'[e]ach Defendant owed Plaintiffs a duty to exercise reasonable care' in, among other things, the 'development, setup, management, maintenance, operation, marketing, advertising, promotion, supervision, and control' of each of Defendants' services."  Dkt. No. 516 at 5 (quoting 2AMC ¶ 916).  As evident from the above discussion, defendants here mischaracterize plaintiffs' theory of negligence, which has been limited by the Court's rulings to focus on defendants' conduct in deliberately designing their platforms to foster compulsive use in young users.

United States District Court
Northern District of California

of Sections 2252 and 2252A.[13]  (*See* 2AMC ¶¶ 1057–66.)  In their short-form complaints

("SFCs"), each of five individual plaintiffs recounts a harrowing history of sexual abuse suffered

while engaging with third parties on Meta's and/or Snap's platforms.[14]  None of these plaintiffs

allege that either social media company encouraged the propagation of their CSAM, but instead

that their platforms were used as the vehicle for communication with abusers and for transmission

of CSAM.  Despite receiving repeated notice of plaintiffs' CSAM, the platforms allegedly failed

to remove the CSAM, report individual users or groups on the platforms that were hosting the

CSAM, or otherwise take appropriate corrective action to abate the continued dissemination of

plaintiffs' CSAM.

This Court must consider whether Section 230 insulates Meta and Snap from liability in

these civil actions as to alleged violations of 18 U.S.C. §§ 2252 and 2252A.

### 2.     Analysis

Section 2252 provides that a person commits a federal crime who, among other activity:

> (1) knowingly transports or ships using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce by any means including by computer or mails, any visual depiction, if—
>
>> (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>>
>> (B) such visual depiction is of such conduct . . . .

18 U.S.C. § 2252(a).  Likewise, Section 2252A provides that a person commits a federal crime

who, among other activity:

> knowingly possesses, or knowingly accesses with intent to view, any . . . material that contains an image of child pornography that has been mailed, or shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign

---

[13] More generally, plaintiffs have also adopted by reference portions of the New Mexico attorney general's complaint against Meta as relates to allegations that Meta facilitates the spread of CSAM and child exploitation.  2AMC ¶ 391B.  A redacted copy of the New Mexico attorney general's complaint was filed on the MDL's docket (No. 22-md-3047) at Dkt. No. 540-3.

[14] *See D.H.* (No. 22-cv-04888) (Snap and Meta); *K.S.* (No. 23-cv-05146) (Snap and Meta); *"Alice" Doe* (No. 4:23-cv-04719) (Snap and Meta); *Ann Frank* (No. 23-cv-04686) (Meta only); *C.F. on behalf of her minor child A.K.* (No. 23-cv-04682) (Meta only).

United States District Court
Northern District of California

> commerce . . . or that was produced using materials that have been mailed, or shipped or transported in or affecting interstate or foreign commerce by any means, including by computer . . . .

18 U.S.C § 2252A(a)(5)(B).

Section 230 of the Communications Decency Act ("CDA") "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100 (9th Cir. 2009). As this Court has previously emphasized, to satisfy the test, a claim must be based on "behavior that is *identical to* publishing or speaking." *Social Media I*, 702 F. Supp. 3d at 826 (quoting *Barnes*, 570 F.3d 1096 at 1107).[15]

Most courts have held Section 230 bars civil CSAM claims against social media platforms. In *Doe v. Twitter*, plaintiffs alleged that Twitter was "notified of the CSAM material depicting John Doe #1 and John Doe #2 as minors on its platform," "initially refused to" remove the material after receiving notice from the plaintiffs, and "still knowingly received, maintained, and distributed this child pornography after such notice," allegedly "profit[ing] from doing so." *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 894–95 (N.D. Cal. 2021), *aff'd in part, rev'd in part sub nom. Doe # 1 v. Twitter, Inc.*, 2023 WL 3220912 (9th Cir. May 3, 2023). The district court concluded

