**Pages 1 - 131**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

```
IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION                      )
                                )  NO. 22-MD-03047 YGR (PHK)
_____ )
```

San Francisco, California
Thursday, March 20, 2025

<u>**REPORTER'S TRANSCRIPT OF PROCEEDINGS**</u>

<u>**APPEARANCES**</u>**:**

For Plaintiffs:

LIEFF, CABRASER, HEIMANN
  & BERNSTEIN LLP
275 Battery Street, 29th Floor
San Francisco, California 94111
BY:  **LEXI J. HAZAM, ATTORNEY AT LAW**
     **PATRICK I. ANDREWS, ATTORNEY AT LAW**

MOTLEY RICE LLC
401 9th Street NW, Suite 630
Washington, D.C. 20004
BY:  **PREVIN WARREN, ATTORNEY AT LAW**

SIMMONS HANLY CONROY LLP
One Court Street
Alton, Illinois 62002
BY:  **ELLYN HURD**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Plaintiff State of Arizona:
   ARIZONA ATTORNEY GENERAL'S OFFICE
   2005 North Central Avenue
   Phoenix, Arizona 85004
 BY: **NATHAN E. WHELIHAN**
   **ASSISTANT ATTORNEY GENERAL**


For Plaintiff State of California:
   CALIFORNIA DEPARTMENT OF JUSTICE
   OFFICE OF THE ATTORNEY GENERAL
   1515 Clay Street, Suite 2000
   Oakland, California 94612
 BY: **JOSHUA OLSZEWSKI-JUBELIRER**
   **DEPUTY ATTORNEY GENERAL**

   CALIFORNIA DEPARTMENT OF JUSTICE
   455 Golden Gate Avenue, 11th Floor
   San Francisco, California 94102
 BY: **EMILY C. KALANITHI**
   **SUPERVISING DEPUTY ATTORNEY GENERAL**

For Plaintiff California Department of Health Care Services:
   CALIFORNIA DEPARTMENT OF JUSTICE
   455 Golden Gate Avenue, Suite 11000
   San Francisco, California 94102
 BY: **BRENDAN P. RUDDY**
   **DEPUTY ATTORNEY GENERAL**

For Plaintiff California Business, Consumer Services and Housing Agency:
   OLSON REMCHO
   1901 Harrison Street, Suite 1550
   Oakland, California 94612-3597
 BY: **MARGARET R. PRINZING, ATTORNEY AT LAW**

For Plaintiff State of Colorado:
   OFFICE OF THE ATTORNEY GENERAL
   COLORADO DEPARTMENT OF LAW
   Business and Licensing
   Ralph L. Carr Judicial Building
   1300 Broadway, Eighth Floor
   Denver, Colorado 80203
 BY: **KRISTA BATCHELDER**
   **ASSISTANT ATTORNEY GENERAL**

   **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For Plaintiff Commonwealth of Kentucky:
                          KENTUCKY OFFICE OF THE ATTORNEY GENERAL
                          Office of Consumer Protection
                          1024 Capital Center Drive, Suite 200
                          Frankfort, Kentucky 40601
                    BY:   **ZACHARY J. RICHARDS**
                          **ASSISTANT ATTORNEY GENERAL**

For Plaintiff State of New Jersey:
                          NEW JERSEY OFFICE OF THE
                            ATTORNEY GENERAL
                          Division of Law
                          124 Halsey Street
                          Box 45029
                          Newark, New Jersey 07101
                    BY:   **VERNA PRADAXAY**
                          **DEPUTY ATTORNEY GENERAL**

For Plaintiff State of Washington:
                          WASHINGTON STATE OFFICE OF
                              THE ATTORNEY GENERAL
                          800 Fifth Avenue, Suite 2000
                          Seattle, Washington 98104
                    BY:   **ALEXANDRA KORY**
                          **ASSISTANT ATTORNEY GENERAL**

For Federal/State Liaison:
                          BEASLEY ALLEN LAW FIRM
                          218 Commerce Street
                          Montgomery, Alabama 36104
                    BY:   **JOSEPH VANZANDT, ATTORNEY AT LAW**

For Defendant Meta Platforms, Inc.:
                          COVINGTON & BURLING LLP
                          1999 Avenue of the Stars, Suite 3500
                          Los Angeles, California 90025
                    BY:   **ASHLEY M. SIMONSEN, ATTORNEY AT LAW**

                          COVINGTON & BURLING LLP
                          Sales Force Tower
                          415 Mission Street, Suite 5400
                          San Francisco, California 94105-2533
                    BY:   **ISAAC D. CHAPUT, ATTORNEY AT LAW**

            **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

**APPEARANCES**:   (CONTINUED)

For Defendant Meta:

> COVINGTON & BURLING LLP
> The New York Times Building
> 620 Eighth Avenue
> New York, New York 10018
> BY:  **CHRISTOPHER Y.L. YEUNG, ATTORNEY AT LAW**
>
> COVINGTON & BURLING LLP
> One City Center
> 850 Tenth Street, NW
> Washington, D.C. 20001-4956
> BY:  **MARIAH K. WATSON, ATTORNEY AT LAW**

For Defendant Snap, Inc.:

> MUNGER, TOLLES & OLSON LLP
> 560 Mission Street, 27th Floor
> San Francisco, California  94105
> BY:  **NATALIE G. MOYCE, ATTORNEY AT LAW**

For Defendant TikTok, Inc.:

> KING & SPALDING LLP
> 1180 Peachtree Street
> Atlanta, Georgia 30309
> BY:  **GEOFFREY M. DRAKE, ATTORNEY AT LAW**

For Defendant YouTube, LLC:

> MORGAN, LEWIS AND BOCKIUS, LLP
> 600 Brickell Avenue - Suite 1600
> Miami, Florida 33131
> BY:  **BRIAN M. ERCOLE, ATTORNEY AT LAW**
>
> WILSON SONSINI GOODRICH & ROSATI
> One Market Plaza
> Spear Street Tower
> San Francisco, California 94105
> BY:  **JENNA K. STOKES, ATTORNEY AT LAW**

For Respondents Vaishnavi Jayakumar and Arturo Bejar:

> BAKER BOTTS LLP
> One Page Mill Road
> Building One, Suite 200
> Palo Alto, California 94304
> BY:  **MICHAEL W. WARD, ATTORNEY AT LAW**

**Thursday - March 20, 2025**                                    **1:11 p.m.**

**P R O C E E D I N G S**

---o0o---

**THE COURTROOM DEPUTY:**  Now calling 22-MD-3047, In Re Social Media Adolescent Addiction and Personal Injury Products Liability Litigation.

Counsel, when speaking, please approach the podium, state your name for the court reporter and the Court.  Thank you.

**THE COURT:**  Good afternoon.

**ALL:**  Good afternoon, Your Honor.

**THE COURT:**  Give me a second to get my computer set up.

(Pause in proceedings.)

**THE COURT:**  All right.  You teed up a bunch of issues for me today.  So kind of what we did last time, I'm going to admonish you not to repeat arguments in the briefing as unnecessary.

And then, also, I'm probably going to by default limit you to about ten minutes each per side on each issue, just so we make sure we finish on time and are able to get to everything.

So shall we start the long march through these?  Let's start with Number -- Docket Number 1773, which is the redacted version.  The unredacted sealed version is 1774-1.  This is Meta's response to RFP Number 102.

Who's arguing this one?

**MR. OLSZEWSKI-JUBELIRER:**  Good afternoon, Your Honor. Josh Olszewski-Jubelirer on behalf of the People of the State of California.

**MR. CHAPUT:**  Good afternoon, Your Honor.  Isaac Chaput from Covington & Burling on behalf of the Meta defendants.

**THE COURT:**  Thank you.

All right.  So let's start -- so, first, there's the data -- let me just make sure I understand the facts here, Mr. Chaput, as to how Meta's data is organized.

With regard to what you've been calling the linked account data, to answer that part of the document request would require -- as I understand from -- I don't know why their name was redacted but -- the declaration of the Meta witness, is it correct that would require merging three different databases that aren't currently merged?  Is that -- am I understanding that correctly?

**MR. CHAPUT:**  Not quite, Your Honor.  It's slightly different from that.

So what would be required is merging different tables that exist within a larger data warehouse.  So they aren't separate storage locations.  It's one warehouse.

**THE COURT:**  Okay.

**MR. CHAPUT:**  But the tables themselves are, as we laid out in the declaration, very voluminous.

**THE COURT:**  Okay.  And why do they need to be merged,

I guess is the question, to answer their request?

**MR. CHAPUT:**  So the linked accounts table is a list of linkages between all of the different accounts that exist between Facebook to Instagram or Instagram to Instagram.

So we need to take that table and then map it to the table that has information about enforcement in order to identify accounts that -- where there is a link and there was no corresponding enforcement action that appears in the enforcement table.

**THE COURT:**  Okay.  And was there a third table?

**MR. CHAPUT:**  Well, so the linked accounts exist in two separate tables --

**THE COURT:**  Okay.  Okay.

**MR. CHAPUT:**  -- Your Honor.

**THE COURT:**  Okay.  All right.  So...

So for the state AGs' position, typically, the rule in discovery is if the documents don't already exist in the ordinary course, you can't force somebody to create something that doesn't exist.

This comes awfully close to forcing them to try to create something that doesn't exist.  Why should I order that?

**MR. OLSZEWSKI-JUBELIRER:**  Your Honor, we -- we disagree with the notion that this would require Meta to create any new data.

What we are asking for is for Meta to query its existing

tables, those linked accounts tables, for the responsive data. And the responsive data are the links between accounts that Meta has enforced against for being under 13 to other accounts owned by those same users that they have not enforced against.

This is highly probative of our COPPA claims.  When they leave children's accounts online that they know belong to children and continue collecting personal information from those children, each one of those is a COPPA violation.  The data will allow us to count individual COPPA violations and identify the scope of Meta's violations.

This is a -- courts, especially in the Northern District, require parties to query dynamic data tables in order to produce new subsets of that data that's responsive to requests.

**THE COURT:**  So what I heard here is that you don't need to merge the tables to get the information they want.  So why -- all he said was all you have to do is query the linked account tables.  He said nothing about the enforcement tables.

**MR. CHAPUT:**  And that's simply incorrect, Your Honor. In order to identify unlinked account tables, which ones are responsive, we can only do that by mapping that data to the enforcement table, because we need to start from the enforcement table, identify the accounts that were enforced against, and then go from there to link to the linked accounts table and look for an account that has a link to that enforced-on account but wasn't enforced.

**THE COURT:** So as I've done in prior DMCs, have you had your techie folks involved in this meet and confer process to figure out whether you're actually speaking the same language as to what data needs to be queried?

**MR. OLSZEWSKI-JUBELIRER:** We have not had the tech people on either side in these meet and confers.

I think -- if I may, Your Honor, I think -- anyway, please go ahead.

**THE COURT:** Well, I mean, you're saying all you want them to do is query an existing set of tables, the linked accounts tables.

Meta is saying no. To get you what you really are asking for, they have to merge or go to two separate sets of tables, the linked account tables and the enforcement tables.

I don't know which one is right. I'm not a data scientist. I haven't looked at Meta's data. I would have thought you would have at least the basic facts here of how the data is structured, and whether it's in separate tables or not appears to be in dispute.

So help me out here. What are you actually looking for, and have you talked about this issue?

**MR. OLSZEWSKI-JUBELIRER:** We have talked about this issue. I think -- I think there's a couple of differences in our positions.

So I think we're on the same page, that the identities of

the -- like, the list of accounts that have been enforced against, we understand from Meta that those exist in a separate table.  I will say, Meta has offered to produce that, but for a different time period.

So it's not like they can't identify which accounts they have enforced against for being under 13.  They've offered to produce that, but they're refusing to produce it for the same time period in which the account match information is available.

THE COURT:  Different dispute than the one we have in front of us now, isn't it?  So let's not get off track because there's a lot of disputes here today.

MR. OLSZEWSKI-JUBELIRER:  Right.  My point, Your Honor, is just that it's not -- it is not infeasible or Meta has not said it's too burdensome to identify, from that enforcement table, which are the responsive records.

In order to identify the responsive information from the linked accounts table, they will need to query that table for the accounts that they have identified that they have enforced against.

I think -- if I may, Your Honor, I think the dispute is about the legal import of gathering this -- this data.  Our contention, based on the case law that we cited --

THE COURT:  We're not even at relevance.  So you don't have to argue relevance to me here.  Right?

**MR. OLSZEWSKI-JUBELIRER:**  Yes, Your Honor.

**THE COURT:**  I understand your relevance argument from the briefing.

So what I'm concerned about is they put in a declaration from the data scientist who's involved in collecting this data and processing it, and she said -- I think it's a she.  Is it a he?

**MR. CHAPUT:**  Yes, she.

**THE COURT:**  She said, you know, it's -- the last time she had to go through one of those tables, it took eight weeks to compute and export the data.

All right.  And to do what you're -- what they're saying they need to do to answer your request -- that is, querying both the enforcement table, mapping it to the linked accounts tables, and then essentially running new queries against that merged set -- they don't even know how long it'll take, is essentially what I've been presented with.

But I do know that other querying steps they've taken for -- you know, involving tables like that have taken weeks. And so, I mean, I will say, there is at least evidence in front of me that there is an undue burden here.

**MR. OLSZEWSKI-JUBELIRER:**  So if I may, Your Honor, Your Honor referenced paragraph 4 of the declaration.

**THE COURT:**  Mm-hmm.

**MR. OLSZEWSKI-JUBELIRER:**  And that does have a

reference to eight weeks to compute this data.  This is a reference to data that Meta produced in response to Personal Injury and School District Plaintiffs' Request Number 124. That is a massive dataset that includes information on user reports about hundreds of different types of violations, only a tiny fraction of which have anything to do with children under the age of 13.

I think the point that we tried to explain to Your Honor is that the volume of data that is responsive and that will require Meta to use it to query this table is an infinitesimal amount of data compared to the amount of data that it took this --

THE COURT:  Again --

MR. OLSZEWSKI-JUBELIRER:  -- engineer eight weeks --

THE COURT:  -- because it --

MR. OLSZEWSKI-JUBELIRER:  -- to deal with.

THE COURT:  But because it was redacted, I won't say which table.

But if you look at paragraph 2 of the declaration, the declarant says that one of the tables we're talking about is over 246 terabytes of data.  That's not infinitesimally smaller.

MR. OLSZEWSKI-JUBELIRER:  Right.  The responsive information from the table is infinitesimally small.

THE COURT:  Well, yeah.  I mean, you can filter out

data from any table and come up with a very --

**MR. OLSZEWSKI-JUBELIRER:**  Right.

**THE COURT:**  -- small subset.

The question is, how long is it going to take to go through a huge amount of data?  How much time and effort is it going to take?

**MR. OLSZEWSKI-JUBELIRER:**  Your Honor, the declaration does not talk about how much time it would take.  As Your Honor said, it doesn't -- it makes no representations about the amount of time it would take to produce the data we are requesting.  It simply says, if Meta needed to analyze the full scope of information about its enforcement actions, about its -- about its user reports, which go back to 2013, about innumerable other issues, they would have to look through this entire table.

We are talking about just things that have happened in the last 50 to 90 days.  That is a tiny fraction of this data.  And there's nothing in this declaration or in Meta's papers that say how long it would take, how many person-hours it would take, how much money it would take to produce the data that we are requesting here.

I will say, this is highly, highly probative of our claims.  If they produce the data that we are looking for, it will identify individual violations of COPPA and will allow us to count the number of times that they left children's accounts

online and continued collecting personal information from them. It is not a speculative inquiry.

THE COURT:  Let me ask you this:  If you were just to simply query the linked accounts tables to find out what the potentially relevant linked accounts are and then separately query the enforcement tables without doing the merger and then produce those results to them and make them do the mapping, would that -- I mean, they're basically asking for a mapping between two disparate tables.  Why not produce the results of the individual queries of the tables to them and make their experts do that?

MR. CHAPUT:  Because the linked accounts tables, Your Honor, don't have the data that's necessary to identify the subset of data that is supposed to be responsive to the request.  Right?  It's just a mapping of one account to another.

And so in order to filter that down to what is actually relevant and responsive, taking a very broad view of relevance, which we do contest, we need to do the merge.  That's the only way that we get to the responsive records, because as Your Honor started off this conversation, the data is not kept in the ordinary course the way that plaintiffs wish it were kept.

And they cite the *Apple* case.  Respectfully, I don't think it stands for the proposition they submit it for.  First of

all, *Apple* wasn't contesting the relevance in that case. Second, it's entirely unclear from the description of the facts in that case if the process that we have to undertake here was the process that *Apple* would have had to undertake in terms of mapping disparate pieces of data onto one another.

In terms of the volume of data that has to be queried, I would call Your Honor's attention to paragraph 3. The Facebook to Instagram linked accounts table just for the last 50 days is 12 trillion rows of data, and so we have to crawl through all 12 trillion rows of data. With an Instagram-to-Instagram linked accounts table, it's only 88 billion rows. Right?

So it's a huge quantity of data that, yes, the resulting output will be very small, but the burden is the quantity of data that has to be analyzed.

**THE COURT:** Has your declarant said she was still determining how much time and effort it would take? I mean, to counsel's point, has she made that determination yet?

