# EXHIBIT K

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE:  JUUL LABS, INC.,          )
MARKETING, SALES PRACTICES AND )  Case No. 3:19-md-02913-WHO
PRODUCTS LIABILITY LITIGATION, )  San Francisco, California
_____)

**BEFORE:  THE HONORABLE WILLIAM H. ORRICK, JUDGE**

**REPORTER'S TRANSCRIPT OF PROCEEDINGS**

**MOTION FOR SUMMARY JUDGMENT and CASE MANAGEMENT CONFERENCE**

Official Court Reporter:
Teri Veres, RMR, CRR
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, Spc. 38
Phoenix, Arizona 85003-2151
(602) 322-7251


Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4           Lieff, Cabraser, Heimann & Bernstein, LLP
             By:  SARAH R. LONDON, ESQ.
 5           275 Battery Street
             29th Floor
 6           San Francisco, California  94111

 7           Keller Rohrback, LLP
             By:  DEAN KAWAMOTO, ESQ.
 8                FELICIA JOHNSTON CRAICK, ESQ.
             1201 Third Avenue
 9           Suite 3200
             Seattle, Washington  98101-3052
10
             Wagstaff & Cartmell, LLP
11           By:  TYLER W. HUDSON, ESQ.
             4740 Grand Avenue
12           Suite 300
             Kansas City, Missouri  64112
13
             Girard Sharp, LLP
14           By:  DENA C. SHARP, ESQ.
             601 California Street
15           Suite 1400
             San Francisco, California  94108
16

17   For the Defendants JUUL Labs, Inc.:

18           Kirkland & Ellis, LLP
             By:  DAVID M. BERNICK, ESQ.
19           1301 Pennsylvania Avenue, N.W.
             Washington, D.C. 20004
20

21           Kirkland & Ellis, LLP
             By:  JASON M. WILCOX, ESQ.
22           1301 Pennsylvania Avenue, N.W.
             Washington, D.C. 20004
23

24

25
```

```
1              A P P E A R A N C E S   C O N T ' D

2

3   For the Defendants Huh, Pritzker and Valani:

4           Kellogg, Hansen, Todd, Figel & Frederick, PLLC, LLP
            By:  MICHAEL J. GUZMAN, ESQ.
5           1615 M Street, N.W.
            Suite 400
6           Washington, D.C.  20036

7
            Folio Law Group, PLLC
8           BY:  RYAN FOLIO, ESQ.
            1200 Westlake Avenue N.
9           Suite 809
            Seattle, Washington  98109
10

11

12  (Appearing via Zoom platform):

13  For the Defendants Altria Group, Inc. and Philip Morris, USA:

14          Arnold & Porter Kay Scholer, LLP
            By:  JOHN C. MASSARO, ESQ.
15          601 Massachusetts Avenue, NW
            Washington, D.C.  20001
16

17  For the Defendant JUUL Labs, Inc.:

18          Kirkland & Ellis, LLP
            By:  PETER A. FARRELL, ESQ.
19          1301 Pennsylvania Avenue, N.W.
            Washington, D.C. 20004
20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2   (The proceedings started at 10:06 a.m.)
 3              COURTROOM DEPUTY:  This Court is now in session.
 4   The Honorable William H. Orrick presiding.
 5              THE COURT:  Good morning everybody, please be
 6   seated.
 7              COURTROOM DEPUTY:  We are here in Case No. 19-2913,
 8   In Re:  JUUL Labs, Incorporated.
 9              And, Judge, would you like appearances today?
10              THE COURT:  I'd like appearances from the people who
11   think they'll be speaking.
12              COURTROOM DEPUTY:  Okay.
13              Counsel, if you would, please, state your appearance
14   for the record.
15              MS. LONDON:  Good morning, Your Honor, Sarah London
16   on behalf of the plaintiffs.
17              THE COURT:  Morning.
18              MS. CRAICK:  Morning, Your Honor, Felicia Craick on
19   behalf of the plaintiffs.
20              MR. HUDSON:  Good morning, Your Honor, Tyler Hudson
21   on behalf of the plaintiffs.
22              MR. KAUFMAN:  Good morning, Your Honor, Andrew
23   Kaufman on behalf of the plaintiffs.
24              MR. KAWAMOTO:  Good morning, Your Honor, Dean
25   Kawamoto on behalf of the plaintiffs.
```

 1              MS. SHARP:  Good morning, Your Honor, Dena Sharp on

 2    behalf of the plaintiffs.

 3              MR. BERNICK:  Good morning, Your Honor, David

 4    Bernick on behalf of JLI.

 5              MR. GUZMAN:  Good morning, Mike Guzman representing

 6    Mr. Valani, Mr. Pritzker and Dr. Huh.

 7              MR. FOLIO:  Good morning, Your Honor, Ryan Folio

 8    representing the same defendants.

 9              MR. WILCOX:  Good morning, Your Honor, Jason Wilcox

10    on behalf of JLI.

11              THE COURT:  All right.  Well, good morning

12    everybody.  You will note that I am wearing a mask.  I'm now

13    taking off my mask, and the rule in my courtroom has been that

14    if you're speaking you don't need to wear a mask, but

15    everybody else should wear a mask.

16              Now, I see that 90 percent of you don't have your

17    masks on, and I'm not going to require you today to wear a

18    mask if that's what you've decided to do.  I expect at least

19    each of the tables have been spending a lot of time in close

20    contact.

21              I will tell you that when we get going in the trial

22    everybody will wear a mask, unless they are speaking; and if

23    they are speaking, as long as they're vaccinated, they don't

24    have to.

25              All right, so what I'm gonna do is I'll give you the

```
 1    tentatives that I have and hold the CMC issues 'til the end.

 2    You can have an hour to talk about anything you want to talk

 3    about.

 4          So the -- with respect to the two letter brief

 5    issues regarding the trial, I'm not gonna require Mr. Garnick

 6    to testify remotely.  You can use his -- plaintiffs can use

 7    his deposition.

 8          I am not going to allow the two Unified School

 9    District students, who were just disclosed two months ago or

10    less, one month ago, to testify.  It's too late.

11          With respect to the motions for summary judgment,

12    I'm gonna deny them all.  The plaintiffs can bring a nuisance

13    claim under the first sentence of Section 731.  I think

14    abatement's a permissible remedy, and I don't see why I can't

15    sort these issues out with respect to the trial plan after the

16    first phase is over to the extent that there's going to be a

17    fear of duplication.

18          If I see it, I could include a special question in

19    the verdict form that would help me make a determination but,

20    otherwise, I don't -- I just don't see the problem at this

21    point with the plaintiffs' trial plan; and with respect to

22    everything else, I think there's a question of fact that is

23    going to be best dealt with at trial and in post-trial

24    motions.

25          So that's the -- those are the tentatives and I'll
```

 1   let the defendants take the first crack at any of them.

 2          MR. WILCOX:  Your Honor, it's Mr. Wilcox again on

 3   behalf of JLI.  I've been nominated to tell you what our plan

 4   of battle is for the day --

 5          THE COURT:  Okay.

 6          MR. WILCOX:  -- if it's okay with you.

 7          THE COURT:  That's fine.

 8          MR. WILCOX:  So our plan is to first have

 9   Mr. Massaro, who's joining remotely, talk about the RICO

10   liability issues and why summary judgement's appropriate on

11   those claims.

12          Mr. Folio will then talk about the PSLRA and RICO

13   damages, and then I'll be back to clean up on the nuisance

14   claim and if I have any time left the negligence claim as

15   well.  So people will be in suspense for a little bit about

16   exactly how many times I can say "*Rincon*" in a 15-minute

17   argument, and then Mr. Bernick will address the trial plan at

18   the end.

19          THE COURT:  Okay.

20          MR. WILCOX:  And we also thought it would make the

21   most sense, Your Honor, but defer to you rather than trying to

22   take all of that as one big chunk and having the plaintiffs

23   respond as one big chunk, which is a lot to digest at once, to

24   ping pong back and forth.  So after Mr. Massaro, have the

25   plaintiffs respond, and then similarly for the other

1    arguments.

2           THE COURT:  Yes, I think that makes the most sense.

3           MR. WILCOX:  Great.  With that, I'll turn it over to

4    Mr. Massaro, Your Honor.

5           THE COURT:  Okay.

6           MR. MASSARO:  Well, if Jason is the heavy hitter,

7    then I'll do my best to serve the role I always played in

8    baseball, which is the speedy lead-off hitter.  I'm not vying

9    for any home runs here.  I'm trying for a single, Your Honor.

10           The Section 1962(c) claim, in particular, it's a

11    complicated case; and I think it can be simplified with

12    respect to that claim, and I have three things to say about

13    it, Court permitting.  First, the control issue.  Second, the

14    issue of the element that the plaintiffs need to prove about

15    the existence of an enterprise; and, finally, the topic of

16    causation as they apply to Section 1962(c) only.

17           On the first topic, the topic of control, the

18    touchstone, obviously, is the *Reves v. Ernst & Young* case, a

19    seven to two decision out of the United States Supreme Court

20    written by Justice Blackmun.

21           There were two issues in that case that are mildly

22    unusual and are present in our case, which is the RICO

23    enterprise that was being pled was a corporation.  That's true

24    here, too.  And also there, the issue in the case was whether

25    an outsider to the corporation, in that case Ernst & Young,

1  could be held liable under Section 1962(c).

2          So obviously applicable to our situation; and there

3  the Court began by saying, well, let's look at the entirety of

4  Section 1962 and see the role that (c) plays in the entirety

5  of the section; and the Court analyzed Section 1962(a) and (b)

6  and said, look, an outsider, who is nonetheless acting in

7  coordination in some way with the RICO enterprise by investing

8  in it or engaging in financial transactions with it, can't be

9  held liable under (a) and (b).

10          And then it looked at Section (d) and it said,

11  again, an outsider who is acting in coordination with the

12  enterprise in furtherance of its own ends but in coordination

13  with the enterprise, if it's pursuant to an agreement and so

14  forth, can be held liable under Section 1962(d).

15          But Section 1962(c), the thing I'm talking about

16  here today and the issue in that case, is about something

17  different said the Supreme Court.  It's about the entity

18  itself; and the Court adopted the test, the Management or

19  Operation Test, and the Court said you need to be operating

20  the entity itself or managing the entity itself in order to be

21  held liable under Section 1962(c).

22          And I keep saying the word "itself" because the

23  Supreme Court said that word over and over again, and I keep

24  saying it the way I'm saying it because the Supreme Court

25  italicized that word every single time they used it to

