IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR<br><br>**DEFENDANTS' LETTER BRIEF REGARDING TRIAL SELECTION OF BELLWETHER SCHOOL DISTRICT CASES**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

I.   **PARTY STRIKES**

On May 20, Plaintiffs and Defendants exercised their strikes on *School District of the Chathams v. Meta Platforms, Inc., et al.*, Case No. 4:23-cv-01466, and *The School Board of Hillsborough County, Florida v. Meta Platforms, Inc., et al.*, Case No. 4:24-cv-01573, respectively. Both were Plaintiff bellwether discovery picks.

Defendants further recommend that the Court exclude from the bellwether trial pool *Board of Education of Jordan School District v. Meta Platforms, Inc., et al.*, Case No. 4:24-cv-01377, and *Tucson Unified School District v. Meta Platforms, Inc., et al.*, Case No. 4:24-cv-01382.[1]

II.  **DEFENDANTS' RECOMMENDATIONS WILL YIELD A REPRESENTATIVE, INFORMATIVE TRIAL POOL**

In deciding which cases to try, Defendants respectfully submit that the Court should consider (i) the size and geography of the school district; (ii) the student and community demographics; (iii) the district's response to COVID-19; (iv) its policies, if any, regarding use of personal electronic devices at school; (v) trial-readiness of the case; and (vi) any unique, district-specific factors that render it unrepresentative of the larger pool. *See, e.g.*, Federal Judicial Center, *Bellwether Trials in MDL Proceedings*, at 22 (2019) (Bellwether case selections "must be representative of the range of cases included in the MDL proceeding").

Several factors weigh in favor of removing Jordan School District ("JSD") and Tucson Unified School District ("TUSD") from the trial pool. Those Districts are outliers with unique factual circumstances. JSD experienced an anomalous "suicide cluster" during the 2017–18 academic year; numerous students in the District tragically ended their lives within a relatively short time period. TUSD has been operating under a federal desegregation order for nearly the entire time period for which it seeks damages. Additionally, unless the Court grants Defendants' motion to preclude reliance on their late-disclosed witnesses [ECF No. 1952], substantial discovery is still needed in both Districts because they disclosed new witnesses on the last day of discovery, and neither case will be trial ready under the current schedule. For these reasons and others, discussed in more detail below, trying JSD's and TUSD's claims will not further the objectives of the bellwether process and will slow down the entire case schedule. Those cases should be removed from the trial pool.

A.   **Board of Education of Jordan School District (Plaintiff Pick)**

**Student Demographics.** JSD, located in Salt Lake County, Utah, serves a homogenous, non-representative population. Nearly 50% of Salt Lake County residents are members of the Church of Jesus Christ of Latter-day Saints ("LDS"), and the numbers are estimated to be even higher in

---

[1] For the Court's convenience, attached as **Appendix 1** is a chart presenting key information contained in Defendants' brief on each of the 10 remaining discovery bellwether cases.

the southwestern portion of the County where JSD is located.[2]  By contrast, an estimated 2% of the adult population in the United States are LDS members.[3]

**Unique Facts & Circumstances.**  During the 2017–18 school year, JSD experienced a "suicide cluster" at Herriman High School: eight then-current students and recent graduates took their lives in short succession.  In addition, six other JSD students and one staff member have died by suicide since May 2018.  Such tragedies are a rare phenomenon: of the districts in the MDL that have reported any student suicides, most reported two or fewer during the relevant time period.  Defendants are unaware of any other district in the broader pool that has experienced a similar "suicide cluster."  It is evident that JSD now seeks to blame these events on Defendants' platforms (contrary to the District's sworn discovery response and prior assertions during RFP negotiations that its claims are not based on harms to specific students).  But JSD is situated in what is known as the "suicide belt."  Across the Mountain West, the suicide rate is nearly twice the national average—and has been for decades.[4]  In short, any trial of JSD's claims would devolve into mini-trials on the precise cause of each suicide, distracting jurors from the more common alleged causation issues facing most districts in the MDL.

Also, given the large LDS population in the District, students at JSD are permitted to attend nearby seminaries—LDS-owned and -operated religious education classes—during a "release time" period during the school day.  Any trial of JSD's claims would necessarily require the parties to devote time and attention to exploring what (if any) role religion, as well as hybrid secular and religious schooling, played in the mental health of JSD students.

**JSD May Not Be Ready for Trial.**  Unless the Court grants Defendants' pending motion to exclude JSD's belatedly disclosed witnesses, it will be virtually impossible to try this case on schedule, further rendering it an unsuitable bellwether candidate.  On the day fact discovery closed, JSD identified six previously undisclosed witnesses to discuss the "prevalence and impact of social media use": an assistant principal, a teacher, the parent of a suicide victim, two former students, and a current student.  Defendants moved to preclude JSD from relying on these witnesses for any purpose.  *See* ECF No. 1952.  As explained in Defendants' motion, if JSD is selected for the trial pool and is permitted to rely on any of these witnesses, Defendants will require extensive additional discovery to ready the case for trial, necessitating an extension of the case schedule.  *Id.* at 11–13.  In addition, JSD served an amended damages computation on May 16—after Defendants already deposed JSD's 30(b)(6) on that topic and all other relevant fact witnesses with knowledge.  Defendants are evaluating the need to depose at least a few of these individuals based on the new information provided.  This additional work will frustrate the parties' trial-preparation efforts.

