# EXHIBIT F

Pages 1 - 131

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Peter H. Kang, Magistrate Judge

IN RE:  SOCIAL MEDIA            )
ADOLESCENT ADDICTION/PERSONAL   )
INJURY PRODUCTS LIABILITY       )
LITIGATION                      )
                                )   **NO. 22-MD-03047 YGR (PHK)**
_____)


                         San Francisco, California
                         Thursday, March 20, 2025



                **REPORTER'S TRANSCRIPT OF PROCEEDINGS**


**APPEARANCES:**


For Plaintiffs:
                    LIEFF, CABRASER, HEIMANN
                      & BERNSTEIN LLP
                    275 Battery Street, 29th Floor
                    San Francisco, California 94111
              BY:   **LEXI J. HAZAM, ATTORNEY AT LAW**
                    **PATRICK I. ANDREWS, ATTORNEY AT LAW**

                    MOTLEY RICE LLC
                    401 9th Street NW, Suite 630
                    Washington, D.C. 20004
              BY:   **PREVIN WARREN, ATTORNEY AT LAW**

                    SIMMONS HANLY CONROY LLP
                    One Court Street
                    Alton, Illinois 62002
              BY:   **ELLYN HURD**


           **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**


REPORTED BY:  Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG
              CSR No. 7445, Official United States Reporter

1    to make clear, counsel for the third parties Ms. Jayakumar and

2    Mr. Bejar is with the law firm of Baker Botts.  Some -- all of

3    you may know I was a partner at Baker Botts before I took the

4    bench.  That was -- I took the bench a year and roughly

5    ten months ago, so not quite two years.  So the general

6    guidance is that I should recuse automatically if it's been

7    less than two years since I left that firm.

8         I received a communication from plaintiffs -- no -- Meta's

9    counsel, somebody's counsel -- Meta's counsel last night

10   indicating that they have no objection to me proceeding to rule

11   on these matters and allowing Baker Botts to appear.  I just

12   want to make sure.  Does anybody have any objection to that?

13   And I just want to confirm Meta has no objection.

14        **MS. SIMONSEN:**  Correct, Your Honor.

15   Ashley Simonsen for the Meta defendants.

16   No objection.

17        **THE COURT:**  So with that, we'll proceed.

18   So let's start with -- we can deal with them -- they're

19   essentially overlapping issues.  Let's deal with 1764 and 1765

20   together at the same time.

21        **MR. WARD:**  Michael Ward.

22        **MS. WATSON:**  Good afternoon, Your Honor.  Mariah

23   Watson with Covington & Burling on behalf of Meta.

24        **THE COURT:**  Good afternoon.

25        **MS. WATSON:**  Good afternoon.

1      Your Honor, we're happy to address both of the briefs

2    together.

3      If it works for you, Your Honor, I'd like to very briefly

4    address why the documents sought by Meta are plainly relevant

5    before turning to Mr. Bejar and Ms. Jayakumar's general

6    objections, which focus on whistleblower protections,

7    First Amendment and, finally, duplicativeness and burden.

8          **THE COURT:**  Yeah.  Actually, because I've read the

9    briefing, so I don't want to go through -- I'd rather, kind of

10   what we did for the other motion.  Let's go through -- because

11   it's really -- as I recall, it's Document Requests Numbers 1

12   and 2 for Ms. Jayakumar and Numbers -- is it 1 and 10 for

13   Mr. Bejar?  Do I have that --

14         **MS. WATSON:**  2 and 10, Your Honor.

15         **THE COURT:**  2 and 10.

16     So let's just take the actual document requests

17   themselves, if you've got them in front of you.

18         **MS. WATSON:**  I do, Your Honor.

19         **THE COURT:**  All right.  So let me just establish, for

20   Mr. Bejar, Mr. Ward, you're not literally arguing that the

21   California Labor Code or Sarbanes-Oxley applies to him.

22         **MR. WARD:**  Yes, we are, Your Honor.

23         **THE COURT:**  You are?

24         **MR. WARD:**  Absolutely, yes.

25         **THE COURT:**  Well, I mean, the Labor Code prevents an

1   employer from preventing an employee from disclosing

2   information to a government or law enforcement agency or to a

3   person with authority over the employee.

4        So Mr. Bejar is not an employee, and he's not disclosing

5   information to a government or law enforcement agency.

6        **MR. WARD:**  Yes, Your Honor.  For a couple of reasons,

7   we believe that it applies.

