# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL MATTERS | MDL No. 3047<br><br>Case No.: 4:22-md-03047-YGR-PHK<br><br>**DECLARATION OF FRANCES HAUGEN IN SUPPORT OF SUPPLEMENTAL BRIEF**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

I, Frances Haugen, declare as follows:

1. I am over the age of 18 and have personal knowledge of the following facts. I could competently testify to these facts if called upon to do so.

2. I provide this Declaration to provide additional information concerning the harms and violations of my First Amendment rights posed by the documents subpoena served on me by Meta at my home on March 4, 2025 (the "Documents Subpoena"), as well as the subpoena for testimony served on me the same day (the "Deposition Subpoena").

3. I was an employee of Facebook, Inc. (now known as Meta) from June 2019 to May 2021. I blew the whistle on Facebook in 2021 due to grave concerns during my time at Facebook about the prioritization of profits over safety and endangering lives.

4. Today, I dedicate my time to serving as an advocate for accountability and transparency in social media. I am the founder and Chief Executive Officer of Beyond the Screen, a nonprofit dedicated to bringing technical expertise and insider experience to a growing ecosystem of checks and balances to drive social media for the common good. In that position, I advocate for building an ecosystem of accountability for the social media industry. As part of its mission, the nonprofit and I associate with others, including governments, civil society groups, academics, journalists, writers, authors, investigators and other concerned citizens, to discuss solutions for what it sees as key issues facing the public because of the social media industry, which includes discussing Meta.

5. I strongly believe that social media has the potential to bring out the best in humanity and have worked tirelessly since my departure from Facebook to help effectuate responsible development and regulation of social media platforms. I have made public statements and testified before Congress and other regulatory bodies across the world about my views on

these topics. These statements have included criticisms of Meta. I have also had numerous private communications reflecting my thoughts on these topics, including my thoughts on petitioning the government.

6. I authored an investigative book, *The Power of One*. It discusses, among other topics, my efforts to gather documents from Facebook and investigate its algorithms and the harms they caused, as well as what the company knew about these harms and the company's failure to address them. My intention in gathering these documents was to share them with the public out of great concern for the harms I was witnessing. I did so through the Facebook Files and through *The Power of One*. As I wrote in the book, "I wanted the world to know what Facebook knew." FRANCES HAUGEN, THE POWER OF ONE 248 (2023). Although the book discusses my investigation's collaboration with some of my sources and collaborators, like Jeff Horwitz of the *Wall Street Journal*, I intentionally did not share all of our communications and methods in the book; nor did I discuss all of my sources and methods used in my investigation of Facebook for *The Power of One*, my Senate and House testimony, and my disclosure of Facebook documents. My work with Mr. Horwitz was complementary and essential to my investigation and work as a social critic and author of an investigative book, and he served as one of my sources for my investigation of Facebook and for *The Power of One*. *See id.* at 279 ("I could not have collected the information to disprove Facebook's misrepresentations without [Jeff].").

7. The Documents Subpoena would require me to disclose 13 years of my confidential documents and communications with a variety of individuals and organizations spanning a vast range of topics. It demands disclosure of my non-public communications with fellow social critics such as, among others, other former Meta employees, members of the news media, other nonprofits

across the globe, state agencies, book publishers, class action lawyers, and whistleblower lawyers—and even with my own lawyers, public relations, and government relations teams.

8. Enforcement of the Documents Subpoena will chill my future communications about Meta and other social media platforms because I will be afraid that my personal, non-public communications with others about these topics will be the target of a subpoena and I will be compelled to disclose them. Others have told me that they will have the same fear communicating with me and that it will chill what they are willing to share. That fear will greatly impact what I write, with whom I feel I can freely speak, and with whom I associate. I would not write as often or as critically of social media companies; I would also be forced to be more cautious about communicating with others on these topics and would curtail whether I associate at all with other social critics, academics, nonprofits, state agencies, and others to discuss issues related to the social media industry; and, if so, how I communicate with them and how frequently I communicate with them (or not).

