UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

Case No. 22-md-03047-YGR   (PHK)

**ORDER RESOLVING DISPUTE RE META'S SUBPOENAS SERVED ON NONPARTY FRANCES HAUGEN**

Re: Dkt. 2061

## INTRODUCTION

This MDL has been referred to the undersigned for discovery.  *See* Dkt. 426.   Now pending before the Court is a joint letter brief regarding a dispute between Meta and nonparty Frances Haugen concerning document and deposition subpoenas Meta served on Haugen.  [Dkt. 2061].  On July 16, 2025, the Parties lodged a copy of the document requests in the subject document subpoena, annotated to reflect the Parties' meet and confers (attached hereto).  *See* Appendix.  The Court heard oral argument from the Parties as to Haugen's objections to both subpoenas on July 17, 2025.  *See* Dkt. 2117.  Pursuant to the Court's direction at that hearing, the Parties filed supplemental briefs on the First Amendment issues (and Haugen filed a supplemental declaration).  [Dkts. 2135, 2136, 2149].  Upon careful review of the briefing, submissions, records of this action, and arguments of counsel, the Court resolves the disputes as to the Haugen subpoenas as set forth herein.

**LEGAL STANDARDS**

The Court has broad discretion and authority to manage discovery. *U.S. Fidelity & Guar. Co. v. Lee Inv. LLC*, 641 F.3d 1126, 1136 n.10 (9th Cir. 2011) ("District courts have wide latitude in controlling discovery, and their rulings will not be overturned in the absence of a clear abuse of discretion."); *Laub v. U.S. Dep't of Int.*, 342 F.3d 1080, 1093 (9th Cir. 2003). The Court's discretion extends to crafting discovery orders that may expand, limit, or differ from the relief requested. *See Crawford-El v. Britton*, 523 U.S. 574, 598 (1998) (holding trial courts have "broad discretion to tailor discovery narrowly and to dictate the sequence of discovery"). For example, the Court may limit the scope of any discovery method if it determines that "the discovery sought is unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive." Fed. R. Civ. P. 26(b)(2)(C)(i).

Federal Rule of Civil Procedure 45 permits a party to serve a subpoena on a nonparty requiring, among other things, the production of "documents, electronically stored information, or tangible things in that person's possession, custody, or control." Fed. R. Civ. P. 41(a)(1)(A)(iii). The scope of discovery allowed under a Rule 45 subpoena is generally the same as the scope of discovery permitted under Rule 26(b). *In re Subpoena to Apple, Inc.*, No. 5:14-cv-80139-LHK, PSG, 2014 WL 2798863, at *2 (N.D. Cal. June 19, 2014); *see* Fed. R. Civ. P. 45 advisory committee's note to 1970 amendment ("[T]he scope of discovery through a subpoena is the same as that applicable to Rule 34 and the other discovery rules."); Fed. R. Civ. P. 34(a) ("A party may serve on any other party a request within the scope of Rule 26(b).").

In this MDL, the Court has repeatedly stated the relevant legal standards. Rule 26(b)(1) delineates the scope of discovery in federal civil actions and provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Information need not be admissible to be discoverable. *Id.* Relevancy for purposes of discovery is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *In re Williams-Sonoma, Inc.*, 947 F.3d 535, 539 (9th Cir. 2020) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 350-51 (1978)); *see also In re Facebook, Inc. Consumer*

United States District Court
Northern District of California

1   *Privacy User Profile Litig.*, No. 18-MD-2843 VC (JSC), 2021 WL 10282215, at *4 (N.D. Cal.

2   Sept. 29, 2021) ("Courts generally recognize that relevancy for purposes of discovery is broader

3   than relevancy for purposes of trial.") (alteration omitted).

4          While the scope of relevance is broad, discovery is not unlimited. *ATS Prods., Inc. v.*

5   *Champion Fiberglass, Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) ("Relevancy, for the purposes

6   of discovery, is defined broadly, although it is not without ultimate and necessary boundaries.").

7   Information, even if relevant, must be "proportional to the needs of the case" to fall within the

8   scope of permissible discovery. Fed. R. Civ. P. 26(b)(1). The 2015 amendments to Rule 26(b)(1)

9   emphasize the need to impose reasonable limits on discovery through increased reliance on the

10  commonsense concept of proportionality: "The objective is to guard against redundant or

11  disproportionate discovery by giving the court authority to reduce the amount of discovery that

12  may be directed to matters that are otherwise proper subjects of inquiry. The [proportionality

13  requirement] is intended to encourage judges to be more aggressive in identifying and

14  discouraging discovery overuse." In evaluating the proportionality of a discovery request, the

15  Court considers "the importance of the issues at stake in the action, the amount in controversy, the

16  parties' relative access to the information, the parties' resources, the importance of the discovery in

17  resolving the issues, and whether the burden or expense of the proposed discovery outweighs its

18  likely benefit." Fed. R. Civ. P. 26(b)(1).

19         The party seeking discovery bears the burden of establishing that its request satisfies the

20  relevancy requirements under Rule 26(b)(1). *La. Pac. Corp. v. Money Mkt. 1 Inst. Inv. Dealer*,

21  285 F.R.D. 481, 485 (N.D. Cal. 2012). The resisting party, in turn, has the burden to show that the

22  discovery should not be allowed. *Id.* The resisting party must specifically explain the reasons

23  why the request at issue is objectionable and may not rely on boilerplate, conclusory, or

24  speculative arguments. *Id.; see also Blankenship v. Hearst Corp.*, 519 F.2d 418, 429 (9th Cir.

25  1975) ("Under the liberal discovery principles of the Federal Rules defendants were required to

26  carry a heavy burden of showing why discovery was denied.").

27         With regard to proportionality, "[t]he parties and the court have a collective responsibility

28  to consider the proportionality of all discovery and consider it in resolving discovery disputes."

United States District Court
Northern District of California

3

1   Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment.  "A party claiming undue

2   burden or expense ordinarily has far better information—perhaps the only information—with

3   respect to that part of the determination.  A party claiming that a request is important to resolve the

4   issues should be able to explain the ways in which the underlying information bears on the issues

5   as that party understands them.  The court's responsibility, using all the information provided by

6   the parties, is to consider these and all the other factors in reaching a case-specific determination

7   of the appropriate scope of discovery."  *Id.*

8       As part of its inherent discretion and authority, the Court has broad discretion in

9   determining relevancy for discovery purposes.  *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d

10  625, 635 (9th Cir. 2005) (citing *Hallett v. Morgan*, 296 F.3d 732, 751 (9th Cir. 2002)).  Similarly,

11  the Court's determination as to the proportionality of discovery lies within its discretion.  *See*

12  *Jones v. Riot Hosp. Grp. LLC*, 95 F.4th 730, 737-38 (9th Cir. 2024) (finding district court did not

13  abuse discretion on proportionality ruling).  Ultimately, "the timing, sequencing and

14  proportionality of discovery is left to the discretion of the Court."  *Toro v. Centene Corp.*, No. 19-

15  cv-05163 LHK (NC), 2020 WL 6108643, at *1 (N.D. Cal. Oct. 14, 2020).

16      As part of its inherent discretion and authority, the Court has discretion in resolving

17  disputes over whether to grant a motion to compel compliance with or to quash a Rule 45

18  subpoena.  *See Garrett v. City & Cnty. of S.F.*, 818 F.2d 1515, 1519 (9th Cir. 1987).  Further, Rule

19  45 expressly states that "[a] party or attorney responsible for issuing and serving a subpoena must

20  take reasonable steps to avoid imposing undue burden or expense on a person subject to the

21  subpoena. The court for the district where compliance is required must enforce this duty[.]"  Fed.

22  R. Civ. P. 45(d)(1); *see also* Rule 45(d)(3)(A)(iv) ("On timely motion, the court for the district

23  where compliance is required *must* quash or modify a subpoena that . . . (iii) requires disclosure of

24  privileged or other protected matter, if no exception or waiver applies; or (iv) subjects a person to

25  undue burden.") (emphasis added).

