UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case Nos.: 4:22-md-03047-YGR-PHK |
| | 4:23-cv-05448-YGR |
| This Filing Relates to: | **JOINT LETTER BRIEF REGARDING META WITNESSES' PREPAREDNESS FOR STATE AGS' 30(B)(6) DEPOSITION TOPICS AND RELATED DISCOVERY REQUESTS** |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

Dear Judge Kang:

The State AGs and Defendants Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC (collectively, "Meta") respectfully submit this letter brief regarding several discovery disputes related to the State AGs' discovery of the Meta Defendants.[1]

Pursuant to the Discovery Standing Order and Civil Local Rule 37-1, the Parties attest that they repeatedly met and conferred by video conference, email, and correspondence before filing this brief. Because all lead counsel were not located in the geographic region of the Northern District of California or otherwise located within 100 miles of each other, they met via videoconference, with the final conferral occurring on August 15, 2025. Lead trial counsel have concluded that no agreement or negotiated resolution can be reached.[2]

---

[1] In the joint letter brief, the parties cite certain documents produced in discovery, as well as the transcripts of Meta's 30(b)(6) witnesses and meet and confer correspondence. In light of the Parties' differing interpretations of the application of the Court's Discovery Standing Order's general prohibition on attachments to letter briefs, Order § H.3, the cited documents are not attached. The Parties are prepared to file the cited materials or otherwise provide them to the Court, at the Court's request.

[2] The parties disagree about the precise scope of their dispute here. The State AGs understood that the dispute concerned various issues with discovery on Meta, including Meta's failure to properly prepare its witnesses, as well as its earlier responses to RFPs and interrogatories, that arose out of the 30(b)(6) deposition of Meta's witnesses. The State AGs believe they made this clear to Meta during meet and confer, including through meet and confer correspondence. Meta understood that the dispute was principally over whether three particular Meta 30(b)(6) witnesses were adequately

Dated:   August 27, 2025                    Respectfully submitted,


                                            **ROB BONTA**
                                            Attorney General
                                            State of California

                                            _/s/ Emily C. Kalanithi_
                                            Nicklas A. Akers (CA SBN 211222)
                                            Senior Assistant Attorney General
                                            Bernard Eskandari (SBN 244395)
                                            Emily Kalanithi (SBN 256972)
                                            Supervising Deputy Attorneys General
                                            Nayha Arora (CA SBN 350467)
                                            David Beglin (CA SBN 356401)
                                            Megan O'Neill (CA SBN 343535)
                                            Joshua Olszewski-Jubelirer (CA SBN 336428)
                                            Marissa Roy (CA SBN 318773)
                                            Brendan Ruddy (CA SBN 297896)
                                            Deputy Attorneys General
                                            California Department of Justice
                                            Office of the Attorney General
                                            455 Golden Gate Ave., Suite 11000
                                            San Francisco, CA 94102-7004
                                            Phone: (415) 510-4400
                                            Fax: (415) 703-5480
                                            Joshua.OlszewskiJubelirer@doj.ca.gov

                                            *Attorneys for Plaintiff the People of the State of*
                                            *California*

                                            **PHILIP J. WEISER**
                                            Attorney General
                                            State of Colorado

                                            _/s/ Krista Batchelder_
                                            Krista Batchelder, CO Reg. No. 45066, *pro hac vice*

---

prepared, and whether Plaintiffs are entitled to any relief in light of any witness's inadequate preparation. During the parties' meet-and-confer, Meta did not understand that Plaintiffs were suggesting that they were entitled to written responses to certain deposition questions regardless of whether a particular witness was adequately prepared.

