Jonathan H. Blavin (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-3089
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Victoria A. Degtyareva (State Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071-3426
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.,*

*[Additional parties and counsel listed on signature pages]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br><br>*Tucson Unified School District v. Meta Platforms Inc., et al.* | MDL No. 3047<br><br>Case No. 4:24-cv-01382-YGR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)**<br><br>**REDACTED**<br><br>Judge:   Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date:   January 26, 2026<br>Time:   8:00 am<br><br>Place:   Courtroom 1, 4th Floor |

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2        **PLEASE TAKE NOTICE THAT**, at 8:00 am on January 26, 2026, before the Honorable

3 Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern

4 District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby

5 do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary

6 judgment in favor of Defendants on all claims by Plaintiff Tucson Unified School District

7 ("Tucson").  This Motion is based on this Notice, the accompanying Memorandum of Points and

8 Authorities, any Reply or other papers submitted in connection with the Motion, including the

9 accompanying Declaration of Victoria A. Degtyareva and the exhibits thereto, and any other matters

10 presented at the time of the hearing.

11

## STATEMENT OF RELIEF SOUGHT

12       Defendants seek entry of summary judgment in their favor on all causes of action that

13 Plaintiff Tucson Unified School District asserts against Defendants or, in the alternative, partial

14 summary judgment as to Plaintiff's claims for past damages,  proposed "strategic plan," and failure-

15 to-warn claim.

16  DATED:  September 30, 2025     Respectfully submitted,

17                     By  */s/ Victoria A. Degtyareva*

18 JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com

19 MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor

20 San Francisco, CA 94105
Tel: (415) 512-4000

21

22 VICTORIA A. DEGTYAREVA (State Bar No. 284199)
Victoria.Degtyareva@mto.com

23 MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor

24 Los Angeles, CA 90071
Tel.: (213) 683-9100

25

26 *Attorneys for Defendant Snap Inc.,*

27 *[Additional counsel listed on signature pages]*

28

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ..................................... I

STATEMENT OF RELIEF SOUGHT .................................................................................... I

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................1

I.     INTRODUCTION.......................................................................................................1

II.    BACKGROUND.........................................................................................................3

       A.     District Background ........................................................................................3

       B.     Tucson's Lack of Evidence .............................................................................5

       C.     Tucson's Theory of Damages .........................................................................7

       D.     Tucson's Proposed "Strategic Plan" ............................................................11

       E.     The Court's Motion-to-Dismiss Ruling .......................................................12

III.   LEGAL STANDARD ..............................................................................................14

IV.    ARGUMENT ...........................................................................................................14

       A.     Tucson Lacks Competent Evidence of Causation. .......................................14

              1.     Tucson's Allegations of Specific Harms All Impermissibly Rely on
                     Third-Party Wrongdoing and Protected Publishing Activities. ..................17

              2.     Tucson Has No Evidence of Mental Health Harms Tied to Any
                     Defendant's Specific Platform. ..........................................................20

                     (a)   Tucson cannot show general causation. ...........................................21

                     (b)   Tucson cannot show harmful use of each Defendant's
                           platform(s) by Tucson's students. ....................................................21

                     (c)   Evidence about social media or cell phone use generally
                           cannot establish causation. ...............................................................22

       B.     Tucson Cannot Show It Is Entitled to Past Damages...............................25

              1.     Tucson Cannot Show Defendants Caused it To Divert Financial
                     Resources. ......................................................................................26

                     (a)   Tucson cannot recover "lost time" damages. ...................................26

                     (b)   Tucson has no competent evidence establishing "lost time"
                           damages. ...........................................................................................28

2. Tucson Has No Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms. ...............................................33

(a) Tucson has no evidence it hired new mental health personnel because of Defendants' platforms. ......................................33

(b) Tucson has no evidence it implemented new programs because of Defendants' platforms. ......................................33

3. Tucson Cannot Recover Property Damage that Results from Third-Party Acts. ...............................................36

C. Tucson's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under Arizona Law. ...............................................37

1. Tucson Cannot Recover the Plan as Equitable Relief for its Nuisance Claim. ...............................................38

(a) Tucson Has an Adequate Remedy at Law. ......................................38

(b) Tucson's Strategic Plan Is Not a Proper "Abatement" Remedy. ...............................................39

2. The Costs of the Strategic Plan Are Not Recoverable as Future Damages. ...............................................43

3. Tucson's Strategic Plan Is Impermissibly Derivative. ...............................................44

D. The Court Should Grant Summary Judgment on Tucson's Failure-to-Warn Claim. ...............................................45

1. Defendants Do Not Owe Tucson a Duty To Warn the District Directly. ...............................................45

2. Tucson Lacks Evidence Supporting Its Failure-to-Warn Claim. ...............................................46

3. Tucson Cannot Assert a Claim that Defendants Failed To Warn Students. ...............................................48

E. The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries. ...............................................49

V. CONCLUSION ...............................................50

1

# TABLE OF AUTHORITIES

2

3

**Page(s)**

4

**FEDERAL CASES**

5

*Allen-Cuffee v. Franklin Cnty. Juv. Det. Ctr.*,
6        2001 WL 242590 (S.D. Ohio Feb. 7, 2001) ...............................................................23

7

*Anderson v. Liberty Lobby, Inc.*,
        477 U.S. 242 (1986) ...............................................................................................14
8

*Argo v. Blue Cross & Blue Shield of Kan. Inc.*,
9        452 F.3d 1193 (10th Cir. 2006) ...............................................................................29

10

*Ass'n of Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*,
        241 F.3d 696 (9th Cir. 2001) ...................................................................................44
11

*Block v. City of Los Angeles*,
12        253 F.3d 410 (9th Cir. 2001) ..............................................................................23, 29

13

*Bozek v. Ariz. Lab. Force Inc.*,
14        2025 WL 264174 (D. Ariz. Jan. 22, 2025) ...............................................................28

15

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
        509 U.S. 209 (1993) ...............................................................................................31
16

*Celotex Corp. v. Catrett*,
17        477 U.S. 317 (1986) ...............................................................................................14

18

*City of Huntington v. AmerisourceBergen Drug Corp.*,
19        609 F. Supp. 3d 408 (S.D. W. Va. 2022) ...............................................................40

20

*Doe (K.B.) v. Backpage.com, LLC*,
        724 F. Supp. 3d 882 (N.D. Cal. 2024) .............................................................20, 24
21

*Doe v. Grindr Inc.*,
22        128 F.4th 1148 (9th Cir. 2025) ...............................................................................45

23

*Edwards Lifesciences Corp. v. St. Jude Med. Inc.*,
24        2004 WL 5642457 (C.D. Cal. Apr. 2, 2004) ...........................................................31

25

*Est. of Bride v. Yolo Techs., Inc.*,
        112 F.4th 1168 (9th Cir. 2024) ..........................................................................19, 45
26

*Griffey v. Magellan Health Inc.*,
27        2022 WL 1811165 (D. Ariz. June 2, 2022) ...............................................................28

28

*Griffey v. Magellan Health Inc.,*
    562 F. Supp. 3d 34 (D. Ariz. 2021) .........................................................................26

*Henricksen v. ConocoPhillips Co.,*
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ...............................................................21

*Johnson v. Yuma Reg'l Med. Ctr.,*
    769 F. Supp. 3d 936 (D. Ariz. 2024) .......................................................................28

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.,*
    497 F. Supp. 3d 552 (N.D. Cal. 2020) .....................................................................42

*Khoros, LLC v. Lenovo (U.S.), Inc.,*
    2020 WL 12655516 (N.D. Cal. Oct. 5, 2020) .........................................................50

*Kimzey v. Yelp! Inc.,*
    836 F.3d 1263 (9th Cir. 2016) .................................................................................18

*Lemmon v. Snap Inc.,*
    995 F.3d 1085 (9th Cir. 2021) .................................................................................19

*M.P. by & through Pinckney v. Meta Platforms Inc.,*
    127 F.4th 516 (4th Cir. 2025) ..................................................................................20

*Mendoza v. Tucson Unified Sch. Dist.,*
    125 F.4th 1262 (9th Cir. 2025) .........................................................................4, 24, 48

*In re Nat'l Prescription Opiate Litig.,*
    2025 WL 354758 (6th Cir. Jan. 31, 2025) ...............................................................41

*Nelson v. Am. Honda Motor Co.,*
    2021 WL 2877919 (W.D. Pa. May 17, 2021) ..........................................................47

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.,*
    730 F.3d 1111 (9th Cir. 2013) ...........................................................................20, 24

*Orr v. Bank of Am., NT & SA,*
    285 F.3d 764 (9th Cir. 2002) ...................................................................................23

*Quinalty v. FocusIT LLC,*
    2024 WL 342454 (D. Ariz. Jan. 30, 2024) .........................................................26, 28

*Rebel Oil Co. v. Atl. Richfield Co.,*
    51 F.3d 1421 (9th Cir. 1995) ...................................................................................31

*Rhynes v. Stryker Corp.,*
    2011 WL 2149095 (N.D. Cal. May 31, 2011) .........................................................38

*Robinson v. C.R. Bard, Inc.,*
    2016 WL 3361825 (N.D. Cal. June 17, 2016) .........................................................38

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020)..................................................................................38

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007)..................................................................................14

*Twitter, Inc. v. Barr*,
    445 F. Supp. 3d 295 (N.D. Cal. 2020) ..................................................................14

*VFD Consulting, Inc. v. 21st Servs.*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) ................................................................16

*In re Williams Sec. Litig. – WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009)........................................................................20, 24

*Wood v. Marathon Refin. Logistics Serv. LLC*,
    2024 WL 2242688 (N.D. Cal. Mar. 21, 2024) ......................................................38

**STATE CASES**

*AHS Rescue, LLC v. Ariz. Outdoor Specialists, Inc.*,
    2019 WL 993093 (Ariz. Ct. App. Feb. 27, 2019) ................................................30

*Ariz. Biltmore Hotel Villas Condos. Ass'n v. Conlon Grp. Ariz., LLC*,
    249 Ariz. 326 (Ariz. Ct. App. 2020) ....................................................................26

*Badia v. City of Casa Grande*,
    195 Ariz. 349 (Ariz. Ct. App. 1999) ....................................................................15

*Barrett v. Harris*,
    207 Ariz. 374 (Ariz. Ct. App. 2004) ........................................................15, 19, 24

*Brandes v. Mitterling*,
    67 Ariz. 349 (Ariz. 1948) .....................................................................................39

*Brown v. City of Phoenix*,
    258 Ariz. 302 (Ariz. Ct. App. 2024) ....................................................................39

*Butler v. Wong*,
    117 Ariz. 395 (Ariz. Ct. App. 1977) ....................................................................36

*Cactus Corp. v. State ex rel. Murphy*,
    14 Ariz. App. 38 (Ariz. Ct. App. 1971) ...............................................................39

*CDT, Inc. v. Addison, Roberts & Ludwig*,
    198 Ariz. 173 (Ariz. Ct. App. 2000) ....................................................................28

*Certainteed Corp. v. Fletcher*,
    794 S.E.2d 641 (Ga. 2016)....................................................................................45

*City of Phoenix v. Whiting*,
    10 Ariz. App. 189 (Ariz. Ct. App. 1969) ...................................................................15

*Coury Bros. Ranches, Inc. v. Ellsworth*,
    103 Ariz. 515 (Ariz. 1968) .........................................................................................43

*Doe v. Pharmacia & Upjohn Co.*,
    879 A.2d 1088 (Md. App. Ct. 2005) ...........................................................................49

*Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*,
    10 Ariz. App. 445 (Ariz. Ct. App. 1969) ...........................................................32, 42

*Gilmore v. Cohen*,
    95 Ariz. 34 (Ariz. 1963) ..................................................................................... passim

*Golonka v. Gen. Motors Corp.*,
    204 Ariz. 575 (Ariz. Ct. App. 2003) ...........................................................................46

*Gourdine v. Crews*,
    955 A.2d 769 (Md. Ct. App. 2008) ......................................................................46, 49

*Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*,
    216 Ariz. 454 (Ariz. Ct. App. 2007) .............................................................15, 16, 36

*Hirsh v. Manley*,
    81 Ariz. 94 (Ariz. 1956) ............................................................................................43

*Kuciemba v. Victory Woodworks, Inc.*,
    531 P.3d 924 (Cal. 2023) ............................................................................................46

*Loiselle v. Cosas Mgmt. Grp., LLC*,
    224 Ariz. 207 (Ariz. Ct. App. 2010) ...........................................................................50

*Mayor & City Council of Balt. v. Purdue Pharma, L.P.*,
    No. 24-C-18-000515 (Balt. City Cir. Ct. Aug. 8, 2025) ......................................41, 42

*McAlister v. Loeb & Loeb*,
    LLP, 571 P.3d 891 (Ariz. 2025) .................................................................................42

*McNutt Oil & Refin. Co. v. D'Ascoli*,
    79 Ariz. 28 (Ariz. 1955) ......................................................................................25, 44

*Mutschler v. City of Phoenix*,
    212 Ariz. 160 (Ariz. Ct. App. 2006) .....................................................................15, 39

*In re Nat'l Prescription Opiate Litig.*,
    265 N.E.3d 1 (Ohio 2024) ..........................................................................................41

*People v. ConAgra Grocery Prods. Co.*,
    17 Cal. App. 5th 51 (Cal. Ct. App. 2017) ...................................................................42

*Piner v. Super. Ct. in & for Cnty. of Maricopa,*
    192 Ariz. 182 (Ariz. 1998) ...................................................................21, 23

*Pompeneo v. Verde Valley Guidance Clinic,*
    226 Ariz. 412 (Ariz. Ct. App. 2011) ...................................................25, 28

*Quiroz v. ACLOA Inc.,*
    243 Ariz. 560 (Ariz. 2018) ...............................................................................48

*Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.,*
    140 Ariz. 174 (Ariz. Ct. App. 1984) ..............................................................42

*Raschke v. Carrier Corp.,*
    146 Ariz. 9 (Ariz. Ct. App. 1985) ..................................................................46

*Robertson v. Sixpence Inns of Am. Inc.,*
    163 Ariz. 539 (Ariz. 1990) ..............................................................................46

*Salica v. Tucson Heart Hosp. – Carondelet, LLC,*
    224 Ariz. 414 (Ariz. Ct. App. 2010) ..............................................................21

*Shaner v. Tucson Airport Auth. Inc.,*
    117 Ariz. 444 (Ariz. Ct. App. 1977) ..............................................................15

*Shetter v. Rochelle,*
    2 Ariz. App. 607 (Ariz. Ct. App. 1966) ........................................................46

*State ex rel. Hunter v. Johnson & Johnson,*
    499 P.3d 719 (Okla. 2021) ..............................................................................40

*State ex rel. Indus. Comm'n v. Standard Oil Co. of Cal.,*
    3 Ariz. App. 389 (Ariz. Ct. App. 1966) ........................................................16

**STATUTES**

47 U.S.C. § 230……………………………………………………………………*passim*

**COURT RULES**

Fed. R. Civ. P. 56(a)...........................................................................................14

**CONSTITUTIONAL PROVISIONS**

First Amendment....................................................................................1, 12, 16, 17

**TREATISES**

Restatement (Second) of Torts § 433B ...........................................................21, 23

Restatement (Second) of Torts § 821B ...............................................................15

1

Restatement (Second) of Torts § 821B(1)..........................................................................39

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Tucson is an urban school district in one of the most impoverished cities of its size in the nation.    The student body includes substantial numbers of students who face poverty and homelessness.  Many students lack healthcare coverage and access to basic necessities such as food, hygiene, clothing, and shoes.    Substance abuse and threats of gun violence challenge Tucson schools.  The District also has a history of racial segregation and discrimination: for nearly the entire time period for which Tucson seeks damages, the District was subject to a desegregation order, including because of racially disparate discipline in Tucson schools.  At the same time, Tucson has never banned cell phones on campus or banned students from using Defendants' platforms on their own devices.  In fact, Tucson uses Defendants' platforms extensively to promote the District and connect with its school communities—even advertising on Defendants' platforms, tracking "likes" and "followers," and hiring a social media "communications specialist."  Nevertheless, Tucson now claims that it is owed money from Defendants to combat an alleged mental health "crisis" among its students, which it claims is due to its students' use of Defendants' platforms.  But in sharp contrast to evidence of the litany of problems facing Tucson, the District does not even have the most basic evidence showing that it suffered harms from its students' use of Defendants' platforms.  Instead, discovery has shown that Tucson cannot support its allegations, and summary judgment is warranted on a series of independent grounds.

*First*, Tucson's claims for nuisance and negligence fail because it has not adduced evidence of causation.  This Court limited the scope of Tucson's claims at the pleading stage, holding that Tucson can predicate claims only on certain actionable conduct—Defendants' use of features that the Court concluded were not protected by Section 230 or the First Amendment or Defendants' alleged failure to warn.  By the same token, the Court made clear that Tucson cannot recover for injuries caused by third-party conduct, third-party content, or protected publishing activities.  But every social-media-related incident Tucson documented during discovery actually stems from third-party content and conduct, such as bullying and vandalism.  And Tucson has no admissible evidence that each Defendant's platform(s) caused any mental health issues among any particular students.

