Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc.; Facebook Holdings, LLC;
Facebook Operations, LLC; Meta Payments Inc.
f/k/a Facebook Payments Inc.; Meta Platforms
Technologies, LLC f/k/a Facebook Technologies,
LLC; Instagram, LLC; and Siculus LLC f/k/a
Siculus, Inc.*

[Additional parties and counsel listed on signature
pages]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*ALL ACTIONS* | MDL No. 3047<br><br>Case No.: 4:22-md-03047-YGR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## NOTICE OF MOTION AND MOTION TO EXCLUDE

PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby do move this Court, under Federal Rule of Evidence 702, for an order excluding Plaintiffs' school district experts.

This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declaration of Ashley M. Simonsen and the exhibits thereto, and any other matters presented at the time of the hearing.

DATED:  September 30, 2025                    Respectfully submitted,


By:    _/s/ Ashley M. Simonsen_

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments, Inc. f/k/a Facebook Payments, Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

*[Additional counsel listed on signature pages]*

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................................1

II.    LEGAL STANDARD..........................................................................................................2

III.   ARGUMENT ......................................................................................................................3

       A.    All Plaintiffs' SD Experts Fail to Disentangle Alleged Harms Arising from Each
             Defendant's Actionable Conduct from Harms Flowing from Social Media Use Generally,
             Third-Party Wrongdoing on Defendants' Platforms, and Defendants' Protected
             Publishing Activities. ...............................................................................................3

             1.    The SD Experts Fail to Separate Each Platform's Purported Effects from One
                   Another or from Social Media Generally. .................................................3

             2.    The SD Experts Fail to Separate out the Non-Foreseeable Bad Acts of Third
                   Parties..........................................................................................................5

             3.    The SD Experts Fail to Separate out Actionable Features from Third-Party
                   Content and Defendants' Protected Publishing Activities..........................7

       B.    Robert Klein's Opinions Should Be Excluded. ......................................................10

             1.    Klein's Survey Does Not Disentangle Defendants' Actionable Conduct from
                   Conduct that Cannot Provide a Basis for Imposing Liability...................10

             2.    Klein's Teacher Survey Results Should Be Excluded as Unreliable..........11

       C.    The Court Should Exclude Bryce Ward's Lost-Time Damages Opinions. .............18

             1.    Dr. Ward Did Not Calculate Damages That Disentangle Defendants' Actionable
                   Conduct from Conduct That Cannot Provide a Basis for Imposing Liability. ......20

             2.    Dr. Ward's Lost-Time Damages Are Not Legally Cognizable Damages. ............23

             3.    Dr. Ward's Teacher-Related Damages Opinions Are Unreliable Because They
                   Are Based on the Unreliable and Inapposite Klein Survey. ...............................24

       D.    The Court Should Exclude Jeffrey Meyers's "Out-of-Pocket" Damages Opinions..........25

       E.    The Court Should Exclude Sharon Hoover's Specific Causation and "Strategic Plan"
             Opinions.................................................................................................................28

             1.    Dr. Hoover's Opinions Are Not Tied to Defendants' Actionable Conduct...........30

             2.    Dr. Hoover's Specific Causation Opinions Should Be Excluded.........................32

             3.    Dr. Hoover's "Strategic Plans" Are Neither Proper Abatement Remedies nor
                   Appropriate Identifications of Future Damages. .................................................35

4.    Dr. Hoover Lacks Any Basis for Her Opinions About the Staffing and Training Levels and Timeframe in Her Strategic Plans. .......................................................35

F.    The Court Should Exclude Douglas Leslie's Estimate of Strategic Plan Costs. ...............40

G.    The Court Should Exclude Plaintiffs' Expert Dr. Osborne's Proffered Opinions............41

1.    Dr. Osborne Fails to Disentangle Actionable and Non-Actionable Conduct as This Court Has Required................................................................................42

2.    Dr. Osborne's Opinions About Purported Trends Outside the Six Trial Bellwether Districts Are Inadmissible.......................................................43

3.    Dr. Osborne's Opinions About Mental Health Impacts and Platform Design Are Outside of His Expertise. .......................................................................47

4.    Dr. Osborne's Opinion That Public Education Is a Public Right Is an Inadmissible Legal Conclusion. ..........................................................................48

5.    Dr. Osborne's Opinions Should Be Excluded Because He Relied on Fake Citations Generated by Artificial Intelligence. .......................................................48

IV.    CONCLUSION................................................................................................49

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AgroFresh Inc. v. Essentiv LLC*,
   2019 WL 9514565 (D. Del. Oct. 7, 2019) ..................................................................6

*Apple, Inc. v. Samsung Elecs. Co.*,
   2013 WL 5955666 (N.D. Cal. Nov. 6, 2013) .............................................................48

*Asetek Danmark A/S v. CoolIT Sys. Inc.*,
   2022 WL 21306657 (N.D. Cal. Oct. 4, 2022)...........................................................44

*In re: Autozone, Inc.*,
   2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ......................................................13, 18

*Avila v. Willits Env't Remediation Tr.*,
   633 F.3d 828 (9th Cir. 2011) ....................................................................................48

*Bartlett v. Mutual Pharmaceutical Co., Inc.*,
   742 F. Supp. 2d 182 (D.N.H. 2010)............................................................................9

*Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*,
   582 F.3d 1227 (11th Cir. 2009) ..................................................................................6

*Bowers v. NCAA*,
   564 F. Supp. 2d 322 (D.N.J. 2008) .............................................................................6

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
   2017 WL 10434367 (N.D. Cal. Jan. 23, 2017).......................................................24, 40

*In re Circuit Breaker Litigation*,
   984 F. Supp. 1267 (C.D. Cal. 1997) ...........................................................................8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
   251 F.3d 1252 (9th Cir. 2001) ..................................................................................12

*In re ConAgra Foods, Inc.*,
   90 F. Supp. 3d at 951 ...............................................................................................18

*Concord Music Grp., Inc. v. Anthropic PBC*,
   2025 WL 1482734 (N.D. Cal. May 23, 2025)............................................................49

*Cooper v. Meritor, Inc.*,
   2019 WL 545263 (N.D. Miss. Feb. 11, 2019).......................................................23, 35

*Daubert v. Merrell Dow Pharms., Inc.*,
   43 F.3d 1311 (9th Cir. 1995) ....................................................................................14

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993).................................................................................38

*Duran v. U.S. Bank Nat. Ass'n*,
    59 Cal.4th 1 (2014) ...............................................................................18

*Elosu v. Middlefork Ranch Inc.*,
    26 F.4th 1017 (9th Cir. 2022) ..................................................................2

*Engilis v. Monsanto Co.*,
    2025 WL 2315898 (9th Cir. Aug. 12, 2025)...............................2, 3, 33

*Fields v. Twitter, Inc.*,
    881 F.3d 739 (9th Cir. 2018) ....................................................................6

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997)..............................................................2, 4, 36, 39

*In re Google Play Store Antitrust Litig.*,
    2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .......................................46

*Grajeda v. Vail Resorts Inc.*,
    2022 WL 17848967 (D. Vt. Dec. 22, 2022) ...........................................46

*Greenwood Utils. Comm'n v. Miss. Power Co.*,
    751 F.2d 1484 (5th Cir. 1985) ..................................................................8

*Hamilton v. McLemore*,
    2021 WL 1654008 (S.D. Miss. Mar. 18, 2021) .....................................36

*Hernandez v. Leichliter*,
    2016 WL 684038 (S.D.N.Y. Feb. 18, 2016)......................................32, 35

*Hollander v. Sandoz Pharms. Corp.*,
    289 F.3d 1193 (10th Cir. 2002) ................................................................4

*IceMOS Tech. Corp. v. Omron Corp.*,
    2019 WL 5960069 (D. Ariz. Nov. 13, 2019)......................................23, 35

*Jimenez v. Allstate Ins. Co.*,
    2019 WL 13088814 (C.D. Cal. May 13, 2019) ..................................13, 18

*Keith v. Volpe*,
    858 F.2d 467 (9th Cir. 1988) ..................................................................12

*Kim v. Benihana, Inc.*,
    2024 WL 3550390 (C.D. Cal. May 20, 2024) ....................................23, 24

*Kohls v. Ellison*,
    2025 WL 66514 (D. Minn. Jan. 10, 2025)..............................................49

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)............................................................................................................45

*Laux v. Mentor Worldwide, LLC*,
   295 F. Supp. 3d 1094 (C.D. Cal. 2017) ............................................................................36

*In re: Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig.*,
   2016 WL 2940778 (D.S.C. May 6, 2016)............................................................................9

*Litton Sys., Inc. v. Honeywell, Inc.*,
   No. CV 90-4823, 1996 WL 634213 (C.D. Cal. July 24, 1996) ...........................................6

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. 2005) ................................................................................34

*Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*,
   89 F.3d 594 (9th Cir. 1996) ..............................................................................................14

*M2 Software, Inc. v. Madacy Ent.*,
   421 F.3d 1073 (9th Cir. 2005) ..........................................................................................12

*Malden Transp. Inc. v. Uber Techs. Inc.*,
   404 F. Supp. 3d 404 (D. Mass. 2019) .............................................................................8, 9

*Marlo v. United Parcel Serv., Inc.*,
   251 F.R.D. 476 (C.D. Cal. 2008) ...............................................................................16, 18

*Marlo v. UPS, Inc.*,
   639 F.3d 942 (9th Cir. 2011) ............................................................................................12

*Mata v. Avianca, Inc.*,
   678 F. Supp. 3d 443 (S.D.N.Y. 2023)...............................................................................49

*Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*,
   2009 WL 10670877 (C.D. Cal. Aug. 18, 2009)............................................................23, 35

*Morgan v. Cmty. Against Violence*,
   2023 WL 6976510 (D.N.M. Oct. 23, 2023)........................................................................49

*Perry v. Novartis Pharms. Corp.*,
   564 F. Supp. 2d 452 (E.D. Pa. 2008) ...............................................................................32

*Piepes v. NAI Ent. Holdings LLC*,
   394 F. Supp. 3d 315 (E.D.N.Y. 2019) .................................................................................9

*Reinsdorf v. Skechers U.SA.*,
   922 F. Supp. 2d 866 (C.D. Cal. 2013) ..............................................................................15

*Rider v. Sandoz Pharms. Corp.*,
   295 F.3d 1194 (11th Cir. 2002) ..........................................................................................4

*Sanderson v. Int'l Flavors & Fragrances, Inc.*,
    950 F. Supp. 981 (C.D. Cal. 1996) ............................................................3, 4

*Sclafani v. Air & Liquid Sys. Corp.*,
    14 F. Supp. 3d 1351 (C.D. Cal. 2014) ..........................................................4

*In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*,
    2021 WL 781682 (D. Md. Mar. 1, 2021) ......................................................8

*Stephens v. Union Pac. R.R. Co.*,
    935 F.3d 852 (9th Cir. 2019) ......................................................................35

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*,
    2008 WL 4755611 (C.D. Cal. Jan. 7, 2008) ...............................................12

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    2008 WL 2323856 (N.D. Cal. May 22, 2008) .......................................24, 34

*Twitter, Inc. v. Taamneh*,
    598 U.S. 471 (2023) ....................................................................................6

*United States v. Tamman*,
    782 F.3d 543 (9th Cir. 2015) ......................................................................48

*In re Viagra Prods. Liab. Litig.*,
    658 F. Supp. 2d 950 (D. Minn. 2009) ..........................................................5

*Virntex, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ...................................................................6

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*,
    500 F. Supp. 3d 940 (N.D. Cal. 2020) .........................................................6

*Wallace v. Countrywide Home Loans*,
    2012 WL 11896333 (C.D. Cal. Aug. 31, 2012) ....................................16, 18

*Willet v. Johnson & Johnson*,
    465 F. Supp. 3d 895 (S.D. Iowa 2020) ........................................................5

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
    715 F. Supp. 3d 587 (D. Del. 2024) .............................................................6

*Zucchella v. Olympusat, Inc.*,
    2023 WL 2628107 (C.D. Cal. Jan. 10, 2023) ..........................................6, 24

**Other Authorities**

Fed. R. Evid. 702 .......................................................................................... *passim*

Fed. R. Evid. 703 ................................................................................................................34

DEFENDANTS' NOTICE OF MOTION AND MOTION TO EXCLUDE TESTIMONY OF SCHOOL DISTRICT EXPERTS
4:22-md-03047-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.    INTRODUCTION**

Plaintiffs' six school district ("SD") experts offer methodologically flawed opinions that run the gamut of Rule 702 failings—from not employing reliable methodologies to relying on legally barred materials to using fake citations created by artificial intelligence.  Most fundamentally, each expert fails to disentangle Defendants' actionable conduct from a panoply of other things: third-party content and protected publishing activities (in violation of this Court's orders, Section 230, and the First Amendment), "social media" or smartphone use writ large, and the actions of third parties.  That failure occurred despite this Court's clear guidance setting forth the specific features for which Defendants could be liable—and the more than two years Plaintiffs have had to address those features through sound methodology.  The expert opinions Plaintiffs offer would not help the jury and are not reliable; they therefore do not pass muster under Rule 702.  And all that aside, each SD expert's opinions suffer from individual problems.  Their survey expert used an unreliable survey that asked teachers to do the impossible: estimate down to the minute, at intervals throughout a decade-long period, how much time they spent dealing with social media-related issues.  Their past damages expert measures what Plaintiffs call "lost time," which is foreclosed under the law.  Their causation and "strategic plan" expert opines with no reliable basis that each Plaintiff has been harmed by social media and proposes a methodologically rootless plan.  And their superintendent expert—who used fake AI citations—offers opinions for which he is not qualified, that amount to impermissible legal conclusions, and that are riddled with other errors.  All should be excluded.

This brief is organized into sections that address:

- All six of Plaintiffs' school district experts' failure to offer opinions specific to Defendants' actionable conduct;

- Mr. Robert Klein, who conducted a survey of Plaintiffs' teachers that serves as a foundation for Dr. Bryce Ward's damages opinions;

- Dr. Bryce Ward, who offers opinions about "lost time" compensatory damages, based on the survey conducted by Mr. Klein in relation to teachers, and based on affidavits and testimony in relation to non-teacher staff;

- Mr. Jeffrey Meyers, who offers opinions about past "out-of-pocket" compensatory damages;

- Dr. Sharon Hoover, who offers specific causation opinions for each Plaintiff and opinions recommending each Plaintiff implement 15-year "strategic plans" in the future;

- Dr. Douglas Leslie, who calculates costs associated with Dr. Sharon Hoover's "strategic plans";

- Dr. Brian Osborne, who offers non-district-specific opinions on the effect of social media on the school environment.

## II.    LEGAL STANDARD

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. "To evaluate reliability, the district court must assess the expert's reasoning or methodology, using as appropriate criteria such as testability, publication in peer-reviewed literature, known or potential error rate, and general acceptance." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (cleaned up). In addition, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered" and exclude the testimony. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (citation omitted).

The 2023 amendments to Rule 702 "sought to 'clarify and emphasize' that proffered expert testimony must meet the admissibility requirements of Rule 702 by a preponderance of the evidence." *Engilis v. Monsanto Co.*, No. 23-4201, 2025 WL 2315898, at *5 (9th Cir. Aug. 12, 2025) (quoting Fed. R. Evid. 702 advisory committee's note to 2023 amendment). "Before the amendment, many courts had erroneously held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. Properly applied, Rule 702 requires that challenges to an expert's opinion go to the weight of the evidence only if a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Id.* (cleaned up). Accordingly, the Ninth Circuit has recently "confirm[ed] that a proponent of expert testimony must always

establish the admissibility criteria of Rule 702 by a preponderance of the evidence and that there is no presumption in favor of admission." *Id.* at *6.

## III.    ARGUMENT

### A.    All Plaintiffs' SD Experts Fail to Disentangle Alleged Harms Arising from Each Defendant's Actionable Conduct from Harms Flowing from Social Media Use Generally, Third-Party Wrongdoing on Defendants' Platforms, and Defendants' Protected Publishing Activities.

