JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105-2907
Telephone:    (415) 512-4000
Facsimile:    (415) 512-4077

ROSE L. EHLER (State Bar No. 296523)
Rose.Ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071-3426
Telephone:    (213) 683-9100
Facsimile:    (213) 687-3702

*Attorneys for Defendant Snap Inc.*

*[Additional parties and counsel listed on
signature pages]*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>ALL ACTIONS | MDL No. 3047<br><br>Case No. 4:22-MD-03047-YGR-PHK<br><br>Honorable Yvonne Gonzalez Rogers<br><br>**DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT**<br><br>**Hearing**:<br>Date:    January 26, 2026<br>Time:    8:00 am<br>Place:    Courtroom 1, Floor 4<br>Judge:    Hon. Yvonne Gonzalez Rogers |

Case No. 4:22-MD-03047-YGR

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, at 8:00 am on January 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street in Oakland, California, Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Instagram, LLC; Facebook Payments, Inc.; Siculus, Inc.; Facebook Operations, LLC; Facebook Technologies, LLC; and Facebook Holdings, LLC (collectively, "Meta" or the "Meta Defendants"); Defendant Snap, Inc. ("Snap"); Defendants ByteDance Ltd.; ByteDance Inc.; TikTok Ltd.; TikTok LLC; and TikTok Inc. (collectively, "TikTok" or the "TikTok Defendants"); and Defendants Google LLC and YouTube LLC (collectively, "YouTube" or the "YouTube Defendants") (and, together with all Defendants, "Defendants") will and hereby do move this Court, under Federal Rule of Evidence 702, for an order excluding the general causation opinions of the Personal Injury/School District Plaintiffs' experts and Attorneys General's experts, including, Mr. Arturo Béjar, Dr. Drew Cingel, Dr. Dimitri Christakis, Dr. Gary Goldfield, Dr. Lauren Hale, Dr. Sharon Hoover, Dr. Anna Lembke, Dr. Ramin Mojtabai, Dr. Stuart Murray, Ms. Lotte Rubaek, Dr. Eva Telzer, Dr. Jean Twenge, and Dr. Bradley Zicherman.

This Motion is based on the Memorandum of Points and Authorities submitted herewith; any Reply Memorandum or other papers submitted in connection with the Motion; Defendants' concurrently filed Omnibus Motion to Exclude General Causation Testimony of Plaintiffs' Experts and accompanying Declaration of Ashley M. Simonsen and exhibits thereto, which include the experts' reports and depositions; any matter of which this Court may properly take judicial notice; and any information presented at argument.

DATED: September 30, 2025             By:   /s/ Jonathan H. Blavin
                                            JONATHAN H. BLAVIN
                                            *Attorney for Defendant Snap Inc.*

1

## TABLE OF CONTENTS

Page

I.    INTRODUCTION .................................................................................................. 1

II.   ARGUMENT ........................................................................................................ 2

      A.   Plaintiffs' Experts May Not Premise Their General Causation Opinions on
           Defendants' Publication of Third-Party Content and Protected Features. ................. 2

      B.   Courts Routinely Reject Expert Testimony Premised on Protected Activity. ........... 5

      C.   Plaintiffs' Experts Fail to Meet the Standards of Rule 702 ........................................ 6

           1.   The experts' opinions depend upon protected publishing features. ................ 7

           2.   Plaintiffs' experts also make no effort to disaggregate the impact of
                content published on social media platforms in their causation
                analyses. ......................................................................................................... 9

           3.   Plaintiffs' experts' efforts to elide the effects of the at-issue features
                and third-party content only underscore the need for exclusion. .................. 12

      D.   The JCCP Court's *Sargon* Ruling Should Not Be Followed Here. .......................... 14

III.  CONCLUSION .................................................................................................... 15

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**FEDERAL CASES**

*In re Circuit Breaker Litigation,*
  984 F. Supp. 1267 (C.D. Cal. 1997)............................................................................5

*City of Pomona v. SQM N. Am. Corp.,*
  750 F.3d 1036 (9th Cir. 2014)...................................................................................13

*Conley v. R.J. Reynolds Tobacco Co.,*
  286 F. Supp. 2d 1097 (N.D. Cal. 2002) .....................................................................5

*Daubert v. Merrell Dow Pharms., Inc.,*
  509 U.S. 579 (1993).............................................................................................2, 3, 5

*Doe v. Grindr,*
  128 F.4th 1148 (9th Cir. 2025)............................................................................4, 15

*Dyroff v. Ultimate Software Grp., Inc.,*
  934 F.3d 1093 (9th Cir. 2019)...................................................................................8

*Engilis v. Monsanto Co.,*
  --- F.4th ---, 2025 WL 2315898 (9th Cir. Aug. 12, 2025).......................................15

*Est. of Bride by & through Bride v. Yolo Techs., Inc.,*
  112 F.4th 1168 (9th Cir. 2024)..................................................................................4

*Gen. Elec. Co. v. Joiner,*
  522 U.S. 136 (1997)............................................................................................6, 13

*Greenwood Utils. Comm'n v. Miss. Power Co.,*
  751 F.2d 1484 (5th Cir. 1985)...................................................................................5

*Hesling v. CSX Transp., Inc.,*
  396 F.3d 632 (5th Cir. 2005).....................................................................................5

*Impinj, Inc. v. NXP United States, Inc.,*
  2023 WL 5174283 (N.D. Cal. June 28, 2023) ..........................................................5

*Jones v. United States,*
  933 F. Supp. 894 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997)................3

*Lemmon v. Snap Inc.,*
  995 F.3d 1085 (9th Cir. 2021)............................................................................2, 4, 6

*In re: Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig.,*
  2016 WL 2940778 (D.S.C. May 6, 2016)................................................................15

*Lowery v. Sanofi-Aventis LLC,*
  2021 WL 872620 (N.D. Ala. Mar. 9, 2021).......................................................3, 15

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

*Malden Transp., Inc. v. Uber Techs. Inc.*,
    404 F. Supp. 3d 404 (D. Mass. 2019), *aff'd*, 8 F.4th 1 (1st Cir. 2021)..........................5

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982) ..........................................................................................................4

*NetChoice, LLC v. Bonta*,
    113 F.4th 1101 (9th Cir. 2024)..........................................................................................4

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) ...........................................................................................5

*In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods.
    Liab. Litig.*,
    2021 WL 781682 (D. Md. Mar. 1, 2021)...........................................................................5

*In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liab.
    Litig.*,
    2023 WL 6794318 (D. Md. Oct. 12, 2023) ........................................................................3

**STATE CASES**

*Innovative Block of S. Texas, Ltd. v. Valley Builders Supply, Inc.*,
    603 S.W.3d 409 (Tex. 2020) ..............................................................................................6

