WILLIAMS & CONNOLLY LLP
Joseph G. Petrosinelli, *pro hac vice*
jpetrosinelli@wc.com
Ashley W. Hardin, *pro hac vice*
ahardin@wc.com
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorney for Defendants YouTube, LLC
and Google LLC*

*[Additional parties and counsel listed on
signature pages]*

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case No.: 4:23-cv-04659-YGR |
| This Document Relates To: | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (CHARLESTON) (SD MSJ No. 3)** |
| *Charleston County School District v. Meta Platforms, Inc.*, et al. | |
| | Judge: Hon. Yvonne Gonzalez Rogers Magistrate Judge: Hon. Peter H. Kang |
| | Date: January 26, 2026 Time: 8:00 AM Place: Courtroom 1, 4th Floor |

1

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

2    PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable

3  Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern

4  District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby

5  do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary

6  judgment in favor of all Defendants on all claims by Plaintiff Charleston County School District

7  ("Charleston").  This Motion is based on this Notice, the accompanying Memorandum of Points

8  and Authorities, any Reply or other papers submitted in connection with the Motion, the

9  accompanying Declaration of Ashley W. Hardin and the exhibits thereto, and any other matters

10  presented at the time of the hearing.

11

## STATEMENT OF RELIEF SOUGHT

12    Defendants seek entry of summary judgment in their favor on all causes of action that

13  Charleston County School District asserts against Defendants or, in the alternative, partial summary

14  judgment as to Charleston's claim for past damages, proposed "strategic plan," and its failure-to-

15  warn claim.

16

17    DATED:  September 30, 2025                    Respectfully submitted,

18

19                                        By:    */s/ Ashley W. Hardin*
                                              _____

20                                             Joseph G. Petrosinelli, *pro hac vice*
                                               jpetrosinelli@wc.com
21                                             Ashley W. Hardin, *pro hac vice*
                                               ahardin@wc.com
22                                             J. Andrew Keyes, *pro hac vice*
                                               akeyes@wc.com
23                                             Neelum J. Wadhwani (SBN 247948)
                                               nwadhwani@wc.com
24                                             WILLIAMS & CONNOLLY LLP
25                                             680 Maine Avenue, SW
                                               Washington, DC 20024
26                                             Telephone: +1 (202) 434-5000

27                                             *Attorneys for Defendants YouTube, LLC and*
                                               *Google LLC*
28

1

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iii

MEMORANDUM OF POINTS AND AUTHORITIES ................................................. 1

I.    INTRODUCTION ................................................................................................. 1

II.   BACKGROUND ................................................................................................... 3

    A.    Charleston County School District Background ............................... 3

    B.    Charleston's Lack of Evidence ............................................................. 5

    C.    Charleston's Theory of Damages .......................................................... 7

    D.    Charleston's Proposed "Strategic Plan" .............................................. 9

    E.    The Court's Motion to Dismiss Ruling ............................................. 11

III.  LEGAL STANDARD ......................................................................................... 13

IV.   ARGUMENT ...................................................................................................... 13

    A.    Charleston Lacks Competent Evidence of Causation. ................... 13

        1.    Charleston's Allegations of Specific Harms All Impermissibly
            Rely on Third-Party Wrongdoing and Protected Publishing
            Activities. ...................................................................................... 15

        2.    Charleston Has No Evidence of Mental Health Harms Tied to
            Any Defendant's Specific Platform. .......................................... 20

    B.    Charleston Cannot Show It Is Entitled to Past Damages. .............. 23

        1.    Charleston Cannot Show Defendants Caused It to Divert
            Financial Resources. .................................................................... 24

            a)    Charleston cannot recover "lost time" damages in this
                case. ....................................................................................... 24

            b)    Charleston has adduced no competent evidence to
                establish "lost time" damages. ......................................... 26

                i.    Charleston's evidence of teacher "lost time"
                    damages is insufficient. .................................................... 26

                ii.    Charleston's Evidence of Other Staff "Lost
                    Time" Damages Is Insufficient. ...................................... 28

        2.    Charleston Has No Competent Evidence That It Incurred Out-
            of-Pocket Costs Because of Defendants' Platforms. .................. 30

            a)    Charleston has no evidence that it hired new mental
                health personnel necause of Defendants' platforms. .... 30

i

b)    Charleston has insufficient evidence that it implemented new programs or purchased other items because of Defendants' platforms. ................................. 31

3.    Charleston Cannot Recover for Property Damage That Results from Third-Party Acts. ................................. 34

C.    Charleston's Proposed 15-Year "Strategic Plan" Is Not Cognizable as "Future Damages." ................................. 35

1.    The Costs of the Strategic Plan Are Not Recoverable As Future Damages. ................................. 36

2.    Charleston's Strategic Plan Is Impermissibly Derivative. ................................. 38

D.    The Court Should Grant Summary Judgment on Charleston's Failure-to-Warn Claim. ................................. 39

1.    Defendants Do Not Owe Charleston a Duty to Warn the District Directly. ................................. 39

2.    Charleston Lacks Evidence Supporting Its Failure to Warn Claim. ................................. 41

3.    Charleston Cannot Assert a Claim that Defendants Failed To Warn Students. ................................. 42

E.    The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries. ................................. 43

CONCLUSION ................................. 44

# TABLE OF AUTHORITIES

## CASES

*Allen v. Long Mfg. NC, Inc.*,
    505 S.E.2d 354 (S.C. Ct. App. 1998) ................................................................ 41

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*,
    241 F.3d 696 (9th Cir. 2001) ............................................................................ 38

*Austin v. Specialty Transp. Servs., Inc.*,
    594 S.E.2d 867 (S.C. Ct. App. 2004) ........................................................... 25, 26

*Babb v. Lee Cnty. Landfill SC, LLC*,
    747 S.E.2d 468 (S.C. 2013) ......................................................................... 24, 25

*Baker v. Equitable Leasing Corp.*,
    275 S.C. 359 (1980) ......................................................................................... 44

*Baughman v. Am. Tel. & Tel. Co.*,
    410 S.E.2d 537 (S.C. 1991) .................................................................. 23, 26, 31

*Block v. City of Los Angeles*,
    253 F.3d 410 (9th Cir. 2001) ............................................................................ 29

*Carroll v. Isle of Palms Pest Control, Inc.*,
    918 S.E.2d 532 (S.C. 2025) .............................................................................. 25

*Certainteed Corp. v. Fletcher*,
    794 S.E.2d 641 (Ga. 2016) ............................................................................... 40

*Charleston Lumber Co. v. Miller Hous. Corp.*,
    458 S.E.2d 431 (S.C. Ct. App. 1995) ................................................................ 26

*Cleveland v. Groceryworks.com, LLC*,
    200 F. Supp. 3d 924 (N.D. Cal. 2016) .............................................................. 33

*Deep Keel, LLC v. Atl. Priv. Equity Grp., LLC*,
    773 S.E.2d 607 (S.C. Ct. App. 2015) ................................................................ 29

*Doe (K.B.) v. Backpage.com, LLC*,
    724 F. Supp. 3d 882 (N.D. Cal. 2024) ......................................................... 19, 23

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ......................................................................... 39

*Doe v. Pharmacia & Upjohn Co.*,
    879 A.2d 1088 (2005) ...................................................................................... 43

*Erhart v. BofI Holding, Inc.*,
  445 F. Supp. 3d 831 (S.D. Cal. 2020) ................................................................. 29

*Est. of Bride ex rel. Bride v. Yolo Technologies, Inc.*,
  112 F.4th 1168 (9th Cir. 2024) ................................................................. 18, 39

*Gourdine v. Crews*,
  955 A.2d 769 (Md. 2008) ................................................................. 41, 43

*Gray v. S. Facilities, Inc.*,
  183 S.E.2d 438 (S.C. 1971) ................................................................. 23, 30, 34

*Henricksen v. ConocoPhillips Co.*,
  605 F. Supp. 2d 1142 (E.D. Wash. 2009) ................................................................. 21

*Hickerson v. Yamaha Motor Corp., U.S.A.*,
  2016 WL 4367141 (D.S.C. Aug. 16, 2016) ................................................................. 41

*In re Williams Sec. Litig.-WCG Subclass*,
  558 F.3d 1130 (10th Cir. 2009) ................................................................. 20

*J & W Corp. v. Broad Creek Marina, LLC*,
  896 S.E.2d 328 (S.C. Ct. App. 2023) ................................................................. 37

*Japan Telecom, Inc. v. Japan Telecom Am. Inc.*,
  287 F.3d 866 (9th Cir. 2002) ................................................................. 33

*Kennedy v. Columbia Lumber & Mfg. Co.*,
  384 S.E.2d 730 (S.C. 1989) ................................................................. 25

*Khoros, LLC v. Lenovo (United States), Inc.*,
  2020 WL 12655516 (N.D. Cal. Oct. 5, 2020) ................................................................. 44

*Kimzey v. Yelp! Inc.*,
  836 F.3d 1263 (9th Cir. 2016) ................................................................. 18

*Kuciemba v. Victory Woodworks, Inc.*,
  531 P.3d 924 (Cal. 2023) ................................................................. 40

*Lemmon v. Snap Inc.*,
  995 F.3d 1085 (9th Cir. 2021) ................................................................. 20

*M.P. by & through Pinckney v. Meta Platforms Inc.*,
  127 F.4th 516 (4th Cir. 2025) ................................................................. 20

*McKnight v. S.C. Dep't of Corr.*,
  684 S.E.2d 566 (S.C. Ct. App. 2009) ................................................................. 14, 21, 28, 34

*Nelson v. Am. Honda Motor Co.*,
  2021 WL 2877919 (W.D. Pa. May 17, 2021) ................................................................. 41

iv

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda,*
730 F.3d 1111 (9th Cir. 2013)................................................................. 20

*Quiroz v. ACLOA Inc.,*
243 Ariz. 560 (2018)................................................................. 43

*Sapp v. Ford Motor Co.,*
687 S.E.2d 47 (S.C. 2009)................................................................. 25

*Singleton v. Sherer,*
659 S.E.2d 196 (S.C. Ct. App. 2008)................................................ 14, 15, 19

*Soremekun v. Thrifty Payless, Inc.,*
509 F.3d 978 (9th Cir. 2007)................................................................. 13

*Stone v. Bethea,*
161 S.E.2d 171 (S.C. 1968) ................................................................. 14

*Summers v. Harrison Const.,*
381 S.E.2d 493 (S.C. Ct. App. 1989)................................................................. 23

*Twitter, Inc. v. Barr,*
445 F. Supp. 3d 295 (N.D. Cal. 2020) ................................................................. 13

*VFD Consulting, Inc. v. 21st Servs.,*
425 F. Supp. 2d 1037 (N.D. Cal. 2006) ................................................................. 15

*Whisenant v. James Island Corp.,*
281 S.E.2d 794 (S.C. 1981) ................................................................. 23, 37

*Wickersham v. Ford Motor Co.,*
853 S.E.2d 329 (S.C. 2020) ................................................................. 14, 19

*Wilder v. Blue Ribbon Taxicab Corp.,*
719 S.E.2d 703 (S.C. Ct. App. 2011)................................................................. 36, 37

**OTHER AUTHORITIES**

Fed. R. Civ. P. 56(a)................................................................. 13

Fed. R. Evid. 801 ................................................................. 29

Fed. R. Evid. 802 ................................................................. 29

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.    INTRODUCTION**

3       Charleston County School District ("Charleston" or "the District") is a large school district

4    that covers urban, suburban, and rural communities in the greater Charleston, South Carolina area.

5    Charleston's students face many issues: violence and abuse in their homes and communities,

6    poverty, homelessness, drug and alcohol abuse.  It is beyond dispute that these and other challenges

7    have harmed its students' well-being.  In the midst of addressing these issues, Charleston has used

8    Defendants' platforms extensively to promote its own activities and connect with the community.

9    Nevertheless, Charleston now claims that it is owed money from Defendants to combat an alleged

10   mental health "crisis" among its students, which it claims is due to their use of Defendants'

11   platforms.  But in sharp contrast to evidence of harms from these broader issues, Charleston does

12   not have even the most basic evidence showing harms from students' use of Defendants' platforms.

13   Charleston cannot support its allegations, and summary judgment is warranted on a series of

14   independent grounds as to Charleston's negligence claim.  The Court dismissed Charleston's public

15   nuisance claim.  *See* ECF No. 1332 ("SD Nuisance Order") at 7, 9.

16       *First*, Charleston's negligence claim fails because it has not adduced evidence supporting

17   causation.  The Court limited the scope of Charleston's claims at the pleadings stage, holding that

18   Charleston can predicate claims only on certain actionable conduct—the features that the Court

19   found not protected by Section 230 or the First Amendment or Defendants' alleged failure to warn.

20   By the same token, Charleston cannot recover for injuries caused by third-party content, third-party

21   conduct, or protected publishing activities.   But the social media-related incidents of which

22   Charleston has evidence stem from bullying, other third-party content on the platforms, or third-

23   party conduct such as vandalism.  And Charleston lacks sufficient proof that each Defendant's

24   platform(s) caused any mental health issues among any particular student.  Indeed, Charleston lacks

25   the most basic facts about its students' use of Defendants' platforms—it does not know what

26   platforms a given student uses, how frequently its students use the platforms, what features they

27   use, or what effects those features have on its students.  At most, Charleston's evidence relates to

28   its students' use of cellphones or "social media" generally—but even that evidence is general and

1

1  sparse.  As a result, Charleston cannot establish that any one of Defendants' platforms—let alone

2  the actionable features of those platforms—*caused* its students any harm or that Charleston incurred

3  expense as a result of that harm.

