ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

*Attorneys for Defendant Snap Inc.*

*[Additional parties and counsel listed on signature pages]*

## UNITED STATES DISTRICT COURT

### FOR THE NORTHERN DISTRICT OF CALIFORNIA

#### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*Irvington Public Schools v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case No.: 4:23-cv-01467-YGR<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT (IRVINGTON) (SD MSJ No. 4)**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT

PLEASE TAKE NOTICE THAT, at 8:00 AM on January 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendants will and hereby do move this Court, under Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Defendants on all claims by Plaintiff Irvington Public Schools.  This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, including the accompanying Declaration of John J. Nolan and the exhibits thereto, and any other matters presented at the time of the hearing.

## STATEMENT OF RELIEF SOUGHT

Defendants seek entry of summary judgment in their favor on all causes of action that Irvington Public Schools asserts against Defendants or, in the alternative, partial summary judgment as to Irvington's claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

DATED:  September 30, 2025

Respectfully submitted,

By:    _/s/ John J. Nolan_

ALLISON BROWN, *pro hac vice*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268 5000

JESSICA DAVIDSON, *pro hac vice*
jessica.davidson@kirkland.com
JOHN J. NOLAN, *pro hac vice*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446 4800

*Attorneys for Defendant Snap Inc.*

*[Additional parties and counsel listed on signature pages]*

## **TABLE OF CONTENTS**

I.      Introduction ................................................................................................1

II.     Background .................................................................................................3

        A.      Irvington Public Schools ................................................................3

        B.      Irvington's Lack of Evidence .........................................................4

        C.      Irvington's Theory of Damages ......................................................6

        D.      Irvington's Proposed "Strategic Plan" ...........................................9

        E.      The Court's Motion-to-Dismiss Ruling ........................................10

III.    Legal Standard ...........................................................................................12

IV.     Argument ...................................................................................................13

        A.      Irvington Lacks Competent Evidence of Causation. ...................13

                1.      Irvington's Allegations of Specific Harms All Impermissibly Rely on
                        Third-Party Content and Protected Publishing Activities. .........................15

                2.      Irvington Has No Competent Evidence of Mental Health Harms Tied
                        to Any Defendant's Specific Platform. .......................................17

        B.      Irvington Cannot Show It Is Entitled to Past Damages. ........................21

                1.      Irvington Cannot Show Defendants Caused It to Divert Financial
                        Resources. .....................................................................22

                2.      Irvington Has No Competent Evidence that It Incurred Specific
                        Additional Costs Because of Defendants' Platforms ................................26

        C.      Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy
                Under the Law. ...............................................................28

                1.      The Costs of the Strategic Plan Are Not Recoverable as Future
                        Damages. ......................................................................29

                2.      Irvington's Strategic Plan Is Impermissibly Derivative. ...........................30

        D.      Defendants Are Entitled to Summary Judgment on Irvington's Failure-to-
                Warn Claim. ...................................................................31

                1.      Defendants Do Not Owe Irvington a Duty to Warn the District
                        Directly. .......................................................................32

                2.      Irvington Lacks Evidence Supporting Its Failure-to-Warn Claim. .............33

ii

3.    Irvington Cannot Assert a Claim that Defendants Failed to Warn Students.................................................................................................35

E.    The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries.......................36

F.    The Court Should Confirm Irvington Has No Claims Against Mark Zuckerberg .................................................................................................37

**V.    Conclusion .................................................................................................39**

# TABLE OF AUTHORITIES

**Cases**                                                                **Page(s)**

*1410 Grand Adams, LLC v. Trematore Constr., LLC*,
2025 WL 1742859 (N.J. Super. Ct. App. Div. June 24, 2025) .................................21

*Alexander v. Cheaster*,
110 N.J.L. 95, 164 A. 287 (N.J. 1933) ...........................................................22

*Ass'n of Wash. Public Hosp. Dists. v. Philip Morris Inc.*,
241 F.3d 696 (9th Cir. 2001) .......................................................................30

*Battaglia v. United Parcel Serv., Inc.*,
70 A.3d 602 (N.J. 2013)..............................................................................29

*Block v. City of Los Angeles*,
253 F.3d 410 (9th Cir. 2001) .......................................................................25

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
112 F.4th 1168 (9th Cir. 2024) .............................................................16, 31

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209 (1993)...................................................................................25

*Caldwell v. Haynes*,
643 A.2d 564 (N.J. 1993)......................................................................21, 22

*Caputzal v. Lindsay Co.*,
222 A.2d 513 (N.J. 1966).............................................................................13

*Certainteed Corp. v. Fletcher*,
794 S.E.2d 641 (Ga. 2016)...........................................................................32

*Coffman v. Keene Corp.*,
628 A.2d 710 (N.J. 1993).............................................................................33

*Conklin v. Hannoch Weisman*,
678 A.2d 1060 (N.J. 1996)...........................................................................13

*Crawford v. City of Bakersfield*,
944 F.3d 1070 (9th Cir. 2019) .....................................................................19

*Doe (K.B.) v. Backpage.com, LLC*,
724 F. Supp. 3d 882 (N.D. Cal. 2024) .....................................................17, 21

*Doe v. Grindr Inc.*,
709 F. Supp. 3d 1047 (C.D. Cal. 2023) ........................................................31

*Doe v. Pharmacia & Upjohn Co.*,
    879 A.2d 1088 (Md. 2005) ....................................................................................36

*Edwards Lifesciences Corp. v. St. Jude Med. Inc.*,
    2004 WL 5642457 (C.D. Cal. Apr. 2, 2004) ...........................................................25

*Endre v. Arnold*,
    692 A.2d 97, 100 (App. Div. 1997) ...................................................................38, 39

*In re Gen. Motors LLC Ignition Switch Litig.*,
    339 F. Supp. 3d 262 (S.D.N.Y. 2018)...............................................................23, 24

*Gourdine v. Crews*,
    955 A.2d 769 (Md. 2008) ...........................................................................33, 35, 36

*Gray v. Clark*,
    654 F. Supp. 3d 1062 (E.D. Cal. 2023)...................................................................19

*Grunwald v. Bronkesh*,
    621 A.2d 459 (N.J. 1993).......................................................................................21

*Henricksen v. ConocoPhillips Co.*,
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ..............................................................18

*Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs. v. Sharemax.com, Inc.*,
    334 F. Supp. 2d 620 (D.N.J. 2004) ........................................................................36

*Jackson v. Hayakawa*,
    682 F.2d 1344, 1347 (9th Cir. 1982) .....................................................................37

*Khoros, LLC v. Lenovo (United States), Inc.*,
    2020 WL 12655516 (N.D. Cal. Oct. 5, 2020)........................................................36

*Kimzey v. Yelp! Inc.*,
    836 F.3d 1263 (9th Cir. 2016) ...............................................................................16

*Kuciemba v. Victory Woodworks, Inc.*,
    531 P.3d 924 (Cal. 2023) .......................................................................................32

*Kurak v. A.P. Green Refractories Co.*,
    689 A.2d 757 (N.J. Super Ct. App. Div. 1997)........................................13, 18, 26

*Lane v. Oil Delivery, Inc.*,
    524 A.2d 405 (N.J. Super. Ct. App. Div. 1987)...................................21, 22, 24, 26, 28

*Lemmon v. Snap Inc.*,
    995 F.3d 1085 (9th Cir. 2021) ...............................................................................17

*Mauro v. Owens-Corning Fiberglas Corp.*,
    542 A.2d 16 (N.J. Super. Ct. App. Div. 1988)........................................................................29

*Mauro v. Raymark Indus., Inc.*,
    561 A.2d 257 (N.J. 1989)..............................................................................................28, 29, 30

*Morris Props., Inc. v. Wheeler*,
    300 A.3d 980 (N.J. Super. Ct. App. Div. 2023)..................................................................21

*Nelson v. Am. Honda Motor Co.*,
    2021 WL 2877919 (W.D. Penn. May 17, 2021)..................................................................34

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) ......................................................................................17, 20

*People Exp. Airlines, Inc. v. Consol. Rail Corp.*,
    495 A.2d 107 (N.J. 1985)......................................................................................................23

*M.P. ex rel. Pinckney v. Meta Platforms Inc.*,
    127 F.4th 516 (4th Cir. 2025) ..............................................................................................17

*Sharpe v. Bestop, Inc.*,
    713 A.2d 1079 (N.J. Super Ct. App. Div. 1998)............................................................33, 34

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ................................................................................................12

*Townsend v. Pierre*,
    110 A.3d 52 (N.J. 2015)..................................................................................................13, 14

*Tuzzeo v. Steele*,
    2025 WL 1734023 (N.J. Super. Ct. App. Div. June 23, 2025)............................................21

*Twitter, Inc. v. Barr*,
    445 F. Supp. 3d 295 (N.D. Cal. 2020) ............................................................................12, 39

*VFD Consulting, Inc. v. 21st Services*,
    425 F. Supp. 2d 1037 (N.D. Cal. 2006) ..............................................................................14

*Vizzoni v. B.M.D.*,
    212 A.3d 962 (N.J. Super. Ct. App. Div. 2019)..................................................................13

*In re Williams Sec. Litigation-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) ......................................................................................17, 21

*Yansomah v. Glita*,
    2008 WL 1744493 (N.J. Super. Ct. App. Div. Apr. 17, 2008)............................................21

vi

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Irvington Public Schools ("Irvington" or the "District") is an urban school district outside of Newark, New Jersey.  It serves a diverse and generally socioeconomically challenged student body, where nearly two-thirds of Irvington students are eligible for free or reduced-cost lunch, and every one of its schools receives federal funding pursuant to Title I.  Community violence, particularly gun violence, has tragically and directly affected Irvington's students.  Irvington's planning documents and administrators acknowledge that these factors affect student wellbeing, but do not mention social media as a potential issue.  Nevertheless, Irvington claims that it is owed money from Defendants to combat an alleged mental health "crisis" among its students, which it claims is due to its students' use of Defendants' platforms.  But Irvington does not even have the most basic evidence showing harms from students' use of Defendants' platforms.  Instead, discovery has shown that Irvington cannot support its allegations on its sole remaining claim of negligence, and summary judgment is warranted on a series of independent grounds.

*First*, Irvington's claim for negligence fails because it has not adduced evidence of causation.  The Court limited the scope of Irvington's claims at the pleadings stage, holding that Irvington can predicate claims only on certain actionable conduct—Defendants' use of the features that the Court concluded were not protected by Section 230 or the First Amendment or Defendants' alleged failure to warn.  By the same token, the Court made clear that Irvington cannot recover for injuries from third-party conduct, third-party content, or protected publishing activities.  But every social-media-related incident Irvington documented during discovery stemmed from third-party content and conduct, such as bullying and violence.  And Irvington has no admissible evidence that each Defendant's platform(s) caused any mental health issues among any particular students.  Indeed, Irvington lacks the most basic facts about overall social media use by its students, much less their use of Defendants' platforms.  It does not know how many students use certain platforms, how frequently its students use Defendants' platforms, what features they use or what effects particular features have on its students.  Rather, Irvington's evidence relates largely to its students' use of

cellphones or "social media" generally.  As a result, Irvington cannot establish that any one of Defendants' platforms—let alone the at-issue features of each platform—*caused* its students any harm or that Irvington incurred expenses as a result of that harm.

*Second,* Irvington failed to adduce evidence of past damages.  Irvington seeks past damages, primarily for the time its staff purportedly "lost" while addressing social media issues.  But under New Jersey law, a party seeking damages for allegedly "lost time" may only do so if such loss corresponds with a non-speculative, monetary injury.  Irvington has no competent, contemporaneous evidence proving lost time; it instead presents only retrospective, made-for-litigation affidavits and a teacher survey as "evidence" of its "lost time."  Nor has Irvington presented any competent evidence tying its few claimed out-of-pocket costs to Defendants' actionable conduct.

*Third*, Irvington's proposed 15-year, $296.1 to $417.2 million "strategic plan" is not recoverable as future damages.  Irvington fails to provide proof, as it must at this stage, that it is reasonably probable to incur these damages in the future, and, moreover, the plan is not designed to compensate Irvington for reasonably expected future expenditures.  Instead, the plan is a voluntary, unrealistic, never-before-used public health measure to tackle youth mental health problems and make up for funding shortfalls that have nothing to do with Defendants.  Moreover, the plan is derivative of students' alleged injuries as the primary purpose of the plan is to provide mental health services to students, including services such as clubs and community engagement that are not tied to social media use.

