[Parties and Counsel Listed on Signature Pages]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case No. 4:22-md-03047-YGR (PHK) |
| This Document Relates To: | **PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT** |
| *Breathitt County Board of Education v. Meta Platforms, Inc., et al.* | |
| *Tucson Unified School District v. Meta Platforms, Inc., et al.* | Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |
| *Charleston County School District v. Meta Platforms, Inc., et al.* | Date: January 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |
| *Irvington Public Schools v. Meta Platforms, Inc., et al.* | |
| *Dekalb County School District v. Meta Platforms, Inc., et al.* | |
| *Board of Education of Harford County v. Meta Platforms, Inc., et al.* | |

# TABLE OF CONTENTS

I.     INTRODUCTION AND "ROAD MAP" .................................................................. 1

II.    LEGAL STANDARD ............................................................................................. 3

III.   ARGUMENT ......................................................................................................... 3

       A.     Genuine material disputes of fact concerning Defendants' liability preclude
              summary judgment ..................................................................................... 3

              1.     Defendants are liable to the Districts for failing to warn about the risks of
                     their platforms. ................................................................................... 3

                     a)     The Court's prior rulings establish Defendants owed a duty to the
                            Districts. ................................................................................... 4

                     b)     Defendants owe a duty to warn the Districts directly. ................... 5

                     c)     Defendants owe a duty to warn students and parents about their
                            platforms' dangers. ................................................................... 8

                     d)     Defendants' failure to warn caused the Districts' injuries. ........... 10

              2.     Defendants breached their duty of care. ................................................ 12

                     a)     Meta's Conduct ......................................................................... 12

                            (1)     Meta's business model .................................................... 12

                            (2)     Meta's targeting of school-aged children ......................... 14

                            (3)     Meta's targeting of schools .............................................. 17

                            (4)     Meta's knowledge of harms .............................................. 21

                            (5)     Meta's failure to exercise reasonable care ........................ 33

                            (6)     Meta's misrepresentations and manipulations ................... 68

                            (7)     Meta's willful and knowing disregard of the rights of others
                                    .................................................................................... 74

                     b)     TikTok's Conduct ...................................................................... 77

                            (1)     TikTok's business model .................................................. 77

                            (2)     TikTok's targeting of school-aged children....................... 79

                            (3)     TikTok's targeting of schools .......................................... 82

                            (4)     TikTok's knowledge of harms .......................................... 86

                            (5)     TikTok's failure to exercise reasonable care ..................... 93

(6)    TikTok's misrepresentations and manipulations ............ 114

(7)    TikTok failed to warn parents, educators, and schools about known mental health risks ............................................. 115

c)    Snap's Conduct ........................................................................ 116

(1)    Snapchat's business model ............................................. 116

(2)    Snapchat's targeting of school-aged children ................ 118

(3)    Snapchat's targeting of schools ..................................... 121

(4)    Snap's knowledge and willful blindness of harms ......... 124

(5)    Snap's failure to exercise reasonable care ..................... 130

(6)    Snap's misrepresentations and manipulations ............... 146

(7)    Snap failed to warn parents, educators, and schools about known mental health risks ............................................. 148

d)    Google/YouTube's Conduct ..................................................... 150

(1)    YouTube's business model ............................................. 150

(2)    YouTube's targeting of school-aged children................ 151

(3)    YouTube's targeting of schools..................................... 155

(4)    YouTube's knowledge of harms..................................... 162

(5)    YouTube's failure to exercise reasonable care .............. 165

(6)    YouTube's misrepresentations and manipulations ......... 184

(7)    YouTube's failure to warn ............................................. 185

3.    Defendants' conduct substantially interferes with the public right to health, safety, and education in Arizona, Georgia, Kentucky, and Maryland.... 185

B.    Defendants' causation arguments are premised on disputed facts and legal errors. ................................................................................................................ 187

1.    Defendants improperly raise the evidentiary bar in requiring Plaintiffs to quantify specific student usage ............................................................... 187

2.    Defendants' "entanglement" arguments on causation are premised on legal errors ................................................................................................... 190

a)    Defendants misapprehend the features at issue by writing this Court's failure to warn ruling out of existence. .......................... 190

b)    The Districts need not rule out every possible alternative causal factor to avoid Section 230. ....................................................... 191

          c)      Juries are routinely called upon to evaluate liability in the context of concurrent causation ............................................................. 193

C.     Genuine material disputes of fact concerning the Districts' damages preclude summary judgment.............................................................................................. 195

     1.     Each Plaintiff has presented evidence of compensable "hard costs.".... 195

          a)      The Districts presented evidence of mitigation measures, including mental health resources, and technology materials, systems, and programming............................................................................. 196

          b)      Defendants cross-cutting entanglement arguments do not support summary judgment on causation ............................................... 199

     2.     Defendants can be required to compensate Districts for the diversion of school resources caused by their misconduct. ......................................... 201

     3.     Mr. Klein's survey raises disputed issues of fact regarding the Districts' lost time damages.................................................................................. 204

D.     The Districts' claims for future damages are legally cognizable........................ 205

     1.     The Districts proffer relevant evidence supporting a claim for future damages.................................................................................................... 205

     2.     Breathitt, DeKalb, Harford, and Tucson's nuisance claims permit the abatement they seek. .......................................................................... 210

          a)      Abatement is a distinct equitable remedy designed to eliminate ongoing and future public harms. ............................................... 210

          b)      Dr. Hoover's strategic plans provide the framework for crafting an abatement remedy. ...................................................................... 211

               (1)     The abatement remedy may include monetary relief...... 212

               (2)     Defendants' state law authorities are inapposite............. 214

               (3)     Defendants' attacks on Dr. Hoover's plans lack merit. .. 215

     3.     The Districts' harms are not derivative.................................................. 216

IV.    CONCLUSION.............................................................................................................. 217

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Aaron's, Inc. v. MDC Grp., Inc.*, 2010 WL 11505919 (N.D. Ga. Dec. 15, 2010). ................................ 202

*Accessory Overhaul Grp., Inc. v. Mesa Airlines, Inc.*, 994 F. Supp. 2d 1296 (N.D. Ga. 2014) ............ 207

*Adams v. Comm'rs of Town of Trappe*, 102 A.2d 830 (Md. Ct. App. 1954) ........................................ 214

*Alcantar v. Hobart Serv.*, 2013 WL 156530 (C.D. Cal. Jan. 15, 2013) ................................................. 205

*Allen v. Greenville Hotel Partners, Inc.*, 2006 WL 1817804 (D.S.C. June 30, 2006) ......................... 194

*Allen v. Long Mfg. NC, Inc.*, 505 S.E.2d 354 (S.C. Ct. App. 1998) ...................................................... 11

*Am. Motorcycle Ass'n v. Super. Ct.*, 578 P.2d 899 (Cal. 1978) ............................................................ 193

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................................ 3

*Andino v. Apple, Inc.*, 2021 WL 1549667 (E.D. Cal. Apr. 20, 2021) ............................................ 210-11

*Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696 (9th Cir. 2001) ............... 216

*Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089 (N.D. Cal. 2021) ............................... 3

*Bailey v. N. Am. Refractories Co.,* 95 S.W.3d 868 (Ky. Ct. App. 2001) ............................................. 190

*Ballou v. Sigma Nu Gen. Fraternity*, 352 S.E.2d 488 (S.C. Ct. App. 1986) ....................................... 194

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009) .............................................................. 69

*Barrett Props., LLC v. Roberts Capitol, Inc.*, 729 S.E.2d 621 (Ga. Ct. App. 2012) ........................... 194

*Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602 (N.J. 2013) ......................................................... 206

*Beasley v. Astrue*, 2011 WL 1327130 (W.D. Wash. Mar. 24, 2011) .................................................... 186

*Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964 (N.D. Cal. 2019) ................................. 195

*Blondell v. Courtney Station 300 LLC*, 865 S.E.2d 589 (Ga. Ct. App. 2021) ...................................... 187

*Brandes v. Mitterling*, 196 P.2d 464 (Ariz. 1948) .............................................................................. 214

*Bride v. Yolo Technologies, Inc.*, 112 F.4th 1168 (9th Cir. 2024)…………………………………………192

*Brookside Assocs. v. Rifkin*, 49 F.3d 490 (9th Cir. 1995) .................................................................... 3

*Brown v. City of Phoenix*, 557 P.3d 321 (Ariz. Ct. App. 2024) ........................................................... 214

*Bullock v. Volkswagen Grp. of Am., Inc.*, 107 F. Supp. 3d 1305 (M.D. Ga. 2015) .............................. 11

*Cactus Corp. v. State ex rel. Murphy*, 480 P.2d 375 (Ariz. Ct. App. 1971) ......................................... 214

*Calise v. Meta Platforms, Inc.*, 103 F.4th 732 (9th Cir. 2024) .............................................. 192

*Campione v. Soden*, 695 A.2d 1364 (N.J. 1997)........................................................................ 200

*Carter v. Wallace & Gale Asbestos Settlement Tr.*, 96 A.3d 147 (Md. Ct. App. 2014)................ 200, 207

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 3

*Cepelak v. HP Inc.*, 2021 WL 5298022 (N.D. Cal. Nov. 15, 2021) ...................................... 211

*CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641 (Ga. 2016) ............................................................ 7

*Charleston Lumber Co. v. Miller Hous. Corp.*, 458 S.E.2d 431 (S.C. Ct. App. 1995) ........................ 202

*City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 1003 (N.D. Cal. 2022) .......

............................................................................................................................ 187-188, 189

*City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 2025 WL 3009526 (4th Cir. Oct. 28,

2025) ............................................................................................................................ 210, 212

*City of Safford v. Seale*, 2009 WL 3390172 (Ariz. Ct. App. Oct. 21, 2009) ........................................ 214

*Coleman v. Mondelez Int'l Inc.*, 554 F. Supp. 3d 1055 (C.D. Cal. 2021)........................................ 210, 211

*Colon v. Robinson*, 2014 WL 7466566 (N.J. Super. Ct. App. Div. Jan. 6, 2015)……………………...206

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142 (3d Cir. 1990) .............................................................. 202

*Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781 (9th Cir. 1982) .................................................. 201, 204

*Correct Transmission, LLC v. Nokia of Am. Corp.*, 2024 WL 1289821 (E.D. Tex. Mar. 26, 2024) ..... 201

*Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d 458 (Ariz. 1968) .......................................... 207

*CRS Sirrine, Inc. v. Dravo Corp.*, 464 S.E.2d 897 (Ga. Ct. App. 1995) ............................................ 194

*Davidson v. Miller*, 344 A.2d 422 (Md. 1975) ................................................................................ 206

*DiLeo v. Nugent*, 592 A.2d 1126 (Md. Ct. Spec. App. 1991)……………………...……………………...206

*Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882 (N.D. Cal. 2024) ........................................ 193

*Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893 (N.D. Cal. 2021)............................................................ 5

*Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025) ............................................................................ 192

*Doe v. Grindr Inc.*, 128 F.4th 1148 (9th Cir. 2025)........................................................................ 193

*Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016)............................................................ 69

*Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333 (Ga. Ct. App. 2007) .................................... 6

*Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877 (6th Cir. 1982) ........................ 202, 204

*Fed. Deposit Ins. Corp. v. Loudermilk*, 826 S.E.2d 116 (Ga. 2019)......................................... 200

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025 (9th Cir. 2010). 205

*Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154 (9th Cir. 2017) ............................................. 209

*Furlong v. Dyal*, 539 S.E.2d 836 (Ga. Ct. App. 2000) ...................................................... 189

*Gassaway Constr. Co. v. Gentry*, 264 S.W.2d 658 (Ky. 1954) ............................................ 202

*Georgia Cas. & Sur. Co. v. Salter's Indus. Serv., Inc.*, 734 S.E.2d 415 (Ga. Ct. App. 2012) ................. 11

*Gilbert v. Stewart*, 255 A.3d 1101 (N.J. 2021) ............................................... 187, 190, 194, 196

*Gilmore v. Cohen*, 386 P.2d 81 (Ariz. 1963) ................................................................ 207

*Gipson v. Kasey*, 150 P.3d 228 (2007)......................................................................... 4

*Gourdine v. Crews*, 955 A.2d 769 (Md. 2008) ............................................................... 7

*Green Meadows Hous. Partners, LP v. Macon-Bibb Cnty.*, 906 S.E.2d 430 (2024) ........................... 215

*Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34 (D. Ariz. 2021) ...................................... 203

*Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869 (N.D. Cal. 2021)................................ 214

*Haltiwanger v. Barr*, 186 S.E.2d 819 (S.C. 1972).................................................... 205, 206

*Hanna  v. Ward Manuf., Inc.*, 2016 WL 3196467 (M.D. Fla. June 9, 2016)................................ 11

*Hayes v. Crawford*, 730 S.E.2d 26 (Ga. Ct. App. 2012)...................................................... 190

*Hickerson v. Yamaha Motor Corp., U.S.A.*, 2016 WL 4367141 (D.S.C. Aug. 16, 2016) ...................... 11

*Hirsh v. Manley*, 300 P.2d 588 (Ariz. 1956).................................................................. 207

*Hunt v. City of L.A.*, 638 F.3d 703 (9th Cir. 2011) ........................................................ 189

*IceMOS Tech. Corp. v. Omron Corp.*, 2020 WL 1083817 (D. Ariz. Mar. 6, 2020)............................ 203

*In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667 (D.S.C. 2021) ................... 203

*In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (S.D.N.Y. 2018)........................ 203

*In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552 (N.D. Cal. 2020) ...................................................................................................... 8, 212

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938 (N.D. Ohio Aug. 26, 2019)........... 210, 212-13

*In re Nat'l Prescription Opiate Litig.*, 622 F. Supp. 3d 584 (N.D. Ohio 2022), *rev'd on other grounds*, 2025 WL 354758 (6th Cir. Jan. 31, 2025) ............................................................. 213

*In re Nat'l Prescrip. Opiate Litig.*, 589 F. Supp. 3d 790 (N.D. Ohio 2022)………………………186, 189

*In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178617 (N.D. Ohio Sept. 3, 2019) .................. 188, 190

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 754 F. Supp. 3d 946

    (N.D. Cal. 2024) ........................................................................................................ *passim*

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2024 WL 5694360

    (N.D. Cal. Nov. 15, 2024) ........................................................................................ 185

*In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849

    (N.D. Cal. 2024) ........................................................................................................ 190

*In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130 (10th Cir. 2009)……………….……………….193

*J&W Corp. v. Broad Creek Marina, LLC*, 896 S.E.2d 328 (S.C. Ct. App. 2023) ................................ 207

*J.D. Jewell, Inc. v. Hancock*, 175 S.E.2d 847 (Ga. 1970) ........................................................... 214

*J.N. Legacy Grp., Inc. v. City of Dallas*, 745 S.E.2d 721 (Ga. Ct. App. 2013) ...................................... 206

*J.T. Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97 (S.C. 2006) .............................................. 189, 190

*Johnson v. Wood*, 2025 WL 2715888 (Ga. Ct. App. Sept. 24, 2025) .................................... 187, 195, 196

*Jones by & through Jones v. IC Bus, LLC,* 626 S.W.3d 661 (Ky. Ct. App. 2020) .................................. 10

*Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66 (Ky. 1973) ........................................................ 7

*KeraLink Int'l, Inc. v. Geri-Care Pharms. Corp.*, 60 F.4th 175 (4th Cir. 2023) ................................... 203

*KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*, 2021 WL 5832242 (D. Md. Nov. 2, 2021) ............... 203

*Kennedy Krieger Inst. v. Partlow*, 191 A.3d 425, (Md. 2018)……………………………………………….8

*Kuciemba v. Victory Woodworks*, 531 P. 3d 924 (Cal. 2023) ..................................................... 7

*Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021)……………….……………………………..… 191, 192

*Lurry v. PharMerica Corp.*, 2024 WL 2965642 (W.D. Ky. June 12, 2024) ........................................ 202

*MacDonald v. Patriot, LLC*, 2017 WL 1788115 (Md. Ct. Spec. App. May 5, 2017) ........................... 203

*Martin v. Howard Cnty.*, 709 A.2d 125 (Md. 1998) .................................................................. 214

*Mason v. Arizona Pub. Serv. Co.*, 622 P.2d 493 (Ariz. Ct. App. 1980) .............................................. 189

*Masson v. New Yorker Mag., Inc.*, 501 U.S. 496 (1991) ............................................................. 3

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ......................................... 3

*Mauro v. Raymark Indus., Inc.*, 561 A.2d 257 (N.J. 1989) ......................................................... 206

*May v. Holzknecht*, 320 S.W.3d 123 (Ky. Ct. App. 2010) ......................................................... 205

*Mayer v. Hous. Auth. of Jersey City*, 202 A.2d 439 (N.J. Super. Ct. App. Div. 1964) ......................... 194

*Mayor and City of Baltimore v. Purdue Pharma, L.P.*, No. 24-C-18-000515 (Md. Cir. Ct. Aug. 8, 2025) ............................................................................................................................................. 213

*McAlister v. Loeb & Loeb, LLP*, 571 P.3d 891 (Ariz. 2025) ...................................... 207

*McNutt Oil & Refin. Co. v. D'Ascoli*, 281 P.2d 966 (Ariz. 1955) ......................... 207

*Meraz v. Ford Motor Co.*, 2014 WL 12558123 (C.D. Cal. June 13, 2014) ...................... 187

*Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507 (11th Cir. 1994).......................... 211

*Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*, 2014 WL 7369898 (W.D. Pa. Dec. 29, 2014) ............................................................................................................................................. 202

*Moody v. NetChoice, LLC*, 603 U.S. 707 (2024) ........................................... 36

*Moore v. City of Atlanta, Ga.*, 2022 WL 19517299 (N.D. Ga. Dec. 19, 2022)...................................... 200

*Musacchio v. United States*, 577 U.S. 237 (2016) ........................................... 5

*Nelson v. Am. Honda Motor Co.*, 2021 WL 2877919 (W.D. Pa. May 17, 2021)..................................... 11

*NetChoice, LLC v. Bonta*, 2025 WL 2600007 (9th Cir. Sept. 9, 2025)...................................... 36

*New Jersey Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*, 2021 WL 6144081 (D.N.J. Dec. 30, 2021) ................................................................................................................................. 7

*New York v. Ferber*, 458 U.S. 747 (1982) ........................................... 69

*Nobles v. Jiffy Mkt. Food Store Corp.*, 579 S.E.2d 63 (Ga. Ct. App. 2003)........................................... 207

*Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482 (Ct. App. 2007).................................. 186-87

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111 (9th Cir. 2013)....... 193

