**Exhibit 106**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

December 23, 2020

**(Meta) Zuckerberg Exhibit 33     3.27.25 mlr**

Chairman Lindsey Graham
Committee on the Judiciary
U.S. Senate
224 Dirksen Senate Office Building
Washington DC 20510

Dear Chairman Graham, Ranking Member Feinstein, and Members of the Committee,

Thank you for your questions for the record from the Committee on the Judiciary's November 17, 2020 virtual hearing.  Per your request, attached are the answers for the record to your questions.

Sincerely,

Facebook, Inc.

1 HACKER WAY
MENLO PARK, CA
94025

FACEBOOK



**Questions from Senator Grassley**

**Questions to Mr. Zuckerberg and Mr. Dorsey**

1. **How do your users hold you and your companies accountable for your content moderation practices?  Congress has the benefit of bringing you before this Committee to answer questions.  But when one of my constituents thinks his or her speech was wrongfully moderated or fact-checked, why should they have any faith that their objection will even be heard?**

   If someone believes that we have gotten a content moderation decision wrong, that person can generally appeal or is given the option to disagree with our decision. We also provide users with the reason for our decision and the specific policy that was violated. In some cases, we then re-review our decisions on those individual pieces of content.

   In order to request re-review of a content decision we made, users are often given the option to "Request Review" or to provide feedback by stating they "Disagree with Decision." We try to make the opportunity to request this review or give this feedback clear, either via a notification or interstitial, but we are always working to improve.

   Transparency in our appeals process is important, so we now include in our Community Standards Enforcement Report how much content people appealed and how much content was restored upon appeal. Gathering and publishing those statistics keeps us accountable to the broader community and enables us to continue improving our content moderation. For more information, see https://transparency.facebook.com/community-standards-enforcement.

   We have also established an Oversight Board so people in the community can appeal our content decisions to a body that has independent judgment. We know that sometimes our systems can feel opaque, and we want people to have a way to hold us accountable and make sure that we are enforcing our standards fairly. The Oversight Board will use its independent judgment to decide some of our hardest cases, and the decisions it makes will be binding.

   When it comes to fact-checking, Facebook partners with more than 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. People may reach out directly to the third-party fact-checking organizations if (1) they have corrected the rated content, or (2) they believe the fact-checker's rating is inaccurate. If a rating is successfully corrected or disputed, the demotion on the content will be lifted and the strike against the domain or Page will be removed. It may take a few days to see the distribution for the domain or Page recover. Additionally, any recovery will be affected by other false news strikes and related interventions (like demotions for clickbait). Fact-checkers are responsible for evaluating the validity of each correction. Fact-checkers are asked to respond to requests in a reasonable time period—ideally one business day for a simple correction, and up to a few business days for more complex disputes.

2. **Do you agree that users should be entitled to due process when content they post is taken down or moderated?  And do you agree that there could be more**

**transparency by your companies in explaining why certain speech or content is moderated?**

Please see the response to your previous question.

**Questions from Senator Leahy**

1.      **You committed to me during your testimony that Facebook will conduct a post-mortem analysis of election misinformation and disinformation spread on your platform.**

    a.      **What is the scope of this review, including what products will be evaluated and what timeframe will it cover?  When do you anticipate the review will be complete?**

    b.      **Unlike Mr. Dorsey, you did not clearly specify whether you will make your internal review public. Will it be made publicly available?**

    c.      **You testified you will also commission independent academics to review the data to make their own findings. How will you select the academics to conduct this review?**

    d.      **What data will be made available to the academics? Do you intend to place any limitations on the availability of such data compared to Facebook's internal review?**

We believe that there is a lot to learn from this election, and we're committed to making sure that we do. We are in the process of evaluating all of our election-related measures to learn what we can from this experience, and to determine whether any of those measures should remain in place going forward.

Earlier this year, we announced a partnership with a team of independent external academics to conduct objective and empirically grounded research on social media's impact on democracy. We want to better understand whether social media makes us more polarized as a society, or if it largely reflects the divisions that already exist; if it helps people become more informed about politics, or less; or if it affects people's attitudes towards government and democracy, including whether and how they vote. We hope that the insights these researchers develop will help advance society's understanding of the intersection of technology and democracy and help Facebook learn how we can better play our part.

Facebook is working with a group of seventeen independent researchers who are experts in the fields of elections, democracy, and social media. Social Science One facilitated the start of the project, and two of its committee chairs, Talia Stroud and Joshua A. Tucker, serve as co-chairs of this project. They selected researchers who represent a variety of institutions, disciplines, areas of expertise, and methodological traditions. Facebook did not select the researchers and is taking measures to ensure that they operate independently.

Three principles guide our work and will continue to do so as we move ahead: independence, transparency, and consent.

**Independence**: The external researchers won't be paid by Facebook, and they won't answer to Facebook either. Neither the questions they've asked nor the conclusions they draw

will be restricted by Facebook. We've signed the same contracts with them that we do with other independent researchers who use our data (and those contracts are publicly posted on Social Science One's website).

      **Transparency**: The researchers have committed to publish their findings in academic journals in open access format, which means they will be freely available to the public. Facebook and the researchers will also document study plans and hypotheses in advance through a pre-registration process and release those initial commitments upon publication of the studies. This means that people will be able to check that we did what we said we would—and didn't hide any of the results. In addition, to allow others to run their own analyses and further check our homework, we plan to deliver de-identified data on the studies we run. We have also invited Michael Wagner, a professor at the University of Wisconsin, to document and publicly comment on our research process as an independent observer.

      **Consent**: We are asking for explicit, informed consent from those who opt to be part of research that analyzes individual-level data. This means research participants will confirm both the use of their data and that they understand how and why their data will be used. Additionally, as part of our studies, we will also analyze aggregated user data on Facebook and Instagram to help us understand patterns. In addition to this, the studies—and our consent language—were reviewed and approved by an Institutional Review Board (IRB) to ensure they adhere to high ethical standards.

2.     **Facebook's labeling around the 2020 election included links to the Bipartisan Policy Center and noted that the U.S. has safeguards in place to maintain the integrity of our elections, but Facebook did not contradict objectively inaccurate posts related to the election. Why not?**

      Freedom of expression is a founding principle for Facebook. And we do not think it is best for a private company to censor politicians in a democracy. Seeing speech from politicians is in the public interest, and in the same way that news outlets will report what a politician says, we think people should generally be able to see it for themselves on our platforms. We don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. Accordingly, direct speech from politicians is generally not eligible for our third-party fact-checking program. A handful of times a year, we leave up content that would otherwise violate our policies if the public interest value outweighs the risk of harm. But there is no newsworthiness exemption to content that incites violence or suppresses voting. Even if a politician or government official says it, if we determine that content may lead to violence or deprive people of their right to vote, we will take that content down.

      In an effort to help connect people with reliable information, we placed a link to the Voting Information Center on posts about voting and the election, both before and after Election Day. We also partnered with Reuters and the National Election Pool to provide reliable information about election results.

For content that does not stem from a political candidate, we work with independent, third-party fact-checkers to help reduce the spread of false news and other types of viral misinformation. If content is deemed by a fact-checker to be false, its distribution will be reduced, and it will appear lower in News Feed. It will be accompanied by Related Articles from fact-checkers, and people trying to share the content will be notified of the additional reporting. They will also be notified if content they have shared in the past has since been rated false by a fact-checker. We also implement an overlaid warning screen on top of photos and videos marked as false. Additionally, we take action against Pages and domains that repeatedly share or publish content that is rated false. Such Pages and domains will see their distribution reduced as the number of offenses increases. Finally, Pages and domains that repeatedly publish or share false news will lose their ability to register as a News Page on Facebook, and if a registered News Page repeatedly shares false news, its News Page registration will be revoked.

We also have strong voter suppression policies, which apply to all users (including politicians), and which prohibit explicit or implicit misrepresentations about how or when to vote that could cause someone to lose their opportunity to vote. We worked closely with election officials to identify and remove misinformation about voting in the lead-up to and during the election, including false claims about polling conditions.

### 3.    Should social media companies have the responsibility of signal-boosting credible information as well as reducing the noise of misinformation?

People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

We also want Facebook to be a place where people can discover more news, information, and perspectives, and we are working to build products that help. Through our News Feed algorithm, we work hard to both actively reduce the distribution of clickbait, sensationalism, and misinformation, and to boost news and information that keeps users informed. We know the importance to users of staying informed about their local communities.

At Facebook, we connect people with reliable information about important issues. For example, since the pandemic started, we have worked to connect people with authoritative health sources through a number of different methods, such as redirecting people to health authorities if they searched for COVID-19 on Facebook or Instagram, and launching a COVID-19 Information Center on Facebook which acts as a central place for people to get the latest news, information from health authorities, resources, and tips to stay healthy and safe. Between March and June, we

directed over 2 billion people globally to resources and health authorities through our COVID-19 Information Center and pop-ups on Facebook and Instagram, with over 600 million people clicking through to learn more. In May, more than 25 million people in the US visited the COVID-19 Information Center. More than 18 million people visited the COVID-19 Information Center in June and more than 14 million people in July.

When it came to the election, we launched a Voting Information Center to connect people with reliable information on deadlines for registering and voting, and details about how to vote by mail or vote early in person. We also displayed links to the Voting Information Center when people posted about voting on Facebook. More than 140 million people have visited the Voting Information Center on Facebook and Instagram since it launched.

Additionally, we launched a Climate Science Information Center on Facebook to provide persistent access to global, regional, and local authoritative information about climate change and its effects. The Center features resources from the world's leading climate organizations and clear steps people can take to combat climate change. We're working with the Intergovernmental Panel on Climate Change (IPCC) and their global network of climate science contributors to include facts, figures, and data. Contributors include the UN Environment Programme (UNEP), the National Oceanic and Atmospheric Administration (NOAA), and the World Meteorological Organization (WMO). We'll also include posts from relevant sources to highlight climate science news.

**4.    What would losing Communications Decency Act Section 230 protections mean for social media powerhouses like Facebook? What would it mean for a tech start-up?**

Section 230 made it possible for every major internet service to be built and ensured important values like free expression and openness were part of how platforms operate. As the internet keeps growing and evolving, the core principles of Section 230 will continue to be crucial for innovation—for small platforms that don't have the same capabilities when it comes to content moderation, for large ones that host billions of pieces of content across the globe, and for the American tech sector as a whole if we are going to maintain our edge in innovation. But that doesn't mean it shouldn't be updated to reflect the way the internet has changed in the last 25 years—and that's why we support thoughtful reform to make sure the law is working as intended.

**5.    Are Facebook's content moderation policies applied uniformly across the board? Could you provide an example?**

When it comes to content moderation, we strive to enforce our policies consistently. Content reviewers assess content based on our Community Standards. We have made our detailed reviewer guidelines public to help people understand how and why we make decisions about the content that is and is not allowed on Facebook.

6.  **Does Facebook prevent conservative news and perspectives from finding a large audience? Is there evidence to suggest that such content is in fact among the most widely available and distributed on Facebook?**

We do not take any steps to give content more or less visibility because of the political leanings of the individual or entity that posted it. There are a variety of factors that contribute to how much engagement a post receives on our platform. The main driver of what users see in their News Feed is their decisions about what type of content they want to see. Your News Feed will mainly include posts from your friends, the Groups you join, or the Pages you follow (which can include the Pages of media organizations). Your friends and family can also share posts with you that they think might interest you from Pages that they follow but you do not.

7.  **What is Facebook doing to ensure that live video posts are not used as a loophole to evade your policies and terms of use?**

The overwhelming majority of people use Facebook Live for positive purposes, like sharing a moment with friends or raising awareness for a cause they care about. Still, Live can be abused, and we have taken steps to limit that abuse.

Before May 2019, if someone posted content that violated our Community Standards— on Live or elsewhere—we took down their post. If they kept posting violating content, we blocked them from using Facebook for a certain period of time, which also removed their ability to broadcast Live. And in some cases, we banned them from our services altogether, either because of repeated low-level violations, or, in rare cases, because of a single egregious violation (for instance, using terror propaganda in a profile picture or sharing images of child exploitation).

Since then, we tightened the rules that apply specifically to Live. We now apply a "one strike" policy to Live in connection with a broader range of offenses. Anyone who violates our most serious policies is restricted from using Live for set periods of time—for example, 30 days—starting on their first offense. For instance, if we discover someone has shared a link to a statement from a terrorist group with no context, that user will be blocked from using Live for a set period of time.

We recognize the tension between people who would prefer unfettered access to our services and the restrictions needed to keep people safe on Facebook. Our goal is to minimize risk of abuse on Live while enabling people to use Live in a positive way every day.

8.  **Twitter banned one of former Trump advisor Steve Bannon's accounts after he posted the outrageous video calling for the beheadings of Dr. Anthony Fauci and FBI Director Christopher Wray.  Facebook did not; you only took the video down.**

    a.  **Do you consider the Bannon beheading video to be an egregious violation of Facebook's terms of use?**

    b.    **If there are not consequences when such high-profile individuals violate your terms of use in such an egregious way, what do you think the lesson will be for others who traffic in extreme, hateful rhetoric?**

Violence and hate have no place on our platform. With regard to the video posted by Mr. Bannon, the video did violate our policies, and we took it down. But having a content violation does not automatically mean that a user's account gets taken down. We work to enforce our policies against those who violate them, and we remove content calling for or advocating violence.

We don't want people to game the system, so we do not share the specific number of violations that leads to a temporary block or permanent suspension. Our Community Standards are a guide for what is and isn't allowed on Facebook. The consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform. For instance, we may warn someone for a first violation, but if they continue to violate our policies, we may restrict their ability to post on Facebook or disable their profile. We also may notify law enforcement when we believe there is a genuine risk of physical harm or a direct threat to public safety.

9.    **In 2018, Facebook acknowledged that it was used to "foment division and incite offline violence" in Myanmar, most particularly against the Rohingya people, and took steps to stop the spread of violence on its platform.**

    a.    **What initiatives did Facebook take to prevent the spread of misinformation around the election in Myanmar?**

    b.    **Were these initiatives successful? How is Facebook measuring success in Myanmar?**

Facebook worked to help protect the integrity of Myanmar's election on our platform. Many teams at Facebook have worked over the past few years to better understand how our platform is used in Myanmar and how we can play a part in helping to prevent harm. We also built a team that is dedicated to Myanmar. This includes people who spend significant time on the ground working with civil society partners who are advocating on a range of human and digital rights issues across Myanmar's diverse, multi-ethnic society. Our goal is to understand and address current issues and those that are on the horizon.

Before the 2020 election, Facebook expanded our misinformation policy in Myanmar so that we removed misinformation that could contribute to the risk of voter suppression or damage the integrity of the electoral process. Working with local partners, we removed verifiable misinformation and unverifiable rumors that were assessed as having the potential to suppress the vote or damage the integrity of the electoral process. For example, we removed posts falsely claiming a candidate is a Bengali, or not a Myanmar citizen, and thus ineligible.

To provide people using the platform with additional context before they share images that are more than a year old and could be potentially misleading, we also introduced an Image

Context reshare product in Myanmar in June 2020. Out-of-context images are often used to deceive and confuse. With this product, users are shown a message when they attempt to share specific types of images, including photos that are over a year old and that may come close to violating Facebook's guidelines on violent content, warning people that the image they are about to share could be misleading.

We also introduced a new feature on Messenger that limits the number of times a message can be forwarded to five. These limits are a proven method of slowing the spread of viral misinformation that has the potential to cause real-world harm. This safety feature is available in Myanmar and, over the course of the next few weeks, we will be making it available to Messenger users worldwide.

Finally, we introduced our third-party fact-checking program in Myanmar in March 2020 as part of our ongoing integrity efforts to reduce the spread of misinformation and improve the quality of the news people find online. We now have three fact-checking partners in Myanmar— BOOM, AFP Fact Check, and Fact Crescendo. We also expanded our warning screens, which are implemented once information has been rated false by our third-party fact-checkers, to include the Burmese language.

When it comes to hate speech, we remove it as soon as we become aware of it. We have invested significantly in proactive detection technology to help us catch violating content more quickly. We also use AI to proactively identify hate speech in 45 languages, including Burmese. We continued to invest in improving this technology and our overall enforcement against hate speech as the election approached. For example, in the second quarter of 2020, we took action against 280,000 pieces of content in Myanmar for violations of our Community Standards prohibiting hate speech, of which we detected 97.8% proactively before it was reported to us. This is up significantly from Q1 2020, when we took action against 51,000 pieces of content for hate speech violations, detecting 83% proactively. And to decrease the risk of problematic content going viral in Myanmar and potentially inciting violence or hatred ahead of or during the election, we significantly reduced the distribution of content that our proactive detection technology identified as likely hate speech. This content was removed when it was determined to violate our policies, and its distribution remained reduced until that determination was made. We used technology to identify new words and phrases associated with hate speech in Myanmar to detect such content.

We also introduced more transparency when it comes to issue, electoral, and political ads, going far beyond the standard in print and broadcast media. All these ads in Myanmar must have a "Paid for by" disclaimer attached to them to show the organization or person behind the ad. All ads about social issues, elections, or politics are also stored in our searchable Ad Library for seven years, which includes additional insights about them to help journalists, regulators, researchers, watchdog groups, and others learn more about ads and hold advertisers and Facebook accountable. To make Pages more transparent, we also worked with two partners in

Myanmar to verify the official national Facebook Pages of political parties. As of August 2020, more than 40 political parties have been given a verified badge. This provides a blue tick on the Facebook Page of a party and makes it easier for users to differentiate a real, official political party Page from unofficial Pages, which is important during an election campaign period.

10. **As I mentioned during the hearing, on October 8th, Facebook took down 38 inauthentic accounts created and controlled by members of the Myanmar military in part to promote anti-Rohingya content. But the same Myanmar military users just turned around and created new accounts to promote the same content. Can you commit to doing more to ensure that Facebook is enforcing its policies and standards at a user level, not just an account level, in Myanmar?**

Over the past several years, we have invested heavily in people, technology, and partnerships to examine and address the abuse of Facebook in Myanmar, and we have repeatedly taken action against violent actors and bad content on Facebook in Myanmar. We've also built a team that is dedicated to Myanmar. The ethnic violence happening in Myanmar is horrific, and we don't want our services to be used to spread hate, incite violence, or fuel tension on the ground.

Our approach to this problem, like the problem itself, is multifaceted, but our purpose is clear: to reduce the likelihood that Facebook will be used to facilitate offline harm. Our tactics include identifying and removing fake accounts; finding and removing violent actors; building better tools and technology that allow us to proactively find bad content; evolving our policies; and continuing to build partnerships and programs on the ground. And we also monitor for efforts to re-establish a presence on Facebook by networks we previously removed. Using both automated and manual detection, we continuously remove accounts and Pages connected to networks we took down in the past. As a result of these actions, the Myanmar military's ability to foment ethnic tension, violence, and hate on Facebook has been severely diminished.

In addition, and as discussed in the response to your previous question, to decrease the risk of problematic content going viral in Myanmar and potentially contributing to incitement of violence or hatred ahead of or during Myanmar's recent election, we significantly reduced the distribution of content that our proactive detection technology identified as likely hate speech. This content was removed when it was determined to violate our policies, and its distribution remained reduced until that determination was made.

In addition to our standard practice of removing accounts that repeatedly violate our Community Standards, we also improved our efforts to temporarily reduce the distribution of content from accounts that have recently and repeatedly violated our policies. This included providing additional information to those whose accounts were affected.

We don't want anyone to use Facebook to incite or promote violence, no matter who they are. That's why we are always evaluating and analyzing our policies around violence committed

by state and non-state actors. We recognize that the sources of ethnic violence in Myanmar are incredibly complex and cannot be resolved by a social media company, but we also want to do the best we can to limit incitement and hate that furthers an already deadly conflict.

11. **As part of its ongoing genocide investigation against Myanmar before the International Court of Justice, The Gambia is seeking documents from Facebook and Twitter through the D.C. District Court that could help prove that Myanmar officials acted with genocidal intent against the Rohingya people. Twitter has reportedly decided to cooperate and provide this information. Facebook has thus far refused to do so. Why won't Facebook cooperate with the investigation?**

Facebook stands against all hate and violence, including in Myanmar. We are cooperating with and handing over relevant data to the U.N. Independent Investigative Mechanism for Myanmar, which is the relevant body that the U.N. has stood up to investigate these crimes and that is tasked with collecting relevant evidence and providing it for use in appropriate proceedings.

But The Gambia's request for the release of documents, including those related to an unbounded number of Myanmar state entity accounts, is extraordinarily broad and well beyond the scope of what is permitted by law. Providing the unprecedented and boundless access that The Gambia seeks would require Facebook to violate the Stored Communications Act, 18 U.S.C. § 2702(a).

12. **Misinformation spreads in many languages on social media platforms. In October 2020, The New York Times reported that misinformation in America thrives in both English and Spanish. In October 2020, a study published in The American Journal of Tropical Medicine and Hygiene, detailed how COVID-19 misinformation has circulated in 25 different languages across at least 87 countries. What are you doing to prevent misinformation from spreading in languages other than English and alerting users about this on the platforms?**

As discussed in the response to your Question 3, we work with over 80 independent, third-party fact-checkers around the world, covering more than 60 languages, all of whom are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. We also added two new US fact-checking partners (Reuters and AFP) who review content in Spanish, in addition to one existing partner (Associated Press). If content is debunked by fact-checkers, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

Ahead of the election, we took a number of steps to address concerns about misinformation, including actions specifically targeted to our Spanish-speaking community. For example, we built a Spanish version of our Voting Information Center, where people were able to find accurate information about the election. On WhatsApp, we partnered with the IFCN to develop a chatbot that enabled people to receive accurate information from ten US fact-checking organizations, including Telemundo and Univision. We also launched a new feature in WhatsApp in which people can easily search the web to receive more information about their chats.

To reduce the spread of misinformation ahead of the election, we also implemented a forwarding limit on Messenger and have a similar limit on WhatsApp, so messages can only be forwarded to five people or groups at a time. Limiting forwarding is an effective way to slow the spread of viral misinformation and harmful content that has the potential to contribute to the risk of real-world harm.

And with respect to COVID-19 misinformation, under our Misinformation and Harm policy, we remove misinformation that could contribute to the risk of imminent violence or physical harm. We have applied this policy to harmful misinformation about COVID-19 since January. In Q2 of 2020, we removed more than seven million pieces of content on Facebook and Instagram globally for containing misinformation that may lead to imminent physical harm, such as content relating to fake preventative measures or exaggerated cures.

And we're working to empower our fact-checking community during COVID-19. Our fact-checking program is a key piece of our multi-pronged strategy to reduce the spread of misinformation on our platforms. This is why, since January, we have taken a number of additional steps to support our fact-checking partners' work to debunk misinformation about COVID-19. In March, we partnered with Poynter's International Fact-Checking Network (IFCN) to launch a $1 million grant program to support fact-checkers in their work around COVID-19. In addition to providing critical funding that enables partners to maintain or increase their capacity during this time, the grants also support projects such as:

- Translation of fact checks from native languages to different languages;

- Multimedia (videos, infographics, podcasts) production about COVID-19;

- Working with health experts for evidence-based and scientific coverage;

- Audience development initiatives that use innovative formats, such as offline or interactive communication, to better reach people with reliable information; and

- Fact-checkers supporting public authorities with reliable information for better communication about COVID-19.

Since we launched this program, we have awarded grants to 21 fact-checking organizations around the world, including PolitiFact in the US, who received a grant for video

fact-checking on coronavirus. We've also launched a year-long fellowship with ten fact-checking organizations that are part of our fact-checking program, to bring on new team members to help them approach this complex and important topic.

**13.    Will you commit to take additional steps based on lessons learned during the 2020 presidential election to prevent the spread of misinformation during the upcoming U.S. Senate elections in Georgia?  What steps are you planning, if any, at this stage?**

On December 15, we announced that we are maintaining for now our temporary pause for ads about social issues, elections, or politics in the US. However, on December 16, we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

We're also helping people register and vote in Georgia by putting reliable information at the top of Facebook and Instagram. This included information about how and when to register ahead of Georgia's deadline, and how to request a mail ballot. We're also showing people how to find polling place times and locations for early voting, followed by how to return their mail ballots, then how to vote on Election Day.

Additionally, we will label content that tries to delegitimize voting in these elections. This includes content with claims like "vote-by-mail leads to fraud." When we become aware of content like this, we will add a label to it from the Bipartisan Policy Center with accurate information that addresses the underlying claim. And, if someone goes to share the content we have labeled, they will first see a message directing them to our Voting Information Center, which provides reliable election information.

Finally, we are deploying the teams and technology we used in the general election to fight voter suppression, misinformation, and interference in the Georgia elections. This includes:

- Running our Elections Operations Center for the Georgia runoffs, to monitor and respond to threats in real time;

- Stopping influence operations by taking down coordinated networks of inauthentic accounts, Pages, and Groups that seek to manipulate the public debate;

- Working with state election authorities to identify and stop potential instances of voter suppression;

- Providing our Voting Alerts tool to state and local election officials in Georgia to send notifications about the election to people on Facebook in their jurisdiction;

- Enforcing our voter interference policies through a combination of AI and human review to find and remove content which breaks our rules;

- Applying warning labels in both Spanish and English to content that our fact-checking partners rate false or partially false; and

- Protecting the accounts of election officials from harassment and other threats, in addition to our Facebook Protect program, which offers security tools and additional protection to safeguard the Facebook and Instagram accounts of campaigns, elected officials, federal and state political party committees, and staff.

14.   **Misinformation campaigns targeting communities of color are a very dangerous tool that contribute to voter suppression. A report by the Senate Intelligence Committee noted that Russian interference in the 2016 election targeted African Americans in our country with disinformation campaigns. In October 2020, NPR reported that people of color were "flooded with misinformation in election's final days."  What steps are you taking to prevent the spread of misinformation campaigns targeting communities of color on Facebook?**

As discussed in the responses to your Questions 3 and 12, we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

On December 1, 2020, we also launched a fact-checking fellowship in the US with the National Association of Black Journalists. The Facebook Journalism Project will provide funding for 9 emerging journalists recruited by the National Association of Black Journalists (NABJ) to participate in year-long fellowships in the newsrooms of IFCN-certified fact-checking organizations in the US. We believe it is important that Black journalists are able to play a role in ensuring that factual information is reported about not only Black communities, but also the policies, people, and decisions that impact such communities on an everyday basis.

We also work to take fast action to prevent misinformation from going viral, especially given that quality reporting and fact-checking takes time. In 2019, we announced that if we identify signals that a piece of content is likely false, we temporarily reduce its distribution in order to allow sufficient time for our independent, third-party fact-checkers to review and determine whether to apply a rating. Quick action is critical in keeping a false claim from going viral, and so we take this step to provide an extra level of protection against potential misinformation. These temporary demotions expire after seven days if the content has not been rated by an independent fact-checker.

With respect to fighting foreign misinformation campaigns, we apply the broadest enforcement measures when we find instances of coordinated inauthentic behavior conducted on

behalf of a government entity or by a foreign actor where the use of fake accounts is central to the operation. That enforcement includes the removal of every on-platform property connected to the operation itself and the people and organizations behind it. We regularly share our findings about the networks we find and remove for coordinated inauthentic behavior.

For example, in March 2020, we removed an inauthentic network operating on behalf of individuals from Russia and targeting the United States. The people behind this network engaged in a number of deceptive tactics, including the use of fake accounts—some of which had already been disabled by our automated systems—to manage Pages posing as non-government organizations or personal blogs. They frequently posted about US news and attempted to grow their audience by focusing on topics like Black history, Black excellence and fashion, celebrity gossip, news and events related to famous Americans like historical figures and celebrities, and LGBTQ issues. They also shared content about oppression and injustice, including police brutality. We detected the network and removed all associated accounts and Pages. We are making progress rooting out this abuse, but it's an ongoing challenge. We're committed to continually improving to stay ahead. That means building better technology, hiring more people, and working more closely with law enforcement, security experts, and other companies.

**Questions from Senator Durbin**

**For questions with subparts, please answer each subpart separately.**

**Questions for Mark Zuckerberg**

1.  **On October 28, *The New York Times* published an article entitled "Evidence of anti-conservative bias by platforms remains anecdotal." The article says: "Conservatives have said for years that online social media platforms censor their views. But their evidence is largely anecdotal, and conservative accounts frequently perform extremely well online."**

    a.  **Do you agree that evidence of online social media platforms censoring conservative views is "largely anecdotal"?**

    b.  **Do you agree that "conservative accounts frequently perform extremely well online"?**

    When it comes to content moderation, we strive to enforce our policies consistently, without regard to political affiliation. Suppressing content on the basis of political ideology or preventing people from seeing what matters most to them directly contradicts Facebook's mission and our business objectives. Content reviewers assess content based on our Community Standards. We have made our detailed reviewer guidelines public to help people understand how and why we make decisions about the content that is and is not allowed on Facebook.

    With respect to News Feed, people see posts from their friends, Pages they've chosen to follow, and Groups they've joined, among others, in their News Feed. On a given day, the number of eligible posts in a user's Feed inventory can number in the thousands, so we use an algorithm to personalize how this content is organized. The goal of the News Feed algorithm is to predict what pieces of content are most relevant to the individual user, and rank (i.e., order) those pieces of content accordingly every time a user opens Facebook, to try and bring those posts that are the most relevant to a person closer to the top of their News Feed. This ranking process has four main elements: the available inventory (all of the available content from the people, Pages, and Groups a person has chosen to connect with); the signals, or data points, that can inform ranking decisions (e.g., who posted a particular piece of content); the predictions we make, including how likely we think a person is to comment on a story, share with a friend, etc.; and a relevancy score for each story, which informs its position in News Feed.

2.  **On August 27, *The New York Times* published an article entitled "What if Facebook is the real silent majority?" The article says: "Right-wing influencers are dominating the political discussion on Facebook." The article points out, for example, that conservative commentator Ben Shapiro had received 56 million interactions on his Facebook page in the previous 30 days – more interactions than the main Facebook pages of *The New York Times*, *The Washington Post*, NPR, ABC News and NBC News combined received in that period. The article also notes that posts from the right-wing Breitbart had been shared four million times in the previous 30 days, which is triple the number of shares from the official pages of every Democratic Senator combined during that period.**

The article further states: "The reason right-wing content performs so well on Facebook is no mystery. The platform is designed to amplify emotionally resonant posts, and conservative commentators are skilled at turning passionate grievances into powerful algorithm fodder. The company also appears willing to bend its rules for popular conservative influencers." The article goes on to discuss reports that Facebook executives had removed "strikes" from the accounts of several high-profile conservative pages that had shared viral misinformation in violation of the company's rules.

a. Is Facebook designed to amplify emotionally resonant posts?

b. Has Facebook ever bent its rules for popular conservative influencers? If so, when and how?

c. Has Facebook ever removed "strikes" from accounts of high-profile conservative pages that had shared misinformation in violation of the company's rules?

There are a variety of factors that contribute to how much engagement a post receives on our platform. But we do not take any steps to give posts more or less visibility because of the ideological leanings of the entity that made the post.

Each user's News Feed content is personalized to them. The most important factor in what people see is who they choose to friend on Facebook and which Pages or Groups they choose to follow.

Once their friends and the Pages and Groups they follow post content on Facebook, we use a process called ranking to try and order that content so that people won't miss posts that are most meaningful to them personally. In other words, across our platform, every user's News Feed will include different content in a different order.

So if a post is getting a lot of visibility on Facebook, it is often the case that lots of people have expressed an interest in seeing content from that poster and that lots of people are sharing the post with their friends and family. And in fact, if you look at the top ten posts actually seen by people each day on Facebook, on most days, you will find that most of the top posts are from the places you'd expect to see—publications like USA Today, CNN, and Fox News.

With respect to misinformation, people often tell us they don't want to see it. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed.

We send content to independent, third-party fact-checkers for review, but it is ultimately at their discretion to decide what to rate. The enqueued content is based on a number of signals, including machine learning-driven insights and false news reports by users, and we also allow third-party fact-checkers to enqueue content themselves.

We believe it's important for the fact-checking process to be transparent, so Page and domain owners will receive a notification when content they shared is rated by a fact-checking

partner. Page owners can also review all violations, including Community Standards violations, in their Page Quality tab. Additionally, the third-party fact-checkers with which we work are all signatories to the IFCN's Code of Principles, which requires transparency of sources and methodology and a commitment to open and honest corrections. To that end, our partners' fact-checking articles are publicly available and easily accessible at their websites. For a list of our third-party fact-checkers in the US, please visit https://www.facebook.com/journalismproject/programs/third-party-fact-checking/partner-map.

