**Exhibit 165**

# PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

S. Hrg. 117–719

# PROTECTING KIDS ONLINE: FACEBOOK, INSTAGRAM, AND MENTAL HEALTH HARM

# HEARING

BEFORE THE

## SUBCOMMITTEE ON CONSUMER PROTECTION, PRODUCT SAFETY, AND DATA SECURITY

OF THE

## COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION UNITED STATES SENATE

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

———

SEPTEMBER 30, 2021

———

Printed for the use of the Committee on Commerce, Science, and Transportation



Available online: http://www.govinfo.gov

———

U.S. GOVERNMENT PUBLISHING OFFICE

53–125 PDF                 WASHINGTON : 2023

SENATE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION

ONE HUNDRED SEVENTEENTH CONGRESS

FIRST SESSION

MARIA CANTWELL, Washington, *Chair*

| | |
|---|---|
| AMY KLOBUCHAR, Minnesota | ROGER WICKER, Mississippi, *Ranking* |
| RICHARD BLUMENTHAL, Connecticut | JOHN THUNE, South Dakota |
| BRIAN SCHATZ, Hawaii | ROY BLUNT, Missouri |
| EDWARD MARKEY, Massachusetts | TED CRUZ, Texas |
| GARY PETERS, Michigan | DEB FISCHER, Nebraska |
| TAMMY BALDWIN, Wisconsin | JERRY MORAN, Kansas |
| TAMMY DUCKWORTH, Illinois | DAN SULLIVAN, Alaska |
| JON TESTER, Montana | MARSHA BLACKBURN, Tennessee |
| KYRSTEN SINEMA, Arizona | TODD YOUNG, Indiana |
| JACKY ROSEN, Nevada | MIKE LEE, Utah |
| BEN RAY LUJÁN, New Mexico | RON JOHNSON, Wisconsin |
| JOHN HICKENLOOPER, Colorado | SHELLEY MOORE CAPITO, West Virginia |
| RAPHAEL WARNOCK, Georgia | RICK SCOTT, Florida |
| | CYNTHIA LUMMIS, Wyoming |

DAVID STRICKLAND, *Staff Director*
MELISSA PORTER, *Deputy Staff Director*
GEORGE GREENWELL, *Policy Coordinator and Security Manager*
JOHN KEAST, *Republican Staff Director*
CRYSTAL TULLY, *Republican Deputy Staff Director*
STEVEN WALL, *General Counsel*

————

SUBCOMMITTEE ON CONSUMER PROTECTION, PRODUCT SAFETY,
AND DATA SECURITY

| | |
|---|---|
| RICHARD BLUMENTHAL, Connecticut, *Chair* | MARSHA BLACKBURN, Tennessee, *Ranking* |
| AMY KLOBUCHAR, Minnesota | JOHN THUNE, South Dakota |
| BRIAN SCHATZ, Hawaii | ROY BLUNT, Missouri |
| EDWARD MARKEY, Massachusetts | JERRY MORAN, Kansas |
| TAMMY BALDWIN, Wisconsin | MIKE LEE, Utah |
| BEN RAY LUJÁN, New Mexico | TODD YOUNG, Indiana |

(II)

# C O N T E N T S

————

|  | Page |
|---|---|
| Hearing held on September 30, 2021 | 1 |
| Statement of Senator Blumenthal | 1 |
| Statement of Senator Blackburn | 3 |
| Statement of Senator Cantwell | 5 |
| Statement of Senator Wicker | 6 |
| Statement of Senator Klobuchar | 16 |
| Statement of Senator Markey | 18 |
| Statement of Senator Thune | 21 |
| Statement of Senator Luján | 23 |
| Statement of Senator Lummis | 29 |
| Statement of Senator Cruz | 31 |
| Statement of Senator Lee | 34 |
| Statement of Senator Sullivan | 38 |

### WITNESSES

| | |
|---|---|
| Antigone Davis, Global Head of Safety, Facebook | 7 |
| Prepared statement | 9 |

### APPENDIX

Response to written questions submitted to Antigone Davis by:

| | |
|---|---|
| Hon. Amy Klobuchar | 43 |
| Hon. Ben Ray Luján | 49 |
| Hon. John Thune | 51 |
| Hon. Mike Lee | 52 |
| Hon. Marsha Blackburn | 57 |

(III)

# PROTECTING KIDS ONLINE: FACEBOOK, INSTAGRAM, AND MENTAL HEALTH HARM

————————

### THURSDAY, SEPTEMBER 30, 2021

U.S. SENATE,
SUBCOMMITTEE ON CONSUMER PROTECTION, PRODUCT
SAFETY, AND DATA SECURITY,
COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION,
*Washington, DC.*

The Subcommittee met, pursuant to notice, at 10:40 a.m., in room SR–253, Russell Senate Office Building, Hon. Richard Blumenthal, Chairman of the Subcommittee, presiding.

Present: Senators Blumenthal [presiding], Cantwell, Klobuchar, Markey, Luján, Blackburn, Wicker, Thune, Cruz, Sullivan, Lee, and Lummis.

### OPENING STATEMENT OF HON. RICHARD BLUMENTHAL, U.S. SENATOR FROM CONNETICUT

Senator BLUMENTHAL. This hearing of the Subcommittee on Consumer Protection of the U.S. Senate Committee on Commerce, Science, and Transportation will come to order. I thank the Ranking Member, Senator Blackburn, for being here and especially wanted to express my gratitude to the Chairman of the Committee, Senator Cantwell, who has encouraged and supported this effort and to the Ranking Member, Senator Wicker, who is also with us and who has helped to lead.

This effort has been very, very bipartisan. I think the ongoing series of hearings that we will have similarly will be bipartisan in its objective and its conduct. I want to welcome our witness, Ms. Davis, who is appearing on behalf of Facebook. Thank you for being with us. This hearing is the third in the series intended to help us draft legislation, but not just educate, not just legislate, but also to prompt action by Facebook itself. And that action has to address the harms that children and teens face on social media.

I want to make clear that our interests are not limited to Facebook and Instagram. Our subcommittee has secured commitments from several social media companies to appear in the coming weeks. We will hold them to those promises. We are here today because Facebook has shown us once again that it is incapable of holding itself accountable. This month, a whistleblower approached my office to provide information about Facebook and Instagram. Thanks to documents provided by that whistleblower, as well as extensive public reporting by the *Wall Street Journal* and others, we now have deep insight into Facebook's relentless campaign to recruit and exploit young users.

2

We now know while Facebook publicly denies that Instagram is deeply harmful for teens, privately Facebook researchers and experts have been ringing the alarm for years. We now know that Facebook routinely puts profits ahead of kids' online safety. We know it chooses the growth of its products over the well-being of our children. And we now know that it is indefensibly delinquent in acting to protect them. It is failing to hold itself accountable. And the question that haunts me is, how can we or parents or anyone trust Facebook? Facebook last night disclosed two reports.

We have those two reports among the documents that the whistleblower has provided. There are numerous other extensive and sophisticated reports that Facebook has not disclosed. Why? That will be a question that I think will resonate throughout this hearing, because the fact of the matter is Facebook has concealed research studies experts that show the harm that has been caused to children on its site, how it knew about that harm, and how it concealed it continually.

In August, ahead of this hearing, Senator Blackburn and I wrote to Mark Zuckerberg, and we asked, as you can see from this poster board, "has Facebook research ever found that its platforms and products can have a negative effect on childrens' and teens' mental health or well-being, such as increased suicidal thoughts, heightened anxiety, unhealthy usage patterns, negative self-image, or other indications of lower well-being?" Facebook's response was, "we are not aware."

"We are not aware of a consensus among studies or experts about how much screen time is too much." That response was simply untrue. Facebook knows. It knows the evidence of harm to teens is substantial, and specific to Instagram. In new previously undisclosed documents provided by the whistleblower, making them available now through these quotes, we know that its own comprehensive internal review indicated that Facebook employees found, "substantial evidence suggests that experiences on Instagram and Facebook make body dissatisfaction worse, particularly viewing attractive images of others, viewing filtered images, posting selfies, and viewing content with certain hashtags."

I am going to repeat that quote, "substantial evidence suggests that experiences on Instagram and Facebook make body dissatisfaction worse, particularly viewing attractive images of others, viewing filtered images, posting selfies, and viewing content with certain hashtags." That finding was not some disgruntled Facebook employee making a complaint. It was Facebook's own employees making a formal finding based on their research. And it was available at the highest levels of Facebook's management. In our August letter, we also asked, "has Facebook ever found that child or teenage users engage in usage patterns that would indicate addictive or unhealthy usage of its platforms or products?"

Facebook didn't even bother to respond directly and pointed us to a previous evasion. And there was a reason it responded in that way because Facebook knows, they know that children struggle with addiction on Instagram, and they didn't want to admit it. Facebook researchers have concluded that teens, "have an addict's narrative about their use," "have an addict's narrative about their use." Another survey, also not disclosed publicly, found that "over

one-third of teens felt they have "only 'a little control' or 'no control at all' over how Instagram makes them feel."

Again, this conclusion is not solely one report, one Facebook employee's perspective, it is a pattern of findings repeated across sophisticated and extensive studies that Facebook itself conducted over the past 4 years. Not displeased or disgruntled employees. Facebook's formal findings and conclusion. Facebook knows the destructive consequences that Instagram's design and algorithms are having on our young people and our society, but it has routinely prioritized its own rapid growth over basic safety for our children. There is a teenage mental health crisis in America. After years of decline, starting in 2007, the suicide rate for young people has begun to skyrocket.

The suicide rate for 10 to 14 year olds has doubled. For young girls, it has quadrupled. Instagram didn't create this crisis, but from the documents provided by the whistleblower, clearly Facebook's own researchers described Instagram itself as a "perfect storm." That, and I quote again, "exacerbates downward spirals." Facebook knew it was a perfect storm through Instagram that exacerbates downward spirals.

My office did its own research. We created an Instagram account identified as a 13 year old girl and followed a few easily findable accounts associated with extreme dieting and eating disorders. Within a day, its recommendations were exclusively filled with accounts that promote self-injury and eating disorders. That is the perfect storm that Instagram has fostered and created. So Facebook has asked us to trust it. But after these evasions and these revelations, why should we? It is clear that Facebook has done nothing to earn that trust, not from us, not from parents, not from the public.

In truth, Facebook has taken big tobacco's playbook. It has hidden its own research on addiction and the toxic effects of its products. It has attempted to deceive the public and us in Congress about what it knows, and it has weaponized childhood vulnerabilities against children themselves. It has chosen growth over children's mental health and well-being, greed over preventing the suffering of children. These internal Facebook studies are filled with recommendations—recommendations from Facebook's own employees. And yet there is no evidence, none, that Facebook has done anything other than a few small, minor marginal changes. We all know that Facebook treated protecting kids with disregard.

If it had protected kids like it did drive up revenue or growth, it would have done a whole lot more. Instead, Facebook has evaded, misled, and deceived. I hope that this hearing provides real transparency and marks the start of a change from Facebook. Parents deserve the truth. Thank you to everyone for being here this morning. I will turn to the Ranking Member and then if the Chair or the Ranking Member have remarks, I would be happy to call on them.

### STATEMENT OF HON. MARSHA BLACKBURN, U.S. SENATOR FROM TENNESSEE

Senator BLACKBURN. Thank you, Mr. Chairman. And I want to say thank you to you and your staff for working in partnership

4

with us on this hearing, and I wish that Senator Markey was still here. He and I have been on this issue since we were each in the House and working on privacy, big tech accountability. So this is the type hearing that has been a long time coming. And this is truly an important conversation for us to be having to continue and to be bringing our findings forward so that the public is aware.

There are a lot of moms, security moms I call them, that are very concerned about what they see happening in the virtual space. 2019, CDC released some data. And adding to what you were talking about, I think this is important. In 2019, the CDC data showed that 20 percent, 20 percent of our American high school students seriously considered attempting suicide, 40 percent reported experiencing sadness, hopelessness.

Now, our children who have lived through COVID, school closings, and more upheaval in their lives than ever before deserve better than this, yet where are the findings about the social interaction and relationship that they so desperately need? Where they are finding this is on social media, onsites like Instagram, TikTok, Snapchat, and now we know that at least one of these sites, Facebook, knows that its services are actively harming young children. They know this. How did they know this? Because they did their own research as Chairman Blumenthal just said. In 2019 and 2020, Facebook's in-house analysts performed a series of deep dives into teen use of Instagram. And it revealed, and I am quoting from the report, "aspects of Instagram exacerbate each other to create a perfect storm. And that perfect storm manifests itself in the minds of teenagers in the form of intense social pressure, addiction, body image issues, and eating disorders, anxiety, depression, and suicidal thoughts."

But it gets even worse than this because Facebook, despite touting their compliance with COPPA, was scheming to bring even younger users into their field. Instagram announced this week that it is temporarily shelving their plans for Instagram Kids. But until this week, they were moving forward with this, trying to bring younger children onto their platforms. Yet at the same time that we are learning this, *The Wall Street Journal* reported how Facebook tried to use play dates, that is, right play dates to attract more children to its messenger kids service.

In fact, Facebook is fully aware that underage children are using their platforms. Not only that, but they encourage older teen siblings to recruit their younger siblings and are actually devising marketing plans to help kids and teens, get this, create secondary or anonymous accounts that they can hide from their parents. And they perform market research on kids as young as 8 years old so they can learn how to recruit them to their sites. Facebook is also aware of other types of harmful content on their site.

In fact, a report shows how Facebook knew about content devoted to coercing women into domestic servitude. Yet they chose to do nothing to stop it until Apple threatened to pull Facebook from the App Store. That is correct. It took Apple standing up to get them to stop this. In fact, this seems to be a recurring theme with this company, do everything and anything to mold the world into your own image for your own profit without any regard for any harm that is going to be done because your focus is on your pocket-

5

book. Adam Mosseri, CEO of Instagram, continues to double down on youth marketing.

He said on *The Today Show* earlier this week when asked about Instagram Kids, and I am quoting him, "I firmly believe it is a good idea as a father. The most important thing to me is the safety of my children." Well, Mr. Mosseri, I am a mother, and I am a grandmother, and I really beg to differ with you. In fact, I would imagine that most of the chief mamas in charge at their own households would disagree with you. I think they would vehemently disagree with you. They don't want their kids going on platforms like Instagram, even if you assure us that it will be safe for tweens. As the Chairman said, "You have lost the trust and we do not trust you with influencing our children, with reading in to their minds."

They also don't want Facebook collecting data on their children because call them whatever you want, tweens, teens, young adults, the bottom line is these are children. They are children. And you and Mr. Zuckerberg, both of you being parents, should understand that Facebook has both a legal and a moral obligation to forgo collecting and using children's data. So, Mr. Chairman, I am grateful for the opportunity that we have this hearing today to continue to investigate, continue to expose what is happening in the virtual space. And I am certain that we will be holding Facebook to account as other tech platforms will be held to account.

Ms. Davis, I do thank you for appearing before us today. And I hope that we can have a very frank and candid conversation. Thank you, Mr. Chairman.

Senator BLUMENTHAL. Thanks, Senator Blackburn. I call on Senator Cantwell.

## STATEMENT OF HON. MARIA CANTWELL,
## U.S. SENATOR FROM WASHINGTON

The CHAIR. Thank you, Mr. Chairman, and thank you and Ranking Member Blackburn for this hearing today and for your longstanding work on this very important public policy area. I think it is very important to understand that our committee would like to move forward on stronger privacy legislation. And yesterday's hearing clearly crystallized that we need to update the Children's Online Privacy Protection Act, and this hearing, I am sure will put even more focus to the fact that we need to do that. I want to thank Senator Markey for his questioning yesterday.

This month, *The Wall Street Journal* published a series of articles about Facebook and Instagram showing the management knew in great detail about the impacts of these products, the harm to children, the harm to teenagers, and in spite, continued to bury that knowledge. So as our colleague just said, data collection of children is something that should have more aggressive attention.

They should not have the products and services track and follow these young children and updating COPPA will be essential. As we said yesterday, the Committee talked about also, first time, privacy and data security violations.

There was unanimous support for that. So it is very important that we continue to take steps on this issue. I agree that the safeguards in place are not enough and we need to do more. So I look forward to hearing from the witness today.

6

Senator BLUMENTHAL. Thank you, Senator Cantwell. Senator Wicker, do you have any opening?

### STATEMENT OF HON. ROGER WICKER, U.S. SENATOR FROM MISSISSIPPI

Senator WICKER. Yes. Thank you, Senator Blumenthal. I will— I will be brief, because we need to get to our witness. Facebook is one of a handful of big tech companies wielding immense power over our Internet experiences. Using its market dominance, Facebook maintains unprecedented control over the vast flow of news information and speech on the Internet. To maintain a free, open, safe, and secure Internet, many of us on this committee have long called for more transparency and accountability from Facebook and other social media platforms.

Today, the content moderation and data collection practices of big tech remain largely hidden to consumers. Too often, Americans are left wondering why their online posts have been deleted, demoted, demonetized, or outright censored without a full explanation. Users also remain in the dark about what data is being collected about them, how it is being used, and to whom it is being sold, and for what purpose. Recent reports from the *Wall Street Journal* may have shed new light on why Facebook's platform management practices have been kept from public view.

This month, the *Journal* revealed that Facebook's so-called Crosschecked Program purportedly exempts certain public figures from its terms of service and community standards. The *Journal* also disclosed Facebook's own internal research documenting the harmful mental effects of the platform and its photo sharing site effects on children and teens. Both of these reports are deeply troubling and only amplify concerns about Facebook's inconsistent enforcement of its content moderation policies and its disregard and well-being for children and teens. This morning, I hope Facebook will be forthcoming about its platform management practices and take this opportunity to address the *Wall Street Journal's* report.

I also hope Facebook will outline what it is doing to increase transparency and begin protecting users of all ages on its platforms. Following yesterday's data privacy hearing, what remains clear to me is that Congress must act to address big tech's continued reign to censor contact—content, censor content, suppress certain viewpoints, prioritize favored political speech, stockpile consumer data, and act in other unfair and anti-competitive ways. The time to act is now. And I am the fourth member of this committee this morning to say that.

Addressing these issues is essential to preserving a free and open Internet and a thriving digital economy for generations to come. We are serious about taking action. Thank you, Mr. Chair.

Senator BLUMENTHAL. Thanks, Senator Wicker. We will now turn to our witness, Ms. Antigone Davis, who is the Global Head of Safety at Facebook. She spearheads Facebook's Safety Advisory Board efforts, and she earned her J.D. from the University of Chicago Law School and her B.A. from Columbia University. Ms. Davis, the floor is yours.

7

**STATEMENT OF ANTIGONE DAVIS, GLOBAL HEAD OF SAFETY,
FACEBOOK**

Ms. DAVIS. Thank you, Chairman Blumenthal, Ranking Member
Blackburn, and distinguished members of the Subcommittee.
Thank you for the opportunity to appear before you today. My
name is Antigone Davis. I am a parent, a former teacher and the
Global Head of Safety at Facebook. Like you, I care deeply about
the safety and well-being of young people online, and I have dedi-
cated the better part of my adult life to these issues.

In my current role, I work with internal teams and external
stakeholders to ensure that Facebook remains a leader in online
safety, including issues of bullying and combating child exploi-
tation. This is some of the most important work that I have done
in my career, and I am proud of the work that my team does every
day.

At Facebook, we take the privacy, safety, and well-being of all
those who use our platform very seriously, especially the youngest
people on our services. We work tirelessly to put in place the right
policies, products, and precautions so they have a safe and positive
experience. We have dedicated teams focused on youth safety and
we invest significant resources in protecting teens online. We also
know that we can't do this work alone. We work closely with ex-
perts and parents to inform the features we develop. We require
everyone to be at least 13 years of age on Facebook and Instagram.

When we learn that an underage user has created an account,
we remove them from our platform. When it comes to those be-
tween 13 and 17, we consult with experts to ensure that our poli-
cies properly account for their presence, for example, by age-gating
content. We work constantly to improve safety and privacy protec-
tions for young people. For example, earlier this year we an-
nounced that all users under 16 in the U.S. will now be defaulted
into a private account when they join Instagram.

We also think it is critical to give parents and guardians the in-
formation, resources, and tools they need to set parameters for
their children and help them develop healthy and safe online hab-
its. That is why we publish a variety of guides and portals intended
to foster important conversations around online safety. And we are
fortunate to do all this work with the help of industry experts, in-
cluding our youth advisors, a group of experts in privacy, youth de-
velopment, psychology, parenting, and youth media.

We understand that recent reporting has raised a lot of questions
about our internal research, including research we do to better un-
derstand young people's experiences on Instagram. We strongly dis-
agree with how this reporting characterized our work, so we want
to be clear about what the research shows and what it does not
show. The research showed that many teens said that Instagram
is helping them with hard issues that are so common to being a
teen.

In fact, one of the main slides referenced in the article includes
a survey of 12 difficult and serious issues like loneliness, anxiety,
sadness, and eating disorders. We asked teens who told us that
they were struggling with these issues whether Instagram was
making things better, worse, or having no effect. On 11 of the 12
issues, teen girls who said they struggled with those issues were

8

more likely to say that Instagram was affirmatively helping them, not making it worse. That was true for teen boys on 12 of 12 issues.

I want to be clear, I am not diminishing the importance of these issues or suggesting that we will ever be satisfied with anyone struggling on our apps. That is why we conduct this research, to make our platform better, to minimize the bad and maximize the good, and to proactively identify where we can improve. And the most important thing about our research is what we have done with it. We have built AI to identify suicide content on our platform and rapidly respond with resources. We have launched tools to help control time spent on our apps.

We have built a dedicated reporting flow for eating disorder related content, and we offer resources when people try to search for it. We have a long track record of using our internal research, external research, and close collaboration with experts to improve our apps and provide resources for people who use them. And our work to respond to this research is ongoing. One idea we think has promise is finding opportunities to jump in if we see people dwelling on certain types of content and point them to content that inspires and uplifts them. Finally, I want to talk—speak to our work on Instagram experience for those under 13.

As every parent knows when it comes to kids and tweens, they are already online. We believe it is better for parents to have the option to give tweens access to a version of Instagram that is designed for them, where parents can supervise and manage their experience than to have them lie about their age to access a platform that wasn't built for them, or rely on an app's ability to verify the age of kids who are too young to have an ID.

That is why we have been working on delivering age-appropriate parent-supervised experiences, something YouTube and TikTok already do. But we recognize how important it is to get this right. And we have heard your concerns, which is why we announced that we are pausing the project to take more time. We will keep listening to parents, keep talking with policies—policymakers and regulators like yourself, keep taking guidance from experts, and we will revisit this project at a later date. There is an important part of what we have been developing for Instagram Kids that we won't be pausing, supervisory tools for parents.

