Thomas P. Cartmell (*pro hac vice*)
Jonathan P. Kieffer (*pro hac vice*)
Austin Brane, SBN 286227
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1100
tcartmell@wcllp.com
jpkieffer@wcllp.com
abrane@wcllp.com

*Attorneys for Plaintiff* (additional
counsel on signature page)

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION, | Case No. 4:22-MD-03047-YGR<br><br>MDL No. 3047<br><br>**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: January 26, 2026<br>Time: 8:00 AM<br>**PLACE: COURTROOM 1, 4ᵀᴴ FLOOR** |
| This Document Relates to:<br><br>Tucson Unified School District v. Meta Platforms Inc., et al.<br><br>Case No.: 4:24-cv-1382 | |

# TABLE OF CONTENTS

I.     BACKGROUND ...................................................................................................... 1

II.    ARGUMENT ........................................................................................................... 1

    A.    TUSD's evidence shows that Defendants caused TUSD's harm and unreasonably interfered with its rights. ........................................................ 1

        1.    Defendants' conduct has substantially contributed to widespread disruption and related harms to TUSD. .......................................... 2

        2.    Defendants disregard evidence and mischaracterize the law. ....................... 7

    B.    TUSD has presented sufficient evidence of damages. ................................. 8

        1.    TUSD's evidence provides a reasonable basis for lost-time damage. .......... 8

        2.    TUSD has presented sufficient evidence of additional costs. ..................... 11

    C.    Dr. Hoover's Strategic Plan is an appropriate remedy under Arizona law. ............. 12

    D.    TUSD has sufficient evidence of Defendants' failure to warn. .............................. 13

        1.    Evidence demonstrates TUSD would have acted on appropriate warnings. 13

III.   CONCLUSION ...................................................................................................... 14

1

## TABLE OF AUTHORITIES

2

3 <u>**CASES**</u>

4 *A. Miner Contracting, Inc. v. Toho-Tolani Cnty. Imp. Dist.*, 311 P.3d 1062 (Ariz. Ct. App. 2013) ............................................................................................................................. 11

5

6 *Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953 (D. Ariz. 2020) ................................. 10

*AHS Rescue, LLC v. Ariz. Outdoor Specialists, Inc.*, 2019 WL 993093 (Ariz. Ct. App. Feb. 27,
7 2019) .................................................................................................................................. 11

8 *Badia v. City of Casa Grande*, 988 P.2d 134 (Ariz. Ct. App. 1999) ........................................ 7

9 *Barrett v. Harris*, 86 P.3d 954 (Ariz. Ct. App. 2004) .............................................................. 1

10 *Boyce v. Indep. Brewers United Corp.*, 2016 WL 374206 (N.D. Cal. Feb. 1, 2016) ............... 8

11 *Bozek v. Ariz. Lab. Force Inc.*, 2025 WL 264174 (D. Ariz. Jan. 22, 2025) ............................ 8

12 *Brown v. City of Phoenix*, 557 P.3d 321 (Ariz. Ct. App. 2024) ............................................. 13

13 *Cactus Corp. v. State ex rel. Murphy*, 480 P.2d 375 (Ariz. Ct. App. 1971) ......................... 13

14 *City of Phoenix v. Whiting*, 457 P.2d 729 (Ariz. Ct. App. 1969)............................................. 2

15 *Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*, 459 P.2d 533 (Ariz. Ct. App. 1969) .............. 11

16 *Gilmore v. Cohen*, 386 P.2d 81 (Ariz. 1963) ………………………………………......8, 10

17 *Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 167 P.3d 711 (Ariz. Ct. App. 2007) .... 7

18 *Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34 (D. Ariz. 2021) ..................................... 8

19 *Harrelson v. Dupnik*, 970 F. Supp. 2d 953 (D. Ariz. 2013) ................................................... 1

20 *Hinshaw v. United States*, 264 F. Supp. 3d 1026 (D. Ariz. 2017) ........................................... 1

21 *In re Bill Johnson's Restaurants, Inc.*, 255 F. Supp. 3d 927 (D. Ariz. 2017)........................... 2

22 *Mutschler v. City of Phoenix*, 129 P.3d 71 (Ariz. Ct. App. 2006) ........................................... 2

23 *Oliver v. Henry*, 260 P.3d 314 (Ariz. Ct. App. 2011)............................................................ 10

24 *PivotHealth Holdings LLC v. Horton*, 2025 WL 1865788 (D. Ariz. July 7, 2025)................. 8

25 *Pompeneo v. Verde Valley Guidance Clinic*, 249 P.3d 1112 249 P.3d 1112, 1116 (Ariz. Ct. App. 2011) .................................................................................................................................. 10

26 *Quinalty v. FocusIT LLC*, 2024 WL 342454 (D. Ariz. Jan. 30, 2024) .................................... 8

27 *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040 (Ariz. 1990).................................... 2

28 *Rollings v. City of Tucson*, 2007 WL 5556969 (Ariz. Ct. App. Dec. 24, 2007) ...................... 2

*Salica v. Tucson Heart Hosp.–Carondelet, L.L.C.*, 231 P.3d 946 (Ariz. Ct. App. 2010)........................7

*Shaner v. Tucson Airport Auth. Inc.*, 573 P.2d 518 (Ariz. Ct. App. 1977)................................................7

*State ex rel. Indus. Comm'n v. Standard Oil Co. of Cal.*, 414 P.2d 992 (Ariz. Ct. App. 1966) ...............7

*Surowiec v. Cap. Title Agency, Inc.* 790 F. Supp. 2d 997 (D. Ariz. 2011)..........................................8, 10

*VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037 (N.D. Cal. 2006)..........................................7

## I.     BACKGROUND

Established in 1867, Tucson Unified School District ("TUSD") is Arizona's second-largest public district, operating more than 80 schools. For over 150 years, it has served one of the State's most racially and economically diverse student populations—roughly 80% students of color, the majority Hispanic, and more than half qualifying for financial assistance. Defendants seek to evade their responsibility for TUSD's harms by pointing to that diversity and to systemic challenges such as poverty, community violence, and racial segregation. But the law says otherwise: under the "eggshell plaintiff" rule, a defendant takes the victim as found. Vulnerability magnifies harm, it does not absolve responsibility.

