**Exhibit 4**

# PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (TUCSON) (SD MSJ NO. 2)

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

1                UNITED STATES DISTRICT COURT
               NORTHERN DISTRICT OF CALIFORNIA
2

   ******************************
3                                    Case No.
   IN RE:  SOCIAL MEDIA ADOLESCENT   4:22-MD-03047-YGR
4  ADDICTION/PERSONAL INJURY
   PRODUCTS LIABILITY LITIGATION
5                                    MDL No. 3047
   ******************************
6

   This Document Relates To:
7

   Tucson Unified School District
8  v. Meta Platforms Inc., et a
9  Case No. 4:24-cv-1382
10 ******************************
11
12           VIDEOTAPED 30(b)(6) DEPOSITION OF
              TUCSON UNIFIED SCHOOL DISTRICT
13                 BY AND THROUGH
                JULIE A. SHIVANONDA
14
15
       Held At:  JW Marriott Tucson
16               Starr Pass Resort & Spa
                 3800 W. Starr Pass Blvd
17               Tucson, Arizona
18
19               April 8th, 2025
                    2:02 p.m.
20
21
22
23
24
   Reported By:
25
   MAUREEN O. POLLARD, CA CSR #14449, RDR

Page 2

```
 1
 2
 3          Videotaped 30(b)(6) Deposition of
 4  Tucson Unified School District, by and through
 5  JULIE A. SHIVANONDA, held at JW Marriott Tucson
 6  Starr Pass Resort & Spa, 3800 W. Starr Pass
 7  Blvd., Tucson, Arizona, commencing at 2:02 p.m.,
 8  on the 8th of April, 2025, before Maureen
 9  O'Connor Pollard, Registered Diplomate Reporter,
10  Realtime Systems Administrator, California CSR
11  #14449.
12
13
14          ï¿½ ï¿½ ï¿½
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1  APPEARANCES (Continued):
 2
    ON BEHALF OF SNAP, INC.:
 3
        MUNGER, TOLLES & OLSON
 4      350 South Grand Avenue, 50th Floor
        Los Angeles, California 90071-3426
 5      213-683-9516
        BY:  VICTORIA A. DEGTYAREVA, ESQ.
 6          victoria.degtyareva@mto.com
        BY:  ROWLEY RICE, ESQ.
 7          rowley.rice@mto.com
        BY:  JULIA KONSTANTINOVSKY, ESQ. (Zoom)
 8          julia.konstantinovsky@mto.com
        BY:  MOHAMED SAID, ESQ. (Zoom)
 9          mohamed.said@mto.com
10      and
11      MUNGER, TOLLES & OLSON
        601 Massachusetts Avenue NW
12      Suite 500E
        Washington, DC 20001
13      202-220-1126
        BY:  STEPHANY REAVES, ESQ.
14          stephany.reaves@mto.com
15
16
    Also Present:
17
        Videographer and Trial Tech:  Dan Lawlor
18
19
20
21
22
23
24
25
```

Page 3

```
 1  APPEARANCES:
 2
    ON BEHALF OF THE PLAINTIFFS:
 3
        WAGSTAFF & CARTMELL
 4      4740 Grand Avenue, Suite 300
        Kansas City, Missouri 64112
 5      816-701-1145
        BY:  MICHAEL P. CUTLER, ESQ.
 6          mcutler@wcllp.com
 7
 8  ON BEHALF OF META PLATFORMS, INC. f/k/a
    FACEBOOK, INC.; FACEBOOK HOLDINGS, LLC;
 9  INSTAGRAM, LLC; FACEBOOK PAYMENTS, INC.;
    FACEBOOK OPERATIONS, LLC; FACEBOOK TECHNOLOGIES,
10  LLC; SICULUS, INC.; and MARK ELLIOT ZUCKERBERG:
11      SHOOK, HARDY & BACON LLP
        2555 Grand Boulevard
12      Kansas City, Missouri 64108
        816-474-6550
13      BY:  DANA STRUEBY, ESQ.
            dstrueby@shb.com
14      BY:  COURTNEY C. BURRESS, ESQ. (Zoom)
            cburress@shb.com
15
16
    ON BEHALF OF ALPHABET INC., GOOGLE LLC,
17  and YOUTUBE, LLC:
18      WILLIAMS & CONNOLLY LLP
        630 Maine Avenue, S.W.
19      Washington, DC 20024
        202-434-5380
20      BY:  ARMANI MADISON, ESQ. (Zoom)
            amadison@wc.com
21
22
23
24
25
```

Page 5

```
 1              INDEX
 2  EXAMINATION                    PAGE
 3  JULIE A. SHIVANONDA
 4   BY MS. DEGTYAREVA              10
 5
 6
 7       E X H I B I T S
 8  NO.      DESCRIPTION           PAGE
 9  Tucson-30(b)(6)-  Defendants' Amended
    Shivanonda-1      Supplemental Notice
10                    of Oral and
                      Videotaped 30(b)(6)
11                    Deposition of
                      Plaintiff Tucson
12                    Unified School
                      District................ 12
13
14  Tucson-30(b)(6)-  Minutes for Regular
    Shivanonda-2      Board Meeting,
15                    Tuesday, September
                      12, 2023................ 38
16  Tucson-30(b)(6)-  Tucson Unified School
    Shivanonda-3      District's Second
17                    Supplemental Initial
                      Disclosure Statement
18                    Pursuant to Federal
                      Rule of Civil
19                    Procedure
                      26(A)(1)(A)(iii)........ 52
20
    Tucson-30(b)(6)-  Plaintiff's Amended
21  Shivanonda-4      Answers to
                      Defendants'
22                    Interrogatories to
                      Tucson Unified School
23                    District (Set 3)........ 56
24  Tucson-30(b)(6)-  Plaintiff Fact Sheet
    Shivanonda-5      - School Districts
25                    (Supplemental).......... 114
```

2 (Pages 2 - 5)

**Page 6**

```
 1
     Tucson-30(b)(6)-  Plaintiff Fact Sheet
 2   Shivanonda-6     - School Districts...... 121
 3   Tucson-30(b)(6)-  Excel spreadsheet,
     Shivanonda-7      Bates
 4                     SM_TUSD_00184507...... 124
 5   Tucson-30(b)(6)-  Plaintiff's Third
     Shivanonda-8      Amended Answers to
 6                     Defendants'
 7                     Interrogatories to
                       Tucson Unified School
 8                     District (Set 1)........ 128
 9   Tucson-30(b)(6)-  Policy Regulation,
     Shivanonda-9      Use of Cell Phones
10                     and Other electronic
                       Signaling Devices,
11                     Bates
                       SM_TUSD_00159360 and
12                     9361.................. 140
13   Tucson-30(b)(6)-  Printout from Yondr
     Shivanonda-10     Website................ 145
14   Tucson-30(b)(6)-  E-mail chain, Bates
     Shivanonda-11     SM_TUSD_00319608
15                     through 9612........... 147
16   Tucson-30(b)(6)-  Cell Phone Feedback
     Shivanonda-12     for Quarter 1 - 110
17                     Teachers Total
18                     Separated by
                       Department and YONDR
19                     and non-YONDR, Bates
                       SM_TUSD_00363931
20                     through 3938.......... 153
21   Tucson-30(b)(6)-  Governing Board
     Shivanonda-13     Policy, Student Use
22                     of Cell Phones and
                       Other Electronic
23                     Devices, Bates
                       SM_TUSD_00006965 and
24                     6966.................. 161
25
```

**Page 7**

```
 1
     Tucson-30(b)(6)-  PowerPoint, Pueblo
 2   Shivanonda-14     Gardens PK-8,
                       2021-2022, Bates
 3                     SM_TUSD_00165722
                       through 5746.......... 172
 4
     Tucson-30(b)(6)-  Printout from TUSD's
 5   Shivanonda-15     website............... 180
 6   Tucson-30(b)(6)-  Printout of TUSD's
     Shivanonda-16     Facebook page......... 181
 7
     Tucson-30(b)(6)-  Printout of TUSD's
 8   Shivanonda-17     Instagram page........ 183
 9   Tucson-30(b)(6)-  Printout of TUSD's
     Shivanonda-18     YouTube account....... 185
10
     Tucson-30(b)(6)-  PowerPoint, Bates
11   Shivanonda-19     SM_TUSD_00464074...... 186
12   Tucson-30(b)(6)-  Document, Get Ready
     Shivanonda-20     for Tucson College
13                     Night, Bates
                       SM_TUSD_00183309...... 187
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 8**

```
 1             - - -
            DEPOSITION SUPPORT INDEX
 2             - - -
 3
     Direction to Witness Not to Answer
 4   PAGE     LINE
 5
        20    18
 6      21     3
        25    24
 7      33    18
 8
 9
     Request for Production of Documents
10   PAGE     LINE
     None.
11
12
13   Stipulations
     PAGE     LINE
14   None.
15
16
     Questions Marked Highly Confidential
17   PAGE     LINE
     None.
18
19
20
21
22
23
24
25
```

**Page 9**