---

[15] Plaintiffs emphasize that "[t]he history of § 230(c)(2) shows that access to pornography was Congress's motivating concern." *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1047 (9th Cir. 2019). As this Court has previously noted, Congress's motivation was more specific: "In enacting Section 230, Congress 'sought to encourage the development and use of technologies that would allow users to filter and control the content seen by themselves or their children.'" *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.* ("*Social Media II*"), 2024 WL 4532937, at *12 n.16 (N.D. Cal. Oct. 15, 2024) (quoting *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1176 (9th Cir. 2024)); *see also* 47 U.S.C. § 230(b)(4) ("It is the policy of the United States," among other goals, "to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material."). Of course, the Court agrees with plaintiffs that "[b]efore giving companies immunity from civil claims for 'knowingly host[ing] illegal child pornography,'. . . we should be certain that is what the law demands." *Malwarebytes, Inc. v. Enigma Software Grp. USA, LLC*, 141 S. Ct. 13, 18 (2020) (Thomas, J., statement respecting denial of certiorari) (second alteration in original) (quoting *Doe v. Bates*, 2006 WL 3813758, at *1 (E.D. Tex. Dec. 27, 2006)).

that the plaintiffs' claims under 18 U.S.C. §§ 2252A and 2255 were barred under Section 230. The Ninth Circuit, in an unpublished opinion, agreed and held that because defendant's activity as alleged "'can be boiled down to deciding whether to exclude material that third parties seek to post online,' such activity 'is perforce immune under section 230.'" *Doe #1*, 2023 WL 3220912, at *2 (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008)).

In *M.H. v. Omegle.com, LLC*, plaintiffs' Section 2252A "child pornography claim assert[ed] that Omegle knowingly possessed child pornography that was generated on its platform" and, in essence, sought "to hold Omegle responsible for the conduct of cappers like John Doe who criminally misappropriate the site." *M.H. v. Omegle.com, LLC*, 2022 WL 93575, at *5 (M.D. Fla. Jan. 10, 2022). The court held that the "CDA bars such claims as they seek to redirect liability onto Omegle for the ultimate actions of their users" and because "each of Plaintiffs' claims ultimately seek to treat Omegle as a publisher or speaker." *Id.*

In *Doe v. Bates*, the court explained that plaintiffs' alleged injury was "grounded in the pornographic photographs having been 'published to the world'" which publication plaintiffs sought to prevent. 2006 WL 3813758, at *19 (E.D. Tex. Dec. 27, 2006) (quoting the first amended complaint). Even though the defendant (AOL) allegedly "took no action to block or remove" the at-issue images, the court held plaintiffs' Section 2252A claim, among others, failed under Section 230 because plaintiffs sought to hold the defendant liable for failing to exercise traditional publishing functions, "such as blocking, screening, or otherwise preventing the dissemination of the images." *Id.*

By contrast, in *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1171 (N.D. Ala. 2022) the court found otherwise. In relevant part, the court wrote that plaintiffs' Section 2252 and 2252A claims allege that defendants were "not only distributors of but also receivers and possessors of child pornography. Receipt and possession of child pornography, alone, are criminal acts, and are not shielded by Section 230 immunity." *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136 at 1169–70. The court distinguished *Doe v. Bates* (discussed *supra*) and explained:

> This Court disagrees with the *Doe v. Bates* court insofar as it treats child pornography in the same way courts have treated speech, such as defamatory statements, instead of treating it as illegal contraband. Bluntly, if Plaintiffs' allegations are true, Defendants, through Pornhub and other sites, host and harbor child pornography—i.e., knowingly receive and possess it—which are illegal acts under the United States Code and which are prosecuted in proceedings against individuals every day. How, then could a corporate defendant escape punishment for the same illegal conduct? Further, Plaintiffs' allegations here are more egregious in that Defendants not only received, possessed, distributed and failed to remove CSAM, as in *Bates*, but they also played a vital role in the creation and development of CSAM, such as by using keywords and tags to encourage users to find CSAM, such as the "Lil" tag used on videos of Plaintiff Doe #1.

*Id.* (footnote omitted).

The parties dispute the application of these precedents. On the one hand, plaintiffs emphasize that the 2AMC alleges the defendants' "direct, illegal, knowing, and unauthorized *possession* of CSAM." (Dkt. No. 597 at 21.) As plaintiffs explain, they "allege that Snap itself knowingly receives and possesses CSAM—*irrespective of whether Snap also published that CSAM*." (Dkt. No. 598, Plfs.' Opp. to Snap's MTD at 8.) Because Sections 2255 and 2252A prohibit knowing *possession* of CSAM, plaintiffs argue their claim does not seek to hold defendants liable for "behavior that is *identical* to publishing or speaking." *Social Media I*, 702 F. Supp. 3d at 826 (quoting *Barnes*, 570 F.3d 1096 at 1107).[16]

The Court disagrees. Plaintiffs' characterization presents an unworkable end-run around Section 230. The only way for defendants to have avoided "possession" of the CSAM material in the first place is to pre-screen content loaded onto its platforms by third parties, which is a traditional publishing activity. In other words, "possession" and failure to pre-screen or remove are two sides of the same coin for an internet-content provider. Notably, as described below, that immunity does *not* extend to criminal prosecutions.