**MR. CHAPUT:** So it's not actually possible to do it until we try. We have to actually start running the process to see how long is this actually going to take.

But, again, that's why we wanted to put in the information that's in paragraph 4 in terms of the eight weeks that it did take when we had to query tables of comparable size because we think that is the most relevant way of getting to the answer. Particularly on the compressed time frame we have to brief

these sorts of disputes, it just wasn't feasible for us to get an answer -- a more robust answer to the question Your Honor just posed.

THE COURT:  All right.  So the briefing says you've already agreed to produce historical data on linked accounts. So that -- so they'll have that side of the data that is within even the superset of things that are relevant.  Right?

MR. CHAPUT:  Correct.  So the enforcement tables have information about accounts that were linked where there was an enforcement action taken, and so that is what's included in the historical data.

I would point out, Your Honor, the definition of "relevant time period" in the states' request, it ends with the date of our response.  So data from the last 50 to 90 days from today just isn't even responsive to the RFP.  So I'm, frankly, a little at sea as to why the states are insisting that we should produce --

THE COURT:  Well --

MR. CHAPUT:  -- current data.

THE COURT:  -- that's because -- I assume they're taking that position because it turns out you didn't maintain historical data beyond the last 50 to 90 days; right?

So if that's all you have, that's all you have.  And I know that's a separate issue about whether you should have and all that.  That's not the dispute in front of me today.  But

I think you understand why they're asking for it, because that's all you said you have.  Right?

MR. CHAPUT:  That's correct, Your Honor.  But it's just entirely outside of the relevant time period, and that does goes to the relevance.  Information about what is happening today doesn't shed any light on what was happening during the relevant time period.

THE COURT:  Well, but if it's all you have, then it's all you have.  I mean, you know, to me, if that's the only enforcement data you have, then I don't see how you don't -- how it isn't within the scope of discovery, even putting aside the general time limits here, just because that's all you have.

MR. CHAPUT:  I hear Your Honor, yes.

THE COURT:  So, okay.  Let me ask you this:  I mean, again, is there a way to get them the data they want without having -- is there a different set of data somewhere?  Is there a different table?  Is there a different database?  Have you queried your data folks to see if there's some other way to get at this other than what you've described as the process that would be required?

MR. CHAPUT:  We've investigated this extensively, Your Honor, and we haven't identified a different way to get them what they're looking for.

THE COURT:  I just -- I don't see how you've overcome the burden issue.  I mean, if it doesn't exist in a merged form

already, then it doesn't exist.  And what you're asking for is essentially for them to create a merged database.

MR. OLSZEWSKI-JUBELIRER:  Your Honor, we're not asking them to merge the database.  We don't need --

THE COURT:  But they have a declaration saying in order to answer your question, they would have to do that. They'd have to map one database to the other.

MR. OLSZEWSKI-JUBELIRER:  If I may, Your Honor, they need to search the database that contains information about which accounts are linked to each other for the responsive data, which are the accounts that are linked to accounts that they have enforced against for being under 13.  They know --

THE COURT:  I thought you've already produced that. You said you produced the historical data that shows accounts that have been enforced against.

MR. CHAPUT:  That's correct, Your Honor.

MR. OLSZEWSKI-JUBELIRER:  They have produced the data -- if I may, Your Honor, they have not produced the full set of data on accounts that have been enforced against.  So far, they've produced data on accounts that have been reported as under 13.  There's another set of data that we understand is forthcoming, but we understand from counsel's representations that it is cut off and doesn't cover the period where the data on linked accounts is available.

We have asked for the data on linked accounts since we

served this RFP last June.  We found out last week that they have, instead of preserving that data all this time that we've been negotiating it, including in December when we specifically said "Data on accounts that are linked to accounts that are under 13 that you have not enforced against is essentially probative and responsive to our request," they have been deleting it.  They have not been preserving it.

THE COURT:  I get that, but that's not before me today.  The issue today is whether they should be forced to produce what they do have.

MR. OLSZEWSKI-JUBELIRER:  Yes.  Your Honor, and I guess what I would say is Meta is one of the largest technology companies in the world.  Their entire business is based on collecting very large amounts of data from billions of users and querying that data in complex ways --

THE COURT:  Okay.

MR. OLSZEWSKI-JUBELIRER:  -- in very profitable ways.

THE COURT:  All right.  That's where you're going.

So here is what I'm going to do.  Since you -- I've given you this advice and directives in previous similar kind of ESI-type disputes.  I'm going to order you -- I'm not going to -- I'm going to deny the motion to enforce it without prejudice, but I'm going to order you to meet and confer with your data folks and your ESI techie folks, like I've said in other similar disputes, to try to figure out a way to get at

maybe not the exact same data you want, but the data that will get you the information you want in a different way.

And you've got to -- Mr. Chaput, you've got to have somebody there who knows kind of the landscape of what kinds of data and what kinds of tables Meta has so that they can answer -- you can answer questions, try to work together to figure out a way to get them this information.

**MR. CHAPUT:**  And, Your Honor, I want to be very clear. We have engaged in extensive investigation of these RFPs, and we have not identified another location.

So I will -- you know, in terms of a meet and confer about the merging process and the complexities of what counsel is describing as just a query, I think we can do that.  But I don't think we're going to be able to have someone who can on the fly disclose additional information to counsel about what may or may not exist when we've engaged in that extensive investigation and it hasn't turned anything else up.

**THE COURT:**  Okay.  But, again, like, I'm not the data scientist here.  If they have their data person there, maybe you can come up with ways to do the queries in a way that doesn't -- that is more streamlined than what your data scientist is saying.

Also, I do take the point, you haven't really put in specific evidence as to the specific amount of time and burden for this specific request.  You've given information that it

would -- from which I can infer that it would be burdensome, but you need to talk more about it with the techies to see if there's a way to get at it and maybe do a test run.  All right?  Maybe, like, come up with a very short filter on both tables, either by time or otherwise -- right? -- to see how long that takes and how burdensome it is and how hard it is, like, just a kind of proof of concept.

          **MR. CHAPUT:**  We'll continue the meet and confer process.

     I do just want to -- I haven't responded to counsel's representations about relevance.  I hear Your Honor that you're not getting there today.  I'm just going to note for the record that we're preserving our objection that what they're after really is irrelevant.

          **THE COURT:**  All right.  So that's the linked account data.

     The happy birthday stuff, to me, that -- I guess what I don't see cited is case law that tells me whether or not providing essentially what Meta is calling a -- even a -- a table that has the text of the communications extracted implicitly discloses the communication, the substance of the communications because of the search terms.  I haven't seen case law either way saying whether that's a violation of the SCA.

          **MR. CHAPUT:**  So, Your Honor, I'd actually point to the

*Optiver* case, which we do cite, which I think is on all fours, and which plaintiffs haven't addressed at all.

So in that case, there was a subpoena recipient who was asked to produce metadata about, but not the contents of, emails that had certain keywords in them, and the Court held that that would necessarily disclose the contents of the emails. And what the Court said was [as read]:

"The SCA prohibits any knowing disclosure by service providers of the content of electronic communications, no matter how insignificant. The search proposed by Optiver would necessarily reveal that the emails identified contain the terms 'PGB' and 'Optiver'" -- which are the disputed terms -- "which are words contained in the body of the communications."

So even though in that case they weren't seeking to compel the contents of the communication, the results of the search, which would have turned over the metadata, would have disclosed the contents.

So I think, Your Honor, that that case actually does squarely address the issue.

**THE COURT:** All right. So why isn't that a violation of the SCA?

**MR. OLSZEWSKI-JUBELIRER:** I'll make two points on that, Your Honor.

I think counsel's argument reaches far too broadly.  Meta discloses the number of posts, public or private, on its platforms and information about the content of those posts all the time in order to paint themselves in what they believe to be a positive light in what they enforce against.

If I may, just -- their website, in which they publicly tout their accomplishments in taking down harmful content, they -- just the page on hate speech defines hate speech, describes what is in these posts.  It says the posts --

[As read]:

"Hate speech is defined as violent or dehumanizing speech, statements of inferiority, calls for exclusion or segregation based on protected characteristics or slurs."

Then they provide a number of posts that have, within the content of those posts, slurs, calls for exclusion or segregation based on protected characteristics, et cetera.

They are disclosing information about the content of posts on their platform all the time.  What they don't want to disclose is information that would show they have massive numbers of children on their platforms because that would be damaging to them.

Taking a step back on the SCA, what Meta has not responded to is -- I think is unrebutted, is that this data is not protected under the SCA because it is not in electronic

storage.  The SCA only protects communications that are in, quote, "electronic storage."

Electronic storage has two -- two ways that data can be in electronic storage.  It can be -- excuse me, Your Honor.  It can be in temporary, intermediate storage incidental to the electronic transmission.  That's if the message is pending delivery to its -- to the recipient.

That's not what these tables are.  These are tables collected in order to provide a source of data for Meta to develop its age estimation algorithms.  It's not -- this is not stored as a copy on its way to the recipients.  I think that's uncontested.

The second way that data can be in electronic storage -- that electronic communications can be in electronic storage is if they are storage -- stored for purposes of backup protection.

These copies are not stored for backup protection.  They are stored for 90 days, and for providing a source of data for Meta's development of its age estimation algorithms.

If someone posts something on Instagram, that's going to stay up on Instagram indefinitely until they delete it, far longer than 90 days.  The copy that's stored for backup of that is not this copy.

These copies are stored not for -- they're not for backup purposes.  They're stored for Meta's development of their age

estimation algorithm.

THE COURT:  Response to that?

MR. CHAPUT:  Certainly.  So starting with the electronic storage issue, plaintiffs are incorrect.  This is uncontested.  The reason it wasn't briefed by Meta is because they raised it for the first time on reply; and with the agreement that the parties have on how these issues are briefed, we haven't had an opportunity to respond.  So I will do so.

THE COURT:  Now is your chance.

MR. CHAPUT:  So the tables at issue with the two-digit numbers are populated from tables within Meta's data warehouse that contain the backup of electronic communications.  So the content at issue is being populated from that backup data.

Additionally, courts construe the phrase "storage or computer processing" in Section 2702 very broadly, extending the protection to a broader class of communications than plaintiffs' proposed very narrow categories.

And there are a couple of cases that I'll point Your Honor to on that point.  There's the *Viacom* case, 253 F.R.D. 256, and that's 264, Note 8, and the *Crispin* case, 717 F.Supp. 2d 965-990.

And there, the Court said that the statute was satisfied even where communications were also maintained, quote, "for display purpose" because that purpose was tied to the storage

services provided.

Returning to the first issue that counsel raised, counsel is mixing apples and oranges, to be frank.  Here, the issue is with disclosure of a particular user engaging in a particular communication.  Right?  What they want is a list of all of the times within the last 90 days where one of these posts appears and who posted it.

What counsel is referring to are Meta's Community Standards Enforcement Reports.  I won't engage in back-and-forth about the purpose of those reports or their veracity.  But those reports are talking about aggregated data.  And aggregated reporting is permitted under the Stored Communications Act because it's not a disclosure of a particular user's communication.

I'm happy to take any questions should Your Honor have.

THE COURT:  Okay.

MR. OLSZEWSKI-JUBELIRER:  If I may respond, Your Honor.

THE COURT:  Very quickly.  You're running out of time.

MR. OLSZEWSKI-JUBELIRER:  Okay.  On a couple of points.

On privacy, Meta is hashing the user IDs.  We are not asking to identify any of these users by account ID, by username.  We just want the numbers of users who are celebrating a birthday under the age of 13.

We even proposed to Meta that they just give us a count of those users, an aggregated cut of this data; and they refused, saying that that would violate the SCA.

If I may, Your Honor, counsel is mixing apples and oranges.  The cases he cited --

THE COURT:  Just so I'm clear, your proposal was that they just give you a number, like just the total number, like a count?

MR. OLSZEWSKI-JUBELIRER:  Yes, Your Honor.  In conferrals, we suggested, okay, Meta doesn't want to tell us that there is a post referring to some hashed user on X date that wishes them a happy 11th birthday.  Why don't you just give us the number of posts wishing anybody an 11th birthday, the number of users who were wished happy 11th birthday five times by five different people?

And they said no, that would also violate the SCA by revealing the contents --

THE COURT:  Stop you there.

MR. OLSZEWSKI-JUBELIRER:  -- of the communications.

THE COURT:  So if it's just a count, why does that violate the SCA?

MR. CHAPUT:  So I don't believe that we've taken the position that that particular query would violate the SCA, Your Honor.

There is still a burden issue, but more fundamentally,

there's a profound relevance issue because there are going to be many, many mishits based on the query that they've proposed, which is just looking for the numbers 10, 11, or 12 within five and "happy" within five of "birthday."  There are myriad ways that a user could post that combination of keywords that wouldn't be someone wishing a user a happy 11th birthday.

So the problem here is in order to do with the data what plaintiffs want to do with it, you have to have the contents of the communications.  And if we have to produce just this aggregated count, Meta has no way of rebutting and showing all of the false positives that exist within the data.

THE COURT:  Why not?  The data is within your control. You could run your own sample internal queries and have your expert say:  Here, I sampled the data, and here is a hundred of them where it wasn't a happy birthday to an 11-year-old.

MR. CHAPUT:  We can't provide those examples, Your Honor, because then we would be divulging the specific contents of specific users' communications.

THE COURT:  Well, he can say:  I ran my own queries and I came up with a hundred that were not happy birthday to an 11-year-old.

MR. CHAPUT:  So, Your Honor, I haven't analyzed this particular issue, and I don't want to freelance on the SCA, which is a complex statute.  I'm not certain if that disclosure to an external expert would be permitted.  So I would need to

look at that issue.

THE COURT:  Well --

MR. CHAPUT:  Right?  Because there's still there a divulgence of the communications.

THE COURT:  But there is a way, in other words, to rebut this if you do your own counter counts -- right? -- and to find the false hits and come up with a final number of false hits.

MR. OLSZEWSKI-JUBELIRER:  If I may respond just on the law.

THE COURT:  No.  You've run out of time.

What I'm going to do, what I'm thinking of doing is I'm going to narrow the request so that it's the exact phrase "happy birthday" -- right? -- with the three, two-digit numbers and require Meta to provide just the counts, not the individual rows or whatever.  Okay?

MR. CHAPUT:  Okay.  Your Honor, I do want to make clear, we're still talking about a huge quantity of data that's in these tables.  They have more than a million gigabytes. It's over a petabyte of data, 3 trillion rows of data.  This is a --

THE COURT:  It's a keyword -- it's a specific keyword phrase search, and it's -- it only goes back how far?

MR. CHAPUT:  It's 90 days, but it is a massive quantity of data just over that --

THE COURT:  Well --

MR. CHAPUT:  -- that 90-day period.

THE COURT:  For this one, your declarations didn't really explain in any detail why -- other than the size of the data to be queried -- right? -- which is slightly different from how burdensome it is to actually come up with a query, process the data and all that.  So I'm overruling your burden objection as to that point because the size of the dataset alone to be queried is not always dispositive of the amount of burden just to run the query through the data.

MR. CHAPUT:  Your Honor, I do want to just very briefly, if you will indulge me, to revisit the relevance point.  The data that plaintiffs will have is not relevant because of the volume of false hits that are going to exist in the data.  It is not actually probative of anything.

THE COURT:  Okay.  That's -- again, you've got ways to -- you're smart folks on your side.  You've got ways to come up with counterarguments as to the relevance of the data.

I think, as phrased, where it's not just "happy" within some number of words but it's actually the phrase "happy birthday" with the two-digit number, I've completely narrowed it in terms of what I think is the more rel- -- an appropriate scope of both proportionality and relevance.  And you can come up with your own internal ways to figure out how many false hits that comes up with and try to rebut the count

that way.  Okay?

MR. CHAPUT:  There is a huge amount of context, Your Honor, that is going to go into that.  For example, it could be a user posting about their child's 11th birthday.  That does not indicate that the 11-year-old is, in fact, on Facebook or Instagram.  It's there is a parent posting about their child.

So the burden on Meta to rebut this is also going to be very significant, and we haven't had an opportunity to brief that.  And I think it is core to the issue because of the very limited relevance, considering the myriad different ways in which the data will not be relevant.

THE COURT:  Well, I mean, until the searches have been run, I don't know how many myriad different ways the data could or couldn't be relevant.  I mean, I understand it's hypothetically possible.  You gave one example of where it's possible.  And it may be plausible.  You may be able to come up with ways to rebut it on the merits of the relevance for purposes of liability down the line.

But for purposes of discovery, I think as I've narrowed it, I think it's within the scope of relevance.

MR. CHAPUT:  Thank you, Your Honor.

THE COURT:  Okay.  All right.  The other thing I'm going to do, again, because of the time frame for the discovery cutoff, is I'm going to -- for each of these, I'm going to

order the parties to work together to come up with a joint proposed order resolving each of these letter briefs as we go through them, to the extent I've ruled from the bench. All right?  Because, presumably, you want something on the docket sooner than I could actually draft 27 different orders. Okay?

MR. CHAPUT:  Understood, Your Honor.