```
 1   emphasize that they were talking about the outside entity
 2   actually acting on behalf of the enterprise itself and being
 3   the actual arms and legs of the entity itself.
 4        So that was the standard the Court applied and
 5   adopted, and it applied it in that case in a way that's
 6   instructive here, too.  Ernst & Young there didn't just audit
 7   the financial statements of the corporation.  Ernst & Young
 8   was alleged to have created the financial statements in
 9   question, valued the key assets that were on that financial
10   statements and presented the financial statements to the Board
11   of Directors, all three things are that are normally done by
12   management of the corporation; but here Ernst & Young did them
13   and, yet, by a seven to two vote the Supreme Court held that's
14   not enough because Ernst & Young was not acting on behalf of
15   the company itself when it did those things as a matter of law
16   and because ultimately the Board of Directors was the one that
17   made the decision about the financial statements.
18        So how does that apply here?  Well, first of all,
19   the proof in the record here is actually exactly to the
20   contrary that Altria was involved in making decisions or
21   acting on behalf of JUUL itself.
22        We've cited to the relationship agreement that the
23   parties signed with each other and we've quoted at length in
24   our papers.  I'm happy to talk about it, but it goes on and on
25   about how JUUL retains complete authority and Altria has no
```

1  authority, under the agreement or any other way, to act on

2  behalf of the entity itself.

3  It's almost -- I -- I don't think the people

4  drafting that agreement had *Reves* in mind, but it's almost as

5  though they did; and then our motion papers set forth on Pages

6  28 to 30 the testimony over and over again from all the key

7  witnesses in this case that further buttresses that idea that

8  Altria did not control JUUL, but that JUUL acted on its own

9  behalf then.

10  And then, finally, there's plaintiffs' expert.

11  Plaintiff has put forward an expert on this topic, and she

12  concedes that Altria did not control JUUL.  So with all of

13  that, not that it's our burden, but I think the evidence

14  demonstrates this standard is not met.

15  So what do the plaintiffs say?  Well, the

16  plaintiffs' expert said while Altria didn't control JUUL,

17  Altria exercised non-coercive power with respect to JUUL and

18  Altria quote "influenced" JUUL.

19  Even if an expert's ipse dixit statements like that

20  could get a plaintiff past summary judgment -- and they didn't

21  in Ernst & Young.  That was a summary judgment case.  Even if

22  they could, this expert parrots the wrong phrases.  The

23  phrases she uses are exactly not the standard that the Supreme

24  Court adopted in *Reves*.  In fact, they're like the standard

25  that the Supreme Court rejected in *Reves*.

1   So the expert doesn't even say the right words, and

2   the plaintiffs haven't come forward in this motion or

3   otherwise with any examples of Altria actually acting on

4   behalf of JUUL where Altria was the decision maker, Altria

5   actually managed JUUL itself or operated JUUL itself.  There's

6   no evidence.  The plaintiffs point to evidence of Altria

7   supposedly influencing JUUL, but that is not the standard.

8   That's the first point, Your Honor, the control point.

9   Second point is a briefer one about the existence of

10  an enterprise; and state courts throughout this land, their

11  dockets are clogged up with tort cases and in most of those

12  tort cases the basic allegation is the officers and directors

13  or employees of some corporation controlled that corporation

14  in a way that led to that corporation committing a tort.

15  Notwithstanding that allegation, those cases are not

16  RICO cases.  They do not automatically become RICO cases

17  because the officers and directors of a corporation control a

18  corporation to do that.  Ordinarily, the way -- and it would

19  be very bad if every tort case did become a RICO case, but

20  ordinarily the way to convert one to the other would be to

21  allege that somehow in controlling the corporation the

22  officers and directors were acting in some way other than the

23  corporation's ordinary course of business or other than the

24  corporation's interests, and for that reason the corporation

25  became a RICO enterprise that was controlled by these

1  officers.

2          That's the most normal way to try to convert the one

3  to the other.  I'm not saying it's the only way, but it's the

4  only way I can think of that the plaintiffs have identified so

5  far; and I don't think, Your Honor, that the plaintiffs have

6  presented any proof of that happening here.

7          They have one footnote citation to some testimony

8  from Mr. Dunlap.  It's nowhere near enough, and then the rest

9  of the course of conduct in this case is exactly to the

10 contrary.  Of course, this case started out as the ordinary

11 tort case in which JUUL was alleged to have been acting in its

12 ordinary course of business, and then there was a RICO

13 association in fact enterprise that was pled, and the Court

14 expressed skepticism about whether the allegations were

15 sufficient to make out that JUUL was doing anything other than

16 acting in its own interests in the ordinary course of

17 business.

18         And when the RICO enterprise was converted to be

19 JUUL, that's the only thing that changed about the case.  The

20 rest of the case remained the same, and these allegations

21 continued to be in the case.  Mr. Wilcox is going to talk

22 about a lot of them where JUUL was alleged to have been acting

23 in the ordinary course of its business to -- in committing the

24 torts that are alleged to have occurred.

25         So the RICO component of this case is unnecessary,

 1   and it's in contradiction to the lion's share of the case and

 2   there's no evidence to support the idea that there's an

 3   enterprise component.  That's the second point, Your Honor.

 4        The final point -- let me just check my time, Your

 5   Honor.  I don't want to go over.  I want to be that speedy

 6   lead-off hitter.

 7        The final point is the point about causation.  The

 8   RICO civil enforcement mechanisms have a heightened causation

 9   or standing requirement.  Section 1964(c) says that any

10   damages the plaintiffs seek needs to be as a result of actions

11   by the defendant in furtherance of the various schemes; and

12   that phrase "as a result of" imposes, in essence, a heightened

13   causation requirement for RICO higher than certain other

14   torts.

15        Here, the allegation -- so what you do is you take a

16   look at what's the -- what's the injury to business or

17   property that's being alleged, and Mr. Folio's going to talk

18   about some of that and how does that trace back to the

19   defendant?

20        Well, here, for example, there's a bathroom door

21   that was damaged.  How did it get damaged?  Some students

22   damaged it.  How did the students damage it?  They wanted to

23   get into the bathroom to engage in JUUL'ing.  Why did they

24   want to get into the bathroom so badly to engage in JUUL'ing?

25   Because they were addicted.  Why were they addicted?  Because

 1    there was an epidemic in the San Francisco schools.  Why was

 2    there an epidemic in the San Francisco schools, say the

 3    plaintiffs, because JUUL in 2015 and at times before Altria's

 4    involvement caused there to be an epidemic in the San

 5    Francisco schools.

 6            What does Altria have to do with this?  Altria, by

 7    engaging in legitimate -- admittedly legitimate distribution

 8    activity to adults lent a veneer of respectability to JUUL's

 9    business that obscured the previously-existing illegitimate

10    conduct.  So that's Altria's involvement; and as I've just

11    described it, that's a very long and attenuated chain of

12    causation, and I would submit that there are too many

13    intervening actors and that the chain is too long to meet the

14    legal test set forth in the *Touchstone* case, the *Holmes* case

15    out of the United States Supreme Court or the *Imagineering*

16    case out of the Ninth Circuit.

17            In each one of those two cases -- happy to talk

18    about them more -- but in each one of those two cases a chain

19    of causation and the intervening actors were much, much -- the

20    chain was much shorter and the intervening actors were much

21    fewer and, yet, the Supreme Court and the Ninth Circuit each

22    held in those cases too attenuated a change of causation.  So

23    that's the first reason why chain of causation fails.

24            The second reason why causation fails is even if you

25    could make out a case by proving up the chain of causation I

 1   just described, the plaintiffs haven't actually come forward
 2   with the proof that's necessary to do that at this stage.
 3   There are no affidavits about the damage that flowed to San
 4   Francisco as a result of this door.  There are no affidavits
 5   about who these students were, why they acted, what caused
 6   them to do what they did; and there are definitely no
 7   affidavits from anyone in the San Francisco public schools,
 8   any student saying that they saw anything Altria said or
 9   touched anything that Altria touched.  There is no factual
10   proof at each stage in this causal chain to link Altria to
11   this damage outcome.  That's the second reason.
12          The final reason is that the proof that actually
13   does exist in the record actually breaks the chain of
14   causation.  It's proof of the break in the chain in causation.
15   So, for example, the plaintiffs admit or they affirmatively
16   contend that the epidemic in the San Francisco public schools
17   was in existence in May 2018.  They say JUUL'ing was
18   ubiquitous in the schools at that time.
19          That's before most of the activity that is alleged
20   to have occurred by Altria in furtherance of the schemes to
21   which Altria is allegedly a party, and so even if Altria's
22   legitimate distribution activities covered up illegitimate
23   prior activities, those prior activities had already
24   resulted -- before Altria even engaged in its activities, had
25   already resulted according to plaintiffs' own allegations in

 1    an epidemic within the San Francisco public schools.

 2            That cuts off the chain of causation or the other

 3    chain of causation that's alleged as to Altria, the flavor

 4    manipulation scheme in which Altria was alleged to have

 5    lobbied the federal government to cause the federal government

 6    to refrain from regulating flavors until a time later than it

 7    otherwise would have.

 8            I feel very strongly, Your Honor, there is no

 9    factual issue of any kind about applicability of the

10    Noerr-Pennington Doctrine to that obligation, but that's not

11    what I'm here to talk about today.

12            Even if that kind of conduct were actionable under

13    Noerr-Pennington, it wouldn't be actionable in this specific

14    case.  It might be actionable in many other cases in this MDL,

15    but not in this specific case; and why is that, because the

16    City of San Francisco banned flavors in April 2018, long

17    before the conduct that I've just described as Altria's, you

18    know, forestalling the regulation of flavors at a national

19    level.  So that cuts off the chain of causation.

20            And the only other thing I'd say on the topic of

21    covering up someone else's activity, there's a Ninth Circuit

22    case directly on point about that in the context of Section

23    1962(c) and that's the *Oki Semiconductor* case.  It's a very

24    short case, and I think it makes clear that these kinds of

25    allegations, even if there were proof of them, would not be

 1  sufficient.  Those are my points, Your Honor.

 2          THE COURT:  All right.  I think you tried to stretch

 3  your single but who is --

 4          MR. MASSARO:  Fair enough.

 5          THE COURT:  Who's gonna respond?

 6          MR. HUDSON:  I will, Your Honor.  Again, Tyler

 7  Hudson for the plaintiffs.

 8          Your Honor, I'll start by taking it in the order

 9  that Mr. Massaro laid out these arguments.  First, operation

10  or management of JLI and then, second, the -- whether there's

11  a cognizable enterprise, and then third on causation.

12          I would note by saying that Your Honor's tentative

13  suggested that what this involved is a significant fact

14  dispute, and I think in large part what you heard from

15  Mr. Massaro is his version of the facts and why he thinks that

16  Altria may be able to prevail at trial.

17          What it didn't hear is any new law or new arguments

18  that would suggest that they be entitled to summary judgment,

19  and that's because in *Reves* -- to start with the Operation or

20  Management Test it's in *Reves,* as this Court set out in its

21  Motion to Dismiss order, the question is whether or not the

22  defendant had some part in directing the affairs of the

23  enterprise; and following that test, which is a highly

24  fact-intensive evaluation, there's clear evidence from which a

25  jury could reach the conclusion that Altria had some part in

1    directing the affairs of the enterprise.

2         The Supreme Court in *Reves* noted that even

3    lower-rung employees could be held liable under RICO.  I mean,

4    certainly if even a lower-rung employee could be held

5    accountable under RICO, the test isn't whether you legally

6    control JLI.  So they set forth for you the wrong test.

7         When you lay out the right test, the evidence is

8    very clear that each one of the defendants, including Altria,

9    did play some part in directing the affairs of JLI.  From

10   Altria's part, I'll focus on that argument for now.

11        Starting on July 28th of 2017 forward, there's clear

12   evidence of communications between Altria and Mr. Pritzker,

13   Mr. Valani and the other members of the JLI board in which

14   they were discussing how to bolster the operations of JLI

15   itself.  So Altria in those meetings wasn't talking about how

16   can we work together to help Altria?

17        They're talking about in that meeting giving advice

18   and planning on things that JLI could do to help improve its

19   sales, and those meetings went on over an 18-month period

20   before Altria makes its investment in JLI and there's -- the

21   record is clear that there are multiple different

22   conversations at that point in time; and keep in mind at the

23   very same time that those conversations are happening about

24   Altria investing in JLI, there's also FDA communications in

25   which the FDA is beginning to ask questions about e-cigarettes

1   and their role in youth vaping.

2         So right at the same -- the evidence -- it's

3   reasonable for a jury hearing that evidence to infer that

4   those conversations just go beyond Altria thinking about

5   what's involved, Altria's best interests; but, instead,

6   they're taking an interest in JUUL, they're communicating with

7   JUUL, they're talking about doing a deal with JUUL all at the

8   same time where there's other factors where, as this Court's

9   noted before, Altria and the individual directors have

10   personal goals.

11         In other words, Altria benefits if there's less

12   regulation of e-cigarettes and there's more people smoking

13   cigarettes and there's more nicotine users in this country.

14   The individual investors, the evidence will show, had a strong

15   interest in their personal goal in order to enrich themselves

16   and become multi -- a hundred millionaires or billionaires

17   from JUUL's investment.

18         So that's the -- that's a flavor for the record that

19   shows Altria's involvement in having some part in directing

20   the affairs of JLI.  After the deal is done, then Altria shuts

21   down its own e-cigarette division and puts its resources

22   behind JUUL.

23         There is a services agreement, and the evidence will

24   show that during that period of time sales actually increased

25   and the 75 percent of JUUL's revenues in 2019 stem from mint,

1  which is -- which goes directly to the evidence about the

2  communications with the FDA and those issues and whether or

3  not there was information concealed from the FDA, which is a

4  fact question.

5          It's not a Noeerr-Pennington lobbying issue.  It's a

6  question of were they withholding information because they had

7  individual goals that they wanted to achieve, you know, at --

8  to increase JLI sales because that was going to boot -- that

9  was going to help each one of the RICO defendants.

10         So that's the evidence on Altria and why it had some

11 part in directing the affairs of JLI.  At the very least,

12 there's a fact question for the jury.

13         The second issue raised was the enterprise and

14 whether there's a cognizable enterprise.  Now, Mr. Massaro

15 said not every case is a RICO case and that's true, and the

16 way we figure out whether there's a RICO --

17         THE COURT:  Mr. Hudson, you may want to slow down a

18 little bit.  If the court reporter was here, she would be

19 telling you that.  So I'm just going to tell you just --

20         MR. HUDSON:  I appreciate that.

21         THE COURT:  I know I'm setting tight time limits,

22 but just take your time.

23         MR. HUDSON:  Yep.  Thank you, your Honor, I

24 appreciate that.

25         So for the enterprise, a RICO claim -- a case

 1   becomes a RICO case if the conduct meets the elements of the
 2   statute.  So -- so for a RICO claim, one of the elements is an
 3   enterprise; but the statute actually defines an enterprise and
 4   that's at 19614, and one definition of an "enterprise" is a
 5   corporation.
 6       So here, the defendants spend pages saying is there
 7   a cognizable RICO enterprise?  But there clearly is an
 8   enterprise.  That's 19614.  What their argument really is is
 9   that their conduct shouldn't be actionable because they're
10   acting within the ordinary course of a business or they're
11   acting within the scope of their corporate duties.
12       Well, that was the exact issue that went before the
13   Supreme Court in *Cedric Kushner,* and the Court rejected the
14   view that you have to be acting outside the scope of your
15   corporate duties.  So that issue has been decided by the
16   Supreme Court.
17       This isn't a novel theory.  I mean, in the *Cedric
18   Kushner* case Don King was sued for RICO for using his
19   corporation as a vehicle.  His corporation was sued under
20   state law for a common law fraud and for tortious interference
21   with the contract.  So this isn't a normal -- this isn't some
22   stretch or some novel theory that we're asking.  We're just
23   asking you apply established Supreme Court law where the facts
24   of this case fit an issue that should go to the jury, and so
25   that is the enterprise issue.

 1          On the causation issue, Your Honor, I think your

 2    Motion to Dismiss order actually directly addressed that issue

 3    because at that point the defendants made the argument that

 4    the conduct was too attenuated, that there were too many links

 5    in the chain and, as you said, there was no other plaintiff

 6    who would have standing to bring these claims.  There's a

 7    direct nexus between the conduct and the harm and so that --

 8    that case -- I mean, it's a straight -- it's a direct

 9    application of those factors.

10          There is a tight nexus here.  The schools are the

11    direct victim of the misconduct, and the evidence will show

12    that they were fully aware that schools were one of the

13    entities being impacted, and one of the things they even did

14    was, you know, made hundreds of calls and communications to

15    schools.  So, again, a highly fact-intensive question with the

16    evidence.

17          The last point Mr. Massaro made was that on

18    causation he contends that we don't have the evidence to show

19    the connection and, again, when you look at the evidence of

20    the mint scheme -- Altria's contention is all the misconduct

21    was done before we became involved; but if you just took mint

22    itself and the mint sales that happened in 2019, Dr. Cutler's

23    report shows that JLI itself made an extra 500 million dollars

24    from those sales; and so remember, by that point in time,

25    Altria is a 35 percent investor.  So it's making a significant

1    amount personally from that investment.

2            So for the reasons that you laid out in your

3    tentative, we don't believe that the Court should grant

4    summary judgment to Altria on any of these issues.

5            THE COURT:  All right, thank you.

6            MR. HUDSON:   Thank you.

7            MR. MASSARO:  And may I speak just briefly, Your

8    Honor --

9            THE COURT:  Sure.

10           MR. MASSARO:  -- to one of the points?

11           I think it's about *Reves* because I think it's a

12   genuine -- there's a genuine way to read *Reves* in the way it

13   was just described, but it's not accurate.

14           When the Court was speak -- first of all, *Reves* was

15   a summary judgment case and the facts as to Ernst & Young were

16   the facts I just described, far more extreme than what we have

17   here.  So it's not like you can just say factual issues, end

18   of discussion.  The Supreme Court expressly rejected that in

19   *Reves;* but, second of all, on the legal point, the Court was

20   talking about who is it that manages or operates a

21   corporation, and it's talking about the members of the Board

22   of Directors, they normally manage.

23           Who is it that operates?  It's these lower-rung

24   employees, and so this discussion of taking some part in a

25   management or operation of the corporation occurred in the

 1  context of people who were already agents or officers of the

 2  corporation; but when the Court then goes on to discuss third

 3  parties, the Court says third parties very different, very

 4  unusual that a third party would ever be in that position and

 5  then the Court posit -- and then it says and Ernst & Young

 6  certainly isn't, and it posits.

 7          It says, we can imagine that there might be

 8  circumstances where somehow a third party comes to control,

 9  that's the word they used, control the corporation; but those

10  aren't present here, and I think the *DeFalco* case out of the

11  Second Circuit that the plaintiffs cited is exactly that type

12  of situation where the town says to a permit applicant, "Dear

13  Mr. Permit Applicant, if you want this town to issue you a

14  permit, you're gonna have to go talk to Mr. Outsider, because

15  Mr. Outsider is the one who decides whether or not this town

16  will issue you a permit."

17          That's the kind of thing the Supreme Court was

18  talking about when it talked about control, and so it's a

19  legal point but if that's the standard -- if I'm correct that

20  that's the standard, I don't think anything that was just

21  said, you know, meets the standard.

22          THE COURT:  All right, thank you.

23          Who's next?

24          MR. FOLIO:  Good morning, Your Honor, Ryan Folio for

25  the non-management directors.

1       So I want to address two issues this morning.  The

2   first is the Private Securities Litigation Reform Act as

3   applied to the RICO claim, and the second is the lack of RICO

4   damages.  So I'm going to be a little bit more ambitious than

5   Mr. Massaro.  I'm going to try to hit a double.  Given the

6   tentative, I'll be happy just to get on base.

7       So let me start -- if I impress one thing on Your