---

[2] *See* Matt Canham, *Salt Lake County is now minority Mormon, and the impacts are far reaching*, Salt Lake Tribune (Dec. 9, 2018), *available at* https://www.sltrib.com/religion/2018/12/09/salt-lake-county-is-now/.

[3] *See* Facts and Statistics, The Church of Jesus Christ of Latter-Day Saints, https://newsroom.churchofjesuschrist.org/facts-and-statistics/country/united-states.

[4] Nafisa Masud, State of Suffering: Curbing the Rise of Utah Suicides, Univ. of Utah (Nov. 4, 2022), *available at* https://utah-health.shorthandstories.com/state-of-suffering/index.html.

**District Size & Geography.** The large size and location of JSD further sets it apart from the broader case pool. It is responsible for more than 57,000 students and 65 schools. The median enrollment in MDL cases is far lower—fewer than 2,300 students—and 90% of those districts have fewer than 30 schools. There are several other medium-to-large school districts in the discovery bellwether pool—including Baltimore, Harford, DeKalb, and Charleston—each of which is more representative of the overall pool than JSD. Further, JSD serves a relatively wealthy, suburban population—the median household income is nearly $95,000, which is above the national median income.[5] Harford is similarly wealthy, and therefore representative of higher-income districts, yet does not have the unique circumstances found in JSD. The size, location, and resources of JSD further render it atypical of most school district cases pending in the MDL.[6]

### B. Tucson Unified School District (Plaintiff Pick)

**Unique Facts & Circumstances.** For most of the time period for which TUSD seeks damages, TUSD operated under a federal desegregation order—a rare legal status that imposed court supervision to remedy ongoing discrimination. In 1974, African American and Mexican American students sued TUSD for intentionally segregating and discriminating against students based on race and national origin. *Fisher v. TUSD*, 652 F.3d 1131, 1134 (9th Cir. 2011). As part of a settlement, TUSD became subject to a court-ordered desegregation plan in 1978. *See Fisher v. TUSD*, No. CIV 4:74-cv-00090 DCB (D. Ariz. Nov. 6, 2024), ECF No. 1713 ("Unitary Status Plan") at 4. With only a brief interruption, TUSD remained under continuous court supervision until July 2022, *Fisher v. TUSD*, No. CV-74-00090-TUC-DCB, 2022 WL 4482641, at *1 (D. Ariz. July 20, 2022), and TUSD continued to implement the desegregation plan until the Ninth Circuit affirmed the district court's order ending the supervision earlier this year, *Mendoza v. TUSD*, 125 F.4th 1262 (9th Cir. 2025).

In a case centered on students' academic performance, discipline, and social and emotional wellbeing over the past decade, TUSD's *lengthy* and *recent* history of institutionalized discrimination will take center stage. TUSD spent the past decade grappling with these problems as a consequence of its *own* functionally segregated school system. *See* Unitary Status Plan at 32 (stating that one objective of the desegregation plan is to "improve the academic achievement and educational outcomes" of certain students and eliminate "disparities for these students in academic achievement, dropout and retention rates, [and] discipline"). TUSD was ordered to devote substantial resources to remedy systemic racial inequities that directly affected students' educational experience and school climate. *Id.* at 7–41, 43–49. This historical context

---

[5] QuickFacts Salt Lake County, Utah, United States Census Bureau, https://www.census.gov/quickfacts/fact/table/saltlakecountyutah/SBO001222.

[6] Neither JSD's response to the pandemic nor its policies related to personal use of electronic devices at school moves the needle here. **Response to COVID-19**. JSD, like all other schools in the bellwether pool, instituted remote learning from March 2020 through the end of the school year. JSD returned to in-person classes in the fall of 2020; however, individual schools were forced to close periodically as a result of community-level testing thresholds. **Electronic Device Policies.** In October 2024, JSD implemented a total cell phone ban for elementary school students and ban of cell phone use in class only for secondary students. Utah has since mandated classroom cell phone bans; the law goes into effect on July 1, 2025.

4

distinguishes TUSD and means any trial would be a poor proxy for other districts' claims.