8        First of all, when he initiated his whistleblowing he was

9   an employee; so we believe he's covered by reason -- or within

10  the meaning of being a current employee.

11       But more importantly, here, the principle that a

12  whistleblower can be retaliated against after they've left

13  employment is inconsistent with the spirit and plain language

14  or plain meaning or intention of the statute, and it's

15  inconsistent with the enforcement practices of the

16  State Department of labor.

17       It's the same principle under Sarbanes-Oxley, and the

18  *Kshetrapal* case states very clearly that it would be completely

19  inconsistent with the enforcement regime in the interest of

20  provoking whistleblowers to say that, as soon as an employer

21  has terminated an employee, then they can continue with

22  practices like blacklisting and ostracizing them, harassing

23  them with legal process.  All of those behaviors, all of that

24  retaliation, it cannot be immunized by the fact that they've

25  already terminated that employee.

1   So we do believe that Mr. Bejar is protected both under

2   the California statute and under Sarbanes-Oxley.

3        **THE COURT:**  But Sarbanes-Oxley requires a securities

4   investigation.  There's no securities investigations here, is

5   there?

6        **MR. WARD:**  No, it's not limited to that.  My

7   understanding, Your Honor, potential violations of law would

8   also be included.

9        And what Mr. Bejar disclosed here was, to start it out,

10  disclosing to senior management information he discovered about

11  the abuses suffered by teens on the Instagram platform,

12  including inappropriate sexual advances that were being

13  experienced by teens in staggering proportions on a weekly

14  basis.

15       And then he continued in his whistleblowing, after an

16  interregnum, by being subpoenaed to testify by the Federal

17  Trade Commission.  He gave testimony before the United States

18  Senate.  He gave testimony to investigators from the State

19  Attorney General's Office for Tennessee.  He has been

20  cooperative in law enforcement investigations.

21       **THE COURT:**  Yeah, but none of that's at issue in the

22  document request specifically; right?

23       **MR. WARD:**  Well, they are, Your Honor, because our

24  view of the improper motive -- this is all retaliatory and

25  chilling of persons -- both Mr. Bejar and of the persons with

1  whom he's communicated.

2      If I may, Your Honor, I think what the -- what Meta is

3  trying to do is try to suggest that this is presumptively

4  discoverable, like it's asking for some innocuous information

5  and obfuscate the context.

6      And I think the number of prior statements that they have

7  of Mr. Bejar and the access to his emails when he was within

8  the company, the important thing to know, Your Honor, is what

9  Mr. Bejar did is he assembled a very detailed submission of

10  these risks and harms to Mr. Zuckerberg and the other members

11  of senior management; and in doing that, he also consulted with

12  a number of other senior executives within the company about

13  the accuracy and validity of the information that he was going

14  to share with senior management.  So there is a long paper

15  trail of communications within the company about what he was

16  about to communicate and its reliability.

17      And then he's testified, as I outlined, multiple days

18  before the FTC, this other testimony.  He's published essays

19  online.  There's probably over a thousand pages of content that

20  they could examine Mr. Bejar about, including all the emails

21  that he had when he was an employee.

22          **THE COURT:**  Okay.  But let me --

23          **MR. WARD:**  And yet --

24          **THE COURT:**  Let me stop you there.

25          **MR. WARD:**  Yes, Your Honor.

1          **THE COURT:**  The document requests are asking for his

2     communications with people, not all the stuff you're talking

3     about.  So I understand that's the context and they've got

4     access to all that, but these specific document requests aren't

5     asking for those materials.

6          **MR. WARD:**  No, but by producing these, we would be --

7     there would be harassment; it would be chilling of other

8     employees.

9          So let me explain this, if I may, Your Honor, and I beg

10    your pardon.

11         What they want and what they're saying is, we want these

12    communications because it might possibly yield some statement

13    that Mr. Bejar -- in addition to the thousands of pages that

14    you have about his statements, there might be something in

15    there that's inconsistent with what he's already said.  But the

16    only statements we want are those of former Meta employees.  We

17    don't care about prior inconsistent statements you may have

18    made with anyone else.  What we want to know is those

19    statements of former and current Meta employees.

20         It's basically like they're saying:  We don't really even

21    care about your statements.  What we're really interested in is

22    the identity and the content of the statements of those people

23    who, even after you've become a known whistleblower, are

24    willing to communicate with you.

25         **THE COURT:**  All right.  So --

 1          **MR. WARD:**  And that is protected.

 2          **THE COURT:**  Okay.

 3          **MR. WARD:**  And the *Awtry* case, I think, is dispositive

 4    here.