9. The Documents Subpoena will also impede my work. If enforced, I would be compelled to produce my drafts and research (Requests 3 and 16) and my documents and communications concerning payments I have received for my work speaking out about the harms posed by social media platforms (Request 15). I would be less inclined to conduct research and write about it, and I would be less inclined to accept invitations to speak in the future if I am afraid that social media companies that I have criticized, such as Meta, are able to gain invasive information about my research and writing or how much I am being paid to speak.

10. Several other requests are so broad that they even call for my confidential communications about the development of my own book, which is critical of Meta and issues relating to social media platforms and is based on my investigation at Meta of internal documents

that led me to blow the whistle. In developing my book, I confidentially communicated with other social critics, including Jeff Horwitz, who authored *Broken Code*, a book that is critical of Facebook and the company's awareness of the harms its algorithms were causing. The Documents Subpoena also calls for confidential communications about my work in founding Beyond the Screen. Compelled disclosure of my communications on these topics would hinder me from communicating about these topics in the future with fellow social critics and others. This compelled disclosure would chill my desire and opportunity to be an author in the future, as well as chilling my dedication to my nonprofit, out of fear that all of my confidential communications and drafts would be at risk of disclosure.

11. Nearly all of the individuals and entities with whom I communicate do so with an expectation of confidentiality due to the highly sensitive nature of the work I, and they, are doing. This includes consulting on issues arising from the negative externalities of social media platforms and engaging with lawmakers, domestically and internationally, on the same as they develop legislation concerning social media platforms.

12. My associations with others will be impaired if I am required to respond to the Subpoenas in full, because the Subpoenas will have a chilling effect on them as well as on me. I will be required to self-censor my own communications out of concern over potential exposure, and I expect others will do the same. Others with whom I have regularly communicated about shared criticisms of Meta and social media companies are likely to stop or curtail their communications with me if I am required to disclose communications that fall within this Subpoena, out of fear that their documents and communications are equally at risk of disclosure. I am afraid that others will be less likely to communicate with me in the future if they see that they could be punished with invasive and chilling subpoenas for doing so, particularly many of the

nonprofits with whom I associate, who operate on extremely small budgets and cannot take the financial risk of being drawn into litigation by Meta or similar companies. As a result, I will not be able to communicate with nonprofits and with individuals who are also critical of issues related to social media as effectively, and I will be isolated from others operating in the space of social media safety.

13. My advocacy work on social media safety will be severely harmed by this chilling effect as well. The Documents Subpoena seeks, for example, "[a]ll Documents and Communications concerning research or analyses related to the use of Social Media Platforms by, the safety of, or the sexual exploitation of persons under 18." This Request—only one of the 23 requests in the Documents Subpoena—would touch upon much of the work done at Beyond the Screen. I, and the employees of Beyond the Screen, would be required to self-censor our communications if they are at risk of being disclosed to one of the most powerful private companies in the space within which we work. This would chill our communications about the social media industry, significantly hindering the work we do to advocate for an ecosystem of accountability for social platforms.

14. I believe that the Subpoenas are an act of retaliation against me by my former employer and an attempt to isolate me from my community. I do not believe that this retaliation is limited to me: I am aware that Meta has made greater attempts to use the judicial system and compelled testimony to silence its whistleblowers, including Sarah Wynn-Williams, in recent months. I am also aware that Meta issued expansive document requests to other former Meta employees, including Arturo Béjar and Vaishnavi Jayakumar, which were recently quashed by this Court. I am greatly concerned that disclosing my confidential communications with others could equally place them at risk of retaliation by Meta, a powerful company with significant resources.

15.  Enforcement of the Deposition Subpoena would have the same chilling effect on me as disclosing the documents themselves, as I would be required to testify about the contents of the confidential documents and communications described above. I am also concerned that testifying about my communications with others, including nonprofits, members of the news media, others critical of Meta and issues concerning social media platforms, and the other entities described in the Documents Subpoena, would have the same chilling effect on my associations with others because they may be more cautious about communicating with me if their communications may be the subject of compelled testimony. In the future, I would be less open in the ways that I communicate about social media platforms and related issues knowing that my non-public communications may be required to be the subject of deposition testimony.

I declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct to the best of my knowledge.

Executed this 24th day of July, 2025, in Carolina, Puerto Rico.

_____
Frances Haugen