26      A nonparty commanded to produce documents pursuant to a Rule 45 subpoena may

27  challenge the subpoena in one of three ways: (1) by written objection; (2) by moving to quash or

28  modify the subpoena; or (3) by moving for a protective order.  *See* Fed. R. Civ. P. 26(c); Fed. R.

United States District Court
Northern District of California

4

1    Civ. P. 45(d)(2)(B), (d)(3).  If a nonparty responds to a Rule 45 subpoena with objections, the

2    party who served the subpoena may move for an order compelling compliance.  Fed. R. Civ. P.

3    45(d)(2)(B)(i).  Written objections to a Rule 45 subpoena must be served "before the earlier of the

4    time specified for compliance or 14 days after the subpoena is served."  Fed. R. Civ. P.

5    45(d)(2)(B).  Failure to timely and properly object to the subpoena generally constitutes a waiver

6    of all grounds for objection, including privilege.  *Richmark Corp. v. Timber Falling Consultants*,

7    959 F.2d 1468, 1473 (9th Cir. 1992) ("It is well established that a failure to object to discovery

8    requests within the time required constitutes a waiver of any objection.").

9         The party seeking to compel compliance with a subpoena bears the burden of establishing

10   that its request seeks relevant information and thus falls within the appropriate scope of discovery.

11   *iSabre GLBL, Inc. v. Kimpton Hotel & Rest. Grp., LLC*, No. 21-mc-80053-MMC (JSC), 2021 WL

12   1839689, at *2 (N.D. Cal. May 6, 2021) ("[T]he party issuing the subpoena must demonstrate that

13   the information sought is relevant and material to the allegations and claims at issue in the

14   proceedings.").  The objecting party, in turn, has the burden of persuasion to show that the

15   discovery should not be allowed.  *Id.* ("Generally, the party moving to quash under Rule 45(d)(3)

16   bears the burden of persuasion[.]").  Accordingly, "a court determining the propriety of a

17   subpoena balances the relevance of the discovery sought, the requesting party's need, and the

18   potential hardship to the party subject to the subpoena."  *ATS Prods., Inc. v. Champion Fiberglass,

19   Inc.*, 309 F.R.D. 527, 531 (N.D. Cal. 2015) (quoting *Gonzales v. Google, Inc.*, 234 F.R.D. 674,

20   680 (N.D. Cal. 2006)).

21        The Court may limit discovery "to protect a party or person from annoyance,

22   embarrassment, oppression, or undue burden or expense."  Fed. R. Civ. P. 26(c).  Discovery

23   restrictions may be even broader where the target is a nonparty.  *Dart Indus. Co. v. Westwood

24   Chem. Co.*, 649 F.2d 646, 649 (9th Cir. 1980) ("While discovery is a valuable right and should not

25   be unnecessarily restricted, the 'necessary' restriction may be broader when a nonparty is the

26   target of discovery. . . . [T]here appear to be quite strong considerations indicating that discovery

27   would be more limited to protect third parties from harassment, inconvenience, or disclosure of

28   confidential documents.") (cleaned up).  "In determining whether a subpoena poses an undue

burden, courts weigh the burden to the subpoenaed party against the value of the information to the serving party.  Generally, this requires consideration of relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed." *Jacoby v. Bd. of Supervisors of La. Sys.*, 709 F. Supp. 3d 1087, 1089 (E.D. Cal. 2023).  In evaluating the undue burden issue, a court may quash a subpoena's request for documents where the party seeking the discovery "can more easily and inexpensively obtain the documents from [the opposing party], rather than from [the] nonparty [served with the subpoena]."  *Moon v. SCP Pool Corp.*, 232 F.R.D. 633, 638 (C.D. Cal. 2005).

**DISCUSSION**

## I.    SUBPOENA FOR DOCUMENTS FROM HAUGEN

The Parties' fundamental dispute concerns whether Haugen should be required to produce documents and communications with current and former Meta employees (both identified and unidentified) regarding social media platforms and the health of minors.  As the Parties' briefing and the public record discloses, Haugen is a former Meta employee who has spoken out publicly and testified in governmental hearings regarding her views about Meta and youth health issues. *See, e.g.*, *Statement of Frances Haugen*, available at https://www.commerce.senate.gov/services/files/FC8A558E-824E-4914-BEDB-3A7B1190BD49 (last visited Aug. 11, 2025).  Haugen also authored a book published in 2023 which discusses her experience working at and her views on Facebook.  FRANCES HAUGEN, THE POWER OF ONE: HOW I FOUND THE STRENGTH TO TELL THE TRUTH AND WHY I BLEW THE WHISTLE ON FACEBOOK, (Little, Brown & Co. 2023).

Of the twenty-three document requests in the subpoena, Request Nos. 1-3 and 6-19 remain disputed and are the subject of this Order.  As noted in the Appendix, Request Nos. 20 and 21 were withdrawn by Meta.  The disputes as to Request Nos. 4-5 and 22-23 were resolved either prior to or at the hearing on this dispute.  As of the date of the opening letter brief, Haugen had produced documents in response to Request Nos. 5, 22, and 23.  [Dkt. 2061 at 5].  Further, in briefing on this dispute, Haugen has agreed to produce nonprivileged emails responsive to Request

United States District Court
Northern District of California

Nos. 6 and 7.  [Dkt. 2136 at 3].  Thus, the Court will not quash Request Nos. 6 and 7 to that extent.

### a.  First Amendment Associational Rights

Haugen objects to most of the document requests in the Meta subpoena on the grounds that the requests infringe her First Amendment rights and privileges.  [Dkt. 2061 at 4-5].  Haugen argues that these requests, if enforced, "would chill and infringe upon her free exercise of speech, association, and her right to petition the government."  *Id.* at 4.  Haugen's objections extend to Request Nos. 1-3, 6-10, 12-14, 16-17, and 19.  *Id.* at 4-5.  Meta argues that "Ms. Haugen cannot shield the communications requested on [First Amendment] grounds, as they are between Ms. Haugen and other third parties, not members of an association expressing shared views."  *Id.* at 8.

The undersigned has previously upheld First Amendment objections by other nonparties in response to similar subpoenas issued to them by Meta in this MDL.  *See* Dkt. 1963.  Familiarity with that previous Order's discussion of First Amendment associational rights and legal doctrine is assumed.  The Parties dispute whether the analysis in that previous Order is correct, and the Court provided an opportunity for the Parties to submit supplemental briefing on the First Amendment issues, focusing primarily on the applicability of the journalist's privilege, the right to petition the government, and the sufficiency of proof regarding the asserted chilling effect.  [Dkt. 2135; Dkt. 2136; Dkt. 2149].

The "First Amendment protects political association as well as political expression, and the freedom to associate with others for the common advancement of political beliefs and ideas is . . . protected by the First and Fourteenth Amendments."  *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139 (9th Cir. 2010) (cleaned up).  "[T]he government must justify its actions not only when it imposes direct limitations on associational rights, but also when governmental action would have the practical effect 'of discouraging' the exercise of constitutionally protected political rights.  Such actions have a chilling effect on, and therefore infringe, the exercise of fundamental rights.  Accordingly, they 'must survive exacting scrutiny.'"  *Id.* (cleaned up).  "Disclosures of political affiliations and activities that have a 'deterrent effect on the exercise of First Amendment rights' are therefore subject to this same 'exacting scrutiny.'  A party who objects to a discovery request

United States District Court
Northern District of California

7

1   as an infringement of the party's First Amendment rights is in essence asserting a First

2   Amendment *privilege*." *Id.* at 1139-40 (cleaned up).

3       In *Chevron Corp. v. Donziger*, No. 13-mc-80038 CRB (NC), 2013 WL 1402727 (N.D.

4   Cal. Apr. 5, 2013), Judge Cousins explained the Ninth Circuit's legal standard for First

5   Amendment protections with regard to freedom of expression and associational rights as follows:

6       *Perry v. Schwarzenegger*, 591 F.3d 1126, 1139–41 (9th Cir. 2009)…
        sets forth a two-part test for analyzing claims of first amendment
7       privilege in a discovery dispute.  First, the party asserting the privilege
        must make "a prima facie showing of arguable first amendment
8       infringement."  "This prima facie showing requires [a party] to
        demonstrate that enforcement of the discovery requests will result in
9       (1) harassment, membership withdrawal, or discouragement of new
        members, or (2) other consequences which objectively suggest an
10      impact on, or chilling of, the members' associational rights."  A prima
        facie showing "turns not on the type of information sought, but on
11      whether disclosure of the information will have a deterrent effect on
        the exercise of protected activities."