Deputy Solicitor General
Shannon Stevenson, CO Reg. No. 35542, *pro hac vice*
Solicitor General
Elizabeth Orem, CO Reg. No. 58309, *pro hac vice*
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
krista.batchelder@coag.gov
Shannon.stevenson@coag.gov
Elizabeth.orem@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

*/s/ Philip Heleringer*
J. Christian Lewis (KY Bar No. 87109),
*Pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*Pro hac vice*
Zachary Richards (KY Bar No. 99209),
*Pro hac vice*
Daniel I. Keiser (KY Bar No. 100264),
*Pro hac vice*
Matthew Cocanougher (KY Bar No. 94292),
*Pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Suite 200
Frankfort, KY 40601
CHRISTIAN.LEWIS@KY.GOV
PHILIP.HELERINGER@KY.GOV
ZACH.RICHARDS@KY.GOV
DANIEL.KEISER@KY.GOV
MATTHEW.COCANOUGHER@KY.GOV
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008),
*Pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017),
*Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021),
*Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021),
*Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs New Jersey Attorney General
and the New Jersey Division of Consumer Affairs
Matthew J. Platkin, Attorney General for the State of
New Jersey, and Cari Fais, Director of the New
Jersey Division of Consumer Affairs*

**COVINGTON & BURLING LLP**

/s/ Ashley M. Simonsen
Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Facsimile: +1 (650) 632-4800
Email:  asimonsen@cov.com

*Attorney for Defendants Meta Platforms, Inc.;
Instagram, LLC; Meta Payments, Inc.; and Meta
Platforms Technologies, LLC*

4

**State AGs:** Meta has failed at multiple stages to fulfill basic discovery obligations, culminating in presenting 30(b)(6) witnesses who were unwilling to answer fundamental and "company critical" questions. To resolve these issues, the State AGs have presented a reasonable compromise: Meta can avoid the most burdensome remedies, such as preparing additional witnesses for deposition, by producing limited additional documents and written responses in the following five categories.

1) Meta refuses to disclose the "Nido: Canonical Rollout Plan" (Project Nido was the development codename for Teen Accounts), which was identified by Meta's 30(b)(6) witness and is hyperlinked in META3047MDL-259-01. A core piece of Meta's defense in this case is the rollout and implementation of Teen Accounts. It is hard to imagine a document more relevant and subject to mandatory disclosure under FRCP 26(a)(1)(A)(ii) and the duty to supplement under FRCP 26(e) than the "Canonical Rollout Plan" for Teen Accounts. Meta has declined to answer conferral questions about how this document could have been missed in initial disclosures, which raises the specter of what other crucial documents have also been missed. Meta should produce the "Nido: Canonical Rollout Plan" and the documents it presumably hyperlinks to.

2) Meta refuses to disclose what percentage of users actually stop using Facebook and Instagram after receiving a nudge to stop using the app. Meta calls this the "Meaningful Adoption" metric in META3047MDL-047-01170067 or the "honor rate" in the 30(b)(6) deposition of Sayed Otaru on topics 15-18. Meta "believe[s] those are stats that were tracked." (Otaru 92:24-93:7). Interrogatory 12 requested "For each month in the Relevant Time Period, identify the percentage rate of adoption for each Safety Feature by users of each platform in each State…" After negotiations Meta promised to disclose the "percentage of teen users in the U.S. who have used each safety tool for which data is available." Meta disclosed only the percentage of users shown a nudge, not the "Meaningful Adoption" or "Honor Rate" of those who closed out of the app after receiving that nudge. (Otaru Exhibit 9). The Meaningful Adoption rate is the relevant metric – it goes to Meta's knowledge of whether the safety feature had the advertised effect on teen behavior. Meta has refused to provide the Meaningful Adoption rate in response to Interrogatory 12, at the depositions of Ms. Davis and Mr. Clegg, at the 30(b)(6) of Mr. Otaru, and in multiple conferrals.

3) Meta put forth Mr. Otaru to testify on 30(b)(6) Topics 15-18, which included "the implementation and monitoring" of "Meta's policies and initiatives for protecting Teen Users from risks to their mental or physical health or wellbeing." Nonetheless he was unable to identify the set of metrics Meta monitored as "Company Critical Metrics" much less describe those measurements. (Otaru 49:3-50:10; 89:8-90:14). FRCP 30(b)(6) requires that "persons designated must testify about information known or reasonably available to the organization." Meta "must designate a knowledgeable person to fully prepare and unevasively answer questions about the designated subject matter." *F.C.C. v. Mizuho Medy Co*., 257 F.R.D. 679, 681 (S.D.Cal. 2009) (cleaned up). Meta failed to adequately prepare Mr. Otaru, who admitted "It would probably have been within normal process to track company critical metrics…" (Otaru 47:14-48:7). Meta should be required to provide written answers to the State AG's 30(b)(6) questions and to identify which metrics Meta considered "Company Critical," for its teen safety features. Those measurements are critical to understand Meta's knowledge and intent regarding monitoring teen safety.