1    Indeed, Tucson lacks the most basic facts about its students' use of Defendants' platforms—it does

2    not know how often a given student uses any platform, what features they use, or what effects those

3    features have on its students.  Rather, Tucson's evidence relates largely to its students' use of

4    cellphones or "social media" generally, and even that evidence is general and sparse.  As a result,

5    Tucson cannot establish that any one of Defendants' platforms—let alone the at-issue features of

6    those platforms—*caused* its students any harm or that Tucson incurred expense as a result of that

7    harm.

8        *Second*, summary judgment is warranted on Tucson's failure to adduce evidence of damages.

9    Tucson seeks past damages, primarily for the time its staff purportedly "lost" while addressing social

10   media issues.  But Arizona law squarely holds that this sort of "lost time" is not compensable as a

11   matter of law.  Even if "lost time" were compensable, Tucson has no competent, contemporaneous

12   evidence proving "lost time"; it instead presents only retrospective, made-for-litigation affidavits

13   and teacher surveys as "evidence" of its "lost time."  Nor has Tucson presented any competent

14   evidence tying its few claimed out-of-pocket losses for payments to certain vendors and property

15   damage repairs to Defendants' actionable conduct.

16       *Third*, Tucson's proposed "abatement" remedy is also improper in form and substance.

17   Tucson seeks over $1 billion through a 15-year "strategic plan" to fund mental health programs in

18   schools (irrespective of any connection to Defendants' alleged conduct).  But, as a threshold matter,

19   Tucson is not entitled to equitable abatement because it has an adequate remedy at law—*i.e.*, money

20   damages (notwithstanding the fact that Tucson cannot prove that it should recover such damages).

21   Further, substantively, Tucson's "strategic plan" does not constitute proper abatement, which

22   requires that the offending party cease *the conduct* causing the alleged nuisance.   Tucson's

23   abatement plan does nothing to address or "abate" Defendants' conduct and therefore fails to

24   constitute abatement.  The plan is also not recoverable as future damages because it depends entirely

25   on speculative future events and is untethered from the injuries Tucson alleges it has experienced.

26       *Fourth*, Tucson has no evidence supporting the critical elements of its failure-to-warn

27   claims.  There is no duty for Defendants to warn a district that its students' use of Defendants'

28   platforms may cause the district financial problems.  No court has ever held that a company is

1  required to provide a warning to a non-user of a product or service that another's use may cause

2  financial injury to the non-user.  Tucson also lacks evidence that it would have behaved differently

3  if a warning had been delivered.  And Arizona law precludes Tucson from asserting a claim based

4  on Defendants' alleged failure to provide warnings to third parties, such as students and their

5  parents.

6     Accordingly, summary judgment is warranted on all of Tucson's claims.

7  **II.    BACKGROUND**

8     **A.    District Background**

9     Tucson is an urban school district that is primarily located in the city of Tucson, Arizona.

10  The District has 88 schools that serve approximately 40,000 students.  Ex. 1 (Second Amended PFS)

11  Response to Qs. 9–10.[1]  Tucson's schools are divided into five geographic regions, each one

12  supervised by a regional assistant superintendent.  Ex. 2 (Sanchez Dep. Ex. 1).

13     Tucson's student body includes a substantial number of students who are refugees, are

14  undocumented, or face poverty and homelessness.  Ex. 3 (Trujillo Dep.) 53:10–13, 58:4–16, 63:6–

15  64:2.  Many students in the District lack healthcare coverage or require food assistance:

16  approximately 82% of students are eligible for free or reduced-price lunch, 25% do not have health

17  insurance, and, as of 2023, 19% lived below the poverty line.  *Id.* 53:10–13, 59:20–60:15; Ex. 4

18  (Gaw Dep.) 115:4–24.  As Tucson's Director of Health Services explained, "we are one of the most

19  impoverished cities of our size in the nation, and in many cases students don't have access to

20  Maslow's basic needs," including "food," "hygiene," "clothing," and "shoes."  Ex. 4 (Gaw Dep.)

21  104:12–17, 105:2–106:1.

22     Substance abuse is also a problem for Tucson.  *Id.* 117:19–118:13; *see also* Ex. 3 (Trujillo

23  Dep.) 62:24–63:2 (agreeing that "there [are] still children in Tucson Unified School District that

24  suffer from substance abuse in the home").  In fact, in 2019, Tucson's superintendent called vaping

25

26

27  ───────────────
[1] All exhibits are attached to the accompanying Declaration of Victoria A. Degtyareva ("Degtyareva

28  Decl.").

1   "problem number one," and the District sued e-cigarette manufacturers for causing disruption in

2   schools and harming student mental health.  Ex. 3 (Trujillo Dep.) 158:6–16, 162:5–163:11.

3       Tucson also has a history of racially disparate treatment; the District was under a

4   desegregation order for more than 40 years, from 1978 until 2022.  *Mendoza v. Tucson Unified Sch.*

5   *Dist.*, 125 F.4th 1262, 1267 (9th Cir. 2025) (summarizing history).  Over the last decade, Tucson

6   has experienced numerous incidents of racial discrimination in its schools, including teachers or

7   administrators using racial slurs and a finding by the District that one of its high schools

8   ████████████████████████████████████████████████████████████████

9   ███████████████   Ex. 5 (April 9, 2025 Shivanonda 30(b)(6) Dep.) 283:19–284:20, 286:10–287:4;

10  *see* Ex. 6 (April 8, 2025 Shivanonda 30(b)(6) Dep. Ex. 28) at 4; Ex. 7 (April 9, 2025 Shivanonda

11  30(b)(6) Dep. Ex. 30) at 2; Ex. 25 (Sanchez Dep.) 126:11–128:11.

12      In contrast to these many well-documented factors that impact the District, Tucson's budgets

13  and strategic planning documents—including the plan for Tucson's Health Services Department—

14  did not identify social media as a problem or priority.  Ex. 3 (Trujillo Dep.) 247:11–253:24; Ex. 8

15  (Trujillo Dep. Ex. 41); Ex. 4 (Gaw Dep.) 111:23–112:25; Ex. 9 (Gaw Dep. Ex. 15) at 5.  Likewise,

16  Tucson annual financial reports did not track any expenditures relating to students' social media use

17  or social media addiction.  Ex. 10 (Hernandez 30(b)(6) Dep.) 53:1–5, 60:3–61:4; Ex. 11 (Hernandez

18  30(b)(6) Dep. Ex. 7).

19      Until Plaintiffs' counsel invited Tucson to join this litigation in January 2023, Tucson had

20  not considered suing Defendants.  Ex. 3 (Trujillo Dep.) 165:16–167:7, 168:13–17; Ex. 17 (Trujillo

21  Dep. Ex. 29).  In fact, Tucson has used social media extensively, both as a district and at individual

22  schools, to communicate with students and the community.  *See, e.g.*, Ex. 12 (April 8, 2025

23  Shivanonda 30(b)(6) Dep.) 180:14–189:8 (Tucson uses social media "to provide regular

24  information" to "our students and our parents" who use social media more than email).  Tucson

25  itself maintains several social media pages (as do individual schools), ████████████████

26  ████████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████████████████████

28  ███████   *Id.*; Ex. 32 (April 8, 2025 Shivanonda Dep. Ex. 20); Ex. 14 (Alvarez Dep. Ex. 10); Ex.

1    15 (Alvarez Dep. Ex. 11); Ex. 16 (Sanchez Dep. Ex. 11) ███████████████████

2    ████████████████████████████; Ex. 25 (Sanchez Dep.) 76:13–20, 82:24–83:17.

3    Tucson also continues to allow students to use YouTube for educational purposes, including on

4    District-issued devices.  Ex. 5 (April 9, 2025 Shivananda 30(b)(6) Dep.) 378:11–20, 384:18–385:7.

5         **B.    Tucson's Lack of Evidence**

6         Before filing this case, Tucson undertook *no* effort to assess its students' social media use in

7    schools, the impacts of social media use on its students' mental health, or the connection between

8    social media use and its students' education.  Tucson has no data on how often its students use social

9    media or which social media platforms they use—so it does not know how often its students use

10   Facebook, Instagram, YouTube, TikTok, or Snapchat.  Ex. 12 (April 8, 2025 Shivananda 30(b)(6)

11   Dep.) 96:25–99:14, 100:12–17.  Tucson also has no data on which features of Defendants' platforms

12   students use—meaning it does not know whether or how often its students use any of the at-issue

13   features.  *Id.* 93:3–19, 100:19–22; *see also* Ex. 3 (Trujillo Dep.) 169:14–21 (Tucson has never

14   surveyed its students on time spent or which features they use).  And Tucson has no competent

15   evidence establishing how much time Tucson students spend using Defendants' platforms as

16   opposed to engaging in other activities on their cell phones, such as texting or playing video games.

17   Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 86:23–89:21.

18        Tucson has never analyzed how many of the disciplinary incidents documented by its

19   schools are attributable to social media, much less any specific platform or any specific platform

20   features.    Ex.  3  (Trujillo  Dep.)  177:20–178:3,  187:22–188:2,  201:20–202:5  (Tucson's

21   superintendent testifying that Tucson has never formally analyzed whether disciplinary incidents

22   are linked to cell phones, social media use, or Defendants' platforms); Ex. 18 (Carrier Dep.) 167:22–

23   168:6, 199:10–200:11 (no knowledge of how many disciplinary incidents were tied to TikTok

24   challenges); Ex. 19 (Salmon Dep.) 180:12–24 (no data of how many code of conduct violations

25   relate to Defendants' platforms).   In a one-time exercise, done specifically in response to

26   Defendants' discovery requests, Tucson ran keyword searches for the names of Defendants'

27

28

1  platforms and "social media" in two databases of disciplinary and safety incidents.[2]  Degtyareva

2  Decl.  ¶¶  47,  59;  Ex.  44  (SM_TUSD_00600418);  Ex.  56  (SM_TUSD_00600116–

3  SM_TUSD_00600417).  Tucson's searches hit on less than 4% of the files searched.  Degtyareva

4  Decl. ¶¶ 47, 59.[3]  And many of the files that did hit on those terms were squarely about third-party

5  content and conduct.  *See, e.g.*, Ex. 44 (SM_TUSD_00600418) at ███████████████████

6  ████████████████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████████████████; Ex. 56

8  (SM_TUSD_00600116–SM_TUSD_00600417)    at    SM_TUSD_00600273 ████████  ████

9  ████████████████████████████████.  When Tucson employees invoked social media-

10  related incidents in this litigation, they similarly concerned third-party content or third-party conduct

11  and not the at-issue features.  *See, e.g.*, Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 99:20–23

12  (testifying as Tucson's 30(b)(6) representative "we are seeing evidence of social media use when

13  students are, you know, videoing a fight on campus and then posting it to a Facebook fight page");

14  Ex. 3 (Trujillo Dep.) 186:17–189:10 (Tucson's superintendent testifying that social media harms

15  student mental health with bullying or threatening "[v]ideos, images, comments," and "memes"

16  posted by students on social media platforms).

17         Tucson likewise lacks data on mental health harms purportedly relating to Defendants'

18  platforms, let alone relating to those platforms' specific at-issue features.  Tucson does not know

19  whether *any* student in Tucson has been diagnosed with a mental health issue linked to Defendants'

20  platforms or how many mental health harms relate to Defendants' platforms.  Ex. 12 (April 8, 2025

21  Shivanonda 30(b)(6) Dep.) 118:5–120:25 (Tucson does not diagnose students with mental health

22

23  _____

    [2] Tucson searched its record management system (which stores information relating to when Tucson
24  school safety officers are dispatched to respond to an incident) and student relations files (which
    contain records of disciplinary incidents).  Ex. 36 (Hallums Dep.) 32:24–33:14 (describing record
25  management system); Ex. 3 (Trujillo Dep.) 193:3–194:16 (describing the student relations files).

26  [3] For the record management system, Tucson's searches hit on 268 case reports of the 7,026 case
    reports searched—approximately 3.8%.  Degtyareva Decl. ¶ 47; Ex. 44 (SM_TUSD_00600418) at
27  1.  For the student relations files, Tucson's searches hit on 82 out of 2,343 records collected—
28  approximately 3.5%.  Degtyareva Decl. ¶ 59.

1    disorders or have knowledge of mental health diagnoses related to social media); Ex. 18 (Carrier

2    Dep.) 164:18–165:1 (Tucson does not have data on student mental health diagnoses or the causes

3    of students' mental illness); *see also* Ex. 18 (Carrier Dep.) 30:16–31:1 (stating that Tucson's

4    counselors "are not clinicians, we do not diagnose").  Tucson refers students to Arizona Complete

5    Health (a statewide healthcare provider) for mental health services, but Tucson does not track why

6    students receive mental health services.  Ex. 20 (Carrier 30(b)(6) Dep.) 12:16–13:12, 14:19–15:18,

7    17:16–24, 21:10–14; Ex. 21 (Carrier 30(b)(6) Ex. 1) Response to Q. 9.  Tucson's health services

8    department also does not provide mental health care to students or track the causes of students

9    seeking care.  Ex. 4 (Gaw Dep.) 41:17–43:11.

10          **C.    Tucson's Theory of Damages**

11          Tucson seeks over $100 million in past "lost time" damages.  Ex. 22 (Ward Rep.) ¶¶ 17, 38.

12   This figure is not based on an amount of money expended or any similar actual, calculable loss.  *See*

13   *infra* Section IV.B.  It is instead based on a loose estimate of how much time teachers and staff

14   "lost" addressing social media issues.  Ex. 22 (Ward Rep.) ¶ 38, Table 5.  Tucson also seeks close

15   to $550,000 in certain expenses related to vendors and property damage.  Ex. 23 (Meyers Rep.) ¶¶ 1,

16   20–21.

17          **"Lost Time" Opportunity Costs.**  The vast majority of Tucson's damages are for the

18   opportunity cost of the time its staff allegedly spent on social media related harms.  Tucson's

19   evidence for this theory consists of (i) a made-for litigation survey that asked teachers to

20   retrospectively estimate the time they spent on issues relating to social media (including but not

21   limited to Defendants' platforms) over the last 11 years; and (ii) affidavits submitted by Tucson

22   administrators that purport to estimate the amount of time that certain job positions spent on social

23   media-related concerns over the last seven to nine years.[4]  Ex. 22 (Ward Rep.) ¶¶ 5–6, 13–17, 29.

24

25   [4] Tucson seeks damages for "lost time" from the 2016–2017 school year through the 2023–2024
     school year.  Ex. 22 (Ward Rep.) ¶¶ 1, 38, Table 5.  The survey on which Tucson bases its claim for
26   teacher lost time asked Tucson teachers to estimate lost time going back as far as 2014.  Ex. 26
     (Klein Rep.) ¶ 37.  The affidavits on which Tucson bases its claim for lost administrator time
27   estimated lost time from either the 2016–2017 school year to the present or the 2018–2019 school
     year to the present.  *Compare* Ex. 27 (July 1, 2025 Lambert Dep. Ex. 1) ¶ 17 (estimating lost time
28   for site administrators from 2018 to 2025), *and* Ex. 28 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15

Tucson's internet survey of current Tucson middle and high school teachers, which was distributed earlier this year, was Tucson's first ever attempt to track the time spent by staff on issues relating to social media. Ex. 24 (June 24, 2025 Hammel Dep.) 170:16–23 (testimony from regional assistant superintendent that she conducted no interviews or surveys on staff time spent dealing with social media); Ex. 13 (Alvarez Dep.) 44:20–24 (same as to teachers and principals); Ex. 25 (Sanchez Dep.) 44:1–10 (same); Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 70:8–14 (Tucson's 30(b)(6) representative testifying that she is "not aware of any explicit analysis" of how much time Tucson staff "spend[] on issues related to [D]efendants' platforms"); Ex. 26 (Klein Rep.) ¶¶ 14, 18. Out of Tucson's approximately 1,000 middle and high school teachers, only 58 (24 middle school and 34 high school teachers) responded to the survey (approximately 6%). Ex. 26 (Klein Rep.) ¶ 40, Appendix E. These respondents answered questions to estimate the number of daily minutes of classroom time they recalled having been "diverted" by social media going as far back as 2014 (up to 11 years before the survey was administered). *Id.* ¶¶ 36, 41. While the survey specifically called out each Defendant's platform(s) as an example of "social media," the survey was not limited to Defendants' platforms, inquired about "social media" generally, and did not ask respondents to limit their estimates to certain features of Defendants' platforms. *Id.* Appendix D. Tucson's expert then calculated the amount of purportedly lost time as a percentage of teachers' salaries and benefits. Ex. 22 (Ward Rep.) ¶¶ 14, 17. Based on this method, Tucson's expert claims the District incurred lost opportunity costs of approximately $26.3 million in wages (or $34.2 million in wages and benefits) for time diverted because of student social media use. *Id.* ¶ 38.