All Plaintiffs' SD experts commit a foundational error because they fail in multiple ways to offer opinions that are relevant to the question at issue in the case: whether *Defendants' actionable conduct* caused the alleged injuries.  Specifically, the experts fail to disentangle Defendants' actionable conduct from (1) other social media platforms or electronic device use in general; (2) the non-foreseeable acts of third-party bad actors; and (3) Defendants' publication of content and use of design features that the Court has ruled are protected by Section 230 and the First Amendment.  These independently dispositive and mutually reinforcing errors require exclusion.

### 1.    The SD Experts Fail to Separate Each Platform's Purported Effects from One Another or from Social Media Generally.

Plaintiffs bear the burden of proving that each Defendant's actionable conduct caused them harm. *See* Defendants' Motions for Summary Judgment ("MSJs") at Part IV.A (concurrently filed).[1]  Under these circumstances, for expert testimony to be relevant and admissible, it must help a jury answer the question of whether "*each defendant* caused [Plaintiffs] to suffer injury." *E.g.*, *Sanderson v. Int'l Flavors & Fragrances, Inc.*, 950 F. Supp. 981, 988 (C.D. Cal. 1996) (emphasis added).  Because Plaintiffs' experts relate only to the question of whether Plaintiffs were harmed by social media generally (including platforms not operated by Defendants, content posted by third party users, and features protected by Section 230 and the First Amendment), the experts' opinions are unreliable, unhelpful to the jury, and inadmissible.

*Sanderson* is instructive.  There, plaintiff alleged injuries flowing from exposure to various fragrance products, but "none of her experts was able to express an opinion that her injuries were caused

---

[1] When each of the MSJs is cited for the same point as to all state laws at issue, Defendants cite them as "MSJs" and the section in which the point appears across them.

by any particular fragrance product or any particular exposure." *Id.* at 986 (emphasis omitted).  On that basis, the court excluded the experts' opinions, explaining that they lacked a "valid scientific connection to the pertinent inquiry" because they could not establish that "exposure to defendants' fragrance products" caused her injury. *Id.* at 1004 (cleaned up).  As the court explained, "while it may be true that plaintiff's evidence would support a finding that her condition was caused by her exposure to fragrance products, that doesn't help her recover against any particular defendant." *Id.* at 988 n.6; *see also, e.g.*, *Sclafani v. Air & Liquid Sys. Corp.*, 14 F. Supp. 3d 1351, 1357 (C.D. Cal. 2014) (finding expert opinion to be insufficient evidence of causation where it related to exposure a class of products as opposed to "exposure to the particular products supplied by" the defendants); *see also Joiner*, 522 U.S. at 146–47 (affirming exclusion of general causation expert where underlying studies failed to isolate and examine exposure to the specific agent at issue); *Hollander v. Sandoz Pharms. Corp.*, 289 F.3d 1193, 1207–09 (10th Cir. 2002) (similar); *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1200–01 (11th Cir. 2002) (similar).

Here, no Plaintiff expert opines that each of Facebook, Instagram, Snapchat, TikTok, and YouTube caused Plaintiffs harm or purports to quantify damages flowing from each of those platforms.  To cite but one example, Robert Klein surveyed Plaintiffs' teachers to determine the amount of classroom time "diverted" to social-media related issues (which was then used by another expert to purportedly calculate past damages).  On its face, however, the survey question asked not about each Defendant's specific platform(s) but about "social media" generally, which it defined as "*e.g.*, Facebook, Instagram, Snapchat, TikTok, YouTube, *etc.*" Ex. 16 (Klein Rep.) D-10 (emphases added).[2]  By listing Defendants' services as only illustrative examples and adding "etc.," Klein expressly invited the survey respondents to consider other platforms—e.g., X, Discord, Reddit, Roblox, Pinterest, etc.—in their analysis.  Klein also failed to differentiate between the services operated by the Defendants in this case.  At deposition, Klein conceded that he lacked information "specific to any one of those five platforms." Ex. 66 (Klein Dep.) 281:8–12.  And when asked whether it was possible to allocate the percent of time allegedly diverted from class

---

[2] All exhibits are to the accompanying Declaration of Ashley M. Simonsen.

instruction across the Defendants' platforms, Mr. Klein responded, "not to any one specific platform from my data." *Id.* at 283:6–9, 283:13–284:1.

As explained in further detail below, this same foundational error infects the opinions of each of Plaintiff's SD experts. None opines how much, if at all, each of Defendants' platforms caused any alleged harms. Instead, their opinions are all about "social media" generally, with no delineation among Defendants' platforms or even between the platforms of Defendants and social media platforms that are not parties. The resulting opinion—that "social media" harmed the bellwether school districts—is not helpful to the jury, is methodologically unreliable, and should be excluded.

### 2. The SD Experts Fail to Separate out the Non-Foreseeable Bad Acts of Third Parties.

The Court held that "non-foreseeable third-party conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms"—"cannot be attribut[ed] to defendants" and that liability cannot be based on such third-party conduct. Order Grant. in Part & Den. in Part Defs' Mot. Dismiss School District & Local Government Entities' Master Compl. ("SD Order") 25–26, ECF 1267. Yet Plaintiffs' SD experts make no effort to distinguish between alleged harms arising from Defendants' actionable conduct and harms arising from third-party wrongdoing that may occur on Defendants' (and other) social media platforms. That renders their opinions unhelpful to the jury and inadmissible under Rule 702 because they seek to impose liability on grounds prohibited by law. *See* Fed. R. Evid. 702(a) (allowing expert testimony only when an "expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine *a fact in issue*" (emphasis added)); *Willet v. Johnson & Johnson*, 465 F. Supp. 3d 895, 910 (S.D. Iowa 2020) ("The court concludes that this opinion . . . is not relevant to any issue remaining in the case, because no claims based on failure to warn remain at issue." (citation omitted)); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 964 (D. Minn. 2009) (excluding as irrelevant expert testimony about conditions unrelated to the one at issue).

Courts routinely exclude expert opinions that improperly seek to measure damages based on conduct that is lawful or otherwise does not provide a valid basis for imposing liability. For example, in antitrust cases, plaintiffs are only entitled to recover "for losses fairly caused by a defendant's unlawful

anticompetitive behavior." *Litton Sys., Inc. v. Honeywell, Inc.*, No. CV 90-4823, 1996 WL 634213, at *2 (C.D. Cal. July 24, 1996). On that basis, the *Litton* court excluded the testimony of plaintiff's damages expert because he failed to "disaggregate" harms that "flow[] from the defendant's unlawful acts as opposed to wholly independent factors including the defendant's lawful procompetitive conduct." *Id.* Similarly, in patent cases, a patentee may only recover "damages attributable to the infringing features." *Wirtgen Am., Inc. v. Caterpillar, Inc.*, 715 F. Supp. 3d 587, 591 (D. Del. 2024) (quoting *Virntex, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014)). Thus, in *Wirtgen*, the court excluded an expert's damages testimony because the expert failed "to isolate the value" that a "specific patent added to [a] machine," instead calculating lost profits based on sales of the entire machine. *Id.* at 592. Indeed, in a variety of circumstances, expert opinions are excluded where they fail to disaggregate the impacts of defendants' actionable conduct from other potential sources of harm that cannot provide a basis for imposing liability. *See, e.g.*, *Boca Raton Cmty. Hosp., Inc. v. Tenet Health Care Corp.*, 582 F.3d 1227, 1233–34 (11th Cir. 2009) (excluding "damages opinion [that] was not confined to charges that [plaintiff's] liability theory would consider unlawful"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949–50 (N.D. Cal. 2020), *aff'd*, No. 20-17480, 2022 WL 187841 (9th Cir. Jan. 20, 2022) (excluding opinion that failed to "isolate" effect of allegedly wrongful conduct); *Zucchella v. Olympusat, Inc.*, No. CV 19-7335, 2023 WL 2628107, at *11 (C.D. Cal. Jan. 10, 2023) (excluding damages calculations that improperly lumped together "damages allegedly caused by others" with damages allegedly caused by defendant); *AgroFresh Inc. v. Essentiv LLC*, No. CV 16-662, 2019 WL 9514565, at *1 (D. Del. Oct. 7, 2019) (excluding a damages expert's testimony where the expert failed "to connect the trade secret (or any other) issues in the case with his sums of costs" and the opinion was "a summation of costs from two general aspects of Plaintiff's business" that were unrelated to the trade secrets at issue); *Bowers v. NCAA*, 564 F. Supp. 2d 322, 350 (D.N.J. 2008) (excluding expert damages testimony because expert failed to "disentangle" the effects of plaintiff's drug abuse and drug abuse-related depression from defendant's alleged wrongdoing).

Here, when Defendants provided generally accessible platforms to the public, they did not become liable for those platforms' misuse by others. *See Fields v. Twitter, Inc.*, 881 F.3d 739, 749–50 (9th Cir. 2018) (proximate cause not adequately alleged when ISIS used Twitter accounts); *see also Twitter, Inc. v.*

*Taamneh*, 598 U.S. 471, 504–05 (2023) (same for abettor liability).  In recognition of that fact, the Court ruled that liability cannot be imposed on Defendants based on crimes, threats or other non-foreseeable bad acts carried out by third parties on Defendants' platforms.  SD Order 25–26.  Yet Plaintiffs' experts make no effort to disentangle or disaggregate harms flowing from such third-party behavior as opposed to harms flowing from Defendants' actionable conduct.

For example, multiple Plaintiff experts include among the social media-related harms that they attribute to Defendants (and seek to quantify as damages) incidents of cyberbullying that occur on Defendants' platforms.  *See, e.g.*, Ex. 66 (Klein Dep.) 261:10–262:5 (conceding that his survey did not exclude bullying and similar conduct); Ex. 70 (Ward Dep.) 144:15–145:7 (admitting that he does not have an opinion on whether his calculations, based on Klein's survey, "include damages relating to time spent by teachers and other school staff addressing the effects of content . . . posted by third parties").  Similarly, Plaintiffs' "out-of-pocket" damages expert Jeffrey Meyers includes among the damages he purports to quantify instances of property damage.  *See, e.g.*, Ex. 43 (Meyers Tucson Rep.) app. C, at 3–4. Because Plaintiffs do not even attempt to show that Defendants "promoted, developed, or participated in" any challenges that in turn caused students to damage any property, the Court has made clear that such non-foreseeable third-party misconduct cannot provide a basis for imposing liability on Defendants. *See* SD Order 25–26.

As explained in further detail below, this methodological failing is common across the opinions of all six SD-specific Plaintiff experts.  None disaggregates harms allegedly caused by Defendants' actionable conduct from harms caused by the wrongful conduct of third parties.  Their opinions are therefore not helpful to the jury, are methodologically unreliable, and should be excluded.

### 3. The SD Experts Fail to Separate out Actionable Features from Third-Party Content and Defendants' Protected Publishing Activities.

As set forth in Defendants' concurrently filed motion regarding excluding expert testimony, the Court has recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected publishing activities.  Rejecting an "all or nothing" approach, the Court made clear that the case must focus on "the *specific conduct* through which the defendants allegedly violated their duties to

plaintiffs"—i.e., Defendants' use of the limited set of "at-issue features" that the Court has held are not barred by Section 230 and the First Amendment.  *See* Order Grant. in Part & Den. in Part Defs' Mot. Dismiss ("PI Order") 14–19, 21–22, ECF 430; SD Order 12–13 (applying analysis to school district claims).[3]  These rulings put Plaintiffs on clear notice of what they must do to prove their claims: prove that the at-issue features are defective or otherwise harmful, and that those same features—independent of Defendants' protected publishing activity—are the legal cause of each Plaintiffs' alleged injuries.

Section 230 prohibits Plaintiffs' experts from relying on the publication of third-party content to form the basis of their liability opinions because the publication of third-party content is allowable—and protected—behavior.  *See* PI Order 16.  Yet Plaintiffs' SD experts make no effort to distinguish between alleged harms arising from Defendants' actionable conduct and harms arising from the content published on Defendants' platforms or from Defendants' protected publishing activity.  That renders their opinions unhelpful to the jury and inadmissible under Rule 702 because they seek to impose liability for prohibited reasons. *See supra* III.A.

In numerous contexts, federal courts have held that expert testimony must be excluded when it relies on or even considers a theory of liability that is legally precluded.  *See, e.g.*, *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1503–04 (5th Cir. 1985) (expert testimony "presented no fact issue for trial" where it "relied almost exclusively on conduct that we have determined to be protected under the *Noerr-Pennington* doctrine"); *Malden Transp. Inc. v. Uber Techs. Inc.*, 404 F. Supp. 3d 404, 424 (D. Mass. 2019), *aff'd*, 8 F.4th 1 (1st Cir. 2021) (similar); *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, No. 17-md-2775, 2021 WL 781682, at *5 (D. Md. Mar. 1, 2021) (excluding expert testimony where claims "are expressly or impliedly preempted by federal law and such testimony would invite a jury to question [preempting conduct]").

This includes cases where the expert testimony does not sufficiently *distinguish* between whether it is based on barred or permissible theories of liability.  For example, in *In re Circuit Breaker Litigation*,

---

[3] The Court also declined "to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general."  SD Order 45. Accordingly, as used in this memorandum, Defendant's "actionable conduct" consists of (1) Defendants' use of the "at-issue" features and (2) Defendants' alleged failure to warn.

984 F. Supp. 1267, 1282 (C.D. Cal. 1997), the court rejected expert opinions in support of defendants' Sherman Act counterclaims as not "helpful to determining whether Plaintiffs' non-immune activities were anticompetitive or violative of the Sherman Act" where "the experts fail entirely to delineate between the injuries caused by Plaintiffs' immune activities and those activities not protected under the *Noerr-Pennington* doctrine." Similarly, in *Malden Transportation*, 404 F. Supp. 3d at 424, the court held that the plaintiff's expert's analysis was improper because it "did not disaggregate the [protected] regulatory impacts" and thus "impermissibly attributed some of Uber's petitioning activity in his causation and damages analysis in violation of the *Noerr-Pennington* Doctrine."

Even though it is impermissible for experts here to rely on the effects of publishing content on Defendants' platforms, Plaintiffs' SD experts do just that. For example, this Court has held that Section 230 and the First Amendment protect the timing and clustering of "notifications" on Defendants' platforms. SD Order 14. Yet when Plaintiffs' survey expert was asked at deposition whether a teacher would have included in their survey response time spent dealing with in-class distractions caused by notification, he responded that "if it diverts time from teaching, then I would hope they would include all of those." Ex. 66 (Klein Dep.) 260:16–18; *see also* Ex. 50 (Osborne Rep.) ¶ 68 (school superintendent expert discussing harm coming from "likes, comments, and notifications").

Because Plaintiffs' experts do not and cannot present their opinions in a manner that disentangles the effects of third-party content from any effect of features (let alone the effects of unprotected features from protected publishing features) in a methodologically reliable way, their testimony risks misleading the jury toward imposing liability on a legally impermissible basis. *See Bartlett v. Mutual Pharmaceutical Co., Inc.*, 742 F. Supp. 2d 182, 188–189 (D.N.H. 2010) (excluding expert testimony as creating danger of undue prejudice and confusion because it was "roundabout way of challenging this court's [earlier] ruling"); *In re: Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2016 WL 2940778, at *3 (D.S.C. May 6, 2016) (it would be "confusing and misleading to the jury to hear [that] testimony . . . when [federally preempted] allegations cannot be the basis of Plaintiffs' claims"); *Cf. Piepes v. NAI Ent. Holdings LLC*, 394 F. Supp. 3d 315, 317 (E.D.N.Y. 2019) ("Although the Court agreed to give the jury the above limiting instruction, it did not agree to forgo its Daubert gatekeeping function in excluding unreliable expert testimony.").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### B.      Robert Klein's Opinions Should Be Excluded.

Mr. Klein's survey—which purports to measure the amount of classroom time "diverted" due to "social media issues" going back more than ten years—should be excluded for two fundamental reasons.[4] *First*, Mr. Klein does not disentangle Defendants' actionable conduct from social media use in general, harms resulting from third-party misconduct, and harms allegedly resulting from Defendants' protected publishing activities, as required. *Second*, Mr. Klein did not conduct a methodologically acceptable survey.

### 1.      Klein's Survey Does Not Disentangle Defendants' Actionable Conduct from Conduct that Cannot Provide a Basis for Imposing Liability.