**FEDERAL RULES**

Fed. R. Evid. 702...........................................................................................1, 2, 3, 6, 12, 13

Case No. 4:22-MD-03047-YGR

# I.    INTRODUCTION

As this Court has recognized, Plaintiffs' claims are governed by legal rules that establish a "significant limitation on [P]laintiffs' theories of recovery." ECF 1267 ("SD Order") at 2. In particular, Section 230 and the First Amendment both independently prohibit imposing liability based on "[D]efendants' roles as publishers of third-party content." ECF 430 at 16 ("PI Order"). Applying these limits in its various motion to dismiss orders, the Court conducted a "conduct-specific, feature-by-feature analysis" and dismissed Plaintiffs' allegations based on a broad array of features of Defendants' platforms—including recommendation algorithms, "endless scroll," autoplay, ephemeral content, location sharing, likes, comments, and notifications. *Id.*; ECF 1214 at 25 ("AG Order"); SD Order at 14. The Court made clear that these features are "no longer part of this case." PI Order at 32. Instead, Plaintiffs must focus on "the *specific conduct* through which the defendants allegedly violated their duties," confining their claims to the narrow set of at-issue features that are not tools for publication or expression. *Id.* at 14 (emphasis added).

These rulings put Plaintiffs on direct notice of what their experts were required to do to address general causation: analyze whether, based on reliable science consistent with the strictures of Rule 702, the *non-protected* features—as opposed to third-party content or protected publishing functions—*independently* can cause the harms that Plaintiffs allege. Yet Plaintiffs, through their general causation experts, ignored the Court's directives. As they freely admitted in deposition, Plaintiffs' experts overtly rested their analyses on the very publishing features that this Court held are protected. For example, as Dr. Lembke acknowledged, "[w]hether a feature may be immunized by Section 230 did not play a factor" in her opinions. Ex. 33 (Lembke MDL Dep.) 125:23–128:24; *see also, e.g.*, Ex. 12 (Christakis MDL Dep.) 87:19–88:3 (he "did not" "try to tease out the impact of one of these features versus the others"); Ex. 43 (Murray JCCP Dep.) 431:16–433:24 ("disaggregat[ing]" features would be "speculative").[1]

---

[1] Pursuant to CMO No. 26, Defendants have concurrently filed an Omnibus Motion to Exclude General Causation Testimony of Plaintiffs' Experts, regarding the methodological flaws in each expert's testimony that constitute additional grounds for exclusion. All exhibits cited herein are attached to the Declaration of Ashley M. Simonsen, filed with that Motion.

It is no surprise that Plaintiffs' experts do not opine on the independent impact, if any, of the at-issue features. The body of scientific literature upon which the experts universally rely makes no attempt to isolate the effects of *unprotected* features divorced from *protected* publishing features and third-party content. That is understandable in the scientific realm, but Section 230 and the First Amendment govern this case—and they restrict the evidence and theories that Plaintiffs can use to hold Defendants liable. As this Court and the Ninth Circuit have made clear, claims against online platforms like Defendants must be "*fully independent of* [their] role in monitoring or publishing third-party content.*" Lemmon v. Snap Inc.*, 995 F.3d 1085, 1093 (9th Cir. 2021) (emphasis added); *see* PI Order at 11 (requiring claims "ha[ve] *nothing to do*" with platform's role as publisher (emphasis added)). Plaintiffs' experts had years to conduct their own analyses isolating any effects of exposure to the at-issue features on teen mental health from any effects of publishing activities. But they have not. Instead, the experts attempt to leapfrog the existing literature, drawing causal conclusions unsupported by the science.

This reality has consequences under Rule 702. Expert testimony is admissible only if it speaks directly to the issues a jury must decide. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 591 (1993). Here, the relevant question is whether the non-publishing features, standing alone, are capable of causing the harms Plaintiffs allege. Opinions premised on the mental-health impact of protected publishing features and third party content—in a case where liability must have "nothing to do" with those things, PI Order at 11—would only confuse the jury and risk an improper verdict. To permit otherwise would allow Plaintiffs to avoid the protections of federal law through expert testimony—and it would conflict with this Court's rulings narrowing the scope of conduct on which liability can be based. Plaintiffs' general causation opinions should be excluded.

## II.      ARGUMENT

### A.      Plaintiffs' Experts May Not Premise Their General Causation Opinions on Defendants' Publication of Third-Party Content and Protected Features.

Liability in this case is uniquely circumscribed by the protections of Section 230 and the First Amendment, which impose a "significant limitation on [P]laintiffs' theories of recovery." SD Order at 2. In particular, this Court has ruled that the following publishing features are protected by Section

230: (1) the "[u]se of algorithms to promote addictive engagement"; (2) "[n]ot providing a beginning and end to a user's 'Feed'"; (3) the "[t]iming and clustering of notifications of third-party content"; (4) "[f]ailing to put [d]efault protective limits to the length and frequency of sessions"; (5) "[f]ailing to institute [b]locks to use during certain times of day (such as during school hours or late at night)]"; (6) "[r]ecommending minor accounts to adult strangers"; (7) "[l]imiting content to short-form and ephemeral content, and allowing private content"; (8) "[p]ublishing geolocating information for minors"; (9) "autoplay features"; (10) "quantification and display of 'Likes'"; and (11) "service of content according to 'variable reinforcement schedules.'" *Id.* at 14; AG Order at 25. The Court also held that the First Amendment protects the "timing and clustering of notifications *of defendants' content*" and "awards to frequent users," which "are speech." PI Order at 5, 22. The Court thus limited the claims to a subset of features it found "are not equivalent to speaking or publishing and can be fixed by defendants without altering the publishing of third-party content." AG Order at 29.[2]

These rulings necessarily set the boundaries for relevant expert testimony in this matter. Under Rule 702, expert testimony must "help the trier of fact . . . to determine a fact *in issue*." Fed. R. Evid. 702(a) (emphasis added). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert,* 509 U.S. 579 at 591. And "[t]estimony that relates only to claims that are preempted is not relevant to the remaining claims." *In re Smith & Nephew Birmingham Hip Resurfacing Hip Implant Prods. Liab. Litig.*, 2023 WL 6794318, at *2 (D. Md. Oct. 12, 2023); *see also Lowery v. Sanofi-Aventis LLC*, 2021 WL 872620, at *21 (N.D. Ala. Mar. 9, 2021) (where federal law "severely limits a plaintiff's theories of liability on his state law claims," excluding expert testimony that goes "to a theory of liability that is preempted and, for that reason, cannot be an issue put to the jury at trial"). This requirement protects against "the special dangers inherent in scientific expert testimony," which "can be both powerful and quite misleading because of the difficulty in evaluating it." *Jones v. United States*, 933 F. Supp. 894, 900 (N.D. Cal. 1996), *aff'd*, 127 F.3d 1154 (9th Cir. 1997) (quoting *Daubert*, 509 U.S. at 595). Those risks are especially

---

[2] Those at-issue features include: not providing effective parental controls; not providing options to self-restrict time on a platform; making it challenging for users to delete their account; not using robust age verification; making it challenging for users to report predator accounts and content to the platform; offering appearance-altering filters; and not labelling filtered content. PI Order at 14–15.