4      *Second*, summary judgment is warranted on Charleston's failure to adduce evidence of

5  damages.  Charleston seeks past damages primarily for the time its staff purportedly "lost" while

6  addressing social media issues.  South Carolina law requires that damages be directly and

7  proximately caused by Defendants' conduct and established with reasonable certainty.  Even if

8  "lost time" were compensable, Charleston has no competent, contemporaneous evidence proving

9  lost time.  For teachers in the District, it instead presents only a retrospective, made-for-litigation

10 survey based on an unreliable sample of teachers as "evidence" of its "lost time."  For certain other

11 staff (principals, assistant principals, and mental health professionals), the evidence is even more

12 threadbare—Charleston bases its damages on two employee affidavits reporting anecdotal hearsay

13 that those two employees purportedly heard from others.  Nor has Charleston provided competent

14 evidence linking its claimed out-of-pocket losses for vendor payments and property damage repairs

15 to Defendants' actionable conduct.

16     *Third*, Charleston's 15-year, $1.4 billion "strategic plan" is not recoverable as future

17 damages.  Charleston fails to provide proof, as it must at this stage, that it is reasonably likely to

18 incur these damages in the future, and the plan is not designed to compensate Charleston for

19 reasonably expected future expenditures.  Instead, it is a voluntary, unrealistic, never-before-used

20 public health measure to tackle youth mental health problems and make up for funding shortfalls

21 that have nothing to do with Defendants.  Moreover, the plan is derivative of students' alleged

22 injuries as the primary purpose of the plan is to provide mental health services to students, including

23 services like clubs and community engagement that are not tied to even to general social media use.

24     *Fourth*, Charleston has no evidence supporting the critical elements of its failure-to-warn

25 claim.  There is no duty on social media platforms to warn a district that its students' use may cause

26 the district financial problems.  No court has ever held that a company is required to provide a

27 warning to a non-user of a product or service that another's use may cause financial injury to the

28

1  non-user. Charleston also lacks evidence that it would have behaved differently if a warning had

2  been delivered. Nor can Charleston assert a claim based on Defendants' alleged failure to provide

3  warnings to third parties such as students and their parents.

4  **II.      BACKGROUND**

5        **A.      Charleston County School District Background**

6        Charleston County School District is a large public school district with a student population

7  of over 50,000 students across 88 schools that covers urban, suburban, and rural areas of Charleston

8  County, South Carolina. *See* Ex. 1 (*About the Charleston County School District*, Charleston

9  County School District, https://www.ccsdschools.com/about-us (last visited September 25, 2025)).

10        Between 2015 and present (the time for which Charleston seeks damages), Charleston has

11  ████████████████████ by and has struggled with a litany of issues impacting students, including

12  ████████████████████████████████████████████████████████

13  ██████████████████████████████████████████ Ex. 2

14  (MR_CCSD_156616) at -616–617. Those issues make it ████████████████████

15  ████████████████████████████████████████████████████████

16  █████████████████████████████ *Id.* at -617. Charleston's superintendent testified

17  that the issues with the most impact on its students are poverty, race, and substance abuse. *See*

18  Ex. 6 (May 19, 2025 Deposition of Superintendent Anita Huggins ("May 19, 2025 Huggins Dep."))

19  216:7–217:21; *see also* Ex. 9 (MR_CCSD_017725) at -726 ████████████████████

20  ████████████████████████████████████████████████████████

21  █████████████████████████); Ex. 3 (30(b)(6) Deposition of Associate

22  Superintendent of School Support and Community Engagement Dr. Shavonna Coakley ("Coakley

23  30(b)(6) Dep.")) 98:14–100:1; Ex. 5 (30(b)(6) Deposition of Executive Director of Student Support

24  Services Lisa Allison ("Allison 30(b)(6) Dep.")) 80:17–82:16 ("Being homeless, again, can

25  absolutely be a risk factor for many different negative student outcomes in education. . . . [B]ecause

26  it can be, we're going to make sure that we distribute resources to be prepared to provide supports

27  to students as they need it. Mental health could be one of those."); *id.* at 83:9–84:3; Ex. 8

28  (Deposition of Director of Nursing Ellen Nitz ("Nitz Dep.")) 45:6–49:2 (describing student

3

1    overdose incidents and drug-altered behavior in Charleston schools and noting that the use of

2    opioids has been a concern for the District); *id.* at 50:8–25; Ex. 6 (May 19, 2025 Huggins Dep.)

3    216:7–217:21 (testifying that "substance abuse"—including alcohol, legal drugs, illegal drugs, and

4    vaping—is a main factor impacting students' mental, emotional, and behavioral health).

5         Students in the District have also often been exposed to violence and abuse.  *See* Ex. 3

6    (Coakley 30(b)(6) Dep.) 86:3–91:14 (agreeing that being exposed to or a victim of violence can

7    adversely affect students and explaining how the District tracks the extent to which its students

8    experience such incidents); *id.* at 95:11–20; Ex. 4 (Deposition of Executive Director of Security

9    and Emergency Management Michael Reidenbach ("Reidenbach Dep.")) 29:11–22 (agreeing that

10   school shootings can cause anxiety among students); *id.* at 30:9–33:8; Ex. 5 (Allison 30(b)(6) Dep.)

11   82:18–83:8 (agreeing that "being a victim of abuse, either physical abuse or sexual abuse, can have

12   a negative impact on students' mental health and well-being," and explaining how the District

13   tracks those incidents through referrals).  Students have been impacted by gun violence, or threats

14   of violence, in Charleston's schools and the broader community.  *See* Ex. 6 (May 19, 2025 Huggins

15   Dep.) at 199:14–200:3 (agreeing that gun violence in the community can have a negative impact

16   on students' wellbeing); Ex. 7 (MR_CCSD_022390) at -390–391; Ex. 8 (Nitz Dep.) 62:7–65:21;

17   Ex. 3 (Coakley 30(b)(6) Dep.) 139:20–140:25.

18        Despite alleging billions of dollars of harm stemming from use of Defendants' platforms in

19   this case, Charleston, to this day, permits the use of YouTube as an instructional tool at school, *see*

20   Ex. 10 (Deposition of Executive Director of Network Operations and Cybersecurity Thomas

21   Nawrocki ("Nawrocki Dep.")) 44:5–19, 45:15–25; Ex. 11 (30(b)(6) Deposition of Executive

22   Director of Information Technology Kenneth Buckheister ("Buckheister 30(b)(6) Dep.")) 39:19–

23   40:10, 41:13–15.  Charleston permitted staff to use YouTube beginning in 2017, permitted students

24   to access YouTube on the District network and District-issued devices beginning in 2019, and

25   continues to allow YouTube use by students for class and homework.  *See* Ex. 10 (Nawrocki Dep.)

26   43:11–23, 91:21–93:23.  Charleston operates its own Facebook, Instagram, and YouTube accounts,

27   *see* Ex. 12 (May 13, 2025 Deposition of Superintendent Anita Huggins ("May 13, 2025 Huggins

28

Dep.")) 132:21–133:8; *see also* Ex. 13 (April 3, 2025 Deposition of Executive Director of Student Support Services Lisa Allison ("Apr. 3, 2025 Allison Dep.")) 113:17–115:4 ("[Charleston] has the social media pages. So if we are creating content that we do want a large number of people to see, we know, because it's there, that it's a good medium for them to be able to do that.").

## B.    Charleston's Lack of Evidence

In contrast with the substantial evidence that these other factors have negatively impacted student mental health, the record evidence shows that Charleston has no similar evidence regarding how Defendants' platforms—more specifically, the at-issue features—may or may not have affected its students. The District lacks admissible, competent data on the most basic facts regarding student use of social media or Defendants' platforms. For example, the District does not know how many of its students use social media. *Compare* Ex. 3 (Coakley 30(b)(6) Dep.) 32:18–33:19 (testifying that the District does not know the "exact number" of students using social media and that it "would assume" that "a large amount of [its] students are using social media" based on disciplinary referral data), *with* Ex. 14 (Deposition of Associate Superintendent of High Schools Dr. Sherry Eppelsheimer ("Eppelsheimer Dep.")) 64:21–66:1 (testifying that the District does not have data on what students are doing on their phone when they get cited for a behavioral infraction). The District has no aggregate data showing how much time its students spend on social media, which platforms they use, how much time they spend on their phones, or what they do on their phones. *See, e.g.*, Ex. 3 (Coakley 30(b)(6) Dep.) 26:2–11 (testifying that the District did not have statistics or numbers showing the amount of time or the frequency of student use of Defendants' platforms and that all she could say is that use was "frequent and daily"); *id.* at 33:21–35:18 (admitting that Charleston does not know how many of its students use each of Defendants' platforms); *id.* at 25:15–22 (testifying that she was unable to provide any statistics or numbers regarding the amount of time or frequency of use by students of electronic devices); *id.* at 30:11–31:9 (testifying that the District "would not know the exact number of students" that have access to personal electronic devices that are Internet enabled); Ex. 12 (May 13, 2025 Huggins Dep.) 47:1–49:13 (testifying that she did not have any quantitative data regarding how much time students spend on social media or how frequently students use Defendants' platform(s)); Ex. 14

5

(Eppelsheimer Dep.) 59:18–60:16 (noting that while she was a High School Principal during the COVID-19 Pandemic, the school "did not have [the] capability" to track how many hours students spent on social media).

The evidence at most shows generalized complaints about cell phone use and "social media" use writ large, but these complaints fail to sufficiently tie any harm to Charleston back to any conduct by a particular Defendant in this case. For example, Charleston can show that students bully each other online and that fights in schools may stem from disputes that began on social media. Dr. Sherry Eppelsheimer, the District's Associate Superintendent of High Schools, testified that students had become "more preoccupied with social media platforms" since the COVID-19 Pandemic. Ex. 14 (Eppelsheimer Dep.) 59:18–60:12. But those social media-related concerns ultimately traced back to third-party-posted content: bullying, altercations, fighting, threats, and messaging other hurtful words. *Id.* at 63:25–64:16, 106:1–12, 112:14–113:12. Dr. Eppelsheimer claimed that she had discussions with school psychologists, guidance counselors, and mental health service providers where she was told that "[s]tudents were getting on social media more regularly" and that "there was more bullying going on" since the pandemic. *Id.* at 63:25–64:12. But she admitted that those bullying concerns stemmed from "messages or content [posted] on [] platforms." *Id.* at 64:13–16. Similarly, the District's corporate representative explained that what "[they] are seeing coming into our school district is issues dealing with students accessing social media platforms to cause harm towards others, whether it's stealing, whether it's body shaming, violent acts of threat, intimidation towards students that lead to assault, major disruption." Ex. 3 (Coakley 30(b)(6) Dep.) 159:20–160:20; *see also id.* at 151:4–19 ("[T]hose incidents that occur off campus end up . . . spilling over into the school where *students are trying to use their phone to update individuals, make postings* around what occurred in the community, and *then plan for what they're going to do next across their social media platforms*." (emphases added)).

Charleston does not have competent evidence that any student in the District has been diagnosed with social media addiction or has mental health harms caused by use of Defendants' platforms. The District does not know how many students received or were referred for treatment

for social media addiction.  *See* Ex. 5 (Allison 30(b)(6) Dep.) 35:23–36:5 (admitting that the District cannot provide the number of students receiving treatment or referred for treatment for social media addiction because it does not "track the referrals like that").  Indeed, the District lacks aggregate data showing the number of students who sought treatment, received treatment or received a referral for treatment because of something they say about social media, and school professionals themselves do not diagnose any disorders such as eating disorders, anxiety, depression, or body dysmorphia.  *See* Ex. 5 (Allison 30(b)(6) Dep.) 103:19–104:16 ("[T]he district does not have a district-level report that indicates [the number of students who have sought treatment, received treatment, or received a referral for treatment because of something relating to social media].  You are absolutely correct."); *id.* at 47:23–49:5 (explaining that school professionals do not diagnose any of those conditions); Ex. 15 (MR_CCSD_048970) at -970–971 (email, dated May 31, 2023, from the Director of School Counseling Services acknowledging, ███████████████

███████████████████████████████████████████████████████

██████████████████████████████████████████

## C.    Charleston's Theory of Damages

Despite lacking any competent evidence that tethers Charleston's alleged harms to the actionable aspects of Defendants' platforms, Charleston seeks $94.5 million in past damages.  This figure is not based on an amount of money expended or any similar actual, calculable financial loss.  *See infra* Section IV.B.  It is instead primarily based on a loose estimate of how much time its teachers and other staff "lost" addressing social media issues.  *Id.*  Charleston also seeks just over $1 million in certain expenses related to vendors.

***"Lost Time" Opportunity Costs.***  The vast majority of Charleston's alleged past damages are for the "opportunity cost" of the time its staff allegedly spent addressing social media-related harms.  *See* Ex. 16 (Second Amended Report of Dr. Bryce Ward for Charleston County School District ("Sec. Am. Ward Rep.")) ¶ 7 ("[P]laintiffs' approach to damages is based on the fundamental economic concept of opportunity cost.").  Charleston's evidence for this theory consists of (i) a made-for-litigation survey that asked teachers to retrospectively estimate the time they spent on issues relating to social media (including but not limited to Defendants' platforms)

7

over the last ten years; and (ii) affidavits submitted by two Charleston administrators that purport to estimate the amount of time that certain job positions spent on social media-related concerns over the last decade.  *See* Ex. 17 (Affidavit of Lisa Kathryn Allison ("Allison Aff.")); Ex. 18 (Affidavit of Anita Huggins ("Huggins Aff.")); Ex. 16 (Sec. Am. Ward Rep.) ¶ 16.