*Fourth*, Irvington has no evidence supporting the critical elements of its failure-to-warn claim.  There is no duty for Defendants to warn a District that its students' use of Defendants' platforms may cause the district financial problems.  No court has ever held that a company is required to provide a warning to a non-user of a product or service that others' use of that product or service may cause financial injury to the non-user.  Irvington also lacks evidence that it would have behaved differently if such a warning had been delivered.  Nor can Irvington assert a claim based on Defendants' alleged failure to provide warnings to third parties, such as students and their parents.

## II.    BACKGROUND

### A.    Irvington Public Schools

Irvington is a public school district located in the township of Irvington, New Jersey, an urban community bordering Newark. Irvington's 13 schools—one traditional high school, one STEAM (Science, Technology, Art, and Math) academy, two middle schools, and nine elementary schools—serve approximately ███ students. Ex. 1 (Irvington 3d Am. PFS) at Q.9–10.[1] Given that 64% of Irvington students are classified as economically disadvantaged—with that figure reaching as high as 81.1% in some schools—Irvington receives federal aid pursuant to a District-wide Title I designation. Ex. 2 (May 6, 2025 Vauss Dep. Ex. 11) at 2 (64% districtwide); Ex. 3 (Zahir Dep. Ex. 10) at 4 (81.1% at Union Avenue Middle School); Ex. 4 (Bussacco Dep.) 60:24–61:2 (Irvington is a "Title I district"). Nearly 40% of Irvington students are Multilingual Learners, which represents a significant increase in recent years. Ex. 2 (May 6, 2025 Vauss Dep. Ex. 11) at 2 (26.9% in 2021–2022 academic year to 38.6% in 2023–2024 academic year); Ex. 5 (May 6, 2025 Vauss Dep.) 180:11–181:13. Irvington currently has approximately █████████████████████ ████████████████████████. Ex. 1 (Irvington 3d Am. PFS) at Q.11–13.

For years, Irvington and its students have faced substantial challenges impacting their wellbeing, education, and daily lives. Irvington has long partnered with several outside resources to address issues such as student poverty, homelessness, drug and alcohol use, and violence. Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 125:16–133:23. Nevertheless, Irvington students have struggled with pressures of financial insecurity, food insecurity, violence, and the need to financially support their families—as well as many other issues affecting their mental health. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 243:13–252:10; Ex. 8 (BW_Irvington00463225) at -3254–55 (██████ ████████████████████████████████); *see also* Ex. 9 (May 15, 2025 Pettiford Dep.) 133:18–134:17 (homelessness among Irvington students increased due to increased unemployment during COVID-19). Violence also plagues the Irvington community.

---

[1]    All exhibit citations are to the accompanying Declaration of John J. Nolan.

Ex. 10 (May 16, 2025 Vauss 30(b)(6) Dep. Ex. 20) at 3; Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 260:4–25 (violent-crime rate more than twice the state average). Irvington students have been victims of violent crime in nearby communities as well—just this summer, one 16-year-old student was tragically and fatally shot in Newark. Ex. 11 (July 1, 2025 News Article) at 2–3. Another Irvington student ███████████████████████████████████████████████████ ███████████████████████████████ Ex. 12 (Irvington 1st Am. Suppl. PFS) at Q.11; Ex. 13 (May 16, 2025 Vauss 30(b)(6) Dep. Ex. 21) at 1–2 (describing gang member's guilty plea to RICO conspiracy in connection with murder of "rival near Irvington High School").

### B.     Irvington's Lack of Evidence

Before filing this case, Irvington never identified social media or Defendants' platforms as a District-wide problem. ██████████████████████████████████████████ ██████████████████████████████████. *See e.g.*, Ex. 14 (BW_Irvington00334437) ("██████████████████████████████████████████████████████████████████); Ex. 15 (BW_Irvington00334790) (██████████████████████); Ex. 4 (Bussacco Dep.) 65:10–14. In fact, the only substantive mention of social media in Irvington's long-term planning documents is in its multi-year District-wide technology plans, where Irvington explains that it ██████████████████████████████████████████████████████. Ex. 16 (BW_Irvington00005126) at 5135 (Irvington "████████████████████████████████████ ████████████████████" in the District's 2013–2016 "Technology Plan"); *see also* Ex. 5 (May 6, 2025 Vauss Dep.) 89:2–7, 146:8–147:13 (Irvington High School runs its own Instagram account), 158:16–159:24 (Irvington teachers use YouTube for instructional purposes).

Irvington does not collect or maintain data regarding its students' use of Defendants' platforms, or electronic devices generally. Irvington does not know how many of its students have accounts with Facebook, Instagram, TikTok, Snapchat, or YouTube. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 51:6–25; Ex. 17 (Mangan Dep.) 66:8–67:19. Irvington does not track or otherwise collect data on how much time Irvington students spend—or what they do—on their phones. *See, e.g.*, Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 88:12–17 (Irvington has no data regarding how often students are on their phones using social media versus engaging in other activities); Ex. 18

4

(May 9, 2025 Vauss Dep.) 401:2–6 (Superintendent does not know how much time District students spend on their phones or social media platforms outside of school); Ex. 17 (Mangan Dep.) 65:9–16 (same for Irvington High Principal); Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 47:13–19 (same for District), 52:1–56:14 (District's "belief" is that students spend 12 to 20 hours per day on "social media" but does not collect data on how much time students spend on Defendants' platforms or on their phones, in general). Despite Irvington's belief, it has never attempted to study what its students do on their phones or for how long they use them. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 42:7–45:14, 53:7–56:22; Ex. 1 (Irvington 3d Am. PFS) at Q.50.

Outside of litigation, Irvington conducted ███████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████████████████. Ex. 1 (Irvington 3d Am. PFS) at Q.47–50. ███████████ ███████████████████████████████████████████████████████████████████ █████████████. Ex. 1 (Irvington 3d Am. PFS) at Q.53–54. Nor has Irvington analyzed the impact, if any, of social media or Defendants' platforms on Irvington students' mental health—nor their academic outcomes, graduation rates, or suspension rates. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 66:16–67:14. Further, Irvington has no evidence that *any* student has *ever* been referred for mental health services due to social media or Defendants' platforms. Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 50:21–51:9 (discussing Ex. 12 (Irvington 1st Am. Suppl. PFS) at Q.9), 61:13–62:2 (no understanding of why students were referred for mental health services).

In fact, Irvington has no evidence of a supposed mental health "crisis" occurring within its schools. Irvington ████████████████████████████████████████████████████ ████████████████████████████████. Ex. 1 (Irvington 3d Am. PFS) at Q.47–49. ██████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ Ex. 1 (Irvington 3d Am. PFS) at Q.9 (total enrollment); Ex. 12 (Irvington 1st Am. Suppl. PFS) at Q.9 (total student mental health referrals); Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 44:1–18. Further, Irvington has no data reflecting any sort of trend in its students' mental, emotional, social,

or behavioral wellbeing tied to student social media use from 2017 through the present.  Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 60:1–61:7.

### C.    Irvington's Theory of Damages

Irvington seeks between approximately $50 million and $57 million in past damages.  *See* Ex. 19 (Am. Ward Rep.) ¶ 1; Ex. 20 (Meyers Rep.) ¶ 1.  This figure is not based on an amount of money expended or any similar actual, provable loss.  *See infra* Part IV.B.1.  Instead, the vast majority (up to $55.7 million) is based on a loose estimate of how much time teachers and staff have purportedly "lost" in time addressing social media issues.[2]  Irvington also seeks approximately $1.5 million for portions of certain expenses related to pre-existing vendors.  Irvington does not seek any past damages for property damage, hiring new staff, or implementing new programs.

***"Lost Time" Opportunity Costs***.  Irvington seeks to recover $48.6 to $55.7 million in damages for the "opportunity cost" of the time its staff allegedly spent on social-media-related issues.  Ex. 19 (Am. Ward Rep.) ¶¶ 1, 38.  Irvington has adduced no competent evidence that Irvington incurred these costs *as a result of* Defendants' platforms, as opposed to costs it was already required to pay as part of operating schools.  Rather, Irvington's evidence for this theory consists of (i) a made-for-litigation survey that asked *teachers* to retrospectively estimate time spent on issues relating to social media (including but not limited to Defendants' platforms) over the last ten years; and (ii) affidavits submitted by two Irvington administrators that purport to estimate the amount of time that certain *non-teaching positions* spent on social-media-related concerns over the last decade.  Ex. 19 (Am. Ward Rep.) ¶¶ 29–36.

In the survey, 103 teachers answered questions to estimate the number of daily minutes of instructional time they recalled having been "diverted" by social media since 2014.  Ex. 21 (Klein Rep.) ¶¶ 20, 40, Appx. E.[3]  While the survey specifically called out each Defendant's platform(s) as

---

[2]    Irvington seeks damages for diverted teacher time in the amount of $8.7 million (wages) or $10.6 million (wages and benefits) based on Mr. Klein's survey, and for diverted non-teaching staff time in the amount of $39.9 million (wages) or $45.1 million (wages and benefits) based on affidavits.  *See* Ex. 19 (Am. Ward Rep.) ¶¶ 1, 16.  Combined, this totals $48.6 million (wages for all employees) or $55.7 million (wages and benefits for all employees).  *Id.* at ¶ 1.

[3]    Middle and high school teachers, but not elementary school teachers, were included in the survey.

an example of "social media," the survey was not limited to Defendants' platforms, inquired about "social media" generally, and did not ask respondents to limit their estimates to certain features of Defendants' platforms. Ex. 21 (Klein Rep.) ¶¶ 14, 32–38. Irvington's expert then converted the amount of purportedly lost time into damages as a percentage of teachers' salaries and benefits. Ex. 19 (Am. Ward Rep.) ¶ 37. Based on this method, Irvington's expert claims the District incurred teacher-related "lost time" opportunity costs of approximately $8.7 or $10.6 million, depending on whether benefits are included in the calculation. *Id.* ¶¶ 1, 38.

Irvington also submitted two affidavits—one from its Superintendent and one from a middle school Health and Social Services Coordinator (counselor/social worker)—that purport to estimate the percentages of time certain non-teacher staff spent "dealing with social media or its impacts" from 2014 to 2025.[4] Ex. 19 (Am. Ward Rep.) ¶¶ 16, 36; Ex. 22 (Vauss Affidavit) ¶¶ 17, 20–23; Ex. 23 (Lopez Affidavit) ¶ 23. Depending on the particular position and year, Irvington's affiants estimated that Irvington staff have spent between 5% and 85% of their time "dealing" with social media. Ex. 19 (Am. Ward Rep.) ¶ 36. However, the estimates did not limit "social media" to actionable conduct or differentiate among particular platforms. *See, e.g.*, Ex. 22 (Vauss Affidavit) ¶ 20; Ex. 23 (Lopez Affidavit) ¶ 23. Instead, the affiants described diverting time to address verbal and physical altercations among students after one celebrity, Doechii, received more likes on a social media post than Beyoncé. S*ee* Ex. 22 (Vauss Affidavit) ¶ 12. And they also describe instances where unspecified Irvington employees had to address bullying and harassment perpetrated by third parties. S*ee* Ex. 22 (Vauss Affidavit) ¶ 13; Ex. 23 (Lopez Affidavit) ¶ 16. These affidavits—which were disclosed after the close of fact discovery—do not cite to any underlying documentation or provide any analysis for their numerical estimates of lost time. *See generally* Ex. 22 (Vauss Affidavit); Ex. 23 (Lopez Affidavit). Instead, the affiants rely on their own memories and hearsay conversations with other employees to create their estimates. *See, e.g.*, Ex. 23 (Lopez Affidavit) ¶ 23 (describing understanding based on interactions with "school community, including counselors, administrators, and other staff"); Ex. 22 (Vauss Affidavit) ¶ 23 (describing

---

[4]    The affiants are Dr. April Vauss, Irvington's Superintendent since 2020, and Ms. Sandra Lopez, an Irvington middle school Health and Social Services Coordinator since 2005.

what Principals and Assistant Principals "report"). Indeed, Irvington's Superintendent and corporate representative testified that, to estimate the amount of time spent by social studies teachers across the *entire* District, Irvington interviewed *one* middle school teacher and *one* middle school principal. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 102:13–105:3. Using a similar methodology to calculating "lost" teacher time damages figures, Irvington's expert then converted the percentages of "lost" time provided in these affidavits to damages for certain non-teaching staff, amounting to $39.9 million (wages) or $45.1 million (wages and benefits). *See* Ex. 19 (Am. Ward Rep.) ¶ 1, 16, 36.