*Ogden v. Bumble Bee Foods, LLC*, 2014 WL 27527 (N.D. Cal. Jan. 2, 2014) ..................................... 3

*Ostrovskaya v. St. John Knits, Inc.*, 2022 WL 2102895 (C.D. Cal. Mar. 31, 2022)............................. 211

*Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467 (Ky. 2001) ............................................... 200

*Parris v. 3M Co.*, 595 F. Supp. 3d 1288 (N.D. Ga. 2022) .............................................................. 9

*Pathways, Inc. v. Hammons*, 113 S.W.3d 85 (Ky. 2003) ................................................... 187, 196

*People v. ConAgra Grocery Prods. Co.,* 227 Cal. Rptr. 3d 499 (Ct. App. 2017) ................................. 214

*Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020 (1983) ......................................... 206

*Pinckney v. Meta Platforms Inc.*, 127 F.4th 516 (4th Cir. 2025)..................................................... 193

*Piner v. Sup. Ct. in and for Cnty. of Maricopa*, 962 P.2d 909 (Ariz. 1998) .......................... 200

*Pittway Corp. v. Collins*, 973 A.2d 771 (Md. Ct. App. 2009) ....................................... 187, 196

*PivotHealth Holdings LLC v. Horton*, 2025 WL 1865788 (D. Ariz. July 7, 2025) ............... 202

*Pratt v. Amisub of SC, Inc.*, 912 S.E.2d 268 (S.C. Ct. App. 2025) .................................... 200

*Quinalty v. FocusIT LLC*, 2024 WL 342454 (D. Ariz. Jan. 30, 2024) ................................ 203

*Quiroz v. ALCOA Inc.*, 416 P.3d 824 (Ariz. 2018) ............................................................. 7

*Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805 (Va. 2018) .................................. 5

*Quynn v. Hulsey*, 850 S.E.2d 725 (Ga. 2020) ................................................................ 200

*R & R Insulation Servs. v. Royal Indem. Co.*, 705 S.E. 2d 223 (Ga. Ct. App. 2010) ......... 10

*Ramah Navajo Sch. Bd., Inc. v. Sebelius*, 2013 WL 12303945 (D.N.M. May 9, 2013) ...... 194

*Rancho Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 680 P.2d 1235 (Ariz. Ct. App. 1984) ..... 207

*Rhynes v. Stryker Corp.*, 2011 WL 2149095 (N.D. Cal. May 31, 2011) ............................ 211

*Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040 (Ariz. 1990) .............................. 194

*Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825 (N.D. Cal. June 17, 2016) ...................... 211

*Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903 (E.D. Cal. 2020) .................... 211

*Rowhouses, Inc. v. Smith, 133 A.3d 1054 (Md. 2016)* ................................................... 189

*Ruggiero v. Yamaha Motor Corp., U.S.A.*, 2017 WL 1197755 (D.N.J. Mar. 31, 2017) ...... 11

*Saide v. Stanton*, 659 P.2d 35 (Ariz. 1983) .................................................................. 206

*Schall v. Suzuki Motor of Am., Inc.*, 450 F. Supp. 3d 771 (W.D. Ky. 2020) .................... 189

*Schwartz v. Hasty*, 175 S.W.3d 621 (Ky. Ct. App. 2005) ............................................... 202

*Shulz v. Chadwell*, 558 S.W.2d 183 (Ky. Ct. App. 1977) .............................................. 202

*Social Media Cases*, 2025 WL 2807828 (Cal. Super. Sep. 22, 2025) ............................. 189

*Sonner v. Premier Nutrition Corp.*, 971 F.3d 834 (9th Cir. 2020) ....................... 210, 211, 214

*Spaw, LLC v. City of Annapolis*, 156 A.3d 906 (Md. Ct. App. 2017) .............................. 214

*State ex rel. Dep't of Ecology v. Anderson*, 620 P.2d 76 (Wash. 1980) ....................... 213-14

*State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420 (D. Md. 2019) ................. 6, 7

*State of Wash. v. McKesson Corp. et al.*, No. 19-2-06975-9 (Sup. Ct. Wash. July 6, 2021) ......... 210, 214

*State v. Rouse*, 647 N.W.2d 286 (Wis. Ct. App. 2002) ................................................. 202

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

*Stollenwerk v. Tri-W. Health Care All.*, 254 F. App'x 664 (9th Cir. 2007) ............................................. 190

*Stringer v. Nat'l Football League*, 749 F. Supp. 2d 680 (S.D. Ohio 2009) .................................................. 9

*Sullivan v. Daimler Trucks N. Am., LLC*, 2019 WL 13563633 (D.S.C. Aug. 28, 2019) ......................... 11

*Superior Farm Mgmt., L.L.C. v. Montgomery*, 513 S.E.2d 215 (Ga. 1999) ............................................ 214

*Teutscher v. Woodson*, 835 F.3d 936 (9th Cir. 2016) ............................................................................. 211

*Thacker v. Ethicon, Inc.*, 47 F.4th 451 (6th Cir. 2022) .......................................................................... 194

*Torres v. Jai Dining Servs. (Phoenix) Inc.*, 497 P.3d 481 (Ariz. 2021) ........................................ 187, 195

*Under Armour, Inc. v. Ziger/Snead, LLP*, 158 A.3d 1134 (Md. Ct. Spec. App. 2017) ......................... 203

*Underwood v. Camden Cnty. Off. of Sheriff*, 2024 WL 1366672 (D.N.J. Mar. 28, 2024) .................... 189

*United States v. Apex Oil Co.*, 579 F.3d 734 (7th Cir. 2009) ................................................................. 212

*United States v. Philip Morris USA Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006) .................................... 18-19

*United States v. Price*, 688 F.2d 204 (3d Cir. 1982) ............................................................................. 214

*USA Truck, Inc. v. Sullair, LLC*, 2020 WL 12656229 (M.D. Ga. Dec. 7, 2020) ...................................... 9

*Walton v. Premier Soccer Club, Inc.*, 334 A.3d 784 (Md. 2025) ........................................................... 194

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .......................................................................... 212

*Wickersham v. Ford Motor Co.*, 853 S.E.2d 329 (S.C. 2020) ....................................................... 187, 196

*Wilder v. Blue Ribbon Taxicab Corp.*, 719 S.E.2d 703 (S.C. Ct. App. 2011) ..................................... 205

*Williams v. Schneider Elec. USA, Inc.*, 2023 WL 4374514 (Ky. Ct. App. July 7, 2023) ......................... 7

*Wood v. Marathon Refining Logistics Serv. LLC*, 2024 WL 2242688 (N.D. Cal. Mar. 21, 2024) ....... 211

*Yonce v. SmithKline Beecham Clinical Lab'ys, Inc.*, 680 A.2d 569 (Md. Ct. Spec. App. 1996) ............ 190

*Zakas v. Jackson*, 835 S.E.2d 371 (Ga. Ct. App. 2019) ....................................................................... 205

*Zayo Grp., LLC v. Sols. Fiber Optic, Inc.*, 2025 WL 2157902 (E.D. Va. July 11, 2025) *report and recommendation adopted*, 2025 WL 2155792 (E.D. Va. July 29, 2025) .......................................... 202

**Statutes & Regulations**

15 U.S.C. § 6501 ....................................................................................................................................... 63

15 U.S.C. § 6502(b)(1)(A)(ii) ................................................................................................................. 171

15 U.S.C. § 6502(b)(1)(B) ...................................................................................................................... 171

18 U.S.C. § 2252……………………………………………………………………………………69

16 C.F.R. § 312.4 ....................................................................................................................... 171

16 C.F.R. § 312.5 .............................................................................................................. 63, 171

16 C.F.R. § 312.6 .............................................................................................................. 63, 171

16 C.F.R. § 312.8 ....................................................................................................................... 171

**Other Authorities**

Brief for Common Sense Media and Frances Haugen as Amici Curiae Supporting Petitioners,

   *Gonzalez, et al., v. Google LLC,* No. 21-1333 (Dec. 6, 2022)…………………………………160

Az. Const. art. XI, § 1 *et seq* ................................................................................................. 186

Ga. Const. art. VIII ................................................................................................................. 186

Ky. Const. § 183 ..................................................................................................................... 186

Md. Const. art. VIII, § 1 *et seq*. ............................................................................................ 186

Fed. R. Civ. P. 56 ............................................................................................................. *passim*

Fed. R. Evid. 702(a) ....................................................................................................... 12, 205

Restatement (Second) of Torts § 433A ........................................................................... 194, 200

Restatement (Second) of Torts § 821B ................................................................................. 210

Restatement (Second) of Torts § 821C(2) ............................................................................ 210

Restatement (Second) of Torts § 821F ................................................................................. 187

*Surgeon General's Warning on Social Media Platforms*, N.Y. Times (June 17, 2024) …………………1

Murthy, Vivek H., *Protecting Youth Mental Health: The U.S. Surgeon General's Advisory* (2023) ...... 14

## I.    INTRODUCTION AND "ROAD MAP"

American teens are facing an unprecedented mental health crisis, and Defendants' social media platforms are a substantial contributing factor. As U.S. Surgeon General Vivek H. Murthy stated, "it is time to require a surgeon general's warning label on social media platforms, stating that social media is associated with significant mental health harms for adolescents." Vivek H. Murthy, *It's Time to Require a Surgeon General's Warning on Social Media Platforms, N.Y. Times* (June 17, 2024). As the harmful effects of Defendants' platforms have mounted, the Plaintiff school districts ("Districts") have been forced to expand counseling, intervention, and mental health services, diverting limited resources from their core mission of education. Defendants attempt to minimize this reality, placing the word *"crisis"* in quotation marks, but the impact on the Districts is undeniable: they have been compelled to address student well-being, at the expense of their core mission to educate. These costs are not static; recent survey data and expert analyses demonstrate that the harms to student mental health—and the resulting burdens on school systems—are ongoing and will continue into the future.

Each Defendant claims it owed no duty to the Districts, that the harms were unforeseeable, or that federal immunity doctrines shield its inaction. The record proves otherwise. Defendants knew their platforms' deliberate exploitation of children's attention for profit was fueling a youth mental health crisis and destabilizing schools. Yet they concealed those facts and failed to warn either the Districts or students and their parents. Defendants' internal research and independent studies leave no doubt: the harms to youth mental health and school systems are measurable, persistent, and worsening—proof that these outcomes were not only foreseeable but inevitable under Defendants' business model.

Defendants' conduct has substantially and foreseeably interfered with the right of children to attend school in an environment conducive to learning and free from preventable psychological harm. The resulting harms from this public nuisance—a widespread mental-health crisis, disrupted classrooms, and the redirection of educational resources—are not isolated or accidental; they are the predictable outcome of corporate choices to maximize youth engagement and advertising revenue at the expense of the Districts and student well-being.

Defendants begin each of their motions by emphasizing the preexisting challenges school Districts already face—poverty, racism, community violence, or natural disasters—as though those realities

absolve them of responsibility. But the law rejects that defense, recognizing that vulnerability does not excuse misconduct; it magnifies its consequences. Every district endured COVID-19 and its disruptions, but that shared challenge does not diminish Defendants' accountability for the distinct harms their platforms imposed on already fragile educational systems.

This Omnibus Response provides the Court with a consolidated explanation of why Defendants' overlapping motions fail, highlighting the common factual and legal disputes that must be resolved by a finder of fact—disputes over duty, breach, causation, and damages that are the same for every District and cannot be resolved on summary judgment. In addition to this filing, each of the six bellwether Districts has submitted its own individual opposition applying their governing state law to their particular facts.

This filing is organized as follows:

**Section II – Legal Standard:** Establishes that under Rule 56, summary judgment is improper where, as here, material facts are in dispute or credibility determinations are required.

**Section III(A) – Liability:** Makes clear that Defendants owed a duty of care to act reasonably to prevent foreseeable harm to students and schools and breached that duty by 1) knowingly and substantially causing and exacerbating the youth mental-health crisis, which the Districts are forced to address, and 2) disrupting District operations and negatively impacting the school environment. The record also establishes that Defendants' conduct created and maintained a public nuisance by unreasonably interfering with the public rights to health, safety, and education.

**Section III(B) – Causation:** Explains that Defendants' "entanglement" arguments misconstrue both law and fact. Plaintiffs are not required to isolate a single cause of harm; concurrent causes are for the jury to resolve. And the record shows a direct nexus between Defendants' creation of a nuisance and their negligent practices, omissions, and failures to warn, and the harms suffered by the Districts.

**Section III(C) – Past Damages:** Details the substantial evidence showing the Districts have incurred compensable losses, including increased expenditures and diversion of school resources. Expert analyses from Dr. Ward and Mr. Klein confirm that the value of teacher and staff time diverted to address disruptions caused by Defendants' platforms represents a recognized and quantifiable injury under law.

**Section III(D) – Future Damages:** Establishes that the Districts' evidence of ongoing harm is concrete and non-speculative. Future damages and abatement remedies are recognized and recoverable

under the laws of each jurisdiction.

Collectively, the six District filings and this Omnibus Response show that Defendants' platforms have imposed real and ongoing harms on the Districts. The record—both shared and District-specific—contains ample evidence of the creation of a public nuisance, and of duty, breach, causation, and damages. Those factual disputes must be resolved by a jury, not on summary judgment.

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). A dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party, and "material" if it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When evaluating a motion for summary judgment, the Court must construe the evidence and draw all reasonable inferences in favor of the non-movant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Brookside Assocs. v. Rifkin,* 49 F.3d 490 (9th Cir. 1995); *Ogden v. Bumble Bee Foods, LLC*, 2014 WL 27527, at 6 (N.D. Cal. Jan. 2, 2014). The Court may not weigh evidence or make credibility determinations. *Masson v. New Yorker Mag., Inc.,* 501 U.S. 496, 520 (1991) (citing *Anderson*, 477 U.S. at 255); *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1099 (N.D. Cal. 2021). Because the Districts have presented ample evidence creating genuine disputes of material fact, summary judgment must be denied.

## III.    ARGUMENT

### A.    Genuine material disputes of fact concerning Defendants' liability preclude summary judgment.

#### 1.    Defendants are liable to the Districts for failing to warn about the risks of their platforms.

Defendants have fueled a youth mental health crisis by deliberately targeting school-aged children with addictive social media platforms designed to maximize engagement and Defendants' profit. They have also targeted schools, actively promoting student use of their platforms during the school day, while failing to warn the Districts, their students, and parents about the serious mental health risks posed by their platforms. The Districts have been left to bear the costs of the ensuing harms, including a compromised educational environment and expenditure and diversion of resources to address student distraction and

3

mental health problems.

Defendants now seek to avoid responsibility for these harms, contending they owed no duty to the Districts because the Districts were not direct users of their platforms. But the Court has already held that Defendants *do* owe a duty to the Districts, and Defendants offer no basis to revisit that legal determination. Defendants' attempt to relitigate this issue is as substantively baseless as it is procedurally improper. Defendants owe a duty to warn the Districts of the harms caused by their deliberately addictive platforms, as well as a duty to warn students and parents of the serious mental health risks their platforms pose. The Districts have presented substantial evidence demonstrating they were harmed as a result of Defendants' breach of those duties. Defendants cannot escape liability by disregarding the predictable impact of their conduct on the very schools left to confront and manage the crisis they created.

**a)**      **The Court's prior rulings establish Defendants owed a duty to the Districts.**

This Court held that Defendants owe the Districts a duty of care grounded in foreseeability, the relationship between Defendants' conduct and the Districts' harms, and public policy. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 754 F. Supp. 3d 946, 972–78 (N.D. Cal. 2024) ("MTD Order"). In denying Defendants' motion to dismiss the Districts' negligence claims, the Court concluded that the Districts plausibly alleged a legal duty of care and expressly allowed their failure-to-warn theories to proceed. *Id.* The Court explained that "three fundamental considerations" guide the duty analysis across jurisdictions:[1] "(1) the relationship between the parties, in particular, the relationship between the defendant's conduct and the plaintiff's injury; (2) the foreseeability of the plaintiff's injury; and (3) public policy concerns." *Id.* at 973. The Court found that all three factors supported a duty of care. *Id.* at 973–78.

Defendants now ignore these settled determinations. Instead, Defendants mischaracterize the Court's ruling, incorrectly claiming it recognized merely a "general" duty, which excludes any duty to warn of "financial harms" from student platform use. *See, e.g.*, Defs.' Breathitt Mot. at 35. But the Court expressly rejected Defendants' effort to dismiss failure-to-warn theories concerning "known risks of

---

[1] Under Arizona law, foreseeability is not a factor in the duty analysis but the relationship between the parties and public policy concerns are factors. *Gipson v. Kasey*, 150 P.3d 228, 231–34 (2007)

4

addiction attendant to any platform features or as to platform construction in general," and held that Defendants owed the Districts a duty of care arising from their "intentional design choices to foster compulsive use in their minor users and a failure to warn thereof." MTD Order, 754 F. Supp. 3d at 963–64, 978. The Court further found that, "as [Defendants] became sophisticated in their targeting and capture of minor users as to instill compulsive use of the platforms . . . it was objectively reasonable to expect the alleged corollary injuries." *Id.* at 975.

This makes sense. The direct impact on the Districts includes financial harms, such as the expenditure and diversion of resources to combat student use of Defendants' platforms during the school day and to address the negative impacts of Defendants' platforms on students. These were not obscure, unknowable consequences of Defendants' actions, but rather a natural result of Defendants' choice to target schools and school-aged children and to design platforms promoting compulsive use, including during school hours. *See infra* at § III.A.2. The Districts should have been warned about these harms. Defendants' argument also ignores that if Defendants had warned the public of the potential negative impacts on students—even without warning the Districts—the Districts could have taken steps to prevent and mitigate the resulting financial harms they experienced.

Defendants cannot relitigate the Court's prior legal determinations at summary judgment. "[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Doe 1 v. Mayorkas*, 530 F. Supp. 3d 893, 909 n.8 (N.D. Cal. 2021) (quoting *Musacchio v. United States*, 577 U.S. 237, 244–45 (2016)). The Court's findings remain controlling—and the record only strengthens them through evidence of Defendants' knowledge of youth engagement, school-day disruption, and the foreseeable burdens their conduct imposed on schools.

### b)    Defendants owe a duty to warn the Districts directly.

Defendants owe a duty to warn the Districts as parties directly and foreseeably harmed by their platforms' design and operation. Under well-established tort principles, a duty to warn arises when a defendant's conduct creates a foreseeable risk of harm to others. MTD Order, 754 F. Supp. 3d at 973 (duty arises where there is "sufficient juxtaposition of the parties in time and space to place the plaintiff in danger from the defendant's acts") (quoting *Quisenberry v. Huntington Ingalls Inc.*, 818 S.E.2d 805, 811 (Va. 2018)). This duty extends to all those the defendant should reasonably expect to be harmed by their

conduct. *See State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 463 (D. Md. 2019) ("duty to warn extends . . . to third persons whom the supplier should expect to be endangered") (cleaned up).