3.    **In the aftermath of the 2020 election, it has become clear that Spanish language election disinformation was a serious problem both before the election and during vote counting. According to a November 7 *Reuters* article entitled "Spanish-language misinformation dogged Democrats in U.S. election," this disinformation spread across multiple platforms, including Facebook, Instagram, and WhatsApp.**

    a.    **Why wasn't Facebook adequately prepared to address Spanish language election disinformation being spread in the lead-up to the 2020 election?**

    b.    **What steps is Facebook taking to identify how extensive this disinformation was on Facebook, Instagram, and WhatsApp? Will you report these findings to this Committee?**

    c.    **What will Facebook do to address Spanish language disinformation before it impacts future elections?**

People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers around the world who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is debunked by a fact-checker, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

Ahead of the election, we took a number of steps to address concerns about misinformation, including actions specifically targeted to our Spanish-speaking community. For example, we built a Spanish version of our Voting Information Center, where people were able to find accurate information about the election. We also added two new US fact-checking partners (Reuters and AFP) who review content in Spanish, in addition to one existing partner (Associated Press). On WhatsApp, we partnered with the IFCN to develop a chatbot that enabled people to receive accurate information from ten US fact-checking organizations, including Telemundo and Univision. We also launched a new feature in WhatsApp in which people can easily search the web to receive more information about their chats.

To reduce the spread of misinformation ahead of the election, we also implemented a forwarding limit on Messenger and have a similar limit on WhatsApp, so messages can only be forwarded to five people or groups at a time. Limiting forwarding is an effective way to slow the spread of viral misinformation and harmful content that has the potential to cause real-world harm.

4.  **When you appeared before the Senate Commerce Committee on October 28, you said in response to a question from Senator Markey that Facebook has a policy in place that prevents any candidate or campaign from "trying to delegitimize the result of the election."  You said: "what we will do in that case is we will append some factual information to any post that is trying to do that."  You said that if one of the candidates tries to "cite an incorrect result, we have a precaution that we've built in to put in the top of the Facebook app, for everyone who signs in the U.S., information about the accurate U.S. election voting results."**

    a.  **Do you believe that outgoing President Trump has posted anything on Facebook that tried to, in your words, "delegitimize the result of the election"?**

    b.  **Facebook posts little disclaimers underneath President Trump's Facebook posts when he makes objectively-false statements such as "I won the election" (Nov. 7 and 15) and "700,000 ballots were not allowed to be viewed in Philadelphia and Pittsburgh which means, based on our great Constitution, we win the state of Pennsylvania!" (Nov. 13).  The disclaimers say things such as: "The U.S. has laws, procedures, and established institutions to ensure the integrity of our elections" or similar statements.  Do you believe these disclaimers are sufficient to prevent the de-legitimization of election results?**

During the election, we worked hard to tackle misinformation and voter suppression. We partnered with election officials to remove false claims about polling conditions and displayed warnings on more than 180 million pieces of election-related content after review by our independent, third-party fact-checkers. We put in place strong voter suppression policies prohibiting explicit or implicit misrepresentations about how or when to vote, as well as attempts to use threats related to COVID-19 to scare people into not voting. We also removed calls for people to engage in voter intimidation that used militarized language or suggested that the goal was to intimidate, exert control, or display power over election officials or voters, and we filtered civic Groups out of recommendations. We partnered with Reuters and the National Election Pool to provide reliable information about election results in the Voting Information Center and notified people proactively as results became available. We worked with the Bipartisan Policy Center to create labels for posts about voting by candidates from both parties to direct people to reliable information. We also attached an informational label to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods.

5.  **On November 10, *Business Insider* published an article entitled "Around half of the top US Facebook posts since Election Day are sowing doubt about the legitimacy of the election."  The article provided an analysis of the most popular posts on Facebook between November 3 and November 10, based on the number of "interactions" (such as "likes") that posts received. The analysis found that "[a] majority of the most popular US posts on Facebook since Election Day have sown doubt about the legitimacy of Joe Biden's election win." Some of these posts included those little disclaimers to flag disputed claims—but they were still widely seen across Facebook.**

    a.  **Are you aware of this report?**

> b.   Do you have any objective metrics that contradict these findings?
>
> c.   Does this report change your analysis of whether Facebook did enough to combat attempts to delegitimize the election?

The view discussed in that article is only one view, and we don't believe the data being used paints the most accurate picture of what's happening on Facebook. The article is showing data about links shares only from Pages, not people, and it focuses on likes and shares, rather than how many people actually see or read an article. In fact, if you look at the top posts actually seen by people each day on Facebook on most days, you will find that most are from places you'd expect to see, like USA Today, CNN, and Fox News.

There are a variety of factors that contribute to how much engagement a post receives on our platform. Each user's News Feed content is personalized to them. The most important factor in what people see is who they choose to friend on Facebook and which Pages or Groups they choose to follow. Once their friends and the Pages and Groups they follow post content on Facebook, we use a ranking process to try and order that content so that people won't miss posts that are most meaningful to them personally. In other words, across our platform, every user's News Feed will include different content in a different order. So if a post is getting a lot of visibility on Facebook, it is often the case that lots of people have expressed an interest in seeing content from that poster and that lots of people are sharing the post with their friends and family.

6.   **I've talked with you before about my concern with Facebook Messenger Kids and other platforms designed for child users. I'm concerned that information collected by these platforms will be retained, used, and potentially shared in ways that may end up impacting those children for the rest of their lives.**

**I understand that usage of Facebook Messenger Kids has increased during the COVID-19 pandemic. In May, *Forbes* reported that Facebook Messenger Kids had seven million monthly active accounts.**

**Facebook's privacy policy for Messenger Kids says that Facebook collects a potentially enormous amount of information about the kids who use it, including:**

- **personally identifying information, such as the child's full name;**

- **the content of messages that kids send and receive;**

- **information about how long kids use the app and what activities they engage in;**

- **information about the people who children connect with on Messenger Kids;**

- **and even information that is collected from the phone or device on which the app is used, including the IP address.**

**Your privacy policy makes clear that: "we may transfer information we collect to third party service providers that support our business," which includes companies who "analyze how Messenger Kids is being used to help us improve the service." You say that these vendors and service providers with whom you share this**

**information are subject to strict data confidentiality agreements, but you don't specify what those agreements provide.**

**a.    Will you provide the Committee with a list of all third party service providers with whom Facebook shares information collected from children through the Messenger Kids app?**

Facebook does not share information collected via Messenger Kids with third parties, as defined by the Children's Online Privacy Protection Act (COPPA).

Messenger Kids does share information with certain vendors and service providers that are only permitted to use that information to provide specific services that support Messenger Kids, consistent with the Messenger Kids Privacy Policy.

**7.    Young kids don't understand that their every click on the internet leaves a trail of personal data that lasts a lifetime. Companies like Facebook are accumulating massive amounts of personal data on children through apps like Messenger Kids, and the kids never had the chance to give their own informed consent before that data collection begins. I think kids deserve the right to request a clean slate once they have grown old enough to appreciate the consequences of their childhood internet use.**

**In 2018, I asked you if you would be open to allowing anyone who grew up using Messenger Kids to delete the data that Facebook collected about them when they become an adult. You replied: "Senator, yes…I think it is a good idea to consider making sure that all that information is deleted."**

**I have introduced a bill, the Clean Slate for Kids Online Act, that would give every American an enforceable legal right to have internet companies delete all personal information that was collected from or about the person when he or she was a child under age 13. Will you commit to support this bill and to support allowing Americans to delete information that was collected from and about them online when they were kids?**

Yes, we support privacy legislation enabling people to delete information in bulk. On Facebook, we require everyone to be at least 13 years old before they can create an account (in some jurisdictions, this age limit may be higher).

In addition to our minimum age requirements, we're committed to protecting the privacy and safety of minors who use our services. These users generally have a more limited experience on Facebook when it comes to the features they have access to, who they share and connect with, and the content they can see (including ads).

**8.    There is substantial evidence that billions of dollars of stolen goods are trafficked, offered for sale, and bought by unsuspecting consumers on online marketplaces.**

**a.    Are any stolen goods offered for sale or sold on Facebook Marketplace?**

We don't allow the sale of stolen goods on our platform.

- Facebook's Terms of Service require users to agree that they will "not use [Facebook's] Products to do or share anything . . . [t]hat is unlawful . . . ."

- Facebook's Commerce Policies, specifically applicable to Marketplace, further state that "Listings may not promote the buying or selling of items that have been stolen."

For more information on our Commerce Policies, see https://www.facebook.com/policies/commerce.

We review Marketplace listings proactively against our Commerce Policies, which are stricter than our Community Standards. Based on the review, the listing can go live, be automatically rejected, or be sent to review teams for further review. Even after a listing goes live, it may be re-reviewed in response to user feedback—for example, when they report suspected policy violations by clicking on the three dots in the upper right corner of a listing and selecting "report listing." We also respond to valid requests from law enforcement.

    **b.**     **What steps does Facebook take to prevent the offering and sale of stolen goods on Facebook Marketplace?**

Please see the response to your Question 8.a.

    **c.**     **How many Facebook employees or FTEs are dedicated to identifying, preventing, investigating, and remedying the sale of stolen goods on Facebook Marketplace?**

We currently have over 35,000 people working on trust and safety across Facebook. With respect to Marketplace, we continue to grow our team, which includes the people responsible for reviewing listings as well as improving and training our systems.

    **d.**     **Please provide the Committee with any policies or procedures that Facebook has made publicly available relating to Facebook's efforts to identify, prevent, investigate, and remedy the offering and sale of stolen goods on Facebook Marketplace.**

Please see the response to your Question 8.a.

    **e.**     **What is the estimated value of stolen goods transacted on Facebook Marketplace per year?**

Facebook is not in a position to make such an estimate.

    **f.**     **What is the approximate number of transactions Facebook has identified per year on Facebook Marketplace involving goods determined to be stolen?**

We don't allow the sale of stolen goods on Facebook. When we become aware of this activity, we remove it. We also respond to valid requests from law enforcement.

    **g.**     **What is the estimated annual number of transactions on Facebook Marketplace that are blocked because the transactions are involve goods that are known or suspected to be stolen?**

Please see the response to your Question 8.f.

**h.    What is the estimated number of transactions per year on Facebook Marketplace in which goods transacted are identified as stolen after the transaction is completed?**

Please see the response to your Question 8.f.

**i.    Please list the specific types of information that Facebook Marketplace requires potential third-party sellers to provide before they are allowed to sell on Facebook Marketplace.**

People using Facebook Marketplace are overwhelmingly individual sellers who exchange secondhand goods in transactions that are conducted in person and off of our platform. Individuals who list items on Facebook Marketplace do not, in most cases, have formal business entities, records of formation, or separate tax identities. Facebook requires that people provide accurate information when they register for a personal account, and personal Facebook accounts are required in order to post an item on Marketplace. For personal privacy and other reasons, we do not require Facebook users to upload government-issued photo identification in connection with creating accounts.

**j.    Please describe with specificity the process Facebook uses to verify the accuracy of information provided by potential third-party sellers before allowing them to offer items for sale on Facebook Marketplace, and please indicate which parts of this verification process are automated, which parts are performed by Facebook employees, and which parts are performed by non-Facebook employees.**

When someone submits a listing on Marketplace, that listing is subjected to automated review against our Commerce Policies. Based on the review, the listing can go live, be automatically rejected, or be sent to review teams for further review. Even after a listing goes live, it may be re-reviewed in response to user feedback—for example, when users report suspected policy violations by clicking on the three dots in the upper right corner of a listing and selecting "report listing." Facebook also receives and takes action on reports of stolen goods from law enforcement and other appropriate legal authorities. We have an appeals process available for anyone who believes that their listing or access to Marketplace was rejected or removed in error. We are continuously evaluating our policies, as well as investing in and soliciting feedback from relevant internal and external groups to improve our enforcement efforts.

For more information on our Commerce Policies, see https://www.facebook.com/policies/commerce.

**k.    Does Facebook have a high-volume seller threshold that requires additional scrutiny or verification of the identifying information or other information provided by third-party sellers on Facebook Marketplace?**

Facebook Marketplace allows people to list products and communicate with interested buyers in their communities. Because most buyers search for items within a specific geographic radius, the vast majority of sales relationships we generate are both community-based and small-scale. People using Facebook Marketplace are overwhelmingly individual sellers who exchange secondhand goods in transactions that are conducted in person and off of our platform. The

economic activity generated by Marketplace is largely conducted off of our platform and as a result, Facebook is unable to determine with any precision the total number of completed sales and associated aggregate gross revenue. Because these exchanges are often completed in person, we are in most cases even unaware of whether a transaction has been completed or the negotiated sales price. For this reason, at this time we have not created any internal category specific to "high-volume third-party sellers."

**l.      What policies and procedures does Facebook have in place to inform brand name manufacturers and retailers when stolen goods are identified as being offered for sale on Facebook Marketplace?   If a brand name manufacturer or retailer contacts Facebook to report that stolen goods are apparently being offered for sale on Facebook Marketplace, what steps does Facebook take in response?**

There is no place on our platform for the sale of stolen goods, and we make this clear in our terms and policies:

- Facebook's Terms of Service require users to agree that they will "not use [Facebook's] Products to do or share anything . . . [t]hat is unlawful . . . ."

- Facebook's Commerce Policies, specifically applicable to Marketplace, further state that "Listings may not promote the buying or selling of items that have been stolen."

For more information on our Commerce Policies, see https://www.facebook.com/policies/commerce.

Facebook enforces its policies primarily through its review system. When someone submits a listing on Marketplace, that listing is subjected to automated review against our Commerce Policies. Based on the review, the listing can go live, be automatically rejected, or be sent to review teams for further review. Even after a listing goes live, it may be re-reviewed in response to user feedback—for example, when they report suspected policy violations by clicking on the three dots in the upper right corner of a listing and selecting "report listing."

We encourage brands and retailers to work directly with law enforcement if they suspect stolen goods are being sold on our surfaces. Facebook receives and takes action on reports of stolen goods from law enforcement and other appropriate legal authorities.

**m.     When a third-party seller on Facebook Marketplace has been determined to have offered stolen goods for sale, does Facebook ban the seller from Facebook Marketplace and prevent the seller from simply reappearing under a different name?**

Our Commerce Policies prohibit the sale of stolen goods on Marketplace. Failure to comply with our policies may result in a variety of consequences, including, but not limited to, removal of listings, suspension or termination of access to any or all Facebook commerce surfaces or features, or additional action against a user's account.

24

**Questions from Senator Cruz**

I.        **Directions**

**Please provide a wholly contained answer to each question. A question's answer should not cross-reference answers provided in other questions.**

**If a question asks for a yes or no answer, please provide a yes or no answer first and then provide subsequent explanation. If the answer to a yes or no question is sometimes yes and sometimes no, please state such first and then describe the circumstances giving rise to each answer.**

**If a question asks for a choice between two options, please begin by stating which option applies, or both, or neither, followed by any subsequent explanation.**

**If you disagree with the premise of a question, please answer the question as-written and then articulate both the premise about which you disagrees and the basis for that disagreement.**

**If you lack a basis for knowing the answer to a question, please first describe what efforts you undertook in order to ascertain an answer to the question and then provide your tentative answer as a consequence of this investigation. If even a tentative answer is impossible at this time, please state why such an answer is impossible and what efforts you and Facebook intend to take to provide an answer in the future. Please further give an estimate as to when the Committee shall receive that answer.**

**If it is impossible to answer a question without divulging confidential or privileged information, please clearly state the basis for confidentiality or privilege invoked and provide as extensive an answer as possible without breaching that confidentiality or privilege. For questions calling for answers requiring confidential information, please provide a complete answer in a sealed, confidential form. These materials will be kept confidential. For questions calling for privileged information, please describe the privileged relationship and identify the privileged documents or materials that, if disclosed, would fully answer the question.**

**If the answer to a question depends on one or more individuals' memory or beliefs and that individual or those individuals either do not recall relevant information or are not available to provide it, please state the names of those individuals, what efforts you undertook to obtain the unavailable information, and the names of other individuals who may have access to that information.**

**To the extent that an answer depends on an ambiguity in the question asked, please state the ambiguity you perceive in the question, and provide multiple answers which articulate each possible reasonable interpretation of the question in light of the ambiguity.**

**To the extent that a question inquires about your actions or Facebook's actions, omissions, or policies, the question also asks about any entities that Facebook owns, controls, or contracts with to provide services, including but not limited to services related to content moderation or advertising sales, including any and all subsidiaries and affiliates of Facebook or any contractor. If context suggests that a question may ask about Facebook as a service rather than as an entity, please answer the question as applied to both Facebook as a service as well as all Facebook's entities and platforms.**

In addition to the questions below, please attach a copy of each and every formal or informal policy, whether presently written or otherwise, regarding the moderation, promotion, evaluation, or alteration of users or content on Facebook. These must include, for example, Terms of Service, Community Guidelines, all formal and informal internal policies adopted in response COVID-19 content and election-related content, and similar policies.

II.    **Questions**

1.    The following questions examine how Facebook views its activities in moderating and directing its platform:

    a.    When Facebook hosts, unaltered, the material of a third party – as in the form of a basic post – is Facebook acting as publisher?

    b.    When Facebook blocks a post, is it acting as a publisher?

    c.    When Facebook intentionally limits the reach of a post, is it acting as a publisher?

    d.    When Facebook covers the face of a post with a warning or other label written by Facebook, requiring the user to click through in order to access the content of that post, is Facebook acting a publisher?

    e.    When Facebook labels a post, instructing the user that the information in the post is subject to controversy or is in dispute, is Facebook acting as a publisher?

    f.    When Facebook labels a post, informing the user that Facebook has determined that the information in the post is untrue, is Facebook acting as a publisher?

    g.    When Facebook makes a judgment regarding the content of a post, and accordingly reduces or limits its dissemination, is Facebook acting as a publisher?

    h.    When Facebook conditions usage of its platform upon not sharing information, is Facebook acting as publisher?

    i.    When Facebook categorizes and organizes posts, deciding on their order or presence on a running timeline, or employs similar tools to suggest content, is Facebook acting as a publisher?

Facebook is, first and foremost, a technology company. We do not create or edit the content that our users publish on our platform. We seek to be a platform for ideas across the political spectrum and moderate content according to our published Community Standards in

order to keep users on the platform safe, reduce objectionable content, and ensure users participate on the platform responsibly.

Section 230 of the Communications Decency Act provides that "[N]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." Section 230 thus bars claims that seek to hold a service provider liable for its decision to, for example, display, remove, or highlight content created by others.

As to your questions regarding warnings or other labels, we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

We also know that people have different sensitivities with regard to graphic and violent content. For that reason, we add a warning label to especially graphic or violent content so that it is not available to people under the age of eighteen and so that people are aware of the graphic or violent nature before they click to see it.

2.   **Facebook recently limited the distribution and dissemination of reporting from the *New York Post* regarding Joe Biden, his family's business dealings, and his campaign.**

   a.   **Has Facebook ever acted to limit the distribution of:**

      i.   **News stories regarding President Trump's personal financial information, including but not limited to confidential tax records?**

      ii.   **The disclosures of Edward Snowden, including but not limited to the illegally obtained material for which he is currently under federal investigation?**

      iii.   **Stories regarding First Lady Trump, and personal conversations recorded without her knowledge or consent?**

   b.   **If the answer to the previous questions is "no," please explain, with specificity, the disparate treatment between these news items. If the answer is "yes," please state with specificity what actions were taken to limit distribution.**

In the weeks leading up to the election, the Director of National Intelligence, the Head of the FBI, and the bipartisan leaders of the Senate Select Committee on Intelligence reminded Americans about the threat posed by foreign influence operations emanating from Russia and Iran. Along with their public warnings, and as part of the ongoing cooperation that tech

companies established with government partners following the 2016 election, the FBI also privately warned tech companies to be on high alert for the potential of hack-and-leak operations carried out by foreign actors in the weeks leading up to November 3rd. We took these risks seriously. In the case of the October 14 *New York Post* story, Given the concerns raised by the FBI and others, we took steps consistent with our policies to slow the spread of suspicious content and provide fact-checkers the opportunity to assess it. However, at no point did we take any action to block or remove the content from the platform. People could—and did—read and share the *Post*'s reporting while we had this temporary demotion in place. Consistent with our policy, after seven days, we lifted the temporary demotion on this content because it was not rated false by an independent fact-checker.

3.   **Facebook has taken unprecedented steps to define for the average user which information is "false," and which information is to be relied upon. Please answer the following questions regarding the public discussion of voter fraud:**

   a.   **Does voter fraud exist?**

   b.   **Are any of the executives at Facebook, including but not limited to those who are making content moderation policy decisions, experts in voter fraud?**

   c.   **What sources of authority does Facebook rely upon in making determinations regarding the truthfulness of claims of voter fraud?**

   d.   **Would the following statement violate Facebook's election information policies: "Absentee ballots remain the largest source of potential voter fraud"?**

   e.   **Would the following statement violate Facebook's election information policies: "Voter fraud is particularly possible where third-party organizations, candidates, and political party activists are involved in handling absentee ballots"?**

   f.   **In making determinations regarding the truth or verifiability of voter fraud claims, does Facebook employ corporate values, beliefs, priorities, or opinions when deciding what content is removed, republished, moderated, labelled, or otherwise promoted or demoted? What are those values?**

   g.   **Does Facebook make these determinations on a viewpoint-neutral basis?**

Because Facebook is a platform for a broad spectrum of ideas, we allow for discussion of controversial topics or points of view, including around the election. We believe that such discussion is important in helping bridge division and promote greater understanding. Suppressing content on the basis of ideological viewpoint directly contradicts Facebook's mission and our business objectives.

People often tell us they don't want to see misinformation, but they also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why, in general, Facebook does not evaluate the truth or falsity of content posted to our platform. Instead, we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its

distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

We don't believe it's appropriate for us to prevent a politician's speech from reaching its audience, which is why Facebook exempts politicians from our third-party fact-checking program. However, when a politician shares previously debunked content, including links, videos, and photos, we demote that content, display related information from fact-checkers, and reject its inclusion in advertisements.

In addition to our normal efforts, we announced a series of policies in advance of the election to help protect the integrity of the election and support our democratic process. We worked with the Bipartisan Policy Center and launched a Voting Information Center to connect people with reliable information on deadlines for registering and voting, and details about how to vote by mail or vote early in person. We also displayed links to the Voting Information Center when people posted about voting on Facebook. We partnered with election officials to remove false claims about polling conditions and displayed warnings on more than 180 million pieces of election-related content after review by our independent, third-party fact-checkers. We put in place strong voter suppression policies prohibiting explicit or implicit misrepresentations about how or when to vote, as well as attempts to use threats related to COVID-19 to scare people into not voting. We partnered with Reuters and the National Election Pool to provide reliable information about election results in the Voting Information Center and notified people proactively as results became available. We added labels to posts about voting by candidates from both parties to direct people to reliable information. We also attached an informational label to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods.

4. **The following questions relate to Facebook's enforcement of its content moderation policies. For this question and its subparts, please construe "content moderation policies" broadly, including decisions regarding the position or order in which content is displayed, the position or order in which users or content appear in searches, whether users or content are promoted or demoted, and all other modifications of content, such as flagging, qualifying, labelling, and denoting.**

a. **In your enforcement of election information content moderation policies:**

i. **How many times has Facebook blocked, flagged, censored, limited the reach of, or otherwise affected the posts, pages, or content of Republican candidates for office between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

ii. **How many times has Facebook blocked, flagged, censored, limited the reach of, or otherwise affected the posts, pages, or content of Democratic candidates for office between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

     **iii.**       **How many times has Facebook blocked, flagged, censored, limited the reach of, or otherwise affected the posts, pages, or content of Republican elected officials between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

     **iv.**       **How many times has Facebook blocked, flagged, censored, limited the reach of, or otherwise affected the posts, pages, or content of Democratic elected officials between January 1, 2016 and November 24, 2020? Please include enforcements that were later reversed or recognized to be in error.**

As a general matter, when we identify or learn of content that violates our policies, we remove that content regardless of who posted it. The ideological affiliation of the user generating the content has no bearing on that content assessment. Rather, decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the review process for reviewers as objective as possible.

In terms of moderation decisions, we have removed content posted by individuals and entities across the political spectrum. For example, we have taken down ads submitted on behalf of the Biden campaign and the Democratic National Committee, and organizations like the SEIU. We also have taken down ads submitted on behalf of the Trump campaign and the Republican National Committee, and organizations like the America First Action PAC.

     **b.**       **For each instance marked and counted in the previous question, please provide the name of the account affected, the content of the material affected, and the specific reason for the enforcement action.**

Please see the response to your Question 4.a.

     **c.**       **In your enforcement of election information content moderation policies, are decisions made and executed by humans, or by algorithm with preset code?**

     **i.**       **Has anyone been tasked with keeping track of which content or users are affected by these policies?**

     **ii.**       **If not, has anyone been tasked with keeping track of other information of this type, in other contexts?**

     **iii.**       **If so, please explain the difference in the maintenance of records.**

To enforce our Community Standards, we have introduced tools that allow us to proactively detect and remove violating content using advances in technology including artificial intelligence, machine learning, and computer vision. We do this by analyzing specific examples of bad content that have been reported and removed to identify patterns of behavior. Those patterns can be used to teach our software to proactively identify similar content.

These advances in technology mean that we can now remove bad content more quickly, identify and review more potentially harmful content, and increase the capacity of our review

team. To ensure the accuracy of these technologies, we constantly test and analyze our systems, technology, and AI to ensure accuracy. All content goes through some degree of automated review, and we use human reviewers to check some content that has been flagged by that automated review or reported by people that use Facebook. We also use human reviewers to perform reviews of content that was not flagged or reported by people to check the accuracy and efficiency of our automated review systems. The percentage of content that is reviewed by a human varies widely depending on the type and context of the content, and we don't target a specific percentage across all content on Facebook.

Our Community Standards Enforcement Report shares metrics on how Facebook is performing in preventing and removing content that violates our Community Standards. The report specifies how much content we took action on during the specified period, as well as how much of it we found before users reported it to us.

    **d.**    **In drafting Facebook's election information content moderation policies and enforcing those same policies with regard to the 2020 elections, did Facebook collaborate with, confer with, or defer to any outside individuals or organizations? If so, please list the individuals and organizations and state the nature of their relationship with Facebook.**

        **i.**    **Does Facebook take account of the political, philosophical, or ideological orientation or reputation of those sources with which it cooperates in executing its election information content moderation policies?**

Academics and other stakeholders share information with Facebook and give feedback on how we might better tackle our policies. That said, we apply our own policies and they may differ from those with whom we engage. We are constantly evaluating—and, where necessary, changing—our content policies.

Our 2020 Voting Information Center was a non-partisan effort that was available to everyone. We linked to and sourced information from state election officials and other non-partisan civic organizations for our users to easily access. We also worked closely with state election officials from both parties through Election Day to ensure the Center was updated with the latest election information in each state.

        **ii.**    **In its enforcement of its election information content moderation policies, Facebook has publicly stated that it relies on the "Bipartisan Policy Center" to fact-check information. Two members of this group's board of directors ran in Democratic primaries in 2020. Also in 2020, the employees of this group donated 100% of their political funds to Joe Biden and 0% to Donald Trump. And in 2017, the group awarded Joe Biden its annual highest award.**

            **1.**    **Given this information, do you believe that the "Bipartisan Policy Center" provides non-partisan fact-check information? If so, what is the basis for this belief?**

2.    **Are the determinations made by the "Bipartisan Policy Center" determinative and final regarding what election information is "true" and what is "false"?**

3.    **If not, who makes the final determination?**

The Bipartisan Policy Center describes itself as "a think tank that actively fosters bipartisanship by combining the best ideas from both parties." Its founders include two prominent Republicans—Bob Dole and Howard Baker—along with two prominent Democrats—Tom Daschle and George Mitchell. Currently serving on the Bipartisan Policy Center's Board of Directors are several prominent Republicans, including Olympia Snowe and Michael Steele.

We worked with the Bipartisan Policy Center as part of our efforts to help provide people with reliable information about the integrity of the election and voting methods. As part of that initiative, we launched Facts About Voting on Facebook and Instagram, which provided articles on important topics about the election and voting, supplied by the Bipartisan Policy Center. As part of our efforts to stop misinformation, we connected people with the facts about common election topics so they were equipped to spot misinformation for themselves—not only on our platforms but elsewhere on the internet and the broader media ecosystem.

Facts About Voting was one part of our Voting Information Center. Through the Voting Information Center, we connected people with reliable information on deadlines for registering and voting and details about how to vote by mail or vote early in person, and we displayed links to the Voting Information Center when people posted about voting on Facebook. More than 140 million people visited the Voting Information Center on Facebook and Instagram since it launched. We are encouraged that more Americans voted in 2020 than ever before, and that our platform helped people take part in the democratic process.

e.    **The following questions relate to the individuals with supervisory authority who are responsible for the formulation and implementation of content moderation policies.**

i.    **Among those individuals with supervisory authority who make substantive decisions regarding content moderation policy, how many:**

1.    **Self-identify or are registered as Democrats?**

2.    **Self-identify or are registered as Republicans?**

3.    **Would identify themselves as "liberal?"**

4.    **Would identify themselves as "conservative?"**

5.    **Have donated to:**

a.    **The Democratic Party?**

b.    **A candidate running for office as a Democrat?**

c.    **A cause primarily affiliated with or supported by the Democratic Party?**

    d.      **A cause primarily affiliated with or supported by liberal interest groups?**

    e.      **A political action committee primarily advocating for the Democratic Party, Democratic candidates or office-holders, or causes primarily supported by the Democratic Party?**

    f.      **The Republican Party?**

    g.      **A candidate running for office as a Republican?**

    h.      **A cause primarily affiliated with or supported by the Republican Party?**

    i.      **A cause primarily affiliated with or supported by conservative interest groups?**

    j.      **A political action committee primarily advocating for the Republican Party, Republican candidates or office-holders, or causes primarily supported by the Republican Party?**

**6.**    **Worked on or volunteered for a Democratic campaign?**

**7.**    **Worked on or volunteered for a Republican campaign?**

**8.**    **Worked on, interned for, or volunteered for a Democratic legislator, State or federal?**

**9.**    **Worked on, interned for, or volunteered for a Republican legislator, State or federal?**

**10.**    **Worked on or interned for a Democratic administration or candidate?**

**11.**    **Worked on or interned for a Republican administration or candidate?**

We do not maintain statistics on these specific data points.

    ii.    **Does Facebook believe that it can adopt and enforce viewpoint neutral content moderation rules if the individuals developing and enforcing those rules overwhelmingly identify as Democrats and progressives?**

Billions of pieces of content are posted to our platform every day. Content reviewers take action on content that is flagged after it is assessed against our Community Standards. Our Community Standards are global, and all reviewers use the same guidelines when assessing content. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the assessment process for reviewers as objective as possible.

We recognize that our policies are only as good as the strength and accuracy of our enforcement—and our enforcement is not perfect. We make mistakes because our processes involve both people and machines, and neither are infallible. We are always working to improve. One way in particular that we become aware of mistakes is through user feedback, such as when users appeal our content moderation decisions.

Every week, we audit a sample of reviewer decisions for accuracy and consistency. We also audit our auditors. When a reviewer makes mistakes or misapplies our policies, we follow up with appropriate training and review the mistakes with our Community Operations team to prevent similar mistakes in the future.

f.    **A Facebook "communications manager"—Andy Stone—publicly declared that the *N.Y. Post* story on Hunter Biden was of questionable validity, and that it would be intentionally demoted for Facebook's hundreds of millions of daily users. Before his employment at Facebook, Andy Stone was a well-known democratic operative.**

   i.    **Did Facebook know about Mr. Stone's history when it hired him for his current position?**

   ii.   **Does Facebook believe that Mr. Stone's action was the result of actual bias?**

      1.    **Whether or not there was actual bias, does Facebook recognize that this action raises an appearance of bias?**

   iii.  **Does Mr. Stone's preference for, and lifelong association with, the Democratic Party reflect the orientation and priorities of the election information content moderation team as a whole?**

   iv.   **Who is responsible for determining what is "true" or "untrue" regarding claims made by users on Facebook?**

   v.    **Has any action been taken against Mr. Stone for this significant error?**

To clarify, the Tweet referenced in your question identified our standard process for reducing misinformation. Mr. Stone noted that the October 14 *New York Post* story was flagged for fact-checking and, consistent with our policies, we temporarily reduced distribution of the story pending fact-checker review.

Additionally, for several months prior to the publication of the October 14 *New York Post* story, the United States intelligence community had urged voters, companies, and the federal government to remain vigilant in the face of the threat of foreign influence operations seeking to undermine our democracy and the integrity of our electoral process. For example, the Director of National Intelligence, the Head of the FBI, and the bipartisan leaders of the Senate Select Committee on Intelligence reminded Americans about the threat posed by foreign influence operations emanating from Russia and Iran. Along with their public warnings, and as part of the ongoing cooperation that tech companies established with government partners following the 2016 election, the FBI also privately warned tech companies to be on high alert for the potential

of hack-and-leak operations carried out by foreign actors in the weeks leading up to November 3rd. We took these risks seriously.