We will continue our work to allow parents to oversee their children's accounts by offering these tools to teen accounts on Instagram. These new features, which parents and teens can opt into, will give parents tools to meaningfully shape their teen's experience. As a parent, this development means a lot to me. I know I would have truly appreciated more insight and tools to help me support my daughter and manage her online experience as she learned how to navigate social media.

I want to thank you for the opportunity to discuss these important issues with you today and answer your questions. Youth safety and well-being are areas where we are investing heavily, and we welcome productive collaboration with lawmakers and elected officials. Thank you and I look forward to our discussion.

[The prepared statement of Ms. Davis follows:]

9

PREPARED STATEMENT OF ANTIGONE DAVIS, GLOBAL HEAD OF SAFETY, FACEBOOK

## I. Introduction

Chairman Blumenthal, Ranking Member Blackburn, and distinguished members of the Subcommittee, thank you for the opportunity to appear before you today. My name is Antigone Davis, and I have served as the Global Head of Safety at Facebook for the past seven years.

I have dedicated the better part of my adult life to protecting the safety and well-being of young people. Before coming to Facebook, I worked as a middle school teacher and spent a decade working for the Office of the Maryland Attorney General, helping to establish the office's first online privacy and safety unit. I serve on the boards of the National Center for Missing and Exploited Children (NCMEC) and the Technology Coalition, two organizations dedicated to fighting child sexual exploitation. I previously served on the boards of the National Cybersecurity Alliance, the Family Online Safety Institute, the National Network to End Domestic Violence, the National Center for the Victims of Crime, and the International Advisory Board for WePROTECT, a global alliance working to protect children from sexual exploitation and abuse online.

In my role at Facebook, I lead the global team responsible for ensuring that Facebook remains a leader in online safety. This work is core to our mission of designing and building products that bring people together. We want our platforms to be a place for meaningful interactions with friends and family, and we cannot achieve that goal if people do not feel safe. My team works tirelessly with our colleagues across the company to put in place the right policies, products, and precautions so that the people who use our services have a safe and positive experience. We also know that Facebook can't do this work alone. As part of my role, I coordinate the efforts of Facebook's Safety Advisory Board, a team of leading safety organizations from around the world who provide Facebook with cutting-edge research and advice on best practices, particularly relating to young people and other vulnerable groups. I also lead our work with our Youth Advisors, our advisory group on suicide prevention, and a global safety network of more than 850 organizations around the world.

The work that I do at Facebook is some of the most important of my career, and I am incredibly proud of the work that my team does every day to protect the safety of the people who use our platforms.

## II. Protecting and Supporting Young People On Our Platforms

In my role, I am especially focused on the safety and well-being of the youngest people who use our services. This work includes keeping underage users off our platform, as well as ensuring that we are taking a comprehensive approach to protecting the youngest people allowed on our services. This work also includes partnering with product teams to address serious issues like child exploitation, suicide and self-harm, and bullying; developing programs and resources to support parents, children, and educators; and working with researchers and other experts to help us understand how social media impacts people so we can use that research to improve our products.

### A. Keeping People Under 13 Off Our Platforms

If a child is under the age of 13, they are not allowed on Facebook or Instagram and should not be using those services. When we learn an underage user has created an account, we remove them from the platform. From June to August of this year, in part due to some of the investments described below, we removed over 600,000 accounts on Instagram alone that were unable to meet our minimum age requirement.

Understanding people's age on the Internet is a complex and industry-wide challenge, but we are doing extensive work to understand if people are old enough to use our apps and to create more age-appropriate experiences and safety measures for young people. In addition to asking for people's date of birth when they register and allowing anyone to report a suspected underage account, we have developed technology that allows us to estimate people's ages, for example, whether someone is younger or older than 18, and we're building similar technology to find and remove accounts belonging to people under the age of 13. We train the technology using multiple signals. We look at things like people wishing a user a happy birthday and the age written in those messages—for example, "Happy 21st Bday!" or "Happy Quinceañera." This technology isn't perfect, and we're always working to improve it, but that's why it's important that we use it alongside many other signals to understand people's ages.

10

While not allowed on Facebook and Instagram, children under 13 are allowed on Messenger Kids, a product that we introduced in 2017. We built Messenger Kids because we heard from parents that there was need for a messaging app that let kids connect while ensuring that parents and guardians had control over the experience. And we designed Messenger Kids with input from thousands of parents and experts, and with the Children's Online Privacy Protection Act in mind.

*B. Product Safety Enhancements for Teens*

We are also dedicated to protecting the youngest people on our services. We have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17.

Whenever we can, we want to prevent young people from interacting with adults they don't know or don't want to engage with. We believe private accounts are the best way to do this, and we recently announced that all users under the age of 16 in the U.S. will now be defaulted into a private account when they join Instagram. For young people who already have a public account on Instagram, we are sharing a notification highlighting the benefits of a private account and explaining how to change their privacy settings. On Facebook, we encourage young people to make their accounts private by defaulting their posting audience to "friends" and by providing education before allowing them to post publicly. We've developed these unique education moments in consultation with experts.

In addition to our work on moving teenagers towards private accounts, we have taken additional steps to protect their safety. Earlier this year, we changed Instagram's direct messaging feature to prevent adults from sending messages to people under 18 who don't follow them. We have also begun using prompts, or safety notices, to encourage teens to be cautious in conversations with adults they're already connected to. Safety notices in direct messages will notify young people when an adult who has been exhibiting potentially suspicious behavior is trying to interact with them. On Facebook, we remove certain information when young people appear in a search (such as their school), and we do not allow them to appear in 'People You May Know' for adults who have been exhibiting potentially suspicious behavior. On Instagram, we prevent adults who have exhibited potentially suspicious behavior from interacting with young people's accounts. We won't show young people's accounts in Explore, Reels, or 'Accounts Suggested for You' to these adults. If they find young people's accounts by searching for their usernames, they won't be able to follow them. They also won't be able to see comments from young people on other people's posts, nor will they be able to leave comments on young people's posts.

We also work to create age-appropriate experiences for teenagers on Facebook and Instagram. This includes age-gating certain content, prohibiting certain types of ads from being served to minors, and limiting options for serving any ads to these users. For example, we have long restricted what kinds of ads can be served to minors, and we recently limited options for serving any ads to people under 18. Now, people under 18 can only have ads served to them based on age, gender, and location, but not interests or activity.

We've also introduced new ways to support people on Instagram who may be affected by negative body image or an eating disorder, including surfacing more expert-backed resources when people search for eating disorder-related content, expanding our work with experts to help inform our policies, and collaborating with community leaders to help them create and share positive, inspiring body image content.

*C. Parental Resources and Controls*

We think it is important to help provide parents and guardians the information, resources, and tools they need to set parameters for their teenagers' use of online technologies and to help them develop healthy and safe online habits. We have been working on parental resources for many years, and this week we announced a significant step forward by bringing parental supervision for teens to Instagram in the coming months. This feature, which parents and teens can opt into, will give parents additional tools to help shape their teens' experience.

This latest announcement builds on years of work to provide parents with resources to help them navigate conversations with their teenagers. As part of our Safety Center, we have a Parent Portal (*https://www.facebook.com/safety/parents*), a Youth Portal (*https://www.facebook.com/safety/youth*), and a Child Safety Hub (*https://www.facebook.com/safety/childsafety*), all of which are focused on fostering conversations around online safety, security, and well-being. These portals give parents and young people access to the information and resources they need to make informed decisions about their online technology use. We also worked with The

11

Child Mind Institute and ConnectSafely to publish a new Parents Guide (*https://about.instagram.com/community/parents*) with the latest safety tools and privacy settings and a list of tips and conversation starters to help parents and guardians navigate discussions with their teens about their online presence. We also worked with the Digital Wellness Lab team on a Family Digital Wellness Guide to help families learn about the media-related health issues that are top of mind for parents today; it includes tips that are practical, easy, and based in science.

And we don't just focus on our own apps. We've also developed a free digital literacy program called Get Digital. It has research-based lessons and resources that will help young people develop the skills they need to become empowered and discerning digital citizens. Get Digital provides educators, parents, and caregivers with lesson plans and activities designed to help build the core competencies and skills young people need to navigate the digital world in safe ways.

### III. Using Research to Improve People's Experience

We understand that recent reporting has raised a lot of questions about our internal research, including research we do to better understand young people's experiences on Instagram. We strongly disagree with how this reporting characterized our work, so we want to be clear about what that research shows, and what it does not show.

In addition to putting specific findings in context, it is also critical to make the nature of this research clear. We undertook this work to inform internal conversations about teens' most negative perceptions of Instagram. It did not measure causal relationships between Instagram and real-world issues. The reporting also implied that the results were surprising and that we hid this research. That is also not true. We have talked about the *strengths and weaknesses* of social media and well-being *publicly* for *more than a decade,* and external researchers have, too. For example, *a survey and interviews* from Harvard found that teens viewed social media "predominantly" positively, though they reported both positive and negative impacts on their relationships and self-expression. And a Pew Internet *survey* reported the majority of teens credit social media for positive outcomes—81 percent said it helps them connect—while some also pointed to its negative impacts—43 percent said they felt pressure to post things that make them "look good."

Our research showed that many teens who are struggling say that Instagram helps them deal with many of the hard issues that are so common to being a teen. In fact, one of the main presentations referenced by the *Wall Street Journal* included a survey of twelve issues—difficult and serious issues like loneliness, anxiety, sadness, and eating disorders. If a teenager shared that they were struggling with an issue, we asked whether Instagram was making things better, worse, or having no effect. For eleven of the twelve issues, teen girls who were struggling were more likely to say that Instagram was affirmatively helping them than making things worse. That was true for teen boys on twelve out of twelve issues.

I'd like to highlight a few other details from the research that the *Wall Street Journal* failed to include:

- Among those teenage girls who said they had felt sadness in the past month, 57 percent said Instagram made things better, and 34 percent said Instagram had no impact. 9 percent said Instagram made it worse.

- Among those teenage girls who said they had experienced loneliness in the past month, 51 percent said Instagram made things better, and 36 percent said Instagram had no impact. 13 percent said Instagram made it worse.

- Among those teenage girls who said they had experienced anxiety in the past month, 40 percent said Instagram made things better, and 48 percent said it made no difference. 12 percent said Instagram made things worse.

- 38 percent of teenage girls who said they struggled with suicidal thoughts and self-harm said Instagram made these issues better for them, and 49 percent said it has no impact.

I want to be clear that we are not diminishing the importance of these issues or suggesting that we will ever be satisfied if *anyone* is struggling on our product. It's why we conduct this research: to make our platforms better, to minimize the bad and maximize the good, and to proactively identify where we can improve. And the most important thing about our research is what we've done with it. We have a long track record of using our research—as well as external research and close collaboration with our Safety Advisory Board, Youth Advisors, and additional experts and organizations—to inform changes to our apps and provide resources for the people who use them. We've built AI to identify suicide-related content on our platform and rapidly respond with resources. We've launched tools to help control time spent on

our apps. We've built a dedicated reporting option for eating disorder-related content, and we pop up resources when people try to search for it. And our work to respond to this research is ongoing. We are looking into ways to encourage users to consider different content if they are consuming content that correlates with negative appearance comparison. Another idea we are exploring is "take a break," a feature that allows you to set a session time limit to take a moment away from scrolling.

We'll continue to look for ways to be more transparent while respecting the privacy and confidentiality of participants and giving our researchers space to do their work. We will also be looking for more opportunities to work with more partners to publish independent studies while also working through how we can allow external researchers more access to our data in a way that respects people's privacy.

### IV. Stepping Back from Instagram for Tweens and Announcing Parental Supervision

Finally, I want to speak to our work on an Instagram experience for tweens. As every parent knows, the reality is that kids and tweens are already online. They're getting phones younger and younger, misrepresenting their age, and downloading apps that are meant for those 13 or older.

We believe that it is better for parents to have the option to give tweens access to a version of Instagram that is designed for them—where parents can supervise and control their experience—than to have them lie about their age to access a platform that wasn't built for them.

That's why we have been working on delivering experiences like Instagram for tweens that are age-appropriate and give parents and guardians visibility and control over what their tweens are doing online. Other companies also have recognized these types of issues and built experiences for kids. YouTube and TikTok both have versions of their app for those under 13. The principle is the same: it's much better for kids to use a safer, more age-appropriate version of social media apps than the alternative.

That said, we recognize how important it is to get this right. We have heard your concerns, and that is why we announced that we are pausing the project to take more time. We'll keep listening to parents, keep talking with policymakers and regulators, keep taking guidance from experts and researchers, and we'll revisit this project at a later date. Critics of this project will inevitably see this as an acknowledgement that the project is a bad idea. That's not the case. The reality is that kids are already online, and we believe that developing age-appropriate experiences designed specifically for them is far better for parents than where we are today.

### V. Conclusion

Facebook is committed to building better products for young people, and to doing everything we can to protect their privacy, safety, and well-being on our platforms. That is why we work to stop people under 13 from accessing platforms that are not built for them, develop features to protect young people on our platforms, build resources and tools for young people and parents, and conduct research and consult with external experts to help ensure that our users have a positive experience. Our goal, through all of these efforts, is to promote meaningful interactions, so that people can use our products to connect and share with the people they care about.

I appreciate the opportunity to discuss these important issues with you today. This is an area where we are investing heavily, and we welcome productive collaboration with lawmakers and elected officials.

Thank you, and I look forward to your questions.

Senator BLUMENTHAL. Thank you, Ms. Davis. You know, we both know—all of us know as parents how vulnerable teens are at this age. How they can succumb to eating disorders, even the suicidal tendencies, and how susceptible they are. So the effects known to Facebook of its site in condoning and even encouraging those tendencies are so deeply repugnant. Facebook knows from its own report disclosed—undisclosed previously that if found in December 2020, a survey of over 50,000 Facebook users that, "teens, women of all ages and people in Western countries experience higher levels of both body image concerns and problems with appearance comparison on Instagram."

13

In an April 2021 report, which also has not been disclosed, it found a quarter of teen girls felt discouraged about their own life and worse about themselves often or very often after using Instagram. Another undisclosed report, March 2020 found, "social comparison is worse on Instagram," in part because its recommendations, "enable never ending rabbit holes" and because it, "perceived as real life." I don't understand, Ms. Davis, how you can deny that Instagram isn't exploiting young users for its own profits.

Ms. DAVIS. Thank you, Senator, for your question. I would like to speak specifically to this as an experienced mom of a teenage daughter, as someone who was a teenage girl herself, and as someone who has taught middle school and teenage girls. I have seen firsthand the troubling intersection between the pressure to be perfect, between body image and finding your identity at that age. And I think what has been lost in this report is that, in fact, with this research, we found that more teen girls actually find Instagram helpful, teen girls who are suffering from these issues, find Instagram helpful than not. Now, that doesn't mean that the ones that aren't, aren't important to us. In fact, that is why we do this research.

Senator BLUMENTHAL. Well, if I may interrupt you, Ms. Davis, these are your own reports. These findings are from your own studies and your own experts. You can speak from your own experience, but will you disclose all of the reports, all the findings? Will you commit to full disclosure?

Ms. DAVIS. Well, I know that we have—Senator, thank you. I know that we have released a number of the reports and we are looking to find ways to release more of this research. I want to be clear that this research is not a bombshell. It is not causal research. It is in fact just directional research that we use for our product——

Senator BLUMENTHAL. Well, I beg to differ with you, Ms. Davis. This research is a bombshell. It is powerful, gripping, riveting evidence that Facebook knows of the harmful effects of its site on children and that it has concealed those facts and findings.

So I ask you to commit that you will make full disclosure all of the thousands of pages of documents that the whistleblower has and more that can be made available. I want to switch to a separate topic, because I think that you have indicated that you are not willing at this point to make a commitment that you will fully disclose everything, unless I am mistaken. I will give you a chance to respond.

Ms. DAVIS. Thank you, Senator. We are looking for ways to release more research. There are privacy considerations that we need to take into place. But I think more importantly, we are actually also looking for ways to give external researchers access to data so that they can do independent research as well.

Senator BLUMENTHAL. Well, I think that is a very important point. You haven't provided that access to researchers. You have refused to make it available to independent experts and researchers. And I will ask you as well for a commitment to do so. And I recognize you are not going to answer this question here. But let me ask you separately, in your remarks, you say, "we think it is important to help provide parents and guardians the information,

14

resources, and tools they need." I want to talk about one major source of concern for parents. They are Finstas.

Finstas, are fake Instagram accounts. Finstas are kids' secret second accounts. Finstas often are intended to avoid parents' oversight. Facebook depends on teens for growth. Facebook knows the teens often are the most tech savvy in the household. That they need or they would like to have critical ways, Facebook would like to have critical ways to acquire new older users.

But Facebook also knows that nearly every teen in the United States has an Instagram account. It can only add more users as fast as there are new 13 year olds. So what Facebook has done is Finstas. In multiple documents, Facebook describes these secret accounts as, "a unique value proposition." It is a growth strategy, a way to boost its monthly active user metric.

And that active user metric is of great interest to your investors, to the markets, and it looks to me like it is another case of prioritizing growth over children's safety. So Facebook claims it is giving tools to parents to help their kids navigate social media and stay safe online, but behind the scenes, your marketers see teens with multiple accounts as "unique value opportunity—propositions," "unique value proposition." And we all know that means Finstas. You are monetizing kids' deceiving their parents. You make money when kids deceive their parents. You make money from these secret accounts. You make money from heightening the metrics that impressed the markets, your investors, raised the stock price. How can parents trust you?

Ms. DAVIS. Respectfully, Senator that is not how I would actually characterize the way we build a product. We build our products to provide the best experience for young people. Interestingly, when you mention Finstas, in my engagement with teens, Finstas are not something that we actually built, they built. They did it to actually provide them with themselves with a more private experience, which is one of the things that led us to think about offering them privacy, more privacy.

So that that is actually where Finstas come from. Teens, not us. But I think more importantly, our announcement that we are going to be providing supervisory tools that give parents actual insight into what their children are doing on Instagram is exactly contrary to what you are suggesting.

Senator BLUMENTHAL. Well, with all due respect, these are private, yes, they are secret, they are secreted from parents so that whatever the tools you may have, parents can't apply them, and they are part of the metrics, they are measured so that you can show growth. I will turn to the Ranking Member.

Senator BLACKBURN. Thank you, Mr. Chairman. And Ms. Davis, thank you for your testimony and for being with us today. We appreciate that. And I congratulate you on a perfectly curated background. It looks beautiful coming across the screen. I wish the message that you were giving us were equally as attractive. Let me go to Instagram's CEO, Adam Mosseri, recently saying, and I used his interview in my opening statements, that 13 year olds are not allowed on Instagram. Is that true? Yes or no?

Ms. DAVIS. 13 year olds and above are allowed on Instagram. Under 13 year olds are not.

15

Senator BLACKBURN. But we know that you are doing research on children as young as 8, and are marketing to 8 to 12 year olds, correct?

Ms. DAVIS. We do not market to 8 to 12 year olds because they are not on Instagram. 13 year olds and above—if we find an account of someone who is under 13, we remove them. In fact, in the last 3 months we removed 600,000 accounts of under 13 year olds.

Senator BLACKBURN. OK. So talk to me about how you enforce the policy, that 13 year old—under 13 cannot be on Instagram?

Ms. DAVIS. Yes, I appreciate that question. So there are a number of different things that we do. We have an age screen. When someone tries to join Instagram, if we see someone trying to repeatedly change the date to get past that, we actually will restrict their ability to access the app. We also allow people to report underage accounts, even if you are not on Facebook, and we will remove them. And we are investing and using AI and other signals to remove underage accounts.

Senator BLACKBURN. OK, let me—not to interrupt, but I have got 5 minutes. Then talk to me about what the map is, because I know you have—your research, your research shows that you have looked into using the map for kids under 13. So why don't you explain that to us?

Ms. DAVIS. Map is just a measure of how many people are using the site in the month. It is monthly active people.

Senator BLACKBURN. OK, but you were going to apply that to children under 13. So therefore you were trying to quantify the number of children that were under 13 years of age that were using your site. Correct?

Ms. DAVIS. Respectfully, that doesn't sound accurate to me. In fact, what we are trying to do——

Senator BLACKBURN. OK. Well, then let's have you clarify that for the record, because your research shows that you were using the map on children under 13. I want to move on and talk to you about the information I have seen about the presence of content on Facebook and Instagram that is used to recruit women into domestic servitude. This is a kind of trafficking where people are forced to work against their will for little or no pay. Their passports are often taken away from them. They can be auctioned online and abused. And I have a poster that is behind me. I hope that you can see this.

I have seen information suggesting that Facebook knew this content was on its website but did nothing to delete it until Apple threatened to drop Facebook from the Apple App Store. To quote from a Facebook internal report, "was this issue known to Facebook before the BBC inquiry and Apple escalation? Yes." But, quoting again, "due to the underreporting of this information and absence of proactive detection, domestic servitude content remained on the platform.

Removing our applications from Apple platforms would have had potentially severe consequences to the business." Ms. Davis, did Facebook know about content on its platform used to recruit women into forced slavery? And why did you not remove it until Apple threatened to drop Facebook from the App Store?

16

Ms. DAVIS. Respectfully, Senator, I don't agree with that characterization of what occurred. In fact, we have policies against sex trafficking on our platform.

Senator BLACKBURN. This is your reporting. Ms. Davis, this is your company's reporting. You knew this was there. You knew it was there. But you didn't do anything about it. Is it still there? Are you still allowing sex trafficking on Facebook? Is this something that girls as young as eight who are on your site are exposed to? Let's get a little bit more definition around this. One more question for you. One of the *Wall Street Journal* articles came out Monday and shared Facebook research about the product segments it would like to target in the future. It shows younger and younger kids. This is your poster. I mean, this is your graphic.

I put it on a poster, where we have been and where we are going. In fact, documents I saw showed Facebook doing market research on 8 year olds. And I am quoting from you all now, "tweens and younger teens are very similar in digital behaviors. Even kids as young as eight are interested in similar digital experiences." The documents show survey results into the digital interest of 8 to 10 year olds. So with this categorization in mind, does Facebook conduct market research on tweens, yes or no?

Ms. DAVIS. Thank you, Senator. I would first like to actually clarify that document that you have behind you. That document is actually from an age appropriate design code, something that Senator Markey and others have actually given to tech companies as a way for us to think about how we design for different ages. It is actually a direction on policy——

Senator BLACKBURN. So you are admitting to me that you are designing for 8 to 12 year olds? I think that that is something that is very interesting because you know that is a violation of the Children's Online Privacy Act. And I guess what you are telling us then is that you also are doing market research on children and that you are continuing to collect data on children as you try to figure out what type of digital experience children, children ages 8 to 12 are interested in having. I am over time, Mr. Chairman. I will yield back.

Senator BLUMENTHAL. Thanks, Senator Blackburn. Senator Klobuchar.