TUSD's students were especially vulnerable to the harms Defendants' platforms caused—compulsive use by students leading to classroom distraction, emotional dysregulation, escalating mental-health needs, and harm to the school environment. Defendants knew these risks but failed to warn about them. Indeed, Defendants' internal research showed that school-aged users, particularly in high-need districts, were suffering the same harms their platforms caused in TUSD. Rather than warn about or remove those dangers, Defendants prioritized engagement and profit over the wellbeing of students and the stability of schools, causing foreseeable harm to TUSD. Defendants' conduct disrupted school operations, undermined learning, damaged student wellbeing, and forced TUSD to divert staff and resources from its educational mission. That substantial, systemic, and ongoing interference is exactly the kind of unreasonable disruption of public rights that gives rise to liability under public nuisance law.

## II.     ARGUMENT

### A. TUSD's evidence shows that Defendants caused TUSD's harm and unreasonably interfered with its rights.

Defendants' wrongful conduct breached their duty of care and created a substantial interference with the public rights to health, safety, and education, as set out in Pls. Omni Opp. § III.A. TUSD's evidence demonstrates both proximate causation and unreasonable interference—core elements of its negligence and public nuisance claims, respectively.

"Causation is generally a question of fact for the jury unless reasonable persons could not conclude that a plaintiff had proved this element." *Hinshaw v. United States*, 264 F. Supp. 3d 1026, 1036 (D. Ariz. 2017) (precluding summary judgment on causation issue) (citing *Barrett v. Harris*, 86 P.3d 954, 958 (Ariz. Ct. App. 2004)); *Harrelson v. Dupnik*, 970 F. Supp. 2d 953, 976 (D. Ariz. 2013) (same).

"Plaintiff need only present probable facts from which the causal relationship reasonably may be inferred." *Robertson v. Sixpence Inns of Am., Inc.*, 789 P.2d 1040, 1046–47 (Ariz. 1990).

Causation for a negligence claim under Arizona law requires "proximate causation." *In re Bill Johnson's Rests., Inc.*, 255 F. Supp. 3d 927, 936 (D. Ariz. 2017). "[F]or a negligent act to amount to proximate cause, it must be a substantial factor in bringing about the injury," *id.*, but "the defendant's act or omission need not be a 'large' or 'abundant' cause of the injury; even if defendant's conduct contributes 'only a little' to plaintiff's damages, liability exists if the damages would not have occurred but for that conduct." *Robertson*, 789 P.2d at 1046–47.

Proximate cause is not a requirement with respect to TUSD's nuisance claim, and the Court should reject Defendants' argument otherwise. *See* ECF No. 2290 (Defendants' Motion for Summary Judgment (Tucson) (SD MSJ No. 2)) ("Motion" or "Mot.") at 15. Defendants rely solely on a 1969 appellate decision concerning a jury instruction—*City of Phoenix v. Whiting*, 457 P.2d 729, 735–36 (Ariz. Ct. App. 1969)—which the court itself described as questionable despite ultimately holding the instruction was not "reversible error." More recent authority confirms that nuisance and negligence are distinct theories: in *Rollings v. City of Tucson*, 2007 WL 5556969, at *3 (Ariz. Ct. App. Dec. 24, 2007), the court held it was error to link the two, because a nuisance plaintiff "needn't prove negligence" but only that the defendant's conduct invaded the plaintiff's rights and caused damage. Consistent with this precedent, Arizona law requires a nuisance plaintiff to show an *unreasonable interference* with a public right, not proximate cause. *Mutschler v. City of Phoenix*, 129 P.3d 71, 77 (Ariz. Ct. App. 2006).

In any event, the same evidence supports the proximate causation and unreasonable interference elements of TUSD's two claims. Defendants' conduct led to students' compulsive or problematic use of Defendants' platforms. This foreseeably disrupted TUSD's educational environment, impairing instruction and forcing the diversion of staff and resources to manage resulting harms. The evidence discussed below is more than enough to create a genuine dispute of material fact concerning Defendants' causation of TUSD's injuries and its substantial and unreasonable interference with the public right to education, health, and safety. Defendants' motion for summary judgment should be denied.

### 1. Defendants' conduct has substantially contributed to widespread disruption and related harms to TUSD.

As discussed in Plaintiff's omnibus response, youth use of Defendants' platforms is pervasive.

TUSD is no exception.[1] The record establishes that TUSD students' use of Defendants' platforms—both on campus generally and in classrooms—is widespread, problematic, and highly disruptive. TUSD's Superintendent, Dr. Gabriel Trujillo, described student social media use as "pervasive." Ex. 1 at 188:3–21. Ms. Julie Shivanonda, TUSD's former Director of Social Emotional Learning ("SEL"), testified that incidents involving "cellphones and social media" have "consistently increased" in recent years, Ex. 2 at 241:20–242:5, and that she has observed a "growing problem of addictive, compulsive, and problematic social media use among [TUSD] students." Ex. 3 at ¶ 8; *see* Ex. 4 at 79:14–80:2 ("phones are pervasive in [the TUSD] community"). Student input during revisions to the Student Code of Conduct confirmed that "there's a high use of cellphones, and the majority of the use from the cellphones is engaging in social media platforms." Ex. 4 at 80:3–83:22.