```
 1          P R O C E E D I N G S
 2
 3        THE VIDEOGRAPHER:  We are now on the
 4   record.  My name is Dan Lawlor, I'm a
 5   videographer representing Golkow, a
 6   Veritext division.
 7        Today's date is April 8, 2025, and
 8   the time is 2:02 p.m.
 9        This video deposition is being held
10   in Tucson, Arizona in the matter of Social
11   Media CA, MDL 3047, Tucson Unified School
12   District versus Meta Platforms, Inc., et
13   al.
14        The deponent is Julie Shivanonda.
15        Counsel will be noted on the
16   stenographic record.
17        The court reporter is Maureen
18   Pollard, and will now swear in the
19   witness.
20             *   *   *
21   Whereupon,
22        JULIE A. SHIVANONDA,
23   being first duly sworn to testify to the truth,
24   the whole truth, and nothing but the truth, was
25   examined and testified as follows:
```

3 (Pages 6 - 9)

Page 10

1                EXAMINATION
2 BY MS. DEGTYAREVA:
3      Q.   Good afternoon, Ms. Shivanonda.
4           Can you please state your name for
5 the record?
6      A.   Julie Ann Shivanonda.
7      Q.   And do you live here in Tucson?
8      A.   I do.
9      Q.   Do you understand that you're under
10 oath today?
11      A.   I do.
12      Q.   Is there any reason that you can't
13 give truthful and accurate testimony today?
14      A.   No.
15      Q.   And are you currently employed by
16 Tucson Unified School District?
17      A.   Yes.
18      Q.   How long have you been employed by
19 the school district?
20      A.   I began in 2012, and then I left the
21 district from 2020 until September of 2021 and
22 returned in September 2021.  So that's about
23 total 13 years.
24      Q.   What is your current job position?
25      A.   Director of social emotional

Page 11

1 learning and school counseling.
2      Q.   And what are your responsibilities
3 in that role?
4      A.   So I oversee the department, which
5 includes our school counselors.  I oversee two
6 school counseling coordinators, a coordinator of
7 social emotional learning, a program manager of
8 substance abuse prevention, a program
9 coordinator of substance abuse prevention, and
10 five community health workers.
11           And so our job is tasked with
12 supporting the social emotional well-being needs
13 of our students and our communities within the
14 Tucson Unified School District.
15      Q.   And do you understand that you're
16 testifying today as a corporate representative
17 of the Tucson Unified School District?
18      A.   I do.
19      Q.   So throughout my questions today I'm
20 going to at points say "TUSD" or "the district,"
21 and do you understand that when I say those
22 things I'm referring to Tucson Unified School
23 District?
24      A.   Correct.
25      Q.   I'm also going to talk about

Page 12

1 defendants' platforms, and do you understand
2 that when I say "defendants' platforms" I'm
3 referring to Facebook, Instagram, TikTok,
4 Snapchat, and YouTube?
5      A.   Yes.
6      Q.   Now, do you understand that TUSD has
7 designated you today to testify about a number
8 of different topics?
9      A.   Yes.
10      MS. DEGTYAREVA:  Let's mark as
11 Exhibit 1 tab 2.
12           (Tucson-30(b)(6)-Shivanonda-1 was
13           marked for identification.)
14      MR. CUTLER:  I've got mine from this
15 morning.  Is it the same one?
16      MS. DEGTYAREVA:  It should be, yeah.
17 We're going to restart at 1, but it should
18 be the same.
19      MR. CUTLER:  I don't need another
20 copy.  Thank you.
21 BY MS. DEGTYAREVA:
22      Q.   Ms. Shivanonda, can you please turn
23 to page 7 of this exhibit?  And do you see on
24 page 7 under Roman Numeral II it says Deposition
25 Topics?

Page 13

1      A.   Yes.
2      Q.   I just want to go through these so
3 that you can confirm which topics you're
4 prepared to testify about as TUSD's
5 representative.
6           Looking at the first title there,
7 Use and Impact, Topics 1 through 7, which goes
8 on to pages 8 and 9.  Are you prepared to
9 testify about Topics 1 through 7?
10      A.   Yes.
11      Q.   Okay.  And then under Awareness,
12 Prevention, and Response, it has Topics 8
13 through 23 on pages 9, 10 and 11.  Are you
14 prepared to testify about Topics 8 through 23?
15      A.   Yes.
16      Q.   We're going to skip the next one and
17 go to page 13, Student Mental Health and Related
18 Services, and under that, Topics 32 through 48
19 which ends on page 16.  Are you prepared to
20 testify about Topics 32 through 48?
21      A.   Yes.
22      Q.   Okay.  The next one on page 16 is
23 Discipline and School Safety, Topics 49 and --
24 sorry, 49 through 55, ending on page 17.  Are
25 you prepared to testify about Topics 49

1 through 55?
2    A.   Yes.
3    Q.   Okay.  Then under School District
4 Performance and Operations, which begins on
5 page 17, are you prepared to testify about
6 Topics 56 through 59?  So not Topic 60 in that
7 section.
8    A.   Yes.
9    Q.   Okay.  Going on to page 18 where it
10 says Relief, are you prepared to testify to
11 Topics 61, 62, and 63?
12    A.   Yes.
13    Q.   And then, finally, under Other
14 District-Specific Topics, are you prepared to
15 testify to Topics 64 and then 66 through 69?
16    A.   It was my understanding that 66
17 would have been a previous defendant.
18    Q.   Excuse me.  I think I misspoke.  64
19 through 67 through 69.
20    A.   So 64, 65, 67, 68, and 69?
21        MR. CUTLER:  64, 67, 68, 69, I think
22 is what she said.
23        THE WITNESS:  Yes.
24 BY MS. DEGTYAREVA:
25    Q.   Okay.  64, 67, 68, and 69, are you

1 prepared to testify about those topics?
2    A.   Yes, correct.  I apologize.
3    Q.   Thank you.
4        And do you understand that your
5 testimony today is the testimony of Tucson
6 Unified School District?
7    A.   Yes.
8    Q.   So because you are testifying on
9 behalf of the school district, I sometimes might
10 say "you" in my questions, and when I say that
11 I'm referring to Tucson Unified School District.
12        Do you understand that?
13    A.   I do.
14    Q.   What did you do to prepare to
15 testify for all of the topics that you've been
16 designated on?
17    A.   So I met with our legal counsel,
18 outside legal counsel as well as internal legal
19 counsel.  I reviewed some of the documents
20 within this case that were shared with me from
21 legal counsel.  And then I met with other
22 district-level stakeholders that might have more
23 explicit information in preparation.
24    Q.   So apart from legal counsel, which
25 other people did you meet with?

1    A.   So I met with a handful of our
2 school district counselors, the department --
3 the director of school safety, director of
4 student relations, director of instructional
5 technology, director of human resources,
6 assistant superintendent of curriculum and
7 instruction, counseling coordinator for middle
8 school and high school.  And I believe that
9 covers it.
10    Q.   Okay.  I want to walk through a
11 couple of those.
12        You said you met with a handful of
13 school district counselors.  Do you remember how
14 many?
15    A.   Roughly ten.
16    Q.   And were those counselors from --
17 were they assigned to a specific school?
18    A.   Yes.  So each of our schools, they
19 do have either one or multiple school
20 counselors, and so the call was put out to any
21 school counselors who were interested in
22 discussing with me.  So there was about ten
23 school counselors ranging from elementary,
24 middle, and high school who were involved.
25    Q.   Of those approximately ten

1 counselors, do you remember how many were
2 assigned to middle schools versus high schools
3 versus elementary schools?
4    A.   From my recollection, I don't
5 remember exactly, there was at least two that
6 were representing middle school, and then
7 probably five or six were at the elementary
8 school level, and the rest were at the high
9 school level.
10    Q.   So you said -- so if there's about
11 two at middle school, five or six at elementary,
12 does that mean two or three were high school?
13 Does that sound about right?
14    A.   Yes.
15    Q.   Do you remember -- do the
16 counselors -- are they assigned to any
17 particular type of topic area or subject area,
18 or do all counselors just provide general
19 counseling services?
20    A.   So in TUSD we following the ASCA
21 model, the American School Counselor Association
22 model, and so all of our school counselors are
23 tasked with meeting the requirements of the ASCA
24 model.  So they do focus on academic support and
25 readiness, social emotional support and

Page 18

1 readiness, as well as college and career
2 readiness.
3    Q.   So none of the counselors you talked
4 to would have been specialized in any particular
5 subject area?
6    A.   Correct.
7    Q.   And I think you mentioned the
8 director of school safety, is that right?
9    A.   Yes.
10    Q.   Who is that?
11    A.   Mr. Joe Hallums.
12    Q.   And the director of student
13 relations, right?
14    A.   Yes.  Anna Warmbrand.
15    Q.   And then the director of
16 instructional technology, who is that?
17    A.   Tracey Rowley.
18    Q.   Okay.  The director of human
19 resources, who is that?
20    A.   Jon Fernandez.
21    Q.   Okay.  And then the assistant
22 superintendent of curriculum and instruction,
23 who is that?
24    A.   Dr. Flori Huitt.
25    Q.   And then counseling coordinator for

Page 19

1 middle school and high school, who is that?
2    A.   Rebecca Carrier.
3    Q.   And for all of those positions, are
4 all of those positions sort of there's just one
5 person in each position, or are they kind of
6 like the counselors where there other people in
7 those positions that you didn't talk to?
8    A.   No, they are those of those
9 positions, correct.
10    Q.   Okay.  So apart from those people we
11 just talked about, anybody else other than
12 counsel that you spoke to to prepare for the
13 deposition?
14    A.   I don't know if that was part of
15 preparation, but we did meet with an expert,
16 Dr. Hoover.
17    Q.   What's his first name?
18    MR. CUTLER:  You can answer.
19    THE WITNESS:  I don't remember her
20 first name.
21 BY MS. DEGTYAREVA:
22    Q.   Her first name.
23    And what type of expert is
24 Dr. Hoover?
25    MR. CUTLER:  I'm going to object.

Page 20

1    Well, I guess if you know you can
2 answer that question.  Go ahead.
3    THE WITNESS:  So Dr. Hoover is an
4 expert in social emotional learning,
5 mental health, and she is from -- I don't
6 remember what college she's from, but she
7 was retained as an expert in the case, is
8 my understanding.
9 BY MS. DEGTYAREVA:
10    Q.   So what was the purpose of your
11 meeting with Dr. Hoover?
12    MR. CUTLER:  I'm going to object to
13 that to the extent it calls for privileged
14 communications.
15 BY MS. DEGTYAREVA:
16    Q.   So, Ms. Shivanonda, unless your
17 counsel instructs --
18    MR. CUTLER:  Yeah, I'll instruct you
19 not to answer the question.
20 BY MS. DEGTYAREVA:
21    Q.   In terms of preparing for this -- to
22 testify about the topics that you were
23 designated for in this deposition, what did you
24 discuss with Dr. Hoover?
25    MR. CUTLER:  Again I'm going to

Page 21

1 object that it's not part of deposition
2 preparation.
3    And I'll instruct you not to answer.
4 BY MS. DEGTYAREVA:
5    Q.   So just to be clear, did you meet
6 with Dr. Hoover to prepare for the deposition?
7    MR. CUTLER:  I think she answered
8 that.
9    Go ahead.
10    THE WITNESS:  No.  In terms of these
11 topics, in preparation was meeting with
12 stakeholders within the district.  As part
13 of the larger context there was a meeting
14 that happened with Dr. Hoover.
15    MR. CUTLER:  Which is separate from
16 this deposition, so I think the questions
17 are about the deposition preparation.
18 BY MS. DEGTYAREVA:
19    Q.   Got it.
20    So in terms of preparation for the
21 topics that you were designated on for this
22 deposition, apart from the people we talked
23 about, and your counsel, anybody else that you
24 met with to prepare?
25    A.   No.

6 (Pages 18 - 21)

1    Q.   I think you said that you also
2 reviewed some documents.  What documents did you
3 review?
4    A.   I reviewed this document to be in
5 preparation of the topics, as well as Plaintiff
6 Fact Sheet, as well as interrogatory documents.
7    Q.   Did you review any internal TUSD
8 documents or documents from TUSD databases,
9 e-mail, anything that wasn't prepared for
10 purposes of the litigation specifically?
11         MR. CUTLER:  Anything not prepared
12    specifically for the litigation.
13         THE WITNESS:  I don't believe it was
14    not prepared for the litigation, no.  This
15    was in preparation for the litigation.
16 BY MS. DEGTYAREVA:
17    Q.   I'm sorry, maybe that was a poorly
18 worded question.
19         But apart from rog responses, the
20 PFS, and then the deposition notice, any other
21 documents you reviewed?
22    A.   Yes.  Internal documents.
23    Q.   What internal documents did you
24 review?
25    A.   Documents around practices in the

1 school district, reviewing public documents, so
2 public information around -- there were some
3 questions around the district academic
4 performance and attendance data which is part of
5 internal documents, which is also publicly
6 populated; review of public documents of
7 governing board meetings; review of discipline
8 and school safety data which are part of
9 internal, which I believe were provided as part
10 of the deposition prep; internal created
11 documents for -- based on -- oh, there was one
12 other person that I forgot that I talked to.  Is
13 that okay?
14    Q.   Sure.  Well, how about you finish
15 your answer about documents and then we'll go
16 back to that one other person.
17    A.   So if I've spoken to anyone, it was
18 a review of particular data that would be able
19 to answer some of these questions.
20         And so there was some data collected
21 from our student information systems around
22 discipline data, around other documentation
23 around like our multi-tiered system of support
24 data, data that our counselors collect in terms
25 of as they monitor and adjust their practices

1 within their work.
2    Q.   Okay.  Does that cover it?  Anything
3 else you reviewed, any other documents?
4    A.   That's -- yeah, that's basically it.
5    Q.   I'm going to ask you a couple more
6 questions about the documents, but you mentioned
7 there was one other person you spoke with that
8 you hadn't mentioned before.  Who was that?
9    A.   Yes.  Michael Blunt, he is a
10 coordinator of our multi-tiered system of
11 support process in the district.
12    Q.   Got it.
13         Okay.  So regarding the documents,
14 for the public documents I think you mentioned
15 board meeting minutes, is that right?
16    A.   Yes.
17    Q.   Do you remember which meeting
18 minutes you reviewed?
19    A.   I do not.  I did an overall kind of
20 general search for -- some of the questions
21 referred to any discussion topics around social
22 media, so a general search of potential
23 discussions around social media, as well as
24 governing board policy.
25    Q.   And when you say you did the search,

1 do you mean just within the board documents, or
2 you did some kind of broader search across
3 multiple databases?
4    A.   Just within the governing board
5 document system.
6    Q.   Do you remember what types of terms
7 you used?
8         MR. CUTLER:  I'm going to object to
9    the extent that this was all done kind of
10    at the direction and/or with counsel.
11         If there are facts you learned or, I
12    guess, just the fact of having done it,
13    that's fine, but, you know, processes,
14    strategies, stuff like that are going to
15    be protected.
16         MS. DEGTYAREVA:  Are you instructing
17    her not to answer that question?
18         MR. CUTLER:  Can you repeat the
19    question?
20         MS. DEGTYAREVA:  I think I asked if
21    she used any particular search terms on
22    those documents to identify the ones that
23    she reviewed.
24         MR. CUTLER:  Yeah, I'll instruct her
25    not to answer.

7 (Pages 22 - 25)

Page 26

1    MS. DEGTYAREVA: Okay.
2 BY MS. DEGTYAREVA:
3    Q.   So for public documents, apart from
4 these governing board meetings, any other public
5 documents you reviewed?
6    A.   TUSD governing board policy
7 documents as well as academic performance data.
8    Q.   Okay. And the academic performance
9 data, what types of documents is that in?
10    A.   School letter grades.
11    Q.   Are those public documents?
12    A.   Those are public documents, yeah,
13 the school report cards essentially through the
14 Arizona State Department of Education.
15    Q.   Got it.
16         Okay. You also mentioned discipline
17 and school safety data. What does that refer
18 to?
19    A.   So that would be data that is
20 elicited from our student information system.
21 So as we -- as the district reports
22 student-level discipline, it gets reported into
23 the Synergy, Student Information System, and so
24 through my discussions with the director of
25 student relations we reviewed specific

Page 27

1 student-level discipline data in preparation for
2 being prepared for some of these topics.
3    Q.   This is all data in Synergy?
4    A.   Yes.
5    Q.   Did you review just sort of
6 aggregate numbers, or did you look up specific
7 individual reports in Synergy?
8    A.   Aggregate numbers.
9    Q.   And so did you look at any
10 details -- beyond just how many numbers of each
11 violation, did you look at any details about
12 what those particular violations -- who they
13 were against, when they happened, what they were
14 about?
15    A.   Not in detail, no.
16    Q.   You say "not in detail." Can you
17 explain what you mean by that?
18    A.   So through conversations as an
19 overall analysis of the data, discussions around
20 more specific information, but the actual
21 reports that I looked at were just the aggregate
22 numbers.
23    Q.   Got it.
24         So you looked at the aggregate
25 numbers, but then you had conversations with

Page 28

1 others about details underlying those numbers?
2    A.   Correct.
3    Q.   And who did you have those
4 conversations with?
5    A.   Anna Warmbrand from student
6 relations, and Joe Hallums from school safety.
7    Q.   Okay. You talked about data
8 collected "from our student information
9 systems." What data is that? Is that the
10 Synergy data, or is that something else?
11    A.   That's the Synergy data.
12    Q.   And then other documentation around
13 the multi-tiered system of support data, what
14 does that refer to?
15    A.   That is also housed in Synergy, our
16 student information system. There is a section
17 within Synergy called MTSS dashboard, and so
18 looking at -- and that is our intervention
19 dashboard, so looking at specific numbers of
20 interventions based on certain categories to
21 give a broader picture of being able to answer
22 some of these topics.
23    Q.   So apart from the discipline data
24 and then the MTSS data in Synergy, any other
25 data in Synergy that you looked at?

Page 29

1    A.   Well, part of the data that was part
2 of discipline data is also the data that
3 connects to school safety, and how school safety
4 may or may not have responded in relation to the
5 discipline data.
6    Q.   Can you explain what the school
7 safety data is?
8    A.   So if there are disciplinary
9 instances that happen on a school campus that
10 may warrant school safety response, that would
11 be collected within the investigation in a
12 disciplinary instance.
13         So some of the questions asked about
14 whether or not school safety was a component of
15 -- in some of these topics, so looking at
16 potential -- if the overall, kind of, numbers
17 around how often school safety may or may not
18 have responded to any disciplinary instances on
19 school campuses.
20    Q.   And was that aggregate data, or was
21 that specific data about specific incidents?
22    A.   Overall aggregate.
23    Q.   Got it.
24         When you talk about data that
25 counselors collect, data that counselors

Page 30

1 collect, what type of data did you review that
2 counselors collect?
3      A.    So counselors, they collect data
4 around number of students who are either
5 referred to them for support of any kind or
6 whether or not students visit the counseling
7 office for any sort of report or needs.
8           Also school counselors provide
9 interventions based on what I said the previous
10 data are on, MTSS, so they collect that data.
11           Counselors also in the past have
12 done more needs assessment type data around
13 their schools to drive their operating, whether
14 they do specific groups on school campus, and
15 so, but that -- over time due to legislation
16 that has been hindered somewhat.
17           So just overall data around the use
18 of time for counselors of how often they're
19 meeting with students, how often they are
20 providing classroom lessons, and then numbers of
21 students visiting the counseling office.
22      Q.    Is all of that data stored in a
23 database of some sort?
24      A.    It's internal.  So our coordinators
25 of counseling, they collect that data.  That's

Page 31

1 generally through things like Microsoft Forms
2 that are internal data.
3      Q.    Okay.  So do individual counselors
4 fill out a form every time they meet with a
5 student, or how do they -- how frequently would
6 they fill out these forms?
7           MR. CUTLER:  Object to form.
8           You can answer.
9           THE WITNESS:  Okay.  It depends.  So
10      counselors, they will -- their time of
11      use, depending upon the level, so our
12      coordinator that supports middle and high
13      school, they do time of use, and she asks
14      for them to submit that quarterly, whereas
15      in elementary and K-8, that coordinator,
16      she has -- she asks for that data on a
17      monthly basis.
18 BY MS. DEGTYAREVA:
19      Q.    The time of use data, is that just
20 here's how many hours I worked in a day, or is
21 that split up in a different way?
22      A.    It is, again, based on, you know,
23 number of small groups or classroom lessons or
24 number of students that they interacted with in
25 their office, or if they participated in an MTSS

Page 32

1 meeting, if they provided intervention supports
2 based on an intervention plan.
3      Q.    And the data that the counselors
4 collect, would that also include data about
5 individual students they met with?
6      A.    They do.  So we do have processes in
7 the district for majority of our support staff,
8 when they do meet with students for specifics,
9 and so all of that is housed in the Synergy
10 student information system.
11      Q.    And the data that you reviewed, did
12 that include data about individual students that
13 the counselors met with?
14      A.    No, it did not.  I was looking at
15 aggregate data.
16      Q.    Okay.  Any other categories of data
17 that we haven't -- talked about the data in
18 Synergy, the public documents, the data that the
19 counselors collect.
20           Any other categories of data or
21 documents you reviewed?
22      A.    No.
23      Q.    Did you bring any documents with you
24 today?
25      A.    No.

Page 33

1      Q.    And as you were reviewing the
2 documents or talking to the people, apart from
3 counsel, did you make any notes?
4      A.    Not outside of being directed by
5 counsel.
6      Q.    And did you bring any notes with you
7 today?
8      A.    No, I did not.
9      Q.    Apart from what we've already talked
10 about, anything else you did to prepare for the
11 deposition today?
12      A.    No.
13      Q.    Are you familiar with the
14 allegations in the case?
15      A.    From what I -- from talking with
16 counsel and based on the documents that we've
17 already discussed that we've reviewed --
18           MR. CUTLER:  If your understanding
19      is from counsel, I would instruct you not
20      to answer.  If you have a
21      self-understanding, then respond with
22      that.
23           THE WITNESS:  Okay.  My general
24      understanding is from discussions with
25      counsel.

9 (Pages 30 - 33)

1  BY MS. DEGTYAREVA:
2      Q.   So at a high level, do you
3  understand that TUSD has filed a lawsuit that
4  alleges that it has been harmed by defendants'
5  platforms?
6      A.   Yes.
7      Q.   So when did TUSD first begin to
8  believe that defendants' platforms were causing
9  harms in its schools?
10     A.   So, first, that's -- that's kind of
11 a difficult question.  I think explicitly, the
12 explicit intention or kind of investigation
13 whether or not to move forward with a lawsuit,
14 it's my understanding that those discussions
15 began in spring of 2023 with the governing
16 board, along with Dr. Trujillo, our
17 superintendent, and legal counsel, creating,
18 drafting the resolution to move forward in
19 September of 2024.
20     Q.   So before spring of 2023, did TUSD
21 have an understanding that defendants' platforms
22 were causing harms in the schools?
23     A.   It is my understanding that there
24 was a level of understanding that there was a
25 causal link between some of the harm that we

1  were noticing and direct causal link, or
2  perceived causal link, to defendants' platforms,
3  yes.
4      Q.   When did TUSD first start to think
5  that there was a causal link?
6      A.   So from my understanding and in my
7  work, when we really started to see a direct
8  response was probably right around the --
9  anywhere from 2014 to 2016 when we started to
10 see an increase of discipline data and social
11 emotional needs in students based on the
12 increase of use of cellphone and social media
13 platforms within our schools.
14     Q.   You say an increase in discipline
15 data and social emotional needs.
16          During that time period, 2014-2016,
17 are you aware of any data that showed those
18 increases were connected to cellphones or social
19 media?
20     A.   So there's definitely anecdotal
21 data.
22          And then in terms of the school
23 district in collecting that data, it's
24 difficult.  Not all of that data is necessarily