On the other hand, defendants argue that plaintiffs' application of the *MG Freesites*

---

[16] Plaintiffs also emphasize that the Ninth Circuit's decision in *Doe v. Twitter* was unreported and arguably not to the contrary.

18

opinion to this case is inconsistent with *Doe v. Twitter* and other Ninth Circuit precedent.  The Court agrees.  The statutory language discussed in *MG Freesites* on which plaintiffs here rely— that Section 230 has "[n]o effect on criminal law," and shall not "be construed to impair the enforcement of" criminal statutes relating to, among others, the "sexual exploitation of children," 47 U.S.C. § 230(e)(1)—has been interpreted to apply to criminal prosecutions, not civil lawsuits. *See, e.g.*, *Doe #1 v. Twitter, Inc.*, 2023 WL 3220912, at *2 (9th Cir. May 3, 2023) ("§ 230(e)(1)'s limitation on § 230 immunity extends only to criminal prosecutions, and not to civil actions based on criminal statutes."); *Doe v. Twitter, Inc.*, 555 F. Supp. 3d 889, 927 (N.D. Cal. 2021) (Section 230(e)(1)'s "exemption does not extend to civil claims asserted under that section."); *Force v. Facebook, Inc.*, 934 F.3d 53, 72 (2d Cir. 2019) ("Section 230(e)(1) is 'quite clearly . . . limited to criminal prosecutions.'" (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 23 (1st Cir. 2016))).  That is, the plain language of Section 230(e)(1)'s exclusion of criminal conduct from Section 230 immunity does not extend to civil suits brought under Sections 2252 or 2252A.

Further, *MG Freesites*'s facts present material differences for purposes of Section 230. Considering the Ninth Circuit's opinion in *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1174 (9th Cir. 2008) ("Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost."), the *MG Freesites* court found that "[t]he facts of this case are unlike those cases in which neutral search tools or algorithms were misused by bad actors."  *MG Freesites*, 676 F. Supp. 3d at 1162; *see also See Social Media I*, 702 F. Supp. 3d at 828 (discussing *Roommates.Com*).  In particular, plaintiffs there alleged that defendants "encourage and materially contribute to the development, optimization, and advertising of CSAM on Pornhub."  *Id.* at 1162.  Thus, given the enhancement activity, Section 230 immunity did not attach.

Here, plaintiffs do not argue that they allege Meta or Snap enhanced the development or distribution of third-party CSAM, but rather that the platforms had actual or constructive knowledge of instances of CSAM on the platforms and failed to properly report that CSAM.  (*See* Dkt. No. 597 at 20–24; Dkt. No. 598 at 6–11.) The difference is material under Section 230.  The alleged conduct is subject to Section 230 immunity in a civil suit.  Both Meta and Snap's motions

United States District Court
Northern District of California

1   to dismiss are **GRANTED** as to plaintiffs' CSAM claims because those claims are barred in a civil

2   suit pursuant to Section 230.[17]

3       ### C.    Wrongful Death, Survival, and Loss of Consortium – Counts 16, 17, 18

4           Defendants move to dismiss plaintiffs' claims of wrongful death (Count 16), survival

5   (Count 17), and loss of consortium (Count 18) as set forth in the 2AMC.

6           Claims of wrongful death, survival, and loss of consortium are derivative in nature, in that

7   these causes of action permit certain family members to recover certain damages resulting from

8   tortious conduct impairing another family member.  *See, e.g.*, Restatement (Second) of Torts § 693

9   (1977) ("One who by reason of his tortious conduct is liable to one spouse for illness or other

10  bodily harm is subject to liability to the other spouse for the resulting loss of the society and

11  services of the first spouse . . . ."); Restatement (Second) of Torts § 925 (1979) ("Although the

12  [wrongful] death statutes create a new cause of action, both they and the survival statutes are

13  dependent upon the rights of the deceased."); *In re Labatt Food Serv., L.P.*, 279 S.W.3d 640, 644

14  (Tex. 2009) ("[W]e have consistently held that the right of statutory beneficiaries to maintain a

15  wrongful death action is entirely derivative of the decedent's right to have sued for his own

16  injuries immediately prior to his death."); *Schaefer v. Allstate Ins. Co.*, 668 N.E.2d 913, 916–17

17  (Ohio 1996) ("Even though a loss of consortium claim is derivative in that it is dependent upon the

18  defendant's having committed a legally cognizable tort upon the spouse who suffers bodily injury,

19  it is nonetheless legally separate and independent from the claim of the spouse who suffered the

20  bodily injury." (citation omitted)).