I do just want to put on the record very briefly, I don't think there's any way we'll get that happy birthday data out before the close of fact discovery, considering the volume that we're going to need to query.  As is reflected in the declaration, there's data engineering effort in addition to just a data scientist running a query; and our teams are already working very, very hard to get out a lot of other data that plaintiffs have requested.  So I can make no guarantees with respect to timing.

THE COURT:  So I've seen in, I don't know if this particular briefing, but briefing throughout the stuff coming up for today, that the parties have agreed on reasonable extensions and to do things reasonably after the cutoff, and I assume you'll -- you've put it on the record.  They're aware of it.

I assume you're not going to object if it comes in after the cutoff.

MR. OLSZEWSKI-JUBELIRER:  We're certainly happy to

continue to confer with Meta on this, as we are on other issues in which data is coming in late.

THE COURT: I mean, you're the one asking for the data so if you're going to get it --

MR. OLSZEWSKI-JUBELIRER: Absolutely.

THE COURT: -- after the cutoff, I assume you're not going to complain.

MR. OLSZEWSKI-JUBELIRER: We would not complain that it's produced late and, therefore, has violated the discovery period.

What I will say is, I think we've indicated, depending on how late it comes in, it may impact our ability to analyze that data and comply with other discovery deadlines.

This is data that we had requested last June. We specifically pointed to one of the documents that we cited to --

THE COURT: My only -- my directive: Talk to each other. Come up with a schedule that you all agree on that works, once you've talked to your folks internally, how long you think it's going to take. Keep the dialogue moving. Okay?

MR. CHAPUT: Understood, Your Honor.

MR. OLSZEWSKI-JUBELIRER: Thank you.

THE COURT: But be aware, I'm -- you know, I don't think there's -- there have been attempts to. Nobody's extended any of the fact discovery deadlines and the expert

discovery deadlines.  So it behooves everyone to proceed, you know, with all deliberate speed to get this stuff done. Okay?

MR. CHAPUT:  Understood, Your Honor.

MR. OLSZEWSKI-JUBELIRER:  Thank you.

THE COURT:  All right.  Who wants to talk about Docket 1775, the use of highly confidential documents with former Meta employees?

MS. SIMONSEN:  Good afternoon, Your Honor.  Ashley Simonsen, Covington & Burling, for the Meta defendants.

THE COURT:  Good afternoon.

MR. DRAKE:  Nelson Drake for the plaintiffs.

THE COURT:  Okay.  So, I mean, this was -- I don't remember.  Who was the Snap attorney who was on the deposition with me where a similar issue came up?  Are they in the room?

MS. SIMONSEN:  I don't believe Ms. Degtyareva is here today.

THE COURT:  All right.  So, but you are all aware -- I assume you've read that deposition transcript -- that we had a very similar dispute on the fly during a deposition of a Snap former -- I remember it was a Snap former employee, if I remember it correctly.

So I've read the briefing.  Because of that other issue, I'm familiar with the dispute.  I'm not going to order predisclosure of the documents to Meta by the plaintiffs,

particularly since the plaintiffs object to that.

Now, certainly, it does seem to me that -- okay. I mean, there is some value in holding back the exhibits until the deposition. I understand that from a lawyer's perspective. But if it does help resolve the dispute and if it's a document that, for example, you've already used with other witnesses in other depositions so the existence of the document as an exhibit, as something that's being used in the case -- everybody knows every case has a certain number of hot documents. If it's something everybody's already aware of, maybe it's to your benefit to tell Meta that you're planning on using those already-known exhibits with a particular deponent because then they can tell you whether or not they're going to object or not.

And maybe they are going to, and then you'll do what I think was the procedure we used at the Snap deposition, where you lay the foundation without showing them the document and establish that they know the information in the document or knew it, or whatever the operative language is; and once you've laid that foundation, then you can show them the document and enter it as an exhibit at the deposition.

Now, the issue as to redactions, that came up on the fly at the Snap deposition because the way they were handling exhibits there, they told me, is they were putting exhibits, like, electronic copies of the exhibits up on a screen. At

first, I thought this was a Zoom deposition, but it was in person.

So tell me if I'm wrong, but were they putting the deposition image up on the screen and because they only wanted to ask the witness about a certain portion of it and that was the portion they had laid the foundation for, then they said they can have their graphics person do the pullout and focus on just that portion so that when they're examining the witness about it, that was the only portion they saw?

But I did say at the deposition, that's fine for the witness; but in terms of, you know, attaching the exhibit to the deposition transcript, actually entering it into the deposition record, they didn't have to redact it for that purpose because the witness isn't keeping a copy of it.  Right?

So I just want to make clear, if you can use that procedure where only the portions that are relevant -- presumably, you're not going to ask about irrelevant portions -- of the document up on the screen, or however you're showing them to the witness, that's fine and you should do that.  Right?  Because, I mean, if part of the document is talking about lunch plans or whatever, you're not going to show that to the witness.  Who cares; right?

But I'm not saying you need to redact the document physically when it gets, you know, attached as an exhibit to the deposition -- right? -- because the transcript is going to

show what portions of the exhibit anyway the witness was testifying about.

Is all that clear?

**MS. SIMONSEN:**  I understand, Your Honor.  Ashley Simonsen for the Meta defendants.

My understanding from speaking with Snap's counsel is that they did enter redacted copies of the exhibits.

**THE COURT:**  That's not what I told them to do.

**MS. SIMONSEN:**  And my understanding as well is that the reason that it was displayed the way it was, was so that the witness could not see the other portions.

Now, Meta has no problem with a former employee seeing information that isn't relevant but that is not highly confidential in a deposition at the same time that they're being questioned about something that they've established they have knowledge of that is highly confidential.

I think our concern is just with plaintiffs establishing that a witness had knowledge of maybe one bullet point -- right? -- in a PowerPoint presentation and then showing them and asking them questions about the entire document when other portions of the document contain highly confidential information.

**THE COURT:**  The problem with the -- and I saw that in the briefing.  The problem with the request is, each document is going to be different.  It may be just, like, a

one-paragraph document; and if you lay the foundation that they know the information, that goes to the entire document; whereas other documents could be a thousand pages long and they only know a portion of it.

And I think you should do the thing we did at the Snap deposition of just showing them the portion that you've established the foundation they know that part about, because, presumably -- just to be clear, if you ask a witness whether they know that -- I don't know -- that May 11th, 1992, was a Sunday -- I'm just making that up; right? -- and the date May 11th, 1992, is in the document, that doesn't lay the foundation that you can show the whole document to the witness. I just want to make that clear.  Right?

So, presumably, like they did at the Snap deposition, they laid the foundation the witness knew about the information they wanted to talk about that was in the document.  There has to be a tie between the foundation and the portion of the document to be queried about.  Does that make sense?

**MR. DRAKE:**  Yes, Your Honor.  Nelson Drake on behalf of the plaintiffs.

I think our position is that these documents were produced to us with information that doesn't provide us with a lot of detail about who knows the information contained within them and the scope of what information they know.  Right?  And so we have to do it on the fly.

And, you know, I think -- I think from our perspective -- right? -- is that these documents are not one paragraph. Many of them are, like, presentations and things like that. And so, you know, if we can establish that the witness worked on the project that is being discussed, then we can show them the entire document.

Like, there's no reason for us to say: Well, you worked on this thing and then you would have been involved in the meetings involving this thing and you would have been in presentations involving this thing and that means you would have presumably had access to, like, the documents -- right? -- that discuss whatever this thing is.

And so, you know, like, I understand that there may be documents -- right? -- where you can only establish foundation with respect to a single bullet or a single slide.

**THE COURT:** Slow down.

**MR. DRAKE:** Sorry.

But it goes a little bit beyond that. And I think what we are trying to avoid is being in a position where we think we are entitled to discuss the entire document, having a dispute with Meta live, and then calling Your Honor -- right? -- six or seven times during a deposition to settle the same issue.

**THE COURT:** Well, (a) I hope that's never going to happen; (b) if you look at the transcript of the foundational questions and record laid by the attorney at the Snap

deposition, I ruled that that was sufficient to show that witness that portion of the document, because he also showed me that portion of the document. And they did ask questions beyond: Did you work on this project? They went a little deeper to lay the foundation. So I think I gave guidance there. That's a pretty good example of that was sufficient foundation to ask about that portion of that document.

And so I'm going to leave it -- I mean, again, I'm not going to tell you how to take your depositions; but you're going to have to spend a couple of minutes laying the foundation. If it's really that important, you're going to want to anyway.

And so I think it's going to be something where (a) it's going to depend on the document; it's going to depend on the witness; and it's going to depend on how the attorney taking the deposition wants to approach the foundational part of it.

And on Meta's part, I assume Meta's going to be reasonable in arguing -- in taking the position as to whether foundation has been laid or not.

**MS. SIMONSEN:** Absolutely, as we have been in prior depositions.

**THE COURT:** So, again, the best guidance I can give you is look to what I did in the Snap deposition and what -- how they showed me what foundation they laid. And then that's, you know, not a -- at least an exemplar -- I'm not going to say

it's the best way, but at least an exemplar of someone who did lay a proper foundation.  Okay?

MR. DRAKE:  Okay.

MS. SIMONSEN:  Thank you, Your Honor.

THE COURT:  Okay.  So it's on you two to come up with a joint proposed order on this letter brief.  Okay?

MS. SIMONSEN:  Will do.

MR. DRAKE:  Okay.  Thank you.

THE COURT:  Who -- the next one is going to be -- let's do Docket 1770, Meta's 30(b)(6) notice amended to the COPPA states.

MR. YEUNG:  Christopher Yeung, Covington, for Meta.

THE COURT:  All right.  So, as -- okay.  So I think, actually, the easiest way to go through this, do you have the depo notice in front of you?

MR. YEUNG:  I do.

THE COURT:  All right.  So I've read the briefing, and I'm going to kind of tackle the issues topic by topic because that appears to be kind of the way people have briefed it.

So for Topic Number 1, policies, procedures, and practices, blah-blah-blah, this phrase "including without limitation to employees of the state and its agencies," I'm going to strike that.  Okay?

I think we made very clear at the last hearing that when Meta is taking a 30(b)(6) of the states, they're taking them as

depositions of the state as an entity and not drilling down to each individual employee and each individual agency. In fact, your co-counsel, I think, told me if you wanted to take depositions of the agencies, you would. All right? So you're taking the deposition of the state, so it does not include without limitation employees and agencies. So I think that addresses a lot of your overbreadth problems with Topic 1.

And the -- and I forget. Is "social media platforms," as a defined term, limited to the defendants in this case? Because you changed it in Topic 2. So I just want to make sure that I understand that it's limited to the defendants in this case.

**MS. KORY:** Alex Corey, Washington State Attorney General's Office.

It is not, Your Honor.

And if I may, I think Topic 1 really is not just overbroad here. I think we're looking at some pretty serious relevance issues. And I know Your Honor is trying to go through topic by topic here, but the threshold issue on all of these topics is really relevance.

And what we're looking at is the COPPA statute only. This is not a consumer protection case that has overarching issues. We're looking at COPPA and the affirmative defenses here. Meta has not stated any particular affirmative defense that relates to COPPA, and that's the problem here.

COPPA is a very simple statute, and there's nothing in the COPPA statute or case law about what the states do.  The states' policies about social media have nothing -- no bearing on COPPA.  The only thing that matters for a COPPA violation is whether Meta is subject to COPPA and whether Meta violated COPPA.  What the states' policies are have no bearing on whether Meta violated COPPA.

THE COURT:  In the interest of time, I've read all -- I understand the argument from the briefing.  I'm sure Mr. Yeung will correct me.

As I understand, Meta's argued that this is relevant because the states got a ruling from Judge Gonzalez Rogers that third-party uses of the platforms can be relevant as to whether or not the platforms are directed to children or not.  Right?

MR. YEUNG:  Correct.  And they're taking discovery of third-party entities about targeted audiences.

THE COURT:  Right.  And their argument that they briefed -- right? -- in response to your relevance argument is that if the states -- I mean, it may or may not happen; but they want to take the discovery to find out if the states have a practice and policy officially of only using Facebook to send communications to adults -- right? -- only.

And there's some -- I'm just hypothetically speaking.  I don't know that to be true.  I'm just hypothetic.  But I assume in the best case, that's what Meta's looking for, is something

that shows that the states themselves, as a third-party user, ostensibly, for these purposes, of the platform, that you do only direct it at adults and not to children, which would tend to undercut the argument that they are directed to children. That's their relevance argument.

MS. KORY:  I mean, even if that's true or not true, I don't understand how that undercuts the argument that Meta would be child directed or not.  The states are just, you know, a collection of many millions of users on the platform. Whether we have, you know, some sort of policy that says that there may or may not be posts or users, you know, using the platforms in a particular way does not render Meta child directed or not.

THE COURT:  But, again, I mean, he just said it. Right?  I know he's going to say it again.

The states are -- part of the way you're trying to establish that they're directed to children is by taking individual discovery from individual third-party users of the platform to see whether their content is directed to children or not.

And so Meta's rebuttal -- this is all in the briefing. The rebuttal to all that is:  Well, if the state plaintiffs are allowed to try to establish their case by showing that a few individual exemplary users are directed to children, then they should be able to take discovery from the plaintiffs -- in this

case, the states -- and other third parties, I assume, to show that their content is not directed to children, and then get into a fight over the impact of all that.

I mean, that's -- as I understand it -- tell me if I'm wrong.  As I understand, that's generally your argument.

MR. YEUNG:  That's right.

THE COURT:  So, I mean, within the scope of discovery relevance -- right?  I'm not saying they're right.  But within the scope of discovery relevance, especially because Judge Gonzalez Rogers ruled on the motion to dismiss in your favor, that you could use third-party content as a way to show whether or not it's directed to children, I don't see how I foreclose them from this discovery.

MS. KORY:  The purpose of that ruling and the purpose of that particular rule is to demonstrate that the third-party content shows that Meta is child directed.  I mean, the fact that the states, you know, post content that may be adult directed does not render Meta not child directed.

THE COURT:  But that's the ultimate question, isn't it?  Essentially, you're -- you, the state COPPA plaintiffs, are going to put in a bunch of evidence arguing just that.  Right?  Look at all these content providers on Meta's platform that are directed to children.  And there's a lot of content directed to children.  We know all the statutory factors.  Right?  And one of the factors is the intended audience.

Right?  And you're going to say, here, for these exemplary content providers, the intended audience is children.

I mean, I'm not saying they're right, but they're going to -- they're telling me they're going to argue that:  Well, okay, but the states are cherry-picking, and here are -- you know, here's a parade of a million other users that are not.  And so overall, when you look at the platform overall, we are not directed to children because you've got to look at the content overall.

I don't know the answer ultimately to the -- who's going to win or lose on that fight.  But in terms of the discovery relevance, I don't -- I think -- I guess I'm not persuaded that it's not within the scope of relevance for discovery.

**MS. KORY:**  Well, I mean, if you look at the actual ruling, it specifically lays out the types of empirical evidence that can be used to determine whether or not a website is directed or targeted --

**THE COURT:**  I read the ruling --

**MS. KORY:**  -- to children.

**THE COURT:**  -- in advance of this.

**MS. KORY:**  I mean, it specifically says "subject matter, visual content, the use of animated characters."  It's very specifically laid out there.  And what is not included in there is policies, procedures, and practices.

So it specifically lays out very -- you know, it's

outlined.  We have it in our brief.  It's also outlined in Judge Gonzalez Rogers' ruling very specifically, the specific items.  I'm happy to direct you to the page.  It's page 4 of our brief.  I can quickly pull up Judge Gonzalez Rogers' ruling.

THE COURT:  I've got it in front of me.  Like I said, I prepared for this.  I know the argument.  Okay?

The problem is she quoted the regulation.  It includes evidence regarding the intended audience.  Right?  And, again, if you've got documents that the intended audience is adults, Meta has argued to me that that would be relevant to their rebuttal to your liability claim.

MS. KORY:  Correct.  But it shows that there is a list of what that evidence is, and the list includes subject matter, visual content, use of animated --

THE COURT:  I've got it in front -- you don't have to repeat it.  I've got it in front of me.

MS. KORY:  Right.

THE COURT:  I see it all.  But, again, part of that also is evidence regarding the intended audience.  So the intended audience -- there has to be -- I mean, if there's a document out there saying "Our intended audience is adults," how do I stop them from taking that discovery?  Again, I'm not saying they're right, but they want to make this argument.

MS. KORY:  I think secondarily to that issue is, it is

not proportional to what they're looking for.  I think it's -- there's no dispute that there is adult-related content on Meta.  Nobody's suggesting that the entirety of Meta's platforms are child directed.  I don't think that anybody is suggesting that.  We haven't claimed that at all.

So the value of Meta proving that there is adult-focused content on the platform is not proportional to the amount of burden it would be required to have all of the states produce, you know, policies, procedures, and practices from --

THE COURT:  Wait.  This is a deposition.  You're not producing any documents.  Right?

MS. KORY:  The deposition notice does have a request for documents --

THE COURT:  Presumably, that was --

MS. KORY:  -- in it.

THE COURT:  Okay.  So, again, we've got other limits on discovery; right?

What I heard here -- right? -- is that you don't want to bring the witness.  There's nothing in the briefing about the documents being overbroad and burdensome.  That's a separate -- presumably, you should be meeting and conferring if that really is a concern.