8   Honor this morning with the Private Securities Litigation

9   Reform Act, it's that there is no factual dispute with respect

10  to this issue.  It is a purely legal issue that is ripe for

11  decision now, and that will be no better decided at the end of

12  a trial than at this stage.

13      So the Court should grant the non-management

14  directors summary judgment on the RICO claim because it's

15  barred by the PSLRA.  This case is not just a good one for

16  application of the PSLRA bar, but an especially strong one.

17      The bar states that, quote, "No person may rely upon

18  any conduct that would have been actionable as fraud in the

19  purchase or sale of securities to establish a RICO violation."

20  The key words here are "would be actionable" as securities

21  fraud.

22      Ordinarily the bar engages a court in what's called

23  a reverse 12(b)(6) inquiry.  The Court asks whether the

24  conduct in question would be actionable as securities fraud,

25  but we do not need to speculate here because in *Klein v.*

1    *Altria Group*, a case decided in the Eastern District of

2    Virginia just last year, securities plaintiffs stated claims

3    arising out of the same conduct that SFUSD now purports to

4    challenge under RICO, that is, an allegedly fraudulent scheme

5    culminating in Altria's investment of 12.8 billion dollars in

6    JLI, which was a massive securities transaction.

7           So the conduct that SFUSD challenges under RICO not

8    only would have been actionable as fraud in the sale of

9    securities, according to one of your colleagues it was

10   actionable as fraud in the sale of securities and SFUSD's RICO

11   claim is, therefore, barred as a matter of law.

12          Logically, SFUSD can escape the bar only by arguing

13   that *Klein* was wrongly decided or by distinguishing *Klein*.

14   SFUSD does not try to argue that *Klein* was wrongly decided;

15   and as non-management directors' reply explained, all of

16   SFUSD's attempts to distinguish *Klein* are foreclosed by

17   existing law.

18          The complaints challenge the very same conduct,

19   defendants' supposed targeting of underaged users with a

20   variety of fraudulent schemes, and every RICO scheme that

21   SFUSD asserts has a direct corollary in *Klein*.  Indeed, SFUSD

22   itself directly accuses Altria of defrauding its investors in

23   the SFUSD at Paragraph 654.

24          The securities plaintiffs kept that same allegation,

25   whether they got it from SFUSD's complaint or a different

1    plaintiff's complaint in this MDL, and they were held to have

2    stated a securities claim.

3         The other distinctions that SFUSD purports to draw

4    are legally irrelevant.  It does not matter, for example, that

5    SFUSD likely lacks standing to bring a securities claim or

6    that it frames its allegations as a fraud on the public as

7    opposed to a fraud on Altria's shareholders.  Other plaintiffs

8    have tried these arguments time and again, including in the

9    Ninth Circuit, and their attempts have repeatedly failed.

10        Finally, SFUSD's reliance on the Ninth Circuit's

11   decision in the *Resner* case is misplaced.  In *Resner* -- and

12   this is the key easy distinction -- no court had held that the

13   conduct the plaintiffs were attempting to challenge under RICO

14   stated a securities claim.

15        By contrast here, *Klein* held that the very conduct

16   SFUSD now attempts to challenge under RICO does state a

17   securities claim.  Indeed, SFUSD cites no case in which one

18   court held that conduct was actionable as securities fraud and

19   then a second court held that a RICO claim could proceed

20   challenging that very same conduct.

21        As far as non-management directors are aware, Your

22   Honor would be the very first told that; and to the contrary,

23   in the non-management directors' motion and then again in the

24   reply, they cite the *Greenfield* case, which applied the PSLRA

25   bar in just that circumstance where some plaintiffs stated

1   securities claims in State Court and then plaintiffs attempted

2   to state a RICO claim arising out of that very same conduct in

3   Federal Court; and the District of Arizona held,

4   unsurprisingly, that the PSLRA bar applied.

5           In sum, there is no issue of fact here.  There is a

6   fundamental legal flaw with plaintiffs' RICO case, and summary

7   judgment should be granted on this basis.

8           At this point I just want to pause and I'd be happy

9   to answer any concerns with Your Honor has with the PSLRA

10  argument.

11          THE COURT:  Please, keep going.

12          MR. FOLIO:  Okay.  So moving on to the issue of RICO

13  damages, here, too, there are legal challenges to the

14  existence of an injury to SFUSD's property, and there's no

15  factual dispute to resolve at any trial.  So the Court should

16  grant summary judgment on the RICO claims on this basis as

17  well.

18          On summary judgment RICO requires SFUSD to come

19  forward with evidence of injury to its property by reason of a

20  RICO violation.  SFUSD must also have evidence of concrete

21  financial loss, not mere injury to an intangible property

22  interest.  SFUSD has no admissible evidence meeting these

23  requirements.

24          I want us to go back in time.  At the Motion to

25  Dismiss stage, Your Honor gave school districts the benefit of

1    the doubt and allowed RICO claims to proceed based on

2    allegations of quote "damage directly to their physical

3    property" closed quote.  Things like littering, installation

4    of vape detectors, cameras and signs; but after months of

5    discovery SFUSD can't point to any evidence of that kind of

6    damage causing a concrete, documented financial loss.

7          Not a single expert can testify about documented,

8    concrete financial loss attributable to injury to SFUSD's

9    property.  Instead, and in contrast to the Motion to Dismiss

10   order that Your Honor issued, SFUSD has pivoted and made

11   intangible injuries the crux of its RICO case.

12         For example, loss of use and enjoyment of property

13   because of locked doors, disruption of the educational

14   environment and threats to students' safety.  Indeed, SFUSD

15   now predicates its RICO injury on a fruity fog, which sounds

16   in personal injury and is classically unrecoverable under

17   RICO.

18         *Ecodiesel* and the Ninth Circuit precedent that it

19   applies hold that these intangible injuries cannot support a

20   RICO claim.  They are more like personal injury, which is not

21   RICO damage.  To be sure, SFUSD also comes up with a handful

22   of instances of what it calls physical property damage, but

23   none of that is supported by admissible evidence and so

24   there's no issue of fact here.

25         No witness can testify about it.  No expert

UNITED STATES DISTRICT COURT

 1   documented it in a report.  Namely, SFUSD relies on staff

 2   notes or notes from the staff of its expert, Michael Dorn, in

 3   an attempt to tie purported RICO violation to things like

 4   broken doors, cut fences and vaping devices hidden in

 5   bathrooms; but this evidence is hearsay and it contains

 6   multiple levels of hearsay on top of that, and SFUSD cannot

 7   overcome summary judgment by relying on inadmissible evidence;

 8   and regardless, no evidence, including the Dorn notes, suggest

 9   that these instances occurred by reason of any violation of

10   RICO, as Mr. Massaro highlighted, nor do they document how

11   much SFUSD lost in concrete financial loss as a result of,

12   say, the broken door or the cut fence.

13           Finally, SFUSD, perhaps recognizing that it has no

14   provable damages at this juncture, ventures that it might

15   sustain damages in the future; but prospective injuries and

16   abatement measures aren't recoverable under RICO, and for that

17   we cite the *Martinez* case.

18           All this, without mentioning the Ninth Circuit's

19   decision in *Canyon County*, which of its own force prevents

20   entities like SFUSD from recovering for expenditures on the

21   provision of public services.  That, too, bars many of SFUSD's

22   asserted damages as a purely legal matter.

23           In sum, the Ninth Circuit has said that absent

24   damage a RICO claim cannot be sustained.  That's the *Pacific*

25   *Dam Corp.* case.  That's the case here so summary judgment

1    should be granted.

2              THE COURT:  All right, thank you.

3              THE WITNESS:  Thank you.

4              THE COURT:  Mr. Hudson.

5              MR. HUDSON:  Thank you, your Honor.

6              If I could, just for two seconds back to the end of

7    Mr. Massaro's argument, only because he promised he was going

8    to hit a single and at the end in rebuttal he tried to hit a

9    home run.

10             So I just want to make sure that even if you apply

11   the standard that he suggested, Dr. Drumwright, one of the

12   plaintiffs' experts, makes it clear that Altria had effective

13   control of JLI.

14             So with that said, I'll then jump in to the PSLRA

15   argument.  The difference in the PSLRA argument is that you

16   have two different lawsuits with two different sets of factual

17   allegations, and in *Klein* the Judge was analyzing the

18   allegations in the securities fraud complaint.

19             So there was -- the Judge in *Klein* wasn't looking at

20   SFUSD's RICO complaint with the RICO allegations with that

21   challenged conduct, the Judge was looking at securities law

22   conduct.  So it's just not true that they're challenging the

23   same conduct.

24             In *Klein* they're challenging the Altria's conduct in

25   terms of the company's disclosures to their shareholders in

 1    their financial statements.  In the SFUSD case we don't have

 2    any allegations about Altria's financial statements or what

 3    should or shouldn't be disclosed in those.

 4          The over -- the overlap, which the defendants are

 5    trying to seize on, is that in the securities case, which was

 6    filed, like, two years later, they -- they look at a lot of

 7    the allegations in the SFUSD complaint and it includes some of

 8    that same subject matter.

 9          What's missing, though -- and this is the most

10    important part of the analysis -- is the SFUSD case would

11    never -- like the complaint that we filed would never support

12    actionable securities fraud, which, as said, is what the test

13    is.  So there's no applicability.  PSLRA just doesn't apply

14    here, and that's why when we filed -- when the motions to

15    dismiss were filed, nobody made this argument because if you

16    just looked at SFUSD's complaint, it's not a securities fraud

17    complaint.  It's not a disguised securities fraud claim so

18    that doctrine has no applicability here.

19          On the RICO damages issues, if I could now move to

20    that, they're focused narrowly on the conduct; but if you take

21    a step back and you look at the test that is articulated and

22    again consider all of the plaintiffs' evidence, we have

23    established RICO standing, and we have shown harm to business

24    or property.

25          Specifically, we've shown that the RICO defendants'

 1   fraudulent scheme violated SFUSD's protected property

 2   interest, and that's what the Ninth Circuit in *Diaz* set out as

 3   the test because you look to -- RICO looks to state law and

 4   asks, is there a protected property interest that's being

 5   violated?

 6           And here, as we lay out in the papers, we point to

 7   the right to use and enjoyment of your property; and so here

 8   the causation is the tight nexus between the fraud scheme,

 9   which causes the JUUL devices to infiltrate SFUSD's property

10   and it disrupts the schools.

11           So they want to focus just on instances of property

12   damage, which we certainly have.  For example, one of the

13   school administrators, Ms. Pak, talks about the hazardous

14   waste and the disposal of that on SFUSD's grounds; but the

15   issue is broader than that and, that is, Mr. Dorn's report

16   lays out and explains that the measures that have occurred at

17   SFUSD aren't sufficient and then he lays out the measures that

18   are needed to address, you know, the invasion of the property

19   interest.

20           And so the evidence that the defendants don't

21   consider and ignore, which would be before the jury, is the

22   SFUSD has a hundred and twenty-five million dollar budget

23   deficit each year; and so the real measures that are needed at

24   SFUSD, which are the same measures that JUUL when they -- when

25   their consultant analyzed the problem, he reached the same

1    conclusion.  "You need a comprehensive technology-based

2    solution."  That's Mr. Dorn.

3          He's our damages expert, and he's gonna testify to

4    the jury and explain the measures that are needed at SFUSD;

5    and so instead of spending the money that SFUSD doesn't have

6    because it has a hundred and twenty-five million dollars

7    budget deficit, it brought this lawsuit; and the lawsuit is

8    seeking compensation as the measure of damages to address and

9    compensate for the invasion of SFUSD's property interest.

10          The concrete financial injury is clear.  It's laid

11    out in Mr. Dorn's report.  He talks exactly about the measures

12    that are needed, the expenses, the amounts.  So that's all

13    laid out to the penny.

14          There's never been a case that the defendants have

15    cited where a plaintiff has to actually cash a check and

16    suffer out-of-pocket losses in order to have standing to bring

17    a RICO claim.  For example, *Diaz* is a key Ninth Circuit case;

18    and in that case it was a false imprisonment case where a

19    person brought a RICO claim against LA Police Department and

20    there -- because he was contending that he was wrongfully

21    detained as part of a scheme, and as a result he -- his

22    protected property interest was the right to tortuous

23    interference with his expectancy to employment.

24          It wasn't just -- it wasn't like he had an amount of

25    lost damages.  He was talking about his ability to go out and

1  try to find a job.  There the Ninth Circuit found that there
2  was RICO standing and that had been met.

3        So it's clear that here SFUSD's testimony meets both
4  the evidence to show that there is a protected property
5  interest that's been violated and that there is concrete
6  financial harm from Mr. Dorn.

7        Now, *Canyon County* was the other case that I heard
8  mentioned.  That doesn't foreclose any of these damages
9  because SFUSD is not seeking compensation for past
10 expenditures on government services that are provided to the
11 public.  So there's a clear demarcation between Mr. Dorn's
12 damages, which involve compensation that arises for violating
13 a protected property interest, which is the invasion of the
14 property and the disruption that it's causing on school
15 grounds and other damages.

16       Here, under the RICO claim, Mr. Dorn's damages tie
17 directly to the invasion of that property interest.  For
18 example, in *Canyon County* or in the opioids case, there were
19 additional categories of damages for past expenses for
20 healthcare costs or other things.  Here, we don't have that
21 issue because we've sorted those out, and Mr. Dorn's damages
22 are focused purely on the compensation that arises from the
23 invasion of the protected property at interest.

24       Then the other cases that the defendants cited, like
25 *Oscar* and *Berg* and *Ove* where they talk about an intangible

property right, all of those dealt with personal injuries to
the plaintiff where they had -- they were annoyed or they had
emotional distress; where things here, this doesn't involve a
theoretical risk or an annoyance.

It involves a condition that exists on SFUSD
property right now that has existed, it does exist.  It
demands measures to be addressed.  Mr. Dorn has outlined
specifically what that money is, and so there's a -- there's a
clear nexus to the property which distinguishes all those
cases.  It's not personal injury.

So the bottom line is, if the jury concludes that
Mr. Dorn's measures are not necessary to address the problems
on SFUSD's property, then the claim would fail partly or
entirely; but that's a fact question for the jury.  SFUSD
clearly has standing to bring a RICO claim.  Mr. Dorn's report
sets out the compensation sought and the measure of damages,
and none of the defendants' cases cited prevent SFUSD from
seeking these damages as compensation at trial for violating
their protected property interest.

THE COURT:  Great, thank you.

MR. HUDSON:  Thank you.

MR. FOLIO:  May I?

THE COURT:  Sure.

MR. FOLIO:  So I'll start on the PSLRA.  As I said,
to escape the effect of Klein, plaintiffs had two options.

1  They could either argue that *Klein* was wrongly decided or

2  attempt to distinguish it, and I just heard my colleague

3  attempt to distinguish *Klein* on the basis that different

4  factual allegations were made there and so different conduct

5  was at issue; and one reason my colleague said that was

6  because SFUSD makes no allegations of securities fraud, does

7  not allege anything about the right -- about the accuracy of

8  Altria's statements to its investigators; and so I mentioned

9  this in my opening, but now I'm just going to read it.

10  SFUSD's complaint at Paragraph 654 says quote, "That

11  same day, October 25th, 2018, Altria continued its deception

12  on an earnings call with investors," end quote.

13  That is a straightforward allegation of securities

14  fraud. In SFUSD's complaint counsel's simply incorrect in

15  stating that SFUSD does not make allegations of securities

16  fraud. Nor would it matter if that allegation in Paragraph

17  654 weren't there or weren't in the securities complaint

18  because the gravamen of each case is the same, and every RICO

19  scheme that SFUSD alleges has a direct corollary in *Klein*.

20  And so I commend very strongly to Your Honor Pages

21  11 through 13 of the non-management director's motion which

22  has a two-page chart -- or page-and-a-half long chart that

23  compares the RICO schemes alleged in SFUSD's complaint against

24  not just the securities complaint, but in some instances the

25  order that Judge Novak issued in the Eastern District of

1    Virginia which credited those schemes in allowing securities

2    plaintiffs to move past a Motion to Dismiss.

3          So the only conduct that supports the RICO claim in

4    this case is those five schemes, and those five schemes were

5    in the securities complaint in spades.

6          The final thing I'll say about, you know, attempting

7    to distinguish the conduct is SFUSD and the securities

8    plaintiffs alleged that the same set of statements are

9    fraudulent.  The only difference is that SFUSD frames them as

10   a fraud on the public, and the securities plaintiffs frame

11   them as a fraud on Altria's investors.  So I'll give you two

12   examples from our motion, which I think are especially good

13   ones.

14         SFUSD's complaint at Paragraph 205, as compared to

15   the securities complaint at Paragraph 160, it's a nearly

16   identical allegation about nicotine equivalency; but the

17   securities plaintiffs just deleted the phrase "distributed via

18   the mail and wires and through acts of mail and wire fraud,"

19   and, instead, they treated it as a securities allegation.

20         Here's my second example:  SFUSD complaint Paragraph

21   227 compared with the securities complaint Paragraph 176, a

22   nearly identical allegation about concealing youth usage from

23   the public and regulators; but the securities plaintiffs added

24   reference to quote "consumers and investors."

25         We have the same factual allegations here.  What

1    happened, as a matter of fact, was that the securities

2    plaintiffs probably picked up a complaint from a plaintiff in

3    this MDL and thought it stated a good securities claim, and

4    they were right, according to Judge Novak.

5           My colleague also said that the complaint as filed

6    would not support securities fraud claim, and that's not the

7    relevant test.  The statute asks whether the conduct would be

8    actionable as securities fraud, and even plaintiffs cite a

9    case, the *Bald Eagle* case out of the Third Circuit that

10   recognizes that is the relevant inquiry, not whether SFUSD's

11   complaint would state a securities fraud complaint.

12          And my final point on the PSLRA issue is my

13   colleague mentioned that no one made this motion in a Motion

14   to Dismiss.  There's a good reason for that.  It's not because

15   the defendants thought it was a bad argument.  It's because at

16   that point, when the Motion to Dismiss was happening, the

17   decision in *Klein* had not come down yet.

18          So in order to argue for the bar in this Court, the

19   defendants would have had to argue contradictory positions in

20   two courts; but now that *Klein* has been decided there's no

21   tension, and the fact of the *Klein* decision, its implications

22   for the RICO claim here are clear.

23          I'll be quick on the RICO damages issues.  I think

24   we should zoom out and just ask, what are we talking about

25   here?  We're talking about things like a single broken door in

 1    the San Francisco Unified School District.  We're talking

 2    about vape devices hidden in water valves and in bathroom --

 3    in bathrooms.

 4          But to be sure, plaintiffs don't want to go to trial

 5    and talk only about the door and only about the valves and

 6    only about the bathrooms, right.  They want to present a

 7    multi-million dollar RICO case to a jury; and so, you know,

 8    this is, in essence, a Trojan horse talking about a few issues

 9    of arguable physical property damage to present a

10    multi-million dollar RICO case over a six -- you know,

11    possibly a six-week trial.

12          And so, you know, if Your Honor has doubts about

13    whether there are, you know, issues of fact pertaining to

14    those allegations of injury, then it would be perfectly proper

15    for Your Honor to issue a partial summary judgment in which

16    Your Honor says the intangible injuries are not recoverable;

17    but by all means, if plaintiffs want to pursue a RICO case

18    about the door, that's their prerogative.

19          But for the reasons I've explained in the opening,

20    there really is no genuine issue of material fact about the

21    few instances of physical property damage that they mention.

22          My colleague says Dorn is a damages expert.  No,

23    he's an abatement expert and none of the physical damage that

24    he discusses made it into -- the past physical damages that he

25    purports to discuss made it into his report.

 1          And finally, you know, my colleague says that we

 2   have no case saying that plaintiffs have to cash a check in

 3   order to recover under RICO.  I would recommend the *Fireman's*

 4   *Fund* case versus *Stites*.  In that case the Ninth Circuit said

 5   that the plaintiff must show that he has suffered a concrete

 6   financial loss by documenting the amount of damages to which

 7   he is entitled.

 8          Plaintiffs have not done that here; and just for

 9   your curiosity, the issue in that case was that plaintiffs

10   didn't have good enough receipts to support their RICO claim.

11   They are so far from that here.  Plaintiffs have not

12   quantified their damages at all.

13          So with that, Your Honor, unless you have any

14   questions, I'll -- I'll rest.

15          THE COURT:  All right, thank you.

16          THE WITNESS:  Great, thanks very much.