Further, the damages TUSD seeks overlap with the requirements of the Unitary Status Plan. The vast majority of TUSD's damages consist of a percentage of the costs associated with certain district personnel—including teaching staff, administrators, counselors, and social workers. Because each of these positions played an integral role in TUSD desegregation efforts, it is impossible to disentangle work on the Unitary Status Plan from work allegedly related to Defendants' platforms. For instance, TUSD seeks 50% of the costs associated with school counselors, 60–80% of the costs associated with social workers, and 40% of the costs associated with MTSS (Multi-Tiered Systems of Support), all of which played important roles under the Unitary Status Plan. *See* Unitary Status Plan at 31, 34.[7] A review of TUSD's own desegregation budget confirms this overlap: the District allocated substantial desegregation funds to support the same positions for which it now seeks to recover damages. TUSD further seeks to recover costs that are expressly required under the Plan, such as changes to its code of conduct and costs associated with restorative practice facilitators. *Id*. at 43–45. TUSD has a particularly egregious history of systemic discrimination, and the resulting Unitary Status Plan complicates both causation and damages issues, making it a poor proxy for other districts' claims.

**TUSD May Not Be Ready for Trial.** Similar to JSD—which is also represented by Wagstaff & Cartmell—TUSD served, on the last day of fact discovery, revised interrogatory responses that, for the first time, identified four new witnesses to discuss the "prevalence and impact of social media use": a high school junior, a middle school principal, a high school principal, and a high school Dean of Students. Just as with JSD, Defendants moved to preclude TUSD from relying on these witnesses, but if TUSD remains in the bellwether pool and is allowed to rely on these untimely disclosed witnesses, Defendants would require extensive discovery to prepare the TUSD case for trial, necessitating an extension of the case schedule. *See* ECF No. 1952-1.

Additionally, TUSD failed to produce the records underlying its allegations. At deposition, it became clear that TUSD's claims rest not on empirical data, but on anecdotal accounts supported by unproduced documents from TUSD's student information system, disciplinary files, and school safety database. For example, TUSD's 30(b)(6) witness testified that "disciplinary data" in the student information system shows fights that happen "because of the use of social media," and that such information is in the "narrative section" of the database. Shivanonda Tr. 139:4–140:1. TUSD's Superintendent testified that the District keeps "meticulous records on student disciplinary situations" which include "detailed narratives" documenting a connection to social media, if any, and that these are "records kept by the student relations department." Trujillo Tr. 192:15–198:13. Yet, TUSD has withheld these materials, thus preventing Defendants from testing the accuracy of the District's allegations. Defendants moved to compel production of documents from TUSD's student information system [ECF No. 1949] and are meeting and conferring about production of the other documents. If Defendants' motion is successful, Defendants may seek further deposition time to cure the prejudice that resulted from TUSD withholding these records

---

[7] *See also* TUSD, Executive Summary of Equity Initiatives Under the Unitary Status Plan, at 19–20, https://deseg.tusd1.org/_theme/files/usp/usp-executive-summary.pdf.

in the first instance. The delays necessitated by TUSD's late disclosures and incomplete document productions make it a poor candidate for trial.

**Student Demographics, District Size & Geography.** TUSD, an urban district located in the western United States, serves a student population that is 65.4% Hispanic/Latino, 18% White, and 6.7% Black. Like JSD, TUSD is among the largest school districts in the country. Unlike 90% of the districts in the MDL, which have fewer than 30 schools, TUSD has 88 schools. It also serves approximately 40,000 students, which is roughly 17 times the median and more than twice the 90th percentile of student enrollment in the MDL pool. There are other large districts in the discovery pool that do not have these unique facts and circumstances.[8]

### III.   THE REMAINING CASES IN THE POOL ARE MOSTLY TRIAL-READY AND HAVE FEWER DISQUALIFYING UNIQUE CIRCUMSTANCES

In contrast to JSD and TUSD, the relevant factors show that the remaining cases are more suitable bellwether candidates. They vary in size and geography, and they reflect key national trends: they encompass diverse community and student demographics, and demonstrate a range of COVID-19 closure and electronic device policies. Moreover, unlike JSD and TUSD, these cases are not encumbered by unique circumstances and are largely trial ready.[9]

#### A.   Baltimore City Board of School Commissioners (Defense Pick)

**Student Demographics.** Baltimore City Public Schools ("BCPS") is an inner-city, urban school district located within the city limits of Baltimore. BCPS's student body—71% Black/African American, 18.6% Hispanic/Latino, and 7.1% White, as well as 76% from low-income families—represents several significantly underserved communities.

**Geography & District Size.** Hailing from the Mid-Atlantic region, BCPS represents more than 40% of the districts in the MDL, including the 17 other Maryland school districts in the overall pool. BCPS is also a larger school district (approximately 75,000 students) in an urban environment.

---

[8] TUSD's COVID-19 response and cell phone policies are not particularly informative. **Response to COVID-19.** TUSD closed physical campuses from March 2020 through the end of the school year. TUSD then implemented a hybrid learning approach before returning to in-person learning for the 2021-22 year. **Electronic Device Policies.** TUSD's district-wide policy allows students to possess cell phones. The policy directs students to keep the device out of view during class, but teachers are permitted to authorize cell phone use. In 2025, Arizona passed legislation that will require schools to limit students' access to cell phones and social media during the school day

[9] On May 19, 2025, plaintiffs disclosed new affidavits for bellwether fact witnesses that were not disclosed during fact discovery or prior to those witnesses' depositions. Defendants are currently analyzing plaintiffs' new disclosures to determine the scope of any additional discovery needed. To the extent it is required, Defendants expect to be able to take any necessary depositions within the current schedule.