 5          **THE COURT:**  Why do you need to know the identity of

 6    current Meta employees who have spoken with Mr. Bejar or

 7    Ms. Jayakumar?

 8          **MS. WATSON:**  Part of our -- so taking multiple -- we

 9    disagree with counsel's characterization of this as harassment

10    and retaliation.  This is a duly authorized subpoena that we

11    served on Mr. Bejar and Ms. Jayakumar prior to their

12    depositions.  In particular, we had indications from

13    depositions, including former Meta employees who were deposed,

14    that they had spoke with Mr. Bejar prior to their depositions.

15          **THE COURT:**  My question is:  Why do you need to know

16    the identities of current Meta employees who have spoken with

17    either of these people?

18          **MS. WATSON:**  We believe that our document requests get

19    at the relevant documents and communications that go to the

20    issues that are at stake in this case; that it will support or

21    undermine positions that Mr. Bejar, Ms. Jayakumar, and other

22    former and current employees who are testifying or have been

23    noticed to testify in this deposition.

24          We believe this is a part of our ability to represent our

25    client and make a robust defense.

1          In addition, it would shed light on the credibilities of

2     these witnesses in particular, whether or not what they are

3     saying in these communications is consistent with what they've

4     been saying in the documents that have been produced.

5          **THE COURT:**  But current Meta employees are covered by

6     the California Labor Code and Sarbanes-Oxley, aren't they?

7          **MS. WATSON:**  What we believe, if there has been --

8          **THE COURT:**  Answer my question.  Current Meta

9     employees are covered by the California Labor Code

10    Section 1102.5 and the Sarbanes-Oxley provision cited by the

11    individuals here; right?

12         **MS. WATSON:**  Specifically for SOX, if they -- if they

13    are a part of an ongoing investigation where they themselves

14    give documents or provide testimony or assist authorities in

15    any way and there is an alleged act of discrimination or

16    harassment, then, yes, Your Honor, we do believe they would be

17    covered.

18         However, Mr. Bejar and Ms. Jayakumar's counsel have not

19    provided any support that says that there has been any sort of

20    retaliation, harassment, or discrimination.  We think that

21    theoretical harms are insufficient in this instance to shield

22    the disclosure of relevant communications.

23         **THE COURT:**  Okay.  So let's move to the broader issue

24    then.  Why don't the First Amendment rights of those current

25    Meta employees protect them from this discovery?  Because,

1  basically, if you're asking for communications between either

2  of these two people, Mr. Bejar and Ms. Jayakumar, with current

3  employees, by definition, you're asking for communications from

4  current employees to them.  And why doesn't that infringe their

5  associational rights?

6      MS. WATSON:  Your Honor, the cases that counsel put

7  forward to support this First Amendment right are not

8  controlling here.  One of them dealt with political

9  association.  We have not seen any allegations that there is

10  any sort of political group that's being threatened here.

11      Another one deals with anonymization.

12      THE COURT:  I've read the case law.  You're trying to

13  limit it to, like, some kind of organized political party or

14  political group.  That's not how the First Amendment works.

15      People, individuals have a right to associate in order to

16  talk about things of public concern.  And just because they're

17  not part of some organized group -- there are plenty of

18  First Amendment cases involving people who are kind of loosely

19  affiliated with the alt-right, for example, and they have

20  First Amendment associational rights.

21      So it doesn't -- you don't need a formal organization or

22  association.  So that argument doesn't hold up to the law.

23      MS. WATSON:  Your Honor, we are asking for specific

24  communications that are directly relevant to social media,

25  social media of mental health --

 1          **THE COURT:**  The way the First Amendment analysis goes

 2    is you've got to show -- right? -- if there is a

 3    First Amendment association right implicated, which I think

 4    there is, as between the current employees for sure, you've got

 5    to show more than just relevance -- right? -- because the

 6    Ninth Circuit says you've got to show highly relevant.

 7          **MS. WATSON:**  We do believe that these documents are

 8    highly relevant.  If there has been an exchange of information

 9    or any sort of documents or what have you with current

10    employees around tools, features, any number of things that are

11    at issue in this case, it is important for us to understand

12    what is being discussed, what is being disclosed.

13          **THE COURT:**  Why?  Why is that important?  You know

14    what your tools are.  You know what your company has.  You know

15    what information your employees have.  Why do you need to know

16    whether or not it was communicated to somebody else?

17          **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

18    Meta defendants.  I just want to jump in to assist my colleague

19    for a moment.