12  *Id.* at *2 (internal citations omitted).

13      Haugen objects to disclosure of privileged communications with current and former Meta

14  employees, with staff and agents of her nonprofit organization, "Beyond the Screen," with other

15  nonprofits, with advocacy groups, and with social critics which "advocate about Meta's risks for

16  minors."  [Dkt. 2136 at 3 (objecting to Request Nos. 1-3, 8-14, 17 and 19)].  Haugen states in her

17  declaration that, if the Court were to compel disclosure of the documents sought:

18      I will be afraid that my personal, non-public communications with
19      others about these topics will be the target of a subpoena and I will be
        compelled to disclose them.  Others have told me that they will have
20      the same fear communicating with me and that it will chill what they
        are willing to share.  That fear will greatly impact what I write, with
21      whom I feel I can freely speak, and with whom I associate. I would
        not write as often or as critically of social media companies; I would
22      also be forced to be more cautious about communicating with others
        on these topics and would curtail whether I associate at all with other
23      social critics, academics, nonprofits, state agencies, and others to
        discuss issues related to the social media industry; and, if so, how I
24      communicate with them and how frequently I communicate with
        them (or not).

25

26  [Dkt. 2136-1 at ¶ 8].  Haugen's counsel argues that the document subpoena is part of a

27  "campaign" by Meta retaliating against whistleblowers.  [Dkt. 2061 at 4, 8].

28      Meta argues that the Haugen declaration is insufficient to demonstrate a basis for her First

United States District Court
Northern District of California

1   Amendment objections.  [Dkt. 2149].  Relying on a pre-*Perry* Ninth Circuit decision, Meta argues

2   that Haugen's declaration fails to present "objective and articulable facts" which go "beyond

3   broad allegations or subjective fears."  *Id.* (citing *Dole v. Local Union 375*, 921 F.2d 969, 972 (9th

4   Cir. 1990).  A careful analysis of *Dole* does not support Meta's argument.  In *Dole*, the Ninth

5   Circuit reiterated an earlier ruling (prior to remand) in that same case in which the objecting party

6   was required "to demonstrate that enforcement of the subpoenas will result in (1) harassment,

7   membership withdrawal, or discouragement of new members, or (2) other consequences which

8   objectively suggest an impact on, or 'chilling' of the members' associational rights."  921 F.2d at

9   972 (quoting *Brock v. Local 375, Plumbers Int'l Union of Am.*, 860 F.2d 346, 350 (9th Cir. 1988)).

10  The Ninth Circuit made clear that *Brock 's prima facie* test had two tiers.  "First, the [objecting

11  party] must demonstrate a causal link between the disclosure and the prospective harm to

12  associational rights.  Second, the [objecting party] must demonstrate that it is the type of

13  association where exposure could incite threats, harassment, acts of retribution, or other adverse

14  consequences that could reasonably dissuade persons from affiliating with it."  *Id.*

15      Significantly, the declaration at issue in *Dole* failed on the first part of the test: a failure to

16  show a causal nexus.  *Id.* at 272-73.  The declaration submitted in *Dole* averred that the decline in

17  voluntary contributions to the labor union fund was caused by publicity regarding the

18  government's investigation into the union, rather than the threat of subpoena enforcement *per se*.

19  "To the extent there has been a 'chill' in affiliations with the [objecting party], the affidavit

20  provides the court no assistance in allocating the responsibility for that chill between the general

21  investigation (the propriety of which the parties do not contest here) and the particular threat of

22  disclosure of contributors' names through the subpoenas."  *Id.* at 272.  That is, the declaration in

23  *Dole* failed to provide any facts of a causal nexus between the subpoena's potential enforcement

24  and the First Amendment rights at issue.  It was in this context that the Ninth Circuit stated, "the

25  courts generally have demanded the presentation of 'objective and articulable facts, which go

26  beyond broad allegations or subjective fears.'"  *Id.*

27      By contrast, the Haugen declaration and the record as a whole demonstrate "objective and

28  articulable facts" regarding the causal link between the disclosure sought and the prospective harm

9

to associational rights.  Haugen attests that compelled disclosure of her personal, nonpublic communications with others about Meta and social media platforms will impact what she writes, with whom she can freely speak and associate, and the frequency of her writing critically of social media companies.  [Dkt. 2136-1 at ¶¶ 8, 10, 13].  Haugen further avers that other people have told her that compelled disclosure will chill what those persons are willing to share with her.  *Id.* at ¶¶ 8, 11-12.  Haugen states that compelled disclosure will cause this chilling of First Amendment associational rights because nonprofits and individuals with whom she has communicated have "extremely small budgets and cannot take the financial risk of being drawn into litigation by Meta or similar companies."  *Id.* at ¶ 12.  Haugen avers as to her belief that "disclosing my confidential communications with others could equally place them at risk of retaliation by Meta, a powerful company with significant resources."  *Id.* at ¶ 14.

In briefing, Haugen's counsel has similarly argued that the Court's analysis and conclusion in its previous ruling on the First Amendment objections to other similar Meta subpoenas is equally applicable here.  *See* Dkt. 1963 at 8 (objecting parties argued "that requiring the disclosure of these communications will have a chilling effect on the associational rights of the current and former Meta employees, because the current and former Meta employees, if identified, would fear adverse employment actions and/or the risk of being 'blackballed' in the industry" and "that discovery of the communications poses unjustifiable risks which ultimately chill the associational rights [the objecting parties] and the Meta employees (current and former) enjoy").

Meta repeats an argument asserted earlier in this litigation that Haugen and the persons she communicated with are not part of any formal "expressive association" or organized group, and thus, do not have the claimed associational rights under the First Amendment.  [Dkt. 2061 at 8]; *cf.* Dkt. 1764 at 4 (Meta arguing for enforcement of subpoena against nonparty Jayakumar: "Jayakumar does not purport to be in a political organization relevant to the subpoena"); Dkt. 1765 at 3 (Meta arguing for enforcement of subpoena against nonparty Bejar: "Bejar is not involved with an political association relevant to the subpoenas").  The Court previously rejected Meta's argument on this point.

While organizations or entities might have standing to assert associational rights, those

United States District Court
Northern District of California

1    rights flow from the members.  *Brock*, 860 F.2d at 349.  In *Brock*, the Ninth Circuit stressed that

2    an emphasis on the organization as an entity is incorrect:

3            The district court's emphasis on organizational structure is misplaced.
         It does not matter whether the Fund is totally independent from the
4            Union, as appellants claim, or merely a bank account of the Union, as
         the district court found.  If the Fund is sufficiently independent of the
5            Union to be considered in its own right, it can attempt to show
         infringement of its members' first amendment rights.  If the Fund is
6            merely an extension of the Union, then the Union can make the
         attempt.  Associational rights are implicated either way.
7

8    *Id.* (emphasis added).  In *Brock*, the Ninth Circuit made clear that the members (who are

9    individuals) have the First Amendment associational rights—and the organizations involved have

10   standing to assert those associational rights on behalf of the members.

11           Furthermore, in *Perry,* the Ninth Circuit recognized that "[t]he freedom to associate with

12   others for the common advancement of political beliefs and ideas lies at the heart of the First

13   Amendment."  591 F.3d at 1132.  There, a group of five individuals and one organization were the

14   "Proponents" of California's Proposition 8, and that group of Proponents objected to discovery

15   requests on First Amendment grounds.  *Id.* at 1132-33.  The Ninth Circuit found that the

16   Proponents adequately demonstrated that they had First Amendment associational rights and there

17   was no indication by the Ninth Circuit that the individuals somehow lacked such rights because

18   they were not part of a formal organization.  *Id.* at 1143-44.  As *Perry* recognized, "[i]mplicit in

19   the right to associate with others to advance one's shared political beliefs is the right to exchange

20   ideas and formulate strategy and messages, and to do so in private."  *Id.* at 1142.