4) Meta planned to "monitor" attempts by teens to circumvent the protections of Teen Accounts (META3047MDL-259-01; p12). At the 30(b)(6) about "implementation and monitoring" of Teen Accounts Mr. Otaru was unable to answer questions about information tracked by Meta according

to META3047MDL-259-01 such as: "what percent of under 16s successfully edited DOB to be over 16" after teen accounts rollout, what was the "number of new second accounts associated with existing U16 accounts" after teen accounts rollout, and what was the "percentage of new supervisions with under 16 accounts on the same device" after teen accounts rollout? (Otaru 41:15-42:3, 53:5-54:11, 54:12-22, 54:23-55:13). Despite also claiming to not know "what percentage of teens attempted to change their age band" when the State AGs asked, on redirect by defense counsel, Mr. Otaru was willing to answer, providing a cherry-picked statistic. (Otaru 41:15-42:3, 170:20-24). Meta should provide written deposition answers to the State AGs' questions.

5) Meta failed to prepare 30(b)(6) witnesses Allison Hartnett and Lars Backstrom to answer numerous questions critical to the AGs' COPPA claims, despite heavily negotiated agreements between the parties as to the scope of testimony. Meta fell short of its duties under FRCP 30(b)(6).

Topic 4(i) related to Meta's determination that multiple accounts belong to the same person, including when users tell Meta which accounts they own ("hard linking"). The AGs allege Meta violated COPPA by failing to remove users when it knew they were under 13 based on the hard-linked accounts. Although Meta's documents state that hard-linked accounts "are accounts that we *know* to be owned by underage users," METAMDL3047-155-00009593, Meta denied an RFA that hard-linked accounts belong to the same person, necessitating further 30(b)(6) discovery. Yet, Hartnett could not answer how often hard-linked accounts belong to the same person, instead pointing to an unproduced study. (Hartnett 213:12-214:19). As routine follow-up, Meta must produce documents describing the study and its results, which are also responsive to RFP 99.

Hartnett and Backstrom were also unprepared to respond to other questions within pre-negotiated topics. For example, Meta agreed since March to provide testimony on its process for reviewing reports of underage users (Topic 4(a)). This is directly relevant to the State AGs' claim that Meta violates COPPA when it automatically ignores reports of underage users when those users do not have bios or photos ("no media/no bio" policy). When asked if Meta automatically ignores underage reports if the reported user has made comments on other people's posts or sent direct messages, the witness testified "**I don't know. We can get back to you on that**" and "**I'm not sure. I don't know**" (Hartnett 179:4-180:12). Meta should provide the promised follow up and answer in written deposition: a. Whether Meta's "no media/no bio" policy for automatically ignoring underage reports on Facebook and Instagram includes ignoring reports where the reported user has (i) made comments on other users' posts?; and (ii) sent direct messages to other users?

Meta should provide written deposition responses to the following additional COPPA-related questions, which are a small subset of the questions that Meta's witnesses were unprepared to answer. Meta's designees offered to follow up on nearly all of these, testifying as to several that they "[knew] who to ask" and that the person at Meta with the information "definitely exists."

b. Does Meta use contact information associated with a user's account that has been disabled for being underage to prevent the user from creating a new account? (Hartnett 244:7-245:6 ("**I'm just uncertain** if we use the contact points [phone or email]. . .**I think we should follow up on this**")).[3]

---

[3] Meta agreed to testify on "Meta's practices and procedures for preventing Child users of Facebook or Instagram from creating new accounts on the other platform." (April 18, 2025 Letter)

    i.    Does Meta use any other piece of information that it has on new account creation to prevent a user from creating a new account after having had their account disabled for being underage? (Hartnett 244:7-245:6)

    ii.    If so, what information does Meta use to prevent a user from creating a new account after having had their account disabled for being underage?