Tucson also submitted four affidavits from Tucson administrators which purported to estimate the percentage of time certain Tucson administrators and non-teaching staff spent "dealing with social media or its impacts" from 2016 to 2025.[5] Ex. 22 (Ward Rep.) ¶ 36; Ex. 27 (July 1,

---

(same), *with* Ex. 29 (June 30, 2025 Shivanonda Dep. Ex. 1) ¶ 18 (estimating lost time for administrators from 2016 to the present), *and* Ex. 30 (Salmon Dep. Ex. 11) ¶ 18 (same).

[5] The affiants were Sabrina Salmon (Senior Director of Exceptional Education), Julie Shivananda (Director of Social Emotional Learning), Holly Hammel (Regional Assistant Superintendent), and Brian Lambert (Regional Assistant Superintendent).

2025 Lambert Dep. Ex. 1) ¶ 17; Ex. 28 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15; Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1) ¶ 18; Ex. 30 (Salmon Dep. Ex. 11) ¶ 18. Depending on the particular position and year, Tucson's affiants estimated that Tucson staff spent between 1% and *100%* of their time dealing with social media. Ex. 28 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15; Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1) ¶ 18. For example, Tucson's Director of Social Emotional Learning— the department responsible for ████████████████████████████████████████ ████████████████████████████ regardless of whether they use social media, Ex. 31 (June 30, 2025 Shivananda Dep.) 77:3–20; Ex. 58 (April 9, 2025 Shivananda 30(b)(6) Dep. Ex. 44) at 2— estimated that she and a member of her staff spent 100% of their time on social media related concerns. Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1) ¶ 18

The affiants' estimates did not limit "social media" to Defendants' platforms or differentiate among particular platforms or platform features—and in one case, the affiant included all time spent on mental health issues generally in her estimate. *E.g.*, Ex. 19 (Salmon Dep.) 154:8–155:15, 164:10–165:5 (estimate includes all time spent on mental health); Ex. 31 (June 30, 2025 Shivananda Dep.) 16:17–17:4 (estimate includes "[a]ny and all" social media platforms). The affiants largely did not consult documents or conduct any numerical analysis to support their affidavits. Ex. 19 (Salmon Dep.) 165:17–166:17; Ex. 30 (Salmon Dep. Ex. 11); Ex. 31 (June 30, 2025 Shivananda Dep.) 18:20–21:19; Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1); Ex. 24 (June 24, 2025 Hammel Dep.) 175:3–11; Ex. 33 (June 24, 2025 Hammel Dep. Ex. 17); Ex. 34 (July 1, 2025 Lambert Dep.) 18:6–19:21; Ex. 27 (July 1, 2025 Lambert Dep. Ex. 1). Instead, the affiants relied primarily on their own memories and conversations with employees and/or parents to create their estimates. Ex. 19 (Salmon Dep.) 165:24–166:8, 170:21–171:2, 173:19–24; Ex. 31 (June 30, 2025 Shivananda Dep.) 18:20–19:23; Ex. 24 (June 24, 2025 Hammel Dep.) 163:2–5, 169:20–170:23, 171:2–172:1, 176:19–177:9, 178:11–25; Ex. 34 (July 1, 2025 Lambert Dep.) 18:6–19:21.

The affiants did not supervise every position for which they provided estimates of lost time. For instance, Tucson provided affidavits from only two of the five regional assistant superintendents (Ms. Hammel and Mr. Lambert), meaning that Tucson's estimates of "lost time" for principals and assistant principals covered only around 40% of Tucson's schools. *See* Ex. 2 (Sanchez Dep. Ex. 1)

(listing Tucson schools and administrators).  At deposition, Ms. Hammel and Mr. Lambert admitted that their estimates of lost time—which in many instances differed substantially from each other—could not be generalized to other regions.  *See* Ex. 34 (July 1, 2025 Lambert Dep.) 21:11–22:8, 26:5–20, 35:9–37:7; Ex. 24 (June 24, 2025 Hammel Dep.) 184:15–186:2.  Likewise, a third affiant (Ms. Shivanonda) never supervised several of the positions for which she provided estimates and even provided time estimates for years when she was not employed at Tucson.  Ex. 31 (June 30, 2025 Shivanonda Dep.) 49:10–51:2, 58:5–13; Ex. 29 (June 30, 2025 Shivanonda Dep. Ex. 1) ¶¶ 4, 18.

Tucson's experts relied entirely on the survey results and these affidavits to calculate Tucson's alleged "opportunity costs" damages—without independently verifying any of the estimates.  Ex. 22 (Ward Report) ¶¶ 1, 29.  By converting the percentage of purportedly lost time into a percentage of staff salaries and benefits, Tucson claims that the District incurred approximately $51.1 million in wages (or $66.4 million in wages and benefits) for time diverted because of student social media use.  *Id.* ¶ 38.

**Out-of-Pocket Expenditures.**  Tucson seeks to recover expenditures it has allegedly incurred because of Defendants' platforms.  Tucson's claimed out-of-pocket damages include $6,444 to fix property damage allegedly caused by vandalism stemming from "challenges" posted on Defendants' platforms.  Ex. 23 (Meyers Rep.) ¶ 20 ("TUSD Reactive Work Orders"); Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 128:15–130:4.  Tucson's claimed damages also include nearly $550,000 in expenditures for Yondr cellphone pouches, cellphone lockers, a complaint reporting system (Awareity), a social emotional learning curriculum (Character Strong), an online therapy platform (Talkspace), and a training program for assessing threats in schools (Comprehensive School Threat Assessment Guidelines).  Ex. 23 (Meyers Rep.) ¶ 24.  The contemporaneous documentation for these expenditures does not show any connection to Defendants' actionable conduct—and for many of them, no connection to social media or Defendants' platforms at all.  *E.g.*, Ex. 5 (April 9, 2025 Shivanonda 30(b)(6) Dep.) 362:1–363:1 (Character Strong); Ex. 3 (Trujillo Dep.) 275:19–276:11 (Talkspace); Ex. 36 (Hallums Dep.) 202:6–205:12 (Comprehensive School Threat Assessment Guidelines, Awareity).

1    **D.      Tucson's Proposed "Strategic Plan"**

2          Tucson also seeks to recover between $1.1 and $1.3 *billion* for a 15-year "strategic plan"

3    developed by one of its experts, Dr. Sharon Hoover, to "abate" the alleged nuisance.[6]  *See* Ex. 37

4    (Hoover Rep.); Ex. 52 (Leslie Rep.) ¶ 3; Plaintiffs' Response to Defendants' Letter Brief Re

5    Anticipated Daubert / Summary Judgment Motions (ECF 2184) at 6 (referring to the Hoover plan

6    as "abatement for those SDs with live nuisance claims"); *see also* Defendants' Rule 702 Motion to

7    Exclude School District Expert Testimony, Section III.E (concurrently filed) (motion to exclude Dr.

8    Hoover's opinions).  The strategic plan does not recommend any changes to Defendants' conduct

9    or platforms.  Instead, it seeks to establish a panoply of initiatives addressing, among other things,

10   mental health, student wellbeing, family engagement, digital literacy, and data infrastructure.

11         Tucson currently has a staff of approximately 6,450 people.  Ex. 1 (Second Amended PFS)

12   Response to Q. 11.   The strategic plan recommends hiring *979 additional* staff, including

13   psychologists, counselors, and even IT staff.  Ex. 37 (Hoover Report) ¶ 100.  The plan would also

14   create numerous new positions, such as 80 "Digital Literacy Specialists," 88 "Life Skills

15   Specialists," 88 "Family Engagement Coordinators," and 80 "School-Based Mental Health

16   Clinicians."  *Id.*  If hired, these and the other recommended professionals would serve *all* students—

17   including some prospective students who have not yet been born—not just those students who use

18   Defendants' platforms or certain features of the platforms.  Ex. 41 (August 12, 2025 Hoover Dep.)

19   300:19–303:1; Ex. 42 (August 13, 2025 Hoover Dep.) 622:22–624:21, 802:18–804:1.  The strategic

20   plan recommends implementing numerous initiatives to address student mental health and digital

21   literacy, such as a new data infrastructure system to purportedly assist schools in identifying—for

22   the first time—students with social-media-related health concerns; increased mental health literacy

23   and life skills programming to help students manage their online activities and their *offline*

24

25

---

26   [6] Dr. Hoover offered a nearly identical strategic plan for each bellwether district, with adjustments
     for the number of recommended personnel.  *See* Defendants' Rule 702 Motion to Exclude School
27   District Expert Testimony, Section III.E (concurrently filed) (motion to exclude Dr. Hoover's
28   opinions).

1   relationships; and school culture and community building initiatives, such as clubs, community

2   events, and parent education efforts.  Ex. 37 (Hoover Report) ¶¶ 65–66, 69–70, 139.

3          The plan does not make any recommendations regarding changes to the operation of any of

4   Defendants' platforms.  The plan does not account for any changes to Defendants' platform that

5   might occur over the plan's 15-year timeline, such as changes to or removal of the features

6   responsible for the alleged harm.  Ex. 41 (August 12, 2025 Hoover Dep.) 308:11–20 ("I haven't

7   studied the changes on the social media platforms"); Ex. 42 (August 13, 2025 Hoover Dep.) 525:21–

8   526:3 ("I don't think I'm offering an opinion that the social media companies change their design.").

9   Nor does the plan consider potential changes in how students might use Defendants' platforms over

10  the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely.  Ex.

11  42 (August 13, 2025 Hoover Dep.) 803:10–20 ("it would be hard for me to predict" whether

12  adolescents will still be using social media 10 years from now), 803:21–804:1 (Hoover has not

13  studied anticipated changes in how students use social media).

14          **E.      The Court's Motion-to-Dismiss Ruling**

15          At the motion-to-dismiss stage, the Court recognized that Section 230 and the First

16  Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the

17  imposition of liability for third-party content and protected publishing activities.  Order Granting in

18  Part and Denying in Part Motion to Dismiss School District and Local Government Entities Master

19  Complaint ("SD Order") (ECF 1267) at 2.  The Court similarly held that Defendants could not be

20  held liable for non-foreseeable third-party conduct, absent some narrow exceptions for conduct

21  promoted by Defendants.  *Id*.  The Court permitted Tucson to proceed on its "core theory" that

22  (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that

23  compulsive use "caused the plaintiff school districts to respond by expending resources."  *Id.* at 26.

24  But at the same time, the Court made clear that the case must focus on "the *specific conduct* through

25  which the defendants allegedly violated their duties to plaintiffs"—*i.e.*, Defendants' use of the

26  limited set of at-issue features that the Court has held are not barred by Section 230 and the First

27  Amendment.  Order Granting in Part and Denying in Part Defendants' Motions to Dismiss ("PI

28

1  Order") (ECF 430) at 14, 48 (emphasis added) (citing *See* 47 U.S.C. § 230); *see* SD Order at 12–13

2  (applying analysis to school district claims).

3      Specifically, the Court permitted Tucson to proceed insofar as its claims were based on

4  Defendants' use of certain "at issue" features—*i.e.*, Defendants' alleged:

5  ● failure to implement robust age verification processes to determine users' ages;

6  ● failure to implement effective parental controls;

7  ● failure to implement effective parental notifications;

8  ● failure to implement opt-in restrictions to the length and frequency of use sessions;

9  ● creation of barriers that make it more difficult for users to delete and/or deactivate their

10     accounts than to create them in the first instance;

11  ● failure to label content that has been edited, such as by applying a filter;

12  ● making of filters available to users so they can, among other things, manipulate their

13     appearance; and

14  ● failure to create adequate processes for users to report suspected CSAM to defendants'

15     platforms.

16  SD Order at 13–14 (hereinafter, the "at-issue features").  By contrast, the Court held that Plaintiffs

17  could *not* base their claims on any of the following features:

18  ● use of algorithms to promote purportedly addictive engagement;

19  ● failing to institute blocks during certain times of the day;

20  ● not providing a beginning and end to a user's feed;

21  ● publishing geolocation information for minors;

22  ● recommending minor accounts to adult strangers;

23  ● limiting content to short-form and ephemeral content, and allowing private content;

24  ● the timing and clustering of notifications of *third-party* content in a way that promotes

25     addiction; and

26  ● the timing and clustering of notifications of *defendants'* content to increase addictive

27     use.

28

-13-

*Id.* at 14.[7]  The Court also declined "at [the motion to dismiss] stage  . . . to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general." *Id.* at 45.  Accordingly, as used in this memorandum, Defendant's "actionable conduct" consists of (1) Defendants' use of the at-issue features and (2) Defendants' alleged failure to warn.

### III.    LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims." *Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  "The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The evidence presented by the parties must be admissible.  Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (internal citation omitted).

### IV.    ARGUMENT

#### A.    Tucson Lacks Competent Evidence of Causation.

Rejecting an "all or nothing" approach, this Court has made clear that in order to prove causation Tucson must connect Defendants' *actionable conduct*—as opposed to social media or electronic device use generally, third-party content, third-party conduct, or Defendants' protected publishing activities—to its alleged injuries. *See* PI Order at 14; SD Order at 2, 12–13.  Despite the

---

[7] The SD Order included the "failure to enable default protective limits to the length and frequency of use sessions" as a feature that was not barred.  But this Court explained in its order addressing Section 230 that claims based on this alleged failure were barred because they "would inherently limit what defendants are able to publish." *See* PI Order at 16.

1  sweeping allegations in the Master Complaint, Tucson lacks *evidence* that any Defendant's

2  actionable conduct caused it injury.

3       To succeed on its negligence claim, Tucson must prove both causation-in-fact and proximate

4  causation.[8]  *See Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 216 Ariz. 454, 460 (Ariz. Ct.

5  App. 2007).  Causation-in-fact requires a plaintiff to "show at trial that the injury would not have

6  occurred 'but for' the defendant's negligent conduct."  *Id.*  To show proximate cause, a plaintiff

7  must "demonstrat[e] a natural and continuous sequence of events stemming from the defendant's

8  act or omission, unbroken by any efficient intervening cause, that produces an injury."  *Barrett v.*

9  *Harris*, 207 Ariz. 374, 378 (Ariz. Ct. App. 2004).  "The mere possibility of causation is not enough,"

10 *Grafitti-Valenzuela*, 216 Ariz. at 460, and "[s]heer speculation is insufficient to establish the

11 necessary element of proximate cause or to defeat summary judgment," *Badia v. City of Casa*

12 *Grande*, 195 Ariz. 349, 357 (Ariz. Ct. App. 1999); *see also Shaner v. Tucson Airport Auth. Inc.*, 117

13 Ariz. 444, 448 (Ariz. Ct. App. 1977) (same).  Thus, to survive summary judgment on its negligence

14 claim in light of the "conduct-specific, feature-by-feature assessment" required by the Court (SD

15 Order at 12), Tucson must come forward with evidence showing that *each Defendant's* actionable

16 conduct directly caused Tucson to incur expenditures.

17      On Tucson's nuisance claim too, it must prove both causation-in-fact and proximate

18 causation.  *See, e.g.*, *City of Phoenix v. Whiting*, 10 Ariz. App. 189, 195–96 (Ariz. Ct. App. 1969).

19 A public nuisance involves "an unreasonable interference with a right common to the general

20 public," including "a significant interference with the public health, the public safety, the public

21 peace, the public comfort or the public convenience." *Mutschler v. City of Phoenix*, 212 Ariz. 160,

22 166 (Ariz. Ct. App. 2006) (quoting Restatement (Second) of Torts § 821B).  Thus, to survive

23 summary judgment on its nuisance claim, Tucson must come forward with evidence that each

24 Defendant's actionable conduct was a direct cause of an *unreasonable* interference with a public

25 right.

26

27  [8] As this Court previously held, in an MDL, on issues of state law, the Court "applies the state law
    that would have been applied to the underlying case as if it had never been transferred into the
28  MDL."  SD Order at 11

The record is clear that Tucson, in fact, has *no* admissible evidence sufficient to prove that it was injured as a result of actionable conduct by Defendants.

*First,* Tucson has no competent evidence that it was harmed as a result of the at-issue features or any alleged failure to warn. Tellingly, the at-issue features are primarily features that *users* or their *parents* can choose to use or not use, such as parental controls, parental notifications, time limits, account deactivation, or CSAM reporting. Tucson has adduced no evidence that giving parents or users additional controls would have any meaningful impact on the District where Tucson has no control over what parents and users do with those features. Rather, Tucson's limited evidence of specific harms allegedly caused by Defendants' platforms points directly to third-party content: Tucson's witnesses have consistently and expressly testified that specific allegedly harmful disruptions in schools occurred as a result of the publication of harmful content on Defendants' platforms. *See, e.g.*, Ex. 31 (June 30, 2025 Shivanonda Dep.) 15:1–16:16 (Tucson's Director of Social Emotional Learning testified that staff spend time addressing "a multitude of [student] behaviors that are often *caused by social media content*" such as videos of fights or bullying comments or photos (emphasis added)). Any claims based on such harms are barred by Section 230 and the First Amendment and thus are not actionable.