Mr. Klein's survey is inadmissible because it does not disaggregate harms allegedly caused by Defendants' actionable conduct from harm caused by other social media platforms, third-party conduct, third-party content made available on Defendants' platforms, and Defendants' protected publishing activities.

To start, Mr. Klein's surveys asked about social media generally, rather than only Defendants' platforms. Specifically, they asked teachers to state how many minutes of instructional time in a typical day were "diverted from teaching due to student use of *social media* (*e.g.*, Facebook, Instagram, Snapchat, TikTok, Youtube, *etc.*)?" *See, e.g.*, Ex. 16 (Klein Rep. Dekalb) D-10 (emphasis added).[5]  And at deposition, Mr. Klein conceded that if, for example, a student's use of X/Twitter caused classroom disruptions, then a teacher would count those disrupted teaching minutes in their survey responses. Ex. 66 (Klein Dep.) 251:19–252:17. Mr. Klein also failed to account for the fact that during periods of his survey, some of Defendants' platforms were not available in the United States.

---

[4] Defendants are moving to exclude Mr. Klein's one overarching opinion, which he applies across his six district specific reports stating that "from 2014 through the present, middle school and high school teachers in Plaintiff's school district have had an increasing amount of their scheduled classroom instruction time diverted due to the use of Defendants' social media platforms by their students." Ex. 16 (Klein Rep. Dekalb) ¶ 1; Ex. 14 (Klein Rep. Breathitt) ¶ 1, Ex. 15 (Klein Rep. Charleston) ¶ 1, Ex. 17 (Klein Rep. Harford) ¶ 1, Ex. 18 (Klein Rep. Irvington) ¶ 1, Ex. 19 (Klein Rep. Tucson) ¶ 1.

[5] Mr. Klein also submitted rebuttal reports.  *See* Exs. 20–25 (Klein Reb. Reps. for Breathitt, Charleston, DeKalb, Harford, Irvington, and Tucson).

Mr. Klein further conceded that his survey "measured the social media as a unit and did not break out individual platforms," and that it is not possible to attribute an amount of diverted teaching time to any particular social media platform based on his survey data. Ex. 66 (Klein Dep.) 280:20–283:14. The Defendants in this case are not a single block. Liability will need to be determined on a defendant-by-defendant basis, and Mr. Klein's survey results cannot serve as a basis for those factual determinations. This was Mr. Klein's design decision, and it is inadequate for this case.

Finally, as the Court has made clear, Plaintiffs can only recover from harm arising from Defendants' actionable conduct—not from users' allegedly harmful experiences with third party content or features protected by Section 230 or the First Amendment. Yet Mr. Klein conceded that his survey did not exclude harms resulting from third party bad acts, such as cyberbullying. Ex. 66 (Klein Dep.) 261:10– 262:5. And he testified in no uncertain terms that, in crafting his survey, "We really didn't inquire about any specific features," and survey responses would include time diverted due to non-actionable features and content such as algorithmic promotion of addictive engagement, notifications, and student conflict or bullying resulting from comments and posts. Ex. 66 (Klein Dep.) 258:12–262:5. Accordingly, for the reasons explained in Part III.A, *supra*, and in Defendants' motion to exclude opinions based on Section 230 and the First Amendment his opinions are unreliable, methodologically unsound, unhelpful to the jury, and so should be excluded.

### 2.    Klein's Teacher Survey Results Should Be Excluded as Unreliable.

Each bellwether Plaintiff School District relies on results from Mr. Klein's surveys to establish their "lost time" damages figures. But Mr. Klein's survey was not conducted according to accepted survey methodologies and thereby suffers from a host of fatal flaws. *First*, the surveys ask respondents to do the impossible: retroactively quantify—down to the minute—instructional time "lost" to social media going back more than ten years, a survey approach that is untested and unsupported. This methodology is contrary to established scientific literature showing that survey respondents cannot accurately provide time-spent information after the passage of mere hours, and certainly not dating back over ten years. *Second*, the surveys relied on impermissibly small response rates, and Mr. Klein admitted that he made no effort to determine if the respondents constituted a representative sample. In short, Mr. Klein's proposed testimony is not the product of sound methodology and should be excluded.

To be admissible, surveys must be "relevant and conducted according to accepted principles." *M2 Software, Inc. v. Madacy Ent.*, 421 F.3d 1073, 1087 (9th Cir. 2005) (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)).  Although certain technical deficiencies in a survey's methodology may go to the weight of the survey rather than its admissibility, where a survey is conducted using unreliable and/or unaccepted principles, it should be excluded in the first instance. *See Marlo v. UPS, Inc.*, 639 F.3d 942 (9th Cir. 2011) (affirming exclusion of survey because "methodological and design problems" rendered it "unrepresentative, unreliable" and of no "probative value"); *M2 Software*, 421 F.3d at 1087 (excluding survey that was not "conducted in a manner that complied with appropriate standards").  "The proponent of the survey bears the burden of establishing its admissibility." *Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, 2008 WL 4755611, at *3 (C.D. Cal. Jan. 7, 2008) (citing *Keith v. Volpe*, 858 F.2d 467, 480 (9th Cir. 1988)).

**Unreliable Retrospective Reporting.**  Mr. Klein's surveys should be excluded first for their use of unreliable retrospective methodology: asking teachers to recall specific data points from various time periods going back eleven school years, contrary to the scientific consensus that survey participants cannot be expected to recall events that far in the past.  Specifically, the surveys purported to measure how much instructional time middle and high school teachers in each District lost due to students' use of "social media" (not just Defendants' platforms).  To achieve this, Mr. Klein asked respondents to enter the total number of minutes in a "typical day" of instruction where they were "diverted away from teaching due to unauthorized use of social media . . . during class," or time spent dealing with "repercussions from student use of social media . . . outside the classroom."  The survey called on respondents to report the specific number of minutes lost at six increasingly remote time intervals, beginning with (1) the then-current school year (2024-2025); (2) the previous year (2023-2024); (3) "[j]ust after in-person classes resumed following Covid-19;" (4) "[j]ust before lockdown due to Covid-19;" (5) a decade ago (2014); and (6) when the respondent "first started teaching at [their] current school."  *See, e.g.* Ex. 16 (Klein Rep. Dekalb) 10. Respondents were instructed to answer only those questions applicable to them.  For example, a teacher who started teaching in 2021 would not provide his/her "lost time" figures for any of the pre-pandemic questions.  *Id.* at ¶ 37.

Such a recall exercise is virtually impossible to perform in any accurate fashion, particularly without the aid of contemporaneous records, and courts regularly exclude surveys that similarly ask respondents to recall information over a period of years. *See Jimenez v. Allstate Ins. Co.*, 2019 WL 13088814, at *23 (C.D. Cal. May 13, 2019) (granting motion to exclude survey in which respondents were asked to quantify an average number of hours worked per week during a 12-year look-back period and noting that the survey was susceptible to recall bias); *In re: Autozone, Inc.*, 2016 WL 4208200, at *19 (N.D. Cal. Aug. 10, 2016), *aff'd*, 789 F. App'x 9 (9th Cir. 2019) (excluding survey with various methodological deficiencies, including that "the survey ask[ed] respondents to recall very specific events that occurred between three and a half and eleven years ago"). As those courts have explained, "there are *serious concerns* in the academic community associated with relying on a survey respondent's own subjective recollections, particularly ones as to estimates of the time spent working." *Jimenez*, 2019 WL 13088814, at *22 (emphasis added). And these are more than mere credibility concerns, particularly where, as here, the expert's survey design has not made any "adjustment for problems with respondents' recall." *Id.* Asking teachers to quantify the number of minutes they spent dealing with the effects of social media would be like asking how many minutes a doctor spent dealing with patients with the flu as opposed to other illnesses. In the absence of contemporaneous records, such a task would be virtually impossible for doctors to complete with any accuracy for the "typical day" last month, let alone more than a decade ago.

The academic community is unequivocal: trying to recall such details from ten years ago, down to the minute, is not merely difficult—it exceeds the limits of reliable memory. *See* Ex. 73 (Belli, R. F. (2005) Improving the Quality of Retrospective Reports) ("[R]esearch on human memory suggests that the quality of data obtained through retrospective reporting is seriously compromised by the limitations of respondent memory. . . This problem seriously compromises the validity of any inferences generated from data relying on respondent recall."). Indeed, substantive law provisions, like statutes of limitations, reinforce this unexceptional conclusion: memories fade over time and thereby become less accurate and sometimes misleading. The statutes of limitations for negligence across all nineteen states at issue in this case, for example, are significantly shorter than the ten-year period on which Mr. Klein's surveys are based. Mr. Klein has not provided any sound basis to refute these findings about the limitations of recall

and admitted at deposition that the type of recall he asked the survey respondents to perform is unreliable: "I think -- you know, for example, I think everyone can probably know where they were on 9/11, of a certain age, I guess. But that doesn't mean I can ask them what they had for dinner that night." Ex. 66 (Klein Dep.) 164:11-16.  The results from such a fundamentally problematic exercise amount are not reliable and require the surveys' exclusion.

Furthermore, Mr. Klein, who has a background in market research, has never conducted a similar recall study during his 36 years performing surveys.  Ex. 66 (Klein Dep.) 49:13-55:6 (discussing Klein's background in conducting market research studies).  Nor could he identify any scientific literature or principles underlying his approach related to retrospective reporting.  He stated generally that his surveys were performed according to accepted principles in two manuals related to the presentation of survey evidence in court.  *See, e.g.*, Ex. 16 (Klein Rep. Dekalb) ¶ 15 ("The survey was designed and conducted according to generally accepted principles of survey research, as set forth in the Federal Judicial Center's Manual for Complex Litigation and Reference Manual on Scientific Evidence.").  But neither one supports or even discusses retrospective survey methodology.  In fact, Mr. Klein was unable either in his reports or his deposition to point to *any source* to support his retrospective questioning methods.[6]  Plaintiffs failed to meet their burden to identify support in Mr. Klein's field of this methodology, and Mr. Klein's opinions accordingly should be excluded.   *See Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995) (expert's methodology must be "practiced by (at least) a recognized minority of scientists in their field" to make sufficient showing of reliability); *Lust ex rel. Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 597-98 (9th Cir. 1996) (excluding expert because expert's opinions were not accepted by a recognized minority in the field).

In his rebuttal reports, Mr. Klein attempted to analogize his methods to an "event history calendar" used to enhance the accuracy of retrospective reporting by anchoring the questions to significant life milestones or public events. *See, e.g.*, Ex. 22 (Klein Rebuttal Rep. Dekalb) ¶ 8.  For example, a reference

---

[6] *See* Ex. 66 (Klein Dep.) 168:18-169:1 ("Q:  Did you cite any articles specifically addressing the question of teacher recall over significant periods of time? THE WITNESS: No, I don't believe so."); *see also id.* at 176:22-177:6 ("Q. Do you have any literature you can cite that would support the proposition that teachers are capable of recalling, down to the minute, time spent on issues relating to social media?  A. I can't quote a study that would match up with each one of those elements of your - your question.").

to the pandemic may help someone remember approximately when they purchased their first home.  But Mr. Klein cannot claim to have relied on this concept in support of his opinions because he admitted at deposition that he *first learned about event history calendars by reading the rebuttal reports of defense experts*. Ex. 66 (Klein Dep.) 207:13-23 ("I hadn't seen the, you know, specific definition of event history calendar before seeing the rebuttal reports.").

Further, Mr. Klein did not actually employ an event history calendar technique.  There is no support that such a technique can be used in a quantitative survey, let alone that it would improve the ability of respondents to identify precise durations of time spent on a poorly defined task years after the fact. Indeed, Mr. Klein acknowledged that such calendars contemplate qualitative interviews while his own survey used a quantitative style.[7]  Even if certain contextual cues like the pandemic are provided, Mr. Klein offered no support that survey questions asking for the recall of such granular information produce reliable data.  Mr. Klein's inability to offer any studies or other analyses in the face of Dr. Stern's extensive research on the limitations of retrospective surveys indicates that his methods are unsupported and unaccepted.  *See Reinsdorf v. Skechers U.SA.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding survey finding that "[Plaintiff] does not identify any scientific principles underlying the [expert's] survey").

In short, Mr. Klein's surveys are unreliable based on the lengthy retrospective nature of the recall required to answer the questions.  Mr. Klein has never conducted a survey like this before and that approach does not conform to acceptable survey methodology.  The surveys should thus be excluded.

**Lack of Representativeness.**  Mr. Klein's surveys should also be excluded because he made no effort to determine—and cannot determine—that the small fraction of current teachers who answered his

---

[7] Ex. 66 (Klein Dep.) 197:16–198:2 ("Q. So just so it's clear, event history calendars are survey methodologies that involve a narrative or conversational style of respondent expression, right? A. It's a qualitative interviewing style, yes. Q. And you didn't do that, right? A. No, we used a quantitative style."); *see also id.* at 208:10-209:1 ("Q. My question -- so there was -- my question, sir, was whether you can point me to any academic literature supporting use of calendar interviewing methodologies that ask the respondents to recall time spent down to the level of minutes on a given day? A:  The -- no, I can't point you to a – any specific academic reference.  But it feels like -- and I believe that this definition that you've provided supports what we did.").

survey questions were representative of the entire teacher population for each District over an eleven-year period.

Because "nonresponse often is not random," the Federal Judicial Center has emphasized that it "is *incumbent on the expert presenting the survey results to analyze the level and sources of nonresponse*" and "to *provide evidence on the potential impact of nonresponse* on the survey results." Ex. 72 (Federal Judicial Center, Reference Manual on Scientific Evidence) at 383 (emphasis added) "A survey that 'begins with a random sample,' but does not 'take measures to assure that nonresponses are random and provide analysis of the reasons of nonresponse,' is not 'the product of reliable principles and methods.'" *Wallace v. Countrywide Home Loans*, No. 08-cv-1463-JST, 2012 WL 11896333, at *4 (C.D. Cal. Aug. 31, 2012) (quoting *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008).

Despite citing the Reference Manual on Scientific Evidence in his report, and agreeing that it is a "very helpful guide" and that "a valid survey needs to include a sample size that's representative of the target population," Mr. Klein made no effort whatsoever to determine whether those who responded to his survey were representative of the broader population:

> Q. And what efforts, if any, did you take to determine whether non-respondents differ from respondents in the nature of the responses they would provide in this case?
>
> A. We had no information about the non-respondents. And so we did what we do in cases related to trademarks or confusion or false advertising, don't do anything to tip off what the nature of the survey is and take as broad a sample as you can.
>
> ***
>
> Q. But just to be clear, you didn't undertake any efforts to determine whether non-respondents and respondents are similarly situated, correct?
>
> THE WITNESS: And I have no reason to think they're not.

Ex. 66 (Klein Dep.) 230:19–231:17.

Mr. Klein's is incorrect that he need not make any effort to determine whether his sample was representative because (1) all (currently-employed) teachers were invited to respond to the survey, and (2) the survey instrument did not on its face tell participants the purpose of the survey. The fact that a survey was distributed to the entire target population says nothing about whether the subjects who

responded are actually representative of the broader population.  As the Reference Manual on Scientific Evidence makes clear, nonresponse bias can still be an issue "[*e*]*ven when a sample is drawn randomly from a complete list of elements in the target population*."  Ex. 72 (Federal Judicial Center, Reference Manual on Scientific Evidence) 383 (emphasis added).[8]  Moreover, Mr. Klein did *not* survey the entire target population: he surveyed only current teachers, whereas the actual target population would include former teachers employed by the Districts during the 2014-2024 time period.[9]

As for Mr. Klein's assertion that he has "no reason to think" that the respondents were differently situated, that is a pure conclusory statement based on nothing more than speculation.  Furthermore, as the Reference Manual on Scientific Evidence makes clear, it is incumbent on an expert sponsoring a survey for use in federal court to "analyze the level and sources of nonresponse" and "assess how that nonresponse is likely to have affected the results"—which Mr. Klein admits he did not do.