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

1   pertinent as to the opinions at issue here, which relate to a core element of liability—causation.

2          The exclusion of causation evidence that turns on content and protected publishing activities

3   is consistent with Ninth Circuit authority and this Court's prior rulings holding that, to avoid Section

4   230, the alleged duty must be "*fully independent of* [Defendants'] role in monitoring or publishing

5   third-party content." *Lemmon*,, 995 F.3d at 1093 (emphasis added); PI Order at 11 (claims must

6   "ha[ve] nothing to do" with publisher role). While "Section 230 does not create immunity simply

7   because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm," PI

8   Order at 11, competent expert testimony must still disaggregate the impact of content and protected

9   features from any actionable aspect of the platforms. As the Ninth Circuit recently held, where "the

10  challenged features of the App are not independent of [a platform's] role as a facilitator and publisher

11  of third-party content," it "is analytically insignificant whether [the] injuries would not have occurred

12  'but for' [the App's] role as a publisher." *Doe v. Grindr*, 128 F.4th 1148, 1153 & n.3 (9th Cir. 2025).

13  And when constitutionally protected speech is intertwined with non-protected conduct, there

14  similarly must be an "evidentiary basis for concluding" there is independent tortious activity to

15  "avoid[] the imposition of punishment for constitutionally protected activity." *NAACP v. Claiborne*

16  *Hardware Co.,* 458 U.S. 886, 933–34 (1982).

17          To give effect to the legal boundaries of Section 230 and the First Amendment, an expert's

18  opinion that Defendants' platforms are capable of causing harm may not be based on evidence of

19  harm caused by the publication of third-party content and other protected acts. To permit otherwise

20  would admit through the side door what this Court (and federal law) has barred from the front,

21  inviting a jury to impose liability based on impermissible grounds.[3]

22

23

_____

24  [3] Plaintiffs cannot invoke their failure-to-warn claims to present general causation opinions premised
    on harm caused by content and protected features. Plaintiffs' general causation experts do not give

25  opinions about the nature or causal impact of any warnings, so their testimony does not support the
    causation inquiry demanded by those claims. Regardless, those failure-to-warn claims are barred by

26  Section 230 and the First Amendment to the same extent as the product defect, negligence, and
    consumer-protection claims—as confirmed by binding Ninth Circuit law. *See Grindr*, 128 F.4th at

27  1154; *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1179–80 (9th Cir. 2024);
    *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024). The Court has deferred briefing on that

28  issue until resolution of Meta's and TikTok's appeal; Defendants preserve that argument here.

-4-                                     Case No. 4:22-MD-03047-YGR
DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

### B.    Courts Routinely Reject Expert Testimony Premised on Protected Activity.

In closely analogous contexts, where some but not all theories of liability are barred by preemption or constitutional immunity, federal courts routinely reject expert testimony as irrelevant on the grounds that it considers a legally precluded theory of liability. *E.g.*, *Greenwood Utils. Comm'n v. Miss. Power Co.*, 751 F.2d 1484, 1503–04 (5th Cir. 1985) (expert testimony "presented no fact issue for trial" where it "relied almost exclusively on conduct that we have determined to be protected under the *Noerr-Pennington* doctrine"); *Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 644–46 (5th Cir. 2005) (excluded testimony as it "was only relevant as to a claim" preempted); *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, 2021 WL 781682, at *5 (D. Md. Mar. 1, 2021) (excluded testimony only relevant to claims "preempted by federal law"); *see also Impinj, Inc. v. NXP United States, Inc.*, 2023 WL 5174283, at *10 (N.D. Cal. June 28, 2023) ("Courts routinely exclude expert testimony that conflicts with the Court's" prior rulings). Such testimony "invite[s] a jury to question" preempted bases of liability, *In re Smith*, 2021 WL 781682, at *5, and is "quite misleading because of the difficulty in evaluating it," *Daubert*, 509 U.S. at 595.

This includes cases where the expert testimony does not sufficiently *distinguish* between whether it is based on barred or permissible theories of liability. For example, in *In re Circuit Breaker Litigation*, the court rejected expert opinions in support of the defendants' Sherman Act counterclaims where "the experts fail[ed] entirely to delineate between the injuries caused by Plaintiffs' immune activities and those activities not protected under the *Noerr-Pennington* doctrine." 984 F. Supp. 1267, 1282 (C.D. Cal. 1997). Similarly, in *Malden Transp., Inc. v. Uber Techs. Inc.*, the court held that the plaintiff's expert's analysis was improper because it "did not disaggregate the [protected] regulatory impacts" and thus "impermissibly attributed some of Uber's petitioning activity in his causation and damages analysis in violation of the *Noerr-Pennington* Doctrine." 404 F. Supp. 3d 404, 424 (D. Mass. 2019), *aff'd*, 8 F.4th 1 (1st Cir. 2021); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) (rejecting expert testimony that "could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events"); *Conley v. R.J. Reynolds Tobacco Co.*, 286 F. Supp. 2d 1097, 1103–05 (N.D. Cal. 2002) (no causation evidence where expert failed to disaggregate

1    whether harm "was caused" during or "outside the immunity period"). The same result applies here.

2    **C.    Plaintiffs' Experts Fail to Meet the Standards of Rule 702.**

3    Here, the causation question for the jury is whether *the non-protected features* of Defendants'

4    platforms are *independently capable* of causing the harms Plaintiffs allege. By definition, expert

5    opinions that rely on the impact of content and protected features cannot be used to show that the

6    non-protected features "independent[ly]" cause harm. *Lemmon*, 995 F.3d at 1093; PI Order at 11.

7    Yet, these are precisely the types of opinions that Plaintiffs' general causation experts seek

8    to offer. Across the board, they admit they examined experiences on Defendants' platforms "as a

9    whole," with no attempt to identify whether the at-issue features independently are capable of causing

10   the harm observed. Worse still, the experts do not simply blur the line between protected and non-

11   protected features to try to establish general causation; they *expressly* rely on the impact of third-

12   party content and features the Court has held to be immunized by Section 230. This makes their

13   testimony doubly flawed: (1) they fail to isolate the specific non-protected features at issue; and (2)

14   the very features they point to as supposedly causing harm are legally irrelevant and barred.