Of the 1,620 teachers surveyed, only 259 (or 15.9%) responded.  Ex. 19 (Expert Report of Robert L. Klein for Charleston County School District ("Klein Rep.")) ¶ 40, App. E.  Those respondents answered questions to estimate the daily number of minutes of teaching during scheduled instruction time that were "diverted" by unauthorized student use of social media for various periods of time since 2014.  *Id.* at ¶ 34 (emphasis added).  While the survey specifically called out each Defendant's platform(s) as an example of "social media," the survey was not limited to Defendants' platforms and inquired about "social media" generally and did not ask respondents to limit their estimates to certain features of Defendants' platforms.  *Id.* at ¶¶ 14, 32–38; *see also id.* ¶¶ 30, 33 (asking about "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, *etc.*)" (emphasis added)).  Charleston's expert then calculated the amount of purportedly lost time as a percentage of teachers' salaries and benefits.  Ex. 16 (Sec. Am. Ward Rep.) ¶¶ 1, 36.  Based on this method, Charleston's expert claims the District incurred lost opportunity costs of approximately $77.9 to $93.5 million, depending on whether benefits are included in the calculation.  *Id.* at ¶ 41.

Charleston also submitted two affidavits from an administrator and its superintendent that purported to estimate the percentage of "work time" certain non-teacher staff (psychologists, counselors, social workers, principals, and assistant principals) spent "dealing with social media or its impacts" at two different time periods: in 2017 and in 2025.[1]  Ex. 16 (Sec. Am. Ward Rep.) ¶ 39; *see generally* Ex. 17 (Allison Aff.); Ex. 18 (Huggins Aff.).  Depending on the particular position and year, Charleston's two affiants estimated that Charleston's staff spent between 6% and 45% of their time "dealing with social media."  Ex. 16 (Sec. Am. Ward Rep.) ¶ 39.  However, the estimates

---

[1] The affiants were Charleston's Executive Director of Student Support Services, Lisa Allison, and its Superintendent, Anita Huggins.  *See* Ex. 17 (Allison Aff.); Ex. 18 (Huggins Aff.).

did not limit "social media" to actionable conduct or differentiate among particular platforms. *See generally* Ex. 17 (Allison Aff.) (using the term "social media" exclusively and not listing any particular platforms); Ex. 18 (Huggins Aff.) (same). The declarants did not consult any documents to support their declarations. *See* Ex. 20 (June 20, 2025 Deposition of Executive Director of Student Support Services Lisa Allison ("June 20, 2025 Allison Dep.")) 229:23–230:3 (agreeing that the time estimates in the affidavits came entirely from oral conversations); Ex. 12 (May 13, 2025 Huggins Dep.) 108:22–111:3 (agreeing that the information in the affidavit was based entirely on conversations with District principals, and that there is no document that reflects that information). Instead, the declarants relied solely on their own memories and conversations with employees to create their estimates. *See id.*

Charleston's expert relied on these affidavits despite not independently verifying them. Ex. 16 (Sec. Am. Ward Rep.) ¶ 32.

***Out-of-Pocket Expenditures.*** Charleston also seeks to recover expenditures it allegedly incurred because of Defendants' platforms. Charleston's claimed out-of-pocket damages include $273,953 for the cost of purchasing Yondr pouches in a few of its schools. Ex. 21 (Expert Report of Jeffrey E. Meyers for Charleston County School District ("Meyers Rep.")) at App. C. The remaining costs include *some* of what it paid for various training, programming, and curriculum, but not all of those costs. *See id.* The District's expert relies on just one affidavit from a Charleston employee that sets out what percentage of that cost the employee believed was attributable to "the impact of social media"—but that employee admitted she did not rely on documents or data to come up with those percentages, and instead "just tried to think about" how much of each cost was attributable to the impact of social media. Ex. 20 (June 20, 2025 Allison Dep.) 200:11–201:23; *see also id.* at 201:24–220:22; Ex. 21 (Meyers Rep.) ¶¶ 20, 22 n.3.

**D.    Charleston's Proposed "Strategic Plan"**

Charleston also seeks to receive money to fund a *$1 to $1.4 billion* "strategic plan" developed by one of its experts, Dr. Sharon Hoover, as future damages. *See* Ex. 22 (Amended Report of Dr. Sharon A. Hoover for Charleston County School District ("Am. Hoover Rep.")) ¶ 10; Ex. 23 (Second Amended Report of Douglas L. Leslie for Charleston County School District ("Sec.

Am. Leslie Rep.")) ¶ 1 (calculating the cost of Dr. Hoover's plan); *see also* Defendants' Rule 702 Motion to Exclude School District Expert Testimony, at Section III.E (seeking to exclude Dr. Hoover's opinions). That plan stretches 15 years into the future and seeks to establish a panoply of initiatives addressing, among other things, mental health, student wellbeing, family engagement, digital literacy, and data infrastructure. *See, e.g.*, Ex. 22 (Am. Hoover Rep.) ¶¶ 58–72; *infra* Section IV.C. Other than adjustments for the number of students in Charleston compared to the other districts, the plan is virtually identical to the plans developed by Dr. Hoover for the other bellwether districts.

The strategic plan recommends hiring 1,087 additional staff, including psychologists, social workers, and even IT staff. Ex. 22 (Am. Hoover Rep.) ¶ 96. This plan would more than double the number of school counselors in Charleston (195 current; Dr. Hoover's plan would add 205 more), and triple the number of school psychologists (51 current; Dr. Hoover's plan would add 102 more). *See id.* at ¶¶ 39, 96. The plan would also create numerous new positions, such as 102 "Digital Literacy Specialists," 80 "Life Skills Specialists," 80 "Family Engagement Coordinators," and 102 "School-Based Mental Health Clinicians." *Id.* at ¶ 96. If hired, these and the other recommended professionals would serve *all* students, not just those students who use Defendants' platforms or the at-issue features of the platforms. Ex. 24 (August 12, 2025 Deposition of Plaintiffs' Expert Dr. Sharon Hoover ("Aug. 12, 2025 Hoover Dep.")) 300:19–303:1; Ex. 25 (August 13, 2025 Deposition of Plaintiffs' Expert Dr. Sharon Hoover ("Aug. 13, 2025 Hoover Dep.")) 622:22–624:21, 802:18–804:1. This would include some prospective students who have not yet been born. The strategic plan recommends implementing numerous initiatives to address student mental health and digital literacy, such as a new data infrastructure system to purportedly assist schools in identifying students with social-media-related health concerns, increased mental health literacy and life skills programming to help students manage their online activities and their *offline* relationships, and school culture and community building initiatives, such as clubs, community events, and parent education efforts. Ex. 22 (Am. Hoover Rep.) ¶¶ 64–65, 69, 135.

The plan does not make any recommendations regarding changes to the operation of any Defendant's platform. *See generally* Ex. 22 (Am. Hoover Rep.); *see also* Ex. 25 (Aug. 13, 2025 Hoover Dep.) 520:15–521:17 (agreeing that the reports prepared did not offer an opinion that any of the Defendants' platforms should discontinue or modify any particular feature or function). The plan does not account for any changes to Defendants' platform that might occur over the plan's 15-year timeline, such as changes to or removal of the features responsible for the alleged harm. *See* Ex. 24 (Aug. 12, 2025 Hoover Dep.) 308:14–20 ("I haven't studied the changes on the social media platforms."); Ex. 25 (Aug. 13, 2025 Hoover Dep.) 524:19–526:6 ("I don't think I'm offering an opinion that the social media companies change their design."). Nor does the plan consider potential changes in how students might use Defendants' platforms over the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely. *See id.* at 803:10–20 (noting that "it would be hard . . . to predict" whether adolescents will still be using social media ten years from now); *id.* at 803:21–804:1 (agreeing that she did not conduct any studies attempting to forecast any anticipated changes in how adolescents use social media).

## E.     The Court's Motion to Dismiss Ruling

At the motion-to-dismiss stage, the Court recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected publishing activities. ECF No. 1267 ("SD Order") at 2. The Court similarly held that Defendants could not be held liable for non-foreseeable third-party conduct, absent some narrow exceptions for conduct promoted by Defendants. *Id.* The Court permitted Charleston to proceed on its "core theory" that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources." *Id.* at 26. At the same time, the Court made clear that the case must focus on "*the specific conduct* through which the defendants allegedly violated their duties to plaintiffs"—*i.e.*, Defendants' use of the limited set of features that the Court has held are not barred by Section 230 and the First Amendment. *See* ECF No. 430 ("PI Order") at 14 (emphasis added); *see also* SD Order at 12–13 (applying analysis to school district claims).

11

1    Specifically, the Court permitted Charleston to proceed insofar as its claims were based on

2    Defendants' use of certain features—*i.e.*, Defendants' alleged

3    • failure to implement robust age verification processes to determine users' ages;

4    • failure to implement effective parental controls;

5    • failure to implement effective parental notifications;

6    • failure to implement opt-in restrictions to the length and frequency of use sessions;

7    • creating barriers that make it more difficult for users to delete and/or deactivate their

8    accounts than to create them in the first instance;

9    • failure to label content that has been edited, such as by applying a filter;

10   • making filters available to users so they can, among other things, manipulate their

11   appearance; and

12   • failure to create adequate processes for users to report suspected CSAM to

13   defendants' platforms.

14   SD Order at 13–14 (hereinafter, the "at-issue features").  By contrast, the Court held that Plaintiffs

15   could not base their claims on any of the following features:

16   • use of algorithms to promote [purportedly] addictive engagement;

17   • failing to institute blocks to use during certain times of day (such as during school

18   hours or late at night);

19   • not providing a beginning and end to a user's "Feed";

20   • publishing geolocating information for minors;

21   • recommending minor accounts to adult strangers;

22   • limiting content to short-form and ephemeral content, and allowing private

23   content;

24   • timing and clustering of notifications of third-party content in a way that promotes

25   addiction; and

26   • the timing and clustering of notifications of defendants' content to increase

27   addictive use.

28

12

1    *Id.* at 14.[2]  The Court also declined "at [the motion to dismiss] stage . . . to hold Section 230 bars

2    liability predicated on a failure to warn of known risks of addiction attendant to any platform

3    features or as to platform construction in general."  *Id.* at 45.  Accordingly, as used in this

4    memorandum, Defendants' "actionable conduct" consists of (1) Defendants' use of the at-issue

5    features and (2) Defendants' alleged failure to warn.

6    **III.    LEGAL STANDARD**

7        Summary judgment is required when "there is no genuine dispute as to any material fact

8    and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where the

9    moving party would not bear the burden at trial, the motion need only specify the basis for summary

10   judgment and identify those portions of the record, if any, which it believes demonstrate the absence

11   of a genuine issue of material fact on some essential element of the claims."  *Twitter, Inc. v. Barr*,

12   445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, J.) (citing *Celotex Corp. v. Catrett*,

13   477 U.S. 317, 323 (1986)).  "The burden then shifts to the opposing party to establish the existence

14   of material disputes of fact that may affect the outcome of the case under the governing substantive

15   law."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "The evidence

16   presented by the parties must be admissible.  Conclusory, speculative testimony in affidavits and

17   moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."

18   *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

19   **IV.    ARGUMENT**

20       **A.    Charleston Lacks Competent Evidence of Causation.**

21       Rejecting an "all or nothing" approach, *see* PI Order at 14, this Court has made clear that in

22   order to prove causation Charleston must connect Defendants' *actionable conduct*—as opposed to

23   social media or electronic device use generally, third-party content, third-party conduct, or

24   Defendants' protected publishing activities—to its alleged injuries.  *Id.* at 14–16; SD Order at 12–

25

26   _____

     [2] The SD Order erroneously listed the "failure to enable default protective limits to the length and
27   frequency of use sessions" as a feature that was not barred.  But this Court explained in its order
     addressing Section 230 that claims based on this alleged failure *were barred* because it "would
28   inherently limit what defendants are able to publish."  *See* PI Order at 16.

1    13.   Despite the sweeping allegations in the Master Complaint, Charleston lacks competent

2    *evidence* that any Defendant's actionable conduct caused it injury.

3          To succeed on its negligence claim, Charleston must prove both causation in fact and "legal

4    cause." *Wickersham v. Ford Motor Co.*, 853 S.E.2d 329, 332 (S.C. 2020).[3] "Causation in fact is

5    proved by establishing the plaintiff's injury would not have occurred 'but for' the defendant's

6    negligence." *Id.* (quoting *Hurd v. Williamsburg County*, 611 S.E.2d 488, 492 (S.C. 2005) (citation

7    omitted)).   "Proximate cause is the efficient, or direct, cause—the thing which brings about the

8    injuries complained of," *Singleton v. Sherer*, 659 S.E.2d 196, 206 (S.C. Ct. App. 2008) (alteration

9    and citation omitted), and cannot be too "remote." *See Wickersham*, 853 S.E.2d at 332 (citation

10   omitted) ("In causation, as in other contexts, 'proximate' is the opposite of 'remote.'"); *see also*

11   *Stone v. Bethea*, 161 S.E.2d 171, 173 (S.C. 1968) ("When the [conduct] appears merely to have

12   brought about a condition of affairs, or a situation in which another and entirely independent and

13   efficient agency intervenes to cause the injury, the latter is to be deemed the direct or proximate

14   cause, and the former only the indirect or remote cause."). Thus, in order to satisfy its burden on

15   summary judgment, in light of the "conduct-specific, feature-by-feature assessment" required by

16   the Court, Charleston must come forward with evidence showing that *each Defendant's* actionable

17   conduct directly caused its students to engage in compulsive use of that Defendant's platform(s),

18   and that Charleston in turn incurred expenditures as a direct result of that compulsive use. *See*

19   *McKnight v. S.C. Dep't of Corr.*, 684 S.E.2d 566, 569 (S.C. Ct. App. 2009) ("When the cause of a

20   plaintiff's injury may be as reasonably attributed to an act for which the defendant is not liable as

21   to one for which he is liable, the plaintiff has failed to carry the burden of establishing the

22   defendant's conduct proximately caused his injuries.").