Irvington's expert relied entirely on the survey results and the affiants to calculate Irvington's alleged "opportunity costs" damages—without independently verifying any of the estimates. Ex. 19 (Am. Ward Rep.) ¶ 29. Based on the calculation methodologies described above, Irvington claims that the District diverted a combined total of $55.7 million in wages and benefits of teachers and non-teaching staff because of student social media use. *Id.* ¶¶ 1, 38. It does so even though purportedly addressing social media issues does not affect District hiring decisions or teacher salaries. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 325:9–21.

***Out-of-Pocket Vendor Costs***. Irvington also seeks to recover over $1.5 million in payments it made to vendors allegedly because of Defendants' platforms.[5] Ex. 20 (Meyers Rep.) ¶ 1. To arrive at this figure, Irvington's expert, Jeffrey Meyers, applies certain percentages to certain expenditures Irvington made in the past—20% for external student support providers (totaling $1,466,683) and 35% for internet firewalls for Irvington's network (totaling $120,750). Ex. 20 (Meyers Rep.) ¶¶ 20–21, Appx. C. Irvington's estimates for these expenditures are not based on contemporaneous documentation for these expenditures that show any connection to social media or Defendants' platforms. *See* Ex. 24 (Pl.'s 3d Am. Answers to Defs.' Interrogatories to Irvington Public Schools (Set 3)) at 3 & Ex. B; Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 306:9–308:15 (Irvington did not review any CarePlus records to arrive at estimates); 312:22–317:1 (cost estimates based on conversations). And Irvington has admitted that it was required to purchase internet firewalls to comply with federal law, regardless of whether Defendants' platforms existed. Ex. 7

---

[5] Outside of litigation. ██████████████████████████████████████████████ Ex. 1 (Irvington 3d Am. PFS) at Q.26–27.

(May 16, 2025 Vauss 30(b)(6) Dep.) 311:8–312:21 (GoGuardian and Palo Alto web filters required for Irvington to comply with Children's Internet Protection Act).

### D. Irvington's Proposed "Strategic Plan"

Irvington also seeks money to fund a *$296.1 to $417.2 million* "strategic plan" developed by one of its experts, Dr. Sharon Hoover.[6]  *See* Ex. 25 (Am. Hoover Rep.); Ex. 26 (2d Am. Leslie Rep.) ¶ 3.  Dr. Hoover's plan, which is substantially the same across all six bellwether districts in terms of the recommended services, stretches 15 years into the future and seeks to establish a panoply of initiatives addressing, among other things, mental health, student wellbeing, family engagement, digital literacy, and data infrastructure. *See generally* Ex. 25 (Am. Hoover Rep.).  For other districts where the public nuisance claim has not been dismissed, Dr. Hoover's proposed plans are ostensibly to "abate" the alleged nuisances.  *See* Defendants' Rule 702 Motion to Exclude School District Expert Testimony at III.E (motion to exclude Dr. Hoover's opinions); Defendants' Rule 702 Motion to Exclude General Causation Testimony at II (same).  But Irvington—whose public nuisance claim has been dismissed—attempts to characterize Dr. Hoover's nearly identical plan as future damages.

Irvington currently has a staff of approximately ███ people.  Ex. 1 (Irvington 3d Am. PFS) at Q.11.   The strategic plan recommends Irvington hire *176 additional staff*—including psychologists, social workers, and even IT staff.  Ex. 25 (Am. Hoover Rep.) ¶ 96.  The plan would also create numerous new positions, such as 16 "digital literacy specialists," 13 "life skills specialists," and 16 "school-based mental health clinicians."  Ex. 25 (Am. Hoover Rep.) ¶ 96.  If hired, these and the other recommended professionals would serve *all* students—including some prospective students who have not yet been born—not just those students who currently use Defendants' platforms or certain features of the platforms.  Ex. 27 (August 12, 2025 Hoover Dep.) 300:17–303:1, Ex. 28 (August 13, 2025 Hoover Dep.) 622:21–624:21, 802:17–804:1.  The strategic plan also recommends implementing numerous initiatives to address student mental health and digital literacy, such as a new data infrastructure system to purportedly assist schools in identifying

---

[6]  Dr. Hoover offered a nearly identical strategic plan for each bellwether district, with adjustments for the number of recommended personnel.

students with social-media-related health concerns, increased mental health literacy and life skills programming to help students manage their online activities and their *offline* relationships, and school culture and community building initiatives, such as clubs, community events, and parent education efforts. Ex. 25 (Am. Hoover Rep.) ¶¶ 56–66, 135.

The plan does not make any recommendations regarding changes to the operation of any platform. *See generally* Ex. 25 (Am. Hoover Rep.). The plan does not account for any changes to Defendants' platforms that might occur over the plan's 15-year timeline, such as changes to or removal of the features responsible for the alleged harm. Ex. 27 (August 12, 2025 Hoover Dep.) 308:14–20 ("I haven't studied the changes on the social media platforms."); Ex. 28 (August 13, 2025 Hoover Dep.) 524:19–526:6 ("I don't think I'm offering an opinion that the social media companies change their design."). Nor does the plan consider potential changes in how students might use Defendants' platforms over the next 15 years or what would occur if one of Defendants' platforms ceased to exist entirely. Ex. 28 (August 13, 2025 Hoover Dep.) 803:10–20 ("[I]t would be hard for me to predict" whether adolescents will still be using social media 10 years from now), 803:21–804:1 (Dr. Hoover has not studied anticipated changes in how students use social media).

### E. The Court's Motion-to-Dismiss Ruling

At the motion-to-dismiss stage, the Court recognized that Section 230 and the First Amendment impose a "significant limitation on [P]laintiffs' theories of recovery" by prohibiting the imposition of liability for third-party content and protected published activities. Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss the School District and Local Government Entities' Master Compl. (ECF No. 1267) ("First SD Order") at 2. The Court similarly held that Defendants could not be held liable for non-foreseeable third-party conduct, absent some narrow exceptions for conduct promoted by Defendants. *Id*. at 25. The Court permitted Irvington to proceed on its "core theory" that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by expending resources." *Id.* at 26. But at the same time, the Court made clear that the case must focus on "the specific conduct through which the defendants allegedly violated their duties to plaintiffs"—*i.e.*, Defendants' use of the limited set of "at-issue features" that the Court has held are not barred by Section 230 and the

10

First Amendment.  Order Granting in Part and Denying in Part Defendants' Mots. to Dismiss (ECF No. 430) ("PI Order") at 14 (emphasis added); *see* First SD Order at 12–13 (applying AG analysis to school district claims).

Specifically, the Court permitted Irvington to proceed insofar as its claims were based on Defendants' use of certain "at issue" features—*i.e.*, Defendants' alleged:

- failure to implement robust age verification processes to determine users' ages;

- failure to implement effective parental controls;

- failure to implement effective parental notifications;

- failure to implement opt-in restrictions to the length and frequency of use sessions;

- creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;

- failure to label content that has been edited, such as by applying a filter;

- making filters available to users so they can, among other things, manipulate their appearance; and

- failure to create adequate processes for users to report suspected CSAM to defendants' platforms.

First SD Order at 12–13 (hereinafter, the "at-issue features").[7]  By contrast, the Court held that Plaintiffs could *not* base their claims on any of the following alleged features:

- use of algorithms to promote [purportedly] addictive engagement;

- failing to institute blocks to use during certain times of day (such as during school hours or late at night);

- not providing a beginning and end to a user's "Feed";

- publishing geolocation information for minors;

- recommending minor accounts to adult strangers;

- limiting content to short-form and ephemeral content, and allowing private content;

---

[7]  The First SD Order included the "failure to enable default protective limits to the length and frequency of use sessions" as a feature that was not barred.  First SD Order at 14.  But this Court explained in its order addressing Section 230 that claims based on this alleged failure were barred because it "would inherently limit what defendants are able to publish."  PI Order at 16.

11

- • timing and clustering of notifications of *third-party* content in a way that promotes addiction; and

- • the timing and clustering of notifications of *defendants'* content to increase addictive use.

First SD Order at 14. The Court also declined "at [the motion to dismiss stage] . . . to hold Section 230 bars liability predicated on a failure to warn of known risks of addiction attendant to any platform features or as to platform construction in general." *Id.* at 45. Accordingly, as used in this memorandum, Defendant's "actionable conduct" consists of (1) Defendants' use of the "at-issue" features and (2) Defendants' alleged failure to warn.

The Court also dismissed Irvington's public-nuisance claim under New Jersey law; Irvington's sole remaining claim is for negligence. *See* Order Granting in Part and Denying in Part Defs.' Mot. to Dismiss the School District and Public Entities' Claims of Public Nuisance (ECF No. 1332) ("Second SD Order") at 10–11.

## III. LEGAL STANDARD

Summary judgment is required when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Where the moving party would not bear the burden at trial, the motion need only specify the basis for summary judgment and identify those portions of the record, if any, which it believes demonstrate the absence of a genuine issue of material fact on some essential element of the claims." *Twitter, Inc. v. Barr*, 445 F. Supp. 3d 295, 302 (N.D. Cal. 2020) (Gonzalez Rogers, *J.*) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The burden then shifts to the opposing party to establish the existence of material disputes of fact that may affect the outcome of the case under the governing substantive law." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The evidence presented by the parties must be admissible. Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment." *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).

## IV.    ARGUMENT

### A.    Irvington Lacks Competent Evidence of Causation.

Rejecting an "all or nothing" approach, the Court made clear that in order to prove causation Irvington must connect Defendants' *actionable conduct*—as opposed to social media or electronic device use generally, third-party content, third-party conduct, or Defendants' protected publishing activities—to its alleged injuries. *See* PI Order at 14; First SD Order at 12–13. Despite the sweeping allegations in the Master Complaint, Irvington lacks *evidence* that any Defendant's actionable conduct actually caused it injury.

To succeed on its (sole remaining) claim of negligence, Irvington must prove both causation in fact and proximate causation. *Conklin v. Hannoch Weisman*, 678 A.2d 1060, 1070–71 (N.J. 1996). Causation in fact requires "proof that the result complained of probably would not have occurred 'but for' the negligent conduct of the defendant" and Defendants' conduct was a "substantial factor contributing to the loss." *Id.* at 1071–72. Under New Jersey law, causes that are not "closely connected" with the harm are not proximate causes and cannot lead to liability. *Caputzal v. Lindsay Co.*, 222 A.2d 513, 518 (N.J. 1966) (internal citations and quotations omitted). "A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to direct a verdict for the defendant." *Townsend v. Pierre*, 110 A.3d 52, 66–67 (N.J. 2015); *accord Vizzoni v. B.M.D.*, 212 A.3d 962, 975 (N.J. Super. Ct. App. Div. 2019). Thus, to survive summary judgment on its negligence claim in light of the "conduct-specific, feature-by-feature assessment" required by the Court, Irvington must come forward with evidence showing that each Defendant's actionable conduct directly caused Irvington cognizable injuries. First SD Order at 12; *Kurak v. A.P. Green Refractories Co.*, 689 A.2d 757, 766 (N.J. Super Ct. App. Div. 1997) (entering judgment notwithstanding the verdict where no causation evidence existed as to *that* defendant, despite sufficient evidence as to another defendant).

Now, after discovery has been completed, the record is clear that Irvington, in fact, has *no* admissible evidence sufficient to prove that it was injured as a result of actionable conduct by Defendants. *First*, Irvington has no sufficient evidence that it was harmed as a result of the at-issue

13

features or any alleged failure to warn.  Tellingly, the at-issue features are primarily features that users or their parents can choose to use or not use, such as parental controls, parental notifications, time limits, account deactivation, or CSAM reporting.  Irvington has adduced no evidence that giving *parents* or *users* additional controls would have any meaningful impact it.  Rather, Irvington's limited evidence of specific harms allegedly caused by Defendants' platforms points directly to third-party content:  Irvington's witnesses have consistently and expressly testified that specific allegedly harmful disruptions in schools occurred as a result of the publication of harmful content on Defendants' platforms.  *See, e.g.*, Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 88:18–89:17 ("The *posts* can upset another student.  The *comments* of viewers can upset another student.  The fact that the *post* may have been *shared* with other students upsets the student.") (emphasis added).  Any claims based on such harms are barred by Section 230 and the First Amendment and thus are not actionable.