Defendants' own internal research, marketing strategies, and school outreach confirm they knew their platform designs were fostering compulsive use among students and producing widespread consequences for schools. *See infra* §§ III.A.2.a.2-3, b.2-3, c.2-3, d.2-3 (discussing Defendants' targeting of young people and schools); III.A.2.a.4, b.4, c.4, d.4 (discussing Defendants' knowledge of harms). Internally, Meta researchers minced no words: ███████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████ Meanwhile, TikTok researched ██████████ ████████████████████████████████████ Snap acknowledged that ████████████████████ ██████████████████████████████████████████████████████ And YouTube—despite knowing ████████████████████████████████ ███████████████████████████████████████████████████████████ ████████████████

By deliberately targeting school-aged children and embedding features that promote compulsive engagement, Defendants created and amplified foreseeable harms the Districts now must address every day. Having created and profited from the very risks that injured the Districts, Defendants cannot now escape liability by artificially narrowing the scope of their duty to warn by framing the Districts' claims as a "novel" attempt to impose a duty on "indirectly injured" non-users of their platforms. *See, e.g.,* Defs.' Breathitt Mot. at 34-35. This Court has already rejected that idea. It is not novel to hold Defendants liable for failing to warn those directly and foreseeably harmed by their conduct. *See* MTD Order, 754 F. Supp. 3d at 974 (holding "that 'the school Districts' injuries are sufficiently 'direct'" to impose a duty of care). The Court's prior holding is squarely aligned with a long line of cases recognizing that those who create foreseeable dangers must take reasonable steps to warn all who are likely to be affected—not merely end-users. *See, e.g.*, *Dozier Crane & Mach., Inc. v. Gibson*, 644 S.E.2d 333, 336 (Ga. App. 2007) ("The common-law duty imposed upon suppliers of chattels includes the duty to warn of foreseeable dangers

---

[2] All exhibits referenced in this brief are attached to the accompanying Declaration of Previn Warren.

arising from the reasonable use for which the product is intended and requires the exercise of reasonable care to inform third persons of the dangerous condition or of the facts which make the product likely to become dangerous."); *State of Maryland v. Exxon Mobil Corp.*, 406 F. Supp. 3d 420, 499 (D. Md. 2019) ("duty to warn extends not only to those for whose use the chattel is supplied but also to third persons whom the supplier should expect to be endangered by its use") (cleaned up); *New Jersey Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*, 2021 WL 6144081, at *7 (D.N.J. Dec. 30, 2021) ("New Jersey courts have not limited the duty to warn to those with whom a defendant has a direct relationship"); *Williams v. Schneider Elec. USA, Inc.*, 2023 WL 4374514, at *4 (Ky. Ct. App. July 7, 2023) (unpublished) ("Kentucky law is clear that duty is not predicated on classifications such as 'bystander or nonconsumer or nonuser'" (quoting *Jones v. Hutchinson Mfg., Inc.*, 502 S.W.2d 66, 69-70 (Ky. 1973)).

Unable to overcome this precedent, Defendants rely on a series of inapposite cases to mischaracterize the Districts' claims as too attenuated to impose a duty. Defendants' reliance on *Gourdine v. Crews*, 955 A.2d 769 (Md. 2008); *CertainTeed Corp. v. Fletcher*, 794 S.E.2d 641 (Ga. 2016); *Quiroz v. ALCOA Inc.*, 416 P.3d 824 (Ariz. 2018); and *Kuciemba v. Victory Woodworks*, 531 P. 3d 924 (Cal. 2023) is misplaced. Each involved remote, incidental injuries to individuals unconnected to the defendants' actions. In *Gourdine*, the court declined to impose a duty on a drug manufacturer because the injured motorist was a remote bystander, with no contact or connection to the manufacturer or product. 955 A.2d at 786 ("there was no contact between [the defendant] and [the decedent] whatsoever"). Similarly, *CertainTeed*, *Quiroz*, and *Kuciemba* involved "take-home" exposure claims—arising from asbestos and the coronavirus—where the plaintiffs were physically and relationally distant from defendants' conduct. *CertainTeed*, 794 S.E.2d at 643; *Quiroz*, 416 P.3d at 827; *Kuciemba*, 531 P. 3d at 930-931.

Unlike the plaintiffs in those cases, the Districts are not remote from the conduct of Defendants. Indeed, this Court has already found "sufficient juxtaposition of the parties in time and space to place the [the Districts] in danger from the [Defendants'] acts." MTD Order, 754 F. Supp. 3d at 973–74 (citation omitted). Defendants identify no facts that undermine this Court's prior holding. Their conduct was neither passive nor attenuated: Defendants directly targeted schools and students, promoting youth engagement during school hours while knowing the predictable consequences to the Districts. *See infra* §§ A.2.a.2-3,

7

b.2-3, c.2-3, d.2-3 (discussing each Defendant's targeting of school-aged children and schools); ████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Their platforms deliberately captured minors' attention throughout the school day, making schools a direct and foreseeable locus of harm—not incidental bystanders. *See id.*; *Kennedy Krieger Inst. v. Partlow*, 191 A.3d 425, 457 (Md. 2018)(distinguishing *Gourdine* and recognizing that a duty may arise where there is a "relational link and direct contact" between the defendant and the injured party). By deliberately fostering compulsive use among students, and failing to warn the Districts, students, and parents of the risks of their platforms, Defendants directly and foreseeably caused the Districts' injuries. MTD Order, 754 F. Supp. 3d at 968, 974–76; *see also In re JUUL Labs, Inc., Mktg., Sales Practices & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 645-651 (N.D. Cal. 2020) (finding that "youth-oriented advertising" and "targeting of youth" created a foreseeable risk of harm to school Districts forced to respond to vaping on campus).

Further, this Court has already rejected Defendants' floodgates argument, finding "[t]he doomsday view is a dramatic overstatement." MTD Order, 754 F. Supp. 3d at 976. The Court held that the recognized duty is "no more expansive than defendants' own intentional and targeted actions to specific schools." *Id.* at 976–77. Thus, imposing duty here does not expand tort law. It enforces accountability for a defined category of misconduct: targeting minors through harmful platform design and failing to warn of the resulting risks. *See In re JUUL Labs*, 497 F. Supp. 3d at 658 (finding that defendants violated Arizona law and public policy "by marketing an addictive product to school-age children, leading to an epidemic of youth vaping and corresponding harms to schools"). As this Court previously recognized, "defendants' concrete and particularized awareness of potential and actual harms to [the Districts] appropriately tailors the scope of duty." MTD Order, 754 F. Supp. 3d at 976-977.

<b>c)    Defendants owe a duty to warn students and parents about their<br>platforms' dangers.</b>

As part of their duty to the Districts, Defendants were obligated to warn the Districts' students and their guardians of the risks posed by their platforms. Instead, Defendants deliberately fostered compulsive use of their platforms, "which foreseeably caused the plaintiff school Districts to respond by expending

8

resources to mitigate the impact of such use in their schools." MTD Order, 754 F. Supp. 3d at 968, 974–76;

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████

Courts have long recognized that a defendant may be held liable for failing to warn a non-plaintiff when that failure leads to a plaintiff's injury. *See Parris v. 3M Co.*, 595 F. Supp. 1288, 1337–38 (N.D. Ga. 2022) (holding that PFAS manufacturers' duty to a proposed class of landowners included a duty to warn a downstream mill of the dangers posed by PFAS); *USA Truck, Inc. v. Sullair, LLC*, 2020 WL 12656229, at *3 (M.D. Ga. Dec. 7, 2020) ("the violation of a duty to exercise reasonable care toward one person to whom that duty is clearly owed can proximately cause an injury to someone other than the person to whom the duty is directly owed"); *see also Stringer v. Nat'l Football League*, 749 F. Supp. 2d 680, 703 (S.D. Ohio 2009) ("If the manufacturer's failure to warn influenced the conduct of a third party, and that third party's acts or omissions were the proximate cause of the plaintiff's injury, then the manufacturer may be held liable.").

Even though Defendants are the movants and bear the burden on summary judgment, they present no evidence that they warned the Districts' students and their parents about the risks associated with Defendants' platforms. Nor do they contest that the Districts' injuries were a foreseeable result of this failure to warn. That alone demonstrates a genuine issue of fact for a jury. Instead, Defendants invoke three inapposite cases—*CertainTeed*, *Gourdine*, and *Quiroz*—to argue for a rule this Court has already rejected. That reliance is misplaced and contrary to established precedent as well as the law of the case.

Multiple courts—including Defendants' authority *CertainTeed* in its concurrence—have refused to adopt Defendants' broad reading. *CertainTeed* turned not on any categorical limitation on the duty to warn, but on the absence of foreseeability due to the parties' highly attenuated relationship. *USA Truck*, 2020 WL 12656229, at *3. As the court in *USA Truck* explained, "*Certainteed* did not hold that a manufacturer could not be held liable when a manufacturer breaches its duty to warn a user and that breach proximately harms a third party." 2020 WL 12656229, at *3; *see also Parris*, 595 F. Supp. 3d at 1337

9

(holding the reasoning in *CertainTeed* "does not foreclose a duty to warn" non-plaintiffs); *CertainTeed*, 794 S.E.2d at 646 (noting that the majority opinion "does not address whether [a plaintiff] might have a claim as an alleged injured party resulting from the failure to warn [an end user.]") (Melton, J. concurring). No such attenuation exists here.

The same is true of *Gourdine* and *Quiroz*, both of which turned on the absence of any meaningful relationship between the defendant's conduct and the plaintiff's harm. In *Gourdine*, the court found no duty where "there was no contact between [the manufacturer] and [the decedent] whatsoever." 955 A.2d at 786. Likewise, *Quiroz* emphasized that "duties are relational" and held that a company's connection to an employee's family member was too attenuated to support a duty. 416 P.3d at 839. In each case, the courts declined to impose a duty because the plaintiffs were remote from the defendants' conduct.

The factors that defeated liability in *CertainTeed, Gourdine,* and *Quiroz* are not present. As this Court has held, the relationship between Defendants and the Districts is sufficiently direct, given that Defendants' platforms were directed at students and schools; the Districts' injuries were foreseeable; and imposing a duty to warn accords with established public policy. MTD Order, 754 F. Supp. 3d at 972–78.

### d) Defendants' failure to warn caused the Districts' injuries.

Contrary to Defendants' assertions, genuine issues of material fact exist as to whether Defendants' failure to warn caused the Districts' injuries. The District-specific oppositions set forth in detail the substantial record evidence demonstrating Defendants failed to warn the Districts, their students, or guardians, and the direct injuries the Districts suffered as a result. *See* Districts' MSJ Opps.; Ex. 1085; Ex. 1086; Ex. 1087; Ex. 1088; Ex. 1089.; Ex. 1090; Ex. 1083; Ex. 1106; Ex. 1107; Ex 1108; Ex. 1109; Ex. 1110; *supra* § III.A.4. As Defendants' own authority demonstrates, this is sufficient evidence of causation to proceed to trial. *See Jones by & through Jones v. IC Bus, LLC*, 626 S.W.3d 661, 682 (Ky. Ct. App. 2020) (finding directed verdict improper where there was evidence demonstrating defendant had knowledge of the dangerous condition and failed to provide any warning); *see also R & R Insulation Servs. v. Royal Indem. Co.*, 705 S.E. 2d 223, 235 (Ga. Ct. App. 2010) (finding summary judgment should be denied where there was evidence that defendants caused injury, because "[w]hile the jury may ultimately determine that any additional warning would not have prevented the harm here, that question is not for this Court to determine at this stage of the proceedings."). Unable to contend with this record, Defendants

10

1    suggest the Districts lack evidence that is not required under the law.

2        Defendants rely on a single inapposite case to argue expert testimony is required on the "adequacy

3    and efficacy" of warnings here. Defs.' Breathitt Mot. at 36; Defs.' Charleston Mot. at 41; Defs.' Harford

4    Mot. at 43-44; Defs.' Irvington Mot. at 34; Defs.' Tucson Mot. at 47 (citing *Nelson v. Am. Honda Motor*

5    *Co.*, 2021 WL 2877919 (W.D. Pa. May 17, 2021)). They are wrong. In *Nelson*, the defendant had issued

6    warnings, and the court required expert testimony to evaluate "***the contents of the existing warnings***." *Id.*

7    at *7 (emphasis added). Other cases cited by Defendants likewise confirm that consideration about the

8    adequacy of warnings is reserved for cases where there is an existing warning. *Allen v. Long Mfg. NC*,

9    505 S.E.2d 354, 360 (S.C. Ct. App. 1998) (evidence that *existing warning* was inadequate created issue

10   of fact as to whether an adequate warning could have changed plaintiff's conduct); *Hickerson v. Yamaha*

11   *Motor Corp., U.S.A.*, 2016 WL 4367141, at *5 (D.S.C. Aug. 16, 2016) (plaintiff failed to show *existing*

12   *warning* inadequate where plaintiff testified she did not read it); *Georgia Cas. & Sur. Co. v. Salter's Indus.*

13   *Serv.*, 734 S.E.2d 415, 421 (Ga. Ct. App. 2012) (no evidence existing warning inadequate).

14       Here, Defendants do not dispute that they provided no warnings about the risks their platforms

15   pose. Because there are no warnings to evaluate, expert testimony on their "adequacy" or "efficacy" is

16   unnecessary and would be illogical. Courts repeatedly recognize that juries are capable of understanding

17   a failure-to-warn claim where no warning exists. *See Bullock v. Volkswagen Grp. of Am., Inc.,* 107 F.

18   Supp. 3d 1305, 1316 (M.D. Ga. 2015) ("Plaintiffs contend that Defendants knew of risks with the design

19   but provided no warning. A jury can understand this issue without a warnings expert."); *Sullivan v.*

20   *Daimler Trucks N. Am., LLC*, 2019 WL 13563633, at *7 (D.S.C. Aug. 28, 2019) ("Plaintiff is not required

21   to produce a human factors expert to testify about the need for a warning about a dangerous condition

22   when no warning exists at all"); *Ruggiero v. Yamaha Motor Corp., U.S.A.*, 2017 WL 1197755, at *10

23   (D.N.J. Mar. 31, 2017), *aff'd*, 778 F. App'x 88 (3d Cir. 2019) (expert testimony on warnings not necessary

24   where "contents of [existing] warnings are not at issue"); *Hanna  v. Ward Manuf.*, 2016 WL 3196467, at

25   *2 (M.D. Fla. June 9, 2016) ("[T]he Court agrees with Plaintiffs' argument that, [where no warnings were

26   provided], expert testimony was not required to prove that Defendant's warnings were inadequate."); *see*

27   *also* Fed. R. Evid. 702(a) (expert testimony must assist the jury in understanding evidence or determining

28   a fact at issue).

Even if expert testimony were required, the record is replete with such testimony supporting the Districts' claims. Indeed, Districts' experts explain that Defendants' platforms pose unreasonable risks to children, that Defendants failed to warn *anyone* of those risks, and that this failure amplified the platforms' harmful effects, which the Districts are now forced to confront. For example, Dr. Seth Noar's expert report details the specific, foreseeable hazards Defendants failed to disclose, and explains how their omissions fell below well-established principles and standards for warnings. Ex. 997 ¶¶ 214–48. As Dr. Noar further opines, Defendants' failure to adopt and enforce a proper, standards-based warning was a driving force behind the harms children suffer from Defendants' platforms. *Id.* ¶¶ 214–64. Likewise, Tim Estes explains that Defendants could have provided clear and effective warnings about the risks of their platforms; without them schools and educators cannot effectively "deal with the fall-out from the negative mental health effects of the platforms." Ex. 989 ¶ 316. Defendants also could have, but chose not to, provide warnings in Congressional testimony and/or in materials they distributed to schools, like their guides for parents. *See infra* § III.A.2.a.6, b.6, c.6-7, d.6-7; *see, e.g.,* Ex. 444B at 358:14-386:6 ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Ex. 444A

at 281:3 ████████████████████████████████████████████████

████████████████████████████████████████

### 2. Defendants breached their duty of care.

#### a) Meta's Conduct

##### (1) Meta's business model

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

**(2)      Meta's targeting of school-aged children**





**(3)     Meta's targeting of schools**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



**(4)      Meta's knowledge of harms**





24

1



28

25



26









PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



31





**(5)     Meta's failure to exercise reasonable care**

33



(a)     **Algorithm**









38



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



42



**(b)** **Infinite Scroll**

**(c)** **Screen Time Management**



44



**(d)    Barriers to Exit**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

**(e)     Notifications**



**(f)    Social Validation Metrics**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



49





**(g)    Beauty Filters**





**(h)     Account recommendations**





PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR







1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

               **(i)**       **CSAM Reporting**

18

19

20

21

22

23

24

25

26

27

28



61



**(j)     Age Verification**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



**(k)    Parental Controls**



1    ████████████████████████████████████████████

2    ████████████████████████████████████████████

3    █████████████████████████

4                **(6)**       **Meta's misrepresentations and manipulations**

5    ██████████████████████████████████████████

6    ████████████████████████████████████████████

7    ████████████████████████████████████████████

8    ████████████████████████████████████████████

9    ████████████████████████████████

10    ██████████████████████████████████████████

11    ████████████████████████████████████████████

12    ████████████████████████████████████████████

13    ████████████████████████████████████████████

14    ████████████████████████████████████████████

15    ████████████████████████████████████████████

16    ████████████████████████████████████████████

17    ████████████████████████████████████████████

18    ████████████████████████████████████████████

19    ████████████████████████████████████████████

20    ████████████████████████████████████████████

21    ████████████████████████████████████████████

22    ████████████████████████████████████████████

23    ████████████████████████████████████████████

24    ████████████████████████████████████████████

25    ████████████████████████████████████████████

26    ████████████████████████████████████████████

27    ████████████████████████████████████████████

28    ████████████████████████████████████████████



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR





PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



**(7)    Meta's willful and knowing disregard of the rights of others**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          b)      TikTok's Conduct

23              (1)      TikTok's business model

24

25

26

27

28



77

**(2)     TikTok's targeting of school-aged children**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27



---

[6] TikTok did not provide statistics that included 13-year-olds, omitting a significant portion of its underage user base.