Given the concerns raised by the FBI and others, we took steps consistent with our policies to slow the spread of suspicious content and provide fact-checkers the opportunity to assess it. However, at no point did we take any action to block or remove the content from the platform. People could—and did—read and share the *Post*'s reporting while we had this temporary demotion in place. Consistent with our policy, after seven days, we lifted the temporary demotion on this content because it was not rated false by an independent fact-checker.

5. **At the same time that many Americans are concerned that tech companies have too much power over our elections, you personally donated $400 million to the Center for Tech and Civic Life ("CTCL") to pay election workers, train poll workers, and rent polling locations.**

   a. **Your donations have funded turnout efforts in heavily Democratic jurisdictions such as Philadelphia. David Plouffe served as a board member and strategist for the Chan Zuckerberg Initiative and argued in his book, A Citizen's Guide to Beating Donald Trump, that the 2020 election would be won by progressives if they targeted turnout efforts in Detroit, Minneapolis, and Philadelphia.**

      i. **Did you have any conversations with Mr. Plouffe or his staff regarding donations to the cause of "election integrity" or to CTCL? If so, would you be willing to disclose those communications?**

      ii. **Before or after donating did you consider whether your funding would have a partisan effect by targeting turnout in Democratic jurisdictions as opposed to other jurisdictions?**

   b. **In Philadelphia, CTCL required the city to open no fewer than 800 new polling places as a condition of funding.**

      i. **Is it appropriate for an individual or private organization to condition millions of dollars in funding to a jurisdiction on that jurisdiction altering its election rules or procedures?**

      ii. **Did you know prior to making your donation that CTCL would place strings on its funding? If so, did you discuss this with CTCL? If not, will you call on CTCL and similar organizations not to interfere with local election practices?**

   c. **Are you aware that your donation at a minimum contributes to the appearance that Big Tech companies like Facebook are committed to using their social and financial power on behalf of Democratic candidates?**

Voting is the foundation of our democracy. Mark Zuckerberg and Priscilla Chan were determined to help ensure that every state and local election jurisdiction had the resources they needed so Americans could vote. Voting is voice, and they believed every American should have the chance to make their voice heard in this election.

The Center for Tech and Civic Life is a non-partisan organization that serves communities throughout the country—urban, rural, and suburban. All local election offices responsible for administering election activities covered by the grant program were eligible to apply for grant funds. Every eligible election department that was verified as legitimate was approved for a grant. CTCL received over 2,500 applications from jurisdictions in a wide variety of geographic areas and in nearly every state, and the majority of requests were from jurisdictions with under 25,000 registered voters.

Mark Zuckerberg and Priscilla Chan agree that the government should have provided these funds, not private citizens. They hope that for future elections the government provides adequate funding. But absent that funding, they believed that it was critical that this urgent need was met.

<u>Questions from Senator Coons</u>

1.    **Some have criticized social media platforms for evaluating new products and business unit performance based on engagement-oriented metrics that in their view, reward misinformation and harmful content.**

    a.    **What metrics does Facebook use when evaluating a new product or the performance of its business units?**

    b.    **How does Facebook ensure that its metrics and incentive structures do not reward the development of products that contribute to misinformation or other harmful content?**

While the specific processes that we use to build and evaluate improvements to our services vary by product, we generally work to ensure that the features we build meet the needs and preferences of our community. Methods we use to hear from our community might include inviting people to sit down for one-on-one interviews, join focus groups, try new products and features, or keep diaries about their experiences with apps over time. We also invite large groups of people to take surveys, often via the Facebook app itself. And with billions of people using Facebook every month, we have to consider carefully ways to ensure we are hearing from representative swaths of the community, all over the world.

2.    **Speaking to *Fast Company* for an August 2020 article about Facebook's fact-checking program, a Facebook spokesman said that Facebook has a system for addressing "repeat offenders."  The spokesman stated that Facebook issues more serious penalties for content creators that repeatedly post misinformation, "unless we determine that one or more of those ratings does not warrant additional consequences."[1]**

    a.    **Please specify the factors that Facebook considers in determining not to impose "additional consequences" on repeat offenders.**

    b.    **Based on data obtained from a Facebook engineer, the *Fast Company* article stated that Facebook will remove "misinformation strikes" from a content creator due to factors including (1) "PR risk," (2) a page's "ad spend," or (3) "'partner sensitivity" over perceived bias.  Does Facebook in fact consider these factors in assessing whether a content creator is a "repeat offender" and whether to take further action against that creator?**

    c.    **If so, as to each of these three factors, please explain whether and how Facebook considers the factor in deciding whether to apply repeat offender sanctions.**

    d.    **What level of transparency do you believe is appropriate regarding decisions about your repeat offender system?**

We work with independent, third-party fact-checkers to help reduce the spread of false

---

[1] *See* Alex Pasternack, "Facebook Is Quietly Pressuring its Independent Fact-Checkers to Change Their Rulings," *Fast Company* (Aug. 20, 2020), *available at* https://www.fastcompany.com/90538655/facebook-is-quietly-pressuring-its-independent-fact-checkers-to-change-their-rulings.

news and other types of viral misinformation. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

While third-party fact-checkers are responsible for rating content, we are responsible for evaluating the consequences of those ratings. We use a strike system, and all of our strikes are time-bound and situationally specific. When Pages, Groups, or domains have a certain number of violations in a certain period, additional enforcement measures are triggered.

We take action against Pages and domains that repeatedly share or publish content that is rated False or Altered. Such Pages and domains will see their distribution reduced as the number of offenses increases, including their eligibility for recommendations and ability to advertise and monetize. Finally, Pages and domains that repeatedly publish or share this content will also lose their ability to register as a News Page on Facebook, and if a registered News Page repeatedly shares false news, its News Page registration will be revoked.

3.    **In light of the fact that misinformation can spread much faster than it can be fact checked, the nonprofit group Avaaz has issued two reports focusing on the question of how to notify and issue corrections to users who have already viewed misinformation by the time it is deemed false.[2]**

   a.    **What is the average length of time that it takes for a piece of content to be fact checked?**

   b.    **A May 2020 *STAT* article suggested that Facebook does not issue tailored corrections to users who viewed content that researchers have said reflects a misinterpretation of their own research.[3]  Why doesn't Facebook issue tailored corrections in those circumstances?**

   c.    **Are there reasons other than the "backfire effect" (i.e., the notion that correcting falsehoods may only amplify the falsehood's prevalence) for this policy?**

As discussed in the response to your previous question, we send content to independent, third-party fact-checkers for review, but it is ultimately at their discretion to decide what to rate. The enqueued content is based on a number of signals, including machine learning-driven insights and false news reports by users, and we also allow third-party fact-checkers to enqueue content themselves.

We do not share data on how long it takes to fact-check content or how many views a

---

[2] *See* Avaaz, "Facebook's Algorithm: A Major Threat to Public Health" (Aug. 19, 2020), *available at* https://secure.avaaz.org/campaign/en/facebook_threat_health/; Avaaz, "White Paper: Correcting the Record" (Apr. 16, 2020), *available at* https://secure.avaaz.org/campaign/en/correct_the_record_study/.
[3] *See* Erin Brodwin, "Facebook's Covid-19 Misinformation Campaign Is Based on Research.  The Authors Worry Facebook Missed the Message," *STAT News* (May 1, 2020), *available at* https://www.statnews.com/2020/05/01/facebooks-covid-19-misinformation-campaign-is-based-on-research-the-authors-worry-facebook-missed-the-message/.

post gets on average before it's fact-checked because these numbers may vary depending on the content; for example, claims related to breaking news or a complex issue may take more time to verify than content that repeats previously debunked claims. We surface signals to our fact-checking partners to help them prioritize what to rate. For example, fact-checking partners can see the estimated number of shares a post has received in the past 24 hours, and how many users have flagged it as potentially false in their News Feed. We also recognize that thorough reporting can take time—this is one of the reasons that we work with independent fact-checking partners, whose work can involve calling primary sources, analyzing videos/images, consulting public data, and more. We continue to have an open dialogue with partners about how we could further improve efficiency. We are testing ways to group content in one place to make it easier for fact-checking partners to find relevant content to review, faster.

We already show labels to people who come across content rated false by our independent fact-checking partners and send notifications to people who try to share this content, or who have previously shared content that's later rated. We're continually looking at additional ways to inform people who may have seen misinformation. We want to ensure we're being thoughtful about the long-term effects of introducing new notifications, and we've been keeping up to date with the latest academic research. Before the launch of any product, we conduct both quantitative and qualitative research and testing to ensure there are no adverse effects. This is so that we can make data-driven decisions informed by the academic community, and not those based solely on intuition.

4. **The Center for American Progress has proposed in the COVID-19 context that Facebook develop a "virality circuit breaker" by which Facebook would "detect, label, suspend algorithmic amplification, and prioritize rapid review and fact-checking of trending coronavirus content that displays reliable misinformation markers."[4] Facebook said in August that it was "piloting a new effort that resembles CAP's suggestion,"[5] and it referenced a "viral content review system" in an October 2020 post about election misinformation.[6]**

   a. **Please provide information about the status of Facebook's viral content review system, including whether and to what extent it is deployed, how it functions, and how it compares with CAP's proposal.**

   b. **What factors does Facebook consider in prioritizing fact-checking so that content most likely to spread and cause harm is fact-checked as soon as possible?**

Since 2016, we've built an advanced system combining people and technology to review the billions of pieces of content that are posted to our platform every day. State-of-the-art AI

[4] *See* Erin Simpson and Adam Conner, "Fighting Coronavirus Misinformation and Disinformation," Center for American Progress (Aug. 18, 2020), *available at* https://www.americanprogress.org/issues/technology-policy/reports/2020/08/18/488714/fighting-coronavirus-misinformation-disinformation/.
[5] *See The Interface with Casey Newton*, Issue #555, *available at* https://www.getrevue.co/profile/caseynewton/issues/new-ideas-for-fighting-covid-19-misinformation-272134?utm_campaign=Issue&utm_content=view_in_browser&utm_medium=email&utm_source=The+Interface (Aug. 20, 2020).
[6] *See* Guy Rosen, "Preparing for Election Day" (Oct. 7, 2020), *available at* https://about.fb.com/news/2020/10/preparing-for-election-day/.

systems flag content that may violate our policies, users report content to us they believe is questionable, and our own teams review content.

As your question indicates, we've been building a parallel viral content review system to flag posts that may be going viral—no matter what type of content it is—as an additional safety net. This helps us catch content that our traditional systems may not pick up. We used this tool throughout the 2020 election, and in countries around the world, to detect and review Facebook and Instagram posts that were likely to go viral and take action if that content violated our policies.

In addition, our teams are using other targeted tools to further pinpoint potentially abusive content and address emerging issues on our platform, including our Crisis Assessment Dashboard (CAD). CAD can, for example, allow us to correlate spikes in hate speech or voter interference content happening in Pages or Groups in near real-time across all 50 states. We have alerts for these spikes in signals, which route to operational teams who review the content for risk trends or potential violations and remove it if we determine it violates our rules.

When it comes to misinformation, in 2019, we announced that if we identify signals that a piece of content is false, we temporarily reduce its distribution in order to allow sufficient time for our independent, third-party fact-checkers to review and determine whether to apply a rating. Quick action is critical in keeping a false claim from going viral, and so we take this step to provide an extra level of protection against potential misinformation. These temporary demotions expire after seven days if the content has not been rated by an independent fact-checker.

5.     **In the lead-up to the November 3, 2020 election, reporting and company representatives have referenced efforts by Facebook to alter content distribution algorithms in an effort to restrict the reach of harmful content.[7]  The scope and extent of such efforts, and to what degree they are temporary or permanent, is unclear.  Please elaborate on the following:**

   a.     **Any systems put in place, whether automated or manual, to alter content distribution or recommendation algorithms;**

   b.     **Any associated changes in content moderation practices;**

   c.     **Specific definitions of content areas to which changes were applied;**

   d.     **An evaluation of the results of such changes, including any metrics you can provide for each week during October and November (or a statement that such evaluation will be included in a subsequent post-mortem analysis).**

We're pleased that, thanks to the hard work of election administrators across the country, the voting process went relatively smoothly. Facebook worked hard to do our part in protecting the integrity of the 2020 election, and we're proud of the work we've done to support our democracy. For example, we ran the largest voting information campaign in American history.

---

[7] *See, e.g.*, Kevin Roose et al., "Roiled By Election, Facebook Struggles to Balance Civility and Growth," *N.Y. Times* (Nov. 24, 2020), *available at* https://www.nytimes.com/2020/11/24/technology/facebook-election-misinformation.html; Mike Isaac, "Facebook, Alarmed by Discord Over Vote Count, Is Said To Be Taking Action," *N.Y. Times* (Nov. 5, 2020), *available at* https://www.nytimes.com/2020/11/05/technology/facebook-election-misinformation.html.

Based on conversion rates we calculated from a few states we partnered with, we estimate that we helped 4.5 million people register to vote across Facebook, Instagram, and Messenger—and helped about 100,000 people sign up to be poll workers. We launched a Voting Information Center to connect people with reliable information on deadlines for registering and voting, and details about how to vote by mail or vote early in person. We also displayed links to the Voting Information Center when people posted about voting on Facebook. More than 140 million people have visited the Voting Information Center on Facebook and Instagram since it launched. We are encouraged that more Americans voted in 2020 than ever before, and that our platform helped people take part in the democratic process.

We also worked to tackle misinformation and voter suppression. We displayed warnings on more than 180 million pieces of content that our third-party fact-checkers debunked. We partnered with election officials to remove false claims about polling conditions, and we put in place strong voter suppression policies that prohibit explicit or implicit misrepresentations about how or when to vote, as well as attempts to use threats related to COVID-19 to scare people into not voting. We removed calls for people to engage in voter intimidation that used militarized language or suggested that the goal was to intimidate, exert control, or display power over election officials or voters. In addition, we blocked new political and issue ads during the final week of the campaign, as well as all political and issue ads after the polls closed on election night.

We also instituted a variety of measures to help in the days and weeks after voting ended:

- We used the Voting Information Center to prepare people for the possibility that it could take a while to get official results. This information helped people understand that there was nothing illegitimate about not having a result on election night.

- We partnered with Reuters and the National Election Pool to provide reliable information about election results. We displayed this in the Voting Information Center, and we notified people proactively as results became available. We added labels to any post by a candidate or campaign trying to declare victory before the results were in, stating that official results were not yet in and directing people to the official results.

- We attached informational labels to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods, for example, by claiming that lawful methods of voting lead to fraud. This label provided basic reliable information about the integrity of the election and voting methods.

- We enforced our violence and harm policies more broadly by expanding our definition of high-risk targets to include election officials, in order to help prevent any attempts to pressure or harm them, especially while they were fulfilling their critical obligations to oversee the vote counting.

- We strengthened our enforcement against militias, conspiracy networks, and other groups that could have been used to organize violence or civil unrest in the period after the election. We removed thousands of these groups from our platform.

Since 2016, we've built an advanced system combining people and technology to review

the billions of pieces of content that are posted to our platform every day. State-of-the-art AI systems flag content that may violate our policies, users report content to us they believe is questionable, and our own teams review content. We've also been building a parallel viral content review system to flag posts that may be going viral—no matter what type of content it is—as an additional safety net. This helps us catch content that our traditional systems may not pick up. We used this tool throughout this election, and in countries around the world, to detect and review Facebook and Instagram posts that were likely to go viral and take action if that content violated our policies.

While the COVID-19 pandemic continues to disrupt our content review workforce, we are seeing some enforcement metrics return to pre-pandemic levels. Our proactive detection rates for violating content are up from the second quarter of this year across most policies, due to improvements in AI and expanding our detection technologies to more languages. Even with a reduced review capacity, we still prioritize the most sensitive content for people to review. We recently published our Community Standards Enforcement Report for the third quarter of 2020, available at https://transparency.facebook.com/community-standards-enforcement.

6.    **Private and public Facebook Groups appear to play an important role in the dissemination of election-related misinformation and incitements to violence on your platform. You announced in a recent Senate hearing on October 28, 2020 that Facebook had suspended its tools that recommend users join online groups dealing with political or social issues in the lead-up to Election Day, and a spokeswoman confirmed with the press that this change was temporary.[8]**

   a.    **When did Facebook implement this measure, and when does it plan to lift the temporary change?**

   b.    **How many groups are currently affected by this change?**

   c.    **In May, the *Wall Street Journal* reported that an internal Facebook researcher found in 2016 that "64% of all extremist group joins are due to our recommendation tools." Has Facebook conducted any other research on the way that groups spread misinformation or foster extremism on the platform?**

   d.    **Please elaborate on other changes Facebook has made with regard to groups in relation to the 2020 election cycle, and Facebook's plans to address the spread of disinformation and incitements to violence in groups going forward.**

During the 2020 election, Facebook was committed to doing our part to help ensure everyone had the chance to make their voice heard. That meant helping people register and vote, clearing up confusion about the election, and taking steps to reduce the chances of election-related violence and unrest.

---

[8] *See* Ryan Mac and Craig Silverman, "Facebook Quietly Suspended Political Group Recommendations Ahead Of The US Presidential Election," *BuzzFeed* (Oct. 30, 2020), *available at* https://www.buzzfeednews.com/article/ryanmac/facebook-suspended-group-recommendations-election.

We partnered with election officials to remove false claims about polling conditions and displayed warnings on more than 180 million pieces of election-related content after review by our independent, third-party fact-checkers. We put in place strong voter suppression policies, and we filtered civic Groups out of recommendations.

We have also been working to keep Facebook Groups safe. People turn to Facebook Groups to connect with others who share their interests, but even if they decide to make a Group private, they have to play by the same rules as everyone else. Our Community Standards apply to public and private Groups, and our proactive detection tools work across both. That means even if someone doesn't report an issue to us, our AI can detect potentially violating content, and we can remove it. For example, over the last year, we removed about 1.5 million pieces of content in Groups for violating our policies on organized hate, 91% of which we found proactively. We also removed about twelve million pieces of content in Groups for violating our policies on hate speech, 87% of which we found proactively. When it comes to Groups themselves, we will take an entire Group down if it repeatedly breaks our rules or if it was set up with the intent to violate our standards. Over the last year, we took down more than one million groups for violating our policies.

Additionally, we're taking further steps to stop people who repeatedly violate our Community Standards from being able to create new Groups. Our existing recidivism policy stops the admins of a Group from creating another Group similar to one we removed. Going forward, admins and moderators of Groups taken down for policy violations will not be able to create any new Groups for a period of time. For members who have any Community Standards violations in a Group, their posts in that Group will now require approval for the next 30 days. This stops their post from being seen by others until an admin or moderator approves it. If admins or moderators repeatedly approve posts that violate our Community Standards, we will remove the Group.

Finally, to combat misinformation across Facebook, we take a "remove, reduce, inform" approach that leverages a global network of independent fact-checkers. For Facebook Groups, this work includes:

- Removing groups that share content that violates our Community Standards. If admins or moderators repeatedly post or approve content that breaks our rules, we take down the whole group.

- Reducing the distribution of groups that share misinformation. Groups that repeatedly share content rated false by fact-checkers won't be recommended to other people on Facebook. We rank all content from these groups lower in News Feed and limit notifications so fewer members see their posts.

- Informing people when they encounter misinformation. We apply a label to content that's been reviewed by fact-checkers, so people can see additional context. We also notify people before they try to share this content, and we let people know if something they shared is later rated false. Group admins are also notified each time a piece of content rated false by fact-checkers is posted in their group, and they can see an overview of this in the Group Quality tool.

We know there is more to do to keep Groups safe on Facebook, and we'll keep improving our technology and policies to ensure Groups remain places where people can connect and find support.

7.    **I appreciate that Facebook has made a number of changes in response to its July 2020 civil rights audit.  Does Facebook plan to set out which of the audit's recommendations it has accepted and which it will not follow?**

There are no quick fixes to the issues and recommendations the Auditors have surfaced. Becoming a better company requires a deep analysis of how we can strengthen and advance civil rights at every level of our company. That is what this audit has been—but it is the beginning of the journey, not the end.

Over the course of the audit process, we have made significant progress in a number of critical areas. But the auditors have been extremely candid with their feedback, urging us to go further in a range of areas. We have already started to put some of the Auditors' recommendations into place, including:

- We're beginning the process of bringing civil rights expertise in-house, starting with a commitment to hire a civil rights leader who will continue to push us on these issues internally, and embedding staff with civil rights expertise on core teams.

- We've expanded our voter suppression policies since the 2016 and 2018 elections so that we now prohibit threats that voting will result in law enforcement consequences and attempts at coordinated interference, both of which could intimidate and demobilize voters.

- We included a link that directs people to our Voting Information Center on all posts about voting, including those from politicians, the goal being that we help make sure people have accurate, real-time information about voting processes in their districts.

- We attached an informational label to content that discusses issues of legitimacy of the election or claims that lawful methods of voting like mail-in ballots led to fraud. This label provided reliable information about the integrity of the election and voting methods.

- We extended the protections we had in place for voting to the 2020 US census by adopting a robust census interference policy, which benefited from the Auditors' input and months of consultation with the US Census Bureau, civil rights groups, and census experts.

- We've gone beyond existing hate speech protections to ban ads that are divisive and include fear-mongering statements.

- We have taken meaningful steps to build a more diverse and inclusive workforce, committing to bring on 30% more people of color in leadership positions, including 30% more Black people.

- We announced a $100 million investment in Black-owned small businesses,

Black creators, and non-profits that serve the Black community in the US, and a commitment to spend at least $100 million with Black-owned businesses, toward a goal of $1 billion in annual spend with diverse suppliers by the end of 2021.

We continue to review seriously the recommendations made by the Auditors and invest in ongoing civil rights infrastructure and long-term change.

8. **I appreciate your decision to calculate and publish global hate speech prevalence following my and my team's inquiries and the civil rights audit recommendations.**

   a. **Does Facebook have the ability to calculate this prevalence on a per-country or per-language basis to identify locations that warrant more resources or are at greater risk of violence? If not, please explain why not. If so, please explain how Facebook will use this information and whether it will make it public.**

   b. **Reporting indicates that for the first time, Facebook employed country-specific Community Standards for the recent Myanmar elections, with favorable results.[9] Please provide background on Facebook's decision to use country-specific Community Standards in this case and whether Facebook plans to do so more in the future.**

   c. **In light of Facebook's experiences in Myanmar, Sri Lanka, and elsewhere, in what circumstances would Facebook reach out to local nongovernmental organizations or (if appropriate) local authorities when there are indications of hate speech on the platform that may lead to violence?**

When it comes to developing and updating our Community Standards, that work falls to our content policy team. We have people in eleven offices around the world, including subject matter experts on issues such as hate speech, child safety, and terrorism. Many of the people on the team have worked on the issues of expression and safety long before coming to Facebook. The core of our policy development process is a twice-monthly global meeting where we debate and discuss potential changes to the Community Standards. In preparation for these meetings, members of our content policy team reach out to internal and external experts, analyze data, conduct research, and study relevant scholarship to inform our policy proposals. We publish minutes of those meetings, which can be found at https://about.fb.com/news/2018/11/content-standards-forum-minutes/.

Based on these meetings, as well as changes in social norms and language, our standards evolve over time. With respect to Myanmar, we have invested heavily in people, technology, and partnerships over the past several years to examine and address the abuse of Facebook in Myanmar, and we have repeatedly taken action against violent actors and bad content on Facebook in Myanmar. We've also built a team that is dedicated to Myanmar. The ethnic violence happening in Myanmar is horrific, and we don't want our services to be used to spread hate, incite violence, or fuel tension on the ground.

Our approach to this problem, like the problem itself, is multifaceted, but our purpose is

---

[9] See Peter Guest, "Facebook's Experimental Hate-Speech Policy Seems To Be Working," *Rest of the World* (Nov. 20, 2020), *available at* https://restofworld.org/2020/pressing-pause-on-fake-news-in-myanmar/.

clear: to prevent Facebook from being used to facilitate offline harm. Our tactics include identifying and removing fake accounts; finding and removing violent actors; building better tools and technology that allows us to proactively find bad content; evolving our policies; and continuing to build partnerships and programs on the ground.

9. **Does Facebook have or is it developing a metric for the prevalence of COVID-19 misinformation? If so, please explain. If not, please explain why not.**

Under our Misinformation and Harm policy, we remove misinformation that contributes to the risk of imminent violence or physical harm. We have applied this policy to harmful misinformation about COVID-19 since January. Between March and October of 2020, we removed more than twelve million pieces of content on Facebook and Instagram for containing misinformation that may lead to imminent physical harm, such as content relating to fake preventative measures or exaggerated cures. And on December 3, we announced that as part of this policy, we will start removing from Facebook and Instagram false claims about COVID-19 vaccines that lead to imminent harm and that have been debunked by public health experts.

For misinformation that does not pose a safety risk but undermines the authenticity and integrity of our platform, we continue to work with our global network of independent, third-party fact-checking partners. Once a post is debunked by a fact-checker on Facebook or Instagram, we reduce its distribution so fewer people see it, and we show warning labels and notifications to people who still come across content that has been rated, or people who try to share it or already have. Based on one fact-check, we're able to kick off similarity detection methods that identify duplicates of debunked stories and apply the same strong warning labels and demotions to those duplicates. Between March and October of 2020, we displayed warnings on about 167 million pieces of content on Facebook worldwide based on COVID-19-related debunking articles written by our fact-checking partners. We've seen people turn to social media during this global health emergency, finding novel ways to stay connected and informed during these difficult times. And since the pandemic started, we have worked to connect people with authoritative health sources through a number of different methods, such as redirecting people to health authorities if they searched for COVID-19 on Facebook or Instagram, and launching a COVID-19 Information Center on Facebook, which acts as a central place for people to get the latest news, information from health authorities, resources, and tips to stay healthy and safe. Between March and June, we directed over 2 billion people globally to resources and health authorities through our COVID-19 Information Center and pop-ups on Facebook and Instagram, with over 600 million people clicking through to learn more.

10. **In the coming months, it is likely that extensive new information about COVID-19 vaccine candidates will become available. Unfortunately, misinformation about vaccines abounds, and the World Health Organization named resulting vaccine hesitancy one of the top ten threats to global health in 2019.[10] In addition, a recent study found that social media users exposed to content on certain vaccines were more likely to grow misinformed over time than were consumers of traditional**

---

[10] *See* Sarah Geoghegan et al., "Vaccine Safety: Myths and Misinformation," *Frontiers in Microbiology* (Mar. 2020), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7090020/.

media.[11]

a.  **Is Facebook proactively engaged in planning efforts to address misinformation about emerging COVID-19 vaccines on its platforms?**

b.  **How does Facebook plan to assess the accuracy of information about these vaccines?**

c.  **Has Facebook partnered with (or will Facebook partner with) fact checkers with relevant training and expertise to address misinformation about COVID-19 vaccines?**

d.  **How will Facebook handle vaccine-related content deemed valid when posted but which more recent guidance or consensus suggests is misleading or inaccurate?**

e.  **How will Facebook engage public health, immunology, and other related experts to identify and contextualize content that is incomplete or misleading?**

Given the recent news that COVID-19 vaccines are rolling out around the world, over the coming weeks we will start removing from Facebook and Instagram false claims about COVID-19 vaccines that lead to imminent harm and that have been debunked by public health experts. This is another way that we are applying our policy to remove misinformation about the virus that could lead to imminent physical harm. This could include false claims about the safety, efficacy, ingredients, or side effects of the vaccines. For example, we will remove false claims that COVID-19 vaccines contain microchips, or anything else that isn't on the official vaccine ingredient list. We will also remove conspiracy theories about COVID-19 vaccines that we know today are false, like that specific populations are being used without their consent to test the vaccine's safety. We will not be able to start enforcing these policies overnight. Since it's early, and facts about COVID-19 vaccines will continue to evolve, we will regularly update the claims we remove based on guidance from public health authorities as they learn more.

When it comes to vaccine misinformation generally, we supplement the work of our third-party fact-checkers for misinformation about vaccinations because misinformation about health topics can be especially problematic. Specifically, we rely on the publicly available work of leading health organizations on the issue of vaccines, such as the US Centers for Disease Control and Prevention (CDC) and the World Health Organization (WHO), among others, to identify verifiable hoaxes on the topic. An example of a claim that has been widely disproven by these organizations is the assertion that vaccines cause autism.

We take a number of different steps to substantially reduce the distribution of these publicly identified vaccine hoaxes across our platform. First, if an ad includes this type of misinformation about vaccinations, it will be rejected. Beyond advertisements, when we become aware of Groups or Pages on Facebook that propagate this type of misinformation, we remove them from recommendation surfaces on the platform and from predictions when you type into search. We likewise won't show or recommend content that contains this misinformation about

---

[11] Dominik Andrezej Stecula et al., "How Trust in Experts and Media Use Affect Acceptance of Common Anti-Vaccination Claims," *Misinformation Review* (Jan. 2020).

vaccinations on Instagram Explore or hashtag pages. Furthermore, all content from offending Groups and Pages will be demoted in News Feed using our ranking systems, and the Groups and Pages themselves will be demoted in search results. When Pages repeatedly post misinformation about vaccinations, they will lose access to our fundraising tools.

Because vaccine hoaxes have been previously (and publicly) debunked by expert health organizations, politicians that post this content would be treated the same as all other users— their organic content would be downranked and their ads would be rejected. Consistent with our overall approach to combating misleading or false information, in addition to reducing its distribution, we seek to inform users with additional context on the topic. For vaccinations, we have gone further and launched educational modules that pop up for US-based users when they engage with content about vaccines, including but not limited to misinformation about vaccines. The educational modules appear on Instagram, as well as in Facebook search, invitations to join Groups, and on Pages. The modules provide US users with authoritative context and other resources from the CDC.

**11.    A July 2020 *New York Times* article noted that according to Facebook's policy communications director, "Facebook is most concerned with flagging or removing content that poses an immediate threat to human health and safety, including disinformation about the coronavirus or hate speech that incites violence.  Climate change content… does not fall within that category."[12]  The Fourth National Climate Assessment concluded that climate change "affects human health by altering exposures to heat waves, floods, droughts, and other extreme events; vector-, food- and waterborne infectious diseases; changes in the quality and safety of air, food, and water; and stresses to mental health and well-being."[13]  What factors did Facebook consider when concluding that climate change—or the denial that climate change is happening—does not pose an immediate threat to human health?**

We recognize the urgency of climate change and are committed to help tackle this global challenge. We are taking action by minimizing our emissions, using renewable energy and reducing our energy and water usage, protecting workers and the environment in our supply chain, and partnering with others around us to develop and share solutions for a more sustainable world. We are doing our part to fulfill the spirit of the Paris Agreement through our support of the We Are Still In coalition and by ramping up our own efforts. We have set an ambitious goal to reduce our operational greenhouse gas emissions by 75 percent by the end of 2020, compared to 2017 levels. In 2019, we reduced our greenhouse gas emissions 59 percent compared to our base year of 2017—equivalent to 364,000 metric tons of $CO_2e$, or nearly 79,000 passenger cars taken off the road for one year.

In addition, our independent, third-party fact-checking partners review and rate climate misinformation. In fact, we have a fact-checking partner specifically dedicated to reviewing science content, and many of the other partners in our network of over 80 global fact-checking partner organizations rate this content as well. As with all claims debunked by our partners, we

---

[12] *See* Veronica Penney, "How Facebook Handles Climate Disinformation," *N.Y. Times* (July 4, 2020), *available at* https://www.nytimes.com/2020/07/14/climate/climate-facebook-fact-checking.html.
[13] Kristi L. Ebi et al., "Human Health," in *Impacts, Risks, and Adaptation in the United States: Fourth National Climate Assessment, Volume II*, U.S. Global Change Research Program (2018), *available at* https://nca2018.globalchange.gov/chapter/14/.

reduce the distribution of posts rated False, Altered, or Partly False in News Feed and apply a label on top of them on Facebook and Instagram so people understand that the content has been rated and what the ratings mean.

We recognize that there are efforts to undermine and otherwise stand in the way of advances being made in climate science. Facebook takes its role seriously as a platform to connect people to information and as a company that feels passionately about climate action.