### STATEMENT OF HON. AMY KLOBUCHAR, U.S. SENATOR FROM MINNESOTA

Senator KLOBUCHAR. Thank you very much. Ms. Davis, we now know that Facebook's own research found that Instagram worsens body image issues for one in three teenage girls. Were you aware of those internal findings before the *Wall Street Journal* articles came out?

Ms. DAVIS. Senator Klobuchar, I would just like to correctly characterize those findings. What those findings are actually of teen girls who already expressed having that issue. One—one is too many——

Senator KLOBUCHAR. OK, I have 5 minutes and I appreciate that, and we will put that on the record, but were you aware of the internal findings before the Wall Street Journal articles came out?

17

Ms. DAVIS. Thank you, Senator Klobuchar. I and my team work on a weekly maybe——

Senator KLOBUCHAR. Could you just answer—I was actually asking a polite question. Were you aware? Could you answer yes or no?

Ms. DAVIS. Yes, I was.

Senator KLOBUCHAR. And what specific steps did you then take in response to your own research and when?

Ms. DAVIS. Senator Klobuchar, I don't know if I could give you exact dates, but what I can tell you is that this research has fueled numerous product changes. So, for example, in the context of eating disorders, we now have a dedicated reporting flow for eating disorder content. We also pop-up resources for individuals if they try to search for this content—numerous changes——

Senator KLOBUCHAR. OK, but could you—OK, well then what I will do is, in writing ask the questions so we can find out the dates from when the research came out and what you did. You were creating, Facebook was creating a version of Instagram that targeted kids under 13. You announced this week that you are pausing that program. What specific criteria will you use to determine whether to unpause the plan and who will make that decision?

Ms. DAVIS. Thank you, Senator Klobuchar. I think what we intend to do at this point in time is to step back to talk with more parents, to engage with more policymakers like yourself, to engage with more experts. What I do know is that parents are—8 out of 10 parents, in fact, for kids under the age of 13 are allowing their children onto sites between the ages of 8 and 12——

Senator KLOBUCHAR. Yes, but I asked who is going to make the decision—I so appreciate if you were answering the question, I would let you go ahead but I was asking who will make the decision about whether to unpause the work on developing that program.

Ms. DAVIS. Well, certainly it will be a collaborative team within the company, but it will be done with the guidance and expertise of our youth advisors, hearing from parents, hearing from policymaker——

Senator KLOBUCHAR. Aright, I know that is guidance, but I was asking the identity of the person who will make the decision. That is all. I will do that in writing again.

Ms. DAVIS. I don't have a single person. I am sorry, Senator Klobuchar.

Senator KLOBUCHAR. OK. Last quarter, Facebook publicly reported that its advertising revenue per user in the U.S. and Canada, this is for a quarter, was $51 per quarter. Didn't even compare with any other industrialized nation or any other country.

They are making so much money off of American users. I asked your colleague Steve Satterfield about that last week in a hearing in my Judiciary Antitrust subcommittee, the hearing we had on big data. In his response, he said he wasn't entirely sure whether the data included Instagram revenue. Does it include Instagram revenue, and specifically, does it include revenue from kids under 18?

Ms. DAVIS. Senator Klobuchar, that is not something I work on, but it is sort of not how we build products, particularly in relation to young people. We actually have always limited ads for young

18

people. And much more recently, we have reduced based on actually guidance from experts that we don't target young people——

Senator KLOBUCHAR. OK, but again, I appreciate that—we are good at filibustering in the Senate too, but I am really concerned about the answer because I think it is specific. And again, I will do this in writing. I will publish the answers. But I am just asking a fact. You guys published these quarterly revenues. We have them on different countries, right, how much money you make. We got that information. And so I am trying to figure out if it includes Instagram.

I am trying to figure out if it includes kids, which I assume it does. And I will keep pursuing it another way. When you estimate the lifetime value of a user, you must do that because I know your profit model and how it works now, after years of taking on this monopoly dominant platform issue. What do you estimate the lifetime value of a user is for kids who start using Facebook products before age 13?

Ms. DAVIS. Respectfully, Senator, that is not how we think about building products for our—for young people. We actually are quite focused on ensuring that parents have the kinds of supervisory tools that they need. That is just—it is just not the way we think about it, certainly not the way I and my team think about it.

Senator KLOBUCHAR. Ms. Davis, that may be true about your team, but are you saying that Facebook in developing products has never considered, and you are under oath, has never considered the profit value of developing products when they make their decisions of how those products look?

Ms. DAVIS. Respectfully, Senator, we are a business. I am fully, fully aware of that, but what we are thinking about is how do we provide the best experience? If we have a very short sighted version of just—without focusing on providing a better experience for people or a good experience, that is just a terrible business model.

Senator KLOBUCHAR. Well, we will follow up in writing. I am out of time, I will try to come back if there is a second round. Thank you very much.

Senator BLUMENTHAL. Thanks, Senator Klobuchar. I am hopeful we will have a second round. I don't know whether Senator Thune is available. If not Senator Moran, or Senator Lee. I will turn to Senator Markey in the absence of a Republican Senator wishing to ask questions. And I am going to vote so you are in charge, Senator Markey.

### STATEMENT OF HON. EDWARD MARKEY,
### U.S. SENATOR FROM MASSACHUSETTS

Senator MARKEY. OK. Thank you, Mr. Chairman, very much. And we will recognize Republican members as they arrive. In April, Senator Blumenthal and I wrote to CEO Mark Zuckerberg ringing the alarm about Facebook's plan to launch a version of Instagram for kids 12 and under. I am pleased that Facebook responded to our concerns and is backing down, at least temporarily, from its plans. But a pause is insufficient. Let's be clear. The problem isn't that Instagram hasn't developed a safe product for kids.

19

The problem is Instagram itself. According to Facebook's own research, teen users consistently blamed Instagram for increases in their anxiety and depression. In fact, 32 percent of teen girls said when they felt bad about their bodies, Instagram made them feel worse. And 6 percent of American teen users trace their desire to kill themselves to Instagram. For teens Instagram is worse than a popularity contest in a high school cafeteria because everyone can immediately see who is the most popular or who is the least popular. Instagram is that first childhood cigarette, meant to get teens hooked early, exploiting the peer pressure of popularity, and ultimately endangering their health.

Facebook is just like big tobacco, pushing a product that they know is harmful to the health of young people, pushing it to them early, all so Facebook can make money. IG stands for Instagram, but it also stands for insta-greed. The last thing we should allow Facebook to do is push young kids to use Instagram. Ms. Davis, will you commit that Facebook will not launch any platforms targeting kids 12 and under that includes features such as like buttons and follow accounts that allow children to quantify popularity. Yes or no?

Ms. DAVIS. Senator Markey, I would like to actually take a second to disagree with your comparison. Our products actually add value and offer—enrich teens' lives. They enable them to connect with their friends, with their family. And actually during COVID, during the pandemic——

Senator MARKEY. I appreciate that. I appreciate that. Senators just have limited time in the question and answer period. I have a question to you. Will you stop launching, will you promise not to launch a site that includes features such as like buttons and follower accounts that allow children to quantify popularity? That is a yes or no.

Ms. DAVIS. Senator Markey, those are the kinds of features that we will be talking about with our experts, trying to understand, in fact, what is most age appropriate and what isn't age appropriate? And we will discuss those features with them, of course.

Senator MARKEY. Well, let me just say this. We are talking about 12 year olds. We are talking about 9 year olds. If you need to do more research on this, you should fire all the people who you are paid to do your research up until now, because this is pretty obvious and it is pretty obvious to every mother and father in our country, because all recent scientific studies by child development experts found that not getting enough likes on social media significantly reduces adolescents' feelings of self-worth. Here is another threat to young people on Instagram.

The app is full of images and videos of popular influencers who peddle products while they flaunt their lavish lifestyles to users. Ms. Davis, will you commit that Facebook will not launch any platforms targeting kids that host influencer marketing, commercial content that children may be incapable of identifying as advertisements? Yes or no?

Ms. DAVIS. Senator that is actually one of the questions that we will be working with, with our experts as well. I do think it is important to point out that our app Messenger Kids, a messaging app for young kids under 13 doesn't show ads at all. And that was

20

based on the feedback that we got from parents and from our experts.

Senator MARKEY. I will just say this, it is not acceptable that you don't have answers for these questions right now. These are the obvious problems that exist. In television, we don't allow the host of a program to hawk a product to a child. It is illegal. You know, I am the author of those laws, so I know it is illegal. And the same thing is true here.

Why Facebook just can't say flat out, no, we won't allow influencers to be trying to push a child toward buying something because that child has now seen a video is just, again, completely and totally unacceptable, because we know the children lack the cognitive ability to decipher whether something is an advertisement and influencer marketing is inherently manipulative to kids. The same thing was true on television, it is true over here. We have to move the same values from television over to the Internet or else the same exploitative policies will be adopted by marketers.

Research also finds that your algorithms send teen users into a spiral of harmful content, including misinformation about COVID and ads for diet pills and appetite suppressants. Ms. Davis, will you commit that Facebook will not launch any platforms targeting children that employ algorithms promoting this dangerous content?

Ms. DAVIS. Thank you, Senator Markey. We actually don't allow weight loss ads to be shown to people under the age of 18 already.

Senator MARKEY. OK, well, that is reassuring because that content shouldn't exist anywhere on your platform. Your platforms, however, from my perspective, are actively promoting these materials and we can't let that happen to kids. So you seem to disagree with whether or not you are doing that. But my research says that you are. So that is also something that I think we should just codify. If Facebook has taught us anything, it is that self-regulation is not an option.

We need rules, rules that are federally mandated, that have to be adhered to by companies. And that is why today I am reintroducing the Kids Internet Design and Safety Act, the KIDS Act, partnering with Senator Blumenthal, who I thank for working with me on this bill. Our legislation bans damaging website design features like follower counts, auto play, and push alerts that are harmful to kids, limits advertising and commercial content like product placement and influencer marketing to kids and prohibits amplification of harmful and violent content to kids.

Ms. Davis, do you agree that Congress needs to pass this legislation and enact these critical safeguards for children online, yes, or no?

Ms. DAVIS. Senator Markey, I think our company has made its position really well known, that we believe it is time for the update of Internet regulations and we would be happy to talk to you and work with you on that.

Senator MARKEY. OK, well, do you support this legislation?

Ms. DAVIS. I would be happy to follow up most certainly.

Senator MARKEY. Well, your company has had this legislation in your possession for months and you are testifying here today before the Committee that we would have to pass this legislation. And again, I just feel that, you know, delay and obfuscation is the legis-

21

lative strategy of Facebook, especially since Facebook has spent millions of dollars on a marketing campaign calling on Congress to pass Internet regulations. And Facebook purports to be committed to children's well-being.

So it is simply wrong that you will not support this legislation to enact protections on kids—for kids online. That is the only conclusion I can reach since you have had it in preparation for this hearing for a long period of time. So we know that Facebook's top priority is its bottom line. Congress has to step in. We have an obligation to enact a bold agenda for young people online. And that means passing the KIDS Act to take on big tech's damaging and coercive tactics to hook kids.

Two, updating the Child Online Privacy Protection Act, to finally give young people up to the age of 16 a privacy bill of rights for the 21st century, and passing my CAMRA Act to launch a major research project at the National Institutes of Health on the effects of tech on children. It is time for us to do this. We cannot wait. This is a crisis, and we must act. Let me now turn and recognize Senator Thune.

### STATEMENT OF HON. JOHN THUNE,
### U.S. SENATOR FROM SOUTH DAKOTA

Senator THUNE. Thank you, Mr. Chair. I, along with many of my colleagues, are deeply concerned about the lack of consumer transparency and limited accountability of big tech companies. Consumers have become increasingly troubled about the way that their information is used by social media platforms and how these sites decide what news and information we see. Because of the secrecy with which platforms protect their algorithms and content moderation practices, which largely has been and continues to be a black box, consumers have little or no idea how the information they see has been shaped by the sites that they're visiting.

I have introduced two bipartisan bills to address these issues, platform accountability and consumer transparency with a PACT Act, and the Filter Bubble Transparency Act. The PACT Act would increase transparency around the content moderation process and provide the consumers more due process when a platform like Facebook removes posts. And the Filter Bubble Transparency Act would give consumers the option to engage with Internet platforms without being manipulated by opaque algorithms. And I would like to, Ms. Davis, just very briefly discuss those with you today.

The *Wall Street Journal* recently revealed that Facebook overhauled its algorithm in 2018 in an effort to boost, "meaningful social interactions, or MSI, meant to strengthen bonds between friends and family." Instead, the overhauled algorithm rewarded outrage and sensationalism, making Facebook's platform an angrier place.

Mr. Zuckerberg reportedly resisted proposed fixes because he was worried it would hurt Facebook's objective to make users engage more with Facebook. Ms. Davis, should consumers be able to use Facebook and Instagram without being manipulated by algorithms designed to keep them engaged on the platform?

Ms. DAVIS. Respectfully, Senator, that is not how we think about—think about our news feed. In fact, our news feed is de-

22

signed to connect people to people that they—that they have a meaningful connection to, so friends, family, things that they are interested in. That particular change actually reduced the amount of time that was spent on our platform by about 50 million hours a day. The goal there was really to promote that more meaningful connection between friends—friends and family.

That said, I do think we have instituted additional controls for people's news feed so people can actually have a news feed that is based on a chronological order as opposed to a ranking. And we have made numerous investments in transparency broadly. We have an annual transparency report.

We actually submit to human rights impact assessment. We have an oversight board, all because we, too, like you, believe more transparency is important.

Senator THUNE. The PACT Act, which I referenced earlier, is a Section 230 legislation introduced with Senator Schatz, which among other things, required that large online platforms remove court determined illegal content and activity within 4 days or lose their Section 230 liability protection. Do you believe that Facebook and other large Internet platforms should remove content that has been found by a court to be illegal?

Ms. DAVIS. Certainly, Senator, we have policies against illegal activity in our platform and illegal content.

Senator THUNE. There is a study published in the Proceedings of the National Academy of Sciences way back in 2014 that revealed that Facebook had conducted a massive experiment of 700,000 users on its platform. It found, "emotional states can be transferred to others via emotional contagion, leading people to experience the same emotions without their awareness." Today, 7 years later, we are learning through media leaks that Facebook's internal studies continue to show the emotional contagion its services can produce among its users, most recently with teen users on Instagram.

What do you think should be done to make users in the public more aware of the emotional contagion that occurs on Facebook and Instagram, and what can be done to counterprogram against emotional contagion on Facebook and Instagram?

Ms. DAVIS. Thank you, Senator. I really appreciate that very thoughtful question. In fact, the research that we did wasn't exactly about emotional contagion. Nonetheless, the recent research really identified areas where we could actually improve our products. So, for example, we saw that young people indicated that when they saw uplifting content or inspiring content that could move them away from some other issues that they are struggling with. And so one of the things that we are looking at is something called nudges, where we would actually nudge somebody who we saw maybe potentially—rabbit-holing down content toward more uplifting or inspiring content to break that, what you are referring to as sort of contagion.

Senator THUNE. Mr. Chairman, my time has expired. But let me just close by saying that I think it is time for us to look at some of these reforms. I have got a couple of bills, as I mentioned, and I just think that users need to know they need more transparency. These algorithms are opaque. And I think in many cases at least, users ought to have an option to be able to see content that hasn't

been moderated by the platform. So I hope that we can make some headway on that, and I hope we do it soon. Thank you.

Senator BLUMENTHAL. Thanks, Senator Thune. I call on Senator Luján.

## STATEMENT OF HON. BEN RAY LUJÁN,
## U.S. SENATOR FROM NEW MEXICO

Senator LUJÁN. Thank you much so much, Mr. Chairman. Ms. Davis, we have heard from you today and from others that Facebook contests *The Wall Street Journal's* reporting on internal research. Rather than argue details, I have a simple question. Yes or no, does Facebook have internal research indicating that Instagram harms teens, particularly harming perceptions of body image which disproportionately affects girls?

Ms. DAVIS. Senator, we have released the two studies in relation to this. What our research showed was that for people who are struggling with these issues, that actually more of them found their engagement on Instagram helpful than harmful. In fact, of the 12 issues that we looked at, 11 of those were the case for young girls and 12 of 12 for teen boys.

Senator LUJÁN. So one of the challenges that I am facing here, Ms. Davis, is that there is two sides to this story. The problem is Facebook is telling both sides, you are saying your own internal research is misleading and taken out of context. So please help us get to the bottom of this. Yes or no, will Facebook release the basis of the research, the data set minus any personally identifiable information to allow for independent analysis?

Ms. DAVIS. Senator, we have already released two of the primary pieces of research. We are actually looking to release additional research and to create greater transparency. We are also quite invested in giving external researchers an opportunity to look at—to access data in a way that is privacy—privacy protected. In addition, we fund and research external independent research through grants, and we would happy to——

Senator LUJÁN. Ms. Davis, I apologize. I don't have a lot of time. If you could please give me a yes or no to this question, and it is either yes or no. Will Facebook release the basis of the research, the dataset, minus any personally identifiable information to allow for independent analysis?

Ms. DAVIS. We are looking to release more of that research.

Senator LUJÁN. That sounds like a yes. Am I incorrect?

Ms. DAVIS. [inaudible]—to do. We have privacy obligations, but we are looking to provide greater transparency——

Senator LUJÁN. Again, that is why I am trying to be clear here, Ms. Davis. You can—I am asking for you to release the data minus any personally identifiable information. And if I am incorrect with your answer being interpreted as yes, please correct me.

Ms. DAVIS. Respectfully, Senator, I want to be really clear——

Senator LUJÁN. That sounds like a no. There is no reason—I am just—yes or no. And if the answer is not yes, then it is a no. On April 11, 2018, I asked Mr. Zuckerberg if Facebook creates shadow profiles for nonusers that utilize the site without logging on or officially creating an account. Despite ongoing and public reporting on this issue, in response, Mr. Zuckerberg claimed that he had never

24

heard the term, quote, shadow profile. Ms. Davis, now, in the context of today's discussion, I will ask a slightly different question. Yes or no? Does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13 without the consent of those children's parents or guardians?

Ms. DAVIS. Senator, children under the age of 13 are not allowed on Instagram or Facebook.

Senator LUJÁN. Does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13? Is your answer, no?

Ms. DAVIS. Respectfully, Senator, we do not allow children under the age of 13——

Senator LUJÁN. That is not the question that I am asking. The question I am asking, in the same way that I asked Mr. Zuckerberg on April 11th about the collection of this information, does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13 without the consent of those parents or guardians. If the answer is no that is sufficient.

Ms. DAVIS. Senator, it would be my understanding that we don't since we don't allow them on our apps.

Senator LUJAN. I appreciate that. I understand that the algorithms underpinning content moderation and recommendations on Facebook and Instagram change on a regular basis. Ms. Davis, yes or no, in preparation of changes to existing algorithms, has Facebook ever first tested potential impacts of those changes before they are rolled out broadly?

Ms. DAVIS. So this is not my area of expertise. I know that we do do testing to understand the impact of changes, but I can't speak specifically to this one.

Senator LUJÁN. Publicly, Facebook has said they do that. Yes or no, has Facebook ever tested whether a change in its platform will later increase growth in users or growth in revenue?

Ms. DAVIS. Senator, would you repeat the question? Your voice sped up weirdly.

Senator LUJÁN. Has Facebook ever tested whether a change to its platform would later increase growth in users or growth in revenue?

Ms. DAVIS. Respectfully, Senator, this is not my—not my particular area of expertise. I can certainly take the question back to the team, but I am sure that we think about business issues of this kind.

Senator LUJÁN. Facebook has said publicly they do. Yes or no, has Facebook ever tested whether a change to its platform increases an individual or a group of users' propensity to post violent or hateful language?

Ms. DAVIS. Again, Senator, this is not my area of expertise. But I would be happy to take your questions back to the right team and get you answers.

Senator LUJÁN. And, Mr. Chairman, I think with that last question, we might get more responses to that one next week. Yes or no, has Facebook ever tested whether a change to its platform makes an individual or a group of users more likely to consider self-harm?

25

Ms. DAVIS. Actually, the research that has been released and has been reported on looks at whether a young person thinks that they—that their first thoughts of suicide occurred on our platform. And, you know, while the numbers there show about 0.5 percent, about a half a percent do, that is one too many.

As someone who had a brother who died by suicide as well as a very close college friend, if there is one person on our platform who attributes their suicidal ideation to our platform, that is one too many and we care deeply about it. And we have built product changes to address that. So we have a suicide prevention reporting flow where you can actually connect with a crisis counselor right from that point, reporting flow. Family members who report something can actually connect with the person immediately, because our experts have told us that when they connect with that person that is one of the best ways to prevent suicide.

We take this issue very seriously and we are the industry leader when it comes to preventing—addressing suicide on our platform.

Senator LUJÁN. And my final question, Mr. Chairman. Yes or no, has Facebook ever found a change to its platform would potentially inflict harm on users, but moved forward because the change would also grow users or increase revenue?

Ms. DAVIS. That has not been my experience at all at Facebook. We care deeply about the safety and security of the people on our platform. We have invested $12 billion in it. We have thousands and thousands of people working on this issue. That is just not how we would approach it.

Senator LUJÁN. Mr. Chairman, I hope that the answer to the very first question that I asked will be a profound, yes. The one area that Facebook can make structural changes here is by simply making research public by default, allow real independent oversight, and I look forward to that information being given to the Committee. If not, I look forward to requesting it formally. Thank you, Mr. Chairman.

Senator BLUMENTHAL. Thanks, Senator Luján. And I think you are absolutely right. In that regard, let me just ask Ms. Davis. You have refused to commit that these research and findings will be made public. Who will make that decision at Facebook?

Ms. DAVIS. I don't know that there is any, Senator, that there is any one person who will make that decision. I do know that there are many people looking——

Senator BLUMENTHAL. Well, let me—let me just ask you this. Isn't it a fact that Mark Zuckerberg is the one who will make that decision?

Ms. DAVIS. Respectfully, Senator, this is the kind of decision that would involve many people in the company. We need to look at our privacy obligations and we are looking to be—to provide more transparency.

Senator BLUMENTHAL. Well, with all due respect to you, the word transparency is easy to use, it is hard to do, and so far there is nothing that you have said to indicate that disclosure of these findings, conclusions, recommendations, facts known to Facebook about the harmful effects of its products will be made available. And, in fact, that a decision will be made by any specific time or by any particular individual. Can you tell us more?

26

Ms. DAVIS. Respectfully, Senator, I think that our commitment to transparency in the last few years should be a very good indication of our commitment. We have launched a transparency report regularly. We have set up an oversight board. We have human rights impact assessments. We are doing a tremendous amount to ensure transparency around our platform. And we are looking for ways to give independent researchers access to data so that they can do independent studies as well.

Senator BLUMENTHAL. You know, that is perhaps one of the most discouraging parts of your testimony that you are relying on your past record of transparency for what you will do in the future. The fact of the matter is, there are thousands of documents that we have only because a whistleblower has come forward, documents that show your own findings. That is directly the opposite of transparency, Ms. Davis.