Ms. Clarinda Rubio, a 27-year TUSD veteran and current high school administrator, confirmed the same pattern. At her prior K–8 school, "students on their phone constantly was definitely an issue," staff "collected anywhere from 10 to 20 phones on a daily basis from students," and teachers routinely observed students using social media during class. Ex. 5 at 134:2–19, 135:20–136:6, 44:8–13; *see also id.* at 128:23–129:3 (phone confiscation a "hot topic" among staff). School administrators have repeatedly raised the issue with parents: in 2019, Santa Rita High School warned that "cellphone use has becom[e] a distracti[on], and the classroom teachers are finding it difficult to have [students] focus on work." Ex. 6 at -1269; *see also* Ex. 7 at -7233-34 (principal and parent acknowledging "major distraction" of student cellphones in classrooms).

Defendants may argue that this demonstrates that smartphones or the internet generally (not their platforms) are the problem, *see* Mot. at 21-24, but that is wrong. *First,* as discussed in Plaintiffs' omnibus response, Defendants' platforms are wildly popular with school-aged youth, a state of the world Defendants went out of their way to ensure.

*Second,* TUSD witnesses confirmed that when problems arise with cellphones, the cause is social media use—not internet browsing or texting. For instance, Ms. Shivanonda testified that "the majority

---

[1] TUSD's use of Defendants' platforms to communicate with its stakeholders does not undermine its claims, as Defendants suggest. Mot. at 4-5. TUSD uses those platforms because that's "where [TUSD students] are, that's where they spend their time." Ex. 8 at 151:2-7; *see also* Ex. 4 at 187:2-13 (same).

of the use from the cellphones is engaging in social media platforms," and that students "report that they don't generally use SMS text, they text via Instagram or via Facebook." Ex. 4 at 80:3–83:22, 150:22–151:18; *see* Ex. 3 at ¶ 11 ("impacts of social media on students' wellbeing are unique to social media" and not observed from general cellphone use). Ms. Rubio similarly testified that "the majority of the time" when a phone is confiscated, it "was linked to social media." Ex. 5 at 86:13–24 (social media is "brought up on all of our conversations … why was a phone confiscated"). She also testified that even "very, very young [TUSD] children" are active on social media, Ex. 5 at 105:21–23—even though all Defendants claim they bar users under the age of 13. *See* Pls. Omni Opp. § III.A.2 (age verification §§).

Documented incidents in TUSD secondary schools for "Improper Use of Technology"—a disciplinary category often involving cellphones and social media—have surged from seven in 2016–17 to 155 in 2023–24. Ex. 9 at –5959; *see* Ex. 2 at 227:17–228:20 ("90 to 95 percent" of such violations involve cellphones and social media). Overall disciplinary incidents likewise rose from 3,994 in 2016–17 to 10,787 in 2023–24, with 70 to 75 percent connected to social media use. Ex. 9 at -5959; Ex. 2 at 228:21–25. Ms. Shivanonda testified that social media is the "through line through most of [TUSD's] discipline" and can contribute to multiple categories of violations. Ex. 4 at 46:23–47:25, 48:25–49:3 ("majority of our discipline practices are somehow connected to the use of social media").[2]

Indeed, during monthly discipline meetings, staff routinely discussed how social media is "disrupting the learning environment [and] causing disrespect" toward teachers. Ex. 5 at 78:19–25.[3] These incidents not only interfere with students' education but also consume substantial staff time. Ex. 2 at 333:12–25 (teachers "constantly" dealing with "students having cellphones and social media," severely taxing the district); Ex. 10 at ¶ 16 (administrators have less time for other duties due to addressing social media impacts). Nearly all discipline incidents require teachers to pause instruction,

---

[2] Defendants suggest that TUSD discipline incidents do not relate to their platforms or only relate to third party content. Mot. at 5-6, 18. That misrepresents the evidence and is belied by TUSD witness testimony. First, the database Defendants cite, records management and student relations, are not TUSD's primary discipline tracking databases. Ex. 4 at 26:16-27:2, 48:1-3, 50:21-52:2. Second, as discussed herein, Defendants' platforms promote and encourage students to engage in attention-seeking behavior, e.g., posting school threats and videos of fights. In the specific incident Defendants cite, the student viewing school shooting videos did not search for them—they were promoted by YouTube. Ex. 12 at -0418.

[3] This and other evidence discussed herein rebuts Defendants' argument that TUSD never analyzed its students' social media use or its impact, and that TUSD has "no data" on the issue. Mot. at 5, 8.

administrators to escort and interview students, and staff to contact parents and implement restorative practices—all of which divert personnel and resources from TUSD's core educational mission.

Beyond classroom disruption, TUSD has experienced a "significant increase" in students' behavioral and social-emotional needs as social media use has risen. Ex. 4 at 66:11–67:9. Ms. Shivananda testified that TUSD has seen an "increase of anxiety and depression and overall mental health supports needed in our school campuses," conditions "heavily influenced due to social media." Ex. 4 at 72:12–17; *see* Ex. 3 ¶ 9 (observing an "alarming rise" in student anxiety and depression tied to social media). Consistent with this testimony, the number of TUSD students identified with an "anxiety" health condition nearly doubled—from 1,948 in 2016–17 to 3,751 in 2023–24. Ex. 11 at -3994–4003.

Ms. Shivananda testified that social media is driving an increased need for mental and behavioral support across TUSD. Ex. 4 at 73:4–16. She further explained that social media undermines students' ability to regulate emotions and problem-solve, and contributes to an "increase of anxiety, depression, [and] social isolation." *Id.* at 136:13–137:25; *see also* Ex. 2 at 267:23–268:6 ("we're seeing a high increase in anxiety and depression due to social media and cellphone usage" and reduced real-world interaction). Ultimately, "social media's impact [on students] directly impacts [their] social-emotional growth," Ex. 2 at 353:24–354:15, requiring expanded SEL programming and mental health services. These impacts impose direct financial costs on TUSD and demonstrate that Defendants' conduct, not isolated incidents involving third party content, caused widespread and ongoing harm to TUSD.