25 able to be collected explicitly.

1          Also, since 2014 we have had several
2  iterations of data platforms, and so in previous
3  data platforms it looks a little bit different
4  than what our data platforms look like now.  So
5  being able to determine exact data and
6  information, I'm not aware that -- if I could
7  speak directly to that from that time period
8  just because of the changes in data collection.
9      Q.   What were the previous platforms
10 that were used?
11     A.   Previously to Synergy the district
12 had an in-house-developed platform called
13 Mojave, and so it was a student information
14 system platform.  It was also where a lot of our
15 support staff documented their time, documented
16 disciplinary actions, or any supports that they
17 may have provided to students and/or
18 conversations with families.
19     Q.   So when did the district switch from
20 Mojave to Synergy?
21     A.   If I remember correctly, I believe
22 that was around either 2017 or 2018.
23     Q.   Was the data from Mojave transferred
24 into Synergy?
25     A.   As much as it was able to.  So I'm

1  not a technology expert, and so my understanding
2  is somewhat limited on how that can transfer.
3  So that may have been some archived data, and
4  then some of the data that could have been
5  transferred, I believe, was transferred into the
6  Synergy platform.
7      Q.   Does the district still have any
8  data that was not able to be transferred from
9  Mojave into Synergy?
10     A.   I am not 100 percent aware.  I do
11 know that, I believe it was two years ago, the
12 district was involved in a technology breach,
13 and so I know because of that a lot of previous
14 data may not have been recovered.  I don't know
15 from what departments, what data was able to be
16 recovered and not prior to moving into more of a
17 cloud-based system.
18     Q.   TUSD asked its board of directors to
19 authorize bringing this lawsuit at a meeting on
20 September 12, 2023, is that right?
21     A.   Can you repeat the question?
22     Q.   Sure.
23          TUSD asked its board of directors to
24 authorize bringing this lawsuit, right?
25     A.   From my understanding, it was a

10 (Pages 34 - 37)

Page 38

1 discussion with superintendent, legal counsel,
2 the governing board. A lot of that work also
3 may have happened in executive session, which is
4 not public knowledge.
5        MR. CUTLER: I think she's just
6    asking about the process generally to
7    start.
8 BY MS. DEGTYAREVA:
9    Q.   Ms. Shivanonda, you can answer the
10 question as you understand it. If you don't
11 understand a question, I would be happy to
12 rephrase it.
13   A.   Okay. So from my understanding the
14 process began looking in at spring of 2023.
15   Q.   And was there a governing board
16 meeting on September 12, 2023, when this issue
17 was discussed?
18   A.   I don't remember all the dates of
19 meetings off the top of my head.
20        MS. DEGTYAREVA: Can we mark as
21    Exhibit 2 tab 45?
22        (Tucson-30(b)(6)-Shivanonda-2 was
23        marked for identification.)
24 BY MS. DEGTYAREVA:
25   Q.   Ms. Shivanonda, do you recognize

Page 39

1 this document?
2    A.   So these -- this appears to be the
3 meeting minutes from the TUSD governing board
4 from September 12, 2023.
5    Q.   And if you turn to page 7 of the
6 document, you'll see at the very bottom it says
7 "Action: 6.3 Resolution in Support of
8 Litigation Against Social Media Companies."
9    A.   Okay.
10   Q.   Do you see that?
11   A.   I do.
12   Q.   Okay. And then underneath that,
13 "Motion to approve the Tucson Unified School
14 District Resolution in Support of Litigation
15 Against Social Media Companies."
16        Do you see that?
17   A.   I do.
18   Q.   So before this meeting on
19 September 12, 2023, had the topic of social
20 media addiction ever come up in any TUSD
21 governing board meetings?
22   A.   Throughout governing board meetings
23 there are numerous topics that are brought to
24 the table. I can't speak to specific dates. I
25 have not have those memorized.

Page 40

1        But in terms of when we look at
2 overall discipline data, reports from discipline
3 data, there has been discussions around the use
4 of social media and the connection of social
5 media within our discipline and our discipline
6 policies, as well as a yearly review of our code
7 of conduct, and based on previous discussions,
8 based on previous discipline data, adjustment to
9 our code of conduct based on the need.
10       So over the past few years we've
11 made different iterations of the code of
12 conduct, including the most recent one where
13 there was also discussion of use of technology
14 and social media in our schools.
15   Q.   And understanding that you don't
16 remember exact dates, do you remember
17 approximately when these discussions concerning
18 social media occurred? Like a year? A month?
19   A.   I would say, from my understanding,
20 on a fairly regular basis, as we do discuss --
21 or as the board has discussed, or questions or
22 concerns have come up with the board around
23 discipline data, around school safety issues, on a
24 fairly regular basis there's a connection to
25 social media that is discussed at governing

Page 41

1 board meetings.
2    Q.   So when was the first time that
3 connection to social media was discussed at a
4 governing board meeting?
5        MR. CUTLER: Object to form.
6        THE WITNESS: I -- again, I have not
7    memorized the dates of all the governing
8    board meetings. There are at least two
9    meetings a month for as many years as the
10   governing board has been active, so I
11   cannot give you that date.
12 BY MS. DEGTYAREVA:
13   Q.   Do you remember the year that
14 discussions of social media first began in a
15 governing board meeting?
16        MR. CUTLER: Object to form.
17        THE WITNESS: Again, going back to
18   around 2015, 2016 when we started seeing a
19   larger increase in the connection of
20   discipline with social media, I imagine
21   that could have been, but I'm not
22   100 percent sure exactly when that began.
23 BY MS. DEGTYAREVA:
24   Q.   And would any discussions around
25 social media, if they happened at a board

11 (Pages 38 - 41)

Page 42

1  meeting, would they be reflected in the board
2  meeting notes?
3         MR. CUTLER: Object to form.
4         THE WITNESS: It's my understanding,
5     yes, all governing -- our school governing
6     board follows open meeting laws, and so
7     all of our governing board meetings are
8     recorded. They are -- the meetings and
9     minutes are available online. So all
10    recordings of -- by video and meetings are
11    available online.
12 BY MS. DEGTYAREVA:
13    Q.  Now, apart from -- or before this --
14 approving this motion to support the litigation
15 against social media companies, were there any
16 resolutions passed by the board that related to
17 social media?
18    A.  I'm not sure about specific
19 resolutions, but again, back to our code of
20 conduct, a lot of discussion around social media
21 and the levels of code of conduct and discipline
22 has been a topic, and that code of conduct has
23 been reviewed every year. Created a new code of
24 conduct a couple of years ago. Previously it
25 was the guidelines for rights, responsibilities

Page 43

1  of students, as well as board actions around the
2  use of social media and technology.
3     Q.  When was the code of conduct -- the
4  new code of conduct created?
5     A.  I don't remember the year. GSRR, I
6  think was through 2020. There was a previous
7  director. I want to say either 2020 or 2021.
8     Q.  Has the code of conduct been updated
9  since then?
10    A.  It has. It is updated yearly.
11    Q.  So is it your testimony that the new
12 code of conduct that was created in either 2020
13 or 2021, was that created because of social
14 media?
15        MR. CUTLER: Object to form.
16        THE WITNESS: The code of conduct,
17    the new -- it was just a new iteration of
18    our previous guides and responsibilities.
19    So we have always had expectations of our
20    students. And then that also connects
21    with the due process as we look at
22    disciplinary practices within the
23    district.
24        And so as we continue to change with
25    the times, as we identify disciplinary

Page 44

1  trends, we update our code of conduct to
2  match based on the discipline that we have
3  seen year to year and over time. And so
4  the updates to the code of conduct always
5  match what we are seeing within our
6  schools.
7  BY MS. DEGTYAREVA:
8     Q.  And so were there -- I guess going
9  back to my question.
10        Was the code of conduct -- were any
11 of the changes that were made in the new code of
12 conduct, were any of those changes made as a
13 result of social media use?
14    A.  In part. So as we look at the code
15 of conduct, there is a specific section around
16 improper use of technology. And so that was
17 also -- the verbiage was discussed and updated
18 due to the increase of the use of social media
19 within schools, yes.
20    Q.  Apart from that section, was there
21 anything else in the code of conduct that was
22 changed because of social media?
23    A.  Again, looking back at our previous
24 data and discipline data and what's needed in
25 the schools, very cognizant of that, and then

Page 45

1  adjusting our code of conduct due to that.
2         So through the analysis of the data,
3  looking at the code of conduct, improper use of
4  technology was one of them.
5         We do also look at, you know,
6  substance abuse as well as aggression data, and
7  all of that, also, I believe that there was some
8  discussion around the use of social media in
9  excess for some of those, and so updated some of
10 the code of conduct language due to that.
11    Q.  Okay. You mentioned substance
12 abuse.
13        What changes were made to the code
14 of conduct related to substance abuse that were
15 made because of social media?
16        MR. CUTLER: Object to form.
17        THE WITNESS: So in the district we
18    have been very responsive to looking at
19    the needs of the community, and then
20    monitoring the data around the use of
21    substance use in our schools and in our
22    community.
23        We've also looked -- we've also
24    created different opportunities for
25    interventions and resources and supports.

12 (Pages 42 - 45)

Page 46

1    And so we have in the past, as part
2 of our code of conduct, if students are
3 engaged with substances, then there was a
4 stipulation in the code of conduct where
5 students were able to engage in substance
6 abuse workshop courses to reduce part of
7 their discipline.
8    And then with our newer, updated
9 department for substance abuse that we are
10 working on this year, we are adjusting
11 that, and that is no longer part of the
12 code of conduct to where -- discipline.
13    One of the reasons for that was we
14 were noticing that students were not
15 necessarily engaging in those workshops
16 and continuing to use and abuse
17 substances. And so the adjustment of the
18 code of conduct was falling back more on
19 the progressive discipline and following
20 through with that discipline versus
21 lightening the discipline, so to speak.
22 BY MS. DEGTYAREVA:
23    Q.   So, Ms. Shivanonda, which of these
24 changes were made as a result of social media?
25    A.   In response to what we've been

Page 47

1 seeing in our schools. So, again, as we look at
2 discipline data, the through line through most
3 of our discipline, we are finding that there are
4 connections to social media.
5    So often we would find substance
6 abuse or substance use on our school campuses
7 and through investigative practices identify
8 that a number of those instances were involved
9 with substance -- were involved with social
10 media. Students were receiving substances,
11 buying and selling substances via social media
12 platforms and practices. And so that also
13 adjusted the -- with the improper use of
14 technology on our campus, and then looking at
15 any of the other disciplinary practices that may
16 occur of that.
17    So if a student was engaging on
18 social media or improper use of technology, and
19 then if there was an aggression component, then
20 we would look at the progressive discipline.
21 And so all of that is wrapped in and connected
22 to the ongoing data points and analysis of how
23 we look at our discipline data to then adjust
24 our code of conduct and our progressive
25 discipline practices.

Page 48

1    Q.   When you talk about the discipline
2 data, are you referring to the Synergy data?
3    A.   Yes.
4    Q.   So in the Synergy data, where would
5 you look in the data to see if an incident was
6 related to social media?
7    A.   So that can be somewhat tricky. So
8 as we -- the way that the district documents
9 data, there's only so much information that can
10 be housed within Synergy. And so we look at the
11 highest level of infraction, and then through
12 the investigative process are able to then
13 determine the trigger point, so to speak, of
14 that discipline.
15    So in a lot of our discipline
16 practices, we were -- or discipline data, we
17 might see a higher level of on the -- the code
18 of conduct. That will be as kind of the main
19 disposition.
20    And then in a lot of the notes that
21 administrators might be adding to that
22 discipline entry would be in the investigation
23 as they're talking to the student that was
24 involved and the other students, any other
25 witnesses. And so through those we are then

Page 49

1 able to identify the majority of our discipline
2 practices are somehow connected to the use of
3 social media.
4    But, again, in our discipline, that
5 top infraction is because of the way that the
6 code of conduct is written, and then how we then
7 assign consequences based on that, and so we may
8 or may not always see in all of the discipline
9 records.
10    However, anecdotally, as we talk
11 with administrators on a regular basis, school
12 counselors, our administrators do work with
13 their regional assistant superintendents, as
14 well as student relations, as they look at the
15 overarching code of conduct and the infractions
16 to determine what a disciplinary consequence may
17 be. And so through those conversations we can
18 see that that kind of through line is generally
19 connected with social media in some way.
20    Q.   So those notes you mentioned, would
21 those be notes that are accessible in Synergy?
22    A.   They could potentially. It also
23 depends on the way that investigations are --
24 not all of the notes from an investigation might
25 always make it into Synergy, again, due to the

13 (Pages 46 - 49)

Page 50

1 platform itself and how we are able to document.
2    Q.   Where else would information about
3 an investigation be found?
4    A.   It might be in personal notes that
5 administrators and other school staff, they take
6 as part of the investigation process.
7    Q.   Are those notes collected anywhere?
8    A.   Generally, they -- it depends on the
9 notes and the infraction.  They may or may not,
10 just because of FERPA violations that may or may
11 not be housed within a student's cumulative file
12 or not.
13    Q.   Are there any other places where
14 notes from an investigation into discipline
15 might be found?
16    MR. CUTLER:  Object to form.
17    THE WITNESS:  Outside of Synergy and
18    if an administrator has their own notes, I
19    don't believe so.
20 BY MS. DEGTYAREVA:
21    Q.   So if you wanted to find out if a
22 particular incident related to social media, how
23 would you go about doing that?
24    A.   Well, we would look at the overall
25 discipline data within Synergy, and then have

Page 51

1 conversations with administrators.
2    The other component of that, if we
3 were to look into that data, all of our schools
4 do follow a practice of looking at their
5 school-level data.
6    We have what's called behavior
7 management team meetings that are required with
8 every school twice per month where they look at
9 their weekly and their monthly discipline data,
10 and then they have conversations around the
11 hotspots around the schools, are we seeing that
12 we're seeing an increase of fights on the
13 playground, are we seeing an increase of
14 students eloping from classrooms, are we seeing
15 evidence of reduced attendance.
16    And then they come up with
17 intervention plans to address that, and then
18 those reports are then turned into our student
19 relations department.
20    Q.   Where are the school-level weekly
21 and monthly discipline data?  Where is that
22 kept?
23    A.   That -- the data comes from Synergy,
24 so they are able to pull a report directly from
25 Synergy, and then there is a meeting template

Page 52

1 that they're required to fill out that then gets
2 turned into the student relations department.
3    Q.   And so every school has this type of
4 meeting twice per month?
5    A.   That is the expectation, yes.
6    Q.   Is there some -- is there a
7 centralized place where all of the meeting
8 templates that are filled out, where those are
9 stored?
10    A.   Yes.  There's a SharePoint site that
11 is facilitated by the student relations
12 department.
13    Q.   Okay.
14    MS. DEGTYAREVA:  Can we please -- I
15    think we're on Exhibit 3.  Can we mark
16    tab 46 as Exhibit 3?
17    (Tucson-30(b)(6)-Shivanonda-3
18    Was marked for identification.)
19 BY MS. DEGTYAREVA:
20    Q.   Ms. Shivanonda, do you recognize
21 this document?
22    A.   Yes.
23    Q.   Okay.  This is titled Tucson Unified
24 School District's Second Supplemental Initial
25 Disclosure Statement Pursuant to Federal Rule of

Page 53

1 Civil Procedure 26(A)(1)(A)(iii).
2    And can you please turn to page 2?
3 So this is page 3 of the exhibit, but on the
4 bottom of the page it says number 2.
5    Do you see where it says Second
6 Supplemental Initial Disclosures at the top of
7 the page?
8    A.   Yes.
9    Q.   And then looking below, it says,
10 "Tucson Unified School District responds that,
11 at this time, it believes its estimated
12 approximate past compensatory damages total at
13 least $103,211,006."
14    Do you see that?
15    A.   I do.
16    Q.   Okay.  So these are -- the
17 approximately 103 million, those are the
18 monetary losses that TUSD attributes to
19 defendants' platforms, is that correct?
20    A.   Yes.
21    Q.   Then looking at the chart that lists
22 -- kind of gives some more detail on how those
23 losses are broken down, are there any monetary
24 losses that TUSD is claiming are attributed to
25 defendants' platforms that are not listed on

Page 54

1 this chart?
2     A.   Can you repeat the question?
3     Q.   Sure.
4          Does this chart include all of the
5 losses that TUSD is claiming are attributed to
6 defendants' platforms?
7          MR. CUTLER:  Object to form.
8          You can answer.
9          THE WITNESS:  It is my understanding
10    that as part of this litigation that this
11    information, yes, came from our chief
12    financial officer as he evaluated the
13    suggested damages, yes.
14 BY MS. DEGTYAREVA:
15    Q.   So are there any monetary losses
16 attributed to defendants' platforms that are not
17 on this chart?
18    A.   I would imagine that it would be
19 very difficult to put a specific dollar
20 number on just given the amount of need we have
21 in our district.  I would imagine that there may
22 be additional that might not be recognized in
23 here, but I was not part of the stakeholder
24 group who did this analysis to identify these
25 numbers.  I've reviewed this document, but I

Page 55

1 could not say for certain that this would
2 encapsulate absolutely everything.
3     Q.   Are you aware of any monetary losses
4 that are not listed here?
5     A.   Not specifically, no.
6     Q.   And who was part of the stakeholder
7 group that was involved in the analysis of
8 identifying these numbers?
9          MR. CUTLER:  Object to form.
10          THE WITNESS:  Do I answer?
11          MR. CUTLER:  Yes.  Unless I say --
12    instruct you not to, my objection is just
13    for the record.
14          THE WITNESS:  Okay.
15          MR. CUTLER:  So with my objection
16    noted, would you mind rereading the
17    question so you can answer?
18          MS. DEGTYAREVA:  I can just restate
19    it.
20          MR. CUTLER:  Okay.  Thank you.
21 BY MS. DEGTYAREVA:
22    Q.   So you mentioned there was a
23 stakeholder group that was involved in the
24 analysis of putting these numbers together.  Who
25 was part of that stakeholder group?

Page 56

1     A.   So it's my understanding that TUSD
2 legal counsel in conjunction with outside
3 counsel and our chief financial officer.  I
4 believe those were the main stakeholders that
5 were looking at the overall monetary value.
6     Q.   So this is divided into three
7 categories of damages, right?
8     A.   Yes.
9     Q.   And the first one is, "Past human
10 and financial resources estimated to have been
11 expended in connection with the harms alleged in
12 Complaint."
13          Right?
14    A.   Yes.
15    Q.   All right.
16          MS. DEGTYAREVA:  Let's mark tab 47
17    as Exhibit Number 4.
18          (Tucson-30(b)(6)-Shivanonda-4 was
19          marked for identification.)
20 BY MS. DEGTYAREVA:
21    Q.   Ms. Shivanonda, have you seen this
22 document before?
23    A.   Yes.  I did review this with
24 counsel.
25    Q.   SO this is titled Plaintiff's

Page 57

1 Amended Answers to Defendants' Interrogatories
2 to Tucson Unified School District (Set 3).
3          And if we go to -- starting at
4 page 3, you'll see there's a lengthy response
5 that goes on to page 4 that talks about on
6 page 4 Category 1, Category 2, and Category 3 of
7 damages.
8          Do you see that?
9     A.   I do.
10    Q.   So did you play any role in
11 preparing this response?
12    A.   I believe I did.  I believe in the
13 beginning of the litigation I did meet with
14 outside counsel and inside counsel as we began
15 to start to talk through who may have been
16 involved.
17          So, for example, we talked about
18 potentially --
19          MR. CUTLER:  I'm going to stop you
20    there.  And to the extent you're talking
21    about the discussions with counsel, that's
22    privileged.  So I think there are ways
23    to -- I think there are ways for you to
24    respond that don't include conversations
25    with counsel.

15 (Pages 54 - 57)

Page 58

1         THE WITNESS:  Okay.
2  BY MS. DEGTYAREVA:
3      Q.   So without going into the substance
4  of any conversations you had with your counsel,
5  were you involved in preparing this response
6  about the three different categories of damages?
7      A.   I believe I may have been in initial
8  conversations in preparation for this overall.
9      Q.   And then on page 4 of this document
10  where it talks about Category 1 of damages,
11  that's referring to the past human financial
12  resources that we were just looking at in the
13  other document, right?
14      A.   I believe so.
15      Q.   And so you see it lists a number of
16  types of damages that fall into this category.
17  Were you involved in identifying the types of
18  damages that are included in Category 1?
19      A.   I believe in initial conversations
20  with counsel I believe I did contribute, yes.
21      Q.   So do you remember which of these
22  categories you identified?
23         THE WITNESS:  Would that be
24      privileged?
25         MR. CUTLER:  Yeah, I mean, I think

Page 59

1      to the extent that you're having
2      conversations with counsel where you're
3      identifying things, that's privileged.
4  BY MS. DEGTYAREVA:
5      Q.   Ms. Shivananda, let me ask you this.
6         Are you aware of any other types of
7  damages that are not listed here that would fall
8  within what's called Category 1?
9         (Witness reviewing document.)
10      A.   I amassed -- this is pretty robust.
11  However, there's, you know, a multitude of ways
12  that we've identified harm.  Off the top of my
13  head I can't speak to specifics, but I imagine
14  that there could potentially be additional.
15  It's hard to quantify all of the ways and all of
16  the things that we're seeing in the district.
17      Q.   So sitting here today are you aware
18  of any other types of damages that are not
19  included in this response?
20         (Witness reviewing document.)
21      A.   Off the top of my head at the
22  moment, no.
23      Q.   Okay.  And then it says in the
24  second paragraph on page 4 that, "In calculating
25  damages associated with Category 1, Plaintiff

Page 60

1  identified costs associated with certain staff,
2  including teachers, assistant principals,
3  principals, and staff providing mental health
4  and related student support services."
5         Do you see that?
6      A.   Mm-hmm.
7      Q.   What does "related student support
8  services" refer to here?
9      A.   I was not the person who created
10  this document, so I can't speak to what the
11  intention was.  In general, providing mental
12  health and related student support services,
13  there's a lot that goes into the need of mental
14  health.
15         We -- mental health could also
16  trigger outwardly behavioral incidences, and so
17  some potential support student services might be
18  creating of intervention plans, might be
19  coaching and training and supporting staff, in
20  supporting students, might be also looking at
21  overall classroom environment, overall school
22  climate and culture, and overall support of
23  student services.
24         So could be a multitude -- a
25  multitude of things wrapped in that.

Page 61

1      Q.   And so then the staff positions that
2  sort of fall into these categories are listed in
3  Exhibit 1 of this document, right?  And if you
4  can turn a couple of pages on, you'll see it
5  says Exhibit 1, and there's a chart after it.
6         Do you see that chart on the first
7  page of Exhibit 1 and another chart on the
8  second page of Exhibit 1?
9      A.   Yes, I see that.
10      Q.   Are those all of the staff positions
11  that fall within sort of these Category 1
12  damages?