21          The Court clarifies that plaintiffs' claims of wrongful death, survival, and loss of

22  consortium remain operative only to the same extent as their "underlying" personal injury

23  claims.[18]  In other words, these claims are subject to the same substantive limitations as set forth

24  _____

25          [17] To be clear, the Court's ruling applies only to claims under 18 U.S.C. §§ 2252 and
    2252A.  Plaintiffs' allegations that defendants have, for instance, negligently "fail[ed] to
26  implement reasonably available means to monitor for, report, and prevent the use of their
    platforms by sexual predators to victimize, abuse, and exploit youth users" (2AMC ¶ 930(g)) have
27  not been dismissed.  *See also Social Media I*, 702 F. Supp. 3d at 839.

28          [18] There is no genuine dispute here.  Defendants argue that these derivative claims must be

United States District Court
Northern District of California

in the Court's prior orders on personal injury plaintiffs' claims and in this Order.  *See Social Media I*, 702 F. Supp. 3d 809; *Social Media II*, 2024 WL 4532937.  A wrongful death, survival, or loss of consortium claim brought by one family member does not substantively enlarge the rights of another family member.  The Court addresses defendants' remaining arguments.

### 1.    Survival and Wrongful Death

Defendants argue that Indiana, Florida, Virginia, and Wyoming do not permit survival claims where the decedents died as a result of their injuries, and that Arizona does not permit plaintiffs asserting survival claims to recover for the decedent's pre-death pain and suffering.  As demonstrated below, the issue largely focuses on the effect of pleading in the alternative where causation is disputed.  Defendants do not address this issue which is dispositive of most of the motion.  Thus, the Court reviews the law of each state.

**Indiana's** "Survival Act provide[s] that if an individual who has a personal injury claim or cause of action dies, the claim or cause of action does not survive and may not be brought by the representative of the deceased party unless the individual dies from causes other than those personal injuries." *Ellenwine v. Fairley*, 846 N.E.2d 657, 660–61 (Ind. 2006).  However, Indiana permits plaintiffs to proceed with claims of wrongful death and survival, even if inconsistent, where causation is disputed. *Smith v. Johnston*, 854 N.E.2d 388, 391 (Ind. Ct. App. 2006) ("Because it was not clear that the defendant's actions caused the decedent's death, damages for wrongful death and survival could be shown," so that plaintiff could "proceed on alternative inconsistent theories . . . .").

In **Florida**, a "separate lawsuit for death-resulting personal injuries cannot be brought as a survival action . . . .  The action can be brought, in a consolidated form, under the new Wrongful Death Act." *Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765, 770 (Fla. 1975).  However, in Florida "it is permissible for a personal representative to pursue both a claim for survival damages

---

dismissed to the same extent as their underlying personal injury claims.  Plaintiffs respond that the Court has not dismissed any of the underlying claims, and so none of the derivative claims can be extinguished on this basis.

and an alternative wrongful death claim where the cause of the decedent's death may be disputed by the parties." *Capone v. Philip Morris USA, Inc.*, 116 So. 3d 363, 378 (Fla. 2013).

"**Virginia** law does not recognize an independent survivorship action in addition to a wrongful death claim where the person dies from the injury or wrongful act." *Smith v. Town of S. Hill*, 611 F. Supp. 3d 148, 191 (E.D. Va. 2020) (quoting *Winkler v. Medtronic, Inc.*, 2018 WL 6271055, at *3 (D. Md. Nov. 29, 2018) (internal quotation marks omitted). "Virginia law does, however, 'allow a survivorship claim to be pleaded in the alternative, averring that if Defendant's conduct did not cause death, it nonetheless caused separate injury not resulting in death.'" *Id.* (quoting *Winkler*, 2018 WL 6271055, at *3 n.4).