But, again, if I'm limiting it just to the state as an entity and it isn't drilling down to each individual employee and each individual agency, you're going to have to come up

with a witness who can say -- maybe there isn't one.  Maybe there isn't a policy, and that's the answer.  Right?

**MS. KORY:**  Well, the problem, Your Honor, is that the state as an entity does not have one individual policy or procedure or practice.

**THE COURT:**  Then maybe that's the answer.  Maybe that's what the witness says.  I don't know.  Each state is going to be different, and you're going to have to prepare your witness to say what the state's position is and what the state does on these issues.  I will --

**MS. KORY:**  I mean --

**THE COURT:**  Let me just finish this.

Can you short circuit at least this topic, some of these, by RFAs?  In other words, if they're willing to concede certain things -- right? -- can't you just avoid the deposition or parts of the deposition entirely by serving some RFAs, saying just admit that you've got policies or some -- if you already know of some, for example, you're preparing for the deposition, why don't you admit that this state has a practice of whatever or a policy of whatever.

**MR. YEUNG:**  So during the conferral process --
Christopher Yeung from Covington for Meta.

We did float the possibility, during the conferral process, of a stipulation, a set of stipulated facts, because I think we want to know what they're agreeing to instead of

serving an RFA only to get a denial on whatever basis.

The state's response was:  No, we don't want to do that because we don't think it's relevant.

So the core issue here, their objection is primarily based on relevance.

THE COURT:  Okay.

MR. YEUNG:  And I think Your Honor has already ruled on that.

THE COURT:  I've overruled your relevance objection.

So in light of that, you either go forward with the deposition, or if you want to come up with an alternative way to narrow the dispute down by substituting one or more of these topics with RFAs or a set of stipulated facts, you can do that, and you avoid the burden of having to prepare a witness too.

MS. KORY:  Understood.

THE COURT:  Okay.  I will say, I'm going to strike Topic Number 2 for overbreadth because the state's use of all these platforms, I mean, (a) that's within -- that data is within the custody and control of each of the platforms.  You know who your state users are, and you can do your own searches of your own posts to figure out how they use each of these platforms.  So that's too overbroad and it's not proportional.

MR. YEUNG:  May I respond to that?  Because, yes, we have the counts, but intended audience information may exist only with the states.

I'll give you an example, a very tangible example from Washington.  Snorkels the Seal is a mascot for the State -- Washington State Board of Education.  It was named Snorkels by a fourth grader after an elementary school naming contest. It's a seal that they print out pictures, kids can color.  The seal, they post on the website.

Snorkels also has an Instagram account.  The Instagram account, based on what we can see from the posts, seem to be directed at adults.  But I want to be able to ask the state about that.  Is that the intent?  Is that how they want to use it?  Because the states have made claims that when you use a cartoon character on an Instagram platform, that makes it directed at children.  What's Snorkels the Seal?  A cartoon that the state is using directed at adults.

THE COURT:  So if you want to ask them about what their intent is, that goes to their policy of use of -- of the use.  That's Topic 1.  That's not -- because Topic 2 is simply their use, like, with no limitations.  That's overbroad.  The answer is Topic 2, no.  If you can figure out a way to get close to or at the information you want with some of the other topics that I'm not striking, I'm sure you're going to figure out ways to do that.

MR. YEUNG:  As long as I can still ask about --

THE COURT:  I'm not going to prejudge the questions because we're not at the deposition.  Right?  You ask the

questions.  They'll make objections.  Right?  And hopefully, you'll be able to work out the objections without needing to call me.  Okay?

**MR. YEUNG:**  Okay.

**THE COURT:**  All right.  But don't try to use one topic to backdoor a different topic that I'm striking.  Okay?  Because that's not okay.

For Topic Number 3, again, I'm going to strike "including without limitation any state agency."  I thought I made very clear at the last hearing that you're taking depositions of the states, and if you want to take depositions of the agencies, you take depositions of the agencies.

**MS. KORY:**  Your Honor, if I may --

**THE COURT:**  Sure.

**MS. KORY:**  -- on Topic 3, again, I think this has a significant issue with relevance.

Anything that the state does to encourage the use of social media has no bearing on the relevance of the COPPA claims or any potential affirmative defenses here.  There's nothing that the states could do to change whether Meta is subject to COPPA or whether Meta violated COPPA, no program or initiative or action that the states could do here.

**THE COURT:**  This is the same relevance argument.  They're going to -- I mean, I don't want to put words in Mr. Yeung's mouth, but I assume he's going to argue that this

goes to intended audience.

MR. YEUNG:  That's right.  That's what we put in the brief.

THE COURT:  Again, we briefed it.  All right?  And so it's the same relevance objection.  I'm going to overrule it.  Okay.

But I am going to limit social media platforms to just the defendants in this case.  It's not any social media platform.  Okay?  And that goes for all these.

Number 4.

MS. KORY:  Your Honor, if I may, if the topics are specifically going to intended audience, is it possible to limit the topics specifically to speak to that so that the topic doesn't go outside the bounds of intended audience?

THE COURT:  Well, they've argued that the topic, as drafted, is relevant to intended audience.  They haven't argued that it's relevant to anything else.

Right?

MR. YEUNG:  Right.  I mean, obviously, we need to -- I think we need to set up the context, and it's not just what is the intended audience.  One question, obviously.  But, yes, that is the purpose of the questioning, to ascertain --

THE COURT:  Again, I'm not going to prejudge the way they get at the questions because I'm not at a deposition and they're going to phrase them.  But you can raise objections,

and if you think they stray beyond what they've identified as the purpose of each topic, then you can make those objections. Hopefully, you'll work them out with each other without needing to call me.

All right.  Number 4, again, with the limitation of social media platforms to just the ones at issue in this MDL, yeah, that one is fine.

Again, I assume you're going to make your relevance objection to Number 4 as well.

**MS. KORY:**  Your Honor, it's very difficult for me to understand how anything here is relevant to a COPPA claim or an affirmative defense.  And frankly, Meta still has not told us which affirmative defense they are raising.  Even today, in the briefing, I don't understand which affirmative defense relates to COPPA.  They have not told us.  They cannot tell us, because none apply.

Can they tell us today?  That's a question I have right now.

**THE COURT:**  Tell them what this defense goes -- what defense this all goes to.

**MR. YEUNG:**  It's to the liability.  Under COPPA, one of the ways that the states intend to prove that COPPA even applies is that -- is that Instagram and Facebook are directed to children.  This is what this is about.  It's a -- it is about the defense to liability.

I don't know why they're so hung up on affirmative defenses. There may also be ways that we can use this to support our affirmative defenses, but it is in defense of the primary theory of lia- -- the claim that they have.

MS. KORY: So my understanding is that there are no affirmative defenses being asserted against COPPA.

MR. YEUNG: That's not correct either. But the discovery we're talking about here at issue in connection with the "directed to children" element, that is something that you have -- that the states have to show and that we can defend against.

I don't know why they're so hung up on affirmative defenses with respect to the "directed at children" analysis.

THE COURT: Defendants rebut the plaintiffs' claim. I mean, and so challenging an element of the plaintiffs' claim is not an affirmative defense; it's rebutting your prima facie case, whatever case you try to put in.

MS. KORY: Understood, Your Honor. I'm just trying to get at -- there are several statements in the letter briefing that get at affirmative defense-type issues, unclean hands-type issues, and Meta simply has not stated which affirmative defenses they are getting at, and I'm trying to understand that specifically.

MR. YEUNG: I think they're making a reference to the things that we said about equitable relief. They're the ones

also seeking equitable relief in connection with COPPA.  We disagree that they're entitled to what they're seeking.

But putting that aside, if you're going to be seeking equitable relief, there's certainly a balancing of the equities that occurs, just as a natural course of discussing what equitable relief is.

So putting aside any other arguments that we may have as to their entitlement to the relief that they seek, if it's equitable, it would be considered.

**THE COURT:**  That's their contention.  Does that clarify it for you?

**MS. KORY:**  Clear as mud, sir.

**THE COURT:**  So Number 4 is okay with that limitation on social media platforms.

Number 5, I'm going to strike that because this is information -- it's asking for communications and collaboration with the social media platforms.  That's within the -- if you're asking for communications with the defendants, then the defendants have those communications.  So you don't need a witness to tell you what you already have in your own possession, custody, and control.  So 5 is out.

6, again, if we limit social media platforms to just the defendants at issue, then 6 is okay.

**MR. YEUNG:**  Your Honor, can I just go back to 5 for a second?

Even if we have the information and it's limited -- assuming -- you've limited social media platforms to defendants.  I get that.  So we're talking about information that we may already have.

I still think we need an opportunity to ask the states about that information.  Otherwise, we can't question them about information, the collaborations that they may have had with us and what their intentions or purposes in things might be.

THE COURT:  Well, as drafted, this is still overbroad.  So, no.  I mean, you may be able to get at some of that through either other discovery you've taken or maybe some rogs or something.  But as drafted, 5 is too broad.  So...

6, it's not time limit -- it is, during the relevant period.  Okay.  So, again, limiting 6 to the social media platforms at issue in this case, 6 is okay.

10 --

MS. KORY:  Your Honor, if I may, on 6, I think a lot of these really present a lot of pretty significant burden issues as well.  You know, I mean, the state's communication or collaboration with any third party could implicate a significant number of conversations.  The state -- you know, I mean, we've discussed this many times, who the state is.

In Washington State, that's over 70,000 employees.  As Meta has defined it, that includes the legislature.  You know,

legislators have many conversations with their constituents.

THE COURT:  I've made clear, their definition of state is not controlling here.  I've said you're only required to provide a witness to talk about the state as an entity.  It doesn't go down to individual people.  Okay?

MS. KORY:  Even so, I mean, any communication that the state has had, this is going to be incredibly difficult to figure out any type of conversation or collaboration with any third party --

THE COURT:  Okay.  That's fair.

MS. KORY:  -- over the last decade.

THE COURT:  I'm going to strike "communications."  So just collaboration with any third party, because collaboration presumably is more than just a random email or correspondence. There's some actual -- the word "labor" is in collaboration. There's some work going on between the state and some third party.  Okay?

MS. KORY:  Thank you, Your Honor.

I would also request that the potential program be struck there too.  I think that that's something that's actually difficult to try to figure out, I think, especially going back 12 years.  It's -- you know, finding an actual program that is 12 years old that may have records, a memory.  But a potential program?  I don't even know where to begin to find something like that.

**THE COURT:** Well, I mean, that's -- no, because, again, I don't -- again, it's collaboration with a third party, and so...

**MR. YEUNG:** If the states' --

**THE COURT:** Yeah.

**MR. YEUNG:** If the states' concern is some sort of burden issue, we've been very -- we've said multiple times, if discussing ways to narrow or alleviate the burden issues is something that will ultimately result in them putting up a witness, the COPPA states putting up the witness on topics like this, and notwithstanding any relevance objection they may have, whatever, that was the context of it, we were more than happy to have that discussion. But so --

**THE COURT:** Let me ask you. Do you object to striking "potential" there?

**MR. YEUNG:** I think the -- I don't think we can give that up entirely, but what I think we can do is try and make an effort to identify for the states things that we might be interested in, examples. I'll give you -- I'll have to go back to my team. If we have evidence that the states tried to collaborate with a third party on some type of program that was directed for under-13 users on Instagram and ultimately did not go forward with it, if one of the reasons is because Instagram is not directed at children, I think we should be able to ask for it, even through --

THE COURT:  I'm going to modify that to "for actual or identified potential program" --

MS. KORY:  Understood.

THE COURT:  -- based on your representation, Mr. Yeung.

Okay?

MR. YEUNG:  Okay.

THE COURT:  All right.  Number 10, I'm going to strike "public."  I mean, I'm sorry.  I'm going to strike "non-public."  So I take the state's point that that would cover random conversations in a hallway or in a conference room between two people.

But public meetings, presumably the state, as a state, must hold, sometimes, a public meeting, a public hearing of some kind on topics.  Maybe you don't; maybe you don't hold any on social media.  But, again, limiting it to the social media platforms in this case, it should be non-burdensome to identify whether any such public meetings occurred.  Okay?

MS. KORY:  And just to clarify, social media platforms relevant to this case, does that mean relevant to the state's case, Meta and -- just Meta, or to all of the social media platforms involved in the MDL?

THE COURT:  The COPPA claims are only against Meta?

MS. KORY:  Correct.

THE COURT:  Well, okay.  So that includes -- I mean,

it's plural because it's Facebook and Instagram; right?  Is there a third one?  There's not a third one involved, is there?

MR. YEUNG:  My understanding -- Ms. Kory can correct me if I'm wrong -- Facebook and Instagram are the two platforms at issue for COPPA.

MS. KORY:  Agreed.

THE COURT:  Okay.  So those are the social media platforms at issue in this case --

MS. KORY:  Thank you.

THE COURT:  -- with regard to the COPPA claims.

All right.  Number 13, Mr. Yeung, why is their investment in any of the defendants relevant?

MR. YEUNG:  I think there are a couple of reasons.  I mean, one is the -- one is this notion of equitable relief that they seek.  And, again, we don't believe that they're entitled to it.  But to the extent that the states have made investments, promoted, via financial incentives, some of the -- basic- -- the platforms at issue here and the conduct that they claim happened here, that would bear on the -- sort of their entitlement to the equities.

It also -- there's also a temporal element here too.  The states filed suit alleging these things happened back in October of '23.  They continued to provide financial incentives, continued to make investments on the same level as they have been to Instagram, to Facebook.  That seemed to -- it

seems to undermine their claim that these were actual violations, that these were actually things that happened.

**THE COURT:** Response?

**MS. KORY:** I struggle to find any reason how equitable relief that the states would seek for a violation of COPPA which could be, you know, "Stop violating COPPA" would be related in any way to the states' investment or revenues related to a social media platform.

I think this would be incredibly difficult to even try to figure out. I mean, maybe states have, you know, state pension plans that have investments in broad ranges of stocks and potentially there's Meta stock in there. I don't know. That would require significant burden to even wade through that. I think the relevance is so impossible to even parse through here to figure out what that would even be related to. The equitable relief thing is -- I don't think has any basis whatsoever.

**MR. YEUNG:** So can I respond briefly to that?

When we asked the states what are they seeking under COPPA, one of the things they asked for was disgorgement. We don't think they're entitled to disgorgement. Just to be very clear, that's what they're claiming. That is more than just "Stop violating COPPA." And there's certainly a balancing that may have to occur if -- and I want to make sure the "if" is clear -- if there's any type of disgorgement analysis that

needs to be taken because, again, we don't think they're entitled to it, number one.

Second point, Washington's pension plan files publicly on the SEC website its holdings, including Meta, and I think the last recorded holding was something like 718 million shares or dollars.  I'll have to go back and check.  I haven't checked.  But this is information they can easily ascertain, some of which is publicly filed.  So we want to be able to ask about it.

THE COURT:  Well, that goes to a question I had.  I mean, I think Hawaii put in some declarations going to the burden of this topic in particular.  Can't you just get this information, especially about investments, from public filings and from document production?

MR. YEUNG:  Some, yes; some, no.  We haven't been able to find Hawaii's.  We have been able to find Washington's.

If the COPPA states are going to produce the documents to us, then -- maybe I'll backtrack.  When we discussed Topic 1, which is the policies, one of the things that we offered to the states was:  If you're going to produce -- if you produce to us the operative policies, we'll focus on those.  Right?

Ms. Kory wrote back to me and said:  No, we're not agreeing to anything on Topic 1.

That's a direct quote from the email she sent me 16 days ago -- I'm sorry -- six days ago, March 14th.

If they're going to produce to us the documents, I think that would facilitate both their educational -- what they need to do in order to educate their witness to testify and what we may need them to do with respect to the testimony.  So I do think that there is something here that, yes, we can talk about, that we can -- we can come to an agreement on if we can confer about it; but that requires some commitment that they're actually going to produce this material to us and not have us, you know, try and find it all.

**THE COURT:**  So correct me if I'm wrong.  Typically, one of the biggest state actor investors in any state is the employee pension fund, typically; right?

**MR. YEUNG:**  That's right.

**THE COURT:**  Can we -- if we -- if you're able to reach agreement that each of the COPPA states' employee pension funds produces in discovery the equivalent of a public filing that shows their holdings in Meta, can we obviate this topic entirely?

**MR. YEUNG:**  We might be able to, yes.  I mean, I'm open to having that discussion if she is, if the COPPA states are.

**MS. KORY:**  I'm happy to take that discussion back to the rest of the states.

**MR. YEUNG:**  And we may need to have obvious- -- you know, some discussion about admis- -- you know, sort of the

verification, authenticity, things like that too.  But I'm open to the idea of narrowing this one with, you know --

THE COURT:  I am concerned about the burden of trying to find every single possible investment by every single little agency or group within a state, but if you limit it -- because to make the point you want to make, if you limit it to the biggest investment holding entity of each state, like the employee pension fund, and you just get the documents that show the holdings, to me, you can obviate this topic entirely.

So I'm going to strike this one tentatively with the assumption that you're going to work out a deal to get the information through alternate means, so a voluntary production of documents.  Okay?

MS. KORY:  Understood.

THE COURT:  All right.

MS. KORY:  Thank you, Your Honor.