17          MR. WILCOX:  I'll admit that I'm going for a home

18   run, Your Honor, but I think --

19          THE COURT:  You know, all these baseball -- I know

20   you all know that I like baseball and so I appreciate your

21   attempting to keep me involved in the arguments, but you don't

22   have to keep going at this.  The Giants' season is over.  I'm

23   ready to move on, so go ahead.

24          MR. WILCOX:  Fair enough.  I won't talk about where

25   I think the outfield fences are at, Your Honor; and, instead,

1     I'll just say that I think our public nuisance argument is

2     pretty simple.

3         The San Francisco Unified School District doesn't

4     have statutory authority to bring a public nuisance claim

5     under the California Court of Appeal's recent decision in

6     *Rincon*. All the Court needs to do to dismiss the nuisance

7     claim is to follow that decision, and this Court is supposed

8     to under Ninth Circuit precedent follow decisions of the

9     California Court of Appeal unless there's convincing evidence

10     that the California Supreme Court would go in a different

11     direction.

12         I don't think there's that convincing evidence here,

13     Your Honor, and I'll talk about it in a moment; but first let

14     me just step back and talk about *Rincon*. So California's

15     public nuisance scheme, as you're familiar with, is spread out

16     across three statutes. There's Section 731, which you

17     mentioned in your tentative decision. There's Section 3493,

18     and then there's Section 3494.

19         And what *Rincon* did is it looked at all three of

20     those provisions and it tried to interpret them together, and

21     based on that it came out with two very clear holdings. The

22     first is that government entities are not private persons who

23     can pursue a public nuisance claim under Section 3493.

24         That was the basis that the School District tried to

25     use in its complaint and how this case has been litigated up

 1   until summary judgment, but now we know under *Rincon* that

 2   doesn't work.

 3        Then in the second -- in the very next sentence of

 4   the opinion at Page 1101 the Court said the term "person" in

 5   Section 731, which is part of the same statutory scheme on

 6   public nuisance, does not include a governmental entity, full

 7   stop.

 8        If it doesn't include a governmental entity, it

 9   doesn't include the School District, Your Honor.  So that

10   should be the end of the nuisance because under *Rincon* they

11   can't bring the claim under Section 3493.  They can't bring it

12   under Section 731, and they also can't bring it under Section

13   3494 because there's no statute that specifically authorizes

14   them to bring that claim.

15        And I get the sense from Your Honor's tentative that

16   you might disagree with what I'm about to say --

17        THE COURT:  Well, I disagree with what you've said

18   so far, but go ahead.

19        MR. WILCOX:  Yes, exactly.  So I'm getting to the

20   windup where you have a perfect opportunity to express your

21   disagreement if you feel -- if you feel so inclined.

22        I don't think there's any reason that the California

23   Supreme Court would reject *Rincon's* reasoning.  It's not just

24   the latest word from the California Court of Appeal on how the

25   statutory scheme for public nuisance works.  It also has the

 1   virtue of being right.  It makes sense of the entire statutory

 2   scheme and reads it all together so that Section 731 doesn't

 3   override Section 3494.  Both of them have life and both of

 4   them have meaning under the scheme.

 5          If you instead go with the view that the first

 6   sentence in Section 731 allows a school district like SFUSD,

 7   or any other governmental entity, to bring a public nuisance

 8   case, it's hard to see what works Section 3494 is doing.

 9          Any government entity who doesn't have a statute it

10   can point to that specifically authorizes it to bring suit can

11   simply bring a claim under Section 731; but what this Court is

12   supposed to do, Your Honor, is look at the statutory scheme as

13   a whole and make it fit together, not pick out certain

14   provisions and say, "I think this provision has primacy over

15   the others."

16          But even if the Court was going to do that, I think

17   under the rule that the specific is supposed to govern the

18   general, the provision that would control is 3494 and its rule

19   that there has to be specific statutory authorization, not the

20   much more general statement of a general right to bring a

21   nuisance action under Section 791.

22          Now, the other virtue I think exists in the *Rincon*

23   opinion, Your Honor, is how it ties each sentence in Section

24   731 back to the Civil Code provisions in 3493 and 3494.  So

25   what it does is it looks at the first sentence in Section 731,

 1    the one that talks about persons, and it ties it back to

 2    Section 3493, which authorizes private persons to bring a

 3    nuisance action if they can bring a claim by showing a special

 4    injury.

 5              And then the second sentence in Section 731, the one

 6    that talks about county counsels, town counsels, district

 7    attorneys, that then speaks directly to 3494 by authorizing

 8    who can bring those types of claims; and it says in general,

 9    as *Rincon* noted, the people who can bring those types of

10    claims on behalf of the community as a whole are the county

11    counsels and the other individuals that are specifically

12    identified there.

13              Otherwise, you need to go out and you need to find a

14    specific statute like the ones that are discussed in the

15    *Lamont* decision that authorize a body to bring a nuisance

16    action explicitly, either by saying that they can abate the

17    nuisance or by saying something like for the sanitation

18    district that they can go into court and get an injunction if

19    parties are violating the sanitation ordinances of the

20    District.

21              We don't have anything like that here, Your Honor,

22    and so I think that under *Rincon* this is a -- as I said, a

23    fairly simple case and, really, all the Court needs to do is

24    apply that decision.  The decision's right, and that's the end

25    of the nuisance case here.

1     The School District has several reasons why it tried

2 to distinguish *Rincon,* which I'm happy to go in to if Your

3 Honor has questions about that, but I think its real argument

4 is ultimately that the Court should ignore *Rincon* and instead

5 follow the 30-year-old decision in *Selma;* and I think *Selma's*

6 a little bit of a dubious decision to follow for a couple of

7 reasons, Your Honor.

8     The first one is that other aspects of this decision

9 when interpreted, for example, who has an actual property

10 interest and what water rights exist, has been widely

11 criticized by other Court of Appeal decisions.

12     So its reasonings are already on shaky ground, but

13 the other and probably more fundamental problem is it doesn't

14 talk about Sections 3493 or 3494 at all, and it doesn't try

15 and explain how to make its interpretation of Section 731 fit

16 together with the rest of the statutory scheme.

17     The only decision from the California Court of

18 Appeal that does that is *Rincon.*  So if Your Honor thinks that

19 you're confronting conflicting decisions and needs to choose

20 which one to follow, I suggest that Your Honor should follow

21 the one that actually looks at the whole statutory scheme and

22 figures out how to make it work together as a whole; and

23 that's, again, *Rincon,* which says that the School District

24 can't bring its nuisance claim.

25     But even if Your Honor doesn't agree with that and

 1    wants to rely on *Selma*, I think the School District still

 2    loses.  *Selma* says that if you want to bring a suit as a

 3    public entity under Section 731, you need to show that your

 4    property was injuriously affected by the nuisance; and that's

 5    then specifically defined in the Code of Civil Procedure

 6    Section 28, and it requires taking, withholding, deteriorating

 7    or destroying the property such that the School District

 8    doesn't have the benefit of it.

 9         There's simply no evidence of that here.  I won't

10    rehash everything that Mr. Folio just said, but I do want to

11    pick up one thing that my friend on the other side said about

12    hazardous waste, and that's always been kind of the linchpin

13    for property damage in this case.

14         There's been these allegations of hazardous waste;

15    but what did Ms. Pak, their 30(b)(6) witness, say about the

16    hazardous waste?  And you can see this at Pages 186 to 187 of

17    Exhibit 3 to our summary judgment motion.

18         What she said was, if there are vaping devices that

19    are found on school grounds, they already have medical waste

20    bins that they've decided they can put them in.  They're

21    already on the school campuses.  They're not causing any

22    particular problem, and she said they actually keep many of

23    them as instructional tools that the teachers can use to

24    either instruct students or that school board staff can -- or,

25    sorry, not school board staff, School District staff can use

1    to instruct teachers on, "Here's what a vaping device looks

2    like.  Here's how it works."

3          That's not significant damage to property that's

4    taking, withholding or deteriorating the school grounds in any

5    meaningful way; and there's no evidence that rises to that

6    level.  In fact, what Ms. Pak said at Page 185 of that

7    exhibit, Exhibit 3, was that there had been no students, no

8    parents and no maintenance staff who have complained about

9    hazardous waste on school grounds; and she went on to say at

10   Page 76 of Exhibit 7 that there's no line item in the Board's

11   budget specifically about hazardous waste on school grounds

12   and dealing with that.

13         If this was really a serious issue that was causing

14   a significant deterioration of school grounds, there would be

15   a line item in the school board budget that dealt with that

16   problem.  There's not.

17         Mr. Folio also talked about Mr. Dorn's report and

18   the problems with that, including that it's hearsay.  I don't

19   want to repeat those again, but I do want to highlight a

20   couple of things, which is where I think that the School

21   District's being a little bit fast and loose with what the

22   record actually says.

23         So, for example, they talk about students at Aptos

24   Middle School stealing a master key in their brief.  That's at

25   Page 48 of their opposition.  What the cite notes in Exhibit

 1  320 actually show is students prop open a door so they can

 2  sneak back into a gymnasium.

 3         I'm sure that's frustrating to school board and

 4  School District staff.  Students certainly shouldn't be doing

 5  that.  I'd never condone that behavior, Your Honor, but it's

 6  not property damage or anything that's physically injurious to

 7  the property.

 8         They talk about at a different middle school how

 9  there's a garden -- an outdoor garden that's supposedly been

10  locked off and students can't use it anymore.  That's, again,

11  not what the actual site report, which is hearsay and not

12  admissible anyway, says.

13         If you look at Exhibit 321, what it actually says is

14  the site assessor, who's not a District employee, it's someone

15  who worked for Mr. Dorn, went out and looked at the site and

16  decided that that garden would be hard to supervise; and he

17  recommended, "Well, given that it's hard to supervise, you

18  really should lock that door just in case students go there to

19  vape and don't let them use the outdoor garden."

20         There's no evidence the School District took up the

21  site assessor on that recommendation, and there's no evidence

22  that anyone at the actual middle school itself thought there

23  was a vaping problem taking place in that garden.

24         What we have is just an overzealous consultant

25  offering a solution that's really in search of a problem; and

1   then we have, as Mr. Folio said, the broken door and, you

2   know, a hole in a fence and maybe some devices that are hidden

3   in a bathroom somewhere.

4           I don't think that those really rise to the level of

5   property damage that sustains a nuisance claim, certainly not

6   a 300 million dollar abatement program, which is what the

7   School District is proposing; but I want to show just how much

8   even those allegations rest on speculation, Your Honor, and

9   aren't enough to get to a jury.

10          So take the damaged fence.  What the School District

11  says in its summary judgment brief, "Well, for that fence

12  students must have cut the hole in it because they wanted to

13  get to a park next door called The Canyons so that they could

14  vape," but here's what the evidence in Exhibit 216 actually

15  shows.

16          It shows that Glen Canyon Park is right next to the

17  school and the properties are separated by a fence.  Some

18  staff members at the school think that students like to go to

19  the park to vape, and they've noticed that there's a hole

20  that's been cut in the fence.  Who put the hole in the fence,

21  Your Honor?  No one knows.  Why did they cut the hole?

22  There's no evidence that goes to that.  It's just speculation

23  that the hole must have been put there by students who are

24  vaping.

25          That can't be enough to sustain a 300 million dollar

 1   abatement claim based on speculation by school staff, who have

 2   no real insight that a hole that was added at some point by

 3   someone must have been there because students wanted to get

 4   through the fence to use a vaping product, and that's really

 5   just emblematic of what I think is the larger errors on

 6   reality, as Mr. Folio talked about a little bit, with where we

 7   are on both the RICO and the nuisance claims.

 8          If we're talking about physical damage to property

 9   and we're down to talking about speculative inferences on

10   holes in fences and broken doors, that's far, far removed from

11   the 300 million dollar abatement claim that this is supposed

12   to be about.

13          That should really give this Court pause about

14   whether the nuisance claim should move forward at all; and,

15   instead, I'd suggest the better route is to simply follow

16   *Rincon* or if not to follow *Rincon,* then at least follow *Selma*

17   and say there has to be real meaningful property damage that's

18   commensurate with the harm that the District wants to abate,

19   and there's just no evidence of that here.

20          So then my final point, Your Honor, is briefly on

21   negligence and damages.  We've talked about this in our

22   briefs, and I don't want to belabor it; but I do want to just

23   very briefly make a couple points about Mr. Dorn, because I

24   think it's emblematic of both the *Sonner* problems that

25   plaintiffs have and the damages problem that they have.

1     So what Mr. Dorn proposes is a 178 million dollar

2  essentially surveillance program that will put cameras in all

3  of the schools.  It will put vape detectors in all of the

4  schools, and it will have access control systems throughout

5  the school campuses.

6     So just like to get into my office building I have

7  to swipe the key card to get in, every student when they want

8  to move around school property and every staff member will

9  have to swipe the key card and have it logged.

10     Now, he originally proposes as an abatement

11  remedy -- and you can see that on Page 8 on Exhibit 208, which

12  is his report, but plaintiffs now say damages too.  They can't

13  have it both ways, Your Honor, under *Sonner* and that's exactly

14  what *Sonner* said plaintiffs can't do.

15     Abatement is an equitable remedy.  If you want to

16  have an equitable remedy and you believe this Court has

17  jurisdiction to offer that remedy, you need to show that

18  there's not an adequate remedy at law; but if you're asking

19  for the exact same amount of money to implement the exact same

20  programs, to solve the exact same harms, both as damages and

21  as an abatement remedy, you by definition have an adequate

22  remedy at law.  It's your damages claim.

23     I think that damages claim won't succeed and I'll

24  talk about why in a second, but that doesn't mean they don't

25  have an adequate remedy of law.  So for that reason alone,

 1  Your Honor should grant summary judgment.

 2          Under *Sonner* Mr. Dorn can't offer his opinions about

 3  the infrastructure improvements that he wants the School

 4  District to make in the abatement phase of this case.

 5          Plaintiffs are gonna have to make that argument

 6  either in phase one of this case on liability and damages or

 7  not at all; and I submit, Your Honor, the answer should be not

 8  at all, and the reason why is because his claim is wholly

 9  speculative, especially when you look at it through the lens

10  of future damages.

11          He's not an economist or a damages expert, and he is

12  not trying to argue about or offer opinions on future harm

13  that the District is going to suffer because of events that

14  have already occurred.

15          He's a school safety specialist with a law

16  enforcement background who's trying to offer proposals about

17  what the school should do in the future to make sure that it

18  doesn't suffer additional harms in the future.  So that alone

19  takes it outside of the realm of damages, but the other

20  problem is the future damages are only available if they're

21  reasonably certain to occur.

22          There's absolutely nothing certain about Mr. Dorn's

23  proposal to install 178 million dollars' worth of surveillance

24  cameras and vape detectors.  Ms. Pak testified at Exhibit 25,

25  Pages 70 to 71, 80 and 96 that there's been no discussions at

1  the School District with parents, principals or school staff

2  about whether to implement any aspect of Mr. Dorn's plan.

3          This isn't something that the School District was

4  excited about and wants to do and just went to Mr. Dorn to ask

5  for implementation help.  This is an invention purely of

6  Mr. Dorn's that he cooked up himself and submitted to the

7  School District and said, "This would be a good thing for you

8  to do."

9          There's been no buy-in at the District level.  In

10  fact, Ms. Pak said that she had no idea installing these

11  cameras would violate collective bargaining agreements with

12  teachers or whether that would have to be the subject of

13  collective bargaining, but that alone shows how speculative

14  this entire enterprise is with Mr. Dorn; but ultimately

15  whether to implement his 178 million dollar program is going

16  to be up to the school board, and the school board will have

17  final say on that.

18          My friend on the other side talked about how they're

19  running at 125 million dollar budget deficit.  When they have

20  a check show up for 178 million dollars, there's no guarantee

21  that what they're going to choose to do with that money is

22  install the systems that Mr. Dorn talks about rather than do

23  something else that they think is a better use of those funds

24  to help students of the District.

25          So it's kind of hard, Your Honor, to think of a

better case of a hypothetical damages number based on a series
of speculative events that ultimately is just a wholly
speculative number, and under cases like *Starwood Hotels* and
*Nixon-Egli*, that's something that can't get to a jury.

The Court needs to grant summary judgment, but
that's too speculative as a matter of law to reach the jury;
and if the Court needed another case to support reaching that
conclusion, I point it to the *Walnut Creek* case, which is a
case that plaintiffs actually cite, and in that case the Court
balked at the idea that it could award future costs under an
environmental statute when there was no binding commitment to
actually incur those costs or spend the money on it.

That's exactly the situation we have here.  There's
no buy-in from the District to actually implement Mr. Dorn's
recommendations, and there's no buy-in from the School
District with a binding commitment that will devote that money
to implementing those programs rather than any of the
District's other needs.

So at the end of the day, Your Honor, I think that
there's no evidence of future damages.  I think there's no
evidence of past damages as well, and without that there's no
negligence claim.  So I'd also ask the Court to grant summary
judgment on the negligence claim; and unless you have further
questions, I'll stop there.

THE COURT:  Thank you, Mr. Wilcox.

UNITED STATES DISTRICT COURT

1          MS. CRAICK:  Good morning, Your Honor.  Felicia
2   Craick again.  So I'll be addressing the nuisance arguments
3   that Mr. Wilcox raised, and then Andrew Kaufman will be
4   addressing the negligence arguments, including questions about
5   the trial plan.
6          First, we believe Your Honor's tentative is correct,
7   that we have standing under 731 as a person whose property has
8   been injured, severely affected or, as the defendants keep on
9   admitting, whose personal enjoyment has been lessened by the
10  nuisance.
11         I wanted to note that it's a little ironic that
12  they're arguing we're not a person under 731, but we are a
13  person under the PSLRA.  Obviously, we think that fails for
14  other reasons; but *Selma* makes clear that government entities,
15  when they're suing to abate a nuisance on their own property,
16  are persons under 731.
17         *Rincon* was not addressing that case where the tribe
18  was trying to sue to abate a nuisance on its own property.  It
19  repeatedly said it was dealing with a claim where the tribe
20  was trying to deal with a nuisance -- alleged nuisance outside
21  of its community off its tribal lands and, in fact, said that
22  if the tribe had been trying to abate the nuisance in its own
23  community, of course they would have authority to do that.
24         So we do not think there is a conflict between
25  *Rincon* and *Selma*.  The one sentence in *Rincon* that defendants

1   rely on actually cites the County of San Luis Obispo, but what

2   that case was talking about was who can sue under the second

3   sentence of 731, as you can see from the block quote.

4        They say that if you're trying to bring a

5   representative claim, then you have to be one of those public

6   prosecutors authorized to do so.  We're not trying to bring a

7   representative claim.

8        I also note that defendants keep on saying *Selma's*

9   really old.  Precedent does not wither with age.  It has to be

10  overruled, and *Rincon* doesn't even purport to overrule *Selma*.

11  In fact, other cases, *Orange County Water District*, *County of*

12  *Santa Clara* have repeated and reaffirmed the relevant language

13  in *Selma* even if you wanted that; and the case that Rincon

14  relies on to find that government entities aren't a person is

15  actually older than *Selma*.

16       The questions of whether or not our property has

17  been injuriously affected or our enjoyment has been lessened,

18  Mr. Hudson talked about that; but, ultimately, that's just a

19  fact issue.  The jury's going to have to decide it, and if

20  Your Honor thinks there is something for the Court to decide,

21  it should decide that post trial after hearing the evidence

22  that comes in.

23       I also wanted to note that Altria makes an argument

24  in its brief that you should dismiss our public nuisance claim

25  3480, somehow we've conceded that's appropriate for dismissal.