**COVID-19 Closures.**  BCPS's response to the COVID-19 pandemic is representative of the significant portion of the MDL pool that did not return to full in-person learning until the 2021–22 school year.  After going fully remote from March 2020 through the end of the school year, BCPS remained mostly virtual for the 2020–21 school year, and most of its students did not completely return to full in-person learning until the beginning of the 2021–22 school year.  This would allow the parties the opportunity to test theories related to potential mental health effects of an especially long pandemic closure and the resulting prolonged isolation among schoolchildren.

**Electronic Device Policies.**  BCPS also reflects diverse approaches to use of electronic devices by students at school that may be instructive.  For the 2024–25 school year, 25 BCPS schools participated in a pilot program to test different methods to limit students' cell phone use.  Participating schools devised their own policies and used some combination of strategies that include locking pouches, collecting and securing phones in the classroom, and securing them in a central location.  In the spring of 2025, BCPS adopted a policy requiring devices to be turned off and put away during the school day (including recess, lunch, and passing periods) effective beginning in the 2025–26 school year.  BCPS's varied approaches to managing student use of personal devices captures the types of policies enacted by the larger MDL pool.

**Unique Facts and Circumstances.**  BCPS did not waive Lexecon and any trial of this case would need to take place in Maryland.[10]

### B. Breathitt County Schools (Defense Pick)

**Geography & District Size.**  Located in the foothills of Kentucky's Appalachian Mountains, Breathitt County Schools' ("BCS") student population of 1,579 represents the 45% of districts in the overall pool with 2,000 students or fewer.  BCS is also representative of 395 MDL districts reporting five schools or fewer.  As the only remaining bellwether district located entirely in a rural community, BCS is also representative of the approximately 42% of cases that were filed by school districts in predominantly rural communities.  Because no other case in the bellwether pool has similar characteristics, a representative trial pool should include BCS.

**Student Demographics.**  Like many rural areas across the United States, BCS's student body is predominately Caucasian: 97.3% White; 1% Hispanic; 0.6% Black; and 1% Two or More Races.

**COVID-19 Closures.**  The COVID-19 pandemic prevented in-person learning beginning in March 2020. BCS quickly re-opened its schools with a hybrid in-person/remote approach in September 2020, which it maintained until August 2022. Accordingly, BCS will serve as a helpful

---

[10] Recent depositions in Baltimore have raised questions regarding whether the case is trial ready. Defendants have been forced to hold open four depositions for different reasons. Among other things, Baltimore's witnesses have identified a large number of highly relevant documents and databases that they say would establish a connection between disciplinary issues and social media that have not been produced.  They also have not produced documents relating to, and have instructed witnesses not to answer questions regarding, two surveys of teachers and staff regarding the impact of social media on Baltimore schools.

test case on the interplay between hybrid learning—which many schools implemented when returning to school during the pandemic—social media use, and students' wellbeing.

**Electronic Device Policy.**  Until 2024, Breathitt High School permitted students to use cell phones on school campuses as long as they were used for instructional purposes.  At the start of the 2024–25 school year, Breathitt High School—which also includes sixth through eighth grade—required students to place their devices in cell phone lockers during class.  Students, however, are still permitted to use cell phones during transition times, lunch, and before and after school.

### C.   **Charleston County School District (Plaintiff Pick)**

**Geography & District Size.**  Charleston County School District's ("CCSD") population of over 50,000 students across 88 schools in South Carolina is larger than most in the MDL.  However, with schools in urban, suburban, and rural environments, it reflects the diverse communities in the MDL.  And 17% of the MDL pool is located either in South Carolina or nearby southeastern states.

**Student Demographics.**  CCSD's student body is 50% White, 31% Black, and 13% Hispanic or Latino.  The median household income ($67,486) falls in the middle of the broader MDL pool.

**COVID-19 Closures.**  In contrast to other districts, CCSD returned to in-person learning much earlier.  Following the COVID-19 pandemic, CCSD reopened at the start of the 2020–21 school year with a hybrid learning model.  Families could choose whether to send their child back to school in-person or continue with remote learning.  As a result, CCSD's case would allow the parties to test the relative importance of one additional year of remote learning—and parental choice—in these cases.

**Electronic Device Policies.**  Pursuant to state mandate, CCSD recently enacted a district-wide cellphone ban.  South Carolina is not alone in this endeavor.  As of May 2025, 21 states have passed similar legislation.[11]  The parties should be able to test the impact of that legislation, if any, on the harms alleged.

**Unique Facts and Circumstances.**  Although South Carolina is one of four states (out of the 19 analyzed in the Court's order on the motions to dismiss, ECF No. 1332) that bars public-nuisance claims of this type, its inclusion remains informative because a significant number of MDL plaintiffs originate from states that do not recognize such claims.  Furthermore, selecting this case for trial would be representative of the 29 other cases from South Carolina.