20          The plaintiffs have already taken Ms. Jayakumar's

21    deposition and many other former employees' depositions.  It is

22    apparent that they are trying to lay the foundation to qualify

23    these individuals as some kind of experts who have opinions on

24    the safety of Meta's platforms, social media industry.

25          Ms. Jayakumar testified that she spoke with current and

1   former Meta employees, including Mr. Bejar, I believe also

2   including Ms. Haugen, and we are entitled to test what are

3   those communications that she had with those former and current

4   employees that serve as the basis for or contradict the

5   opinions and the positions that plaintiffs are going to try to

6   proffer to support their case.

7        And that is why we are entitled to probe what are these

8   facts, these communications that are being relayed by current

9   and former employees to Ms. Jayakumar, to Mr. Bejar, and do

10  they undermine or support the opinions and the testimony that

11  they're giving.  We are absolute entitled to then probe what

12  those communications were, and it doesn't infringe their

13  First Amendment right of communication.

14       I would also note, for what it's worth, Your Honor, the

15  protective order in this case does apply to any productions by

16  these non-parties.  They can certainly, if there's a basis for

17  doing so, designate these communications as confidential if

18  they believe there's a basis.  You know, we don't know that

19  there would be.  But there are ways to protect these

20  individuals.

21       But merely serving a document subpoena in response to

22  plaintiffs noticing these individuals' depositions is not a

23  violation of their First Amendment rights, just as it's not

24  an -- it's not a violation of whistleblower protections.

25            **MR. WARREN:**  Your Honor, may I be heard?

1        **THE COURT:**  It must be a big issue because I've got

2   four lawyers in front of me now.

3        **MR. WARREN:**  Yes, Your Honor.  It's turning into a

4   team sport.

5        Well, since plaintiffs were invoked --

6        **THE COURT:**  Enter your appearance.

7        **MR. WARREN:**  Thank you.

8        Previn Warren on behalf of the personal injury and school

9   district plaintiffs.

10        There's a factual issue I just want to address.  This

11   subpoena for documents was issued after Ms. Jayakumar's

12   deposition.  So if they were interested in understanding all

13   these facts, they could have issued it beforehand.  I'm not

14   saying that makes it permissible.  But there have been

15   representations suggesting it was issued before the deposition.

16   That's not true.

17        **THE COURT:**  Okay.

18        **MS. WATSON:**  Counsel, if I may correct, it was issued

19   before her March 6th deposition, as we're arguing these

20   together.  Apologies for the lack of clarification.

21        **MR. WARREN:**  Okay.  I can address that.

22        So Ms. Jayakumar was deposed for two days.  There was a

23   need to continue that deposition for 20 minutes to address a

24   single document that needed to be -- the confidentiality of

25   which was in dispute.  That was resolved, and then her

1    deposition was concluded for 20 minutes, which, by agreement,

2    was limited to just that document.

3        So I think it is standing on the edge of a very, very fine

4    technicality to indicate that that subpoena issued before her

5    deposition.  It was truly after, you know, every relevant

6    portion of that.  99 percent of the deposition was concluded.

7        **MS. WATSON:**  Counselor, we have not seen in the

8    briefing any indication that there is a deadline or rule or

9    case law that supports a timing of a subpoena.

10        She indicated in her testimony that she spoke to both

11    former and current employees.  As a follow-up to that specific

12    testimony that was given, we provided a narrowly tailored

13    subpoena requesting those documents.

14        While she may have acknowledged that she spoke with them

15    during her testimony, the contents of what was spoken about,

16    the breadth of what was spoken about, the number of times are

17    all things that we are able to vet via a document production.

18        **THE COURT:**  Just as a factual matter, did she testify

19    at her deposition that she spoke with the people listed in

20    Document Request Number 2?

21        **MS. WATSON:**  She -- oh.  She mentioned some of these

22    individuals, Your Honor, yes.

23        **THE COURT:**  Where did those names come from?

24        **MR. WARD:**  No.  She spoke with -- she said she spoke

25    with Arturo Bejar for the purpose of finding an attorney.

1    Those are other witnesses that I represent, Your Honor.

2        **THE COURT:**  Okay.  So she did not volunteer the names

3    of the people in Request Number 2.

4        **MR. WARD:**  I should say -- no, Your Honor.

5    And I should correct.  I don't represent Frances Haugen.

6    The rest of the persons identified there are --

7        **THE COURT:**  And did Mr. --

8        **MR. WARD:**  -- clients of mine.