21           In briefing here, Haugen cites *Pebble Ltd. v. EPA*, 310 F.R.D. 575 (D. Alaska 2015) as

22   legal support for the argument that First Amendment associational rights are properly asserted by

23   individuals communicating even if not part of a formal association.  [Dkt. 2061 at 9].  In *Pebble*,

24   the court applied the *Perry* standard in quashing subpoenas served on nonparties (two

25   conservation organizations and individuals associated with those organizations).  The subpoenas

26   sought all communications between the subpoenaed parties and thirty-one other nonparties

27   regarding the EPA's proceedings on a mining project opposed by the subpoenaed parties.  The

28   *Pebble* court held:

> [P]ublic participation before federal administrative agencies involves "the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest." Both the District of Columbia District Court and the Ninth Circuit Court have recognized that discovery such as that sought by plaintiff in this case has the tendency to chill the free exercise of political speech and association which is protected by the First Amendment.

310 F.R.D. at 582 (cleaned up). After reviewing the declarations submitted and finding that the subpoenaed parties demonstrated a *prima facie* case of infringement on their First Amendment associational rights, the *Pebble* court found that the party seeking to enforce the subpoenas failed "to show that what it seeks goes to the heart of its claim and is carefully tailored to avoid unnecessary interference with protected activities." *Id.* (citing *Beinin v. Ctr. for the Study of Popular Culture*, No. C 06-02298 JW, 2007 WL 1795693, at *3 (N.D. Cal. June 20, 2007)).

In its reply briefing, Meta does not discuss *Pebble* or attempt to effectively distinguish that case from the facts of this case. Nor does Meta discuss the cited *Beinin* opinion (relied on in *Pebble*) from this District, in which Judge Ware overruled objections to then-Magistrate Judge Seeborg's order denying a motion to compel the disclosure of names and email addresses of individuals who sent emails to the plaintiff expressing support for his litigation. In *Beinin*, Judge Seeborg found that "the interests that underlie the associational privilege are fully implicated *notwithstanding the fact that there is no formal organization per se.*" 2007 WL 1795693, at *2 (emphasis added). In affirming Judge Seeborg's ruling, Judge Ware recognized that:

> Support of litigation is a form of expression and association protected by the First Amendment. Compelled disclosure of the names of individuals or groups supporting a plaintiff's lawsuit thus creates a risk of interference with First Amendment-protected interests in two ways. First, compelled disclosure might make the plaintiff, or future plaintiffs, reluctant to accept the support of unpopular groups, so that evidence of their support cannot be used against the plaintiff at trial. Second, the supporters themselves may desire anonymity, and may withhold support if they fear their names will be disclosed.

*Id.* at *3 (emphasis added). The Court finds the reasoning of both *Beinin* and *Pebble* to be directly applicable to the current dispute.

Meta's failure to distinguish these precedents, which directly undercut Meta's assertion that First Amendment associational rights are limited to organized groups or "expressive

12

United States District Court
Northern District of California

1   associations," further diminishes Meta's arguments on the current dispute.  Moreover, Meta's

2   assertion on this point is puzzling because several of the subpoena's requests explicitly seek

3   Haugen's communications with identified and named organizations involved in public affairs and

4   communications/media, *i.e.,* "expressive associations."  *See* Request No. 9 (seeking

5   communications with the CEO and Partner of Bryson Gillette, a public affairs, strategic

6   communications, and political campaigns firm); Request No. 11 (seeking communications with

7   Reset Tech, a lobbying firm, and "any lobbying firms concerning the user of Social Media

8   Platforms by, the safety of, or the sexual exploitation of persons under the age of 18"); Request

9   No. 14 (seeking communications with the Omidyar Network, the Luminate Group, the Democracy

10  Fund, Mr. Pierre Omidyar, and any "other non-profit or advocacy groups controlled by or

11  affiliated with Mr. Omidyar"); Request No. 17 (seeking communications with Common Sense

12  Media, McCourt Institute, Sustainable Media Center, Center for Humane Technology, Integrity

13  Institute, Council for Responsible Social Media, and individuals associated with each); Request

14  No. 19 (seeking documents and communications with Haugen's nonprofit group, Beyond the

15  Screen).  Based on Meta's own arguments and logic, these requests (Request Nos. 9, 11, 14, 17,

16  and 19) are properly quashed under the First Amendment because they expressly seek Haugen's

17  private, confidential communications with "expressive associations."  Indeed, Meta made clear in

18  briefing that it does not object to Haugen withholding from production in response to Request No.

19  19 "private, internal communications among a core group of BTS members or employees

20  concerning the formulation of strategy."  [Dkt. 2149 at 3].

21         With regard to the second prong of the *Brock* test, Haugen has established that "exposure

22  could incite threats, harassment, acts of retribution, or other adverse consequences that could

23  reasonably dissuade persons from affiliating with" her.  *Dole*, 921 F.2d at 972.  Meta's own

24  actions in this litigation demonstrate the adverse consequences Haugen has identified which such

25  persons could face if exposed—while this case concerns whether Meta is liable under various legal

26  theories for the design of its services/platform, Meta has subpoenaed, moved to compel

27  enforcement of subpoenas, and deposed several publicly known individual nonparties who have

28  spoken out publicly or testified as to their views on Meta.  Like Haugen, none of those individuals

1    are parties to this MDL.  Meta's liability in this MDL stems from Meta's own actions, and

2    whether Meta is liable does not depend on ascertaining the sincerity or scope of the personal views

3    of those subpoenaed individuals (nor does Meta's liability depend on whether Haugen is credible

4    as to her personal views).

5         In addition to the alleged risk of "blackballing" in the industry due to Meta's influence and

6    reach (discussed in the Court's previous Order on the First Amendment issues implicated here),

7    the costs of responding to a subpoena, preparing for and sitting for a deposition, and opposing a

8    motion to compel are not insignificant burdens for an individual.  Haugen has averred that using

9    109 search terms (based on the subpoena) to locate potentially responsive documents resulted in a

10   total hit count of over fourteen thousand documents.  *See* Dkt. 2061-1 at ¶ 7; Dkt. 2061-2 at ¶¶ 5-

11   6.  Haugen's counsel estimates that the review of those documents would take approximately 239

12   hours, billed at attorney rates ranging from $300 to $910 per hour.  Dkt. 2061-2 at ¶ 10.  At the

13   lowest billing rate, the estimated attorney fees would be $71,700 for this review, not including

14   time spent using additional search terms or contacting third parties to provide notice of any

15   production (if required).  *Id.* at ¶¶ 9, 11.  This burden on Haugen, an individual working for a

16   nonprofit, is coupled with the time spent on collecting documents and conferring with her counsel

17   (as well as preparing declarations necessitated by this motion to compel).  Beyond the economic

18   costs, the time and effort spent on responding to a subpoena and attending deposition, which

19   necessarily detracts from an individual nonparty's vocation and regular activities of life, are also

20   burdens resulting from Meta's seeking discovery by subpoenas.  The Court takes this into account

21   in the context of the Ninth Circuit's directives to provide nonparties with special consideration

22   when faced with discovery demands by subpoenas.  As Haugen has attested and the Court finds,

23   Meta's own pursuit of discovery from individual nonparties (including filing multiple discovery

24   motions in this MDL) constitute objective and articulable facts which would negatively impact the

25   willingness of other as-yet unidentified nonparties to associate with Haugen, should the Court

26   enforce the subpoena as requested by Meta here.