    iii.    During what periods of time did Meta use this information to prevent a user from creating a new account after having had their account disabled for being underage?

c.    When examining an account on Facebook or Instagram that has been reported as underage, Meta's human reviewers do not examine media or profiles associated with accounts that are hard-linked to the reported account, at least as of April 1, 2024, correct? (Hartnett 204:3-19 (responding "**I would like to follow up and check this. I'm not sure . . . But I know who to ask**")).[4]

d.    What threshold has Meta used for the precision of its integrity soft-matching models (i) generally (Hartnett 294:4-23 ("**Once again, that's something we can follow up on**. . . . [W]e did not find someone who could speak to us about that, **but that person definitely exists**"); and (ii) when using the model outputs to identify accounts to be disabled? (Hartnett 294:4-296:11)[5]

e.    What surfaces does Meta's heuristic review to detect underage users? (Hartnett 116:17-117:15 ("I will have to check exactly which surfaces it looks like at for the . . . statements of age").)

f.    Does Meta's heuristic look at users' captions on photographs to detect underage users? (*Id.*)[6]

g.    Did Meta use videos posted by Facebook and Instagram users to train (i) its generative AI models? (Backstrom 38:13-40:10); (ii) its Emu model? (Backstrom 38:13-40:10)[7]

**Meta:**

Meta has produced six 30(b)(6) witnesses who have provided almost 17 hours of detailed testimony on a slew of topics. Those witnesses spent hours preparing for their depositions and, for the most part, the State Attorney General Plaintiffs ("State AGs") do not dispute that they were adequately prepared. The State AGs, however, argue that they are now entitled to additional discovery because three witnesses did not answer each and every specific question they put forward on a handful of topics—questions they could have, and should have, disclosed in advance. *See* ECF No. 553 ("long ago the courts abandoned allowing litigation by ambush or surprise").

---

[4] Meta agreed in a May 28 letter to testify on several aspects of the AGs' May 19 letter, including "Meta's use of hard-linking . . . in its review of accounts reported to be under the age of 13."

[5] Meta agreed in a June 4 email to prepare its witness to provide "general testimony on the reliability of soft-match techniques to identify accounts that belong to the same user."

[6] In conferrals, Meta offered to respond to Questions d-f above and should be held to this offer.

[7] Meta agreed in a June 9 email to provide testimony on specific sections of documents that the State AGs had identified, which included the sentence that Meta used "[p]ublicly shared posts on Instagram and Facebook, including photos, videos, and text," to train its generative AI models.

The State AGs are wrong, especially given the magnitude of discovery in this case.

Discovery in this matter has lasted roughly a year and a half. During the discovery process–which closed on April 4, 2025–Meta produced over 2.5 million documents, answered hundreds of written deposition questions and interrogatories, and produced some 45 witnesses for fact depositions. On top of that, late in the discovery period, the State AGs served Meta with a 30(b)(6) notice containing 19 overbroad Topics, many of which contained a flurry of subtopics and none of which identified the precise testimony sought with "painstaking specificity," as required. *Batiste v. City of Richmond*, 2023 WL 2951538, at *2 (N.D. Cal. Apr. 14, 2023). In the interest of compromise, Meta agreed to provide certain forms of *general* testimony for the Topics, but made clear that given the sheer number of Topics (and their variety and breadth), Meta's witnesses could not be expected to address each potential question relating to those Topics. *See Apple Inc. v. Samsung Elecs. Co.*, 2012 WL 1511901, at *2 (N.D. Cal. Jan. 27, 2012) (preparing to answer all "questions about the designated subject matter" becomes "less realistic and increasingly impossible as the number and breadth of noticed subject areas expand"). The parties then proceeded with the 30(b)(6) deposition, where the parties agreed that the State AGs would be given 17 hours of questioning time.

The State AGs have largely used up their allotted time, and now ask this court for more discovery. As this Court aptly noted, however, there must be an "end point to fact discovery," ECF No. 1956, and certain witnesses' inability to address each and every question posed does not justify prolonging the discovery process further, *see Baker v. Amazon Logistics, Inc.*, 2025 WL 1865992, at *5 (E.D. La. July 7, 2025) ("incomplete [30(b)(6)] testimony in some areas does not overshadow the otherwise overall thoroughness" of the testimony, and a finding of inadequate preparation is reserved for "extreme obfuscation and unpreparedness," not "simply the deponent's inability to answer every single question presented"). Meta addresses the State AGs' specific concerns with each of the three relevant witnesses below.