*Second*, setting aside instances related to third-party content, Tucson has no admissible evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses. Indeed, Tucson lacks even basic information about the extent or nature of its students' use of Defendants' platforms or about students' mental health. While Tucson may gesture toward fact or expert testimony about "social media" or cellphone use generally, such evidence is insufficient to meet its burden on summary judgment.

For these reasons, summary judgment on causation grounds is warranted. *See, e.g.*, *Grafitti-Valenzuela*, 216 Ariz. at 460 ("on summary judgment, the plaintiff must at least create a question of fact" as to causation); *State ex rel. Indus. Comm'n v. Standard Oil Co. of Cal.*, 3 Ariz. App. 389, 393 (Ariz. Ct. App. 1966) (where "proximate cause" is absent, "as a matter of law, the defendant is not liable and . . . summary judgment [is] properly granted"); *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) ("Summary judgment in a negligence action is

1  appropriate if the record does not support . . . proximate cause . . . ."); *see also* SD Order at 21–22

2  ("where the existence of proximate cause turns not on a question of fact but on whether the facts

3  alleged are capable of establishing proximate cause, the issue is a matter of law resolvable" by the

4  court).

5       **1.    Tucson's Allegations of Specific Harms All Impermissibly Rely on
             Third-Party Wrongdoing and Protected Publishing Activities.**

6

7        The Court has made clear that liability in this case cannot arise from the (i) "mere publication

8  of a third party content" or (ii) features that the Court held are protected by Section 230 or the First

9  Amendment.  SD Order at 12–14, 26.  It has likewise made clear that "non-foreseeable third-party

10  conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on

11  defendants' platforms"—"cannot be attributable to defendants."  *Id.* at 25–26.  Thus, to satisfy its

12  burden on summary judgment, Tucson must come forward with competent evidence sufficient to

13  prove that Defendants' *actionable conduct*—as opposed to content, protected features, or third-party

14  bad acts—caused it harm.  It has not.

15        Tucson has no competent evidence sufficient to show that it was harmed as a result of the

16  at-issue features or any alleged failure to warn.  For example, Tucson has no specific, admissible

17  evidence regarding the number of its students who used Defendants' platforms prior to age 13.

18  Thus, it is unsurprising that Tucson lacks evidence that Defendants' alleged failure to implement

19  "robust" age verification processes caused it to incur expenses.  Tucson also has no evidence that

20  giving users platform-level tools to set their own voluntary time limits—above and beyond the

21  controls already available on the users' devices—or changing the processes for account deactivation

22  would have meaningfully reduced the use of any platform by Tucson's students, let alone that any

23  such reduction would have led to Tucson incurring fewer expenses.  Tucson similarly lacks specific,

24  admissible evidence that it incurred expenses as a result of Defendants' alleged failure to implement

25  effective parental controls or notifications as it has no evidence of how many parents already use

26  parental controls or how many would use different parental controls had they been

27  implemented.  The same holds true for each of the at-issue features.  Nor has Tucson presented

28

1    evidence of what any warning should have looked like or that such a warning would have made a

2    difference to Tucson's alleged harms.  *Infra* Section IV.D.2.

3         Instead, the only *specific* evidence of harm that Tucson has proffered is of harm caused by

4    third-party bad acts and protected publishing activities on Defendants' platforms—precisely the

5    type of conduct the Court held is not actionable.   For instance, Tucson's Director of Social

6    Emotional Learning testified that staff spend time addressing "a multitude of [student] behaviors

7    that are often *caused by social media content*" such as videos of fights or bullying comments or

8    photos.  Ex. 31 (June 30, 2025 Shivananda Dep.) 15:1–16:16 (emphasis added); *id.* 13:10–14:22,

9    90:6–12; *see also* Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 99:15–24 (testifying as Tucson's

10   30(b)(6) representative "we are seeing evidence of social media use when students are, you know,

11   videoing a fight on campus and then posting it to a Facebook fight page").   Likewise, when asked

12   how social media harms student mental health, Tucson's superintendent cited bullying or

13   threatening "[v]ideos, images, comments," and "memes" posted by students on social media

14   platforms.  Ex. 3 (Trujillo Dep.) 186:17–189:10.  He also pointed to "viral videos and social media

15   postings of threats to shoot a school," and the potential for misinformation to spread online.  *Id.*

16   77:14–19, 170:4–25.  Other witnesses similarly cited bullying and harassment caused by students

17   posting or messaging harmful content, fights resulting from posts shared on a platform, and students

18   causing property damage after viewing challenges posted by third parties.  *See, e.g.*, Ex. 18 (Carrier

19   Dep.) 166:16–24, 167:14–19; Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 72:19–73:16, 99:15–

20   100:6; Ex. 34 (July 1, 2025 Lambert Dep.) 57:10–58:6; Ex. 35 (Schwartz-Warmbrand Dep.) at

21   40:21–44:19; Ex. 43 (Rubio Dep.) 81:13–82:10, 97:20–98:12.  Likewise, searches for all social

22   media-related incidents in Tucson's databases of safety and disciplinary incidents returned multiple

23   incidents related to third-party content posted on social media.   *See, e.g.*, Ex. 44

24   (SM_TUSD_00600418) at ██████████████████████████████████

25   ████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████

27   ████████████████████████████.

28

1   There is no dispute that all such content on Defendants' platforms was posted by third

2   parties.  *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (user comments and

3   posts are "prototypical" user-provided content within the scope of Section 230).  Defendants'

4   publication of that content falls squarely within the heartland of conduct protected by Section 230

5   and cannot be used to establish that Defendants caused harm to Tucson.  PI Order at 11–12; *see*

6   *also, e.g.*, *Est. of Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1173, 1182 (9th Cir. 2024) (Section 230

7   protects publishers of "harassing and bullying speech").

8   While recognizing that "mere publication of . . . third-party content" cannot form the basis

9   of liability under Section 230, the Court in its motion to dismiss order on the school districts' claims

10  carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" through

11  "conduct like providing cash prizes to challenge participants."  SD Order at 25.  Tucson, however,

12  has no evidence that any Defendant provided cash prizes to any participant in a dangerous challenge,

13  created filters that facilitated dangerous challenges, or otherwise "promoted, developed, or

14  participated in a foreseeably dangerous challenge" that caused Tucson harm beyond the Defendant's

15  mere "algorithmic publication, curation, or amplification" of the challenge.  *Id.* at 26; Ex. 12 (April

16  8, 2025 Shivanonda 30(b)(6) Dep.) 135:9–136:3 (Tucson's 30(b)(6) representative citing

17  "algorithms," "likes," "repost[s]," and "reshares" as the ways in which Defendants "promoted or

18  encouraged" challenges); Ex. 35 (Schwartz-Warmbrand Dep.) 45:15–46:8 (no reason to believe

19  TikTok offered prizes to students for participating in a challenge); Ex. 18 (Carrier Dep.) 201:18–

20  202:25 (same); Ex. 43 (Rubio Dep.) 145:24–147:4 (same), 147:7–18 (no reason to believe

21  Defendants created challenges).  Defendants are therefore entitled to summary judgment regarding

22  challenges.

23  Similarly, the Court recognized that liability might arise as a result of a filter created by a

24  Defendant itself.  SD Order at 25.  But Tucson has no evidence that it suffered any harm as a result

25  of a filter created by a Defendant.  Summary judgment on filters is thus also warranted.

26  In short, Tucson has no evidence that it suffered any injury as a result of the at-issue features

27  of Defendants' platforms—let alone evidence that Defendants' actionable conduct was a "but for"

28  cause and a "substantial factor" in causing the harm.  *See Barrett*, 207 Ariz. at 383.  Because Tucson

cannot connect *Defendants' actionable conduct*—as opposed to third-party wrongdoing or the publication of content—to its alleged injuries, Defendants are entitled to summary judgment.  *See, e.g.*, *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (allowing claim to proceed where alleged duty violated was "*fully independent of* [Defendants'] role in monitoring or publishing third-party content" (emphasis added)); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (Section 230 bars "state tort claims [that] are inextricably intertwined with [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024) (granting summary judgment where claim was "intertwined" with conduct protected by Section 230); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors."); *In re Williams Sec. Litig. – WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (granting summary judgment where "theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events").

### 2. Tucson Has No Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform.

Tucson's "core theory" of injury—and the basis on which the Court permitted it to proceed at the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources."  SD Order at 26.  Setting aside alleged incidents involving third-party content and third-party wrongdoing, however, the record is clear that Tucson has no competent evidence that it was injured as a result of its students' "compulsive use" of each Defendant's specific platform(s).  While Tucson points to generalized testimony regarding theoretical harms from "social media" use or cellphone use writ large, that testimony cannot meet Tucson's burden to show that it was injured by each Defendant's specific platform(s)—let alone each Defendant's actionable conduct.

-20-

1

                  **(a)    Tucson cannot show general causation.**

2         As a threshold matter, and as explained in Defendants' Rule 702 motions on general

3 causation, the scientific evidence does *not* support the theory that use of Defendants' platforms

4 causes youth to engage in the type of problematic behaviors alleged.  *See* Defendants' Motion to

5 Exclude General Causation Testimony of Plaintiffs' Experts (concurrently filed).  Because Tucson

6 cannot establish general causation, Defendants are entitled to summary judgment.  *See, e.g.*,

7 *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) (granting

8 summary judgment motion after excluding all general causation opinions under Rule 702 because

9 "[g]eneral causation [is an] essential element[] of Plaintiffs' prima facie case" and "[e]xpert

10 testimony is necessary to make this showing since this is a toxic tort lawsuit").

11

                  **(b)    Tucson cannot show harmful use of each Defendant's platform(s)**
12                             **by Tucson's students.**

13         Independent of its failure to establish general causation, Tucson cannot establish that each

14 Defendant's specific platform(s)—or even all of the Defendants' platforms combined—caused it

15 harm.  To establish liability, "the plaintiff has the burden of proving that the conduct of *each*

16 *defendant* was a cause of the injury."  *Piner v. Super. Ct. in & for Cnty. of Maricopa*, 192 Ariz. 182,

17 189 (Ariz. 1998) (emphasis added) (quoting Restatement (Second) of Torts § 433B); *see also, e.g.*,

18 *Salica v. Tucson Heart Hosp. – Carondelet, LLC*, 224 Ariz. 414, 420 (Ariz. Ct. App. 2010) (same).

19         Tucson has no competent evidence that any student—much less a significant number of

20 students—has used one or more of Defendants' platforms in a way that harms their mental health.

21 Tucson's 30(b)(6) representative admitted that Tucson has never conducted any "explicit survey"

22 or "explicit analysis" of the "prevalence of harms that are allegedly associated with students' social

23 media use" in Tucson.  Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 101:21–102:21.  To the

24 contrary, Tucson lacks even basic information about the extent or nature of its students' use of

25 Defendants' platforms.  It does not know the answer to key threshold questions, including how many

26 of its students used Facebook, Instagram, YouTube, TikTok, or Snapchat; how often they used them;

27 when they used them; for how long they used them; or which features of the platforms they used.

28

*See* Ex. 3 (Trujillo Dep.) 169:5–170:2; Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 96:25–97:13, 100:12–101:11.

Tucson also cannot differentiate students' use of technology from use of Defendants' platforms. Tucson has no data regarding students' use of any given Defendants' platform(s) as opposed to other internet social media platforms, gaming platforms, or the myriad other apps one can access on a cellphone, such as text messaging. Ex. 18 (Carrier Dep.) 105:14–23, 164:14–17; Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 84:9–25 ("the district does not track student device usage"), 86:15–88:16. And Tucson has no data regarding how many students, if any, have sought treatment or been diagnosed with mental health issues as a result of their use of Defendants' platforms. Ex. 18 (Carrier Dep.) 164:18–165:1; Ex. 20 (Carrier 30(b)(6) Dep.) 14:19–15:18, 17:16–24, 21:10–14; Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 118:5–120:25. Accordingly, Tucson could not possibly show the predicate of its claims—that the negligent design of the at-issue features by each Defendant led to students' harmful use of *that Defendant's* platform(s), which in turn caused Tucson to incur expenses in responding to that harm.

       **(c)**    **Evidence about social media or cell phone use generally cannot establish causation.**

Fact or expert testimony about generalized harms from cellphone or "social media" use writ large cannot establish that Defendants' actionable conduct caused Tucson's alleged injuries.

At deposition, beyond examples of alleged harms tied to third-party content, Tucson's witnesses cited anecdotal examples of harms that purportedly resulted from students using "social media" or "cell phones." *See, e.g.*, Ex. 31 (June 30, 2025 Shivananda Dep.) 14:23–15:16 ("issues of disordered eating that comes from the content that the youth or the students are either viewing or engaging in on social media platforms"), Ex. 35 (Schwartz-Warmbrand Dep.) 46:9–48:23 (role of "social media" in disciplinary violations). But witnesses also admitted that, when they identified "social media" as a problem, they were not able to identify the particular platform. *See, e.g.*, Ex. 31 (June 30, 2025 Shivananda Dep.) 16:17–17:4 (definition of "social media" included "[a]ny and all" platforms); Ex. 19 (Salmon Dep.) 164:10–15 (estimates of time spent on issues related to social media were "not specific[] to defendants' platforms"). For instance, the Senior Director of

1   Exceptional Education admitted that "for the majority of students with disabilities, I have no

2   interaction or information on the platform that they're using." Ex. 19 (Salmon Dep.) 176:9–16.

3   Likewise, witnesses identified "cell phones" or social media" as a problem in schools because "a

4   student refuses to put away a device, a cell phone, a school laptop, or computer." Ex. 31 (June 30,

5   2025 Shivananda Dep.) 14:23–16:16.  And they admitted that Tucson does not track what websites

6   students visit or what apps they use, Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 84:9–16, and

7   that students refusing to put away devices is often linked to *Tucson-issued* devices (which prohibit

8   access to social media), Ex. 19 (Salmon Dep.) 176:9–178:6; Ex. 30 (Salmon Dep. Ex. 11) ¶ 9.

9         Tucson's anecdotal testimony about cell phones or social media as a whole fails to link

10  Tucson's alleged harms to students' use of Defendants' platforms or any at-issue feature of

11  Defendants' platforms.  *See* PI Order at 14 (focusing on Defendants' "specific conduct"); *Piner*, 192

12  Ariz. at 189 (plaintiff must show that "each defendant was a cause of the injury" (quoting

13  Restatement (Second) of Torts § 433B)).  Further, one-off examples cannot possibly show causation

14  for an entire school district of 88 schools and approximately 40,000 students from 2016 to the

15  present.

16        And, in any event, the anecdotal testimony provided by Tucson's witnesses is inadmissible

17  because the witnesses lack personal knowledge of students' social media use and instead rely on

18  hearsay conversations with third parties.  *See, e.g.*, Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.)

19  119:7–121:2 ("we do often see or hear of connections of social media," from "anecdotal

20  conversations" with "community agencies and medical professionals"), 87:17–88:16 (referring to

21  "talking with parents" about students' device usage, including video game usage, but admitting "we

22  don't explicitly track that"); *see Orr v. Bank of Am., NT & SA*, 285 F.3d 764, 778–79 (9th Cir. 2002)

23  (excluding deposition testimony based on third-party statement as hearsay); *Block v. City of Los

24  Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (excluding an affidavit based on inadmissible hearsay

25  where it relied on statements from third parties); *Allen-Cuffee v. Franklin Cnty. Juv. Det. Ctr.*, 2001

26  WL 242590, at *11 (S.D. Ohio Feb. 7, 2001) (summary judgment granted where plaintiff's

27  "anecdotal evidence" was based on "inadmissible hearsay" because plaintiff "related many

28  conversations and incidents that she was not privy to, and did not provide either affidavits or

1   deposition testimony" from individuals with personal knowledge).     Unverified, untracked

2   conversations with unknown third parties cannot show causation.

3       Tucson's experts likewise fail to link Tucson's alleged injuries to actionable conduct by each

4   specific Defendant.  For example, Dr. Sharon Hoover impermissibly groups together all "social

5   media" platforms—including those not at issue.  *See generally* Ex. 37 (Hoover Rep.).  At no point

6   in her report does Dr. Hoover define "social media," and she certainly does not define it as limited

7   to the five platforms at issue, let alone separate out those platforms.  Dr. Hoover conceded in her

8   deposition that her causation analysis and opinions are not specific to any platform.  *See* Ex. 41

9   (August 12, 2025 Hoover Dep.) 154:2–17 ("I didn't parse out an opinion and it's, you know, 20

10  percent YouTube and 30 percent, you know, Meta, et cetera.  So I didn't think about it that way"),

11  262:18–24 (admitting she did not perform a causation analysis for any individual platform).

12      In short, Tucson has no competent evidence that each Defendant's specific platform(s) in

13  fact caused (or are even capable of causing) compulsive use on the part of its students, let alone that

14  such compulsive use caused Tucson to incur expenditures.

15                          *       *       *

16      Importantly, Tucson's failure to present evidence regarding each Defendant's platform(s) is

17  compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms

18  or Defendants' alleged failure to warn.  *See supra* Section IV.A.1.  At bottom, Tucson is required

19  to come forward with evidence that each Defendant's actionable conduct caused it to incur injury.