Mr. Klein's testimony, moreover, demonstrates that nonresponse bias could have impacted his surveys.  For example, he admitted that because he made no effort to assess teacher tenure, he had no way of knowing whether "a disproportionate number of newer teachers responded to his survey"—which could bias the results if newer teachers had greater difficulty with classroom management.  Ex. 66 (Klein Dep.) 264:9–13.  Mr. Klein also admitted that he made no effort to assess what subjects the teachers surveyed taught and agreed that his sample could be biased "if kids were more distracted in math class than social studies" and the respondents were disproportionately weighted toward math teachers.  Ex. 66 (Klein Dep.) 243:19–245:20.  And Mr. Klein further admitted that he did not determine whether the survey respondents were representative of the broader population by age, despite asking the survey respondents for their age.  Ex. 66 (Klein Dep.) 239:12–240:21    In short, there is ample reason to doubt Mr. Klein's unearned assumption that those who responded to his survey were representative of the entire survey population.

---

[8] *See also* Ex. 74 (Baker et al., Evaluating Survey Quality In Today's Complex Environment) (discussing different types of survey error and noting the distinction between "coverage" error which refers to whether the survey was sent to the entire target population, and "non-response" error, which refers to whether members of the target population actually responded to the survey).

[9] Ex. 66 (Klein Dep.) 305:6-11 ("Q: So there were no surveys sent to teachers who were employed in 2014 but were not employed, at the time of the survey, by the district, correct? A. Yes, that -- well, that's correct.").

This is especially true given the small percentage of teachers who actually responded to his surveys. *See, e.g.*, *In re: Autozone, Inc.*, 2016 WL 4208200, at *17 (finding that for a survey to be admissible, its sample size "must be sufficiently large to provide reliable information about the larger group"). The response rates for the 2014-15 school years ranged from 1% to 10%, and for four of the six Districts was below 20% even for the 2024-25 school year.[10] Courts have excluded surveys with similarly low response rates. *See Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485 (C.D. Cal. 2008), *aff'd*, 639 F.3d 942 (9th Cir. 2011); *Jimenez*, 2019 WL 13088814, at *23 (finding that expert did not sufficiently justify how the results from a survey yielding a response rate of "only 33%" could be extrapolated); *Wallace*, 2012 WL 11896333, at *4 (survey was deemed inadmissible where the response rate was "an unacceptable low 32.3 percent" and where there was no analysis of the determinants of nonresponse); *Duran v. U.S. Bank Nat. Ass'n*, 59 Cal.4th 1, 42 (2014) (finding that a sample size of 8% inadequate); *In re: Autozone, Inc.*, 2016 WL 4208200, at *17 (finding that a survey response rate of 6% is inadequate); *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d at 951 (excluding survey when, among other deficiencies, it had a 5% response rate).[11]

In short, as the Federal Judicial Center has made clear, it was incumbent on Mr. Klein to establish that his survey involved a representative sample. Because he made no effort to do so, and because there is ample reason to believe that his very small sample was not representative, his surveys should be excluded as unreliable.

## C.    The Court Should Exclude Bryce Ward's Lost-Time Damages Opinions.

Dr. Bryce Ward, Plaintiffs' lost-time damages expert, should be excluded because he did not put forth any methodology for calculating damages attributable to Defendants' actionable conduct and based his inapposite calculations on fundamentally unreliable data. Dr. Ward is an economist who purports to

---

[10] The 2014-15 and 2024-25 response rates for each District were:  Tucson (1%-5%), DeKalb (1.1%-5.4 %), Harford (3.4%-8.4%), Charleston (2%-14.4%), Irvington (8.1%-33%), and Breathitt (10%-58.6%).

[11] Although a survey's non-response rate often "goes to the weight of the results rather than their admissibility," where, as here, a survey proponent cannot "validate that the survey was reliably designed and administered, [response-rate] concerns reasonably suggest that the survey's methodology may be flawed." *In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 951 (C.D. Cal. 2015), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017).

calculate each District's "past compensatory damages . . . for time diverted and efforts expended due to student social media use." *E.g.*, Ex. 57 (Ward Tucson Rep.) ¶ 1; Exs. 52–56 (Ward Reps. for Breathitt, Charleston, DeKalb, Harford, and Irvington) (applying same methodology).[12]  Dr. Ward's "past compensatory damages" are "simply the amount that the district paid an employee proportional to the amount of time that the employee spent addressing issues relating to social media." *See* Ex. 70 (Ward Dep.) 182:18–25.  He characterizes these alleged damages as "opportunity costs," Ex. 57 (Ward Tucson Rep.) ¶ 1, although he does not identify any opportunities—financial or otherwise—that any Plaintiff forewent because of the alleged time spent addressing social media issues.  *See* Ex. 70 (Ward Dep.) 229:10–14 (admitting he has "no sense" of "what would have happened in the world without social media" and has "not done any analysis of that").

Dr. Ward does not opine that any Plaintiff incurred any out-of-pocket costs. *Id.* at 169:7–16.  He does not opine that any Plaintiff hired more employees because of Defendants' conduct. *Id.* at 168:16–169:6.  Nor does he opine that any Plaintiff paid any employee more because of Defendants' conduct than they otherwise would have paid in the absence of Defendants' conduct. *Id.* at 168:1–15.  Accordingly, Dr. Ward calculates as past "damages" amounts that the Plaintiffs did and would have paid in the ordinary course, regardless of Defendants' actionable conduct.

For all six Districts, Dr. Ward calculated past compensatory damages related to categories of teachers (e.g., middle school teachers, high school teachers).  For five of the districts (all except DeKalb), Dr. Ward also calculated past compensatory damages for certain categories of non-teacher staff (e.g., superintendents, principals, counselors).  Dr. Ward's calculations for all Districts proceeded as follows: First, he calculated the total salary and benefits paid for each category of employees. *E.g.*, Ex. 57 (Ward Tucson Rep.) ¶¶ 14–21.  Second, he multiplied the total salary and benefits for each employee category by a percentage purportedly reflecting "time diverted and efforts expended due to student social media use." *E.g.*, *id.* ¶¶ 37–38.  Dr. Ward did not determine the "time diverted" percentages himself.  For the teachers, Dr. Ward relied on the reports of Plaintiffs' survey expert Robert Klein. *E.g.*, *id.* ¶ 29.  For the

---

[12] Dr. Ward also disclosed a rebuttal report for each Plaintiff.  *See* Exs. 58–63 (Ward Reb. Reps. for Breathitt, Charleston, DeKalb, Harford, Irvington, and Tucson).

non-teacher staff, Dr. Ward relied on time estimates provided in district employee affidavits (for Breathitt, Charleston, Irvington, and Tucson) or in interrogatory responses and employee testimony (for Harford). *See id.*; Ex. 70 (Ward Dep.) 99:11–21, 103:22–104:3. Dr. Ward took no steps to validate the reliability of any of the time estimates he relied upon. *Id.* at 94:21–95:11, 100:10–101:3, 104:21–105:9. Dr. Ward's total damages calculations range from $3 million (Breathitt) to $178.5 million (DeKalb). *See* Ex. 52 (Ward Breathitt Rep.) ¶ 44; Ex. 54 (Ward DeKalb Rep.) ¶ 36.

Dr. Ward's opinions do not meet the requirements of Rule 702 for three independent reasons. *First*, Dr. Ward made no attempt to calculate damages attributable to the purported effects of Defendants' actionable conduct (distinguished from the effects of all "social media" whether party to this lawsuit or not, or the effects of content or protected features on Defendants' platforms that this Court had concluded cannot be a basis for liability). *Second*, he did not calculate legally cognizable damages because his lost-time "damages" are amounts Plaintiffs would have spent regardless of the existence of "social media" generally or Defendants' actionable conduct specifically. *Third*, Dr. Ward's opinions related to teacher time are unreliable because they are based on the unreliable and inadmissible Klein survey.

1.    **Dr. Ward Did Not Calculate Damages That Disentangle Defendants' Actionable Conduct from Conduct That Cannot Provide a Basis for Imposing Liability.**

Dr. Ward purports to apply a methodology for calculating "damages" for "time diverted" "due to student *social media use*." *E.g.*, Ex. 57 (Ward Tucson Rep.) ¶ 1. But he makes no attempt to apply a methodology for calculating damages attributable to *Defendants' actionable conduct*. Instead, he improperly includes lost time attributable to non-Defendant social media platforms, the effects of non-foreseeable third-party conduct, and content and features protected by Section 230 or the First Amendment.

To determine the amount of time diverted due to student social media use, Dr. Ward relied on (i) the Klein survey (for teacher time); and (ii) employee affidavits and deposition testimony (for non-teacher staff time). The evidence ends there. In essence, Dr. Ward is a calculator, and he cannot vouch for the relevance or accuracy of the inputs he used. It was not "part of [Dr. Ward's] assignment to determine that the Klein teacher time survey, the employee affidavits, and the employee testimony measured the right thing." Ex. 70 (Ward Dep.) 314:5–14. He does not know whether his calculations "include damages

relating to time spent by teachers and other school staff addressing the effects of content . . . posted by third parties," *id.* at 144:15–145:7, or include time attributable to non-Defendant "social media" platforms, *id.* at 123:6–14, 314:16–315:2.

Nonetheless, Dr. Ward speculated at his deposition that the Klein survey and affiants on which he relied limited their estimates to only Defendants' actionable conduct. *See* Ex. 70 (Ward Dep.) 122:5–14, 136:1–4. When asked for the basis for that belief, Dr. Ward explained that because Mr. Klein and the affiants "were tasked to provide me time loss estimates in the context of this litigation," he "would be stunned if they provided [him] an estimate that wasn't germane to the litigation." *Id.* 136:5–12. But Dr. Ward's unsupported belief is inaccurate, and the reality is indeed stunning: the sources on which he relied made no attempt to limit their estimates to the issues attributable to Defendants' at-issue features. Instead, they provided estimates of time spent addressing all student social media use.

Mr. Klein's failure to isolate harms flowing from Defendants' actionable conduct, discussed above, equally infects the employee affidavits and testimony upon which Dr. Ward relied for estimating non-teacher lost-time damages. The affidavits and testimony, on their face, estimate percentages of time spent addressing the effects of third-party content on "social media," not the effects of Defendants' at-issue features.[13] For example:

- A Breathitt affiant estimated the time that principals and assistant principals spent "addressing social media impacts on students," which she says relates to instances involving children who do "not want to come to school because of a comment posted on social media," instances where "a comment/threat was made by a student on social media," and "meet[ing] with students that have been reported to fight because messages were posted on social media." Ex. 84 )Aff. Daphne Noble) ¶ 14.

- A Charleston affiant estimated the time that "school psychologists, school counselors, and social workers" spent addressing "[p]roblems arising out of students' use of social media platforms,"

---

[13] *See, e.g.*, Ex. 84 (Aff. Daphne Noble) ¶ 14 (Breathitt); Ex. 86 (Aff. Lisa Kathryn Allison) ¶¶ 10, 13 (Charleston); Ex. 91 (Hennigan Dep.) 53:18–54:9, 59:19–25 (Harford); Ex. 85 (Aff. Dr. April Vauss) ¶¶ 8–9, 12–15, 20–23 (Irvington); Ex. 89 (Decl. Holly Hammel) ¶¶ 9–11, 15 (Tucson).

which she describes as involving "dealing with threats, bullying, fights, and property damage with a nexus to social media." Ex. 86 (Aff. Lisa Kathryn Allison) ¶¶ 10, 13.

- An Irvington affiant estimated the time that various categories of employees, including principals, counselors, social workers, school psychologists, and nurses, spent addressing "social media related concerns" and "direct and indirect impacts associated with the scholars' social media use." Ex. 85 (Aff. Dr. April Vauss) ¶¶ 20–23. Dr. Vauss's examples of time spent include addressing a student "argument" related to "likes" made on social media posts about musicians Beyonce and Doechii, *id.* ¶ 12, and "bullying and harassment that occurs on social media platforms," *id.* ¶ 13.

Moreover, depositions of the employees who provided estimates confirm that their estimates include time unrelated to Defendants' platforms at all (much less Defendants' actionable conduct). For example, when asked "[w]hat social media platforms are included" in the percentages she supplied Dr. Ward, a Tucson affiant answered "[a]ny and all" and noted that "over the years, there have been numerous new social media platforms that either have changed or have been introduced." Ex. 93 (June 30, 2025, Shivanonda Dep.) 16:17–17:4; *see also* Ex. 91 (Hennigan Dep.) 40:15–20 (Harford employee, relied upon by Ward, testifying that "social media platforms" used by students include "BeReal, Discord, GroupMe, Kik, Omegle, Pinterest, Reddit, Twitch, Tumblr, WhatsApp, Twitter and Yik Yak"). Similarly, another Tucson affiant admitted that the percentages she supplied include time that has no specific connection to Defendants' platforms whatsoever:

> Q.  Do you understand these percentages to be specifically connected to defendants' platforms?
>
> A.  Not specifically connected.  These are more of, like, mental health concerns that students are experiencing and staff members, the amount of time that they're spending supporting students in those areas.
>
> Q.  So this would include mental health concerns related to supporting students' disabilities?
>
> A.  So this would include, like, whatever mental health concern or counseling that a student has.

Ex. 96 (Salmon Dep.) 154:20–155:11; *see also id.* at 163:25–164:15.

Like the Plaintiffs' affiants, Dr. Ward took no steps to limit his calculations to Defendants' actionable conduct.  He did not "eliminate from any time estimates time spent addressing content posted

on social media by third parties," Ex. 70 (Ward Dep.) 146:17–147:2; "distinguish between time loss to student use of Defendants' platforms as distinct from time loss due to student use of all social media," *id.* at 133:16–134:8; or "eliminate time spent addressing issues relating to students who are not addicted to any of Defendants' platforms from [his] damages estimates," *id.* at 157:18–158:22.  Moreover, Dr. Ward concedes that his damages estimates do not answer "how much in damages a school district incurred because of student use of YouTube specifically" or "because of student use of SnapChat or TikTok or Instagram or Facebook."  *Id.* at 89:10–90:14.  Ward's opinions are concededly not tailored to the alleged harms, and should be excluded.

It is no answer to say that Dr. Ward simply relies on inputs provided by others and thus questions about flaws inherent in those inputs can be posed to others.  For Dr. Ward's opinions to be admissible, he must offer testimony that "will help the trier of fact . . . to determine a fact in issue," base his testimony on "sufficient facts or data," and "reliabl[y] appl[y] . . . principles and methods to the facts of the case." Fed. R. Evid. 702.  A damages expert's opinion "is unreliable and unhelpful to the trier of fact under Rule 702" where, as here, it relies on "percentages" that are "irrelevant" to the damages at issue in the case— even if those percentages come from another testifying expert.  *See Kim v. Benihana, Inc.*, 2024 WL 3550390, at *6 (C.D. Cal. May 20, 2024).  Dr. Ward's use of irrelevant inputs from the Klein surveys, as well as employee affidavits and testimony, is incompatible with Rule 702 and requires exclusion of his opinions.

### 2.    Dr. Ward's Lost-Time Damages Are Not Legally Cognizable Damages.

As explained above, Ward's "damages" are not new or additional amounts that Plaintiffs spent because of Defendants' actionable conduct but are instead amounts that Plaintiffs would have paid regardless of Defendants' conduct.  *See* Ex. 70 (Ward Dep.) 168:1–169:16.  For the reasons explained in Defendants' motions for summary judgment, these lost-time damages are not recoverable under the substantive law that governs these cases.  *See* MSJs at IV.C.  Ward's damages opinions should therefore be excluded.  *Cooper v. Meritor, Inc.*, 2019 WL 545263, at *3 (N.D. Miss. Feb. 11, 2019) ("[E]xpert testimony on damages not recoverable under law is properly excluded."); *accord IceMOS Tech. Corp. v. Omron Corp.*, 2019 WL 5960069, at *19 (D. Ariz. Nov. 13, 2019); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2009 WL 10670877, at *2 (C.D. Cal. Aug. 18, 2009).

### 3.    Dr. Ward's Teacher-Related Damages Opinions Are Unreliable Because They Are Based on the Unreliable and Inapposite Klein Survey.