15   Plaintiffs' methodology flies in the face of *Daubert*'s requirements. Imagine an expert in a

16   defamation case who claims to have identified the damages caused by an allegedly defamatory

17   statement in a news article, but who bases her analysis on the impact of the article as a whole—most

18   of which contained non-actionable speech protected by the First Amendment. Just as such testimony

19   would fail to establish that the plaintiff's damages were caused by the specific statement at issue,

20   *e.g.*, *Innovative Block of S. Texas, Ltd. v. Valley Builders Supply, Inc.*, 603 S.W.3d 409, 423 (Tex.

21   2020) (excluding expert's opinion that "did not limit his calculations to any specific defamatory

22   statement"), Plaintiffs' experts' views that social media in the aggregate is capable of causing harm—

23   while relying heavily on the impacts of protected activity—is not a reliable or helpful scientific

24   opinion about the specific features actually at issue.[4]

25   
─────────────

26   [4] Plaintiffs' experts' approach does not pass muster under even basic tort causation principles. Imagine a case where a general causation expert is asked to opine on whether a specific medication

27   can cause liver damage. The expert would not be permitted to opine that the medication is capable of causing harm if the only studies he consulted evaluated patients with other risk factors for the disease that admittedly could not be excluded as causal. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136,

28   146–47 (1997) (affirming exclusion of causation expert testimony where experts relied on study

1          **1.      The experts' opinions depend upon protected publishing features.**

2          In reaching their causal opinions, Plaintiffs' experts overtly rely—either wholly or

3  predominantly—on features this Court *has already held* are immunized by Section 230 and the First

4  Amendment. Indeed, the experts conceded that "[w]hether a feature may be immunized by Section

5  230 did not play a factor" in their opinions. Ex. 33 (Lembke MDL Dep.) 125:23–128:24; *see also*

6  Ex. 44 (Murray MDL Dep.) 270:8–271:5 ("Q. Did anyone provide you with a list or summary of any

7  kind of the defendants' platform features that are immunized or not subject to liability? A. No.").

8          Nearly *every one* of Plaintiffs' general causation experts purports to offer opinions as to

9  protected features such as algorithms; "endless scroll"; autoplay; notifications of third-party content;

10 likes; geolocation sharing; and short-form and ephemeral content. PI Order at 16. Such features were

11 not merely considered by Plaintiffs' experts—they are foundational to their opinions. For example,

12 Dr. Goldfield testified that he believes the "key drivers of engagement and addiction" include

13 "algorithms, autoplay, infinite scroll, notifications, geolocation sharing, ephemeral content, short-

14 form content" and "[l]ikes." Ex. 26 (Goldfield MDL Dep.) 665:25–666:11, 691:8–14. As Dr. Murray

15 put it, "the features that are embedded in the harms that I've discussed in my report would include

16 the endless scroll," "the algorithm," "the comments and likes [that] can augment social comparison

17 processes," and "notifications." Ex. 44 (Murray MDL Dep.) 271:6–272:15.[5]

18 _____

19 showing a "PCB-exposed group in Japan that had seen a statistically significant increase in lung
   cancer deaths" where "subjects of this study, however, had been exposed to numerous potential
20 carcinogens"). So too here. *E.g.*, Ex. 43 (Murray JCCP Dep.) 431:16–433:24 (admitting it would be
   "speculative" to allocate harm caused "by content, … by algorithm or some other feature"). Of
21 course, the experts' opinions are even more egregious because federal law imposes further limitations
   on the causal inquiry they never accounted for.

22 [5] *E.g.*, Ex. 6 (Christakis Rep.) ¶¶ 187–196 ("likes," "comments," "rewards," "algorithmic
   recommendations," "auto-play," "infinite scroll," "notifications"); Ex. 18 (Cingel Rep.) ¶¶ 77–117,
23 133–138 ("infinite scroll," "autoplay," "push notifications," "recommender algorithms," "ephemeral
   content," "social cues and peer feedback," and "location sharing"); Ex. 24 (Goldfield Rep.) ¶ 1, 330
24 ("likes," "comments," "push notifications," "algorithms," "infinite scroll," "auto-scroll"); Ex. 30
   (Lembke Rep.) 17–19 ("endless scroll/infinite scroll," "autoplay," "likes," "shares," "comments,"
25 "algorithmic feed," "notifications," "ephemeral content"); Ex. 34 (Mojtabai Rep.) ¶¶ 115, 258, 276,
   304 ("[a]lgorithmic targeting," "'likes' and positive comments," "notifications," "short-form
26 videos"); Ex. 42 (Murray Rep.) ¶¶ 156, 330, 336 ("ranking algorithms," "infinite scroll,"
   "notifications," "likes," "comments"); Ex. 56 (Telzer Rep.) ¶¶ 123–138 ("algorithm," "default
27 setting to public," "ephemeral content," "likes/metrics," "infinite/endless scroll," "direct messaging,"
   "comments," "notifications," "stories," "explore/for you page"); *see also* Ex. 96 (Zicherman Rep.)
28 ¶¶ 2, 36; Ex. 92 (Hale Rep.) ¶ 34; Ex. 81 (Hoover Tucson Reb. Rep.) ¶¶ 21, 171.

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

Take algorithms, a quintessential publishing feature falling in the heartland of Section 230 immunity. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019); PI Order at 18–19. Dr. Twenge explained that "a key element" of social media "is that it has an algorithm that is designed to have users spend as much time as possible and come back to the app as often as possible." Ex. 74 (Twenge JCCP Dep.) 70:17–71:5. And Dr. Mojtabai agrees that "[a]lgorithmic targeting is an important factor in the development of problematic use." Ex. 34 (Mojtabai Rep.) 62–66 (describing how "personalization of content … contribute[s] to the development of social media addiction"). Similarly, Plaintiffs' experts premise their causation opinions on the "endless scroll" feature— another feature this Court has expressly held is protected by Section 230. PI Order at 16. As Dr. Telzer puts it, "One of the most addictive aspects of social media is the endless scroll, where platforms continuously load new content without a stopping point." Ex. 56 (Telzer Rep.) ¶ 128. Dr. Lembke agrees, describing "*endless scroll/infinite scroll*" as "digital cocaine" that "increas[es] the risk of addiction and other mental health harms." Ex. 30 (Lembke Rep.) 17–18.