23         The record is clear that Charleston, in fact, has no competent evidence to support the

24   assertion that it was injured as a result of actionable conduct by Defendants. *First*, Charleston has

25   no competent evidence that it was harmed as a result of the at-issue features or any alleged failure

26

27   [3] South Carolina uses the terminology "proximate cause" to refer to causation in general, and the
     term "legal cause" refers to what most other jurisdictions call proximate cause. *See Wickersham*,
28   853 S.E.2d at 332 (noting that the legal cause analysis focuses on foreseeability).

1    to warn.  Tellingly, the at-issue features are primarily features that *users* or their *parents* can choose

2    to use or not use, such as parental controls, parental notifications, time limits, account deactivation,

3    or CSAM reporting.  Charleston has provided no evidence that giving parents or users additional

4    controls would have any meaningful impact on the District where Charleston has no control over

5    what parents and users do with those features.

6          Rather, Charleston's limited, anecdotal evidence of specific harms allegedly caused by

7    Defendants' platforms is about third-party content: Charleston's witnesses have consistently and

8    expressly testified that specific allegedly harmful disruptions in schools occurred as a result of the

9    publication of harmful content on Defendants' platforms.  Any claims based on such harms are

10   barred by Section 230 and the First Amendment and thus are not actionable.  *See* SD Order at 2.

11         *Second*, setting aside instances related to third-party content, Charleston has no admissible

12   evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses.  *See*

13   ECF No. 729, Pls.' First Am. Master Compl. (Local Government and School District) ("Master

14   Compl.") at ¶¶ 9, 19.  While Charleston may gesture toward fact or expert testimony about "social

15   media" or cellphone use generally, such evidence is insufficient to meet its burden on summary

16   judgment.  For these reasons, summary judgment on causation grounds is warranted.  *See Singleton*,

17   659 S.E.2d at 204, 206 (finding summary judgment appropriate where "the evidence negates the

18   existence of both causation in fact and legal cause as a matter of law"); *VFD Consulting, Inc. v.*

19   *21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) ("Summary judgment in a negligence

20   action is appropriate if the record does not support . . . proximate cause[.]"); *see also* SD Order at

21   21–22 ("[W]here the existence of proximate cause turns not on a question of fact but on whether

22   the facts alleged are capable of establishing proximate cause, the issue is a matter of law resolvable

23   [by the court].").

24                **1.    Charleston's Allegations of Specific Harms All Impermissibly Rely on**
                        **Third-Party Wrongdoing and Protected Publishing Activities.**
25

26         The Court has made clear that liability in this case cannot arise from the (i) "mere

27   publication" of content or (ii) features that the Court held are protected by Section 230 or the First

28   Amendment.  SD Order at 25–26.  It has likewise made clear that "non-foreseeable third-party

                                                15

conduct"—such as "dangerous challenges, threats, and crimes disseminated or perpetrated on [D]efendants' platforms"—"cannot be attribut[ed] to [D]efendants." *Id.* Thus, in order to satisfy its burden on summary judgment, Charleston must come forward with evidence that Defendants' *actionable conduct*—as opposed to content, protected features, or third-party bad acts—caused it harm.

Charleston has no evidence that it was harmed as a result of the at-issue features or any failure to warn. For example, Charleston has no competent evidence regarding the number of its students who used Defendants' platforms, let alone prior to age 13. *See, e.g.*, Ex. 3 (Coakley 30(b)(6) Dep.) 32:18–33:19; *see also supra* Section II.B. Thus, it is unsurprising that Charleston lacks evidence that Defendants' alleged failure to implement "robust" age verification processes caused it to incur expenses. Charleston does not know what parental controls or screen time limits are enabled on their students' personal devices. *See* Ex. 3 (Coakley 30(b)(6) Dep.) 32:9–17. It also has no evidence that giving users platform-level tools to set their own voluntary time limits—above and beyond the controls already available on the users' devices—or implementing default time limits would have reduced its social media-related expenditures. Charleston similarly lacks evidence that it incurred expenses as a result of Defendants' alleged failure to implement effective parental controls or notifications. The same holds true for each of the at-issue features. Nor has Charleston presented evidence of what any warning should have looked like or that such a warning would have made a difference to Charleston's alleged harms. *See infra* Section IV.D.

Instead, the only *specific* evidence that Charleston has proffered is of harm caused by third-party content, third-party conduct, and protected publishing activities on Defendants' platforms—precisely the type of conduct the Court has found is not actionable. For example, when asked whether Charleston believes that Defendants' platforms were "responsible for contributing to students' mental, physical, emotional, or behavioral health problems," Shavonna Coakley, the District's Executive Director of Student Support Services and its corporate representative, testified that that was "the perception" because "when you look at the screenshots of everything that comes in, you get to see *the group chat messaging of the words that are being used* where" one student

"might have told another student to go kill themselves," "targeted" another, engaged in "*body shaming*," told "*the student that they are ugly or this is why no one likes them, and so forth*." Ex. 3 (Coakley 30(b)(6) Dep.) 107:17–109:13 (emphases added). Furthermore, Coakley identified the following features of Defendants' platforms when describing the "pervasive issue in Charleston": "notifications, postings, followers, anything that's going to make them a YouTube star or where they can search for ways to cause harm or hurt, threats[] and intimidations, plan for major disruption and fights within the school district," "using [] platforms" to "create videos, present violence and weapons," "search[] for ways to cause harm to self or others," "promot[e] body shaming of other students, cyberbullying," and "posting personal information""—none of which are actionable. *Id.* at 36:2–37:7; *see also* SD Order at 14.

Other witnesses recounted similar issues—instances related to student bullying, inappropriate student comments on social media, inappropriate images posted of classmates, inappropriate videos, on-campus fight videos, comments on school press releases, and the destruction of school bathrooms by students. Dr. Sherry Eppelsheimer, the District's Associate Superintendent of High Schools, testified that social media-related concerns ultimately traced back to third-party-posted content: bullying, fighting, threats, altercations, and messaging other hurtful words. *See* Ex. 14 (Eppelsheimer Dep.) 63:25–64:16, 106:1–21, 112:14–113:12. Dr. Eppelsheimer claimed that she had discussions with school psychologists, guidance counselors, and mental health service providers where she was told that "there was more bullying going on" since the pandemic. *Id.* at 63:25–64:12. But she admitted that such concerns stemmed from "messages or content [posted] on [] platforms." *Id.* at 64:13–16.[4]

---

[4] *See also* Ex. 5 (Allison 30(b)(6) Dep.) 74:13–76:21 (agreeing that students are negatively impacted by bullying and cyberbullying and explaining how the District tracks such incidents in Review360); *id.* at 32:20–33:24 (explaining how the District conducts behavioral and threat assessments and noting that the District typically sees, "for example, in a post or a shared Snap, or something like that, that comes across to [staff] and that [it is] tracking down and assessing," and that such incidents "may start as a Snapchat or an Instagram or Facebook post of someone holding a gun [] that might be a threat to others"); Ex. 4 (Reidenbach Dep.) 100:1–9 (describing incidents where inappropriate photos were "AirDropped to other students' phones"); Ex. 3 (Coakley 30(b)(6) Dep.) 106:18–107:16 (explaining that incidents tend to stem from "student[s] posting something on their Instagram or TikTok page that may have been shared across Facebook," students submitting "screenshots or actual videos of the postings of the threats or the intimidating act toward

17

There is no dispute that such content on Defendants' platforms was posted by third parties. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) ("The prototypical service qualifying for [CDA] immunity is an online messaging board . . . on which [users] post comments and respond to comments posted by others."). Defendants' publication of that content falls squarely within the heartland of conduct protected by Section 230, is not actionable, and cannot be used to establish that Defendants caused harm to Charleston. *See* PI Order at 14–19; *see also, e.g.*, *Est. of Bride ex rel. Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168, 1172, 1182 (9th Cir. 2024) (Section 230 protects publishers of "harassing and bullying speech"), *cert. denied*, 145 S. Ct. 1435 (2025).

While recognizing that "mere publication of third-party content" cannot form the basis of liability under Section 230, the Court in its motion to dismiss order on the School Districts' claims carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" through "conduct like providing cash prizes to challenge participants." SD Order at 25. There is extremely limited evidence of social media challenges being an issue in Charleston at all: an isolated instance in which, according to Charleston's emails, bathroom vandalism "*may or may not* be related" to a "TikTok challenge." Ex. 26 (MR_CCSD_110914) at -915 (emphasis added); *see also* Ex. 4 (Reidenbach Dep.) 90:16– 91:13 (describing instances where "bathrooms [were] being vandalized that were mentioned as being possibly attributable to the TikTok challenge"); Ex. 27 (MR_CCSD_219625) (forwarding an email from a reporter ████████████████████ ████████████████████████████████████████████████ ████████████████████████████. And there are some emails referencing challenges experienced elsewhere in the country. *See* Ex. 28 (MR_CCSD_191383) (email exchange between the Chief Operating Officer and the Executive Director of Information Technology speculating ████████████████████████████████████████

---

other students," or students accessing YouTube to "go and look at the video that was created" which they call "disc [sic] videos or [] tracks" where a student "target[s]" another or a group of students); Ex. 12 (May 13, 2025 Huggins Dep.) 113:3–23 (explaining that the District often deals with issues where "there's something . . . damaging that's been posted of a female student," or "there might be a fight that is . . . recorded and then posted on Instagram or Snapchat" which then "causes other disturbances").

1    ███████.  In any event, even accepting Charleston was harmed by "challenges," the District's

2    corporate representative testified that such "challenges" involved students posting content on social

3    media platforms to mimic other users' posts.  *See* Ex. 3 (Coakley 30(b)(6) Dep.) 51:1–21 (agreeing

4    that her testimony about "challenges" referred to the situation where "*a user of TikTok posts* some

5    kind of challenge *for other users* to mimic" (emphases added)).  And Charleston has no evidence

6    that any Defendant provided cash prizes to any participant in a dangerous challenge, created filters

7    that facilitated dangerous challenges, or otherwise "promoted, developed, or participated in a

8    foreseeably dangerous challenge" that caused Charleston harm beyond the Defendant's mere

9    "algorithmic publication, curation, or amplification" of the challenge.  SD Order at 26.  Defendants

10   are therefore entitled to summary judgment regarding challenges.

11       Similarly, the Court recognized that liability might arise as a result of a filter created by a

12   Defendant itself.  But Charleston has no evidence that it suffered any harm as a result of a filter

13   created by a Defendant, whether in the context of social media challenges or otherwise.  Summary

14   judgment on filters is thus also warranted due to Charleston's lack of evidence.

15       In short, Charleston has no competent evidence that it suffered any injury flowing from the

16   at-issue features—let alone evidence that Defendants' actionable conduct was a "but for" cause and

17   "the efficient, or direct, cause . . . [of] the injuries complained of."  *See Singleton*, 659 S.E.2d at

18   206 (citation omitted); *Wickersham*, 853 S.E.2d at 332.  Because Charleston cannot connect

19   *Defendants' actionable conduct*—as opposed to third-party wrongdoing or the publication of

20   content—to its alleged injuries, Defendants are entitled to summary judgment.  *See, e.g.*, *Lemmon

21   v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (allowing claim to proceed where alleged

22   duty violated was "*fully independent of* [Defendants'] role in monitoring or publishing third-party

23   content" (emphasis added)); *M.P. by & through Pinckney v. Meta Platforms Inc.*, 127 F.4th 516,

24   525 (4th Cir. 2025) (CDA bars "state tort claims [that] are inextricably intertwined with

25   [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com, LLC*, 724 F.

26   Supp. 3d 882, 885 (N.D. Cal. 2024) (granting summary judgment where claim "intertwined" with

27   conduct protected by Section 230); *see also Nuveen Mun.  High Income Opportunity Fund v. City*

28

1   *of Alameda*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that affect

2   refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must

3   reasonably distinguish the impact of those risks from other economic factors."); *In re Williams Sec.*

4   *Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (granting summary judgment where

5   "theories of loss causation could not distinguish between loss attributable to the alleged fraud and

6   loss attributable to non-fraud related news and events").

7                    **2.    Charleston Has No Evidence of Mental Health Harms Tied to Any
                             Defendant's Specific Platform.**

8

9        Charleston's "*core* theory" of injury—and the basis on which the Court permitted it proceed

10   at the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive

11   use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond

12   by expending resources."  SD Order at 26.  Setting aside alleged incidents involving third party

13   content and wrongdoing, however, the record is clear that Charleston has no evidence that it was

14   injured as a result of its students' "compulsive use" of each Defendant's specific platform(s).  While

15   Charleston points to generalized testimony regarding harms from "social media" use or smartphone

16   use generally, that testimony cannot meet Charleston's burden to show that it was injured by each

17   Defendant's specific platform(s)—let alone each Defendant's actionable conduct.

18        As a threshold matter, and as explained in Defendants' Rule 702 motion on general

19   causation, the scientific evidence actually does *not* support the theory that Defendants' platforms

20   can cause youth to engage in the type of "compulsive use" alleged.  Because Charleston cannot

21   establish general causation, Defendants are entitled to summary judgment.  *See, e.g.*, *Henricksen v.*

22   *ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) ("General causation and

23   specific causation are essential elements of Plaintiffs' prima facie case . . . .  Expert testimony is

24   necessary to make this showing" and without reliable expert testimony, "the jury could only

25   speculate that a causal relationship exists.").