*Second*, setting aside instances related to third-party content, Irvington has no evidence that students' "compulsive use" of Defendants' platforms caused it to incur expenses.  Indeed, Irvington lacks even basic information about the extent or nature of its students' use of Defendants' platforms or about students' mental health.  While Irvington may gesture toward fact or expert testimony about "social media" or cellphone use generally, such evidence is insufficient to meet its burden to show that *each* Defendant's *actionable* conduct caused its injuries.  For these reasons, summary judgment on causation grounds is warranted.  *Townsend*, 110 A.3d at 67 (affirming grant of summary judgment for plaintiff's consequent failure to establish proximate cause); *VFD Consulting, Inc. v. 21st Services*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) ("Summary judgment in a negligence action is appropriate if the record does not support . . . proximate cause."); *see also* First SD Order at 21–22 ("where the existence of proximate cause turns not on a question of fact but on whether the facts alleged are capable of establishing proximate cause, the issue is a matter of law resolvable" by the court.).

1

2

   1.     **Irvington's Allegations of Specific Harms All Impermissibly Rely on
          Third-Party Content and Protected Publishing Activities.**

3

        Liability in this case cannot arise from the (i) "mere publication of . . . content" or (ii)

4    features that the Court held are protected by Section 230 or the First Amendment.  First SD Order at

5    25.   The Court has likewise made clear that "non-foreseeable third-party conduct"—such as

6    "dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms—

7    "cannot be attribut[ed] to defendants."  *Id*. at 25–26.  Thus, to satisfy its burden on summary

8    judgment, Irvington must come forward with evidence that Defendants' *actionable conduct*—as

9    opposed to content, protected features, or third-party bad acts—caused it harm.  It has not.

10        Irvington has no competent evidence sufficient to show that it was harmed by the at-issue

11   features or any failure to warn.  For example, Irvington has no specific, admissible evidence

12   regarding the number of its students who used Defendants' platforms prior to age 13.  Thus, it is

13   unsurprising that Irvington lacks evidence that Defendants' alleged failure to implement "robust"

14   age verification processes caused it to incur expenses.  Irvington also has no specific, admissible

15   evidence that giving users platform-level tools to set their own voluntary time limits (above and

16   beyond the controls already available on the users' devices) or changing the processes for account

17   deactivation would have meaningfully reduced the use of any platform by Irvington's students, let

18   alone that any such reduction would have led to Irvington incurring fewer expenses.  Irvington

19   similarly lacks specific, admissible evidence that it incurred expenses as a result of Defendants'

20   alleged failure to implement effective parental controls or notifications as it has no evidence of how

21   many parents already use parental controls or how many would use different parental controls had

22   they been implemented.  Indeed, the same holds true for each of the "at-issue" features.[8]

23        Instead, the only *specific* evidence of injury that Irvington has proffered is of harm allegedly

24   caused by third-party bad acts and protected publishing activities on Defendants' platforms—

25   precisely the type of conduct the Court has ruled is not actionable.  For instance, Irvington's

26   Superintendent testified that Irvington's awareness of its students' activities on social media is

27

28
___
[8]   Nor has Irvington presented competent evidence of what any warning should have looked like or
      that such a warning would have made a difference to Irvington's alleged injuries.  *Infra* IV.D.2.

limited to the belief that they "are posting and sharing and liking fights and other things that are negative." Ex. 18 (May 9, 2025 Vauss Dep.) 401:9–402:8; *see also* Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 276:2–280:3 (describing Irvington students' posts and comments about who was closer with the victims of tragic accidental shooting and car accident and how those online disagreements resulted in "violence or physical fighting" at the high school). Likewise, Irvington attempts to blame a Defendant's platform for a fatal shooting occurring within its community, as well as other ███████████████████████████ based on posts and other user-submitted content. Ex. 12 (Irvington 1st Am. Suppl. PFS) at Q.10–11. Irvington witnesses also identified "videos" and "harassing comments" about students as a cause for depression and need for support. *See, e.g.*, Ex. 23 (Lopez Affidavit) ¶ 16. Irvington's Superintendent testified that her estimates of how much time administrators spent dealing with social media—*e.g.*, allegedly 80% of assistant principals' time in 2023 and 2024—"involved posts to social media that are liked, commented on, shared, and then . . . spill[ed] into in person incidents" at Irvington schools. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 85:12–86:25 (discussing Ex. 24 (Pl.'s 3d Am. Answers to Defs.' Interrogatories to Irvington Public Schools (Set 3)) at 3, Ex. A).

There is no dispute that such content on Defendants' platforms was posted by third parties and is non-actionable under Section 230. *See, e.g.*, *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1266 (9th Cir. 2016) (user comments and posts are "prototypical" user-provided content within the scope of Section 230). Defendants' publication of that content falls squarely within the heartland of conduct protected by Section 230 as not actionable and cannot be used to establish that Defendants negligently caused harm to Irvington. PI Order at 14–19; *see also, e.g.*, *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1172–73, 1182 (9th Cir. 2024) (Section 230 protects publishers of "harassing and bullying speech").

While recognizing that "mere publication of [] third-party content" cannot form the basis of liability under Section 230, the Court carved out a narrow exception for any challenges that Defendants allegedly "promote[d]" through "conduct like providing cash prizes to challenge participants." First SD Order at 25 (citation modified). Irvington, however, has no evidence that any Defendant offered cash prizes to any participant in a dangerous challenge, created filters that

facilitated dangerous challenges, or otherwise "promoted, developed, or participated in a foreseeably dangerous challenge" that caused Irvington harm beyond the Defendant's mere "algorithmic publication, curation, or amplification" of the challenge. Defendants are therefore entitled to summary judgment regarding challenges. *Id.* at 26.

Similarly, the Court recognized that liability might arise as a result of filters created by a Defendant itself. *Id.* at 25, n.18. But Irvington has no competent evidence that it suffered any harm as a result of filters—let alone a filter created by a Defendant. Summary judgment on filters is thus also warranted.

In short, because Irvington cannot connect *Defendants' actionable conduct*—as opposed to third-party wrongdoing or the publication of content—to its alleged injuries, Defendants are entitled to summary judgment. *See, e.g.*, *Lemmon v. Snap Inc.*, 995 F.3d 1085, 1092–93 (9th Cir. 2021) (allowing claim to proceed where alleged duty violated was "*fully independent of* [Defendants'] role in monitoring or publishing third-party content") (emphasis added); *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 525 (4th Cir. 2025) (CDA bars "state tort claims [that] are inextricably intertwined with [platform's] role as a publisher of third-party content"); *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882, 885 (N.D. Cal. 2024) (granting judgment on the pleadings where claim "intertwined" with conduct protected by Section 230); *see also Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1123 (9th Cir. 2013) ("Because there are a tangle of factors that affect refinancing and sale, evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors."); *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (granting summary judgment where "theories of loss causation could not distinguish between loss attributable to the alleged fraud and loss attributable to non-fraud related news and events").

### 2.  Irvington Has No Competent Evidence of Mental Health Harms Tied to Any Defendant's Specific Platform.

Irvington's "core theory" of injury—and the basis on which the Court permitted it proceed at the motion-to-dismiss stage—is that (1) "defendants' conduct deliberately fostered compulsive use of their platforms" and (2) that compulsive use "caused the plaintiff school districts to respond by

17

expending resources."  First SD Order at 26.  Setting aside alleged incidents involving third-party content and wrongdoing, however, the record is clear that Irvington has no competent evidence that it was injured as a result of its students' alleged "compulsive use" of each Defendant's specific platform(s).  While Irvington points to generalized testimony regarding harms from "social media" use or smartphone use generally, that testimony cannot meet Irvington's burden to show that it was injured by each Defendant's specific platform(s)—let alone by each Defendant's actionable conduct.

As a threshold matter, and as explained in Defendants' Rule 702 motion on general causation, the scientific evidence does *not* support the theory that use of Defendants' platforms causes youth to suffer from the type of mental health harms alleged.  Because Irvington cannot establish general causation, Defendants are entitled to summary judgment.  *See, e.g.*, *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1177 (E.D. Wash. 2009) ("General causation [is an] essential element[] of Plaintiffs' prima facie case . . . .  Expert testimony is necessary to make this showing" and because the Court excluded all general causation opinions under Rule 702, "Defendant's motions for summary judgment must be and are GRANTED.") (citations omitted).

Even setting that foundational defect aside, Irvington cannot establish that each Defendant's specific platform(s)—or even all of the Defendants' platforms combined—caused it harm.  *See Kurak*, 689 A.2d at 766.  Irvington has no such Defendant-specific evidence.  It lacks competent evidence that any student, much less a significant number of students, has used one or more of Defendants' platforms in a way that harmed the student's mental health.  Indeed, Irvington lacks even basic information about the extent or nature of its students' use of Defendants' platforms. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 53:7–56:14, 65:22–66:15 (no attempt to study prevalence of students' use of social media).  It does not know with any specificity the answers to key threshold questions, including how many of its students have accounts with Facebook, Instagram, YouTube, TikTok, or Snapchat.  Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 51:6–25; Ex. 17 (Mangan Dep.) 66:8–67:19.  Nor does it know with any specificity how often students used Defendants' platforms; when they used them; for how long they used them; or which features of the platforms they used other than posts, comments, shares, and likes.  *See id.*; Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 64:10–16; Ex. 18 (May 9, 2025 Vauss Dep.) 401:2–402:8.  More to the point, Irvington has not

18

identified any trends in its students' mental, emotional, social, or behavioral health generally or related to social media specifically.  Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 68:20–70:1. Irvington's head counselor and corporate representative, admitted that Irvington does not know whether it has referred even one of its students for mental health services due to social media.  *See, e.g.*, Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 50:21–51:9 (discussing Ex. 12 (Irvington 1st Am. Suppl. PFS) at Q.9).

Irvington has also failed to offer sufficient evidence differentiating student use of cell phones generally from use of Defendants' platforms.  The District has no data regarding students' use of any given Defendant's platform(s) as opposed to other social media platforms, gaming platforms, streaming platforms, or the myriad other applications or utilities one can access on a cell phone, such as text messaging.  Ex. 6 (May 13, 2025 Pettiford 30(b)(6) Dep.) 88:12–17.  At deposition, Irvington's corporate representative cited anecdotal examples of alleged harms from students using "social media" or "cell phones."  *See. e.g.*, Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 55:1–12 (District's awareness of "social media" use is not limited to Defendants' platforms), 146:4–147:4 (describing issues with Irvington students watching movies on personal devices).  Proffered affidavit testimony from two Irvington affiants, Dr. Vauss (Superintendent) and Ms. Lopez (middle school counselor/social worker), is similarly non-specific and speculative.  Both affiants assert (identical) improper diagnosis and causation opinions that they have observed "a rise in scholar anxiety and depression" that they "believe is tied to social media."[9]  Ex. 22 (Vauss Affidavit) ¶ 8; Ex. 23 (Lopez Affidavit) ¶ 8.[10]  Neither affiant identifies any particular Defendant platform anywhere in their affidavit.  Accordingly, Irvington cannot possibly show the predicate of its claims—that actionable

---

[9]  The affiants' unfounded assertions that (i) there is a rise in students' anxiety and depression, and (ii) they "believe" it is tied to social media are not corroborated by any Irvington documents produced in this case, and they constitute improper lay opinions on issues requiring specialized knowledge and expertise.  Fed. R. Evid. 702; *Gray v. Clark*, 654 F. Supp. 3d 1062, 1071 (E.D. Cal. 2023) ("[C]ourts do not allow lay witnesses to testify as to the cause, effect, diagnosis or prognosis of their injuries, because such opinions require testimony from a medical expert."); *Crawford v. City of Bakersfield*, 944 F.3d 1070, 1079 (9th Cir. 2019) (noting that, while lay witnesses may testify regarding their observations of other individuals' behavior, they may not opine that another suffers from a mental illness).

[10]  Irvington did not disclose either affiant as a hybrid fact and expert witness pursuant to Fed. R. Civ. P. 26.

conduct on the part of *each* Defendant (or even of Defendants as a whole) led to compulsive use on that Defendant's platform(s) by Irvington students, which in turn caused Irvington to incur expense.