28



**(3)    TikTok's targeting of schools**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

85

1

2

3

4

5

6

7

8

9

10

11

12

13                    **(4)     TikTok's knowledge of harms**

14

15

16

17

18

19

20                    **(a)     TikTok's addiction problem**

21

22

23

24

25

26

27

28

**(b)    TikTok's executives and employees**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22            **(c)        TikTok intentionally engineered addiction**

23

24

25

26

27

28

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



**(d)    TikTok knew** 





**(5)     TikTok's failure to exercise reasonable care**

**(a)     Age Verification**



94



95





**(b)** **Parental Controls**

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



**(c)     Screen Time Management**







**(d)      "The Ugly Side of Beauty Filters"**





**(e)    Algorithm**



107

**(f)      Notifications**



**(g)    TikTok Now**



**(h)    TikTok LIVE**

111

**(i)     CSAM reporting**



**(j)    TikTok's Buried "Safety Center"**

**(k)    Barriers to Exit**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22 **(6)     TikTok's misrepresentations and manipulations**

23

24

25

26

27

28



114

(7)     **TikTok failed to warn parents, educators, and schools about known mental health risks**



**c)     Snap's Conduct**

        **(1)     Snapchat's business model**



117

**(2)    Snapchat's targeting of school-aged children**





**(3)    Snapchat's targeting of schools**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



123

**(4)      Snap's knowledge and willful blindness of harms**





127





129

**(5)     Snap's failure to exercise reasonable care**

**(a)     Age Verification**









**(b)    Parental Controls**



**(c)** **Barriers to Exit**

**(d)    Geolocation**



137

**(e)     Notifications**



**(f)      Screen Time Management**



**(g)    Algorithm and Infinite Scroll**



141



**(h)     Account Recommendations**



(i)     **Beauty Filters**

1 █████████████████████████████████████████

2 ████████████████████████████

3    ██████████████████████████████████████

4 █████████████████████████████████████████

5 █████████████████████████████████████████

6 █████████████████████████████████████████

7 █████████████████████████████████████████

8 █████████████████████████████████████████

9 █████████████████████████████████████████

10 █████████████████████████████████████████

11 █████████████████████████████████████████

12 █████████████████████████████████████████

13 █████████████████████████████████████████

14 █████████████████████████████████████████

15 █████████████████████████████████████████

16 █████████████████████████████████████████

17 █████████████████████████████████████████

18 ███████████████████████████████████

19    ██████████████████████████████████████

20 █████████████████████████████████████████

21 █████████████████████████████████████████

22 █████████████████████████████████████████

23 █████████████████████████████████████████

24 ██████.

**(j)    CSAM Reporting**

26    ██████████████████████████████████████

27 █████████████████████████████████████████

28 █████████████████████████████████████████



**(6)      Snap's misrepresentations and manipulations**



**(7)**     **Snap failed to warn parents, educators, and schools about known mental health risks**





**d)** **Google/YouTube's Conduct**

**(1)** **YouTube's business model**



**(2)    YouTube's targeting of school-aged children**

151

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



153



154
PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

**(3)     YouTube's targeting of schools**

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28





PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



159

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



**(4)    YouTube's knowledge of harms**



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

████████████████████████████████████████████████████

**(5)    YouTube's failure to exercise reasonable care**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**(a)    Autoplay**

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

**(b)** **Infinite Scroll**



**(c)** **Algorithm**



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR



170



**(d)    Age Verification**



172





174



175



**(e)     Barriers to Exit**



**(f)     Parental Controls**

178

**(g)     Notifications**



**(h)    Screen Time Management**



181

**(i)    Beauty Filters**



PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

**(6)** **YouTube's misrepresentations and manipulations**

**(7)    YouTube's failure to warn**

[REDACTED]

**3.    Defendants' conduct substantially interferes with the public right to health, safety, and education in Arizona, Georgia, Kentucky, and Maryland**

In the preceding pages, the Districts have illustrated the scale of Defendants' wrongdoing. Defendants' conduct breaches their duty of care to the Districts and is legally negligent. It also constitutes a significant interference with the public's right to health, safety, and education. The Court has permitted Breathitt, Tucson, DeKalb, and Harford to seek remedies for that interference through a public nuisance cause of action. *See In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 2024 WL

5694360, at *17 (N.D. Cal. Nov. 15, 2024) ("Public Nuisance MTD Order").

Defendants argue in a cursory fashion that these Districts have not demonstrated a *significant* interference with a public right. Defs.' Breathitt Mot. at 12-13 ("Breathitt must come forward with evidence that each Defendant's actionable conduct was a direct cause of a *significant* interference with a public right…"); Defs.' Dekalb Mot. at 12-14 (similar); Defs.' Tucson Mot. at 15-17 (similar); Defs.' Harford Mot. at 15-16 (similar). As an initial matter. Defendants waived this argument by failing to develop it. *Beasley v. Astrue*, 2011 WL 1327130, at *2 (W.D. Wash. Mar. 24, 2011) (cursorily raising an issue without any supporting analysis or explanation waives the issue raised). Defendants' argument also fails on the merits. Defendants cite no cases granting summary judgment on the issue of whether an interference with public rights is "significant." That is unsurprising, because the significance of a defendant's contribution to a public nuisance is a fact-intensive "question properly left to the jury." *In re Nat'l Prescrip. Opiate Litig.*, 589 F. Supp. 3d 790, 809 (N.D. Ohio 2022).

In the preceding pages of this omnibus brief, and in each District's accompanying submission, each District has adduced evidence that the design of Defendants' platforms has led millions of young people to experience compulsive use and attendant mental health issues, which significantly disrupts and harms school operations and the school environment, and frustrates the ability of schools to achieve their mandate of educating students. Each District has also put forth evidence that Defendants' conduct foreseeably caused it to expend and divert resources to address these problems. *See, e.g.*, Ex. 1000 ¶¶ 5, 123. This is precisely the type of evidence this Court found may support a significant interference with the public right to health and safety. MTD Order, 754 F. Supp. 3d at 956-59; Public Nuisance Order, 2024 WL 5694360, at *14 & n.20. Moreover, while the Court declined to address the public right to education at the pleading stage, the evidence set forth in this submission and the Districts' accompanying submissions shows that Defendants' conduct violated the public right to education in Arizona, Georgia, Kentucky, and Maryland. Public Nuisance MTD Order, 2024 WL 5694360, at *14. All four states recognize a public right to education. Az. Const. art. XI, § 1 *et seq*.; Ga. Const. art. VIII, § 1 *et seq*.; Ky. Const. § 183; Md. Const. art. VIII, § 1 *et seq*.

This evidence is sufficient for a jury to determine there has been a "significant interference" in a public right and accordingly, creates a triable issue of fact under Arizona, Georgia, Kentucky, and

Maryland nuisance law. *Nolan v. Starlight Pines Homeowners Ass'n*, 216 Ariz. 482, 489 (Ct. App. 2007) (significant interference means something "real and appreciable" that is "more than slight inconvenience or petty annoyance") (citing Restatement (Second) of Torts § 821F); *see also Blondell v. Courtney Station 300 LLC*, 865 S.E.2d 589, 601 (Ga. Ct. App. 2021).

Given that the Districts have proffered evidence of Defendants' significant interference with public rights to health, safety, and education, Defendants are not entitled to summary adjudication on this issue.

**B.      Defendants' causation arguments are premised on disputed facts and legal errors.**

**1.      Defendants improperly raise the evidentiary bar in requiring Plaintiffs to quantify specific student usage**

In each bellwether state, questions of actual and proximate causation are for the jury to decide, unless the evidence supports only one inference, such that no reasonable juror could find for the plaintiff. *Torres v. Jai Dining Servs. (Phoenix) Inc.*, 497 P.3d 481, 486 (Ariz. 2021); *Johnson v. Wood*, 2025 WL 2715888, at *4 (Ga. Ct. App. Sept. 24, 2025); *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003); *Pittway Corp. v. Collins*, 973 A.2d 771, 253 (Md. Ct. App. 2009); *Gilbert v. Stewart*, 255 A.3d 1101, 1113-14 (N.J. 2021); *Wickersham v. Ford Motor Co.*, 853 S.E.2d 329, 390–91 (S.C. 2020). "Only in plain and undisputed cases should a court even consider resolving such fact-intensive questions as proximate causation on summary judgment." *Meraz v. Ford Motor Co.*, 2014 WL 12558123, at *12 (C.D. Cal. June 13, 2014) (cleaned up). Defendants have not come close to meeting this high standard.

Defendants argue that causation can only be demonstrated if the Districts can precisely quantify the exact harm caused by each Defendant by furnishing data regarding individual student use of each individual feature of each individual platform. Defs.' Tucson Mot. at 5–7, 14–15; Defs.' Dekalb Mot. at 5, 12–13; Defs.' Breathitt Mot. at 12–13; Defs.' Harford Mot. at 14–15; Defs.' Irvington Mot. at 14–15; Defs.' Charleston Mot. at 14–15. This argument fails for several reasons.

*First*, Defendants' extreme position—that schools should be able to produce quantifiable evidence measuring their students' use by platform, duration, and even feature—does not reflect the law, and is not consistent with the facts of this case. It is for the jury to decide whether the Districts' evidence is sufficient to establish causation, not for Defendants to dictate the form of that that evidence. In *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, the court rejected the argument that proof of causation required tracing

187

each defendant's individual prescription all the way through to the end-user's specific harm, because "the substantial factor test does not require 'the kind of incontrovertible linkage proposed by'" Defendants. 620 F. Supp. 3d 936, 1003 (N.D. Cal. 2022). The court found "it is difficult to take seriously the argument that the failure to identify specific" such data "is fatal to Plaintiff's case." *Id.* at 1004, 1004 n.31. So too here. First, there are legal constraints on schools' ability to obtain student usage data. Moreover, as a practical matter, schools are in the business of teaching and caring for students, not meticulously cataloging each instance of social media usage. As Dr. Hoover has explained, school districts are resource-constrained institutions and "existing [school district data] systems often do not track the types of internal service referrals, behavioral disruptions, or emotional dysregulation commonly tied to social media use." Ex. 1103 ¶ 14; Ex. 1102 ¶14; Ex. 1101 ¶14; Ex. 1104 ¶ 14; Ex. 1105 ¶ 14; Ex. 1100 ¶ 16. In a telling contradiction, Defendants oppose the remedy of better data infrastructure for the Districts to track such events. *See* Defs.' Tuscon Mot. at 11; Defs.' Deklab Mot. at 8–9; Defs.' Breathitt Mot. at 9; Defs.' Harford Mot. at 10; Defs.' Irvington Mot. at 9; Defs.' Charleston Mot. at 9–10.

*Second*, Defendants' argument ignores the substantial evidence the Districts have produced through fact and expert testimony, showing that each District was foreseeably harmed by widespread, problematic use of Defendants' platforms. *See supra* § III.A.2; *see* Ex. 1000 ¶ 30; Ex. 656 ¶¶ 54-75; Ex. 982 at ¶¶ 269-530; Ex. 1004 ¶¶ 311-50; Ex. 1005 ¶¶ 5.a-5.j; Ex. 981 ¶¶ 282-367; Ex. 1095 ¶¶ 48-52; Ex. 1096 ¶¶ 49-51; Ex. 1093 ¶¶ 48-52; Ex. 1091 ¶¶ 52-54; Ex. 1092 ¶¶ 46-50; Ex. 1094 ¶¶ 51-55; Ex. 656 ¶¶ 54-75. This evidence incorporates a broad array of facts that support the schools' claims and is more than sufficient to create disputed issues of material fact. *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178617, at *3 (N.D. Ohio Sept. 3, 2019) (denying summary judgment and rejecting argument that plaintiffs could not prove causation against multiple defendants who all contributed to injuries).

*Third*, Defendants are mistaken in arguing that references to "social media" by administrators, teachers, and counselors are not probative. Defendants are not obscure, niche platforms—they are the most popular social media platforms used by American youth. Ex. 981 ¶¶ 284-87, 290, 329-30; Ex. 1038 at 1-2. A reasonable jury could infer that when educators and students refer to "social media," they mean Instagram, TikTok, YouTube, and Snapchat—even if each reference does not name the platforms explicitly. *See* Ex. 1000 ¶ 30 (Dr. Hoover explaining that "[a]ccording to a recent Pew Research Center

188

report, over a third of teens say they are using the top five online platforms (YouTube, TikTok, Instagram, Snapchat and Facebook) almost constantly"); Ex. 1097A at 203:7-24 ("[S]ince you've asked about the four defendants' platforms, those are … by the work that I do with students and schools, the ones that are most often brought up and used … When I speak about social media, [in my reports] it's talking about the platforms that young people are using, and those happen to be the defendants' platforms."). Even if these statements were viewed as "circumstantial evidence," that is enough: "California courts have repeatedly held that causation may be reasonably inferred from circumstantial evidence in the context of mass torts." *City & Cnty. of San Francisco v. Purdue Pharma L.P.*, 620 F. Supp. 3d 936, 1002 (N.D. Cal. 2022). The same principle applies under the laws of every bellwether state.[8] And at summary judgment, all inferences must be drawn in favor of the Districts. *Hunt v. City of L.A.*, 638 F.3d 703, 709 (9th Cir. 2011).

*Fourth*, Defendants are wrong that the Districts must produce evidence apportioning a precise percentage of liability to each Defendant. Determining the relative significance of each Defendant's conduct is a question for the jury. *See In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d 790, 808 (N.D. Ohio 2022) ("Determining the significance of each Defendant's . . . conduct [in causing the nuisance] was a question properly left to the jury); *see also Social Media Cases*, 2025 WL 2807828, at *7 (Cal. Super. Sep. 22, 2025) ("Determining whether the substance or instrumentality upon which liability is premised caused a particular plaintiff's harm is . . . the role of the jury."). A nearly identical argument was rejected in the Opioids MDL. There, a network of manufacturers, distributors, and pharmacies each contributed to a nationwide public nuisance. The defendants argued that the local government plaintiffs could not prove the causal contribution of any individual defendant to any particular county without individualized evidence. *In re Nat'l Prescription Opiate Litig.*, 589 F. Supp. 3d at 808. The court squarely

---

[8] *Schall v. Suzuki Motor of Am., Inc.*, 450 F. Supp. 3d 771, 784 (W.D. Ky. 2020) ("Causation may be proved by circumstantial evidence"); *Mason v. Arizona Pub. Serv. Co.*, 622 P.2d 493, 500 (Ariz. Ct. App. 1980) ("Proximate cause may be determined from circumstantial evidence."); *J.T. Baggerly v. CSX Transp., Inc.*, 635 S.E.2d 97, 101 (S.C. 2006) ("Normally, proximate cause is a question of fact for the jury, and it may be proved by direct or circumstantial evidence."); *Furlong v. Dyal*, 539 S.E.2d 836, 838 (Ga. Ct. App. 2000) (plaintiff permitted to rely on "circumstantial and opinion evidence to create a jury question" "on the issue of causation"); *Rowhouses, Inc. v. Smith*, 133 A.3d 1054, 1067 (Md. 2016) (circumstantial evidence and expert testimony can suffice to prove causation); *Underwood v. Camden Cnty. Off. of Sheriff*, 2024 WL 1366672, at *3 (D.N.J. Mar. 28, 2024) ("circumstantial evidence can be used to establish causation").

rejected that argument, holding it "ignore[d] the aggregate nature of the evidence presented at trial and the natural inferences allowed therefrom." *Id.* The aggregate evidence "supported a reasonable inference that [each] Defendants' conduct was a substantial factor in creating the alleged nuisance." *Id.* The court concluded, "aggregate proof of causation [is] sufficient to overcome summary judgment." *In re Nat'l Prescription Opiate Litig.*, 2019 WL 4178617, at *3.

Similarly, the Districts have offered aggregate evidence showing that each Defendant's conduct was a substantial, concurring, or contributing factor in causing the Districts' harm. That is all the law requires. *See Bailey v. N. Am. Refractories Co.,* 95 S.W.3d 868, 871-73 (Ky. Ct. App. 2001) (applying substantial factor test under Kentucky law); *Stollenwerk v. Tri-W. Health Care All.*, 254 F. App'x 664 (9th Cir. 2007) (applying substantial factor test under Arizona law); *Gilbert v. Stewart,* 255 A.3d 1101, 1114 (N.J. 2021) (applying substantial factor test under New Jersey law); *Yonce v. SmithKline Beecham Clinical Lab'ys, Inc.*, 680 A.2d 569, 576-77 (Md. Ct. Sp. App. 1996) (applying substantial factor test under Maryland law); *J.T. Baggerly*, 635 S.E.2d at 101 (explaining that causation is satisfied where the evidence establishes that the defendant's negligence is "a concurring or a contributing proximate cause.") (citation omitted); *Hayes v. Crawford*, 730 S.E.2d 26, 29 (Ga. Ct. App. 2012) (similarly providing for concurrent proximate causation).

### 2. Defendants' "entanglement" arguments on causation are premised on legal errors

#### a) Defendants misapprehend the features at issue by writing this Court's failure to warn ruling out of existence.

To prevail on their failure to warn claims, the Districts are not required to prove that each individual platform feature independently caused or contributed to their harm. This Court has repeatedly held that Defendants may be held liable for failing to warn "of known risks of addiction attendant to any platform features *or as to platform construction in general*." MTD Order, 754 F. Supp. 3d at 963–64 (emphasis added); *accord In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig.*, 753 F. Supp. 3d 849, 865 (N.D. Cal. 2024) ("AG MTD Order"). Defendants' suggestion that summary judgment is warranted because the District have not linked each specific feature to the harms alleged ignores—and would nullify—those rulings. In any event, the record contains ample evidence trying particular platform features to the harms suffered. *See supra* at § III.A.2.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

b)    **The Districts need not rule out every possible alternative causal factor to avoid Section 230.**

Similarly, Section 230 also does not bar the Districts' claims simply because their harms are factually related to "third-party wrongdoing or the publication of content." Mot. 16. Defendants' attempt to graft a "but-for" causation test onto Section 230 has been squarely rejected by the Ninth Circuit.

Defendants misread *Lemmon v. Snap, Inc.*, which held that "[t]he duty to design a reasonably safe product is fully independent of Snap's role in monitoring or publishing third-party content." 995 F.3d 1085, 1093 (9th Cir. 2021). In holding Section 230 did ***not*** bar claims premised on Snap's product-designer duties, the Ninth Circuit expressly acknowledged that "publishing content is a but-for cause of just about everything Snap is involved in," yet clarified that this fact "does not mean that" holding Snap liable for harm caused by its speed filter "seeks to hold Snap responsible in its capacity as a 'publisher or speaker.'" *Id.* Even though content may be involved in Snap's operations—including, of course, the speed filter, which was created to apply to users' person-to-person snaps—"that does not mean that" holding Snap liable for harm caused by the speed filter would be holding it responsible as a publisher. *Id.* Section 230 protection only attaches where a plaintiff's claim would require Snap to "alter[] the content that Snapchat's users generate" which is not being requested here. *Id.* at 1092; *see id.* ("Snap's alleged duty in this case thus 'has nothing to do with' its editing, monitoring, or removing of the content that its users generate through Snapchat.").