We recently launched a Climate Science Information Center on Facebook to provide persistent access to global, regional, and local authoritative information about climate change and its effects, similar to what we've done with COVID-19 and elections. Our new Climate Science Information Center will connect people to factual, timely, regionally relevant information wherever it makes sense in the Facebook experience. This is the first step in a dedicated effort by our Discovery and Sustainability teams. The Center features resources from the world's leading climate organizations and clear steps people can take to combat climate change. We're working with the Intergovernmental Panel on Climate Change (IPCC) and their global network of climate science contributors to include facts, figures, and data. Contributors include the UN Environment Programme (UNEP), the National Oceanic and Atmospheric Administration (NOAA), and the World Meteorological Organization (WMO). We'll also include posts from relevant sources to highlight climate science news.

12. **The Violence and Incitement Policy of Facebook's Community Standards has prohibited "calls to action…to bring weapons to locations including but not limited to places of worship, educational facilities, polling places, or locations used to count votes or administer an election (or encouraging others to do the same)."[14] Facebook further indicated in 2019 that it banned "posts from people who intend to bring weapons anywhere to intimidate or harass others" and event pages that call to "bring weapons to an event or location when the stated intent is to intimidate or harass vulnerable individuals or members of a specific racial, religious, or other protected group."[15]**

   a. **Please clarify Facebook's understanding of its call to arms policy as of August 2020, and in particular how it interprets the prohibition on pages that "intimidate or harass."**

   b. **What evidence will Facebook consider in deciding whether a page is intended to "intimidate or harass"?**

   c. **You testified that the Kenosha Guard event page "did not necessarily violate [the] call to arms policy at the time." The Kenosha event page called for "armed citizens" to come to the center of town "to protect lives and property" on a night with expected protests regarding the shooting of Jacob Blake. Is it Facebook's position that the Kenosha event page in fact was not intended to intimidate or harass? Please explain how that could be so.**

   d. **I understand and appreciate that Facebook has made changes to its call to**

---

[14] *See* Facebook, "Community Standards", https://www.facebook.com/communitystandards/credible_violence/.
[15] *See* Sheryl Sandberg, "A Second Update On Our Civil Rights Audit," (June 30, 2019), *available at* https://about.fb.com/news/2019/06/second-update-civil-rights-audit/.

**arms policies after Kenosha regarding high-risk or temporarily high-risk locations.  Has Facebook made any changes to its interpretation of pages that intimidate or harass?  What proactive routines does Facebook employ to identify such pages, if any?**

Under our Violence and Incitement policy, we remove content, disable accounts, and work with law enforcement when we believe there is a genuine risk of physical harm or direct threat to public safety. We also try to consider the language and context in order to distinguish casual statements from content that constitutes a credible threat to public or personal safety.

Over the last several years we've continued to update and refine our Violence and Incitement policy. The most recent update to the policy was made after the events in Kenosha in August. In this update, we developed a framework whereby we can identify certain locations that are more at risk for violence or intimidation by the threat of violence, the same as we identify schools, polling places, and houses of worship, and remove more implicit calls and statements to bring weapons to that location. This policy could have meant the Kenosha Guard Event Page violated our Violence and Incitement policy, had it been live at the time. But either way, the Kenosha Guard Page and the Event Page it hosted violated our policy addressing Militarized Social movements, and the militia group's main Page was removed on that basis.

Indeed, earlier in August, we updated our policies to address militia organizations a week before the horrible events in Kenosha, and since then, we have identified over 600 groups that we consider militarized social movements and banned them from operating Pages, Groups, and Instagram accounts for their organizations. Following the violence that took place in Kenosha, we removed the shooter's Facebook and Instagram account and took action against organizations and content related to Kenosha. We have found no evidence that suggests the shooter followed the Kenosha Guard Page or that he was invited to the Event Page they organized.

13.    **While important questions about the potential addictive properties of social media remain open for further research, the association between social media use and mental health disorders, especially among youth, raises urgent questions.[16]**

a.    **What research has Facebook conducted internally on the mental health impacts of social media use?**

b.    **What resources has Facebook made available for independent, external study of the potential implications of its platform for users' mental health?**

c.    **Has Facebook integrated the findings of any such studies into its product design?**

d.    **In your November 17 testimony, you stressed that Facebook prioritizes "meaningful" over prolonged engagement with its products.  How does**

---

[16] *See, e.g.*, Cleveland Clinic, "Is It Possible to Become Addicted to Social Media?" (Mar. 1, 2019), *available at* *https://health.clevelandclinic.org/is-it-possible-to-become-addicted-to-social-media/*; Elroy Boers et al., "Association of Screen Time and Depression in Adolescence," *JAMA Pediatrics* (2019), *available at* https://jamanetwork.com/journals/jamapediatrics/article-abstract/2737909?guestAccessKey=f3fe2ed6-1fb3-44cc-a9a8-a38bd0463942&utm_content=weekly_highlights&utm_term=081019&utm_source=silverchair&utm_campaign=jama_network&cmp=1&utm_medium=email.

**Facebook understand and measure "meaningful" engagement, and on what health research does Facebook base those assessments?**

We design our services to be useful. And we want the time people spend on Facebook and Instagram to be intentional, positive, and inspiring. The effects of social media are still being studied, and we work in collaboration with leading mental health experts to better understand this area and make product decisions that enable meaningful social interactions.

Our goal is to support meaningful social interactions, and we make product decisions across the company to reflect that. We don't set goals for the team that manages News Feed around increasing time spent on the platform because we want to make sure that the team is focused on the value they deliver to people.

We frequently make changes to the algorithm that drives News Feed ranking in an effort to improve people's experience on Facebook. For example, in 2018, we responded to feedback from our community that public content—posts from businesses, brands, and media—was crowding out the personal moments that lead us to connect more with each other. As a result, we moved from focusing only on helping people find relevant content to helping them have more meaningful social interactions. This meant that people began seeing more content from their friends, family, and Groups. We also reduce the distribution of some problematic types of content, including content that users may find spammy or low-quality, such as clickbait headlines, misinformation as confirmed by third-party fact-checkers, and links to low-quality webpages like ad farms. When we did this, time spent on the platform actually dropped, but we believe that it increased meaningful engagement.

We've also introduced tools with people's well-being in mind so that they can manage their experience:

- **Time spent controls**: Help people manage their time on Facebook and Instagram with a dashboard that shows how much time people have spent in the app in the past week, a customizable daily time alert, and a setting to limit notifications.

- **Keyword Snooze and Unfollow**: Give people the option to temporarily hide posts by keywords or permanently hide posts by specific users.

- **News Feed and Ad Preferences**: Help people prioritize the family and friends they want to connect with and specify the kinds of ads that are relevant to them.

- **Privacy Checkup and Security Checkup**: Provide people with the ability to review who they're posting to, manage or delete apps connected to their account, and edit the privacy of the information on their profile.

We have also supported the Children and Media Research Advancement Act (CAMRA) to study the impact of technology on the health and development of young people.

14. **The 1998 Digital Millennium Copyright Act (DMCA) established a "notice and takedown" system for policing copyright infringement on the internet, but a recent Copyright Office report concluded that "Congress' original intended balance has been tilted askew" and that takedown notices have not remedied the widespread**

problem of digital piracy.[17]  I am concerned about the impact of this ongoing piracy on our nation's creative community.

   a.    What responsibility should platforms like Facebook shoulder in proactively identifying, removing, and blocking infringing content?

   b.    What steps has Facebook taken to protect copyright owners beyond processing DMCA takedown notices?

   c.    Does Facebook ever monetize copyrighted content that is posted without the permission of the copyright owner?

   d.    As further noted in the recent Copyright Office report, "Congress' vision of broad, open, cross-industry standards-setting for the creation of standard technical measures has not come to pass."  Why do you think that is, and do you have any hope that future voluntary standardization of technical measures will combat digital piracy effectively?

At Facebook, we take intellectual property rights very seriously. For this reason, we have invested extensive resources in building a world-class IP protection program. Our commitment to protecting intellectual property rights is enshrined in our terms and policies that prohibit users from posting content that infringes third parties' IP rights:

- Facebook's Terms of Service require users to agree that they "may not use our Products to do or share anything . . . [t]hat infringes or violates someone else's rights" and further provide that "[w]e may also disable your account if you repeatedly infringe other people's intellectual property rights."

- Facebook's Community Standards, which describe in more detail what is and is not allowed on Facebook, expand on these principles. The Community Standards note, among other things: "Facebook takes intellectual property rights seriously and believes they are important to promoting expression, creativity, and innovation in our community."

- The Instagram Terms of Use and Community Guidelines similarly prohibit IP infringement.

In our experience, one of the most effective ways to enforce these provisions is to partner closely with rights holders, to learn from one another, and to develop voluntary measures that address these issues at scale and in forward-looking ways. We devote significant time and resources to these voluntary collaborations with rights holders around the world and in a wide variety of industries, to share essential insights and feedback that help us continually develop our copyright policies and measures.

We are committed to continuously developing tools and programs that help rights holders more effectively identify and report potentially infringing content. In some instances, our tools eliminate the need for rights holders to report any content at all. Of course, it is difficult for

---

[17] United States Copyright Office, *Section 512 of Title 17: A Report of the Register of Copyrights* (May 21, 2020), *available at* https://www.copyright.gov/policy/section512/section-512-full-report.pdf.

Facebook to independently identify what content rights holders may believe infringes their rights without input from the rights holders themselves. Only rights holders know the extent of their rights, or what entities they may have licensed their content to, and to what degree. That said, our collaboration with rights holders has resulted in many enhancements to Facebook's policies and procedures over the years. It is a central component of our approach to stopping IP infringement, as it provides insight into trends and developments that we address through our enforcement measures.

A foundation of our IP protection program is our effective and efficient notice-and-takedown system, through which we provide dedicated channels for rights holders to report content they believe infringes their rights. These include custom online reporting forms dedicated to copyright and other IP violations, through which rights holders can report different types of content they believe are infringing, including individual posts, photos, videos, or advertisements, as well as entire profiles, accounts, Pages, Groups, or Events. We also allow for rights holders to report multiple pieces of content in a single report, further enhancing and streamlining the reporting process.

Each report submitted by a rights holder is processed by our IP Operations team, a global team of trained professionals who provide around-the-clock coverage in multiple languages, every day of the year. If a report is complete and valid, the team will promptly remove the reported content—typically in less than 24 hours, and often within hours or even minutes. If any information is missing, or if the team needs to clarify anything, more information may be requested, and rights holders can communicate directly with the team via email in those situations. We believe that this manual processing is important in striking the right balance to ensure that rights holders have clear and effective processes for enforcing their rights, and that content is removed only in response to complete and valid reports, to help safeguard users' lawful free speech rights.

When we receive a report of infringement in a specific post, we do not limit our review to the individual post, but in appropriate circumstances instead look at the entire account, Group, or Page to determine whether it is dedicated generally to infringing activity. Where such an account, Group, or Page is dedicated to infringing activity, we will disable it, even if the rights holder has reported just a single piece of content. In addition to outright removals, we may take other actions, including prohibiting the posting of content for a set period of time or, in the case of repeat infringers, disabling their Facebook or Instagram accounts, as appropriate.

In addition to notice-and-takedown, we work closely with rights holders to develop additional tools, programs, and technical measures to help them more effectively identify and disable potentially infringing content. Rights Manager is a video-, audio-, and image-matching tool that we developed for creators to identify content on Facebook and Instagram, including Live videos, that match rights holders' copyrighted content. Rights holders of all sizes—including individual creators as well as television and movie studios, sports leagues, music entities, and others—can have access to Rights Manager, subject to a simple application process.

Once approved, participating rights holders can upload reference files of their copyrighted content directly into Rights Manager. Thereafter, when a match to a user's uploaded video is detected, the rights holder can decide what action to take on that matching video, depending upon the rights holder's particular needs and circumstances. These actions include the capability to block the content from being viewed by anyone other than the uploading user. In

some instances, if a rights holder chooses to block all content matching certain criteria, it can significantly reduce their need to submit future reports (though users maintain the ability to dispute blocks where appropriate).

Rights Manager gives rights holders many other options as well. For example, instead of blocking content, rights holders may choose to monitor it for insights about how their content is performing on the platform—consistent with rights holders' desire to understand the current and potential audience for their content. Alternatively, rights holders can choose to place a banner with matching user videos that links to a promotional destination of their choice, or they can claim ad earnings from the video (which allows them to gain the revenue that is generated from ads that may run on the matched video). Importantly, use of Rights Manager is free for rights holders.

Separate from Rights Manager, our collaboration with rights holders has also allowed us to invest in proactive measures to identify and remove infringing activity in certain circumstances—typically before a report from a rights holder is ever even submitted. We're working to test new approaches to this challenge using technologies like machine learning and so on. Our partnerships have informed other measures as well. These include steps we have taken to stop the spread of third-party links dedicated to infringement on our platform, as well as to remove content related to devices that facilitate illicit streaming of copyrighted material.

**Questions from Senator Hawley**

1.  **How many entries in Facebook's Tasks tool pertain to content moderation and reference contacts at Google?**

    The "Tasks" system is an internal project management tool used by our teams to manage in-house tasks—tasks that might be as simple as providing a new employee with a computer, or as complicated as designing a new and complex feature for our platforms. As described during the hearing, the Tasks tool is essentially a "company-wide to-do list": a chronological tracking system of decisions made and then implemented by our teams. These include decisions related to violations of our Community Standards.

    When it comes to content moderation, our Community Standards are published online at https://www.facebook.com/communitystandards/. Our Community Standards outline what is and is not allowed on Facebook. We base our policies on principles of voice, safety, dignity, authenticity, and privacy. We also publish our quarterly Community Standards Enforcement Report (https://transparency.facebook.com/) to give visibility into how we are doing at enforcing the Community Standards. Google and Twitter have their own content moderation policies and make content moderation decisions based on those policies.

2.  **How many entries in Facebook's Tasks tool pertain to content moderation and reference contacts at Twitter?**

    Please see the response to your previous question.

3.  **How many entries in Facebook's Tasks tool pertain to content moderation and reference contacts or information from the Southern Poverty Law Center?**

    Please see the response to your Question 1.

    With respect to the Southern Poverty Law Center, Facebook talks to academics and experts who study, among other things, religious liberties, freedom of speech, and organized hate groups. The Southern Poverty Law Center is one of the many groups we speak with in this capacity. These academics and experts share information with Facebook on how organizations are adapting to social media and give feedback on how Facebook might better tackle these problems. That said, we apply our own policies about what constitutes hate speech, and our definition of hate speech may differ from others, including those with whom we partner. We are constantly evaluating—and, where necessary, changing—our content policies.

    Further, our own content policy team includes subject matter experts who are focused on staying ahead of trends in hate speech. Their work is used to inform our Community Operations team, which reviews content that our users and automated tools flag as inappropriate, dangerous, abusive, or otherwise violating our policies, including our hate speech policy.

4.  **Please provide a list of all hashtags, URLs, and real-world individuals that Facebook has banned across its platform, along with notations of whether the impetus for the ban stemmed from contacts with employees at Twitter, Google, or the Southern Poverty Law Center.**

As described in the response to your Question 1, our content moderation policies are set out in our Community Standards, which are publicly available at https://www.facebook.com/communitystandards/. Our policies differ from content moderation policies issued by Google and Twitter and, for that reason and others, our content moderation decisions may be different.

With respect to the Southern Poverty Law Center, please see the response to your previous question.

**5.      How many accounts in the United States has Facebook surveilled or shut down using the Centra tool?**

Centra is an internal Facebook tool used to centralize and aid investigations into complex subjects such as coordinated inauthentic behavior, which we work hard to keep off our platform. With respect to coordinated inauthentic behavior, we regularly share our findings about the coordinated inauthentic behavior we detect and remove from our platforms through our Coordinated Inauthentic Behavior Reports. These reports share information about all networks we take down over the course of a month to make it easier for people to see the progress we're making in one place. For example, in our October 2020 report, we described fourteen networks of accounts, Pages, and Groups that we removed, eight of which targeted domestic audiences in their own countries—accounts, Pages, and Groups from Georgia, Myanmar, Ukraine, and Azerbaijan—and six of which focused on people outside of their countries—accounts, Pages, and groups from Iran, Egypt, the US, and Mexico. For more information, see https://about.fb.com/wp-content/uploads/2020/11/October-2020-CIB-Report.pdf.

**6.      When a Facebook employee accesses a Facebook user's private messages, that access is allegedly tracked and audited. How many such audits were conducted by Facebook during fiscal year 2019?**

At Facebook, the privacy and security of people's data is of the utmost importance. We've created dozens of teams, both technical and non-technical, that are focused solely on privacy. As part of that focus, we look critically at data use across all our operations. We have developed and conducted a Risk Assessment Process that reviews how we use data across the entire company and its products and services, assessing risks and putting safeguards in place to address them, which include access controls. We currently have thousands of people working on these privacy-related projects, and we're hiring many more.

The circumstances in which Facebook collects, uses, and shares user information are described in our Data Policy, which is available at https://www.facebook.com/policy.php.

As Mark Zuckerberg announced in his post "A Privacy-Focused Vision for Social Networking" (available at https://www.facebook.com/notes/mark-zuckerberg/a-privacy-focused-vision-for-social-networking/10156700570096634/), Messenger is transitioning towards end-to-end encrypting all messages so that only the sender and recipient have access to them.

7.    **A November 23 article in the *Financial Times*, entitled "Facebook plans charm offensive for Joe Biden" reported that "[c]ompany executives are planning a major push to encourage users to take a coronavirus vaccine, as well as incentivising people to share content related to the Paris climate agreement, which Joe Biden has promised to rejoin, in the hopes of winning favour in Washington." Please describe all steps Facebook intends to take to encourage users to share content related to the Paris climate agreement.**

Freedom of expression is one of our core values, and we believe that the Facebook community is richer and stronger when a broad range of viewpoints is represented. We are committed to encouraging dialogue and the free flow of ideas by designing our products to give people a voice. We do not create or edit the content that our users post on our platform, and we do not discourage users from discussing any topic, so long as they comply with our Community Standards and other policies when posting content.

8.    **Please explain how any advocacy by Facebook for rejoining the Paris climate agreement would be consistent with Facebook's self-description as a "platform" and not a "publisher."**

Facebook is, first and foremost, a technology company. We do not create or edit the content that our users post on our platform. We seek to be a platform for ideas across the political spectrum and moderate content according to our published Community Standards to keep users on the platform safe, reduce objectionable content, and ensure users participate on the platform responsibly.

Section 230 does not restrict a service from also exercising its right to speak about political or social issues, including climate change, which is one of the most urgent issues facing our world today. We're working to minimize our energy, emissions, and water impact; protect workers and the environment in our supply chain; and partner with others to develop and share science-driven solutions.

**Questions from Senator Blumenthal**

1.     **During your testimony, you stated that Facebook has taken "a couple of steps" to combat rampant disinformation on social media in Spanish-speaking sites.**

     a.     **Who is in charge of setting Spanish-language content policy and making high-level decisions about enforcement, including about posts that come from high-ranking U.S. officials and the president?**

     b.     **How many U.S.-based Spanish language content moderators does Facebook have and what is the proportion of U.S.-based Spanish-language moderators to U.S.-based Spanish-language Facebook users? How does that compare to U.S.-based English-language moderators vs. U.S.-based English-language users?**

People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers around the world who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is debunked by a fact-checker, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

Ahead of the election, we took a number of steps to address concerns about misinformation, including actions specifically targeted to our Spanish-speaking community. For example, we built a Spanish version of our Voting Information Center, where people were able to find accurate information about the election. We also added two new US fact-checking partners (Reuters and AFP) who review content in Spanish, in addition to one existing partner (Associated Press). On WhatsApp, we partnered with the IFCN to develop a chatbot that enabled people to receive accurate information from ten US fact-checking organizations, including Telemundo and Univision. We also launched a new feature in WhatsApp in which people can easily search the web to receive more information about their chats.

To reduce the spread of misinformation ahead of the election, we also implemented a forwarding limit on Messenger and have a similar limit on WhatsApp, so messages can only be forwarded to five people or groups at a time. Limiting forwarding is an effective way to slow the spread of viral misinformation and harmful content that has the potential to cause real-world harm.

When it comes to content moderation, we have Community Standards that outline what is and is not allowed on Facebook. As a general matter, when we identify or learn of content that violates our policies, we remove that content regardless of who posted it. We base our policies on principles of safety, voice, and equity. Our policy development is informed by input from our community and from experts and organizations outside Facebook so we can better understand different perspectives on safety and expression, as well as the impact of our policies on different communities globally. Based on this feedback, as well as changes in social norms and language, our standards evolve over time.

We have over 35,000 people working on safety and security, about 15,000 of whom review content. The majority of our content reviewers are people who work full-time for our partners and work at sites managed by these partners. We have a global network of partner companies so that we can quickly adjust the focus of our workforce as needed. This approach gives us the ability to, for example, make sure we have the right language or regional expertise. Our partners have a core competency in this type of work and are able to help us adjust as new needs arise or when a situation around the world warrants it.

2.    **During questions, you would not commit to taking down Steve Bannon's account despite the fact that Mr. Bannon called for the beheadings of Dr. Fauci and FBI Director Wray for not acting more favorably toward President Trump.**

    a.    **Why was Mr. Bannon not removed from the platform after calling for violence against public figures?**

    b.    **Under what circumstances would Facebook ban Mr. Bannon from the platform for calls to violence?**

Violence and hate have no place on our platform. The video that was posted to Mr. Bannon's Page violated our policies, and we took it down. But having a content violation does not automatically mean that a user's account gets taken down. We work to enforce our policies against anyone who violates them, and we remove content calling for or advocating violence.

We don't want people to game the system, so we do not share the specific number of violations that leads to a temporary block or permanent suspension. Our Community Standards are a guide for what is and isn't allowed on Facebook. The consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform. For instance, we may warn someone for a first violation, but if they continue to violate our policies, we may restrict their ability to post on Facebook or disable their profile. We also notify law enforcement when we believe there is a genuine risk of physical harm or a direct threat to public safety.

3.    **We all have an interest in setting a baseline standard for privacy protections. Some in the tech industry want preemption, but there are significant concerns over whether the standard we set will be enforced. Would you be open to a national consumer privacy law that includes some form of private enforcement?**

We have expressed concerns generally about private rights of action, especially that they do not benefit consumers in practice and lead to diverging interpretations of the law. Nonetheless, we have supported bills where the private right of action was limited in scope, such as the CCPA (which allows actions with respect to data breaches). As such, we would be interested in working with you and other stakeholders to find a compromise.

4.    **Section 230 shuts the courthouse door on victims seeking justice. Even when tech companies are aware of abuse and crime – even when they amplify and promote that conduct – they are immune. Researchers have demonstrated that Facebook's ad algorithms have discriminated based on race, age, and gender. In *Riddick v. Facebook*, and other numerous cases filed by civil rights advocates, Facebook used Section 230 immunity to attempt to shut down those civil rights claims through broad claims of immunity.**

**a.    Should an online platform that facilitates discriminatory advertising be fully accountable under our civil right laws?**

Discrimination and discriminatory advertising have no place on Facebook's platforms, and we remove such content as soon as we become aware of it.

Our policies have long prohibited discrimination, and we have made significant changes to prevent advertisers from misusing our tools to discriminate in their ad targeting. As part of settlement agreements with civil rights organizations like the National Fair Housing Alliance, and based on ongoing input from civil rights experts, we have taken the industry lead by changing the way advertisers may select the audience for housing, employment, and credit (HEC) ads. Specifically, we have eliminated the ability to target HEC ads based on age, gender, or zip code, and we have severely restricted the number of interest category targeting options available. We've expanded our enforcement of these restrictions across all the tools businesses use to buy ads. Even before we made these changes, advertisers were prohibited from using any multicultural affinity interest segments, either for inclusion or exclusion, when running HEC ads. We've also added Housing, Employment, and Credit ad sections to the Ad Library, making it easy to search for and view all currently active US ads about housing, employment, and credit opportunities, regardless of the advertiser's intended audience. We've also committed to studying the potential for algorithmic bias, including in our ad algorithms, with input from the civil rights community, industry experts, and academics.

**b.    Should Section 230 serve as a shield for online platforms against protections for children, civil rights, and consumer protection where platforms enable the promotion of illegal content or conduct?**

Facebook's Community Standards prohibit coordinating harm and criminal activity, and we certainly think it is important that platforms address illegal activity on their platforms.

Facebook supported SESTA/FOSTA, and we were very pleased to be able to work successfully with a bipartisan group of Senators on a bill that protects women and children from the harms of sex trafficking. We would welcome the opportunity to work with the Committee on proposals to modify Section 230 in ways that focus on bad actors, while being mindful not to disincentivize platforms from identifying and removing illegal activity.

**c.    How would Facebook suggest that Section 230 be reformed to ensure that it encourages platforms to be good Samaritans—not bad actors?**

The debate about Section 230 shows that people of all political persuasions are unhappy with the status quo.

Section 230 made it possible for every major internet service to be built and ensured important values like free expression and openness were part of how platforms operate. Changing it is a significant decision. However, we believe Congress should update the law to make sure it's working as intended, for example, by separating good actors from bad by making sure that companies can't hide behind Section 230 to avoid responsibility for intentionally facilitating illegal activity on their platforms. People want to know that companies are taking responsibility for combating harmful content—especially illegal activity—on their platforms.

They want to know that when platforms remove content, they are doing so fairly and transparently. And they want to make sure that platforms are held accountable.

More broadly, we support the ideas around transparency and industry collaboration that are being discussed in some of the current bipartisan proposals, and we look forward to a meaningful dialogue about how we might update the law to deal with the problems we face today.

5.    **During your testimony, you stated that Facebook was on heightened alert for misinformation and disinformation during the 2020 election, and took additional steps to label misinformation and disinformation to protect the integrity of the 2020 election. Additionally, on October 20, 2020, according to Buzzfeed News, you told Facebook employees that, "Once we're past these events [the 2020 Election], and we've resolved them peacefully, I wouldn't expect that we continue to adopt a lot more policies that are restricting of a lot more content."**

    a.    **How will Facebook's content moderation policies and practices differ from the period surrounding the 2020 election after the Georgia runoff? Are there policies or practices that you expect to scale back after the runoff?**

Facebook worked hard to do our part in protecting the integrity of the 2020 election, taking a variety of actions to connect people with reliable information and decrease the risks of confusion and abuse of our systems. Some of these actions—such as placing labels on all posts about voting that link to the Voting Information Center—will be ending over the coming weeks as the election period concludes. We are in the process of evaluating all of our election-related measures to learn what we can from this experience, and to determine whether any of those measures should remain in place going forward.

On December 15, we announced that, though we are maintaining for now our temporary pause for ads about social issues, elections, or politics in the US, on December 16 we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

6.    **Facebook has removed a number of "Stop The Steal" groups and accounts. However, The Real Facebook Oversight Board, an advocacy group, has reported several "Stop The Steal" groups are still operating, including a private Facebook group that reportedly has over 250,000 members.**

    a.    **What are Facebook's policies around taking down "Stop The Steal" groups?**

When it came to the "Stop the Steal" Group, we took down the Group within about 24 hours. We quickly removed the Group because it was organized around the delegitimization of the election process, and we saw worrying calls for violence from some members of the Group, in violation of our policies.

    b.    **Private groups reduce the prevalence of user-generated reporting and public scrutiny. How does Facebook's content moderation efforts ensure that private groups are subject to effective enforcement of its terms of service and policies?**

Private Groups can be important places for people to come together and share around a range of personal topics, but being in a private Group doesn't mean that a user's actions should go unchecked. We have a responsibility to keep Facebook safe, which is why our Community Standards apply across Facebook, including in private Groups. We have a specialized team that has been working on the Safe Communities Initiative, which seeks to protect people using Facebook Groups from harm. Made up of product managers, engineers, machine learning experts, and content reviewers, this team works to anticipate the potential ways people can cause harm in groups and develop solutions to minimize and prevent it.

In terms of enforcing the Community Standards in private Groups, we focus on detecting violating content proactively, providing tools for Group admins, and providing transparency and control for Group members. When it comes to detection, we use AI and machine learning to proactively detect bad content before anyone reports it, and sometimes before people even see it.

As content is flagged by our systems or reported by people, trained reviewers consider context and determine whether the content violates our Community Standards. We then use these examples to train our technology to get better at finding and removing similar content. This process applies to all public and private Groups.

To help admins run meaningful Groups, we built Group Quality, which gives admins an overview of content Facebook has removed and flagged to them for most Community Standards violations. We also added a section about false news found in Groups. These tools give admins more clarity about how and when we enforce our policies in their Groups and gives them greater visibility into what is happening in their communities. This also means that they're more accountable for what happens under their watch. We help admins to establish positive Group norms by adding a section for rules so they can be clear about what is and isn't allowed. Admins and moderators also have the option to share which rule a member broke when declining a pending post, removing a comment, or muting a member.

7.    **In October, Facebook sent a warning to the NYU Ad Observatory, a research project that collects and studies political ads on Facebook. In its 'notice of violation,' Facebook stated that "browser plugins and other extensions that scrape information raise security and privacy concerns." However, according to the NYU project's website, the browser extension does not collect personal information. Additionally, the Ad Observatory has demonstrated that Facebook's Ad Library is sometimes incomplete, missing political ads from campaigns and political action committees. I appreciate the need to protect Facebook users from unscrupulous third parties and infringements of privacy, however, I also recognize that the NYU program enables accountability and that the takedown demand has raised concerns from civil rights groups.**

   a.    **What information does the NYU Ad Observer store that presents substantial security and privacy concerns to the Facebook user that installs the app?**

   b.    **Is it Facebook's position that no browser plugin can process or collect information from Facebook even with clear and demonstrable consent from that user?**

  c.  **Is it Facebook's position that the Ad Library, Ad Library API, and Ad Library Report are equivalent replacement for the Ad Observer? How are third parties expected to audit and hold Facebook accountable without tools such as the Ad Observer?**

  d.  **At last week's hearing, you said that you considered NYU's tool to be violating Facebook's consent decree with the FTC. Since the NYU tool collects no personal information, could you explain what they do collect that you consider to be covered information as per the terms of that decree?**

We recognize the importance of ads data to researchers and democracy, but we also have an obligation—including under our agreement with the FTC—to take steps to prevent unauthorized access to user data. In this case, NYU's browser extension works by scraping content from Facebook.

It is not our intention to impede transparency—far from it. Facebook's Ad Library and Ad Library API are used extensively by researchers to bring insights into political advertising. We're committed to providing ads transparency in ways that respect people's privacy, and we will continue to invest in new ways of doing that.

**8.**  **According to media reports, Facebook will not allow any posts "in support" of Kyle Rittenhouse, the 17-year-old charged in the shooting deaths of two people in Kenosha, Wisconsin. However, as the Anti-Defamation League has documented, Facebook groups and users have continued to glorify this horrendous act of violence. Please describe Facebook's current policies with respect to posts that support Rittenhouse and the enforcement policies with respect to those users.**

With regard to the type of content described in your question, we removed the shooter's Facebook and Instagram accounts under our Dangerous Individuals and Organizations policy because we do not allow mass shooters to have a presence on our site. Under this policy, we also remove content that praises, supports, or represents the violence that took place or the person who committed the violence. We continue to remove this content as soon as we identify it on our platform. Additionally, we also remove content that glorifies violence or celebrates the suffering or humiliation of others, because it may create an environment that discourages participation. We do allow content that includes the discussion of laws, punishments, potential charges, or potential legal defenses.

**9.**  **Since Joe Biden was declared the President-elect, President Trump has routinely flouted Facebook's policies, hourly seeking to delegitimize the outcomes of the election. There is a real threat of violence, and these unfounded allegations are corrosive to our democracy. Your counterpart, Twitter, recently had a policy where a user could not view President Trump's misinformation unless they affirmatively clicked "view" on a warning label. Users also could not retweet or comment on the tweet.**

  a.  **Why did Facebook not adopt a similar approach?**

  b.  **Under what conditions would Facebook adopt the same protections against President Trump's misinformation?**

We do not think it is best for a private company to censor politicians in a democracy. Seeing speech from politicians is in the public interest, and in the same way that news outlets will report what a politician says, we think people should generally be able to see it for themselves on our platforms. We don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. Accordingly, direct speech from politicians is generally not eligible for our third-party fact-checking program. A handful of times a year, we leave up content that would otherwise violate our policies if the public interest value outweighs the risk of harm. But there is no newsworthiness exemption to content that incites violence or suppresses voting. Even if a politician or government official says it, if we determine that content may lead to violence or deprive people of their right to vote, we will take that content down

In an effort to help connect people with reliable information, we placed a link to the Voting Information Center on posts about voting and the election, both before and after Election Day. We also ran notifications at the top of Facebook and Instagram to help people find information about results as they came in. And we attached an informational label to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods, for example, by claiming that lawful methods of voting will lead to fraud. This label provided basic, reliable information about the integrity of the election and voting methods.