I realize that you are testifying here about the efforts of Facebook to counter those documents, but the only way to counter facts is with real transparency. Let me ask you, while we are waiting for other Senators to arrive, I know that some are on their way.

For years, Instagram did nothing about eating disorders. It began to take some small steps, only when a 14 year old girl, her name is Molly Russell, took her own life. She was getting trapped in that perfect storm that Facebook researchers described. Your own researchers called it a perfect storm. Our research has shown that right now in real time, Instagram's recommendations will still latch onto a person's insecurities, a young woman's vulnerabilities about their bodies and drag them into dark places that glorify eating disorders and self-harm. That is what Instagram does.

In fact, according to documents provided to me as recently as April 2021, that is this year, a Facebook engineer raised concerns that, "no one has decided to dial into eating disorders." They documented the problems we have verified. So, you knew. You knew. How long should it take to fix these problems? What are you going to do to address what we have found just within the past week or so?

Ms. DAVIS. Senator, we have been working with suicide prevention experts since 2006. We also work with eating disorder experts. We don't allow the promotion of either kind of content on our platform. We do allow individuals to talk about their journeys to recovery because our experts have told us that that is really important and helpful to them. We have a dedicated reporting flow when it comes to eating disorder content, and we actually offer resources of support. That is all work that has been generated out of both this research and working with our experts.

Senator BLUMENTHAL. So let me—Ms. Davis, because our time is—our time is limited. And in your answer, in response to my question, what are you going to do to fix the problem? You are essentially saying there is no problem. Is that right?

Ms. DAVIS. Respectfully, Senator, no, in fact, that is not what I am saying. As long as there is one person dealing with the issue on our platform, we consider it a problem. And actually there are additional product changes that we are looking at. So, for example, I think I mentioned earlier that we are looking at nudges toward uplifting content. One of the things that has—teens themselves has

27

identified as helpful to them when they are dealing with certain issues that they are struggling with like eating disorders.

We are also looking at something called take a break, where we would encourage somebody to take a break when we think they may be rabbit holing down certain kinds of content or on the app too long.

Senator BLUMENTHAL. So you are not committing to any specific steps by any specific time, but you do acknowledge there is a problem with eating disorders, with suicidal tendencies that may be fostered or promoted?

Ms. DAVIS. Sure. Certainly, Senator, I think we actually have issues in relation to teens and suicide and eating disorders within our society. And to the extent that those things play out on our platform, we take them extraordinarily seriously. And while you have asked—you mentioned a time commitment and I can't give you a time commitment, but I can tell you that we are working on it. And I can tell you that in addition to all the things that we already do, we would be happy to follow up with you and share with you our progress in that direction. We take the issues very seriously.

Senator BLUMENTHAL. I know you take it seriously. At least that is what you are telling us. But all you are doing is looking at these possible steps. And with all due respect, these steps are baby steps, not even baby steps, in the direction of trying to improve Instagram and meet the very serious problems that have been disclosed. Let me come right to the point. Instagram for kids has been paused. How long will it be paused?

Ms. DAVIS. I don't have a specific date, but I do have a commitment from all of us at Facebook that we will be speaking to parents. We will be talking to policymakers like yourselves. We will be talking to experts. We want to get this right. We also know that young people are online under the age of 12 on apps that aren't designed for them, that we want to get their parents the supervisory tools and insights that they need so that they can manage the amount of time that their child is spending, so they can determine what their child should be seeing or should not be seeing, actually fundamentally to allow them to parent their children.

Senator BLUMENTHAL. Who will make the decision about how long Instagram for Kids is paused? Mark Zuckerberg, right?

Ms. DAVIS. There is no one person who makes a decision like that. We think about that collaboratively, but quite honestly, we will be working with experts to understand and get to feel that people are in a comfortable place before doing so.

Senator BLUMENTHAL. Senator Blackburn.

Senator BLACKBURN. Thank you, Mr. Chairman. Ms. Davis let's go back to this issue of all the data that you all are collecting on kids through your program where you are tracking them, you are doing the digital experience surveys. What do you do with that data and how long do you keep it? And do you have the parents' permission to do that research?

Ms. DAVIS. Whenever we do research, we use the most stringent privacy protections. And whenever we do research with minors, we certainly get parental consent.

28

Senator BLACKBURN. You get parental consent. Why don't you submit to us for the record a screenshot of what you use as a parental consent form? Will you do that?

Ms. DAVIS. Senator, I would be happy to take your request back to the teams that do the research.

Senator BLACKBURN. No, we want a copy of the form. If you get parental consent, there has to be some kind of form that is signed. So even if it is a digital signature. So why don't you submit that to the record? Will you submit the form for the record?

Ms. DAVIS. Senator, I will go back to the teams and bring that request to them.

Senator BLACKBURN. OK. The *Wall Street Journal* articles have had a big impact and have helped to bring some sunlight to your practices. And I am sure that Mr. Zuckerberg was not pleased with this. And in some of the documents we have seen that there is a real lack of governance. It is kind of his way or the highway at Facebook. So how long have you worked at Facebook?

Ms. DAVIS. I have worked there for 7 years.

Senator BLACKBURN. Seven years, OK. And have you all deleted any documents since you learned about the whistleblower in *The Wall Street Journal* reporting?

Ms. DAVIS. Senator, we would not do anything in violation of any law. I really—there are 60,000 employees. I have no idea if any— I would never suggest that I know what e-mails one of our 60,000 employees have deleted.

Senator BLACKBURN. OK, well, how are you restricting access to data internally? Have your policies changed since *The Wall Street Journal* articles?

Ms. DAVIS. Senator, not that I am aware of, certainly.

Senator BLACKBURN. OK, so you don't know if there is a parental consent form, even though you say you have people sign one if you are going to do research on their children. I would be interested to see if it is similar to a medical release form that parents have to sign. And you don't know if you have changed any practices about data handled internally or if you have eliminated data? OK, let me ask you this, will you commit that Facebook will not take revenge, retribution, or retaliation against the whistleblower?

Ms. DAVIS. Senator, we would never take—retaliate against someone coming to speak for speaking to Congress. That is just not who we are.

Senator BLACKBURN. OK, but you are not going to say about the actions? I wasn't asking about speaking in Congress, I was asking about the actions. But we will leave that where it is. Are you aware of Facebook enabling tracking on the Uyghur Muslims in Xinjiang province in China when they would download Messenger? Are you aware that they have put tracking spyware in Messenger in China?

Ms. DAVIS. Senator, in fact, we did not put that tracking spyware, we found that tracking spyware. We removed it. We have briefed the Senate on it.

Senator BLACKBURN. OK. Why did Senator Blumenthal's office so easily access Instagram and set up this account for a 13 year old and then immediately they began to receive information about eating disorders and self-harm content? What kind of artificial intelligence are you using that would direct them that way?

29

Ms. DAVIS. Senator, we do not direct people toward content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and to remove it.

Senator BLACKBURN. OK, so what you are saying is the experience that Senator Blumenthal's office had is an outlier or an anomaly. Is that correct?

Ms. DAVIS. Senator Blackburn, I haven't seen the particular things. I would take a look, but I can tell you that our policy——

Senator BLACKBURN. I am sure he can send you the digital copy of the poster that he had here. So thank you. And Mr. Chairman, I yield my time.

Senator BLUMENTHAL. Thank you, Senator Blackburn. And we can make available to you, Ms. Davis, all of the information about how easily and readily we put this profile of a 13 year old young woman on and the reactions on eating disorders. I am sure you already have the findings and evidence that supports our conclusions. Senator Lummis is on remotely.

### STATEMENT OF HON. CYNTHIA LUMMIS,
### U.S. SENATOR FROM WYOMING

Senator LUMMIS. Thank you, Mr. Chairman. Like many members of this committee, I am alarmed by the revelations of the *Wall Street Journal* article demonstrating the disturbing conclusions of Facebook's own research, conclusions which merit repeating. Just under one in three teen girls reported the Instagram app made them feel worse about their body image. Another significant portion of users also reported increased feelings of anxiety, suicidal thoughts, depression, and eating disorders as a result of the app's use.

Unfortunately, this research did nothing more than confirm many of our earlier intuitions and suspicions, social media can be dangerous to your mental health. I look forward to more studies on the impact of social media on mental health. However, I am concerned by the consistent lack of transparency from Facebook. The fact is that this committee would not be here without the brave whistleblower who stepped forward to shed light on this issue, an issue that many of us had previously sought answers to before and that we now seek answers to today. We must remember that despite apps that purport to be free for us to use, there is a very real cost, one that often comes at the price of our youth's mental health.

I was fortunate to grow up without the pressures of social media, but for the first time in today's generation, the children struggle with how to grow up managing a virtual version of themselves, all while the billion dollar industries compete for their time, information, money, and attention.

So I firmly believe that more must be done. I recently signed on to a bill that would update the Children's Online Privacy Protection Act by placing strict restrictions on behavioral advertising directed at children. So my question for you, Ms. Davis, has Facebook conducted research into how children are more easily manipulated by highly personalized advertising?

Ms. DAVIS. Senator, I would not be familiar with that research. What I can tell you is that we have very limited advertising to

young people. You can only actually now target a young person based on their gender, age, or location. For messenger kids for under 13, we actually don't allow ads at all. And I think we would want to know how we can safely provide an experience for young people on our apps in relation to advertising. And that is why we have our rules in place.

Senator LUMMIS. Has Facebook withheld any other relevant information relating to its service's impact on mental health scares. Here is why I ask. When asked during a Congressional hearing in March of earlier this year about the impact of social media on children's mental health, Mr. Zuckerberg responded, "the research that we have seen is that using social apps to connect with other people can have positive mental health benefits." That is only one side of the coin.

This answer clearly only told part of the story. These documents reveal Facebook knew that. How can Congress or Facebook users have confidence in the credibility and safety of Facebook moving forward, and is Facebook withholding information about studies they have done on negative mental health consequences?

Ms. DAVIS. Thank you. Thank you for your question, Senator. Actually, I would say that the one sided and misleading reports actually were in *The Wall Street Journal,* which didn't provide the full context. In fact, the research showed that many more people, actually more teens found the Instagram use helpful when they were struggling with these particular issues. Our research is not bombshell research.

It is research that is—currently there is similar research out of Harvard, out of Pew, out of Berkeley. That doesn't mean we don't take it seriously. We do this research to improve our product, to make our products better for young people, to provide them with a positive experience. Right now, young people tell us—8 out of 10 tell us that they have a neutral, positive experience on our app. We want that to be 10 out of 10. If there is someone struggling on our platforms, we want to build product changes to improve their experience and help support them.

Senator LUMMIS. So do you have information that from the 2 out of 10 who have not had neutral or positive experiences, so you know how to adapt the presentation of your product to consider the fact that some children seem harmed or negatively impacted by what they are seeing?

Ms. DAVIS. Thank you, Senator. I really, really appreciate that thoughtful question. Actually, some of the research that we did was to actually find out from those teens what they thought could be particularly helpful to them. And one of the things that they identified is inspiring content or content that talks about people overcoming these particular issues, uplifting content. And so we are actually looking at some product changes to find ways to nudge that content to individuals who are struggling.

Senator LUMMIS. Thank you, Ms. Davis. Mr. Chairman, I yield back.

Senator BLUMENTHAL. Thank you, Senator. I am going to do the second vote and yield to Senator Cruz for his questions, and I will be back shortly.

**STATEMENT OF HON. TED CRUZ,**
**U.S. SENATOR FROM TEXAS**

Senator CRUZ. Thank you, Mr. Chairman. Ms. Davis, where are you right now?

Ms. DAVIS. Washington, D.C., in a conference room.

Senator CRUZ. So you are in Washington, D.C. Why aren't you in this hearing room right now?

Ms. DAVIS. This is where I was told the come with COVID protocols, for the safety and security of my family.

Senator CRUZ. Facebook is in the process of hiding. Facebook is in the process of trying to avoid accountability. You are not physically here, even though you are blocks away from us. So you are sitting in a conference room, but you don't want to actually face Senators and answer questions. Last week, a colleague of yours, I guess, didn't have the instincts of hiding that you did.

Mr. Satterfield actually came physically and was here for a hearing. And by the way, we have hearings every week, even with COVID. So it is witnesses that want to hide and avoid us that that are not physically here and choose to do it over video as well. But your colleague, Mr. Satterfield, played the Sergeant Schultz game. If you remember the old TV show Hogan's Heroes. His testimony was essentially, I hear nothing, I see nothing.

And so when it came to Facebook's research concerning the incredible harm that Instagram is inflicting on young girls, your colleague Mr. Satterfield said, he didn't know anything about it. That he didn't cover those issues, he didn't know anything about it. So I would assume, Ms. Davis, as global head of safety, you are familiar with these issues?

Ms. DAVIS. Certainly.

Senator CRUZ. So you are not going to plead ignorance, as Mr. Satterfield did, is that right?

Ms. DAVIS. I will answer questions about—in my area of expertise, of course.

Senator CRUZ. OK, one of the things *The Wall Street Journal* reported was that Mark Zuckerberg was personally and directly aware of that research. Is that correct?

Ms. DAVIS. Senator, Mark pays attention to a lot of the impact research that we do, and I would—I don't know whether he was aware of the specific piece of research, but I know that he is looking at the research as we all are. I work with the research teams on a weekly basis, a daily basis, actually, in relation to the safety and security of the people on our platform.

Senator CRUZ. Alright. So you said you weren't going to plead ignorance. Your very next question is, I don't know. It was reported Mark Zuckerberg was personally aware. Have you ever discussed this research with Mark Zuckerberg, yes or no?

Ms. DAVIS. This particular research, I don't remember discussing that with him, no.

Senator CRUZ. OK. A minute ago, you said that this research was, and I wrote it down because the phrase really jumped out at me—you said, "this is not bombshell research." I found that a pretty remarkable statement. The *Wall Street Journal* reported that your Facebook research concluded that 13 percent of British users and 6 percent of American users trace their desire to kill them-

32

selves to Instagram. Is that right? Is that a conclusion of your research?

Ms. DAVIS. Respectfully, Senator, actually, what the research shows, if you look at it more carefully, is that about 0.5 percent of teens indicate a connection of suicidal ideation to their Instagram use, and these are just teens who have that ideation. That is 0.5 percent too many, and we have invested incredibly heavily in suicide prevention on our platform. For example, we have reporting flows specifically dedicated——

Senator CRUZ. So you just suggested a moment ago—you just suggested a moment ago that I look at the research more carefully. How would you propose I do that? Have you released the research?

Ms. DAVIS. We have released two of the primary pieces of research that are part of that story, and we are looking to release additional research.

Senator CRUZ. So was *The Wall Street Journal* not telling the truth when it said, "13 percent of British users and 6 percent of American users trace their desire to kill themselves to Instagram." That is from *The Wall Street Journal*. Was that true or false?

Ms. DAVIS. It is a misunderstanding of the research. But I would point you to the blog posts that our Vice President of Research wrote that goes through—and explains the research.

Senator CRUZ. And has the full research been released or not?

Ms. DAVIS. Actually, Senator, we have released two of the specific studies and we are looking to release more research——

Senator CRUZ. So what is the research you haven't released? What are you keeping secret? Because you are telling us if only you knew the full research and then at the same time, you are not releasing the research. So which is it?

Ms. DAVIS. I am not sure I understand your question.

Senator CRUZ. Do you want us to examine the full research or not?

Ms. DAVIS. Released two primary sources. We are trying to release others. I believe you have——

Senator CRUZ. So you have cherry picked the ones you want us to see. Have you released the research—I haven't seen this research, so if you have released it, I will happily take a look at it? Have you released the research that *The Wall Street Journal* said concluded, and this is your own researcher concluding, 13 percent of British users and 6 percent of American users trace their desire to kill themselves to Instagram? Have you released the underlying, the entire underlying research behind that?

Ms. DAVIS. Senator, again, I disagree with the characterization of the research in the *Wall Street Journal*——

Senator CRUZ. Have you released the entire research behind it? Have you released the research behind it? The entire research?

Ms. DAVIS. We have released the two studies as I have said——

Senator CRUZ. So you have cherry picked part of the research that you think helps your spin right now. So let me ask you, if 6 percent of American users trace their desire to kill themselves to Instagram, you just said that's not bombshell research. Tell me what would be bombshell research if 6 percent is not, what would be?

33

Ms. DAVIS. Respectfully, Senator that is again, a mischaracterization of the research. And maybe more importantly, what the research shows is that in the small instances, in that 0.5 percent, there is actually an opportunity for us to help. That teens do find that we can be helpful in these instances.

Senator CRUZ. So has Facebook changed your policies after you had a report that said teenagers using your product were significantly more likely to kill themselves? Did you change your policies in any regard to prevent that?

Ms. DAVIS. Respectfully, Senator, we have a set of suicide prevention experts that we work with on a regular basis, and we are constantly updating our policies——

Senator CRUZ. Did you change your policies as a result of this research informing you that your products were making teenage girls significantly more likely to kill themselves?

Ms. DAVIS. We update our policies on an ongoing basis——

Senator CRUZ. You are not answering my question. Did you change your policies in response to this research? That is a yes or no.

Ms. DAVIS. We change—we change our policies based on expert guidance, not based on——

Senator CRUZ. So you are not going to answer that question. I am just going to ask one final question. Which is your company conducted, paid for research that informed you that your products were making teenage girls more likely to kill themselves. I have a two part question, number one, have you quantified how many children have taken their own lives because of your products? And number two, as the global head of safety for Facebook, what would you say to a mother? What would you say to a father who lost a child because of Facebook's products?

Ms. DAVIS. First of all, Senator Cruz, the research that you are referring to is, in fact not causal research. So that is important to understand. Second of all, as someone who has had a brother die by suicide as well as a close college friend who has died by suicide, I would offer any family who has ever lost a child, regardless of whether it has to do with Facebook or not, in relation to suicide, the utmost of empathy.

Senator CRUZ. So you didn't answer the question if you have done any effort to quantify how many children have taken their own lives because of Facebook's products. Have you done any, has the company done any effort to quantify or put a number to it?

Ms. DAVIS. Causal research of that kind, Senator, requires an extraordinarily long period of time. In fact, we have made significant investments to understand——

Senator CRUZ. Is that a no?

Ms. DAVIS. Cause and effect——

Senator CRUZ. Is that a no?

Ms. DAVIS. This is not causal research, Senator.

Senator CRUZ. So it is a no, you have done no research to determine how many children have taken their own lives because of Facebook's products.

Ms. DAVIS. That is not research that we can do easily. That is a long term set of research. That is just—it is not, but——

34

Senator CRUZ. Well, I am sorry, it is not easy. Let me suggest that when you have children taking their own lives, it is worth doing. Your characterization that this is not bombshell research is inaccurate. And for the parents who are losing their children, it is a bombshell in their lives. And I understand Facebook needs to make a buck. And so if the research isn't easy, apparently you guys aren't doing it. But there is a reason people across the country are horrified at this behavior.

Senator BLACKBURN. Thank you, Mr. Cruz. Senator Lee, you are recognized.

### STATEMENT OF HON. MIKE LEE,
### U.S. SENATOR FROM UTAH

Senator LEE. Thank you, Madam Chair. Ms. Davis, I have long been concerned about the targeting of adult-themed ads to minors, because adult content or sexually suggestive content has unique psychological effects on minors. I think it should be addressed when we are talking about teen mental health. And so my first question to you is, does Facebook, and by Facebook here, I mean Facebook and Instagram, allow these businesses to target their advertisements to children using your platform, children who are between the ages of 13 and 17? I just need a yes or no answer on that. Do you allow businesses to target those kinds of advertisements to kids between 13 and 17?

Ms. DAVIS. Thank you, Senator. If you will allow me to explain how we do advertising for our app, that would be helpful to answer your question——

Senator LEE. Yes, but I would like a yes or no. If you need a sentence to add to that, that is fine. But I would like a yes or no, and you can take a sentence or so to do it. But I have got a lot of content I want to cover.

Ms. DAVIS. So when we do ads to young people, there are only three things that advertisers can target around age, gender, and location. We also prohibit certain ads to young people, including weight loss ads. And one of the reasons that we are so invested in looking at things like Instagram youth is to try to create more age appropriate experiences.

Senator LEE. OK——

Ms. DAVIS.—give parents' control——

Senator LEE.—so you do allow some businesses to target their advertisements to young children. I get that. I would like a "yes or no" on this one also. And I really just need you to work with me on this, because when you get through material—I am not trying to play gotcha. Just need you to give me a yes or no. If you need a sentence to explain, that's fine. Does Facebook collect data—do either Facebook or Instagram collect data or assign interest of adult related material to the profiles of children using your platform? By adult related material, I mean, you know, things not limited to sexually suggestive content, but also things like, I don't know, cigarettes, alcohol, or other things that are—that would be considered more appropriately themed to adults?

Ms. DAVIS. Senator, thank you for your question. We don't allow—let me answer certain parts of this as directly as I can here. We don't allow tobacco ads to—at all. We don't allow them to chil-

35

dren either. We don't allow alcohol ads to minors. We also have policies against some of the content, the kind of content that you are referring to. So, for example, we don't allow——

Senator LEE. Yes. Keep in mind this question—you are answering you are answering a different question than the one I asked, but we have got to move on because I have got limited time. Does Facebook and does Instagram allow businesses to target children on your platforms with advertisements that are sexually suggestive, sexually explicit, or that contain other adult themes or products?

Ms. DAVIS. Senator, I would have to understand more what you mean, but we don't allow young people to see certain types of content and we have age-gating around certain types of content. I would have to see specifically what you are talking about. And I would be happy to follow up with you for sure.

Senator LEE. So what is the process then for determining what advertisements are age appropriate and permitted by Facebook to be targeted at children?

Ms. DAVIS. There are category of ads—categories of ads that we don't allow for young people. So I have mentioned a few of them, tobacco, alcohol, weight loss products. I would be happy to get you for the full list.

Senator LEE. I would very much like to see that. I think that would be important to happen, and I also hope that in our follow up that you can also let us know what data you are collecting about the interests that your users have in those age groups. Now, I hear countless stories about how platforms, including Instagram, but by no means limited to Instagram, can facilitate child exploitation as well as easy access to pornography. Each of these platforms have an app that is available through the Apple App Store and the Google Play App Store, which have an age rating guide to guide consumers to what is considered age appropriate content. For example, for Apple on Apple's App Store, Instagram and Facebook are rated for children 12 and up, and on Google Play, Instagram and Facebook are both rated T for teen. Is that 12 plus rating from Apple and the teen rating from Google, is the recommendation that Facebook made to Apple and Google for suggesting the operating— in other words, did those age ratings come from Facebook? I can't hear you. I think you are on mute. Can you unmute? I need you to get her unmute.