*Third,* TUSD witnesses identified Defendants' specific platforms as the source of disruption. Ms. Shivananda testified that "the majority" of disciplinary incidents involving social media "connect[ed] with platforms such as Facebook and Instagram." Ex. 4 at 85:22–86:13. Ms. Rubio testified that TikTok, Instagram, and Snapchat are the platforms most often involved in student misconduct. Ex. 5 at 82:15–21. She described, for example, incidents of "tardiness and truancies" caused by students "creating their videos for their TikToks" instead of attending class. Ex. 5 at 42:22–43:5. She observed the "constant notifications" and "constant dinging" from cell phones—triggered by the amplification of "receiving a lot of comments or follows or likes," mostly on TikTok and Instagram. Ex. 5 at 44:17–45:13. Regional Superintendent Brian Lambert echoed this testimony, explaining that his discussions with students and families repeatedly involve the same platforms—Instagram, Snapchat, and TikTok. Ex. 13 at 142:6–22;

*see also* Ex. 1 at 168:19–169:13, 172:11–173:5 (discussing disruptive incidents involving TikTok, Snapchat, and Instagram); Ex. 14 at 46:9-48:23 (discussing Instagram, Snapchat, TikTok, and YouTube); Ex. 15 at 188:22-190:5 (substantial work with SEL curriculum to help address students' needs resulting from use of social media, specifically TikTok, Instagram, YouTube, and Snapchat).

Defendants seek to avoid liability by claiming there is no evidence that certain features of their platforms contributed to TUSD's harm. Mot. at *passim*. That argument rests on a misunderstanding of the law of this case—*all* platform features are relevant as part of TUSD's "failure to warn" theory. *See* Pls. Omnibus Opp. § III.A.1.a. Further, Defendants ignore the factual record and expert testimony detailed in Plaintiffs' omnibus opposition brief. And TUSD witnesses themselves provided examples of features driving students' compulsive and problematic use. Ms. Rebecca Carrier, TUSD's counselor coordinator for secondary schools, testified that middle, high school, and even elementary school girls exhibit unhealthy behavior tied to the number of "likes" they receive on social media, and that she has seen the direct impact of social media filters on body dysmorphia for TUSD students. Ex. 8 at 108:10–109:13, 202:18-203:7, 166:25-167:11 (TUSD counselors have organized groups for TUSD students struggling with body dysmorphia). Ms. Rubio similarly observed students repeatedly "checking their streaks" and monitoring whether their posts had received "likes and comments." Ex. 5 at 43:22–44:4. She also noted that students can "create as many [social media] accounts as they want," causing increased disruption. Ex. 5 at 88:1-22. These problems are worsened by the absence of effective parental controls or age verification. Ms. Shivanonda testified that features such as "likes," "love," "reposts," and "reshares" drive students' compulsive engagement, explaining that these tools "make students want to engage and get the likes and get the clout." Ex. 4 at 135:9–136:3. Defendants have furnished *no* evidence that they warned TUSD, or the students and parents in its community, about any of these risks.[4]

On this record, a reasonable jury could find that Defendants' platforms and their lack of warnings

---

[4] Defendants also suggest that TUSD-issued devices are the problem. Mot. at 23 ("students refusing to put away devices is often linked to *Tucson-issued* devices"). First, the device TUSD students use to access Defendants' platforms is irrelevant: the harms caused by the platforms exists regardless of the device. Second, the cited incident involved a student that "had very severe reactions to the restriction or limitation or removal of technology" and became physically aggressive when a device was taken from him. That only underscores the addiction problem, which the evidence discussed herein and in Plaintiffs' omnibus opposition demonstrates is due to Defendants' conduct.

1   substantially contributed to TUSD's harm. The evidence shows those platforms are the primary drivers

2   of classroom disruption, escalating discipline, staff diversion, and rising student mental-health needs at

3   TUSD. This record squarely attributes TUSD's injuries primarily to Defendants' conduct—not third-

4   party content, general internet use, or hypothetical third-party apps—and precludes summary judgment

5   on TUSD's negligence and public-nuisance claims.

6   **2.   Defendants disregard evidence and mischaracterize the law.**

7   Defendants' claim that TUSD lacks "competent" causation evidence ignores the record and

8   misstates the law. TUSD raises two points in addition to those presented in Plaintiffs' omnibus

9   opposition briefs. *First*, Arizona law requires only that a plaintiff present evidence—not a specific type

10  of evidence—from which a jury could reasonably infer causation, and TUSD has done so. *See Salica v.*

11  *Tucson Heart Hosp.–Carondelet, L.L.C.*, 231 P.3d 946, 952 (Ariz. Ct. App. 2010) (finding testimony

12  other than the type typically relied on "sufficient to establish both a breach of the standard of care and

13  causation"). TUSD's evidence, discussed herein, provides sufficient evidence from which a jury could

14  find that Defendants' conduct contributed to TUSD's harm.