13      A.   I do know that in the creation of
14  this document a lot of discussion was around.  I
15  don't know 100 percent certain that this would
16  be an exhaustive list.
17         Again, it's very intricate in the
18  way that our school districts are created and
19  who may be collaborating to support.  This does
20  look like a fairly comprehensive list, but it
21  may or may not be completely exhaustive.
22      Q.   So looking at the first chart in
23  Exhibit 1 of this document, who was responsible
24  for selecting the positions to include in this
25  chart?

16 (Pages 58 - 61)

Page 62

1          MR. CUTLER:  I'm going to object to
2     the extent that this was covered in the
3     prior deposition and answered.
4          But you can answer.
5  BY MS. DEGTYAREVA:
6     Q.   Who was responsible for selecting
7  the positions included in this chart?
8     A.   It was my understanding that
9  internal legal counsel, external legal counsel,
10 collaboration with chief financial officer.  I'm
11 not sure at what and how -- what capacity our
12 superintendent may have been involved, but the
13 majority of this was determined with counsel,
14 again within preliminary discussions that I was
15 part of with counsel, also different
16 departments, we kind of identified who in our
17 departments may be providing support, so I think
18 that also influenced these lists.
19    Q.   Did you provide input into what
20 positions should be included here?
21    A.   I did.  So based on any of the
22 positions that may be connected to my particular
23 department, yes.
24    Q.   And so what did TUSD do to determine
25 that each of these positions was in some ways

Page 63

1  impacted by defendants' platforms?
2          MR. CUTLER:  Object to form.
3  BY MS. DEGTYAREVA:
4     Q.   You can answer.
5     A.   As we look at our overall operating
6  procedures in the district, we identify specific
7  staff members that provide specific resources
8  and supports to students in our school
9  community.
10         The majority of the employees listed
11 on these lists do in some capacity provide
12 behavioral support, instructional support.  The
13 difficulty in kind of parsing that out is that
14 within a school district system if a student,
15 for example, goes to the health office for a
16 stomachache, that could mean that they have a
17 stomachache, it could mean that they're going to
18 the health office every day in math because they
19 have math anxiety.
20         And so then the health assistant
21 would then potentially collaborate with other
22 staff within the school system to then determine
23 whether or not it was an academic issue, whether
24 it was a physical issue, whether it was a mental
25 health issue, or a behavioral issue.

Page 64

1          And so because of that, it can get
2  somewhat cumbersome to identify, so the majority
3  of the staff on our school campuses would be
4  somehow connected in supporting the overarching
5  whole child needs of all of our students.
6     Q.   So did you -- does this list include
7  essentially every staff member that supports the
8  overarching whole child needs of their students?
9          MR. CUTLER:  Object to form.
10         THE WITNESS:  Can you -- on the
11    tablet, can you go to the second page and
12    make it bigger for me?  This one is very
13    hard to read.
14 BY MS. DEGTYAREVA:
15    Q.   The writing is very small.
16    A.   Okay.
17         (Witness reviewing document.)
18    A.   So all of these staff would
19 absolutely support.  There's -- there actually
20 are probably some staff on here that are not
21 indicated that I think could be.
22         So when a student comes to a campus,
23 there's a multitude of staff members that
24 they're going to potentially engage in.  We're
25 not sure, you know, if a student is going to

Page 65

1  connect with the office manager, for example.
2  Or they're crossing the crosswalk so they might
3  also make a connection with the crossing guard.
4  They might also, you know, share something about
5  their day or how they're feeling with a crossing
6  guard.
7          So the reality is that students
8  might make a connection with an adult on the
9  school campus, and so there are probably other
10 people represented on here that may also be
11 involved in the support of the overarching needs
12 of our children.
13         I think this is a pretty significant
14 list, but I would imagine there's probably
15 additional people that we also could lean into
16 to say that some of their work would also be
17 supporting student overall mental health.
18    Q.   Okay.  So it's your understanding,
19 though, that this list includes the positions
20 that are involved in supporting the overarching
21 needs of the students?
22    A.   Yes, this list does that, and then
23 there might be others that are missing.
24    Q.   Now, if you go back to -- actually,
25 sorry, staying on these two charts, you'll see

17 (Pages 62 - 65)

1 that both charts start with school year 16-17,
2 2016-2017?
3     A.   Mm-hmm.
4     Q.   What's the basis for starting these
5 calculations at school year 2016-2017?
6         MR. CUTLER:  I will object.  This
7 was asked and answered earlier as well.
8         But you can answer.
9 BY MS. DEGTYAREVA:
10    Q.   You can answer.
11    A.   Again, from my understanding, what
12 we talked about before, we -- as we started to
13 see an increase in the need, an increase in use
14 of cellphones and social media started right
15 around anywhere from 2014, 2015, 2016.  So I
16 think 2016 is a pretty good basis in terms of
17 when we really started to see a spike in needs
18 of students.
19    Q.   And you say 2016 is when you
20 "started to see a spike in needs of students."
21 What data does TUSD have that shows that spike
22 in the needs of students?
23    A.   So again multiple -- multitude of
24 data points.  Again, some of the data we may not
25 be able to explicitly access now due to shifts

1 in data reporting.
2         I can just say from my personal
3 experience when I was working in a school in
4 2016 -- I was at a middle school in 2016 -- I
5 regularly would engage with students, behavioral
6 and social emotionally, due to the use of social
7 media.  And so from my personal experience I can
8 say that just from my work with students we did
9 see a significant increase in around 2015, 2016.
10    Q.   What districtwide data -- so not
11 specific to just one middle school, but what
12 districtwide data does TUSD have that shows that
13 there was a spike in the needs of students
14 around 2016?
15        MR. CUTLER:  Object to form.
16        THE WITNESS:  We do have discipline
17    data that spans, you know, the years, we
18    do collect that data, so whether or not we
19    could access the Mojave data prior to
20    moving into Synergy.
21        But, again, discipline data does
22    show connections between the use of
23    student devices and technology and
24    increase in behavioral instances on our
25    campuses.

1 BY MS. DEGTYAREVA:
2     Q.   In preparing to testify for the
3 deposition today, did you review any
4 districtwide data that showed there was a spike
5 in the needs of students starting around the
6 2016-2017 school year?
7     A.   Not from 2016, due to the shift in
8 and because of the data breach, so I wasn't able
9 to see that.
10    Q.   Now, going back -- so in this
11 document, going back to page 4, in the second
12 paragraph you'll see it says -- after it
13 identifies the types of staff that were
14 included, it says, "A percentage was then
15 applied to each staff category or position for
16 each respective year to reach an approximate
17 total of this category of damages."
18        Do you see that?
19    A.   I do.
20    Q.   So then if we go back to Exhibit 1,
21 to the two charts we were looking at, in both
22 charts there's a column that says Weight, and
23 then it has a percentage.
24        Do you see those columns?
25    A.   I do.

1     Q.   How did TUSD calculate the
2 percentage to put in the Weight columns?
3         MR. CUTLER:  Object to form.  Asked
4     and answered.
5         You can answer.
6         THE WITNESS:  So as we look at again
7     these particular positions, really looking
8     at the purpose of the position and then
9     potentially the amount of time spent,
10    again, in preparation for the litigation
11    with internal and outside legal counsel,
12    different departments did provide input
13    around which positions may be included,
14    and how much of that work would be
15    potentially connected to the litigation.
16 BY MS. DEGTYAREVA:
17    Q.   So you said looking at "the amount
18 of time spent."  Does TUSD have any data showing
19 the amount of time that each of these positions
20 spends on issues related to social media?
21    A.   There may be some.  So not all of
22 our positions are required to clock in and out,
23 not a lot of our -- not all of our positions are
24 required to collect data around minute by minute
25 or hour by hour.

18 (Pages 66 - 69)

Page 70

1     Anecdotally as we have discussions
2 and department leaders do know what their
3 employees are working on, utilizing evaluation
4 processes, strategic planning, action plans,
5 different departments are able to ascertain the
6 level of work that their individual employees
7 are doing, and so that was a big part of it.
8     Q.   Has TUSD conducted any analysis to
9 show how much time each of these positions
10 spends on issues related to defendants'
11 platforms?
12        MR. CUTLER:  Object to form.
13        THE WITNESS:  I'm not aware of any
14 explicit analysis.
15 BY MS. DEGTYAREVA:
16     Q.   Has TUSD collected these sort of
17 different data sources you mentioned, evaluation
18 processes, strategic planning, has TUSD
19 collected that information to try to analyze the
20 amount of time spent?
21        MR. CUTLER:  Object to form.
22        THE WITNESS:  As the district as a
23 whole, I know it's the expectations of
24 each individual department to develop
25 those and manage those.  As the district

Page 71

1 as a whole, I'm not aware that there's
2 been any sort of explicit collection
3 protocol for collecting that and then
4 doing any deep dive of analysis.
5 BY MS. DEGTYAREVA:
6     Q.   Does TUSD allege that any of the
7 positions listed on these two charts were
8 created specifically because of defendants'
9 platforms?
10        MR. CUTLER:  Objection.  Asked and
11 answered.
12        THE WITNESS:  So there's been --
13 social media platforms have definitely
14 influenced.  So again looking at the
15 overarching needs of the district, I can
16 speak to my particular department, and my
17 position was explicitly created to address
18 the explicit social emotional mental
19 health needs of our students, which I know
20 was also heavily influenced based on the
21 data.
22        And as we've seen with social media
23 being kind of that through line between --
24 through a lot of our data, especially our
25 discipline data, our school climate and

Page 72

1 culture data, that was definitely an
2 influencing factor in the creation.
3        In the school counseling department,
4 the decision to apply for the Arizona
5 Department of Ed school safety grant to
6 increase the number of school counselors
7 and social workers, and those school
8 counselors and social workers are
9 indicated on this list, was influenced
10 again by the overarching anecdotal data,
11 disciplinary data.
12        Again, that connection to social
13 media and what we were seeing in the
14 increase of anxiety and depression and
15 overall mental health supports needed in
16 our school campuses was heavily influenced
17 due to social media.
18 BY MS. DEGTYAREVA:
19     Q.   You mentioned several times, you
20 know, overall mental health support and social
21 emotional mental health needs of students.
22 Which positions on these charts does TUSD allege
23 were created specifically because of defendants'
24 platforms, not overarching mental health, but
25 specifically because of defendants' platforms?

Page 73

1        MR. CUTLER:  Objection.  Asked and
2 answered.
3        You can answer again.
4        THE WITNESS:  Social media platforms
5 highly influence the anxiety, the
6 depression, body dysmorphia.  We've seen
7 an increase in disciplinary needs due to
8 social media, due to students creating
9 profiles and posting about fights which
10 are then disrupting the classroom
11 environment.
12        And so the influence of social media
13 is an identified cause for needing the
14 increase of social emotional mental
15 support -- mental health supports on our
16 campuses.
17 BY MS. DEGTYAREVA:
18     Q.   So which specific positions were
19 created because of defendants' platforms?
20        MR. CUTLER:  Objection.  Asked and
21 answered.
22        THE WITNESS:  On this list, without,
23 again, influenced -- right, so social
24 media and all of the other supports needed
25 due to that influenced obviously my

19 (Pages 70 - 73)

Page 74

1  position as well as my SEL coordinator
2  within PD. Counselors, right, I talked
3  about increased number of counselors due
4  to that.
5      It's difficult to also say because
6  these positions, also, they support in
7  other ways, but we've also identified the
8  need for maybe additional positions and
9  supports because of that.
10     Restorative practice facilitators, I
11  know that at least 70 percent of their
12  work generally is in response to some sort
13  of social media in terms of having to
14  restore relationships between students on
15  campus. So I know a lot of that work,
16  whether or not that was created
17  specifically because of social media, I
18  know it was highly influenced because,
19  again, it's based on data.
20     So all of the practices that the
21  district employs in identifying the
22  employees and the positions that are
23  needed are based on data sources and
24  practices, and the majority of that is
25  influenced by the social media increase.

Page 75

1  BY MS. DEGTYAREVA:
2   Q.  Ms. Shivanonda, I'm not asking which
3  positions spend some amount of time relating to
4  social media, but are you aware of any position
5  on these lists that was created specifically
6  because of defendants' platforms?
7      MR. CUTLER: Objection. Asked and
8  answered.
9      You can answer again.
10     THE WITNESS: It's again -- it's
11  highly influenced, right. Social media is
12  a high connection point to the increase in
13  social emotional needs of our students.
14     So my position in my department was,
15  again, highly influenced because of the
16  need of the support for anxiety,
17  depression, social emotional learning
18  needs on our campuses which we have
19  identified as an increased need due to the
20  connection to social media.
21     So in a roundabout way I guess my
22  department definitely would have been
23  created, again, because of the influence
24  of the social media platforms.
25     Again, the increase of potential, on

Page 76

1  the first list, increase in the need of
2  these positions are, again, highly
3  influenced because of the social media
4  that is creating numerous problems on our
5  school campuses.
6  BY MS. DEGTYAREVA:
7   Q.  So I just want to make sure I
8  understand your testimony.
9      Is your testimony that your
10  department, social emotional learning
11  department, that was created specially because
12  of defendants' platforms?
13   A.  It was highly influenced due to
14  social media platforms, yes.
15     MS. DEGTYAREVA: We've been going, I
16  think, over an hour. Maybe now is a good
17  time for a break.
18     MR. CUTLER: Sure.
19     THE VIDEOGRAPHER: We are going off
20  record. The time is 3:24.
21     (Whereupon, a recess was taken.)
22     THE VIDEOGRAPHER: We're going back
23  on record. The time is 3:39.
24  BY MS. DEGTYAREVA:
25   Q.  Okay. Ms. Shivanonda, I'd like to

Page 77

1  move on to a slightly different topic.
2      Does TUSD have any data on how many
3  of its students have cellphones?
4   A.  That is not the type of data that we
5  generally would collect.
6   Q.  How about data on how many students
7  have tablets?
8   A.  The district has data around
9  district-provided devices, the number of
10  devices, but we do not track the number of
11  student personal devices, no.
12   Q.  Is your understanding that for
13  many TUSD students they would get cellphones or
14  tablets or other electronic devices from their
15  parents?
16     MR. CUTLER: Object to form.
17     THE WITNESS: That would be my
18  understanding.
19  BY MS. DEGTYAREVA:
20   Q.  Does TUSD have any data on the
21  amount of time that students spend on their
22  cellphones or non-school-district-issued
23  devices?
24   A.  So that can be tricky. We don't
25  have specific survey data. We have anecdotal

Golkow Technologies,
A Veritext Division

877-370-3377                                        www.veritext.com

1 data. We can also look at discipline data.
2     So, again, going back to the code of
3 conduct, if any students have been disciplined
4 for improper use of technology, we would have
5 that data.
6     Q.  Just to be clear, I'm not asking
7 about data on how many times or how much time
8 students have been disciplined for using
9 cellphones, but just data on how often they use
10 their cellphone, at home, at school, in
11 violation of policy, not in violation of policy.
12     A.  So for -- obviously the violation of
13 policy would be indicated within our discipline
14 policies. I do know that the district may have
15 some anecdotal data around asking, you know,
16 teachers potentially on, you know, how often
17 they may be asking students to put away a
18 cellphone.
19     I do know, as part of preparation
20 for the litigation, potentially asking of some
21 students of how often they use cellphones, but
22 explicit data, that's not something that the
23 district is able to collect on a regular basis.
24     Q.  That anecdotal data, so starting
25 with asking teachers, is that data tracked

1 anywhere anecdotally? The anecdotal data, is
2 that tracked anywhere?
3     A.  Not to my knowledge explicitly. So,
4 again, through potential conversation data
5 around needs of support at schools, there's
6 anecdotal data through conversations, but to my
7 knowledge I don't believe it's explicitly
8 tracked.
9     Q.  In preparing to testify today, did
10 you review any documents that talked about what
11 teachers say regarding how much time their
12 students spend on cellphones?
13     A.  Explicit documented data, no.
14     Q.  And then you also mentioned that
15 there might be some anecdotal data from students
16 about how much they use their cellphones.
17     What anecdotal data are you
18 referring to there?
19     A.  So in -- just in conversations, I
20 know that when I, you know, talk with counselors
21 and they talk with teachers, they talk with
22 teachers about how often they're seeing students
23 on their phones, if teachers talk to students
24 about phones, that's really pervasive. Phones
25 are pervasive in our community. And so kind of

1 talking through that, but I don't have explicit,
2 you know, written documentation around.
3     Q.  I think -- and if I misunderstood
4 you earlier, please let me know, but I thought
5 you said that TUSD asks some students how often
6 they use cellphones, is that right?
7     A.  So in the past, as we have -- again,
8 looking at data, part of the process to evaluate
9 the code of conduct, I know that the student
10 relations department did hold -- they hold --
11 held some conversation opportunities, the
12 restorative practice facilitators at those sites
13 held conversation opportunities with students
14 around their perception of the code of conduct,
15 and I know that there were some questions around
16 the use of cellphones. I do not know whether or
17 not that data was explicitly tracked or stored
18 anywhere.
19     Q.  So you don't know if that data
20 was -- the answers from those conversations were
21 recorded anywhere?
22     A.  I do not, correct.
23     Q.  When were those conversations held?
24     A.  So there was an update to the code
25 of conduct beginning -- so there was a committee

1 last spring, so spring of '25 -- '24, where the
2 student relations department was eliciting --
3 was having conversations with students about the
4 code of conduct. So it was through that spring
5 that they were eliciting feedback on the code of
6 conduct, which also included the improper use of
7 technology.
8     Q.  And how many students participated
9 in those conversations?
10     A.  The focus was primarily on middle
11 and high school. I know that they were not able
12 to speak to every student. So I do not know an
13 exact number, but probably at least a couple of
14 hundred.
15     Q.  Were these in-person conversations,
16 or were they responses to a written
17 questionnaire?
18     A.  These were in person. So the staff
19 from the student relations department traveled
20 to the school and met with groups of students
21 that were, I believe, determined by the
22 administrator on which students were able to
23 participate.
24     Q.  Were the conversations recorded,
25 video or audio recorded?

21 (Pages 78 - 81)

Page 82

1    A.   Not to my knowledge, no.
2    Q.   And was there a summary written
3 about the result of those conversations?
4    A.   I believe there was a summary that
5 was produced to be able to influence the update
6 of the code of conduct.
7    Q.   Who wrote that summary?
8    A.   I believe it most likely would have
9 been Anna Warmbrand.
10    Q.   And is there a -- does a copy of
11 that summary still exist?
12    A.   I'm not sure.
13    Q.   If it did, where would it be stored?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  Most likely within her
16 department.
17 BY MS. DEGTYAREVA:
18    Q.   Do you know what specific questions
19 those students were asked about social media?
20    A.   I do not know the explicit
21 questions, no.
22    Q.   Do you know if they were asked
23 anything specifically about any of defendants'
24 platforms?
25    A.   I am not aware of the questions.

Page 83

1    Q.   So what were the result -- or what
2 did the students -- I guess at a high level,
3 what did the students say about their use of
4 cellphones --
5        MR. CUTLER:  Object to form.
6 BY MS. DEGTYAREVA:
7    Q.   -- during those conversations?
8        MR. CUTLER:  Sorry.
9        THE WITNESS:  Answer?
10        MR. CUTLER:  Yeah.
11        THE WITNESS:  So it's my
12 understanding through those conversations,
13 and again secondhand information, but
14 students did indicate that there's a high
15 use of cellphones, and the majority of the
16 use from the cellphones is engaging in
17 social media platforms, and that there's a
18 high drive for using that use.  And they,
19 through some of the summaries, identified
20 that -- they did identify that it was
21 somewhat of a problem within schools and
22 within instructional practices.
23 BY MS. DEGTYAREVA:
24    Q.   And do you have any data on what
25 percentage of students said that or what grades

Page 84

1 they were in?
2    A.   Again, I do not have access to that
3 explicit data.  Again, just through
4 conversation, that overall general idea of the
5 majority of the students did report that there's
6 high level use of cellphones and social media.
7 And again, the targeted audience were middle
8 schools' and high schools' students.
9    Q.   Now, does TUSD track what websites
10 its students visit on their cellphones or other
11 devices that are not issued by TUSD?
12    A.   No, the district does not track
13 student device usage.
14    Q.   Does it track what applications
15 students have installed on their devices?
16    A.   No, we do not track that data.
17    Q.   So TUSD doesn't know if students
18 have apps that they would use to listen to
19 music?
20    A.   Not explicitly, no.  We do not track
21 any student-level devices unless they somehow
22 got access to WIFI.  If they were on the
23 district WIFI, then potentially technology could
24 probably, but I don't know if they would be able
25 to track specific apps.

Page 85

1    Q.   Is it your testimony that if the
2 student was on the district WIFI, the school or
3 TUSD would be able to track what apps they're
4 using, or they would not be able to track?  I'm
5 not sure I understood.
6    A.   I'm not sure I understood my answer
7 either.
8        For the majority, our students are
9 not able to access TUSD WIFI.  I do know that in
10 the technology department, the technology
11 department is able to track district-level
12 devices and WIFI websites and things.
13        And so if a student would somehow be
14 able to access TUSD WIFI, I imagine that that
15 could have been traceable.  But I don't believe
16 that we would be able to track or trace if
17 students have specific apps.
18    Q.   So if a student was using a personal
19 cellphone or other device, TUSD doesn't know
20 what apps they have on the devices?
21    A.   Correct.
22    Q.   And TUSD doesn't know what apps
23 they're using?  In other words, not just that
24 they have them installed, but what apps they're
25 actually using on the devices, doesn't have any

22 (Pages 82 - 85)

Page 86

1  data about that?
2      MR. CUTLER:  Objection to form.
3      THE WITNESS:  The data we do have
4  is, again, within our discipline data.  So
5  when discipline is reported, the majority
6  of the discipline that is connected to
7  social media does connect with platforms
8  such as Facebook and Instagram, where we
9  will see evidence of student postings or
10 there will be pictures.  So in that case
11 we do have data that can track
12 disciplinary infractions that are
13 connected to social media.
14 BY MS. DEGTYAREVA:
15     Q.  Does TUSD know what apps or have
16 data showing what apps students are using while
17 they're at home?
18     A.  No.
19     Q.  How about while they're on their
20 lunch break?
21     A.  Again, unless there's a discipline
22 incidence where we would have that data, no.
23     Q.  Does TUSD have data on how many text
24 messages TUSD students send and receive?  And by
25 that I mean SMS messages or iMessages.

Page 87

1      A.  No.
2      Q.  And does TUSD have data on what