**Wyoming** law provides that "in actions for personal injury damages, if the person entitled thereto dies recovery is limited to damages for wrongful death." Wyo. Stat. Ann. § 1-4-101. However, Wyoming "expressly permits the pleading of inconsistent claims" and has done so with respect to alternatively pled survival and wrongful death claims. *Osborne v. Empres At Riverton, LLC*, 2023 WL 4064267, at *5 (Wyo. Dist. Ct. May 08, 2023) (permitting "at this stage of the proceeding and when addressed solely on the pleadings in a motion to dismiss under Rule 12(b)(6)," "inconsistent" and separate survival and wrongful death claims).

Thus, the viability of a survival or wrongful death claim, where pled as alternatives, may be addressed more clearly in this MDL alongside specific causation as applied to a particular plaintiff. [19] Defendants' motion to dismiss plaintiffs' claims of survival and wrongful death brought under Indiana, Florida, Virginia, and Wyoming law is **DENIED.**

As to **Arizona**, its "survival statute provides that 'every cause of action,'" with some exceptions,[20] "'shall survive the death of the person entitled thereto or liable therefor, and may be

---

[19] Plaintiffs also argue that, under certain circumstances, survival claims may continue where there are multiple injuries, only some of which cause death. *See, e.g.*, *Gaston v. Life Care Centers of Am., Inc.*, 488 P.3d 929, 937 (Wyo. 2021) ("[S]eparate survival and wrongful death claims may be maintained when the same defendant commits multiple negligent acts causing separate injuries to the decedent, some non-fatal and others fatal."). The Court need not address this contention at this stage given its ruling.

[20] In Arizona, the causes of action that do not survive the decedent's passing are "a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate

United States District Court
Northern District of California

asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed.'" *Atwood v. Days*, 2024 WL 810563, at *14 (D. Ariz. Feb. 27, 2024) (quoting Ariz. Rev. Stat. § 14-3110).  Plaintiffs make no response to defendants' citation to this law.  Thus, damages for pre-death pain and suffering are excluded from any survival claims asserted under Arizona law.  The motion as to whether damages sought via survival claims arising under Arizona law are limited as described above by Ariz. Rev. Stat. § 14-3110 is **GRANTED**.

### 2.    Loss of Consortium – Count 18

The final cause of action in plaintiffs' 2AMC, styled "Loss of Consortium and Society" (Count 18), seeks relief for plaintiffs' loss of "their childrens', wards', spouses', parents', siblings', and/or other close family members' consortium, companionship, services, society, love, and comforts," as well as costs "for medical aid, medical treatment, and medications."  (2AMC ¶¶ 1090–91.)[21]  While a state may recognize claims for loss of *parental* consortium, *i.e.*, claims brought by a child for loss of a parent's consortium due to injury to the parent, the state may not necessarily recognize claims of *filial* consortium, *i.e.*, claims brought by a parent for loss of a child's consortium due to injury to the child.  *See, e.g.*, *Perez v. Stanford*, 2021 WL 828560, at *5 & nn. 3–4 (Conn. Super. Ct. Jan. 19, 2021) (surveying states and finding fifteen permit claims of filial consortium while ten prohibit the claim).  The instant dispute concerns whether plaintiffs (i) may assert claims of filial consortium under the laws of certain states,[22] and (ii) may seek

_____

maintenance, alimony, loss of consortium or invasion of the right of privacy."  Ariz. Rev. Stat. § 14-3110.  These exceptions have no bearing on the statute's prohibition on damages for pain and suffering.  That is, damages for pain and suffering are not permitted in any surviving cause of action under Arizona law.

[21] As of defendants' December 22, 2023 motion, defendants represented that the MDL included 87 loss of consortium plaintiffs, 85 of whom are parents, one of whom is a grandparent, and one of whom does not specify a relationship.  (Dkt. No. 516 at 27 n.18.)

[22] Specifically, defendants move to dismiss "(1) all loss of consortium claims brought by non-qualified family members under Alabama, Arkansas, California, Connecticut, Delaware, Georgia, Indiana, Kansas, Maine, Maryland, Michigan, Minnesota, Mississippi, Missouri, New Hampshire, New York, North Carolina, Pennsylvania, South Carolina, South Dakota, Virginia, or District of Columbia law; and (2) all claims for loss of consortium brought by parents of

United States District Court
Northern District of California

1    recovery of damages for loss of services and for medical expenses as pled in Count 18.