THE COURT:  But that's without prejudice to coming back, because if you refuse to produce the documents -- if the states, not you.  But if the states refuse to produce the documents, I may reconsider this.  Okay?

MS. KORY:  Understood.  Thank you, Your Honor.

MR. YEUNG:  Can I also -- there's a -- it's not just investments, though.  This is any other -- there are other financial benefits and things likes tax incentives, tax credits, things that -- other financial incentives that the

states may provide.

THE COURT:  Tax incentives and tax benefits, those are public.  You should be able to get those.

MR. YEUNG:  Maybe.  I don't know that we have all of them.  I don't know that they are -- that each of the grants have been provided to us during the course of discovery.  We've received some of them.

THE COURT:  Two things.  If they're public -- and you have to talk to each state whether the state -- whether it's the Franchise Tax Board, whatever the local entity is -- has published all its -- made publicly available all its tax grants and tax credits related to social media companies, then point them to it.  Right?  And that should obviate it.  And if they're in some way not publicized, produce them and you can avoid this topic as well.

MS. KORY:  Understood.

THE COURT:  All right.  Okay?  All right.  So that's 13.

And then is that it?  Wait.  Is there any more?  Oh, 25.

We're running out of time before the next break, so I'm going to do these real quickly.

I think 25 is the same thing -- no.  25, the answer is no.  I don't understand why you need the financial arrangements for this litigation between the states.  To me, that's not -- it doesn't go to liability.

MR. YEUNG: Are they seeking attorney's fees and costs from us? Because if they are, I think that's really the -- we need to understand what the financial arrangements are if that's part of the relief that they're seeking from us.

THE COURT: Again, typically, people fight about attorney's fees and things after the case is all done. And you can always make a request to take limited discovery at that point. To do it now, I think, is premature.

MR. YEUNG: So this would be without prejudice to raising it later?

THE COURT: Yes.

Okay. And then the last one is 31. This one needs to be time limited. It wasn't on its face. So limited to the relevant time period. And limit social media platforms to the ones we talked about at issue for the COPPA claims. And then it's good to go -- okay? -- with the understanding I've made sure the definition of "state" is as I've said it, not as they've tried to define it too. Okay?

MS. KORY: Understood.

THE COURT: With that, I'm told we should take a break.

And remember, joint proposed order to resolve so I can put this on the docket. Okay?

MS. KORY: Thank you, Your Honor.

MR. YEUNG: Thank you.

THE COURTROOM DEPUTY:  Please come back at 2:45.

(Recess taken at 2:35 p.m.)

(Proceedings resumed at 2:52 p.m.)

THE COURT:  Okay.  Back on the record.

Who wants to talk about Docket Number 1781, the very late-filed joint letter brief on plaintiffs' intent to depose three former Meta employees?

MS. HAZAM:  Good afternoon, Your Honor.  Lexi Hazam for plaintiffs.

THE COURT:  Good afternoon.

MR. CHAPUT:  Good afternoon again, Your Honor.  Isaac Chaput, Covington & Burling, for the Meta defendants.

THE COURT:  Took me a while to figure out from the briefing.  The depositions are going forward because state Attorney Generals who are not part of the MDL are going to take the depositions anyway?  Is that what you meant by "the depositions are going forward anyway"?

MS. HAZAM:  That is, in fact, the case, Your Honor.

In other words, non-MDL state AGs have subpoenaed these witnesses for deposition.  The depositions would proceed in accordance with those subpoenas, assuming that the subpoenas are enforceable, witnesses are willing, et cetera.

Those non-MDL AGs are not subject to any of the provisions of our deposition protocol or our discovery schedule, although we believe there's good cause to extend that as needed here.

**THE COURT:**  If the depositions are going forward anyway, why object?

**MR. CHAPUT:**  So a couple of points, Your Honor.

First, whether the depositions are actually going to proceed is not yet certain.  As far as we know, the plaintiffs have not properly served Sarah Wynn-Williams.  It's unclear if they have properly served Brian Boland.

And Mr. Simons has apparently said if the deposition can't go forward on April 1st, it can't go forward at all.  So that timing is very unclear.  At least for the Tennessee Attorney General, they are under an obligation to schedule depositions at a mutually agreeable time.

Additionally, though, plaintiffs' position on this really obscures the facts.  The strategy here is being driven by these MDL plaintiffs, not the Attorneys General in the other cases.  The MDL plaintiffs are the ones who first notified us they wanted to take these depositions.  They are the ones who prenegotiated --

**THE COURT:**  That's all in the briefing.  That's all in the briefing.  I get all that.  All right?

But as a practical matter, if the depositions are going forward anyway, how do you -- I mean, really, as a practical matter, why object?

**MR. CHAPUT:**  So a couple of reasons, Your Honor.

First, plaintiffs here haven't shown good cause that they

should be entitled to take these specific depositions out of time, and so it's really a matter of orderly process.  They had years to identify these witnesses.  They have been vocal and public about their position on Meta for years, and plaintiffs just didn't identify them until very late in the game.

And we've scheduled a limited number of other depositions that are going to happen after the cutoff already.  We shouldn't be adding more at that late date when Meta, like all the other parties, should be able to instead turn its attention quickly to the next phases of this case, which are rapidly coming upon us:  bellwether selection, expert discovery.  We shouldn't be required to absorb the prejudice of splitting our attention between all of these multiple different events.

**THE COURT:**  All right.  Is the purpose of Ms. Wynn-Williams' deposition solely focused on her book that just came out?

**MS. HAZAM:**  It is solely focused on the materials in her book.  She is not a custodian.  One of the reasons these depositions do not pose any significant burden to Meta is that they are not custodians for whom any large number of documents have been produced.

Meta also does not represent them, so it does not have to spend the time preparing them.

There are some documents that mention Ms. Wynn-Williams in our database.  We'd prefer not to be precluded from using them.

But the focus and the impetus is her book, which was only published just over a week ago.

THE COURT:  All right.  So the statements -- I want to make a hundred percent sure I'm clear on the facts on the record.

The statements in her book, especially the chapter that plaintiffs have highlighted, I just want to be clear.  Has she ever made those allegations in any kind of article, publication, speech, public forum in any way previously?

MS. HAZAM:  Not to our knowledge.  And the articles cited in Meta's brief do not mention her at all.

MR. CHAPUT:  The articles themselves, however, Your Honor, were published in 2017.  Plaintiffs have had ample opportunity to take discovery about the topics of those articles, and they, apparently, just didn't do anything until they read six pages in Ms. Wynn-Williams' book that came out a couple of weeks ago.  And now they've decided that this is a critical issue for discovery in the case.

The facts just simply can't be reconciled with one another.  If they cared about that event, they have had a year to take discovery on it and haven't done so.

MS. HAZAM:  Your Honor?

THE COURT:  You could have taken the deposition of the authors of those previous articles; right?

MS. HAZAM:  They are reporters.  Some of them are in

Australia.  So I certainly don't think that our choice should be between taking the depositions of third parties, a number of whom are located abroad, without knowing who at Meta was involved, and being able to take the deposition of this witness whose book was just published if she can be served and is willing to be deposed in a reasonable time.  That is not our burden to meet.

So, Your Honor, we are willing to provide the 30 days' notice for this deposition, even though we don't necessarily think it should be required for the parties to have adequate time to prepare.  It is Meta that has declined that invitation, despite the fact that both sides are conducting some discrete discovery, including depositions, after the cutoff.

**THE COURT:**  Okay.

**MS. HAZAM:**  Defendants have sought to do so also.

**THE COURT:**  I get that.  This was all briefed.

Okay.  So is Ms. Wynn-Williams represented by counsel? Has she objected to the subpoena, or has she made clear she's going to sit for the deposition and she's going to accept the subpoena?

**MS. HAZAM:**  No.  We have connected outreach.  We have not yet identified her counsel.

If we can't, we are not seeking letters rogatory from the Court to try to enforce this subpoena if she's located abroad, as Meta says.  So this is a matter of whether we can

make contact and she is willing to sit for the deposition.

The other two have been contacted.

THE COURT:  All right.  So if she is unwilling to sit for the deposition or if she's going to object to the subpoena or insist on Hague Convention or international discovery procedures, it's too late for international discovery procedures.  I just issued a ruling in a different case where somebody tried to ask for letters rogatory way too late in the game.  So --

MS. HAZAM:  Understood.  We agree.

THE COURT:  -- if she, or through her counsel, raises Hague convention or letters rogatory, some kind of international discovery procedure in order for her to sit for the deposition properly, then the deposition will not go forward.

MS. HAZAM:  Understood, Your Honor.

THE COURT:  If she voluntarily appears -- I mean, I understand Meta's position.  Technically, she's a third party. So unless Meta's got a right or privilege on her -- on the information in her testimony, technically, Meta doesn't have standing to object to the subpoena.  I understand you're relying on the other orders on scheduling here.

But I think, given that her book just came out, I think -- as to Ms. Williams, I think there has been a sufficient basis, assuming she agrees and she agrees to sit.

And I'm going to leave it up to you to work out scheduling on a cooperative basis the way you have been -- right? -- and -- but particularly as to her, because she is a third party.  So in third-party situations, their scheduling is usually more important than the parties' convenience.  Okay?

MR. CHAPUT:  Your Honor, may I ask one question?

THE COURT:  Yes.

MR. CHAPUT:  Since the motivation behind the Court's ruling is the fact that the MDL parties are essentially tagging along, would it be appropriate to rule that either Tennessee or Arkansas or Massachusetts needs to be the primary questioner at the deposition?  And to the extent the MDL parties have supplemental questions, they can ask them at the end.  But if the idea is, well, this is going to happen anyway, then it should be those parties who are really driving the bus, as it were.

THE COURT:  Any objection to that?

MS. HAZAM:  Yes, Your Honor.  I don't think that's the premise.  It is an argument that means that Meta faces very little burden here.  We have not determined who would take the lead if this deposition were to occur.  I don't think the MDL's hands should be bound when we still have time, plenty of time left on our limits because we've taken down other depositions, including apex depositions for which preparation is much more intense.

**THE COURT:** All right. So I'm not going to order it, but I'm going to suggest that you try to get the -- because part of my ruling here is the practicality. If those other State AGs are going to take the deposition anyway, my strong suggestion is that they should take the lead in asking the questions. You can always prepare them ahead of time. And presumably, if it's only about that one chapter in the book, it's not going to be a long deposition either.

**MS. HAZAM:** We're not anticipating it being a long deposition.

**THE COURT:** Okay. So that's as to Ms. Wynn-Williams.

Jump to Mr. Boland. I mean, the blog post that was the basis for wanting to depose him was from January of this year. He's obviously been known to the plaintiffs and to Meta for a long time. Why wait so long?

**MS. HAZAM:** So to be clear, Your Honor, all three of these are third-party witnesses. They also are not custodians. None of them are.

**THE COURT:** Sure.

**MS. HAZAM:** So our documentary collection for them is minimal, and they don't pop up in custodial collections necessarily.

We understand that a few months have passed, but this is a willing witness, as we understand it, who would be sitting for this deposition, if not prior to the current close of

discovery, then shortly thereafter.  Presuming that that can go forward -- and he has been served and the subpoena has been domesticated, then I think we should be permitted to take a short deposition.

We have defendants seeking the same.  Again, TikTok, just this past week, after we issued these subpoenas, is seeking to subpoena a third party also located abroad out of time.

**THE COURT:**  Okay.

**MR. CHAPUT:**  So a couple of points, Your Honor.

First, counsel has referenced a number of times the limited number of documents with these individuals' names on them in the production.  That underscores the irrelevance of their testimony.  We ran exceptionally broad search terms over 127 Meta employee custodians, have produced millions and millions and millions of documents, and these people barely show up.  They barely register.  So these are not relevant depositions.

With respect to Mr. Boland's blog post, Your Honor is correct that happened a number of months ago.  We haven't heard anything in those months until just a couple of weeks ago.

It's also notable that the relevance in the blog post is a handful of words, not really Mr. Boland's own knowledge, just a handful of words linking to a news article about someone who is going to be deposed in the next few weeks, which is Arturo Bejar.  So to the extent there's anything relevant in that blog

post, it's Mr. Bejar, whose testimony plaintiffs are already going to secure.

So, you know, considering the vocal nature of Mr. Boland's participation in the public sphere about his time at Meta, it's, frankly, surprising that plaintiffs say that they had no idea he existed until just a couple of weeks ago.

THE COURT:  Given that he's testified in front of government panels and he's spoken, he has public- -- at least public pronouncements or things, instead of taking his deposition, can't you just produce that in discovery and just have your other witnesses and experts rely on it?

MS. HAZAM:  We could potentially if Meta is willing to not object to us doing so.  I think we might be open to that.

I do want to note that this is a Meta employee who was there from 2009 to the end of 2020, working in marketing and advertising.  So a very different role than Mr. Bejar.  But plaintiffs are not closed to the kind of approach Your Honor is suggesting.  We could meet and confer about that.

THE COURT:  Why not avoid the deposition entirely by getting some of his other public testimony and documents into the discovery record, and then you can -- the lawyers and your experts and other witnesses can argue the relevance and impact and import of those documents and his pronouncements.

MR. CHAPUT:  There would also be issues as to admissibility of that testimony --

**THE COURT:** Not my job.

**MR. CHAPUT:** -- which I understand Your Honor is not going to address. I just wanted to flag it.

One additional point with respect to the TikTok subpoena that counsel has referenced, it's not a subpoena that Meta issued, which is evident from the fact that it was TikTok. Additionally, it's a document subpoena, first and foremost. The box for deposition is already -- is also ticked.

My understanding is that TikTok has not reached a decision as to whether they actually want to proceed with the deposition. And in any event, I don't believe the subpoena has been served. So I think it's kind of ancillary to this present dispute.

**THE COURT:** Okay. So --

**MS. HAZAM:** Your Honor, if I may, I think that what Mr. Chaput just said about admissibility is a reason to take Mr. Boland's deposition if he's willing and if it can be a short deposition that takes place soon in April, because, otherwise, we may be in a position where he could be put on a trial witness list, and then we're governed by Discovery Management Order 2 and CMO 10 as to whether his deposition takes place then, or we could be having disputes about admissibility later.

So I do not think that this poses any significant burden on Meta if he's willing to sit during that time.

THE COURT:  Has he agreed to a date certain for his deposition?

MS. HAZAM:  No.  Dates are being discussed.  And Meta obviously can contact his counsel as well.  We've advised them of who the counsel is.

THE COURT:  Who is his counsel?  Are they here today?

MR. WARREN:  It's Zuckerman Spaeder.  That's the firm.

THE COURT:  Since you are still working out the dates and it's actually not set that he'll be deposed because you don't have date, time, and all that, I'm going to give you a short deadline.

Within the next week, I'm going to order you to meet and confer to see if you can obviate Mr. Boland's deposition entirely by coming up with a stipulation as to some identified universe of documents that would get into the discovery record. And if you can reach agreements on admissibility, try that, but at least as to authenticity and putting it into the record for purposes of the case.  Okay?

MR. CHAPUT:  Your Honor, to the extent the deposition does go forward, since plaintiffs' representation is that this recent blog post is really the crux of what they're after, could we limit the scope of the deposition just to that one blog post and not to various other things Mr. Boland may have said or thought?

As we discussed, his name is on documents in the

production.  They could have identified him earlier to the extent they cared about things outside of the scope of that blog post.

**MS. HAZAM:**  Your Honor, the blog post is a couple of paragraphs long, but it does reference something that then led us to Mr. Boland's views on how Meta prioritizes engagement over safety.  We would like to talk to him about his knowledge about that topic, not limited to just the words of the blog post.

**THE COURT:**  I think the question is:  Are you going to bring in a whole bunch of other documents?

**MS. HAZAM:**  I do not anticipate this being a document-intensive deposition at all.

**THE COURT:**  Okay.  With that representation, I'm not going to order them limit it by topic.

But with those representations, I'm going to hold you to that.

And you're certainly free to make objections at the deposition if they stray beyond what their representation is of what they plan to depose the witness on.  Okay?

And, hopefully, nobody's going to be calling me during this deposition to say somebody's gone beyond the scope of the deposition here.  All right?

But, so you've got a week to try to work out avoiding the deposition, if you can, just through his other testimony and

other documents.  And if you can't, then, again, if you can't work out a date and he objects, then it's not going forward, okay, because there's no time to work out an objection to a subpoena.

MS. HAZAM:  Understood, Your Honor.

Your Honor, I have breaking news that we literally just got, so I'm sharing it with the Court and with counsel.

And that is, it sounds like we have managed to locate a lawyer for Ms. Wynn-Williams who will accept service of the subpoena.

THE COURT:  Well, okay.  So you work that out between yourselves.

MS. HAZAM:  We will.

MR. CHAPUT:  I always love to meet and confer in real time in front of the Court.

THE COURT:  All right.  So that's as to Mr. Boland.  I want to make sure I pronounce it.  Is it Mr. Simons or Simmons? I forget.

MS. HAZAM:  Simons, Your Honor.

THE COURT:  Simons.

All right.  So same basic rule as to international discovery.  If he or his lawyer insists on international discovery procedures for him to sit, then it's not going forward.

MS. HAZAM:  They do not, Your Honor.  He has agreed to

sit on April 1st without any such procedures.