```
 1    Obviously that isn't true, and I think there's a
 2    misunderstanding there about 3480, which defines public
 3    nuisance; 3479, which defines nuisances generally; and 3481,
 4    which defines private nuisance.  So I think they're just a
 5    little confused about that.
 6          We also believe we have statutory authorization
 7    under the statutes.  Lamont and MBTE make clear that you don't
 8    need to specifically say the authority is to abate a nuisance;
 9    but, again, Your Honor doesn't have to reach that because the
10    plain language of 731 makes it clear that we do have standing.
11          On the -- before I move on from nuisance, I'm gonna
12    talk briefly about adequate remedy at law.  I just wanted to
13    make sure Your Honor didn't have any other things it wanted me
14    to address.
15          THE COURT:  Please, go ahead.
16          MS. CRAICK:  Okay.  Adequate remedy at law, Judge
17    Polster recently recognized abatement provides a more speedy,
18    just, effectual remedy --
19          THE COURT:  You might want to slow down just a
20    little bit.
21          MS. CRAICK:  Sorry.  Judge Polster recently
22    recognized that abatement provides a more speedy, effectual
23    and permanent remedy than can be had at law.  I mean, that's
24    ultimately the question about the adequate remedy at law.
25          We also have two experts, Dr. Winickoff and
```

Dr. Kelver (sp.) that we're only pursuing on abatement.  It's
a serious portion of our plan.  Mr. Wilcox repeatedly said
that Dorn's damages were 178 million.  I think he added an
extra "1" there.  In our briefing it's 78 million, but
regardless there's a large portion of what's needed here to
clean up this problem that we don't get as damages, as even we
concede, and this Court has previously held that abatement as
a -- is a prospective remedy, and prospective remedies like
injunction are not barred because you can get damages.

          I will turn it over to my colleague, Andrew Kaufman,
to address the other arguments.

          THE COURT:  Great, thank you.

          MS. CRAICK:  Thank you, your Honor.

          MR. KAUFMAN:  Good morning, Your Honor, Andrew
Kaufman for the plaintiff; and I'll just briefly discuss the
damages issues that Mr. Wilcox argued.

          I think the starting point on damages is to
recognize the overwhelming evidence of a past and
currently-existing youth vaping problem on school campuses.
We point to overwhelming fact and expert testimony that there
was and continues to be an epidemic.

          Witnesses talked about how e-cigarette use is the
top current concern at SFUSD.  Persistent problem, widespread
use.  Mr. Dorn found a pervasive negative impact and
challenges e-cigarette use have had on the teaching and

 1  learning environment.

 2          Now, to portray that we've not incurred any harm and

 3  actually argue that e-cigarette use is a beneficial

 4  educational tool at the School District, respectfully their

 5  briefing and their argument today cherry picks and cites

 6  testimony out of context only underscoring the real jury

 7  questions that exist in this case.

 8          Just to take one very quick example, they said in

 9  their briefing that our 30(b)(6) deponent, Ms. Pak, testified

10  that SFUSD has no evidence of harms associated with vaping, no

11  evidence.  What that deponent actually said is that she knew

12  of significant staff time, resources and access to facilities

13  that had been impacted by JUUL and other vaping use even

14  though they don't segregate the dollars spent on those

15  specifically.  So I think that's one very telling example.

16          Now, turning to their actual damages arguments --

17  and I don't want to cover the same ground Mr. Hudson already

18  discussed about property damage -- but to put it briefly, this

19  is money the School District needs but does not have to

20  address its actual existing, current harm to detect and deal

21  with vaping on campus to make the campuses function

22  effectively right now.

23          Essentially, defendants' argument is, "SFUSD, you

24  have not been able to spend the money to solve your problem.

25  Therefore, you cannot as a matter of law prove entitlement to

 1    money to solve your problem."  We'd submit that is unlawful as

 2    it is illogical.

 3            Now, they say our damages are wholesale speculation;

 4    and I'm glad Mr. Wilcox mentioned the cases they cited because

 5    I really encourage the Court to look at those cases if you

 6    have any doubt on this issue.

 7            The *Nixon* case, there was literally no

 8    quantification of damages whatsoever.  They cite the *Rasidescu*

 9    case.  This is a case where a pro se plaintiff asserted that a

10    bank damaged his credit and sought compensation for future

11    purchases he intended to make but would not be able to,

12    including snow mobiles, ATVs and a job paying five million

13    dollars.  That is what wholesale speculation looks like, and

14    it's nothing like this case.

15            Their argument is that the process for SFUSD

16    spending money is too cumbersome.  Candidly, we don't find

17    cases saying that this is a factor when the jury looks at

18    something like a life care plan.  SFUSD is injured and these

19    amounts are necessary to remediate the harm.  They are the

20    measure of injury, quite literally damages.  The process of

21    allocating funds is just not relevant; but even if it were

22    relevant, this just raises more jury questions.

23            Mr. Wilcox mentioned Exhibit 25.  Go look at that

24    exhibit, Your Honor.  What our witness testified there, the

25    most important and concrete thing she testified to, is that

1  SFUSD would install vape sensors if they had the funding, that

2  they view those as safety infrastructure just like a fire

3  alarm.

4         Other elements that he mentioned are simply pure

5  speculation, something the jury, we think, candidly must

6  reject, but at minimum should consider.  Whether the school

7  board needs to authorize funding, the school board authorized

8  this lawsuit.  So there's no evidence that this is an

9  impenetrable barrier.  Teachers unions, look at Exhibit 25.

10  The only evidence for that point is their deposition question.

11  Questions are not evidence.  Answers are evidence.

12         So for all these reasons we think we set forth

13  sufficient evidence on damages to go to the jury, thank you.

14         THE COURT:  All right.  Thank you, Mr. Kaufman.

15         Mr. Wilcox, come on back.

16         MR. WILCOX:  Thank you, your Honor, just a couple

17  brief points.

18         So first on public nuisance, I was accused of

19  repeatedly omitting personal enjoyment from the statutory

20  language and from the cases.  There's a reason why I didn't

21  talk about it.  It's because none of the cases talk about it.

22         *Selma* and every case that follows it, even if you

23  want to go down the *Selma* line, cuts off and you have to show

24  that the property was injuriously affected.  They don't talk

25  about personal enjoyment to property, and that makes sense.

1    When you're talking about a public entity, the idea

2 of personal enjoyment in property is somewhat of an oxymoron;

3 but more importantly, of course, is *Rincon* and the Court

4 should follow *Rincon.*  So they tried having it both ways.

5    I'm talking about whether the School District is a

6 person under the PSLRA and -- or whether it's a person for

7 purposes of the nuisance statute.  The simple answer to that,

8 Your Honor, is they're two different statutes.

9    The California Supreme Court itself recognized in

10 the *Wells* decision, which is discussed extensively in *Rincon*

11 itself, what the word "person" means and whether it includes a

12 government entity depends on the context of the overall

13 statutory scheme.

14    So it's perfectly consistent for a statute like the

15 PSLRA to include a government within its scope, and for a

16 statute like 731 not to include government entities within the

17 scope of its definition of "person."

18    They also try and say, well, the case that *Rincon*

19 cites was a case about the second sentence of Section 731.  So

20 that must be what *Rincon* was talking about, too; but the

21 language of *Rincon* is talking about what the word "person"

22 means in Section 731.

23    The only place where the word "person" appears in

24 Section 731 is in the first sentence that talks about persons

25 who have been injuriously affected by a nuisance can bring a

 1    claim and can sue for damages and seek abatement.  So that's

 2    what *Rincon* is talking about when it says in pretty

 3    unequivocal language all government entities are not persons

 4    for purposes of Section 731.

 5            The final point on public nuisance, Your Honor, is

 6    this notion that *Rincon* was really about suits off tribal

 7    lands.  I think that confuses *Rincon's* reasoning for its

 8    holding.  I've just told you what the holding from *Rincon* was.

 9    One of the reasons why it was uncomfortable with allowing

10    government entities, including tribes, to bring public

11    nuisance claims as persons was because of what the tribes were

12    trying to do, which was bring a suit off of tribal land to

13    regulate Indian gaming.

14            It found, looking at the second sentence of Section

15    731, that the people who are supposed to have primary

16    authority for regulating public nuisances within their

17    boundaries are the officials that are named there, which don't

18    include tribes and don't include the School District; but if

19    we think that that's what *Rincon* is really about, that's a

20    problem for the School District, too.

21            Its abatement claim isn't limited to the school

22    boundaries or the classroom door.  It's seeking a public

23    health program that would affect all of San Francisco County.

24    That's far beyond the boundaries of the schools.  So if

25    *Rincon's* a case about boundaries, it's a case that very

1      significantly narrows this case.

2            Turning briefly to *Sonner*, Your Honor, and their

3      argument that there's no *Sonner* problem here, I just point you

4      to *Sonner* itself at Page 844 where the decision says one of

5      its primary reasons for dismissing the claim was quote,

6      "Sonner fails to explain how the same amount of money for the

7      exact same harm is inadequate or incomplete."

8            We have the same issue here.  The District hasn't

9      offered any explanation for how it's inadequate or incomplete

10     to get the same amount of money from Dr. Dorn as future

11     damages as it would be as an abatement remedy.  So under

12     *Sonner* it needs to be out as an abatement remedy.

13           And I recognize that Judge Polster talked about the

14     advantages of equity in his opioid decision; but, frankly, he

15     wasn't confronting *Sonner* and he wasn't addressing that

16     decision and he wasn't considering making those statements in

17     the context of discussing whether someone had an adequate

18     remedy at law.

19           It may be that there are advantages to equity.

20     There's all kinds of reasons why people would prefer to bring

21     an equitable claim.  The plaintiff in *Sonner* chose to bring an

22     equitable claim.  It clearly saw an advantage to doing that,

23     but just because it might have an advantage doesn't mean

24     there's an adequate remedy at law.

25           And then on damages, Mr. Kaufman talked a lot about

1    the harms that the District perceives --

2              THE COURT:  Keep going.

3              MR. WILCOX:  Sorry, I thought that someone was

4    telling me I was talking too fast.

5              He talks a lot about the, you know, harms that the

6    District perceives.  We disagree with whether some of those

7    harms exist, but I recognize that's not a question for today.

8    The problem with their damages claim today is they don't have

9    a methodology to put a number on that -- on those harms.

10             They don't have an expert who tries to put a number

11   on what their harms are.  They don't have a fact witness who

12   tries to put a number on those past harms, and other than

13   putting in a couple of invoices for, you know, roughly $17,000

14   in posters and pamphlets they don't have any financial

15   documents showing any of the harm that they're alleging

16   either, certainly no harms that are to tied to classroom

17   disruptions or disciplinary issues, which has always been the

18   real focus of their claim.  So that's the damages problem

19   here.

20             Now, on Mr. Dorn, I didn't hear anything from him

21   about how there's any binding commitment that the money will

22   actually be spent in this way or how it's -- instead, it just

23   seemed to be "Trust us, I promise we'll use the money in this

24   way."

25             Just like Mr. Kaufman, I encourage you to look at

1  the exhibits that we've been talking about.  Ms. Pak was clear

2  that there's just been no discussions at any level about

3  whether the District actually wants to implement those

4  programs.  Mr. Dorn has come up with a plan.  It might be a

5  good plan, but we have no idea whether the School District

6  wants to implement it.

7        He accused me of relying on our deposition questions

8  rather than the deposition answers.  Please, go look at that

9  answer.  She was asked the question have -- "Do you know

10  whether you would have to collectively bargain with teachers

11  about that?"  She gave the answer "I don't know."  That's not

12  our question.  That's her answer.

13        So the bottom line is Mr. Dorn's offering a big

14  number.  I may have gotten the number wrong and it may be 78

15  versus 178.  Either way it's a big number, but you can't

16  pursue it through equity because they now claim they have an

17  adequate remedy at law; and they can't pursue it at the

18  upcoming trial because it's simply too speculative to reach

19  the jury when it relies on too many steps down the road of

20  will independent actors who have unfettered discretion

21  actually spend the money in the way that Mr. Dorn proposes.

22        Thank you, your Honor.

23        THE COURT:  Thank you, Mr. Wilcox.

24        MR. WILCOX:  So I think the final thing that we want

25  to talk about today with the little bit of time we have left

 1  is -- I promise, I didn't eat quite all of our time, although

 2  I may have been close.

 3          THE COURT:  You got about three minutes, and you're

 4  not going to be able to respond to anything that the

 5  plaintiffs have to say; but I'm sure Mr. Bernick has that well

 6  in mind.  So come on up, Mr. Bernick.

 7          MR. BERNICK:  Your Honor, I'm gonna break with

 8  precedent, Your Honor.  I appreciate having the three minutes,

 9  but I think that we understand the tentative and we're

10  prepared to go forward and we appreciate your taking the time

11  this morning.  So I have nothing further.

12          THE COURT:  All right, thank you.

13          So would the plaintiffs like to address any of the

14  issues that they haven't addressed yet?

15          MR. KAWAMOTO:  Thank you, Your Honor.  I would like

16  to take a brief run at your tentative regarding Mr. Garnick's

17  testimony.

18          THE COURT:  Okay.

19          THE COURT REPORTER:  Counsel, please announce your

20  name.

21          MR. KAWAMOTO:  Oh, apologies.  Dean Kawamoto for the

22  plaintiffs.

23          Altria is offering testimony from Mr. Garnick that

24  is hotly disputed and for which in-person testimony and

25  cross-examination is required, and I want to provide some

1   context for that.

2          According to Mr. Garnick, he was concerned that

3   pod-based products were contributing to the youth vaping

4   epidemic, and he recommended that Altria advise the FDA to

5   remove all pod-based products from the market.  According to

6   Mr. Garnick, at a key meeting with the FDA Altria did exactly

7   that.

8          The plaintiffs believe that this testimony is

9   untruthful.  Mr. Willard, Altria's CEO at the time and the

10  lead presenter at this meeting, testified that he did not

11  advise FDA to ban all base products -- all pod-based products

12  and in a subsequent letter to the FDA Altria stated it was

13  removing its own pod-based products from the market, but did

14  not recommend banning all pod-based products from the market;

15  and a ban on all pod-based products would include JUUL's

16  products.

17         Altria's deposition designations indicate that they

18  intend to play Mr. Garnick's testimony that Altria did the

19  right thing and recommended the FDA ban all pod-based products

20  to the jury.  They want to play this testimony to the jury.

21         Plaintiffs contend that Mr. Garnick's testimony is

22  self-serving and inaccurate, and we submit that

23  notwithstanding Altria's belief that all pod-based products

24  were contributing to a youth vaping epidemic, Altria was not

25  going to advocate for an FDA ban in order to protect public

 1   health because it did not want to harm JUUL's sales in the
 2   event it could successfully acquire that company.
 3          This is an important factual dispute that the jury
 4   is going to need to resolve by weighing the credibility of the
 5   different witnesses, chief among them Mr. Garnick; and as
 6   multiple courts have emphasized in granting Rule 43
 7   applications, there is little doubt that live testimony by
 8   contemporaneous transmission offers a jury a better quality of
 9   evidence than a videotaped deposition.
10          So that is our basis for requesting Mr. Garnick's
11   testimony via Rule 43.
12          THE COURT:  Well, don't you have -- you've got -- I
13   assume you cross-examined him on the deposition -- during the
14   deposition about this?
15          MR. KAWAMOTO:  Yes, we did.
16          THE COURT:  And you're going to present the evidence
17   that you described at the beginning, which contradicts what he
18   says?
19          MR. KAWAMOTO:  Yes, we are.
20          THE COURT:  And you'll be able to say "and Altria
21   did not bring Mr. Garnick here to give us a further
22   opportunity to cross-examine him.  They just -- they have him
23   on the video."  Is there -- what's the problem?
24          MR. KAWAMOTO:  Well, I think the other problem --
25          THE COURT:  Because you know he is outside the

1  subpoena power of the Court.  Of course, federal judges can do
2  anything; but besides that general rule, it's not enshrined in
3  the Federal Rules of Civil Procedure.  You had -- you had a
4  fair shot at him.  You had two days with him, as I understand
5  it, and if Altria's making the choice not to bring him because
6  he's a busy guy, he's got other things to do, I don't -- I
7  don't think it's -- I think they get to make that choice.
8       MR. KAWAMOTO:  Okay.  Well, I understand that, Your
9  Honor, though I would note if you look at Altria's witness
10 list, it may be that there are not going to be any live Altria
11 fact witnesses at this trial.  They have a --
12      THE COURT:  Well, isn't that something to point out?
13 I mean, they get to -- people get to make choices in
14 litigation, and if they don't bring a live witness to the
15 trial will the jury think that that's -- will the jury not
16 care?  Will the jury think that's a good thing or a bad thing?
17 I don't know, but that's a choice that Altria can make and
18 it's, I assume, something that you were planning around as you
19 were preparing for trial.
20      You knew these people were going to be beyond your
21 subpoena power, and you took that position that you get to
22 show them.  You don't have to have -- you don't have to read a
23 cold record to them so. . .
24      MR. KAWAMOTO:  Well, I understand all that, Your
25 Honor.  If I can try one last argument?

1           THE COURT:  Go ahead.

2           MR. KAWAMOTO:  So, I mean, Altria has produced a

3    number of documents after depositions were taken that were not

4    used in any of the depositions and this includes documents

5    that were -- they disclosed documents as a result of privilege

6    downgrades.

7           So there is a universe of documents out there that

8    we've not been able to use in any depositions, and given the

9    defendants' position on orphan documents, you know, the

10   benefit of having a live Altria witness would be our ability

11   to use those documents and get them into evidence via a

12   witness.

13          THE COURT:  So explain that to me a little further.

14   Did you not -- have you recently discovered documents that you

15   couldn't use at a deposition to authenticate them or is it

16   just you'd like to have people describe things that are in the

17   documents that you didn't have when you took the deposition?

18          THE WITNESS:  It's the latter.  I mean, there are

19   documents that we may wish to use and could be helpful to the

20   case depending on how it evolves during trial; but without a

21   live witness it would be a challenge, I think, to get them in.

22          THE COURT:  You would have to convince me that after

23   speaking with the defendants with respect to the specific

24   documents that are important to you that there would be good

25   cause to -- for me to change the perspective that I've