### D.   **DeKalb County School District (Defense Pick)**

**Student Demographics, Geography & District Size.**  DeKalb County School District ("DCSD") is a large suburban school district located near Atlanta, Georgia, educating more than 96,000 students across 127 schools.  Though DCSD is larger than the "average" district in the MDL pool, unlike Tucson, it is representative of the 85% of MDL districts located in the eastern half of the

---

[11] Ballotpedia, *State policies on cellphone use in K-12 public schools*, available at https://ballotpedia.org/State_policies_on_cellphone_use_in_K-12_public_schools#:~:text=As%20of%20May%208%2C%202025,or%20limit%20cellphones%20in%20classrooms.

8

country, as well as the 17% of districts located in the Southeast. Further, the demographics of its student population are far more representative than Tucson's within the larger MDL pool. DCSD serves a student population that is 30% White, 52% Black, 6% Asian, and 8.6% Hispanic or Latino.

**COVID-19 Closures.** DCSD's operations were significantly disrupted by the COVID-19 pandemic. DCSD did not return to in-person learning until Spring 2021, approximately one year after remote learning began. Selecting DCSD for the trial pool would allow the parties to test the relative effects of social isolation experienced by students due to the COVID-19 pandemic.

**Electronic Device Policies.** Selecting DCSD would also help the parties and the Court to understand the import, if any, of physical restrictions to students' cellphones. In September 2024, DCSD instituted pilot programs to test Yondr pouches in 10 schools and cell phone lockers in eight schools. As of April 2025, DCSD had not yet decided whether to continue or expand the Yondr pouch or cell phone locker programs beyond this academic year.

**Unique Facts and Circumstances.** DCSD did not waive Lexecon and any trial of this case would need to take place in Georgia.

### E. Board of Education of Harford County (Plaintiff Pick)

**District Size & Geography.** Harford County Public Schools ("HCPS") educates 38,000 students across 54 schools. HCPS covers mostly suburban and rural areas on the outskirts of the Baltimore metropolitan area.

**Student Demographics.** HCPS's student population is 58% White, 21% Black, and 9% Hispanic or Latino. The median household income is over $110,000. Trying this case would help the parties to understand the interplay, if any, between socioeconomic status, demographics, and the alleged harms, meaningfully advancing resolution of the broader litigation.

**COVID-19 Closures.** HCPS partially reinstated in-person learning in March 2021 on a hybrid schedule. It is representative of 40% of the MDL pool districts located in the Mid-Atlantic and Northeastern United States, many of which instituted lengthy, year-long (or longer) school closures as a result of the pandemic.

**Electronic Device Policies.** HCPS implemented a new cell phone policy for the 2024-25 school year that prohibits cell phone use in classrooms and limits students' access to personal devices based on their grade levels. According to HCPS witnesses, the new policy has had positive results.

### F. Irvington Public Schools (Defense Pick)

**Geography & Student Demographics.** Irvington Public Schools ("IPS") is an urban school district in New Jersey, directly adjacent to Newark and 15 miles west of New York City. IPS would be representative of the 410 cases located in and around New Jersey, including in New York and Pennsylvania. IPS's student body is approximately 67% Black, 32% Hispanic, and 1% other or multiple ethnicities. 38% of the IPS students are English Language Learners. A significant percentage of IPS students, 64%, are classified as "economically disadvantaged" by the State of

New Jersey, meaning that those students are eligible for free or reduced lunch based on their household incomes.

**District Size.**  There are nearly 7,800 students enrolled in 14 IPS schools, making it close to the average district in the MDL pool (mean of around 8,700 students and 15 schools).

**COVID-19 Closures.**  IPS transitioned to remote learning from March 2020 to April 2021 due to COVID-19, and then again from December 2021 to January 2022 due to a surge of COVID-19 cases.  IPS will thus represent a useful test case on the interplay between remote learning, social media use, and students' mental and emotional wellbeing.

**Electronic Device Policies.**  IPS policy prohibits student use of personal cell phones during and between classes.  They are allowed to use their phones during lunch periods, before school, and after school.  However, IPS schools do not follow this policy—which requires confiscation of cell phones when visible, to be returned at the end of the day if a first-time offense or at the end of the school year if a repeat offense—to the letter and often tell students to put their phones away without confiscating them.

**Unique Facts and Circumstances.**  Although New Jersey is one of four states (out of the 19 analyzed in the Court's order on the motions to dismiss, ECF No. 1332) that bars public-nuisance claims of this type, its inclusion remains informative because a significant number of MDL plaintiffs originate from states that do not recognize such claims.  Furthermore, Plaintiffs struck the other New Jersey district in the bellwether pool; as such, selecting this case for trial would be representative of the 51 other cases from New Jersey.