9        **THE COURT:**  -- Bejar identify at his deposition -- he

10   was deposed; right?

11       **MS. WATSON:**  He's not deposed yet, Your Honor.

12       **THE COURT:**  Has there been any identification by him

13   as to -- well, where did the names in Document Request

14   Number 10 come from?

15       **MS. WATSON:**  These are former employees who have

16   worked on or are related to this litigation and have been

17   noticed in many instances, though I understand some of the

18   notices have been pulled, but these are former Meta employees.

19       **MR. WARREN:**  Your Honor, I think that's inaccurate.

20   I think these are former Meta employees who have been

21   critical of Meta.  I think that's the common thread that unites

22   these names.

23   And the clear purpose of this request is to harass that

24   group of individuals.

25       **MS. SIMONSEN:**  Your Honor, Ashley Simonsen for the

1    Meta defendants.

2        These are individuals who plaintiffs have either noticed

3    for deposition in the past and taken them down or already taken

4    their deposition.

5        And we know from the testimony of Ms. Jayakumar, we also

6    know from other depositions of former employees, that there are

7    these discussions going on among them, with each other and with

8    individuals currently employed at Meta.  And so that is the

9    basis for naming these individual people.  It is not an attempt

10   to harass or retaliate.

11       Plaintiffs have identified these former employees, and

12   they're eliciting testimony from them, or at one point intended

13   to elicit testimony from them, to support their claims.  We are

14   absolutely entitled to probe the basis for these people's

15   testimonies to the extent they're offering critiques, opinions,

16   positions contrary to Meta's.

17           MR. WARREN:  Your Honor, I think that's more or less

18   an admission of what I just said.  We've deposed other former

19   employees.  We're just in the middle of deposing Nick Clegg

20   right now.  I don't see him on that list.  K.X. Jin is another

21   individual we've deposed who's a former.  He's not on that

22   list.

23           THE COURT:  He is.

24           MR. WARREN:  Oh.  Well, okay.  So I don't have the

25   list in front of me.

1      Is that correct?

2          **MS. SIMONSEN:**  And I believe Mr. Clegg, Your Honor,

3   I believe that's only a recent departure, if I'm correct.  I

4   could be wrong about that.

5      But in any event, this is not an attempt to harass or

6   retaliate.  We're simply, in the narrowest, most targeted way

7   that we can with subpoenas, asking for the very communications

8   that were discussed in deposition, which is exactly the type of

9   request for production I remember Your Honor describing a year

10  ago, in a separate discovery dispute, as being the types of

11  targeted requests that might be appropriate at a later point in

12  time in discovery.  And that's all this is.

13         **MR. WARD:**  Your Honor, if I can reenter the fray here

14  for a moment.

15     Firstly, I appreciate that there's some admission now that

16  the purpose of this deposition -- or this request is not to get

17  the prior statements of Mr. Bejar.  It's to discover the

18  identities of these people who've expressed willingness to

19  associate with him after he's become known as a whistleblower.

20     So I think the motive here, consistent with Meta's

21  position that they believe apparently it's appropriate to

22  retaliate against former employees, like the concerns that

23  these employees would have and their First Amendment rights are

24  reasonable here.

25     Secondly, Ms. Jayakumar was not noticed as an expert

1   testimony.  The argument that she will be somehow is very

2   speculative.  There's no basis for that whatsoever.

3       She gave factual testimony.  It was critical of the

4   company.  Following that, they issued a subpoena for all of her

5   personal communications.  It was clearly retaliatory and

6   reactive to her testimony, just as it was for Margaret Gould

7   Stewart and Allison Lee.  As soon as their testimony concluded

8   and that testimony was critical, these intrusive document

9   requests were made only because they were critical of the

10  company.

11      With respect --

12          **THE COURT:**  Let me stop you there.

13      With regard to the identified people in Request 2 and

14  Request 10, 10 for Mr. Bejar, 2 to Ms. Jayakumar, I mean, their

15  identities of these people are known to everyone.  Right?

16  They're known to Meta.  They're known to everyone.  Right?

17          **MR. WARD:**  Yeah.  It's an excellent point, Your Honor.

18  And they were asked -- a number of them, at least, in their

19  depositions -- did you discuss -- what did you discuss

20  beforehand?  And each of them explained -- or I should say none

21  of them asserted that they had discussed the subjects of their

22  testimony beforehand.

23      So the foundation for that assertion was attempted, and it

24  failed.  There's no basis to speculate that they discussed

25  their testimony with each other or somehow orchestrated it or

1   that one's statements informed another's testimony.  It's just

2   not present here.