27         Further, with regard to the Request Nos. 6-7 and 10 (seeking Haugen's documents and

28   communications relating to her testimony before governmental entities, her communications with

United States District Court
Northern District of California

Congressional members or staff, and her communications with regulators and law enforcement), the fact that these requests seek documents relating to Haugen's direct communications with politicians and their staff directly implicates her First Amendment rights. As noted in *Pebble*, courts have "aptly recognized that public participation before federal administrative agencies involves 'the freedom to protest policies to which one is opposed, and the freedom to organize, raise money, and associate with other like-minded persons so as to effectively convey the message of the protest.'" 310 F.R.D. at 582 (citations omitted). At the hearing on this dispute, Meta argued that the requests seeking documents and communications about Haugen's preparations for her testimony and communications with governmental entities could potentially reveal material for impeachment. While Meta has access to all of Haugen's public testimony, her nonpublic communications and documents used to prepare for such testimony and meetings with government entities so as to effectively convey her messages are protected by her associational rights and her right to petition the government under the First Amendment. Because these requests have not been narrowed by Meta, their scope (as sought to be enforced) plainly implicates Haugen's First Amendment rights to associate and to petition the government.

Based on the record presented, the Court finds that Haugen has made a *prima facie* showing of infringement of her First Amendment associational rights and, as to Request Nos. 6-7 and 10, her right to petition the government. *Perry*, 591 F.3d at 1140. Further, the Court finds that Haugen has satisfied the two-prong test in *Brock* as summarized in *Dole*—first, she has demonstrated a causal link between the disclosure and the prospective harm to associational rights; and second, she has demonstrated that exposure could incite harassment, acts of retribution, or other adverse consequences that could reasonably dissuade persons from affiliating with her. *Dole*, 921 F.2d at 972. As discussed herein, the Court finds that Haugen has demonstrated that enforcement of the objected-to requests in the Meta subpoena will, at the very least, have a negative impact and chilling effect on the associational rights at issue here as between Haugen and current/former Meta employees, the staff and agents of Haugen's nonprofit organization, other nonprofits, advocacy groups, and social critics which advocate about Meta's risks for minors. In light of these findings, the burden shifts to Meta to demonstrate an interest in obtaining the

United States District Court
Northern District of California

1    discovery sufficient to justify the deterrent effect on the free exercise of the constitutionally

2    protected right of free association.  *Perry*, 591 F.3d at 1140.

3          With regard to the need or interest in obtaining these documents, at the hearing and in

4    briefing, Meta argued that the operative complaint in this action mentions Haugen multiple times,

5    that Haugen is therefore a "uniquely prominent witness in this litigation," and that Meta needs this

6    discovery in order to seek material which could be used for impeachment and to attack her

7    credibility.  Meta argues that the documents requests are "highly relevant to the claims and Meta's

8    defenses in this MDL because responsive documents will evidence Ms. Haugen's views on TMH

9    [teen mental health] issues, reveal information she has relied on in making claims about social

10   media, demonstrate her bias, and provide context for Ms. Haugen's statements on which plaintiffs

11   rely in bringing their claims."  [Dkt. 2016 at 7].

12         In analyzing the First Amendment rights at stake here, the Ninth Circuit requires that

13   courts "balance the burdens imposed on individuals and associations against the significance of

14   the . . . interest in disclosure, to determine whether the 'interest in disclosure . . . outweighs the

15   harm[.]'"  *Perry*, 591 F.3d at 1140 (cleaned up).  *Perry* provides further guidance on evaluating

16   this balance:

> This balancing may take into account, for example, the importance of
> the litigation; the centrality of the information sought to the issues in
> the case; the existence of less intrusive means of obtaining the
> information; and the substantiality of the First Amendment interests
> at stake.  Importantly, the party seeking the discovery must show that
> the information sought is highly relevant to the claims or defenses in
> the litigation—a more demanding standard of relevance than that
> under Federal Rule of Civil Procedure 26(b)(1).  The request must
> also be carefully tailored to avoid unnecessary interference with
> protected activities, and the information must be otherwise
> unavailable.

23   *Id.* at 1140-41 (cleaned up).

24         In *Beinin*, Judge Ware held that the party seeking the discovery must meet the "compelling

25   interest" standard as follows:

> The First Amendment privacy interest is overridden only when the
> party seeking the information asserts a compelling interest.  A
> "compelling interest" is one that "is crucial to the party's case," goes
> to the "heart of the claims," or is "directly relevant to the [party's]
> claim."  This is because the First Amendment occupies a "preferred

16

position . . . in the pantheon of freedoms," and its interests are not easily overridden.

2007 WL 1795693, at *3 (citations omitted).

Here, Meta has not shown that the interest in disclosure outweighs the burdens imposed on Haugen.  First, while the Court assumes for purposes of this First Amendment analysis that the documents sought have some relevance to the case, the documents sought are not central to the issues in the case.  Whether Meta is liable requires analyzing its services and behavior, not deciding whether Haugen's views are truthful.  At oral argument, counsel for the Plaintiffs made clear they will not rely on Haugen as an expert witness.  In the negotiations prior to the filing of letter briefing on this dispute, Plaintiffs' counsel even offered to withdraw or remove Haugen as a fact witness "to help prevent Meta's retaliation against her." [Dkt. 2061 at 9].  Meta, however, "refused."  *Id.*  As a non-expert witness, and third party to this case, Haugen's personal views or opinions (and their bases) are not crucial to this case, do not go to the heart of the claims, and are not directly relevant to either Plaintiffs' claims or Meta's claims.  Meta's assertion that Haugen has a "heightened role in this litigation" is not borne out by the record presented.  Rather, the primary reason she has a role in this litigation now is because Meta has kept her involved in the case.  While Meta makes much of the fact that Haugen is mentioned multiple times in the operative complaint (second most after Mark Zuckerberg), Haugen points out that she is mentioned in less than ten of the over one thousand paragraphs of the pleading.  A desire to obtain information to potentially impeach Haugen is not highly relevant or even central to the issues in this case, particularly where Plaintiffs' counsel offered not to call Haugen as a witness.  *Perry*, 591 F.3d at 1140 (setting heightened relevance standard if *prima facie* case is established).  As Plaintiffs have conceded, the case could proceed fully without Haugen testifying at trial—thus demonstrating the fundamental lack of centrality or criticality of the discovery sought.  If Haugen's testimony is not central to this case, then documents sought to impeach her are similarly not central or critical to this case.

Further, as Haugen's former employer, Meta has in its possession or control all communications that Haugen had with other Meta employees (including former Meta employees) during her employment, to the extent she and those other Meta employees used Meta's email,

17

direct messaging, voicemail, fax, and other communication equipment and services. Meta also has possession and control of Haugen's work files, which would include documents and communications sought by these requests. Similarly, Meta has possession or control over any communications that current and former Meta employees have had with Haugen after she left Meta's employ, to the extent those Meta employees used Meta's email or other communication systems. Meta clearly knows about and has Haugen's interviews, public documents, testimony, and publication about Meta. Additionally, Meta has apparently deposed several former Meta employees who have had communications with Haugen.

Given all of these other sources of information and documents from or concerning Haugen available to Meta, and particularly in light of the fact that Meta has been able to identify at least some former Meta employees who have had communications with Haugen and has taken discovery from those persons, the Court finds that there exist less intrusive means of obtaining the information sought. At least as to current and former Meta employees, some of the information sought is not otherwise unavailable. The need for these documents is thus diminished by the fact that Meta has access to multiple other sources of information which can be used to probe Haugen's views. Clearly, Meta has ample information and documents disclosing Haugen's views about Meta, and as discussed below, Meta is free to probe Haugen's expressed views at deposition. The documents sought by these specific requests are thus of diminished importance in light of these other sources of discovery produced and available in this case, and are accordingly not proportional to the needs of the case.

The Court finds that the documents sought do not meet the more demanding standard of relevance applicable here under *Perry*. To the extent that Meta justifies these requests on the grounds that they may result in the production of documents which may go to credibility issues, the Court finds that a mere desire for potentially impeaching documents does not alone meet the more exacting relevance standard in the First Amendment context. The desire for material for impeachment of a nonparty (who is not an expert witness and was proposed to be withdrawn as a trial witness by Plaintiffs' counsel) is not proportional to the needs of the case under Rule 26, particularly where it is an open question whether she would even be called to testify at trial by

anyone.