Ms. Hartnett

Ms. Hartnett was designated to provide general testimony for fifteen topics and subtopics (Topics 2(a), 2(b), 2(c), 2(d), 3, 4(a), 4(b), 4(c), 4(d), 4(e), 4(f), 4(g), 4(i), 5, 6). To prepare, she met with her counsel on 12 occasions and consulted with over a dozen relevant subject-matter experts. The State AGs deposed her for a little over 6 hours, and they do not dispute that Ms. Hartnett adequately addressed most of their questions, including questions on data collection (Topics 2(a) and 2(b)), COPPA compliance (Topics 3, 4(e), 4(f)), the collection of age information (Topic 4(g)), and the removal of users under the age of 13 ("U13 users") (Topic 4(b)). Ms. Hartnett was also prepared to address several Topics that the State AGs insisted upon, yet for which they asked *no* questions, such as teen celebrities and influencers (Topic 2(c)), child accounts managed by parents (Topic 2(d)), and the backlog of user reporting (Topic 4(a)).

Nevertheless, the State AGs argue that Ms. Hartnett was not adequately prepared because she did not answer, to their satisfaction, each specific question they asked during the deposition. As an initial matter, if those questions were truly important, the State AGs could have disclosed them in advance. The State AGs cannot leverage their own lack of transparency to now secure additional discovery. Regardless, their complaints regarding Ms. Hartnett's testimony are unjustified. For example, the State AGs argue that she could not address all of their questions about certain

documents that they previously disclosed. However, the State AGs identified 47 documents just three business days before her deposition, followed by an additional 67 documents at the end of the business day just before her deposition. Further, those documents, in total, spanned over 1000 pages. They then questioned her on *fewer than 25* of those documents. For those documents, the State AGs asked hyper-specific questions that go beyond any reasonable recall; *e.g.*, they asked whether she knew "what metrics are on [a particular] dashboard" referenced on a single page of a single exhibit. If the State AGs wanted answers to those specific questions, they should have disclosed them well in advance. Additionally, the State AGs did disclose a different set of documents regarding Topic 4(i) well in advance of the deposition, and Meta educated Ms. Hartnett on those documents; yet the State AGs remarkably asked no questions about them.

The State AGs also take issue with Ms. Hartnett's preparation for Topics 4(i), 5, and 6, but do not dispute that Ms. Hartnett was able to answer many of their questions on those Topics. Their complaints here similarly lack merit. The State AGs contend that for Topic 4(i)—which generally covered the means for identifying multiple accounts associated with the same Meta user—Ms. Hartnett could not answer certain specific questions concerning "hard-link techniques," such as their false positive rate percentage. Relatedly, For Topic 5—which concerned inauthentic reports of U13 users on Meta—the State AGs chide Ms. Hartnett for being unable to identify the precise processes by which Meta identified inauthentic U13 user reports caused by scripting attacks. The State AGs, however, do not dispute that Ms. Hartnett was able to answer many other questions concerning both hard-link techniques and scripting attacks. Her inability to answer certain other questions on those issues does not render her overall testimony deficient. *See* ECF No. 1807 (a 30(b)(6) deposition is not a "memory test"). And on Topic 6, the State AGs do not dispute that Ms. Hartnett could answer their questions. Instead, they simply argue that they did not like her responses. In particular, they assert that the explanation Ms. Hartnett gave for why Meta did not roll out a particular U13 User reporting system was purportedly inconsistent with a single document produced by Meta. But the State AGs have cited to no case indicating that a witness is not adequately prepared simply because she provides testimony that the opposing party believes is inconsistent with other evidence. Ms. Hartnett provided her testimony, under oath, and to the extent the State AGs believe the testimony is inconsistent with other evidence in the record, they can make that argument in a future merits brief.

At bottom, Ms. Hartnett provided a significant amount of testimony on a host of Topics. Her inability to answer a handful of questions is not cause for reopening her deposition.