20  This requires them to disentangle both (1) alleged harms flowing from online activity that does not

21  involve a given Defendant and (2) alleged harms flowing from third-party content and protected

22  publishing activity accessed by students on each Defendant's platform.  *See generally* Defendants'

23  Motion to Exclude Testimony of School District Experts, Section III.A (concurrently filed).

24  Accordingly, even if the experts are correct that school districts have experienced harm as a result

25  of "social media" generally, their opinions do nothing to establish that *Tucson* has experienced harm

26  arising specifically from *each Defendant's actionable conduct—i.e.*, excluding other online

27  platforms, third party wrongdoing, content published on Defendants' (and others') platforms, and

28  the protected features of Defendants' platforms.  That wholesale failure is fatal on summary

1    judgment.  PI Order at 14; *see, e.g.*, *Barrett*, 207 Ariz. at 378; *see also Nuveen*, 730 F.3d at 1123;

2    *Williams Sec. Litig.*, 558 F.3d at 1132; *Backpage.com*, LLC, 724 F. Supp. 3d at 885.

3         **B.**     **Tucson Cannot Show It Is Entitled to Past Damages.**

4         Tucson has presented no competent evidence to prove that it is entitled to any of its purported

5    damages.  The party seeking damages has "[t]he burden . . . to show the amount of their damages

6    with reasonable certainty."  *Gilmore v. Cohen*, 95 Ariz. 34, 36 (Ariz. 1963).  "'[C]onjecture or

7    speculation' cannot provide the basis for an award of damages," and "the evidence must make an

8    'approximately accurate estimate' possible."  *Id.* (quoting *McNutt Oil & Refin. Co. v. D'Ascoli*, 79

9    Ariz. 28, 34 (Ariz. 1955)).  Summary judgment in a negligence action is appropriate where the

10   plaintiff cannot prove damages "supported by admissible evidence."  *Pompeneo v. Verde Valley

11   Guidance Clinic*, 226 Ariz. 412, 415–16 (Ariz. Ct. App. 2011) (affirming summary judgment

12   because plaintiff "presented no evidence . . . that he suffered compensable damages").

13        In holding that the School Districts' claims were not improperly derivative of their students'

14   alleged harms, the Court found in its motion-to-dismiss ruling that the School Districts had

15   adequately pled that they bore injuries—and damages—that were unique to them: "diverting and

16   increasing financial resources to address the disruptive forces of defendants' social media products

17   in school; hiring mental health personnel and developing mental health resources; implementing

18   new information technology and physical resources to limit access to and mitigate risks caused by

19   defendants' platforms; and repairing property damage."  SD Order at 19–20.  But now that discovery

20   is complete, Tucson has presented no competent evidence of any of these alleged damages.

21        *First*, Tucson has no competent evidence that it diverted any financial resources as a result

22   of Defendants' actionable conduct.  While it relies on its expert's calculation of damages relating to

23   alleged "*lost time*"—estimates related to the percentage of time that Tucson teachers purportedly

24   had to spend addressing issues related to "social media"—such costs (i) are not recoverable under

25   Arizona law and (ii) are not tied to Defendants' actionable conduct.  *Second*, Tucson has no

26   admissible, competent evidence that it hired new mental health personnel, developed new mental

27   health resources, or implemented other new resources because of Defendants' actionable conduct.

28   *Third*, Tucson cannot recover for repairing property damage because the evidence is undisputed that

1   this damage resulted from third-party acts, which under this Court's prior ruling cannot form the

2   basis of liability.  Summary judgment is warranted as to Tucson's negligence claim.  *Pompeneo*,

3   226 Ariz. at 415–16.

### 1.    Tucson Cannot Show Defendants Caused It To Divert Financial Resources.

6       There is no evidence establishing with "reasonable certainty" that Tucson has diverted

7   financial resources as a result of Defendants' actionable conduct.  *See Gilmore*, 95 Ariz. at 36 ("The

8   burden was on the plaintiffs to show the amount of their damages with reasonable certainty.").  There

9   is, for example, no evidence that Tucson has spent *any* money because of the at-issue features of

10  Defendants' platforms.  Tucson does *not* claim that it had to hire any additional teachers or staff as

11  a result of Defendants' platforms.  *See* Ex. 10 (Hernandez 30(b)(6) Dep.) 40:10–13; Ex. 55 (Ward

12  Dep.) 168:16–169:6.  Nor does Tucson claim that it had to pay any employee more because of

13  Defendants' platforms.  Ex. 55 (Ward Dep.) 168:1–15.  Instead, Tucson claims that it diverted

14  financial resources because "relevant staff time during the school day—such as that of teachers—is

15  finite" and "some portion of that time is redirected away from other tasks," to purportedly deal with

16  the distractions of social media.  Ex. 22 (Ward Rep.) ¶ 10.  On that theory, Tucson asserts that it is

17  entitled to $100.6 million in "lost time" damages for the time its teachers and administrators

18  purportedly spent over approximately a decade addressing issues related to social media.  *Id.* ¶ 38.

19  But Tucson cannot recover this damage because it is neither a recoverable category of damage under

20  Arizona law nor has Tucson met its evidentiary burden to prove entitlement to the claimed amount.

### (a)    Tucson cannot recover "lost time" damages.

22      Under Arizona law, compensatory damages "aim to place the plaintiff in the position it

23  would have occupied had the defendant not committed the tort," such as "out-of-pocket

24  damages . . . to compensate" the plaintiff for "fees it would not have incurred" otherwise.  *Ariz.*

25  *Biltmore Hotel Villas Condos. Ass'n v. Conlon Grp. Ariz., LLC*, 249 Ariz. 326, 333 (Ariz. Ct. App.

26  2020).  Under this rule, "general allegations of lost time . . . are not cognizable injuries."  *Griffey v.*

27  *Magellan Health Inc.*, 562 F. Supp. 3d 34, 45 (D. Ariz. 2021) (citation modified).  Therefore, courts

28  applying Arizona law have consistently rejected claims for "lost time" damages separate from "out-

1  of-pocket expenses, or any other tangible harm." *Quinalty v. FocusIT LLC*, 2024 WL 342454, at

2  *4 (D. Ariz. Jan. 30, 2024).

3         Tucson's claim for "lost time" damages contravenes this well-established law.  Tucson's

4  estimates are based solely on its expert's survey and on affidavits submitted by Tucson

5  administrators, but that evidence does not establish any actual monetary loss.  Tucson calculated its

6  "lost time" damages by asking a small portion of its staff—through a teacher survey and

7  administrator affidavits—to estimate how much time they and others in the District spent addressing

8  issues related to social media going back about a decade.  Ex. 26 (Klein Rep.) ¶ 41; Ex. 19 (Salmon

9  Dep.) 165:17–166:17; Ex. 30 (Salmon Dep. Ex. 11) ¶ 18; Ex. 31 (June 30, 2025 Shivanonda Dep.)

10  18:20–19:23; Ex. 29 (June 30, 2025 Shivanonda Dep. Ex. 1) ¶ 18; Ex. 24 (June 24, 2025 Hammel

11  Dep.) 164:6–16, 175:3–11; Ex. 33 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15; Ex. 34 (July 1, 2025

12  Lambert Dep.) 18:6–19:21; Ex. 27 (July 1, 2025 Lambert Dep. Ex 1) ¶ 17.  Tucson's expert then

13  took the unverified responses, calculated the percentage of time purportedly spent addressing social

14  media, and multiplied that percentage against the wages and benefits of all teachers and many staff

15  personnel within the Tucson school district to come to a sum of $100.6 million.  Ex. 22 (Ward Rep.)

16  ¶¶ 10–13, 38, Table 5.

17         Tucson has no evidence that this approximately $100 million constitutes an actual monetary

18  loss.  Tucson did not spend over $100 million as a result of "lost" teacher and staff time due to

19  Defendants' platforms, nor did it hire any new teachers or staff or pay any additional wages or

20  benefits because of Defendants' platforms.  Tucson's expert acknowledged that the money Tucson

21  pays its teachers and staff in salary and benefits is not dependent on *how* time is spent performing

22  their duties, and Tucson would have paid the same amount in wages and benefits to them even if

23  Defendants' platforms did not exist at all.  *See* Ex. 55 (Ward Dep.) 165:21–166:22, 168:1–15

24  (Plaintiffs' damages expert agreeing he is not "opining that because of Defendants' platforms

25  specifically any school district had to pay teachers more than they would have paid teachers if

26  Defendants' platforms did not exist").  Because the entire claimed amount is money that Tucson

27  would have spent on staff wages and benefits in any case regardless of whether its students even

28  used Defendants' platforms, this is just the type of "lost time" theory that Arizona law rejects.

1

**(b)    Tucson has no competent evidence establishing "lost time" damages.**

2

3    Even if Tucson's alleged "lost time" damages were recoverable under Arizona law, Tucson

4    failed to meet its burden to adduce competent evidence to justify this award.  *Pompeneo*, 226 Ariz.

5    at 415–16; *see, e.g.*, *Johnson v. Yuma Reg'l Med. Ctr.*, 769 F. Supp. 3d 936, 949 (D. Ariz. 2024)

6    (dismissing claim for lost time as "speculative"); *Bozek v. Ariz. Lab. Force Inc.*, 2025 WL 264174,

7    at *5 (D. Ariz. Jan. 22, 2025) (same); *Griffey v. Magellan Health Inc.*, 2022 WL 1811165, at *4 (D.

8    Ariz. June 2, 2022) (same).  Allowing a plaintiff to recover "lost time" damages of the type Tucson

9    seeks would violate the general rule that "[n]egligence damages must be actual and appreciable,

10   non-speculative, and . . . more than merely the threat of future harm."  *Quinalty*, 2024 WL 5223587,

11   at *4 (citing *CDT, Inc. v. Addison, Roberts & Ludwig*, 198 Ariz. 173, 176–77 (Ariz. Ct. App. 2000)).

12   During fact discovery, Tucson did not produce any documentary or contemporaneous

13   evidence supporting its claims of lost time, and Tucson's own personnel readily admitted there was

14   no such evidence.  Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 70:8–14 (stating that she was

15   unaware of any "explicit analysis" Tucson conducted regarding time spent by staff on issues related

16   to Defendants' platforms); Ex. 24 (June 24, 2025 Hammel Dep.) 170:16–23 (no interviews or

17   surveys of Tucson's site administrators regarding time spent); Ex. 13 (Alvarez Dep.) 44:20–24

18   (regional assistant superintendent conducted no interviews of teachers or principals regarding time

19   spent on issues related to Defendants' platforms); Ex. 25 (Sanchez Dep.) 44:1–10 (same).  The

20   retrospective, made-for-litigation administrator affidavits and teacher surveys on which Tucson

21   relies cannot establish its "lost time" damages amount with "reasonable certainty."  *Gilmore*, 95

22   Ariz. at 36.

23   **Staff "Lost Time."**  Tucson submitted affidavits from four administrators purporting to

24   establish the percentage of time spent by certain job categories on "social media related concerns

25   and addressing the impacts of students' personal social media use."  Ex. 27 (July 1, 2025 Lambert

26   Dep. Ex 1) ¶ 17; Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1) ¶ 18; Ex. 30 (Salmon Dep. Ex. 11)

27   ¶ 18; Ex. 33 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15.  These affiants estimated time allegedly lost

28

-28-

1    by *hundreds* of Tucson employees per year from as early as 2016 to the present,[9] yet they largely

2    did not consult documents or conduct numerical analysis to inform their estimates.  Ex. 19 (Salmon

3    Dep.) 165:17–166:17; Ex. 30 (Salmon Dep. Ex. 11); Ex. 31 (June 30, 2025 Shivananda Dep.) 18:20–

4    21:19; Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1); Ex. 24 (June 24, 2025 Hammel Dep.) 175:3–

5    11; Ex. 33 (June 24, 2025 Hammel Dep. Ex. 17); Ex. 34 (July 1, 2025 Lambert Dep.) 18:6–19:21;

6    Ex. 27 (July 1, 2025 Lambert Dep. Ex 1).  Instead, the affiants relied primarily on their memory and

7    unspecified conversations with other employees—and one did so even for time periods when she

8    did not work in the District.  Ex. 19 (Salmon Dep.) 165:17–166:8, 170:21–171:2, 173:3–24 (citing

9    "anecdotal data" and "information" gleaned from prior conversations); Ex. 31 (June 30, 2025

10   Shivananda Dep.) 58:5–60:20 (confirming that she provided estimates based on unspecified

11   "conversations" with Tucson employees for the 2020–2021 school year despite being employed at

12   a private school for that period); Ex. 29 (June 30, 2025 Shivananda Dep. Ex. 1) ¶ 18; Ex. 24 (June

13   24, 2025 Hammel Dep.) 170:16–23, 171:2–172:1 (agreeing that estimates were based on "[her]

14   memory" and citing "experience of talking with principals"); Ex. 28 (June 24, 2025 Hammel Dep.

15   Ex. 17) ¶ 15; Ex. 34 (July 1, 2025 Lambert Dep.) 18:6–19:21 (confirming that estimates were "based

16   on [his] experience" and conversations with various administrators); Ex. 27 (July 1, 2025 Lambert

17   Dep. Ex. 1) ¶ 17.  One affiant also never supervised many of the positions for which she purported

18   to estimate lost time.  Ex. 31 (June 30, 2025 Shivananda Dep.) 49:10–51:2; Ex. 29 (June 30, 2025

19   Shivananda Dep. Ex. 1) ¶ 18.

20          Accordingly, Tucson's affidavits are inadmissible for lack of personal knowledge and

21   hearsay.  *See Block*, 253 F.3d at 419 (affidavit inadmissible for lack of personal knowledge where

22   affiant "was not personally involved" in relevant events and "did not personally review any business

23   records containing information" on the events); *Argo v. Blue Cross & Blue Shield of Kan. Inc.*, 452

24   F.3d 1193, 1200 (10th Cir. 2006) (affiant could not claim personal knowledge over entire company

25   where he "was not in a position to acquire such comprehensive knowledge").

26   _____

27   [9] *See* Ex. 22 (Ward Rep.) ¶ 16 n.4 (citing spreadsheets of base pay for each employee included in damages calculation for 2017–2024); *see, e.g.*, Ex. 59 (SM_TUSD_00599630) (spreadsheet for

28   2017 listing, among others, hundreds of non-teacher employees included in damages calculations).

Even if the testimony were admissible, it would not be sufficient to establish the amount of time purportedly lost with reasonable certainty. Deposition testimony established that the affiants' estimates of lost time were "rough" or "ballpark" estimates. Ex. 31 (June 30, 2025 Shivanonda Dep.) 33:12–34:4; Ex. 34 (July 1, 2025 Lambert Dep.) 19:22–21:1. Many of the affiants provided only a range of percentages for particular years, and different affiants provided different percentages for the same types of positions. Ex. 27 (July 1, 2025 Lambert Dep. Ex. 1) ¶ 17; Ex. 28 (June 24, 2025 Hammel Dep. Ex. 17) ¶ 15; Ex. 34 (July 1, 2025 Lambert Dep.) 27:20–29:4; Ex. 24 (June 24, 2025 Hammel Dep.) 174:9–17. Affiants also admitted that the real percentage of lost time might be *different* from their estimates or that their estimates might not apply to all schools in Tucson. Ex. 34 (July 1, 2025 Lambert Dep.) 21:11–22:8, 26:5–20, 35:9–37:7; Ex. 24 (June 24, 2025 Hammel Dep.) 184:15–186:2. This type of evidence is insufficient under Arizona law. *See Gilmore*, 95 Ariz. at 36 (plaintiff failed to establish damages because "[t]he evidence relating to damages was all in the form of testimony by plaintiffs" and "[n]o books of account or other record of the costs . . . were introduced"); *AHS Rescue, LLC v. Ariz. Outdoor Specialists, Inc.*, 2019 WL 993093, at *4 (Ariz. Ct. App. Feb. 27, 2019) (deposition testimony regarding a "ballpark" estimate of damages did not create genuine dispute).

Moreover, the affidavits include time spent on incidents relating to *other* platforms, alleged harms stemming from content, and, in some cases, issues that have nothing to do with social media whatsoever. For instance, the Senior Director of Exceptional Education testified that her estimates for "lost time" for positions in her department were "not specifically connected" to Defendants' platforms and included all time spent relating to supporting students' mental health generally. Ex. 19 (Salmon Dep.) 154:8–155:15, 163:25–165:5 ("So this would include, like, whatever mental health concern or counseling that a student has."); *see also* Ex. 31 (June 30, 2025 Shivanonda Dep.) 16:17–17:4 (estimate would include "[a]ny and all" social media platforms). Likewise, a regional assistant superintendent cited "a student *texting* another student to fight" and "a parent bringing in *a string of texts* going, look, so and so is threatening my child," as examples of lost time. Ex. 24 (June 24, 2025 Hammel Dep.) 164:17–165:7 (emphasis added). The affiants also admitted that their estimates included time spent addressing "a multitude of behaviors that are often caused by social

media content," including by "post[ing] videos, comments, likes, [and] shares." Ex. 31 (June 30, 2025 Shivanonda Dep.) 15:1–16:16, 90:6–12; *see also id.* 31:2–12 ("the majority of [counselors'] time is spent dealing with behaviors based on social media content"); Ex. 34 (July 1, 2025 Lambert Dep.) 12:13–13:10 ("majority" of purportedly lost time is spent investigating "concerns about a particular social media post or video or photo, "an accusation someone has made," and "the spreading of the video [of a fight] via social media"). Tucson's "lost time" estimates for non-teaching staff are, thus, plainly not estimates of time spent addressing Defendants' actionable conduct. *See supra* Section IV.A.