Dr. Ward's opinions should likewise be excluded because they rely on the unreliable Klein teacher surveys. "The results of Klein's teacher time survey are an essential and necessary input to [Ward's] estimate of damages relating to teacher salaries and benefits teacher-time damages." Ex. 70 (Ward Dep.) 91:11–17. Dr. Ward, for his part, merely assumes that Mr. Klein's survey is reliable, *id.* at 94:21–95:11; however, for the reasons explained above, Mr. Klein's survey is unreliable and should be excluded. And if the Court agrees, then it must also exclude Dr. Ward's opinions on teacher-related damages, which are expressly predicated on the results of that survey. *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases her opinion on . . . the unreliable opinion of another expert, a district court may properly exclude the first expert's testimony."); *Zucchella,* 2023 WL 2628107, at *17 (expert's "opinion is inadmissible to the extent it relies on [excluded expert's] opinion"). Of course, even if Mr. Klein's survey and the teacher time estimates were admissible for *some* purpose (they are not), the teacher survey results still cannot supply "sufficient facts or data" for Ward's damages opinions because—as described above—they provide *no facts or data whatsoever* regarding the effects of Defendants' actionable conduct. *See Kim*, 2024 WL 3550390, at *6.[14]

---

[14] For similar reasons, if Plaintiffs fail to present relevant admissible evidence of how much non-teacher employee time was diverted, then Dr. Ward's opinions regarding non-teacher-employee-related damages must be excluded as well. Dr. Ward admits that employee affidavits are "an essential and necessary input to [his] estimate of damages relating to non-teacher salaries and benefits." Ex. 70 (Ward Dep.) 99:22–100:4. Dr. Ward simply "assume[d] that the time estimates in the employee affidavits are reliable and accurate" and is not "able to say whether the time estimates provided in the employee affidavits are accurate." *Id.* at 100:6–9, 101:16–20. An expert can rely on these sorts of "foundational" facts provided by a parties' employees only if the parties' employees testify to the facts with firsthand knowledge at trial. *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856, at *2 (N.D. Cal. May 22, 2008). Defendants address evidentiary issues with Plaintiffs' time estimates in their Motions for Summary Judgment and reserve the right to re-raise at a later date the matter of Dr. Ward's reliance on those estimates.

### D.    The Court Should Exclude Jeffrey Meyers's "Out-of-Pocket" Damages Opinions.

Jeffrey Meyers, Plaintiffs' "out-of-pocket" damages expert, should be excluded because, like Plaintiffs' other experts, he fails to disentangle Defendants' actionable conduct from social media use in general, harms resulting from third-party conduct, and harms allegedly resulting from Defendants' protected publishing activities. Like Dr. Ward, Mr. Meyers' methodology is to simply accept Plaintiff-provided assertions as to which costs should be imputed to Defendants, and present those calculations as expertise—without applying any scrutiny, and despite the evident disconnect from Defendants' actionable conduct.

Mr. Meyers describes himself as an expert in forensic accounting. His damages calculations proceed in three steps. First, Mr. Meyers "worked with" each Plaintiff "to identify certain vendors involving costs related to Technology, Social Emotional Learning (SEL) Curriculum, Mental Health and Property Damage incurred as a result of the alleged improper actions of the Defendants." *E.g.*, Ex. 43 (Meyers Tucson Rep.) ¶ 14; *see also* Exs. 38–42 (Meyers Reps. for Breathitt, Charleston, DeKalb, Harford, and Irvington).[15] Second, he calculated the "Total Costs" that each Plaintiff paid to each vendor. Ex. 43 (Meyers Tucson Rep.) ¶ 15. Third, he multiplied the "Total Costs" for each vendor by an "Allocation Percent," provided in an employee affidavit or interrogatory response, which he says reflects the "percentage of the Vendor Costs [that] were incurred as a result of the alleged improper actions of Defendants." *Id.* ¶¶ 21–23. Mr. Meyers opines that the result of that calculation represents "damages relating to certain out-of-pocket costs attributable to the alleged improper actions of Defendants." *Id.* ¶ 24. His damages calculations range from $64,514 (Breathitt) to almost $1.6 million (Irvington). Ex. 38 (Meyers Breathitt Rep.) ¶ 24; Ex. 42 (Meyers Irvington Rep.) ¶ 24.

Much like Dr. Ward's methodology, Mr. Meyers' methodology hinges on the use of "Allocation Percents"—derived from employee affidavits for Breathitt, Charleston, and DeKalb, and from interrogatory responses for Harford, Irvington, and Tucson, Ex. 68 (Meyers Dep.) 116:8–13, 134:11–18—to determine the portion of vendor costs that he opines are "attributable to the alleged improper actions of

---

[15] Mr. Meyers also submitted a rebuttal report for each Plaintiff. *See* Exs. 44–49 (Meyers Reb. Reps. For Breathitt, Charleston, DeKalb, Harford, Irvington, and Tucson).

Defendants." But no "facts or data," Fed. R. Evid. 702(b), support Mr. Meyers' opinion that the "Allocation Percents" reflect what portion of vendor costs are "attributable to the alleged improper actions of Defendants," and he has employed no methodology (much less a reliable one) for determining which costs are attributable to Defendants' actionable conduct, Fed. R. Evid. 702 (c), (d).

All the affidavits on which Mr. Meyers relied provide estimates of vendor costs that relate to "social media" generally, not Defendants' actionable conduct. Ex. 88 (Aff. Phil Watts (Breathitt)) ¶ 9 ("Percentage Attributable to Social Media"); Ex. 86 (Aff. Lisa Kathryn Allison (Charleston)) ¶¶ 24–31 (estimating costs attributable to "social media"); Ex. 87 (Aff. Monika Davis (DeKalb)) ¶ 15 (estimating costs "related to the District's attempts to block and/or limit social media"). At his deposition, Mr. Meyers professed a belief that the affiants have provided or will provide estimates "relating to the alleged improper actions of defendants," which he said was based on "the statements [in the affidavits] themselves," which "speak for themselves." Ex. 68 (Meyers Dep.) 120:2–6, 121:24–122:11.[16] The affidavits do speak for themselves, and they plainly relate to all "social media" with no limitation to Defendants, much less to Defendants' actionable conduct. Exs. 86–88 (Allison, Davis, and Watts affidavits).

The interrogatory responses that Mr. Meyers relies upon fare no better. For example, to calculate damages relating to Harford's internet content filter costs, Meyers relies on a single percentage from a Harford interrogatory response, a 20% "Weight" relating to the "Office of Technology & Information." *See* Meyers Dep. 386:20–387:8 (referencing Ex. 90 (Harford Interrog. Resps.) 8. While the Harford interrogatory response purports to relate to "Defendants' wrongful conduct," Ex. 90 (Harford Interrog. Resps.) 6, Harford's subsequent corporate representative testimony "on the weight percentage that was selected for the Office of Technology & Information and used as the allocation percent in plaintiffs' expert Jeffrey Meyers' calculations" demonstrates that the 20% figure does not in fact relate to Defendants'

---

[16] Mr. Meyers asserted that he had one conversation with one of the affiants, Breathitt superintendent Phil Watts, and that Mr. Watts "could not have been more crystal clear that these [vendor costs] were as a result of the actions at issue in this trial." Ex. 68 (Meyers Dep.) 177:5–178:1. Mr. Meyers' vague assertion does not change the plain meaning of Mr. Watt's affidavit, which refers to "social media" as a monolith. Ex. 88 (Aff. Phil Watts (Breathitt)) ¶ 9. Moreover, there is no factual foundation whatsoever for Mr. Meyers' assertion. Critically, Mr. Meyers admitted that Mr. Watts did not tell him "what the [Defendants'] actions were that were at issue and which were not at issue." Ex. 68 (Meyers Dep*.)* 178:3–6.

1    actionable conduct.  Ex. 94 (Moore 30(b)(6) Dep.) 12:1–11.  Harford's corporate representative testified

2    that he provided the 20% figure in response to being asked "the amount of time . . . that we spend on social

3    media-related events."  *Id.* at 15:17–24.  He determined the number by going to the "two individuals that

4    are the primary point of contact for such events" and asking them "on an average could you tell me how

5    many events in a given week you are contacted with to investigate or deal with issues related to social

6    media and students."  *Id.* at 16:18–17:5.  The 20% would include time spent verifying "a rumor that

7    someone posted personal information" on social media.  *Id.* at 26:4–13.  Plainly, the 20% figure is an

8    estimate of *time spent* related to social media, not an estimate of *costs* caused by Defendants' actionable

9    conduct.[17]  Corporate representative testimony regarding the Irvington and Tucson responses has similarly

10   shown that the percentages are not based on Defendants' actionable conduct.[18]

11       Mr. Meyers did not use any methodology to remedy the flaws with his inputs.  *See, e.g.*, Ex. 68

12   (Meyers Dep.) 180:5–181:1 (no attempt to eliminate from his damages costs "related to the effects of

13   content on social media platforms").  Nor did he provide Defendant-specific calculations that would allow

14   a jury to determine damages attributable to each Defendant individually.  *See* MSJs at IV.A–B; Ex. 68

15   (Meyers Dep.) 95:23–96:3, 99:2–12, 100:3–21.  Mr. Meyers' opinions should be excluded because they

16   lack any reliability whatsoever as calculations of damages attributable to Defendants' actionable conduct

17   and thus would not be helpful to any jury.

---

[17] Additionally, as explained in Defendants' Harford MSJ, the 20% figure represents (at best) an inapposite estimate of Harford employee time and is not an estimate relevant to invoiced internet content filter costs at all.

[18] Ex. 92 (May 16, 2025, Vauss 30(b)(6) Dep.) 303:10–18 (Irvington corporate representative testifying that interrogatory response reflects the "percentage of [vendor] *time*"—not costs—"that [the vendors] service Irvington Public Schools that they allocate to social media" (emphasis added)), 312:12–21 (admitting that if "students did not use social media" the district would "still be using" the internet content filters included in Meyers' calculations); Ex. 95 (Ross 30(b)(6) Dep.) 67:12–69:19 (Tucson corporate representative unable to say whether percentages "distinguish[ed] between the impact of content posted on defendants' platforms as opposed to the design of defendants' platforms" and speculating that response likely did not distinguish between impact of third-party messages and platform design because "it's all on the platform and there's an impact").

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### E. The Court Should Exclude Sharon Hoover's Specific Causation and "Strategic Plan" Opinions.

Dr. Sharon Hoover is a licensed clinical psychologist and a professor emeritus at the University of Maryland School of Medicine's Division of Child and Adolescent Psychiatry. Ex. 1 (Hoover Rep.) ¶ 12; Ex. 64 (Aug. 12, Hoover Dep.) 15:21–16:9. Despite her 25 years of work in the school mental health field, Dr. Hoover could not identify at her deposition a single article she had authored, or professional presentation she had given, about the impact of students' use of social media on schools. *See* Ex. 65 (Aug. 13 Hoover Dep.) 798:8–800:24. Nevertheless, in this litigation, Dr. Hoover offers three categories of opinions: (1) general causation opinions about the purported effects of social media on student mental health and schools; (2) specific causation opinions about the effects of social media on the Districts; and (3) "strategic plans" for each District "to prevent and mitigate the negative impact of student social media use on school districts, schools, the school environment, student well-being and learning."[19] Defendants address Dr. Hoover's general causation opinions in Section IV.A.9 of their Motion to Exclude General Causation Testimony and her specific causation and "strategic plan" opinions below.

On specific causation, Dr. Hoover opines that "[t]he cumulative negative impacts of student social media use . . . have required" each District "to expend and redirect already limited resources." *E.g.*, Ex. 2 (Hoover Breathitt Rep.) ¶ 4; Ex. 4 (Hoover DeKalb Rep.) ¶ 4. Dr. Hoover's District-specific opinions rely on contentions made in Plaintiffs' made-for-litigation documents and by Plaintiffs' employees in interviews and deposition testimony. *E.g.*, Ex. 2 (Hoover Breathitt Rep.) ¶ 27; Ex. 4 (Hoover DeKalb Rep.) ¶ 27.

Dr. Hoover's "strategic plans" suggest that each District undertake massive efforts over a 15-year period "to prevent and mitigate the negative impact of student social media use on school districts, schools, the school environment, student well-being and learning." *E.g.* Ex. 4 (Hoover DeKalb Rep.) ¶ 2, 5–9. Dr. Hoover recommends that each District hire a fleet of new employees in identical ratios across every district. *See* Ex. 2 (Hoover Breathitt Rep.) ¶ 107 (recommending 46 new employees); Ex. 4 (Hoover

---

[19] Dr. Hoover submitted a total of 14 reports: a non-case-specific affirmative report, Ex. 1 (Hoover Rep.); case-specific affirmative reports for each District, Exs. 2–7; a non-case-specific rebuttal report, Ex. 79 (Hoover Reb. Rep.); and case-specific rebuttal reports for each District, Exs. 8–13.

DeKalb Rep.) ¶ 97 (recommending 1,916 new employees). She recommends that each District (regardless of size) hire six new district-wide positions—including a Director of Life Skills Education and a Director of Family Engagement and Education—and that each District hire, one new "Mental Health Literacy Specialist" per 500 students, one new school counselor per 250 students, and so forth, for 11 school-level positions. *See* Ex. 2 (Hoover Breathitt Rep.) ¶ 107; Ex. 4 (Hoover DeKalb Rep.) ¶ 97. She also recommends that each District implement a wide-ranging staff training program, collectively suggesting *millions* of hours of staff training. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 102–133. The costs for Dr. Hoover's plans are calculated by Dr. Douglas Leslie, who opines that each District needs from $51.7 million to $4.3 billion (depending on the size of the district) to implement Dr. Hoover's plan. *See infra* Section III.F.

According to Dr. Hoover, these staffing and training recommendations support "comprehensive school mental health systems" in each District and include three "tiers" of support. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 44, 97-98, 161. In Tier 1, Dr. Hoover recommends a broad array of "universal policies and interventions for *all* students, staff, and families," Ex. 1 (Hoover Rep.) ¶¶ 95–96 (emphasis added), including "Screen Time Management Initiatives" and "Life Skills Programming." Ex. 4 (Hoover DeKalb Rep.) ¶¶ 60, 62. In Tier 2, Dr. Hoover recommends "targeted interventions for students with mild to moderate concerns" such as "small group sessions" and "short term counseling" about "online stress," "social comparison, FOMO . . . , self-esteem, and online safety." *Id.* ¶ 68–69. And, in Tier 3, she recommends specialized mental health treatment plans for students with severe issues, "expert guidance on managing screen time," "Referral to Community-Based Digital Wellness Programs," and "Crisis Intervention for Social Media-Related Crises." *Id.* ¶¶ 71–73.

Dr. Hoover's opinions are not reliable, lack sufficient facts and data, and should be excluded. *First*, Dr. Hoover's opinions relate to social media generally and are not limited to the harms caused by Defendants' actionable conduct. *Second*, her specific causation opinions lack any reliable basis, resting on statements of "key informants" she interviewed and other assertions by the Districts (such as Plaintiff Fact Sheets) that cannot support a causal conclusion. *Third*, her "strategic plan" does not constitute proper "abatement" or a proper measure of "future damages." *Fourth*, there is no reliable basis for either the staffing and training levels set forth in Dr. Hoover's strategic plans nor for their 15-year duration.

1

### 1.    Dr. Hoover's Opinions Are Not Tied to Defendants' Actionable Conduct.

2

Like Plaintiffs' other experts, Dr. Hoover fails to offer opinions relating to Defendants' actionable

3

conduct.  Her causation opinions about "social media" and "strategic plans" to remedy harms from "social

4

media" improperly address : (1) other social media platforms or electronic device use in general; (2) the

5

non-foreseeable acts of third-party bad actors; and (3) Defendants' publication of that content and use of

6

design features that the Court has ruled are protected by Section 230 and the First Amendment.

7

***Specific Causation.***  In describing the basis for her specific causation opinions about the "negative

8

impacts of student social media use" on each District, Dr. Hoover points to "key informant interviews"

9

with unnamed District employees that identify third-party conduct, content, and protected features of

10

social media as the cause of harms.  *E.g.* Ex. 4 (Hoover DeKalb Rep.) ¶¶ 4, 47; *id.* ¶ 49 ("Students face a

11

perpetual state of anxiety, distress, and sometimes fear due to online threats and derogatory content . . . .");

12

*id.* ¶ 50 ("When a student receives a notification it takes about 15 minutes away from their engagement.");

13

Ex. 2 (Hoover Breathitt Report) ¶ 47; *id.* ¶ 51 ("Face-to-face communication skills have declined.  'I don't

14

think our students talk on phone anymore.  It's all about messaging.'"); *id.* ¶ 52 (accounts post

15

"embarrassing photos of students . . . lead[ing] to embarrassment, distrust, fights, and lower attendance").