Critically, Plaintiffs' experts concede they have not excised the causal effect of protected features covered by the Court's rulings from their opinions and, thus, have no methodology capable of answering the general causation question at issue. Dr. Lembke, for instance, acknowledged that she hasn't "gone through the exercise in [her] report of would this platform still be addict[ive] and unsafe if I removed one feature," Ex. 33 (Lembke MDL Dep.) 143:14–23, and, instead, looked at the causal effect of all features "in aggregate," *id.* 155:21–23. Dr. Christakis also stated he "did not" "try to tease out the impact of one of these features versus the others," explaining, "the studies … looked at the experience of the platforms as they exist. And as they exist, multiple features are present." Ex. 12 (Christakis MDL Dep.) 87:19–88:3. When asked if he could isolate the harm caused by any single feature, such as infinite scroll or autoplay, Dr. Goldfield replied, "They all cause or contribute to cause [harm.] … [T]hese features work together." Ex. 26 (Goldfield MDL Dep.) 665:25–666:21. Similarly, Dr. Murray explained that it would be "speculative" to opine whether any amount of alleged harm is "caused by the content . . . by [the] algorithm or some other feature." Ex. 43 (Murray JCCP Dep.) 433:13–24. Defendants agree: any assertion that harm can be independently caused by the at issue features is "speculative," and does not pass muster under *Daubert*.

1

**2.    Plaintiffs' experts also make no effort to disaggregate the impact of content published on social media platforms in their causation analyses.**

2

3        Plaintiffs' experts' overt reliance on protected features—without attempting to isolate the

4    impact of the at-issue features—is sufficient, by itself, to exclude their opinions. But the problem

5    with their testimony runs even deeper. The experts' opinions rely on scientific and medical literature

6    that invariably analyzes the potential impacts of third-party content published on Defendants'

7    platforms in concluding that there is a purported link between social media use and mental health

8    effects. That literature does not analyze the possible impact of a platform's particular features

9    separate from the content they publish, let alone distinguish between publishing and non-publishing

10   features, as designated by the Court's rulings. The U.S. Surgeon General's 2023 Advisory, on which

11   several Plaintiffs' experts rely, illustrates the point: "[s]cientific evidence suggests that harmful

12   content exposure" is a "primary area[] for concern." Ex. 7 at 8.[6] The same is true of the studies

13   Plaintiffs' experts rely most heavily upon.[7] Indeed, Plaintiffs' experts repeatedly acknowledged in

14   their depositions that they relied on a range of studies assessing "how participants in the study reacted

15   and responded to content on social media." Ex. 23 (Mojtabai JCCP Dep.) 594:2–9.

16       Even where the relied-upon studies do not expressly invoke content or publishing features,

17   those protected elements are fundamentally baked into the generalized measures of total screen time

18   or time spent analyzed by those studies.[8] *See* Ex. 19 (Cingel JCCP Dep.) 100:7–10 (most studies

19   "measure time spent on social media"); Ex. 25 (Goldfield JCCP Dep.) 251:22–24 ("I've based my

20   _____

[6] *E.g.*, Ex. 6 (Christakis Rep.) ¶ 100; Ex. 34 (Mojtabai Rep.) ¶ 80; Ex. 56 (Telzer Rep.) ¶ 25.

21
[7] *E.g.*, Ex. 6 (Christakis Rep.) 178, 186, 244–69, 281–89 (content and body image, eating disorders,
22   depression, suicide, "risky behaviors"); Ex. 18 (Cingel Rep.) 59, 61–62, 67 (content and suicide, self-
     esteem, body image); Ex. 24 (Goldfield Rep.) 104–06, 120–21 ("upward social comparison" images,
23   harmful content, and mental health issues); Ex. 30 (Lembke Rep.) 18 (algorithmic feeds of posts,
     likes, comments, and addiction); Ex. 34 (Mojtabai Rep.) 40–42, 45–47, 49–51, 77–78 (exposure to
24   "appearance-ideal" images or images that induce "upward social comparison" and self-esteem,
     depression, anxiety); Ex. 42 (Murray Rep.) 74–90 (content and body image, eating disorders); Ex.
     56 (Telzer Rep.) 92–95 ("other-produced content" and body image).
25
[8] *E.g.*, Ex. 6 (Christakis Rep.) 213–223, 242–43, 245–46, 278–81 (time spent on social media and
26   depression, anxiety, suicide); Ex. 18 (Cingel Rep.) 57–61, 63–64, 66–67 (time spent and depression,
     anxiety, "general mental health"); Ex. 24 (Goldfield Rep.) 40–45, 57–63, 91–94 (meta-analyses of
27   "social media use" and "mental health," "body image," "problematic behaviors"); Ex. 34 (Mojtabai
     Rep.) 32–40 (time spent and depression); Ex. 42 (Murray Rep.) 75, 99–100, 109–113, 127–29, 138–
28   41 (time spent and body image, eating disorders, depression, anxiety, sleep disorders); Ex. 56 (Telzer
     Rep.) 125–27, 173–74 (same); Ex. 71 (Twenge Rep.) 10–13, 22–25, 29–33 (same).

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

opinions on the literature, most of which measures time on the app"). Those studies cannot differentiate the potential effects of viewing content from the potential effects, if any, of supposedly content-independent features, because measuring the amount of time an individual spends on social media does not exclude or control for the effect of the content encountered while on social media. This limitation plagues even the most rigorous studies, randomized controlled trials, that examine the effect of reduction in total time spent on social media on mental health outcomes.[9] Plaintiffs' experts have acknowledged that "[i]t is not as simple as time spent on a device or activity but rather ***how that time is spent*** that matters." Ex. 14 at 2277 (Christakis & Hale 2019) (emphasis added); *see* Ex. 57 (Telzer JCCP Dep.) 480:18–482:10 (same). These studies, therefore, cannot support admissible expert testimony capable of answering the general causation question set by the Court.

Reflecting the limitations of the literature on which their opinions are based, Plaintiffs' experts acknowledged they did not even try to disaggregate the alleged effects of viewing and reading content from harms allegedly caused by "design features." As Dr. Goldfield conceded, "it's really difficult to disentangle content from the features." Ex. 25 (Goldfield JCCP Dep.) 233:16–234:13. Dr. Murray similarly observed, in summarizing the studies he and other experts rely upon, that the studies "documenting harm assess social media in the context of both the content and all the design features," and that "disaggregat[ing]" them would be "speculative." Ex. 43 (Murray JCCP Dep.) 431:16–433:24. And as Dr. Christakis put it, whether any effects observed are attributable in time-spent studies "due to people being exposed to features" versus "people being exposed to content" is "***unanswerable***." Ex. 15 (Christakis JCCP Dep.) 227:16–228:5 (emphasis added).[10]

The experts' dependence on content is not just implicit. In many instances, Plaintiffs' experts' opinions rely directly on exposure to third-party content as the causal mechanism between social media use and resulting harms. For example, as Dr. Christakis stated, the "***amplification of content***

---

[9] *E.g.*, Ex. 6 (Christakis Rep.) 218–223; Ex. 24 (Goldfield Rep.) 91–94; Ex. 30 (Lembke Rep.) 78–81; Ex. 34 (Mojtabai Rep.) 41–42, 82–84; Ex. 56 (Telzer Rep.) 93; Ex. 71 (Twenge Rep.) 31–34.