26        Even setting that foundational defect aside, Charleston cannot establish that each

27   Defendant's specific platform(s) caused it harm—which it must do to prove liability.  *See*

28

*McKnight*, 684 S.E.2d at 569.  It lacks competent evidence that any student, much less a significant number of students, has used one or more of Defendants' platforms in a way that harmed the student's mental health.  Indeed, Charleston lacks basic information about the extent or nature of its students' use of Defendants' platforms and basic information about the causes of students' mental health harms.  It has no aggregate data showing how many of its students used Facebook, Instagram, YouTube, TikTok, or Snapchat, how often they used them, when they used them, or for how long they used them.[5]  *See* Ex. 3 (Coakley 30(b)(6) Dep.) 32:18–33:19 (testifying that the District does not know the "exact number" of students using social media and that it "would assume" that "a large amount of [its] students are using social media" based on disciplinary referral data); *id.* at 26:2–11 (testifying that the District did not have statistics or numbers showing the frequency of student use of Defendants' platforms and that all she could say is that use was "frequent and daily"); *id.* at 33:21–35:18 (admitting that Charleston does not know how many of its students use each of Defendants' platforms); *id.* at 25:15–22 (testifying that she was unable to provide any statistics or numbers regarding the amount of time or frequency of use by students of electronic devices); *id.* at 30:11–31:9 (testifying that the District "would not know the exact number of students" that have access to personal electronic devices that are Internet enabled); Ex. 12 (May 13, 2025 Huggins Dep.) 47:1–15 (testifying that she did not have any quantitative data regarding students' use of Defendants' platform(s), and that that information would have to be "self-reported by students").  The District's corporate representative also admitted that Charleston is not able to identify "how many students received treatment or were referred for treatment for social media addiction," if any.  *See* Ex. 5 (Allison 30(b)(6) Dep.) 35:23–36:5 (testifying that Charleston does not have that information for any year from 2018 to present); *id.* at 43:19–44:7 (noting that referrals "will not indicate" that they were "*because of* social media" (emphasis added)).  Accordingly,

---

[5] Some of the District's witnesses claim that such data "may exist," *see* Ex. 12 (May 13, 2025 Huggins Dep.) 48:5–49:3, in databases compiling disciplinary infractions or referrals, like Review360, *see* Ex. 3 (Coakley 30(b)(6) Dep.) 33:8–19.  But the District's Associate Superintendent of High Schools admitted that the District does not know what students are doing on their phones when they are cited for a behavioral infraction, *see* Ex. 14 (Eppelsheimer Dep.) 64:21–25.

Charleston could not possibly show the predicate of its claims—that wrongful conduct by each Defendant, or that Defendants' *at-issue features* specifically, led to the compulsive use of that Defendant's platform(s), which in turn caused Charleston to incur expenses in responding to that compulsive use.

Charleston's experts likewise fail to link the District's alleged injuries to actionable conduct by each Defendant. For example, Dr. Hoover impermissibly groups together all "social media" platforms—including those not at issue. *See* Ex. 22 (Am. Hoover Rep.) ¶ 2 ("I have been retained as an expert by the Plaintiffs' . . . to analyze the impact of student social media use on school districts . . . ."). At no point in her report does Dr. Hoover define "social media," and she certainly does not define it to include only the five platforms at issue, let alone separate out those platforms. *See generally* Ex. 22 (Am. Hoover Rep.). Dr. Hoover conceded in her deposition that her causation analysis and opinions are not specific to any platform. *See* Ex. 24 (Aug. 12, 2025 Hoover Dep.) 154:9–13 ("I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera. So I didn't think about it that way."); *id.* at 262:18–22 (admitting she did not perform a causation analysis for any individual platform).

In short, Charleston has no evidence that each Defendant's specific platform(s) in fact caused (or are even capable of causing) compulsive use on the part of its students, let alone that such compulsive use caused Charleston to incur expenditures.

*             *             *

Importantly, Charleston's failure to present evidence regarding each Defendant's platform(s) is compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms or Defendants' alleged failure to warn. *See supra* Section IV.A.1. At bottom, Charleston is required to come forward with evidence that each Defendant's actionable conduct caused it to incur injury. This requires it to disentangle both (1) alleged harms flowing from online activity that does not involve a given Defendant and (2) alleged harms flowing from third-party content and protected publishing activity accessed by students on each Defendant's platform(s). But Charleston and its experts have done neither, instead focusing broadly on social

22

media use.  *See generally* Defendants' Motion to Exclude Plaintiffs' General Causation Expert Testimony; Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony. Accordingly, even if Charleston's experts were correct that Charleston has experienced harm as a result of "social media" generally, their opinions do not establish that Charleston has experienced harm arising specifically from each Defendant's actionable conduct—*i.e.*, excluding third party wrongdoing, content published on Defendants' (and others') platforms, and the protected features of Defendants' platforms.  That wholesale failure is fatal on summary judgment.  *See* PI Order at 14–19; *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024).

**B.      Charleston Cannot Show It Is Entitled to Past Damages.**

The party seeking damages has the burden of proof to show the amount of loss in a manner "as to enable the court or jury to determine the amount thereof with reasonable certainty or accuracy."  *Whisenant v. James Island Corp.*, 281 S.E.2d 794, 796 (S.C. 1981); *see also Gray v. S. Facilities, Inc.*, 183 S.E.2d 438, 444 (S.C. 1971) ("Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation.").  To maintain a cause for negligence, a plaintiff must prove damages as an essential element of the claim—failure to do so means "a negligence claim is not stated."  *Summers v. Harrison Const.*, 381 S.E.2d 493, 495 (S.C. Ct. App. 1989).  Because Charleston has failed to present "any competent evidence showing either the existence or the amount of damage[s]," *Baughman v. Am. Tel. & Tel. Co.*, 410 S.E.2d 537, 546 (S.C. 1991), summary judgment is warranted as to Charleston's negligence claim.

In holding that the School Districts' claims were not improperly derivative of their students' alleged harms, the Court found that the School Districts had adequately alleged that they bore injuries that were unique to them: "diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage."  SD Order at 19–20.

Charleston has put forward no competent evidence establishing with reasonable certainty past, non-derivative damages resulting from Defendants' actionable conduct.  *First*, Charleston's

23

only evidence of the diversion of resources is a claim for diversion of "time"—not financial resources. Its claimed damages relate overwhelmingly to the percentage of time that Charleston teachers and staff purportedly had to spend addressing issues related to "social media." These costs are not recoverable under South Carolina law, and, separately, Charleston lacks competent evidence that it incurred such damages as a result of Defendants' actionable conduct. *Second*, Charleston has no competent evidence that it hired new mental health personnel, developed new mental health resources, or implemented other new resources because of Defendants' actionable conduct. While Charleston alleges certain out-of-pocket costs that it purportedly incurred, it has presented no evidence that these costs were actually caused by Defendants' platforms, let alone Defendants' actionable conduct. *Third*, Charleston cannot recover for repairing property damage because the evidence is undisputed that the only incident of which Charleston has any evidence resulted from third-party acts, which, under this Court's prior ruling cannot form the basis of liability.

### 1.    Charleston Cannot Show Defendants Caused It to Divert Financial Resources.

Charleston does not put forth proof of its purported damages resulting from hiring any additional staff or paying them more because of Defendants' actionable conduct. Instead, Charleston asserts that it is entitled to $93.5 million in "lost time" damages for the time that its teachers, counselors, and psychologists purportedly spent addressing issues related to social media. Ex. 16 (Sec. Am. Ward Rep.) ¶ 41. Charleston cannot recover this damage because it is not a recoverable category of damage, and Charleston has not met its evidentiary burden to prove it is entitled to the claimed amount.

#### a)    Charleston cannot recover "lost time" damages in this case.

"[M]ere annoyance, inconvenience, or discomfort a plaintiff may suffer" is not enough to recover damages in a negligence action. *Babb v. Lee Cnty. Landfill SC, LLC*, 747 S.E.2d 468, 481 (S.C. 2013); *see also Kennedy v. Columbia Lumber & Mfg. Co.*, 384 S.E.2d 730, 734 (S.C. 1989) ("[T]ort liability [for a defective product] only lies where the damage done is to other property or is personal injury."); *Sapp v. Ford Motor Co.*, 687 S.E.2d 47, 50 (S.C. 2009) ("Imposing liability

merely for the creation of risk when there are no actual damages drastically changes the fundamental elements of a tort action, makes any amount of damages entirely speculative, and holds the manufacturer as an insurer against all possible risk of harm."), *abrogated on other grounds by Carroll v. Isle of Palms Pest Control, Inc.*, 918 S.E.2d 532 (S.C. 2025).  The District does not allege any physical injury, and even if it is claiming property damage, *see infra* Section IV.B.3, those damages are, at most, very small and unsupported.  *See Babb*, 747 S.E.2d at 481 ("Generally, under South Carolina law, the damages element requires a plaintiff to establish physical injury or property damage.").  Instead, Charleston seeks damages for "lost time" for staff having to spend time dealing with issues related to social media.

The amounts for lost time are not available under South Carolina law because the "basic measure of actual damages is the amount needed to compensate the plaintiff for the losses proximately caused by the defendant's wrong so that the plaintiff will be in the same position he would have been in if there had been no wrongful injury." *Austin v. Specialty Transp. Servs., Inc.*, 594 S.E.2d 867, 874 (S.C. Ct. App. 2004).  Charleston has not suffered any actual financial losses.  It did not spend $93.5 million as a result of "lost" teacher time due to the at-issue features of Defendants' platforms; nor does that amount represent hiring any new teachers or paying any teachers additional wages or benefits, and it, of course, does not represent the loss of any earnings or earning capacity.  Charleston's own expert admitted that the money Charleston pays its teachers and staff in salary and benefits is not dependent on *how* time is spent performing their duties— because Charleston would have paid that same amount in wages and benefits to its teachers even if Defendants' platforms did not exist at all.  *See* Ex. 29 (Deposition of Plaintiffs' Expert Dr. Bryce Ward ("Ward Dep.")) 165:21–166:2 (agreeing that student use of social media does not affect how much the District pays the teacher); *id.* 166:17–22 (agreeing that the amount of time that a non-teacher employee spends addressing student use of social media does not affect how much the School District pays that employee); *id.* 168:1–11 (agreeing he is not "opining that because of Defendants' platforms specifically any school district had to pay teachers more than they would have paid teachers if Defendants' platforms did not exist").  Nor was Charleston "deprived" of the

services for which it paid staff.[6]  Managing student misbehavior and disruption has always been a core responsibility of teachers and school staff.  Charleston does not have competent evidence that its employees' purported inability to spend time on other tasks due to alleged disruptions caused any harm beyond the purported diversion of time.  As a result, contrary to South Carolina law, any award of damages for "lost time" would not restore Charleston to its prior position; it would be a windfall.  *See Austin*, 594 S.E.2d at 874 (noting that damages should put the "injured party" in "the same position he was in before the wrongful injury occurred").

**b)    Charleston has adduced no competent evidence to establish "lost time" damages.**

Even if the Court were to accept that Charleston could recover "lost time" damages in theory, Charleston failed to meet its burden to adduce competent evidence to justify this award. *See Baughman*, 410 S.E.2d at 546.  Dr. Ward's $93.5 million figure rests on three sources: a survey conducted by Charleston's expert Robert Klein, the affidavit of Charleston's Executive Director of Student Support Lisa Allison, and the affidavit of Charleston's Superintendent Anita Huggins.  *See* Ex. 16 (Sec. Am. Ward Rep.) ¶¶ 13, 16, App. B.  Dr. Ward's calculation draws on the survey for its teacher time estimates and relies on the affidavits for its figures concerning school counselors, psychologists, social workers, principals, and assistant principals.  *Id.*

**i.    Charleston's evidence of teacher "lost time" damages is insufficient.**

Charleston offers only Mr. Klein's teacher survey as evidence of alleged lost time for teachers, which is insufficient as a matter of law to establish lost damages.

To calculate the amount of damages allegedly incurred, Charleston's experts invited all of Charleston's current middle school and high school teachers (1,620 total) to respond to a survey that asked each participant to estimate how much time the teacher spent teaching and how much of

---

[6] This distinguishes cases like *Charleston Lumber Co. v. Miller Hous. Corp.*, 458 S.E.2d 431, 437 (S.C. Ct. App. 1995), where, in a fraud case, the court permitted recovery for time spent by one party's employees "checking and correcting the bids versus the actual charges" because the other party was fraudulently overbilling.  No South Carolina court has extended *Charleston Lumber* outside of the fraud context.

26

that time was allegedly spent addressing distractions due to social media over the past decade (back to 2014). Ex. 19 (Klein Rep.) ¶¶ 1–2, App. E. Charleston experts then took the unverified responses of the self-selected 259 unnamed teachers—only *15.9%* of Charleston's current middle and high school-teachers—calculated the percentage of instruction time purportedly spent addressing social media, and multiplied that percentage against the wages and benefits of all middle and high school teachers within the District. *See* Ex. 19 (Klein Rep.) ¶¶ 1–2; Ex. 16 (Sec. Am. Ward Rep.) ¶¶ 16, 33–38.

During fact discovery, Charleston did not produce any contemporaneous documentary evidence supporting these claims of lost time. At most, deposition and affidavit testimony regarding lost time contains vague, anecdotal, post hoc, non-specific references to time spent attending to purported disruptions due to social media writ large (*i.e.*, not specifically as to any of Defendants' platforms)—typically in the form of hearsay statements by individuals lacking personal knowledge.

For the reasons explained in Defendants' Rule 702 motion, the Klein survey (and Dr. Ward's damages report based on that survey) are unreliable and inadmissible. The use of a retrospective survey to purportedly measure—down to the minute—the amount of time that teachers purportedly spent dealing with social-media related "distraction" for periods of a decade or longer is not a reliable methodology. Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony, at Section III.B, C. And Plaintiff's expert did nothing to test or ensure that the answers of the 15.9% of teachers who self-selected to take the survey could be reliably extrapolated and applied to the other *84.1%* of teachers who declined to participate in this survey. *See id.* Charleston thus failed to establish with "reasonably certainty" its estimate of lost time damages.