Irvington's experts likewise fail to link Irvington's alleged injuries to specific Defendants or to actionable conduct by each specific Defendant. For example, Dr. Hoover impermissibly groups together all "social media" platforms—including those not at issue. *See generally* Ex. 25 (Am. Hoover Rep.). At no point in her report does Dr. Hoover define "social media," and she certainly does not define it to include only the five platforms at issue, let alone separate out those platforms. Dr. Hoover conceded in her deposition that her causation analysis and opinions are not specific to any platform. *See* Ex. 27 (August 12, 2025 Hoover Dep.) 154:2–17 ("I didn't parse out an opinion and it's, you know, 20 percent YouTube and 30 percent, you know, Meta, et cetera. So[,] I didn't think about it that way."), 262:18–24 (admitting she did not perform a causation analysis for any individual platform).

*       *       *

Importantly, Irvington's failure to present evidence regarding each Defendant's platform(s) is compounded by its failure to tie its alleged harms to the at-issue features of Defendants' platforms or Defendants' alleged failure to warn. *See supra* Parts II.E, IV.A.1. At bottom, Irvington is required to come forward with evidence that each Defendant's actionable conduct caused its alleged injury. This requires them to disentangle both (1) online activity that does not involve a given Defendant and (2) alleged harms flowing third-party content and protected publishing activity accessed by students on each Defendant's platform. But Irvington and its experts have done neither, instead focusing broadly on social media use. *See generally* Defendants' Motion to Exclude Plaintiffs' School District Expert Testimony at III.A. Accordingly, even if the experts are correct that Irvington has experienced harm as a result of "social media" generally, their opinions do nothing to establish that Irvington has experienced harm arising specifically from each Defendant's actionable conduct—*i.e.*, excluding third-party wrongdoing, content published on Defendants' (and others') platforms, and the protected features of Defendants' platforms. That wholesale failure is fatal on summary judgment. *See* PI Order at 14–19; *see also Nuveen Mun. High Income Opportunity Fund*, 730 F.3d

20

at 1123; *In re Williams Sec. Litigation-WCG Subclass*, 558 F.3d at 1143; *Backpage.com, LLC*, 724 F. Supp. 3d at 885.

### B.    Irvington Cannot Show It Is Entitled to Past Damages.

Irvington cannot survive summary judgment for another reason: it cannot show that it is entitled to any compensable damages. "Proof of actual damages"—that is, damages "that are real and substantial as opposed to speculative"—"is an 'essential element' in a negligence action." *Grunwald v. Bronkesh*, 621 A.2d 459, 465 (N.J. 1993) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241 (1937)); *Tuzzeo v. Steele*, 2025 WL 1734023 (N.J. Super. Ct. App. Div. June 23, 2025). Therefore, it is Irvington's burden to prove damages "with such certainty" that a jury has a logical basis to make a "fair and reasonable estimate" of damages. *Caldwell v. Haynes*, 643 A.2d 564, 571 (N.J. 1993); *Lane v. Oil Delivery, Inc.*, 524 A.2d 405, 409 (N.J. Super. Ct. App. Div. 1987). Of course, "[i]t is well-settled that the law abhors damages based on mere speculation." *1410 Grand Adams, LLC v. Trematore Constr., LLC*, 2025 WL 1742859, at *8 (N.J. Super. Ct. App. Div. June 24, 2025). Summary judgment in a negligence action is appropriate where the plaintiff cannot prove damages by competent, admissible evidence. *Morris Props., Inc. v. Wheeler*, 300 A.3d 980, 986–89 (N.J. Super. Ct. App. 2023) (affirming summary judgment where plaintiffs failed to adduce competent evidence on damages); *Yansomah v. Glita*, 2008 WL 1744493, *1 (N.J. Super. Ct. App. Div. Apr. 17, 2008) ("[O]nly admissible evidence may defeat summary judgment."). In holding that the School District Plaintiffs' claims were not improperly derivative of their students' alleged harms, the Court found that they had adequately alleged that the following injuries that were unique to them: "diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; hiring mental health personnel and developing mental health resources; implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and repairing property damage." First SD Order at 19–20.

Irvington has put forward no competent evidence reasonably establishing past, non-derivative damages resulting from Defendants' actionable conduct. *First*, Irvington has no competent evidence that it diverted any financial resources as a result of Defendants' actionable

conduct. While it relies on its expert's calculation of damages relating to alleged *"lost time"*—estimates related to the percentage of time that Irvington teachers and staff purportedly had to spend addressing issues related to "social media"—such costs are not recoverable under New Jersey law and, even if they were, Irvington lacks competent evidence that it incurred such damages. *Second*, Irvington has no evidence that it hired new mental health personnel, developed new mental health resources, or implemented other new resources as a result of Defendants' actionable conduct.[11]

### 1. Irvington Cannot Show Defendants Caused It to Divert Financial Resources.

Irvington bears the burden to present evidence sufficient to "lay[] a foundation which will enable the trier of the facts to make a *fair and reasonable estimate*" its alleged damages. *Lane*, 524 A.2d at 409 (emphasis added). Irvington does not claim—and there is no evidence—that it had to hire any additional staff or pay them more because of Defendants' actionable conduct. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 325:9–21. Instead, Irvington advances a theory that its staff spent *time* addressing social media issues, and that it should be compensated for this lost time. But that "lost time" is not recoverable under New Jersey law and Irvington has not supported these claimed damages with competent evidence.

### a) Irvington Cannot Recover "Lost Time" Damages.

"Fair compensatory damages resulting from the tortious infliction of injury encompass no more than the amount that will make the plaintiff whole, that is, the actual loss." *Caldwell v. Haynes*, 643 A.2d 564, 569 (N.J. 1994). Accordingly, New Jersey courts evaluating claims about "lost time" have required that the plaintiff show diminished earnings or earning capacity. S*ee, e.g.*, *Caldwell*, 643 A.2d at 570–73 ("An injured party has the right to be compensated for diminished earning capacity" measured as "the wages lost as a result of the defendant's wrongdoing"); *Alexander v. Cheaster*, 164 A. 287, 288 (N.J. 1933) (injured plaintiff may recover in tort for "loss of

---

[11] Unlike some other districts, Irvington does not seek compensation for property damage attributable to Defendants' platforms. *See* Ex. 29 (1st Am. 2d Suppl. Fed. R. Civ. P. 26 Initial Disclosure) at p.2; Ex. 24 (Pl.'s 3d Am. Answers to Defs.' Interrogatories to Irvington Public Schools (Set 3)) at Ex. B (asserting costs for external programs and services but *not* property damage). In any event, it cannot recover for repairing property damage because it has put forth no evidence concerning any such property damage. First SD Order at 14.

1    time[] and *consequent loss of earnings*" (emphasis added)).   And so, as a district court surveying

2    New Jersey law has held, "lost time" is not compensable beyond lost income or earnings.  *See In re*

3    *Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262, 309, 317 (S.D.N.Y. 2018) (holding

4    New Jersey courts have "traditionally treated lost time as lost income").[12]

5         Yet Irvington seeks precisely that:   "lost time" of its staff unmoored from any actual

6    monetary loss.   The way that Irvington purports to calculate its "lost time" damages illustrates

7    precisely why courts have held that such damages are too speculative to be recoverable.   Irvington's

8    experts invited all of Irvington's current middle school and high school teachers (270 total) to

9    respond to a survey that asked each survey taker to provide their own unverified estimates of how

10   much time the teacher remembers spending addressing distractions due to social media over the *past*

11   *decade* (back to 2014).  *See* Ex. 21 (Klein Rep.) ¶¶ 19–39.   The survey gave recent memory no

12   greater weight than a teacher's recollection of their classroom practices ten years earlier and failed to

13   include any safeguards against responses based upon faulty or self-serving memory.   Irvington's

14   experts then took the unverified responses of 130 unnamed teachers, calculated the percentage of

15   instruction time purportedly spent addressing social media, and multiplied that percentage against

16   the wages and benefits of teachers within the Irvington school district to come to a sum of $8.7 to

17   $10.6 million.  *Id.* ¶¶ 40–43; *see* Ex. 19 (Am. Ward Rep.) ¶¶ 1, 30–35, 38.

18        Irvington has no evidence that this potential $8.7 to $10.6 million constitutes an actual

19   monetary loss.  Irvington *did not spend* $8.7 to $10.6 million as a result of "lost" teacher time due to

20   Defendants' platforms.  Nor did it hire any new teachers or pay any teachers additional wages or

21   ───────────────
     [12]  "Lost time" damages—which are pure economic-loss damages—are also not available to
22   Irvington under New Jersey law because Irvington is not pursuing those claims based on any
     negligent infliction of physical harm or property damage, and it cannot show any lost earnings or
23   expected gains, let alone that such alleged losses were *particularly* foreseeable by Defendants.
     *See People Exp. Airlines, Inc. v. Consol. Rail Corp.*, 495 A.2d 107, 118 (N.J. 1985) (absent
24   physical harm to the plaintiff or property damage, "lost" economic interests in negligence claims
     must be "particularly foreseeab[le]").  Under similar circumstances, New Jersey courts have only
25   allowed "particular claimants" to "survive motions for summary judgment" where "[t]here were
     no intervening causes," "[t]he economic injury was close in time and space," "the defendant had
26   ample opportunity to ascertain the identity and nature of the plaintiff's interests," and "the
     amount of litigation and extent of liability was finite, rather than expansive."  *Id.* at 116–17
27   (citing *Rickards v. Sun Oil Co.*, 41 A.2d 267 (N.J. 1945) (denying plaintiffs' recovery of "losses
     from expectant gains" due to defendant's allegedly negligent destruction of a bridge leading to
28   plaintiffs' retail businesses but not damaging the businesses themselves)).

benefits as a result of Defendants' actionable conduct. *See*, *e.g.*, Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 325:9–14 (the number of teachers that Irvington hires does not depend on student social media use), 325:16–21 (teacher salaries are not based on how much its students are using social media); Ex. 1 (Irvington 3d Am. PFS) at Q.27 ██████████████████████████ ████████████████████████████

While Irvington tries to claim it lost a percentage of its staff time, its own expert admitted that the money Irvington pays its teachers in salaries and benefits is not dependent on how time is spent performing their duties, and it would have paid that same amount in wages and benefits to its teachers even if Defendants' platforms did not exist at all, or if fewer of its students used Defendants; platforms. *See* Ex. 30 (Ward Dep.) 165:21–167:15, 187:15–188:18 (Plaintiffs' damages expert agreeing he is not "opining that because of Defendants' platforms specifically any school district had to pay teachers more than they would have paid teachers if Defendants' platforms did not exist"). In short, the entire claimed amount is money that Irvington would have spent on employee wages and benefits, regardless of whether its students even used Defendants' platforms. This is just the type of "lost time" theory that New Jersey law—like the law in the overwhelming majority of states—rejects. *See In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. at 317.

        **b)**      **Irvington Has No Competent Evidence Establishing These "Lost Time" Damages.**

Even if New Jersey law permitted recovery of nebulous "lost time" damages like these, Irvington cannot meet its burden to prove those damages—let alone to a reasonable degree. *See Lane*, 524 A.2d at 409. During fact discovery, Irvington did not produce any documentary or contemporaneous evidence supporting its claims of lost time. At most, Irvington offers deposition and affidavit testimony regarding lost time containing vague, anecdotal, post hoc, or non-specific references to time spent attending to purported disruptions due to social media generally (*i.e.*, not specifically as to any Defendants' actionable conduct)—typically in the form of hearsay statements by individuals lacking personal knowledge.[13] Indeed, much of the plain language used in the

---

[13] For example, Irvington's Superintendent testified that her "lost time" estimate for social studies teachers across the whole District over nearly a decade is based on a single "interview" with a

affidavits belies any personal knowledge as to several of the statements. *See* Ex. 22 (Vauss Affidavit) ¶¶ 12, 14–15 (attesting to what "we" or "the District" have seen, have observed, or are aware of, not the affiant); Ex. 23 (Lopez Affidavit) ¶¶ 12, 15–17 (similar).

Irvington's attempt to patch this hole through expert testimony is unavailing. "If the facts in the record contradict an expert opinion, the opinion, although it may be admissible, cannot be relied upon to defeat summary judgment." *Edwards Lifesciences Corp. v. St. Jude Med. Inc.*, 2004 WL 5642457, at *5 n.5 (C.D. Cal. Apr. 2, 2004) (citing *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1440 (9th Cir. 1995); *accord Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict."). For the reasons explained in Defendants' Rule 702 motion, the Klein survey (and the damages report based on that survey) is unreliable and inadmissible. The use of a retrospective survey to purportedly measure—down to the minute—the amount of time that teachers supposedly spent dealing with social-media-related "distraction" for periods of up to a decade or longer is not a reliable methodology. *See* Defendants' Omnibus School District 702 Motion at III.B. And Irvington's expert did nothing to test or ensure that the answers of teachers who responded to the survey could be reliably extrapolated and applied to the majority of other teachers who declined to participate or were not employed by Irvington for the entire period covered. Irvington has thus failed to sufficiently establish its estimate of lost time damages.