The rule from *Lemmon* is clear: under Section 230, a defendant may be held liable for its own design decisions—even when those decisions affect how it distributes third-party content—but it cannot be held liable for publishing or failing to remove that content. Yet in Defendants' telling, *Lemmon* imposes an unprecedented limitation on tort liability, allowing claims to proceed only if "fully independent" of any publishing activity. That is not what *Lemmon* said. The Ninth Circuit simply recognized that social media companies have a duty to design safe platforms—separate from their editorial choices about what content to publish. It did not hold that content must be "fully independent" of the causal chain. Indeed, if Defendants' selective reading were correct, *Lemmon* itself would have been dismissed—since the alleged harm there arose from Snap's Speed Filter, a feature inherently intertwined with user content. *See* 995

F.3d at 1092 (recognizing that "Snap acted as the 'publisher or speaker' of user content by transmitting Landen's snap"). That is plainly not what *Lemmon* held, no matter how Defendants try to spin it.

At any rate, Defendants' attempt to reintroduce a "but for" test into *Lemmon* has been rejected by subsequent Ninth Circuit precedent. The court has clarified that Section 230 applies only when a plaintiff seeks to hold a defendant liable for third-party content, not when a claim challenges the company's own design choices, even if those choices relate to such content. In *Bride v. Yolo Technologies, Inc.*, the court explained that the claim in *Lemmon* "did not depend on third-party content"—and Section 230 therefore did not apply—because it "did 'not depend on what messages, if any, a Snapchat user employing the Speed Filter actually sends.'" 112 F.4th 1168, 1180 (9th Cir. 2024) (quoting *Lemmon*, 995 F.3d at 1094). In *Doe 1 v. Twitter*, 148 F.4th 635 (9th Cir. 2025), the court reaffirmed that *Lemmon* involved treating Snap as a "'product designer' rather than a 'publisher or speaker,'" because the claim "turned on Snap's design architecture rather than the publication of any content." *Id.* at 645. The *Doe 1* plaintiffs alleged defects in Twitter's mechanism for reporting CSAM—defects inseparable from the existence of third-party content. Yet Section 230 still did not apply, because the claim targeted Twitter's defective "reporting mechanism," which could be fixed "without monitoring, removing, or in any way engaging with third-party content." *Id.*

*Calise v. Meta Platforms, Inc.* underscores the same principle. In that case, the Ninth Circuit explained, "it is not enough that a claim, **including its underlying facts**, stems from third-party content for § 230 immunity to apply." 103 F.4th 732, 742 (9th Cir. 2024) (emphasis added). Indeed, the court recognized that nearly any claim alleging a failure to warn about an online platform could, in some sense, "concern content." *Id.* at 742. But that alone is not enough to trigger Section 230. As *Calise* observed, "it is not true that 'providing a warning' would not require 'considering the content posted.' How could Internet Brands warn about certain harmful content without considering what it was? Such a rudimentary fact-bound inquiry quickly falls apart and runs up against our precedent." *Id.* Section 230 was never intended to bar claims simply because content exists in the background. Sometimes content is involved, and that's fine.

In the bellwether cases, third-party content is related to various defective design features of Defendants' platforms. But, importantly, the Districts do not allege harm from the content itself—and, as

school districts rather than individual users, they do not allege having viewed content *at all*. Under these circumstances, Section 230 is plainly inapplicable.

The additional cases Defendants cite do not help them. In *M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516 (4th Cir. 2025), the Fourth Circuit applied Section 230 because the plaintiff sought to "hold Facebook liable for disseminating 'improper content' on its website." *Id.* at 525. Likewise, in *Doe (K.B.) v. Backpage.com, LLC*, 724 F. Supp. 3d 882 (N.D. Cal. 2024), Section 230 applied because the plaintiff's "entire claim [was] based on the content of the subsequent interaction" with a third party." *Id.* at 885. *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1121 (9th Cir. 2013) and *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1138 (10th Cir. 2009) addressed loss causation in securities fraud, not factual or proximate causation in tort. Here, by contrast, the record contains ample evidence creating triable issues of causation.

In reply, Defendants may also point to *Doe v. Grindr Inc.*, 128 F.4th 1148, 1153 (9th Cir. 2025), but that case does not support their expansive view of Section 230. There, the plaintiff challenged Grindr's decision to allow him "to communicate with abusive adults." *Id.* In *Grindr*, the communication itself was the harm—the wrongful act and injury were one and the same. The claim thus turned on third-party content and publishing activity; the alleged harm and content were inseparable, not "independent" of each other. *See id.* By contrast, the Districts' claims do not arise from any third-party communication or content, but from Defendants' own defective platform design and failure to warn of known risks. *See id.*

### c)    Juries are routinely called upon to evaluate liability in the context of concurrent causation

Defendants are also wrong as a matter of basic tort law: They are not entitled to summary judgment simply because the Districts cannot perfectly isolate the harm caused by each platform. Under settled common law, "a tortfeasor is liable for any injury of which his negligence is a proximate cause." *Am. Motorcycle Ass'n v. Super. Ct.*, 578 P.2d 899, 904 (Cal. 1978). Even if "it is simply impossible to determine whether or not a particular concurrent tortfeasor's negligence, acting alone, would have caused the same injury," each may still be held liable for the harm it proximately caused. *Id.* at 589.

Left unsaid in Defendants' motions is that every bellwether jurisdiction applies the same rule: proximate cause exists where a defendant's "conduct was a substantial factor in bringing about the injuries,

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR

even where there are other intervening causes which were foreseeable or were normal incidents of the risk created." *Gilbert v. Stewart*, 255 A.3d 1101, 1114 (N.J. 2021). This standard "does not require an unsevered connecting link between the negligent conduct and the ultimate harm." *Id.* (emphasis omitted). Rather, a plaintiff need only show it is "reasonably probable" that each defendant's conduct contributed to its injuries. *E.g.*, *Walton v. Premier Soccer Club, Inc.*, 334 A.3d 784, 796–97 (Md. 2025).[9] The Districts survive summary judgment on this ground because they have established it is "more likely than not" each Defendant's platform contributed to their alleged harm. *Walton*, 334 A.3d at 793. It would defy logic and settled tort law to hold that each Defendant may be a "substantial" factor in causing harm, yet escape liability simply because their misconduct is intertwined with that of other tortfeasors.

These basic legal principles also resolve Defendants' argument that the Districts must completely isolate the harm caused by their defective features from any potential negative effects from third-party misconduct, or even other platform features Defendants claim are not at issue (despite this Court's failure-to-warn ruling). The existence of "preexisting social issues affecting the community" does not undermine the Districts' claims, and the Districts are not required "to precisely apportion [their] injuries" to the alleged harm rather than to unrelated societal factors. *Ramah Navajo Sch. Bd., Inc. v. Sebelius*, 2013 WL 12303945, at *19 (D.N.M. May 9, 2013). Instead, "it is the duty of the trier of fact to make the best estimate in its power to base its damages calculation on the actionable injury itself." *Id.*; *see* Restatement (Second) of Torts § 433A(1) cmt. b (where there are multiple concurrent causes, damages should be awarded if "it is possible to make a rough estimate which will fairly apportion such subsidiary elements of damages."); *see also, e.g.*, *CRS Sirrine, Inc. v. Dravo Corp.*, 464 S.E.2d 897, 900 (Ga. Ct. App. 1995)

---

[9] The other bellwether states' laws are in accord. *See, e.g.*, *Mayer v. Hous. Auth. of Jersey City*, 202 A.2d 439, 447 (N.J. Super. Ct. App. Div. 1964), *aff'd* 210 A.2d 617 (N.J. 1965) ("If the evidence, viewed in the light most favorable to plaintiff, would cause fair-minded men to differ as to whether there was a reasonably probable relation of cause and effect between the alleged negligence and the injuries, the issue must be submitted to the jury."); *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1046–47 (Ariz. 1990) ("Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred."); *Barrett Props., LLC v. Roberts Capitol, Inc.*, 729 S.E.2d 621, 624 (Ga. Ct. App. 2012) ("To establish proximate cause, a plaintiff….must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result."); *accord Thacker v. Ethicon, Inc.*, 47 F.4th 451, 460 (6th Cir. 2022); *Allen v. Greenville Hotel Partners, Inc.*, 2006 WL 1817804, at *6 (D.S.C. June 30, 2006) (quoting *Ballou v. Sigma Nu Gen. Fraternity*, 352 S.E.2d 488, 493 (S.C. Ct. App. 1986)) (In South Carolina, causation can only be resolved on a motion for summary judgment in "rare or exceptional cases.").

---

194

("if a plaintiff can show with reasonable certainty the total amount of damages and the degree to which those damages are attributable to defendant, that is sufficient to support an award."). Aside from failure-to-warn, evidence concerning features shielded by Section 230 remains relevant for context.[10]

### C.    Genuine material disputes of fact concerning the Districts' damages preclude summary judgment.

#### 1.    Each Plaintiff has presented evidence of compensable "hard costs."

The Court ruled that school districts may seek damages for various costs incurred as a result of Defendants' negligence and nuisance, including but not limited to: "[1] diverting and increasing financial resources to address the disruptive forces of defendants' social media products in school; [2] hiring mental health personnel and developing mental health resources; [3] implementing new information technology and physical resources to limit access to and mitigate risks caused by defendants' platforms; and [4] repairing property damage." MTD Order, 754 F. Supp. 3d at 967. Consistent with the Court's ruling, the Districts have supplied invoices detailing their costs, which were described in the expert reports of Jeffrey Meyers. *See* Exs. 574, 575, 576, 577, 578, 579. District employees have likewise attested that these costs directly resulted from Defendants' misconduct. *See infra* § III.C.1.a.

Defendants do not claim that the Districts' hard costs are not recoverable as a matter of law and, with limited exceptions, do not challenge whether the Districts have evidence of those costs. Instead, they claim that the schools have no "competent" evidence of past damages. Defs.' Tucson Mot. at 25; Defs.' Dekalb Mot. at 22; Defs.' Breathitt Mot. at 20; Defs.' Irvington Mot. at 21; Defs.'Charleston Mot. at 23. This is shorthand for asking the Court to cut out the jury and *weigh* the evidence, which is impermissible at summary judgment. *See Berman v. Freedom Fin. Network, LLC*, 400 F. Supp. 3d 964, 969 (N.D. Cal. 2019) (Gonzalez-Rogers, J.) ("the weighing of the evidence, and the drawing of legitimate inferences from facts are jury functions, not those of a judge.").

Because the schools have presented evidence that their costs were incurred due to Defendants' misconduct, the question is for the jury to weigh and make an ultimate finding about causation. In every bellwether state, questions of general and proximate cause are for the jury unless there is *no* possibility of

---

[10] The Districts more fully respond to this misguided argument in the 230 Daubert Opp.

an inference supporting the non-moving party. *Torres v. Jai Dining Servs. (Phoenix) Inc.*, 497 P.3d 481, 486 (Ariz. 2021); *Johnson v. Wood*, 2025 WL 2715888, at *4 (Ga. Ct. App. Sept. 24, 2025) ("Questions of negligence, diligence, contributory negligence, and proximate cause are peculiarly matters for the jury, and a court should not take the place of the jury in solving them, except in plain and indisputable cases." (citation omitted)); *Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 89 (Ky. 2003); *Pittway Corp. v. Collins*, 973 A.2d 771, 253 (Md. Ct. App. 2009); *Gilbert v. Stewart*, 255 A.3d 1101, 1113–14 (N.J. 2021); *Wickersham v. Ford Motor Co.*, 853 S.E.2d 329, 390–91 (S.C. 2020). This is not one of those rare cases. The record contains ample evidence of causation, which remains disputed and must therefore be resolved by the jury. Defendants can argue to the jury that these costs were attributable to some other cause, and the jury will evaluate and weigh the evidence presented.

<blockquote>

a)    **The Districts presented evidence of incurred costs relating to mental health resources, and technology materials, systems, and programming.**

</blockquote>

The Districts have adduced evidence of costs incurred to address Defendants' misconduct, such as costs of adding mental health resources and implementing new technology, including physical materials, systems, and programming. The Court has already confirmed that such categories of damages are recoverable. MTD Order, 754 F. Supp. 3d at 963.

**Technology Lockers.** Several Districts seek compensation for purchasing physical technology lockers (i.e. Yondr pouches[11], Amazon Capital lockers, or other similar devices) in response to Defendants' conduct.[12] While Defendants object to these costs by arguing the lockers are intended to stop students "from accessing their phones *generally*, not just Defendants' platforms," the Districts have

---

[11] Yondr pouches are locking magnetic pouches purchased by schools to secure students' phones during the school day, limit cell phone and social media use, reduce classroom distractions, and promote a more focused learning environment.

[12] **Technology Lockers. Tucson**: Yondr pouches ($16,850) and Amazon Capital lockers ($16,101). *See* Ex. 579 at App'x C Ex. 1 at 1-2. **DeKalb**: Yondr pouches ($391,076) and McGee phone lockers ($21,280). *See* Ex. 576 at App'x C Ex. 1 at 1. **Breathitt**: Quill cellphone caddies ($209) and Amazon Capital lockers ($1,758). *See* Ex. 574 at App'x C Ex. 1 at 1. **Charleston**: Yondr pouches ($273,953). *See* Ex. 575 at App'x C Ex. 1 at 1. **Harford** and **Irvington** do not seek compensation for technology lockers.

presented evidence that the lockers would not have been purchased but for social media use in schools.[13] Defendants do not engage with these proffered facts, which create a clear question for the jury to determine whether social media use from Defendants' platforms was a substantial factor in requiring the purchase of technology lockers. That there may be other benefits of locking phones away during school is not dispositive, and Defendants present no evidence that other cellphone use is the sole or superseding cause necessitating locker purchases.

**Filtering and Monitoring Software.** Certain Districts seek partial compensation for purchases of internet filter systems and school software that block social media websites in schools or assist school staff in monitoring students' use:

- **Breathitt**: 75% compensation for implementing monitoring software Hapara ($47,468); 50% compensation for implementing E-Hallpass software Eduspire ($725); and 25% compensation for implementing E-Hallpass software Securly ($2,222). *See* Ex. 574 at App'x C Ex. 1 at 1-3.

- **Tucson**: 40% compensation for implementing online reporting system Awareity ($33,582). *See* Ex. 579 at App'x C Ex. 1 at 1.

- **Irvington**: 35% compensation for implementing filtering systems GoGuardian ($73,185) and Palo Alto ($47,565). *See* Ex. 578 at App'x C Ex. 1 at 5-6.

- **DeKalb**: 30% compensation for implementing filtering system Lightspeed ($1,173,042). *See* Ex. 576 at App'x C Ex. 1 at 1.

- **Harford**: 20% compensation for implementing filtering systems Skyline ($68,447) and Cisco Umbrella ($64,346). *See* Ex. 577 at App'x C Ex. 1 at 1.

- **Charleston** does not seek compensation for internet filtering systems or monitoring software.

Defendants argue that these systems are not used *solely* to block or respond to social media, (*e.g.* Defs.' Tuscon Mot. at 34; Defs.' Breathitt Mot. at 25), or that schools may have been required to implement filtering software irrespective of Defendants' platforms (Defs.' Dekalb Mot. at 28; Defs.' Harford Mot. at 31-32; Defs.' Irvington Mot. at 27). However, the Districts have presented evidence that these costs are

---

[13] **Tucson**: Ex. 1125 at 41:19-44:3; Ex. 1126 ¶ 12 (Sabino installed cellphone lockers to physically remove phones and access to social media from students because alerts prompt checking social media instead of focusing on class); **DeKalb**: Ex. 1127 at 82:10-83:6 (implementation of pouches and lockers was a direct response to distractions from social media platforms); **Breathitt**: Ex. 1128 at 16:11-15 (district would not have purchased cell phone caddies "if it was not for social media"); **Charleston**: Ex. 1129 at 58:1-22.

in part attributable to Defendants' platforms, so these facts are in dispute.[14]

**Mental Health Resources.** Certain Districts seek compensation for new and increased mental health resources, as set out below. The District adduce evidence that Defendants' platforms were a substantial factor in necessitating expansion of these resources.[15]

- **Tucson**: 40% compensation for access to online therapy platform Talkspace ($231,021). *See* Ex. 579 at App'x C Ex. 1 at 2.

- **Irvington**: 20% compensation for mental health resources through New Jersey Coalition for Inclusive Education ($325,147), Care Plus NJ ($624,917), Brett Dinovi & Associates ($226,467), Live Breathe Calm ($19,770), Generations Family Guidance ($58,160), Center for Partnership Services ($146,136), and Momentum Therapy Services ($66,086). *See* Ex. 578 at App'x C Ex. 1 at 1-7.

- **Breathitt**, **Charleston**, **DeKalb**, and **Harford** and do not seek compensation for expanded mental health resources beyond the lost time for staff providing those resources, as discussed in the lost time section.

Defendants claim that the estimated percentage compensation for Tucson's resources lacks sufficient basis, *see* Defs.' Tucson Mot. at 34-35, and that one of Irvington's vendors charges a flat rate that it would have incurred absent Defendants' misconduct. *See* Defs.' Irvington Mot. at 27. *But see* Ex.579; Ex. 582; Ex. 668. These arguments go to the weight of the evidence and are for the jury to consider. Defendants admit that the District experts relied on sworn interrogatory responses that confirm these resources were required in part due to social media use in schools. The fact that these programs may provide benefit to some students beyond the context of social media use does not erase the fact that they were used in

---

[14] **Breathitt**: Ex. 661 at 22:11-23:9 (Hapara's focus is "keeping [students] off their social media and then also keeping them off videos, YouTube videos"), 23:16-24 (Hapara "was purchased above and beyond just the normal blocking and filters."); Ex. 1133 at 128:11–22 (Breathitt uses Hapara to disconnect students from social media); **DeKalb**: Ex. 1130 at 143:2–24 (Lightspeed is designed to block access to social media websites); Ex. 520 ¶¶ 8-15 ("30% of Lightspeed costs are related to the District's attempts to block and/or limit social media."); **Harford**: Ex. 598 at 28:6-25 (explaining 20% attribution of costs to social media events), 21:5-24:25 (describing filtering specific to social media, not just what law requires); Ex. 571 at 13:11 (describing that Cisco and Skyline are used to block social media).