We also have strong voter suppression policies, which apply to all users (including politicians) and prohibit explicit or implicit misrepresentations about how or when to vote that could cause someone to lose their opportunity to vote. We worked closely with election officials to identify and remove misinformation about voting in the lead-up to and during the election, including false claims about polling conditions.

**10.    This year, Russia and Iran engaged in aggressive campaigns to suppress the vote and undermine candidates throughout the election.**

**a.    Is it correct that Facebook received warnings from law enforcement about the threat of hack-and-leak operations during the election?**

Yes. For several months before the election, the US intelligence community urged voters, companies, and the federal government to remain vigilant in the face of the threat of foreign influence operations seeking to undermine our democracy and the integrity of our electoral process. The Director of National Intelligence, the Head of the FBI, and the bipartisan leaders of the Senate Select Committee on Intelligence reminded Americans specifically about the threat posed by foreign influence operations emanating from Russia and Iran. Along with their public warnings, and as part of the ongoing cooperation that tech companies established with government partners following the 2016 election, the FBI also privately warned tech companies to be on high alert for the potential of hack-and-leak operations carried out by foreign actors in the weeks leading up to November 3rd.

**b.    Would you have taken the same steps as you did with the *New York Post*, if it were *The Guardian* and about one of the Trump children?**

If the circumstances were the same, we would have taken the same steps with respect to a story about one of President Trump's children.

In the case of the October 14 *New York Post* story, given the concerns raised by the FBI and others regarding foreign influence operations discussed above, we took steps consistent with our previously announced policies to slow the spread of suspicious content and provide our independent, third-party fact-checkers the opportunity to assess it. However, at no point did we take any action to block or remove the content from the platform. People could—and did—read and share the *Post*'s reporting while we had this temporary demotion in place. Consistent with our policy, after seven days, we lifted the temporary demotion on this content because it was not rated by an independent fact-checker.

11.    **According to a Wall Street Journal article, Facebook has studied but shelved research and recommendations on how to make its platforms less divisive. It is concerning that online platforms such as yours have been the entry points and radicalization tools for violent hate and racism. What specific steps have you taken to ensure that your platforms, such as recommendation and amplification algorithms, do not promote hateful or racist content or groups?**

The *Wall Street Journal* story your question references used a couple of isolated initiatives we decided against to argue that we don't care about the underlying issues—and it ignored the significant efforts we did make. The piece disregarded how our research, and the research we continue to commission, informed dozens of other changes and new products. It also ignored other measures we've taken to fight polarization. As a result, readers were left with the impression we are ignoring an issue that in fact we have invested heavily in.

In addition, the study in question was not produced by the team whose primary role at the company focuses on groups that commit violence and spread disinformation, so it's not the best lens through which to understand our work in those areas.

We are proud of the work we have done to make Facebook an unwelcome place for those committed to acts of violence. In fact, our Dangerous Individuals and Organizations policy has long been the broadest and most aggressive in the industry. And in August 2020, we expanded that policy to address militarized social movements and violence-inducing conspiracy networks, such as QAnon. The purpose of this policy is to prevent offline harm that may be related to content on Facebook, and so in the course of that work we contact law enforcement if we see imminent credible threats on the platform. We remove language that incites or facilitates serious violence. We also ban groups that proclaim a hateful and violent mission from having a presence on our apps, and we remove content that represents, praises, or supports them.

Moving fast to find and remove dangerous organizations, including terrorist and hate groups, takes significant investment in both people and technology. At Facebook, we have tripled the size of our teams working in safety and security since 2016 to over 35,000 people—including teams that review reports of hate speech and content that praises, supports, or represents hate groups. We also have several hundred people who exclusively or primarily focus on countering dangerous organizations as their core responsibility. This group includes former academics who are experts on counterterrorism, former prosecutors and law enforcement agents, investigators and analysts, and engineers.

Four years ago, we developed a playbook and a series of automated techniques to detect content related to terrorist organizations such as ISIS, al Qaeda, and their affiliates. We've since expanded these techniques to detect and remove content related to other terrorist and hate groups. We're now able to detect and review text embedded in images and videos, and we've built media-matching technology to find content that's identical or near-identical to photos, videos, text, and even audio that we've already removed. When we started detecting hate organizations, we focused on groups that posed the greatest threat of violence at that time, and we've now expanded to detect more groups tied to different hate-based and violent extremist ideologies and using different languages. In addition to building new tools, we've also adapted strategies from our counterterrorism work, such as leveraging off-platform signals to identify dangerous content on Facebook and implementing procedures to audit the accuracy of our AI's decisions over time.

We understand, however, that simply working to keep violence off Facebook is not an adequate solution to the problem of online content tied to violent extremism, particularly because bad actors can leverage a variety of platforms and operate offline as well. While we work 24/7 to identify, review, and remove violent extremist content, our efforts do not stop there. We believe our partnerships with other companies, civil society, researchers, and governments are crucial to combating this threat. For example, our P2P Global Digital Challenge, which engages university students around the world in competitions to create social media campaigns and offline strategies to challenge hateful and extremist narratives, has launched over 600 counterspeech campaigns from students in 75 countries, engaged over 6,500 students, and reached over 200 million people. We have also developed a Redirect program to connect people searching for violent extremist material with offline organizations dedicated to helping people disconnect from extremist groups. The program is active now in four countries, including the United States, where we have partnered with Life After Hate, an organization founded by former violent extremists, to help people disconnect from white supremacist groups.

With respect to recommendations, we've made our recommendation guidelines public in our Help Center. Our recommendation guidelines are used to determine what content is eligible to appear in recommendations. By making these guidelines public, we hope to help people better understand the kinds of content we recommend, and provide context on why some types of content aren't included in recommendations and therefore may not be distributed as widely.

In developing these guidelines, we consulted 50 leading experts specializing in recommender systems, expression, safety, and digital rights. These consultations help ensure we provide a safe and positive experience when we recommend things on our apps.

<u>Questions from Senator Tillis</u>

1.    **My subcommittee has spent this year holding a series of hearings on the Digital Millennium Copyright Act (DMCA) and the safe harbors that internet service providers enjoy when it comes to copyright infringement by their users. Tech company witnesses said they can't identify infringements by their users – but Facebook is very good at identifying and censoring or taking down or flagging content from conservative voices. Don't you think that if Facebook can track and take down political content that it also has the ability to take down content that infringes the IP of hard-working American creators?**

Facebook is a platform for ideas across the political spectrum. Suppressing content on the basis of political viewpoint is directly contrary to Facebook's mission and our business objectives. As a general matter, when we identify or learn of content that violates our policies, we remove that content regardless of who posted it. The political affiliation of the user generating the content has no bearing on that content assessment. Rather, decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the decision-making process for reviewers as objective as possible.

As to Facebook's work to combat copyright infringement, we take IP rights seriously, and we aim to foster a safe and trusted community that encourages people to share content lawfully on Facebook and Instagram. To this end, we've put numerous measures in place to help rights holders protect their intellectual property swiftly and easily. These measures include a global notice-and-takedown program, a robust repeat infringer policy, user education hubs (to help prevent infringement in advance), and other sophisticated tools and initiatives that help rights holders control the use of their content and identify potential IP violations—notably, our state-of-the-art content management tool Rights Manager. We also work to detect and address infringing material ourselves. We have developed these tools and practices in close collaboration with rights holders, taking into account their changing needs and shifts in the online ecosystem, all while ensuring that users' rights to lawful freedom of expression are protected.

Facebook's IP protection measures begin with our Terms of Service and our Community Standards, which prohibit people from posting content that infringes others' IP rights. Similar provisions are included in Instagram's Terms of Use and Community Guidelines. Under our policies, rights holders can submit IP reports identifying content on Facebook and Instagram that they believe infringes their rights. If a report is complete and valid, we will act promptly to remove the reported content.

It can be difficult for Facebook to independently identify what content a rights holder may believe infringes their rights without input from the rights holders themselves. Only rights holders know the extent of their rights, or what entities they may have licensed their content to, and to what degree. Nonetheless, we collaborate with rights holders to build tools, and to identify trends and insights about infringing activity that allow us to invest in proactive measures to identify and remove infringing activity in certain circumstances—typically before a report from a rights holder is ever submitted.

For instance, we have built our Rights Manager tool to help rights holders identify videos on Facebook and Instagram that match their copyrighted content and provide them with choices about what actions to take depending upon the rights holder's particular needs and circumstances—including the ability to block the content from being viewed by anyone else. We're also working to test new approaches using machine learning, in order to detect and remove copyright violations without an IP report or other involvement from rights holders. And we've implemented measures to stop the spread of third-party links that are dedicated to infringement on our platform, as well as to remove content related to devices that facilitate illicit streaming. In developing these policies, in addition to eliminating potentially infringing content, Facebook takes great care in ensuring that our policies do not disrupt lawful speech.

**2.    I believe at the Commerce Committee hearing last month you noted that Facebook has something like 40,000 content moderators around the world. How many of your moderators are looking for copyright infringement?**

We spent $3.7 billion in 2019 investing in safety and security—an amount greater than our revenue at the time of our IPO. We have over 35,000 people working on safety and security, about 15,000 of whom review content, including content flagged as infringing copyright. Among these are our IP Operations team, a global team of trained professionals who provide around-the-clock coverage in multiple languages, every day of the year. Each IP report submitted by a rights holder is processed by our IP Operations team.

**3.    How does Facebook determine that it is appropriate to take a proactive step to counter, address, block, or remove content? Are the considerations different for political content and copyright-infringing content?**

As a general matter, when we identify or learn of content that violates our policies, we remove that content regardless of who posted it. The political affiliation of the user generating the content has no bearing on that content assessment. Rather, decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the review process for reviewers as objective as possible.

To enforce our Community Standards, we have introduced tools that allow us to proactively detect and remove certain violating content using advances in technology, including artificial intelligence, machine learning, and computer vision. We do this by analyzing specific examples of bad content that have been reported and removed to identify patterns of behavior. Those patterns can be used to teach our software to proactively identify similar content.

Advances in technology mean that we can now remove bad content more quickly, identify and review more potentially harmful content, and increase the capacity of our review team. To ensure the accuracy of these technologies, we constantly test and analyze our systems, technology, and AI to ensure accuracy. All content goes through some degree of automated review, and we use human reviewers to check some content that has been flagged by that automated review or reported by people that use Facebook. We also use human reviewers to perform reviews of content that was not flagged or reported by people, to check the accuracy and efficiency of our automated review systems. The percentage of content that is reviewed by a

human varies widely depending on the type and context of the content, and we don't target a specific percentage across all content on Facebook.

When it comes to content alleged to infringe copyright, Facebook complies with the notice-and-takedown procedures set out in section 512 of the United States Digital Millennium Copyright Act (DMCA). Each report submitted by a rights holder is processed by our IP Operations team, which is a global team of trained professionals who provide around-the-clock coverage in multiple languages, every day of the year. If a report is complete and valid, the team will promptly remove the reported content—typically in less than 24 hours, and often within hours or even minutes—and confirm that action with the rights holder that reported it.

Additionally, when we receive a report of infringement in a specific post, we do not limit our review to the individual post, but in appropriate circumstances instead look at the entire account, Group, or Page to determine whether it is dedicated generally to infringing activity. Where such an account, Group, or Page is dedicated to infringing activity, we will disable it, even if the rights holder has reported just a single piece of content. In addition to outright removals, we may take other actions, including prohibiting the posting of content for a set period of time or, in the case of repeat infringers, disabling their Facebook or Instagram accounts, as appropriate.

If a user's content is removed under the DMCA, they will receive instructions about how to file a counter-notification in the message the user receives. If the user submits a proper counter-notice, we forward it to the party that reported the content. The removed content, subject to the counter-notice, will then be restored unless the reporting party notifies us within fourteen days that they have filed a lawsuit for copyright infringement. This is the process described in the DMCA.

It can be difficult for Facebook to independently identify what content a rights holder may believe infringes their rights without input from the rights holders themselves. Only rights holders know the extent of their rights, or what entities they may have licensed their content to, and to what degree. That said, our collaboration with rights holders is a central component of our approach to stopping IP infringement, as it provides insight into trends and developments that we address through our enforcement measures. Our collaboration with rights holders has allowed us to invest in proactive measures to identify and remove infringing activity in certain circumstances—typically before a report from a rights holder is ever submitted.

For instance, we have built a tool called Rights Manager that helps rights holders identify videos on Facebook and Instagram that match their copyrighted content and provides them with choices about what actions to take depending upon the rights holder's particular needs and circumstances—including the ability to block it from being viewed by anyone else. We're also working to test new approaches using machine learning in order to detect and remove copyright violations without an IP report or other involvement from rights holders. And we've implemented measures to stop the spread of third-party links that are dedicated to infringement on our platform, as well as to remove content related to devices that facilitate illicit streaming. In developing these policies, in addition to eliminating potentially infringing content, Facebook takes great care in ensuring that our policies do not disrupt lawful speech.

**4.      I know Facebook has developed significant technological tools to guard against foreign interference in elections or to identify and label content that you deem**

**politically misleading, inaccurate, or dispute. What types of technological tools do you use to identify and address content that infringes copyright?**

Facebook is committed to developing tools and programs that help rights holders more effectively identify and report potentially infringing content. In some instances, our tools eliminate the need for rights holders to report any content at all. It can be difficult for Facebook to independently identify what content rights holders may believe infringes their rights without input from the rights holders themselves. Only rights holders know the extent of their rights, or what entities they may have licensed their content to, and to what degree. That said, we have developed many of these tools and programs cooperatively with rights holders. This collaboration has resulted in many enhancements to Facebook's policies and procedures over the years. Our collaboration with rights holders is a central component of our approach to stopping IP infringement, as it provides insight into trends and developments that we address through our enforcement measures.

As just one example of this collaboration, we built and have further enhanced our scaled content management and matching tool, called Rights Manager, based on feedback and input from all types of rights holders. Specifically, Rights Manager is a free, video-, audio- and image-matching tool that we developed for creators to identify content on Facebook and Instagram, including Live videos, that match rights holders' copyrighted content. Rights holders of all sizes—from individual creators to television and movie studios, sports leagues, music entities, and others—can have access to Rights Manager, subject to a simple application process.

Once approved, participating rights holders can upload reference files of their copyrighted content directly into Rights Manager. Thereafter, when a match to a user's uploaded video is detected, the rights holder can decide what action to take on that matching video, depending upon the rights holder's particular needs and circumstances. These actions include the capability to block the content from being viewed by anyone other than the uploading user. In some instances, if a rights holder chooses to block all content matching certain criteria, it can significantly reduce their need to submit future reports (though users maintain the ability to dispute blocks where appropriate).

Rights Manager gives rights holders many other options as well. For example, instead of blocking content, rights holders may choose to monitor it for insights about how their content is performing on the platform—consistent with rights holders' desire to understand the current and potential audience for their content. Alternatively, rights holders can choose to place a banner on matching user videos that links to a promotional destination of their choice, or they can claim ad earnings from the video (which allows them to gain the revenue that is generated from ads that may run on the matched video). Importantly, use of Rights Manager is free for rights holders.

Users of Rights Manager can even add trusted partners and properties to protect them from matching their reference files. Facebook maintains a detailed Help Center that provides further information on the functioning and practices of Rights Manager, available at https://www.facebook.com/business/help/1548693938521733.

Our collaboration with rights holders has also allowed us to invest in proactive measures to identify and remove infringing activity entirely on our own—typically before a report from a rights holder is ever even submitted. We're working to test new approaches to this challenge using technologies like machine learning. Our partnerships have informed other measures as

well. These include steps we have taken to stop the spread of third-party links dedicated to infringement on our platform, as well as to remove content related to devices that facilitate illicit streaming of copyrighted material.

5.  **I understand that you've come around on section 230 reform. Of course the devil is in the details, but do you also support the reform of the Digital Millennium Copyright Act that I've been leading, particularly the section 512 safe harbors that have encouraged some online services to ignore copyright infringement?**

We believe that Facebook and Instagram should empower content creators of all types. We also understand that online piracy is a significant problem—one that transcends any one platform, or any one country. And we're acutely aware of the negative effect it can have on the many creators around the world whose work can be stolen and illegally shared. That's why we are so focused on tackling this issue in creative, far-reaching, and effective ways. The current DMCA framework has enabled our work in this area. We were pleased to participate in the hearing on DMCA reform on December 15, 2020, and we would welcome the opportunity to further engage with the Committee on these issues.

6.  **We're now continuing the DMCA reform process with draft legislation that I want stakeholders from all perspectives to help me refine so we can build consensus. Do I have your commitment that Facebook will participate constructively and in good faith?**

We welcome the opportunity to be a constructive and good-faith partner, including discussions on policy related to online protection of intellectual property. We believe that Facebook and Instagram should empower content creators of all types. We also understand that online piracy is a significant problem—one that transcends any one platform, or any one country. And we're acutely aware of the negative effect it can have on the many creators around the world whose work can be stolen and illegally shared. And that's why we are so focused on tackling this issue in creative, far-reaching, and effective ways. The current DMCA framework has enabled our work in this area. We were pleased to participate in the hearing on DMCA reform on December 15, 2020, and we would welcome the opportunity to further engage with the Committee on these issues.

7.  **It is not uncommon for legitimate media outlets to make corrections or update stories that they publish and post on Facebook. Does your platform place a notification on posts for stories that have been corrected? If not, why not?**

Facebook works with 80 third-party fact-checking organizations globally who review content in more than 50 languages. We have ten partners who focus primarily on the US: AFP - Hub, the Associated Press, FactCheck.org, PolitiFact, Check Your Fact, Science Feedback, the Dispatch, Reuters Fact Check, USA TODAY, and Lead Stories. All of our fact-checking partners have been certified by the International Fact-Checking Network (IFCN), a unit of the Poynter Institute. The IFCN requires fact-checkers to adhere to a strict journalistic Code of Principles that includes a commitment to non-partisanship; a commitment to transparency of sources, funding, and methodology; and a commitment to an open and honest corrections policy.

Publishers may reach out directly to the third-party fact-checking organizations if (1) they have corrected the rated content, or if (2) they believe the fact-checker's rating is inaccurate. To

issue a correction, the publisher must correct the false content and clearly state that a correction was made directly on the story. To dispute a rating, the publisher must clearly indicate why the original rating was inaccurate. If a rating is successfully corrected or disputed, the demotion on the content will be lifted and the strike against the domain or Page will be removed. It may take a few days to see the distribution for the domain or Page recover. Additionally, any recovery will be affected by other false news strikes and related interventions (like demotions for clickbait). Corrections and disputes are processed at the fact-checker's discretion. Fact-checkers are asked to respond to requests in a reasonable time period—ideally one business day for a simple correction, and up to a few business days for more complex disputes.

8.    **You claim you are not a publisher. At the same time you substitute your judgment for what can be published on your website for the editorial decision of traditional news outlets. The main example of this is the recent censoring of the New York Post story on Hunter Biden. How are you not engaging in editorial decision making by prohibiting a traditional news outlet from publishing a story on your site?**

In the weeks leading up to the election, the Director of National Intelligence, the Head of the FBI, and the bipartisan leaders of the Senate Select Committee on Intelligence reminded Americans about the threat posed by foreign influence operations emanating from Russia and Iran. Along with their public warnings, and as part of the ongoing cooperation that tech companies established with government partners following the 2016 election, the FBI also privately warned tech companies to be on high alert for the potential of hack-and-leak operations carried out by foreign actors in the weeks leading up to November 3rd. We took these risks seriously. Given the concerns raised by the FBI and others, we took steps consistent with our policies to slow the spread of suspicious content and provide fact-checkers the opportunity to assess it. However, at no point did we take any action to block or remove the content from the platform. People could—and did—read and share the *Post*'s reporting while we had this temporary demotion in place. Consistent with our policy, after seven days, we lifted the temporary demotion on this content because it was not rated false by an independent fact-checker.

9.    **Has your company or any subsidiary entered into an agreement, either written or not, with a government to either limit access to certain information, or to not limit government officials posts or place warnings on those posts?**

When something on Facebook or Instagram is reported to us as violating local law, but it doesn't go against our Community Standards, we may restrict the content's availability only in the country where it is alleged to be illegal after careful legal review. We receive reports from governments and courts, as well from non-government entities such as members of the Facebook community and NGOs.

In our quarterly Transparency Report, we detail instances where we limited access to content based on applicable local law. For more information, please visit https://transparency.facebook.com/content-restrictions.

10.    **Do you have a list of every account and post of an elected officeholder that has been flagged or censored? If so, please provide a list of every officeholder and candidate that has been flagged or censored in any way, and the number of times each individual was flagged or censored.**

While we do not have a list of every account that has been subject to our content moderation policies, we can say that we have removed content posted by individuals and entities across the political spectrum.

11. **On November 11, 2020—Veterans Day—I posted on Instagram to express my appreciation for all those who served. This post was on my official Senate Instagram account—which is verified by Instagram. It was also the week after the election and did not mention the election. Yet Instagram placed a flag on this post. The warning on the post stated "See the results and other info about the 2020 US Election."**

  - **Why was this post flagged?**

  - **Was the decision to flag this post made by an algorithm or individual? Or was it a combination?**

  - **Please describe each step of the process for reviewing this post and placing a flag on it.**

  - **What about this post was related to the 2020 election?**

  - **How many other posts by current members of Congress' Veterans Day posts on Facebook or Instagram were also flagged? Please provide a list of all members of Congress and governors whose posts were flagged, as well as the information displayed on that post.**

  - **Were Veterans Day posts by any candidate for federal office, including Congress and for President, flagged? If so, please provide a list of all candidates whose posts were flagged and the text placed on those posts.**



We placed a label with a link to the Voting Information Center on posts about voting and the election, both before and after Election Day. The labels did not contradict or question any content in the posts, but merely gave users the opportunity to access reliable information about the election if they wished.

**12.     You suggest that Congress and the American people should trust you. But then I see a post from my official Senate account thanking veterans flagged and it gives me pause. Will you allow Congress to observe the process at your company for evaluating and making a decision on what action to take on political posts?**

We do not think that tech companies should be making so many decisions about these important issues alone. We believe we need a more active role for governments and regulators. One idea is for third-party bodies to set standards governing the distribution of harmful content and measure companies against those standards. Regulation could set baselines for what is prohibited and require companies to build systems for keeping harmful content to a bare minimum. By updating the rules for the internet, we can preserve what's best about it—the freedom for people to express themselves and for entrepreneurs to build new things—while also protecting society from broader harms.

**13.     Why do you only place warnings on some stories published by traditional news sources and not go one step farther and provide more context on all posts from traditional news sources when the text in the post or the title of the post may not fully tell an accurate story?**

People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is debunked by a fact-checker, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

As discussed above, if content is debunked by a fact-checker, its distribution will be reduced and we will implement an overlaid warning screen on top, regardless of who the publisher is. For content that has been rated Missing Context, meaning the content may mislead without additional context, we're focusing on surfacing more information from our fact-checking partners, and we have introduced a lighter-weight warning label to precisely reflect fact-checkers' assessments.

**14.     What procedures does Facebook have in place to ensure content moderation is done in an objective manner?**

When we identify or learn of content that violates our policies, we remove that content regardless of who posted it. The political affiliation of the user generating the content has no bearing on that content assessment. Rather, decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. We seek to

write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the review process for reviewers as objective as possible.

Every week, we audit a sample of reviewer decisions for accuracy and consistency. We also audit our auditors. When a reviewer makes mistakes or misapplies our policies, we follow up with appropriate training and review the mistakes with our Community Operations team to prevent similar mistakes in the future.

We also generally provide our users with the option to disagree with our decision when we have removed their content for violating our policies or when they have reported content and we have decided it does not violate our policies. In some cases, we then re-review our decisions on those individual pieces of content.

**15.    Does Facebook have a tool to track all content moderation tags and decisions?**

- **If not, how do you ensure consistency and evaluate appeals?**

- **If so, what is the name of this tool?**

- **What information does it track?**

- **Who has access to this tool?**

- **Does it track who makes a content moderation decision?**

- **Do you collect metadata on this platform? Are you willing to share trends based on this metadata with Congress?**

- **Are Republicans subject to content moderation more than Democrats based on the information you have from this platform?**

We track decisions for the purpose of the quality of those decisions and for statistically significant sampling for reporting in our Community Standards Enforcement Report. Our Community Standards Enforcement Report can be found at https://transparency.facebook.com/community-standards-enforcement.

**Questions from Senator Hirono**

1.     **During the hearing, you defended Facebook's decision not to suspend the account of former White House Advisor Steve Bannon despite Mr. Bannon's suggestion in a video posted to Facebook that FBI Director Christopher Wray and Director of the National Institute of Allergy and Infectious Diseases Anthony Fauci be beheaded. You testified that while Mr. Bannon's post violated Facebook's policy against violence and incitement, he had not amassed sufficient strikes to warrant suspension of his account.**

    a.     **How many strikes must an account accrue before it is suspended?**

    b.     **How many strikes has Mr. Bannon's Facebook account accrued?**

    c.     **How many strikes have been removed from Mr. Bannon's account? Provide an explanation for the removal of each strike.**

    d.     **Is the decision to suspend an account based solely on the number strikes an account receives or are the type and severity of violations also factors? In particular, what impact, if any, does the egregiousness of a violation (e.g., calling for the beheading of two government officials) have on the decision to suspend an account?**

Violence and hate have no place on our platform. With regard to the video posted by Mr. Bannon, the video did violate our policies, and we took it down. But having a content violation does not automatically mean that a user's account gets taken down. We work to enforce our policies against those who violate them, and we remove content calling for or advocating violence.

We don't want people to game the system, so we do not share the specific number of violations that leads to a temporary block or permanent suspension. Our Community Standards are a guide for what is and isn't allowed on Facebook. The consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform. For instance, we may warn someone for a first violation, but if they continue to violate our policies, we may restrict their ability to post on Facebook or disable their profile. We also may notify law enforcement when we believe there is a genuine risk of physical harm or a direct threat to public safety.

2.     *Buzzfeed* **recently reported that Facebook tracks an internal metric on "violence and incitement trends" driven by its platform.**

    a.     **What does Facebook's "violence and incitement trends" metric capture?**

    b.     **How is the "violence and incitement trends" metric used on Facebook?**

    c.     **What level of "violence and incitement" is Facebook willing to tolerate on its platform?**

Our Violence and Incitement Policy seeks to prevent potential offline harm that may be related to content on Facebook. While we understand that people commonly express disdain or disagreement by threatening or calling for violence in non-serious ways, we remove language that incites or facilitates serious violence. We remove content, disable accounts, and work with law enforcement when we believe there is a genuine risk of physical harm or direct threat to public safety. We also try to consider the language and context in order to distinguish casual statements from content that constitutes a credible threat to public or personal safety. We do not currently track content removed under our Violence and Incitement Policy in our Community Standards Enforcement Report.

3.    **Facebook regularly touts its actions to address hate speech and violent groups on its platform. However, these efforts often come after the issues on the platform have resulted in real-world harms. For example, Facebook removed a network of accounts associated with the so-called "boogaloo" movement in late June. This came after Facebook faced public criticism—from me, among others—for failing to take action against the movement and weeks after two individuals associated with the boogaloo movement, who met on Facebook, murdered a federal security officer outside a courthouse in Oakland. Similarly, Facebook announced its "Militarized Social Movements" policy to combat QAnon-affiliated pages on August 19. This was well over a year after the FBI labeled QAnon a domestic terror threat after several real-world incidents.**

      **What resources—in terms of money and manpower—does Facebook invest to identify and stop potentially dangerous conspiracy theories and trends before they go viral and lead to real-world harm?**

We remove content calling for or advocating violence, and we ban organizations and individuals that proclaim a violent mission. We also remove content that expresses support or praise for groups, leaders, or individuals involved in these activities. In fact, our Dangerous Individuals and Organizations policy has long been the broadest and most aggressive in the industry.

One reason we designate groups internally is because of a lack of authoritative external lists designating terrorist groups—and government lists tend to be updated very slowly. For example, Facebook has designated more than 250 white supremacist groups under our Dangerous Organizations policy; the United States has only taken a formal designation action against one, the Russian Imperial Movement. The same pattern applies to many other groups, among them The Base, Azov Battalion, Blood and Honour, and Combat 18, all of which were designated by Facebook before designation by any Western government. Of course, governments do enforce general laws against violence against members of these groups without a designation—and the same principle applies on Facebook. Even before the standard for a designation is met, we always apply our other policies, including those prohibiting violence, incitement, and hate speech.

In fact, in the case of Boogaloo, before we applied our most restrictive policy on the movement—the Dangerous Individuals and Organizations policy—in June 2020, we had:

- Updated our Violence and Incitement policy (https://www.facebook.com/communitystandards/credible_violence) last spring to prohibit the use of "boogaloo" and related terms when accompanied by statements and images depicting armed violence. In total, we've listed over 50 different terms that we recognize as violating our policy in this context because they have the same meaning tied to this movement and are used in an effort to skirt our detection.

- Removed over 800 posts referencing these terms for violating our Violence and Incitement policy (https://www.facebook.com/communitystandards/credible_violence) within a two-month period.

- Limited the distribution of Pages and Groups referencing the Boogaloo movement by removing them from the recommendations we show people on Facebook.

- Designated and banned the perpetrators of specific attacks and attempts at mass violence including the attacks in Oakland, CA, Santa Cruz, CA, and Las Vegas, NV in May and June of this year. In response to each attack, we designated the violence or attempt at violence, as well as the perpetrators, resulting in us prohibiting these individuals from having a further presence on our platform and removing content that praises, supports, or represents these individuals and the events themselves.

We've also seen movements that, while not necessarily directly organizing violence, have celebrated violent acts, have shown that they have weapons and suggested they will use them, or have individual followers with patterns of violent behavior. To respond, we expanded our Dangerous Individuals and Organizations policy with two new definitions to address militia groups, as well as other organizations and movements that have demonstrated significant risks to public safety, including QAnon. Militia groups that meet our criteria to be banned from using Pages, Groups, and Instagram are defined as "militarized social movements." Separately, QAnon fits our criteria as a violence-inducing conspiracy network. Since that expansion, we've taken action against Facebook Pages, Groups, and Instagram accounts tied to offline anarchist groups that support violent acts amidst protests, US-based militia organizations, and QAnon.

Since we expanded our policy, we've identified over 600 militarized social movements, removing about 2,400 Pages, 14,200 Groups, and about 1,300 Instagram accounts they maintained. In addition, we've removed about 1,700 Pages, 5,600 Groups, and about 18,700 Instagram accounts representing QAnon. For more information, please visit https://about.fb.com/news/2020/08/addressing-movements-and-organizations-tied-to-violence/.

In terms of resources, we spent $3.7 billion in 2019 investing in safety and security—an amount greater than our revenue at the time of our IPO. We now have over 35,000 people working in this area, about 15,000 of whom review content.

4. **In your opening statement, you made reference to a partnership Facebook formed with a group of academics to "better understand whether social media makes us**

more polarized as a society." According to a May 2020 article in *The Wall Street Journal*, an internal Facebook team already studied Facebook's role in driving divisiveness and reported to company management that "[o]ur algorithms exploit the human brain's attraction to divisiveness. . . . If left unchecked, [the platform would provide users] more and more divisive content in an effort to gain user attention & increase time on the platform." The article reports that you and other senior executives "largely shelved the basic research . . . and weakened or blocked efforts to apply its conclusions to Facebook products."

    **a.**    **Please provide a copy of the research referenced in *The Wall Street Journal* article.**

    **b.**    **Please list the recommendations made by Facebook's internal team along with the actions ultimately taken by Facebook to address the polarization problem.**

The *Wall Street Journal* story your question references used a couple of isolated initiatives we decided against to argue that we don't care about the underlying issues—and it ignored the significant efforts we did make. The piece disregarded how our research, and the research we continue to commission, informed dozens of other changes and new products. It also ignored other measures we've taken to fight polarization. As a result, readers were left with the impression we are ignoring an issue that in fact we have invested heavily in.

Facebook is a platform that reflects the conversations already taking place in society. We are keenly aware of the concern that our platform is contributing to polarization, and we have been working to understand the role that we play in discourse and information diversity.

For example, in 2018 and 2019, we conducted a multi-method research study to help us understand polarization and identify potential steps to help address it. In particular, we sought to understand better why people are polarized and how Facebook may play a role in that polarization. As part of the study, we interviewed experts, observed trainings for people who want to moderate conversations in their communities, participated in expert workshops, and analyzed platform usage. We also partnered with organizations to facilitate such events and trainings in the US. We found that, while polarization is in no way a new aspect of society, social media may exacerbate the human tendency to polarize by increasing the speed at which people can share information, incubating filter bubbles and echo chambers, and allowing people to engage with divisive content.