Ms. DAVIS. Sorry about that, Senator. This is not necessarily my area of expertise, but I will answer to the best of my understanding. We don't submit the age and say this is the age of our app. We actually submit a form that we fill out, and then an app rating is assigned to our app.

Senator LEE. Assigned by whom? By the app stores?

Ms. DAVIS. Again, this is not exactly my area of expertise, and I am probably not the best person to answer you, but I am happy to get more information. I think it is an interesting line of questioning and I don't mean to not be able to answer for you.

Senator LEE. OK. You know, a lot of these questions that I am asking relate to the fact that due to the allegations that we are hearing about today, about problematic content, including content

36

that is sexually explicit or suggestive or in some cases adult themed, if not sexually explicit or suggestive.

In light of the fact that that content does exist, why is there such a disparity between the app's rating on the one hand, and the content that is available on the platform on the other? And what are you doing to promote appropriate age ratings and transparency about the content that is on your platforms, taking into account that you have got a whole lot of teenage and child users, and that not all of that content is appropriate for them?

Ms. DAVIS. Senator, I am glad you are asking this question, because as a parent, this is one of the things that I thought about quite a bit in relation to raising my teenage daughter in terms of access, particularly to sexually suggestive content, as well as content that I thought could—across media and social media and broadly impact her sense of her own body image and well-being.

And one of the things that we committed to when we paused Instagram youth, was actually giving parents supervisory tools in relation to their teen that is on Instagram, in part for exactly what you are talking about, which is to give them the ability to better manage their child's experience, to have visibility into it, to actually potentially control portions and meaningfully control their child's experience, and certainly to give them the visibility to make—to set boundaries.

Senator LEE. Right. But on the existing apps, the existing apps have an age rating. And so I really would like to know whether you recommended those age ratings, and regardless of whether you recommended them, whether you think those are appropriate, given the availability of content that is not suitable for children?

Ms. DAVIS. We do not recommend those ratings and we are very focused on building age appropriate experiences. It is why we are investing in AI, and it is why we are looking at Instagram youth. And it is actually why we have put these supervisory tools, are going to be launching the supervisory tools on Instagram, because like you, we care very much that parents can help determine what their child should see and not see.

Senator LEE. OK, I am out of time, but I want to just leave you with a parting question. Are those are those ratings appropriate? Let's say Apple's rating, 12 on up. Are they appropriate for Facebook or Instagram or any other platform like them, or not really another platform like them, but if there were, a platform that like Facebook and Instagram does allow for minors to access, in some cases, be targeted using material that is not appropriate for children? So are those age ratings appropriate?

Ms. DAVIS. Senator, I would really love for you to invite Apple to answer those questions. And I would love to hear from Apple——

Senator LEE. Oh, believe me, I have asked Apple this question many times. I have had many conversations with Apple, and I will continue to have conversations with Apple. But I am asking your opinion as a Facebook executive?

Ms. DAVIS. I don't have visibility into their—into the decisions, the decisions that they make, but what we do have control over is building age appropriate experiences and that is what we are trying to do. So we are trying to actually develop experiences where

37

parents have supervisory control, where under the age of 13 we can actually ensure age appropriate content. We are putting in policies in place on our apps who are 13 over to ensure that kids don't have access to inappropriate content. This is all part of our ongoing work and our commitment to families.

Senator LEE. The term attractive nuisance, the term used in the common law keeps coming to mind. I wish we could talk more about attractive nuisances, but my time has expired. Thank you, Mr. Chairman.

Senator BLUMENTHAL. Thanks, Senator Lee. And we will be inviting other tech companies to testify. And I hope that they will respond to the kinds of questions that you have raised here, Senator Lee. Just a few final questions. You were asked about possible retaliatory action. And you said, I think that it is not who we are, there would be no retaliation against a whistleblower. Will you commit there will be no legal action, based on the disclosure of the whistleblower's documents?

Ms. DAVIS. I am aware that there are rules in terms of the Senate, and we will comply with those rules.

Senator BLUMENTHAL. I am asking you whether there will be any legal action based on the disclosure of the documents, either from the whistleblower or anyone else publicly?

Ms. DAVIS. We have committed to not retaliating for them coming to the Senate.

Senator BLUMENTHAL. So that is a yes, there will be no legal action based on the disclosure of documents, Facebook documents, that is a yes? Correct?

Ms. DAVIS. Senator, we have committed to not retaliating for this individual coming—speaking to the Senate.

Senator BLUMENTHAL. Can you tell me, Ms. Davis, following up on Senator Blackburn's question. Regarding these documents that have been disclosed publicly, all thousands of them, not just the two that Facebook disclosed last night, have you locked down these documents, shutting out other Facebook employees?

Ms. DAVIS. Senator, it is not my understanding that we have done it, but I—no, it is not my understanding that we have done that.

Senator BLUMENTHAL. You have not. That is your testimony?

Ms. DAVIS. I just am not the person, the right person to ask, and I can certainly follow up and get an answer for you, but it is not my understanding of anything like that.

Senator BLUMENTHAL. I would like you to confirm, if you would, that those documents, the research, the findings and recommendations are available to others at Facebook. And I am just going to ask you finally, you have declined to commit that any more of those documents will be made available. Who in the company will get back to us in response to that question?

Ms. DAVIS. We will be sure to follow up with your office. I will take it back to the team to work with your office and come back to you.

Senator BLUMENTHAL. Will you commit to ending Finsta?

Ms. DAVIS. Senator, again, let me explain, we don't actually—we don't actually do Finsta. What Finsta refers to is young people setting up accounts where they may want to have more privacy. You

38

refer to it as privacy from their parents. What—in my interaction with teens, what I found is that they sometimes like to have an account where they can interact just with their—with a smaller group of friends.

Senator BLUMENTHAL. Well, Finsta is one of your products or services. We are not talking about Google or Apple. It is Facebook, correct?

Ms. DAVIS. Finsta is slang for a type of account. It is not——

Senator BLUMENTHAL. OK, will you end that type of account?

Ms. DAVIS. We—I am not sure I understand exactly what you are asking. What I can say is that based on what we have seen in terms of teens using those kinds of accounts, we have actually given them additional privacy options to address those kinds of issues, where they want more privacy so they can have more privacy.

Senator BLUMENTHAL. Well, I don't think that is an answer to my question. I think we have reached the end of our hearing. We have another vote. I don't think any of my colleagues have any other questions. So sorry, Senator Sullivan.

### STATEMENT OF HON. DAN SULLIVAN,
### U.S. SENATOR FROM ALASKA

Senator SULLIVAN. Thank you, Mr. Chairman.

Senator BLUMENTHAL. I am so glad you are here. I am glad I ran into you on the floor.

Senator SULLIVAN. Yes. Thank you for holding this hearing. And I think it is a really important hearing. And I know you care a lot about it. I care a lot about it. So, Ms. Davis, it is probably—well, I want to ask you, but I have three daughters, and when I read the—when I read the *Wall Street Journal* story, I was shocked, but, you know, in some ways, not surprised because I think we have seen a lot of this. So when you are looking at your applications, your services, do you balance the mental health needs of Americans versus the addictive nature of the products that you sell?

Ms. DAVIS. Thank you, Senator. I think you were going to ask me whether if I have children. I do. I have a 23 year old daughter. First of all, I don't agree with the characterization of our product, but in fact, we do think quite seriously and——

Senator SULLIVAN. What don't you—sorry, I am going to interrupt here. What don't you agree with I just said? Addictive nature? I said addictive nature versus mental health. What two phrases did you not agree with?

Ms. DAVIS. So I disagree with calling our product addictive. I also think that is not how we build products. But to your question——

Senator SULLIVAN. No, I mean—sorry, I am going to drill down on that. You don't think you are—you don't think your products are addictive in terms of teenagers constantly wanting to be engaged in social media?

Ms. DAVIS. Senator, as a parent and as someone who talks to parents quite a bit, it is—certainly parents, all parents, I haven't met a parent who doesn't think about the time that their child spends on their phone. And one of the things actually that we have done to actually to try to address that is to make people aware of how much time they are spending. There is a dashboard where

39

they can see it. They can actually set a reminder to let them know that they have been on so they will get off.

In addition, we are looking at something called take a break, which would prompt somebody when they have been on to take a break. So that, I think gets at your questions, but I want to——

Senator SULLIVAN. So is you—let me—I want to—well, I will let you get to mental health, but I want to drill down on this addictive element. But isn't part of your business model to have more eye-balls for a longer amount of time engaged using your services?

Ms. DAVIS. Respectfully, Senator that is not actually how we build our products. In fact, we made changes to our news feed to allow for more meaningful interactions, knowing that that would impact the time spent. In fact, it did impact the time spent by about 50 million hours per day. But we did it anyway because we were trying to build a positive, more positive experience.

Senator SULLIVAN. So can you address the issue of mental health? Were you aware of these mental health challenges for teen-age girls? I am sure you have seen the statistics more broadly about suicides for teenage American females. What are you doing to address that? And were you aware of these challenges, according to *The Wall Street Journal* that was in that study?

Ms. DAVIS. Certainly, Senator. I am very aware of the issues that teens face. I used to be a middle school and high school teacher and had a teenage daughter and was a teen myself. And being a teen comes with some—comes with challenges. And that is reflected sometimes in our platform. And what we have done, and why we did this research was to identify where those challenges may be on our platform and how we could potentially change our product to help.

What we saw with that research was that in out of 12 issues, really challenging issues, issues like anxiety, depression, loneliness, sadness, that out of 11 out of 12 teens, more teens said that they thought that their experience on the platform was helpful than harmful. Now, the teens where they found it harmful——

Senator SULLIVAN. But do you believe that? I don't——

Ms. DAVIS. We actually want to make those changes. We want to make changes to actually provide them with a better experi-ence——

Senator SULLIVAN. You—sorry, I am going to interrupt. My time is getting shorter. Do you have evidence that those issues, isola-tion, mental health, do you have evidence that those challenges and mental health challenges are actually helped by using, for ex-ample, Instagram, more or less. Are you telling me that the use of your products, actually limits those challenges? I think it is almost obvious that they increase those challenges. So what is your testi-mony today? I thought you said that it actually reduces that, is that what you just said? Because I find that quite remarkable.

Ms. DAVIS. Thank you, Senator. Actually, there is a blog post that our Vice President of Research has released on this. I want to be really careful that this research is not causal research, it is what teens said about their experiences on our platform. And the numbers that you are talking to speak specifically to teens who identified as suffering from these particular issues. I think what is really important here, though, is that this research actually is

being used to make product changes, to identify places where we can be more supportive of teens.

So, for example, take a break is something I mentioned earlier in some of the questioning. This is something that would surface to a teen who may be online for a long period of time and give them an opportunity to take a break so they don't rabbit hole down a direction that may be not positive. But we are also looking at something called nudging, where we would nudge them toward uplifting or inspiring content because they told us that that content can be helpful.

Our goal here is to really—right now, the research shows that 8 out of 10 teens say that they have a positive to neutral experience. Our goal is for that to actually be 10 out of 10 and for it to be positive. We want to provide a better experience for teens.

Senator SULLIVAN. OK, let me—let me end here. I am going over my time, but I don't see any other Senators waiting for questions, and I know the Chairman is going to come back to wrap this up, but look, I think the issues of mental health, of depression, of isolation, I think the social media engagement, particularly for teenagers, enhances these challenges, and I think we are going to see this more and more studies.

And you mentioned take a break. I am not a big fan of the Chinese Communist Party. As a matter of fact, most things they do, I instinctively disagree with. But you may have seen recently that they have—way they do things, it wasn't a law, I guess it was an edict from on high from the party and Xi Jinping, but they have told Chinese teenagers to take a real break and to limit the amount of time that a teenager in China can spend on social media or gaming or things like this.

Do you think the U.S. Government needs to look at doing something like that, an edict, if you guys won't? I personally believe that we are going to look back like 20 years from now and see the massive social mental health challenges that were created by this era when teenagers had phones in their faces starting in seventh and eighth grade and continue to have them, and we are going to look back and we are going to go, what in the hell were we thinking?

Maybe it might be the one time where we say, why didn't we, like the Chinese Communist Party, say take a break. What do you think about the Chinese new edict on taking a break for over a billion people, and should the U.S. Government think about doing something like that? Not relying on you guys, because I do think your business model in part is eyeballs and time spent online with your services.

I mean, I think that is pretty obvious. If you have less viewers and less time, you are going to get more—you are going to get less revenue. So, can you really on your own help people take a break or do we, the U.S. Government have to help people take a break like the Chinese are doing right now?

Ms. DAVIS. Respectfully, Senator, I think that there is some complexity here. So, for example, during COVID, young people used apps like ours to actually stay connected. It was a lifeline for them. They couldn't go to school. They couldn't go to their colleges. They couldn't do their graduations. Social apps actually provided them

with a way to stay connected to their friends and their family. So I think it is a bit more complex than that.

That said, I think I would certainly like for apps like ours to build experiences where parents can actually have some control over the time that their children are spending, similar to what we did in Messenger Kids. I think parents would far more welcome the ability to set time controls than to have an edict on high tell them how much, or how to parent their children.

Senator SULLIVAN. So what do you think of the Chinese edict? I know you guys aren't allowed in China, but what do you think of it?

Ms. DAVIS. As a parent, I would much prefer to be able to determine my child's time online than to have China tell me how to raise my child.

Senator SULLIVAN. OK. Fair enough. I am going to move to recess this hearing for a few minutes until the Chairman comes back. So, Ms. Davis, if you can just hold on for a few more minutes, the Chairman will be back in, I think, about just a couple of minutes. So for now, this hearing stands in recess until the arrival back of the Chairman.

[Recess.]

Senator BLUMENTHAL. We are back from a brief recess. I am hopeful that our witness is still online and with us. I was going to offer her the opportunity, if she has anything to add in conclusion.

Ms. DAVIS. Sorry, Senator, was that directed to me?

Senator BLUMENTHAL. Yes.

Ms. DAVIS. Thank you. Really, the only thing that I would add is that I look forward to the hearings where TikTok and others will come. I think it is important for us to hear from companies that have already started providing these types of apps to young people under the age of 13. TikTok, I think does. YouTube, Google does. It would be good to understand what they are trying to solve for. As an industry, we face a real issue, and we are trying to figure out a way how to best serve young people in a way that actually meets the needs of their parents and families.

Senator BLUMENTHAL. I take your point, Ms. Davis, and TikTok, along with others, will be invited, have been invited and others will be here. At this point we are not specifying who. But I would emphasize that each company bears its own responsibility. The race to the bottom has to stop. Facebook, in effect, has let it. And if Facebook can't hold itself accountable, Congress must act. The record so far is Facebook can't be trusted to hold itself accountable. Nothing personal to you.

And you have, in fact said that some amorphous team will make these decisions about disclosure, about Instagram for Kids on pause, about potential legal action. These kinds of decisions, ultimately, I am assuming, will be made by Mark Zuckerberg. But the point is right now, Facebook has failed to hold itself accountable, and Congress and the public must do so. So we are concluding this hearing and the record will be kept open for a week in case any of my colleagues have written questions.

Thank you very much, Ms. Davis. We really appreciate your participating. And we look forward to your responses to the questions

42

that you said that you would respond to. Thank you very much. This hearing is adjourned.

Ms. DAVIS. Thank you for the opportunity.

Senator BLUMENTHAL. Thank you.

[Whereupon, at 1:10 p.m., the hearing was adjourned.]

# A P P E N D I X

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. AMY KLOBUCHAR TO
ANTIGONE DAVIS

*Instagram for Kids.* Facebook was creating a version of Instagram that targeted kids under 13. The company announced recently that it is pausing that program for now. At the hearing, I asked how Facebook plans to determine when and how to "unpause" the program. Please respond to the following:

*Question 1.* What specific criteria will Facebook use to determine whether to "unpause" this plan?

Answer. We started our work to build an Instagram experience for tweens (aged 10–12) to address an important problem seen across our industry: kids are getting phones younger and younger, misrepresenting their age, and downloading apps that are meant for those 13 or older. We believe that it is better for parents to have the option to give tweens access to a version of Instagram that is designed for them—where parents can supervise and control their experience—than to have them lie about their age to access a platform that wasn't built for them.

We were working on delivering experiences that are age-appropriate and give parents and guardians visibility and control over what their tweens are doing online, like an Instagram experience for tweens. Other companies also have recognized these types of issues and built experiences for kids. For example, YouTube and TikTok both have versions of their apps for those under 13. The principle is the same: it's much better for parents and guardians to have the option for their kids to use a safer, more age-appropriate version of social media apps than the alternative.

To be clear, our intention was not for this version to be the same as Instagram today. It was never meant for younger kids, but for tweens (aged 10–12). It would have required parental permission to join, we would not have shown ads, and it would have had age-appropriate content and features. Parents would have been able to supervise the time their tweens spent on the app and oversee who could message them, who could follow them, and who they could follow.

While we stand by the need to develop this experience, we recently announced that we are pausing this project. This will give us time to work with parents, experts, policymakers, and regulators to listen to their concerns and to demonstrate the value and importance of this project for tweens online today. Any decision to resume work on the project will be made in collaboration with various teams across the company and with the guidance and input of parents, experts, policymakers, and regulators.

Finally, while we're pausing our development of an Instagram experience for tweens, we'll continue our work to allow parents to oversee their teens' accounts by expanding parental supervision tools to teen accounts (aged 13 and over) on Instagram. These new features, which parents and teens can opt into, will give parents the tools to meaningfully shape their teens' experience. We'll have more to share on this in the coming months.

*Question 2.* Ms. Davis testified that a group of Facebook employees would be the decision makers as to whether to "unpause" the program for "Instagram Kids." Please identify all members of that group.

Answer. As discussed in the answer to your Question 1, any decision to resume work on the project will be made in collaboration with various teams across the company and with the guidance and input of parents, experts, policymakers, and regulators. As Head of Instagram, Adam Mosseri will ultimately make the decision to resume, in consultation with members of Meta's leadership team.

*Question 3.* Ms. Davis also testified that Facebook is consulting with more outside experts, including parents, about "Instagram Kids." Please name all the groups and individuals that Facebook currently plans to reach out to for this purpose.

Answer. Please see the response to your Question 1.

44

*Question 4.* Will Facebook's Board of Directors have any role in making this decision to unpause "Instagram Kids"? If so, describe what role the Board will have.

Answer. Please see the response to your Question 1.

*Question 5.* Please name the individual who has the final authority to "unpause" the "Instagram Kids" program.

Answer. Please see the response to your Question 2.

*Profits.* Last quarter, Facebook publicly reported that its advertising revenue per user in the United States and Canada was $51.58.

*Question 1.* How much of the advertising revenue per user in the United States and Canada came from each of (a) Facebook, (b) Instagram, (c) Snapchat, and (d) all other Facebook services?

Answer. We do not break out this information publicly in this way. We publicly report our Average Revenue per User (ARPU) on Facebook, both for advertising and other revenue, broken out by geographic region. In the U.S. and Canada, Facebook's ARPU from advertising (calculated by dividing Meta's advertising revenue by Facebook's monthly active users) was $51.58 in the second quarter of 2021 and $50.34 in the third quarter of 2021. We also report the Average Revenue per Person (ARPP) across Meta's family of apps, both for advertising and other revenue. Meta's ARPP from advertising across its family of apps was $8.21 in the second quarter of 2021 and $7.98 in the third quarter of 2021. For more information, please see our latest earnings presentation (*https://s21.q4cdn.com/399680738/files/doc_finan cials/2021/q3/FB-Earnings-Presentation-Q3-2021.pdf*). Snapchat is not a Meta platform.

*Question 2.* How much of the revenue per user came from users under 18?

- Please provide a breakdown by (a) Facebook, (b) Instagram, (c) Snapchat, and (d) all other Facebook services.

- If precise figures are unavailable, explain why and provide estimates.

Answer. We do not break out this information publicly.

*Value of Young Users.* The *Wall Street Journal* reported on a document that quoted internal Facebook research, asking "Why do we care about tweens?" and answering its own question: "They are a valuable but untapped audience."

*Question 1.* Why are children ages 10–12 so valuable to Facebook?

Answer. We require a minimum age of 13 to use Facebook and Instagram in the U.S. It is common for social media companies to try to understand how teens and preteens use technology. Like all technology companies, we want to appeal to the next generation, but to be clear, we do not knowingly attempt to recruit people who aren't old enough to use our apps.

We started our work to build an Instagram experience for tweens (aged 10–12) to address an important problem seen across our industry: kids are getting phones younger and younger, misrepresenting their age, and downloading apps that are meant for those 13 or older. We believe that it is better for parents to have the option to give tweens access to a version of Instagram that is designed for them—where parents can supervise and control their experience—than to have them lie about their age to access a platform that wasn't built for them.

We were working on delivering experiences that are age-appropriate and give parents and guardians visibility and control over what their tweens are doing online, like an Instagram experience for tweens. Other companies also have recognized these types of issues and built experiences for kids. For example, YouTube and TikTok both have versions of their apps for those under 13. The principle is the same: it's much better for parents and guardians to have the option for their kids to use a safer, more age-appropriate version of social media apps than the alternative.

*Question 2.* What is the lifetime value of a user for kids who start using Facebook products before age 13?

Answer. Please see the response to your Question 1. We prohibit users under the age of 13 from using Facebook or Instagram. When we learn an underage user has created an account, we remove them from the platform. We do not calculate a lifetime value of Messenger Kids users.

*Question 3.* Does Facebook have any analysis that examines the financial value of users to the Company?

- Describe all such analyses involving users in the United States, including but not limited to the expected revenue per user for those who start using its products before age 13.

45

- If any of those analyses have been presented to any officer or director at Facebook in the last 18 months, please identify to whom the analysis was presented and provide a copy of it.

Answer. We publicly report our Average Revenue per User (ARPU) on Facebook, both for advertising and other revenue, broken out by geographic region. In the U.S. and Canada, Facebook's ARPU from advertising was $51.58 in the second quarter of 2021 and $50.34 in the third quarter of 2021. We also report the Average Revenue per Person (ARPP) across Meta's family of apps, both for advertising and other revenue. Meta's ARPP from advertising across its family of apps was $8.21 in the second quarter of 2021 and $7.98 in the third quarter of 2021. For more information, please see our latest earnings presentation (*https://s21.q4cdn.com/3996807 38/files/doc_financials/2021/q3/FB-Earnings-Presentation-Q3-2021.pdf*). We do not break out this information publicly by age.

*Underage Instagram Users.* Ms. Davis testified that between June and August of this year, Facebook removed over 600,000 Instagram accounts of kids under 13.

*Question 1.* In the same time period, how many Facebook accounts did the company remove for kids under 13?

Answer. In the third quarter of 2021, Meta removed more than 2.6 million accounts on Facebook and 850,000 accounts on Instagram because they were unable to meet our minimum age requirement.

Understanding people's age on the Internet is a complex challenge across our industry, and we already have various methods of finding and removing accounts used by people who misrepresent their age. For example, anyone can report an underage account to us. Our content reviewers are also trained to flag reported accounts that appear to be used by people who are underage. If these people are unable to prove they meet our minimum age requirements, we delete their accounts.