15  *Second,* the Arizona cases Defendants cite do not support summary judgment. Unlike the

16  plaintiffs in those cases, TUSD has presented evidence that Defendants knew of their platforms' harmful

17  effects on youth, exploited children's underdeveloped impulse control, and caused significant,

18  observable harm in TUSD schools. *See Grafitti-Valenzuela ex rel. Grafitti v. City of Phoenix*, 167 P.3d

19  711, 718-19 (Ariz. Ct. App. 2007) (no foreseeability when plaintiff failed to show that abductor relied

20  on alleged defective conditions); *Badia v. City of Casa Grande*, 988 P.2d 134, 142 (Ariz. Ct. App. 1999)

21  (no foreseeability when plaintiff failed to present any evidence that police could have known that

22  victim's sobriety level or that police custom would cause another to attack victim); *Shaner v. Tucson*

23  *Airport Auth. Inc.*, 573 P.2d 518, 522 (Ariz. Ct. App. 1977) (no "reasonable probability" that lack of

24  lighting caused abduction in parking lot when plaintiff provided "no evidence of what happened" there);

25  *State ex rel. Indus. Comm'n v. Standard Oil Co. of Cal.*, 414 P.2d 992, 996 (Ariz. Ct. App. 1966)

26  (decedent's attempt at welding a half-full fuel tank that exploded was not foreseeable by defendant).[5]

27

28  ---
    [5] *VFD Consulting, Inc. v. 21st Servs.*, 425 F. Supp. 2d 1037, 1053 (N.D. Cal. 2006) is distinguishable, as it was decided under Minnesota law and the plaintiff failed to argue against summary judgment .

**B.  TUSD has presented sufficient evidence of damages.**

Summary judgment is improper where a plaintiff provides "some reasonable basis for computing the amount of damage" with "such precision as, from the nature of his claim and the available evidence, is possible." *Surowiec v. Cap. Title Agency*, *Inc.* 790 F. Supp. 2d 997, 1001 (D. Ariz. 2011) (quoting *Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963)). "[D]oubts as to the extent of the injury should be resolved in favor of the innocent plaintiff and against the wrongdoer," and "certainty in amount" is not required once the fact of damage is established. *Id.*; *Gilmore*, 386 P.2d at 82.

**1.  TUSD's evidence provides a reasonable basis for lost-time damage.**

Defendants' conduct has caused pervasive disruption and diversion of TUSD's limited resources, from increased classroom and campus disturbances to expanded behavioral and mental-health demands. TUSD is entitled to recover for this lost time.

As fully explained in Plaintiffs' omnibus opposition, damages such as lost time are recoverable under Arizona law. The law recognizes that when a defendant's conduct forces a public entity to divert personnel, time, and resources to address resulting harms, those losses are compensable. Defendants cite cases relating to individuals suing after a data breach[6], but they are distinguishable because the "lost time" alleged was just the personal inconvenience felt by an individual. Arizona law recognizes as damages loss of an employee's ability to perform their official functions, which is what TUSD seeks to recover for here. *See PivotHealth Holdings LLC v. Horton*, 2025 WL 1865788, at *2 (D. Ariz. July 7, 2025) (finding damages including "employee time" plausibly alleged as concrete monetary harm).

TUSD has presented more than enough evidence of lost time to defeat summary judgment, especially given that the court "must view the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor." *Boyce v. Indep. Brewers United Corp.*, 2016 WL 374206, at *2 (N.D. Cal. Feb. 1, 2016). Specifically, multiple TUSD witnesses attest to staff positions impacted by Defendants' conduct and the extent of their diverted time. For instance, drawing on 21 years of experience at TUSD, Ms. Shivanonda estimated the percentage of work time that counselors,

---

[6] *Griffey v. Magellan Health Inc.*, 562 F. Supp. 3d 34, 45 (D. Ariz. 2021) (individuals alleging lost time and future harm after data breach); *accord Quinalty v. FocusIT LLC*, 2024 WL 342454, at *4 (D. Ariz. Jan. 30, 2024); *Bozek v. Ariz. Lab. Force Inc.*, 2025 WL 264174, at *5 (D. Ariz. Jan. 22, 2025).

restorative-practice facilitators, behavior specialists, social workers, school psychologists, and administrators devote to social-media-related issues. Ex. 4 at 62:24–65:23; Ex. 16, Ex. 1, p.1 ("Support Staff Chart"); *see also* Ex. 4 at 64:6–65:23 (testifying that this list is conservative). She based these estimates on regular meetings with counselors, community-health workers, and Multi-Tiered Systems of Supports ("MTSS") teams, as well as behavioral and mental-health data reviews. Ex. 3 at ¶ 17; Ex. 17 at 48:22–51:2, 51:22–52:21.[7] Her estimates are corroborated by other administrators. *See* Ex. 8 at 40:20–41:15 (testimony of Rebecca Carrier, TUSD's counseling program coordinator, that social-media-related issues "permeate through most everything we do.").

That's not all. Dr. Sabrina Salmon, TUSD's Senior Director of Exceptional Education, has over 15 years in K–12 education and has worked for TUSD since 2016. Ex. 18 at ¶¶ 3–4. Drawing on that experience, Dr. Salmon provided conservative estimates of the time *her* staff devote to addressing social-media-related problems. Ex. 18 at ¶ 18. That includes social workers, school psychologists, counseling interns, psychology interns and externs, and exceptional education and behavior intervention specialists. Ex. 18 at ¶¶ 6, 18; Ex. 19 at 152:8–154:1, 165:24–166:9; Ex. 16 at Rog. 5 & Ex. 1, p. 1.

TUSD has also presented evidence of the time principals and assistant principals at the elementary, middle, and high school levels spend addressing disruptions and related impacts caused by Defendants' conduct. Mr. Lambert, a long-time TUSD employee and Regional Assistant Superintendent since 2018, oversees principals responding to classroom disruptions, behavioral investigations, and stakeholder communications caused by Defendants' platforms. Ex. 20 at ¶¶ 4–5. According to Mr. Lambert, social media "permeates and exacerbates many, if not most, of the substantial issues" students face. Ex. 20 at ¶ 6. He provided conservative estimates of the time principals and assistant principals at each school level spend addressing these issues, Ex. 20 at ¶¶ 16-17; Ex. 21 at 15:1–21:10, 22:9–27:2, stating that he believes his experience is representative of other TUSD regions. Ex. 20 ¶ 20.