3  content might be in those SMS messages or
4  iMessages?
5      A.  No.  Not on personal devices, no.
6      Q.  Does TUSD know how many of its
7  students play video games?
8      A.  No.  That's not data we track.
9      Q.  Does TUSD know how much time
10 students might spend playing video games?
11     A.  We don't have explicit data, but,
12 again, through anecdotally through
13 conversations, we have somewhat of an idea of
14 the pervasiveness of the use of technology, yes.
15     Q.  I'm talking specifically about video
16 games.
17     Does TUSD know how much time
18 students spend playing video games?
19     A.  Again, through anecdotal data,
20 potentially through conversations, can have an
21 idea, but, no, we don't specifically track.
22     Q.  So what is that anecdotal data about
23 how much time students spend playing video
24 games?
25     A.  In classrooms, when students are

Page 88

1  talking about their video games, teachers have
2  conversations about, you know, their video
3  games, asking how often they're on.
4      Other data points that when we do
5  engage with parents, attendance data, when we
6  have students that are either tardy or absent, a
7  lot of that anecdotal data, talking with parents
8  about students being on their devices at all
9  hours of night and not being able to get them
10 off of their devices in order to then get up and
11 get ready for school.
12     But, again, outside of explicit --
13 we don't explicitly track that, but there's
14 other data sources that can provide some data
15 that can inform at least, again, anecdotally the
16 pervasiveness.
17     Q.  And just so you understand, just to
18 bring you back to my question, I'm asking
19 specifically about video games.
20     A.  Correct, both.
21     Q.  So not all devices, just video
22 games.
23     What does the anecdotal data show
24 about how much time students spend playing video
25 games?

Page 89

1      MR. CUTLER:  Object to form.  Asked
2  and answered.
3      Answer again.
4      THE WITNESS:  Same.  So similarly,
5  so again, through anecdotal data, through
6  conversations with students, through
7  conversations with parents, have a pretty
8  good idea of how often students are
9  playing video games.
10 BY MS. DEGTYAREVA:
11     Q.  What does the anecdotal say about
12 how often students are playing video games?
13     A.  So I don't know that data off the
14 top of my head, but knowing that we have those
15 conversations, and a lot of staff, school staff,
16 have conversations with students, it's quite
17 frequent, especially -- and it also depends on
18 age level.  So we do see higher instances of
19 younger elementary students engaging in video
20 game usage versus at a high school level they're
21 engaging in more social media-type activities.
22     Q.  I believe you testified that
23 attendance data, attendance data might have some
24 information on what students are doing on
25 devices.

23 (Pages 86 - 89)

Page 90

1    Did I understand that correctly?
2    A.   Again, data anecdotally.  So when
3 we -- when students are absent or when students
4 are tardy, it is the expectation that parents
5 will report the reasons for those absences.  And
6 oftentimes we do have parents disclose to
7 teachers, to admin, to counselors that their
8 child is playing video games or on their devices
9 and struggling to get them off of those, so then
10 it is affecting sleep, and then they have a hard
11 time getting them up in the morning and getting
12 them to school on time.
13    Q.   Are those parental reports saved
14 anywhere?
15    A.   They could potentially be, again,
16 within the student information system.  When
17 counselors or administrators talk with parents,
18 we do have a place called Student Conference
19 where those are housed, but, again, some of
20 those conversations could be FERPA protected.
21    Q.   What is Student Conference?
22    A.   Student Conference is a section
23 within Synergy.  So it is a place in our student
24 information system where support staff or
25 administrators may collect, again, anecdotal

Page 91

1 data or data from talking to a student or
2 talking to a parent to be able to collect that
3 data so they have evidence of what that
4 conversation was about.
5    Q.   And what types of conversations or
6 anecdotal data might be recorded in Student
7 Conference?
8        MR. CUTLER:  Object to form.
9        THE WITNESS:  So again, conference
10    notes would be anything related to a
11    student.  So if a counselor had a
12    conversation with a parent and a parent
13    had concerns and they were asking for
14    maybe more counseling services, that might
15    be noted in the Student Conference.
16        If a restorative practice
17    facilitator meets with a group of students
18    to have a -- what's called a restorative
19    circle to restore any climate and culture
20    needs, they would capture that potentially
21    in Student Conference.  So it's any
22    student-level connection data.
23 BY MS. DEGTYAREVA:
24    Q.   So a lot of that anecdotal data that
25 you've been talking about today, would that be

Page 92

1 found in Student Conference?
2        MR. CUTLER:  Object to form.
3        THE WITNESS:  It could potentially
4    be, again, if it's student-level data, so
5    a direct conversation with a student or a
6    direct conversation with a parent about a
7    student.
8 BY MS. DEGTYAREVA:
9    Q.   Are there any other databases where
10 some of this anecdotal data might be found?
11    A.   The majority of our data would be
12 found in our student information system.  So
13 whether that be in Synergy with that Student
14 Conference or within the MTSS platform where
15 students -- or where teachers or staff may make
16 observations about either behavior or academic
17 needs of students, they would document that
18 within the MTSS part of Synergy, but all of that
19 data would be in our student information system.
20    Q.   The MTSS platform, is that all in
21 Synergy, or is there a separate platform?
22    A.   It is all in Synergy, yes.
23    Q.   So is it your testimony that the
24 Student Conference data and the MTSS portion of
25 Synergy, all of those may contain information

Page 93

1 about students' use of social media?
2    A.   Correct.
3    Q.   Now, does TUSD track whether on
4 their personal devices students have parental
5 controls enabled?
6    A.   No.
7    Q.   And does TUSD track whether students
8 have any screen time limits enabled on their
9 personal devices?
10    A.   No.
11    Q.   Does TUSD track whether -- excuse
12 me -- whether parents enforce any other types of
13 restrictions on their children's use of devices?
14    A.   No.
15    Q.   Has TUSD ever attempted to study the
16 prevalence of social media use by students at
17 TUSD?
18    A.   Not explicitly that I'm aware of,
19 no.
20    Q.   When you say "not explicitly," what
21 do you mean by that?
22    A.   Again, as we look at our overall
23 needs of our system, teachers may report the --
24 to administrators, so there's oftentimes
25 opportunities for teachers to, you know, share

24 (Pages 90 - 93)

Page 94

1  concerns, right. So if there's an issue of
2  classroom management or if students are
3  disruptive, there's again conversationally data.
4          So the difficulty in a school
5  district is, a lot of the work that we do is
6  immediate and so it's a lot of conversation and
7  it's a lot of trying to kind of parse out what
8  is the reason behind some of the behaviors, and
9  so not a lot of that is tracked in any sort of
10  platform or any sort of actual, like, explicit
11  way.
12          I do know that, you know, when we
13  are looking, again, at triggers and reasons for
14  explaining maybe discipline, again, there's
15  conversational data around, Oh, I'm noticing an
16  increase of third graders that are bringing
17  their phones to school and I'm struggling to get
18  them to put them away in their backpack. So
19  then we might talk about what are the
20  interventions for that, but that's more
21  conversational at the different times within the
22  school day.
23          So there's a lot of opportunities
24  for teachers to collaborate amongst with
25  teachers and hear what they're seeing and what

Page 95

1  their needs are, then that may come up to the
2  level of the administrators. And then at the
3  district level again we look at overarching data
4  points such as discipline, so what are we seeing
5  in our schools based on the discipline.
6          And again that could potentially be
7  conversations with administrators, conversations
8  with teachers that are not necessarily
9  documented anywhere.
10      Q.  So you talked about teachers
11  reporting concerns to administrators. Are those
12  ever documented somewhere?
13          MR. CUTLER: Objection to form.
14          THE WITNESS: Again, they could
15      potentially. We don't necessarily have a
16      specific process for teachers for
17      concerns.
18          There is a platform within the
19      district called Awareity where -- it's a
20      digital resource where anyone in the
21      community can either report anonymously or
22      non-anonymously any concerns that they may
23      have, and so those would then go to the
24      regional assistant superintendents, and
25      then they would work with the

Page 96

1      administrators to kind of analyze and
2      investigate some of those concerns.
3          But, otherwise, no, like a lot of
4      our work, it really does -- it's really
5      anecdotal. It's through conversations of
6      identifying, This is what I'm seeing, this
7      is, you know, the support that I might
8      need, and then coming together with teams,
9      then potentially, you know, reaching out
10      to district departments to provide maybe
11      some professional development or some
12      other supports and resources as needed.
13  BY MS. DEGTYAREVA:
14      Q.  So the Awareity data that you just
15  talked about, is that sort of an example of some
16  of the anecdotal data that you might have?
17      A.  Awareity could be more of the, like,
18  explicit data in terms of the reporting of
19  concerns. So parents and community members have
20  access to that to report,
21  teachers/administrators have access to that to
22  report. But outside of that and our particular
23  discipline data, a lot of, like I said, the
24  anecdotal comes from conversation.
25      Q.  So you've talked a lot about

Page 97

1  anecdotal data and conversations. Does TUSD
2  have data on a specific -- what specific
3  percentage of its students use defendants'
4  platforms?
5          MR. CUTLER: Objection. Asked and
6      answered.
7          Go ahead, answer again.
8          THE WITNESS: No, we do not. We're
9      not able to track. So, again, we don't
10      have any access to personal devices of
11      students, so we're not able to track
12      how -- what platforms they're using and
13      how often.
14  BY MS. DEGTYAREVA:
15      Q.  And you've also talked today about
16  social media. Does TUSD have any data on how
17  many students use social media applications that
18  are not defendants' platforms?
19      A.  Again back to, again, our discipline
20  data, right. So when we look at disciplinary
21  action, if there's a fight, if there's an
22  aggressive act, if there's improper use of
23  technology, that would be potentially indicated
24  in that data, whatever platform that is being
25  used.

Page 98

1        I don't know that we've done a deep
2 dive into identifying all of the -- which of the
3 platforms are used, we just know that the
4 majority of the platforms that are available we
5 are seeing in high levels of instances of
6 discipline.
7     Q.   So you mentioned, sort of, "the
8 majority of the platforms that are available."
9 Are you referring to specific platforms there?
10       A.   Well, the reality is that there's
11 new platforms that are popping up on a regular
12 basis, so we are seeing instances of any of the
13 available social media platforms that students
14 may be accessing.  We have seen evidence of
15 those being used within our disciplinary data.
16       Q.   So have you, for example, seen -- or
17 have you seen evidence of students using
18 Discord?
19       A.   Yes.
20       Q.   How about X, or formerly Twitter?
21       A.   Yes.
22       Q.   BeReal?
23       A.   Yes.
24       Q.   Reddit?
25       A.   I'm not aware of Reddit being used

Page 99

1 very often, but potentially.
2     Q.   Does TUSD have any data on the
3 amount of time that its students spend on any
4 specific social media site?
5     A.   Not that I'm aware.
6     Q.   And does TUSD have any data on how
7 much time its students spend specifically on
8 defendants' platforms as opposed to any other
9 social media sites?
10       A.   Outside of, again, discipline
11 reporting and conversations with students about,
12 you know, what they're doing on social media,
13 no, we are not explicitly tracking that outside
14 of discipline.
15       Q.   So, again, outside of discipline,
16 does TUSD have any data on what students do when
17 they're on social media apps?
18       A.   Well, I mean, outside of discipline
19 -- we may or may not have discipline instances,
20 but we are seeing evidence of social media use
21 when students are, you know, videoing a fight on
22 campus and then posting it to a Facebook fight
23 page, and then other students are congregating
24 around and having ongoing conversations.
25       Again, anecdotally teachers are

Page 100

1 reporting, you know, students are interrupting
2 class time and going into other classrooms that
3 they're not supposed to be in because they've
4 seen evidence of, Oh, hey, there's going to be a
5 fight here, this was posted here, we saw this
6 video.
7        So, again, outside of discipline
8 data, we are also able to see the anecdotal data
9 of around all the other students that can be
10 involved based on the use of the social media
11 platforms.
12       Q.   Does TUSD have any data showing how
13 much time students spend on the different types
14 of activities that they could be doing on
15 defendants' apps -- or on defendants' platforms?
16       MR. CUTLER:  Object to form.
17       THE WITNESS:  No, not explicitly.
18 BY MS. DEGTYAREVA:
19       Q.   Does TUSD have data on which
20 features of defendants' platforms its students
21 use?
22       A.   Not for -- no.
23       Q.   So does TUSD, for example, know how
24 much time its students spend messaging their
25 friends and family?

Page 101

1     A.   No.
2     Q.   Or how much time students spend
3 creating their own content?
4     A.   If it's, again, connected to
5 discipline, if students are caught with their
6 phones on a campus, then we might have that
7 data, but overall the amount of time, no.
8     Q.   Does TUSD have any data on how much
9 time its students spend watching educational
10 content on defendants' platforms?
11       A.   No.
12       Q.   Has TUSD ever attempted to study the
13 prevalence of harms that are allegedly
14 associated with students' social media use in
15 TUSD?
16       MR. CUTLER:  Object to form.
17       THE WITNESS:  Can you repeat the
18 question?
19 BY MS. DEGTYAREVA:
20       Q.   Sure.
21       Has TUSD ever attempted to study the
22 prevalence of harms that are allegedly
23 associated with students' social media use in
24 TUSD?
25       MR. CUTLER:  Same objection.

26 (Pages 98 - 101)

Page 102

1    THE WITNESS: Again, I would say
2 through analysis of needs in our school
3 system. An explicit survey or an explicit
4 analysis, not necessarily, but through
5 things like the conversations with
6 students around adjusting the code of
7 conduct.
8    And when we, you know, do talk to
9 teachers about, like, what are the needs
10 and the concerns within the school system
11 in our behavior management team meetings
12 and looking at that discipline-level data,
13 some, you know, evidence of analysis can
14 be connected and developed as we, as a
15 whole, as a district, attempt to respond
16 and identify the interventions that might
17 need to be put in place.
18    But anything formal, I am not aware
19 that we've conducted anything explicitly
20 formal that we would be able to provide a
21 report on.
22 BY MS. DEGTYAREVA:
23    Q.  So when you say that some analysis
24 can be developed, what analysis are you talking
25 about?

Page 103

1    A.  Again, review of data. So, again,
2 review of the discipline practices, review of
3 talking with teachers of what are we seeing on
4 campus, how often are, you know, students
5 interrupting classrooms because of use of social
6 media; when we look at school safety data, the
7 number of times, you know, school safety
8 officers were deployed to a school in relation
9 to a social media complaint or disciplinary
10 infraction.
11    Kind of that overall collective
12 identify what is happening in our system, we
13 pride ourselves in keeping our thumb on the
14 pulse of what's happening in our system to then
15 drive the operations and the policies in order
16 to better support our schools and community.
17    Q.  So has TUSD ever conducted such an
18 analysis of review of data?
19    A.  Like I said, we've not explicitly
20 created any sort of report. Again, through our
21 operation, that's just kind of the way that the
22 school district works, is we're not set up in a
23 way to explicitly collect hard data on a regular
24 basis, the majority of the school district
25 operating as what we would consider, like, soft

Page 104

1 data when we're looking at from school to
2 school.
3    So we have 88 schools plus a virtual
4 school that all of them are going to have
5 different needs, and so, again, looking at
6 collective data points trying to get a better
7 idea of what the school systems need to then
8 better be able to ensure that we're meeting
9 those needs to the best of our ability.
10    Q.  Has TUSD ever conducted this type of
11 analysis of soft data?
12    A.  I mean, it's ongoing. We do it all
13 of the time. So all of our schools, again,
14 every school creates, you know, targeted plans
15 for how they're going to address and support
16 their school climate and culture.
17    One thing that we did recognize
18 through, again, that soft data was the need for
19 PBIS, positive behavior intervention supports,
20 on all of our school campuses. And so I do know
21 that our student relations department was tasked
22 with ensuring that every school received four
23 hours of professional development, and that was
24 in the '23-'24 school year, so deploying their
25 staff to provide ongoing training on how to

Page 105

1 implement positive behavior intervention systems
2 on school campuses, how to train and support
3 teachers in how to respond to behaviors.
4    So those kind of soft data then turn
5 into practices where we then identify supports
6 needed.
7    Q.  You mentioned that every school
8 creates targeted plans. Are those plans
9 documented somewhere?
10    A.  So every administrator does go
11 through an evaluation process with their
12 supervisor, the regional assistant
13 superintendent, and part of that evaluation is
14 to create action plans based on school-level
15 data.
16    Q.  And so are those action plans
17 documented somewhere?
18    A.  I imagine they would be with the
19 regional assistant superintendents.
20    Q.  So each regional assistant
21 superintendent would have the action plans for
22 the school they're assigned to?
23    A.  It's part of the evaluation process
24 for the school administrator, so, yes, it would
25 be part of that evaluation.

27 (Pages 102 - 105)

Page 106

1    Q.   And you also gave the example of how
2  you recognize the need for PBIS using soft data.
3  Was there an analysis conducted and documented
4  that then led you to the conclusion that you
5  need PBIS?
6    A.   No.  Again, through conversations
7  and then identifying the overarching need, as we
8  again look at overall school discipline data,
9  recognizing -- and then, again, just through
10  conversational data on the number of students
11  needing to go see the school counselor, the
12  number of students that are needing additional
13  support, that kind of soft data drove us to the
14  explicit practices to ensure we were providing
15  things like professional development for our
16  staff.
17    Q.   So is there any documentation of all
18  of this review that you did of the various soft
19  data?
20    A.   I don't know that that's explicitly,
21  you know, at the district level where we're,
22  again, creating hard data.  The data would be in
23  the practice, so then the practice of
24  implementing the PBIS would be probably the
25  closest amount of hard data that we would be

Page 107

1  able to produce.
2    Q.   You mentioned -- you've been talking
3  about things at the district level at times.
4  Has there been any analysis done at the
5  individual school level?
6    MR. CUTLER:  Object to form.
7  Go ahead.
8    THE WITNESS:  So the district does
9  regularly review different data points.
10  So we've talked about in my
11  preparation of looking at our publicly
12  available school letter grades, so looking
13  at, you know, based on school letter
14  grades per school, what, you know, are the
15  overall responsibility of the school and
16  supports that are needed, similarly to,
17  again, behavioral data.
18  And then also our district does
19  employ a school quality survey, so we
20  survey students, staff, and community
21  members on a yearly basis, so that data
22  would then drive supports needed at
23  potential individual schools.
24  We do ask schools to review that
25  data on a regular basis and then -- along

Page 108

1  with discipline data, to then identify
2  what are the additional supports that are
3  needed on the school campus.
4  BY MS. DEGTYAREVA:
5    Q.   Does the school quality survey, does
6  that include questions about social media use?
7    A.   The school quality survey is about
8  60 questions long, and I'm not recalling the
9  exact questions off the top of my head.
10  BY MS. DEGTYAREVA:
11    Q.   Where would copies of those survey
12  responses be saved?
13    MR. CUTLER:  Object to form.
14    THE WITNESS:  That would be
15  internal, internal data sources with
16  our -- within the district.
17  BY MS. DEGTYAREVA:
18    Q.   Which data sources?
19    A.   Our assessment and evaluation
20  department, they collect and house that data,
21  and then it is shared with school-level
22  personnel.
23    Q.   Is there a database they use to
24  collect and house it?
25    A.   Yes.  So there's a TUSD database

Page 109

1  that is utilized, yes.
2    Q.   And what is that called?
3    A.   Called TUSD Web Data.
4    Q.   What other types of data are in TUSD
5  web data?
6    A.   School letter grades, attendance
7  data.  I'm not sure if discipline data is there.
8  Academic data, so the -- my brain is fried.
9  It's now called AASA, it used to be called AZ
10  Merit, the national testing that we do in the
11  country that we're required to do.
12  So that's that yearly data, you
13  know, ACT data, and then the district also has
14  quarterly benchmarks, academic benchmarks, and
15  so that data would also be housed in there to
16  look at the overall academic.
17    Q.   And just so I'm clear, though, this
18  is a different database than Synergy?
19    A.   Correct.
20    Q.   Does TUSD track how many of its
21  students receive mental health treatment?
22    A.   As much as -- well, we track if we
23  do any sort of referral for mental health
24  treatment.  We do not track -- so that would be,
25  you know, a HIPAA violation.  We don't require

28 (Pages 106 - 109)

Page 110

1 parents to inform us of any of that. However,
2 we do have a system in place where we refer to
3 local behavioral health agencies for mental and
4 behavioral health support.
5     Q.    So if a student sought out mental
6 health treatment without being referred by TUSD,
7 TUSD wouldn't have that data?
8     A.    We may or may not know.
9     Q.    You say you may or may not. In what
10 circumstances would you have data about a
11 student who sought mental health treatment
12 without being referred by TUSD?
13     A.    If a parent disclosed that
14 information to the school district.
15     Q.    And for the data on TUSD referrals
16 of mental health treatment, where is that data
17 tracked?
18     A.    So that is through Arizona Complete
19 Health. We work with that agency, and they help
20 us monitor that referral data.
21         So through the social emotional
22 learning department we collaborate, we have
23 memorandums of understanding with five local
24 health -- behavioral health agencies, and every
25 one of our schools is assigned to one particular

Page 111

1 behavioral health agency. And then our school
2 counselor is the main referrer to that agency
3 with parental support, with parental permission.
4     Q.    So data on every student who is
5 referred to one of those agencies is in Arizona
6 Complete Health system, is that right?
7     A.    Correct.
8     Q.    And what type of data is recorded in
9 that system about the referrals?
10     A.    So that is just the number of
11 referrals. So due to HIPAA, we then do not
12 receive any sort of data back from the agencies
13 on whether or not students are engaging in
14 services or how often, so we just have our
15 number of referrals of students referred to
16 agencies.
17     Q.    Would you receive any data on
18 whether a student is ultimately diagnosed with
19 any mental health condition?
20     A.    Only in the case if there was a
21 release of information. If the parents approved
22 a release of information from the agency to the
23 school, that may be disclosed. But that is not
24 necessarily trackable data. That may just be
25 used internally at the school to identify any

Page 112

1 additional resources that the school may be able
2 to support with.
3     Q.    So for those cases where the parents
4 do disclose diagnosis data, that diagnosis data
5 is not tracked anywhere?
6     A.    Only in terms of if it is then used.
7 If it's used -- if there needs to be like a
8 chronic health certification in the health
9 office or if it's used for any intervention data