2        This dispute has somewhat of a protracted history.  Plaintiffs' 2AMC does not distinguish

3    between states with respect to claims of loss of consortium, in effect deferring to individual

4    plaintiffs to choose whether to assert a loss of consortium claim under their state's law in their

5    respective SFCs.  At argument, plaintiffs acknowledged that many states may not permit a parent

6    to bring a standalone loss of filial consortium claim, explaining that "if there's a state's law that

7    says a parent cannot bring a standalone loss of consortium claim for the loss of a child, of course

8    we don't dispute that other than to say that if you dismiss that, . . . it should be without prejudice

9    to that's parent's ability to recover consortium-like remedies through other claims . . . ."  (Dkt. No.

10   974, Tr. of June 21, 2024 Case Management Conference at 70:7–13.)  Plaintiffs agreed to re-

11   review and determine what states "clearly don't recognize a claim for loss of consortium" (*id.* at

12   77:9–10) and later agreed to stipulate to the fact that many states do not permit a loss of

13   consortium for filial consortium (*see* Dkt. No. 1023, Case Management Order No. 16 at 4).

14       In their stipulation, plaintiffs "acknowledge[d] that the heading 'Loss of Consortium and

15   Society' in the [2AMC] was inartful, to the extent that it may imply that Count 18 asserts *only*

16   claims seeking damages for loss of consortium."  (Dkt. No. 1046 at 3.)  Rather, plaintiffs aver that

17   Count 18 seeks three categories of damages: (i) loss of consortium, (ii) loss of services, and

18   (iii) medical expenses.  (*Id.*)[23]  With that clarification, plaintiffs consent to partial dismissal of

19   only the parental "loss of consortium" portion of Count 18 as to states that do not recognize

20   parental loss of consortium claims, namely: Alabama, Arkansas, California, Colorado, Delaware,

21   the District of Columbia, Georgia, Illinois, Indiana, Kansas, Maryland, Maine, Michigan,

22   Minnesota, Missouri, Mississippi, New Hampshire, New York, North Carolina, Oregon,

23   Pennsylvania, South Carolina, South Dakota, Texas, and Virginia.  (*Id.* at 4.)

24

25   _____

26   nonfatally injured children under Colorado, Illinois, Oregon, and Texas law."  Dkt. No. 516 at 29.

27   [23] Defendants are on some notice that plaintiffs sought these damages because all three
     forms of damages are described in the paragraphs under Count 18, albeit under the header "Loss

28   of Consortium and Society."  (2AMC ¶¶ 1090–91.)

United States District Court
Northern District of California

Plaintiffs caution, however, that each of these jurisdictions *permits* damages for parental loss of *services* and for *medical expenses*, providing authority from each state in support. (*Id.* at 4–7.) Plaintiffs point to exemplar authority from a couple states where courts have permitted claims broadly styled as seeking "loss of consortium" or "parental claims" to proceed to the extent those claims sought loss of services and medical expenses, while dismissing the claim to the extent it sought to recover damages for loss of society, despite the name affixed to the claim in the complaint. *See George v. Windham*, 94 N.Y.S.3d 363, 365 (N.Y. App. Div. 2019) (affirming dismissal of cause of action seeking "damages allegedly suffered by the plaintiff for her loss of the society and services of the children" to the extent it "sought damages for the plaintiff's loss of the children's society" but reversing trial court where it directed dismissal of the claim insofar as it "as sought to recover damages for the loss of the children's services and the expense for their care and treatment"); *Domion v. Triquint Semiconductor, Inc.*, 2018 WL 3385904, at *5 (D. Or. June 11, 2018) (recommending grant of motion to dismiss plaintiffs' cause of action styled as "Parental Claims" to the extent plaintiffs "seek damages for loss of consortium" and "mental and emotional anguish" but recommending denial to the extent the "Parental Claims" include "economic damages, including medical expenses"), *findings and recommendations adopted*, 2018 WL 3385174 (D. Or. July 9, 2018); *cf. I.M. v. United States*, 362 F. Supp. 3d 161, 172 (S.D.N.Y. 2019) (granting motion for summary judgment on "loss of services" claim to the extent the claim sought damages for loss of services due to lack of record evidence but denying motion "only insofar as the claim relates to the medical expenses [the parent] testified she has incurred for treatment of" her child).