THE COURT:  Okay.  And, I mean, in the briefing -- I'm not going to repeat the arguments Meta made, but in the briefing, they did raise a question as to the potential relevance of his deposition giving -- and if you balance that against the cost and the fact people have to go to London to take a deposition of somebody who is going to talk about AI algorithms -- and, presumably, there has already been some discovery as to AI algorithms -- what's the -- how does that proportionality burden balance out?

MS. HAZAM:  He is a member of Meta's responsible AI team, and he is the only such member who I believe could be deposed in this case.  In other words, there have not been other members of that team who have been deposed.  He has unique knowledge, I believe, of that.  He has a Ph.D. background that is relevant to it, and he was a visiting research scientist with that team from 2018 to 2022, a key period in this case.

Very few documents that he's on; so, again, not at all a document-intensive deposition.  And, again, also meaning that finding those -- I think it's literally about 50 total in a universe of 2.2 million -- without him being a custodian was not something that could happen readily.

Also some of his relevance is based on conversations which we've had with him, which obviously can be explored at the

deposition.

THE COURT: Mr. Chaput?

MR. CHAPUT: First, Your Honor, plaintiffs have offered nothing beyond this passing reference to the algorithm as his relevance to this case.

Plaintiffs have had ample opportunity in the course of discovery to explore the operation of the various machine learning tools that power Meta systems.

Counsel has just said that this was the only deponent who could be deposed from the responsible AI team. I have no idea why that would be the case. If plaintiffs cared about the responsible AI team, they've had the full discovery period to explore it, and they waited until the final weeks of discovery to pursue this deposition from someone who has given us one day and he says take it or leave it.

So that, I think, is really the problem with Mr. Simons, is the burden during the next few weeks, when we should be spending our time finishing out the discovery that had been planned, we need to have people now reallocate their time to prepare for and focus on this deposition.

It may be document light, but that doesn't mean it's preparation light. We need to develop a plan to take this person's deposition because we certainly are going to have questioning ourselves for the witness, particularly considering that plaintiffs have now conceded that they've been talking to

him for weeks, during which time we had no idea that they were contemplating seeking his testimony.

MS. HAZAM:  Your Honor, the conversations with Mr. Simons or his counsel lasted all of three weeks, and during that time, we were not at all certain that he would be willing to sit for a deposition.  As soon as we learned of his willingness, we notified Meta.  That was 19 days in advance of the notice date.  He's a sitting member of Parliament.  And we have taken down more depos from this time period than we have added, and the depos we've taken down were of apex witnesses or high-level witnesses that Meta represents and needs to prepare for and which were custodians who had much larger volume of documents.

This witness is relevant.  He's very familiar with the algorithms at Meta and how they operate, which are a key part of our case, and the warnings about those algorithms.  He's both a public policy person and a research scientist.

And this is the date that he is available.  We believe that, again, this is not more than a one-day deposition that doesn't have a lot of documents.

THE COURT:  Give me your response to the point that you could have deposed -- you could have taken discovery about other people on that AI -- responsible AI -- is it committee?

MS. HAZAM:  There's a team.  And the point was not to say it was impossible or infeasible.  The point was to say that

we discovered this witness's knowledge and very promptly acted on it in a -- as a needle in a haystack of millions of documents.

MR. CHAPUT:  Your Honor, this individual published a book in January 2023 which he describes as being based in part on his time as a visiting researcher at Meta on the responsible AI team.  This is not new information.  And for Mr. Simons, in particular, there's no explanation from plaintiffs about why they just recently discovered him and couldn't have discovered him any time in the two years since he published this book.

MS. HAZAM:  Your Honor, if I may, I would like to just note Mr. Chaput's comments earlier with regards to the TikTok deposition.

That is not at all unique.  We also have all of the defendants seeking to depose certain treaters for our bellwether plaintiffs after the deadline because of conflicts they have on dates that the treaters offered prior to the deadline.

We would like to be able to offer another date here that is slightly later.  Because this is a sitting member of Parliament, this is the time that he was available.

THE COURT:  The plaintiffs, I assume, have taken discovery on the AI algorithms that Meta uses.

MS. HAZAM:  We have had some written discovery on algorithms, absolutely.

THE COURT:  Have you taken depositions of anybody knowledgeable about AI?

MS. HAZAM:  Certainly, algorithms have come up in depositions.  But he has a unique kind of knowledge regarding them, and he is a current third party.

THE COURT:  Give me more detail.  I mean, you said "unique."  If you've already taken some depositions and you've gotten documents on the algorithm -- the algorithm is what it is.  Right?  So how unique could his knowledge be?

MS. HAZAM:  I would say that the algorithms are relevant here, plural, and he has knowledge as to various.

MR. CHAPUT:  Your Honor, that's a non-answer.  There are many employees of Meta who have knowledge about the various machine learning tools that undergird Meta systems.

If plaintiffs really cared about the facts of how those systems work, they have had years to explore that.  I think what we're going to find is that Mr. Simons has not knowledge and facts, but opinions, and that plaintiffs would like to sponsor those opinions in what would effectively amount to improper expert testimony, and we're just going to end up in a fight to exclude all of this testimony that is going to be burdensome to prepare for about it being expert testimony. There's no purposes in taking it in the first place if he doesn't actually have unique information that plaintiffs couldn't get from some other source throughout the course of

discovery.

And I would just like to underscore, the lack of documents from this individual in our voluminous document productions means he's not relevant.  It doesn't mean that he's a needle in a haystack.

**MS. HAZAM:**  Your Honor, I beg to disagree.  Defendant wants to have it both ways.  They want to say that if there are more than a small number of documents, it's too burdensome.  If there is a small number of documents, it means they're not relevant.

Relevance is not measured by number of documents.  There sometimes can be small numbers of very important documents. We've had depositions that were largely for two or three of them.

And the notion that we don't care about these issues or that we've had years we think is a gross exaggeration.  We do care about them.  There are plenty of people with opinions out there.  If we were just wanting to depose people with opinions, we'd had many, many to choose from.  This is someone who is at Meta, doing research.

**THE COURT:**  Is this another deposition that could be obviated based on getting his book and some of his other public pronouncements into the record?

**MS. HAZAM:**  I do not think so.  And, again, that goes to him having knowledge beyond public statements.

THE COURT:  All right.  So assuming he is not insisting on Hague Convention or international discovery procedures and is not objecting to sitting for the deposition, it can go forward.

But at least the implicit representation from Ms. Hazam, that you're not going to be seeking opinion testimony from a lay witness through this deposition, then I'm assuming it's going to be a short deposition on factual matters.

MS. HAZAM:  Yes, Your Honor.

THE COURT:  All right.  Okay.

All right.  That's that one.  Joint proposed order on this one.

MR. CHAPUT:  Thank you, Your Honor.

MS. HAZAM:  Thank you, Your Honor.

THE COURT:  And you will note, I've not set deadlines on the joint proposed orders because (a) I've given you rulings from the bench, but also I assume it's to all your benefits to get those to me quicker rather than later because we've got the deadline coming up and you all want to make sure things proceed apace.

MS. HAZAM:  Yes, Your Honor.

THE COURT:  So I'm expecting that.

MR. CHAPUT:  Understood.  Thank you, your Honor.

THE COURT:  All right.  So before we turn to the merits of Docket 1764 and 1765, just for the record, I do want

to make clear, counsel for the third parties Ms. Jayakumar and Mr. Bejar is with the law firm of Baker Botts.  Some -- all of you may know I was a partner at Baker Botts before I took the bench.  That was -- I took the bench a year and roughly ten months ago, so not quite two years.  So the general guidance is that I should recuse automatically if it's been less than two years since I left that firm.

I received a communication from plaintiffs -- no -- Meta's counsel, somebody's counsel -- Meta's counsel last night indicating that they have no objection to me proceeding to rule on these matters and allowing Baker Botts to appear.  I just want to make sure.  Does anybody have any objection to that? And I just want to confirm Meta has no objection.

MS. SIMONSEN:  Correct, Your Honor.

Ashley Simonsen for the Meta defendants.

No objection.

THE COURT:  So with that, we'll proceed.

So let's start with -- we can deal with them -- they're essentially overlapping issues.  Let's deal with 1764 and 1765 together at the same time.

MR. WARD:  Michael Ward.

MS. WATSON:  Good afternoon, Your Honor.  Mariah Watson with Covington & Burling on behalf of Meta.

THE COURT:  Good afternoon.

MS. WATSON:  Good afternoon.

Your Honor, we're happy to address both of the briefs together.

If it works for you, Your Honor, I'd like to very briefly address why the documents sought by Meta are plainly relevant before turning to Mr. Bejar and Ms. Jayakumar's general objections, which focus on whistleblower protections, First Amendment and, finally, duplicativeness and burden.

**THE COURT:** Yeah. Actually, because I've read the briefing, so I don't want to go through -- I'd rather, kind of what we did for the other motion. Let's go through -- because it's really -- as I recall, it's Document Requests Numbers 1 and 2 for Ms. Jayakumar and Numbers -- is it 1 and 10 for Mr. Bejar? Do I have that --

**MS. WATSON:** 2 and 10, Your Honor.

**THE COURT:** 2 and 10.

So let's just take the actual document requests themselves, if you've got them in front of you.

**MS. WATSON:** I do, Your Honor.

**THE COURT:** All right. So let me just establish, for Mr. Bejar, Mr. Ward, you're not literally arguing that the California Labor Code or Sarbanes-Oxley applies to him.

**MR. WARD:** Yes, we are, Your Honor.

**THE COURT:** You are?

**MR. WARD:** Absolutely, yes.

**THE COURT:** Well, I mean, the Labor Code prevents an

employer from preventing an employee from disclosing information to a government or law enforcement agency or to a person with authority over the employee.

So Mr. Bejar is not an employee, and he's not disclosing information to a government or law enforcement agency.

**MR. WARD:**  Yes, Your Honor.  For a couple of reasons, we believe that it applies.

First of all, when he initiated his whistleblowing he was an employee; so we believe he's covered by reason -- or within the meaning of being a current employee.

But more importantly, here, the principle that a whistleblower can be retaliated against after they've left employment is inconsistent with the spirit and plain language or plain meaning or intention of the statute, and it's inconsistent with the enforcement practices of the State Department of labor.

It's the same principle under Sarbanes-Oxley, and the *Kshetrapal* case states very clearly that it would be completely inconsistent with the enforcement regime in the interest of provoking whistleblowers to say that, as soon as an employer has terminated an employee, then they can continue with practices like blacklisting and ostracizing them, harassing them with legal process.  All of those behaviors, all of that retaliation, it cannot be immunized by the fact that they've already terminated that employee.

So we do believe that Mr. Bejar is protected both under the California statute and under Sarbanes-Oxley.

**THE COURT:** But Sarbanes-Oxley requires a securities investigation. There's no securities investigations here, is there?

**MR. WARD:** No, it's not limited to that. My understanding, Your Honor, potential violations of law would also be included.

And what Mr. Bejar disclosed here was, to start it out, disclosing to senior management information he discovered about the abuses suffered by teens on the Instagram platform, including inappropriate sexual advances that were being experienced by teens in staggering proportions on a weekly basis.

And then he continued in his whistleblowing, after an interregnum, by being subpoenaed to testify by the Federal Trade Commission. He gave testimony before the United States Senate. He gave testimony to investigators from the State Attorney General's Office for Tennessee. He has been cooperative in law enforcement investigations.

**THE COURT:** Yeah, but none of that's at issue in the document request specifically; right?

**MR. WARD:** Well, they are, Your Honor, because our view of the improper motive -- this is all retaliatory and chilling of persons -- both Mr. Bejar and of the persons with

whom he's communicated.

If I may, Your Honor, I think what the -- what Meta is trying to do is try to suggest that this is presumptively discoverable, like it's asking for some innocuous information and obfuscate the context.

And I think the number of prior statements that they have of Mr. Bejar and the access to his emails when he was within the company, the important thing to know, Your Honor, is what Mr. Bejar did is he assembled a very detailed submission of these risks and harms to Mr. Zuckerberg and the other members of senior management; and in doing that, he also consulted with a number of other senior executives within the company about the accuracy and validity of the information that he was going to share with senior management.  So there is a long paper trail of communications within the company about what he was about to communicate and its reliability.

And then he's testified, as I outlined, multiple days before the FTC, this other testimony.  He's published essays online.  There's probably over a thousand pages of content that they could examine Mr. Bejar about, including all the emails that he had when he was an employee.

**THE COURT:**  Okay.  But let me --

**MR. WARD:**  And yet --

**THE COURT:**  Let me stop you there.

**MR. WARD:**  Yes, Your Honor.

**THE COURT:**  The document requests are asking for his communications with people, not all the stuff you're talking about.  So I understand that's the context and they've got access to all that, but these specific document requests aren't asking for those materials.

**MR. WARD:**  No, but by producing these, we would be -- there would be harassment; it would be chilling of other employees.

So let me explain this, if I may, Your Honor, and I beg your pardon.

What they want and what they're saying is, we want these communications because it might possibly yield some statement that Mr. Bejar -- in addition to the thousands of pages that you have about his statements, there might be something in there that's inconsistent with what he's already said.  But the only statements we want are those of former Meta employees.  We don't care about prior inconsistent statements you may have made with anyone else.  What we want to know is those statements of former and current Meta employees.

It's basically like they're saying:  We don't really even care about your statements.  What we're really interested in is the identity and the content of the statements of those people who, even after you've become a known whistleblower, are willing to communicate with you.

**THE COURT:**  All right.  So --

MR. WARD:  And that is protected.

THE COURT:  Okay.

MR. WARD:  And the *Awtry* case, I think, is dispositive here.

THE COURT:  Why do you need to know the identity of current Meta employees who have spoken with Mr. Bejar or Ms. Jayakumar?

MS. WATSON:  Part of our -- so taking multiple -- we disagree with counsel's characterization of this as harassment and retaliation.  This is a duly authorized subpoena that we served on Mr. Bejar and Ms. Jayakumar prior to their depositions.  In particular, we had indications from depositions, including former Meta employees who were deposed, that they had spoke with Mr. Bejar prior to their depositions.

THE COURT:  My question is:  Why do you need to know the identities of current Meta employees who have spoken with either of these people?

MS. WATSON:  We believe that our document requests get at the relevant documents and communications that go to the issues that are at stake in this case; that it will support or undermine positions that Mr. Bejar, Ms. Jayakumar, and other former and current employees who are testifying or have been noticed to testify in this deposition.

We believe this is a part of our ability to represent our client and make a robust defense.

In addition, it would shed light on the credibilities of these witnesses in particular, whether or not what they are saying in these communications is consistent with what they've been saying in the documents that have been produced.

THE COURT:  But current Meta employees are covered by the California Labor Code and Sarbanes-Oxley, aren't they?

MS. WATSON:  What we believe, if there has been --

THE COURT:  Answer my question.  Current Meta employees are covered by the California Labor Code Section 1102.5 and the Sarbanes-Oxley provision cited by the individuals here; right?

MS. WATSON:  Specifically for SOX, if they -- if they are a part of an ongoing investigation where they themselves give documents or provide testimony or assist authorities in any way and there is an alleged act of discrimination or harassment, then, yes, Your Honor, we do believe they would be covered.

However, Mr. Bejar and Ms. Jayakumar's counsel have not provided any support that says that there has been any sort of retaliation, harassment, or discrimination.  We think that theoretical harms are insufficient in this instance to shield the disclosure of relevant communications.

THE COURT:  Okay.  So let's move to the broader issue then.  Why don't the First Amendment rights of those current Meta employees protect them from this discovery?  Because,

basically, if you're asking for communications between either of these two people, Mr. Bejar and Ms. Jayakumar, with current employees, by definition, you're asking for communications from current employees to them.  And why doesn't that infringe their associational rights?

**MS. WATSON:**  Your Honor, the cases that counsel put forward to support this First Amendment right are not controlling here.  One of them dealt with political association.  We have not seen any allegations that there is any sort of political group that's being threatened here.

Another one deals with anonymization.

**THE COURT:**  I've read the case law.  You're trying to limit it to, like, some kind of organized political party or political group.  That's not how the First Amendment works.

People, individuals have a right to associate in order to talk about things of public concern.  And just because they're not part of some organized group -- there are plenty of First Amendment cases involving people who are kind of loosely affiliated with the alt-right, for example, and they have First Amendment associational rights.

So it doesn't -- you don't need a formal organization or association.  So that argument doesn't hold up to the law.

**MS. WATSON:**  Your Honor, we are asking for specific communications that are directly relevant to social media, social media of mental health --

**THE COURT:** The way the First Amendment analysis goes is you've got to show -- right? -- if there is a First Amendment association right implicated, which I think there is, as between the current employees for sure, you've got to show more than just relevance -- right? -- because the Ninth Circuit says you've got to show highly relevant.

**MS. WATSON:** We do believe that these documents are highly relevant. If there has been an exchange of information or any sort of documents or what have you with current employees around tools, features, any number of things that are at issue in this case, it is important for us to understand what is being discussed, what is being disclosed.

**THE COURT:** Why? Why is that important? You know what your tools are. You know what your company has. You know what information your employees have. Why do you need to know whether or not it was communicated to somebody else?