```
 1   provided to you already, which is not favorably inclined to
 2   bring a live witness; but if there's something -- you know, if
 3   there is -- if there is something that is absolutely pivotal
 4   and the defendants are saying tough luck, then let me know and
 5   we'll -- maybe I'll tell you tough luck.
 6           THE WITNESS:  Okay.  Thank you, your Honor.
 7           THE COURT:  Okay.
 8           MS. LONDON:  Good afternoon, Your Honor, Sarah
 9   London.  Now it's my turn on the San Francisco Unified School
10   District students -- or former students.
11           Now, this is an important issue for not just the San
12   Francisco case; but, frankly, for all cases it's kind of a
13   case management issue.  So, hence, the hat that I'm wearing
14   today to bring this to your attention --
15           THE COURT:  Okay.
16           THE WITNESS:  -- so we don't mess this up throughout
17   the entire litigation.
18           Now, I appreciate Your Honor has said it's too late,
19   the disclosure of the two former students; and, frankly, I
20   understand that is a gut response.  It does seem pretty close
21   to trial.
22           THE COURT:  Actually, it's a well thought-out,
23   formulated response, not a gut response.  Go ahead.
24           THE WITNESS:  I was speaking to my own gut response
25   certainly; but to exclude San Francisco's two only former
```

 1   student witnesses, it's a rather severe penalty and I at least

 2   wanted to walk through the different discovery responses and

 3   talk about the context and why it's our position we didn't

 4   miss any deadlines, we weren't too late and when the right

 5   time would have been and to better understand for us how we

 6   can go forward not just with our witnesses, but also

 7   addressing and handling new witnesses that appear on the

 8   defendants' list, as it happened to us.

 9           So let me start with the two opportunities that the

10   defendants claim are untimely.  They talked about the

11   plaintiff fact sheet.  I think as Your Honor knows and we --

12   this was very hotly litigated, the plaintiffs did not in the

13   government entity cases or any of the litigations do an

14   initial disclosure.  We did plaintiff fact sheets.

15           So we weren't trying to be cute by saying, "Oh, we

16   didn't have initial disclosure obligations," but it's

17   absolutely accurate that we did have plaintiff fact sheet

18   obligations.  That was very hotly contested.  We proposed a

19   version of the fact sheet that was streamlined and narrow and

20   focused on -- or analogous to the opioid litigation.

21           The defendants had a different view.  They proposed

22   a very broad and expansive fact sheet.  We litigated this in

23   front of Judge Corley, and she largely adopted the version

24   that we had proposed.

25           That plaintiff fact sheet, if you look at it, it

has -- under the category of witnesses, it talks about three

kinds of witnesses it seeks information.  The first is a

superintendent, the second is an assistant superintendent, and

the third are the persons most knowledgeable about the vaping

epidemic in the schools; and in that list we provided ten or

so witnesses.  You can see it.  It's one of the exhibits in

the briefing, but it doesn't seek disclosure of all potential

witnesses.

So we didn't read that to impose upon us an

obligation to supplement for any potential trial witnesses

that might come later down the road or somebody to be

discovered in discovery.  It was persons most knowledgeable;

and, of course, the defendants did the same thing.  When they

did their initial disclosures, we didn't get 4,000 people who

might have knowledge about the case.  We got the persons most

knowledgeable.  So we proceeded on that basis.

Now, to interpret that fact sheet and the

requirement that we provide the persons most knowledgeable as

imposing a continuing obligation to supplement anyone we might

call at trial, that's news to us.  That seems like kind of an

eleventh hour obligation we feel imposed upon us because it

was something litigated that it would not be such a broad and

wide-raging list of people.

Further, we then litigated defendants' FOIA.  As you

may recall, they served subpoenas and FOIA requests to try to

 1    get around some of Judge Corley's rulings and, again, Judge

 2    Corley denied those requests and struck them.

 3            So we litigated this issue to have these rather

 4    narrow fact sheets because of the burdens on the School

 5    District, and those were weighed against their request for

 6    liberal discovery, the burdens and as well as, of course, the

 7    privacy issues within the School District about disclosing

 8    student records.  So those were litigated.

 9            So we don't believe that failing to supplement or

10    provide updated fact sheets as to potential trial witnesses

11    was an untimely or failure on our part of a disclosure.

12            The second one that they point to are

13    interrogatories.  So they cited for Your Honor the

14    interrogatories that we responded to.  So the first one,

15    Interrogatory 1, now, that requested all persons with any

16    possible knowledge.

17            Again, we objected to that as being too overly

18    broad, as any litigant would, as they did as well, and we

19    limited our response to employees of the District; and that

20    presumably was not objected to or further discussed among the

21    parties because that response stood.  They didn't seek a

22    motion to compel further responses to that.  It was narrowed

23    to just employees of the District.

24            Now, there was another rog that asked about

25    individuals harmed, but we're not seeking to have witnesses