### G.   Spartanburg County School District 6 (Defense Pick)

**District Size, Student Demographics & Geography.**  Spartanburg County School District 6 ("SCSD6") serves a student body of nearly 12,000 across 17 schools.  The student population is not too far above the MDL mean of 8,700 students.  SCSD6's student body is 38% White, 30% Black, and 20% Hispanic.  SCSD6 is representative of 83 districts in South Carolina and nearby southeastern states, and it is a mix of rural, suburban, and urban areas.

**COVID-19 Closures.**  SCSD6 returned to daily in-person instruction (with the option of remote learning) much earlier than other districts, at the beginning of the 2020–21 academic year.  Including SCSD6 in the trial pool would allow the parties to test the impact, if any, COVID-19 had on plaintiffs' alleged harms.

**Electronic Device Policies.**  Like other states represented in the MDL pool, South Carolina passed legislation regarding student cellphone use at school.  In response, SCSD6 implemented a policy requiring students to have cell phones and smart devices powered off and put away during school.  Like with other districts in the bellwether discovery pool, according to SCSD6's witnesses, the policy has had positive results.

**Unique Facts and Circumstances.**  Although South Carolina is one of four states (out of the 19 analyzed in the Court's order on the motions to dismiss, ECF No. 1332) that bars public-nuisance claims of this type, its inclusion remains informative because a significant number of MDL

plaintiffs originate from states that do not recognize such claims. Furthermore, selecting this case for trial would be representative of the 29 other cases from South Carolina.

### H. St. Charles Parish Public Schools (Defense Pick)

**Trial Readiness.** Unlike nearly all of the seven other districts described in section III, *supra*, St. Charles Parish Public Schools ("SCPPS") may not be trial-ready. On April 28, 2025, three weeks after the close of fact discovery, SCPPS served an amended response to Defendants' Interrogatory No. 1, identifying 19 additional fact witnesses, including seven witnesses that had never been disclosed in any capacity. On May 12, 2025, SCPPS agreed to withdraw several of those witnesses, and on May 22 still more, but it maintained that it would rely on four of the newly identified witnesses for their experts, summary judgment, and/or at trial, including two principals, a high school student, and a middle school student. SCPPS produced some documents pertaining to two of those four witnesses on May 16 and 22, 2025, with more documents still to be produced; however, SCPPS is refusing to produce any records related to the two SCPPS students. None of the witnesses have been deposed as of the date of this filing, nor can Defendants consider agreeing to depositions before receiving all necessary documents. Further, on May 16, 2025, six weeks after the close of fact discovery, SCPPS served an amended answer to Defendants' Interrogatory No. 5, revising its damages analysis after Defendants already deposed SCPPS's Rule 30(b)(6) witness on this issue. Due to SCPPS's untimely additions and amendments, further fact discovery may remain, unless the Court rules that plaintiffs may not rely on these late disclosures.

**Geography, District Size & Student Demographics.** SCPPS is a small-to-medium sized school district located approximately 20 miles west of New Orleans, Louisiana, and is comprised of a mix of urban and rural areas. It is representative of the 49 MDL districts in the gulf. The total population of the parish is approximately 52,500 people, with a median income of approximately $79,200. SCPPS has a student population of 9,346 across 20 schools, representative of the larger MDL pool where almost 90% of districts have 18,500 students or less and fewer than 30 schools. SCPPS serves a student body that is 64% White, 26% Black, and 7% Hispanic.

**COVID-19 Closures.** As a result of COVID-19, SCPPS transitioned to remote learning in March 2020 through the end of the school year. SCPPS moved to hybrid remote/in-person learning during the fall of 2020 and returned to full in-person learning in spring 2021. SCPPS is representative of other MDL districts that experimented with hybrid learning and will be instructive on how this novel educational concept affected students.

**Electronic Device Policies.** As of the start of the 2024–25 school year, SCPPS, like all Louisiana school districts, is now subject to Louisiana Act No. 313, which prohibits students from using cell phones at school during the school day. SCPPS administration has taken steps to enforce this law across the District. SCPPS is representative of districts in the more than 21 states that have passed similar laws and required changes to district-level policies to ensure compliance.

DATED: May 23, 2025                              KING & SPALDING LLP

By: */s/ Geoffrey M. Drake*
Geoffrey M. Drake, Admitted *pro hac vice*
TaCara D. Harris, Admitted *pro hac vice*
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521
Telephone: (404) 572-4600
Facsimile: (404) 572-5100
Email: gdrake@kslaw.com
        tharris@kslaw.com

KING & SPALDING LLP
David P. Mattern, Admitted *pro hac vice*
1700 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20006-4707
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
Email: dmattern@kslaw.com

KING & SPALDING LLP
Bailey J. Langner (SBN 307753)
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300
Email: blangner@kslaw.com

*Attorneys for Defendants
TikTok Inc., ByteDance Inc., TikTok Ltd.,
ByteDance Ltd., and TikTok LLC*


COVINGTON & BURLING LLP
By: */s/ Ashley M. Simonsen*
Ashley M. Simonsen
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: (424) 332-4800
Facsimile: + 1 (424) 332-4749
Email: asimonsen@cov.com