3         THE COURT:  Well, okay.  But what I'm really getting

4   at, if they are known -- I'm talking about the former

5   employees.  These are all former employees in Request 2 and 10;

6   right?

7       Just so I'm clear, Mr. Bejar, Ms. Haugen, K.X. Jin,

8   Mr. Jin, Ms. Stewart, Mr. Patel -- is it Mr. Raskin? -- and

9   Ms. Lee, they're all former employees; is that correct?

10        MS. WATSON:  Yes, Your Honor.

11        MR. WARD:  Mr. Raskin is not.

12        MR. WARREN:  Mr. Raskin is not a former employee of

13   any of the defendants.

14        THE COURT:  He's just a true third party, then.

15        MR. WARREN:  He's a true third party.

16        THE COURT:  Okay.

17        MR. WARREN:  He has been deposed.

18        THE COURT:  But none of them are current Meta

19   employees, is the point.  Right?

20        MR. WARD:  Correct.

21        THE COURT:  And in some way are they all known as

22   having expressed views critical of Meta publicly?

23        MR. WARREN:  I don't know if they're known publicly

24   that way.  I think that that is a fair reading of some of the

25   deposition testimony they gave.

1          **THE COURT:**  Okay.  So -- because I think you

2   represented that you think, you speculate that the reason

3   they're listed and other people are not is because they've

4   taken positions critical of Meta.

5          **MR. WARREN:**  I think that is correct.

6          **THE COURT:**  All right.  So the concern as to these

7   former identified employees, that they could be retaliated

8   against, because they're now known -- right? -- I mean, the

9   horse is already out of the barn with regard to them.  Right?

10      I mean, whether or not they ever get retaliated against,

11  whether or not they ever get blacklisted, you know, in the

12  industry in general, (a) that's not before me because there's

13  no evidence of that, and (b) there's nothing to protect here.

14  They're already known.  Their views are already -- I mean,

15  their identity is already out there.

16          **MR. WARD:**  I disagree, Your Honor.  Even the intrusion

17  into their privacy rights is itself a harassment and

18  retaliatory and a harm.  Their identity alone is not the only

19  thing to be concerned with here.

20          **MR. WARREN:**  And, Your Honor, may I add one point

21  here.  There's a chilling effect in terms of these witnesses

22  coming forward to testify at trial.  I mean, it is true that in

23  the confines of a deposition, they have offered testimony

24  that's critical of the company.  But if the company can then

25  retaliate against them through harassing discovery requests,

1   the purpose of that is to scare them away from taking the stand

2   and to speak what they have to speak in front of a jury.

3        And that is a really troubling precedent to set in this

4   litigation when, you know, there are potentially other former

5   employees or current employees who may wish to speak out

6   against the company's practices but currently don't feel like

7   they have the latitude to do that because of concerns about

8   what might happen to them in terms of what the company then

9   does, seeking burdensome invasions into their privacy.

10       **MS. SIMONSEN:**  Your Honor, Ms. Simonsen again.

11       Taken to its logical conclusion, this argument would

12   suggest that any time plaintiffs are suing a company, they can

13   go out and depose former employees critical of the company, and

14   the company then is not allowed to go out and seek discovery in

15   documentary form from those employees.  That cannot be the law.

16   We are entitled to defend ourselves.

17       **THE COURT:**  Oh.  I mean, the document requests here

18   are drafted very broadly.  It says all documents and

19   communications with any of these people.

20       **MS. SIMONSEN:**  We are -- and, Your Honor, we're happy

21   to meet and confer -- I want to be clear about that -- with

22   Mr. Ward about the scope of these.  The problem is, there's

23   been no opportunity to do that.  He has objected entirely to

24   even talking about a narrowing scope, taking the position that

25   it would be, with no substantiation, incredibly difficult and

1  financially burdensome to conduct searches for these documents

2  without any explanation or detail.  Like the burden

3  declarations we were talking about earlier, nothing like that

4  in the record.

5      Now, I truly mean that, Your Honor.  We're happy to sit

6  down.  We can craft search terms.  We can narrow these readily,

7  and we're happy to do so.  But that's not the dispute we're

8  here on today because there's been an outright objection to

9  producing any of these documents.

10      **MR. WARD:**  Well, I think that's not completely

11  accurate.  And I've not talked to Ms. Simonsen about this

12  before.  So in my consultations with her colleagues on this,

13  I've pointed out that the usual mechanisms of search terms that

14  are capable or available to someone like her client who have a

15  forensics package and they can search through documents and

16  then we can kind of scope this is one thing.