As a fallback argument, Meta asserts that quashing the requests entirely is not justified because it is incumbent on Haugen to perform a "document-specific analysis" of the extent of the applicability of the privilege under *Perry*. [Dkt. 2149 at 3]. That is, Meta argues that Haugen bears the burden of reviewing every single possibly responsive document and then performing a document-by-document review to identify whether a particular document constitutes a "private, internal communication" which discusses "formulation of strategy." *Id.* Nothing in *Perry* mandates this procedure, which would impose all of the burdens of responding to discovery which the Ninth Circuit has mandated that district courts should especially take into consideration when third parties are involved. That is, the reason a whole subpoena (or a whole request) may be quashed under Rule 45 is to relieve a nonparty of that kind of burden when balanced against relevance.

Further, this argument presupposes that Meta is interested in nonprivileged communications on topics outside of "formulation of strategy" or the substance of Haugen's expressed views about Meta. At oral argument, the Court asked Meta's counsel if Meta was truly interested in obtaining emails between Haugen and third parties (such as congressional staff) regarding nonprivileged topics such as scheduling of meetings, and Meta's counsel common sensically admitted that such communications are not of any interest (precisely because they are not substantive, because they are outside the scope of the privilege). As the party seeking to enforce the subpoena at this stage, it is incumbent on Meta, before documents have been produced, to identify those subcategories of nonprivileged documents responsive to the requests which are relevant and of any interest to the Parties in this case. Meta has not done so, for the obvious reason that the very documents Meta seeks are those nonpublic, confidential documents and substantive communications between Haugen and third parties which discuss "formulation of strategy" and otherwise relate to the expressing of views protected by the First Amendment. As a result, Meta has not identified for the Court any basis to enforce the subpoena to require Haugen to search for and produce responsive documents and communications which fall outside the scope of the privilege (because Meta has no interest in such nonprivileged and likely non-substantive

1    documents).

2         Taking into consideration all factors presented by the Parties, the Court therefore finds that

3    the balance of harms to the First Amendment associational rights here are not outweighed by the

4    interest in disclosure of communications with current or unidentified former Meta employees, with

5    the staff and agents of Haugen's nonprofit organization, with other nonprofits, with advocacy

6    groups, and with social critics which advocate about Meta's risks for minors.  Accordingly, except

7    as to the nonprivileged emails responsive to Request Nos. 6-7 discussed above, the Court finds

8    that Request Nos. 1-3, 6-17, and 19 do not meet the Ninth Circuit's standards for enforcement in

9    light of Haugen's First Amendment objections and are appropriately quashed to the extent they

10   seek documents protected by Haugen's First Amendment associational rights and her right to

11   petition the government.

12   **II.    FIRST AMENDMENT: JOURNALIST'S PRIVILEGE.**

13        Haugen objects to Request Nos. 2-3, 8-14, and 16-19 to the extent that they seek

14   documents protected from discovery by the journalist's privilege under the First Amendment.

15   Request No. 18 is the most relevant request at issue, because it seeks all documents and

16   communications "related to the research, development, and publication of" Haugen's recently

17   published book "insofar as the Documents and Communications also relate to the use of Social

18   Media Platforms by, the safety of, or the sexual exploitation of persons under the age of 18."  *See*

19   Appendix.  As noted above, Haugen authored a book published in 2023 titled, "The Power of One:

20   How I Found the Strength to Tell the Truth and Why I Blew the Whistle on Facebook," and thus,

21   she asserts she is entitled to invoke the journalist's privilege.  [Dkt. 2136 at 3].  In support of her

22   objection, Haugen cites *Shoen v. Shoen*, 5 F.3d 1289 (9th Cir. 1993).  In response, Meta argues

23   that the journalist's privilege does not apply to the author of a memoir because such an author is

24   not acting as a journalist under *Shoen*.  [Dkt. 2135 at 3].

25        In *Shoen*, the Ninth Circuit explained the scope of the journalist's privilege as follows:

26             [W]hen facts acquired by a journalist in the course of gathering the
               news become the target of discovery, a qualified privilege against
27             compelled disclosure comes into play. . . . [W]e interpreted Branzburg
               v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972), as
28             establishing such a qualified privilege for journalists. . . . Rooted in

> the First Amendment, the privilege is a recognition that society's interest in protecting the integrity of the newsgathering process, and in ensuring the free flow of information to the public, is an interest "of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice." We held in Farr that the journalist's privilege recognized in Branzburg was a "partial First Amendment shield" that protects journalists against compelled disclosure in all judicial proceedings, civil and criminal alike.

5 F.3d at 1292 (citations omitted).

It is well-settled that, under *Shoen*, book authors are entitled to invoke the journalist's privilege:

> The journalist's privilege is designed to protect investigative reporting, regardless of the medium used to report the news to the public. Investigative book authors, like more conventional reporters, have historically played a vital role in bringing to light "newsworthy" facts on topical and controversial matters of great public importance. At the turn of the century, for example, muckraking authors such as Lincoln Steffens and Upton Sinclair exposed widespread corruption and abuse in American life. More recently[, social critics such as Rachel Carson, Ralph Nader, Jessica Mitford, and others have written books that have made significant contributions to the public discourse on major issues confronting the American people. Indeed, it would be unthinkable to have a rule that an investigative journalist, such as Bob Woodward, would be protected by the privilege in his capacity as a newspaper reporter writing about Watergate, but not as the author of a book on the same topic.
>
> In sum, we see no principled basis for denying the protection of the journalist's privilege to investigative book authors while granting it to more traditional print and broadcast journalists. What makes journalism journalism is not its format but its content.

*Id.* at 1293 (footnotes omitted).

Meta's argument that the journalist's privilege is inapplicable because Haugen's book is a "memoir" is not supported by controlling law and appears to be based on a misreading of *Shoen*. *Shoen* held that the qualified privilege protects against compelled disclosure of "facts acquired by a journalist in the course of gathering the news" and "protect[s] the integrity of the newsgathering process," even if there is "some incidental sacrifice of sources of facts needed in the administration of justice." *Id.* at 1292. The determination as to whether the privilege applies thus turns on whether the party seeking compelled disclosure seeks facts acquired by the author in the course of gathering the news written about in the book, include the sources of such facts. The

21

Ninth Circuit's lengthy discussion as to the applicability of the privilege to book authors stresses that the touchstone of the inquiry is not the form of the media at issue (*i.e.,* newsprint or television news versus book), but rather the content. *Id.* at 1293. Thus, Meta's labelling Haugen's book a "memoir" is beside the point, because it is an attempt to elevate form over substance.

Here, while parts of Haugen's book discuss her youth and upbringing or her career both before and after working for Meta, those are not the sections of the book for which Meta is seeking discovery. As noted, Request No. 18 seeks all documents and communications relating to Haugen's book to the extent that they "relate to the use of Social Media Platforms by, the safety of, or the sexual exploitation of persons under the age of 18." It is thus clear that Meta is seeking disclosure of Haugen's sources, facts gathered, and her process for gathering the facts which culminated in her writing the portions of her book discussing what she observed at Meta and her views about Meta and teen mental health issues. Under *Shoen*, the journalist's privilege protects against compelled disclosure of such materials.

In *Shoen*, the Ninth Circuit stressed that the journalist's privilege "is qualified, not absolute," stating that "the process of deciding whether the privilege is overcome requires that 'the claimed First Amendment privilege and the opposing need for disclosure be judicially weighed in light of the surrounding facts, and a balance struck to determine where lies the paramount interest.'" 5 F.3d at 1292-93 (citations omitted). As discussed above, Meta's asserted need for this discovery is based on a desire to seek materials which might be used to impeach Haugen (should she testify at trial) and to attack her credibility. Again, it bears repeating that Haugen is not a party to this litigation, she is not an expert witness, and it was even proposed by Plaintiffs' counsel that she be withdrawn as a fact witness. Haugen may never testify at trial. Her third-party opinions are those of a layperson, and there has been no determination as to whether she would even be allowed to testify as to opinions even if she were to testify at trial (and if so, to what extent any such opinions would be admissible). Seeking compelled disclosure of material to potentially impeach a nonparty fact witness (particularly where Meta has other sources of information and materials about Haugen, as discussed above) does not outweigh the qualified First Amendment journalist's privilege on this record.