Mr. Otaru

Mr. Otaru was designated to provide testimony on Topics 15-18. For those Topics, the parties agreed that Meta would provide general testimony on certain tools developed for young platform users, along with general testimony on tools that Meta considered, but did not adopt, for those users. Although Mr. Otaru already had significant knowledge relating to the agreed-upon Topics— he is Instagram's Director of Youth Protections—he prepared for the deposition by reviewing documents, consulting with subject matter experts, and meeting with counsel at least 12 times before the deposition. The State AGs deposed him for 3.5 hours, and Mr. Otaru provided extensive testimony on the agreed-upon Topics.

None of this is disputed. Instead, like with Ms. Hartnett's testimony, they fault Mr. Otaru for not

being able to answer each and every question they posed, many of which sought specific data figures and none of which were disclosed before the deposition. For example, the State AGs asked for the estimated percentage of young users enrolled in Teen Accounts, the percentage of teen accounts that have parental supervision, and the percentage of teens that attempted to change their age band after Teen Accounts rolled out. No witness could have anticipated (and memorized the answers to) those specific, data-driven questions, especially since the data can morph over time. A 30(b)(6) deposition is not a memory test, and the questions posed by the State AGs were better suited for interrogatories, assuming they were appropriate at all. The State AGs also should have disclosed these specific questions in advance, which would have enabled Meta to prepare for those questions. Their objections to Mr. Otaru's testimony thus lack merit.

Mr. Backstrom

The State AGs also contend that Mr. Backstrom was inadequately prepared, but in correspondence with Meta, the only basis they identified for this complaint is that he could not answer roughly eight specific questions. For reasons similar to those set forth above, Mr. Backstrom's inability to answer certain questions to the satisfaction of the State AGs did not render him ill-prepared for his deposition. Mr. Backstrom was designated to testify on only one Topic concerning the use of user information to train certain specific technical models. He prepared for his deposition by meeting with counsel at least three times and consulting with two subject matter experts. Ultimately, he was deposed for less than an hour, and was able to answer dozens of questions concerning the relevant Topic. Although he could not answer each question counsel asked–an inevitability in most depositions–he was adequately prepared. *See supra*.

**State AGs' Response:** As this Court has held, discovery disputes should be assessed through the "commonsense concept of proportionality." (ECF 1990, p.2; *see* FRCP 26(b)(1)). As the Ninth Circuit has stated: "wide access to relevant facts serves the integrity and fairness of the judicial process by promoting the search for the truth." *Shoen v. Shoen*, 5 F.3d 1289, 1292 (9th Cir. 1993).

Rather than promoting the search for truth, Meta's responses elevate technicality over truth. Meta seeks to apply an unreasonable (and even hypocritical) burden on the State AGs to have already sought any conceivable follow-up on the over 2.5 million documents produced, when Meta's own lawyers are clearly still processing those materials and have issued 10 different clawback notices (including as recently as last week), and changed the privilege designation of thousands of pages of material since the "close" of discovery in April 2025. The State AGs have requested limited, targeted follow-up document production of highly relevant information, most of which should already have been affirmatively produced by Meta earlier in the litigation. Meta's late-breaking implementation of Teen Accounts, and making them so central to its defense in this case, has naturally created a situation where limited follow-up document production is necessary. Meta has offered no reason why this would create any undue burden or prejudice with trial at least 9 to 12 months away, nor was it able to articulate any when asked about prejudice during conferrals. These targeted document requests fall clearly within what this Court called the "go-get-'em request[s] that come[] out of a deposition." (ECF 967, 32:17-33:12). As the Court stated: "I don't consider those to be burdensome at all because it's just a follow-up of that kind; right?" (*Id.*)

Likewise, Meta cannot avoid providing the limited follow-up information requested by pointing to the April end of fact discovery. The timing of the 30(b)(6) deposition was due to Meta's refusal

to provide any dates for the deposition for months while the parties painstakingly negotiated the scope of testimony that Meta would prepare its witnesses to provide, corresponding over more than a dozen letters and emails and numerous conferrals. Although the State AGs originally served their 30(b)(6) notice in January, Meta first offered dates for testimony in May (after the end of fact discovery), only to demand the State AGs postpone to engage in further scope negotiations.