Tucson's attempt to patch this hole through expert testimony is unavailing. "If the facts in the record contradict an expert opinion, the opinion, although it may be admissible, cannot be relied upon to defeat summary judgment." *Edwards Lifesciences Corp. v. St. Jude Med. Inc.*, 2004 WL 5642457, at *5 n.5 (C.D. Cal. Apr. 2, 2004) (citing *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995)); *accord Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). Here, in calculating the amount of time that non-teaching staff allegedly had to divert time because of Defendants' platforms, Tucson's expert relies solely on the unsubstantiated, inadmissible affidavits from Tucson administrators discussed above. Ex. 22 (Ward Rep.) ¶ 29 (expert relied on affidavits); Ex. 55 (Ward Dep.) 286:20–288:7 (expert did not verify affidavits); *see also* Defendants' Motion to Exclude Testimony of School District Experts, Section III.C (concurrently filed) (motion to exclude Dr. Ward's opinions). Accordingly, Tucson has no admissible, competent evidence to support its claimed "lost time" damages for non-teaching staff.

**Teacher "Lost Time."** Similarly, for the reasons explained in Defendants' Rule 702 motion, the survey purporting to establish teachers' "lost time" (and the damages report based on that survey) is unreliable and inadmissible: The use of a retrospective survey to purportedly measure—down to the minute—the amount of time that teachers purportedly spent dealing with social-media related "distraction" for periods of up to a decade or longer is not a reliable

1   methodology.  *See* Defendants' Motion to Exclude Testimony of School District Experts, Section

2   III.B (concurrently filed) (motion to exclude Mr. Klein's opinions).  And Tucson's expert did

3   nothing to test or ensure that the answers of the *less than 6%* of self-selected teachers who responded

4   to the survey could be reliably extrapolated and generalized to the other *94%* of teachers who

5   declined to participate—including teachers who may teach different grades and at different schools.

6   Nor can the survey results be applied reliably to teachers previously employed by the District—

7   whose tenures cover some portion of the time period at issue—who were never given the opportunity

8   to take the survey.  Tucson has thus failed to establish with "reasonable certainty" its estimate of

9   lost time damages.

10      Tucson's teacher lost time estimates also suffer from another, independently fatal flaw: like

11  the administrator affidavits, they estimate time spent on issues related to "social media" instead of

12  Defendants' platforms specifically.  The teacher survey questions ask only about time spent dealing

13  with "social media" generally.  The questions were not limited to platforms operated by the four

14  Defendants in this case, let alone specific to any one of Defendants' platforms as would be necessary

15  to recover damages against them.  Ex. 26 (Klein Rep.) Appendix D at 9.  And the survey made no

16  effort to distinguish between time spent dealing with issues arising from the at-issue features, as

17  opposed to issues arising from, for example, third-party content posted on Defendants' (or other)

18  platforms.  *Id.*

19      In short, Tucson failed to meet its "burden . . . to show the amount of [its] damages with

20  reasonable certainty."  *Gilmore*, 95 Ariz. at 36; *see also Earle M. Jorgensen Co. v. Tesmer Mfg.*

21  *Co.*, 10 Ariz. App. 445, 451–52 (Ariz. Ct. App. 1969) (holding plaintiff could not establish damages

22  because "the evidence fails to establish any reasonably certain factual basis for the computation of

23  the Amount of the claimed lost profits").  Because there is neither admissible nor non-speculative

24  evidence as to the amount of time actually lost, Tucson failed to meet its burden and summary

25  judgment in Defendants' favor is warranted.  *Id.*; *see also* Defendants' Motion to Exclude Testimony

26  of School District Experts, Section III.B–III.D (concurrently filed) (motions to exclude opinions of

27  Mr. Klein, Dr. Ward, and Mr. Meyers).

28

2.    **Tucson Has No Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms.**

Tucson fares no better in its attempt to justify its damages for alleged out-of-pocket costs—*i.e.*, new mental health personnel or third-party vendor costs. There is no evidence that any of these costs were the result of Defendants' actionable conduct.

(a)    **Tucson has no evidence it hired new mental health personnel because of Defendants' platforms.**

While Tucson initially alleged that it had to hire new staff to address mental health issues caused by Defendants' platforms (Master Compl. ¶ 212; Ex. 1 (Second Amended PFS) Response to Q. 23), Tucson now admits it did *not* have to hire any additional teachers or staff as a result of Defendants' platforms. *See* Ex. 10 (Hernandez 30(b)(6) Dep.) 40:10–13; Ex. 55 (Ward Dep.) 168:16–169:6. As a result, Tucson cannot show any basis for recovering this category of damages.

(b)    **Tucson has no evidence it implemented new programs because of Defendants' platforms.**

Tucson also seeks to recover nearly $550,000 in expenditures to specific vendors or programs. These include the purchase of Yondr cellphone pouches and cellphone lockers, an online reporting system (Awareity), a social emotional learning curriculum (Character Strong), an online therapy platform (Talkspace), and a school threat assessment. Ex. 23 (Meyers Rep.) ¶¶ 20, 24; Ex. 49 (Ross Dep. Ex. 1) at 11 (listing percentages of damages for each vendor). But Tucson's effort to tag Defendants with these costs fails for three reasons: (1) Tucson has not shown that these expenses were triggered by students' use of *Defendants'* platforms, as opposed to their phones generally or other entirely unrelated causes; (2) Tucson has not shown that it was the "at-issue," as opposed to protected, features of Defendants' platforms that triggered the need for these costs; and (3) Tucson has not calculated its alleged damages with any reasonable degree of certainty.

*First*, Tucson cannot show that these damages were caused by Defendants at all. Tucson's expert relied entirely on Tucson's interrogatory responses and did not separately determine whether the expenditures were incurred because of Defendants' platforms or whether the purported allocation of costs relating to Defendants' platforms were correct. Ex. 45 (Meyers Dep.) 144:1–

-33-

145:5, 432:7–434:3.  The evidence shows that these damages are unsupported.  Indeed, for most items of damages, Tucson claimed without explanation or justification that the same percentage (40%) of expenditures was attributable to Defendants' platforms.

**Yondr/Cellphone Lockers**.  Tucson seeks 100% of the costs associated with purchasing Yondr pouches and cellphone lockers, Ex. 49 (Ross Dep. Ex. 1) at 11, but these are items that the District purchased to keep students from accessing their phones *generally*—not just Defendants' platforms.  Ex. 12 (April 8, 2025 Shivananda 30(b)(6) Dep.) 149:9–150:20 ███████████ ████████████████████████████████████████████████████████████████████, 162:16–25 (cellphone lockers require all students to put cellphones in locker every class period); Ex. 3 (Trujillo Dep.) 334:20–335:3  (Yondr is "one of the more effective" strategies to reduce "cellphone use").

**Awareity.**  With no justification for its percentage allocation, Tucson seeks 40% of the cost of Awareity, the District's online reporting system.  Ex. 49 (Ross Dep. Ex. 1) at 11.  Awareity allows Tucson community members to report *any* general concern to the District's administration, such as HR issues, dissatisfaction with administrators, concerns about cleanliness, facilities and groundskeeping concerns, and even positive reports like acts of kindness.  Ex. 5 (April 9, 2025 Shivananda 30(b)(6) Dep.) 235:8–19; Ex. 36 (Hallums Dep.) 203:10–204:16; Ex. 25 (Sanchez Dep.) at 68:1–19.  Many Awareity reports have nothing to do with Defendants' platforms or even social media generally, such as ██████████████████████████████████████████████████████ ███████████████████████████████████████████.  *See* Ex. 38 (SM_TUSD_00365952) █████████ ██████████████████████████████████████████████████████████████████████████; Ex. 39 (SM_TUSD_00365953) ██████████████████████████████████████████████████ ███████████.  Yet Tucson has never analyzed the number of reports, if any, that relate to social media or Defendants' platforms.  Ex. 13 (Alvarez Dep.) 55:19–24; Ex. 40 (May 14, 2025 Hammel Dep.) 87:18–21; Ex. 46 (May 14, 2025 Lambert Dep.) 55:9–21; Ex. 36 (Hallums Dep.) 205:2–12.

**Character Strong/Talkspace***.*  Tucson seeks 40% of the costs associated with Character Strong, Tucson's social and emotional learning curriculum, and Talkspace, an online mental health platform.  Ex. 49 (Ross Dep. Ex. 1) at 11.  Yet—just like for Awareity—Tucson has offered no

evidence justifying its 40% allocation.  Tucson's implementation plans for these programs do not mention social media or Defendants' platforms at all; nor are they limited to students who use social media.  Ex. 5 (April 9, 2025 Shivanonda 30(b)(6) Dep.) 362:1–363:1 (Character Strong); Ex. 3 (Trujillo Dep.) 275:19–276:11 (Talkspace).  To the contrary, witnesses admitted that both programs were broadly beneficial for all students regardless of social media use.  Ex. 5 (April 9, 2025 Shivanonda 30(b)(6) Dep.) 362:20–363:1 (Character Strong focuses on developing self-awareness, self-management, responsible decision making, social awareness, and relationship skills); Ex. 3 (Trujillo Dep.) 275:19–24 (Talkspace is "for any student or family in crisis").

**Threat Assessment.**  Tucson also claims 40% of the cost for the Comprehensive School Threat Assessment Guidelines, again with no explanation.  Ex. 49 (Ross Dep. Ex. 1) at 11.  But that program has existed for nearly three decades—long before Defendants' platforms—and evaluates a broad range of threats at Tucson schools, such as physical threats, social-emotional threats, and suicidal ideation.  Ex. 36 (Hallums Dep.) 199:9–203:9; Ex. 47 (Hallums Dep. Ex. 28) at 2; Ex. 31 (June 30, 2025 Shivanonda Dep.) 67:16–24.  The program's documentation does not mention social media or Defendants' platforms.  Ex. 36 (Hallums Dep.) 202:2–203:9; Ex. 47 (Hallums Dep. Ex. 28).

*Second*, even if Tucson could show that Defendants' platforms were one of the District's many considerations in incurring these costs, Tucson has no evidence that these costs were incurred as a result of Defendants' *actionable conduct*.  As explained above, liability may *not* be based on harms flowing from content published on Defendants' platforms, third-party wrongdoing, or Defendants' protected publishing activities.  *See supra* Section IV.A.  Tucson's damages expert, however, admitted that he is not opining whether any damages would be less absent Defendants' actionable conduct.  *See* Ex. 45 (Meyers Dep.) 199:21–200:1.  And, while Tucson has submitted interrogatory responses claiming a certain percentage of costs as damages, there is no evidence that these percentages separate out costs attributable to third-party content or the barred features.  Ex. 48 (Ross Dep.) 67:12–69:19 (attorney who verified Tucson interrogatory responses did not know whether responses accounted for other social media platforms, content, third-party conduct, or barred features).  Costs related to "social media" generally or even use of Defendants' platforms

1    generally—with no attempt to isolate the effects of the at-issue features—cannot serve as the basis

2    for recovery of damages.  *See Butler v. Wong*, 117 Ariz. 395, 396 (Ariz. Ct. App. 1977) ("It is not

3    sufficient in an action for damages that plaintiff show a certain injury might have been caused by

4    the negligence of defendant.  It is necessary to establish that the injuries have been so caused.").

5          *Finally*, Tucson has not presented any evidence that would render it possible to properly

6    calculate that amount of loss *caused by Defendants' actionable conduct* with any "reasonable

7    certainty."  *Gilmore*, 95 Ariz. at 36.  Tucson does not track costs incurred as a result of social media

8    generally, let alone the aspects of each Defendant's platform that the Court deemed actionable here.

9    Ex. 10 (Hernandez 30(b)(6) Dep.) 17:17–20, 22:10–23:10, 60:3–61:4; *see Grafitti-Valenzuela*, 216

10   Ariz. at 460 (plaintiff must show that "[a] defendant's acts are the proximate cause of a plaintiff's

11   injury," and "[t]he mere possibility of causation is not enough").  Tucson has therefore adduced no

12   competent evidence to allow a factfinder to be able to apportion costs appropriately or calculate

13   damages with reasonable certainty.  *Gilmore*, 95 Ariz. at 36.

14              **3.      Tucson Cannot Recover Property Damage that Results from Third-Party Acts.**

15

16         Tucson seeks $6,444 for the cost of repairing property damage allegedly caused by social

17   media challenges.  Ex. 23 (Meyers Rep.) ¶ 20 ("TUSD Reactive Work Orders").  This damage was

18   indisputably caused by third-party acts, such as alleged vandalism purportedly stemming from social

19   media challenges.  Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 128:15–130:4 (explaining

20   incidents of property damage were identified based on "connection with any of the

21   Facebook/TikTok challenges that were in that time frame").  And, as explained above, the Court

22   precluded Tucson from recovering for such conduct unless it can show that Defendants promoted

23   the third-party content, such as by creating a filter to facilitate the challenge or paying participants

24   cash prizes. SD Order at 25.  Tucson has no evidence that Defendants have engaged in such conduct

25   (Section IV.A.1 *supra*) and as such cannot recover this category of damages.

26

27

28

1      **C.      Tucson's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy**
2              **Under Arizona Law.**

3          Tucson seeks over *one billion dollars* to implement a voluntary 15-year "strategic plan,"

4   authored by Tucson's expert, Dr. Sharon Hoover, to address anticipated student well-being and

5   learning issues in the future.  The plan does not recommend that the District stop allowing its

6   students to access Defendants' platforms on its networks or devices, and does not recommend

7   changes to Defendants' conduct.  The plan's recommended staffing levels have no relationship to

8   the number of Tucson's students using Defendants' platforms or the amount of time they spend on

9   the platforms.  Nor is the plan tied to addressing mental health issues allegedly resulting only from

10  Defendants' platforms; the plan's recommendations are divorced from any attempt to estimate the

11  level of alleged harm from Defendants' platforms to Tucson or its students.  Instead, the plan applies

12  to *all* students *regardless* of whether they use Defendants' platforms.  For example, the plan

13  recommends hiring nearly 1,000 additional staff to provide, among other things:

14      •   "Life Skills Programming" to teach students "empathy, emotion regulation, [and] navigating
15          social pressure";

16      •   "Mental Health Literacy" to educate students, educators, and families about mental health
17          challenges, not just those limited to use of Defendants' platforms;

18      •   Promotion of in-person social activities such as clubs and community events to encourage
19          belonging; and

20      •   "Intensive Mental Health Treatment" for students allegedly suffering from psychological
21          effects of social media and other causes.

22  Ex. 37 (Hoover Report) ¶¶ 65–66, 69, 74, 100.  In short, the plan is a one-billion-dollar attempt to

23  solve resource and funding problems that long predate and have nothing to do with Defendants'

24  platforms.

25          Tucson's strategic plan is not a proper remedy for any of Tucson's claims.  *First*, Tucson

26  cannot recover the strategic plan as equitable relief for its nuisance claims for two separate reasons:

27  (i) Tucson has admitted it has an adequate remedy at law—damages for its alleged negligence and

28  nuisance claims—which forecloses any equitable relief; and (ii) even if Tucson lacked an adequate

-37-

remedy at law, the strategic plan is not a permissible remedy under Arizona law. *Second*, Tucson's strategic plan is not recoverable as future damages because the plan's 15 years of expenditures do not compensate Tucson for money that Tucson will, with reasonable certainty, have to spend in the future. *Third*, even if the plan qualified as permissible equitable relief or future damages, the largest component of the strategic plan—the funding of mental health treatment for students—is impermissibly derivative of alleged injuries to students.

> **1.    Tucson Cannot Recover the Plan as Equitable Relief for its Nuisance Claim.**

> **(a)    Tucson Has an Adequate Remedy at Law.**

To obtain equitable relief, a plaintiff must show it lacks an adequate remedy at law, which Tucson cannot do because it admits that future damages are available for the same alleged harms. *See Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020) (plaintiff "must establish that she lacks an adequate remedy at law before securing equitable restitution"); *Wood v. Marathon Refin. Logistics Serv. LLC*, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (Gonzalez Rogers, J.) (granting summary judgment on equitable remedy because "Plaintiffs have not explained why the existing remedy [at law] is inadequate"). Courts have consistently held that a remedy is "adequate" where damages are legally available, even if the plaintiff ultimately cannot prove entitlement to them. *See, e.g.*, *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) ("Plaintiffs' argument that they will have no adequate remedy at law if their other claims fail is unavailing. Where the claims pleaded by a plaintiff *may* entitle her to an adequate remedy at law, equitable relief is unavailable."); *Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825, at *3 & n.3 (N.D. Cal. June 17, 2016) (dismissing UCL claim because an adequate remedy at law existed through the "compensatory damages" sought by the plaintiff, even though all legal claims were simultaneously dismissed as barred by the statute of limitations; "the fact that [plaintiff's] other claims have been barred by the statute of limitations does not affect the court's analysis").