16

Dr. Hoover does not use any methodology to determine whether the at-issue features of Defendants' social

17

media platforms (disentangled from social media generally, third-party bad acts, or content or protected

18

features) caused harm to each District.

19

***Strategic Plan.***  In each of her six district-specific reports, Dr. Hoover states dozens of times that

20

her plan would address "social media."  The components of the plans do not mention Defendants, and her

21

reports do not suggest that her plans are limited to addressing only harms caused by Defendants' platforms,

22

much less Defendants' actionable conduct.  Dr. Hoover belatedly and baldly asserted at her deposition

23

that her plans "are specific to the impacts of the defendants' platforms," Ex. 65 (Aug. 13 Hoover Dep.)

24

809:1-4.  But even if that *ipse dixit* statement could be credited (it cannot), it would not cure Dr. Hoover's

25

failure to tailor her plans to Defendants' *actionable* conduct.  Dr. Hoover admitted that she did not "look[]

26

27

28

at all of the specific features across every platform and the distinctions between them" and did not consider "the details of each of the defendant platforms' features." Ex. 64 (Aug. 12 Hoover Dep.) 153:14–154:1.[20]

Dr. Hoover's recommendations are not even confined to student social media users. At her deposition, Dr. Hoover confirmed that *her plan provides services to students that have never used Defendants' platforms—or even social media—at all.* Ex. 65 (Aug. 13 Hoover Dep.) 623:10–18 ("[S]tudents who may not have used the platforms could still benefit from services that are offered to address the harms."); *id.* 627:11–16 ("[I]nherent in the plan is that students who may not have been exposed to or may not be saying that they're addicted to social media could engage in the services."). Dr. Hoover also admitted that her plan would remain the same if one of the Defendant's platforms stopped operating, *id.* 701:2-21, underscoring that her plan is not limited to addressing harms caused by Defendants' platforms, much less their actionable conduct.

As a result, Dr. Hoover's plan fundamentally fails to apply any principles or methods "to the facts of the case." Fed. R. Evid. 702(d). Indeed, Dr. Hoover rejects as "improper" the notion that her plan should address "only those harms 'incrementally' caused by Defendants' platforms." Ex. 13 (Hoover Tucson Reb. Rep.) ¶ 117. In Dr. Hoover's understanding, limiting her opinions to harms caused by Defendants' platforms would be "inconsistent with standard practice in public health and school systems planning." *Id.* Of course, it makes sense that, outside of litigation, experts would seek to broadly address all harms that a school district faces, just as a doctor would treat all of a patient's medical problems. But just as a medical expert could not propose a treatment plan designed to address a plaintiff's ailments beyond those caused by a defendant's alleged misconduct, Dr. Hoover cannot testify to a "strategic plan" that addresses harms beyond those specifically caused by Defendants' actionable conduct. *See supra* Section III.E.1.

---

[20] Hoover's belated and sporadic gestures toward "features" in her rebuttal reports also fail to connect her opinions to Defendants' actionable conduct. For example, Dr. Hoover declares (with no foundation whatsoever) that "[s]ocial media's immersive design features (such as infinite scroll, push notifications, and public social ranking)" create "classroom distraction." Ex. 13 (Hoover Tucson Reb. Reb. Rep.) ¶ 171. But those are among the features that this Court has said are protected under Section 230 or the First Amendment, so a plan designed to remedy harms allegedly caused by those features would be improper. *See* Motion to Exclude Testimony Under Section 230 and the First Amendment at III.

31

1

### 2.      Dr. Hoover's Specific Causation Opinions Should Be Excluded.

2        Rule 702 does not permit an expert to opine that a defendant caused a plaintiff's injury on the basis

3   that the plaintiff says so.  *See Hernandez v. Leichliter*, 2016 WL 684038, at *2 (S.D.N.Y. Feb. 18, 2016)

4   (excluding expert causation testimony because expert did not "offer any 'quantitative or scientifically-

5   based testimony' for his causation determination" but instead "merely repeat[ed] or recast[] the testimony

6   of [Plaintiff] in order to arrive at a theory of causation." (citations omitted)).  Because that is precisely

7   what Dr. Hoover did here, her specific causation opinions are not "based on sufficient facts or data" or

8   "the product of reliable principles and methods," Fed. R. Evid. 702(b), (c), and should be excluded.

9        Dr. Hoover admits that she does not have any quantitative data showing how much time each

10  District's students spend on social media during the school day, Ex. 64 (Aug. 12 Hoover Dep.) 63:23–

11  64:8, or what percentage of students spend time on social media generally or Defendants' platforms

12  specifically outside of school, Ex. 65 (Aug. 13 Hoover Dep.) 414:9–415:21 (Tucson), 416:17–417:22

13  (Charleston), 418:18–419:16 (Breathitt, DeKalb, Harford, and Irvington).  The only quantitative data

14  about time spent by minors on social media is generalized nationwide data.  *E.g.*, *id.* at 415:11–14 ("I

15  could tell you what we know based on national data.  But if you're asking me specifically for Tucson,

16  no.").

17       Dr. Hoover did not rely on any quantitative data reflecting how many students—*if any at all*—in

18  each District were diagnosed with social media addiction or identified as needing an assessment for social

19  media addiction.  *Id.* 421:9–424:12.  Nor did she rely on any quantitative data on how many students in

20  each District were identified as having depression, *id.* at 449:15–456:5; how many were identified as being

21  distracted, *id.* 425:5–426:7; how many were bullied, *id.* at 432:6–434:4; or how many suffer diminished

22  social skills, *id.* 430:5–431:10 (admitting lack of data for Tucson and Charleston).  She thus lacked any

23  District-specific quantitative data from which she could possibly draw conclusions about the effect of

24  social media on District students, much less about the effect of Defendants' actionable conduct on District

25  students.

26       The "non-existence of good data does not allow expert witnesses to speculate or base their

27  conclusions on inadequate supporting science."  *Perry v. Novartis Pharms. Corp.*, 564 F. Supp. 2d 452,

28  467–68 (E.D. Pa. 2008).  Yet that is precisely what Dr. Hoover does.  She opines that each District was

harmed based on Plaintiffs' self-serving allegations for litigation purposes, unattributed statements by District officials in undocumented conversations, and depositions of District personnel—none of which provide a reliable basis for her specific causation opinions.

*First*, Dr. Hoover cited School Health Assessment and Performance Evaluation ("SHAPE") profiles that each District completed at her request as part of this litigation. *E.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶ 27. Per Dr. Hoover, the SHAPE profile form "is intended for state leaders and districts and schools and individuals to assess different components of their school mental health system." Ex. 65 (Aug. 13 Hoover Dep.) 559:22–560:5. Although SHAPE profiles provide some information about each District's current staffing and the types of services it provides its students, they say nothing about (a) how many students have reported or been diagnosed, treated, or referred for treatment for any mental health condition, (b) any impact of those mental health conditions on the schools, or (c) any potential causes of any student mental health issues. Importantly, the profiles do not mention Defendants' platforms or social media at all. *See, e.g.*, Ex. 76 (DeKalb SHAPE Profile); Ex. 77 (Breathitt SHAPE Profile).

*Second*, Dr. Hoover cites the Plaintiff Fact Sheets that each District filled out for this lawsuit. *E.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶ 27. The limited factual information in a Plaintiff Fact Sheet, *see, e.g.*, Ex. 78 (DeKalb Third Amended Plaintiff Fact Sheet), cannot possibly provide a reliable basis for a specific causation opinion. *See Engilis v. Monsanto Co.*, 2025 WL 2315898, at *7–8 (9th Cir. Aug. 12, 2025) (excluding an expert's causation opinions because he "simply concluded that [a factor] could be ruled out as a potential cause" where that information came solely from a plaintiff fact sheet).

*Third*, Dr. Hoover relies on her characterization of so-called "Key Informant" interviews she conducted with District leaders. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 27, 47–55. Dr. Hoover promised each "informant" that she would not tie his or her statements to his or her name. Ex. 64 (Aug. 12 Hoover Dep.) 30:21–31:16; Ex. 65 (Aug. 13 Hoover Dep.) 577:6–578:8. While Plaintiffs' counsel identified several "Key Informants" per district with whom Dr. Hoover spoke, Dr. Hoover is unable to link any of the statements with any particular "Key Informant." Ex. 80 (June 6, 2025 Email from M. Yeates). All she can say for any particular statement is that one of multiple people made the comment; and the only record she has of these alleged statements are the handful of excerpted, partial "quotations" in each District-specific report. Ex. 65 (Aug. 13 Hoover Dep.) 573:22–577:19. Accordingly, there is no

33

context for any partial quotation, no evidence that Dr. Hoover quoted the speakers correctly, nor any ability to evaluate any speaker's factual basis, bias, or motivation for any statement. It is blind hearsay that Dr. Hoover accepts as true and relies upon for her specific causation opinions without affording Defendants the chance to probe and test these statements. As a court in this district recognized, "[o]ne of the worst abuses in civil litigation is the attempted spoon-feeding of client-prepared and lawyer-orchestrated 'facts' to a hired expert who then 'relies' on the information to express an opinion." *Therasense, Inc. v. Becton, Dickinson & Co.*, 2008 WL 2323856, at *1 (N.D. Cal. May 22, 2008). As *Therasense* explains, expert reliance on these sorts of "facts" is improper for at least two reasons. First, the "spoon-feeding" of the "facts" has the intent and effect of improperly circumventing the prohibition against hearsay. *Id.* Second, "no professional should reasonably rely on such a rigged and biased source of information for any materially important fact to his or her opinion" and "[t]here is no 'particular field' in which experts go along with this charade other than in litigation." *Id.* at *2 (citing Fed. R. Evid. 703); *accord Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005).

The problems identified in *Therasense* are present here. As one example, Dr. Hoover quotes unspecified Harford "leaders" as saying students' "little brains are changing because of it." Ex. 5 (Hoover Harford Rep.) ¶ 53. This quote does not explain what the "it" is. The internet generally? Phones? Bullying? Content viewed on social media? Defendants' platforms? The at-issue features of Defendants' platforms? It is unclear, and neither Defendants (nor the Court or jury) have any ability to assess the meaning of the anonymous statement or the foundation for it. Indeed, when Defendants inquired at one "Key Informant's" deposition into the purpose of and discussions at her meeting with Dr. Hoover, Plaintiffs' counsel asserted privilege and instructed the witness not to answer. Ex. 81 (Apr. 8, 2025 Shivanonda Dep.) 20:10-21:3; *see Therasense*, 2008 WL 2323856, at *3 (excluding opinions because party offering expert did not "permit defendants to question" the employee witness who expert relied upon, "concealing" information "under a claim of privilege"). In any event, no expert can reasonably rely on the statements of an unidentified employee of a plaintiff to support an opinion on the complex scientific question of whether or why "brains are changing." *See Therasense*, 2008 WL 2323856, at *2.

*Finally*, Dr. Hoover relies on deposition testimony from District employees. As with the "Key Informant" interviews, Rule 702 does not permit Dr. Hoover to opine that students' use of social media

caused Plaintiffs' harms on the basis that that is what Plaintiffs' employees say. *See Hernandez*, 2016 WL 684038, at *2 ("To the extent [expert] merely repeats or recasts the testimony of [Plaintiff] in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion." (citation omitted)); *see also Stephens v. Union Pac. R.R. Co.*, 935 F.3d 852, 856–57 (9th Cir. 2019) (expert cannot base opinion on a party's "assumptions and speculation").

### 3. Dr. Hoover's "Strategic Plans" Are Neither Proper Abatement Remedies nor Appropriate Identifications of Future Damages.

For the reasons explained in Defendants' Motions for Summary Judgment, Dr. Hoover's "strategic plans" are not a proper remedy in any of the six bellwether Districts. They are not a proper abatement remedy nor assessments of future damages. *See* MSJs at IV.C. Because Dr. Hoover thus opines upon a remedy that is unavailable in this matter, her opinions must be excluded as irrelevant. *Cooper v. Meritor, Inc.*, 2019 WL 545263, at *3 (N.D. Miss. Feb. 11, 2019) ("[E]xpert testimony on damages not recoverable under law is properly excluded."); *accord IceMOS Tech. Corp. v. Omron Corp.*, 2019 WL 5960069, at *19 (D. Ariz. Nov. 13, 2019); *Medtronic MiniMed, Inc. v. Nova Biomedical Corp.*, 2009 WL 10670877, at *2 (C.D. Cal. Aug. 18, 2009).

### 4. Dr. Hoover Lacks Any Basis for Her Opinions About the Staffing and Training Levels and Timeframe in Her Strategic Plans.

Dr. Hoover's strategic plans call for massive hiring. Across all six Districts, Dr. Hoover calls for a total of nearly 5,000 new employees to be employed for 15 years. Dr. Hoover recommends that each Plaintiff hire the same six "District Staff." and recommends that each Plaintiff hire "School-building Staff" using the same per-student or per-school ratios. *See* Ex. 2 (Hoover Breathitt Rep.) ¶ 107; Ex. 3 (Hoover Charleston Rep.) ¶ 96; Ex. 4 (Hoover DeKalb Rep.) ¶ 97; Ex. 5 (Hoover Harford Rep.) ¶ 106; Ex. 6 (Hoover Irvington Rep.) ¶ 96; Ex. 7 (Hoover Tucson Rep.) ¶ 100.[21]

---

[21] If Dr. Hoover's staffing recommendations were applied to all of the approximately 19,000 public school districts in the U.S. (comprised of approximately 99,000 schools and serving approximately 49 million students), Dr. Hoover would be recommending more than 1.2 million new staff. *See* Ex. 82 (U.S. Dep't of Educ., Common Core of Data, "Table 2. Number of operating public elementary and secondary schools and districts, student membership, teachers, and pupil/teacher ratio, by state or jurisdiction: School year 2023–24").

Rule 702 requires Dr. Hoover to base her opinions regarding the scope and timeline of an appropriate remedy "on sufficient facts or data" and to use "reliable principles and methods" in reaching her conclusions. Fed. R. Evid. 702(b), (c); *see Hamilton v. McLemore*, 2021 WL 1654008, at *4 (S.D. Miss. Mar. 18, 2021) (excluding expert "opinion as to the length of treatment necessary" that was based on expert's say-so). Dr. Hoover does neither. Her staffing and training recommendations and her 15-year timeline are based on her *ipse dixit*.

***Staffing and Training.*** One would expect that, to support her call for such a massive investment, Dr. Hoover would cite reliable sources supporting her proposed staffing levels, or at least provide an explanation, grounded in a reliable methodology, for why these specific staffing levels are appropriate. But Dr. Hoover does not do so. Her staffing recommendations lack any basis beyond the barest of *ipse dixit*. She cites *no sources* that call for these levels or ratios of staffing to address student social media use, much less to address compulsive use caused by Defendants' at-issue features. Nor does she provide any explanation of how she determined the staffing levels were appropriate. Dr. Hoover has not determined the number of students in each District suffering from harms caused by Defendants' actionable conduct (or even social media generally) and she is unable to say how many students would receive the non-universal services identified in her plan. *See* Ex. 65 (Aug. 13 Hoover Dep.) 718:10–720:18; *see also id.* at 425:5–426:7, 430:5–431:10; 432:6–434:4, 449:15–456:5. She simply states—without any explanation whatsoever—that there should be one "Digital Literacy Specialist" per 500 students, one "School-Based Mental Health Clinician" per 500 students, one new IT staff hire per school, etc. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 80–97. Rule 702 forbids this sort of "because I said so" testimony, and Dr. Hoover's constant invoking of her "experience" as a talisman cannot be used as a way to smuggle in her bare say-so. *See Joiner*, 522 U.S. at 146 ("[N]othing . . . requires a district court to admit opinion evidence that is connected to the existing data only by the *ipse dixit* of the expert."); *Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094, 1103 (C.D. Cal. 2017) (excluding expert who "provide[d] no support for his 'because I said so' conclusion") (citation omitted), *aff'd*, 786 F. App'x, 84 (9th Cir. 2019).