[10] *E.g.*, Ex. 15 (Christakis JCCP Dep.) 227:24–228:2 ("[T]here is no content devoid of features on social media sites."); Ex. 19 (Cingel JCCP Dep.) 97:2–7 ("I cannot separate these two things from one another. They're intricately tied together"); Ex. 91 (Rubaek JCCP Dep.) 163:21–164:7; Ex. 89 (Béjar MDL Dep.) 218:6–8; Ex. 93 (Hale MDL Dep.) 241:19–242:5.

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

and ***design that pushes the content*** to vulnerable children is part of the mechanism by which social media simultaneously increases engagement and the risk of harm." Ex. 6 (Christakis Rep.) ¶ 328 (emphases added). As Dr. Mojtabai, Plaintiffs' sole epidemiologist, explained, "[a]ll of the observational studies that [he's] aware of … assess[ed] how participants in the study reacted and responded to content on social media," and, of the handful of experimental studies he relied upon, many "exposed participants to different types of content and then assessed whether mood change or change in social comparison is induced." Ex. 23 (Mojtabai JCCP Dep.) 590:17–592:2, 594:2–9.

The experts' out-of-court statements admit the same. Dr. Telzer, for instance, stated in a 2023 interview that it "really depends [on] what adolescents are doing when they're on social media"— i.e., what content they are engaging with. Ex. 57 (Telzer JCCP Dep.) 480:18–482:10. Whether they are "connecting with their close friends and having good, happy conversations," or are "exposed to cyberhate or something negative," can affect whether "a few hours" is "not problematic," or "a few minutes is too much." *Id.* at 482:12–483:23. Dr. Twenge believes that the causal mechanisms of harm by social media include "exposure to suicide and self-injury content," "cyberbullying," and social comparison content. Ex. 73 (Twenge MDL Dep.) 390:7–17, 395:6–13, 398:1–22, 402:7–403:24.[11]

Dr. Murray, Plaintiffs' leading general causation expert on eating disorders, opines, "[t]he promotion of eating disorder content and the recurrent exposure on social media platforms confers significant risk for the development of eating disorder psychopathology." Ex. 42 (Murray Rep.) 83. He relies on studies measuring exposure to specific types of content including "body checking videos," "teasing and bullying," "digitally enhanced and unrealistic images" from "influencers," "exercise, dieting, and toxic eating disorders videos," and "[t]hinspiration content." *Id.* ¶¶ 153–177. Dr. Telzer also opines that "content impact[s] body image," noting "studies consistently finding causal evidence that this exposure increases body image concerns." Ex. 56 (Telzer Rep.) ¶¶ 196, 201. And Dr. Lembke testified that social media leads to eating disorders by "push[ing] increasingly potent images," like "anorexia-related content." Ex. 31 (Lembke JCCP Dep.) 225:16–226:5.

---

[11] *E.g.*, Ex. 18 (Cingel Rep.) ¶ 80 ("social comparison processes on social media platforms have been identified as one of the most common mechanisms that explain poor mental health," driven by posting and viewing "positively-valanced material in order to receive positive social feedback").

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

The experts' opinions regarding social media use and suicidal ideation and behavior suffer from the same causal problem. Dr. Mojtabai explains that most studies on the subject have focused on the association between exposure to "specific content (e.g., cybervictimization or viewing material related to self-injurious thoughts or behavior)" on social media and suicide. Ex. 34 (Mojtabai Rep.) ¶¶ 180–81. Similarly, Dr. Lembke stated she was unaware of "any studies that have evaluated whether or not the features of social media, independent of content, causes or contributes to suicidality." Ex. 31 (Lembke JCCP Dep.) 232:18–233:2. Reviewing this same base of literature, Dr. Cingel opines "there are relatively consistent links between social media use and adolescent suicidal ideation," because studies have shown "suicide content related social media use," "cybervictimization," and "shar[ing] suicidal content on social media" are associated with suicidal behavior. Ex. 18 (Cingel Rep.) ¶¶ 153–54. Dr. Christakis declares, "Let us examine in more depth the causal role that Meta may play in promoting SSI. First, there is the presence of the content itself. Meta's platform is replete with suicidal content[.]" Ex. 6 (Christakis Rep.) ¶ 434.

Put simply, these limitations in the literature have profound consequences under Rule 702. Plaintiffs' experts cannot support any causal inferences regarding the impact of non-protected features, because the literature they relied upon does not rule out that content and publishing activities are what drive the entirety of any measured effects. In fact, when asked, "Do you cite any study in your report that made an effort to actually separate out the impact of the content on social media from the features?," Dr. Twenge responded, "I don't believe so. I'm not – and I'm not sure how that could be done." Ex. 74 (Twenge JCCP Dep.) 455:22–456:2. Dr. Goldfield stated, "it's really difficult to disentangle content from the features," because "there are, to my knowledge, no meta-analyses on disentangling" the two. Ex. 25 (Goldfield JCCP Dep.) 231:5–232:14, 233:16–234:13. Dr. Murray similarly testified that such studies "assess social media in the context of both the content and all the design features," and "disaggregat[ing]" them would be "speculative." Ex. 43 (Murray JCCP Dep.) 432:19–433:24. These admissions are fatal to the admissibility of their opinions.

### 3. Plaintiffs' experts' efforts to elide the effects of the at-issue features and third-party content only underscore the need for exclusion.

Plaintiffs' experts attempt to paper over these flaws in their opinions by making conclusory

1    assertions that their opinions are not dependent on protected publishing features or content. But this

2    contortion of the literature is sheer "*ipse dixit* of the expert[s]," unsupported by the studies; it

3    constitutes "too great an analytical gap between the data and the opinion preferred" to support

4    admission of the their testimony. *Joiner*, 522 U.S. at 146. When closely scrutinized, the experts

5    provide no reliable methodology demonstrating that the at-issue features of Defendants' platforms

6    are capable of causing the alleged serious mental health harms separate and apart independent from

7    Defendants' "publication of third-party content." PI Order at 15; *see City of Pomona v. SQM N. Am.*

8    *Corp.*, 750 F.3d 1036, 1046 (9th Cir. 2014) ("expert's methodology" unreliable where it is "simply

9    a subjective, conclusory approach that cannot reasonably be assessed").

10        Case in point: some of the experts baldly claim that the studies they rely upon are "content

11   agnostic." Ex. 44 (Murray MDL Dep.) 310:11–311:19; *see also, e.g.*, Ex. 74 (Twenge JCCP Dep.)