The lost time estimates also suffer from another, independently fatal flaw: while Defendants' platforms were used as examples of "social media," the survey questions ask about time spent dealing with "social media" generally and were not limited to Defendants' platforms. *See* Ex. 19 (Klein Rep.) ¶¶ 30, 33 (asking about "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, *etc.*)" (emphasis added)). The questions did not distinguish between time spent

1    dealing with issues arising from the at-issue features, as opposed to issues arising from, for

2    example, third-party content posted on Defendants' (or other) platforms.  Accordingly, the "lost

3    time" estimates are plainly not estimates of time spent addressing Defendants' *actionable* conduct.

4    *See McKnight*, 684 S.E.2d at 569 ("When the cause of a plaintiff's injury may be as reasonably

5    attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff

6    has failed to carry the burden of establishing the defendant's conduct proximately caused his

7    injuries."); *see also supra* Section IV.A.

8                    **ii.        Charleston's Evidence of Other Staff "Lost Time"
                                  Damages Is Insufficient.**
9

10   Charleston rests solely on two employee affidavits as evidence of alleged lost time for

11   school counselors, psychologists, social workers, principals, and assistant principals.    The

12   Executive Director of Student Support Services affidavit purports to estimate the percentage of

13   work time spent on social media issues for all 200-plus school psychologists, counselors, and social

14   workers in the District in two separate years, 2017 and 2025, even though she herself is not a school

15   psychologist, counselor, or social worker, and those school-level employees do not report to her

16   directly.  *See generally* Ex. 17 (Allison Aff.); *see also* Ex. 16 (Sec. Am. Ward Rep.) ¶ 39, tbl. 4; *id.*

17   at App. B (providing the materials considered listing the affidavit).  The other affidavit, from

18   Charleston's Superintendent, purports to estimate the percentage of work time spent on social

19   media issues for all the dozens of principals and assistant principals in Charleston's middle and

20   high schools.  *See generally* Ex. 18 (Huggins Aff.); *see also* Ex. 16 (Sec. Am. Ward Rep.) ¶ 39, tbl.

21   4; *id.* at App. B (providing the materials considered listing the affidavit).

22   Charleston cannot rely on the affidavits of the Executive Director of Student Support

23   Services (Lisa Allison) and the Superintendent (Anita Huggins) because these affidavits merely

24   repeat hearsay learned by the affiant from other employees.  Allison admitted that all of her lost

25   time estimates for school counselors, psychologists, and social workers "are based on what [she]

26   learned from . . . oral conversations."  Ex. 20 (June 20, 2025 Allison Dep.) 229:23–230:3.  Huggins'

27   estimates about principal and assistant principal lost time are likewise based entirely on

28   "conversations [she] had with . . . principals" (but not assistant principals, despite offering estimates

                                                      28

of assistant principal time).  Ex. 12 (May 13, 2025 Huggins Dep.) 108:22–111:3.  The estimates in these affidavits are plainly hearsay and not admissible (and Dr. Ward cannot be a conduit for that hearsay).  *See* Fed. R. Evid. 801, 802; *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (finding that affidavit inadmissible for lack of personal knowledge where affiant "was not personally involved" in relevant events and "did not personally review any business records containing information" on the events); *Erhart v. BofI Holding, Inc*., 445 F. Supp. 3d 831, 839, 841 (S.D. Cal. 2020) (noting that an expert may not "merely act[] as a transmitter for testimonial hearsay," and finding it "inappropriate to allow [the expert] to place [personnel cost] evidence before the jury by taking advantage of Rule 703's relaxed personal knowledge and hearsay requirements"); *Deep Keel, LLC v. Atl. Priv. Equity Grp., LLC*, 773 S.E.2d 607, 614–15 (S.C. Ct. App. 2015) (finding that the master-in-equity in a foreclosure case abused his discretion in admitting lay witness testimony on damages because "[h]is testimony . . . was offered to prove the truth of the statements and was hearsay" to which no hearsay exception applied).

Moreover, these estimates are not credible and should be rejected.  The Executive Director for Student Support Services, Lisa Allison, described her attempt to gather this information as "trying to poll [these employees] informally."  Ex. 20 (June 20, 2025 Allison Dep.) 170:9–171:9. Allison did not have any notes of these conversations and has no documents that reflect what Charleston's employees told her about these time estimates.  *Id.* at 176:12–22.  And all of these conversations on which her estimates were based occurred after the lawsuit was filed during "the course of the litigation." *Id.* at 227:15–228:8; *see also id.* at 228:9–229:2 (testifying that it was "definitely fair" to say that her conversations with District employees, where the employees quantified the amount of time spent addressing social media concerns, "were all after the lawsuit had been filed").  Likewise, Superintendent Anita Huggins admitted that her estimates were gathered "anecdotally in conversations with all principals," and that she failed to name any particular principals to whom she spoke about these estimates.  Ex. 12 (May 13, 2025 Huggins Dep.) 111:17–112:21.

The South Carolina Court of Appeals' decision in *Bowers v. Bowers* is instructive.  561 S.E.2d 610 (S.C. Ct. App. 2002).  There, in an equitable distribution proceeding, the court reversed the lower court's valuation of a martial home that was based on a married woman's "guesstimate based on just some conversation [she] had with Prudential Company." *Id.* at 614–15. The court determined that her valuation was based not on her personal knowledge regarding the home's true value, but instead was "bottomed and premised entirely upon the unsupported and unsubstantiated advice of an unknown third party." *Id.* at 614.  Thus, the court held that the wife's valuation was speculative, it being based on her "parroting of an unknown third party's valuation of the home" and not supported by evidence.  *Id.* at 615.  Charleston likewise relies solely on speculative estimates in these two affidavits, and those estimates are based wholly on hearsay.

Because there is neither admissible nor non-speculative evidence as to the amount of time actually lost, Charleston failed to meet its burden, and summary judgment in Defendants' favor is warranted.  *Gray*, 183 S.E.2d at 444 ("Neither the existence, causation nor amount of damages can be left to conjecture, guess or speculation."); *see also* Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony.

### 2. Charleston Has No Competent Evidence That It Incurred Out-of-Pocket Costs Because of Defendants' Platforms.

Charleston fares no better in its attempt to justify its damages for alleged out-of-pocket costs—*i.e.* new mental health personnel or third-party vendor costs.  There is no evidence that any of these costs were the result of Defendants' actionable conduct.

#### a) Charleston has no evidence that it hired new mental health personnel because of Defendants' platforms.

Charleston vaguely claims that it hired new mental health personnel as a result of Defendants' platforms.  *See* Ex. 30 (Pl.'s First Suppl. Answers to Defs.' Interrogatories to Charleston County School District (Set 3) (Apr. 23, 2025) ("Charleston Apr. 23, 2025 Interrog. Resps.")) at 5 (listing "Increased Hiring" as an undifferentiated subcategory of "Teacher/Staff/Administrative Costs"); Master Compl. ¶ 212 (listing "Hiring additional counselors, staff, and personnel" as a cost); Ex. 31 (30(b)(6) Deposition of Chief Financial Officer

30

1  Daniel Prentice ("Prentice 30(b)(6) Dep.")) 96:6–97:21 (testifying that the District has hired

2  additional staff for mental health issues, but "acknowledg[ing] that there are lots of reasons why

3  students have mental health issues" and "lots of reasons why students are distracted or disruptive

4  in class" that have "nothing to do with social media").  But none of Charleston's experts that

5  quantify past damages quantify the amount Charleston has paid for new hires it claims were

6  necessary due to Defendants' platforms.  *See generally* Ex. 21 (Meyers Rep.); Ex. 16 (Sec. Am.

7  Ward Rep.).  Charleston therefore has not identified competent evidence of additional expenses it

8  incurred to hire any new mental health personnel because of students' use of Defendants' platforms.

9  *See Baughman*, 410 S.E.2d at 546 (finding "bald allegations" in depositions and interrogatories are

10  insufficient to create a genuine issue of fact where there is a "total absence of any competent

11  evidence showing either the existence or the amount of damage . . . or that any such damage was

12  proximately caused by the acts of [defendant]" (citation omitted)).

13          **b)**     **Charleston has insufficient evidence that it implemented new**
                     **programs or purchased other items because of Defendants'**
14                    **platforms.**

15          Charleston seeks $1,003,400 in damages for out-of-pocket costs paid for: Yondr pouches to

16  prevent its students from accessing their phones while at school, and third-party training and mental

17  health programming costs.  *See* Ex. 21 (Meyers Rep.) ¶¶ 1, 23, App. C.  But Charleston failed to

18  produce evidence that Defendants' at-issue conduct caused Charleston to incur the expenses for

19  these programs.

20          *First*, Charleston seeks as damages from Defendants 100% of the $273,953 it paid to

21  purchase Yondr pouches in a few of its schools.  Ex. 21 (Meyers Rep.) ¶ 20, App. C; *see also* Ex.

22  10 (Nawrocki Dep.) 103:15–104:21 (testifying that five District schools and one charter school

23  have implemented the pouches).  But Charleston purchased Yondr pouches to keep students from

24  accessing their phones *generally*, not just Defendants' platforms.  Given the reasons for purchasing

25  Yondr pouches go far beyond student use of Defendants' platforms, Charleston does not have

26  competent evidence of its damages as to its category.

27

28

Moreover, Charleston lacks evidence to support that 100% allocation figure. The District's expert, Jeffrey Meyers, admitted at his deposition that the affidavit he relied on to determine the "allocation percentages" for other third-party costs paid by Charleston did not include *any* percentage estimating what portion of the Yondr costs were attributable to Defendants' platforms at all. Ex. 32 (Deposition of Plaintiffs' Expert Jeffrey Meyers ("Meyers Dep.")) 326:20–329:6, 334:10–14; *see also* Ex. 17 (Allison Aff.) (containing no reference to Yondr pouches at all). Meyers said that the only document that included such a percentage for Yondr pouch expenditures was the District's discovery responses. Ex. 32 (Meyers Dep.) 334:10–335:24. And he understood this document to mean Charleston is claiming that 100% of its Yondr pouch costs are damages attributable to Defendants' at-issue conduct. *Id.* at 336:7–338:4. But the Interrogatory Response does not claim any such percentage. *See* Ex. 30 (Charleston Apr. 23, 2025 Interrog. Resps.) at 5. That discovery response lists damages for a catchall category titled "Technology/ Software/ Yondr Pouches" that (a) does not break out costs for Yondr pouches; (b) does not include any percentages at all; and (c) lists per-year figures in the multiple millions of dollars from 2016–2024, far higher than Meyers's proffered Yondr pouch costs of $273,9523 from 2021 to 2024. *Id.* This discovery response does not support the claimed damages for Yondr pouches.

*Second*, Charleston seeks to recover, as attributable to the effects of "social media" generally, various training, programming, and curriculum costs: 7% of what it paid to the Flippen Group for the Capturing Kids' Hearts program (from 2015–2024); 20% of what it paid to Panorama Education for a social emotional learning and climate data platform (2016–2025); 40% of what it paid to the International Institute for Restorative Practices for restorative practices training and coaching provided to its employees (2017–2025); 35% of what it paid to the Committee for Children for the Second Step social emotional learning curricula (2016–2024); 40% of what it paid to Restorative Resolutions for educational training services, coaching support, and consulting services (2021–2024); 40% of what it paid Restorative Coaching for professional development for staff (2023–2024); and 80% of what it (a) paid the Social Emotional Learning Alliance for South

Carolina for licensing the film "Screenagers," and (b) paid for hosting panel discussions about this film (2024). *See* Ex. 17 (Allison Aff.) ¶¶ 21–31; *see also* Ex. 21 (Meyers Rep.) ¶¶ 21–22, App. C.

The only evidence that these percentages are attributable to the impact of "social media" is a single statement from the affidavit of Charleston's Executive Director of Student Support Services, Lisa Allison, asserting that the allocation percentages for those payments are "attributable to social media's impacts on [Charleston] and efforts to mitigate these impacts." Ex. 17 (Allison Aff.) ¶¶ 21–31 (repeating that same phrase for each cost item). When asked at her deposition how she arrived at these estimates, this employee admitted that she did not rely on documents or data to support those figures, and instead "just tried to . . . think about the bucket [of work for that program] that *might* be specifically related to impact of social media." Ex. 20 (June 20, 2025 Allison Dep.) 200:11–201:23 (emphasis added), *see also id.* at 201:24–220:22. These conjured-up percentages, which are admittedly not based on documents or data, are exactly the type of self-serving, speculative affidavit that is insufficient to defeat summary judgment. *See Cleveland v. Groceryworks.com, LLC*, 200 F. Supp. 3d 924, 937 (N.D. Cal. 2016) ("Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment."); *Japan Telecom, Inc. v. Japan Telecom Am. Inc.*, 287 F.3d 866, 875 n.1 (9th Cir. 2002) (noting that declarant "statements [that] lack foundation and constitute hearsay" are accorded "no weight" when considering a motion for summary judgment, and affirming the trial court's grant of summary judgment in favor of defendants).

Even if Charleston could show that Defendants' platforms were one of the many considerations by the District in incurring these costs, Charleston makes no showing that these costs were incurred as a result of the *features* of Defendants' platforms to which this litigation is limited. This is an improper attempt to circumvent the Court's ruling that liability may not be based on harms flowing from content published on Defendants' platforms, third-party wrongdoing, or Defendants' protected publishing activities. *See supra* Section IV.A. But Charleston has not shown that it incurred these costs as a result of Defendant's actionable conduct. Likewise, Ms. Allison made no attempt to distinguish among different social media platforms in her affidavit. *See*

*generally* Ex. 17 (Allison Aff.).  Charleston cannot recover costs allegedly incurred in dealing with "social media" generally.  *See McKnight*, 684 S.E.2d at 569 ("When the cause of a plaintiff's injury may be as reasonably attributed to an act for which the defendant is not liable as to one for which he is liable, the plaintiff has failed to carry the burden of establishing the defendant's conduct proximately caused his injuries.").