---

single social studies teacher. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 101:16–104:21. Similarly, her affidavit is based on hearsay and speculation. Ex. 22 (Vauss Affidavit) ¶ 23 ("District Principals and Assistant Principals *report* that they spend approximately 80% of their time today dealing with issues related to social media . . . . The time spent today by administrators has increased from approximately 30% in 2016.") (emphasis added); *see also id.* ¶ 21–22 (offering personal beliefs as to how much time School Psychologists and School Nurses spend "on issues related to social media"). Such testimony is inadmissible. Fed. R. Evid. 602, 801; *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (excluding an affidavit based on inadmissible hearsay where it relied on statements from third parties). Moreover, Irvington's affiants tie their lost time estimates to non-actionable conduct. *See* Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 85:12–86:25 (attributing "lost time" to dealing with "students who posted things to social media," related "comment[s]" on those posts, and resulting "fights or other in-person incidents."). Even if the Court credited such statements, they do not establish the purportedly lost time with sufficient certainty.

Irvington's lost teacher time estimates also suffer from another, independently fatal flaw: the survey questions ask only about time spent dealing with "social media" generally. The questions specifically mention each Defendant's platform(s) as an example of "social media," but the survey was not limited to platforms operated by the Defendants' platforms, let alone specific to any one of Defendants' platforms as would be necessary to recover damages against them. *See Kurak*, 689 A.2d at 766 (requiring proof that "each defendant" is liable). And the survey made no effort to distinguish between time spent dealing with issues arising from the at-issue features, as opposed to issues arising from, for example, third-party content posted on Defendants' (or other) platforms. Accordingly, the "lost time" estimates are plainly not estimates of time spent addressing Defendants' actionable conduct.

Because there is neither admissible nor non-speculative evidence as to the amount of time lost, Irvington failed to meet its burden and summary judgment in Defendants' favor is warranted. *Lane*, 524 A.2d at 409.

### 2. Irvington Has No Competent Evidence that It Incurred Specific Additional Costs Because of Defendants' Platforms

Irvington fares no better in its attempt to justify its damages for alleged out-of-pocket costs—*i.e.*, third-party vendor costs. There is no evidence that any of these costs were the result of Defendants' actionable conduct.

#### a) Irvington Has No Evidence It Hired New Mental Health Personnel or Incurred Costs for Property Damage Because of Defendants' Platforms.

Irvington does not seek to recover costs relating to hiring new personnel or repairing property damage as a result of Defendants' actionable conduct. Its damages disclosures identify only "lost" personnel time and portions of expenditures for existing external vendor services. Ex. 29 (1st Am. 2d Suppl. Fed. R. Civ. P. 26 Initial Disclosure) at p.2; Ex. 24 (Pl.'s 3d Am. Answers to Defs.' Interrogatories to Irvington Public Schools (Set 3)) at Exs. A (asserting costs for existing employees but not for hiring new ones), B (asserting costs for existing external programs and services but not new programs or property damage). Nor do any of its experts opine on damages related to vandalism or property damage. *See generally* Ex. 20 (Meyers Rep.); Ex. 19 (Am. Ward Rep.);

Ex. 26 (2d Am. Leslie Rep.).  Thus, Irvington cannot show any basis for recovering these categories of damages.

                     **b)**        **Irvington Has No Competent Evidence It Implemented New Programs Because of Defendants' Platforms.**

Irvington seeks past damages relating to out-of-pocket vendor costs for third-party vendors totaling approximately $1.5 million.  *See* Ex. 20 (Meyers Rep.) Appx. C.  These include $120,750 for internet content filters and $1,466,683 for external counseling vendors.  *See id.*  But Irvington's efforts to saddle Defendants with these costs fail for three reasons.

*First*, Irvington has not shown that these expenses were triggered by students' use of Defendants' platforms at all.  Irvington cannot dispute that it implemented web filters (GoGuardian and Palo Alto) to comply with the Children's Internet Protection Act and would still purchase them even if its students did not use any social media at all.  Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 311:8–312:21.  Moreover, those services do far more than just filter the platforms at issue in this litigation.  As Irvington's Executive Director of Technology and Media testified, GoGuardian is a web filter and Palo Alto is a firewall and a web filter and Irvington filters out "*anything noneducational.*"  *See* Ex. 31 (Amberg Dep.) 134:1–9; 172:11–18.  As to the external counseling vendor costs, Irvington has no idea whether any student has been referred for mental services because of social media, Defendants' platforms, or any particular features of the platforms.  *See supra* Part II.B.  And CarePlus—one of Irvington's external vendors—charges a fixed price for its services, regardless of how many students are referred.  Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 310:16–311:5; Ex. 34 (BW_Irvington00034660) at -4663; Ex. 32 (BW_Irvington00720246) at -0257–58 ▮▮▮▮▮▮▮▮▮▮▮▮▮).  As another example, Momentum Therapy Services ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮.  *E.g.*, Ex. 33 (BW_Irvington00461528) at –1538.

*Second*, Irvington makes no showing that these costs were incurred as a result of *Defendants' actionable conduct*.  Instead, Irvington's claimed damages relate to costs allegedly incurred in dealing with "social media" or third-party content generally.  As explained above, however, liability

may *not* be based on harms flowing from content published on Defendants' platforms, third-party wrongdoing, or Defendants' protected publishing activities. *See supra* Part IV.A.1.

*Third*, Irvington's evidence makes it impossible for "the trier of the facts to make a fair and reasonable estimate" of the loss allegedly resulting from Defendants' actionable conduct. *Lane*, 524 A.2d at 409. Irvington does not ███████████████████████████████████████, let alone the aspects of each Defendant's platform that the Court deemed actionable here. *See* Ex. 1 (Irvington 3d Am. PFS) at Q.27. Reginald Lamptey, Irvington's Assistant Superintendent and corporate representative, testified that Irvington is unaware of a way to calculate the amount of expenditures for guidance services that were provided to its students for issues related to social media. Ex. 35 (Lamptey 30(b)(6) Dep.) 80:13–25. Irvington has therefore provided no competent evidence to allow a factfinder to be able to proportion costs appropriately to calculate damages.

### C. Plaintiff's Proposed 15-Year "Strategic Plan" Is Not a Cognizable Remedy Under the Law.

Because the Court dismissed Irvington's public nuisance claim, its sole remaining claim is for negligence. *See* Second SD Order at 10–11. Therefore, the only prospective relief potentially available to Irvington is compensatory damages for future harm that is "reasonably probable to occur." *Mauro v. Raymark Indus., Inc.*, 561 A.2d 257, 261 (N.J. 1989) [hereafter *Mauro I*].

Irvington seeks *$296.1 to $417.2 million* to implement a voluntary 15-year "strategic plan," authored by Irvington's expert, Dr. Hoover, to address anticipated student wellbeing and learning issues in the future.[14] Ex. 26 (2d Am. Leslie Rep.) ¶ 3. The plan does not recommend that Irvington stop allowing its students to access Defendants' platforms on its networks or devices, and does not recommend changes to Defendants' conduct. *See generally* Ex. 25 (Am. Hoover Rep.). The plan's recommended staffing levels have no relationship to the number of Irvington's students using Defendants' platforms or the amount of time they spend on the platforms. Nor is the plan tied to addressing mental-health issues allegedly resulting only from Defendants' platforms: the plan's

---

[14] The recommendations in Dr. Hoover's plan for Irvington are nearly identical to those in the other school districts in the bellwether trial pool, including the four with active public nuisance claims. *See, e.g.*, Ex. 28 (August 13, 2025 Hoover Dep.) 591:4–601:13 (same new positions for each district).

recommendations are divorced from any attempt to estimate the level of alleged harm *from Defendants' platforms* to Irvington or its students.  Instead, the plan applies to *all* students *regardless* of whether they use Defendants' platforms.  For example, the plan recommends hiring and training *176* new employees to provide, among other things:

- "Life skills programming" to teach students "empathy, emotion regulation, [and] navigating social media pressure";

- "Mental Health literacy" to educate students, educators, and families about mental health challenges, not just those limited to use of Defendants' platforms;

- Promotion of in-person social activities such as clubs and community events to encourage belonging; and

- "Intensive mental health treatment" for students allegedly suffering from psychological effects of social media and other causes.

*See generally* Ex. 25 (Am. Hoover Rep.) ¶¶ 58–72.  In short, the plan is a $296.1 to $417.2 million attempt to solve resource and funding problems that long predate and have nothing to do with Defendants' platforms.

Irvington's strategic plan is not a proper remedy for its negligence claim.  *First*, Irvington's strategic plan is not recoverable as future damages because the plan's 15 years of expenditures do not compensate Irvington for money that it will, with reasonable probability, spend in the future.  *Second*, even if the plan were an appropriate measure of future damages, the largest component of the strategic plan—the funding of mental health treatment for students—is impermissibly derivative of alleged injuries to students.

### 1.    The Costs of the Strategic Plan Are Not Recoverable as Future Damages.

"The long-standing rule in New Jersey is that prospective damages are not recoverable unless they are reasonably probable to occur."  *Mauro I*, 561 A.2d at 261.  This "rule seeks to ensure that the plaintiff will be made whole while preventing an improper award of damages based on conjecture or speculation."  *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602, 623 (N.J. 2013).  A future injury is "reasonably probable" if it is "more probabl[e] than not" to occur.  *Mauro v. Owens-Corning Fiberglas Corp.*, 542 A.2d 16, 20 (N.J. Super. Ct. App. Div. 1988), *affirmed by Mauro I*.  "[A] consequence of an injury which is possible, which may possibly ensue, is a risk which

1  [Irvington] must bear." *Mauro I*, 561 A.2d at 267 (quoting *Budden v. Goldstein*, 128 A.2d 730, 734

2  (N.J. App. 1957) with approval).

3  Irvington cannot show that it reasonably expects *to have to make* the expenditures

4  recommended in Dr. Hoover's plan over the next 15 years as a result of Defendants' actionable

5  conduct. Rather, the plan is a separate, *recommended* expense that the District *could*, but does not

6  have to, choose to fund programs to deal with teen mental health generally, untethered to any

7  specific features of Defendants' platforms. Irvington has not instituted Dr. Hoover's plan, it is under

8  no obligation to do so, and absent a recovery of money from Defendants in this lawsuit, Irvington

9  will *not* institute the plan or incur the associated costs. In fact, despite having *decades* to do so,

10 Irvington has *never* reached the student-to-staff ratios for school psychologists, school counselors, or

11 school social workers recommended by professional organizations, which form the basis of

12 Dr. Hoover's recommendations for these positions. *See* Ex. 25 (Am. Hoover Rep.) ¶ 35 (identifying

13 Irvington's ratios as 1:976, 1:868, and 1:601, respectively). And while Dr. Hoover testified that the

14 plan constitutes "best practices," no public school district in the country has ever implemented this

15 type of comprehensive plan, and there is no professional organization that has ever suggested that a

16 plan of this nature is necessary or advisable to address student use of social media in general, much

17 less just Defendants' platforms. Ex. 28 (August 13, 2025 Hoover Dep.) 605:23–607:16, 612:7–23,

18 806:16–807:6. A suggestion of expenditures for a novel set of optional, recommended programs that

19 might be made only if a plaintiff receives a large monetary award in a lawsuit is not the type of

20 "reasonably probable" future damage that is recoverable in New Jersey.

21         **2.    Irvington's Strategic Plan Is Impermissibly Derivative.**

22 As discussed above, funding for the strategic plan is not compensation for direct and distinct

23 expenditures that Irvington has been forced or will be forced to make as a result of Defendants'

24 allegedly tortious conduct. Instead, the plan is about developing discretionary programs to educate,

25 treat, and support *students* for their alleged injuries. Paying for treatment of others' injuries is the

26 type of classic derivative injury for which recovery is not available. *See Ass'n of Wash. Public*

27 *Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 700, 703–04 (9th Cir. 2001) (rejecting public

28

1    hospital districts' attempt to recover costs for treating patients suffering from tobacco-related

2    illnesses).