[15] **Tucson**: Ex 543 at 72:12-17 (district has seen an "increase of anxiety and depression and overall mental health supports needed on [its] campuses," with conditions "heavily influenced by social media"), 73:4-16 (increased "anxiety, depression, and body dysmorphia" attributable to "social media platforms" drove need for increased mental health resources); **Irvington**: Ex. 524 at 99:22-100:8 (describing social media as a "main" reason why increased mental health resources were required); Ex. 600 at 146:1-147:16 (attributing social media as a substantial factor in mental health harms for IPS students, including by exacerbating preexisting problems).

response to Defendants' misconduct. Defendants offer no evidence that an alternate cause was the sole or superseding cause of these costs, and even if they did, that would be in dispute.

**Programming.** The same is true of evidence of new and increased social emotional learning (SEL) programming costs and other responsive costs, which the Districts have incurred as follows:

- **Breathitt**: 50% compensation for programming from Kids First ($498); 25% compensation for programming from Remix Education ($2,733); 50% compensation for programming from Millstone Labs ($6,719). *See* Ex. 574 at App'x C Ex. 1 at 1-2.
- **Tucson**: 40% compensation for programming with Character Strong ($242,856). *See* Ex. 579 at App'x C Ex. 1 at 1-2. 40% compensation for creating Comprehensive School Threat Assessment Guidelines ($2,912). *See* Ex. 579 at App'x C Ex. 1 at 2.
- **Charleston**: 7% compensation for programming from Flippen Group ($95,476); 20% compensation for implementing a social emotional learning platform from Panorama Education ($192,105); 40% compensation for restorative practices training and coaching from International Institute for Restorative Practices ($163,278); 35% compensation for social emotional learning curricula from Committee for Children for the Second Step ($226,278); 40% compensation for programming from Restorative Resolutions ($33,110); 40% compensation for educational training services provided by Restorative Coaching ($9,600); 80% compensation for educational services from Social Emotional Learning Alliance for South Carolina ($9,600). *See* Ex. 575 at App'x C Ex. 1 at 1-9.
- **DeKalb**, **Harford**, and **Irvington** are not seeking compensation for hard costs of expanded programming.

The Districts have presented evidence that they implemented various programming in part as a response to rising and disruptive social media use in schools.[16] It is for the jury to determine whether the evidence establishes that Defendants were a substantial factor in causing the Districts to incur those costs.

      **b)**      **Defendants' cross-cutting entanglement arguments do not support summary judgment on causation**

---

[16] **Tucson**: Ex. 543B at 354:10-15; *see also id.* at 357:21-358:6 (connecting the need for social emotional curriculum in Tucson to the negative impact of social media on students' social emotional well-being), 362:10-19 (noting that Character Strong curriculum is focused on social emotional skills and includes specific lessons about social media); Ex. 543A at 71:6-72:17 (increased anxiety, depression, and overall mental health supports needed by students heavily influenced by Defendants' platforms); Ex. 547 at 188:22-190:5 (identifying substantial work with SEL curriculum to help address students' needs resulting from student use of social media, specifically TikTok, Instagram, YouTube, and Snapchat); **Breathitt**: Ex. 1128 at 46:23–47:14 (Cyber Safe Week to discuss dangers of social media apps); **Charleston**: Ex. 548 ¶ 31 (Screenagers directly attributable to Ds' conduct); *id.* ¶ 26 (increased use of Panorama attributed to Ds' conduct); *id.* ¶ 24; *id.* ¶ 25 (connecting Flippen Group's Capturing Kids' Hearts to social media); Ex. 566B at 200:15-202:16 (apportioned for costs working with adults rather than students); *id.* at 64:15-95:22 (connecting Second Step to alleged harms); Ex. 566A at 88:21-90:10 (connecting restorative practices curriculum to social media).

Defendants argue that the Districts failed to attribute their costs solely to Defendants' conduct. But this disregards a "long-recognized tenet of tort law" that there can be multiple "'but-for' causes" that support liability, and as a result a plaintiff is not required to show actionable conduct "was the 'sole' cause at summary judgment." *See Moore v. City of Atlanta, Ga.*, 2022 WL 19517299, at *25 (N.D. Ga. Dec. 19, 2022); *supra* § III.B.2.

Along the same lines, Defendants argue that the Districts' costs are too difficult to calculate or apportion given multiple potential causes. That is no basis to grant summary judgment on causation. Under the law of all bellwether states, apportionment of damages among defendants is a question for the jury that flows from its determination of fault for any (or all) of the Defendants. *Piner v. Sup. Ct. in and for Cnty. of Maricopa*, 962 P.2d 909, 915 (Ariz. 1998) (defendant's liability is not "limited by apportioning damages, but only by apportioning fault"); *Quynn v. Hulsey*, 850 S.E.2d 725, 729 (Ga. 2020) (jury apportions damages between multiple tortfeasors "according to the percentage of their fault"); *Fed. Deposit Ins. Corp. v. Loudermilk*, 826 S.E.2d 116, 126 (Ga. 2019) (same); *Owens Corning Fiberglas Corp. v. Parrish*, 58 S.W.3d 467, 479 (Ky. 2001) ("If . . . the evidence does not permit apportionment of the damage between separate causes, then comparative fault principles apply, and the trial court should instruct the jury to apportion damages according to the proportionate fault of the parties."); *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 96 A.3d 147, 160 (Md. Ct. App. 2014) (noting that where injury is divisible and apportionment is a fact question, burden rests with defendant to show how damages should be apportioned); *Campione v. Soden*, 695 A.2d 1364, 1370-71 (N.J. 1997) (discussing apportionment and reasoning that the question of apportionment is for the jury); *Pratt v. Amisub of SC, Inc.*, 912 S.E.2d 268, 282-83 (S.C. Ct. App. 2025) (explaining South Carolina's joint tortfeasor statutory scheme, including role of jury in apportioning fault and damages); *see also* Restatement (Second) of Torts § 433A (explaining difference between apportionment for divisible injuries with an evidentiary basis for determining contribution, versus indivisible harms where evidence that guides apportionment of damages is lacking).

Defendants separately criticize the Districts for relying on interrogatory responses. *E.g.,* Defs.' Tucson Mot. at 33, 35. These criticisms are unavailing. Experts are permitted to rely upon sworn interrogatory responses, and Rule 56 expressly contemplates that interrogatories may be used to demonstrate a genuine dispute of material fact that will defeat a motion for summary judgment. *See*

200

*Correct Transmission, LLC v. Nokia of Am. Corp.*, 2024 WL 1289821, at \*5 (E.D. Tex. Mar. 26, 2024); Fed. R. Civ. P. 56(c)(1)(A). If Defendants wish to challenge the sufficiency of Plaintiffs' interrogatory responses, which have been verified under penalty of perjury, they can present that argument to the jury.

### 2. Defendants can be required to compensate Districts for the diversion of school resources caused by their misconduct.

Defendants' challenge to the Districts' diversion-of-resources damages fails for multiple, independently sufficient reasons. Across their six motions for summary judgment, Defendants fundamentally misstate the law in asserting that the Districts cannot recover the costs of employee time diverted to address the disruptions to instructional time and school operations caused by Defendants' social media platforms. Defendants' position rests on inapposite authority and a mischaracterization of compensable damages, improperly suggesting that the Districts may recover only new or additional expenditures incurred as a direct result of Defendants' misconduct. The law is clear that diversion of resources itself constitutes a recognized and compensable injury, and courts have long permitted recovery of such damages. *See Convoy Co. v. Sperry Rand Corp.*, 672 F.2d 781, 785 (9th Cir. 1982).

As an initial matter, the Ninth Circuit has squarely rejected Defendants' improper contention that the Districts cannot recover for employee time lost to addressing harms caused by Defendants, simply because the Districts would have paid those employees' salaries and benefits regardless. In *Convoy Co. v. Sperry Rand Corp.*, the plaintiff sought damages for "the hours its salaried personnel spent supervising [a malfunctioning] computer system." *Id.* at 783. On appeal, the defendant argued that such damages were impermissible because "salaried supervisory staff costs . . . [are] not allowable as a matter of law" and the plaintiff "would have paid the staff's salary in any event." *Id.* at 785. The Ninth Circuit expressly rejected that argument, holding that "the issue is not whether [the plaintiff] would have paid the supervisors' salaries if the defendant had not breached the contract, but whether the breach deprived Convoy of the services it paid for." *Id.*

Indeed, "[m]ost courts that have considered the issue have concluded that a plaintiff can recover the value of employees' lost services as damages in a contract or tort action, ***even when it had not shown that it incurred additional expenses or lost profits.***" *State v. Rouse*, 647 N.W.2d 286, 289 (Wis. Ct. App. 2002) (emphasis added) (collecting cases); *see also Zayo Grp., LLC v. Sols. Fiber Optic, Inc.*, 2025 WL

2157902, at *4 (E.D. Va. July 11, 2025), *report and recommendation adopted*, 2025 WL 2155792 (E.D. Va. July 29, 2025) (ordering damages including "internal labor costs"); *Mobile Conversions, Inc. v. Allegheny Ford Truck Sales*, 2014 WL 7369898, at *6 (W.D. Pa. Dec. 29, 2014); *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 883 (6th Cir. 1982) (upholding award of 1/5 of a CEO's salary based on time spent addressing fallout from defendants' conduct).

Specifically, Kentucky courts recognize that lost time and opportunity costs incurred while mitigating the consequences of another's wrongful conduct constitute a cognizable form of damages in negligence actions. *See Lurry v. PharMerica Corp.*, 2024 WL 2965642, at 3 (W.D. Ky. June 12, 2024) ("lost time and opportunity costs associated with attempting to mitigate the actual consequences of the defendant's conduct" are recoverable damages); *see also Shulz v. Chadwell*, 558 S.W.2d 183, 187 (Ky. Ct. App. 1977) (holding that where one partner became unavailable for work, the amount paid to the other partner to perform the same work was "sufficient evidence of probative value on the issue of lost time"). Defendants' cited authorities do not support a contrary conclusion. *See Schwartz v. Hasty*, 175 S.W.3d 621, 625 (Ky. Ct. App. 2005) (not addressing lost employee time); *Gassaway Constr. Co. v. Gentry*, 264 S.W.2d 658, 659 (Ky. 1954) (finding insufficient evidence to establish loss-of-time damages).

Similarly, Georgia courts permit plaintiffs to seek recovery of portions of employee salaries, such as those sought here, and reject arguments that permitting such damages would allow recovery of costs the plaintiff would have otherwise incurred. *See Aaron's, Inc. v. MDC Grp., Inc.*, 2010 WL 11505919, at *7 (N.D. Ga. Dec. 15, 2010). Similarly, the Third Circuit, applying New Jersey law, upheld an award for compensatory damages including "the value of the time [Plaintiff's] employees expended in attempting to reduce or avert the damage flowing from the" defendant's conduct. *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1146, 1150 (3d Cir. 1990). Courts in Arizona have also upheld damages seeking compensation for lost employee time. *See PivotHealth Holdings LLC v. Horton*, 2025 WL 1865788, at *2 (D. Ariz. July 7, 2025) (finding standing based on damages including "employee time" that was "incurred in responding to" the defendant's conduct); *IceMOS Tech. Corp. v. Omron Corp.*, 2020 WL 1083817, at *4 (D. Ariz. Mar. 6, 2020) (permitting plaintiff to present evidence at trial "seeking costs of the salaries of its employees  for time spent working" to address defendant's conduct).

Defendants' own cited authority confirms that lost employee time is a compensable form of

damages under South Carolina law. *See Charleston Lumber Co. v. Miller Hous. Corp.*, 458 S.E.2d 431, 437 (S.C. Ct. App. 1995) ("The Millers alleged damages of lost employee time based on their personnel having to spend numerous hours each month checking and correcting the bids versus the actual charges. We find that employee time is a compensable damage."). While Defendants suggest -- without citing any authority—that *Charleston Lumber*'s holding is limited to fraud claims, courts routinely recognize lost-time damages in negligence actions. *See In re Blackbaud, Inc., Customer Data Breach Litig.*, 567 F. Supp. 3d 667, 687 (D.S.C. 2021) (finding plaintiffs alleged cognizable injury under South Carolina law for time and money spent mitigating injuries arising from defendant's negligence).

Finally, courts applying Maryland law have expressly rejected the same argument Defendants advance here—that no loss is incurred because an employer would have paid the employees anyway. *See Under Armour, Inc. v. Ziger/Snead, LLP*, 158 A.3d 1134, 1138 (Md. Ct. Spec. App. 2017) (holding that "diverted employee time [is] a compensable loss"). As Maryland courts have explained, because "diverted employee time" prevents employees from rendering "other service to the [plaintiff]," such costs are recoverable. *MacDonald v. Patriot, LLC*, 2017 WL 1788115, at *12 (Md. Ct. Spec. App. May 5, 2017); *see also KeraLink Int'l, Inc. v. Stradis Healthcare, LLC*, 2021 WL 5832242, at *1 (D. Md. Nov. 2, 2021), *aff'd sub nom. KeraLink Int'l, Inc. v. Geri-Care Pharms. Corp.*, 60 F.4th 175 (4th Cir. 2023) (entering judgment for damages including "costs of employee time").

Defendants rely on authority disallowing recovery for lost *personal* time. That authority is inapposite: Those cases involved plaintiffs seeking compensation for their own inconvenience, not for the loss of employee services suffered by an organizational plaintiff. *See Quinalty v. FocusIT LLC*, 2024 WL 342454, at *4 (D. Ariz. Jan. 30, 2024) (plaintiff alleged lost personal time responding to data breach); *Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 45 (D. Ariz. 2021) (same); *In re Gen. Motors LLC Ignition Switch Litig.*, 339 F. Supp. 3d 262 (S.D.N.Y. 2018) (plaintiffs alleged lost personal time seeking repair of their vehicle). The Districts' claim is different. The Districts do not seek recovery for personal inconvenience, but for the value of employee time and services diverted from their intended educational and operational functions to address the disruptions caused by Defendants' platforms. As the Sixth Circuit recognized, "[employer] was paying [employee], and the time he spent was [employer]'s time, not his own." *Dunn Appraisal Co. v. Honeywell Info. Sys. Inc.*, 687 F.2d 877, 884 (6th Cir. 1982).

203

As Dr. Ward explained, his calculation of damages based on diverted employee time "is based on the fundamental economic concept of opportunity cost," and the harm to the Districts is "the value of the foregone alternative." *E.g.*, Ex. 1083 ¶ 8. To quantify the cost of these foregone activities, "[e]conomists often estimate the opportunity cost of time using the individual's wage." *Id.* ¶ 9. This is a widely-accepted method of calculating the opportunity costs in an educational setting. As Dr. Ward explained, where an intervention "requires teachers to reallocate their time from instruction, that time should be counted as an opportunity cost to the school represented by the teachers' wages and benefits for that time." Ex. 1084 ¶ 17 (quoting Levin et al., *Economic Evaluation in Education: Cost-Effectiveness and Benefit-Cost Analysis*, 4th ed. 2017, at 69).

In short, the diversion of teacher and staff time from their educational mission, to address the disruptions caused by Defendants' social media platforms, constitutes a compensable form of harm, recognized both by established precedent and economic principles. While Defendants fault the Districts for responding to this novel and externally imposed harm with the resources available to them, state and federal law uniformly recognize that when a defendant's conduct deprives a plaintiff of the services of its personnel, that deprivation is a cognizable form of damages. *See Convoy Co.*, 672 F.2d at 785. Defendants' motions should be denied to the extent they seek to preclude the Districts' recovery for the substantial loss of employee time and resources diverted to address the harms caused by Defendants' platforms.

### 3. Mr. Klein's survey raises disputed issues of fact regarding the Districts' lost time damages.

Defendants incorrectly contend that the Districts lack evidence of their lost time damages by challenging the teacher survey conducted by Mr. Klein. As explained in Plaintiffs' Omnibus Daubert Opposition, Mr. Klein—an MIT-educated expert in market research with over fifty years of experience and more than 1,000 surveys administered—designed and executed the survey in accordance with well-accepted principles of market research. Its findings provide reliable, admissible evidence supporting the Districts' damages and raise disputed issues of fact regarding lost instructional time. *See* SD Daubert Opp. § III.B; Ex. 1085 ¶ 41 (Breathitt: scheduled classroom time diverted 1.4-5.2% for middle school, 5.2-3.9% for high school); Ex. 1086 ¶ 41 (Charleston: scheduled classroom time diverted 5.5-7.1% for middle school, 4.1-4.3% for high school); Ex. 1087 ¶ 41 (DeKalb: scheduled classroom time diverted 1.6-5.2%

1    for middle school, 4.6-11.7% for high school); Ex. 1088 ¶ 41 (Harford: scheduled classroom time diverted

2    1.9-5.7% for middle school, 3.1-10.6% for high school); Ex. 1089 ¶ 41 (Irvington: scheduled classroom

3    time diverted 4.7-2.2% for middle school, 3.7-9.9% for high school); Ex. 1090 ¶ 41 (Tucson: scheduled

4    classroom time diverted 2.6-5.2% for middle school, 3.7-14.8% for high school).

5          Mr. Klein's survey quantifies the instructional time lost because of Defendants' conduct based on

6    the accounts of those with first-hand knowledge—teachers and administrators directly impacted by

7    Defendants' platforms. While Defendants seek to dismiss these educator accounts, Mr. Klein's analysis

8    offers a scientifically valid and methodologically sound measure of the Districts' diverted resources and

9    lost time. *See* SD Daubert Opp. § III.B. Courts routinely recognize that survey evidence based on

10   employee self-reporting can provide a reasonable approximation of damages where detailed

11   contemporaneous records are unavailable. *See, e.g.*, *Alcantar v. Hobart Serv.*, 2013 WL 156530, at 4 (C.D.

12   Cal. Jan. 15, 2013) ("It would be unreasonable to expect employees to maintain records of every time they

13   were provided a meal break," and "survey evidence … is relevant to give an approximation of damages.").

14         Ultimately, Defendants' criticisms of the Klein survey go to weight, not admissibility. The survey

15   easily satisfies Rule 702 and creates genuine issues of material fact sufficient to preclude summary

16   judgment on the issue of lost time. *See id.*; *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,*

17   *Inc.*, 618 F.3d 1025, 1037 (9th Cir. 2010) (survey admissible under Rule 702 raised triable issue of fact).