This study was just one part of our larger efforts on depolarization. We engage external partners in our efforts to understand and address polarization and the implications, benefits, and pitfalls of our products. In 2018, for example, we worked with more than 50 partners in various capacities, including academics, activists, former extremists, peace-builders, community leaders, journalists, and organizations. Facebook's engagements have included one-on-one research interviews, group workshops, field visits, internships, and trips to Facebook. We've incorporated our learnings into product feedback and new product ideas.

In 2018, we made a fundamental change to the way content is surfaced in people's News Feeds to prioritize posts from friends and family over news and other public content. We've worked to reduce clickbait headlines and links to misleading and spammy posts. We've also consulted 50 leading experts specializing in recommender systems, expression, safety, and digital rights to develop Recommendation Guidelines, which we use to determine what content is eligible to appear as recommended content. These guidelines make clear that we work to prevent the recommendation of certain types of problematic content, such as false or misleading content or content associated with real-world organizations that are tied to violence.

This year, we also requested proposals for research regarding misinformation and polarization. We will award $2 million in unrestricted gifts to support independent social science research on misinformation and polarization related to social communication technologies. We aim to support both foundational and applied research that will enrich the scientific community's understanding of challenges related to misinformation, polarization, information quality, and conflict on social media and social technology platforms. A few areas of interest include health, politics, digital literacy, and news. Ultimately, our goal is to support the growth of the scientific community in these spaces and to contribute to a shared understanding across the broader industry on how social technology companies can address content governance challenges on their platforms. We believe that investing in research to understand the spectrum of human perspective is critical if we're going to reach Facebook's mission and build tools that combat polarization, build empathy, and bring the world closer together.

5.    **In his opening statement, Mr. Dorsey testified that "companies like Twitter should publish their moderation process."**

   a.    **Do you agree with Mr. Dorsey's statement?**

   b.    **Does Facebook commit to publishing its content moderation process?  If so, when?  If not, why not?**

We agree that transparency is important. To demonstrate our continued commitment to making Facebook transparent, we publish in full our policies, our Community Standards, so that people can read and understand our rules for what is and isn't allowed on Facebook. We also release our Community Standards Enforcement Report (available at https://transparency.facebook.com/community-standards-enforcement) on a quarterly basis to report on our progress and demonstrate our continued commitment to making Facebook safe and inclusive. This report shares metrics on how Facebook is performing in preventing and removing content that violates our Community Standards. We also share data in this report on our process for appealing and restoring content to correct mistakes in our enforcement decisions.

6.    **In his opening statement, Mr. Dorsey expressed his belief that "people should have choices about the key algorithms that affect their experience online," including the ability to use algorithms created by third parties to rank and filter the content they see.**

   a.    **Do you agree that "people should have choices about the key algorithms that affect their experience online?"**

      **b.**      **Do you commit to allowing people to choose the algorithm that ranks and filters the content they see on Facebook, including a choice of algorithms developed by third parties?**

An algorithm is a formula or set of steps for solving a particular problem. At Facebook, we use algorithms to offer customized user experiences and to help us achieve our mission of building a global and informed community. For example, we use algorithms to help generate and display search results (see https://about.fb.com/news/2018/11/inside-feed-how-search-works/), to determine the order of posts that are displayed in each person's personalized News Feed (see https://about.fb.com/news/2018/05/inside-feed-news-feed-ranking/), and to serve ads that may be relevant to them.

On Facebook, people see posts from their friends, Pages they've chosen to follow, and Groups they've joined, among others, in their News Feed. On a given day, the number of eligible posts in a user's Feed inventory can number in the thousands, so we use an algorithm to personalize how this content is organized. The goal of the News Feed algorithm is to predict what pieces of content are most relevant to the individual user, and rank (i.e., order) those pieces of content accordingly every time a user opens Facebook, to try and bring those posts that are the most relevant to a person closer to the top of their News Feed. This ranking process has four main elements: the available inventory (all of the available content from the people, Pages, and Groups a person has chosen to connect with); the signals, or data points, that can inform ranking decisions (e.g., who posted a particular piece of content); the predictions we make, including how likely we think a person is to comment on a story, share with a friend, etc.; and a relevancy score for each story, which informs its position in News Feed. For more information, see a descriptive video posted at https://about.fb.com/news/2018/05/inside-feed-news-feed-ranking/.

We frequently make changes to the algorithms that drive News Feed ranking in an effort to improve people's experience on Facebook. For example, in 2018, we responded to feedback from our community that public content—posts from businesses, brands, and media—was crowding out the personal moments that lead us to connect more with each other. As a result, we moved from focusing only on helping users find relevant content to helping them have more meaningful social interactions. This meant that users began seeing more content from their friends, family, and Groups. We also reduce the distribution of some problematic types of content, including content that users may find spammy or low-quality, such as clickbait headlines, misinformation as confirmed by third-party fact-checkers, and links to low-quality webpages like ad farms.

People choose who to friend, which Pages to follow, and which Groups to join on Facebook, and those choices are the fundamental drivers of their experiences on Facebook. In addition, through their News Feed Preferences, users can choose to see posts from certain friends and Pages higher up in their News Feed. Controls also include Snooze, which keeps the content from a selected person, Page, or Group out of a user's News Feed for a limited time. If those controls still don't deliver the experience a person wants, and they'd prefer to see their News Feed ordered chronologically, they can change to the "Most Recent" Feed view (see https://www.facebook.com/help/218728138156311).

To help people on Facebook better understand what they see from friends, Pages, and Groups in News Feed, including how and why that content is ranked in particular ways, we publish a series of blog posts that highlight major updates to News Feed and explain the thinking behind them. Also, in 2019, we launched a feature called "Why am I seeing this post?" (see https://about.fb.com/news/2019/03/why-am-i-seeing-this/). This feature directly responded to user feedback asking for more transparency around why certain content appears in News Feed and easier access to News Feed controls. Additionally, we promoted a series of educational initiatives and campaigns to help people learn about the technology that underlies our various products and features, which includes AI and machine learning, through our series called "Inside Feed" (see https://about.fb.com/news/category/inside-feed/).

**7.     Facebook's independent Oversight Board recently began accepting cases. However, its jurisdiction is currently limited to cases involving content that was taken down by Facebook as violative of its Community Standards.**

    **a.     Do you commit to expanding the Oversight Board's jurisdiction to include cases involving content that Facebook left up despite a claim that it violated one of Facebook's Community Standards? If so, when will the Oversight Board be given this authority? If not, why not?**

    **b.     Do you commit to expanding the Oversight Board's jurisdiction to include reviews of Facebook's algorithm for ranking and filtering content? If so, when will the Oversight Board be given this authority? If not, why not?**

Our goal is to bring all types of content outlined in the bylaws for the Oversight Board, including content left up, into scope as quickly as possible, and we have made that commitment to the board members. Content that is still live on the site is challenging, since it can continually be changed. We are building a system to freeze that content when appealed.

Another complication of enabling all users to have the ability to appeal all content left up by Facebook is that if all users had the ability to appeal all content left up, the number of pieces of content that could be appealed to the board would be in the millions every day. We are working now to create a manageable system for users to appeal content left up, while not overwhelming the board with user appeals, and while trying to ensure a high percentage of significant and difficult cases reach the board. One of the board's main goals is to protect users' freedom of expression and to ensure that Facebook isn't using its role to remove people's speech unfairly. Because of this, we prioritized reinstating users' content that was removed. In the meantime, Facebook will also be able to refer content that has been left up for the board to review.

Ultimately, the goal is for the Oversight Board to play an important role in Facebook's overall governance, and the board's charter is set up for the scope of the board to grow and evolve over time. Currently, when it comes to algorithmic design and data practices, we have additional partnerships and tools in place to provide audits and checks on these aspects of our technology.

8.      **Section 230(c)(1) of the Communications Decency Act currently grants platforms like yours broad immunity for content posted by third parties, even if platforms have knowledge of the content, promote the content, or profit off the content. This immunity applies regardless of platform's size, resources, or efforts to moderate content.**

      a.      **Do you believe that all internet platforms should receive the same degree of immunity under Section 230(c)(1) regardless of their size and resources?**

      b.      **Do you believe that all internet platforms should receive the same degree of immunity under Section 230(c)(1) regardless of whether, and to what extent, they moderate content?**

      c.      **Would you support legislation that required platforms to earn their immunity under Section 230(c)(1) by conditioning immunity on meeting a minimum standard of care?**

Section 230 made it possible for every major internet service to be built and ensured important values like free expression and openness were part of how platforms operate. Changing it is a significant decision. However, we believe Congress should update the law to make sure it's working as intended, for example, by separating good actors from bad by making sure that companies can't hide behind Section 230 to avoid responsibility for intentionally facilitating illegal activity on their platforms. People want to know that companies are taking responsibility for combating harmful content—especially illegal activity—on their platforms. They want to know that when platforms remove content, they are doing so fairly and transparently. And they want to make sure that platforms are held accountable.

More broadly, we support the ideas around transparency and industry collaboration that are being discussed in some of the current bipartisan proposals, and we agree that it is important to consider how changes to the law might impact smaller platforms or impede innovation. We look forward to a meaningful dialogue about how we might update the law to deal with the problems we face today.

9.      **Earlier this year, President of the Coalition for a Safer Web, Amb. Marc Ginsberg, wrote to Facebook COO Sheryl Sandberg informing her that a video of the on-air murder of former-WDBJ reporter Alison Parker was available on Facebook. Ms. Sandberg had the video removed and informed Amb. Ginsberg that the video would be saved "to prevent future uploads." However, additional videos of Ms. Parker's murder remain accessible on Facebook and Instagram to this day, despite a policy against "Violent and Graphic Content."**

      a.      **What specific steps has Facebook taken to ensure that videos of Ms. Parker's murder are either removed from Facebook and Instagram or not uploaded in the first place?**

      b.      **Please explain Facebook's process for proactively identifying content that may violate Facebook's Community Standards, including any automated**

processes employed by Facebook such as hashing or machine learning. To the extent Instagram's process differs from Facebook's, please describe those differences.

c.     Once content has been flagged as possibly violating Facebook's Community Standards—whether through Facebook's internal processes or through the efforts of users—please explain the process for determining whether the content should be removed or have other action taken.

d.     When Facebook becomes aware of Facebook or Instagram being used to spread violent and graphic footage of a particular event, does Facebook take additional steps beyond its normal content moderation practices to remove such footage? If so, please describe those steps in detail.

Our thoughts are with Ms. Parker's family and friends. It is reprehensible than anyone would share a video of her murder, and we have worked hard to keep that video, and others like it, off our platforms.

Through our Violent and Graphic Content policy, we aim to remove content that shows videos of people or dead bodies suffering violent acts,[18] as well as any content that glorifies violence or celebrates the suffering or humiliation of others. To enforce these policies, we have introduced tools that allow us to proactively detect and remove violating content using advances in technology including artificial intelligence, machine learning, and computer vision. We do this by analyzing specific examples of bad content that have been reported and removed to identify patterns of behavior. Those patterns can be used to teach our software to proactively identify similar content.

These advances in technology mean that we can now remove bad content faster, get to more content, and increase the capacity of our review team. To ensure the accuracy of these technologies, we are constantly testing them, and we use human review of new content that is flagged as well as AI and machine learning to assess accuracy. All content goes through some degree of automated review, and we use human reviewers to check some content that has been flagged by that automated review or reported by people that use Facebook.

10.     In response to the COVID-19 pandemic, Facebook in March placed thousands of content reviewers on paid leave and relied more heavily on artificial intelligence for review of sensitive content. Some of those content reviewers were recently brought back to work.

a.     How many content reviewers are currently operational?

---

[18] Our policy prohibits posting videos of people or dead bodies in non-medical settings if they depict dismemberment, visible internal organs, partially decomposed bodies, charred or burning people unless in the context of cremation or self-immolation when that action is a form of political speech or newsworthy, victims of cannibalism, throat-slitting, or live streams of capital punishment of a person. For more information, please see https://www.facebook.com/communitystandards/graphic_violence.

We have over 35,000 people working on safety and security, about 15,000 of whom review content. The majority of our content reviewers are people who work full-time for our partners and work at sites managed by these partners. We have a global network of partner companies so that we can quickly adjust the focus of our workforce as needed. This approach gives us the ability to, for example, make sure we have the right language or regional expertise. Our partners have a core competency in this type of work and are able to help us adjust as new needs arise or when a situation around the world warrants it.

In March, we sent our content reviewers home for their health and safety in response to the COVID-19 pandemic. Since that time, we've slowly and responsibly enabled the overwhelming majority to resume their work. The majority of our content reviewers have been enabled to work from home, while some reviewers dealing with certain workstreams containing our most sensitive content have resumed in-office work with strict health and safety protocols in place.

**b.    What was the impact of shifting more of the content review burden to artificial intelligence?**

To enforce our Community Standards, we have introduced tools that allow us to proactively detect and remove certain violating content using advances in technology including artificial intelligence, machine learning, and computer vision. We do this by analyzing specific examples of bad content that have been reported and removed to identify patterns of behavior. Those patterns can be used to teach our software to proactively identify similar content.

These advances in technology mean that we can now remove bad content more quickly, identify and review more potentially harmful content, and increase the capacity of our review team. To ensure the accuracy of these technologies, we constantly test and analyze our systems, technology, and AI to ensure accuracy. All content goes through some degree of automated review, and we use human reviewers to check some content that has been flagged by that automated review or reported by people that use Facebook. We also use human reviewers to perform reviews of content that was not flagged or reported by people, to check the accuracy and efficiency of our automated review systems. The percentage of content that is reviewed by a human varies widely depending on the type and context of the content, and we don't target a specific percentage across all content on Facebook. Our work in this area is an ongoing balance between the people who participate in our content moderation process and advancements in technology.

**Questions from Senator Booker**

*Please note: Although we addressed some of these issues at the hearing, given the significant time constraints of live questioning I would like to give you the opportunity to respond fully in writing.*

1.    **Social media platforms, including Facebook, have a responsibility to stem the flow of election misinformation on their platforms. I believe it is possible for platforms like Facebook to ensure Americans' freedom to speak out while protecting the legitimacy of our democratic process and the public's safety.**

    a.    **Has Facebook considered implementing viral circuit breakers as proposed by Professor Ellen Goodman and the Center for American Progress,[19] where social media platforms would design a pause in the algorithmic amplification of fast-growing content about the election until content moderators can conduct an effective review for accuracy? Do you think this would be an effective tool in combatting the flow of misinformation on social media?**

    b.    **Has Facebook considered instituting a short delay on content from specific high-reach accounts to allow for human review, just as live network TV institutes a short delay to prevent unacceptable content from airing?  Do you think this would be an effective tool in combatting the flow of misinformation on social media?**

    c.    **Will Facebook commit to hiding false and misleading content that baselessly delegitimizes our democratic process—content designed to sow doubt and division— behind a click-through warning label? Will Facebook commit to ensuring that its algorithm does not amplify such content?**

    People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is deemed by a fact-checker to be False, Altered, or Partly False, according to our public definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

    We also work to take fast action to prevent misinformation from going viral, especially given that quality reporting and fact-checking takes time. In 2019, we announced that if we

---

[19] Adam Conner & Erin Simpson, *Results Not Found: Addressing Social Media's Threat to Democratic Legitimacy and Public Safety After Election Day*, CTR. FOR AM. PROGRESS (Oct. 23, 2020), https://www.americanprogress.org/issues/technology-policy/reports/2020/10/23/492232/results-not-found-addressing-social-medias-threat-democratic- legitimacy-public-safety-election-day.

identify signals that a piece of content is likely false, we temporarily reduce its distribution in order to allow sufficient time for our independent, third-party fact-checkers to review and determine whether to apply a rating. Quick action is critical in keeping a false claim from going viral, and so we take this step to provide an extra level of protection against potential misinformation. These temporary demotions expire after seven days if the content has not been rated by an independent fact-checker.

We've also been building a parallel viral content review system to flag posts that may be going viral—no matter what type of content it is—as an additional safety net. This helps us catch content that our traditional systems may not pick up. We used this tool throughout the 2020 election, and in countries around the world, to detect and review Facebook and Instagram posts that were likely to go viral and take action if that content violated our policies.

In addition, our teams are using other targeted tools to further pinpoint potentially abusive content and address emerging issues on our platform, including our Crisis Assessment Dashboard (CAD). CAD can, for example, allow us to correlate spikes in hate speech or voter interference content happening in Pages or Groups in near real-time across all 50 states. We have alerts for these spikes in signals, which route to operational teams who review the content for risk trends or potential violations and remove it if we determine it violates our rules.

2.      **Do you agree that social media platforms like yours have a responsibility to continue enforcing their enhanced election-related rules for user-generated content during the period between Election Day and the presidential inauguration on January 20?**

Facebook worked hard to do our part in protecting the integrity of the 2020 election, taking a variety of actions to connect people with reliable information and decrease the risks of confusion and abuse of our systems. We are in the process of evaluating all of our election-related measures to learn what we can from this experience, and to determine whether any of those measures should remain in place going forward.

On December 15, we announced that we are maintaining for now our temporary pause for ads about social issues, elections, or politics in the US. However, on December 16, we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

We're also helping people register and vote in Georgia by putting reliable information at the top of Facebook and Instagram. This included information about how and when to register ahead of Georgia's deadline, and how to request a mail ballot. We're also showing people how to find polling place times and locations for early voting, followed by how to return their mail ballots, then how to vote on Election Day.

Additionally, we will label content that tries to delegitimize voting in these elections. This includes content with claims like "vote-by-mail leads to fraud." When we become aware of content like this, we will add a label to it from the Bipartisan Policy Center with accurate information that addresses the underlying claim. And if someone goes to share the content we have labeled, they will first see a message directing them to our Voting Information Center,

which provides reliable election information.

Finally, we are deploying the teams and technology we used in the general election to fight voter suppression, misinformation, and interference in the Georgia elections. This includes:

- Running our Elections Operations Center for the Georgia runoffs, to monitor and respond to threats in real time.

- Stopping influence operations by taking down coordinated networks of inauthentic accounts, Pages, and Groups that seek to manipulate the public debate.

- Working with state election authorities to identify and stop potential instances of voter suppression.

- Providing our Voting Alerts tool to state and local election officials in Georgia to send notifications about the election to people on Facebook in their jurisdiction.

- Enforcing our voter interference policies through a combination of AI and human review to find and remove content that breaks our rules.

- Applying warning labels in both Spanish and English to content that our fact-checking partners rate as false or partially false.

- Protecting the accounts of election officials from harassment and other threats, in addition to our Facebook Protect program, which offers security tools and additional protection to safeguard the Facebook and Instagram accounts of campaigns, elected officials, federal and state political party committees, and staff.

**3.    What steps have you taken to modify Facebook's algorithms to ensure that blatantly false election disinformation posted by election officials that receives high levels of interaction isn't amplified?**

We do not think it is best for a private company to censor politicians in a democracy. Seeing speech from politicians is in the public interest, and in the same way that news outlets will report what a politician says, we think people should generally be able to see it for themselves on our platforms. We don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. Accordingly, direct speech from politicians is generally not eligible for our third-party fact-checking program. A handful of times a year, we leave up content that would otherwise violate our policies if the public interest value outweighs the risk of harm. But there is no newsworthiness exemption to content that incites violence or suppresses voting. Even if a politician or government official says it, if we determine that content may lead to violence or deprive people of their right to vote, we will take that content

down.

In an effort to help connect people with reliable information, we placed a link to the Voting Information Center on posts about voting and the election, both before and after Election Day. We also ran notifications at the top of Facebook and Instagram to help people find information about results as they came in. And we attached an informational label to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods, for example, by claiming that lawful methods of voting will lead to fraud. This label provided basic reliable information about the integrity of the election and voting methods.

For content that does not stem from a political candidate, we work with independent, third-party fact-checkers to help reduce the spread of false news and other types of viral misinformation. If content is deemed by a fact-checker to be False, Altered, or Partly False, its distribution will be reduced, and it will appear lower in News Feed. It will be accompanied by Related Articles from fact-checkers, and people trying to share the content will be notified of the additional reporting. They will also be notified if content they have shared in the past has since been rated false by a fact-checker. We also implement an overlaid warning screen on top of photos and videos marked as false. Additionally, we take action against Pages and domains that repeatedly share or publish content which is rated False or Altered. Such Pages and domains will see their distribution reduced as the number of offenses increases. Finally, Pages and domains that repeatedly publish or share this content will lose their ability to register as a News Page on Facebook and could lose their ability to advertise or monetize. If a registered News Page repeatedly shares this content, its News Page registration will be revoked.

**4.      If an elected official repeatedly and flagrantly violates Facebook's policies, at what point would Facebook impose a more severe enforcement penalty beyond labeling or hiding individual posts?**

Please see the response to your previous question. With respect to Facebook's policies more broadly, our Community Standards apply to all content, and we assess everyone under those Standards, including politicians. The consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform.

**5.      What is the most significant enforcement action Facebook has taken against an American elected official's account for violating your policies?**

We do not typically comment on specific cases of content removal for privacy reasons. When we identify or learn of content that violates our policies, we remove that content regardless of who posted it. Decisions about whether to remove content are based on our publicly available Community Standards.

**6.      What is the most significant enforcement action Facebook has taken against a foreign leader's account for violating your policies?**

We strive to enforce our policies consistently, without regard to political

affiliation or the country from which a user hails. Our Community Standards apply to all content, and we assess everyone under those Standards. When we identify or learn of content that violates our policies, we remove that content regardless of who posted it.

7.   **Has Facebook undertaken any studies about how hiding a post behind a warning label—as opposed to just adding a label beneath a post—limits the spread of disinformation? Has Facebook studied what content fills the void when these steps are taken? And if so, what has Facebook found? If not, do you plan to initiate such studies, or will you make a commitment to do so?**

As discussed in further detail in the response to your Question 8, Facebook works with third-party fact-checkers to review and rate the accuracy of content. Content across Facebook and Instagram that has been rated false or altered is prominently labeled so people can better decide for themselves what to read, trust, and share. These labels are shown on top of false and altered photos and videos, including on top of Stories content on Instagram and link out to the assessment from the fact-checker.

We have studied the impact of our fact-checking labels in some cases. During the month of April 2020, we displayed warnings on about 50 million posts related to COVID-19 on Facebook, based on around 7,500 articles by our independent fact-checking partners. When people saw those warning labels, 95% of the time they did not go on to view the original content.

8.   **President Trump is spreading dangerous misinformation about our electoral process on your platforms right now. What specific lessons have you learned since Election Day? And what concrete steps has Facebook taken to enhance its enforcement policies regarding election disinformation since Election Day?**

Facebook worked hard to do our part in protecting the integrity of the 2020 election, and we're proud of the work we've done to support our democracy. For example, we ran the largest voting information campaign in American history. Based on conversion rates we calculated from a few states we partnered with, we estimate that we helped 4.5 million people register to vote across Facebook, Instagram, and Messenger—and helped about 100,000 people sign up to be poll workers. We launched a Voting Information Center to connect people with reliable information on deadlines for registering and voting and details about how to vote by mail or vote early in person, and we displayed links to the Voting Information Center when people posted about voting on Facebook. More than 140 million people have visited the Voting Information Center on Facebook and Instagram since it launched. We are encouraged that more Americans voted in 2020 than ever before, and that our platform helped people take part in the democratic process.

We also worked to tackle misinformation and voter suppression. We displayed warnings on more than 180 million pieces of content that our third-party fact-checkers debunked. We partnered with election officials to remove false claims about polling conditions, and we put in place strong voter suppression policies that prohibit explicit or implicit misrepresentations about how or when to vote, as well as attempts to use threats

related to COVID-19 to scare people into not voting. We removed calls for people to engage in voter intimidation that used militarized language or suggested that the goal was to intimidate, exert control, or display power over election officials or voters. In addition, we blocked new political and issue ads during the final week of the campaign, as well as all political and issue ads after the polls closed on election night.

With respect to the Georgia US Senate runoff elections, on December 15, we announced that we are maintaining for now our temporary pause for ads about social issues, elections, or politics in the US. However, on December 16, we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

We're also helping people register and vote in Georgia by putting reliable information at the top of Facebook and Instagram. This included information about how and when to register ahead of Georgia's deadline, and how to request a mail ballot. We're also showing people how to find polling place times and locations for early voting, followed by how to return their mail ballots, then how to vote on Election Day.

Additionally, we will label content that tries to delegitimize voting in these elections. This includes content with claims like "vote-by-mail leads to fraud." When we become aware of content like this, we will add a label to it from the Bipartisan Policy Center with accurate information that addresses the underlying claim. And if someone goes to share the content we have labeled, they will first see a message directing them to our Voting Information Center, which provides reliable election information.

Finally, we are deploying the teams and technology we used in the general election to fight voter suppression, misinformation, and interference in the Georgia elections. This includes:

- Running our Elections Operations Center for the Georgia runoffs, to monitor and respond to threats in real time.

- Stopping influence operations by taking down coordinated networks of inauthentic accounts, Pages, and Groups that seek to manipulate the public debate.

- Working with state election authorities to identify and stop potential instances of voter suppression.

- Providing our Voting Alerts tool to state and local election officials in Georgia to send notifications about the election to people on Facebook in their jurisdiction.

- Enforcing our voter interference policies through a combination of AI and human review to find and remove content that breaks our rules.

- Applying warning labels in both Spanish and English to content that our fact-

checking partners rate as false or partially false.

- Protecting the accounts of election officials from harassment and other threats, in addition to our Facebook Protect program, which offers security tools and additional protection to safeguard the Facebook and Instagram accounts of campaigns, elected officials, federal and state political party committees, and staff.

9.      **At noon on January 20, Donald Trump will no longer be President of the United States. If he continues to spread election misinformation in the future, will Facebook treat Donald Trump's posts differently—as an ex-President—from how the platform does now?**

As discussed in the responses to your Questions 3 and 4, we do not think it is right for a private company to censor politicians in a democracy; accordingly, direct speech from politicians is generally not eligible for our third-party fact-checking program. However, we take a variety of steps to connect people with reliable information about elections and voting, including placing informational labels on politicians' posts. And our Community Standards apply to all content, and we assess everyone under those Standards, including politicians.

Persons who are neither candidates nor officials continue to be covered by our third-party fact-checking program.

10.      **The day after Election Day, a group was formed on Facebook called "Stop the Steal." It gained more than 350,000 members. The group was filled with disinformation posts seeking to delegitimize the election—as well as explicit calls to violence. It took nearly a full day before this group was shut down by Facebook. And even then, dozens of smaller groups of this kind sprung up in its place.[20]**

a.      **Outside groups such as the Center for Countering Digital Hate flagged the group's posts containing calls to violence—hours before Facebook shut it down. Especially in this moment of heightened concern, why did it take so long for this large and fast- growing group to be shut down by Facebook?**

When it came to the "Stop the Steal" Group, we took down the Group within about 24 hours. We removed the Group because it was organized around the delegitimization of the election process, and we saw worrying calls for violence from some members of the Group, in violation of our policies.

b.      **How does Facebook factor in speed when trying to combat surges of disinformation and calls to violence like what we saw with the "Stop the**

---

[20] *E.g.*, Sheera Frenkel, *The Rise and Fall of the 'Stop the Steal' Facebook Group*, N.Y. TIMES (Nov. 5, 2020), https://www.nytimes.com/2020/11/05/technology/stop-the-steal-facebook-group.html; Shirin Ghaffary, *Facebook Took Down a Massive "Stop the Steal" Group After Its Members Called for Violence*, VOX: RECODE (Nov. 5, 2020), https://www.vox.com/recode/2020/11/5/21551437/stop-the-steal-facebook-group-takedown-members-violence-election-fraud-trump.

Steal" group?

Since 2016, we've built an advanced system combining people and technology to review the billions of pieces of content that are posted to our platform every day. State-of-the-art AI systems flag content that may violate our policies, users report content to us they believe is questionable, and our own teams review content.

We've been building a parallel viral content review system to flag posts that may be going viral—no matter what type of content it is—as an additional safety net. This helps us catch content that our traditional systems may not pick up. We used this tool throughout the 2020 election, and in countries around the world, to detect and review Facebook and Instagram posts that were likely to go viral and take action if that content violated our policies.

In addition, our teams are using other targeted tools to further pinpoint potentially abusive content and address emerging issues on our platform, including our Crisis Assessment Dashboard (CAD). CAD can, for example, allow us to correlate spikes in hate speech or voter interference content happening in Pages or Groups in near real-time across all 50 states. We have alerts for these spikes in signals, which route to operational teams who review the content for risk trends or potential violations and remove it if we determine it violates our rules.

When it comes to misinformation, in 2019, we announced that if we identify signals that a piece of content is false, we temporarily reduce its distribution in order to allow sufficient time for our independent, third-party fact-checkers to review and determine whether to apply a rating. Quick action is critical in keeping a false claim from going viral, and so we take this step to provide an extra level of protection against potential misinformation. These temporary demotions expire after seven days if the content has not been rated by an independent fact-checker.

11. **In a video that was posted on Facebook, Twitter, and YouTube a couple days after the election, Steve Bannon—a former top advisor to President Trump—made horrendous statements about acts of violence against Dr. Anthony Fauci and FBI Director Christopher Wray. In response, Twitter permanently suspended Mr. Bannon's Twitter account. It also suspended his show's Twitter account. By contrast, Facebook left the video up on Mr. Bannon's page for about 10 hours, where it was viewed about 200,000 times before Facebook removed it.[21]**

    a.    **Why hasn't Steve Bannon been banned or suspended from Facebook's**

---

[21] *E.g.*, Curt Devine, Donie O'Sullivan & Kara Scannell, *Twitter Permanently Suspends Steve Bannon Account After Talk of Beheading*, CNN BUS. (Nov. 6, 2020), https://www.cnn.com/2020/11/05/tech/steve-bannon-twitter-permanent-suspension/index.html; Jaclyn Diaz, *Twitter Permanently Suspends Steve Bannon Account After Beheading Comments*, NPR (Nov. 6, 2020), https://www.npr.org/2020/11/06/932052602/twitter-permanently-suspends-steve-bannon-account-after-beheading-comments.

platform for inciting violence against senior government officials?

b.    **If this content doesn't merit a suspension from Facebook, can you describe what kinds of content would?**

Violence and hate have no place on our platform. With regard to the video posted by Mr. Bannon, the video did violate our policies, and we took it down. But having a content violation does not automatically mean that a user's account gets taken down. We work to enforce our policies against those who violate them, and we remove content calling for or advocating violence.

We don't want people to game the system, so we do not share the specific number of violations that leads to a temporary block or permanent suspension. Our Community Standards are a guide for what is and isn't allowed on Facebook. The consequences for violating our Community Standards vary depending on the severity of the violation and the person's history on the platform. For instance, we may warn someone for a first violation, but if they continue to violate our policies, we may restrict their ability to post on Facebook or disable their profile. We also may notify law enforcement when we believe there is a genuine risk of physical harm or a direct threat to public safety.

**Questions from Senator Blackburn**

1.      **There are only two conservative members out of a total of twenty members currently serving on Facebook's Oversight Board. Will Facebook commit to appointing more conservative members on the Facebook Oversight Board, in order to ensure a diversity of perspectives on the Board?**

The goal of the Oversight Board is to make sure people using our platforms around the world can express themselves, while also holding Facebook accountable for the content decisions that we make. The members of the Oversight Board reflect a diverse range of views and experiences. This first group of twenty members, many of whom have been critical of Facebook in the past, will grow to 40 over time, and will bring diverse perspectives and experiences to these decisions. It's worth recognizing that a full 25% of the initial members, and 50% of the co-chairs, are from the US—more than any other country.

When we work with the board to appoint the remaining twenty members, we will continue to aim to bring members with a diverse range of views to the board.

2.      **Will Facebook remain open to appointing members on the Facebook Oversight Board who may have served as political appointees in President Donald J. Trump's administration, in order to ensure a diversity of perspectives on the Board?**

While we cannot commit to specific appointments, we can commit to appointing members that have varying social and political viewpoints from across the globe, which we believe is critical if we're to have a group of members deciding content cases on behalf of our nearly three billion diverse users. A key qualification of all board members is their value of free expression, including speech they might disagree with.

3.      **Does Facebook still use technology acquired from Israeli data surveillance app Onavo for any purpose?**

Facebook discontinued Onavo's non-VPN products in October 2017. We removed Onavo Protect, a VPN product, from the Apple App Store in August 2018 and from the Google Play Store in February 2019. In May 2019, we discontinued Onavo Protect entirely.

4.      **Did Facebook ever collect user data on WhatsApp users through the Israeli data surveillance app Onavo before acquiring WhatsApp in 2014?**

Facebook acquired Onavo in 2013. Onavo offered several apps, including Onavo Protect. Onavo Protect provided a VPN to protect users' personal information on their phones. VPNs establish a secure connection between the consumer and VPN service provider. Standard VPN functionality requires consumer app and web traffic to be routed through central servers. This means that the VPN provider receives information from people about their activity on the device.