In addition, we've developed artificial intelligence technology that allows us to estimate people's ages, like if someone is below or above 18. We train the technology using multiple signals. We look at things like people wishing you a happy birthday and the age written in those messages—for example, "Happy 21st Bday!" or "Happy Quinceañera." We're also building technology to find and remove accounts belonging to people under the age of 13. This technology isn't perfect, and we're always working to improve it, but that's why it's important we use it alongside many other signals to understand people's ages.

We're also in discussions with the wider technology industry on how we can work together to share information in privacy-preserving ways that help apps establish whether they are over a specific age. One area that we believe has real promise is working with operating system (OS) providers, Internet browsers, and other providers so they can share information to help apps establish whether someone is of an appropriate age.

This has the dual benefit of helping developers keep underage people off their apps, while removing the need for people to go through different and potentially cumbersome age verification processes across multiple apps and services. While it's ultimately up to individual apps and websites to enforce their age policies and comply with their legal obligations, collaboration with OS providers, Internet browsers, and others would be a helpful addition to those efforts.

*Question 2.* Does Facebook have any internal estimates within the last 18 months of how many kids under 13 have accounts on any or all of its services, excluding Messenger Kids?

- If so, please provide those internal estimates, broken down by service if available, and identify who made the estimates.

Answer. We have limited applicable information at our disposal to provide this estimate because, per our Terms of Service, people under 13 are not allowed on our platforms. As discussed in the answer to your Question 1, when we learn that someone under 13 years old is on our platform, we remove them.

*Question 3.* Please name the individual at Facebook who has ultimate responsibility for the company's policies and practices about removing accounts associated with kids under 13.

Answer. As discussed in the answers to your previous questions, when we learn that someone under 13 years old is on Facebook or Instagram, we remove them. We develop our policies and products not only to comply with COPPA but also to meet and exceed the high standards of parents and families. Our policies are developed by our policy team in close consultation with our safety teams, compliance teams, community operations teams, and more—and we consult with external stakeholders and experts in fields like child safety, privacy, technology, public safety, and more.

46

In terms of enforcement, we have over 40,000 people working on safety and security, including content reviewers. Our content reviewers are also trained to flag reported accounts that appear to be used by people under 13 years old, and anyone can report an underage account to us.

*Prevalence of Eating Disorder Content.* Ms. Davis testified that Facebook tries to reduce the prevalence of content about disordered eating on its sites.

*Question 1.* There have been reports that accounts registered as belonging to a 13 year old girl with an interest in weight loss and dieting had Instagram's algorithm promote content from accounts titled "I have to be thin," "Eternally starving," and "I want to be perfect." Please explain how the algorithm generates these results.

Answer. We prohibit content that promotes or encourages eating disorders, and we removed the accounts shared with us by the media for breaking these rules. We have also removed the violating accounts identified by Senator Blumenthal and his staff that we were made aware of. We use technology and reports from our community to find and remove this content as quickly as we can, and we're always working to improve. We'll continue to follow expert advice from academics and mental health organizations, like the National Eating Disorder Association (NEDA), to strike the difficult balance between allowing people to share their mental health experiences and protecting them from potentially harmful content.

To be clear, our policies prohibit any content that celebrates, encourages, or promotes self-injury, including eating disorders. In the third quarter of 2021, we removed about 12 million pieces of suicide and self-injury content from Facebook and Instagram; we detected over 96 percent of that content before people reported it to us. Most of the content we remove is material that we find ourselves through automated systems. A significant portion of that is detected and removed when it is uploaded. In some cases, content requires human review to understand the context in which material was posted. We're constantly working, including with global experts, to improve in this important area. For example, on Instagram, we recently created a dedicated option to report eating disorder content to make it easier to report violating content and provide resources to those who may be struggling. While people have always been able to report content related to eating disorders, users will now see a separate dedicated option to do so.

However, we do allow people to share their own experiences and journeys around self-image and body acceptance on our platforms because we know, and experts agree, that these stories can prompt important conversations and provide community support. But we also know such content can be triggering for some. To address this, when someone tries to search for or share self-harm related content on Facebook or Instagram, we blur potentially triggering images and point people to helpful resources. Additionally, if someone tries searching for terms related to eating disorders, we share dedicated resources, including contacts for local eating disorder hotlines in certain countries. In the United States, for example, we surface expert informed resources, including from NEDA. These resources will also be surfaced if someone tries sharing this content. Additionally, for those concerned that a person's post suggests they may need help with these issues, our Help Center provides information about eating disorders and guidance to help start a conversation with someone who may be struggling with eating disorders. We also provide a list of recommended Dos and Don'ts (developed with NEDA) for talking to someone about their eating disorder.

We are also taking steps to protect vulnerable users on Instagram from being exposed to content that is permissible (but possibly triggering) by making it harder to find. We remove such posts from places where people discover new content, including in our Explore page, and we are not recommending accounts identified as posting such content. In addition, when someone starts typing a known hashtag or account related to suicide and self-harm into search, we are also working to restrict results. Additionally, our Help Center provides information about eating disorders and how to support someone who may be struggling with these issues.

*Question 2.* What has Facebook done to remove accounts that promote eating disorders?

Answer. As discussed in the response to your previous question, our policies prohibit any content that celebrates, encourages, or promotes self-injury, including eating disorders. In the third quarter of 2021, we removed about 12 million pieces of suicide and self-injury content from Facebook and Instagram; we detected over 96 percent of that content before people reported it to us. And we're constantly working, including with global experts, to improve in this important area. For example, on Instagram, we recently created a dedicated option to report eating disorder content to make it easier to report violating content and provide resources to those who

47

may be struggling. While people have always been able to report content related to eating disorders, users will now see a separate dedicated option to do so.

We enforce our policies using a combination of reports from our community, human review, and artificial intelligence. Most of the content we remove is material that we find ourselves through automated systems. A significant portion of that is detected and removed when it is uploaded. In some cases, content requires human review to understand the context in which material was posted. Today, we have 40,000 people working on safety and security and have invested more than $13 billion in teams and technology in this area since 2016. We have approximately 15,000 reviewers globally who work every day to review content in line with our policies and keep Facebook a safe place for all our users. These reviewers go through training to ensure they understand our policies and can enforce those policies accurately and consistently at-scale. Our reviewers are audited to ensure quality enforcement.

*Question 3.* Please name the individual at Facebook who has ultimate responsibility for reducing harmful conduct related to eating disorders.

Answer. As discussed in the response to your previous question, we have 40,000 people working on safety and security. Decisions related to how to reduce this content are made in collaboration with various teams across the company and, as appropriate, with the guidance and input of parents and experts.

While we already work in partnership with experts to understand how to support those affected by eating disorders, there's always more we can learn. That's why we're hosting feedback sessions with community leaders and experts globally to learn more about emerging issues in the eating disorders space and new approaches for offering support. We also worked with NEDA in 2021 to share programming during National Eating Disorders Awareness Week in the U.S. for the third year in a row. Throughout the week, community leaders shared Reels to encourage positive body image, push back against weight stigma and harmful stereotypes, and emphasize that all bodies are worthy and deserve to be celebrated.

*Question 4.* Has Facebook taken any action in light of these recent news reports? If so, please describe what actions were taken, and please name the individual(s) who decided to take those actions.

Answer. We have a long track record of using our internal research—as well as external research and close collaboration with our Safety Advisory Board, Youth Advisors and additional experts, and organizations—to inform changes to our apps and provide resources for the people who use them. Our research demonstrates our commitment to understanding complex and difficult issues young people may struggle with and informs the work we do to help those experiencing these issues. In fact, we invest in this research to proactively identify where we can improve. For example, on Instagram:

- We've introduced new resources to support those struggling with body image issues and created a dedicated reporting flow for eating disorder-related content.
- We worked with the JED Foundation to create expert and research-backed educational resources for teens on how to navigate experiences like social comparison on Instagram.
- We updated our policies to prohibit graphic content related to suicide and took steps to protect vulnerable people from being exposed to content related to suicide and self-injury more generally in places like Explore.
- We launched Restrict, which allows people to protect themselves from bullying without the fear of retaliation.
- To prevent bullying, we've created comment warnings when people try to post potentially offensive comments. So far, we've found that, about 50 percent of the time, people edited or deleted their comments based on these warnings.
- We launched Hidden Words, which allows people to automatically filter Direct Message (DM) requests that contain offensive words, phrases, and emojis into a Hidden Folder that they never have to open if they don't want to. This feature also filters DM requests that are likely to be spammy or low-quality.

Research also informs our work on issues like negative body image, and in September 2021, we announced that we're exploring two new ideas on Instagram. First, from our research, we're starting to understand the types of content that might contribute to negative social comparison, and we're exploring "nudges" to prompt people to look at different topics if they're repeatedly looking at this type of content. We're cautiously optimistic that these nudges will help point people towards content that inspires and uplifts them. Second, we are launching a feature called "Take a Break,"

48

which will enable people to put their account on pause and take a moment to consider whether the time they're spending on our platform is meaningful.

We are committed to learning even more about these important issues, and we welcome the opportunity to work together with Congress and others in the industry to develop industry-wide standards.

*Awareness of Internal Research.* Ms. Davis testified that she was aware of the internal research Facebook had done on body image and other mental health issues related to teens and Instagram. Please respond to the following:

*Question 1.* Describe how Ms. Davis became aware of the research, including who made her aware and when. Include the date(s) she became aware of the studies, approximating if necessary.

Answer. As Meta's Global Head of Safety, Ms. Davis and her team work closely with Meta's researchers on an ongoing basis to understand the issues affecting teens on our platforms and to improve their experiences, as do many other teams and company leaders.

*Question 2.* What steps did she take when she became aware of the research?

Answer. We take the issues of safety and well-being on our platforms very seriously, especially for the youngest people who use our services. We are committed to working with parents and families, as well as experts in child development, online safety, and children's health and media, to ensure we are building better products for families. That means building tools that promote meaningful interactions and helping people manage their time on our platform. It also means giving parents the information, resources, and tools they need to help their children develop healthy and safe online habits. And it means continued research in this area.

We employ and work with researchers from backgrounds that include clinical psychology, child psychology, public health, education, anthropology, and communication, and we collaborate with top scholars to navigate various complex issues, including those related to well-being for users on Facebook and Instagram. Meta also awards grants to external researchers in order to help us better understand how experiences on Facebook and Instagram relate to the safety and health of our community, including teen communities. And because safety and well-being aren't just Meta issues, but societal issues, we work with experts in the field to look more broadly at the impact of mobile technology and social media on children and how to better support them as they transition through different stages of life.

Like many other large companies and especially other technology companies, we do research to hold up a mirror to ourselves and ask difficult questions about how people interact with our platforms. That means our insights often shed light on problems, but they inspire new ideas and changes. Most importantly, we do research to make our products better. We evaluate possible solutions and work every day to make our platform a positive and safer experience for our community.

For example, our research has informed a number of steps we've taken, including:

- We created a dedicated reporting flow for eating disorder-related content after learning some people were having difficulty reporting such content using our prior flow.

- We launched Hidden Words, which allows people to automatically filter Direct Message (DM) requests that contain offensive words, phrases, and emojis into a Hidden Folder that they never have to open if they don't want to. This feature also filters DM requests that are likely to be spammy or low-quality.

- To prevent bullying, we've created comment warnings when people try to post potentially offensive comments. So far, we've found that, about 50 percent of the time, people edited or deleted their comments based on these warnings.

- We rolled out Your Time on Facebook, which we launched in August of 2018, centralizing tools and options for people to manage their time. In April of 2020, we added Quiet Mode to this, which mutes most push notifications. If you try to open Facebook while in Quiet Mode, you'll be reminded that you set this time aside to limit your time using the app.

- We launched Control Your Notifications, which includes shortcuts to help you manage your notifications. It includes an option to mute all push notifications as well as manage the "red dots" in the shortcuts menu. Red dots can be removed from Marketplace, Groups, News, and the "hamburger" menu.

- We added See Your Time, which shows usage time per day, daytime/nighttime, and app visits. You can also get weekly usage updates and easy access to your activity log.

- We have also launched a series of tools and features on Instagram to help people control the time they spend on the app. This includes things like the ability

49

to "mute" accounts to control what posts you see, a feature called "You're All Caught Up" that lets you know when you've seen all the recent content in your Feed, and time management tools where you can see your total time on the app each day and set a daily reminder that alerts you when you've reached a set amount of time on Instagram.

These are just examples of the types of products and controls that we have launched publicly or are continuing to explore based on this research. And we're constantly working to improve. For example, we're exploring two new ideas: encouraging people to look at other topics if they're dwelling on content that might contribute to negative social comparison, and a feature called "Take a Break," which allows people to put their account on pause and take a moment to consider whether the time they're spending is meaningful.

*Question 3.* Did she make any recommendations about changing Facebook's products in response to the research?

- Please describe those recommendations in detail.
- Who helped her develop those recommendations? Please provide their names.

Answer. Please see the response to your Question 2.

*Question 4.* Did Facebook enact her recommendations?

- When?
- Who was responsible for enacting those changes?
- Did she recommend any actions that the company declined to take? If so, what were those actions?
- Did anyone at Facebook follow up on the changes it made to determine whether they were actually mitigating the problems identified in the research? If so, who did that, and what did the investigation show?

Answer. Please see the response to your Question 2.

*Question 5.* Did anyone else at Facebook make recommendations in response to the research?

- If so, who?
- What recommendations were made?
- Were they enacted, and if so, when?
- Did anyone at Facebook follow up on those changes to determine whether they were actually mitigating the problems identified in the research? If so, who did that, and what did the investigation show?

Answer. Please see the response to your Question 2.

*Question 6.* Ms. Davis testified that Facebook made changes about how eating disorder information is provided on Instagram in response to the research. To the extent not previously covered in responses to the previous questions, describe all product changes Facebook made as a result of her recommendations about these troubling research findings.

Answer. Please see the response to your previous questions.

————

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. BEN RAY LUJÁN TO ANTIGONE DAVIS

*Data Transparency.* During her testimony, Ms. Frances Haugen stated that "I believe, in collaboration with academics and other researchers, that we can develop privacy-conscious ways of exposing radically more data that is available today. It is important for our ability to understand how algorithms work, how Facebook shapes the information we get to see, that we have these data sets be publicly available for scrutiny."

We must have real transparency. Data should be made publicly available in a way that preserves user privacy and confidentiality by default. With that in mind, I will repeat a question from the hearing.

*Question.* Will Facebook release the basis of its research revealed in reporting by the *Wall Street Journal* (the datasets minus any personally identifiable information) to allow for independent analysis?

Answer. These are complex issues that we want people to be thinking about. We understand the responsibility that comes with operating a global tech platform, and we take it very seriously. We undertake research to ask ourselves hard questions—to spot any potential gaps in our systems and to identify any potential problems to

50

fix. We evaluate possible solutions and work every day to make our platform a positive and safe experience for our community.

One of the reasons we keep much of this work confidential is simple: we want to promote full and frank discussion. Research is a key part of how we make our products better, and it would be worrisome if we weren't doing it. Maintaining the privacy of our research and communications is intended to ensure that people at Meta, including researchers and research participants, feel comfortable engaging with nuanced, and sometimes very difficult, issues, and engaging in a candid discussion about how best to address those issues.

That said, greater transparency and appropriate context are things we think about a lot. We know there is interest in the way our platforms operate and the steps we take to improve them. We don't shy away from that scrutiny, and we are working to find an appropriate path forward when it comes to communicating about our research in a way that allows us to continue to promote full and frank discussion while also respecting the privacy of our users. We will also continue to work to publish research externally and to engage and collaborate with experts. For example, we have ongoing relationships with groups like the Aspen Institute and the Humanity Center, and we are a founding sponsor of the Digital Wellness Lab run jointly by Harvard University and Boston Children's Hospital.

We are also working to improve transparency and contribute to research in other areas. For example, in advance of the 2020 U.S. election, we announced a new research partnership with independent external academics to better understand the impact of Facebook and Instagram on key political attitudes and behaviors during the 2020 U.S. elections, building on the initiative we launched in 2018. It is examining the impact of how people interact with our products, including content shared in News Feed and across Instagram, and the role of features like content ranking systems.

*Detecting Underage Users.* During questioning, you said that Facebook and Instagram do not allow users under the age of thirteen. Ms. Haugen insisted that it is "vital" that Facebook publish the methods by which they detect underage users because "they are on the platform in far greater numbers than anyone is aware".

*Question.* Will Facebook publish the processes and algorithms it uses to detect the presence of underage users on its platform?

Answer. Understanding people's age on the Internet is a complex challenge across our industry, and we already have various methods of finding and removing accounts used by people who misrepresent their age. For example, anyone can report an underage account to us. Our content reviewers are also trained to flag reported accounts that appear to be used by people who are underage. If these people are unable to prove they meet our minimum age requirements, we delete their accounts. In the third quarter of 2021, Meta removed more than 2.6 million accounts on Facebook and 850,000 accounts on Instagram because they were unable to meet our minimum age requirement.

In addition, we've developed artificial intelligence technology that allows us to estimate people's ages, like if someone is below or above 18. We train the technology using multiple signals. We look at things like people wishing you a happy birthday and the age written in those messages—for example, "Happy 21st Bday!" or "Happy Quinceañera." We're also building technology to find and remove accounts belonging to people under the age of 13. This technology isn't perfect, and we're always working to improve it, but that's why it's important we use it alongside many other signals to understand people's ages.

We do not share detailed descriptions of how our tools work in order to avoid providing a roadmap to people who are trying to evade detection.

We're also in discussions with the wider technology industry on how we can work together to share information in privacy-preserving ways that help apps and websites establish whether people are over a specific age. One area that we believe has real promise is working with operating system (OS) providers, Internet browsers, and other providers so they can share information to help apps and websites establish whether someone is of an appropriate age.

This has the dual benefit of helping developers keep underage people off their apps and websites, while also removing the need for people to go through different and potentially cumbersome age verification processes across multiple apps and services. While it's ultimately up to individual apps and websites to enforce their age policies and comply with their legal obligations, collaboration with OS providers, Internet browsers, and others would be a helpful addition to those efforts.

*Decision-making Priorities.* In person, I asked whether Facebook ever found that a change to its platform would potentially inflict harm on its users, but moved for-

51

ward because it would grow users or increase revenue. In your response, you claimed that this was not your "experience at all at Facebook."

I would like to reassert the question for the record. In her testimony, Ms. Haugen stated that "facebook prioritized that content on the system, the reshares, over the impacts to misinformation, hate speech or violence incitement."

*Question.* Has Facebook ever made internal product decisions that prioritized engagement over the potential impact on misinformation, hate speech, or violence and incitement?

Answer. As an initial matter, we prohibit terrorist content, hate speech, and other content that violates our Community Standards. Additionally, under our Community Standards, we remove misinformation that contributes to the risk of imminent violence or physical harm. When we find this content, we remove it.

More broadly, we build our systems to prioritize meaningful content, rather than enraging or polarizing content. Our teams work hard to ensure that our systems help people less frequently see problematic content, like misinformation that is debunked by third-party fact-checkers and borderline policy-violating content.

Facebook's mission is to bring communities closer together, and, to that end, we optimize for meaningful social interaction rather than for attention and time. In fact, back in 2018, we changed the way we approached News Feed rankings to focus not only on serving people the most relevant content, but also on helping them have more meaningful interactions—primarily by doing more to prioritize content from friends, family, and Groups they are part of. We recognized that this shift would lead to people spending less time on Facebook, because Pages—where media entities, sports teams, politicians, and celebrities, among others, tend to have a presence—generally post more engaging (though less personally meaningful) content than a user's personal friends or family. But we view this change as a success because we believe it improved the experience of our users, and we think building positive experiences is good for the business in the long term. The company's long-term growth will be best served if people continue to use and value its products for years to come. If we prioritized trying to keep users online for a few extra minutes, but in doing so made them unhappy or angry and less likely to return in the future, it would be self-defeating.

———

Response to Written Questions Submitted by Hon. John Thune to Antigone Davis

*Question 1.* As you know, on October 14, 2020, Andy Stone, Policy Communications Director at Facebook, tweeted that Facebook would be "reducing its distribution" of a New York Post article dated that same day headlined "Smoking-gun email reveals how Hunter Biden introduced Ukrainian businessman to VP dad." Stone further tweeted that "this is part of our standard process to reduce the spread of misinformation." However, Ben Schreckinger, a reporter at Politico, has independently confirmed that this e-mail and others uncovered by the New York Post were in fact authentic.

Does Facebook regret harming our democracy by suppressing true information about the corruption of a presidential candidate at the height of the 2020 presidential campaign?

Answer. In 2019, we announced that, if we identify signals that a piece of content is false, we temporarily reduce its distribution in order to allow sufficient time for our independent third-party fact-checkers to review and determine whether to apply a rating. Quick action is critical in keeping a false claim from going viral, and so we take this step to provide an extra level of protection against potential misinformation. These temporary demotions expire after seven days if the content has not been rated false by an independent fact-checker.

In the weeks leading up to the election, the Director of National Intelligence, the Head of the FBI, and the bipartisan leaders of the Senate Select Committee on Intelligence reminded Americans about the threat posed by foreign influence operations emanating from Russia and Iran. Along with their public warnings, and as part of the ongoing cooperation that tech companies established with government partners following the 2016 election, the FBI also privately warned tech companies to be on high alert for the potential of hack-and-leak operations carried out by foreign actors in the weeks leading up to November 3, 2020. We took these risks seriously.

In the case of the October 14 *New York Post* story, we were not able to verify whether the content was part of a foreign influence operation. Given the concerns raised by the FBI and others, we took steps consistent with our policies to slow the spread of suspicious content and provide fact-checkers the opportunity to assess it.

52

However, at no point did we take any action to block or remove the content from the platform. People could—and did—read and share the *Post*'s reporting while we had this temporary demotion in place. Consistent with our policy, after seven days, we lifted the temporary demotion on this content because it was not rated false by an independent fact-checker.

*Question 2.* The PACT Act would promote transparency by requiring Internet platforms like Facebook to disclose in detail their moderation and censorship practices, and to submit public reports identifying and explaining why Facebook posts have been removed or deemphasized.

Do you believe this provision would help build trust with Facebook's users?

Answer. The approach in the bill is thoughtful, and we support efforts aimed at greater transparency and external accountability. Any such approach should have clear requirements, so that platforms know what is expected of them. We look forward to engaging with your office further on this proposal.

———

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. MIKE LEE TO
ANTIGONE DAVIS

*Question 1.* During your testimony, I asked if Facebook targets adult themed ads to underage children. You responded with the following:

"When we do ads to young people, there are only three things that an advertiser can target around—age, gender, location. We also prohibit certain ads to young people, including weight loss ads. . . . We don't allow tobacco ads at all. We don't allow them to children. We don't allow them to minors."