Holly Hammel, an educator with 26 years of experience who joined TUSD in 2009 and has served as Regional Assistant Superintendent since 2018, gave comparable estimates for her region. Ex. 10 at ¶¶ 3–4, 13, 15; Ex. 15 at 169:20–172:23, 173:20–174:8. Like Mr. Lambert, Ms. Hammel oversees

---

[7] Contrary to Defendants' suggestion, Mot. at 10, Ms. Shivanonda's brief leave in 2020–21 did not limit her familiarity with these impacts. Ex. 3 ¶ 4.

1   principals and regularly confronts the negative effects of Defendants' platforms, which she views as one

2   of the district's most persistent challenges. Ex. 10 at ¶¶ 5–6. Ms. Hammel testified that students are

3   increasingly unable to regulate their use of or disengage from these platforms, *id.* at ¶ 7; Ex. 15 at 189:20–

4   190:5, and she believes her experience is representative district-wide. Ex. 10 at ¶ 18.

5       Expert evidence reinforces these findings. Market-research expert Robert Klein surveyed TUSD

6   secondary teachers and found that instructional time lost to student use of Defendants' platforms rose

7   from 2.6% to 5.3% for middle-school teachers and from 3.7% to 20.0% for high-school teachers between

8   2014 and 2023–24. Ex. 22 at ¶¶ 1, 2, 41. Economist Dr. Bryce Ward analyzed TUSD's and Mr. Klein's

9   data and concluded that, from 2016–17 through 2023–24, TUSD incurred $77.4 million to $100.6 million

10  in lost opportunity costs—including wages and benefits—for time diverted to address the effects of

11  Defendants' platforms. Ex. 23 at ¶¶ 1, 38. All of this occurred despite TUSD's extensive mitigation

12  efforts, including Yondr pouches, cellphone lockers, front-office cellphone collection, and parental

13  outreach. *See infra* § III.B.2; Ex. 4 at 146:22–147:8, 162:16–163:13; Ex. 5 at 133:11–18.

14      As explained in Plaintiffs' Section 230 Daubert brief, Defendants' argument that TUSD's

15  evidence is deficient because some incidents may involve other platforms or Section 230-protected

16  content does not entitle them to summary judgment. There is ample evidence that TUSD's harms arise

17  from students' use of Defendants' platforms, and that evidence should go to a jury.

18      Finally, Arizona law does not require the mathematical precision Defendants demand. As

19  *Gilmore* holds, "the plaintiff in every case should supply some reasonable basis for computing the

20  amount of damage and must do so *with such precision as, from the nature of his claim and the available*

21  *evidence, is possible*." 386 P.2d at 83 (emphasis added). Absolute precision is unnecessary, and "doubts

22  as to the extent of injury should be resolved in favor of the innocent plaintiff." *Surowiec*, 790 F. Supp.

23  2d at 1001. Arizona courts and the Ninth Circuit routinely accept reasonable time estimates when exact

24  calculations are impractical. *See Ader v. SimonMed Imaging Inc.*, 465 F. Supp. 3d 953, 966 (D. Ariz.

25  2020) (estimates of hours worked sufficient to prove overtime claims); *Oliver v. Henry*, 260 P.3d 314,

26  316 (Ariz. Ct. App. 2011) (rejecting argument that damages required a specific calculation).

27      Defendants' cited authorities are inapposite. *Pompeneo v. Verde Valley Guidance Clinic*, 249

28  P.3d 1112, 1116 (Ariz. Ct. App. 2011), involved a plaintiff who presented *no* evidence of compensable

damages—unlike TUSD, which has produced testimony, responses, and documentation. *Earle M. Jorgensen Co. v. Tesmer Mfg. Co.*, 459 P.2d 533, 539–40 (Ariz. Ct. App. 1969) held that the plaintiff had not presented sufficient evidence of lost profits and noted a lack of "factual basis for the computation." *AHS Rescue, LLC v. Ariz. Outdoor Specialists, Inc.*, 2019 WL 993093, at *4 (Ariz. Ct. App. Feb. 27, 2019) held that the plaintiff's unverified disclosure of damages calculations unaccompanied by reliable testimony was insufficient. TUSD's case is more aligned with *A. Miner Contracting, Inc. v. Toho-Tolani Cnty. Imp. Dist.*, 311 P.3d 1062, 1072–73 (Ariz. Ct. App. 2013), where the court upheld damages supported by itemized explanations and credible estimates.

## 2. TUSD has presented sufficient evidence of additional costs.

TUSD has presented ample evidence of costs directly attributable to Defendants' conduct, including personnel, training, and program expenditures. These damages need not be caused exclusively by Defendants' narrow definition of "at-issue" conduct. Pls. Omni Opp. §§ III.B, III.C.1.

TUSD has incurred at least $543,331.60 in past expenditures for programs necessitated by Defendants' conduct. Ex. 16 at 10-11. These include, but are not limited to:

- **Yondr Pouches ($16,850).** Tucson High Magnet School piloted a Yondr pouch program in the 2019-2020 school year for select classes. Ex. 4 at 146:2-147:13; Ex. 30 at ¶ 20, App. C, Ex 1 p. 1; Ex. 16 at Rog 5 & Ex. 1, p. 4; Ex. 24 at -5587. Defendants' conduct and student use of social media was the reason TUSD implemented the Yondr program. Ex. 25 at 41:19-43:16. TUSD did not implement the program district-wide due to financial constraints. Ex. 1 at 333:1-3.