10 within the MTSS system, it may be documented.
11 If it's not being used by the school in any way,
12 then, no, it would not be documented.
13     Q.    Does the referral data that's
14 tracked in Arizona Complete Health system, does
15 that include the reason for the referral?
16     A.    It does not.
17     Q.    Does that include any information
18 about whatever interaction led to the student
19 being referred?
20     A.    Not in that data. Our school
21 counselors, again, they facilitate the referral
22 process, and so if a student needs to be
23 referred, that information would be part of that
24 referral process. I believe that information
25 would be FERPA and HIPAA protected.

Page 113

1     Q.    And where is the information about
2 the referral process stored?
3     A.    That is within our -- in the social
4 emotional learning department operating
5 procedures in our SharePoint around what schools
6 are referred where, and then we actually connect
7 the schools with the agencies themselves, and
8 then they work directly with the agencies to
9 identify what that referral process is and
10 whether or not they have a specific referral
11 form.
12     Q.    So this social emotional learning
13 department has a SharePoint that includes
14 information about why students were referred
15 to -- for mental health treatment?
16     A.    No. Just the process of -- just the
17 higher-level information of which schools are
18 assigned to which organization and which agency.
19         But, no, we do not track any of that
20 reason data around why a student may or may not
21 have been referred.
22     Q.    Does anyone else in TUSD track that
23 reason data?
24         MR. CUTLER: Object to form.
25         THE WITNESS: Again, the school

29 (Pages 110 - 113)

1    counselor with parental permission would
2    fill out the referral form that would just
3    have high-level data, would just have
4    demographic data, and it may have the
5    reason of the referral, but then the
6    majority of that information is then
7    collected by the agency itself.
8  BY MS. DEGTYAREVA:
9      Q.   And where are the referral forms
10 stored?
11     A.   We do not store them.  The
12 counselors, they complete their referral, and
13 then it is sent to the referring agency.
14          MS. DEGTYAREVA:  Let's mark -- what
15     exhibit number are we on?
16          MS. REAVES:  5.
17          MS. DEGTYAREVA:  Let's mark tab 5 as
18     Exhibit 5.
19          (Tucson-30(b)(6)-Shivanonda-5 was
20          marked for identification.)
21 BY MS. DEGTYAREVA:
22     Q.   Do you recognize this document?
23     A.   Yes, I do.
24     Q.   And if you turn to page 6 of this
25 document, you'll see question number 9.  It

1  says, "Provide the number of students in your
2  district referred for mental health services, if
3  such referrals are tracked."
4          And then there's a chart with some
5  numbers.
6          Do you see that?
7      A.   Yes.
8      Q.   So does this data come from that
9  Arizona Complete Health system that we've been
10 talking about?
11     A.   So this data would include that.
12 This data also would include if students are
13 referred for any mental health support services
14 on school campuses, so the number of students
15 who may have been referred to a school counselor
16 or to maybe a restorative practices facilitator
17 or a school social worker.
18     Q.   And so where is that data about --
19 if students are referred for mental health
20 support services on school campuses, where is
21 that data stored?
22     A.   So that would be dependent upon the
23 department.  So, for example, school counselor
24 referrals would be collected in the school
25 counselor department; referrals for maybe our

1  student equity services would be -- would be
2  kept within that department.  It would be
3  department specific.
4      Q.   So to put together this additive
5  number of student referrals, what are the
6  different databases that you would need to look
7  at?
8      A.   Most likely would need to be a
9  conversation with the leader of that department
10 to collect that data.
11     Q.   And what are the -- what are all the
12 departments that would have to be involved in
13 those conversations?
14     A.   I am not 100 percent sure which of
15 the departments were involved in these numbers.
16 I know for sure would be school counseling,
17 potentially social work.  Our social work
18 department is kind of split, so I don't know if
19 these would include any of our exceptional ed
20 students.
21          Majority of our social workers only
22 provide support to exceptional ed student.  We
23 do have some general ed social workers, so that
24 may be tracked in here.  And then that would
25 probably be data within our assistant

1  superintendents or regional assistant
2  superintendents.
3      Q.   So each of the departments you
4  mentioned, plus the assistant superintendents or
5  regional assistant superintendents, would have
6  data about these various referrals?
7          MR. CUTLER:  Object to form.  Asked
8      and answered.
9  BY MS. DEGTYAREVA:
10     Q.   You may answer.
11     A.   Yes.
12     Q.   And for any of the referrals that
13 are students being referred internally for
14 mental health services within the school, does
15 TUSD have any records of why the students were
16 referred?
17     A.   Most likely, again, that would
18 probably be through our multi-tiered system of
19 support process.  So when students are referred
20 for additional supports, it generally goes
21 through that centralized process.
22     Q.   And that would, again, be the
23 multi-tiered system support data in Synergy?
24     A.   Yes.
25     Q.   And then for the students who are

Page 118

1 referred to the internal school mental health
2 services, does TUSD have any data on any
3 diagnosis that they may receive from a TUSD
4 professional?
5 A. TUSD, we do not diagnose students
6 with any disorders. We are not clinicians or
7 medical staff.
8 Q. Is TUSD aware of any student who has
9 a diagnosis from a medical professional that the
10 student is addicted to social media?
11 A. I'm not sure that I can answer that
12 question. I don't know -- I don't know if that
13 is currently a diagnosis in the DSM-5.
14 Q. Are you aware of any such diagnosis
15 of a TUSD student?
16 A. I am not, but I don't know all of
17 the diagnoses of all 40,000 students across the
18 district.
19 Q. Is TUSD aware of any student who has
20 a diagnosis from a medical professional that the
21 student was harmed by social media, that their
22 mental health was harmed by social media?
23 A. That's a difficult question. Again,
24 when we're working with diagnoses, we don't
25 always know. There's FERPA and HIPAA

Page 119

1 regulations in terms of being able to disclose
2 some of that information, so that would be
3 difficult for me to ascertain. We don't -- and
4 unless you have an IEP for a specific category,
5 we don't necessarily track that because that,
6 again, is HIPAA.
7 Q. So, again, sitting here today are
8 you aware of any student who has a diagnosis
9 from a medical professional that the student's
10 mental health was harmed by social media?
11 MR. CUTLER: Objection. Form, asked
12 and answered.
13 You can answer again.
14 THE WITNESS: Again, I don't know
15 student explicit numbers. I can tell you
16 that we -- and through school counseling
17 department, we know of students who may
18 have engaged in intensive either inpatient
19 or outpatient in regards to suicide
20 ideation, and through that there may be --
21 we do often see or hear of connections of
22 social media. Do I know of any explicit
23 diagnosis? No, not off the top of my
24 head.
25 ///

Page 120

1 BY MS. DEGTYAREVA:
2 Q. You said you often see or hear of
3 connections of social media.
4 Are you referring to information
5 that you see or hear from medical professionals?
6 A. We do actually collaborate with
7 community agencies and medical professionals and
8 have had, again, anecdotal conversations around
9 the use of social media and the harm. I've also
10 done quite a bit research around youth social
11 media and youth mental health.
12 I'm sorry. Can you repeat the
13 question?
14 Q. Sure.
15 You talked about students where
16 there was -- you see or hear of some connection
17 of social media. I'm just wondering if it's
18 your testimony that you are aware of a medical
19 professional that has identified some student in
20 TUSD whose mental health was harmed by social
21 media, some specific student.
22 MR. CUTLER: Object to form.
23 THE WITNESS: No. Again, HIPAA
24 generally prevents us in knowing direct
25 diagnoses. We are unable to generally

Page 121

1 talk with medical professionals around
2 diagnoses.
3 MS. DEGTYAREVA: Okay. Let's mark
4 as -- what's this exhibit?
5 MS. REAVES: 6.
6 MS. DEGTYAREVA: Let's mark as
7 Exhibit 6 tab 4.
8 THE WITNESS: I don't know if it
9 matters, but my name is spelled
10 incorrectly.
11 MR. CUTLER: That's okay.
12 (Tucson-30(b)(6)-Shivanonda-6 was
13 marked for identification.)
14 BY MS. DEGTYAREVA:
15 Q. Ms. Shivanonda, are you familiar
16 with the document that's been marked as
17 Exhibit 6?
18 (Witness reviewing document.)
19 A. Yes, I am. I am aware of this.
20 Q. One moment.
21 So this is labeled Plaintiff Fact
22 Sheet - School Districts. And can you please
23 turn to page 27?
24 Do you see under question 38 it
25 says, "Health Services collects data on

31 (Pages 118 - 121)

Page 122

1 medical-related conditions, signs, and symptoms.
2 The current electronic health record (EHR)
3 reports 'behavioral' codes and conditions only."
4 　　　So this Health Services collects
5 data and medical-related conditions. What data
6 is that referring to?
7 　　A. So, again, if the diagnosis is
8 provided from parents, then -- and especially if
9 it would be considered impairing the academic
10 learning environment, this information might be
11 part of their health record, their school health
12 record.
13 　　Q. So the Health Services data would be
14 information that's self-reported by the parents,
15 is that right?
16 　　A. Yes. Parents fill out medical cards
17 or information, and then depending upon what
18 they want to include, then it will be in that
19 data.
20 　　Q. Is this different than the referral
21 data that we were just talking about?
22 　　A. Yes.
23 　　Q. Actually, going back to the -- just
24 a quick question on the referral data that I
25 forgot to ask you.

Page 123

1 　　　In the chart we were just looking at
2 in the prior exhibit, it has data going back to
3 the school year of 2018 to 2019, and it says
4 data not available for 2017 through 2018.
5 　　　Is any referral data available
6 before the 2018-2019 school year?
7 　　A. I am not sure. Again, we had a
8 change of platforms, and then our referral to
9 behavioral health agencies did not start until
10 2018. And, again, with the change in the
11 platforms, I cannot speak to whether or not that
12 data would be available.
13 　　Q. So before 2018, TUSD was not
14 referring students to outside mental health
15 services?
16 　　A. Not as explicitly as we are now. In
17 2018 we began the explicit MOU process. First
18 for -- so prior to that counselors may, you
19 know, work with parents and may have shared, you
20 know, here's resources available in the
21 community and they would maybe direct parents,
22 but in 2018 we began facilitating more of an
23 explicit referral process through collaboration.
24 　　　MS. DEGTYAREVA: Let's mark as
25 Exhibit 7 tab 42.

Page 124

1 　　　(Tucson-30(b)(6)-Shivanonda-7 was
2 　　　marked for identification.)
3 BY MS. DEGTYAREVA:
4 　　Q. And tab 42, so this is an Excel
5 sheet, a large Excel sheet that could not be
6 printed. So what I'm going to pass you is just
7 a slipsheet, but the Excel itself we're going to
8 pull up on a screen.
9 　　A. Okay.
10 　　Q. And can you please go -- scroll over
11 to the tab labeled HLT 601, all the way to the
12 right. If you click on the three dots, it
13 should come up. So the three dots next to HS
14 9th grade. Yeah, there you go. HLT 601. Okay.
15 　　　So taking a look at this tab labeled
16 HLT 601, it lists a number of conditions, codes,
17 and years.
18 　　　Is this -- well, what is this data?
19 　　A. I am not familiar with this
20 spreadsheet.
21 　　Q. Okay. You don't know if this is the
22 same data that we were just talking about that
23 was collected by Health Services?
24 　　A. So I received the Plaintiff Fact
25 Sheet, but I did not review this attached Excel

Page 125

1 spreadsheet.
2 　　Q. And just for the record, the Excel
3 spreadsheet is not attached. This is just a
4 different document.
5 　　　So I'm just asking if you know
6 whether this is the same data or not.
7 　　　MR. CUTLER: That's the question.
8 Do you know whether it is or not?
9 　　　THE WITNESS: I do not.
10 BY MS. DEGTYAREVA:
11 　　Q. Okay. Do you have any idea where
12 the information in this spreadsheet that we're
13 looking at comes from?
14 　　　MR. CUTLER: Do you need to review
15 　　the spreadsheet or anything?
16 　　　THE WITNESS: That would be great.
17 Am I able to review the spreadsheet?
18 BY MS. DEGTYAREVA:
19 　　Q. Sure. If you want to -- is there a
20 specific tab you want to review that would be
21 helpful for you? If you can look down on the
22 bottom, there are a number of tabs.
23 　　A. Can you go back to maybe the first
24 tab?
25 　　　MR. CUTLER: Can you tell her what

32 (Pages 122 - 125)

Page 126

1  this is?
2      MS. DEGTYAREVA: I truly don't know,
3  which is why we're asking.
4      MR. CUTLER: Well, I don't think she
5  has any foundation to answer questions
6  about this.
7      MS. DEGTYAREVA: Whether she was --
8  what's the topic?
9      MR. CUTLER: I understand that there
10 are topics, but if we don't even know what
11 the spreadsheet is, I'm not sure how you
12 expect her to answer questions on it.
13     MS. DEGTYAREVA: That's the point of
14 designating a 30(b)(6) witness, so that we
15 can find out information.
16     MR. CUTLER: You can put any
17 spreadsheet in front of them and ask
18 questions about it?
19     MS. DEGTYAREVA: It's a spreadsheet
20 by TUSD that appears to relate to a topic
21 that she was designated on. If she
22 doesn't know, that's where we are, but
23 we're entitled to ask her.
24     MR. CUTLER: That's what she said.
25     ///

Page 127

1  BY MS. DEGTYAREVA:
2      Q.  Well, Ms. Shivanonda, if you look at
3  the slipsheet that we gave to you, you'll see
4  there's a metadata form, which includes a file
5  name that says "2024-2025 WAM Workbook."
6      A.  Okay.
7      Q.  Does that title have any meaning to
8  you?
9      A.  It does not, but I do know that if
10 it comes from Joseph Gau, director of Health
11 Services, I imagine this would be information
12 from the Health Services department.
13     Q.  But, again, you're not aware of
14 anything relating to that tab we're looking at?
15     A.  I am not.
16     Q.  And then just to confirm, can we go
17 back to the spreadsheet and look at the tab
18 labeled HLT 603?
19         Do you know anything about the
20 information that's listed in this tab or where
21 it comes from?
22     A.  I do not. It looks as though this
23 would be -- this looks as though -- so our
24 health office assistant, this looks as though
25 these would be the services that they had

Page 128

1  provided to students, looks like that's their
2  documentation.
3      Q.  And under the description, do you
4  know who is responsible for inputting that
5  description?
6      MR. CUTLER: Object to form. Lacks
7  foundation.
8      THE WITNESS: I don't.
9      MS. DEGTYAREVA: Can we please mark
10 for the record Exhibit 8, which is going
11 to be tab 3.
12         (Tucson-30(b)(6)-Shivanonda-8 was
13         marked for identification.)
14 BY MS. DEGTYAREVA:
15     Q.  Ms. Shivanonda, are you familiar
16 with this document?
17         (Witness reviewing document.)
18     A.  Yes.
19     Q.  This is titled Plaintiff's Third
20 Amended Answers to Defendants' Interrogatories
21 to Tucson Unified School District (Set 1).
22         Then if you turn to page 8, under
23 Interrogatory Number 3, do you see where it
24 says, "Separately identify and describe
25 (including the date, location, nature and

Page 129

1  extent, and cost of repair or replacement) every
2  instance of vandalism, property damage, or
3  criminal action you contend occurred as a result
4  of Online Media and Communications Services."
5      Do you see that?
6      A.  I do see that.
7      Q.  Going on to the next page, starting
8  on 9, page 9, there's a chart that spans several
9  pages and goes until page 14.
10         Were you involved in preparing this
11 chart?
12     A.  I was not.
13     Q.  Do you have personal knowledge of
14 any of the incidents that are listed in this
15 chart?
16     A.  I have -- I have some overall
17 knowledge, yes. I don't have specific
18 knowledge.
19     Q.  Does TUSD attribute all of these
20 instances to social media?
21     A.  Yes.
22     Q.  And what is TUSD's basis for
23 attributing these incidents to social media?
24     A.  Time frame, and then reporting
25 documents. So connection with any of the

33 (Pages 126 - 129)

1 Facebook/TikTok challenges that were in that
2 time frame, and then the reports from school
3 personnel to report the reasons behind why they
4 needed these -- fixes needed to be fixed.
5    Q.   How did TUSD identify the incidents
6 that were -- that it attributed to social media?
7    A.   Again, part of the reporting process
8 to request a facilities or maintenance request,
9 there are specific components in the requests,
10 so school staff will denote a reason behind why
11 they need a particular facility's request to be
12 completed.
13    Q.   And where is the data about those
14 requests stored?
15    A.   That would be within our facilities
16 and maintenance database.
17    Q.   Does that database have a name?
18    A.   It eludes me at the moment.
19    Q.   And so that database would include a
20 narrative response that explains the reason for
21 the incident?
22    A.   Correct, yes.  So whenever -- again,
23 when there's a facilities request made, the
24 school or the personnel will denote the date,
25 what was vandalized, where, what needs to be

1 fixed and why.
2    Q.   Did TUSD take any steps to verify
3 that these instances of vandalism listed in the
4 charts were, in fact, related to social media
5 platforms?
6    A.   I can't speak to every one, but I do
7 know that as part of the investigative process,
8 especially at these higher level, there's
9 generally an investigation around what has
10 particularly happened.
11      And then, as you can see, kind of
12 categories and time frames, they all correspond
13 to specific social media challenges, so
14 backwards mapping, and then having conversations
15 with students and investigating some of the
16 reasons.
17      Like I said, I can't speak to every
18 single, but I do know that many of them were
19 investigated.
20    Q.   And are the details or results of
21 those investigations, is that recorded anywhere?
22    A.   If a perpetrator, so to speak, was
23 identified, then it would be within the
24 disciplinary database.  But if it could not
25 identify a specific person who did the damage,

1 it may or may not be indicated in any of those
2 databases.
3    Q.   Now, you mentioned that the time
4 frames listed here correspond to some specific
5 social media challenges.
6      Can you please provide more
7 information about that?
8      MR. CUTLER:  Object to form.
9      THE WITNESS:  So, again, staying on
10   the pulse of what's happening, so, for
11   example, we know that there was a lot of
12   social media challenges, TikTok challenges
13   within a lot of these time frames where
14   there were videos that were posted that
15   were encouraging students to slap their
16   teacher and take a video of it, of ripping
17   off sinks, ripping off paper towel
18   dispensers, soap dispensers.
19      So there was a lot of challenges
20   that were being posted that many of our
21   students felt the need to emulate and then
22   basically get, you know, likes and
23   accolades for.  So a lot of these would
24   correspond to some of those specific
25   challenges that we knew of that were

1   occurring during that time frame.
2 BY MS. DEGTYAREVA:
3    Q.   So can you explain which of these
4 incidents correspond to which social media
5 challenge?
6      MR. CUTLER:  Object to form.
7      THE WITNESS:  Again, there's so many
8   dates here and so many.  I couldn't speak
9   to specifics without going through and
10   evaluating all of the data that we may
11   have.
12 BY MS. DEGTYAREVA:
13    Q.   Just sitting here today looking at
14 the chart, are there any that jump out at you as
15 ones you can identify as being associated with a
16 specific challenge?
17    A.   A lot of the bathroom -- the
18 bathroom specific ones were definitely.  Some of
19 the ceiling tiles and vandalizing, some of those
20 were also, things like steal this, steal that.
21 The sinks.  A lot of the bathroom was a big
22 component of those challenges.  I know that for
23 sure.
24    Q.   So when identifying these incidents,
25 did TUSD include -- so, for example, if there

1 was a social media challenge related to
2 bathrooms at a particular time, did TUSD include
3 every instance of vandalism that happened in a
4 bathroom at that time?
5     A.   That, I'm not sure of.  I imagine
6 somewhere, if there wasn't a need for a fix, it
7 may or may not have been.  It may have all been
8 just looped in to, you know, Henry Elementary
9 bathroom vandalism.
10     So I can't speak to all of the
11 specifics, again, without being able to see all
12 of the particular facility's requests.
13     Q.   Do you know if for each of these
14 incidents there would be a record somewhere that
15 specifically ties the incident to a social media
16 challenge?
17     A.   Again, I believe I've answered that,
18 but it, again -- it would determine if I were to
19 look at the specific facility request.
20     Q.   I think my question is, do you know
21 if, for each of these, the facility request, it
22 specifically stated that it was a result of a
23 social media challenge?
24     A.   I do not know if every single one of
25 these would have a social media challenge

1 specifically noted in the facility's request.  I
2 have not reviewed every single facility's
3 request.
4     Q.   Does TUSD have any basis to believe
5 that defendants promoted or encouraged any of
6 the challenges that you were referencing?
7     Can you repeat the question?
8     Q.   Sure.
9     Does TUSD have any basis to believe
10 that defendants promoted or encouraged any of
11 the social media challenges that you were just
12 referencing?
13     A.   Well, I would say that the inherent
14 nature of the platforms and the creation of the
15 likes and the reposts and whether or not you can
16 go viral and the way that the algorithms work on
17 certain platforms, on what gets viral, what's
18 not, I would gauge to say that yes, that they
19 would have some knowledge and promotion of that
20 just in the way that inherent algorithms work
21 within the platforms.
22     The component of the likes and the
23 love and the repost and the reshares, that is, I
24 would say, evidence in the way that it's created
25 to continuously create an opportunity for

1 students to want to engage and get the likes and
2 get the clout, so to speak, from engaging in
3 those instances on social media, yes.
4     Q.   And other than the incidents
5 identified in this chart, are you aware of any
6 other property damage that TUSD believes it
7 suffered as a result of social media?
8     A.   That would be difficult because I've
9 not memorized all of these.  I do know that --
10 for example, I do know that -- can you repeat
11 the question?  I apologize.
12     Q.   Sure.
13     Apart from the incidents that are
14 listed in this chart, are you aware of any other
15 property damage that TUSD believes it suffered
16 as a result of social media?
17     A.   So at a higher level, again, making
18 kind of that causal link between social media
19 and property damage, what we are seeing is that
20 due to either students being left out on social
21 media or if they're social media posts or -- and
22 then also a lot of -- there's a lot of, like,
23 fight pages where students are videoing other
24 students on campus in a fight, and then what
25 happens then is either the fight breaks out,

1 something might get broken.  We do know of other
2 people actually getting hurt on school campus
3 and property.  We've had teachers that are
4 getting pushed and hurt.
5     I don't know if any of our other
6 information on here, such as we were having
7 desks flipped and things were thrown in
8 classrooms, and we are attributing that to,
9 again, the disruption of the use of social media
10 and the way that it's affecting students being
11 able to regulate their emotions.
12     And so it may not be explicit on
13 here, but we have seen, like I said, tables are
14 being flipped.  We've got even elementary
15 students that are flipping chairs, where we have
16 to evacuate students when we've got tables
17 broken, teachers' desks are broken, books are
18 ripped up, things are thrown.
19     And so all of that has a direct
20 causal link to what we're seeing as an increase
21 of anxiety, depression, social isolation,
22 students not being able to problem-solve and
23 being able to regulate themselves as a response
24 to what they're seeing and what they're engaging
25 on on social media.

35 (Pages 134 - 137)

1      So, yes, I would say that there's
2  probably quite a bit that is not indicated on
3  here, and, again, that would be kind of more of
4  our soft data where we may or may not be
5  explicitly collecting that data in any sort of
6  database.
7      Q.   So you don't have any data that
8  shows that there are any other -- there's any
9  other property damage that is directly tied to
10  social media?
11      MR. CUTLER:  Object to form.  Asked
12      and answered.
13      THE WITNESS:  Again, causation data,
14      right, discipline data, anecdotal data as
15      we talk with teachers.
16      It's not always reported if
17      teachers' personal property is damaged,
18      which we know that it is on a regular
19      basis in school classrooms.