Plaintiffs propose two options for how to handle Count 18. For one, the Court could enter partial dismissal of Count 18 only to the extent it encompasses loss of *consortium* claims as to plaintiffs' stipulated jurisdictions, leaving Count 18 intact "insofar as [plaintiffs' claims] seek permissible pecuniary damages" like loss of services or medical expenses. (Dkt. No. 1046 at 7–8.) This is the approach taken by the authorities cited in the preceding paragraph. Alternatively, plaintiffs propose that the Court could permit plaintiffs leave to amend and restructure Count 18 into three counts: Count 18A, for Loss of Consortium; Count 18B, for Loss of Services; and

Count 18C, for Medical Expenses.[24]  (*Id.* at 10.)

For efficiency purposes, the Court agrees that partial dismissal is appropriate.  Thus, defendants' motion to dismiss Count 18 is **GRANTED** to the extent any plaintiff seek damages for loss of filial consortium under the laws of Alabama, Arkansas, California, Colorado, Delaware, the District of Columbia, Georgia, Illinois, Indiana, Kansas, Maryland, Maine, Michigan, Minnesota, Missouri, Mississippi, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, and Virginia.[25]  At this stage, the Court declines to dismiss any claims of filial consortium brought under Connecticut law,[26] or claims for

---

[24] While objecting, defendants prefer this approach over the other.

[25] Defendants' motion to dismiss is technically broader, seeking dismissal of loss of consortium claims for all "non-qualified" family members.  Dkt. No. 516 at 29.  As defendants note, because nearly all loss of consortium claims are brought by parents, their brief—and thus this Order—focuses on loss of filial consortium claims.  *Id.* at 29 n.22.  Further, because at the time of defendants' motion only one non-parent (a grandparent) asserted a claim for loss of consortium, the Court does not consider a motion to dismiss claims of loss of consortium brought by other family members ripe.  In other words, even though plaintiffs' 2AMC—an administrative pleading device used in MDLs—lists other family members (2AMC ¶ 1091), there is no actual dispute beyond filial consortium claims until another family member (*e.g.*, a sibling) brings a claim for loss of consortium.  As to the grandparent, the parties have not identified the state law their claim arises under, but the Court presumes that if a state does not recognize a parent's claim for loss of filial consortium, the state would not incongruously recognize a grandparent's claim for loss of filial consortium.

[26] Plaintiffs' stipulated list of states that do not recognize claims of filial consortium is inclusive of all of the states for which defendants seek dismissal of loss of consortium claims brought by non-qualified family members (Dkt. No. 516 at 29), except for Connecticut, whose courts, plaintiffs maintain, provide sufficient authority to recognize claims of loss of filial consortium.

In *Campos v. Coleman*, the Supreme Court of Connecticut recognized claims for loss of *parental* consortium.  123 A.3d 854, 868 (Conn. 2015).  Since *Campos*, Connecticut trial courts have disagreed whether *Campos*'s logic can be extended to authorize claims of *filial* consortium.  *Compare Perez v. Stanford*, 2021 WL 828560 (Conn. Super. Ct. Jan. 19, 2021) (permitting claim for loss of filial consortium and denying motion to strike), *with Menefee v. CCMC Corp.*, 2024 WL 164912, at *7 (Conn. Super. Ct. Jan. 10, 2024) (rejecting claim for loss of filial consortium and granting motion to strike).  "There is no appellate precedent expressly authorizing a claim for loss of filial consortium" in Connecticut.  *Menefee*, 2024 WL 164912, at *1.  Given that Connecticut trial courts go both ways on this issue, and because the Court would benefit from a discussion of the specific allegations supporting a Connecticut plaintiffs' claim for loss of filial consortium in order to apply the public policy considerations discussed in *Campos*, the Court

United States District Court
Northern District of California

loss of services or medical expenses.

The Court understands defendants' concerns but ultimately believes partial dismissal is optimal. Nonetheless, the Court addresses defendants' concerns and provides further clarity:

*First*, with respect to whether the approach contravenes Rules 18(a)(2) and 10(b) of the Federal Rules of Civil Procedure allegedly leaving defendants "to guess which of these three distinct claims each plaintiff is asserting," (Dkt. No. 1066 at 2),[27] notice pleading remains sufficient and exact precision is not required. The Plaintiff Fact Sheet ("PFS") is an adequate mechanism to clarify whether the plaintiff seeks damages for loss of services, medical expenses, or both. (*See* Dkt. No. 551-2, Plaintiff Fact Sheet at 15 ("Do you claim medical expenses . . . as a result of the injuries you allege in this case?" "Is anyone claiming loss of consortium and/or loss of services as a result of your use of Defendants' platforms?").) Should a plaintiff seek solely loss of filial consortium damages under the law of a state that does not recognize such damages, that plaintiff is **ORDERED** to file an amended SFC withdrawing their claim for relief under Count 18 within thirty (30) days of this Order. Defendants may of course mount specific challenges in future motions as to any evidence of loss of services or medical expenses provided by particular plaintiffs, including whether a given plaintiff's state law permits recovery of those damages via the underlying causes of action asserted by the plaintiff.