**MS. SIMONSEN:** Your Honor, Ashley Simonsen for the Meta defendants. I just want to jump in to assist my colleague for a moment.

The plaintiffs have already taken Ms. Jayakumar's deposition and many other former employees' depositions. It is apparent that they are trying to lay the foundation to qualify these individuals as some kind of experts who have opinions on the safety of Meta's platforms, social media industry.

Ms. Jayakumar testified that she spoke with current and

former Meta employees, including Mr. Bejar, I believe also including Ms. Haugen, and we are entitled to test what are those communications that she had with those former and current employees that serve as the basis for or contradict the opinions and the positions that plaintiffs are going to try to proffer to support their case.

And that is why we are entitled to probe what are these facts, these communications that are being relayed by current and former employees to Ms. Jayakumar, to Mr. Bejar, and do they undermine or support the opinions and the testimony that they're giving. We are absolute entitled to then probe what those communications were, and it doesn't infringe their First Amendment right of communication.

I would also note, for what it's worth, Your Honor, the protective order in this case does apply to any productions by these non-parties. They can certainly, if there's a basis for doing so, designate these communications as confidential if they believe there's a basis. You know, we don't know that there would be. But there are ways to protect these individuals.

But merely serving a document subpoena in response to plaintiffs noticing these individuals' depositions is not a violation of their First Amendment rights, just as it's not an -- it's not a violation of whistleblower protections.

MR. WARREN: Your Honor, may I be heard?

THE COURT:  It must be a big issue because I've got four lawyers in front of me now.

MR. WARREN:  Yes, Your Honor.  It's turning into a team sport.

Well, since plaintiffs were invoked --

THE COURT:  Enter your appearance.

MR. WARREN:  Thank you.

Previn Warren on behalf of the personal injury and school district plaintiffs.

There's a factual issue I just want to address.  This subpoena for documents was issued after Ms. Jayakumar's deposition.  So if they were interested in understanding all these facts, they could have issued it beforehand.  I'm not saying that makes it permissible.  But there have been representations suggesting it was issued before the deposition.  That's not true.

THE COURT:  Okay.

MS. WATSON:  Counsel, if I may correct, it was issued before her March 6th deposition, as we're arguing these together.  Apologies for the lack of clarification.

MR. WARREN:  Okay.  I can address that.

So Ms. Jayakumar was deposed for two days.  There was a need to continue that deposition for 20 minutes to address a single document that needed to be -- the confidentiality of which was in dispute.  That was resolved, and then her

deposition was concluded for 20 minutes, which, by agreement, was limited to just that document.

So I think it is standing on the edge of a very, very fine technicality to indicate that that subpoena issued before her deposition. It was truly after, you know, every relevant portion of that. 99 percent of the deposition was concluded.

MS. WATSON: Counselor, we have not seen in the briefing any indication that there is a deadline or rule or case law that supports a timing of a subpoena.

She indicated in her testimony that she spoke to both former and current employees. As a follow-up to that specific testimony that was given, we provided a narrowly tailored subpoena requesting those documents.

While she may have acknowledged that she spoke with them during her testimony, the contents of what was spoken about, the breadth of what was spoken about, the number of times are all things that we are able to vet via a document production.

THE COURT: Just as a factual matter, did she testify at her deposition that she spoke with the people listed in Document Request Number 2?

MS. WATSON: She -- oh. She mentioned some of these individuals, Your Honor, yes.

THE COURT: Where did those names come from?

MR. WARD: No. She spoke with -- she said she spoke with Arturo Bejar for the purpose of finding an attorney.

Those are other witnesses that I represent, Your Honor.

THE COURT:  Okay.  So she did not volunteer the names of the people in Request Number 2.

MR. WARD:  I should say -- no, Your Honor.

And I should correct.  I don't represent Frances Haugen.  The rest of the persons identified there are --

THE COURT:  And did Mr. --

MR. WARD:  -- clients of mine.

THE COURT:  -- Bejar identify at his deposition -- he was deposed; right?

MS. WATSON:  He's not deposed yet, Your Honor.

THE COURT:  Has there been any identification by him as to -- well, where did the names in Document Request Number 10 come from?

MS. WATSON:  These are former employees who have worked on or are related to this litigation and have been noticed in many instances, though I understand some of the notices have been pulled, but these are former Meta employees.

MR. WARREN:  Your Honor, I think that's inaccurate.

I think these are former Meta employees who have been critical of Meta.  I think that's the common thread that unites these names.

And the clear purpose of this request is to harass that group of individuals.

MS. SIMONSEN:  Your Honor, Ashley Simonsen for the

Meta defendants.

These are individuals who plaintiffs have either noticed for deposition in the past and taken them down or already taken their deposition.

And we know from the testimony of Ms. Jayakumar, we also know from other depositions of former employees, that there are these discussions going on among them, with each other and with individuals currently employed at Meta. And so that is the basis for naming these individual people. It is not an attempt to harass or retaliate.

Plaintiffs have identified these former employees, and they're eliciting testimony from them, or at one point intended to elicit testimony from them, to support their claims. We are absolutely entitled to probe the basis for these people's testimonies to the extent they're offering critiques, opinions, positions contrary to Meta's.

**MR. WARREN:** Your Honor, I think that's more or less an admission of what I just said. We've deposed other former employees. We're just in the middle of deposing Nick Clegg right now. I don't see him on that list. K.X. Jin is another individual we've deposed who's a former. He's not on that list.

**THE COURT:** He is.

**MR. WARREN:** Oh. Well, okay. So I don't have the list in front of me.

Is that correct?

**MS. SIMONSEN:**  And I believe Mr. Clegg, Your Honor, I believe that's only a recent departure, if I'm correct.  I could be wrong about that.

But in any event, this is not an attempt to harass or retaliate.  We're simply, in the narrowest, most targeted way that we can with subpoenas, asking for the very communications that were discussed in deposition, which is exactly the type of request for production I remember Your Honor describing a year ago, in a separate discovery dispute, as being the types of targeted requests that might be appropriate at a later point in time in discovery.  And that's all this is.

**MR. WARD:**  Your Honor, if I can reenter the fray here for a moment.

Firstly, I appreciate that there's some admission now that the purpose of this deposition -- or this request is not to get the prior statements of Mr. Bejar.  It's to discover the identities of these people who've expressed willingness to associate with him after he's become known as a whistleblower.

So I think the motive here, consistent with Meta's position that they believe apparently it's appropriate to retaliate against former employees, like the concerns that these employees would have and their First Amendment rights are reasonable here.

Secondly, Ms. Jayakumar was not noticed as an expert

testimony.  The argument that she will be somehow is very speculative.  There's no basis for that whatsoever.

She gave factual testimony.  It was critical of the company.  Following that, they issued a subpoena for all of her personal communications.  It was clearly retaliatory and reactive to her testimony, just as it was for Margaret Gould Stewart and Allison Lee.  As soon as their testimony concluded and that testimony was critical, these intrusive document requests were made only because they were critical of the company.

With respect --

**THE COURT:**  Let me stop you there.

With regard to the identified people in Request 2 and Request 10, 10 for Mr. Bejar, 2 to Ms. Jayakumar, I mean, their identities of these people are known to everyone.  Right?  They're known to Meta.  They're known to everyone.  Right?

**MR. WARD:**  Yeah.  It's an excellent point, Your Honor.  And they were asked -- a number of them, at least, in their depositions -- did you discuss -- what did you discuss beforehand?  And each of them explained -- or I should say none of them asserted that they had discussed the subjects of their testimony beforehand.

So the foundation for that assertion was attempted, and it failed.  There's no basis to speculate that they discussed their testimony with each other or somehow orchestrated it or

that one's statements informed another's testimony.  It's just not present here.

THE COURT:  Well, okay.  But what I'm really getting at, if they are known -- I'm talking about the former employees.  These are all former employees in Request 2 and 10; right?

Just so I'm clear, Mr. Bejar, Ms. Haugen, K.X. Jin, Mr. Jin, Ms. Stewart, Mr. Patel -- is it Mr. Raskin? -- and Ms. Lee, they're all former employees; is that correct?

MS. WATSON:  Yes, Your Honor.

MR. WARD:  Mr. Raskin is not.

MR. WARREN:  Mr. Raskin is not a former employee of any of the defendants.

THE COURT:  He's just a true third party, then.

MR. WARREN:  He's a true third party.

THE COURT:  Okay.

MR. WARREN:  He has been deposed.

THE COURT:  But none of them are current Meta employees, is the point.  Right?

MR. WARD:  Correct.

THE COURT:  And in some way are they all known as having expressed views critical of Meta publicly?

MR. WARREN:  I don't know if they're known publicly that way.  I think that that is a fair reading of some of the deposition testimony they gave.

**THE COURT:** Okay. So -- because I think you represented that you think, you speculate that the reason they're listed and other people are not is because they've taken positions critical of Meta.

**MR. WARREN:** I think that is correct.

**THE COURT:** All right. So the concern as to these former identified employees, that they could be retaliated against, because they're now known -- right? -- I mean, the horse is already out of the barn with regard to them. Right?

I mean, whether or not they ever get retaliated against, whether or not they ever get blacklisted, you know, in the industry in general, (a) that's not before me because there's no evidence of that, and (b) there's nothing to protect here. They're already known. Their views are already -- I mean, their identity is already out there.

**MR. WARD:** I disagree, Your Honor. Even the intrusion into their privacy rights is itself a harassment and retaliatory and a harm. Their identity alone is not the only thing to be concerned with here.

**MR. WARREN:** And, Your Honor, may I add one point here. There's a chilling effect in terms of these witnesses coming forward to testify at trial. I mean, it is true that in the confines of a deposition, they have offered testimony that's critical of the company. But if the company can then retaliate against them through harassing discovery requests,

the purpose of that is to scare them away from taking the stand and to speak what they have to speak in front of a jury.

And that is a really troubling precedent to set in this litigation when, you know, there are potentially other former employees or current employees who may wish to speak out against the company's practices but currently don't feel like they have the latitude to do that because of concerns about what might happen to them in terms of what the company then does, seeking burdensome invasions into their privacy.

**MS. SIMONSEN:**  Your Honor, Ms. Simonsen again.

Taken to its logical conclusion, this argument would suggest that any time plaintiffs are suing a company, they can go out and depose former employees critical of the company, and the company then is not allowed to go out and seek discovery in documentary form from those employees.  That cannot be the law. We are entitled to defend ourselves.

**THE COURT:**  Oh.  I mean, the document requests here are drafted very broadly.  It says all documents and communications with any of these people.

**MS. SIMONSEN:**  We are -- and, Your Honor, we're happy to meet and confer -- I want to be clear about that -- with Mr. Ward about the scope of these.  The problem is, there's been no opportunity to do that.  He has objected entirely to even talking about a narrowing scope, taking the position that it would be, with no substantiation, incredibly difficult and

financially burdensome to conduct searches for these documents without any explanation or detail. Like the burden declarations we were talking about earlier, nothing like that in the record.

Now, I truly mean that, Your Honor. We're happy to sit down. We can craft search terms. We can narrow these readily, and we're happy to do so. But that's not the dispute we're here on today because there's been an outright objection to producing any of these documents.

**MR. WARD:** Well, I think that's not completely accurate. And I've not talked to Ms. Simonsen about this before. So in my consultations with her colleagues on this, I've pointed out that the usual mechanisms of search terms that are capable or available to someone like her client who have a forensics package and they can search through documents and then we can kind of scope this is one thing.

For somebody who is asked to go through 13 years of Gmail emails to find out, like, is this an email that touched on the subject of social media harms and is this person a former employee is just an impossible burden to ask a third party to go through. It's unreasonable on its face.

**MR. WARREN:** And if I may add, Your Honor, the defendants are in possession of all of these former employees' documents during the time when they worked at the company. So the most probative and relevant communications that they might

have already exist on their servers.

MS. SIMONSEN:  And, Your Honor, you already made this point.  We're not asking for documents that we already have. We're asking for a very limited set of documents: communications with specific identified individuals and maybe other former and current employees.  But, again, we're happy to confer with Mr. Ward about that.

It is absolutely not unreasonable on its face to ask a third party who has sat for a deposition in a case who plaintiffs are using to support their case to search their Gmail for communications with specific individuals.  We don't even know how many communications are going to come back if she were just to search for the names of the individuals we've asked for communications with.

So I don't think I need to explain, Your Honor.  It's not enough to simply say that that's unreasonable on its face. There's been absolutely no substantiation for it.

MR. WARREN:  Your Honor, the relevance of these communications is beyond fleeting.  All of what these witnesses have had to say concern their time at the company, what they personally observed, and the safety practices, or lack thereof, that were in place at Meta.  That's what matters about these witnesses.

Who they talk to after they left is not going to support a claim or defense in this case.  It just isn't.  It's not

relevant.  And whatever marginal relevance exists is dramatically outweighed by the First Amendment concerns, the privacy concerns, and the potential chilling effect of further employees coming forward.

MS. SIMONSEN:  Your Honor, what they said about their time at the company and what they observed, if they shared that information with Mr. Bejar or Ms. Jayakumar and those individuals, in turn, are relying on that information for the positions that they are taking that plaintiffs are relying on for their claims or, by contrast, if it undermines their testimony, it's absolutely relevant.

MR. WARREN:  Mr. Bejar and Ms. Haugen have yet to be deposed.  They can simply be asked those questions at their depositions.

THE COURT:  So, okay.  Anything further?

MS. SIMONSEN:  One final point, Your Honor, would be --

THE COURT:  Yeah.

MS. SIMONSEN:  -- that I'm not sure what standing Mr. Warren has to be standing here making these arguments.

He does not represent these third parties.

MR. WARREN:  Oh, I absolutely have standing.

Ms. Simonsen affirmatively brought up points that plaintiffs made at the depositions.  She brought up plaintiffs' strategy in seeking these depositions and their attempts to use

these witnesses as experts, and the like.  So that's why I'm standing up here.  I didn't plan to.

**THE COURT:**  Okay.  First, as to current employees, they're admittedly covered by the protection of the California Labor Code and Sarbanes-Oxley.  They also have their own First Amendment rights.  I'm not going to allow any discovery as to communications with current employees.  To me, the First Amendment issues as to them have been shown satisfactorily.

Under the -- the way the Ninth Circuit has crafted the test, if First Amendment rights are implicated, then it's incumbent on the party seeking the discovery not merely to show relevance, but to show highly relevant.

And let me just say, trying to find documents that would tend to impeach or undercut somebody's testimony otherwise is not sufficient.  I mean, I think the *Perry/Schwarzenegger* case ruled that way.  And so -- but we've talked about how I think the specific Requests 2 and 10 that identify specific people, I'm going to order you to meet and confer -- right? -- and see if you can come up with some agreed set of -- subset of highly relevant documents that meet the Ninth Circuit's test for disclosure, despite the implication of the First Amendment rights, because the First Amendment rights can be overcome if -- really only if you really show it's truly highly relevant.  Right?  And so I'm going to leave it up to your good

offices to try to work that out because it's not a complete --
the First Amendment is not a complete bar to the discovery
because it could be that they're able to come up with something
and you may have to compromise on that.  Okay?

MR. WARD:  Yes, Your Honor.

THE COURT:  All right.  So -- but I am going to
sustain the objections to Requests 1 for Ms. Jayakumar and --
what's the other one? -- Number 2 to Mr. Bejar.

And I take Ms. Simonsen's representation that as to the
remaining requests, the phrase "all documents and
communications," you're going to work out narrowing on that.
You're going to work out narrowing on maybe the people, the
specified people, maybe the categories of, you know, what you
mean by mental, social, emotional, or behavioral health,
safety, et cetera.  Right?

So work those out and see if you can come to some
agreement that's within the scope of what I think is the
First Amendment rubric for getting discovery of highly relevant
documents.  Okay?

MS. SIMONSEN:  Thank you, Your Honor.

THE COURT:  And I'm going to expect you-all to work it
out.  And, you know, I will point out that there are -- as they
made clear, there are documents in your own possession as to
some of these former -- these former employees' documents that
you have at your disposal to use in discovery to try to impeach

somebody else's -- impeach testimony.  Right?  So this is not the kind of thing -- if it's simply impeachment and undercutting somebody's testimony, I'll just give you that guidance.  The way I read *Perry/Schwarzenegger*, that's not enough.

MS. SIMONSEN:  Understood Your Honor.  I think it does go further than that, but understood.  We'll meet and confer.

THE COURT:  That was most of what I heard you arguing today, was undercutting people's testimony.

Okay.  So I think with that guidance, can you come up -- craft a joint proposed order on this?

MS. SIMONSEN:  Yes, Your Honor.

MR. WARD:  Yes, Your Honor.

THE COURT:  Okay.  Thank you.

MS. WATSON:  Thank you.

MR. WARREN:  Thank you.

THE COURT:  All right.  So I think I heard the YouTube deposition dispute that is Docket Number 1777 got withdrawn because you worked it out.  Is that right?

MS. HURD:  Yes, correct.

Ellyn Hurd for plaintiffs.

MS. STOKES:  That's correct.  Jenna Stokes, Wilson Sonsini.

THE COURT:  Thank you and congratulations.

(Laughter.)

THE COURT:  So is the motion withdrawn or denied as moot, or how do you want to resolve it on the docket?