```
 1   come -- individual students testify about their personal
 2   injuries.  So we don't think that rog either fits this issue.
 3   That wasn't one we should have supplemented because neither of
 4   the two witnesses based on the testimony that we plan to offer
 5   are saying, "I," you know "suffered an addiction to
 6   e-cigarettes."
 7              To the contrary, they're just talking about what
 8   they observed within the District.  So we don't feel that our
 9   failures to supplement either of those rogs was untimely
10   either.
11              So it then creates this other problem for us.  We
12   made an agreement with the defendants, as you've heard ad
13   nauseam that if no one deposed a witness, they appeared on the
14   trial list, they can come later.
15              Well, it has to mean something; and when I saw, you
16   know, that they were objecting to these two witnesses, it was
17   quite ironic to me because there's a -- there's the old sauce
18   for the goose, sauce for the gander.  No one had said that
19   today so it was my turn, but here's what really applies.  So I
20   I want to talk about Erik Auguston.
21              He's a scientist in the company.  This is a current
22   employee of JUUL today and had been an employee for several
23   years.  This is somebody who was not on their initial
24   disclosures.  Now, JUUL did have to serve Rule 26 initial
25   disclosures in this case.  He did not appear on their initial
```

1  disclosure list as a potential witness or someone with
2  knowledge, didn't appear on any of the individual directors'
3  disclosures either.
4       Then when we had a meet and confer over potential
5  custodians in this case, a much wider-ranging group of people
6  that might possibly have documents that could be responsive,
7  Mr. August -- Dr. Auguston wasn't on that list either.  So he
8  wasn't even a potential custodian of this case.
9       Fast forward until April of 2022, two months before
10 the B.B. trial, he appears on their witness list for the first
11 time.  Then two weeks later he's starred as a likely to come
12 to trial witness, one of eight.  So this very important
13 witness to them was somebody we only learned about very close
14 to the B.B. trial, but there's more.
15      Because he was not even a custodian, we had to
16 negotiate with them and file a motion to compel to get his
17 custodial file, which we still had not received.  So we
18 received 14,000 new documents for this witness just weeks
19 before the originally-scheduled B.B. trial, and these just
20 weren't some e-mails.
21      These are serious scientific behavioral studies that
22 required a ton of preparation and correspondence with our
23 experts, and this was long after our expert discovery had
24 closed, long after summary judgment and, nevertheless, we
25 persisted.

1    We took the deposition.  We prepared for the

2    deposition.  We reviewed 14,000 documents at the eve of that

3    trial, and we just actually took that deposition last week

4    because we had asked counsel, "Well, will he be on your SFUSD

5    trial list?" and they said "yes."

6    So I don't mean to create a "what about a," but this

7    is kind of an equitable estoppel argument or waiver argument

8    or something because, clearly, if the standard of this

9    proceeding is that anyone whose name appeared somewhere in

10   discovery, because, surely, Dr. Auguston appeared on some

11   document we had read sometime in the litigation, they could

12   appear on the witness list and then we would depose them.

13   We thought that was the rule.  That was the

14   agreement, and so we were abiding by that and we did that; and

15   the prejudice to us was substantially more.  The burden to us

16   is substantially more from that kind of a witness to these two

17   witnesses who not only could have been identified and deposed

18   by the other side just as much as us; but, also, we've given

19   them affidavits of what exactly they're going to say and made

20   them available.

21   So it seems very self-serving to interpret the

22   discovery obligations in this case in one way that penalizes

23   us and punishes us and not allows us to call witnesses that we

24   think the jury would be interested to hear from while they

25   play this game with the very scientific and technical witness

1   way long after expert discovery is closed.

2          So I just wanted to make the full record because
3   it's not easy to put all of that in three or two pages.  I'm
4   assuming we didn't have a reply or we didn't file a written
5   reply.  So I wanted to make sure the record was totally
6   complete before Your Honor ruled on this.

7          But I think the other point, because of how this
8   whole discovery history has unfolded in this case, San
9   Francisco is not the only school district that will not have
10  students on that list.  In fact, as I understand it, it's all
11  of them.  So we are gonna be in this posture in all of our
12  school district cases because of this -- our understanding
13  about how the discovery process worked and all of that.

14         So I just wanted to make those points, Your Honor,
15  and if you have any questions for us, I'm happy to answer
16  them.

17         THE COURT:  Well, I'm gonna ask the defendants in a
18  second about the "what about a" because that's the only thing
19  -- of the many strong points that you made, it's the only one
20  that actually resonates with me.

21         The reason I tentatively exclude the two San
22  Francisco witnesses is hopefully to avoid this problem in the
23  future, which is finding -- telling the other side two months
24  before trial that you have gone through so much discovery to
25  get ready that you now have two people who are gonna be

 1  talking about material and important things that you knew
 2  about from the very beginning of filing the case.

 3          I can't imagine a trial lawyer for a school district
 4  who didn't think it would be a good idea to have a student or
 5  somebody or two or more explain what was going on in the
 6  school.  I mean, that just makes no sense to me and the fact
 7  that you didn't find -- and I can't believe that it's that
 8  hard -- it would have been that hard to talk to school
 9  administrators and see, you know, who were the kids, who were
10  the problematic kids, who were the this, who were the that and
11  find them and put a place holder if they -- if you're working
12  diligently and you're just scouring the schools and you can't
13  find those people, put a place holder and say, "We're looking,
14  we're gonna find a couple of students -- I'm pretty sure we're
15  going to find them," and find them more than two months before
16  trial slipping -- it's not slipping, but putting people on to
17  a witness list right before trial on a -- in a case like this,
18  I think it doesn't work.

19          In B.B. there were two people who were kind of in a
20  similar situation.  One, the defendants had knowledge and
21  control and I said that person ought to be able to testify but
22  it's not news -- it shouldn't have been news to the plaintiffs
23  that I had this concern because I X'd out the other person so
24  -- so anyways, but I am interested in somebody who would speak
25  as to how Mr. Auguston was treated and whether there is some

1   -- whether I should make any equitable -- so-called equitable

2   adjustment with respect to a witness -- these two witnesses

3   and then never letting it happen again.

4          Mr. Bernick.

5          MR. BERNICK:  I think that Mr. Farrell, if I'm not

6   mistaken, will be --

7          THE COURT:  Okay.

8          MR. FARRELL:  Yes, your Honor, Peter Farrell for

9   JLI.  I'm happy to address the Auguston question.  I will say

10  I think Your Honor has it exactly right in terms of the two

11  witnesses that are from SFUSD, but let me start with

12  Mr. Auguston because I don't think it's an apples to apples.

13         Mr. Auguston was deposed before we even started fact

14  discovery in this MDL in the North Carolina Attorney General

15  case.  He was deposed as a 30(b)(6) witness for JLI.

16         The plaintiffs in the MDL here demanded all of those

17  deposition transcripts, and they were produced to the

18  plaintiffs, I believe, before we even started fact discovery

19  in front of Your Honor and certainly before we started

20  deposition discovery in Your Honor's court.

21         So this is not an instance where the fact that

22  Mr. Auguston might know something was completely unknown to

23  the plaintiffs so they had no reason to know about him.

24         Ms. London pointed out, "Well, are we supposed to

25  just know that because somebody's name is on a document they

 1  might be an important person?"  That's not what happened.  He

 2  was put forward as a 30(b)(6) witness on topics that are

 3  relevant to the case here.

 4          Second, Ms. London pointed out the issue of

 5  custodial files.  That issue was specifically discussed by the

 6  parties.  The agreement of the parties was that custodial

 7  files would be produced for witnesses who were deposed in the

 8  MDL, and we specifically noted to the plaintiffs in our back

 9  and forth with them that if somebody wasn't deposed, their

10  custodial file would not be produced.  Obviously, to the

11  extent their documents were, you know, picked up by other

12  search terms and so on they were produced in that context.

13          So how did we even get to having Mr. Auguston's

14  involvement here at all?  It was, in fact, as Your Honor

15  noted, a response to the issue that came up in the B.B. case

16  where we objected, as Your Honor recalls, to the four new

17  witnesses the plaintiffs identified.

18          Your Honor allowed two of those witnesses to appear

19  at the trial if it had gone forward in the spring, and so we

20  in fairness said, "Well, we now have two brand new people who

21  we didn't have a chance to depose who are going to come in and

22  talk about certain issues.  Mr. Auguston, in part, would

23  respond to those."

24          So it was tied up in the B.B. trial.  The plaintiffs

25  had, in fact, themselves deposed Mr. Auguston at this point.

 1    They've had his deposition testimony as a 30(b)(6) witness on

 2    behalf of JLI for over two years at this point.

 3           So to say that they are the same thing as two former

 4    students from the San Francisco School District I think just

 5    doesn't hold any water.

 6           I also just want to emphasize, and I think Your

 7    Honor is there already, but just so that the record is clear,

 8    you'll recall in the San Francisco Unified case itself, the

 9    defendants were quite concerned, I believe about a year ago,

10    when we came to Your Honor and said, "You know, we have real

11    concerns.  We haven't gotten everything we're supposed to get

12    in fact discovery.  We see these expert reports.  What's going

13    on here?"

14           And the plaintiffs repeatedly told us, "Don't worry

15    about it.  You know everything you need to know about fact

16    discovery."  We came to Your Honor and said, "Judge, we have

17    concerns," and you have denied our motion and said, "The

18    plaintiffs say that you have what you have.  I'm not making

19    adjustments to the schedule."

20           We served the interrogatories that Ms. London just

21    alluded to, and now we're being told the gotcha game of,

22    "Well, even though we previously told you we identified all of

23    our people and even though we then submitted interrogatory

24    responses, you should have known, defendants, that you needed

25    to come follow up with us in case we didn't really tell you

1   about everybody."

2          I really think that that's a -- that's unfair to the

3   defendants at this point, particularly in light of the

4   position the plaintiffs have been taking for a year with

5   respect to fact discovery on the SFUSD case in particular.

6          So I think Your Honor has it exactly right on the

7   plaintiffs' obligation to identify those witnesses.  They

8   didn't do it, and I certainly don't see how Mr. Auguston, as

9   an example, should change that analysis in any way.

10         THE COURT:  Okay.  And just to be clear with

11  Mr. Auguston, you're representing that he would not have been

12  a witness in the B.B. case but for the fact that I let the two

13  -- what are they, the kids in New York, I can't remember, the

14  disco party, testify?  That's what -- that's your

15  representation?

16         MR. FARRELL:  That was for the trial at the time.

17  Right now, obviously, Your Honor, we have reset that trial and

18  so on and so forth.  So I can't say whether and to what extent

19  we would call him in another trial in the MDL or, frankly, in

20  the B.B. case itself if it's retried -- or not retried, but

21  tried for the first time in the future; but that's what

22  resulted in the addition of him as a witness, but even setting

23  that aside, as I said before, he was well known to the

24  plaintiffs as a person with knowledge because of his

25  30(b)(6)testimony in the North Carolina case.