COVINGTON & BURLING LLP
Phyllis A. Jones, Admitted *pro hac vice*
Paul W. Schmidt, Admitted *pro hac vice*
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956

12

Telephone: + 1 (202) 662-6000
Facsimile: + 1 (202) 662-6291
Email: pajones@cov.com

*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Facebook Payments, Inc.; Facebook Technologies, LLC; Instagram, LLC; Siculus, Inc.; and Mark Elliot Zuckerberg*

MUNGER, TOLLES & OLSON LLP
By: */s/ Jonathan H. Blavin*
Jonathan H. Blavin, SBN 230269
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077
Email: jonathan.blavin@mto.com

Rose L. Ehler (SBN 29652)
Victoria A. Degtyareva (SBN 284199)
Laura M. Lopez, (SBN 313450)
Ariel T. Teshuva (SBN 324238)
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702
Email: rose.ehler@mto.com
Email: victoria.degtyareva@mto.com
Email: Ariel.Teshuva@mto.com

*Attorneys for Defendant Snap Inc.*

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
By: */s/ Brian M. Willen*
Brian M. Willen (*pro hac vice*)
WILSON SONSINI GOODRICH & ROSATI
1301 Avenue of the Americas, 40th Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (212) 999-5899

Email: bwillen@wsgr.com

Lauren Gallo White (SBN 309075)
Samantha A. Machock (SBN 298852)
WILSON SONSINI GOODRICH & ROSATI
One Market Plaza, Spear Tower, Suite 3300
San Francisco, CA 94105
Telephone: (415) 947-2000
Facsimile: (415) 947-2099
Email: lwhite@wsgr.com
Email: smachock@wsgr.com

Christopher Chiou (SBN 233587)
Matthew K. Donohue (SBN 302144)
WILSON SONSINI GOODRICH & ROSATI
953 East Third Street, Suite 100
Los Angeles, CA 90013
Telephone: (323) 210-2900
Facsimile: (866) 974-7329
Email: cchiou@wsgr.com
Email: mdonohue@wsgr.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

WILLIAMS & CONNOLLY LLP
By: */s/ Joseph G. Petrosinelli*
Joseph G. Petrosinelli (*pro hac vice*)
jpetrosinelli@wc.com
Ashley W. Hardin (*pro hac vice*)
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Telephone.: 202-434-5000
Fax: 202-434-5029

*Attorneys for Defendants YouTube, LLC and Google LLC*

MORGAN, LEWIS & BOCKIUS LLP
By: */s/ Yardena R. Zwang-Weissman*
Yardena R. Zwang-Weissman (SBN 247111)
300 South Grand Avenue, 22nd Floor
Los Angeles, CA 90071-3132
Tel.: 213.612.7238

Email: yardena.zwang-weissman@morganlewis.com

Brian Ercole (*pro hac vice*)
600 Brickell Avenue, Suite 1600
Miami, FL 33131-3075
Tel.: 305.415.3416
Email: brian.ercole@morganlewis.com

Stephanie Schuster (*pro hac vice*)
1111 Pennsylvania Avenue NW
NW Washington, DC 20004-2541
Tel.: 202.373.6595
Email: stephanie.schuster@morganlewis.com

*Attorneys for Defendants YouTube, LLC and Google LLC*

## ATTESTATION

I, Geoffrey M. Drake, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: May 23, 2025