17      For somebody who is asked to go through 13 years of Gmail

18  emails to find out, like, is this an email that touched on the

19  subject of social media harms and is this person a former

20  employee is just an impossible burden to ask a third party to

21  go through.  It's unreasonable on its face.

22      **MR. WARREN:**  And if I may add, Your Honor, the

23  defendants are in possession of all of these former employees'

24  documents during the time when they worked at the company.  So

25  the most probative and relevant communications that they might

1    have already exist on their servers.

2         **MS. SIMONSEN:**  And, Your Honor, you already made this

3    point.  We're not asking for documents that we already have.

4    We're asking for a very limited set of documents:

5    communications with specific identified individuals and maybe

6    other former and current employees.  But, again, we're happy to

7    confer with Mr. Ward about that.

8         It is absolutely not unreasonable on its face to ask a

9    third party who has sat for a deposition in a case who

10   plaintiffs are using to support their case to search their

11   Gmail for communications with specific individuals.  We don't

12   even know how many communications are going to come back if she

13   were just to search for the names of the individuals we've

14   asked for communications with.

15        So I don't think I need to explain, Your Honor.  It's not

16   enough to simply say that that's unreasonable on its face.

17   There's been absolutely no substantiation for it.

18        **MR. WARREN:**  Your Honor, the relevance of these

19   communications is beyond fleeting.  All of what these witnesses

20   have had to say concern their time at the company, what they

21   personally observed, and the safety practices, or lack thereof,

22   that were in place at Meta.  That's what matters about these

23   witnesses.

24        Who they talk to after they left is not going to support a

25   claim or defense in this case.  It just isn't.  It's not

 1    relevant.  And whatever marginal relevance exists is

 2    dramatically outweighed by the First Amendment concerns, the

 3    privacy concerns, and the potential chilling effect of further

 4    employees coming forward.

 5         MS. SIMONSEN:  Your Honor, what they said about their

 6    time at the company and what they observed, if they shared that

 7    information with Mr. Bejar or Ms. Jayakumar and those

 8    individuals, in turn, are relying on that information for the

 9    positions that they are taking that plaintiffs are relying on

10    for their claims or, by contrast, if it undermines their

11    testimony, it's absolutely relevant.

12         MR. WARREN:  Mr. Bejar and Ms. Haugen have yet to be

13    deposed.  They can simply be asked those questions at their

14    depositions.

15         THE COURT:  So, okay.  Anything further?

16         MS. SIMONSEN:  One final point, Your Honor, would

17    be --

18         THE COURT:  Yeah.

19         MS. SIMONSEN:  -- that I'm not sure what standing

20    Mr. Warren has to be standing here making these arguments.

21      He does not represent these third parties.

22         MR. WARREN:  Oh, I absolutely have standing.

23      Ms. Simonsen affirmatively brought up points that

24    plaintiffs made at the depositions.  She brought up plaintiffs'

25    strategy in seeking these depositions and their attempts to use

1    these witnesses as experts, and the like.  So that's why I'm

2    standing up here.  I didn't plan to.

3         **THE COURT:**  Okay.  First, as to current employees,

4    they're admittedly covered by the protection of the California

5    Labor Code and Sarbanes-Oxley.  They also have their own

6    First Amendment rights.  I'm not going to allow any discovery

7    as to communications with current employees.  To me, the

8    First Amendment issues as to them have been shown

9    satisfactorily.

10        Under the -- the way the Ninth Circuit has crafted the

11   test, if First Amendment rights are implicated, then it's

12   incumbent on the party seeking the discovery not merely to show

13   relevance, but to show highly relevant.

14        And let me just say, trying to find documents that would

15   tend to impeach or undercut somebody's testimony otherwise is

16   not sufficient.  I mean, I think the *Perry/Schwarzenegger* case

17   ruled that way.  And so -- but we've talked about how I think

18   the specific Requests 2 and 10 that identify specific people,

19   I'm going to order you to meet and confer -- right? -- and see

20   if you can come up with some agreed set of -- subset of highly

21   relevant documents that meet the Ninth Circuit's test for

22   disclosure, despite the implication of the First Amendment

23   rights, because the First Amendment rights can be overcome

24   if -- really only if you really show it's truly highly

25   relevant.  Right?  And so I'm going to leave it up to your good

1   offices to try to work that out because it's not a complete --

2   the First Amendment is not a complete bar to the discovery

3   because it could be that they're able to come up with something

4   and you may have to compromise on that.  Okay?