22

1        Accordingly, the Court finds that, under the applicable legal standards, Request No. 18 is

2  properly quashed in its entirety.  The Court further finds that Request Nos. 2-3, 8-14, and 16-17,

3  and 19 are properly quashed to the extent seeking documents protected from discovery under the

4  journalist's privilege.

5  **III.**       **RELEVANCE AND LACK OF PROPORTIONALITY OBJECTIONS.**

6        Haugen also objects that Request Nos. 1-3 and 6-19 as overbroad, irrelevant, and/or

7  disproportionate to the needs of the case.  [Dkt. 2061 at 5 (objecting to Request Nos. 2-3 and 6-19

8  as overbroad, outside the scope of relevant discovery, and unduly burdensome); Dkt. 2136 at 3

9  (objecting to Request Nos. 1 and 13 as irrelevant, and Request Nos. 3 and 15-16 as irrelevant and

10  disproportionate to the needs of the case)].  As discussed above, Meta argues that these requests

11  seek relevant documents because of Haugen's asserted importance to the case and because of

12  Meta's need to find material to impeach Haugen.

13        As drafted, a number of the requests seek documents which are of limited relevance to this

14  case.  Request Nos. 6-7 and 10 seek all communications and documents relating to Haugen's

15  testimony before governmental bodies, state regulators, and communications with congressional

16  members and their staff.  *See* Appendix.  As discussed above, at oral argument, counsel for Meta

17  conceded that, despite the breadth of the requests, Meta is not interested in receiving non-

18  substantive documents and communications on issues such as scheduling of meetings.  Meta's

19  asserted need for these materials to potentially impeach Haugen ignores whether impeaching

20  Haugen on her personal views about Meta is within the scope of relevance for discovery.  Juries in

21  this MDL are never going to have to decide whether Haugen's testimony before Congress or

22  communications with regulators/law enforcement was truthful or had a reasonable basis—this is

23  not a perjury case against Haugen.

24        Similarly, Request Nos. 8-9 and 12-13 seek all communications and documents relating to

25  Haugen's interview on *60 Minutes*, her communications with CBS, the Wall Street Journal, or

26  other reporters, and the publication of "The Facebook Files" by the Wall Street Journal.  *See*

27  Appendix.  Again, a jury is never going to be tasked with deciding whether Haugen's views as

28  stated to the press were truthful or had a reasonable basis—this is not a defamation case.  Indeed,

*United States District Court*
*Northern District of California*

23

United States District Court
Northern District of California

1    at oral argument, counsel for Meta conceded that documents relating to "publication" of "The

2    Facebook Files" could be "set aside" as irrelevant.

3         Request No. 15 seeks documents relating to payments or reimbursements to Haugen for

4    her appearances or statements.  Haugen is not an expert witness in this MDL.  The issue of any

5    payments or reimbursements for expenses to Haugen is far afield from the liability issues in this

6    litigation.  There is no cause of action in this case which depends on making any findings as to

7    Haugen's receipt of money.

8         Request No. 18 seeks documents and communications relating to Haugen's book, and

9    Request No. 19 seeks documents on the development of her nonprofit.  The research, bases, and

10   materials used in the drafting of her book or the development of her nonprofit are similarly far

11   afield from the issues disputed in this MDL.  Indeed, Request No. 18 seeks documents on "the

12   publication" of Haugen's book and, as Meta's counsel conceded in the context of Request No. 13,

13   documents on the publication of a book are properly set aside in this case.

14        Accordingly, the Court finds that Request Nos. 6-10, 12-13, 15-16, and 18-19, as sought to

15   be enforced, seek material that is outside the scope of relevance for purposes of discovery.  Meta

16   has not sought to significantly narrow or focus these requests to any identifiable subgroup of

17   potentially relevant documents, and thus, there is no basis in the record to enforce these requests

18   partially.  The Court therefore sustains Haugen's relevance objections to these requests and, for

19   this separate reason, quashes them as presented.

20        Further, Haugen's proportionality objections to the requests stress the thirteen-year time

21   frame covered by Meta's requests (compared to the two years Haugen spent working at Meta) and

22   the burden of searching through over a decade's worth of documents.  Under Rule 26's traditional

23   standard for proportionality of discovery, Meta has not shown that the discovery requests at issue

24   are proportional to the needs of the case.  As discussed above, Plaintiffs' counsel offered to

25   withdraw Haugen as a fact witness for trial, and disclaimed relying on her as an expert witness.

26   There is thus a realistic probability that Haugen may never testify at trial.  If she does not testify at

27   trial, then material for impeachment is unnecessary and certainly not proportional to the needs of

28   the case.  Even if she did testify at trial, it would appear to be an unusual case in which sixteen

1    different document requests seeking material for impeachment of a nonparty lay witness would all

2    be proportional to the needs of a case.

3         Haugen has averred that the hit count using 109 search terms (based on the subpoena) to

4    locate potentially responsive documents resulted in a total of over fourteen thousand documents.

5    *See* Dkt. 2061-1 at ¶ 7; Dkt. 2061-2 at ¶¶ 5-6.  Haugen's counsel estimates that the review of those

6    documents would take approximately 239 hours, billed at attorney rates ranging from $300 to

7    $910 per hour.  [Dkt. 2061-2 at ¶ 10].  At the lowest billing rate, the lowest amount of estimated

8    attorney fees would thus be $71,700 for this review and search, not including time spent using

9    additional search terms or contacting third parties to provide notice of any production (if required).

10   *Id.* at ¶¶ 9, 11.  This burden on Haugen, an individual working for a nonprofit, is to be balanced

11   against Meta's asserted need for the documents.  As noted above, Meta's position is that these

12   requests are proper because they may reveal information which could be used to impeach Haugen.

13   And as noted, Haugen is not an expert witness, she was proposed to be taken off the trial witness

14   list by Plaintiffs, and she may never testify at trial.  Meta does not contend that any of the

15   documents sought are necessary for (much less related to) any affirmative defenses, or that they

16   are central to rebutting liability.  The potential for impeachment here is not shown to sufficiently

17   outweigh the burden of response to the subpoena.

18        Haugen has sufficiently demonstrated that Request Nos. 1-4 and 6-19, as drafted and

19   sought to be enforced, are not proportional to the needs of the case in light of Haugen's resources,

20   the lack of importance of the discovery in resolving the issues disputed in this MDL, and the

21   burden or expense of the proposed discovery which outweighs its likely benefit.  Again, Meta has

22   not sought to significantly narrow or focus these requests on any identifiable subgroup of

23   documents to reduce the burden of review and collection, and thus, there is no basis in the record

24   to enforce these requests partially.  The Court therefore sustains Haugen's lack of proportionality

25   objections to these requests and, for this separate reason, quashes them as presented.

26   **IV.    DEPOSITION SUBPOENA.**

27        In addition to the document subpoena, the Parties present a dispute relating to the

28   deposition subpoena served on Haugen.  Haugen objects not to the deposition subpoena itself—

United States District Court
Northern District of California

1    she has agreed to sit for deposition noticed by Meta.  [Dkt. 2061 at 4].  Rather, Haugen seeks a

2    preemptive ruling on her objections that the anticipated scope of questions Meta might ask would

3    infringe her First Amendment rights and further seeks a ruling limiting the deposition to certain

4    identified topics.  *Id.* at 5.  Meta argues that Haugen's deposition should not be limited to certain

5    topics and that her request is premature.  *Id.* at 6-7.