Rather than seek broad additional depositions, the State AGs have asked for written deposition answers to targeted questions that are all focused on information that Meta has conceded it has and tracks. Meta's only response to the targeted requests for information is to argue that the State AGs should have provided the 30(b)(6) questions in advance so the witness would not have had to memorize too much information. This argument is disingenuous because the parties engaged in painstaking negotiations leading up to the depositions in order to provide Meta with specificity about the topics. Meta's witness gave equivocal answers on these pre-identified topics and in many cases asked to follow up. Aside from a dispute about the time period to be covered by Meta's testimony, Meta did not otherwise seek court intervention to strike, narrow, or limit the State AGs' 30(b)(6) notices and instead accepted the notices as negotiated. Because the questions discussed above seek information the 30(b)(6) witnesses either conceded Meta tracks or agreed to follow up on,[8] then the proportional solution that advances the search for truth is to require Meta to provide limited requested documents and written deposition answers.

The requests before the Court by the State AGs reflect a more narrowed and reduced set of requests for information than initially requested and for which there is strong legal and factual support. For example, Meta's opening statement above on Hartnett and Backstrom's testimony addresses numerous issues coming out of the 30(b)(6) depositions that are not even the subject of the State AGs' motion here. While the State AGs do not concede that the designees were properly prepared on other topics,[9] in the interest of compromise, the State AGs narrowed their requests to a small subset of information that was ultimately reflected in an August 7 compromise letter to Meta. Rather than engaging with this offer, Meta rejected it out of hand and went on to brief the larger set of disputes. The requests for relief in this joint letter brief are narrowly tailored to case-critical information which Meta has reasonable access to, and which would create no undue burden or prejudice to produce. The Court should facilitate the search for truth and the production of highly relevant discovery by ordering production of documents and written deposition answers in

---

[8] The State AGs sought to attach to this letter brief the cited portions of the transcript as well as the Rule 30(b)(6) deposition notice (see ECF 1956-1) as "excerpt[s] of the specifically disputed discovery request or material," Discovery Standing Order § H.3. Meta refused to agree.

[9] Meta's opening statement also misrepresents the disputed topics. As only one example, the State AGs never agreed that Ms. Hartnett "adequately answered" questions on Topic 4(f) (prevention of further collection of personal information from child users). Indeed, as the State AGs explained above in Section 5.b., despite Meta agreeing to provide testimony on this topic, including specifically as to Meta's practices for preventing Child users from creating new accounts (through which Meta collects personal information), Ms. Hartnett refused to unequivocally testify that there were no such practices. Instead, Ms. Hartnett offered to follow up to confirm whether Meta used users' contact information. (Hartnett 243:7-245:6.) Meta should provide that confirmation in written deposition responses, as requested above.

accordance with the five categories discussed above.

**Meta's Response:** In their opening section, the State AGs lodge "five categories" of objections, most of which simply catalogue certain questions that three Meta witnesses did not answer. Unsurprisingly, however, the State AGs cite to no precedent indicating that a party has failed to satisfy its Rule 30(b)(6) obligations if its witnesses cannot answer every single question asked. Nor could they: although a party must use reasonable efforts to prepare its witnesses—which Meta did through weeks of witness preparation, *see supra*—a witness is not expected to know every fact relating to each Topic she covers. *See supra* (a 30(b)(6) deponent is not ill-prepared simply because she cannot "answer every single question presented"); *In re JDS Uniphase Corp. Sec. Litig.*, 2007 WL 219857, at *1 (N.D. Cal. Jan. 29, 2007) (a corporation "need not make extreme efforts to obtain all information possibly relevant to the [30(b)(6)] requests"). Furthermore, the State AGs' brief also fails to explain why they did not preview the relevant questions in advance of the depositions, which would have allowed Meta to focus on them during witness preparation sessions. For these reasons, and others, each of the State AG's "five categories" of objections fails.[10]