Here, Tucson's nuisance and negligence claims rest on the same alleged conduct—the design of Defendants' platforms—and its proposed "strategic plan" is offered as both abatement and future damages. *See* Plaintiffs' Response to Defendants' Letter Brief Re Anticipated Daubert

1    / Summary Judgment Motions (ECF 2184) at 6 ("[I]n addition to abatement for those SDs with

2    live nuisance claims, the plans also serve as a measure of future damages under their negligence

3    claims."). That overlap makes equitable relief unavailable regardless of whether Tucson is able to

4    prove future damages (which as discussed below, it is not). *See Sonner*, 971 F.3d at 844

5    (affirming dismissal of claim for equitable relief because plaintiff "seeks the same sum in

6    equitable restitution as . . . she requested in damages to compensate her for the same past harm").

7    The real problem here is not that Tucson lacks an adequate remedy at law but its inability to prove

8    its entitlement to that remedy.

9            **(b)      Tucson's Strategic Plan Is Not a Proper "Abatement" Remedy.**

10            Even if Tucson had no adequate remedy at law, the strategic plan is not a proper abatement

11    remedy under Arizona law. In Arizona, a public nuisance is "an unreasonable interference with a

12    right common to the general public." *Mutschler*, 212 Ariz. at 166 (quoting Restatement (Second)

13    of Torts § 821B(1)). The remedy of abatement for a public nuisance under Arizona law has

14    historically involved an injunction directing the offending party to cease *the conduct* causing the

15    alleged nuisance (or in cases involving pollution or physical structures, removing the physical

16    manifestation of the defendant's conduct). *See Cactus Corp. v. State ex rel. Murphy*, 14 Ariz. App.

17    38, 41 (Ariz. Ct. App. 1971) (remedy for nuisance is "to abate *the activity* by injunction" (emphasis

18    added)); *Brown v. City of Phoenix*, 258 Ariz. 302, 310 (Ariz. Ct. App. 2024) (injunction required

19    city to "abate the nuisance" through "*removal* of all tents and other makeshift structures" (emphasis

20    added)); *Brandes v. Mitterling*, 67 Ariz. 349, 352, 358 (Ariz. 1948) (granting injunction "to

21    terminate the use of [a] field as an airport and to *forbid the continuance of the various alleged acts*

22    causing injury" (emphasis added)).

23            Tucson's abatement plan does nothing of the sort. *First*, the plan has nothing to do with

24    "abating" any conduct of Defendants. The plan would not require Defendants to change how they

25    design, operate, or market their platforms in general or for youth specifically. Ex. 42 (August 13,

26    2025 Hoover Dep.) 526:1–3 ("I don't think I'm offering an opinion that the social media companies

27    change their design."). There are no recommendations, for example, for Defendants to get rid of

28    filters or use better or different warnings or parental controls. Instead, Tucson seeks over one billion

1   dollars to fund a voluntary plan that it could spend in its unfettered discretion to implement an

2   expansive range of programs for the social and emotional wellness of students regardless of whether

3   those students use Defendants' platforms. Ex. 50 (Leslie Dep.) 67:11–14 ("Q. Do you understand

4   that the plan and its components are not mandated or required by anything?  A. That's my

5   understanding.").  That is not proper "abatement" relief—this is a school district attempting to use

6   litigation to fundraise for basic school programs that would be desirable regardless of whether

7   Defendants' platforms existed.  *See, e.g.*, *City of Huntington v. AmerisourceBergen Drug Corp.*,

8   609 F. Supp. 3d 408, 483–84 (S.D. W. Va. 2022) (rejecting abatement plan "directed" at treating

9   downstream harms of opioid use, rather than "any of defendants' alleged nuisance-causing

10  conduct"); *State ex rel. Hunter v. Johnson & Johnson*, 499 P.3d 719, 729 (Okla. 2021) (rejecting

11  abatement plan that "does not stop the act or omission that constitutes a nuisance").

12      *Second*, the plan is not tied to the harms allegedly resulting from the design of Defendants'

13  platforms, and it goes far beyond what would be necessary to address any impacts of the design of

14  Defendants' platforms on Tucson.  The plan purports to provide treatment for "students

15  experiencing stress, anxiety, or emotional stress, including"—but, critically, not limited to—"those

16  struggling with the negative impacts of social media."  Ex. 37 (Hoover Report) ¶ 71.  The plan is

17  about supporting students up to 15 years in the future, which includes potential students who are

18  now babies—and those who are not yet even born—and have neither attended Tucson schools nor

19  used, much less suffered any harm from, any Defendant's platform(s).  It is impossible to predict

20  whether any of those babies and unborn children will ever use Defendants' platforms or their

21  allegedly harmful features, if those features still even exist years in the future.  Thus, the plan is

22  overinclusive and goes far beyond addressing harms allegedly caused by Defendants.  But at the

23  same time, the services recommended in the plan would not be available to help many current

24  students who are allegedly suffering harms related to Defendants because they will age out of the

25  Tucson school system before any plan is implemented.  *See id.* ¶¶ 124–127 (outlining 15-year

26  professional development plan).  Thus, even if it were proper "abatement" relief to remediate the

27  downstream personal injuries allegedly resulting from nuisance-causing conduct, the strategic plan

28  does not do that.

1   In short, the plan is not tied to remediating mental health issues allegedly caused by
2   Defendants but is instead a wish-list of programs that schools could provide in an ideal world to
3   benefit all students.  *See* Ex. 41 (August 12, 2025 Hoover Dep.) 300:19–303:1 (agreeing that,
4   regardless of whether they use social media, all students should receive counseling services and
5   education on digital literacy, mental health literacy, life skills, and screentime management), 306:2–
6   307:5 (agreeing that students should receive mental health support regardless of whether they use
7   social media); Ex. 42 (August 13, 2025 Hoover Dep.) 631:24–636:1, 637:15–638:6 (agreeing certain
8   components of the plan are intended for all students).  The plan is directed not just at users of
9   Defendants' platforms but to solve endemic staffing and budget problems that were not created by
10  Defendants.  *See, e.g.*, Ex. 42 (August 13, 2025 Hoover Dep.) 644:7–647:23 (explaining why 48 of
11  the 50 states do not meet national recommendations on the number of school psychologists: "[W]e
12  have a context and a history of . . . workforce challenges with respect to school
13  psychologists . . . .  [I]n my experience with districts, it's because they don't have the resources to
14  hire the needed professionals . . . .  [I]t's often because they don't have the funding to hire a needed
15  school psychologist.").

16  No Arizona cases (or any appellate cases in the country) have recognized the sort of
17  "monetary abatement" remedy that Tucson seeks.  Defendants are aware of only two trial courts in
18  the country that have awarded this type of monetary abatement to treat downstream consequences
19  of alleged nuisance-causing conduct, both in the context of the opioid litigation.  One (the Ohio
20  MDL federal court) was vacated on appeal when the Sixth Circuit overruled the MDL court and
21  held (like the other appellate court to have considered the issue, the Oklahoma Supreme Court) that
22  there was no cause of action for public nuisance under the circumstances in the first place.[10]  The

---

25  [10] *In re Nat'l Prescription Opiate Litig.*, 2025 WL 354758, at *1 (6th Cir. Jan. 31, 2025) (citing *In
26  re Nat'l Prescription Opiate Litig.*, 265 N.E.3d 1, 11 (Ohio 2024)) (recognizing that Ohio Supreme
    Court, via certified question, held that state statute overruled prior Ohio Supreme Court case
27  permitting a cause of action for public nuisance against gun manufacturers for unreasonably
    interfering with the public health and safety, and holding that nuisance claims brought by Ohio cities
28  and counties in opioid litigation should have been dismissed at the outset).

1    other is a Maryland trial court decision, which relied on that vacated MDL opinion.[11]    Tucson's

2    strategic plan is therefore not proper abatement relief and should be denied as a matter of law.

3         Tucson's abatement plan would not pass muster even under cases that have permitted the

4    payment of money as an equitable abatement remedy.  *See, e.g.*, *People v. ConAgra Grocery Prods.*

5    *Co.*, 17 Cal. App. 5th 51 (Cal. Ct. App. 2017); *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods.*

6    *Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020).  In *ConAgra*, the abatement remedy consisted of

7    an order for defendants to fund the removal of the lead paint from homes.  17 Cal. App. 5th at 132–

8    33.  It did not involve a monetary fund to treat downstream consequences of the alleged nuisance,

9    like funding for medical expenses or other treatment.  Indeed, the court specified that "the abatement

10   account would be utilized *not to recompense anyone for accrued harm* but solely to pay for the

11   prospective removal of the hazards"—*i.e.*, removal of the lead paint from homes.  *Id.* (emphasis

12   added).   The abatement remedy was therefore tied to eliminating the defendants' conduct and

13   removing the pollutant from the environment, not treating injuries from lead paint ingestion.

14   Likewise, *JUUL Labs*, which was decided at the motion-to-dismiss stage, held only that an

15   abatement fund might theoretically be proper and agreed with the general principle that "an

16   equitable remedy's *sole* purpose is to eliminate the hazard that is causing prospective harm to the

17   plaintiff."  497 F. Supp. 3d at 653 (emphasis added) (quoting *ConAgra*, 17 Cal. App. at 132).  The

18   court was not faced with a fully developed evidentiary record of what the prospective fund might

19   consist of or whether the proposed fund was actually tailored to address the alleged nuisance.

20

21

22

---

23   [11] *See Mayor & City Council of Balt. v. Purdue Pharma, L.P.*, No. 24-C-18-000515 (Balt. City Cir.

24   Ct. Aug. 8, 2025).  There, the trial court held that the City of Baltimore could recover as an equitable
     remedy a "monetary abatement remedy" from two distributors of prescription opioids to fund certain

25   voluntary programs aimed at reducing harms associated with both legal and illegal opioid abuse.
     *Id.* at 1.  The court did not cite any Maryland cases that have awarded such a "monetary abatement

26   remedy," but relied only on the overturned opioid MDL trial court.  In any event, even that opinion
     would not support the vast majority of Dr. Hoover's plan because the court rejected the City's

27   request for funding for "all of the proposed costs for treatment services and for supplies of the
     three . . . medications used in treatment."  *Id.* at 26.

28

## 2.      The Costs of the Strategic Plan Are Not Recoverable as Future Damages.

Nor can Tucson rescue its strategic plan by classifying the costs as future damages.  Arizona courts have consistently held that future damages can be recovered only if they are demonstrated with "reasonable certainty."  *See, e.g.*, *Gilmore*, 95 Ariz. at 36; *Earle M. Jorgensen Co.*, 10 Ariz. App. at 451–52; *McAlister v. Loeb & Loeb,* LLP, 571 P.3d 891, 897 (Ariz. 2025).  The burden rests on the plaintiff to show "reasonable certainty."  *Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 140 Ariz. 174, 184–86 (Ariz. Ct. App. 1984).  "Damages that are speculative, remote or uncertain may not form the basis of a judgment," and they cannot be based on the "guesses or estimates of witnesses."  *Coury Bros. Ranches, Inc. v. Ellsworth*, 103 Ariz. 515, 521 (Ariz. 1968); *see also Hirsh v. Manley*, 81 Ariz. 94, 103 (Ariz. 1956) (the jury must not be permitted to "speculate as to possible" future losses).

Tucson cannot show that it reasonably expects *to have to make* the expenditures recommended in Hoover's plan over the next 15 years as a result of Defendants' conduct.[12]  Rather, the plan is a separate, *recommended* expense that the District *could*, but does not have to, expend to fund programs to deal with student mental health generally—untethered to any specific features of Defendants' platforms.  Tucson has not instituted the Hoover plan; it is under no obligation to do so, and absent a recovery of money from Defendants in this lawsuit, Tucson will *not* institute the plan or incur the associated costs.  Indeed, Tucson's budgets and strategic planning documents do not identify social media as a problem.  Ex. 3 (Trujillo Dep.) 247:11–253:24.  And while Dr. Hoover testified that the plan constitutes "best practices," no public school district in the country has ever implemented this type of comprehensive plan, and there is no professional organization that has ever suggested that a plan of this nature is necessary or advisable to address student use of social

---

[12] Hoover's plan has an annual cost that is nearly *eight times greater* than Tucson's claimed past damages.  Tucson claims that, from 2016 to 2024, it has been injured in the amount of about $550,000 for out of pocket costs and $100.6 million in "lost" staff time.  *See* Section IV(B)(1).  Tucson's purported past damages are therefore approximately $11 million per year.  Ex. 22 (Ward Report) ¶¶ 1, 38, Table 5; Ex. 51 (Meyers Rep. Appendix C).  By contrast, Tucson claims the value of its strategic plan will cost $1.1 to 1.3 *billion* over 15 years, a cost of $73 to $86 million per year.  Ex. 52 (Leslie Rep.) ¶ 3.

1  media in general, much less just Defendants' platforms.  Ex. 42 (August 13, 2025 Hoover Dep.)

2  605:23–607:16, 612:7–23, 806:22–807:6.  A suggestion of expenditures for a novel set of optional,

3  recommended programs that might be made only if a plaintiff receives a large monetary award in a

4  lawsuit is not the type of "reasonably certain" future damages that are recoverable in Arizona.

5      In short, Tucson's strategic plan is too speculative to be a form of damages.  *See Gilmore*,

6  95 Ariz. at 36 ("conjecture or speculation" that a plaintiff will make the claimed expenditures

7  "cannot provide the basis for an award of damages"); *McNutt Oil & Refin. Co.*, 79 Ariz. at 34

8  (same).

9          **3.    Tucson's Strategic Plan Is Impermissibly Derivative.**

10     As discussed above, funding for the strategic plan is not compensation for direct and distinct

11  expenditures that Tucson has been forced to make, or will be forced to make, as a result of

12  Defendants' alleged tortious conduct.  Instead, the plan is about developing discretionary programs

13  to educate, treat, and support *students* for their alleged injuries.  Paying for treatment of others'

14  injuries is the type of classic derivative injury for which recovery is not available.  *See Ass'n of*

15  *Wash. Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001) (rejecting

16  public hospital districts' attempt to recover costs for treating patients suffering from tobacco-related

17  illnesses).

18     At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on

19  the basis that their alleged harms are impermissibly derivative of students' alleged harms.  SD Order

20  at 21.  The Court's reasoning was based on allegations that the School Districts had been directly

21  injured because "they *have had to* hire mental health personnel and develop further mental health

22  resources to mitigate the negative in-school consequences of their students' . . . use of defendants'

23  platforms" and because "the school districts appear to seek *recovery of unique damages*."  *Id.* at 19–

24  21 (emphasis added).  The record evidence now demonstrates that Tucson does not seek recovery

25  for those types of injuries, but to institute a sweeping plan for the benefit of students that it will not

26  otherwise implement or be forced to implement.  Thus, even if funding for the strategic plan were

27  the type of legally cognizable damages or abatement that Tucson could recover, any recovery would

28  be for derivative injuries.

1    **D.    The Court Should Grant Summary Judgment on Tucson's Failure-To-Warn
2    Claim.**

3    Tucson contends that "Defendants failed to adequately warn [Tucson] about the physical

4   and mental health risks posed by their platforms and the increased resources that [Tucson] would

5   need to expend to address the youth mental health crisis Defendants caused." Master Compl. ¶ 1034.

6   But Defendants do not owe a duty to provide warnings to a school district that its students' use of

7   Defendants' platforms may cause financial harm to the District, and Defendants are entitled to

8   summary judgment on Tucson's failure-to-warn claim.[13]  Further, even if there were a duty to warn

9   school districts, Tucson's claim fails for lack of evidence. Tucson has adduced no evidence of what

10  a warning to school districts should have said, to whom or how it should have been made, or that

11  any warning would have reduced Tucson's alleged damages.  And to the extent that Tucson contends

12  that Defendants owed a tort duty *running to Tucson* to provide warnings *to its students* (or their

13  parents), its claim likewise fails.

14    **1.    Defendants Do Not Owe Tucson a Duty To Warn the District Directly.**

15    Tucson advances a novel theory on its failure-to-warn claim: it alleges that Defendants had

16  a duty to provide a warning to school districts—distinct from the warnings that allegedly should

17  have been provided to student users and parents—that student use of the platforms could cause harm

18  to those students, which might, in turn, cause the school district to expend additional resources.