For 15 of 17 positions called for in her plan (comprising 3,605 new hires across the six Districts), Dr. Hoover uses ratios that were apparently plucked from thin air. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 80–97 (recommending staffing ratios without citing any sources supporting those ratios). For the

remaining two positions—counselors and psychologists—Dr. Hoover uses ratios that are identical to the ratios recommended by the National Association of School Counselors and National Association of School Psychologists (1:250 and 1:500 respectively). Ex. 75 (Am. Sch. Counselor Ass'n, *School Counselor Roles & Ratios*) ("ASCA Standards")); Ex. 83 (Nat'l Ass'n of Sch. Psychologists, *The Professional Standards of the National Association of School Psychologist*s) 12 ("NASP Standards")); *see* Ex. 65 (Aug. 13 Hoover Dep.) 640:5-641:6. But those staffing ratios are irrelevant here because they reflect recommended staffing to support *all* students dealing with *all* of the myriad issues that students face. They are *not* recommendations related to staffing required to address *only* issues relating to student social media use, let alone Defendants' at-issue conduct. Ex. 65 (Aug. 13 Hoover Dep.) 658:14–661:5; *see also*, Ex. 75 (ASCA Standards); Ex. 83 (NASP Standards) at 12.

Moreover, Dr. Hoover does not recommend that the Districts merely staff up to meet the ratios recommended by these associations; instead, she calls for each District (regardless of how many counselors or psychologists it currently employs) to hire an entire new complement of counselors and psychologists solely to address student social media-related issues, as well as dozens of new, different employees with substantially overlapping job descriptions to do the same. *E.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶ 74 (recommending that the district "employ new staffing and professional development rather than rely solely on existing school personnel or programming" to address the alleged impact of social media in schools). She does not provide any methodology (much less a reliable one) for concluding that ratios designed to provide services to *all students* should be used to address only Defendants' actionable conduct. Dr. Hoover's use of these unsupported and inapposite ratios underscores the complete lack of "sufficient facts or data" or "reliable principles and methods" supporting her opinions. Fed. R. Evid. 702(b), (c).

Dr. Hoover's lack of an articulated basis for her staffing levels is all the more problematic because her recommendations are unprecedented. Before this case, Dr. Hoover had never tailored a plan to address students' use of phones, online platforms, or Defendants' platforms, Ex. 64 (Aug. 12 Hoover Dep.) 347:23–348:11, and she is not aware of any school district that has adopted a "strategic plan" like the one she proposes. Ex. 65 (Aug. 13 Hoover Dep.) 806:16–807:6. In other words, Dr. Hoover is asking this

Court to accept her say-so regarding a plan that no school district has ever implemented before. The Court should reject Dr. Hoover's request.

The problems that render Dr. Hoover's staffing recommendations inadmissible equally infect her opinions regarding employee training. Across the six districts, she recommends that Defendants pay for *millions of hours* of training for district employees. *See, e.g.*, Ex. 4 (Hoover DeKalb Rep.) ¶¶ 102–134; Ex. 7 (Hoover Tucson Reb. Rep.) ¶ 125. She identifies no sources supporting the number of training hours she recommends and no methodology for determining what number of hours was appropriate. Accordingly, her recommendations regarding a multi-million-hour training plan funded by Defendants should be excluded as well.

***15-Year Timeline.*** Hoover opines that a "15-year timeline is both a reasonable and necessary duration" for her strategic plan. Ex. 1 (Hoover Rep.) ¶¶ 7, 106–119. This opinion—which supports her recommendation that Defendants fund additional staff and additional training for the next 15 years—lacks a reliable basis. *See generally id.* Dr. Hoover did not model or project the number of students who will require services at any point in the future, much less throughout the entirety of her 15-year timeline. By her own admission, Dr. Hoover cannot predict whether adolescents will even be using social media (let alone Defendants' platforms) 10 years from now and could not recall any peer-reviewed studies forecasting changes in how students will use social media. Ex. 65 (Aug. 13 Hoover Dep.) 803:10–804:15. Nor has she modeled or projected how effective her plan will be beyond rote analogy to the tobacco context, such that one could possibly "test" her opinion that the 15-year timeline is reasonable and necessary. *Id.* 472:11-22 (unable to say how plan will affect rates of depression), 474:22–475:10 (anxiety), 476:14–477:6 (suicide and self-harm), 477:15–478:23 (body dysmorphic disorder and negative body image), 479:1–18 (sleep deprivation); *cf. Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593 (1993) ("Ordinarily, a key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact will be whether it can be (and has been) tested.").

Dr. Hoover cites only one "example" of a public-health response that she says had a 15-year implementation period: the public health response to youth tobacco use in the 1990s and early 2000s. Ex. 1 (Hoover Rep.) ¶ 107; Ex. 64 (Aug. 12 Hoover Dep.) 310:22–312:11. Aside from a single sentence in Dr. Hoover's report highlighting key strategies from the tobacco response, Ex. 1 (Hoover Rep.) ¶ 107

("consistent messaging, health education, capacity-building in schools, and the integration of behavior change supports throughout students' developmental years"), Dr. Hoover does not attempt to explain how the nature and scale of her plan mirrors past school-based tobacco interventions or why the tobacco experience suggests her (different) proposed interventions would be effective. *See id.*; *see also* Ex. 64 (Aug. 12 Hoover Dep.) 313:16-21 ("Q. What is your understanding of the school-based prevention efforts related to tobacco? A. Yeah, so I don't come here pretending to be an expert on tobacco prevention."). Her attempt to defend the analogy in her rebuttal reports reveals the lack of reliable basis or methodology supporting her opinions. Dr. Hoover contends that her "comparison" to tobacco "is not based on mechanistic similarity but on the scale, entrenchment, and persistence of an externally introduced harm." Ex. 13 (Hoover Tucson Reb. Rep.) ¶ 124. In other words, Dr. Hoover's opinion boils down to: Because there was a reduction in tobacco use over a 15-year time period, it is reasonable and necessary that her different plan to address a different problem with a different mechanism and purported effects be in place for 15 years. That unsupported leap does not meet the requirements of Rule 702. *See Joiner*, 522 U.S. at 146.

The two remaining justifications that Dr. Hoover provides for her 15-year timeline are divorced from consideration of what efforts are necessary to address harm caused by Defendants' actionable conduct. *First*, she contends that "[a] 15-year timeline allows districts to follow a full K-12 student cohort from entry to graduation." Ex. 1 (Hoover Rep.) ¶¶ 110–11. But the theoretical value in this tracking exercise is unrelated to an evaluation of what is necessary to address the harms allegedly caused by Defendants' actionable conduct.[22] Nor has Dr. Hoover offered any basis for opining that students who are currently 3 years old, and almost certainly have never used social media, will require any services because of Defendants' actionable conduct, much less 13 years' worth of services. Second, she asserts that "sustainable system change takes 10-15 years." Ex. 1 (Hoover Rep.) ¶ 112. But again, the question that Dr. Hoover should be answering is what steps are necessary to remedy the alleged harms of

---

[22] To give an analogy, if a defendant allegedly caused a physical injury to a plaintiff requiring *some* physical therapy, the plaintiff's expert would need to estimate *how much* physical therapy the injury required; the plaintiff's expert could not recommend a 15-year course of physical therapy on the basis that there would be academic value in measuring the effects of 15 years of physical therapy.

1  Defendants' actionable conduct, not what steps are necessary to effectuate "sustainable system change"

2  in the Districts. Dr. Hoover's failure to tie her "strategic plan" to "the facts of the case," Fed. R. Evid.

3  702(d), requires its exclusion.

### F.  The Court Should Exclude Douglas Leslie's Estimate of Strategic Plan Costs.

5  Dr. Leslie's role is limited. He is not "doing anything else" besides estimating the costs of

6  implementing the "strategic plans" that Dr. Hoover has recommended for the six trial bellwether districts.

7  Ex. 67 (Leslie Dep.) 74:16–19; *see also*, Exs. 26–31 (Leslie's reports for each district).[23] He is not opining

8  that Dr. Hoover's recommended strategic plan should be implemented in any particular school, Ex. 67

9  (Leslie Dep.) 80:6–10; that any strategic plan is needed because of students' use of social media or

10  Defendants' platforms, *id.* at 72:11–19; why a strategic plan should include particular elements, *id.* at

11  72:7–10; or who should pay the costs of implementing Dr. Hoover's plan, *id.* at 82:2–7. Dr. Leslie does

12  not know if Districts will implement any part of Dr. Hoover's recommended strategic plans in the future

13  if they do not recover the cost of the plan in this lawsuit. *Id.* at 85:3–10. And he did not undertake any

14  analysis or review of any Defendant's conduct or form any opinion whether any Defendant caused harm

15  to any school district, *id.* at 75:11–17; should be required to discontinue or modify any feature or function

16  of its platform, *id.* at 75:24–76:13; or should be required to do (or stop doing) something, *id.* at 76:14–

17  77:2.[24]

18  In short, Dr. Leslie agrees his opinion in this case "is limited to costing out Dr. Hoover's strategic

19  plan." *Id.* at 88:3–6. As set forth above, all of Dr. Hoover's opinions should be excluded. If Dr. Hoover's

20  recommended strategic plans for the trial bellwether Districts are excluded, there is no predicate or

21  foundation for Dr. Leslie's cost projections, and he has nothing relevant to offer. *See In re Cathode Ray*

22  *Tube (CRT) Antitrust Litig.*, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases

---

[23] Dr. Leslie also submitted rebuttal reports for each Plaintiff. *See* Exs. 32–37 (Leslie Reb. Reps. for Breathitt, Charleston, DeKalb, Harford, Irvington, and Tucson).

[24] Dr. Leslie also confirmed that he is not offering any opinion on: how often students use cell phones, social media, or Defendants' platforms, *id.* at 68:14–69:5; how much time students spend on cell phones, social media, or Defendants' platforms, *id.* at 69:6–20; whether students' use of social media or Defendants' platforms causes them harm, *id.* at 69:21–70:6; or whether students' use of social media causes harm to schools, *id.* at 70:23–71:3.

her opinion on . . . the unreliable opinion of another expert, a district court may properly exclude the first expert's testimony.").

### G.     The Court Should Exclude Plaintiffs' Expert Dr. Osborne's Proffered Opinions.

Plaintiffs offer expert Brian Osborne, Ed.D., a former school superintendent in New Jersey, to opine about "social media's" effects on the school environment.  Dr. Osborne's opinions are inadmissible.  *First*, all his opinions are predicated on "social media" writ large, without disentangling Defendants from other "social media" or Defendants' actionable conduct from protected conduct and features that this Court already held cannot be a basis for liability.  *Second*, his opinions about purported trends *elsewhere in the country* are irrelevant and lack any reliable methodology or factual basis.  Moreover, his opinions about trends outside the bellwether jurisdictions are entirely based on either undocumented, unverifiable hearsay from unidentified school district officials he refuses to disclose, or his own unsupported *ipse dixit*.  But an expert is not permitted to be a mere conduit for reporting inadmissible hearsay, and without that hearsay, Dr. Osborne cites only his say-so.  That is not a valid methodology.  *Third*, Dr. Osborne's opinions about the scientific literature on mental health and the design of social media platforms are outside of his expertise, as he acknowledges.  *Fourth*, he improperly offers a legal conclusion that public education is a public right.  *Finally*, his admitted reliance on non-existent sources hallucinated by artificial intelligence is an independent basis for excluding his opinions.

Dr. Osborne opines generally that "social media platforms as designed, operated, and promoted by Defendants and used by students, disrupt school operations . . . [and] require significant utilization and/or diversion of resources[.]"  Ex. 50 (Osborne Rep.) ¶ 3.  He claims that the "effects of social media . . . are now shaping behavior and mental health in ways that fundamentally disrupt school[s]"; and social media use by students has caused the diversion of school resources to "to address mental health, educational, disciplinary, and student support issues."  *Id.* ¶ 4.  But he did not visit any of the six trial bellwether districts, he did not interview anyone from any of these districts, and he did not review any quantitative or objective data about these six districts.  He thus admits that he has no idea whether the national trends he identifies affect any of the six bellwether trial districts.  Dr. Osborne opines that these are "nationwide trends" in schools, but he admits that he is *not* offering the opinion that these trends affect the six trial bellwether districts.  Ex. 69 (Osborne Dep.) 138:6–10; *see also* Ex. 51 (Osborne Reb. Rep.) ¶ 90.  And

after admittedly relying on citations hallucinated by artificial intelligence, he opines that the scientific literature shows that students experience adverse mental health effects from social media use and that "as students' use of social media has become more immersive, compulsive, and socially consequential, school leaders are increasingly called upon to manage disruptions that originate or escalate online, as well as the challenges of decreased teacher morale and student attention." Ex. 51 (Osborne Reb. Rep.) ¶ 26.

### 1. Dr. Osborne Fails to Disentangle Actionable and Non-Actionable Conduct as This Court Has Required.

Like Plaintiffs' other experts, Dr. Osborne's opinions should be excluded because he fails to disentangle the effects of each Defendant platform from the others or "social media" and cell phone use generally. He also fails to disentangle the allegedly harmful effects of Defendants' actionable conduct from conduct and features this Court already held cannot be the basis of liability. *See supra* Section III.A.2.

Dr. Osborne testified that his "understanding" of the term social media is it only includes the five Defendant platforms in this case. Ex. 69 (Osborne Dep.) 169:18–170:21. However, he failed to analyze whether other platforms, such as Twitter/X or Discord, are social media. *Id.* at 170:22–171:11. And he did no analysis to allocate the particular impact of any one of these platforms. *Id.* at 366:18–367:1. The failure to separate out the particular impacts of the five specific platforms at issue renders his opinions inadmissible.

He also repeatedly attributes harm to third-party conduct, protected features and the content made available on Defendants' platforms. *E.g.*, Ex. 50 (Osborne Rep.) ¶ 68 (discussing harm coming from "likes, comments, and notifications"), ¶ 78 ("Students frequently arrive at school already upset by something that happened online the night before . . . but that can derail the entire day."); Ex. 51 (Osborne Reb. Rep.) ¶ 51 (claiming that disciplinary incidents often "trace back to online conflict"). Indeed, he admitted that he does not "understand the nuances of the features and the way that they might be changing and all of that well enough to say which ones are the specific culprits." Ex. 69 (Osborne Dep.) 183:20–184:23. These failures require exclusion of his opinions.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**2.    Dr. Osborne's Opinions About Purported Trends Outside the Six Trial Bellwether Districts Are Inadmissible.**

**a)    Dr. Osborne's Opinions About Trends Elsewhere in the Country Are Irrelevant.**

Dr. Osborne readily admits that he is *not* offering the opinion that his identified trends affect the six trial bellwether districts.  Ex. 69 (Osborne Dep.) 138:6–10 ("*Looking at the effects of social media and its use on the six districts in particular was not within the scope of my task*.") (emphasis added); *see also* Ex. 51 (Osborne Reb. Rep.) ¶ 90 ("My role as an expert was not to conduct a forensic audit of each district's data, but to offer a national, practice-informed perspective on systemic impacts that are widely experienced by schools and districts.").  And he admits that he has no basis for extrapolating his opinions about general, nationwide trends to any of the six bellwether districts because he "*didn't review any data or documents related to the six specific districts*."  *Id.* at 166:11–167:20 (emphasis added).

Dr. Osborne did not visit any of the six trial bellwether districts, *see id.* at 203:3–8; did not interview anyone from any of these districts, *id.* at 202:16–23; and did not review any quantitative or objective data about these districts, *id.* at 166:4–10, 167:12–17.  He acknowledged that, before opining that trends elsewhere applied to the bellwether districts, he "would need to verify those reasonable extrapolations and transferability assumptions using data and documents from the specific school districts."  *Id.* at 167:21–169:11.  But because he "*did not review data and documents from those specific districts,* [*he*] *would stop short of saying that they could be verified in those particular settings*."  *Id.* (emphasis added).[25]  Dr. Osborne's opinions are therefore irrelevant to the six trial bellwether districts and should be excluded.

**b)    Dr. Osborne Lacks Any Reliable Methodology or Basis for His Opinions About Schools Outside of the Six Trial Bellwether Districts.**

---

[25] Dr. Osborne also did not review documents or data specific to any of the six districts about: mental health providers being overwhelmed, teacher morale or burnout, the frequency or intensity of discipline issues, bullying, reduced student focus, escalating peer conflict, emotional dysregulation, demand for mental health services, compulsive use of social media, fear of exposure on social media, social exclusion, public shaming, disruptions to school climate or operations, disruptions to the educational experience, funding for mental health services, rules to limit social media and electronic device use, increased costs or diverted resources by the districts, heightened emotional strain, or reduced leadership capacity.  Ex. 69 (Osborne Dep.) 129:9–169:17.