12   468:21–22 (asserting "time spent studies are agnostic to content"). But "content agnostic" does not

13   mean that content is irrelevant to the study's findings, or that the study is focused on non-publishing

14   features. Dr. Murray explained his definition of "content agnostic" as follows: "Well, a lot of these

15   studies … don't code for what type of content [the participants are] viewing. And the times that

16   they've documented in some of the studies I have referenced don't all emanate from the same content

17   at all, so it seems that they're content agnostic." Ex. 44 (Murray MDL Dep.) 311:7–312:19. In other

18   words, by "content agnostic," Dr. Murray means that, through their social media use, study

19   participants viewed content that presumably varied by participant, but that content was not

20   controlled, measured, or tracked (let alone compared to particular features). To actually control for

21   the effect of content would require an analysis that isolates the effect of exposure to an at-issue

22   feature. Plaintiffs' experts had years to do this analysis, yet never did so. Their failure to do so (and

23   to point to any reliable literature doing so) is decisive.

24        These admissions highlight one of the core problems with Plaintiffs' experts' opinions: the

25   literature cannot differentiate the impact of protected publishing features and content from any

26   impact of the non-publishing features of Defendants' platforms. And Plaintiffs' experts fail to proffer

27   any basis, let alone a methodologically sound one, for doing that disentangling work. As a result,

28   their general causation opinions should be excluded under Rule 702.

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

**D.     The JCCP Court's *Sargon* Ruling Should Not Be Followed Here.**

The JCCP Court's ruling on the admissibility of certain experts' general causation opinions considers neither this Court's prior rulings, nor binding federal precedent. It should not be followed.

Most fundamentally, the JCCP Court's order is premised on different theories of liability that may be available in the JCCP—but not in this matter. As discussed, this Court expressly held that the core features of Defendants' platforms on which Plaintiffs' experts rely are protected by Section 230 and the First Amendment and, thus, cannot form the basis for Plaintiffs' claims—including causation. The JCCP litigation is not similarly limited and, accordingly, that Court deemed admissible expert testimony as to exactly those features. *See, e.g.*, Ex. 2 (JCCP Order) at 16 (permitting testimony regarding "algorithm-generated personalized experience, auto-scroll … notifications … likes and comments"). That alone makes the JCCP order inapplicable here.

Moreover, the JCCP Court credited Plaintiffs' conclusory assertions that studies assessing time spent on social media—which the court agreed comprises the majority of the literature—analyzed features independent from content, simply because the studies "do not focus on a *particular type of content*." Ex. 2 (JCCP Order) at 12, 24. But as discussed, that analysis is flawed because these studies made no effort to control for the effects of content at all. Because the studies do not control for the key variable (content), they cannot be used to disaggregate or isolate the impact of other variables (non-publishing features). This Court, by contrast, has properly recognized that the Section 230 inquiry analyzes whether platforms are required "to change **how** they publish such content," not whether a specific piece of content is at issue. PI Order at 17 (emphasis added). And the JCCP Court wholly ignored that the experts often *do* expressly rely upon the effects of *specific* types of content in their opinions—including eating disorder and suicidality-related content.

The JCCP Court also did not grapple with federal authority that is binding on this Court regarding the boundaries of Section 230 and the First Amendment. The JCCP Court accepted the plaintiffs' arguments that requiring their experts to limit their opinions to the impact of non-protected features would effectively impose a "but for" test by allegedly requiring Plaintiffs to prove that content played *no role* in their injuries. Ex. 2 (JCCP Order) at 10. But that reasoning inverts the Section 230 inquiry and was recently rejected by the Ninth Circuit in *Grindr*. Defendants are not

Case No. 4:22-MD-03047-YGR

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

demanding Plaintiffs prove that content played no role in their injuries. At this stage, Defendants ask only that Plaintiffs meet their burden to establish—via qualified expert testimony—that the at-issue features are capable of causing harm "independent of [the platform's] role as a facilitator and publisher of third-party content." *Grindr*, 128 F.4th at 1153. As the Ninth Circuit explained, where that independence is missing, it "is analytically insignificant whether [the plaintiff's] injuries would not have occurred 'but for' [the defendant's] role as a publisher." *Id* at 1153 & n.3. Expert opinions that admittedly rely on the impact of protected features and content, by definition, cannot be used to demonstrate that non-protected features are independently capable of causing harm.

These errors, and disregard of Ninth Circuit authority, also led the JCCP Court to minimize its gatekeeping role and underestimate the task placed before the jury. While noting that "separat[ing] out and not award[ing] damages for any harm caused by the Defendants' publication of content … may not be an easy task," that Court stated that "it is not different in kind from a jury's responsibility for applying other legal and factual distinctions." Ex. 2 (JCCP Order) at 11. But federal law is to the contrary. *Daubert* stands for the proposition that jury instructions are not an adequate remedy for improper expert testimony. "The district court cannot abdicate its role as gatekeeper" of relevant and reliable testimony, "nor delegat[e] that role to the jury." *Engilis v. Monsanto Co.*, --- F.4th ---, 2025 WL 2315898, at *6 (9th Cir. Aug. 12, 2025) (citation omitted); *In re: Lipitor Mktg., Sales Pracs. & Prods. Liab. Litig.*, 2016 WL 2940778, at *3 (D.S.C. May 6, 2016) ("confusing and misleading to the jury to hear testimony…when [federally preempted] allegations cannot be the basis of" claims). Indeed, it would be pure speculation for a juror to attempt to differentiate between actionable and nonactionable expert evidence, where the experts themselves are incapable of doing so. Simply put, where expert testimony goes "to a theory of liability that is preempted," it "cannot be an issue put to the jury at trial." *Lowery*, 2021 WL 872620, at *21. With no opinions isolating the effects of the non-protected features at issue, Plaintiffs' experts opinions will not assist the jury and should be excluded.

## III.    CONCLUSION

For these reasons, and those in the concurrently-filed Omnibus Motion to Exclude General Causation Testimony, the Court should exclude Plaintiffs' general causation expert opinions.