Charleston has therefore adduced no competent evidence that would "enable the court or jury to determine the amount [of out of pocket damages] with reasonable certainty or accuracy." *Gray*, 183 S.E.2d at 444.

### 3. Charleston Cannot Recover for Property Damage That Results from Third-Party Acts.

Charleston has previously claimed that it suffered property damage as a result of Defendants' platforms, *see* Ex. 30 (Charleston Apr. 23, 2025 Interrog. Resps.) at 5, but its experts have not purported to calculate the amounts Charleston has purportedly spent to address such property damage, Ex. 21 (Meyers Rep.) at App. C.  In addition, Defendants served discovery requesting specific information about the alleged costs incurred by Plaintiff as a result of claimed property damage, *see* Ex. 33 (Defs.' Interrogatories to Charleston County School District (Set 3) (Dec. 18, 2024)) at 2, and Charleston did not identify any specific costs in their discovery responses or their document productions.  *See generally* Ex. 30 (Charleston Apr. 23, 2025 Interrog. Resps.).

The only potential evidence Charleston has put forth calculating any such damage is the testimony of its corporate representative, who claimed that Charleston spent $100,000 on the cost of repairing damage to a bathroom caused by students flushing vapes down toilets to avoid getting caught vaping.  *See* Ex. 31 (Prentice 30(b)(6) Dep.) 30:19–32:10, 90:24–91:16.  Charleston testified that the basis for Defendants' alleged responsibility is students' use of Snapchat or Facebook Messenger to arrange meet-ups to vape in bathrooms.  *Id.* at 30:19–32:10.  The District's testimony was that the Defendants' platforms were "being a conduit to the damage that occurred in the [school] facility."  *Id.* at 89:21–90:3.  This evidence does not show Charleston's incidents of property damage fit within the narrow categories identified in the Court's order.

1    This damage was indisputably caused by third-party acts—vandalism by students. As

2    explained above, the Court precluded Charleston from recovering for such conduct unless it could

3    show that Defendants promoted the third party content, such as by creating a filter to facilitate the

4    challenge or paying participants cash prizes. SD Order at 25. Charleston has no evidence that

5    Defendants have engaged in such conduct, *see supra* Section IV.A, and so cannot recover this

6    category of damages.

7    **C.    Charleston's Proposed 15-Year "Strategic Plan" Is Not Cognizable as "Future Damages."**

8

9    Charleston seeks as "future damages" the payment of over *one billion dollars* to implement

10   a voluntary 15-year "strategic plan," authored by Charleston's expert Dr. Sharon Hoover, to address

11   anticipated student wellbeing and learning issues in the future. *See generally* Ex. 22 (Am. Hoover

12   Rep.); *see also* Ex. 30 (Charleston Apr. 23, 2025 Interrog. Resps.) at 6. The plan's recommended

13   staffing levels have no relationship to the number of students using Defendants' platforms in

14   Charleston or the amount of time they spend on the platforms. Nor is the plan tied to addressing

15   mental health issues allegedly resulting only from Defendants' platforms: the plan's

16   recommendations are divorced from any attempt to estimate the level of alleged harm *from*

17   *Defendants' platforms* to Charleston or its students. Instead, the plan applies to *all* students

18   *regardless* of whether they use Defendants' platforms. For example, the plan recommends hiring

19   and training *1,087* new employees to provide, among other things:

20   • Digital literacy education for students to teach "healthy boundaries with technology;"

21   • "Life skills programming" to teach students "empathy, emotion regulation, [and]

22   navigating social media pressure;";

23   • "Mental health literacy" to educate students, educators, and families about mental health

24   challenges, not just those limited to use of Defendants' platforms;

25   • Anti-cyberbullying programming;

26   • "Digital detox challenges" to develop healthier relationships with screens and technology

27   in general;

28

- Promotion of in-person social activities such as clubs and community events to encourage belonging; and

- "Intensive mental health treatment" for students allegedly suffering from psychological effects of social media and other causes.

*See* Ex. 22 (Am. Hoover Rep.) ¶¶ 58–72.  In short, the plan is a $1 billion attempt to solve resource and funding problems that long pre-date and have nothing to do with Defendants' platforms.

Charleston's strategic plan is not a proper remedy.  Charleston cannot recover the strategic plan as equitable relief because it has no nuisance claim.  SD Nuisance Order at 7, 9.  And Charleston's strategic plan is not recoverable as future damages for its negligence claim because the plan's 15 years of expenditures do not compensate Charleston for money that Charleston will, with reasonable certainty, have to spend in the future.  Even if the plan qualified as permissible future damages, the largest component of the strategic plan—the funding of mental health treatment for students—is impermissibly derivative of alleged injuries to students.

### 1.    The Costs of the Strategic Plan Are Not Recoverable As Future Damages.

Under South Carolina law, future damages are generally recoverable as long as "the damages are reasonably certain to result in the future from *the injury*."  *Wilder v. Blue Ribbon Taxicab Corp.*, 719 S.E.2d 703, 708 (S.C. Ct. App. 2011) (per curiam) (emphasis added) (citing *Haltiwanger v. Barr*, 186 S.E.2d 819, 821 (S.C. 1972)).  Charleston contends that its injuries are the distinct financial injuries of "having to expend, divert and increase their limited resources to address the ongoing youth mental health crisis."  Master Compl. ¶ 1026; *see also id.* at ¶ 996; SD Order at 19–20.  Charleston has steadfastly disclaimed that its injuries are the mental health and educational harms that students are allegedly experiencing because of Defendants' platform features.[7]

---

[7] *See* ECF No. 668, Pls.' Opp'n Defs.' Mot. Dismiss, at 40–41 ("The injury pled by the School Districts—including the need to (i) hire additional personnel to address students' mental, emotional, and social health issues; and (ii) divert resources to address behavioral and disciplinary issues and educate staff, students, and members of the public about the harms of Defendants' platforms and

36

1    Charleston cannot recover the costs of Dr. Hoover's plan as future damages because even

2    if purely financial damages were compensable in tort, Charleston cannot show that it reasonably

3    expects *to have to make* these expenditures over the next 15 years as a result of Defendants'

4    actionable conduct. *See Wilder*, 719 S.E.2d at 708. A suggestion of expenditures for a novel set

5    of optional, recommended programs that might be made only if a plaintiff receives a large monetary

6    award in a lawsuit is not the type of "reasonably certain" future damage that is recoverable in South

7    Carolina. *J & W Corp. v. Broad Creek Marina, LLC*, 896 S.E.2d 328, 349 (S.C. Ct. App. 2023)

8    ("[I]n order for damages to be recoverable, the evidence should be such as to enable the court or

9    jury to determine the amount thereof with reasonable certainty or accuracy." (quoting *Whisenant*

10   *v. James Island Corp.*, 281 S.E.2d 794, 796 (S.C. 1981))); *see also id.* ("[N]either the existence,

11   causation nor amount of damages can be left to conjecture, guess or speculation[.]" (quoting

12   *Whisenant*, 281 S.E.2d at 796)).

13   The plan is not tied to the past damages that Charleston seeks. Rather, on a per-year basis,

14   the costs of Dr. Hoover's plan are *ten times* the value of Charleston's alleged past "damages."

15   Charleston claims that, from 2015 to 2024, it has been injured in the amount of $1 million for out-

16   of-pocket costs for internet content filters and $93.5 million in "lost" staff time. *See supra* Section

17   IV.B; Ex. 16 (Sec. Am. Ward Rep.) ¶ 1; Ex. 21 (Meyers Rep.) at App. C. Charleston's purported

18   past damages are therefore approximately $10.5 million per year. Charleston claims the value of

19   its strategic plan will cost $1.3 to $1.8 *billion* over 15 years, a cost of $86.6 to $120 million per

20   year. *See* Ex. 23 (Sec. Am. Leslie Rep.) ¶ 3. The plan is instead a separate, *recommended* expense

21   that the District *could*, but does not have to, expend. Charleston has presented no competent

22   evidence that it is required to hire the personnel or institute the programs recommended by Dr.

23   Hoover's plan. Charleston has not instituted Dr. Hoover's plan; it is under no obligation to do so,

24   and absent a recovery of money from Defendants in this lawsuit, Charleston will *not* institute the

25   plan or incur the associated costs. Charleston has not presented competent evidence that it will

26

27   ─────────────────

address property damage—is manifestly different in kind than the personal injury harms suffered

28   by the users of Defendants' platforms and the harm to the public at large.").

1    succeed in hiring the personnel or instituting the programs recommended by Dr. Hoover's plan.

2    Indeed, to date, Charleston has not even identified social media as a problem in its strategic plans.

3    *See* Ex. 34 (Charleston County School District, Strategic Plan, https://www.ccsdschools.com/

4    about-us/strategic-plan) (omitting not identifying social media as a problem).  And while Dr.

5    Hoover testified that the plan constitutes "best practices," Ex. 25 (Aug. 13, 2025 Hoover Dep.)

6    605:23–607:16, no public school district in the country has ever implemented this type of

7    comprehensive plan, *id.* at 806:16–807:6, and there is no professional organization that has

8    suggested that a plan of this nature is necessary or advisable to address student use of social media

9    in general, much less just Defendants' platforms, *id.* at 612:7–23.

10                    **2.    Charleston's Strategic Plan Is Impermissibly Derivative.**

11            As discussed above, funding for the strategic plan is not compensation for direct and distinct

12   expenditures that Charleston has been forced to make or will be forced to make as a result of

13   Defendants' alleged tortious conduct.  Instead, the plan is about developing discretionary programs

14   to educate, treat, and support students for their alleged injuries.  Paying for treatment of others'

15   injuries is the type of classic derivative injury for which recovery is not available.  *See Ass'n of*

16   *Wash. Public Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001)

17   (rejecting public hospital districts' attempt to recover costs for treating patients suffering from

18   tobacco-related illnesses).

19            At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on

20   the basis that their alleged harms are impermissibly derivative of students' alleged harms.  SD

21   Order at 21.  The Court's reasoning was based on allegations that the School Districts had been

22   directly injured because "they *have had to* hire mental health personnel and develop further mental

23   health resources to mitigate the negative in-school consequences of their students' . . . use of

24   defendants' platforms" and because "the school districts appear to seek *recovery of unique*

25   *damages*."  *Id.* at 19–21 (emphases added).  The record evidence now demonstrates that Charleston

26   does not seek recovery for those types of injuries, but to institute a sweeping plan for the benefit of

27   students that it will not otherwise implement or be forced to implement.  Thus, even if funding for

28

1    the strategic plan were the type of legally cognizable damages or abatement that Charleston could

2    recover, any recovery would be for derivative injuries.

3        **D.    The Court Should Grant Summary Judgment on Charleston's Failure-to-Warn Claim.**

4

5        Charleston contends that "Defendants failed to adequately warn [Charleston] about the

6    physical and mental health risks posed by their platforms and the increased resources that

7    [Charleston] would need to expend to address the youth mental health crisis Defendants caused."

8    Master Compl. ¶ 1034.  But Defendants do not owe a duty to provide warnings to a school district

9    that its students' use of Defendants' platforms may cause financial harm to the District, and

10   Defendants are entitled to summary judgment on Charleston's failure-to-warn claim.[8]  Even if there

11   were a duty to warn school districts, Charleston's claims fail for lack of evidence: Charleston has

12   adduced no evidence of what a warning to school districts should have said, to whom or how it

13   should have been made, or that any warning would have reduced Charleston's alleged damages.

14       And to the extent that Charleston contends that Defendants owed a tort duty *running to*

15   *Charleston* to provide warnings *to its students* (or their parents), its claim likewise fails.

16           **1.    Defendants Do Not Owe Charleston a Duty to Warn the District Directly.**

17

18       The District advances a novel theory on its failure-to-warn claim: it alleges that Defendants

19   had a duty to provide a warning to school districts—distinct from the warnings that allegedly should

20   have been provided to student users and parents—that student use of the platforms could cause

21   harm to those students, which might, in turn, cause the school district to expend additional resources

22

---

23   [8] Defendants also contend that they are entitled to summary judgment on Charleston's failure-to-warn claim that arises from third-party content or protected publishing activities for the threshold

24   reason that they are barred by Section 230.  *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025) (barring claim "that Grindr had a duty to warn Doe about the risks of child sexual exploitation

25   on the App."); *Est. of Bride ex rel. Bride v. Yolo Technologies, Inc*., 112 F. 4th 1168, 1179–80 (9th Cir. 2024) (barring failure to warn claim challenging anonymity feature of app that faulted app "for

26   not mitigating, in some way, the harmful effects of the harassing and bullying content" through anonymity feature).  Per the Court's instructions given the pending appeal by Meta and TikTok,

27   Defendants reserve their right to challenge Charleston's failure-to-warn claims as being barred by Section 230 at a later time.

28

39

in responding to the harms to the students.  Master Compl. ¶¶ 1034, 1036.  Defendants are not aware of any case in any jurisdiction that has held there is a duty to warn a non-user of a product that others' use of that product may cause financial injury to the plaintiff.  Such a rule would lead to an absurd result—*e.g.*, alcohol companies would need to warn landlords that their tenants might damage property while under the influence of alcohol, and tobacco companies would need to warn employers that they might need to pay increased healthcare costs for employees who smoke.