3         At the motion-to-dismiss stage, the Court declined to dismiss the School District cases on the

4    basis that their alleged harms are impermissibly derivative of students' alleged harms.  First SD

5    Order at 21.  The Court's reasoning was based on allegations that the School Districts had been

6    directly injured because "they *have had to* hire mental health personnel and develop further mental

7    health resources to mitigate the negative in-school consequences of their students' . . . use of

8    defendants' platforms" and because "the school districts appear to seek *recovery of unique*

9    *damages*."  *Id.* at 19–21 (emphasis added).  The record evidence now demonstrates that Irvington

10   does not seek recovery for those types of injuries, but to institute a sweeping plan for the benefit of

11   students that it will not otherwise implement or be forced to implement.  Thus, even if funding for

12   the strategic plan were the type of legally cognizable damages or abatement that Irvington could

13   recover, any recovery would be for derivative injuries.

14       **D.    Defendants Are Entitled to Summary Judgment on Irvington's Failure-to-Warn**
         **Claim.**

15

16       Irvington contends "Defendants failed to adequately warn [it] about the physical and mental

17   health risks posed by their platforms and the increased resources that [it] would need to expend to

18   address the youth mental health crisis Defendants caused."  Master Complaint ¶ 1034.  But

19   Defendants do not owe a duty to provide warnings to a school district that its students' use of

20   Defendants' platforms may cause financial harm to the District.[15]  Even if there were a duty to warn

21   school districts, Irvington's claim fails for lack of evidence:  Irvington has no evidence of what a

22

23   _____
     [15]   Defendants also contend that they are entitled to summary judgment on Irvington's failure-to-
24   warn claim that arises from third-party content or protected publishing activities for the threshold
     reason that such a claim is barred by Section 230.  *Doe v. Grindr Inc.*, 709 F. Supp. 3d 1047,
25   1054 (C.D. Cal. 2023), *aff'd*, 128 F.4th 1148 (9th Cir. 2025) (barring claim "that Grindr had a
     duty to warn Doe about the risks of child sexual exploitation on the App"); *Est. of Bride*, 112 F.
26   4th at 1179–80 (barring failure to warn claim challenging anonymity feature of app that faulted
     app "for not mitigating, in some way, the harmful effects of the harassing and bullying content"
27   through anonymity feature).  Per the Court's instructions given the pending appeal by Meta and
     TikTok, Defendants reserve their right to challenge Irvington's failure-to-warn claims as being
28   barred by Section 230 at a later time.

warning to school districts should have said, to whom or how it should have been made, or that any warning would have reduced Irvington's alleged damages.

And to the extent that Irvington contends that Defendants owed a tort duty *running to Irvington* to provide warnings *to its students* (or their parents), its claim likewise fails.

### 1.    Defendants Do Not Owe Irvington a Duty to Warn the District Directly.

Irvington advances a novel failure-to-warn claim: it alleges that Defendants had a duty to provide a warning to school districts—distinct from the warnings that allegedly should have been provided to student users and parents—that student use of the platforms could cause harm to those students, which might, in turn, cause Irvington to expend additional resources in responding to the harms to the students.  Master Complaint ¶¶ 1034, 1036.  Defendants are not aware of any case in any jurisdiction that has held there is a duty to warn a non-user of a product that others' use of that product may cause financial injury to the plaintiff.  Such a rule would lead to an absurd result—*e.g.*, alcohol companies would need to warn landlords that their tenants might damage property while under the influence of alcohol, and tobacco companies would need to warn employers that they might need to pay increased healthcare costs for employees who smoke.  And even in cases involving *physical* injuries, courts have held that a defendant has no duty to warn third parties that they might become indirectly injured by a defendant's alleged negligence.  *See, e.g.*, *Certainteed Corp. v. Fletcher*, 794 S.E.2d 641, 643 (Ga. 2016) (finding manufacturer of a facility's "asbestos-laden water pipes" did not have a duty to warn plaintiff of the dangers of asbestos dust where she claimed she developed mesothelioma from laundering the asbestos-dust-covered work clothing of her father, who worked at the facility); *Kuciemba v. Victory Woodworks, Inc.*, 531 P.3d 924, 943 (Cal. 2023) (employer had no duty to employee's wife to prevent spread of coronavirus at work).  If there is no duty to warn a third party that a product might cause physical injury, then there is certainly no duty to warn a third party that the use of the product could cause downstream financial injuries.

While Defendants acknowledge that the Court previously held that Defendants owe a general duty of care to school districts, they respectfully submit that the Court's analysis does not support

finding a duty to provide a warning directly to school districts about potential financial harms resulting from student use.  None of the cases relied on by the Court in its prior rulings contemplate a duty to warn third parties that someone else may use the defendant's product or service, become injured, and thereby cause downstream economic consequences to the third party.  Recognizing such broad duties here "would expand traditional tort concepts beyond manageable bounds, because such duty could apply to all individuals who could have been affected by" the user's use of the product or service.  *Gourdine v. Crews*, 955 A.2d 769, 786 (Md. 2008).

### 2.    Irvington Lacks Evidence Supporting Its Failure-to-Warn Claim.

Even if Defendants owed Irvington a duty to warn, the claim still fails.[16]  "When [a product's] alleged defect is the failure to provide warnings, a plaintiff is required to prove that the absence of a warning was a proximate cause of his harm."  *Coffman v. Keene Corp.*, 628 A.2d 710, 716 (N.J. 1993).  In other words, a plaintiff must show that it would have behaved differently with the warning.

Irvington will likely argue that it can satisfy this requirement by virtue of the heeding presumption—a rebuttable presumption that it would have read and acted upon an adequate warning if Defendants had provided one.  *Coffman*, 628 A.2d at 716–20.  Since adopting the heeding presumption in *Coffman*, New Jersey courts have consistently discussed this presumption in the context of *users*.  *See id.* at 718 ("The heeding presumption . . . encourage[s] manufacturers . . . to alert *users* of the hazards arising from the use of [their] products through effective warnings." (emphasis added)); *id.* at 723 ("Just as it is fair and reasonable to assume that such a warning will serve to render the product safe because it is calculated to alert the foreseeable *user* of the product of its dangers, so should one assume that such a warning if provided will be followed." (emphasis added)); *Sharpe v. Bestop, Inc.*, 713 A.2d 1079, 1084 (N.J. Super Ct. App. Div. 1998) (quoting *Coffman* for the proposition that the heeding presumption serves to "alert users" of the harms associated with the use of products).  That Irvington is an inappropriate beneficiary of the heeding presumption is reinforced by how New Jersey courts describe the evidence defendants must adduce

---

[16]   The Court already held that any duty to warn is limited by Section 230 to warnings about platform *features* and *designs*.  *See* First SD Order at 34–36.

to rebut the presumption, which again focuses on *users*. *See, e.g.*, *Sharpe*, 713 A.2d at 1091 (holding that to rebut the heeding presumption, a defendant must adduce evidence relating to the plaintiff's indifference to safety warnings "as construed by the reasonable user").

In the circumstances at issue here, where the adequacy and efficacy of a warning to a school district about alleged financial consequences from student use of online platforms "are not within the common knowledge of jurors . . . , expert testimony is necessary to support [Irvington's] warning defects claim." *Nelson v. Am. Honda Motor Co.*, 2021 WL 2877919, at *7 (W.D. Penn. May 17, 2021). Yet, none of Irvington's experts opined that Defendants should have warned school districts (as opposed to users and parents), save for one isolated statement "that parents, children and the public (including schools) be **fully informed about the risks and harms the platforms present.**" Ex. 37 (Estes Rep.) ¶ 316.

Nor has Irvington offered any evidence (fact or expert) of what a warning to school districts should have looked like or how it should have been implemented. Specifically, there is no evidence of *who* in the District should have received the warning, *what* it should have said, *when* it should have been provided, or *where* and *how* the warning should have been communicated. These are all significant questions given that the allegation is that a warning should be provided to entities that may not themselves be users of or have any interaction with the platforms. Irvington has not offered any evidence (fact or expert) that a warning directly to the District would have reduced its alleged harms or damages.

Perhaps most critically, Irvington has not offered any evidence (fact or expert) that a warning directly to the District would have reduced its alleged harms or damages. Irvington already prohibited student cell phone use during class. Ex. 7 (May 16, 2025 Vauss 30(b)(6) Dep.) 48:15–21. And Irvington's Superintendent testified that Irvington would not have taken any further steps to prohibit student personal devices on school grounds entirely because Irvington considers them safety tools and because that is how parents are able to communicate with students. Ex. 5 (May 6, 2025 Vauss Dep.) 143:21–145:2. And when students are at home, Irvington administrators do not see themselves as having responsibility for how students use technology (as opposed to parents). Ex. 36 (Amberg Dep. Ex. 13) at 1 ("When a student is off-campus, parents are responsible for supervising

34

internet access and usage."); Ex. 31 (Amberg Dep.) 219:2–17.  There certainly is no evidence that a warning to *the school district* would have caused any *student* to use Defendants' platforms less and thereby avoid the alleged harms of addiction and mental health problems in the first place, much less that *a sufficient number of students* would have used the platforms less and experienced such fewer harms that Irvington would have had to expend materially fewer resources in responding to the alleged youth mental health crisis in the District.  Summary judgment is therefore warranted.

      **3.**      **Irvington Cannot Assert a Claim that Defendants Failed to Warn Students.**

To the extent that Irvington is claiming that Defendants had a duty running to the District based on Defendants' alleged failure "to adequately warn youth [and] their parents," Master Complaint ¶ 265, 1034, Defendants are also entitled to summary judgment.[17]

On this point, *Gourdine v. Crews*, 955 A.2d 769 (Md. 2008), is instructive.  There, the plaintiff sued a pharmaceutical manufacturer after a driver suffering adverse effects from the defendant's medications struck and killed plaintiff's husband.  The plaintiff acknowledged that the manufacturer did not owe a duty to provide warnings directly to her husband.  Instead, she sought to recover for injuries flowing from the manufacturer's failure to provide adequate warnings to the users of its medications.  The court rejected that effort, holding that even if the warnings provided to users were inadequate and automobile accidents were a foreseeable result of the inadequate warnings, the manufacturer did not owe a duty to warn users running to and enforceable by potential secondary victims like plaintiff's husband.  As the court explained, "there was no direct connection between [the manufacturer's] warnings, or the alleged lack thereof, and [plaintiff's husband's] injury.  In fact, there was no contact between [the manufacturer] and [plaintiff's husband] whatsoever."  *Id.* at 786.

The same is true for Irvington.  It does not claim harm as a direct user of Defendants' platforms, but that it was a secondary victim of Defendants' alleged failure to warn users that they

---

[17] Irvington does not purport to bring representative claims on behalf of its students or their families.  Nor could it.  *See* Defs.' Motion to Dismiss the School District and Local Government Entities' Master Complaint (ECF No. 601) at 44 & n.34 (collecting authorities).

could become addicted or suffer mental health harms from use of Defendants' platforms. Imposition of a duty to warn users of Defendants' platforms that runs from Defendants to school districts is thus unwarranted and unsupported. *Id.*; *see also Doe v. Pharmacia & Upjohn Co.*, 879 A.2d 1088, 1096 (Md. 2005) (employer had no duty running to employee's wife to warn employee of the risk of HIV infection even though employer knew employee was exposed to HIV in his work and that he was married).

### E.    The Court Should Grant Summary Judgment for the Non-Operating Meta Defendants Not Even Arguably Involved in Any Alleged Injuries.