18        **D.    The Districts' claims for future damages are legally cognizable.**

19               **1.    The Districts proffer relevant evidence supporting a claim for future**
20                      **damages.**

21         In each bellwether jurisdiction, a plaintiff may obtain an award of future damages if it proves

22   ongoing injury and the costs of remediation. *See, e.g.*, *May v. Holzknecht*, 320 S.W.3d 123, 128 (Ky. Ct.

23   App. 2010); *Haltiwanger v. Barr*, 186 S.E.2d 819, 820 (S.C. 1972); *Wilder v. Blue Ribbon Taxicab Corp.*,

24   719 S.E.2d 703, 708 (S.C. Ct. App. 2011); *Zakas v. Jackson*, 835 S.E.2d 371, 373 (Ga. Ct. App. 2019);

25   *DiLeo v. Nugent*, 592 A.2d 1126, 1134–35 (Md. Ct. Spec. App. 1991); *Colon v. Robinson*, 2014 WL

26   7466566 at *6 (N.J. Super. Ct. App. Div. Jan. 6, 2015*); Saide v. Stanton,* 659 P.2d 35, 38 (Ariz. 1983).

27   Here, the Districts properly seek future damages under their negligence claims by presenting evidence

28   that (1) Defendants' platforms are reasonably certain to cause ongoing injury and (2) the costs of

addressing those harms. *See, e.g.*, Ex. 1000; *see also* Ex. 1098. That is all the law requires.

The Districts have presented expert testimony from Dr. Hoover explaining that the Defendants have caused numerous ongoing harms that are reasonably certain to recur. *See, e.g.*, Ex. 1000 ¶¶ 54–55 (describing "frequent and pervasive" social-media interruptions that undermine instruction), ¶ 61 (explaining the "growing burden on teachers" to manage behavioral fallout), ¶ 77 (describing diversion of "limited funding and staffing resources" to address social-media impacts); Ex. 1096 ¶ 55 (opining that Charleston County requires additional resources to address social-media harms); *accord*; Ex. 1091 ¶ 65; Ex. 1092 ¶ 55, Ex. 1093 ¶ 56;  Ex. 1094 ¶ 59; Ex. 1095 ¶ 66; *see also* Ex. 1000 ¶¶ 30–84.

Dr. Hoover next opines that her detailed, 15-year strategic plans are necessary to prevent these future injuries. *See* Ex. 1091 ¶¶ 106, 110; Ex. 1093 ¶¶ 97, 101; Ex. 1094 ¶¶ 100, 104; Ex. 1095 ¶¶107, 111Dr. Leslie then quantifies the costs necessary for each District to implement those plans. *See* Ex. 609, Ex. 610, Ex. 611, Ex. 612, Ex. 613, Ex. 614. This evidence alone establishes a genuine issue of material fact on future damages. *See Haltiwanger*, 186 S.E.2d at 820.

Defendants cite no authority requiring plaintiffs to prove they can fund mitigation measures absent a damages award. No such rule exists, and for good reason: It would be illogical for Defendants to be absolved just because the entities they harm are underfunded public institutions. Defendants cite three groups of cases, each less relevant than the last.

*First*, they cite cases in which damages were denied because the asserted future injury was speculative, not reasonably certain. *See Mauro v. Raymark Indus., Inc.*, 561 A.2d 257 (N.J. 1989); *Battaglia v. United Parcel Serv., Inc.*, 70 A.3d 602 (N.J. 2013); *J.N. Legacy Grp., Inc. v. City of Dallas*, 745 S.E.2d 721, 729 (Ga. Ct. App. 2013); *Pierce v. Johns-Manville Sales Corp.*, 464 A.2d 1020, 1026 (Md. 1983); *Davidson v. Miller*, 344 A.2d 422, 427 (Md. 1975). These cases are inapposite, given the Districts *have* presented evidence indicating their future injuries are reasonably certain. *See, e.g.*, Ex. 1000 ¶ 8 ("student social media use has had—and continues to have—a profound and detrimental impact"); Ex. 1099 ¶¶ 72, 135, 175. At a minimum, whether a future injury is reasonably certain is a question for the jury. *See Mauro*, 116 N.J. at 139.

*Second*, pertinent to Tucson's case, Defendants cite Arizona cases involving lost profits—*Gilmore v. Cohen*, 386 P.2d 81 (Ariz. 1963); *McAlister v. Loeb & Loeb, LLP*, 571 P.3d 891 (Ariz. 2025); *Rancho*

*Pescado, Inc. v. Nw. Mut. Life Ins. Co.*, 680 P.2d 1235 (Ariz. Ct. App. 1984); and *McNutt Oil & Refin. Co. v. D'Ascoli*, 281 P.2d 966, 970-971 (Ariz. 1955). But as those cases explain, a plaintiff needs "such precision as, from the nature of the claim and available evidence, is possible." *Gilmore*, 386 P.2d at 83. And lost profits are distinct because they are amenable to "mathematical precision"—they may be proven through "books of account," "informal memoranda of previous transactions," or "past income tax returns." *Gilmore*, 386 P.2d at 82–83. The Districts do not seek lost profits and, in any event, Dr. Leslie has provided precise calculations of the costs necessary to address the ongoing harms caused by Defendants' platforms. *See* Ex. 614 ¶¶ 19-20.

**Third**, Defendants cite cases that simply do not involve future damages at all, and hence are entirely irrelevant to the question at hand. *See Nobles v. Jiffy Mkt. Food Store Corp.*, 579 S.E.2d 63 (Ga. Ct. App. 2003) (concerning liquidated damages award, not future losses); *see also J&W Corp. v. Broad Creek Marina, LLC*, 896 S.E.2d 328 (S.C. Ct. App. 2023); *Accessory Overhaul Grp., Inc. v. Mesa Airlines, Inc.*, 994 F. Supp. 2d 1296 (N.D. Ga. 2014); *Carter v. Wallace & Gale Asbestos Settlement Tr.*, 96 A.3d 147, 157 (2014); *Coury Bros. Ranches, Inc. v. Ellsworth*, 446 P.2d 458 (Ariz. 1968); *Hirsh v. Manley*, 300 P.2d 588 (Ariz. 1956).

Here, the evidence establishes ongoing harm with reasonable certainty. Dr. Hoover's plans were specifically designed to address the continuing, systemic injuries Defendants' platforms cause to school operations, learning, and student well-being. *See* Ex. 1000 ¶ 5. Specifically, Dr. Hoover determined that Defendants' platforms continue to damage the Districts by negatively affecting:

- **School operations** ("reshaped the educational landscape in ways that extend well beyond individual student behavior," Ex. 1000 ¶ 83);

- **School climate and environment** ("pervasive negative impact on schools and the school environment," *id.* ¶ 34);

- **Learning and performance** ("many teachers report that social media use interferes with their teaching and students' learning," *id.* ¶ 45; "growing frustration with managing screen use in class," *id.* ¶¶ 60, 80, 82);

- **Teaching effectiveness and classroom dynamics** ("the strain Defendants' platforms place on teacher-student relationships," *id.* ¶ 53);

- **Teacher morale and job satisfaction** ("teachers often experience a decline in morale when faced with the constant distractions caused by students' social media use," *id.* ¶ 58); and

- **Student mental health** ("[s]chools are increasingly burdened with managing the mental health consequences of social media overuse," *id*. ¶ 78; *see id*. ¶¶ 30–82; Exs. 1091–1096 ¶ 4 (each describing how districts have been forced to "expend and redirect already limited resources" to address these harms)).

Dr. Hoover concludes these harms will persist and intensify absent substantial intervention, warning that without implementation of her plans, the Districts will "perpetuat[e] ineffective approaches" and remain unable "to coordinate services, evaluate impact, and make data-informed decisions." *See* Ex. 1000 ¶¶ 8–9, 125; *see also* Ex. 1102 ¶¶ 35, 46, 60; Ex. 1103 ¶¶ 32, 51; Ex. 1101 ¶¶ 33, 58; Ex. 1104 ¶ 44; Ex. 1105 ¶¶ 39, 137; Ex. 1100 ¶¶ 56, 129. She emphasizes that her 15-year, multi-tiered framework is necessary to prevent and mitigate escalating harms within school environments. Combined with Dr. Leslie's detailed cost analysis, this evidence provides a concrete, non-speculative basis for a future-damages award.

Defendants' assertion that Dr. Hoover's plans are merely optional "recommendations" mischaracterizes her work (and diminishes what is, at a minimum, a genuine dispute of fact for the jury to resolve). Dr. Hoover makes clear that the measures she proposes are evidence-based requirements, not flexible suggestions. As she explains, "the staffing and cost recommendations [she] present[s] are not aspirational targets or flexible guidelines; they represent the level of investment and capacity required to adequately address the harms due to social media use in school communities." Ex. 1101 ¶ 41. Across her reports, Dr. Hoover underscores that these recommendations are grounded in empirical data, implementation science, and public-health precedent, reflecting the actual scale of intervention needed to remediate the harms caused by Defendants' platforms. *See also* Ex. 1100 ¶ 189 ("not aspirational" but "grounded in evidence of what is needed to meet the behavioral and mental-health needs of students"); Ex. 1102 ¶ 45 (providing "evidence-informed recommendations for the staffing, training, and system design needed to meet" the harms); Ex. 1105 ¶ 32 (recommendations are "realistic and proportionate to respond" to social-media harms); Ex. 1103 ¶ 41; Ex. 1104 ¶ 32.

Nor is it surprising that the Districts have not yet implemented Dr. Hoover's plans. These are resource-constrained public school systems seeking damages precisely because they cannot fund such measures without relief. Dr. Hoover's role was not to design a plan limited by current budgets but to identify what is necessary to remediate the harms Defendants have caused. *See, e.g.*, Ex. 1105 ¶ 27 ("My

role is not to budget based on current constraints, but to provide an evidence-informed benchmark for the staffing levels necessary to meet the scale and specificity of social media-related student distress."). That other districts have not yet implemented identical frameworks is immaterial (and, in any event, may just demonstrate their comparable budget constraints); Dr. Hoover's plans are tailored to these Plaintiffs' unique needs and the specific harms caused by Defendants' platforms. The fact that no other district has had the funding or occasion to request such plans underscores their necessity, not their novelty. In any event, Defendants' argument ignores the over one thousand other school districts who, like the Districts, have brought suit against Defendants seeking comparable relief.

Defendants' claim that Districts cannot hire sufficient personnel is likewise baseless. Dr. Hoover directly refutes it: "[C]ontrary to claims that the proposed staffing levels are unattainable, current data reflect a steady flow of qualified school mental-health professionals entering the field." Ex. 1099 ¶ 48; *see also* Ex. 1102 ¶ 41; *accord* Exs. 1100 ¶ 40; 1101 ¶ 38; 1103 ¶ 34; 1104 ¶ 34; 1105 ¶ 31.

Finally, Defendants' argument that Tucson and Charleston have not yet budgeted for social-media-specific interventions is irrelevant. As Dr. Hoover explains, these Districts "lack the resources and infrastructure to address the modern, external threat to student well-being and school functioning" within their standard budgets. Ex. 1100 ¶ 175; *see also id.* ¶ 182 ("that social-media harms are not prominently featured in older internal documents or district budgets further supports my conclusion that districts have not had the systems, staffing, or awareness to adequately monitor or address these harms"); Ex. 1101 ¶ 128 ("the fact that a district has not fully incorporated a new and emerging harm into its formal systems ... does not mean the harm does not exist or is not substantial"). Similarly, Irvington's historic understaffing has only been exacerbated by Defendants' misconduct. *See* Ex. 1105 ¶¶ 26–28.

In sum, the Districts have presented robust, expert-supported evidence of ongoing, reasonably certain future harm, and the precise costs necessary to remedy them. These are issues of fact for a jury, not matters for summary judgment. *Fuller v. Idaho Dep't of Corr.*, 865 F.3d 1154, 1161 (9th Cir. 2017).

2.    **Breathitt, DeKalb, Harford, and Tucson's nuisance claims permit the abatement they seek.**

a)    **Abatement is a distinct equitable remedy designed to eliminate ongoing and future public harms.**

Breathitt, DeKalb, Harford, and Tucson seek the equitable remedy of abatement to address ongoing and future harms caused by Defendants' nuisance. *See* Restatement (Second) of Torts § 821C(2) (1979). In addition to asserting negligence claims, Breathitt, DeKalb, Harford, and Tucson bring claims for public nuisance, which rest on a different legal theory. Negligence requires proof that Defendants owed and breached a duty. *See* MTD Order, 756 F. Supp. 3d at 972. Remedies are limited to money damages (any may include future damages, *see supra*). Nuisance requires proof that Defendants created "an unreasonable interference with a right common to the general public," and, if proven, authorizes the Court to fashion an equitable remedy. *See* Restatement (Second) of Torts §§ 821B–C (1979).

Abatement is a court-crafted equitable remedy, wholly distinct from damages. *City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 2025 WL 3009526, at *12 (4th Cir. Oct. 28, 2025) ("[P]ublic nuisance claims serve [the] function [of] focusing on harm suffered by the public more generally and seeking abatement of that harm through the court's equitable authority."); *State of Wash. v. McKesson Corp. et al.*, No. 19-2-06975-9 (Sup. Ct. Wash. July 6, 2021) (granting motion to strike jury demand for abatement because it is "equitable in nature, and should be tried to the Court"). As explained in *In re Nat'l Prescription Opiate Litig.*, "[t]he goal [of abatement] is not to compensate the harmed party for harms already caused by the nuisance. This would be an award of damages. Instead, an abatement remedy is intended to compensate the plaintiff for the costs of rectifying the nuisance, going forward." 2019 WL 4043938, at *1 (N.D. Ohio Aug. 26, 2019). Because abatement may "be more certain, prompt, or efficient than the monetary damages [they] seek[], but may ultimately not attain," it is proper for the Districts to pursue both damages and abatement. *See Coleman v. Mondelez Int'l Inc.*, 554 F. Supp. 3d 1055, 1065 (C.D. Cal. 2021) (plaintiffs may pursue equitable relief and damages under separate claims).

Here, the Districts ask the Court to create an abatement plan to eliminate the nuisance in their schools. Guided by the testimony of Dr. Hoover and Dr. Leslie, this plan would be a post-trial, Court-crafted remedy akin to an injunction. *See id.* Unlike a damages award, abatement allows the Court to order and oversee implementation to address Defendants' ongoing harms. *See Andino v. Apple, Inc.*, 2021 WL

210

1549667, at *5 (E.D. Cal. Apr. 20, 2021) ("Money damages are an inadequate remedy for future harm.").

Defendants argue that potential recovery of future damages bars abatement. They rely on *Sonner v. Premier Nutrition Corp.* but misread its holding. *Sonner* merely provides that a plaintiff cannot "secure equitable" relief *if* an adequate remedy at law exists. 971 F.3d 834, 844 (9th Cir. 2020) (emphasis added). At trial, a plaintiff may pursue both (as cases interpreting *Sonner* make clear). *Cepelak v. HP Inc.*, 2021 WL 5298022, at *2 (N.D. Cal. Nov. 15, 2021) (allowing damages and equitable relief in the alternative); *Coleman*, 554 F. Supp. 3d at 1065; *Ostrovskaya v. St. John Knits, Inc.*, 2022 WL 2102895, at *5 (C.D. Cal. Mar. 31, 2022); *Roper v. Big Heart Pet Brands, Inc.*, 510 F. Supp. 3d 903, 917 (E.D. Cal. 2020). *If* a jury ultimately awards future damages duplicative of the abatement sought, the Court may decline to impose an additional equitable remedy. In various cases cited by Defendants, that was the case: The equitable relief sought was wholly duplicative of the damages requested. *See Wood v. Marathon Refining Logistics Serv. LLC*, 2024 WL 2242688, at *10 (N.D. Cal. Mar. 21, 2024) (barring plaintiff from seeking equitable restitution that merely duplicated past damages); *Rhynes v. Stryker Corp.*, 2011 WL 2149095, at *4 (N.D. Cal. May 31, 2011) (plaintiff failed to show damages would not provide full compensation).[17] By contrast, the abatement the Districts seek uniquely addresses ongoing and future harms by allowing the Court to fashion a remedy that eliminates the nuisance.

In any event, the determination of whether abatement is or is not duplicative of a damages award is properly made post-trial. *See Teutscher v. Woodson*, 835 F.3d 936, 957 (9th Cir. 2016) (holding that a plaintiff may seek backward-looking damages from a jury and a "forward-looking remedy . . . from the court in equity"). Accordingly, Breathitt, DeKalb, Harford, and Tucson may pursue equitable abatement through their public nuisance claims.

> **b)    Dr. Hoover's strategic plans provide the framework for crafting an abatement remedy.**

As explained in the Districts' opposition to Defendants' motion seeking to exclude Dr. Hoover and other experts ("SD Daubert Opp."), Dr. Hoover's plans were developed consistently with her standard

---

[17] Defendants also cite two entirely inapposite cases in support of their argument—*Robinson v. C.R. Bard, Inc.*, 2016 WL 3361825 (N.D. Cal. June 17, 2016) (where the plaintiff had not pursued any timely claims) and *Mitsubishi Int'l Corp. v. Cardinal Textile Sales, Inc.*, 14 F.3d 1507, 1518 (11th Cir. 1994) (concerning the suis generis procedural and equitable context of a pre-judgment constructive trust on assets).

practice and are grounded in public health and implementation science. They outline in specific detail the staffing and programs needed to prevent and mitigate the harms caused by Defendants—providing comprehensive, district-wide interventions, including universal policies for all students, staff, and families, and more intensive programs for those with greater needs. This approach is essential because the harms from Defendants' platforms "pervade the school[s]" and require proactive services "for those students who may not have yet used a platform directly themselves." Ex. 1097B at 623:10–624:4; *see also* Ex. 1000 ¶ 34. Dr. Hoover further opines that a 15-year timeline is the "necessary duration for implementing a comprehensive, district-led strategic plan to prevent and mitigate the negative impact of social media on school districts, schools, the school environment, student well-being and learning," given comparable public health initiatives, the developmental K–12 timeframe, and system change requirements. Ex. 1000 ¶ 7; *see also* ¶ 33 (describing a 15-year integrated mitigation plan).