In other words, Onavo only collected app usage data from people using Onavo who made the choice to share data about their usage of their own devices with Onavo. For example, when people downloaded the Onavo Protect VPN app to help secure their connection, they were informed about the information that would be collected and how it would be used.

5.    **Did Facebook ever collect user data on Houseparty users through the Israeli data surveillance app Onavo?**

Please see the response to your previous question.

6.    **Did Facebook ever collect user data on Snapchat users through the Israeli data surveillance app Onavo?**

Please see the response to your Question 4.

7.    **Did Facebook ever rely on the Israeli surveillance app Onavo to track the number of messages Snapchat users sent through Snapchat?**

Please see the response to your Question 4.

8.    **Did Facebook ever discouraged influencers from referencing Snapchat on their accounts on Instagram—which Facebook owns?**

Freedom of expression is one of our core values, and we believe that the Facebook community is richer and stronger when a broad range of viewpoints is represented. We are committed to encouraging dialogue and the free flow of ideas by designing our products to give people a voice. We do not create or edit the content that people post on our platform.

9.    **Did Mark Zuckerberg or another Facebook executive ever make an offer to acquire Snap? If so, please provide details of such an exchange.**

We typically do not discuss details regarding our acquisition strategy, but as a general matter, Facebook's goal when it comes to acquisitions is to combine the strengths of the acquired company with Facebook to make better products for users, businesses, and developers.

10.    **Did Mark Zuckerberg or another Facebook executive ever threaten to copy Snapchat's features and then implemented copycat stories, filters and stickers on Facebook's services as part of Facebook's efforts to acquire Snapchat?**

From time to time, we've responded to competitive pressures and consumer demand by launching features inspired by other apps. This is common—and evidence of a highly competitive market. For instance, Facebook launched News Feed first, but now many apps and platforms have feeds, like Twitter and LinkedIn. Kakao was the first company to launch an ephemeral stories feature, which Snapchat, YouTube, and Instagram have iterated and improved upon.

11.    **In reference to TikTok, Facebook's COO Sheryl Sandberg said, "It's a Chinese company, if people are concerned about the data, I think there is cause for concern." What concerns does have Facebook have about TikTok's data harvesting and surveillance of American users?**

We know that the Chinese government doesn't share our values around expression and human rights, so it's reasonable for people to be concerned about the potential for government access to data and censorship implications when Chinese-owned tech companies serve large numbers of people all around the world. While these are important issues for policymakers to consider, we also encourage caution before considering the idea of banning apps. Such an action could set a precedent for other countries and could have long-term consequences for US leadership and our vision of an open internet.

12.    **When TikTok users link their Instagram account to their TikTok profiles, what Instagram user data is made available to TikTok?**

When TikTok users link their Instagram account to their TikTok profiles, they are presented with a permissions screen through which they can choose to explicitly share some of their Instagram account information with TikTok. If users choose to link their Instagram account to their profile, they can choose to share content to Instagram from TikTok.

13.    **When Instagram users directly upload a TikTok video from TikTok to their Instagram Feed or Stories, does TikTok need permission to access the user's Instagram account, and if so, what data is provided to TikTok from the user's Instagram account?**

Please see the response to your previous question.

14.    **Has Instagram implemented any new features or adjustments to be compatible with TikTok?**

TikTok has become a Facebook ad success story. They continue to use our ad platform to grow, becoming the successful platform they are today, including competing with Facebook's services. Like all companies in the technology sector and beyond, we closely follow commercial developments in the industry. We are constantly striving to improve consumers' experience, and an important part of that is responding to new features people demand.

15.    **Has Facebook discouraged users, influencers, or any other people who use Facebook to reach an audience, from promoting or referencing Facebook's competitors?**

Please see the response to your Question 8.

16.    **Does Facebook collect data from users outside of interactions with the Facebook website and apps?**

Yes, like many Internet services, we do sometimes receive information in these circumstances, including from third parties that send us information through Facebook Business Tools they use, like our social plug-ins (such as the Like button), Facebook Login, our APIs and SDKs, or the Facebook pixel. We provide more information about the data we receive about users in our Data Policy, which can be found at https://www.facebook.com/policy.php.

**17.   Does Facebook monitor internet traffic on devices used to access Facebook or any of Facebook's apps?**

Please see the response to your previous question.

**18.   Please provide an overview of how Facebook treats political advertising.**

All election-related and issue ads on Facebook and Instagram in the US must be clearly labeled, including a "Paid for by" disclosure from the advertiser at the top of the ad. This helps ensure that people can see who is paying for the ad, which is especially important when the Page name doesn't match the name of the entity or person funding the ad. When people click on the label, they'll be taken to the Ad Library, where they can see more information—for example, the campaign budget associated with an individual ad and how many people saw it, including their age, location, and gender. People on Facebook visiting the Ad Library can see and search ads with political or issue content an advertiser has run in the US for up to seven years. Advertisers wanting to run ads with political content in the US will also need to verify their identity and location.

**19.   Please provide an overview of Facebook's prohibition on political advertising in the lead-up to the November 3, 2020 Elections.**

We decided to block new political and issue ads during the final week of the campaign. We recognize that it's important that campaigns can run get-out-the-vote campaigns, and we generally believe that the best antidote to bad speech is more speech. But we also recognized that in the final days of certain elections, there may not be enough time to contest new claims. Advertisers were able to continue running ads they started running before the final week and to adjust the targeting for those ads, but those ads were already published transparently in our Ad Library so that anyone, including fact-checkers and journalists, could scrutinize them.

In addition, while we know that ads are an important way to express voice, we decided to temporarily stop running all social issue, electoral, or political ads in the US after the polls closed on November 3, to reduce opportunities for confusion or abuse. However, on December 16, we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

**20.   Will Facebook's prohibition on political advertising extend to the lead-up to the January 5, 2021 Georgia Senate run-offs?**

On December 15, we announced that we are maintaining for now our temporary pause for ads about social issues, elections, or politics in the US. However, on December 16, we began enabling advertisers who are authorized to run ads about social issues, elections, or politics to run ads specifically in Georgia about Georgia's runoff elections.

**21.** **Does Facebook treat advertising from certain political campaigns, parties, or organizations differently from others?**

All advertisers are subject to our Advertising Policies, including campaigns and politicians. Those policies, including what content is prohibited or restricted, can be found at https://www.facebook.com/policies/ads/overview.

**22.** **Does Facebook prioritize or suppress certain political advertisements to be displayed based on data collected from the user?**

In general, advertisers can reach people on Facebook based on information about users' interests, actions, and connections. Facebook users can review and change the interests that advertisers can use to reach them with ads in their Ad Preferences. Users can also select to see fewer political ads and are able to stop seeing ads based on a particular advertiser's Custom Audience list. And users can choose "Why am I seeing this ad?" to get more context on why they might be seeing it.

For more information, see https://www.facebook.com/policy.php.

**23.** **How does Facebook moderate or determine which political advertisements to display on its website and apps?**

Ads on Facebook or Instagram are subject to our Advertising Policies, which are the rules regarding what types of ad content are allowed. When advertisers place an order, ads are reviewed against these policies using a combination of automated and manual processes. Most ads are reviewed within 24 hours, although in some cases it may take longer. During the ad review process, we'll check the ad's images, text, targeting, and positioning, in addition to the content on the ad's landing page. For more information on our Advertising Policies, please see https://www.facebook.com/policies/ads/.

In addition, all users must abide by our Community Standards, which apply to ads and include policies that, for example, ban hate speech, harmful content, and content designed to intimidate voters or stop them from exercising their right to vote. We regularly disallow ads from politicians that break our rules.

**24.** **Does Facebook make determinations on which advertisements to accept or reject based on public or popular sentiment, even when these advertisements or the entities buying them do not violate Facebook's policies?**

No. Please see the response to your previous question.

25.    **Would it be against Facebook's business policy to discriminate against political affiliation in its advertising business?**

Facebook is a platform for ideas across the political spectrum. Suppressing content on the basis of political viewpoint or preventing people from seeing what matters most to them is directly contrary to Facebook's mission and our business objectives.

26.    **How does Facebook prevent content moderators from engaging in political discrimination in their determination of which advertisements to accept on the platform?**

Ads on Facebook and Instagram are subject to our Advertising Policies and our Community Standards. We release these standards publicly so everyone can understand what the rules are, and we have a comprehensive program of training and oversight to promote consistency in our enforcement decisions.

27.    **How does Facebook determine when a group created by users, that is primarily political in nature, violates Facebook's guidelines and user agreement?**

All groups are subject to our Community Standards. Our proactive detection tools work across all Groups to determine if a Group is in violation of our standards. That means even if someone doesn't report an issue to us, our AI can detect potentially violating content, and we can remove it. We also remove Groups whose members share content in the Group that discusses potential violence, even if they use veiled language and symbols. We also combat misinformation within Groups by:

- Removing Groups that share content that violates our Community Standards. If admins or moderators repeatedly post or approve content that breaks our rules, we take down the whole Group.

- Reducing the distribution of Groups that repeatedly share misinformation. Groups that repeatedly share content rated false by fact-checkers won't be recommended to other people on Facebook. We rank all content from these Groups lower in News Feed and limit notifications so fewer members see their posts.

- Informing people when they encounter misinformation. We apply a label to content that's been reviewed by fact-checkers, so people can see additional context. We also notify people before they try to share this content, and we let people know if something they shared is later rated false. Group admins are also notified each time a piece of content rated false by fact-checkers is posted in their Group, and they can see an overview of this in the Group Quality tool.

These policies apply across the board to all Groups, regardless of their subject matter.

28.   **How does Facebook determine when an event created by users to organize a political rally or meeting violates Facebook's guidelines and user agreement?**

Our Community Standards outline what is and is not allowed on Facebook. We remove Events when they violate our Community Standards. For example, our Dangerous Individuals and Organizations policy bans any non-state organization or individual that proclaims a violent mission or has engaged in acts of violence. We recently expanded the policy to address organizations and movements that have demonstrated significant risks to public safety but do not meet the rigorous criteria to be designated as a dangerous organization and banned from having any presence on our platform. This includes militarized social movements and violence-inducing conspiracy networks, such as QAnon.

29.   **Does Facebook ever hinder the activity and display of speech of certain groups without explicitly banning the group?**

As a general matter, when we identify or learn of content that violates our policies, we remove that content regardless of who posted it. Decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions.

30.   **Does Facebook ever attempt to prevent the growth of certain groups or profiles without explicitly banning the group or profile?**

Please see the response to your previous question.

31.   **Does Instagram engage in "shadow banning" any users or groups?**

No.

32.   **How does Facebook determine when political speech posted on its platform deserves a warning label?**

Freedom of expression is a founding principle for Facebook. Giving people a voice to express themselves has been at the heart of everything we do. We think people should be able to see for themselves what politicians are saying, and we don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. That's why direct speech from politicians is generally not eligible for our third-party fact-checking program.

In June 2020, Facebook announced that it would be attaching a link to our Voting Information Center for all posts that discuss voting, including from politicians. As Mark Zuckerberg said at the time, the decision to label posts was not a judgment of whether the posts themselves are accurate. Rather, Facebook wanted people to have access to reliable information.

In September 2020, we announced additional steps we were taking to help secure the integrity of the US elections by encouraging voting, connecting people to authoritative

information, and reducing the risks of post-election confusion. For example, we attached an informational label to content that seeks to delegitimize the outcome of the election or discuss the legitimacy of voting methods, for example, by claiming that lawful methods of voting led to fraud. And, when a candidate or campaign tried to declare victory before the final results were in, we added a label to their posts directing people to the official results from Reuters and the National Election Pool. We did not change our policy that direct speech from politicians is generally not eligible for our third-party fact-checking program as part of that announcement. For more information, please visit https://about.fb.com/news/2020/09/additional-steps-to-protect-the-us-elections/.

**33.    How does Facebook determine when posts, photographs, or videos on its platform deserves an "Elections" flag?**

Please see the response to your previous question.

**34.    How does Instagram determine when posts, photographs, or videos on its platform deserves an "Elections" flag?**

Please see the response to your Question 32.

**35.    How does Facebook determine what events, issues, and topics warrant warning labels and further scrutiny by Facebook's content moderation?**

People often tell us they don't want to see misinformation. People also tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is debunked by a fact-checker, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

When it comes to content moderation, we remove content when we determine it violates our policies, regardless of who posted it. Decisions about whether to remove content are based on our Community Standards, which guide all reviewers when making decisions. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the decision-making process for reviewers as objective as possible. We have made our detailed reviewer guidelines public to help people understand how and why we make decisions about the content that is and is not allowed on Facebook.

For more information regarding Facebook's efforts to label content related to the election, please see the response to your Question 32.

**36.    Will Facebook's ability to assist law enforcement investigations diminish from the implementation of end-to-end encryption across all of its platforms?**

Implementation of encryption does not undercut our commitment to work with law enforcement, and we deeply respect and support the work law enforcement agencies do to keep us safe. We have invested immense resources in safety, developing skills and expertise in building and protecting public digital spaces. And we have a dedicated Law Enforcement Response Team with dozens of full-time employees to manage law enforcement data requests, including those that involve emergencies and threats to life. These are resources Facebook will deploy to ensure we can provide private, secure communications while keeping people safe. The same world-class engineers and operational teams who built the tools, AI, and systems that have made us industry-leading on safety to date are turning their attention to this effort.

Law enforcement will still receive valuable information in response to lawful requests. For example, even within an encrypted system, we will still be able to respond to lawful requests for metadata, including potentially critical location or account information. Nor will Facebook's end-to-end encryption interfere with law enforcement's ability to retrieve messages stored on a device. People will also still be able to report concerning content to us, and we will be able to provide that content to law enforcement when appropriate.

We already have an encrypted messaging service, WhatsApp, that—in contrast to some other encrypted services—provides a simple way for people to report abuse or safety concerns. WhatsApp also relies on available unencrypted information, including profile photos and group information, to prevent and detect abuse on the app proactively. As we move to end-to-end encryption across our messaging platforms, these capabilities will only get stronger with our ability to obtain additional signals from the public portions of our platform. We will also continue to provide unencrypted content from the public spaces of Instagram and Facebook, which we do not plan to encrypt—in response to lawful requests.

Ensuring that encryption is implemented across our messaging services in an effective and responsible manner requires continued dialogue and collaboration with industry, policymakers, and others. As we work through these efforts to develop new and innovative products and technologies with the goal of enhancing privacy and security, we appreciate that this will be an ongoing process involving other technology companies, law enforcement agencies, legislators, and non-profit organizations working on these issues. We have been consulting regularly with these experts over the past many months and will continue to do so.

**37.    How will Facebook continue to provide the same level of assistance to law enforcement if end-to-end encryption is implemented across all of its platforms?**

Please see the response to your previous question.

**38.    Does Facebook specifically monitor certain users' speech and activity based on political affiliation or membership in political groups on Facebook's platform?**

No.

39.  **Does Facebook maintain any informal or formal lists of U.S. public officials who are specifically targeted for monitoring over their Facebook posts?**

We strive to enforce our policies consistently, without regard to political affiliation. Our Community Standards apply to all content, and we assess everyone under those Standards.

40.  **Does Facebook maintain a list of users that have a history of posting "misleading" or "false" speech as determined by Facebook's criteria?**

As discussed in the response to your Question 35, for content that does not stem from a political candidate, we work with independent, third-party fact-checkers to help reduce the spread of false news and other types of viral misinformation. If content is debunked by a fact-checker, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of content marked as false. People who try to share the content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

We take action against Pages and domains that repeatedly share or publish content that is rated False or Altered. Such Pages and domains will see their distribution reduced as the number of offenses increases, including their eligibility for recommendations and ability to advertise and monetize. Finally, Pages and domains that repeatedly publish or share false news will also lose their ability to register as a News Page on Facebook, and if a registered News Page repeatedly shares false news, its News Page registration will be revoked.

When it comes to content moderation, we remove content when we determine it violates our policies, regardless of who posted it. Decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. We don't want people to game the system, so we do not share the specific number of violations that leads to a temporary block or permanent suspension. When we remove content for violating our policies, we notify the person who posted it to explain why, with some narrow exceptions to account for things like child exploitation imagery.

If someone violates our policies multiple times, their account will be temporarily blocked; a Page that does so will be unpublished. When a person is in a temporary block, they can read things on Facebook, but they can't like, comment, or post. If that person is also the admin of a Facebook Page, the block prevents them from posting to the Page. Pages that repeatedly violate our policies may also lose the ability to advertise on Facebook.

41.  **Does Facebook more closely moderate the activity or speech of users that have a history of posting "misleading" or "false" speech as determined by Facebook's criteria?**

Please see the response to your previous question.

**42.    Does Facebook more closely moderate or monitor the activity or speech of users who interact with posts that have deserved Facebook's warning labels?**

Please see the response to your Question 40. Decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. When we identify or learn of content that violates our policies, we remove that content regardless of who posted it.

**43.    Does Facebook more closely moderate or monitor the activity or speech of users who follow profiles that often make posts deserving of Facebook's warning labels?**

Please see the response to your Question 40. Decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. When we identify or learn of content that violates our policies, we remove that content, regardless of who posted it.

**44.    Does Facebook more closely moderate or monitor the activity or speech of users based on their friends list?**

Please see the response to your Question 40. Decisions about whether to remove content are based on our Community Standards, which direct all reviewers when making decisions. When we identify or learn of content that violates our policies, we remove that content, regardless of who posted it.

**45.    Does Facebook more closely moderate or monitor the activity or speech of users who make offensive and objectionable, but not unlawful, speech?**

Decisions about whether to remove content are based on whether the content violates our Community Standards. Discussing controversial topics or espousing a debated point of view is not at odds with our Community Standards. We believe that such discussion is important in helping bridge division and promote greater understanding.

**46.    How does Facebook limit the spread of "false" or "misleading" speech or prevent them from being displayed to other users?**

Please see the responses to your Questions 35 and 40, which describe Facebook's efforts to reduce the spread of misinformation.

**47.    How does Facebook determine whether or not speech is "false" or "misleading?"**

Please see the responses to your Questions 35 and 40. We work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news.

48. **Please list the news or information sources, if any, that Facebook uses to determine whether or not speech on its platform deserves warning labels or moderation.**

As discussed in the responses to your Questions 35, 40, and 47, we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news.

Fact-checkers review and rate the accuracy of stories through original reporting, including interviewing primary sources, consulting public data, and conducting analyses of media, including photos and video.

49. **Does Facebook determine which news or information sources to consult based on the sources' political leaning or affiliation? If so, how many of these sources would be considered "liberal" and how many "conservative?"**

Please see the response to your previous question.

50. **Does Facebook promote certain news stories and sources in users' news feed based on the user's preference or political leaning that Facebook has determined?**

On a given day, the number of eligible posts in a Facebook user's News Feed inventory can number in the thousands, so we use an algorithm to personalize how this content is organized. The goal of the News Feed algorithm is to predict what pieces of content are most relevant to the individual user, and rank (i.e., order) those pieces of content accordingly every time a user opens Facebook, to try and bring those posts that are the most relevant to a person closer to the top of their News Feed. This ranking process has four main elements: the available inventory (all of the available content from the people, Pages, and Groups a person has chosen to connect with); the signals, or data points, that can inform ranking decisions (e.g., who posted a particular piece of content); the predictions we make, including how likely we think a person is to comment on a story, share with a friend, etc.; and a relevancy score for each story, which informs its position in News Feed.

We frequently make changes to the algorithms that drive News Feed ranking in an effort to improve people's experience on Facebook. For example, in 2018, we responded to feedback from our community that public content—posts from businesses, brands, and media—was crowding out the personal moments that lead us to connect more with each other. As a result, we moved from focusing only on helping users find relevant content to helping them have more meaningful social interactions. This meant that users began seeing more content from their friends, family, and Groups. We also reduce the distribution of some problematic types of content, including content that users may find spammy or low-quality, such as clickbait headlines, misinformation as confirmed by third-party fact-checkers, and links to low-quality webpages like ad farms.

To help people on Facebook better understand what they see from friends, Pages, and Groups in News Feed, including how and why that content is ranked in particular ways, we

publish a series of blog posts that highlight major updates to News Feed and explain the thinking behind them. Also, in 2019, we launched a feature called "Why am I seeing this post?" (see https://about.fb.com/news/2019/03/why-am-i-seeing-this/). This feature directly responded to user feedback asking for more transparency around why certain content appears in News Feed and easier access to News Feed controls. Through their News Feed Preferences, users can choose to see posts from certain friends and Pages higher up in their News Feed. Controls also include Snooze, which keeps the content from a selected person, Page, or Group out of a user's News Feed for a limited time.

Users who do not wish to consume ranked News Feed also have access to a control to view content purely chronologically from those they follow in the "Most Recent" Feed view (see https://www.facebook.com/help/218728138156311).

**51.    Does Facebook promote certain news sources (such as CNN, MSNBC or Washington Post) over other sources to all users?**

We want Facebook to be a place where people can discover more news, information, and a variety of perspectives, and we are working to build products that help do that.

All users on Facebook have a personalized experience—including with regard to news content—but we work to ensure that people see reliable and informative news on Facebook, especially during major news cycles and around important topics like COVID-19. We also work hard to reduce the distribution of clickbait, sensationalism, and misinformation. It's important to note that news stories make up a small portion of what people see on Facebook, and political news makes up a smaller fraction of that news content.

We're always improving our news-related products, partnerships, and processes to better serve people who use Facebook. Notably:

- In January 2019, Facebook announced a $300 million investment in news programs, partnerships, and content, focused on supporting local news outlets and philanthropic efforts.
- In October 2019, we announced "Facebook News," a dedicated place for news on Facebook. Facebook News gives people more control over the stories they see, and the ability to explore a wider range of their news interests, directly within the Facebook app. It also highlights the most relevant national stories of the day.
- In June 2020, we announced updates to the way news stories are ranked in News Feed to prioritize original reporting and stories with transparent authorship. These signals are based on user research and were built with feedback from news publishers and academic experts.

To learn more about news on Facebook, please see: https://www.facebook.com/journalismproject/facebook-news-feed-for-news-publishers.

52. **Does Facebook suppress, hide, or moderate certain news sources over other sources to all users?**

Please see the response to your Question 50.

53. **Has Facebook ever censored, suppressed, or limited any articles or videos from the following publications?**

   a.   **CNN**

   b.   **MSNBC**

   c.   **Washington Post**

   d.   **The New York Times**

   e.   **The Los Angeles Times**

   f.   **Fox News**

   g.   **The Wall Street Journal**

   h.   **New York Post**

   i.   **Breitbart**

   j.   **Newsmax**

   k.   **One American News**

   l.   **National Review**

   m.   **The Federalist**

   n.   **The Washington Times**

   o.   **Free Beacon**

When we identify or learn of content that violates our policies, we remove that content, regardless of who posted it. We seek to write actionable policies that clearly distinguish between violating and non-violating content, and we seek to make the decision-making process for reviewers as objective as possible.

We also work to reduce the spread of viral misinformation on our platform. Our users tell us that they don't want Facebook to be the arbiter of truth or falsity. That's why we work with over 80 independent, third-party fact-checkers who are certified through the non-partisan International Fact-Checking Network (IFCN) to help identify and review false news. If content is

deemed by a fact-checker to be False, Altered, or Partly False, according to our publicly available definitions, its distribution will be reduced, and it will appear lower in News Feed. We also implement an overlaid warning screen on top of fact-checked content. People who try to share that content will be notified of the fact-checker's reporting and rating, and they will also be notified if content they have shared in the past has since been rated false by a fact-checker.

**54.    Does Facebook favor news sources of a certain size or reputation over other smaller sources?**

Please see the responses to your Questions 50 and 51.

**55.    Does Facebook ever favor news sources that are generally perceived as more "conservative" or "liberal?"**

Please see the response to your Question 50.

**56.    Does Facebook have any business relationship with any newspapers, news television channels, or news networks to promote their stories and articles to Facebook's users?**

In January 2019, we announced a $300 million investment in news programs, partnerships, and content. In so doing, we have established a multi-year commitment that should give publishers the confidence to plan ahead.

People want to see high-quality news on Facebook, and we are proud to partner with many leading media outlets to bring them that content through Facebook News, the tab we launched on Facebook in 2019 dedicated entirely to news content. We are constantly evaluating the product to ensure it meets our users' needs, and we will consider doing paid deals with additional publishers as the product evolves.

We negotiate directly and bilaterally with publishers on compensation terms for inclusion in Facebook News. We identify these publishers by considering many factors, including the content they produce across four categories (general, topical, local, and diverse), and we aim to ensure that we have the volume and type of content we need in order to create a compelling user experience within the Facebook News product. We worked closely with publishers as we built the Facebook News product, and we strive to maintain an open dialogue with each of our publisher partners about all aspects of our relationship, including, as appropriate, issues related to licensing fees.

For more information about Facebook News, please visit https://www.facebook.com/news/howitworks. For more information about our News Page Index, please see https://www.facebook.com/help/publisher/377680816096171.

**57.    Please explain the difference, if any, between "curating" by Facebook's team of news curators and "editorializing" by newspaper journalists.**

Facebook is, first and foremost, a technology company. We do not create or edit the content that our users publish on our platform. We seek to be a platform for ideas across the political spectrum and moderate content according to our published Community Standards in order to keep users on the platform safe, reduce objectionable content, and ensure users participate on the platform responsibly.

**58.    Does Facebook endorse the views and positions featured in articles chosen by Facebook's news curators?**

To help give people a better sense of what's happening in the news, in some places, Facebook News features content selected by an independent, diverse team of journalists with experience in a range of newsrooms. Their job is to give users an overview of news published by informative and reliable news sources and publishers across a variety of subject areas—from politics and world affairs to entertainment and science.

To do this, the team is transparent about the guidelines they use and make curatorial choices independently, not at the direction of Facebook, publishers, or advertisers. They apply the same guidelines and criteria to coverage about Facebook as they would to any other company or industry. When this team picks stories to appear in Facebook News, they start by looking at specific criteria for both the topic and individual articles. The guidelines used by the team are publicly available at facebook.com/news. Facebook does not endorse the content included in articles selected by the curation team.

**59.    Does Facebook intentionally select members of its news curation team based on political leaning or affiliation?**

No.

**60.    Is Facebook expressing its own speech through its content moderation policies and enforcement?**

Facebook engages in protected activity under the First Amendment when it moderates content according to its published Community Standards.

**61.    Does Facebook combine and share user data collected across Facebook's multiple services: Facebook, Messenger, Instagram, and WhatsApp?**

Facebook, Instagram, Messenger, and WhatsApp share infrastructure, systems, and technology with one another to provide an innovative, relevant, consistent, and safe experience for users across the Facebook Company Products. We also process information about users across the Facebook Companies for the purposes described in the Facebook Data Policy, as permitted by applicable law and in accordance with their terms and policies. For example, we process information from WhatsApp about accounts sending spam on its service so we can take appropriate action against those accounts on Facebook, Instagram, or Messenger. We also work to understand how people use and interact with Facebook Company Products, such as

understanding the number of unique users on different Facebook Company Products. For more information, please see the Facebook, Messenger, and Instagram Data Policy at https://www.facebook.com/policy.php and the WhatsApp privacy policy at https://www.whatsapp.com/legal/privacy-policy.

**62.    Does Facebook collect data from users' conversations contained within Messenger direct messages between users?**

We must collect data from conversations to provide the messaging service. We don't use the content of users' messages with other people for ad targeting, which means advertisers can't target users based on what they say in messages. As described in the Facebook Data Policy (which applies to Instagram, Facebook, and Messenger), we use all of the data we collect to:

- Provide, personalize, and improve our products;

- Provide measurement, analytics, and other business services;

- Promote safety, integrity, and security;

- Communicate with users; and

- Research and innovate for social good.

**63.    Does Facebook use data collected from Messenger conversations to make determinations for the user's experience on Facebook's platform and on which advertisements and posts the user sees?**

Please see the response to your previous question.

**64.    Does Instagram use human employees or algorithms to monitor any conversations contained within direct messages between Instagram users?**

Please see the response to your Question 62.

**65.    Is data collected from Facebook or Messenger users ever shared with advertisers on Instagram so that advertisers can target ads to those same users on Instagram?**

We provide advertisers—including those who advertise across different Facebook services—with reports about the kinds of people seeing their ads and how their ads are performing, but we don't share information that personally identifies people (information such as name or that by itself can be used to contact or identify a person) unless we have permission from people. For example, we provide statistical demographic information to advertisers (e.g., that an ad was seen by 2,436 women between the ages of 25 and 34 in Maryland) to help them better understand their audience. We also confirm which Facebook ads led people to make purchases or take an action with an advertiser.

66. **Is data collected from Instagram users ever shared with advertisers on Facebook so that advertisers can target ads to those same users on Facebook?**

Please see the response to your previous question.

67. **What information from the content of Messenger conversations can be shared with advertisers, and do Messenger users have the ability to opt-out of this data sharing?**

We don't share the content of Messenger conversations with advertisers, unless, of course, the conversation is with an advertiser. For more details, please see the responses to your Questions 62 and 65.

68. **What information from the content of Instagram direct message conversations can be shared with advertisers, and do Instagram users have the ability to opt-out of this data sharing?**

We don't share the content of Instagram direct message conversations with advertisers, unless, of course, the conversation is with an advertiser. For more details, please see the responses to your Questions 62 and 65.

69. **Does Facebook make determinations on users' political leanings or affiliations based on data collected from direct messages?**

No.

70. **Does Facebook make determinations on users' political leanings or affiliations based on what posts and videos users view and their search history?**

Users can choose to add information about their political views to the "About" section of their Timeline. If someone adds this information to their profile, they can later choose to delete it. If they do so, we will remove it from our site and delete it in accordance with our Data Policy.

We enable ad targeting options—called "interests" and "behaviors" (sometimes called "categories")—that are based on people's activities on Facebook, and if enabled, information we receive from partners off Facebook. These may include options relating to political topics.

We give people information and control over ad targeting options through our Ad Preferences tool, where people can manage their ad experience, including their "interests," which are keywords associated with a person based on activities such as liking Pages and clicking ads, and additional "categories" about how, when, and where they connect to Facebook. People can also see and control the advertisers that are currently showing them ads based on the person's information or activity such as interactions with an advertiser's website, app, or store.

People also can choose whether we use information about their activities on websites and apps off of Facebook to show them ads through Facebook, and whether we can use their Facebook advertising interests to show them ads off of Facebook.

71. **When Facebook applied an Elections flag to Senator Blackburn's November 7, 2020 post regarding the "Trump Accountability project," was the action performed by Facebook's algorithm or a human censor?**

We placed a label with a link to the Voting Information Center on posts about voting and the election, both before and after Election Day. The labels did not contradict or question any content in the posts, but merely gave users the opportunity to access reliable information about the election if they wished.

72. **How do Facebook human content moderators review the actions performed by a censoring algorithm to place an Elections flag on a Facebook post?**

Please see the response to your previous question.

73. **Are there ways for ordinary Facebook or Instagram users who are not public officials to appeal a decision to apply a warning label or flag to their speech?**

Yes. Any publisher can appeal a rating by contacting a fact-checking partner directly. Publishers can either dispute a rating or make a correction. Fact-checking partners are ultimately responsible for deciding whether to update a rating, which will lift enforcement on the content, Page, or domain. For more information, please visit https://www.facebook.com/business/help/2593586717571940?id=673052479947730.

When it comes to content moderation, we provide our users with the option to request re-review of individual pieces of content that were removed for adult nudity or sexual activity, hate speech, or graphic violence. Re-review is also available for additional content areas, including dangerous organizations and individuals, bullying and harassment, and regulated goods. This option to request re-review is also available to individuals who have reported content that was not removed.

Transparency in our appeals process is important, so we now include in our Community Standards Enforcement Report how much content people appealed and how much content was restored upon appeal. Gathering and publishing those statistics keeps us accountable to the broader community and enables us to continue improving our content moderation. For more information, see https://transparency.facebook.com/community-standards-enforcement.

74. **Does Facebook's content moderation policies or algorithm treat public figures or elected officials any differently than ordinary users?**

Our policies and algorithms generally don't distinguish between public figures and our other users. On occasion, pursuant to our newsworthiness policy (which is detailed in our publicly available Community Standards), we allow content for public awareness which would

otherwise go against our Community Standards. This is the case only if the public interest value of the content outweighs the risk of harm. That said, our newsworthiness policy is rarely applied to politicians' speech.

To be clear, there are certain types of content that we don't allow by anyone—even if it's newsworthy—including content that might lead to voter suppression, or that involves incitement or encouragement to violence.