After our exchange, I was approached by an organization called the Technology Transparency Project (TTP), who told me that they conducted an experiment last month to run a series of ads that they targeted broadly to 13–17-year-old users in the United States. TTP thankfully stopped these ads from being distributed to users, but TTP has indicated that Facebook did approve them for an audience of up to 9.1 million users—all of which are teens. These ads included alcohol, prescription drugs, vaping, eating disorder tips, and dating profile encouragement.

Could you please explain TTP's findings and how Facebook approved these ads since, according to your testimony, Facebook's policy doesn't allow for these ads?

How do you reconcile the TTP experiment with Facebook's current advertising policy?

Answer. We are aware of the Tech Transparency Project's reporting. To be clear, these ads violated our policies, and we understand that they ultimately did not run. Our teams investigated this issue and are taking steps to improve our systems as well as to improve reviewer accuracy around ads that may be promoting violating content like eating disorders.

Ads on Facebook are subject to Facebook's Community Standards (and ads on Instagram are subject to Instagram's Community Guidelines). Our Community Standards prohibit any content that celebrates, encourages, or promotes self-injury, including eating disorders. Further, our Advertising Policies place additional requirements on advertisers to help make our platforms a safe and positive place for people, organizations, and businesses. For example, these policies prohibit advertisements promoting certain content to any users, regardless of age, including ads that promote the sale or use of tobacco products and related paraphernalia or ads that promote electronic cigarettes, vaporizers, or any other products that simulate smoking. Ads also may not promote the sale of illicit or recreational drugs or other unsafe substances.

Our Advertising Policies also restrict certain content based on age. Ads targeted to minors must not promote products, services, or content that are inappropriate, illegal, or unsafe, or that exploit, mislead, or exert undue pressure on the age groups targeted. Ads that promote or reference alcohol, for instance, must only be targeted to people 21 years or older in the U.S. Similarly, any ads marketing weight loss products and services, cosmetic procedures, gambling, or dating services, among other topics, must be targeted to people 18 years or older at a minimum. If someone is under a certain age and attempts to view a Page or account with an age restriction, they will be blocked from viewing it.

Moreover, we have several mechanisms for advertisers and Page admins to control the audience eligible to view the content they produce. When an advertiser decides to create an ad, we provide age and location targeting options during the ad creation process. The advertiser must comply with our Advertising Policies and any applicable local laws, and they can do so, for example, by specifying that their ads

53

be shown only to users that meet a minimum age or are located in a specific country. Page admins can also use age restrictions to limit the audience of their Page.

We already give people ways to tell us that they would rather not see ads based on their interests or on their activities on other websites and apps, such as through controls within our ad settings. But we also know that young people may not be well equipped to make these decisions on their own, which is why we're taking a more precautionary approach. Specifically, we announced changes this year that allow advertisers to target ads to people under 18 (or older in certain countries) based only on their age, gender, and location. This means that previously available targeting options for users under 18, like those based on interests or on their activity on other apps and websites, are no longer available to advertisers. These changes are global and apply to Instagram, Facebook, and Messenger. When young people become adults, we notify them about targeting options that advertisers can now use to reach them and the tools we provide to them to control their ad experience.

*Question 2.* I shared the information about TTP's experiment with Frances Haugen during her hearing last week, and she provided the following testimony:

"It is very possible that none of those ads were seen by a human. And the reality is that we've seen from repeated documents within my disclosure, is that Facebook's AI systems only catch a very tiny minority of offending content."

Is this statement true?

Could you please explain Facebook's current process for using AI to approve ads on its platform?

What is Facebook currently doing to improve its process to ensure that these types of ads are not approved?

Answer. Our advertising review system is designed to review all ads before they go live. This system relies primarily on automated technology to apply our Advertising Policies to the millions of ads that run across our apps. While our review is largely automated, we rely on our teams to build and train these systems, and in some cases, to manually review ads.

While our review is typically completed within 24 hours, it may take longer, and ads can be reviewed again, including after they're live. Based on the results of the review, an ad is either rejected or allowed to run. If an ad is rejected, an advertiser can create a new ad—either with new ad creative or by revising the rejected ad—or request another review if they believe their ad was incorrectly rejected. To process re-review requests from advertisers, we rely more heavily on teams of human reviewers, but we are continuously assessing ways to increase automation.

We also have reporting, authenticity, and transparency features to encourage advertiser accountability. People can report ads they believe violate our policies by clicking the three dots in the upper right-hand corner of the ad. These reports are an important signal for our advertising review systems, and may prompt a re-review of the ad. This feedback also helps to improve our policies and enforcement.

Ads remain subject to review and re-review at all times and may be rejected for violation of our policies at any time.

However, our enforcement isn't perfect, and both machines and people make mistakes. When we launch a new policy, like the recently announced changes discussed in response to your Question 1, it can take time for the various parts of our enforcement system, both automated technology and trained global teams, to learn how to correctly and consistently enforce the new standard. As we gather new data and feedback, our machine learning models, our automated enforcement, and our manual review teams improve.

We regularly assess and continue to make improvements to our review system to improve our detection of ads that violate our policies and to help protect young people from seeing inappropriate ads. We make changes based on trends in the ads ecosystem and adjust for new tactics that we find from people misusing the platform.

*Question 3.* You testified that Facebook only targets ads to children based around—age, gender, and location—and does not target based on specific interest categories.

Does Facebook collect interest category data on teens even if they aren't at this moment running ads to those interest categories?

If yes, what is the purpose of collecting this data?

Does Facebook collect "interest" data on children that is for adult products—tobacco, alcohol, drug related interests—or for sexually suggestive interests?

Answer. As explained in our Data Policy, we collect three basic categories of data about people: (1) data about things people do and share (and who they connect with) on our services; (2) data about the devices people use to access our services; and

54

(3) data we receive from partners, including the websites and apps that use our Business Tools. Our Business Tools Terms expressly prohibit our partners from sharing with us data they know or reasonably should know is from or about children under the age of 13.

As far as the amount of data we collect about Facebook users (who are required to be at least 13 years old), the answer depends on the person. People who have only recently signed up for Facebook have usually shared only a few things—such as name, contact information, age, and gender. Over time, as people use our products and interact with our services, we receive more data from them, and this data helps us provide more relevant content and services. That data will fall into the categories noted above, but the specific data we receive will, in large part, depend on how the person chooses to use Facebook. For example, some people use Facebook to share photos, so we receive and store photos for those people. Some people enjoy watching videos on Facebook; when they do, we receive information about the video they watched, and we can use that information to help show other videos in their News Feeds. Other people seldom or never watch videos, so we do not receive the same kind of information from them, and their News Feeds are likely to feature fewer videos.

We give people easy access to controls, like Ad Preferences, to manage the ads they see, learn more about how ads work, and hide ads from specific advertisers or topics. We know that young people may not be well equipped to make these decisions on their own, which is why we're taking a more precautionary approach. Specifically, and as you reference, we announced changes this year that allow advertisers to only target ads to people under 18 (or older in certain countries) based on their age, gender, and location. This means that previously available targeting options for users under 18, like those based on interests or on their activity on other apps and websites, are no longer available to advertisers. When young people become adults, we notify them about targeting options that advertisers can now use to reach them and the tools we provide to them to control their ad experience. And for all users, we do not sell this information to third parties.

*Question 4.* The *Wall Street Journal* indicated that over the past year, Facebook hired an outside consultant to advise it on the risks of continued trafficking on its sites. The consultant recommended that if revenue came in from trafficking advertisements, Facebook should develop a policy to ensure it does not profit off of it.

Has such a policy been adopted?

If so, what are the details of this policy? Please share the specific policy. Does Facebook no longer reap profits from these advertisements, or does Facebook simply not contract with them in the first place?

If not, what is the delay in creating this policy? Additionally, if Facebook can identify these advertisements, why can't they create a method to avoid contracts with trafficking advertisements in the first place?

Answer. There is no place on Meta's platforms for human trafficking. We prohibit ads facilitating or coordinating such activities. We want our users to have a positive and safe experience and strongly oppose the abuse of our apps to facilitate human trafficking. Facebook and Instagram have long-standing policies and protocols to combat any such abuse. Our policies prohibit content or behaviors that may lead to human trafficking. Facebook has consolidated several existing exploitation policies that were previously housed in different sections of the Community Standards into one dedicated section that focuses on human exploitation and captures a broad range of harmful activities that may manifest on our platform.

We remove content on Facebook and Instagram that facilitates or coordinates the exploitation of humans, including human trafficking. We define human trafficking in our Community Standards as the "exploitation of humans in order to force them to engage in commercial sex, labor, or other activities against their will. It relies on deception, force and coercion, and degrades humans by depriving them of their freedom while economically or materially benefiting others." Our definition of Human Exploitation adapts the definitions of human trafficking and human smuggling from the Protocol to Prevent, Suppress and Punish Trafficking in Persons (Palermo Protocol) and Protocol Against the Smuggling of Migrants. Bad actors are continually evolving their tactics to evade enforcement, but we are committed to continuing to improve so that we can help keep people safe.

Our practices and policies recognize human trafficking is a serious problem that requires a multifaceted approach across different teams at Facebook and Instagram. Human trafficking practices are global and societal issues that require knowledge of local market contexts. We employ local market experts to understand, identify, and surface trafficking trends on Facebook and Instagram and train our cross-functional teams to recognize them. We have members of teams across investigations,

55

engineering, research, content policy, and business integrity who work on our anti-trafficking efforts.

We work with law enforcement around the world to help keep our community safe, both on and offline. This sometimes means providing information (in accordance with applicable law and our terms of service) that will help them respond to emergencies, including those that involve the immediate risk of harm, such as those related to human exploitation. We also work with organizations around the world to provide resources and support for victims and survivors of human trafficking, and we direct people to expert organizations like Polaris and the National Human Trafficking Hotline.

We use a variety of tools to disrupt criminal organizations, including designating them under our Dangerous Organizations policy, conducting human review, applying a wide range of artificial intelligence (AI), and disrupting networks. We look to enact countermeasures—both on our platforms and via our external partnerships—to stop bad actors and businesses from using our services to commit crimes, and in all stages of the trafficking lifecycle. However, this is an adversarial space, and although we have tools to combat recidivism, we do find these organizations try to return to our platforms. We continue to invest in AI to help us improve our enforcement against these organizations at scale.

In addition, we support our ability to detect violating content related to human trafficking through major investments by our technical and operational teams. Those increasing investments are geared toward improving our ability to identify the illicit actors, networks, organizations, and businesses that perpetrate these activities and to disrupt them accordingly.

Finally, Meta also supported SESTA/FOSTA, and we were very pleased to be able to work successfully with a bipartisan group of Senators on a bill that protects women and children from the harms of sex trafficking.

We continue to work on improving these areas, including identifying and strengthening ways in which we can combat human trafficking, and we encourage anyone who encounters content on Meta's platforms that indicates someone is in immediate physical danger related to human trafficking to contact local law enforcement immediately and report this content to us.

*Question 5.* In the WSJ "Facebook Files," a list called "XCheck" is detailed. This list allegedly suspends moderation practices from high profile figures.

Considering other threats on the platform such as trafficking and drug cartels, why was this such a high priority of Facebook's?

What efforts, if any, have been made to scale back this system in order to put its users on "equal footing" as Mr. Zuckerberg allegedly intends?

How are individuals selected to be added to the list?

Who is on this list and thus not subject to Facebook's moderation practices?

Answer. The Cross-Check program was built to double-check our own enforcement in cases where, for example, a content review decision could require more understanding and there could be a higher risk from a mistake. For example, we apply some of our most important cross-checks to posts from vulnerable populations such as activists raising awareness of hate or violence or from journalists reporting from conflict zones. This is where context is really important. We aim to strike a balance between the time it takes to examine the broader context and ensuring that violating content does not remain on our platform.

The Cross-Check program is not intended to be a program for anyone to be "protected" or "exempt" from the enforcement of our Community Standards, and it is not a process for interceding on behalf of a user to reverse a content decision. Rather, it is a tool in our toolbox for content enforcement broadly on the Facebook platform that helps to prevent false positives (*i.e.,* taking down something that we shouldn't have).

In addition to being an internal check, this system is also designed to help us focus our resources where they are needed the most. We have long said that we rely on a combination of human review and AI to enforce our Community Standards. Our Cross-Check program is simply a component of our human review process.

As noted, our efforts to improve the Cross-Check program are ongoing, and we know that there is more work to be done. But we are committed to engaging with our stakeholders as we continue to implement further improvements to Meta systems. Just recently, we asked our Oversight Board for recommendations about how we can continue to improve our Cross-Check system. Specifically, we are asking the Board for guidance on the criteria we use to determine what is prioritized for a secondary review via Cross-Check, as well as how we manage the program. Over the coming weeks and months, we will continue to brief the Board on our Cross-Check system and engage with them to answer their questions. We welcome their recommendations and the independent oversight they provide.

56

*Question 6.* Facebook has often worked with the "National Center for Missing and Exploited Children" (NCMEC) to refer child sexual exploitation (CSAM) material on its platform for follow up from law enforcement.

How much material does Facebook refer to NCMEC annually?

Is there reform that needs to take place in this process to ensure resources are available for robust follow up to the material that is report to NCMEC and the DOJ?

Answer. Our work on child safety has spanned more than a decade. Across our family of apps, we take a comprehensive approach to child safety that includes zero-tolerance policies prohibiting child exploitation; cutting-edge technology to prevent, detect, remove, and report policy violations; and victim resources and support. More than 40,000 people work on security and safety at Meta. We also collaborate with industry child safety experts and civil society around the world to fight the online exploitation of children because our commitment to safeguarding children extends beyond our apps to the broader internet.

Our industry-leading efforts to combat child exploitation follow a three-pronged approach: prevent this abhorrent harm in the first place; detect, remove, and report exploitative activity that escapes these efforts; and work with experts and authorities to keep children safe. We apply this approach across both the public spaces of Facebook, like Pages, Groups, and Profiles, as well as on our private messaging services, like Messenger.

We have specially trained teams with backgrounds in law enforcement, online safety, analytics, and forensic investigations review potentially violating content and report findings to the National Center for Missing and Exploited Children (NCMEC)—a U.S.-based nonprofit devoted to the prevention of and recovery from child victimization. The reports to NCMEC include content from around the world, and in turn, NCMEC works with U.S. federal, state, and local law enforcement, as well as law enforcement globally, to find and help victims.

We have no tolerance for the sexual exploitation of children on our platforms. When we become aware of apparent child sexual exploitation, we report it to NCMEC. We also publish data related to this type of content quarterly in our Community Standards Enforcement Report. In the third quarter of 2021, we removed approximately over 22 million pieces of child sexual exploitation content, as well as over 2 million pieces of child nudity and physical abuse content from Facebook and Instagram. These numbers do not represent the number of individual victims or unique pieces of content, as the same or similar content may be shared and removed multiple times.

To understand how and why people share child exploitative content on Facebook and Instagram, we conducted an in-depth analysis of the illegal child exploitative content we reported to NCMEC in October and November of 2020. We found that more than 90 percent of this content was the same as or visually similar to previously reported content. And copies of just six videos were responsible for more than half of the child exploitative content we reported in that time period. However, one victim of this horrible crime is one too many.

In February of this year, we announced new tools we're testing to keep people from sharing content that victimizes children and improvements we've made to our detection and reporting tools. Based on the findings from our analysis discussed above, we are developing targeted solutions, including new tools and policies to reduce the sharing of this type of content. We've started by testing new tools including one aimed at the potentially malicious searching for this content: a pop-up that is shown to people who search for terms on our apps associated with child exploitation. The pop-up offers ways to get help from offender diversion organizations and shares information about the consequences of viewing illegal content. We've also expanded our work to detect and remove networks that violate our child exploitation policies, similar to our efforts against coordinated inauthentic behavior and dangerous organizations.

After consultations with child safety experts and organizations, we've also made it easier to report content for violating our child exploitation policies. We added the option to choose "involves a child" under the "Nudity & Sexual Activity" category of reporting in more places on Facebook and Instagram. These reports will be prioritized for review. We also started using Google's Content Safety API to help us better prioritize content that may contain child exploitation for our content reviewers to assess.

With respect to our cooperation with law enforcement, we have developed a streamlined online process through which we accept and review all legal requests from law enforcement. We expedite requests pertaining to child safety, and we have a team dedicated to engaging with the likes of NCMEC, International Centre for Missing & Exploited Children (ICMEC), Child Exploitation and Online Protection

57

Command (CEOP), Interpol, the FBI, and numerous other local, federal, and international law enforcement organizations and departments to ensure that they have the information and training needed to make the best use of this process and that we are supporting efforts to improve these processes. If we have reason to believe that a child is in immediate or imminent danger, we may proactively refer a case to local law enforcement (as well as report it to NCMEC) to ensure that the child is immediately safeguarded.

———————

RESPONSE TO WRITTEN QUESTIONS SUBMITTED BY HON. MARSHA BLACKBURN TO ANTIGONE DAVIS

*Question 1.* I asked you during the hearing whether Facebook gets consent for research it does on kids and teens. You said they do.

What is the process for Facebook and Instagram to get consent from parents when kids and teens participate in research studies?

If you get parental consent via form, please provide a (blank) copy of that form.

Answer. We appreciate the opportunity to provide additional context on these issues. Facebook's and Instagram's research teams work to observe industry best practices for conducting research, including ensuring research is done ethically and in compliance with applicable law.

In the U.S., when conducting qualitative research (*e.g.,* an interview or focus group) with a participant under the age of 18, we ask that both the research participant and their parent or legal guardian sign our Research Participation Agreement. In some cases, we hire third parties to conduct research, in which case the third party is the one interacting with and collecting information from the participant. When a third party conducts the study, the third party's notice and consent forms and procedures may be used. We ensure the third parties we hire are contractually obligated to comply with all applicable laws, including to obtain necessary consent from participants and parents.

It is important to note that "research" is a broad term and can take many forms, and a signed consent form is not appropriate for all research studies. For example, there are cases in which we may ask for user feedback through voluntary surveys within the Facebook or Instagram applications, which are available to users aged 13 and over. In those cases, U.S. law does not require parental consent before 13 to 17 year-old users participate, but (i) participation is strictly voluntary, and (ii) we provide the users with clear notice about our practices, including through our Data Policy (*https://www.facebook.com/policy.php*).

Attached, please find the most recent version of our Research Participation Agreement, which we require participants and parents or guardians to sign before participating in a qualitative study (*e.g.,* an interview or focus group). As noted above, when we hire a third party to conduct research on our behalf, the third party may use its own consent form.

*Question 2.* During the hearing with the Facebook whistleblower, Frances Haugen, she indicated that Facebook uses a variety of research practices to glean information from its kid and teen users, including young children.

Please explain how Facebook recruits children and teens to its research studies and what forms those studies take.

Do you have child psychologists or similar therapists on staff who help conduct those studies or who work with kids and teens to discuss their experiences on your platforms?

Answer. The method for recruiting research participants depends on the type of research. For example, we may send users an e-mail inviting them to participate in a study. In other cases, we may surface invitations within the Facebook and Instagram applications. We may also hire third parties to conduct research on our behalf, in which case the third party often handles recruiting research participants.

We are thoughtful in our approach to engaging children under 13 and their parents for participation in research. For example, for research with Messenger Kids users, we worked with a third party to establish a panel of parents who were interested in allowing their children to participate in research and who consented to this participation. We do not surface invitations for research feedback within the Messenger Kids experience.

Regardless of methodology, we align with industry best practices and ensure users remain in control, for example, by allowing them to opt out of research-related communications if they choose.

In terms of the forms research studies take, studies can be qualitative—for example, interviews and focus groups. In other cases, research studies may be quan-

58

titative and in the form of an online survey, for example, either within the Facebook or Instagram applications or on a third-party platform.

We take the issues of safety and well-being on our platforms very seriously, especially for the youngest people who use our services. We are committed to working with parents and families, as well as experts in child development, online safety, and children's health and media, to ensure we are building better products for families. That means building tools that promote meaningful interactions and helping people manage their time on our platform. It also means giving parents the information, resources, and tools they need to help their children develop healthy and safe online habits. And it means continued research in this area.

We employ and work with researchers from backgrounds that include clinical psychology, pediatrics, developmental psychology, public health, bioethics, education, anthropology, and communication. We collaborate with top scholars to navigate various complex issues, including those related to well-being for people on Facebook and Instagram. Meta also awards grants to external researchers in order to help us better understand how experiences on Facebook and Instagram relate to the safety and health of our community, including teen communities. And because safety and well-being aren't just Meta issues, but societal issues, we work with experts in the field to look more broadly at the impact of mobile technology and social media on children, and how to better support them as they transition through different stages of life.

*Question 3.* 3. During the hearing, you did not clearly indicate who will make the ultimate decision about whether Instagram Kids is launched.

Who, specifically, will make this ultimate decision? Is it Mark Zuckerberg himself?

Or Adam Mosseri along with Mr. Zuckerberg?

Answer. We started our work to build an Instagram experience for tweens (aged 10–12) to address an important problem seen across our industry: kids are getting phones younger and younger, misrepresenting their age, and downloading apps that are meant for those 13 or older. We believe that it is better for parents to have the option to give tweens access to a version of Instagram that is designed for them—where parents can supervise and control their experience—than to have them lie about their age to access a platform that wasn't built for them.

We were working on delivering experiences that are age-appropriate and give parents and guardians visibility and control over what their tweens are doing online, like an Instagram experience for tweens. Other companies also have recognized these types of issues and built experiences for kids. For example, YouTube and TikTok both have versions of their apps for those under 13. The principle is the same: it's much better for parents and guardians to have the option for their kids to use a safer, more age-appropriate version of social media apps than the alternative.

While we stand by the need to develop this experience, we recently announced that we are pausing this project. Any decision to resume work on the project will be made in collaboration with various teams across the company, and with the guidance and input of parents, experts, policymakers, and regulators. As Head of Instagram, Adam Mosseri will ultimately make the decision to resume, in consultation with members of Meta's leadership team.

*Question 4.* 4. You indicated that Facebook recently deleted 600,000 accounts of kids under 13 who, pursuant to COPPA, should not be on the platform. This week, Ms. Haugen indicated it could be removed to comply with GDPR.

What do Facebook and Instagram do with the data of underage children when they are removed from the platform?

Is it in fact deleted?

Or do you retain any form or portion of it in case the account is reactivated in the future?

Answer. At Meta, we take the issues of safety and well-being on our platforms very seriously, especially for the youngest people who use our services. As per our terms, in the U.S., we require people to be at least 13 years old to sign up for Facebook and Instagram.

In the third quarter of 2021, we removed more than 850,000 accounts on Instagram because they were unable to meet our minimum age requirement. Instagram disabled these accounts after they were put through an age "checkpoint" and the users were unable to or did not provide identification showing they were at least 13 years old. If a user does not provide adequate documentation that they meet the minimum age requirements within 30 days, their account is permanently disabled and removed from Instagram. When the account is disabled, the data is deleted consistent with the Company's standard deletion policies.