- **Cellphone Lockers ($16,101).** Sabino High School implemented a policy requiring students to put their phones in a locker every class period. Ex. 4 at 162:16-163:13; Ex. 30 at ¶ 20, App. C, Ex 1 p. 3; Ex. 16 at Rog 5, Ex. 1, p. 4; Ex. 26 at -9003. Sabino High School purchased the cellphone lockers and implemented its policy because of Defendants' conduct. Ex. 25 at 43:17-44:3; Ex. 10 at ¶ 12 (installed lockers to physically remove the phone and access to social media from students because alerts prompted students to check social media instead of focusing on class).

- **Character Strong ($242,856).** TUSD began using the Character Strong SEL curriculum in the 2020-21 school year. Ex. 2 at 360:16–20; Ex. 30 at ¶ 20, App. C, Ex. 1 pp. 1–2; Ex. 16 at Rog. 5 & Ex. 1, p. 4. As discussed herein, social media directly harms students' emotional regulation and well-being, necessitating SEL programming.

- **Talkspace ($231,021).** Talkspace is a digital platform that provides online mental health services for any student or family in need through TUSD's partnerships with behavior health service agencies. Ex. 1 at 275:19-24. As detailed above, TUSD has seen students' needs for mental health support increase due to the use and influence of Defendants' platforms.

---

1   This is not an exhaustive list. For instance, TUSD also created the SEL & Development Department,

2   including Director and Coordinator positions, to address the growing emotional and behavioral needs of

3   students. Ex. 4 at 71:6–72:17, 73:18–74:25, 76:9–14. As Ms. Shivanonda testified, social media "directly

4   impacts the social-emotional growth of students," necessitating expanded SEL resources and staff. Ex.

5   2 at 267:15–268:21.

6         Defendants' claim that these costs are unrelated to their platforms ignores the record. The

7   evidence demonstrates that Defendants' conduct was a substantial factor necessitating each identified

8   expenditure. Defendants also argue that TUSD cannot recover these costs because it cannot precisely

9   isolate or proportionally attribute them among Defendants' platforms. Mot. at 35-36. But that argument

10  misunderstands both the evidence and the law. TUSD, like any school district, lacks access to students'

11  personal devices and cannot track usage by platform. Ex. 4 at 96:25–97:13. Nonetheless, as shown above

12  and in Plaintiffs' omnibus opposition, §§ III.A.1–2, the record overwhelmingly demonstrates that

13  TUSD's harms specifically stem from Defendants' platforms.

14        Defendants' assertion that TUSD "admitted" it did not hire additional teachers or staff due to

15  Defendants' conduct, Mot. at 33, is misleading and contrary to the record. TUSD witnesses testified that

16  the district needs more counselors, support staff, and site administrators but cannot afford to hire them

17  due to funding limitations. Ex. 1 at 136:10–15, 139:8–10; Ex. 8 at 54:21–24, 73:25–74:8, 81:13–19; Ex.

18  10 at ¶ 17; Ex. 20 at ¶ 19; Ex. 3 at ¶ 20; Ex. 18 at ¶ 20; Ex. 27 at –0519. The inability to hire needed

19  personnel because resources are already strained by Defendants' conduct is itself a compensable harm.

20        **C.  Dr. Hoover's Strategic Plan is an appropriate remedy under Arizona law.**

21        Defendants' challenges to Dr. Hoover's Strategic Plan and its role in addressing the harms caused

22  by Defendants' platforms are addressed in Pls. Omni Opp. § III.D and SD Daubert Opp. § III.F.

23  Defendants' conduct created and perpetuated a public nuisance by designing and marketing their

24  platforms to students in ways that encourage compulsive use, despite knowing that their platforms were

25  harmful to adolescents. This has fundamentally disrupted education and harmed the school environment

26  and school districts, including TUSD. *See* Ex. 28 § IV; Ex. 29 at 6-12. The "manifestation" of that

27  conduct is (1) student distraction and negative impact on student academic focus, learning, and

28  performance; (2) a decline in student social skills and face to face interactions; (3) a negative impact on

teaching effectiveness, classroom dynamics, teacher morale, and job satisfaction; (4) disrupted student sleep; (5) increases in student anxiety, depression, self-harm and negative body image; and (6) an overall burden on constrained school resources. Ex. 28 § IV. Dr. Hoover's Strategic Plan targets these harms that Defendants' platforms have caused and are continuing to cause TUSD, by treating, reducing, and preventing their continuation.

This constitutes a proper abatement remedy under Arizona law.[8] Arizona law imposes no requirement that abatement be physical. Defendants' cases confirm that abatement encompasses removing or remedying the source of harm, not merely for tangible nuisances. In *Cactus Corp. v. State ex rel. Murphy*, 480 P.2d 375, 378 (Ariz. Ct. App. 1971), the court affirmed removal of a harmful film from a drive-in theater. Here, TUSD similarly seeks removal of the harm to TUSD by preventing and mitigating ongoing and future harms caused by Defendants' platforms. *See* Ex. 28 § V; Ex. 29 at 12-43. In *Brown v. City of Phoenix*, 557 P.3d 321, 329 (Ariz. Ct. App. 2024), the court approved abatement through removal of the injury-causing property. Dr. Hoover's Strategic Plan similarly removes the cascading harms from the nuisance Defendants created—through interventions, training, and student support. Thus, under Arizona's broad conception of abatement, the Strategic Plan—aimed at preventing and mitigating the ongoing harms of Defendants' platforms—is a lawful and equitable remedy.

Defendants' arguments concerning the future damages embodied in Dr. Hoover's Strategic Plan are discussed in Plaintiffs' omnibus opposition § III.D. Finally, as explained in Plaintiffs' omnibus opposition § III.C.2, the plan addresses harms directly inflicted on TUSD itself.

### D. TUSD has sufficient evidence of Defendants' failure to warn.

Plaintiffs' arguments that Defendant breached its duty to school districts by failing to warn students, parents, the public, and the Districts, including TUSD, are addressed in Plaintiffs' omnibus opposition § III.A.1. This duty is established under Arizona law.