20      We know that there's many instances
21      where student personal devices are stolen
22      on campus, and then the time that it takes
23      for, you know, investigations.  I guess
24      that's not property damage, so to speak.
25      But, yes, there's causation data

1      that we could glean from some of our
2      disciplinary data.
3  BY MS. DEGTYAREVA:
4      Q.   And, Ms. Shivanonda, again, I'm
5  talking about property damage.
6      Are you aware of any data showing
7  that there's any other property damage not
8  mentioned here that is directly caused by social
9  media?
10      MR. CUTLER:  Object to form.  Asked
11      and answered.
12      Answer again.
13      THE WITNESS:  Correct.
14      Again, through disciplinary data,
15      yes.  So it may not have been to the level
16      of we're putting in a facilities request,
17      but, again, because of fights on campus,
18      because of the uproar that happens because
19      of the use of social media, we are seeing
20      potential other property damage that may
21      or may not be included in here, yes.
22  BY MS. DEGTYAREVA:
23      Q.   And the disciplinary data that
24  you've been talking about, is that the Synergy
25  data?

1      A.   Correct.
2      Q.   So would that be sort of in the
3  narrative section of Synergy that there would be
4  a tie to social media?
5      A.   Correct.
6      MS. DEGTYAREVA:  I think we've been
7      going for close to an hour and a half.
8      Would now be a good time for a break?
9      MR. CUTLER:  Sounds good.
10      THE VIDEOGRAPHER:  We're going off
11      record.  The time is 4:59.
12      (Whereupon, a recess was taken.)
13      THE VIDEOGRAPHER:  We're going back
14      on record.  The time is 5:19.
15      MS. DEGTYAREVA:  Let's mark as
16      Exhibit 9 tab 8.
17      (Tucson-30(b)(6)-Shivanonda-9 was
18      marked for identification.)
19  BY MS. DEGTYAREVA:
20      Q.   Ms. Shivanonda, do you recognize
21  this document?
22      A.   I do.
23      Q.   What is it?
24      A.   This is a TUSD policy.
25      Q.   And specifically is this the policy

1  on cellphone usage?
2      A.   It is.
3      Q.   Now, TUSD's policy does not ban
4  cellphone from campus, right?
5      A.   Correct.
6      Q.   It states that cellphones may be
7  used on or off campus before or after school,
8  correct?
9      A.   Correct.
10      Q.   And it states that cellphones may be
11  used by high school students during lunch,
12  right?
13      A.   Correct.
14      When was this updated?  Is there a
15  date when it was updated?  There may be an
16  updated version.
17      Q.   Do you remember when this policy was
18  last updated?
19      A.   I just reviewed the policy recently.
20  So this one says, "Revision:  August 25, 2006."
21      Q.   Has the policy been updated since
22  this time?
23      A.   I believe it may have.
24      Q.   And under the current policy, are
25  cellphones allowed to be used on or off campus

36 (Pages 138 - 141)

Page 142

1 before or after school?
2     A.   Yes.
3     Q.   And under the current policy, are
4 high school students allowed to use cellphones
5 during lunch?
6     A.   Under the current policy, that
7 provides authorization for additional -- or for
8 administrators to determine any cellphone use
9 guidelines on their school campus, so I believe
10 the new one removes the "during lunch for high
11 school students only."
12     Q.   Where would a copy of this policy,
13 the current policy, be found?
14     A.   On the TUSD governing board website.
15     Q.   And under the current policy -- so
16 in this version it says cellphones may be used
17 by elementary and middle school students during
18 lunch periods if an administrator approval had
19 been obtained, is that right?
20     A.   So, yes.  So in the new updated
21 policy, the guidelines are dependent upon
22 administrator discretion.
23     Q.   And just for the record, this is the
24 policy that was produced with the PFS in this
25 case, but it's your testimony that this policy

Page 143

1 is not current?
2         MR. CUTLER:  I'm going to object to
3     the form.
4 BY MS. DEGTYAREVA:
5     Q.   So it is your testimony that this
6 policy that was produced with the PFS is not
7 current?
8         MR. CUTLER:  This was produced with
9     the PFS?
10         MS. DEGTYAREVA:  This was produced
11     with the PFS.
12         MR. CUTLER:  It's marked 159360?
13 BY MS. DEGTYAREVA:
14     Q.   So it's your testimony that this
15 policy is not current, is that right?
16         MR. CUTLER:  I'm going to object.
17     Misstates the testimony.  I think she said
18     it might not be current.
19         THE WITNESS:  From my understanding,
20     I believe that there is an updated policy,
21     especially if this revision says
22     August 25th, 2006.
23 BY MS. DEGTYAREVA:
24     Q.   You know what, why don't we pull up
25 the -- you said it was on the governing board

Page 144

1 website?
2     A.   Mm-hmm.
3     Q.   Okay.  Why don't we pull that up.
4         MS. DEGTYAREVA:  Can we take a
5     minute break so we can find that?
6         MR. CUTLER:  Sure.
7         MS. DEGTYAREVA:  Let's go off the
8     record.
9         THE VIDEOGRAPHER:  We're going off
10     record.  The time is 5:23.
11         (Discussion off the record.)
12         THE VIDEOGRAPHER:  We're going back
13     on record.  The time is 5:25.
14 BY MS. DEGTYAREVA:
15     Q.   Okay.  Ms. Shivanonda, we were just
16 talking about this use of cellphones and other
17 electronic signaling devices' policy regulation.
18 And just for the record, we have confirmed that
19 this is the version that is available currently
20 on TUSD's website of the policy regulation.
21         So in this policy regulation that is
22 currently on TUSD's website, it states that
23 cellphones may be used on or off campus before
24 or after school, correct?
25     A.   Correct.

Page 145

1     Q.   And, again, this policy regulation
2 states that cellphones may be used during lunch
3 for high school students only?
4     A.   That is what this says, yes.
5     Q.   This policy regulation states that
6 cellphones may be used by elementary and middle
7 school students during lunch periods if they
8 have administrative approval, correct?
9     A.   Correct.
10     Q.   It also says that cellphones may be
11 used on field trips or excursions at -- excuse
12 me, if they are allowed.  Excuse me.  Strike
13 that.
14         It says may be used for educational
15 activities if a teacher approves, correct?
16     A.   Correct.
17     Q.   And it says that if a teacher or
18 coach approves, it may be used during -- they
19 may be used during extended trips and sporting
20 events, correct?
21     A.   Correct.
22         MS. DEGTYAREVA:  Let's mark tab 11
23     as Exhibit 10.
24         (Tucson-30(b)(6)-Shivanonda-10 was
25         marked for identification.)

37 (Pages 142 - 145)

Page 146

1 BY MS. DEGTYAREVA:
2    Q.   Ms. Shivananda, I'll represent to
3 you that this is a printout from a website of a
4 company called Yondr.
5         Do you know what Yondr is?
6    A.   I do.
7    Q.   What is it?
8    A.   It is a company that creates pouches
9 that can be locked for students to put
10 cellphones in so they don't have access to them.
11   Q.   And so if a student puts their phone
12 into a Yondr pouch, the student then isn't able
13 to use the phone, correct?
14   A.   Correct.
15   Q.   And the student can keep the locked
16 pouch with them, they just can't access the
17 phone, right?
18   A.   Correct.
19   Q.   Now, Yondr services are available to
20 school districts, is that right?
21   A.   At a cost.
22   Q.   And TUSD has actually used Yondr
23 services before, right?
24   A.   Yes.  It was used at one high
25 school.

Page 147

1    Q.   Which high school was that?
2    A.   Tucson High.
3    Q.   And it was used at Tucson High for
4 just one school year, right?
5    A.   Correct.
6    Q.   That was the 2019 through 2020
7 school year?
8    A.   Correct.
9    Q.   And in that one school for the year
10 it was used, TUSD only used the Yondr pouches
11 for math and English language arts classes,
12 right?
13   A.   Correct.
14   Q.   Now, have there been any other times
15 TUSD has used Yondr on any of its campuses?
16   A.   Not that I'm aware of at the
17 district level we supported Yondr.  Schools also
18 have the autonomy for identifying maybe other
19 resources, but I'm not aware of other schools
20 explicitly using Yondr.
21       MS. DEGTYAREVA:  Let's go and mark
22 Exhibit 11.  Let's mark tab 14 as
23 Exhibit 11.
24       (Tucson-30(b)(6)-Shivananda-11 was
25       marked for identification.)

Page 148

1 BY MS. DEGTYAREVA:
2    Q.   Ms. Shivananda, do you see that this
3 is an e-mail chain titled Yondr for Tucson High
4 Magnet School?
5         Do you see that?
6         MR. CUTLER:  Take your time to
7    review the whole document.
8         (Witness reviewing document.)
9 BY MS. DEGTYAREVA:
10   Q.   Let me know when you're ready.
11       (Witness reviewing document.)
12   A.   Okay.
13   Q.   This is an e-mail chain with a
14 subject line Yondr for Tucson High Magnet
15 School, right?
16   A.   Yes.
17   Q.   Tucson High Magnet School, is that
18 the same Tucson High that we were just talking
19 about?
20   A.   Yes.
21   Q.   And if you look on the e-mail that
22 starts at the bottom of page 1 from Shawna
23 Rodriguez, June 12, 2019.
24       Who is Shawna Rodriguez?
25   A.   At that time she was the current

Page 149

1 principal of Tucson High.
2    Q.   And going to the next page which
3 ends in Bates numbers 609, you'll see it says,
4 "Here is our plan:"
5         And then the first bullet is a
6 "Needs Assessment:"
7         Do you see that?
8    A.   Mm-hmm.
9    Q.   So this "Needs Assessment" listed
10 some of the reasons that Tucson High Magnet
11 School wanted to try Yondr pouches, right?
12   A.   That's what it looks like, mm-hmm.
13   Q.   And some of the things listed here
14 include, "Truancy or extensive time away from
15 class due to cell phone use of meeting up with
16 friends or ordering food through Uber Eats, Grub
17 Hub etc."
18       Right?
19   A.   Mm-hmm.
20   Q.   Also this "Coordinate of fights,
21 drug transactions, meeting up with
22 girlfriend/boyfriends that can lead to
23 inappropriate behavior."
24       Right?
25   A.   Mm-hmm.

38 (Pages 146 - 149)

Page 150

1    Q.  "Invitation to classes where there
2  is a substitute teacher having students who are
3  not on the roster to 'hangout' in the class
4  since the sub is unfamiliar with the class; this
5  has also led to in-class fights."
6        Do you see that?
7    A.  Mm-hmm.
8    Q.  So all of these are issues that
9  could involve cellphones, right?
10   A.  Yes.
11   Q.  But some of these actually expressly
12 call out other apps like Uber Eats and Grubhub
13 that are not social media, right?
14   A.  Yes.
15   Q.  And other things listed here like
16 meeting up with a girlfriend or boyfriend are
17 things that can be done via social media, via
18 text message, correct?
19       MR. CUTLER:  Object to form.
20       THE WITNESS:  Correct, I imagine.
21 BY MS. DEGTYAREVA:
22   Q.  Does TUSD have data showing what
23 percentage of these types of communications were
24 made via text message as opposed to social media
25 apps?

Page 151

1        MR. CUTLER:  Object to form.
2        THE WITNESS:  So when we think about
3  data -- we've talked about soft data,
4  right?  So in our discipline data, we can
5  see a trend of the majority of students
6  are utilizing social media apps for their
7  connection.
8        When we have had opportunities to
9  talk with students, the majority of
10 students do report that they don't
11 generally use SMS text, they text via
12 Instagram or via Facebook.
13       So it doesn't explicitly call that
14 out here, but from our anecdotal data and
15 then our discipline data, it does -- there
16 is an evidence of social media use to --
17 that's generally the most used method for
18 texting.
19 BY MS. DEGTYAREVA:
20   Q.  And again this discipline data that
21 you're relying on for this is the Synergy data,
22 the narrative sections of the Synergy data?
23       MR. CUTLER:  Object to form.
24       THE WITNESS:  Correct.  That's part
25 of it, yes.

Page 152

1  BY MS. DEGTYAREVA:
2    Q.  And the conversations with students,
3  are those recorded in any data source?
4    A.  Again, not necessarily.  So it's
5  difficult -- a lot of the work that we do again
6  is in conversation and anecdotal data.  I can't
7  speak to what Shawna did in this time, but we
8  often will just talk with students and identify,
9  like, how are you using your cellphones to try
10 to get a better handle on it.
11       So that could be considered data,
12 yes.
13   Q.  Now, this -- the Needs Assessment in
14 this e-mail, in this Needs Assessment, Shawna
15 Rodriguez never used the words "social media,"
16 right?
17   A.  Correct.
18   Q.  She never mentioned any of
19 defendants' platforms by name in this Needs
20 Assessment, right?
21   A.  Correct.
22   Q.  And she did mention some other apps
23 by names here, correct?
24   A.  Correct.
25       MS. DEGTYAREVA:  Now let's mark as

Page 153

1        Exhibit 12 tab 13.
2            (Tucson-30(b)(6)-Shivanonda-12 was
3            marked for identification.)
4  BY MS. DEGTYAREVA:
5    Q.  Ms. Shivanonda, do you see at the
6  top here it says Cell Phone Feedback for Quarter
7  1 - 110 Teachers Total Separated By Department
8  and YONDR and Non-YONDR?
9        Do you see that?
10   A.  I do.
11       Can I take a second to review this
12 document.
13   Q.  Sure.  Yeah.  Let me know when
14 you're ready.
15       (Witness reviewing document.)
16   A.  Okay.
17   Q.  So these are survey results from the
18 first quarter that Tucson High Magnet School was
19 using Yondr, correct?
20       MR. CUTLER:  Objection.  Lacks
21 foundation.
22       THE WITNESS:  It looks as though.
23 BY MS. DEGTYAREVA:
24   Q.  And 110 teachers were surveyed?
25   A.  That is what it says.

39 (Pages 150 - 153)

Page 154

1    Q.   Now, this survey appears to be
2 broken down by teachers in different subjects,
3 ELA (19), Math (22), Fine Arts (13), and so on,
4 right?
5    A.   Yes.
6    Q.   And only the math and ELA classes
7 are the ones that used Yondr, correct?
8    A.   That is my understanding, yes.
9    Q.   And just if you could quickly go
10 back to the prior exhibit which was the e-mail
11 from Shawna Rodriguez, at the bottom of page --
12 of the first page, Ms. Rodriguez says, "I am
13 really eager to implement our cell phone policy
14 this year."
15       Do you see that?
16    A.   Yes.
17    Q.   So taking you back to exhibit --
18 sorry, exhibit we were just looking at of the
19 survey results --
20       MR. CUTLER:  12.
21 BY MS. DEGTYAREVA:
22    Q.   -- Exhibit 12.
23       So this survey includes teachers'
24 responses to the new cellphone policy from
25 classrooms that use Yondr and then from

Page 155

1 non-Yondr classrooms as well, correct?
2       MR. CUTLER:  Object to form.
3    Foundation.
4       THE WITNESS:  That is what this
5    looks like, yes.
6 BY MS. DEGTYAREVA:
7    Q.   And based on the results of this
8 survey, a lot of the teachers found the new
9 cellphone policy to be effective, right?
10       MR. CUTLER:  Foundation.
11       THE WITNESS:  Based on this, it
12    appears the numbers are higher for
13    effective than ineffective.
14 BY MS. DEGTYAREVA:
15    Q.   So teachers in the math and ELA
16 classes who were using Yondr, there's some
17 comments here showing that they found the policy
18 to be effective at reducing cellphone use,
19 correct?
20       MR. CUTLER:  Object to form.
21    Foundation.
22       THE WITNESS:  Based on my review of
23    these, yes, it does seem like there's
24    positive responses.
25       ///

Page 156

1 BY MS. DEGTYAREVA:
2    Q.   And just to look at a couple of
3 these quotes on page -- the page ending in Bates
4 931, at the bottom of the page one of the
5 teachers says, "Works for me!  It's easy if you
6 enforce it and use it consistently."
7       Do you see that?
8    A.   I do see that, mm-hmm.
9    Q.   And go to the next page, 932.  This
10 is from the math class.  One of the teachers
11 says, "Strong consistent consequences are
12 working."
13       Do you see that?
14    A.   I do.
15    Q.   Another one says, "Night and Day
16 from last year; keep up Admin support."
17       Do you see that?
18    A.   I do.
19    Q.   Another one says, "Kids are more
20 focused and do more work."
21       Do you see that?
22    A.   Yes.
23    Q.   And one says, "Last year it was
24 every day; this year so far I've only had to
25 talk with one student so far."

Page 157

1       Do you see that?
2    A.   I do.
3    Q.   And then the teachers in the other
4 classrooms who were not using Yondr also found
5 the new cellphone policy was -- or for the most
6 part also found that the new cellphone policy
7 was effective based on these survey results,
8 right?
9       MR. CUTLER:  Objection.  Form,
10    foundation.
11       THE WITNESS:  As the document, yes,
12    it does appear to say that.
13 BY MS. DEGTYAREVA:
14    Q.   And in the teacher responses some of
15 them talk about other methods, such as having a
16 student leave their cellphone in a backpack
17 against the wall as also being effective, right?
18    A.   Which page does that say that?
19    Q.   Sure.  So let's take a look at a
20 couple of examples.
21       So on the page ending in 933, under
22 Fine Arts, one of the teachers says, "Bags
23 against wall problem solved."
24       Do you see that?
25    A.   Yes.

40 (Pages 154 - 157)

Page 158

1    Q.    And again in this non-Yondr
2 classroom, another teacher says, "The
3 consistency school-wide means less arguments in
4 my room."
5         Do you see that?
6         MR. CUTLER:  Objection to form.
7 Foundation.
8         THE WITNESS:  Yes, I do see that.
9 BY MS. DEGTYAREVA:
10    Q.    Another comment, "I have less
11 cellphone use overall."
12        Do you see that?
13    A.    I do.
14    Q.    And the last one on this page, "I
15 have had zero pushback because the school wide
16 policy makes kids believe we are serious."
17        Do you see that?
18    A.    I see that, yes.
19    Q.    And going on to the next page ending
20 in 934, in World Languages and ELD, a teacher
21 says, "Phones in backpacks, backpacks stowed
22 away.  Halleluia."
23        Do you see that?
24    A.    I see that.
25    Q.    Now, several of the teachers

Page 159

1 surveyed also noted they have always had a
2 strict enforcement policy in their individual
3 classrooms and didn't have a problem with phones
4 even before Yondr.
5         Do you see that?
6     A.    Yes.  I've seen a few of those, yes.
7     Q.    So looking at a couple of examples
8 in the Bates ending in 935, at the very top one
9 teacher said, "I've always maintained a strict
10 enforcement of no cellphones in my classroom."
11        Do you see that?
12    A.    I do.
13    Q.    And at the bottom of that same page,
14 at the very bottom a teacher said, "I have had a
15 strict policy for years.  I run my classroom
16 without interference from cellphones."
17        Do you see that?
18    A.    I do see that.
19    Q.    Did TUSD consider implementing Yondr
20 in other schools?
21    A.    I am not aware.  What I -- I am not
22 aware, correct.
23    Q.    Well, did TUSD ever estimate the
24 cost of implementing Yondr in other schools?
25    A.    I am not aware.

Page 160

1    Q.    But TUSD never implemented Yondr
2 districtwide, correct?
3    A.    Correct.
4    Q.    And apart from, again, this one
5 school in one year and just two class subjects,
6 it never implemented Yondr in any other schools?
7    A.    That is my understanding, correct.
8    Q.    Has TUSD ever implemented a
9 districtwide policy requiring what some of these
10 teachers refer to as the backpack policy, so
11 requiring students to put their phones in their
12 backpacks during class?
13    A.    As part of the current TUSD
14 cellphone policy, it does require at least the
15 verbiage -- the one that I found online that I
16 said is a little bit different than the one we
17 looked at, it does say that cellphones are to be
18 stored in backpacks or in lockers or out of
19 sight and not being used.  So we do currently
20 have that policy.  And then administrators at
21 school campuses then can adjust their own
22 policies based on their campus needs.
23        MS. DEGTYAREVA:  Can we mark as
24    Exhibit 13 tab 9?
25        ///

Page 161

1         (Tucson-30(b)(6)-Shivananda-13 was
2         marked for identification.)
3 BY MS. DEGTYAREVA:
4    Q.    Ms. Shivanonda, this is a document
5 titled Governing Board Policy, Policy Title,
6 Student Use of Cellphones and Other Electronic
7 Devices.
8         Do you see that?
9    A.    Yes, correct.
10    Q.    Is this the document you were
11 testifying about as the other cellphone policy?
12    A.    Yes, it is.
13    Q.    And this document says, near the
14 middle of the page, "Cellphone and/or electronic
15 devices are to be kept out of view in a
16 student's locker, pocket, or carrying bag."
17        Do you see that?
18    A.    Correct, yes.
19    Q.    So under this policy students can
20 keep their cellphones in their pockets?
21    A.    Correct.
22    Q.    TUSD has never implemented a
23 districtwide policy that required students to
24 put their phones in their backpacks, correct?
25        MR. CUTLER:  Object to form.

41 (Pages 158 - 161)

Page 162

1          THE WITNESS:  Correct.  However,
2     also part of this policy, the principal
3     shall establish additional guidelines
4     appropriate to campus needs, and so many
5     of our schools have integrated more
6     stricter cellphone policies to where they
7     either need to be turned in at the office
8     or put away in their backpacks.
9  BY MS. DEGTYAREVA:
10     Q.    How many schools have implemented
11     those stricter policies?
12     A.    I'm not aware of the number.  I do
13     know it's up to the school administration to
14     identify how they want to implement those
15     policies outside of this one.
16     Q.    Can you name some of the schools
17     that have a stricter cellphone policy?
18     A.    Yes.  So Sabino High School,
19     actually they purchased cellphone lockers this
20     past school year.  And so every one of their
21     classrooms has a set of 40 lockers with keys,
22     and they adjusted their cellphone policy where
23     it is a requirement for all students to put
24     cellphones in a cellphone locker in every class
25     period.

Page 163

1          I do know that Steele Elementary,
2     for the elementary students, if students do have
3     a cellphone, they are asked to turn it in to the
4     front office.
5          I know that Wakefield Middle School
6     has also instituted stricter cellphone policies.
7     Morgan Maxwell instituted stricter
8     cellphone policies as well as clear backpack
9     policies to then also be able to see that
10     cellphones were in backpacks versus on the
11     person.
12          And those are just a few that I can
13     think of off the top of my head.
14     Q.    And where are those school-specific
15     policies, where are they recorded?
16     A.    In the school-specific handbook and
17     guidelines for the operation of that school.
18     Q.    So each school has a handbook that
19     contains a cellphone policy, or do not all
20     schools have the specific cellphone policy?
21     A.    So every school should have a
22     handbook that at least has the governing board's
23     cellphone policy.  And if they have any
24     additional requirements regarding cellphones,
25     then that would be indicated in their cellphone

Page 164

1     policy.
2     Q.    Some of the things you mentioned
3     that have been adopted by a couple of the
4     schools, cellphone lockers, is there any other
5     school except Sabino High School that uses
6     cellphone lockers?
7     A.    Not currently, but I do know that
8     they have been conversation for additional high
9     schools to look at implementing in the new
10     school year.
11     Q.    And has the district ever
12     implemented a districtwide policy that requires
13     the use of cellphone lockers?
14     A.    No.
15     Q.    You also talked about an elementary
16     school that requires students to turn in their
17     cellphones to the front office.
18          Is there any other school that
19     requires students to turn their cellphones in to
20     the front office?
21     A.    As part of -- I don't know
22     explicitly off the top of my head, but I do know
23     that it's part of the disciplinary process.
24     Part of that would be if the student has their
25     cellphone out or is violating the policy, it can

Page 165

1     be confiscated, and after a certain number of
2     instances it will either be turned in to the
3     office or kept until a parent can come pick it
4     up.
5          There are, maybe, some specific
6     individual students that have an intervention
7     plan that requires them not to have a cellphone,
8     but, again, that would be determinant upon
9     school discipline data and in partnership with
10     administration.
11     Q.    So apart from Steele Elementary
12     School, is there any other school in Tucson
13     Unified School District that requires every
14     student just as a matter of course to turn their
15     cellphone in to the front office?
16          MR. CUTLER:  Object to form.
17          THE WITNESS:  Not that I am aware of
18     to that level.
19  BY MS. DEGTYAREVA:
20     Q.    You talked about Wakefield Middle
21     School also having a stricter cellphone policy.
22          What did that policy require?
23     A.    So that is, again, having
24     students -- requiring students to have
25     cellphones in backpacks and more of the

42 (Pages 162 - 165)

Page 166

1  implementation of the expectations around the
2  discipline.  So they have enacted stricter
3  cellphone policies in terms of seeing it out and
4  monitoring that students have it out during
5  instructional practice times.
6      Q.  Apart from Wakefield Middle School,
7  are you aware of any other school in the