*Second*, with respect to whether any of the states permit recovery of loss of services and/or medical expenses damages without an independent right of action to pursue such claims, (Dkt. No. 1066 at 4–5), plaintiffs agree that these claims are derivative and require plaintiff to successfully establish an underlying claim, as discussed above. Further, with a few exceptions,[28]

---

declines to dismiss any Connecticut plaintiffs' claims for loss of filial consortium on the briefing and record before the Court.

[27] *See, e.g.*, *Bautista v. Los Angeles Cnty.*, 216 F.3d 837, 840 (9th Cir. 2000) ("Separate counts will be required if necessary to enable the defendant to frame a responsive pleading or to enable the court and the other parties to understand the claims." (citation omitted)).

[28] In Count 10, which asserts a claim of negligence per se, plaintiffs and consortium plaintiffs do not rely on the term "compensatory damages," but plaintiffs and consortium plaintiffs do allege they suffered injury in the form of "emotional distress, diagnosed mental health conditions, loss of income and earning capacity, reputational harm, physical harm, past and future

the majority of plaintiffs' causes of action specify that "Consortium Plaintiffs" seek relief in the form of "compensatory damages," among other damages. (2AMC ¶¶ 856, 871, 894, 913, 938, 975, 987, 999, 1093.) Regardless, because plaintiffs have adequately alleged underlying causes of action, defendants' concern is unfounded.

## III.    CONCLUSION

To summarize, defendants' motions to dismiss are **GRANTED IN PART** and **DENIED IN PART**.

*First*, defendants' motion to dismiss plaintiffs' claims of general negligence (Count 5) is **GRANTED IN PART** to the same extent as set forth in prior orders with respect to Section 230, the First Amendment, third-party harms, and defendants' motion to dismiss is otherwise **DENIED**. Plaintiffs' claim of general negligence survives.

*Second*, Meta's and Snap's motions to dismiss plaintiffs' claims of violations of CSAM statutes (Counts 12 and 14) are **GRANTED**. Section 230 prohibits plaintiffs from bringing these claims in a civil action.

*Third*, defendants' motion to dismiss plaintiffs' claims of wrongful death (Count 16), survival (Count 17), and loss of consortium (Count 18) is **GRANTED IN PART** and **DENIED IN PART**:

Defendants' motion to dismiss claims of wrongful death and survival is **DENIED** because plaintiffs may plead claims of wrongful death and survival as alternative theories of liability, even if inconsistent with each other. However, damages for pre-death pain and suffering are excluded from any survival claims asserted under Arizona law.

Defendants' motion to dismiss plaintiffs' claims of loss of consortium is **GRANTED** to the extent plaintiffs assert claims of loss of filial consortium under the laws of Alabama, Arkansas,

---

medical expenses, and pain and suffering." (2AMC ¶¶ 1014, 1020.)

Counts 12 and 14, which assert violations of federal criminal CSAM statutes, only list plaintiffs and not consortium plaintiffs as seeking damages. (*Id.* ¶¶ 1048, 1066.) The same is true for Counts 16 (Wrongful Death) and 17 (Survival). (*Id.* ¶¶ 1084, 1088.)

United States District Court
Northern District of California

California, Colorado, Delaware, the District of Columbia, Georgia, Illinois, Indiana, Kansas, Maryland, Maine, Michigan, Minnesota, Missouri, Mississippi, New Hampshire, New York, North Carolina, Oregon, Pennsylvania, South Carolina, South Dakota, Texas, and Virginia. Defendants' motion to dismiss claims of loss of consortium is otherwise DENIED, including with respect to claims for loss of services or medical expenses.

This terminates Dkt. Nos. 516 and 533 in Case No. 22-md-03047; Dkt. No. 29 in Case No. 22-cv-04888; Dkt. No. 14 in Case No. 23-cv-04719; and Dkt. No. 12 in Case No. 23-cv-05146.

IT IS SO ORDERED.

Dated: February 28, 2025

_____
YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
Northern District of California