MS. HURD:  Either withdrawn or moot, I think.

THE COURT:  I guess the real question, were you planning on filing some kind of stip to memorialize it, or you already worked it out and you don't need to?

MS. HURD:  No.  I think that's worked out.  I think the notice is --

THE COURT:  All right.  So withdrawn as moot.

Okay.  That leaves the status report.  Who's here from Kansas?

MR. ANDREWS:  Your Honor, sorry.  Before we get to that --

THE COURT:  Sure.

MR. ANDREWS:  Patrick Andrews for the plaintiffs.

I just wanted to note that there was one more dispute in the ripe section over Jessica Smith's clawback of --

THE COURT:  I was going to save that for after this, but we can go there now.

MR. ANDREWS:  Okay.

THE COURT:  Go ahead.

MR. ANDREWS:  I just wanted to note for the record that since it deals with such sensitive and privileged materials and there is briefing submitted under seal on it, we're happy to rest on the papers.

If Your Honor has any questions, I'm also happy to answer those, but I just didn't want that one dispute to get missed in the shuffle.

THE COURT: Well, okay. Go ahead.

MR. ERCOLE: Brian Ercole, Your Honor, good afternoon, for the YouTube defendants, on behalf of sort of all the defendants here.

Your Honor, we're happy to proceed however you would prefer to proceed. Obviously, we are here to address any issues you may have. Happy to make any arguments. Have any questions about any of the issues encompassed by the motion. So, again, happy to proceed however you would prefer to on this issue.

THE COURT: Okay. Just so -- this is, for the record, this is Docket Number 1751. The unredacted version is 1761-1.

As to the clawback, I didn't have any questions. So I'm happy to -- if you're happy to rest on the briefing, then I'm happy to resolve it based on that.

MR. ERCOLE: Well, Your Honor, I would actually -- I mean, if it's possible just to sort of reiterate from the defendants' perspective the importance of these particular documents; and obviously, we had the opportunity to submit a brief and then the one-page supplement. But I do think there are a couple of points I would just like to highlight, considering the importance of these documents and why they are

potentially case and claim dispositive here.

And so I'm happy to do that.  I don't know what the best way to make those points would be, given the request to sort of seal the record here.

**THE COURT:**  Well, everyone in the room is under the protective order -- is allowed to see things under the protective order or not?

**MR. ANDREWS:**  Your Honor, I do believe that there is a Zoom and that this is open court.

**THE COURT:**  Yeah.

**MR. ERCOLE:**  Sorry to complicate things, Your Honor.

**THE COURT:**  Well, I don't want to hold up this hearing.

Is there a way to anonymize or somehow use code words or initials or some way to obfuscate the details of the documents so that we can -- you can make the arguments, or do we need to get into the actual details?

**MR. ANDREWS:**  I mean, respectfully, Your Honor, if counsel intends to get into the substance of these at all, I think we've already pierced that privilege because her name, Jessica Smith, is on the Docket entry for this, and I don't think there's any way to anonymize that at this point.  And it's our contention that the substance of these is entirely privileged.

**THE COURT:**  Why don't we do it this way:  If you've

got additional -- I'm going to allow you to submit a one-page additional brief if you really want to make additional points that you haven't -- because if you've already made the points in your original briefing, I don't think it's going to help you.

So do you really need -- are these really new points or were these points you were going to emphasize?

MR. ERCOLE:  They were points to emphasize during argument today, Your Honor, as to the importance.  I know the issues are fresh in your mind.  I know you're thinking about resolving it.  And so that was the point obviously.  This is an important matter for us.  These are important documents.  It's an important case.  And so we want to just -- wanted to have the opportunity just to emphasize certain things associated with that.

THE COURT:  Just because of the way -- the sensitivity of the documents and all that, if you want to emphasize something, I'm not sure we need more briefing on that; but if there are actually new points you want to make, by tomorrow -- all right? -- because assuming you were ready to tell me them verbally, by tomorrow you can submit a half-page letter brief raising your new points.

MR. ERCOLE:  Your Honor, if we're not going to be able to sort of, like, sort of present argument today, I think everything is sort of fairly encompassed in what we've

submitted.  It's just really emphasis for purposes of argument on the importance of --

THE COURT:  Okay.  If it's just a matter of emphasizing things, I don't think -- given the fact we'd have to clear the courtroom and shut down the Zoom, I don't think it's worth -- as a practical matter, worth doing.  I've read the briefing.

And, again, I'll give you the chance, if you want to, to submit a half page, and same with the plaintiffs, if you want to submit a half page emphasizing your points, you can tomorrow.  If I don't see anything tomorrow, I'm going to assume you're foregoing that chance.

MR. ERCOLE:  Understood, Your Honor.

MR. ANDREWS:  Understand, Your Honor.

THE COURT:  Okay.  All right.  So who's here from Kansas or representing Kansas?

MR. VANZANDT:  I'm sorry, Your Honor.  I am not from Kansas.  I'm from Alabama.  Name is Joseph VanZandt.

I do have an issue related to the PI cases that I need to raise quickly.  It should not take long.  And so if Your Honor would allow, I'll go ahead and do that now.

So my name is Joseph VanZandt.  I represent the personal injury and school direct plaintiffs.

This issue is something that's not been raised before Your Honor before.  We have notified defendants of it, and

defendants are aware that we are raising it today.

It's a little bizarre situation.  So I'm going to -- if you let me explain it, then I'll explain why it is we feel like we need to raise it to Your Honor.  It has to do with an individual who is associated -- the founder of a company that is a vendor of the plaintiffs in this litigation.

THE COURT:  Okay.

MR. VANZANDT:  And so the company at issue is Computer Forensic Services, often referred to as CFS.  And in this litigation, CFS has handled the, essentially, ESI collection for the bellwether plaintiffs in both the MDL and JCCP.  So device collection, other sources of ESI, CFS has handled that collection.

And the individual at issue -- and I'm about to get into that individual -- has also submitted a declaration to Your Honor this last December related to an MDL bellwether case.

THE COURT:  Okay.

MR. VANZANDT:  So that's why we're raising the issue to Your Honor.

So the issue is that there have been allegations -- and I'll say "allegations" because the plaintiffs have -- are taking no position on it, have no way to verify the veracity of these allegations -- but related to an individual named Mark Lanterman, who is the founder and chief technology officer

of CFS.

The allegations came in a filing filed in a separate case last week in the Northern District of Florida, filed by the law firm Perkins Coie, essentially alleging that Mr. Lanterman has falsified his background and his qualifications, specifically related to his education, where he attended college, if he attended college, and then also the degrees that he has obtained.

And so those allegations have been made against Mr. Lanterman in a separate matter. And because the plaintiffs, in general, my firm specifically, filed a declaration by Mr. Lanterman essentially restating what is now alleged to be false in terms of his background, with Your Honor, we wanted to notify you of that.

The declaration at issue was in the Clevenger matter. And I have the specifics in case Your Honor wanted to see the docket. But the declaration was filed. Your Honor ruled on the issue and essentially gave the plaintiffs the option to put Mr. Lanterman up for a deposition or withdraw his declaration, and we responded by withdrawing his declaration. So the declaration at issue has been withdrawn.

And so we're not necessarily asking Your Honor to do anything about it, but we did feel an obligation to notify the Court that those allegations are out there.

Separate and apart from that, the work that CFS has done

for the plaintiffs in this case, the plaintiffs have no reason to believe there's anything improper with the work that his company has done.  It's not just him.  There are other individuals at his company who have been doing the collections work.  We've seen no issue or have no concerns about the work, and the defendants have not made us aware of any concerns that they have in terms of the collection that has taken place.

But plaintiffs are taking these allegations seriously. We're investigating it and then considering all of our options moving forward in terms of continued work on ESI.

**MS. SIMONSEN:**  Ashley Simonsen for the Meta defendants.

To their credit, I want to acknowledge that the JCCP plaintiffs did bring this to our attention I think about as soon as possible after they learned about it.

We do have concerns.  I mean, these allegations do raise, I think, serious concerns.

And we're also considering kind of next steps and any options or relief we may feel we need to pursue, given that, as we understand it, CFS did do the collections for all of the bellwether plaintiffs across the two cases.

So I'll leave it at that.  I think we'll probably be back to Your Honor on this issue.

**THE COURT:**  Okay.  All right.  Have you -- I mean, there are many ways to look into this and investigate it.  Have

the plaintiffs or the plaintiffs' lawyers engaged a different firm to kind of do essentially an audit or some kind of double-check of CFS's work to bolster the -- you know, the belief that it was done appropriately, despite Mr. Lanterman's background?

MR. VANZANDT:  Your Honor, we are actively working on this.  We found out about it over the weekend --

THE COURT:  Okay.

MR. VANZANDT:  -- and so we've already contacted and are interviewing and doing background checks of other additional vendors and looking to transfer vendors, but also looking to check the work that has been done by CFS.

We certainly will continue to meet and confer with defendants on it.  This is the first we're hearing that there may be some concern about the accuracy for the work that's already been done.

We notified Judge Kuhl of this yesterday, telling Your Honor today.

And so we certainly will continue to meet and confer with defendants.  And we don't think there's going to be an issue there, but we're taking all reasonable steps.

THE COURT:  Okay.  And I definitely want to thank you for being up-front about this and bringing it to everybody's attention so we can all deal with it.

And, hopefully, it will turn out not -- those allegations

against him will turn out not to impact this case in any way, but please continue to work it out.  And if you need to do some cleanup in some way, then I'm sure you can work that out too.

MR. VANZANDT:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.  All right.  Thank you for that, Mr. VanZandt.

Okay.  In the DMC status report, Kansas said they were going to give a status report on their documents.  So what is the update?

MS. BATCHELDER:  Krista Batchelder with the State of Colorado.

The update -- and I've conferred with Mr. Yeung here that this is the update to be provided -- that the agencies with Kansas who had received Rule 45 subpoenas will produce the documents consistent with the protocol previously agreed upon with Meta.

In light of the Court's recent order clarifying that the Kansas AG does not have custody over state agency documents, agencies who have not received third-party subpoenas have not agreed to produce documents.

Meta intends to promptly serve Rule 45 subpoenas on the two remaining agencies, the Kansas Governors' Office and the Department of Aging and Disability Services, and expects those agencies to produce previously agreed documents consistent with the other Kansas agencies.

**MR. YEUNG:**  That's right.

**MS. BATCHELDER:**  I read that into the record correctly.  All right.

**THE COURT:**  Thank you for that update.  So it looks like things are proceeding apace.

**MS. BATCHELDER:**  Yes.

**THE COURT:**  So thank you for that.

**MS. BATCHELDER:**  Thank you.

**THE COURT:**  The only other state that seemed to have some kind of update or maybe -- Mr. Yeung, maybe you can address it.  I think maybe two states, Rhode Island and Delaware.  It looks like there was still some discussion going on with both of those.

**MR. YEUNG:**  Yes.  I think the discussions are still ongoing.  We just want to provide this update in the DMC statement so that Your Honor is aware of what's going on.

**THE COURT:**  Okay.

**MR. YEUNG:**  But we are still discussing with them.

**THE COURT:**  Glad you're still discussing with them and working forward on that.

Okay.  So that's everything I saw in the DMC statement to talk about.  Was there anything else that I'm overlooking in the DMC statement?

**MR. YEUNG:**  There's one final item that I think Mr. Richards from Kentucky wanted to address with me as well.

We are -- there are some -- there's a disagreement over whether or not certain disputes over the 30(b)(6) notice that Meta served on the states with consumer protection claims, whether or not those disputes are ripe or not.

We've resolved that ripeness issue.

We are continuing to talk, and we have agreed to submit a stipulation to Your Honor that essentially provides for us to submit briefing to you next Friday, the 28th, I believe --

Right?

**MR. RICHARDS:**  (Nods head.)

**MR. YEUNG:**  -- if the disputes are unresolved; but in the meantime, we'll continue to talk.

**MR. RICHARDS:**  And I would just add that there is a part of -- Zachary Richards for the Kentucky Attorney General's Office on behalf of the State AGs.

I would just add that there is a term in there about phasing and sequencing depositions pending resolution of that dispute that's part of that stipulation.  We plan to confer tomorrow and, hopefully, resolve those disputes, but plan to submit any briefing by next Friday on the papers.

**THE COURT:**  Okay.  So I think you know my views on this.  Things like scheduling and phase -- like where you sequence things and all that, those are absolutely the kinds of things lawyers should be able to work out.

**MR. RICHARDS:**  Yes.

**THE COURT:** So I'm --

**MR. RICHARDS:** Just to be clear, Your Honor, that was part of the agreement we are reaching.

**THE COURT:** Good.  Yes.  Good.  Thank you for that.  Anything else from Kentucky or the other --

**MR. RICHARDS:** Nothing from me, Your Honor.

**THE COURT:** -- states?

So the other housekeeping issue is, we need to -- well, cutoff -- fact discovery cuts off in -- technically, in about two and a half weeks.  Do we need to have a DMC in May, then?

**MS. SIMONSEN:** Your Honor, Ashley Simonsen for the defendants.

I think we can probably take it as it comes, but I'm happy to talk with plaintiffs about it.

**MR. WARREN:** Yeah.  At this point, we don't really know if there will be anything that would be ripe, but maybe we can meet and confer and see what's kind of left in a week or two and then get back to Your Honor.

**MS. HAZAM:** The only thing that I'm thinking of would be -- I know YouTube, I think, are still present.  The lawyers are going to be meeting and conferring on trying to resolve the issues that were taken down from today.  So there's a possibility those may still need to be briefed.

And then we're going to be meeting and conferring about Mr. Boland if we don't resolve things.

May be useful to keep the date for now with an eye towards being able to take it down.

THE COURT:  Well, my point is we don't have a date in May.  We never set one.  So the question is:  Should we set one?

MS. HAZAM:  I thought there was a date set for April 22nd.  Am I wrong about that?  It's fine if I am.

MS. SIMONSEN:  There is for April but -- which is why I think Your Honor was asking about whether we need to then also go to May, and I think that --

THE COURT:  I've been trying to set them two months ahead -- right? -- so --

MS. HAZAM:  I see.

THE COURT:  -- we can all plan.

MS. HAZAM:  We misunderstood.

So I don't think we need to necessarily set for May right now.  I would agree with that.

THE COURT:  Okay.  Okay.  So, hopefully, you won't need me during expert discovery at all, and we will be done in April.  Right?  One can hope.

MR. WARREN:  Sounds great.

THE COURT:  I mean, you've been working together; right?

Okay.  So I do know, from her schedule, Judge Gonzalez Rogers, I think the -- because she took off the CMC for

tomorrow.  And the next one I think she set was in June.  Is that right?  Is there a break for two months?

**MS. SIMONSEN:**  I'm not aware of that, Your Honor.  We do have a CMC in April, Mr. Drake has reported.

**THE COURT:**  You do have a CMC in April.  Okay.

**MS. HAZAM:**  And then June, Your Honor.

**THE COURT:**  And then June.

Okay.  So, because I've done this in other cases where discovery is kind of ending, we can go every other month -- right? -- and maybe we think about setting -- if you don't want to set one in May but maybe just set a control date in June and even take that off at the last minute, just for any cleanup, if there's final cleanup on either ongoing trickle fact discovery or any -- hopefully nothing on expert discovery.

But you know what I mean.  That might be -- since she's having you come back in June, that might make sense.

For your consideration, as much as I love seeing you all.

**MR. WARREN:**  Your Honor, do you have an available date?

**THE COURT:**  Well, if she's going to set hers -- she set hers, as I see it, on June --

**MS. HAZAM:**  13th, Your Honor.

**THE COURT:**  13th?  I'd have to move some things, but we can -- I mean, Thursday June 12th, the day before, would work.  I'd have to move things around.

**MR. WARREN:**  Your Honor, that makes sense to us to just hold that date in June.

**THE COURT:**  Okay.  We'll pencil that in as a control date, and then you tell me in April whether we still want to keep it, and then you tell me in May, if we meet in May, or if we don't, that we don't need it.  Okay?

**MR. WARREN:**  Sounds good.

**THE COURT:**  All right.  But it's set for -- so we'll set it for June 12th at 1:00 p.m.  All right.  And then subject to being taken off if you -- if the parties so desire.

**MR. WARREN:**  Thank you, Your Honor.

**MS. SIMONSEN:**  Thank you, Your Honor.

**THE COURT:**  Don't tell me at the last minute.

**MR. WARREN:**  We won't.

**THE COURT:**  All right.  Anything else?

**MR. WARREN:**  Not from the plaintiffs, Your Honor.

**MS. SIMONSEN:**  Nothing for the defendants.

**THE COURT:**  All right.  Well, God, I thought this would go much longer than it did, given how many letter briefs you all filed.

So thank you for the arguments.  And, again, work on your proposed orders so we can get all those on the docket and get all this cleaned up.  Okay?

**MS. SIMONSEN:**  Will do.  Thank you.

**THE COURT:**  All right.  Thank you.

PROCEEDINGS

**THE COURTROOM DEPUTY:**  We're off the record in this matter.

Court is in recess.

(Proceedings adjourned at 4:09 p.m.)

---o0o---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:  Tuesday, March 25, 2025

*Ana Dub*

_____

Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

CSR No. 7445, Official United States Reporter