```
 1              THE COURT:  I heard that, okay.

 2          Ms. London.

 3              MS. LONDON:  Thank you, your Honor.

 4          I just want to respond to a couple things.  First of

 5  all, Mr. Farrell's incorrect about the agreement and

 6  understanding about the custodial files, and I'm quite

 7  troubled if that's actually correct about what he thought the

 8  obligations were because as part of our ESI discovery

 9  discussions, we met and conferred extensively over a list of

10  potential custodians through which the search terms would be

11  run.

12          That's any potential person that might have

13  documents that would be responsive to our request, and

14  Mr. Auguston wasn't even included on the list that they

15  provided to us as someone whose documents might hit on search

16  terms.  That's how new he was to this litigation.

17          It's true he was a 30(b)(6) in North Carolina, but

18  he did not appear on the initial disclosures for this MDL.

19  Certainly didn't give us notice he would be coming in as some

20  sort of star witness on his personal knowledge or facts in

21  this case; and to the extent he might or might not be called,

22  we went through an enormous amount of effort to take his

23  deposition because we were represented that he was going to be

24  testifying in the SFUSD case.

25          This would be brand new to us since he was -- I
```

     1    mean, the subject of his testimony are behavioral studies in
     2    the regulatory work that JLI did.  I mean, he was part of
     3    buying the whole journal article that JLI bought.  I mean,
     4    this is not -- has nothing to do with these two New York
     5    social media influencer types that were coming in B.B.
     6            I don't know what the connection to that is.  We've
     7    been operating as though he is some key important witness that
     8    we learned about very last minute on a very complicated and
     9    technical subject and, nevertheless, we went forward because
    10    our understanding was, "Well, we said if somebody appears on
    11    the list, we'll take the deposition," and we got ready for it
    12    and we did it and so it's -- I just had to correct that.
    13            And then this whole issue about, you know, these 200
    14    witnesses that they were so concerned about, first of all,
    15    that was who did Dr. Dorn survey, right, and that was 200
    16    people across all five of the bellwether cases; and among the
    17    San Francisco people that were identified, they were District
    18    level employees and Dr. Dorn didn't send any of the surveys to
    19    students.  So no students would have been disclosed during
    20    part of that because that was a separate issue and discussion.
    21            So, you know, I appreciate Your Honor's attention to
    22    this issue.  It's obviously very important to us and I
    23    appreciate your comments, and we'll just note that the issue
    24    about discovery as to students and which students to interview
    25    and how to go about finding students was a very sensitive one.

 1    It's a sensitive one that we have litigated early and often in

 2    this case on discovery related to the PFS and to the

 3    interrogatories, how do we balance the students' privacy and

 4    our access and defendants' access to students balanced against

 5    all the other needs in the case.

 6             So I just want to be very clear with the Court it is

 7    not as though plaintiffs' counsel had access to students that

 8    we had behind the scenes with our clients to be talking to

 9    students that they didn't have.

10             The students at issue here are students that were

11    either public -- that made public statements.  So Ms. Love,

12    who went on TV, gave a statement to the press that either side

13    could have, you know, accessed and reached out to.  I

14    appreciate Your Honor's point about how late in the process it

15    seemed that we did that; but, nevertheless, this is not like

16    somebody that our client gave us secret access to their

17    records.  These were publicly-available people that we went

18    out and searched to find them in the public space.

19             Likewise, with Ms. Cho, she sent a letter to the

20    school board -- or the School District with four other

21    students named.  They publicly took a position about the

22    vaping crisis and how to address that in their school.  We

23    provided that letter to the defendants.  All four of those

24    students could have been found through the same kind of public

25    channels that we found and talked to the student through.

1          So I just want to be very clear we weren't back room
2   secretly, you know, doing something and then hiding it.  We
3   were trying to be very sensitive in balancing these issues.
4          THE COURT:  Yeah, and I wasn't saying that.  I was
5   talking about the timing of when this all got done and how --
6   you know, and I think for everybody, as I've stressed from the
7   beginning, and for the most part I think you have been doing,
8   this is -- getting to trial and getting through discovery has
9   to be collaborative and you have to pay attention to the needs
10  of the other side.
11         It's not clear to me about Mr. Auguston, and I've
12  got to think just a little more about this and then I'll put
13  something in the minute order but the -- but if you're going
14  to have witnesses come in, the other side needs to know.  They
15  need to have the documents.  They need to do the things that
16  any lawyers would want to do whether it's any kind of a case,
17  and you're not so special and you don't get to have your own
18  strategies about this.
19         This is just -- this is just common sense in making
20  a trial come off in a way that at the end affords justice,
21  which is what I'm most interested in.
22         MS. LONDON:  Thank you, your Honor.
23         THE COURT:  Okay, so let's go on to the CMC portion
24  of our time together.
25         So the first thing and -- the first thing is that

 1    we're gonna use a jury questionnaire.  You had one for B.B.  I

 2    imagine you're -- I don't know whether it works completely for

 3    this case.

 4              MS. LONDON:  Very close, Your Honor.  We've been

 5    discussing with the other side.  We have a few adjustments to

 6    the questionnaire we'd like to make, and we plan to submit our

 7    current -- I think it's a competing -- like competing

 8    proposals or a few adjustments we'd like to make.  We plan to

 9    submit that to the Court either on Monday or Tuesday.  If you

10    prefer it Monday, we can do it Monday.

11              THE COURT:  I don't want it Monday.  Tuesday will be

12    fine because I'm going to submit it to the jury office on

13    October 13th --

14              MS. LONDON:  Thank you, Your Honor.

15              THE COURT:  -- so that we're ready to go.

16              The procedure for designation reports and exhibits

17    that you mentioned, the -- you can forward the designation

18    reports and exhibits to the whopo@canduscourts.gov e-mail, and

19    what would be most helpful to me -- I don't know how this --

20    what this report is gonna look like exactly.

21              The -- it would be great if it is hyper linked, if

22    everything that you want me to rule on is hyper linked to the

23    material.  So if it's the deposition transcript, if it's to

24    something that Judge Larson did so that I don't have to go

25    searching.

1    Just present it to me in a way that would be most

2  helpful to me, and you know the document better than I do and

3  I'm -- I will trust you to do that, but I think having as much

4  stuff hyper linked would be really valuable to me.

5    The dispute that you described at some length over

6  the surveys, that seems to be resolved.  Is there anything

7  left to deal with on that?  Okay.

8    The -- you asked for time prior to trial -- "shortly

9  before trial," I think was your terminology, for evidentiary

10  issues and deposition designations.  "Shortly before trial"

11  for me will be -- I have the mornings of October 26th and

12  27th, which isn't that short before trial.

13    It's probably not what you were thinking, but those

14  are really the only mornings that I've got until we select the

15  jury.  So you have to get me things -- I don't know -- when am

16  I gonna -- I'll ask Ms. London.

17    When am I gonna see that I need to prepare for a

18  hearing on October 26th or 27th?

19    MS. LONDON:  I believe, Your Honor, we have -- our

20  pretrial statement is Monday the 24th.

21    THE COURT:  Yes.

22    MS. LONDON:  So then I -- is the question when can

23  we provide you with the things for the 26th and 27th?

24    THE COURT:  Yes, and what's it going to be?

25    MS. LONDON:  I expect it's going to be a subset of

```
 1    exhibits that we have disputes over, and we'll make sure it's
 2    not too voluminous and it will be some priority deposition
 3    designations that we either want to play first up or early up
 4    in the trial.
 5            So we will confer with the other side about keeping
 6    that relatively limited and streamlined, but if we can get it
 7    to you -- I know you'll have a lot to look at with the
 8    pretrial conference materials.  We'll try to provide it to you
 9    the Friday before or Thursday before.  Would that be
10    sufficient?
11            THE COURT:  I think you should provide it as soon as
12    it's ready to be provided and --
13            MS. LONDON:  Happily.
14            THE COURT:  -- I will get at it.  I'm gonna be
15    looking at it remotely while doing some other things that
16    weekend.  So whenever it's done, send it on.
17            MS. LONDON:  Understood.  Thank you, your Honor.
18            THE COURT:  Okay.  And then the final issue from the
19    CMC related -- so let's actually set a time.  So let's have a
20    hearing at 9:30 on the 26th, and I will reserve 9:30 on the
21    27th as well in the event that either I'm not ready or there's
22    more stuff than I can deal with the first day and just assume
23    that that will be no longer than two hours hearing -- I mean
24    to those.
25            And then with respect to the number of exhibits, to
```

1  me the most important thing is to be dealing with the

2  important exhibits and it sounds as though -- I don't know how

3  many exhibits you actually think you're gonna put in to the

4  trial that the jury's gonna look at.  I probably speculated to

5  you before how many exhibits I think juries actually pay

6  attention to, and it is a tenth of what you think it is.  I

7  don't know what numbers you think it is, but it's about a

8  tenth of them.

9        So my idea is that as the parties know, in addition

10  to those 300 about documents that they know they're gonna be

11  using with witnesses that you make sure that the other side

12  knows, but I'm not gonna do any further culling.  You have

13  more important things to do than that.  I would be more -- so

14  I'm not gonna require more than that.

15        If as the plaintiffs know that they're not gonna be

16  using stuff, you also ought to let them know because it's a

17  ridiculous number of exhibits that are -- that have been

18  numbered.  I just -- at the end of the day thinking about how

19  I would be going about preparing stuff, I think I would just

20  focus on the important things; and I think doing the exchange

21  of 300 gets you pretty close to what you need, and you know

22  who the witnesses in general are gonna be and you know how to

23  prepare examinations so I'm not worried about that.

24        All right.  Ms. London, is there anything else we

25  ought to do today?

1      MS. LONDON:  No.  Thank you, your Honor, for your

2  time.

3      THE COURT:  Okay.  Anybody from the defense?

4      Mr. Bernick?

5      MR. FARRELL:  Your Honor, if I could just briefly,

6  one of my -- this is Peter Farrell for JLI.  I just wanted to

7  be sure I didn't misspeak earlier because one of my colleagues

8  just nudged me on the question of Mr. Auguston and the two

9  witnesses from earlier.

10      If I gave Your Honor the impression that he was

11  meant to be a rebuttal witness, or something of that nature in

12  response to the two, then I misspoke.  We certainly added him

13  after the witnesses were changing, including the two that I

14  was alluding to, but his testimony would or could potentially

15  be broader than just responding to what those two people said.

16  So I just wanted to be clear that I didn't suggest something

17  to the contrary in our colloquy earlier.

18      THE COURT:  Well, you did to me.  I may have -- I

19  may have missed what you were saying.

20      MR. FARRELL:  Then I'm glad I clarified, Your Honor.

21  I didn't -- I didn't mean to suggest to the contrary.

22      THE COURT:  Okay.  That does make a difference to me

23  in the way that I'm looking at this.  So I will think about

24  this a little more, but thank you for clarifying that,

25  Mr. Farrell.  I appreciate it.

1    MR. FARRELL:  Respectfully, not to go back to it --

2    THE COURT:  No, no, you've said enough.

3    MR. FARRELL:  All right.  Thank you, your Honor.

4    THE COURT:  I appreciate your -- I appreciate your

5    argument and I realize the witnesses stand in a different --

6    in different positions and -- but I, also, in the way that you

7    were considering how to address the disclosure of witnesses, I

8    think it presents a different question.

9    So I'm gonna -- I will think about that.

10    MR. BERNICK:  The only thing I will add is that

11    Dr. Auguston is -- and I think, in fact, Ms. London referred

12    to this.  He is really well-known.  I mean, he is a major

13    player in behavioral sciences --

14    THE COURT:  Well, you might have then thought about

15    disclosing him --

16    MR. BERNICK:  Well, nobody --

17    THE COURT:  Mr. Bernick, don't interrupt me.  I get

18    to interrupt you.

19    MR. BERNICK:  Okay, sorry.

20    THE COURT:  That's one of the prerogatives of being

21    a judge.  And the other thing, then you get into real "what

22    about-ism."  You know, Ms. London says, "Well, these students

23    wrote a letter.  You could have seen that or you could have

24    seen this interview or that interview."

25    The point is that if you're gonna use somebody, if

1   you think they're really important to your case, you got to

2   disclose them and you got to disclose them before two months;

3   but you had a working practice that was ill-defined that --

4   where the plaintiffs ended up jumping through some hoops in

5   order to get ready for this and it's -- it seems -- I do want

6   to think about this a little more, but it does seem fair to

7   make you jump through a couple of hoops as well.

8           MR. BERNICK:  Thank you, your Honor.

9           MR. MASSARO:  Your Honor, John Massaro on behalf of

10  Altria.  I'm not sure that the plaintiffs are saying that

11  Altria had any such working practice, and I'm not aware of us

12  having any such practice.

13          THE COURT:  I'm hoping -- I actually don't want to

14  get into this, but thank you, Mr. Massaro.  I appreciate that

15  and, also, starting off with the baseball analogy but the -- I

16  am hoping that after today we have a somewhat clearer

17  understanding of what people's obligations are.

18          So I am going to think about Mr. Auguston and you

19  were getting up, Mr. Bernick, I think, to say something else?

20          MR. BERNICK:  No, no, no, it was just -- just a

21  really small thing that I'm sure probably doesn't make a

22  difference; but this really is a situation where he's a very,

23  very prominent guy and so, yeah, we made the decision that we

24  wanted to call him but it's not -- he's been out there, you

25  know, very visibly throughout this -- he's the guy that wrote

1    all these articles.

2            THE COURT:  I thought you were going to go to

3    another topic.  I've heard enough about him, and I actually

4    think the point you're making works against you.

5            MR. BERNICK:  Well, it may very well be but I

6    just. . .

7            THE COURT:  All right.  Is there anything else that

8    anybody else wants to raise at the CMC portion of this?

9            All right, thank you all very much.  I look forward

10   to seeing you often in the future.

11   *(Proceedings ended at 12:20 p.m.)*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1              **_REPORTER'S CERTIFICATION_**

2

3              I, TERI VERES, do hereby certify that I am duly

4    appointed and qualified to act as Official Court Reporter for

5    the United States District Court for the District of Arizona.

6              I FURTHER CERTIFY that the foregoing pages

7    constitute a full, true, and accurate transcript of all of

8    that portion of the proceedings contained herein, had in the

9    above-entitled cause on the date specified therein, and that

10   said transcript was prepared under my direction and control.

11             DATED at Phoenix, Arizona, this 8th of

12   October, 2022.

13
                                    ____s/Teri Veres_____
14                                  TERI VERES, RMR, CRR

15

16

17

18

19

20

21

22

23

24

25