By: */s/ Geoffrey M. Drake*

# Appendix 1

| CASE BACKGROUND | | | DEMOGRAPHICS | | | | SCHOOL POLICIES | | DAMAGES & ABATEMENT | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Plaintiff** | **Party Pick** | **Lexecon Waiver (Y/N)** | **School Size** | **Student Demographics** | **Community Served** | **Median Household Income** | **Cell Phone Policy** | **Covid-19 Closures** | **Compensatory Damages ($)** | **Abatement ($)** |
| Baltimore City Board of School Commissioners (Maryland) | D | N | **Very Large** 76,841 students 160 schools | **Predominately Minority** 71% Black 18.6% Hispanic/Latino 7.1% White | Urban | **Low** $59,623 | **Bell-to-Bell Ban** As of Spring 2025: Devices must be powered off and put away on campus | **1+ Year Remote** March 2020-End of SY: Remote 2020-2021 SY: Majority remote 2021-2022 SY: In-Person | $77.8M to $91M | $2.3B to $2.9B |
| Breathitt County School District (Kentucky) | D | Y | **Small** 1,579 students 4-5 schools during RTP | **Predominantly White** 96.2% White | Rural | **Low** $41,101 | **Classroom Ban** As of 2024-2025 School Year: Devices must stored in cell phone lockers during class | **2+ Years Remote or Hybrid** March 2020-End of SY: Remote 2020-2021 SY: Hybrid 2021-2022 SY: Hybrid | $2.1M to $2.7M | $46.0M to $48.5M |
| Charleston County School District (South Carolina) | P | Y | **Large** 50,400 students 88 schools | **Racially Diverse** 50% White 31% Black 13% Hispanic/Latino | **Mixed** Urban, Suburban, Rural | **Medium** $67,486 | **Bell-to-Bell Ban** As of January 2025: cell phones banned district-wide pursuant to state mandate | **3+ Months Remote; 1 Year Parents' Choice** March 2020-End of SY: Remote 2020-2021 SY: Parents decided 2021-2022 SY: In-Person | $91.1M to $108.9M | $1.2B to $1.4B |
| DeKalb County School District (Georgia) | D | N | **Very Large** 96,460 students 127 schools | **Predominately Minority** 52.4% Black 30.0% White 8.6% Hispanic/Latino 6.1% Asian 0.6% American Indian | Suburban | **Medium** $77,169 | **No Ban, Piloting Restrictions** As of Fall 2024: Piloting use of Yondr bags to restrict cell phone use/access | **1+ Year Remote** March 2020-End of SY: Remote 2020-2021 SY: Remote until Spring 2021 2021-2022 SY: In-Person | $102.9M to $128.3M | $2.2B to $3.3B |
| Harford County, Board of Education of (Maryland) | P | Y | **Large** 38,106 students 54 schools | **Predominantly White** 58% White 21% Black 9% Hispanic/Latino | **Mixed** Rural, Suburban | **High** $100,915 | **Bell-to-Bell Ban (K-8); Classroom Ban (9-12)** As of 2024-2025 School Year: Devices must be powered off and put away during school hours or class depending on grade level | **1+ Year Remote or Hybrid** March 2020-End of SY: Remote 2020-2021 SY: Remote - hybrid beginning spring 2021 2021-2022 SY: In-Person | $30.9M to $41.4M | $1.0B to $1.2B |
| Irvington Public Schools (New Jersey) | D | Y | **Medium** 7,982 students 12 schools | **Predominately Minority** 67% Black 32% Hispanic 1% Other or Multi-Racial | Urban | **Low** $57,293 | **Banned Except for Lunch** Longstanding policy banning personal devices at school, including during class and passing periods, but not lunch | **1+ Year Remote** March 2020-End of SY: Remote 2020-2021 SY: Remote until April 2021 2021-2022 SY: In-Person | $48M to $54.9M | $263.1M to $319.7M |
| Jordan School District, Board of Education of (Utah)* | P | Y | **Very Large** 57,083 students 65 schools | **Predominantly White** 70% White 20% Hispanic/Latino 5% Multi-Racial 2% Pacific Islander 2% Asian 1% Black | Suburban | **High** $95,000 | **Bell-to-Bell Ban (K-6); Classroom Ban (7-12)** As of October 2024: Elementary students banned from using personal devices during school day; Secondary students banned from using during class | **3+ Months Remote** March 2020-End of SY: Remote 2020-2021 SY: In-Person with individual school closures based on testing data | $55.7M to $69.7M | $1.3B to $1.4B |
| Spartanburg 6 School District (South Carolina) | D | Y | **Medium** 11,937 students 17 schools | **Racially Diverse** 38% White 30% Black 20% Hispanic/Latino | **Mixed** Rural, Suburban, Urban | **Low** $64,195 | **Bell-to-Bell Ban** As of January 2025: cell phones banned district-wide pursuant to state mandate | **3+ Months Remote; 1 Year Parents' Choice** March 2020-End of SY: Remote 2020-2021 SY: Parents decided 2021-2022 SY: In-Person | $8.9M to $12.3M | $256.2M to $377.3M |

| District | | | Size | Demographics | Locale | Income | Phone Policy | Remote/Hybrid | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **St. Charles Parish Public Schools (Louisiana)** | D | Y | **Medium**<br>9,346 students<br>20 schools | **Predominantly White**<br>64% White<br>26% Black<br>7% Hispanic/Latino | **Mixed**<br>Rural,<br>Suburban | **Medium**<br>$79,191 | **Bell-to-Bell Ban**<br>As of 2024-2025 School Year: cell phones banned district-wide pursuant to state mandate | **1+ Year Remote or Hybrid**<br>March 2020-End of SY: Remote<br>2020-2021 SY: Hybrid until Spring 2021, then in-person<br>2021-2022 SY: In-Person | $8M to $11.6M | $248.5M to $277.2M |
| **Tucson Unified School District (Arizona)*** | P | Y | **Large**<br>39,927 students<br>88 schools | **Predominately Minority**<br>65.4% Hispanic/Latino<br>18% White<br>6.7% Black<br>4% Multiracial<br>3.7% Native American<br>1.7% Asian | **Urban** | **Low**<br>$61,398 | **Classroom Ban**<br>Longstanding policy banning personal device use during instructional time unless authorized; In 2025, Arizona legislature passed a broader state-wide ban that has not yet gone into effect | **1+ Year Remote or Hybrid**<br>March 2020-End of SY: Remote<br>2020-2021 SY: Hybrid<br>2021-2022 SY: In-Person | $77.9M to $101.1M | $988.7M to $1.0B |

**\*Defendants' Recommend Strikes.**