5          **MR. WARD:**  Yes, Your Honor.

6          **THE COURT:**  All right.  So -- but I am going to

7   sustain the objections to Requests 1 for Ms. Jayakumar and --

8   what's the other one? -- Number 2 to Mr. Bejar.

9          And I take Ms. Simonsen's representation that as to the

10  remaining requests, the phrase "all documents and

11  communications," you're going to work out narrowing on that.

12  You're going to work out narrowing on maybe the people, the

13  specified people, maybe the categories of, you know, what you

14  mean by mental, social, emotional, or behavioral health,

15  safety, et cetera.  Right?

16         So work those out and see if you can come to some

17  agreement that's within the scope of what I think is the

18  First Amendment rubric for getting discovery of highly relevant

19  documents.  Okay?

20         **MS. SIMONSEN:**  Thank you, Your Honor.

21         **THE COURT:**  And I'm going to expect you-all to work it

22  out.  And, you know, I will point out that there are -- as they

23  made clear, there are documents in your own possession as to

24  some of these former -- these former employees' documents that

25  you have at your disposal to use in discovery to try to impeach

1    somebody else's -- impeach testimony.  Right?  So this is not

2    the kind of thing -- if it's simply impeachment and

3    undercutting somebody's testimony, I'll just give you that

4    guidance.  The way I read *Perry/Schwarzenegger*, that's not

5    enough.

6            **MS. SIMONSEN:**  Understood Your Honor.  I think it does

7    go further than that, but understood.  We'll meet and confer.

8            **THE COURT:**  That was most of what I heard you arguing

9    today, was undercutting people's testimony.

10       Okay.  So I think with that guidance, can you come up --

11   craft a joint proposed order on this?

12           **MS. SIMONSEN:**  Yes, Your Honor.

13           **MR. WARD:**  Yes, Your Honor.

14           **THE COURT:**  Okay.  Thank you.

15           **MS. WATSON:**  Thank you.

16           **MR. WARREN:**  Thank you.

17           **THE COURT:**  All right.  So I think I heard the YouTube

18   deposition dispute that is Docket Number 1777 got withdrawn

19   because you worked it out.  Is that right?

20           **MS. HURD:**  Yes, correct.

21       Ellyn Hurd for plaintiffs.

22           **MS. STOKES:**  That's correct.  Jenna Stokes, Wilson

23   Sonsini.

24           **THE COURT:**  Thank you and congratulations.

25                        (Laughter.)

 1              **THE COURT:**  So is the motion withdrawn or denied as

 2   moot, or how do you want to resolve it on the docket?

 3              **MS. HURD:**  Either withdrawn or moot, I think.

 4              **THE COURT:**  I guess the real question, were you

 5   planning on filing some kind of stip to memorialize it, or you

 6   already worked it out and you don't need to?

 7              **MS. HURD:**  No.  I think that's worked out.  I think

 8   the notice is --

 9              **THE COURT:**  All right.  So withdrawn as moot.

10      Okay.  That leaves the status report.  Who's here from

11   Kansas?

12              **MR. ANDREWS:**  Your Honor, sorry.  Before we get to

13   that --

14              **THE COURT:**  Sure.

15              **MR. ANDREWS:**  Patrick Andrews for the plaintiffs.

16      I just wanted to note that there was one more dispute in

17   the ripe section over Jessica Smith's clawback of --

18              **THE COURT:**  I was going to save that for after this,

19   but we can go there now.

20              **MR. ANDREWS:**  Okay.

21              **THE COURT:**  Go ahead.

22              **MR. ANDREWS:**  I just wanted to note for the record

23   that since it deals with such sensitive and privileged

24   materials and there is briefing submitted under seal on it,

25   we're happy to rest on the papers.

1      **THE COURTROOM DEPUTY:**  We're off the record in this

2  matter.

3      Court is in recess.

4          (Proceedings adjourned at 4:09 p.m.)

5                  ---o0o---

6

7              **CERTIFICATE OF REPORTER**

8      I certify that the foregoing is a correct transcript

9  from the record of proceedings in the above-entitled matter.

10

11  DATE:  Tuesday, March 25, 2025

12

13

14

15

16  _____

17      Ana Dub, RDR, RMR, CRR, CCRR, CRG, CCG

18      CSR No. 7445, Official United States Reporter

19

20

21

22

23

24

25