6            As the Court noted at the hearing on this matter, Haugen's request is procedurally

7    improper.  First, she is being deposed in her capacity as an individual and there is no requirement

8    under the Federal Rules of Civil Procedure for a party taking a deposition of a natural person

9    under Rule 30(b)(1) to list out and limit their questioning to certain previewed topics as if this

10   were a Rule 30(b)(6) deposition of an organization or entity.  Second, whether Haugen has a

11   legitimate objection to a deposition question on the basis of First Amendment or other privilege is

12   highly fact-specific and dependent on the phrasing of the deposition question.  It is premature to

13   ask for a ruling on privilege objections to questions which have not yet been asked.  *See Clarke v.*

14   *Am. Commerce Nat'l Bank*, 974 F.2d 127, 129 (9th Cir. 1992) ("[W]e have noted that blanket

15   assertions of the privilege are 'extremely disfavored.'  The privilege must ordinarily be raised as to

16   each record sought to allow the court to rule with specificity.") (internal citation omitted);

17   *E.E.O.C. v. Kaplan Higher Educ. Corp.*, No. 1:10 CV 2882, 2011 WL 2115878, at *3 (N.D. Ohio

18   May 27, 2011) ("The Court finds that ruling on any assertions of privilege prior to a deposition

19   would be premature[.]").  If the Court was to provide an advisory opinion as to specific privilege

20   objections in a vacuum, that risks the potential for inviting further mischief in the form of more

21   arguments over interpretation and scope (likely impeding the timely completion of the deposition).

22   The normal procedure is for the deposition to go forward and for questions to be asked, subject to

23   any properly asserted privilege objection specific to a question asked, to allow for specificity in

24   the record should there be a need for further judicial intervention.  *See O'Toole v. City of Antioch*,

25   No. 11-cv-01502-PJH (MEJ), 2015 WL 1848134, at *3 (N.D. Cal. April 14, 2015) (denying

26   request to quash deposition subpoena entirely and stating that "[a] party claiming the privilege

27   must identify specific communications and the grounds supporting the privilege as to each piece

28   of evidence over which privilege is asserted").

United States District Court
Northern District of California

26

United States District Court
Northern District of California

1    At oral argument, the Court admonished counsel for Meta not to waste time attempting to

2  elicit unnecessarily numerous privilege or First Amendment objections or instructions not to

3  answer.  Attempting to intrude into a privilege by asking unduly repeated, objectionable questions

4  or by probing aggressively into the extent of a privilege assertion in an attempt to either obtain a

5  basis for arguing waiver if a question is answered or to create more discovery disputes is not a

6  productive use of the Parties' time, the witness's, time, or counsel's time.  Wise and experienced

7  counsel will take into account this Court's rulings in this Order and directives throughout this

8  MDL in crafting questions and making productive use of the time spent at deposition.

9    At oral argument, the Court also admonished counsel for Haugen not to waste time by

10  objecting and instructing not to answer questions on the basis of an unjustified and unreasonable

11  assertion of privilege as to any specific questions.  For example, as the Court has ruled in the

12  previous Order, because Meta is already aware of the identity of several people who have had

13  communications with Haugen (and has apparently deposed a number of them already), the

14  assertion of First Amendment or other privilege solely as to those persons' identities would appear

15  to be unjustified and moot.  *See* Dkt. 1963 at 15.  To the extent other third parties have already

16  produced documents or testified as to the substance of their communications with Haugen, the

17  assertion of First Amendment or other privilege as to those already-disclosed communications

18  would also appear to lack a reasonable basis.  Wise and experienced counsel will take into account

19  not only this Court's rulings (herein and throughout this MDL), but also the record of discovery

20  and disclosure in this case, in defending Haugen's deposition to make sure the deposition is

21  completed timely and with a minimum of disruptions.  Counsel are reminded of their obligations

22  under Rule 30(c)(2) ("[T]estimony is taken subject to any objection.  An objection must be stated

23  concisely in a nonargumentative and nonsuggestive manner.  A person may instruct a deponent

24  not to answer only when necessary to preserve a privilege, to enforce a limitation ordered by the

25  court, or to present a motion under Rule 30(d)(3).").

26    The Court finds that this dispute is premature. The fact that the Court is denying without

27  prejudice Haugen's motion with regard to her deposition is self-evidently not a decision on the

28  merits of the propriety (or lack thereof) of any privilege objection which may be made at Haugen's

1    deposition.  Because Haugen's motion is premature, any argument that this Order constitutes an

2    express or implicit overruling of any specific privilege objections would be unfounded.  *Kaplan*,

3    2011 WL 2115878, at *3.

4         Further, the undersigned reminds counsel of their obligations under Section D of the

5    Discovery Standing Order regarding depositions.  The undersigned is cognizant that the Parties

6    have a need to complete this deposition in short order, to the extent the deposition transcript may

7    be used in any expert reports.  The undersigned trusts counsel to cooperate as required in the

8    scheduling of both the completion of Haugen's document production and the scheduling and

9    logistics for her deposition

10                                    **CONCLUSION**

11        Pursuant to and for all the reasons discussed herein, the Court **GRANTS** Haugen's motion

12   to quash Request Nos. 1-3 and 8-19, and **GRANTS** Haugen's motion to quash-in-part Request

13   Nos. 6 and 7.

14        In light of this Order and the representations that Haugen has already produced documents

15   and agreed to do so in response to certain requests, the Court estimates that Haugen's document

16   production is either already completed or can be completed promptly.  Accordingly, the Court

17   **ORDERS** Haugen to complete her document production in response to the document subpoena

18   (as modified/quashed by this Order) by no later than __September 5, 2025__.  Nothing in this Order

19   precludes the Parties from reaching agreement on extending that deadline.

20        Further, because Haugen has agreed to search for and produce nonprivileged documents

21   responsive to Request Nos. 5, 6, 7, 22 and 23, it is possible that Haugen will find and then

22   withhold privileged documents responsive to those requests.  Accordingly, the Court **ORDERS**

23   Haugen (as the person asserting the privilege) to serve a categorical privilege log on Meta for any

24   such documents responsive to these requests by no later than __September 5, 2025__.  Nothing in this

25   Order precludes the Parties from reaching agreement on extending that deadline. The Court is

26   requiring a categorical privilege log because of the consideration to be given with regard to burden

27   on Haugen as a nonparty, and out of consideration for the shortness of time (because fact

28   discovery closed long ago).  A categorical privilege log will allow the Parties to determine

United States District Court
Northern District of California

28

whether there is even a dispute as to the assertion of privilege as to any such withheld documents, particularly in light of this Order.  *See Doe v. Kaiser Found. Health Plan, Inc.*, No. 23-cv-02865-EMC (PHK), 2024 WL 3511627, at *4 (N.D. Cal. July 23, 2024); *Facebook Consumer Privacy User Profile Litig.*, 2022 WL 18863582, at *1 (Discovery Special Master Order resolving disputes as to certain specific documents identified from categorical privilege logs).

The Court further **DENIES WITHOUT PREJUDICE** Haugen's request for a ruling, prior to her deposition, on privilege objections and **DENIES** Haugen's request to limit her Rule 30(b)(1) deposition to only certain identified topics as if it were a Rule 30(b)(6) deposition.

The Court further **ORDERS** counsel for the Parties (including Haugen) to meet and confer promptly to finalize and reach agreement on the logistics and schedule for her deposition.  That meet and confer process **SHALL** be completed by **August 26, 2025** and Haugen's deposition **SHALL** be taken and completed by no later than **September 15, 2025**.  Nothing in this Order precludes the Parties from reaching agreement to extend these deadlines.

Counsel for Meta and Haugen **SHALL** file a joint status report on **September 8, 2025**, reporting on the status of Haugen's completion of her document production, the service of her categorical privilege log, and the final scheduling of her deposition.  The Parties are expected to exercise diligence and professional coordination/courtesy in completing this discovery relating to Haugen.

This **RESOLVES** Dkt. 2061.

**IT IS SO ORDERED.**

Date:  August 19, 2025

PETER H. KANG
United States Magistrate Judge

United States District Court
Northern District of California

29