The first four "categories" pertain to Mr. Otaru. As an initial matter, there is no dispute regarding the first category, which seeks a document titled "Nido: Canonical Rollout Plan." Meta will collect and produce the current version of that document. The second category demands new data that the State AGs never requested before, either in their 30(b)(6) notice or in any written discovery request.[11] Specifically, the State AGs seek data on "honor rates," *i.e.*, "the percentage of users [who] actually stop[ped] using Facebook and Instagram after receiving a nudge to stop using the app." The State AGs do not even argue that any agreed-upon 30(b)(6) topic covered "honor rates." Instead, they argue that the parties' agreement on Interrogatory 12 covered "honor rates." But even that is false. As the State AGs acknowledge, in response to Interrogatory 12, Meta agreed to provide the "percentage of teen users in the U.S. who have *used* each safety tool for which data is available." (emphasis added). "Honor rates" are different. As defined by the State AGs, "honor rates" do not represent the percentage of users who have *used* the "nudges" feature, but rather the percentage of users who *ceased using Facebook or Instagram* after receiving a nudge. Thus, the State AGs are now making a new data request even though fact discovery closed months ago.

Categories three and four fault Mr. Otaru for being unable to respond to highly detailed questions that the State AGs failed to disclose in advance. Category three contends Mr. Otaru could not identify the "metrics Meta monitored as 'Company Critical Metrics'" for teen safety tools and "describe those measurements." Category four notes that Mr. Otaru could not provide a series of

[10] Note that, in their correspondence with Meta, the State AGs raised several issues that they did not reference in their brief, including objections to testimony that Hartnett provided in response to Topics 5 and 6. The State AGs never disclosed to Meta that they did not intend to reference those Topics in their brief, which is why Meta addressed those Topics in its opening section.

[11] Neither the transcripts of these witnesses' depositions nor the State AGs' original 30(b)(6) notice (which was the subject of extensive negotiations and narrowing) constitutes "the specifically disputed discovery request or material" underlying this dispute. Since "no other attachments [to letter briefs] are permitted unless the Court orders otherwise," Standing Order Section H(3), Meta did not agree to attach those items to this brief. Meta offered to provide the Court with a joint submission containing the agreed-upon topics instead of the obsolete 30(b)(6) notice, but the State AGs refused that suggestion.

12

specific data points, including the "'percent of under 16s successfully edited DOB to be over 16' after teen accounts rollout" and "the 'percentage of new supervisions with under 16 accounts on the same device' after teen accounts rollout." According to the State AGs, these questions fell within their request for information on the "monitoring" of "policies and initiatives for protecting Teen Users." But that broad request did not give Meta fair notice of the *specific data* the State AGs planned to request during the deposition. *See Crystal Lakes v. Bath & Body Works, LLC*, 2018 WL 10467489, at *2 (E.D. Cal. Aug. 15, 2018) ("Rule 30(b)(6) deponents are not expected to be clairvoyant or encyclopedic in their knowledge; questions or sub-questions can be asked" on "specific or complex matters within larger designated issues for which the deponent could not have reasonably anticipated the need to develop knowledge"). Regardless, at least with respect to category three, Mr. Otaru did provide testimony. *See*, *e.g.*, Otaru Dep. at 34:1-19, 46:21-48:7.

And finally, category five suffers from similar flaws. That category largely lists a series of specific questions that Ms. Hartnett did not address. Ms. Harnett, however, did address a large number of other questions on a broad range of Topics. As for Mr. Backstrom, the State AGs' brief identifies only one question he could not answer. That does not entitle the State AGs to any relief.

In sum, Meta spent a significant amount of resources preparing its witnesses, all of whom were able to address a range of questions. Although certain witnesses could not answer a few questions concerning certain Topics, that does not mean they were ill-prepared. Ultimately, the State AGs' "inadequate preparation" arguments are little more than an attempt to prolong the fact discovery period so they can continue to demand information. Fact discovery, however, closed months ago, and the Court should not reopen it because certain 30(b)(6) witnesses did not meet a standard of perfection imposed by neither the Federal Rules nor applicable precedent.

## ATTESTATION

I, Emily C. Kalanithi, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: August 27, 2025

By: /s/ *Emily C. Kalanithi*
Emily Kalanithi