19  Master Compl. ¶¶ 1034, 1036.  Defendants are not aware of any case in any jurisdiction that has

20  held there is a duty to warn a non-user of a service that others' use of that service may cause financial

21  injury to the plaintiff.  Such a rule would lead to an absurd result—*e.g.*, alcohol companies would

22

23  ───────────────
    [13] Defendants also contend that they are entitled to summary judgment on Tucson's failure-to-warn
24  claim that arises from third-party content or protected publishing activities for the threshold reason
    that such a claim is barred by Section 230.  *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir.
25  2025) (barring claim "that Grindr had a duty to warn Doe about the risks of child sexual exploitation
    on the App"); *Est. of Bride*, 112 F.4th at 1179–80 (barring failure to warn claim challenging
26  anonymity feature of app that faulted app "for not mitigating, in some way, the harmful effects of
    the harassing and bullying content" through anonymity feature).  Per the Court's instructions given
27  the pending appeal by Meta and TikTok, Defendants reserve their right to challenge Tucson's
    failure-to-warn claim as being barred by Section 230 at a later time.
28

need to warn landlords that their tenants might damage property while under the influence of alcohol, and tobacco companies would need to warn employers that they might need to pay increased healthcare costs for employees who smoke.

Even in cases involving *physical* injuries, courts have held that a defendant has no duty to warn third parties that they might become indirectly injured by a defendant's alleged negligence. *See, e.g.*, *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 643, 645 (Ga. 2016) (finding manufacturer of a facility's "asbestos-laden water pipes" did not have a duty to warn plaintiff of the dangers of asbestos dust where she claimed she developed mesothelioma from laundering the asbestos-dust-covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of coronavirus at work).

While Defendants acknowledge that the Court previously held that Defendants owe a general duty of care to Tucson, they respectfully submit that the Court's analysis does not support finding a duty to provide a warning directly to Tucson about potential financial harms resulting from student use.  None of the cases relied on by the Court in its prior rulings contemplates a duty to warn third parties that someone else may use the defendant's service, become injured, and thereby cause downstream economic consequences to the third party.  *See* SD Order at 27–34.  Recognizing such broad duties "would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by" the user's use of the service. *Gourdine v. Crews*, 955 A.2d 769, 786 (Md. Ct. App. 2008).

### 2. Tucson Lacks Evidence Supporting Its Failure-To-Warn Claim.

Even if Defendants owed Tucson a duty to warn, the claim still fails.  A plaintiff asserting a failure to warn claim must show that "the failure to warn was . . . the proximate cause of the incident."  *Raschke v. Carrier Corp.*, 146 Ariz. 9, 12 (Ariz. Ct. App. 1985) (granting summary judgment for defendant because proposed warning would not have prevented injury); *Shetter v. Rochelle*, 2 Ariz. App. 607, 609 (Ariz. Ct. App. 1966) (defendant could not be held liable because of "complete lack of evidence tending to show that any failure to warn was the proximate cause of plaintiff's injury").  "To prove causation," the plaintiff is also "required to present evidence that if

1    [the defendant] had issued a proper warning, [the plaintiff] would have taken precautions to avoid

2    the" injuries. *Golonka v. Gen. Motors Corp.*, 204 Ariz. 575, 584–85 (Ariz. Ct. App. 2003); *see also,*

3    *e.g.*, *Robertson v. Sixpence Inns of Am. Inc.*, 163 Ariz. 539, 546 (Ariz. 1990). In the circumstances

4    at issue here, where the adequacy and efficacy of a warning to a school district about alleged

5    financial consequences from student use of online platforms "are not within the common knowledge

6    of jurors . . . expert testimony is necessary to support [Tucson's] warning defects claim." *Nelson v.*

7    *Am. Honda Motor Co.*, 2021 WL 2877919, at *7 (W.D. Pa. May 17, 2021).

8         Yet none of Tucson's experts opined that Defendants should have warned school districts

9    (as opposed to users and parents), save for one isolated statement that "parents, children and the

10    public (including schools) [should] be fully informed about the risks and harms the platforms

11    present." *See* Ex. 53 (Estes Rep.) ¶ 316. Nor has Tucson offered any evidence (fact or expert) of

12    what a warning to school districts should have looked like or how it should have been implemented.

13    Specifically, there is no evidence of *who* in the District should have received the warning, *what* it

14    should have said, *when* it should have been provided, or *where* and *how* the warning should have

15    been communicated. These are all significant questions given that the allegation is that a warning

16    should be provided to entities that may not themselves be users of or have any interaction with the

17    platforms. Because the record is silent on each point, Tucson has not met its burden of proof.

18         Perhaps most critically, Tucson has not offered any evidence (fact or expert) that a warning

19    directly to the District would have reduced its alleged harms or damages. There is no evidence that,

20    in the face of such a warning, Tucson itself would have further restricted access to Defendants'

21    platforms by students. The only record evidence is to the contrary: even after Tucson filed this

22    lawsuit, its cellphone policy allows students to possess cellphones on campus; allows high school

23    students to use their cellphones during passing period and lunch; and allows teachers to approve the

24    use of cellphones for education purposes, during field trips, and during sporting events. Ex. 13

25    (Alvarez Dep.) 58:11–59:3; Ex. 3 (Trujillo Dep.) 329:3–330:15; Ex. 54 (Trujillo Dep. Ex. 64 (TUSD

26    Cell Phone Policy (JICJ)); Ex. 60 (April 8, 2025 Shivanonda 30(b)(6) Ex. 9) (TUSD Regulation

27    "Use of Cell Phones and Other Electronic Signaling Devices" (JICJ-R)); Ex. 25 (Sanchez Dep.)

28    70:25–71:10; Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 144:15–145:21. And, years after

filing suit, Tucson does not ban students from using social media on their personal devices at school. Ex. 13 (Alvarez Dep.) 59:4–7; Ex. 3 (Trujillo Dep.) 330:23–331:1. Tucson also continues to maintain accounts on some of Defendants' platforms to engage with its students and their families, and it has never posted any warning in connection with its own use of Defendants' platforms. Ex. 3 (Trujillo Dep.) 318:7–20, 319:9–19; Ex. 12 (April 8, 2025 Shivanonda 30(b)(6) Dep.) 180:5–189:8. There certainly is no evidence that a warning to *Tucson* would have caused any *student* to use Defendants' platforms less and thereby avoid the alleged harms of addiction and mental health problems in the first place, much less that *a sufficient number of students* would have used the platforms less and experienced such fewer harms that Tucson would have had to expend fewer resources in responding to the alleged youth mental health crisis in the District. Summary judgment is therefore warranted.

### 3. Tucson Cannot Assert a Claim that Defendants Failed To Warn Students.

To the extent Tucson is claiming that Defendants had a duty running to the District based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Compl. ¶ 265, Defendants are also entitled to summary judgment. Tucson does not purport to bring representative claims on behalf of its students or their families. Nor could it. *See* Defendants' Motion to Dismiss the School District and Local Government Entities' Master Complaint (ECF 601) at 44 & n.34 (collecting authorities).

The Arizona Supreme Court's decision in *Quiroz v. ACLOA Inc.*, 243 Ariz. 560 (Ariz. 2018), precludes Tucson's claim. There, the plaintiff sued the owner of a manufacturing plant after the plaintiff's father allegedly had "his clothes. . . contaminated with asbestos fibers" while working at that plant and exposed the plaintiff to those fibers when he "came home from work," causing the plaintiff to contract cancer. *Id.* at 563. The plaintiff did not allege that the defendant owed any duty to warn him directly. Instead, he sought to recover for injuries flowing from the defendant's failure to provide adequate warnings to his father "about the dangers of secondary asbestos exposure." *Id.* The court rejected that effort, holding that even if the harms to third parties like the plaintiff were a foreseeable result of any inadequate warnings, the defendants did not owe a duty to warn its

1   employees *running to and enforceable by* potential secondary victims like the plaintiff. *Id.* at 565,

2   579; *see also id.* at 564–65 (explaining that Arizona law does not recognize foreseeability as a factor

3   in determining whether a duty exists). The court explained that public policy did not support such

4   a duty to warn because no state statute created such a duty. *Id.* at 566–67 ("[I]n the absence of a

5   statute, we exercise great restraint in declaring public policy. . . . [W]e have ultimately premised

6   the existence of a duty on a statute or a recognized special relationship."). The court also explained

7   that a contrary rule would expand liability for a failure to warn to an absurdly broad universe of

8   potential plaintiffs, as the defendant "would have owed a presumed duty of care to [the father's]

9   neighbors and friends, babysitters and cab drivers, waiters and bartenders, dentists and physicians,

10  and fellow church members." *Id.* at 577.

11      Tucson's claim fails for the same reasons. Tucson does not claim harm as a direct user of

12  Defendants' platforms or through any other kind of direct relationship with Defendants; it claims

13  that it was a secondary victim of Defendants' alleged failure to warn users that they could become

14  addicted or suffer mental health harms from use of Defendants' platforms. Imposition of a duty to

15  warn users of Defendants' platforms that runs from Defendants to school districts would "expand

16  tort liability beyond manageable bounds." *Id.*; *see also Gourdine*, 955 A.2d at 750 (pharmaceutical

17  manufacturer had no duty running to plaintiff to warn third party who suffered adverse effects from

18  defendant's medication and struck and killed plaintiff's husband while driving even assuming

19  accident was foreseeable result of inadequate warnings); *Doe v. Pharmacia & Upjohn Co.*, 879 A.2d

20  1088, 1096 (Md. App. Ct. 2005) (employer had no duty running to employee's wife to warn

21  employee of the risk of HIV infection even though employer knew employee was exposed to HIV

22  in his work and that he was married).

23      **E.    The Court Should Grant Summary Judgment for the Non-Operating Meta
               Defendants Not Even Arguably Involved in Any Alleged Injuries.**

24

25      SD Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section,

26  "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible for

27  the development and operation of Facebook and Instagram. *See* Ex. 57 (Meta Defendants'

28  Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question ("DWQ"))

at 21–22, 25. The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments, Inc.; Siculus, Inc.; Facebook Operations, LLC; Meta Platforms Technologies, Inc.; Facebook Technologies, LLC; Facebook Holdings, LLC; and Instagram, LLC (the "Non-Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram. *See id.*

Summary judgment should therefore be awarded to the Non-Operating Defendants for the additional reason that they had no involvement in Plaintiff's alleged injuries. "As a general matter, corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely have legal independence from each other and each can only be held liable for its own acts or omissions." *Khoros, LLC v. Lenovo (U.S.), Inc.*, 2020 WL 12655516, at \*14 (N.D. Cal. Oct. 5, 2020) (surveying California and Delaware law); *see Loiselle v. Cosas Mgmt. Grp., LLC*, 224 Ariz. 207, 214 (Ariz. Ct. App. 2010) ("A basic axiom of corporate law is that a corporation will be treated as a separate entity unless there is sufficient reason to disregard the corporate form." (citation omitted)).[14] To sustain its claims, Tucson must prove that *each Defendant* caused it harm. *See supra* Section IV.A. But Tucson has no evidence by which to do so. Indeed, the evidence shows that the Non-Operating Defendants engage in activities wholly unrelated to the school districts' claims, namely: "payment processing" (Facebook Payments, Inc); "operat[ing] . . . data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "hold[ing] certain Instagram intellectual property" (Instagram, LLC). Ex. 57 (DWQ) at 21–22, 25. For this additional reason, the Non-Operating Defendants are all entitled to summary judgment.

## V.    CONCLUSION

Defendants seek entry of summary judgment in their favor on all causes of action that Tucson asserts against Defendants or, in the alternative, partial summary judgment as to Tucson's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

---

[14] Because this outcome is required under the laws of all three states potentially at issue, MPI does not apply a choice-of-law analysis or take a position on which state's law applies to this question.

1    DATED:  September 30, 2025        Respectfully submitted,

2

3
                                By:    */s/ Victoria A. Degtyareva*
4                                      JONATHAN H. BLAVIN (State Bar No. 230269)
                                       Jonathan.Blavin@mto.com
5                                      MUNGER, TOLLES & OLSON LLP
                                       560 Mission Street, 27th Floor
6                                      San Francisco, CA 94105
                                       Tel: (415) 512-4000
7
                                       VICTORIA A. DEGTYAREVA (State Bar No. 284199)
8                                      Victoria.Degtyareva@mto.com
                                       MUNGER, TOLLES & OLSON LLP
9                                      350 South Grand Avenue, 50th Floor
                                       Los Angeles, CA 90071
10                                     Tel.: (213) 683-9100

11
                                       ALLISON BROWN (*pro hac vice*)
12                                     alli.brown@kirkland.com
                                       KIRKLAND & ELLIS LLP
13                                     2005 Market Street, Suite 1000
                                       Philadelphia, PA 19103
14                                     Tel.: (215) 268-5000

15                                     JESSICA DAVIDSON (*pro hac vice*)
                                       jessica.davidson@kirkland.com
16                                     JOHN J. NOLAN (*pro hac vice*)
                                       jack.nolan@kirkland.com
17                                     KIRKLAND & ELLIS LLP
                                       601 Lexington Avenue
18                                     New York, NY 10022
                                       Tel.: (212) 446-4800
19
                                       *Attorneys for Defendant Snap Inc.*
20

21                                     */s/ Ashley W. Hardin*
                                       JOSEPH G. PETROSINELLI (*pro hac vice*)
22                                     jpetrosinelli@wc.com
                                       ASHLEY W. HARDIN (*pro hac vice*)
23                                     ahardin@wc.com
                                       J. ANDREW KEYES (*pro hac vice*)
24                                     akeyes@wc.com
                                       NEELUM J. WADHWANI (SBN 247948)
25                                     nwadhwani@wc.com
                                       WILLIAMS & CONNOLLY LLP
26                                     680 Maine Avenue, SW
                                       Washington, DC 20024
27                                     Tel.: (202) 434-5000

28                                     *Attorneys for Defendants YouTube, LLC and Google LLC*

-51-

1

2          /s/ Christian J. Pistilli
           ASHLEY M. SIMONSEN (State Bar No. 275203)
3          asimonsen@cov.com
           COVINGTON & BURLING LLP
4          1999 Avenue of the Stars
           Los Angeles, California 90067
5          Telephone: (424) 332-4800

6          PHYLLIS A. JONES (*pro hac vice*)
           pajones@cov.com
7          PAUL W. SCHMIDT (*pro hac vice*)
           pschmidt@cov.com
8          CHRISTIAN J. PISTILLI (*pro hac vice*)
           cpistilli@cov.com
9          COVINGTON & BURLING LLP
           One City Center
10         850 Tenth Street, NW
           Washington, DC 20001-4956
11         Tel.: (202) 662-6000

12         *Attorneys for Defendants Meta Platforms, Inc. f/k/a*
           *Facebook, Inc.; Facebook Holdings, LLC; Facebook*
13         *Operations, LLC; Meta Payments Inc. f/k/a Facebook*
           *Payments Inc.; Meta Platforms Technologies, LLC f/k/a*
14         *Facebook Technologies, LLC; Instagram, LLC; and*
           *Siculus LLC f/k/a Siculus, Inc.*

15

16         /s/ Bailey J. Langner
           GEOFFREY M. DRAKE (*pro hac vice*)
17         gdrake@kslaw.com
           TACARA D. HARRIS (*pro hac vice*)
18         tharris@kslaw.com
           KING & SPALDING LLP
19         1180 Peachtree Street, NE, Suite 1600
           Atlanta, GA 30309
20         Tel.: (404) 572-4600

21         DAVID P. MATTERN (*pro hac vice*)
           dmattern@kslaw.com
22         KING & SPALDING LLP
           1700 Pennsylvania Avenue, NW
23         Suite 900
           Washington, D.C. 20006
24         Tel.: (202) 737-0500

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

BAILEY J. LANGNER (State Bar No. 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Tel.: (415) 318-1200

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd., ByteDance Ltd.,*
*and TikTok LLC*

1

## **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER 27**

2

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3     DATED:   September 30, 2025              By:     */s/ Victoria A. Degtyareva*
                                              Victoria A. Degtyareva
4                                             *Attorney for Defendant Snap Inc.*

5

                                              By:     */s/ Christian J. Pistilli*
6                                             Christian J. Pistilli
                                              *Attorney for Defendants Meta Platforms, Inc. f/k/a*
7                                             *Facebook, Inc.; Facebook Holdings, LLC;*
                                              *Facebook Operations, LLC; Meta Payments Inc.*
8                                             *f/k/a Facebook Payments Inc.; Meta Platforms*
                                              *Technologies, LLC f/k/a Facebook Technologies,*
9                                             *LLC; Instagram, LLC; and Siculus LLC f/k/a*
                                              *Siculus, Inc.*
10

11                                            By:     */s/ Bailey J. Langner*
                                              Bailey J. Langner
12                                            *Attorney for Defendants TikTok Inc., ByteDance*
                                              *Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*
13

14                                            By:     */s/ Ashley W. Hardin*
                                              Ashley W. Hardin
15                                            *Attorney for Defendants YouTube, LLC and Google*
                                              *LLC*
16

17

18

19

20

21

22

23

24

25

26

27

28

1

## <u>ATTESTATION</u>

2      I, Victoria A. Degtyareva, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the

3   concurrence to the filing of this document has been obtained from each signatory hereto.

4

5   DATED:   September 30, 2025                By:   */s/ Victoria A. Degtyareva*

6                                                    Victoria A. Degtyareva

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28