Dr. Osborne concedes his opinions are based entirely on hearsay and experience: an "experience-based synthesis of information collected from current school leaders [from outside of the bellwether districts] and 33 years of expertise and experience," Ex. 51 (Osborne Reb. Rep.) ¶ 6, which leads to his "pattern recognition," *id.* ¶ 8. He testified that his pattern identification involves (1) talking to school leaders over the years, and then (2) discerning whether patterns emerge. Ex. 69 (Osborne Dep.) 378:14–379:7. Neither the regurgitation of hearsay nor his say-so is a permissible methodology under Rule 702. *See* Fed. R. Evid. 702(b), (c).

### (1)    Dr. Osborne Cannot Be a Conduit for Repeating Hearsay About What Is Happening Outside the Six Trial Bellwether Districts.

Plaintiffs are attempting to use Dr. Osborne as a conduit to usher in a wide swath of undocumented, unrepresentative, unattributed, and unattributable hearsay statements by non-plaintiff school district employees. That is not allowed. *Asetek Danmark A/S v. CoolIT Sys. Inc.*, 2022 WL 21306657, at *20 (N.D. Cal. Oct. 4, 2022) ("[A] party cannot call an expert simply as a conduit for introducing hearsay under the guise that the testifying expert used the hearsay as the basis of his testimony." (citation omitted)).

In his reports, Dr. Osborne acknowledged that his opinions about school districts elsewhere in the country simply repeat what he claims to have heard in undocumented exchanges with school leaders whom he cannot or will not identify. Ex. 50 (Osborne Rep.) ¶ 24 (referencing "My formal and informal discussions with school and district leaders . . . frequently and consistently include situations involving . . . challenges stemming from students' compulsive use of social media."); Ex. 51 (Osborne Reb. Rep.) ¶ 108 (discussing "operational realities reported by educators across districts and regions"), ¶ 120 ("While my report does not claim to be based on a statistically representative sample, it draws from my interactions over time with school leaders."); *see also* Ex. 69 (Osborne Dep.) 234:11–235:3, 239:9–240:9 (referencing his "conversations" with school officials), 240:10–247:22 (refusing to say to whom he spoke).

Dr. Osborne cannot conduct an end-run around the hearsay rules by testifying that undocumented, unverifiable statements—from unidentified individuals in unidentified jurisdictions outside the bellwether districts—purportedly form "a pattern." Even if what was happening in particular jurisdictions outside the trial bellwether school districts were relevant (it is not), Defendants have no way of testing who made

these statements, whether Dr. Osborne is accurately describing them, and whether those statements were based on personal knowledge (or instead were themselves recycling other hearsay or speculation). *See id.* at 235:4–236:6 (confirming he has no notes or other records of these conversations). The Court should not permit this gambit. The trial for each bellwether district should focus on in-court testimony from individuals with firsthand knowledge about that district, not hearsay statements about school districts somewhere else in the country.

> **(2)** **Apart from Hearsay, Dr. Osborne's Opinions About Schools Outside the Six Trial Bellwether Districts Are Inadmissible *Ipse Dixit*.**

Without being able to echo hearsay (merely repeating whatever he claims school leaders told him), Dr. Osborne has nothing more than "experience" to prop up his claims about trends or patterns. *E.g.*, Ex. 51 (Osborne Reb. Rep.) ¶ 96 (describing his report as "a synthesis of professional knowledge, institutional experience, and field-based testimony"). Invocation of experience is not a methodology. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("[N]othing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." (quotation omitted)). "If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Dr. Osborne fails to do that, which renders his opinions inadmissible.

Thus, stripped of hearsay, Dr. Osborne's discernment of "patterns" is just his say-so, not a methodology. He offers no explanation for how he reaches the conclusions set out in his reports other than stating he applied his expertise to the hearsay statements he considered in his reports. He admitted he did not follow a consistent methodology for conversing with school leaders, nor did he discuss the same topics with them. Ex. 69 (Osborne Dep.) 236:7–238:10. He conceded there is nothing objective or replicable about his approach: there is no "rubric" for pattern identification, there was no minimum number of data points for observed phenomena to be "independently verifiable" as a pattern, there is no specific length of time over which a phenomenon must occur to constitute a pattern, and his approach is

"qualitative." *Id.* at 379:8–382:2. Yet he claims any concerns about the foundation for his opinions are unwarranted because he has "a good pulse on what's happening in schools." *Id.* at 379:21–381:8. His unsupported say-so about issues supposedly affecting schools is not admissible. *See In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *9–10 (N.D. Cal. Aug. 28, 2023) (finding inadmissible expert testimony that had relied on mere "assert[ions], with no real analysis or data," and had proffered "no visible factual support" or explanation as to "[w]hy any of [his testimony] might be true").[26]

### c)    Dr. Osborne Cannot Parrot Deposition Testimony from this Case.

While he concedes that he is not offering opinions about the six trial districts and has no basis to do so, *see supra* Section III.G, Dr. Osborne reviewed *some* deposition transcripts for *some* of the six trial districts, which he claims "helped validate" his opinions about school trends in general. Ex. 50 (Osborne Rep.) ¶ 17; Ex. 71 (Osborne Rep. Materials Considered List at 6–8) (listing some deposition transcripts for some of the bellwether districts).

Dr. Osborne cannot serve as a vehicle for repeating, summarizing or characterizing what Plaintiff witnesses said in their depositions, or saying that this deposition testimony matches up with the hearsay he has heard from other school districts. Where an expert "merely repeats or recasts the testimony of fact witnesses in order to arrive at a theory of causation, he is not testifying as an expert witness based upon specialized knowledge, but rather is acting as a conduit for another witness's testimony in the guise of an expert's opinion." *Grajeda v. Vail Resorts Inc.*, 2022 WL 17848967, at *3 (D. Vt. Dec. 22, 2022) (citation omitted) (excluding expert's testimony where the expert "arrived at his causation opinion" about how plaintiff was injured in a skiing accident by reviewing plaintiff's statements and records, without "perform[ing] [any] other independent analysis"). Simply reporting what others said is not the application of any expertise. The jury is charged with listening to those witnesses live at trial (or by designation) and

---

[26] As further illustration, Dr. Osborne opines that many issues facing schools are measurable, but he does not offer a single quantifiable measurement or metric of such issues. He claims that "burdens on schools caused by social media design are real, measurable, and increasingly unsustainable," Ex. 51 (Osborne Reb. Rep.) ¶ 63, but does not provide any measurement of these supposed burdens. He also claims that there are "rising levels of anxiety, depression, sleep loss, classroom disruption, cyberbullying, and self-harm," and that these increases "are not isolated or incidental," without providing any quantitative data from any school to support that claim. *Id.* ¶ 93.

must weigh the evidence based on the words and demeanor of those witnesses, not Osborne's or anyone else's account of what they purportedly said.

### 3. Dr. Osborne's Opinions About Mental Health Impacts and Platform Design Are Outside of His Expertise.

In his report, Dr. Osborne repeatedly claims that social media has adverse mental health impacts on youth. *E.g.*, Ex. 50 (Osborne Rep.) ¶¶ 31, 69–73, 76; Ex. 51 (Osborne Reb. Rep.) ¶¶ 26, 31. But he is an educational consultant and former superintendent, not a doctor, psychiatrist, psychologist, mental health professional, statistician, or data science expert. Ex. 69 (Osborne Dep.) 35:23–-36:2, 283:14–17, 285:19–23. He admits that "the use of scientific evidence is kind of best left to people who are statisticians or scientists or engaged deeply in this material," *id.* at 283:14–24, and that whether "the scientific evidence supports the position that social media causes poor mental health outcomes among students in educational settings" is "*best left to other experts* who understand the statistics and the research design that would enable someone to make such a claim," *id.* at 284:8–18 (emphasis added). Thus, by his own admission, he lacks the necessary "scientific, technical, or other specialized knowledge" under Rule 702 to tell a jury that social media causes mental health harms.

He also opines across both of his reports about the design and engineering of social media platforms. *E.g.*, Ex. 51 (Osborne Reb. Rep.) ¶ 50 (claiming platforms are "engineered to maximize attention, extend time on devices, and deepen user dependency"), *id.* ¶¶ 55, 76, 79, 85, 89, 93, 115, 119; Ex. 50 (Osborne Rep.) ¶¶ 68, 92, 96, 98, 104, 106. Dr. Osborne goes as far as opining that social media companies "failed to adequately warn users." Ex. 51 (Osborne Reb. Rep.) ¶ 50. But, once again, he admits he is not an expert in platform design or in the features of social media platforms. Ex. 69 (Osborne Dep.) 34:19–35:22, 73:10–16 ("I'm not an expert in the features [of social media platforms].").[27]

---

[27] *See also id.* at 106:13–25 ("Oh, yes. I'm not an expert in the platform design. . . . I read literature from people who researched this. That would not make me an expert."), 175:12–17 ("So I'm not an expert on all the myriad of design features. I'm not an expert in how they're engineered. I wouldn't be a good source of naming all of them or knowing or understanding the difference across the platforms."), 181:8–15 ("[T]he list of specific [platform] features is not really something that I'm an expert on or am prepared to talk about. What I know is that they're there, they exist, they're in the design . . . ."), 183:13–19 ("What those features are, how they interact with one another, how they're coded, what the differences are across the platforms . . . . [I]t's outside the scope of my expertise.").

Dr. Osborne's cursory literature review related to mental health issues and the design of social media platforms, *id.* at 286:18–287:8, does not allow him to circumvent this lack of expertise. *Id.* at 106:13–21 ("I read literature from people who researched [platform design]. *That would not make me an expert.*" (emphasis added)). Because "experts may not make expert conclusions about areas outside their expertise," *Apple, Inc. v. Samsung Elecs. Co.*, 2013 WL 5955666, at *2 (N.D. Cal. Nov. 6, 2013), the Court should exclude Osborne's opinions about the causes of mental health impacts on youth and the design or engineering of social media platforms. *Avila v. Willits Env't Remediation Tr.*, 633 F.3d 828, 839 (9th Cir. 2011) (an expert must "stay[] within the reasonable confines of his subject area" when offering an opinion (citation omitted)).

### 4. Dr. Osborne's Opinion That Public Education Is a Public Right Is an Inadmissible Legal Conclusion.

Dr. Osborne also attempts to smuggle in a legal conclusion that is the exclusive province of the Court. Conflating "common goods" with the legal term "public rights," he claims "[p]ublic education is a public right, and its effective functioning is essential to the health of our society and democracy." Ex. 50 (Osborne Rep.) p. 7; *see also id.* at p. 17, ¶ 102. This opinion should be excluded because it is well-settled that "an expert cannot testify to a matter of law amounting to a legal conclusion." *United States v. Tamman*, 782 F.3d 543, 552 (9th Cir. 2015). Whether public education is a "public right" as that term is used in public nuisance law is a question of law for this Court alone to decide. *See, e.g.*, Dkt. 1332 ("SD Nuisance Order") at 23 (finding that plaintiffs sufficiently pled "that the public health is a right common to the public" but "declin[ing] to rule on the issue of whether defendants' have unreasonably interfered with a public right to education."). The Court should not permit Dr. Osborne to opine on a legal issue on which the Court withheld ruling at the motion to dismiss stage. SD Nuisance Order at 23.

### 5. Dr. Osborne's Opinions Should Be Excluded Because He Relied on Fake Citations Generated by Artificial Intelligence.

Only when confronted at his deposition that several of his citations in his report were either incorrect or entirely made up did Dr. Osborne admit that two articles he relied upon "don't exist" at all. Ex. 69 (Osborne Dep.) 308:9–20; *see also* Ex. 50 (Osborne Rep. at 34 (citing "Popat, S., & Tarrant, A. (2023)"); Ex. 51 (Osborne Reb. Rep. at 7 n.5 (citing "Crow, G., Miskel, C. G., & Peterson, R. L. (1997)"). He claims other articles he incorrectly listed were miscites for real articles. *Id.* at 308:21–309:4. He

claims these citation errors and hallucinations resulted from "trying to use Gemini [an artificial intelligence product] to APA format those citations," after which he "got back bad citations." *Id.* at 308:9–309:16, 310:8–311:15. Courts have excluded expert reports for similar AI hallucinations. *See, e.g., Kohls v. Ellison*, 2025 WL 66514, at *4–5 (D. Minn. Jan. 10, 2025) (excluding expert declaration that included "fake, AI-generated sources"); *Concord Music Grp., Inc. v. Anthropic PBC*, 2025 WL 1482734, at *3 (N.D. Cal. May 23, 2025) (striking portion of expert report that relied on AI-hallucinated article). *Cf. Mata v. Avianca, Inc.*, 678 F. Supp. 3d 443, 466 (S.D.N.Y. 2023) (sanctioning attorney for including fake, AI-generated legal citations in a filing); *Morgan v. Cmty. Against Violence*, 2023 WL 6976510, at *8 (D.N.M. Oct. 23, 2023) (use of non-existent citations result in "wasting the opposing party's time and money, the Court's time and resources, and reputational harms to the legal system").

Dr. Osborne has served amended reports that replace the hallucinated cites with actual articles, but that does not cure this issue. He has not offered any explanation for why he did not correct the fake citations promptly upon discovering them—perhaps waiting to see if Defendants caught the issue. And "at the end of the day, even if the errors were an innocent mistake, and even if the propositions are substantively accurate, the fact remains that [Dr. Osborne] submitted" reports where he claimed, based on "fake citations," that he held his opinions to a reasonable degree of professional certainty, *see Kohls*, 2025 WL 66514, at *3–4, notwithstanding he had "certifie[d] [his] understanding that [he] owe[s] a primary and overriding duty of candor and professional integrity to help the Court on matters within [his] expertise and in all submissions to, or testimony before, the Court," Ex. 50 (Osborne Rep.) p. 31. Even assuming the Court finds Dr. Osborne's explanation to be "helpful, thorough, and plausible," his failure to adhere to the standards to which he averred in his report should "shatter[] his credibility with this Court." *See Kohls*, 2025 WL 66514, at *4. Exclusion of his report is the proper remedy. *See id.* at *4–5.

## IV.    CONCLUSION

Defendants respectfully request that the Court exclude the testimony of Plaintiffs' experts Mr. Klein, Dr. Ward, Mr. Meyers, Dr. Hoover, Dr. Leslie, and Dr. Osborne.

DATED:  September 30, 2025

Respectfully submitted,


By:    /s/ Ashley M. Simonsen

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Phyllis A. Jones (*pro hac vice*)
Paul W. Schmidt (*pro hac vice*)
Christian J. Pistilli (*pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pajones@cov.com
Email: pschmidt@cov.com
Email: cpistilli@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*


/s/ John J. Nolan

ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP

601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

JONATHAN H. BLAVIN (State Bar
No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State
Bar No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

*/s/ David P. Mattern*
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, pro hac vice
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants TikTok Inc.,
ByteDance Inc., ByteDance Ltd., TikTok
Ltd., and TikTok, LLC*

1

2                                                     /s/ Ashley W. Hardin_____
                                                    JOSEPH G. PETROSINELLI, *pro hac*
3                                                   *vice*
                                                    jpetrosinelli@wc.com
4                                                   ASHLEY W. HARDIN, *pro hac vice*
                                                    ahardin@wc.com
5                                                   J. ANDREW KEYES, *pro hac vice*
                                                    akeyes@wc.com
6                                                   NEELUM J. WADHWANI (SBN
                                                    247948)
7                                                   nwadhwani@wc.com
                                                    WILLIAMS & CONNOLLY LLP
8                                                   680 Maine Avenue, SW
                                                    Washington, DC 20024
9                                                   Tel.: (202) 434-5000

10                                                  *Attorneys for Defendants YouTube, LLC*
                                                    *and Google LLC*
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>FILER'S ATTESTATION</u>

I, Ashley M. Simonsen, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:   September 30, 2025             By:   <u>*/s/ Ashley M. Simonsen*</u>
                                              Ashley M. Simonsen