1    DATED: September 30, 2025              **MUNGER, TOLLES & OLSON LLP**

2

3                                          By:   */s/ Jonathan H. Blavin*

4                                                 Jonathan H. Blavin

5                                                 JONATHAN H. BLAVIN, SBN 230269
                                                  jonathan.blavin@mto.com
6                                                 MUNGER, TOLLES & OLSON LLP
                                                  560 Mission Street, 27th Floor
7                                                 San Francisco, CA 94105
8                                                 Tel.: (415) 512-4000

9                                                 ROSE L. EHLER, SBN 296523
                                                  Rose.Ehler@mto.com
10                                                MUNGER, TOLLES & OLSON LLP
                                                  350 South Grand Avenue, 50th Floor
11                                                Los Angeles, CA 90071
                                                  Tel.: (213) 683-9100
12

13                                                *Attorneys for Defendant Snap Inc.*

14

15                                         **KIRKLAND & ELLIS LLP**

16

17                                         By:   */s/ Allison Brown*

18                                                Allison Brown

19                                                ALLISON BROWN, *pro hac vice*
                                                  KIRKLAND & ELLIS LLP
20                                                601 Lexington Avenue
                                                  New York, NY 10022
21                                                Telephone: (212) 446-4757
                                                  Email: Alli.Brown@kirkland.com
22

23                                                JESSICA DAVIDSON, pro hac vice
                                                  KIRKLAND & ELLIS LLP
24                                                601 Lexington Avenue
                                                  New York, NY 10022
25                                                Telephone: (212) 446-4723
                                                  Email: Jessica.davidson@kirkland.com
26

27                                                *Attorneys for Defendant Snap Inc.*

28

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

1
2          **COVINGTON & BURLING LLP**

3

4          By:   /s/ Ashley M. Simonsen
                  Ashley M. Simonsen

5
                  ASHLEY M. SIMONSEN (Bar No. 275203)
6                 asimonsen@cov.com
                  Covington & Burling LLP
7                 1999 Avenue of the Stars
                  Los Angeles, California 90067
8                 Telephone: (424) 332-4800
9                 Facsimile: (424) 332-4749

10                PHYLLIS A. JONES (*pro hac vice*)
                  PAUL W. SCHMIDT (*pro hac vice*)
11                CHRISTIAN J. PISTILLI (pro hac vice)
                  pajones@cov.com
12                pschmidt@cov.com
                  Email: cpistilli@cov.com
13                Covington & Burling LLP
                  One City Center
14                850 Tenth Street, NW
                  Washington, DC 20001-4956
15                Telephone: (202) 662-6000
16                Facsimile: (202) 662-6291

17
                  *Attorneys for Defendants Meta Platforms, Inc.*
18                *f/k/a Facebook, Inc.; Facebook Holdings, LLC;*
                  *Facebook Operations, LLC; Meta Payments*
19                *Inc. f/k/a Facebook Payments Inc.; Meta*
                  *Platforms Technologies, LLC f/k/a Facebook*
20                *Technologies, LLC; Instagram, LLC; and*
21                *Siculus LLC f/k/a Siculus, Inc.*

22

23

24

25

26

27

28

Case No. 4:22-MD-03047-YGR
DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

1

**KING & SPALDING LLP**

2

3
By:   /s/ Geoffrey M. Drake

4
Geoffrey M. Drake

5
Geoffrey M. Drake, *pro hac vice*
TaCara D. Harris, *pro hac vice*

6
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309-3521

7
Telephone: (404) 572-4600

8
Facsimile: (404) 572-5100
Email: gdrake@kslaw.com

9
tharris@kslaw.com

10
David P. Mattern, *pro hac vice*

11
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW, Suite 900

12
Washington, DC 20006-4707
Telephone: (202) 737-0500

13
Facsimile: (202) 626-3737
Email: dmattern@kslaw.com

14

15
Bailey J. Langner (SBN 307753)
KING & SPALDING LLP

16
50 California Street, Suite 3300
San Francisco, CA 94111

17
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

18
Email: blangner@kslaw.com

19
*Attorneys for Defendants TikTok Inc.,*

20
*ByteDance Inc., TikTok Ltd., ByteDance Ltd.,*
*and TikTok LLC*

21

22

23

24

25

26

27

28

-18-

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**WILSON SONSINI GOODRICH & ROSATI**
Professional Corporation


By:  _/s/ Brian M. Willen_
        Brian M. Willen

        Brian M. Willen (pro hac vice)
        Wilson Sonsini Goodrich & Rosati PC
        1301 Avenue of the Americas, 40th Floor
        New York, New York 10019
        Telephone: (212) 999-5800
        Facsimile: (212) 999-5899
        bwillen@wsgr.com

        Lauren Gallo White (SBN 309075)
        Samantha A. Machock (SBN 298852)
        Wilson Sonsini Goodrich & Rosati PC
        One Market Plaza, Spear Tower, Suite 3300
        San Francisco, CA 94105
        Telephone: (415) 947-2000
        Facsimile: (947-2099
        lwhite@wsgr.com
        smachock@wsgr.com

        Christopher Chiou (SBN 233587)
        Matthew K. Donohue (SBN 302144)
        Wilson Sonsini Goodrich & Rosati PC
        953 East Third Street, Suite 100
        Los Angeles, CA 90013
        Telephone: (323) 210-2900
        Facsimile: (866) 974-7329
        cchio@wsgr.com
        mdonohue@wsgr.com

        *Attorneys for Defendants YouTube, LLC and
        Google LLC*

**MORGAN LEWIS & BOCKIUS LLP**


By:  */s/ Yardena R. Zwang-Weissman*
      Yardena R. Zwang-Weissman

      Yardena R. Zwang-Weissman (SBN 247111)
      300 South Grand Avenue, 22nd Floor
      Los Angeles, CA 90071-3132
      Telephone: (213) 612-7238
      yardena.zwang-
      weissman@morganlewis.com

      Brian Ercole (pro hac vice)
      600 Brickell Avenue, Suite 1600
      Miami, FL 33131-3075
      Telephone: (305) 415-3416
      brian.ercole@morganlewis.com

      Stephanie Schuster (pro hac vice)
      1111 Pennsylvania Avenue NW
      Washington, DC 20004-2541
      Telephone: (202) 373-6595
      stephanie.schuster@morganlewis.com

      *Attorneys for Defendants YouTube, LLC and*
      *Google LLC*


**WILLIAMS & CONNOLLY LLP**


By:  */s/ Joseph G. Petrosinelli*
      Joseph G. Petrosinelli

      JOSEPH G. PETROSINELLI (pro hac vice)
      ASHLEY W. HARDIN (pro hac vice)
      680 Maine Avenue, SW
      Washington, DC 20024
      Tel.: 202-434-5000
      jpetrosinelli@wc.com
      ahardin@wc.com

      *Attorneys for Defendants YouTube, LLC and*
      *Google LLC*

-20-

# ATTESTATION

I, Jonathan H. Blavin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.


DATED:   September 30, 2025                    By:   */s/ Jonathan H. Blavin*
                                                        Jonathan H. Blavin

DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS' GENERAL CAUSATION OPINIONS
FOR FAILURE TO ACCOUNT FOR SECTION 230 AND THE FIRST AMENDMENT