Even in cases involving *physical* injuries, courts have held that a defendant has no duty to warn third parties that they might become indirectly injured by a defendant's alleged negligence. *See, e.g.*, *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 643, 645–46 (Ga. 2016) (finding manufacturer of a facility's "asbestos-laden water pipes" did not have a duty to warn plaintiff of the dangers of asbestos dust where she claimed she developed mesothelioma from laundering the asbestos-dust-covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of coronavirus at work).  If there is no duty to warn a third party that a product might cause physical injury, then there is certainly no duty to warn a third party that the use of the product could cause downstream financial injuries.

While Defendants acknowledge that the Court previously held that Defendants owe a general duty of care to school districts, they respectfully submit that the Court's analysis does not support finding a duty to provide a warning directly to school districts about potential financial harms resulting from student use.  None of the cases relied on by the Court in its prior rulings contemplate a duty to warn third parties that someone else may use the defendant's product or service, become injured, and thereby cause downstream economic consequences to the third party.[9] Recognizing such broad duties "would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by" the user's use of the product or service. *Gourdine v. Crews*, 955 A.2d 769, 786 (Md. 2008).

---

[9] *See* SD Order at 27–34.

### 2.      Charleston Lacks Evidence Supporting Its Failure to Warn Claim.

Even if Defendants owed Charleston a duty to warn, the claim still fails.[10]  A plaintiff asserting a failure to warn claim must show "that the inadequate warnings caused her injuries." *Hickerson v. Yamaha Motor Corp., U.S.A.*, 2016 WL 4367141, at *5 (D.S.C. Aug. 16, 2016).  The plaintiff also "has the burden of showing that a warning would have made a difference in the conduct of the person warned."  *Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354, 359 (S.C. Ct. App. 1998) (citing 63A Am. Jur. 2d *Products Liability* § 1240 (1997)).  In the circumstances at issue here, where the adequacy and efficacy of a warning to a school district about alleged financial consequences from student use of online platforms "are not within the common knowledge of jurors, . . . . expert testimony is necessary to support [Charleston's] warning defects claim." *Nelson v. Am. Honda Motor Co.*, 2021 WL 2877919, at *8 (W.D. Pa. May 17, 2021).  Yet none of Plaintiff's experts opined that Defendants should have warned school districts (as opposed to users and parents), save for one isolated statement that "parents, children and the public (including schools) [should] be fully informed about the risks and harms the platforms present."  Ex. 35 (Expert Report of Tim Estes ("Estes Rep.")) ¶ 316.

Nor has Charleston offered any evidence (fact or expert) of what a warning to school districts should have looked like or how it should have been implemented.  Specifically, there is no evidence of *who* in the districts should have received the warning, *what* it should have said, *when* it should have been provided, or *where* and *how* the warning should have been communicated. These are all significant questions given that the allegation is that a warning should be provided to entities that may not themselves be users of or have any interaction with the platforms.  Because the record is silent on each point, Charleston has not met its burden of proof.

Perhaps most critically, Charleston has not offered any evidence (fact or expert) that a warning directly to the District would have reduced its alleged harms or damages.  There is no evidence that, in the face of such a warning, Charleston itself would have further restricted access to Defendants' platforms by students.  The only record evidence is to the contrary: it continues to

---

[10] The Court already held that any duty to warn is limited by Section 230 to warnings about platform *features* and *designs*.  *See* SD Order at 34.

allow students to access those platforms even now, years after filing suit. Charleston also continues to maintain accounts on Defendants' platforms to engage with its community. *See* Ex. 12 (May 13, 2025 Huggins Dep.) 132:21–135:12 (explaining that the District has a YouTube, Instagram, and Facebook account, that the Associate of Communications is responsible for "manag[ing] the social media platforms," and that she "forward[s] photos or content that might be appropriate" to post).[11] In the case of YouTube, Charleston affirmatively allows students to access the platform on district-issued devices on the district network for schoolwork. *See* Ex. 12 (May 13, 2025 Huggins Dep.) 147:24–148:10. There certainly is no evidence that a warning to *the School District* would have caused any *student* to use Defendants' platforms less and thereby avoid the alleged harms of addiction and mental health problems in the first place, much less that *a sufficient number of students* would have used the platforms less and experienced such fewer harms that Charleston would have had to expend materially fewer resources in responding to the alleged youth mental health crisis in the District.[12]

### 3. Charleston Cannot Assert a Claim that Defendants Failed To Warn Students.

To the extent that Charleston is claiming that Defendants had a duty running to the District based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Compl. ¶ 265, Defendants are also entitled to summary judgment.[13]

On this point, *Gourdine v. Crews*, 955 A.2d 769 (Md. 2008) is instructive. There, the plaintiff sued a pharmaceutical manufacturer after a driver suffering adverse effects from the

---

[11] Charleston instituted a ban on cell phone usage during the school day by students but only after the State of South Carolina required it to do so. *See* Ex. 36 (May 13, 2025 30(b)(6) Deposition of Superintendent Anita Huggins ("Huggins 30(b)(6) Dep.")) 33:8–13, 40:4–15, 48:6–15. Charleston itself did not choose to institute the ban to reduce student access to Defendants' platforms. *See id*. at 38:20–40:11.

[12] As explained in *supra* Section IV.A, Charleston lacks data permitting it to isolate the alleged harms caused by *any* factor—let alone from an alleged failure to warn it about potential downstream financial harms resulting from students' use of Defendants' platforms.

[13] Charleston does not purport to bring representative claims on behalf of its students or their families. Nor could it. *See* ECF No. 601, Defs.' Mot. to Dismiss the School District and Local Government Entities' Master Compl., at 44–45, nn. 34 & 40.

1  defendant's medications struck and killed plaintiff's husband.  The plaintiff acknowledged that the

2  manufacturer did not owe a duty to provide warnings directly to her husband.  Instead, she sought

3  to recover for injuries flowing from the manufacturer's failure to provide adequate warnings to the

4  users of its medications.  The court rejected that effort, holding that even if the warnings provided

5  to users were inadequate and automobile accidents were a foreseeable result of the inadequate

6  warnings, the manufacturer did not owe a duty to warn users running to and enforceable by potential

7  secondary victims like plaintiff's husband.  As the court explained, "there was no direct connection

8  between [the manufacturer's] warnings, or the alleged lack thereof, and [plaintiff's husband's]

9  injury.  In fact, there was no contact between [the manufacturer] and [plaintiff's husband]

10  whatsoever." *Id.* at 750.

11      The same is true of Charleston.  It does not claim harm as a direct user of Defendants'

12  platforms, but as a secondary victim of Defendants' alleged failure to warn users that they could

13  become addicted or suffer mental health harms from use of Defendants' platforms.  Imposition of

14  a duty to warn users of Defendants' platforms that runs from Defendants to school districts is thus

15  unwarranted and unsupported.  *Id.*; *see also Doe v. Pharmacia & Upjohn Co.*, 879 A.2d 1088,

16  1096–97 (2005) (finding that an employer had no duty running to employee's wife to warn

17  employee of the risk of HIV infection even though employer knew employee was exposed to HIV

18  in his work and that he was married); *Quiroz v. ACLOA Inc.*, 243 Ariz. 560, 563 (2018) (holding

19  that manufacturer did not have duty to warn employee of risk that employee might expose his son

20  to secondary asbestos).

21      **E.    The Court Should Grant Summary Judgment for the Non-Operating Meta**
        **Defendants Not Even Arguably Involved in Any Alleged Injuries.**

22

23      SD Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section,

24  "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible

25  for the development and operation of Facebook and Instagram.  *See* Ex. 37 (Meta Defendants'

26  Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question ("DWQ"))

27  at 21–22, 25.  The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc.,

28  Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC

43

1   f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-

2   Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram.  *See id.*

3        Summary judgment should therefore be awarded to the Non-Operating Defendants for the

4   additional reason that they had no involvement in Plaintiff's alleged injuries.  "As a general matter,

5   corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely

6   have legal independence from each other and each can only be held liable for its own acts or

7   omissions."  *Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *14 (N.D. Cal.

8   Oct. 5, 2020) (surveying California and Delaware law); *see Baker v. Equitable Leasing Corp.*, 275

9   S.C. 359, 367 (1980) ("different legal corporations usually are regarded as distinct legal entities"

10  (cleaned up)).[14]  And to sustain its claims, Charleston must prove that each Defendant caused it

11  harm.  *See supra* Section IV.A.  But Charleston has no evidence by which to do so.  Indeed, the

12  evidence shows that the Non-Operating Defendants engage in activities wholly unrelated to the

13  school districts' claims, namely:  "payment processing" (Facebook Payments Inc); "operat[ing] . .

14  . data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "holding certain Instagram

15  intellectual property" (Instagram, LLC).  Ex. 37 (DWQ) at 21–22, 25. For this additional reason,

16  the Non-Operating Defendants are all entitled to summary judgment.

17                                    **CONCLUSION**

18       Defendants seek entry of summary judgment in their favor on all causes of action that

19  Charleston asserts against Defendants or, in the alternative, partial summary judgment as to

20  Charleston's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

21

22

23

24

25

26  ───────────────

27  [14] Because this outcome is required under the laws of all three states potentially at issue, Meta
    does not apply a choice-of-law analysis or take a position on which state's law applies to this
    question.

28

1    Dated:  September 30, 2025                        Respectfully submitted,

2                                                       By:    /s/ Ashley W. Hardin
                                                               JOSEPH G. PETROSINELLI, *pro hac vice*
3                                                              jpetrosinelli@wc.com
                                                               ASHLEY W. HARDIN, *pro hac vice*
4                                                              ahardin@wc.com
                                                               J. ANDREW KEYES, *pro hac vice*
5                                                              akeyes@wc.com
                                                               NEELUM J. WADHWANI (SBN 247948)
6                                                              nwadhwani@wc.com
                                                               WILLIAMS & CONNOLLY LLP
7                                                              680 Maine Avenue, SW
                                                               Washington, DC 20024
8                                                              Tel.: (202) 434-5000

9                                                              *Attorneys for Defendants YouTube, LLC
                                                               and Google LLC*
10

11                                                             /s/ Christian Pistilli
                                                               Ashley M. Simonsen (Bar No. 275203)
12                                                             COVINGTON & BURLING LLP
                                                               1999 Avenue of the Stars
13                                                             Los Angeles, California 90067
                                                               Telephone: (424) 332-4800
14                                                             Facsimile: (424) 332-4749
                                                               Email: asimonsen@cov.com
15

16                                                             Phyllis A. Jones (*pro hac vice*)
                                                               Paul W. Schmidt (*pro hac vice*)
17                                                             Christian J. Pistilli (*pro hac vice*)
                                                               COVINGTON & BURLING LLP
18                                                             One City Center
                                                               850 Tenth Street, NW
19                                                             Washington, DC 20001-4956
                                                               Telephone: (202) 662-6000
20                                                             Facsimile: (202) 662-6291
                                                               Email: pajones@cov.com
21                                                             Email: pschmidt@cov.com
                                                               Email: cpistilli@cov.com
22
                                                               *Attorneys for Defendants Meta Platforms,
23                                                             Inc. f/k/a Facebook, Inc.; Facebook
                                                               Holdings, LLC; Facebook Operations,
24                                                             LLC; Meta Payments Inc. f/k/a Facebook
                                                               Payments Inc.; Meta Platforms
25                                                             Technologies, LLC f/k/a Facebook
                                                               Technologies, LLC; Instagram, LLC; and
26                                                             Siculus LLC f/k/a Siculus, Inc.*

27

28

                                            45

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*/s/ David P. Mattern*
GEOFFREY M. DRAKE, *pro hac vice*
gdrake@kslaw.com
TACARA D. HARRIS, pro hac vice
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Telephone: (404) 572-4600
Facsimile: (404) 572-5100

DAVID P. MATTERN, *pro hac vice*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737

BAILEY J. LANGNER (SBN 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Telephone: (415) 318-1200
Facsimile: (415) 318-1300

*Attorneys for Defendants TikTok Inc.,*
*ByteDance Inc., ByteDance Ltd., TikTok*
*Ltd., and TikTok, LLC*

*/s/ John J. Nolan*
ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

JONATHAN H. BLAVIN (State Bar No.
230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP

46

560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

VICTORIA A. DEGTYAREVA (State Bar
No. 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

1

## **ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

2

    I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

3

DATED:  September 30, 2025        By:    */s/ J. Andrew Keyes*

4
                                    J. Andrew Keyes
                                    *Attorney for Defendants YouTube, LLC and*

5
                                    *Google LLC*

6
                           By:    */s/ Christian J. Pistilli*

7
                                    Christian J. Pistilli
                                    *Attorney for Defendants Meta Platforms,*

8
                                    *Inc. f/k/a Facebook, Inc.; Facebook*
                                    *Holdings, LLC; Facebook Operations,*

9
                                    *LLC; Meta Payments Inc. f/k/a Facebook*
                                    *Payments Inc.; Meta Platforms*

10
                                    *Technologies, LLC f/k/a Facebook*
                                    *Technologies, LLC; Instagram, LLC; and*

11
                                    *Siculus LLC f/k/a Siculus, Inc.*

12
                           By:    */s/ David P. Mattern*

13
                                    David P. Mattern
                                    *Attorney for Defendants TikTok Inc.,*

14
                                    *ByteDance Inc., ByteDance Ltd., TikTok*
                                    *Ltd., and TikTok, LLC*

15
                           By:    */s/ John J. Nolan*

16
                                    John J. Nolan
                                    *Attorney for Defendant Snap Inc.*

17

18

19

## **ATTESTATION PURSUANT TO LOCAL RULE 5-1**

20

    I, Ashely W. Hardin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the

21

concurrence to the filing of this document has been obtained from each signatory hereto.

22

DATED:  September 30, 2025        By:    */s/ Ashley W. Hardin*

23
                                    Ashley W. Hardin

24

25

26

27

28

48