The School District Plaintiffs inexplicably sued various subsidiaries of Meta Platforms, Inc. (in this section, "MPI"), but the uncontradicted evidence in the record demonstrates that only MPI is responsible for the development and operation of Facebook and Instagram. *See* Ex. 38 (Meta Defendants' Responses and Objections to Plaintiffs' Rule 30(b)(6) Deposition by Written Question) ("DWQ") at 21–22, 25. The other Meta Defendants—Meta Payments Inc. f/k/a Facebook Payments Inc., Siculus LLC f/k/a Siculus, Inc., Facebook Operations, LLC, Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC, Facebook Holdings, LLC, and Instagram LLC (the "Non-Operating Defendants")—are subsidiaries and do not operate Facebook or Instagram. *See id.*

Summary judgment should therefore be awarded to the Non-Operating Defendants for the additional reason that they had no involvement in Plaintiff's alleged injuries. "As a general matter, corporations are regarded as individual legal entities; parents, subsidiaries, and affiliates largely have legal independence from each other and each can only be held liable for its own acts or omissions." *Khoros, LLC v. Lenovo (United States), Inc.*, 2020 WL 12655516, at *14 (N.D. Cal. Oct. 5, 2020) (surveying California and Delaware law); *see Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs. v. Sharemax.com, Inc.*, 334 F. Supp. 2d 620, 626 (D.N.J. 2004) ("Generally, it is deeply ingrained in our economic and legal systems that a parent corporation is not liable for the acts of its subsidiaries." (cleaned up)).[18]  And to sustain its claims, Irvington must prove that *each Defendant*

---

[18]  Because this outcome is required under the laws of all three states potentially at issue, Meta does not apply a choice-of-law analysis or take a position on which state's law applies to this question.

caused it harm. *See supra* Part IV.A.. But Irvington has no evidence by which to do so. Indeed, the evidence shows that the Non-Operating Defendants engage in activities wholly unrelated to the school districts' claims, namely: "payment processing" (Facebook Payments Inc); "operat[ing] . . . data center[s]" (Siculus, Inc. and Facebook Operations, LLC); and "hold[ing] certain Instagram intellectual property" (Instagram, LLC). Ex. 38 (DWQ) at 21–22, 25. For this additional reason, the Non-Operating Defendants are all entitled to summary judgment.

### F.    The Court Should Confirm Irvington Has No Claims Against Mark Zuckerberg

To the extent Irvington purports to assert claims against Mark Zuckerberg, those claims should also be dismissed on the pleadings or, in the alternative, summary judgment should be granted in his favor. *See* Fed. R. Civ. P. 12(b), 12(c), or 56.[19]

*First*, Irvington never served Mr. Zuckerberg with its complaint. *See Jackson v. Hayakawa*, 682 F.2d 1344, 1347 (9th Cir. 1982) (no personal jurisdiction over defendant if not served in accordance with Rule 4(d)). Irvington's initial complaint, which was filed in the District of New Jersey on March 3, 2023, did not name Mr. Zuckerberg as a Defendant. *See Irvington Public Schools v. Meta Platforms, Inc., et al.*, Case No. 2:23-cv-01233 (D.N.J.). Mr. Zuckerberg also was not named as a Defendant in the School District Plaintiffs' original or amended Master Complaints. *See* ECF No. 504 (Dec. 18, 2023), *as amended* ECF No. 729 (Mar. 27, 2024). On March 14, 2024, *after* Mr. Zuckerberg filed his motion to dismiss (but before the Court granted that motion), Irvington filed a short form complaint that listed Mr. Zuckerberg as an "Other Defendant." *See* Case No. 4:23-cv-01467-YGR, ECF No. 26 ("SFC"). However, Irvington failed to follow the process set out in the SD SFC Implementation Order, entered the previous month, for adding a new defendant to a case. Under that Order, any "newly named Defendant[]" must be properly served in accordance with Rule 4 of the Federal Rules of Civil Procedure. ECF No. 620 §§ IV(A) ¶¶ 12, IV(B) ¶ 19; *see* Fed. R. Civ. P. 4(e) (service on individual). Yet Irvington never served Mr. Zuckerberg with its

---

[19] Counsel for Meta has reached out to Irvington counsel regarding the points expressed in this section, and Irvington counsel promptly responded to confer. The Parties are going to confer further on this question and will promptly update the Court if they are able to resolve this issue.

SFC.[20]    Accordingly, any claims Irvington purports to assert against Mr. Zuckerberg must be dismissed.  *See* Fed. R. Civ. P. 12(b)(1); *see also* Fed. R. Civ. P. 4(m) (court "must" dismiss action against defendant if defendant not served within 90 days after complaint is filed).[21]

*Second*, this Court already dismissed claims asserted against Mr. Zuckerberg "in over two dozen cases in this multi-district litigation."  ECF No. 1312 at 1; *see also* ECF No. 753 (dismissing negligent and fraudulent misrepresentation claims against Mr. Zuckerberg).  While the Court technically was addressing only the personal injury claims that were pending against Mr. Zuckerberg as of the date his motion was filed, its ruling should apply equally to Irvington.

*Third*, even if Irvington had properly added Mr. Zuckerberg as a defendant to its complaint, and even if the Court's prior ruling dismissing Mr. Zuckerberg did not apply to Irvington's SFC, its claims against Mr. Zuckerberg would still be subject to dismissal for failure to state a claim.  Irvington purports to assert two claims against Mr. Zuckerberg: public nuisance and negligence.  This Court already dismissed Irvington's public nuisance claim.  *See* ECF No. 1332 at 27.  As to Irvington's negligence claim, Irvington fails to allege that Mr. Zuckerberg owed it a duty, as required under New Jersey law.  *E.g.*, *Endre v. Arnold*, 692 A.2d 97, 100 (N.J. Super. Ct. App. Div. 1997).  Irvington alleges that Mr. "Zuckerberg controlled, directed, approved, and/or ratified the harmful and unlawful conduct described in the Master Consolidated Complaint."  SFC ¶ 11.  Yet this Court previously dismissed claims brought by Personal Injury plaintiffs against Mr. Zuckerberg based on the same theory.  ECF No. 1312.  Specifically, the Court declined to impose liability on Mr. Zuckerberg based on his alleged "control over platform development," "awareness of safety risks," "denials of resource requests" and "public representations on platform safety."  ECF No. 1312 at 12–13 (cleaned up).  Because Irvington relies on that same constellation of allegations as its

---

[20]   In the earlier Personal Injury cases which Mr. Zuckerberg moved to dismiss, counsel accepted service for him as to those cases only following outreach from Plaintiffs' counsel.

[21]   *See also* School District SFC Implementation Order (ECF No. 620) §§ III ¶ 10 (all SD SFCs deemed answered and denied "without waiver of any defense or right to move to dismiss, and with full preservation of all arguments and defenses that may be raised in any responsive pleading that may be required by future order of the Court or motion to dismiss"), IV(A) ¶ 13 (newly named defendants' right "to challenge jurisdiction and venue are hereby preserved and explicitly not waived by Plaintiffs' direct filing of SFCs").

1  only basis for asserting a claim against Mr. Zuckerberg, SFC ¶¶ 12–31, its claim fails as a matter of

2  law.

3      Finally, Mr. Zuckerberg is entitled to summary judgment because Irvington lacks any

4  evidence to support its assertions that (1) Mr. Zuckerberg breached any duty or (2) any such breach

5  proximately caused Irvington injury. *See, e.g.*, *Endre*, 692 A.2d at 100; *Twitter, Inc.*, 445 F. Supp. at

6  302.

7  **V.      CONCLUSION**

8      Defendants seek entry of summary judgment in their favor on all causes of action that

9  Irvington asserts against Defendants or, in the alternative, partial summary judgment as to Plaintiff's

10  claim for past damages, proposed "strategic plan," and its failure-to-warn claim.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DATED:  September 30, 2025                     Respectfully submitted,

                                              By:  /s/ John J. Nolan
                                                    ALLISON BROWN, *pro hac vice*
                                                    alli.brown@kirkland.com
                                                    KIRKLAND & ELLIS LLP
                                                    2005 Market Street, Suite 1000
                                                    Philadelphia, PA 19103
                                                    Tel.: (215) 268-5000

                                                    JESSICA DAVIDSON, *pro hac vice*
                                                    jessica.davidson@kirkland.com
                                                    JOHN J. NOLAN, *pro hac vice*
                                                    jack.nolan@kirkland.com
                                                    KIRKLAND & ELLIS LLP
                                                    601 Lexington Avenue
                                                    New York, NY 10022
                                                    Tel.: (212) 446-4800

                                                    JONATHAN H. BLAVIN (State Bar No.
                                                    230269)
                                                    Jonathan.Blavin@mto.com
                                                    MUNGER, TOLLES & OLSON LLP
                                                    560 Mission Street, 27th Floor
                                                    San Francisco, CA 94105
                                                    Tel: (415) 512-4000

                                                    VICTORIA A. DEGTYAREVA (State Bar
                                                    No. 284199)
                                                    Victoria.Degtyareva@mto.com
                                                    MUNGER, TOLLES & OLSON LLP
                                                    350 South Grand Avenue, 50th Floor
                                                    Los Angeles, CA 90071
                                                    Tel.: (213) 683-9100
                                                    Facsimile: (213) 687-3702

                                                    *Attorneys for Defendant Snap Inc.*

                                                    /s/ Christian Pistilli
                                                    Ashley M. Simonsen (Bar No. 275203)
                                                    COVINGTON & BURLING LLP
                                                    1999 Avenue of the Stars
                                                    Los Angeles, California 90067
                                                    Telephone: (424) 332-4800
                                                    Facsimile: (424) 332-4749
                                                    Email: asimonsen@cov.com

                                                    Phyllis A. Jones (*pro hac vice*)
                                                    Paul W. Schmidt (*pro hac vice*)
                                                    Christian J. Pistilli (*pro hac vice*)
                                                    COVINGTON & BURLING LLP
                                                    One City Center
                                                    850 Tenth Street, NW

1   Washington, DC 20001-4956
    Telephone: (202) 662-6000
2   Facsimile: (202) 662-6291
    Email: pajones@cov.com
3   Email: pschmidt@cov.com
    Email: cpistilli@cov.com
4
    *Attorneys for Defendants Meta Platforms, Inc.*
5   *f/k/a Facebook, Inc.; Facebook Holdings,*
    *LLC; Facebook Operations, LLC; Meta*
6   *Payments Inc. f/k/a Facebook Payments Inc.;*
    *Meta Platforms Technologies, LLC f/k/a*
7   *Facebook Technologies, LLC; Instagram,*
    *LLC; and Siculus LLC f/k/a Siculus, Inc.*
8
9   */s/ Bailey Langner*
    GEOFFREY M. DRAKE, *pro hac vice*
10  gdrake@kslaw.com
    TACARA D. HARRIS, pro hac vice
11  tharris@kslaw.com
    KING & SPALDING LLP
12  1180 Peachtree Street, NE, Suite 1600
    Atlanta, GA 30309
13  Telephone: (404) 572-4600
    Facsimile: (404) 572-5100
14
    DAVID P. MATTERN, *pro hac vice*
15  dmattern@kslaw.com
    KING & SPALDING LLP
16  1700 Pennsylvania Avenue, NW
    Suite 900
17  Washington, D.C. 20006
    Telephone: (202) 737-0500
18  Facsimile: (202) 626-3737
19  BAILEY J. LANGNER (SBN 307753)
    *blangner@kslaw.com*
20  KING & SPALDING LLP
    50 California Street, Suite 3300
21  San Francisco, CA 94111
    Telephone: (415) 318-1200
22  Facsimile: (415) 318-1300
23  *Attorneys for Defendants TikTok Inc.,*
    *ByteDance Inc., ByteDance Ltd., TikTok Ltd.,*
24  *and TikTok, LLC*
25
    */s/ Ashley W. Hardin*
26  JOSEPH G. PETROSINELLI, *pro hac vice*
    jpetrosinelli@wc.com
27  ASHLEY W. HARDIN, *pro hac vice*
    ahardin@wc.com
28  J. ANDREW KEYES, *pro hac vice*

41

1    akeyes@wc.com
     NEELUM J. WADHWANI (SBN 247948)
2    nwadhwani@wc.com
     WILLIAMS & CONNOLLY LLP
3    680 Maine Avenue, SW
     Washington, DC 20024
4    Tel.: (202) 434-5000

5    *Attorneys for Defendants YouTube, LLC and*
     *Google LLC*

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED:   September 30, 2025

By:   */s/ John J. Nolan*
John J. Nolan
*Attorney for Defendant Snap Inc.*

By:   */s/ Christian J. Pistilli*
Christian J. Pistilli
*Attorney for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

By:   */s/ Bailey J. Langner*
Bailey J. Langner
*Attorney for Defendants TikTok Inc., ByteDance Inc., ByteDance Ltd., TikTok Ltd., and TikTok, LLC*

By:   */s/ Neelum J. Wadhwani*
Neelum J. Wadhwani
*Attorney for Defendants YouTube, LLC and Google LLC*

## ATTESTATION PURSUANT TO LOCAL RULE 5-1

I, John J. Nolan, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED:   September 30, 2025

By:   */s/ John J. Nolan*
John J. Nolan