Dr. Hoover's strategic plans provide the Court with detailed guidance for crafting an abatement remedy for Breathitt, DeKalb, Harford, and Tucson. *See* Ex. 1091 ¶¶ 106, 110; Ex. 1093 ¶¶ 97, 101; Ex. 1094 ¶¶ 100, 104; Ex. 1095 ¶¶ 107, 111; *see also In re Nat'l Prescription Opiate Litig.*, 2019 WL 4043938, at *1 (N.D. Ohio Aug. 26, 2019) (noting that abatement is an equitable remedy fashioned by the Court using expert testimony and trial evidence). Further, Dr. Leslie calculated the cost to implement Dr. Hoover's plan for each District. This evidence should also assist the Court in crafting an abatement remedy, as monetary funds are an appropriate form of abatement. *See infra*. In short, the Districts have offered precisely what is required—expert guidance to assist the Court in crafting an abatement remedy

### (1)    The abatement remedy may include monetary relief.

Defendants wrongly argue that abatement cannot include monetary relief. Courts have long rejected the "myth" that equitable remedies never involve payment: "the assumption that 'equitable remedies are always orders to act or not to act, rather than to pay, is a myth; equity often orders payment.'" *United States v. Apex Oil Co.*, 579 F.3d 734, 736 (7th Cir. 2009).

As an equitable remedy, abatement may be "mold[ed] to the circumstances of [the] particular case." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Courts addressing public health crises have recognized that abatement may include a monetary fund. In the opioid litigation, the Fourth Circuit held that "the remedy of abatement . . . permit[s] a monetary award to fund . . . abatement efforts,"

212

emphasizing that "[c]ourts have broad powers to effect equitable relief." *City of Huntington, W. Virginia v. AmerisourceBergen Drug Corp.*, 2025 WL 3009526, at *20 (4th Cir. Oct. 28, 2025). Likewise, in *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, the court found that a nuisance abatement remedy may "require defendants to expend the money necessary to abate the nuisance" and ordered contributions to an abatement fund to address youth vaping. 497 F. Supp. 3d 552, 653 (N.D. Cal. 2020). That is precisely what the Districts seek here—a post-trial, Court-crafted remedy guided by Dr. Hoover's and Dr. Leslie's testimony regarding the measures and costs necessary to abate the nuisance. Defendants' effort to distinguish *JUUL* fails; while the *JUUL* plaintiffs proposed only an outline, the Districts have presented detailed, expert-supported abatement plans for the Court's consideration.

Recent decisions confirm the same principle. In *Mayor and City of Baltimore v. Purdue Pharma, L.P.*, No. 24-C-18-000515, slip op. at 1, 23 (Md. Cir. Ct. Aug. 8, 2025), the court crafted a post-trial abatement plan funded by monetary payments to hire staff and expand treatment and harm-reduction services. Similarly, Dr. Hoover's plans propose staffing and training programs to prevent and mitigate harms caused by Defendants' platforms. *See, e.g.*, Ex. 1000 ¶¶ 6, 83–84, 95–122; Ex. 1093 ¶¶ 74–85. Defendants attempt to distinguish the *Purdue Pharma* plan by noting that the court did not fund *every* proposed treatment and service cost. This misses the point. The *Purdue Pharma* court conducted a fact-based, post-trial inquiry, guided by the jury's findings, to determine which treatments and services should be included—and it did incorporate multiple treatment and recovery programs into its plan. This Court should engage in a similar post-trial evaluation to determine the appropriate scope of the abatement plan.

*In re Nat'l Prescription Opiate Litig.*, 622 F. Supp. 3d 584, 606 (N.D. Ohio 2022), *rev'd on other grounds*, 2025 WL 354758 (6th Cir. Jan. 31, 2025), likewise held that abatement may require payment, explaining that "eliminating a hazard that continues to cause prospective harm . . . will, in virtually all cases, cost a liable defendant some amount of money," and that an equitable abatement award "forces a liable defendant to clean up the mess it made." *Id.* Again, that is exactly what the Districts seek. While Defendants disingenuously assert that *In re Nat'l Prescription Opiate Litig.* was vacated, no appellate court has overturned any of the court's rulings on abatement. The appeal addressed only whether an Ohio state statute barred the underlying public nuisance claim, an issue wholly irrelevant here.

Other courts agree that monetary abatement remains equitable and confirm that this Court may—and should—fashion a monetary abatement remedy tailored to these harms. See *State of Wash. v. McKesson Corp.*, No. 19-2-06975-9, slip op. at 2 (Wash. Super. Ct. July 6, 2021) (quoting *State ex rel. Dep't of Ecology v. Anderson*, 620 P.2d 76 (Wash. 1980)) ("a claim remains equitable even though a money judgment might form a part of the relief asked"); *People v. ConAgra Grocery Prods. Co.*, 227 Cal. Rptr. 3d 499 (Ct. App. 2017) (requiring defendants to fund an abatement account to carry out remediation).

### (2) Defendants' state law authorities are inapposite.

Defendants' reliance on state cases to limit this Court's authority is misplaced. Their own authority, *Sonner*, confirms that "state law cannot expand or limit a federal court's equitable authority," even in diversity cases. 971 F.3d at 841. Federal courts possess "broad powers to tailor and fashion appropriate equitable remedies." *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982); *Guthrie v. Transamerica Life Ins. Co.*, 561 F. Supp. 3d 869, 873 (N.D. Cal. 2021).

Even if state law were relevant, state courts have recognized that abatement can extend beyond simply stopping or removing the nuisance. For example, *Brown v. City of Phoenix*, 557 P.3d 321, 327 (Ariz. Ct. App. 2024) distinguishes between the removal and the abatement of nuisances and dealt with an injunction requiring both the removal of certain individuals and the cleanup of hazardous materials they left behind. *City of Safford v. Seale*, 2009 WL 3390172, at *2 (Ariz. Ct. App. Oct. 21, 2009) also recognizes that abatement can include remediation as well as removal. Similarly, while *Spaw, LLC v. City of Annapolis*, 156 A.3d 906, 931 (Md. Ct. App. 2017) did not consider the proper scope of abatement remedies, it recognized in dicta that requiring the defendant to not just halt the offending conduct but affirmatively undertake action to undo the effects of the violation would be an appropriate form of abatement. *See also Adams v. Comm'rs of Town of Trappe*, 102 A.2d 830 (Md. Ct. App. 1954) (requiring defendant to not just stop sale of gasoline but remove tank and pump).

Additionally, none of the cases cited by Defendants held that enjoining conduct is the only acceptable form of abatement. In *Superior Farm Mgmt., L.L.C. v. Montgomery*, 513 S.E.2d 215, 217-18 (Ga. 1999), the nuisance was planned but had not yet begun, so no other form of abatement other than an injunction was possible. *See also Brandes v. Mitterling*, 196 P.2d 464 (Ariz. 1948) (plaintiffs sought only injunction against future use); *Cactus Corp. v. State ex rel. Murphy*, 480 P.2d 375 (Ariz. Ct. App. 1971)

214

1    (same, and nuisance was present for less than two weeks). Meanwhile, *Martin v. Howard Cnty.*, 709 A.2d

2    125 (Md. 1998) and *J.D. Jewell, Inc. v. Hancock*, 175 S.E.2d 847 (Ga. 1970), address, respectively, the

3    difference between legal and equitable remedies and jurisdiction and venue, not the appropriate forms of

4    abatement. Likewise, *Green Meadows Hous. Partners, LP v. Macon-Bibb Cnty.*, 906 S.E.2d 430, 441

5    (2024) turned on the statutory scope of receiverships, not the breadth of available abatement remedies.

6                    **(3)    Defendants' attacks on Dr. Hoover's plans lack merit.**

7            Defendants wrongly claim that Dr. Hoover's plans are untethered to Defendants' conduct because

8    they include comprehensive mental health services. That argument ignores national school mental health

9    standards and implementation science, both of which require a comprehensive approach. *See* Ex. 1099 ¶

10   3 (multi-tiered system supports ("MTSS") are "tailored" to meet the "distinct behavioral, emotional, and

11   cognitive risks introduced by social media and the harm to school districts and the school environment");

12   *id.* ¶ 67 (MTSS are supported by "public health implementation science, and evidence-informed school

13   mental health frameworks" and "peer-reviewed studies"). Moreover, Dr. Hoover directly links her plans

14   to Defendants' misconduct. She explains: "Educators report struggling to maintain engagement and

15   classroom cohesion amid pervasive digital distractions, while students themselves are contending with

16   anxiety, depression, negative body image, and sleep deprivation—all caused or exacerbated by social

17   media use. These individual-level challenges converge to strain school-wide resources, forcing districts

18   to divert limited staffing and funding to address the mental health and behavioral consequences of digital

19   overuse." Ex. 1000 ¶ 83; *see also* Ex. 1091 ¶ 4; Ex. 1092 ¶ 4; Ex. 1093 ¶ 4; Ex. 1095 ¶ 4; Ex. 1096 ¶ 4.

20           Defendants' critique of the plans' 15-year duration fares no better. The plans target harm to the

21   Districts, not individual students, and are designed to prevent and mitigate systemic harm over time. *See,*

22   *e.g.*, Ex. 1000 ¶ 6. Implementation science supports the 15-year timeline as the "necessary duration for

23   implementing a comprehensive, district-led strategic plan . . . [allowing] for the full cycle of planning,

24   implementation, evaluation, and sustainability." Ex. 1000 ¶ 7; *see* Ex. 1099 ¶ 74. As Dr. Hoover explains,

25   the harms "pervade the school," and "it [is] essential to put services in place for those students who may

26   not have yet used a platform directly themselves." Ex. 1097B at 623:10–624:4; *id.* at 627:2–628:7.

27           Defendants' "wish-list" characterization is equally baseless. Dr. Hoover makes clear that her

28   staffing recommendations respond to new and exacerbated harms created by Defendants' platforms, not

215

to historic understaffing. Ex. 1103 ¶ 40 (plans include "additional staffing . . . necessary to respond to the mental health and learning impacts of social media"), ¶ 49 (Defendants' platforms "have not replaced historical challenges; they have created new challenges and have magnified previous challenges"). Her recommendations are a separate MTSS framework targeted specifically to social-media-related harms. *See, e.g.*, Ex. 1093 ¶ 7 ("Existing staffing and programming . . . are insufficient to address the complex impacts of social media. A comprehensive and sustainable plan requires new, dedicated staffing and professional development."), ¶ 27 ("My recommendations are additive, not duplicative . . . targeted toward addressing harms that existing efforts were never designed to address, including those stemming from compulsive platform use."), ¶ 40 (current staff face "role dilution" because of new harms from Defendants' platforms; "the solution is . . . to expand capacity").

Ultimately, Defendants' objections raise factual disputes appropriate for cross-examination, not summary judgment. *See Fuller*, 865 F.3d at 1161.

### 3.    The Districts' harms are not derivative.

As this Court has already held, the Districts seek recovery for harms they have themselves suffered and continue to suffer due to Defendants' platforms—not for harms suffered by students. *See* MTD Order, 754 F. Supp. 3d at 968 (rejecting Defendants' derivative-injury argument and distinguishing *Ass'n of Washington Pub. Hosp. Dists. v. Philip Morris Inc.*, 241 F.3d 696, 701 (9th Cir. 2001)). Defendants' contrary claim mischaracterizes Dr. Hoover's strategic plans, which directly address the Districts' own operational and financial injuries. *See, e.g.*, Ex. 1000 ¶ 83 (explaining that student-level challenges "converge to strain school-wide resources, forcing districts to divert limiting staffing and funding to address the mental health and behavioral consequences of digital overuse.").

That Dr. Hoover's plans include student mental-health services does not render the Districts' harms derivative. Schools are legally and financially responsible for providing those services, and Defendants' platforms have magnified those burdens. *See id.* ¶ 5. As Dr. Hoover explains, "mental health challenges triggered and exacerbated by social media use have direct implications for schools, as they affect students' academic performance, social skills, and overall well-being." *Id.* ¶ 85. Defendants ignore that these are institutional harms: disruptions to school operations, depletion of budgets, and deterioration of the educational environment. *See id.* ¶¶ 83–85 (describing the "profound and far-reaching impact … on

216

the school environment" and the "considerable resource strain on schools").

In sum, Dr. Hoover's strategic plans are aimed squarely at remedying harms suffered by the Districts themselves, not vicariously at student injuries. As this Court has already held, the Districts "seek recovery of unique damages" they have directly sustained and continue to sustain as a result of Defendants' misconduct. *See* MTD Order, 754 F. Supp. 3d at 968.

## IV. CONCLUSION

For the reasons set forth in this omnibus filing, and the accompanying briefs filed by each District, summary judgment should be denied. Genuine issues of material fact exist as to Defendants' negligence and their creation and maintenance of a public nuisance that burdens schools and communities. A jury is entitled to see and hear the evidence of Defendants' misconduct.

Respectfully submitted,

DATED: November 7, 2025

By: */s/ Previn Warren*
PREVIN WARREN
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

LEXI J. HAZAM
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 BATTERY STREET, 29TH FLOOR
SAN FRANCISCO, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

*Co-Lead Counsel*

CHRISTOPHER A. SEEGER
**SEEGER WEISS, LLP**
55 CHALLENGER ROAD, 6TH FLOOR
RIDGEFIELD PARK, NJ 07660
Telephone: 973-639-9100
cseeger@seegerweiss.com

*Counsel to Co-Lead Counsel and Settlement Counsel*

217

JENNIE LEE ANDERSON
**ANDRUS ANDERSON, LLP**
155 MONTGOMERY STREET, SUITE 900
SAN FRANCISCO, CA 94104
Telephone: 415-986-1400
jennie@andrusanderson.com

*Liaison Counsel and Ombudsperson*

MATTHEW BERGMAN
**SOCIAL MEDIA VICTIMS LAW CENTER**
821 SECOND AVENUE, SUITE 2100
SEATTLE, WA 98104
Telephone: 206-741-4862
matt@socialmediavictims.org

JAMES J. BILSBORROW
**WEITZ & LUXENBERG, PC**
700 BROADWAY
NEW YORK, NY 10003
Telephone: 212-558-5500
jbilsborrow@weitzlux.com

ELLYN HURD
**SIMMONS HANLY CONROY, LLC**
112 MADISON AVE, 7TH FLOOR
NEW YORK, NY 10016
Telephone: 212-257-8482
ehurd@simmonsfirm.com

ANDRE MURA
**GIBBS MURA, A LAW GROUP**
1111 BROADWAY, SUITE 2100
OAKLAND, CA 94607
Telephone: 510-350-9717
amm@classlawgroup.com

MICHAEL M. WEINKOWITZ
**LEVIN SEDRAN & BERMAN, LLP**
510 WALNUT STREET
SUITE 500
PHILADELPHIA, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com

*Plaintiffs' Steering Committee Leadership*

RON AUSTIN
**RON AUSTIN LAW**
400 MANHATTAN BLVD.
HARVEY, LA 70058
Telephone: 504-227–8100
raustin@ronaustinlaw.com

AELISH M. BAIG
**ROBBINS GELLER RUDMAN & DOWD LLP**
1 MONTGOMERY STREET, #1800
SAN FRANCISCO, CA 94104
Telephone: 415-288-4545
AelishB@rgrd.com

PAIGE BOLDT
**ANAPOL WEISS**
130 N. 18TH STREET, #1600
PHILADELPHIA, PA 19103
Telephone: 215-929-8822
pboldt@anapolweiss.com

THOMAS P. CARTMELL
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Telephone: 816-701-1100
tcartmell@wcllp.com

FELICIA CRAICK
**KELLER ROHRBACK LLP**
1201 THIRD AVENUE, SUITE 3400
SEATTLE, WA 98101
Telephone: 206-623-1900
fcraick@kellerrohrback.com

SARAH EMERY
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KY 40202

219

Telephone: 859-600-6725
semery@justicestartshere.com

KIRK GOZA
**GOZA HONNOLD**
9500 NALL AVE. #400
OVERLAND PARK, KS 66207
Telephone: 913-412-2964
Kgoza @gohonlaw.com

RONALD E. JOHNSON, JR.
**HENDY JOHNSON VAUGHN EMERY PSC**
600 WEST MAIN STREET, SUITE 100
LOUISVILLE, KY 40202
Telephone: 859-578-4444
rjohnson@justicestartshere.com

MATTHEW P. LEGG
**BROCKSTEDT MANDALAS FEDERICO, LLC**
2850 QUARRY LAKE DRIVE, SUITE 220
BALTIMORE, MD 21209
Telephone: 410-421-7777
mlegg@lawbmf.com

SIN-TING MARY LIU
**AYLSTOCK WITKIN KREIS &
OVERHOLTZ, PLLC**
17 EAST MAIN STREET, SUITE 200
PENSACOLA, FL 32502
Telephone: 510-698-9566
mliu@awkolaw.com

JAMES MARSH
**MARSH LAW FIRM PLLC**
31 HUDSON YARDS, 11TH FLOOR
NEW YORK, NY 10001-2170
Telephone: 212-372-3030
jamesmarsh@marshlaw.com

JOSEPH H. MELTER
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 KING OF PRUSSIA ROAD
RADNOR, PA 19087
Telephone: 610-667-7706
jmeltzer@ktmc.com

HILLARY NAPPI
**AWK ATTORNEYS**

1133 WESTCHESTER AVE, SUITE N-224
WHITE PLAINS, NY 10604
Telephone: 914-468-4840
hnappi@awk-saa.com

EMMIE PAULOS
**LEVIN PAPANTONIO RAFFERTY**
316 SOUTH BAYLEN STREET, SUITE 600
PENSACOLA, FL 32502
Telephone: 850-435-7107
epaulos@levinlaw.com

RUTH THI RIZKALLA
**THE CARLSON LAW FIRM, PC**
1500 ROSECRANS AVE., STE. 500
MANHATTAN BEACH, CA 90266
Telephone: 415-308-1915
rrizkalla@carlsonattorneys.com

ROLAND TELLIS
DAVID FERNANDES
**BARON & BUDD, P.C.**
15910 Ventura Boulevard, Suite 1600
Encino, CA 91436
Telephone: 818-839-2333
rtellis@baronbudd.com
dfernandes@baronbudd.com

DIANDRA "FU" DEBROSSE ZIMMERMANN
**DICELLO LEVITT**
505 20th St North
Suite 1500
Birmingham, Alabama 35203
Telephone: 205-855-5700
fu@dicellolevitt.com

*Plaintiffs' Steering Committee Membership*

JOSEPH VANZANDT
**BEASLEY ALLEN**
234 COMMERCE STREET
MONTGOMERY, AL 36103
Telephone: 334-269-2343
joseph.vanzandt@beasleyallen.com

*Federal/State Liaison*

*Attorneys for Individual Plaintiffs*

## <u>ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27</u>

I, Previn Warren, attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated: November 7, 2025                    By: <u>*/s/ Previn Warren*</u>

## <u>FILER'S ATTESTATION</u>

I, Previn Warren, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

Dated: November 7, 2025

By: <u>*/s/ Previn Warren*</u>

PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT
4:22-md-03047-YGR