When it comes to speech from politicians more generally, we don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. Speech from candidates and elected officials is some of the most scrutinized speech in our society, and we believe people should decide what is credible, not tech companies. That's why direct speech from politicians is generally not eligible for our third-party fact-checking program. When it comes to ads, we require politicians to follow our Advertising Policies.

### 75. Does Instagram's content moderation policies or algorithm treat public figures or elected officials any differently than ordinary users?

Please see the answer to your previous question.

### 76. How many Republican elected officials have made Facebook posts that have been penalized with warning labels or flags during the 2020 elections?

We strive to enforce our policies consistently, without regard to political affiliation. Our Community Standards apply to all content, and we assess everyone under those Standards. When we identify or learn of content that violates our policies, we remove that content, regardless of who posted it. The political affiliation of the user generating the content has no bearing on that content assessment.

During the election, we added labels to posts about voting by candidates from both parties to direct people to reliable information. We also attached an informational label to content that sought to delegitimize the outcome of the election or discuss the legitimacy of voting methods. But when it comes to speech from politicians, we don't believe that it's an appropriate role for us to referee political debates and prevent a politician's speech from reaching its audience and being subject to public debate and scrutiny. Speech from candidates and elected officials is some of the most scrutinized speech in our society, and we believe people should decide what is credible, not tech companies. That's why direct speech from politicians is not eligible for our independent, third-party fact-checking program. We have had this policy on the books for more than two years now, posted publicly on our site under our fact-checking program policies. This means that organic content or ads from politicians aren't eligible to be reviewed by our third-party fact-checking partners. This policy applies equally to all candidates for public office, including presidential candidates.

Our policies don't mean that politicians can say whatever they want on Facebook. They can't spread misinformation about where, when, or how to vote, for example, or incite violence. And when a politician shares previously debunked content, including links, videos, and photos,

we demote that content, display related information from fact-checkers, and reject its inclusion in advertisements. When it comes to ads, while we won't remove politicians' ads based solely on the outcome of a fact check, we still require politicians to follow our Advertising Policies.

**77.    How many Republican candidates have made Facebook posts that have been penalized with warning labels or flags during the 2020 elections?**

Please see the response to your previous question.

**78.    How many Democratic elected officials have made Facebook posts that have been penalized with warning labels or flags during the 2020 elections?**

Please see the response to your Question 76.

**79.    How many Democratic candidates have made Facebook posts that have been penalized with warning labels or flags during the 2020 elections?**

Please see the response to your Question 76.

**80.    During the 2020 elections, what percentage of posts that have warning labels applied were made by users who associate with "conservative" or Republican political groups, profiles, and speech?**

Please see the response to your Question 76.

**81.    During the 2020 elections, what percentage of posts that have warning labels applied were made by users who associate with "liberal" or Democratic political groups, profiles, and speech?**

Please see the response to your Question 76.

**82.    Does Facebook associate devices used to access Facebook's services with certain users and track users' activity across these devices?**

Facebook's Data Policy explains that we associate information across different devices that people use to provide a consistent experience wherever they use Facebook.

Facebook's services inherently operate on a cross-device basis: understanding when people use our services across multiple devices helps us provide the same personalized experience wherever people use Facebook—for example, to ensure that people's News Feeds or profiles contain the same content whether they access our services on their mobile phone or in a desktop computer's web browser.

In support of those and other purposes, we collect information from and about the computers, phones, connected TVs, and other web-connected devices our users use that integrate with our Products, and we combine this information across a user's different devices. For example, we use information collected about a person's use of our Products on their phone to better personalize the content (including ads) or features they see when they use our Products on another device, such as their laptop or tablet, or to measure whether they took an action in response to an ad we showed them on their phone or on a different device.

83.    **Does Facebook track activity by competing apps on devices that have installed Facebook's apps and services?**

Like all companies in the technology sector and beyond, we closely follow commercial developments in the industry. We are constantly striving to improve the services we offer to our community, and an important part of that is responding to new features users demand. To analyze these trends, Facebook has relied on a variety of sources, including Comscore, App Annie, SimilarWeb, and others. Websites and apps have used market research services for years, including the same sources Facebook uses.

We use these insights to improve products like Facebook, Instagram, WhatsApp, Portal, and Oculus, and to benefit the broader community. This type of market research is common and central to improving our products and services.

Facebook also has a market research program called Viewpoints that offers numerous types of research programs in which Facebook users and non-users alike can choose to participate. One such program is an app called Study that collects and analyzes data regarding participants' app usage, including (i) apps installed on participants' phones, (ii) time spent using apps, (iii) country, device, and network type, and (iv) app activity names, which may show the names of app features a participant is using. It leverages a public API from Android, and thus collects data that any other developer could access by obtaining the appropriate permission(s) from the user. The Study program does not collect content information, such as emails, text messages, usernames, passwords, payment information, any field into which users write text, photos and videos on users' devices or that they upload or share with others, websites that users visit through a browser, or the contents of user purchases.

Facebook uses this data to learn which apps people value and how they're used, allowing Facebook to better understand its community to improve its products and services, including general improvement of ad targeting at an aggregated level. Facebook does not use this data to target ads to individual users.

All registered participants have agreed to share their app usage data with Facebook, and they are compensated for taking part in the program. More information about Study is available at https://about.fb.com/news/2019/06/study-from-facebook/; we also explain how to participate during registration, before participants accept the terms of Study from Facebook. Participants can leave the program at any time.

84.    **How does Facebook share user data with other companies through Facebook's advertising business?**

Please see the response to your Question 65.

85.    **How does Facebook share user data with other companies who link user accounts with Facebook?**

When using Facebook Login, developers' apps may ask for a user's permission to obtain an app user's email address without prior review by Facebook. Apps that undergo our app review process may be approved to request a user's permission to access one or more categories of more detailed information, such as a user's birthday, friends list, hometown, Groups, likes, photos, posts, videos, and similar information on Facebook, which would be shown as a part of the request for the user's permission.

Users can view and edit the categories of information that they have granted permission to apps to request through their App and Website Settings.

**86.    How does Facebook protect the privacy of its users from third-party developers and other companies who may partner with Facebook?**

Please see our Platform Terms for information about Facebook's work with third-party developers. The Platform Terms can be found at https://developers.facebook.com/terms/. Under our recent settlement with the Federal Trade Commission, we are required to monitor developers' compliance with these Terms.

**87.    How do Facebook's users limit the exposure of their data to third-party developers to who partner with Facebook or collect data on app users' friends?**

Please see the responses to your Questions 85 and 86.

**88.    What federal privacy laws or regulations does Facebook believe is necessary to adequately protect users' data?**

We have supported efforts to develop a comprehensive privacy law in the US because we believe that it would provide people with strong protections for their data and would provide clarity and consistency for companies that hold Americans' data.

New privacy regulation in the United States should protect people's right to choose how their information is used—while enabling companies to use information for safety purposes and to provide services. It should require companies to take steps to protect data, like building a privacy governance program and working to guard against data misuse. And it should establish a way to hold companies like Facebook accountable by empowering a single regulator to enforce the law and imposing sanctions for violations.

**89.    What changes in Section 230 of the Communications Decency Act does Facebook believe is necessary to combat abuse and misinformation on its platform?**

The debate about Section 230 shows that people of all political persuasions are unhappy with the status quo. People want to know that platforms are taking responsibility for combatting harmful content on the one hand and, on the other, that when they remove content, they are doing so fairly and transparently.

Section 230 made it possible for every major internet service to develop and ensured that important values like free expression and openness were part of how platforms operate. Changing it is a significant decision. However, we believe Congress should update the law to

make sure it's working as intended. We support the ideas around transparency and industry collaboration that are being discussed in some of the current bipartisan proposals, and we look forward to a meaningful dialogue about how we might update the law to deal with the problems we face today.

Facebook supported SESTA/FOSTA, and we were very pleased to be able to work successfully with a bipartisan group of Senators on a bill that protects women and children from the harms of sex trafficking. We would welcome the opportunity to work with the Committee on proposals to modify Section 230 in ways that focus on bad actors, while being mindful not to disincentivize platforms from identifying and removing illegal activity.

**90.    Has Facebook ever failed to accurately represent how it treats user data in its statements and terms of service?**

We work hard to provide clear information to people about how their information is used and how they can control it. We agree that companies should provide clear and plain information about their use of data, and we strive to do this in our Data Policy, in in-product notices and education, and throughout our products—and we continuously work on improving this.

**91.    Does Facebook ever comply with foreign authorities attempting to censor or ban certain political or religious speech or groups?**

A number of countries around the world have laws that limit content that might otherwise be allowed by our Community Standards or US law. In Germany, for example, laws forbid incitement to hatred. There are times when we may have to remove or restrict access to content because it violates a law in a particular country, even though it does not violate our Community Standards. Further, when governments believe that something on the internet violates their laws, they may contact companies like Facebook and ask us to restrict access to that content. When we receive such a request, it is scrutinized to determine if the request has come from the recognized authority in the country and if the specified content does indeed violate local laws. If we determine that it does, then we may make it unavailable in the relevant country or territory.

We report the number of pieces of content restricted in each country where our products are available. You may view information about how we restrict content based on local law here: https://transparency.facebook.com/content-restrictions.

**92.    Does Facebook monitor certain users at the request of foreign governments?**

We disclose account records in accordance with our terms of service and applicable law, including the federal Stored Communications Act (SCA), 18 U.S.C. §§ 2701-2712. A Mutual Legal Assistance Treaty request or letter rogatory may be required to compel the disclosure of the contents of an account in response to a request from a foreign government. If requests appear to be legally deficient, overly broad, or vague, our Law Enforcement Response Team will reject the requests outright or contact the law enforcement agency that issued the legal process for more information and to work to narrow the scope of the legal process so that it is limited to the users and data relevant to the investigation.

As part of our ongoing effort to share more information about the requests we receive from governments around the world, Facebook regularly produces a report on government requests for user data. For more information, please see https://transparency.facebook.com/government-data-requests.

**93.    Does Facebook manipulate users' news feeds, displayed advertising, and browsing activity based on requests or preferences from foreign governments?**

We do not block access to Facebook products and services in areas where they are otherwise generally available on the basis of specific government requests. We may independently limit access to certain functionality—such as peer-to-peer payments or facial recognition—in some jurisdictions based on legal and regulatory requirements.

In some instances, we may receive requests from governments or other parties to remove content that does not violate our Community Standards but is alleged to contravene local law. When we receive such requests, we conduct a careful review to confirm whether the report is legally valid and consistent with international norms, as well as assess the impact of our response on the availability of other speech. When we comply with a request, we restrict the content only within the relevant jurisdiction. We publish details of content restrictions made pursuant to local law, as well as details of our process for handling these requests, in our Transparency Report (https://transparency.facebook.com/content-restrictions).

**94.    Does Facebook use location data to comply with any requests from foreign governments to censor and suppress content uploaded from certain geographical areas?**

Please see the responses to your Questions 92 and 93.

**95.    Does Facebook use location data to track the location of individuals at the request of foreign governments?**

Please see the responses to your Questions 92 and 93.

**96.    Has Facebook ever changed its user agreement or community guidelines based on preferences and requests from foreign governments?**

The content policy team at Facebook is responsible for developing our Community Standards. We have people in eleven offices around the world, including subject matter experts on issues such as hate speech, child safety, and terrorism. Many of the people on the team have worked on the issues of expression and safety long before coming to Facebook. The core of our policy development process is a twice-monthly global meeting where we debate and discuss potential changes to the Community Standards. In preparation for these meetings, members of our content policy team reach out to internal and external experts, analyze data, conduct research, and study relevant scholarship to inform our policy proposals. We publish minutes of those meetings, which can be found at https://about.fb.com/news/2018/11/content-standards-forum-minutes/.

Based on these meetings, as well as changes in social norms and language, our standards evolve over time. What has not changed—and will not change—are the underlying principles of voice, safety, dignity, authenticity, and privacy on which these standards are based. To start conversations and make connections, people need to know they are safe. Facebook should also be a place where people can express their opinions freely, even if some people might find those opinions objectionable. This can be challenging given the global nature of our service, which is why equity is such an important principle: we aim to apply these standards consistently and fairly to all communities and cultures. We outline these principles explicitly in the preamble to the standards, and we bring them to life by sharing the rationale behind each individual policy.

97. **Has Facebook complied with requests from a foreign government to manipulate Facebook's operations in other countries?**

Please see the response to your Question 91.

98. **Does Facebook have any advertising business with state-run newspapers in the People's Republic of China?**

Out of an abundance of caution, we recently prohibited ads in the United States from state-controlled media entities, including Chinese state-media entities we have identified pursuant to our policies. For more information, see https://about.fb.com/news/2020/06/labeling-state-controlled-media/.

99. **Does Facebook deliver advertisements from foreign state-run newspapers or propaganda from China to U.S. users?**

This year, we announced that we are labelling media outlets that we believe are wholly or partially under the editorial control of their government. And to ensure we're equally transparent when it comes to paid content from these publishers, we will also label ads from state-controlled media outlets. While state-controlled media outlets rarely advertise in the US, we blocked ads from these outlets in the US out of an abundance of caution to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the November 2020 election in the US.

When it comes to political or issue ads, we do not permit advertisers to place ads about social issues, elections, or politics unless they confirm their ID as being in the country where they want to place such ads. We also require them to disclose who is behind the ad, which will appear on the ad itself. The ad and "Paid for by" disclaimer are placed in the Ad Library for seven years, along with more information such as range of spend and impressions, as well as demographics of who saw the ad.

100. **Does Facebook deliver advertisements from foreign state-run newspapers or propaganda to users outside of country where the advertising content originated?**

Please see the response to your previous question.

101. **Does Facebook attempt to limit, ban, or suppress foreign propaganda shared by users?**

We remove content linked to coordinated inauthentic behavior (CIB) campaigns, including those connected to foreign actors. When we take down these deceptive operations, we are taking action based on the behavior we see on our platform—not based on who the actors behind it are or what they say. Through our investigations, we know that most of the content shared by coordinated manipulation campaigns isn't provably false, and would in fact be acceptable political discourse if shared by authentic audiences. The real issue is that the actors behind these campaigns are using deceptive behaviors to conceal the identity of the organization behind a campaign, make the organization or its activity appear more popular or trustworthy than it is, or evade our enforcement efforts. That's why we know that content on its own isn't a strong signal for determining if a particular post in and of itself is part of foreign interference (which we define as coordinated inauthentic behavior on behalf of a foreign entity). For a comprehensive overview of how we respond to inauthentic behavior, see https://about.fb.com/news/2019/10/inauthentic-behavior-policy-update/. For our reporting on our findings about the coordinated inauthentic behavior we have detected and removed from our platform, see https://about.fb.com/news/tag/coordinated-inauthentic-behavior/.

In addition to enforcing against CIB, we also work to counter less sophisticated, at times higher volume, Inauthentic Behavior, including behavior coming from foreign spammers trying to trick people into amplifying their content for financial gain. For instance, we've seen malicious actors around the world use US political and social issues to drive people to off-platform domains filled with ads or selling merchandise. We've also seen spammers use similar tactics to leverage prominent topics in other regions around the world. At first glance, these can be mistaken for politically motivated influence operations, when in fact they come from malicious actors who simply use political themes as a form of spam or clickbait lures. Earlier this year, we launched our first Inauthentic Behavior report that shares examples of this behavior and how we handled them. For more on our work against these manipulation tactics, see https://about.fb.com/news/2020/10/inauthentic-behavior-report/.

Finally, to help people better understand who's behind the news they see on Facebook, we began to label media outlets that are wholly or partially under the editorial control of their government. We provide greater transparency into these publishers because they combine the influence of a media organization with the strategic backing of a state, and we believe people should know if the news they read is coming from a publication that may be under the influence of a government.

State-controlled media outlets rarely advertise in the US, but we blocked ads from these outlets in the US out of an abundance of caution to provide an extra layer of protection against various types of foreign influence in the public debate ahead of the recent election in the US.

**102.    How much did Facebook generate in 2019 ad revenue from Chinese businesses and government agencies?**

Please see the response to your Question 98.

**103.    Please describe how Facebook's plans for Libra fit into the company's larger agenda to become the "WeChat of the West."**

On December 1, 2020, Libra changed its name to Diem. The Diem project is governed by an independent member organization—the Diem Association—headquartered in Geneva, Switzerland. Diem is a new payment system and financial infrastructure built on blockchain technology. Facebook is one of the 27 organizations that have come together to form the Diem Association. Facebook will engage with the Diem Association and with the Diem payment system through Novi Financial, a regulated financial company.

Novi Financial was founded with the mission of making money work better for everyone. We believe that all people around the world should have equal access to financial services. The first product Novi Financial will introduce is the Novi digital wallet.

Facebook is about putting power in people's hands. Our services give people a voice to express what matters to them, and to build businesses that create opportunity. Giving people control of their money is important too. The idea behind Diem and Novi is that sending money should be as easy and secure as sending a message. Diem will be a global payments system, fully backed by a reserve of cash and other highly liquid assets. A simple, secure, and stable way to transfer money is empowering and could help people everywhere. That is why Facebook supports the efforts behind the Diem project.

It's also important to note that China is moving quickly to launch similar projects in the coming months. Diem and Novi will extend America's financial leadership, as well as our democratic values and oversight, around the world. That is important to Facebook, because if America doesn't innovate, our country's leadership is not guaranteed.

**104.  Has Facebook ended its user data sharing agreement with Huawei?**

In the early days of mobile, the demand for Facebook outpaced our ability to build versions of the product that worked on every phone or operating system. It's hard to remember now, but back then there were no app stores. So companies like Facebook, Google, Twitter, and YouTube had to work directly with operating system and device manufacturers to get their products into people's hands. This took a lot of time, and Facebook was not able to get to everyone.

To bridge this gap, we built a set of device-integrated APIs that allowed companies to recreate Facebook-like experiences for their individual devices or operating systems. Over the last decade, around 70 companies have used them—including many household names such as Amazon, Apple, Blackberry, HTC, Microsoft, and Samsung. All these partnerships were built on a common interest—the desire for people to be able to use Facebook or Facebook features, whatever their device or operating system.

Given that these APIs enabled other companies to recreate the Facebook experience, we controlled them tightly from the start. We are not aware of any abuse of user data by Huawei (or other device integration partners), and Huawei has publicly confirmed that it has never collected or stored any Facebook user data on its servers.

**105.  Can Facebook's algorithms detect when users are a potential suicide risk?**

When someone is expressing thoughts of suicide, it's important to get them help as quickly as possible. Because friends and family are connected through Facebook, we can help a person in distress get in touch with people who can support them. For years, people have had the ability to report Facebook posts that they feel indicate someone is thinking about suicide. This flags the posts for review by trained members of our Community Operations team, who can connect the poster with support resources if needed.

We also use artificial intelligence and machine learning to expand our ability to get timely help to people in need. These tools use signals such as phrases in posts and concerned comments from friends and family to identify posts from people who might be at risk. Day and time of the original posting are factors, as well, as experts say the early hours of the morning and Sundays, when the workweek looms, can be common times for contemplating suicide.

Even with the introduction of these AI-fueled detection efforts, people are still core to Facebook's success around suicide prevention. That's why anyone who flags a potential cry for help is shown support options, including resources for help and ways to connect with loved ones. And whether a post is reported by a concerned friend or family member or identified via technology, the next steps in the process remain the same. A trained member of Facebook's Community Operations team reviews it to determine if the person is at risk—and if so, the original poster is shown support options, such as prompts to reach out to a friend and helpline phone numbers. In serious cases, when it's determined that there may be imminent danger of self-harm, Facebook may contact local authorities.

For more information on our suicide prevention efforts, please see https://www.facebook.com/safety/wellbeing/suicideprevention.

**106. Please describe how Facebook's suicide algorithm scans users' posts and messages for potential risk of self-harm and how this information is shared with law enforcement officials.**

Please see the response to your Question 105.

**107. Does Facebook aggregate and analyze the information collected from its suicide detection algorithm to determine any large-scale trends of self-harm and depression among Facebook users?**

No, but last year, we began exploring ways to share public data from our platform on how people talk about suicide with academic researchers through the social media monitoring tool, CrowdTangle.

**108. Is Facebook able to determine whether increased use of its platform among teenage girls has any correlation with increased signs of depression within this demographic, through the information collected from its suicide detection algorithm or other technology?**

No.

109. **Is Facebook able to determine whether increased use of its platform among teenage girls has any correlation with increased signs of anxiety within this demographic, through the information collected from its suicide detection algorithm or other technology?**

No.

110. **Is Facebook able to determine whether increased use of its platform among teenage girls has any correlation with increased signs of self-harm within this demographic, through the information collected from its suicide detection algorithm or other technology?**

No.

111. **During the hearing, when asked by Chairman Graham, Mark Zuckerberg said he was familiar with the Social Dilemma, the Netflix documentary exposing the skyrocketing rise in child suicide rates coinciding with children's exposure to platforms such as Facebook. Facebook's seven-point memo responding to the Social Dilemma do not mention or dispute the documentary's claims about the link between social media use and child suicide. Does Facebook have any user data at its disposal to confirm or disprove claims that increased use of Facebook or Instagram can lead to greater rates of depression, anxiety, or self-harm among children?**

Mental health, suicide, and self-injury are serious issues with devastating consequences. We don't take them lightly, and our deepest sympathies are with anyone affected by them.

We strive to find the right balance between allowing people to share their experiences and get support from friends, family, and others in the community with protecting vulnerable and impressionable people from content that could put them at risk.

To help us do that, since 2006, we've worked with experts from around the world to inform our policies, practices, and products supporting those at risk of suicide or self-injury. This includes examining the latest research in this space and supporting industry research in this area. External experts including Dr. Andrew Przybylski, a psychologist at the Oxford Internet Institute and a leading expert in the impact of technology, have raised concerns with data sets and a lack of evidence showing a correlation between technology use and the risk of teen depression and suicide. Expert Vicky Rideout has even said that correlations between high smartphone use and social media use increasing the likelihood for suicide or depression "does not indicate a causal link" and "could serve as a dangerous distraction from the hard work that needs to happen in adolescent mental health."

Last year we began exploring ways to share public data from our platform on how people talk about suicide with academic researchers through the social media monitoring tool, CrowdTangle.

We will continue to improve our technology and make sure our policies keep up with the latest research and with people's changing behavior to make our platform a safe and supportive place for everyone.

**112.    What is the current list of games available to Facebook users on the free cloud gaming service?**

As of December 22, 2020, the following games are available to users on Facebook's Cloud Gaming platform:

| Publisher | Game |
| --- | --- |
| Gameloft | Asphalt 9 |
| Ubisoft | Hungry Shark Evolution |
| Gameloft | Dragon Mania Legends |
| Gameloft | Lego Legacy |
| Plarium | Vikings: War of Clans |
| Tilting Point | Operation: New Earth |
| Tilting Point | Warhammer Chaos & Conquest |
| Ten Square Games | Wild Hunt |
| JoyCity | Pirates of the Caribbean - TOW |
| Moonton | Mobile Legends Adventure |
| Red Bull | Dirt Bike Unchained |
| Concrete | PGA Tour Shootout |
| Qublix | Solitaire: Arthur's Tale |
| 2K Games | WWE SuperCard |
| Atari | RollerCoaster Tycoon Touch |

**113.    Which game developers did Facebook partner with in order to develop the games available on its free cloud gaming service?**

Facebook does not typically develop games for our cloud gaming service, but rather provides application program interfaces, or "APIs" (which enable apps to read from and write to the Facebook social graph) and software development kits, or "SDKs" (which help developers integrate Facebook functionality into their apps). We also answer questions and offer suggestions for best practices. Developers upload their games to Facebook servers, and we provide testing and debugging tools for developers to use before their games are available to public users.

**114.    Why did Facebook choose to offer a free-to-play model instead of a subscription service offered by competitors, which typically charge between $5 to $15 monthly?**

The main reason Facebook chose free-to-play over a subscription service was that it aligns with Facebook's overall business approach of offering ad-supported products at no upfront cost to people. This allows everyone to try out a product like cloud gaming rather than only allowing access to a group of gamers who have the dedicated interest and financial means to pay for a subscription.

Additionally, given that all of Facebook's existing gaming products are free-to-play, the bulk of the existing business relationships that Facebook has with gaming developers are with developers that create free-to-play games. As a result, it was more practical to launch a service with such games.

**115. Can users on Facebook's free cloud gaming service choose to opt out of receiving ads while playing?**

Deciding whether to monetize via advertising in their cloud games is at the discretion of the developer, not Facebook. For background, each game developer chooses their own monetization strategy on cloud gaming, as they do on other platforms like Apple's App Store and the Google Play store. For instance, some developers choose to show ads in their games on Facebook, Apple's iOS, or Google's Android. Other games on those platforms focus on in-app purchases rather than ads, and may even contain no ads at all. Should a game developer choose to include ads in their cloud game, they can implement Facebook's Audience Network and share in the revenue generated by ads shown to their game's users.

**116. Please describe the full extent of personal user data collected when users play games on the free cloud gaming service, such as age, gender, geolocation data, and in-game interaction with specific Facebook friends.**

Facebook's data collection is governed by Facebook's publicly posted Data Policy (https://www.facebook.com/policy.php).

The game developers themselves may collect user data directly through their games. This collection and use is subject to the developer's privacy policy, which Facebook requires the developer to surface to the user prior to the game launching. Developers are also subject to our Developer Policy (https://developers.facebook.com/devpolicy/) and Platform Terms (https://developers.facebook.com/terms), which limit the ways the developer may use gamers' Facebook data.

**117. Please describe what personal user data is shared with advertisers on the free cloud gaming service, such as age, gender, geolocation data, time spent playing, and in-game interaction with specific Facebook friends.**

Please see the responses to your Questions 64 and 116.

**118. Does Facebook keep a record of in-game conversations between Facebook users who play games on the free cloud gaming service? If so, can users opt-out of the data collection of this record of their communications?**

Cloud Games, including any in-game messaging functionality, are predominantly managed by the third-party game developers of those games. Any data that the developer collects within the game is subject to the developer's privacy policy, which Facebook requires the developer to show to the user prior to the game launching.

Facebook does not generally record in-game activity, including any in-game conversations. That said, if needed to improve or troubleshoot the product, Facebook may record or collect data about gameplay and thus could capture pieces of in-game conversations that occur within that gameplay.

**119.  What preventative mechanisms does Facebook have in place to prevent child predators from communicating with underage children while playing games with them on the free cloud gaming service?**

Most games on our cloud gaming service do not currently offer chat functionality. When cloud games do provide methods of communication, those are operated by the game developer itself, not on Facebook's chat services, so, as explained above, we do not generally access in-game communications.

We limit the Cloud Games we host on our platform to trusted developers that allow players to easily report abusive behavior directly to the developer, as they would on other gaming platforms. Additionally, users may create "Player Names" as pseudonyms when they play, which provides another layer of privacy.

However, if users who met in-game were to connect on Facebook services, those communications would be subject to numerous preventative measures in our primary chat features (Messenger and Rooms). This includes proactive analysis to identify potential abusive activity, scanning to detect transmission of known child abuse images, and a reporting mechanism so people can let us know if they're experiencing abuse from another Facebook user.

**120.  How many users does Facebook currently have on the free cloud gaming service?**

Roughly 300,000 players per week, as of December 1, 2020.

**121.  How much in digital ad revenue did Facebook generate in the first month of its free cloud gaming service?**

From October 26, 2020 to November 24, 2020, Facebook derived $5,859 of gross revenue from showing ads in cloud games. Inclusion of ads and their placement in cloud games is at developers' discretion, and many opt for a monetization strategy of in-app purchases instead of advertising. As with in-app advertising on our other gaming products, Facebook shares that revenue with developers, with the majority of the revenue going to developers.

**122.  Since Facebook does not charge a subscription fee for games available on its free cloud gaming service, is the goal of this service instead to keep users on the Facebook platform?**

There are several goals of the Facebook Cloud Gaming product. As with all offerings within Facebook's apps, we hope to deliver value and enjoyment to our users. The primary reason that the service is free is that it lowers the barrier to entry for casual game users and allows them to try cloud gaming without having to make a financial investment. If we're able to deliver value to our users through the product, Facebook will benefit from increased user engagement with our platform and a revenue share from in-app purchases and advertising. We also hope game developers will advertise more with us to help promote their games. Finally, we believe cloud gaming will grow gaming communities (e.g., Groups) on Facebook.

123. **Facebook co-founder Chris Hughes calls Facebook a "powerful monopoly, eclipsing all of its rivals and erasing competition." He elaborated, "When it hasn't acquired its way to dominance, Facebook has used its monopoly position to shut out competing companies or has copied their technology." Please explain whether these statements provide an accurate assessment of Facebook's business strategy.**

We reject that characterization.

We face competition every day, which pushes us to build the highest-quality products. We have many competitors, both domestically and internationally, that are enjoyed by hundreds of millions, if not billions, of people.

We work hard to innovate and to differentiate our products and services because we understand that consumers have many choices and can leave Facebook if they're not happy. For example, the average person with a smartphone has more than 80 apps on their phone, and they use close to 40 of those apps every month. And because so many services are low-priced or free, people are able to try new services as often as they like. If a person does not enjoy a product or experience, they can—and do—switch from it to explore the myriad other options available. This creates strong competition for every product and service Facebook offers, as well as pressure to develop new features to attract and retain consumer interest.

Given the highly competitive landscape, we are proud that Facebook offers a set of products and services that many people enjoy. This constant competition keeps us on our toes and acts as a powerful force that drives us to innovate.

124. **Facebook's first president Sean Parker said, "The thought process that went into building these applications, Facebook being the first of them, . . . was all about: 'How do we consume as much of your time and conscious attention as possible?'" He elaborated, "It's a social-validation feedback loop," and "you're exploiting a vulnerability in human psychology." Please explain whether these statements provide an accurate assessment of Facebook's business strategy.**

We design our services to be useful. And we want the time people spend on Facebook and Instagram to be intentional, positive, and inspiring. The effects of social media are still being studied, and we work in collaboration with leading mental health experts to better understand this area.

According to the research, it really comes down to how you use the technology. For example, on social media, you can passively scroll through posts, much like watching TV, or actively interact with friends—messaging and commenting on each other's posts. Just like in person, interacting with people you care about can be beneficial, while simply watching others from the sidelines may make you feel worse. A study we conducted with Robert Kraut at Carnegie Mellon University found that people who sent or received more messages, comments, and Timeline posts reported improvements in social support, depression, and loneliness. The positive effects were even stronger when people talked with their close friends online. Other peer-reviewed longitudinal research and experiments have found similar positive benefits between well-being and active engagement on Facebook.

Our goal is to support meaningful social interactions, and we make product decisions across the company to reflect that. We don't set goals for the team that manages News Feed around increasing time spent on the platform because we want to make sure that the team is focused on the value they deliver to people.

We frequently make changes to the algorithm that drives News Feed ranking in an effort to improve people's experience on Facebook. For example, in 2018, we responded to feedback from our community that public content—posts from businesses, brands, and media—was crowding out the personal moments that lead us to connect more with each other. As a result, we moved from focusing only on helping people find relevant content to helping them have more meaningful social interactions. This meant that people began seeing more content from their friends, family, and Groups. We also reduce the distribution of some problematic types of content, including content that users may find spammy or low-quality, such as clickbait headlines, misinformation as confirmed by third-party fact-checkers, and links to low-quality webpages like ad farms.

We've also introduced tools that can be used to help manage users' experience:

- <u>Time spent controls</u>: Help people manage their time on Facebook and Instagram with a dashboard that shows how much time people have spent in the app and on that device in the past week, a customizable daily time alert, and a setting to limit notifications.

- <u>News Feed Preferences</u>: Allow users to choose to see posts from certain friends, family, Groups, or Pages higher up in their News Feed. Controls also include Snooze, which keeps the content from a selected person, Page, or Group out of a user's News Feed for a limited time.

- <u>Privacy Checkup and Security Checkup</u>: Provide people with the ability to review who they're posting to, manage or delete apps connected to their account, and edit the privacy of the information on their profile.

**125.   Former Facebook Chief Security Officer Alex Stamos said, in describing Facebook, "There's a little bit of a banana republic kind of feel to having the platform itself." He elaborated, "just like if, in older times, the radio station that is influenced by the**

**government or the phone network making a decision to put their thumb on the scale." Please explain whether these statements provide an accurate assessment of Facebook's business strategy.**

At Facebook, our role is to make sure there is a level playing field, not to be a political participant ourselves. We want to ensure that users hear and can scrutinize what their politicians have to say. All politicians, regardless of political affiliation, are required to follow our Advertising Policies and Community Standards, and we also believe that free speech is a critical part of a healthy democracy. This is why we do not submit speech by politicians to our independent third-party fact-checkers. Organic posts with speech from a politician that may otherwise violate our policies may nonetheless be allowed in a small number of cases under our newsworthiness exception. In these cases, we would apply a label for transparency.