*Question 5.* 5. As I mentioned at the hearing, a 2019 Facebook internal report, entitled "Apple Escalation on Domestic Servitude—how we made it through this SEV," outlined how Facebook knew about forced domestic servitude content on its platform, but did not remove it in full until after Apple threatened to pull Facebook from its app store [("Was this issue known to Facebook before BBC enquiry and Apple escalation? Yes.")]. Yet you disputed this during the hearing, saying you did not agree with the interpretation of Facebook's own report.

Please explain in detail what happened in this case.

Why did Facebook—in its words—allow for an "absence of proactive detection," which meant that "domestic servitude content remained in the platform?

Answer. We've been combatting domestic servitude on our platform for many years, and our goal remains to prevent anyone from using our platform to exploit others. In 2019, we further expanded these efforts by building a dedicated team and increased the scope of harms that team addresses later that year.

We have teams across investigations, engineering, research, policy, and integrity who are dedicated to anti-trafficking efforts, and we've invested in technology to proactively detect human exploitation and to enforce our Community Standards, which prohibit this behavior.

Our proactive detection technology in this space is designed to detect this content and activity around the world. We're constantly working to improve this technology to help us catch more of this content more quickly—including expansion into more languages and the ability to detect different kinds of exploitation.

More broadly, how does Facebook approach human exploitation content on the platform to ensure it is removed?

Answer. Our policies prohibit the use of our services for illegal purposes. We are committed to fully complying with all applicable international human rights standards, labor and employment laws, rules, and regulations, and to working to mitigate the risks of modern slavery and domestic servitude in our business operations and supply chains. Facebook and Instagram have long-standing policies and protocols to combat any such abuse. Our policies prohibit content or behaviors that may lead to human trafficking, including domestic servitude. Bad actors are continually evolving their tactics to evade enforcement, but we are committed to continuing to improve so that we can help keep people safe.

We work to remove content on Facebook and Instagram that facilitates or coordinates the exploitation of humans, including human trafficking. We define human trafficking in our Community Standards as the "exploitation of humans in order to force them to engage in commercial sex, labor, or other activities against their will. It relies on deception, force and coercion, and degrades humans by depriving them of their freedom while economically or materially benefiting others." Our definition of human exploitation adapts the definitions of human trafficking and human smuggling from the Protocol to Prevent, Suppress and Punish Trafficking in Persons (Palermo Protocol) and Protocol Against the Smuggling of Migrants.

Our practices and policies recognize domestic servitude is a serious problem that requires a multifaceted approach across different teams at Facebook and Instagram. Domestic servitude practices are global and societal issues that require knowledge of local market contexts. We employ local market experts to understand, identify, and surface trends on Facebook and Instagram and train our cross-functional teams to recognize them. We have members of teams across investigations, engineering, research, content policy, and business integrity who work on our anti-trafficking efforts.

We work with law enforcement around the world to help keep our community safe, both on and offline. This sometimes means providing information (in accordance with applicable law and our terms of service) that will help them respond to emergencies, including those that involve the immediate risk of harm, such as those related to human exploitation. We also work with organizations around the world to provide resources and support for victims and survivors of human trafficking, and we direct people to expert organizations like Polaris and the National Human Trafficking Hotline.

We use a variety of tools to disrupt criminal organizations, including designating them under our Dangerous Organizations policy, conducting human review, applying a wide range of artificial intelligence (AI), and disrupting networks. We look to enact countermeasures—both on our platforms and via our external partnerships—to stop bad actors and businesses from using our services to commit crimes, and in all stages of the trafficking lifecycle. However, this is an adversarial space, and although we have tools to combat recidivism, we do find these organizations try to return to our platforms. We continue to invest in AI to help us improve our enforcement against these organizations at scale.

60

In addition, we support our ability to detect violating content related to domestic servitude through investments by our technical and operational teams. Those increasing investments are geared toward improving our ability to identify the illicit actors, networks, organizations, and businesses that perpetrate these activities and to disrupt them accordingly.

We continue to work on improving these areas, including strengthening ways in which we can combat domestic servitude, and we encourage anyone who encounters content on Meta's platforms that indicates someone is in immediate physical danger related to domestic servitude to contact local law enforcement immediately and report this content to us.

*Question 6.* During our hearing with the Facebook whistleblower, she indicated that Facebook can estimate how many children under 13 are on the platform using measures such as its "MAP." In fact, data shared with my office indicates that you did just that.

How does Facebook determine when underage children are on its platforms, both for internal research or for purposes of complying with COPPA?

If, during the course of internal research, you estimate a given number of underage kids are on Facebook or Instagram, what steps do you take do identify and remove those children?

How regularly are you removing underage kids from the platforms, if you had—as you said—600,000 to remove at any given time?

Answer. Understanding people's age on the Internet is a complex challenge across our industry, and we already have various methods of finding and removing accounts used by people who misrepresent their age. For example, anyone can report an underage account to us. Our content reviewers are also trained to flag reported accounts that appear to be used by people who are underage. If these people are unable to prove they meet our minimum age requirements, we delete their accounts. In the third quarter of 2021, Meta removed more than 2.6 million accounts on Facebook and 850,000 accounts on Instagram because they were unable to meet our minimum age requirement.

In addition, we've developed artificial intelligence technology that allows us to estimate people's ages, like if someone is below or above 18. We train the technology using multiple signals. We look at things like people wishing a user happy birthday, and the age written in those messages—for example, "Happy 21st Bday!" or "Happy Quinceañera." We're also building technology to find and remove accounts belonging to people under the age of 13. This technology isn't perfect, and we're always working to improve it, but that's why it's important we use it alongside many other signals to understand people's ages.

We're also in discussions with the wider technology industry on how we can work together to share information in privacy-preserving ways to help apps establish whether people are over a specific age. One area that we believe has real promise is working with operating system (OS) providers, Internet browsers, and other providers so they can share information to help apps establish whether someone is of an appropriate age.

This has the dual benefit of helping developers keep underage people off their apps, while removing the need for people to go through different and potentially cumbersome age verification processes across multiple apps and services. While it's ultimately up to individual apps and websites to enforce their age policies and comply with their legal obligations, collaboration with OS providers, Internet browsers, and others would be a helpful addition to those efforts.

61

ATTACHMENT

**RESEARCH PARTICIPATION
AGREEMENT**

This Research Participation Agreement ("**Agreement**") is between the applicable Meta Entity (as defined below) and its affiliates (collectively "**Meta**", "**us**", "**our**") and the undersigned person ("**Participant**", "**you**", "**your**"). "**Meta Entity**" means (a) Meta Platforms, Inc. if you are a resident of a region outside of the European Economic Area ("**EEA**"), and (b) Facebook Ireland Limited if you are a resident of a state in the EEA. Participation in the research project(s) described by Meta to you ("**Research**") is governed by this Agreement, as is Meta's collection, use, and other processing of the information in relation to the Research.  Please take time to read the Privacy Notice set out in Exhibit A of this Agreement.

For good and valuable consideration, the receipt of which you hereby acknowledge, you and Meta agree to the following terms and conditions:

1.         <u>Overview</u>.  Meta carries out a variety of research programs and focus groups in order to gain insights into how users engage with Meta's released, prototype or experimental hardware ("**Hardware**"), software (including modifications, enhancements, updates, and documentation) that may or may not be used with the Hardware ("**Software**"), and/or any related materials or services (collectively, with Hardware and Software, referred to herein as "**Product(s)**"). We also conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health, and well-being. Meta's collection, use, and other processing of your Research Data (as defined in Section 2 below) in relation to the Research is detailed in the Privacy Notice set out in Exhibit A of this Agreement ("**Privacy Notice**").  Meta may engage a third-party company to conduct the Research on our behalf ("**Research Administrator**").

2.         <u>Information collected in connection with the Research</u>. In connection with your participation in the Research, Meta and/or a Research Administrator may collect your information, including your name, age, gender, address, email address, phone number, and other personal background ("**Participant Data**"). Meta may collect your ideas, comments, opinions, responses to questions, and any other feedback you provide ("**Response Data**"). Meta may also record you in any format during the Research, including recording your use of our Products, measurements, answers, communications, and voice through any means, including without limitation, audio, video, photography, and screen captures ("**Recordings**"). Participant Data, Response Data, and Recordings collectively constitute "**Research Data**." In this regard, by participating in the Research, you freely accept the use of your image (i.e., video or photos) and voice recording as indicated above by Meta for research purposes and understand it is necessary for conducting the Research.

Please carefully review the attached Privacy Notice for further information about Meta's processing of Research Data in relation to the Research.

3.         <u>Merged Data</u>. Your information that is separately processed by Meta under the applicable data policy ("**Data Policy**") may be linked with Research Data (together, the "**Merged Data**") to assist with the Research.  For example, as part of your participation in the Research, you may need to connect one or more Products with your personal social media accounts, such as your Facebook, Messenger, Instagram and/or Oculus account, to enable testing of product features and functionality.  Merged Data will be used in accordance with the terms of this agreement, including the Privacy Notice attached to this Agreement.  Any processing of

62

Research Data or Merged Data for the purposes of the Research will not affect your existing use of the Meta Products, which will remain subject to the applicable data policy for each product.

4.     <u>Ownership of Participant Data and Recordings</u>.  Meta acknowledges and agrees that Participant owns all right, title, and interest in and to Participant Data and Recordings on and from their creation. If and to the extent any right, title, and interest in and to Participant Data or Recordings do not automatically vest in Participant, Meta assigns and transfers all such right, title, and interest in and to Participant Data or Recordings to Participant. Participant hereby grants Meta a perpetual, worldwide, irrevocable, transferable, non-exclusive, sub-licensable royalty-free license to use, modify, distribute, reproduce, create derivative works from, and perform/display such Participant Data and Recordings for internal research purposes. Research Data may incorporate your information and you acknowledge that this information may be used, retained, and stored by Meta in accordance with the Privacy Notice.  In the event that you withdraw your consent to the processing of your information, Meta will remove identifiable information from the Research Data.

5.     <u>Ownership of Response Data</u>: Meta owns all right, title and interest in Response Data. To the extent that ownership of Response Data vests in Participant and not Meta, Participant hereby grants Meta a worldwide, transferable, sub-licensable, royalty-free, non-exclusive, perpetual and irrevocable license to use, modify, distribute, reproduce, create derivative works from, perform/display, distribute and market Response Data for any purpose, including, but not limited to incorporation or implementation of such Response Data into a Meta technology, program, service or product. Should you disclose to Meta any unsolicited inventions or ideas, including but not limited to, technology, products, systems and services, Meta may use and build upon such information without restriction and on a royalty-free basis.  You unconditionally and irrevocably waive, in respect of the Response Data, all moral rights which you may now or at any future time be entitled under applicable laws.

6.     [<u>Payment</u>.  As payment for full participation in the Research, Meta will cause Participant to be paid_____[amount & currency] [commensurate to the level of participation] ("**Participation Fee**").  The Participation Fee is to compensate you for the value of your Response Data, your time, and any expenses you incur in participating.  You warrant that you are receiving the Participation Fee to compensate you for the time and effort spent participating in Research, and for no other purpose, and accepting the Participation Fee is in compliance with all applicable laws.]

7.     <u>Voluntary participation; Termination</u>.

You understand that participation in the Research is entirely voluntary and that you may at any time choose to stop participating in, or decline to participate in, any portion of the Research by using the contact information provided in the Privacy Notice. Meta, or its Research Administrator, may terminate your participation in the Research at any time whether during a Research project or at the end of a Research project, irrespective of whether you have been engaged on a one-off or an on-going basis.  If you withdraw your participation, or if your participation is terminated, any Research Data obtained prior to such withdrawal or termination may be used in accordance with this Agreement and Sections 4-5, 9, and 11-13 will survive such termination.

8.     <u>Conditions for participation in Research</u>.  By signing this Agreement and participating in Research, you agree to: (i) comply with the terms of this Agreement, as well as

63

any of our other terms and policies that may apply; (ii) provide true, correct, and complete information about yourself; and (iii) ensure that you engage in the Research in an honest, transparent, and good faith manner. To the extent this Agreement conflicts with other applicable terms, this Agreement will govern with respect to your participation in this Research.

If you are not an Employee of Meta, you acknowledge that nothing in this Agreement shall be construed as creating an employment, agency, partnership, or similar relationship with Meta. This Agreement does not give you the authority to obligate or bind Meta, or to incur any liability on behalf of Meta. You warrant that you are not organized or resident in a country or territory that is subject to U.S., EU, or United Nations comprehensive trade sanctions (e.g., Crimea, Cuba, North Korea, Iran, and Syria, as such list may be amended). You further warrant that you are not the target of any trade sanctions administered or enforced by the U.S. Government, the EU, the United Nations, or other applicable Governmental Authority and are not acting on behalf of any target of trade sanctions.

9.        Use and disclosure of Confidential Information.  "**Confidential Information**" means all information disclosed by or relating to Meta that you receive, have access to, or are exposed to, directly or indirectly, in connection with the Research. Confidential Information does not include any information that (i) becomes publicly available without breach of this Agreement, (ii) is previously known to you, or (iii) is received from a third party who did not wrongfully acquire or disclose such information. You may use Confidential Information only as necessary to perform your obligations under this Agreement. You will maintain Confidential Information in strict confidence and will not disclose Confidential Information to any third party without Meta's prior written consent. Meta does not grant to you any ownership or license rights in Confidential Information. Upon Meta's request, you will promptly destroy all tangible materials embodying Confidential Information in your possession.

10.        Meta-Provided Products. During the Research, Meta may discuss Product(s). Your potential access to, or understanding of the Product(s), and all materials pertaining to the Product(s), are provided only for your use in participating in the Research. You agree to return any Meta-provided Product(s) and/or remove (including allowing Meta to remove) access to any Meta-provided Software and all related data from your Hardware as instructed by Meta upon the completion of the Research.

11.        Acknowledgment of Risks; Release.  You understand that there may be known and unknown risks involved with your participation in the Research, and those risks could include property damage, personal injury, or illness. With this understanding, you agree to follow all safety procedures, guidelines and suggestions provided by Meta. Should you experience any injury, discomfort, or adverse effect that you feel relates to your participation in the Research, you will immediately (i) cease your participation in the Research; and (ii) provide prompt notification to Meta or the Research Administrator. To the fullest extent permitted by applicable law, you hereby release and discharge Meta from any and all claims, demands, actions, and causes of action, of any kind or character, as well as the costs and expenses thereof, including lawyers' fees, arising out of or in connection with your participation in the Research and/or the use of the Research Data as set forth in this Agreement, including claims for defamation and infringement of an intellectual property right.

12.        Limitation of Liability.  TO THE FULLEST EXTENT PERMISSIBLE BY LAW, NEITHER PARTY SHALL BE LIABLE TO THE OTHER UNDER THE AGREEMENT UNDER ANY CONTRACT, NEGLIGENCE, STRICT LIABILITY, TORT OR OTHER LEGAL OR EQUITABLE THEORY FOR: (A) ANY INCIDENTAL, INDIRECT, CONSEQUENTIAL,

64

EXEMPLARY, PUNITIVE OR SPECIAL DAMAGES OF ANY NATURE WHATSOEVER, REGARDLESS OF WHETHER SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES; OR (B) ANY AMOUNTS IN EXCESS OF FIVE HUNDRED U.S. DOLLARS ($500) OR THE EQUIVALENT IN THE LOCAL CURRENCY.

13.      <u>Miscellaneous</u>.  If you are a consumer and habitually reside in the United Kingdom or a Member State of the European Union, the law of Ireland will apply to any claim, cause of action, or dispute you have against us that arises out of or relates to this Agreement ("**Claim**"), and you may resolve your Claim in the Courts of Ireland. In all other cases, you agree that the Claim must be resolved in a competent court in San Mateo county, California and that the substantive laws of the State of California in the United States of America (excluding conflict of laws rules) will govern this Agreement and any Claim, without regard to conflict of law provision.

This Agreement constitutes the parties' entire agreement on the subject matter hereof, and supersedes all prior understandings, agreements, and discussions. It may only be modified in writing signed by both parties.  If any provision(s) of this Agreement (or part of any provision) are held unenforceable, this Agreement will continue in full force and effect without that provision or part-provision and the parties will negotiate in good faith to amend this Agreement to reflect the original intent of the parties.  All of our rights and obligations under this Agreement are freely assignable by us.  This Agreement may be executed in counterparts including fax, PDF and other electronic copies. All executed counterparts constitute one document.

65

**ACCEPTED AND AGREED TO:**

I have read and understand this Agreement, including its disclosure of Meta's collection, use, and sharing of my information.  I agree to participate in the Research in accordance with this Agreement.

Participant's Name: _____

Participant's Signature: _____          Date: _____

Email: _____

**Complete the following if the above Participant is a minor:**

I represent that I am the parent or legal guardian of the above minor Participant, and I consent to them entering into this Agreement and agree to have them bound by its terms.  I understand that I can withdraw this consent at any time by using the contact information provided in the Privacy Notice and that I can refuse at any time to permit the further use or maintenance of any information collected from the above minor Participant.  I understand that I may request to review the Personal Information collected from the above minor Participant at any time.

Parent/Legal Guardian Name: _____

Parent/Legal Guardian Signature: _____          Date: _____

Parent/Legal Guardian Email: _____

**PRIVACY CONSENT:**

**Consent to Process Research Data**

I confirm that I have read, understand, and consent to the collection, use, sharing, and other processing of Research Data as described in Section 2 above and in the Privacy Notice and acknowledge that this may include data with special protections under applicable law, including the categories of data identified in the Privacy Notice.

I understand that I can withdraw this consent at any time by using the contact information provided in the Privacy Notice.

Participant's Name: _____

Participant's Signature: _____          Date: _____

(if applicable) Parent/Legal Guardian Signature: _____

66

**Consent to Process Merged Data**

I confirm that I have read, understand, and consent to the collection, use, sharing, and other processing of Merged Data as described in Section 3 above and in the Privacy Notice and acknowledge that this may include data with special protections under applicable law, including the categories of data identified in the Privacy Notice.

I understand that I can withdraw this consent at any time by using the contact information provided in the Privacy Notice.

Participant's Name: _____

Participant's Signature: _____          Date: _____

(if applicable) Parent/Legal Guardian Signature: _____

67

**Privacy Notice for Research Participants**

This Privacy Notice for Research Participants ("**Privacy Notice**") explains how we collect, use, and share your information for the purpose of this Research.

1.        Underline: What kinds of information do we collect. The information that we collect pertains to Research Data and Merged Data as described in Sections 2 and 3 of the Agreement.  This information may fall into the following categories:

- Identifiers, including unique identifiers (e.g., your name), and device IDs;
- Data that may have special protections under the laws of your country, if you choose to provide it, including:
  - data revealing racial or ethnic origin,
  - data revealing political opinions,
  - data revealing religious or philosophical beliefs/organization membership,
  - data revealing trade-union membership,
  - data revealing health, sex life, or sexual orientation, or
  - biometric information, like photos and face imagery, processed to uniquely identify a person;
- Commercial Information, if you choose to provide it;
- Internet or other electronic network activity information, including content you view or engage with;
- Location-related information, including precise device location if you choose to allow us to collect it;
- Audio or visual Information, including photos and videos, if you choose to provide it;
- Professional or employment information, if you choose to provide it;
- Education information, if you choose to provide it;
- Financial information, if you choose to provide it; and
- Information derived from other information about you, which could include your preferences, interests, and other information used to personalize your experience.

2.        How do we use this information. Meta may use your information for product research and development purposes and does this by developing, testing, troubleshooting, and improving Products based upon the results of the Research. We may also use your information to conduct and support research and innovation on topics of general social welfare, technological advancement, public interest, health, and well-being.  If applicable, Meta may also use your information for payment verification purposes.

3.        How is this information shared. Meta shares information, including Research Data and Merged Data, with its affiliates, and our service providers. We don't sell any of your information to anyone.  Your information may be transferred outside the country where it is located. While your information is outside of your country of residence, it is subject to the laws of the country in which it is held, and may be subject to disclosure to the governments, courts or law enforcement or regulatory agencies of such other country, pursuant to the laws of such country.  Information controlled by Facebook Ireland Limited will be transferred or transmitted to, or stored and processed in, the United States or other countries outside of where you live for the purposes as described in this Privacy Notice. We utilize standard contractual clauses approved by the European Commission and rely on the European Commission's adequacy decisions about certain countries, as applicable, for data transfers from the EEA to the United States and other countries.

68

4.      <u>Consent</u>.  As described in the applicable Research Participation Agreement with you, participation in any Research is entirely voluntary.  You are under no obligation to participate in the Research.  However, if you choose to participate, the processing of your information is a fundamental part of the Research. Meta collects, uses and discloses your information, which you provide as part of the Research, with your consent. Meta collects, uses and discloses any information with special protections, which you provide as part of the Research, with your explicit consent. You have a right to withdraw your consent to the processing of your information and to cease your participation at any time by using the contact information set out below.

5.      <u>How long do we retain information</u>.  Meta will retain your information that we collect during this Research for the duration of the Research and for such time thereafter as required to conduct analyses, respond to peer review or otherwise verify the Research, and in order to comply with our legal and regulatory obligations.

6.      <u>Your Legal Rights</u>.  You have certain legal rights depending on the jurisdiction in which you are located, including the right to:

- Refuse to provide consent to our processing of your information;
- Withdraw your consent to our processing of your information, at which point your information will be erased or anonymized under applicable laws;
- Request that we disclose to you the information we collect, use, or disclose, and information about our data practices;
- Request that we erase or anonymize information we have collected about you;
- Request that we rectify any inaccurate information concerning you;
- Receive information that you have provided to us in a structured, commonly used and machine readable format;
- Lodge a complaint with the applicable privacy supervisory authority in your country of residence.  If you are an EU/EEA resident your applicable supervisory authority is the Irish Data Protection Commission.

We will not discriminate against you for exercising any of these rights.

If you would like to exercise rights available to you under applicable law, please contact us via the contact information provided below**.**

7.      <u>Contact</u>.  If you have any questions or concerns about this privacy notice or wish to exercise rights available to you under applicable law, please contact us via email at <u>RPAContact@FB.com</u>**.**

You can also contact us by post mail at:

*If you are <u>not</u> a resident of a state in the EEA:*

Meta Platforms, Inc.
ATTN: Privacy Operations
1601 Willow Road
Menlo Park, CA 94025

69

*If you are a resident of a state in the EEA, the data controller responsible for your personal information is Facebook Ireland Limited:*

Facebook Ireland Ltd.
4 Grand Canal Square,
Grand Canal Harbour,
Dublin 2, Ireland

You can also contact Facebook Ireland Limited's DPO by filling out the contact form available at < https://www.facebook.com/help/contact/540977946302970 >.