### 1. Evidence demonstrates TUSD would have acted on appropriate warnings.

Defendants speculate that TUSD would have ignored any warning, pointing to the fact that its cellphone policy was not an outright ban. The record proves otherwise. TUSD has long restricted

---

[8] Arizona does not limit nuisance to physical impacts on land. *See Brenteson Wholesale, Inc. v. Ariz. Pub. Serv. Co.*, 803 P.2d 930, 934 (Ariz. Ct. App. 1990) (citing Restatement (2d) of Torts § 821D).

cellphone use during school hours and at school-sponsored events, and in recent years implemented additional measures, including Yondr pouches, cellphone lockers, and clear-bag policies. Ex. 4 at 146:22–147:8, 162:16–163:13.

TUSD witnesses explained that policy enforcement is constrained by funding and competing parental concerns about safety and communication. Ex. 4 at 169:15–170:10; Ex. 14 at 173:5–174:5; Ex. 1 at 335:4–336:4; Ex. 7 at –7233-35. And with limited staff, an outright ban is impractical. Ex. 1 at 336:11–337:22, 340:8–342:2. Nevertheless, TUSD has continually strengthened restrictions and mitigation efforts as it has become aware of the harms caused by Defendants' platforms.[9]

Moreover, as Ms. Shivanonda explains, appropriate and timely warnings from Defendants would have prompted TUSD to act earlier and in ways not limited to stricter cell phone policies. With adequate warnings, TUSD could have, *inter alia*:

- developed parent, student, and staff education addressing healthy and balanced technology use;

- updated handbooks, digital citizenship curricula, and technology policies to reflect known risks and protective strategies;

- adapted counseling and wellness programs to monitor students exhibiting problematic use;

- trained educators to identify early warning signs of social media overuse and distress; and,

- worked with our community partners to offer preventive and responsive interventions.

Ex. 31 at ¶ 6. This rebuts Defendants' speculation that TUSD would have failed to respond to warnings.

### III.    CONCLUSION

TUSD has raised sufficient evidence showing that Defendants' conduct foreseeably, substantially, and unreasonably disrupted TUSD's operations, diverted educational resources, and caused measurable harm. Genuine disputes as to causation and damages foreclose summary judgment, and TUSD is entitled to present its case to a jury.

---

[9] Defendants argue that TUSD's failure to warn claim is undermined by it not preventing students from accessing Defendants' platforms on students' personal devices. Mot. at 48. This is a red herring— TUSD has no means to dictate what students access when allowed on their personal devices.

Dated: November 7, 2025

**WAGSTAFF & CARTMELL LLP**


*/s/ Austin Brane*
Austin Brane


Thomas P. Cartmell (*pro hac vice*)
Jonathan P. Kieffer (*pro hac vice*)
Austin Brane, SBN 286227
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1100
tcartmell@wcllp.com
jpkieffer@wcllp.com
abrane@wcllp.com


Kirk J. Goza (*pro hac vice*)
Brad Honnold (*pro hac vice*)
**GOZA & HONNOLD LLC**
9500 Nall Ave., Ste 400
Overland Park, KS 66207
Tel. (913) 451-3433
kgoza@gohonlaw.com
bhonnold@gohonlaw.com


Joseph G. VanZandt (*pro hac vice*)
Davis Vaughn (*pro hac vice*)
Jennifer Emmel (*pro hac vice*)
Clinton Richardson (*pro hac vice*)
Seth Harding (*pro hac vice*)
**BEASLEY ALLEN CROW**
**METHVIN PORTIS & MILES, LLC**
234 Commerce Street
Montgomery, AL 36103
Tel:  334-269-2343
Joseph.VanZandt@BeasleyAllen.com
Davis.Vaughn@BeasleyAllen.com
Jennifer.Emmel@BeasleyAllen.com
Clinton.Richardson@BeasleyAllen.com
Seth.Harding@BeasleyAllen.com

***Counsel for Plaintiff***

Lexi J. Hazam
**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415-956-1000
lhazam@lchb.com

Previn Warren
**MOTLEY RICE LLC**
401 9th Street NW Suite 630
Washington DC 20004
Telephone: 202-386-9610
pwarren@motleyrice.com

*Co-Lead Counsel*

Michael M. Weinkowitz
**LEVIN SEDRAN & BERMAN, LLP**
510 Walnut Street
Suite 500
Philadelphia, PA 19106
Telephone: 215-592-1500
mweinkowitz@lfsbalw.com

MELISSA YEATES
**KESSLER TOPAZ MELTZER & CHECK LLP**
280 King of Prussia Road
Radnor, PA 19087
Telephone: 610-667-7706
myeates@ktmc.com

*Co-chairs School District Committee*
*Plaintiffs' Steering Committee Leadership*

## <u>ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27</u>

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated: November 7, 2025

**WAGSTAFF & CARTMELL LLP**

*/s/ Austin Brane*
Austin Brane

Thomas P. Cartmell (*pro hac vice*)
Jonathan P. Kieffer (*pro hac vice*)
Austin Brane, SBN 286227
**WAGSTAFF & CARTMELL LLP**
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
Tel: (816) 701-1100
tcartmell@wcllp.com
jpkieffer@wcllp.com
abrane@wcllp.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served via electronic mail on November 7, 2025, to Counsel for Defendants:

MetaNoticeofService@cov.com

SnapNoticeofService@mto.com

TikTokNoticeofService@faegredrinker.com

SERVICE-YOUTUBE-INRESOCIALMEDIAM@LIST.WSGR.COM

mdl3047coleadfirms@listserv.motleyrice.com

pscservicemdl3047@motleyrice.com


*/s/ Austin Brane*
Austin Brane