8  district that has a schoolwide policy requiring
9  students to put their phones in backpacks?
10      A.  I'm not thinking of specific names
11  on the top of my head, but I do know that the
12  majority of our schools do look at the cellphone
13  policy and do implement in ways appropriate to
14  their campus.
15      Q.  So, again, just going back to my
16  question, you are not aware of any other school
17  except for Wakefield Middle School that requires
18  students to put their cellphones in backpacks?
19      MR. CUTLER:  Object to form.
20  BY MS. DEGTYAREVA:
21      Q.  Is that right?
22      A.  Not off the top of my head, correct.
23      Q.  Then you said Morgan Maxwell has
24  also instituted stricter cellphone policies as
25  well as clear backpack policies?

Page 167

1      A.  Correct.
2      Q.  So apart from the clear backpack
3  policy, is there anything else about Morgan
4  Maxwell's cellphone policy that is different
5  from the districtwide policy?
6      A.  Again, it requires the cellphone to
7  be in the backpack.
8      Q.  Are you aware of any other school
9  apart from Morgan Maxwell that has instituted a
10  schoolwide clear backpack policy?
11      A.  I know that I had a discussion with
12  the principal of Morgan Maxwell, and she did
13  indicate.  I believe there were one or two other
14  middle schools, but I am not recalling the name
15  of the middle schools off the top of my head
16  right now.
17      Q.  Okay.  So we've talked about Sabino
18  High School, Steele Elementary School, Wakefield
19  Middle School, Morgan Maxwell, and perhaps one
20  or two other schools that have also instituted a
21  clear backpack policy.
22          Any other schools you can think of
23  sitting here today that have a stricter
24  cellphone policy?
25      A.  Again, I know the majority of our

Page 168

1  schools, they do enhance their cellphone policy.
2  I just am not recalling specifics off the top of
3  my head right now.
4      Q.  Are you aware of the ways in which
5  the other schools enhance the cellphone policy?
6      A.  I believe it's more in the
7  implementation of the discipline.  One of the
8  difficulties lies in there's a lot of barriers
9  and pushback from community and from parents,
10  which can make it very difficult for
11  implementation of specific cellphone policies.
12          And so I know that majority of the
13  schools do attempt to follow this policy and
14  then establish additional guidelines.  I do not
15  know at what extent every school -- we have
16  almost 90 schools in the district, so I do not
17  know to what extent all of the schools have
18  added additional guidelines.
19      Q.  I want to ask a couple more
20  questions about Sabino High School and their
21  locker policy.
22          What was the cost of implementing
23  cellphone lockers at Sabino High School?
24      A.  $14,000.
25      Q.  How big is that high school?

Page 169

1      A.  I want to say almost 800, 800
2  students.
3      Q.  Has TUSD ever analyzed how much it
4  would cost to implement a cellphone locker
5  policy at every school in the district?
6      A.  Not that I'm aware of with cost.
7      Q.  And at Sabino High School, are
8  students still allowed to access their
9  cellphones during conference periods, passing
10  periods, and lunch?
11      A.  They are required to put their
12  cellphone in every core and elective class.  So
13  if they're not in a classroom, then they do have
14  access to their cellphone.
15      Q.  Apart from the two policy documents
16  that we looked at, the two districtwide policy
17  documents, has TUSD implemented any other
18  districtwide policies regarding cellphone use?
19      A.  So the governing board has had
20  discussions around implementing more stringent
21  cellphone policies.  There comes a lot of
22  pushback and barriers within the community.  We
23  do hear from a lot of parents that do not --
24  they have fear of their students not being able
25  to access their cellphones in emergent

43 (Pages 166 - 169)

Page 170

1 situations.
2        Our governing board has requested
3 more additional information.  They're also not
4 sure of how they're being used, as part of this
5 policy also says that teachers can potentially
6 have cellphones used for instructional purposes.
7        So they have had discussions around
8 stricter cellphone policies, but have not
9 enacted anything specific outside of the current
10 policy as it stands.
11    Q.   Okay.  So the two policy documents
12 we looked at are the only two districtwide
13 policy documents on cellphones, correct?
14        MR. CUTLER:  Object to form.
15        THE WITNESS:  Correct.
16 BY MS. DEGTYAREVA:
17    Q.   I believe you testified earlier that
18 TUSD also has WIFI on its school campuses, is
19 that right?
20    A.   That is correct.
21    Q.   Are students able to use their
22 personal devices to access the WIFI on the
23 school campuses?
24        MR. CUTLER:  Objection.  Asked and
25    answered.

Page 171

1        THE WITNESS:  No, students are not.
2    The policy is that students are not able
3    to use district WIFI on their personal
4    devices.
5 BY MS. DEGTYAREVA:
6    Q.   Are there any restrictions that
7 prevent students from accessing the WIFI on
8 their personal devices?
9    A.   The district does take precautions
10 and it is not widely known, the knowledge of the
11 WIFI password, and even for staff.  Majority of
12 staff, we are not able to use our own personal
13 devices and get connected to WIFI.  So all of
14 the WIFI connections do run through our
15 technology department.
16        Students can be savvy and sometimes
17 they may be able to find ways, but for the
18 majority of the practices, students should not
19 be able to access district-level WIFI on their
20 personal devices.
21    Q.   But TUSD does provide students with
22 school-issued devices, right?
23    A.   Correct.
24    Q.   And are students able to use the
25 school-issued devices to access the WIFI on

Page 172

1 TUSD's campuses?
2    A.   Yes.
3        MS. DEGTYAREVA:  Let's mark as
4    Exhibit 14 tab 16.
5        (Tucson-30(b)(6)-Shivanonda-14 was
6        marked for identification.)
7 BY MS. DEGTYAREVA:
8    Q.   Let me know when you're ready.
9        (Witness reviewing document.)
10    A.   Okay.
11    Q.   Looking at the first page, it says
12 Pueblo Gardens PK through 8.
13    A.   Yes.
14    Q.   What does that refer to?
15    A.   That is one of our TUSD schools.
16    Q.   And this is a presentation welcoming
17 back families to the school for the 2021-2022
18 school year?
19    A.   That is what is looks like.
20    Q.   Turning to the page ending Bates
21 723, do you see where it says at the top "Please
22 join us on Facebook"?
23    A.   Yes.
24    Q.   So this school is inviting parents
25 or inviting families to join -- or to follow

Page 173

1 them on Facebook, correct?
2    A.   That is what it looks like, yes.
3    Q.   And then if you go to page ending in
4 725 titled Verizon Innovative Learning Schools,
5 do you see that?
6    A.   Mm-hmm.
7    Q.   What is an innovative learning
8 school?
9    A.   TUSD has received some grant funding
10 and has collaborated with Verizon to create
11 innovative learning schools.  So we have -- I
12 don't remember off the top of my head how many
13 Verizon innovative learning schools.  I want to
14 say maybe around ten.  But it is a partnership
15 with Verizon to provide additional access to
16 instructional tools.
17    Q.   This presentation says that iPads
18 are issued for all students grades 6 through 8
19 with limited data plan but unlimited WIFI.
20        Are iPads issued to all students
21 grades 6 through 8 across all of TUSD?
22    A.   No.
23    Q.   So which students get TUSD -- which
24 students get iPads districtwide?
25    A.   iPads are used in a variety of ways

44 (Pages 170 - 173)

1 at some of our elementary schools. At our
2 younger grades, kinder, first grade, they may
3 have iPads to use for instructional purposes.
4 And then our Verizon Innovative Learning Schools
5 use the iPads in lieu of a district-issued
6 Chromebook or laptop.
7    Q.   So this presentation for this
8 particular school, it then says at the bottom of
9 this page, "Grade K through 5 students will be
10 loaned Chromebooks."
11    A.   Correct.
12    Q.   So do all students across TUSD get
13 Chromebooks?
14    A.   We are a one-to-one school. So yes,
15 depending upon if there's iPad or laptop,
16 students do -- are loaned a device.
17    Q.   Okay. So just to make sure I
18 understand, every student across the district
19 gets some device, and it's either a Chromebook
20 or an iPad?
21    A.   Correct.
22    Q.   And are all of those devices able to
23 connect -- all those school-issued devices able
24 to connect to the unlimited WIFI offered by
25 TUSD?

1    A.   Those devices are able to connect
2 TUSD WIFI when they are on TUSD campus.
3        I don't know about the terminology
4 of "unlimited WIFI." For majority of our
5 students the district does not provide WIFI in
6 their home, especially not with the Chromebooks.
7 So I can't necessarily speak to what that word
8 "unlimited" necessarily means for the iPads.
9    Q.   So the WIFI is available on all of
10 the devices while they are at school?
11    A.   Correct.
12    Q.   Does TUSD limit what apps can be
13 downloaded on the iPads or the Chromebooks?
14    A.   Yes.
15    Q.   And what are the limitations?
16    A.   So for downloading of apps, they all
17 come prestandard. So students are not able to
18 download any specific apps of their choosing.
19 So the Chromebooks are -- the district has
20 identified the appropriate learning apps that
21 are able to be used, and then those are
22 preloaded onto those Chromebooks.
23    Q.   Does TUSD place any limits on what
24 websites can be accessed on the iPads or the
25 Chromebooks that are issued by TUSD?

1    A.   Yes.
2    Q.   And what are those limits?
3    A.   So the district does engage in
4 filtering practices for all WIFI, for both staff
5 and students. And so all social media platforms
6 are not allowed to be used by students on TUSD
7 WIFI.
8        And then keyword, there are specific
9 keywords within that filtering that would block
10 specific content based on keywords that have
11 been determined by our technology department.
12    Q.   You said all social media platforms
13 are not allowed to be used by students on TUSD
14 WIFI.
15        Which specific social media
16 platforms are not permitted on the WIFI?
17    A.   Facebook, Instagram, TikTok, X. The
18 other platform names are escaping me. Snapchat.
19 Facebook, Instagram, TikTok, Snapchat, X,
20 Discord. Those are the main ones that are
21 coming to mind.
22    Q.   Are there any other websites that
23 students can't access on the TUSD WIFI?
24    A.   Again, it's based on content, so
25 content filtering.

1    Q.   Just make sure I understand, for the
2 social media platforms you just mentioned, are
3 those based on content filtering, or are those
4 just completely prohibited?
5    A.   Those are just prohibited.
6    Q.   So are there any other websites that
7 are completely prohibited and not based on
8 content filtering?
9    A.   Any websites that would have to do
10 with pornography, any other websites that would
11 be explicit content that would be not
12 appropriate for students.
13    Q.   Any other specific websites you can
14 think of?
15    A.   I'm trying to think, because there's
16 been some websites that even -- oh, so things
17 like Netflix, Hulu, streaming services are also
18 blocked. Students are able to access -- I'm
19 sorry. It's 6:11 on Tuesday. So I'm having a
20 hard time coming up with every website.
21    Q.   Is there a document somewhere that
22 lists all of the websites that are not allowed
23 on the TUSD WIFI?
24        MR. CUTLER: Object to form.
25        THE WITNESS: That would most likely

45 (Pages 174 - 177)

Page 178

1    be probably internal with our technology
2    department as they are the ones who manage
3    that. I can't think of maybe any public
4    documents that would list every single
5    website.
6  BY MS. DEGTYAREVA:
7       Q.    And how long have the website
8  limitations been in place?
9       A.    The limitations have been in place
10  pretty -- well, when we started really moving
11  towards one-on-one was when we were coming back,
12  2020 -- well, in 2020 we did provide devices for
13  students for at-home use.
14          Prior to that there were access to
15  technology within classrooms. Some of our
16  schools would have what we would call a COW,
17  computer on wheels, with a whole cartful of
18  computers to be able to use for instructional
19  practices, and so content filtering was in place
20  then.
21          So as long as I can really remember,
22  as long as we've been providing access to
23  technology for students on campuses, there has
24  been some sort of filtering, but I can't speak
25  to the exact specifics.

Page 179

1       Q.    And have defendants' platforms
2  always been included on the list of websites
3  that are not permitted?
4       A.    To my knowledge, I believe so.
5       Q.    Now, are students able to use their
6  school-issued iPads or Chromebooks to access
7  their home WIFI?
8       A.    Yes. If they have WIFI at their
9  home, it is enabled to be able to access WIFI.
10       Q.    And so if a student is using their
11  school-issued devices on their home WIFI, are
12  there any restrictions on what websites they can
13  visit?
14       A.    TUSD, we are only able to filter on
15  TUSD WIFI, so we do not have the ability to do
16  any filtering on the home WIFI, so no.
17       Q.    Does TUSD give parents the ability
18  to use parental controls on the school-issued
19  devices?
20       A.    I believe so, but I am not
21  100 percent sure on all the details of that.
22       Q.    Do you know what parental controls
23  are available on school-issued devices?
24       A.    I do not.
25       Q.    Does TUSD have data on how many

Page 180

1  parents use parental controls on school-issued
2  devices?
3       A.    I do not believe that that is data
4  that is collected, no.
5       Q.    Now, TUSD itself uses social media
6  to communicate with its students and their
7  families, correct?
8       A.    Correct.
9          MS. DEGTYAREVA: Let's mark as
10  Exhibit 15 tab 18.
11          (Tucson-30(b)(6)-Shivanonda-15 was
12          marked for identification.)
13  BY MS. DEGTYAREVA:
14       Q.    Ms. Shivanonda, this is a printout
15  of TUSD's website. Does this look familiar to
16  you?
17       A.    It does.
18       Q.    And if you go to the third page of
19  this exhibit, at the very bottom do you see a
20  row of icons?
21       A.    I do.
22       Q.    So the first icon there is a link to
23  TUSD's Facebook page, right?
24       A.    Correct.
25       Q.    And then the third icon is a link to

Page 181

1  TUSD's Instagram page, correct?
2       A.    Correct.
3       Q.    Okay. Actually, well, sorry, the
4  second icon is a link to the X page, correct?
5       A.    Correct.
6       Q.    The fourth icon, is that Vimeo?
7       A.    I believe so.
8       Q.    The fifth icon, is that a link to
9  TUSD's YouTube page?
10       A.    Correct.
11       Q.    The sixth icon, is that a link to
12  TUSD's LinkedIn page?
13       A.    Yes.
14       Q.    And what is the last icon?
15       A.    That is the Awareity platform. As I
16  had mentioned before, Awareity is our platform
17  for students and anyone, really, to report any
18  concerns.
19          MS. DEGTYAREVA: Okay. Let's mark
20  as Exhibit 16 tab 19.
21          (Tucson-30(b)(6)-Shivanonda-16 was
22          marked for identification.)
23  BY MS. DEGTYAREVA:
24       Q.    Ms. Shivanonda, this is a printout
25  from TUSD's Facebook page.

46 (Pages 178 - 181)

Page 182

1        Do you see that?
2    A.   I do.
3    Q.   How long has TUSD had a Facebook
4 page?
5    A.   I am not sure of how long; however,
6 I do know that over the last several years it
7 has been used with more consistency.  I know
8 that that's been, I guess, used with more
9 consistency just over the last couple of years.
10   Q.   When you say "with more
11 consistency," do you mean more often?
12       MR. CUTLER:  Object to form.
13       THE WITNESS:  Yes.
14 BY MS. DEGTYAREVA:
15   Q.   And on TUSD's Facebook page, is
16 there anything warning students or families
17 about TUSD's position that Facebook could be
18 harmful to mental health?
19   A.   I have not done a deep dive of the
20 TUSD Facebook page, so at face value on this
21 document, I am not seeing anything.
22   Q.   And according to -- at least at the
23 time this page was printed, it says that TUSD
24 has 24,000 followers on Facebook, correct?
25   A.   That's what it looks like.

Page 183

1    Q.   Now, individual schools within TUSD
2 also have Facebook -- or at least some of the
3 schools have Facebook pages, right?
4    A.   Yes.  I don't know if all do, but
5 many do, yes.
6    Q.   And TUSD at times posts photographs
7 of its students on its Facebook page, right?
8    A.   Only students that have -- the
9 parents have signed waivers for digital media to
10 be used.
11   Q.   It allows people to like content on
12 its Facebook page, right?
13   A.   It appears so, yes.
14   Q.   And TUSD allows people to post
15 comments on its Facebook page, right?
16   A.   I would say for the majority of them
17 probably.  There might be some where that may be
18 restricted, but...
19       MS. DEGTYAREVA:  Let's mark as
20 Exhibit 17 tab 21.
21       (Tucson-30(b)(6)-Shivanonda-17 was
22       marked for identification.)
23 BY MS. DEGTYAREVA:
24   Q.   Ms. Shivanonda, this is a printout
25 from TUSD's Instagram page.  Do you recognize

Page 184

1 this?
2    A.   I do.
3    Q.   Are you aware of any warning that
4 TUSD has posted on its Instagram page that
5 Instagram could be harmful to students?
6    A.   I have, again, not done a deep dive
7 of the TUSD Instagram page; however, I'm not
8 seeing anything on this document.
9    Q.   And at the time that this printout
10 was made, it said that TUSD had 3,335 followers
11 on Instagram, right?
12   A.   That is correct.
13   Q.   TUSD posts content on its Instagram
14 page, right?
15   A.   Yes.
16   Q.   TUSD posts pictures of its students
17 on the Instagram page, right?
18   A.   Again, those that have submitted for
19 media postings, yes.
20   Q.   TUSD allows people to like content
21 on its Instagram page, right?
22   A.   Yes, appears so.
23   Q.   And people can leave comments on
24 TUSD's content on the Instagram page, right?
25   A.   Yes.

Page 185

1        MS. DEGTYAREVA:  Okay.  Let's mark
2 as Exhibit 18 tab 22.
3        (Tucson-30(b)(6)-Shivanonda-18 was
4        marked for identification.)
5 BY MS. DEGTYAREVA:
6    Q.   Ms. Shivanonda, this is a printout
7 from TUSD's YouTube account.
8        Do you recognize this?
9    A.   I do.
10   Q.   How long has TUSD had a YouTube
11 account?
12   A.   The district has used YouTube for
13 varying degrees for several years.  Most of the
14 TUSD media, at least at the beginning of the use
15 of YouTube, was not public, it was used
16 internally.  We still also have many of our
17 videos that are internal use, and then very
18 specific of what may be public.
19   Q.   There is some content that is public
20 on TUSD's YouTube page?
21   A.   There is some content that is
22 public, yes.
23   Q.   Are you aware of any content that
24 TUSD has posted onto its YouTube page that warns
25 students that YouTube could be harmful?

47 (Pages 182 - 185)

Page 186

1    A.   Directly on its YouTube page, I am
2  not aware.
3    Q.   And at the time that this printout
4  was made, it says that TUSD has 2.46 thousand
5  subscribers on its YouTube page, correct?
6    A.   That's what this says, yes.
7         MS. DEGTYAREVA:  Now let's take a
8    look at Exhibit 19.  We'll mark tab 40 as
9    Exhibit 19.
10         (Tucson-30(b)(6)-Shivanonda-19 was
11         marked for identification.)
12  BY MS. DEGTYAREVA:
13    Q.   So if you turn to the page after the
14  document -- or after the page that says Produced
15  in Native Format, do you see that this is a
16  presentation from Valencia Middle School,
17  Welcome Vesey Elementary Parents?
18    A.   Vesey, yes.
19    Q.   Vesey.
20         Are those both schools in TUSD?
21    A.   They are.
22    Q.   And if you turn to the last page of
23  this presentation, do you see where it says,
24  "Parent notification:  website, Instagram,
25  Facebook, and Twitter of daily happenings"?

Page 187

1    A.   Oh, okay.  Yes.
2    Q.   So TUSD schools encourage parents to
3  use these websites to learn about daily
4  happenings at the schools, is that right?
5         MR. CUTLER:  Object to form.
6         THE WITNESS:  The school district
7    tries to keep up with the times.  And we
8    know that the majority of our students and
9    our parents, they utilize social media
10    more so than maybe e-mail, so in order to
11    be able to provide regular information, it
12    does leverage the platforms that the
13    community is using, yes.
14         MS. DEGTYAREVA:  Let's mark as
15    Exhibit 20 tab 23.
16         (Tucson-30(b)(6)-Shivanonda-20 was
17         marked for identification.)
18  BY MS. DEGTYAREVA:
19    Q.   Do you see at the bottom of this
20  page it says Tucson Unified School District?
21    A.   I do.
22    Q.   And then the document appears to be
23  titled Get Ready for Tucson College Night.
24         Do you see that?
25    A.   I do.

Page 188

1    Q.   Is this an event that Tucson Unified
2  School District put on?
3    A.   This is an event that, yes, the
4  Vesey school counseling department puts on
5  annually.
6    Q.   And so this is a flyer that's
7  inviting students to register for this college
8  night, correct?
9    A.   Correct.
10    Q.   Now, do you see that there is a --
11  well, first, a barcode next to "Prior to Tucson
12  College night" --
13    A.   Yes.
14    Q.   -- on the right of the page?
15    A.   Mm-hmm.
16    Q.   So students are able to use their
17  cellphones to -- not barcode, QR code -- to scan
18  the QR code?
19         (Room interruption.)
20         (Discussion off the record.)
21  BY MS. DEGTYAREVA:
22    Q.   So going back to the exhibit we were
23  on, students are able to use their cellphones to
24  scan this QR code in order to register for this
25  college fair, correct?

Page 189

1    A.   Correct.
2    Q.   And then there's a code at the
3  bottom for the Snapchat app, correct?
4    A.   Correct.
5    Q.   That was another way that students
6  were able to either find information about or
7  register for this college fair, correct?
8    A.   Correct.
9         MS. DEGTYAREVA:  Actually, I think
10    now might be a good time to break.  Let's
11    go off the record.
12         THE VIDEOGRAPHER:  We are going off
13    record.  The time is 6:27.
14         (Whereupon, the deposition was
15         adjourned.)
16         THE VIDEOGRAPHER:  The time on the
17    record today for counsel for Snap is 2:46.
18    And we're off the record.
19
20
21
22
23
24
25

48 (Pages 186 - 189)

Page 190

CERTIFICATE OF COURT REPORTER

1
2
3        I, MAUREEN O'CONNOR POLLARD,
4  Registered Diplomate Reporter, CSR No. 14449 for
5  the State of California, the officer before whom
6  the foregoing deposition was taken, do hereby
7  certify that the foregoing transcript is a true
8  and correct record of the testimony given; that
9  said testimony was taken by me stenographically
10  and thereafter reduced to typewriting under my
11  direction; and that I am neither counsel for,
12  related to, nor employed by any of the parties
13  to this case and have no interest, financial or
14  otherwise, in its outcome.
15        Dated this 9th day of April,
16  2025.
17

18  _____
19        MAUREEN O'CONNOR POLLARD
20        CSR No. 14449
21
22
23
24
25

Page 191

INSTRUCTIONS TO WITNESS

1
2
3        Please read your deposition over
4  carefully and make any necessary corrections.
5  You should state the reason in the appropriate
6  space on the errata sheet for any corrections
7  that are made.
8        After doing so, please sign the
9  errata sheet and date it.  It will be attached
10  to your deposition.
11        It is imperative that you return
12  the original errata sheet to the deposing
13  attorney within thirty (30) days of receipt of
14  the deposition transcript by you.  If you fail
15  to do so, the deposition transcript may be
16  deemed to be accurate and may be used in court.
17
18
19
20
21
22
23
24
25

Page 192

1        - - - - - -
          E R R A T A
2        - - - - - -
3  PAGE  LINE  CHANGE
4  ____  ____  _____
5    REASON: _____
6  ____  ____  _____
7    REASON: _____
8  ____  ____  _____
9    REASON: _____
10 ____  ____  _____
11   REASON: _____
12 ____  ____  _____
13   REASON: _____
14 ____  ____  _____
15   REASON: _____
16 ____  ____  _____
17   REASON: _____
18 ____  ____  _____
19   REASON: _____
20 ____  ____  _____
21   REASON: _____
22 ____  ____  _____
23
24
25

Page 193

1
2        ACKNOWLEDGMENT OF DEPONENT
3
4        I, _____, do
   Hereby certify that I have read the foregoing
5  pages, and that the same is a correct
   transcription of the answers given by me to the
6  questions therein propounded, except for the
   corrections or changes in form or substance, if
7  any, noted in the attached Errata Sheet.
8
9  _____
10  WITNESS NAME        DATE
11
12
13
14
15
16  Subscribed and sworn
   To before me this
17  _____ day of _____, 20____.
18  My commission expires: _____
19
   _____
20  Notary Public
21
22
23
24
25

Page 194

```
 1        LAWYER'S NOTES
 2  PAGE  LINE
 3  ____  ____  _____
 4  ____  ____  _____
 5  ____  ____  _____
 6  ____  ____  _____
 7  ____  ____  _____
 8  ____  ____  _____
 9  ____  ____  _____
10  ____  ____  _____
11  ____  ____  _____
12  ____  ____  _____
13  ____  ____  _____
14  ____  ____  _____
15  ____  ____  _____
16  ____  ____  _____
17  ____  ____  _____
18  ____  ____  _____
19  ____  ____  _____
20  ____  ____  _____
21  ____  ____  _____
22  ____  ____  _____
23  ____  ____  _____
24  ____  ____  _____
25
```

Golkow Technologies,
A Veritext Division
877-370-3377                                              www.veritext.com